**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 31**

---

*Exhs. § 2255 Motion*                                    *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

## DECLARATION OF LEONARD POST

I, Leonard Post, declare the following:

I am one of the investigators contracted by the Federal Defender's office for the Eastern District of California to work on Kenneth Eugene Barrett's case in preparation for filing a motion attacking his convictions and death sentence pursuant to 28 U.S.C. section 2255. During my investigation, I interviewed numerous witnesses including Travis and Cindy Crawford, Richard Barrett, and Mary Rogers.

Travis Crawford testified in the first stage of Mr. Barrett's trial. Cindy Crawford testified in both stages of Mr. Barrett's trial. On December 11, 2008, I interviewed Travis Crawford in the presence of his parents, Roger and Phyllis Crawford at their home in the McKey community. At that time, Travis was separated from his wife, Cindy Crawford, and lived with his parents.

I interviewed Cindy Crawford separately in the presence of another investigator, Dale Anderson, on January 13, 2009. The interview with Cindy took place at her mother's trailer.

In the presence of his parents, Travis Crawford told me the following:

Travis Crawford explained that his mother, Phyllis Crawford, is the sister of Kenneth Barrett's mother, Gelene Dotson, which makes him Mr. Barrett's first cousin. He explained that Gelene lives in the trailer on the adjacent property just west of where we sat.

Travis related that he and Mr. Barrett used to hunt and fish together, and were close. Travis stated that before Mr. Barrett was arrested, he was at Mr. Barrett's home practically every day and that Mr. Barrett "would do anything in the world" for him. He stated that Mr. Barrett liked to help people and that in the last few years before his arrest on the murder charge Mr. Barrett rarely left his property. Travis expressed concern about Mr. Barrett's ability to care for

1

himself, stating that Mr. Barrett would eat meals at his mother's house, and sometimes friends would bring him food.

Travis stated that he Travis had a long struggle with drugs and has anxiety and panic attacks. He stated that his "mind does not work that well." For example, he will go out to his truck to get something, and by the time he gets there, he will have forgotten what it was he went to get. Travis stated that when he has problems with anxiety, he gets so nervous that he just does "whatever it is that comes to mind." Travis stated that he was like this as a child, prior to using drugs, and that he is under a doctor's care and is "trying to be healthy." Travis stated that he was a long-term methamphetamine user, and that he believed he would likely die if he used drugs again because his doctor told him that if he ever shot up again, it would likely kill him on the spot. He stated that he was aware that his drug use was the result of the psychological problems from which he suffers and which he does not understand.

He stated that psychological problems run in his family. Of his three children, he stated that his oldest child, now a grown woman suffers from bipolar disorder, that one of his sons seems a little slow and is having a hard time, but that his other son is a straight-A student, and he has "hopes that he will turn out all right."

Travis stated that he had problems in school and joined the United States Army, trying to make a go of it. He stated that he was not able to adapt to Army life and spent two months in the brig because he could not keep up with all the rules and was late to formation. He stated that it made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. He stated that he had received "a less than honorable" discharge from the Army.

2

Travis stated clearly in the presence of his mother and father that he testified falsely in Mr. Barrett's trial. He stated that at the time he testified, he was "living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble." Travis Crawford stated that for several years before Mr. Barrett was arrested, through the time of Mr. Barrett's state and federal trials, and up until four months before this interview, he had been doing methamphetamine all day, every day. He stated that when he testified against Mr. Barrett, he was high on meth. He also stated that all of the snitches who testified against Mr. Barrett were "on dope" when they testified. Travis stated that he and the other snitches were also high on drugs when the prosecutor, AUSA Mike Littlefield, interviewed them. He stated that anybody who had been around drug addicts would have known that. When John Philpot took him to see Mr. Littlefield, Travis stated that he was sure that Sheriff Philpot knew that Travis knew that Mr. Philpot knew that he was stoned. Travis stated that he felt as though he "was already arrested" and "didn't know if [he] was ever going to come back home."

During the interview, Travis stated that when Mr. Littlefield interviewed him about Mr. Barrett, he was terrified of losing his freedom and said whatever he thought Littlefield wanted him to say. Travis stated that Mr. Littlefield had asked him if Kenneth Barrett had said that he (Mr. Barrett) "was going down in a blaze of glory," and that before he could answer, Mr. Littlefield told him all the bad things that would happen to him if he "lied." Travis stated that he was so scared that he said, "Yes," that Mr. Barrett had stated that he would go down in a blaze of glory if the cops came to his residence. Travis stated that when he gave this answer, he was panicking because he was afraid. Travis stated that Mr. Littlefield told him he knew things about him (Travis). Travis repeated that he was extremely scared during his interview with Mr.

3

Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis stated to me affirmatively that he never heard Kenneth Barrett state that he was "going down in a blaze of glory" or express any sentiment like that.

Travis stated that he had testified against somebody prior to testifying against Mr. Barrett. On that occasion, Travis stated that he had been arrested for bad checks and was afraid of going to jail. In lieu of prosecution, he stated that he wore a wire and made four or five controlled drug buys. Travis stated that he believed he could have been killed while doing this. Travis stated that he ultimately had to testify against the person he bought the drugs from, even though the police lied to him and told him he would not have to testify.

During the interview, Travis stated that Sheriff John Philpot was at Kenneth Barrett's residence approximately two weeks before the raid that led to the fatal shooting of the trooper, and that when Sheriff Philpot went to Mr. Barrett's residence he had inspected Kenneth Barrett's guns without incident. Travis stated that Mr. Barrett told him the local authorities had a drug case against him (Kenneth Barrett), but it was not serious. Travis Crawford stated that Mr. Barrett never told him anything about an outstanding warrant for Mr. Barrett's arrest. Travis stated that at the time he testified against Mr. Barrett, he thought having a warrant and having a case were the same thing. He stated that he now knows these are two very different things.

During the interview, Travis Crawford stated that Mr. Barrett put a sign on his fence just a couple of days before Trooper Eales was killed. Travis stated that the sign was not directed at the police; "it was directed at anybody." The sign was intended, stated Travis, to scare people away from trespassing on Mr. Barrett's property and stealing his belongings.

When Travis Crawford spoke to me and told me all of the above in the presence of his

4

parents, he was separated from his wife, Cindy Crawford. Based on what Travis Crawford told me, a declaration for his signature was prepared, detailing all of the information related above. On February 15, 2009, when I asked Travis to read over the declaration detailing what he had told me, he had reunited with his wife and declined to read the declaration. He stated that he would "not sign anything," and that his psychiatrist had advised him that further involvement in Mr. Barrett's case was detrimental to his health and that his problems with anxiety were the result of his past association with Mr. Barrett, which was contrary to his earlier statement that the onset of his anxiety was in his childhood. It is my belief, based on my extensive investigation of this case that Travis Crawford declined to sign the declaration because he believed that telling the truth would get him in trouble, and that he was being pressured by Cindy Crawford not to cooperate. Family, friends and associates of Travis and Cindy Crawford informed me that Travis and Cindy have reputations in the community as liars and thieves who would say and do anything to stay out of jail and to obtain drugs. Two witnesses, Paul Rickie Lansford, and Brandy Hill were present at the time Mr. Barrett allegedly made the "blaze of glory" statement in Travis Crawford's presence, and they informed me that Mr. Barrett did not make such a statement then, and that they never heard Mr. Barrett make such a statement or express that idea at any time.

As noted above, I interviewed Cindy Crawford separately from Travis Crawford in the presence of another investigator, Dale Anderson. During this interview, Cindy Crawford told Mr. Anderson and me the following:

Cindy stated that she testified as a government witness in Kenneth Barrett's federal trial. She acknowledged that her husband, Travis Crawford, also testified against Mr. Barrett. She stated that as of 1999, she had known Mr. Barrett for approximately four years.

5

Cindy Crawford stated that one to two weeks prior to her initial testimony against Kenneth Barrett, John Philpot came to see her. Mr. Philpot told her that she had to leave with him. Cindy Crawford stated that she did not know whether she was under arrest or not, but it was clear to her that she had no choice but to go with Mr. Philpot. She stated that she got into Mr. Philpot's car and that he drove her to Muskogee. There, she met AUSA Mike Littlefield and "several men wearing guns" who appeared to be law enforcement officers. Cindy Crawford stated that the meeting occurred in Mr. Littlefield's office.

Cindy Crawford stated that the men wearing guns showed her several firearms that looked similar to ones that belonged to Mr. Barrett. Cindy stated that Mr. Littlefield told her that she needed to work with him and testify against Mr. Barrett, or she was going to prison. She stated that Mr. Littlefield reminded her that she was on a five-year deferred sentence in a drug case. Mr. Littlefield told her that Mr. Barrett's house had been under surveillance for 6 months prior to the shooting of the trooper, and that during this surveillance she was seen acting as a "lookout" on Kenneth Barrett's front porch while he cooked methamphetamine on the property. Cindy Crawford stated to us that she had never seen Mr. Barrett cook methamphetamine at any time and that she had never acted as a lookout for Mr. Barrett.

Cindy Crawford stated to us that at the time of the meeting in Mike Littlefield's office, she had no pending criminal charges, but had lost one of her children to foster care. Cindy stated that during the meeting, the threat that she would not get her child back hung in the air.

Cindy Crawford stated that during the meeting in Mr. Littlefield's office, she was told by Mr. Littlefield there were certain ways she could phrase her testimony. Cindy stated that Mr. Littlefield told her that in her testimony, she should make Kenneth Barrett appear as violent as

6

possible and as an imminent threat to those around him. Cindy stated that Mr. Littlefield had discussed with her the possibility that she risked perjury charges if she did not put this type of spin on her testimony. Mr. Littlefield also told her that they could make it extremely hard on her if she refused to testify against Mr. Barrett.

Cindy Crawford stated that when she was at the meeting in Mr. Littlefield's office in Muskogee, she was not told that she was under arrest, but that the atmosphere was intimidating. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside the restroom. She stated that she believed she was not free to leave because Mr. Philpot had driven her to Muskogee, and she had no way back home other than him. Cindy Crawford stated that she was not going to mess with Mr. Philpot because of his reputation for violence.

Cindy Crawford stated that Mr. Littlefield interviewed her about Kenneth Barrett's federal case separately from her husband, Travis Crawford. Cindy stated that Travis told her that John Philpot told him that if Travis said the right things on the witness stand, he would not get into trouble. Cindy stated that Mr. Littlefield, and later John Philpot, told her that she did not have to talk to or be interviewed by Mr. Barrett's lawyers or anyone working with them if she did not want to. Cindy stated that it was implied she should not speak to the defense.

Cindy Crawford stated that it was her recollection that when she testified at Mr. Barrett's federal trial, neither the prosecution nor the defense asked about her prior offenses. She admitted to Mr. Anderson and me that she was a heavy drug user at the time she testified against Mr. Barrett.

Cindy Crawford stated during our interview that during the time she knew Kenneth Barrett, she never bought drugs from him, but just used drugs with him. She stated that when

Mr. Littlefield interviewed her in his office, as described above, she was just coming down off a two-day meth high. She stated that the same was true when she testified at Mr. Barrett's trial. Cindy stated, "If you had ever crashed from a meth high, you would know that you would not be in your right mind."

Cindy stated that she suffered from post-traumatic stress disorder (PTSD) due to things that happened to her when she was growing up. She stated that she overreacts to stressful situations, sometimes to the point of passing out. She told us that when she was growing up, her father was often in a rage, and that her father had molested her and her sister. Because of this experience, she stated that when she is stressed she overreacts, and does not always perceive things correctly or exaggerates what is happening or has happened. Cindy Crawford stated that when she testified in the second stage of Mr. Barrett's trial about Mr. Barrett having once pressed a gun against her leg, she may well have been overreacting and embellishing the story, due to her PTSD. As Dale Anderson and I were leaving her residence, she called to us as we opened the door (she was in a leg cast and incapacitated at the time) and stated that on second thought she was sure she had misread the mood of the situation and overreacted. She stated that Kenneth Barrett had a history of being nice and helpful to her.

Cindy Crawford stated that during her interviews with the government before she testified in the first stage of trial, she had not told them about the incident with Kenneth Barrett putting the gun barrel to her leg. According to Cindy, the prosecutor or law enforcement asked her about this incident after her first stage testimony. Cindy stated that the only person who could have told law enforcement about the incident was the only other person present, Richie Barrett. I interviewed Richie Barrett and he stated that neither that specific incident nor anything

8

resembling it ever took place. I asked Richie Barrett if he would be willing to provide that information in a declaration under penalty of perjury and he said that he would.

Cindy Crawford stated that the prosecutors in the federal trial were upset with her when she denied ever seeing chemicals and equipment for making methamphetamine at Kenneth Barrett's house. Cindy stated they were also upset when she said she never saw Mr. Barrett cook methamphetamine. She said that the prosecutors were upset with her after her first stage testimony because she had not made Mr. Barrett seem threatening. She stated, "They were very angry. They scared me and threatened me." Cindy stated that while the government never told her explicitly that it was all right to lie during her testimony, it was implied that she could lie and make things up so long as it helped the government's case and hurt Mr. Barrett.

Cindy Crawford stated that she was aware John Philpot had gone out to Kenneth Barrett's property not too long before the shooting of the trooper to check Mr. Barrett's guns, and there had been no problem. Cindy said that from the information she had about this incident, Mr. Barrett and John Philpot acted like they were old buddies.

Everything that Cindy Crawford stated to Mr. Anderson and me, as reported above, was detailed in a declaration for her signature. After the declaration was prepared, I brought it to Cindy and Travis's house, asked her to review it for accuracy, and to sign the declaration if it was accurate, as she promised she would. Cindy stated that she would not read the declaration. She then asked me to leave. When I continued to talk with Travis, Cindy Crawford called the sheriff's office, or pretended to. Cindy's statements and conduct indicated she would not read the declaration because she did not want to verify the things she stated previously, or risk getting into trouble for telling the truth about her testimony.

9

As part of my assigned work on Kenneth Barrett's case, I also interviewed Mary Rogers. Ms. Rogers identified herself to me as the widow of Bill Ed Rogers, who was an attorney in Sallisaw, Oklahoma, until he passed away. Bill Ed Rogers was appointed to represent Mr. Barrett on a 1997 criminal charge (State v. Barrett, CF-97-00086, one count of Unlawful Delivery of Controlled Drug, filed 3/24/97). I was advised that Mr. Barrett had "fired" Bill Ed Rogers. I had read the docket sheet, which neither reflected that a hearing had ever been held on Mr. Rogers' motion to withdraw, or that another attorney had substituted into the case. [Oklahoma District Court Records, "Case Detail"]

On December 5, 2008, I asked Ms. Rogers if she could locate Mr. Barrett's file. Ms. Rogers told me that after her husband died, she caused his files to be moved to her (their) former residence at 303 Fryar Drive, which is now her son's home. She told me she pulled Mr. Barrett's file from a carton that had a list of the files it contained. She stated that she copied the file in its entirety in the exact order it was in and returned it to the file in the same order. I picked up the copy of the file from her on December 12, 2008. Ms. Rogers stated that she is maintaining the original file with her husband's other business documents.

Ms. Rogers and I reviewed the file and there was no letter indicating that a warrant had been issued for Mr. Barrett's failure to appear. Ms. Rogers informed me that her husband was hurt about the way Mr. Barrett fired him and the untrue and paranoid accusations Mr. Barrett made about Mr. Rogers colluding with the prosecution. She stated that had her husband been told that a warrant had been issued, he would have noted it in the file because he was a good lawyer and he kept good records. Nothing in the file indicated that her husband received such notice.

When last week I asked Ms. Rogers to sign a declaration averring to the facts above, she

told me she would first seek the advice of counsel. Several days later, she advised me that her lawyer advised her not to sign anything. Neither she nor her lawyer had read the two-page declaration, one page of which was the signature page.

I called her lawyer, Michael Daffin, of Sallisaw several times. He did not return my calls. Last Friday, I went by his office and he apologized for not getting back to me and explained that he had been ill. He told me he was awaiting a call and hoped to be having gall bladder surgery in 10 minutes. Still, I asked him to read the declaration. He stated that if the facts were true he would have no problem having his client sign the declaration, but that he would likely not get to it prior to his surgery and recovery period, which put it past our filing date.

I went by his office on the following Wednesday (this week) and he had not yet had his surgery, but was having further testing on Thursday. I asked if I could have Ms Rogers call him. He said, "Sure." I called Ms. Rogers who seemed amenable, but said she could not make the call until Thursday morning when I knew Mr. Daffin had a doctor's appointment. Despite repeated efforts, I was not able to reach either one of them. Mr. Barrett's counsel then directed me to recite in this declaration my efforts to reach Ms. Rogers.

The file clearly indicated that Mr. Rogers had received a no-time offer from the state. In other words, if Mr. Barrett pleaded to the charge, he would not have gone to jail unless he violated the terms of his probation. There is a letter in the file from an assistant district attorney stating that discovery was ready to be picked up by Mr. Rogers. Based on my review of the file, Mr. Rogers did not obtain that discovery. [BILL ED Rodgers case file, CF-97-00086] When I sought it those files from the Sequoyah County clerk's office in January 2009, I was informed that all the files related to that case had been sent to the U.S. Attorney's office.

11



I declare under penalty of perjury that the foregoing 12-page declaration is true and correct.

Executed by me this 13th day of March, 2009, in Sequoya County, Oklahoma.

_____
Leonard Post

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,    )
    )
             *Plaintiff,*    )
    )
v.    )        **Case No. 6:04-CR-00115-JHP-SPS**
    )
KENNETH EUGENE BARRETT,    )
    )
           *Defendant.*    )

---

**EXHIBIT 32**

---

# LUNACY RECORD

State Examiner & Inspector's Form No. 1382     WARDEN COMPANY, OKLAHOMA CITY

| IN THE MATTER OF THE SANITY OF | STATE OF OKLAHOMA | |
|---|---|---|
| *Wallace Dotson* | COUNTY OF *Sequoyah* | IN THE COUNTY COURT |
| *Vian R2 - McKay)* | No. *266* | |

| PETITION | | ORDER OF ADMISSION | |
|---|---|---|---|
| DATE FILED | DATE OF HEARING | DATE ISSUED | DELIVERED TO SHERIFF |

*May 4*_____, 19*48* _____, 191___

By Whom *Tom Dotson*

Address *Vian R+2 - Okla*

_____, 191____   _____, 191____

To_____Oklahoma State Hospital

at_____Oklahoma

Received at Hospital by Medical Superintendent_____, 191___

## PHYSICIANS

| Date of Appointment | NAME | REPORT FILED | FEES ALLOWED | EXPENSES | TOTAL ALLOW |
|---|---|---|---|---|---|
| *5/4* 19*48* | *Ja Chul* | 191 | $ | $ | $ |
| 191 | | 191 | $ | $ | $ |

## GUARDIAN AD-LITEM

| Date of Appointment | NAME | SERVICE RENDERED |
|---|---|---|
| 191 | | |

| PLEADINGS | | PROCESS | | | | |
|---|---|---|---|---|---|---|
| DATE FILED | NAME | DATE ISSUED | NAME | DATE RETURNED | BY WHOM SERVED | OFFICER' |
| | *Pet Order of Ref. Order appt. Report* | *5-3-48* | | *5-4-48* | *Chas - Hutchus under Sheriff* | |

## MINUTES OF PROCEEDINGS

*6-4-48 Paroled by Institution*

*6-8-48 Discharged from records of Eastern State Hospital*

KEB502739

# JOURNAL

STATE OF OKLAHOMA, COUNTY OF _Sequoyah_____ ss.                    IN THE COUNTY COURT OF SAID COUNTY

IN THE MATTER OF THE SANITY OF_____Wallace Dotson_____    No.__366___

### PETITION FOR ORDER OF ADMISSION TO STATE HOSPITAL

To the County Court of Said County, and to the Honorable Judge Thereof:

Your petitioner respectfully alleges that____he is a resident of the County of _Sequoyah_ and State of _Oklahoma_

That _Tom Dotson_____ is an actual bona fide resident of the County of _Sequoyah_ State of Oklahoma, is a____male person about the age of _22_ years, and is now within the said County and is living with _his father_____at or near the town—city of _Marble City._

That your petitioner has good reason to, and does believe that the said _Wallace Dotson_____is an insane person and a proper subject for custody and treatment in a hospital for the insane; that the condition of the said person is such that it is_____necessary that____he be taken into custody and detained pending final hearing hereof.

That the facts upon which this allegation of insanity is based, and because of which this application for said order is made, are as follows:_____

_has some kind of spells, but now he is completely out of his mind, threw some brick at some members of the family, hasn't been asleep in 3 days and nights._

Your petitioner further alleges that ____he is informed and verily believes that the following named persons, of full age, whose names and places of residence respectfully are as follows, are related to the said insane person, to-wit:

| Name | Relationship | Post Office | State |
|---|---|---|---|
| Tom Dotson & Lucindia Dotson | father & mother | Vian R 2 | Okla |
| O. & Charley Dotson | brothers | Braggs | |
| Hooly Dotson | | Perry | |
| Mrs. Manely Holcomb | sister | Ft. Gibson | |
| Mrs. Lillie Taylor | | | |

Your petitioner is the __father_____of the said insane person—or that he is the_____(Official Title)_____of said County and State, and by reason of such fact is authorized to institute this proceeding.

Further, your petitioner is informed, and believes and upon such information and belief, alleges that the said insane person has estate in his own right of the approximate value, as follows: Real Property $_None_Personal Property $_____, Total Value $_____ Said estate is situated in_____ County, State of_____

WHEREFORE, your petitioner prays that a date be fixed for a hearing in the above-styled matter; that notice of said hearing be given as required by law; that two reputable physicians be appointed and required to make a personal examination of and investigation into the sanity of the said alleged insane person and that said physicians make report of their findings, as by law required; and that said _Wallace Dotson_____be brought before the Court and Judge thereof on the date so fixed for the said hearing to be dealt with as provided by law in such cases; and that the court by proper order make provision for the support and maintenance of the said person.

Form by the Attorney General—State Examiner and Inspector's Form No. 1368.    _Tom L. Dotson_____, Petitioner.

_Witness to mark_
_Floyd Smith — Deputy_

### CERTIFICATE

STATE OF OKLAHOMA, COUNTY OF_____ ss.

It having been made to appear to the Court, that valid personal service cannot be made on the person alleged herein to be insane on account of his incompetency; and upon his next of kin, of full age, on account of their non-residence of the said County and State, or uncertainty of location, and upon the person with whom he resides on account that such person has no interest in or authority over said alleged insane person; and it is by the Court deemed proper to dispense with such personal service; and_____

It is hereby ordered that a guardian ad litem be appointed, and that service be made upon the person so appointed.

_____, County Judge.

Filed____May 4_____, 1948.

_J B Taylor_, Court Clerk.

By _Floyd Smith_____, Deputy.

---

Form by the Attorney General. State Examiner & Inspector's Form No. 1370.
STATE OF OKLAHOMA, COUNTY OF_Sequoyah____ss.                    IN THE COUNTY COURT OF SAID COUNTY
THE MATTER OF THE SANITY OF_Wallace Dotson_____    No._266___

### ORDER FOR ADMISSION TO STATE HOSPITAL.

NOW, on this _4___day of_May_____, 1948, the above-entitled matter came on to be heard before the County Court of_Sequoyah____County, Oklahoma, and it appearing to the satisfaction of the Court that due and legal notice of the hearing of the petition filed herein by_Tom Dotson____alleging the insanity of_Wallace Dotson_____and praying an order for h_is_ admission to the State Hospital for the Insane, has been given as required by law and as directed by the Court.

THEREUPON, the Court proceeded to the hearing and final determination of the said proceeding. After having examined the certificates of the two physicians appointed to examine the said _Wallace Dotson____and to report to this Court as to h_is_ sanity, and after hearing the evidence of witnesses and being fully advised in the premises, finds that the said_Wallace Dotson_____is insane; and that____he should be admitted to a State Hospital for the Insane, there to be treated and kept as _Charity_____patient.

IT IS, THEREFORE, ORDERED by the Court that said _Wallace Dotson_ be admitted to the _Eastern___Oklahoma _State_ Hospital at_Vinita_____, Oklahoma, as a_Charity_____patient, there to be detained and kept until legally discharged.

IT IS FURTHER ORDERED, That the sheriff of said county of_Sequoyah_____, be and he is hereby authorized and directed forthwith to transport the said _Wallace Dotson____, so adjudged to be insane, to the said hospital, and to deliver h____, together with a certified copy of this order and of the physicians' final certificate herein to the medical superintendent of the said hospital, who is hereby authorized and directed to receive, keep and detain the said person until legally discharged.
IT IS FURTHER ORDERED, That the said sheriff shall cause said medical superintendent to acknowledge hereon the receipt of the above-named insane person, and forthwith make return hereof showing the manner in which he has executed this order.
Done in open court, this the day first above written.

_J. T. Brockman_____, County Judge.

### RECEIPT FOR PATIENT.

Receipt is hereby acknowledged of _Wallace Dotson_____, the insane person named in the within order, and I hereby certify that at the time ___he was delivered to me there was in attendance with said person _Chas Hutchen_ sheriff, with _Tom Dotson_ and _____, guards.

Dated at_Vinita_____this_4__day of_____May_____, 1948.

_Edward K. Witcher M D_
Medical Superintendent of_____Oklahoma _Eastern_ Hospital

### SHERIFF'S RETURN.

STATE OF OKLAHOMA, COUNTY OF_Sequoyah_____, ss.
Received the within order on the_7__day of_May_____, 1948, at_____o'clock____M., and in pursuance of the command thereof, executed the same by transporting the within named _Wallace Dotson_ to the _Eastern_ Oklahoma___Hospital at_Vinita_____, Oklahoma, and there delivering h_im_ on the_7__day of_May_____, 1948, at_5__o'clock____M., into the custody of the medical Superintendent of said institution, together with a certified copy of this order and of the physician's final certificate.

_Henry Jones_____, Sheriff.

By_Charley Hutchen_Deputy—Under-sheriff.

Filed____5 — 4_____, 1948.

_J B Taylor_____, Court Clerk.

By_____, Deputy.

| SHERIFF'S FEES | |
|---|---|
| Executing order and making return thereof $ | .50 |
| ____miles travel     -    -    -    -    - | 25.00 |
| TOTAL FEES    -    -    -    $ | 25.00 |
| EXPENSES—Receipts attached: | |
| Transportation for    -    -    - | 25.00 |
| Hotel and lodging for    -    -    - | 3.10 |
| TOTAL EXPENSE    -    -    -    $ | 28.10 |

KEB502740

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,    )
    )
    *Plaintiff,*    )
    )
v.    )    **Case No. 6:04-CR-00115-JHP-SPS**
    )
KENNETH EUGENE BARRETT,    )
    )
    *Defendant.*    )

**EXHIBIT 33**

# RECORD OF MENTAL HEALTH PROCEEDING

SE&I Form B-74 (1949) Superseding SEI Form 1382

IN THE DISTRICT COURT OF ........................................ COUNTY

STATE OF OKLAHOMA:

In the Matter of Mental Illness of

Kenneth Barrett

No. MH-86-29

| Date Filed | | | Date Case Filed............ Date of Hearing.................. | Items Recorded | | Cost Accruals | | | | Date Paid | | | Voucher No. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mo. | Da. | Yr. | Nature of Instrument | Book | Page | Clerk's Cost | Sheriff's Cost | Miscl. | On Court Order | Mo. | Da. | Yr. | |
| 10 | 9 | 86 | Pet. | | | | | | | | | | |
| ⌐ | | | Peace Officer's aff. | | | | | | | | | | |
| ⌐ | | | Professional Statement | | | | | | | | | | |
| ⌐ | | | Temp Order issued | | | | | | | | | | |
| 10 | 10 | 86 | notice of certification | | | | | | | | | | |
| ✓ | ✓ | ✓ | copy of Drs. progress notes | | | | | | | | | | |
| ✓ | ✓ | ✓ | issue order of admission not to exceed 28 days from initial admission | | | | | | | | | | |
| 10 | 10 | 86 | Admission Notification (ESH) | | | | | | | | | | |
| 10 | 13 | 86 | Temp. order ret'd (ESH 10-10-86) | | | | | | | | | | |
| 10 | 10 | 86 | min - coming on for 72 hr hrg, Barrett appeared in person w/atty. John Adams, State rep. by Higgins, deft. admitted to East St Hosp. for period not to exceed 28 days from initial date of admission. cjt 11 303 | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | MH-92-64　In Re: Johnny Johnson ✓ | | | | | | | | | | |
| | | | | | | | | | | | | | |
| 11 | 16 | 92 | Pet | | | | | | | | | | |
| ⌐ | | | Off. for a detention | | | | | | | | | | |

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 34**

---

**DECLARATION OF JOHN DAVID ECHOLS**

I, John David Echols, declare the following:

I am an attorney licensed to practice in the State of Oklahoma and the various federal district courts in Oklahoma, including the Eastern District. I am also admitted to practice in the United States Supreme Court and the United States Court of Appeals for the Tenth Circuit. I am currently a trial attorney with the Oklahoma Indigent Defense System, Capital Trial Division, Sapulpa office.

I represented Kenneth Eugene Barrett in his two state court trials for the shooting death of Oklahoma Highway Patrol trooper Rocky Eales. Lawyer Jeffrey Standing Bear was second chair counsel in Mr. Barrett's first state trial. Attorney Jack Gordon was second chair counsel in Mr. Barrett's second state trial. During the time of Kenny Barrett's state trials, I was assisted by OIDS investigators Steve Leedy, Jack Stringer, and Lisa Cooper. We also had the assistance of a mitigation investigator, Roseann Schaye, who did preliminary investigative work for a second stage case. Ms. Schaye's work was suspended prior to the first state trial.

Mr. Barrett's first state trial ended in a hung jury during the guilt/innocence phase. In his second state trial, Mr. Barrett was acquitted of first degree murder and convicted of first degree manslaughter. He was also convicted of a lesser included offense, assault and battery with a dangerous weapon (ABDW). On the remaining two counts of discharging a deadly weapon with intent to kill, Mr. Barrett was acquitted. Mr. Barrett was sentenced by the jury to 20 years on the manslaughter charge, and 10 years on the ABDW charge.

1

Mr. Barrett was indicted in federal court on charges related to Trooper Eales's death the day before the statute of limitations ran on the underlying drug charges. When Mr. Barrett was indicted, Paul Brunton, the Federal Defender for the Northern and Eastern Districts of Oklahoma, called me about being lead counsel for Mr. Barrett in his federal case. The proposal, as stated to me by Mr. Brunton, was that I would be appointed lead counsel and Rob Nigh of Tulsa was to be appointed second chair. I was to handle the majority of the trial preparation, including preparation of the penalty phase defense, as well as trial work; Mr. Nigh was to assist with motions work and handle administrative matters such as budgeting requests.

Mr. Brunton met with United States District Judge James Payne about appointing Mr. Nigh and me to represent Mr. Barrett. Judge Payne agreed to appoint me, but declined to appoint Mr. Nigh. Mr. Brunton informed me that Judge Payne wanted to develop a local capital defense bar in the Eastern District, and therefore decided to appoint former Eastern District United States Attorney Roger Hilfiger as co-counsel. In it's minute order, the Court first stated that the substitution of Mr. Hilfiger was by agreement with Mr. Brunton. It is my understanding that Mr. Brunton then wrote Judge Payne, asking that the Court minute reflect Mr. Brunton's objection to the substitution of Mr. Hilfiger for Mr. Nigh. Magistrate Judge Shreder then entered an amended minute order specifying that I had been appointed at the request of the Federal Defender, an Mr. Hilfiger had been appointed at the direction of the Court.

I was familiar with Mr. Hilfiger because when he was the United States Attorney

for the Eastern District, he had handled the prosecution of a client of mine in a Savings and Loan matter.  That matter was resolved successfully for my client.  After Mr. Hilfiger was appointed as co-counsel for Mr. Barrett, I provided Mr. Hilfiger with access to a secure website, which had my state files in Mr. Barrett's case on a computer data base.  Those who access the site are identified when they visit the site.   I was able to track who visited the site, and during the time I worked on Kenny Barrett's case with Mr. Hilfiger, I saw no indication of him accessing the database containing the state files.

The first time Mr. Hilfiger and I appeared before Judge Payne on Mr. Barrett's case, Judge Payne stated that he wanted the case tried quickly and that this should be no problem, because I had handled Kenny's state case.  I explained to Judge Payne at the time that there were significant tasks that needed to be undertaken to prepare the case adequately for another trial.  For example, while the preliminary investigation begun by Roseann Schaye had identified certain evidence and avenues of investigation regarding potential mental state guilt and penalty phase defenses, significant additional investigation and expert consultation remained to be done.  Similarly, questions regarding the existence and role of a confidential informant in this case had not been resolved to my satisfaction by the conclusion of the state proceedings.  The federal authorities' decision to prosecute Mr. Barrett in a capital case therefore made it imperative for me to investigate the practices of the District 27 Drug Task Force including, but not limited to, their cultivation and reliance on purported informants or "snitch" witnesses.

As I informed Judge Payne in my motion for permission to withdraw, during the

3

time Mr. Hilfiger and I were appointed to work together, we maintained a cordial relationship.  As I also informed Judge Payne, however, I felt Mr. Hilfiger was not doing work on the case that I had expected him to do, and I was left to handle virtually all the substantive tasks, as well as the all the case budgeting.  I also stated my concerns about Mr. Hilfiger's lack of work to Richard Burr, who was the representative of the Federal Death Penalty Resource Counsel project assisting with the case.  Although I was lead counsel, I was aware that Judge Payne had specifically selected Mr. Hilfiger for the case over Mr. Brunton's recommendation of Rob Nigh.

At the outset, Judge Payne stated that he regarded himself as the guardian of the public purse and that he would not authorize what he regarded as unnecessary expenses. During my representation of Mr. Barrett in federal court, virtually the only budgeting request Judge Payne approved without drastic cuts was for defense counsel to travel to the Justice Department in Washington, D.C. for a meeting to try to persuade the Justice Department to decline a capital prosecution of Mr. Barrett.

Over the course of my federal court representation of Mr. Barrett, I submitted approximately nine budgeting requests for experts, investigators, expenses and the like, all of which were rejected in whole or in substantial part by Judge Payne.  As I informed Judge Payne at the time, the budget I submitted was based in part on my knowledge of the tasks that were not completed during the state proceedings, and in part on materials which I received from Federal Death Penalty Resource Counsel, and from my review of materials they made available on their website. These materials, and information I

subsequently received from Richard Burr, indicated the time I budgeted for attorneys, and the resources I sought, were in line with the time, fees, and personnel relied upon in other federal capital prosecutions.

Prior to my submitting a proposed budget of attorney hours for various categories of work Mr. Hilfiger provided me his projections of the time he would need to spend in each category. Other than giving me these projections, Mr. Hilfiger did not assist with administrative or substantive case preparation tasks. This division of labor required me to expend an inordinate amount of time on budgeting requests and administrative matters. In April 2005, the court held that I would not be compensated for any of the time I spent preparing the detailed budgets on which Judge Payne insisted. This included time spent conferring with experts regarding the needs of the defense. These conferences were necessary for two reasons. First, so that the experts could learn what the status of my knowledge of the evidence was, and second, so that I could prepare the budget requests. Mr. Hilfiger did not participate in these conferences, although I had no objection to him being involved in these aspects of preparing Mr. Barrett's defense.

I was basically not being compensated for consulting with Mr. Hilfiger on the few occasions that he was available to me, nor with Federal Death Penalty Resource Counsel. For example, payment vouchers I sent in for legal research would be cut in half. The judge believed I did not need to do much if any research on federal death penalty law because I was "learned counsel." The same was true for research I did on search and seizure issues. Simply stated, my fee requests and budgeting requests were not being

5

approved, or were being approved for far less than the time I devoted to tasks that I and Federal Death Penalty Resource Counsel believed were reasonably necessary to prepare the case for trial.

As I recall, one of my first requests concerned preparation of transcripts of the second state court trial. Judge Payne initially opposed our request based in part upon his stated opinion that we could rely upon my memory of the trial.

Based on the capital nature of the case and the involvement of drugs, I wanted to hire an investigator to complete the investigation of mental state issues and law enforcement practices. The rate I was quoted for private investigative services in the area was Fifty Dollars ($50.00) per hour. At that rate, I would have been able to engage Dale Eberle, who had formerly participated in the NDOK drug task force, and who was therefore particularly qualified to conduct the drug subculture investigation which we needed to defend the federal case. Judge Payne, however, said he would authorize a maximum of only Thirty Dollars ($30.00) per hour for such services, because that was the rate charged OIDS by an investigator who withdrew for health reasons prior to the first state court trial.

Judge Payne authorized only 100 hours of investigation. Based on the information I received from consulting with the Federal Death Penalty Resource Counsel, which I shared with Judge Payne, it was my understanding that the hours I requested constituted only 3/5 of the average hours authorized by federal courts for fact investigation in capital cases; and the requested hourly rate of $50 an hour was $15 below the low end of the

range ($65 - $85) nationally authorized for fact investigators in federal capital cases at the time.

I also sought to retain the services of jury consultant Joe Gustaferro. Mr. Gustaferro had recently assisted the attorneys in Terry Nichols' state court trial and those attorneys recommended him highly. Judge Payne, however, would not authorize any payments whatsoever for jury consultation, citing the extensive litigation experience of Mr. Hilfiger and me.

I also requested authorization for 267 hours of the services of a mitigation specialist to be compensated at a rate of $75 per hour, for a total of $20,025; and travel expenses $5,000. Judge Payne approved only 100 hours at $150 per hour, and no travel expenses. I again shared with Judge Payne the information compiled by the Federal Death Penalty Resource Counsel demonstrating that the requested hours were barely a third of those authorized in an average federal death penalty case; and that these substantially limited hours were reasonably necessary to complete the preliminary mitigation investigation that had been initiated in state court. Although Judge Payne inexplicably doubled the requested rate of compensation for the mitigation investigator, this was of no practical assistance to me because, as Judge Payne was also informed by the Federal Death Penalty Counsel, the denial of expense was completely unworkable and apparently unprecedented in federal death penalty litigation.

Judge Payne also made substantial and unworkable reductions in the amounts requested for the services of forensic experts, including a tool mark and illegal drug

7

analyst, and a trajectory and crime scene reconstruction expert.  Although the requested hourly rate for these experts was well within the range established by national practice at the time of compensating such qualified experts between $125 and $250 per hour, Judge Payne authorized only $100 per hour.  Judge Payne also denied most of the requests for the experts' travel and other out-of-pocket expenses.  The reduced hourly rate approved by Judge Payne and the lack of expenses again made it unworkable to obtain the services of any expert qualified to perform the requested services.

Judge Payne similarly made unworkable reductions to my request for the services of mental health experts to assess Mr. Barrett's brain dysfunction, future dangerousness and hypervigilant overreaction to perceived threats of annihilation.  My request for a total of $24,000 was well under the average authorization for a federal death penalty case at the time ($30,000) and indicated hourly rates of $125-$150 were at the low end or well below the range of hourly rates authorized by federal courts in death penalty cases for the services of a psychologist ($150-250) and psychiatrist ($250-350).  Judge Payne nevertheless approved the retention of only one mental health expert for 40 hours of work, limited compensation to a rate of $100 an hour for an expert who was a psychologist or $125 per hour for a psychiatrist, for a total of $4,000-5,000.  Based on the data assembled by the Federal Death Penalty Resource Counsel, and provided to Judge Payne, the limitation on the number of experts, hours, rate of compensation, as well as the denial of expenses, were all completely out of line with the standards of practice prevailing in federal death penalty cases, and precluded meaningful investigation of

8

mental health issues.

On one occasion, after I submitted the budget requests, Mr. Hilfiger called me and told me to substantially reduce the requests solely because the judge would not approve them. To my knowledge, Mr. Hilfiger's suggestion was not based on any consultation with the Federal Death Penalty Resource Counsel attorneys, or any other experienced capital litigator. Nor did Mr. Hilfiger have sufficient knowledge of the facts, training and experience as a capital lawyer to render an informed, independent opinion regarding the reasonableness of my funding request. Based on my own training and experience, as well as my consultation with attorneys at the offices of the Federal Death Penalty Resource Counsel, I knew that Mr. Hilfiger's suggestion to reduce the budget request was unreasonable. In a conference call among Judge Payne, Mr. Hilfiger and myself to discuss this matter, Mr. Hilfiger did not join me in advocating for the reasonably necessary funding.

Judge Payne also imposed onerous, exacting conditions for budget requests, which required me to set forth in minute detail a description of specific tasks and which lawyer would perform which task, when each task would be completed and the amount of hours required for each specific activity. In consultation with the Federal Death Penalty Resource Counsel, I also informed Judge Payne that the process requiring pre-authorization and circuit-level review of non-attorney services pursuant to 21 U.S.C. §§ 848(q)(9) and (10)(B) is not applicable to attorney services, and that pursuant to the Guide to Judicial Policies and Procedures, Vol. VII, "Appointment of Counsel in

9

Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), case budgeting should be made in light of counsel's "best preliminary estimate that can be made of all services," including services of counsel. Although the level of detailed quantification of tasks and necessary hours demanded by Judge Payne is virtually impossible to predict, Judge Payne required me to submit such detailed budget proposals in advance, including seeking authorization to do legal research. I did my best to comply with these requirements, and obtained pre-approved authorization from the court. When I submitted vouchers, however, my compensation was routinely cut significantly. I was compensated at an effective rate of approximately Sixty Dollars ($60.00) an hour.

As I stated to Judge Payne at the time, delays in the Court's approval (or rejection) of the budgets I had submitted were eating into the time available to prepare for trial. Some of the budget proposals for Mr. Barrett's defense were first raised with Magistrate Judge Shreder in early December 2004. In February, I responded to a letter from Judge Payne with a letter that in many respects repeated things Magistrate Judge Shreder elicited from me months earlier. Prior to the exchange of letters, in the hope that disputes of budgeting of attorney fees would not delay the acquisition of needed experts, I began to submit separate budget requests - one for attorney fees and a second for experts and expenses. This did not resolve either impasse.

As reflected in the then-current data compiled by the Office of Defender Services and made available to Judge Payne by the Federal Death Penalty Resource Counsel, my projection of 2,000 hours of attorney time necessary to represent Mr. Barrett effectively

10

was well *below* the range of 2,400 to 3,000 hours then being expended in death-authorized federal cases. The Federal Death Penalty Resource Counsel also was unaware of any other instance in which a federal judge routinely cut attorney hours by 50% without providing counsel an opportunity to discuss any legitimate concerns the court might have with the amount of requested compensation.

I was therefore prevented from adequately preparing the case because Judge Payne refused to authorize reasonable fees or expenses for expert and investigative assistance. Judge Payne made me disclose how much money I had earned on Mr. Barrett's state case. Judge Payne expressed on more than one occasion that because I had tried the state case and had been on the state case for years, I did not need all the help and assistance I was requesting.

I was appointed lead counsel for Mr. Barrett in the federal case in the Fall of 2004, and we were still litigating budget requests in April, 2005. As of that time, I was not aware of Mr. Hilfiger doing any investigation other than perhaps visiting the scene and taking some photographs. We still were working without experts or investigators, and my attorney fee vouchers were being cut routinely. I discussed these difficulties with Paul Brunton, and also consulted with the federal capital resource center. After extensively reviewing the matter with the Federal Death Penalty Resource Counsel, I concluded that Judge Payne's reduction of attorney's fees, estimate of the hours necessary to represent Mr. Barrett and restrictions on non-attorney funds for investigative and expert services were substantially inconsistent with the standards and practices

11

governing federal court trials in death penalty cases such as Mr. Barrett's.

Judge Payne's ongoing refusal to authorize adequate resources led me to conclude I would not be able to discharge my professional and ethical obligations to prepare Mr. Barrett's case adequately for trial. I therefore presented my concerns as the bases for a motion to allow me to withdraw as counsel, including in the motion a statement from Mr. Barrett that he wanted me to continue as his lawyer. I anticipated that Judge Payne would deny the request and that this would "force the issue" by getting a ruling that could be appealed to the Tenth Circuit. I urged Mr. Hilfiger to join the motion to withdraw in light of my professional judgment, and concurrence of the Federal Death Penalty Resource Counsel, that we were being prevented from representing Mr. Barrett effectively. Mr. Hilfiger declined to join the motion, and urged me not to file it, but he did not offer any reason to challenge my assertion that the trial preparation was being hamstrung by Judge Payne's denial of ancillary investigative and expert services.

Within a short period of time, Judge Payne granted my motion to withdraw, removed me from the case, designated Mr. Hilfiger as lead counsel, and appointed Bret Smith as second chair. In my opinion, Mr. Hilfiger was not qualified under the appropriate ABA Guidelines to act as first chair in a federal capital case. To my knowledge, Bret Smith had no capital experience.

At the time I withdrew from the case, I was unaware of Mr. Hilfiger having performed any significant work on the case, with the exception of a few pleadings, making court appearances, conducting a brief scene visit, and traveling to Washington,

12

D.C. for the D.O.J. meeting, as described above. At the time I withdrew, Mr. Hilfiger had not contributed significant legal research, nor had he contributed significantly to the major motions and briefs.

Everything in the federal case, during the time I was participating, was an uphill struggle with Judge Payne. Over and above the funding issues, I was required to file a motion and brief setting out the serial numbers of my computers and accessories before they could be brought into the Courthouse. I was also, from time to time, chastised by the Court for such things as titling an agreed scheduling motion as a "joint" motion, when it contained a statement that the United States Attorney endorsed and agreed with the motion, but did not bear Mr. Sperling's signature.

At the time I withdrew from the case, I advised Mr. Hilfiger that he needed to immediately undertake extensive investigation and preparation for a possible penalty phase. I explained to him that the work performed by Roseann Schaye, the mitigation investigator in the state case, was very preliminary in nature and far from complete. Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt. In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family mental illness. Based on these preliminary results, if Mr. Barrett's case had proceeded to a penalty phase in state court, I would have requested the time and funding necessary to investigate Mr. Barrett's cognitive impairments that suggested brain

13

damage, his mother's consumption of alcohol during her pregnancy with Mr. Barrett, and the presence, severity and effect of mental illness on Mr. Barrett's behavior and functioning.

Based on my experience, I knew that it was important that I had built a rapport with Mr. Barrett so that he would trust my judgment regarding the appropriateness of investigating and presenting certain evidence.  I am aware that a variety of factors, including depression, a sense of hopelessness and the fear of shame and embarrassment can adversely affect a client's ability to endure the presentation of penalty phase evidence.  For this reason, I and other members of the state court trial team made every reasonable effort, including regular visits with Mr. Barrett, to encourage and support his participation in preparing both the guilt and penalty phase of his trial.  Mr. Barrett cooperated with all of our requests to be examined by a mental health professional, provided us with potential sources of background information and helped us to locate significant witnesses who knew the details of his upbringing.  Because of the attorney-client relationship we established with him and, which in my opinion, any qualified lawyer would endeavor to establish with a capital client, Mr. Barrett did not place any restrictions on the evidence we were permitted to investigate or prepare to present in the event of a penalty phase.

As mentioned above, however, we had not completed the necessary investigation and preparation of a penalty phase presentation by the conclusion of Mr. Barrett's state trials.  I therefore stressed to Mr. Hilfiger the importance of completing a mitigation

investigation so that he would be able to make informed decisions and able to advise Mr.

Barrett of possible defenses.

After I withdrew from the federal case and gave Mr. Hilfiger this report on the

status of the prior investigation, he never again consulted me on the legal and factual

issues surrounding Mr. Barrett's case.

It was always my belief that investigator Clint Johnson and the District 27 Drug

Task Force simply made up a C.I. out of whole cloth.  In my opinion Charles "Monk"

Sanders was not the alleged confidential informant (C.I.) used to secure the search and

arrest warrants that were prepared in advance of the raid on Mr. Barrett's home.  Despite

our repeated efforts, including extraordinary writs to the Court of Criminal Appeals, the

identity of the C.I. was not disclosed during the state trials.  Prior to the second state trial,

Clint Johnson was ordered by the Court to write the supposed C.I.'s name on a paper that

was then placed in an envelope, sealed and placed in the state court file.  It is my

understanding that the envelope was opened just prior to the federal trial, and that the

name of  Charles "Monk" Sanders was written on the paper.  In my opinion, Mr. Sanders

was an informant, but that he did not actually fill the C.I.'s alleged role.  In fact, Mr.

Monk's federal trial testimony conflicted with the averments made in the affidavits

supporting the state arrest and search warrants.

It is also my understanding that during jury selection in Mr. Barrett's federal trial,

the government disclosed for the first time its intention to call informant or "snitch"

witnesses to testify to certain statements Mr. Barrett purportedly made regarding his

15

intention to harm law enforcement officers. The belated disclosure of such potentially significant witnesses would have further raised my suspicions regarding the reliability and truthfulness of the proffered testimony. It is my professional judgment that no reasonably competent capital trial attorney would have permitted the government to introduce the testimony of such belatedly identified witnesses without first obtaining, or at least requesting a continuance sufficient to afford the defense full discovery – including, but not limited to any of the witnesses statements, the circumstances under which they allegedly first came to the attention of the prosecution, records of their criminal histories to include pending cases, and any consideration promised or expected in consideration for their testimony – and a reasonable opportunity to investigate the witnesses' background and substance of their alleged statements to the authorities, including the circumstances and context of Mr. Barrett's reported statements.

These matters occurred several years ago, and I have not reviewed either my files or the Court's records, relying only on my best recollection of the events. I related the information detailed herein to one of Mr. Barrett's current attorneys, David Autry, in interviews with me. Based on those interviews, this declaration was drafted for my signature. I have carefully reviewed its contents, and it reflects accurately what I told Mr. Autry.

16

I declare under penalty of perjury that this declaration, consisting of 17-pages, is true and correct to the best of my recollection and belief.

Executed by me this 13th day of May, 2009, in Tulsa County, Oklahoma.


/S/

John David Echols

17

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 35**

---

## am I supposed to do all this?

(Mother will check if I do)

### AT ABOUT THREE MONTHS   MORE OR LESS

Lift chest clear of surface when placed face down _6 weeks_

Straighten knees when held erect _6 weeks_

Hold head erect and steady when held to shoulders ✓

Sit on lap, hold head erect and steady with support of ribs only ✓

Follow flashlight with eyes: vertically_____ horizontally_____ circularly_____

Smile in response to Mother's voice ✓

Observe anyone speaking_____ Inspect hand_____ Laugh aloud_____

Manipulate object placed in hand_____ Splash in bath_____

Make stepping movements when held erect_____

Open mouth at sight of nipple before lips are touched_____

### AROUND SIX MONTHS

Hold head erect when carried ✓

Sit alone on flat surface momentarily ✓

Stand firmly with help when held erect ✓

Roll from back to stomach and vice-versa on flat surface ✓

Reach and grasp for an object when in sitting position ✓

Pick up one-inch cube with fingers ✓

Scoop up 1/8-inch cube ✓   Discover feet ✓

Look at object with which am playing ✓

Look at floor for fallen toy when in high-chair or lap_____

Make various vocalizations ✓

Notice difference between familiar persons and strangers ✓

Not much affected by strangers, new scenes or solitude ✓

Crow and coo actively when pleased ✓

Cry and fret when toy is taken ✓

[ 20 ]

## I'M GETTING BIGGER NOW!

### AT ABOUT NINE MONTHS

Sit on floor and handle playthings without losing balance ✓

Crawl on stomach, making some progress ✓

Creep on hands and knees ✓

Bang table with toys or other objects ✓

Knock down block houses in play_____

Oppose thumb and forefinger in picking up one-inch cube_____

Wave "bye-bye" or play "peek-a-boo" instinctively_____

Take bottle in and out of mouth ✓

Respond to animated facial expressions_____

Bowel control_____ Respond when name is called ✓

Express vocal sounds upon recognition of familiar person or object_____

Associate outdoor clothing with being taken out_____

May react to strangers_____

Reach for objects persistently_____

Say "ma-ma" or "da-da" or equivalent_____

Make stepping movements when feet are touched to floor ✓

### ONE YEAR OR THEREABOUTS

Pull self to standing position with help of furniture ✓

Walk with help ✓   Creep actively and rapidly ✓

Comprehend simple verbal commands and commissions ✓

May cooperate in dressing and undressing ✓

May climb steps_____ Hold and drink from cup_____

Put one block on another when shown_____

Say two or three words indicating want_____

Play "pat-a-cake" or similar demonstrable game_____

Pick up small object with finger and thumb ✓

Show preference for one hand in reaching_____

Make rhythm movements to music ✓

Indicate need of toilet_____

Dear Folks: Don't worry if I don't do ALL of these things at the ages specified. If I do about half of them at the proper time, I'm doing all right.

(signed)_____

[ 21 ]

KEB501953

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

**EXHIBIT 36**

---

Rodger;

Maybe I seem hasty to you. But at this time. I don't know what I'm doing or going to do. Or should do. With John gone I feel's like thongs are going to take a turn. You need to know that it's nothing against you or Bret. It could have been to other lawyers and I would have done the same. One day I feel one way and the next I feel another. I guess I have no choice now than to let you do your best. Rodger, this case was close to being beat the second time. Everything we need to be it is there. The reason I feel the way I do is because, I felt John would finally win it this time, It can be done. I don't want to go back to prison to were I'm screwed around on my levels to were It takes me twice as long to get out. Screw the politics. Just try your hardest to beat this to were I can go home. I have gave 6 years of my life for something that they caused to happen. I've got alot of thongs that are good for this case. So hopefully now that there is no-other means for me but to beat this we can put this behind us and start over and go this right and win. I'll try my best to act right. I've got so much riding on this. Everything to get my life back in order is waitin. A good Job a good woman. I've got two grand kids. I've never even seen. After 6 years of this It gets old Rodger. Please understand that.

Thank you    Kenneth Barrett

KEB009690

**INTENTIONALLY LEFT BLANK**
**EXHIBIT NUMBERS 37-58 NOT USED**

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 59**

SEQUOYAH COUNTY, OKLAHOMA

| No. | STYLE OF CASE | NATURE OF ACTION | ATTORNEYS | | |
|---|---|---|---|---|---|
| 792 | STATE OF OKLAHOMA<br>vs.<br>Henry Edwards | Manslaughter | H. D. P.<br><br>J. M. Mc Combs | | |

| DATE 1925 | FILINGS, PROCEEDINGS AND RETURNS | Clerk's Costs Plaintiff | Clerk's Costs Defendant | Sheriff's Costs | Miscel-laneous | Credits | Disburse-ments | |
|---|---|---|---|---|---|---|---|---|
| 7/16 | To file Transcript | 1 00 | | | | | | |
| | Docket fee | | | | | | | |
| 1. 20 | To file Praec & Iss Sum | 35 | | | | | | |
| | Reg Sum | | | | 1 00 | | | |
| 7 7 | To file & Rec'd Information | 95 | | | | | | |
| 12 | To file & Record Verdict | 50 | | | | | | |
| | | | | Acquitted | | | | |
| | | | | 9-11-25 | | | | |

SEP 30 1926<br>No Property in Sequoyah Co<br>Accord to records of Co<br>R. L. [illegible]

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 60**

## CRIMINAL APPEARANCE DOCKET

573

vised 1968)

| STYLE OF CASE | NATURE OF ACTION | ATTORNEYS |
|---|---|---|
| State of Oklahoma | Cultivation of Mari | District Attorney |
| vs. Deborah Everyby Marilyn Crawford | | For Defendant |

Return Day_____ 19___ Answer Day_____ 19___

| | ITEMS RECORDED | | CLERK'S COSTS | SHERIFF'S COSTS | MISC. FEES | WITNESS FEES | DEPOSIT IN CASE | DISBURSED | BALANCE CASH ON HAND |
|---|---|---|---|---|---|---|---|---|---|
| | Book | Page | | | | | | | |

Inf.
Minute - Defs. pres., St. J.P.A., Deffen of of Inf, bond set at
$3000 each; Arraign passed to 6-1-77 at 1:30 P.M.
Bond (D.C.) Everyby                     14363
Bond (D.C.) Crawford                    34 364
Minute - def pres St J.P.A, def pres w/att. John Ayers, P.N.G., Pre. Hrg set
6-17-77 at 10 A.M., bond lowered to $900
Order dismissing                        4-1-77