IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
                                    )
               *Plaintiff,*      )
                                    )
v.                                      )        Case No. 6:04-CR-00115-JHP-SPS
                                      )
KENNETH EUGENE BARRETT, )
                                      )
              *Defendant.*    )

---

## DEFENDANT'S MOTION FOR COLLATERAL RELIEF,

## TO VACATE, SET ASIDE, OR CORRECT SENTENCE,

## AND FOR A NEW TRIAL

---

## TABLE OF CONTENTS

I.     Preliminary Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.     Statement Regarding Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.     Grounds for Disqualifying Trial Judge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      C.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.     Events Leading to the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            1.     The Alleged Offense and the Bench Warrant . . . . . . . . . . . . . . . . . . . 8

            2.     The Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            3.     September 24, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.     Three Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            1.     State Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            2.     Federal Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.   Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      Claim 1.     Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel . . . . . 17

      Claim 2.     Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. § 3006A and the Sixth Amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

            A.     Unreasonable Acts and Omissions Affecting the First and Second Stages of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

                  Overview of First-Stage Ineffective Assistance . . . . . . . . . . . . . . 44

Evidence of Constitutionally Deficient Representation . . . . . . . . 48

1.      Failure to professionally re-urge the motion to suppress
        under *Franks v. Delaware,* 438 U.S. 154 (1978). . . . . . . 48

Ineffective Assistance of Appellate Counsel . . . . . . . . . . . . . . . . 60

2.      Trial counsel unreasonably failed to investigate and
        introduce evidence of eyewitnesses as well as mental
        impairment and illness that would have rebutted the
        prosecution's theory of the case, supported the defense
        theory, and formed the basis for conviction of a lesser
        offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

3.      Due to the unreasonable failure of Mr. Barrett's trial
        counsel to retain expert assistance, Mr. Barrett was tried
        while incompetent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

4.      But for trial counsel's unreasonable omissions it is
        reasonably probable that the jury would have rejected the
        testimony of the Government's eleventh hour "snitch"
        witnesses and, like the two juries before them, refused
        to convict Mr. Barrett of premeditated murder. . . . . . . . . 76

        a.      Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 78

        b.      Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 86

        c.      Charles "Monk" Sanders . . . . . . . . . . . . . . . . . . 94

                1.      Failure to adequately investigate and
                        prepare to cross-examine Sanders about
                        his previous convictions, charges against
                        him that were dismissed, and the favorable
                        treatment he often secured to escape
                        punishment. . . . . . . . . . . . . . . . . . . . . . . . 94

                2.      Counsel was professionally unreasonable
                        for failing to investigate and produce
                        witnesses who could have impeached
                        specific claims made by Sanders, and
                        Sanders's credibility as a whole. . . . . . . 113

        d.      Randy Weaver . . . . . . . . . . . . . . . . . . . . . . . . . 119

e.    Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . . 121

f.    Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

g.    Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . 123

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

5.    Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

6.    The outcome of the trial is unreliable due to trial counsel's unreasonably failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

7.    Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials . . . . . . . . . . . . . . . . . . . . . 144

8.    Counsel was professionally unreasonable for failing to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on. This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers. . . . . . . . . . . . . . . . . . . . . . . . . . 149

a.    Toby Barrett  . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

b.    Alvin Hahn . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

9.    Trial counsel was professionally unreasonable for failing to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence. . . . . . . . . . . . . 154

10.    Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.  . . . . . . . . . . . . . . . . . . . . . . . 160

11.    The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions . . . . . . . . . . . . . . . . . . . . . . . . . 175

12.    Trial counsel were ineffective for failing to adequately preserve the record, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

13.    Counsel was professionally unreasonable for failing to object to numerous instances of prosecutorial misconduct in closing argument in both stages of trial.  . . . . . . . . . . . . 180

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

B.    Unreasonable Acts and Omissions Affecting the Second
Stage of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

1.    Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

2.    Prejudice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

a.    The family, social, and medical background of Kenny Barrett  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Family History of Mental Illness . . . . . . . . . . . . . . . . . . 191

Maternal Family Mental Illness . . . . . . . . . . . . . . . . . . . 191

Paternal Family Mental Illness . . . . . . . . . . . . . . . . . . . . 193

Maternal Family History  . . . . . . . . . . . . . . . . . . . . . . . . 195

Paternal Family History . . . . . . . . . . . . . . . . . . . . . . . . . 198

Family of Origin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Infancy and Childhood Development . . . . . . . . . . . . . . 207

Onset of Mental Illness . . . . . . . . . . . . . . . . . . . . . . . . 216

b.    Kenny Barrett's mental illness and organic
brain dysfunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

c.    The prosecution's exploitation of trial counsel's
deficient performance . . . . . . . . . . . . . . . . . . . . . . . . . 231

3.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

Claim 3.    Mr. Barrett was Denied his Rights to Due Process and Equal Protection of
the Laws, and his Right to Expert and Investigative Assistance under 18
U.S.C. § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Claim 4.    Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution Were
Violated by the Use of False Information in Obtaining the
No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search
Warrant Obtained by Clint Johnson Was Invalid under *Franks v.
Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Was
Ineffective for Failing to Raise the Issue on Direct Appeal . . . . . . . . . . 247

Claim 5.    Mr. Barrett was Denied his Fifth Amendment Right to Due Process,
his Sixth Amendment Rights to Counsel and Confrontation, and his
Eighth Amendment Right to a Fair and Reliable Capital Sentencing
Process Due to the Government's Suppression of Exculpatory
Evidence, Knowing use of Perjured Testimony, and Failures to
Correct False Testimony; Mr. Barrett is Entitled to Relief
from his Conviction and Sentence Based on Newly
Discovered Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

A.    Suppressed Exculpatory Evidence, Evidence of Knowing use of
Perjured Testimony, and Newly Discovered Evidence . . . . . . . 257

1.    Evidence regarding informant witnesses Charles
"Monk" Sanders, Travis Crawford, Cindy Crawford,
Brandie Zane Price, Karen Real and Randy Turman
entitles Mr. Barrett to relief from his convictions and
sentences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

a.    Charles "Monk" Sanders . . . . . . . . . . . . . . . . . 257

b.    Travis Crawford . . . . . . . . . . . . . . . . . . . . . . . . . 262

c.    Cindy Crawford . . . . . . . . . . . . . . . . . . . . . . . . 267

d.    Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . 273

e.    Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

f.    Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . 277

2.    The Government failed to reveal exculpatory evidence
of a witness who failed to corroborate
Charles Sanders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

B.    The Judgements of Conviction and Sentence Should be
Vacated Based on the Suppression and New Discovery of
Evidence Undermining the Credibility of Key Law
Enforcement Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

1.    Evidence of Clint Johnson's illicit activities . . . . . . . . . 280

2.    David Michael Littlefield's illicit activities . . . . . . . . . . 286

3.    John Philpot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290

C.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's
Interference with Defense Counsel's Investigation
of Key Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

D.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's
Improper Questioning of Witnesses . . . . . . . . . . . . . . . . . . . . . . 297

Claim 6.    Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to
the United States Constitution were Violated Due to the Court's
Restrictions on the Use of his Statements . . . . . . . . . . . . . . . . . . . . . . 303

Claim 8.    Mr. Barrett was Tried while Incompetent in Violation of the Fifth,
Sixth, and Eighth Amendments to the United States Constitution . . . . 310

Claim 9.    Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments
to the United States Constitution were Violated When the Trial Court
Failed to Instruct on a Lesser Included Homicide Offense.  Direct
Appeal Counsel Was Ineffective for Failing to Raise this Issue. . . . . . 314

Claim 10.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

Claim 11.      Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Was Ineffective for Failing to Raise this Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Claim 12.      The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

Claim 13.      Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336

Claim 14.      Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.  . . . . . . . . . . . . . . . . . . . . . . . 348

Claim 15.      Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351

Claim 17       Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case . . . . . . . . . . . . 354

IV.    Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 355

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

Ake v. Oklahoma, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Alcorta v. Texas, 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

Apprendi v. New Jersey, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333, 334

Banks v. Dretke, 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Bates v. Bell, 402 F.3d 635 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Batson v. Kentucky, 476 U.S. 76 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315, 318

Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 73, 311

Bowen v. Maynard, 799 F.3d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Brecht v. Abrahamson, supra, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brooks v. Tennessee, 406 U.S. 605 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Bush v. Gore, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Carey v. Duckworth, 738 F.2d 875 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Carter v. Bowersox, 265 F.3d 705 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Cooper v. Oklahoma, 517 U.S. 348 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Crane v. Kentucky, 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264, 266, 271

Crowe v. Sanders, 864 F.2d 430 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Cuyler v. Sullivan, 446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 302

Davis v. Polk, 2007 WL 2898711 (W.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . passim

Deck v. Missouri, 544 U.S. 622 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Delaware v. Van Arsdale, 475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297, 302

Driscoll v. Delo, 71 F.3d 701 (8th Cir. 1995),
*cert. denied,* 519 U.S. 910 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 139

Drope v. Missouri, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

Dunn v. Roberts, 963 F.2d 308 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Dusky v. United States, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

Eagle v. Linahan, 279 F.3d 1283 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Eddmonds v. Peters, 93 F.3d 1307 (7th Cir. 1996),
cert. denied, 520 U.S. 1172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Estelle v. McGuire, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Estelle v. Williams, 425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Evitts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Felde v. Butler, 817 F.2d 281 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Ferguson v. Georgia, 365 U.S. 570 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fero v. Kerby, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254, 290

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 175

Geders v. United States, 466 U.S. 648 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Gilbert v. Mullen, 302 F.3d 1166 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

Giles v. Maryland, 386 U.S. 66 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262, 257

Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330

Godinez v. Moran, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346

Gordon v. Kelly, 2000 WL 145144 (6th Cir. Feb. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 301

Gravely v. Mills, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Gray v. Mississippi, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Greer v. Miller, 483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966),
*cert. denied*, 396 U.S. 865 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 292

Hall v. Washington, 106 F.3d 742 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Hamilton v. Alabama, 368 U.S. 52 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Herring v. New York, 422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 175

High v. Head, 209 F.3d 1257 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Hodge v. Hurley, 426 F.3d 368 (6th Cir.  2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 2000),
*cert. denied,* 121 S.Ct. 332 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

Holbrook v. Flynn, 475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

Holloway v. Arkansas, 435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Horton v. Massie, 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished) . . . . . . . . . . . . . 128

Hull v. Kyler, 190 F.3d 88 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 343

Illinois v. Allen, 397 U.S. 337 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308, 343, 344

Iimbler v. Pachtman, 424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Jaffee v. Redmond, 518 U.S. 1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Jones v. Polk, 401 F.3d 257 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305, 306

Keeble v. United States, 412 U.S. 205 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . 47, 137, 165

Kyles v. Whitley, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253, 254

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

Liles v. Saffle, 945 F.2d 333 (10th Cir. 1991),
*cert. denied*, 502 U.S. 1066 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302, 304, 307

Marchu v. United States, 926 F.3d 50 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Martin v. Grosshans, 424 F.3d 588 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

McCracken v. Gibson, 268 F.3d 970 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Medina v. California, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 311

Mickens v. Taylor, 535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Miller v. Pate, 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257, 279, 286

Mitchell v. Gibson, 262 F.3d 1036 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Mooney v. Hollohan, 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257, 279

Moore v. Illinois, 408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Mullaney v. Wilbur, 421 U.S. 684 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 319

In re Murchison, 349 U.S. 133 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Murray v. Carrier, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

Nuckols v. Gibson, 233 F.3d 1261 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 291

Odle v. Woodford, 238 F.3d 1084 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

Pate v. Robinson, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Patton v. Mullin, 425 F.3d 788 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 302

Peltier v. Booker, 348 F.3d 888 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Polk County v. Dodson, 454 U.S. 312 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

Reynoso v. Giurbino, 462 F.3d 1099 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 127

Riggins v. Nevada, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333, 334, 351

Rock v. Arkansas, 483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Rompilla v. Beard, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 323

Schmuck v. United States, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Scott v. Mullin, 303 F.3d 1222 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 291

Skipper v. South Carolina, 476 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304, 307

Smith v. Gibson, 197 F.3d 454 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Smith v. Roberts, 115 F.3d 818 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Snowden v. Singleterry, 135 F.3d 732 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Steidl v. Fermon, 494 F.3d 623 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickler v. Green, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253, 290

Sullivan v. Louisiana, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

Taylor v. Kentucky, 436 U.S. 478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

Thomas v. Goldsmith, 979 F.2d 746 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Tuggle v. Netherland, 526 U.S. 10 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Turrentine v. Mullin, 390 F.3d 1181 (10th Cir. 2004),
*cert. denied*, 545 U.S. 1106 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315

United States v. Abeyta, 27 F.3d 470 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

United States v. Antone, 603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

United States v. Bagley, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254, 290

United States v. Barnette, 211 F.3d 803 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

United States v. Barrett, 469 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

United States v. Bodkins, 2005 WL 1118158 (W.D. Va. May 11, 2005) . . . . . . . . . . . . . . . . . 322

United States v. Bridwell, 583 F.2d 1135 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

United States v. Burbage, 365 F.3d 1174 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Calisto, 838 F.2d 711 (3rd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 316

United States v. Davis, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001) . . . . . . . . . . . . . . . . . . 322

United States v. Deleon, 979 F.2d 761 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. ex rel. Gregory Madef, 223 F. Supp. 2d 968
(N.D. Ill. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

United States v. Hernandez, 94 F.3d 606 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

United States v. Honken, 378 F. Supp. 2d 1040 (N.D. Iowa 2004) . . . . . . . . . . . . . . . . . . . . . 322

United States v. Humphrey, 208 F.3d 1190 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 176

United States v. Joe, 8 F.3d 1488 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

United States v. Johns, 851 F.2d 1311 (9th Cir. 1988),
cert. denied, 505 U.S. 1226 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Johnson, 130 F.3d 1420 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Johnson, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Kennedy, 131 F.3d 1371 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Libby, 429 F. Supp. 2d 1 (D. D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Lofton, 776 F.2d 918 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 319

United States  v. McIntosh, 124 F.3d 1330 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 345

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

United States v. Osorio, 929 F.2d 753 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

United States v. Pritchard, 745 F.2d 1112 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Quintanilla, 193 F.3d 1139 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 253, 255

United States v. Ramsey, 323 F. Supp. 2d 27 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 174

United States v. Rich, 580 F.2d 929 (9th Cir.),
*cert. denied*, 439 U.S. 935 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

United States v. Rosales-Rodriguez, 289 F.3d 1106 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 344

United States v. Sands, 899 F.2d 912 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

United States v. Scafe, 822 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 317

United States v. Serawop, 410 F.3d 656 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

United States v. Sloan, 776 F.2d 926 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

United States v. Smith, 543 F.3d 1211 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

United States v. Soundingsides, 820 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 70, 317

United States v. Thomas, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266
(D.Md. January 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

United States v. Visinaiz, 428 F.3d 1300 (10th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

United States v. Warner, 23 F.3d 287 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Viereck, v. United States, 318 U.S. 236 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

Village of Willowbrook v. Olech, 528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Wainwright v. Witt, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Washington v. Hofbrauer, 228 F.3d 689 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 181

Williamson v. Ward, 110  F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Witherspoon v. Illinois, 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

Wood v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 18

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 178, 179, 335

## STATE CASES

Dunkle v. State, 139 P.3d 228 (Okl. Cr. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140, 141

## DOCKETED CASES

In re Clint Johnson, No. 01-72501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

Crawford v. Mattox, Sequoyah County Case No. P-03-458 . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Michael Mackey, et al. v. Cindy Crawford, Sequoyah County Case No. PO-03-390 . . . . . . . . . 90

State of Oklahoma v. Richard Loy Gray, Jr. Cherokee County Case No. CF-2007-28 . . . 283, 284

United States v. McAdams, et al., No. CR-07-16-RAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

## FEDERAL STATUTES

21 U.S.C. §§ 848(q)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 42, 236

18 U.S.C. § 3432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

18 U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293, 294, 351

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 334

18 U.S.C. § 3599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33

18 U.S.C. § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

28 U.S.C. §§ 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Fed. R. Civ.P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Fed. R  Crim.P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Fed. R. Crim.P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Fed. R. Crim.P. 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276

Fed. R. Crim.P. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Fed. R. Evid. 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

Fed. R. Evid. 608 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Evid. 615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Fed. R. Evid 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:04-CR-00115-JHP-SPS |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR COLLATERAL RELIEF**

COMES NOW defendant KENNETH EUGENE BARRETT, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence. Through counsel, Mr. Barrett states the following grounds for granting this motion:

I.      **Preliminary Matters**

A.      **Statement Regarding Form**

In accordance with Rule 2 of the Rules Governing Section 2255 Cases, this Motion sets forth only the facts and claims entitling Mr. Barrett to relief. It does not contain legal argument or citation. Mr. Barrett will shortly file a separate motion seeking permission and a schedule by which to file a Memorandum in Support of the Motion.

Def's § 2255 Mot.                                    1                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

References to prior proceedings are as follows:

- References to the consecutively paginated trial transcripts:  R. *xxx*;

- References to hearing transcripts not consecutively paginated with the trial transcripts:  Tr. [date] Hr'g;

- References to documents filed with the court such as pleadings, motions, and orders cite the docket number:  Doc. *xxx*

- References to the two state trials:  1st St. Tr. Tx at *xxx*, and 2nd St. Tr. Tx at *xxx*;

- References to the exhibits to this Motion are by the name of the exhibit;

- All other references are self-explanatory or based on the Blue Book.

B.    **Grounds for Disqualifying Trial Judge**

In Claim 1 and elsewhere in this Motion, Mr. Barrett relies upon evidence of the trial judge's on- and off-the-record actions in relation to Mr. Barrett's defense, including *ex parte* communications with prosecutors.  The evidence that must be considered in evaluating this Motion disqualifies the trial judge from making any rulings affecting the process for adjudicating this Motion or the merits of any claims stated herein.  28 U.S.C. §§ 455(a), (b)(1), (b)(3), (b)(5)(iv); *Marchu v. United States*, 926 F.3d 50, 59 (1st Cir. 1991) (specific allegations about off-the-record actions of trial judge required that § 2255 motion be heard by different judge). Therefore, this Motion requests that the trial judge recuse himself without making any further rulings in the case.

Mr. Barrett will make a separate motion to recuse.  However, the principle that no person can be a judge in his own case, *In re Murchison*, 349 U.S. 133, 136 (1955), is sufficiently well established and invoked by the facts presented herein that recusal should not await a formal

motion.  It would be a violation of due process for the trial judge to make any rulings regarding this motion.  *Aetna Life Insurance Company v. Lavoie*, 475 U.S. 813 (1986).

### C.    Introduction

Kenneth Eugene Barrett was acquitted of the murder for which he now sits on death row.  After an Oklahoma jury convicted him of manslaughter, the Government presided over an unfair trial in this court in order to obtain a death sentence in response to anger over the result of the state proceedings.  The trial in this court could fairly be described as a travesty.

In order to improve their chances of obtaining the desired result, the Government loaded the dice with seven drug-addict informants who were nowhere to be found during the five years Mr. Barrett's state case was pending, but who materialized at the last minute to provide the Government much needed "evidence" of intent.  A number of these noxious characters dutifully marched to the witness stand to recite "statements" from Mr. Barrett that he intended to kill any law enforcement officer who stepped on his property.  Some of these witnesses also sought to portray Mr. Barrett as a drug manufacturer, even though no drug lab was found on his property when it was searched after Oklahoma Highway Patrol Trooper David "Rocky" Eales was tragically killed.

In handling these witnesses, the Government used a carrot and stick approach.  To get them to toe the mark, the Government employed intimidation and threats with at least two of them, Travis and Cindy Crawford.  This strong-arm tactic was headed up by disgraced former Assistant United States Attorney David Michael Littlefield, who was charged in 2007 with beating his children, and whose license to practice law is currently in peril based on charges filed by the Oklahoma Bar Association as a result of his child abuse case.

The carrot was undisclosed deals only vaguely hinted at during trial, or concealed altogether, and only consummated at or after the conclusion of Mr. Barrett's trial. The big winner in the snitch sweepstakes was Charles "Monk" Sanders, an eighteen-time (at least) convicted felon who was the alleged "C.I." for corrupt Drug Task Force officer Clint Johnson's search warrant for Mr. Barrett's residence, which set this entire tragedy in train. Sanders, who was permitted by Seqouyah County officials to run riot despite an almost unending series of convictions, saw any future jail time evaporate, had "split sentences" he never should have received in numerous felony cases reduced to straight *unsupervised* probation, and was even excused from paying any costs or fines in his cases, all courtesy of the Government and state prosecutors after he testified at Mr. Barrett's trial.

Others were also rewarded for their testimony. Karen Real, serving a fourteen year federal sentence in a drug manufacturing and firearms case, saw her sentence reduced to time served on the Government's Rule 35 motion shortly after Mr. Barrett was convicted and sentenced to death. Brandie Zane Price, a convicted felon who was depicted as having been delivered from her drug addiction at the time she testified against Mr. Barrett, was later charged in the Eastern District with being a member of a wide-ranging drug conspiracy. In the indictment filed against her and others, Price was charged with having started her participation in the drug conspiracy just a few short weeks after Mr. Barrett was formally sentenced. Randy Turman, a methamphetamine manufacturer who had a pending six-count drug case hanging over his head at the time he testified against Mr. Barrett, falsely testified on cross-examination that his case had "done been taken care of," when in fact it had not. The Government surely knew Turman was lying, but sat silently by and allowed him to perjure himself, in derogation of its duty to correct

false testimony.  In 2007, after being inactive for years, Turman's case was dismissed by Sequoyah County prosecutors "in the interests of justice."

The Government knew it still had a shaky edifice on its hands.  With sufficient time and a competent defense investigation, it would take but a few prods for the whole ramshackle thing to come crashing down.  In order to prevent investigation by the defense, the Government contrived to keep the identity of these witnesses secret for as long as possible to forestall any effective defense investigation.  As the general jury qualification process in Mr. Barrett's trial began, the Government filed a spurious sealed motion to delay identifying the names and addresses of the snitch witnesses.  An improper *ex parte* hearing was conducted by the court on the motion.  As the court quickly realized, the Government had zero evidence for its request; none of these witnesses were in the least bit of danger.  Outside the presence of defense counsel, their Government adversaries were allowed to speak for them on the question of whether the trial and already begun, thus precluding the informants from testifying under the applicable notice statute, and what steps the Government proposed so the defense would eventually have "access" to these witnesses.  The court recognized a lengthy continuance would likely be necessary to permit proper time for defense preparation.  In passing, AUSA Littlefield let slip he was aware of a witness who would contradict Charles Sanders.

When the hearing was eventually unsealed and defense counsel were allowed to "participate," neither the court nor the Government informed the defense of what had gone on behind closed doors.  What had occurred was misrepresented to defense counsel.  There was no reason to keep what had transpired at the hearing secret, since there was no basis for the Government's motion to begin with.  Defense counsel were led down the primrose path, hastily agreeing to an arrangement whereby they would be allowed, under Government supervision, to

interview the informant witnesses.  However, except in one instance, these witnesses refused to speak to the defense.  Having agreed to what the Government presented as a fait accompli, the ability of defense counsel to investigate and impeach these witnesses, and to marshal independent evidence contradicting them, went up in smoke.  Mr. Barrett shows in this motion that with a competent investigation, the credibility of the Government's key witnesses would have been destroyed.

The Government's tactics of secrecy, obfuscation and misdirection, exemplified by what occurred at the *ex parte* hearing, typified the prosecutors' conduct of the entire case.  Mr. Barrett shows in this motion that the Government routinely violated its duties to disclose exculpatory evidence, and also sponsored or knowingly allowed materially false testimony.

Well before the *ex parte* hearing, Mr. Barrett found the sledding rough in his efforts to receive what every criminal defendant in this country is entitled to as a matter of fundamental constitutional right: a fair trial.  Mr. Barrett had to contend not only with prosecutors who were determined to press every fair and unfair advantage at their disposal, but the court as well.

From the inception of the case the court demonstrated concerns with and an interest in matters inconsistent with providing Mr. Barrett competent representation.  Tulsa attorney John Echols successfully represented Mr. Barrett in state court.  He was obviously the best choice to defend Mr. Barrett against the late-coming federal charges.  The court only appointed Mr. Echols as a means of saving money, and rejected the Federal Defenders' recommendations of qualified co-counsel in order to give less-qualified local counsel experience needed to form the basis for a local panel of capital attorneys.  The court's furtherance of these

interests virtually forced Mr. Echols off the case, including by withholding compensation for the budgeting investigation the court required Echols to undertake.

After Mr. Echols threw up his hands in frustration and withdrew from the case, more compliant counsel saw it to its predictable end.  Mr. Barrett demonstrates in this motion that trial counsel, due to a combination of interference from the court and their own unprofessional errors and omissions, rendered ineffective assistance in the guilt/innocence stage of trial.  Counsel failed to consult any experts, or even question the purported "expertise" of Government witnesses whose qualifications and methods the court recognized as lacking.

Trial counsel, in part deceived by the court and Government following *ex parte* communications, failed to seek a continuance to investigate the seven secret informants.  Mr. Barrett shows here that even moderate investigation would have shown these witnesses were unworthy of belief.

Counsel's ineffectiveness, again for the same combination of reasons, continued into the penalty phase.  Because counsel were underfunded and failed to properly prepare, the prosecution was able to portray Mr. Barrett as nothing more than a mean, common criminal from an ordinary, unremarkable background, who had simply decided to embark on the path that led him to the courtroom.  Defense counsel did virtually nothing to counter the prosecution's depiction of their client, putting on a superficial and misleading mitigation case that both played right into the Government's hands and failed utterly to reveal Mr. Barrett's true character, history and background.

Mr. Barrett was and is nothing like the prosecution argued.  A competent mitigation investigation would have shown the truth about him.  Severe mental illness has plagued Mr. Barrett's family for generations.  As shown in this motion, Kenneth Barrett has

struggled with severe organic, psychiatric, psychological and intellectual impairments his whole life.  This evidence would have been relevant not only in the penalty phase, but in the first stage of trial as well.

Far from being a "bad person" who came from an ordinary background and simply chose to walk a twisted road, Kenneth Barrett is the product of a woefully dysfunctional marriage, a union that was rife with alcohol and other substance abuse, mental dysfunction, chaos, emotional and at times physical abuse, and infidelity.  Kenneth Barrett's upbringing was anything but normal.  As he struggled from birth with his genetic inheritance, he was forced to grow up in the maelstrom of chaos and neglect created by his parents.  The psychological and emotional abuse his parents visited on each other as their doomed-from-the-start marriage unraveled was, from the beginning of his life, visited on him.

The numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences.

## II.     Statement of the Case

### 1..     Events Leading to the Offense

#### 1.     The Alleged Offense and the Bench Warrant

In March 1997, Mr. Barrett was charged with unlawful delivery of a controlled substance arising from the alleged sale of $25 of methamphetamine to an undercover agent.  In the court proceedings for this case, Attorney Bill Ed Rogers represented Mr. Barrett until September 11, 1998, when Mr. Rogers filed a motion to withdraw from the case.  The court docket reflects that Mr. Barrett asked the Court for an appointed attorney on December 14, 1998; however, there is no indication that the court appointed an attorney for him. There was no other activity in the case until January 19, 1999, when the docket stated that "subp's issued."

Def's § 2255 Mot.                    8                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

On January 28, 1999, a bench warrant was issued for Mr. Barrett for "failing to appear for jury trial" on January 27, 1999. Mr. Barrett's bail bondsmen, Martin Daggs, testified that he eventually became aware of the bench warrant but never saw a need to notify Mr. Barrett about the warrant. Mr. Daggs stated that he knew where Mr. Barrett lived and he could find him if he wanted to.

### 2.    The Search Warrant

Eight months after the issuance of the bench warrant, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force) prepared an affidavit for a search warrant for Mr. Barrett's residence.  The affidavit asserted that a confidential informant had seen Mr. Barrett sell drugs on one occasion between September 15 and 18, 1999; that he had seen Mr. Barrett engage in other drug transactions at his house; that he had overheard Mr. Barrett say "'if the cops try to raid me they will regret it because I'm going to kill the first cop through the door'"; that Mr. Barrett had guns in his house; and that Mr. Barrett sold drugs at night because he believed search warrants could not be served at night.  (At trial the confidential informant was identified as Charles "Monk" Sanders.  Sanders testified and on cross-examination denied having seen, heard, done, and said the specific things attributed to him in Johnson's affidavit.)

On September 20, 1999, a District Court Clerk signed the requested search warrant which authorized law enforcement officers to conduct the search at any time of the day or night and to enter Mr. Barrett's residence without the normally required knocking and announcing their presence.  Inexplicably, there did not appear to have been any discussion about simply paying a visit to Mr. Barrett, despite the fact that law enforcement had visited Mr. Barrett in the recent past and even inspected his weapons without any violence.

In any event, Johnson considered the search warrant to be "high risk" in nature and contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. Johnson met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force would then perform the actual search of Barrett's residence. The Tact Team decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.

### 3.     September 24, 1999

Until late in the night of September 23 and after midnight on the September 24, Mr. Barrett and his son Toby had worked in their garage on a Camaro Mr. Barrett had promised to Toby if he returned to high school.  After they finished up around 12:30 A.M., Toby cleaned up the garage and was walking to his trailer.  At that time, the five Tact Team vehicles headed towards Mr. Barrett's residence.  What happened next was the subject of conflicting accounts by the law enforcement officers involved.

The lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Mr. Barrett's residence.  The driver, Trooper John "Buddy" Hamilton, observed Toby as he entered the private driveway to the east of Barrett's residence, but continued with the execution of the no-knock warrant.  Hamilton then turned his vehicle westward towards Mr. Barrett's house and entered a deep ditch that lay between Mr. Barrett's cabin and the property to the east, and drove straight towards the house.

Toby screamed, "Dad," as the unmarked Bronco continued toward the porch.

Mr. Barrett was eating a bowl of cereal when he heard Toby yell.  He went to the doorway and saw the high-beam bright headlights coming towards his cabin from the ditch on the side of his house.  Mr. Barrett ran inside, grabbed a gun and shoved it in his waistband and went to the window.  As Mr. Barrett approached the window, he was shot in the lower portion of his body.  Mr. Barrett  grabbed his Colt Sporter rifle, which was loaded with two full and one partially full magazine of ammunition, and started firing out the doorway.

The lead Bronco hit the porch of the cabin.  As it had been approaching, the second and third vehicles entered the property.  They stopped slightly behind Hamilton's vehicle.  Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Mr. Barrett's house, and yelled at Toby to get on the ground.  Trooper Darst eventually took custody of Toby Barrett and determined he was unarmed.

The shooting lasted less than thirty seconds.  At some point, Hamilton's passenger, Trooper David "Rocky" Eales, opened the front passenger door, got out of the vehicle, and began moving towards the rear of the vehicle. Before he arrived at the rear of the vehicle, Trooper Eales was struck by three bullets or bullet fragments.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle. Hamilton then moved towards the rear of his vehicle. As he did so, he was shot in the back of the left shoulder. When he reached the back of the vehicle, Hamilton observed Eales face down on the ground, with Trooper Ricky Manion attempting to assist him.

At some point in the melee, Manion shot Mr. Barrett in the lower body. Hamilton approached and entered the house, told Mr. Barrett to get up, and Mr. Barrett responded that he could not because he had been shot. Hamilton, with the assistance of Troopers Manion and Steve Hash, dragged Mr. Barrett out of the house and into the front yard and beat him. Mr. Barrett had been shot four times.

After unsuccessfully attempting to provide first aid to Trooper Eales, Tact Team members transported him to a local hospital, where he was pronounced dead. A search of Mr. Barrett's property, including his house and outbuildings, failed to yield methamphetamine. The government seized items that it contended were related to the production and use of methamphetamine, including coffee filters, pseudoephedrine, ephedrine tablets, red phosphorus, and iodine.

**B.    Three Trials**

**1.    State Trials**

Mr. Barrett was tried in Oklahoma State court, twice, as set out more fully in the Procedural History. The state court jury rejected the first-degree murder charge and instead found Mr. Barrett guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Mr. Barrett guilty of the lesser-included offense of assault and battery with a dangerous weapon.  The jury acquitted Mr. Barrett on the two counts of discharge of a firearm with intent to kill.  Mr. Barrett did not appeal his convictions or sentences.

**2.    Federal Trial**

Mr. Barrett's federal trial was markedly different from his state trials. In the first phase, most notably different was the testimony of seven informants, who did not testify in either

of the state trials. The identity of these snitches was not made known to the defense until days before the trial was about to start. These snitches came forward with statements that Mr. Barrett allegedly made about "going down in a blaze of glory" and the like.

At the sentencing phase of Mr. Barrett's trial, the government presented testimony with respect to victim impact and future dangerousness. In the category of future dangerousness, the government presented the following witnesses:

1.    Stanley Philpot, a Sequoyah County reserve deputy sheriff, who testified about an incident in which he stopped Mr. Barrett in his truck and informed him of the outstanding felony warrant for his arrest. Stanley followed Mr. Barrett home, at which time Mr. Barrett allegedly stood on the porch holding a gun. Stanley called for back up but neither Mr. Barrett nor the gun could be found.

2.    Johnny Philpot, former Sequoyah County Sheriff, who testified that he was called as back up for the above incident.

3.    Cindy Crawford, who testified that Mr. Barrett allegedly held a gun to her leg because she refused to sleep with him and said that he would "fucking kill her" if she came back to his place.

4.    Charles "Monk" Sanders, who testified that he overheard Mr. Barrett on the phone in jail while they were both incarcerated. Sanders said he heard Mr. Barrett say that they needed to find the person who got him arrested so they could "kill that son of a bitch."

5.      Larry Lane, a Sequoyah County Sheriff's Deputy, who stated that Mr.

Barrett ran a police check point and he pursued him until he ran off the

road and ran away on foot.

6.      Shannon Smith, a former Sequoyah County Sheriff's Deputy, who was

present at the checkpoint. Smith testified that Mr. Barrett pulled off so fast

that two police officers had to jump out of the way. Smith also testified

that on a different occasion he saw Mr. Barrett slapping his wife. Smith

said that he told Mr. Barrett to stop and Mr. Barrett allegedly told Smith

"he was going to get his gun and kill him."

With respect to victim impact, the government presented the following witnesses:

1.      William DeWeese, Rocky Eales' best friend from the Marine Corps, who

testified that Trooper Eales was an outstanding person, an outstanding

marine and like a brother to him.

2.      Nancy Eales Stalcup, Rocky Eales' sister, who testified that Trooper Eales

was a wonderful person and a wonderful brother. Ms. Stalcup stated that

Trooper Eales' death had a deteriorating effect on her health for which she

had to receive medical care.

3.      Bobbie Eales, Rocky Eales' mother, who testified about her son and read a

five-page written statement into the record that described her loss and

pain.

4.      Gene Hise, an Oklahoma State Highway Patrolman and good friend of

Rocky Eales, who testified about informing Kelli Eales of Rocky's death

and his loss and Post-Traumatic Stress Disorder since Trooper Eales' death.

5.    Kelli Eales, Trooper Eales' wife, who testified about her husband's death
and the loss she has suffered. Mrs. Eales also read into the record statements her children had writ
The mitigation stage of the sentencing hearing lasted less than three days.  There
was no testimony regarding Mr. Barrett's mental health.

Mr. Barrett's counsel presented the following witnesses in mitigation:

1.    Maudeen Vann, First Deputy County Clerk, Sequoyah, Oklahoma, who
testified as to the verdict in the state trial, the 30-year sentence Mr. Barrett
received and was serving and the fact that he had no prior felony record.

2.    Kathy Trotter, Mr. Barrett's cousin, who briefly testified that everyone in
the family grew up with guns and used guns. She also testified that she
was a process server and familiar with the legal community and had no
knowledge of Mr. Barrett's involvement in violent activities other than
some instances of domestic violence.

3.    Jimmy Wilson, a case manager at the Oklahoma Department of
Corrections, who testified as to the actual time Mr. Barrett would serve on
his state sentence, the type of facility in which he would serve his
sentence, his restrictions and his possibility of parole.

4.    Abby Stites, Mr. Barrett's former wife, who testified about their troubled
marriage and that it was not all Mr. Barrett's fault; she was equally to
blame

5.    Craig Edgmon, Mr. Barrett's neighbor, who testified that Mr. Barrett was a
good mechanic and worked on his car, truck and farm equipment.

6.     Clyde Edgmon, Mr. Barrett's neighbor and Craig Edgmon's father, who also testified that Mr. Barrett was a good mechanic who charged a fair price and sometimes did work for no charge. Mr. Edgmon also testified that law enforcement (John Owens and Sandy Gerdner) came by his house when Mr. Barrett was working on Mr. Edgmon's truck and talked to Mr. Barrett for some time. This was a very friendly exchange that took place three to six months before the raid.

7.     Robert Gude, a former jailer at the Sequoyah County Jail, who testified about the conditions at the Sequoyah County Jail and Mr. Barrett's behavior at the jail.

8.     Courtney Burke, an assistant administrator at the Sequoyah County Jail, who testified regarding Mr. Barrett's behavior while housed at the jail.

9.     Martin Daggs, a bail bondsman in Sequoyah County who had bonded Mr. Barrett out of jail on the 1997 drug case. Daggs testified that he was aware of the bench warrant but never did anything to make Mr. Barrett aware of the bench warrant because a judgment of forfeiture had never been ordered.

10.    Steve Barrett, Mr. Barrett's brother, who testified superficially about his and Mr. Barrett's childhood.

11.    Roger Crawford, Mr. Barrett's uncle and neighbor, who testified that Mr. Barrett was a good father, a good son, a good neighbor and good mechanic.

12.     Gelene Dotson, Mr. Barrett's mother, who testified superficially about Mr.

Barrett's childhood, his marriage and his adult life.

13.     Ernest Barrett, Mr. Barrett's father, who testified superficially about Mr.

Barrett's youth.

14.     Doris Barrett, Mr. Barrett's stepmother, who testified that Mr. Barrett was

like a son to her.

## III.   Claims for Relief

**Claim 1.      Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments

made elsewhere in this Motion and the exhibits thereto.

Actions of the trial court denied Mr. Barrett a fair trial under conditions required

or routinely provided to similarly situated defendants pursuant to 18 U.S.C. §§ 3005, 3006A, and

3599, the Judicial Conference's Guidelines for implementation of the Criminal Justice Act,

prevailing professional norms of criminal defense practice, and the Fifth, Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution.[1]

_____

[1] As stated *supra* in § I.B, this claim and others presented in this Motion rely upon witness accounts of the trial judge's on- and off-the-record interference with Mr. Barrett's defense. Mr. Barrett respectfully submits that the law requires the trial judge to disqualify himself from ruling on this motion, and from any decisions respecting the process for ruling on this motion. 28 U.S.C. §§ 455(a), (b)(1), (b)(3), (b)(5)(iv); *In re Murchison*, 349 U.S. 133, 136 (1955); *Marchu v. United States*, 926 F.3d 50, 59 (1st Cir. 1991). Mr. Barrett objects to the trial judge making any rulings in respect of this motion.

Judicial interference with defense counsel carrying out their constitutional function as opponents of the Government violates the Sixth Amendment, without a showing of prejudice. *Geders v. United States*, 466 U.S. 648 (1976) (trial court's order prohibiting defense counsel from consulting with defendant during recess between direct and cross-examination); *Herring v. New York*, 422 U.S. 853 (1975) (order barring defense counsel from summing up in bench trial); *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (rule requiring defendant to testify before any other witnesses denied defendant benefit of counsel's advice and guidance); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (denial of counsel at arraignment where defenses had to be raised); *Ferguson v. Georgia*, 365 U.S. 570 (1961) (where state rule made defendant incompetent to give sworn testimony Constitution required that counsel be permitted to guide unsworn statement). While Mr. Barrett need not show prejudice from the court's actions described in this Claim, he can make that showing and does so in Claims 2, 3, 5, and 14, *infra*.

The trial court's stated interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and its communications with counsel created a conflict between the court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense. *Woods v. Georgia*, 450 U.S. 261 (1981).

The evidence presented herein demonstrates that the trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases. The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as "a 'class of one,' . . . intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). *See also*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

The trial judge's conduct towards Mr. Barrett's interests and his counsel violated the Code of Judicial Conduct and was not impartial. "No matter what the evidence against (a defendant), he had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Partiality on the part of a judge in a civil appeal violates due process. *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1985). The Supreme Court has "emphasized the special importance of fair procedure" in death penalty cases, including giving adequate notice to the defense of the judge's plans. *Lankford v. Idaho*, 500 U.S. 110, 125 (1991), quoting and citing, *Gardner v. Florida*, 430 U.S. 349, 357 (1977).

Federal law provides that the court shall consider the recommendations of the Federal Defender when appointing counsel. 18 U.S.C. § 3005. Pursuant to the Judicial Conference's *Guidelines for the Administration of the Criminal Justice Act and Related Statutes* ("CJA Guidelines") the Federal Defender and the court should take into account "the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation." (CJA Guidelines, ¶ 6.01(B)(1)). Courts are encouraged to appoint counsel who "are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation." (CJA Guidelines ¶ 6.01.)

Judge Payne initially expressed a desire to appoint the Federal Defender to represent Mr. Barrett. When the Federal Defender informed Judge Payne that the only attorney in his office qualified to handle a capital case was already appointed to such a case, Judge Payne indicated that he anticipated the assistant federal defender who normally worked in the Eastern District would be responsible. The Federal Defender explained that the attorney was not

qualified and his office could not provide competent representation to two capital defendants at the same time.

Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Decl. Julia O'Connell; Decl. John D. Echols).  Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation.  (Decl. Julia O'Connell).

During discussions with these attorneys, the trial judge expressed an interest in considering factors that are not recognized by the Judicial Conference or national indigent defense organizations as indicative of an attorney's qualifications to provide effective representation.  Judge Payne expressed an interest in appointing less-qualified attorneys to represent Mr. Barrett as a means of giving local attorneys experience so that a local panel could be formed for representation in capital cases.  (Decl. Julia O'Connell; Decl. John D. Echols).  To this end, the trial judge rejected the recommendation of Robert Nigh and appointed Roger Hilfiger, based in part on Mr. Hilfiger's past experience as United States Attorney for the Eastern District of Oklahoma.  *Id.*

The CJA Guidelines provide that courts budgeting federal death penalty cases should ask counsel for the "best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial." (CJA Guidelines, ¶ 6.02F(3)(C)(ii)).  The Judicial Conference's guidelines also provide that these "[c]ase budgets should be submitted *ex parte* and filed and maintained under seal."  *(Id.* at ¶ 6.02(F)).  The trial court in this case required a high degree of specificity, and

threatened to reverse the prior order Judge White entered authorizing *ex parte* submissions if counsel did not disclose "a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case)." Letter from Hon. James H. Payne to John David Echols dated 2/22/05 ("Payne Letter to Echols").

Judge Payne expressed a desire that the case rapidly proceed to trial. (Decl. John Echols). On January 7, 2005, the court admonished Mr. Barrett's attorneys for failing to mention the need for a continuance during a status conference earlier in the day. Doc. 31. The court said, "Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel." *Ibid.*

On January 31, 2005, Mr. Barrett's counsel filed a detailed, 10-page, budget proposal. (Doc. 46.)

Like the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the Judicial Conference's guidelines recognize the importance of prompt authorization of funds so that delay will not result in a denial of effective representation. The CJA Guidelines encourage courts "to employ[] an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity," ¶ 6.02(F)(3), and encourage courts to "act upon requests for services where prompt authorization is necessary for adequate representation." (¶ 6.02(F)(5)). The trial court in this case did not hold such a conference.

On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals. Docs. 50, 51. On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but

not about Mr. Hilfiger's representation. (Payne Letter to Echols). Throughout the letter, Judge Payne expressed concern that Mr. Echols was being paid to represent Mr. Barrett in a third trial, and expressed the view that no further investigation should need to be done after the previous trials. *Ibid.* Mr. Echols responded by letter on February 28, 2005. (Letter from John David Echols to Hon. James H. Payne dated 2/28/05).

As noted *supra*, the statutes and guidelines related to case budgeting in federal death penalty cases state a preference for *ex parte*, sealed proceedings in order to protect defense confidentiality. The trial court in this case expressly considered using Mr. Barrett's budget submissions to aid the prosecution. In his letter to Mr. Echols, Judge Payne stated that lifting the order on *ex parte* budgeting "might actually help resolve this case more expeditiously by allowing the government an earlier opportunity to object to the admissibility [of Mr. Barrett's experts] and perhaps allow the court to rule on the admissibility issues prior to expenditure of funds for experts which might not be allowed to testify at trial." (Payne Letter to Echols at 2). Mr. Echols objected that this proposal would infringe on Mr. Barrett's Sixth Amendment rights, and it was not implemented.

On February 28, 2005, Mr. Echols informed the court that delays in authorization of a budget for any defense preparation was endangering counsel's ability to prepare for trial on the court's schedule. (Echols letter to Payne at 5). The court did not rule on the defense's budget proposal until March 18, 2005. Doc. 97. At that point, discovery was scheduled to close on May 11, 2005, and trial was scheduled to start on July 11, 2005. (Scheduling Order filed 12/11/04 (Doc. 22)).

Richard Burr, an attorney retained by the Office of the Defender Services of the Administrative Office of the United States Courts, served as an advisor to Mr. Barrett's counsel,

John Echols, through the auspices of the Federal Death Penalty Resource Counsel project ("FDPRC"). (Decl. Richard Burr; Decl. John D. Echols).[2] As Mr. Burr stated to the court at the time, the FDPRC collects "data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases." (Decl. Richard Burr re attorney compensation dated 4/4/05 and filed as Exh. B to Doc. 107). Mr. Barrett's counsel relied upon the data collected by the FDPRC in making his funds requests. (Echols letter to Payne).

The trial court's funding decisions were based on the judge's subjective view of what was "'reasonably necessary' to provide fair compensation and to provide the defense with necessary tools for a fair trial." (Order filed 3/18/05 at 2.) However, the court's reasoning in denying specific requests was inconsistent with the Sixth Amendment role of counsel in exercising independent professional judgment and providing an adversarial testing of the prosecution's case. *Polk County v. Dodson*, 454 U.S. 312, 320-22 (1981).

The trial court had before it declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants. (*See* Decl. Richard H. Burr). The trial court's order evidences no consideration of these norms or practice, whether adversarial and judicial. The trial judge's order evidences no consideration for the specific needs of counsel as expressed in their funds requests. The trial judge's limitations on funds were not based on any evidence of or expressed concern for fiscal limitations.

---

[2] Mr. Burr offered his assistance to Roger Hilfiger, but Mr. Hilfiger did not seek any assistance. (Decl. Richard Burr).

As expert counsel advised the court at the time,

in the GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol, VII, "Appointment of Counsel in Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), Courts are encouraged in the course of case budgeting to secure counsel's "best preliminary estimate that can be made of all services," including the services of counsel.

[]      It is clear that the reason the attorney services were not included in the pre-authorization and circuit review provisions of 21 U.S.C. §§ 848(q)(9) and (10)(B) is that attorney services, to be meaningful, must be provided as the professional judgment of the attorney dictates and cannot, therefore, be subject to pre-authorization without significantly interfering with, even paralyzing, the process of representation.

For this reason, the inclusion of attorney services in the case budgeting guidelines of the GUIDE TO JUDICIARY POLICIES AND PROCEDURES is intended, *not* to interject the courts into case management, but to require *counsel* to assess the representation needs of the case in order to give the courts a way of projecting what counsel believes to be reasonable expenditures of time.  If the expenditure of attorney time thereafter begins to depart in substantial ways from these projections, the budgeting of attorney time provides a basis for the court to question the attorney about the necessity of his or her efforts.  This is the way in which the federal courts have uniformly approached the matter of budgeting attorney time in capital cases - with due deference to the exercise of attorney judgment, but with a basis for questioning certain expenditures of time.

(Decl. Richard H. Burr dated 4/4/05, filed as Exh. A to Doc. 107).

Investigation is a core function of defense counsel.  ABA Standards for Criminal Justice, Standard 4-4.1 (requiring "prompt investigation").  The relevant guidelines to administration of the Criminal Justice Act provide that "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services."  The trial court authorized funds for Mr. Barrett's representation on a far more narrow basis.

Indeed, the trial court's funding order went beyond the simple approval or denial or funds.  Mr. Barrett's trial counsel requested funds to investigate and develop evidence for the

defense. (Doc. 51; Echols letter to Payne). The trial court refused to permit trial counsel to expend funds in investigation based on their independent professional judgment. (Order filed 3/18/05 at 2 n.2.) The court stated that it would not approve payment of vouchers for investigative services unless counsel filed "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial." *Ibid.* This threat was contrary to the CJA Guidelines which provide in relevant part: "Courts, in examining the case budget, may reconsider amounts authorized for services prior to the budget's approval; however, *courts shall not rescind prior authorization where work has already been performed.*" (CJA Guidelines, ¶ 6.02(F)(5) [emphasis added]).

The trial judge's conditioning of funds on his subjective evaluation of the significance of the facts counsel sought to investigate barred or chilled investigation into factual matters trial counsel deemed necessary through their exercise of independent professional judgment. If Mr. Barrett had been represented by private counsel or an independent indigent defense office, the investigation of his case would not have been limited to factual issues that had "significance" to the person paying counsel.

As set forth more fully in Claim 3, *infra*, the court reduced the compensation rate of Mr. Barrett's investigator from the private investigator rate of $50.00 per hour to the rate charged by a state-subsidized agency for its salaried investigators. Order filed 5/5/05 at 3 n.1. In the court's initial order reducing the rate, the court did not disclose the state agency's rate as the basis for the reduction. *(See* Order filed 3/18/05 at 2.) This limitation meant that for Mr. Barrett's investigator, compared to his other cases, he lost $20.00 for every hour spent working on Mr. Barrett's case.

Mr. Burr compared this Court's March 18, 2005 order reducing resources for Mr. Barrett's defense with the data collected by the FDPRC.  Mr. Burr informed the trial court:

> The number of hours needed for fact investigation of course varies from case to case.  The number of hours requested here, however, is below the average for federal cases in which the death penalty has been authorized.  The average number of hours approved for fact investigation in authorized cases is closer to 500 hours.  The 100 hours approved by the Court is certainly enough to get a fact investigator started, but since it is far less than counsel has estimated is needed, approving only 100 hours now means that counsel in the near future will likely have to submit another request for approval of additional hours.

(Decl. Richard H. Burr re Non-Attorney Costs, dated 4/4/05, filed as Exh. C to Doc. 107).  The court treated this statement as an "illustration" that Mr. Barrett's counsel "have the attitude that the budget in this matter is unlimited . . . ."  (Order filed 5/5/05 (Doc. 128) at 3 & n.1.)

The trial court did not merely deny funds to Mr. Barrett's defense, it interjected into the funding denial a false impression of the evidence that would be admitted at trial.  The court denied 75 percent of the time and one hundred percent of the in-court assistance trial counsel requested from a ballistics and crime scene reconstruction expert.  (*Compare* Doc. 50 at 7 *with* Order filed 3/18/05 at 3).  At the same time, the court said, "Counsel should be aware that this Court has, [*sic*] never allowed crime scene reconstruction to be introduced in trial."  (Order filed 3/18/05 at 3).  Trial counsel did not consult a crime scene reconstruction expert.  (Tr. 10/3/05 Hr'g at 8).  The court's ruling gave counsel an unwarranted impression of the need to consult with a crime scene reconstruction expert and left counsel with no ability to bring such an expert to court to testify or assist in cross-examination.  Contrary to the impression given by the court's March 18 order, the court permitted the Government to present and place heavy reliance upon crime scene reconstruction evidence.  (*See* R. 3154-3484).

As set forth more fully in Claim 3, *infra*, the trial court denied in full or in majority all Mr. Barrett's requests for expert and investigative services. The court stated no basis for any denial or reduction related to the facts or circumstances of the case. Based on the FDPRC's data regarding other capital cases, the court's ruling against Mr. Barrett was unique. Mr. Burr informed the court at the time that Mr. Barrett's request for a mitigation specialist was "well below average," and "no federal court ha[d] failed to provide expenses for mitigation specialists' work." (Decl. Richard H. Burr dated 4/4/05, Exh. C to Doc. 107). Where this court denied funds for experts to travel as part of their work on Mr. Barrett's defense, Mr Burr found that "[t]ravel expenses - lodging, meals, and transportation - are always provided, as are any other expenses incidental to the expert's ability to provide services." *Id.* Where this court permitted Mr. Barrett's counsel to retain only one mental health expert, regardless of the circumstances, the FDPRC found, the "standard practice in federal capital cases is to provide the services of more than one mental health expert." *Id.*

The trial court paradoxically relied upon the experienced judgment of trial counsel as grounds for denying requests they made based on their considered professional judgment. For example, the court denied counsel's request for a jury consultant on the ground that trial counsel had extensive experience picking juries. (Order filed 3/18/05 at 3.) This ruling was influenced by the trial judge's personal choice of trial counsel. The trial judge personally selected Roger Hilfiger to represent Mr. Barrett against the recommendations of experienced defense counsel. (Decl. Julia O'Connell). The trial judge then relied upon his own subjective view of Mr. Hilfiger's experience, not as a defense lawyer, but as the former United States Attorney as a reason for denying counsel's request for a jury consultant. (Order filed 3/18/05 at 3.) However, as set forth *infra* this ruling did not bind Mr. Hilfiger as it would have bound Mr. Echols.

The trial judge hampered trial counsel's ability to prepare a defense by at first denying, then delaying, authorization for counsel to obtain the prior testimony of prosecution witnesses. (Order filed 3/18/05 at 4.) The court's reasoning is contrary to the purpose of the right to counsel. Where the Supreme Court has held that the purpose of defense counsel is opposing the prosecution, the trial judge initially denied access to the second state trial transcripts on the ground that "the government has indicated they do not need the prior transcripts to try this case. If counsel for the government are able to try this case without prior state court trial transcripts, defense counsel should be able to do the same." *Id.* at 5. Just as the right to cross-examine witnesses depends upon the availability of counsel, so too does the right depend upon the court not denying counsel access to readily available sources of cross-examination. *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

Initially, the court would not permit the second state trial transcripts to be obtained "unless convinced the testimony of said [prior] witness is critical to the issue of the defendant's intent as it relates to the elements of the offenses charged herein." (Order filed 3/18/05 at 6.) The court later rescinded this limitation and permitted counsel to obtain the transcripts they had been seeking since January 2005. *(See* Doc. 23.) Although some transcripts were obtained, the delay caused by the trial judge prevented preparation of transcripts before each witness who testified previously testified in federal court. The delay also impeded or prevented defense counsel's preparation for cross-examination. *See* Claim 2A, *infra*.

The trial court also limited the ability of defense counsel to prepare for and conduct cross-examinations by denying access to transcripts of witnesses' testimony in earlier federal hearings. (Order filed 3/18/05 at 6.) This ruling was especially arbitrary and unfair in that the court could have provided Mr. Barrett's counsel these transcripts without making it part

of the budget. The Criminal Justice Act specifically provides that court reporters may be paid separately for preparing transcripts in cases of indigency.

Congress, the Judicial Conference, and every professional association concerned with criminal defense practice have expressed the view that cases involving the death penalty require higher degrees of skill and greater preparation than other criminal cases. The trial judge in this case compared the budget for Mr. Barrett's case only to unidentified budgets in non-capital criminal cases. *(See generally* Orders filed 3/18/05 and 5/5/05.)

The court's rejection of Mr. Echols's proposed budget was part of a pattern of interference with, or indifference to, Mr. Barrett's legal representation. As stated *supra*, the trial judge initially wanted to appoint two local attorneys to represent Mr. Barrett so that the capital experience of the local bar would be increased. (Decl. Julia O'Connell). In his letter to Mr. Echols in February 2005, Judge Payne indicated he had appointed Mr. Echols, at least in part, because Echols and the Public Defender left him with the understanding that "there would be a substantial savings in the amount of time that would be required for [Echols] to represent the defendant." (Payne letter to Echols).

As stated *supra*, the trial court required Mr. Echols, as lead counsel, to submit very detailed and specific budget requests. On April 1, 2005, the Magistrate Judge recommended denying Mr. Echols any compensation for time spent preparing those budgets. The CJA Guidelines specifically provide that time spent on case budgeting in *capital* cases is compensable. Mr. Burr submitted a declaration to the Court regarding the extraordinary nature of the ruling against Mr. Echols's voucher:

> In every federal capital case with which the members of our project are familiar - which is virtually all such cases since the inception of the Federal Death Penalty Resource Counsel project in 1992 - defense counsel have been compensated for

their work in seeking funding for the services of defense investigators and experts. We know of no other case in which the court has refused to compensate counsel for such work. The reason for this is that, in seeking funding for these services, counsel is required to plan the defense investigation and litigation, determine the specific need for investigation and expert assistance, identify appropriate, competent investigators and experts, and contact a number of investigators and experts to discuss the merits of the case and the need for their services and to determine whether those investigators and experts are actually appropriate and available. All of these efforts are in direct service to the client. Unlike the preparation of defense counsel's CJA 30 vouchers, through which counsel is compensated - and for which courts usually do not compensate counsel, the work of counsel in seeking finds [*sic*] for investigation and expert assistance is of no financial benefit to counsel. Its sole purpose if [*sic*] to assist the client in his or her defense.

(Decl. Richard H. Burr re Compensation for Budgeting, dated 4/14/05, filed as Exh. to Doc. 118). The trial court denied Mr. Echols compensation, because lawyers in the Eastern District in *non-capital* cases were not compensated for budgeting. (Order filed 5/5/05 at 4.)

Mr. Echols's budget submissions were based in part on advice and data regarding other federal death penalty cases that Mr. Echols received from Federal Death Penalty Resource Counsel. Only Mr. Echols sought the advice of these experts; Mr. Hilfiger did not. (Decl. Richard Burr; Decl. John D. Echols). Although compensation for consultation with expert counsel is specifically authorized by the Criminal Justice Act and 18 U.S.C. § 3599(f), the Magistrate Judge recommended denying payment for Mr. Echols's consultations, and Judge Payne upheld this ruling. (Order filed 5/5/05.)

On April 4 and 6, 2005, Mr. Echols filed motions seeking reconsideration of the March 18 budget order and April 1 report and recommendation regarding vouchers. These filings sought a budget conference as provided in the CJA Guidelines and included four declarations from Federal Death Penalty Resource Counsel, Richard Burr, some of which are

quoted herein, regarding the CJA Guidelines and statements that the restrictions imposed by the court were unique in all the previously litigated federal death penalty cases.

On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett citing five circumstances that prevented him from providing effective representation: (1) the trial was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment.  Doc. 113.  Mr. Hilfiger had urged Mr. Echols not to file the motion. (Decl Richard Burr; Decl. John D. Echols).  However, during a hearing on the motion, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order.  (Decl. John D. Echols).

Mr. Echols stated as one ground for his motion to withdraw:  "The relationship between the undersigned and co-counsel, Roger Hilfiger, is cordial, but we have not been able to work effectively together, and virtually all of the work performed on pleadings, budgeting and other issues has been performed by Mr. Echols."  (Doc. 113 at ¶ 4.)  In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work.  (Order filed 5/5/05 at 5.)  The court instead focused on Mr. Hilfiger being "more familiar with practice before this Court than Mr. Echols."  *Ibid.*

In granting Mr. Echols's motion to withdraw the court expressed displeasure with the amount of information Mr. Echols provided in his budget submissions.  (Order filed 5/5/05 at 2-3.)  The court permitted Mr. Echols to withdraw in part because his budget proposals had not "'set forth separately and with specificity the time each of the appointed attorneys anticipates

Def's § 2255 Mot.                               31                         *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

spending' on each of several categories." *Ibid.* (quoting Order filed 1/29/05 (Doc. 38)).  The record shows Mr. Echols filed lengthy budget requests describing the specific needs of the defense and, most, but not all the time, describing with particularity the experts he sought to hire and the work they would perform.  (Docs. 50, 51.)  Mr. Echols also sent Judge Payne a six page single-spaced letter detailing the amounts he and others were paid for Mr. Barrett's defense in state court, and what matters were not completely investigated there.

Judge Payne did not hold Mr. Hilfiger to the same standards as Mr. Echols. During the trial the court became concerned that Mr. Hilfiger and Mr. Smith would exceed the budget authorized on March 18, 2005.  (Tr. 10/3/05 Hr'g.)  In that event, Judge Payne said, "I think the safest thing to do maybe on the attorney's fees for October would be for y'all to analyze that and get me an amended budget just to -- I mean, just make your best guestimate."  (Tr. 10/3/05 Hr'g at 8.)

In his letter to Mr. Echols, Judge Payne expressed his concern that Mr. Echols not be unduly compensated for work if his prior representation of Mr. Barrett made further labors unnecessary.  The court had limited Mr. Echols's rate of compensation to $125.00 per hour.  On May 17, 2005, the day Mr. Hilfiger was made lead counsel, Judge Payne raised his compensation rate to $150.00 per hour.  (Tr. 10/3/05 Hr'g at 3.)

The concerns Mr. Echols expressed in his motion to withdraw about the lack of work Mr. Hilfiger committed to the case proved to be well-founded, although the court was again unconcerned.  On May 23, 2005, Mr. Barrett filed a motion seeking appointment of new counsel based, in part, on the assertion that the case loads of appointed counsel interfered with their ability to devote sufficient time to his defense.  (Doc. 135.)  Mr. Barrett's counsel did not file a response to the motion.  There was no hearing on the motion.

On May 24, 2005, the court denied Mr. Barrett's motion to replace counsel.  Doc. 137.  The denial was based in part on the "finding" that "[c]ounsel has a copy of the first state court trial transcript . . . ."  (Order filed 5/24/05 (Doc. 137) at 2 n.2.)  The denial was based in part on the court's belief that appointed counsel "will have adequate time to prepare for this particular case." *Id.* at 2.  Subsequent events suggest there was no basis for these two statements in the May 24 order.

On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date. Doc. 138.  Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such material needs to be reviewed to determine its value for defensive purposes, in this new action." (Doc. 138 at 1.)  Mr. Hilfiger was not specific about when he received the materials, but the evidence indicates it was between May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion.  Regardless of the specific date, the record reveals no basis for the court's statement that Hilfiger possessed the record on May 24, and shows that whatever Mr. Hilfiger "possessed" on that date, he had not reviewed it during the six months that had elapsed since his appointment in November 2004.

Mr. Hilfiger's statement about not having reviewed the records from the state-court proceedings, including discovery and transcripts, indicates that he had not made a sufficient inquiry into the facts of the case to support the position he took on the budget during the May 5, 2005, hearing.  On May 17, 2005, the court directed Mr. Hilfiger to file by May 27, 2005, any supplemental budget request he deemed necessary.  (Tr. 10/3/05 Hr'g at 3.)  Assuming the trial court had learned on or before May 17, 2005, that Mr. Hilfiger had not become familiar with the

previous litigation over the previous six months, it was unreasonable for the court to give Mr. Hilfiger only 10 days to request supplemental resources.

In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the files and records related to the case. (Doc. 50 at 4; Echols letter to Payne at 1 n.1.)  On March 18, 2005, the court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to complete these tasks. (Doc. 97 at 2.)  In any event, it was impossible for Mr. Hilfiger to have completed these tasks between May 17 and May 27, and Mr. Hilfiger did not file an amended budget.

As noted *supra*, in January, when Mr. Echols was lead counsel, the court chastised Mr. Barrett's defense for failing to devote sufficient attention to the case that it could stay on schedule. (Doc. 31.)  The court admonished counsel to give the case the "highest priority." *Ibid.*  In May, when Mr. Hilfiger acknowledged that he had not reviewed the records from the prior state court proceedings, and after Mr. Echols and the lawyers' vouchers revealed the paucity of Mr. Hilfiger's work on the case, the trial court expressed no concern about Mr. Hilfiger's priorities, and simply granted the continuance. (Tr. 6/6/05 Hr'g; Doc. 142.)  In September, Mr. Smith revealed that Mr. Hilfiger had not assembled the files and records related to the mitigation investigation that had been done in state court. (Tr. 9/9/05 Hr'g at 43.)  Again, the court was not concerned with new counsel's priorities.

Mr. Hilfiger himself had informed Mr. Echols and the court that it would take him as second-chair 300 hours to prepare for trial, *not* including court hearings, legal research and preparation of pleadings and briefs. (Doc. 51 at 4.)  On October 3, 2005, with the trial underway, Mr. Hilfiger informed the court that he had worked approximately 300 hours on the case,

*including* legal research and writing and preparation for and in all court proceedings.  (Tr. 10/3/05 Hr'g at 5.)  Whereas the court had expressed a great deal of skepticism about Mr. Echols's requests for compensable hours, Mr. Hilfiger's statements prompted no expressions of concern.

In other respects, the record does not support the inference that Judge Payne's treatment of Mr. Echols was based either on fiscal concerns or concern for Mr. Barrett's representation.  The trial court denied Mr. Echols's request for a jury consultant on the ground that, "Each of defense counsel come before this Court with combined practical experiences on in excess of sixty years in selecting criminal juries, including Mr. Hilfiger's experiences as United States Attorney for the Eastern District of Oklahoma."  (Doc. 97 at 3.)  If counsel's allegedly vast experience supported their professional judgment in selecting the jury, as the court conjectured, there was no reason for the court to reject the same professionals' judgment that they required the assistance of a jury consultant.

As noted already, after he was elevated to lead counsel, Mr. Hilfiger filed no supplemental budget request.  On September 9, 2005, Mr. Hilfiger informed the court that he would be relying upon a private jury consultant.  (Tr. 9/9/05 Hr'g at 10.)  Mr. Hilfiger casually stated, "I'll assume Angie Cole will be coming in with us the next two weeks.  She's going to set at the counsel table with us during the selection."  *Ibid.*  The court recognized Ms. Cole's name and identified her as a jury consultant.  *Ibid.*  Despite the earlier denial of funds based on Mr. Hilfiger's particular experience, and the fact that the court was paying Mr. Hilfiger more than it had paid Mr. Echols, Judge Payne expressed no concern or objection to Mr. Hilfiger's unauthorized retention of an expert for two weeks of trial.  *Ibid.*  If Mr. Hilfiger had been able to obtain a jury consultant without funds from the court, he did not inform Mr. Echols of the fact.

Def's § 2255 Mot.                                35                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

In summary, Judge Payne had only reluctantly appointed John Echols to represent Mr. Barrett, and then based in significant part, at least, on the belief that Mr. Echols would be able to try the case cheaply and quickly. Judge Payne personally chose Roger Hilfiger to represent Mr. Barrett for reasons that had nothing to do with the circumstances of Mr. Barrett's case, but for the purpose of using Mr. Barrett to develop a local capital defense panel. During Mr. Echols's tenure, Judge Payne imposed requirements and restrictions on budgeting and investigation that experts concluded were unheard of in federal death penalty trials, and that intruded upon the constitutionally protected independence of counsel. At one point, Judge Payne threatened to use counsel's budget proposals as a mechanism for finding defense experts' testimony inadmissible at trial. When Mr. Echols left the case due to these restrictions, and Mr. Hilfiger sought no additional resources, Judge Payne's conduct towards defense counsel changed. Judge Payne permitted Mr. Hilfiger to show a lack of diligence and inattention to budget matters. Under these conditions, Mr. Barrett did not receive independent, reasonably funded, reasonably prepared, representation.

The trial judge also violated Mr. Barrett's right to due process, and the Code of Judicial Conduct, by conducting *ex parte* communications with the prosecutors. During an *ex parte* hearing held September 13, 2005, the judge solicited the views of the United States Attorney regarding such matters as (a) when the trial started for purposes of 18 U.S.C. § 3432, (b) whether the defense should be entitled to a continuance based on delayed disclosure of witnesses, and (c) whether the disclosures posed a problem under Rule 404(b) of the Federal Rules of Evidence. (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 22-23.) Although the hearing was held for the purpose of disclosing information supposedly related to dangers to witnesses, the trial court

solicited the prosecutor's views on these other matters which did not involve discussion of any information that could not be disclosed to the defense.

Also during the *ex parte* portion of the hearing Assistant United States Attorney Michael Littlefield revealed that he knew the identity of a witness who failed to corroborate statements by informant, Charles Sanders.  (Tr. 9/13/05 Hr'g at 14, 17.)

The court's conduct during the *ex parte* portion of the September 9, 2005 proceedings, and its conduct in relation to those proceedings thereafter, violated Rule 2.9 of Canon 2 of the Code of Judicial Conduct.

After the *ex parte* portion of the hearing, and at the beginning of the hearing with defense counsel present, the court did not disclose the discussion regarding the meaning of § 3432, the discussion of the continuance, AUSA Littlefield's revelation about a witness, or the discussion of Rule 404(b).  (Tr. 9/13/05 Hr'g at 25-27.)  During the *ex parte* conversation, the judge revealed to the prosecutors that he had researched the § 3432 issue and found support for the proposition that the trial had started the previous day.  (Tr. 9/13/05 Hr'g at 4-5.)  The court permitted the prosecutor to represent, outside the presence of the defense, that the Government "and defense counsel have been operating under the inference that the trial begins on or after the 26th [of September]."  *Id.* at 7.

Once defense counsel was present, the judge did not reveal the findings of his research in relation to § 3432, though they were potentially helpful to the defense.  The court made no effort to confirm the prosecutor's representations, or familiarize itself with the defense attorneys' views on § 3432.

During the *ex parte* conference, the judge said the following regarding a possible continuance:

> Well, I – of course, the notice of who the witnesses are – the term ambush you are familiar with and I guess what concerns me is when these names are revealed with three days [*sic*] notice that we are going to have a request for a continuance.  It would be difficult – if they are as important to the government's case as you say they may be, it looks like we are setting this case up for a long continuance.

(Tr. 9/13/05 Hr'g at 12.)  Then the prosecutors conferred off the record.  (At the conclusion of the *ex parte* conference the court said he would see the prosecutors "down stairs" indicating the conference occurred in chambers.)  During the hearing with defense counsel present, the judge did not share his views regarding possible ambush and defense potentially needing a long continuance.

The trial judge's statements showed the court was aware that the seven informant witnesses were very important to the Government's case.  Nevertheless, during the portion of the hearing with defense counsel present, and in subsequent related proceedings on September 14, 2005, the court did not bring up the female witness who failed to corroborate confidential informant Charles "Monk" Sanders, either to ask whether the witness had been identified to the defense or to notify the defense that the court had been informed of the existence of a witness who could impeach Sanders.

The judge misrepresented the content of the *ex parte* conference to defense counsel.  When the *ex parte* hearing concluded the judge and prosecutor were discussing Rule 404(b), with the court saying "there is 404(b) material obviously in the proposed motion, it appears to me."  (Tr. 9/13/05 Hr'g at 22.)  The prosecutor agreed "[i]t appears to be implicit." *Ibid.*  Then the prosecutor offered a rationale for not "provid[ing] reasonable notice in advance of trial," (Fed. R. Evid. 404(b)), and the judge said he would "take this matter under advisement" before calling the conference to an end.  *Id.* at 23.

At the beginning of the hearing with defense counsel present, the judge did not reveal these discussions. The prosecutor sought guidance from the court regarding "where we were when we stopped" the *ex parte* conference. (Tr. 9/13/05 Hr'g at 26.) The court said they had been discussing "security issues." *Ibid.* The court said, "it sounded like there had been some discussion with defense counsel. And that's about as much as the Court knows." *Ibid.* The transcript shows the court drastically understated the true scope of the *ex parte* communications. Once they were thus misstated, the prosecutor said, "I'm willing for the matter to be unsealed." *Ibid.* Mr. Barrett's trial counsel were entitled to rely upon the court's representations. The combination of the court's omissions and the prosecutor's sudden willingness for the hearing to be unsealed suggested to defense counsel the transcript need not be requested or reviewed.[3]

During the *ex parte* portion of the hearing, the judge made statements suggesting skepticism about the Government's position. The court specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger. *Id.* at 20. The court did not inform the defense that the government had failed to produce evidence of an actual danger to its witnesses. Without disclosing the weakness of the Government's position, the court permitted defense counsel to agree (a) to further delays in learning the identities and contact information for the witnesses, and (b) to be limited in its access to Government witnesses to the extent that they would only be interviewed in the presence of Government representatives. *(Id.* at 27.)

The court had another opportunity to inform defense counsel of what transpired during the September 9 *ex parte* hearing. On September 14, 2005, after jury selection

---

[3] Of course, whether it was unsealed during the trial was irrelevant insofar as Judge Payne had denied counsel any funds for obtaining pretrial hearing transcripts. (Doc. 97.)

proceedings ended, the court raised the issue of the unidentified witnesses. The United States

Attorney informed the court that the Government and Mr. Barrett's counsel had reached an

agreement that the witnesses' names, contact information, criminal histories and (allegedly)

promises made to them would be revealed the following Monday. (R. 840.) The United States

Attorney further advised the court that the defense would, possibly, have access to some of the

witnesses at the prosecutor's office. (R. 841.) Mr. Hilfiger stated that he had no objection to the

arrangement, "based on what we talked about yesterday." *Ibid.* The court then stated that this

would make a "clear record" and the parties' "announcement . . . resolves everything that is

under seal." (R. 843.)

It is a violation of due process for the Government to attempt to restrict defense

access to witnesses, for example, by telling the witnesses they should only agree to defense

interviews if the Government is present. *See Gregory v. United States*, 369 F.2d 185 (D.C. Cir.

1966), *cert. denied*, 396 U.S. 865 (1969). It is unprofessional conduct for a prosecutor to

condition a witness's interview with defense counsel on the prosecutor being present. (ABA

Standard 3-3.1(c) (commentary)). The trial court permitted defense counsel for Mr. Barrett to

agree to such restrictions (Tr. 9/13/05 Hr'g at 27; R. 841-42), without revealing to the defense the

weaknesses in the Government's motion for a protective order that the court had freely discussed

with the prosecutors.

The trial judge's withholding of his views about a continuance was particularly

prejudicial. Mr. Hilfiger has consistently and repeatedly stated that he agreed to the delays and

other restrictions on his access to information about the witnesses because he believed Judge

Payne would not grant a continuance of the trial. (Decl. Mark Henricksen). Judge Payne's

views, as freely expressed to the prosecutors, would have given Mr. Hilfiger a completely

different view of the situation.  If Judge Payne had revealed his research regarding § 3432, the issue would not have been reviewed for plain error on appeal.  If Judge Payne had revealed his views on a continuance, Mr. Hilfiger likely would have requested one, and again the matter would have been reviewed differently on appeal.  If Judge Payne had revealed his views on the weakness of the Government's motion for a protective order, Mr. Hilfiger would have had further grounds for a continuance and grounds for objecting to restrictions the Government placed on access to witnesses.  Mr. Hilfiger also would have had grounds for a continuance if Judge Payne had revealed that Mr. Littlefield knew the identity of an impeachment witness who had not been disclosed in discovery, as the court's earlier orders required.

The trial judge's conduct in soliciting *ex parte* the prosecutor's views on the court's private concerns while at the same time failing to accurately disclose those communications to the defense violated Mr. Barrett's right to due process of law.  The disparate conduct of the court between the prosecution and defense is evidence of bias.  In a capital case, courts may not consider information the defense has no opportunity to hear or explain.

For the foregoing reasons, the trial judge should recuse himself from this case.  Thereafter, this Court should grant the relief sought herein.

To the extent the matters raised in this Claim could have been raised on direct appeal, appellate counsel were ineffective.  As stated *supra*, Judge Payne specifically selected Mr. Hilfiger for this case, and Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter.  Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal.  To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in this Claim could not be adequately litigated on appeal, because they required consideration of extra-record evidence. (Decl. Mark Henricksen). To the extent, Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work. (ABA Guidelines, *supra*, Guideline 10.15.1.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal. (Decl. Mark Henricksen). However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal. *Id.* Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards. At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised herein had been raised on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 2.     Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. § 3006A and the Sixth Amendment to the United States Constitution**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

This claim is governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. The acts and omissions described herein fell

below prevailing professional norms of capital defense practice.  Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Barrett would not have been convicted of the charged offenses, or that he would have received a sentence less than death.

### A. Unreasonable Acts and Omissions Affecting the First and Second Stages of Trial

The judgments of conviction and the sentence imposed on Mr. Barrett were obtained in violation of his Sixth Amendment right to effective assistance of counsel.  As set forth in Claim 1, *supra*, the trial court interfered with the constitutionally protected independence of trial counsel.  Numerous acts and omissions of Mr. Barrett's appointed counsel fell below the standards set forth in prevailing professional norms.  *See generally, Rompilla v. Beard,* 545 U.S. 374 (2005)(result of second stage trial held unreliable due to counsel's failure to investigate prosecution evidence and provide material to relevant experts); *Wiggins v. Smith,* 539 U.S. 510 (2003)(result of second stage trial held unreliable due to failure of defense counsel to conduct thorough independent investigation for defense evidence); *Williams v. Taylor,* 529 U.S. 362 (2000)(result of second stage trial held unreliable due to defense counsel's failure to obtain documentary and testimonial evidence favorable to defense); *Kimmelman v. Morrison,* 477 U.S. 365 (1986)(deficient performance in first stage found where defense counsel failed to seek discovery and file appropriate motions); *Strickland v. Washington,* 466 U.S. 668 (1984)(test for violation of Sixth Amendment in both stages of capital trial is (a) whether counsel's conduct fell below prevailing professional norms; (b) whether there was a reasonable probability of more favorable result).

The trial court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, *see* Claim 1, *supra*, created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense. *See Wood v. Georgia,* 450 U.S. 261 (1981). This conflict adversely affected counsel's performance in that they failed to obtain the services of numerous experts, failed to devote time to preparing for and conducting the trial that counsel himself had considered necessary prior to the court's rulings, and failed to use other resources as expected under prevailing professional norms. *See generally, Mickens v. Taylor,* 535 U.S. 162 (2002); *Cuyler v. Sullivan,* 446 U.S. 335 (1980); *Holloway v. Arkansas,* 435 U.S. 475 (1978). *See also* Claim 3, *infra.*

The facts supporting this claim include the following, as well as others to be developed following further investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing.

### Overview of First-Stage Ineffective Assistance

Multiple acts and omissions of trial counsel fell below prevailing professional norms of capital defense practice, and, either individually or in combination with each other, undermine confidence in the guilty verdicts returned by the jury. These include:

1.    Trial counsel failed to professionally re-urge the motion to suppress the fruits of the search of Mr. Barrett's residence and property based on *Franks v. Delaware,* 438 U.S. 154, 156 (1978), after it was discovered, during the cross-examination of Charles "Monk" Sanders, that he was the confidential informant who provided the alleged probable cause for the no-knock warrant. Sanders testified on cross-examination that he did not provide District 27

Drug Task Force agent Clint Johnson the information which formed the basis for probable cause. In fact, based on Sanders's testimony on cross-examination in the first stage of trial, any information he could allegedly provide did not support the averments made by Johnson in the affidavit for the search warrant. To the extent the issue was developed on the trial record, direct appeal counsel was ineffective for failing to raise the *Franks* issue.

2.    Trial counsel failed to professionally and properly investigate and develop evidence showing that Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms. This evidence (a) would have supported one or more defense theory instructions, (b) would have supported instructions on lesser-included offenses, and (c) would have effectively countered the Government's arguments on intent in both stages of trial.

3.    Trial counsel unreasonably failed to investigate Mr. Barrett's history of bipolar disorder and treatment with psychotropic medications, and the affects of Mr. Barrett not taking prescribed medications during trial. Consequently, Mr. Barrett was tried while incompetent, and was denied his right to a contemporaneous determination of competence.

4.    By acceding to an eleventh hour arrangement to "interview" the informant witnesses during trial, and by failing to move for a continuance, trial counsel was not able to effectively investigate and challenge the testimony of these witnesses. In any event, no professionally reasonable investigation into the backgrounds of these witnesses and their testimony was undertaken in whatever little time was available. Had a continuance been secured, and a professionally reasonable investigation been otherwise undertaken, the credibility of these witnesses and their testimony could have been effectively attacked.

5.     Trial counsel was professionally unreasonable in failing to develop and introduce independent expert testimony to challenge the crime scene reconstruction testimony of Iris Dalley.

6.     Trial counsel was professionally unreasonable for failing to hire an independent expert on SWAT tactics, instead of relying on a hostile, pro-prosecution witness who could do the defense case little, if any good.

7.     Counsel was professionally unreasonable for failing to utilize the transcripts from the second state trial to impeach the police witnesses.  Counsel was also ineffective for eliciting damaging hearsay testimony from Clint Johnson, and failing to correct this error with facts that would expose Johnson's answers as false.

8.     Trial counsel unprofessionally failed to develop available evidence and testimony that would have impeached the testimony of Government witnesses and the government's theory that because of the lighting on the police vehicles, Mr. Barrett "knew" that law enforcement, rather than civilian trespassers, had entered his property at the time he fired his weapon.

9.     Trial counsel unprofessionally failed to develop available evidence to counteract the Government's claim that Mr. Barrett knew he had an active warrant for his arrest on a state drug charge, rather than just a pending case.  This evidence would have undermined the Government's theory that Mr. Barrett was hiding from the law because he "knew" he had an active warrant, and was lying in wait for the police.  Likewise, trial counsel was professionally unreasonable for failing to develop available evidence that Mr. Barrett had been reluctant to leave his property for several years preceding his state drug case.  This would have countered the Government's argument that Mr. Barrett "holed up" on his property because he "knew" he had

an active warrant, and was making "preparations" to meet any police presence with force. Similarly, trial counsel unprofessionally failed to develop and present available evidence that Sequoyah County Sheriff John Philpot had been to Mr. Barrett's property a mere four weeks or so before the raid, and inspected Mr. Barrett's weapons without incident.  This evidence would have supported the motion to suppress and shown that a no-knock warrant and an armed raid on Mr. Barrett's property in the middle of the night by numerous law enforcement officers was completely unnecessary and unfounded.  Additionally, this evidence could have been used to effectively impeach Government witnesses and the Government's theory of the case.

10.    Trial counsel was professionally unreasonable for failing to object to the expert witness testimony of Jim Horn, which the court struck *sua sponte* because it did not meet the standards for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150-51 (1999).  To the extent this issue was framed by the record, direct appeal counsel was ineffective for failing to raise it.

11.    Trial counsel was professionally unreasonable in failing to object to certain matters that were raised on direct appeal, but were reviewed under the onerous plain error standard due to trial counsel's failure to object.

12.    Trial counsel unreasonably failed to seek appropriate jury instructions at both stages of trial including instructions on the theory of the defense, lesser included offenses, the questionably reliability of testimony from drug addicts and informants, and residual doubts about the manner in which the shooting occurred.  If these instructions had been given, there is a reasonable probability the jury would have understood how to reach more favorable verdicts.

13.     Trial counsel was professionally unreasonable for failing to object to prosecutorial misconduct in closing arguments in both stages of trial.

**Evidence of Constitutionally Deficient Representation**

**1.     Failure to professionally re-urge the motion to suppress under *Franks v. Delaware,* 438 U.S. 154 (1978).**

Trial counsel was professionally unreasonable for failing to adequately re-urge the motion to suppress under *Franks v. Delaware, supra* following the first stage testimony of Charles "Monk" Sanders.  Counsel's failure in this regard undermines confidence in the jury's first stage verdicts.  Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a no-knock warrant were false, or were made in reckless disregard for the truth, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression.  The failure to competently argue the *Franks* motion obviously undermines confidence in the outcome of the first stage of trial.  Because the search warrant was defective under *Franks,* the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned guilty verdicts.

The information used to secure the no-knock search warrant in this case was based on information supplied to Clint Johnson, the affiant on the warrant, by an alleged confidential informant (C.I.)  The C.I. did not testify at Mr. Barrett's two state trials.  At the conclusion of the second state trial, Clint Johnson wrote the alleged informant's name on a piece of paper, and placed it in an envelope, which was sealed in the state court file.  (Tr. 1/ 26/05 Hr'g. at 88-89).  It was only when Sanders testified in the first stage of Mr. Barrett's federal trial that it was

revealed, for the first time, that Sanders was the alleged informant who supplied the information

providing probable cause.  (R. 2521).

In pertinent part, the affidavit for the no-knock, nighttime search warrant state the

following:

> On September 18, 1999 this affiant was contacted by a confidential informant (CI) who advised that, within the past seventy-two (72) hours, they were in the above-described residence and observed a male that is known to the CI as Kenny Barrett present a quantity of white powder substance and represent it as being "methamphetamine."

> The CI went on to state that while in the above described residence they observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money.  The CI stated that they had been in the above-described residence on previous occasions and observed Kenny Barrett make "drug transactions."  The CI further stated that while in the above-described residence they overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."

> The C.I. also stated that while in the residence they [*sic*] observed several pistols lying around the residence and also Kenny Barrett had a pistol on his person.

> This affiant is familiar with Kenny Barrett due to a pending investigation for the past six (6) months and is familiar that [sic] Kenny Barrett has an outstanding felony arrest warrant out of Sequoyah County, Oklahoma for failure to appear for a jury trial and unlawful delivery of CDS case number CF-97-86.

> This affiant has learned from the CI that Kenny Barrett is maintaining his "drug transactions" in the night time hours due to the cover of darkness and that law enforcement personnel are less frequent [sic] at night.

> The CI further stated that Kenny Barrett, due to Kenny Barrett's belief that law enforcement personnel cannot execute search warrants during the night, sell's [sic] controlled dangerous substances at nighttime and keeps large quantities of meth-amphetamine in his residence at nighttime in order to be undetected by law enforcement personnel.

> This affiant asks that this search warrant be directed for day or night service due to the facts stated herein.

> This affiant received information from the informant on at least five (5) occasions. Each time that this informant has provided information, the information proved to be true and accurate and resulted in the confiscation of illegal substances.

Affidavit for search warrant signed by Clint Johnson and warrant signed by Sequoyah County Judge Dennis Sprouse on September 20, 1999.

On cross-examination in Mr. Barrett's federal trial, Sanders largely disavowed the information that was contained in the search warrant affidavit, and which allegedly supplied probable cause for the no-knock search. Sanders's testimony on cross-examination demonstrates that the search warrant affidavit was knowingly based on false information, or that this "information" was supplied to the Sequoyah County District Court with reckless disregard for the truth. Without the false information allegedly supplied by Sanders, there was clearly insufficient evidence to establish probable cause, let alone probable cause for a no-knock warrant. In contrast to the representations made in the search warrant affidavit, Sanders testified to the following on cross-examination:

1.    That he never saw Mr. Barrett manufacture methamphetamine on his property, or attempt to do so, and that he never told Clint Johnson anything to indicate that Mr. Barrett was manufacturing or attempting to manufacture methamphetamine (R. 2596-97, 2609);

2.    That when he first met with Johnson after having been to Mr. Barrett's residence in July, 1999, he gave Johnson no information regarding drugs on Mr. Barrett's property. He did not see any drugs on Mr. Barrett's property, and did not even do drugs with him on any occasion he was supposedly at Mr. Barrett's residence in July, 1999 (R. 2597-98);

3.    In September, 1999[4], Sanders, at Johnson's direction, allegedly went to Mr. Barrett's residence to exchange a set of car keys. Based on when Sanders alleged this trip occurred, it was just days before the raid in the early morning hours of September 24, 1999. A "day or two" after being at Mr. Barrett's, Sanders testified he was not asked by Clint Johnson whether he saw any drug activity at Mr. Barrett's on September 19 or 20. Sanders testified that if Johnson had asked him about drug activity at Mr. Barrett's on September 19 or September 20, he "probably" would have told him that he saw no drug activity. Sanders then testified, "I didn't see him doing nothing." (R. 2608-2610);

4(a).    After allegedly being at Mr. Barrett's in mid-September, 1999, Sanders testified that Johnson directed him to again go back to Mr. Barrett's property. Sanders testified that he told Johnson what he observed on this supposed trip to Mr. Barrett's. According to Sanders, the pretext for going to Mr. Barrett's on this last occasion was to ask Mr. Barrett about the title to an automobile. Sanders claimed to have been accompanied by his nephew. Sanders thought that either he or his nephew asked Mr. Barrett if he had any drugs available. Mr. Barrett apparently had no methamphetamine. The only drugs supposedly seen by Sanders was a joint of marijuana, which he, his nephew, and Mr. Barrett smoked in Mr. Barrett's cabin. (R. 2618-22);

4(b).    Sanders allegedly reported to Clint Johnson in the last meeting that he had seen guns at Mr. Barrett's. He had also reported to Johnson seeing firearms at Mr. Barrett's residence when he allegedly visited in August, 1999. To the extent Johnson in his affidavit presented this information as a new development to justify altering the existing bench warrant to

---

[4] Sanders placed the date of this alleged trip to Mr. Barrett's cabin as September 19 or 20, 1999. The state search warrant was issued on September 20, 1999. Of course, the precise dates of Sanders's alleged trips to Mr. Barrett's property are unclear. *E.g.,* R. 2518-21, 2609.

a no-knock warrant, Johnson mislead the court.  Authorities had long been aware that like many

rural dwellers, Mr. Barrett had firearms on his property.  In any event, the search warrant

affidavit was directed at drug activity only, not the possession of weapons.  (R. 2623);

   5.  Sanders's gave conflicting accounts of alleged visits to Mr. Barrett's shack

which, together, show he did not observe any drug transactions there.  On direct examination,

Sanders testified that in August 1999 he went to Mr. Barrett's home with a person identified only

as "Ronny," and saw Mr. Barrett hand something to "Ronny."  Sanders testified that the alleged

trip was for the purpose of buying drugs.  At the close of cross-examination, defense counsel

walked Sanders through the information Sanders had given to Clint Johnson, according to

Sanders's testimony on cross-examination.  Sanders agreed that when he was supposedly at Mr.

Barrett's in July 1999 (a) he did not see any drugs, (b) did not see any manufacturing or

attempted manufacturing of methamphetamine, and (c) did not do any drugs with Mr. Barrett.

Therefore, Sanders testified, based on his alleged July trips to Mr. Barrett's property, Sanders

told Johnson *nothing* about Mr. Barrett engaging in drug activities.  Sanders also testified that

when he supposedly went to Mr. Barrett's place in August 1999, with his sister and "Ronny," he

saw no drugs, and told Johnson he saw no drugs or any evidence of drug manufacturing.  Sanders

admitted he did not go into Mr. Barrett's house with "Ronny" (he waited in the car), and never

testified he saw Mr. Barrett go outside.  How he saw any alleged drug transaction is therefore a

mystery.  (R. 2599-2601, 2625-28).

   Sanders agreed with defense counsel that he saw no drug manufacturing or other

drug activity at Mr. Barrett's in September 1999, other than smoking a "joint" on what he

claimed was his last trip to the property before the raid.  Aside from smoking a joint with Mr.

Barrett on this occasion, the only drug activity he witnessed or participated in at Mr. Barrett's

residence was when he and Movant, who was also a methamphetamine user, shot methamphetamine together.  (R. 2625-28).

Sanders's cross-examination testimony also belied Johnson's claims (a) that Sanders informed him that Mr. Barrett conducted drug transactions at night because there were fewer police around, and (b) that Mr. Barrett kept a "large quantity" of drugs in his house at night because he believed the police could not conduct a nighttime search.  Of course, no "large

quantity" of drugs were found when Mr. Barrett's residence and property were searched by the authorities.

After Sanders was cross-examined, AUSA Littlefield asked to take a "bathroom break."  (R. 2630).  The real purpose of the break was for Littlefield to talk to Sanders about his testimony.  Sanders admitted Littlefield talked to him during the break.  At first, he denied anything was discussed except how much longer he would be on the stand.  In the next breath, he then admitted that Littlefield "may have" asked him whether he was confused about dates. Sanders did not "think" Littlefied asked him about the substance of his testimony on cross-examination.  (R. 2239-40, 2642).

After speaking to Sanders during the break, Littlefield sought to repair the damage inflicted by Sanders's remarkably inconsistent testimony by having Sanders contradict, within a matter of a few minutes of the cross-examination having ended, certain aspects of the testimony he gave when questioned by defense counsel.  Sanders's abrupt about-face on re-direct alone demonstrates that this is a witness who cannot be believed about anything, and demonstrates that he was anything but the "reliable" confidential informant Clint Johnson claimed him to be in the search warrant affidavit.

On re-direct, and in contrast to his testimony on cross-examination, Sanders stated that when he went to exchange car keys at Mr. Barrett's residence three to four days before Trooper Eales's was killed, Mr. Barrett sold drugs to Geniece Thomas.[5]  He also claimed he went to Mr. Barrett's residence with Thomas on more than two occasions to buy drugs.  He also claimed that he saw drug activity practically every time he supposedly went to Mr. Barrett's property, and that he would have reported any such drug activity to his alleged "handler," Clint Johnson.  Changing up his testimony from cross-examination, Sanders then claimed that on his last alleged trip to Mr. Barrett's, he saw a substance in Mr. Barrett's cabin that he believed to be methamphetamine.  Again in contrast to his testimony on cross-examination, Sanders claimed he may have even been at Mr. Barrett's after the last supposed trip he testified about on cross, and that he could not remember how many times, during the summer of 1999 and into September 1999, he had been to Mr. Barrett's property.  (R. 2531-38).

On re-cross, Sanders contradicted himself in the same breath about whether he shot methamphetamine daily, gave conflicting answers as to whether there was a drug transaction at Mr. Barrett's when he supposedly went there with Geniece Thomas the first time, and again contradicted his testimony on cross-examination by stating that when he allegedly went to Mr. Barrett's with his nephew, he saw methamphetamine in addition to marijuana.  (R. 2642-48).

After Sanders testified, defense counsel re-urged the motion to suppress, but did so in a manner that did not comport with prevailing professional norms.  (R. 2677-80).  Defense

---

[5]  "Geniece" is the way Ms. Thomas's name is spelled in the transcript.  Her name is actually Janesse Thomas.  What she has to say about Mr. Sanders's account of their alleged trips to buy drugs at Mr. Barrett's residence is addressed in the portion of this claim relating to counsel's failure to investigate and effectively impeach the informant witnesses.  (*See also* Decl. Janesse Thomas.)

counsel argued orally that the motion to suppress was being re-urged because, based on Sanders's testimony on cross-examination, the warrant was based on "faulty" information. Clint Johnson, who had been questioned about the search warrant affidavit during the hearing on the motion to suppress, related certain information contained in the affidavit that Sanders specifically denied giving. Specifically, page 2 of the search warrant affidavit stated that the C.I. (Sanders) had advised Johnson within the last 72 hours he had been at Mr. Barrett's residence and observed Mr. Barrett present a quantity of white powder, which Mr. Barrett represented was methamphetamine. On cross-examination, Sanders stated there had been no discussion about what Sanders thought was methamphetamine in Mr. Barrett's kitchen. According to Sanders's testimony on cross-examination, there had been no representation that this substance was methamphetamine, and no presentation of the white powder to Sanders. The search warrant affidavit went on to state that the C.I. (Sanders) observed Mr. Barrett divide and exchange a portion of white powder for a quantity of money. Sanders testified on cross-examination that this did not happen. Defense counsel pointed out they were confronted with all this by the answers Sanders gave on cross-examination; there had been no opportunity to interview Sanders before he testified.

AUSA Littlefield responded that Clint Johnson had testified at the hearing on the motion to suppress, had testified under oath what he had been told by the C.I., and what facts had formed the basis for the search warrant affidavit. (R. 2679.)

The court instructed defense counsel to put the motion in writing, and for the Government to respond in writing. The court stated that it would either hold a hearing, if such was deemed necessary, or would rule on the pleadings. (R. 2679.) As pointed out by the Government in its response to the renewed suppression motion:

> The entire basis of defendant's Motion to Reurge the Motion to Suppressarises from "testimony" of Charles Sanders which was elicited on cross-examination. Specifically, Barrett relies upon the statement attributed to Sanders in the affidavit that he assumed a powder to be methamphetamine. Sanders purportedly testified that he did not advise Clint Johnson that Barrett represented such powder as methamphetamine to him purportedly denied telling Clint Johnson that he had observed Barrett divide and exchange a portion of white powder for quantity of money. [sic]  Barrett's Motion to Reurge ignores substantial portions of Sanders' testimony on direct and redirect examination.

(Doc.  231 at 1).

The court ruled on the renewed motion to suppress by written order, without conducting an evidentiary hearing.  (Doc. 253.)  In its ruling, the court noted that in the original motion to suppress, there was no *Franks* allegation, a rather irrelevant observation because the basis for the *Franks* claim occurred during trial.  Rather, it had been alleged that the C.I. did not really exist.  The court summarized at length aspects of Sanders's testimony, and concluded that, in light of the testimony of Johnson and Sanders, *as well as other witnesses to activities at Mr. Barrett's residence*, there was "absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful."  Because Johnson accepted as true what he was told by Sanders, and because Johnson had found Sanders to have given reliable information in the past, "the affidavit was properly supported."  Based on the totality of the testimony, it was concluded that Mr. Barrett had "not even established that the information provided in 1999 by the informant was untruthful or unreliable."  Thus, the court concluded, facts recited in the affidavit "could not have been made with deliberate or reckless disregard for the truth."  Doc. 253 at 7.

Had defense counsel forcefully and properly re-urged the motion to suppress based on *Franks v. Delaware, supra,* the motion by all rights should and would have been

sustained. Moreover, as shown below, the court's order is seriously flawed. Trial counsel urged only one (or at best two) grounds in support of the renewed motion to suppress based on *Franks*. These revolved around Sanders's assumption that a powder he observed at Mr. Barrett's residence was methamphetamine; Sanders's testimony on cross-examination that Mr. Barrett did not represent the powder to be methamphetamine; and the fact Sanders did not tell Johnson he saw Mr. Barrett divide and exchange a portion of the white powder for money.

The one or two areas of impeachment cited by the defense simply scratched the surface. Based solely on the cross-examination of Sanders (as well as other factors that could have been used to impeach Sanders, but were not, as is discussed in another subpart of this claim for relief and Claim 5, *infra*), the defense could have argued much more, and would have been entitled to an evidentiary hearing and suppression of the evidence. Aside from what was stated in the re-urged, counsel could have argued the following:

(1) that Sanders had never seen drug manufacturing or attempted drug manufacturing at Mr. Barrett's residence at any time, which conflicted with the averment in the affidavit that Mr. Barrett kept a "large quantity" of drugs at this house;

(2) that Sanders witnessed no drug activities of any kind on Mr. Barrett's property in July 1999, which also conflicts with Johnson's claims that Sanders said Mr. Barrett kept a large quantity of drugs and engaged in repeated drug sales at night;

(3) that Johnson was recklessly indifferent to the truth in that he did not ask Sanders whether he observed drug activity at Mr. Barrett's residence in mid-September 1999 when he supposedly was there with his girlfriend Ms. Thomas to exchange a set of car keys; if Johnson had asked, Sanders would have contradicted the affidavit because he

"probably" would have told Johnson he witnessed no drug activity, because "I didn't see him doing nothing";

(4) that Johnson knew Sanders had not reliably brought back evidence of methamphetamine activity as shown by Sanders's testimony that after Johnson told him to go back to Mr. Barrett's in September 1999 – after Sanders had supposedly been there just a short time before – Sanders or his "nephew" asked if Mr. Barrett had any drugs

available, but there was no methamphetamine, and the three of them simply smoked marijuana;

(5) that Sanders further testified to Johnson's indifference when, summarizing what he supposedly knew, Sanders repeated he witnessed no drug activity at Mr. Barrett's in July 1999, and told Johnson nothing about any drug activity at Mr. Barrett's during that month;

(6) that, consistent with the court's order, there was no drug activity witnessed in August, 1999; and that, other than smoking a joint with Mr. Barrett and his "nephew," Sanders witnessed no drug activity at Mr. Barrett's in September, 1999.

Again, Sanders's claim that he had seen guns in Mr. Barrett's residence provided no probable cause for a drug search warrant, which is what Johnson secured. Nor did Sanders's claim that Mr. Barrett had threatened law enforcement provide probable cause for a drug search warrant.

Counsel also unreasonably failed to argue evidence of Johnson's reckless disregard for the truth. Sanders testified he was in regular contact with Johnson and continued to use drugs steadily. Sanders acknowledged in his testimony that his drug use seriously impaired

his ability to recall and relate information accurately. Sanders testified that Johnson, in effect, made a point of not asking Sanders about his own drug use or, on occasion, what he saw or failed to see at Mr. Barrett's residence. This demonstrated Johnson could not rely reasonably on Sanders for anything. Counsel also unreasonably failed to argue that Sanders would radically change his testimony depending simply on which lawyer was asking him questions. Johnson surely would have seen the same tendency in Sanders to say whatever pleased the authority figure asking him questions. Based on his supposed repeated and close contact with Sanders, Johnson had to be well aware of this fact.

In sum, Sanders not only disavowed the statements Clint Johnson attributed to him, Sanders repeatedly asserted that Johnson *had not asked* about Sanders's own drug use – which would impair his perceptions and his truthfulness – or what Sanders supposedly observed. This testimony would have shown that Johnson made material false statements in the affidavit for search warrant both about the informant's alleged observations and Johnson's own grounds for trusting the informant. These false statements negate *the entirety of the warrant affidavit*. At a minimum, it is clear, based on Sanders's testimony on cross-examination, that Johnson recklessly disregarded the truth in reciting the "facts" supporting "probable cause" for the search warrant. *United States v. Deleon,* 979 F.2d 761 (9th Cir. 1992); *United States v. Calisto,* 838 F.2d 711 (3rd Cir. 1988); *United States v. Pritchard,* 745 F.2d 1112 (7th Cir. 1984)(*Franks* violations established, including instances of affiant reporting information informants never supplied).

In its order denying the renewed motion to suppress, the court did not recite all the facts bearing on the use of false statements by Johnson, or Johnson's reckless disregard for the truth. Had these matters been urged, there is a reasonable probability that the outcome of the

renewed suppression motion would have been different. At a minimum, had all the evidence from Sanders's cross-examination been marshaled, the defense surely would have been entitled to the evidentiary hearing under *Franks* that was denied when the court simply ruled on the pleadings. *United States v. Johns,* 851 F.2d 1311 (9th Cir. 1988), *cert. denied,* 505 U.S. 1226 (1992).

In its order, the court seemed to rely on the testimony of other informant witnesses to buttress the credibility of Sanders and Johnson. Not only could counsel, had they conducted a reasonable investigation (or had the time to conduct a reasonable investigation), have impeached many of these other witnesses (see below), the court could not properly rely on years-after-the-fact testimony to find that the search warrant affidavit, founded solely on information from Charles "Monk" Sanders, was based on the truth, rather than outright fabrication or a reckless disregard of the truth.

### Ineffective Assistance of Appellate Counsel

The question of the As set forth *supra*, the *Franks* issue, and counsel's failure to effectively argue it, was at least partially framed by the record.[6] The issue was not raised on direct appeal. Because the issue was obviously meritorious, even with the record that was made, there could be no reasonable strategic basis for omitting it. The failure to raise this issue was professionally unreasonable. Because it was shown above that the *Franks* issue, in conjunction with a claim of ineffective assistance of trial counsel for failing to competently argue it, would have made a difference in the outcome of the appeal, Mr. Barrett was prejudiced. Had the issue

---

[6] *Brady* evidence suppressed by the Government, and/or newly discovered evidence, places the *Franks* issue in a much stronger light than even existed on the trial record. This is addressed in a separate claim for relief.

been raised, there is a reasonable probability that the outcome of the appeal would have been

different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Eagle v. Linahan,* 279 F.3d 1283, 1301-06, 1308

(11th Cir. 2002)(counsel ineffective on appeal for failing to raise error apparent on the record);

*Carter v. Bowersox,* 265 F.3d 705, 709-10, 716 (8th Cir. 2001)(direct appeal counsel ineffective

for failing to raise issue apparent on the record, even though not preserved or adequately

preserved, under plain error standard).   While an action under 28 U.S.C. section 2255 is not

intended as a second direct appeal, and issues framed by the trial record and which could been,

but were not, raised on direct appeal, are ordinarily considered procedurally barred *United States*

*v. Warner,* 23 F.3d 287, 291 (10th Cir. 1994), cause for excusing waiver exists where appellate

counsel provides ineffective assistance.  *Murray v. Carrier,* 477 U.S. 478 (1986).

> **2.   Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense**

The Government's theory of the case was that Mr. Barrett anticipated a police

raid, prepared for it, and intended to use deadly force if the police came to his property.  The

prosecution argued that when Mr. Barrett began firing his weapon, he was well aware that the

police, rather than trespassers, had arrived.  This argument was highly relevant to count 3 of the

superseding indictment, which charged that Mr. Barrett intentionally killed a state law

enforcement officer in the performance of his official duties.  (Doc. 52.)  This is the count of

conviction for which Mr. Barrett received the death penalty.  (Docs. 258, 285.)

In the first stage of trial, the jury was instructed that among the essential elements

of the offense charged in count 3 was that Mr. Barrett intentionally killed the victim, knowing or

having reason to know that the victim was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties. (Doc. 240; R. 4262-64, 4266-67.)

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting. In addition to these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate. Rather than the intentional and remorseless killer one who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals. The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case as to both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise the risk assessment she had done in preparation for a second stage proceeding in state court. Due to counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to

be the antithesis of the Government's picture.[7]  Professional norms of criminal practice,

particularly in capital cases, tell attorneys that they should secure expert assistance.  Counsel's

failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues,

in light of the defense arguments made at trial respecting how the shooting occurred, constitute

deficient performance.  *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510

(2003).

The results of an accurate and reliable mental health evaluation demonstrate that

trial counsel's failings were prejudicial.  George W. Woods, Jr., M.D., a Board Certified

psychiatrist who specializes in psychiatry and neuropsychiatry, performed a clinical and forensic

evaluation of Mr. Barrett in February 2009, and concluded to a reasonable degree of medical

certainty, *inter alia*, Mr. Barrett's mental functioning was impaired at the time of the offense by

psychiatric illness and significant brain damage, which prevented him from knowing or

deliberating on the nature of his responses to the police incursion before he acted.  Dr. Woods

concluded that at the time of charged offenses, Mr. Barrett suffered from several major brain

disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in

the areas that are necessary to exercise judgment and reasoning.  Among the most significant

functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent

annihilation coupled with an inability to understand or regulate his reactions – including

overreactions – to perceived threats.  Thus, when the events unfolded at the time of the offense,

---

[7] Claims 1 and 3 show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

Mr. Barrett could not and did not know right from wrong, and acted with the distorted perception that his response was necessary to keep intruders from killing him.  (Decl. of George Woods.)

Dr. Woods's evaluation was based on reliable information that was reasonably available to trial counsel through timely investigation.  This information included social and medical history documents, as well as witness accounts, which documented Mr. Barrett's personal as well as family history of mental illness.  The data Dr. Woods relied on, and which was available to trial counsel, also included a neuropsychological evaluation performed by Dr. Myla Young.

Dr. Young has a wealth of experience, has published in peer reviewed journals, and has lectured and instructed other professionals in her field on a frequent basis.  (Appendix to decl. of Myla Young, curriculum vitae.)  She administered sixteen hours of neuropsychological testing to Mr. Barrett over a period of three days, and reviewed his relevant educational, medical and mental health records.  (Decl. of Myla Young at 7-24.)

Dr. Young's testing determined that Mr. Barrett has significant brain damage and resulting brain dysfunction.  This damage primarily involves the prefrontal and temporal cortices of the brain.  Proper functioning of these areas of the brain is necessary "for the brain to effectively communicate information and function effectively."  The severity of Mr. Barrett's brain dysfunction has a negative impact on each and every aspect of Mr. Barrett's daily functioning.

Most especially, Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment."  (Decl. of Myla Young at 24.)  Mr. Barrett's disabilities are further exacerbated under "conditions of complexity and/or

highly stressful situations." (Decl. of Myla Young at 24.) Mr. Barrett is a "concrete thinker,"

whose executive function, which controls the ability to think, organize, problem solve, and

change actions based on the information he receives, is severely compromised. (Decl. of Myla

Young at 11, 13.) Because of the significant impairments to Mr. Barrett's temporal cortex, he

has difficulty processing visual information and is abnormally subject to feelings of fear and

paranoia, with consequent tendencies to impulsiveness and aggressive outbursts. (Decl. of Myla

Young at 13.) Mr. Barrett's ability to actively process and comprehend information, including

visual information, in the "here and now," or as it unfolds, is severely compromised. (Decl. of

Myla Young at 14, 15, 19.) In lay terms, Mr. Barrett acts or reacts before he is able to accurately

perceive and process what is going on around him, a dysfunction that is especially heightened, as

noted, in stressful situations. (Decl. of Myla Young at 14, 24.) Mr. Barrett has moderate to

significant impairments in his ability to visually scan and accurately recognize information.

(Decl. of Myla Young at 20.) The "fluency" with which Mr. Barrett interprets visual

information, and the manner in which he processes such information, is also significantly

impaired. (Decl. of Myla Young at 21, 23.)

As Dr. Woods explained, the accuracy and reliability of Dr. Young's

neuropsychological tests results are medically unassailable:

> [N]europsychological testing offers a reliable method for the delineation of
> cognitive strengths and weaknesses. The clinical batteries administered by Dr.
> Young included methods for validating findings of deficits within individual test
> protocols and across the battery of tests. When administered across a broad variety
> of testing instruments, congruent results further confirm the accuracy and
> reliability of test results. The successful manipulation of test data to exaggerate
> measures of neurological impairment in a manner that eluded detection by
> imbedded validity scales would have required Mr. Barrett to have specific
> knowledge and mastery of neuroanatomy and test construction.

Based on his consideration of these and other psychiatric data, Dr. Woods

concluded:

[¶]    Mr. Barrett meets diagnostic criteria in the DSM-IV-TR? for Bipolar
Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic,
severe, 309.81.  He also has clinically measured diffuse brain damage, particularly
in the prefrontal, temporal, and limbic system cortices, with the most cognitively
significant impairment located in the orbitofrontal and dorsolateral regions of the
prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive
functioning and behavior that is severely compromised by overlapping symptoms
of depression and mania – diagnostic of Bipolar and secondary to PTSD – and
impairments in higher cortical regions necessary for inhibition, reasoning and
judgment.

[¶]    Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be
categorized on Axis III. "Executive functioning" is a term addressed by many but
coalesced by Lezak to discriminate cognitive functions from the "how" or
"whether" of human behaviors (Lezak 1983).

***

[¶]    Ample anecdotal and congruent documentary evidence confirm that Mr.
Barrett's mental disorders and defects pre-existed the date of the commitment
offense and his trial.

(Decl. George W. Woods, Jr., M.D. at ¶¶ 66-68.)

The concurrent findings of Dr. Young and Dr. Woods show that,

[¶]    Mr. Barrett's functioning at the time of the offense was compromised by
multiple neurological and neuropsychiatric symptoms . . . .

* * *

[¶]    He was suffering from both acute and chronic symptoms of his Post
Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these
disorders, both disorders of mood, were amplified by a disinhibited, disjunctured,
debilitated brain that limited Mr. Barrett's understanding of both the legal
proceedings and the fear, suspicion, racing thoughts, and poor adaptive function
from which he was suffering.

[¶]    Mr. Barrett's chronic PTSD became acutely activated by the event leading
to his arrest. As previously noted, Mr. Barrett had multiple individual stressors
which qualified for a stressor that was life threatening. Over the course of his life,

he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]    He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]    Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregultion primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]    Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of

emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]    Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]    Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]    Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer. It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]    My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment. The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Decl. George W. Woods, Jr., M.D. at ¶¶ 69-78.)

Mr. Barrett's trial counsel were ineffective for failing to utilize whatever resources they had to discover these facts about their client's organic brain impairments. Prevailing professional norms called upon trial counsel to investigate their client's medical history prior to trial so that counsel could make informed decisions about what strategies to pursue. They were certainly on notice that Mr. Barrett had mental problems, based on existing mental health records from Eastern State Hospital, Sequoyah Memorial Hospital, Wagoner Community Hospital, and the Bill Willis mental health facility in Sallisaw, as well as the preliminary results of the mental health investigation conducted by predecessor counsel in the state court proceedings. Yet trial counsel did not retain an expert prior to trial who could advise them regarding mental state defenses that would be available at either stage.

If counsel had undertaken reasonable steps to investigate, prepare and present evidence regarding Mr. Barrett's severe organic deficits, the first stage defense of lack of intent, the argument that Mr. Barrett was unaware that the police were on his property, and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably. Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even

if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile.  At a minimum, this evidence would have been critical in contesting the intent element of count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The exculpatory nature of expert testimony regarding Mr. Barrett's numerous and severe psychiatric, psychological and organic impairments could have been buttressed by reasonably available testimony from lay witnesses about Mr. Barrett's mental state.  In addition to providing contemporaneous, real world accounts of Mr. Barrett's impaired mental functioning, the testimony of such witnesses would have confirmed that Mr. Barrett's disabilities pre-dated the charged offenses and thus clearly impaired his mental state at the time in question.  Family witnesses interviewed in connection with the current proceedings describe an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened.  (See, e.g., Decls. of Abby Stites, Toby Barrett, Sylvia Gelene Dotson, Mark Dotson, Ruth Harris, Kathy Trotter, Ernest Barrett, Steve Barrett, Ada Blount, Nona Reich, and Carolyn Joseph.)  None of these witnesses, if they were interviewed at all by trial counsel, was questioned about Mr. Barrett's mental state, either with respect to the first or the second stage of trial.

The accurate picture of Mr. Barrett and his mental state, and how it bore on his intent, was further evidenced by reasonably available records of Mr. Barrett's previous hospitalizations, which counsel could have obtained, but unreasonably failed to do so. In 1986, Mr. Barrett was at Eastern State Hospital in Vinita after shooting himself in a suicide attempt. Among other things, he was diagnosed with bipolar disorder. In 1995, he was again hospitalized because he was "losing [his] mind." On this occasion, Mr. Barrett was diagnosed with an acute psychotic reaction. Mr. Barrett had also received mental health treatment, as noted, at Wagoner Community Hospital and the Bill Willis facility in Sallisaw. *(See* Eastern State Hospital Records, Wagoner Community Hospital records, and Bill Willis Mental Health Center records.) As discussed in detail in Mr. Barrett's claim that he was denied effective assistance of counsel in the penalty phase of trial, his family history, on both his mother's and father's side, is replete with serious mental illness, suicide and suicide attempts. (Decl. of George Woods.)

Not only would all of this evidence have been critical in attacking the intent element of count 3, it also would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to count 3.[8]

Tenth Circuit Pattern Instruction 2.54 outlines the elements of voluntary manslaughter under 18 U.S.C. section 1112(a), para. 2. Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion. Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life. Heat of

---

[8] As argued in Claim 9, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force. *United States v. Scafe*, 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides*, 820 F.2d 1232, 1242 (10th Cir. 1987).

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether. E.g., *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975); *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985)("a defendant in a federal murder case who has sufficiently raised a heat of passion defense [is] entitled to instructions informing the jury of the theory of defense and the Government's duty to prove beyond a reasonable doubt the absence of a heat of passion in order to obtain a murder conviction."); *United States v. Serawop*, 410 F.3d 656. 660-70 (10th Cir. 2005)(citing Lofton's holding that in order to establish malice, the prosecution must prove the absence of a heat of passion beyond a reasonable doubt when it is an issue in the case).

Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

In sum, trial counsel, had they acted, or been permitted to act, in a manner consistent with prevailing professional norms, would have investigated and presented evidence from Toby Barrett and Alvin Hahn that corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other

indications that the vehicle heading toward his house and young son contained law enforcement officers. Trial counsel also would have investigated Mr. Barrett's background and medical history and, through consultation with appropriate experts, found extensive evidence of organic brain dysfunction, bipolar disorder and PTSD. Had this evidence been produced, there is a reasonable probability that the outcome of the first stage of trial would have been different. This evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to count 3, and would have supported either outright acquittal or a finding that, at most, Mr. Barrett was guilty of was voluntary manslaughter.

3.      **Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent**

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, compulsory process, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, a trial free of materially false and misleading evidence, to confront and cross examine witnesses, and to a jury trial as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, by virtue of trial counsel's prejudicial failure wholly or adequately to investigate Mr. Barrett's mental state and functioning before and during trial, and further failure to invoke adequate procedures, and obtain the assistance of experts, necessary evidence and/or any other reasonable and constitutionally requisite means by which to evaluate, assess and diagnose Mr. Barrett's

underlying mental diseases and defects, and accurately and reliably determine his mental competency to stand trial.

As a corollary to a defendant's due process right not to be tried or sentenced while he is mentally incompetent (see, e.g., *Medina v. California*, 505 U.S. 437, 453, 112 S.Ct. 2572 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173, 95 S.Ct. 896 (1975); *Pate v. Robinson*, 383 U.S. 375, 386, 86 S.Ct. 836 (1966)), "judges must depend to some extent on counsel to bring [competence] issues into focus." (*Drope v. Missouri*, 420 U.S. 162, 176-77 (1975).) Whenever information that is made known to the trial court raises a doubt that a defendant is mentally competent to stand trial, the minimal guarantees of federal and state due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough and reliable mental health evaluation. *(Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997).) Defense counsel are therefore constitutionally obligated to vindicate this rudimentary trial right by bringing evidence suggesting incompetence to the attention of the court. (Id.; Bouchillon v. Collins, 907 F.2d 589, 595 (5th Cir. 1990).)

Trial counsel failed to investigate Mr. Barrett's mental health as it related to competency, to guilt-innocence phase defenses, and to punishment phase mitigation, and they failed to raise and preserve numerous legal issues involved, all to his prejudice. Counsel unreasonably failed wholly or adequately to complete the investigation of Mr. Barrett's social history and background, and failed to consult with qualified mental health experts, including a neuropsychologist, despite the existence of readily available evidence of which counsel were or should have been aware including, but not limited to Mr. Barrett's history of psychiatric diagnoses and treatments, and his family history of mental illness. "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has

notice of the client's history of mental problems." (*Williamson v. Ward*, 110 F.3d, at 1518-19 (quoting *Bouchillon v. Collins*, 907 F.2d, at 595).)

As a result of counsel's unreasonable failing, no one working on Mr. Barrett's behalf obtained requisite social history data, nor did any competent mental health professional conduct any of testing and other evaluation necessary to perform a reliable assessment of Mr. Barrett's competency including, but not limited to medically indicated neurological and neuropsychological testing, which was necessary to determine the existence, nature and severity of Mr. Barrett's brain damage and mental illnesses.

If counsel had conducted a professionally adequate investigation, including retaining competent mental health professionals, they would have learned that Mr. Barrett suffered from a life-long history of impaired functioning that was medically indicative of a neuropsychiatric condition, which included organic brain damage associated with, or superimposed on, a chronic major mental illness, Bipolar Disorder and Post Traumatic Stress Disorder (PTSD).   Access to, consideration of and reliance on the results of the neuropsychological testing that was medically and forensically indicated would have enabled any competent expert to inform counsel that the functional impairments associated with the neurologically damaged areas of Mr. Barrett's brain were consistent impairment of the domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights.

Any reasonably diligent counsel informed of such information would have been obligated to request a hearing to determine Mr. Barrett's competency.  (See, e.g., *Williamson v. Ward*, 110 F.3d 1514-17 (counsel ineffective for not raising a competency claim where defendant

had been diagnosed with and treated for mental illness); see, also, *Barnett v. Hargett*, 174 F.3d 1128, 1135-36 (10th Cir. 1999) (defendant's history of mental illness and counsel's belief that defendant was presently incompetent among the factors supporting a bona fide doubt as to competency); ABA Standards, Mental Health, Standard 7-4.2 ("Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence").)

To establish the prejudice of counsel's failure to seek a timely competency hearing, Mr. Barrett must show only a reasonable probability that he was incompetent at the time of his trial.  *(Hull v. Kyler*, 190 F.3d 88, 105 (3d Cir. 1999) (citing *Eddmonds v. Peters*, 93 F.3d 1307, 1317 (7th Cir. 1996), cert. denied, 520 U.S. 1172 (1997); and *Felde v. Butler*, 817 F.2d 281, 282 (5th Cir. 1987)); see also *Williamson*, supra, 110 F.3d at 1519 (same).).  "[T]he evidence of Mr. [Barrett's] mental state which we have recited at length throughout this [petition] establishes a reasonable probability that he was not competent to stand trial." *(Williamson*, 110 F.3d,  at 1519.)  The documentary evidence submitted in support of Mr. Barrett's petition demonstrates that consistent the results of testing, employing reliable neuropsychological instruments for assessing brain impairment, have measured Mr. Barrett in the impaired range on the critical indicators of brain damage to his frontal lobes and executive functioning.  Mr. Barrett's previous, psychiatric  diagnosis of Bipolar Disorder, made by independent, state clinicians, is supported by the observations of lay witnesses over the course of his life.  The medical indications in his social history and life-time functioning, which meet diagnostic criteria for PTSD, are also documented by reliable sources.  Moreover, the congruence of all the clinical data, including social history, testing and reported symptoms demonstrates that Mr. Barrett is not malingering or exaggerating his condition.

Mr. Barrett's brain damage, coupled with his disruptive psychotic illness, left him unable to appreciate the nature of his actions at the time of the offenses for which he was tried and convicted; and unable rationally to understand the proceedings or to assist in his defense during the period in which he was tried. As Dr. George Woods, Jr. concluded, "Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial." (Decl. of George Woods, M.D., at 81.)

Rather, Mr. Barrett's ability to understand and track the judicial proceedings was substantially impaired by the confluence of his psychiatric disorders and measured brain damage. The fragments of police bullets in Mr. Barrett's body caused him continuing pain, and provoked an immunological reaction, all of which served as "built-in reminders" of his life-threatening trauma. The ongoing distortion and distraction of Mr. Barrett's PTSD were compounded by the racing thoughts symptomatic of the disabling "manic form" of Bipolar Disorder. (See *Williamson v. Ward*, 110 F.3d, at 1519; Decl. of George Woods, Jr., M.D., at 80.) These disabling impacts on Mr. Barrett's mental state were, in turn, exponentially increased by the effect of his brain damage that left Mr. Barrett being "unable to get unstuck." (Decl. of George Woods, Jr., M.D., at 80.) This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Id. at 59, 80.)

In light of this record, it is clear that trial counsel's "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process." (*Williamson v. Ward*, 110 F.3d, at 1519.) Accordingly, Mr. Barrett should be granted a new trial. (Id.)

**4.    But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

Claim 1 discussed the improper ex parte hearing held between the Court and the Government on the prosecution's sealed motion to delay disclosing the identities of their seven informant witnesses. During this hearing, the court criticized the Government for failing to raise the issue sooner. The court also found the Government's justification for throwing a veil of secrecy over these witnesses unconvincing, because literally no evidence was produced that any of them had been threatened or were in any sort of danger. The Government merely represented that these witnesses, all of whom had criminal records, had an undefined and inchoate "fear" that they "may" be in danger if they testified. The court made the obvious point that it envisioned a long continuance to allow the defense sufficient time to investigate these witnesses and prepare for their testimony. (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27.)

None of this was revealed to the defense when they were finally allowed to participate in the hearing. Instead, counsel unreasonably blundered into an "arrangement" with the Government to "interview" these witnesses – in the presence of the Government yet – to find out what they were going to say. (Tr. 9/13/05 Hr'g at 27; R. 840-43.) There were no reports of anything the witnesses told the Government, presumably because Government counsel – particularly AUSA Mike Littlefield – interviewed them alone so as to claim attorney work-product as a shield to discovery.

The defense was literally flying blind. The "arrangement," doomed as it was from the start to be anything approaching an adequate substitute for a competent investigation, backfired when all but one of the witnesses refused to be interviewed by the defense. The

obvious and reasonable path of moving for a continuance, which the court itself knew was the proper course,  was not taken.  As a result, the defense was woefully unprepared to effectively cross-examine these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand.  Had a continuance been asked for, it would have been granted, based on the court's own remarks during the *ex parte* hearing.  Because a continuance was not requested, and because trial counsel otherwise failed to conduct an adequate investigation, a wealth of evidence that would have destroyed the credibility of the informant witnesses was never heard by the jury.[9]

A wealth of evidence was available to impeach the Government's key witnesses. As set forth in Claim 5, *infa*, the Government suppressed material impeachment evidence related to these witnesses and engaged in improper delay tactics to prevent trial counsel discovering the evidence independently.  Whether due to the Government, and/or the trial court's misconduct, or trial counsel's unreasonable failure to seek a continuance, there is a reasonable probability that jurors would have rejected the seven snitches if they had heard the following evidence attacking their testimony.

### a.    Travis Crawford[10]

---

[9]  Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the appeal, questioned Mr. Hilfiger about why he did not seek a continuance.  Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case.  Decl. of Mark Henricksen.  Of course, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

[10]  Mr. Barrett is in possession of newly discovered evidence that eviscerates the credibility of Travis Crawford's trial testimony.  Mr. Crawford recently recanted his testimony against Mr. Barrett.  (Claim 5A, B)

Travis Crawford, Mr. Barrett's maternal first cousin (R. 450-51), testified in the first stage of trial that the day before the police raid, he noticed a white SUV drive down the road in front of Mr. Barrett's cabin.  Mr. Crawford testified he saw Mr. Barrett go to his front gate at the time the SUV passed.  Crawford claimed to have walked over to Mr. Barrett's property from his parents' house.  Mr. Barrett allegedly told him that he (Mr. Barrett) knew that the people in the white SUV were the police.  Mr. Barrett expressed the opinion that they were probably going to come back to serve a warrant.  With respect to the potential service of the warrant, Mr. Barrett said, "D.G.F." which, according to Travis Crawford, means "Don't Give a Fuck."  Crawford testified Mr. Barrett told him that he was "going out in a blaze of glory," as he had supposedly said on numerous previous occasions.  (R. 462-66.)  Travis Crawford testified that while he had been a methamphetamine user for 15 years, he had been "clean" for nine months.[11]  (R. 457.)

On cross-examination, Mr. Crawford stated he had been arrested previously for failure to pay $11,000.00 in back child support.  He was also arrested on hot check charges many years before.  He admitted to having used a lot of drugs.  His alleged "past" drug use affected his memory, distorted his perception, and his mind was not as sharp as it had been before he became a methamphetamine addict.  (R 467-68, 472.)

Mr. Crawford had never been interviewed by the defense before his testimony.  He acknowledged on cross-examination that he had an appointment to talk to defense counsel the preceding Friday, but claimed he did not show up because he was working and would have been

---

[11]  This is in marked contrast with what Mr. Crawford revealed recently to a defense investigator.  Mr. Crawford stated that he was a heavy methamphetamine user at the time he was interviewed by the Government, had taken drugs before his testimony, and was under the influence of drugs at the time he testified against Mr. Barrett.  This is discussed in Mr. Barrett's *Brady/*newly discovered evidence claim.

fired from his job if he absented himself for the interview. He claimed he was not told by the prosecution that defense counsel had made themselves available on the previous Saturday and Sunday to interview him. (R. 468-69.) Sequoyah County Sheriff John Philpot had been by his residence to let him know that Mr. Barrett's lawyers might want to talk to him. (R 469.) Mr. Crawford admitted he had never provided a written statement to law enforcement or the Government prosecutors relating what his testimony would be. (R. 481.)

When asked why he was coming forward with this information six years after the fact, Mr. Crawford said it was because he had been subpoenaed; he himself wanted to know why he had been contacted by the Government. He denied being threatened with charges or other dire consequences if he failed to cooperate with the prosecution.[12] (R. 470.) Before being approached to testify in the federal trial, he had never talked to anyone about what he supposedly knew of the circumstances surrounding the shooting of Trooper Eales. Despite the admitted problems with his memory, Mr. Crawford claimed he remembered the years-old events to which he testified. He could not recall how many times he had spoken to Sheriff Philpot about what he knew, and also stated, at one point, that he had not had any conversations with government agents other than Sheriff Philpot. (R. 481-82.)

On re-direct examination, AUSA Littlefield reminded Mr. Crawford that he had talked to Littlefield about testifying, and Crawford then stated that before Littlefield interviewed him, he had spoken to no law enforcement agents about Mr. Barrett. "Correcting" his earlier testimony about his contacts with Sheriff Philpot, Mr. Crawford stated either Littlefield, Sheriff Philpot, or Lance and Judy Bergman got a message to him that he needed to be in court. If

---

[12] Crawford stated recently he had been threatened by Littlefield, which ensured his cooperation. *See Brady/*newly discovered evidence claim.

Sheriff Philpot was the individual who contacted him for this purpose, this would be the only contact he had with the Sheriff about the case.  (R 487-88.)

On cross-examination, Mr. Crawford basically repeated the claims he made on direct about his conversation with Mr. Barrett on the late afternoon or evening of  September 23rd regarding the white SUV that had driven past Mr. Barrett's property.  He assumed the occupants of the vehicle were "the laws" instead of Kevin Adams, who owned a white Bronco and lived approximately a mile from Mr. Barrett, even though the vehicle he saw was unmarked, had no antennas like those on law enforcement vehicles, had no spotlights, and Mr. Crawford was not able to see the vehicle's license tag. (R 478-79.)  Retreating somewhat from his testimony on direct examination, Mr. Crawford said that when he went to speak to Mr. Barrett that evening, he did not tell Mr. Barrett that the "laws" had just driven by, and were probably coming to get him, although he might have commented to Mr. Barrett that the people who had driven by in the white SUV were law enforcement officers.  Ultimately, Crawford testified on re-direct examination that when the white SUV drove past and he went to talk to Mr. Barrett, he did not recall whether or he or Mr. Barrett commented that the occupants of the vehicle were law enforcement, but it "seem[ed]" this subject was discussed.  Travis Crawford stuck to his claim that Mr. Barrett said that he was "going out in a blaze of glory."  (R 479-80, 484.)  Mr. Crawford believed that when he went over to talk to Mr. Barrett, the front gate to the property was open, and then "guessed" that Mr. Barrett locked the gate. (R. 48-81.)

During his testimony, Mr. Crawford never mentioned – and was never asked – about his testifying as an informant or snitch in any other case.[13]  Had counsel asked about this,

---

[13]  *See* Mr. Barrett's *Brady* claim.

and had Crawford been truthful, it would have been revealed to the jury that Crawford had acted as a police informant in the past and had given testimony against others in order to escape prosecution, a fact that surely would have adversely affected his credibility.

Because trial counsel was professionally unreasonable in failing to move for a continuance, and otherwise failed to conduct a proper investigation, the jury failed to hear from witnesses who could have testified that Crawford was dishonest and not to be believed about anything, particularly with regard to the events on the evening of September 23, 1999.

Rick Lunsford is a local Sallisaw resident who could have been located and interviewed if any sort of competent defense investigation into Mr. Crawford had been conducted. Mr. Lunsford, along with several other people, were at Mr. Barrett's residence on the afternoon of September 23rd, at the time Mr. Barrett was approached by Travis Crawford about the white SUV that had driven past the property. Mr. Lunsford had arrived at Mr. Barrett's around noon on September 22nd, and stayed until around 9:00 p.m. on September 23rd. Mr. Lunsford went to Mr. Barrett's to drop off a Chevy truck he was selling to him. Mr. Lunsford told investigators currently working for Mr. Barrett that on the late afternoon of September 23rd, Mr. Barrett and others were standing near the fence to Mr. Barrett's property. Travis Crawford walked over from his parents house, which was located a couple of residences down the road, and stood at the fence line. Mr. Crawford asked Mr. Barrett whether he had seen the white SUV that had driven by toward the dead-end, but had not yet driven back. Crawford stated he believed the individuals in the SUV were law enforcement officers. Mr. Barrett did not take Crawford seriously, because he did not trust Crawford. Mr. Barrett was more nervous about Mr. Crawford than he was of law enforcement. Travis Crawford was regarded as a "flake," and it was well known that he had acted as a police snitch in the past. (Decl. of Rick Lunsford.)

After Crawford left, Mr. Barrett told the others who were present that if they wanted to leave because of the SUV, they should do so. Mr. Barrett was concerned about the others getting in trouble if in fact the SUV contained law enforcement officers, because everyone there was using drugs. Toby Barrett and Mr. Lunsford stayed, and the others left. Toby Barrett locked the gate to the driveway, and Mr. Barrett, Toby Barrett and Mr. Lunsford went to either Mr. Barrett's cabin or his garage. Mr. Lunsford left Mr. Barrett's property around 9:00 p.m. to see his family. (Decl. of Rick Lunsford.)

Mr. Lunsford states that during the time Crawford came to Mr. Barrett's to talk about the white SUV, before that occurrence, and after that time until Lunsford left later that night, Mr. Barrett *never* said that he would shoot or kill the first law enforcement officer who came on his property, or that if the police came on his property and tried to arrest him, he would "go out in a blaze of glory." Mr. Barrett never said this or anything like it either on September 23, 1999, or at any other time Mr. Lunsford was around Mr. Barrett. Such a statement would be out of character for Mr. Barrett, because he was not a violent or threatening person. (Decl. of Rick Lunsford.)

Had any investigation been conducted by trial counsel, and had Lunsford been contacted, he could also have opined on Travis Crawford's truthfulness, and Crawford's reputation for honesty in the community. (Fed.R.Evid. 608(a).) In Lunsford's opinion, Travis Crawford is a completely dishonest person; nothing he says can be believed. Mr. Crawford was not only a heavy drug user, but also dealt drugs. Mr. Crawford would sell bad dope to people and "rip them off." Travis Crawford would basically do and say anything to get his hands on drugs, or to get out of trouble. Travis Crawford was known in the community for his dishonesty and untrustworthiness. (Decl. of Rick Lunsford.) Even if Mr. Lunsford would have been

prevented from giving "extrinsic evidence" regarding his knowledge of specific dishonest and bad acts on Crawford's part, they could have been inquired into during Crawford's cross-examination, because they were probative of his truthfulness or untruthfulness.  Fed.R.Evid. 608(b).

Mr. Lunsford was never contacted by any representatives of Mr. Barrett in connection with the federal trial.  Had he been contacted, he would have been willing to testify to the matters described above.  (Decl. of Rick Lunsford.)

Brandy Hill is Travis Crawford's niece.  Ms. Hill told investigators currently working on Mr. Barrett's behalf that she, like Rick Lunsford, was present at Mr. Barrett's on the afternoon and evening of September 23, 1999.  She was present when Travis Crawford came to the fence of Mr. Barrett's property to tell Mr. Barrett about the white SUV that had driven by. Crawford stated he believed police were in the vehicle, or that his father, Roger Crawford, believed it was a police vehicle.  Crawford said his father saw the white SUV drive down the road toward the dead-end, but it had not come back.  After relaying this information, Crawford walked back home.  Shortly after this, Ms. Hill's husband Sean Hill arrived at Mr. Barrett's, and she went home.  (Decl. of Brandy Hill.)

During and after the time Crawford spoke to Mr. Barrett and the others who were there, there was no talk by Mr. Barrett about killing or shooting the police or "going out in a blaze of glory."  After Travis Crawford expressed his suspicions about the white SUV, Mr. Barrett did not react with threats, or in a heated manner. He behaved as if it were normal that the police had driven by.  According to Ms. Hill, the police drove by Mr. Barrett's property all the time, sometimes up to three times a week, from 1996 to 1999.  (Decl. of Brandy Hill.)

According to Ms. Hill, and in contrast to Travis Crawford's claim at trial that he had been offered nothing by the Government in exchange for his testimony, Crawford told her that both he and his wife, Cindy Crawford, had been paid for their testimony against Mr. Barrett. Again in contrast to Crawford's claim that he had been off drugs for a period of months before his testimony, Crawford told Ms. Hill he did two "hits" of dope immediately before testifying, and was under the influence of drugs when he testified. (Decl. of Brandy Hill. *See also,* Mr. Barrett's *Brady* and newly discovered evidence claim.)

Ms. Hill was never interviewed by Mr. Barrett's federal lawyers, or any investigator working for them. She was an easily discoverable, readily available witness. Had she been contacted, she would have given them the information related above, and would have agreed to testify as a defense witness for Mr. Barrett. (Decl. of Brandy Hill.)

Toby Barrett was obviously a readily available witness. He testified for the prosecution in the two state-court trials. He was present at his father's residence on the evening of September 23, 1999. On that evening, Mr. Barrett asked Toby to close the gate to the driveway. Because the gate was usually kept locked in the evenings (certainly a routine occurrence in rural areas), this was nothing out of the ordinary. On September 23rd, Mr. Barrett said nothing to Toby Barrett, or in Toby Barrett's presence, about the police, let alone that he believed they were coming to arrest him and that he would "go out in a blaze of glory." While trial counsel spoke briefly to Toby Barrett several times, he never discussed with Toby any testimony he could give. Had he been asked, Toby Barrett would have testified to these facts, as well as others which are discussed elsewhere in this motion. (Decl. of Toby Barrett.)

Trial counsel could have, but did not, discuss with Mr. Barrett's and Mr. Crawford's aunt, Carolyn Joseph, her knowledge of Travis Crawford's honesty and trustworthiness. Although trial counsel interviewed Ms. Joseph briefly, she was never questioned about the credibility of either Travis Crawford or Cindy Crawford. (Decl. of Carolyn Joseph.)

According to Ms. Joseph, Travis Crawford, contrary to his claim of being "clean" of drugs for several months preceding his testimony, was a heavy drug user at the time of Mr. Barrett's trial. It is her personal belief that Crawford is not an honest or trustworthy person. Nor does Mr. Crawford have a reputation for honesty in the community at large. (Fed.R.Evid. 608(a).) (Decl. of Carolyn Joseph.)

Every time Mr. Crawford would come to her house, something turned up missing or stolen. Travis Crawford would steal from Ms. Joseph in order to get money to buy drugs. Crawford was the type of person who would say one thing and then do the opposite, so long as it was to his advantage. Ms. Joseph once paid Crawford $400.00 in advance to build a well house on her property. Crawford simply pocketed the money and never built the well house. Crawford never repaid the money he took for a job he never did. The materials that had been purchased for construction of the well house were later stolen. Travis Crawford and/or his wife Cindy were the only people who could have stolen the materials. Crawford once stole four rolls of barbed wire from Ms. Joseph's property, and later admitted the theft to her. Crawford even went so far as to steal from the property of her late son, DeWitt Joseph, who had been killed in an automobile accident. Decl. of Carolyn Joseph.

Even if Ms. Joseph could not give "extraneous evidence" of the specific bad acts of Crawford that reflected his dishonesty, trial counsel, using the information gained from her, could have cross-examined him about these dishonest acts. (Fed.R.Evid. 608(b).) Coupled with testimony from Ms. Joseph regarding her opinion that Crawford is a dishonest person, and is regarded as dishonest in the community, any denials offered by Crawford to the specific acts of dishonesty he committed against his own aunt would have rung hollow and marked him as a witness of dreadful credibility.

### b.    Cindy Crawford[14]

Cindy Crawford testified for the Government in both stages of trial. Like her husband, she never talked to defense counsel before her testimony but denied that she had simply refused to meet with them. (R. 3063, 3069.)

In the first stage, she testified she had done drugs at Mr. Barrett's house, although she did not know who supplied the drugs. Cindy Crawford testified Mr. Barrett told her he had a misdemeanor warrant out for his arrest, and that he stayed on his property because he did not want to get in trouble. He knew there was a chance the police could come to his house; that was why he had guns for protection. According to Cindy Crawford, Mr. Barrett told her that if the police (or anyone else, for that matter), invaded his property, he would "go out in a blaze of glory." (R. 3063-69.)

---

[14] Movant is also in possession of newly discovered evidence demonstrating that Cindy Crawford was pressured and threatened by former AUSA Mike Littlefield into testifying against Mr. Barrett, that she was coached in her testimony, and that she embellished her second stage testimony. Movant is also now in possession of Cindy Crawford's medical records, which show that she suffers from post-traumatic stress disorder and other maladies impacting her credibility, and which support her recent statement to defense investigators that she embellished her penalty phase testimony against Mr. Barrett and was susceptible to pressure from the prosecutor and law enforcement. *See* Mr. Barrett's *Brady/*newly discovered evidence claim.

On cross-examination in the first stage of trial, Cindy Crawford stated she started using methamphetamine at age 18.  She used the drug for nine years, and would either snort it or shoot it.  She stated or implied on direct examination that she was currently drug and alcohol free.  (R. 3161.)  While on a "meth run," the longest she had stayed up was five days.  While using methamphetamine, she would often stay up for three to four days at a time.  (R. 3070-71.)

Cindy Crawford admitted her drug use had caused her to lose a sense of time.  To her, time was just a blur that played tricks on her mind.  (R. 3073.)  She really did not know when Mr. Barrett had made the alleged statement about having an outstanding misdemeanor warrant.  Defense counsel, in his questioning, stated that any misdemeanor warrant for Mr. Barrett would have been long before 1999.  (R. 3072.) While she had done drugs at Mr. Barrett's residence, she was not testifying that Mr. Barrett had ever given her drugs.  (R. 3072.) With respect to Mr. Barrett's statement about taking on the police and "going out in a blaze of glory," Cindy Crawford stated this was typical "doper talk" that she had often heard from many drug users.  (R. 3075.)

In the penalty phase of trial, Cindy Crawford claimed Mr. Barrett once became angry with her because she would not have sex with him.  He ran from his home when she was leaving with his brother Richie Barrett, put the barrel of a rifle against her leg, and threatened to kill her.  (R. 4577-79.)

As with the other informant or "snitch" witnesses, trial counsel relied strictly on cross-examination in a weak effort to impeach Cindy Crawford.  Had trial counsel moved for a continuance and obtained the time to investigate Crawford, or conducted a reasonable investigation in the time allowed, a wealth of evidence could have been developed which would have shown her to be a witness who jurors would have found not worthy of belief.

During the first stage of trial, Cindy Crawford was never questioned on whether she suffered from any mental problems. In her second stage testimony, she volunteered that she suffered from PTSD, but it was of course too late to use the information to cast doubt on what she told the jury in the first stage. A reasonable investigation would have uncovered evidence regarding her mental condition, which, along with her drug use, could have impeached her ability to recall and relate, and her overall credibility. Medical records for Cindy Crawford confirm that she suffers from PTSD, is subject to bouts of anxiety, and has panic attacks. Medical records of Cindy Crawford, filed under seal.

Although Crawford testified on direct examination that she was on a five year deferred sentence for misdemeanor marijuana possession (R. 3061), and had a previous misdemeanor marijuana conviction in 1999, counsel failed to explore whether her testimony was motivated by a fear that if she declined to cooperate with the Government, she might face acceleration of her current deferred sentence to either a suspended sentence, which would constitute a felony conviction under Oklahoma law, or could face jail or prison time. Counsel, who evidently did not search Cindy Crawford's court files, failed to ask her about the fact that she could have been charged with a felony rather than a misdemeanor for her second marijuana possession case, and whether the fact she had not been charged with a felony was due to her regularly acting as a police informant, as other witnesses could have attested. (Files in Sequoyah County Case Nos. CF-99-645 and CF-04-63.)

Counsel failed to question Cindy Crawford about the fact that her two misdemeanor marijuana cases were originally charged as felonies. Because counsel made no court record search, he neglected to confront her with the fact that a bench warrant had been issued for her arrest for failure to appear on July 19, 2005, just shortly before Mr. Barrett's trial

commenced. Counsel also neglected to question her about the fact that on March 20, 2005, the Sequoyah County District Attorney's Office had filed an application to accelerate her deferred sentence because she had failed to pay certain required fees. Significantly, the bench warrant and the application to accelerate were hanging over Cindy Crawford's head at the time she testified against Mr. Barrett. It was not until April 24, 2006, after Mr. Barrett's trial concluded, that the application to accelerate and the bench warrant were withdrawn because she had finally complied with the terms of her probation. (Files in Sequoyah County Case Nos. CF-99-645 and CF-0463.) The circumstances surrounding Crawford's Sequoyah County cases could have been used to show she had a powerful motive to testify for the Government in exchange for help in keeping her deferred sentence. *E.g., Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003)(counsel ineffective in part for failing to impeach immunized witness with fact he was on a deferred sentence and had a motive to help the prosecution in order to help himself).

Due to a failure to investigate Cindy Crawford's court history, the jury was denied other valuable impeachment evidence. The court file in the domestic case of *Crawford v. Mattox,* Sequoyah County Case No. P-03-458, contains a letter from Larry and Brandy Sell, the grandparents of one of Crawford's children, to District Judge John Garrett. The letter states that Cindy Crawford has problems with depression, and threatened to "do something with her baby," which she would be able to "get away with" because she had been in the Harbor View mental hospital. The letter also states that drugs had become "all consuming" for Cindy Crawford. This would not only demonstrate a history of mental illness, but would show that Cindy Crawford was such a despicable and unbelievable character that she had actually threatened harm to her own child, while contemplating the use of her mental illness as an excuse or defense. (File in Sequoyah County Case No. P-03-458.)

Again because no investigation of Cindy Crawford's court records was made, counsel failed to confront her with the numerous acts of dishonesty which served as the basis for a victim protective order in *Michael Mackey, et al. v. Cindy Crawford,* Sequoyah County Case No. PO-03-390. The application for protective order states the plaintiffs had been harassed with false accusations by Crawford, threats to cause problems for Mr. Mackey's children, acts of stalking, and burglary of the Mackey home and storage shed. (File, Sequoyah County Case No. PO-03-390.) Again, even if extraneous evidence of these misdeeds reflecting Cindy Crawford's lack of honesty could not have been introduced, Crawford certainly could have been cross-examined about them. (Fed.R.Evid. 608(b).)

Aside from court records which would have severely impeached Cindy Crawford's credibility, counsel failed to investigate and produce numerous available witnesses who could have testified to her complete dishonesty and lack of believability, as well as her history as a police informant.

Roger Crawford testified briefly as a second stage witness for Mr. Barrett. In preparation for his second stage testimony, he was only interviewed for a matter of minutes. Unfortunately, trial counsel neglected to interview him regarding information he had on the credibility of Cindy Crawford. Had Roger Crawford been properly interviewed, he could have testified in both stages of trial that in his personal opinion, Cindy Crawford was completely dishonest and untrustworthy, and that her reputation in the community for honesty was extremely poor. Roger Crawford could have testified that at the time of her testimony at Mr. Barrett's trial, Cindy Crawford was a heavy drug user, contrary to what she tried to claim to the jury. Roger Crawford also would have testified that it was well known in the community that Cindy Crawford, far from being a disinterested witness, had regularly acted as a police informant to

escape prosecution and punishment for her own criminal activities. Roger Crawford would have testified that Cindy Crawford had filed false reports about family members with the Oklahoma Department of Human Services, and also had made false accusations when seeking victim protective orders. Mr. Crawford was in an excellent position to offer an opinion on Cindy Crawford's dishonesty and her reputation in the community for dishonesty. He is Cindy Crawford's father in law, and has known her for years. (Decl. of Roger Crawford.)

Mike Mackey is another witness counsel easily could have discovered by searching court files related to Cindy Crawford. Mr. Mackey is one of several individuals who filed for a protective order against Cindy Crawford. He has also known her for years. He was never contacted or interviewed by Mr. Barrett's trial lawyers, or any investigator working on their behalf. Had he been contacted, he could have testified that in his opinion, Cindy Crawford is thoroughly dishonest and untrustworthy. Her reputation for honesty in the community is abysmal. Mr. Mackey goes so far as to state that Cindy Crawford is the "most wickedly evil" person he has ever had the misfortune to run across. Ms. Crawford made false reports to state DHS regarding him and his mentally handicapped son, and lied to get a victim protective order against him. Mr. Mackey is also aware that Cindy Crawford has made false claims to the authorities about other family members. According to Mr. Mackey, Cindy Crawford has repeatedly broken into his home and stolen from him in order to get money or property to buy drugs. Like Roger Crawford, Mr. Mackey is aware that Cindy Crawford has long worked as a snitch for the local police, and "works the system" to escape responsibility for her own actions, while getting other people into trouble. Decl. of Mike Mackey.

Again, even if extrinsic evidence of Crawford's bad and dishonest acts could not have been introduced through Mackey's first stage testimony, they could have been inquired into

during cross-examination of Crawford.  (Fed.R.Evid. 608(b).)  Extrinsic evidence of these acts of criminality could have been introduced in the penalty phase, since Crawford made a return appearance to the witness stand, and the rules of evidence are relaxed in the penalty phase of a capital case.  (18 U.S.C. § 3593(c).)

Brandy Hill is another witness who, with a competent investigation, could have given testimony regarding Cindy Crawford's honesty.  As noted in the discussion of Travis Crawford, Ms. Hill was never contacted before or during Mr. Barrett's trial.  Ms. Hill has known Cindy Crawford for many years.  In her opinion, Cindy Crawford is completely dishonest and untrustworthy.  Ms. Crawford's reputation for honesty in the community is extremely poor.  Ms. Hill describes Cindy Crawford as manipulative.  Cindy Crawford has stolen from Ms. Hill and her family on numerous occasions in order to get money to buy drugs.  Like other witnesses who could have testified to Cindy Crawford's dreadful lack of honesty, Ms. Hill is aware that Cindy Crawford has long acted as a local police informant and has lied against others to obtain something of advantage for herself.  (Decl. of Brandy Hill.)

Similar testimony could have been offered by Sean Hill.  Mr. Hill, though available at the time of trial, was never contacted by anyone working on Mr. Barrett's defense.  He states that Cindy Crawford's reputation in the community is that "she's dishonest, evil and worthless." (Decl. of Sean Hill.)

Carolyn Joseph has known Cindy Crawford for years.  As with Travis Crawford, Ms. Joseph was not interviewed regarding her knowledge of Cindy Crawford's honesty, or any other information which would have served to impeach Ms. Crawford.  Ms. Joseph could have testified that Cindy Crawford was a heavy drug user, and that, in her opinion, Ms. Crawford's drug use affected her mentally.  According to Ms. Joseph, Cindy Crawford has the mind and attitude of a

twelve year old child. In Ms. Joseph's personal opinion, Cindy Crawford is "so deceitful and dishonest that it is pitiful." Ms. Crawford's reputation in the community for honesty is, to put it mildly, poor. No one Ms. Joseph knows would trust or believe anything Cindy Crawford said. Cindy Crawford has stolen from Ms. Joseph on several occasions and has conned money out of her. (Decl. of Carolyn Joseph.)

Still another witness who could have testified regarding Cindy Crawford's bedrock lack of honesty is Gwendolyn Crawford, Travis Crawford's sister. Ms. Crawford, as with the other individuals who could have been, but were not, contacted to testify on Mr. Barrett's behalf, has known Cindy Crawford for years. In her opinion, Cindy Crawford is thoroughly and totally dishonest. Cindy Crawford is well known in the community for her dishonesty. Echoing several of the other witnesses who know Cindy Crawford well, her reputation for honesty in the community is bottom-of-the-barrel. Gwendolyn Crawford is also aware that Cindy Crawford has acted as a police snitch for years and does not hesitate to falsely accuse others if it means getting something for herself. (Decl of Gwendolyn Crawford.)

Cindy Crawford's penalty phase testimony that Mr. Barrett had put a rifle barrel to a leg and threatened to kill her, allegedly because she would not have sex with him, could have been conclusively impeached if trial counsel had interviewed Mr. Barrett's brother, Richie Barrett. Crawford testified this incident occurred when she was leaving Mr. Barrett's property with Richie Barrett. Richie Barrett was interviewed by a defense investigator in connection with the current action. Richie Barrett states unequivocally that Cindy Barrett fabricated this story out of whole cloth, and that the incident never occurred. (Decl. of Richard Barrett.)

### c.    Charles "Monk" Sanders

       **1.**        **Failure to adequately investigate and prepare to cross-examine Sanders about his previous convictions, charges against him that were dismissed, and the favorable treatment he often secured to escape punishment.**

As noted *supra*, but unknown to the jury, Charles Sanders, the alleged C.I. on the Clint Johnson search warrant, was a professional informant. He gave wildly conflicting trial testimony regarding alleged drug activities at Mr. Barrett's residence in the Summer of 1999. He also testified that at some undetermined time, Mr. Barrett allegedly made statements that he would shoot the first law enforcement officer who came on his property. (R. 2515.) In the penalty phase of trial, the Government once more sponsored Sanders to testify that Mr. Barrett, while incarcerated, supposedly contacted a third party about doing harm to Sanders. (R. 4587.) In an off-hand manner, Sanders testified, under questioning by AUSA Littlefield, that the most the Government was going to do for him in exchange for his testimony was to talk to prosecutors in Sequoyah and Tulsa Counties, informing them of Sanders's cooperation in the case against Mr. Barrett. (R. 2494.)

Trial counsel's unreasonably failed to investigate and challenge Sanders from a myriad of angles the informant's history made readily available. Not only did counsel fail to capitalize on the entirety of Sanders's cross-examination testimony when the motion to suppress was re-urged, but counsel failed to effectively impeach him, both on cross-examination and with independent evidence.

While trial counsel cross-examined Sanders on some, but by no means all, of his prior convictions, counsel failed to conduct a search of court records, not only to demonstrate that Sanders lied about the number and nature of his previous convictions, but that he had received amazing deal after amazing deal for his work as an informant, including after he

supposedly gave information to Clint Johnson about Mr. Barrett. In that sense, assuming he really was the C.I. on the Johnson search warrant, Sanders had *already received and was continuing to receive favor from the authorities based on his "work" against Mr. Barrett.* Had counsel effectively cross-examined Sanders about his prior record, he could have easily exposed Sanders's lies that Clint Johnson only helped with "some" of his cases, had not gotten out of "a lot" of trouble, and that he was not both working as an informant and free to commit whatever crimes he wanted to. (R. 2535-37.)

The beginning of cross-examination revealed no court searches were conducted on Sanders's previous convictions. Counsel stated that he had looked at Sanders's D.O.C. "sheet." This obviously referred to the Oklahoma Department of Corrections website, which would merely list, without any elaboration at all, the case numbers in which Sanders had been convicted, and the offenses for which he was convicted. Counsel confronted Sanders with the fact that he had far more than the four priors Sanders's acknowledged on direct examination, a patent lie that prosecutor Littlefield had an obligation to correct, but did not. (R. 2524.) *See* Claim 5, *infra*.

Counsel superficially asked[15] Sanders about the following prior convictions: (1) an Arkansas conviction in 1986 for distribution of drugs, for which Sanders received a sentence of four years confinement, and six years probation; (2) a 1989 conviction in Sequoyah County for uttering a forged instrument, for which Sanders allegedly received one year in the county jail, and time on probation; (3) a 1990 sexual battery conviction and drug possession conviction in Sequoyah County, for which he received three years incarceration and seven years suspended; (4)

---

[15] R. 2524-36.

a 1992 Sequoyah County conviction for drug possession, in which Sanders received a sentence of three years in prison and seven years suspended (Sanders claimed this was "the same" case as his 1990 Sequoyah County conviction, even though the conviction was in a different case number); 5) a Muskogee County conviction in Case No. CF-93-131 for illegal possession of a weapon, bringing drugs or alcohol into a jail, and escape (Sanders acknowledged the escape conviction, but said he had not been convicted of the other charges); (6) a 1995 conviction in Arkansas for possession of drugs, concealing stolen property, and forgery; (7) a Sequoyah County conviction in Case No. CF-98-346, for which Sanders received five years incarceration and twenty years suspended; (8) a conviction in Sequoyah County Case No. CF-98-363, for uttering a forged instrument, for which Sanders received five years incarceration and twenty years suspended; (9) a conviction in Sequoyah County Case No. CF-99-562 for concealing stolen property, for which Sanders received five years incarceration twenty years suspended (a condition of probation in these last three cases was that Sanders successfully complete a Department of Corrections drug program, which Sanders claimed he had not yet been able to get into); (10) a conviction in Sequoyah County Case No. CF-03-124 for two counts of running a roadblock; and (11) a conviction in Sequoyah County Case No. CF-04-19 for two counts of concealing stolen property, second degree burglary, and second degree arson, for which Sanders received a deal similar to that in the other Sequoyah County cases.

Sanders agreed that after this many convictions, he received, on his current sentences, a very favorable deal (to say the least), requiring him at most to do five years in prison, which would equate to service of only two and one-half years, even if he was not able to enter the Department of Corrections drug program, which, upon completion, would put him back

on the streets immediately.  Sanders admitted that his mentor, Clint Johnson, had helped him with "some," but by no means all, of his prior cases.  (R. 2534-35.)

Had counsel conducted even minimal research into Sanders's court records, far more about the witness's's abysmal criminal history and the virtual "get out of jail free" cards he received  repeatedly would have been revealed to the jury.  The following readily available records, among others, would have marked Sanders as a career informant who would say and do anything to continue to have access to drugs and escape incarceration:

(1)    Counsel failed to point out that in Sequoyah County Case No. CF-92-91, in which Sanders was convicted of felony drug possession in count 5, the state had charged him with having previously been convicted in Sebastian County, Arkansas, with delivery of marijuana and amphetamines in Case No. 86-604-B.  Sanders was also charged in this Sequoyah County case with the misdemeanors of attempting to elude the police, possession of drug paraphernalia, driving under the influence, and possession of marijuana.

The allegation of the "after former" would have set Sanders's exposure, under then existing Oklahoma law, at ten years to life on the felony drug charge.  (21 O.S. 1991, section 51.)  He also could have been charged with felony possession of marijuana, rather than a misdemeanor, because of his prior Arkansas drug conviction.  (63 O.S. section 2-402 (2).)  Instead, he initially was sentenced to 10 years imprisonment on the felony drug charge, and one year in the county jail on the marijuana possession charge.  An amended judgment and sentence cut Sanders's prison time on the felony drug charge from ten to three years, with the balance suspended, with the misdemeanor attempting to elude and possession of paraphernalia charges dismissed, and a one year concurrent sentence on the DUI charge.  (File in Sequoyah County Case No. CF-92-91.)

(2)     In Sequoyah County Case No. CF-97-9, Sanders was charged with three crimes of dishonesty: Concealing stolen property, and two counts of uttering a forged instrument. Although Sanders could have been charged with two or more "after formers," which would have set his exposure at twenty years to life under Oklahoma law, he was not. (21 O.S. 1991, section 51.) Instead, the concealing stolen property felony charge was dismissed, and the two uttering charges were reduced to misdemeanors, for which he received one year suspended sentences, to run concurrently. *(See* File in Sequoyah County Case No. CF-97-9.)

On October 2, 1998, an application to revoke Sanders's misdemeanor suspended sentences was filed because Sanders had violated the terms of his probation by committing second degree burglary and larceny from a house as charged in Sequoyah County Case No. CF-98-128, and also because he failed to pay the restitution he promised when he received his misdemeanor suspended sentences.

On October 7, 1998, Sanders failed to appear for a court hearing, and a bench warrant was issued for his arrest. No disposition is shown for the revocation action. The last entry in the docket on this case notes that on December 9, 1999, a waiver of preliminary hearing in Sequoyah County Case No. CF-99-562 was filed. As discussed below, the application to revoke in this case was later "passed" for ninety days, and would be dismissed altogether upon payment of restitution. If restitution were not paid, Sanders would receive one year in the county jail. As matters developed, and as is discussed below, Sanders was required to pay no restitution.

Although these records indicated Sanders was receiving favorable treatment from the Sequoyah County District Attorney at the time he was working for Clint Johnson to gather

"evidence" against Mr. Barrett, and Mr. Barrett's trial counsel demonstrated a desire to impeach Sanders on those grounds, trial counsel failed to present these records to the jury.

(3)    In Sequoyah County Case No. CF-97-75, Sanders was charged with the felony crime of running a roadblock, and misdemeanors for attempting to elude, having an open container, and reckless driving.  Although prior felony conviction enhancements could have been filed to increase the range of punishment on the running a roadblock felony charge, they were not.  On October 16, 1997, this case was dismissed outright on motion of the state, based on what is reflected on OSCN.  The court case file itself apparently shows no disposition.  Sanders was questioned on none of this by defense counsel.  (File in Sequoyah County Case No. CF-97-75.)

(4)    In Sequoyah County Case No. CF-97-140, Sanders was charged with concealing stolen property and felony possession of methamphetamine.  It was alleged on page two of the information that he had three prior felony convictions, all out of Sequoyah County, in Case Nos. CF-89-396 (uttering a forged instrument); CF-92-91 (drug possession); and CF-90144 (sexual battery).  Again, Sanders was facing up to life in prison upon conviction.  (21 O.S. section 51.)  Instead, again on October 16, 1997, all charges were dismissed on motion of the state, according to OSCN.  The court file itself shows no case disposition.  Counsel did not cross-examine Sanders on this gift from the state prosecutors.

(5)    In Sequoyah County Case No. CF-98-22, Sanders was charged with concealing stolen property, grand larceny, unlawful use of a police radio, and *providing false information to a police officer*.  Despite his many prior convictions, Sanders received an illegal deferred sentence, which was later accelerated.  (22 O.S. 1991, section 991c (prohibiting

defendant with even one prior felony conviction from receiving a deferred sentence).[16]  Counsel

was professionally unreasonable for failing to question Sanders about how he managed to get a

deferred sentence from Sequoyah County authorities when, due to his record, the deferment was

absolutely barred by law.  (Record from court clerk's office on case; other parts of file have been

lost or destroyed.)

(6)    In Sequoyah County Case No. CF-98-128, Sanders was charged with the

felonies of second degree burglary and larceny from a house.  The three "after-formers" alleged

in Sequoyah County Case No. CF-97-140 (Sequoyah County Case Nos. CRF-89-396, CRF-92-91

and CRF-90-144) were alleged, setting Sanders's exposure at twenty years to life.  An amended

information alleging the same charges and same "after-formers" was filed on July 7, 1998.

Miraculously, the state dismissed the after former conviction allegations, and Sanders received

patently illegal five year deferred sentences, running concurrently, with costs waived by the

District Attorney's office.  The sentences were also ordered to run concurrently with a conviction

Sanders obtained in Creek County.  CF-98-128 was case was later dismissed with costs, as is

discussed below.  (File in Sequoyah County Case No. CF-98-128.)

It was unreasonable for Mr. Barrett's trail counsel not to discover and use on

cross-examination records showing that Sanders, who faced the prospect of life in prison on this

offense alone, received illegal deferred sentences, and that even those illegally lenient sentences

eventually were lifted.

---

[16]  This statute was later amended by 22 O.S. section 991c (F) to permit convicted felons
to receive a deferred sentence, but only on motion and waiver by the State.

(7)    In Sequoyah County Case No. CF-98-346, Sanders was charged with possession of methamphetamine (a felony) and misdemeanor possession of drug paraphernalia. Again, he was charged after having been previously convicted of the same three Sequoyah County felonies discussed above.  Sanders was yet again facing twenty to life.  Per a plea agreement reached with the state, Sanders received a twenty year suspended sentence.  The misdemeanor charge was dismissed.  At the time he entered his plea, due to his record of prior felony convictions, Sanders was not eligible for a suspended sentence under Oklahoma law as it then existed.  (22 O.S. 1991, section 51; 22 O.S. 1991, section 991c.)[17]

Although Mr. Barrett's trial counsel briefly alluded to this case, and the sentence Sanders received, counsel failed to point out the following impeaching facts: (a) on May 3, 2001, the state filed an application to revoke Sanders's suspended sentence because he had been arrested for larceny of merchandise from a retailer and possession of drug paraphernalia in Sequoyah County Case No. CF-01-314, and also failed to report to his probation officer, as he told the court he would do when he received his suspended sentence; (b) on August 23, 2001, the court ordered Sanders's sentence revoked in full, with Sanders ordered to complete the "Last Stop" program in the department of corrections, upon successful completion of which the balance of the sentence would again be suspended; (c) coming to Sanders's aid yet again, the Sequoyah County District Attorney's Office moved on February 22, 2002, to amend the revocation to allow Sanders to attend either the "Last Stop" program, or an equivalent program, and requested that the sentence in this case be ordered to run concurrently with the sentence in

---

[17]  Again, as with the statute governing deferred, the law was later amended to permit defendants, such as Sanders, with two or more prior felony convictions to received suspended sentences, but only on motion and waiver by the State.

Sequoyah County Case No. CF-98-363; (d) a *nunc pro tunc* orders granting these requests were entered by the court on March 5 and March 28, 2002; (e) on March 12, 2004, the District Attorney filed a second application to revoke Sanders's suspended sentence, because he had committed a new offense, burglary in the second degree, as alleged in Sequoyah County Case No. CF-04-19; (f) an amended second application to revoke Sanders's suspended sentence was filed on June 17, 2004, based on the amended information filed in Case No. CF-04-19, which alleged, in addition to second degree burglary, that Sanders had also committed the offenses of second degree arson, concealing stolen property, and felon in possession of a firearm; (g) on November 17, 2004, instead of revoking the entirety of the suspended sentence, the court, pursuant to Sanders's agreement with the state, revoked only five years of the suspended sentence, with the entirety of the sentence to again be suspended if Sanders successfully completed the "Key to Life" program in the Department of Corrections; (h) incredibly, the partial revocation in this case was ordered to run concurrently with the suspended in whole or in part sentences in Sequoyah County Case Nos. CF-98-363, CF-99-562, CF-04-19, and CF-03-124.

Sanders was not questioned about the fact he faced revocation of the entire twenty year sentence based on his various probation violations, with consecutive time in his other active Sequoyah County cases. Nor was it brought to the jury's attention that absent the various deals he received, Sanders was once more facing the potential of life in prison on this offense of conviction due to his record of previous felony convictions. Counsel also failed to point out Sanders's statutory ineligibility for any suspended sentence due to his prior felony convictions, absent a motion and waiver from the State. (File in Sequoyah County Case No. 98-346.)

(8)    In Sequoyah County Case No. CF-98-363, Sanders was charged, yet again, with uttering a forged instrument. The same previous felony convictions noted in the cases

above were alleged on page 2 of the information, meaning Sanders was facing twenty to life.  On December 9, 1999, the allegation of prior convictions was dismissed and Sanders received a twenty years suspended sentence that he was not eligible to receive under then-existing Oklahoma law.  This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-99-562 and CF-98-346.

Again in this case, an application to revoke was filed on May 3, 2001, for failure to report, and based on Sanders's arrest for felony larceny of merchandise from a retailer and possession of drug paraphernalia, a misdemeanor, as charged in Sequoyah County Case No. CF-01-314.  Again, an order revoking was entered by the state court on August 23, 2001, with the sentence ordered revoked in full, but to be suspended in its entirety if Sanders successfully completed the "Last Stop" program in the Department of Corrections.  Sanders was allowed to self-surrender to the county jail instead of being immediately placed in custody.

As described in connection with Case No. CF-98-346, a motion to amend the order revoking was filed.  A *nunc pro tunc* order amending the previous revocation order, and directing Sanders's sentence to be served concurrently with the sentence in Sequoyah County Case No. CF-98-346, was entered.  A second motion to revoke based on the same allegations of new offenses filed in CF-98-346, were also filed in connection with this case.  On April 17, 2004, the court entered a second order revoking Sander's suspended sentence.  As with Case No. CF-98-346, only five years of the twenty-year suspended sentence was revoked, and the sentence would again be suspended in its entirety if Sanders successfully completed the in-house "Key to Life" program or its equivalent.  This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-98-346, CF-99-562, CF-04-19, and CF-03-124.

Counsel failed to cross-examine Sanders about the fact he faced a sentence of up to life imprisonment on this conviction absent the deal he received, and, having received probation, could have had his sentence revoked in full, with consecutive time on all his other active cases, absent the tremendous break he received from the prosecutors.  (File in Sequoyah County Case No. CF-98-363.)

(9)    In Sequoyah County Case No. CF-99-562, Sanders was charged with still more crimes of dishonesty.  Some, but not all of the charges in this case, were mentioned briefly by defense counsel on cross-examination.  Sanders was charged with three counts of concealing stolen property, one count of uttering a forged instrument, misdemeanor possession of marijuana (which could have been charged as a felony due to Sanders's prior drug convictions), and possession of a sawed-off shotgun.  Instead of trotting out the usual three "after-formers" charged in some of the cases discussed above, Sanders was charged with committing the instant offenses after previous conviction of five felonies.  In addition to the same three prior Sequoyah County felony that were usually alleged on page 2, it was also charged that Sanders had felony convictions in Muskogee County Case No. CF-93-772 for escape from custody, and Muskogee County Case No. CF-93-131 for carrying a weapon into the jail.  Yet again, Sanders faced twenty to life.

Based on yet another deal-of-a-lifetime, Sanders received a twenty year suspended sentence on count 1.  In an extraordinary gift from prosecutors, and at an extraordinary cost to public safety, counts 2, 3, 4, 5 and 6 were dismissed outright.  Consequently, Sanders, a convicted felon many times over, was allowed to walk around with a sawed-off shotgun, with no repercussion whatsoever.

This case was "wrapped up" on the same guilty plea forms with Sequoyah County Case Nos. CF-98-363, CF-98-346, CF-98-128, and CF-97-9. As noted, Sanders received a twenty year suspended sentence on the felony conviction in CF-98-363; Case No. CF-98-128 was dismissed with costs Sanders was later relieved of paying; and the long-moribund revocation action in CF-97-9 was passed for ninety days to allow payment of restitution, which, in the end, Sanders was never required to pay, thus making hollow the threat of a year in jail for failure to satisfy restitution.

The same application and amended applications to revoke, and the same or similar *nunc pro tunc* orders discussed above in Sanders's other cases, were filed in this case. As with the other cases discussed above, Sander's suspended sentence in this case was first revoked for only five years. He would revert to full probationary status upon completion of a Department of Corrections drug program. The initial revocation order for up to five years and the rest were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-03-124 and CF-04-19.

Trial counsel failed to question Sanders about the fact he was facing up to life in prison in this case; that five of the six charges lodged against him were dismissed; and that, without the largesse of the state prosecutors, he could have (and should have, based on his horrific record) faced revocation of all the suspended sentences he was serving, to be served consecutively. As with the other cases discussed above, counsel failed to point out that Sanders was either ineligible for a suspended sentence, or had to receive a special dispensation from the prosecution to get one. (File in Sequoyah County Case No. CF-99-562.)

(10)   In Sequoyah County Case No. CF-01-314, Sanders was charged with another felony crime of dishonesty, larceny of merchandise from a retailer. He was also charged

with a misdemeanor for possession of drug paraphernalia.  The state alleged in page two of the information that Sanders committed the felony larceny after having been convicted of six felonies (Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363 and CF-99-562).  With two or more "after-formers," Sanders faced a minimum of twenty years, and a maximum of life on the felony charge.

Initially, on August 23, 2001, this case was dismissed upon the payment of costs. On October 19, 2002, the case was "combined" with other cases, with a result similar to those discussed above.

Mr. Barrett's trial counsel unreasonably failed to reference this case at all during cross-examination, and thereby failed to inform the jury that from the time Sanders became Clint Johnson's confidential informant he received the most extraordinary lenient treatment which left him free to roam the streets committing crime after crime.  (File in Sequoyah County Case No. CF-01-314.)

(11)    In Sequoyah County Case No. CF-03-124, Sanders was charged in a seven count information with: 1) feloniously pointing a firearm; 2) being a felon in possession of a firearm; 3) felony running a roadblock; 4) felony running a roadblock; 5) attempting to elude (misdemeanor); 6) reckless driving (misdemeanor); 7) and resisting an officer (misdemeanor). Sanders was charged with the felony offenses in this case after having been convicted of six felonies Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562.  With the allegation of two or more "after-formers," Sanders was staring at his usual 20 to life term.

Sanders, as with all his other Sequoyah County convictions, entered into wildly generous plea agreement with the state.  As reflected by the judgment and sentence in this case,

filed on November 17, 2004, counts 1 and 2 were dismissed. The allegation of "after-formers" carried no real sting. The misdemeanor charges were dismissed. On the felony running a roadblock charges in counts 3 and 4, Sanders was "punished" with sentences of twenty-five years, running concurrently, all to be suspended except for the first five years (also running concurrently), with the entirety of the sentences to be suspended upon completion of the "Key to Life" program, or another similar program. These sentences were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19. (File in Sequoyah County Case No. CF-03-124.)

Mr. Barrett's trial counsel unreasonably failed to impeach Sanders with this highly prejudicial evidence. The jury could not help but notice that Sanders was given the lightest treatment for conduct very similar to acts the Government attributed to Mr. Barrett. The jury also would have been impressed to learn that charges had been dismissed in this case, that Sanders again escaped 20 years to life due to prosecutors' intervention, that despite his repeated crimes Sanders never drew consecutive sentences, and that, as reflected by his other cases, prosecutors for years gave Sanders a license to commit whatever crime he wished in Sequoyah County, with only the most minor of consequences.

(12)    In Sequoyah County Case No. CF-04-19, Sanders was originally charged with second degree burglary, after former conviction of six felonies Sequoyah County Case Nos. CRF-89-396, CRF-90, 144, CRF-92-91, CF-98-346, CF-98-363, and CF-99-562. The case was amended to charge additional counts of second degree arson, concealing stolen property, and felonious possession of a firearm.

On November 17, 2004, per a plea agreement with the state, and with the "page two" still intact, Sanders was sentenced on each of counts 1, 2, and 3 to twenty-five years

Def's § 2255 Mot.                    108                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

imprisonment, with all but the first five years suspended, and with the balance of the sentences suspended in full upon completion of the Department of Corrections in-house drug program. Count 4, in which Sanders was charged with being a felon in possession of a firearm, was dismissed. The sentences in this case were ordered to run concurrently to one another and concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562, and CF-03-124. (File in Sequoyah County Case No. CF-04-19.)

Counsel was professionally unreasonable in failing to cross-examine Sanders on the fact that he faced twenty to life absent a deal from the state prosecutors, that he received concurrent probation time rather than consecutive prison time, and that the firearm charge against him was dismissed.

(13)     In Cherokee County Case No. CF-98-111, Sanders was (and still is) charged with no fewer than six counts of uttering a forged instrument, after former conviction of felonies. Amended and second amended informations were filed on June 1, 1998 and August 20, 1998, respectively. Although he promised to appear at all court dates after being released on bond, he incurred a failure to appear. A bench warrant was issued on May 15, 1998. Sanders had a second failure to appear on March 24, 2000. On May 3, 2001, he was ordered released to a bondsman. The case is still pending today. The last docket entry, for November 25, 2008, shows that Sanders could not make it to court as scheduled because of eye surgery. (File in Cherokee County Case No. CF-98-111.)

Counsel was professionally unreasonable for failing to cross-examine Sanders about this pending case, the existence of which could have been discovered easily. Because this case was still pending without disposition during Mr. Barrett's trial, seven years after it had been

filed, Sanders's bias and motive in appearing as a Government witness in the hopes that he could resolve this case favorably – as he had all of his other cases – was apparent.

(14)    In Muskogee County Case Nos. CF-93-131 and CF-93-772 Sanders was convicted of escape and carrying a weapon into a jail, respectively.  Sanders attempted to claim that these were the same case, when they clearly were not.  Counsel was professionally unreasonable in failing to demonstrate that Sanders lied and that he in fact had separate Muskogee County convictions.  (Files in Muskogee County Case Nos. CF-93-131 and CF-93-772.)

(16)    In Tulsa County Case No. CF-94-1503, Sanders was charged with uttering a forged instrument.  This case was dismissed years later, on September 18, 2001.  Costs were assessed against the state.  Counsel was professionally unreasonable for failing to cross-examine Sanders regarding the disposition of this case, in which he once again avoided a conviction and prison time.  (File in Tulsa County Case No. CF-94-1503.)

(17)    In Tulsa County Case No. CM-03-6603, Sanders was charged with obtaining merchandise by false pretenses, a crime of dishonesty upon which he could have been cross-examined, but was not.  Sanders received a one year suspended sentence, fines and costs.  Although he surely promised to do so, Sanders failed to appear before the Tulsa County cost administrator as directed on March 24, 2004.  A bench warrant was issued for his arrest on April 12, 2004.  An application to revoke his suspended sentence was filed on April 14, 2004.  Another bench warrant for Sanders's arrest was issued on May 20, 2004.  On October 6, 2005, Sanders was sentenced to thirty-six days in jail, at a rate of $15.00 per day, to work off what was owed.  Not only the fact of Sanders's conviction for this crime of dishonesty, but his failure to follow through on promises to fulfill the terms of his suspended sentence, could have been inquired into

on cross-examination to show him to be a completely untrustworthy individual, who will say one thing to receive something of advantage to himself, but whose word is utterly worthless. (File in Tulsa County Case No. CM-03-6603.)

(18)    In Tulsa County Case No. CM-04-1187, Sanders was charged with drug possession and possession of drug paraphernalia. On April 5, 2004, he incurred a failure to appear, despite a promise as a condition of his bond to make all court appearances. During Mr. Barrett's trial, Sanders appeared, in custody, on September 28, 2005. He entered a not guilty plea, and the case was set for the jury sounding docket on October 13, 2005. On that date, again during Mr. Barrett's trial, and around the time he appeared as a first stage witness, the case was passed to November 17, 2005. On November 17, the last day of Mr. Barrett's trial, the case was passed to February 2, 2006, because Sanders was "in federal custody." On December 9, 2005, Sanders appeared in custody, entered a guilty plea, and was rewarded with sentences of one year in the county jail on each count, with the jail time suspended. (File in Tulsa County Case No. CM-04-1187.)

Mr. Barrett's trial counsel unreasonably failed to discover the facts and cross-examine Sanders over the fact that this case kept getting passed until Sanders performed for the Government at Mr. Barrett's trial, the obvious implication being that any deals he would receive in that case were contingent solely on how much he pleased the Government.

(19)    In Sequoyah County Case No. CM-00-389, Sanders was charged with attempting to elude an officer, affixing an improper license plate to his vehicle, and eluding arrest. On June 30, 2000, Sanders entered into a plea bargain which called for count 1 (attempted eluding) to be dismissed, fines and costs on count 2 (improperly affixing a license plate), and a one year suspended sentence and a fine on count 3 (eluding arrest). On March 7, 2001, a bench

warrant was issued for Sanders's arrest for failure to satisfy terms of probation he promised the court he would fulfill at the time he entered his plea. Counsel was professionally unreasonable for failing to cross-examine Sanders on this act of dishonesty. (File in Sequoyah County Case No. CM-00-389.)

(20)     In Sequoyah County Case No. CM-03-365, Sanders was arrested, among other charges, for possession of marijuana. He also attempted to resist arrest. Counsel was professionally unreasonable for failing to cross-examine Sanders about the fact that with his prior drug convictions, he could have been, but was not, charged with felony possession of marijuana rather than a misdemeanor. (File in Sequoyah County Case No. CM-03-365.)

In sum, counsel was professionally unreasonable for failing to move for a continuance so Sanders could be cross-examined effectively about his litany of prior convictions; his deals, which could only have resulted from his working continuously as a snitch; the charges and cases against him which had been dismissed; the fact that he was facing up to life in prison on many charges, but got virtually nothing by way of punishment; his acts of dishonesty in connection with various charges and his obligation to appear in court and adhere to the conditions of his probation, and the like.

Counsel even failed to discover all of Sanders's prior convictions. Counsel stated that by his count, Sanders had ten previous convictions, or nine, if Sanders's dispute with one of them was credited. (R. 2524-36.) In truth, after the dismissed cases and charges against Sanders are set aside, Sanders had no fewer than eighteen prior felony convictions, if the various counts of conviction are totaled. The better part of a day or more could have been spent cross-examining Sanders about his criminal record and the wonderful deals he got time after time, even while he continued to commit crimes with impunity. Instead, counsel merely scratched the

surface, cross-examining Sanders generally (and inaccurately) about the number of previous

felony convictions, what they were for, and that he received little jail or prison time. Counsel

neglected altogether to cross-examine Sanders about his misdemeanor cases involving

dishonesty, and did not even draw the jury's attention to the fact that many of Sanders's

convictions, for both felonies and misdemeanors, involved acts of dishonesty.

Had an effective cross-examination on Sanders's record been conducted, his

credibility would have been completely destroyed in the eyes of any rational jury. Impeachment

of Sanders also would have undercut the credibility of Clint Johnson and other Sequoyah County

law enforcement officials, not to mention the Government then relying upon him to seek a death

sentence. These omissions alone, or in conjunction with counsel's other failures to investigate

the informant witnesses and prosecution evidence, undermines confidence in the verdict. If trial

counsel had presented the available evidence, the jury would have had an entirely different and

more truthful view of the case, including that the raid on Mr. Barrett's house was conducted on

the word of someone whom the Sequoyah County District Attorney knew was a lifelong liar,

drug addict, and opportunistic snitch.

> **2. Counsel was professionally unreasonable for failing to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole.**

Even in the absence of moving for and securing a reasonable continuance to

investigate the snitch witnesses, it is plain that counsel failed to perform an adequate

investigation into readily available evidence and witnesses that would have impeached Sanders's credibility and shown him to be completely unworthy of belief about anything and everything. Instead of locating available witnesses to impeach Sanders, counsel relied on cross-examination alone, which was plainly inadequate.

As noted, Sanders was somewhat "confused" over the dates he supposedly visited Mr. Barrett's property. Based on one reasonable interpretation of the dates Sanders claimed to have been at Mr. Barrett's residence, and as argued by AUSA Littlefield to the jury, Sanders was at Mr. Barrett's on the afternoon of September 23, 2009, just hours before the early morning police raid on Mr. Barrett's property. Littlefield told the jury Sanders was present around 5:00 p.m. to 6:00 p.m. on September 23rd, around the time the gate to Mr. Barrett's driveway was locked. (R. 4299.)

Had counsel conducted a reasonable investigation, or sought the time to conduct one, they could have produced Rick Lunsford as a witness to rebut this claim. As noted in the discussion of Travis Crawford's testimony, Mr. Lunsford arrived at Mr. Barrett's around noon on September 22, 1999, and stayed until approximately 9:00 p.m. on September 23rd. Lunsford states that Sanders was never at Mr. Barrett's property on either September 22 or September 23, 1999. Of course, Mr. Lunsford was never contacted by defense counsel. Had he been contacted,

he would have been willing to testify that Sanders was never on Mr. Barrett's property on the afternoon and early evening of September 23rd. (Decl. of Rick Lunsford.)

Likewise, trial counsel failed to contact and interview another witness who could have refuted Sanders's claim to have been in Mr. Barrett's house, where he supposedly saw methamphetamine and a drug sale, according to his direct testimony, in September, 1999. Sean

Hill would have testified that Sanders was never in Mr. Barrett's house because Mr. Barrett would not let him in.  Mr. Barrett and his real friends stayed as far away from Sanders as possible because it was well known he was a chronic liar and a police snitch.  (Decl. of Sean Hill.)

As noted, Brandy Hill was present at Mr. Barrett's on the afternoon of September 23, 1999.  She could have identified the people who were present during that time.  Charles Sanders was not among them.  Ms. Hill was never contacted by defense counsel.  (Decl. of Brandy Hill.)

Critically, Sanders testified that two to three days before the shooting, he went to Mr. Barrett's with his then-girlfriend, Geniece [sic] Thomas.[18]  He gave conflicting testimony as to whether Mr. Barrett sold drugs to either him or Ms. Thomas, on this or any other occasion. When questioned by the prosecutor, Sanders claimed that Mr. Barrett sold Ms. Thomas drugs. Questioned by defense counsel, Sanders stated that there was no drug deal when he supposedly went to Mr. Barrett's two to three days before the police raid, and that he merely went there, with Ms. Thomas, to exchange a set of car keys.

Trial counsel never contacted Ms. Thomas.  She was an available witness.  Had counsel located and interviewed her, she would have testified that Sanders was lying.  Ms. Thomas would have testified that she was not at Mr. Barrett's with Sanders a few days before the shooting.  She also would have testified that on the occasions she did go to Mr. Barrett's she never went with Sanders.  Moreover, Ms. Thomas could have testified that on the occasions she went to Mr. Barrett's, she never bought drugs from him.  On any occasion she was at Mr. Barrett's when Sanders was on the property, she never witnessed or had any knowledge of any

---

[18]  Her true name is Janesse Thomas.

drug transactions between Mr. Barrett and Sanders. Mr. Barrett would not have sold drugs or engaged in drug activities with Sanders because Mr. Barrett neither liked nor trusted Sanders, who was a well-known snitch. (Decl. of Janesse Thomas.)

Counsel unreasonably failed to investigate and produce some of the witnesses discussed immediately above, and others, who could have testified that Sanders is a pathological liar whose word was worthless. Not only did these witnesses have personal opinions that Sanders was dishonest and completely untrustworthy, but they were well aware that Sanders's reputation for truth and veracity in the community was horrendous. These witnesses also could have armed counsel with information to cross-examine Sanders, in the first stage of trial, about various bad acts and acts of dishonesty. Since Sanders also appeared as a penalty phase witness for the Government, and because the rules of evidence are relaxed in the second stage of a capital trial, these witnesses could have given specific testimony on specific bad acts of Sanders and actions which reflected negatively on his credibility.

Rick Lunsford could have testified that he knows Sanders, and had done drugs with him in the past. Sanders was a heavy drug user, who also dealt drugs. In Mr. Lunsford's opinion, Sanders is a totally dishonest person. Mr. Lunsford would not believe anything Sanders said. Sanders was even dishonest in his drug dealings. Sanders often sold bad dope to people and ripped them off. Of course, he never seemed to get in trouble for his drug dealings. Mr. Lunsford is aware that Sanders once kidnaped a woman, Sally Davis. Not only does Mr. Lunsford have a personal opinion that Sanders is wholly dishonest, but he has a well known, and richly deserved, reputation for dishonesty in the community. Mr. Lunsford, as noted in the discussion regarding Travis Crawford, also could have testified that Mr. Barrett never threatened

harm to the police, and never said he would go out in a "blaze of glory" or anything like that. (Decl. of Rick Lunsford.)

Janesse Thomas, Mr. Sanders one-time girlfriend, could have testified that in her personal opinion, Sanders is completely dishonest and would say and do anything as long as he believed he would obtain something of advantage to himself. Sanders's reputation for honesty in the community is horrible. Ms. Thomas could also have given testimony showing that Sanders resented Mr. Barrett and had a motive to lie against him. On one occasion, when Thomas was still Sanders's girlfriend, she tried to get away from him and called Mr. Barrett and another friend for help. Thomas left Sanders, and was picked up by Mr. Barrett. Sanders and his mother, Evelyn Sanders, followed Mr. Barrett and Thomas. Sanders was angry and was trying to persuade Ms. Thomas to come back with him and his mother. Instead, Mr. Barrett was able to get Ms. Thomas away from Sanders. (Decl. of Janesse Thomas.) Based on these events, jurors would have found Sanders had a personal motive to lie about Mr. Barrett, apart from or in addition to his interest in currying favor with law enforcement.

Sean Hill could have testified that in his personal opinion, Charles Sanders is a liar who had no credibility whatever. Sanders's reputation in the community for truth and veracity is abysmal; Sanders is known as a thief, a liar and a snitch. It was known in the wider community that Sanders lies about others in order to get favorable treatment from law enforcement. When Mr. Hill heard that the Government sponsored Sanders as a witness at Mr. Barrett's trial, he could not believe the prosecutors would rely on Sanders because of his lengthy arrest record. In his penalty phase testimony, Sanders claimed that Mr. Barrett had made statements to the effect that the informant against him should be found and harmed. Mr. Hill could have given testimony from which the jury could infer that Sanders was attributing to Mr.

Barrett actions that routinely occurred.  Mr. Hill would have informed the jury that when Sanders is in jail, it is known that he is routinely beaten up by other inmates because he is a liar.  (Decl.of Sean Hill.)

Sally Davis Johnson, a one-time girlfriend of Sanders, was available as a witness, but was never contacted by the defense.  She last had contact with Sanders in 2004, before Mr. Barrett's trial.  In her personal opinion, Sanders is completely unbelievable and untrustworthy.  Sanders is extremely dishonest even when sober, but when he is on drugs, he is "100 times more dishonest."  Ms. Johnson could never believe anything Sanders said on any subject.  (Decl. of Sally Davis Johnson.)

Ms. Johnson could have provided defense counsel with information about specific bad acts of dishonesty and violence that could have been used to impeach Sanders in the first stage of trial, even if she could not have given "extraneous evidence" on these matters in the first stage.  Ms. Johnson could have testified to these acts, however, in the penalty phase.  This evidence would have put the lie to the prosecution's portrayal of Sanders as simply a non-violent doper who was himself the innocent victim of planned violence by others.

On one occasion, Sanders used lies and fraud to get Ms. Johnson to go with him.  Sanders showed up at her house and said he needed to talk to her.  She told him she could talk to him briefly, but had to get back to school.  She left with Sanders in his car.  Against her will, Sanders kidnaped her and took her to Vian, Oklahoma, where she was held for eight days.  She was beaten on a daily basis by Sanders, and was even stabbed.  During this ordeal, Sanders lied to her repeatedly, telling her he would take her home when her bruises healed.  Instead, Sanders simply kept beating her.  When she tried to escape, Sanders threw a knife at her, and stabbed her in the foot.  Sanders also used a knife to cut her from her neck to her chin.  After five days of

being held by Sanders, he turned himself in to the police on an outstanding charge. At this point, Sanders turned Ms. Johnson over to his mother, Evelyn Sanders, who confined her for another two to three days. The police finally rescued Ms. Johnson. Evelyn Sanders tried to cover up Ms. Johnson's many bruises with make-up. A police report was made by Ms. Davis about what Sanders did to her. (Decl. of Sally Davis Johnson.)[19]

Ms. Johnson could have told defense counsel, had she been contacted, about an act of threatened violence committed by Sanders. Sanders once threatened Ms. Johnson's mother, Linda Davis, because Ms. Davis would not tell Sanders where Ms. Johnson was. Sanders stated that unless Ms. Davis gave him the information he wanted, he would find Ms. Johnson and cut her tongue out. (Decl. of Sally Davis Johnson.)

Ms. Johnson, had she been contacted by defense counsel, also could have informed the defense about other specific acts of dishonesty committed by Sanders. Sanders once took her along on a stealing spree, during which Sanders stole from virtually everyone he knew in order to get money to buy drugs. The police were informed about this by Ms. Johnson. Sanders had also stolen from Ms. Johnson and her family in order to get money to buy drugs. Sanders was so pathetically dishonest he once stole Ms. Johnson's children's toys in order to pawn them for drug money. (Decl. of Sally Davis Johnson.)

Finally, one of Sanders's own relatives could have testified, had he been contacted by the defense, that Charles "Monk" Sanders is a completely untrustworthy and unbelievable individual. Billy Poindexter is Sanders's uncle, and has known Sanders his entire life. According to Mr. Poindexter, "you can believe him [Sanders] about as far as you can throw a

---

[19] Evidently, based on the search of Sanders's court records, he was never charged in this incident because he was working as a police snitch.

pick-up truck." Sanders, who has been in trouble his whole life, is unbelievable in everything he says. Mr. Poindexter would not believe his nephew about anything. Mr. Poindexter is aware that when Sanders testified at Mr. Barrett's trial, Sanders was doing so in order to get out of his own troubles with the law. Mr. Poindexter is also aware that after testifying against Mr. Barrett, Sanders served no jail time for anything he was in trouble for. Mr. Poindexter states also that he is aware that Sanders's reputation in the community for truthfulness is awful. Had Mr. Poindexter been contacted by Mr. Barrett's trial lawyers, he would have testified. (Decl. of Billy Poindexter.)

Additionally, had trial counsel moved for a continuance, they could have developed all the evidence detailed above respecting Sanders's credibility to mount a withering attack on the search warrant under *Franks*. This evidence would demonstrate conclusively that *no one, including Clint Johnson*, could have used Sanders as a "reliable" confidential informant.[20]

### d.    Randy Weaver

Randall Weaver testified in the first stage of Mr. Barrett's trial. He stated that in 1999, he was using methamphetamine, and had been to Mr. Barrett's place three or four times in the spring and summer of that year. Using the death of Trooper Eales as a benchmark, Weaver stated he had been to Mr. Barrett's earlier in 1999 year looking at cars. On that occasion, Weaver and Mr. Barrett used methamphetamine together. Weaver went to Mr. Barrett because he was a good mechanic. Whenever he went to Mr. Barrett's property, the gate was open; Mr. Barrett did not come out with a gun on the occasions Weaver went to the property. Weaver testified he

---

[20] *See also,* Mr. Barrett's *Brady/*newly discovered evidence claim respecting the complete lack of credibility of both Sanders and Johnson.

bought $20.00 of methamphetamine from Mr. Barrett. Weaver claimed Mr. Barrett told him that he (Mr. Barrett) had missed a court date, and that he thought a warrant had been issued. (R. 1835-39.)

Weaver, who was interviewed by Bret Smith and defense investigator Loyd Cobb in AUSA Mike Littlefield's presence, testified he had first been approached about Mr. Barrett's federal case by Littlefield, who came to his tattoo shop in Arkansas. Weaver had previously done time on an Arkansas cocaine charge. When Littlefield came to see him at the tattoo shop, he asked whether Weaver had ever sold ammunition to Mr. Barrett, and informed Weaver that it was against federal law for Weaver to possess ammunition because of his previous conviction. Weaver told Littlefield he never sold ammunition to Mr. Barrett. Littlefield's statement to Mr. Weaver about the sale of ammunition might be construed as a subtle threat, but Weaver felt he had nothing to worry about because he had done nothing wrong. (R. 1835-39.)

Questioned by defense counsel, Weaver testified that in a rural area like he and Mr. Barrett lived in, people don't drive up without warning in the middle of the night. If a gate is closed, people should not go onto somebody else's property. It makes no sense to do such a thing. (R. 1840-45.)

Although he was interviewed briefly by the defense, defense counsel and the defense investigator failed to ask Weaver whether, when Mr. Barrett supposedly discussed his court case, or at any other time during the Spring and Summer of 1999, he ever said words to the effect that he would blast the first policeman who came onto his property, would "go out in a blaze of glory," or had in any way, at any time, threatened the police. Had he been asked these questions at trial, Weaver would have testified that Mr. Barrett never made such statements to

him or anyone else in his presence.  In fact, Mr. Barrett never indicated to Weaver that he would ever do violence to anyone.  (Decl. of David Autry.)

###### e.   Brandie Zane Price

Brandie Price testified she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period.  (R. 3485-86.)  Price testified that a week to ten days before the shooting incident, Mr. Barrett mentioned that he had an outstanding warrant and that the police were going to come get him.  Mr. Barrett supposedly stated that if the police arrived, those present should either grab a gun or hit the floor, because he "was going to take as many of them bastards out as he could."  (R. 3492-93.)

Price stated that she usually went to Mr. Barrett's house with Ronny Baldwin,[21] who would drive her vehicle through the ditch area the police went through when they raided Mr. Barrett's house.  (R. 3502-06.)  Defense counsel cross-examined Price about statements she made to the authorities in 2000, where she stated that Mr. Barrett had a MAC-10 and a Mini-14 at his residence, which were unlike the weapons she described on cross-examination.  She also stated in 2000 that she went to Mr. Barrett's with a lady named Jaime Crow, which she denied doing in her testimony.  (R. 3509-11.)

Price's claim that Ronny Baldwin or she usually approached Mr. Barrett's residence from the east through the ditch in her Mazda or Mitsubishi automobile could have been easily refuted by the testimony of Sean and Brandy Hill.  Had they been contacted, they would

---

[21]  Ronny Baldwin testified for the defense.  He stated he could never recollect going to Mr. Barrett's house with her at any time, and that he never would have driven her car through the depressed area to the east of Mr. Barrett's cabin.  Baldwin could not have gone to Mr. Barrett's in August and September as she claimed, because he was jailed on August 4, 1999, and remained in jail through the entire month of September, 1999.  (R. 4117-23, 4182-83.)

have testified that it would have been impossible for this low-slung vehicle, no matter how slowly it was going, to navigate the ditch successfully.  The undercarriage would have been severely damaged in the attempt.  (Decls. of Sean Hill and Brandy Hill.)

Counsel also failed to call any witnesses who could testify to their personal opinions regarding Price's honesty, or her reputation for honesty in the community.  Sean Hill was an available witness never contacted by the police.  If he had been interviewed and prepared to testify, he could have told the jury that Price was known in the community as a thoroughly dishonest person who would do or say anything to obtain drugs.  (Decl. of Sean Hill.  *See also* Claim 5, *infra*.)  Moreover, the witnesses who were never investigated who could have impeached claims by Monk Sanders, Travis Crawford and Cindy Crawford that Mr. Barrett made threatening statements against law enforcement could have been used to indirectly discredit Price, since her story was simply too pat and conveniently lined up with what Sanders and the Crawfords said on the witness stand.

### f.    Karen Real

Karen Real, like all the other informant witnesses except Randy Weaver, refused to talk to the defense.  (R. 3076-77.)  At the time she testified against Mr. Barrett, she was serving a fourteen year federal sentence on drug charges and a firearms charge.  (*See* Claim 5, *infra*.)  Real had been to Mr. Barrett's on several occasions.  She claimed he usually kept his gate locked, and that when people arrived on his property, he would grab a gun before he determined who they were.  (R. 3085-86.)  Real did drugs with Mr. Barrett, and testified that he sold drugs and kept syringes in his house.  (R. 3087-88, 3099, 3091, 3102-03.)  According to Real, Mr. Barrett stated he would shoot the police if they came on his property.  (R. 3106.)

Counsel relied strictly on cross-examination in an attempt to impeach Karen Real. No witnesses who knew her in the community were called to testify regarding her honesty. As with Brandie Price, Sean Hill could have testified that Real's word was not to be believed. According to Mr. Hill, Real is a "pretty messed up" person. Although Real's federal conviction was brought out, counsel never asked her if she had provided information against her co-defendants in an effort to secure leniency. Mr. Hill states that she informed on her boyfriend and co-defendant, Doss Gann, in an attempt to get favorable treatment. Karen Real is the type of person who would do and say anything to get out of trouble. (Decl. of Sean Hill.) Again, witnesses who could have been called to impeach the claims of the Crawfords and Sanders that Mr. Barrett threatened violence against the authorities if they came on his property could have been used to indirectly impeach Real's virtually identical claim.

### g.    Randy Turman

At trial, Randy Turman claimed Mr. Barrett taught him how to cook methamphetamine. (R. 193.) At the time he testified, Turman had pending state charges for manufacturing methamphetamine. (R. 193.) He was at liberty on a $120,000.00 bond. Turman admitted that he had cooked methamphetamine once a week for five years, and to possessing a firearm while doing so. When asked about these charges, Turman said "it's done been taken care of." (R. 445-46.) The witness had taken numerous drugs over an extended period of time, and was once up for four days on a "meth run." (R. 430-31.) Turman claimed there was nothing going on in his case. He had gone to court, and as far as he knew, the charges had been resolved. (R. 434-35.) Turman testified he had no deals in exchange for his testimony, that he had not been given immunity from punishment, that he never worked as an informant or paid informant. He declined to talk to the defense because he figured he would be questioned in court, and that

would suffice.  Asked if one of the charges currently lodged against him was for altering the

serial number on an SKS, he stated that charge had been dropped.  (R. 434-35, 439-44.)  Turman

stated he was simply in court to tell the truth.  (R. 445.)

Turman claimed he met Mr. Barrett three or four months before Trooper Eales

was shot.  (R. 364-65.)  He "hung out" at Mr. Barrett's and would use methamphetamine there.

(R. 366.)  He stated he witnessed Mr. Barrett cooking methamphetamine in his cabin.  (R. 377.)

He identified Government's Exhibit 65, a photograph taken in Mr. Barrett's shop of mineral

spirits, toluene, and paint thinner.  Turman stated Mr. Barrett would use these ingredients to cook

meth.  (R. 383-84.)  Tubing used to manufacture methamphetamine was kept in Mr. Barrett's

cabin.  (R. 384-85.)  Glassware used in the manufacturing process was kept in a water trough.

(R. 385-86.)  Turman explained how Mr. Barrett supposedly "powdered" methamphetamine in

his shop and how a hose was attached to a gas tank during the cooking process.  (R. 387-91.)

Turman testified, though, that he never actually saw Mr. Barrett cooking meth, and that he never

really discussed the manufacturing process with Mr. Barrett, even though he claimed Mr. Barrett

was the person who taught him how to cook meth.  (R. 389-91.)

Turman testified he recognized items that were in Mr. Barrett's house during the

summer of 1999, including a tool box and hose, and explained how Mr. Barrett could used these

items to make dope.  (Government's Exhibit 63, R. 396-97.)  Turman testified Mr. Barrett would

lock the gate to his driveway to restrict access to his property, and identified the "warning sign"

that had been placed there.  (Government's Exhibit 104.)  The witness claimed Mr. Barrett never

left his property because there was a warrant out for his arrest, and that he was afraid the police

would come to his house.  (R. 397-401, 416.)

Mr. Barrett kept several weapons in his home, including a .233 Colt Sporter rifle; a .22 pistol; a Smith and Wesson 9mm pistol; and a double-barreled 12-gauge shotgun, which Turman said he sold Mr. Barrett.  (R. 401, 404-11.)

Turman admitted he went to Mr. Barrett's house to paint a car on one occasion, and that the enamel reducer and mineral spirits in the cabinet to Mr. Barrett's shop were used to paint vehicles.  (R. 437-39.)

Thus, Turman was a critical witness on the underlying drug charges in the superseding indictment, as well as on the question of Mr. Barrett's intent.  Turman was especially important on the drug charges, since the search of Mr. Barrett's home and property yielded no working methamphetamine lab and virtually no drugs.  It was therefore of paramount importance that Turman be effectively impeached.  This, trial counsel failed to take reasonable steps to do.

Trial counsel was professionally unreasonable for failing to research Turman's court file on the charge that had "done been taken care of."  The pending felony drug and firearms charges were still open when Turman testified.  Contrary to Turman's testimony, the possession of a firearm with an altered serial number charge had not been dismissed.  The only way these charges could have been "taken care of" is if Turman were acting as a police informant, and was going to get some sort of deal in exchange for his informant work and his testimony against Mr. Barrett.

In Sequoyah County Case No. CF-02-477, filed on September 10, 2002, Turman was charged in a six count information with manufacturing methamphetamine; possession of methamphetamine with intent to distribute, possession of precursor material; another count of possession of precursor material; possession of a firearm while committing a felony; and

possession of a firearm with an altered serial number. The charges were based on evidence recovered during the execution of a search warrant. Turman posted an appearance bond on September 20, 2002. A preliminary hearing was set for April 17, 2003. The preliminary hearing was re-set for June 12, 2003, and apparently re-set again on later dates, since preliminary hearing was ultimately waived on November 3, 2003. According to documents in the Sequoyah County Court file, the case literally fell off the map until May 9, 2007, when the District Attorney's Office filed a motion to dismiss "in the best interests of justice." The motion to dismiss was granted by written order the same day it was filed. (File in Sequoyah County Case No. CF-02-477.)

Counsel was professionally unreasonable for failing to expose Turman's bald-faced lie about his case having been "taken care of," and one of the firearms charges having been dismissed, when the case was still active and literally nothing had happened on it in two years. Not only would Turman have been exposed as a perjurer, but the curious chronology of his Sequoyah County felony case could have been used to support counsel's claim on cross-examination, which Turman denied, that he was a police snitch, had made an undisclosed deal with the Government for his testimony against Mr. Barrett, and was going to be rewarded in the end (as he was) depending on whether he pleased the Government with his testimony.

Counsel was also professionally unreasonable, as with the other informant witnesses discussed above, in failing to develop and introduce evidence regarding Turman's overall lack of honesty. Sean Hill could have testified that Randy Turman is "as low as you get," and that he was known in the community as a thief who would "testify against anyone to save his own skin." (Decl. of Sean Hill.)

**Conclusion**

There was one major difference between Mr. Barrett's state prosecution, which ended in a conviction of manslaughter, and his federal case, which resulted in the death penalty: the testimony of the seven snitches, who were nowhere to be found in 2002 and 2004, when Mr. Barrett was tried in state court. Their testimony was vital to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges. Despite the obvious importance of these witnesses, as the trial court itself stated on September 13, 2005, Mr. Barrett's trial counsel failed to move for a continuance, and took virtually no steps to investigate and impeach these witnesses. Because of the critical importance of these witnesses, who could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial. There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsel's indefensible errors and omissions, the result of the guilt stage of trial would have been different. At a minimum, these failings also had a prejudicial effect on the punishment stage. *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington,* 466 U.S. 668 (1984).

This case is analogous to *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002), where, in the context of a *Brady* claim, a capital conviction was vacated because exculpatory evidence which could have been used to impeach witnesses was not disclosed. The concealed evidence, there and in Mr. Barrett's case would have shown that witnesses had motive to lie and had colluded in their stories. *See also Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2002) (counsel ineffective in part for failing to impeach immunized witness). *See also, e.g., Reynoso v. Giurbino,* 462 F.3d 1099, 1114, 1120 (9th Cir. 2006) and *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995), *cert. denied,* 519 U.S. 910 (1996)(counsel ineffective for failing to impeach); *Horton v. Massie,* 2000 WL 107386 (10th Cir. Jan. 31, 2000)(unpublished)(counsel ineffective for failing

to call defendant's young daughter in murder case to support claim that while defendant was present, she did not participate; the prosecution's key witness told inconsistent stories, and prosecutor emphasized defendant's version was uncorroborated; counsel was also ineffective for failing to investigate and present evidence that the prosecution's chief witnesses were collaborating with each other and had a motive to lie).

> **5.** **Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence.**

Trial counsel was professionally unreasonable for failing to hire an independent crime analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley. Mr. Barrett's counsel sought $17,000.00 for an expert to conduct a crime scene reconstruction, in anticipation that the Government would rely on Iris Dalley, who appeared as a witness at Mr. Barrett's two state trials. Counsel sought authorization to hire Edward Hueske of Denton, Texas. Mr. Hueske had consulted with the defense during Mr. Barrett's state trials. The court authorized $4,000.00 for a crime scene reconstructionist. After Mr. Echols left the case, trial counsel Roger Hilfiger informed the court that it had not used available funds to hire a crime scene reconstructionist, but instead used the funds for an investigator. Loyd Cobb, the investigator hired by trial counsel, testified that he went to Mr. Barrett's property and took photographs, at least some of which were introduced into evidence. *See* Claim 1, *supra*, and 3, *infra.*

As stated in Claims 1 and 3, Mr. Barrett had a constitutional and statutory right to expert assistance to rebut the Government's witness. Prevailing professional norms of criminal defense practice advise attorneys to obtain expert assistance. Mr. Barrett's trial counsel acted unreasonably by failing to secure any benefit from the exercise of Mr. Barrett's statutory and

constitutional rights to expert assistance. Counsel's failure to investigate the benefits of expert advice was deficient performance. *Rompilla v. Beard,* 545 U.S. 374 (2005)(ineffective assistance to fail to investigate evidence the defense knew prosecutors intended to use); *Wiggins v. Smith,* 539 U.S. 510 (2003)(counsel could not have made a reasonable decision to forego further investigation because they lacked sufficient information).

Iris Dalley was a key witness for the Government. Her crime scene reconstruction testimony was used by the prosecution to argue that Mr. Barrett had been standing on the porch when he fired his .223 Sporter rifle, and therefore would have seen the several police vehicles with emergency lights engaged which had descended on his property. The defense contended that Mr. Barrett fired from inside his house and would only have seen the lead vehicle, driven by Buddy Hamilton, which did not have any emergency lights engaged, and thus could not be identified as a police vehicle. Dalley's crime scene reconstruction testimony, complete with a PowerPoint presentation and animations, which were shown to the jury but not introduced as exhibits, was used to support the prosecution's theory.

Trial counsel's unreasonable omission was prejudicial. Had counsel engaged the services of the independent expert authorized for Mr. Barrett's defense, it could have been shown that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with the necessary protocols for conducting a legitimate and reliable reconstruction. In connection with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the exhibits introduced in the case, her PowerPoint presentation, her animations, and other materials upon which she relied. Mr. Hueske, a nationally known expert whose credentials, training and experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was not worthy of belief. (Report and curriculum vitae of Edward Hueske.)

In his report, Mr. Hueske first shows that Dalley's use of inappropriate terminology reflects her poor understanding of the fundamentals of crime scene analysis, if not an intention to confuse, rather than inform, the jury. "Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components." For example, Dalley, in her testimony, refers to the "front quarter panel" of the Ford Bronco driven by Buddy Hamilton, and in which David Eales was a passenger, when she is trying to reference the front fender. Instead of referring to the "driver's side" and "passenger's side" of the vehicle as points of orientation, she used the confusing terms "left" and "right." Dalley used the term "sidewall," which obviously refers to the portion of a tire, when she is attempting to describe an inner body panel on the Ford Bronco. Dalley consistently and improperly used the term "projectile" to refer to anything that may have caused an impact, rather than using correct terms for a bullet, a bullet fragment, or other constituent parts of a bullet. (Hueske report at 2.)

Dalley exhibited a fundamental misunderstanding of "bullet fragmentation upon impact with glass[.]" In reality, fragmentation of a bullet begins when it impacts a surface such as glass. If trial counsel had secured Mr. Hueske's services, the jury would have known that Dalley erroneously stated that a bullet would only fragment after perforating or passing through glass. Dalley admitted she was not a firearms examiner, stating that she seeks the assistance of such experts when she has a "ballistics" question. While it could be argued that one need not be a firearms expert to conduct a crime scene reconstruction, "a basic understanding of firearms and ammunition components is essential to being able to recognize what one is viewing at a shooting scene." Mr. Hueske notes Dalley testified there "might" be some caliber similar to a .233 rifle that "could have made" some of the bullet holes in the Bronco. When asked by defense counsel for examples, Dalley could not come up with any. (Hueske report at 2-3.)

If he had been called to testify, Mr. Hueske would have exposed to the jury that Dalley's use of "inappropriate terminology and ambiguous statements" made understanding her testimony difficult. Dalley's shortcomings in these areas likely reflect her lack of expertise with firearms and vehicles. (Hueske report at 3.) Hueske's analysis shows that Dalley lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle.

Mr. Hueske states there are numerous more serious flaws in Dalley's attempt at a crime scene reconstruction in this case, and with her trial testimony. Mr. Hueske's bottom line conclusion is that Dalley "did not follow widely accepted protocol used in shooting incident reconstruction. ... Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation." (Hueske report at 3, 6.)

Mr. Hueske would have exposed the following failings to the jury:

1)      Standard, accepted crime scene reconstruction protocol requires a determination of the length, width and height of any vehicle involved in a shooting. Dalley neglected to determine the dimensions of the Ford Bronco in aid of any trajectory analysis. There is also an unresolved question as to how wide the passenger door was open when shots were fired. No measurements were taken. Instead, Dalley illogically explained that because the passenger door was curved, it could not be measured. (Hueske report at 3.)

2)      Before trajectory rods are used, proper protocol demands an examination of the margins, interior surface, and surrounding area for trace evidence. Placing trajectory rods

in bullet holes, as Dalley did, invariably alters them.  Dalley was specifically asked whether she saw gunshot residue around any bullet holes, and state she saw none.  (R. 3399.)  Hueske report at 3.

3)     To legitimately evaluate the area around a bullet hole for trace evidence, close inspection with a magnifying lens, or a lift for later analysis, should be done.  Bullet holes should also be examined for blood, tissue, hair, fibers or other forms of trace evidence.  Dalley failed to do this.  Hueske report at 3.

4)     The caliber of a bullet creating a bullet hole can be determined with an acceptable degree of confidence, when bullet holes are "symmetrical and devoid of any distortion."  In such instances, accepted, standard protocol requires the length and width of the bullet holes to be measured with a pair of dial calipers.  The width of the hole can be "related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates."  Dalley could not determine the caliber of any bullets striking the Bronco (and thus could not say whether any of them were created by "friendly fire") (R. 3298.)  Based on some of the photographs taken of the bullet holes in the Bronco, it appears they could have been measured to determine caliber with the appropriate instrument.  (Hueske report at 3.)

5)     Dalley's heavy reliance on trajectory rods to determine the trajectories of the fired rounds failed to follow protocols and was based on unwarranted assumptions.  Correct placement of trajectory rods to properly determine trajectories "requires an understanding of bullet penetration/perforation in a variety of substrates."  This is especially true with bullets that fragment or tend to fragment, like rounds fired from a .233 rifle.  Equally important is knowing when the calculation of trajectories, rather than the use of trajectory rods to determine them, is called for.  Trajectory rods such as Dalley utilized are a reliable tool for determining bullet

trajectories where there is "a secondary impact that has not resulted from initial impact deflection and/or fragmentation." However, Dalley attempted to determine bullet trajectories "utilizing fragment impacts into secondary targets based on the presumption" that the bullet core, or a large part of the bullet core, "travels in a straight path." This assumption is unwarranted, and skews the analysis. Mr. Hueske would have explained that Dalley was making contradictory claims, as when she testified (correctly) that the "exact path" of each bullet could not be determined, and also testified (incorrectly) that her trajectory patterns, as she described them, were "accurate." (R. 3446. Hueske report at 4.)

6)     Dalley relied upon fallacious reasoning to say that bullets would pass through an intervening target such as the passenger door of the Bronco "undeterred," or straight through. Dalley testified repeatedly that bullets going through the "partially open" Bronco door would go "straight through," and that bullet core fragments would do the same. Where, as in this case, bullets fragment on impact, the path or trajectory is unpredictable. Dalley conjured a number of scenarios to make her theory that the bullet trajectories were unaffected by intervening targets (and thus her trajectory analysis as a whole) "fit" the evidence. Dalley posited that the passenger door of the Ford Bronco moved to various different positions "to account for the incongruity of different trajectories through it." (R. 3314) Although this type of movement cannot be excluded, it is a speculative endeavor to make the evidence correspond with the theory being propounded. The more likely explanation is that bullet deflections or fragmentations account for the variations in bullet trajectories through the vehicle door. Deflections occur

frequently when bullets strike objects with irregular surfaces, as opposed to those which strike flat surfaces. (Hueske report at 4.)

7)     Dalley lacked basic equipment and measurements necessary to make her diagrams and animations reliable.  When trying to ascertain the trajectories of bullet holes in vehicles and other inanimate objects, trajectory rods placed through the bullet holes are referenced by two linear and two angular coordinates.  This is indispensable to establishing "reproducible data for creating diagrams and animations" that *accurately*, within the limits of uncertainty, represent the true bullet trajectories.  Mr. Hueske finds it "amazing" that Dalley *did not* determine any of the angles because she "did not have the necessary equipment."  ( R. 3275)  All that would be required to perform this essential task is a "$30 zero base protractor and a $5 plumb bob."  Because Dalley failed to take such measurements, and because she could not determine the "exact paths" of the bullets using trajectory rods alone, "it is unclear how the diagrams and animation she produced can be perceived as having any reliability." Again, the chief reason for getting such linear and angular measurements "is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident." (Hueske report at 5.)

8)     Dalley failed to ascertain bullet impact angles "relative to a common point of reference (plumb line) [as] is the accepted standard" for reliable reconstruction.  (Hueske report at 5.)  In her testimony, Dalley generally described the terrain of the shooting scene as "hilly," but did not establish the exact grade of the terrain, or consider the potential impact the grade might have had on what she perceived to be the trajectories of the bullets hitting the Ford Bronco.

9)     Where holes are of questionable origin, and may or may not be bullet holes, the proper procedure requires on-site chemical testing for the presence of copper or lead to

confirm that the holes or perforations were produced by a bullet rather than something else. Although Dalley testified that she had some knowledge of this kind of testing, she did not testify that she actually conducted it. (Hueske report at 5.)

10)    Dalley testified she had "no means of sequencing any of the shots" at the scene. This was not accurate. Analysis to determine the sequence of shots is not always possible, but it can sometimes be accomplished "through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets [or] fragments[,]" such as glass, fibers, hair, paint and other substances. Thus, Dalley had the means of attempting to sequence the shots, but she either was not aware of the techniques used in that process or, she chose not to employ those methods either at the scene or later. (Hueske report at 5.)

11)    Critically, Mr. Hueske could have shown that Ms. Dalley failed to employ well known methods that could have shed light on the location of Hamilton's Bronco when specific shots struck it. In any incident involving a moving vehicle, any legitimate reconstruction or re-enactment would include actually placing the Bronco in various positions to determine the likelihood of each shot coming from one or more particular positions. It was particularly important here to determine the angle of fire after the Bronco came to a stop. However, the Bronco itself was not placed in a variety of positions to determine the trajectories of the shots fired at or into it. Dalley testified that before she arrived at the scene, the Bronco had been moved. However, she also testified there were tire impressions and a fluid deposit in the dirt in front of Mr. Barrett's residence. These markings could have been used to re-position the Bronco to where it came to rest before being moved. (Hueske report at 5.)

Def's § 2255 Mot.                    136                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

12)   Dalley employed a fundamentally flawed approach when she attempted to establish the trajectory of bullets that passed through the window glass, blinds and curtain or towel hanging over the front window of Mr. Barrett's cabin. She testified that the results of her trajectory analysis for these objects were reliable. (R. 3389.) First, the accepted method for reliably determining trajectories is to set up a tripod and place a laser on the tripod. Dalley had someone assisting her hold a trajectory rod by hand. Second, Dalley failed to take measurements of the hole locations. (Hueske report at 5.)

13)   Dalley's method of "placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation." *Ibid.*

14)   Dalley overstated her ability to reach a warranted conclusion regarding the critical issue of Mr. Barrett's position in relation to the Bronco. When attempting to determine the distance of fire on the bullet holes in the cabin window, Dalley testified she did not "see" any evidence of gunshot residue on the window. Because of this, she opined that the distance had to be greater than three feet from the glass, since the literature states that the absence of gunshot residue at the edges of a bullet hole indicates shots were fired from greater than three feet away from impact. This general rule varies greatly depending on the weapon used, and also depends on the type of ammunition used. To correctly evaluate the maximum muzzle to target distance, the weapon in question should be fired into glass like that at the scene, and the same type of ammunition should be used. (Hueske report at 6.)

15)    In a shooting incident like this, a metal detector should be used to detect the presence of bullets or bullet fragments. Dalley did not attempt to locate any bullets or fragments in the soil. (Hueske report at 6.)

16)    In reaching her conclusion that David Eales was struck in the right arm after he exited the Bronco, Dalley ignored the elementary dictum in forensic science that "absence of evidence is not evidence of absence." Dalley testified that since she found no tissue in the Bronco, and tissue appeared to be missing based on the appearance (to her) of the wound, Trooper Eales must have been outside when he was struck. However, Dalley's testimony fails to establish that she looked for any tissue outside the Bronco. It would have been easy to try to confirm Dalley's conclusion by spraying luminol on the ground in the area around the Bronco. There is nothing to show this was done. An honest forensic scientist would say the fact that evidence is not found (and Dalley apparently took no steps to find it) cannot be used to "conclude anything other than that no evidence was found." (Hueske report at 6.) Dalley's conclusion in this regard was critical to the prosecution's theory because the Government argued that at the time Trooper Eales was shot, he was outside the Bronco and the type of equipment he was wearing would have made it obvious to Mr. Barrett that he was a law enforcement officer.

In sum, if trial counsel had obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Rule 702 of the Federal Rules of Evidence and under *Daubert v. Merrrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993) and *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999). Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction. She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology. Due to these numerous failures, her conclusions, aimed at

strengthening the Government's case, were scientifically unreliable.  At a minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, was outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis.

Under Fed.R.Evid. 702, the trial court is charged with being the "gatekeeper" where expert testimony is concerned, ensuring only that reliable evidence comes before the jury. Among the factors used to determine the reliability of scientific or other expert evidence are: 1) whether the theory can be and has been tested; 2) whether the theory has been subjected to peer review and publication; 3) if relevant, the known or potential rate of error; 4) the existence and maintenance of standards controlling its operation; and 5) whether it has achieved general acceptance in the relevant community.  *Daubert* 509 at 593-94.  While crime scene reconstruction evidence (including an analysis of trajectory patterns) is generally accepted in the overall field of forensic science, Mr. Hueske's report demonstrates that Dalley's methodology, and thus her conclusions, fell well outside the range of accepted protocol and were thus unreliable.  Dalley just made it up as she went along in service of her goal of assisting the Government to obtain convictions.  Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken because it failed to comply with *Daubert* and *Kumho Tire*.

Because Dalley's analysis was an important part of the Government's case, it was inexcusable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense.  Had all the flaws in Dally's testimony

been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle. If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired, and was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All this is especially critical on the issue of intent with respect to count 3 of the superseding indictment, the intent elements of counts 1 and 2, and the intent elements in the penalty phase.

To obtain a conviction on count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by this knowledge. Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and compromised memories of the tactical team members who testified. Thus, the prejudice under *Strickland* flowing from counsel's failure to effectively contest Dalley's testimony with expert assistance is readily apparent. *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998)(counsel unreasonable and ineffective for failing to object to improper expert testimony); *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995)(counsel professionally unreasonable and ineffective for failing to impeach serology evidence).

It is not just Mr. Barrett's current lawyers who say Ms. Dalley, far from being an objective scientific witness, is a partisan advocate who dresses up her personal opinions in the

guise of "science."  The Oklahoma Court of Criminal Appeals has chastised her, recently

reversing a first degree murder conviction due to Dalley''s unreliable, unscientific testimony,

including the improper use of computer animations.  *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl.

Cr. 2006).  In that case, the defendant's murder conviction was reversed in large part because Iris

Dalley's conclusions and computer-generated animations were not based on objective scientific

findings, but simply restated the prosecution's theory of the case under a "scientific" gloss.

Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case.  She used

improper methodologies and techniques to "package" evidence already heard by the jury,

offering conclusions based on an incompetent and unscientific evaluation of the evidence.

In addition to trial counsel's other failings with respect to Dalley's testimony,

counsel were professionally unreasonable for failing to investigate Dalley's track record of giving

scientifically groundless testimony.  Although the *Dunkle* case was decided in 2006, after Mr.

Barrett's trial concluded in 2005, the case was tried some years before, the appellate briefs had

been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the

criminal defense community.

**6.      The outcome of the trial is unreliable due to trial counsel's unreasonably failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death**

The methods used by the Oklahoma Highway Patrol tactical team were highly

questionable.  Based on all the circumstances surrounding the mission, it was ill-conceived and

should have been aborted.  Instead, even though the element of surprise – the motivation behind

the plan to begin with – had been totally lost because the "drive-by" vehicle was spotted the

afternoon before the raid; Toby Barrett was in the yard when the police arrived and yelled a

warning; the lights were on in Mr. Barrett's house, meaning he was still awake; and ultimately the lead, unmarked vehicle, with no police lights on, actually ran into Mr. Barrett's house, plan went forward, with tragic results for Trooper Eales.

Mr. Barrett's trial counsel unreasonably failed to secure the testimony of an independent expert to show that the raid was plagued by numerous tactical errors that contributed to Trooper Eales's death.  Prior to trial, Mr. Echols sought authorization to retain an independent expert on tact-team methods and procedures.  (Doc. 50.)  The court authorized some funds for this evidence.  (Doc. 97.)  However, Mr. Barrett's trial counsel never contacted the expert Mr. Echols wanted to retain.  Trial counsel's omission was not an informed tactical decision.

During the trial, Mr. Barrett's counsel informed the court that a law enforcement witness, Chuck Choney, who testified for the prosecution in state court and had provided favorable evidence on cross-examination, was reluctant to be subpoenaed as a defense witness and provide evidence favorable to the defense.  (Tr. 10/03/05 Hr'g at 6-7.)  Trial counsel told the court they were "in the process of trying to get this swat [sic] team expert to testify."  *Id.* at 6.

Trial counsel knew or should have known that it was necessary to retain another expert to assist the defense because of Mr. Choney's affinity with law enforcement.  Mr. Echols had known this, and requested authorization to retain another, independent, expert.  (Doc. 50 at 5.)  During a hearing on March 22, 2005, Mr. Echols stated, in Mr. Hilfiger's presence, "we'd like to be able to call Mr. Choney.  But he said he's an ex-FBI agent, and he'd rather be drawn and quartered than appear in court as a defense witness in Mr. Barrett's case."  (Tr. 3/22/05 Hr'g at 14-15.)

Trial counsel did not attempt to contact Mr. Choney until approximately mid-September, 2005.  Trial counsel made unsuccessful efforts to speak with Mr. Choney by

telephone on September 13, 2005, and were told Mr. Choney would not be available until September 22 or 23.  Thus, at the time trial started, Mr. Barrett's counsel conducted no investigation into what evidence could be presented from an independent expert authorized by the court, and fell back on a witness counsel knew would not cooperate.  If trial counsel had enforced Mr. Barrett's constitutional and statutory rights to expert assistance, the evidence would have shown that Trooper Hamilton's errors in conceiving the raid and carrying it out meant, among other things, a) that Mr. Barrett did not have visual evidence that the lead Bronco was a law enforcement vehicle, and had no signs of law enforcement until after the shooting; b) that the lead vehicle lacked necessary cover from a sniper; c) that the lead Bronco advanced onto the property from a tactically disadvantageous position; d) that the team lost the element of surprise; e) that the situation was dangerous for non-tactical personnel; f) that the presence of observers made a violent altercation more likely, though unnecessary; g) that the lead Bronco's approach and the  position of other vehicles unnecessarily exposed Trooper Eales to both friendly fire and hostile fire.

Instead of forcefully bringing these points to the jury's attention, the defense relied on the extremely reluctant Mr. Choney, who only appeared because he was compelled to by subpoena.  He turned out to be a Government witness rather than a defense witness.  He did offer some criticisms of the manner in which the raid was conceived and executed, such as the inclusion of the caravan of local dignitaries and law enforcement onlookers, and the failure of the tactical team to independently verify the reliability of the information provided by the alleged confidential informant.  However, the Government easily turned Mr. Choney into a prosecution witness on cross-examination.  In his opinion, while hindsight might suggest other alternatives to

the action taken, there was no compelling need to have aborted the mission. His bottom line was devastating to the defense: the tactical team did nothing wrong.

The Tenth Circuit dealt with an analogous situation, in the context of a capital defendant's sentencing stage representation, in *Hooper v. Mullin,* 314 F.3d 1162, 1167-71 (10th Cir. 2002). In *Hooper,* the second stage strategy was to present evidence that the defendant suffered from brain damage and was cognitively impaired. Hooper had once attended anger management counseling. His psychologist wrote a report opining, among other things, that the defendant's cognitive functioning was largely adequate, but he had difficulty controlling his temper. Counsel then hired a forensic psychologist to review the other psychologist's report. Based on the review, the second expert stated there may be evidence of mild brain damage, and it was possible the defendant suffered from serious psychological problems. These conclusions could not be reached, however, unless the defendant were examined personally. At the eleventh hour, defense counsel subpoenaed the second psychologist to testify. He was extremely hostile to the defense because he had warned counsel he could reach no conclusions without examining the defendant himself. He had warned counsel before being subpoenaed that his testimony would likely be more aggravating than mitigating. He testified that he could reach no conclusion because he had not examined the accused, and that any tentative indications of possible brain damage could not be confirmed. The prosecution then called the anger management counselor in rebuttal, who testified that while the defendant suffered from a mild learning disability, he had no brain damage or other special problems. The Tenth Circuit found counsel's strategy unreasonable, and that the defendant was prejudiced.

So it was with Mr. Choney. He was contacted late in the day by defense counsel. He was strongly aligned with law enforcement. He made it clear that he did not want to testify

for the defense. He appeared only when compelled by a subpoena. Whatever little mileage the defense got out of his testimony was quickly reversed during the prosecution's cross-examination. On the whole, Mr. Choney's testimony supported the Government's case, and exonerated the tactical team of any serious errors. As in *Hooper*, defense counsel knew Choney would be a most reluctant, if not to say hostile, witness, but he was thrown into the breach anyway, with the predictable negative consequences to Mr. Barrett.

Counsel's failure to retain an independent expert and reliance upon a witness who would not even talk to them, was plainly unreasonable and prejudicial. *Strickland v. Washington,* 466 U.S. 668 (1984). As evidenced by the arguments of both the defense and prosecution at the close of the first stage, questions about how the raid was conceived and carried out were critical issues. If trial counsel had presented the numerous deficiencies pointed out here, there is a reasonable probability the jury would have rejected either murder or the death penalty.

### 7.    Mr. Barrett's trial counsel unreasonably failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials

Claims 1 and 3 discuss the court's interference with proper defense preparation with respect to authorizing payment for the transcripts of the testimony from the second state trial at public expense. The court initially denied the request, adding the proviso that the matter could be reconsidered upon a specific showing that the testimony requested went to Mr. Barrett's intent. Eventually, the court permitted the record of the testimony to be provided at public expense, but far too late for counsel to be adequately prepared. Trial counsel also unreasonably failed to make use of impeachment material that was available to them, and/or elicited damaging testimony on cross-examination, even where that testimony was beyond the scope of direct.

There were numerous delays occasioned in acquiring the transcripts, and they continued through Mr. Barrett's federal trial. At a June 6, 2005 status conference, a few short months before trial was to begin, the court was informed that based on counsel's communications with the court reporter, it was anticipated that the transcripts would be ready by July 11, 2005. (Tr. 6/6/05 Hr'g at 4-5.) This proved a pipe dream. At another status conference on July 15, 2005, the court was informed that the state court reporter had completed five of the nine volumes of testimony. At the pretrial hearing on August 31, 2005, it was revealed that little if any progress had been made; five volumes of testimony had still not been completed. (Tr. 8/31/05 Hr'g at 38-39.) The transcripts continued to trickle in during trial.

A combination of the court's rulings on the transcript issue, the delay in producing the transcripts, and counsel's unreasonable preparation with the transcripts they had resulted in counsel failing to effectively impeach the tactical team members and Clint Johnson on several critical points with their testimony from the second state trial.

As already stated herein, a key factual dispute was whether Mr. Barrett would have known the police were on his property because the emergency lights on some of the vehicles were engaged. Because of the delay in producing the transcripts, counsel's failure to prepare in the time available, or both, crucial opportunities for impeachment in this area were lost.

At the federal trial, Trooper Poe stated he became aware that emergency lighting was being used when he saw Trooper Hamilton's vehicle come into view from the east, implying that emergency lights were engaged before any shots were fired, and thus supporting the Government's theory. (R. 1412.) However, at the second state trial, he testified that he first became aware of seeing emergency lights *after* he heard shooting break out. (2nd St. Tr. Tx. at

Def's § 2255 Mot.                                146                          *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

747.) Trooper Greninger gave conflicting evidence between the second state trial and the federal trial regarding what lighting he observed. In state court, he testified he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on. (2nd St. Tr. TX at 448, 461.) At the federal trial, he testified Trooper Manion activated his emergency lights as he turned into the driveway before entering the property. He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged. He was not completely sure Trooper Hise's emergency lights were on. Trooper Pettingill did not activate his lights. (R. 732, 760, 770, 773, 822.)

Most significantly, Clint Johnson testified initially in the second state trial that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road. He was impeached with a prior statement in which he said he only saw taillights, not emergency lights. Johnson made no mention in his statement about arriving thirty seconds after the tactical team and seeing any red and blue emergency lights. (2nd St. Tr. TX at 25, 49, 51.) In the federal trial, Johnson said nothing on direct examination about any lighting. Trial counsel was caught flat-footed on cross-examination, when he opened the area up and Johnson, in contrast to the statement he was impeached with in state court, testified that he saw emergency lighting on the patrol vehicle and the second Ford Bronco. (R. 358, 361.) Counsel failed to impeach Johnson as counsel did in the second state trial. Arguably, not even a transcript would have been required to undermine Johnson on this point, because he was impeached in state court with a previous statement, not previous testimony.

The issue of whether Mr. Barrett or the police opened fire first was obviously critical. At the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house. He heard shots as

he exited his vehicle by the fence, and the gunfire was over by the time he was at the fence. (2nd St. Tr. TX at 757, 766.) None of this was brought out on cross-examination at Mr. Barrett's federal trial.

The issue of where Trooper Hamilton's Bronco was when it first received fire was a focal point of the debate over Mr. Barrett's knowledge and intent. Although Trooper Greninger professed a failed memory at the federal trial, and could only say that the shooting began somewhere between the ditch and where Hamilton's Bronco came to a stop (R. 736), he testified at the state trial (albeit with an addled memory), that while he had no real idea when the shooting started, Hamilton's vehicle was ahead of his and had cleared the ditch; he became aware of the shooting between the time his vehicle cleared the ditch and came to a stop halfway between the ditch and Hamilton's Bronco. In his first statement to investigators following the incident, he recalled hearing gunfire as Hamilton's vehicle approach the front of the house at the time he recalled hearing gunfire, which would indicate Hamilton had already gone through the ditch and was near the house when the gunfire started, supporting Mr. Barrett's defense argument that he only fired when Hamilton's Bronco was almost literally in front of his house, with its headlights obstructing Mr. Barrett's view. (2nd St. Tr. TX 450, 504.) Mr. Barrett's trial counsel unreasonably failed to refresh Greninger's memory with his helpful state court testimony, and to introduce that prior recorded recollection, or inconsistent statement.

Trooper Hamilton testified in state court that the shooting started as his vehicle was coming out of the ditch, and after he noticed Toby Barrett in the yard and began driving toward him. (2nd St. Tr. Tx 330.) This was helpful to the defense argument that Mr. Barrett only started firing when the Bronco was close to his house and was in fact headed toward his son, a dangerous situation any father would react to. In federal court, Hamilton stated the gunfire began

earlier. Instead of gunfire starting as he was coming out of the ditch, Hamilton stated gunfire began shortly after he initially hit the ditch. In contrast to his testimony in state court, Hamilton stated his vehicle began receiving fire at head level in the middle of the windshield. (R. 534, 603, 674.) Counsel failed to effectively contrast Hamilton's testimonies on this point.

Defense counsel failed to exploit other differences between the state and federal trial testimony. At the state trial, neither Troopers Poe nor Greninger testified to seeing any guns in Mr. Barrett's house. In federal court, Trooper Poe said he saw an AR 15 and a shotgun in the back room off the entryway. Greninger testified the rifle he found in his home was the one used to fire on the officers. (R. 1426, 1427, 748-49.)

Perhaps Mr. Barrett's trial counsel's most grievous error appeared during cross-examination of Clint Johnson. On direct examination, no details regarding any belief Johnson had that serving the warrant was "high risk" were explored. On cross-examination, Mr. Barrett's counsel asked an open-ended question, and received a barrage of hearsay damaging to Mr. Barrett. When counsel opened the door, Johnson marched through it, in the most prejudicial manner imaginable. Johnson stated he believed this was a "high risk" operation because Mr. Barrett had threatened to kill police officers and that he was making methamphetamine at his residence, which also creates hazards to law enforcement trying to take down a meth lab. Buttressing the testimony not only of the despicable Charles Sanders, but five of the seven informant witness, Johnson stated not only that several people had reported to the sheriff's office that Mr. Barrett was constantly firing weapons across the road, but that they had received several tips from different people within the last six months that Mr. Barrett was going to kill law enforcement officers. This damaging answer, given only because counsel opened the door, just

hung in the air.  Counsel undermined the defense's own (meager) efforts to attack the credibility of the informant witnesses due to these "prior reports" from "several" sources.[22]

Counsel's failures to impeach were professionally unreasonable, and not motivated by any legitimate strategy.  Indeed it was contrary to the strategy evidenced in counsel's closing argument where Mr. Hilfiger sought to sow doubt about the accuracy of various officers' accounts of the raid.  Counsel's elicitation of damaging evidence from Johnson was highly prejudicial under the *Strickland* test, because it tended to invest credibility – however spurious it might have been, and however false Johnson's testimony was – that they otherwise lacked.

> **8.    Counsel was professionally unreasonable for failing to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on.  This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers.**

### a.    Toby Barrett

The primary contention of the defense in the first stage of trial was that when Mr. Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware that it was a police vehicle, and was unaware that several police vehicles had driven onto his property.  It was undisputed that the lead vehicle driven by Hamilton, which the evidence showed struck Mr. Barrett's porch, had no emergency lights engaged and appeared to be a civilian vehicle.

---

[22] Johnson's testimony was surely false.  None of these "known sources" reporting threats by Mr. Barrett to kill law enforcement officers were presented at the state trials.  Surely, if several individuals were reporting this, they would have testified in 2002 and 2004.  Counsel failed to point out that Johnson had given no such testimony previously.  Indeed, the informant witnesses were purely last-minute creatures of the federal trial.

Although no defense theory instructions were given, the defense argued that because Hamilton's car was unmarked, Mr. Barrett reasonably believed he was shooting at trespassers who had zoomed into his yard and struck his house with their vehicle, and reacted by shooting from inside his house.

The prosecution relied upon testimony from members of the tactical team to argue that but for Hamilton's vehicle and the "sniper" vehicle initially parked outside the locked gate to the property, the other police vehicles on or near the property had emergency lights of one sort or another engaged, making it obvious to Mr. Barrett that he was shooting at the police. The prosecution contended Mr. Barrett fired some of the shots after he emerged from his home, and could easily observe that the police were on his property.

Among the omissions of counsel that were inconsistent with prevailing professional norms was counsel's failure to call Toby Barrett to rebut the law enforcement officers' accounts of the raid. Mr. Barrett had a right, protected by the Fifth, Sixth and Eighth Amendments to the United States Constitution, to present evidence inconsistent with the prosecution's theory of how the raid was conducted.

Prevailing professional norms of capital defense practice required Mr. Barrett's trial counsel to investigate, develop, and present witness testimony that could have called into question the manner in which law enforcement officers conducted the raid. (ABA Guideline 10.7 – Investigation and Commentary (specifically noting duty to interview eyewitnesses).)

Trial counsel were aware, or should have been aware, that there were conflicting accounts of the raid, even among law enforcement officers. Toby Barrett was the only witness to the beginning of the raid other than law enforcement officers. Toby Barrett testified in two prior state-court trials. Toby Barrett was prepared for his testimony in those cases and was willing and

able to be prepared by trial counsel to testify in the federal trial. (Decl. Toby Barrett. *See also* 1st State Tr. Tx at 1781.) Obviously, each of the state-court trials ended in a result more favorable to Mr. Barrett than the result of the federal trial.

During the federal trial, the Government made much of the sign on Mr. Barrett's gate. Toby Barrett would have testified, as he did when called by the prosecution in the first state-court trial, that the sign was only meant to convey "No trespassing or something. He had one something to that effect, sir." (1st St. Tr. Tx at 1787.)

Toby Barrett also testified as a prosecution witness in state court that the gate on which the sign was posted was open at the time the Bronco drove by earlier in the day. (1st St. Trial Tx at 1822.) Toby Barrett's account of being in the front yard with his friend Bubba Thompson at the time of the drive-by is consistent with the testimony of Trooper Greninger, who saw two people in the yard at the time. (R. 724.) However, Trooper Hamilton testified in federal court that the gate was locked at the time of the drive-by, and this was offered as a justification for driving onto the property. (R. 518.)

In other respects, Toby Barrett's testimony is consistent with Trooper Hamilton's for example, in confirming that Hamilton had his headlights on but no lights signaling that he was law enforcement. (1st St. Trial Tx at 1796-97; R. 524-26, 598.) However, Trooper Greninger testified that the vehicles' lights were turned on at the commencement of the raid. Officer Steve Hash could not verify Greninger's account. (R. 1036-37.)

Toby Barrett testified in state court that when the shooting occurred, there were no police vehicles with emergency lights on at all that were visible. (1st St. Trial Tx at 1796.) The first police lights he saw were on the vehicle that crashed through the gate, but this was after the shooting was over. (Decl. of Toby Barrett.) He denied telling the police he saw flashing lights.

(1st St. Trial Tx at 1809.)  Toby Barrett saw Hamilton's vehicle speed into the yard, he called out "Dad!"  (1st St. Trial Tx at 1790, 1795.)  Toby Barrett never saw his father out on the front porch, shooting.  He never really saw his father at all, except for perhaps a split second, after which Mr. Barrett went back inside the house. (1st St. Trial Tx 1794, 1795, 1796.)  He never saw who was firing a weapon.  (1st St. Trial Tx at 1807.)  The entire incident happened very quickly.  (Decl. of Toby Barrett.)  The declaration Toby Barrett recently provided to investigators currently working for his father is consistent with his state trial testimony.  (Decl. of Toby Barrett.)

Mr. Barrett's federal trial counsel had every reason to trust the reliability of Toby Barrett's account.  The prosecution in state court deemed Toby Barrett a reliable witness regarding the sequence of events leading up to and during the raid.  His testimony was consistent with the state jury's verdict.

Toby Barrett's testimony would have provided the jury reasonable doubt regarding the federal prosecutor's argument regarding the raid, and in particular, his argument that Mr. Barrett intentionally killed Trooper Eales knowing he was part of a law enforcement raid.  Toby Barrett would have contradicted the prosecutor's assertion that the sign on Mr. Barrett's gate was evidence of intent.  (*See* R. 4297, 4305.)  Toby Barrett's testimony that his father only knew a SUV was speeding onto the property, and had only a split second's view of the Bronco before he went inside; that the Bronco's headlights were shining on the porch; and that no police lights were visible as the shooting occurred, would have contradicted the prosecutor's argument that Mr. Barrett had the opportunity to observe the scene, see police lights, and form the intent to kill before the shooting started.  (*See* R. 4299-4302.)

Toby Barrett's location when the lead Bronco pulled up was important to trial counsel's closing argument.  (R. 4316-17.)  Instead of being able to draw the jury's attention to

Toby's testimony regarding his location when the Bronco pulled in, and point to a specific location on an exhibit, as the state trial prosecutor had done, trial counsel could only argue "Toby Barrett was some place out in here."  (R 4317.)

Even though Toby Barrett had testified at his father's state trials, counsel in the federal case made no effort to interview him or prepare him to testify.  In his recent declaration, Toby Barrett states, "I went up to Mr. Hilfiger in court more than once and asked him if he was going to want me to testify at the trial.  He said yes each time, but he never called me.  He never asked me about the incident, my father's mental problems, my home life or about me or my mom."  (Decl. of Toby Barrett.)

**b.    Alvin Hahn**

Alvin Hahn was a neighbor of Mr. Barrett's.  On the night of the shooting, he was asleep and was awakened by gunfire.  When Mr. Hahn looked outside about fifteen seconds after the shooting stopped, he saw only one vehicle with its police lights on.  (Decl. of Alvin Hahn.)

Mr. Hahn's account is consistent with Toby Barrett's, and would have corroborated Toby Barrett's testimony that *after* the shooting, there was only one police vehicle with its emergency lights on, namely the vehicle that crashed through the gate.  Just as it was professionally unreasonable to fail to call Toby Barrett as a witness, counsel had no legitimate reason for neglecting to call Alvin Hahn, who could have supported the defense theory that the police descended on Mr. Barrett's property with nothing to indicate they were law enforcement, and that Mr. Barrett had every reason to believe he was being invaded by trespassers.

Because the testimony of Toby Barrett and Alvin Hahn would have conflicted sharply with the accounts of the Government's witnesses, and supported the defense claim that Mr. Barrett had no idea he was shooting at the police, Mr. Barrett was prejudiced.  Viewed

individually, and especially collectively, with all the evidence defense counsel failed to prepare

and produce in the first stage of trial to counter the Government's case, there is a reasonable

likelihood of a different result had Toby Barrett and Alvin Hahn been called as witnesses.

*Strickland v. Washington,* 466 U.S. 668 (1984).

> **9.      Trial counsel was professionally unreasonable for failing to investigate, develop and introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware he was subject to an active felony arrest warrant at the time of the shooting incident, was not "hiding out" on his property in anticipation of a police raid, and was not prepared to meet any police presence with violence.**

The Government made much of the "fact" that Mr. Barrett was well aware there

was a warrant out for him for failing to appear in a minor felony drug case. *See* file, Sequoyah

County Case No. CF-97-80, *State of Oklahoma v. Kenneth Eugene Barrett.* According to the

Government, Mr. Barrett anticipated the police were going to arrest him at any time on this

warrant, and was therefore making preparations to repel the police with deadly force. This theory

was founded on the testimony of informant witnesses Charles Sanders, Travis Crawford, Cindy

Crawford, Brandie Price and Karen Real, who, as noted, testified that Mr. Barrett told them about

the warrant, and stated he would kill the first policeman who came on his property and would

"go out in a blaze of glory." The Government argued that the killing of Trooper Eales was the

fulfillment of Mr. Barrett's "plan."

Trial counsel did virtually nothing to rebut this claim other than rely on cross-

examination. Had counsel been paying sufficient attention to certain testimony that was

introduced at the hearing on Mr. Barrett's motion to suppress  (Tr. 1/ 26/05 Hr'g at 25-45),

testimony of Bernell Edwards, Deputy Sequoyah County Court Clerk, and had they conducted

anything approaching a reasonable, professional investigation, the Government's theory would have evaporated, the snitches would have been further impeached, and the Government's case for intent would have suffered mightily.

The Government called Ms. Edwards at the motion to suppress hearing to testify regarding the contents of the court file in CF-97-80. Ms. Edwards stated that according to the file, Mr. Barrett had a trial date of January 25, 1999, at which he failed to appear. A bench warrant was issued on January 27, 1999. When a defendant is not represented by an attorney, the practice of the court clerk's office is to mail a notice regarding the missed court appearance to the defendant. (Tr. 1/ 26/05 at 25, 29; File in Sequoyah County Case No. CF-97-80.)

On cross-examination by Mr. Echols, it was pointed out there was nothing in the file to indicate that, in accordance with Oklahoma law, the bench warrant was issued on the motion of the District Attorney. (Tr. 1/ 26/ 05 at 36.) The docket sheet showed that at one time, Mr. Barrett was represented by attorney Bill Ed Rogers. Mr. Rogers filed a motion to withdraw on September 11, 1998, but there was no docket entry showing that he had actually been allowed to withdraw. (Tr. 1/ 26/05 at 37-38.) Mr. Barrett applied for court appointed counsel on December 14, 1998. Nothing in the court file indicated that Mr. Barrett's bail bondsman was given notice of the bench warrant. There was nothing in the court file showing that based on Mr. Barrett's failure to appear, a bond forfeiture action was instituted, which would have necessitated the bondsman to bring Mr. Barrett in so the bondsman would not be liable for the entire amount of the bond. There was nothing in the court file to show that Mr. Barrett had actually received notice that he failed to appear, and that a bench warrant had been issued for his arrest. The letter sent by the court clerk's office was simply sent in the regular mail; the letter was not certified,

with a return receipt requested. (Tr. 1/ 26/05 at 39-43, 45.) For all the court file suggested, Mr. Barrett was totally unaware there was a warrant out for his arrest.

Without question, it was professionally unreasonable for counsel to fail to call Ms. Edwards, or another representative of the court clerk's office, to sponsor the court file to demonstrate there was *no official record indicating Mr. Barrett would have been aware a warrant had been issued for his arrest.* The evidence was already in the record. Only gross neglect can explain this glaring failure to review the file in the case that started the entire tragic chain of events. *Rompilla v. Beard*, *supra*.

Mr. Rogers, the last attorney to represent Mr. Barrett in this case, whose motion to withdraw was never granted, certainly never informed Mr. Barrett that he had an outstanding warrant. Mr. Rogers is now deceased. In connection with this 2255 motion, his widow, Mary Rogers, was contacted by a defense investigator. Mr. Barrett's current representatives have obtained a copy of Mr. Rogers's file in the case. Mrs. Rogers states there is nothing in her late husband's file to show that Mr. Rogers ever informed Mr. Barrett he had missed a court date, and that a warrant had been issued for his arrest. Even if Mr. Rogers had been informed a bench warrant had been issued, he would not have informed Mr. Barrett, because Mr. Rogers was upset over the manner in which Mr. Barrett had terminated his services. (Decl. of Leonard Post; Bill Ed Rogers's attorney file.)

In addition, the file of Bill Ed Rogers shows that Mr. Barrett was offered a plea in which he faced no jail time. This fact alone, or in conjunction with other set forth herein, would have convinced jurors that the State had unnecessarily sought the no-knock warrant. This fact, combined with the evidence of errors made in the planning and execution of the raid, and the abundant impeachment evidence undermining the Government's eleventh-hour informants,

would have given jurors more than reasonable doubt about Mr. Barrett's intent, and certainly the death penalty.

Trial counsel considered it important that Mr. Barrett had not received notice of the bench warrant. But, inexplicably, the defense waited until the second stage of trial to call Mr. Barrett's bail bondsman, Martin Daggs. He explained that he had never informed Mr. Barrett of the bench warrant. The bond was never forfeited. Mr. Daggs testified that if he needed to get hold of Mr. Barrett to surrender him on a warrant or bring him to court, he knew where to find him. There was no sound, strategic reason for deferring Mr. Daggs's testimony to the penalty phase, when he could have and should have been called in the first stage in aid of refuting the Government's theory of the case.

Had Mr. Barrett's trial counsel conducted a reasonable investigation there were other readily available witnesses who could have testified that Mr. Barrett was unconcerned with the police, had been staying on his property rather than venturing out into the larger community for years *preceding* any warrant, and *had in fact been visited by the police within a few weeks of the shooting incident without incident and without being taken into custody.* Evidence was also readily available that would have demonstrated that had Mr. Barrett and his family been contacted and told he had an outstanding warrant, he would have turned himself in or allowed his family to do so.[23]

Janice Sanders, a relative of Mr. Barrett's, lived near his property. Approximately three weeks or so before the shooting incident, she called the police because Mr. Barrett was

---

[23] *See also* Mr. Barrett's *Brady/*newly discovered evidence claim. Former Sequoyah County Sheriff Philpot has admitted to a defense investigator, consistent with the statements of Janice Sanders and Sylvia Gelene Dotson, that he was on Mr. Barrett's property, without incident, within a month of Trooper Eales being killed.

firing a gun into the air.  Five officers, including Sequoyah County Sheriff John Philpot, responded to Mr. Barrett's residence.  The sheriff inspected Mr. Barrett's rifle to determine whether it was empty, and gave it back to him.  There was no confrontation with the authorities, and Mr. Barrett was not taken into custody on the "outstanding warrant" or for any other reason.[24] (Decl. of Janice Sanders.)  Although Ms. Sanders was interviewed by defense counsel, she was not called as a witness.  When she was contacted by Mr. Hilfiger and a man who was likely Bret Smith, this gentleman asked Mr. Hilfiger if he was going to call Ms. Sanders as a witness.  To his surprise, Mr. Hilfiger said "no."  (Decl. of Janice Sanders.)[25]

Mr. Barrett's mother, Sylvia Gelene Dotson, who lived next door, was called as a defense witness in the first stage of trial, but she was not asked about the police coming to her son's residence shortly before the shooting incident, or how long Mr. Barrett had kept close to his property.  Had she been asked, she would have testified that Mr. Barrett was not capable of living on his own, and thus stayed close to his relatives in the community for support.  He had been doing this long before the "warrant" was issued.  Ms. Dotson was stunned at the midnight raid on Mr. Barrett's house.  Had the police simply contacted Mr. Barrett's family, they would have

---

[24]  During Mr. Barrett's state case, Mr. Philpot was deposed by John Echols regarding his previous contacts with Mr. Barrett.  In late 1998, Sheriff Philpot and others, including Deputy Sheldon Fair, went to Mr. Barrett's residence over a complaint that he was firing weapons, something he did not infrequently.  Decl. of Janice Sanders. On this occasion, Sheriff Philpot arrived after the other officers.  When the sheriff arrived, the officers who were already there were inspecting Mr. Barrett's weapons and running the serial numbers.  One of the weapons being inspected appeared to be an SKS.  Sheriff Philpot informed Mr. Barrett that he had an outstanding misdemeanor warrant.  Mr. Barrett said he would appear and take care of the matter.  Sheriff Philpot did not take Mr. Barrett in on the warrant.  Mr. Barrett never threatened any of the officers, and his weapons were returned to him after they were inspected.  Philpot Deposition.

[25]  In addition to impeaching the Government's theory of the case, testimony from Ms. Sanders and Ms. Dotson would have been important to the motion to suppress, showing there was no cause for a no-knock, nighttime warrant.

brought him in. Even if the police had come out to simply arrest Mr. Barrett in a non-confrontational way, there would have been no problem. Moreover, shortly before the raid, and consistent with what Janice Sanders says, the police had been to Mr. Barrett's property to inspect his weapons. There had been no violence and no problem. (Decl. of Sylvia Gelene Dotson.)

Ruth Harris, Mr. Barrett's aunt, also states that had the authorities simply let the family know that Mr. Barrett had an outstanding warrant, it could have been arranged without any difficulty for Mr. Barrett to surrender peacefully. (Decl. of Ruth Harris.)

Another of Mr. Barrett's aunts, Phyllis Crawford, lived just down the road. On one occasion when Mr. Barrett felt he was wanted for something by the police, far from threatening violence or bragging that he would "go out in a blaze of glory," Mr. Barrett came to her in tears, asking what he should do. Ms. Crawford told if the police really wanted them, he should simply go with them. Instead of issuing threats, this advice seemed entirely reasonable to Mr. Barrett, and calmed him down. (Decl. of Phyllis Crawford.)

Sean Hill, who was available to testify but never contacted by the defense, states that far from "hiding out" from a warrant, Mr. Barrett had really never left his property for years. Police drove by Mr. Barrett's property all the time. When Tom Sanders would call in noise complaints against Mr. Barrett, the police would drive by, and there was no reaction from Mr. Barrett. Mr. Barrett was used to the regular police patrols and police presence in the area. His attitude was, he was there if the police wanted him. Mr. Hill also could have testified that the sign on Mr. Barrett's gate (Government Exhibit 104) which the prosecution made much of had been placed there on September 22, 1999, because the night before drug addicts had climbed over the fence and woken Mr. Barrett up. (Decl. of Sean Hill.)

Brandy Hill could have given similar testimony. She states that from 1996 to the time of the shooting incident, police drove by Mr. Barrett's place on a frequent basis, sometimes up to three times a week. Mr. Barrett was used to the police presence and was not bothered by it. (Decl. of Brandy Hill.)

Had counsel conducted a proper investigation and presented this evidence, there is a reasonable probability that the outcome would have been different, since it directly countered the prosecution's theory of the case. Compared to this evidence, the self-serving testimony of the seven snitches would have been found clearly wanting in credibility. *Strickland v. Washington,* 466 U.S. 668 (1984); *Cargle v. Mullin,* 317 F.3d 1196, 1120-26 (10th Cir. 2003) (defense counsel ineffective for failing to conduct a reasonable investigation, which would have uncovered witnesses who could countered testimony of prosecution witnesses and supported defense claim of non-involvement in the homicides); *Williamson v. Ward,* 110 F.3d 1508, 1514 (10th Cir. 1997) (duty all lines of defense strictly observed in capital cases; counsel ineffective for, among other things, failure to present evidence showing third party had confessed).

> **10.    Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony. Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress" (R. 849.) Trial counsel allowed the jury to hear Horn's testimony over a period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.

The Government was clearly concerned about the discrepancies in the testimony of its fact witnesses, both as compared to other witnesses, and with regard to their testimony in the previous state court trials.  (R. 925, 934, 1630-31.)  Consequently, it again called a witness who had previously testified at the state court trials, former FBI agent James Horn.  Horn testified to his credentials, including a B.S. in Psychology – although he admitted he was not a psychologist (R. 843, 909) –  and a Masters of Forensic Science degree from George Washington University in Washington D.C.  (R. 843.)  Horn also stated he was board certified through the American Academy of Experts in Traumatic Stress in "Emergency Crisis Response" and "Traumatic Stress."  (R. 848.)   He informed the jury, in some detail, about his service as a decorated Marine Corps infantry officer, having served two terms in Vietnam before joining the FBI.  (R. 843-45.)  Horn had worked with the FBI's behavioral unit as a criminal profiler, and then as program manager of the FBI critical incident program.  (R. 845-848.)

Horn's testimony revealed a strong affiliation with law enforcement and allowed him to present himself as having extraordinary first-hand knowledge of traumatic events. Even during the process of stating his credentials before being offered as an expert, Horn spoke of having been exposed to rocket attacks by the Viet Cong, engaging in combat with the North Vietnamese,  and working for the FBI on "critical incidents" such as Hurricanes Andrew and Hugo, the Oklahoma City Bombing and the assassination attempt on Ronald Reagan, as well as being a member of the first FBI SWAT team (R. 844-847.)[26]

---

[26]During the two state court trials, Horn similarly claimed involvement in the FBI's first SWAT team (Trial # 1, 2120), the aftermath of the Oklahoma City Bombing (Trial # 1, 2122; Trial # 2, 1436, 1441); wartime experience in Vietnam (Trial # 1, 2135; Trial # 2, 1436-37, 1445, 1451, 1459-60); the incident at Wounded Knee (Trial # 2, 1437-39, 1460); as part of an anti-terrorist squad at the Lake Placid Winter Olympics (Trial # 2, 1438); and in connection with a fatal sky-jacking (Trial # 2, 1439).

Def's § 2255 Mot.                    162                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Horn was accepted by the court as an "expert witness in the area of traumatic stress" without objection from the defense (R. 849), nor any request for a *Daubert* hearing.[27] Horn then testified in very general terms about the impact of trauma on an individual's ability to relate and recall the incidents and circumstances in question.   While unable to comment on the specifics of any of the lay witnesses' testimony (R. 881), Horn narrated the impact of "personal feeling[s] of mortality and vulnerability" that trauma creates (R. 850), and particularly how there is "an extreme aggravation by the loss and injury to fellow police and fellow agents ... the worst thing that happens to a law enforcement officer in the line of duty is the death of a partner in the line of duty. So we can expect to see in those circumstances the worst, the most serious impact in effects on the colleagues who survive." (R. 851.)  In explaining his views about the impact of trauma on recollection, Horn referred repeatedly to his FBI days and cited to specific cases he had been involved in or had simply heard of, giving names and locations.  (R. 852-4, 858, 859, 860.)  However, he offered no particular opinion concerning the members of the SWAT team in this case, even though he had actually been involved in debriefing them in group "counseling sessions," where he had offered them "peer support" (R. 905, 874-79), and claimed that he had the officers sign confidentiality agreements concerning the debriefing.  Horn stated correctly that "confidentiality doesn't extend to the courtroom, privilege does." (R. 880.)   However, counsel simply acquiesced to Horn not testifying about the specifics of what had been said in the debriefing, apparently out of concern that Horn should not run the risk of creating a conflict for himself.  (R. 881.)

---

[27]*See Daubert v. Merrell Dow Pharmaceuticals, Inc.*,  509 U.S. 579 (1993).

After testimony from Horn running to some forty printed pages (R. 849-889), including his narrating what an FBI "psychiatrist" had said on the soundtrack of a training video (R. 856), the court finally intervened *sua sponte*, noting that: "I don't have a clue why the government called this witness ... I don't know what his expertise is ... I don't think a foundation has been laid ... it could be a *Daubert* issue ...". (R. 890.)

Nonetheless, Horn's testimony continued without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and Horn establishing that his work was not "interested in critiquing and facts, but in helping them resolve their emotional response to these incidents." (R. 897-98.)   As his testimony continued, it became apparent that Horn was unfamiliar with various concepts relevant to the area of memory and trauma, such as acute traumatic disassociation (R. 908-10),[28] confabulation (R. 906),[29] and contamination of memory through contact with others.  (R. 900-901.)[30]  In fact, Horn made it plain that he was not interested in the current research in the field, just in dealing with individual cases.  (R. 883.)

Before recessing for the day, the court again expressed concern about Horn giving expert testimony, citing to Rule 702 and the fact that Horn "hasn't talked about any principles or

---

[28]*See, e.g.,* Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83, American Psychiatric Publishing 2007.

[29]Horn defined confabulation as "it means to make it up," whereas confabulation is the formation of false memories, perceptions or beliefs as a result of neurological or psychological dysfunction.  Helen Phillips, *Mind Fiction: Why your brain tells tall tales,* 2572 New Scientist, 7th October 2006.

[30]Contamination of eyewitness testimony by subsequent input is a phenomenon that has been confirmed by clinical studies. Anthony Esgate, *An Introduction to Applied Cognitive Psychology*, 51 Psychology Press 2004.

methods that he has used to reach any conclusion and he hasn't applied any of the principles or methods reliably to any facts of this case because he really hasn't talked about the facts in this case." (R. 918.)  The following morning, having expressed further concern, the court indicated that it was contemplating striking Horn's testimony, since it was not likely to aid the jury in resolving any factual dispute, but rather consisted merely of talking "in generalities." (R. 923-27.)  Only after the court had questioned the government at length about the relevance and usefulness of Horn's testimony (R. 923-940) did the defense finally make the half-hearted statement: "I think the Court should consider striking his testimony" (R. 940).  When given a further opportunity to ask that the testimony to be stricken, the defense still failed to affirmatively request that remedy. (R. 948.)   The court then permitted further cross-examination of the witness before the jury (R. 949-958) at the end of which the defense finally moved to strike.  However, the Government was then permitted to take the witness on redirect.  (R. 966-975.)

Eventually, the Court gave counsel a further opportunity to argue the issue (R.1628-1632) and then struck the testimony (R. 1636), giving an instruction to disregard:

> Members of the jury, if you will listen, I'm going to give an instruction.  I started to say a special instruction.  It's not special, it's just – it's just a – (Pause) Not a special instruction, but just an instruction in regard to some testimony you have heard from Mr. Horn.  So if you would listen to this interim instruction:  Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial.  As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law.  As a matter of law, I have determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial.  You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case.  Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

(R. 1740.)

Nothing in the record indicates that defense counsel urged any amendment to the instruction, even though the trial court gave them that opportunity. (R. 1636-37.) And, inexplicably, in spite of the trial court's concern about Horn's testimony, and willingness to strike it, defense counsel made no motion for a mistrial.

Horn's testimony, as the court readily saw, was inadmissible under Fed.R.Evid. 702. The fact was equally clear on the basis of the two state trial transcripts. As noted in the above discussion concerning counsel's failure to challenge the testimony of Iris Dalley, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 599, charged trial judges with the "gatekeeper" function of excluding unreliable expert testimony and ensuring that the proposed testimony will assist the trier of fact in understanding or determining a fact in issue. To do so, first, the trial court must ensure that the evidence is reliable. *Id. at 592.* Second, the court must ensure that the evidence will assist the trier of fact and is thus relevant. *Id. Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999) further held that the principles enunciated in *Daubert* applied to all expert testimony, not merely scientific evidence.

Counsel were ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony. Counsel had ample opportunity to prepare for Horn's testimony and consider whether to challenge it, because Horn was listed in the Government's witness list  and had testified at the two previous state court trials. Counsel do not appear to have bothered to ascertain what Horn's qualifications were.  During a budgeting hearing on the morning before Horn testified, Mr. Hilfiger stated he believed Horn was a psychologist. (Tr. 10/3005 at p. 7.)  However, although Horn had a degree in psychology and had acquired practical experience as an FBI agent, he frankly stated that he was not a psychologist (R. 909) or

psychiatrist (R. 907), was not focused on research, or with accuracy of recollections, but with the counseling of individuals. (R. 883, 903-904.)

Horn did state, however, that he was Board Certified in two areas, "Emergency Crisis Response" and "Traumatic Stress", through the "American Academy of Experts in Traumatic Stress" [AAETS] (R. 848.)   Had defense counsel spent even a few minutes researching those qualifications, they would have discovered that the AAETS is an organization in which membership can be bought over the internet (at present, for as little as $60), and that its "Board Certification" credential simply requires a "comprehensive application and examination, along with supporting documentation ... utilized in concert to validate a member's experience in working with survivors of traumatic events, knowledge of the literature and level of education."[31] Indeed, it is an organization through which one can become "Certified in Acute Traumatic Stress Management" merely by completing an application and taking an examination based on a book, "Comprehensive Acute Traumatic Stress Management," which is purchased through the AAETS itself.[32]   When contacted for information about Board Certification in Traumatic Stress, the AAETS provides a link to "The National Center for Crisis Management," which produces a form indicating that Board Certification may be obtained for $350.00, a resume/vita and copies of relevant licenses and certificates, with no mention of any examination, and with the applicant self-certifying as to completion of "relevant course work concerning the specific speciality area" and to other ill-defined criteria.[33]   For example, 30% of the necessary points required for Board

---

[31]*See* http://www.aaets.org/diplomate.htm (last accessed March 2, 2009)

[32]*See* http://www.aaets.org/catsm.htm (last accessed March 2, 2009)

[33]*See* http://www.nc-cm.org/APPLICATION%20FOR%20SPECIALTIES.cwk.pdf (last accessed March 9, 2009).  The National Center for Crisis Management offers no fewer than

Certification can be acquired by being "Author/Co-author of an article, paper and/or presentation related to the specific specialty area," but the Board Certification application does not even demand a copy of the article or paper in question.

Further, when being cross-examined about an article by psychiatrist Park Dietz, Horn was asked whether he was a "master's level educated expert in this field," to which he replied "In emergency response, yes, emergency crises response." (R. 908).[34]  This was clearly untrue: his master's was in forensic science, but counsel did not correct that false impression.

Defense counsel did not even talk to Horn in advance of his testimony (R. 863), but cross-examined him by asking questions to which they did not know the answers he would give.  R. 863-866, 887.   For example, they attempted to question him about an article by Dave Grossman on "Critical Incident Amnesia," asserting that Horn "knows Dr. Grossman," only to have Horn state moments later that he knew nothing about Grossman. R. 885-888.[35]  The defense also continued to reinforce Horn's credentials, for example bringing out his role as state director of the Oklahoma Chapter of Concerns of Police Survivors (R. 866), his award from the

---

fourteen different Board Certifications, in Forensic Traumatology, Emergency Crisis Response, Motor Vehicle Trauma, Disability Trauma, Pain Management, Illness Trauma, University Crisis Response, Bereavement Trauma, Domestic Violence, Sexual Abuse, Rape Trauma, Stress Management, School Crisis Response and as a "Crisis Chaplain".

[34]The article appears to have been J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 Journal of Forensic Sciences, Issue No. 5 (2002).

[35]The article in question was not introduced into evidence.  It was, presumably, Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 The Firearms Instructor: The Official Journal of the International Association of Law Enforcement Firearms Instructors (Aug. 2001).  *See* http://www.traumaregister.co.uk/Articles/critical_incident_amnesia.htm  (last accessed March 6, 2009).

"Concerns of Police Survivors" group (R. 867), the number of presentations he had supposedly given (R. 868), the fact that he had already testified twice concerning this incident (R. 869), and his supposed involvement in research.  R. 883-84.   While bolstering Horn's seeming credentials, the defense failed altogether to attack the "board certifications" he had acquired through a diploma mill.

Defense counsel were also ineffective for failing to challenge the essential shortcoming of Horn's testimony:  that it was not helpful to the trier of fact.[36] Ultimately Horn was, as the court put it, nothing more than "a forensic person who deals with traumatic experiences that police officers have." (R. 935.)   Horn did not hold himself out as a psychiatrist (R. 907), or a psychologist. (R. 909.)   Horn himself emphasized that his work involved helping people cope with the stress of unexpected trauma, not with any issue concerning factual debriefing.  He did not even really purport to be giving his opinions as an expert, seeming confused when asked whether he was expressing an expert opinion: "Pardon? ... if I am testifying as an expert witness, I guess what I'm saying are expert answers."  (R. 957.)

Defense counsel appear to have had no real strategy concerning Horn's testimony. They conceded admissibility, but then had second thoughts when the court ruled the testimony inadmissible and suggested moving to strike it.  Counsel indicated that they had foregone their opportunity to present their own witness to rebut the matters to which he testified, intending simply to "develop out of him what we could find useful and move on down the road and not

---

[36]The suggestion that counsel made a legitimate strategic decision not to challenge Horn but to adopt whatever aspects of his testimony were useful, (R. 959) is belied by their obvious lack of preparation.   The unopposed admission of his testimony, and counsel's eventual need to have it stricken were "the result of inattention, not reasoned strategic judgment." *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005)(internal citation omitted)(counsel ineffective for failure to review readily available court file concerning previous conviction).

have an expert come up and tell the other side of the stories *per se.*" (R. 959.)  Given Horn's

lifelong work with law enforcement, and the nebulous nature of his expertise, this "decision" was

uninformed and unreasonable under prevailing professional standards.[37]  It is hard to ascertain

whether defense counsel actually viewed Horn as a witness for or against their client, but their

sheer unpreparedness resulted in a "cross-examination" that was faltering, and characterized by

the witness denying knowledge of the authorities that counsel was seeking to have discussed,

resulting in an entirely unsuccessful examination on the part of the defense.

The court had authorized limited funds for trial counsel to retain a psychologist to

assist in preparing to deal with Mr. Barrett's and the law enforcement officers' responses to the

raid.  (Doc. 97.)  However, the court permitted Mr. Barrett to be assisted by only one mental

health expert and only at below-market rates of compensation, and only for a number of hours far

below the norm for federal capital trials, although the expert had to cover many disparate issues.

*See* Claims 1, *supra*, and 3, *infra.*  Mr. Hilfiger, whom the court personally selected to represent

Mr. Barrett as part of a plan to develop a panel for future capital cases (Decl. of Julia O'Connell),

declined to join his former lead counsel in requesting additional funds from the court.  (Decl. of

John Echols.)  Mr. Hilfiger stated that he relied upon Jeanne Russell, Ed.D., to provide him

questions for his cross-examination of Horn.  (Tr. 10/3/05 Hr'g at 7.)  Trial counsel did not

contact Dr. Russell until mid-August, and did not possess the second state trial transcripts until

late September, 2005, at the earliest.

---

[37]This quixotic attempt to get mileage out of a witness so favorable to the prosecution was mirrored in the October 3 Budget Hearing, where counsel revealed that they were contemplating compelling the testimony of a "SWAT team expert" they knew to be actively opposed to testifying for them.  *Id.* at 6.  See claim of unreasonable performance regarding Chuck Choney.

Dr. Russell, in her communications to trial counsel, questioned what role Horn was to play in the trial, and admitted difficulty in framing questions for him. A particular concern for her was whether Horn was a mental health expert who might be prevented from testifying for reasons of confidentiality and privilege, and the fact that Horn was assuming dual roles by providing counseling and then testifying as an expert regarding the same subject matter. Defense counsel seemed to accept without question that Horn could not testify about what the officers had actually said in the debriefing sessions (R. 938), apparently believing that information was somehow privileged. Similarly, counsel did not pursue discovery of any notes or records of the various debriefing sessions. (R. 939.) While the federal courts are authorized to define new privileges, and the "recognition of a privilege based on a confidential relationship should be determined on a case-by-case basis," *Jaffee v. Redmond*, 518 U.S. 1, 5-7 (1996)(recognizing privilege in communications with licensed social worker), no "traumatic stress debriefing" privilege has yet emerged, and counsel did not raise or argue Mr. Barrett's right to effective representation through full discovery and cross-examination informed by knowledge of what was said at the debriefings.[38] Thus, their ineffective performance in accepting at face value Horn's claim of confidentiality spilled over into their cross-examination of the tactical team officers.

Not only did counsel lack information from the debriefings with which to cross-examine, but they also overlooked the critical fact that the group sessions were, in effect, a pre-

---

[38]Strong policy arguments would militate against allowing law enforcement to conceal such debriefings on privilege grounds. To do so would create the temptation to hold debriefings in every controversial case in order to chill defense counsel's ability to cross-examine effectively about the possibility of contamination of witnesses. Moreover, since the officers in this case effectively waived any privilege by testifying as to the facts of the incident, shielding them from inquiry into earlier and possibly inconsistent statements would be decidedly unfair.

emptive violation of FED. R. EVID. 615:  an untrammeled opportunity for the officers to learn in

advance what other officers would say and, consciously or unconsciously, adopt other officers'

perspectives on the incident.  Defense counsel also did not question the narrative technique

adopted by some of the officers, of speaking in the present tense - a recognized therapeutic

technique in trauma counseling - when describing what they said had taken place.[39]  This not only

suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more

powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been

admitted and was highly prejudicial.  It was the court that recognized Horn had nothing

legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had

a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in

futility.  Horn painted a powerful picture of law enforcement officers as a valiant brotherhood,

referring to "one of our FBI heroes" (R. 855), to the powerful impact of losing a colleague (R.

851) and to the close relationship of SWAT team members: "it's very akin to the relationship I

still have to this day with the Marines with whom I served in Vietnam because there is a bond

when you face life-threatening situations that is formed, that is probably like no other bond." R.

861-62.  Not only did this testimony improperly bolster the prosecution witnesses,[40] suggesting

that the inaccuracies in their testimony were of little moment, given the trauma experienced by

the grieving band of law enforcement agents, it also amounted to victim impact testimony that

_____

[39]*See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71 Guilford Press 2001.

[40]The Court itself acknowledged this facet of the testimony when ruling that it would strike the testimony: "At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue." R. 1635.

should never have come in at the guilt phase.[41]  Moreover, it sought to explain the fact that officers might "recall" significant facts long after an incident which they had not previously mentioned, without beginning to explore the question of whether those recovered "memories" were reliable recollections.  (R. 858-59.)

Horn's connection with the FBI alone would have been perceived by the jury as lending weight to what he said.  Another court, in holding that the testimony of a member of the FBI's Behavioral Analysis Unit failed to satisfy *Daubert*, noted: "In light of ... the considerable authority and even mystique in which these experts are cloaked due to their status within the FBI, it is essential to establish the reliability of such expert testimony." *United States v. Thomas*, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266 at * 90-94 (D.Md. January 13, 2006)(criticizing unreliability, lack of proven methodology and circular reasoning of agent's testimony).

This was not a case where an isolated and fleeting reference to an improper matter would have been easily cured.  It is normally presumed "that a jury will follow an instruction to disregard inadmissible evidence *unless* there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987)(internal quotation marks and citations omitted)(emphasis added);  *Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005)(single reference to defendant as an "ex-con" cured by instruction to disregard). The probability that the court's instruction prevented the jury from considering Horn's testimony in the ways stated herein is overwhelmingly small.  Horn's testimony stretched out over two days, and the supposedly curative instruction given by the court was late in coming.

_____

[41]  It is noteworthy that victim impact was one of the aggravators ultimately found by the jury in deciding to sentence Mr. Barrett to death.

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005. This delay can only have allowed the evidence to sink into the jury's consciousness. By contrast, in *United States v. Joe*, 8 F.3d 1488, 1498 (10th Cir. 1993) an erroneous reference to the defendant's prior incarceration was a "single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction"; consequently reversal was not required. Moreover, the low-key nature of the instruction, which downplayed even its own importance, can have done little to erase the jury's recall of Horn's testimony. "It's not special ... Not a special instruction, but just an instruction in regard to some testimony that you have heard from Mr. Horn." (R. 1739.) The trial court also missed an opportunity to drive home the importance of the instruction, by failing to emphasize that the evidence was simply inadmissible as a matter of controlling law, but rather stating that the ruling "is based solely on my interpretation of the law applicable in this case." (R. 1740.)

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder. It can therefore be readily concluded that the evidence was otherwise "not overwhelming" and that the impact of Horn's testimony on the jury requires a new trial. *See United States v. Sands*, 899 F.2d 912 (10th Cir. 1990)(new trial warranted where it cannot be said with reasonable certainty that the improper reference "had but very slight effect on the verdict of the jury").

Given the history of this case, especially with two prior trials that had not resulted in a murder conviction, let alone a death sentence, defense counsel had nothing to lose on their client's behalf by moving for a mistrial. The trial court had properly identified the shortcomings of Horn's testimony, and made clear its readiness to strike that testimony. The court had

recognized the appropriateness of giving an instruction to disregard, although the instruction

actually given was inadequate.  Defense counsel could and should have argued that the jury's

exposure to Horn's evidence had irredeemably tainted Mr. Barrett's right to a fair trial.  There

was no downside to a motion for mistrial and therefore no strategic reasons for failing to make

the motion.  Counsel's failure to move for a mistrial clearly demonstrated deficient performance.

In a similar situation, where counsel only realized during the testimony of a

government witness that his client's statement had been given after he had already involved his

rights, a trial court suppressed the statement.  However, only a cautionary instruction was given

and counsel did not move for a mistrial.  *United States v. Ramsey*, 323 F.Supp.2d 27, 33  (D.D.C.

2004).  Counsel's performance was held to be deficient in the circumstances of that case, where

"any reasonable defense lawyer would have jumped at the chance to start the trial afresh."  *Id*. at

37.  Given Mr. Barrett's counsel's lack of preparedness, their failure to even attempt to obtain a

mistrial defies explanation.  *See also Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir.

2005)(trial counsel ineffective for failing to move for mistrial after prosecutor's inflammatory

closing argument); *Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996)(counsel ineffective for failing

to move for mistrial after repeated references to defendant's exercise of right to remain silent);

*Crowe v. Sanders*, 864 F.2d 430 (6th Cir. 1989)(counsel ineffective for failing to seek mistrial

after court gave improper parole instructions).

To the extent the issue could have been fully resolved on the record, direct appeal

counsel for Mr. Barrett unreasonably failed to raise the issue of the ineffective assistance

provided by trial counsel with regard to Mr. Horn's testimony, and their failure to mitigate or

correct that error through a stronger instruction or a mistrial.  However, as indicated here, there is

extra-record evidence in trial counsel's files showing that they did not conduct a timely or thorough investigation of Horn's qualifications, the limitations of his testimony, their own expert's ability to provide questions on cross-examination, or the general admissibility of his testimony under federal law.

The fact that trial counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern, did not waive these issues. Appellate counsel could and should have raised the issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion. *United States v. Johnson*, 520 U.S. 461, 467 (1997); *United States v. Olano*, 507 U.S. 725, 732 (1993). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Burbage,* 365 F.3d 1174, 1180 (10th Cir. 2004). The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial. Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

> **11.    The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions**

Trial counsel's role in representing a criminal defendant is giving the jury a way to find reasonable doubt. In this respect, closing argument is an indispensable aspect of the defense function. *Herring v. New York*, 422 U.S. 853 (1975); *Gardner v. Florida*, 430 U.S. 349,

360 (1977).  However, the defense lawyer also must request jury instructions that frame the issues and enable the jury to give effect to the defense's theories.  Absent such an instruction, defense evidence may not be given appropriate effect.

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument.  The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, an instruction on Oklahoma's "make-my-day" law, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses.  These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution in this case from the two previous state-court prosecutions.  Some of these witnesses acknowledge at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified.  These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

Courts have long given instructions that inform the jury that the testimony of an informant "'must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.'"  *See, e.g., United States v. Humphrey*, 208 F.3d 1190, 1206 (10th Cir. 2000).  *See also United States v. Bridwell*, 583 F.2d 1135, 1142 n.6 (10th Cir. 1978).

Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their testimony.  Karen Real Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, and Brandi Price were all drug addicts at relevant times.

Courts have long instructed juries that the

testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.

[¶]  You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support."  *United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir.2005) (citations omitted).  The defense theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained law enforcement officer (R 4314), and (b) Mr. Barrett was not engaged in the drug manufacture or distribution when the raid took place.  As evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction.

**12.    Trial counsel were ineffective for failing to adequately preserve the record, resulting in numerous meritorious**

**claims on direct appeal being evaluated under the
onerous plain error standard.**

Trial counsel were professionally unreasonable for failing to make proper objections in order to preserve the record for appeal.  As a consequence, Mr. Barrett was denied his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment.

As demonstrated by the direct appeal decision in this case, *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007), Mr. Barrett's trial counsel failed to timely preserve complete objections to: 1) the prosecution's violation of Oklahoma state law requirements for nighttime search warrants (*id.* at 1089-90): 2) the improper execution of search warrants by federal officers (*id.* at 1090); 3) the violation of Fed.R.Crim.P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home (*id.* at 1090-91); 4) the insufficiency of Mr. Barrett's federal indictment (*id.* at 1090-91); 5) the improper multiplicity of various counts of Mr. Barrett's federal indictment for the same alleged criminal conduct (*id.* at 1095-96); 6) the misjoinder of offenses in violation of Fed.R.Crim.P. 8 (*id.* At 1096-97); 7) the improper admission of victim impact evidence (*id.* at 1097-1101; 8) the prosecutor's use of racially motivated strikes in violation of *Batson v. Kentucky,* 476 U.S. 76 (1986), in that defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual, and also failed to inquire into the Government's justifications for the strikes (*id.* at 1105-06); 9) the federal death penalty statute's improper allowance of non-statutory factors in aggravation (*id.* at 1108); 10) the lack of constitutionally required proportionality review (*id.* at 1108-09); 11) the violation of *Woodson v. North Carolina,*

428 U.S. 280 (1976) occasioned by the court's use of a relaxed standard for the admissibility of evidence (*id.* at 1109-10); 12) the federal death penalty statute's improper allowance of impermissibly vague aggravating factors ( *id.* At 1110); 13) the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor (*id.* at 1110-11); and 14) the government's improper failure to timely provide the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill.  *(Id.* at 1115-17.)

Trial counsel's failure to make full and timely objections to each of these errors constituted ineffective assistance of counsel.  *Strickland v. Washington,* 466 U.S. 668 (1984). The American Bar Association ("ABA") guidelines provide a guide in determining what constitutes reasonable performance in capital cases.  *Wiggins v. Smith,* 539 U.S. 510, 524 (2003). Under the ABA guidelines, trial counsel have a duty to "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim."  (ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, COMMENTARY TO STANDARD 10.8), 31 *Hofstra L.Rev.* 913, 1028 (2003).  Trial counsel must bear in mind "the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited."  *Id.*   Once counsel has made a decision that a clam should be made, counsel has the duty to "present the claim as forcefully as possible" and "ensure that a full record is made of all legal proceedings in connection with the claim."  *Id.* at 1028-29.

Each of the claims discussed above had merit.  Mr. Barrett would have suffered no adverse consequences had trial counsel made timely and complete objections on any or all of these grounds.  Accordingly, trial counsel's failure to preserve Mr. Barrett's objections on each of these grounds fell far below the standards expected of competent counsel in capital cases.

Each of the objections discussed above raised a question of law, or mixed questions of law and fact, subject to de novo review. *See, e.g., United States v. Smith,* 543 F.3d 1211, 1226 (10th Cir. 2008) ("When considering a *Batson* claim, we review de novo whether the proffered explanations were race-neutral"); *United States v. Johnson,* 130 F.3d 1420 (10th Cir. 1997) ("misjoinder under Rule 8 is a question of law subject to de novo review"); *United States v. McIntosh,* 124 F.3d 1330, 1336 (10th Cir. 1997) ("We review claims of multiplicity de novo). However, based upon trial counsel's failure to make complete and timely objections, the Court of Appeals reviewed each of these claims for plain error. Had counsel made appropriate objections, Mr. Barrett would have obtained relief from his convictions and sentence of death based on each of these errors under the appropriate de novo standard of review.

The constitutional violations set forth above warrant the granting of 2255 relief without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abramson,* 507 U.S. 619, 638 n. 9 (1993). Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the jury's determinations of guilt and punishment, rendering them fundamentally unfair and resulting in a miscarriage of justice.

**13.     Counsel was professionally unreasonable for failing to object to numerous instances of prosecutorial misconduct in closing argument in both stages of trial.**

Claim 5, section C details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase. The specific instances will not be repeated but are incorporated herein by specific reference. Faced with arguments that could in no sense be termed appropriate, counsel failed

altogether to object.  The failure to object to clear prosecutorial misconduct can never be termed a reasonable strategy.  Especially in light of the numerous, serious constitutional errors which plagued Mr. Barrett's trial, this omission by counsel was prejudicial.  In this case, the prosecution basically did whatever it pleased.  That abuse of the process continued unabated in closing arguments, to Mr. Barrett's clear detriment. *E.g., Hodge v. Hurley,* 426 F.3d 368, 386-89 (6th Cir. 2005); *Washington v. Hofbrauer,* 228 F.3d 689, 703, 709 (6th Cir. 2000); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996)(finding counsel ineffective for failing to object to misconduct in closing arguments).

## Conclusion

The unprofessional and prejudicial errors of counsel permeated the first stage of trial.  From the failure to properly attack the search warrant, to the failure to impeach witnesses; to the failure to produce witnesses who could eviscerate the credibility of the Government's witnesses and otherwise support Mr. Barrett's defense; to the failure to properly secure and utilize expert witnesses; to failure to object to improper experts called by the Government; to the failure to investigate, be prepared, and demand the time to be prepared, no rational observer could be left with any other conclusion than that counsel ineffectively represented Mr. Barrett in the guilt/innocence phase of trial.  While several instances of ineffectiveness, standing alone, are sufficient to warrant vacating Mr. Barrett's convictions, taken together, the conclusion that counsel was ineffective in the first stage of trial is inescapable.  *E.g., United States v. ex rel. Gregory Madef,* 223 F.Supp.2d 968, 973 (N.D. Ill. 2002) (viewing evidence that formed basis for ineffective claim in the aggregate, and not individually).

Accordingly, Mr. Barrett is entitled to relief from each of the three counts of conviction.

### B.       Unreasonable Acts and Omissions Affecting the Second Stage of Trial

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to his background and character and the circumstances of the offense. *Williams v. Taylor*, 529 U.S. 362, 393 (2000). Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"). *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004).

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. In a capital case, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" at the second stage of trial. *Wiggins*, 539 U.S. at 537. In sum, the Sixth Amendment is violated in a capital sentencing proceeding where defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant and offer an explanation for his conduct. *Smith v. Mullin*, 379 F.3d at 929, 943.

"Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).

### 1.       *Deficient Performance*

Trial counsel were impeded in their efforts to develop mitigation evidence by the trial court's refusal to authorize funds for retaining the necessary resources. As stated in Claim 1, *supra*, the trial court denied Mr. Barrett resources regularly afforded similarly situated capital defendants, and which were deemed necessary in the independent professional judgment of his trial counsel. *(See also* Docs. 50, 51, 57, 97, 128; Decl. John Echols; Decl. Richard Burr.)

Mr. Barrett's trial counsel had a duty to retain a mitigation specialist to assist in preparation for the penalty phase. (ABA Guideline 4.1(A)(2).) Trial counsel were on notice that the work done by a person previously hired in state court was incomplete, and that the work was done by a novice who refused to produce a summary of her findings for counsel. (Letter from John Echols to Honorable James H. Payne dated 2/2/8/2005; Decl. John Echols.) However, trial counsel were aware, or should have been aware, that the preliminary investigation showed there was evidence of mental disorders and other mitigating factors.

The attorneys who represented Mr. Barrett at trial did not obtain the files of the mitigation investigator who worked on the case before the first state trial, although the files were readily available. (Decl. Steve Leedy; Decl. John Echols). Nor did Mr. Barrett's trial attorneys timely confer with the prior attorneys who had worked on second-stage issues in order to develop or implement a plan of investigation or for trial. (Decl. Frank Gordon; Decl. John Echols). The available files included records showing that Mr. Barrett had been raised in a chaotic household by neglectful, alcoholic parents, a father who was only present when not out drinking and carousing, that Mr. Barrett attempted suicide as a young man, and had been diagnosed with a major medical disorder.

On March 18, 2005, less than six months before the start of trial, the court authorized Mr. Barrett's counsel to retain Inquisitor, Inc., to perform the function of a mitigation

specialist. (Doc. 97). The delay was contrary to ABA Guidelines which call for assembly of the

defense team "[a]s soon as possible after designation" of lead counsel. (ABA Guideline

10.4(C).) Trial counsel first sought funds for this task on January 31, 2005, then again on

February 7, 2005. (Docs. 46 and 50). Although counsel's professional judgment and that of the

mitigation consultant they sought to retain dictated that the investigation would require $20,000

in labor and $5,000 in travel expenses, the court arbitrarily cut this figure in half without any

allowance for travel expenses. (Doc. 97). *See* Claim 1, *supra*, and 3, *infra*.

The denial of travel funds – which were essential in this case – may have been due

in part to counsel erroneously informing the court that Mr. Barrett had "not lived in numerous

locales." (Doc. 50). Had counsel asked Mr. Barrett or his family, they could have told counsel

that Mr. Barrett was born and lived as a child in Illinois, lived as a child in New Jersey, and

Indiana, and lived and worked as an adult in Arkansas, western Oklahoma, Texas, and Idaho.

Even with this misinformation, the trial court's denial of travel funds obviously impaired the

prospects for an investigation in that the mitigation investigator resided in Tennessee and even

the most minimal investigation would require travel to Oklahoma.

Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing

upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in

aggravation." (ABA Guideline 10.11(A).) Reasonably competent counsel would speak with

"[w]itnesses familiar with [and obtain] evidence relating to the client's life and development

from conception to the time of sentencing, that would be explanatory of the offense . . ., would

rebut or explain evidence presented by the prosecutor, would present positive aspects of the

client's life, or would otherwise support a sentence less than death." (ABA Guideline 10.11(F)(1).)

Mr. Barrett's trial counsel knew or should have known that Mr. Barrett's family lived nearby and were ready to be interviewed or re-interviewed. However, neither of the attorneys who tried the case, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history. (*See*, *e.g.*, Decl. Brandie Hill; Decl. Carolyn Joseph; Decl. Issac Barrett; Decl. Doris Barrett; Decl. Ernest Barrett; Decl. Gwen Crawford; Decl. Kathy Trotter; Decl. Janice Sanders (partial interview by trial counsel); Decl. Paul Lunsford; Decl. Shawn Hill; Decl. Toby Barrett).

On May 17, 2005, the court appointed Roger Hilfiger Mr. Barrett's lead counsel in place of John Echols. The court also appointed Bret A. Smith. Mr. Hilfger had only worked on one prior federal death penalty case. Mr. Smith had no capital experience, yet Mr. Hilfiger gave him primary responsibility for the penalty trial. Contrary to 18 U.S.C. § 3005, and § 3599, and Judicial Conference guidelines, Mr. Smith was appointed without consultation with the Federal Defender. As stated in Claim 1, *supra*, the trial judge chose counsel for Mr. Barrett based on the judge's desire to give inexperienced local attorneys capital experience so that they could form a capital panel in the Eastern District.

On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005. The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done

to prepare for a penalty trial. (Echols letter to Payne; Decl. John Echols; Doc. 113; Decl. Richard Burr).

Mr. Hilfiger did not seek an amendment of the budget. His failure to do so was unreasonable. On May 26, 2005, Mr. Hilfiger filed a motion for a continuance based on his having only recently received the files and records related to some of the state court proceedings, including transcripts and discovery. Mr. Hilfiger stated in his motion that he was not familiar with the materials. In February 2005, Mr. Hilfiger had informed Mr. Echols that it would take him (Mr. Hilfiger) 160 hours to assemble and review the files related to the case. On September 9, 2005, Mr. Smith advised the court that as of that date, Mr. Barrett's lawyers had not yet assembled or reviewed the records of the preliminary mitigation investigation that had been done prior to the first state trial. These statements, and the declarations of John Echols, Frank Gordon, and Steve Leedy, show Mr. Hilfiger failed to undertake a reasonable investigation before concluding that no additional funds were needed to prepare for either stage of trial.

On or about June 30, 2005, trial counsel telephoned then Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation investigator. (Decl. Julia O'Connell). Trial counsel had not contacted the mitigation specialist whom the court had authorized to work on Mr. Barrett's case. (Letter from Ron Lax to Tivon Schardl dated 9/24/08). Nor had trial counsel familiarized himself with the results of an earlier mitigation investigation. (Decl. Steve Leedy; Decl. John Echols; Decl. Frank Gordon). Ms. O'Connell recommended that trial counsel contact Richard Burr, Federal Death Penalty Resource Counsel, for assistance. Trial counsel did not contact him. (Decl. Richard Burr.) At that time, the trial was approximately ten weeks away. As Federal Defender O'Connell explains, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second stage

investigation if it hadn't already been completed, even if Mr. Hilfiger were able to secure the services of a mitigation investigator or investigators.  (Decl. Julia O'Connell).

Mr. Barrett's trial counsel did not secure the services of a mitigation specialist or other trained mitigation investigator.  Although the court authorized trial counsel to retain Inquisitor, Inc., trial counsel failed to contact the agency, and never sent any documents or requested any investigation for Mr. Barrett's case.  (Letter from Ron Lax to Tivon Schardl dated 9/24/08).

As the Supreme Court has held, where there is a failure to investigate, alleged "strategic" decisions are not reasonable.  In all capital cases, prevailing norms of capital defense practice, and empirical research on its results, indicate that "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."  (ABA Guideline 10.10.1; ABA Guidelines, 31 Hofstra L. Rev. 913, 1059, 1065 (2003) (commentary on Guideline 10.11) ("counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").)

Trial counsel were aware that expert testimony regarding the mind's response to threats such as an unmarked S.U.V. barreling towards one's cabin was important so that the jury could understand Mr. Barrett's reactions.  (Doc. 50.)  Trial counsel were aware that Mr. Barrett "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders."  *Ibid.*  Trial counsel were aware that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic

brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting." *Ibid.*

The court authorized trial counsel "to hire a psychiatrist or a psychologist for up to 40 hours." (Doc. 97.)  This ruling denied Mr. Barrett the expert assistance he was entitled to under the Due Process Clause of the Fifth Amendment.  *See* Claim 3, *infra*.  It also denied Mr. Barrett the resources afforded similarly situated defendants in federal death penalty cases.  (Decl. Richard Burr; Doc. 107).  The court denied Mr. Barrett resources that would exceed the amount of money spent to represent him in state court, (Doc. 128 at 4), even though there was no second stage of trial in state court.

Prevailing professional norms of capital defense practice provide that counsel should obtain the assistance of expert witnesses who will be provided relevant supporting documentation regarding the defendant's medical, scholastic, cultural, economic, and sociological background.  (ABA Guideline 10.11(F)(1).)  The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation.  (Tr. 9/9/05 Hr'g at 38.)  Mr. Barrett's trial counsel did not retain an expert to assess mental health mitigation and did not conduct a background investigation that would have supported a reliable opinion.

In mid-August 2005, Mr. Barrett's counsel contacted Jeanne Russell, Ed.D., regarding the risk assessment that had been contemplated in January and authorized in March, 2005.  The scope of Dr. Russell's inquiry was limited, and did not encompass many mitigating factors previously identified by trial counsel and routinely pursued in capital cases.  Dr. Russell did nothing more for Mr. Barrett's federal counsel than update the report she had prepared in

2003 in anticipation of the second state trial.  Indeed, trial counsel represented to the court that the defense did not have to produce a report from Dr. Russell pursuant to Federal Rule of Criminal Procedure 12.2 because Dr. Russell would not testify regarding Mr. Barrett's mental condition.  (Tr. 9/9/05 Hr'g at 41).

By September 9, 2005, Mr. Barrett's trial counsel had not obtained records from any state court investigation for a penalty phase.  (Tr. 9/9/05 Hr'g at 43).  Mr. Smith said he had contacted "Mr. Echols[] because we have been able to find very little on mitigation" from the past trials.  *Ibid.*  Mr. Smith told the court Dr. Russell's testimony would not involve an examination of Mr. Barrett.  *Id.* at 41.  Dr. Russell had "examined" Mr. Barrett, however.  At that time, Mr. Smith believed that Dr. Russell only had "reviewed records and what have you."  (Tr. 9/9/05 Hr'g at 41).  The court generously described the defense's preparation as "still work in progress."  *Id.* at 42.

On October 3, 2005, trial counsel disclosed to the court that they had not consulted a psychiatrist or psychologist.  (Tr. 10/3/05 Hr'g at 7).  Mr. Hilfiger informed the court that Dr. Russell would be used as a mitigation expert.  *Ibid.*  However, Mr. Smith had previously informed the court and the Government that Dr. Russell would not be testifying regarding mental health mitigation.  (Tr. 9/9/05 Hr'g at 41).  Mr. Hilfiger apparently meant that Dr. Russell would act as a mitigation investigator.  However, Dr. Russell was not qualified to conduct a mitigation investigation, and she so informed Mr. Smith in August 2005.

### 2.  *Prejudice*

Trial counsel informed the jury that four categories of "mitigation evidence" would be presented:  (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration; (4)

"Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999." (R. 4704). The cursory description of the evidence that would be presented in the last category (R. 4709-13), was not "an accurate representation of [Mr. Barrett]" (R. 4713), in that it was terribly incomplete; a reflection of counsel's lack of investigation.

If trial counsel had followed the norms of capital defense practice, and pursued the evidence available to them, the jury would have heard truer and radically different testimony regarding Mr. Barrett. Jurors would have learned the following about Mr. Barrett, his background, and character:

<blockquote>

a.      **The family, social, and medical background of Kenny Barrett**

**<u>Introduction</u>**

</blockquote>

Kenneth Barrett's familial roots began in Sequoyah County, Oklahoma, at the intersection of two epic journeys in American history. The deprivation of Depression era Sallisaw provided the inspiration for the Joad family in *Grapes of Wrath* who came to personify legions of real-life sharecroppers living in the nearly hopeless circumstances of Sallisaw's drought and poverty before they set out for California. The Trail of Tears[42] ended at Sallisaw Creek for those Cherokees who survived starvation, freezing temperature, disease and murder during their forced relocation from their homelands.

---

[42] In 1838, the US government uprooted some 13,000 Cherokee Indians from their land east of the Mississippi River and forced them westward into the Oklahoma territory. The 1,000 mile route they took to Oklahoma is called the Trail of Tears because of the hardships of weather, disease, and starvation that claimed the lives of 4,000 Cherokee. It was a dismal journey that took place in the middle of harsh winter, and forced Indians from their homelands through north Georgia, middle Tennessee, Kentucky, Missouri, and Arkansas, into present day Oklahoma.

Kenny 's heritage is a blend of both cultures.  His paternal relatives, the Barretts, were hard-scrabble farmers, who married Cherokee Indians.  His maternal relatives, the Dotsons, were Cherokee ranchers who married non-Indians. (Gelene Dotson, Genealogy Memorandum; Abe Dotson Marriage Certificate; Ida Melton, Death Certificate; Allen Real, Death Certificate) With some success and much tragedy, both families endured the historical forces that shaped their communities.  Some family members grew up in Indian orphanages, some became successful ranchers, educators, doctors, and business people.  Many struggled with profound mental illness and its attendant chaos.

Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life.  It made him vulnerable to developing major psychiatric illness.  In lay terms, Kenny  was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families.  His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

**Family History of Mental Illness**

Kenny  meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.  His family has long struggled with their vulnerability to mental illness.  Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases. Although members carried genetic-based risk factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people.  Other family members required psychiatric

institutionalization.  This spectrum of impairment included other family members who functioned marginally, but were unable to meet their responsibilities to their families and community.  The nature and severity of Kenny 's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

<strong><u>Maternal Family Mental Illness</u></strong>

Kenny 's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities.  Kenny 's mother's family "had to deal with mental illness for a long time." (Decl. Phyllis Crawford.)  Kenny 's mother, Gelene Dotson, has suffered from clinical depression, mood swings and anxiety since her teenage years.   Gelene's sister, Carolyn (Kenny's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with a regimen of mood stabilizers and antidepressants.  (Decl.  Carolyn Joseph; Carolyn Joseph, Medical Records; Carolyn Joseph, Marriage Certificate.)   One of Carolyn's daughters manifests signs of mood-related psychiatric distress and is unable to rear her children. (Decl. Carolyn Joseph.)   Gelene's brother Mark, the youngest child in her family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments." (Decl. Mark Dotson.)

One of Kenny 's maternal cousins, Gwendolyn Crawford, also has bipolar mood disorder that necessitates ongoing treatment and medication.  (Decl. Gwendolyn Crawford; Gwen Crawford, School Records;  Decl. Brandy Hill; Brandy Hill, Medical Record.)  Gwendolyn's two children both have significant mental impairments.  Her 26 year old son Brandon has a developmental disability and is unable to speak or live independently.  (Decl. Gwendolyn

Crawford; Brandon Smith, Social Security Earned Income Statement; Brandon Smith, Guardianship Proceedings.)  Gwendolyn's daughter Brandy Hill reported that her family "learned first hand about bipolar disorder and depression" and that Brandy herself "battle[d) with depression," experienced episodes of "high euphoria" and underwent treatment for her mood disorder until she could no longer tolerate chemical regimens.  (Decl. Brandy Hill; Brandy Hill Medical Records.)

Travis Crawford, another of Kenny 's first cousins, also receives medication for anxiety and reported a history depression.  (Decl. Travis Crawford; Travis Crawford Medical Records.)  Travis has had "a long struggle with drugs and ha[s) anxiety and panic attacks" and his "mind does not work that well."  (Decl. Travis Crawford.)  Travis understands that "psychological problems run in [his) family" and reports his oldest daughter, now "a grown young woman" has bipolar disorder and one of his sons "seems a little slow and is having a tough time of it."  (Decl. Travis Crawford.)

Gelene's uncle, Warren Dotson, has two daughters who "each have a son who is bipolar, and it is a challenge for a lifetime.  It never goes away."  (Decl. Nona Reich.)

In the maternal family, depression and mood disorders trace back to Kenny 's grandmother's (Hattie Gertrude Dotson) generation.  Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the Twentieth Century.  (Decl. Carolyn Joseph; Hattie Gertrude Dotson, Death Certificate.)  Another relative, Wallace Dotson, was involuntarily hospitalized at the state mental institution on a petition brought by his father, Tom Dotson,[43] who

---

[43]Tom Dotson was the uncle of Kenny's maternal grandfather, Hugh Dotson.  (Hugh Dotson, Death Certificate.)

described Wallace as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights." (Wallace Dotson Lunacy Record)

### Paternal Family Mental Illness

Mental disease and its affects on family life were transmitted down at least four generations of Barretts. Kenny 's great great grandfather, as did his great grandfather, his grandfather and finally Kenny himself. (A. J. Barrett, Mental Health Record; A. J Barrett, Eastern State Hospital Record; Decl. Issac Barrett) As Kenny 's cousin, Kathy Trotter, explained: "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression." (Decl. Kathy Trotter.) Kenny 's great great grandfather, A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918. (A.J. Barrett, Certificate of Lunacy.) Kenny 's great grandfather, Issac Clifford Barrett, by all accounts a man who was committed to his family and community, overcame tremendous odds and poverty to build a successful ranch ("cow rich"), but ended his life by suicide. (Decl. Issac Barret and Linda Riley; Isaac Clifford Barrett, Death Certificate.)

Issac's oldest son, Andrew Jackson "A.J." Barrett shared in only the tragedy of Issac's life and none of its success. A.J., Kenny 's grandfather, was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety. A.J. terrorized his wife who hid "in the woods" from him (Decl. Linda Riley.), raped one of his daughters who became pregnant and placed the baby for adoption (Decl. Issac Barrett), and went on drunken rampages through town. His Certificate of Lunacy documents auditory hallucinations, persecutory delusions and paranoid ideation. (A.J. Barrett Certificate of Lunacy.)

His family believed he "was bipolar." (Decl. Linda Riley.) A.J. was able to work only "sporadically." His family eked out a "marginal" living, and at one point A.J. was involuntarily committed to the state hospital for one month but returned home to his wife who would not "consider divorce." (A.J. Barrett Eastern State Hospital Records; Decl. Linda Riley; A. J. Barrett, Death Certificate.)

A.J.'s maternal family also faced the tragedy of mental illness. A.J.'s mother (and Kenny 's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," (A.J. Barrett, Eastern State Hospital Records), wandered the ranch at night talking to herself and believed that she was canning goods for the winter when she washed bottles in the middle of the night (Decl. Issac Barrett.) She "died very confused." (A.J. Barrett, Eastern State Hospital Records; Mary Ellen Barrett, Death Certificate.) Mary's brother, Howard, was "Looney Tunes" (Decl. Issac Barrett), and Howard's son, Billy Dean who was a disabled veteran with a history of schizophrenia, committed suicide. (Billy Dean Maxwell Death Certificate; Billy Dean Maxwell Mental Health Record.) Kenny 's great aunt, Elnora Long, is bipolar and requires significant doses of medication. (Decl. Kathy Trotter and Issac Barrett.) Elnora, who has a complicated lineage, is "very emotionally unstable" and "unpredictable." (Decl. Kathy Trotter.) Kathy, Kenny 's cousin who experienced an anxiety and depressive episode and was hospitalized, believes Elnora is manic depressive because of her extreme mood swings. (Decl. Kathy Trotter; Kathy Trotter Medical Records.) Elnora is Ernie and his siblings' maternal half sister whose father was her mother's former son in law's brother.

Kenny has one paternal aunt (Linda Riley) and three paternal cousins who suffer from depression and bipolar disorder. His father's sister, Linda Riley, is treated for depression, and both her adult daughters have been diagnosed with bipolar disorder. (Linda Riley Medical

Def's § 2255 Mot.                    196                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Records.) Linda's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.

### Maternal Family History

Kenny 's maternal grandfather, Hugh Dotson, was a direct descendant of Cherokee Native Americans, whose every day life reflected the travails and successes Indians in eastern Oklahoma. Hugh, who grew up in an Indian orphanage became an adult universally loved by his children and grandchildren and respected in the Sallisaw community. He spent his formative years living at Dwight Mission,[44] an Indian mission school started by the Presbyterian Church. Hugh's mother, Minnie Andrews, placed Hugh and four of his siblings (Christine, John E., Anna, and Eleanor) at Dwight Mission after their father, Abe Dotson, was murdered. (Decl. Warren Dotson.) Hugh's mother, a widow with no ability to support her children, placed her two younger children (Lela and Warren) with her husband's relatives. (Decl. Warren Dotson and Carl Cook; Sequoyah County Times; Minnie Andrews, Death Certificate.)

Circumstances of Abe Dotson's death are unclear, but it is indisputable that he, two of his brothers, and his brother's son were killed by gunfire over a three year period in separate incidents. Abe, his siblings Mark and Greenberry, and his nephew Bee, were Cherokee,

---

[44]Dwight Presbyterian Mission of the Cherokees was originally founded in 1820 as an Indian mission school in western Arkansas and was named for Timothy Dwight, president of Yale University. In 1838, as Cherokees were forced into Oklahoma, Dwight Mission was moved at the invitation of the Cherokee chief to its current location 20 miles into then newly organized Indian Territory. Dwight Mission served generations of Native Americans as a mission and training school until public education became available and the school was finally closed in 1948.

and it appears that at least one of the men who shot and killed them did so with impunity.[45] (Oklahoma v. Henry Edwards; The Vian Press; The Sequoyah Times.)

Abe's son, Hugh, and the other Indian children at the mission worked in its fields and stockyards to earn their keep. Hugh impressed the administrators at Dwight Mission with his skill and sense of responsibility. Hugh and his siblings stayed in the community after they left Dwight Mission, farming as sharecroppers and day laborers. They barely survived, and some of his siblings made the long trek to California in hopes of better jobs in the fields.

Hugh married Hattie Gertrude Real in 1939 (Hugh Dotson Marriage Certificate), and they had five children over their life-long marriage, the oldest of whom is Sylvia Gelene Dotson, Kenny's mother. (Sylvia Gelene Dotson Birth Certificate.) Hugh "barely earned enough to live on." (Decl. Gelene Dotson.) Hugh, Hattie and their growing family lived in " tumble down" houses that "were in pretty bad shape even by standards back then." (Decl. Gelene Dotson.) The family "had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking."

World War II intervened, and Hugh served in the U.S. Army. When he returned home he attended classes on the GI bill that were taught by his brother in law, Carl Cook. Hugh "learned how to run a farm, a big farm, not just a home farm," and when Gelene was six, the family moved to the Dwight Mission School where Hugh ran the farm. (Decl. Gelene Dotson.) Gelene " always heard" her family was "part Indian and that [she) was 3/16 Cherokee." (Decl. Gelene Dotson.)

---

[45]Cherokee Census Cards M2799 and 3294.

Dwight Mission provided a house for the family that had electricity and plumbing, and Gelene began her elementary education at the school. She was her mother's least favorite no matter that she was the most attentive to her mother's needs. (Decl. Gelene Dotson.) The school shut down in 1949, but the Presbyterian Church sent Hugh and his family to its Menual School in Albuquerque that served Spanish speaking students from New Mexico. Hugh "ran the cattle and vegetable farm" and served as "the overseer" to the student farm hands. (Decl. Gelene Dotson.) After a year at Menaul Hugh accepted the church's offer for him to run the farm operations at a new orphanage in Farmington, Missouri. The family stayed in Farmington two years until the orphanage closed and the family moved back to Oklahoma.

Rural Sallisaw offered no jobs, and Hugh and his family moved in with his brother-in-law Carl and sister Christine. (Decl. Carl Cook.) Public schools did not conduct classes during cotton season because children had to join parents picking and chopping cotton. Hugh and his family traveled to western Oklahoma and "chopped cotton in the spring and pulled cotton balls in the fall." (Decl. Gelene Dotson.) The family returned to Sallisaw when school began in the fall, but left at Christmas to join family in California who had arranged for Hugh to become an irrigation manager on a large farm near Bakersfield. Gelene loved her life on that farm where they "were not migrant workers, but people who lived there permanently" in the "30 or 40 houses on the farm, all with kids." (Decl. Gelene Dotson.) It was "a joyful time" and Gelene "was a happy child," but her mother and father yearned to return to Sallisaw and own their own land. (Decl. Gelene Dotson.) Gelene explained that "[l)and is just something very important" to her family and "always has been." (Decl. Gelene Dotson.)

Hugh and his wife Hattie were dedicated to their dream of owning land. Hugh "worked seven day weeks, 12 hour-days" and "was tired from too much work but he never

considered working less." (Decl. Gelene Dotson.) Children in the family "always knew [they]

went out there to make enough money to buy [their) own place back home." (Decl. Gelene

Dotson.)  When they had saved enough, the family returned to its roots and soon after their

youngest child was born in 1961, Hugh bought 40 acres in Sequoyah County. Gelene and her

siblings enrolled in local public schools, and Gelene graduated but she never recaptured the joy

of her few years in California.  Years later, Hugh gave each of his five children seven of his

treasured 40 acres and retained five.  Kenneth Barrett  eventually built his shack for $150.00 on a

spit of  his grandfather's land adjacent to his mother's house, on land that Gelene expected she

would one day be deeded, and she was.

### Paternal Family History

Like Hugh Dotson, Issac Clifford Barrett, Kenny's paternal grandfather enjoyed a

fine reputation in Sequoyah County.  From 1917 to 1943, Issac managed a 20,000-acre ranch

owned by a Kansas doctor.  Issac married Mary Ellen Maxwell, who was one of ten children born

in Sequoyah County. Issac was known as "a fair man" who, when he learned of a neighbor's

falling on hard times, shared the bounty of his own garden.  (Decl. Issac Barrett.)  Issac "had his

burdens to carry after he married" Mary.  She had a "mental breakdown" (A.J. Barrett Eastern

State Hospital Records), and "walked around the yard talking to herself.  At night, she would

wake up, wash jars, and think she was canning."  (Decl. Issac Barrett.)  According to Issac

Barrett, Mary's brother, Howard Maxwell, was "Loony Tunes" and Howard's son Billy Dean

Maxwell was involuntarily committed to the state mental institution four times over a ten year

period before he committed suicide by shooting himself in the head.  (Decl. Issac Barrett; Billy

Dean Maxwell Death Certificate; Billy Jean Maxwell, Record of Mental Health Proceeding.)

Issac also committed suicide, by "ingesting a remedy for black leg cattle disease" on November

24, 1952. (Decl. Issac Barrett.) Family members believed Issac killed himself "because he had a broken heart" after his brother convinced him to sell his cattle and invest all the proceeds in a failed enterprise. "He had nothing left." (Decl. Issac Barrett.)

Issac's oldest son, Andrew Jackson Barrett (A.J.), is Kenny's paternal grandfather, but "[w)hatever good Issac had in him, and there was plenty of it, did not pass down" to A.J. (Decl. Issac Barrett.) A. J. married Ada Mae Hatter, a woman who came to be "very well thought of" and who " was someone who worked extremely hard." (Decl. Kathy Trotter; A. J. Barrett, Marriage Certificate.) Ada's mother, Ida Melton, was an Indian (Ida Melton Death Certificate) married to Sam Hatter. (Sam Hatter Marriage Certificate.) Ida and Sam divorced, and Ida married A.J.'s brother John. (Sam Hatter, Divorce Proceedings; Sam Hatter, Marriage Certificate to Bessie) Ida and John had one child, Elnora Barrett Long, who was debilitated by

her manic depression and anxiety to such a degree that she has recently been put in a nursing home. Ida's marriage to John meant that her son-in-law, A.J., was also her brother-in-law.

A.J. and his wife, Ada Mae "lived a hard life." (Decl. Issac Barrett.) Three children "died at or near childbirth; the oldest was two weeks old. Two are buried in Akins cemetery. The stillbirth is buried back in the mountains." (Decl. Issac Barrett.) The oldest of the five children born to A.J. and Ada Mae who survived is Ernest (Ernie) Barrett, Kenny's father. Ernie and his the four siblings who survived (Margaret, Issac, Gary and Linda) lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with "a dirt floor and no electricity or running water. [W)ell water was not usable for humans, although it was all right for animals and crops." (Decl. Issac Barrett.)

A.J.'s education ended at the seventh or eighth grade. He worked sporadically as a laborer "doing public construction work" and "spent eleven months in the service during World War II." [A.J. Barrett, Eastern State Hospital Records.)  Unable to support his family, "[t)he entire family had to work in the fields traveling from one crop to the next."  (Decl. Issac Barrett.) State Hospital records described their economic status as "marginal," and the family "had a tough time getting by." [A.J. Barrett, Eastern State Hospital Records)

Life for Ernie, Kenny's father, and other children in the family was  dismal.  One of Ernie's "earliest memories is being taken out of school to work in the fields."  Decl. Ernest Barrett .)  Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell, and picked beans in Moffitt, Oklahoma.  It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

(Decl. Ernest Barrett.)

"We had a neighbor who raised purple whole peas for animal feed. My Granny Ida asked her if we could have what she had left on the vines for our cows—we scavenged them and my mom cooked them." (Decl. Linda Riley.)

A.J. was unable to ameliorate the harshness of poverty and its impact on his family.  His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month.  (A.J. Barrett, Eastern State Hospital Records.)  None of his children "wanted him to be at home because of the crazy things

he did." (Decl. Issac Barrett.) He suffered from mood swings that he attempted unsuccessfully to self medicate with copious amounts of alcohol, to which he became addicted. His alcoholism only aggravated his behavior. (A.J. Barrett, Eastern State Hospital Records.) Family members believed his behavior worsened after an automobile accident in 1960, but he "had always been high tempered and jealous." (A.J. Barrett, Eastern State Hospital Records.) His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen." (Decl. Issac Barrett.) When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb" (Decl. Issac Barrett), but he "was difficult to figure out because he was also a decent guy when he was sober." (Decl. Ernie Barrett.) A.J. spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption. (Decl. Issac Barrett.)

A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Kenny's father Ernie, tried to "stay out of [his) way." The children left home as soon as they could. (A.J. Barrett, Eastern State Hospital Records.) Family members reported that A.J. had "two different personalities" and "angry spells about three times a week." (A.J. Barrett, Eastern State Hospital Records.) A.J. had "enormous moods swings from being an alright guy to being totally out of control." (Decl. Ernest Barrett.)

A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers." (A.J. Barrett, Eastern State Hospital Records.) A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were) going to kill him." (A.J. Barrett, Eastern State Hospital Records.) A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality."

(A.J. Barrett, Eastern State Hospital Records.)  A physician examining A.J. when he was

admitted to the state hospital, reported his findings:

> His memory for past and remote past is poor.  He can retain a number of
> five digits but is unable to repeat them in reverse with any degree of
> facility.  Serial subtraction of eight from one hundred is done with much
> hesitation and inaccuracy.  His general intelligence seems inaverage and
> dull normal.  His reasoning and judgement are limited.  His insight is poor.

(A.J. Barrett, Eastern State Hospital Records.)

Ernie and his siblings were powerless to protect themselves or their mother from

A.J.'s assaults and terror.  A.J.'s wife, Ada Mae, was an old fashioned woman who "would not

divorce" him (Decl. Linda Riley; A.J. Barrett, Eastern State Hospital Records), even though

"nothing could stop him from attacking" them."  (Decl. Ernest Barrett.)  Ada "was churchgoing

and devout; she did not believe in leaving a marriage no matter how bad it was."  (Decl. Ernest

Barrett.)  Ernie believed his mother "was as good a woman as there is, but she had a hard life

between my father being half crazy and always poor."  (Decl. Ernest Barrett.)   Ernie tried "[a)s

the oldest boy in the family," to protect his mother and the other children, but he was "no match"

for his father until he was "half grown."  (Decl. Ernest Barrett.)  Because Ernie tried to "get

between" his father mother" when A.J. attacked her, he "got beaten more than the other

children."  (Decl. Ernest Barrett.)

Ernie developed characteristic responses to the life threatening trauma he

witnessed and experienced.  He "learned never to cry" when his father hit him and he does not

remember "feeling a hell of a lot."  (Decl. Ernest Barrett.)   High school for Ernie was

"different."  (Decl. Ernest Barrett .)  In a community known for its poverty, Ernie's family stood

out as still poorer than most.  Other students "made fun of [Ernie) and laughed at [him) because

of the way [he) dressed."  (Decl. Ernest Barrett.)  Ernie responded to the taunts with fighting

"every boy in [his) high school class to hold any respect." (Decl. Ernest Barrett.)  Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out." [Decl.  Issac Barrett.)  Ernie's brother described him as "pretty cruel."  (Decl. Issac Barrett.)  He treated his younger siblings "pretty rough," and when he made them  cry, "he thought it was funny."  (Decl. Issac Barrett.)  Ernie's brother thought Ernie was "a lot like [his) father," A.J. (Decl. Issac Barrett.)  An aunt who taught Ernie in elementary school described him as "mean child."  (Decl. Ruth Harris.)

Ernie left home without graduating from high school and joined the U.S. Marines. He kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess.  He was three months short of 17 the last time he stepped between his father and mother to try and protect her.  His father hit him across the shoulder with a "19-inch metal file that busted [his) shoulder wide open."  He still has a scar from it.  (Decl. Ernest Barrett.) Ernie described that day: " I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others.  I was 6'3" and weighed 187 pounds." (Decl. Ernest Barrett.)

### Family of Origin

Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, budding alcoholism, and little understanding of the demands of parenting.  They met in high school, dated briefly before Ernie left to join the U.S. Marines,  reunited by accident when both were back in their home town and married July 8, 1960, without much thought.  (Decl. Ernest Barrett and Gelene Dotson; Ernest Barrett Marriage Certificate.) Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning.  Although Ernie was very "determined not to live in the kind of poverty [he) knew as a child growing up," he had little notion of family life or fatherhood.  (Decl. Ernest Barrett.) Ernie acknowledges that he "did not give much thought to fatherhood" and "did not think about Gelene or, later on, the boys, other than working and supporting them."  (Decl. Ernest Barrett.)

Ernie "almost immediately started running around with other women" (Decl. Ernest Barrett.) and was gone for days at a time.  He had his "mind set on doing whatever" he wanted, as long as he worked.  (Decl. Ernest Barrett.)  After he finished his shift at the plant, he went to bars and got "into as many brawls as there were" before coming home.  (Decl. Ernest Barrett.) Ernie "did pretty much whatever [he) wanted to. [He) would go out, drink as much as [he) wanted, and chase women," a pattern he maintained until well after his marriage with Gelene ended.   He "drank a fifth at a time."  (Decl. Ernest Barrett.)  Today Ernie is deeply ashamed of his behavior towards his children and wishes he "could take it back and do for [his) children what they needed and be the kind of parent they deserved."  (Decl.  Ernest Barrett.)  At the time he and Gelene started their family, his only measurement of success was being able to work himself  "up from pushing brooms to production manager."  (Decl. Ernest Barrett.)

Gelene was "pretty depressed" and  "miserable" in the marriage.  (Decl. Gelene Dotson.) She was "a heavy drinker with dramatic mood swings."  (Decl. Mark Dotson.)   She had planned on going to college but discovered she was "crazy about Ernie" who " came home kind of like a knight in shining armor."  (Decl. Gelene Dotson.)  She did not realize, until after they married that Ernie "was not the same boy" she knew in high school and that "he had changed, none for the better."  (Decl. Gelene Dotson.)  Looking back, she "never imagined that life with Ernie could be so terrible, not just for [her), but for the children [they) had together."

Ernie's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing. " (Decl. Gelene Dotson.)  Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar  "looking for him – he would be out drinking," but barkeepers would tell her he was not there.  (Decl. Gelene Dotson.)  Throughout their 13-year marriage, Ernie 'had his other women."  There was never a time he did not have other women.  Gelene "drank right from the beginning of the marriage," according to Ernie.  One of Gelene's sisters, Phyllis, who visited Gelene when she was pregnant with Kenneth Barrett reported that "Gelene drank from the moment she woke up until she went to bed."  (Decl. Phyllis Crawford.)

Kenny 's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife with recrimination.  Ernie was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children.  Gelene says that "[I)t drove [her) crazy," and that she "begged, pleaded, threatened, and cried with Ernie."  (Decl. Gelene Dotson.)   They "split up and got back together and threatened to leave each other over and over."  (Decl. Gelene Dotson.) They " always had a difficult time of it."  (Decl. Gelene Dotson.)

Their son Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  (Kenneth Barrett, Birth Certificate.)  He was followed by his younger brother, Richard, born June 24, 1964 (Decl. Gelene Barrett; Richard Barrett, Birth Certificate.)  Shortly after Richard's birth, Gelene left Ernie for almost three years and returned home to Sallisaw with the boys.  Ernie "felt bad about leaving" his sons but he "could not take Gelene anymore."  (Decl. Ernest Barrett.) Ernie admits that he "was still young and immature" and not " much of a husband" who "just put the boys out of [his) mind as much as [he) could."  (Decl. Ernest Barrett.)

The three-year separation ended when Ernie was not able to "keep the boys out of [his) mind" and he reunited with Gelene in 1967.  (Decl. Ernest Barrett.)  Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend.  (Decl. Ernie Barrett.)  The nature of the marriage did not change after Gelene and the boys returned to Illinois.  Gelene gave birth to their third and last child, Stephen, January 1, 1969.  (Decl. Gelene Dotson; Stephen Barrett, Birth Certificate.)  Gelene and Ernie "both drank as much as [they) could," and Ernie "still stayed away from home."  (Decl. Ernest Barrett.)  Ernie was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence.  Ernie contacted a friend in New Jersey who found him a job at a glass plant.  Leaving Joliet allowed him to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting.  The family moved, living first in Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time."  (Decl.  Ernest Barrett.)

Gelene's humiliation at Ernie's hands continued.  Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey.  (Decl. Gelene Dotson.)  Ernie had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened."  (Decl.  Gelene Dotson.)  Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys.  Gelene contracted gonorrhea twice from Ernie.  Although Ernie had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her) lip."  (Decl. Gelene Dotson.)  Gelene "was at the end of her rope" and left Ernie for good in Lake

Hopatcong, returning home to Sallisaw with three young boys in 1972. Ernie and Gelene

divorced June 20, 1973. (Decl. Gelene Dotson; Sylvia Gelene Barrett, Divorce Proceedings.)

### Infancy and Childhood Development

Kenny has long standing neurologic deficits that were apparent early in his

infancy, continued throughout his childhood and adolescence, and affected his behavior and

understanding over the course of his life. Although it is difficult if not impossible to determine

with precision the etiology of his neurological deficits, there is no doubt that they are present and

significant. These deficits can be the result of his mother's ingestion of alcohol or other

neurotoxins during her pregnancy with him, head trauma he sustained during childhood and

young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one

or more of these factors.

Gelene was stressed throughout her pregnancy with Kenny, which she describes

as "very difficult." (Decl. Gelene Dotson.) She was in "constant pain," uncomfortable, and

depressed. (Decl. Gelene Dotson.) She described her pregnancy as "battling with Kenny before

he was born." (Decl. Gelene Dotson.) Gelene drank throughout her pregnancy with Kenny,

unaware of alcohol's potentially devastating effect on a developing fetus's brain. (Decl. Gelene

Dotson; Decl. Linda Riley.) Gelene's in laws commented on her early alcoholism and stated she

"was a drunk right out of high school." (Decl. Kathy Trotter.)

Kenny had a difficult infancy and "exhausted" his mother. (Decl. Gelene

Dotson.) His "days and nights were mixed up," and he "was colicky" and unable to be

comforted. (Decl. Gelene Dotson.) He cried and fussed "all the time," making Gelene think all

babies must be like him. After she had her other two children and observed their development,

she "realized something was wrong with Kenny." (Decl. Gelene Dotson.) Gelene received no

help from her husband who acknowledged he "was not around the house much when Kenny was a little baby" but " heard all about how hard it was to sooth him.  He was colicky and cried all the time." (Decl. Ernest Barrett.)  Kenny was born with a large lump on the back of his head.  (Decl. Gelene Dotson.)

Kenny  failed to meet developmental milestones expected of healthy infants. Gelene faithfully recorded Kenny's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital. (Kenneth Barrett, Baby Book Excerpt) Although it appears that he met most of his three and six month milestones, he lagged in some.

At three months, Kenny  did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched."  Kenny's mother nursed him. [Kenneth Barrett, Baby Book excerpt, KEB 501 953)

At nine months, Kenny  did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent," or make stepping movements when feet are touched to floor."  [Kenneth Barrett, Baby Book excerpts)

At one year, Kenny 's delays were more obvious.  His mother noted he "had trouble learning to walk." (Decl. Gelene Dotson.)  He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."  (Kenneth Barrett, Baby Book excerpts.)

Kenny early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyper activity. Gelene recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active." (Decl. Gelene Dotson.) Gelene described him as "a handful" who "could not be still" and "was more than hyper." (Decl. Gelene Dotson.) An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still." (Decl. Phyllis Crawford.) Ada Blount, Kenny's maternal great aunt, recollected that "Kenny was a hyper little boy who could not sit still." (Decl. Ada Blount.)

Ernie recollected that when Kenny "got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing." (Decl. Ernest Barrett.) Janice Sanders, a maternal cousin, remembered that "Kenny was a hyper little boy, the most hyper child" she had have ever seen. (Decl. Janice Sanders.) She also noticed that Kenny "had strong feelings" (Decl. Janice Sanders), a common symptom of children who develop bipolar mood disorder. Other family members who "used to babysit Kenny and

saw him on and off through his teens and at family reunions" confirmed that he was "very hyperactive." (Decl. Nona Reich.)

Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children." (Decl. of Phyllis Crawford.) Kenny "was extremely sensitive and cried over every little thing from the time he was small until he was a grown man . . . . He would break down and cry easily." [Phyllis Crawford) His cousin remembered that "back then we called Kenny hyper. He was erratic and temperamental. (Decl. Kathy Trotter.) His mother reported that "any little thing could upset him, but it took a lot to

calm him." (Decl. Gelene Dotson.) Ernie also recognized that Kenny was "a sensitive little boy...who cried if you hurt his feelings." (Decl. Ernest Barrett.) When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything. He had to have his stomach pumped twice when on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax." (Decl. Gelene Dotson.) Kenny's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot." (Decl. Gelene Dotson.)

Gelene was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to Kenny's impairments by punishing him. Gelene admits that she decided "to be especially hard on Kenney because he went from one thing to the next" and "was never still." (Decl. Gelene Dotson.) It "almost drove [her] crazy." (Decl. Gelene Dotson.) She thought he "was emotional about things that did not matter. He would cry and scream like there was no tomorrow." (Decl. Gelene Dotson.)

She physically punished him by beating him with a thin belt and degraded him verbally. Ernie remembered that Gelene "used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too." (Decl. Ernest Barrett.) Gelene's niece by marriage "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to. . .kids was angry." (Decl. Kathy Trotter.) Children were "afraid of her." (Decl. Kathy Trotter.) Kenny suffered "more verbal abuse from her than her other two children." (Decl. Kathy Trotter.) Kenny's neurologic impairments and his chaotic home life took their toll on his school work. Gelene stated he "had a difficult time in school and was in special classes part of the time." (Decl. Gelene Dotson.) Kenny had difficulty almost immediately in school. He failed reading and arithmetic in the first grade and was barely

able to keep pace with his peers.  He had difficulty learning to read.  (Decl. Gelene Dotson;

Kenneth Barrett school records.)

Ernie "hardly had anything to do with [Kenny ) after the divorce, and everyone

could see how much it hurt Kenny."  Even when Ernie made a semi- annual trips to town to see

his sons, family reported he was insensitive to his children's needs.  He came "by to show off his

new Corvette when his children did not have shoes or decent clothes to wear."  (Decls. Issac

Barrett and Phyllis Crawford.)  Ernie's sister in law did not think Ernie was "a good husband or

father. Ernie did not come around and visit his children the way he should have.  He was absent

in their lives.  Ernie has always been for Ernie."  (Decl. Ruth Harris.)  Ernie "went his way and

let Gelene take care of the kids."  (Decl. Ruth Harris.)

Ernie remembered that "Kenny kicked and screamed to stay" with Ernie and "did

not want to go with his mother back to Oklahoma."   (Decl. Ernest Barrett.)  Kenny  "wanted to

stay" with Ernie, but Ernie felt he "was not set up to take care of him and work."  (Decl. Ernest

Barrett.)

Gelene's emotional needs took precedence over Kenny .  Her sister recalled that

Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected

Kenny badly."  (Decl. Phyllis Crawford.)  Gelene brought different men into the house when

Kenny was entering his teenage years, and "it was very confusing for him."  (Decl. Phyllis

Crawford.)   Gelene "seldom gave Kenny a kind word" and "screamed at him over anything."

(Decl. Phyllis Crawford.)  Gelene once asked Phyllis to intervene and help her get Kenny  out of

his room.  Phyllis and her husband went to Gelene's house and talked to Kenny .  Kenny  told

them "he could not get his mom's voice out of his head.  The only time Gelene talked to him was

to scream." (Decl. Phyllis Crawford.) Gelene's "ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability. She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings." (Decl. Steve Barrett.) When Gelene "lost control of herself," she whipped the boys, but "there was no real parenting." (Decl. Steve Barrett.)

Gelene was harsher with Kenny , "verbally and physically," than she was with her other two sons. (Decl. Steve Barrett.) Gelene used a strap to whip Kenny, and Kenny "hated" it. (Decl. Steve Barrett.) Kenny had a German shepherd that Ernie had given him, and the dog was very protective of Kenny. When Gelene "would try to beat" Kenny, he would hide behind the dog and the dog would growl at Gelene and not let her near him. (Decl. Steve Barrett The dog was run over by a car.

Steve, Kenny 's youngest brother, lived at home with Kenny, Richard, and his mother, but found refuge and support with the extended family. Steve, an educator and principal at a junior high school, has given great thought to understanding how he "was able to overcome many of the challenges" he faced and "how those challenges affected Kenny." (Decl. Steve Barrett.)

Steve and Kenny "were exposed to vastly different environments and experiences" during their formative years due to Steve's much younger age. (Decl. Steve Barrett.) Steve benefitted from the guidance, support, and structure of an extended family that "Kenny never experienced in his developmental period. Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children." (Decl. Steve Barrett.)

While Gelene's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for with his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Kenny was repeating eighth grade." (Decl. Steve Barrett.)  Steve was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson. Steve believes "another critical factor" is that Ernie. . . abandoned Kenny when Kenny most needed him" but that Steve, at the age of two, had no real relationship with Ernie.  (Decl. Steve Barrett.) Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him) in their love and guidance."  (Decl. Steve Barrett.)

Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education.  Kenny failed in school."  (Decl. Steve Barrett.) School became the focal point for Steve and provided "the value system" that was absent at home.  Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had."  (Decl. Steve Barrett.)

Gelene was unable "to have meaningful conversations about day to day problems, to figure out how to solve normal problems that arise in the course of every day life, or to tolerate the routine activity of growing boys."  (Decl. Steve Barrett.)  Steve once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness."  (Decl. Steve Barrett.) Gelene "did not know how to respond to Kenny's special needs as a youngster with profound psychological problems."  (Decl. Steve Barrett.)

Kenny begged his father to allow him to live with him, and Ernie relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny

completed ninth grade." (Decl. Ernest Barrett.) Kenny resented Ernie's wife Diana and "it got the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest. (Diana Barrett, Marriage Certificate.) He went flying slamming against the wall." (Decl. Ernest Barrett.) After his father's assault, Kenny went back to Sallisaw and soon withdrew from school.

Gelene reported that Kenny "never got over" the divorce and believed that it "caused some of Kenny's problems." (Decl. Gelene Dotson.) She knew that "Kenny never adjusted" after the family moved back to Sallisaw when Kenny was in the seventh grade. (Decl. Gelene Dotson.) Kenny "got pretty depressed and lost interest in school." (Decl. Gelene Dotson.) Kenny's youngest brother Steve realized that Kenny "idolized Ernie." (Decl. Steve Barrett.) He could tell "how much Kenny missed [their) dad by the way he acted when Kenny was around him. Kenny made sure to stay in close proximity. . . Ernie was a god to Kenny." (Decl. Steve Barrett.) Extended family members knew that "Kenny never had much of a father," and "never had any guidance." (Decl. Ada Blount.)

Kenny had "a hard time with lessons" and repeated the eighth grade. (Decl. Ernest Barrett.) In the fall of 1976, at the age of 14, Kenny enrolled in eighth grade for the second time at Tommy Spear Junior High in Sallisaw. He was placed in special education classes in English and staff made "some adjustments to the curriculum" for him. [Kenneth Barrett School Records) At the end of the academic year, he showed improvement in two courses (math and social sciences) and decline in one course (science.) It was a very difficult year for Kenny, whose beloved grandmother, Ada Mae, died in 1976. (Ada Mae Barrett, Death Certificate.) Ada Mae "adored" him, and "[w)hen she died . . . Kenny was just 14. It was as if the only adult who ever cherished him had gone." (Decl. Kathy Trotter.) Ada Mae's death was

the hardest on Kenny "because his father had recently deserted him at the age he most needed direction." (Decl. Kathy Trotter.)

Kenny moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976. His grades declined in three of the five subjects (general math, comm arts, and life science.) [Kenneth Barrett School Records) Kenny returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time." (Decl. Ernest Barrett.)

When Kenny was 17, Kenny was assaulted and beaten by Sallisaw police officer John Philpot, who hit Kenny so forcefully, it broke Officer Philpot's hand. [FBI memorandum) The assault had long term consequences on Kenny who could not understand the reason for the assault. Kenny had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars." (Decl. Gelene Dotson.) The incident only added to Kenny's already burgeoning paranoia. The traumatic impact of the assault on Kenny , then a manic-depressive, brain damaged youth with a low I.Q., directly affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a

shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him. (Decl. George Woods, M.D.)

**Onset of Mental Illness**

Kenny entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits. He battled "terrible mood swings" and periods of depression that lasted for days. He hoped that hard work would make his pain go away. It did not. He had

worked steadily since he left high school, and "his bosses liked him."  He was "a good worker, strong, and able" and was "proud of his work."  (Decl. Gelene Dotson.)  By the time Kenny was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

Soon, Kenny  met and fell in love with a beautiful young girl, Abby, and they married in 1980 when he was 19 and she was almost 16. (Kenneth Barrett, Marriage Certificate) Their only child, Toby, was born December 1, 1980. [Toby Barrett, Birth Certificate)  Kenny and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other."  (Decl. Gelene Dotson.)

Kenny  "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene for the first few years of their marriage.  (Decl. Abby Stites.) Kenny 's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs.  Kenny 's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment.  Abby reported that "Gelene made Kenny get up from bed and party with crack and pot."  (Decl. Abby Stites.)  Gelene never treated "her other sons the way she treated Kenny."  (Decl. Abby Stites.)  She and Kenny had a "terrible relationship."  (Decl. Abby Stites.)  Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated." (Pulice v. Barrett, Application for Temporary Order; Gelene Dotson, Marriage Certificate to Paul Dudley; Gelene Dudley, Divorce Proceedings.)

Kenny  tried "to bury his problems under constant work and activity."  (Decl. Steve Barrett.)  Kenny  measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own.  Depressive episodes overtook him, and he would "get real depressed and sleep all the time."  (Decl. Abby Stites.)  The only antidote to his

depression was drugs.  His wife knew that "he smoked a lot of pot, but without it he never got motivated. He turned to drugs to make himself feel better." (Decl. Abby Stites.)  He used methamphetamine as an antidepressant and discovered that he could work well under its influence.  Abby observed that Kenny  "would work hard and then sleep all the time. . . .[He) did the drugs to make himself feel better, because otherwise he would just sleep." (Decl. Abby Stites.)

Kenny 's behavior easily fit the pattern of bipolar mood disorder, and his family knew he was "deeply troubled." (Decl. Kathy Trotter.)  His wife thought he was "like a manic depressive, hot one minute and depressed and even immobile the next." (Decl. Abby Stites.)  Kenny had "racing thoughts." (Decl. Abby Stites.)  He did things without thinking and "then regretted them" (Decl. Abby Stites.)  Abby knew that Kenny  "did not act the way normal people act" and that he "got swept away in his emotions." (Decl. Abby Stites.)  When Kenny lost control of himself, he hit Abby and later "would come back crying, begging" Abby to take him back. (Decl. Abby Stites.)  He was genuinely "remorseful" and would "be good as he could be—he would go the extra mile,. . . . but he could not keep it up." (Decl. Abby Stites.)

Kenny 's cousin, Brandy recognized Kenny 's bipolar mood disorder created severe problems for his marriage.  Brandy compared Kenny 's behavior to her own behavior and reported that her "mood swings" made it "hard" on her husband because she "used to attack him, kind of the way Kenny and Abby fought." (Decl. Brandy Hill; Brandy Hill, Oklahoma Department Mental Health and Substance Abuse Service.)

Kenny  and Abby separated and reunited frequently; his mood fluctuations and deep depressive episodes made him irritable, agitated, paranoid, and suspicious.  During one of

the separations, he went to his father's home where Ernie found work for him.  Ernie described

his observations of the effect of Kenny's mental impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense.
> Sometimes he would be very down but other times he would be manic, always on
> the go and upbeat.  Kenny cried a lot when he and Abby were separated. He
> bawled like a baby when he talked about it.  In 1986, when Kenny was separated
> from Abby and was very depressed, he stayed with Doris and me.  I got him a job
> with Kerr Glass and he was making real good money.  Kenny had a truck. He
> worked about three months and then left in the middle of a shift, just walked away
> from a $200,000 machine that he left running. Soon after that, he tried to kill
> himself by shooting himself in the chest with a shotgun I had lent his youngest
> brother Steve.

(Decl. Ernest Barrett.)

Abby knew that Kenny "had mental issues" and tried to persuade him to seek

psychiatric treatment.  (Decl. Abby Stites.)  Abby recognized that she "was the only stable thing

he ever had in his life" and that she "kept him together."  (Decl. Abby Stites.)  She opposed his

drug use but stayed with him in their fitful marriage to try "to keep him from falling off the deep

edge."  (Decl. Abby Stites.)  Kenny's brother reported, "[a)s troubled as Kenny was, he worked

all the time."  (Decl. Steve Barrett.)  Kenny 's use of drugs allowed him to keep working, despite

his serious mental illness.  Kenny increased the amount of drugs he ingested in direct response to

the symptoms of depression he experienced; his goal was very simple.  He needed

methamphetamines in order to work.

Abby lost battle after battle with Kenny's bipolar mood disorder.  In 1986, Kenny

attempted suicide and nearly succeeded in killing himself with a shotgun blast to his chest.

(Kenneth Barrett, Sequoyah Memorial Hospital Records, 1986.)  Kenny's brother Steve was

home at their mother's and witnessed Kenny's suicide attempt:

> In a terrible episode of depression, he tried to kill himself.  I was home with
> Monty and Podgy in the living room watching Carl Sagan kind of stuff on

television.  Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. . . .Kenny was in and out of it, mumbling, making no sense.  Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

(Decl. Steve Barrett.)

Abby convinced Kenny to see a psychiatrist after he survived the shooting, and he briefly took Elavil and Ascendin.  His dramatic mood swings continued to be "like a roller coaster."  (Decl. Abby Stites.)  Elavil was extremely helpful and made a big difference in Kenny, but- he discontinued his treatment.

Kenny continued to decline and was involuntarily committed to Eastern State Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic alcoholism or drug abuse" that created "an immediate likelihood of serious harm to self or others."  (Kenneth Barrett,  Eastern State Hospital Records; Kenneth Barrett, Record of Mental Health Proceeding.) The admitting psychiatrist provisionally diagnosed Kenny with  "depressive neurosis with suicidal potential extremely high."  (Kenneth Barrett Eastern State Hospital Records) The nursing assessment reported that Kenny did "not recognize problems."   (Kenneth Barrett Eastern State Hospital Records) Kenny had a nine year history of polysubstance abuse.  Kenny hand wrote on a printed questionnaire, "I wish I was back home in the woods."   (Kenneth Barrett Eastern State Hospital Records)

On mental status examination, Kenny was noted to be "labile" and to laugh "inappropriately at times."  (Kenneth Barrett  Eastern State Hospital Records)   His insight and judgment were impaired. Staff found Kenny to be "courteous, cooperative."  (Kenneth Barrett Eastern State Hospital Records) Kenny acknowledged that he had "a hot temper."  (Kenneth

Barrett  Eastern State Hospital Records) Kenny's highest level of functioning in the preceding

year was "poor." (Kenneth Barrett  Eastern State Hospital Records)   Kenny reported being

anxious and depressed.  He was paranoid and blamed his wife and mother for his being

hospitalized.  Kenny was discharged early on October 17, 1986 to his cousin.  His discharge

summary noted he "wants to return to work." (Kenneth Barrett  Eastern State Hospital Records)

Kenny was not able to return to work.  Gelene arranged for his second cousins to

"pick Kenny up from Eastern State after they had him committed." (Decl. Nona Reich.)  Nona

described Kenny's preoccupation with Abby:

> He stayed with me in Kellyville that first week. It was apparent how much Kenny
> loved Abby and he could not get his mind off her.  He was very paranoid, being
> without her. Gelene hoped that by staying with us he would be in a new
> environment and do better.

(Decl. Nona Reich.)

Kenny  sustained repeated head injuries from his work and from car accidents.  He

was preoccupied and distracted by depression and mania and unable to focus his attention.  He

applied for disability due to his mental impairments, and was denied but evaluators found him to

be "moderately depressed" and periodically unable to "think clearly." (Kenneth Barrett Social

Security Administration Determination of Eligibility) Kenny made repeated trips to the hospital

after falling down stairs, sustaining a contusion to his right periorbital region of his head, being

involved in a motor vehicle accident, experiencing rib and chest pain, and suffering a rash "all

over." (Kenneth Barrett Sequoyah Memorial Hospital Records)

When Kenny 's marriage ended after 14 years, he "never recovered." (Decl. Abby

Stites; Kenneth Barrett, Divorce Proceedings.)  He and Abby had wanted the marriage to work

for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and

severe mood swings that came at unpredictable times and derailed their lives. By the end of their marriage, Abby "felt like (they) were more like brother-sister than wife and husband because (she) was always bailing him out of trouble and taking care of him" and "trying to keep up with his mood swings." (Decl. Abby Stites.) Kenny was too impaired to take care of Abby, and she recognized that "he was mentally ill." (Decl. Abby Stites.) It pained Abby to leave Kenny because "(t)here were times he could be good. . . .and would try so hard to be good. (Decl. Abby Stites.) She also knew that "he could not function without her." (Decl. Abby Stites.)

After their final separation, Kenny spiraled downward, as Abby had predicted. His multiple impairments made it impossible for him to function independently. He was hospitalized January 20, 1995, given "10 mg of Haldol IM," and diagnosed with bipolar mood disorder after telling hospital staff, "I'm losing my mind." (Kenneth Barrett, Wagoner Community Hospital) Hospital staff noted he was "extremely agitated." (Kenneth Barrett, Sequoyah Memorial Hospital) During his three day hospitalization, staff reported he was "very agitated" and not able to sleep "for a few days." (Kenneth Barrett, Wagoner Community Hospital) He demonstrated "lack of concentration" and "rapid thought process." (Kenneth Barrett, Wagoner Community Hospital)

Kenny was discharged to his mother with "outpatient follow-up at the Bill Willis Community Mental Health," but he did not follow through. (Kenneth Barrett, Wagoner Community Hospital; Bob Willis Community Mental Health Center; Muskogee County Jail) Kenny "moved back home" and "built a little shack" next door to his mother's trailer. (Decl. Steve Barrett.) His brother visited it and observed that the shack was "almost Waldenish in its own way." (Decl. Steve Barrett.) The shack was constructed from discarded and used materials, did not have electricity or plumbing and only had "the essential stuff." (Decl. Steve Barrett;

Decl. Gelene Dotson and Attachment.)   Kenny "ran an electrical cord from (Gelene's) trailer to his shack for electricity." (Decl. Gelene Dotson.)  Gelene prepared his meals for him, and he ate at her trailer.   Kenny 's son, Toby, visited often, but knew that his father had "some problems inside his head" and "always thought he had a chemical imbalance." (Decl. Toby Barrett.)  Even as a teenager, Toby " knew something was wrong with him because he had mood changes that were not normal." (Decl. Toby Barrett.)  Toby observed that his "dad could be in the best of moods one minute, then the worst" who was "a very paranoid and "a very scared person." (Decl. Toby Barrett.)

Everyone in the family and Kenny 's ex wife knew he could not "live on his own." (Decl. Gelene Dotson.)  During his and Abby's frequent separations, "Kenny always came home" to his mother.  (Decl. Gelene Dotson.)  An aunt explained that Kenny's "only security was with Gelene because he did not have anybody else" to care for him.  (Decl. Ruth Harris.)  Kenny's son who had to come to terms with his father's mental illness "had to bring things to him" after his father "stopped leaving his property."  (Decl. Toby Barrett.)

Gelene "knew he had serious mental problems" but "hoped if he lived close to (her) and just worked on his cars and fixed things for people, he might be able to make it." (Decl. Gelene Dotson.)  He stayed more and more to himself and became more and more paranoid, but he was not a loner at all because many friends visited him.  (Decl. Rick Lunsford, Brandy Hill and Sean Hill.)  Kenny told a neighbor, Alvin Hahn, "he thought there were satellites watching him."  (Decl. Alvin Hahn.)

As Kenny 's paranoia increased, so too did his dependency on family.  His friends knew his paranoia was in full force and was the reason he "hardly left his property for several years."  (Decl. Shawn Hill.)  His aunt Phyllis understood that he "was never able to be

independent as a grown man.  His emotions got in the way of his being able to live too far from

home."  Phyllis described an incident that explained how he relied on family when his emotions

overcame him:

> [A] couple of years before the incident, Kenny had run to my house in tears,
> crying,  "The laws are after me. They're coming! What should I do?" I told him
> we were going to walk out of the house and that he was going to get in the police
> car and that's just what he did. Kenny had been afraid to go to jail because at that
> time the papers had said someone had been beaten to death at the jail.

(Decl. Phyllis Crawford.)

Despite the limitations of his mental impairments, Kenny "would give you the

shirt off his back if you needed it."  (Decl.  Phyllis Crawford.)  He "tried to stay close to home,

always worked hard and took pride in his work."  (Decl.  Phyllis Crawford.)  Kenny's family and

friends uniformly reported that Kenny was not violent or dangerous to them.  His great aunt Ada

stated, "I never felt threatened by Kenny. He did not bother me any, but I worried about him."

(Decl. Ada Blount.)  Janice, his cousin, grew irritated and inpatient with Kenny on more one

occasion for playing his music too loud and called the police to Kenny's, but she loved Kenny

and "was never afraid of him."  (Decl. Janice Sanders.)  Kenny's maternal aunt Ruth found him

to be "sweet person, nice, and respectful" whose drug use "may have hidden his mental illness."

(Decl. Ruth Harris.)  Ruth and her husband, who visited Kenny "to talk about the Bible and how

he could straighten out his life" were never afraid of him" and did not "believe he would

intentionally hurt anyone."  (Decl. Ruth Harris.)  Relatives visited and talked with Kenny.  His

second cousin Nona, who "got along wonderfully" with him counseled him about religion. (Decl.

Nona Reich.)  Nona described the last conversation she had with Kenny:

> The last conversation I had with Kenny was in 1995-96 when my husband at the
> time and I visited Gelene.  Kenny came by to visit. It was clear to me that Kenny
> was studying life and thinking deeply, trying to figure things out. I remember he

said, "'Aunt Nona, how do you know there's a God?" I took him to the window and said, "See how beautiful that is."  He agreed but asked me "Why can't we see God?"  I tried to explain to him that the Bible says we should worship God in spirit and we will see His truth.

(Decl. Nona Reich.)

Friends and family thought at times Kenny would be alright.  A friend and neighbor reported that "Kenny had a reputation in the community as an excellent mechanic who was fair."  (Decl. Rick Lunsford.)  A cousin, Brandy Hill, remembered that "Kenny was very generous, and his auto repair business was getting more solid every day. People would pay him hundreds of dollars in cash to replace an engine or a transmission."  (Decl. Brandy Hill.) Despite Kenny's mental illness, his son Toby had "a lot of fond memories of . . . going canoeing, and helping him work on cars."  (Decl. Toby Barrett.)  Toby was intimate with Kenny's fears but knew that Kenny "was not dangerous," and Toby "was not afraid of him."  (Decl. Toby Barrett.) Toby thought that Kenny "did the best he could" and saw that his father "had a tender side to him" that helped "offset the pain of having a dad with mental problems."  (Decl. Toby Barrett.)

The family hoped that Kenny could recover.  His mother described their observations:

As time went on, he did a little better, built a garage and fixed everything from appliances to cars, trucks, and trailers for friends and neighbors.  He stayed more and more to himself, though, and did not like to leave the property.  Friends bought him food and went grocery shopping for him.  He ate most of his meals at my trailer, and I cooked for him.  I hoped and prayed he was going to make it.  At least, I believed, with him living right next door, he was safe and I could keep an eye on him.  We had our arguments; that's for sure.  He was so paranoid and crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Decl. Gelene Dotson).

   **b.**  **Kenny Barrett's mental illness and organic brain dysfunction**

If trial counsel had followed prevailing norms and provided experts the documented evidence of Mr. Barrett's background and character Mr. Barrett's jury would have heard and considered extensive evidence of mental illness and neurologic impairment. As explained by Dr. Young: "The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex." (Decl. Myla Young at ¶ 28.)

Dr. Young explains that the areas of the brain in which Mr. Barrett experiences dysfunction are important because of their functions:

> The frontal cortex is comprised of three general cortices—motor cortex, premotor cortex, and prefrontal cortex. The motor cortex provides a mechanism to control execution of movement of limbs, hands, feet and fingers. The pre-motor cortex selects and carries out the movements to be executed including repetitive movements and actions in response to external cues. The pre-motor cortex also primarily mediates information that is communicated by the parietal cortex, cingulated cortex, and basal ganglia. The prefrontal cortex allows the individual to accommodate complexity and accommodate stress, and is responsible for thinking and acting, referred to as "executive functioning." Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received. More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation. Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders. The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.
>
> [¶]    The temporal cortex encompasses the primary auditory cortex, secondary visual cortex, and structures of the limbic system. Primary functions of the temporal cortex are both verbal and visual memory and learning, processing speech sounds and speech emotional tones, and interpreting speech sounds, tones

and emotional meaning.  The temporal cortex is also responsible for processing visual information and the ability to recognize facial expressions, and interpret facial emotions.  Significant impact of temporal cortex dysfunction is particularly implicated in amnesia, hyper-religiosity, hypergraphia, fear, paranoia, impulsiveness and aggressive outbursts in addition to the previously described cognitive disabilities.  Brain functioning associated with frontal and temporal cortices has been known, is described and is documented in multiple sources for many years.  Two resources which provide a representative description of frontal and temporal brain functioning are Kolb & Wishaw, 2003 and Grant & Adams, 2009.

(Decl. Myla Young, Ph.D. at ¶¶ 26-27.)

Dr. Young's findings are based on approximately 16 hours of neuropsychological testing including intelligence testing, clinical interview including a history, review of educational records, and reviews of medical and psychiatric treatment.  As explained by George W. Woods, Jr., M.D., a psychiatrist who also examined Mr. Barrett:

neuropsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.

(Decl. George W. Woods, Jr., M.D. at ¶ 62.)

The testing data and congruent findings on psychiatric study show Mr. Barrett experiences dysfunction in areas of his brain

that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing

the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing. Mr. Barrett suffers significantly impaired functioning in all these domains.

(Decl. George W. Woods, Jr., M.D. at ¶ 58.)

In addition to these neuropsychological deficits (and others detailed in Dr. Young's declaration), Mr. Barrett suffers from severe mental illness:

Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81. He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex. Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

[¶]    Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983). Lezak emphasized the fluid nature of executive functioning and how dependent the cognitive and emotional aspects of functioning were on the "executive." Baddeley grouped these behaviors into cognitive domains that included problems in planning,organizing behaviors, disinhibition, perseveration, reduced fluency, and initiation (Baddeley 1986). Baddeley coined the term "dysexecutive syndrome." Each component of executive functioning has added to the array of cognitive processes, which include maintaining a problem-solving set for goal-directed behavior, interference control, flexibility, strategic planning ability, and the ability to anticipate and engage in goal-directed activity (Denckla 1994). The definition of executive function is encompassed by actions fueled by conceptualizations, such as the ability to filter interference, engage in goal-directed behaviors, anticipate the consequences of one's actions, and the adaptive concept of mental flexibility (Luria 1969; Luria 1980; Stuss and Benson 1986; Denckla 1996; Goldberg 2001). The concept of morality, ethical behaviors, self-awareness, and the idea of the frontal lobes as manager and programmer of the human psyche are also included." (Ardila et al, Executive Function, Medlink Neurology, 2009)

(Decl. George W. Woods, Jr. M.D. at ¶¶ 66-67.)

Dr. Woods explains that people with frontal lobe damage, and people with Bipolar Disorder share suffering in significant areas of daily functioning. "Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become incorrect." (Decl. George W. Woods, Jr., M.D. at ¶ 59.)

> Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

(*Id.* at ¶ 60.)

Mr. Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses. Mr. Barrett's personal and family history, as set forth *supra* and as documented in the exhibits to this Motion, is replete with incidence of major mental illness, including Bipolar Disorder. A qualified clinician would have explained the significance of this remarkable history to jurors.

> [¶]     Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult. The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

> [¶]     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan

effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

[¶]    Mr. Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Decl. George W. Woods, Jr. M.D. at ¶¶ 63-65.)

In other words, "Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial." (*Id.* at ¶ 68.)

If trial counsel had informed themselves regarding Mr. Barrett's history, and consulted relevant experts, the jury too would have been informed that

> [¶]    Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.
>
> * * *
>
> [¶]    Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.
>
> [¶]    Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.
>
> [¶]    He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual

disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]    Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]    Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]    Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]    Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]    Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]    My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the

environment. The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Decl. George W. Woods, Jr. M.D. at ¶¶ 69-78.)

Courts, including the Supreme Court, have repeatedly held that evidence of mental impairment such as the devastating history Mr. Barrett has experienced, when it is kept from the jury due to counsel's unreasonable omissions, undermines confidence in the verdict. That should be this Court's judgement here.

**c.    The prosecution's exploitation of trial counsel's deficient performance**

Not surprisingly, the inaccurate, incomplete and misleading  portrayal of Mr. Barrett and his background and character given by the extremely superficial and unprofessional "mitigation case" that was placed before the jury was ripe fodder for ridicule by the prosecutors in closing arguments. Because of trial counsel's abysmal failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance. (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22). Because the jury never learned of Mr. Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Mr. Barrett as a prime candidate for the death penalty.

Going down the list of the few, bare-bones mitigating circumstances that were instructed upon based on the evidence presented, AUSA Littlefield noted the jury had been told Mr. Barrett was simply a "father," which involved no more than a biological process. Left unsaid

Def's § 2255 Mot.                    233                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

was what kind of father he was. The prosecutor also ridiculed the claim that Mr. Barrett was a loved son and stepson, remarking that what was missing was any feelings Mr. Barrett had for his parents. It was pointed out that Ernie Barrett had not seen his son for two years before the shooting of trooper Eales, and that his stepmother had only had contact with him after he was in jail. As to Mr. Barrett's relationship with his mother, Gelene Dotson, the prosecutor pointed out that they had a tumultuous relationship with frequent arguments, fights and threats between them. Mr. Littlefield remarked that Mr. Barrett's parents cared so much for him that they could not tell the difference between him being "hyper" and being "hyped up" on drugs. As to Mr. Barrett being a good neighbor and friend, the prosecutor reminded the jurors that all they heard was that he fixed cars cheaply. Dismissing the mitigating circumstance that Mr. Barrett's execution would have an impact on his child, family and friends, the prosecutor was quick to point out that since Toby Barrett had not testified, there was no evidence that Mr. Barrett's death would have any negative impact on his own child. Indeed, the only testimony regarding the impact of Mr. Barrett's execution on his family came from his stepmother, Doris Barrett, who would no longer be able to visit Mr. Barrett in prison. Making short work of the claim that Mr. Barrett had expressed remorse, Littlefield told the jury that Mr. Barrett only told his mother that he wished things had turned out differently. This ambiguous statement was used as a springboard for the prosecutor to argue that by this, Mr. Barrett simply meant that he was sorry he had gotten caught and was prevented from "killing more of the bastards." Finally, the "catch-all" instruction on any other factors the jury might find to be mitigating opened the door for more negative characterizations of Mr. Barrett, whom the prosecutor described as having dropped out of school because he did not want to get a haircut; as a user and seller of methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that he allowed him to remain on

the property knowing full well that a police raid, which was going to be met by lethal force, was imminent.  (R. 5354, 5356).

Since virtually nothing of Mr. Barrett's background, history and upbringing was placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Mr. Barrett.  (R. 5358)

Picking up the theme that Mr. Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.  Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."  Kathy Trotter was dismissed as a witness who knew very little about her cousin, Mr. Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.   Mr. Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Mr. Sperling contrasted Mr. Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."  Mr. Sperling pointed out that Mr. Barrett had only sporadic contact with his mother until his arrest, hinting that he was a bad and neglectful son.  Ernie Barrett, being the good father that he was, gave Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow] them."  Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication

being that her loyalty was more a tribute to her than anything positive or redeeming about Mr. Barrett. Whatever Mr. Barrett had done for his family was vague and undetermined, and was in any event far outweighed by the crimes he had committed. If the jurors were tempted to feel any sympathy for Mr. Barrett's family at all, they should remember that Mr. Barrett abandoned his family by his own conduct. Mr. Sperling stated that Mr. Barrett had "victimized" his own family by making them serve as "props" or witnesses on his behalf in the penalty phase. Concluding his remarks on Mr. Barrett's mitigation case, Mr. Sperling told the jury that Mr. Barrett had paid for his membership among "the worst of the worst." Mr. Barrett was simply a murderer who had killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for his victim. (R. 5417-20).

### 3.      Conclusion

The record and extra record evidence establishes that Mr. Barrett's trial counsel first possessed some information about Mr. Barrett's background in late May 2005. By the beginning of July, trial counsel were searching about for a mitigation specialist. In August, trial counsel learned it was essentially too late to develop a social history and mental health diagnoses informed by that history. In September, the month the trial began, trial counsel were again searching about for information they should have had the previous December. The evidence shows trial counsel never contacted the mitigation specialist the trial court authorized, and never obtained all the records of the state-court mitigation investigation. Trial counsel's statements on the record establish that they made no effort to obtain a psychiatric or psychological evaluation of Mr. Barrett, and merely repackaged, at the last possible minute or later, the risk assessment done years earlier at the request of state-court counsel. This evidence more conclusively establishes deficient performance than any previously found in *Rompilla*, *Wiggins*, or *Williams*, *supra*.

Def's § 2255 Mot.                    236                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The evidence of prejudice is greater, too. Due to trial counsel's inattention, the jury was uninformed of Mr. Barrett's background, the desperate alcoholism of his parents, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging harsher treatment he experienced from his mother, his father's abandonment of the family, moving from place to place due to the parent's inability to sustain a life, and finally landing in Sequoyah County. There Kenny Barrett's head injuries and genetic vulnerability to mental illness overtook him. He developed Bipolar Disorder and exhibited the symptoms of his organic brain damage. Despite the mania and paranoia, the hypervigilence, hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local sheriff, all knew that Mr. Barrett would have gone peacefully into custody if someone he knew had simply asked him to. The overwhelming weight of the evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation. Just as Trooper Eales should not have been put in danger, Mr. Barrett should not have been sentenced to death.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 3.    Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Expert and Investigative Assistance under 18 U.S.C. § 3006A**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett had a due process right to the assistance of investigators and experts qualified and sufficiently compensated to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). Other similarly situated defendants in federal death penalty cases received such assistance as the trial court withheld from Mr. Barrett.

Mr. Barrett had a constitutional right to the expert assistance necessary to counter the prosecution's evidence and to develop defense evidence relevant to both stages of trial. *Ake v. Oklahoma*, 470 U.S. 68, 71 (1985); *Tuggle v. Netherland*, 526 U.S. 10 (1995) (*per curiam*); *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000); *Dunn v. Roberts*, 963 F.2d 308 (10th Cir. 1992); *Liles v. Saffle*, 945 F.2d 333 (10th Cir. 1991), *cert. denied*, 502 U.S. 1066 (1992). Mr. Barrett also had a statutory right to such assistance, pursuant to 18 U.S.C. §§ 3006A and 3599(a)(1)(A), 3599(f), and 3599(g). *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985). Congress has provided that, in capital cases, the "defendant shall be allowed, in his defense to make *any proof* that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution." (18 U.S.C. § 3005 [emphasis added]). Mr. Barrett therefore had a right, as secured by statute, the Due Process and Equal Protection Clauses, to the tools necessary to build a defense, including expert assistance, at the same level and to the same extent as provided or otherwise available to similarly situated persons.

The trial court violated Mr. Barrett's constitutional and statutory rights by denying him expert assistance that was lawful, necessary, and appropriate under the circumstances of the case. The types of lawful witnesses to which the trial court denied Mr. Barrett fair access included a psychiatrist, neuropsychologist, psychologist, mitigation specialist, ballistics expert,

independent fact investigator, an independent expert on SWAT team practices, a metallurgist, a drug analyst, crime scene reconstruction expert, and a jury consultant. The complete or partial denial of these expert and investigative resources was prejudicial both individually and in combination.

In addition to the denial of expert and investigative assistance afforded other capital defendants, the trial court denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial. (Order filed 3/18/05 (Doc. 97) at 6-7.) Mr. Barrett was plainly entitled to those transcripts pursuant to Chapter 2, section 2.27, and Chapter 3, section 3.12(A) of the Guidelines for the Administration of the Criminal Justice Act. Effective trial counsel, or the trial judge, should have known that it was unnecessary for counsel even to seek reimbursement for transcripts as the court reporter would normally be independently compensated through the Criminal Justice Act. The trial court's decision to reject these Judicial Conference guidelines was arbitrary and capricious. The error was particularly prejudicial because it denied or delayed Mr. Barrett's trial

counsel access to the trial court's *ex parte* communications with the prosecutors until it was too late. *See* Claim 1, *supra*.

Mr. Barrett had a history psychiatric treatment, including involuntary hospitalization and forced medication with psychotropic drugs. (Decl. George Woods). Trial counsel were aware, or should have been aware, of this history. (*See* Doc. 208; Eastern State Hospital Records of Kenneth Barrett; Muskogee County Jail Medical Records of Kenneth Barrett; Decl. Roseann Schaye). In addition, Mr. Barrett had a history of illicit drug use and of head injuries. Furthermore he has a multi-generational predisposition to developing serious

mental illness, including the bipolar disorder for which he was medically diagnosed prior to the events in question. These factors, together with his developmental and trauma history indicated the forensic appropriateness of performing a comprehensive neuropsychological evaluation to assess the presence and effects of brain dysfunction which, again, had a medically indicated onset prior to his arrest. (Dec. Roseann Schaye; Dec. Myla Young; Dec. George Woods). Counsel requested the assistance of a neuropsychologist to perform testing, as well as of a medical doctor to explain the significance of this combination of medication, other drugs and injuries, including the significance of any discontinuation of treatment. Nonetheless, the trial court would permit Mr. Barrett's counsel the assistance of a psychiatrist or a psychologist, but not both. (Order filed 3/18/05 (Doc. 97).

In light of the information known or available to Mr. Barrett's trial counsel, prevailing norms of capital defense practice required that they consult with experts whose training and experience were appropriate to addressing Mr. Barrett's history and the needs of the litigation. The appropriate experts included a medical doctor who could diagnose and explain the functional impact of Mr. Barrett's mental disorders, a neuropsychologist who could determine the location, nature and severity of Mr. Barrett's probable brain dysfunction, and a mitigation specialist qualified to gather data in a manner consistent with the clinical protocols of mental health professionals when considering social history and medical information in the course of forming their opinions. (Decl. Richard H. Burr dated 4/4/05 (Exh. C to Doc. 107) at 4, 8). To the extent trial counsel failed to apprise the court of the specific need for psychiatric assistance, or the assistance of any other expert or investigator, their conduct fell below prevailing professional norms. (ABA Guideline 10.4(C)(2)(a), as soon as possible after designation of lead counsel, defense team should include a mitigation specialist, fact investigator,

Def's § 2255 Mot.                    240                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

and a person "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments"; ABA Guideline 10.11(F)(2), counsel have duty to seek appropriate expert assistance). *See also* Claim 2, *supra*.

Trial counsel informed the trial court that the court's refusal to permit more than one mental health professional to assist in Mr. Barrett's defense was contrary to law, the Judicial Council's Guidelines for the administration of the Criminal Justice Act, and the practice of district courts in numerous other federal death penalty cases with similar circumstances. (Docs. 107, 112; Decl. Richard H. Burr). "The standard practice in federal capital trials is to provide the services of more than one mental health expert." (Decl. Richard H. Burr, Exh. C to Doc. 107). Counsel also informed the court that authorization for a single expert at the cut rates permitted by the court made it impossible to retain an expert competent to provide the necessary assistance, and that the court's authorization was inadequate to develop defense evidence or to rebut the prosecution evidence at both stages of trial. (Docs. 107, 112; Decl. Richard Burr).

The court's denial of psychiatric assistance for Mr. Barrett's defense was prejudicial. As stated in the attached declaration of George W. Woods, M.D., a psychiatrist retained at the time of trial would have provided Mr. Barrett with evidence to rebut the prosecution's theory of malice aforethought and intent, and would have provided abundant mitigation evidence. *See* Claim 2, *supra*.

In addition to the outright denial of psychiatric assistance, the trial court arbitrarily denied funding for all expert and investigative resources that were necessary for Mr. Barrett to receive adequate representation. *(Compare* Doc. 51 *with* Order filed 3/18/05 (Doc. 97)). Contrary to Judicial Council Guidelines, and the ABA Guidelines, contrary to the Supreme Court's recognition that death penalty cases entail a higher level of due process, and contrary to

the tendency of experts, investigators and other paraprofessionals to charge more for the more

exacting work required by capital cases, the trial court consistently based its funding decision on

a comparison to non-capital cases in the Eastern District.  (Order filed 5/5/05 (Doc. 128) at 3 n.1,

4, 6.)

Mr. Barrett's counsel demonstrated the need for a psychologist to assist in

preparation of the defense.  *(See* Order filed 3/18/05 (Doc. 97) at 3.)  Counsel sought this expert

for purposes similar to those envisioned by the Government in retaining Jim Horn.  *(See* Doc. 50

at 5-6.)  Counsel informed the court that a psychologist could not be retained for less than

$150.00 per hour, and estimated 60 hours would be needed (Doc. 50 at 5-6), but the court limited

the defense to 40 hours at $100.00 per hour.  This was despite the fact that the court had been

informed that this reduced hourly rate was 30-60% below the hourly rate of $150-250 authorized

by federal courts for such services in death penalty cases.  (Dec. Richard H. Burr, Exh. C to Doc.

107, at 8).  The court gave no reason for this restriction and cited no information upon which the

court could have found that any competent psychologist would have worked for the approved

rate.

Mr. Barrett specifically sought the assistance of a psychologist who had assisted

in the preparation for trial, and testified in the penalty trials, of other federal death penalty

defendants.  (Doc. 107).  That psychologist had been compensated in other similar cases at a rate

of $270.00 per hour, and counsel advised the court that he could complete his work in 30 hours.

*(Id.* at 3-4.)  The court denied the request without explanation.

Mr. Barrett sought the assistance of a mental health expert who was competent to

diagnose organic brain dysfunction.  (Doc. 50 at 8).  Counsel justified this request with the

findings of prior investigations, including that Mr. Barrett had used drugs known to cause brain

damage, and that he had suffered significant head injuries during his life. *Ibid.* Except to the extent the assistance of such an expert was included in the authorization for a psychologist, the court denied this request without explanation. (Doc. 97 at 3). This summary denial was highly prejudicial to Mr. Barrett. As the attached declaration of Myla Young, Ph.D., shows, Mr. Barrett's history of head injury resulted in significant impairments in his functioning. *See* Claim 2, *supra*.

Mr. Barrett's counsel, in consultation with a mitigation specialist, Federal Death Penalty Resource Counsel, and the Federal Defender, concluded that a mitigation specialist would require more than 333 hours and $5,000.00 in travel costs. Counsel and the mitigation specialist based this estimate on the knowledge gained in a preliminary investigation conducted before Mr. Barrett's first state-court trial. (Docs. 50, 107). A mitigation specialist is an essential member of the team in a capital case. (ABA Guideline 10.7.) Without explanation, the court limited the mitigation investigation to 100 hours and no travel.[46] As resource counsel informed the court at the time,

> The number of hours requested by the defense is well below average. The average number of hours worked by mitigation specialists in federal capital cases is 600 hours. In a number of cases, mitigation specialist services have exceeded 1000 hours. Investigating a client's life history thoroughly - through gathering and reviewing documents and interviewing scores of witnesses who are often difficult to find - and working with counsel and other experts to develop the themes of mitigation and the way in which mitigation will be presented, is extremely labor intensive. The modest number of hours requested by the defense here reflects the hope that the mitigation investigation previously conducted, but not completed in the state prosecution will be of use in the current investigation. Measured against the number of hours authorized for mitigation specialist services in every other

---

[46] The court authorized "100 hours at $150.00 per hour" apparently without realizing that the mitigation specialist counsel had consulted quoted a rate of $75 per hour. *(See* Doc. 107.)

capital case in which the death penalty has been authorized, the 100 hours
approved by the Court is grossly inadequate.

(Decl. Richard H. Burr (Exh. C to Doc. 107) at 4).

The court's withholding of resources was highly prejudicial. As shown in the social history presented in Claim 2, section B, and the numerous declarations cited therein, a reasonable mitigation investigation, including travel to the various states in which Mr. Barrett lived as a child and adult, would have produced abundant mitigation evidence.

Mr. Barrett sought 300 hours of investigative assistance at a rate of $50 per hour. (Doc. 50 at 4). The court permitted only 100 hours of investigation, and limited it to those areas in which counsel could show a particularly acute need. (Order filed 3/18/05 (Doc. 97) at 2). "The average number of hours approved for fact investigation in authorized cases is closer to 500 hours." (Decl. Richard H. Burr (Exh. C to Doc. 107) at 3). The Court knew in fact that this rate was considered reasonable by experts in relation to the practice in other federal capital cases. Moreover, despite the preauthorization, the court, contrary to Judicial Conference guidelines, conditioned payment of an investigator on counsel persuading the court with "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial." (Order filed 3/18/05 (Doc. 97) at 2 n.2). The court prohibited the investigator from working at market rates, and required him to work at the same rate as state-subsidized investigators working for salary at the Oklahoma Indigent Defense Service ("OIDS") even though state-subsidized investigators were not available to Mr. Barrett. (Order filed 5/5/05 (Doc. 128) at 3 n.1. *See also* Decl. Steve Leedy).

At a minimum, the restrictions the court placed on investigation chilled inquiry. Compared with his other cases, Mr. Barrett's investigator *lost $20.00 each hour* he worked on

Mr. Barrett's case.  Moreover, the court's requirements for approving vouchers meant there was no guarantee any specific amount of time would be compensated at all.  The investigator could work many hours on an issue only to find after he submitted a voucher that the facts he had investigated were not, in the court's view, significant to evidence that would be used at trial.

The Government relied extensively upon testimony regarding the trajectory of bullets during the raid on Mr. Barrett's house.  Mr. Barrett's counsel requested the assistance of an expert, Edward E. Hueske, to assist in responding to the Government's evidence, performing up to 80 hours work, billed at a rate of $ 200 per hour, in addition to $ 1,000 for lodging, travel and incidentals.  (Doc. 50 at 7).  While the Government faced no limits on its ability to marshal this type of evidence, the court, again without explanation, authorized less than one fourth the amount Mr. Barrett's counsel and the expert they consulted determined was reasonably necessary to confront the Government's case.  (*Compare* Doc. 50 at 7 *with* Doc. 97 at 3).  Moreover, the court did not authorize any lodging or travel expenses at all whatsoever.

After advising Mr. Barrett's counsel that "this Court has[] never allowed crime scene reconstruction to be introduced in trial" (Doc. 97 at 3), and at the same time denying Mr. Barrett seventy-five percent of the time and one hundred percent of the in-court assistance counsel needed from Mr. Hueske, the Court admitted the Government's crime scene reconstruction evidence without reservation.  As a result of the Court's denial of funds, it was impossible for Mr. Barrett to have an expert present either to challenge the admissibility of the Government's testimony under Federal Rule of Evidence 702, or to assist with cross-examination of the Government's "expert."  To the extent the Court's statement about its past practice regarding crime scene reconstructions misled counsel into foregoing expert assistance, the

Def's § 2255 Mot.                    245                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Court's interference with the defense went well beyond the mere denial of funds and constituted active interference in the functioning of the defense. *See* Claim 1, *supra*.

The court's denial of funds for ballistics and crime scene reconstruction experts was prejudicial. As set forth in Claim 2, *supra*, if trial counsel had been able to consult with an expert prior to trial, they could have presented evidence to exclude the testimony of Iris Dalley, an "expert" who was central to the Government's theory of how the shooting took place, including whether Mr. Barrett was in a position to see emergency lights when the shooting started. Even if counsel had not succeeded in excluding that testimony entirely pursuant to FED. R. EVID 702 and *Daubert v. Merrell Dow*, 509 U.S. 579 (1993), counsel would have been far better able to rebut it. For example, if counsel had been able to employ adequate expert services, at a minimum, Mr. Barrett would have shown the following:

    (a)    Dalley failed to follow standard protocol by omitting the measurement of the objects through which she claimed bullets passed;

    (b)    Dalley failed to follow accepted methods by using magnification and/or chemical analysis to detect the presence of gun shot residue, blood, tissue, hair, fibers or other matter around bullet holes;

    (c)    Dalley falsely claimed she could not determine the caliber of bullet holes in the Bronco whereas the determination could have been made with standard tools and methods;

    (d)    Dalley offered misleading testimony, beyond the scientific bounds of her methodology, when she claimed that the trajectories she identified for bullet fragments were "accurate" while the method she used could not provide an accurate trajectory;

(e)    Dalley selected descriptions of the evidence to fit the Government's theory when she described the trajectories of bullets that passed through the door of the Bronco;

(f)    Dalley's diagrams and animation were not based on accepted methods, and she testified falsely when she claimed she lacked the necessary equipment to create data with which other experts could attempt to reproduce her findings based on those diagrams and that animation;

(g)    Dalley failed to use available, accepted methods (such as a plumb line) to determine the grade of the terrain on which the shooting occurred;

(h)    Dalley failed to employ proper methods of chemical analysis before concluding that holes of questionable origin came from bullets;

(i)    Dalley misrepresented the facts when she claimed there was "no means of sequencing any of the shots," while the truth was that she did not employ the available means to determine whether they would produce reliable results, i.e. Dalley ignored scientific methods that might have invalidated her claims;

(j)    Dalley failed to use accepted methods for determining the trajectory of bullets that struck a moving vehicle, failing to move the Bronco back to the place where it initially came to rest, and ignoring another standard practice that might have invalidated her findings;

Dalley employed scientifically inappropriate methods for making claims about the trajectory of bullets that passed through the window of Mr. Barrett's cabin;

(k) Dalley overstated her ability to estimate the distance of a firearm from the cabin window based on a rule of thumb, and ignored more reliable methods that might have contradicted her theory;

(l) Dalley failed to use the standard tool of a metal detector to locate any bullets or fragments in the soil;

(m) Dalley failed to follow an essential, generally accepted protocol for reconstructing a shooting scene when she did not attempt to collect all the bullets or fragments from the interior of the Bronco;

(n) Dalley's conclusion regarding the location of Trooper Eales' arm when it was struck was based on her failure to examine the surrounding area for tissue or blood, and her violation of a cornerstone of forensic science.

(Report Edward Hueske).

To the extent the trial court's denial of expert and investigative resources could have been raised on the existing record, appellate counsel was ineffective for failing to raise the claim. Trial counsel Hilfiger, who also was counsel on appeal, had a conflict of interest which prevented him raising this claim, insofar as he failed to make use of the resources the trial court had authorized.

The record and extra-record evidence establishes that the trial court's denial of resources was not harmless and was highly prejudicial. Mr. Barrett could have presented substantial evidence to counter the Government's case at both stages of trial. The trial court's denial of access to this evidence violated Mr. Barrett's right to due process, to confront adverse witnesses, and to effective assistance of counsel.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 4.**     **Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Was Ineffective for Failing to Raise the Issue on Direct Appeal**. .

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

As shown in Claim 2, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress, the trial record itself established the Clint Johnson warrant was invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Suppressed *Brady* material and other evidence gathered in

support of this 2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case *was* Sanders.  *Illinois v. Gates,* 462 U.S. 213 (1983) (totality of the circumstances test used to judge validity of search warrants; an informant's veracity, reliability,

and basis of knowledge are all important considerations in determining whether information as a whole is sufficient to supply probable cause).  If Sanders is unreliable, his information is *per se* unreliable.  Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

Sanders could not be relied upon to provide reliable information.  No reasonable person could put stock in anything he says.  Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999.  Numerous other felony charges against him were dismissed because of his work as a snitch.  He always had a motive to lie against others to get out of his own scrapes with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community, when any sane system of justice would have flushed him ages ago.  His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention a laundry list of other felonies.  He has a history of promising to appear in court and then failing to appear.  He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation.  He is a long term drug addict. Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth.  Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history

of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave. All this was known about Sanders in 1999, and it has only gotten worse.

At the time he signed the affidavit, Clint Johnson was aware of Sanders lack of reliability, and Johnson himself intentionally ignored evidence of Sanders then-current drug usage, crimes of dishonesty, and Sanders inability to see evidence of drug activity at Mr. Barrett's residence during the critical time. Yet Johnson still relied on this miscreant as a "reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from several people in the community, including one of Sanders's uncles, who say without reservation and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that this is the opinion by acclamation in the community as a whole. (Decls. of Rick Lunsford, Brandy Hill, Sally Davis Johnson, Janesse Thomas, Sean Hill, and Billy Poindexter.) Sanders claimed that he and Janesse Thomas bought drugs at Mr. Barrett's a few days before the shooting incident. Ms. Thomas says this is absolutely false.

Is it to be believed that the community as a whole regards Sanders as thoroughly dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable informant, about whom nothing had to be revealed to a reviewing magistrate? It simply does not wash. Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders for information about Mr. Barrett or anyone else, let alone presenting that information in a search warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's honesty. As stated in Claims 1 and 2, Mike Littlefield informed the court of a witness who failed to corroborate Sanders. This would have assisted in establishing a *Franks* claim, and in generally impeaching Sanders, but the evidence was never revealed to the defense. The transcript of this hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself. The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts, deceit and corruption, including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence. Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced. In sum, Johnson and Sanders were birds of a feather: both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the C.I. that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance. (Decl. of Rodney Floyd.)

A search warrant must be voided and the fruits suppressed when 1) it is found the affiant knowingly or recklessly included false statements *or omitted material information from the affidavit in support of a search warrant,* and 2) it is concluded that after excising such false

statements and considering such material omissions, the corrected affidavit does not supply probable cause to search. *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978); *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir. 1997).

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable. Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate. Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant. In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth. Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime

warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument. Especially in light of the fact there were numerous issues raised on appeal that were reviewed under a plain error standard, because there had been no contemporaneous objection or record, it was professionally unreasonable to omit this issue, and to argue that the court erred in failing to conduct an evidentiary hearing. Mr. Barrett was prejudiced by this omission. *Strickland v. Washington,* 466 U.S. 668 (1984). Decl. of Mark Henricksen. Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in this motion, and specifically requests a *Franks* hearing, or its equivalent. He has more than made the requisite showing.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 5.** **Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Conviction and Sentence Based on Newly Discovered Evidence**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

## Introduction

The Government had an affirmative duty to learn about evidence favorable to the defense, whether as to liability or punishment, including, of course, impeachment material, in the possession of law enforcement agencies, and disclose that evidence to Mr. Barrett's counsel. *Banks v. Dretke,* 540 U.S. 668, 696 (2004); *Strickler v. Green,* 527 U.S. 263 (1999); *Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Bowen v. Maynard,* 799 F.3d 593, 610 (10th Cir. 1986) (*Brady* obligations extend to impeachment evidence); *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir. 1984); *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991); *United States v. Libby,* 429 F. Supp.2d 1, 10-11 (D. D.C. 2006). This duty extended beyond the point in time when any individual witness testified, and has continued to the present day.  *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla,* 193 F.3d 1139, 1146-49 (10th Cir. 1999)(citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987)); *Steidl v. Fermon,* 494 F.3d 623, 630 (7th Cir. 2007)("For evidence known to the state at the time of trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *High v. Head,* 209 F.3d 1257, 1265 n.8 (11th Cir. 2000).  *See also, Banks,* 540 U.S. at 696; *Giglio,* 405 U.S. at 155; *United States v. Kojayan,* 8 F.3d 1315, 1320, 1323-25 (9th Cir. 1993); *Thomas v. Goldsmith,* 979 F.2d 746, 749-50 (9th Cir. 1992)(prosecution has an obligation to turn over exculpatory evidence relevant to habeas proceedings, even if it was not discovered prior to the close of trial); Fed.R.Crim.P. 16 ( c); Fed.R.Civ.P. 26(g)(1).  *Cf.  Imbler v. Pachtman,* 424 U.S. 409, 427, n. 25

(1976)(under ABA Criminal Justice Standard 3-3.11, commentary, "A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case ... The duty of the prosecutor is to acquire all the relevant evidence ...").

This duty also extends to any member of law enforcement acting on behalf of government agencies, whether or not the prosecutor has personal knowledge of the evidence in question, and whether or not the information is in possession of law enforcement agencies and officials outside the prosecuting agency itself. *United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979)(facts known to state law enforcement personnel imputed to federal prosecutors when "the two governments ... pooled their investigative energies to a considerable extent.")

To establish a *Brady* violation, a Movant must show: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant either as to guilt or punishment; and (3) that the evidence was material. The good faith or bad faith of the prosecution is irrelevant. Evidence is "material" only if there is a reasonable probability that, had the evidence been disclosed, the outcome of trial would have been different. *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), citing *United States v. Bagley,* 473 U.S. 667, 682 (1985). To prevail, a Movant need not show that it is more "probable than not" that had the evidence been disclosed, the outcome would have been different. Rather, the question is whether, considering the cumulative effect of the suppressed evidence, *Kyles,* 514 U.S. at 436, "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Id.*, at 441.

Newly discovered evidence, *i.e.,* evidence which could not have been discovered by the exercise of due diligence before or during trial, may also form the basis for relief under

section 2255. *E.g., United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996)(rejecting newly

discovered evidence claim raised in initial 2255 petition, which was filed during pendency of

direct appeal, on the merits); (Fed. R. Crim. P. 33.)  To warrant relief on a claim of newly

discovered evidence, it must be shown: 1) that the evidence was discovered after the trial; 2) that

failure to learn of the evidence was not caused by a lack of diligence; 3) the evidence is not

merely impeaching in character; 4) the evidence is material to the principal issues involved; and

5) the evidence is of such a nature that, had it been disclosed to the jury, there is a reasonable

probability of a different outcome, *i.e.,* acquittal or a lesser sentence.  *Peltier v. Booker,* 348 F.3d

888, 890 (10th Cir. 2003); *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997).

A *Brady* claim may be a subspecies of a newly discovered evidence claim.  *United

States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999).  Whether the claims made below

constitute *Brady* violations, newly discovered evidence, or both, Mr. Barrett is entitled to relief

from his convictions and sentences.

The prosecution in Mr. Barrett's case suppressed, before, during and after trial,

exculpatory evidence relevant to several key witnesses.  Deals or leniency given to these

witnesses in exchange for their testimony in Mr. Barrett's case and, with respect to Charles

Sanders, deals he received in other cases because of his supposed work as an informant, were not

disclosed.  Threats to witnesses to get them to cooperate with the Government were not

disclosed.  Relevant to this were the ongoing criminal activities of former AUSA Mike

Littlefield, which came to light in 2007, when he was allowed to enter an *Alford* plea in

Muskogee County District Court to charges of physically abusing his own children.  Among

other misdeeds, Littlefield suppressed exculpatory evidence regarding one of the seven informant

witnesses that was made known to the court during the improper *ex parte* hearing on the

Government's motion to delay disclosure of the identities of its seven informant witnesses, but never disclosed to the defense.  *See* Claim 1.

Some of the evidence discussed below  was relevant not only to the credibility of witnesses, but the propriety of the initial nighttime, no knock search warrant that was secured by Drug Task Force agent Clint Johnson, based on the good word of Charles "Monk" Sanders.  The Government or its agents were aware of numerous impeaching facts regarding acts of dishonesty and criminality of Clint Johnson and his girlfriend, OSBI agent Vickie Lyons, none of which were revealed to the defense.

Most egregious of all, the Government knowingly used perjured testimony from Randy Turman, who claimed that a Sequoyah County felony case had been disposed of and was no longer active when it was in fact open, giving Turman every reason to fashion his testimony to the Government's liking.  The same could also be said for its tactic of implying to the jury that the most it would do for Charles Sanders was "talk to" the prosecutors in Sequoyah and Tulsa Counties about his cases there, to let them know that Sanders had cooperated in the federal case against Mr. Barrett.  At the improper *ex parte* hearing discussed in Claim 1, AUSA Littlefield told the court that he knew the identify of an informant witness who failed to corroborate Charles Sanders.  Thus, it could be said the Government knew Sanders's testimony was false, as was the basis for the search warrant secured by Clint Johnson.  In any event, the Government failed to disclose exculpatory evidence of the witness who failed to corroborate Sanders.  It could also be said that the Government sponsored false testimony from Travis and Cindy Crawford.  Newly discovered evidence reveals that their testimony was the product of threats and intimidation.  *See Giglio v. United States,* 405 U.S. 150 (1972); *Giles v. Maryland,* 386 U.S. 66 (1967); *Miller v. Pate,* 386 U.S. 1 (1967); *Napue v. Illinois,* 360 U.S. 264 (1959); *Mooney v. Holohan,* 294 U.S.

103 (1959).  If the jury's verdict could be affected by false testimony presented by the prosecution – as it surely was here – a new trial is required.

        **A.**       **Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured Testimony, and Newly Discovered Evidence**

           **1.**       **Evidence regarding informant witnesses Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences**

                **a.**       **Charles "Monk" Sanders**

The prosecution suppressed deals given to Charles "Monk" Sanders in Sequoyah and Tulsa Counties in exchange for his testimony, in both stages of trial, against Mr. Barrett.  In examining Sanders at trial, AUSA Littlefield merely stated, and Sanders agreed, that he would speak to the authorities in Sequoyah and Tulsa Counties regarding Sanders's cooperation, implying there were no guarantees anything would be done.  (R. 2495.)  In fact, near the end of Mr. Barrett's trial on November 17, 2005, Sanders got a sweetheart deal on his active Sequoyah County cases, and more favors shortly thereafter, all due to a "plea agreement with feds." Favorable disposition of Sanders's active Tulsa County case was delayed until after Mr. Barrett's trial.  The prosecution cynically attempted to jettison its *Brady* obligations with respect to Sanders's testimony by either failing to reveal deals it knew were in the works, and/or postponing the culmination of those deals until the end of Mr. Barrett's trial or shortly after its conclusion. The Government's ploys in these regards plainly violated the *continuing duty* to disclose *Brady* evidence.

Of course, Sanders's alleged information was the basis upon which the no-knock warrant secured by his alleged handler Clint Johnson was issued.  Sanders's testimony was

critical to the drug charges which underlay the various counts of the superseding indictment, and to the Government's arguments on malice and intent with respect to both stages of trial.

As noted in Mr. Barrett's first stage ineffective assistance of counsel argument respecting trial counsel's failure to impeach Sanders with the number and nature of his previous convictions (Claim 2, section A.4, *supra*), as well as favorable treatment he had received in these and other cases, Sanders had convictions in Sequoyah County Case No. CF-98-346, (for which he originally received a twenty year suspended sentence, of dubious legality due to his numerous prior convictions), for the felony offense of possession of methamphetamine. Sanders was also charged in this case with a misdemeanor count for possession of drug paraphernalia, which was dismissed pursuant to plea bargain. Two applications to revoke Sanders's suspended sentence were filed. Initially, five years of the suspended sentence was ordered revoked, but the balance would again be suspended if Sanders completed a Department of Corrections drug program. The revocation was ordered to run concurrent with similar dispositions in Case Nos. CF-98-363, CF-99-562, CF-04-19 and CF-03-124. (File in Sequoyah County Case CF-98-346.)

In CF-98-363, Sanders received another twenty year suspended sentence for uttering a forged instrument, to run concurrently with the sentences in Case Nos. CF-99-562 and CF-98-346. Similar applications to revoke were filed in this case based on Sanders's failure to abide by the terms and conditions of probation, in part because he committed new offenses. Initially, as with CF-98-346, the court ordered five years of the sentence to be revoked, with the balance to again be suspended in full upon completion of the drug program. The revocation in this case was ordered to run concurrently with similar actions taken in Case Nos. CF-98-346, CF-99-562, CF-03-124, and CF-04-19. (File in Sequoyah County Case No. CF-98-363.)

In CF-99-562, in which Sanders was initially charged with three counts of concealing stolen property, uttering a forged instrument, felonious possession of a sawed-off shotgun, and a misdemeanor charge of possession of marijuana, he was allowed to plead to a single count of concealing stolen property, with the other counts dismissed.  He originally received a twenty year suspended sentence.  Again, applications to revoke were filed due to Sanders's commission of new crimes and for otherwise failing to adhere to the terms of his probation.  Five years of the sentence was revoked, the balance again to be suspended upon completion of an in-house drug program.  The sentence in this case was ordered to run concurrently with similar dispositions in Case Nos. 98-346, 98-363, 03-124 and 04-19.  (File in Sequoyah County Case No. CF-99-562.)

In Case No. CF-03-124, Sanders was allowed to plead guilty to two counts of feloniously running a roadblock, with the other charges dismissed.  Sanders received concurrent twenty-five year sentences on the two counts of conviction, with all but five years suspended, and with the entirety of the terms to be suspended on successful completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. In CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (File in Sequoyah County Case No. CF-03-124.)

In Case No. CF-04-19, Sanders was eventually charged in an amended information with second degree burglary, second degree arson, concealing stolen property, and feloniously carrying a firearm.  The firearm charge was dismissed pursuant to the plea agreement.  On the three remaining counts, Sanders was sentenced to concurrent terms of twenty-five years, with all but the first five years suspended and, yet again, the balance to be suspended upon

completion of the drug program.  The sentences in this case were ordered to run concurrently with the sentences in Case Nos. 98-346, 98-363, 99-562 and 03-124.  (File in Sequoyah County Case No. CF-04-19.)

The Government violated Mr. Barrett's due process rights by failing to disclose that on November 17, 2005 (the final day of Mr. Barrett's trial), and because of his testimony in Mr. Barrett's trial, amended judgments and sentences were entered on behalf of Sanders in all of the above-described cases, with a filing date of November 23, 2005 (well before Mr. Barrett's formal sentencing) ordering that Sanders receive straight suspended sentences across the board. Moreover, in each of the cases discussed above, an order was entered on April 3, 2006, making Sanders's suspended sentences in these cases unsupervised by the Department of Corrections, even though the sentences did not expire until 2030.  This was done, according to the notations on the orders, "***per plea agreement with feds***."  Finally, on December 8, 2008, orders were entered in each of these cases relieving Sanders of the obligation to pay any outstanding fines or costs.  (*See* the above listed Sequoyah County court files (emphasis added).)

Sanders received similar largesse as the result of his testimony against Mr. Barrett in his pending Tulsa County Case, disposition of which, as noted in the ineffective assistance of counsel argument, was delayed until Sanders could perform for the Government in Mr. Barrett's trial.  In Tulsa County Case No. CM-04-1187, Sanders's case was passed from November 13, 2005 until November 17, 2005 (the last day of Mr. Barrett''s trial), and was again passed from November 17 until December 9, 2005.  At that time, instead of facing jail on his misdemeanor drug possession and possession of drug paraphernalia charges, despite his numerous prior convictions, because of his testimony against Mr. Barrett, Sanders received concurrent one year suspended sentences.

During the pendency of this 2255 action, investigators for Mr. Barrett have attempted repeatedly to interview Sanders, but were stymied.  Sanders initially told a defense investigator he would meet with him, and had things he wanted to discuss, but dodged all subsequent attempts at an interview.  However, when a defense investigator spoke to Sanders's mother, Evelyn Sanders, regarding her son's testimony against Mr. Barrett, she revealed that Sanders had been promised a number of things in exchange for his testimony that he never received.  (Decl. of Dale Anderson.)  This witness's statement suggests that aside from the leniency he got, Sanders was given other inducements by the Government to testify against Mr. Barrett.

Not only did the prosecution flatly violate *Brady* and its progeny by failing to disclose Sanders's deals in the particular cases discussed above, it wantonly violated its *Brady* obligations by failing to reveal the jaw-dropping favorable treatment Sanders had received in *all his* Sequoyah County and other cases, as detailed in the ineffectiveness of counsel claim.  Taken together, this evidence would have destroyed Sanders's credibility, shown his motive to lie, and would have shown, contrary to this court's order, that Clint Johnson – whose nefarious, but never revealed, acts of dishonesty and criminality are discussed below – could not have reasonably relied on "information" from Sanders to establish probable cause for the no-knock search

warrant, which was the poisonous tree from which the later search warrants resulting in the recovery of drug and firearms related evidence grew.

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the

situation, it sponsored materially false testimony. *Giglio v. United States,* 405 U.S. 150 (1972).

At a minimum, the Government failed in its duty to correct false testimony. *Giles v. Maryland*,

386 U.S. 66 (1966); *Alcorta v. Texas*, 355 U.S. 28 (1957).

### b. Travis Crawford

During the investigation conducted for this 2255 motion, Mr. Barrett has

discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about

material matters. Travis Crawford supplied testimony critical to the Government's case for

malice and intent, at least as to count 3 of the superseding indictment. Crawford's testimony was

also crucial to establishing the intent elements in the punishment phase of trial. Crawford's

testimony was summarized in the claim regarding ineffective assistance of counsel in the first

stage of trial, and will not be repeated here.

When Crawford was interviewed in the presence of his parents on December 11,

2008 by defense investigator Leonard Post, he recanted his trial testimony. To summarize, Mr.

Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years

before the raid which led to Trooper Eales's death. At trial, of course, the prosecution contended

that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for

his arrest on the  Sequoyah County drug charge. (Decl. of Leonard Post.)

Mr. Crawford stated that he has anxiety and psychological problems, something

he was not cross-examined on at trial. Although he was a long-time methamphetamine addict, he

told Mr. Post he had been off drugs for four months preceding Mr. Post's interview. Before

finally getting off drugs, Crawford had been a daily methamphetamine user for years preceding

Mr. Barrett's arrest in this case and during Mr. Barrett's federal trial. (Decl. of Leonard Post.)

Thus, Crawford's trial testimony to the effect that he was not a drug addict or under the influence of drugs at the time he testified against Mr. Barrett was false.

Mr. Crawford stated that at the time he was interviewed by then-AUSA Mike Littlefield regarding Mr. Barrett, he was "living in so many places and was so strung out" on drugs, that he did whatever he was told by anyone in authority in order to stay out of trouble. Mr. Crawford states that when he was interviewed by Mr. Littlefield, he was high on drugs. Moreover, anybody who had been around drug addicts for any period of time (which surely includes Mr. Littlefield and then-Sequoyah County Sheriff John Philpot, who took Crawford to Muskogee to be interviewed by Littlefield) would have known Crawford was high. Not only was Mr. Crawford under the influence of illicit drugs at the time he was interviewed by Littlefield, but he was also high when he testified in the first stage of Mr. Barrett's trial. Crawford stated that the other informant witnesses who testified against Mr. Barrett were high and strung out on drugs at the time of their testimony. (Decl. of Leonard Post.)

When Sheriff Philpot took Crawford to Muskogee to be interviewed by Mike Littlefield shortly before Mr. Barrett's trial, Crawford felt he "was already arrested" and did not know "if [he] was ever going to come back home." When Littlefield interviewed him at the United States Attorney's office, Mr. Crawford was terrified about losing his freedom. Consequently, he said whatever he thought it was Littlefield wanted him to say. Mr. Littlefield asked Travis Crawford if Kenneth Barrett ever said he (Mr. Barrett) was "going to go down in a blaze of glory" if the police ever came onto his property. Littlefield made it clear to Crawford what the appropriate answer was. Crawford stated that before he could answer, Littlefield threatened him, stating bad things would happen to him if he "lied." Where a witness is pressured to testify, the prosecution has every reason to believe that the product of that coercion

will be false testimony.  Mr. Crawford stated he was scared and panicked, and therefore told

Littlefield that Mr. Barrett had made this statement.  According to Mr. Crawford, the truth was

otherwise: *Mr. Barrett never made such a statement, or anything like it, at any time*.  (Decl. of

Leonard Post.)

Travis Crawford's recantation is corroborated by witnesses who were present at

Mr. Barrett's house on September 23, 1999, but were not called to testify at trial.  *See* Claim 2,

section A.4, *supra*.  Rick Lunsford and Brandy Hill are adamant in stating the Mr. Barrett never

made such a statement.  (Decls. of Rick Lunsford and Brandy Hill.)

Because the Government and its agents knew or had reason to know that

Crawford was a drug addict at the time he was interviewed by the prosecution, and at the time he

testified at trial, the Government was obligated to disclose this information under *Brady*.  Due

process and the rules of professional conduct required AUSA Littlefield to correct Travis

Crawford's false testimony about being off drugs.  The same is true of at least some of the other

informant witnesses, whom Mr. Crawford states were high at the time of their testimony.

Moreover, the Government plainly violated its *Brady* obligations by failing to reveal Littlefield's

threats to induce cooperation and shape Crawford's testimony.  *Crivens v. Roth,* 172 F.3d 991,

998-99 (7th Cir. 1999)(prosecution violated *Brady* where police had intimidated key witnesses to

murder of police officer, and failed to disclose material information as to who was seen carrying

the murder weapon moments after the shooting).

Mr. Crawford admitted that before he became a witness against Mr. Barrett, he

had previously worked as a snitch for local law enforcement, setting up drug buys at the direction

of the authorities in exchange for escaping bogus check charges he was facing.  Crawford stated

that he testified regarding the controlled drug buys in state court, even though the police had promised him he would not have to do so.  Decl. of Leonard Post.  Crawford's history as an informant was not testified to at trial, though it was known to the Government or its agents.  Crawford's work as a snitch was exculpatory evidence affecting his credibility.  By failing to inform the defense of this fact, the Government violated is *Brady* obligations.

In marked contrast to what the Government attempted to portray at Mr. Barrett's trial regarding the "necessity" for a no-knock warrant and the armed raid on Mr. Barrett's property, Travis Crawford stated that only two weeks or so before the raid, Sheriff John Philpot had gone to Mr. Barrett's residence and inspected his firearms without incident.  (Decl. of Leonard Post.)

This information is consistent with that given by Janice Sanders and Sylvia Gelene Dotson, who, though never asked by trial counsel, state that Sheriff Philpot and other law enforcement agents were at Mr. Barrett's house mere weeks before the raid.  *See* Claim 2.  As shown below, ex-Sheriff Philpot recently admitted to a defense investigator that he indeed was at Mr. Barrett's less than a month before the raid, and encountered no violence or threats.  Mr. Barrett was not arrested on his outstanding failure to appear warrant.  (Decl. of Rodney Floyd.)  This exculpatory evidence, of which the Government and/or its agent Mr. Philpot was well aware, was concealed from the defense in violation of *Brady.*

Again in contrast to what Mr. Crawford implied in his testimony, and to what the Government argued at trial, he recently stated that while Mr. Barrett told him he had a pending state drug charge, he was not overly concerned with it.  Mr. Barrett never told Crawford he had an outstanding warrant, and was thus laying low and hiding from the law.  Crawford simply

assumed that having an active case meant the same thing as having an active arrest warrant. (Decl. of Leonard Post.)

At trial, with the aid of Mr. Crawford's testimony, the Government made much of the sign posted on the gate, construing it as a threat to law enforcement.  Mr. Crawford states that the sign was posted as a warning to anyone coming on the property in order to prevent trespassing and theft.  (Decl. of Leonard Post.)

A defense investigator reduced to writing what Mr. Crawford stated when he was interviewed.  When the investigator presented the writing to Mr. Crawford, he refused to read it or "sign anything," siting the advice of his psychiatrist.  (Decl. Leonard Post.)  However, even in this tale, Mr. Crawford was caught in a contradiction.  (*Id.* at 5.)

However, Mr. Crawford's parents, Roger and Phyllis Crawford, witnessed his recantation.  They have signed declarations attesting to their son's statements to Mr. Post, statements which destroy the credibility of his trial testimony against Mr. Barrett.  (Decls. of Roger and Phyllis Crawford.)  Of course, as noted above, Mr. Post has also executed a declaration detailing Travis Crawford's recantation.  (Decl. of Leonard Post.)

Evidence of Crawford's recantation is newly discovered, and could not have been discovered with the exercise of due diligence before or during trial, because the Government sprung the existence of Crawford and the other informant witnesses (without initially giving their names) after juror qualification had begun, and Crawford refused to be interviewed by the defense.  Crawford's recantation pulls the rug out from under the prosecution's arguments respecting malice and intent in both stages of trial.  Crawford was *the key Government witness* in this respect, because he testified that only hours before the raid, Mr. Barrett talked about the police "drive-by," the "fact" that they were coming back, that he (Mr. Barrett) "[didn't] give a

fuck," and that he (Mr. Barrett) was going to go out in a "blaze of glory."  Crawford's recantation

also undermines the Government theory that Mr. Barrett only stayed close to home, and was thus

lying in wait for a supposedly inevitable police raid, after he supposedly learned that he had a

warrant out for his arrest.

### c.    Cindy Crawford

As outlined in the first stage ineffective assistance of counsel argument (Claim 2,

section A.4, *supra*), Cindy Crawford testified in the guilt/innocence stage of trial regarding drug

activity she witnessed at Mr. Barrett's home, and Mr. Barrett's supposed threats to law

enforcement if his property were raided.  In the penalty phase of trial, Cindy Crawford testified

that on one occasion, Mr. Barrett, after she rebuffed his sexual advances and was leaving his

residence with Richie Barrett, came out of the house, put the barrel of a rifle up to her leg, and

threatened to kill her.

Leonard Post and another defense investigator currently working on Mr. Barrett's

case, Dale Anderson, interviewed Cindy Crawford on January 13, 2009.  Like her husband,

Cindy Crawford refused to *read* a declaration which faithfully recounted what she told Messrs.

Post and Anderson.  (Decl. Leonard Post.)  Mr. Post's and Mr. Anderson's declarations detail

what Cindy Crawford told them, which is summarized as follows.

Cindy Crawford explained how she was contacted by the Government.  According

to her, one to two weeks before she testified in the first stage of Mr. Barrett's trial, Sequoyah

County Sheriff John Philpot came to see her.  Philpot told her she had to go with him.  Although

Ms. Crawford was unsure whether she was under arrest, it was clear to her that she had no choice

but to go with Sheriff Philpot.  She was driven by Mr. Philpot to the United States Attorney's

office in Muskogee, where she was interviewed by Mike Littlefield in Littlefield's office.  (Decls. of Leonard Post and Dale Anderson.)

Armed law enforcement officers were also present during the interview.  They showed Ms. Crawford several firearms which looked similar to ones she had seen in Mr. Barrett's cabin. In order to secure her cooperation and testimony, Mike Littlefield threatened her.  Littlefield told her she need to work with him and testify against Mr. Barrett.  Otherwise, she was going to prison.  Littlefield pointedly reminded her that she was then under a five-year deferred sentence in a drug case.  Littlefield told Ms. Crawford that Mr. Barrett's residence had been under surveillance for six months preceding the raid, and that she had supposedly been observed on his porch acting as a "lookout" while methamphetamine was cooked on the property.[47]  While Ms. Crawford states that she had no pending charges at the time she was interviewed by Littlefield, she had recently lost a child to foster care.  Along with the threat of prosecution, the possibility that she would not get her child back unless she played ball with the Government hung in the air throughout the interview.  (Decls. of Leonard Post and Dale Anderson.)

According to what Ms. Crawford recently told Mr. Barrett's defense investigators, Mike Littlefield not only threatened her, but coached her testimony.  Littlefield told her to make Mr. Barrett appear violent and an imminent threat to those around him.  Again issuing threats, Littlefield told her that she risked a perjury charge if she did not testify in this manner.  Littlefield emphasized that he could make it extremely hard on her if she did not testify against Mr. Barrett. (Decls. of Leonard Post and Dale Anderson.)

---

[47]  Consistent with her first stage trial testimony, Cindy Crawford told Mr. Post and Mr. Anderson that she never saw Mr. Barrett cook methamphetamine on his property.  She had done drugs at Mr. Barrett's residence, but did not know who supplied them.  Ms. Crawford never bought drugs from Mr. Barrett.  Decls. of Leonard Post and Dale Anderson.

In addition to the threats, Ms. Crawford described the interview taking place in an intimidating atmosphere. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside. It was her belief that she was not free to decline to be interviewed, to terminate the interview, or to leave. Mr. Philpot had driven her to Muskogee, and she had no way back other than him. Ms. Crawford expressed the sentiment that she was not going to cross Sheriff Philpot due to his reputation for violence. (Decls. of Leonard Post and Dale Anderson.)

Ms. Crawford was interviewed by the Government separately from her husband, Travis. After both had been interviewed, Travis Crawford told her that Philpot had told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. (Decls. of Leonard Post and Dale Anderson.)

Mike Littlefield and John Philpot discouraged her from talking to Mr. Barrett's lawyers. Both told her that she did not have to talk to the defense. According to Ms. Crawford, the clear implication was that she should not speak to the defense. (Decls. of Leonard Post and Dale Anderson.)

Like her husband Travis Crawford, Cindy Crawford was under the effects or after-effects of heavy methamphetamine use at the time she was interviewed by Mr. Littlefield and law enforcement at Littlefield's office. At the time of the interview in the prosecutor's office, Cindy Crawford was just coming down from a two day methamphetamine high. She also admitted to being in the same condition when she testified against Mr. Barrett, because her heavy drug use was ongoing at the time of his trial. That her drug use affected what she told Mr. Littlefield and testified to at trial is apparent from her recent comment to Mr. Barrett's current investigators: "If

you had ever crashed from a meth high, you would know that you would not be in your right mind." (Decls. of Leonard Post and Dale Anderson.)

Although, on cross-examination in the second stage of trial, Cindy Crawford told defense counsel she suffered from PTSD, her mental condition was not inquired about during her first stage testimony, and was not effectively exploited by counsel in the penalty phase, largely because Crawford refused to be interviewed by trial counsel. (*See* Claim 2) Because Crawford refused to be interviewed, there are facts about the manner in which her mental condition impacts her credibility that were only recently discovered.[48] (Cindy Crawford medical records, filed under seal.) According to what Ms. Crawford told Mr. Post and Mr. Anderson, one of the symptoms of her PTSD is that she overreacts in stressful situations, sometimes to the point of passing out. She admitted that when she is under stress, she may not perceive things correctly. This causes her to exaggerate what is going on around her. Ms. Crawford told Mr. Post and Mr. Anderson that when she testified in the penalty phase about Mr. Barrett allegedly pressing a gun to her leg, her mental condition very well could have caused her to overreact and embellish the incident. At the conclusion of her recent interview with the defense investigators, Cindy Crawford told them that having given this alleged incident more thought, she was positive she had overreacted to it. She emphasized that Mr. Barrett had a history of being nice and helpful to her. (Decls. of Leonard Post and Dale Anderson.)

However, even Ms. Crawford's claim to have overreacted is a fabrication. A readily available witness to the alleged event, Richie Barrett, states that neither the incident

---

[48] Cindy Crawford executed a release authorizing Mr. Barrett's counsel to obtain her medical records.

Crawford described nor anything like it ever happened.  (*See* Claim 2; Decl. Richard Barrett; Decl. of Leonard Post.)

Between her first stage and second stage testimony, the prosecution subjected Cindy Crawford to more threats.  The Government was upset with her first stage performance on the witness stand because she denied seeing chemicals or equipment for making methamphetamine at Mr. Barrett's cabin or on his property, and because she had not made Mr. Barrett seem threatening or violent.  To quote Ms. Crawford, "They [the Government] were very angry.  They scared me and threatened me."  Again, according to Ms. Crawford, while the Government never told her explicitly that she could lie and fabricate during her testimony, it was implied that she could say whatever she wanted, true or not, so long as it helped the Government's case.  (Decls. of Leonard Post and Dale Anderson.)

In several areas, the Government violated its *Brady* duties with respect to Cindy Crawford.  Ms. Crawford implied during her first stage testimony that she was off drugs ( R. 3070), but, based on what Ms. Crawford recently told defense investigators, this was incorrect.  The Government or its agents, based on its observations of Ms. Crawford, had to know that she was a drug user both at the time she was interviewed by Littlefield and when she gave testimony.  If not, this evidence is at a minimum newly discovered.  It is also submitted that the Government or its agents were aware of Cindy Crawford's mental problems, but this was only revealed, and not developed well, when she volunteered this information to trial counsel during cross-examination in the penalty phase of trial.  The Government's intimidation of and threats to Cindy Crawford, as well as disgraced former AUSA Mike Littlefield's "coaching" of her testimony, were well known, obviously, to Littlefield himself and the law enforcement officers who participated in Crawford's interview at Littlefield's office.  The Government's

failure to reveal these facts is a *Brady* violation as well as newly discovered evidence. *Crivens v. Roth,* 172 F.3d 991, 998-99 (7th Cir. 1999). The impeaching evidence related above would have seriously undermined Cindy Crawford's credibility. More seriously, where, as with Cindy Crawford, a witness is threatened and coached, the prosecution is guilty of knowingly sponsoring materially false testimony and/or failing to correct false testimony in violation of Mr. Barrett's right to due process of law. *Giglio*, *supra*; *Giles*, *supra*; *Alcorta*, *supra*.

Additionally, as reflected by the declarations of several available witnesses whom the defense did not call at trial to impeach Cindy Crawford's credibility, it was well known in the community that she acted on a regular basis as a snitch for local law enforcement. This *Brady* information was never revealed, and the Government or its agents had to know about it.

The fact that Crawford received favor from the authorities for acting as a snitch, against Mr. Barrett or others, is demonstrated by the manner in which her conviction in Sequoyah County Case No. CF-04-63 was handled. Crawford was originally charged with felony possession of marijuana, because she had incurred a previous marijuana possession conviction. On April 28, 2005, she entered a no contest plea to a misdemeanor and received a five year deferred sentence. She received a one year deferred sentence on count 2, which charged misdemeanor possession of drug paraphernalia. On March 20, 2005, an application to accelerate Ms. Crawford's deferred sentence was filed because she failed to make a required payment. On July 17, 2005, shortly before Mr. Barrett's trial commenced, a bench warrant was issued for failure to appear. On April 24, 2006, after Mr. Barrett's trial, an application to dismiss the acceleration action was filed because Crawford had finally "paid in full." (File in Sequoyah County Case No. CF-04-63.) Thus, when she testified at Mr. Barrett's trial, an acceleration action for failure to comply with the terms of her deferred sentence was pending, but this

impeaching information, which could have been used to argue that Crawford had a motive to please the prosecutors lest her deferred sentence be accelerated, was not disclosed. *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003).

The *Brady* violations committed by the Government with respect to Cindy Crawford could also be considered a form of newly discovered evidence that could not have been discovered with the exercise of due diligence. As with all the informant witnesses, her identity was not revealed until the eleventh hour, the Government kept her under tight wraps, and she refused to speak with the defense.

Cindy Crawford continues to milk benefits for her work as an informant, and her testimony against Mr. Barrett, up to the present day. She was charged in Sequoyah County Case No. CF-08-224 with first degree burglary and conspiracy on June 18, 2008, which was amended on July 13, 2008. The first degree burglary charge carried from seven to twenty years. The conspiracy charge carried up to ten years. On December 15, 2008 she received an almost unheard of two year deferred sentence on the first degree burglary charge, with the conspiracy charge dismissed. (File in Sequoyah County Case No. CF-08-224.)

### d.     Brandie Zane Price

Price testified in the first stage of Mr. Barrett's trial. She claimed that she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period. (R. 3485-86.) For various convictions she received in Sequoyah County, she was sentenced to complete the RTP program, a regimented inmate discipline program for females within the Oklahoma Department of Corrections. The balance of her sentences were suspended upon her completion of the program. (R. 3487.) Responding to feeds by prosecutor Littlefield,

Def's § 2255 Mot.                           275                           *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

Price testified that the program "worked," that she was "absolutely" clean of drugs, and, presumably, any drug related activity. (R. 3488, 3497.)

After Mr. Barrett's trial, Brandie Zane Price and others were charged in the Eastern District in a methamphetamine drug distribution conspiracy. *United States v. McAdams, et al.,* No. CR-07-16-RAW. The indictment alleged that the overall conspiracy began "prior to approximately" May, 2006, and continued to February 20, 2007. Significantly, the indictment alleged that beginning approximately January 1, 2006, until June 22, 2006, Price received from the lead defendant in the case, Joseph Alondo McAdams, one pound of methamphetamine per delivery, receiving one delivery and as many as three deliveries a week. (Doc. 18, CR-07-16-RAW.) Mr. Barrett's trial concluded November 17, 2005, and he was formally sentenced on December 19, 2005, less than two weeks before the same United States Attorney who prosecuted Mr. Barrett later alleged that Price began receiving large quantities of methamphetamine for resale in a widespread drug conspiracy.

Price was later allowed to plead guilty to a superseding information (Doc. 116, CR-07-16-RAW) charging that from May, 2006 to February 20, 2007, she distributed and possessed with intent to distribute in excess of 500 grams of methamphetamine, or a mixture or substance containing methamphetamine. A plea agreement, in which Price agreed to provide all information regarding criminal activities known by her to the Government, and in which the Government, based on its assessment of the value of her cooperation, agreed, if appropriate, to move for a Guidelines downward departure, was entered into. (Doc. 121, CR-07-16-RAW.)

Price was ultimately sentenced to sixty months imprisonment. (Doc. 218, CR-07-16-RAW.) She received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial.*

Otherwise, the punishment range for the offense of conviction was a mandatory minimum of ten years imprisonment, a maximum of life, and not less than five years supervised release.  In the September 7, 2007 edition of the *Fort Smith Times-Record*, under the headline "Drug Offender Receives Break," the news article about Price's sentencing hearing states, "Price's sentence was significantly impacted by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon Sperling stated in a news release."  News article, Ft. Smith Times Record.  Thus,  Price received substantial favor not for her cooperation in the drug conspiracy case in which she was charged, but for her testimony against Mr. Barrett, which preceded the drug indictment against her.[49]

Mr. Barrett alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against Mr. Barrett that she was involved in drug use and drug dealing.  This is clearly exculpatory evidence affecting her credibility that was not disclosed by the Government.  Nor, under the Government's continuing duty to disclose exculpatory evidence under *Brady*, has it been disclosed by the Government that in exchange for her testimony against Mr. Barrett, she received a substantial downward departure in her own federal drug case.  The deal Price received in her federal drug case based on her testimony against Mr. Barrett is also newly discovered, because it occurred after Mr. Barrett's trial.  The Government's knowledge of these facts expose them once again to be the purveyors of false testimony – Ms. Price was not the clean, law-abiding citizen it portrayed her to be.

### e.    Karen Real

---

[49]  The various sentencing memoranda and motion for downward departure are sealed. Docs. 198, 200, 204, 205, 206, No. CR-07-16-RAW.

Karen Real was another of the informant witnesses the Government kept under wraps until the eleventh hour, and who refused to talk to the defense. (R. 3076-77.) At the time Real appeared as a Government witness, she was serving a fourteen year federal sentence.[50] During direct examination, AUSA Littlefield asked Real if he ever indicated that he would do anything for her based on her cooperation. Real initially answered "[n]o, sir." Littlefield then asked, "Did I talk about anything I'd say to the court?" Real responded, "Well, you just mentioned that, you know, what I did. And that it would be up to the judge." (R. 3080-81.) On cross-examination, Real testified that while she hoped her testimony against Mr. Barrett could help her with her sentence, she was not really expecting anything. (R. 3134.)

Although the picture painted for the jury was that the Government would inform Real's sentencing judge of her cooperation, and that Real, while hopeful of a break, was not really expecting one, she actually received the largest favor she could have received shortly after Mr. Barrett's trial concluded. On March 1, 2006, the Government did much more than "mention" Ms. Real's testimony, it initiated a new proceeding in her case by filing a motion under Fed.R.Crim.P. 35 for reduction of sentence, based on her cooperation against Mr. Barrett. (Doc. 148 in Case No. 6:00-cr-21-FHS.) On April 25, 2005, the sentencing court reduced Real's

---

[50] In Eastern District Case No. 6:00-cr-21-FHS, Real had been convicted of conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamine (count 1); maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine (count 3); and possessing a firearm during a drug trafficking crime (count 5). Real received sentences of 108 months on count 1, 60 months on count 3, running concurrently to count 1; and 60 months on count 5, running consecutively to the concurrent terms on counts 1 and 3. (Doc. 158, Apr. 25, 2006, order reducing sentence on Government's Rule 35 motion)

sentence from 168 months (fourteen years) to time served (six years), and ordered Real's immediate release from custody. (Doc. 158 in Case No. 6:00-cr-21-FHS.)

Mr. Barrett submits that the Government misled the jury with respect to the assistance it was going to give Real. The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation against Mr. Barrett, an eventuality which in fact occurred. The Government has a continuing duty to disclose exculpatory evidence under *Brady*. This Government's true intentions were never disclosed to the defense or told to the jury. Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial. Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial. Yet again, the Government's conduct in soft-peddling the assistance it was going to give Real in exchange for her testimony constituted a violation of *Giglio v. United States,* 405 U.S. 150 (1972) and *Napue v. Illinois,* 360 U.S. 264 (1959).

### f.    Randy Turman

It was argued in Claim 2 that counsel was ineffective for failing to research Turman's court file in Sequoyah County Case No. CF-02-447, and expose his perjury that this six count felony charge had been "taken care of" or disposed of, but was still pending, with no action in the case for two years preceding Mr. Barrett's trial. Regardless of any duty counsel had to investigate Turman's criminal background, the Government had an overarching duty to refrain from sponsoring perjured testimony, and to disclose exculpatory evidence.

The Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let

him give false testimony anyway. This is a classic violation of the rules announced in *Giglio, Napue, Mooney,* and *Miller, supra*, and the Government should be held fully accountable for it. It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch. Otherwise, there was no reason for his case to lie dormant for two years. The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head. Clearly, his testimony was motivated by the fact he had a still pending felony case. Unless he pleased the prosecutors with his testimony, there is every reason to believe they would have taken action against him, or seen to it that the Sequoyah County authorities did.

The Government's conduct in connection with Turman is a *Brady* violation. The fact he had an open, unresolved felony case gave him a powerful motive to testify for the Government, and this fact affected his credibility.

Finally, the fact Turman's case was dismissed "in the interests of justice" in 2007 after lying dormant for years is highly indicative that his testimony against Mr. Barrett was at least in part a basis for the dismissal. This constitutes newly discovered evidence.

### 2.   The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders

In Claim 1, *supra*, Mr. Barrett described the *ex parte* hearing held September 13, 2005, during which AUSA Mike Littlefield, in the presence of the United States Attorney, informed the court that Littlefield had spoken with, and knew the identity of, a witness who when questioned failed to corroborate to which Charles "Monk" Sanders would eventually testify in the penalty phase of Mr. Barrett's trial. (Tr. 9/13/05 H'rg at 14, 17.) Littlefield advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when

he overheard her speaking on the telephone.  Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him.  Littlefield told the court he had spoken with the woman himself, and she did not corroborate Sanders, although Littlefield claimed he subjectively believed the woman's denial was motivated by fear.

The fact that the Government knew the identity of a witness who failed to corroborate Sanders about a key piece of second-stage testimony was not disclosed until after trial when appellate counsel obtained the transcript of the *ex parte* proceeding.  To this day, the Government has failed to identify the witness.  This was clearly *Brady* material, because it was evidence that could have been used not only to impeach Sanders's testimony, but to attack the search warrant under *Franks v. Delaware,* 438 U.S. 154 (1978).

But the situation is worse than that.  Sanders was able to commit crimes with impunity, and the Government knew that.  As long as he was willing to inform on others, Sanders had a "get out of jail free" card.  No reasonable person could believe Sanders about anything.  This is especially true since the prosecution was in possession of evidence that Sanders's sorry word was contradicted by another witness.  Due to Sanders's record of total dishonesty and the fact that he was contradicted by another witness known to the prosecutor, polluting a federal courtroom with Sanders's testimony constituted the knowing use of perjured evidence.  *E.g., Miller v. Pate,* 386 U.S. 1 (1967); *Mooney v. Hollohan,* 294 U.S. 103 (1935).

**B.    The Judgements of Conviction and Sentence Should be
Vacated Based on the Suppression and New Discovery of
Evidence Undermining the Credibility of Key Law
Enforcement Personnel**

The Government suppressed exculpatory evidence that would have shown Clint

Johnson and Vickie Lyons to be witnesses of poor credibility.  With respect to evidence showing

Johnson had no credibility, the suppressed evidence would have also supported a motion to

suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  The Government suppressed

exculpatory evidence that would have torpedoed not only the warrant, but its seven informant

witnesses and overall theory of the case, because Sequoyah County Sheriff John Philpot had been

to Mr. Barrett's residence with other officers less than a month before the September 24, 1999

incident without coming to any harm.  Newly discovered evidence of former AUSA Littlefield's

criminal activities supports claims by some of the informant witnesses that they were threatened

and coerced into giving testimony.

**1.    Evidence of Clint Johnson's illicit activities**

But for Clint Johnson's alleged reliance upon "Monk" Sanders to secure the

nighttime, no-knock warrant for Mr. Barrett's residence and property, David "Rocky" Eales's

tragic death never would have occurred.  The Government or its agents knew that Johnson, just

like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of

areas.  To the extent the impeachment evidence discussed below was generated after Mr.

Barrett's trial, it constitutes newly discovered evidence.  However, the Government was aware of

this evidence, or had a duty to become aware of it, and has once again failed to fulfill its

*continuing* duty to disclose exculpatory evidence.  The impeachment evidence detailed below not

only could have been used to attack the overall testimony of Johnson and Sanders, but could have

been used at either stage of Mr. Barrett's trial to argue that but for the acts of a "dirty cop," Clint Johnson, the entire chain of events leading to Trooper Eales's death never would have occurred.

At the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office. Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson. Had the jury known these facts, Johnson's credibility, and the validity of the no-knock search warrant, would have been destroyed. Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Although not known to the defense, at the time of Mr. Barrett's trial, Johnson, Lyons and a number of other state law enforcement officers involved in Movant's case had been involved in a series of crimes involving the misuse of their office. On November 1, 2005, while Mr. Barrett's trial was ongoing, Cherokee County District Attorney investigators Tommy Morgan and Jeff Lancaster reported to District Attorney Richard Gray that Johnson had passed four bad checks in September, 2005 at Champlain's Truck Stop in Tahlequah. (Memo to Richard Gray from Tommy Morgan and Jeff Lancaster dated November 1, 2005.) Beginning on November 5, 2005, Assistant District Attorney and Drug Task Force Director Jeff Sheridan kept a detailed log of discussions with Johnson, which led to Johnson's termination and the seizure of his vehicle on January 5, 2006. (Log of events from November 2005 through January 2006 by Jeff Sheridan; Letter from Richard Gray to Clint Johnson dated January 5, 2006.) On January 5, 2006, District Attorney investigators found in Johnson's car various drugs and drug paraphernalia that had never been logged into evidence, which they suspected Johnson had

acquired through seizure or purchase with official funds, and which they suspected Johnson was abusing himself. (Report of Investigation dated January 5, 2006 from Courtney Bates; February 3, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries.) These items included multiple syringes, a pipe, a spoon with methamphetamine residue, a partially smoked hand-rolled marijuana cigarette, vials of liquid methamphetamine, a baggie containing marijuana, and bottles of Xanex and Darvon. (OSBI Criminalistics Investigation Report dated January 26, 2006.)

As early as November 9, 2005, Sheridan was expressing concern over Johnson's inability to account for funds allegedly used for drug buys by confidential informants and funds seized during drug raids. (Log of events from November 2005 through January 2006 by Jeff Sheridan; Memo dated November 17, 2005 from Donovan Dobbs to Jeff Sheridan; Undated Memo from Jeff Sheridan to Clint Johnson; Undated Memo from Jeff Sheridan to Richard Gray; Memo dated November 21, 2005 from Jeff Sheridan to Clint Johnson; Memo dated December 19, 2005 from Courtney Bates to Jeff Sheridan; Memo dated December 27, 2005 from Jeff Sheridan to Clint Johnson; January 17, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries; February 22, 2006 Letter from Richard Gray to OSBI Special Agent Shawn Ward; Undated Report of Second OSBI Interview of Clint Johnson; Memo dated November 13, 2006 from Misty Brinley to Richard Gray).

Johnson had considerable difficulties managing his finances. He declared bankruptcy in 2001, and his actions in passing hot checks had further alarmed his supervisors. (*In re Clint Johnson,* No. 01-72501, United States Bankruptcy Court, E.D. Okl.) In December 2005 and January 2006, Sheridan repeatedly expressed his conviction that Johnson was lying to him. (Log of events from November, 2005 through January, 2006 by Jeff Sheridan; Undated Memo from Jeff Sheridan to Richard Gray). On November 23, 2005, Sheridan noted Johnson's

possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation. (Log of events from November, 2005 to January, 2006 by Jeff Sheridan). It is plainly apparent that law enforcement knew, during the course of Mr. Barrett's trial, that Johnson was involved in a course of serious criminal conduct that involved financial dishonesty and the misuse of his office.

In October, 2006, a Multi-County Grand Jury unsealed an indictment against Richard Gray, the District Attorney for Cherokee and Sequoyah Counties, for embezzling money seized as evidence from drug investigations. In June, 2008, Okmulgee County District Judge Michael Claver dismissed the charges against Gray at the conclusion of the prosecution's case, and barred further prosecution, based on defense counsel's scathing impeachment of Clint Johnson, who testified as a prosecution witness.

The transcript of the cross-examination of Clint Johnson, which took place on June 4, 2008, is replete with additional evidence of Johnson's misappropriation of funds. (Transcript of Proceedings in *State of Oklahoma v. Richard Loy Gray, Jr.,* Cherokee County Case No. CF-2007-28, June 4, 2008) (hereinafter "Gray RT"). During the cross-examination of Johnson, Gray's defense counsel suggested that: 1) Johnson had fathered a child out of wedlock with the daughter of former Adair County Sheriff Charles Hartshorne, and that Johnson and Hartshorne were dividing up drug money between themselves (Gray RT 26-27); 2) Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of the OSBI (*id.* at 74); 3) based on his relationship with Lyons, Johnson knew that the OSBI would do nothing to address official theft of drug money (*id.*); 4) Johnson used Lyons's cell phone and drove her car, and when government officials confronted Johnson about property he had illegally taken, Lyons brought it back (*id.*); 5) Johnson attempted to borrow, and in some cases did borrow, money from

counsel for defendants whose assets Johnson seized (*id.* at 65); 6) Johnson illegally released

funds seized from defendants to defense counsel, and then obtained kickbacks from defense

counsel for this illegal conduct (*id.* at 66-67); 7) Johnson used drug funds as his own private

ATM (*id.* at 64); 8) throughout 2003 and 2004, Johnson took money seized from drug arrests and

purchased cashier's checks for his own personal use (*id.* at 68); and 9) Johnson began writing bad

checks as early as May, 2003.  *Id.* at 54.

    None of this information was shared by the Government with Mr. Barrett's

lawyers; it is obvious they intentionally concealed it.  Mr. Barrett's current counsel first learned

of this information in February, 2009, when they obtained a copy of the court reporter's transcript

of Johnson's testimony in Richard Gray's trial and defense exhibits in Mr. Gray's case.  Mr.

Barrett's counsel are currently investigating this newly discovered evidence of prosecutorial

misconduct, and will amend this motion to include new details about the breadth and scope of

this misconduct as it becomes available to them.

    But there is now abundant evidence calling into question Mr. Barrett's conviction.

An evidentiary hearing was conducted on Mr. Barrett's motion to suppress on January 26, 2005

(Tr. 1/26/05 Hr'g), Johnson was called by the Government, and testified that the no-knock search

warrant he obtained was based on information he received from a confidential informant (later

identified as Charles Sanders).  Johnson had used this particular informant at least five times, and

the informant had "never been wrong."  (Tr. 1/ 26/05 Hr'g at 66-67.)

    On cross-examination, Johnson acknowledged that during the state court

proceedings, he had never revealed the name of the confidential informant, and that defense

counsel John Echols (who examined Johnson at the motion hearing) was the only one who had

asked for the identity.  Johnson admitted writing the name of the C.I. on a piece of paper, which

was placed in a sealed envelope in the state court file. (Tr. 1/ 26/05 Hr'g at 78, 83-90.) However, Johnson stated that he had revealed the name of the C.I. to the United States Attorney's Office. (Tr. 1/ 26/05 Hr'g at 81.)

Johnson testified that before September, 1999 the C.I. had been involved in criminal activity leading to formal charges. (Tr. 1/ 26/05 Hr'g at 82-83.) When counsel asked Johnson whether the informant had been involved in other criminal activity since September 1999, the Government objected on relevance grounds, and the magistrate sustained the objection, holding that only what occurred before the no-knock warrant was issued was relevant. Counsel responded that he always believed the C.I. was not a real person, but a composite. (Tr. 1/ 26/05, Hr'g at 83-90.) In the state proceedings, one of the reasons given for shielding the alleged C.I.'s identity was the claim the C.I. was involved in assisting an ongoing investigation until 2004. Of course, the claim the C.I.'s identity was being protected for this reason (assuming Sanders was the C.I.) is obviously false. Sanders, with the patronage of Clint Johnson, was allowed to commit crimes at will in Sequoyah County after 1999 with only minor consequences. The Government did not want it brought out at the suppression hearing that Johnson's C.I. had continued to commit crimes with impunity and was therefore an unreliable source. The Government, who had been informed of Sanders's identity, was well aware of the litany of crimes he had committed since 1999, and knew that his identity was not being protected because of an "ongoing investigation." *(E.g., Giglio v. United States,* 405 U.S. 150 (1972).)

Switching tracks, Mr. Echols asked Johnson if the C.I. had participated in drug transactions or drug dealing prior to September 24, 1999. Johnson replied, "They [meaning drugs] were probably used some, yes, sir." Asked if the C.I. sold drugs, Johnson stated "Not that

I am aware of."  Asked if the C.I. had run a meth lab, Johnson again replied, "Not that I am aware of, no, sir."  (Tr. 1/ 26/05 Hr'g at  92.)

Johnson, who was presumably aware of Sanders's extensive criminal history before 1999, gave false testimony on this score.  As illustrated in the first stage ineffective assistance of counsel claim, Sanders had a 1986 Arkansas conviction for delivery of cocaine and amphetamines.  Information gathered during this 2255 investigation indicates that Sanders also routinely sold drugs, activities Johnson would have known about if he were regularly in contact with Sanders and not recklessly disregarding the truth of his activities.  (Decls. of Rick Lunsford and Sean Hill.)  Johnson's testimony was false on a material matter and prevented proper development of evidence to challenge the warrant because of the unreliability of the C.I.  The prosecution had every reason to be aware of Sanders's criminal conviction in Arkansas for drug delivery, but stood silently by as Johnson gave false testimony.  *Miller v. Pate,* 386 U.S. 1 (1967).

The Government was well aware of damning evidence regarding the alleged C.I., Charles Sanders, but used objections to prevent counsel from eliciting this information in order to build a record for a motion to suppress based on *Franks v. Delaware,* 438 U.S. 154 (1978).  It was not until trial, when Sanders testified, that only some of his criminal history, but not the many deals and the repeated lenient treatment he had received, was revealed.  By then, the *Franks* challenge that was mounted was incompetent, as detailed in Claim 2.

### 2.    David Michael Littlefield's illicit activities

Following Mr. Barrett's conviction

[United States Attorney Sheldon] Sperling said he is grateful to Mike Littlefield
for his work as chief prosecutor in the case; and to Sequoyah County Sheriff

Johnny Philpot, who was instrumental in identifying key witnesses who could prove Barrett acted with premeditation.

(Tehleqhah *Daily Press*.)  In fact Littlefield himself was responsible for bringing the seven drug-addict informants to support the Government's case, as he stated during the *ex parte* hearing held September 13, 2005, and discussed elsewhere in this Motion.

Former AUSA Littlefield threatened and pressured Travis and Cindy Crawford to provide testimony against Mr. Barrett.  Since Littlefield primarily conducted the interviews of the seven informant witnesses, it is likely that others were threatened as well.  Support for this claim comes from newly discovered evidence of Littlefield's own troubles with the law, and consequent proceedings against him by the Oklahoma Bar Association.

In Muskogee County Case No. CF-07-363, Littlefield was charged with felony child abuse.  On August 3, 2007, Littlefield was permitted to enter an *Alford* plea to count 2 of the Information, charging child abuse by injury in violation of 10 O.S. 2001, section 7115(A). Based on this plea, Littlefield received a two year unsupervised deferred sentence, and was required to pay court costs.  *See* Complaint, *State of Oklahoma ex rel. Oklahoma Bar Association v. David M. Littlefield,* OBAD #1720, SCBD #5338, filed with the Oklahoma Supreme Court on September 28, 2007.  Littlefield's criminal case file in Muskogee County was expunged even before the Bar Complaint was filed, although his deferred sentence was to run for two years from August 3, 2007.[51]  (Trial Brief of Complainant, p. 2, filed on January 2, 2008, in *State of*

---

[51]  The fact Littlefield's case was expunged long before his two year deferred sentence expired, as noted by the Bar Association's Assistant General Counsel, prevents Mr. Barrett from ascertaining whether Littlefield lied to investigators before entering his plea.  It also prevents Mr. Barrett from ascertaining why Mr. Littlefield received such favorable treatment.

*Oklahoma ex rel. Oklahoma Bar Association v. Littlefield, supra.*)  As of the date of the filing of Mr. Barrett's 2255 motion, the Bar action against Littlefield is still pending.

In the affidavit for search warrant for Littlefield's home*,* captioned SW-07-34, and filed in the District Court of Muskogee County on April 23, 2007, Jan Ray, a Muskogee County Deputy Sheriff, states in pertinent part that Littlefield had been brutally abusing his minor children for a period of years extending back to the time he was the chief prosecutor on Mr. Barrett's case.  (Affidavit for search warrant, SW-07-34, filed in Muskogee County District Court, April 23, 2007, signed by affiant on April 13, 2007.)

Based on the affidavit, a search warrant was issued on April 13, 2007, and filed in the court record on April 23, 2007.  (Search warrant, SW-07-34.)  Various camera and computer equipment were seized in the search.  (Search warrant return, SW-07-34, filed in the District Court of Muskogee County on April 23, 2007.)

Littlefield did not contest the charges.  He was found guilty on an *Alford* plea, receiving a very generous sentence which has already been dismissed, with the case file expunged.  The Bar Association action against him is still pending.

Littlefield's child abuse charges are relevant to the manner in which he handled the informant witnesses in Mr. Barrett's case.  A bully who apparently had no compunction about using his minor children as punching bags for years to work out his "temper fits" and frustrations would have no problem threatening witnesses with all manner of dire consequences to keep them in line and produce the desired testimony against Mr. Barrett.  This newly discovered evidence regarding Littlefield's own deplorable and shocking criminal conduct against his own children not only corroborates Travis Crawford's and Cindy Crawford's claims they were threatened by Littlefield to secure their testimony, but is also relevant to Mr. Barrett's claim of prosecutorial

misconduct dealing with the manner in which Littlefield handled his informant witnesses in an attempt to prevent defense counsel from having anything close to a reasonable opportunity to investigate the backgrounds of these witnesses and their testimony.

The current defense investigation supports the claim Littlefield routinely sought to intimidate witnesses.   Janice Sanders described her contact with Littlefield:

> Mr. Littlefield came to see me.  Johnny Philpot accompanied him.  Mr. Littlefield got angry with me when I told him that I thought that Kenny's state sentence was fair and that it was un-American to try him again since he had been convicted and sentenced.

(Decl. of Janice Sanders.)

### 3.    John Philpot

The Government argued extensively at trial that a middle-of-the-night, no-knock search warrant had to be issued to search Mr. Barrett's property, and that the authorities had to proceed in the way they did, because Mr. Barrett was dangerous; if he had any warning that police were on his property, he would have shot them.  This was the repeated theme of the Government's case, based on its seven informant witnesses.

The truth is otherwise.  John Philpot, former Sequoyah County Sheriff, recently admitted to a defense investigator that he and other local law enforcement officers were on Mr. Barrett's property less than a month before the raid which led to the death of David Eales, as police reports reflect they had also done the previous year.  There were no shots fired and no violence from Mr. Barrett.  (Decl. of Rodney Floyd.)

This evidence, known to the Government or its agents, was unquestionably exculpatory, in several respects.  Had this fact been known to the defense, the entire edifice of the prosecution's case would have crumbled.  It would have supported an attack on the nighttime,

no-knock warrant, demonstrating there was no probable cause for a warrant of this type. Because the initial warrant lacked probable cause, the fruits of any subsequent warrant, *i.e.,* drugs and firearms evidence later seized, would have been acquired unlawfully, knocking out the foundations of the three counts in the superseding indictment. This evidence would have discredited the seven snitches, some of whom claimed that were told by Mr. Barrett that if the police came on his property, he would shoot the first one through the door, and that he hoped the first officer through the door would be John Philpot. This evidence would have demonstrated that, as the defense argued, Mr. Barrett was unaware the police were raiding his property; he thought he was repelling civilian trespassers. Even if convictions had been returned, this evidence was relevant to rebutting the intent factors alleged by the Government in the punishment phase.

### Conclusion

Certainly when viewed together, the exculpatory evidence suppressed by the Government, some of which could also be termed newly discovered evidence, the other newly discovered evidence discussed above, and the Government's sponsorship of false testimony would have made the difference between conviction and acquittal at trial. At a minimum, it would have made a difference in the sentencing stage.

The Government suppressed and has continued to suppress evidence which would have dealt fatal blows to Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Karen Real, Randy Turman, Clint Johnson, Vickie Lyons, and John Philpot. At least two of the informant witnesses, Travis and Cindy Crawford, testified based on threats from then-AUSA Littlefield, a fact well known, obviously, to Littlefield himself. The suppressed exculpatory or newly discovered evidence, or both, affecting the credibility of these witnesses,

were known and became known to the Government and its agents.  This evidence  was

unquestionably favorable to Mr. Barrett, and was material in the sense that disclosure of this

evidence would have created a reasonable probability of a different outcome.  *Strickler v.*

*Greene,* 527 U.S. 263, 289 (1999); *United States v. Bagley,* 473 U.S. 667, 682 (1985); *Fero v.*

*Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994).

Taken together, the suppressed exculpatory evidence addressed above would have

been fatal to the admissibility of all the physical evidence introduced against Mr. Barrett, and

would have left in shreds the prosecution's claims of Mr. Barrett's "intent," as testified to by the

seven informants.  Newly discovered evidence in the form of after-the-fact deals given to various

prosecution witnesses – which Mr. Barrett contends still constitutes *Brady* material, because

these deals were in the works or promised all along, and because the prosecution's duty under

*Brady* is continuing – would have shown the various snitch witnesses to have no credibility

whatever.  *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002)(habeas relief granted in section

2254 case where exculpatory evidence, even if it could only be used for impeachment purposes,

was suppressed); *Mitchell v. Gibson,* 262 F.3d 1036, 1059-60, 1062-63, 1065 (10th Cir.

2001)(vacating death sentence in 2254 case for failure to reveal exculpatory evidence of testing

on physical evidence); *Nuckols v. Gibson,* 233 F.3d 1261 (10th Cir. 2000)(habeas relief granted in

section 2254 case where prosecution failed to disclose material evidence impeaching a key

prosecution witness).

Travis Crawford's recantation, if known at the time of Mr. Barrett's trial, belies

the prosecution's theory of intent and could have been used to impeach the credibility of other

witnesses' claims that Mr. Barrett had threatened armed confrontation with the police.  Likewise,

had the former AUSA's violent temper and assaultive behavior against his own children been

known at the time of Mr. Barrett's trial, the claims now made by the Crawfords that they were coerced to testify against Mr. Barrett ring true. The newly discovered evidence discussed here goes to the foundation of the case.

Most troubling, of course, is the Government's sponsorship of false evidence from Randy Turman, Charles Sanders and, at the motion to suppress, from Clint Johnson. This evidence clearly affected the outcome of trial. Threats to witnesses Travis and Cindy Crawford is also a form of false evidence; a threatened witness is, *per se*, an unreliable witness. The Government also misled the jury about what it was going to do for Sanders and Karen Real in exchange for their testimony, in violation of *Giglio.*

The misconduct of the prosecutors was repeated and blatant. Mr. Barrett's fundamental constitutional rights were violated. He should be granted relief from his convictions and sentences.

**C.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses**

The prosecution violates a defendant's right to due process when it interferes with the defense's access to prosecution witnesses. *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865 (1969). It is unprofessional conduct for prosecutors to impede defense counsel's access to prosecution witnesses. (ABA Criminal Justice Standards, Pros. Function § 3-3.1(c) & commentary (3d ed. 1993)("ABA Standards").) "It is imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights." *United States v. Rich*, 580 F.2d 929, 934 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978). Thus courts cannot tolerate "any governmental conduct that has the purpose or effect of discouraging witnesses from cooperating with the counsel of an accused." *Ibid.* Thus,

"counsel may not make his or her presence a condition of the interview" between the defense lawyer and a witness.  (Commentary on Standard 3-3.1(c).)

The prosecution in Mr. Barrett's case interfered with the defense's access to key prosecution witnesses including Karen Real, Randy Turman, Randall Weaver, Charles "Monk" Sanders, Cindy Crawford, Travis Crawford, and Brandie Price.  Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor.  (Decl. Roger Crawford; Decl. Leonard Post.) Additionally, the prosecutors intentionally delayed access to the identities of the witnesses in order to prevent meaningful interviews with them, including by preventing interviews with incarcerated witnesses, and to prevent meaningful investigations of their backgrounds and honesty.

Prosecutors intentionally withheld the names and contact information for these witnesses.  On February 17, 2005, prosecutor D. Michael Littlefield wrote in a letter to defense counsel that the Government did not intend to reveal the identity of the confidential informant, and added the "situation would change should we determine to utilize this individual as a witness."  The Government did not reveal the identities of its seven key witnesses until September 15, 2005.  In order to keep the identities secret past the deadline imposed by 18 U.S.C. § 3592, the Government filed a baseless motion for a protective order.  The trial court found the Government could have filed its motion to keep the witnesses' names from the defense weeks earlier.  (Tr. 9/13/05 Hr'g at 5).  The trial court found the Government's motion did not present any evidence to justify withholding the names and other information from the defense. (Tr. 9/13/05 Hr'g at 4).  The prosecutor admitted that the Government could have raised its concerns about at least some of the witnesses earlier.  *Id.* at 9.  Despite the delay the court found

"there is no evidence of any overt activities by anyone on behalf of the defendant to intimidate witnesses that you [the Government] are aware of." *Id.* at 19.[52]

During an *in camera* the hearing on the Government's motion for a protective order, AUSA Littlefield was not candid with the court. The court appeared to recognize that Littlefield was making inconsistent claims. On the one hand he was claiming that the defense attorneys had sufficient notice of the witnesses (a) because they were Mr. Barrett's associates and family members (Tr. 9/13/05 Hr'g at 9-10), and (b) because the Littlefield told defense counsel what the witnesses would testify to. *Ibid.* The court raised the obvious point that if Littlefield had been so forthcoming, there was no need for secrecy because, the disclosed information would be sufficient for Mr. Barrett "to be able to determine roughly who we are talking about." *Id.* at 11. Littlefield said it would not be. This admission strongly suggests Mr. Barrett was not aware of having said the things attributed to him by the witnesses because he had never said them.

At that point the United States Attorney cut Littlefield off and had an off-the-record discussion. Back on the record, Littlefield said that the notice he had provided would be insufficient to identify the witnesses because Mr. Barrett had said these things to so many people, it would be hard for him to remember them all. Littlefield could produce no evidence of this "belief" he had. *Id.* at 12.

Following the *in camera ex parte* hearing, the Government and Judge Payne withheld from defense counsel information that was critical to the defense including:  (a) that the court's research indicated that for purposes of § 3532 the trial had started the previous day; (b)

---

[52] The only person the Government could point to who had any known affinity with Mr. Barrett that could conceivably suggest a threat, was a man who posed no threat whatsoever because he was in a federal prison somewhere. *Id.* at 14.

that the court indicated a request for a continuance would be valid based on the importance of the witnesses and what they would say; (c) that the Government had made representations about defense counsel's interpretation of § 3532; (d) that AUSA Littlefield had spoken with a witness who failed to corroborate information from confidential informant Charles Sanders; (e) that the Government's motion for a protective order relied upon information the court deemed irrelevant – *viz.* that the court permitted Mr. Barrett to be restrained by an electric-shock belt and that the court would keep jurors anonymous – and lacked sufficient factual support; (f) that the prosecutors revealed *in camera* information that fell within the notice requirements of Federal Rule of Evidence 404(b). *See* Claim 1, *supra*.

To the extent Mr. Barrett's trial counsel acquiesced in the prosecutors' plan to delay production of the witnesses' names, contact, information, statements, and the arrangements for interviewing the witnesses, Mr. Barrett was denied his right to effective assistance of counsel. As the prosecutor said, Mr. Barrett's trial counsel had no information about the identities of the witnesses or the content of their testimony. (Tr. 9/13/05 Hr'g at 6-7). With the information withheld from them, trial counsel could not have made an informed decision regarding whether delayed disclosure was acceptable, whether the arrangements for interviews were acceptable, and whether trial counsel were ready for trial once the witness names were known. *Rompilla v. Beard*, 545 U.S. 374, 383-86 (2005) (failure to investigate evidence prosecution intended to rely upon was obviously deficient); *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003) (failure to investigate could not be justified where trial counsel had inadequate basis for decision); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984) (decisions are reasonable only to extent supported by adequate investigation).

The concerns of any reasonable defense lawyer under the circumstances – including the need for a continuance – were obvious to the trial court. (Tr. 9/13/05 Hr'g at 10, 12.) The record shows defense counsel acquiesced in the Government's proposal that witnesses be interviewed with Government representatives present. *Id.* at 27. In addition to this "decision" being professionally unreasonable, it was to some extent induced by the trial court's failure to disclose weaknesses the Court had identified in the Government's position, weaknesses the court disclosed to prosecutors, but not to the defense. *See* Claim 1, *supra*. Neither Mr. Barrett nor his counsel could have made an informed decision about access to the witnesses without the information the trial court possessed but was unwilling to share with the defense. To the extent Mr. Barrett's trial counsel could have uncovered the same legal arguments the court identified, they failed to act professionally.

Faced with the Government's intentional delay (the confidential informant at least was known to the Government from the start), and the Government's pretextual expression of concern for the witnesses' safety, and ignorant of the Court's views and complicity in extending the delay, Mr. Barrett's trial counsel "agreed" to restrictions on their access to witnesses. The Government's promise of restricted access was itself illusory. Mr. Barrett's counsel were unable to conduct any meaningful interviews of the witnesses prior to trial. The delays also prevented or impeded meaningful investigation of the witnesses. As shown *supra* in this Claim and Claim 2, an investigation of the Government's key witnesses would have yielded abundant evidence of their dishonesty and incentives to color their testimony to the desires of law enforcement.

If trial counsel had met their ethical and constitutional obligations to Mr. Barrett, there is a reasonable probability the outcome of the case would have been different. In the absence of the seven snitches' testimony two prior juries refused to convict Mr. Barrett of capital

murder.  As the trial judge repeatedly asserted in his budget rulings and elsewhere in the record, the main difference between the federal case and state cases was the question of premeditation, or a pre-formed intent to kill.  As the United States Attorney has publicly acknowledged, the seven snitches were key to the Government's ability to convince the jury Mr. Barrett acted with the requisite *mens rea*.  But for the Government's misconduct or trial counsel's deficient performance, the evidence presented herein would have impeached the seven witnesses.  It is reasonably probable that if the witnesses had been impeached with the evidence presented herewith, Mr. Barrett would not have been convicted of capital murder, or would not have been sentenced to death.

**D.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument**

Throughout the penalty phase of Mr. Barrett's trial prosecutors repeatedly and in various ways violated rules of professional conduct regarding the questioning of witnesses.  *(See* ABA Standard 3-5.6.)  These improper questions, together with the prosecutor's "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

The prosecutor's improper conduct included the following examples:  The prosecutor improperly asked questions for which he lacked a good faith basis, or to which he knew the witness could not give an answer based on personal knowledge, the effect being to imply that the prosecutor had knowledge of the facts.  (R. 4743 (implying existence of records adverse to Mr. Barrett), 4765-66, 4781 (implying Mr. Barrett had been denied custody of his son), 4788-92, 4850, 4852-53, 4859, 4862, 4866, 4869, 4911, 4913, 4925 (bolstering Karen Real

by implying prosecutor's knowledge of her reputation for honesty), 4980, 5006 (falsely suggesting prosecutor had knowledge of Mr. Barrett trying to infect jail worker with communicable disease).)

The prosecutor improperly commented upon Mr. Barrett exercising his trial rights in state court. (R. 4765.) The prosecutor improperly adduced through a witness who lacked personal knowledge whether someone who is sentenced to 20 years' imprisonment will be released earlier by the Department of Corrections. (R. 4765-66.)

The prosecutor asked witnesses whether other witnesses had made false statements although, due to Federal Rule of Evidence 615, the witness being questioned could have had no knowledge of the other witnesses' testimony. (R. 5092.)

The prosecutor repeatedly exceeded the scope of direct examination and asked witnesses questions about the seven informant witnesses the Government presented in federal court, or Abby Stite's charges against Mr. Barrett, although – or because – the prosecutor knew the witnesses lacked personal knowledge of the facts. (R. 4767, 4788-92, 4925, 4926, 5024-26, 5045 (Littlefield acknowledging he asked question knowing witness had no personal knowledge), 5069, 5116.) As the prosecutor's obvious goal was to merely repeat the testimony of witnesses who claimed to observe various facts, regardless of whether the witness testifying had said anything related to the other witnesses' testimony, the questioning lacked any probative value and trial counsel were ineffective for failing to object. The effect of the prosecutor's improper questioning was to repeat the Government's case over and over and over, and make defense witnesses appear ignorant of facts to which their testimony did not relate. Ultimately, the prosecutor's misconduct – enabled by trial counsel's unreasonable failure to object – completely drowned out the defense witnesses' testimony.

In arguing for death, the prosecutors stooped to conquer.

In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently.  Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards."  (R. 5356-57.)  The Tenth Circuit has condemned similar tactics. *Paxton v. Ward,* 199 F.3d 1197, 1217 (10th Cir. 1999) (prosecutorial misconduct justified sentencing relief where, in connection with unadjudicated homicide introduced in the penalty phase, prosecution objection prevented defendant from showing the charge had been dismissed because he passed a polygraph test, and prosecutor took advantage of the ruling to argue "we don't know why" the case was dismissed, implying dismissal could have stemmed from a technicality).

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer.  This was "way over the capital murder line."  (R. 5402-03.)  Similarly, Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?"  (R. 5412.) Denigrating Mr. Barrett's fundamental right to a fair trial,  Sperling, in the form of a rhetorical question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness."  (R. 5408.)

Trotting out a variation on the old Bob Macy[53] "three hots and a cot" argument, which the Tenth Circuit has condemned on more than one occasion, Sperling repeatedly – and falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room." (R. 5412, 5423.) Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation. (R. 5412.) Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates. (R. 5412.) *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin,* 311 F.3d 1002, 1014-15 (10th Cir. 2002). In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent." (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence." Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?" The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill." (R. 5412-13.)

---

[53] Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[54], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough." to testify.  R. 5414-15.  *Gordon v. Kelly,* 2000 WL 145144 (6th Cir. Feb. 1, 2000) (unpublished) (pervasive efforts by prosecutor to portray defendant as being feared by witnesses required habeas relief).

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them.  To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. R. 5415.  This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense

---

[54]  This was a knowing false statement on the prosecutor's part.  As discussed in Claim 1, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett.  "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

enough to put them on the stand.  Sperling was well aware they *could not have testified by law* because the case never got past the first stage.

Shielded by the court's erroneous ruling excluding Mr. Barrett's statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]."  R. 5419. The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did.  Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone.  Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing."  The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops."  R. 5420-21.  There were additional comments on Mr. Barrett's supposed lack of remorse.  R. 5419-20, 5421-22.  *Paxton v. Ward,* 199 F.3d at 1217.

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life.  (R. 5420.)  *Cf. Penry v. Lynaugh,* 492 U.S. 302, 319 (1989); *Lockett v. Ohio,* 438 U.S. 586 (1978).

Sperling aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again.  (R. 5421-22.)  Remarks of this nature have always been deemed improper.  *Viereck, v. United States,* 318 U.S. 236, 247-48 (1943); *Cargle v. Mullin,* 317 F.3d 1196, 1223 (10th Cir. 2003).  Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warned the jury they would make him a "hero" in prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time."  (R. 5423.)  This was little better than telling the

jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit. *Bates v. Bell,* 402 F.3d 635, 642 (6th Cir. 2005).

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections. *See* Claim 2. *Darden v. Wainwright,* 477 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). The error stemming from prosecutorial misconduct cannot be termed harmless, even under the strict due process test of *Darden* and *Donnelly.* This was not a runaway case for the death penalty. The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

Prosecutorial misconduct was not raised on direct appeal. Because the misconduct of the prosecutors in the second stage of trial was so glaring, no reasonable strategy excused the failure to raise the claim. Based on the fact the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evittts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 6.    Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth and Fourteenth Amendment of the United States Constitution, to due process, to effective assistance of counsel, to a reliable sentence, to present defense evidence, and to rebut the evidence introduced against him were violated when the trial court unduly restricted defense counsel's opportunity to present significant, relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales, and restricted the jury's consideration of the state-court verdict.

The court's exclusion of this essential evidence during penalty phase proceedings violated Mr. Barrett's right to jury consideration, as a mitigating factor, of important evidence of Mr. Barrett's character, in violation of *Skipper v. South Carolina*, 476 U.S. 1 (1976) and *Lockett v. Ohio*, 438 U.S. 586 (1978). The exclusion of this evidence also violated Mr. Barrett's Sixth Amendment right to offer evidence in support of his claims. *Rock v. Arkansas*, 483 U.S. 44 (1987). The exclusion of this evidence deprived Mr. Barrett "of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986). These restrictions also denied Mr. Barrett the opportunity to conduct an effective cross-examination of prosecution witnesses, in violation of Mr. Barrett's rights under the Confrontation Clause of the Sixth Amendment. *Delaware v. Van Arsdale*, 475 U.S. 673, 678 (1986). Finally, the trial court's rulings on this issue fatally infected the proceedings and violated Mr. Barrett's due process rights. *Estelle v. McGuire*, 502 U.S. 62, 70 (1991); *Moore v. Illinois*, 408 U.S. 786, 800 (1972).

During the course of Mr. Barrett's trial, trial counsel sought to admit a number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales. For example, Mr. Barrett's counsel sought to admit the written statement of

Trooper Glen Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person got killed.  I wished it had been me."   (Police Report dated September 29, 1999.)

However, the prosecutor objected to these statements, and the court incorrectly excluded them.  The Government cynically exploited the court's ruling in closing argument, mocking the notion Mr. Barrett had any remorse at all.  The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the bastards."  (R. 5356.)  With Mr. Barrett's expressions of remorse excluded, the United State Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer." (R. 5423.)  During closing argument, Mr. Barrett's counsel argued, as a factor in aggravation, that Mr. Barrett expressed remorse for his crimes.  As a result, all of the jurors rejected as a mitigating factor that Mr. Barrett expressed remorse for his crimes.  *U.S. v. Barrett*, 496 F.3d 1079, 1088 (10th Cir. 2007).

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation.  In fact, Mr. Barrett's expressions of remores were highly relevant and admissible. Remorse is "an important mitigating factor." *Jones v. Polk*, 401 F.3d 257, 264 (4th Cir. 2005). *See also Riggins v. Nevada*, 504 U.S. 127, 144 (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps be determinative of whether the offender lives or dies.")  This is particularly true when, as in this case, the Government "emphasized the lack of remorse in closing argument." *Jones v. Polk*, 401 F.3d at 264.

"Short of a defendant taking the stand, often the only way to present evidence of remorse is through the hearsay statements of others." *Davis v. Polk*, 2007 WL 2898711, at *18 (W.D.N.C. 2007).   Accordingly, the use of hearsay rules to prevent the admission of expressions of remorse violates the *Lockett* line of cases, which hold:

> that 'a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could not be part of the sentencing decision at all.

*Jones v. Polk*, 401 F.3d at 263 *quoting Johnson v. Texas*, 509 U.S. 350, 362 (1993) (court erred in excluding as hearsay at penalty phase letter in which capital defendant expressed remorse).

The court's error in excluding this evidence prejudiced Mr. Barrett.  Had Mr. Barrett been allowed to present this evidence, there is a substantial probability that he would not have been sentenced to death.  The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case.  21 U.S.C. section 848(j), in effect at the time of Mr. Barrett's trial, that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice.  Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that expressions of remorse are more prejudicial than probative.  The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced

the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on Mr. Barrett's conviction and death sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel was ineffective for failing to raise this issue, clearly framed by the record, on direct appeal. Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded. *Skipper v. South Carolina,* 476 U.S. 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio,* 438 U.S. 586 (1978). There could be no reasonable strategy for neglecting to raise this issue. There is a reasonable probability that had it been raised, the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

### Claim 7. Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place visible restraints on Mr.

Barrett during the trial without a finding that Mr. Barrett was or would be a security risk. Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist. The belt left an unusual bulge that was visible through Mr. Barrett's clothing. The marshals ability to send an electric shock through the belt intimidated Mr. Barrett and posed a danger to him that impaired his ability fully to observe and participate in the trial, including communicating with his attorneys.

The Supreme Court has long held that the use of visible restraints on a defendant without a particularized finding of necessity violates due process and can impair a defendant's Sixth Amendment right to effective assistance of counsel, to a presumption of innocence, and to a fair and reliable capital sentencing proceeding as guaranteed by the Eighth Amendment. *Deck v. Missouri*, 544 U.S. 622, 632 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v. Williams*, 425 U.S. 501 (1976); and *Illinois v. Allen*, 397 U.S. 337 (1970).

During a sealed hearing held August 31, 2005, a deputy U.S. Marshal testified that there were never any problems with Mr. Barrett acting out or showing any signs of being a risk of danger or escape. The Court opined that the mere fact that a stun belt had been used against other capital defendants without their lawyers complaining was a ground to permit its use. Mr. Barrett had been through two previous capital trials related to the same events and during that time never posed any security risk or risk of escape. In sum, none of the constitutionally required circumstances existed to justify placing visible and/or intimidating constraints on Mr. Barrett during trial.

On September 9, 2005, the Court abdicated its role and consigned the question of whether to place restraints on Mr. Barrett to the discretion of the U.S. Marshal service. This

ruling violated Mr. Barrett's rights under the cases cited *supra*, and his right to a fair and impartial trial judge. *See also* Claim 1.

In an *ex parte* hearing outside the presence of defense counsel, the trial judge stated that "probably any capital case where I was the presiding judge a stun belt would be used just because of the nature of the potential punishment. It just seems that it's a common – almost a common sense call under those circumstances." (Tr/ 9/13/05 ex parte Hr'g at 13.) The Supreme Court requires much more than a "common sense call" before a defendant can be restrained in a threatening manner during a capital trial.

The stun belt created a visible bulge in Mr. Barrett's clothing that was observable by the jury. (Decl. Doris Barrett). In addition, Mr. Barrett was known by the Government and Court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy. Indeed, the jury found that Mr. Barrett had suffered abuse from Philpot. The Government and Court also were aware that Mr. Barrett had been beaten and threatened by law enforcement officers for his role in the death of David Eales. Under the circumstances it was reasonable for Mr. Barrett to fear that he would be stunned by the marshals on the slightest perceived provocation, and as this issue was raised by trial counsel, the Court was aware that the stun belt would inhibit Mr. Barrett's movements and communications with counsel in court. After all, he was to be restrained even though the marshals admitted he had never caused them any trouble.

Trial counsel informed the court that Mr. Barrett was at special risk from the stun belt due to conductive steel wire in his chest and abdomen area. (Tr. 9/9/05 Hr'g at 27.) (Trial counsel's statement at this hearing reveals that three days before the trial began trial counsel Hilfiger had not reviewed Mr. Barrett's medical records which clearly mention – and in the case of x-rays, depict – the metal wires in Mr. Barrett's chest.) Trial counsel's statements informed

the court that Mr. Barrett was especially fearful of the stun belt and the danger it posed to him. This fear was exacerbated by the marshal's failure to conduct or inquire about Mr. Barrett's unique medical circumstances. Since the trial, trial counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial.

The unjustified use of restraints on Mr. Barrett inhibited his movement and communications with counsel and made him appear dangerous to jurors. The stun belt scared and intimidated Mr. Barrett and chilled his communications, and restricted his ability fully to observe and participate in the proceedings.

To the extent the stun belt was used without sufficient justification, its use was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance. The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt. In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness. Therefore, there is a reasonable probability that Mr. Barrett would have been granted a new trial if the issue had been raised on direct appeal.

To the extent the record was insufficiently developed for this claim to have been raised on direct appeal, trial counsel's performance was deficient. Counsel recognized the serious danger for prejudice and continued to object on September 9, 2005, when the Court gave the marshal discretion to restrain Mr. Barrett without either the prerequisite legal or medical showings of necessity or safety.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

Def's § 2255 Mot.                    312                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 8.    Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.

The federal constitutional due process guarantees of a fair trial, at which the accused has a right to be present and rationally participate in the proceedings, prohibit the trial of a defendant who is mentally incompetent. *Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966). It is therefore "well-settled that the 'criminal trial of an incompetent defendant violates due process.'" *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001) (en banc) (quoting *Media v. California*, 505 U.S. at 453).

A defendant is mentally incompetent if, as the result of mental disease or defect, the defendant is unable to comprehend the nature of the proceedings or rationally assist counsel

in conducting the defense. *Drope v. Missouri*, 420 U.S. at 172; *see* 18 U.S.C. § 4241. Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990).

The substantive due process violation that resulted from requiring Mr. Barrett to stand trial while he was mentally incompetent may be established by any relevant evidence, including both the evidence available at the time of trial, as well as any evidence developed since then. *Odle v. Woodford*, 238 F.3d 1084, 1090 (9th Cir. 2001) (determination whether defendant was incompetent in fact required consideration of "old" evidence of mental state evidence at trial and "new" evidence of post-conviction psychiatric evaluations); *Reynolds v. Norris*, 86 F.3d 796,802 (8th Cir. 1996); see, also, *Gilbert v. Mullen*, 302 F.3d 1166, 1178 (10th Cir. 2002) (discussing different burdens of proof for substantive and procedural competency claims).

The factual allegations set forth in more detail in Claims 2 and 13, and incorporated by this reference as though fully set forth; and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition irrefutably demonstrates that Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings. At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions. *Williamson v. Ward*, 110 F.3d 1508, 1519 (10th Cir. 1997). Mr. Barrett was involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication.

In the months preceding Mr. Barrett's arrest, he was psychiatrically decompensating, and his disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft; and withdrew to his rundown shack, unable to venture into the outside world. Mr. Barrett's mental state was further impaired by brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations. Neuropsychological assessment of Mr. Barrett by Dr. Myla Young has revealed that prior to and throughout Mr. Barrett's trial, he suffered brain dysfunction that seriously disrupted his executive functioning, compromising his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information.   (Declaration of Myla H. Young, Ph.D., at ¶¶ 36-38;  Declaration of George W. Woods, Jr. M.D., at ¶¶ 57-58.)

George W. Woods, Jr., M.D., a clinical and forensic psychiatrist, has concluded that Mr. Barrett was incompetent at the time of trial, based on Dr. Woods's review of extensive life history and medical data, his clinical evaluation of Mr. Barrett in February 2009, and his consideration of Mr. Barrett's psychiatric diagnosis of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD), as well as the neuropsychological findings of Dr. Young.  In Dr. Woods's expert medical opinion, Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial due to a confluence of his psychiatric disorders (Bipolar Disorder and PTSD) and his neurocognitive dysfunction resulting from his brain damage.  (Decl. of George Woods, Jr., M.D., at ¶ 81.)  The distorting and distracting effects of the PTSD were exacerbated

by "built-in reminders," in the form of bullet fragments that caused Mr. Barrett continual and significant pain, and an immunological reaction he had to the bullet fragments in his body. (*Id.* at ¶ 79.) In turn, Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder. (See *Williamson v. Ward*, 110 F.3d, at 1519; Decl. of George Woods, Jr., M.D., at ¶ 80.) These disabling impacts on Mr. Barrett's mental state were synergistically increased by the effect of his brain damage to produce a "ruminative" thought process, which prevented Mr. Barrett being "unable to get unstuck." (Decl. of George Woods, Jr., M.D., at ¶ 80.) This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Id. at ¶¶ 59, 80.)

As discussed more fully in Claim 13 the trial record reflects the functional impacts of Mr. Barrett's cluster of impairments. Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument. His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals. Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident. Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations. Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense. Because such behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

The trial and sentencing of Mr. Barrett while he was actually mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice. *Pate v. Robinson*, 383 U.S., at 386-387; *Dusky v. United States*, 362 U.S. 402 (1960). The error deprived Mr. Barrett of a fair and reliable determination of guilt and penalty. *Pate v. Robinson*, 383 U.S., at 386.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 9.      Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense. Direct Appeal Counsel Was Ineffective for Failing to Raise this Issue.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

In a capital case, where the evidence supports it, a court must instruct the jury on a lesser- included homicide offense. This "third option" between first degree murder and acquittal helps insure the reliability of any death verdict if the defendant is convicted of first degree murder. *Beck v. Alabama,* 447 U.S. 625 (1980). *See also, Turrentine v. Mullin,* 390 F.3d 1181, 1192-94 (10th Cir. 2004), *cert. denied*, 545 U.S. 1106 (2005); *Hogan v. Gibson,* 197 F.3d 1297 (10th Cir. 2000), *cert. denied,* 121 S.Ct. 332 (2000)(finding *Beck* error for failing to instruct on lesser forms of homicide).

Here, both the prosecution and the defense requested the trial court instruct on voluntary manslaughter. (R. 4212, 4213, 4215, 4218-19. 18 U.S.C. section 1112.) The United

States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter.  Consistent with the reasoning behind *Beck v. Alabama, supra* the prosecutor stated that because this was a capital case, caution dictated a lesser included-offense instruction be given.  The United States Attorney distinguished count 3 from counts 1 and 2 (which in essence charged felony murder), because count 3 had a specific knowledge and intent element. To be guilty of count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case.  As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  (R. 4215-19,  *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.)  The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing."  (R. 4211, 4222.)

The court's ruling violated Mr. Barrett's Fifth Amendment due process rights and his Eighth Amendment rights to a reliable sentencing determination.

This circuit applies a four-part test to determine whether an instruction on a lesser-included offense is warranted: 1) there must be a proper request; 2) the lesser offense consists of some, but not all, of the elements of the greater offense; 3) the element or elements distinguishing the greater and lesser offense are in dispute; and 4) based on the evidence, the jury

could rationally convict the defendant of the lesser offense and acquit him of the greater offense. *United States v. Chanthadara,* 230 F.3d 1237, 1257 (10th Cir. 2000); *United States v. Abeyta,* 27 F.3d 470, 473 (10th Cir. 1994). "In the federal courts, it has long been beyond dispute" that a defendant is entitled to an instruction on a lesser offense if the evidence would permit a rational

jury to find him guilty of the lesser offense and acquit him of the greater. *Keeble v. United States,* 412 U.S. 205, 208 (1974).

All four requirements for an instruction on voluntary manslaughter were met in Mr. Barrett's case.

There was a proper request, not only by Mr. Barrett, but from the Government as well.

The lesser offense consists of some, but not all, of the elements of the greater offense. The elements of voluntary manslaughter are: 1) the defendant killed the victim; 2) the defendant acted unlawfully; 3) while in a sudden quarrel or a heat of passion, and therefore without malice, the defendant either a) intentionally killed the victim, or b) intended to cause serious bodily injury, or c) acted recklessly with extreme disregard for human life. "Intentionally killed" means either 1) a specific purpose to take the life of another human being, or 2) a willingness to act knowing that the death of another human being is practically certain to follow from that conduct. "Heat of passion" is a passion, fear or rage in which the defendant loses normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force. Voluntary heat of passion manslaughter is "murder without malice." (Tenth Circuit Pattern Jury Instruction 2.54.) *See also, e.g., United*

*States v. Scafe,* 822 F.2d 1232, 1242 (10ᵗʰ Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10ᵗʰ Cir. 1987).

The pertinent elements of count 3 of the superseding indictment, which distinguish it from a "straight" felony murder because a specific intent in connection with the homicide is required, as opposed to simply the intent to commit an underlying felony, are the intentional killing of a state law enforcement officer, whom the defendant knew or had reason to know was a law enforcement officer, and who was killed while engaging in *and on account of* the performance of his official duties. (Doc. 240; R. 4262-63.)

The distinction between the elements of count 3 and voluntary manslaughter is intent. The elements of voluntary manslaughter are a subset of the greater offense, since it would be impossible to commit the greater offense without first committing the lesser offense, *i.e.,* the intentional killing of another human being. The lesser offense of voluntary manslaughter contains no element not required for the greater offense charged in count 3; again, the distinction lies in the level and nature of intent. *Schmuck v. United States,* 489 U.S. 705, 716 (1989).

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute. The crux of the whole case was knowledge and intent. The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties. The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired. This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Finally, based on the evidence, a rational jury could convict Mr. Barrett of the lesser-included offense and acquit him of the greater offense. *This is exactly what happened in state court, where Mr. Barrett was convicted of heat of passion manslaughter based on the same defense theory that was advanced in the federal trial.*

Because all four of the elements for determining when a lesser-included offense must be instructed upon were met in Mr. Barrett's case, the court committed constitutional error, at least with respect to count 3, in failing to charge the jury on the offense of voluntary manslaughter. *Beck v. Alabama,* 447 U.S. 625 (1980).

Mr. Barrett also contends, as was discussed in Claim 2, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for counts 1 and 2. Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined. When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder. *Mullaney v. Wilbur,* 421 U.S. 421 U.S. 684, 704 (1975); *United States v. Lofton,* 776 F.2d 918, 920 (10th Cir. 1985).

It is truly inexplicable why this issue was not raised on direct appeal. Although many issues not preserved for review with timely objections or records were raised on appeal, this fully preserved issue, *even conceded by the Government at trial,* was not. Appellate counsel was well aware that Mr. Barrett had been convicted of manslaughter in state court. The factual basis for Mr. Barrett's federal court defense was the same as it was in state court. Under these very clear circumstances, *no* reasonable strategy excuses the failure to raise this issue, as appellate counsel recognizes. Decl. of Mark Henricksen. Had this issue been raised, there is at

the very least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to count 3, would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 10.     Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's right to effective assistance of counsel, to due process, and to a reliable capital sentencing proceeding were violated due to the absence of evidence and an instruction permitting the jury to know and give mitigating effect to evidence casting a doubt on the manner in which the murder of Trooper Eales occurred.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11.  This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction. (R. 5288.) Mr. Hilfiger stated that he did not object. (R. 5289.) This omission was professionally unreasonable.

Readily available evidence from long study of how jurors decide whether to impose a death sentence had shown that residual doubts about the defendant's conduct can be powerful factors in deciding to vote for life. Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998); John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation: the Necessity of Knowing and Heeding what Capital Jurors Tell us about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008).

Mr. Barrett's defense counsel were aware that two prior juries had sufficient doubts about his culpability that they either could not reach a unanimous verdict or rejected first-degree murder liability. The principal difference between those trials and the federal trial was the testimony of seven informants, each of whom was impeached on cross-examination. As argued elsewhere in this Motion, if trial counsel had conducted a reasonable investigation, and/or the Government had complied with its constitutional obligation to disclose exculpatory evidence, further impeachment would have been presented. Regardless of those constitutional violations, trial counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in their sentencing deliberations whatever value there was in the first stage cross-examination of the informants.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred. The trial ruling excluding such evidence treated the issue as one of guilt or innocence. Professionally diligent counsel would have pointed out that

the evidence of the prior conviction showed that a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings.

Trial counsel were on notice that courts in other federal death penalty cases, as well as state courts, had held that residual doubt is a valid mitigation circumstance. Trial counsel received from Federal Death Penalty Resource Counsel lists of cases that included references to cases in which residual doubt was considered in mitigation, and where the defendant received a sentence less than death.

Capital juries are called upon to express the community's reasoned moral response to the crime. Knowledge that two prior juries had been unconvinced that the crime was committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

Attorneys acting in a manner consistent with prevailing professional norms would have argued to the court that evidence of the prior jury's conclusion was relevant to the defense evidence presented in the first stage of trial. For example, during some of their cross-examination, trial counsel attempted to show the jury that nearly all the Government's informant witnesses who provided evidence of malice aforethought had not come forth with their claims during the previous six years of investigation and litigation. (R. 481, testimony of Travis Crawford; R. 3128, testimony of Karen Real.) Reasonably diligent defense counsel would have argued that these witnesses' testimony was an insufficiently reliable foundation for a death sentence, and informed the jury that another jury representing the community had concluded, without those witnesses' testimony, that the death of Trooper Eales was not caused in a capitally culpable manner.

Def's § 2255 Mot.                    324                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

To the extent the trial ruling excluding consideration of residual doubts about the manner in which the offense occurred was based upon trial counsel proffering sufficient evidence to call into question the reliability of the Government's evidence, the ruling was based on trial counsel's unreasonable failure to investigate the informant witnesses and/or the Government's misconduct in withholding impeachment evidence and/or limiting defense counsel's access to the witnesses as alleged elsewhere in this motion.

District courts in other federal death penalty cases permitted the use of "residual doubt" evidence in mitigation. *United States v. Davis*, 132 F.Supp. 2d 455 (E.D. La. Feb. 2, 2001); *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004); *United States v. Bodkins*, 2005 WL 1118158 (W.D. Va. May 11, 2005). Trial counsel knew, or should have known, about these cases. Their existence was discoverable without the need of independent research. Federal Death Penalty Resource Counsel knew of them and would have informed Mr. Barrett's trial counsel about them.

The Tenth Circuit has recognized repeatedly that residual doubt may be an appropriate strategy in the penalty phase of a capital case. *Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002)(reasonable strategy for counsel, having argued defendant's innocence in the first stage, to a adopt a "residual doubt" approach in the penalty phase); *McCracken v. Gibson,* 268 F.3d 970, 979 (10th Cir. 2001)(counsel not ineffective in penalty phase; he tried to develop some mitigating evidence and also reasonably relied on a residual doubt argument); *Smith v. Gibson,* 197 F.3d 454, 462 (10th Cir. 1999)(citing *Lockhart v. McCree,* 476 U.S. 162, 181 (1986) and recognizing that residual doubt strategy can be extremely effective in a capital case). The court's preclusion of residual doubt evidence and argument flew in the face not only of authority in other federal death penalty cases, but of the law in this circuit.

Compounding the error, the court gave a bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it might have on the sentence in the federal proceedings.  (Doc. 257, Instruction No. 19, R. 5320-21.)

For similar reasons, it was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal.  (ABA Guideline 10.15.1.)  It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent.

The trial court's refusal to permit Mr. Barrett to rely upon mitigation that other similarly situated defendants were permitted to present was arbitrary and capricious, and violated Mr. Barrett's rights to due process, equal protection of the laws, and to be free from the cruel and unusual imposition of capital punishment.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 11.    Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While  Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option.  Appellate Counsel Was Ineffective for Failing to Raise this Issue on Direct Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

All that is required for a juror to sit in a capital case is the jurors willingness to consider the range of punishment options. A juror cannot be forced to commit that he or she will actually vote for the death penalty. A juror can be personally, religiously or philosophically opposed to capital punishment and still serve, even if considering or voting for the death penalty would do violence to his or her conscience. So long as a juror's personal views would not prevent or substantially impair him or her from considering all possible punishments and following the court's instructions, the juror is qualified to serve. Excusing a juror for cause who opposes the death penalty or has conscientious scruples against imposing it, but could nonetheless consider it violates the Fifth, Sixth and Fourteenth Amendments. *Gray v. Mississippi,* 481 U.S. 648, 668 (1987); *Wainwright v. Witt,* 469 U.S. 412, 424 (1985); *Adams v. Texas,* 448 U.S. 38, 45 (1980); *Witherspoon v. Illinois,* 391 U.S. 510 (1968).

Juror 62 was improperly excused for cause by the court solely because of her conscientious scruples against the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might do violence to her conscience, and even though it might be difficult.

Asked by the court if she had any opinions about the death penalty, Juror 62 responded, "I don't – I could not do it. I could not say anybody to be sentenced to death." Asked if she meant by this that she could not personally carry out an execution, the juror stated, "I couldn't even say they deserve it, no. I don't believe in it." The juror stated she could impose a life sentence and had no philosophical, religious, moral or other objections to such a sentence, and said, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]"

Questioned by defense counsel, the juror said that she had held her views on the death penalty her whole adult life. Defense counsel informed her that in order to be qualified to sit on a capital case, she would have to consider not only evidence in mitigation, but the Government's evidence as to why the death penalty should be imposed and to give that evidence "due consideration." Asked if she would be able to do this, the juror responded:

> Well, I don't know if I understand your question, but I could listen to that and see whether he needs to either have the death penalty or go to prison for life without parole.

(R. individual jury selection 823-24.)

Again asked, in a slightly different way, whether she could listen to the evidence in aggravation and mitigation, and weigh the evidence, she said she "could probably say he needed to or should," as long as the responsibility lay elsewhere, "but I could not say that he – myself, that he needs the death penalty." The juror answered "No[]" when asked if she could imagine a murder so heinous that she could "find for the death penalty" after "having considered the Government's evidence[.]" R. individual jury selection 824-25.

Questioned briefly by the Government, the juror was asked if she could sign her name to a death verdict form "knowing that the result of that verdict would be the death by execution of another human being, the defendant in this case[.]" The juror responded that if she thought the crime "deserved it," she "probably could sign a paper saying that he should get the death penalty, but I couldn't say to do it. I could not sign a paper that says the death penalty for him." Told by the prosecutor that a jury's death verdict was not just a recommendation, and that

the judge could not change the verdict, the juror said, "I could not do that, huh-uh." R. individual

jury selection 825-26.

The court asked additional death-qualification questions of the juror:

Q.   ... If I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.   If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life. But if you told me I had to do it, and I thought that he actually – the crime was so heinous that he should

have the death penalty, because I was instructed to do it, and I thought it was, I could do it. I would do it. But I do not – I would live –

Q.   So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.   I understand that.

Q.   And – but if you were selected – otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.    I would consider it, yes.

Q.   And, of course, when you say "consider it," couched in the – in the history of how you've answered these questions, it prompts me to say: Would you consider it fairly? I mean, in this case, the first thing that would have to happen, before we got to even a sentencing stage, is there would have to be a finding –

A.   Right.

Q.   – that justified – I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law,  justified either death or imprisonment for life without the possibility of release. So, under those circumstances, then the Government would have to follow through with their obligation and put on aggravating factors. And aggravating factors are those factors that would suggest that death is the appropriate punishment. Then the defendant would have the opportunity to put on

> what's called mitigating factors.  And as a juror, you'd be obligated to not exactly balance them, but give serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty.  So, do you think you could do that?
>
> A.    I think I could.  It would be very hard for me to do that, but if it was my duty.
>
> Q.    Well, I think when you say it would be – that encourages me, because you say it would be very hard.  I agree.  I don't disagree with that.  It will be very hard.  I mean, the people who end up sitting as jurors in any case, but particularly in this case, it's going to be very hard.
>
> A.    Uh-huh.
>
> Q.    And it should be very hard.

(R. individual jury selection 826-28.)

Before turning the floor over for additional questions by counsel, the court asked the juror if she could consider life without the possibility of release, to which the juror responded, "Definitely.  I could do that." (R. individual jury selection 828-29.)

Defense counsel had no additional questions for Juror 62.  R. individual jury selection 829.  Questioned again by the Government, the juror stated she realized the judge would never tell her what decision to make.  Asked if, considering the two penalty options, she would "take life as the more comfortable out, given [her] feelings about the death penalty[]," the juror said she would "take life, but it wouldn't be comfortable.  I would still take life in prison, yes." R. individual jury selection 829-30.  Asked if she could ever envision a situation in which "[she] would sign [her] name to a death verdict?", the juror responded:

> If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes.  That would be my duty.  I'm here, and that would be what I'm here for.  But I couldn't live with it, but I would do that, yes.

(R. individual jury selection 830.)

The juror again stated she understood the court would not tell her what sentence to impose. The Government then asked not whether the juror could simply consider both punishment options, but whether she was "capable for returning a death verdict for this defendant[]," to which the juror understandably replied, "I don't know whether I could or not." Again going to the ultimate issue of whether the juror would actually vote to impose the death penalty, given a choice between life and death, the juror was asked if she could "imagine a circumstance in which you would ever impose a death penalty[,]" to which the juror said "No." (R. individual jury selection 830-31.) Mining the same subject – not merely whether the juror could consider death as a punishment option, but whether she could "ever return a death penalty unless the judge told you, you had to[,]" the juror responded that she probably could, but could not predict her vote in advance:

> I think I would have to hear what he has done and how heinous it was and all of this. And I have a – something personal in my life, that happened to me, and I could not, you know – had no remorse about it. So, I don't know how I would react, but I – you know, since this has never – I've never had this or have to think about, I just always thought I could never do this. But I think that if it was so bad that I think this person should not even be here anymore, I possibly could do that. Now, I can't say that I would – you know – I – I – my mind can always be changed, but it has to be changed to where I understand it. So, I thought – if he deserved it, I – I probably – I think I probably could, but I – I'm only human.

(R. individual jury selection 831-32.)

Yet again going beyond whether the juror could consider the death penalty, the prosecutor asked her in effect "how bad it would have to be" before she voted for the death penalty, to which the juror responded, "It would have to be pretty bad." In response to the prosecutor's question regarding what she meant, the juror gave the example of killing or torturing a child, but she "couldn't tell you how bad it would have to be." (R., individual jury selection 832.)

Unsatisfied still, the prosecutor continued without court interference (or objection) to harangue the juror with whether, and under what precise circumstances, she could actually vote to impose the death penalty. Juror 62 responded reasonably that everything would depend on the facts, but gave every indication that she could consider both penalties, despite her personal views on capital punishment:

> Q. All right. Other than torture to a child or something – other than torture to a child, can you imagine a circumstance in which you'd return a death verdict?
>
> A. I never heard anything so heinous that I even had to think about it. But I would have to give it a lot of thought. But I'm – I'm just – I cannot lie to you. I would have to say that I would not know until I'm in that situation.
>
> Q. Okay. Well, at the end of the day –
>
> A. Okay.
>
> Q. – are your feelings such that you would really be substantially impaired in serving as a juror in a case where you might be asked to vote in favor of a death penalty?
>
> A. Like I say, it depends on what he has done and how bad I think it is And I'd have to weigh all of the things – I cannot say yes nor can I say no. I would think that – I would think that I am just enough to know that if this is what it is, and I think he deserves it, I probably could sign, yes. But I'd have to really decide for myself – you know, I'd have to hear it. I can't say no, I'll just go in here and sign it. I'd have to see how bad it is. And it would have to be really bad.[55]

(R., individual jury selection 832-33.)

---

[55] This is certainly a fair point. The Supreme Court has held repeatedly that the death penalty should be reserved for a relatively small class of first degree murderers among the entire universe of those convicted of first degree murder. *E.g., Godfrey v. Georgia,* 446 U.S. 420 (1980).

Def's § 2255 Mot.                    332                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

The United States Attorney then had the temerity to tell the juror that he could not "try the case for you today," detailing the facts of the case so as to inquire whether, on those facts, they would be "bad enough" for her to return the death penalty, even though he asked her repeatedly to commit in advance to signing a death verdict. (R. individual jury selection 833-34.) As noted above, this is not the test of qualification to sit on a capital jury. Worn down by repeated questioning on whether she could not just consider both punishment options, but could put her name to a death verdict, the juror, again very reasonably in light of the fact she had heard no evidence, said, "Well, let me just say no, then. Because, you know, I would have to say no right now. I know no other thing except to say no, I could not sign it." (R., individual jury selection 834.)

What else could the juror say to such a question? This is on par with saying, as rational people would, that they could not convict until hearing the evidence. Jurors are frequently told during voir dire that due to the presumption of innocence, if they had to vote on the case "right now," the verdict would have to be not guilty. The same is true of similar questions asked regarding the penalty phase, since the Government shoulders the burden of proof.

Continuing the seemingly endless round-robin, the court again inquired of Juror 62 on whether she could set her personal views aside and follow the court's sentencing instructions:

> Q.    ... But if I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions – and I want to repeat those – if they are, tell me – your personal opinions about the death penalty, are they so strong that you would not be able to follow the instructions?

Def's § 2255 Mot.                    333                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

A.     Well, I have to say it again, it's my duty to do this or not to do this, but if you told me that that was one or the other, and I thought he deserved the death penalty, I would have to – I think I could sign the death penalty, if I listened to the information and that it was bad enough, I – and you told me that this was my duty and that this – I probably could sign the death penalty.

Q.     And could you, likewise, consider the possible imposition of life imprisonment without the possibility of release?

A.     Certainly could.

(R., individual jury selection 835-36.)

Defense counsel argued the juror was qualified, and had in fact "backed off her initial stance" when questioned by the Government.  (R., individual jury selection 838.) The Government moved to excuse Juror 62 for cause, arguing that she answered "three or four questions in the right direction, under significant pressure."  (Left unsaid, of course, was that any pressure applied to the juror came from Mr. Sperling himself, rather than defense counsel or, for that matter, the court.)  Yet again focusing on the irrelevant inquiry whether the juror could commit ahead of time to voting for death, the Government maintained the juror was "substantially impaired," because a murder would have to be "really heinous" before she would vote for death.  The court agreed with the Government that the juror was "substantially impaired" and excused her for cause, over objection by defense counsel.  (R. individual jury selection 838-40.)

This is a classic case of the cardinal *Witherspoon* error: excusing a juror who, though it would be difficult, could set her personal views aside, follow the law, and consider all punishment options, even if it would be unpleasant and would bother her conscience.  A juror does not have to be "comfortable" with the death penalty to impose it.  Juror 62 said repeatedly

she could consider the death penalty.   She simply wouldn't take the Government's bait and commit ahead of time to voting for it, which is not the test.

The excusal of Juror 62 was not raised on direct appeal, even though the error was plainly apparent from the record.  There was no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 12.** **The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment, and the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment because the jury was not instructed that the reasonable doubt

standard governed the ultimate penalty determination in this case. *Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

Although this Court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The jury was provided with the following penalty phase instruction regarding the weighing process:

> As to Count Three, you must find first the Defendant was at least 18 years of age at the time he committed the offense; and second, the Government has proven beyond a reasonable doubt the existence of the threshold eligibility factor; and third, the existence of at least one statutory aggravating factor; and fourth, that the threshold eligibility factor plus the statutory aggravating factor or factors which you have found to exist sufficiently outweigh any mitigating factor or factors which you found to exist are [*sic*] in the absence of the mitigating factor or factors alone are sufficient to justify imposition of a sentence of death.

(R. 4502.)

This instruction mirrors the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors. *See* 18 U.S.C. § 3593(e).

However, as discussed below, the instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances

that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 455. The *Apprendi* principles applies to factfindings necessary to put a capital defendant to death. *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase. These findings include a finding that the aggravating factors outweigh any mitigating factors.

Under the *Apprendi* holding, because additional factual findings are absolutely required in order to impose an increased punishment, they are sentencing factors that must be proved beyond a reasonable doubt. Under the *Apprendi* rationale, petitioner was entitled to a jury instruction that before a death verdict could be returned, the jury was required to find that the aggravating  factors outweighed the mitigating factors beyond a reasonable doubt.

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). This requirement of heightened reliability requires that the jurors making a finding beyond a reasonable doubt that the death penalty is the appropriate punishment for capital defendants.

This Court's failure to provide such an instruction to the jury renders Mr. Barrett's death sentence unconstitutional. To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.

The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993). It is, therefore, reversible per se. *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668. 686 (1984). Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instructions on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been grated a new penalty trial.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 13.    Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett was denied rights secured by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and rule 43, Federal Rules of Criminal Procedure, when the trial court ordered him removed from the courtroom without a hearing, without a warning, and without just cause.  Mr. Barrett's trial counsel acted unreasonably under the circumstances and Mr. Barrett was prejudiced by their unreasonable acts and omissions.  Mr. Barrett was held before the jury under the effects and influence of a medication regimen, including both the administration of contra indicated drugs and discontinuation of necessary medication, which substantially exacerbated the neuropsychological impairments of his ability to inhibit unconscious responses to stressful situations, and to exercise judgment, reason and self-control; he was not properly prepared for closing arguments, and was forced to make an un-counseled choice between being present in court under the prejudicial condition of unlawful restraints or relinquishing his right to be present for his trial.

The facts in support of this claim, among others to be presented after further investigation, discovery, access to subpoena power, and an evidentiary hearing, include the following:

During the prosecutor's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom. The marshals restrained him and asked the judge if Mr. Barrett should be removed. The court said yes. (R. 5421.) Two to three marshals then took Mr. Barrett from the courtroom, and the prosecutor concluded his closing argument. The court sent the jury out. (R. 5429.) The court then held a hearing with counsel but without Mr. Barrett present to discuss whether it should instruct the jury about Mr. Barrett's removal from the court room. (R. 5430.) The court described the incident in the following way:

> Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this. He said something other than that I could not detect. And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up. I can't say that he was attempting to come out across the table but he did attempt to get up and take a step. As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom. I will say that once the marshals made contact with the Defendant, he ceased – there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury.

(R. 5430.)

Mr. Hilfiger stated that the words Mr. Barrett said which the court did not hear were Mr. Barrett asking why the court and Government did not permit the jury to hear about his statements to law enforcement. (R. 5431.) Mr. Hilfiger also corrected the court's description by saying Mr. Barrett

> was not making an aggressive move toward anybody. What he was saying is I want to get out of courtroom [sic]. Take me out of the courtroom. I don't want to

be here. And then the marshals, you know, asked you if they could take him out. Before that they were trying to put him back down in the chair. His move as I saw at that point was he was saying, you know, take me out of the courtroom. I want to get out of here. It wasn't an aggressive move towards anybody, just he wanted to get out.

(R. 5432.)

Mr. Hilfiger then stated that Mr. Barrett personally did not want a curative instruction and did not "want to participate in the court proceeding now." (R. 5432.)

According to the prosecutor, a deputy marshal "indicated or asked the Court do you want us to take him out and you [the Court] said yes. And at about that same time, the Defendant indicated he also wanted to leave." (R. 5433.)

The court confirmed that it ordered Mr. Barrett removed from the courtroom, and added that Mr. Barrett "was removed from the courtroom by two or three deputy marshals." (R. 5433-34.)

The Government asserted that the court "should make specific inquiry of the Defendant." (R. 5434.)

Mr. Hilfiger requested no instructions. (R. 5434.) When the court read its proposed instruction, Mr. Hilfiger stated, "I don't really care one way or the other. I don't object, I don't approve." (R. 5435.)

Mr. Hilfiger and Mr. Smith described that in their past interactions with Mr. Barrett, they observed him get upset then calm down and discuss matters. (R. 5436-37.) They recommended that his alleged desires regarding presence in court be revisited. *Ibid.* However, when the court offered them the opportunity to revisit the issue with Mr. Barrett before the court ruled, Mr. Hilfiger declined. (R. 5437.) Trial counsel did not have a private conversation with

Mr. Barrett about the incident or his presence; they spoke to him in the presence of a deputy U.S. marshal.  (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints."  (R. 5438.)  The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems."  (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him.  (R. 5438.)

Mr. Barrett was brought into the courtroom, and the following took place:

Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings.  I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?

Mr. Barrett:     Yes, Your Honor.

The Court:     Do you have any questions of the Court about that?

Mr. Barrett:     No, sir.

The Court:     I'll ask the marshal to return – (Interrupted)

Mr. Hilfiger:     One more.  Does that include the verdict?

Mr. Barrett:     Yes, Your Honor.

The Court:     Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:     Yes, sir.

(R. 5439.)

Mr. Barrett was escorted out, and the jury escorted in.  (R. 5439.)

The court read the following instruction to the jury:

Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing arguments are evidence in this case and you should not consider them in rendering your verdict herein.

(R. 5440.)

Mr. Barrett was absent for the jury instructions, (R. 5440-45), and for the reading of the jury's verdict. (R. 5448-50.)

Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." (*Id.*, Standard 4-5.1.) One reason for this professional norm is "to keep the client from making suicidal choices about the case." (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb. 1989 ed.)). Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be present during trial.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation of his background, including his mental health problems. *See* Claim 2, *supra*. Nevertheless, Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder; (c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of steroids. Reasonably diligent counsel, informed about their client's condition, would have taken steps to obtain a competent mental health evaluation and judicial determination of the medical

necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically decompensated  since the termination of the medications; and the nature and severity of the functional impact of discontinuing and/or administering any medication on his ability to communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regiment to which Mr. Barrett was subjected was justified by medical necessity, reasonably diligent counsel would have sought a further medical and legal determination of the degree to which the effects of such a regiment interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive information; his capacity to understand his rights and make informed decisions regarding the exercise of waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and prepared him for them.  If Mr. Barrett nonetheless acted inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regiment, as well as an assessment of Mr. Barrett's adjudicatory competency.

Mr. Barrett's counsel failed to gather medical records of his medical treatment in jail during the trial and/or failed to provide those records to a competent mental health or other medical expert retained by the defense. Had trial counsel conducted a reasonable inquiry, they would have known that Mr. Barrett had been injected with steroids in jail. If counsel had developed the relationship of trust required in criminal cases, counsel would have been aware that the steroids had a medically predictable effect that contraindicated their use with defendants who were on trial, and impaired Mr. Barrett's ability to control his inability to endure any psychological or emotional distress that might be caused by the prosecutor's arguments.

Mr. Barrett had a right, protected by the Fifth and Eighth Amendments, to have the jury receive a fair, unadulterated view of him, including his reaction to the proceedings. *See Riggins v. Nevada*, 504 U.S. 127, 142, 143-144 (1992) (Kennedy, J., concurring). Due to the actions of jailers and the unreasonable omissions of Mr. Barrett's trial counsel, the jury was permitted to see him under the affects of steroids and without the benefit of medication deemed medically necessary to control the emotional dysregulation caused by his bipolar disorder.

Trial counsel's failings and the trial court's denial of authorization for counsel to obtain necessary and appropriate mental health assistance, including the assistance of a psychiatrist, individually and cumulatively deprived Mr. Barrett of his right not to be tried while his functioning was altered and impaired by the effects of voluntarily or involuntarily administered or discontinued medication, and/or while his functioning was altered and impaired by the effects of a medication regimen that was unjustified by any medical necessity. *See* Claims 1, 2, and 3, *supra*.

Mr. Barrett's periodically altered mental condition, the ineffectiveness of his attorneys, and the unlawful actions of the court and marshals, also resulted in the denial of his

right to be present during the close of the penalty trial.  The Confrontation Clause of the Sixth

Amendment and the Due Process Clause of the Fifth Amendment guaranteed Mr. Barrett the

right to be present during all critical stages of the case.  *Illinois v. Allen*, 397 U.S. 337 (1970).

Under the controlling law,

> a defendant can lose his right to be present at trial if, *after he has been warned* by
> the judge that he will be removed if he continues his disruptive behavior, he
> nevertheless insists on conducting himself in a manner so disorderly, disruptive,
> and disrespectful of the court that his trial cannot be carried on with him in the
> courtroom.

*(Id.*, 397 U.S. at 343 [emphasis added]).  The trial court's order – which the court initially did not

reveal on the record – that marshals remove Mr. Barrett without warning did not comport with

the requirements of law.  (R. 5430, 5433-34.)

Whether the defense sought or objected to an instruction from the court regarding

Mr. Barrett's actions, was the "exclusive province" of counsel.  (ABA Standard 4-5.2(c).)  As

reflected in counsel's statements on the record, Mr. Barrett's counsel unreasonably failed to give

the matter sufficient thought to determine whether an instruction was desirable or not.  (R. 5435.)

Counsel unreasonably failed to consider whether an instruction that the jury should disregard the

marshal's action in removing Mr. Barrett from the courtroom would have mitigated the prejudice

of the jury having witnesses him being forcibly removed.

The willingness of Mr. Barrett's counsel and the trial court to let Mr. Barrett be

absent from court during the prosecutor's closing argument and the court's instructions violated

Mr. Barrett's constitutional rights.  The trial court plainly ignored the requirement that "courts

must indulge every reasonable presumption against the loss of constitutional rights." *Allen*,

*supra*, 397 U.S. at 343, when it (a) ordered that Mr. Barrett be placed in additional restraints

besides the electric shock device he wore on his back, and (b) permitted him to be absent without informing him that his presence was a constitutional right, and the risks of giving up that right. Mr. Barrett did not knowingly and intelligently waive his right to be present.

Trial counsel's performance was ineffective because they allowed him to absent himself rom the courtroom during critical stages (closing argument, jury instructions) without ensuring that he was making an informed, knowing and intelligent decision.

The error in allowing Mr. Barrett's absence was not harmless. In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshal to remove him. His presence would have contributed to the fairness of the proceeding because Mr. Barrett could have advised his counsel about the facts. In the context of jury instructions, prejudice has been found wherever defendant and his lawyer were absent when the court instructed the jury, because counsel could have objected to the instruction or suggested an alternate instruction. See, e.g. *United States v. Rosales-Rodriguez,* 289 f. 3d 1106, 1110 (9th Cir. 2002). Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. "I really don't care one way or the other." (R. 5435.) Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

Among the most prejudicial inferences affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. *See Riggins*, 504 U.S., at 144 (Kennedy, J., concur.). Similarly, any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have concluded prejudicially that the

marshals acted in response to Mr. Barrett's threatening behavior toward someone in the courtroom or an attempt to escape.

These are other examples of the prejudice that ensued from Mr. Barrett's absence:

It matters not that Mr. Barrett's counsel was present when he was absent.

Although the presence of counsel is certainly a relevant factor to be considered in determining whether a defendant's absence was harmless, the right to be present at trial - grounded in the Confrontation Clause and the Due Process Clause - is not a gossamer right inevitably swept away simply because a defendant is represented, in his absence, by counsel. The right to be present is distinct from the right to be represented by counsel. The right to be present would be hollow indeed if it was dependent upon the lack of representation by counsel. Furthermore, such a rule would ignore the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests.

*United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001) (Opn. by Carnes, J.). Similarly, Mr. Barrett need not demonstrate any particular issue that his counsel failed to raise in his absence. Forcing Mr. Barrett to make such a showing in order to demonstrate prejudicial error from his absence devalues the constitutional right to be present, and ignores the assistance that a defendant can provide to his counsel during trial. If we were to require that a defendant show with specificity how his presence might have changed the course or outcome of a trial, then the right to be present would cease to exist in many cases in which the evidence of guilt is strong. The right to be present at one's own trial is not that weak. *See Riggins,* 504 U.S., at 137. "Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different [in the absence of drugging] would be purely speculative."; *United States v. Novaton*, 271 F.3d. At 1000.

Mr. Barrett's trial counsel acted unreasonably (a) by failing to object to the additional restraints; (b) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (c) by failing to consult mental health or other medical experts

regarding Mr. Barrett's condition, including his competence to make a valid waiver; (d) by failing to raise a doubt about Mr. Barrett's competence; (e) by failing to seek a hearing on his competence and/or the affects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (f) by failing to advise him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Significantly, one of the prosecutors explicitly conceded that he did not "think he [Mr. Barrett] – *consciously* chose to do what he did in the presence of the jury." (R. 5427 [emphasis added].)  According to Mr. Hilfiger, Mr. Barrett himself said "I couldn't take it anymore." (R. 5437.)

Due to trial counsel's unreasonable omissions, or the court's actions, Mr. Barrett was denied (a) his rights under *Riggins*, *supra*; (b) his right to a hearing on his competence to waive presence, *Pate v. Robinson*, 383 U.S. 375 (1966); *Godinez v. Moran*, 509 U.S. 389 (1993); (c) his right to be present and free of unjustified restraints, *see* Claim 7, *supra*; and (d) his right to a fair and reliable verdict on punishment.

Irrespective of whether Mr. Barrett could have made or did make a valid waiver of his right to be present, trial counsel acted unreasonably by failing to seek an instruction that was necessary to avoid harm to the jury's deliberations.  Trial counsel's statements on the record reflect that counsel considered only whether the court's proposed instruction brought Mr. Barrett's actions to mind, or minimized their effects.  Mr. Hilfiger twice stated that he could not think of an instruction to give the jury.  (R. 5426-28.)  Unable to decide, he said, "I don't care."

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the scope of the problem.  The court's instructions permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing.  Although Mr. Hilfiger was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett.  There is no reason why Mr. Hilfiger would not have sought a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal.  Had counsel raised the issues presented in this claim it is reasonably probably that the court would have found the numerous violation of federal law were not harmless beyond a reasonable doubt, or constitute plain error.

This Court should find the error substantially influenced the jury's verdict, and vacate the sentence of death imposed on Mr. Barrett in violation of the Constitution and laws of the United States.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 14.    Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency.  Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims.  As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level."  (Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001.)  Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were

presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized.  During the administration of Attorney General Gonzalez, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[56]  (2007 Decl. of Kevin McNally)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence.  According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases.  Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference."  (Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases.  This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008.  (2008 Decl. of Kevin McNally.)  Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403.  She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim.

---

[56]    Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzalez.

Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero." (Decl. of Lauren Cohen Bell.)

While some of the statistics above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[57] Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act, is the work of a single decision maker, i.e.

---

[57]     Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim. Appellate counsel did not raise the issue on appeal. *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI. To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel was ineffective in failing to pursue and develop the issue.

the DOJ. This fact renders the above statistics all the more probative of discrimination. The Court should grant relief from Mr. Barrett's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

**Claim 15.**    **Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial b y a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, because the indictment in his case made no mention of the federal death penalty and did not charge the aggravating factors required for a capital offense under 18 U.S.C. § 3592(c) or any of the additional non-statutory aggravating factors relied upon by the government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

As the Supreme Court has made clear in a line of cases:

"[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).  In direct contravention of these principles, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the government claimed justified Mr. Barrett's death sentence in the indictment.  This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel unreasonably failed to raise this issue on direct appeal.  There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 16**      **Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution**.

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury. Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial.

Mr. Barrett's rights to a fair trial and to due process were violated when the jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process. Where jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment. Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett her Sixth and Fourteenth Amendment rights to a fair trial and due process.

The introduction of extraneous materials or evidence has consistently been held to mandate a new trial. Mr. Barrett should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice. Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments. Relief is appropriate.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

**Claim 17    Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case**

Mr. Barrett's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, and a reliable determination of guilt and penalty, and fundamental fairness. *Taylor v. Kentucky*, 436 U.S. 478, 487, and n. 15 (1978).

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In addition, Mr. Barrett re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process. Each of these errors deprived Mr. Barrett of important constitutional rights, including but not limited to his right to due

process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claim presented in this Motion individually justifies reversal , when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

## IV.    Prayer for Relief

WHEREFORE, Movant Kenneth Eugene Barrett asks that this Court provide the following relief:

1. Disqualify itself and have all proceedings regarding this Motion reassigned randomly to another judge;

2. That Movant be permitted to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

3. Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States

District Court, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

4. Permit Movant to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

5. Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion, and any defenses thereto raised by the Respondent's Answer;

6. Permit Movant to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion;

7. Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Movant's Response to any Affirmative Defenses raised by the Respondent. Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

8. Permit oral argument as appropriate and required;

9. Vacate Movant's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

10. Grant such further and additional relief as may be just.

DATED:   March 15, 2009

Respectfully submitted,

 /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

 /s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

APPENDIX A

PROCEDURAL HISTORY

I.    State Court Proceedings

1.    On September 24, 1999, Movant was charged by Information in the District Court
of Sequoyah County, Oklahoma with one count of first-degree murder and three
counts of shooting with intent to kill. The information was subsequently amended
to charge Movant with one count of first-degree murder, one count of shooting
with intent to kill, and two counts of discharging a firearm with intent to kill.
(Case No. CR 99-493, Garrett, J.)

2.    The case proceeded to trial and ended in a hung jury on October 18, 2002.

3.    Movant was re-tried on the same charges in January and February of 2004.
The jury rejected the first-degree murder charge and instead found Movant
guilty of the lesser-included crime of first-degree manslaughter. The jury
also rejected the shooting with intent to kill charge and instead found
Movant guilty of the lesser-included offense of assault and battery with a
dangerous weapon.  The jury acquitted Movant on the two counts of
discharge of a firearm with intent to kill.

4.    On April 19, 2004, Movant was sentenced to a term of imprisonment of
twenty years on the manslaughter conviction and ten years on the assault
and battery conviction, with the two terms to run consecutively.

5.    Movant did not appeal his convictions or sentences.

6.    At both state trials, Movant was represented by John David Echols, Esq.,
and the State was represented by Darrell Dowty, Asst. Dist. Atty.

## II.   Federal District Court Proceedings

7.   On September 23, 2004, a criminal Complaint was filed against Movant in the United Stated District Court for the Eastern District of Oklahoma charging him with eight criminal counts, including intentionally killing a state law enforcement officer engaged in the performance of the state law enforcement officer's official duties, in violation of 21 U.S. C. § 848(e)(1).

8.   On November 9, 2004, a federal grand jury returned a three-count Indictment against Movant. Count 1 charged Movant with using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 2 charged Movant with using and carrying a firearm in relation to a crime of violence, i.e., the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties, and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 3 charged Movant with intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). With respect to Count 3, the grand jury made the following "Special Findings": (a) Movant was 18 years of age or older at the time of the offense; (b) Movant intentionally killed a state law enforcement officer, intentionally inflicted serious bodily injury that resulted in the death of a state law enforcement officer,

Def's § 2255 Mot.                              362                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and a state law enforcement officer died as a direct result of the act, or intentionally and specifically engaged in an act of violence, knowing that the act created a great risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and a state law enforcement officer died as a direct result of the act; and (c) Movant, in the commission of the drug trafficking offenses alleged in Count 3, and in escaping apprehension for a violation of said offenses, knowingly created a grave risk of death to one or more persons. (Case No. 6:04-cr-115P, Payne, J.)

9.   On February 9, 2005, the grand jury returned a superseding indictment against Movant. Although the superseding indictment included some amendments, it contained the same three basic counts as the original indictment.

10.   On February 15, 2005, the government filed notice of its intent to seek the death penalty with respect to all three counts with which Movant was charged.

11.   The case proceeded to trial on September 12, 2005. On November 4, 2005, the jury found Movant guilty of all three counts. In response to special interrogatories propounded by the District Court, the jury found beyond a reasonable doubt that Movant committed murder in connection with

Counts 1 and 2 (i.e., that he committed the unlawful killing of Trooper Eales with malice aforethought).

12. On November 9, 2005, the second-stage proceedings began.

13. On November 17, 2005, at the conclusion of all the second-stage evidence, the jury found, in pertinent part, that Movant was at least eighteen years old at the time of the offenses of conviction, and that, with respect to each of the three counts of conviction, he intentionally killed Trooper Eales.

14. As for the statutory aggravating factors, the jury found, with respect to Counts 1 and 2, that Movant killed or attempted to kill more than one person, i.e., Troopers John Hamilton, Jr., and David Eales, in a single criminal episode, and committed the offenses after substantial planning and premeditation to cause the death of a person. (The jury rejected the statutory aggravating factor that Barrett knowingly created a grave risk of death to persons other than Hamilton and Eales.) With respect to Count 3, the jury found that Movant, in the commission of the offense or in escaping apprehension for the offense, knowingly created a grave risk of death to one or more persons in addition to Trooper Eales, and that Movant committed the offense after substantial planning and premeditation. As for the non-statutory aggravating factors, the jury found, with respect to all three counts of conviction, that Movant caused injury, harm, and loss to the victim's family, but rejected the government's assertion that Movant was likely to commit criminal acts of violence in the

future which would be a continuing and serious threat in an institutional correctional setting to the lives or safety of other persons.

15. As for mitigating factors, some or all of the jurors found the existence of the following factors with respect to all three counts: Barrett had accepted responsibility for the death of Eales from his previous conviction (found by five jurors with respect to each count); Barrett had been convicted and punished for the death of Eales (found by five jurors with respect to each count); Barrett, at the time of the shooting incident, had no prior felony convictions (found by all twelve jurors with respect to each count); Barrett was a father (found by all twelve jurors with respect to each count); Barrett was a loved son and stepson (found by all twelve jurors with respect to each count); Barrett was a good neighbor and friend (found by seven jurors with respect to each count); Barrett's death would impact his child, family and friends (found by all twelve jurors with respect to each count); Barrett would not present a future danger to society by being imprisoned for life without possibility of release as demonstrated by his incarceration since September 24, 1999 (found by two jurors with respect to each count); that other factors in Barrett's childhood, background or character mitigated against imposition of the death sentence (found by one juror with respect to Counts 1 and 2, and by two jurors with respect to Count 3); that Barrett never left his residence during 1999 (found by one juror with respect to each count); and that Sequoyah County Sheriff Johnny Philpot had mistreated Barrett when Barrett was seventeen years old (i.e., Philpot had

an altercation with Barrett during which Philpot broke Barrett's jaw) (found by six jurors with respect to each count). All of the jurors rejected the alleged mitigating factor that Barrett had expressed remorse for his crimes.

16. Ultimately, the jury found that sentences of life imprisonment without the possibility of release should be imposed with respect to Counts 1 and 2, and that a sentence of death should be imposed with respect to Count 3.

17. On December 19, 2005, the district court conducted a sentencing proceeding during which it imposed the sentences recommended by the jury. Judgment was entered in the case on December 29, 2005.

18. Movant filed a timely Notice of Appeal of his convictions and his death sentence to the United States Court of Appeals for the Tenth Circuit on December 28, 2005 (Case No. 06-7005).

19. Roger Hilfiger, Esq. and Bret Smith, Esq. represented the Movant in these proceedings. The Government was represented by Sheldon Sperling, U.S. Atty. and D. Michael Littlefield, Asst. U.S. Atty.

III. Federal Court of Appeals Proceedings

20. In his direct appeal, Movant challenged his convictions and sentence of death by raising the following claims:

a. The district court erred by denying Movant's motion to suppress. More specifically, the search warrant did not satisfy the Oklahoma standards for a nighttime warrant; the executing officers failed to meet Oklahoma standards regarding executing officers; the warrant failed to comply with

Fed. R. Crim. P. 41 (warrant was not issued by a federal officer); and the evidence should be suppressed on double jeopardy grounds.

b.  Movant challenged the indictment, more specifically, its sufficiency because it failed to set forth elements of predicate offenses; its multiplicity because all three counts were based on the same conduct, firearms, drugs, and killing of the same person; and misjoinder of offenses.

c.  The district court allowed admission of improper victim impact evidence.

d.  The district court allowed juror misconduct, more specifically, one of the jurors knew a state trooper involved in the case and another trooper had limited contact with a juror.

e.  The government violated *Batson* by failing to exercise its peremptory challenges in a race neutral manner.

f.  Movant challenged the constitutionality of the federal death penalty scheme, more specifically, arguing that the penalty phase process of weighing aggravating and mitigating factors violates the Sixth Amendment; the federal scheme unconstitutionally delegates legislative authority; the statute fails to require proportional review; the statute allows for consideration of impermissibly vague aggravating factors; and the statute does not narrow the class of persons eligible for the death penalty.

g.  Movant challenged the "intent to kill" aggravating factor, more specifically, because that factor is used in the eligibility process then again in the weighing process.

h.  The government did not present sufficient evidence of "intent to kill."

       i.       The government failed to produce names and addresses of key witnesses.

       k.       The district court erred by failing to dismiss the indictment on double jeopardy grounds.

       l.       The government failed to follow the *Petite* policy.

       m.       Movant asserted cumulative error.

21. On July 25, 2007, the Court of Appeals rejected all of the Movant's claims and affirmed the judgment of the District Court. The decision is published at 496 F.3d 1079 (10th Cir. 2007) (Tacha, Briscoe, Murphy).

22. A timely Petition for Certiorari was filed on October 12, 2007.

23. The Petition for Certiorari was denied on March 17, 2008 at 128 S.Ct. 1648 (2008).

24. Mark Henricksen, Esq. and Roger Hilfiger, Esq. represented Movant in these proceedings. The Government was represented by Sheldon Sperling, US Atty. and D. Michael Littlefield, Asst. US Atty.

APPENDIX B

INDEX TO EXHIBITS

NON-SEALED EXHIBITS

<u>**VOLUME I**</u>

Exhibit 1            Marriage Certificate for A.J. and Ada Barrett

Exhibit 2            Marriage Certificate for Abe and Minnie Dotson

Exhibit 3            Marriage Certificate for Allen and Ida Real

Exhibit 4            Marriage Certificate for David and Carolyn Joseph

Exhibit 5            Marriage Certificate for Ernest and Sylvia Gelene
                     Barrett

Exhibit 6            Declaration of Rodney Floyd

Exhibit 7            Marriage Certificate for Kenneth and Abigail Barrett

Exhibit 8            Marriage Certificate for Hugh and Hattie Dotson

Exhibit  9           Marriage Certificate for Sam and Ida Hatter

Exhibit 10           Marriage Certificate for Sam and Bessie Hatter

Exhibit 11           Marriage Certificate for Paul and Sylvia Gelene Dudley

Exhibit 12           Divorce File for Ernest and Sylvia Gelene Barrett

Exhibit 13           Declaration of Janesse Thomas

Exhibit 14           Declaration of Dale Anderson

Exhibit 15           Divorce File for Isaac and Marilyn Barrett

Exhibit 16           *State of Oklahoma vs. Abe Dotson*, dated December 14, 1917 and
                     December 15, 1917 (Commitment to Penitentiary)

Exhibit 17           *State of Oklahoma vs. Abe Dotson*, Record of Informations, dated
                     November 12, 1915 (Assault with the Intent to Kill)

Exhibit 18        *State of Oklahoma vs. Abe Dotson*, Criminal Docket, dated 1915 (Assault with the Intent to Kill)

Exhibit 19        *State of Oklahoma vs. Abe Dotson,* Criminal Docket (Carrying Weapon)

Exhibit 20        *State of Oklahoma vs. Abe Dotson*, Criminal Trial Docket (Drunk in a Public Place)

Exhibit 21        *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Drunk in a Public Place)

Exhibit 22        *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Larcenry)

Exhibit 23        *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Obtaining Money Under False Pretense)

Exhibit 24        Declaration of David Autry

Exhibit 25        *State of Oklahoma vs. Billy Dean Maxwell*, Case Number 1715 (Burglary)

Exhibit 26        *In the Matter of Mental Illness of Billy Dean Maxwell*, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982

Exhibit 27        *In the Matter of the Sanity of A.J. Barrett*, Case Number 141, Lunacy Record, dated August 12, 1918

Exhibit 28        *In the Matter of the Sanity of A.J. Barrett*, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital

Exhibit 29        Declaration of Mark Henricksen

Exhibit 30        *Ada Blount vs. Kathleen Blake*, Case Number 13026

Exhibit 31        Declaration of Leonard Post

Exhibit 32        *In the Matter of the Sanity of Wallace Dotson*, Lunacy Record, Case Number 366, dated May 4, 1948

Exhibit 33        *In the Matter of Mental Illness of Kenneth Barrett*, Case Number 481, Record of Mental Health Proceeding

Exhibit 34        Declaration of John Echols

Exhibit 35        Excerpts from Kenneth Barrett's Baby Book

Exhibit 36                    Letter from Kenneth Barrett

Exhibit 37-58                 Intentionally Left Blank, No Exhibits

Exhibit 59                    *State of Oklahoma vs. Henry Edwards* (Manslaughter)

Exhibit 60                    *State of Oklahoma vs. Marilyn Crawford*, Case Number 3005, Criminal Docket (Cultivation of Mari)

Exhibit 61                    *State of Oklahoma vs. Kenneth Barrett*, Docket Sheet, Case Number CF-97-00086

Exhibit 62                    *State of Oklahoma vs. Tom Dotson*, Case Number 3005, Criminal Docket (Disposing of Mortgaged Property)

Exhibit 63                    *State of Oklahoma vs. Tom Dotson*, Case Number 2763, Criminal Docket (Manslaughter in the First Degree)

Exhibit 64                    Letter from John Echols to Honorable James H. Payne, dated February 28, 2005

Exhibit 65                    Letter from Honorable James H. Payne to John Echols, dated February 22, 2005

Exhibit 66                    Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008

Exhibit 67                    Declaration of Julia O'Connell

Exhibit 68                    *United States of America vs. Karen Real*, Case Number, Case Number CR-00-21-FHS

Exhibit 69                    *Barrett Death Sentence Upheld*, Tahlequah Daily Press, dated July 27, 2007

Exhibit 70                    *Drug Offender Receives Break*, Times Record

Exhibit 71                    Letter to the Editor, *She Questions Sheriff's Department*, dated October 17, 1999

Exhibit 72                    *State of Oklahoma vs. Charles Sanders*, Case Number CF-1998-00022

Exhibit 73                    Photographs of Kenneth Barrett's shack

Exhibit 74                    Declaration of Ada Blout

Exhibit 75          Declaration of Alvin Hahn

Exhibit 76          Declaration of Billy Poindexter

Exhibit 77          Declaration of Brandy Hill

Exhibit 78          Declaration of Carolyn Joseph

Exhibit 79          Declaration of Dewey Padgett

Exhibit 80          Declaration of Doris Barrett, dated February 10, 2009

Exhibit 81          Declaration of Ernest Barrett

Exhibit 82          Declaration of Frank Gordon

Exhibit 83          Declaration of Gwendolyn Crawford

Exhibit 84          Declaration of Issac Barrett

Exhibit 85          Declaration of Janice Sanders

Exhibit 86          Declaration of Kathy Trotter

Exhibit 87          Declaration of Linda Riley

## VOLUME II

Exhibit 88          Declaration of Mike Mackey

Exhibit 89          Declaration of Dr. Myla Young

Exhibit 90          Declaration of Paul Rickie Lunsford

Exhibit 91          Declaration of Phyllis Crawford

Exhibit 92          Declaration of Roger Crawford

Exhibit 93          Declaration of Ruth Harris

Exhibit 94          Declaration of Sally Davis Johnson

Exhibit 95          Declaration of Shawn Hill

Exhibit 96          Declaration of Toby Barrett

| | |
|---|---|
| Exhibit 97 | Declaration of Sylvia Gelene Dotson |
| Exhibit 98 | Declaration of Mark Dotson |
| Exhibit 99 | Declaration of Steve Barrett |
| Exhibit 100 | Declaration of Warren Dotson |
| Exhibit 101 | Declaration of Nona Reich |
| Exhibit 102 | Declaration of Carl Cook |
| Exhibit 103 | Declaration of Abby Stites |
| Exhibit 104 | Declaration of Richard Barrett |
| Exhibit 105 | Declaration of Doris Barrett, March 5, 2009 |
| Exhibit 106 | New Articles from Vian American and Sequoyah County Democrat Regarding Abe Dotson |
| Exhibit 107 | Description Narrative, Written by Trooper Glen Smithson, dated September 29, 1999 |
| Exhibit 108 | Excerpt from the Deposition of John Philpot |
| Exhibit 109 | Report by Edward E. Hueske |
| Exhibit 110 | Curriculum Vitae of Edward E. Hueske |
| Exhibit 111 | Declaration of Steve Leedy |
| Exhibit 112 | Declaration of Lauren Cohen Bell |
| Exhibit 113 | 2008 Declaration of Kevin McNally |
| Exhibit 114 | Declaration of Rodney Floyd |
| Exhibit 115 | Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001 |
| Exhibit 116 | 2007 Declaration of Kevin McNally |
| Exhibit 117 | Declaration of Dr. George Woods |

| | |
|---|---|
| Exhibit 118 | Declaration of Roseann Schaye |

**SEALED EXHIBITS**

| | |
|---|---|
| Exhibit 119 | Birth Certificate of Kenneth Barrett |
| Exhibit 120 | Birth Certificate of Sylvia Gelene Dotson |
| Exhibit 121 | Birth Certificate of Richard Barrett |
| Exhibit 122 | Birth Certificate of Toby Barrett |
| Exhibit 123 | Birth Certificate of Stephen Barrett |
| Exhibit 124 | Death Certificates of Allen M. Real and Allen Cleveland Real |
| Exhibit 125 | Death Certificate of A.J. Barrett |
| Exhibit 126 | Death Certificate of Ada Melton Barrett |
| Exhibit 127 | Death Certificate of Albert Maxwell |
| Exhibit 128 | Death Certificate of Billy Maxwell |
| Exhibit 129 | Death Certificate of Hattie Dotson |
| Exhibit 130 | Death Certificate of Death Certificate of Hugh Dotson |
| Exhibit 131 | Death Certificate of Ida Melton |
| Exhibit 132 | Death Certificate of Isaac Barrett |
| Exhibit 133 | Death Certificate of Mary Barrett |
| Exhibit 134 | Death Certificate of Minnie Andrews |
| Exhibit 135 | Brandon Smith Social Security Records, Itemized Statement of Earnings |
| Exhibit 136 | Educational Records for Kenneth Barrett |
| Exhibit 137 | Educational Records for Gwendolyn Barrett |
| Exhibit 138 | Educational Records for Ernest Barrett |

Exhibit 139          Medical Records for Carolyn Joseph

Exhibit 140          Medical Records for Kathy Trotter

Exhibit 141          Medical Records for Brandy Hill

Exhibit 142          Medical Records for Toby Barrett

Exhibit 143          Medical Records for Travis Crawford

Exhibit 144          Medical Records for Cynthia Crawford

Exhibit 145          Medical Records for Linda Riley

Exhibit 146          Medical Records for A.J. Barrett

Exhibit 147          Medical Records for Kenneth Barrett

Exhibit 148          Report of Interview with Kenneth Barrett by the Oklahoma State Bureau of Investigation, dated October 11, 1999

Exhibit 149          Marriage Certificate for Ernest and Diana Barrett

Exhibit 150          Divorce File for Eugene and Sylvia Gelene Dudley

Exhibit 151          Divorce File for Kenneth and Abigail Barrett

Exhibit 152          *Kimberly Pulice vs. Richard Barrett*, Case Number JFP-2004-17

Exhibit 153          *In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG

Exhibit 154          *In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481

Exhibit 155          Sylvia Gelene Dotson's Genealogy Memorandum

Exhibit 156          *State of Oklahoma vs. David Littlefield*, Case Number SCBD-5338

Exhibit 157          *State of Oklahoma vs. Charles Sanders,* Case Number CF-97-9

Exhibit 158          *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-75

Exhibit 159          *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-128

Exhibit 160          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-346

Exhibit 161          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-363

Exhibit 162          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-99-562

Exhibit 163          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2001-314

Exhibit 164          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2003-124

Exhibit 165          *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2004-19

Exhibit 166          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-03-365

Exhibit 167          *State of Oklahoma vs. Charles Sanders*, Case Number  CM-96-0444

Exhibit 168          *State of Oklahoma vs. Charles Sanders*, Case Number  CRF-92-91

Exhibit 169          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-08-224

Exhibit 170          *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-2204-613

Exhibit 171          *State of Oklahoma vs. Cindy Crawford Mattox*, Case Number
                     CM-2001-885

Exhibit 172          *State Oklahoma vs. Brandie Price*, Case Number  CF-99-549

Exhibit 173          *State Oklahoma vs. Brandie Price*, Case Number  CM-00-900

Exhibit 174          *United States of America vs. Brandie Price*, Case Number
                     CR-07-16-RAW

Exhibit 175          *State Oklahoma vs. Charles Sanders*, Case Number  CF-97-140

Exhibit 176          *Michael Mackey vs. Cindy Crawford*, Case Number  PO-03-390

Exhibit 177          *State Oklahoma vs. Aubrey Jacobs, Joseph Jacobs, James Jacobs, Brandie
                     Price*, Case Number CF-98-481

Exhibit 178          *State of Oklahoma vs. Travis Crawford*, Case Number  CM-08-655

Exhibit 179          *State of Oklahoma vs. Randy Weaver*, Case Number  CF-00-668

Exhibit 180          Letter from Larry and Brenda Sell to Honorable John Garrett

Exhibit 181          Background Materials on Clint Johnson:  Testimony of Clint Johnson in
                     *State of Oklahoma vs. Richard Loy Gray* and Exhibits

Exhibit 182          Bill Ed Rogers's File

Exhibit 183          *State of Oklahoma vs. Charles Sanders*, Case Numbers CM-08-1525 and CF-98-111

Exhibit 184          *State of Oklahoma vs. Charles Sanders*, Case Number CF-94-1503

Exhibit 185          *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-6603

Exhibit 186          *State of Oklahoma vs. Charles Sanders*, Case Number CM-04- 1187

Exhibit 187          *State of Oklahoma vs. Charles Sanders*, Case Number CM-00-389

Exhibit 188          *State of Oklahoma vs. David Littlefield*, Case Number TRC-02-04186

Exhibit 189          *State of Oklahoma vs. David Littlefield*, Case Number CF-2007-369

Exhibit 190          *State of Oklahoma vs. Dawn Littlefield*, Case Number TRC-08-00774

Exhibit 191          *State of Oklahoma vs. Dawn Littlefield*, Case Number CF-2006-244

Exhibit 192          *Pam Littlefield vs. Mike Littlefield*, Case Number CJ-05-572

Exhibit 193          *Bank of Oklahoma vs. Jennifer and David Littlefield*, Case Number CJ-03-988

Exhibit 194          Affidavit for Search Warrant signed by Clint Johnson and Search Warrant, dated September 20, 1999

Exhibit 195          *State of Oklahoma vs. Randy Turman*, Case Number CF-02-477

## VERIFICATION UNDER PENALTY OF PERJURY

My name is Tivon Schardl. I am an attorney licensed to practice law by the State of Florida, and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma. I am a supervising assistant federal defender in the Capital Habeas Unit of the Federal Defender Office for the Eastern District of California. In 2008, I was appointed post-conviction counsel for Kenneth Eugene Barrett with David Autry as lead counsel.

I am authorized by Kenneth Eugene Barrett to file the foregoing motion to vacate, set aside, or correct the sentence, and for a new trial made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure. I am filing the motion on Mr. Barrett's behalf. Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence is made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure. I declare that the contents of the foregoing Motion are true except for those matters based upon information and belief, and I believe the latter matters to be true. The sources of my information include, but are not limited to, official court records, various documents prepared during investigation of this Motion, and items in the possession of other lawyers, investigators and/or experts connected with the preparation of this Motion. I make this verification pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's knowledge.

Def's § 2255 Mot.                    378                    *U.S. v. Barrett*, 6:04-CR-115-JHP-SPS

I declare, under penalty of perjury, that the foregoing is true and correct.

/s/  Tivon Schardl
Tivon Schardl