**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 29**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

## DECLARATION OF MARK HENRICKSEN

I, Mark Henricksen, declare the following:

I am a lawyer licensed to practice in the State of Oklahoma. I am also licensed to practice in the various federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court. I am in private practice in Oklahoma City, Oklahoma.

I was appointed to represent Kenneth Eugene Barrett as lead counsel in his direct appeal to the United States Court of Appeals for the Tenth Circuit. Mr. Barrett's lead trial counsel, Roger Hilfiger, was also appointed on the appeal.

Based on my knowledge of the case and discussions with trial counsel, Bret Smith, Mr. Hilfiger's second chair, was put in charge of the defense penalty phase case, even though he had no experience in capital cases. Mr. Hilfiger did not like his client, Kenny Barrett. It was apparent to me after reviewing the trial transcript, the other transcripts in association with the federal trial, and the investigation that was conducted by Messrs. Hilfiger and Smith that nothing close to a complete second stage investigation was ever conducted. There was effectively no second stage investigator for Mr. Barrett. Mr. Hilfiger and Mr. Barrett never really got along, and Mr. Barrett wanted his former lawyer, John Echols back as his lawyer. Overall, there was a poor attorney/client relationship between Mr. Hilfiger and Mr. Barrett. Based on my dealings with Mr. Hilfiger, he had a blasé attitude toward the case. Mr. Hilfiger gave the distinct impression of wanting to get the case

1

behind him because he was with a small law firm and the case was consuming too much of his time.

During my work on Mr. Barrett's direct appeal, I spoke with John Echols, who had represented Mr. Barrett in state court and was originally his lead attorney in the federal prosecution. I reviewed, of course, various budgetary requests Mr. Echols made, and the manner in which the trial court dealt with them. It was evident that Judge Payne wanted remarkably detailed budget requests from Mr. Echols. Mr. Echols, in my opinion, did not have time to jump through the various administrative and budgetary hoops that had been placed in his way by Judge Payne, and work up the trial of the case, which is the reason he withdrew from representing Mr. Barrett. In contrast, it was also evident that Judge Payne was not nearly as exacting when it came to requests made by Mr. Hilfiger, although the budgets that were approved for investigators, experts and the like were extremely limited.

Mr. Echols informed me that the strictures placed on him by Judge Payne made the case virtually impossible to defend in an effective manner. By moving to withdraw, he thought he was going to call the judge's bluff, but Judge Payne rather quickly granted Mr. Echols's motion to withdraw.

When I was appointed to handle Mr. Barrett's direct appeal, Judge Payne told the Federal Defender for the Western District of Oklahoma, Susan Otto, that he wanted either Mr. Hilfiger or Mr. Smith appointed on the appeal also. This was in furtherance of Judge Payne's plan to develop a local capital defense bar in the Eastern District. It is my view that

2

this is also why Bret Smith, with no capital experience, was appointed co-counsel with Mr. Hilfiger for the trial of Mr. Barrett's case after Mr. Echols withdrew. I learned from Susan Otto that Mr. Barrett's case was to be the inaugural or "test case" for this plan.

During my representation of Mr. Barrett, I consulted on several occasions with Dick Burr, federal capital resource counsel. Mr. Burr informed me that he had consulted with Mr. Echols when Mr. Echols was lead counsel, but was not consulted after Mr. Hilfiger and Mr. Smith took over the case.

As anyone who has read the direct appeal opinion in Mr. Barrett's case can see, many of the issues raised were reviewed under the "plain error" standard because of a lack of contemporaneous objections at trial. When I asked Mr. Hilfiger about the failure to object, he said he was trying to "win" the case and did not want to "offend" the jury by making unsuccessful objections. Mr. Hilfiger also did not want to "offend" Judge Payne by making too many objections, which he felt were likely to be overruled, although not necessarily because they lacked merit.

During the trial, it was revealed that Charles "Monk" Sanders was the alleged confidential informant whose information supplied the authorities probable cause for a no-knock search warrant of Mr. Barrett's property, and for Mr. Barrett's arrest. However, during his trial testimony, Mr. Sanders testified that he never told the authorities various things that supplied the basis for the no-knock warrant. A very weak record was made on this. When I inquired of Mr. Hilfiger why he did not strenuously object and forcefully ask

3

to re-open the search warrant issue, he stated that he was afraid of Judge Payne's reaction and did not want to "interrupt" the trial. He believed that he had little chance of success on this point with Judge Payne based on his understanding that the court wanted to get the trial underway.

As to the seven informant or "snitch" witnesses who appeared at Mr. Barrett's trial, and who were sprung on the defense during jury selection, I asked Mr. Hilfiger why he did not move for a continuance in order to investigate these witnesses. I also asked him why he acceded to an arrangement that permitted him to interview the witnesses in the presence of AUSA Mike Littlefield and law enforcement, particularly when the witnesses more or less refused to talk to him, there was no discovery of what these witnesses said to Littlefield, and there was little time to try to counteract their testimony. Mr. Hilfiger told me that he agreed to the arrangement because it meant he would at least get to interview the witnesses himself, even though this did not turn out as planned. He also said that because the trial was ongoing, he did not want to antagonize the judge by asking for a continuance, even after the witnesses more or less refused to talk to him. Mr. Hilfiger believed that since there was some time before the witnesses actually testified, some investigation could be done into them. Of course, no witnesses for the defense who could impugn the credibility of these seven witnesses were called, and the defense relied solely on cross-examination to try to attack their stories. Mr. Hilfiger said that he believed that no continuance was possible due to Judge Payne's desire to stay on schedule, and that this compromise was better than

4

nothing.

Some of the following paragraphs include propositions identified by Mr. Barret's current lawyers. I am not presently in a position to evaluate the merit of each in comparison to the propositions I chose to raise, and therefore cannot say I would have made the same decisions if I had recognized some of these issues at the time. The Tenth Circuit initially permitted the appellant's brief to be 14,000 words. I applied for an oversized brief of 24,000 words. The court ruled that the brief was limited to 20,000 words and that no further amendments to the case management order would be considered prior to submitting the appellant's brief. I had to edit it to reduce the brief to the 20,000 word threshold. Although I agree that the following issues should have been considered, every appeal involves some triage of issues.

I did not raise on direct appeal a search and seizure issue based on "Monk" Sanders' trial testimony that he had not told the police the matters that were included in the affidavit for search warrant to justify a no-knock warrant. I did not raise this issue because I believed it had not been adequately preserved by Mr. Hilfiger. I could have raised this issue, and had no legitimate strategic reason for not raising it, because the issue was, however inadequately, framed by the record. As noted, there were several issues raised on appeal for which no contemporaneous objection or record had been made at trial.

I did not raise issues relating to the lack of defense theory instructions or lesser included instructions because, again, I believed that a less than adequate job had been done

by trial counsel in arguing these issues. Again, I could have raised this issue, since some record was made. This is particularly true because self-defense was basically the defense raised at trial, and there was testimony in the record to indicate that if anything, Mr. Barrett was guilty of manslaughter or some lesser offense, not first degree murder as framed by the counts in the indictment. Of course, the jury in the state case acquitted Mr. Barrett of first degree murder and convicted him of manslaughter.

I was aware from my reading of the record that Mr. Barrett wore a "stun belt" under his clothing throughout trial. The defense objected. I discussed the stun belt with Mr. Hilfiger, who told me that while he believed the stun belt was not visible, it did detract from Mr. Barrett's communications with counsel in the courtroom. I did not recognize as a viable issue for appeal the stun belt's affect on Mr. Barrett's communication with counsel, and therefore did not reject it.

I was aware from my reading of the record that an ex parte hearing was conducted between the Government and Judge Payne regarding the Government's motion, which was originally placed under seal, to delay disclosure of the identity of the seven informant witnesses. During the ex parte hearing, Judge Payne stated that he could see a long continuance coming based on the fact that the identities of these witnesses had not been revealed and the Government wanted to delay disclosure. Mr. Hilfiger did not move for a continuance. I did not have a strategic reason for failing to raise issues surrounding this ex parte hearing. I was disappointed that trial counsel had acquiesced on this issue between the

6

time of the <u>ex parte</u> hearing and the resumption of open court. I interviewed Mr. Hilfiger repeatedly on this point. He consistently said that an application for a continuance was pointless and that he hoped to gain some useful information from this compromise. In my opinion, there was no professional basis for such a judgment. A reasonable lawyer would have demanded a continuance, and funds with which to conduct an investigation.

Although this was a lead argument in Mr. Barrett's appeal, I anticipated that trial counsel had failed to preserve the record.

In fact, the alleged compromise was meaningless in practice, and Mr. Barrett did not receive the benefit of pre-trial investigation or an adequately preserved record of this failure of due process.

I did not draft all of this declaration. The information contained in this declaration is based on what I told one of Mr. Barrett's current lawyers, David Autry, when he interviewed me about the case. I was also interviewed by another of Mr. Barrett's current lawyers, Tim Schardl. The information in this declaration also reflects what I told him. I have carefully reviewed this declaration, and it states accurately what I told these lawyers.

I declare, under penalty of perjury, that the foregoing 7 page declaration is true and correct.

Executed by me this 13 day of _____March_____, 2009, in Oklahoma County, Oklahoma.

_____
Mark Henricksen

7