**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**


KENNETH EUGENE BARRETT,    )
    )
       *Movant,*    )
    )
v.    )    **Case No. 6:09-cv-00105-JHP**
    )
UNITED STATES OF AMERICA,    )
    )
       *Respondent.*  )


**EXHIBIT 31**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

## DECLARATION OF LEONARD POST

I, Leonard Post, declare the following:

I am one of the investigators contracted by the Federal Defender's office for the Eastern District of California to work on Kenneth Eugene Barrett's case in preparation for filing a motion attacking his convictions and death sentence pursuant to 28 U.S.C. section 2255. During my investigation, I interviewed numerous witnesses including Travis and Cindy Crawford, Richard Barrett, and Mary Rogers.

Travis Crawford testified in the first stage of Mr. Barrett's trial. Cindy Crawford testified in both stages of Mr. Barrett's trial. On December 11, 2008, I interviewed Travis Crawford in the presence of his parents, Roger and Phyllis Crawford at their home in the McKey community. At that time, Travis was separated from his wife, Cindy Crawford, and lived with his parents.

I interviewed Cindy Crawford separately in the presence of another investigator, Dale Anderson, on January 13, 2009. The interview with Cindy took place at her mother's trailer.

In the presence of his parents, Travis Crawford told me the following:

Travis Crawford explained that his mother, Phyllis Crawford, is the sister of Kenneth Barrett's mother, Gelene Dotson, which makes him Mr. Barrett's first cousin. He explained that Gelene lives in the trailer on the adjacent property just west of where we sat.

Travis related that he and Mr. Barrett used to hunt and fish together, and were close. Travis stated that before Mr. Barrett was arrested, he was at Mr. Barrett's home practically every day and that Mr. Barrett "would do anything in the world" for him. He stated that Mr. Barrett liked to help people and that in the last few years before his arrest on the murder charge Mr. Barrett rarely left his property. Travis expressed concern about Mr. Barrett's ability to care for

1

himself, stating that Mr. Barrett would eat meals at his mother's house, and sometimes friends would bring him food.

Travis stated that he Travis had a long struggle with drugs and has anxiety and panic attacks. He stated that his "mind does not work that well." For example, he will go out to his truck to get something, and by the time he gets there, he will have forgotten what it was he went to get. Travis stated that when he has problems with anxiety, he gets so nervous that he just does "whatever it is that comes to mind." Travis stated that he was like this as a child, prior to using drugs, and that he is under a doctor's care and is "trying to be healthy." Travis stated that he was a long-term methamphetamine user, and that he believed he would likely die if he used drugs again because his doctor told him that if he ever shot up again, it would likely kill him on the spot. He stated that he was aware that his drug use was the result of the psychological problems from which he suffers and which he does not understand.

He stated that psychological problems run in his family. Of his three children, he stated that his oldest child, now a grown woman suffers from bipolar disorder, that one of his sons seems a little slow and is having a hard time, but that his other son is a straight-A student, and he has "hopes that he will turn out all right."

Travis stated that he had problems in school and joined the United States Army, trying to make a go of it. He stated that he was not able to adapt to Army life and spent two months in the brig because he could not keep up with all the rules and was late to formation. He stated that it made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. He stated that he had received "a less than honorable" discharge from the Army.

2

Travis stated clearly in the presence of his mother and father that he testified falsely in Mr. Barrett's trial. He stated that at the time he testified, he was "living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble." Travis Crawford stated that for several years before Mr. Barrett was arrested, through the time of Mr. Barrett's state and federal trials, and up until four months before this interview, he had been doing methamphetamine all day, every day. He stated that when he testified against Mr. Barrett, he was high on meth. He also stated that all of the snitches who testified against Mr. Barrett were "on dope" when they testified. Travis stated that he and the other snitches were also high on drugs when the prosecutor, AUSA Mike Littlefield, interviewed them. He stated that anybody who had been around drug addicts would have known that. When John Philpot took him to see Mr. Littlefield, Travis stated that he was sure that Sheriff Philpot knew that Travis knew that Mr. Philpot knew that he was stoned. Travis stated that he felt as though he "was already arrested" and "didn't know if [he] was ever going to come back home."

During the interview, Travis stated that when Mr. Littlefield interviewed him about Mr. Barrett, he was terrified of losing his freedom and said whatever he thought Littlefield wanted him to say. Travis stated that Mr. Littlefield had asked him if Kenneth Barrett had said that he (Mr. Barrett) "was going down in a blaze of glory," and that before he could answer, Mr. Littlefield told him all the bad things that would happen to him if he "lied." Travis stated that he was so scared that he said, "Yes," that Mr. Barrett had stated that he would go down in a blaze of glory if the cops came to his residence. Travis stated that when he gave this answer, he was panicking because he was afraid. Travis stated that Mr. Littlefield told him he knew things about him (Travis). Travis repeated that he was extremely scared during his interview with Mr.

3

Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis stated to me affirmatively that he never heard Kenneth Barrett state that he was "going down in a blaze of glory" or express any sentiment like that.

Travis stated that he had testified against somebody prior to testifying against Mr. Barrett. On that occasion, Travis stated that he had been arrested for bad checks and was afraid of going to jail. In lieu of prosecution, he stated that he wore a wire and made four or five controlled drug buys. Travis stated that he believed he could have been killed while doing this. Travis stated that he ultimately had to testify against the person he bought the drugs from, even though the police lied to him and told him he would not have to testify.

During the interview, Travis stated that Sheriff John Philpot was at Kenneth Barrett's residence approximately two weeks before the raid that led to the fatal shooting of the trooper, and that when Sheriff Philpot went to Mr. Barrett's residence he had inspected Kenneth Barrett's guns without incident. Travis stated that Mr. Barrett told him the local authorities had a drug case against him (Kenneth Barrett), but it was not serious. Travis Crawford stated that Mr. Barrett never told him anything about an outstanding warrant for Mr. Barrett's arrest. Travis stated that at the time he testified against Mr. Barrett, he thought having a warrant and having a case were the same thing. He stated that he now knows these are two very different things.

During the interview, Travis Crawford stated that Mr. Barrett put a sign on his fence just a couple of days before Trooper Eales was killed. Travis stated that the sign was not directed at the police; "it was directed at anybody." The sign was intended, stated Travis, to scare people away from trespassing on Mr. Barrett's property and stealing his belongings.

When Travis Crawford spoke to me and told me all of the above in the presence of his

4

parents, he was separated from his wife, Cindy Crawford. Based on what Travis Crawford told me, a declaration for his signature was prepared, detailing all of the information related above. On February 15, 2009, when I asked Travis to read over the declaration detailing what he had told me, he had reunited with his wife and declined to read the declaration. He stated that he would "not sign anything," and that his psychiatrist had advised him that further involvement in Mr. Barrett's case was detrimental to his health and that his problems with anxiety were the result of his past association with Mr. Barrett, which was contrary to his earlier statement that the onset of his anxiety was in his childhood. It is my belief, based on my extensive investigation of this case that Travis Crawford declined to sign the declaration because he believed that telling the truth would get him in trouble, and that he was being pressured by Cindy Crawford not to cooperate. Family, friends and associates of Travis and Cindy Crawford informed me that Travis and Cindy have reputations in the community as liars and thieves who would say and do anything to stay out of jail and to obtain drugs. Two witnesses, Paul Rickie Lansford, and Brandy Hill were present at the time Mr. Barrett allegedly made the "blaze of glory" statement in Travis Crawford's presence, and they informed me that Mr. Barrett did not make such a statement then, and that they never heard Mr. Barrett make such a statement or express that idea at any time.

As noted above, I interviewed Cindy Crawford separately from Travis Crawford in the presence of another investigator, Dale Anderson. During this interview, Cindy Crawford told Mr. Anderson and me the following:

Cindy stated that she testified as a government witness in Kenneth Barrett's federal trial. She acknowledged that her husband, Travis Crawford, also testified against Mr. Barrett. She stated that as of 1999, she had known Mr. Barrett for approximately four years.

5

Cindy Crawford stated that one to two weeks prior to her initial testimony against Kenneth Barrett, John Philpot came to see her. Mr. Philpot told her that she had to leave with him. Cindy Crawford stated that she did not know whether she was under arrest or not, but it was clear to her that she had no choice but to go with Mr. Philpot. She stated that she got into Mr. Philpot's car and that he drove her to Muskogee. There, she met AUSA Mike Littlefield and "several men wearing guns" who appeared to be law enforcement officers. Cindy Crawford stated that the meeting occurred in Mr. Littlefield's office.

Cindy Crawford stated that the men wearing guns showed her several firearms that looked similar to ones that belonged to Mr. Barrett. Cindy stated that Mr. Littlefield told her that she needed to work with him and testify against Mr. Barrett, or she was going to prison. She stated that Mr. Littlefield reminded her that she was on a five-year deferred sentence in a drug case. Mr. Littlefield told her that Mr. Barrett's house had been under surveillance for 6 months prior to the shooting of the trooper, and that during this surveillance she was seen acting as a "lookout" on Kenneth Barrett's front porch while he cooked methamphetamine on the property. Cindy Crawford stated to us that she had never seen Mr. Barrett cook methamphetamine at any time and that she had never acted as a lookout for Mr. Barrett.

Cindy Crawford stated to us that at the time of the meeting in Mike Littlefield's office, she had no pending criminal charges, but had lost one of her children to foster care. Cindy stated that during the meeting, the threat that she would not get her child back hung in the air.

Cindy Crawford stated that during the meeting in Mr. Littlefield's office, she was told by Mr. Littlefield there were certain ways she could phrase her testimony. Cindy stated that Mr. Littlefield told her that in her testimony, she should make Kenneth Barrett appear as violent as

6

possible and as an imminent threat to those around him. Cindy stated that Mr. Littlefield had discussed with her the possibility that she risked perjury charges if she did not put this type of spin on her testimony. Mr. Littlefield also told her that they could make it extremely hard on her if she refused to testify against Mr. Barrett.

Cindy Crawford stated that when she was at the meeting in Mr. Littlefield's office in Muskogee, she was not told that she was under arrest, but that the atmosphere was intimidating. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside the restroom. She stated that she believed she was not free to leave because Mr. Philpot had driven her to Muskogee, and she had no way back home other than him. Cindy Crawford stated that she was not going to mess with Mr. Philpot because of his reputation for violence.

Cindy Crawford stated that Mr. Littlefield interviewed her about Kenneth Barrett's federal case separately from her husband, Travis Crawford. Cindy stated that Travis told her that John Philpot told him that if Travis said the right things on the witness stand, he would not get into trouble. Cindy stated that Mr. Littlefield, and later John Philpot, told her that she did not have to talk to or be interviewed by Mr. Barrett's lawyers or anyone working with them if she did not want to. Cindy stated that it was implied she should not speak to the defense.

Cindy Crawford stated that it was her recollection that when she testified at Mr. Barrett's federal trial, neither the prosecution nor the defense asked about her prior offenses. She admitted to Mr. Anderson and me that she was a heavy drug user at the time she testified against Mr. Barrett.

Cindy Crawford stated during our interview that during the time she knew Kenneth Barrett, she never bought drugs from him, but just used drugs with him. She stated that when

7

Mr. Littlefield interviewed her in his office, as described above, she was just coming down off a two-day meth high. She stated that the same was true when she testified at Mr. Barrett's trial. Cindy stated, "If you had ever crashed from a meth high, you would know that you would not be in your right mind."

Cindy stated that she suffered from post-traumatic stress disorder (PTSD) due to things that happened to her when she was growing up. She stated that she overreacts to stressful situations, sometimes to the point of passing out. She told us that when she was growing up, her father was often in a rage, and that her father had molested her and her sister. Because of this experience, she stated that when she is stressed she overreacts, and does not always perceive things correctly or exaggerates what is happening or has happened. Cindy Crawford stated that when she testified in the second stage of Mr. Barrett's trial about Mr. Barrett having once pressed a gun against her leg, she may well have been overreacting and embellishing the story, due to her PTSD. As Dale Anderson and I were leaving her residence, she called to us as we opened the door (she was in a leg cast and incapacitated at the time) and stated that on second thought she was sure she had misread the mood of the situation and overreacted. She stated that Kenneth Barrett had a history of being nice and helpful to her.

Cindy Crawford stated that during her interviews with the government before she testified in the first stage of trial, she had not told them about the incident with Kenneth Barrett putting the gun barrel to her leg. According to Cindy, the prosecutor or law enforcement asked her about this incident after her first stage testimony. Cindy stated that the only person who could have told law enforcement about the incident was the only other person present, Richie Barrett. I interviewed Richie Barrett and he stated that neither that specific incident nor anything

8

resembling it ever took place. I asked Richie Barrett if he would be willing to provide that information in a declaration under penalty of perjury and he said that he would.

Cindy Crawford stated that the prosecutors in the federal trial were upset with her when she denied ever seeing chemicals and equipment for making methamphetamine at Kenneth Barrett's house. Cindy stated they were also upset when she said she never saw Mr. Barrett cook methamphetamine. She said that the prosecutors were upset with her after her first stage testimony because she had not made Mr. Barrett seem threatening. She stated, "They were very angry. They scared me and threatened me." Cindy stated that while the government never told her explicitly that it was all right to lie during her testimony, it was implied that she could lie and make things up so long as it helped the government's case and hurt Mr. Barrett.

Cindy Crawford stated that she was aware John Philpot had gone out to Kenneth Barrett's property not too long before the shooting of the trooper to check Mr. Barrett's guns, and there had been no problem. Cindy said that from the information she had about this incident, Mr. Barrett and John Philpot acted like they were old buddies.

Everything that Cindy Crawford stated to Mr. Anderson and me, as reported above, was detailed in a declaration for her signature. After the declaration was prepared, I brought it to Cindy and Travis's house, asked her to review it for accuracy, and to sign the declaration if it was accurate, as she promised she would. Cindy stated that she would not read the declaration. She then asked me to leave. When I continued to talk with Travis, Cindy Crawford called the sheriff's office, or pretended to. Cindy's statements and conduct indicated she would not read the declaration because she did not want to verify the things she stated previously, or risk getting into trouble for telling the truth about her testimony.

9

As part of my assigned work on Kenneth Barrett's case, I also interviewed Mary Rogers. Ms. Rogers identified herself to me as the widow of Bill Ed Rogers, who was an attorney in Sallisaw, Oklahoma, until he passed away. Bill Ed Rogers was appointed to represent Mr. Barrett on a 1997 criminal charge (State v. Barrett, CF-97-00086, one count of Unlawful Delivery of Controlled Drug, filed 3/24/97). I was advised that Mr. Barrett had "fired" Bill Ed Rogers. I had read the docket sheet, which neither reflected that a hearing had ever been held on Mr. Rogers' motion to withdraw, or that another attorney had substituted into the case. [Oklahoma District Court Records, "Case Detail"]

On December 5, 2008, I asked Ms. Rogers if she could locate Mr. Barrett's file. Ms. Rogers told me that after her husband died, she caused his files to be moved to her (their) former residence at 303 Fryar Drive, which is now her son's home. She told me she pulled Mr. Barrett's file from a carton that had a list of the files it contained. She stated that she copied the file in its entirety in the exact order it was in and returned it to the file in the same order. I picked up the copy of the file from her on December 12, 2008. Ms. Rogers stated that she is maintaining the original file with her husband's other business documents.

Ms. Rogers and I reviewed the file and there was no letter indicating that a warrant had been issued for Mr. Barrett's failure to appear. Ms. Rogers informed me that her husband was hurt about the way Mr. Barrett fired him and the untrue and paranoid accusations Mr. Barrett made about Mr. Rogers colluding with the prosecution. She stated that had her husband been told that a warrant had been issued, he would have noted it in the file because he was a good lawyer and he kept good records. Nothing in the file indicated that her husband received such notice.

When last week I asked Ms. Rogers to sign a declaration averring to the facts above, she

10

told me she would first seek the advice of counsel. Several days later, she advised me that her lawyer advised her not to sign anything. Neither she nor her lawyer had read the two-page declaration, one page of which was the signature page.

I called her lawyer, Michael Daffin, of Sallisaw several times. He did not return my calls. Last Friday, I went by his office and he apologized for not getting back to me and explained that he had been ill. He told me he was awaiting a call and hoped to be having gall bladder surgery in 10 minutes. Still, I asked him to read the declaration. He stated that if the facts were true he would have no problem having his client sign the declaration, but that he would likely not get to it prior to his surgery and recovery period, which put it past our filing date.

I went by his office on the following Wednesday (this week) and he had not yet had his surgery, but was having further testing on Thursday. I asked if I could have Ms Rogers call him. He said, "Sure." I called Ms. Rogers who seemed amenable, but said she could not make the call until Thursday morning when I knew Mr. Daffin had a doctor's appointment. Despite repeated efforts, I was not able to reach either one of them. Mr. Barrett's counsel then directed me to recite in this declaration my efforts to reach Ms. Rogers.

The file clearly indicated that Mr. Rogers had received a no-time offer from the state. In other words, if Mr. Barrett pleaded to the charge, he would not have gone to jail unless he violated the terms of his probation. There is a letter in the file from an assistant district attorney stating that discovery was ready to be picked up by Mr. Rogers. Based on my review of the file, Mr. Rogers did not obtain that discovery. [BILL ED Rodgers case file, CF-97-00086] When I sought it those files from the Sequoyah County clerk's office in January 2009, I was informed that all the files related to that case had been sent to the U.S. Attorney's office.

11



I declare under penalty of perjury that the foregoing 12-page declaration is true and correct.

Executed by me this 13th day of March, 2009, in Sequoya County, Oklahoma.

Leonard Post