**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **KENNETH EUGENE BARRETT,** )<br>)<br>*Movant,* )<br>)<br>**v.** )<br>)<br>**UNITED STATES OF AMERICA,** )<br>)<br>*Respondent.* ) | **Case No. 6:09-cv-00105-JHP** |

---

**EXHIBIT 34**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

**DECLARATION OF JOHN DAVID ECHOLS**

I, John David Echols, declare the following:

I am an attorney licensed to practice in the State of Oklahoma and the various federal district courts in Oklahoma, including the Eastern District.  I am also admitted to practice in the United States Supreme Court and the United States Court of Appeals for the Tenth Circuit.  I am currently a trial attorney with the Oklahoma Indigent Defense System, Capital Trial Division, Sapulpa office.

I represented Kenneth Eugene Barrett in his two state court trials for the shooting death of Oklahoma Highway Patrol trooper Rocky Eales.  Lawyer Jeffrey Standing Bear was second chair counsel in Mr. Barrett's first state trial.  Attorney Jack Gordon was second chair counsel in Mr. Barrett's second state trial.  During the time of Kenny Barrett's state trials, I was assisted by OIDS investigators Steve Leedy, Jack Stringer, and Lisa Cooper.  We also had the assistance of a mitigation investigator, Roseann Schaye, who did preliminary investigative work for a second stage case.  Ms. Schaye's work was suspended prior to the first state trial.

Mr. Barrett's first state trial ended in a hung jury during the guilt/innocence phase.  In his second state trial, Mr. Barrett was acquitted of first degree murder and convicted of first degree manslaughter.  He was also convicted of a lesser included offense, assault and battery with a dangerous weapon (ABDW).  On the remaining two counts of discharging a deadly weapon with intent to kill, Mr. Barrett was acquitted.  Mr. Barrett was sentenced by the jury to 20 years on the manslaughter charge, and 10 years on the ABDW charge.

Mr. Barrett was indicted in federal court on charges related to Trooper Eales's death the day before the statute of limitations ran on the underlying drug charges. When Mr. Barrett was indicted, Paul Brunton, the Federal Defender for the Northern and Eastern Districts of Oklahoma, called me about being lead counsel for Mr. Barrett in his federal case. The proposal, as stated to me by Mr. Brunton, was that I would be appointed lead counsel and Rob Nigh of Tulsa was to be appointed second chair. I was to handle the majority of the trial preparation, including preparation of the penalty phase defense, as well as trial work; Mr. Nigh was to assist with motions work and handle administrative matters such as budgeting requests.

Mr. Brunton met with United States District Judge James Payne about appointing Mr. Nigh and me to represent Mr. Barrett. Judge Payne agreed to appoint me, but declined to appoint Mr. Nigh. Mr. Brunton informed me that Judge Payne wanted to develop a local capital defense bar in the Eastern District, and therefore decided to appoint former Eastern District United States Attorney Roger Hilfiger as co-counsel. In it's minute order, the Court first stated that the substitution of Mr. Hilfiger was by agreement with Mr. Brunton. It is my understanding that Mr. Brunton then wrote Judge Payne, asking that the Court minute reflect Mr. Brunton's objection to the substitution of Mr. Hilfiger for Mr. Nigh. Magistrate Judge Shreder then entered an amended minute order specifying that I had been appointed at the request of the Federal Defender, an Mr. Hilfiger had been appointed at the direction of the Court.

I was familiar with Mr. Hilfiger because when he was the United States Attorney

2

for the Eastern District, he had handled the prosecution of a client of mine in a Savings

and Loan matter.  That matter was resolved successfully for my client.  After Mr. Hilfiger

was appointed as co-counsel for Mr. Barrett, I provided Mr. Hilfiger with access to a

secure website, which had my state files in Mr. Barrett's case on a computer data base.

Those who access the site are identified when they visit the site.   I was able to track who

visited the site, and during the time I worked on Kenny Barrett's case with Mr. Hilfiger, I

saw no indication of him accessing the database containing the state files.

The first time Mr. Hilfiger and I appeared before Judge Payne on Mr. Barrett's

case, Judge Payne stated that he wanted the case tried quickly and that this should be no

problem, because I had handled Kenny's state case.  I explained to Judge Payne at the

time that there were significant tasks that needed to be undertaken to prepare the case

adequately for another trial.  For example, while the preliminary investigation begun by

Roseann Schaye had identified certain evidence and avenues of investigation regarding

potential mental state guilt and penalty phase defenses, significant additional

investigation and expert consultation remained to be done.  Similarly, questions regarding

the existence and role of a confidential informant in this case had not been resolved to my

satisfaction by the conclusion of the state proceedings.  The federal authorities' decision

to prosecute Mr. Barrett in a capital case therefore made it imperative for me to

investigate the practices of the District 27 Drug Task Force including, but not limited to,

their cultivation and reliance on purported informants or "snitch" witnesses.

As I informed Judge Payne in my motion for permission to withdraw, during the

time Mr. Hilfiger and I were appointed to work together, we maintained a cordial relationship. As I also informed Judge Payne, however, I felt Mr. Hilfiger was not doing work on the case that I had expected him to do, and I was left to handle virtually all the substantive tasks, as well as the all the case budgeting. I also stated my concerns about Mr. Hilfiger's lack of work to Richard Burr, who was the representative of the Federal Death Penalty Resource Counsel project assisting with the case. Although I was lead counsel, I was aware that Judge Payne had specifically selected Mr. Hilfiger for the case over Mr. Brunton's recommendation of Rob Nigh.

At the outset, Judge Payne stated that he regarded himself as the guardian of the public purse and that he would not authorize what he regarded as unnecessary expenses. During my representation of Mr. Barrett in federal court, virtually the only budgeting request Judge Payne approved without drastic cuts was for defense counsel to travel to the Justice Department in Washington, D.C. for a meeting to try to persuade the Justice Department to decline a capital prosecution of Mr. Barrett.

Over the course of my federal court representation of Mr. Barrett, I submitted approximately nine budgeting requests for experts, investigators, expenses and the like, all of which were rejected in whole or in substantial part by Judge Payne. As I informed Judge Payne at the time, the budget I submitted was based in part on my knowledge of the tasks that were not completed during the state proceedings, and in part on materials which I received from Federal Death Penalty Resource Counsel, and from my review of materials they made available on their website. These materials, and information I

4

subsequently received from Richard Burr, indicated the time I budgeted for attorneys, and the resources I sought, were in line with the time, fees, and personnel relied upon in other federal capital prosecutions.

Prior to my submitting a proposed budget of attorney hours for various categories of work Mr. Hilfiger provided me his projections of the time he would need to spend in each category. Other than giving me these projections, Mr. Hilfiger did not assist with administrative or substantive case preparation tasks. This division of labor required me to expend an inordinate amount of time on budgeting requests and administrative matters. In April 2005, the court held that I would not be compensated for any of the time I spent preparing the detailed budgets on which Judge Payne insisted. This included time spent conferring with experts regarding the needs of the defense. These conferences were necessary for two reasons. First, so that the experts could learn what the status of my knowledge of the evidence was, and second, so that I could prepare the budget requests. Mr. Hilfiger did not participate in these conferences, although I had no objection to him being involved in these aspects of preparing Mr. Barrett's defense.

I was basically not being compensated for consulting with Mr. Hilfiger on the few occasions that he was available to me, nor with Federal Death Penalty Resource Counsel. For example, payment vouchers I sent in for legal research would be cut in half. The judge believed I did not need to do much if any research on federal death penalty law because I was "learned counsel." The same was true for research I did on search and seizure issues. Simply stated, my fee requests and budgeting requests were not being

5

approved, or were being approved for far less than the time I devoted to tasks that I and Federal Death Penalty Resource Counsel believed were reasonably necessary to prepare the case for trial.

As I recall, one of my first requests concerned preparation of transcripts of the second state court trial. Judge Payne initially opposed our request based in part upon his stated opinion that we could rely upon my memory of the trial.

Based on the capital nature of the case and the involvement of drugs, I wanted to hire an investigator to complete the investigation of mental state issues and law enforcement practices. The rate I was quoted for private investigative services in the area was Fifty Dollars ($50.00) per hour. At that rate, I would have been able to engage Dale Eberle, who had formerly participated in the NDOK drug task force, and who was therefore particularly qualified to conduct the drug subculture investigation which we needed to defend the federal case. Judge Payne, however, said he would authorize a maximum of only Thirty Dollars ($30.00) per hour for such services, because that was the rate charged OIDS by an investigator who withdrew for health reasons prior to the first state court trial.

Judge Payne authorized only 100 hours of investigation. Based on the information I received from consulting with the Federal Death Penalty Resource Counsel, which I shared with Judge Payne, it was my understanding that the hours I requested constituted only 3/5 of the average hours authorized by federal courts for fact investigation in capital cases; and the requested hourly rate of $50 an hour was $15 below the low end of the

6

range ($65 - $85) nationally authorized for fact investigators in federal capital cases at the time.

I also sought to retain the services of jury consultant Joe Gustaferro.  Mr. Gustaferro had recently assisted the attorneys in Terry Nichols' state court trial and those attorneys recommended him highly.  Judge Payne, however, would not authorize any payments whatsoever for jury consultation, citing the extensive litigation experience of Mr. Hilfiger and me.

I also requested authorization for 267 hours of the services of a mitigation specialist to be compensated at a rate of $75 per hour, for a total of $20,025; and travel expenses $5,000.  Judge Payne approved only 100 hours at $150 per hour, and no travel expenses.  I again shared with Judge Payne the information compiled by the Federal Death Penalty Resource Counsel demonstrating that the requested hours were barely a third of those authorized in an average federal death penalty case; and that these substantially limited hours were reasonably necessary to complete the preliminary mitigation investigation that had been initiated in state court.  Although Judge Payne inexplicably doubled the requested rate of compensation for the mitigation investigator, this was of no practical assistance to me because, as Judge Payne was also informed by the Federal Death Penalty Counsel, the denial of expense was completely unworkable and apparently unprecedented in federal death penalty litigation.

Judge Payne also made substantial and unworkable reductions in the amounts requested for the services of forensic experts, including a tool mark and illegal drug

7

analyst, and a trajectory and crime scene reconstruction expert.  Although the requested

hourly rate for these experts was well within the range established by national practice at

the time of compensating such qualified experts between $125 and $250 per hour, Judge

Payne authorized only $100 per hour.  Judge Payne also denied most of the requests for

the experts' travel and other out-of-pocket expenses.  The reduced hourly rate approved

by Judge Payne and the lack of expenses again made it unworkable to obtain the services

of any expert qualified to perform the requested services.

Judge Payne similarly made unworkable reductions to my request for the services

of mental health experts to assess Mr. Barrett's brain dysfunction, future dangerousness

and hypervigilant overreaction to perceived threats of annihilation.  My request for a total

of $24,000 was well under the average authorization for a federal death penalty case at

the time ($30,000) and indicated hourly rates of $125-$150 were at the low end or well

below the range of hourly rates authorized by federal courts in death penalty cases for the

services of a psychologist ($150-250) and psychiatrist ($250-350).  Judge Payne

nevertheless approved the retention of only one mental health expert for 40 hours of

work, limited compensation to a rate of $100 an hour for an expert who was a

psychologist or $125 per hour for a psychiatrist, for a total of $4,000-5,000.  Based on the

data assembled by the Federal Death Penalty Resource Counsel, and provided to Judge

Payne, the limitation on the number of experts, hours, rate of compensation, as well as

the denial of expenses, were all completely out of line with the standards of practice

prevailing in federal death penalty cases, and precluded meaningful investigation of

mental health issues.

On one occasion, after I submitted the budget requests, Mr. Hilfiger called me and told me to substantially reduce the requests solely because the judge would not approve them. To my knowledge, Mr. Hilfiger's suggestion was not based on any consultation with the Federal Death Penalty Resource Counsel attorneys, or any other experienced capital litigator. Nor did Mr. Hilfiger have sufficient knowledge of the facts, training and experience as a capital lawyer to render an informed, independent opinion regarding the reasonableness of my funding request. Based on my own training and experience, as well as my consultation with attorneys at the offices of the Federal Death Penalty Resource Counsel, I knew that Mr. Hilfiger's suggestion to reduce the budget request was unreasonable. In a conference call among Judge Payne, Mr. Hilfiger and myself to discuss this matter, Mr. Hilfiger did not join me in advocating for the reasonably necessary funding.

Judge Payne also imposed onerous, exacting conditions for budget requests, which required me to set forth in minute detail a description of specific tasks and which lawyer would perform which task, when each task would be completed and the amount of hours required for each specific activity. In consultation with the Federal Death Penalty Resource Counsel, I also informed Judge Payne that the process requiring pre-authorization and circuit-level review of non-attorney services pursuant to 21 U.S.C. §§ 848(q)(9) and (10)(B) is not applicable to attorney services, and that pursuant to the Guide to Judicial Policies and Procedures, Vol. VII, "Appointment of Counsel in

9

Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), case budgeting should be made in light of counsel's "best preliminary estimate that can be made of all services," including services of counsel. Although the level of detailed quantification of tasks and necessary hours demanded by Judge Payne is virtually impossible to predict, Judge Payne required me to submit such detailed budget proposals in advance, including seeking authorization to do legal research. I did my best to comply with these requirements, and obtained pre-approved authorization from the court. When I submitted vouchers, however, my compensation was routinely cut significantly. I was compensated at an effective rate of approximately Sixty Dollars ($60.00) an hour.

As I stated to Judge Payne at the time, delays in the Court's approval (or rejection) of the budgets I had submitted were eating into the time available to prepare for trial. Some of the budget proposals for Mr. Barrett's defense were first raised with Magistrate Judge Shreder in early December 2004. In February, I responded to a letter from Judge Payne with a letter that in many respects repeated things Magistrate Judge Shreder elicited from me months earlier. Prior to the exchange of letters, in the hope that disputes of budgeting of attorney fees would not delay the acquisition of needed experts, I began to submit separate budget requests - one for attorney fees and a second for experts and expenses. This did not resolve either impasse.

As reflected in the then-current data compiled by the Office of Defender Services and made available to Judge Payne by the Federal Death Penalty Resource Counsel, my projection of 2,000 hours of attorney time necessary to represent Mr. Barrett effectively

10

was well *below* the range of 2,400 to 3,000 hours then being expended in death-authorized federal cases. The Federal Death Penalty Resource Counsel also was unaware of any other instance in which a federal judge routinely cut attorney hours by 50% without providing counsel an opportunity to discuss any legitimate concerns the court might have with the amount of requested compensation.

I was therefore prevented from adequately preparing the case because Judge Payne refused to authorize reasonable fees or expenses for expert and investigative assistance. Judge Payne made me disclose how much money I had earned on Mr. Barrett's state case. Judge Payne expressed on more than one occasion that because I had tried the state case and had been on the state case for years, I did not need all the help and assistance I was requesting.

I was appointed lead counsel for Mr. Barrett in the federal case in the Fall of 2004, and we were still litigating budget requests in April, 2005. As of that time, I was not aware of Mr. Hilfiger doing any investigation other than perhaps visiting the scene and taking some photographs. We still were working without experts or investigators, and my attorney fee vouchers were being cut routinely. I discussed these difficulties with Paul Brunton, and also consulted with the federal capital resource center. After extensively reviewing the matter with the Federal Death Penalty Resource Counsel, I concluded that Judge Payne's reduction of attorney's fees, estimate of the hours necessary to represent Mr. Barrett and restrictions on non-attorney funds for investigative and expert services were substantially inconsistent with the standards and practices

11

governing federal court trials in death penalty cases such as Mr. Barrett's.

Judge Payne's ongoing refusal to authorize adequate resources led me to conclude I would not be able to discharge my professional and ethical obligations to prepare Mr. Barrett's case adequately for trial. I therefore presented my concerns as the bases for a motion to allow me to withdraw as counsel, including in the motion a statement from Mr. Barrett that he wanted me to continue as his lawyer. I anticipated that Judge Payne would deny the request and that this would "force the issue" by getting a ruling that could be appealed to the Tenth Circuit. I urged Mr. Hilfiger to join the motion to withdraw in light of my professional judgment, and concurrence of the Federal Death Penalty Resource Counsel, that we were being prevented from representing Mr. Barrett effectively. Mr. Hilfiger declined to join the motion, and urged me not to file it, but he did not offer any reason to challenge my assertion that the trial preparation was being hamstrung by Judge Payne's denial of ancillary investigative and expert services.

Within a short period of time, Judge Payne granted my motion to withdraw, removed me from the case, designated Mr. Hilfiger as lead counsel, and appointed Bret Smith as second chair. In my opinion, Mr. Hilfiger was not qualified under the appropriate ABA Guidelines to act as first chair in a federal capital case. To my knowledge, Bret Smith had no capital experience.

At the time I withdrew from the case, I was unaware of Mr. Hilfiger having performed any significant work on the case, with the exception of a few pleadings, making court appearances, conducting a brief scene visit, and traveling to Washington,

12

D.C. for the D.O.J. meeting, as described above.  At the time I withdrew, Mr. Hilfiger had not contributed significant legal research, nor had he contributed significantly to the major motions and briefs.

Everything in the federal case, during the time I was participating, was an uphill struggle with Judge Payne.  Over and above the funding issues, I was required to file a motion and brief setting out the serial numbers of my computers and accessories before they could be brought into the Courthouse.  I was also, from time to time, chastised by the Court for such things as titling an agreed scheduling motion as a "joint" motion, when it contained a statement that the United States Attorney endorsed and agreed with the motion, but did not bear Mr. Sperling's signature.

At the time I withdrew from the case, I advised Mr. Hilfiger that he needed to immediately undertake extensive investigation and preparation for a possible penalty phase.  I explained to him that the work performed by Roseann Schaye, the mitigation investigator in the state case, was very preliminary in nature and far from complete.  Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt.  In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family mental illness.  Based on these preliminary results, if Mr. Barrett's case had proceeded to a penalty phase in state court, I would have requested the time and funding necessary to investigate Mr. Barrett's cognitive impairments that suggested brain

13

damage, his mother's consumption of alcohol during her pregnancy with Mr. Barrett, and the presence, severity and effect of mental illness on Mr. Barrett's behavior and functioning.

Based on my experience, I knew that it was important that I had built a rapport with Mr. Barrett so that he would trust my judgment regarding the appropriateness of investigating and presenting certain evidence. I am aware that a variety of factors, including depression, a sense of hopelessness and the fear of shame and embarrassment can adversely affect a client's ability to endure the presentation of penalty phase evidence. For this reason, I and other members of the state court trial team made every reasonable effort, including regular visits with Mr. Barrett, to encourage and support his participation in preparing both the guilt and penalty phase of his trial. Mr. Barrett cooperated with all of our requests to be examined by a mental health professional, provided us with potential sources of background information and helped us to locate significant witnesses who knew the details of his upbringing. Because of the attorney-client relationship we established with him and, which in my opinion, any qualified lawyer would endeavor to establish with a capital client, Mr. Barrett did not place any restrictions on the evidence we were permitted to investigate or prepare to present in the event of a penalty phase.

As mentioned above, however, we had not completed the necessary investigation and preparation of a penalty phase presentation by the conclusion of Mr. Barrett's state trials. I therefore stressed to Mr. Hilfiger the importance of completing a mitigation

investigation so that he would be able to make informed decisions and able to advise Mr. Barrett of possible defenses.

After I withdrew from the federal case and gave Mr. Hilfiger this report on the status of the prior investigation, he never again consulted me on the legal and factual issues surrounding Mr. Barrett's case.

It was always my belief that investigator Clint Johnson and the District 27 Drug Task Force simply made up a C.I. out of whole cloth. In my opinion Charles "Monk" Sanders was not the alleged confidential informant (C.I.) used to secure the search and arrest warrants that were prepared in advance of the raid on Mr. Barrett's home. Despite our repeated efforts, including extraordinary writs to the Court of Criminal Appeals, the identity of the C.I. was not disclosed during the state trials. Prior to the second state trial, Clint Johnson was ordered by the Court to write the supposed C.I.'s name on a paper that was then placed in an envelope, sealed and placed in the state court file. It is my understanding that the envelope was opened just prior to the federal trial, and that the name of Charles "Monk" Sanders was written on the paper. In my opinion, Mr. Sanders was an informant, but that he did not actually fill the C.I.'s alleged role. In fact, Mr. Monk's federal trial testimony conflicted with the averments made in the affidavits supporting the state arrest and search warrants.

It is also my understanding that during jury selection in Mr. Barrett's federal trial, the government disclosed for the first time its intention to call informant or "snitch" witnesses to testify to certain statements Mr. Barrett purportedly made regarding his

15

intention to harm law enforcement officers. The belated disclosure of such potentially significant witnesses would have further raised my suspicions regarding the reliability and truthfulness of the proffered testimony. It is my professional judgment that no reasonably competent capital trial attorney would have permitted the government to introduce the testimony of such belatedly identified witnesses without first obtaining, or at least requesting a continuance sufficient to afford the defense full discovery – including, but not limited to any of the witnesses statements, the circumstances under which they allegedly first came to the attention of the prosecution, records of their criminal histories to include pending cases, and any consideration promised or expected in consideration for their testimony – and a reasonable opportunity to investigate the witnesses' background and substance of their alleged statements to the authorities, including the circumstances and context of Mr. Barrett's reported statements.

These matters occurred several years ago, and I have not reviewed either my files or the Court's records, relying only on my best recollection of the events. I related the information detailed herein to one of Mr. Barrett's current attorneys, David Autry, in interviews with me. Based on those interviews, this declaration was drafted for my signature. I have carefully reviewed its contents, and it reflects accurately what I told Mr. Autry.

I declare under penalty of perjury that this declaration, consisting of 17-pages, is true and correct to the best of my recollection and belief.

Executed by me this 13th day of May, 2009, in Tulsa County, Oklahoma.

/S/
John David Echols

17