**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 44**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---



**The Florida State University**
Tallahassee, Florida 32306-1127

*College of Criminology and Criminal Justice*

June 23, 2009

Mr. Tivon Schardl
Assistant Federal Defender
Federal Defender's Office
801 1 Street, 3rd Floor
Sacramento, CA 95814

RE: *United States v. Kenneth Eugene Barrett*

Dear Mr. Schardl:

Pursuant to your request, I would like at this time to submit the following report relative to the above styled matter.

Let me state at the outset that my analysis of the extensive file provided by your office concerning this case discloses extremely serious violations of well established standards and procedures of the law enforcement profession by the District 27 Task Force officers and the Oklahoma Highway Patrol Tactical Team members who planned and executed the raid on Mr. Barrett's residence which resulted in the shooting death of Oklahoma State Trooper David Eales.

It is my professional opinion as a criminologist and police standards specialist who has evaluated over three hundred law enforcement shooting incidents throughout the nation, and who has also instructed officers and authored widely used training material on police use of force and the handling of critical incidents, that the procedural violations in question resulted in a tragedy which was both foreseeable and preventable. I would like to emphasize that this conclusion remains even if one hypothetically construes all facts in a light most favorable to the officers who planned and participated in the raid which was conducted just after midnight on September 24, 1999.

The decision to rapidly approach Kenneth Barrett's house unannounced, under conditions of darkness, using unmarked vehicles in the lead was a grossly reckless action and one foreseeably likely to evoke a violent response from Barrett. *The manner in which this arrest operation was conducted renders unanswerable the important question of whether Barrett realized he was being confronted by law enforcement officers, as opposed to narcotics dealers or others whom he believed might do him harm.* Concern for the safety of all involved, including the arresting officers, *should have mandated making every reasonable effort to assure that Mr. Barrett realized this was a law enforcement operation prior to its initiation.*

(2)

As a law enforcement procedures specialist, I have examined many situations over the years in which police officers shot other officers simply because they didn't realize they were police (indeed, one such fatal incident occurred recently in New York city), as well as incidents where offenders discharged weapons at persons they didn't realize at the time were police officers. I have also analyzed the causation of tragic situations involving nighttime gunfire exchanges between law abiding home owners and police officers which resulted in injury or death because residents mistook police for intruders.

It is obviously imperative that law enforcement officers make their purpose and presence clearly known, unless concerns over the destruction of evidence or imminent danger to themselves or others dictate otherwise. Despite the fact that District 27 Task Force officers and members of the OHP Tactical Team were in possession of a "no-knock warrant," any concern about loss of evidence should have been eclipsed by the issue of officer safety, given what was known about Mr. Barrett's possession of firearms as well as his methamphetamine use and personal instability.

In the vast majority of arrest situations, officers know little or nothing in advance about the persons they are seeking to take into custody and usually have no real opportunity to control the circumstances surrounding the encounter. The instant case was very different in this regard. Both the District 27 Task Force officers and the OHP Tactical Team knew well in advance the following important things about Kenneth Barrett which should have resulted in a very different arrest plan than the one which was utilized:

(1) Barrett was thought by officers to be routinely armed and to have often discharged weapons "wildly" on his property during the nighttime hours. One of the firearms in his possession at the time of the raid was believed to be an AR-15 assault rifle, a formidable long range weapon which posed a foreseeable risk of potential harm to officers as well as others in the immediate area.

(2) Barrett had reportedly experienced prior conflict with law enforcement officers during which he had fled from them. There were also claims that he had verbalized threats against the police, including a determination not to be taken alive. The officers who planned and conducted the raid had information indicating that he "guarded" his residence at all times.

(3) Barrett had a known serious history of methamphetamine use. Law enforcement officers are well aware that individuals under the influence of this substance commonly exhibit paranoid ideation, sleeplessness, high anxiety and mental confusion. They are often fearful of being attacked by others, including rival drug dealers and police. Their potential for violence is accordingly high.

(4) The terrain surrounding Barrett's cabin was extremely exposed and afforded officers poor cover and concealment during an approach. The seemingly arbitrary decision to conduct this operation under conditions of darkness greatly compounded the danger involved. The known presence of Barrett's teenaged son on the property and the possible risk of harm to him was another factor which strongly contraindicated the kind of abrupt nighttime raid which was planned.

(3)

Despite knowledge of the aforementioned dangerous circumstances, and a realization that the arrest plan was inherently "high risk" in nature, District 27 Task Force officers and members of the OHP Tactical Team inexplicably orchestrated and executed what can only be characterized as a chaotic midnight raid on Barrett's armed residence. The raid was led by a white unmarked Ford Bronco containing the decedent Trooper Eales and Trooper Hamilton, who cut across a field and rapidly drove toward the cabin with their high beams on—a reckless act which elicited a hail of gunfire from Mr. Barrett's AR-15 rifle and an ensuing firefight. Given the position of those taking part in the raid coupled with the problem of nighttime visibility, a potential crossfire situation involving officers could easily have resulted.

The case record reveals *absolutely no exigent circumstance* which would have justified such an extremely reckless course of police conduct, given the availability of alternative safe methods for taking a person such as Mr. Barrett into custody. Let me represent to you that from a professional police standards and procedures standpoint, the accepted tactical sequence in this type of situation (absent imminent danger to another person) is always: *(1) Talk them out*; (2) *Force them out* (e.g., by creating discomfort through cutting power and water to the residence, use of tear gas projectiles, etc.); (3) *Take them out*. It should be noted that entry and confrontation are regarded as a *last resort* because of the obvious danger involved and should be attempted only when negotiations to persuade the person to surrender have clearly been exhausted.

From a tactical standpoint, the arrest plan should have involved *consideration of the potential for a barricaded gunman situation arising*. This very real possibility would indicate initial establishment of a safe perimeter around the property by participating police personnel, including sniper coverage of the residence, as well as the presence of trained crisis negotiators at the scene prior to any attempt to initiate communication with Barrett. Plans should also have been made to bring to the location resource persons who could potentially be of assistance in persuading Mr. Barrett to surrender should he refuse to do so (e.g., family members, mental health counselors, clergy-- anyone whose presence might be helpful should a crisis situation develop).

In the case at hand, communication with Mr. Barrett should and could have been initiated from sufficient distance and cover to afford participating officers a reasonable degree of safety. Marked patrol cars with their overhead emergency lights operating should have been positioned outside the gate to Barrett's property in a highly visible position. Service of the warrant under daylight conditions would have afforded officers better visibility of the cabin and the area immediately surrounding it, as well as resolving any question as to Barrett's awareness of the presence of law enforcement. Given the fact that Barrett ostensibly had neither a land line nor a cell phone, a patrol car P.A. or bullhorn could have been utilized from a position of cover to announce that officers were there to execute a warrant for his arrest, and to order him to exit the cabin with his hands empty and in view. In this kind of widely employed apprehension scenario, officers would not have needlessly risked misidentification and exposed themselves to potential gunfire. All communications by police negotiators seeking to persuade Kenneth Barrett to surrender would have been conducted from a safe position. After reviewing the circumstances

(4)

surrounding this incident, one is led inexorably to ask why the involved District 27 Task Force officers and OHP Tactical Team members would not have opted to use readily available and vastly safer alternative methods of apprehension.

Caution, patience and a prioritizing of safety are essential elements in the handling of such a potentially dangerous arrest. The passage of time usually works to the advantage of officers, with most such encounters eventually being resolved without serious injury or loss of life to anyone. Unfortunately, the District 27 Task Force Officers and OHP Tactical Team members who participated in this raid, including Tactical Team Commander Kerry Pettingill, evidently lacked essential training and experience in the planning and execution of such arrests.

In conclusion, it is my considered professional opinion that the violations of well established standards and procedures of the police profession discussed in this report were a significant cause of the preventable violence which occurred at Kenneth Barrett's residence on September 24, 1999.

I had no contact whatsoever with defense counsel concerning this matter prior to your retention of me, nor did I receive any documents regarding it until your office forwarded file material to me. Had defense counsel contacted me earlier, and provided me with the case file your office has, I would have expressed the professional opinions set forth in this report.

Please do not hesitate to contact me further at this time should you require any additional information or clarification of any of the points made in this report.

Very truly yours,

George L. Kirkham
Professor Emeritus