**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 55**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# DECLARATION OF BILL SHARP, Ph.D.

I, Bill Sharp, declare the following:

1.      I am a licensed clinical psychologist practicing in Norman, Oklahoma. An attorney representing Kenneth Barrett has asked me to give this account of my past involvement in Mr. Barrett's case, and my opinion regarding mitigation evidence that could have been presented on his behalf.

2.      In 2002, when Mr. Barrett was facing murder charges in Sequoya County, the Oklahoma Indigent Defense System ("OIDS") asked me to evaluate Mr. Barrett. I was not referred a specific question from OIDS; it was a general request to perform an assessment of Mr. Barrett. John Echols represented Mr. Barrett at the time. I conducted an assessment of Mr. Barrett in the Sallisaw Courthouse on September 28, 2002. The assessment included an interview with Mr. Barrett and the administration of psychological tests. I interviewed Mr. Barrett a second time before the second trial, and also spoke with Mr. Barrett's father in person, and another relative by telephone.

3.      Mr. Barrett first impressed me with his paranoia. I have conducted many assessments of defendants in criminal cases. In all these forensic evaluations, Mr. Barrett stands out as my most suspicious client. He would not consent to the interview until he had proof that I was there on behalf of his defense lawyers and not for some subversive reason. Mr. Barrett first asked a deputy whether he could call Mr. Echols on the telephone, then agreed to set aside his concerns and proceed when I offered to provide a copy of my contract with OIDS. Mr. Barrett was cooperative after expressing his suspicions, and became more comfortable and open on a second interview, although he remained guarded and suspicious.

4.      In response to my questions, Mr. Barrett gave me basic information about his physical condition. This included explaining that scars on his chest and back were from a self-inflicted shotgun wound, and other scars on his chest and hip were from being shot by others. Mr. Barrett also related some of his personal history such as his place of birth, age, that he had two younger brothers, and that

Decl. Bill Sharp, Ph.D.                                                                 Page 1 of 6

his parents divorced when he was 13 years old. Mr. Barrett told me that he had been married and had one son.

5.    Mr. Barrett was tentative and had difficulty recalling information about his education. He described a history of moving from state to state and changing schools in the process. He related that he repeated the eighth grade and attended special education classes in that grade. Mr. Barrett stated that he left school in the ninth grade, during which he was enrolled in school in Indiana.

6.    Mr. Barrett also experienced difficulty recalling his work history. He was able to tell me that he began working as a farm hand in Indiana at age 14, that he worked on framing houses for a construction company, worked on oil pipelines and as a roughneck, and finally as a mechanic. He could not account for all the time between leaving school and his circumstances prior to his arrest.

7.    Mr. Barrett's ability to recall his medical history was similarly spotty. He did relate to having been in an automobile accident, and to being prescribed the psychotropic medication Elavil for depression following his attempt at suicide.

8.    Mr. Barrett related that he was facing charges of first degree murder and attempted murder. He said that his prior legal history included driving under the influence and traffic violations.

9.    Mr. Barrett related that he started drinking alcohol at age 11 and had "lots of trouble" with it before giving it up in 1992. He related that alcohol contributed to problems with his former wife. Mr. Barrett also described extensive, daily use of Cannabis which began with experimentation at age 14. His drug history also was notable for differential use of "uppers and downers." His use of "downers" included Tuinal, Placidyl, and combining Valium with alcohol and other drugs. He also acknowledged using cocaine and PCP. He was a heavy smoker.

10.    Mr. Barrett informed me that there was a family history of depression, substance abuse, and mental illness. He related that he had been described as "hyper" throughout his life, and, while denying paranoia, acknowledged being suspicious of the motives of others.

Decl. Bill Sharp, Ph.D.

Page 2 of 6

11. With the exception of the memory problems to which I have referred, which were more serious, I found Mr. Barrett minimally impaired on a basic mental status examination. He was oriented to person, place, time and situation. He showed some impairment in attention, concentration, and ability to calculate. He could recall two of three items in a test of short-term memory. He had no discomfort or insight regarding his long-term memory problems.

12. Data from Mr. Barrett's self-report form were consistent with his presentation on clinical interview. He was fearful, paranoid, had difficulty concentrating, was uneasy about others, and disordered in his thinking.

13. My diagnostic impressions of Mr. Barrett were of a person with multiple chemical dependency problems that were in remission while he remained in a controlled environment. I found he had an unspecified learning disorder, and attention deficit/hyperactivity disorder ("ADHD"), of a predominantly hyperactive and impulsive type. He met the criteria for avoidant personality disorder and paranoid personality disorder. I assessed his global functioning at 45, indicating that in his then current state he was experiencing serious impairment in his daily functioning.

14. During my assessment of Mr. Barrett, I observed a tremor in his hands and he complained of a buzzing in his ears that interfered with his hearing. He also showed significant difficulty with long-term memory of times and events. Based on my findings, I recommended that Mr. Barrett undergo an evaluation for organic neurological damage. I also recommended further mental health treatment.

15. After I performed my assessment of Mr. Barrett, his attorneys asked me to work with them in the event Mr. Barrett was convicted of first degree murder and faced a trial over the imposition of the death penalty. I consulted with Mr. Echols and Jack Gordon, who also represented Mr. Barrett during his second trial. As I've mentioned, I met with Mr. Barrett one more time, spoke with his father, and another relative. My recollection is that I was asked to update my prior assessment, and that no

Decl. Bill Sharp, Ph.D.

further work was contemplated by the lawyers.

16. After the jury acquitted Mr. Barrett of murder and convicted him of manslaughter, my involvement in the case came to an end. In 2005 someone asked me to fax my report. I had no conversations with Mr. Barrett's lawyers or any experts working with them. The next contact I had with a representative of Mr. Barrett's legal team was in 2008 when I was asked for my file on Mr. Barrett. After providing my records, in 2009, I was asked to review the declarations of Myla Young, Ph.D., and George W. Woods, M.D., and more detailed information about Mr. Barrett's family history and personal history than I had during the earlier proceedings.

17. On reviewing the social history data I was struck by the level of impairment family members saw in Mr. Barrett's mother and father. As I've indicated I had been aware that there were substance abuse problems in the family, but I did not have as complete a picture from longtime observers of the parents' functioning. The impact of alcoholism and mental illness on the parents, and therefore on Mr. Barrett during his formative years, was much worse than I knew. Alcohol use by a mother is known to impact brain development, including by leading to a lack of attention, neglect and abnormal attachment during infancy and childhood.

18. I also was struck by the prevalence of mental illness in the family, especially bipolar disorder. I had seen impulsivity in Mr. Barrett, and in his personal history. Impulsivity appears to have significantly hurt Mr. Barrett, particularly in his decision-making.

19. Dr. Young's declaration indicates she performed a thorough neuropsychological evaluation of Mr. Barrett. This evaluation is generally the type of evaluation I recommended in my report in 2002. Dr. Young's findings are consistent with my own, but also add to them. We agree that Mr. Barrett is impaired in his abilities to attend to information, take that information in, and respond appropriately. The additional data regarding the mother's drinking in combination with scores on intelligence testing, the ADHD I saw in my assessment, and bipolar disorder are features seen in the

Decl. Bill Sharp, Ph.D.                                    Page 4 of 6

spectrum of symptoms one associates with Fetal Alcohol Syndrome. While I do not find Mr. Barrett meets the diagnostic criteria for FAS, it is likely that his relatively poor performance on some measures of intelligence, his difficulty with attention and switching, and the features of bipolar disorder seen in his life are related to prenatal exposure to alcohol.

20. I find Dr. Young's findings regarding Mr. Barrett's frontal and limbic functioning to be significant for an understanding of his conduct. His functioning on neuropsychological tests indicates that on his best day, Mr. Barrett is a poor planner. But there were a whole constellation of factors that would make the effects that underlying organic damage much worse. Mr. Barrett is paranoid and any planning in relation to other people would be affected by this distorted, fearful view of others' motives. Mr. Barrett also engaged in dangerous substance abuse, including the use of methamphetamine which can increase unwarranted feelings of suspicion and anxiety. In addition, Mr. Barrett suffers from bipolar disorder which leads to taking on unrealistic goals, or feeling capable, when in an elevated state, of carrying out tasks one could not accomplish.

21. Mr. Barrett's isolation is significant for understanding his functioning and ability to interact with the world. Mr. Barrett had been by a law enforcement officer, Sheriff Johnny Philpot, who was a large presence in the community. Mr. Barrett could hardly go into town without running into Sheriff Philpot or one of his men.

22. I am familiar with the facts of the case being a midnight raid by Oklahoma Highway Patrol on Mr. Barrett's cabin while Mr. Barrett's teenage son and himself were present. Taking this information into account and Mr. Barrett's assessment by myself, Dr. Young, and Dr. Woods, one could conclude that Mr. Barrett's response to the raid on his property was impulsive and not thought-out. I liken the situation to a person being surprised in the night by an unexpected phone call or alarm clock. In general, someone in those circumstances will experience some disorientation and difficulty understanding events. For someone with Mr. Barrett's mental impairments those experiences would be

Decl. Bill Sharp, Ph.D.

magnified many times over. For a normally functioning person to understand how Mr. Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

23.    Dr. Woods' diagnoses fit the data on Mr. Barrett and my own observations. In any case involving possible diagnoses of bipolar disorder and methamphetamine or alcohol abuse, one has to consider the overlap of sequelae. At different times, Mr. Barrett may have satisfied the diagnostic criteria for bipolar disorder, ADHD, anxiety and depressive disorder. However, at the time I saw Mr. Barrett in 2002 and 2004, he had been incarcerated for three to four years and therefore relatively free from the affects of elicit substances. Dr. Woods and Dr. Young saw Mr. Barrett at an even greater distance from his substance abuse. The observations of family members and clinicians over time support the conclusion that Mr. Barrett's cycling through periods of elevated mood and activity interspersed with periods of depression and inactivity is due to bipolar disorder and not the affects of drugs or alcohol.

I declare, under penalty of perjury, as provided in the laws of the United States, that the foregoing six-page declaration is true and correct.

Executed by me this 21st day of September 2009 in Tulsa County, Oklahoma.

BILL SHARP, Ph.D.

Decl. Bill Sharp, Ph.D.                                                                 Page 6 of 6