**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

---

**EXHIBIT 64**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

# John David Echols                     *Attorney at Law*

SUBMITTED *EX PARTE* AND UNDER SEAL

*VÍA HAND DELIVERY TO THE CLERK*                Monday, February 28, 2005

Honorable James H. Payne
Chief Judge
Eastern District of Oklahoma
101 N. 5th Street
Muskogee, OK  74401

In Re:  US v. Barrett
EDOK Case No. CR-04-115-P

Your Honor:

Thank you for your letter of February 22, 2005. For mutual convenience, I am responding to your inquires in the order in which they appear in your letter.

1.      Savings due to prior representation.

The budget which I submitted was based in part on materials which I received from Federal Death Penalty Resource Counsel, and from review of materials on the FDPRC website, capdefnet.org. These materials indicate that the time I "budgeted" for attorneys is in line with the time and fees expended in other federal capital prosecutions.[1]

In my view, the principal advantage from my prior representation of Mr. Barrett is not that I can represent him more cheaply, but that I can represent him more effectively. Having said that, I do believe that another attorney without my case-specific experience would need to expend a great deal of additional time and effort absorbing the unique history of the case as it played out in state court.

I found it very difficult to predict the time, particularly to break it down into categories as I was ordered to do. It may well be that my estimates are overly pessimistic. However, from my perspective, I believe that the proposed budget for attorney time does take into account the fact that I am not starting from zero, and that a great deal of the work already performed can serve as a foundation for further efforts. I also know that whatever the budgeted amounts, the Court will have an opportunity to review the actual time expended prior to approval.[2]

2.      Fair compensation.

The Oklahoma Indigent Defense System pays contract "lead" counsel in a capital case $60 per "out of court" hour, and $80 per "in court" hour. The contracts also specify that the maximum payment for lead counsel is $20,000, although this amount can be exceeded if the

---

[1]     In addition, in my experience it is generally more expensive in time and effort to move a case quickly on all fronts, than to allow the case to proceed in a more linear way.

[2]     The entries for Mr. Hilfiger were based on projections he provided. As noted in our Sixth and Seventh *Ex Parte* motions, I broke the attorney budget out from the experts budget so that consideration of attorney fees would not delay presentation of the experts portion to the Circuit Court of Appeals.

**Bank of America Bldg., Suite 2112**                **Voice: 918.299.3802**
**P.O. Box 701196**                                  **Fax:  918.299.9765**
**Tulsa, OK 74170-1196**                             **defender@pianosa.com**

KEB013596

Honorable James H. Payne
February 28, 2005
Page 2 of 6

OIDS Board of Directors makes a finding, as it did in Mr. Barrett's case, that a given case is an exceptional one.

I received approximately $72,229.00 for the first state court trial, although the bulk of this was not paid until the summer of 2003 because OIDS was literally out of money. I do not have available a complete breakdown of the "in court" vs. "out of court" hours for the first $29,214.00 of this sum, but for the balance of $43,015.00, the breakdown was 455.25 out of court hours and 196.25 in court hours. From January 1, 2003, through sentencing in the second trial, I billed and received $59,105.00, representing 720.75 out of court hours and 198.25 in court hours.

In both trials, I bore the expenses of my own secretary, and staying in Sallisaw. I also believe that the time which I recorded and submitted to OIDS was at least 20% low, particularly through the first trial.

In the first trial, OIDS hired or provided the following to assist me:[3]

- an outside investigator, Jim Allison. Mr. Allison was paid approximately $10,000. However, he became seriously ill before the first trial and was not able to participate fully, and OIDS agreed to assign two of its "in house" investigators, Steve Leedy and Jack Stringer to assist me as the case developed to trial.

- an outside mitigation investigator, Roseanne Schaye. Ms. Schaye received approximately $20,000 for her services, but she abruptly resigned prior to the first trial because she was not given an additional unlimited budget authorization. She then refused to submit a summary of her findings and/or tasks remaining unless OIDS paid her an additional $4 or $5,000 fee. Steve Leedy, listed above, retrieved the documents she had accumulated and assumed her responsibilities.

- a SWAT team tactics expert, Monroe Earl Simpson. Mr. Simpson received approximately $5,000 for his services. He was available to testify, but we elected not to present any defense witnesses. I was also very disappointed in the quality of his work, and did not request the use his services for the second trial.

- a psychologist, Faust Bianco. Mr. Bianco charged $150 per hour for testing and evaluating Mr. Barrett. I believe his compensation was under $4,000 for the first case. Mr. Bianco and Ms. Schaye disagreed completely concerning Mr. Barrett's mental well being. OIDS in house psychologist Kathy Lafortune, who is also an attorney, was then involved in the case and was prepared to testify in any second stage proceeding.

- a forensics expert, Ron Singer. Mr. Singer was retained with a $5,000 budget, but because the case took so long to bring to trial, he was compelled to withdraw before he devoted any specific time to the case. OIDS then provided the use of two of its in house

---

[3] I do not have available the hourly billing records for the outside experts, but I believe these estimates based on my recollection are reasonably accurate. The OIDS in house employees are salaried and did not submit time records through me. Also, this reflects only the OIDS staff members who were specifically assigned significant duties for the defense. Throughout the two trials, many other OIDS lawyers and employees consulted with us whenever we requested.

Bank of America Bldg., Suite 2112
P.O. Box 701196
Tulsa, OK  74170-1196

Voice:  918.299.3802
Fax:  918.299.9765
defender@pianosa.com

KEB013597

Honorable James H. Payne
February 28, 2005
Page 3 of 6

forensics experts, Laura Schile for scientific issues, and Lisa Cooper for issues relating to weapons, trajectory analysis and the like. Ms. Cooper sat with me at counsel table throughout both trials.

- a jury consultant, Ernest Harper. Mr. Harper was an in house OIDS employee who specialized in the use of a computer database as an aid to jury selection. Mr. Harper worked with us for approximately two weeks, and returned to other duties after *voir dire.*

In the second trial, and at our specific request, OIDS agreed to assign the same "in house" personnel to the case.[4] In addition, OIDS contracted with Ed Hueske, in place of Mr. Singer, and Jeannie Russell, in place of Mr. Bianco. Mr. Hueske was paid approximately $4,000 for forensic testing and consultation, and he was present and ready to testify concerning weapons related issues if needed. Ms. Russell tested Mr. Barrett, consulted with me, and was prepared to testify in a second stage proceeding. She worked principally with my second chair, Jack Gordon, Jr.. I do not have a clear recollection of her total billings, but I believe they were less than $5,000.

3.    Legal research.

You are correct that we reviewed many similar legal issues in the state court trials. However, I believe that the dynamics of the state court cases differ considerably from this federal case. Judge Garrett preferred to discuss anticipated legal issues informally with the prosecution and defense. For example, in discussing issues relating to jury selection and search and seizure, he would "telegraph" his anticipated ruling based on his understanding of the law. Knowing his position in advance, on issues for which he indicated he would rule against us, we concentrated on being certain that a proper record was made to preserve the issue for any prospective appeal. While this required significant preparation, it was not what I would term "thoroughly" researched.

This was true in relation to death penalty issues as well. His position was known, based upon our discussions and his own experience in capital trials. Moreover, Judge Garrett had ruled that, in the event of a first stage verdict of guilty as charged, there would be at least a two week delay before the beginning of any second stage proceeding.[5] We deferred finalizing our position on these issues until and unless that became necessary. For example, although we prepared drafts, we never presented finalized second stage proposed instructions to Judge Garrett in either trial.

In just the past week, the FDPRC counsel have provided me with two resent opinions from other federal district courts which total almost 300 pages in length. Both opinions, *U.S. v. Sampson*[6] and *U.S. v. Johnson,*[7] emphasize the limited amount of clear precedent concerning

---

[4]    Steve Leedy, Jack Stringer, Kathy Lafortune, Laura Schile, and Lisa Cooper. By the time of the second trial, Mr. Harper was no longer with OIDS, and he was replaced in the jury selection role by another OIDS employee, Angie Cole.

[5]    This hiatus between first and second stages is, in my opinion, a sound concept, even if second stage legal issues are resolved prior to the first stage.

[6]    District Judge Mark L. Wolf, USDC Massachusetts, Cr. No. 01-10384-MLW, issued August 26, 2004.

[7]    Chief Judge Mark W. Bennett, USDC Northern District of Iowa, No. CR 01-3046-MWB, issued on February 18, 2005.

---

Bank of America Bldg., Suite 2112
P.O. Box 701196
Tulsa, OK 74170-1196

Voice: 918.299.3802
Fax: 918.299.9765
defender@pianosa.com

KEB013598

Honorable James H. Payne
February 28, 2005
Page 4 of 6

federal death penalty law, and the subtle distinctions between §848 provisions and the balance of federal death penalty law. We will be in large part "writing the book as we go," and in my view this is a more demanding task than locating and following [or objecting to] clear precedent. Add in possible *Apprendi*, *Blakely* and *Booker* issues, and I believe we will need to do far more than merely "update" the previous research.

4.     The use of an investigator.

When I first approached the budgeting issue, I basically thought as you have suggested. However, by the time of my first conference with Magistrate Shreder, I had begun to realize that we are not receiving the same level of cooperation from the United States Attorneys Office that we did from the state court prosecutors.[8] I also became increasingly aware that the government hopes to hang the "drug king pin" label on Mr. Barrett even though the search after his arrest revealed little other than a modest amount of precursors and trace amounts of methamphetamine.

Judge Garrett indicated early on that he considered drug abuse testimony to be troubling because of its potential for prejudicial impact. While drugs were referred to frequently, the only "druggie" whom the state called to testify, was Steven Carl Smith, who got no further than a hearing outside the presence of the jury, in which he admitted that he had committed perjury during that very hearing. Judge Garrett ordered him arrested for perjury and the state then withdrew its notice of intention to call him.[9]

The drug culture in southeastern Oklahoma is both elusive and ingrained. Throughout both state court trials we received rumors of all sorts concerning organized criminal activities and political corruption. Those rumors continue, and a thorough fact investigation could conceivably turn up evidence that Mr. Barrett was targeted not for drug activities, but in retaliation for his having angered local criminal interests.

In my opinion, we will need to be more informed generally about the drug evidence. As soon as we succeed in learning the identity of the government's intended witnesses, we will need to be thoroughly informed about those individuals and their relationship to organized criminal activities and law enforcement agencies.

With respect to the relative costs of fact investigators vs. mitigation investigators [with fact investigators less expensive], I based my opinion on my prior experiences along with anecdotal information from other attorneys. When I sought mitigation services before the first trial, most of the recognized mitigation specialists received fees in the $100 to $150 per hour range. Ms. Schaye was a "beginner" with little experience, but a good resume. She agreed to work for OIDS for $70 per hour, but as I indicated above, she was just beginning in the business and agreed to a lower than usual rate.

---

[8]     The state court prosecutors made all of their witnesses and evidence available to us at our request. In contrast, the government has refused virtually every informal discovery request, and has simply refused to reply to our request that they be responsible for summoning the law enforcement witnesses to hearings or trial.

[9]     In a typical miscarriage of justice, Mr. Smith plead guilty and was placed on an illegal suspended sentence with the concurrence of the prosecutors and the Drug Task Force. This for a man who had admitted committing perjury in a capital case!

---

**Bank of America Bldg., Suite 2112**
**P.O. Box 701196**
**Tulsa, OK 74170-1196**

**Voice: 918.299.3802**
**Fax:  918.299.9765**
**defender@pianosa.com**

KEB013599

Honorable James H. Payne
February 28, 2005
Page 5 of 6

I also note that Inquisitor, Inc., the agency which I have requested, charges only $75 per hour, which is lower than I anticipated, but still higher than the rate of $50 per hour requested for Mr. Eberle. There is still a differential, but it is smaller than I anticipated.

5.     The existence of a clear plan for the defense.

I believe that my previous comments address this issue for the most part. Also, while I do think that we have a clear idea of the foundation of Mr. Barrett's first and second stage defenses, I continue to disagree that this knowledge allows me to predict, "how much time [I] plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case."

I also note that in both trials, the state court prosecutors endeavored to present a complete picture to the juries. They basically called all available witnesses. I do not expect the government to simply retry the case that has twice failed to convince a jury that Mr. Barrett intended to kill anyone. They will, in my opinion try a bare bones case that barely, if at all, touches on the statutory elements. It will therefore fall to us to give the jury the complete truth, a task which will take more time and effort than relying on cross-examination.

6.     Ex-parte proceedings.

With respect to particular experts who will be either interacting with the government [such as receiving evidence for independent testing] or certainly testifying at trial, I agree that disclosure of the name of that person *after they have been approved* will not damage Mr. Barrett. However, the disclosure of the justification advanced for each individual expert would necessarily disclose privileged attorney client information. Moreover, I think that if an expert of one sort or the other is approved, and the name and general purpose of the expert is revealed to the government, then the Court could entertain any government objection before the requested funds have been entirely expended.[10]

Generally, exposing Mr. Barrett's attorneys' plans and strategies infringes on his Sixth Amendment rights, and could irreparably harm his defense. I believe also that this is the reason the government has not objected to *ex parte* proceedings concerning the funding of his defense.

7.     Finally, I would like to respectfully express something of my own views about this process.

I am frankly concerned that Mr. Barrett cannot wait much longer to engage the requested experts if we are to be expected to meet the Court's present schedule. Recognizing your responsibility to protect the public purse, it may be that we are simply attempting to meet a schedule which is unrealistic.[11]

---

[10]     With respect to psychological or physiological experts, even the identity of the approved expert should not be revealed until we determine to give notice under Rule 12.2.

[11]     I won't expand upon this point here, because the government is not privy to this correspondence. However, Mr. Littlefield has expressed similar concerns, particularly concerning the transcript of the second trial.

**Bank of America Bldg., Suite 2112**
**P.O. Box 701196**
**Tulsa, OK 74170-1196**

**Voice: 918.299.3802**
**Fax:   918.299.9765**
defender@pianosa.com

KEB013600

Honorable James H. Payne
February 28, 2005
Page 6 of 6

I am also concerned that Your Honor may view these budgets and budgeted amounts as being set in stone, or a ceiling above which Mr. Barrett's defense should or may not go. This cuts both ways, and it may be that I have subconsciously over estimated some items out of concern that Your Honor will not take kindly to "upward departures." Then again, I have also been instructed that I am to make this case my "highest priority," which I am endeavoring to do.

I was literally sickened when informed by a reporter that the September 23, 2004, Complaint had been filed on the day the statue of limitations ran for drug offenses. From our perspective, this case should never have been filed, and zero dollars should have been needed for this defense. Nevertheless, there is a small constituency to which the government responds that insists on a third trial, and then possibly a fourth or even a fifth if this one doesn't turn out as they wish. Based on what we know now, our sincere efforts to convince the government not to file [Petite Policy] and not to seek the death penalty [Authorization by the Justice Department] amounted to a fool's errand. We anticipate that the government will continue to present one public face to the Court and the defense, while seeking every fair *and unfair* advantage.

I appreciate the opportunity to respond to your concerns. My strong preference would be that we continue to communicate our concerns to one another, and that, on Mr. Barrett's behalf, we be granted the flexibility to alter and amend our plan as the case progresses to trial.

Sincerely,

John David Echols

JDE:am
cc: Roger Hilfiger

**Bank of America Bldg., Suite 2112**
**P.O. Box 701196**
**Tulsa, OK 74170-1196**

**Voice: 918.299.3802**
**Fax:  918.299.9765**
**defender@pianosa.com**

KEB013601