**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,    )
        )
        *Movant,*    )
        )
**v.**    )    **Case No. 6:09-cv-00105-JHP**
        )
UNITED STATES OF AMERICA,    )
        )
        *Respondent.*  )

---

**EXHIBIT 108**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

---

5

files on our confidential informants and keep track of the money that's paid to them.

Q    How would you, for instance --

A    In the form of a receipt with a -- a signed receipt with a thumb print on it in a confidential file.

Q    Each and every payment would have such a --

A    Yes.

Q    -- receipt?  Without identifying any person by name, do you know whether or not the confidential informant that was the basis for the issuance of the search warrant used to raid Mr. Barrett's home was ever paid money through your office?

A    No.  Whoever it was was not ours, no sheriff's department informant.

Q    Do you have any knowledge of the identity of that person?

A    No, sir, I do not.  I never did.

Q    Has anyone since the time of the trial asked you if you could provide information about a particular individual, whether he be reliable or whatnot, anything of that kind?

A    In reference to this particular informant?

Q    Yes.

A    No.

Q    Now, back in our -- all of the stuff that we've received in this case, there's a reference to a time when one or more people from your office went out to Mr. Barrett's

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

6

home and inspected some weapons.

A    Uh-huh.

Q    Do you recall, generally, a reference to that?

A    I remember one specific incident where I went out.  After the officers had already been there, I arrived there.

Q    Fill me in on that instance.

A    I think the call was he was supposedly shooting out there; and if I remember right, a deputy by the name of Shelton Fare was the first officer there.  And when I got there I think another one had arrived and I don't remember who it was.  They had some firearms they were inspecting when I arrived.  Kenny was in the house and they were running the serial numbers and, in effect, looking at the guns.

Q    And was there a AR15-type weapon that was being looked at then?

A    Not that I remember, no.  I believe the one they had actually looking at when I got there was a -- I think it was an SKS or it looked like it.  I didn't inspect it.  I just saw it.

Q    Did you have any dealing with Mr. Barrett at that time?

A    Yes.  I walked up to the porch and talked to him.

Q    What do you recall about your conversation?

A    Mostly about -- some of it was about shooting.  I guess about shooting.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

00002404

KEB312948

7

Q    You were kind of telling him to calm down, that kind of thing?

A    Did I tell him to calm down?

Q    No, I don't mean calm down. I mean but to tell him to behave himself a little better as a neighbor?

A    Yeah, shooting in general around a residential area. You had to be careful and all of this stuff, and then I called his attention to a misdemeanor warrant that was outstanding on him.

Q    And what did you tell him about the misdemeanor warrant?

A    I told him there was one. And he said he was planning on going in and appearing on that and taking care of it or doing whatever. He promised me that he would.

Q    Did Mr. Barrett threaten you when you were out there?

A    No.

Q    Prior to the time that this search warrant was executed out at his place, did anybody ask you for advice concerning whether or not there might have been a different way of proceeding?

A    In the execution of the warrant?

Q    Yeah. When the task force obtained this no-knock warrant and brought in the tact team, did anybody talk with you about whether it was necessary to bring in the tact team in order to deal with Mr. Barrett?

A    It was discussed at one point before the warrant -- way

00002405

KEB312949