**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:09-cv-00105-JHP** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**EXHIBIT 109**

**TO KENNETH EUGENE BARRETT'S**

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

# Forensic Training & Consulting, LLC

| | |
|---|---|
| 1544 Valley Creek Rd. | Ph: 940-383-8668 |
| Denton, Texas 76205 | E-mail: xprtwit@aol.com |

March 10, 2009

David Autry
1021 NW 16th Street
Oklahoma City, OK 73106

**Re** *United States of America vs. Kenneth Barrett* (FT&C Case # 03-5767) – **Review of Testimony by Terrence Higgs and Iris Dalley**

## Introduction

I was requested to review transcripts of trial testimony by Terrence Higgs and Iris Dalley in United States vs. Kenneth Barrett. I was provided both transcripts, along with a directory of court exhibits and 4 CDs containing demonstrative exhibits used by Iris Dalley, videos of the scene and images of the scale model used at trial. This is the report of my findings concerning that review.

## Higgs testimony

My review of the testimony given by Terrence Higgs revealed some issues of minor concern, but nothing of substantive concern in my opinion. The specific issues that I would categorize as being of only minor concern are as follows:

1. In his testimony concerning the number of shots that might have been fired by the officers' H&K MP5 9mm submachine gun, Mr. Higgs failed to point out that the MP5, according to H&K, should not be loaded to full magazine capacity due to the potential for jamming. Thus, basing the number of shots potentially fired on starting with a fully loaded magazine is unreliable unless it can be confirmed that the OSBI does not follow the H&K recommendation.
2. In his testimony concerning ejection characteristics for fired casings, Mr. Higgs failed to mention that, from time to time, anomalous ejection paths do result. That means a weapon that typically ejects to the right, all else being equal, may occasionally eject to the left and so on.

In his testimony concerning bullet spin, Mr. Higgs gave a flawed explanation that opined that, for a time, bullet spin overcomes the effects of gravity during its flight. In response to that, I would point to the classic ballistics question: "If a bullet is fired from a weapon held parallel to the ground and at the moment that the bullet exits the muzzle, a similar bullet is dropped to the ground from the same height the gun barrel is above the ground, which bullet would hit the ground first?" The answer, of course, is that they would hit the ground at the same time

since gravity acts on them equally and neither the horizontal velocity nor the spin stabilization of the fired bullet has any effect of the force of gravity.

4. Mr. Higgs testified that he "would expect a ricochet" for bullet impact angles of 60 degrees or less. The reality is more like 20 degrees or less.

5. Mr. Higgs expressed the opinion that many examiners have historically had in regard to the production of photographs as demonstrative exhibits in firearms examinations of fired bullet and cartridge case markings (i.e. photomicrographs). I would point out, however, that many firearms examiners do produce such photographs in court contrary to the old argument that "beauty lies in the eye of the beholder".

As already stated, I consider all these statements to be of only minor concern. The majority of Mr. Higgs' testimony is very credible and forthright. I am unable to assess the validity of any of the actual comparisons of bullets/fragments and cartridge cases on the basis of this verbal testimony alone. To do so would require my access to both the bench notes of Mr. Higgs and the photographs he states he took of his comparisons, at the least, and possibly the evidence itself.

**Dalley testimony**

Based upon my review of the testimony given by Iris Dalley, there are, in my opinion, some minor issues as well as some substantive issues of concern. My specific concerns are as follows:

Minor issues

Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components. Specifically, these are the terms that were inappropriately used:

1. The term "front quarter panel" is used to refer to the front fender.
2. The terms "left" and "right" are used when "driver side" and "passenger side" are appropriate.
3. The term "side wall", which is a term for part of the anatomy of a tire, is used several times to describe an inner body panel on the Ford Bronco.
4. The term "projectile", typically misused by non-firearms trained individuals, is applied to anything and everything presumably responsible for impacts/perforations rather than the appropriate terms "bullet", "bullet fragment", "bullet jacket", "jacket fragment", "bullet core" and "bullet core fragment".
5. Ms/ Dalley's explanation of bullet fragmentation upon impact with glass is flawed. She states that the bullet impacts the glass, perforating it and then exiting it whereupon it fragments. The reality is fragmentation begins upon impact.
6. Ms. Dalley, by her own admission, is not a firearms examiner, but states she seeks out the assistance of firearms examiners when she has a "ballistics" question. Arguably, one can reconstruct a shooting incident without being a firearms examiner, but a basic understanding of firearms and ammunition components is

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

2

essential to being able to recognize what one is viewing at a shooting scene. This lack of understanding/familiarity was exemplified when she stated that there might be some caliber similar to a 223 that could have made some of the bullet holes in the Bronco but when asked by the defense attorney for an example she could not name one.

The use of inappropriate terminology and ambiguous statements in testimony makes it difficult for anyone to understand, but particularly so for lay individuals. This is no doubt reflective of the fact that Ms. Dalley is not a trained firearms examiner and is also apparently not very well versed in vehicle component terminology. The use of incorrect terminology constitutes only a minor concern in my opinion, however.

Substantive issues

There are, in my opinion, a number of substantive issues with regard to both Ms. Dalley's approach to shooting incident reconstruction in general and this reconstruction in particular. These concerns are as follows:

1. From her various responses to questions from both the prosecution and the defense, it appears that Ms. Dalley did not follow widely accepted protocol used in shooting incident reconstruction. This protocol includes the following:

    a. The dimensions of the Bronco were not determined. Standard protocol involves determining, at a minimum, length, width and height of vehicles involved in shootings. Similarly, there was a question as to how wide one of the Bronco's doors was open for several shots but no measurements were taken and the explanation "the door was curved so it could not be measured" was given.

    b. Prior to inserting trajectory rods into bullet holes (or otherwise altering them), one is well advised to examine the hole margins, interior surfaces and area surrounding them for trace evidence. Ms. Dalley was specifically asked about gunshot residue around some of the bullets holes at the scene but stated "she did not see any" (pg 3399). A legitimate evaluation of areas around bullet holes for trace evidence requires close inspection with a hand lens and/or making a lift for lab testing. Likewise, the presence of blood, tissue, hair, fibers, etc. should be looked for in and around bullet holes.

    c. Whenever bullet holes appear to be symmetrical and devoid of significant distortion, the length and width of the holes should be determined using a pair of dial calipers. The width can be related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates. Ms. Dalley testified that she could not determine the caliber of any of the responsible bullets striking the Bronco (pg 3298). Measurement of some of the holes, based upon the photographs included in the materials received, appears to have been something that could have been reliably carried out.

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

3

d.  The proper placement of trajectory rods in bullet holes in order to reliably approximate the responsible bullet trajectories requires an understanding of the characteristics of bullet penetration/perforation in a variety of substrates. This is particularly true with bullets that fragment, such as the 223 bullets in this incident. It is equally important to have sufficient experience to know when calculation of trajectories, rather than use of trajectory rods, is preferable and to know when the use of alternate means are appropriate. For trajectory rods to be a feasible method for reliably representing bullet trajectories, one needs to have a secondary impact that has not resulted from initial impact deflection and/or fragmentation. Ms. Dalley attempted to establish bullet trajectories utilizing fragment impacts into secondary targets based upon the presumption that the core (or a large fragment thereof) travels in a straight path. She correctly testified (pg 3466) that there was no way to determine the "exact path" of each bullet fragment and yet proposes that her trajectories, as represented, are "accurate".

e.  Ms. Dalley repeatedly testified that bullets passing through the "partially open" Bronco door would go "straight through" and that bullet core fragments would do likewise (it is presumed that only fragments were recovered because Ms. Dalley testified that "No, I didn't find any [fragments] consistent with being parts of a single bullet." – pg 3298). One need only recall the "magic bullet" path in the John F. Kennedy assassination to recognize the fallacy of proposing that bullets pass through intermediary target undeterred ("straight through"). The situation for bullets that fragment upon impact is even more unpredictable. In order to attempt to make her theory of bullet trajectories being unimpeded by intermediary targets fit the evidence, Ms. Dalley proposed that the door moved to various positions to account for the incongruity of the different trajectories through it (pg 3314). While such movement cannot be excluded, it is more likely that bullet deflections/fragmentation account for the trajectory variations in the door. When bullets impact surfaces with irregular contours (i.e. other than flat surfaces) deflection can and does occur with frequency.

f.  Bullet holes in vehicles and other inanimate objects and the trajectory rods placed in those bullet holes are generally referenced by two sets of coordinates (2 linear and 2 angular) in order to establish reproducible data for creating diagrams, animations, etc. that accurately represent the true trajectories (within the limits of measuring uncertainty). Ms. Dalley stated, rather amazingly, that she did not determine any of the angles because she "did not have the necessary equipment" (pg 3275). All that is required is a $30 zero base protractor and a $5 plumb bob. The primary reason for obtaining such linear and angular measurements is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident. Given her testimony that she took no such measurements and that she could not establish "exact paths" using

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

4

trajectory rods alone, it is unclear how the diagrams and animation she produced can be perceived as having any reliability.

    g. Ms. Dalley testified that the terrain at the shooting scene could be described as "hilly" but apparently did nothing to establish the exact grade or assess the potential impact any such grade might have on the perceived trajectories of bullets striking the Bronco. At the very least, determining bullet impact angles relative to a common point of reference (plumb line) is the accepted standard.

    h. When there are holes of questionable origin, proper procedure calls for on-scene chemical testing for the presence of copper and lead to confirm that they were produced by bullets. Ms. Dalley testified to having knowledge of that type testing but did not testify that she, in fact, conducted any of it.

    i. Ms. Dalley testified that she had "no means of sequencing any of the shots" at the scene. The sequencing of shots, while certainly not always possible, can sometimes be accomplished through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets/fragments (glass, fibers, hair, paint, etc.). There was no testimony that would indicate that any of this type examination/testing was ever done, either on-scene or off-scene.

    j. In an incident involving a moving vehicle, as with the Bronco in this case, a reenactment would include physically placing the Bronco in various positions and making a determination (typically projecting a laser beam from each bullet hole of interest, where possible) as to the feasibility of the each shot coming a particular position or positions. Of particular importance in this incident are the shots that occurred after the Bronco came to a stop. While Ms. Dalley testified that the Bronco had been moved to another position prior to her arrival, she also testified that there were tire impressions and a fluid deposit in the soil in front of the cabin that could have been used to reestablish the position before moving.

2. Ms. Dalley's approach to establishing the trajectory of bullet holes through the cabin window glass, blinds and curtain ("towel") and the Bronco windows was inappropriate. She testified that her results were unreliable for the cabin window part of her analysis (pg 3389).

    a. She had someone hold the trajectory rod rather than set up a tripod and place the laser on the tripod.

    b. She took no measurements of the hole locations.

Her methodology, as she testified to it, of placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation.

3. Ms. Dalley testified that she concluded that, not "seeing" any evidence of gunshot residue on the cabin window that was shot through, that the distance of the muzzle would have been "greater than 3 feet" from the glass because that distance has been reported in forensic literature. That testimony was an apparent reference to a general rule of thumb that varies considerably from weapon to weapon and is also dependent upon the particular ammunition used. The correct evaluation of maximum muzzle to target distance would require test firing into glass like that at

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

5

the scene using the incident weapon and ammunition like that used to produce the bullet holes in question.

4.  Ms. Dalley testified that she did not attempt to locate any bullets/fragments in the soil. A metal detector should have been used to attempt to locate any bullets/fragments in the soil.

5.  Ms. Dalley testified that she did not attempt to collect all of the bullets/fragments inside the Bronco. According to generally accepted protocol in shooting incident reconstruction, all shots need to be accounted for when possible. The location and recovery of bullets/fragments is an essential aspect of that endeavor.

6.  Ms. Dalley testified that she concluded that the bullet wound to Trooper Eales' right arm had to take place after he exited the Bronco because of "the absence of tissue inside the Bronco" and the fact that tissue appeared to be missing in the area of the arm wound. She did not, however, testify to finding any tissue outside the Bronco. She did not indicate that she ever attempted to locate tissue outside the Bronco. One way to test for it would have involved spraying luminol on the ground in the area around the Bronco. That apparently was not done. Furthermore, one of the cornerstones of forensic science is "Absence of evidence is not evidence of absence." That refers to the fact that not finding evidence cannot be used to conclude anything other than that no evidence was found. That statement is attributed to one of Ms. Dalley's own colleagues, well-known bloodstain pattern analyst Herbert Leon MacDonnel of Corning, New York.

In summary, Ms. Dalley's testimony indicates that she did not follow accepted protocol in the evaluations she conducted at the shooting scene. Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation. In order to confirm this apparent failure to follow appropriate protocol, it would be necessary to have access to Ms. Dalley's field notes, photographs and other supporting documents in this matter.

These opinions are based upon my 35 years experience as a firearms examiner and shooting reconstruction expert, my independent research in the area of shooting incident reconstruction and specialized training that I have received in firearms, firearms-related issues and shooting incident reconstruction as reflected in my attached curriculum vitae.

Edward E. Hueske
Consulting Forensic Scientist

*Note: The opinions expressed herein are based upon the information that was available at the time of this writing. Should new or different information be forthcoming, the right to modify these opinions accordingly is hereby reserved.*

*Fellow – American Academy of Forensic Sciences*
*Emeritus Member – American Society of Crime Laboratory Directors*
*Emeritus Member – Southwestern Association of Forensic Scientists*

6