Page 1

AO 243
(Rev.  10/07)

# Motion to Vacate, Set Aside, or Correct a Sentence
# By a Person in Federal Custody

**(Motion Under 28 U.S.C. § 2255)**

### Instructions

1. To use this form, you must be a person who is serving a sentence under a judgment against you in a federal court. You are asking for relief from the conviction or the sentence. This form is your motion for relief.

2. You must file the form in the United States district court that entered the judgment that you are challenging. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file the motion in the federal court that entered that judgment.

3. Make sure the form is typed or neatly written.

4. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5. Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or arguments, you must submit them in a separate memorandum.

6. If you cannot pay for the costs of this motion (such as costs for an attorney or transcripts), you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you.

7. In this motion, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different judge or division (either in the same district or in a different district), you must file a separate motion.

8. When you have completed the form, send the original and two copies to the Clerk of the United States District Court at this address:

> Clerk, United States District Court for
> Address
> City, State Zip Code

9. **CAUTION:  You must include in this motion all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this motion, you may be barred from presenting additional grounds at a later date.**

10. **CAPITAL CASES:  If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT

SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District | Eastern District of Oklahoma |
|---|---|---|
| Name (under which you wee convicted): Kenneth Eugene Barrett | | Docket or Case No.: 06:09-cv-00105 JHP |
| Place of Confinement:  Terra Haute, Indiana | | Prisoner No.: 04342-063 |
| UNITED STATES OF AMERICA | | Movant (include name under which you were convicted) Kenneth Eugene Barrett |
| | v. | |

MOTION

1.    (a) Name and location of court that entered the judgment of conviction you are challenging:

U.S. District Court, Eastern District of Oklahoma, Muskogee, Oklahoma.

(b) Criminal docket or case number (if you know):   04-CR-115

2.    (a) date of the judgment of conviction (if you know):  December 29, 2005

(b) Date of sentencing:  December 19, 2005

3.    Length of sentence:  Death, 2 life sentences

4.    Nature of crime (all counts):

Count I:   18 U.S.C. § 924 (c)(1)(A) and (j)

Count II:  18 U.S.C. § 924 (c)(1)(A) and (j)

Count III: 18 U.S.C. § 848 (e)(1)(B)

5.    (a) what was your plea?  (Check one)

(1)    Not guilty  ☒        (2)    Guilty  ☐        (3) Nolo contendere (no contest)   ☐

(b)  If you entered a guilty plea to one count or indictment, and a not guilty plea to another

count or indictment, what did you plead guilty to and what did you plead not guilty to?

6.    If you went to trial, what kind of trial did you have? (Check one)    Jury ☒        Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing? Yes ☐   No ☒

8. Did you appeal from the judgment of conviction?   Yes ☒   No ☐

9. If you did appeal, answer the following:

(a) Name of court:   U.S. Court of Appeals for the Tenth Circuit.

(b) Docket or case number (if you know):   06-7005.

(c) Result:   Affirmed.

(d) Date of result (if you know):   July 25, 2007.

(e) Citation to the case (if you know): 496 F.3d 1079.

(f) Grounds raised:

In his direct appeal, Movant challenged his convictions and sentence of death by raising

the following claims:

a. The district court erred by denying Movant's motion to suppress. More specifically, the search warrant did not satisfy the Oklahoma standards for a nighttime warrant; the executing officers failed to meet Oklahoma standards regarding executing officers; the warrant failed to comply with Fed. R. Crim. P. 41 (warrant was not issued by a federal officer); and the evidence should be suppressed on double jeopardy grounds.

b. Movant challenged the indictment, more specifically, its sufficiency because it failed to set forth elements of predicate offenses; its multiplicity because all three counts were based on the same conduct (firearms, drugs, and killing of the same person) and misjoinder of offenses.

c. The district court allowed admission of improper victim impact evidence.

d.  The district court allowed juror misconduct, more specifically, one of the jurors knew a state trooper involved in the case and another trooper had limited contact with a juror.

e.  The Government violated *Batson* by failing to exercise its peremptory challenges in a race neutral manner.

f.  Movant challenged the constitutionality of the federal death penalty scheme, more specifically, arguing that the penalty phase process of weighing aggravating and mitigating factors violates the Sixth Amendment; the federal scheme unconstitutionally delegates legislative authority; the statute fails to require proportionality review; the statute allows for consideration of impermissibly vague aggravating factors; and the statute does not narrow the class of persons eligible for the death penalty.

g.  Movant challenged the "intent to kill" aggravating factor, more specifically, because that factor is used in the eligibility process then again in the weighing process.

h.  The Government did not present sufficient evidence of "intent to kill."

i.  The Government failed to produce names and addresses of key witnesses.

k.  The district court erred by failing to dismiss the indictment on double jeopardy grounds.

l.  The Government failed to follow the *Petite* policy.

m.  Movant asserted cumulative error.

(g) Did you file a petition for certiorari in the United States Supreme Court?  Yes ☒  No ☐

If "Yes," answer the following:

(1) Docket or case number (if you know): 07-7066

(2) Result:  Denied.

(3) Date of result (if you know):  March 17, 2008

(4) Citation to the case (if you know):  128 S.Ct. 1646.

(5) Grounds raised:

GROUND ONE: Did inclusion of the "intent to kill" eligibility factor in weighing the aggravating factors against the mitigating factors in second stage, pursuant to the statute which required aggravating factors to substantially outweigh the mitigating factors, result in an improper weighing scheme violating the Fifth, Sixth and Eighth Amendments.

I.      The Federal Death Penalty Act, 18 U.S.C. § 3591, *et seq.*

II.     Capital Offenses Under 21 U.S.C. § 848

GROUND TWO: Did the trial court commit reversible error in denying the motion to suppress the drug search warrant?

GROUND THREE: Was victim impact evidence so unduly prejudicial as to deny petitioner of his constitutional rights under the Fifth and Eighth Amendments?

10.     Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

Yes ☐  No ☒

This is an amendment of Petitioner's only application for collateral relief.

11.     If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the Proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition or

 application?        Yes  ☐         No  ☐

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or

application?        Yes  ☐         No  ☐

 (7) Result:

 (8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your

motion, petition, or application?

(1) First petition:    Yes  ☐        No  ☐

(2) Second petition:  Yes  ☐        No  ☐

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly

why you did not

12.    For this motion, state every ground on which you claim that you are being held in violation of the

Constitution, laws, or treaties of the United States.  Attach additional pages if you have more

than four grounds.  State the facts supporting each ground.

**GROUND ONE**:

**Actions of the Trial Court Violated Mr. Barrett's Rights to Due Process, to Effective Assistance of Counsel, to Cross-Examine Witnesses, to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**.

(a)    Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

Actions of the trial court denied Mr. Barrett a fair trial under conditions required or routinely provided to similarly situated defendants[1]

The trial court interfered with Mr. Barrett's counsel. The trial court stated an interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and it engaged in communications with counsel that created a conflict between the court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense.

The trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases.  The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as a class of one, intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment.  Imposition of the death penalty through such a skewed process is arbitrary.

---

[1] Mr. Barrett would present citations to authorities that serve as an aid to understanding and responding to each of his claims, as well as supporting argument in light of these authorities,  but the court has ordered him not to do so.

The trial judge's conduct towards Mr. Barrett's interests and his counsel violated the Code of Judicial Conduct and was not impartial.

The court was required to consider the recommendations of the Federal Defender when appointing counsel.  The Federal Defender and the court should take into account the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation.  Courts are encouraged to appoint counsel who are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation.

Judge Payne initially expressed a desire to appoint the Federal Defender to represent Mr. Barrett.  When the Federal Defender informed Judge Payne that the only attorney in his office qualified to handle a capital case was already appointed to such a case, Judge Payne indicated that he anticipated the assistant federal defender who normally worked in the Eastern District would be responsible.  The Federal Defender explained that the attorney was not qualified and his office could not provide competent representation to two capital defendants at the same time.  (Exhibit 67.)

Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Exhibit 54; Exhibit 67; Exhibit 34.)  Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation.  (Exhibit 54; Exhibit 67.)

During discussions with these attorneys, the trial judge expressed an interest in considering factors that are not recognized by the Judicial Conference or national indigent defense organizations as indicative of an attorney's qualifications to provide effective representation. Judge Payne expressed an interest in appointing less-qualified attorneys to represent Mr. Barrett as a means of giving local attorneys experience so that a local panel could be formed for representation in capital cases. (Exhibit 54; Exhibit 67; Exhibit 34.). To this end, the trial judge rejected the recommendation of Robert Nigh and appointed Roger Hilfiger, based in part on Mr. Hilfiger's past experience as United States Attorney for the Eastern District of Oklahoma. *Id.*

The CJA Guidelines provide that courts budgeting federal death penalty cases should ask counsel for the "best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial." The Judicial Conference's guidelines also provide that these "[c]ase budgets should be submitted *ex parte* and filed and maintained under seal." The trial court in this case required a high degree of specificity, and threatened to reverse the prior order Judge White entered authorizing *ex parte* submissions if counsel did not disclose "a detailed strategy for the defense (e.g., how much time you plan to spend each week on this case and exactly what task each attorney will be assigned in preparation for this federal case)." (Exhibit 65 – Letter from Hon. James H. Payne to John David Echols dated 2/22/05.)

Judge Payne expressed a desire that the case rapidly proceed to trial. (Exhibit 34.) On January 7, 2005, the court admonished Mr. Barrett's attorneys for failing to mention the need for a continuance during a status conference earlier in the day. (Doc. 31.) The court said,

"Counsel is reminded this is a death penalty case, which should be given the highest priority by counsel." *Ibid.*

On January 31, 2005, Mr. Barrett's counsel filed a detailed, 10-page, budget proposal. (Doc. 46.)

The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases and the Judicial Conference's guidelines recognize the importance of prompt authorization of funds so that delay will not result in a denial of effective representation. The CJA Guidelines encourage courts "to employ[] an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity," and encourage courts to "act upon requests for services where prompt authorization is necessary for adequate representation." The trial court in this case did not hold such a conference.

On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals. (Docs. 50, 51.) On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but not about Mr. Hilfiger's representation. (Exhibit 65.) Throughout the letter, Judge Payne expressed concern that Mr. Echols was being paid to represent Mr. Barrett in a third trial, and expressed the view that no further investigation should needed to be done after the previous trials. *Ibid.* Mr. Echols responded by letter on February 28, 2005. (Exhibit 64.)

Statutes and guidelines related to case budgeting in federal death penalty cases state a preference for *ex parte*, sealed proceedings in order to protect defense confidentiality. The trial court in this case expressly considered using Mr. Barrett's budget submissions to aid the prosecution. In his letter to Mr. Echols, Judge Payne stated that lifting the order on *ex parte*

budgeting "might actually help resolve this case more expeditiously by allowing the government an earlier opportunity to object to the admissibility [of Mr. Barrett's experts] and perhaps allow the court to rule on the admissibility issues prior to expenditure of funds for experts which might not be allowed to testify at trial." (Exhibit 65 at 2.) Mr. Echols objected that this proposal would infringe on Mr. Barrett's Sixth Amendment rights, and it was not implemented.

On February 28, 2005, Mr. Echols informed the court that delays in authorization of a budget for any defense preparation were endangering counsel's ability to prepare for trial on the court's schedule. (Exhibit 64 at 5.) The court did not rule on the defense's budget proposal until March 18, 2005. (Doc. 97.) At that point, discovery was scheduled to close on May 11, 2005, and trial was scheduled to start on July 11, 2005. (Scheduling Order filed 12/11/04 (Doc. 22).)

Richard Burr, an attorney retained by the Office of the Defender Services of the Administrative Office of the United States Courts, served as an advisor to Mr. Barrett's counsel, John Echols, through the auspices of the Federal Death Penalty Resource Counsel project ("FDPRC"). (Exhibit 118; Exhibit 34.)[2] As Mr. Burr stated to the court at the time, the FDPRC collects "data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases." (Decl. Richard Burr re attorney compensation dated 4/4/05 and filed as Exh. B to Doc. 107.) Mr. Barrett's counsel relied upon the data collected by the FDPRC in making his funds requests. (Exhibit 64.)

---

[2] Mr. Burr offered his assistance to Roger Hilfiger, but Mr. Hilfiger did not seek any assistance from Mr. Burr. (Exhibit 29; Exhibit 118.)

The trial court's funding decisions were based on the judge's subjective view of what was "'reasonably necessary' to provide fair compensation and to provide the defense with necessary tools for a fair trial." (Order filed 3/18/05 at 2.)

The trial court had before it declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants. (Exhibit 118.) The trial court's order evidences no consideration of these norms or practice, whether adversarial or judicial. The trial judge's order evidences no consideration for the specific needs of counsel as expressed in their funds requests. The trial judge's limitations on funds were not based on any evidence of or expressed concern for fiscal limitations.

As expert counsel advised the court at the time,

in the GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol, VII, "Appointment of Counsel in Criminal Cases," Chapter VI, §§ 6.02(F)(3)(c)(i) and (ii), Courts are encouraged in the course of case budgeting to secure counsel's "best preliminary estimate that can be made of all services," including the services of counsel.

[] It is clear that the reason the attorney services were not included in the pre-authorization and circuit review provisions of 21 U.S.C. §§ 848(q)(9) and (10)(B) is that attorney services, to be meaningful, must be provided as the professional judgment of the attorney dictates and cannot, therefore, be subject to pre-authorization without significantly interfering with, even paralyzing, the process of representation.

For this reason, the inclusion of attorney services in the case budgeting guidelines of the GUIDE TO JUDICIARY POLICIES AND PROCEDURES is intended, *not* to interject the courts into case management, but to require *counsel* to assess the representation needs of the case in order to give the courts a way of projecting what counsel believes to be reasonable expenditures of time. If the expenditure of attorney time thereafter begins to depart in substantial ways from these

projections, the budgeting of attorney time provides a basis for the court to question the attorney about the necessity of his or her efforts. This is the way in which the federal courts have uniformly approached the matter of budgeting attorney time in capital cases - with due deference to the exercise of attorney judgment, but with a basis for questioning certain expenditures of time.

(Decl. Richard H. Burr dated 4/4/05, filed as Exh. A to Doc. 107.)

Investigation is a core function of defense counsel. ABA Standards for Criminal Justice, Standard 4-4.1 (requiring "prompt investigation"). The relevant guidelines to administration of the Criminal Justice Act provide that "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services." The trial court authorized funds for Mr. Barrett's representation on a far more narrow basis.

Indeed, the trial court's funding order went beyond the simple approval or denial or funds. Mr. Barrett's trial counsel requested funds to investigate and develop evidence for the defense. (Doc. 51; Exhibit 64.) The trial court refused to permit trial counsel to expend funds in investigation based on their independent professional judgment. (Order filed 3/18/05 at 2 n.2.) The court stated that it would not approve payment of vouchers for investigative services unless counsel filed "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial." *Ibid.* This threat was contrary to the CJA Guidelines which provide in relevant part: "Courts, in examining the case budget, may reconsider amounts authorized for services prior to the budget's approval; however, *courts shall not rescind prior authorization where work has already been performed*."

The trial judge's conditioning of funds on his subjective evaluation of the significance of the facts counsel sought to investigate barred or chilled investigation into factual matters trial counsel deemed necessary through their exercise of independent professional judgment. If Mr. Barrett had been represented by private counsel or an independent indigent defense office, the investigation of his case would not have been limited to factual issues that had "significance" to the person paying counsel.

As set forth more fully in Ground Three, *infra*, the court reduced the compensation rate of Mr. Barrett's investigator from the private investigator rate of $50.00 per hour to the rate charged by a state-subsidized agency for its salaried investigators. (Order filed 5/5/05 at 3 n.1.) In the court's initial order reducing the rate, the court did not disclose the state agency's rate as the basis for the reduction. (*See* Order filed 3/18/05 at 2.) This limitation meant that for Mr. Barrett's investigator, compared to his other cases, he *lost* $20.00 for every hour spent working on Mr. Barrett's case.

Mr. Burr compared this Court's March 18, 2005 order reducing resources for Mr. Barrett's defense with the data collected by the FDPRC. Mr. Burr informed the trial court:

> The number of hours needed for fact investigation of course varies from case to case. The number of hours requested here, however, is below the average for federal cases in which the death penalty has been authorized. The average number of hours approved for fact investigation in authorized cases is closer to 500 hours. The 100 hours approved by the Court is certainly enough to get a fact investigator started, but since it is far less than counsel has estimated is needed, approving only 100 hours now means that counsel in the near future will likely have to submit another request for approval of additional hours.

(Decl. Richard H. Burr re Non-Attorney Costs, dated 4/4/05, filed as Exh. C to Doc. 107.)  The court treated this statement as an "illustration" that Mr. Barrett's counsel "have the attitude that the budget in this matter is unlimited . . . ."  (Order filed 5/5/05 (Doc. 128) at 3 & n.1.)

The trial court did not merely deny funds to Mr. Barrett's defense, it interjected into the funding denial a false impression of the evidence that would be admitted at trial.  The court denied 75 percent of the time and one hundred percent of the in-court assistance trial counsel requested from a ballistics and crime scene reconstruction expert.  (*Compare* Doc. 50 at 7 *with* Order filed 3/18/05 at 3.)  At the same time, the court said, "Counsel should be aware that this Court has, [*sic*] never allowed crime scene reconstruction to be introduced in trial."  (Order filed 3/18/05 at 3.)  Trial counsel did not consult a crime scene reconstruction expert.  (Tr. 10/3/05 Hr'g at 8.)  The court's ruling gave counsel an unwarranted impression of the need to consult with a crime scene reconstruction expert and left counsel with no ability to bring such an expert to court to testify or assist in cross-examination.  Contrary to the impression given by the court's March 18 order, the court permitted the Government to present and place heavy reliance upon crime scene reconstruction evidence.  (*See* R. 3154-3484.)

As set forth more fully in Ground Three, *infra*, the trial court denied in full or in majority all Mr. Barrett's requests for expert and investigative services.  The court stated no basis for any denial or reduction related to the facts or circumstances of the case.  Based on the FDPRC's data regarding other capital cases, the court's ruling against Mr. Barrett was unique.  Mr. Burr informed the court at the time that Mr. Barrett's request for a mitigation specialist was "well below average," and "no federal court ha[d] failed to provide expenses for mitigation specialists' work."  (Decl. Richard H. Burr dated 4/4/05, Exh. C to Doc. 107.)  Where this court

denied funds for experts to travel as part of their work on Mr. Barrett's defense, Mr. Burr found

that "[t]ravel expenses - lodging, meals, and transportation - are always provided, as are any

other expenses incidental to the expert's ability to provide services." (*Id.*)  Where this court

permitted Mr. Barrett's counsel to retain only one mental health expert, regardless of the

circumstances, the FDPRC found, the "standard practice in federal capital cases is to provide the

services of more than one mental health expert." *Id.*  Trial counsel felt the court's restriction of

funds was an impediment to preparing a mitigation investigation.  (*See* Exhibit 56.)

The trial court paradoxically relied upon the experienced judgment of trial counsel

as grounds for denying requests they made based on their considered professional judgment.  For

example, the court denied counsel's request for a jury consultant on the ground that trial counsel

had extensive experience picking juries.  (Order filed 3/18/05 at 3.)  This ruling was influenced

by the trial judge's personal choice of trial counsel.  The trial judge personally selected  Roger

Hilfiger to represent Mr. Barrett against the recommendations of experienced defense counsel.

(Exhibit 54; Exhibit 67.)  The trial judge then relied upon his own subjective view of Mr.

Hilfiger's experience, not as a defense lawyer, but as the former United States Attorney as a

reason for denying counsel's request for a jury consultant.  (Order filed 3/18/05 at 3.)  However,

as set forth *infra* this ruling did not bind Mr. Hilfiger as it would have bound Mr. Echols.

The trial judge hampered trial counsel's ability to prepare a defense by at first

denying, then delaying, authorization for counsel to obtain the prior testimony of prosecution

witnesses.  (Order filed 3/18/05 at 4.)  The court's reasoning is contrary to the purpose of the right

to counsel.  Where the Supreme Court has held that the purpose of defense counsel is opposing

the prosecution, the trial judge initially denied access to the second state trial transcripts on the

ground that "the government has indicated they do not need the prior transcripts to try this case. If counsel for the government are able to try this case without prior state court trial transcripts, defense counsel should be able to do the same." (*Id.* at 5.) Just as the right to cross-examine witnesses depends upon the availability of counsel, so too does the right depend upon the court not denying counsel access to readily available sources of cross-examination.

Initially, the court would not permit the second state trial transcripts to be obtained "unless convinced the testimony of said [prior] witness is critical to the issue of the defendant's intent as it relates to the elements of the offenses charged herein." (Order filed 3/18/05 at 6.) The court later rescinded this limitation and permitted counsel to obtain the transcripts they had been seeking since January 2005. (*See* Doc. 23.) Although some transcripts were obtained, the delay caused by the trial judge prevented preparation of transcripts before each witness who testified previously testified in federal court. The delay also impeded or prevented defense counsel's preparation for cross-examination. *See* Ground Two, Part A, *infra*.

The trial court also limited the ability of defense counsel to prepare for and conduct cross-examinations by denying access to transcripts of witnesses' testimony in earlier federal hearings. (Order filed 3/18/05 at 6.) This ruling was especially arbitrary and unfair in that the court could have provided Mr. Barrett's counsel these transcripts without making it part of the budget. The Criminal Justice Act specifically provides that court reporters may be paid separately for preparing transcripts in cases of indigence.

Congress, the Judicial Conference, and every professional association concerned with criminal defense practice have expressed the view that cases involving the death penalty require higher degrees of skill and greater preparation than other criminal cases. The trial judge

in this case compared the budget for Mr. Barrett's case only to unidentified budgets in non-capital criminal cases. (*See generally* Orders filed 3/18/05 and 5/5/05.)

The court's rejection of Mr. Echols's proposed budget was part of a pattern of interference with, or indifference to, Mr. Barrett's legal representation. As stated *supra*, the trial judge initially wanted to appoint two local attorneys to represent Mr. Barrett so that the capital experience of the local bar would be increased. (Exhibit 67.) In his letter to Mr. Echols in February 2005, Judge Payne indicated he had appointed Mr. Echols, at least in part, because Echols and the Public Defender left him with the understanding that "there would be a substantial savings in the amount of time that would be required for [Echols] to represent the defendant." (Exhibit 65.)

As stated *supra*, the trial court required Mr. Echols, as lead counsel, to submit very detailed and specific budget requests. On April 1, 2005, the Magistrate Judge recommended denying Mr. Echols any compensation for time spent preparing those budgets. The CJA Guidelines specifically provide that time spent on case budgeting in *capital* cases is compensable. Mr. Burr submitted a declaration to the Court regarding the extraordinary nature of the ruling against Mr. Echols's voucher:

> In every federal capital case with which the members of our project are familiar - which is virtually all such cases since the inception of the Federal Death Penalty Resource Counsel project in 1992 - defense counsel have been compensated for their work in seeking funding for the services of defense investigators and experts. We know of no other case in which the court has refused to compensate counsel for such work. The reason for this is that, in seeking funding for these services, counsel is required to plan the defense investigation and litigation, determine the specific need for investigation and expert assistance, identify appropriate, competent investigators and experts, and contact a number of investigators and experts to discuss the merits of the case and the need for their services and to determine whether those investigators and experts are actually appropriate and

> available.  All of these efforts are in direct service to the client.  Unlike the preparation of defense counsel's CJA 30 vouchers, through which counsel is compensated - and for which courts usually do not compensate counsel, the work of counsel in seeking finds [*sic*] for investigation and expert assistance is of no financial benefit to counsel.  Its sole purpose if [*sic*] to assist the client in his or her defense.

(Decl. Richard H. Burr re Compensation for Budgeting, dated 4/14/05, filed as Exh. to Doc. 118.)  The trial court denied Mr. Echols compensation, because lawyers in the Eastern District in *non-capital* cases were not compensated for budgeting.  (Order filed 5/5/05 at 4.)

Mr. Echols's budget submissions were based in part on advice and data regarding other federal death penalty cases that Mr. Echols received from Federal Death Penalty Resource Counsel.  Only Mr. Echols sought the advice of these experts; Mr. Hilfiger did not.  (Exhibit 118; Exhibit 34.)  Although compensation for consultation with expert counsel is specifically authorized by the Criminal Justice Act and 18 U.S.C. § 3599(f), the Magistrate Judge recommended denying payment for Mr. Echols's consultations, and Judge Payne upheld this ruling.  (Order filed 5/5/05.)

On April 4 and 6, 2005, Mr. Echols filed motions seeking reconsideration of the March 18 budget order and April 1 report and recommendation regarding vouchers.  These filings sought a budget conference as provided in the CJA Guidelines and included four declarations from Federal Death Penalty Resource Counsel, Richard Burr, some of which are quoted herein, regarding the CJA Guidelines and statements that the restrictions imposed by the court were unique in all the previously litigated federal death penalty cases.

On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett citing five circumstances that prevented him from providing effective representation: (1) the trial

was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment.  (Doc. 113.)  Mr. Hilfiger had urged Mr. Echols not to file the motion.  (Exhibit 118; Exhibit 34.)  However, during a hearing on the motion, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order.  (Exhibit 34.)

Mr. Echols stated as one ground for his motion to withdraw:  "The relationship between the undersigned and co-counsel, Roger Hilfiger, is cordial, but we have not been able to work effectively together, and virtually all of the work performed on pleadings, budgeting and other issues has been performed by Mr. Echols."  (Doc. 113 at ¶ 4.)  In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work.  (Order filed 5/5/05 at 5.)  The court instead focused on Mr. Hilfiger being "more familiar with practice before this Court than Mr. Echols."  (*Ibid.*)

In granting Mr. Echols's motion to withdraw the court expressed displeasure with the amount of information Mr. Echols provided in his budget submissions.  (Order filed 5/5/05 at 2-3.)  The court permitted Mr. Echols to withdraw in part because his budget proposals had not "'set forth separately and with specificity the time each of the appointed attorneys anticipates spending' on each of several categories."  (*Ibid.* (quoting Order filed 1/29/05 (Doc. 38).)  The record shows Mr. Echols filed lengthy budget requests describing the specific needs of the defense and, most, but not all the time, describing with particularity the experts he sought to hire

and the work they would perform.  (Docs. 50, 51.)  Mr. Echols also sent Judge Payne a six page single-spaced letter detailing the amounts he and others were paid for Mr. Barrett's defense in state court, and what matters were not completely investigated there.

Judge Payne did not hold Mr. Hilfiger to the same standards as Mr. Echols. During the trial the court became concerned that Mr. Hilfiger and Mr. Smith would exceed the budget authorized on March 18, 2005.  (Tr. 10/3/05 Hr'g.)  In that event, Judge Payne said, "I think the safest thing to do maybe on the attorney's fees for October would be for y'all to analyze that and get me an amended budget just to -- I mean, just make your best guestimate."  (Tr. 10/3/05 Hr'g at 8.)

In his letter to Mr. Echols, Judge Payne expressed his concern that Mr. Echols not be unduly compensated for work if his prior representation of Mr. Barrett made further labors unnecessary.  The court had limited Mr. Echols's rate of compensation to $125.00 per hour.  On May 17, 2005, the day Mr. Hilfiger was made lead counsel, Judge Payne raised his compensation rate to $150.00 per hour.  (Tr. 10/3/05 Hr'g at 3.)

The concerns Mr. Echols expressed in his motion to withdraw about the lack of work Mr. Hilfiger committed to the case proved to be well-founded, although the court was again unconcerned.  On May 23, 2005, Mr. Barrett filed a motion seeking appointment of new counsel based, in part, on the assertion that the case loads of appointed counsel interfered with their ability to devote sufficient time to his defense.  (Doc. 135.)  Mr. Barrett's counsel did not file a response to the motion.  There was no hearing on the motion.

On May 24, 2005, the court denied Mr. Barrett's motion to replace counsel.  (Doc. 137.)  The denial was based in part on the "finding" that "[c]ounsel has a copy of the first state

court trial transcript . . . ."  (Order filed 5/24/05 (Doc. 137) at 2 n.2.)  The denial was based in

part on the court's belief that appointed counsel "will have adequate time to prepare for this

particular case." *Id.* at 2.  Subsequent events suggest there was no basis for these two statements

in the May 24 order.

On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date.

(Doc. 138.)  Counsel averred as one ground for the continuance that Mr. Hilfiger had "been

presented with ten storage boxes of materials, discovery, motions and other paperwork from

defendant's two State jury trials, including transcripts of the first State jury trial; and all of such

material needs to be reviewed to determine its value for defensive purposes, in this new action."

(Doc. 138 at 1.)  Mr. Hilfiger was not specific about when he received the materials, but the

evidence indicates it was between May 17, 2005, the day Mr. Hilfiger was made lead counsel,

and May 26, the date of his assertion.  Regardless of the specific date, the record reveals no basis

for the court's statement that Hilfiger possessed the record on May 24, and shows that whatever

Mr. Hilfiger "possessed" on that date, he had not reviewed it during the six months that had

elapsed since his appointment in November 2004.

Mr. Hilfiger's statement about not having reviewed the records from the state-

court proceedings, including discovery and transcripts, indicates that he had not made a sufficient

inquiry into the facts of the case to support the position he took on the budget during the May 5,

2005, hearing.  On May 17, 2005, the court directed Mr. Hilfiger to file by May 27, 2005, any

supplemental budget request he deemed necessary.  (Tr. 10/3/05 Hr'g at 3.)  Assuming the trial

court had learned on or before May 17, 2005, that Mr. Hilfiger had not become familiar with the

previous litigation over the previous six months, it was unreasonable for the court to give Mr.

Hilfiger only 10 days to request supplemental resources.

In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the

court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the

files and records related to the case. (Doc. 50 at 4; Exhibit 64 at 1 n.1.) On March 18, 2005, the

court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to

complete these tasks. (Doc. 97 at 2.) In any event, it was impossible for Mr. Hilfiger to have

completed these tasks between May 17 and May 27, and Mr. Hilfiger did not file an amended

budget.

In January, when Mr. Echols was lead counsel, the court chastised Mr. Barrett's

defense for failing to devote sufficient attention to the case that it could stay on schedule. (Doc.

31.) The court admonished counsel to give the case the "highest priority." *Ibid.* In May, when

Mr. Hilfiger acknowledged that he had not reviewed the records from the prior state court

proceedings, and after Mr. Echols and the lawyers' vouchers revealed the paucity of Mr.

Hilfiger's work on the case, the trial court expressed no concern about Mr. Hilfiger's priorities,

and simply granted the continuance. (Tr. 6/6/05 Hr'g; Doc. 142.) In September, Mr. Smith

revealed that Mr. Hilfiger had not assembled the files and records related to the mitigation

investigation that had been done in state court. (Tr. 9/9/05 Hr'g at 43.) Again, the court was not

concerned with new counsel's priorities.

Mr. Hilfiger himself had informed Mr. Echols and the court that it would take him

as second-chair 300 hours to prepare for trial, *not* including court hearings, legal research and

preparation of pleadings and briefs. (Doc. 51 at 4.) On October 3, 2005, with the trial underway,

Mr. Hilfiger informed the court that he had worked approximately 300 hours on the case, *including* legal research and writing and preparation for and in all court proceedings. (Tr. 10/3/05 Hr'g at 5.) Whereas the court had expressed a great deal of skepticism about Mr. Echols's requests for compensable hours, Mr. Hilfiger's statements prompted no expressions of concern.

In other respects, the record does not support the inference that Judge Payne's treatment of Mr. Echols was based either on fiscal concerns or concern for Mr. Barrett's representation. The trial court denied Mr. Echols's request for a jury consultant on the ground that, "Each of defense counsel come before this Court with combined practical experiences on in excess of sixty years in selecting criminal juries, including Mr. Hilfiger's experiences as United States Attorney for the Eastern District of Oklahoma." (Doc. 97 at 3.) If counsel's allegedly vast experience supported their professional judgment in selecting the jury, as the court conjectured, there was no reason for the court to reject the same professionals' judgment that they required the assistance of a jury consultant.

After he was elevated to lead counsel, Mr. Hilfiger filed no supplemental budget request. On September 9, 2005, Mr. Hilfiger informed the court that he would be relying upon a private jury consultant. (Tr. 9/9/05 Hr'g at 10.) Mr. Hilfiger casually stated, "I'll assume Angie Cole will be coming in with us the next two weeks. She's going to set [*sic*] at the counsel table with us during the selection." (*Ibid.*) The court recognized Ms. Cole's name and identified her as a jury consultant. (*Ibid.*) Despite the earlier denial of funds based on Mr. Hilfiger's particular experience, and the fact that the court was paying Mr. Hilfiger more than it had paid Mr. Echols, Judge Payne expressed no concern or objection to Mr. Hilfiger's unauthorized retention of an

expert for two weeks of trial. (*Ibid.*) If Mr. Hilfiger had been able to obtain a jury consultant without funds from the court, he did not inform Mr. Echols of the fact.

In summary, Judge Payne had only reluctantly appointed John Echols to represent Mr. Barrett, and then based in significant part, at least, on the belief that Mr. Echols would be able to try the case cheaply and quickly. Judge Payne personally chose Roger Hilfiger to represent Mr. Barrett for reasons that had nothing to do with the circumstances of Mr. Barrett's case, but for the purpose of using Mr. Barrett to develop a local capital defense panel. During Mr. Echols's tenure, Judge Payne imposed requirements and restrictions on budgeting and investigation that experts concluded were unheard of in federal death penalty trials, and that intruded upon the constitutionally protected independence of counsel. At one point, Judge Payne threatened to use counsel's budget proposals as a mechanism for finding defense experts' testimony inadmissible at trial. When Mr. Echols left the case due to these restrictions, and Mr. Hilfiger sought no additional resources, Judge Payne's conduct towards defense counsel changed. Judge Payne permitted, or through his actions encouraged, Mr. Hilfiger to show a lack of diligence and inattention to the conduct of the case including obtaining resources, investigative, and expert assistance. Under these conditions, Mr. Barrett did not receive independent, reasonably funded, reasonably prepared, representation.

The trial judge also violated Mr. Barrett's right to due process, and the Code of Judicial Conduct, by conducting *ex parte* communications with the prosecutors. During an *ex parte* hearing held September 13, 2005, the judge solicited the views of the United States Attorney regarding such matters as (a) when the trial started for purposes of 18 U.S.C. § 3432, (b) whether the defense should be entitled to a continuance based on delayed disclosure of

witnesses, and (c) whether the disclosures posed a problem under Rule 404(b) of the Federal Rules of Evidence.  (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 22-23.)  Although the hearing was held for the purpose of disclosing information supposedly related to dangers to witnesses, the trial court solicited the prosecutor's views on these other matters which did not involve discussion of any information that could not be disclosed to the defense.

Also during the *ex parte* portion of the hearing Assistant United States Attorney Michael Littlefield revealed that he knew the identity of a witness who failed to corroborate statements by informant, Charles Sanders.  (Tr. 9/13/05 Hr'g at 14, 17.)

The court's conduct during the *ex parte* portion of the September 13, 2005 proceedings, and its conduct in relation to those proceedings thereafter, violated Rule 2.9 of Canon 2 of the Code of Judicial Conduct.

After the *ex parte* portion of the hearing, and at the beginning of the hearing with defense counsel present, the court did not disclose the discussion regarding the meaning of § 3432, the discussion of the continuance, AUSA Littlefield's revelation about a witness, or the discussion of Rule 404(b).  (Tr. 9/13/05 Hr'g at 25-27.)  During the *ex parte* conversation, the judge revealed to the prosecutors that he had researched the § 3432 issue and found support for the proposition that the trial had started the previous day.  (Tr. 9/13/05 Hr'g at 4-5.)  The court permitted the prosecutor to represent, outside the presence of the defense, that the Government "and defense counsel have been operating under the inference that the trial begins on or after the 26th [of September]."  *Id.* at 7.

Once defense counsel was present, the judge did not reveal the findings of his research in relation to § 3432, though they were potentially helpful to the defense.  The court

made no effort to confirm the prosecutor's representations, or familiarize itself with the defense

attorneys' views on § 3432.

During the *ex parte* conference, the judge said the following regarding a possible

continuance:

> Well, I – of course, the notice of who the witnesses are – the term ambush you are
> familiar with and I guess what concerns me is when these names are revealed with
> three days [*sic*] notice that we are going to have a request for a continuance.  It
> would be difficult – if they are as important to the government's case as you say
> they may be, it looks like we are setting this case up for a long continuance.

(Tr. 9/13/05 Hr'g at 12.)  Then the prosecutors conferred off the record.  (At the conclusion of

the *ex parte* conference the court said he would see the prosecutors "down stairs" indicating the

conference occurred in chambers.)  During the hearing with defense counsel present, the judge

did not share his views regarding possible ambush and the defense potentially needing a long

continuance.

The trial judge's statements showed the court was aware that the seven informant

witnesses were very important to the Government's case.  Nevertheless, during the portion of the

hearing with defense counsel present, and in subsequent related proceedings on September 14,

2005, the court did not bring up the female witness who failed to corroborate confidential

informant Charles "Monk" Sanders, either to ask whether the witness had been identified to the

defense or to notify the defense that the court had been informed of the existence of a witness

who could impeach Sanders.

The judge misrepresented the content of the *ex parte* conference to defense

counsel.  When the *ex parte* hearing concluded the judge and prosecutor were discussing Rule

404(b), with the court saying "there is 404(b) material obviously in the proposed motion, it

appears to me." (Tr. 9/13/05 Hr'g at 22.)  The prosecutor agreed "[i]t appears to be implicit." *Ibid.*  Then the prosecutor offered a rationale for not "provid[ing] reasonable notice in advance of trial," (Fed. R. Evid. 404(b)), and the judge said he would "take this matter under advisement" before calling the conference to an end.  *Id.* at 23.

At the beginning of the hearing with defense counsel present, the judge did not reveal these discussions.  The prosecutor sought guidance from the court regarding "where we were when we stopped" the *ex parte* conference.  (Tr. 9/13/05 Hr'g at 26.)  The court said they had been discussing "security issues."  *Ibid.*  The court said, "it sounded like there had been some discussion with defense counsel.  And that's about as much as the Court knows."  *Ibid.*  The transcript shows the court drastically understated the true scope of the *ex parte* communications.  Once they were thus misstated, the prosecutor said, "I'm willing for the matter to be unsealed."  *Ibid.*  Mr. Barrett's trial counsel were entitled to rely upon the court's representations.  The combination of the court's omissions and the prosecutor's sudden willingness for the hearing to be unsealed suggested to defense counsel the transcript need not be requested or reviewed.[3]

During the *ex parte* portion of the hearing, the judge made statements suggesting skepticism about the Government's position.  The court specifically and repeatedly emphasized that the Government had no evidence of any overt act by any person that would suggest the witnesses were in danger.  *(Id.* at 20.)  The court did not inform the defense that the government had failed to produce evidence of an actual danger to its witnesses.  Without disclosing the weakness of the Government's position, the court permitted defense counsel to agree (a) to

---

[3]  Of course, whether it was unsealed during the trial was irrelevant insofar as Judge Payne had denied counsel any funds for obtaining pretrial hearing transcripts.  (Doc. 97.)

further delays in learning the identities and contact information for the witnesses, and (b) to be limited in its access to Government witnesses to the extent that they would only be interviewed in the presence of Government representatives. (*Id.* at 27.)

The court had another opportunity to inform defense counsel of what transpired during the September 13 *ex parte* hearing. On September 14, 2005, after jury selection proceedings ended, the court raised the issue of the unidentified witnesses. The United States Attorney informed the court that the Government and Mr. Barrett's counsel had reached an agreement that the witnesses' names, contact information, criminal histories and (allegedly) promises made to them would be revealed the following Monday. (R. 840.) The United States Attorney further advised the court that the defense would, possibly, have access to some of the witnesses at the prosecutor's office. (R. 841.) Mr. Hilfiger stated that he had no objection to the arrangement, "based on what we talked about yesterday." *Ibid.* The court then stated that this would make a "clear record" and the parties' "announcement . . . resolves everything that is under seal." (R. 843.)

As shown in Ground Two, Parts A.4 and A.5, trial counsel acted unreasonably by failing to object to the delayed disclosures, by failing to seek a reasonable continuance, and by failing to investigate the seven informant witnesses. Evidence available at the time would have provided extensive grounds for impeachment and cross-examination.

The Government restricted defense access to witnesses, for example, by telling the witnesses they should only agree to defense interviews if the Government is present. The American Bar Association considers it unprofessional conduct for a prosecutor to condition a witness's interview with defense counsel on the prosecutor being present. The trial court

permitted defense counsel for Mr. Barrett to agree to such restrictions (Tr. 9/13/05 Hr'g at 27; R. 841-42), without revealing to the defense the weaknesses in the Government's motion for a protective order that the court had freely discussed with the prosecutors.

The trial judge's withholding of his views about a continuance was particularly prejudicial. Mr. Hilfiger has consistently and repeatedly stated that he agreed to the delays and other restrictions on his access to information about the witnesses because he believed Judge Payne would not grant a continuance of the trial. (Exhibit 29.) Judge Payne's views, as freely expressed to the prosecutors, would have given Mr. Hilfiger a completely different view of the situation. If Judge Payne had revealed his research regarding § 3432, the issue would not have been reviewed for plain error on appeal. If Judge Payne had revealed his views on a continuance, Mr. Hilfiger likely would have requested one, and again the matter would have been reviewed differently on appeal. If Judge Payne had revealed his views on the weakness of the Government's motion for a protective order, Mr. Hilfiger would have had further grounds for a continuance and grounds for objecting to restrictions the Government placed on access to witnesses. Mr. Hilfiger also would have had grounds for a continuance if Judge Payne had revealed that Mr. Littlefield knew the identity of an impeachment witness who had not been disclosed in discovery, as the court's earlier orders required.

The trial judge's conduct in soliciting *ex parte* the prosecutor's views on the court's private concerns while at the same time failing to accurately disclose those communications to the defense violated Mr. Barrett's right to due process of law. The disparate conduct of the court between the prosecution and defense is evidence of bias. In a capital case, courts may not consider information the defense has no opportunity to hear or explain.

For the foregoing reasons, the trial judge should recuse himself from this case. Thereafter, this Court should grant the relief sought herein.

To the extent the matters raised in this Claim could have been raised on direct appeal, appellate counsel were ineffective. As stated *supra*, Judge Payne specifically selected Mr. Hilfiger for this case, and Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter. Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal. To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in this Claim could not be adequately litigated on appeal, because they required consideration of extra-record evidence. (Exhibit 29.) To the extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal. (Exhibit 29.) However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal. *Id.* Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards. At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised herein had been raised on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, the limitations on pleading imposed by the courts, and/or unlawful conduct by the Government or state law enforcement officials.

(b)        **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐        No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

Relies on extra-record evidence, ineffective assistance of trial and appellate counsel.

See Grounds Two, Five and Eighteen.

(c)        **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐        No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. [section sign] 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

       Yes   ☐          No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

       Yes   ☐          No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

       Yes   ☐          No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND TWO**:

> **Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

      Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

      The numerous acts and omissions of Movant's trial counsel described herein fell below prevailing professional norms of capital defense practice.  Absent these acts and omissions, whether considered individually or collectively, there is a reasonable probability that Mr. Barrett would not have been convicted of the charged offenses, or that he would have received a sentence less than death.

A.    As set forth in Ground One, the trial court interfered with the constitutionally protected independence of trial counsel.

**1.    There is a reason the numerous acts and omissions of Mr. Barrett's appointed counsel fell below the standards set forth in prevailing professional norms.**

The trial court's stated desire to minimize costs associated with Mr. Barrett's defense and to appoint local counsel to this case for the purpose of establishing their credentials for appointment in future capital cases, *see* Ground One, created an actual conflict between the financial and professional interests of appointed counsel and Mr. Barrett's interest in thorough investigation and a vigorous defense. This conflict adversely affected counsel's performance in that they failed to obtain the services of numerous experts, failed to devote time to preparing for and conducting the trial that counsel himself had considered necessary prior to the court's rulings, and failed to use other resources as expected under prevailing professional norms.

**2.    Trial counsel for Movant committed unreasonable acts and made unreasonable omissions when rearguing the motion to suppress under *Franks v. Delaware*, 438 U.S. 154 (1978), following the first stage testimony of Charles "Monk" Sanders.**

Counsel's failure in this regard undermines confidence in the jury's first stage verdicts. Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a no-knock warrant were false, or were made in reckless disregard for the truth, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression. Because the search warrant was defective under *Franks*, the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned

guilty verdicts. Counsel's unreasonable acts and omissions therefore undermine confidence in the trials outcome.

The information used to secure the no-knock search warrant in this case was based on information supplied to Clint Johnson, the affiant on the warrant, by an alleged confidential informant (C.I.) The C.I. did not testify at Mr. Barrett's two state trials. At the conclusion of the second state trial, Clint Johnson wrote the alleged informant's name on a piece of paper, and placed it in an envelope, which was sealed in the state court file. (Tr. 1/ 26/05 Hr'g. at 88-89). It was only when Sanders testified in the first stage of Mr. Barrett's federal trial that it was revealed, for the first time that Sanders was the alleged informant who supplied the information providing probable cause. (R. 2521).

In pertinent part, the affidavit for the no-knock, nighttime search warrant states the following:

> On September 18, 1999 this affiant was contacted by a confidential informant (CI) who advised that, within the past seventy-two (72) hours, they [sic] were in the above-described residence and observed a male that is known to the CI as Kenny Barrett present a quantity of white powder substance and represent it as being "methamphetamine."

> The CI went on to state that while in the above described residence they [sic] observed Kenny Barrett divide and exchange a portion of the white powder substance for a quantity of money. The CI stated that they [sic] had been in the above-described residence on previous occasions and observed Kenny Barrett make "drug transactions." The CI further stated that while in the above-described residence they [sic] overheard Kenny Barrett state "if the cops try to raid me they will regret it because I'm going to kill the first cop through the door."

> The C.I. also stated that while in the residence they [sic] observed several pistols lying around the residence and also Kenny Barrett had a pistol on his person.

> This affiant is familiar with Kenny Barrett due to a pending investigation for the past six (6) months and is familiar that [sic] Kenny Barrett has an outstanding

felony arrest warrant out of Sequoyah County, Oklahoma for failure to appear for a jury trial and unlawful delivery of CDS case number CF-97-86.

This affiant has learned from the CI that Kenny Barrett is maintaining his "drug transactions" in the night time hours due to the cover of darkness and that law enforcement personnel are less frequent [sic] at night.

The CI further stated that Kenny Barrett, due to Kenny Barrett's belief that law enforcement personnel cannot execute search warrants during the night, sell's [sic] controlled dangerous substances at nighttime and keeps large quantities of meth-amphetamine in his residence at nighttime in order to be undetected by law enforcement personnel.

This affiant asks that this search warrant be directed for day or night service due to the facts stated herein.

This affiant received information from the informant on at least five (5) occasions. Each time that this informant has provided information, the information proved to be true and accurate and resulted in the confiscation of illegal substances.

(Exhibit 194.)

On cross-examination in Mr. Barrett's federal trial, Sanders largely disavowed the information that was contained in the search warrant affidavit, and which allegedly supplied probable cause for the no-knock search. Sanders's testimony on cross-examination demonstrates that the search warrant affidavit was knowingly based on false information, or that this "information" was supplied to the Sequoyah County District Court with reckless disregard for the truth. Without the false information allegedly supplied by Sanders, there was clearly insufficient evidence to establish probable cause, let alone probable cause for a no-knock warrant. In contrast to the representations made in the search warrant affidavit, Sanders testified to the following on cross-examination:

a.    That he never saw Mr. Barrett manufacture methamphetamine on his property, or attempt to do so, and that he never told Clint Johnson anything to indicate that Mr. Barrett was manufacturing or attempting to manufacture methamphetamine (R. 2596-97, 2609);

b.    That when he first met with Johnson after having been to Mr. Barrett's residence in July, 1999, he gave Johnson no information regarding drugs on Mr. Barrett's property.  He did not see any drugs on Mr. Barrett's property, and did not even do drugs with him on any occasion he was supposedly at Mr. Barrett's residence in July, 1999 (R. 2597-98);

c.    In September, 1999[4], Sanders, at Johnson's direction, allegedly went to Mr. Barrett's residence to exchange a set of car keys.  Based on when Sanders alleged this trip occurred, it was just days before the raid in the early morning hours of September 24, 1999.  A "day or two" after being at Mr. Barrett's, Sanders testified he was not asked by Clint Johnson whether he saw any drug activity at Mr. Barrett's on September 19 or 20.  Sanders testified that if Johnson had asked him about drug activity at Mr. Barrett's on September 19 or September 20, he "probably" would have told him that he saw no drug activity.  Sanders then testified, "I didn't see him doing nothing."  (R. 2608-2610);

d (1).    After allegedly being at Mr. Barrett's in mid-September, 1999, Sanders testified that Johnson directed him to again go back to Mr. Barrett's property.  Sanders testified that he told Johnson what he observed on this supposed trip to Mr. Barrett's.  According to Sanders, the pretext for going to Mr. Barrett's on this last occasion was to ask Mr. Barrett about the title to an automobile.  Sanders claimed to have been accompanied by his nephew.  Sanders

_____

[4]  Sanders placed the date of this alleged trip to Mr. Barrett's cabin as September 19 or 20, 1999. The state search warrant was issued on September 20, 1999.  Of course, the precise dates of Sanders's alleged trips to Mr. Barrett's property are unclear.  *E.g.,* R. 2518-21, 2609.

thought that either he or his nephew asked Mr. Barrett if he had any drugs available.  Mr. Barrett

apparently had no methamphetamine.  The only drugs supposedly seen by Sanders was a joint of

marijuana, which he, his nephew, and Mr. Barrett smoked in Mr. Barrett's cabin.  (R. 2618-22);

       d(2).    Sanders allegedly reported to Clint Johnson in the last meeting that he had

seen guns at Mr. Barrett's.  He had also reported to Johnson seeing firearms at Mr. Barrett's

residence when he allegedly visited in August, 1999.  To the extent Johnson in his affidavit

presented this information as a new development to justify altering the existing bench warrant to

a no-knock warrant, Johnson misled the court.  Authorities had long been aware that like many

rural dwellers, Mr. Barrett had firearms on his property.  In any event, the search warrant

affidavit was directed at drug activity only, not the possession of weapons.  (R. 2623);

       e.    Sanders's gave conflicting accounts of alleged visits to Mr. Barrett's shack

which, together, show he did not observe any drug transactions there.  On direct examination,

Sanders testified that in August 1999 he went to Mr. Barrett's home with a person identified only

as "Ronny," and saw Mr. Barrett hand something to "Ronny."  Sanders testified that the alleged

trip was for the purpose of buying drugs.  At the close of cross-examination, defense counsel

walked Sanders through the information Sanders had given to Clint Johnson, according to

Sanders's testimony on cross-examination.  Sanders agreed that when he was supposedly at Mr.

Barrett's in July 1999 (a) he did not see any drugs, (b) did not see any manufacturing or

attempted manufacturing of methamphetamine, and (c) did not do any drugs with Mr. Barrett.

Therefore, Sanders testified that based on his alleged July trips to Mr. Barrett's property he

would have told Johnson *nothing* about Mr. Barrett engaging in drug activities.  Sanders also

testified that when he supposedly went to Mr. Barrett's place in August 1999, with his sister and

"Ronny," he saw no drugs, and told Johnson he saw no drugs or any evidence of drug manufacturing. Sanders admitted he did not go into Mr. Barrett's house with "Ronny" (he waited in the car), and never testified he saw Mr. Barrett go outside. How he saw any alleged drug transaction is therefore a mystery. (R. 2599-2601, 2625-28).

Sanders agreed with defense counsel that he saw no drug manufacturing or other drug activity at Mr. Barrett's in September 1999, other than smoking a "joint" on what he claimed was his last trip to the property before the raid. Aside from smoking a joint with Mr. Barrett on this occasion, the only drug activity he witnessed or participated in at Mr. Barrett's residence was when he and Movant, who was also a methamphetamine user, shot methamphetamine together. (R. 2625-28).

Sanders's cross-examination testimony also belied Johnson's claims (a) that Sanders informed him that Mr. Barrett conducted drug transactions at night because there were fewer police around, and (b) that Mr. Barrett kept a "large quantity" of drugs in his house at night because he believed the police could not conduct a nighttime search. Of course, no "large quantity" of drugs was found when Mr. Barrett's residence and property were searched by the authorities.

After Sanders was cross-examined, AUSA Littlefield asked to take a "bathroom break." (R. 2630). The real purpose of the break was for Littlefield to talk to Sanders about his testimony. Sanders admitted Littlefield talked to him during the break. At first, he denied anything was discussed except how much longer he would be on the stand. In the next breath, he then admitted that Littlefield "may have" asked him whether he was confused about dates.

Sanders did not "think" Littlefield asked him about the substance of his testimony on cross-examination.  (R. 2239-40, 2642).

After speaking to Sanders during the break, Littlefield sought to repair the damage inflicted by Sanders's remarkably inconsistent testimony by having Sanders contradict, within a matter of a few minutes of the cross-examination having ended, certain aspects of the testimony he gave when questioned by defense counsel.  Sanders's abrupt about-face on re-direct alone demonstrates that this is a witness who cannot be believed about anything, and demonstrates that he was anything but the "reliable" confidential informant Clint Johnson claimed him to be in the search warrant affidavit.

On re-direct, and in contrast to his testimony on cross-examination, Sanders stated that when he went to exchange car keys at Mr. Barrett's residence three to four days before Trooper Eales's was killed, Mr. Barrett sold drugs to Geniece Thomas.[5]  He also claimed he went to Mr. Barrett's residence with Thomas on more than two occasions to buy drugs.  He also claimed that he saw drug activity practically every time he supposedly went to Mr. Barrett's property, and that he would have reported any such drug activity to his alleged "handler," Clint Johnson.  Changing up his testimony from cross-examination, Sanders then claimed that on his last alleged trip to Mr. Barrett's, he saw a substance in Mr. Barrett's cabin that he believed to be methamphetamine.  Again in contrast to his testimony on cross-examination, Sanders claimed he may have even been at Mr. Barrett's after the last supposed trip he testified about on cross, and

---

[5] "Geniece" is the way Ms. Thomas's name is spelled in the transcript.  Her name is actually Janesse Thomas.  What she has to say about Mr. Sanders's account of their alleged trips to buy drugs at Mr. Barrett's residence is addressed in the portion of this claim relating to counsel's failure to investigate and effectively impeach the informant witnesses.  (*See also* Exhibit 13.)

that he could not remember how many times, during the summer of 1999 and into September 1999, he had been to Mr. Barrett's property.  (R. 2531-38).

On re-cross, Sanders contradicted himself about whether he shot methamphetamine daily, gave conflicting answers as to whether there was a drug transaction at Mr. Barrett's when he supposedly went there with Geniece Thomas the first time, and again contradicted his testimony on cross-examination by stating that when he allegedly went to Mr. Barrett's with his nephew, he saw methamphetamine in addition to marijuana.  (R. 2642-48).

After Sanders testified, defense counsel re-urged the motion to suppress, but did so in a manner that did not comport with prevailing professional norms.  (R. 2677-80).  Defense counsel argued orally that the motion to suppress was being re-urged because, based on Sanders's testimony on cross-examination, the warrant was based on "faulty" information.  Clint Johnson, who had been questioned about the search warrant affidavit during the hearing on the motion to suppress, related certain information contained in the affidavit that Sanders specifically denied giving.  Specifically, page 2 of the search warrant affidavit stated that the C.I. (Sanders) had advised Johnson within the last 72 hours he had been at Mr. Barrett's residence and observed Mr. Barrett present a quantity of white powder, which Mr. Barrett represented was methamphetamine.  On cross-examination, Sanders stated there had been no discussion about what Sanders thought was methamphetamine in Mr. Barrett's kitchen.  According to Sanders's testimony on cross-examination, there had been no representation that this substance was methamphetamine, and no presentation of the white powder to Sanders.  The search warrant affidavit went on to state that the C.I. (Sanders) observed Mr. Barrett divide and exchange a portion of white powder for a quantity of money.  Sanders testified on cross-examination that this

did not happen.  Defense counsel pointed out they were confronted with all this by the answers Sanders gave on cross-examination; there had been no opportunity to interview Sanders before he testified.

AUSA Littlefield responded that Clint Johnson had testified at the hearing on the motion to suppress, had testified under oath what he had been told by the C.I., and what facts had formed the basis for the search warrant affidavit.  (R. 2679.)

The court instructed defense counsel to put the motion in writing, and for the Government to respond in writing.  The court stated that it would either hold a hearing, if such was deemed necessary, or would rule on the pleadings.  (R. 2679.)  As pointed out by the Government in its response to the renewed suppression motion:

> The entire basis of defendant's Motion to Reurge the Motion to Suppress arises from "testimony" of Charles Sanders which was elicited on cross-examination. Specifically, Barrett relies upon the statement attributed to Sanders in the affidavit that he assumed a powder to be methamphetamine. Sanders purportedly testified that he did not advise Clint Johnson that Barrett represented such powder as methamphetamine to him purportedly denied telling Clint Johnson that he had observed Barrett divide and exchange a portion of white powder for quantity of money. [sic]  Barrett's Motion to Reurge ignores substantial portions of Sanders' testimony on direct and redirect examination.

(Doc. 231 at 1.)

The court ruled on the renewed motion to suppress by written order, without conducting an evidentiary hearing.  (Doc. 253.)  In its ruling, the court noted that in the original motion to suppress, there was no *Franks* allegation, a rather irrelevant observation because the basis for the *Franks* claim occurred during trial.  Instead, it had been alleged that the C.I. did not really exist.  The court summarized at length aspects of Sanders's testimony, and concluded that, in light of the testimony of Johnson and Sanders, *as well as other witnesses to activities at Mr.*

*Barrett's residence*, there was "absolutely no basis for the defendant's assertion that the information contained within the affidavit was not truthful." Because Johnson accepted as true what he was told by Sanders, and because Johnson had found Sanders to have given reliable information in the past, "the affidavit was properly supported." Based on the totality of the testimony, it was concluded that Mr. Barrett had "not even established that the information provided in 1999 by the informant was untruthful or unreliable." Thus, the court concluded, facts recited in the affidavit "could not have been made with deliberate or reckless disregard for the truth." (Doc. 253 at 7.).

Had defense counsel forcefully and properly re-urged the motion to suppress based on *Franks v. Delaware, supra,* the motion by all rights should and would have been sustained. Moreover, as shown below, the court's order is seriously flawed. Trial counsel urged only one (or at best two) grounds in support of the renewed motion to suppress based on *Franks.* These revolved around Sanders's assumption that a powder he observed at Mr. Barrett's residence was methamphetamine; Sanders's testimony on cross-examination that Mr. Barrett did not represent the powder to be methamphetamine; and the fact Sanders did not tell Johnson he saw Mr. Barrett divide and exchange a portion of the white powder for money.

The one or two areas of impeachment cited by the defense simply scratched the surface. Based solely on the cross-examination of Sanders (as well as other factors that could have been used to impeach Sanders, but were not, as is discussed in another subpart of this claim for relief and Ground Five, *infra*), the defense could have argued much more, and would have been entitled to an evidentiary hearing and suppression of the evidence. Aside from what was stated in the re-urged motion to suppress, counsel could have argued the following:

a.      that Sanders had never seen drug manufacturing or attempted drug manufacturing at Mr. Barrett's residence at any time, which conflicted with the averment in the affidavit that Mr. Barrett kept a "large quantity" of drugs at his house;

b.      that Sanders witnessed no drug activities of any kind on Mr. Barrett's property in July 1999, which also conflicts with Johnson's claims that Sanders said Mr. Barrett kept a large quantity of drugs and engaged in repeated drug sales at night;

c.      that Johnson was recklessly indifferent to the truth in that he did not ask Sanders whether he observed drug activity at Mr. Barrett's residence in mid-September 1999 when he supposedly was there with his girlfriend Ms. Thomas to exchange a set of car keys; if Johnson had asked, Sanders would have contradicted the affidavit because he "probably" would have told Johnson he witnessed no drug activity, because "I didn't see him doing nothing";

d.      that Johnson knew Sanders had not informed him of methamphetamine activity as shown when Sanders testified that after Johnson told him to go back to Mr. Barrett's in September 1999 – after Sanders had supposedly been there just a short time before – Sanders or his "nephew" asked if Mr. Barrett had any drugs available, but there was no methamphetamine, and the three of them simply smoked marijuana;

e.      that Sanders further testified to Johnson's indifference when, summarizing what he supposedly knew, Sanders repeated he witnessed no drug activity at Mr.

Barrett's in July 1999, and told Johnson nothing about any drug activity at Mr.

Barrett's during that month;

f.        that, consistent with the court's order, there was no drug activity witnessed

in August, 1999; and that, other than smoking a joint with Mr. Barrett and his

"nephew," Sanders witnessed no drug activity at Mr. Barrett's in September,

1999.

Again, Sanders's claim that he had seen guns in Mr. Barrett's residence provided

no probable cause for a drug search warrant, which is what Johnson secured. Nor did Sanders's

claim that Mr. Barrett had threatened law enforcement provide probable cause for a drug search

warrant.

Counsel also unreasonably failed to argue evidence of Johnson's reckless

disregard for the truth. Sanders testified he was in regular contact with Johnson and continued to

use drugs steadily. Sanders acknowledged in his testimony that his drug use seriously impaired

his ability to recall and relate information accurately. Sanders testified that Johnson, in effect,

made a point of not asking Sanders about his own drug use or, on occasion, what he saw or failed

to see at Mr. Barrett's residence. This demonstrated Johnson could not rely reasonably on

Sanders for anything. Counsel also unreasonably failed to argue that Sanders would radically

change his testimony depending simply on which lawyer was asking him questions. Johnson

surely would have seen the same tendency in Sanders to say whatever pleased the authority figure

asking him questions. Based on his supposed repeated and close contact with Sanders, Johnson

had to be well aware of this fact.

In sum, Sanders not only disavowed the statements Clint Johnson attributed to him, he repeatedly asserted that Johnson had not asked about Sanders's own drug use – which would impair his perceptions and his truthfulness – or what he supposedly observed.  This testimony would have shown that Johnson made material false statements in the affidavit for search warrant both about the informant's alleged observations and Johnson's own grounds for trusting the informant.  These false statements negate the entirety of the warrant affidavit.  At a minimum, it is clear, based on Sanders's testimony on cross-examination, that Johnson recklessly disregarded the truth in reciting the "facts" supporting "probable cause" for the search warrant.

In its order denying the renewed motion to suppress, the court did not recite all the facts bearing on the use of false statements by Johnson, or Johnson's reckless disregard for the truth.  Had these matters been urged, there is a reasonable probability that the outcome of the renewed suppression motion would have been different.  At a minimum, had all the evidence from Sanders's cross-examination been marshaled, the defense surely would have been entitled to the evidentiary hearing under *Franks* that was denied when the court simply ruled on the pleadings.

In its order, the court seemed to rely on the testimony of other informant witnesses to buttress the credibility of Sanders and Johnson.  Not only could counsel, had they conducted a reasonable investigation (or had the time to conduct a reasonable investigation), have impeached many of these other witnesses (see below), the court could not properly rely on years-after-the-fact testimony to find that the search warrant affidavit, founded solely on information from Charles "Monk" Sanders, was based on the truth, rather than outright fabrication or a reckless disregard of the truth.

The *Franks* issue, and counsel's failure to effectively argue it, was at least partially framed by the record.[6]  The issue was not raised on direct appeal.  Because the issue was obviously meritorious, even with the record that was made, there could be no reasonable strategic basis for omitting it.  The failure to raise this issue was professionally unreasonable and prejudicial.  *See* Ground Eighteen, *infra*.

> **3.     Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense.**

The Government's theory of the case was that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property.  The prosecution argued that when Mr. Barrett began firing his weapon, he was well aware that the police, rather than trespassers, had arrived.  This argument was highly relevant to count 3 of the superseding indictment, which charged that Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties.  (Doc. 52.)  This is the count of conviction for which Mr. Barrett received the death penalty.  (Docs. 258, 285.)

In the first stage of trial, the jury was instructed that among the essential elements of the offense charged in count 3 were that Mr. Barrett intentionally killed the victim, knowing or having reason to know that the victim was a law enforcement officer, and that the victim was

---

[6]  *Brady* evidence suppressed by the Government, and/or newly discovered evidence, places the *Franks* issue in a much stronger light than even existed on the trial record.  See Ground Five, *infra*.

killed while engaging in and on account of the performance of his official duties. (Doc. 240; R. 4262-64, 4266-67.)

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting. Mr. Barrett also shows that the actions of the Tact Team fell outside professional standards for law enforcement and that one aspect of the team's recklessness was the use of unprofessional procedures that minimized the chances of being recognized as law enforcement. (Exhibit 44.) In addition to these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate. Rather than the intentional and remorseless killer who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals. The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case as to both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise

the risk assessment she had done in preparation for a second stage proceeding in state court, and to conduct research on memory loss stemming from traumatic events. Due to counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to be the antithesis of the Government's picture.[7] Professional norms of criminal practice, particularly in capital cases, tell attorneys that they should secure expert assistance. (*E.g.*, ABA Guidelines 10.7, 10.10.1, and 10.11.) Counsel's failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues, in light of the defense arguments made at trial respecting how the shooting occurred, constitute deficient performance.

The results of an accurate and reliable mental health evaluation demonstrate that trial counsel's failings were prejudicial. George W. Woods, Jr., M.D., a Board Certified psychiatrist who specializes in psychiatry and neuropsychiatry, performed a clinical and forensic evaluation of Mr. Barrett in February 2009, and concluded to a reasonable degree of medical certainty, *inter alia*, Mr. Barrett's mental functioning was impaired at the time of the offense by psychiatric illness and significant brain damage, which prevented him from knowing or deliberating on the nature of his responses to the police incursion before he acted. Dr. Woods concluded that at the time of the charged offenses, Mr. Barrett suffered from several major brain disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in the areas that are necessary to exercise judgment and reasoning. Among the most significant functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent

---

[7] Grounds One and Three show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

annihilation coupled with an inability to understand or regulate his reactions – including overreactions – to perceived threats.  Thus, when the events unfolded at the time of the offense, Mr. Barrett could not and did not know right from wrong, and acted with the distorted perception that his response was necessary to keep intruders from killing him.  (Exhibit 117.)

Dr. Woods's evaluation was based on reliable information that was reasonably available to trial counsel through timely investigation.  This information included social and medical history documents, the opinions of experts consulted during prior proceedings, as well as witness accounts that documented Mr. Barrett's personal as well as family history of mental illness.  The data Dr. Woods relied on, and which was available to trial counsel, also included a neuropsychological evaluation performed by Dr. Myla Young.

Dr. Young has a wealth of experience, has published in peer reviewed journals, and has lectured and instructed other professionals in her field on a frequent basis.  (Appendix to Exhibit 89, curriculum vitae.)  She administered sixteen hours of neuropsychological testing to Mr. Barrett over a period of three days, and reviewed his relevant educational, medical and mental health records.  (Exhibit 89 at 7-24.)

Dr. Young's testing determined that Mr. Barrett has significant brain damage and resulting brain dysfunction.  This damage primarily involves the prefrontal and temporal cortices of the brain.  Proper functioning of these areas of the brain is necessary "for the brain to effectively communicate information and function effectively."  The severity of Mr. Barrett's brain dysfunction has a negative impact on each and every aspect of Mr. Barrett's daily functioning.

Most especially, Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment." (Exhibit 89 at 24.) Mr. Barrett's disabilities are further exacerbated under "conditions of complexity and/or highly stressful situations." (Exhibit 89 at 24.) Mr. Barrett is a "concrete thinker," whose executive function, which controls the ability to think, organize, problem solve, and change actions based on the information he receives, is severely compromised. (Exhibit 89 at 11, 13.) Because of the significant impairments to Mr. Barrett's temporal cortex, he has difficulty processing visual information and is abnormally subject to feelings of fear and paranoia, with consequent tendencies to impulsiveness and aggressive outbursts. (Exhibit 89 at 13.) Mr. Barrett's ability to actively process and comprehend information is compromised. This includes the ability to actively to process visual information, in the "here and now," or as it unfolds. (Exhibit 89 at 14, 15, 19.) In lay terms, Mr. Barrett acts or reacts before he is able to accurately perceive and process what is going on around him, a dysfunction that is especially heightened, as noted, in stressful situations. (Exhibit 89 at 14, 24.) Mr. Barrett has moderate to significant impairments in his ability to visually scan and accurately recognize information. (Exhibit 89 at 20.) The "fluency" with which Mr. Barrett interprets visual information, and the manner in which he processes such information, is also significantly impaired. (Exhibit 89 at 21, 23.)

As Dr. Woods explained, the accuracy and reliability of Dr. Young's neuropsychological tests results are medically unassailable:

> [N]europsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test

protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.  The successful manipulation of test data to exaggerate measures of neurological impairment in a manner that eluded detection by imbedded validity scales would have required Mr. Barrett to have specific knowledge and mastery of neuroanatomy and test construction.

Based on his consideration of these and other psychiatric data, Dr. Woods concluded:

[¶]    Mr. Barrett meets diagnostic criteria in the DSM-IV-TR for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

[¶]    Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).

***

[¶]    Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

(Exhibit 117 at ¶¶ 66-68.)

The concurrent findings of Dr. Young and Dr. Woods show that,

[¶]    Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms . . . .

* * *

[¶]     He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]     Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]     He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]     Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]     Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]     Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]     Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

[¶]     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated

startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer. It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]    My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment. The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

Movant's trial counsel unreasonably failed to utilize whatever resources they had to discover these facts about their client's organic brain impairments. Prevailing professional norms called upon trial counsel to investigate their client's medical history prior to trial so that counsel could make informed decisions about what strategies to pursue. Trial Counsel were on notice that Mr. Barrett had mental problems, based on existing mental health records from Eastern State Hospital, Sequoyah Memorial Hospital, Wagoner Community Hospital, and the Bill Willis mental health facility in Sallisaw, as well as the preliminary results of the mental health investigation conducted by predecessor counsel in the state court proceedings. Yet trial counsel did not retain an expert prior to trial who could advise them regarding mental state defenses that would be available at either stage.

If counsel had undertaken reasonable steps to investigate, prepare and present evidence regarding Mr. Barrett's severe organic deficits, the first stage defense of lack of intent, and the arguments that Mr. Barrett was unaware that the police were on his property and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably. Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile. At a minimum, this evidence would have been critical in contesting the intent element of count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The exculpatory nature of expert testimony regarding Mr. Barrett's numerous and severe psychiatric, psychological and organic impairments could have been buttressed by reasonably available testimony from lay witnesses about Mr. Barrett's mental state. In addition to providing contemporaneous, real-world accounts of Mr. Barrett's impaired mental functioning, the testimony of such witnesses would have confirmed that Mr. Barrett's disabilities pre-dated the charged offenses and thus clearly impaired his mental state at the time in question. Family witnesses interviewed in connection with the current proceedings describe an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving

what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened. (*See, e.g.*, Exhibit 103; Exhibit 96; Exhibit 97; Exhibit 98; Exhibit 93; Exhibit 86; Exhibit 81; Exhibit 99; Exhibit 74; 101; Exhibit 79.) None of these witnesses, if they were interviewed at all by trial counsel, were questioned about Mr. Barrett's mental state, either with respect to the first or the second stage of trial.

The accurate picture of Mr. Barrett and his mental state, and how it bore on his intent, was further evidenced by reasonably available records of Mr. Barrett's previous hospitalizations, which counsel could have obtained, but unreasonably failed to do so. In 1986, Mr. Barrett was at Eastern State Hospital in Vinita after shooting himself in a suicide attempt. Among other things, he was diagnosed with bipolar disorder. In 1995, he was again hospitalized because he was "losing [his] mind." On this occasion, Mr. Barrett was diagnosed with an acute psychotic reaction. Mr. Barrett had also received mental health treatment, as noted, at Wagoner Community Hospital and the Bill Willis facility in Sallisaw. (*See* Exhibit 147.) As discussed in detail in Mr. Barrett's claim that he was denied effective assistance of counsel in the penalty phase of trial, his family history, on both his mother's and father's side, is replete with serious mental illness, suicide and suicide attempts. (Exhibit 117.)

Not only would all of this evidence have been critical in attacking the intent element of count 3, it also would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to Count 3.[8]

---

[8] As argued in Ground Nine, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion. Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life. Heat of passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force.

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether. Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

In sum, trial counsel, had they acted, or been permitted to act, in a manner consistent with prevailing professional norms, would have investigated and presented evidence from Toby Barrett and Alvin Hahn that corroborated several law enforcement witnesses, and showed that at the critical moment, Mr. Barrett likely could not see any emergency lights or other indications that the vehicle heading toward his house and young son contained law enforcement officers. Trial counsel also would have investigated Mr. Barrett's background and medical history and, through consultation with appropriate experts, found extensive evidence of organic brain dysfunction, bipolar disorder and PTSD. Had this evidence been produced, there is a

reasonable probability that the outcome of the first stage of trial would have been different. This evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to Count 3, and would have supported either outright acquittal or a finding that, at most, Mr. Barrett was guilty of voluntary manslaughter.

**4.    Due to the unreasonable failure of Mr. Barrett's trial counsel to retain expert assistance, Mr. Barrett was tried while incompetent.**

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, compulsory process, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, a trial free of materially false and misleading evidence, to confront and cross examine witnesses, and to a jury trial as guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution, by virtue of trial counsel's prejudicial failure wholly or adequately to investigate Mr. Barrett's mental state and functioning before and during trial, and further failure to invoke adequate procedures, and obtain the assistance of experts, necessary evidence and/or any other reasonable and constitutionally requisite means by which to evaluate, assess and diagnose Mr. Barrett's underlying mental diseases and defects, and accurately and reliably determine his mental competency to stand trial.

Judges must depend to some extent on counsel to bring competence issues into focus. Defense counsel are constitutionally and professionally obligated to vindicate the right to a competence determination by bringing evidence suggesting incompetence to the attention of the court.

Trial counsel failed to investigate Mr. Barrett's mental health as it related to competency, to guilt-innocence phase defenses, and to punishment phase mitigation, and they failed to raise and preserve numerous legal issues involved, all to his prejudice. Counsel unreasonably failed to complete the investigation of Mr. Barrett's social history and background, and failed to consult with qualified mental health experts, including a neuropsychologist, despite the existence of readily available evidence of which counsel were or should have been aware including, but not limited to Mr. Barrett's history of psychiatric diagnoses and treatments, and his family history of mental illness.

As a result of counsel's unreasonable failing, no one working on Mr. Barrett's behalf obtained requisite social history data, nor did any competent mental health professional conduct testing and other evaluation methods necessary to perform a reliable assessment of Mr. Barrett's competency including, but not limited to medically indicated neurological and neuropsychological testing, which was necessary to determine the existence, nature and severity of Mr. Barrett's brain damage and mental illnesses.

If counsel had conducted a professionally adequate investigation, including retaining competent mental health professionals, they would have learned that Mr. Barrett suffered from a life-long history of impaired functioning that was medically indicative of a neuropsychiatric condition, which included organic brain damage associated with, or superimposed on, chronic major mental illnesses, Bipolar Disorder and Post Traumatic Stress Disorder (PTSD). Access to, consideration of and reliance on the results of the neuropsychological testing that was medically and forensically indicated would have enabled any competent expert to inform counsel that the functional impairments associated with the

neurologically damaged areas of Mr. Barrett's brain were consistent with impairment of the domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights.

ABA Mental Health Standard 7-4-2 codifies a professional norm of criminal defense practice in which reasonably diligent counsel informed of such information would have been obligated to request a hearing to determine Mr. Barrett's competency.

There is a reasonable probability that Movant was incompetent at the time of his trial. The documentary evidence submitted in support of Mr. Barrett's petition demonstrates that he is in the impaired range on the critical indicators of brain damage to his frontal lobes and executive functioning. (Exibits 35, 89, 117.) Mr. Barrett's previous psychiatric diagnosis of Bipolar Disorder, made by independent state clinicians, is supported by the observations of lay witnesses over the course of his life. The medical indications in his social history and life-time functioning, which meet diagnostic criteria for PTSD, are also documented by reliable sources. Moreover, the congruence of all the clinical data, including social history, testing and reported symptoms demonstrates that Mr. Barrett is not malingering or exaggerating his condition.

Mr. Barrett's brain damage, coupled with his disruptive psychotic illness, left him unable to appreciate the nature of his actions at the time of the offenses for which he was tried and convicted, and left him unable rationally to understand the proceedings or to assist in his defense during the period in which he was tried. As Dr. George Woods, Jr. concluded, "Mr.

Barrett was unable rationally to assist his attorneys in the preparation of his trial." (Exhibit 117 at 81.)

Rather, Mr. Barrett's ability to understand and track the judicial proceedings was substantially impaired by the confluence of his psychiatric disorders and measured brain damage. The fragments of police bullets in Mr. Barrett's body caused him continuing pain, and provoked an immunological reaction, all of which served as "built-in reminders" of his life-threatening trauma. The ongoing distortion and distraction of Mr. Barrett's PTSD were compounded by the racing thoughts symptomatic of the disabling "manic form" of Bipolar Disorder. (Exhibit 117 at ¶ 80.) These disabling impacts on Mr. Barrett's mental state were, in turn, exponentially increased by the effect of his brain damage that left Mr. Barrett being "unable to get unstuck." (Exhibit 117 at ¶ 80.) This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Exhibit 117 at ¶¶ 59, 80.)

Trial counsel's unreasonable omissions were exacerbated by the court's infliction of an electric shock belt on Mr. Barrett. (*See* Ground Seven, *infra*.)

The evidence shows that trial counsel's lack of investigation created a substantial risk that their client's due process rights were violated by standing trial while incompetent, and therefore undermines confidence in the reliability of the adversarial testing process.

**5.      But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

Ground One discussed the trial court's improper failure to disclose the contents of the *ex parte* hearing held between the Court and the Government on the prosecution's sealed motion to delay disclosing the identities of their seven informant witnesses. During this hearing, the Court criticized the Government for failing to raise the issue sooner. The Court also found the Government's justification for throwing a veil of secrecy over these witnesses unconvincing, because no evidence was produced that any of them had been threatened or were in any sort of danger. The Government merely represented that these witnesses, all of whom had criminal records, had an undefined and inchoate "fear" that they "may" be in danger if they testified. The Court made the obvious point that it envisioned a long continuance to allow the defense sufficient time to investigate these witnesses and prepare for their testimony. (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27.) However, the Court also enabled the Government to benefit by its motion by deferring ruling and withholding information.

Movant's trial counsel unreasonably acceded into an "arrangement" with the Government to "interview" these key witnesses in the presence of the Government. (Tr. 9/13/05 Hr'g at 27; R. 840-43.) There were no reports of anything the witnesses told the Government, presumably because Government counsel – particularly AUSA Mike Littlefield – interviewed them alone so as to claim attorney work-product as a shield to discovery.

The defense was flying blind. The "arrangement," doomed as it was from the start to be anything approaching an adequate substitute for a competent investigation, backfired when all but one of the witnesses refused to be interviewed by the defense. The obvious and reasonable path of moving for a continuance, which the court itself knew was the proper course, was not taken. As a result, the defense was woefully unprepared to effectively cross-examine

these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand. Had a continuance been asked for, it would have been granted, based on the court's own remarks during the *ex parte* hearing. Because a continuance was not requested, and because trial counsel otherwise failed to conduct an adequate investigation, a wealth of evidence that would have destroyed the credibility of the informant witnesses was never heard by the jury.

Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the appeal, questioned Mr. Hilfiger about why he did not seek a continuance. Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case. (Exhibit 29.) Of course, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

A great deal of evidence was available to impeach the Government's key witnesses. As set forth in Ground Five, *infra*, the Government suppressed material impeachment evidence related to these witnesses and engaged in improper delay tactics to prevent trial counsel from discovering the evidence independently. Whether due to the Government, and/or the trial court's misconduct, or trial counsel's unreasonable failure to seek a continuance, there is a reasonable probability that jurors would have rejected the seven snitches if they had heard the following evidence attacking their testimony.

### a.     Travis Crawford.

Travis Crawford, Mr. Barrett's maternal first cousin (R. 450-51), testified in the first stage of trial that the day before the police raid, he noticed a white SUV drive down the road in front of Mr. Barrett's cabin.  Mr. Crawford testified he saw Mr. Barrett go to his front gate at the time the SUV passed.  Crawford claimed to have walked over to Mr. Barrett's property from his parents' house.  Mr. Barrett allegedly told him that he (Mr. Barrett) knew that the people in the white SUV were the police.  Mr. Barrett expressed the opinion that they were probably going to come back to serve a warrant.  With respect to the potential service of the warrant, Mr. Barrett said, "D.G.F." which, according to Travis Crawford, means "Don't Give a Fuck."  Crawford testified Mr. Barrett told him that he was "going out in a blaze of glory," as he had supposedly said on numerous previous occasions.  (R. 462-66.)  Travis Crawford testified that while he had been a methamphetamine user for 15 years, he had been "clean" for nine months.[9]  (R. 457.)

On cross-examination, Mr. Crawford stated he had been arrested previously for failure to pay $11,000.00 in back child support.  He was also arrested on hot check charges many years before.  He admitted to having used a lot of drugs.  His alleged "past" drug use affected his memory, distorted his perception, and his mind was not as sharp as it had been before he became a methamphetamine addict.  (R 467-68, 472.)

Mr. Crawford had never been interviewed by the defense before his testimony. He acknowledged on cross-examination that he had an appointment to talk to defense counsel the

---

[9]  This is in marked contrast with what Mr. Crawford revealed recently to a defense investigator. Mr. Crawford stated that he was a heavy methamphetamine user at the time he was interviewed by the Government, had taken drugs before his testimony, and was under the influence of drugs at the time he testified against Mr. Barrett.  *See also* Ground Five.

preceding Friday, but claimed he did not show up because he was working and would have been fired from his job if he absented himself for the interview. He claimed he was not told by the prosecution that defense counsel had made themselves available on the previous Saturday and Sunday to interview him. (R. 468-69.) Sequoyah County Sheriff John Philpot had been by his residence to let him know that Mr. Barrett's lawyers might want to talk to him. (R 469.) Mr. Crawford admitted he had never provided a written statement to law enforcement or the Government prosecutors relating what his testimony would be. (R. 481.)

When asked why he was coming forward with this information six years after the fact, Mr. Crawford said it was because he had been subpoenaed; he himself wanted to know why he had been contacted by the Government. He denied being threatened with charges or other dire consequences if he failed to cooperate with the prosecution.[10] (R. 470.) Before being approached to testify in the federal trial, he had never talked to anyone about what he supposedly knew of the circumstances surrounding the shooting of Trooper Eales. Despite the admitted problems with his memory, Mr. Crawford claimed he remembered the years-old events to which he testified. He could not recall how many times he had spoken to Sheriff Philpot about what he knew, and also stated, at one point, that he had not had any conversations with government agents other than Sheriff Philpot. (R. 481-82.)

On re-direct examination, AUSA Littlefield reminded Mr. Crawford that he had talked to Littlefield about testifying, and Crawford then stated that before Littlefield interviewed him, he had spoken to no law enforcement agents about Mr. Barrett. "Correcting" his earlier

---

[10] Crawford stated recently he had been threatened by Littlefield, which ensured his cooperation. (See Ground Five *infra.*)

testimony about his contacts with Sheriff Philpot, Mr. Crawford stated either Littlefield, Sheriff Philpot, or Lance and Judy Bergman got a message to him that he needed to be in court.  If Sheriff Philpot was the individual who contacted him for this purpose, this would be the only contact he had with the Sheriff about the case.  (R 487-88.)

On cross-examination, Mr. Crawford basically repeated the claims he made on direct about his conversation with Mr. Barrett on the late afternoon or evening of  September 23 regarding the white SUV that had driven past Mr. Barrett's property.  He assumed the occupants of the vehicle were "the laws" instead of Kevin Adams, who owned a white Bronco and lived approximately a mile from Mr. Barrett, even though the vehicle he saw was unmarked, had no antennas like those on law enforcement vehicles, had no spotlights, and Mr. Crawford was not able to see the vehicle's license tag. (R 478-79.)  Retreating somewhat from his testimony on direct examination, Mr. Crawford said that when he went to speak to Mr. Barrett that evening, he did not tell Mr. Barrett that the "laws" had just driven by, and were probably coming to get him, although he might have commented to Mr. Barrett that the people who had driven by in the white SUV were law enforcement officers.  Ultimately, Crawford testified on re-direct examination that when the white SUV drove past and he went to talk to Mr. Barrett, he did not recall whether he or Mr. Barrett commented that the occupants of the vehicle were law enforcement, but it "seem[ed]" this subject was discussed.  Travis Crawford stuck to his claim that Mr. Barrett said that he was "going out in a blaze of glory."  (R 479-80, 484.)  Mr. Crawford believed that when he went over to talk to Mr. Barrett, the front gate to the property was open, and then "guessed" that Mr. Barrett locked the gate. (R. 48-81.)

During his testimony, Mr. Crawford never mentioned – and was never asked – about his testifying as an informant or snitch in any other case. Had counsel asked about this, and had Crawford been truthful, it would have been revealed to the jury that Crawford had acted as a police informant in the past and had given testimony against others in order to escape prosecution, a fact that surely would have adversely affected his credibility. (Exhibit 45, Exhibit 92.) See also Ground Five, *infra.*

Because trial counsel was professionally unreasonable in failing to move for a continuance, and otherwise failed to conduct a proper investigation, the jury failed to hear from witnesses who could have testified that Crawford was dishonest and not to be believed about anything, particularly with regard to the events on the evening of September 23, 1999. Mr. Barrett is in possession of newly discovered evidence showing that Travis Crawford's trial testimony was false. Mr. Crawford recently recanted his testimony against Mr. Barrett. (*See* Exhibit 45; Exhibit 92; Exhibit 31; *see also* Ground Five §§ A & B.)

Rick Lunsford is a local Sallisaw resident who could have been located and interviewed if any sort of competent defense investigation into Mr. Crawford had been conducted. Mr. Lunsford, along with several other people, were at Mr. Barrett's residence on the afternoon of September 23, at the time Mr. Barrett was approached by Travis Crawford about the white SUV that had driven past the property. Mr. Lunsford had arrived at Mr. Barrett's around noon on September 22, and stayed until around 9:00 p.m. on September 23. Mr. Lunsford went to Mr. Barrett's to drop off a Chevy truck he was selling to him. Mr. Lunsford told investigators currently working for Mr. Barrett that on the late afternoon of September 23, Mr. Barrett and others were standing near the fence to Mr. Barrett's property. Travis Crawford walked over from

his parents house, which was located a couple of residences down the road, and stood at the fence line.  Mr. Crawford asked Mr. Barrett whether he had seen the white SUV that had driven by toward the dead-end, but had not yet driven back.  Crawford stated he believed the individuals in the SUV were law enforcement officers.  Mr. Barrett did not take Crawford seriously, because he did not trust Crawford.  Mr. Barrett was more nervous about Mr. Crawford than he was of law enforcement.  Mr. Lunsford would have testified that Travis Crawford was regarded as a "real flaky person" and that he was known to have been a police informant in the past.  (Exhibit 90.)

After Crawford left, Mr. Barrett told the others who were present that if they wanted to leave because of the SUV, they should do so.  Mr. Barrett was concerned about the others getting in trouble if in fact the SUV contained law enforcement officers, because everyone there was using drugs.  Toby Barrett and Mr. Lunsford stayed, and the others left.  Toby Barrett locked the gate to the driveway, and Mr. Barrett, Toby Barrett and Mr. Lunsford went to either Mr. Barrett's cabin or his garage.  Mr. Lunsford left Mr. Barrett's property around 9:00 p.m. to see his family.  (Exhibit 90.)

Mr. Lunsford states that during the time Crawford came to Mr. Barrett's to talk about the white SUV, before that occurrence, and after that time until Lunsford left later that night, Mr. Barrett *never* said that he would shoot or kill the first law enforcement officer who came on his property, or that if the police came on his property and tried to arrest him, he would "go out in a blaze of glory."  Mr. Barrett never said this or anything like it either on September 23, 1999, or at any other time Mr. Lunsford was around Mr. Barrett.  Such a statement would be out of character for Mr. Barrett, because he was not a violent or threatening person.  (Exhibit 90.)

Had any investigation been conducted by trial counsel, and had Lunsford been contacted, he could also have opined on Travis Crawford's truthfulness, and Crawford's reputation for honesty in the community. In Lunsford's opinion, Travis Crawford is a completely dishonest person; nothing he says can be believed. Mr. Crawford was not only a heavy drug user, but also dealt drugs. Mr. Crawford would sell bad dope to people and "rip them off." Travis Crawford would basically do and say anything to get his hands on drugs, or to get out of trouble. Travis Crawford was known in the community for his dishonesty and untrustworthiness. (Exhibit 90.) Independent of Mr. Lunsford's testimony, his knowledge of Travis Crawford's conduct and record would have provided Mr. Barrett's counsel with additional grounds for impeaching Crawford on cross-examination. .

Mr. Lunsford was never contacted by any representatives of Mr. Barrett in connection with the federal trial. Had he been contacted, he would have been willing to testify to the matters described above. (Exhibit 90.)

Brandy Hill is Travis Crawford's niece. Ms. Hill told investigators currently working on Mr. Barrett's behalf that she, like Rick Lunsford, was present at Mr. Barrett's on the afternoon and evening of September 23, 1999. She was present when Travis Crawford came to the fence of Mr. Barrett's property to tell Mr. Barrett about the white SUV that had driven by. Crawford stated he believed police were in the vehicle, or that his father, Roger Crawford, believed it was a police vehicle. Crawford said his father saw the white SUV drive down the road toward the dead-end, but it had not come back. After relaying this information, Crawford walked back home. Shortly after this, Ms. Hill's husband Sean Hill arrived at Mr. Barrett's, and she went home. (Exhibit 77.)

During and after the time Crawford spoke to Mr. Barrett and the others who were there, there was no talk by Mr. Barrett about killing or shooting the police or "going out in a blaze of glory." After Travis Crawford expressed his suspicions about the white SUV, Mr. Barrett did not react with threats, or in a heated manner. He behaved as if it were normal that the police had driven by. According to Ms. Hill, the police drove by Mr. Barrett's property all the time, sometimes up to three times a week, from 1996 to 1999. (Exhibit 77.)

According to Ms. Hill, and in contrast to Travis Crawford's claim at trial that he had been offered nothing by the Government in exchange for his testimony, Crawford told her that both he and his wife, Cindy Crawford, had been paid for their testimony against Mr. Barrett. Again in contrast to Crawford's claim that he had been off drugs for a period of months before his testimony, Crawford told Ms. Hill he did two "hits" of dope immediately before testifying, and was under the influence of drugs when he testified. (Exhibit 77.) (*See also,* Mr. Barrett's *Brady* and newly discovered evidence claim.)

Ms. Hill was never interviewed by Mr. Barrett's federal lawyers, or any investigator working for them. She was an easily discoverable, readily available witness. Had she been contacted, she would have given them the information related above, and would have agreed to testify as a defense witness for Mr. Barrett. (Exhibit 77.)

Toby Barrett was obviously a readily available witness. He testified for the prosecution in the two state-court trials. He was present at his father's residence on the evening of September 23, 1999. On that evening, Mr. Barrett asked Toby to close the gate to the driveway. Because the gate was usually kept locked in the evenings (certainly a routine occurrence in rural areas), this was nothing out of the ordinary. On September 23, Mr. Barrett

said nothing to Toby Barrett, or in Toby Barrett's presence, about the police, let alone that he believed they were coming to arrest him and that he would "go out in a blaze of glory." While trial counsel spoke briefly to Toby Barrett several times, he never discussed with Toby any testimony he could give. Had he been asked, Toby Barrett would have testified to these facts, as well as others which are discussed elsewhere in this motion. (Exhibit 96.)

Like Rick Lunsford, Brandy Hill and Toby Barrett, Robert "Bubba" Thompson was present at Mr. Barrett's on the afternoon of September 23, 1999. Although he cannot recall specifically whether he saw Travis Crawford there that afternoon, he is sure that while he was there, Mr. Barrett never made any statements about expecting the police to raid his house, wanting to kill law enforcement officers, or desiring to go out "in a blaze of glory." (Exhibit 37.) In fact, Mr. Thompson never heard Mr. Barrett make such statements at any time, even though he was a frequent visitor to Mr. Barrett's property in 1999 because he was close friends with Toby Barrett. (Exhibit 37.)

Trial counsel could have, but did not, discuss with Mr. Barrett's and Mr. Crawford's aunt, Carolyn Joseph, her knowledge of Travis Crawford's honesty and trustworthiness. Although trial counsel interviewed Ms. Joseph briefly, she was never questioned about the credibility of either Travis Crawford or Cindy Crawford. (Exhibit 78.)

According to Ms. Joseph, Travis Crawford, contrary to his claim of being "clean" of drugs for several months preceding his testimony, was a heavy drug user at the time of Mr. Barrett's trial. It is her personal belief that Crawford is not an honest or trustworthy person. Nor does Mr. Crawford have a reputation for honesty in the community at large. (Exhibit 78.)

Every time Mr. Crawford would come to her house, something turned up missing or stolen. Travis Crawford would steal from Ms. Joseph in order to get money to buy drugs. Crawford was the type of person who would say one thing and then do the opposite, so long as it was to his advantage. Ms. Joseph once paid Crawford $400.00 in advance to build a well house on her property. Crawford simply pocketed the money and never built the well house. Crawford never repaid the money he took for a job he never did. The materials that had been purchased for construction of the well house were later stolen. Travis Crawford and/or his wife Cindy were the only people who could have stolen the materials. Crawford once stole four rolls of barbed wire from Ms. Joseph's property, and later admitted the theft to her. Crawford even went so far as to steal from the property of her late son, DeWitt Joseph, who had been killed in an automobile accident. (Exhibit 78.)

Even if Ms. Joseph could not give "extraneous evidence" of the specific bad acts of Crawford that reflected his dishonesty, trial counsel, using the information gained from her, could have cross-examined him about these dishonest acts. Coupled with testimony from Ms. Joseph regarding her opinion that Crawford is a dishonest person, and is regarded as dishonest in the community, any denials offered by Crawford to the specific acts of dishonesty he committed against his own aunt would have rung hollow and marked him as a witness of dreadful credibility.

### b. Cindy Crawford.

Movant is in possession of evidence demonstrating that Cindy Crawford was pressured and threatened by former AUSA Mike Littlefield into testifying against Mr. Barrett, that she was coached in her testimony, and that she embellished her second stage testimony.

Movant is now in possession of Cindy Crawford's medical records, which show that she suffers from post-traumatic stress disorder and other maladies impacting her credibility, and which support her recent statement to defense investigators that she embellished her penalty phase testimony against Mr. Barrett and was susceptible to pressure from the prosecutor and law enforcement. See Ground Five, *infra.* Ms. Crawford gave Movant's counsel access to these records.

Cindy Crawford testified for the Government in both stages of trial. Like her husband, she never talked to defense counsel before her testimony but denied that she had simply refused to meet with them. (R. 3063, 3069.)

In the first stage, she testified she had done drugs at Mr. Barrett's house, although she did not know who supplied the drugs. Cindy Crawford testified Mr. Barrett told her he had a misdemeanor warrant out for his arrest, and that he stayed on his property because he did not want to get in trouble. He knew there was a chance the police could come to his house; that was why he had guns for protection. According to Cindy Crawford, Mr. Barrett told her that if the police (or anyone else, for that matter), invaded his property, he would "go out in a blaze of glory." (R. 3063-69.)

On cross-examination in the first stage of trial, Cindy Crawford stated she started using methamphetamine at age 18. She used the drug for nine years, and would either snort it or shoot it. She stated or implied on direct examination that she was currently drug and alcohol free. (R. 3161.) While on a "meth run," the longest she had stayed up was five days. While using methamphetamine, she would often stay up for three to four days at a time. (R. 3070-71.)

Cindy Crawford admitted her drug use had caused her to lose a sense of time. To her, time was just a blur that played tricks on her mind. (R. 3073.) She really did not know when Mr. Barrett had made the alleged statement about having an outstanding misdemeanor warrant. Defense counsel, in his questioning, stated that any misdemeanor warrant for Mr. Barrett would have been long before 1999. (R. 3072.) While she had done drugs at Mr. Barrett's residence, she was not testifying that Mr. Barrett had ever given her drugs. (R. 3072.) With respect to Mr. Barrett's statement about taking on the police and "going out in a blaze of glory," Cindy Crawford stated this was typical "doper talk" that she had often heard from many drug users. (R. 3075.)

In the penalty phase of trial, Cindy Crawford claimed Mr. Barrett once became angry with her because she would not have sex with him. He ran from his home when she was leaving with his brother Richie Barrett, put the barrel of a rifle against her leg, and threatened to kill her. (R. 4577-79.)

As with the other informant or "snitch" witnesses, trial counsel relied strictly on cross-examination to impeach Cindy Crawford. Had trial counsel moved for a continuance and obtained the time to investigate Crawford, or conducted a reasonable investigation in the time allowed, a wealth of evidence could have been developed which would have shown her to be a witness who jurors would have found not worthy of belief.

During the first stage of trial, Cindy Crawford was never questioned on whether she suffered from any mental problems. In her second stage testimony, she volunteered that she suffered from PTSD, but it was of course too late to use the information to cast doubt on what she told the jury in the first stage. A reasonable investigation would have uncovered evidence

that she had an impaired mental condition, which, along with her drug use, could have impeached her ability to recall and relate, and shown her to be unstable and amenable to pressure or influence from law enforcement. Medical records for Cindy Crawford confirm that she suffers from PTSD, is subject to bouts of anxiety, and has panic attacks. (Exhibit 144.)

Although Crawford testified on direct examination that she was on a five year deferred sentence for misdemeanor marijuana possession (R. 3061), and had a previous misdemeanor marijuana conviction in 1999, counsel failed to explore whether her testimony was motivated by a fear that if she declined to cooperate with the Government, she might face acceleration of her current deferred sentence to either a suspended sentence, which would constitute a felony conviction under Oklahoma law, or could face jail or prison time. Counsel, who evidently did not search Cindy Crawford's court files, failed to ask her about the fact that she could have been charged with a felony rather than a misdemeanor for her second marijuana possession case, and whether the fact she had not been charged with a felony was due to her regularly acting as a police informant, as other witnesses could have attested. (Exhibit 204; Exhibit 170.)

Counsel failed to question Cindy Crawford about the fact that her two misdemeanor marijuana cases were originally charged as felonies. Trial counsel neglected to confront her with the fact that a bench warrant had been issued for her arrest for failure to appear on July 19, 2005, just shortly before Mr. Barrett's trial commenced. Counsel also neglected to question her about the fact that on March 20, 2005, the Sequoyah County District Attorney's Office had filed an application to accelerate her deferred sentence because she had failed to pay certain required fees. Significantly, the bench warrant and the application to accelerate were

hanging over Cindy Crawford's head at the time she testified against Mr. Barrett. It was not until April 24, 2006, after Mr. Barrett's trial concluded, that the application to accelerate and the bench warrant were withdrawn because she had finally complied with the terms of her probation. (Exhibit 204; Exhibit 170.) The circumstances surrounding Crawford's Sequoyah County cases could have been used to show she had a powerful motive to testify for the Government in exchange for help in keeping her deferred sentence.

Due to a failure to investigate Cindy Crawford's court history, the jury was denied other valuable impeachment evidence. The court file in the domestic case of *Crawford v. Mattox,* Sequoyah County Case No. P-03-458, contains a letter from Larry and Brandie Sell, the grandparents of one of Crawford's children, to District Judge John Garrett. The letter states that Cindy Crawford has problems with depression, and threatened to "do something with her baby," which she would be able to "get away with" because she had been in the Harbor View mental hospital. The letter also states that drugs had become "all consuming" for Cindy Crawford. This would not only demonstrate a history of mental illness, but would show that Cindy Crawford was such a despicable and unbelievable character that she had actually threatened harm to her own child, while contemplating the use of her mental illness as an excuse or defense. (File in Sequoyah County Case No. P-03-458.)

Again because no investigation of Cindy Crawford's court records was made, counsel failed to confront her with the numerous acts of dishonesty which served as the basis for a victim protective order in *Michael Mackey, et al. v. Cindy Crawford,* Sequoyah County Case No. PO-03-390. The application for protective order states the plaintiffs had been harassed with false accusations by Crawford, threats to cause problems for Mr. Mackey's children, acts of

stalking, and burglary of the Mackey home and storage shed.  (Exhibit 176.)  Again, even if

extraneous evidence of these misdeeds reflecting Cindy Crawford's lack of honesty could not

have been introduced, Crawford certainly could have been cross-examined about them.

Aside from court records which would have severely impeached Cindy

Crawford's credibility, counsel failed to investigate and produce numerous available witnesses

who could have testified to her complete dishonesty and lack of believability, as well as her

history as a police informant.

Roger Crawford testified briefly as a second stage witness for Mr. Barrett.  In

preparation for his second stage testimony, he was only interviewed for a matter of minutes.

Unfortunately, trial counsel neglected to interview him regarding information he had on the

credibility of Cindy Crawford.  Had Roger Crawford been properly interviewed, he could have

testified in both stages of trial that Cindy Crawford was dishonest and untrustworthy, and that her

reputation in the community for honesty was extremely poor.  Roger Crawford could have

testified that at the time of her testimony at Mr. Barrett's trial, Cindy Crawford was a heavy drug

user, contrary to what she tried to claim to the jury.  Roger Crawford also would have testified

that it was well known in the community that Cindy Crawford, far from being a disinterested

witness, had regularly acted as a police informant to escape prosecution and punishment for her

own criminal activities.  Roger Crawford would have testified that Cindy Crawford had filed

false reports about family members with the Oklahoma Department of Human Services, and also

had made false accusations when seeking victim protective orders.  Mr. Crawford was in an

excellent position to offer an opinion on Cindy Crawford's dishonesty and her reputation in the

community for dishonesty.  He is Cindy Crawford's father in law, and has known her for years. (Exhibit 92.)

Mike Mackey is another witness counsel easily could have discovered by searching court files related to Cindy Crawford.  Mr. Mackey is one of several individuals who filed for a protective order against Cindy Crawford.  He has also known her for years.  He was never contacted or interviewed by Mr. Barrett's trial lawyers, or any investigator working on their behalf.  Had he been contacted, he could have testified that Cindy Crawford is thoroughly dishonest and untrustworthy, and her reputation in the community for honesty is abysmal.  Mr. Mackey goes so far as to state that Cindy Crawford is the "most wickedly evil" person he has ever had the misfortune to run across.  Ms. Crawford made false reports to state DHS regarding him and his mentally handicapped son, and lied to get a victim protective order against him.  Mr. Mackey is also aware that Cindy Crawford has made false claims to the authorities about other family members.  According to Mr. Mackey, Cindy Crawford has repeatedly broken into his home and stolen from him in order to get money or property to buy drugs.  Like Roger Crawford, Mr. Mackey is aware that Cindy Crawford has long worked as a snitch for the local police, and "works the system" to escape responsibility for her own actions, while getting other people into trouble.  (Exhibit 88.)

Again, even if extrinsic evidence of Crawford's bad and dishonest acts could not have been introduced through Mackey's first stage testimony, they could have been inquired into during cross-examination of Crawford.  Extrinsic evidence of these acts of criminality could have been introduced in the penalty phase when Crawford returned to the witness stand.

Brandy Hill is another witness who, with a competent investigation, could have given testimony regarding Cindy Crawford's lack of honesty. As noted in the discussion of Travis Crawford, Ms. Hill was never contacted before or during Mr. Barrett's trial. Ms. Hill has known Cindy Crawford for many years. In her opinion, Cindy Crawford is completely dishonest and untrustworthy. Ms. Crawford's reputation for honesty in the community is extremely poor. Ms. Hill describes Cindy Crawford as manipulative. Cindy Crawford has stolen from Ms. Hill and her family on numerous occasions in order to get money to buy drugs. Like other witnesses who could have testified to Cindy Crawford's dreadful lack of honesty, Ms. Hill is aware that Cindy Crawford has long acted as a local police informant and has lied against others to obtain something of advantage for herself. (Exhibit 77.)

Similar testimony could have been offered by Sean Hill. Mr. Hill, though available at the time of trial, was never contacted by anyone working on Mr. Barrett's defense. He states that Cindy Crawford's reputation in the community is that "she's dishonest, evil and worthless." (Exhibit 95.)

Carolyn Joseph has known Cindy Crawford for years. As with Travis Crawford, Ms. Joseph was not interviewed regarding her knowledge of Cindy Crawford's honesty, or any other information which would have served to impeach Ms. Crawford. Ms. Joseph could have testified that Cindy Crawford was a heavy drug user, and that, in her opinion, Ms. Crawford's drug use affected her mentally. According to Ms. Joseph, Cindy Crawford has the mind and attitude of a twelve year old child. In Ms. Joseph's personal opinion, Cindy Crawford is "so deceitful and dishonest that it is pitiful." Ms. Crawford's reputation in the community for honesty is, to put it mildly, poor. No one Ms. Joseph knows would trust or believe anything

Cindy Crawford said. Cindy Crawford has stolen from Ms. Joseph on several occasions and has conned money out of her. (Exhibit 78.)

Still another witness who could have testified to Cindy Crawford's bedrock reputation for dishonesty is Gwendolyn Crawford, Travis Crawford's sister. Ms. Crawford, as with the other individuals who could have been, but were not contacted to testify on Mr. Barrett's behalf, has known Cindy Crawford for years. Gwen Crawford's experience of Cindy informed her opinion that Cindy Crawford is dishonest, and is well known in the community for her dishonesty. Echoing several of the other witnesses who know Cindy Crawford well, her reputation for honesty in the community is bottom-of-the-barrel. Gwendolyn Crawford is also aware that Cindy Crawford has acted as a police snitch for years and does not hesitate to falsely accuse others if it means getting something for herself. (Exhibit 83.)

Cindy Crawford's penalty phase testimony that Mr. Barrett had put a rifle barrel to her leg and threatened to kill her, allegedly because she would not have sex with him, could have been further impeached if trial counsel had interviewed Mr. Barrett's brother, Richie Barrett. Crawford testified this incident occurred when she was leaving Mr. Barrett's property with Richie Barrett. Richie Barrett was interviewed by a defense investigator in connection with the current action. Richie Barrett states unequivocally that Cindy Barrett fabricated this story out of whole cloth, and that the incident never occurred. (Exhibit 104.)

Cindy Crawford's claim that Mr. Barrett had threatened violence to law enforcement officers if they came on his property could have been impeached had defense counsel investigated and produced witnesses Rick Lunsford, Toby Barrett, Brandy Hill, and Robert "Bubba" Thompson, all of whom state that Mr. Barrett never made such statements

around them and would not have done so.  (Exhibit 90; Exhibit 96; Exhibit 77; Exhibit 37.)  This same point could have been made through Government witness Randy Weaver, had counsel simply asked the obvious.  (Exhibit 38.)

### c.   Charles "Monk" Sanders.

#### 1.   Failure to adequately investigate and prepare to cross-examine Sanders about his previous convictions, charges against him that were dismissed, and the favorable treatment he often secured to escape punishment.

Movant's trial counsel failed to investigate and present numerous grounds for impeachment of Charles "Monk" Sanders, the alleged confidential source for information contained in Clint Johnson's affidavit for a no-knock warrant.  The evidence related to impeachment is vast.  Movant presents this evidence under subheadings to facilitate understanding.

Sanders was a professional informant.  He gave wildly conflicting trial testimony regarding alleged drug activities at Mr. Barrett's residence in the Summer of 1999.  He also testified that at some undetermined time, Mr. Barrett allegedly made statements that he would shoot the first law enforcement officer who came on his property.  (R. 2515.)  In the penalty phase of trial, the Government once more sponsored Sanders to testify that Mr. Barrett, while incarcerated, supposedly contacted a third party about doing harm to the informant in his case.  (R. 4587.)  In an off-hand manner, Sanders testified, under questioning by AUSA Littlefield, that the most the Government was going to do for him in exchange for his testimony was to talk to prosecutors in Sequoyah and Tulsa Counties, informing them of Sanders's cooperation in the case against Mr. Barrett.  (R. 2494.)

Trial counsel unreasonably failed to investigate and challenge Sanders from a myriad of angles the informant's history made readily available. Trial counsel not only failed to capitalize on the entirety of Sanders's cross-examination testimony when he re-urged the motion to suppress, but counsel failed to impeach him effectively, both on cross-examination and with independent evidence.

While trial counsel cross-examined Sanders on some, but by no means all, of his prior convictions, counsel failed to conduct a search of court records, not only to demonstrate that Sanders lied about the number and nature of his previous convictions, but that he had received amazing deal after amazing deal for his work as an informant, including after he supposedly gave information to Clint Johnson about Mr. Barrett. In that sense, assuming he really was the C.I. on the Johnson search warrant, Sanders had *already received and was continuing to receive favor from the authorities based on his "work" against Mr. Barrett.* Had counsel effectively cross-examined Sanders about his prior record, he could have easily exposed Sanders's lies including that Clint Johnson only helped with "some" of his cases, that Sanders had not gotten out of "a lot" of trouble, and his denial that he could commit crimes without fear of paying the full consequences as long as he worked as an informant. (R. 2535-37.)

The beginning of cross-examination revealed no court searches were conducted on Sanders's previous convictions. Counsel stated that he had looked at Sanders's D.O.C. "sheet." This obviously referred to the Oklahoma Department of Corrections website, which would merely list, without any elaboration at all, the case numbers in which Sanders had been convicted, and the offenses for which he was convicted. Counsel confronted Sanders with the fact that he had far more than the four priors he acknowledged on direct examination, a patent lie

Page 83

that prosecutor Littlefield had an obligation to correct, but did not. (R. 2524.) *See* Ground Five, *infra*.

Counsel superficially asked Sanders about the following prior convictions: (1) an Arkansas conviction in 1986 for distribution of drugs, for which Sanders received a sentence of four years confinement, and six years probation; (2) a 1989 conviction in Sequoyah County for uttering a forged instrument, for which Sanders allegedly received one year in the county jail, and time on probation; (3) a 1990 sexual battery conviction and drug possession conviction in Sequoyah County, for which he received three years incarceration and seven years suspended; (4) a 1992 Sequoyah County conviction for drug possession, in which Sanders received a sentence of three years in prison and seven years suspended (Sanders claimed this was "the same" case as his 1990 Sequoyah County conviction, even though the conviction was in a different case number); 5) a Muskogee County conviction in Case No. CF-93-131 for illegal possession of a weapon, bringing drugs or alcohol into a jail, and escape (Sanders acknowledged the escape conviction, but said he had not been convicted of the other charges); (6) a 1995 conviction in Arkansas for possession of drugs, concealing stolen property, and forgery; (7) a Sequoyah County conviction in Case No. CF-98-346, for which Sanders received five years incarceration and twenty years suspended; (8) a conviction in Sequoyah County Case No. CF-98-363, for uttering a forged instrument, for which Sanders received five years incarceration and twenty years suspended; (9) a conviction in Sequoyah County Case No. CF-99-562 for concealing stolen property, for which Sanders received five years incarceration and twenty years suspended (a condition of probation in these last three cases was that Sanders successfully complete a Department of Corrections drug program, which Sanders claimed he had not yet been able to get into); (10) a conviction in

Sequoyah County Case No. CF-03-124 for two counts of running a roadblock; and (11) a conviction in Sequoyah County Case No. CF-04-19 for two counts of concealing stolen property, second degree burglary, and second degree arson, for which Sanders received a deal similar to that in the other Sequoyah County cases.  (R. 2524-36.)

Sanders agreed that after this many convictions, he received, on his current sentences, a very favorable deal (to say the least), requiring him at most to serve five years in prison, which would equate to service of only two and one-half years, even if he was not able to enter the Department of Corrections drug program, which, upon completion, would put him back on the streets immediately.  Sanders admitted that his mentor, Clint Johnson, had helped him with "some," but by no means all, of his prior cases.  (R. 2534-35.)

Had counsel conducted even minimal research into Sanders's court records, far more about the witness's criminal history and the virtual "get out of jail free" cards he received repeatedly would have been revealed to the jury.  The following readily available records, from the nineteen cases marked "a" through "s", among others, would have marked Sanders as a career informant who would say and do anything to continue to have access to drugs and escape incarceration:

a.      Counsel failed to point out that in Sequoyah County Case No. CF-92-91, in which Sanders was convicted of felony drug possession in count 5, the state had charged him with having previously been convicted in Sebastian County, Arkansas, with delivery of marijuana and amphetamines in Case No. 86-604-B.  Sanders was also charged in this Sequoyah County case with the misdemeanors of attempting to elude the police, possession of drug paraphernalia, driving under the influence, and possession of marijuana.

The allegation of the "after former" would have set Sanders's exposure, under then existing Oklahoma law, at ten years to life on the felony drug charge. (21 O.S. 1991, section 51.) He also could have been charged with felony possession of marijuana, rather than a misdemeanor, because of his prior Arkansas drug conviction. (63 O.S. section 2-402 (2).) Instead, he initially was sentenced to 10 years imprisonment on the felony drug charge, and one year in the county jail on the marijuana possession charge. An amended judgment and sentence cut Sanders's prison time on the felony drug charge from ten to three years, with the balance suspended, with the misdemeanor attempting to elude and possession of paraphernalia charges dismissed, and a one year concurrent sentence on the DUI charge. (Exhibit 168.)

b.    In Sequoyah County Case No. CF-97-9, Sanders was charged with three crimes of dishonesty: concealing stolen property, and two counts of uttering a forged instrument. Although Sanders could have been charged with two or more "after formers," which would have set his exposure at twenty years to life under Oklahoma law, he was not. (21 O.S. 1991, section 51.) Instead, the concealing stolen property felony charge was dismissed, and the two uttering charges were reduced to misdemeanors, for which he received one year suspended sentences, to run concurrently. (Exhibit 157.)

On October 2, 1998, an application to revoke Sanders's misdemeanor suspended sentences was filed because Sanders had violated the terms of his probation by committing second degree burglary and larceny from a house as charged in Sequoyah County Case No. CF-98-128, and also by failing to pay the restitution he promised when he received his misdemeanor suspended sentences.

On October 7, 1998, Sanders failed to appear for a court hearing, and a bench warrant was issued for his arrest. No disposition is shown for the revocation action. The last entry in the docket on this case notes that on December 9, 1999, a waiver of preliminary hearing in Sequoyah County Case No. CF-99-562 was filed. As discussed below, the application to revoke in this case was later "passed" for ninety days, and would be dismissed altogether upon payment of restitution. If restitution were not paid, Sanders would receive one year in the county jail. As matters developed, and as is discussed below, Sanders was required to pay no restitution.

Although these records indicated Sanders was receiving favorable treatment from the Sequoyah County District Attorney at the time he was working for Clint Johnson to gather "evidence" against Mr. Barrett, and Mr. Barrett's trial counsel demonstrated a desire to impeach Sanders on those grounds, trial counsel failed to present these records to the jury.

c.      In Sequoyah County Case No. CF-97-75, Sanders was charged with the felony crime of running a roadblock, and misdemeanors for attempting to elude, having an open container, and reckless driving. Although prior felony conviction enhancements could have been filed to increase the range of punishment on the running a roadblock felony charge, they were not. On October 16, 1997, this case was dismissed outright on motion of the state, based on what is reflected on OSCN. The court case file itself apparently shows no disposition. Sanders was questioned on none of this by defense counsel. (Exhibit 158.)

d.      In Sequoyah County Case No. CF-97-140, Sanders was charged with concealing stolen property and felony possession of methamphetamine. It was alleged on page two of the information that he had three prior felony convictions, all out of Sequoyah County, in Case Nos. CF-89-396 (uttering a forged instrument); CF-92-91 (drug possession); and

CF-90-144 (sexual battery). Again, Sanders was facing up to life in prison upon conviction. (21 O.S. section 51.) Instead, again on October 16, 1997, all charges were dismissed on motion of the state, according to OSCN. The court file itself shows no case disposition. Counsel did not cross-examine Sanders on this gift from the state prosecutors.

         e.      In Sequoyah County Case No. CF-98-22, Sanders was charged with concealing stolen property, grand larceny, unlawful use of a police radio, and *providing false information to a police officer*. Despite his many prior convictions, Sanders received an illegal deferred sentence, which was later accelerated. (22 O.S. 1991, section 991c (prohibiting defendant with even one prior felony conviction from receiving a deferred sentence).[11] Counsel was professionally unreasonable for failing to question Sanders about how he managed to get a deferred sentence from Sequoyah County authorities when, due to his record, the deferment was absolutely barred by law. (Record from court clerk's office on case; other parts of file have been lost or destroyed.)

         f.      In Sequoyah County Case No. CF-98-128, Sanders was charged with the felonies of second degree burglary and larceny from a house. The three "after-formers" alleged in Sequoyah County Case No. CF-97-140 (Sequoyah County Case Nos. CRF-89-396, Exhibit 168; and CRF-90-144) were alleged, setting Sanders's exposure at twenty years to life. An amended information alleging the same charges and same "after-formers" was filed on July 7, 1998. Miraculously, the state dismissed the after former conviction allegations, and Sanders received patently illegal five year deferred sentences, running concurrently, with costs waived by

---

[11] This statute was later amended by 22 O.S. section 991c (F) to permit convicted felons to receive a deferred sentence, but only on motion and waiver by the State.

the District Attorney's office.  The sentences were also ordered to run concurrently with a conviction Sanders obtained in Creek County.  Later, CF-98-128 was dismissed with costs, as is discussed below.  (Exhibit 159.)

It was unreasonable for Mr. Barrett's trial counsel not to discover and use on cross-examination records showing that Sanders, who faced the prospect of life in prison on this offense alone, received illegal deferred sentences, and that even those illegally lenient sentences eventually were lifted.

g.  In Sequoyah County Case No. CF-98-346, Sanders was charged with possession of methamphetamine (a felony) and misdemeanor possession of drug paraphernalia.  Again, he was charged after having been previously convicted of the same three Sequoyah County felonies discussed above.  Sanders was yet again facing twenty to life.  Per a plea agreement reached with the state, Sanders received a twenty year suspended sentence.  The misdemeanor charge was dismissed.  At the time he entered his plea, due to his record of prior felony convictions, Sanders was not eligible for a suspended sentence under Oklahoma law as it then existed.  (22 O.S. 1991, § 51; 22 O.S. 1991, § 991c.)[12]

Although Mr. Barrett's trial counsel briefly alluded to this case, and the sentence Sanders received, counsel failed to point out the following impeaching facts: (a) on May 3, 2001, the state filed an application to revoke Sanders's suspended sentence because he had been arrested for larceny of merchandise from a retailer and possession of drug paraphernalia in Sequoyah County Case No. CF-01-314, and also failed to report to his probation officer, as he

---

[12]  Again, as with the statute governing deferred sentences, the law was later amended to permit defendants, such as Sanders, with two or more prior felony convictions to received suspended sentences, but only on motion and waiver by the State.

told the court he would do when he received his suspended sentence; (b) on August 23, 2001, the court ordered Sanders's sentence revoked in full, with Sanders ordered to complete the "Last Stop" program in the Department of Corrections, upon successful completion of which the balance of the sentence would again be suspended; (c) coming to Sanders's aid yet again, the Sequoyah County District Attorney's Office moved on February 22, 2002, to amend the revocation to allow Sanders to attend either the "Last Stop" program, or an equivalent program, and requested that the sentence in this case be ordered to run concurrently with the sentence in Sequoyah County Case No. CF-98-363; (d) *nunc pro tunc* orders granting these requests were entered by the court on March 5 and March 28, 2002; (e) on March 12, 2004, the District Attorney filed a second application to revoke Sanders's suspended sentence, because he had committed a new offense, burglary in the second degree, as alleged in Sequoyah County Case No. CF-04-19; (f) an amended second application to revoke Sanders's suspended sentence was filed on June 17, 2004, based on the amended information filed in Case No. CF-04-19, which alleged, in addition to second degree burglary, that Sanders had also committed the offenses of second degree arson, concealing stolen property, and felon in possession of a firearm; (g) on November 17, 2004, instead of revoking the entirety of the suspended sentence, the court, pursuant to Sanders's agreement with the state, revoked only five years of the suspended sentence, with the entirety of the sentence to again be suspended if Sanders successfully completed the "Key to Life" program in the Department of Corrections; (h) incredibly, the partial revocation in this case was ordered to run concurrently with the suspended in whole or in part sentences in Sequoyah County Case Nos. CF-98-363, CF-99-562, CF-04-19, and CF-03-124.

Sanders was not questioned about the fact he faced revocation of the entire twenty year sentence based on his various probation violations, with consecutive time in his other active Sequoyah County cases. Nor was it brought to the jury's attention that absent the various deals he received, Sanders was once more facing the potential of life in prison on this offense of conviction due to his record of previous felony convictions. Counsel also failed to point out Sanders's statutory ineligibility for any suspended sentence due to his prior felony convictions, absent a motion and waiver from the State. (Exhibit 160.)

h. In Sequoyah County Case No. CF-98-363, Sanders was charged, yet again, with uttering a forged instrument. The same previous felony convictions noted in the cases above were alleged on page 2 of the information, meaning Sanders was facing twenty to life. On December 9, 1999, the allegation of prior convictions was dismissed and Sanders received a twenty years suspended sentence that he was not eligible to receive under then-existing Oklahoma law. This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-99-562 and CF-98-346.

Again in this case, an application to revoke was filed on May 3, 2001, for failure to report, and based on Sanders's arrest for felony larceny of merchandise from a retailer and possession of drug paraphernalia, a misdemeanor, as charged in Sequoyah County Case No. CF-01-314. Again, an order revoking was entered by the state court on August 23, 2001, with the sentence ordered revoked in full, but to be suspended in its entirety if Sanders successfully completed the "Last Stop" program in the Department of Corrections. Sanders was allowed to self-surrender to the county jail instead of being immediately placed in custody.

As described in connection with Case No. CF-98-346, a motion to amend the order revoking was filed. A *nunc pro tunc* order amending the previous revocation order, and directing Sanders's sentence to be served concurrently with the sentence in Sequoyah County Case No. CF-98-346, was entered. A second motion to revoke based on the same allegations of new offenses filed in CF-98-346, was also filed in connection with this case. On April 17, 2004, the court entered a second order revoking Sander's suspended sentence. As with Case No. CF-98-346, only five years of the twenty-year suspended sentence was revoked, and the sentence would again be suspended in its entirety if Sanders successfully completed the in-house "Key to Life" program or its equivalent. This sentence was ordered to run concurrently with Sanders's sentences in Sequoyah County Case Nos. CF-98-346, CF-99-562, CF-04-19, and CF-03-124.

Counsel failed to cross-examine Sanders about the fact he faced a sentence of up to life imprisonment on this conviction absent the deal he received, and, having received probation, could have had his sentence revoked in full, with consecutive time on all his other active cases, absent the tremendous break he received from the prosecutors. (Exhibit 161.)

i.     In Sequoyah County Case No. CF-99-562, Sanders was charged with still more crimes of dishonesty. Some, but not all of the charges in this case, were mentioned briefly by defense counsel on cross-examination. Sanders was charged with three counts of concealing stolen property, one count of uttering a forged instrument, misdemeanor possession of marijuana (which could have been charged as a felony due to Sanders's prior drug convictions), and possession of a sawed-off shotgun. Instead of trotting out the usual three "after-formers" charged in some of the cases discussed above, Sanders was charged with committing the instant offenses after previous conviction of five felonies. In addition to the same

three prior Sequoyah County felonies that were usually alleged on page 2, it was also charged

that Sanders had felony convictions in Muskogee County Case No. CF-93-772 for escape from

custody, and Muskogee County Case No. CF-93-131 for carrying a weapon into the jail. Yet

again, Sanders faced twenty years to life.

Based on yet another deal-of-a-lifetime, Sanders received a twenty year suspended

sentence on count 1. In an extraordinary gift from prosecutors, and at an extraordinary cost to

public safety, counts 2, 3, 4, 5 and 6 were dismissed outright. Consequently, Sanders, a

convicted felon many times over, was allowed to walk around with a sawed-off shotgun, with no

repercussion whatsoever.

This case was "wrapped up" on the same guilty plea forms with Sequoyah County

Case Nos. CF-98-363, CF-98-346, CF-98-128, and CF-97-9. As noted, Sanders received a

twenty year suspended sentence on the felony conviction in CF-98-363; Case No. CF-98-128 was

dismissed with costs Sanders was later relieved of paying; and the long-moribund revocation

action in CF-97-9 was passed for ninety days to allow payment of restitution, which, in the end,

Sanders was never required to pay, thus making hollow the threat of a year in jail for failure to

satisfy restitution.

The same application and amended applications to revoke, and the same or similar

*nunc pro tunc* orders discussed above in Sanders's other cases, were filed in this case. As with

the other cases discussed above, Sander's suspended sentence in this case was first revoked for

only five years. He would revert to full probationary status upon completion of a Department of

Corrections drug program. The initial revocation order for up to five years and the rest were

ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-03-124 and CF-04-19.

Trial counsel failed to question Sanders about the fact he was facing up to life in prison in this case; that five of the six charges lodged against him were dismissed; and that, without the largesse of the state prosecutors, he could have (and should have, based on his horrific record) faced revocation of all the suspended sentences he was serving, to be served consecutively. As with the other cases discussed above, counsel failed to point out that Sanders was either ineligible for a suspended sentence, or had to receive a special dispensation from the prosecution to get one. (Exhibit 162.)

j.     In Sequoyah County Case No. CF-01-314, Sanders was charged with another felony crime of dishonesty, larceny of merchandise from a retailer. He was also charged with a misdemeanor for possession of drug paraphernalia. The state alleged in page two of the information that Sanders committed the felony of larceny after having been convicted of six felonies (Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562). (Exhibit 163; Exhibit 160; Exhibit 161; Exhibit 162, Exhibit 168.) With two or more "after-formers," Sanders faced a minimum of twenty years, and a maximum of life on the felony charge.

Initially, on August 23, 2001, this case was dismissed upon the payment of costs. On October 19, 2002, the case was "combined" with other cases, with a result similar to those discussed above.

Mr. Barrett's trial counsel unreasonably failed to reference this case at all during cross-examination, and thereby failed to inform the jury that from the time Sanders became Clint

Johnson's confidential informant he received the most extraordinary lenient treatment which left him free to roam the streets committing crime after crime.  (Exhibit 163.)

     k.  In Sequoyah County Case No. CF-03-124, Sanders was charged in a seven count information with: 1) feloniously pointing a firearm; 2) being a felon in possession of a firearm; 3) felony running a roadblock; 4) felony running a roadblock; 5) attempting to elude (misdemeanor); 6) reckless driving (misdemeanor); 7) and resisting an officer (misdemeanor). Sanders was charged with the felony offenses in this case after having been convicted of six felonies in Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CF-92-91, CF-98-346, CF-98-363, and CF-99-562.  With the allegation of two or more "after-formers," Sanders was staring at his usual 20 to life term.

    Sanders, as with all his other Sequoyah County convictions, entered into wildly generous plea agreement with the state.  As reflected by the judgment and sentence in this case, filed on November 17, 2004, counts 1 and 2 were dismissed.  The allegation of "after-formers" carried no real sting.  The misdemeanor charges were dismissed.  On the felony running a roadblock charges in counts 3 and 4, Sanders was "punished" with sentences of twenty-five years, running concurrently, all to be suspended except for the first five years (also running concurrently), with the entirety of the sentences to be suspended upon completion of the "Key to Life" program, or another similar program.  These sentences were ordered to run concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19.  (Exhibit 164.)

    Mr. Barrett's trial counsel unreasonably failed to impeach Sanders with this highly impeaching evidence.  The jury could not help but notice that Sanders was given the lightest

treatment for conduct very similar to acts the Government attributed to Mr. Barrett. The jury also would have been impressed to learn that charges had been dismissed in this case, that Sanders again escaped 20 years to life due to prosecutors' intervention, that despite his repeated crimes Sanders never drew consecutive sentences, and that, as reflected by his other cases, prosecutors for years gave Sanders a license to commit whatever crime he wished in Sequoyah County, with only the most minor of consequences.

l.    In Sequoyah County Case No. CF-04-19, Sanders was originally charged with second degree burglary, after former conviction of six felonies in Sequoyah County Case Nos. CRF-89-396, CRF-90-144, CRF-92-91, CF-98-346, CF-98-363, and CF-99-562. The case was amended to charge additional counts of second degree arson, concealing stolen property, and felonious possession of a firearm.

On November 17, 2004, per a plea agreement with the state, and with the "page two" still intact, Sanders was sentenced on each of counts 1, 2, and 3 to twenty-five years imprisonment, with all but the first five years suspended, and with the balance of the sentences suspended in full upon completion of the Department of Corrections in-house drug program. Count 4, in which Sanders was charged with being a felon in possession of a firearm, was dismissed. The sentences in this case were ordered to run concurrently to one another and concurrently with the sentences in Sequoyah County Case Nos. CF-98-346, CF-98-363, CF-99-562, and CF-03-124. (Exhibit 165.)

Counsel was professionally unreasonable in failing to cross-examine Sanders on the fact that he faced twenty to life absent a deal from the state prosecutors, that he received

concurrent probation time rather than consecutive prison time, and that the firearm charge against him was dismissed.

m.      In Cherokee County Case No. CF-98-111, Sanders was charged with no fewer than six counts of uttering a forged instrument, after former conviction of felonies. Amended and second amended informations were filed on June 1, 1998 and August 20, 1998, respectively.  Although he promised to appear at all court dates after being released on bond, he incurred a failure to appear.  A bench warrant was issued on May 15, 1998.  Sanders had a second failure to appear on March 24, 2000.  On May 3, 2001, he was ordered released to a bondsman.  On July 29, 2009, in keeping with the unbelievable sweetheart deals Sanders has received throughout his appalling and protracted criminal career, the felony charges in this case were dismissed on payment of costs of $229.00, with payment to be made beginning September 1, 2009.  (Exhibit 183; Exhibit 57.)

Counsel were professionally unreasonable for failing to cross-examine Sanders about this case, which was pending at the time of Mr. Barrett's trial.  Because this case was still pending without disposition during Mr. Barrett's trial, seven years after it had been filed, Sanders's bias and motive in appearing as a Government witness in the hopes that he could resolve this case favorably – as he had all of his other cases – was apparent.

n.      In Muskogee County Case Nos. CF-93-131 and CF-93-772 Sanders was convicted of escape and carrying a weapon into a jail, respectively.  Sanders attempted to claim that these were the same case, when they clearly were not.  Counsel was professionally unreasonable in failing to demonstrate that Sanders lied and that he in fact had separate Muskogee County convictions.  (Exhibit 183.)

o.      In Tulsa County Case No. CF-94-1503, Sanders was charged with uttering a forged instrument.  This case was dismissed years later, on September 18, 2001.  Costs were assessed against the state.  Counsel was professionally unreasonable for failing to cross-examine Sanders regarding the disposition of this case, in which he once again avoided a conviction and prison time.  (Exhibit 183.)

p.      In Tulsa County Case No. CM-03-6603, Sanders was charged with obtaining merchandise by false pretenses, a crime of dishonesty upon which he could have been cross-examined, but was not.  Sanders received a one year suspended sentence, fines and costs.  Although he surely promised to do so, Sanders failed to appear before the Tulsa County cost administrator as directed on March 24, 2004.  A bench warrant was issued for his arrest on April 12, 2004.  An application to revoke his suspended sentence was filed on April 14, 2004.  Another bench warrant for Sanders's arrest was issued on May 20, 2004.  On October 6, 2005, Sanders was sentenced to thirty-six days in jail, at a rate of $15.00 per day, to work off what was owed.  Not only the fact of Sanders's conviction for this crime of dishonesty, but his failure to follow through on promises to fulfill the terms of his suspended sentence, could have been inquired into on cross-examination to show him to be a completely untrustworthy individual, who will say one thing to receive something of advantage to himself, but whose word is utterly worthless.  (Exhibit 185.)

q.      In Tulsa County Case No. CM-04-1187, Sanders was charged with drug possession and possession of drug paraphernalia.  On April 5, 2004, he incurred a failure to appear, despite a promise as a condition of his bond to make all court appearances.  During Mr. Barrett's trial, Sanders appeared, in custody, on September 28, 2005.  He entered a not guilty

plea, and the case was set for the jury sounding docket on October 13, 2005. On that date, again during Mr. Barrett's trial, and around the time he appeared as a first stage witness, the case was passed to November 17, 2005. On November 17, the last day of Mr. Barrett's trial, the case was passed to February 2, 2006, because Sanders was "in federal custody." On December 9, 2005, Sanders appeared in custody, entered a guilty plea, and was rewarded with sentences of one year in the county jail on each count, with the jail time suspended. (Exhibit 186.)

Mr. Barrett's trial counsel unreasonably failed to cross-examine Sanders over the fact that this case kept getting passed until Sanders performed for the Government at Mr. Barrett's trial, the obvious implication being that any deals he would receive in that case were contingent solely on how much he pleased the Government.

r.    In Sequoyah County Case No. CM-00-389, Sanders was charged with attempting to elude an officer, affixing an improper license plate to his vehicle, and eluding arrest. On June 30, 2000, Sanders entered into a plea bargain which called for count 1 (attempted eluding) to be dismissed, fines and costs on count 2 (improperly affixing a license plate), and a one year suspended sentence and a fine on count 3 (eluding arrest). On March 7, 2001, a bench warrant was issued for Sanders's arrest for failure to satisfy terms of probation he promised the court he would fulfill at the time he entered his plea. Counsel was professionally unreasonable for failing to cross-examine Sanders on this act of dishonesty. (Exhibit 187.)

s.    In Sequoyah County Case No. CM-03-365, Sanders was arrested, among other charges, for possession of marijuana. He also attempted to resist arrest. Counsel was professionally unreasonable for failing to cross-examine Sanders about the fact that with his

prior drug convictions, he could have been, but was not, charged with felony possession of marijuana rather than a misdemeanor. (Exhibit 166.)

In sum, counsel was professionally unreasonable for failing to move for a continuance so Sanders could be cross-examined effectively about his litany of prior convictions; his deals which the jury could have concluded resulted from his working continuously as a snitch; the charges and cases against him which had been dismissed; the fact that he was facing up to life in prison on many charges, but got virtually nothing by way of punishment; his acts of dishonesty in connection with various charges and his obligation to appear in court and adhere to the conditions of his probation, and the like.

Counsel even failed to discover all of Sanders's prior convictions. Counsel stated that by his count, Sanders had ten previous convictions, or nine, if Sanders's dispute with one of them was credited. (R. 2524-36.) In truth, after the dismissed cases and charges against Sanders are set aside, Sanders had no fewer than eighteen prior felony convictions, if the various counts of conviction are totaled. The better part of a day or more could have been spent cross-examining Sanders about his criminal record and the wonderful deals he got time after time, even while he continued to commit crimes with impunity. Instead, counsel merely scratched the surface, cross-examining Sanders generally (and inaccurately) about the number of previous felony convictions, what they were for, and that he received little jail or prison time. Counsel neglected altogether to cross-examine Sanders about his misdemeanor cases involving dishonesty, and did not even draw the jury's attention to the fact that many of Sanders's convictions, for both felonies and misdemeanors, involved acts of dishonesty.

Had an effective cross-examination on Sanders's record been conducted, his credibility would have been completely destroyed in the eyes of any rational jury. Impeachment of Sanders also would have undercut the credibility of Clint Johnson and other Sequoyah County law enforcement officials, not to mention the Government then relying upon him to seek a death sentence. These omissions alone, or in conjunction with counsel's other failures to investigate the informant witnesses and prosecution evidence, undermines confidence in the verdict. If trial counsel had presented the available evidence, the jury would have had an entirely different and more truthful view of the case, including that the raid on Mr. Barrett's house was conducted on the word of someone whom the Sequoyah County District Attorney knew was a lifelong liar, drug addict, and opportunistic snitch.

**2.      Counsel unreasonably failed to investigate and produce witnesses who could have impeached specific claims made by Sanders, and Sanders's credibility as a whole.**

Even in the absence of moving for and securing a reasonable continuance to investigate the snitch witnesses, it is plain that counsel failed to perform an adequate investigation into readily available evidence and witnesses who would have impeached Sanders's credibility and shown him to be completely unworthy of belief about anything and everything. Instead of locating available witnesses to impeach Sanders, counsel relied on cross-examination alone, which was plainly inadequate.

As noted, Sanders was somewhat "confused" over the dates he supposedly visited Mr. Barrett's property. Based on one reasonable interpretation of the dates Sanders claimed to have been at Mr. Barrett's residence, and as argued by AUSA Littlefield to the jury, Sanders was at Mr. Barrett's on the afternoon of September 23, 2009,  just hours before the early morning

police raid on Mr. Barrett's property. Littlefield told the jury Sanders was present around 5:00 p.m. to 6:00 p.m. on September 23, around the time the gate to Mr. Barrett's driveway was locked. (R. 4299.)

Had counsel conducted a reasonable investigation, or sought the time to conduct one, they could have produced Rick Lunsford as a witness to rebut this claim. As noted in the discussion of Travis Crawford's testimony, Mr. Lunsford arrived at Mr. Barrett's around noon on September 22, 1999, and stayed until approximately 9:00 p.m. on September 23. Mr. Lunsford states that Sanders was never at Mr. Barrett's property on either September 22 or September 23, 1999. Mr. Barrett's trial counsel did not contact Mr. Lunsford. Had he been contacted, he would have been willing to testify that Sanders was never on Mr. Barrett's property on the afternoon and early evening of September 23. (Exhibit 90.)

Likewise, trial counsel failed to contact and interview another witness who could have refuted Sanders's claim to have been in Mr. Barrett's house, where he supposedly saw methamphetamine and a drug sale, according to his direct testimony, in September, 1999. Sean Hill would have testified that Sanders was never in Mr. Barrett's house because Mr. Barrett would not let him in. Mr. Barrett and his real friends stayed as far away from Sanders as possible because it was well known he was a chronic liar and a police snitch. (Exhibit 95.)

As noted, Brandy Hill was present at Mr. Barrett's on the afternoon of September 23, 1999. She could have identified the people who were present during that time. Charles Sanders was not among them. Ms. Hill was never contacted by defense counsel. (Exhibit 77.)

Critically, Sanders testified that two to three days before the shooting, he went to Mr. Barrett's with his then-girlfriend, Geniece [sic] Thomas.[13]  He gave conflicting testimony as to whether Mr. Barrett sold drugs to either him or Ms. Thomas, on this or any other occasion. When questioned by the prosecutor, Sanders claimed that Mr. Barrett sold Ms. Thomas drugs. Questioned by defense counsel, Sanders stated that there was no drug deal when he supposedly went to Mr. Barrett's two to three days before the police raid, and that he merely went there, with Ms. Thomas, to exchange a set of car keys.

Trial counsel never contacted Ms. Thomas.  She was an available witness.  Had counsel located and interviewed her, she would have testified that Sanders was lying.  Ms. Thomas would have testified that she was not at Mr. Barrett's with Sanders a few days before the shooting.  She also would have testified that on the occasions she did go to Mr. Barrett's, she never went with Sanders.  Moreover, Ms. Thomas could have testified that on the occasions she went to Mr. Barrett's, she never bought drugs from him.  On any occasion she was at Mr. Barrett's when Sanders was on the property, she never witnessed or had any knowledge of any drug transactions between Mr. Barrett and Sanders.  Mr. Barrett would not have sold drugs or engaged in drug activities with Sanders because Mr. Barrett neither liked nor trusted Sanders, who was a well-known snitch.  (Exhibit 13.)

Staff Sergeant Robert "Bubba" Thompson is an eyewitness whom trial counsel could have called to impeach Sanders's and the Government's claim that Sanders was at Mr. Barrett's on the afternoon of September 23, 1999.  Trial counsel never contacted Mr. Thompson, although he was readily available and would have testified had he been asked to do so.  In 1999,

---

[13]  Her true name is Janesse Thomas.

Mr. Thompson was a good friend of Toby Barrett's, and often visited the Barrett property. He was at Mr. Barrett's on the afternoon of September 23, hanging out with Toby Barrett on the front porch. There were two or three other people visiting with Kenneth Barrett at the time Mr. Thompson was there. Mr. Thompson is sure that Charles "Monk" Sanders was not at Mr. Barrett's on the afternoon of September 23. In fact, Mr. Thompson never saw Sanders at Mr. Barrett's, even though Thompson was a frequent visitor. Contrary to the claims of Sanders and some of the other informant witnesses, Mr. Thompson never heard Mr. Barrett state, on September 23, 1999, or at any other time, that he wanted to kill police, that he would kill any law enforcement officer who came on his property, or that he wanted to go out "in a blaze of glory." (Exhibit 37.)

Counsel unreasonably failed to interview and present at trial some of the witnesses discussed immediately above, and others who could have testified that Sanders is a pathological liar whose word should not have been relied upon by Clint Johnson or the jury. These witnesses were known in the community, had experience with Sanders, had formed the opinion that Sanders was dishonest and completely untrustworthy, and knew that Sanders had a horrendous reputation in the community for truth and veracity. These witnesses also could have armed counsel with information to cross-examine Sanders, in the first stage of trial, about various bad acts and acts of dishonesty. Since Sanders also appeared as a penalty phase witness for the Government, and because the rules of evidence are relaxed in the second stage of a capital trial, these witnesses could have given specific testimony on specific bad acts of Sanders and actions which reflected negatively on his credibility. The impeachment of Sanders, alone or in

conjunction with doubts about the conduct of the Tact Team, would have provided jurors with reason to vote for a sentence less than death.

Rick Lunsford could have testified that he knows Sanders, and had done drugs with him in the past. Sanders was a heavy drug user, who also dealt drugs. In Mr. Lunsford's opinion, Sanders is a dishonest person. Mr. Lunsford would not believe anything Sanders said. Sanders was even dishonest in his drug dealings. Sanders often sold bad dope to people and ripped them off. As reflected in court documents, he never seemed to get in trouble for his drug dealings. Mr. Lunsford is aware that Sanders once kidnaped a woman, Sally Davis. Mr. Lunsford could have testified to his personal opinion that Sanders is wholly dishonest, and his knowledge that Sanders has a richly deserved reputation for dishonesty in the community. Mr. Lunsford, as noted in the discussion regarding Travis Crawford, also could have testified that Mr. Barrett never threatened harm to the police, and never said he would go out in a "blaze of glory" or anything like that. (Exhibit 90.)

Janesse Thomas, Mr. Sanders one-time girlfriend, could have testified to her well-informed opinion that Sanders is dishonest and would say and do anything as long as he believed he would obtain something of advantage to himself. Sanders's reputation for honesty in the community is horrible. Ms. Thomas could also have given testimony showing that Sanders resented Mr. Barrett and had a motive to lie against him. On one occasion, when Thomas was still Sanders's girlfriend, she tried to get away from him and called Mr. Barrett and another friend for help. Thomas left Sanders, and was picked up by Mr. Barrett. Sanders and his mother, Evelyn Sanders, followed Mr. Barrett and Thomas. Sanders was angry and was trying to persuade Ms. Thomas to come back with him and his mother. Instead, Mr. Barrett was able to

get Ms. Thomas away from Sanders. (Exhibit 13.) Based on these events, jurors would have found Sanders had a personal motive to lie about Mr. Barrett, apart from or in addition to his interest in currying favor with law enforcement.

Sean Hill, another person with experience and knowledge of Sanders, could have testified to his opinion, and the community's judgment, that Charles Sanders is a liar who was accorded no credibility whatever, and was known to trade false allegations about others for favors from law enforcement. When Mr. Hill heard that the Government sponsored Sanders as a witness at Mr. Barrett's trial, he could not believe the prosecutors would rely on Sanders because of his lengthy arrest record. In his penalty phase testimony, Sanders claimed that Mr. Barrett had made statements to the effect that the informant against him should be found and harmed. Mr. Hill could have given testimony from which the jury could infer that Sanders was attributing to Mr. Barrett actions that routinely occurred without any connection to Mr. Barrett. Mr. Hill would have informed the jury that when Sanders is in jail, he is routinely beaten up by other inmates because he falsely informs on others. (Exhibit 95.)

Sally Davis Johnson, a one-time girlfriend of Sanders, was available as a witness, but was never contacted by the defense. She last had contact with Sanders in 2004, before Mr. Barrett's trial. In her personal opinion, Sanders is untrustworthy. Sanders is dishonest when sober, but when he is on drugs, he is "100 times more dishonest." Ms. Johnson could never believe anything Sanders said on any subject. (Exhibit 94.)

Ms. Johnson could have provided defense counsel with information about specific bad acts of dishonesty and violence that could have been used to impeach Sanders either in the first or second stage of trial. This evidence would have put the lie to the prosecution's portrayal

of Sanders as simply a non-violent doper who was himself the innocent victim of planned violence by others.

On one occasion, Sanders used lies and fraud to get Ms. Johnson to go with him. Sanders showed up at her house and said he needed to talk to her. She told him she could talk to him briefly, but had to get back to school. She left with Sanders in his car. Against her will, Sanders kidnaped her and took her to Vian, Oklahoma, where she was held for eight days. She was beaten on a daily basis by Sanders, and was even stabbed. During this ordeal, Sanders lied to her repeatedly, telling her he would take her home when her bruises healed. Instead, Sanders simply kept beating her. When she tried to escape, Sanders threw a knife at her, and stabbed her in the foot. Sanders also used a knife to cut her from her neck to her chin. After five days of being held by Sanders, he turned himself in to the police on an outstanding charge. At this point, Sanders turned Ms. Johnson over to his mother, Evelyn Sanders, who confined her for another two to three days. The police finally rescued Ms. Johnson. Evelyn Sanders tried to cover up Ms. Johnson's many bruises with make-up. A police report was made by Ms. Davis about what Sanders did to her. (Exhibit 94.)[14]

Ms. Johnson could have told defense counsel, had she been contacted, about an act of threatened violence committed by Sanders. Sanders once threatened Ms. Johnson's mother, Linda Davis, because Ms. Davis would not tell Sanders where Ms. Johnson was. Sanders stated that unless Ms. Davis gave him the information he wanted, he would find Ms. Johnson and cut her tongue out. (Exhibit 94.)

---

[14] Evidently, based on the search of Sanders's court records, he was never charged in this incident because he was working as a police snitch.

Ms. Johnson, had she been contacted by defense counsel, also could have informed the defense about other specific acts of dishonesty committed by Sanders. Sanders once took her along on a stealing spree, during which Sanders stole from virtually everyone he knew in order to get money to buy drugs. The police were informed about this by Ms. Johnson. Sanders had also stolen from Ms. Johnson and her family in order to get money to buy drugs. Sanders was so pathetically dishonest he once stole Ms. Johnson's children's toys in order to pawn them for drug money. (Exhibit 94.)

One of Mr. Sanders's own relatives could have testified, had he been contacted by the defense, that "Monk" is untrustworthy and his claims are considered uniformly unbelievable. Billy Poindexter is Sanders's uncle, and has known Sanders his entire life. According to Mr. Poindexter, "you can believe him [Sanders] about as far as you can throw a pick-up truck." Mr. Poindexter would have confirmed that Sanders has been in trouble his whole life. Mr. Poindexter himself would not believe his nephew about anything. Mr. Poindexter is aware that when Sanders testified at Mr. Barrett's trial, Sanders was doing so in order to get out of his own troubles with the law. Mr. Poindexter is also aware that after testifying against Mr. Barrett, Sanders served no jail time for anything he was in trouble for. Mr. Poindexter would have testified that Sanders has a low reputation in the community for truthfulness. (Exhibit 76.)

Additionally, had trial counsel moved for a continuance, they could have developed all the evidence detailed above respecting Sanders's credibility to mount a persuasive

attack on the search warrant under *Franks*. This evidence would demonstrate that no one, including Clint Johnson, could have used Sanders as a "reliable" confidential informant.[15]

### d.    Randy Weaver.

Randall Weaver testified in the first stage of Mr. Barrett's trial. He stated that in 1999, he was using methamphetamine, and had been to Mr. Barrett's place three or four times in the Spring and Summer of that year. Using the death of Trooper Eales as a benchmark, Weaver stated he had been to Mr. Barrett's earlier in 1999 looking at cars. On that occasion, Weaver and Mr. Barrett used methamphetamine together. Weaver went to Mr. Barrett because he was a good mechanic. Whenever he went to Mr. Barrett's property, the gate was open; Mr. Barrett did not come out with a gun on the occasions Weaver went to the property. Weaver testified he bought $20.00 of methamphetamine from Mr. Barrett. Weaver claimed Mr. Barrett told him that he (Mr. Barrett) had missed a court date, and that he thought a warrant had been issued. (R. 1835-39.)

Weaver, who was interviewed by Bret Smith and defense investigator Loyd Cobb in AUSA Mike Littlefield's presence, testified he had first been approached about Mr. Barrett's federal case by Littlefield, who came to his tattoo shop in Arkansas. Weaver had previously done time on an Arkansas cocaine charge. When Littlefield came to see him at the tattoo shop, he asked whether Weaver had ever sold ammunition to Mr. Barrett, and informed Weaver that it was against federal law for Weaver to possess ammunition because of his previous conviction. Weaver told Littlefield he never sold ammunition to Mr. Barrett. Littlefield's statement to Mr.

---

[15] *See also* Ground Five (Mr. Barrett's *Brady/*newly discovered evidence claim regarding the complete lack of credibility of both Sanders and Johnson).

Weaver about the sale of ammunition might be construed as a subtle threat, but Weaver felt he had nothing to worry about because he had done nothing wrong. (R. 1835-39.)

Questioned by defense counsel, Weaver testified that in a rural area like he and Mr. Barrett lived in, people don't drive up without warning in the middle of the night. If a gate is closed, people should not go onto somebody else's property. It makes no sense to do such a thing. (R. 1840-45.)

Although he was interviewed briefly by the defense, defense counsel and the defense investigator failed to ask Weaver whether, when Mr. Barrett supposedly discussed his court case, or at any other time during the Spring and Summer of 1999, he ever said words to the effect that he would blast the first policeman who came onto his property, would "go out in a blaze of glory," or had in any way, at any time, threatened the police. Had he been asked these questions at trial, Weaver would have testified that Mr. Barrett never made such statements to him or anyone else in his presence. In fact, Mr. Barrett never indicated to Weaver that he would ever do violence to anyone. (Exhibit 24; Exhibit 38.)

### e.    Brandie Zane Price.

Brandie Price testified she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period. (R. 3485-86.) Price testified that a week to ten days before the shooting incident, Mr. Barrett mentioned that he had an outstanding warrant and that the police were going to come get him. Mr. Barrett supposedly stated that if the police arrived, those present should either grab a gun or hit the floor, because he "was going to take as many of them bastards out as he could." (R. 3492-93.)

Price stated that she usually went to Mr. Barrett's house with Ronny Baldwin,[16] who would drive her vehicle through the ditch area the police went through when they raided Mr. Barrett's house.  (R. 3502-06.)  Defense counsel cross-examined Price about statements she made to the authorities in 2000, where she stated that Mr. Barrett had a MAC-10 and a Mini-14 at his residence, which were unlike the weapons she described on cross-examination.  She also stated in 2000 that she went to Mr. Barrett's with a lady named Jaime Crow, which she denied doing in her testimony.  (R. 3509-11.)

Price's claim that Ronny Baldwin or she usually approached Mr. Barrett's residence from the east through the ditch in her Mazda or Mitsubishi automobile could have been easily refuted by the testimony of Sean and Brandy Hill.  Had they been contacted, they would have testified that it would have been impossible for this low-slung vehicle, no matter how slowly it was going, to navigate the ditch successfully.  The undercarriage would have been severely damaged in the attempt.  (Exhibit 95; Exhibit 77.)

Counsel also failed to call any witnesses who could testify to their well-informed opinions regarding Price's honesty, or her reputation for honesty in the community.  Sean Hill was an available witness never contacted by the defense.  If he had been interviewed and prepared to testify, he could have told the jury that Price was known in the community as a thoroughly dishonest person who would do or say anything to obtain drugs.  (Exhibit 95. *See also* Ground Five, *infra*.)  Moreover, the witnesses who were never investigated who could have

---

[16] Ronny Baldwin testified for the defense.  He stated he could never recollect going to Mr. Barrett's house with Brandie Price at any time, and that he never would have driven her car through the depressed area to the east of Mr. Barrett's cabin.  Baldwin could not have gone to Mr. Barrett's in August and September as she claimed, because he was jailed on August 4, 1999, and remained in jail through the entire month of September 1999.  (R. 4117-23, 4182-83.)

impeached claims by Monk Sanders, Travis Crawford and Cindy Crawford that Mr. Barrett made threatening statements against law enforcement could have been used to indirectly discredit Price, since her story was simply too pat and conveniently lined up with what Sanders and the Crawfords said on the witness stand. (Exhibit 90; Exhibit 77; Exhibit 96; Exhibit 38; Exhibit 37.)

### f.  Karen Real.

Karen Real, like all the other informant witnesses except Randy Weaver, refused to talk to the defense. (R. 3076-77.) At the time she testified against Mr. Barrett, she was serving a fourteen year federal sentence on drug charges and a firearms charge. (*See* Ground Five, *infra*.) Real had been to Mr. Barrett's on several occasions. She claimed he usually kept his gate locked, and that when people arrived on his property, he would grab a gun before he determined who they were. (R. 3085-86.) Real did drugs with Mr. Barrett, and testified that he sold drugs and kept syringes in his house. (R. 3087-88, 3099, 3091, 3102-03.) According to Real, Mr. Barrett stated he would shoot the police if they came on his property. (R. 3106.)

Counsel relied strictly on cross-examination in an attempt to impeach Karen Real. No witnesses who knew her in the community were called to testify regarding her honesty. As with Brandie Price, Sean Hill could have testified that Real's word was not to be believed. According to Mr. Hill, Real is a "pretty messed up" person. Although Real's federal conviction was brought out, counsel never asked her if she had provided information against her co-defendants in an effort to secure leniency. Mr. Hill states that she informed on her boyfriend and co-defendant, Doss Gann, in an attempt to get favorable treatment. Karen Real is the type of person who would do and say anything to get out of trouble. (Exhibit 95.) Again, witnesses who

could have been called to impeach the claims of the Crawfords and Sanders that Mr. Barrett

threatened violence against the authorities if they came on his property could have been used to

indirectly impeach Real's virtually identical claim. (Exhibit 90; Exhibit 77; Exhibit 96; Exhibit

38; Exhibit 37.)

As with a number of the informant witnesses, trial counsel failed to conduct a

search of available state court files to impeach Karen Real. A search of the Sequoyah and

Cherokee County Court files would have shown that she had several serious state drug cases that

were ultimately dismissed, some shortly before Mr. Barrett's trial. These dismissed charges

would have shown Real's bias and motive in testifying against Mr. Barrett. Bias and motive are

never "collateral matters" from which a witness can be shielded from cross-examination.

Moreover, it is of no significance if some or all of these state charges were dismissed in lieu of

Real's federal prosecution. Under the dual sovereign doctrine, Real could have, but for the

dismissal of these charges, faced serious prison time in the Oklahoma Department of

Corrections. After all, Mr. Barrett was convicted in both state and federal court for a single

alleged criminal transaction. There was nothing to guarantee that the state charges against Real

would not be revived if she failed to please the federal prosecutors with her testimony against

Mr. Barrett.

In Sequoyah County Case No. CF-97-445A, Real was charged with attempted

manufacture of methamphetamine, possession of CDS with intent to distribute, possession of

marijuana, two counts of possession of CDS, and two counts of possession of drug paraphernalia.

These charges were filed on December 22, 1997. The case was passed, or little action was taken

on it, until May 18, 2004, when a motion to dismiss was filed.  The motion to dismiss was granted by an order entered on May 24, 2004.  (Exhibit 52.)

In Sequoyah County Case No. CF-98-264A, Real was charged with manufacturing methamphetamine, trafficking in methamphetamine, unlawful use of a police radio, possession of CDS, and possession of drug paraphernalia.  The charges were filed on July 29, 1998.  A bench warrant for failure to appear was issued on June 7, 1999, and was recalled on June 9 or 10, 1999.  Nothing happened in the case until May 18, 2004, until a motion to dismiss was filed.  The motion was granted on May 24, 2004.  (Exhibit 51.)

In Sequoyah County Case No. CF-99-250A, Real was charged with trafficking methamphetamine, possession of marijuana with intent to distribute, unlawful use of a police radio, possession of a firearm in the commission of a felony, and unlawful possession of drug paraphernalia.  This case was filed on June 8, 1999, over three months before Trooper Eales was killed.  Little or no action was taken on the case before it was dismissed on May 24, 2004, based on a motion filed on May 18, 2004. (Exhibit 49.)

In Sequoyah County Case No. CF-99-251, Real was charged with unlawful possession of CDS.  The information was filed June 28, 1999.  On February 15, 2001, an order was entered that Real was awaiting sentencing in her federal case and that this state case would be dismissed after Real was sentenced in federal court.  On September 4, 2001, a motion to dismiss and an order dismissing the case were filed.  The order dismissing was apparently finalized on December 20, 2001.  (Exhibit 50.)

In Cherokee County Case No. CF-99-18,  Real was charged, on January 26, 1999, with trafficking in illegal drugs, manufacture of a controlled dangerous substance, possession of

marijuana with intent to distribute, possession of a controlled dangerous substance in the presence of a minor child, and use of a weapon in the commission of a crime. The case was passed on a number of occasions. On February 15, 2001, an order was entered that Real was awaiting sentencing in federal court, and that the case would be dismissed after she had received her federal sentence. On June 4, 2001, a motion to dismiss and an order dismissing were filed. (Exhibit 47.)

In Cherokee County Case No. CM-99-40, Real was charged with the misdemeanor of possession of drug paraphernalia. The case was filed on January 26, 1999. Little happened on the case until February 15, 2001. An order was entered noting that Real was pending sentencing in federal court, and that the case would be dismissed after Real received her federal sentence. On September 4, 2001, a motion to dismiss and an order dismissing the case were entered. (Exhibit 48.)

In Cherokee County Case No. CF-99-251, Real was charged with possession of CDS. The charge was filed on June 28, 1999. On February 15, 2001, an order was entered reflecting that Real was awaiting sentence in federal court, and that the case would be dismissed after she received her federal sentence. On September 4, 2001, a motion to dismiss the case and an order dismissing the case were entered. (Exhibit 50.)

Because counsel failed to adequately research Real's criminal record, the jury was left with the false impression that the only trouble she had been in stemmed from the federal prosecution on which she was doing time when she testified against Mr. Barrett.[17] Based on the

---

[17] Real was rewarded for her testimony against Mr. Barrett when the Government filed a Rule 35 motion to reduce her 14 year sentence to time served. See Ground Five.

dismissed state charges, counsel could have drawn her credibility into serious question by pointing out that she had previously avoided the potential of lengthy sentences in state court, which could well have run consecutively to one another and to her federal sentence, and that to prevent the possible revival of her state cases, it was certainly in her interest to cooperate with the Government in Mr. Barrett's prosecution. Each of these state cases involved separate criminal transactions, and some were apparently dismissed not necessarily in lieu of federal prosecution, but for other reasons. It certainly could have been strongly implied on cross-examination that some of these cases were dismissed because Real acted as a police informant. Mr. Barrett's trial counsel's failure to discover Real's state criminal record was professionally unreasonable, and prejudiced Mr. Barrett because her direct testimony was largely unscathed by cross-examination. Thus, the jury was wrongly left with another largely un-impeached witness who regaled it with tales of Mr. Barrett's "plan" to confront law enforcement with deadly force if his property were ever raided.

### g.    Randy Turman.

At trial, Randy Turman claimed Mr. Barrett taught him how to cook methamphetamine. (R. 193.) At the time he testified, Turman had pending state charges for manufacturing methamphetamine. (R. 193.) He was at liberty on a $120,000.00 bond. Turman admitted that he had cooked methamphetamine once a week for five years, and that he possessed a firearm while doing so. When asked about these charges, Turman said "it's done been taken care of." (R. 445-46.) The witness had taken numerous drugs over an extended period of time, and was once up for four days on a "meth run." (R. 430-31.) Turman claimed there was nothing going on in his case. He had gone to court, and as far as he knew, the charges had been resolved.

(R. 434-35.)  Turman testified he had no deals in exchange for his testimony, that he had not been given immunity from punishment, and that he never worked as an informant or paid informant.  He declined to talk to the defense because he figured he would be questioned in court, and that would suffice.  Asked if one of the charges currently lodged against him was for altering the serial number on an SKS, he stated that charge had been dropped.  (R. 434-35, 439-44.)  Turman stated he was simply in court to tell the truth.  (R. 445.)

Turman claimed he met Mr. Barrett three or four months before Trooper Eales was shot.  (R. 364-65.)  He "hung out" at Mr. Barrett's and would use methamphetamine there.  (R. 366.)  He stated he witnessed Mr. Barrett cooking methamphetamine in his cabin.  (R. 377.)  He identified Government's Exhibit 65, a photograph taken in Mr. Barrett's shop of mineral spirits, toluene, and paint thinner.  Turman stated Mr. Barrett would use these ingredients to cook meth.  (R. 383-84.)  Tubing used to manufacture methamphetamine was kept in Mr. Barrett's cabin.  (R. 384-85.)  Glassware used in the manufacturing process was kept in a water trough.  (R. 385-86.)  Turman explained how Mr. Barrett supposedly "powdered" methamphetamine in his shop and how a hose was attached to a gas tank during the cooking process.  (R. 387-91.)  Turman testified, though, that he never actually saw Mr. Barrett cooking meth, and that he never really discussed the manufacturing process with Mr. Barrett, even though he claimed Mr. Barrett was the person who taught him how to cook meth.  (R. 389-91.)

Turman testified he recognized items that were in Mr. Barrett's house during the summer of 1999, including a tool box and hose, and explained how Mr. Barrett could used these items to make dope.  (Government's Exhibit 63, R. 396-97.)  Turman testified Mr. Barrett would lock the gate to his driveway to restrict access to his property, and identified the "warning sign"

that had been placed there. (Government's Exhibit 104.) The witness claimed Mr. Barrett never left his property because there was a warrant out for his arrest, and that he was afraid the police would come to his house. (R. 397-401, 416.)

Mr. Barrett kept several weapons in his home, including a .233 Colt Sporter rifle; a .22 pistol; a Smith and Wesson 9mm pistol; and a double-barreled 12-gauge shotgun, which Turman said he sold Mr. Barrett. (R. 401, 404-11.)

Turman admitted he went to Mr. Barrett's house to paint a car on one occasion, and that the enamel reducer and mineral spirits in the cabinet to Mr. Barrett's shop were used to paint vehicles. (R. 437-39.)

Turman testified Mr. Barrett had expressed concern about law enforcement coming to his property, and allegedly stated there would be a shoot-out if this occurred. According to Turman, Mr. Barrett expressed the hope that Sheriff Philpot or Frank Loyd would be the first law enforcement officers through the door. (R. 412). Turman also testified that on one occasion, late at night, an individual had come to the gate of Mr. Barrett's property and said he was running from the law and expected law enforcement to arrive at any time. Mr. Barrett's response to this, according to Turman, was to go into his cabin and retrieve his Colt Sporter rifle. (R. 414-15).

Thus, Turman was a critical witness on the underlying drug charges in the superseding indictment, as well as on the question of Mr. Barrett's intent. Turman was especially important on the drug charges, since the search of Mr. Barrett's home and property yielded no working methamphetamine lab and virtually no drugs. It was therefore of paramount

importance that Turman be effectively impeached.  This, trial counsel failed to take reasonable steps to do.

Trial counsel were professionally unreasonable for failing to research Turman's court file on the charge that had "done been taken care of."  The pending felony drug and firearms charges were still open when Turman testified.  Contrary to Turman's testimony, the possession of a firearm with an altered serial number charge had not been dismissed.  The only way these charges could have been "taken care of" is if Turman were acting as a police informant, and was going to get some sort of deal in exchange for his informant work and his testimony against Mr. Barrett.

In Sequoyah County Case No. CF-02-477, filed on September 10, 2002, Turman was charged in a six count information with manufacturing methamphetamine; possession of methamphetamine with intent to distribute; possession of precursor material; another count of possession of precursor material; possession of a firearm while committing a felony; and possession of a firearm with an altered serial number.  The charges were based on evidence recovered during the execution of a search warrant.  Turman posted an appearance bond on September 20, 2002.  A preliminary hearing was set for April 17, 2003.  The preliminary hearing was re-set for June 12, 2003, and apparently re-set again on later dates, since the preliminary hearing was ultimately waived on November 3, 2003.  According to documents in the Sequoyah County Court file, the case literally fell off the map until May 9, 2007, when the District Attorney's Office filed a motion to dismiss "in the best interests of justice."  The motion to dismiss was granted by written order the same day it was filed.  (Exhibit 195.)

Counsel were professionally unreasonable for failing to expose Turman's bald-faced lie about his case having been "taken care of," and one of the firearms charges having been dismissed, when the case was still active and literally nothing had happened on it in two years. Not only would Turman have been exposed as a perjurer, but the curious chronology of his Sequoyah County felony case could have been used to support counsel's claim on cross-examination, which Turman denied, that he was a police snitch, had made an undisclosed deal with the Government for his testimony against Mr. Barrett, and was going to be rewarded in the end (as he was) depending on whether he pleased the Government with his testimony. With respect to Turman's testimony regarding Mr. Barrett's supposed comments about law enforcement, counsel were also unreasonable for failing to produce testimony from available witnesses who could have testified, in direct contrast to the informant witnesses, that Mr. Barrett did not and would not threaten violence toward law enforcement. (E.g., Exhibits 37, 77, 90, 96).

Counsel were also professionally unreasonable, as with the other informant witnesses discussed above, in failing to develop and introduce evidence regarding Turman's overall lack of honesty. Sean Hill could have testified that Randy Turman is "as low as you get," and that he was known in the community as a thief who would "testify against anyone to save his own skin." (Exhibit 95.)

The testimony of the seven snitches was the main difference between Mr. Barrett's state prosecution, which ended in a conviction of manslaughter, and his federal case, which resulted in the death penalty. Their testimony was vital to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges. Despite the obvious importance of these witnesses, as the trial court itself stated on September 13, 2005, Mr. Barrett's

trial counsel failed to move for a continuance, and failed to conduct a thorough investigation in order to impeach these witnesses.  Counsel in effect agreed to a trial by ambush with respect to the seven crucial informant witnesses.  Because of the critical importance of these witnesses, who could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial.  There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsel's indefensible errors and omissions, the result of the guilt stage of trial would have been different.  At a minimum, these failings also had a prejudicial effect on the punishment stage.

**6.    Trial counsel were ineffective in failing to make appropriate and timely objections to improper hearsay evidence of other bad acts**.

On September 22, 2005, after the start of the trial, the Government filed a Notice of Intent to Offer Evidence of Other Crimes.  (Doc. 206.)  Aside from evidence regarding narcotics activity at Mr. Barrett's residence preceding the shooting of Trooper Eales, the Government stated it intended to offer testimony from the majority of its informant witnesses (Charles Sanders, Randy Turman, Cindy Crawford, Travis Crawford and Brandie Price) that in the weeks and months preceding the shooting of Trooper Eales, Mr. Barrett had made statements to the effect that if law enforcement came on his property, he would shoot them.[18]  The Government argued these alleged statements were relevant to show Mr. Barrett's intent. (Doc. 206 at 1-3.)  The Government's filing failed to give notice that informant witness Karen Real would offer similar evidence of supposed statements made by Mr. Barrett.  Before Mr. Barrett

---

[18]  Mr. Barrett's claim concerns only the testimony offered by the informant witnesses regarding his alleged statements or actions related to those statements.

could respond, the Government's filing said, "The defendant has not complained of lack of notice." (Doc. 206 at 4.)

The Government's Notice was filed nine days after the trial court, during an *ex parte* hearing, advised the prosecutors that the testimony they intended to present from informants included evidence covered by Fed. R. Evid. 404(b). (Tr. 8/13/05 Hr'g at 22-23.) The court permitted the prosecutors to argue outside the presence of Mr. Barrett and his counsel that the testimony was not within the scope of the rule. *Ibid.* Following the conclusion of that discussion, when defense counsel were present, the trial court described the content of the *ex parte* discussion without revealing that it included the court stating that the testimony described *in camera* included 404(b) evidence. *Id.* at 25-27.

On September 27, 2005, trial counsel for Mr. Barrett filed a response to the Government's 404(b) Notice, contesting specifically the evidence of Mr. Barrett's alleged statements, and arguing that the proposed testimony from the informant witnesses was irrelevant propensity evidence; any marginal relevance or probative value it might possess was outweighed by the danger of unfair prejudice. (Doc. 215.)

On the same day counsel for Mr. Barrett filed their response to the 404(b) Notice, the court stated it would rule on admissibility as the evidence developed, and directed the Government to approach the bench immediately before it intended to offer such evidence. Defense counsel were directed to submit an appropriate limiting instruction, should they desire to do so. (R. 174.) Defense counsel filed a proposed limiting instruction on September 28. (Doc. 218.)

Without objection, informant Randy Turman testified that Mr. Barrett expressed concerns that the police were going to come to his property; said there would be a shootout if this happened; that he hoped Sequoyah County Sheriff John Philpot or Frank Loyd would be the first officers through the door; and that he would "take out" as many officers as he could. (R. 412-13.) Turman also testified about a supposed late-night incident where a man came to the gate of Mr. Barrett's property and said he was running from the law and expected the police to arrive. In response to this, Mr. Barrett supposedly went in his cabin and retrieved his Colt Sporter rifle. (R. 414-15.) This testimony was met with an objection, which was overruled. (R. 414.)

Turman testified that he began going to Mr. Barrett's property three to four months before the shooting of Trooper Eales. By his vague estimate, he was last there a month or two before the shooting. (R. 413.) On cross-examination, Turman stated he could not remember the dates and times on which any of the incidents he testified occurred. All Turman could really say was that they had to have occurred in the three to four months preceding the shooting of Trooper Eales that he claimed to have frequented Mr. Barrett's property. (R. 422-23.)

Without objection, Charles Sanders, on direct examination, stated Mr. Barrett told him that if the police came to his property, he would shoot the first officer who came through the door, and that he expected it to be John Philpot. No real time frame was given for this alleged statement. (R. 2515.) On cross-examination, Sanders testified that in September 1999, Clint Johnson asked if Mr. Barrett had ever made any statements about doing violence to law enforcement. Sanders stated, "I think the response was that me and Kenny Barrett had a discussion about him killing John Philpot if he came through his door." (R. 2612.) Sanders was

initially unable to put any kind of time frame on this statement; the statement was simply made "sometime," and he did not know when the alleged conversation occurred. Drifting toward an attempt at some sort of specificity, Sanders then said that while the conversation could not have occurred in 1998, it would have been before July, 1999. (R. 2612, 2614.)

Responding to a leading question by the prosecutor which set the relevant time frame at a month or two before the shooting of Trooper Eales, Cindy Crawford testified Mr. Barrett said he would "go out in a blaze of glory" if the police raided his property. This statement supposedly occurred in the context of Mr. Barrett remarking that he had a misdemeanor warrant outstanding. Crawford admitted she was a heavy drug user at the time of this alleged conversation, that she lost her sense of time when she was on drugs, and that Mr. Barrett's reference to a misdemeanor warrant could have been made long before 1999. (R. 3068, 3070, 3072-73.) No objection was made to Crawford's testimony regarding Mr. Barrett's alleged statements. (R. 3068.)

Brandie Price, who claimed she went to Mr. Barrett's cabin in August and September 1999, testified that a week to ten days before the shooting of Trooper Eales, Mr. Barrett remarked that he had an outstanding warrant and that if the police came to the property, any visitors to his residence should either grab a gun or hit the floor. Mr. Barrett supposedly stated that he would "take out as many" lawmen as he could. Price admitted that her memory was very foggy during this period of time due to her drug use. (R. 3485-86, 3492-93, 3507, 3509.) No objection was made to Price's testimony regarding Mr. Barrett's purported statements.

Karen Real testified she periodically visited Mr. Barrett at his cabin from 1997 until, by her estimation, early 1999. (R. 3082-83.)  She told defense counsel it was possible the last time she had been to Mr. Barrett's property was in late 1998. (R. 3118-20.)  During this time period, according to Real, Mr. Barrett expressed a negative view of law enforcement. (R. 3090.)  Initially, a defense objection was sustained when the prosecutor asked Real what Mr. Barrett had specifically said about this subject. (R. 3090.)  A short time later, without objection, when asked what Mr. Barrett had said about the police in late 1998 or early 1999, Real responded Mr. Barrett said he would shoot law enforcement officers who came on his property. (R. 3106.)  Like the other informant witnesses, Real had been a heavy drug user.  At the conclusion of Real's testimony, defense counsel moved to strike her testimony because it was remote in time.  The prosecution countered that Real's testimony related to a continuing pattern of behavior on Mr. Barrett's part.  The court overruled the objection. (R. 3135-36.)

The only witness to give testimony respecting alleged statements by Mr. Barrett threatening violence to law enforcement that was in any sense contemporaneous with the shooting of Trooper Eales came from Travis Crawford.  Crawford testified that on September 23, 1999, the afternoon before the shooting, Mr. Barrett said if the police came on his property he would "go out in a blaze of glory." (R. 462-66.)  As noted in Mr. Barrett's original petition and this amendment, Crawford has since recanted his testimony. (*See* Ground 5(A)(b), *infra*.)

Evidence of Mr. Barrett's alleged statements to these witnesses, excluding Travis Crawford, was inadmissible, and wrongly argued and considered by the jury as propensity evidence in violation of Fed. R. Evid. 404(b).  Trial counsel unreasonably failed (a) to seek reasonable pretrial disclosure of these statements, (b) to make appropriate objections to the

Government's delay and to the admissibility of the statements, and (c) to seek an appropriate order limiting the jury's consideration of the evidence to Mr. Barrett's alleged state of mind at the time the statements were made.

Trial counsel were on notice by September 12, 2005, at the latest, that the Government intended to use informant witnesses, but made no request for notice under Rule 404(b). To the extent earlier requests for discovery included requests for 404(b) notice, trial counsel unreasonably failed to assert that the Government had staged an ambush (as the trial judge himself thought likely, Tr. 9/13/05 Hr'g at 7, 10-12), failed to seek a continuance to investigate, and failed to object that the Government failed to show good cause for the late disclosures, as required by Rule 404(b).

The statements were hearsay, and pursuant to Fed.R.Evid. 803(3) were admissible only to show the declarant's state of mind at the time the statements allegedly were made. The alleged statements made weeks, several months, or many months before the offense could not reliably or relevantly evince Mr. Barrett's intent on the night Trooper Eales was fatally shot; they were injected into the trial simply to unfairly prejudice Mr. Barrett.

Moreover, any time frame placed on these alleged statements by the informant witnesses was completely unreliable. Their memories were vague in the extreme due not only to the passage of time, but because of their own repeated use of mind-altering drugs. The alleged statements attributed to Mr. Barrett by Turman, Sanders, Cindy Crawford, Brandie Price and Karen Real *were not* close in time to the offense itself, and had only possible worth, not real probative value. Any slight probative value this evidence could arguably be said to possess was clearly outweighed by the danger of unfair prejudice.

Even assuming Mr. Barrett made these statements (which he did not), they could not relate to any specific intent to do harm to law enforcement when the Highway Patrol Tact Team invaded his property unannounced in the middle of the night, with the lead vehicle having all the appearance of a civilian automobile. This evidence simply covered Mr. Barrett in a veil of unwarranted suspicion.

Although defense counsel filed a response the Government's 404(b) Notice objecting to the admission of Mr. Barrett's statements to these witnesses, and made, as outlined above, sporadic objections during the testimony of Randy Turman and Karen Real, the remainder of the evidence complained of here passed without a contemporaneous objection, and a contemporaneous request for a limiting instruction. Because the evidence addressed here was clearly inadmissible, and trial counsel recognized its inadmissibility in their response to the Government's 404(b) Notice, counsel were professionally unreasonable for failing to make adequate, contemporaneous objections. Since the testimony of the informant witnesses regarding Mr. Barrett's supposed statements was the centerpiece of the Government's case for intent, the failure to adequately object affected the trial outcome. Without the informants' inadmissible statements the prosecution's case would have been no stronger than the prosecution case presented to the two state juries. The actual results of these trials demonstrates there is at least a reasonable probability that the result of the federal trial would have been different if federal trial counsel had challenged admissibility.

Defense counsel were also professionally unreasonable, to Mr. Barrett's prejudice, for failing to object to Karen Real's other crimes or bad act testimony because no pretrial notice was given as required by Rule 404(b), and for failing to object to the prosecution's 404(b) Notice

because it was filed untimely. Rule 404(b) states that upon request, reasonable notice in advance of trial of other crimes or bad act evidence must be given, absent good cause indicating notice should be excused. The prosecution did not file its 404(b) Notice until individual jury selection in the case was underway.

To the extent trial counsel did object to the other bad acts evidence addressed here, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue. *See* Ground Eighteen, *infra*.

**7.    Due to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence.**

Trial counsel were professionally unreasonable for failing to hire an independent crime analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley. Mr. Barrett's counsel sought $17,000.00 for an expert to conduct a crime scene reconstruction, in anticipation that the Government would rely on Iris Dalley, who appeared as a witness at Mr. Barrett's two state trials. Counsel sought authorization to hire Edward Hueske of Denton, Texas. Mr. Hueske had consulted with the defense during Mr. Barrett's state trials. The court authorized $4,000.00 for a crime scene reconstructionist. After Mr. Echols left the case, trial counsel Roger Hilfiger informed the court that het had not used available funds to hire a crime scene reconstructionist, but instead used the funds for an investigator. Loyd Cobb, the investigator hired by trial counsel, testified that he went to Mr. Barrett's property and took photographs, at least some of which were introduced into evidence. *See* Ground One, *supra*, and Ground Three, *infra.*

As stated in Grounds One and Three, Mr. Barrett had a constitutional and statutory right to expert assistance to rebut the Government's witness. Prevailing professional norms of criminal defense practice advise attorneys to obtain expert assistance. Mr. Barrett's trial counsel acted unreasonably by failing to secure any benefit from the exercise of Mr. Barrett's statutory and constitutional rights to expert assistance. Counsel's failure to investigate the benefits of expert advice was deficient performance.

Iris Dalley was a key witness for the Government. Her crime scene reconstruction testimony was used by the prosecution to argue that Mr. Barrett had been standing on the porch when he fired his .233 Sporter rifle, and therefore would have seen the several police vehicles with emergency lights engaged which had descended on his property. The defense contended that Mr. Barrett fired from inside his house and would only have seen the lead vehicle, driven by Buddy Hamilton, which did not have any emergency lights engaged, and thus could not be identified as a police vehicle. Dalley's crime scene reconstruction testimony, complete with a PowerPoint presentation and animations, which were shown to the jury but not introduced as exhibits, was used to support the prosecution's theory.

Trial counsel's unreasonable omission was prejudicial. Had counsel engaged the services of the independent expert authorized for Mr. Barrett's defense, the defense could have been shown that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with the necessary protocols for conducting a legitimate and reliable reconstruction. In connection with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the exhibits introduced in the case, her PowerPoint presentation, her animations, and other materials upon which she relied. Mr. Hueske, a nationally known expert whose credentials,

training and experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was not worthy of belief. (Exhibit 109; Exhibit 110.)

In his report, Mr. Hueske first shows that Dalley's use of inappropriate terminology reflects her poor understanding of the fundamentals of crime scene analysis, if not an intention to confuse, rather than inform, the jury. "Ms. Dalley repeatedly uses terminology that is inappropriate both with regard to vehicular descriptions and firearms components." For example, Dalley, in her testimony, refers to the "front quarter panel" of the Ford Bronco driven by Buddy Hamilton, and in which David Eales was a passenger, when she is trying to reference the front fender. Instead of referring to the "driver's side" and "passenger's side" of the vehicle as points of orientation, she used the confusing terms "left" and "right." Dalley used the term "sidewall," which obviously refers to the portion of a tire, when she is attempting to describe an inner body panel on the Ford Bronco. Dalley consistently and improperly used the term "projectile" to refer to anything that may have caused an impact, rather than using correct terms for a bullet, a bullet fragment, or other constituent parts of a bullet. (Exhibit 109 at 2.)

Dalley exhibited a fundamental misunderstanding of "bullet fragmentation upon impact with glass[.]" In reality, fragmentation of a bullet begins when it impacts a surface such as glass. If trial counsel had secured Mr. Hueske's services, the jury would have known that Dalley erroneously stated that a bullet would only fragment after perforating or passing through glass. Dalley admitted she was not a firearms examiner, stating that she seeks the assistance of such experts when she has a "ballistics" question. While it could be argued that one need not be a firearms expert to conduct a crime scene reconstruction, "a basic understanding of firearms and ammunition components is essential to being able to recognize what one is viewing at a shooting

scene."  Mr. Hueske notes Dalley testified there "might" be some caliber similar to a .233 rifle that "could have made" some of the bullet holes in the Bronco.  When asked by defense counsel for examples, Dalley could not come up with any.  (Exhibit 109 at 2-3.)

If he had been called to testify, Mr. Hueske would have exposed to the jury that Dalley's use of "inappropriate terminology and ambiguous statements" made understanding her testimony difficult.  Dalley's shortcomings in these areas likely reflect her lack of expertise with firearms and vehicles.  (Exhibit 109 at 3.)  Hueske's analysis shows that Dalley lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle.

Mr. Hueske states there are numerous more serious flaws in Dalley's attempt at a crime scene reconstruction in this case, and with her trial testimony.  Mr. Hueske's bottom line conclusion is that Dalley "did not follow widely accepted protocol used in shooting incident reconstruction. ... Consequently, her findings cannot be regarded as being generally reliable for purposes of reconstructing the events associated with the shooting under investigation."  (Exhibit 109 at 3, 6.)

Mr. Hueske would have exposed the following failings to the jury:

a.	Standard, accepted crime scene reconstruction protocol requires a determination of the length, width and height of any vehicle involved in a shooting.  Dalley neglected to determine the dimensions of the Ford Bronco in aid of any trajectory analysis.  There is also an unresolved question as to how wide the passenger door was open when shots were fired.  No measurements were taken.  Instead, Dalley illogically explained that because the

passenger door was curved, it could not be measured. (Exhibit 109 at 3.)

b. Before trajectory rods are used, proper protocol demands an examination of the margins, interior surface, and surrounding area for trace evidence. Placing trajectory rods in bullet holes, as Dalley did, invariably alters them. Dalley was specifically asked whether she saw gunshot residue around any bullet holes, and stated she saw none. (R. 3399.) (Exhibit 109 at 3.)

c. To legitimately evaluate the area around a bullet hole for trace evidence, close inspection with a magnifying lens, or a lift for later analysis, should be done. Bullet holes should also be examined for blood, tissue, hair, fibers or other forms of trace evidence. Dalley failed to do this. (Exhibit 109 at 3.)

d. The caliber of a bullet creating a bullet hole can be determined with an acceptable degree of confidence, when bullet holes are "symmetrical and devoid of any distortion." In such instances, accepted, standard protocol requires the length and width of the bullet holes to be measured with a pair of dial calipers. The width of the hole can be "related to the maximum caliber in inelastic substrates and the minimum caliber in elastic substrates." Dalley could not determine the caliber of any bullets striking the Bronco (and thus could not say whether any of them were created by "friendly fire"). (R. 3298.) Based on some of the photographs taken of the bullet holes in the Bronco, it appears they could have been measured to determine caliber with the appropriate instrument. (Exhibit 109 at 3.)

e. Dalley's heavy reliance on trajectory rods to determine the trajectories of the fired rounds failed to follow protocols and was based on unwarranted assumptions. Correct placement of trajectory rods to properly determine trajectories "requires an understanding of

bullet penetration/perforation in a variety of substrates." This is especially true with bullets that fragment or tend to fragment, like rounds fired from a .233 rifle. Equally important is knowing when the calculation of trajectories, rather than the use of trajectory rods to determine them, is called for. Trajectory rods such as Dalley utilized are a reliable tool for determining bullet trajectories where there is "a secondary impact that has not resulted from initial impact deflection and/or fragmentation." However, Dalley attempted to determine bullet trajectories "utilizing fragment impacts into secondary targets based on the presumption" that the bullet core, or a large part of the bullet core, "travels in a straight path." This assumption is unwarranted, and skews the analysis. Mr. Hueske would have explained that Dalley was making contradictory claims, as when she testified (correctly) that the "exact path" of each bullet could not be determined, and also testified (incorrectly) that her trajectory patterns, as she described them, were "accurate." (R. 3446; Exhibit 109 at 4.)

f.      Dalley relied upon fallacious reasoning to say that bullets would pass through an intervening target such as the passenger door of the Bronco "undeterred," or straight through. Dalley testified repeatedly that bullets going through the "partially open" Bronco door would go "straight through," and that bullet core fragments would do the same. Where, as in this case, bullets fragment on impact, the path or trajectory is unpredictable. Dalley conjured a number of scenarios to make her theory that the bullet trajectories were unaffected by intervening targets (and thus her trajectory analysis as a whole) "fit" the evidence. Dalley posited that the passenger door of the Ford Bronco moved to various different positions "to account for the incongruity of different trajectories through it." (R. 3314) Although this type of movement cannot be excluded, it is a speculative endeavor to make the evidence correspond with the theory

being propounded.  The more likely explanation is that bullet deflections or fragmentations account for the variations in bullet trajectories through the vehicle door.  Deflections occur frequently when bullets strike objects with irregular surfaces, as opposed to those which strike flat surfaces.  (Exhibit 109 at 4.)

> g.      Dalley lacked basic equipment and measurements necessary to make her diagrams and animations reliable.  When trying to ascertain the trajectories of bullet holes in vehicles and other inanimate objects, trajectory rods placed through the bullet holes are referenced by two linear and two angular coordinates.  This is indispensable to establishing "reproducible data for creating diagrams and animations" that *accurately*, within the limits of uncertainty, represent the true bullet trajectories.  Mr. Hueske finds it "amazing" that Dalley *did not* determine any of the angles because she "did not have the necessary equipment."  ( R. 3275) All that would be required to perform this essential task is a "$30 zero base protractor and a $5 plumb bob."  Because Dalley failed to take such measurements, and because she could not determine the "exact paths" of the bullets using trajectory rods alone, "it is unclear how the diagrams and animation she produced can be perceived as having any reliability." Again, the chief reason for getting such linear and angular measurements "is to be able to accurately create diagrams and animations, such as the ones Ms. Dalley prepared in this incident." (Exhibit 109 report at 5.)

> h.      Dalley failed to ascertain bullet impact angles "relative to a common point of reference (plumb line) [as] is the accepted standard" for reliable reconstruction.  (Exhibit 109 at 5.)  In her testimony, Dalley generally described the terrain of the shooting scene as "hilly," but did not establish the exact grade of the terrain, or consider the potential impact the grade might

have had on what she perceived to be the trajectories of the bullets hitting the Ford Bronco.

        i.      Where holes are of questionable origin, and may or may not be bullet holes, the proper procedure requires on-site chemical testing for the presence of copper or lead to confirm that the holes or perforations were produced by a bullet rather than something else. Although Dalley testified that she had some knowledge of this kind of testing, she did not testify that she actually conducted it. (Exhibit 109 at 5.)

        j.      Dalley testified she had "no means of sequencing any of the shots" at the scene. This was not accurate. Analysis to determine the sequence of shots is not always possible, but it can sometimes be accomplished "through a combination of the fracture patterns associated with glass impacts/perforations and the presence of trace evidence on recovered bullets [or] fragments[,]" such as glass, fibers, hair, paint and other substances. Thus, Dalley had the means of attempting to sequence the shots, but she either was not aware of the techniques used in that process or, she chose not to employ those methods either at the scene or later. (Exhibit 109 at 5.)

        k.      Critically, Mr. Hueske could have shown that Ms. Dalley failed to employ well known methods that could have shed light on the location of Hamilton's Bronco when specific shots struck it. In any incident involving a moving vehicle, any legitimate reconstruction or re-enactment would include actually placing the Bronco in various positions to determine the likelihood of each shot coming from one or more particular positions. It was particularly important here to determine the angle of fire after the Bronco came to a stop. However, the Bronco itself was not placed in a variety of positions to determine the trajectories of the shots fired at or into it. Dalley testified that before she arrived at the scene, the Bronco had been moved. However, she also testified there were tire impressions and a fluid deposit in the dirt in

front of Mr. Barrett's residence. These markings could have been used to re-position the Bronco to where it came to rest before being moved. (Exhibit 109 at 5.)

l.     Dalley employed a fundamentally flawed approach when she attempted to establish the trajectory of bullets that passed through the window glass, blinds and curtain or towel hanging over the front window of Mr. Barrett's cabin. She testified that the results of her trajectory analysis for these objects were reliable. (R. 3389.) First, the accepted method for reliably determining trajectories is to set up a tripod and place a laser on the tripod. Dalley had someone assisting her hold a trajectory rod by hand. Second, Dalley failed to take measurements of the hole locations. (Exhibit 109 at 5.)

m.     Dalley's method of "placing a hand-held laser into bullet holes in the Bronco window glass is equally flawed since it presumes no deflection resulted from either the impacts or the fragmentation." *Ibid.*

n.     Dalley overstated her ability to reach a warranted conclusion regarding the critical issue of Mr. Barrett's position in relation to the Bronco. When attempting to determine the distance of fire on the bullet holes in the cabin window, Dalley testified she did not "see" any evidence of gunshot residue on the window. Because of this, she opined that the distance had to be greater than three feet from the glass, since the literature states that the absence of gunshot residue at the edges of a bullet hole indicates shots were fired from greater than three feet away from impact. This general rule varies greatly depending on the weapon used, and also depends on the type of ammunition used. To correctly evaluate the maximum muzzle to target distance, the weapon in question should be fired into glass like that at the scene, and the same type of ammunition should be used. (Exhibit 109 at 6.)

o.    In a shooting incident like this, a metal detector should be used to detect the presence of bullets or bullet fragments.  Dalley did not attempt to locate any bullets or fragments in the soil.  (Exhibit 109 at 6.)

p.    In reaching her conclusion that David Eales was struck in the right arm after he exited the Bronco, Dalley ignored the elementary dictum in forensic science that "absence of evidence is not evidence of absence."  Dalley testified that since she found no tissue in the Bronco, and tissue appeared to be missing based on the appearance (to her) of the wound, Trooper Eales must have been outside when he was struck.  However, Dalley's testimony fails to establish that she looked for any tissue outside the Bronco. It would have been easy to try to confirm Dalley's conclusion by spraying luminol on the ground in the area around the Bronco.  There is nothing to show this was done.  An honest forensic scientist would say the fact that evidence is not found (and Dalley apparently took no steps to find it) cannot be used to "conclude anything other than that no evidence was found."  (Exhibit 109 at 6.)  Dalley's conclusion in this regard was critical to the prosecution's theory because the Government argued that at the time Trooper Eales was shot, he was outside the Bronco and the type of equipment he was wearing would have made it obvious to Mr. Barrett that he was a law enforcement officer.

In sum, if trial counsel had obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Fed.R.Evid 702. Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction.  She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology.  Due to these numerous failures, her conclusions, aimed at strengthening the Government's case, were scientifically unreliable.  At a

minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, were outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis.

Mr. Hueske's report demonstrates that Dalley's methodology, and thus her conclusions, fell well outside the range of accepted protocol and were thus unreliable. Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken.

Due to the importance of Dalley's analysis to the Government's case, it was unreasonable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense. Had all the flaws in Dally's testimony been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle. If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired, and was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All this is especially critical on the issue of intent with respect to Count 3 of the superseding indictment, the intent elements of Counts 1 and 2, and the intent elements in the penalty phase. Even if the trial court had received Dalley's testimony, there is at least a

reasonable probability that the outcome of the trial would have been different. If jurors had been shown the chasm between what counts as a scientifically reliable claim and Dalley's testimony they would have reached any of several conclusions adverse to the prosecution from finding that Dalley just made things up in an effort to assist the prosecution, to finding that her conclusions were entitled to little credence or weight.

To obtain a conviction on Count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by this knowledge. Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and compromised memories of the tactical team members who testified.

It is not only Movant who says Ms. Dalley is not the objective scientific witness she was portrayed as during trial but is a partisan advocate who dresses up her personal opinions in the guise of "science." The Oklahoma Court of Criminal Appeals has chastised Ms. Dalley, recently reversing a first degree murder conviction due to Dalley's unreliable, unscientific testimony, including the improper use of computer animations. *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl. Cr. 2006). In that case, the defendant's murder conviction was reversed in large part because Iris Dalley's conclusions and computer-generated animations were not based on objective scientific findings, but simply restated the prosecution's theory of the case under a "scientific" gloss. Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case. She used improper methodologies and techniques to "package" evidence already heard by the jury, offering conclusions based on an incompetent and unscientific evaluation of the evidence.

In addition to trial counsel's other failings with respect to Dalley's testimony, counsel were professionally unreasonable for failing to investigate Dalley's track record of giving scientifically groundless testimony. Although the *Dunkle* case was decided in 2006, after Mr. Barrett's trial concluded in 2005, the case was tried some years before, the appellate briefs had been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the criminal defense community.

**8.     The outcome of the trial is unreliable due to trial counsel's unreasonable failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death.**

The jury should have heard that methods used by the Oklahoma Highway Patrol tactical team were contrary to established law enforcement standards and practices. Based on all the circumstances surrounding the mission, it was ill-conceived and should have been aborted. Even though every piece of information considered by the Task Force and Tact Team called for a daytime, talk-first approach, with prominent insignia of law enforcement and the use of distance and cover, the officers chose a nighttime, close-contact, force-first approach, with no advanced signs of law enforcement. The results of this provocative assault were foreseeable and tragic for Trooper Eales who, due to poor planning and execution, was exposed to gunfire on all sides.

Mr. Barrett's trial counsel unreasonably failed to secure the testimony of an independent expert who would have revealed to the jury that the midnight raid was reckless and dangerous, as though calculated to provoke a violent response, and that it was foreseeable that these errors would result in harm to a law enforcement officer. Prior to trial, Mr. Echols sought

authorization to retain an independent expert on tact-team methods and procedures, Dr. George Kirkham. (Doc. 50.) The court authorized some funds for this expert. (Doc. 97.) However, Mr. Barrett's trial counsel never contacted the expert.

Trial counsel knew or should have known that it was necessary to retain an expert to assist the defense. In the second state trial Chuck Choney, a former FBI agent, testified for the prosecution and, when surprised on cross-examination, provided testimony favorable to Mr. Barrett. However, trial counsel knew that Mr. Choney, because of his affinity with law enforcement, was unhappy about his testimony and was unwilling to provide any further helpful testimony for Mr. Barrett. Based on this knowledge, trial counsel requested authorization to retain another, independent expert, Dr. Kirkham. (Doc. 50 at 5.) During a hearing on March 22, 2005, Mr. Echols stated, in Mr. Hilfiger's presence, "we'd like to be able to call Mr. Choney. But he said he's an ex-FBI agent, and he'd rather be drawn and quartered than appear in court as a defense witness in Mr. Barrett's case." (Tr. 3/22/05 Hr'g at 14-15.)

After the court authorized part of the funds trial counsel sought to retain Dr. Kirkham, trial counsel failed to contact him. Dr. Kirkham received no background materials and had no contact with trial counsel about assisting in Mr. Barrett's defense. (Exhibit 44.)

Trial counsel did not attempt to contact Mr. Choney until approximately mid-September, 2005. Trial counsel made unsuccessful efforts to speak with Mr. Choney by telephone on September 13, 2005, and were told Mr. Choney would not be available until September 22 or 23. Thus, at the time trial started, Mr. Barrett's counsel conducted no investigation into what evidence could be presented from an independent expert authorized by

the court, and fell back on a witness who counsel knew would take any opportunity to harm Mr. Barrett's case.

Even after the trial started, trial counsel knew Mr. Choney was reluctant to be subpoenaed as a defense witness and provide evidence favorable to the defense. (Tr. 10/03/05 Hr'g at 6-7.) Trial counsel told the court they were "in the process of trying to get this swat [sic] team expert to testify." *Id.* at 6. Yet counsel made no effort to learn what opinions Dr. Kirkham would have had if he had been informed of the facts of the case. Trial counsel could not have made a reasonable decision to forego Dr. Kirkham's assistance because they had not inquired into what that assistance would mean, and they knew they would get no assistance from Choney.

If trial counsel had enforced Mr. Barrett's constitutional and statutory rights to expert assistance, Dr. Kirkham would have provided the jury with more than reasonable doubt about Mr. Barrett's alleged intent. Dr. Kirkham would have explained that the jury could assume – against the weight of evidence – that the claims made in Clint Johnson's affidavit were true, and even credit the dubious testimony of the other informants, and still conclude that the raid was uncalled for and conducted in a way that provoked violence and minimized the chances that Mr. Barrett would see that he was being confronted by law enforcement officers. The evidence would have shown the raid was contrary to the standards and practices of law enforcement agencies precisely because it increased the chance that the target would be unable to tell whether those attacking him and his teenage son were law enforcement officers. The Tact Team's errors conceiving the raid and carrying it out meant (a) the first vehicle visible to Mr. Barrett would have no law enforcement markings; (b) the nighttime darkness made it more difficult to identify law enforcement vehicles; (c) there would be no audible indication that law enforcement was

involved in the attack; (d) the raid would play into any paranoid fears or legitimate fears of being attacked by drug dealers or other criminals; (e) that the lead vehicle lacked necessary cover from the terrain or a sniper; (f) that the lead Bronco advanced onto the property from a tactically disadvantageous position that drew fire towards Trooper Eales; and (g) that the plan ignored a variety of tactics deemed by law enforcement experts to be less likely to result in violence. (Exhibit 44 at 3-4.)

Instead of forcefully bringing these points to the jury's attention, the defense relied on the extremely reluctant Mr. Choney, who only appeared because he was compelled to by subpoena. He turned out to be a Government witness rather than a defense witness. He did offer some criticisms of the manner in which the raid was conceived and executed, such as the inclusion of the caravan of local dignitaries and law enforcement onlookers, and the failure of the tactical team to independently verify the reliability of the information provided by the alleged confidential informant. However, the Government easily turned Mr. Choney into a prosecution witness on cross-examination. In his opinion, while hindsight might suggest other alternatives to the action taken, there was no compelling need to have aborted the mission.

Mr. Choney was contacted late in the day by defense counsel. He was strongly aligned with law enforcement. He made it clear that he did not want to testify for the defense. He appeared only when compelled by a subpoena. Whatever little mileage the defense got out of his testimony was quickly reversed during the prosecution's cross-examination. On the whole, Mr. Choney's testimony supported the Government's case, and exonerated the tactical team of any serious errors. Defense counsel knew Choney would be a most reluctant, if not to say

hostile, witness, but he was thrown into the breach anyway, with the predictable negative

consequences to Mr. Barrett.

Counsel's failure to retain an independent expert and reliance upon a witness who

would not even talk to them, was plainly unreasonable and prejudicial. As evidenced by the

arguments of both the defense and prosecution at the close of the first stage, questions about how

the raid was conceived and carried out were critical issues. If trial counsel had presented the

numerous deficiencies pointed out here, there is a reasonable probability the jury would have

rejected either murder or the death penalty. One indication of this probability is the state-court

jury's acquittal of Mr. Barrett on charges of murder. Had the federal jury known that law

enforcement standards and practices counseled against a raid of this type precisely because the

failure to give the clearest sign of law enforcement's presence is more likely to provoke an

uninformed, violent response, there is a reasonable probability that Mr. Barrett either would not

have been convicted of murder, or not have been sentenced to death.

**9.      Mr. Barrett's trial counsel unreasonably and prejudicially failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials.**

Grounds One and Three discuss the trial court's interference with proper defense

preparation with respect to authorizing payment for the transcripts of the testimony from the

second state trial at public expense. The Court initially denied the request, adding the proviso

that the matter could be reconsidered upon a specific showing that the testimony requested went

to Mr. Barrett's intent. Eventually, the Court permitted the record of the testimony to be

provided at public expense, but far too late for counsel to be adequately prepared. Trial counsel

also unreasonably failed to make use of impeachment material that was available to them, and/or

elicited damaging testimony on cross-examination, even where that testimony was beyond the scope of direct.

There were numerous delays occasioned in acquiring the transcripts, and they continued through Mr. Barrett's federal trial. At a June 6, 2005 status conference, a few short months before trial was to begin, the court was informed that based on counsel's communications with the court reporter, it was anticipated that the transcripts would be ready by July 11, 2005. (Tr. 6/6/05 Hr'g at 4-5.) This proved to be an unreasonable assumption. At another status conference on July 15, 2005, the Court was informed that the state court reporter had completed five of the nine volumes of testimony. On August 30, 2005, trial counsel reiterated that the transcripts were necessary for the defense to prepare for trial. At the pretrial hearing on August 31, 2005, it was revealed that little if any progress had been made; five volumes of testimony had still not been completed. (Tr. 8/31/05 Hr'g at 38-39.) The transcripts continued to trickle in during trial.

A combination of the Court's rulings on the transcript issue, the delay in producing the transcripts, and counsel's unreasonable preparation with the transcripts they had resulted in counsel failing to effectively impeach the tactical team members and Clint Johnson on several critical points with their testimony from the second state trial.

As already stated herein, a key factual dispute was whether Mr. Barrett knew the police were on his property because the emergency lights on some of the vehicles were engaged and visible to him prior to the shooting. Because of the delay in producing the transcripts, counsel's failure to prepare in the time available, or both, Mr. Barrett lost crucial opportunities for the impeachment of key prosecution witnesses in violation of his Fifth, Sixth, Eighth and

Fourteenth Amendment rights, as well as his statutory and rule-based rights to counsel, discovery, and cross-examination.

At the federal trial, Trooper Poe stated he became aware that emergency lighting was being used when he saw Trooper Hamilton's vehicle come into view from the east, implying that emergency lights were engaged before any shots were fired, and thus supporting the Government's theory.  (R. 1412.)  However, at the second state trial, he testified that he first became aware of seeing emergency lights *after* he heard shooting break out.  (2nd St. Tr. Tx. at 747.)  Trooper Greninger gave conflicting evidence between the second state trial and the federal trial regarding what lighting he observed.  In state court, he testified he turned on his emergency lights after turning left to approach Mr. Barrett's residence, and recalled seeing Trooper Hise's emergency lights on.  (2nd St. Tr. Tx at 448, 461.)  At the federal trial, he testified Trooper Manion activated his emergency lights as he turned into the driveway before entering the property.  He noticed also that Trooper Hash had his emergency lights on, but did not know when they were engaged.  He was not completely sure Trooper Hise's emergency lights were on.  Trooper Pettingill did not activate his lights.  (R. 732, 760, 770, 773, 822.)

Most significantly, Clint Johnson testified initially in the second state trial that he was thirty seconds behind the tactical team and saw red and blue police lights at the intersection after turning onto the dirt road.  He was impeached with a prior statement in which he said he only saw taillights, not emergency lights.  Johnson made no mention in his statement about arriving thirty seconds after the tactical team and seeing any red and blue emergency lights.  (2nd St. Tr. Tx at 25, 49, 51.)  In the federal trial, Johnson said nothing on direct examination about any lighting.  Trial counsel was caught flat-footed on cross-examination, when he opened the

area up and Johnson, in contrast to the statement he was impeached with in state court, testified that he saw emergency lighting on the patrol vehicle and the second Ford Bronco. (R. 358, 361.) Counsel failed to impeach Johnson as counsel did in the second state trial. Arguably, not even a transcript would have been required to undermine Johnson on this point, because he was impeached in state court with a previous statement, not previous testimony.

There obviously was a critical question as to whether Mr. Barrett or the police opened fire first. At the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house. He heard shots as he exited his vehicle by the fence, and the gunfire was over by the time he was at the fence. (2nd St. Tr. Tx at 757, 766.) None of this was brought out on cross-examination at Mr. Barrett's federal trial.

The issue of where Trooper Hamilton's Bronco was when it first received fire was a focal point of the debate over Mr. Barrett's knowledge and intent. Although Trooper Greninger professed a failed memory at the federal trial, and could only say that the shooting began somewhere between the ditch and where Hamilton's Bronco came to a stop (R. 736), he testified at the state trial (albeit with an addled memory), that while he had no real idea when the shooting started, Hamilton's vehicle was ahead of his and had cleared the ditch; he became aware of the shooting between the time his vehicle cleared the ditch and came to a stop halfway between the ditch and Hamilton's Bronco. In his first statement to investigators following the incident, he recalled hearing gunfire as Hamilton's vehicle approached the front of the house, which would indicate Hamilton had already gone through the ditch and was near the house when the gunfire started. This statement supported Mr. Barrett's defense argument that he only fired when

Hamilton's Bronco was almost literally in front of his house, with its headlights obstructing Mr. Barrett's view.  (2nd St. Tr. Tx 450, 504.)  Mr. Barrett's trial counsel unreasonably failed to refresh Greninger's memory with his helpful state court testimony, and to introduce that prior recorded recollection, or inconsistent statement.

Trooper Hamilton testified in state court that the shooting started as his vehicle was coming out of the ditch, and after he noticed Toby Barrett in the yard and began driving toward him.  (2nd St. Tr. Tx 330.)  This was helpful to the defense argument that Mr. Barrett only started firing when the Bronco was close to his house and was in fact headed toward his son, a dangerous situation to which any father would react.  In federal court, Hamilton stated the gunfire began earlier.  Instead of gunfire starting as he was coming out of the ditch, Hamilton stated gunfire began shortly after he initially hit the ditch.   In contrast to his testimony in state court, Hamilton stated his vehicle began receiving fire at head level in the middle of the windshield.  (R. 534, 603, 674.)  Counsel failed to effectively contrast Hamilton's testimonies on this point.

Defense counsel failed to exploit other differences between the state and federal trial testimony.  At the state trial, neither Troopers Poe nor Greninger testified to seeing any guns in Mr. Barrett's house.  In federal court, Trooper Poe said he saw an AR 15 and a shotgun in the back room off the entryway.  Greninger testified the rifle he found in Mr. Barrett's cabin was the one used to fire on the officers.  (R. 1426, 1427, 748-49.)

Perhaps Mr. Barrett's trial counsel's most grievous error occurred during cross-examination of Clint Johnson.  On direct examination, no details regarding any belief Johnson had that serving the warrant was "high risk" were explored.  On cross-examination, Mr. Barrett's

counsel asked an open-ended question, and received a barrage of hearsay damaging to Mr. Barrett.  When counsel opened the door, Johnson marched through it, in the most prejudicial manner imaginable.  Johnson stated he believed this was a "high risk" operation because Mr. Barrett had threatened to kill police officers and that he was making methamphetamine at his residence, which also creates hazards to law enforcement trying to take down a meth lab. Buttressing the testimony not only of the despicable Charles Sanders, but six of the seven informant witness, Johnson stated not only that several people had reported to the sheriff's office that Mr. Barrett was constantly firing weapons across the road, but that they had received several tips from different people within the last six months that Mr. Barrett was going to kill law enforcement officers.[19]  This damaging answer, given only because counsel opened the door, just hung in the air.  Counsel undermined the defense's own (meager) efforts to attack the credibility of the informant witnesses by brining out testimony from Johnson regarding these "prior reports" from "several" sources.[20]

Counsel's failures to impeach were professionally unreasonable, and not motivated by any legitimate strategy.  Indeed it was contrary to the strategy evidenced in counsel's closing argument where Mr. Hilfiger sought to sow doubt about the accuracy of various

---

[19] As shown elsewhere in this Ground and in Ground Three, trial counsel's blundering cross-examination was most damaging because counsel failed to retain the expert in police tactics whose assistance the Court had authorized in part.  Without an independent source of information about the raid, the Government was able to give jurors the *false* impression that the conduct of the tactical team was appropriate under the circumstances Johnson described.

[20] Johnson's testimony was surely false.  None of these "known sources" reporting threats by Mr. Barrett to kill law enforcement officers were presented at the state trials.  Surely, if several individuals were reporting this, they would have testified in 2002 and 2004.  Counsel failed to point out that Johnson had given no such testimony previously.  Indeed, the informant witnesses were purely last-minute creatures of the federal trial.

officers' accounts of the raid. Counsel's elicitation of damaging evidence from Johnson was highly prejudicial because it tended to invest credibility in the informant witnesses – however spurious it might have been, and however false Johnson's testimony was – that these witnesses otherwise lacked.

Trial counsel's unreasonable failure to investigate what an independent expert would say about the conduct of the tactical team, and their unreasonable failure to impeach Johnson, left the jury with two false impressions: (a) that at the time of the raid Johnson and the tactical team had sources of information other than Monk Sanders; and (b) that even if the information they had was true and backed by multiple sources, the raid was reckless and carried out in a way that made it hardest for Mr. Barrett to recognize his attackers as law enforcement officers. There is a reasonable probability that jurors would have rejected first degree murder or the death sentence if counsel had impeached law enforcement witnesses with available evidence.

**10.    Trial counsel unreasonably failed to introduce readily available evidence that would have impeached the Government's claim that aside from Trooper Hamilton's vehicle, the other police vehicles that entered Mr. Barrett's property had emergency lights on. This evidence would have raised significant doubts about the Government's claim that Mr. Barrett "knew" he was firing on police officers.**

**a.    Toby Barrett.**

The primary contention of the defense in the first stage of trial was that when Mr. Barrett fired on the Ford Bronco driven by Buddy Hamilton, he was unaware that it was a police vehicle, and was unaware that several police vehicles had driven onto his property. It was undisputed that the lead vehicle driven by Hamilton, which the evidence showed struck Mr.

Barrett's porch, had no emergency lights engaged and appeared to be a civilian vehicle. Although no defense theory instructions were given, the defense argued that because Hamilton's car was unmarked, Mr. Barrett reasonably believed he was shooting at trespassers who had zoomed into his yard and struck his house with their vehicle, and reacted by shooting from inside his house.

The prosecution relied upon testimony from members of the tactical team to argue that but for Hamilton's vehicle and the "sniper" vehicle initially parked outside the locked gate to the property, the other police vehicles on or near the property had emergency lights of one sort or another engaged, making it obvious to Mr. Barrett that he was shooting at the police. The prosecution contended Mr. Barrett fired some of the shots after he emerged from his home, and could easily observe that the police were on his property.

Among the omissions of counsel that were inconsistent with prevailing professional norms was counsel's failure to call Toby Barrett to rebut the law enforcement officers' accounts of the raid. These witnesses would have furthered Mr. Barrett's right to present evidence inconsistent with the prosecution's theory of how the raid was conducted.

Prevailing professional norms of capital defense practice required Mr. Barrett's trial counsel to investigate, develop, and present witness testimony that could have called into question the manner in which law enforcement officers conducted the raid. (ABA Guideline 10.7 – Investigation and Commentary (specifically noting duty to interview eyewitnesses).)

Trial counsel were aware, or should have been aware, that there were conflicting accounts of the raid, even among law enforcement officers. Toby Barrett was the only witness to the beginning of the raid other than law enforcement officers. Toby Barrett testified in two prior

state-court trials.  Toby Barrett was prepared for his testimony in those cases and was willing and able to be prepared by trial counsel to testify in the federal trial.  (Exhibit 96.  *See also* 1st State Tr. Tx at 1781.)  Obviously, each of the state-court trials ended in a result more favorable to Mr. Barrett than the result of the federal trial.

During the federal trial, the Government made much of the sign on Mr. Barrett's gate.  Toby Barrett would have testified, as he did when called by the prosecution in the first state-court trial, that the sign was only meant to convey "No trespassing or something.  He had one something to that effect, sir."  (1st St. Tr. Tx at 1787.)

Toby Barrett also testified as a prosecution witness in state court that the gate on which the sign was posted was open at the time the Bronco drove by earlier in the day.  (1st St. Tr. Tx at 1822.)  Toby Barrett's account of being in the front yard with his friend Bubba Thompson at the time of the drive-by is consistent with the testimony of Trooper Greninger, who saw two people in the yard at the time.  (R. 724.)  However, Trooper Hamilton testified in federal court that the gate was locked at the time of the drive-by, and this was offered as a justification for driving onto the property.  (R. 518.)

In other respects, the testimonies of Toby Barrett and Trooper Hamilton are consistent with each other.  For example, Toby Barrett confirmed that Hamilton had his headlights on but no lights signaling that he was law enforcement.  (1st St. Tr. Tx at 1796-97; R. 524-26, 598.)  However, Trooper Greninger testified that the vehicles' lights were turned on at the commencement of the raid.  Officer Steve Hash could not verify Greninger's account.  (R. 1036-37.)

Toby Barrett testified in state court that when the shooting occurred, there were no police vehicles with emergency lights on at all that were visible. (1st St. Tr. Tx at 1796.) The first police lights he saw were on the vehicle that crashed through the gate, but this was after the shooting was over. (Exhibit 96.) He denied telling the police he saw flashing lights. (1st St. Tr. Tx at 1809.) When Toby Barrett saw Hamilton's vehicle speed into the yard, he called out "Dad!" (1st St. Tr. Tx at 1790, 1795.) Toby Barrett never saw his father out on the front porch, shooting. If he saw his father at all it was for perhaps a split second, after which Mr. Barrett went back inside the house. (1st St. Tr. Tx 1794, 1795, 1796.) He never saw who was firing a weapon. (1st St. Tr. Tx at 1807.) The entire incident happened very quickly. (Exhibit 96.) The declaration Toby Barrett recently provided to investigators currently working for his father is consistent with his state trial testimony. (Exhibit 96.)

Mr. Barrett's federal trial counsel had every reason to trust the reliability of Toby Barrett's account. The prosecution in state court deemed Toby Barrett a reliable witness regarding the sequence of events leading up to and during the raid. His testimony was consistent with the state jury's verdict.

Toby Barrett's testimony would have provided the jury reasonable doubt regarding the federal prosecutor's argument regarding the raid, and in particular, his argument that the bullet that killed Trooper Eales was fired by Mr. Barrett with the intention of killing someone who was part of a law enforcement raid. Toby Barrett would have contradicted the prosecutor's assertion that the sign on Mr. Barrett's gate was evidence of intent. (*See* R. 4297, 4305.) Toby Barrett's testimony that his father only knew a SUV was speeding onto the property, and had only a split second's view of the Bronco before he went inside; that the

Bronco's headlights were shining on the porch; and that no police lights were visible as the shooting occurred, would have contradicted the prosecutor's argument that Mr. Barrett had the opportunity to observe the scene, see police lights, and form the intent to kill before the shooting started. (*See* R. 4299-4302.)

Toby Barrett's location when the lead Bronco pulled up would have been important to defense trial counsel's closing argument. (R. 4316-17.) Instead of being able to draw the jury's attention to Toby's testimony regarding his location when the Bronco pulled in, and point to a specific location on an exhibit, as the state trial prosecutor had done, trial counsel could only argue "Toby Barrett was some place out in here." (R 4317.)

Even though Toby Barrett had testified at his father's state trials, counsel in the federal case made no effort to interview him or prepare him to testify. In his recent declaration, Toby Barrett states, "I went up to Mr. Hilfiger in court more than once and asked him if he was going to want me to testify at the trial. He said yes each time, but he never called me. He never asked me about the incident, my father's mental problems, my home life or about me or my mom." (Exhibit 96.)

### b.      Alvin Hahn.

Alvin Hahn was a neighbor of Mr. Barrett's. On the night of the shooting, he was asleep and was awakened by gunfire. When Mr. Hahn looked outside about fifteen seconds after the shooting stopped, he saw only one vehicle with its police lights on. (Exhibit 75.)

Mr. Hahn's account is consistent with Toby Barrett's, and would have corroborated Toby Barrett's testimony that *after* the shooting, there was only one police vehicle with its emergency lights on, namely the vehicle that crashed through the gate. Just as it was

professionally unreasonable to fail to call Toby Barrett as a witness, counsel had no legitimate

reason for neglecting to call Alvin Hahn, who could have supported the defense theory that the

police descended on Mr. Barrett's property with nothing to indicate they were law enforcement,

and that Mr. Barrett had every reason to believe he was being invaded by trespassers.

Trial counsel's omissions of known witnesses Toby Barrett and Alvin Hahn were

unreasonable and prejudicial.  The testimony of Toby Barrett and Alvin Hahn would have

conflicted sharply with the accounts of the Government's witnesses, and provided jurors with

evidence that Mr. Barrett did not know, in the few seconds he had to act, that the people

attacking his cabin in the middle of the night were law enforcement officers.  Viewed

individually or collectively, with all the evidence defense counsel failed to prepare and produce

in the first stage of trial to counter the Government's case, there is a reasonable likelihood of a

different result had Toby Barrett and Alvin Hahn been called as witnesses.

**11.    Trial counsel unreasonably failed to investigate, develop and
introduce evidence that, contrary to the Government's argument, Mr. Barrett was unaware
he was subject to an active felony arrest warrant at the time of the shooting incident, was
not "hiding out" on his property in anticipation of a police raid, and was not prepared to
meet any police presence with violence.**

A key component of the Government's case was its theory that Mr. Barrett was

well aware there was a warrant out for him for failing to appear for trial in a minor felony drug

case.  *See* file, Sequoyah County Case No. CF-97-80, *State of Oklahoma v. Kenneth Eugene

Barrett.*  According to the Government, Mr. Barrett anticipated the police were going to arrest

him at any time on this warrant, and he was therefore making preparations to repel the police

with deadly force. This theory was founded on the testimony of informant witnesses Charles Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Randy Turman and Karen Real, who, as noted, testified that Mr. Barrett told them about the warrant, and stated he would kill the first policeman who came on his property and would "go out in a blaze of glory." The Government argued that the killing of Trooper Eales was the fulfillment of Mr. Barrett's "plan."

It was imperative that trial counsel rebut this linchpin theory of the Government's case; yet, trial counsel did virtually nothing to rebut this argument other than rely on cross-examination. Had counsel conducted anything approaching a reasonable, professional investigation into Mr. Barrett's alleged failure to appear, or had they been paying sufficient attention to certain testimony that was introduced at the hearing on Mr. Barrett's motion to suppress (Tr. 1/ 26/05 Hr'g at 25-45, testimony of Bernell Edwards, Deputy Sequoyah County Court Clerk), the Government's theory would have evaporated, the snitches would have been further impeached, and the Government's case for intent would have suffered mightily.

### a. Mr. Barrett's "failure to appear".

Any reasonable investigation would have cast doubt on Mr. Barrett's alleged failure to show up for trial and the circumstances surrounding the warrant issued for his arrest. Had trial counsel conducted a reasonable investigation of the court files related to Mr. Barrett's state court charges, they would have discovered that there was not going to be a trial. No citizens had been summoned for jury service on the date of Mr. Barrett's scheduled trial, January 25, 1999. (Exhibit 39.) In fact, when the Clerk of the Sequoyah County Court checked the court records, she found that no citizens were summoned for jury service in January 1999, and no jurors reported to the court during the entire month of January 1999. (Exhibit 39.) This is

curious, as Ms. Edwards specifically testified at the suppression hearing that the trial scheduled for January 25, 1999 was a jury trial. (Tr. 1/ 26/05 at 25.) Accordingly, Mr. Barrett was charged with failing to appear for a trial that never was scheduled. He was not the only party who failed to appear; apparently, the entire jury failed to appear because they were never summoned.

The importance of this fact – and the importance of this fact being pointed out to a jury – goes to the defense theory of the suspect circumstances involving every single detail of the state prosecution of Mr. Barrett. The trial that never was is the first shaky detail in the whole house of cards.  The first cause of the events leading to Trooper Eales death was a warrant issued for Mr. Barrett's arrest for his failure to appear for a trial that was not going to happen anyway. That warrant was "issued" in violation of state law as the state court found.  The warrant was "issued" by a deputy clerk who lacked legal authority because the warrant was not sought on application by the District Attorney.

The State's "investigation" went downhill from there.  The rare no-knock warrant was intended to deny Mr. Barrett notice he was going to be arrested.  The warrant was based on the statements of a serial felon, informant, and liar, and a law enforcement officer who proved to be a crook himself.  Evidence indicated that Mr. Barrett had cooperated with authorities in the past, and had not been violent toward law enforcement officers.  The suspicious confidential informant recanted at trial the information he allegedly gave in the search warrant affidavit.  The search warrant was executed with a team of "dignitaries."  Once the search warrant was executed, no methamphetamine was ever discovered.  Each of these facts is consistent with the conclusion that Mr. Barrett was the target of an unjustified raid that was recklessly conceived and implemented in a manner designed to conceal the fact that law enforcement officers were the

raiders.  In other words, the fact that there was no jury summoned for the day Mr. Barrett was supposed to be tried supports the conclusion of the state-court jury that this was not a case of a man lying in wait for law enforcement officers.  Trial counsel's lack of investigation was inexcusable and caused extreme prejudice to Mr. Barrett.

### b.   Mr. Barrett's lack of knowledge of the warrant.

The Government called Ms. Bernell Edwards at the motion to suppress hearing to testify regarding the contents of the court file in CF-97-80.  Ms. Edwards stated that according to the file, Mr. Barrett had a trial date of January 25, 1999, at which he failed to appear.  A bench warrant was issued for Mr. Barrett on January 27, 1999.  When a defendant is not represented by an attorney, the practice of the court clerk's office is to mail a notice regarding the missed court appearance to the defendant.  (Tr. 1/ 26/05 at 25, 29; File in Sequoyah County Case No. CF-97-80.)

On cross-examination by Mr. Echols, it was pointed out there was nothing in the file to indicate that, in accordance with Oklahoma law, the bench warrant was issued on the motion of the District Attorney.  (Tr. 1/ 26/ 05 at 36.)  The docket sheet showed that at one time, Mr. Barrett was represented by attorney Bill Ed Rogers.  Mr. Rogers filed a motion to withdraw on September 11, 1998, but there was no docket entry showing that he had actually been allowed to withdraw.  (Tr. 1/ 26/05 at 37-38.)  Mr. Barrett applied for court appointed counsel on December 14, 1998.  Nothing in the court file indicated that Mr. Barrett's bail bondsman was given notice of the bench warrant.  There was nothing in the court file showing that based on Mr. Barrett's failure to appear, a bond forfeiture action was instituted, which would have necessitated the bondsman to bring Mr. Barrett in so the bondsman would not be liable for the entire amount

of the bond. There was nothing in the court file to show that Mr. Barrett had actually received notice that he failed to appear, and that a bench warrant had been issued for his arrest. The letter sent by the court clerk's office was simply sent in the regular mail; the letter was not certified, with a return receipt requested. (Tr. 1/26/05 at 39-43, 45.) For all the court file suggested, Mr. Barrett was totally unaware there was a warrant out for his arrest.

Without question, it was professionally unreasonable for counsel to fail to call Ms. Edwards, or another representative of the court clerk's office, to sponsor the court file to demonstrate there was *no official record indicating Mr. Barrett would have been aware a warrant had been issued for his arrest.* The evidence was already in the record. Only gross neglect can explain this glaring failure to review the file in the case that started the entire tragic chain of events.

Mr. Rogers, the last attorney to represent Mr. Barrett in the state-court distribution case, whose motion to withdraw was never granted, certainly never informed Mr. Barrett that he had an outstanding warrant. Mr. Rogers is now deceased. In connection with this Petition, his widow, Mary Rogers, was contacted by a defense investigator. Mr. Barrett's current representatives have obtained a copy of Mr. Rogers's file in the case. Mrs. Rogers states there is nothing in her late husband's file to show that Mr. Rogers ever informed Mr. Barrett he had missed a court date, and that a warrant had been issued for his arrest. Even if Mr. Rogers had been informed a bench warrant had been issued, he would not have informed Mr. Barrett, because Mr. Rogers was upset over the manner in which Mr. Barrett had terminated his services. (Exhibit 31; Exhibit 182.)

In addition, the file of Bill Ed Rogers shows that Mr. Barrett was offered a plea in which he faced no jail time. This fact alone, or in conjunction with other facts set forth herein, including that no jury was called for the "trial," would have convinced jurors that the State had unnecessarily sought the no-knock warrant. This fact, combined with the evidence of errors made in the planning and execution of the raid, and the abundant impeachment evidence undermining the Government's eleventh-hour informants, would have given jurors more than reasonable doubt about Mr. Barrett's intent, and certainly the death penalty.

Trial counsel considered it important that Mr. Barrett had not received notice of the bench warrant. But, inexplicably, the defense waited until the second stage of trial to call Mr. Barrett's bail bondsman, Martin Daggs. He explained that he had never informed Mr. Barrett of the bench warrant. The bond was never forfeited. Mr. Daggs testified that if he needed to get hold of Mr. Barrett to surrender him on a warrant or bring him to court, he knew where to find him. There was no sound, strategic reason for deferring Mr. Daggs's testimony to the penalty phase, when he could have and should have been called in the first stage in aid of refuting the Government's theory of the case.

### c.     Mr. Barrett's previous cooperation with the law.

Had Mr. Barrett's trial counsel conducted a reasonable investigation, there were other readily available witnesses who could have testified that Mr. Barrett was unconcerned with the police, had been staying on his property rather than venturing out into the larger community for years *preceding* any warrant, and had in fact been visited by the police within a few weeks of the shooting incident without incident and without being taken into custody. Evidence was also readily available that would have demonstrated that had Mr. Barrett and his family been

contacted and told he had an outstanding warrant, he would have turned himself in or allowed his family to do so. See also Ground Five (suppression of evidence and newly discovered evidence).[21]

Janice Sanders, a relative of Mr. Barrett's, lived near his property. Approximately three weeks or so before the shooting incident, she called the police because Mr. Barrett was firing a gun into the air. Five officers, including Sequoyah County Sheriff John Philpot, responded to Mr. Barrett's residence. The sheriff inspected Mr. Barrett's rifle to determine whether it was empty, and gave it back to him. There was no confrontation with the authorities, and Mr. Barrett was not taken into custody on the "outstanding warrant" or for any other reason. (Exhibit 85.)

During Mr. Barrett's state case, Mr. Philpot was deposed by John Echols regarding his previous contacts with Mr. Barrett. In late 1998, Sheriff Philpot and others, including Deputy Sheldon Fair, went to Mr. Barrett's residence over a complaint that he was firing weapons, something he did not infrequently. (Exhibit 85.) On this occasion, Sheriff Philpot arrived after the other officers. When the sheriff arrived, the officers who were already there were inspecting Mr. Barrett's weapons and running the serial numbers. One of the weapons being inspected appeared to be an SKS. Sheriff Philpot informed Mr. Barrett that he had an outstanding misdemeanor warrant. Mr. Barrett said he would appear and take care of the matter. Sheriff Philpot did not take Mr. Barrett in on the warrant. Mr. Barrett never threatened

---

[21] *See also* Ground 5, (*Brady/*newly discovered evidence). Former Sequoyah County Sheriff Philpot has admitted to a defense investigator, consistent with the statements of Janice Sanders and Sylvia Gelene Dotson, that he was on Mr. Barrett's property, without incident, within a month of Trooper Eales being killed.

any of the officers, and his weapons were returned to him after they were inspected. (Exhibit 108.)

Although Ms. Sanders was interviewed by defense counsel, she was not called as a witness. When she was contacted by Mr. Hilfiger and a man who was likely Bret Smith, this gentleman asked Mr. Hilfiger if he was going to call Ms. Sanders as a witness. To his surprise, Mr. Hilfiger said "no." (Exhibit 85.) In addition to impeaching the Government's theory of the case, testimony from Ms. Sanders and Ms. Dotson would have been important to the motion to suppress, showing there was no cause for a no-knock, nighttime warrant.

Mr. Barrett's mother, Sylvia Gelene Dotson, who lived next door, was called as a defense witness in the first stage of trial, but she was not asked about the police coming to her son's residence shortly before the shooting incident, or how long Mr. Barrett had kept close to his property. Had she been asked, she would have testified that Mr. Barrett was not capable of living on his own, and thus stayed close to his relatives in the community for support. He had been doing this long before the "warrant" was issued. Ms. Dotson was stunned at the midnight raid on Mr. Barrett's house. Had the police simply contacted Mr. Barrett's family, they would have brought him in. Even if the police had come out to simply arrest Mr. Barrett in a non-confrontational way, there would have been no problem. Moreover, shortly before the raid, and consistent with what Janice Sanders says, the police had been to Mr. Barrett's property to inspect his weapons. There had been no violence and no problem. (Exhibit 97.)

Ruth Harris, Mr. Barrett's aunt, also states that had the authorities simply let the family know that Mr. Barrett had an outstanding warrant, it could have been arranged without any difficulty for Mr. Barrett to surrender peacefully. (Exhibit 93.)

Another of Mr. Barrett's aunts, Phyllis Crawford, lived just down the road. On one occasion when Mr. Barrett felt he was wanted for something by the police, far from threatening violence or bragging that he would "go out in a blaze of glory," Mr. Barrett came to her in tears, asking what he should do. Ms. Crawford told him if the police really wanted him, he should simply go with them. Instead of issuing threats, this advice seemed entirely reasonable to Mr. Barrett, and calmed him down. (Exhibit 91.)

Sean Hill, who was available to testify but never contacted by the defense, states that far from "hiding out" from a warrant, Mr. Barrett had really never left his property for years. Police drove by Mr. Barrett's property all the time. When Tom Sanders would call in noise complaints against Mr. Barrett, the police would drive by, and there was no reaction from Mr. Barrett. Mr. Barrett was used to the regular police patrols and police presence in the area. His view was that he was there if the police wanted him. Mr. Hill also could have testified that the sign on Mr. Barrett's gate (Government Exhibit 104) which the prosecution made much of had been placed there on September 22, 1999, because the night before drug addicts had climbed over the fence and woken Mr. Barrett up. (Exhibit 95.)

Brandy Hill could have given similar testimony. She states that from 1996 to the time of the shooting incident, police drove by Mr. Barrett's place on a frequent basis, sometimes up to three times a week. Mr. Barrett was used to the police presence and was not bothered by it. (Exhibit 77.)

Trial counsel also unreasonably failed to call in the first stage one of Mr. Barrett's neighbors, Clyde Edgmon, and bail bondsman Martin Daggs. Both these witnesses were known to trial counsel at some point, as they were called to testify in the second stage of trial. In the

penalty phase, Mr. Edgmon testified that approximately six months before the raid, two law enforcement officers, John Owens and Sandy Gerdner, came by his house when Mr. Barrett was working on a truck for him. The officers talked to Mr. Barrett for some time. There were no problems, and Mr. Barrett was friendly with the officers. Mr. Edgmon, Ms. Hill, and other witnesses contradicted the Government's theory that Mr. Barrett was "hiding out" from the law for months before the raid, priming himself for a violent confrontation. Mr. Edgmon's testimony also would have cast doubt on the claims of several of the informant witnesses that Mr. Barrett was prepared to "go out in a blaze of glory" and would react violently to any police contact.

Had counsel conducted a proper investigation and presented this evidence, there is a reasonable probability that the outcome would have been different. Evidence that there was no jury trial for which Mr. Barrett "failed" to appear, that the bench warrant was invalid, that he was without counsel, that he had no notice of the "trial," and that he was willing to be questioned and produce his firearms to law enforcement directly countered the prosecution's theory of the case. Compared to this evidence, the self-serving testimony of the seven snitches would have been found clearly wanting in credibility.

**12.    Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony. Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of  irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress"  (R. 849.)  Trial counsel allowed the jury to hear Horn's testimony over a

period of two days, failed to timely move to strike that testimony, and when the court did finally

strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.

The Government was clearly concerned about the discrepancies in the testimony

of its fact witnesses, both as compared to other witnesses, and with regard to their own testimony

in the previous state court trials.  (R. 925, 934, 1630-31.)  Consequently, it again called a witness

who had previously testified at the state court trials, former FBI agent James Horn.  Horn

testified to his credentials, including a B.S. in Psychology – although he admitted he was not a

psychologist (R. 843, 909) –  and a Masters of Forensic Science degree from George Washington

University in Washington D.C.  (R. 843.)  Horn also stated he was board certified through the

American Academy of Experts in Traumatic Stress in "Emergency Crisis Response" and

"Traumatic Stress."  (R. 848.)   He informed the jury, in some detail, about his service as a

decorated Marine Corps infantry officer, having served two tours in Vietnam before joining the

FBI.  (R. 843-45.)  Horn had worked with the FBI's behavioral unit as a criminal profiler, and

then as program manager of the FBI critical incident program.  (R. 845-848.)

Horn's testimony revealed a strong affiliation with law enforcement and allowed

him to present himself as having extraordinary first-hand knowledge of traumatic events. Even

during the process of stating his credentials before being offered as an expert, Horn spoke of

having been exposed to rocket attacks by the Viet Cong, engaging in combat with the North

Vietnamese,  and working for the FBI on "critical incidents" such as Hurricanes Andrew and

Hugo, the Oklahoma City Bombing and the assassination attempt on Ronald Reagan, as well as

being a member of the first FBI SWAT team (R. 844-847.)

During the two state court trials, Horn similarly claimed involvement in the FBI's first SWAT team (Trial # 1, 2120), the aftermath of the Oklahoma City Bombing (Trial # 1, 2122; Trial # 2, 1436, 1441); wartime experience in Vietnam (Trial # 1, 2135; Trial # 2, 1436-37, 1445, 1451, 1459-60); the incident at Wounded Knee (Trial # 2, 1437-39, 1460); as part of an anti-terrorist squad at the Lake Placid Winter Olympics (Trial # 2, 1438); and in connection with a fatal sky-jacking (Trial # 2, 1439).

Horn was accepted by the court as an "expert witness in the area of traumatic stress" without objection from the defense (R. 849), nor any request for a *Daubert* hearing. Horn then testified in very general terms about the impact of trauma on an individual's ability to relate and recall the incidents and circumstances in question.  While unable to comment on the specifics of any of the lay witnesses' testimony (R. 881), Horn narrated the impact of "personal feeling[s] of mortality and vulnerability" that trauma creates (R. 850), and particularly how there is "an extreme aggravation by the loss and injury to fellow police and fellow agents ... the worst thing that happens to a law enforcement officer in the line of duty is the death of a partner in the line of duty. So we can expect to see in those circumstances the worst, the most serious impact in effects on the colleagues who survive." (R. 851.)  In explaining his views about the impact of trauma on recollection, Horn referred repeatedly to his FBI days and cited to specific cases he had been involved in or had simply heard of, giving names and locations.  (R. 852-4, 858, 859, 860.)  However, he offered no particular opinion concerning the members of the SWAT team in this case, even though he had actually been involved in debriefing them in group "counseling sessions," where he had offered them "peer support" (R. 905, 874-79), and claimed that he had the officers sign confidentiality agreements concerning the debriefing.  Horn stated correctly that

"confidentiality doesn't extend to the courtroom, privilege does." (R. 880.) However, counsel simply acquiesced to Horn not testifying about the specifics of what had been said in the debriefing, apparently out of concern that Horn should not run the risk of creating a conflict for himself. (R. 881.)

After testimony from Horn running to some forty printed pages (R. 849-889), including his narration of what an FBI "psychiatrist" had said on the soundtrack of a training video (R. 856), the court finally intervened *sua sponte*, noting that: "I don't have a clue why the government called this witness ... I don't know what his expertise is ... I don't think a foundation has been laid ... it could be a *Daubert* issue ...". (R. 890.)

Nonetheless, Horn's testimony continued without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and Horn establishing that his work was not "interested in critiquing and facts, but in helping them resolve their emotional response to these incidents." (R. 897-98.) As his testimony continued, it became apparent that Horn was unfamiliar with various concepts relevant to the area of memory and trauma, such as acute traumatic disassociation (R. 908-10),[22] confabulation (R. 906),[23] and contamination of memory through contact with others. (R. 900-901.)[24] In fact,

---

[22]*See, e.g.,* Vermetten, Dorahy and Spiegel, *Traumatic Dissocation: Neurobiology and Treatment* p. 83, American Psychiatric Publishing 2007.

[23]Horn defined confabulation as "it means to make it up," whereas confabulation is the formation of false memories, perceptions or beliefs as a result of neurological or psychological dysfunction. Helen Phillips, *Mind Fiction: Why your brain tells tall tales,* 2572 New Scientist, 7th October 2006.

[24]Contamination of eyewitness testimony by subsequent input is a phenomenon that has been confirmed by clinical studies. Anthony Esgate, *An Introduction to Applied Cognitive Psychology*,
(continued...)

Horn made it plain that he was not interested in the current research in the field, just in dealing with individual cases. (R. 883.)

Before recessing for the day, the court again expressed concern about Horn giving expert testimony, citing to Fed.R.Evid. 702 and the fact that Horn "hasn't talked about any principles or methods that he has used to reach any conclusion and he hasn't applied any of the principles or methods reliably to any facts of this case because he really hasn't talked about the facts in this case." (R. 918.) The following morning, having expressed further concern, the court indicated that it was contemplating striking Horn's testimony, since it was not likely to aid the jury in resolving any factual dispute, but rather consisted merely of talking "in generalities." (R. 923-27.) Only after the court had questioned the government at length about the relevance and usefulness of Horn's testimony (R. 923-940) did the defense finally make the half-hearted statement: "I think the Court should consider striking his testimony" (R. 940). When given a further opportunity to ask that the testimony to be stricken, the defense still failed to affirmatively request that remedy. (R. 948.) The court then permitted further cross-examination of the witness before the jury (R. 949-958) at the end of which the defense finally moved to strike. However, the Government was then permitted to take the witness on redirect. (R. 966-975.)

Eventually, the Court gave counsel a further opportunity to argue the issue (R.1628-1632) and then struck the testimony (R. 1636), giving an instruction to disregard:

> Members of the jury, if you will listen, I'm going to give an
> instruction. I started to say a special instruction. It's not special,
> it's just – it's just a – (Pause) Not a special instruction, but just an
> instruction in regard to some testimony you have heard from Mr.

---

[24](...continued)
51 Psychology Press 2004.

> Horn.  So if you would listen to this interim instruction:  Ladies and gentlemen of the jury, when we started this trial I gave you some preliminary instructions to guide you in your participation in this trial.  As I advised you at that time, it is my duty to determine the law applicable to this case and it is your duty to accept and follow my instructions regardless of whether or not you agree with the law.  As a matter of law, I have determined that the testimony which you heard on Monday afternoon and Tuesday morning of James Horn should not have been admitted into this trial.  You should not speculate about the reasons for my ruling on this issue; it is based solely on my interpretation of the law applicable in this case.  Therefore, I instruct you that you should disregard Mr. Horn's testimony in its entirety and not consider it for any purpose in making your decision when reaching a verdict in this case.

(R. 1740.)

Nothing in the record indicates that defense counsel urged any amendment to the instruction, even though the trial court gave them that opportunity.  (R. 1636-37.)  Inexplicably, in spite of the trial court's concern about Horn's testimony, and willingness to strike it, defense counsel made no motion for a mistrial.

Horn's testimony, as the court readily saw, was inadmissible under Fed. R. Evid. 702.  The fact was equally clear on the basis of the two state trial transcripts.

Counsel were ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony.  Counsel had ample opportunity to prepare for Horn's testimony and consider whether to challenge it, because Horn was listed in the Government's witness list  and had testified at the two previous state court trials.  Counsel do not appear to have bothered to ascertain what Horn's qualifications were.   During a budgeting hearing on the morning before Horn testified, Mr. Hilfiger stated he believed Horn was a psychologist. (Tr. 10/3005 at p. 7.)   However, although Horn had a degree in psychology and had acquired practical experience as an FBI agent, he frankly stated that he was not a psychologist (R. 909) or

psychiatrist (R. 907), was not focused on research, or with accuracy of recollections,  but with the counseling of individuals.  (R. 883, 903-904.)

Horn did state, however, that he was Board Certified in two areas, "Emergency Crisis Response" and "Traumatic Stress", through the "American Academy of Experts in Traumatic Stress" [AAETS] (R. 848.)   Had defense counsel spent even a few minutes researching those qualifications, they would have discovered that the AAETS is an organization in which membership can be bought over the internet (at present, for as little as $60), and that its "Board Certification" credential simply requires a "comprehensive application and examination, along with supporting documentation ... utilized in concert to validate a member's experience in working with survivors of traumatic events, knowledge of the literature and level of education."[25] Indeed, it is an organization through which one can become "Certified in Acute Traumatic Stress Management" merely by completing an application and taking an examination based on a book, "Comprehensive Acute Traumatic Stress Management," which is purchased through the AAETS itself.[26]   When contacted for information about Board Certification in Traumatic Stress, the AAETS provides a link to "The National Center for Crisis Management," which produces a form indicating that Board Certification may be obtained for $350.00, a resume/vita and copies of relevant licenses and certificates, with no mention of any examination, and with the applicant self-certifying as to completion of "relevant course work concerning the specific speciality area"

---

[25]See http://www.aaets.org/diplomate.htm (last accessed March 2, 2009).

[26]See http://www.aaets.org/catsm.htm (last accessed March 2, 2009).

and to other ill-defined criteria.[27]  For example, 30% of the necessary points required for Board Certification can be acquired by being "Author/Co-author of an article, paper and/or presentation related to the specific specialty area," but the Board Certification application does not even demand a copy of the article or paper in question.

Further, when being cross-examined about an article by psychiatrist Park Dietz, Horn was asked whether he was a "master's level educated expert in this field," to which he replied "In emergency response, yes, emergency crises response." (R. 908).[28]  This was clearly untrue: his master's was in forensic science, but counsel did not correct that false impression.

Defense counsel did not even talk to Horn in advance of his testimony (R. 863), but cross-examined him by asking questions to which they did not know the answers he would give.  R. 863-866, 887.  For example, they attempted to question him about an article by Dave Grossman on "Critical Incident Amnesia," asserting that Horn "knows Dr. Grossman," only to have Horn state moments later that he knew nothing about Grossman. R. 885-888.[29]  The defense

[27]*See* http://www.nc-cm.org/APPLICATION%20FOR%20SPECIALTIES.cwk.pdf (last accessed March 9, 2009).  The National Center for Crisis Management offers no fewer than fourteen different Board Certifications, in Forensic Traumatology, Emergency Crisis Response, Motor Vehicle Trauma, Disability Trauma, Pain Management, Illness Trauma, University Crisis Response, Bereavement Trauma, Domestic Violence, Sexual Abuse, Rape Trauma, Stress Management, School Crisis Response and as a "Crisis Chaplain."

[28]The article appears to have been J.M. Rivard, P. Dietz, D. Martell and M. Widawski, *Acute Dissociative Responses in Law Enforcement Officer involved in Critical Shooting Incidents: the clinical and forensic implications*, 47 Journal of Forensic Sciences, Issue No. 5 (2002).

[29]The article in question was not introduced into evidence.  It was, presumably, Lt. Col. Dave Grossman & Bruce K. Siddle, *Critical Incident Amnesia and the Implication of Memory Loss During Extreme Survival Stress Situations*, 31 The Firearms Instructor: The Official Journal of the International Association of Law Enforcement Firearms Instructors (Aug. 2001).  *See* http://www.traumaregister.co.uk/Articles/critical_incident_amnesia.htm  (last accessed March 6,
(continued...)

also continued to reinforce Horn's credentials, for example bringing out his role as state director of the Oklahoma Chapter of Concerns of Police Survivors (R. 866), his award from the "Concerns of Police Survivors" group (R. 867), the number of presentations he had supposedly given (R. 868), the fact that he had already testified twice concerning this incident (R. 869), and his supposed involvement in research. R. 883-84. While bolstering Horn's seeming credentials, the defense failed altogether to attack the "board certifications" he had acquired through a diploma mill.

Defense counsel were also ineffective for failing to challenge the essential shortcoming of Horn's testimony: that it was not helpful to the trier of fact. Any suggestion that counsel made a legitimate strategic decision not to challenge Horn but to adopt whatever aspects of his testimony were useful, (R. 959) is belied by their obvious lack of preparation. The unopposed admission of his testimony, and counsel's eventual need to have it stricken were the result of inattention, not reasoned strategic judgment.

Ultimately Horn was, as the court put it, nothing more than "a forensic person who deals with traumatic experiences that police officers have." (R. 935.) Horn did not hold himself out as a psychiatrist (R. 907), or a psychologist. (R. 909.) Horn himself emphasized that his work involved helping people cope with the stress of unexpected trauma, not with any issue concerning factual debriefing. He did not even really purport to be giving his opinions as an expert, seeming confused when asked whether he was expressing an expert opinion: "Pardon? ... if I am testifying as an expert witness, I guess what I'm saying are expert answers." (R. 957.)

---

[29](...continued)
2009).

Defense counsel appear to have had no real strategy concerning Horn's testimony. They conceded admissibility, but then had second thoughts when the court ruled the testimony inadmissible and suggested moving to strike it.  Counsel indicated that they had foregone their opportunity to present their own witness to rebut the matters to which he testified, intending simply to "develop out of him what we could find useful and move on down the road and not have an expert come up and tell the other side of the stories *per se.*"  (R. 959.)  Given Horn's lifelong work with law enforcement, and the nebulous nature of his expertise, this "decision" was uninformed and unreasonable under prevailing professional standards.  It is hard to ascertain whether defense counsel actually viewed Horn as a witness for or against their client, but their sheer unpreparedness resulted in a "cross-examination" that was faltering, and characterized by the witness denying knowledge of the authorities that counsel was seeking to have discussed, resulting in an entirely unsuccessful examination on the part of the defense.

This quixotic attempt to get mileage out of a witness so favorable to the prosecution was mirrored in the October 3 Budget Hearing, where counsel revealed that they were contemplating compelling the testimony of a "SWAT team expert" they knew to be actively opposed to testifying for them.  *Id.* at 6.  *See supra* claim of unreasonable performance regarding Chuck Choney.

The court had authorized limited funds for trial counsel to retain a psychologist to assist in preparing to deal with Mr. Barrett's and the law enforcement officers' responses to the raid. (Doc. 97.)  However, the court permitted Mr. Barrett to be assisted by only one mental health expert and only at below-market rates of compensation, and only for a number of hours far below the norm for federal capital trials, although the expert had to cover many disparate issues.

*See* Grounds One, *supra*, and Three, *infra.* Mr. Hilfiger, whom the court personally selected to represent Mr. Barrett as part of a plan to develop a panel for future capital cases (Exhibit 67), declined to join his former lead counsel in requesting additional funds from the court. (Exhibit 34.) Mr. Hilfiger stated that he relied upon Jeanne Russell, Ed.D., to provide him questions for his cross-examination of Horn. (Tr. 10/3/05 Hr'g at 7.) Trial counsel did not contact Dr. Russell until mid-August, and did not possess the second state trial transcripts until late September, 2005, at the earliest.

Dr. Russell, in her communications to trial counsel, questioned what role Horn was to play in the trial, and admitted difficulty in framing questions for him. A particular concern for her was whether Horn was a mental health expert who might be prevented from testifying for reasons of confidentiality and privilege, and the fact that Horn was assuming dual roles by providing counseling and then testifying as an expert regarding the same subject matter. Defense counsel seemed to accept without question that Horn could not testify about what the officers had actually said in the debriefing sessions (R. 938), apparently believing that information was somehow privileged. Similarly, counsel did not pursue discovery of any notes or records of the various debriefing sessions. (R. 939.)

Not only did counsel lack information from the debriefings with which to cross-examine, but they also overlooked the critical fact that the group sessions were, in effect, a pre-emptive violation of Fed. R. Evid. 615: an untrammeled opportunity for the officers to learn in advance what other officers would say and, consciously or unconsciously, adopt other officers' perspectives on the incident. Defense counsel also did not question the narrative technique adopted by some of the officers, of speaking in the present tense - a recognized therapeutic

technique in trauma counseling - when describing what they said had taken place.[30]  This not only suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been admitted and was highly prejudicial.  It was the court that recognized Horn had nothing legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in futility.  Horn painted a powerful picture of law enforcement officers as a valiant brotherhood, referring to "one of our FBI heroes" (R. 855), to the powerful impact of losing a colleague (R. 851) and to the close relationship of SWAT team members: "it's very akin to the relationship I still have to this day with the Marines with whom I served in Vietnam because there is a bond when you face life-threatening situations that is formed, that is probably like no other bond." R. 861-62.  Not only did this testimony improperly bolster the prosecution witnesses, suggesting that the inaccuracies in their testimony were of little moment, given the trauma experienced by the grieving band of law enforcement agents, it also amounted to victim impact testimony that should never have come in at the guilt phase.  The Court itself acknowledged this facet of the testimony when ruling that it would strike the testimony: "At best, Mr. Horn's testimony is simply an attempt by the government to bolster the credibility of its witnesses for memory lapses of those witnesses at issue." (R. 1635.)  Moreover, it sought to explain the fact that officers might "recall" significant facts long after an incident which they had not previously mentioned, without

---

[30]  *See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71 Guilford Press 2001.

beginning to explore the question of whether those recovered "memories" were reliable recollections. (R. 858-59.)

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005. This delay allowed the evidence to sink into the jury's consciousness. Moreover, the low-key nature of the instruction, which downplayed even its own importance, can have done little to erase the jury's recall of Horn's testimony. "It's not special ... Not a special instruction, but just an instruction in regard to some testimony that you have heard from Mr. Horn." (R. 1739.) The trial court also missed an opportunity to drive home the importance of the instruction, by failing to emphasize that the evidence was simply inadmissible as a matter of controlling law, but rather stating that the ruling "is based solely on my interpretation of the law applicable in this case." (R. 1740.)

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder. It can therefore be readily concluded that the evidence was otherwise not overwhelming and that the impact of Horn's testimony on the jury requires a new trial.

Given the history of this case, especially with two prior trials that had not resulted in a murder conviction, let alone a death sentence, defense counsel had nothing to lose on their client's behalf by moving for a mistrial. The trial court had properly identified the shortcomings of Horn's testimony, and made clear its readiness to strike that testimony. The court had recognized the appropriateness of giving an instruction to disregard, although the instruction actually given was inadequate. Defense counsel could and should have argued that the jury's

exposure to Horn's evidence had irredeemably tainted Mr. Barrett's right to a fair trial. There was no downside to a motion for mistrial and therefore no strategic reasons for failing to make the motion. Counsel's failure to move for a mistrial clearly demonstrated deficient performance.

To the extent the issue could have been fully resolved on the record, direct appeal counsel for Mr. Barrett unreasonably failed to raise the issue of the ineffective assistance provided by trial counsel with regard to Mr. Horn's testimony, and their failure to mitigate or correct that error through a stronger instruction or a mistrial. *See* Ground Nineteen, *infra*. However, as indicated here, there is extra-record evidence in trial counsel's files showing that they did not conduct a timely or thorough investigation of Horn's qualifications, the limitations of his testimony, their own expert's ability to provide questions on cross-examination, or the general admissibility of his testimony under federal law.

**13.    The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions.**

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument. Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect. The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses. These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution

in this case from the two previous state-court prosecutions.  Some of these witnesses

acknowledged at trial, or have acknowledged since the trial, that they were involved in illegal

activities before, during, and after their testimony or the events about which they testified.  These

activities included illegal drug possession, use, and/or distribution, various civil violations,

making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, be informed about, and seek

from the trial court, such orders as may be available to assist in the presentation of the defense.

The informant witnesses also confessed to being drug addicts, either at the time of

their testimony, or at the time they allegedly perceived the "events" they described in their

testimony.  Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis

Crawford, Cindy Crawford, and Brandie Price were all drug addicts at relevant times.

Courts have long instructed juries that the

testimony of someone who is shown to have used addictive drugs during the
period of time about which the witness testified must always be examined and
weighed by the jury with greater care and caution than the testimony of ordinary
witnesses.

[¶]  You should never convict any defendant upon the unsupported testimony of
such a witness unless you believe that testimony beyond a reasonable doubt.

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

Movant was entitled to an instruction on his theory of defense.  The defense

theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication

that the vehicle speeding toward him contained law enforcement officers (R 4314), and (b) Mr.

Barrett was not engaged in drug manufacturing or distribution when the raid took place.  As

evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement

percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction.

**14.    The outcomes of the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard.**

Trial counsel were professionally unreasonable for failing to make proper objections in order to preserve the record for appeal.  As a consequence, Mr. Barrett was denied his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment.

As demonstrated by the direct appeal decision in this case, *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007), Mr. Barrett's trial counsel failed to timely preserve complete objections to the following:

1.    the prosecution's violation of Oklahoma state law requirements for nighttime search warrants (*id.* at 1089-90);

2.    the improper execution of search warrants by federal officers (*id.* at 1090);

3.    the violation of Fed. R. Crim. P. 41, because no federal judge or magistrate authorized the search warrant executed on Mr. Barrett's home (*id.* at 1090-91);

4.    the insufficiency of Mr. Barrett's federal indictment (*id.* at 1090-91);

5.    the improper multiplicity of various counts of Mr. Barrett's federal indictment for the same alleged criminal conduct (*id.* at 1095-96);

6.      the misjoinder of offenses in violation of Fed.R.Crim.P. 8 (*id.* at 1096-97);

7.      the improper admission of victim impact evidence (*id.* at 1097-1101);

8.      the prosecutor's use of racially motivated strikes in violation of *Batson v. Kentucky,* 476 U.S. 76 (1986), in that defense counsel failed to present reasons why the government's purported race-neutral reasons for peremptory strikes were false and pretextual, and also failed to inquire into the Government's justifications for the strikes (*id.* at 1105-06);

9.      the federal death penalty statute's improper allowance of non-statutory factors in aggravation (*id.* at 1108);

10.      the lack of constitutionally required proportionality review (*id.* at 1108-09);

11.      the violation of *Woodson v. North Carolina,* 428 U.S. 280 (1976) occasioned by the court's use of a relaxed standard for the admissibility of evidence (*id.* at 1109-10);

12.      the federal death penalty statute's improper allowance of impermissibly vague aggravating factors ( *id.* at 1110);

13.      the improper double counting of Mr. Barrett's alleged intent to kill as both a special circumstance and an aggravating factor (*id.* at 1110-11); and,

14.      The Government's improper failure to give timely discovery of the names of seven prosecution witnesses called to establish Mr. Barrett's intent to kill (*id.* at 1115-17.)

Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial. Whether considered as a repeated omission, or considered cumulatively with other unreasonable acts and omissions, there is a reasonable probability that the outcome of the first or second stage of trial would have been different if trial counsel had objected.

Ground Five, section C details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase. The specific instances will not be repeated herein but are incorporated herein by specific reference. Faced with arguments that could in no sense be termed appropriate, counsel failed altogether to object. The failure to object to clear prosecutorial misconduct can never be termed a reasonable strategy. Especially in light of the numerous, serious constitutional errors which plagued Mr. Barrett's trial, this omission by counsel was prejudicial. Trial counsel's omitted objections permitted the prosecution to do whatever it pleased, and abuses of the process continued unabated in second stage closing arguments, to Mr. Barrett's clear detriment.

## Conclusion

But for trial counsel's numerous unreasonable acts and omissions, each one a contravention of prevailing professional norms, there is at least a reasonable probability that jurors would have reached a different verdict in the first stage of trial. In summary, the deficient performance affecting the first stage verdict, second stage verdict, or both, includes the following:

Counsel late in the case recognized the need to attack the search warrant based on the trial testimony of the C.I., Charles "Monk" Sanders, but unreasonably omitted key facts and

argument from their briefing.  A competent and thorough re-urging of the motion to suppress based on *Franks v. Delaware*, 438 U.S. 154 (1978), likely would have resulted in the exclusion of much of the  Government's case.

When informed that prosecutors sought to conceal seven informant witnesses, and did conceal them until after the start of jury selection, counsel unreasonably acquiesced to a trial by ambush when they acceded to an arrangement that resulted in these crucial prosecution witnesses taking the stand with little or no time to investigate their backgrounds, criminal records, or their motives for testifying.  As a result, a wealth of impeachment evidence that could have been used to show them to be the incredible, self-serving witnesses they were was not produced.  Because counsel unreasonably failed to seek a continuance, or were induced into not seeking a continuance by prosecutorial and judicial misconduct, counsel left relatively unscathed key prosecution witnesses whose credibility would have been shattered.  With reasonable investigation the Government's case for intent, particularly with respect to Count 3 of the superseding indictment, would have been damaged beyond repair.

Trial counsel unreasonably failed to object to the seven informants' testimony to prior bad acts under Fed. R. Evid. 404(b).  When the Government failed to give notice that Karen Real would offer such testimony, in violation fo Rule 404(b), trial counsel offered no objection. Trial counsel permitted the prosecutors to use the hearsay evidence for an improper, and highly prejudicial purpose, i.e., to show Mr. Barrett's state of mind at a time far removed from his alleged statements and under circumstances that gave the alleged statements little probative value.

Numerous witnesses were available to rebut the Government's claim that Mr. Barrett had "holed up" on his property, readying himself for an attack on law enforcement, because he feared the authorities would arrest him on an outstanding felony warrant. This spurious claim went virtually unchallenged due to a total failure of investigation although court documents and court personnel would have shown, *inter alia*, there was no trial, no jurors were summoned, the failure-to-appear warrant was invalid, and Mr. Barrett was without counsel. The two witnesses the defense did call that would have challenged this theory – Martin Daggs and Clyde Edgmon – inexplicably did not appear until the sentencing phase of trial, even though their testimony was directly relevant to the guilt/innocence stage. Several other witnesses who could have refuted the prosecution's theory were either never contacted or were interviewed only superficially. Likewise, defense counsel failed to produce readily available witnesses who could have contradicted the testimony of law enforcement regarding the lighting used on the police vehicles, and supported the defense argument that Mr. Barrett reasonably believed he and his property were being attacked by lawless intruders.

Mr. Barrett had a well-documented history of mental impairments that were highly relevant to why he stayed close to his property, what he would have perceived at the time of the raid, and on his intent at the time of the shooting, but, due to both limitations on funds for expert witnesses and counsel's failure to investigate and prepare, the jury heard about none of this. Because of counsel's failures, the Government had a clear path to falsely portraying Mr. Barrett as a deliberate killer. Along the same lines, counsel failed altogether to challenge Mr. Barrett's competency to stand trial, though a thorough investigation would have revealed his mental competency to be very much in doubt.

Trial counsel unreasonably failed to use what funds were available to prepare to impeach prosecution "expert," Iris Dalley, and her dubious "reconstruction" of the manner in which the shooting occurred.  Due to trial counsel's failure to retain an expert he asked the court to authorize, no *Daubert* challenge was made to exclude her testimony and conclusions, and the jury never heard that her methodology and testimony were seriously flawed and lacking in a reliable foundation.  In a related fashion, the version of events testified to by the members of the OHP Tactical Team, which dovetailed with Dalley's "expert testimony," was not impeached with readily available previous testimony they had given in the two state trials.  Any failures of memory on their part, or contradictions in their testimony, were allowed to be explained away by James Horn, another "expert" who held forth for the better part of two days without objection, until the court itself struck his testimony because it so plainly failed to meet the test of *Daubert* and *Kumho Tire*.  The court's curative instruction was inadequate; the bell could not be unrung.  Horn never should have been allowed to appear, but counsel's failure to object to his obviously inadmissible testimony ensured that Mr. Barrett would be prejudiced.  Whatever headway counsel did make in casting doubt on the testimony of the officers was swept away in the welter of innocent explanations for their inconsistent testimony offered by Horn.

Trial counsel recognized that it was crucial to present expert testimony to show that the raid by law enforcement was contrary to law enforcement policies and procedures, was inadvisable, ill-conceived, poorly planned, and was met by violence from Mr. Barrett only because law enforcement did not make its presence plainly known.  But trial counsel failed to contact the expert the court authorized them to retain for that purpose.  The effort to support this theory came to grief when the defense inexplicably decided to rely on the testimony of Chuck

Choney, even though the witness told trial counsel he was hostile to Mr. Barrett and would not testify for the defense. What few half-hearted criticisms he may have offered for the manner in which the raid was conducted were more than counterbalanced by his defense at almost every turn of the conduct of the OHP Tactical Team, and his ringing conclusion that they did "nothing wrong." Had counsel engaged the services of a truly independent expert, the jury would have heard an entirely different story. Dr. Kirkham, an independent, nationally recognized authority whom the Court authorized counsel to hire as the defense's SWAT expert, would have testified that the OHP raid on Mr. Barrett's property was a textbook example in almost every respect of *what not to do,* resulting in Mr. Barrett reacting in the belief that criminal trespassers were on his property.

Symptomatic of counsel's ineffectiveness were also the failure to request appropriate instructions; the failure, on many points eventually raised on direct appeal, to adequately preserve the record with timely objections and motions; and the failure to object to prosecutorial misconduct.

Based on the above evidence, the conclusion is inescapable that trial counsel rendered ineffective assistance in the first stage of trial. As the results of the state prosecution demonstrated, this was a very defensible case, even with (or perhaps especially) the eleventh hour addition of the informant witnesses. The deficiencies of counsel argued above were not grounded in sound strategy, but fell outside the wide range of reasonable professional assistance. Mr. Barrett was clearly prejudiced. Whether the Court views the errors of trial counsel individually or in the aggregate, a different outcome was reasonably likely.

**B.      Unreasonable Acts and Omissions Primarily Affecting the Second Stage of Trial.**

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to his background and character and the circumstances of the offense, i.e., evidence that the jury could have relied upon to understand Mr. Barrett and offer an explanation for his conduct.  Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines").  The evidence detailed herein shows numerous unreasonable acts and omissions of Movant's trial counsel, and further shows there is a reasonable probability that at least one juror would have struck a different balance at the second stage of trial.

**1.      The evidence of deficient performance – trial counsel's unreasonable failure to interview witnesses, gather documentary evidence, consult with experts, counter the Government's case, and argue for a sentences less than death – includes the following:**

Trial counsel were impeded in their efforts to develop mitigation evidence by the trial court's refusal to authorize funds for retaining the necessary resources.  As stated in Ground One, *supra*, and Ground Three, *infra*, the allegations of which are incorporated herein by specific reference, the trial court denied Mr. Barrett resources regularly afforded similarly situated capital defendants, and which were deemed necessary in the independent professional judgment of his trial counsel.  (*See also* Docs. 50, 51, 57, 97, 128; Exhibit 34; Exhibit 118.)

Mr. Barrett's trial counsel had a duty to retain a mitigation specialist to assist in preparation for the penalty phase. (ABA Guideline 4.1(A)(2).) Trial counsel were on notice that the work done by a person previously hired in state court was incomplete, and that the work was done by a novice who refused to produce a summary of her findings for counsel. (Exhibit 64 Letter to Honorable James H. Payne dated 2/2/8/2005; Exhibit 34.) However, trial counsel were aware, or should have been aware, that the preliminary investigation showed there was evidence of mental disorders and other mitigating factors. Mental health professionals who were consulted during state proceedings found evidence of paranoia, a mood disorder, Attention Deficit/Hyperactivity Disorder ("ADHD"), and organic brain impairment including deficits in impulse control and processing information, especially under stress.

The attorneys who represented Mr. Barrett at trial did not obtain the files of the mitigation investigator who worked on the case before the first state trial, although the files were readily available. (Exhibit 111; Exhibit 34.) Nor did Mr. Barrett's trial attorneys timely confer with the prior attorneys who had worked on second-stage issues in order to develop or implement a plan of investigation or for trial. (Exhibit 82; Exhibit 34.) The available files included records showing that Mr. Barrett had been raised in a chaotic household by neglectful, alcoholic parents, a father who was only present when not out drinking and carousing, that Mr. Barrett attempted suicide as a young man, and had been diagnosed with Bipolar Disorder.

On March 18, 2005, less than six months before the start of trial, the court authorized Mr. Barrett's counsel to retain Inquisitor, Inc., to perform the function of a mitigation specialist. (Doc. 97.) The delay was contrary to ABA Guidelines which call for assembly of the defense team "[a]s soon as possible after designation" of lead counsel. (ABA Guideline

10.4(C).)  Trial counsel first sought funds for this task on January 31, 2005, then again on February 7, 2005.  (Docs. 46 and 50.)  Although counsel's professional judgment and that of the mitigation consultant they sought to retain dictated that the investigation would require $20,000 in labor and $5,000 in travel expenses, the court arbitrarily cut this figure in half without any allowance for travel expenses.  (Doc. 97.)  *See* Grounds One, *supra*, and Three, *infra*.

The denial of travel funds – which were essential in this case – may have been due in part to counsel erroneously informing the court that Mr. Barrett had "not lived in numerous locales."  (Doc. 50.)  Had counsel asked Mr. Barrett or his family, they could have told counsel that Mr. Barrett was born and lived as a child in Illinois, lived as a child in New Jersey and Indiana, and lived and worked as an adult in Arkansas, western Oklahoma, Texas, and Idaho. Even with this misinformation, the trial court's denial of travel funds obviously impaired the prospects for an investigation in that the mitigation investigator resided in Tennessee and even the most minimal investigation would require travel to Oklahoma.

Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation."  (ABA Guideline 10.11(A).)  Reasonably competent counsel would speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death."  (ABA Guideline 10.11(F)(1).)

Mr. Barrett's trial counsel knew or should have known that Mr. Barrett's family lived nearby and were ready to be interviewed or re-interviewed.  However, neither of the attorneys who tried the case, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history.  (*See*, *e.g.*, Exhibit 77; Exhibit 78; Exhibit 84; Exhibit 80; Exhibit 81; Exhibit 83; Exhibit 86; Exhibit 85; Exhibit 90; Exhibit 95; Exhibit 96; Exhibit 37.)

On May 17, 2005, the court appointed Roger Hilfiger Mr. Barrett's lead counsel in place of John Echols.  The court also appointed Bret A. Smith.  Mr. Hilfiger had only worked on one prior federal death penalty case.  Mr. Smith had no capital experience, yet Mr. Hilfiger gave him primary responsibility for the penalty trial.  Contrary to statutes and Judicial Conference guidelines, Mr. Smith was appointed without consultation with the Federal Defender.  As stated in Ground One, *supra*, the trial judge chose counsel for Mr. Barrett based on the judge's desire to give inexperienced local attorneys capital experience so that they could form a capital panel in the Eastern District.

On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005.  The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done to prepare for a penalty trial.  (Exhibit 64; Exhibit 34; Doc. 113; Exhibit 118.)

Mr. Hilfiger did not seek an amendment of the budget.  His failure to do so was unreasonable.  On May 26, 2005, Mr. Hilfiger filed a motion for a continuance based on his

having only recently received the files and records related to some of the state court proceedings, including transcripts and discovery.  Mr. Hilfiger stated in his motion that he was not familiar with the materials.  In February 2005, Mr. Hilfiger had informed Mr. Echols that it would take him (Mr. Hilfiger) 160 hours to assemble and review the files related to the case.  On September 9, 2005, Mr. Smith advised the court that as of that date, Mr. Barrett's lawyers had not yet assembled or reviewed the records of the preliminary mitigation investigation that had been done prior to the first state trial.  These statements, and the declarations of John Echols, Jack Gordon, and Steve Leedy (Exhibits 34, 82 and 111), show Mr. Hilfiger failed to undertake a reasonable investigation before concluding that no additional funds were needed to prepare for either stage of trial.

On or about June 30, 2005, trial counsel telephoned then Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation investigator. (Exhibit 67.)  Trial counsel had not contacted the mitigation specialist whom the court had authorized to work on Mr. Barrett's case.  (Exhibit 66.)  Nor had trial counsel familiarized himself with the results of an earlier mitigation investigation.  (Exhibit 111; Exhibit 34; Exhibit 82.)  Ms. O'Connell recommended that trial counsel contact Richard Burr, Federal Death Penalty Resource Counsel, for assistance.  Trial counsel did not contact him.  (Exhibit 118.)  At that time, the trial was approximately ten weeks away.  As Federal Defender O'Connell explains, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second-stage investigation if it had not already been completed, even if Mr. Hilfiger were able to secure the services of a mitigation investigator or investigators.  (Exhibit 67.)

Mr. Barrett's trial counsel did not secure the services of a mitigation specialist or other trained mitigation investigator. Although the court authorized trial counsel to retain Inquisitor, Inc., trial counsel failed to contact the agency, and never sent any documents or requested any investigation for Mr. Barrett's case. (Exhibit 66.)

As the Supreme Court has held, where there is a failure to investigate, alleged "strategic" decisions are not reasonable. In all capital cases, prevailing norms of capital defense practice, and empirical research on its results, indicate that "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." (ABA Guideline 10.10.1; ABA Guidelines, 31 Hofstra L. Rev. 913, 1059, 1065 (2003) (commentary on Guideline 10.11) ("counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").)

Trial counsel were aware that expert testimony regarding the mind's response to threats such as an unmarked S.U.V. barreling towards one's cabin was important so that the jury could understand Mr. Barrett's reactions. (Doc. 50.) Trial counsel were aware that Mr. Barrett "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders." *Ibid.* Trial counsel were aware that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting." *Ibid.*

The court authorized trial counsel "to hire a psychiatrist or a psychologist for up to 40 hours." (Doc. 97.) This ruling denied Mr. Barrett the expert assistance to which he was

entitled. *See* Ground Three, *infra*. It also denied Mr. Barrett the resources afforded similarly situated defendants in federal death penalty cases. (Exhibit 118; Doc. 107.) The court denied Mr. Barrett resources that would exceed the amount of money spent to represent him in state court, (Doc. 128 at 4), even though there was no second stage of trial in state court.

Trial counsel obtained a copy of a preliminary report prepared by a mental health expert, Bill Sharp, Ph.D., prior to the first state trial. (Exhibit 55 at ¶ 16.) Dr. Sharp had identified numerous sources of mitigation, and recommended further testing and treatment. (*Id.* at ¶¶ 9-14.) Federal trial counsel never consulted with Dr. Sharp about his findings or how his diagnoses might be relevant to mitigating circumstances. (*Id.* at ¶ 16.) Dr. Sharp's report put trial counsel on notice that Mr. Barrett suffered from extreme paranoia and long-term memory problems (*id.* at ¶¶ 3, 14), facts that would have indicated a need to spend more time with Mr. Barrett and to rely on other sources for background information. (ABA Guideline 10.7 and commentary, 31 Hofstra L. Rev. at 1023-24.)

Prevailing professional norms of capital defense practice provide that counsel should obtain the assistance of expert witnesses who will be provided relevant supporting documentation regarding the defendant's medical, scholastic, cultural, economic, and sociological background. (ABA Guideline 10.11(F)(1).) The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation. (Tr. 9/9/05 Hr'g at 38.) Mr. Barrett's trial counsel did not retain an expert to assess mental health mitigation and did not conduct a background investigation that would have supported a reliable opinion. At no time prior to or during the federal trial did Mr. Hilfiger or Mr. Smith either

consult with mental health professionals who had consulted with Mr. Echols during the state-court proceedings or obtain their files.

In mid-August 2005, Mr. Barrett's counsel contacted Jeanne Russell, Ed.D., regarding the risk assessment that had been contemplated in January and authorized in March, 2005. (Exhibit 56.) Dr. Russell had performed an assessment of Mr. Barrett in preparation for the state trial. In mid-August 2005, federal trial counsel did not have the report she provided to Mr. Echols in 2003. (*Id.*) The scope of Dr. Russell's inquiry was limited, and did not encompass many mitigating factors previously identified by trial counsel and routinely pursued in capital cases. Dr. Russell did nothing more for Mr. Barrett's federal counsel than update the report she had prepared in 2003 in anticipation of the second state trial, and conduct some research on an unrelated matter. (*Id.*) At the time of her report in September 2005 she had conducted no additional interviews.

Dr. Russell was not asked to conduct a mental health evaluation for the purpose of identifying mitigation evidence such as the existence of a serious mental illness or organic brain dysfunction. (Exhibit 56.) Indeed, trial counsel represented to the court that the defense did not have to produce a report from Dr. Russell pursuant to Fed. R. Cr. P. 12.2 because Dr. Russell would not testify regarding Mr. Barrett's mental condition. (Tr. 9/9/05 Hr'g at 41.)

Mr. Smith asked Dr. Russell whether she would conduct a mitigation investigation. (Exhibit 56.) She informed him that she was not qualified to take on that assignment, and that it was too late for anyone to conduct the type of thorough background investigation she viewed as the norm in other capital cases with which she had been involved.

(*Id.*)  Mr. Smith indicated that the trial court's refusal to provide the defense with resources impaired their ability to conduct such an investigation.  (*Id.*)

By September 9, 2005, Mr. Barrett's trial counsel had not obtained records from any state court investigation for a penalty phase.  (Tr. 9/9/05 Hr'g at 43.)  Mr. Smith said he had contacted "Mr. Echols[] because we have been able to find very little on mitigation" from the past trials.  *Ibid.*  This hardly should have come as a surprise given (a) that Mr. Echols had informed Mr. Hilfiger and the Court that his preparation for a mitigation case was never fully formed during the state trials, (b) that Mr. Echols withdrew from the case in large part because he believed the Court's limitations on time and resources made reasonable preparation for a penalty phase impossible, and (c) that there was no penalty phase in either state trial.  Mr. Smith told the court Dr. Russell's testimony would not involve an examination of Mr. Barrett.  *Id.* at 41.  Dr. Russell had "examined" Mr. Barrett, however.  At that time, Mr. Smith believed that Dr. Russell only had "reviewed records and what have you."  (Tr. 9/9/05 Hr'g at 41.)  The court generously described the defense's preparation as "still work in progress."  *Id.* at 42.

By September 15, 2005, when Dr. Russell submitted her "updated" report, she had not had an opportunity to conduct any additional interviews.  (Exhibit 56.)

On October 3, 2005, trial counsel disclosed to the court that they had not consulted a psychiatrist or psychologist.  (Tr. 10/3/05 Hr'g at 7.)  Mr. Hilfiger informed the court that Dr. Russell would be used as a mitigation expert.  *Ibid.*  However, Mr. Smith had previously informed the court and the Government that Dr. Russell would not be testifying regarding mental health mitigation.  (Tr. 9/9/05 Hr'g at 41.)  Mr. Hilfiger apparently meant that Dr. Russell would

act as a mitigation investigator. However, Dr. Russell was not qualified to conduct a mitigation investigation, and she so informed Mr. Smith in August 2005.

As stated in § A of this Ground for relief, *supra*, trial counsel unreasonably failed to investigate, *inter alia*, (a) the circumstances of the state drug charges for which trial Mr. Barrett allegedly failed to appear; (b) the Government's evidence of how the raid occurred and the supposed "reconstruction" of the crime scene; (c) whether the conduct of the raid followed law enforcement protocols for identification and safety; and (d) the unreliability of the Government's eleventh hour informant witnesses. Trial counsel's unreasonable omissions denied the jury a thorough understanding of the events of September 24, 1999, and denied Mr. Barrett a defense applicable to both stages of trial. Their conduct constitutes deficient performance.

**2. The evidence demonstrating prejudice from trial counsel's deficient performance includes abundant, readily available evidence of Mr. Barrett's neglectful upbringing, parental drug abuse and mental illness, his own mental illness and organic brain impairment. This evidence includes the following:**

A thorough investigation of Mr. Barrett's background would have provided the jury with a completely different, more accurate, and exculpatory view of events, including Mr. Barrett's character and actions. Jurors informed by this evidence would have understood that Mr. Barrett would not and did not knowingly or intentionally take the life of a law enforcement officer. Having failed to inform themselves of the readily available evidence, trial counsel presented only a superficial penalty case.

Trial counsel informed the jury that four categories of "mitigation evidence" would be presented:  (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration"; (4) "Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999."  (R. 4704).  The cursory description of the evidence that would be presented in the last category (R. 4709-13), was not "an accurate representation of [Mr. Barrett]" (R. 4713), in that it was terribly incomplete.

If trial counsel had followed the norms of capital defense practice, and pursued the evidence available to them, the jury would have heard truer and radically different testimony regarding Mr. Barrett.  Jurors would have learned the following about Mr. Barrett, his background, and character:

> **a.      The family, social, and medical background of Kenny Barrett.**

### Introduction

Kenneth Barrett's familial roots began in Sequoyah County, Oklahoma, at the intersection of two epic journeys in American history.  The deprivation of Depression era Sallisaw provided the inspiration for the Joad family in *The Grapes of Wrath* who came to personify legions of real-life sharecroppers living in the nearly hopeless circumstances of Sallisaw's drought and poverty before they set out for California.  The Trail of Tears[31] ended at

---

[31]  In 1838, the US government uprooted some 13,000 Cherokee Indians from their land east of the Mississippi River and forced them westward into the Oklahoma territory.  The 1,000 mile route they took to Oklahoma is called the Trail of Tears because of the hardships of weather, disease, and starvation that claimed the lives of 4,000 Cherokee.  It was a dismal journey that took place in the middle of harsh winter, and forced Indians from their homelands through north

(continued...)

Sallisaw Creek for those Cherokees who survived starvation, freezing temperature, disease and murder during their forced relocation from their homelands.

Kenny's heritage is a blend of both cultures. His paternal relatives, the Barretts, were hard-scrabble farmers, who married Cherokee Indians. His maternal relatives, the Dotsons, were Cherokee ranchers who married non-Indians. (Exhibits 155, 2, 131, 124.) With some success and much tragedy, both families endured the historical forces that shaped their communities. Some family members grew up in Indian orphanages, some became successful ranchers, educators, doctors, and business people. Many struggled with profound mental illness and its attendant chaos.

Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life. It made him vulnerable to developing major psychiatric illness. In lay terms, Kenny was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families. His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

### Family History of Mental Illness

Kenny meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component. (Exhibit 117.) Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases. Although members carried genetic-based risk

---

[31](...continued)
Georgia, middle Tennessee, Kentucky, Missouri, and Arkansas, into present day Oklahoma.

factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people. Other family members required psychiatric institutionalization. This spectrum of impairment included other family members who functioned marginally, but were unable to meet their responsibilities to their families and community. The nature and severity of Kenny's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

### Maternal Family Mental Illness

Kenny's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities. Kenny's mother's family "had to deal with mental illness for a long time." (Exhibit 91.) Kenny's mother, Gelene Dotson, has suffered from clinical depression, mood swings and anxiety since her teenage years. Gelene's sister, Carolyn (Kenny's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with a regimen of mood stabilizers and antidepressants. (Exhibit 4; Exhibit 78; Exhibit 139; Exhibit 202.) One of Carolyn's daughters manifests signs of mood-related psychiatric distress and is unable to rear her children. (Exhibit 78.) Gelene's brother Mark, the youngest child in her family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments." (Exhibit 98.)

One of Kenny's maternal cousins, Gwendolyn Crawford, also has bipolar mood disorder that necessitates ongoing treatment and medication. (Exhibit 83; Exhibit 137; Exhibit 77; Exhibit 41; Exhibit 201.) Gwendolyn's two children both have significant mental

impairments. Her 26 year old son Brandon has a developmental disability and is unable to speak or live independently. (Exhibit 83; Exhibit 135; Exhibit 153.) Gwendolyn's daughter Brandy Hill reported that her family "learned first hand about bipolar disorder and depression" and that Brandy herself "battle[d] with depression," experienced episodes of "high euphoria" and underwent treatment for her mood disorder until she could no longer tolerate chemical regimens. (Exhibit 77; Exhibit 141.)

Travis Crawford, another of Kenny's first cousins (*see* Exhibit 198), also receives medication for anxiety and reports a history depression. (Exhibit 45; Exhibit 92; Exhibit 143.) Travis has had "a long struggle with drugs and ha[s] anxiety and panic attacks" and his "mind does not work that well." (Exhibit 45; Exhibit 92.) He struggled and did not succeed in the Army, or in his employment. (Exhibit 196; Exhibit 203.) Travis understands that "psychological problems run in [his]family" and reports his oldest daughter, now "a grown young woman" has bipolar disorder and one of his sons "seems a little slow and is having a tough time of it." (Exhibit 45; Exhibit 92.)

Gelene's uncle, Warren Dotson, has two daughters who "each have a son who is bipolar, and it is a challenge for a lifetime. It never goes away." (Exhibit 101.)

In the maternal family, depression and mood disorders trace back to Kenny's grandmother's (Hattie Gertrude Dotson) generation. Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the Twentieth Century. (Exhibit 78; Exhibit 129.) Another relative, Wallace Dotson, was involuntarily hospitalized at the state mental institution on a

petition brought by his father, Tom Dotson,[32] who described Wallace as being "completely out of his mind," suffering from  "some kind of spells" and not having slept for "three days and nights." (Exhibit 32.)

### Paternal Family Mental Illness

Mental disease and its affects on family life were transmitted down at least four generations of Barretts.  Illness has affected Kenny's great-great-grandfather, his great grandfather, his grandfather and finally Kenny  himself.  (Exhibit 28; Exhibit 146; Exhibit 84.) As Kenny's cousin, Kathy Trotter, explained: "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression." (Exhibit 86.) Kenny's great-great-grandfather,  A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918.  (Exhibit 27.)  Kenny's great grandfather, Issac Clifford Barrett, by all accounts a man who was committed to his family and community, overcame tremendous odds and poverty to build a successful ranch ("cow rich"), but ended his life by suicide.  (Exhibit 84, Exhibit 87, Exhibit 132.)

Issac's oldest son, Andrew Jackson "A.J." Barrett shared in only the tragedy of Issac's life and none of its success.  A.J., Kenny's grandfather (*see* Exhibit 1) , was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety. A.J. terrorized his wife who hid "in the woods" from him (Exhibit 87), raped one of his daughters who became pregnant and placed the baby for adoption (Exhibit 84), and went on drunken rampages through town.  His Certificate of Lunacy documents auditory hallucinations,

---

[32]Tom Dotson was the uncle of Kenny's maternal grandfather, Hugh Dotson.  (Exhibit 130.)

persecutory delusions and paranoid ideation.  (Exhibit 27.)  His family believed he "was bipolar."

(Exhibit 87.)  A.J. was able to work only "sporadically."  His family eked out a "marginal"

living, and at one point A.J. was involuntarily committed to the state hospital for one month but

returned home to his wife who would not "consider divorce."  (Exhibit 87; Exhibit 125; Exhibit

146.)

A.J.'s maternal family also faced the tragedy of mental illness.  A.J.'s mother (and

Kenny's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," (Exhibit

146), wandered the ranch at night talking to herself and believed that she was canning goods for

the winter when she washed bottles in the middle of the night (Exhibit 84).  She "died very

confused."  (Exhibit 146; Exhibit 133.)  Mary's brother, Howard, was "Looney Tunes" (Exhibit

84), and Howard's son, Billy Dean, who was a disabled veteran with a history of schizophrenia,

committed suicide.  (Exhibit 26; Exhibit 128.)  Kenny's great aunt, Elnora Long, is bipolar and

requires significant doses of medication.  (Exhibit 84; Exhibit 86.)  Elnora, who has a

complicated lineage, is "very emotionally unstable" and "unpredictable."  (Exhibit 86.)  Kathy,

Kenny's cousin who experienced an anxiety and depressive episode and was hospitalized,

believes Elnora is manic depressive because of her extreme mood swings.  (Exhibit 86; Exhibit

140.)  Elnora is Ernie and his siblings' maternal half sister whose father was her mother's former

son in law's brother.

Kenny  has one paternal aunt (Linda Riley) and three paternal cousins who suffer

from depression and bipolar disorder.  His father's sister, Linda Riley, is treated for depression,

and both her adult daughters have been diagnosed with bipolar disorder.  (Exhibit 86; Exhibit

145.)  Linda's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.  (Exhibit 86.)

### Maternal Family History

Kenny's maternal grandfather, Hugh Dotson, was a direct descendant of Cherokee Native Americans, whose everyday life reflected the travails and successes of Indians in eastern Oklahoma.  Hugh grew up in an Indian orphanage, and became an adult universally loved by his children and grandchildren and respected in the Sallisaw community.  He spent his formative years living at Dwight Mission,[33] an Indian mission school started by the Presbyterian Church. Hugh's mother, Minnie Andrews,  placed Hugh and four of his siblings (Christine, John E., Anna, and Eleanor) at Dwight Mission after their father, Abe Dotson, was murdered.  (Exhibit 100.)  Hugh's mother, a widow with no ability to support her children, placed her two younger children (Lela and Warren) with her husband's relatives.  (Exhibit 100; Exhibit 102; Exhibit 106; Exhibit 134.)

Circumstances of Abe Dotson's death are unclear, but it is indisputable that he, two of his brothers, and his brother's son were killed by gunfire over a three year period in separate incidents.  Abe, his siblings Mark and Greenberry, and his nephew Bee, were Cherokee,

---

[33]Dwight Presbyterian Mission of the Cherokees was originally founded in 1820 as an Indian mission school in western Arkansas and was named for Timothy Dwight, president of Yale University.  In 1838, as Cherokees were forced into Oklahoma, Dwight Mission was moved at the invitation of the Cherokee chief to its current location 20 miles into then newly organized Indian Territory. Dwight Mission served generations of Native Americans as a mission and training school until public education became available and the school was finally closed in 1948.

and it appears that at least one of the men who shot and killed them did so with impunity.[34] (Exhibit 59; Exhibit 106.)  Records also show that Abe got into trouble with alcohol, committed violent offenses and stole.  (Exhibits 16 through 23.)

Abe's son, Hugh, and the other Indian children at the mission worked in its fields and stockyards to earn their keep.  Hugh impressed the administrators at Dwight Mission with his skill and sense of responsibility.  Hugh and his siblings stayed in the community after they left Dwight Mission, farming as sharecroppers and day laborers.  They barely survived, and some of his siblings made the long trek to California in hopes of better jobs in the fields.

Hugh married Hattie Gertrude Real in 1939 (Exhibit 8), and they had five children over their life-long marriage, the oldest of whom is Sylvia Gelene Dotson, Kenny's mother. (Exhibit 120.)  Hugh "barely earned enough to live on."  (Exhibit 97.)  Hugh, Hattie and their growing family lived in "tumble down" houses that "were in pretty bad shape even by standards back then."  (Exhibit 97.)  The family "had no running water, electricity or plumbing and used wood stoves for heating and kerosene for cooking."  (Exhibit 97.)

World War II intervened, and Hugh served in the U.S. Army.  When he returned home he attended classes on the GI bill that were taught by his brother in law, Carl Cook.  Hugh "learned how to run a farm, a big farm, not just a home farm," and when Gelene was six, the family moved to the Dwight Mission School where Hugh ran the farm.  (Exhibit 97.)  Gelene "always heard" her family was "part Indian and that [she] was 3/16 Cherokee."  (Exhibit 97.)

---

[34]Cherokee Census Cards M2799 and 3294.

Dwight Mission provided a house for the family that had electricity and plumbing, and Gelene began her elementary education at the school. She was her mother's least favorite no matter that she was the most attentive to her mother's needs. (Exhibit 97.) The school shut down in 1949, but the Presbyterian Church sent Hugh and his family to its Menual School in Albuquerque that served Spanish speaking students from New Mexico. Hugh "ran the cattle and vegetable farm" and served as "the overseer" to the student farm hands. (Exhibit 97.) After a year at Menual Hugh accepted the church's offer for him to run the farm operations at a new orphanage in Farmington, Missouri. The family stayed in Farmington two years until the orphanage closed and the family moved back to Oklahoma.

Rural Sallisaw offered no jobs, and Hugh and his family moved in with his brother-in-law Carl and sister Christine. (Exhibit 102.) Public schools did not conduct classes during cotton season because children had to join parents picking and chopping cotton. Hugh and his family traveled to western Oklahoma and "chopped cotton in the spring and pulled cotton balls in the fall." (Exhibit 97.) The family returned to Sallisaw when school began in the fall, but left at Christmas to join family in California who had arranged for Hugh to become an irrigation manager on a large farm near Bakersfield. Gelene loved her life on that farm where they "were not migrant workers, but people who lived there permanently" in the "30 or 40 houses on the farm, all with kids." (Exhibit 97.) It was "a joyful time" and Gelene "was a happy child," but her mother and father yearned to return to Sallisaw and own their own land. (Exhibit 97.) Gelene explained that "[l]and is just something very important" to her family and "always has been." (Exhibit 97.)

Hugh and his wife Hattie were dedicated to their dream of owning land. Hugh "worked seven day weeks, 12 hour-days" and "was tired from too much work but he never considered working less." (Exhibit 97.) Children in the family "always knew [they] went out there to make enough money to buy [their] own place back home." (Exhibit 97.) When they had saved enough, the family returned to its roots and soon after their youngest child was born in 1961, Hugh bought 40 acres in Sequoyah County. Gelene and her siblings enrolled in local public schools, and Gelene graduated but she never recaptured the joy of her few years in California. Years later, Hugh gave each of his five children seven of his treasured 40 acres and retained five. Kenneth Barrett eventually built his shack for $150.00 on a spit of his grandfather's land adjacent to his mother's house, on land that Gelene expected she would one day be deeded, and she was.

### Paternal Family History

Like Hugh Dotson, Issac Clifford Barrett, Kenny's paternal great-grandfather, enjoyed a fine reputation in Sequoyah County. From 1917 to 1943, Issac managed a 20,000-acre ranch owned by a Kansas doctor. Issac married Mary Ellen Maxwell, who was one of ten children born in Sequoyah County. Issac was known as "a fair man" who, when he learned of a neighbor's falling on hard times, shared the bounty of his own garden. (Exhibit 84.) Issac "had his burdens to carry after he married" Mary. She had a "mental breakdown" (Exhibit 146), and "walked around the yard talking to herself. At night, she would wake up, wash jars, and think she was canning." (Exhibit 84.) According to Issac Barrett, Mary's brother, Howard Maxwell, was "Loony Tunes" and Howard's son Billy Dean Maxwell was accused of burglary, and was involuntarily committed to the state mental institution four times over a ten year period before he

committed suicide by shooting himself in the head.  (Exhibit 84; Exhibit 25; Exhibit 26; Exhibit 128.)  Issac also committed suicide, by "ingesting a remedy for black leg cattle disease" on November 24, 1952.  (Exhibit 84.)  Family members believed Issac killed himself "because he had a broken heart" after his brother convinced him to sell his cattle and invest all the proceeds in a failed enterprise.  "He had nothing left."  (Exhibit 84.)

Issac's oldest son, Andrew Jackson Barrett (A.J.), is Kenny's paternal grandfather, but "[w]hatever good Issac had in him, and there was plenty of it, did not pass down" to A.J. (Exhibit 84.)  A.J. married Ada Mae Hatter, a woman who came to be "very well thought of" and who " was someone who worked extremely hard."  (Exhibit 86; Exhibit 1.)  Ada's mother, Ida Melton, was an Indian (Exhibit 131) married to Sam Hatter.  (Exhibit 9.)   Ida and Sam divorced, and Ida married A.J.'s brother John.  (*See* Exhibit 10.)  Ida and John had one child, Elnora Barrett Long, who was debilitated by her manic depression and anxiety to such a degree that she has recently been put in a nursing home.  Ida's marriage to John meant that her son-in-law, A.J., was also her brother-in-law.

A.J. and his wife, Ada Mae "lived a hard life."  (Exhibit 84.)  Three children "died at or near childbirth; the oldest was two weeks old.  Two are buried in Akins cemetery.  The stillbirth is buried back in the mountains."  (Exhibit 84.)  The oldest of the five children born to A.J. and Ada Mae who survived is Ernest (Ernie) Barrett, Kenny's father.  Ernie and his four siblings who survived (Margaret, Issac, Gary and Linda) lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with "a dirt floor and no electricity or running water. [W]ell water was not usable for humans, although it was all right for animals and crops." (Exhibit 84.)

A.J.'s education ended at the seventh or eighth grade. He worked sporadically as a laborer "doing public construction work" and "spent eleven months in the service during World War II." (Exhibit 146.) Unable to support his family, "[t]he entire family had to work in the fields traveling from one crop to the next." (Exhibit 84.) State Hospital records described their economic status as "marginal," and the family "had a tough time getting by." (Exhibit 146.)

Life for Ernie, Kenny's father, and other children in the family was dismal. One of Ernie's "earliest memories is being taken out of school to work in the fields." (Exhibit 81.) Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field. Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell [sic], and picked beans in Moffitt [sic], Oklahoma. It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown. It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it. When cotton season came, we worked or we starved. When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

(Exhibit 81.)

"We had a neighbor who raised purple whole peas for animal feed. My Granny Ida asked her if we could have what she had left on the vines for our cows—we scavenged them and my mom cooked them." (Exhibit 87.)

A.J. was unable to ameliorate the harshness of poverty and its impact on his family. His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month. (Exhibit 146.) None of his children "wanted him to be at home because of the crazy things he did." (Exhibit 84.) He

suffered from mood swings that he attempted unsuccessfully to self medicate with copious amounts of alcohol, to which he became addicted. His alcoholism only aggravated his behavior. (Exhibit 146.) Family members believed his behavior worsened after an automobile accident in 1960, but he "had always been high tempered and jealous." (Exhibit 146.) His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen." (Exhibit 84.) When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb" (Exhibit 84), but he "was difficult to figure out because he was also a decent guy when he was sober." (Exhibit 81.) A.J. spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption. (Exhibit 84.)

A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Kenny's father Ernie, tried to "stay out of [his] way." The children left home as soon as they could. (Exhibit 146.) Family members reported that A.J. had "two different personalities" and "angry spells about three times a week." (Exhibit 146.) A.J. had "enormous moods swings from being an alright guy to being totally out of control." (Exhibit 81.)

A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers." (Exhibit 146.) A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were] going to kill him." (Exhibit 146.) A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality." (Exhibit 146.) A physician examining A.J. when he was admitted to the state hospital, reported his findings:

> His memory for past and remote past is poor. He can retain a number of five digits but is unable to repeat them in reverse with any degree of facility. Serial subtraction of eight from one hundred is done with much hesitation and inaccuracy. His general intelligence seems inaverage and dull normal. His reasoning and judgement are limited. His insight is poor.

(Exhibit 146.)

Ernie and his siblings were powerless to protect themselves or their mother from A.J.'s assaults and terror. A.J.'s wife, Ada Mae, was an old fashioned woman who "would not divorce" him (Exhibit 87; Exhibit 146), even though "nothing could stop him from attacking them." (Exhibit 81.) Ada "was churchgoing and devout; she did not believe in leaving a marriage no matter how bad it was." (Exhibit 81.) Ernie believed his mother "was as good a woman as there is, but she had a hard life between my father being half crazy and always poor." (Exhibit 81.) Ernie tried "[a]s the oldest boy in the family," to protect his mother and the other children, but he was "no match" for his father until he was "half grown." (Exhibit 81.) Because Ernie tried to "get between" his father and mother when A.J. attacked her, he "got beaten more than the other children." (Exhibit 81.)

Ernie developed characteristic responses to the life threatening trauma he witnessed and experienced. He "learned never to cry" when his father hit him and he does not remember "feeling a hell of a lot." (Exhibit 81.) High school for Ernie was "different." (Exhibit 81 .) In a community known for its poverty, Ernie's family stood out as still poorer than most. Other students "made fun of [Ernie] and laughed at [him] because of the way [he] dressed." (Exhibit 81.) Ernie responded to the taunts with fighting "every boy in [his] high school class to hold any respect." (Exhibit 81.) Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out." (Exhibit 84.) Ernie's brother

described him as "pretty cruel." (Exhibit 84.) He treated his younger siblings "pretty rough," and when he made them cry, "he thought it was funny." (Exhibit 84.) Ernie's brother thought Ernie was "a lot like [his] father," A.J. (Exhibit 84.) An aunt who taught Ernie in elementary school described him as "a mean child." (Exhibit 93.)

Ernie left home without graduating from high school and joined the U.S. Marines. He kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess. He was three months short of 17 the last time he stepped between his father and mother to try and protect her. His father hit him across the shoulder with a "19-inch metal file that busted [his] shoulder wide open." He still has a scar from it. (Exhibit 81.) Ernie described that day: " I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others. I was 6'3" and weighed 187 pounds." (Exhibit 81.)

### Family of Origin

Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, budding alcoholism, and little understanding of the demands of parenting. They met in high school, dated briefly before Ernie left to join the U.S. Marines, reunited by accident when both were back in their home town and married July 8, 1960, without much thought. (Exhibit 91; Exhibit 97; Exhibit 5.) Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning. Although Ernie was very "determined not to live in the kind of poverty [he] knew as

a child growing up," he had little notion of family life or fatherhood.  (Exhibit 81.)

Ernie acknowledges that he "did not give much thought to fatherhood" and "did not think about

Gelene or, later on, the boys, other than working and supporting them."  (Exhibit 81.)

Ernie "almost immediately started running around with other women" (Exhibit

81) and was gone for days at a time.  He had his "mind set on doing whatever" he wanted, as

long as he worked.  (Exhibit 81.)  After he finished his shift at the plant, he went to bars and got

"into as many brawls as there were" before coming home.  (Exhibit 81.)  Ernie "did pretty much

whatever [he] wanted to.  [He] would go out, drink as much as [he] wanted, and chase women," a

pattern he maintained until well after his marriage with Gelene ended.   He "drank a fifth at a

time."  (Exhibit 81.)  Today Ernie is deeply ashamed of his behavior towards his children and

wishes he "could take it back and do for [his] children what they needed and be the kind of

parent they deserved."  (Exhibit 81.)  At the time he and Gelene started their family, his only

measurement of success was being able to work himself  "up from pushing brooms to production

manager."  (Exhibit 81.)

Gelene was "pretty depressed" and  "miserable" in the marriage.  (Exhibit 97.)

She was "a heavy drinker with dramatic mood swings."  (Exhibit 98.)   She had planned on going

to college but discovered she was "crazy about Ernie" who "came home kind of like a knight in

shining armor."  (Exhibit 97.)  She did not realize, until after they married, that Ernie "was not

the same boy" she knew in high school and that "he had changed, none for the better."  (Exhibit

97.)  Looking back, she "never imagined that life with Ernie could be so terrible, not just for

[her], but for the children [they] had together."

Ernie's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing. " (Exhibit 97.)  Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar  "looking for him – he would be out drinking," but barkeepers would tell her he was not there.  (Exhibit 97.)  Throughout their 13-year marriage, Ernie "had his other women."  There was never a time he did not have other women.  Gelene "drank right from the beginning of the marriage," according to Ernie.  One of Gelene's sisters, Phyllis (*see* Exhibit 197), who visited Gelene when she was pregnant with Kenneth Barrett reported that "Gelene drank from the moment she woke up until she went to bed."  (Exhibit 91.)

Kenny's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife with recrimination.  Ernie was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children.  Gelene says that "[I]t drove [her] crazy," and that she "begged, pleaded, threatened, and cried with Ernie."  (Exhibit 97.)   They "split up and got back together and threatened to leave each other over and over."  (Exhibit 97.) They "always had a difficult time of it."  (Exhibit 97.)

Their son Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  (Exhibit 119.)  He was followed by his younger brother, Richard, born June 24, 1964.  (Exhibit 97; Exhibit 121.)  Shortly after Richard's birth, Gelene left Ernie for almost three years and returned home to Sallisaw with the boys.  Ernie "felt bad about leaving" his sons but he "could not take Gelene anymore."  (Exhibit 81.)  Ernie admits that he "was still young and

immature" and not " much of a husband" who "just put the boys out of [his] mind as much as [he] could." (Exhibit 81.)

The three-year separation ended when Ernie was not able to "keep the boys out of [his] mind" and he reunited with Gelene in 1967. (Exhibit 81.) Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend. (Exhibit 81.) The nature of the marriage did not change after Gelene and the boys returned to Illinois. Gelene gave birth to their third and last child, Stephen, January 1, 1969. (Exhibit 97; Exhibit 123.) Gelene and Ernie "both drank as much as [they] could," and Ernie "still stayed away from home." (Exhibit 81.) Ernie was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence. Ernie contacted a friend in New Jersey who found him a job at a glass plant. Leaving Joliet allowed him to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting. The family moved, living first in Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time." (Exhibit 81.)

Gelene's humiliation at Ernie's hands continued. Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey. (Exhibit 97.) Ernie had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened." (Exhibit 97.) Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys. Gelene contracted gonorrhea twice from Ernie. Although Ernie had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her] lip." (Exhibit 97.) Gelene "was at

the end of her rope" and left Ernie for good in Lake Hopatcong, returning home to Sallisaw with three young boys in 1972.  Ernie and Gelene divorced June 20, 1973.  (Exhibit 97; Exhibit 12.)

## Infancy and Childhood Development

Kenny  has long standing neurologic deficits that were apparent early in his infancy, continued throughout his childhood and adolescence, and affected his behavior and understanding over the course of his life.  Although it is difficult if not impossible to determine with precision the etiology of his neurological deficits, there is no doubt that they are present and significant.  These deficits can be the result of his mother's ingestion of alcohol or other neurotoxins during her pregnancy with him, head trauma he sustained during childhood and young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one or more of these factors.

Gelene was stressed throughout her pregnancy with Kenny, which she describes as "very difficult."  (Exhibit 97.)  She was in "constant pain," uncomfortable, and depressed.  (Exhibit 97.)  She described her pregnancy as "battling with Kenny before he was born."  (Exhibit 97.)  Gelene drank throughout her pregnancy with Kenny, unaware of alcohol's potentially devastating effect on a developing fetus's brain.  (Exhibit 97; Decl. Linda Riley.)  Gelene's in-laws commented on her early alcoholism and stated she "was a drunk right out of high school."  (Exhibit 86.)

Kenny  had a difficult infancy and "exhausted" his mother.  (Exhibit 97.)  His "days and nights were mixed up," and he "was colicky" and unable to be comforted.  (Exhibit 97.)  He cried and fussed "all the time," making Gelene think all babies must be like him.  After she had her other two children and observed their development, she "realized something was

wrong with Kenny." (Exhibit 97.) Gelene received no help from her husband who acknowledged he "was not around the house much when Kenny was a little baby" but " heard all about how hard it was to soothe him. He was colicky and cried all the time." (Exhibit 81.) Kenny was born with a large lump on the back of his head. (Exhibit 97.)

Kenny failed to meet developmental milestones expected of healthy infants. Gelene faithfully recorded Kenny's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital. (Exhibit 35.) Although it appears that he met most of his three and six month milestones, he lagged in some.

At three months, Kenny did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched." Kenny's mother nursed him. (Exhibit 35.)

At nine months, Kenny did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave "bye-bye" or play "peek-a-boo" instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say "ma-ma" or "da-da" or equivalent," or "make stepping movements when feet are touched to floor." (Exhibit 35.)

At one year, Kenny's delays were more obvious. His mother noted he "had trouble learning to walk." (Exhibit 97.) He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play "pat-a-cake," or "show preference for one hand in reaching." (Exhibit 35.)

Kenny early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyperactivity. Gelene recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active." (Exhibit 97.) Gelene described him as "a handful" who "could not be still" and "was more than hyper." (Exhibit 97.) An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still." (Exhibit 91.) Ada Blount, Kenny's maternal great aunt, recollected that "Kenny was a hyper little boy who could not sit still." (Exhibit 74.)

Ernie recollected that when Kenny "got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing." (Exhibit 81.) Janice Sanders, a maternal cousin, remembered that "Kenny was a hyper little boy, the most hyper child" she had have ever seen. (Exhibit 85.) She also noticed that Kenny "had strong feelings" (Exhibit 85), a common symptom of children who develop bipolar mood disorder. Other family members who "used to babysit Kenny and saw him on and off through his teens and at family reunions" confirmed that he was "very hyperactive." (Exhibit 101.)

Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children." (Exhibit 91.) Kenny "was extremely sensitive and cried over every little thing from the time he was small until he was a grown man . . . . He would break down and cry easily." (Exhibit 91.) His cousin remembered that "back then we called Kenny hyper. He was erratic and temperamental." (Exhibit 86.) His mother reported that "any little thing could upset him, but it took a lot to calm him." (Exhibit 97.) Ernie also recognized that Kenny was "a sensitive little boy...who cried if you hurt his feelings." (Exhibit

81.) When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything. He had to have his stomach pumped twice when on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax." (Exhibit 97.) Kenny's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot." (Exhibit 97.)

Gelene was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to Kenny's impairments by punishing him. Gelene admits that she decided "to be especially hard on Kenney because he went from one thing to the next" and "was never still." (Exhibit 97.) It "almost drove [her] crazy." (Exhibit 97.) She thought he "was emotional about things that did not matter. He would cry and scream like there was no tomorrow." (Exhibit 97.)

She physically punished him by beating him with a thin belt and degraded him verbally. Ernie remembered that Gelene "used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too." (Exhibit 81.) Gelene's niece by marriage "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to. . .kids was angry." (Exhibit 86.) Children were "afraid of her." (Exhibit 86.) Kenny suffered "more verbal abuse from her than her other two children." (Exhibit 86.) Kenny's neurologic impairments and his chaotic home life took their toll on his school work. Gelene stated he "had a difficult time in school and was in special classes part of the time." (Exhibit 97.) Kenny had difficulty almost immediately in school. He failed reading

and arithmetic in the first grade and was barely able to keep pace with his peers. He had difficulty learning to read. (Exhibit 97; Exhibit 136.)

Ernie "hardly had anything to do with [Kenny] after the divorce, and everyone could see how much it hurt Kenny." Even when Ernie made semi-annual trips to town to see his sons, family reported he was insensitive to his children's needs. He came "by to show off his new Corvette when his children did not have shoes or decent clothes to wear." (Exhibit 84; Exhibit 91.) Ernie's sister in law did not think Ernie was "a good husband or father. Ernie did not come around and visit his children the way he should have. He was absent in their lives. Ernie has always been for Ernie." (Exhibit 93.) Ernie "went his way and let Gelene take care of the kids." (Exhibit 93.)

Ernie remembered that "Kenny kicked and screamed to stay" with Ernie and "did not want to go with his mother back to Oklahoma." (Exhibit 81.) Kenny "wanted to stay" with Ernie, but Ernie felt he "was not set up to take care of him and work." (Exhibit 81.)

Gelene's emotional needs took precedence over Kenny . Her sister recalled that Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected Kenny badly." (Exhibit 91.) Gelene brought different men into the house when Kenny was entering his teenage years, and "it was very confusing for him." (Exhibit 91.) Gelene "seldom gave Kenny a kind word" and "screamed at him over anything." (Exhibit 91.) Gelene once asked Phyllis to intervene and help her get Kenny out of his room. Phyllis and her husband went to Gelene's house and talked to Kenny. Kenny told them "he could not get his mom's voice out of his head. The only time Gelene talked to him was to scream." (Exhibit 91.) Gelene's "ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and

unpredictability. She had a hard enough time dealing with her own needs, let alone having to deal with Kenny's hyperactivity and mood swings." (Exhibit 99.) When Gelene "lost control of herself," she whipped the boys, but "there was no real parenting." (Exhibit 99.)

Gelene was harsher with Kenny, "verbally and physically," than she was with her other two sons. (Exhibit 99.) Gelene used a strap to whip Kenny, and Kenny "hated" it. (Exhibit 99.) Kenny had a German shepherd that Ernie had given him, and the dog was very protective of Kenny. When Gelene "would try to beat" Kenny, he would hide behind the dog and the dog would growl at Gelene and not let her near him. (Exhibit 99.) The dog was run over by a car.

Steve, Kenny's youngest brother, lived at home with Kenny, Richard, and his mother, but found refuge and support with the extended family. Steve, an educator and principal at a junior high school, has given great thought to understanding how he "was able to overcome many of the challenges" he faced and "how those challenges affected Kenny." (Exhibit 99.)

Steve and Kenny "were exposed to vastly different environments and experiences" during their formative years due to Steve's much younger age. (Exhibit 99.) Steve benefitted from the guidance, support, and structure of an extended family that "Kenny never experienced in his developmental period. Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children." (Exhibit 99.)

While Gelene's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for with his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Kenny was

repeating eighth grade. (Exhibit 99.) Steve was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson. Steve believes "another critical factor" is that "Ernie. . . abandoned Kenny when Kenny most needed him" but that Steve, at the age of two, had no real relationship with Ernie. (Exhibit 99.) Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him] in their love and guidance." (Exhibit 99.)

Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education. Kenny failed in school." (Exhibit 99.) School became the focal point for Steve and provided "the value system" that was absent at home. Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had." (Exhibit 99.)

Gelene was unable "to have meaningful conversations about day to day problems, to figure out how to solve normal problems that arise in the course of everyday life, or to tolerate the routine activity of growing boys." (Exhibit 99.) Steve once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness." (Exhibit 99.) Gelene "did not know how to respond to Kenny's special needs as a youngster with profound psychological problems." (Exhibit 99.)

Kenny begged his father to allow him to live with him, and Ernie relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana, where Kenny completed ninth grade." (Exhibit 81.) Kenny resented Ernie's wife Diana and "it got the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest. He went

Page 220

flying slamming against the wall." (Exhibit 81; Exhibit 149.) After his father's assault, Kenny went back to Sallisaw and soon withdrew from school.

Gelene reported that Kenny "never got over" the divorce and believed that it "caused some of Kenny's problems." (Exhibit 97.) She knew that "Kenny never adjusted" after the family moved back to Sallisaw when Kenny was in the seventh grade. (Exhibit 97.) Kenny "got pretty depressed and lost interest in school." (Exhibit 97.) Kenny's youngest brother Steve realized that Kenny "idolized Ernie." (Exhibit 99.) He could tell "how much Kenny missed [their] dad by the way he acted when Kenny was around him. Kenny made sure to stay in close proximity. . . Ernie was a god to Kenny." (Exhibit 99.) Extended family members knew that "Kenny never had much of a father," and "never had any guidance." (Exhibit 74.)

Kenny had "a hard time with lessons" and repeated the eighth grade. (Exhibit 81.) In the fall of 1976, at the age of 14, Kenny enrolled in eighth grade for the second time at Tommy Spear Junior High in Sallisaw. He was placed in special education classes in English and staff made "some adjustments to the curriculum" for him. (Exhibit 136.) At the end of the academic year, he showed improvement in two courses (math and social sciences) and decline in one course (science). It was a very difficult year for Kenny, whose beloved grandmother, Ada Mae, died in 1976. (Exhibit 126.) Ada Mae "adored" him, and "[w]hen she died . . . Kenny was just 14. It was as if the only adult who ever cherished him had gone." (Exhibit 86.) Ada Mae's death was the hardest on Kenny "because his father had recently deserted him at the age he most needed direction." (Exhibit 86.)

Kenny moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976. His

grades declined in three of the five subjects (general math, comm arts, and life science). (Exhibit 136.) Kenny returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time." (Exhibit 81; Exhibit 200.)

When Kenny was 17, he was assaulted and beaten by Sallisaw police officer John Philpot, who hit Kenny so forcefully, it broke Officer Philpot's hand. The assault had long term consequences on Kenny who could not understand the reason for the assault. Kenny had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars." (Exhibit 97.) The incident only added to Kenny's already burgeoning paranoia. The traumatic impact of the assault on Kenny – then a youth with manic-depressive illness, brain damage and a low I.Q. – affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him. (Exhibit 117.)

### Onset of Mental Illness

Kenny entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits. He battled "terrible mood swings" and periods of depression that lasted for days. He hoped that hard work would make his pain go away. It did not. He had worked steadily since he left high school, and "his bosses liked him." He was "a good worker, strong, and able" and was "proud of his work." (Exhibit 97.) By the time Kenny was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

Soon, Kenny met and fell in love with a beautiful young girl, Abby, and they married in 1980 when he was 19 and she was almost 16. (Exhibit 7.) Their only child, Toby,

was born December 1, 1980. (Exhibit 122.) Kenny and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other." (Exhibit 97.)

Kenny "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene for the first few years of their marriage. (Exhibit 103.) Kenny's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs. Kenny's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment. Abby reported that "Gelene made Kenny get up from bed and party with crack and pot." (Exhibit 103.) Gelene never treated "her other sons the way she treated Kenny." (Exhibit 103.) She and Kenny had a "terrible relationship." (Exhibit 103.) Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated." (Exhibit 152; Exhibit 11; Exhibit 150.)

Kenny tried "to bury his problems under constant work and activity." (Exhibit 99.) Kenny measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own. Depressive episodes overtook him, and he would "get real depressed and sleep all the time." (Exhibit 103.) The only antidote to his depression was drugs. His wife knew that "he smoked a lot of pot, but without it he never got motivated. He turned to drugs to make himself feel better." (Exhibit 103.) He used methamphetamine as an antidepressant and discovered that he could work well under its influence. Abby observed that Kenny "would work hard and then sleep all the time. . . .[He] did the drugs to make himself feel better, because otherwise he would just sleep." (Exhibit 103.)

Kenny's behavior easily fit the pattern of bipolar mood disorder, and his family knew he was "deeply troubled." (Exhibit 86.) His wife thought he was "like a manic depressive, hot one minute and depressed and even immobile the next." (Exhibit 103.) Kenny had "racing thoughts." (Exhibit 103.) He did things without thinking and "then regretted them." (Exhibit 103.) Abby knew that Kenny "did not act the way normal people act" and that he "got swept away in his emotions." (Exhibit 103.) When Kenny lost control of himself, he hit Abby and later "would come back crying, begging" Abby to take him back. (Exhibit 103.) He was genuinely "remorseful" and would "be good as he could be—he would go the extra mile,. . . . but he could not keep it up." (Exhibit 103.)

Kenny's cousin, Brandy, recognized Kenny's bipolar mood disorder created severe problems for his marriage. Brandy compared Kenny's behavior to her own behavior and reported that her "mood swings" made it "hard" on her husband because she "used to attack him, kind of the way Kenny and Abby fought." (Exhibit 77; Exhibit 141.)

Kenny and Abby separated and reunited frequently; his mood fluctuations and deep depressive episodes made him irritable, agitated, paranoid, and suspicious. During one of the separations, he went to his father's home where Ernie found work for him. Ernie described his observations of the effect of Kenny's mental impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic, always on the go and upbeat. Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it. In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me. I got him a job with Kerr Glass and he was making real good money. Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill

himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve.

(Exhibit 81.)

Abby knew that Kenny "had mental issues" and tried to persuade him to seek psychiatric treatment. (Exhibit 103.) Abby recognized that she "was the only stable thing he ever had in his life" and that she "kept him together." (Exhibit 103.) She opposed his drug use but stayed with him in their fitful marriage to try "to keep him from falling off the deep edge." (Exhibit 103.) Kenny's brother reported, "[a]s troubled as Kenny was, he worked all the time." (Exhibit 99.) Kenny's use of drugs allowed him to keep working, despite his serious mental illness. Kenny increased the amount of drugs he ingested in direct response to the symptoms of depression he experienced; his goal was very simple. He needed methamphetamines in order to work.

Abby lost battle after battle with Kenny's bipolar mood disorder. In 1986, Kenny attempted suicide and nearly succeeded in killing himself with a shotgun blast to his chest. (Exhibit 147.) Kenny's brother Steve was home at their mother's and witnessed Kenny's suicide attempt:

> In a terrible episode of depression, he tried to kill himself. I was home with Monty and Podgy in the living room watching Carl Sagan kind of stuff on television. Kenny came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenny leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. . . .Kenny was in and out of it, mumbling, making no sense. Kenny was in ICU in Sparks Medical Center in Fort Smith for 11 days.

(Exhibit 99.)

Abby convinced Kenny to see a psychiatrist after he survived the shooting, and he briefly took Elavil and Ascendin.  His dramatic mood swings continued to be "like a roller coaster."  (Exhibit 103.)  Elavil was extremely helpful and made a big difference in Kenny, but he discontinued his treatment.

Kenny continued to decline and was involuntarily committed to Eastern State Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic alcoholism or drug abuse" that created "an immediate likelihood of serious harm to self or others."  (Exhibit 147; Exhibit 33.)  The admitting psychiatrist provisionally diagnosed Kenny with "depressive neurosis with suicidal potential extremely high."  (Exhibit 147.)  The nursing assessment reported that Kenny did "not recognize problems."  (Exhibit 147.)  Kenny had a nine year history of polysubstance abuse.  Kenny hand wrote on a printed questionnaire, "I wish I was back home in the woods."  (Exhibit 147.)

On the mental status examination, Kenny was noted to be "labile" and to laugh "inappropriately at times."  (Exhibit 147.)   His insight and judgment were impaired.  Staff found Kenny to be "courteous, cooperative."  (Exhibit 147.)  Kenny acknowledged that he had "a hot temper."  (Exhibit 147.)  Kenny's highest level of functioning in the preceding year was "poor." (Exhibit 147.)  Kenny reported being anxious and depressed.  He was paranoid and blamed his wife and mother for his being hospitalized.  Kenny was discharged early on October 17, 1986 to his cousin.  His discharge summary noted he "wants to return to work."  (Exhibit 147.)

Kenny was not able to return to work.  Gelene arranged for his second cousins to "pick Kenny up from Eastern State after they had him committed."  (Exhibit 101.)  Nona described Kenny's preoccupation with Abby:

> He stayed with me in Kellyville that first week.  It was apparent how much Kenny loved Abby and he could not get his mind off her.  He was very paranoid, being without her. Gelene hoped that by staying with us he would be in a new environment and do better.

(Exhibit 101.)

Kenny  sustained repeated head injuries from his work and from car accidents.  He was preoccupied and distracted by depression and mania and unable to focus his attention.  He applied for disability due to his mental impairments, and was denied but evaluators found him to be "moderately depressed" and periodically unable to "think clearly."  (Exhibit 147.)  Kenny made repeated trips to the hospital after falling down stairs, sustaining a contusion to the right periorbital region of his head, being involved in a motor vehicle accident, experiencing rib and chest pain, and suffering a rash "all over."  (Exhibit 147.)

When Kenny's marriage ended after 14 years, he "never recovered."  (Exhibit 103; Kenneth Barrett, Divorce Proceedings.)  He and Abby had wanted the marriage to work for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and severe mood swings that came at unpredictable times and derailed their lives.  By the end of their marriage, Abby "felt like [they] were more like brother-sister than wife and husband because [she] was always bailing him out of trouble and taking care of him" and "trying to keep up with his mood swings."  (Exhibit 103.)  Kenny was too impaired to take care of Abby, and she recognized that "he was mentally ill."  (Exhibit 103.)  It pained Abby to leave Kenny because "[t]here were times he could be good. . . .and would try so hard to be good."  (Exhibit 103.)  She also knew that "he could not function without her."  (Exhibit 103.)

After their final separation, Kenny spiraled downward, as Abby had predicted. His multiple impairments made it impossible for him to function independently. He was hospitalized January 20, 1995, given "10 mg of Haldol IM," and diagnosed with bipolar mood disorder after telling hospital staff, "I'm losing my mind." (Exhibit 147.) Hospital staff noted he was "extremely agitated." (Exhibit 147.) During his three day hospitalization, staff reported he was "very agitated" and not able to sleep "for a few days." (Exhibit 147.) He demonstrated "lack of concentration" and "rapid thought process." (Exhibit 147.)

Kenny was discharged to his mother with "outpatient follow-up at the Bill Willis Community Mental Health," but he did not follow through. (Exhibit 147.) Kenny "moved back home" and "built a little shack" next door to his mother's trailer. (Exhibit 99.) His brother visited it and observed that the shack was "almost Waldenish in its own way." (Exhibit 99.) The shack was constructed from discarded and used materials, did not have electricity or plumbing and only had "the essential stuff." (Exhibit 99; Exhibit 97 and Attachment.) Kenny "ran an electrical cord from (Gelene's) trailer to his shack for electricity." (Exhibit 97.) Gelene prepared his meals for him, and he ate at her trailer. Kenny's son, Toby, visited often, but knew that his father had "some problems inside his head" and "always thought he had a chemical imbalance." (Exhibit 96.) Even as a teenager, Toby "knew something was wrong with him because he had mood changes that were not normal." (Exhibit 96.) Toby observed that his "dad could be in the best of moods one minute, then the worst" and was "a very paranoid" and "a very scared person." (Exhibit 96.)

Everyone in the family and Kenny's ex-wife knew he could not "live on his own." (Exhibit 97.) During his and Abby's frequent separations, "Kenny always came home" to his

mother.  (Exhibit 97.)  An aunt explained that Kenny's "only security was with Gelene because he did not have anybody else" to care for him.  (Exhibit 93.)  Kenny's son who had to come to terms with his father's mental illness "had to bring things to him" after his father "stopped leaving his property."  (Exhibit 96.)

Gelene "knew he had serious mental problems" but "hoped if he lived close to [her] and just worked on his cars and fixed things for people, he might be able to make it." (Exhibit 97.)  He stayed more and more to himself and became more and more paranoid, but he was not a loner at all because many friends visited him.  (Exhibit 90; Exhibit 77; Exhibit 95.) Kenny told a neighbor, Alvin Hahn, "he thought there were satellites watching him."  (Exhibit 75.)

As Kenny's paranoia increased, so too did his dependency on family.  His friends knew his paranoia was in full force and was the reason he "hardly left his property for several years."  (Exhibit 95)  His aunt Phyllis understood that he "was never able to be independent as a grown man.  His emotions got in the way of his being able to live too far from home."  Phyllis described an incident that explained how he relied on family when his emotions overcame him:

> [A] couple of years before the incident, Kenny had run to my house in tears, crying,  "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail.

(Exhibit 91.)

Despite the limitations created by his mental impairments, Kenny "would give you the shirt off his back if you needed it."  (Exhibit 91.)  He "tried to stay close to home, always worked hard and took pride in his work."  (Exhibit 91.)  Kenny's family and friends uniformly

reported that Kenny was not violent or dangerous to them. His great aunt Ada stated, "I never felt threatened by Kenny. He did not bother me any, but I worried about him." (Exhibit 74.) Janice, his cousin, grew irritated and impatient with Kenny on more one occasion for playing his music too loud and called the police to Kenny's, but she loved Kenny and "was never afraid of him." (Exhibit 85.) Kenny's maternal aunt Ruth found him to be "sweet person, nice, and respectful" whose drug use "may have hidden his mental illness." (Exhibit 93.) Ruth and her husband, who visited Kenny "to talk about the Bible and how he could straighten out his life" were "never afraid of him" and did not "believe he would intentionally hurt anyone." (Exhibit 93.) Relatives visited and talked with Kenny. His second cousin Nona, who "got along wonderfully" with him counseled him about religion. (Exhibit 101.) Nona described the last conversation she had with Kenny:

> The last conversation I had with Kenny was in 1995-96 when my husband at the time and I visited Gelene. Kenny came by to visit. It was clear to me that Kenny was studying life and thinking deeply, trying to figure things out. I remember he said, "'Aunt Nona, how do you know there's a God?" I took him to the window and said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says we should worship God in spirit and we will see His truth.

(Exhibit 101.)

Friends and family thought at times Kenny would be alright. A friend and neighbor reported that "Kenny had a reputation in the community as an excellent mechanic who was fair." (Exhibit 90.) A cousin, Brandy Hill, remembered that "Kenny was very generous, and his auto repair business was getting more solid every day. People would pay him hundreds of dollars in cash to replace an engine or a transmission." (Exhibit 77.) Despite Kenny's mental illness, his son Toby had "a lot of fond memories of . . . going canoeing, and helping him work

on cars." (Exhibit 96.) Toby was intimate with Kenny's fears but knew that Kenny "was not

dangerous," and Toby "was not afraid of him." (Exhibit 96.) Toby thought that Kenny "did the

best he could" and saw that his father "had a tender side to him" that helped "offset the pain of

having a dad with mental problems." (Exhibit 96.)

The family hoped that Kenny could recover. His mother described their

observations:

> As time went on, he did a little better, built a garage and fixed everything from
> appliances to cars, trucks, and trailers for friends and neighbors. He stayed more
> and more to himself, though, and did not like to leave the property. Friends
> bought him food and went grocery shopping for him. He ate most of his meals at
> my trailer, and I cooked for him. I hoped and prayed he was going to make it. At
> least, I believed, with him living right next door, he was safe and I could keep an
> eye on him. We had our arguments; that's for sure. He was so paranoid and
> crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Exhibit 97.)

### b. Kenny Barrett's mental illness and organic brain dysfunction.

Mr. Barrett's trial counsel had a duty to obtain this information about his family

and his own personal history. This is the story of a unique human being whom jurors never met.

If trial counsel had gathered this readily available information and provided it to a qualified

expert, as prevailing professional norms required, the jury would have understood how Mr.

Barrett's life history, while intrinsically compelling, also has profound implications for a

scientific understanding of his mind and actions. A competent mental health expert would have

seen significant risk factors in Mr. Barrett's background that would have helped explain who he

is and why he would act as he did.

> Both father's and mother's sides of Mr. Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family. Mr. Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children. Mr. Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse. These factors likely potentiated Mr. Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

(Exhibit 117 at ¶ 22.)

An expert presented with the available background data would have informed the jury that Mr. "Barrett's own genetically based potential for developing a mental illness was significantly increased by the circumstances of his upbringing, especially his parents' chemical dependency." (Exhibit 117 at ¶ 30.)

> His parents' dependency and their different, unpredictable behaviors while intoxicated, further compromised Mr. Barrett's ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate perception of social cues and interpersonal interactions. Ernie Barrett was frequently physically absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered emotionally distant and neglectful by her intoxication. These behaviors left Mr. Barrett's parents ill equipped to develop the primary attachments or provide the basic physical and emotional nurturing necessary for a young child's normal, healthy neurocognitive development.

(Exhibit 117 at ¶ 32.)

As Dr. Woods explains, research published by the National Academy of Science documents the impact of such parenting on a child's developing brain:

> *From Neurons to Neighborhoods*, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that affect the developing brain. They also determined that chronic stress is detrimental to the normal development of the brain. ***

[¶]    Parental neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the longest term and most pernicious effects of all such early traumatic experiences.

[¶]    The brain is only starting to grow, mature, and differentiate at the time of birth.  Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated.  The newborn child's interpersonal and environmental experiences determine the rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment.  The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Mr. Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

(Exhibit 117 at ¶¶ 33-35.)

Documents and family history also present experts with data that are important to understanding what chemical and other physical insults touched Mr. Barrett's development.  His mother drank when she was pregnant with him.  Alcohol use during pregnancy is known to be associated with abnormal brain development and brain dysfunction.  (Exhibit 89 at ¶ 23, Exhibit 117 at ¶ 37.)  Mr. Barrett's brain continued to be affected by alcohol and other drugs in adolescence and young adulthood.  His father initiated his drinking at age seven, and drinking and drug use, modeled by his parents, continued from there until it included a vast array of substances and prolonged exposure.  Research informed mental health clinicians that childhood and adolescent intoxication has damaging neurological consequences.  (Exhibit 89 at ¶ 23.)

Mr. Barrett's chemical dependency history is consistent with the high incidence of substance use secondary to the increased neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar disorder. Mr. Barrett's combination of traumatic stress and bipolar disorder predisposed him to chemical

dependency. PTSD and bipolar disorder each have a co-occurring incidence with
chemical dependence greater than 40% in the clinical literature.

(Exhibit 117 at ¶ 44.)

Jurors would want to know whether there were signs that these sources of trauma
and potential impairment had an effect on the young Kenny Barrett. Records kept
contemporaneously, when considered by clinicians, showed evidence of harm.

> As a child, Mr. Barrett exhibited signs of impaired neurological growth, failing to
> meet developmental milestones expected of healthy infants. During his first year,
> Mr. Barrett exhibited increasing delays in areas associated with creating
> interpersonal relations and emotional development. Among other delays, at age
> three months, he did not "observe anyone speaking, inspect hand, laugh aloud,
> manipulate object placed in hand"; at nine months, he did not "knock down block
> houses in play, oppose thumb and forefinger in picking up one-inch cube, wave
> 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial
> expressions, express vocal sounds upon recognition of familiar person or object,
> associate outdoor clothing with being taken out, react to strangers, reach for
> objects persistently, say 'ma-ma' or 'da-da' or equivalent"; at one year, Mr.
> Barrett's mother noticed that he "had trouble learning to walk," and could not
> "drink from cup, put one block on another when shown, say two or three words
> indicating want, play 'pat-a-cake,'" or "show preference for one hand in
> reaching."
>
> [¶]     Mr. Barrett failed reading in the first grade, was required to repeat the
> eighth grade and was eventually referred to special education classes before he
> dropped out of school in the ninth grade. By pre-adolescence his hyperactivity,
> irritability, isolation, and impaired academic functioning introduced the prodromal
> symptoms associated with major mood disorder. He became more hyperactive,
> intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally
> decompensate without apparent provocation.

(Exhibit 117 at ¶¶ 38-39.)

The life history information that was available to trial counsel includes evidence
of other sources of trauma that placed him at risk for organic brain impairment. (Exhibit 89 at ¶
21, Exhibit 171 at ¶ 41.) He was hit in the head with a steel ball when he was eight or nine years

old; at age 17, Johnny Philpot beat Mr. Barrett about the face and head, including a blow that broke his jaw; in his early twenties, he was involved in motorcycle accidents; at age 24, he shot himself in the chest with a shotgun.  *Id.*

If trial counsel had followed prevailing professional norms and had timely retained appropriate mental health experts to assist the defense, Mr. Barrett's jury would have heard extensive evidence of mental illness and impaired brain functions due to organic damage. As explained by Dr. Young:  "The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex."  (Exhibit 89 at  ¶ 28.)

The prefrontal cortex is responsible for executive functioning, which allows an individual to think and reason; solve problems; adapt to circumstances; accurately receive, process and organize information; make rational decisions; and, based on the information that is received, adapt behavior based on experience and make appropriate choices of action.

> More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

(Exhibit 89 at ¶ 26.)

Dr. Young's findings are based on approximately 16 hours of neuropsychological testing, including intelligence testing, a clinical interview including the taking of a history, review of educational records, and a review of psychiatric and medical records. (Exhibit 89 at ¶¶ 20-26.) The objective testing and historical study performed by Dr. Young constitutes an accepted, reliable method for assessing cognitive function. (Exhibit 89 at ¶ 62.) Based on the historical data available at the time of trial and the scientific literature, Dr. Young opines that the damage to Mr. Barrett's prefrontal cortex likely stems from abnormal prenatal development, traumatic brain injuries Mr. Barrett suffered, and drug abuse. (Exhibit 89 at ¶¶ 63-65.)

Like any other person, Mr. Barrett has areas of weakness and areas of strength in the many brain functions evaluated by a neuropsychological test battery. However, testing shows Mr. Barrett is impaired in some areas which means that he functions at a level below the average person, and sometimes far below. The testing data and congruent findings on psychiatric study show Mr. Barrett experiences dysfunction in areas of his brain

> that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use

of hindsight and foresight in the direction of current processing.  Mr. Barrett suffers significantly impaired functioning in all these domains.

(Exhibit 117 at ¶ 58.)  In less scientific terms, Mr. Barrett has brain damage that makes him less able than a normal person to process information and formulate a rational response.

Mr. Barrett's temporal cortex is also damaged or otherwise dysfunctional, and in ways that complement (aggravate) his other impairments, as they relate to culpability in the death of Trooper Eales.  The temporal cortex controls verbal and visual memory, as well as learning, interpreting and processing speech and the emotional tones and meaning in speech.  The temporal cortex is also responsible for processing visual information.  Dysfunction of the temporal cortex is associated with, among other things, amnesia, fear, paranoia, impulsivity, and outbursts of aggression.  (Exhibit 89 at ¶¶ 36-77.)

Based on Dr. Young's findings and his own assessment, psychiatrist George W. Woods, Jr., M.D. concludes that Mr. Barrett experiences dysfunction in the areas of the brain that are necessary to sound reasoning, judgment and planning.  That is, "Mr. Barrett . . . suffers from a Dysexecutive Syndrome, which would be categorized on Axis III" of the DSM-IV-TR™.  (Exhibit 117 at ¶ 67.)  In other words, Mr. Barrett's ability to accurately and appropriately process, retain, integrate and respond to information and events as they unfold is significantly compromised.  (Exhibit 117 at ¶ 58.)

The areas in which Mr. Barrett experiences impairment make understanding his functioning a necessary part of understanding him as a unique human being trying to get along in the world, and for understanding the events of September 24, 1999.  The problems Mr. Barrett

has experienced from organic brain impairments are compounded and exacerbated by severe

psychiatric illness.

> Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder,
> severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe,
> 309.81.   * * *  Mr. Barrett's clinical profile medically indicates cognitive
> functioning and behavior that is severely compromised by overlapping symptoms
> of depression and mania – diagnostic of Bipolar and secondary to PTSD – and
> impairments in higher cortical regions necessary for inhibition, reasoning and
> judgment.

(Exhibit 117 at ¶ 66.)  As Dr. Woods states it, Mr. Barrett's cognitive functioning and behavior

"is severely compromised by overlapping symptoms of depression and mania ... and

impairments in [the] higher cortical regions necessary for inhibition, reasoning and judgment."

(Exhibit 117 at ¶ 66.)

The development of Mr. Barrett's bipolar disorder was strongly influenced by his

familial predisposition to this and other mental illnesses.  As shown in the attached medical

records and summarized *supra*, Mr. Barrett comes from a family plagued with bipolar disorder.

The onset of his organic brain damage can likely be traced not only to early head trauma, but his

mother's drinking while pregnant, and other factors.  (Exhibit 117 at ¶¶ 63-65.)

Dr. Woods explains that people with frontal lobe damage, and people with

Bipolar Disorder share suffering in significant areas of daily functioning.  "Both groups of

patients perseverate in that they continue to select stimuli in accordance with a previously

enforced rule that has been changed by the examiner and thus become [sic] incorrect."  (Exhibit

117 at ¶ 59.)

> Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to
> integrate multiple environmental occurrences into a coherent picture, is based
> upon the neurocognitive deficits objectively identified by Dr. Young. These types

of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

(*Id.* at ¶ 60.)

Mr. Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses. Mr. Barrett's personal and family history, as set forth *supra* and as documented in the exhibits to this Petition, is replete with incidence of major mental illness, including Bipolar Disorder. A qualified clinician would have explained the significance of this remarkable history to jurors.

[¶]    Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult. The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

[¶]    The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

[¶]    Mr. Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Exhibit 117 at ¶¶ 63-65.)

In other words, "Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial." (Exhibit 117 at ¶ 68.)

If trial counsel had informed themselves regarding Mr. Barrett's history, and consulted relevant experts, the jury too would have been informed that

[¶]   Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.

* * *

[¶]   Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

[¶]   Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

[¶]   He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

[¶]   Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

[¶]   Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of

emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

[¶]      Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor.  Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

[¶]      Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme.  He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce.  Mr. Barrett had become increasingly withdrawn, by everyone's account.  He reported to me that the years from his divorce and the raid on his home were the darkest of his life.  He was self medicating more heavily than ever before.

[¶]      Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property.  This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation.  His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

[¶]      My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

Trial counsel had available to them some resources for obtaining mental health evidence to present in mitigation. If trial counsel had contacted Dr. Bill Sharp, who had done a preliminary evaluation during the state-court proceedings, he would have been able to rely upon the additional social history data and neuropsychological findings. (Exhibit 55 at ¶ 16.) Dr. Sharp concurs in the findings of Dr. Young and Dr. Woods. (*Id.* at ¶ 23.)

> Taking [the social history] information into account and Mr. Barrett's assessment by myself, Dr. Young, and Dr. Woods, one could conclude that Mr. Barrett's response to the raid on his property was impulsive and not thought-out. I liken the situation to a person being surprised in the night by an unexpected phone call or alarm clock. In general, someone in those circumstances will experience some disorientation and difficulty understanding events. For someone with Mr. Barrett's mental impairments those experiences would be magnified many times over. For a normally functioning person to understand how Mr. Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

(*Id.* at ¶ 24.)

Armed with the available information, trial counsel would have been able to persuade the jury on multiple fronts including (a) doubts about the truthfulness and motivations of the prosecution's informants; (b) doubts about the need for a no-knock warrant (including whether Mr. Barrett could have failed to appear for a trial that was not going to happen); (c) the inappropriate nature of the raid and the tactics that call into doubt whether Mr. Barrett could have seen that his attackers were law enforcement officers; (d) that the Tact Team recklessly approached a man who was hyperreactive, who had been suicidal, who was extremely paranoid, and whose teenage son was threatened; (e) that Mr. Barrett had pre-existing, organically induced impairments in the abilities to solve problems, the ability to engage in goal-directed behavior, the ability to plan strategically, the ability to anticipate the consequences of his actions, the ability to

see the "big picture," and the ability to be mentally flexible rather than rigidly persist in an action that new information indicates is inappropriate; (f) that apart from the conditions existing at the time of the offense, Mr. Barrett grew up in an environment of alcoholism, violence, selfishness, abuse, and neglect; (g) that he struggled to overcome the burdens of his background and mental impairments but in doing so fell into drug abuse that exacerbated these problems.

As elaborated in the conclusion to Mr. Barrett's second stage ineffective assistance of counsel arguments, trial counsel had a clearly defined duty to investigate, develop and present this mental health evidence in the penalty phase of trial. The mental health evidence that could have and should have been presented on Mr. Barrett's behalf was not only powerful evidence in mitigation of punishment, as the Supreme Court has recognized repeatedly, but was also directly relevant to refuting the statutory aggravating circumstances that Mr. Barrett *knowingly* created a grave risk of death to one or more persons in addition to Trooper Eales, and that Mr. Barrett committed the offense after substantial planning and premeditation.

The evidence presented here shows both that trial counsel's lack of investigation and expert consultation fell below the objective standards of reasonableness codified in the ABA Standards and Guidelines and in case law. There was abundant undisclosed mitigating evidence which, taken as a whole, might well have influenced the jury's appraisal of Mr. Barrett's culpability. Had the jury been able to place the evidence related to both phases of trial on the mitigation side of the scale, there a reasonable probability that at least one juror would have struck a different balance. Accordingly, the sentence of death should be vacated.

### c.  The prosecution's exploitation of trial counsel's deficient performance.

Not surprisingly, the inaccurate, incomplete and misleading portrayal of Mr. Barrett and his background and character given by the extremely superficial and unprofessional "mitigation case" that was placed before the jury was ripe fodder for ridicule by the prosecutors in closing arguments. Due to the unreasonable failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance. (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22). Due to trial counsel's unreasonable failure to inform the jury regarding Mr. Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Mr. Barrett as a prime candidate for the death penalty.

Prosecutor Littlefield ran down a list of the few, bare-bones mitigating circumstances that were instructed upon based on the evidence presented. Littlefield noted the jury had been told Mr. Barrett was simply a "father," which involved no more than a biological process. Left unsaid was what kind of father he was. The prosecutor also ridiculed the claim that Mr. Barrett was a loved son and stepson, remarking that what was missing was any feelings Mr. Barrett had for his parents. It was pointed out that Ernie Barrett had not seen his son for two years before the shooting of Trooper Eales, and that his stepmother had only had contact with him after he was in jail. As to Mr. Barrett's relationship with his mother, Gelene Dotson, the

prosecutor pointed out that they had a tumultuous relationship with frequent arguments, fights

and threats between them.  Mr. Littlefield remarked that Mr. Barrett's parents cared so much for

him that they could not tell the difference between him being "hyper" and being "hyped up" on

drugs.  As to Mr. Barrett being a good neighbor and friend, the prosecutor reminded the jurors

that all they heard was that he fixed cars cheaply.  Dismissing the mitigating circumstance that

Mr. Barrett's execution would have an impact on his child, family and friends, the prosecutor

was quick to point out that since Toby Barrett had not testified, there was no evidence that Mr.

Barrett's death would have any negative impact on his own child.  Indeed, the only testimony

regarding the impact of Mr. Barrett's execution on his family came from his stepmother, Doris

Barrett, who would no longer be able to visit Mr. Barrett in prison.  Making short work of the

claim that Mr. Barrett had expressed remorse, Littlefield told the jury that Mr. Barrett only told

his mother that he wished things had turned out differently.  This ambiguous statement was used

as a springboard for the prosecutor to argue that by this, Mr. Barrett simply meant that he was

sorry he had gotten caught and was prevented from "killing more of the bastards."  Finally, the

"catch-all" instruction on any other factors the jury might find to be mitigating opened the door

for more negative characterizations of Mr. Barrett, whom the prosecutor described as having

dropped out of school because he did not want to get a haircut; as a user and seller of

methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that

he allowed him to remain on the property knowing full well that a police raid, which was going

to be met by lethal force, was imminent.  (R. 5354, 5356.)

Since virtually nothing of Mr. Barrett's background, history and upbringing was

placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as

simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Mr. Barrett.  (R. 5358.)

Picking up the theme that Mr. Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.  Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."  Kathy Trotter was dismissed as a witness who knew very little about her cousin, Mr. Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.  Mr. Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Mr. Sperling contrasted Mr. Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."  Mr. Sperling pointed out that Mr. Barrett had only sporadic contact with his mother until his arrest, hinting that he was a bad and neglectful son.  Ernie Barrett, being the good father that he was, gave Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow] them."  Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication being that her loyalty was more a tribute to her than anything positive or redeeming about Mr. Barrett.  Whatever Mr. Barrett had done for his family was vague and undetermined, and was in any event far outweighed by the crimes he had committed.  If the jurors were tempted to feel any

sympathy for Mr. Barrett's family at all, they should remember that Mr. Barrett abandoned his

family by his own conduct.  Mr. Sperling stated that Mr. Barrett had "victimized" his own family

by making them serve as "props" or witnesses on his behalf in the penalty phase.  Concluding his

remarks on Mr. Barrett's mitigation case, Mr. Sperling told the jury that Mr. Barrett had paid for

his membership among "the worst of the worst."  Mr. Barrett was simply a murderer who had

killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for

his victim.  (R. 5417-20.)

The record and extra record evidence establishes that Mr. Barrett's trial counsel

first possessed some information about Mr. Barrett's background in late May 2005.  By the

beginning of July, trial counsel were searching about for a mitigation specialist.  In August, trial

counsel learned it was essentially too late to develop a social history and mental health diagnoses

informed by that history.  In September, the month the trial began, trial counsel were again

searching about for information they should have had the previous December.  The evidence

shows trial counsel never contacted the mitigation specialist the trial court authorized, and never

obtained all the records of the state-court mitigation investigation.  Trial counsel's statements on

the record establish that they made no effort to obtain a psychiatric or psychological evaluation of

Mr. Barrett, and merely repackaged, at the last possible minute or later, the risk assessment done

years earlier at the request of state-court counsel.

Prejudice from trial counsel's failures to properly investigate and present available

evidence in mitigation, exacerbated by the trial court's funding restrictions (*see* Ground Three),

is manifest because the Government's case for death was hardly overwhelming.  The jury

rejected the death sentence on Counts 1 and 2.  Even though the death sentence was imposed on

Count 3, the jury rejected the non-statutory aggravating circumstance that Mr. Barrett would constitute a continuing threat to society. The statutory aggravating circumstances the jury did find all revolved around the circumstances of the commission of the offense (which, it should be noted, would have been viewed in an entirely different way had counsel not rendered ineffective assistance in the guilt/innocence stage). Especially where, as here, the case for death was not overwhelming, prejudice from counsels' unprofessional performance is readily apparent.

Due to the lack of investigation, the jury was uninformed of Mr. Barrett's background, the desperate alcoholism of his parents, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging harsher treatment he experienced from his mother, his father's abandonment of the family, moving from place to place due to the parents' inability to sustain a life, and finally landing in Sequoyah County. There Kenny Barrett's head injuries and genetic vulnerability to mental illness overtook him. He developed Bipolar Disorder and exhibited the symptoms of his organic brain damage. Despite the mania and paranoia, the hypervigilence, hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local sheriff, all knew that Mr. Barrett would have gone peacefully into custody if someone he knew had simply asked him to. The overwhelming weight of the evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation. Just as Trooper Eales should not have been put in danger, Mr. Barrett should not have been sentenced to death.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐      No ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This is a claim of ineffective assistance of trial counsel, which is properly raised for the first time in post-conviction proceedings, because it relies largely on evidence and investigation outside the trial record.  To the extent any of the individual claims of ineffective assistance of appellate counsel could have been raised on direct appeal, appellate counsel was ineffective. Claims of ineffective assistance of appellate counsel are properly raised for the first time in post-conviction proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐      No ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. [section sign] 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

     Yes  ☐       No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

     Yes  ☐       No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

     Yes  ☐       No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND THREE**:

> **Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Transcripts, Expert and Investigative Assistance under 18 U.S.C. §§3005 & 3006A.**

(a)     Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

     Mr. Barrett incorporates by specific reference all facts, allegations and arguments

made elsewhere in this petition, and all supporting exhibits, as well as all facts, allegations and

arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The trial court violated Mr. Barrett's constitutional and statutory rights by denying him expert assistance that was lawful, necessary, and appropriate under the circumstances of the case. The types of lawful witnesses to which the trial court denied Mr. Barrett fair access included a psychiatrist, neuropsychologist, psychologist, mitigation specialist, ballistics expert, independent fact investigator, an independent expert on SWAT team practices, a metallurgist, a drug analyst, crime scene reconstruction expert, and a jury consultant. The complete or partial denial of these expert and investigative resources was prejudicial both individually and in combination.

In addition to the denial of expert and investigative assistance afforded other capital defendants, the trial court denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial. (Order filed 3/18/05 (Doc. 97) at 6-7.) Mr. Barrett was plainly entitled to those transcripts pursuant to Chapter 2, section 2.27, and Chapter 3, section 3.12(A) of the Guidelines for the Administration of the Criminal Justice Act. Effective trial counsel, or the trial judge, should have known that it was unnecessary for counsel even to seek reimbursement for transcripts as the court reporter would normally be independently compensated through the Criminal Justice Act. The trial court's decision to reject these Judicial Conference guidelines was arbitrary and capricious. The error was particularly prejudicial because it denied or delayed Mr. Barrett's trial counsel access to the trial court's *ex parte* communications with the prosecutors until it was too late. *See* Grounds One and Two, *supra*.

Mr. Barrett had a history of psychiatric treatment, including involuntary hospitalization and forced medication with psychotropic drugs. (Exhibit 117; Exhibit 147.) Trial counsel were aware, or should have been aware, of this history. (*See* Doc. 208; Exhibit 147; Muskogee County Jail Medical Records of Kenneth Barrett; Exhibit 118.) In addition, Mr. Barrett had a history of illicit drug use and of head injuries. Furthermore, he has a multi-generational predisposition to developing serious mental illness, including the Bipolar Disorder for which he was medically diagnosed prior to the events in question. These factors, together with his developmental and trauma history, indicated the forensic appropriateness of performing a comprehensive neuropsychological evaluation to assess the presence and effects of brain dysfunction which, again, had a medically indicated onset prior to his arrest. (Exhibit 118; Exhibit 89; Exhibit 117.)

Counsel requested the assistance of a neuropsychologist to perform testing, as well as of a medical doctor to explain the significance of this combination of medication, and other drugs and injuries, including the significance of any discontinuation of treatment. Nonetheless, the trial court would permit Mr. Barrett's counsel the assistance of a psychiatrist or a psychologist, but not both. (Order filed 3/18/05 (Doc. 97).)

In light of the information known or available to Mr. Barrett's trial counsel, prevailing norms of capital defense practice required that they consult with experts whose training and experience were appropriate to addressing Mr. Barrett's history and the needs of the litigation. The appropriate experts included a medical doctor who could diagnose and explain the functional impact of Mr. Barrett's mental disorders, a neuropsychologist who could determine the location, nature and severity of Mr. Barrett's probable brain dysfunction, and a

mitigation specialist qualified to gather data in a manner consistent with the clinical protocols of mental health professionals when considering social history and medical information in the course of forming their opinions.   (Decl. Richard H. Burr dated 4/4/05, filed as Exh. C to Doc. 107, at 4, 8.)  To the extent trial counsel failed to apprise the court of the specific need for psychiatric assistance, or the assistance of any other expert or investigator, their conduct fell below prevailing professional norms.  *See also* Ground Two, *supra*.

Trial counsel informed the trial court that the court's refusal to permit more than one mental health professional to assist in Mr. Barrett's defense was contrary to law, the Judicial Council's Guidelines for the administration of the Criminal Justice Act, and the practice of district courts in numerous other federal death penalty cases with similar circumstances.  (Docs. 107, 112; Exhibit 53.)  "The standard practice in federal capital trials is to provide the services of more than one mental health expert."  (Decl. Richard H. Burr, filed as Exh. C to Doc. 107.) Counsel also informed the court that authorization for a single expert at the cut rates permitted by the court made it impossible to retain an expert competent to provide the necessary assistance, and that the court's authorization was inadequate to develop defense evidence or to rebut the prosecution evidence at both stages of trial.  (Docs. 107, 112; Exhibit 118.)

The court's denial of psychiatric assistance for Mr. Barrett's defense was prejudicial.  Trial counsel informed Dr. Russell in August 2005 that the court would not fund a thorough investigation for mitigating circumstances.  (Exhibit 56.)  As stated in the attached declaration of George W. Woods, M.D., a psychiatrist retained at the time of trial would have provided Mr. Barrett with evidence to rebut the prosecution's theory of malice aforethought and intent, and would have provided abundant mitigation evidence.  *See* Ground Two, *supra*.

In addition to the outright denial of psychiatric assistance, the trial court arbitrarily denied funding for all expert and investigative resources that were necessary for Mr. Barrett to receive adequate representation. (*Compare* Doc. 51 *with* Order filed 3/18/05 (Doc. 97).) Contrary to Judicial Council Guidelines, and the ABA Guidelines, contrary to the Supreme Court's recognition that death penalty cases demand a higher level of due process, and contrary to the tendency of experts, investigators and other paraprofessionals to charge more for the more exacting work required by capital cases, the trial court consistently based its funding decision on a comparison to non-capital cases in the Eastern District. (Order filed 5/5/05 (Doc. 128) at 3 n.1, 4, 6.)

Mr. Barrett's counsel demonstrated the need for a psychologist to assist in preparation of the defense. (*See* Order filed 3/18/05 (Doc. 97) at 3.) Counsel sought this expert for purposes similar to those envisioned by the Government in retaining Jim Horn. (*See* Doc. 50 at 5-6.) Counsel informed the court that a psychologist could not be retained for less than $150.00 per hour, and estimated 60 hours would be needed (Doc. 50 at 5-6), but the court limited the defense to 40 hours at $100.00 per hour. This was despite the fact that the court had been informed that this reduced hourly rate was 30-60% below the hourly rate of $150-250 authorized by federal courts for such services in death penalty cases. (Exh. C to Doc. 107, at 8.) The court gave no reason for this restriction and cited no information upon which the court could have found that any competent psychologist would have worked for the approved rate.

Mr. Barrett specifically sought the assistance of a psychologist who had assisted in the preparation for trial, and testified in the penalty trials, of other federal death penalty defendants. (Doc. 107.) That psychologist had been compensated in other similar cases at a rate

of $270.00 per hour, and counsel advised the court that he could complete his work in 30 hours. (*Id.* at 3-4.)  The court denied the request without explanation.

Mr. Barrett sought the assistance of a mental health expert who was competent to diagnose organic brain dysfunction.  (Doc. 50 at 8.)  Counsel justified this request with the findings of prior investigations, including that Mr. Barrett had used drugs known to cause brain damage, and that he had suffered significant head injuries during his life.  (*Ibid.*)  Except to the extent the assistance of such an expert was included in the authorization for a psychologist, the court denied this request without explanation.  (Doc. 97 at 3.)  This summary denial was highly prejudicial to Mr. Barrett.  The only expert on whom trial counsel attempted to rely, Dr. Russell, had not evaluated Mr. Barrett for mental illness or organic brain dysfunction.  (Exhibit 56.)  As shown in the attached declaration of Myla Young, Ph.D. (Exhibit 89), Mr. Barrett's history of insults to his brain resulted in significant impairments in his functioning.  (*See* Ground Two, *supra*.)

Mr. Barrett's counsel, in consultation with a mitigation specialist, Federal Death Penalty Resource Counsel, and the Federal Defender, concluded that a mitigation specialist would require more than 333 hours and $5,000.00 in travel costs.  Counsel and the mitigation specialist based this estimate on the knowledge gained in a preliminary investigation conducted before Mr. Barrett's first state-court trial.  (Docs. 50, 107.)  A mitigation specialist is an essential member of the team in a capital case.  (ABA Guideline 10.7.)  Without explanation, the court

limited the mitigation investigation to 100 hours and no travel.[35]  As resource counsel informed

the court at the time,

> The number of hours requested by the defense is well below average.  The average number of hours worked by mitigation specialists in federal capital cases is 600 hours.  In a number of cases, mitigation specialist services have exceeded 1000 hours.  Investigating a client's life history thoroughly - through gathering and reviewing documents and interviewing scores of witnesses who are often difficult to find - and working with counsel and other experts to develop the themes of mitigation and the way in which mitigation will be presented, is extremely labor intensive.  The modest number of hours requested by the defense here reflects the hope that the mitigation investigation previously conducted, but not completed in the state prosecution will be of use in the current investigation.  Measured against the number of hours authorized for mitigation specialist services in every other capital case in which the death penalty has been authorized, the 100 hours approved by the Court is grossly inadequate.

(Exh. C to Doc. 107 at 4.)

The court's withholding of resources was highly prejudicial.  Shortly before trial,

trial counsel turned to Dr. Jeanne Russell, for whom the court had approved some funds, and

asked her to conduct a mitigation investigation.  (Exhibit 56.)  Dr. Russell was not qualified to

perform that role, even if trial counsel had contacted her in time, which he did not.  (*Id.*)  Trial

counsel informed Dr. Russell that the defense's efforts were hampered by the court's refusal to

approve resources for a comprehensive mitigation investigation.  (*Id.*)  As shown in the social

history presented in Ground Two, Part B, and the numerous declarations cited therein, a

reasonable mitigation investigation, including travel to the various states in which Mr. Barrett

lived as a child and adult, would have produced abundant mitigation evidence.

---

[35]  The court authorized "100 hours at $150.00 per hour" apparently without realizing that the mitigation specialist counsel had consulted quoted a rate of $75 per hour.  (*See* Doc. 107.)

Mr. Barrett sought 300 hours of investigative assistance at a rate of $50 per hour.

(Doc. 50 at 4.)  The court permitted only 100 hours of investigation, and limited it to those areas

in which counsel could show a particularly acute need.  (Order filed 3/18/05 (Doc. 97) at 2.)

"The average number of hours approved for fact investigation in authorized cases is closer to 500

hours."  (Exh. C to Doc. 107 at 3.)  The Court was aware that this rate was considered reasonable

by experts in relation to the practice in other federal capital cases.  Moreover, despite the

preauthorization, the court, contrary to Judicial Conference guidelines, conditioned payment of

an investigator on counsel persuading the court with "detailed statements regarding the exact

factual issues investigated and the significance of those facts to the evidence which counsel

anticipates will be admitted at trial."  (Order filed 3/18/05 (Doc. 97) at 2 n.2.)  The court

prohibited the investigator from working at market rates, and required him to work at the same

rate as state-subsidized investigators working for salary at the Oklahoma Indigent Defense

System ("OIDS") even though state-subsidized investigators were not available to Mr. Barrett.

(Order filed 5/5/05 (Doc. 128) at 3 n.1.  *See also* Exhibit 111.)

At a minimum, the restrictions the court placed on investigation chilled inquiry.

Compared with his other cases, Mr. Barrett's investigator *lost $20.00 each hour* he worked on

Mr. Barrett's case.  Moreover, the court's requirements for approving vouchers meant there was

no guarantee any specific amount of time would be compensated at all.  The investigator could

work many hours on an issue only to find after he submitted a voucher that the facts he had

investigated were not, in the court's view, significant to evidence that would be used at trial.

The Government relied extensively upon testimony regarding the trajectory of

bullets during the raid on Mr. Barrett's house.  Mr. Barrett's counsel requested the assistance of

an expert, Edward E. Hueske, to assist in responding to the Government's evidence, performing

up to 80 hours work, billed at a rate of $200.00 per hour, in addition to $1,000.00 for lodging,

travel and incidentals. (Doc. 50 at 7.) While the Government faced no limits on its ability to

marshal this type of evidence, the court, again without explanation, authorized less than one

fourth the amount Mr. Barrett's counsel and the expert they consulted determined was reasonably

necessary to confront the Government's case. (*Compare* Doc. 50 at 7 *with* Doc. 97 at 3 *and with*

18 U.S.C. § 3005). Moreover, the court did not authorize any lodging or travel expenses

whatsoever which would have made it impossible for a defense expert to observe the testimony

of the Government's expert and impossible for the defense expert to travel to Oklahoma to

testify.

After advising Mr. Barrett's counsel that "this Court has[] never allowed crime

scene reconstruction to be introduced in trial" (Doc. 97 at 3), and at the same time denying Mr.

Barrett seventy-five percent of the time and one hundred percent of the in-court assistance

counsel needed from Mr. Hueske, the Court admitted the Government's crime scene

reconstruction evidence without reservation. As a result of the Court's denial of funds, it was

impossible for Mr. Barrett to have an expert present either to challenge the admissibility of the

Government's testimony under Federal Rule of Evidence 702, or to assist with cross-examination

of the Government's "expert." To the extent the Court's statement about its past practice

regarding crime scene reconstructions misled counsel into foregoing expert assistance, the

Court's interference with the defense went well beyond the mere denial of funds and constituted

active interference in the functioning of the defense. *See* Ground One, *supra*.

The court's denial of funds for ballistics and crime scene reconstruction experts was prejudicial. As set forth in Ground Two, *supra*, if trial counsel had been able to consult with an expert prior to trial, they could have presented evidence to exclude the testimony of Iris Dalley, an "expert" who was central to the Government's theory of how the shooting took place, including whether Mr. Barrett was in a position to see emergency lights when the shooting started. Even if counsel had not succeeded in excluding that testimony entirely, counsel would have been far better able to rebut it. For example, if counsel had been able to employ adequate expert services, at a minimum, Mr. Barrett would have shown the following:

i.      Dalley failed to follow standard protocol by omitting the measurement of the objects through which she claimed bullets passed;

ii.     Dalley failed to follow accepted methods by using magnification and/or chemical analysis to detect the presence of gun shot residue, blood, tissue, hair, fibers or other matter around bullet holes;

iii.    Dalley falsely claimed she could not determine the caliber of bullet holes in the Bronco whereas the determination could have been made with standard tools and methods;

iv.     Dalley offered misleading testimony, beyond the scientific bounds of her methodology, when she claimed that the trajectories she identified for bullet fragments were "accurate" while the method she used could not provide an accurate trajectory;

v.      Dalley selected descriptions of the evidence to fit the Government's theory when she described the trajectories of bullets that passed through the door of the Bronco;

vi.      Dalley's diagrams and animation were not based on accepted methods, and she testified falsely when she claimed she lacked the necessary equipment to create data with which other experts could attempt to reproduce her findings based on those diagrams and that animation;

vii.      Dalley failed to use available, accepted methods (such as a plumb line) to determine the grade of the terrain on which the shooting occurred;

viii.      Dalley failed to employ proper methods of chemical analysis before concluding that holes of questionable origin came from bullets;

ix.      Dalley misrepresented the facts when she claimed there was "no means of sequencing any of the shots," while the truth was that she did not employ the available means to determine whether they would produce reliable results, i.e. Dalley ignored scientific methods that might have invalidated her claims;

x.      Dalley failed to use accepted methods for determining the trajectory of bullets that struck a moving vehicle, failing to move the Bronco back to the place where it initially came to rest, and ignoring another standard practice that might have invalidated her findings; Dalley employed scientifically inappropriate methods for making claims about the trajectory of bullets that passed through the window of Mr. Barrett's cabin;

(k)     Dalley overstated her ability to estimate the distance of a firearm from the cabin window based on a rule of thumb, and ignored more reliable methods that might have contradicted her theory;

(l)     Dalley failed to use the standard tool of a metal detector to locate any bullets or fragments in the soil;

(m)     Dalley failed to follow an essential, generally accepted protocol for reconstructing a shooting scene when she did not attempt to collect all the bullets or fragments from the interior of the Bronco;

(n)     Dalley's conclusion regarding the location of Trooper Eales' arm when it was struck was based on her failure to examine the surrounding area for tissue or blood, and her violation of a cornerstone of forensic science.

(Exhibit 109.)

The trial court denied Mr. Barrett due process, equal protection, and his statutory rights to develop a defense by denying him meaningful access to an expert in law enforcement tactics. As stated in Ground Two, *supra*, trial counsel sought funds to retain Dr. George Kirkham, a criminologist, sworn law enforcement officer, and expert in police tactics. (Doc. 50 at 5.) Counsel informed the court that Dr. Kirkham charged a flat rate for pretrial review and preparation, and that he would need to travel from his residence in Florida. (*Ibid.*) The trial court, without explanation, refused to authorize Dr. Kirkham's rate, arbitrarily limited the defense to 40 hours of services at $100.00 per hour, and denied funds for Dr. Kirkham to travel. (Doc. 97 at 3.)

As stated in Ground Two, *supra*, if trial counsel had been able to retain Dr. Kirkham, or had been diligent in pursuing his services, the jury would have heard that the raid on Mr. Barrett's home (a) violated – indeed, was converse to – established law enforcement standards and procedures in that it relied upon force and aggression before any other methods were explored; (b) was carried out in a way that minimized the chances of Mr. Barrett having visible evidence that his attackers were law enforcement officers and no audible evidence of law enforcement's presence; ©) was carried out in a way that trained law enforcement officers would expect to provoke a violent response from the target; and (d) unnecessarily exposed Troopers Hamilton and Eales to gunfire from the cabin and other law enforcement officers.  Dr. Kirkham would have explained how these things are just as true if the jury credited the testimony of the Government's seven informants, as they were when the second state court jury, without the testimony of those witnesses, acquitted Mr. Barrett of first-degree murder.  (Exhibit 44.)  That is, with expert assistance, Mr. Barrett would have been able to show that he did not have the intent to kill law enforcement officers, or, at a minimum, that there was every reason to doubt the Government's claim that he had such intent.  Jurors at the second stage or trial would have had ample grounds to vote for a sentence less than death if they had known of the errors made in deciding upon, planning, and conducting the ill-fated attack.

To the extent the trial court's denial of expert and investigative resources could have been raised on the existing record, appellate counsel was ineffective for failing to raise the claim.  *See* Ground Eighteen, *infra*.  Trial counsel Hilfiger, who also was counsel on appeal, had a conflict of interest which prevented him raising this claim, insofar as he failed to make use of the resources the trial court had authorized.  *Id.* and Ground One, *supra*.

The record and extra-record evidence establishes that the trial court's denial of resources was not harmless and was highly prejudicial. Mr. Barrett could have presented substantial evidence to counter the Government's case at both stages of trial. The trial court's denial of access to this evidence violated Mr. Barrett's right to due process, to confront adverse witnesses, and to effective assistance of counsel.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)   **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐   No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)   **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐   No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the

judgments of conviction and sentences; this issue is properly before the court in a "first" post-

conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐        No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐        No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐        No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND FOUR**

> **Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Were Ineffective for Failing to Raise the Issue on Direct Appeal.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

As shown in Ground Two, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress, the trial record itself established the Clint Johnson warrant was invalid.  Suppressed *Brady* material and other evidence gathered in support of this 2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case *was* Sanders.  If Sanders is unreliable, his information is *per se* unreliable.  Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting

information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

Sanders could not be relied upon to provide reliable information. No reasonable person could put stock in anything he says. Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999. Numerous other felony charges against him were dismissed because of his work as a snitch. He always had a motive to lie against others to get out of his own scrapes with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community. His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention a laundry list of other felonies. He has a history of promising to appear in court and then failing to appear. He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation. He is a long time drug addict. Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth. Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave. All this was known about Sanders in 1999, and it has only gotten worse.

At the time he signed the affidavit, Clint Johnson was aware of Sanders's lack of reliability, and Johnson himself intentionally ignored evidence of Sanders's then-current drug

usage, crimes of dishonesty, and Sanders's inability to see evidence of drug activity at Mr.

Barrett's residence during the critical time.  Yet Johnson still relied on this miscreant as a

"reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to

produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from

several people in the community, including one of Sanders's uncles, who say without reservation

and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that

this is the opinion by acclamation in the community as a whole.  (Exhibit 90; Exhibit 70; Exhibit

94; Exhibit 76; Exhibit 13; Exhibit 95.)  Sanders claimed that he and Janesse Thomas bought

drugs at Mr. Barrett's a few days before the shooting incident.  Ms. Thomas says this is

absolutely false.

Is it to be believed that the community as a whole regards Sanders as thoroughly

dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable

informant, about whom nothing had to be revealed to a reviewing magistrate?  It simply does not

wash.  Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders

for information about Mr. Barrett or anyone else, let alone presenting that information in a search

warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's dishonesty.

As stated in Grounds One and Two, Mike Littlefield informed the court of a witness who failed

to corroborate Sanders.  This would have assisted in establishing a *Franks* claim, and in generally

impeaching Sanders, but the evidence was never revealed to the defense.  The transcript of this

hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself.  The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts, deceit and corruption,  including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence.  Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced.  In sum, Johnson and Sanders were birds of a feather:  both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the C.I.  that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance.  (Exhibit 6.)

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable. Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate.  Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to

escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause.

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant. In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth. Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument. (Exhibit 29.) *See* Ground Eighteen, *infra*. Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in this motion, and specifically requests a *Franks* hearing, or its equivalent. He has more than made the requisite showing.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)　　**Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes　☐　　No　☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)　　**Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes　☐　　No　☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes  ☐       No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes  ☐       No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes  ☐       No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND FIVE**

> **Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

     Mr. Barrett incorporates by specific reference all facts, allegations and arguments

made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and

arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The prosecution in Mr. Barrett's case suppressed, before, during and after trial, exculpatory evidence relevant to several key witnesses. Deals or leniency given to these witnesses in exchange for their testimony in Mr. Barrett's case and, with respect to Charles Sanders, deals he received in other cases because of his supposed work as an informant, were not disclosed. Threats to witnesses to get them to cooperate with the Government were not disclosed. Relevant to this were the ongoing criminal activities of former AUSA Mike Littlefield, which came to light in 2007, when he was allowed to enter an *Alford* plea in Muskogee County District Court to charges of physically abusing his own children, the relevance of which is explained in Ground Five, Part B.2, *infra*. Among other misdeeds, Littlefield suppressed exculpatory evidence regarding one of the seven informant witnesses that was made known to the court during the improper *ex parte* hearing on the Government's motion to delay disclosure of the identities of its seven informant witnesses, but never disclosed to the defense. (*See* Ground One, *supra*.)

Some of the evidence discussed below was relevant not only to the credibility of witnesses, but the propriety of the initial nighttime, no knock search warrant that was secured by Drug Task Force agent Clint Johnson, based on the good word of Charles "Monk" Sanders. The Government or its agents were aware of numerous impeaching facts regarding acts of dishonesty and criminality of Clint Johnson and his girlfriend, OSBI agent Vickie Lyons, none of which were revealed to the defense.

Most egregious of all, the Government knowingly used perjured testimony from Randy Turman, who claimed that a Sequoyah County felony case had been disposed of and was no longer active when it was in fact open, giving Turman every reason to fashion his testimony to the Government's liking. The same could also be said for its tactic of implying to the jury that the most it would do for Charles Sanders was "talk to" the prosecutors in Sequoyah and Tulsa Counties about his cases there, to let them know that Sanders had cooperated in the federal case against Mr. Barrett. At the improper *ex parte* hearing discussed in Ground One, AUSA Littlefield told the court that he knew the identify of an informant witness who failed to corroborate Charles Sanders. Thus, it could be said the Government knew Sanders's testimony was false, as was the basis for the search warrant secured by Clint Johnson. In any event, the Government failed to disclose exculpatory evidence of the witness who failed to corroborate Sanders. The Government also sponsored false testimony from Travis and Cindy Crawford. Newly discovered evidence reveals that their testimony was the product of threats and intimidation. If the jury's verdict could be affected by false testimony presented by the prosecution – as it surely was here – vacation of Mr. Barrett's convictions and sentences is required.

    **A.**    **Suppressed Exculpatory Evidence, Evidence of Knowing use of Perjured Testimony, and Newly Discovered Evidence**

        **1.**    **Evidence regarding informant witnesses Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman entitles Mr. Barrett to relief from his convictions and sentences.**

### a.      Charles "Monk" Sanders

The prosecution suppressed deals given to Charles "Monk" Sanders in Sequoyah

and Tulsa Counties in exchange for his testimony, in both stages of trial, against Mr. Barrett.  In

examining Sanders at trial, AUSA Littlefield merely stated, and Sanders agreed, that he would

speak to the authorities in Sequoyah and Tulsa Counties regarding Sanders's cooperation,

implying there were no guarantees anything would be done.  (R. 2495.)  In fact, near the end of

Mr. Barrett's trial on November 17, 2005, Sanders got a sweetheart deal on his active Sequoyah

County cases, and more favors shortly thereafter, all due to a "plea agreement with feds."

Favorable disposition of Sanders's active Tulsa County case was delayed until after Mr. Barrett's

trial.  The prosecution cynically attempted to jettison its *Brady* obligations with respect to

Sanders's testimony by either failing to reveal deals it knew were in the works, and/or postponing

the culmination of those deals until the end of Mr. Barrett's trial or shortly after its conclusion.

The Government's ploys in these regards plainly violated the *continuing duty* to disclose *Brady*

evidence.  Moreover, the prosecution violated its *Brady* obligations by failing to disclose to the

defense Sanders's complete criminal history, which could have and should have been used for

impeachment purposes.  It was argued in Ground Two that trial counsel were ineffective in

failing to cross-examine Sanders about all his previous criminal convictions and dismissed cases;

counsel unreasonably failed to make a search of Sanders's available court files.  Above and

beyond that failing, the prosecution was obligated under *Brady* to reveal Sanders's complete

criminal history to the defense, since it constituted impeachment evidence.  The prosecution

failed to do so, papering over Sanders's appalling criminal history on direct examination, and

leaving defense counsel to simply scratch the surface based on what counsel was able to glean from the Department of Corrections website.

Of course, Sanders's alleged information was the basis upon which the no-knock warrant was secured.. Sanders's testimony was critical to the drug charges which underlay the various counts of the superseding indictment, and to the Government's arguments on malice and intent with respect to both stages of trial.

As noted in Mr. Barrett's first stage ineffective assistance of counsel argument respecting trial counsel's failure to impeach Sanders with the number and nature of his previous convictions (Ground Two, section A.4, *supra*), as well as favorable treatment he had received in these and other cases, Sanders had convictions in Sequoyah County Case No. CF-98-346 (for which he originally received a twenty year suspended sentence, of dubious legality due to his numerous prior convictions), for the felony offense of possession of methamphetamine. Sanders was also charged in this case with a misdemeanor count for possession of drug paraphernalia, which was dismissed pursuant to plea bargain. Two applications to revoke Sanders's suspended sentence were filed. Initially, five years of the suspended sentence was ordered revoked, but the balance would again be suspended if Sanders completed a Department of Corrections drug program. The revocation was ordered to run concurrently with similar dispositions Case Nos. CF-98-363, CF-99-562, CF-04-19 and CF-03-124. (Exhibit 160.)

In CF-98-363, Sanders received another twenty year suspended sentence for uttering a forged instrument, to run concurrently with the sentences in Case Nos. CF-99-562 and CF-98-346. Similar applications to revoke were filed in this case based on Sanders's failure to abide by the terms and conditions of probation, in part because he committed new offenses.

Initially, as with CF-98-346, the court ordered five years of the sentence to be revoked, with the balance to again be suspended in full upon completion of the drug program. The revocation in this case was ordered to run concurrently with similar actions taken in Case Nos. CF-98-346, CF-99-562, CF-03-124, and CF-04-19. (Exhibit 161.)

In CF-99-562, in which Sanders was initially charged with three counts of concealing stolen property, uttering a forged instrument, felonious possession of a sawed-off shotgun, and a misdemeanor charge of possession of marijuana, he was allowed to plead to a single count of concealing stolen property, with the other counts dismissed. He originally received a twenty year suspended sentence. Again, applications to revoke were filed due to Sanders's commission of new crimes and for otherwise failing to adhere to the terms of his probation. Five years of the sentence was revoked, the balance again to be suspended upon completion of an in-house drug program. The sentence in this case was ordered to run concurrently with similar dispositions in Case Nos. 98-346, 98-363, 03-124 and 04-19. (Exhibit 162.)

In Case No. CF-03-124, Sanders was allowed to plead guilty to two counts of feloniously running a roadblock, with the other charges dismissed. Sanders received concurrent twenty-five year sentences on the two counts of conviction, with all but five years suspended, and with the entirety of the terms to be suspended on successful completion of the drug program. The sentences in this case were ordered to run concurrently with the sentences in Case Nos. CF-98-346, CF-98-363, CF-99-562 and CF-04-19. (Exhibit 164.)

In Case No. CF-04-19, Sanders was eventually charged in an amended information with second degree burglary, second degree arson, concealing stolen property, and

feloniously carrying a firearm. The firearm charge was dismissed pursuant to the plea agreement. On the three remaining counts, Sanders was sentenced to concurrent terms of twenty-five years, with all but the first five years suspended and, yet again, the balance to be suspended upon completion of the drug program. The sentences in this case were ordered to run concurrently with the sentences in Case Nos. 98-346, 98-363, 99-562 and 03-124. (Exhibit 165.)

The Government violated Mr. Barrett's due process rights by failing to disclose that on November 17, 2005 (the final day of Mr. Barrett's trial), and because of his testimony in Mr. Barrett's trial, amended judgments and sentences were entered on behalf of Sanders in all of the above-described cases, with a filing date of November 23, 2005 (well before Mr. Barrett's formal sentencing) ordering that Sanders receive straight suspended sentences across the board. Moreover, in each of the cases discussed above, an order was entered on April 3, 2006, making Sanders's suspended sentences in these cases unsupervised by the Department of Corrections, even though the sentences did not expire until 2030. This was done, according to the notations on the orders, "***per plea agreement with feds***." (Emphasis added). Finally, on December 8, 2008, orders were entered in each of these cases relieving Sanders of the obligation to pay any outstanding fines or costs. (*See* the above listed Sequoyah County court files.)

Sanders received similar largesse as the result of his testimony against Mr. Barrett in his pending Tulsa County Case, disposition of which, as noted in the ineffective assistance of counsel argument, was delayed until Sanders could perform for the Government in Mr. Barrett's trial. In Tulsa County Case No. CM-04-1187, Sanders's case was passed from November 13, 2005 until November 17, 2005 (the last day of Mr. Barrett's trial), and was again passed from November 17 until December 9, 2005. At that time, instead of facing jail on his misdemeanor

drug possession and possession of drug paraphernalia charges, despite his numerous prior convictions, because of his testimony against Mr. Barrett, Sanders received concurrent one year suspended sentences.

During the pendency of this §2255 action, investigators for Mr. Barrett have attempted repeatedly to interview Sanders, but were stymied. Sanders initially told a defense investigator he would meet with him, and had things he wanted to discuss, but dodged all subsequent attempts at an interview. However, when a defense investigator spoke to Sanders's mother, Evelyn Sanders, regarding her son's testimony against Mr. Barrett, she revealed that Sanders had been promised a number of things in exchange for his testimony that he never received. (Exhibit 14.) This witness's statement suggests that aside from the leniency he got, Sanders was given other inducements by the Government to testify against Mr. Barrett.

Not only did the prosecution flatly violate *Brady* and its progeny by failing to disclose Sanders's deals in the particular cases discussed above, it wantonly violated its *Brady* obligations by failing to reveal the jaw-dropping favorable treatment Sanders had received in *all his* Sequoyah County and other cases, as detailed in the ineffectiveness of counsel claim. Taken together, this evidence would have destroyed Sanders's credibility, shown his motive to lie, and would have shown, contrary to this court's order, that Clint Johnson – whose nefarious, but never revealed, acts of dishonesty and criminality are discussed below – could not have reasonably relied on "information" from Sanders to establish probable cause for the no-knock search warrant, which was the poisonous tree from which the later search warrants resulting in the recovery of drug and firearms related evidence grew.

When the prosecution falsely suggested it would merely "talk to" county prosecutors, even though Sanders received deals on the last day of Mr. Barrett's trial in Sequoyah County and shortly thereafter in Tulsa County, and Sanders agreed with this assessment of the situation, it sponsored materially false testimony.

### b.  Travis Crawford.[36]

During the investigation conducted for this §2255 motion, Mr. Barrett has discovered that one of the key witnesses in the first stage of trial, Travis Crawford, lied about material matters.  Travis Crawford supplied testimony critical to the Government's case for malice and intent, at least as to count 3 of the superseding indictment.  Crawford's testimony was also crucial to establishing the intent elements in the punishment phase of trial.  Crawford's testimony was summarized in the claim regarding ineffective assistance of counsel in the first stage of trial, and will not be repeated here.

When Crawford was interviewed in the presence of his parents on December 11, 2008 by defense investigator Leonard Post, he recanted his trial testimony.  To summarize, Mr. Crawford told Mr. Post the following:

Mr. Barrett's habit of not leaving his property had been established several years before the raid which led to Trooper Eales's death.  At trial, of course, the prosecution contended that Mr. Barrett rarely left his property only after he supposedly learned there was a warrant for his arrest on the  Sequoyah County drug charge.  (Exhibit 45.)

---

[36] At the time Mr. Barrett filed his original Motion to Vacate, Mr. Crawford had declined to sign a declaration reflecting what he told defense investigator Leonard Post.  Mr. Crawford has since signed his declaration to the information he gave a defense investigator prior to Mr. Barrett's initial filing. (*See* Exhibit 91; Exhibit 92; Exhibit 31; and, Exhibit 45.)

Mr. Crawford stated that he has anxiety and psychological problems, something he was not cross-examined on at trial.[37]  Although he was a long-time methamphetamine addict, he told Mr. Post he had been off drugs for four months preceding Mr. Post's interview.  Before finally getting off drugs, Crawford had been a daily methamphetamine user for years preceding Mr. Barrett's arrest in this case and during Mr. Barrett's federal trial.  (Exhibit 45.)  Thus, Crawford's trial testimony to the effect that he was not a drug addict or under the influence of drugs at the time he testified against Mr. Barrett was false.

Mr. Crawford stated that at the time he was interviewed by then-AUSA Mike Littlefield regarding Mr. Barrett, he was "living in so many places and was so strung out" on drugs, that he did whatever he was told by anyone in authority in order to stay out of trouble.  Mr. Crawford states that when he was interviewed by Mr. Littlefield, he was high on drugs. Moreover, anybody who had been around drug addicts for any period of time (which surely includes Mr. Littlefield and then-Sequoyah County Sheriff John Philpot, who took Crawford to Muskogee to be interviewed by Littlefield)  would have known Crawford was high.  Not only was Mr. Crawford under the influence of illicit drugs at the time he was interviewed by Littlefield, but he was also high when he testified in the first stage of Mr. Barrett's trial. Crawford stated that the other informant witnesses who testified against Mr. Barrett were high and strung out on drugs at the time of their testimony.  (Exhibit 45.)

---

[37] These problems and his drug abuse also doubtless contributed to the difficulties he had while in the military, which Mr. Crawford alludes to in his declaration, and his spotty employment history.  Travis Crawford's military records reflect that he went AWOL four times, and suffered at least one conviction at a court-martial.  Mr. Crawford was not honorably discharged.  (Sealed military records of Travis Crawford.)   He also did not maintain steady employment in the years preceding or following the assault on Mr. Barrett's home.  (Exhibit 143.)

When Sheriff Philpot took Crawford to Muskogee to be interviewed by Mike Littlefield shortly before Mr. Barrett's trial, Crawford felt he "was already arrested" and did not know "if [he] was ever going to come back home." When Littlefield interviewed him at the United States Attorney's Office, Mr. Crawford was terrified about losing his freedom. Consequently, he said whatever he thought it was Littlefield wanted him to say. Mr. Littlefield asked Travis Crawford if Kenneth Barrett ever said he (Mr. Barrett) was "going to go down in a blaze of glory" if the police ever came onto his property. Littlefield made it clear to Crawford what the appropriate answer was. Crawford stated that before he could answer, Littlefield threatened him, stating bad things would happen to him if he "lied." Where a witness is pressured to testify, the prosecution has every reason to believe that the product of that coercion will be false testimony. Mr. Crawford stated he was scared and panicked, and therefore told Littlefield that Mr. Barrett had made this statement. According to Mr. Crawford, the truth was otherwise: *Mr. Barrett never made such a statement, or anything like it, at any time*. (Exhibit 45.)

Travis Crawford's recantation is corroborated by witnesses who were present at Mr. Barrett's house on September 23, 1999, but were not called to testify at trial. *See* Ground Two, section A.4, *supra*. Rick Lunsford and Brandy Hill are adamant in stating the Mr. Barrett never made such a statement. (Exhibit 90; Exhibit 77.)

Because the Government and its agents knew or had reason to know that Crawford was a drug addict at the time he was interviewed by the prosecution, and at the time he testified at trial, the Government was obligated to disclose this information under *Brady*. Due process and the rules of professional conduct required AUSA Littlefield to correct Travis

Crawford's false testimony about being off drugs. The same is true of at least some of the other informant witnesses, whom Mr. Crawford states were high at the time of their testimony. Moreover, the Government plainly violated its *Brady* obligations by failing to reveal Littlefield's threats to induce cooperation and shape Crawford's testimony.

Mr. Crawford admitted that before he became a witness against Mr. Barrett, he had previously worked as a snitch for local law enforcement, setting up drug buys at the direction of the authorities in exchange for escaping bogus check charges he was facing. Crawford stated that he testified regarding the controlled drug buys in state court, even though the police had promised him he would not have to do so. (Exhibit 45.) Crawford's history as an informant was not testified to at trial, though it was known to the Government or its agents. Crawford's work as a snitch was exculpatory evidence affecting his credibility. By failing to inform the defense of this fact, the Government violated is *Brady* obligations.

In marked contrast to what the Government attempted to portray at Mr. Barrett's trial regarding the "necessity" for a no-knock warrant and the armed raid on Mr. Barrett's property, Travis Crawford stated that only two weeks or so before the raid, Sheriff John Philpot had gone to Mr. Barrett's residence and inspected his firearms without incident. (Exhibit 45.)

This information is consistent with that given by Janice Sanders and Sylvia Gelene Dotson, who, though never asked by trial counsel, state that Sheriff Philpot and other law enforcement agents were at Mr. Barrett's house mere weeks before the raid. *See* Ground Two. As shown below, ex-Sheriff Philpot recently admitted to a defense investigator that he indeed was at Mr. Barrett's less than a month before the raid, and encountered no violence or threats. Mr. Barrett was not arrested on his outstanding failure to appear warrant. (Exhibit 6.) This

exculpatory evidence, of which the Government and/or its agent Mr. Philpot was well aware, was

concealed from the defense in violation of *Brady.*

Again in contrast to what Mr. Crawford implied in his testimony, and to what the

Government argued at trial, he recently stated that while Mr. Barrett told him he had a pending

state drug charge, he was not overly concerned with it. Mr. Barrett never told Crawford he had

an outstanding warrant, and was thus laying low and hiding from the law. Crawford simply

assumed that having an active case meant the same thing as having an active arrest warrant.

(Exhibit 45.)

At trial, with the aid of Mr. Crawford's testimony, the Government made much of

the sign posted on the gate, construing it as a threat to law enforcement. Mr. Crawford states that

the sign was posted as a warning to anyone coming on the property in order to prevent

trespassing and theft. (Exhibit 45.)[38]

Evidence of Crawford's recantation is newly discovered, and could not have been

discovered with the exercise of due diligence before or during trial, because the Government

sprung the existence of Crawford and the other informant witnesses (without initially giving their

names) after juror qualification had begun, and Crawford refused to be interviewed by the

defense. Crawford's recantation pulls the rug out from under the prosecution's arguments

respecting malice and intent in both stages of trial. Crawford was *the key Government witness* in

---

[38] At the time the original and corrected §2255 motions in Mr. Barrett's case were filed, Travis Crawford had declined to sign a declaration reflecting his statements to a defense investigator currently working for Mr. Barrett. Thus, declarations reflecting what Mr. Crawford said were filed by his parents, Roger and Phyllis Crawford, and defense investigator Leonard Post. During the continuing investigation following the filing of the §2255 action, Mr. Crawford has signed his declaration.

this respect, because he testified that only hours before the raid, Mr. Barrett talked about the police "drive-by," the "fact" that they were coming back, that he (Mr. Barrett) "[didn't] give a fuck," and that he (Mr. Barrett) was going to go out in a "blaze of glory." Crawford's recantation also undermines the Government theory that Mr. Barrett only stayed close to home, and was thus lying in wait for a supposedly inevitable police raid, after he supposedly learned that he had a warrant out for his arrest.

### c. Cindy Crawford.

As outlined in the first stage ineffective assistance of counsel argument (Ground Two, section A.4, *supra*), Cindy Crawford testified in the guilt/innocence stage of trial regarding drug activity she witnessed at Mr. Barrett's home, and Mr. Barrett's supposed threats to law enforcement if his property were raided. In the penalty phase of trial, Cindy Crawford testified that on one occasion, Mr. Barrett, after she rebuffed his sexual advances and was leaving his residence with Richie Barrett, came out of the house, put the barrel of a rifle up to her leg, and threatened to kill her.

Leonard Post and another defense investigator currently working on Mr. Barrett's case, Dale Anderson, interviewed Cindy Crawford on January 13, 2009. Like her husband, Cindy Crawford refused to *read* a declaration which faithfully recounted what she told Messrs. Post and Anderson. (Exhibit 31.) Mr. Post's and Mr. Anderson's declarations detail what Cindy Crawford told them, which is summarized as follows.

Cindy Crawford explained how she was contacted by the Government. According to her, one to two weeks before she testified in the first stage of Mr. Barrett's trial, Sequoyah County Sheriff John Philpot came to see her. Philpot told her she had to go with him. Although

Ms. Crawford was unsure whether she was under arrest, it was clear to her that she had no choice but to go with Sheriff Philpot. She was driven by Mr. Philpot to the United States Attorney's office in Muskogee, where she was interviewed by Mike Littlefield in Littlefield's office. (Exhibit 31; Exhibit 14.)

Armed law enforcement officers were also present during the interview. They showed Ms. Crawford several firearms which looked similar to ones she had seen in Mr. Barrett's cabin. In order to secure her cooperation and testimony, Mike Littlefield threatened her. Littlefield told her she need to work with him and testify against Mr. Barrett. Otherwise, she was going to prison. Littlefield pointedly reminded her that she was then under a five-year deferred sentence in a drug case. Littlefield told Ms. Crawford that Mr. Barrett's residence had been under surveillance for six months preceding the raid, and that she had supposedly been observed on his porch acting as a "lookout" while methamphetamine was cooked on the property.[39] While Ms. Crawford states that she had no pending charges at the time she was interviewed by Littlefield, she had recently lost a child to foster care. Along with the threat of prosecution, the possibility that she would not get her child back unless she played ball with the Government hung in the air throughout the interview. (Exhibit 31; Exhibit 14.)

According to what Ms. Crawford recently told Mr. Barrett's defense investigators, Mike Littlefield not only threatened her, but coached her testimony. Littlefield told her to make Mr. Barrett appear violent and an imminent threat to those around him. Again issuing threats,

_____

[39] Consistent with her first stage trial testimony, Cindy Crawford told Mr. Post and Mr. Anderson that she never saw Mr. Barrett cook methamphetamine on his property. She had done drugs at Mr. Barrett's residence, but did not know who supplied them. Ms. Crawford never bought drugs from Mr. Barrett. (Exhibit 31; Exhibit 14.)

Littlefield told her that she risked a perjury charge if she did not testify in this manner. Littlefield emphasized that he could make it extremely hard on her if she did not testify against Mr. Barrett. (Exhibit 31; Exhibit 14.)

In addition to the threats, Ms. Crawford described the interview taking place in an intimidating atmosphere. She stated that when she went to the bathroom, an armed guard accompanied her and waited outside. It was her belief that she was not free to decline to be interviewed, to terminate the interview, or to leave. Mr. Philpot had driven her to Muskogee, and she had no way back other than him. Ms. Crawford expressed the sentiment that she was not going to cross Sheriff Philpot due to his reputation for violence. (Exhibit 31; Exhibit 14.)

Ms. Crawford was interviewed by the Government separately from her husband, Travis. After both had been interviewed, Travis Crawford told her that Philpot had told him that if he (Travis) said the right things on the witness stand, he would not get into trouble. (Exhibit 31; Exhibit 14.)

Mike Littlefield and John Philpot discouraged her from talking to Mr. Barrett's lawyers. Both told her that she did not have to talk to the defense. According to Ms. Crawford, the clear implication was that she should not speak to the defense. (Exhibit 31; Exhibit 14.)

Like her husband Travis Crawford, Cindy Crawford was under the effects or after-effects of heavy methamphetamine use at the time she was interviewed by Mr. Littlefield and law enforcement at Littlefield's office. At the time of the interview in the prosecutor's office, Cindy Crawford was just coming down from a two day methamphetamine high. She also admitted to being in the same condition when she testified against Mr. Barrett, because her heavy drug use was ongoing at the time of his trial. That her drug use affected what she told Mr. Littlefield and

testified to at trial is apparent from her recent comment to Mr. Barrett's current investigators: "If you had ever crashed from a meth high, you would know that you would not be in your right mind." (Exhibit 31; Exhibit 14.)

Although, on cross-examination in the second stage of trial, Cindy Crawford told defense counsel she suffered from PTSD, her mental condition was not inquired about during her first stage testimony, and was not effectively exploited by counsel in the penalty phase, largely because Crawford refused to be interviewed by trial counsel. (*See* Ground Two) Because Crawford refused to be interviewed, there are facts about the manner in which her mental condition impacts her credibility that were only recently discovered.[40] (Exhibit 144.) According to what Ms. Crawford told Mr. Post and Mr. Anderson, one of the symptoms of her PTSD is that she overreacts in stressful situations, sometimes to the point of passing out. She admitted that when she is under stress, she may not perceive things correctly. This causes her to exaggerate what is going on around her. Ms. Crawford told Mr. Post and Mr. Anderson that when she testified in the penalty phase about Mr. Barrett allegedly pressing a gun to her leg, her mental condition very well could have caused her to overreact and embellish the incident. At the conclusion of her recent interview with the defense investigators, Cindy Crawford told them that having given this alleged incident more thought, she was positive she had overreacted to it. She emphasized that Mr. Barrett had a history of being nice and helpful to her. (Exhibit 31; Exhibit 14.)

---

[40] Cindy Crawford executed a release authorizing Mr. Barrett's counsel to obtain her medical records.

However, even Ms. Crawford's claim to have overreacted is a fabrication. A readily available witness to the alleged event, Richie Barrett, states that neither the incident Crawford described nor anything like it ever happened. (*See* Ground Two; Exhibit 104; Exhibit 31.)

Between her first stage and second stage testimony, the prosecution subjected Cindy Crawford to more threats. The Government was upset with her first stage performance on the witness stand because she denied seeing chemicals or equipment for making methamphetamine at Mr. Barrett's cabin or on his property, and because she had not made Mr. Barrett seem threatening or violent. To quote Ms. Crawford, "They [the Government] were very angry. They scared me and threatened me." Again, according to Ms. Crawford, while the Government never told her explicitly that she could lie and fabricate during her testimony, it was implied that she could say whatever she wanted, true or not, so long as it helped the Government's case. (Exhibit 31; Exhibit 14.)

In several areas, the Government violated its *Brady* duties with respect to Cindy Crawford. Ms. Crawford implied during her first stage testimony that she was off drugs ( R. 3070), but, based on what Ms. Crawford recently told defense investigators, this was incorrect. The Government or its agents, based on its observations of Ms. Crawford, had to know that she was a drug user both at the time she was interviewed by Littlefield and when she gave testimony. If not, this evidence is at a minimum newly discovered. It is also submitted that the Government or its agents were aware of Cindy Crawford's mental problems, but this was only revealed, and not developed well, when she volunteered this information to trial counsel during cross-examination in the penalty phase of trial. The Government's intimidation of and

threats to Cindy Crawford, as well as disgraced former AUSA Mike Littlefield's "coaching" of her testimony, were well known, obviously, to Littlefield himself and the law enforcement officers who participated in Crawford's interview at Littlefield's office. The Government's failure to reveal these facts is a *Brady* violation as well as newly discovered evidence. The impeaching evidence related above would have seriously undermined Cindy Crawford's credibility. More significantly, where, as with Cindy Crawford, a witness is threatened and coached, the prosecution is guilty of knowingly sponsoring materially false testimony and/or failing to correct false testimony in violation of Mr. Barrett's right to due process of law.

Additionally, as reflected by the declarations of several available witnesses whom the defense did not call at trial to impeach Cindy Crawford's credibility, it was well known in the community that she acted on a regular basis as a snitch for local law enforcement. This *Brady* information was never revealed, and the Government or its agents had to know about it.

The fact that Crawford received favor from the authorities for acting as a snitch, against Mr. Barrett or others, is demonstrated by the manner in which her conviction in Sequoyah County Case No. CF-2004-613 was handled. Crawford was originally charged with felony possession of marijuana, because she had incurred a previous marijuana possession conviction. On April 28, 2005, she entered a no contest plea to a misdemeanor and received a five year deferred sentence. She received a one year deferred sentence on count 2, which charged misdemeanor possession of drug paraphernalia. On March 20, 2005, an application to accelerate Ms. Crawford's deferred sentence was filed because she failed to make a required payment. On July 17, 2005, shortly before Mr. Barrett's trial commenced, a bench warrant was issued for failure to appear. On April 24, 2006, after Mr. Barrett's trial, an application to dismiss the

acceleration action was filed because Crawford had finally "paid in full." (Exhibit 170.) Thus, when she testified at Mr. Barrett's trial, an acceleration action for failure to comply with the terms of her deferred sentence was pending, but this impeaching information, which could have been used to argue that Crawford had a motive to please the prosecutors lest her deferred sentence be accelerated, was not disclosed.

The *Brady* violations committed by the Government with respect to Cindy Crawford could also be considered a form of newly discovered evidence that could not have been discovered with the exercise of due diligence. As with all the informant witnesses, her identity was not revealed until the eleventh hour, the Government kept her under tight wraps, and she refused to speak with the defense.

Cindy Crawford continues to milk benefits from her work as an informant, and her testimony against Mr. Barrett, up to the present day. She was charged in Sequoyah County Case No. CF-08-224 with first degree burglary and conspiracy on June 18, 2008, which was amended on July 13, 2008. The first degree burglary charge carried from seven to twenty years. The conspiracy charge carried up to ten years. On December 15, 2008 she received an almost unheard of two year deferred sentence on the first degree burglary charge, with the conspiracy charge dismissed. (Exhibit 169.)

### d.    Brandie Zane Price.

Price testified in the first stage of Mr. Barrett's trial. She claimed that she first met Mr. Barrett in August or September, 1999, and went to his residence four to six times during this period. (R. 3485-86.) For various convictions she received in Sequoyah County, she was sentenced to complete the RTP program, a regimented inmate discipline program for females

within the Oklahoma Department of Corrections.  The balance of her sentences were suspended

upon her completion of the program.  (R. 3487.)  Responding to feeds by prosecutor Littlefield,

Price testified that the program "worked," that she was "absolutely" clean of drugs, and,

presumably, was not engaging in any drug related activity.  (R. 3488, 3497.)

After Mr. Barrett's trial, Brandie Zane Price and others were charged in the

Eastern District in a methamphetamine drug distribution conspiracy.  *United States v. McAdams,*

*et al.,* No. CR-07-16-RAW.  The indictment alleged that the overall conspiracy began "prior to

approximately" May, 2006, and continued to February 20, 2007.  Significantly, the indictment

alleged that beginning approximately January 1, 2006, until June 22, 2006, Price received from

the lead defendant in the case, Joseph Alondo McAdams, one pound of methamphetamine per

delivery, receiving between one delivery and as many as three deliveries a week.  (Doc. 18, CR-

07-16-RAW.)  (Exhibit 174.)  Mr. Barrett's trial concluded November 17, 2005, and he was

formally sentenced on December 19, 2005, less than two weeks before the same United States

Attorney who prosecuted Mr. Barrett later alleged that Price began receiving large quantities of

methamphetamine for resale in a widespread drug conspiracy.

Price was later allowed to plead guilty to a superseding information (Doc. 116,

CR-07-16-RAW) (Exhibit 174) charging that from May, 2006 to February 20, 2007, she

distributed and possessed with intent to distribute in excess of 500 grams of methamphetamine,

or a mixture or substance containing methamphetamine.  A plea agreement, in which Price

agreed to provide all information regarding criminal activities known by her to the Government,

and in which the Government, based on its assessment of the value of her cooperation, agreed, if

appropriate, to move for a Guidelines downward departure, was entered into. (Doc. 121, CR-07-16-RAW.) (Exhibit 174.)

Price was ultimately sentenced to sixty months imprisonment. (Doc. 218, CR-07-16-RAW.) (Exhibit 174.) She received a substantial downward departure or variance from the advisory Guideline range based *on her cooperation and testimony against Mr. Barrett at his federal trial.* Otherwise, the punishment range for the offense of conviction was a mandatory minimum of ten years imprisonment, a maximum of life, and not less than five years supervised release. In the September 7, 2007 edition of the *Fort Smith Times-Record*, under the headline "Drug Offender Receives Break," the news article about Price's sentencing hearing states, "Price's sentence was significantly impacted by her testimony in the government's case against Kenneth Eugene Barrett, U.S. Attorney Sheldon Sperling stated in a news release." (Exhibit 70.) Thus, Price received substantial favor not for her cooperation in the drug conspiracy case in which she was charged, but for her testimony against Mr. Barrett, which preceded the drug indictment against her.[41]

Mr. Barrett alleges that the Government or its agents knew full well (or had reason to know) at the time of Brandie Price's testimony against Mr. Barrett that she was involved in drug use and drug dealing. This is clearly exculpatory evidence affecting her credibility that was not disclosed by the Government. Nor, under the Government's continuing duty to disclose exculpatory evidence under *Brady*, has it been disclosed by the Government that in exchange for her testimony against Mr. Barrett, she received a substantial downward departure in her own

---

[41] The various sentencing memoranda and motion for downward departure are sealed. Docs. 198, 200, 204, 205, 206, No. CR-07-16-RAW.

federal drug case. The deal Price received in her federal drug case based on her testimony against Mr. Barrett is also newly discovered, because it occurred after Mr. Barrett's trial. The Government's knowledge of these facts expose it once again to be the purveyors of false testimony – Ms. Price was not the clean, law-abiding citizen it portrayed her to be.

### e.   Karen Real.

Karen Real was another of the informant witnesses the Government kept under wraps until the eleventh hour, and who refused to talk to the defense. (R. 3076-77.) At the time Real appeared as a Government witness, she was serving a fourteen year federal sentence.[42] During direct examination, AUSA Littlefield asked Real if he ever indicated that he would do anything for her based on her cooperation. Real initially answered "[n]o, sir." Littlefield then asked, "Did I talk about anything I'd say to the court?" Real responded, "Well, you just mentioned that, you know, what I did. And that it would be up to the judge." (R. 3080-81.) On cross-examination, Real testified that while she hoped her testimony against Mr. Barrett could help her with her sentence, she was not really expecting anything. (R. 3134.)

Although the picture painted for the jury was that the Government would inform Real's sentencing judge of her cooperation, and that Real, while hopeful of a break, was not really expecting one, she actually received the largest favor she could have received shortly after Mr. Barrett's trial concluded. On March 1, 2006, the Government did much more than

---

[42] In Eastern District Case No. 6:00-cr-21-FHS, Real had been convicted of conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamine (count 1); maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine (count 3); and possessing a firearm during a drug trafficking crime (count 5). Real received sentences of 108 months on count 1, 60 months on count 3, running concurrently to count 1; and 60 months on count 5, running consecutively to the concurrent terms on counts 1 and 3. (Doc. 158, Apr. 25, 2006, order reducing sentence on Government's Rule 35 motion.) (Exhibit 68.)

"mention" Ms. Real's testimony, it initiated a new proceeding in her case by filing a motion under Fed.R.Crim.P. 35 for reduction of sentence, based on her cooperation against Mr. Barrett. (Doc. 148 in Case No. 6:00-cr-21-FHS.) (Exhibit 68.) On April 25, 2005, the sentencing court reduced Real's sentence from 168 months (fourteen years) to time served (six years), and ordered Real's immediate release from custody. (Doc. 158 in Case No. 6:00-cr-21-FHS.) (Exhibit 68.) The Government also violated its *Brady* obligations by failing to disclose the numerous state cases, discussed in Ground Two (4)(f), that were dismissed against Real, and which could have been used as impeachment evidence. The Government was obligated under *Brady* to disclose to the defense Real's criminal record, and failed to do so. As with the other *Brady* violations discussed here, Mr. Barrett was prejudiced by the Government's "hide the ball" approach. Due to its failure to follow the law, the Government was allowed to portray this witness as far more credible than she really was.

Mr. Barrett submits that the Government misled the jury with respect to the assistance it was going to give Real. The Government surely knew all along that it would ask that Real's sentence be reduced to time served based on her cooperation against Mr. Barrett, an eventuality which in fact occurred. The Government has a continuing duty to disclose exculpatory evidence under *Brady*. The Government's true intentions were never disclosed to the defense or told to the jury. Additionally, the tremendous break Real received on her sentence is newly discovered evidence adversely impacting her credibility and the Government's lack of forthrightness at trial. Evidence of Real's deal could not have been discovered with the exercise of due diligence before or during trial, because it post-dated Mr. Barrett's trial. Yet again, the

Government's conduct in soft-peddling the assistance it was going to give Real in exchange for her testimony constituted a constitutional violation..

### f.    Randy Turman.

It was argued in Ground Two that counsel were ineffective for failing to research Turman's court file in Sequoyah County Case No. CF-02-447 (Exhibit 195), and expose his perjury that this six count felony charge had been "taken care of" or disposed of, but was still pending, with no action in the case for two years preceding Mr. Barrett's trial. Regardless of any duty counsel had to investigate Turman's criminal background, the Government had an overarching duty to refrain from sponsoring perjured testimony, and to disclose exculpatory evidence.

The Government or its agents obviously knew that Turman was committing perjury when he stated he no longer had a pending felony case in Sequoyah County, but they let him give false testimony anyway. It is equally clear the Government knew, despite Turman's denials, that he had worked or was working as a snitch. Otherwise, there was no reason for his case to lie dormant for two years. The Government let Turman get away with another blatant falsehood when he stated the Government had nothing to hang over his head. Clearly, his testimony was motivated by the fact he had a still pending felony case. Unless he pleased the prosecutors with his testimony, there is every reason to believe they would have taken action against him, or seen to it that the Sequoyah County authorities did.

The Government's conduct in connection with Turman is a *Brady* violation. The fact he had an open, unresolved felony case gave him a powerful motive to testify for the Government, and this fact affected his credibility.

Finally, the fact Turman's case was dismissed "in the interests of justice" in 2007 after lying dormant for years is highly indicative that his testimony against Mr. Barrett was at least in part a basis for the dismissal. (Exhibit 195.) This constitutes newly discovered evidence.

### 2. The Government failed to reveal exculpatory evidence of a witness who failed to corroborate Charles Sanders.

In Ground One, *supra*, Mr. Barrett described the *ex parte* hearing held September 13, 2005, during which AUSA Mike Littlefield, in the presence of the United States Attorney, informed the court that Littlefield had spoken with, and knew the identity of, a witness who when questioned failed to corroborate information to which Charles "Monk" Sanders would eventually testify in the penalty phase of Mr. Barrett's trial. (Tr. 9/13/05 H'rg at 14, 17.) Littlefield advised the court that he attempted to corroborate Sanders's claim that he (Sanders) was in a woman's house when he overheard her speaking on the telephone. Sanders, as he later testified, claimed he could recognize Mr. Barrett's voice over the phone, and that he heard the voice say they had to identify the C.I. and get rid of him. Littlefield told the court he had spoken with the woman himself, and she did not corroborate Sanders, although Littlefield claimed he subjectively believed the woman's denial was motivated by fear.

The fact that the Government knew the identity of a witness who failed to corroborate Sanders about a key piece of second-stage testimony was not disclosed until after trial when appellate counsel obtained the transcript of the *ex parte* proceeding. To this day, the Government has failed to identify the witness. This was clearly *Brady* material, because it was evidence that could have been used not only to impeach Sanders's testimony, but to attack the search warrant.

But the situation is worse than that. Sanders was able to commit crimes with impunity, and the Government knew that. As long as he was willing to inform on others, Sanders had a "get out of jail free" card. No reasonable person could believe Sanders about anything. This is especially true since the prosecution was in possession of evidence that Sanders's sorry word was contradicted by another witness. Due to Sanders's record of total dishonesty and the fact that he was contradicted by another witness known to the prosecutor, polluting a federal courtroom with Sanders's testimony constituted the knowing use of perjured evidence.

> **B.**      **The Judgements of Conviction and Sentence Should be Vacated Based on the Suppression and New Discovery of Evidence Undermining the Credibility of Key Law Enforcement Personnel.**

The Government suppressed exculpatory evidence that would have shown Clint Johnson and Vickie Lyons to be witnesses of poor credibility. With respect to evidence showing Johnson had no credibility, the suppressed evidence would have also supported a motion to suppress. The Government suppressed exculpatory evidence that would have torpedoed not only the warrant, but its seven informant witnesses and overall theory of the case, because Sequoyah County Sheriff John Philpot had been to Mr. Barrett's residence with other officers less than a month before the September 24, 1999 incident without coming to any harm. Newly discovered evidence of former AUSA Littlefield's criminal activities supports claims by some of the informant witnesses that they were threatened and coerced into giving testimony.

### 1.      Evidence of Clint Johnson's illicit activities.

But for Clint Johnson's alleged reliance upon "Monk" Sanders to secure the nighttime, no-knock warrant for Mr. Barrett's residence and property, David "Rocky" Eales's tragic death never would have occurred.  The Government or its agents knew that Johnson, just like his alleged snitch, Sanders, is untrustworthy and was subject to impeachment in a variety of areas.  To the extent the impeachment evidence discussed below was generated after Mr. Barrett's trial, it constitutes newly discovered evidence.  However, the Government was aware of this evidence, or had a duty to become aware of it, and has once again failed to fulfill its *continuing* duty to disclose exculpatory evidence.  The impeachment evidence detailed below not only could have been used to attack the overall testimony of Johnson and Sanders, but could have been used at either stage of Mr. Barrett's trial to argue that but for the acts of a "dirty cop," Clint Johnson, the entire chain of events leading to Trooper Eales's death never would have occurred.

At the time of Mr. Barrett's trial and shortly thereafter, Johnson was under official investigation for embezzlement of funds, illegal drug use, perjury, and gross misuse of his official office.  Agent Vickie Lyons of the Oklahoma State Bureau of Investigation, another critical witness in the Government's case against Mr. Barrett, colluded with and protected Johnson.  Had the jury known these facts, Johnson's credibility, and the validity of the no-knock search warrant, would have been destroyed.  Likewise, the credibility of Vickie Lyons would have suffered greatly had the jury learned of her participation in her boyfriend Clint Johnson's numerous illegal activities.

Although not known to the defense, at the time of Mr. Barrett's trial, Johnson, Lyons and a number of other state law enforcement officers involved in Mr.  Barrett's case had

been involved in a series of crimes involving the misuse of their office. On November 1, 2005, while Mr. Barrett's trial was ongoing, Cherokee County District Attorney investigators Tommy Morgan and Jeff Lancaster reported to District Attorney Richard Gray that Johnson had passed four bad checks in September, 2005 at Champlain's Truck Stop in Tahlequah. (Exhibit 181 - Memo to Richard Gray from Tommy Morgan and Jeff Lancaster dated November 1, 2005.) Beginning on November 5, 2005, Assistant District Attorney and Drug Task Force Director Jeff Sheridan kept a detailed log of discussions with Johnson, which led to Johnson's termination and the seizure of his vehicle on January 5, 2006. (Exhibit 181 - Log of events from November 2005 through January 2006 by Jeff Sheridan; Letter from Richard Gray to Clint Johnson dated January 5, 2006.) On January 5, 2006, District Attorney investigators found in Johnson's car various drugs and drug paraphernalia that had never been logged into evidence, which they suspected Johnson had acquired through seizure or purchase with official funds, and which they suspected Johnson was abusing himself. (Exhibit 181 - Report of Investigation dated January 5, 2006 from Courtney Bates; February 3, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries.) These items included multiple syringes, a pipe, a spoon with methamphetamine residue, a partially smoked hand-rolled marijuana cigarette, vials of liquid methamphetamine, a baggie containing marijuana, and bottles of Xanax and Darvon. (Exhibit 181 - OSBI Criminalistics Investigation Report dated January 26, 2006.)

As early as November 9, 2005, Sheridan was expressing concern over Johnson's inability to account for funds allegedly used for drug buys by confidential informants and funds seized during drug raids. (Exhibit 181 - Log of events from November 2005 through January 2006 by Jeff Sheridan; Memo dated November 17, 2005 from Donovan Dobbs to Jeff Sheridan; Undated

Memo from Jeff Sheridan to Clint Johnson; Undated Memo from Jeff Sheridan to Richard Gray; Memo dated November 21, 2005 from Jeff Sheridan to Clint Johnson; Memo dated December 19, 2005 from Courtney Bates to Jeff Sheridan; Memo dated December 27, 2005 from Jeff Sheridan to Clint Johnson; January 17, 2006 Letter from Richard Gray to OSBI Inspector Chuck Jeffries; February 22, 2006 Letter from Richard Gray to OSBI Special Agent Shawn Ward; Undated Report of Second OSBI Interview of Clint Johnson; Memo dated November 13, 2006 from Misty Brinley to Richard Gray).

Johnson had considerable difficulties managing his finances. He declared bankruptcy in 2001, and his actions in passing hot checks had further alarmed his supervisors. (Exhibit 181 - *In re Clint Johnson,* No. 01-72501, United States Bankruptcy Court, E.D. Okl.) In December 2005 and January 2006, Sheridan repeatedly expressed his conviction that Johnson was lying to him. (Exhibit 181 - Log of events from November, 2005 through January, 2006 by Jeff Sheridan; Undated Memo from Jeff Sheridan to Richard Gray). On November 23, 2005, Sheridan noted Johnson's possible involvement, as either a target or witness, in a Multi-County Grand Jury criminal investigation. (Exhibit 181 - Log of events from November, 2005 to January, 2006 by Jeff Sheridan). It is plainly apparent that law enforcement knew, during the course of Mr. Barrett's trial, that Johnson was involved in a course of serious criminal conduct that involved financial dishonesty and the misuse of his office.

In October, 2006, a Multi-County Grand Jury unsealed an indictment against Richard Gray, the District Attorney for Cherokee and Sequoyah Counties, for embezzling money seized as evidence from drug investigations. In June, 2008, Okmulgee County District Judge Michael Claver dismissed the charges against Gray at the conclusion of the prosecution's case,

and barred further prosecution, based on defense counsel's scathing impeachment of Clint

Johnson, who testified as a prosecution witness.

The transcript of the cross-examination of Clint Johnson, which took place on

June 4, 2008, is replete with additional evidence of Johnson's misappropriation of funds.

(Exhibit 181 - Transcript of Proceedings in *State of Oklahoma v. Richard Loy Gray, Jr.,*

Cherokee County Case No. CF-2007-28, June 4, 2008.) (hereinafter "Gray RT".)  During the

cross-examination of Johnson, Gray's defense counsel suggested that: 1) Johnson had fathered a

child out of wedlock with the daughter of former Adair County Sheriff Charles Hartshorne, and

that Johnson and Hartshorne were dividing up drug money between themselves (Gray RT 26-27);

2) Johnson lived with another critical prosecution witness in Mr. Barrett's case, Vickie Lyons of

the OSBI (*id.* at 74); 3) based on his relationship with Lyons, Johnson knew that the OSBI would

do nothing to address official theft of drug money (*id.*); 4) Johnson used Lyons's cell phone and

drove her car, and when government officials confronted Johnson about property he had illegally

taken, Lyons brought it back (*id.*); 5) Johnson attempted to borrow, and in some cases did

borrow, money from counsel for defendants whose assets Johnson seized (*id.* at 65); 6) Johnson

illegally released funds seized from defendants to defense counsel, and then obtained kickbacks

from defense counsel for this illegal conduct (*id.* at 66-67); 7) Johnson used drug funds as his

own private ATM (*id.* at 64); 8) throughout 2003 and 2004, Johnson took money seized from

drug arrests and purchased cashier's checks for his own personal use (*id.* at 68); and 9) Johnson

began writing bad checks as early as May, 2003.  *Id.* at 54.

None of this information was shared by the Government with Mr. Barrett's

lawyers; it is obvious they intentionally concealed it.  Mr. Barrett's current counsel first learned

of this information in February, 2009, when they obtained a copy of the court reporter's transcript of Johnson's testimony in Richard Gray's trial and defense exhibits in Mr. Gray's case. Mr. Barrett's counsel are currently investigating this newly discovered evidence of prosecutorial misconduct, and will amend this motion to include new details about the breadth and scope of this misconduct as it becomes available to them.

But there is now abundant evidence calling into question Mr. Barrett's convictions. At an evidentiary hearing conducted on Mr. Barrett's motion to suppress on January 26, 2005 (Tr. ½6/05 Hr'g), Johnson was called by the Government, and testified that the no-knock search warrant he obtained was based on information he received from a confidential informant (later identified as Charles Sanders). Johnson had used this particular informant at least five times, and the informant had "never been wrong." (Tr. 1/ 26/05 Hr'g at 66-67.)

On cross-examination, Johnson acknowledged that during the state court proceedings, he had never revealed the name of the confidential informant, and that defense counsel John Echols (who examined Johnson at the motion hearing) was the only one who had asked for the identity. Johnson admitted writing the name of the C.I. on a piece of paper, which was placed in a sealed envelope in the state court file. (Tr. 1/ 26/05 Hr'g at 78, 83-90.) However, Johnson stated that he had revealed the name of the C.I. to the United States Attorney's Office. (Tr. 1/ 26/05 Hr'g at 81.)

Johnson testified that before September, 1999 the C.I. had been involved in criminal activity leading to formal charges. (Tr. 1/ 26/05 Hr'g at 82-83.) When counsel asked Johnson whether the informant had been involved in other criminal activity since September 1999, the Government objected on relevance grounds, and the magistrate sustained the objection,

holding that only what occurred before the no-knock warrant was issued was relevant. Counsel responded that he always believed the C.I. was not a real person, but a composite. (Tr. 1/ 26/05, Hr'g at 83-90.) In the state proceedings, one of the reasons given for shielding the alleged C.I.'s identity was the claim the C.I. was involved in assisting an ongoing investigation until 2004. Of course, the claim the C.I.'s identity was being protected for this reason (assuming Sanders was the C.I.) is obviously false. Sanders, with the patronage of Clint Johnson, was allowed to commit crimes at will in Sequoyah County after 1999 with only minor consequences. The Government did not want it brought out at the suppression hearing that Johnson's C.I. had continued to commit crimes with impunity and was therefore an unreliable source. The Government, which had been informed of Sanders's identity, was well aware of the litany of crimes he had committed since 1999, and knew that his identity was not being protected because of an "ongoing investigation."

Switching tracks, Mr. Echols asked Johnson if the C.I. had participated in drug transactions or drug dealing prior to September 24, 1999. Johnson replied, "They [meaning drugs] were probably used some, yes, sir." Asked if the C.I. sold drugs, Johnson stated "Not that I am aware of." Asked if the C.I. had run a meth lab, Johnson again replied, "Not that I am aware of, no, sir." (Tr. 1/ 26/05 Hr'g at 92.)

Johnson, who was presumably aware of Sanders's extensive criminal history before 1999, gave false testimony on this score. As illustrated in the first stage ineffective assistance of counsel claim, Sanders had a 1986 Arkansas conviction for delivery of cocaine and amphetamines. Information gathered during this §2255 investigation indicates that Sanders also routinely sold drugs, activities Johnson would have known about if he were regularly in contact

with Sanders and not recklessly disregarding the truth of his activities.  (Exhibit 90; Exhibit 95.)

Johnson's testimony was false on a material matter and prevented proper development of

evidence to challenge the warrant because of the unreliability of the C.I.  The prosecution had

every reason to be aware of Sanders's criminal conviction in Arkansas for drug delivery, but

stood silently by as Johnson gave false testimony.

The Government was well aware of damning evidence regarding the alleged C.I.,

Charles Sanders, but used objections to prevent counsel from eliciting this information in order

to build a record for a motion to suppress.  It was not until trial, when Sanders testified, that only

some of his criminal history, but not the many deals and the repeated lenient treatment he had

received, was revealed.  By then, the challenge to the search warrant that was mounted was

incompetent, as detailed in Ground Two.

### 2.    David Michael Littlefield's illicit activities.

Following Mr. Barrett's conviction

> [United States Attorney Sheldon] Sperling said he is grateful to Mike Littlefield
> for his work as chief prosecutor in the case; and to Sequoyah County Sheriff
> Johnny Philpot, who was instrumental in identifying key witnesses who could
> prove Barrett acted with premeditation.

(Exhibit 69 - Tahlequah *Daily Press*.)  In fact Littlefield himself was responsible for bringing the

seven drug-addict informants to support the Government's case, as he stated during the *ex parte*

hearing held September 13, 2005, and discussed elsewhere in this Petition.

Former AUSA Littlefield threatened and pressured Travis and Cindy Crawford to

provide testimony against Mr. Barrett.  Since Littlefield primarily conducted the interviews of the

seven informant witnesses, it is likely that others were threatened as well.  Support for this claim

comes from newly discovered evidence of Littlefield's own troubles with the law, and consequent proceedings against him by the Oklahoma Bar Association.

In Muskogee County Case No. CF-07-363, Littlefield was charged with felony child abuse. On August 3, 2007, Littlefield was permitted to enter an *Alford* plea to count 2 of the Information, charging child abuse by injury in violation of 10 O.S. 2001, section 7115(A). Based on this plea, Littlefield received a two year unsupervised deferred sentence, and was required to pay court costs. *See* Complaint, *State of Oklahoma ex rel. Oklahoma Bar Association v. David M. Littlefield,* OBAD #1720, SCBD #5338, filed with the Oklahoma Supreme Court on September 28, 2007. Littlefield's criminal case file in Muskogee County was expunged even before the Bar Complaint was filed, although his deferred sentence was to run for two years from August 3, 2007.[43] (Exhibit 156 - Trial Brief of Complainant, p. 2, filed on January 2, 2008, in *State of Oklahoma ex rel. Oklahoma Bar Association v. Littlefield, supra.*) On September 14, 2009, the Oklahoma Supreme Court determined that, based on the Bar Complaint filed against Littlefield, he should receive a private reprimand by the Court, scheduled to occur on October 22, 2009. (Exhibit 53.)

In the affidavit for search warrant for Littlefield's home, captioned SW-07-34, and filed in the District Court of Muskogee County on April 23, 2007, Jan Ray, a Muskogee County Deputy Sheriff, states in pertinent part that Littlefield had been brutally abusing his minor children for a period of years extending back to the time he was the chief prosecutor on Mr.

---

[43] The fact Littlefield's case was expunged long before his two year deferred sentence expired, as noted by the Bar Association's Assistant General Counsel, prevents Mr. Barrett from ascertaining whether Littlefield lied to investigators before entering his plea. It also prevents Mr. Barrett from ascertaining why Mr. Littlefield received such favorable treatment.

Barrett's case.  (Exhibit 189 - Affidavit for search warrant, SW-07-34, filed in Muskogee County

District Court, April 23, 2007, signed by affiant on April 13, 2007.)

Based on the affidavit, a search warrant was issued on April 13, 2007, and filed in

the court record on April 23, 2007.  (Exhibit 189 - Search warrant, SW-07-34.)  Various camera

and computer equipment were seized in the search.  (Exhibit 189 - Search warrant return, SW-

07-34, filed in the District Court of Muskogee County on April 23, 2007.)

Littlefield did not contest the charges.  He was found guilty on an *Alford* plea,

receiving a very generous sentence which has already been dismissed, with the case file

expunged.

The Bar Association action resulted in a private reprimand.  (Exhibit 53.)

Littlefield was found guilty of violations of Rule 8.4(b) of the Oklahoma Rules of Professional

Conduct, and Rule 1.3 of the Rules Governing Disciplinary Proceedings.  *Id.*  Thus, the

Oklahoma Supreme Court found Littlefield's actions reflect adversely on his honesty,

trustworthiness, or fitness as a lawyer in other respects.  *Id.*  Just as the Oklahoma Supreme Court

found that Littlefield's conduct brought "discredit upon the legal profession," this Court should

find that his conduct both in and out of court during Mr. Barrett's trial brings discredit upon the

judgment of conviction and sentence of death Littlefield engineered.

Littlefield's child abuse charges are relevant to the manner in which he handled

the informant witnesses in Mr. Barrett's case.  A bully who apparently had no compunction about

using his minor children as punching bags for years to work out his "temper fits" and frustrations

would have no problem threatening witnesses with all manner of dire consequences to keep them

in line and produce the desired testimony against Mr. Barrett.  This newly discovered evidence

regarding Littlefield's own deplorable and shocking criminal conduct against his own children

not only corroborates Travis Crawford's and Cindy Crawford's claims they were threatened by

Littlefield to secure their testimony, and Randy Weaver's assertion that Littlefield tried to

intimidate him, but also is relevant to Mr. Barrett's claim of prosecutorial misconduct dealing

with the manner in which Littlefield handled his informant witnesses in an attempt to prevent

defense counsel from having anything close to a reasonable opportunity to investigate the

backgrounds of these witnesses and their testimony.

The current defense investigation supports the claim Littlefield routinely sought to

intimidate witnesses.   Janice Sanders described her contact with Littlefield:

> Mr. Littlefield came to see me.  Johnny Philpot accompanied him.  Mr. Littlefield
> got angry with me when I told him that I thought that Kenny's state sentence was
> fair and that it was un-American to try him again since he had been convicted and
> sentenced.

(Exhibit 85.)[44]

---

[44] Since Mr. Barrett's original Motion to Vacate was filed, there has been continuing investigation into Littlefield's Muskogee County child abuse charges, which have been shrouded in secrecy because the file was apparently improperly expunged even before his 2-year deferred sentence expired.  An investigator working on Mr. Barrett's case interviewed Tim Brown, the current chief of police in Webbers Falls, Oklahoma.  Mr. Brown was formerly a lieutenant in the Muskogee County Sheriff's Department.  He was employed with the Muskogee County Sheriff's Office at the time criminal charges were filed against Littlefield.  He was also a member of the Eastern Oklahoma Regional Child Death Review Board.  According to Mr. Brown, Littlefield threatened the sheriff's investigators working on the child abuse case.  Littlefield also dismissed the charges as "bullshit" (a protestation of innocence belied by his later *Alford* plea), and, adopting a victim role, claimed the Muskogee County Sheriff's Office was "trying to get him." In addition to committing child abuse, it was alleged by Mike and Dawn Littlefield's daughter that her parents smoked marijuana in front of her and her younger brother.
    According to Mr. Brown, the prosecutors assigned to Littlefield's criminal case from the Oklahoma Attorney General's Office were scared that Littlefield's prosecution would "open up a can of worms" because Littlefield, while he was employed with the Muskogee County District Attorney's Office, had prosecuted most of the big drug cases brought in that county.  During the

(continued...)

During the penalty trial Littlefield repeatedly questioned Mr. Barrett's ex-wife, Abby Stites, about instances of violence in their marriage. Each time Ms. Stites put these events in context – including Mr. Barrett's mental illness and her own violence towards him – Littlefield returned the jury's attention to Mr. Barrett. It is now clear that Littlefield had his own guilt to project onto Mr. Barrett during this cross-examination. Although jurors rejected the idea that Mr. Barrett was a future danger, it is likely that Littlefield's harping on the violence in the Barrett marriage had an impact on the jury's assessment of the appropriate punishment. This Court should not permit a death verdict to stand where it was influenced by the rhetoric of a prosecutor expiating his own sins of abuse on the life of the defendant.

### 3.    John Philpot.

The Government argued extensively at trial that a middle-of-the-night, no-knock search warrant had to be issued to search Mr. Barrett's property, and that the authorities had to proceed in the way they did, because Mr. Barrett was dangerous; if he had any warning that police were on his property, he would have shot them. This was the repeated theme of the Government's case, based on its seven informant witnesses.

---

[44](...continued)
continuing defense investigation into this matter, former DHS child abuse investigator Melissa Todd was also interviewed. While she declined to discuss Littlefield's criminal case because of confidentiality concerns, she attested to the honesty of Tim Brown. (Exhibit 43.)

Littlefield's conduct lends additional support to Mr. Barrett's claim that Littlefield threatened the informant witnesses he cultivated for Mr. Barrett's federal prosecution. It shows that Littlefield behaved as a law unto himself, a pattern of conduct indicating he would have few qualms about concealing *Brady* material and sponsoring false testimony. Mr. Barrett will continue to seek information from the Government about these matters and amend his claims as the information becomes available to him.

The truth is otherwise. John Philpot, former Sequoyah County Sheriff, recently admitted to a defense investigator that he and other local law enforcement officers were on Mr. Barrett's property less than a month before the raid which led to the death of David Eales, as police reports reflect they had also done the previous year. There were no shots fired and no violence from Mr. Barrett. (Exhibit 6.)

This evidence, known to the Government or its agents, was unquestionably exculpatory, in several respects. Had this fact been known to the defense, the entire edifice of the prosecution's case would have crumbled. It would have supported an attack on the nighttime, no-knock warrant, demonstrating there was no probable cause for a warrant of this type. Because the initial warrant lacked probable cause, the fruits of any subsequent warrant, *i.e.,* drugs and firearms evidence later seized, would have been acquired unlawfully, knocking out the foundations of the three counts in the superseding indictment. This evidence would have discredited the seven snitches, some of whom claimed they were told by Mr. Barrett that if the police came on his property, he would shoot the first one through the door, and that he hoped the first officer through the door would be John Philpot. This evidence would have demonstrated that, as the defense argued, Mr. Barrett was unaware the police were raiding his property; he thought he was repelling civilian trespassers. Even if convictions had been returned, this evidence was relevant to rebutting the intent factors alleged by the Government in the punishment phase.

Certainly when viewed together, the exculpatory evidence suppressed by the Government, some of which could also be termed newly discovered evidence, the other newly discovered evidence discussed above, and the Government's sponsorship of false testimony

would have made the difference between conviction and acquittal at trial.  At a minimum, it would have made a difference in the sentencing stage.

The Government suppressed and has continued to suppress evidence which would have dealt fatal blows to Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, Brandie Price, Karen Real, Randy Turman, Clint Johnson, Vickie Lyons, and John Philpot.  At least two of the informant witnesses, Travis and Cindy Crawford, testified based on threats from then-AUSA Littlefield, a fact well known, obviously, to Littlefield himself.  The suppressed exculpatory or newly discovered evidence, or both, affecting the credibility of these witnesses, were known and became known to the Government and its agents.  This evidence  was unquestionably favorable to Mr. Barrett, and was material in the sense that disclosure of this evidence would have created a reasonable probability of a different outcome.

Taken together, the suppressed exculpatory evidence addressed above would have been fatal to the admissibility of all the physical evidence introduced against Mr. Barrett, and would have left in shreds the prosecution's claims of Mr. Barrett's "intent," as testified to by the seven informants.  Newly discovered evidence in the form of after-the-fact deals given to various prosecution witnesses – which Mr. Barrett contends still constitutes *Brady* material, because these deals were in the works or promised all along, and because the prosecution's duty under *Brady* is continuing – would have shown the various snitch witnesses to have no credibility whatever.

Travis Crawford's recantation, if known at the time of Mr. Barrett's trial, belies the prosecution's theory of intent and could have been used to impeach the credibility of other witnesses' claims that Mr. Barrett had threatened armed confrontation with the police.  Likewise,

had the former AUSA's violent temper and assaultive behavior against his own children been known at the time of Mr. Barrett's trial, the claims now made by the Crawfords that they were coerced to testify against Mr. Barrett ring true. The newly discovered evidence discussed here goes to the foundation of the case.

Most troubling, of course, is the Government's sponsorship of false evidence from Randy Turman, Charles Sanders and, at the motion to suppress, from Clint Johnson. This evidence clearly affected the outcome of trial. Threats to witnesses Travis and Cindy Crawford is also a form of false evidence; a threatened witness is, *per se*, an unreliable witness. The Government also misled the jury about what it was going to do for Sanders and Karen Real in exchange for their testimony.

The misconduct of the prosecutors was repeated and blatant. Mr. Barrett's fundamental constitutional rights were violated. He should be granted relief from his convictions and sentences.

### C.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Interference with Defense Counsel's Investigation of Key Witnesses.

The prosecution in Mr. Barrett's case interfered with the defense's access to key prosecution witnesses including Karen Real, Randy Turman, Randall Weaver, Charles "Monk" Sanders, Cindy Crawford, Travis Crawford, and Brandie Price. Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor. (Exhibit 92; Exhibit 31.) For example, Karen Real has told Mr. Barrett's investigator that she was told not to speak with him. (Exhibit 43.) Additionally, the prosecutors intentionally delayed access to the identities of the witnesses in

order to prevent meaningful interviews with them, including by preventing interviews with

incarcerated witnesses, and to prevent meaningful investigations of their backgrounds and

honesty.

Prosecutors intentionally withheld the names and contact information for these

witnesses.  On February 17, 2005, prosecutor D. Michael Littlefield wrote in a letter to defense

counsel that the Government did not intend to reveal the identity of the confidential informant,

and added the "situation would change should we determine to utilize this individual as a

witness."  The Government did not reveal the identities of its seven key witnesses until

September 15, 2005.  In order to keep the identities secret past the deadline imposed by 18

U.S.C. § 3432, the Government filed a baseless motion for a protective order.  The trial court

found the Government could have filed its motion to keep the witnesses' names from the defense

weeks earlier.  (Tr. 9/13/05 Hr'g at 5).  The trial court found the Government's motion did not

present any evidence to justify withholding the names and other information from the defense.

(Tr. 9/13/05 Hr'g at 4).  The prosecutor admitted that the Government could have raised its

concerns about at least some of the witnesses earlier.  *Id.* at 9.  Despite the delay the court found

"there is no evidence of any overt activities by anyone on behalf of the defendant to intimidate

witnesses that you [the Government] are aware of."  *Id.* at 19.[45]

During an *in camera* hearing on the Government's motion for a protective order,

AUSA Littlefield was not candid with the court.  The court appeared to recognize that Littlefield

was making inconsistent claims.  On the one hand he was claiming that the defense attorneys had

_____

[45] The only person the Government could point to who had any known affinity with Mr. Barrett
that could conceivably suggest a threat, was a man who posed no threat whatsoever because he
was in a federal prison somewhere.  *Id.* at 14.

sufficient notice of the witnesses (a) because they were Mr. Barrett's associates and family members (Tr. 9/13/05 Hr'g at 9-10), and (b) because Littlefield told defense counsel what the witnesses would testify to. *Ibid.* The court raised the obvious point that if Littlefield had been so forthcoming, there was no need for secrecy because the disclosed information would be sufficient for Mr. Barrett "to be able to determine roughly who we are talking about." *Id.* at 11. Littlefield said it would not be. This admission strongly suggests Mr. Barrett was not aware of having said the things attributed to him by the witnesses because he had never said them.

At that point the United States Attorney cut Littlefield off and had an off-the-record discussion. Back on the record, Littlefield said that the notice he had provided would be insufficient to identify the witnesses because Mr. Barrett had said these things to so many people, it would be hard for him to remember them all. Littlefield could produce no evidence of this "belief" he had. *Id.* at 12.

Following the *in camera ex parte* hearing, the Government and Judge Payne withheld from defense counsel information that was critical to the defense including: (a) that the court's research indicated that for purposes of § 3532 the trial had started the previous day; (b) that the court indicated a request for a continuance would be valid based on the importance of the witnesses and what they would say; (c) that the Government had made representations about defense counsel's interpretation of § 3532; (d) that AUSA Littlefield had spoken with a witness who failed to corroborate information from confidential informant Charles Sanders; (e) that the Government's motion for a protective order relied upon information the court deemed irrelevant – *viz.* that the court permitted Mr. Barrett to be restrained by an electric-shock belt and that the court would keep jurors anonymous – and lacked sufficient factual support; (f) that the

prosecutors revealed *in camera* information that fell within the notice requirements of Federal Rule of Evidence 404(b).  *See* Ground One, *supra*.

To the extent Mr. Barrett's trial counsel acquiesced in the prosecutors' plan to delay production of the witnesses' names, contact information, statements, and the arrangements for interviewing the witnesses, Mr. Barrett was denied his right to effective assistance of counsel. As the prosecutor said, Mr. Barrett's trial counsel had no information about the identities of the witnesses or the content of their testimony.  (Tr. 9/13/05 Hr'g at 6-7).  With the information withheld from them, trial counsel could not have made an informed decision regarding whether delayed disclosure was acceptable, whether the arrangements for interviews were acceptable, and whether trial counsel were ready for trial once the witness names were known.

The concerns of any reasonable defense lawyer under the circumstances – including the need for a continuance – were obvious to the trial court.  (Tr. 9/13/05 Hr'g at 10, 12.)  The record shows defense counsel acquiesced in the Government's proposal that witnesses be interviewed with Government representatives present.  *Id.* at 27.  In addition to this "decision" being professionally unreasonable, it was to some extent induced by the trial court's failure to disclose weaknesses the Court had identified in the Government's position, weaknesses the court disclosed to prosecutors, but not to the defense.  *See* Ground One, *supra*.  Neither Mr. Barrett nor his counsel could have made an informed decision about access to the witnesses without the information the trial court possessed but was unwilling to share with the defense.  To the extent Mr. Barrett's trial counsel could have uncovered the same legal arguments the court identified, they failed to act professionally.

Faced with the Government's intentional delay (the confidential informant at least was known to the Government from the start), and the Government's pretextual expression of concern for the witnesses' safety, and ignorant of the Court's views and complicity in extending the delay, Mr. Barrett's trial counsel "agreed" to restrictions on their access to witnesses. The Government's promise of restricted access was itself illusory. Mr. Barrett's counsel were unable to conduct any meaningful interviews of the witnesses prior to trial. The delays also prevented or impeded meaningful investigation of the witnesses. As shown *supra* in this Ground and Ground Two, an investigation of the Government's key witnesses would have yielded abundant evidence of their dishonesty and incentives to color their testimony to the desires of law enforcement.

If trial counsel had met their ethical and constitutional obligations to Mr. Barrett, there is a reasonable probability the outcome of the case would have been different. In the absence of the seven snitches' testimony two prior juries refused to convict Mr. Barrett of capital murder. As the trial judge repeatedly asserted in his budget rulings and elsewhere in the record, the main difference between the federal case and state cases was the question of premeditation, or a pre-formed intent to kill. As the United States Attorney has publicly acknowledged, the seven snitches were key to the Government's ability to convince the jury Mr. Barrett acted with the requisite *mens rea*. But for the Government's misconduct or trial counsel's deficient performance, the evidence presented herein would have impeached the seven witnesses. It is reasonably probable that if the witnesses had been impeached with the evidence presented herewith, Mr. Barrett would not have been convicted of capital murder, or would not have been sentenced to death.

**D.    Mr. Barrett is Entitled to a New Trial Due to the  Prosecution's Improper Questioning of Witnesses and Closing Argument**.

The prosecutor's improper conduct included the following examples:  The prosecutor improperly asked questions for which he lacked a good faith basis, or to which he knew the witness could not give an answer based on personal knowledge, the effect being to imply that the prosecutor had knowledge of the facts.  (R. 4743 (implying existence of records adverse to Mr. Barrett), 4765-66, 4781 (implying Mr. Barrett had been denied custody of his son), 4788-92, 4850, 4852-53, 4859, 4862, 4866, 4869, 4911, 4913, 4925 (bolstering Karen Real by implying prosecutor's knowledge of her reputation for honesty), 4980, 5006 (falsely suggesting prosecutor had knowledge of Mr. Barrett trying to infect jail worker with communicable disease).)

The prosecutor improperly commented upon Mr. Barrett exercising his trial rights in state court.  (R. 4765.)  The prosecutor improperly adduced through a witness who lacked personal knowledge whether someone who is sentenced to 20 years' imprisonment will be released earlier by the Department of Corrections.  (R. 4765-66.)

The prosecutor asked witnesses whether other witnesses had made false statements although, due to Federal Rule of Evidence 615, the witness being questioned could have had no knowledge of the other witnesses' testimony.  (R. 5092.)

The prosecutor repeatedly exceeded the scope of direct examination and asked witnesses questions about the seven informant witnesses the Government presented in federal court, or Abby Stites' charges against Mr. Barrett, although – or because – the prosecutor knew the witnesses lacked personal knowledge of the facts.  (R. 4767, 4788-92, 4925, 4926, 5024-26,

5045 (Littlefield acknowledging he asked question knowing witness had no personal knowledge), 5069, 5116.)  As the prosecutor's obvious goal was to merely repeat the testimony of witnesses who claimed to observe various facts, regardless of whether the witness testifying had said anything related to the other witnesses' testimony, the questioning lacked any probative value and trial counsel were ineffective for failing to object.  The effect of the prosecutor's improper questioning was to repeat the Government's case over and over and over, and make defense witnesses appear ignorant of facts to which their testimony did not relate.  Ultimately, the prosecutor's misconduct – enabled by trial counsel's unreasonable failure to object – completely drowned out the defense witnesses' testimony.

In arguing for death, the prosecutors stooped to conquer.

In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently.  Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards."  (R. 5356-57.)

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer.  This was "way over the capital murder line."  (R. 5402-03.)  Similarly,  Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?"  (R. 5412.)

Denigrating Mr. Barrett's fundamental right to a fair trial,  Sperling, in the form of a rhetorical question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness."  (R. 5408.)

Trotting out a variation on the old Bob Macy[46] "three hots and a cot" argument, Sperling repeatedly – and  falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room."  (R. 5412, 5423.)  Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation.  (R. 5412.)  Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates.  (R. 5412.) In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent."  (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence."  Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?"  The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill."  (R. 5412-13.)

---

[46]  Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[47], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough." to testify.  (R. 5414-15.)

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them.  To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. (R. 5415.)  This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense enough to put them on the stand.  Sperling was well aware they *could not have testified by law* because the case never got past the first stage.  Shielded by the court's erroneous ruling excluding

---

[47] This was a knowing false statement on the prosecutor's part.  As discussed in Ground One, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett.  "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

Mr. Barrett's statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]." (R. 5419.) The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did. Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone. Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing." The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops." (R. 5420-21.) There were additional comments on Mr. Barrett's supposed lack of remorse. (R. 5419-20, 5421-22.)

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life. (R. 5420.)

Sperling improperly aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again. (R. 5421-22.)

Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warning the jury they would make him a "hero" in prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.) This was little better than telling the jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit.

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections. *See* Ground Two. The error stemming from

prosecutorial misconduct cannot be termed harmless. This was not a runaway case for the death penalty. The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

A claim of prosecutorial misconduct was not raised on direct appeal. Because the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused the failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)   **Direct Appeal of Ground Five:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐   No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)  **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐    No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes  ☐    No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes  ☐    No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes  ☐    No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND SIX**

> **Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements**.

(a)    Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The court wrongly excluded relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales, and improperly restricted the jury's consideration of the state-court verdict.

During the course of Mr. Barrett's trial, trial counsel sought to admit a number of statements made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper Eales.  For example, Mr. Barrett's counsel sought to admit the written statement of Trooper Glen Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person got killed.  I wished it had been me."   (Exhibit 107.)

However, the prosecutor objected to these statements, and the court incorrectly excluded them.  The Government cynically exploited the court's ruling in closing argument,

mocking the notion Mr. Barrett had any remorse at all.  The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the bastards." (R. 5356.)  During closing argument, Mr. Barrett's counsel argued, as a factor in mitigation, that Mr. Barrett expressed  remorse.  With Mr. Barrett's expressions of remorse excluded, the United States Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer." (R. 5423.)  As a result, all of the jurors rejected as a mitigating factor that Mr. Barrett expressed remorse for his crimes.

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation.  In fact, Mr. Barrett's expressions of remorse were highly relevant and admissible. Remorse is an important mitigating factor.  This is particularly true when, as in this case, the Government emphasized the lack of remorse in closing argument.

The court's error in excluding this evidence prejudiced Mr. Barrett.  Had Mr. Barrett been allowed to present this evidence, there is a substantial probability that he would not have been sentenced to death.  The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case.  21 U.S.C. section 848(j), in effect at the time of Mr. Barrett's trial, states that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice.  Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that

expressions of remorse are more prejudicial than probative. The court excluded highly relevant

mitigating evidence of remorse, which opened the door for the Government to prejudicially

deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

Appellate counsel were ineffective for failing to raise this issue, clearly framed by

the record, on direct appeal. Because of the overriding importance of mitigating evidence in

capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where,

as here, relevant mitigating evidence is excluded. There could be no reasonable strategy for

neglecting to raise this issue. There is a reasonable probability that had it been raised, the

outcome of the appeal would have been different.

Should this claim require amendment, the need is traceable to the extraordinary

circumstances of his appointed counsel's medical impairment, the unavailability of evidence

despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government

or state law enforcement officials.

(b)    **Direct Appeal of Ground Six:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐     No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal because it pertains to ineffective assistance of

trial and direct appeal counsel, matters which are appropriately addressed in the first instance in

these collateral proceedings.

(c)     **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐       No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes   ☐       No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes   ☐       No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes   ☐       No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND SEVEN**

> **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification**.

(a)   Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and the exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place visible restraints on Mr. Barrett during the trial without a finding that Mr. Barrett was or would be a security risk. Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist.  The belt left an unusual bulge that was visible through Mr. Barrett's clothing.  The marshals' ability to send an electric shock through the belt intimidated Mr. Barrett and posed a danger to him that impaired his ability fully to observe and participate in the trial, including communicating with his attorneys.

During a sealed hearing held August 31, 2005, a deputy U.S. Marshal testified that there were never any problems with Mr. Barrett acting out or showing any signs of being a risk of danger or escape.  The Court opined that the mere fact that a stun belt had been used against other capital defendants without their lawyers complaining was a ground to permit its use.  Mr.

Barrett had been through two previous capital trials related to the same events and during that time never posed any security risk or risk of escape. In sum, none of the constitutionally required circumstances existed to justify placing visible and/or intimidating restraints on Mr. Barrett during trial.

On September 9, 2005, the Court abdicated its role and consigned the question of whether to place restraints on Mr. Barrett to the discretion of the U.S. Marshal Service. This ruling, in addition to violating the constitutional rights mentioned above, violated Mr. Barrett's right to a fair and impartial trial judge. *See also* Ground One.

In an *ex parte* hearing outside the presence of defense counsel, the trial judge stated that "probably any capital case where I was the presiding judge a stun belt would be used just because of the nature of the potential punishment. It just seems that it's a common – almost a common sense call under those circumstances." (Tr/ 9/13/05 ex parte Hr'g at 13.) The Supreme Court requires much more than a "common sense call" before a defendant can be restrained in the fashion Mr. Barrett was.

The stun belt created a visible bulge in Mr. Barrett's clothing that was observable by the jury. (Exhibit 80.) In addition, Mr. Barrett was known by the Government and Court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy. Indeed, the jury found that Mr. Barrett had suffered abuse from Philpot. The Government and Court also were aware that Mr. Barrett had been beaten and threatened by law enforcement officers for his role in the death of David Eales. Under the circumstances it was reasonable for Mr. Barrett to fear that he would be stunned by the marshals on the slightest perceived provocation, and as this issue was raised by trial counsel, the Court was aware that the stun belt would inhibit Mr. Barrett's movements and

communications with counsel in court. After all, he was to be restrained even though the marshals admitted he had never caused them any trouble.

Trial counsel informed the court that Mr. Barrett was at special risk from the stun belt due to conductive steel wire in his chest and abdomen area. (Tr. 9/9/05 Hr'g at 27.) (Trial counsel's statement at this hearing reveals that three days before the trial began trial counsel Hilfiger had not reviewed Mr. Barrett's medical records which clearly mention – and in the case of x-rays, depict – the metal wires in Mr. Barrett's chest.) Trial counsel's statements informed the court that Mr. Barrett was especially fearful of the stun belt and the danger it posed to him. This fear was exacerbated by the marshal's failure to conduct or inquire about Mr. Barrett's unique medical circumstances. Since the trial, trial counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial. (Exhibit 29.)

The unjustified use of restraints on Mr. Barrett inhibited his movement and communications with counsel and made him appear dangerous to jurors. The stun belt scared and intimidated Mr. Barrett and chilled his communications, and restricted his ability fully to observe and participate in the proceedings.

To the extent the stun belt was used without sufficient justification, its use was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance. The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt. In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness. Therefore, there is a reasonable probability that Mr.

Barrett would have been granted a new trial if the issue had been raised on direct appeal. *See* Ground Eighteen, *infra*.

To the extent the record was insufficiently developed for this claim to have been raised on direct appeal, trial counsel's performance was deficient. Counsel recognized the serious danger for prejudice and continued to object on September 9, 2005, when the Court gave the marshal discretion to restrain Mr. Barrett without either the prerequisite legal or medical showings of necessity or safety.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)    **Direct Appeal of Ground Seven:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)    **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐        No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐        No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐        No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND EIGHT**

> **Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**.

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and the exhibits thereto.

The judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial.

The factual allegations set forth in more detail in Grounds Two and Thirteen, and incorporated by this reference as though fully set forth; and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition irrefutably demonstrates that Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings.   At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions.  Mr. Barrett was

involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with

antipsychotic medication.

In the months preceding Mr. Barrett's arrest, he was psychiatrically

decompensating, and his disordered thinking became increasingly paranoid and delusional as he

became preoccupied with the distorted belief that he was being monitored by some form of

unknown aircraft; and withdrew to his rundown shack, unable to venture into the outside world.

Mr. Barrett's mental state was further impaired by brain damage, particularly in the areas that are

necessary to reason, exercise sound judgment and inhibit overreaction to stress situations.

Neuropsychological assessment of Mr. Barrett by Dr. Myla Young has revealed that prior to and

throughout Mr. Barrett's trial, he suffered brain dysfunction that seriously disrupted his executive

functioning, compromising his ability to engage in purposeful, organized, strategic,

self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit

reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee

the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct

motor output; and adequately process and make use of new information.   (Exhibit 89 at ¶¶

36-38;  Exhibit 117 at ¶¶ 57-58.)

George W. Woods, Jr., M.D., a clinical and forensic psychiatrist, has concluded

that Mr. Barrett was incompetent at the time of trial, based on Dr. Woods's review of extensive

life history and medical data, his clinical evaluation of Mr. Barrett in February 2009, and his

consideration of Mr. Barrett's psychiatric diagnosis of Bipolar Disorder and Post Traumatic

Stress Disorder (PTSD), as well as the neuropsychological findings of Dr. Young.  In Dr.

Woods's expert medical opinion, Mr. Barrett was unable rationally to assist his attorneys in the

preparation of his trial due to a confluence of his psychiatric disorders (Bipolar Disorder and PTSD) and his neurocognitive dysfunction resulting from his brain damage. (Exhibit 117 at ¶ 81.) The distorting and distracting effects of the PTSD were exacerbated by "built-in reminders," in the form of bullet fragments that caused Mr. Barrett continual and significant pain, and an immunological reaction he had to the bullet fragments in his body. (Exhibit 117 at ¶ 79.) In turn, Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder. (Exhibit 117 at ¶ 80.) These disabling impacts on Mr. Barrett's mental state were synergistically increased by the effect of his brain damage to produce a "ruminative" thought process, which caused Mr. Barrett to be "unable to get unstuck." (Exhibit 117, at ¶ 80.) This caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings. (Exhibit 117 at ¶¶ 59, 80.)

As discussed more fully in Ground Thirteen, the trial record reflects the functional impacts of Mr. Barrett's cluster of impairments. Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument. His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals. Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident. Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations. Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense. Because such

behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Eight:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes ☐        No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes ☐        No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes ☐        No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND NINE**

> **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Were Ineffective for Failing to Raise this Issue.**

(a)      Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

At Mr. Barrett's trial, both the prosecution and the defense requested that the trial court instruct on voluntary manslaughter.  (R. 4212, 4213, 4215, 4218-19.  18 U.S.C. § 1112.) The United States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter.  Consistent with the reasoning behind the authority applicable to this issue, the prosecutor stated that because this was a capital case, caution dictated a lesser included-offense instruction be given.  The United States Attorney distinguished count 3 from counts 1 and 2 (which in essence charged felony murder), because count 3 had a specific knowledge and intent element.  To be guilty of count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case.  As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove

beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties. (R. 4215-19, *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.) The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing." (R. 4211, 4222.)

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute. The crux of the whole case was knowledge and intent. The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties. The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired. This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Mr. Barrett also contends, as was discussed in Ground Two, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for Counts 1 and 2. Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined. When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder.

As set forth in Ground Eighteen, *infra*, appellate counsel were ineffective for failing to raise this issue on appeal, particularly insofar as the error was conceded by the

Government at trial, appellate counsel were well aware that Mr. Barrett had been convicted of manslaughter in state court, and the factual basis for Mr. Barrett's federal court defense was the same as it was in state court. (Exhibit 29.)

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)  **Direct Appeal of Ground Nine:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐  No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)  **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐  No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes  ☐        No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes  ☐        No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes  ☐        No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TEN**

> **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor.**

(a)       Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11.  This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction.  (R. 5288.)  Mr. Hilfiger stated that he did not object.  (R. 5289.)  This omission was professionally unreasonable.

Mr. Barrett's defense counsel were aware that two prior juries had sufficient doubts about his culpability that they either could not reach a unanimous verdict or rejected first-degree murder liability.  The principal difference between those trials and the federal trial was the testimony of seven informants, each of whom was impeached, to a limited and ineffective degree, on cross-examination.  As argued elsewhere in this Petition, if trial counsel had

conducted a reasonable investigation, and/or the Government had complied with its constitutional obligation to disclose exculpatory evidence, further impeachment would have been presented. Regardless of those constitutional violations, trial counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in their sentencing deliberations whatever value there was in the first stage cross-examination of the informants.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred. The trial ruling excluding such evidence treated the issue as one of guilt or innocence. Professionally diligent counsel would have pointed out that the evidence of the prior conviction showed that a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings.

Trial counsel were on notice that courts in other federal death penalty cases, as well as state courts, had held that residual doubt is a valid mitigation circumstance. Trial counsel received from Federal Death Penalty Resource Counsel lists of cases that included references to cases in which residual doubt was considered in mitigation, and where the defendant received a sentence less than death.

Capital juries are called upon to express the community's reasoned moral response to the crime. Knowledge that two prior juries had been unconvinced that the crime was committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

Attorneys acting in a manner consistent with prevailing professional norms would have argued to the court that evidence of the prior jury's conclusion was relevant to the defense evidence presented in the first stage of trial. For example, during some of their cross-examination, trial counsel attempted to show the jury that nearly all the Government's informant witnesses who provided evidence of malice aforethought had not come forth with their claims during the previous six years of investigation and litigation. (R. 481, testimony of Travis Crawford; R. 3128, testimony of Karen Real.) Reasonably diligent defense counsel would have argued that these witnesses' testimony was an insufficiently reliable foundation for a death sentence, and informed the jury that another jury representing the community had concluded, without those witnesses' testimony, that the death of Trooper Eales was not caused in a capitally culpable manner.

To the extent the trial ruling excluding consideration of residual doubts about the manner in which the offense occurred was based upon trial counsel proffering sufficient evidence to call into question the reliability of the Government's evidence, the ruling was based on trial counsel's unreasonable failure to investigate the informant witnesses and/or the Government's misconduct in withholding impeachment evidence and/or limiting defense counsel's access to the witnesses as alleged elsewhere in this motion.

Compounding the error, the court gave a bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it

might have on the sentence in the federal proceedings.  (Doc. 257, Instruction No. 19, R. 5320-21.)

For similar reasons, direct appeal counsel were professionally unreasonable for failing to raise this issue on direct appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)    **Direct Appeal of Ground Ten:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐    No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)    **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐    No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the

judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes  ☐        No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes  ☐        No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes  ☐        No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND ELEVEN**

> **Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option. Appellate Counsel Were Ineffective for Failing to Raise this Issue on Direct Appeal.**

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and argument made in his original, corrected and amended petitions previously filed, and exhibits thereto.

Juror 62 was improperly excused for cause by the court solely because of her conscientious scruples against the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might do violence to her conscience, and even though it might be difficult.

Asked by the court if she had any opinions about the death penalty, Juror 62 responded, "I don't – I could not do it. I could not say anybody to be sentenced to death." Asked if she meant by this that she could not personally carry out an execution, the juror stated, "I couldn't even say they deserve it, no. I don't believe in it." The juror stated she could impose a life sentence and had no philosophical, religious, moral or other objections to such a sentence, and said, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]" (R. Individual jury selection, 819-21.)

Questioned by defense counsel, the juror said that she had held her views on the death penalty her whole adult life. Defense counsel informed her that in order to be qualified to sit on a capital case, she would have to consider not only evidence in mitigation, but the

Government's evidence as to why the death penalty should be imposed and to give that evidence

"due consideration." Asked if she would be able to do this, the juror responded:

> Well, I don't know if I understand your question, but I could listen to that and see
> whether he needs to either have the death penalty or go to prison for life without
> parole.

(R. individual jury selection 823-24.)

Again asked, in a slightly different way, whether she could listen to the evidence

in aggravation and mitigation, and weigh the evidence, she said she "could probably say he

needed to or should," as long as the responsibility lay elsewhere, "but I could not say that he –

myself, that he needs the death penalty." The juror answered "No[]" when asked if she could

imagine a murder so heinous that she could "find for the death penalty" after "having considered

the Government's evidence[.]" (R. individual jury selection 824-25.)

Questioned briefly by the Government, the juror was asked if she could sign her

name to a death verdict form "knowing that the result of that verdict would be the death by

execution of another human being, the defendant in this case[.]" The juror responded that if she

thought the crime "deserved it," she "probably could sign a paper saying that he should get the

death penalty, but I couldn't say to do it. I could not sign a paper that says the death penalty for

him." Told by the prosecutor that a jury's death verdict was not just a recommendation, and that

the judge could not change the verdict, the juror said, "I could not do that, huh-uh." (R.

individual jury selection 825-26.)

The court asked additional death-qualification questions of the juror:

> Q.     ... If I instructed you that the law requires you to consider both the death
>           penalty and life imprisonment without the possibility of release, are your

personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.    If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life.  But if you told me I had to do it, and I thought that he actually – the crime was so heinous that he should have the death penalty, because I was instructed to do it, and I thought it was, I could do it.  I would do it.  But I do not – I would live –

Q.    So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.    I understand that.

Q.    And – but if you were selected – otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.    I would consider it, yes.

Q.    And, of course, when you say "consider it," couched in the – in the history of how you've answered these questions, it prompts me to say: Would you consider it fairly?  I mean, in this case, the first thing that would have to happen, before we got to even a sentencing stage, is there would have to be a finding –

A.    Right.

Q.    – that justified – I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law,  justified either death or imprisonment for life without the possibility of release.  So, under those circumstances, then the Government would have to follow through with their obligation and put on aggravating factors.  And aggravating factors are those factors that would suggest that death is the appropriate punishment.  Then the defendant would have the opportunity to put on what's called mitigating factors.  And as a juror, you'd be obligated to not exactly balance them, but give serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty.  So, do you think you could do that?

A.    I think I could.  It would be very hard for me to do that, but if it was my duty.

Q.    Well, I think when you say it would be – that encourages me, because you say it would be very hard.  I agree.  I don't disagree with that.  It will be very hard.  I mean, the people who end up sitting as jurors in any case, but particularly in this case, it's going to be very hard.

A.    Uh-huh.

Q.    And it should be very hard.

(R. individual jury selection 826-28.)

Before turning the floor over for additional questions by counsel, the court asked the juror if she could consider life without the possibility of release, to which the juror responded, "Definitely.  I could do that." (R. individual jury selection 828-29.)

Defense counsel had no additional questions for Juror 62.  (R. individual jury selection 829.)  Questioned again by the Government, the juror stated she realized the judge would never tell her what decision to make.  Asked if, considering the two penalty options, she would "take life as the more comfortable out, given [her] feelings about the death penalty[]," the juror said she would "take life, but it wouldn't be comfortable.  I would still take life in prison, yes."  (R. individual jury selection 829-30.)  Asked if she could ever envision a situation in which "[she] would sign [her] name to a death verdict?", the juror responded:

If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes.  That would be my duty.  I'm here, and that

would be what I'm here for.  But I couldn't live with it, but I would do that, yes.

(R. individual jury selection 830.)

The juror again stated she understood the court would not tell her what sentence to impose.  The Government then asked not whether the juror could simply consider both punishment options, but whether she was "capable for returning a death verdict for this

defendant[]," to which the juror understandably replied, "I don't know whether I could or not."

Again going to the ultimate issue of whether the juror would actually vote to impose the death

penalty, given a choice between life and death, the juror was asked if she could "imagine a

circumstance in which you would ever impose a death penalty[,]" to which the juror said "No."

(R. individual jury selection 830-31.) Mining the same subject – not merely whether the juror

could consider death as a punishment option, but whether she could "ever return a death penalty

unless the judge told you, you had to[,]"– the juror responded that she probably could, but could

not predict her vote in advance:

> I think I would have to hear what he has done and how heinous it was and all of this. And I have a – something personal in my life, that happened to me, and I could not, you know – had no remorse about it. So, I don't know how I would react, but I – you know, since this has never – I've never had this or have to think about, I just always thought I could never do this. But I think that if it was so bad that I think this person should not even be here anymore, I possibly could do that. Now, I can't say that I would – you know – I – I – my mind can always be changed, but it has to be changed to where I understand it. So, I thought – if he deserved it, I – I probably – I think I probably could, but I – I'm only human.

(R. individual jury selection 831-32.)

Yet again going beyond whether the juror could consider the death penalty, the

prosecutor asked her in effect "how bad it would have to be" before she voted for the death

penalty, to which the juror responded, "It would have to be pretty bad." In response to the

prosecutor's question regarding what she meant, the juror gave the example of killing or torturing

a child, but she "couldn't tell you how bad it would have to be." (R., individual jury selection

832.)

Unsatisfied still, the prosecutor continued without court interference (or objection)

to harangue the juror with whether, and under what precise circumstances, she could actually

vote to impose the death penalty. Juror 62 responded reasonably that everything would depend

on the facts, but gave every indication that she could consider both penalties, despite her personal

views on capital punishment:

> Q. All right. Other than torture to a child or something – other than torture to a child, can you imagine a circumstance in which you'd return a death verdict?

> A. I never heard anything so heinous that I even had to think about it. But I would have to give it a lot of thought. But I'm – I'm just – I cannot lie to you. I would have to say that I would not know until I'm in that situation.

> Q. Okay. Well, at the end of the day –

> A. Okay.

> Q. – are your feelings such that you would really be substantially impaired in serving as a juror in a case where you might be asked to vote in favor of a death penalty?

> A. Like I say, it depends on what he has done and how bad I think it is. And I'd have to weigh all of the things – I cannot say yes nor can I say no. I would think that – I would think that I am just enough to know that if this is what it is, and I think he deserves it, I probably could sign, yes. But I'd have to really decide for myself – you know, I'd have to hear it. I can't say no, I'll just go in here and sign it. I'd have to see how bad it is. And it would have to be really bad.

(R., individual jury selection 832-33.)

The United States Attorney then had the temerity to tell the juror that he could not

"try the case for you today," detailing the facts of the case so as to inquire whether, on those

facts, they would be "bad enough" for her to return the death penalty, even though he asked her

repeatedly to commit in advance to signing a death verdict. (R. individual jury selection 833-34.)

Worn down by repeated questioning on whether she could not just consider both punishment

options, but could put her name to a death verdict, the juror, again very reasonably in light of the

fact she had heard no evidence, said, "Well, let me just say no, then. Because, you know, I

would have to say no right now. I know no other thing except to say no, I could not sign it." (R.,

individual jury selection 834.)

Continuing the seemingly endless round-robin, the court again inquired of Juror

62 whether she could set her personal views aside and follow the court's sentencing instructions:

> Q.    ... But if I instructed you that the law requires you to consider both the
> death penalty and life imprisonment without the possibility of release, are
> your personal opinions – and I want to repeat those – if they are, tell me –
> your personal opinions about the death penalty, are they so strong that you
> would not be able to follow the instructions?
>
> A.    Well, I have to say it again, it's my duty to do this or not to do this, but if
> you told me that that was one or the other, and I thought he deserved the
> death penalty, I would have to – I think I could sign the death penalty, if I
> listened to the information and that it was bad enough, I – and you told me
> that this was my duty and that this – I probably could sign the death
> penalty.
>
> Q.    And could you, likewise, consider the possible imposition of life
> imprisonment without the possibility of release?
>
> A.    Certainly could.

(R., individual jury selection 835-36.)

Defense counsel argued the juror was qualified, and had in fact "backed off her

initial stance" when questioned by the Government. (R., individual jury selection 838.) The

Government moved to excuse Juror 62 for cause, arguing that she answered "three or four

questions in the right direction, under significant pressure." (Left unsaid, of course, was that any

pressure applied to the juror came from Mr. Sperling himself, rather than defense counsel or, for

that matter, the court.) Yet again focusing on the irrelevant inquiry whether the juror could

commit ahead of time to voting for death, the Government maintained the juror was

"substantially impaired," because a murder would have to be "really heinous" before she would vote for death. The court agreed with the Government that the juror was "substantially impaired" and excused her for cause, over objection by defense counsel. (R. individual jury selection 838-40.) The excusal for cause of Juror 62 was improper.

The excusal of Juror 62 was not raised on direct appeal, even though the error was plainly apparent from the record. There was no reasonable strategic ground for omitting this argument. Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)     **Direct Appeal of Ground Eleven:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐     No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal due to ineffective assistance of appellate counsel, a matter which is appropriately addressed in the first instance in these collateral proceedings.

(c)     **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐     No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes  ☐       No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes  ☐       No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes  ☐       No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWELVE**

> **The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**.

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows.  Although this court instructed the jury that it must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors.  The jury was provided with the following penalty phase instruction regarding the weighing process:

> As to Count Three, you must find first the Defendant was at least 18 years of age at the time he committed the offense; and second, the Government has proven beyond a reasonable doubt the existence of the threshold eligibility factor; and third, the existence of at least one statutory aggravating factor; and fourth, that the threshold eligibility factor plus the statutory aggravating factor or factors which you have found to exist sufficiently outweigh any mitigating factor or factors which you found to exist are [*sic*] in the absence of the mitigating factor or factors alone are sufficient to justify imposition of a sentence of death.

(R. 4502.)

The instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they

are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel. Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial. *See* Ground Eighteen, *infra*.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Twelve:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal because it pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)    **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐    No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes  ☐    No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes  ☐    No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes  ☐    No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THIRTEEN**

**Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective**.

(a)    Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, and allegations made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and argument made in his original, corrected and amended petitions previously filed, and exhibits thereto.

The facts in support of this claim, among others to be presented after further investigation, discovery, access to subpoena power, and an evidentiary hearing, include the following:

During the prosecutor's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom.  The marshals restrained him and asked the judge if Mr. Barrett should be removed.  The court said yes.  (R. 5421.)  Two to three marshals then took Mr. Barrett from the courtroom, and the prosecutor concluded his closing argument.  The court sent the jury out.  (R. 5429.)  The court then held a hearing with counsel but without Mr. Barrett present to discuss whether it should instruct the jury about Mr. Barrett's removal from the court room.  (R. 5430.)

The court described the incident in the following way:

> Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this. He said something other than that I could not detect. And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up. I can't say that he was attempting to come out across the table but he did attempt to get up and take a step. As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom. I will say that once the marshals made contact with the Defendant, he ceased – there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury.

(R. 5430.)

Mr. Hilfiger stated that the words Mr. Barrett said which the court did not hear were Mr. Barrett asking why the court and Government did not permit the jury to hear about his statements to law enforcement. (R. 5431.) Mr. Hilfiger also corrected the court's description by saying Mr. Barrett

> was not making an aggressive move toward anybody. What he was saying is I want to get out of courtroom [*sic*]. Take me out of the courtroom. I don't want to be here. And then the marshals, you know, asked you if they could take him out. Before that they were trying to put him back down in the chair. His move as I saw at that point was he was saying, you know, take me out of the courtroom. I want to get out of here. It wasn't an aggressive move towards anybody, just he wanted to get out.

(R. 5432.)

Mr. Hilfiger then stated that Mr. Barrett personally did not want a curative instruction and did not "want to participate in the court proceeding now." (R. 5432.)

According to the prosecutor, a deputy marshal "indicated or asked the Court do you want us to take him out and you [the Court] said yes. And at about that same time, the Defendant indicated he also wanted to leave." (R. 5433.)

The court confirmed that it ordered Mr. Barrett removed from the courtroom, and added that Mr. Barrett "was removed from the courtroom by two or three deputy marshals." (R. 5433-34.)

The Government asserted that the court "should make specific inquiry of the Defendant." (R. 5434.)

Mr. Hilfiger requested no instructions. (R. 5434.) When the court read its proposed instruction, Mr. Hilfiger stated, "I don't really care one way or the other. I don't object, I don't approve." (R. 5435.)

Mr. Hilfiger and Mr. Smith described that in their past interactions with Mr. Barrett, they observed him get upset then calm down and discuss matters. (R. 5436-37.) They recommended that his alleged desires regarding presence in court be revisited. *Ibid.* However, when the court offered them the opportunity to revisit the issue with Mr. Barrett before the court ruled, Mr. Hilfiger declined. (R. 5437.) Trial counsel did not have a private conversation with Mr. Barrett about the incident or his presence; they spoke to him in the presence of a deputy U.S. marshal. (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints." (R. 5438.) The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems." (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him. (R. 5438.)

Mr. Barrett was brought into the courtroom, and the following took place:

> Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further

proceedings; is that correct?

Mr. Barrett:     Yes, Your Honor.

The Court:       Do you have any questions of the Court about that?

Mr. Barrett:     No, sir.

The Court:       I'll ask the marshal to return – (Interrupted)

Mr. Hilfiger:    One more.  Does that include the verdict?

Mr. Barrett:     Yes, Your Honor.

The Court:       Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

Mr. Barrett:     Yes, sir.

(R. 5439.)

Mr. Barrett was escorted out, and the jury escorted in.  (R. 5439.)

The court read the following instruction to the jury:

Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing arguments are evidence in this case and you should not consider them in rendering your verdict herein.

(R. 5440.)

Mr. Barrett was absent for the jury instructions, (R. 5440-45), and for the reading of the jury's verdict.  (R. 5448-50.)

Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid

Page 361

estimate of the probable outcome." *(Id.*, Standard 4-5.1.)  One reason for this professional norm

is "to keep the client from making suicidal choices about the case."  (ABA Guidelines for the

Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb.

1989 ed.)).  Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the

jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be

present during trial.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation

of his background, including his mental health problems.  *See* Ground Two, *supra*.  Nevertheless,

Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted

suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder;

(c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was

not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of

steroids.  Reasonably diligent counsel, informed about their client's condition, would have taken

steps to obtain a competent mental health evaluation and judicial determination of the medical

necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness

of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically

decompensated  since the termination of the medications; and the nature and severity of the

functional impact of discontinuing and/or administering any medication on his ability to

communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regimen to which Mr. Barrett

was subjected was justified by medical necessity, reasonably diligent counsel would have sought

a further medical and legal determination of the degree to which the effects of such a regimen

interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive information; his capacity to understand his rights and make informed decisions regarding the exercise of waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and preparing him for them. If Mr. Barrett nonetheless acted inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regimen, as well as an assessment of Mr. Barrett's adjudicatory competency.

Mr. Barrett's counsel failed to gather medical records of his medical treatment in jail during the trial and/or failed to provide those records to a competent mental health or other medical expert retained by the defense. Had trial counsel conducted a reasonable inquiry, they would have known that Mr. Barrett had been injected with steroids in jail. If counsel had developed the relationship of trust required in criminal cases, counsel would have been aware that the steroids had a medically predictable effect that contraindicated their use with defendants

who were on trial, and impaired Mr. Barrett's capacity to control his inability to endure any psychological or emotional distress that might be caused by the prosecutor's arguments.

Due to the actions of jailers and the unreasonable omissions of Mr. Barrett's trial counsel, the jury was permitted to see him under the effects of steroids and without the benefit of medication deemed medically necessary to control the emotional dysregulation caused by his bipolar disorder.

Trial counsel's failings and the trial court's denial of authorization for counsel to obtain necessary and appropriate mental health assistance, including the assistance of a psychiatrist, individually and cumulatively deprived Mr. Barrett of his right not to be tried while his functioning was altered and impaired by the effects of voluntarily or involuntarily administered or discontinued medication, and/or while his functioning was altered and impaired by the effects of a medication regimen that was unjustified by any medical necessity. *See* Grounds One, Two and Three, *supra*.

Mr. Barrett's periodically altered mental condition, the ineffectiveness of his attorneys, and the unlawful actions of the court and marshals, also resulted in the denial of his right to be present during the close of the penalty trial. The trial court's order – which the court initially did not reveal on the record – that marshals remove Mr. Barrett without warning did not comport with the requirements of law. (R. 5430, 5433-34.)

Whether the defense sought or objected to an instruction from the court regarding Mr. Barrett's actions was the "exclusive province" of counsel. (ABA Standard 4-5.2(c).) As reflected in counsel's statements on the record, Mr. Barrett's counsel unreasonably failed to give the matter sufficient thought to determine whether an instruction was desirable or not. (R. 5435.)

Counsel unreasonably failed to consider whether an instruction that the jury should disregard the marshal's action in removing Mr. Barrett from the courtroom would have mitigated the prejudice of the jury having witnessed him being forcibly removed.

The willingness of Mr. Barrett's counsel and the trial court to let Mr. Barrett be absent from court during the remainder of the prosecutor's argument, the court's instructions, and the reading of the penalty phase verdict violated Mr. Barrett's constitutional rights.

Trial counsel's performance was ineffective because they allowed him to absent himself from the courtroom during critical stages (closing argument, jury instructions, and the reading of the penalty phase verdict) without ensuring that he was making an informed, knowing and intelligent decision.

The error in allowing Mr. Barrett's absence was not harmless. In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshal to remove him. His presence would have contributed to the fairness of the proceeding because Mr. Barrett could have advised his counsel about the facts. Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. "I really don't care one way or the other." (R. 5435.) Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

Among the most prejudicial inferences affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. Similarly, any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have

concluded prejudicially that the marshals acted in response to Mr. Barrett's threatening behavior toward someone in the courtroom or an attempt to escape.

Mr. Barrett's trial counsel acted unreasonably (a) by failing to object to the additional restraints; (b) by failing to object to the choice the court gave Mr. Barrett (be present in unlawful restraints or absent); (c) by failing to consult mental health or other medical experts regarding Mr. Barrett's condition, including his competence to make a valid waiver; (d) by failing to raise a doubt about Mr. Barrett's competence; (e) by failing to seek a hearing on his competence and/or the effects of his not taking medication for depression or bipolar disorder and the affects of the steroids; (f) by failing to advise him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Significantly, one of the prosecutors explicitly conceded that he did not "think he [Mr. Barrett] – *consciously* chose to do what he did in the presence of the jury." (R. 5427 [emphasis added].)  According to Mr. Hilfiger, Mr. Barrett himself said "I couldn't take it anymore." (R. 5437.)

Irrespective of whether Mr. Barrett could have made or did make a valid waiver of his right to be present, trial counsel acted unreasonably by failing to seek an instruction that was necessary to avoid harm to the jury's deliberations.  Trial counsel's statements on the record reflect that counsel considered only whether the court's proposed instruction brought Mr. Barrett's actions to mind, or minimized their effects.  Mr. Hilfiger twice stated that he could not think of an instruction to give the jury.  (R. 5426-28.)  Unable to decide, he said, "I don't care."

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the scope of the problem. The court's instructions permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing. Although Mr. Hilfiger was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett. There is no reason why Mr. Hilfiger would not have sought a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal. Had counsel raised the issues presented in this claim it is reasonably probable that the court would have found the numerous violations of federal law were not harmless beyond a reasonable doubt, or constituted plain error. *See* Ground Eighteen, *infra*.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Thirteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes   ☐        No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes   ☐        No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes   ☐        No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND FOURTEEN**

> **Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition, and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims. As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level." (Exhibit 115.) Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized. During the administration of Attorney General Gonzales, the difference was even more striking: 41% of cases involving white victims

were authorized, while only 16% of cases involving non-white victims were authorized.[48] (Exhibit 116.)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence. According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases. Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference." (Exhibit 115.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases. This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008. (Exhibit 113.) Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403. She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim. Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero." (Exhibit 112.)

---

[48]     Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzales.

While some of the statistics above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[49]  Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act is the work of a single decision maker, i.e. the DOJ.  This fact renders the above statistics all the more probative of discrimination.  The Court should grant relief from Mr. Barrett's death sentence because the Government's charging

---

[49]  Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim. Appellate counsel did not raise the issue on appeal.  *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI.  To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel were ineffective in failing to pursue and develop the issue.  *See* Ground Eighteen, *infra*.

and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

(b)      **Direct Appeal of Ground Fourteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐      No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐      No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes  ☐        No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes  ☐        No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes  ☐        No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND FIFTEEN**

**Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal.**

(a)    Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

In direct contravention of the constitutional principles mentioned in the heading for this Ground for Relief, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the Government claimed justified Mr. Barrett's death sentence in the indictment. This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

Appellate counsel unreasonably failed to raise this issue on direct appeal. There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Fifteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal because it pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes  ☐      No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes  ☐      No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes  ☐      No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND SIXTEEN**

> **Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth  Amendments to the United States Constitution**.

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and exhibits thereto.

Mr. Barrett's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury.  Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Barrett and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial.  The jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett his Sixth and Fourteenth Amendment rights to a fair trial and due process.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice. Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Sixteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the

judgments of conviction and sentences; this issue is properly before the court in a "first" post-

conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes    ☐        No    ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes    ☐        No    ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes    ☐        No    ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal

or raise this issue:

**GROUND SEVENTEEN**

> **Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment.**

(a)     Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition, and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended Petitions previously filed, and exhibits thereto.

Throughout his life, Mr. Barrett has struggled with severe mental illness, as well as organic brain disease and neurological and intellectual impairments. The Eighth Amendment's prohibition of the execution of the mentally retarded and underage offenders should be expanded to preclude the execution of severely mentally ill individuals such as Mr. Barrett.  Similar to people with mental retardation and juveniles, the execution of the mentally ill serves no retributive or deterrent function and offends "evolving standards of decency."

Mr. Barrett does not have, and never has had, an intact brain.  (*See* Ground Two, § B.2.b., *supra*; Exhibit 117; Exhibit 89.)  He suffers from severe mental illness in the form of Bipolar Disorder, Post Traumatic Stress Disorder and Dysexecutive Syndrome, and his brain is organically damaged.  Experts who have examined Mr. Barrett have opined that Mr. Barrett's functioning is compromised by multiple neurological and neuropsychiatric symptoms such that he mis-processes information and cannot understand the difference between right and wrong. (Exhibit 117.)  Simply put, Mr. Barrett cannot think the way that other people think; he cannot experience and interact with the world the way other people do; and he cannot act in his own best interest in a rational manner.  Because of both his organic brain disease and severe mental illness,

there is no meaningful way to distinguish Mr. Barrett from the mentally retarded or juvenile

murderers.

(b)      **Direct Appeal of Ground Seventeen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes   ☐      No   ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely

on direct appeal, because it relies on evidence and investigation outside the direct appeal record,

and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are

appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes   ☐      No   ☐

Not applicable: The current motion is an amendment of original, corrected and amended

motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other

issues raised herein are not successor or second and subsequent collateral attacks on the

judgments of conviction and sentences; this issue is properly before the court in a "first" post-

conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐        No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐        No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐        No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND EIGHTEEN**

> **The Failure of Counsel to Raise or Effectively Argue on Appeal Claims Which Are of Record Violated Mr. Barrett's Due Process and Sixth Amendment Rights to Effective Assistance of Appellate Counsel.**

(a)    Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and argument made in his original, corrected and amended petitions previously filed, and exhibits thereto.

**A.      Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel.**

**1.      Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government.**

As stated *supra*, Judge Payne specifically selected Roger Hilfiger for this case over the recommendations of the Oklahoma Federal Defenders that he appoint more experienced capital defense counsel. Judge Payne appointed Mr. Hilfiger for the expressed purpose of boosting counsel's experience so that he could receive future capital appointments. Judge Payne refused to compensate prior lead counsel, John Echols, at the highest prevailing rate for capital defense counsel, but immediately raised Mr. Hilfiger's compensation to that level after Mr. Echols withdrew from the case. Judge Payne required Mr. Echols to be painstaking in his accounting for resources, but permitted Mr. Hilfiger to make requests based on his "best guestimate." In sum, Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter. Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal. To the extent the matters raised herein bear on Mr. Hilfiger's performance at trial, Mr. Barrett's interests and Mr. Hilfiger's were in conflict with each other.

Mark Henricksen, who was appointed to represent Mr. Barrett on appeal, believed the issues related to counsel that are raised in Ground One could not be adequately litigated on appeal, because they required consideration of extra-record evidence. (Exhibit 29.) To the extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal. (Exhibit 29.) However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal. (*Id.*) Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below prevailing standards. At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised in Ground One had been raised on appeal. The record shows the trial judge interceded on behalf of the prosecution in a way that deceived defense counsel and aided the prosecutors in their effort to delay revealing the names and type of testimony that would be offered from the Government's seven most important witnesses.

> **2.      Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under *Franks v. Delaware,* 438 U.S. 154 (1978).**

For the reasons stated in Ground Two, Part A.1, and Ground Four, *supra*, Mr. Barrett had at the time of appeal, a claim based on *Franks v. Delaware*, that was at least partially framed by the record. Appellate counsel did not raise the issue because he felt trial counsel had failed to make an adequate record. (Exhibit 29.) The *Franks* issue, in conjunction with a claim of ineffective assistance of trial counsel for failing to competently argue it, would have made a difference in the outcome of the appeal, and Mr. Barrett was prejudiced. Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

3.      **Appellate Counsel Unreasonably Failed to Raise on
        Appeal the Government's Inappropriate Use of Hearsay
        Evidence used to Show Propensity or Character.**

In Ground Two, Part A.5, Mr. Barrett demonstrated that improper "propensity"

evidence concerning alleged statements made by him to various informant witnesses threatening

violence to the police if they showed up on his property was wrongly admitted, and that trial

counsel were ineffective for failing to lodge appropriate, timely objections to this evidence.  To

the extent trial counsel did preserve this issue by filing a response to the Government's 404(b)

Notice (Docs. 206, 215), and by at least lodging some objections to part of this testimony, direct

appeal counsel were ineffective for failing to raise a substantive 404(b) issue.

Because the 404(b) issue was meritorious, even based on the record that was

made, no reasonable strategic basis for excluding it exists.  Due to trial counsel's omissions,

appellate counsel was forced to raise several issues that were subject to review for clear error.

The failure to raise the issue was professionally unreasonable.  Had the issue been raised, a

reasonable probability exists that the outcome of the appeal would have been different.

4.      **Appellate Counsel Unreasonably Failed to Raise on
        Appeal the Jury's Exposure to Phony Expert Jim Horn.**

In Ground Two, Part A.11, Mr. Barrett showed that the testimony of Government

"expert" Jim Horn was erroneously and prejudicially heard by the jury.  The fact that trial

counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and

only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern,

did not necessarily waive for appeal the issues of mistrial and a meaningful jury instruction to

cure the error in permitting Horn to testify.  Appellate counsel could and should have raised the

issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion.

The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial.  Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

> **5.**     **Appellate Counsel Unreasonably Failed to Raise on Appeal the Prosecutors' Use of Improper, Inflammatory Argument in Violation of Mr. Barrett's Due Process Rights**

Prosecutorial misconduct through questions and argument as described Ground Five, Part D was not raised on direct appeal.  The misconduct of the prosecutors in both stages of trial was glaring.  No reasonable strategy excused the failure to raise the claim.  Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.

> **6.**     **Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements.**

As set forth in Ground Six, *supra*, the trial court placed unconstitutional restrictions on the introduction and use of Mr. Barrett's statements.  This issue was clearly framed by the record.  Appellate counsel acted unreasonably in failing to present this issue to the Court of Appeals.  Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded.  There could be no reasonable strategy for neglecting to

raise this issue. There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.

Without considering the mitigating impact Mr. Barrett's statements would have had, the Court of Appeals could not conduct meaningful review of the death sentence. The appellate court's view of the balance of aggravating and mitigating evidence was skewed, as was the jury's, in favor of death.

**7.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial.**

As set forth in Ground Seven, *supra*, the trial court, admittedly without constitutionally required justification, ordered Mr. Barrett to be fitted with an electric-shock belt during trial. The shock pack created a large bulge under Mr. Barrett's clothes, induced fear in Mr. Barrett, distracted him from the trial, and prevented him from sitting normally or concentrating on the proceedings.

The trial court's lack of justification for the use of this restraint was apparent on the record, as were some of its affects on the trial. To the extent the shock belt was used without sufficient justification, the constitutional violation was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance. Appellate counsel believed the issue required extra-record development. (Exhibit 29.) The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt. In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could not and cannot establish harmlessness. Therefore, there is a reasonable probability that Mr. Barrett would have been

granted a new trial if the issue had been raised on direct appeal.

> **8.** **Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses**.

As set forth in Ground Nine, *supra*, the trial court unconstitutionally failed to instruct the jury on the lesser included offense of voluntary manslaughter. Appellate counsel asserts he failed to raise this issue because it was not adequately preserved for appeal by co-appellate counsel, Roger Hilfiger. (Exhibit 29.) Counsel's judgment was unreasonable. Although many issues not preserved for review with timely objections or records were raised on appeal, this fully preserved issue, *even conceded by the Government at trial,* was not. Appellate counsel was well aware that Mr. Barrett had been convicted of manslaughter in state court. The factual basis for Mr. Barrett's federal court defense was the same as it was in state court. Under these very clear circumstances, *no* reasonable strategy excuses the failure to raise this issue, as appellate counsel recognizes. (Exhibit 29.) Had this issue been raised, there is at the very least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to Count 3, would have been different.

> **9.** **Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred**.

As set forth in Ground Ten, *supra*, the trial court violated Mr. Barrett's rights under the Fifth, Sixth, and Eighth Amendments by failing to instruct jurors that they could consider in the second stage doubts regarding the raid. It was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal. It is at least

reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent and reversed the death judgment.

### 10.    Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62.

The dismissal of Juror 62, as set out in detail in Ground Eleven, *supra*, was not raised on direct appeal, even though the error was plainly apparent from the record.  There was no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

### 11.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence.

As set forth in Ground Twelve, *supra*,  the Court's failure to provide an instruction to the jury regarding the Government's burden to prove beyond a reasonable doubt that the aggravating circumstances outweigh mitigating circumstances renders Mr. Barrett's death sentence unconstitutional.  To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.  The "fact" that the aggravating factors outweigh the evidence in mitigation is *the indispensable factual finding* that increases the penalty for a crime beyond the prescribed statutory maximum.  Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Barrett's case was constitutionally invalid. Had appellate

counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial.

> **12. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom.**

As set forth in Ground Thirteen, *supra*, Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated due to the effects of drugs he was given in jail, trial counsel's failure to inquire about the drugs' effects, the trial court's removal of Mr. Barrett from the Courtroom in the presence of the jury without cause or inquiry, and Mr. Barrett's subsequent absence from critical stages of the proceedings without a valid waiver. To the extent the matters surrounding the forceful removal and denial of presence at all critical proceedings are a matter of record, it was unreasonable for appellate counsel not to raise these issues on appeal. It is at least reasonably probable that the conviction or sentence would have been reversed and new proceedings ordered if these multiple violations of the Constitution were presented on appeal.

> **13. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty.**

As set forth in Ground Fourteen, *supra*, trial counsel filed a Motion To Declare The Federal Death Penalty Statute Unconstitutional (Doc. 78), which addressed the disparate application of the statute but did not argue disparity based on the race of the victim. Appellate counsel did not raise on appeal the issue of the unconstitutionality of the federal death penalty on the basis of arbitrary and capricious disparities in application of the penalty based on the race of the victim on appeal. To the extent, if any, that trial counsel did properly raise and preserve the

question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused" (Doc. 78 at 3), appellate counsel acted unreasonably in failing to raise the issue. There is a reasonable probability that the death sentence would have been vacated had the issue been raised.

To the extent the Court of Appeals prevented appellate counsel from raising this issue, the court's review of the death sentence imposed on Mr. Barrett was constitutionally inadequate. The Court of Appeals failed to consider the disproportionate use of the federal death penalty based on the race of the victim.

### 14.    Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment.

As set forth in Ground Fifteen, *supra*, Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case made did not charge either the non-statutory aggravating factors relied upon by the government during the penalty phase or the allegation that the aggravating factors outweighed the mitigating factors. Appellate counsel unreasonably failed to raise this issue on direct appeal. There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

**B.     A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise.**

The Court of Appeals reviewed the errors in this case cumulatively. *United States v. Barrett*, *supra*, 496 F.3d at 1121. "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" *Ibid.*, quoting, *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002). The review conducted on appeal was deficient due to the unreasonable omissions of appellate counsel, the Court of Appeals' limitations on counsel, or both.

There is a reasonable probability that any two or more of the errors identified herein *supra*, if they had been considered cumulatively on appeal, would hare resulted in reversal. Several of the errors appellate counsel unreasonably failed to raise, or did raise on appeal, complement each other such that the risk of harm is increased. For example, the harm from the trial court's withholding from trial counsel the contents of the *ex parte* hearing complements the continuance issue raised on appeal. As appellate counsel states, without knowing that Judge Payne had said he believed a continuance was likely, failed to seek a continuance because he believed the court would deny the request. (Exhibit 29.) Issues related to the seven snitches would have been enhanced if trial and appellate counsel had argued the Government's violation of Fed. R. Evid. 404(b), particularly with regard to failure to disclose that Karen Real would testify to prior bad acts.

Multiple errors in the second stage had greater cumulative impact than their already prejudicial independent impact. The jury in this case, after being denied the opportunity

to convict on manslaughter, was denied consideration of Mr. Barrett's statements, doubts about the raid, and were inflamed by improper argument and seeing Mr. Barrett in an electric shock belt. These errors, in and of themselves, or combined with the unconstitutional circumstances that removed Mr. Barrett from the courtroom, had a prejudicial influence on the penalty deliberations.

Whether considered individually or cumulatively, appellate counsel's unreasonable failure to raise issues on appeal, and/or the Court of Appeals' failure to consider them, violated Mr. Barrett's rights under the Fifth, Eighth, and Fourteenth Amendments.

(b)      **Direct Appeal of Ground Eighteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐      No ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue pertains to ineffective assistance of trial and direct appeal counsel, a matter which is appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐      No ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

      Yes   ☐        No   ☐

(4) Did you appeal from the denial of your motion, petition, or application?

      Yes   ☐        No   ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

      Yes   ☐        No   ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND NINETEEN**

> **Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case.**

(a)    Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

Mr. Barrett's convictions and sentences are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness.

Mr. Barrett incorporates by specific reference all facts, allegations and arguments made elsewhere in this Petition and the exhibits thereto, as well as all facts, allegations and arguments made in his original, corrected and amended petitions previously filed, and the exhibits thereto.  In addition, Mr. Barrett re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process.  Each of these errors deprived Mr. Barrett of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claims presented in this Petition individually justifies reversal, when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

Should this claim require amendment, the need is traceable to the extraordinary circumstances of his appointed counsel's medical impairment, the unavailability of evidence despite the diligence of Mr. Barrett and his counsel, and/or unlawful conduct by the Government or state law enforcement officials.

(b)      **Direct Appeal of Ground Nineteen:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes  ☐      No  ☒

(2) If you did not raise this issue in your direct appeal, explain why:

This issue was not raised on direct appeal, and could not be raised fully and completely on direct appeal, because it relies on evidence and investigation outside the direct appeal record, and also pertains to ineffective assistance of trial and direct appeal counsel, matters which are appropriately addressed in the first instance in these collateral proceedings.

(c)      **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes  ☐      No  ☐

Not applicable: The current motion is an amendment of original, corrected and amended motions under 28 U.S.C. § 2255, and is filed under the direction of the court; this and other issues raised herein are not successor or second and subsequent collateral attacks on the judgments of conviction and sentences; this issue is properly before the court in a "first" post-conviction or collateral proceeding.

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes  ☐          No  ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes  ☐          No  ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes  ☐          No  ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13.    Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them.

**No.  Each ground presented here is a repetition and continuation of a claim or subclaim previously presented in the petition filed March 16, 2009, corrected on March 17, 2009, and amended on September 25, 2009.**

14.    Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for judgement you are challenging?    Yes  ☒          No  ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

**This filing is a court-ordered amendment of the same petition/motion timely filed March 16, 2009 in Eastern District of Oklahoma Case No. 09-cv-105-JHP, and corrected on March 17, 2009, and amended as of right on September 25, 2009. Those pleadings remain pending.**

15.    Give the name and address, if know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:  n/a

(b) At arraignment and plea:

John D. Echols, P.O. Box 701196, Jenks, OK 74037; Roger

Hilfiger, 620 W. Broadway, Muskogee, OK 74401

(c) At trial:

Roger Hilfiger, 620 W. Broadway, Muskogee, OK 74401; Bret A.

Smith, 417 West Broadway, P.O. Box 2250, Muskogee, OK 74402

(d) At sentencing:

Roger Hilfiger, 620 W. Broadway, Muskogee, OK 74401; Bret A.

Smith, 417 West Broadway, P.O. Box 2250, Muskogee, OK 74402

(e) On appeal:

Mark Henrickesen, 600 N. Walker, Suite 220, Oklahoma City, OK

73102; Roger Hilfiger, 620 W. Broadway, Muskogee, OK 74401

(f) In any post-conviction proceeding:

David B. Autry, 1021 N.W. 16th Street, Oklahoma City, OK

73106; Tivon Schardl, Office of the Federal Defender, 801 I Street,

3rd Floor, Sacramento, CA 95814

(g) On appeal from any ruling against you in a post-conviction proceeding:

16.   Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?   Yes   ☒         No   ☐

17.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?   Yes   ☐         No   ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?         Yes   ☐         No   ☐

18.    TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statue of limitations as contained in 28 U.S.C. § 2255 does not bar your motion. ***************

**This is a court-ordered amendment of a timely filed motion.**

**All grounds presented herein were filed prior to the expiration of the statute of limitations.  Each part of this amendment relates back to the timely motion/petition filed March 16, 2009, corrected on March 17, 2009, and amended as of right on September 25, 2009.  To the extent any allegation in this amendment was not previously filed, it was not previously discoverable through the exercise of due diligence, or Mr. Barrett was prevented from presenting it due to the unconstitutional conduct of the government actors as to whom the allegation relates.**

---

***************The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of -
> (1) the date on which the judgment of conviction became final;
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, the movant asks that the Court grant the following relief:

1.     That United States District Judge James H. Payne recuse himself and have all proceedings regarding this Petition reassigned randomly to another judge;

2.     That Petitioner be permitted to file a Memorandum of Law in Support of this Petition in accordance with a briefing schedule established by this Court;

3.     Require Respondent to file an Answer to the Petition in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Petitioner's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

4.     Permit Petitioner to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

5.     Permit Petitioner to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Petition, and refute any defenses thereto raised by the Respondent's Answer;

6.     Permit Petitioner to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Petitioner, and, to allow the amendment to relate back to the date of the filing of his Section 2255 Motion;

7.    Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Petitioner's Response to any Affirmative Defenses raised by the Respondent. Because Petitioner has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

8.    Permit oral argument as appropriate and required;

9.    Vacate Petitioner's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and or any other relief to which movant may be entitled.

/s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

/s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

/s/ Joan M. Fisher
JOAN M. FISHER, IDA Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 ~~was placed in the prison mailing system~~ **electronically filed** on  December 4, 2009.

Executed (signed) on __December 4, 2009__   (date).

 /s/ Joan M. Fisher

Signature of Movant

by:    Joan M. Fisher

Assistant Federal Defender

Counsel for Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

I am an attorney licensed to practice law by the State of Florida, and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma.  I am a research and writing attorney in the Office of the Federal Defender for the Eastern District of California.  In 2008, I was appointed post-conviction counsel for Kenneth Eugene Barrett with David B. Autry as lead counsel.

I am authorized by Kenneth Eugene Barrett to file the foregoing amended motion to vacate, set aside, or correct the sentence pursuant to 28 U.S.C. § 2255.  I am filing the amended motion on Mr. Barrett's behalf.  Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing amended motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence is made pursuant to 28 U.S.C. § 2255.  I declare that the contents of the foregoing amended motion are true except for those

matters based upon information and belief, and I believe the latter matters to be true.  The

sources of my information include, but are not limited to, official court records, various

documents obtained or prepared during investigation of this amended motion, and items in the

possession of other lawyers, investigators and/or experts connected with the preparation of this

amended motion.  I make this verification pursuant to Rule 2(b)(5) of the Rules Governing §

2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's

knowledge.

/s/ Joan M. Fisher

**Certificate of Electronic Filing and Service**

I hereby certify that on this 4th day of December 2009, I caused the foregoing AMENDED

PETITION to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served

electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and

Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

/s/ Joan M. Fisher