**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**REDACTED EXHIBIT 181a**

**TO KENNETH EUGENE BARRETT'S**

**SECOND AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

1

IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,       )
                    )
         Plaintiff,   )
                    )
vs.                  )
                    )   CASE NO.  CF-2007-28
RICHARD LOY GRAY, JR.,  )
                    )
         Defendant.   )

PARTIAL TRANSCRIPT OF JURY TRIAL HEARING

HAD ON THE 4TH DAY OF JUNE, 2008

BEFORE THE HONORABLE H. MICHAEL CLAVER

DISTRICT JUDGE OF THE DISTRICT COURT IN AND FOR

OKMULGEE COUNTY, OKLAHOMA

APPEARANCES:

On Behalf of the Plaintiff:     MS.  JOEL-LYN McCORMICK
                               MR.  CHARLES S. ROGERS
                               Assistant Attorney Generals
                               313 Northeast 21st Street
                               Oklahoma City, Oklahoma  73105

On Behalf of the Defendant:     MR.  CLARK BREWSTER
                               MR.  ROBERT R. NIGH, JR.
                               MR.  MARVIN G. LIZAMA
                               Attorneys at Law
                               2617 East 21st
                               Tulsa, Oklahoma  74114

REPORTED BY:

RUSSELL E. SIMMONS, C.S.R.
Official Court Reporter
Oklahoma Number 01633
Okmulgee County Courthouse
Okmulgee, Oklahoma  74447
(918) 756-0673

COPY

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

FORM C-100 - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

i

<u>I-N-D-E-X</u>

Page No.

Proceedings commenced. ------------------------------------------ 2

EVIDENCE PRESENTED ON BEHALF OF THE STATE:

<u>CLINT JOHNSON</u> testified:

Direct Examination by Ms. McCormick ------------------- 2
Cross-Examination by Mr. Brewster. ------------------- 25
Quiet bench conference. ----------------------------- 26
Continued Cross-Examination by Mr. Brewster. ------- 29
Voir Dire Examination by Ms. McCormick. ------------ 38
Continued Cross-Examination by Mr. Brewster. ------- 39
Quiet bench conference. ----------------------------- 49
Continued Cross-Examination by Mr. Brewster. ------- 50
Quiet bench conference. ----------------------------- 54
Open court. ----------------------------------------- 55
Continued Cross-Examination by Mr. Brewster. ------- 56
Quiet bench conference. ----------------------------- 57
Continued Cross-Examination by Mr. Brewster. ------- 58
Quiet bench conference. ----------------------------- 65
Continued Cross-Examination by Mr. Brewster. ------- 66
Quiet bench conference. ----------------------------- 73
Open court. ----------------------------------------- 75
Continued Cross-Examination by Mr. Brewster. ------- 76
Quiet bench conference. ----------------------------- 76
Open court. ----------------------------------------- 78
Redirect Examination by Ms. McCormick. ------------- 78

Partial transcript concluded. -------------------------------- 84

Certificate of the Reporter. --------------------------------- 85

<u>DEFENDANT'S EXHIBIT</u>

| No. | Identified | Offered | Admitted |
|-----|------------|---------|----------|
| 2 | Pg. 38 (Safe Register) | Pg. 38 | Pg. 50 --- 86 |

DISTRICT COURT OF OKLAHOMA -- OFFICIAL TRANSCRIPT

i

2

(The following is a Partial Transcript of the proceedings that were had in the Okmulgee County Courthouse, Courtroom No. 1, on the 4th day of June, 2008, containing Clint Johnson's testimony:)

THE COURT:  We'll again reopen the record in CF-2007-28, STATE OF OKLAHOMA vs. RICHARD LOY GRAY, JR. Again acknowledge for the record the jury's returned to the jury box.  All parties are present.

And if the State would call their next witness, please.

MS. McCORMICK:  Thank you, Your Honor.  The State calls Clint Johnson.

THE COURT:  Mr. Johnson, if you'd raise your right hand, please.

CLINT JOHNSON,

called as a witness on behalf of the Plaintiff, having been first duly sworn upon his oath to testify the truth, testified as follows:

THE COURT:  Okay.  If you'd have a seat, please. And I'll ask you to state your name for the record.

THE WITNESS:  Clint Johnson.

THE COURT:  And you may proceed.

MS. McCORMICK:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. McCORMICK:

Q.    Sir, if you will, will you please start by giving the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

3

jury an overview as to your law enforcement career?

A.    I started out with the Cherokee County Sheriff's Department as a reserve officer slash dispatcher, jailer.  I went to the street full-time as a full-time officer in, I believe, '95.  Worked there.  Worked with the Cherokee County Sheriff's office for, I think, around two years until I went to the District Attorney's office.

Q.    And when you refer to the District Attorney's office, are you referring to District 27?

A.    Yes, ma'am.

Q.    And, sir, when you began your employment with District 27, who was the District Attorney at that time?

A.    Dianne Barker-Harrold.

Q.    And how long were you with District 27?

A.    Approximately nine years.

Q.    Sir, I want to visit with you regarding your employment with District 27, in particular, and talk to you a little bit about some of your various assignments.  What were your various assignments when you were employed with District 27?

A.    I was a truancy officer to start with.  And then I began as a bogus check investigator arresting on bogus checks.  And then I went to the Drug Task Force.

Q.    How long were you a truancy officer?

A.    Approximately eight months, I'd say.

Q.    And then how long were you an investigator in the bogus

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

4

check division?

A.    Around the same time frame, eight months or so.

Q.    And then if I recall your outline, then you went on to be assigned to the Drug Task Force?

A.    Yes.

Q:    If you will, describe for the ladies and gentlemen of the jury what your duties and responsibilities were in reference to your assignment to the Drug Task Force?

A.    Investigation of narcotics cases.  Working methamphetamine labs.  Then I also later on became field supervisor of the Drug Task Force.

Q.    Now, as you previously explained, you began your employment with under the administration of Dianne Barker-Harrold.  Did that continue until a new administration?

A.    Yes, it did.

Q.    And who -- who -- what other district attorneys did you serve?

A.    Richard Gray.

Q.    Do you see Richard Gray present in the courtroom today?

A.    Yes, I do.

Q.    Will you --

            MR. BREWSTER:  (Interposing)  Your Honor, we'd stipulate that he knows Mr. Gray.

            MS. McCORMICK:  Thank you, Counsel.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

5

THE COURT:  Thank you, sir.

Q.   (By Ms. McCormick)  Sir, do you recall what year it was when the Defendant became District Attorney?

A.   2003.

Q.   And I'd like for you to explain for the ladies and gentlemen of the jury what was the makeup or the organization within the Drug Task Force unit at the time the Defendant became District Attorney?

A.   I was the Drug Task Force.

Q.   And who -- who -- who were the other members of the Drug Task Force?

A.   It was me for a short period.  And then Pam Stephens came on board as our secretary.  And then eventually James Carver was hired on.  And then Jerry Stephens.

Q.   Was there a director for the Drug Task Force?

A.   I'm sorry.  Yes.  Vyrl Keeter.

Q.   And how long was Mr. Keeter the director?

A.   Two and a half -- two years.  Somewhere through there, I'd say.

Q.   Were there other directors after Mr. Keeter?

A.   Yes, there were.

Q.   Who were they?

A.   Donovan Dobbs and Jeff Sheridan.

Q.   Well, you've described that at some point James Carver also became an agent and served on the Drug Task Force.  If

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

6

you will, describe how the two of you worked together. Would you -- would you work in couple on your assignments, or would you work investigations independent of Agent Carver?

A.    Both.  We worked couples or independent investigations.

Q.    And given the nature of your work, how would you characterize the closeness between your work with Mr. Carver?  Did you usually know what he was doing and vice versa?

A.    For the most part, yes.  I mean, we knew what each other was doing.

Q.    Describe for the ladies and gentlemen of the jury what were the reporting habits with regard to your work in the field.  How did you report to the director?

A.    We'd see him in person.  Tell him what we were doing or call him on the phone, or -- or -- and let him know what we were doing.

Q.    And what level of contact did you have with the Defendant?

A.    A lot.

Q.    And while you may know what you mean by a lot, if you'll elaborate as to what you mean by a lot?

A.    There for a while I was calling him on almost a daily basis.

Q.    How did that come about?

A.    He wanted to know what we were doing.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

Q.    How did you become aware that the Defendant wanted to know what you were doing?

A.    He told us to call him.  He wanted to know.

Q.    At what point during his administration did that type of contact begin?

A.    I called him every -- I mean, since he took over, I'd call him.

Q.    Did you find anything out of the ordinary about that level of contact with the District Attorney?

A.    I did.

Q.    And, if you will, what was unusual about that?

A.    Working narcotics cases, the more -- the less people that know about a drug raid or a drug bust, the better off you are.  Whenever working narcotics cases and the level of involvement that somebody wants to get into it that is prosecuting the case, then I think it makes them more of a witness than it does being able to prosecute a case.  And plus I had questions about some of the people that I seen him dealing with.

Q.    Okay.  Well, if you -- you've -- you've touched upon the manner in which you must conduct those type -- the types of investigations you were assigned.  If you will, describe some of the tools that are necessary in your work as a narcotics investigator.  How do you go about investigating those types of crimes?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

A.    Using informants, buys, observations, trash pulls. There are several resources to use.

Q.    And it sounds like through these various sources, you collect information.  Once you collect information, is it also common for you to conduct search warrants?

A.    Yes.

Q.    I want to go back through your list.  You talk about informants.  And when you reference informants, explain or elaborate for the ladies and gentlemen of the jury how you go about using what you refer to as informants?

A.    Informants would be used.  Someone gets picked up on possession, and they want to talk or -- or gets picked up on a drug case or some kind of violation, and they want to talk about people selling drugs or using drugs or making meth. They would tell us about it.  And then you could use -- you could go out and make them a certified confidential informant.

The way you do that is you meet them someplace. You pat them down for money or dope or anything that they may have.  You know, make sure they don't have anything on their person.  You follow them to a residence that they said that they could buy narcotics from.  You do that on three occasions, and you could use them as a certified confidential informant, as long as you observe them that they can actually produce what they said they can produce.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

9

Q.    You also referenced what you call buys.  What do you mean by buys?

A.    Using Drug Task Force confidential informant funds to purchase drugs.

Q.    From the suppliers?

A.    From -- from the suppliers, yes.  I'm sorry.

Q.    Then you referenced trash pulls.  What do you mean by that?

A.    Anybody cooking methamphetamine, if they throw their trash out, we can show up to the residence.  And then if it's on the street curb, whatever, once it's picked up, then we can dig through it and see if they had a meth lab, chemicals, items used in meth labs or anything like that.  And then go back and write a search warrant on it.

Q.    Okay.  Sir, I'd like to turn your attention to a particular investigation or a particular case in which the Drug Task Force was involved in reference to Thomas Dayberry.  Are you familiar with that matter?

A.    Yes, I am.

Q.    And, if you will, explain for the ladies and gentlemen of the jury what, if any, involvement did you have in the Thomas Dayberry matter?

A.    I was called by the Adair County Sheriff's Department to assist in the execution of a search warrant, and I did.

Q.    How did you assist?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

10

A.    I drove to Adair County.  Went up and assisted them in security of the residence, and make sure the site was safe.

Q.    So did you -- were you at all involved in collecting or seizing any of the items thought to have evidentiary value at the scene?

A.    No.

Q.    Did you have any other involvement in -- in that matter?

A.    I did.  Not -- not on the search warrant part, no.

Q.    Okay.  After the search warrant?

A.    Yes.

Q.    What, if any, involvement did you have?

A.    I went to Adair County Sheriff's Department.  And Deputy Ralph Lucy that was an Adair County Deputy Sheriff, I guess case agent on the case, is the one who caught me there and asked me if he could turn over some money to me for the Drug Task Force.

Q.    And so who originally seized the funds that Officer Deputy Lucy contacted you about?

A.    I believe he did.

Q.    And so did you -- and what did you do after you received that request from Deputy Lucy?

A.    We went back to the deputy room.  And he had the funds laying there on his desk.  And I counted it.  And I believe I got more of a count than what he did.  And he counted it again.  And then we redid a receipt because I got more of a

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

11

count than he did.  I -- then I remember putting it in a bag, and taping it, and signed it, and sealed it.

Q.   Okay.  Do you remember anything or can you describe for the ladies and gentlemen of the jury how the money was contained when you received it from -- from Deputy Lucy?

A.   Just in the bank bag.  When we were there, I remember a bank bag.

Q.   And then you've described this process where there was a document or a receipt.  Was this a pre-prepared document?

A.   Yes.

Q.   Who prepared it?

A.   Ralph Lucy.

Q.   What, if anything, did you do once the funds were counted to -- what did you do to further secure the -- the -- the -- the container the money was in?

A.   I stuck it in the bag, and put -- put -- wrapped it in tape, and signed initials on it.

Q.   What type of tape?  Do you recall any type -- any -- any description of the tape?

A.   Clear tape.  Like the wrapping tape, that wide stuff, about two inches wide or so.

Q.   And did -- did Deputy Lucy remain present throughout this process?

A.   He was in the room, yes.

Q.   What did you do with the funds after you took possession

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

12

of them?

A.    Took them, put them in my car, in my state-issued vehicle.

Q.    Where did you go after that?

A.    I couldn't tell you.  I don't know.  I mean, I probably went out to work.  I don't know.

Q.    What did you do with the funds eventually?

A.    Took them to the Drug Task Force office.

Q.    Do you recall when it was you took them to the Drug Task Force office?

A.    I believe it was the next morning.

Q.    Did anyone, other than you, have access to your -- your county-issued vehicle during the time the funds were placed in your car?

A.    No.

Q.    If you will, explain or describe for the jury how you went about placing the funds or securing the funds inside the Drug Task Force office the next morning?

A.    Best I recall I went to the office.  I walked in.  I believe Pam Stephens was there.  Told her I needed to place the funds in the vault.  And went in there and placed them in.

Q.    Okay.  And -- and what, if any, part did Ms. Stephens play in assisting you in placing the funds in the vault?

A.    She would have been standing there.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

13

Q.    Do you recall that specifically her standing there?

A.    I don't recall it specifically.  But I can tell you that I never went in there by myself into the vault.

Q.    And when you're referring to the vault, explain or -- to the ladies and gentlemen of the jury to what are you referring?

A.    We had the evidence room.  And then there was also a safe, a small safe, probably about that big in the evidence room.  And that's what I'm referring to the vault.

MS. McCORMICK:  Your Honor, may I approach the witness?

THE COURT:  Yes, ma'am.

Q.    (By Ms. McCormick)  Sir, I'm publishing State's Exhibit No. 16 previously admitted.  And I'd ask you if you recognize State's Exhibit 16?

A.    Yes.

Q.    What is State's Exhibit 16?

A.    That would have been the return that Ralph Lucy did.  That's the receipt that I saw that morning.

Q.    I'm showing you the -- from the top to the bottom.  Sir, in your testimony you described that there was an exercise where you said you counted, or your count was higher, or you counted more.  Do you see any markings on State's Exhibit 16 that reflect any changes you made in the amount in reference to the amount?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

14

A.    Yes, I do.

Q.    And, sir, at the bottom of the page, if you will, describe the signatures that appear on the bottom of the page?

A.    The affiant is Ralph Lucy, it appears.  And then I signed as recipient.

Q.    Sir, I'm also going to show you what's been previously admitted as Defendant's Exhibit 24.  Do you recognize Defendant's Exhibit 24?

A.    That appears to be the bank bag, yes.

Q.    And, sir, in your testimony, you describe that you took an effort to further secure the bag.  And that you used tape, and you indicated it was approximately two inches wide.  Did you actually place that tape on the bank bag or on some other container the bank bag was placed in?

A.    I believe on the bank bag.

Q.    That -- that -- did officer or Deputy Lucy assist you in that effort?

A.    I don't recall.  He was in the room.  I mean, I don't recall that when I taped it up.

Q.    Once you placed the money -- once the monies were placed in the bank bag and further secured with tape, do you recall if the bank bag was placed in an envelope or any other container?

A.    I don't recall that.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

15

Q.   Sir, if you will, describe the process you -- you carried out when you're placing the funds into what you refer to as the vault or the safe?

A.   Went in, took it into the evidence room, opened the safe, put the funds in it, and then signed a piece of paper that we had for the log.

Q.   And when you say a piece of paper, what type of piece of paper did you sign?

A.   It was a log sheet for the evidence vault.

Q.   What information is inscribed on -- on the register or the log next to the safe?

A.   The money seized, from whom, the time, date, I think location maybe.  I can't remember what all's on it.  Signed out by, signed in by.

Q.   After you placed the funds into the safe, what, if any, occasion did you have to see the funds anytime after that date?

A.   I didn't.

Q.   Sir, I'm going to publish to the jury what's been previously been offered as State's Exhibit 2 and Defendant's 1, and ask you if you recognize State's Exhibit 2?

A.   A Drug Task Force safe register.

Q.   Okay.  Is this the registry to which you've referred in your last response?

A.   Yes.  That's the log for the money seized.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

16

Q.    And, sir, do you recall the date on which you submitted the funds in reference to Thomas Dayberry to the -- the safe?

A.    I don't remember the exact date.  I can look at it here.  I can tell you.  I believe it was the 16th.

Q.    And, sir --

A.    (Interposing)  Of '03.

Q.    -- if I draw --

A.    (Interposing)  10.

Q.    -- the jury's attention to the second page, do you see the entry relevant to your placement of funds in reference to the Thomas Dayberry case?

A.    10-16 of '03.

Q.    And, sir, there appears to be some markings where that have been scribbled out.  Are you aware as to who made that marking?

A.    No, I -- I don't.

Q.    Do you recall that?

A.    I -- I probably scribbled it out if I messed up writing something.

Q.    And so as you previously described, the information that you document is the date on which you're logging the evidence in.  Then you indicated by whom.  And, if you will, explain what is placed in the block by whom?

A.    That's CJ, which is my initials.  And Delta 13 was my call number on the radio.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

17

Q.    And then you're describing the items or the purpose; is that correct?

A.    That's correct.

Q.    Sir, did you ever have a reason to access those funds after you placed them into the safe?

A.    No.

Q.    I'd like to turn your attention now to March of 2004. Were you still a member of the District 27 Drug Task Force at that time?

A.    Yes, I was.

Q.    And I'll ask you, sir, if you can describe, did anything unusual happen in reference to money kept in the Drug Task Force safe office in March of 2004?

A.    It was removed.

Q.    And how -- how did you learn about the removal of the money?

A.    I spoke to James Carver. And he advised me that the Defendant was removing the money from the safe.

Q.    Where were you at the time?

A.    I was on vacation.

Q.    And what -- what did you do after you learned about the removal of the money?

A.    I went to the office.

Q.    And can you describe for the jury how much time lapse between the time you were contacted by Agent Carver and

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

18

actually arrived at the office?

A.    Maybe 15, 20 minutes.  Somewhere through there.

Q.    Who was present at the Drug Task Force office once you arrived?

A.    Pam Stephens, myself, Vyrl Keeter, I believe, Jeff Lancaster, the Defendant.  That -- I can't remember the other ones, I mean, if there was any more there.

Q.    Describe what was going on.  What did you observe once you entered the office?

A.    Laying on Pam Stephens' desk was some envelopes from the safe.  And then I observed the Defendant going back and forth into the evidence room.

Q.    And what, if any, interaction did -- did you have with the Defendant as he's going back and forth?

A.    None that I can recall.

Q.    Did the two of you speak?

A.    I think we said a few words to one another, but nothing I can recall.

Q.    Do you remember anything in particular about his demeanor?

A.    Smiling.

Q.    What did you observe after initially entering the office and seeing the activity?  Did you -- did you go further into the office or into the -- the -- the evidence room?

A.    No.  I never went in there.  I believe I walked out and

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

19

went to the bogus check office and got me something to drink and come back into the office.

Q. Did you make contact with James Carver?

A. I believe we spoke.

Q. How long were you there before you went over to the bogus check division?

A. I don't know. A couple, two or three, four minutes, somewhere in there.

Q. And after going to the bogus check division, what did you do?

A. I came back to the Drug Task Force office.

Q. And --

A. And just stood around.

Q. -- describe what was going on when you returned to the Drug Task Force office?

A. They were still had the money laid out and everything, and the Defendant was gathering it all up.

Q. And when you say had the money laid out, were -- were you actually seeing money laid out, or were there evidence envelopes?

A. The evidence envelopes.

Q. And -- and can you describe for the ladies and gentlemen of the jury the condition of the evidence envelopes?

A. They were all sealed up. I mean evidence envelopes laying on the desk that I observed.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

Q.    Did it appear, from your observation, that any of them had been disturbed in any way, unsealed or resealed?

A.    No.

Q.    How long did this process last?

A.    Maybe 20 minutes or so.

Q.    And what happened after that?

A.    The Defendant gathered it all up and left.

Q.    Do you know where he went?

A.    I know where he told me he went.  I don't know.

Q.    What did the Defendant say?

A.    That he was taking it to the safety deposit box.

Q.    Did he offer any further explanation?

A.    No.

Q.    Did you question him?

A.    No, I didn't.

Q.    Who left with him?

A.    I believe Jeff Lancaster.  And then I left right when he was leaving, I believe.

Q.    So you saw the two of them leave together?

A.    I can't -- I don't recall that.

Q.    After observing the evidence envelopes being removed and taken by this Defendant on the date in March of 2004, did you ever see those evidence envelopes again?

A.    One of them.

Q.    Describe the time you saw one of the evidence envelopes

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

21

again.

A.    Probably two or three months later in Adair County.

Q.    And what occasioned you to see the envelope again?

A.    The Defendant was at the Adair County Sheriff's -- or Courthouse.  And I was over there at the Adair County Courthouse.  The Defendant asked me to come to his truck.  We walked outside.  Went down to his truck.  He pulls a evidence envelope from his truck.  Asked me what I can tell him about it.  I looked at it.  I believe there was some bills in it or something.  And I think it was from the Dayberry -- or I'm sorry.  From the Scarborough case.  And I told him it looked like some money from Scarborough.  And he said that there was over $2,000.00 missing.  And I believe that's when I --

Q.    (Interposing)  What was your response?  What was your response?

A.    I said, well, if you believe something's missing, let's call the Oklahoma State Bureau of Investigation.  I even picked up my phone off my side.

Q.    And what did the Defendant -- what was the Defendant's reaction?

A.    He didn't want to do that.  It would be a black eye on his office.  And he said he'd make it up somehow.  And --

Q.    Was there any further discussion regarding these missing funds?

A.    Yes, there was.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

22

Q.    What else was said, and by whom?

A.    He took the evidence envelope back from me and threw it back in the truck.  Said he shouldn't be talking to me about it anyway.  That it was James Carver's case.

Q.    Describe this evidence envelope for the ladies and gentlemen of the jury.

A.    Probably I'd say somewhere around this wide, maybe that tall.  You know, I don't recall exactly.  But and had writing on it where you fill in the suspect, the time and date and everything on the front of it.

Q.    What type of material was it made of?

A.    Plastic.  It was clear plastic.

Q.    Did you observe any openings on -- on the evidence envelope?

A.    Yes, I did.

Q.    And describe for the ladies and gentlemen of the jury any openings you saw.

A.    It looked like it had been like you tear plastic.  It looks like it had been tore open on the top of the evidence envelope.

        MS. McCORMICK:  Your Honor, may I approach?

        THE COURT:  Yes, ma'am.

Q.    (By Ms. McCormick)  Sir, I'm going to hand you what's been offered into evidence as Defendant's Exhibit No. 13.  Do you recognize Defendant's Exhibit 13?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

23

A.    Evidence envelope.

Q.    And you described an evidence envelope that was shown to you back in late 2004 by the Defendant.  Is it the same evidence envelope that's marked as Defendant's Exhibit 13?

A.    No.

Q.    Have you seen Defendant's Exhibit 13 before?

A.    Yes, I have.

Q.    When was the first time you saw it?

A.    The preliminary hearing.

Q.    In this case?

A.    Yes.

Q.    Well, you've indicated that when the Defendant showed you the bag back in late 2004, you were able to see writing on the bag.  Is it your testimony that the tear was on the side where there was no writing, or was it on the side where you place information regarding the -- the case?

A.    The best I can recall, if you have an evidence bag about this size, it would have been up here.

Q.    What other conversations did you have with the Defendant regarding the evidence bag or the missing contents?

A.    That was it.

Q.    Did the Defendant ever approach you at any other time regarding any other monies?

A.    No.

Q.    And, sir, I'll ask you if before the evidence was

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

24

removed from the safe in March of 2004, did the Defendant approach you and question you about any missing monies at that time prior to that time?

A.    No.

MS. McCORMICK:  Your Honor, may I have a moment, please?

THE COURT:  Yes, ma'am.

MS. McCORMICK:  Your Honor, may I approach?

THE COURT:  Yes, ma'am.

Q.    (By Ms. McCormick)  Sir, just one last thing.  For the record, you indicated in reference to Defendant's 13 that there was a tear.  And I just want to describe for the record exactly where you believe where you observed the tear on the bag that was shown to you by the Defendant?

A.    It would have been up here on the top.

Q.    And --

A.    Right there.

Q.    And you're pointing, if you're facing the bag, you're pointing to the upper right-hand corner; is that correct?

A.    The bag would have been smaller, so it would have been maybe across it.

Q.    And -- and what type of tear was it?  Was it a straight tear, or as if it had been cut like Defendant's 13, or what type of tear was it?

A.    Like if you grab plastic and pull it, it breaks it and

25

tears it.

MS. McCORMICK:  Your Honor, I pass the witness.

THE COURT:  Thank you.

Mr. Brewster?

CROSS-EXAMINATION

BY MR. BREWSTER:

Q.    Mr. Johnson, what are you doing now?

A.    I'm worker's comp.

Q.    You're on worker's comp?

A.    Yes, sir.

Q.    Okay.  And is that all you're doing?  I mean, you're not -- not able to work now?

A.    I'm not working now, no, sir.

Q.    But I understand you're running for office.  I saw your truck out there, I think.

MS. McCORMICK:  Objection.  Relevance.

THE COURT:  You can answer, Mr. Johnson.

A.    (By the Witness)  Yes, I am.

Q.    (By Mr. Brewster)  Running for sheriff, aren't you?

A.    Yes, sir.

Q.    Now, I'm puzzled because yesterday we had the benefit of listening to Officer Lucy who testified under oath that you were not present at the Dayberry search.  You just testified that you were.  Could you clarify that for me?

A.    Yes, sir, I was.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

Q.   Well, Officer Lucy testified very directly.  I asked were you present?  He said no.  It's just you were there where he didn't see you, or --

A.   I was there.

MS. McCORMICK:  Objection.  Calls for speculation.  He -- he can't speak for Officer Lucy.

MR. BREWSTER:  Okay.  All right.

Q.   (By Mr. Brewster)  So you were there at the Dayberry search.  Now, who's the sheriff over there in Adair County then?

A.   When Mr. Lucy was there?

Q.   Yeah.

A.   Charles Hartshorn.

Q.   And do you have any relationship with that family at all?

MS. McCORMICK:  Objection.  Relevance.

MR. BREWSTER:  It's -- it's relevant.

MS. McCORMICK:  Your Honor, may we approach?

THE COURT:  Yes, ma'am.

(The following was a quiet bench conference:)

MS. McCORMICK:  Your Honor, I'm objecting regarding this Defendant -- this witness' relationship with the former -- the former sheriff of Adair County.  Counsel wants to go into it with regard to this witness having fathered a child by the sheriff's daughter.  That has absolutely no

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

relevance, and it is not proper for impeachment. It's not -- it's beyond the scope of direct examination. Has absolutely no place in this record.

MR. BREWSTER: It is relevant because I'm going to show that he and the sheriff had been dividing that money. I've got a couple of other accounts. I'm going to be able to show that at the forfeiture, that they never showed. I got the lawyer will testify he returned to the Defendant. Was in the last -- or returned to the Defendant in that case. I've got the case number. I've got the lawyer. It was the last in his hands that --

MS. McCORMICK: (Interposing) Well, he certainly hasn't given the State notice of that. And I'd ask that he be -- that he be excluded. He's not given the State any notice whatsoever regarding supposed funds that were divided between this witness and Sheriff Hartshorn. He's making it up as we go.

MR. BREWSTER: I'm not making it up. He was examined on cross-examination at preliminary hearing. And you have the transcript. There's an exhibit in the preliminary hearing that demonstrates that.

MS. McCORMICK: Your Honor, I'd ask --

THE COURT: (Interposing) Just a minute.

MS. McCORMICK: -- that Counsel -- he's putting on a show.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

28

MR. BREWSTER: No, I'm not blurting it out. I'm trying to be courteous to the reporter.

MS. McCORMICK: He has a microphone. He can hear.

THE COURT: Folks, let's just make our record and go on.

MR. BREWSTER: I simply am going to show that he had a very -- a relationship with Hartshorn's daughter. He's essentially Hartshorn's, I guess, son-in-law by virtue of the fact that he fathered a child by Hartshorn's daughter. And that just shows a connection.

MS. McCORMICK: Your Honor --

THE COURT: (Interposing) Okay. I've heard enough. We'll allow -- we'll consider allowing you to do that in your case as far as his credibility in your case in chief.

MR. BREWSTER: Judge --

THE COURT: Let me finish. We'll constrain it to the areas that we discussed in previous hearings.

MS. McCORMICK: Your Honor, in the previous hearing, you were very clear that they had to have given us notice.

THE COURT: Like I said, we'll consider that. But I'm not telling you he can. I said we'll consider it.

MS. McCORMICK: But he cannot go into it now?

THE COURT: No.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

29

MS. McCORMICK:  Thank you, Your Honor.

THE COURT:  Thank you, sir.

(The following was had in open court:)

Q.    (By Mr. Brewster)  Now, sir, I would like to ask you when did you meet up with Officer Lucy at the search?

A.    I believe it was while he was on the search warrant scene.

Q.    Okay.  And we saw some photographs, and not all of them.  There was a number of items seized out there at that search in the Dayberry/Rose search, right?

A.    I believe so, yes.

Q.    And were you assisting in that as well?

A.    Was I on the --

Q.    (Interposing)  Yes.

A.    -- Dayberry/Rose case?  Yeah.  That's the same case.

Q.    So you were assisting in that search?

A.    I assisted in the execution of the search warrant.

Q.    Okay.  And just what did you do?

A.    Arrived, assisted on securing the residence, and left. I observed a methamphetamine lab there, I believe.

Q.    Okay.  And then it was a number of days after that -- did you help count the money at the search?

A.    No, I didn't.

Q.    Okay.  When did you start counting the money?

A.    The day I went in, and Ralph Lucy caught me at the Adair

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

30

County Sheriff's Department.

Q.    Okay.  And do you know why Officer Lucy had contacted you about picking up the money?

A.    I believe I walked into the Sheriff's office that morning.

Q.    Okay.  But why would you be the custodian of the money?

A.    He has to turn it over to the Drug Task Force.

Q.    Who suggested that to Officer Lucy?

        MS. McCORMICK:  Objection.  Calls for hearsay, speculation.

        MR. BREWSTER:  If he knows.  It might have been in his presence.

        THE COURT:  If you know, Mr. Johnson, you can answer.

Q.    (By Mr. Brewster)  Who suggested to Officer Lucy that you get the money?

A.    I don't know.

Q.    You don't know.  And tell me now, I'd like to understand, you told these ladies and gentlemen of the jury that you secured the money with tape?

A.    Yes, sir.

Q.    How did you do that?

A.    I wrapped tape around it.

Q.    Around the bank bag?

A.    That I recall, yes, sir.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

31

Q.    Was this adhesive tape?

A.    As far as I know, yes.

          MR. BREWSTER:  All right.  May I approach briefly?

          THE COURT:  Yes, sir.

Q.    (By Mr. Brewster)  Let me hand you what's been marked and received into evidence as Exhibit No. 24, Defense.  Show us where the tape is.

A.    I don't see any tape.

Q.    Okay.  How did you put the tape around that bag?

A.    Wrapped it around.

Q.    Is there any residue, any sticky stuff surface there?

A.    Not that I see any sticky stuff on it.

          MR. BREWSTER:  Okay.  May I publish that to the jury?

          THE COURT:  Yes, sir.

Q.    (By Mr. Brewster)  And how many -- how many wrappings of tape did you put around this, sir, to secure it?

A.    Don't know.

Q.    Okay.  And -- and you did that right in the presence of Officer Lucy, wrapped the tape around the bag; is that what you're telling us?

A.    Yes, sir.

Q.    Okay.  And then you kept the bag, what, for a day?

A.    Overnight, yes.

Q.    Okay.  And then after you -- then you went to the -- the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

32

Drug Task Force safe that's in the evidence room there in Cherokee County?

A.    Yes, sir.

Q.    Now, was there a requirement that two people check the money in then?  And I'm talking about at this time.  This would have been roughly, I believe, in October 16th of 2003?

A.    That was my requirement, that I would go in there with two people.

Q.    And so you would always have another person initial that they were there with you?

A.    No, sir.

Q.    Okay.  But you would have something like the people that were in the Drug Task Force office document it somehow that they were there with you when you went into the safe?

A.    No, sir.

Q.    How would you accomplish that, that documentation, that there were two people going in the safe with you?

A.    I'd always go in there.  I'd say -- Pam there or Jerry -- James Carver or Jerry Stephens, I'd say, hey, go in there with me.

Q.    Well, I had asked James Carver if he ever entered by himself or do you ever enter by yourself --

MS. McCORMICK:  (Interposing)  Objection. Counsel's testifying.

MR. BREWSTER:  It's cross-examination.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

MS. McCORMICK:  In reference to other --

THE COURT:  He can finish his question, then I'll let you object.  So go ahead.

Q.    (By Mr. Brewster)  I asked Mr. Carver whether he accessed the safe by himself without anyone there.  He said yes.  I said did Clint Johnson access it?  Yes, by himself.

Are you telling me that that's not -- that he perjured himself when he said that?

MS. McCORMICK:  Objection.

THE COURT:  Overruled.

Q.    (By Mr. Brewster)  Do you know?

A.    I can't tell you what Mr. Carver testified to.  All I can tell you is what I can testify to.

Q.    Okay, sir.  Now, could we look at this log?  I believe it's first Defense Exhibit No. 1.

MR. BREWSTER:  Mr. Jarvi.

MR. JARVI:  Yes.  Number 1?

MR. NIGH:  Yes.

Q.    (By Mr. Brewster)  This is the log at least that was put in place at least by June 20th of '03; am I correct?

A.    Yes, sir.

Q.    Did the log before that time look like this?

A.    I don't know.

Q.    Well, you were there, weren't you?

A.    I didn't do anything before that date except up until

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

34

2003, and it was turned over to Sequoyah County when our other secretary was there.

Q.    No.  No.  No.  Sir, I'm asking were you in the Drug Task Force in the year of 2003?

A.    Yes, sir.

Q.    All right.  As a matter of fact, you were there under the previous administration -- previous administration, the one prior to Mr. Gray assuming office, right?

A.    Yes, sir.

Q.    And -- and then after Mr. Gray assumed office, you were gone for about three months on comp leave; am I right?

A.    After he assumed office?

Q.    Yes.  January, February, March?

A.    No, sir.

Q.    You were not on comp leave as documented by your hours?

A.    I was working in January of '03.

Q.    How about February and March?

A.    I believe I was working then, too.

Q.    Huh?

A.    I believe I was working then, also.

Q.    Did you turn hours in for those months, or did you turn comp time in?

A.    I would have turned in a time sheet.

Q.    Did you come to Mr. Gray and ask him to keep you employed because you needed the job?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

35

A.    Yes, I did.

Q.    Okay.  And what did he say?

A.    Okay.

Q.    And then was there a period of time where you were the only Drug Task Force officer?

A.    Yes.

Q.    All right.  Now, my question to you is on this log, was there a log similar to this prior to June 20th of '03?

A.    Not that I made.

Q.    So this was instituted after Mr. Gray assumed office?

A.    No.  This was after our security came on board, and I did this.

Q.    Prior to this, how did the log become maintained or record maintained as to who had access to the money in the safe?

A.    It was turned over to the secretary in Sallisaw.  So you'd have to ask her.

Q.    So at least by June 20th of '03, there's a safe, and we've heard this, but there's a safe within the evidence room, right?

A.    That's correct.

Q.    The safe has a combination?

A.    Correct.

Q.    You have the combination?

A.    Yes.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

36

Q.    And Mr. Carver has the combination?

A.    Correct.

Q.    All right.  And who logged money in on this particular log of the money that went in there?

A.    Myself and James Carver.

Q.    And what we have here is a log in by you here with no -- we don't know who it belongs to, do we?

A.    No, sir.

Q.    And then Mr. Carver follows suit.  He puts no -- we don't know who it belongs to?

A.    Correct.

Q.    And then another one we don't know who it belongs to?

A.    Another one with no name on it, yes, sir.

Q.    Right.  And then another one we don't know who it belongs to?

A.    That's correct.

Q.    And then we got an entry made by you down here just somebody.  We don't even know how much money's involved, right?  Redbird people's money?

A.    Right.

Q.    That's the log you were maintaining at this time period, right?

A.    Yes, sir.

        MR. BREWSTER:  Can we turn to Page 2?

Q.    (By Mr. Brewster)  As a matter of fact, when you logged

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

in the Dayberry money here, you didn't even indicate who it belonged to, did you?

A.    Can't make out that last writing up there.

Q.    Yeah.  Because that's Mr. Gray's writing, isn't it?

A.    I don't know.

Q.    As a matter of fact, you put it in there with no entry as to who owned it, didn't you?

A.    I don't know.

Q.    Is that your handwriting?

A.    I can't see that.  It's blurry.

Q.    Okay.

        MR. BREWSTER:  May I approach briefly, Your Honor?

        THE COURT:  Yes, sir.

Q.    (By Mr. Brewster)  I believe you have a book.  But if -- if we've taken it back, I'll get you one.  Does he have a book?

        THE COURT:  Does he want to use mine?

        MR. BREWSTER:  Oh, Your Honor, I believe we have one here --

        THE COURT:  Okay.

        MR. BREWSTER:  -- for the witness.  May I approach briefly?

        THE COURT:  Yes, sir.

Q.    (By Mr. Brewster)  What I'm specifically referring to, sir, is this entry right here that has a bunch of scratch

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

38

out.  And then the entry there, that's Mr. Gray's handwriting, isn't it?

A.    I can't tell you whose handwriting that is.

Q.    Okay.  Let me direct your attention, if I can, to Exhibit No. 2 for identification purposes, Defense.  Can you tell me, sir, have you seen that document before?

A.    Yes, sir.

Q.    Is that a log that was maintained at the Drug Task Force called the safe register?

A.    Yes.

Q.    All right.

         MR. BREWSTER:  I would move for the introduction of Defendant's Exhibit No. 2.

         THE COURT:  Any objection, Ms. McCormick?

         MS. McCORMICK:  One moment, please.  Your Honor, may I voir dire the witness?

         THE COURT:  Yes, ma'am.

                    VOIR DIRE EXAMINATION

BY MS. McCORMICK:

Q.    Sir, I'd ask you if you'll compare Defendant's Exhibit No. 1 and Defendant's Exhibit No. 2.  There seems to be additional writing.  Will you take a moment to look at Defendant's Exhibit No. 2?

A.    Okay.

Q.    Sir, if you'll just compare the two exhibits and see the

                    DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

39

places where additional writing has been placed.

A.   Yes, there has been.

Q.   Are you aware or do you know who was responsible for the additional writing?

A.   I don't.

Q.   Okay.

MS. McCORMICK:   Your Honor, I don't believe this witness is the proper witness to sponsor this Defendant's Exhibit No. 2.   We object.

THE COURT:   Mr. Brewster?

CONTINUED CROSS-EXAMINATION

BY MR. BREWSTER:

Q.   I direct your attention to Page 2 of that particular Exhibit No. 2.   Just a couple more questions.   Do you see entries made on 3-2 and 3-1 of '04, sir, at the bottom of that page?   March 2nd, '04, JC; March 1, '04, CJ?

A.   I don't see your -- you're talking about March of '04?

Q.   Right.

A.   I don't.

Q.   Exhibit No. 2?

A.   Oh, hold on.   I'm on Exhibit 1.   Sorry.   Yes.

Q.   As a matter of fact, that was the log that you started entering into after February 3rd, '04, isn't it?   You made those entries, or one entry anyway?

A.   One entry, yes.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

FORM C-100 - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Q.    Tell me if it's not true, sir, that when Mr. Gray --

MR. BREWSTER:  Exhibit No. 1, please.  Display it.

Q.    (By Mr. Brewster)  When Mr. Gray saw the log, he started questioning you, and he said, Clint, we've got to know who owns this money, and this log needs to be updated, and we need to know where it is and who owns it, didn't he?

A.    No, sir.

Q.    And then after he did that, you then -- look at Exhibit No. 2 -- filled in some of the names on the money.  That's your handwriting, isn't it, sir?

A.    Which one are you talking about?

Q.    Exhibit No. 2.  Well, look at CJ, 7-24-03, 588, Mary Brewer.  That's your handwriting, isn't it, sir?

A.    That's not my handwriting, no.

Q.    The next one, Miguel Sanchez, that's your handwriting, isn't it, sir?

MS. McCORMICK:  Object to Counsel testifying regarding the exhibit which has not been offered.

MR. BREWSTER:  It's a leading question.

THE COURT:  He can ask about that, about it.  I think attempting to lay a foundation for its admission, he can certainly --

Q.    (By Mr. Brewster)  (Interposing)  Isn't that correct, sir?

THE COURT:  -- actually challenge him about that.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

MR. BREWSTER: I'm sorry, Your Honor.

Q. (By Mr. Brewster) Isn't that correct, sir?

A. Would you ask the question, again, please?

Q. Yes. Did you write in Miguel Sanchez?

A. I don't believe that's my handwriting, no.

Q. Okay. As a matter of fact, and I'm going to ask you directly now, after Mr. Gray saw this log and was asking questions about making sure this money was being safely kept, he demanded that you fill in data indicating who the owners of this money was, didn't he, sir?

A. No, sir.

Q. How do you suppose on Exhibit No. 2, for identification purposes, that information got put in there?

A. I don't know.

Q. And, as a matter of fact, even after Mr. Gray tried to get to pen you down as to what money and where the money belonged to, you still didn't indicate -- look at Page 2 of Exhibit No. 2 -- who the $6,534.00 belonged to, did you?

A. He didn't ask me about it.

Q. You never -- that never was put on Exhibit No. 2?

A. What?

Q. Any entry?

A. It shows $6,534.00 logged in the safe on 10-16 of '03.

Q. And, as a matter of fact, it was only after Mr. Gray got the envelopes out, tried to figure out who owned this money,

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

42

saw it on the envelope, and wrote it on the log was it ever determined who this money belonged to as far as the log goes; am I correct, sir?

A.    I can't tell you what Mr. Gray did.

Q.    Okay.  Now, this entry here, this Exhibit No. 2, did there come a time that Pam Stephens, the secretary, was asked to put it in her computer?

MS. McCORMICK:  Your Honor, I object to Defendant's Exhibit No. 2 being published to the jury.

MR. BREWSTER:  No.  No.

MS. McCORMICK:  It hasn't been offered.

MR. BREWSTER:  Exhibit No. 2 is not published to the jury.  Your Honor, we're on Exhibit No. 1.

MS. McCORMICK:  Well, look at --

MR. BREWSTER:  That's Exhibit No. 1.

MS. McCORMICK:  I apologize.

MR. ROGERS:  It's not marked, Your Honor.  That's probably the source of confusion.  Mr. Brewster obviously didn't mark this exhibit so that we can tell which one it was.

MR. BREWSTER:  It's State's Exhibit No. 2 at the preliminary hearing.  It's presently Defendant's Exhibit No. 1.

THE COURT:  Go ahead, sir.

MR. BREWSTER:  Sorry for the confusion, Your

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

43

Honor.  I -- I think I'm responsible for that.

Q.    (By Mr. Brewster)  Mr. Johnson, my question to you is were you aware that at some point in February or March, Pam Stephens was asked to put it in a computer so that money could be verified?

A.    I knew that she kept a log on the computer.

Q.    And did you ever see that log?

A.    Probably at some point.  I don't recall it.

Q.    Okay.  When you say at some point, you don't -- you don't recall ever seeing her computerized log?

A.    I don't recall.

Q.    Okay.  And directing your attention, if I could, to Exhibit No. 3 before you, sir, for identification purposes. Have you ever seen that computerized version of the log?

A.    Yes.  Yes.

Q.    Okay.  Now, is that -- is that supposed to be a -- the computer record of Exhibit No. 1, the one that's kept in the safe?

A.    Yes.

Q.    Okay.  Then tell me, if you would, how on 7-24-03, look at the entry of Exhibit No. 1, the $588.00, Ms. Stephens from the log would know who it belonged to unless Exhibit No. 2 was not updated by you at the request of Mr. Gray?

A.    I can tell you Mr. Gray never asked me to update anything.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

44

Q.    Okay, sir.  We talked a little bit about -- you did, I mean, in your direct examination about that day of March 25th of 2004 when James Carver called you and said Mr. Gray was at the evidence room removing the envelopes that contained the forfeiture money.  Remember that?

A.    Spoke to James Carver that day.

Q.    And it's your testimony that you were there?

A.    Yes.

Q.    Do you know of any person that saw you that --

A.    I was there.

Q.    Okay.  Do you know of any person that saw you?  Because I've examined them all, and I've not heard one say you were there.  And I'm just curious who did you speak with?

A.    The Defendant.

Q.    Okay.  So he would know you were there?

A.    Mr. Carver.

Q.    Mr. Carver denied you were there when I asked.

       MS. McCORMICK:  Objection.  Counsel's testifying.

       MR. BREWSTER:  Okay.  I asked --

       THE COURT:  (Interposing)  Sustained.

       MR. BREWSTER:  -- under oath.  Okay.  I'm sorry.

       THE COURT:  Thank you.

       MR. BREWSTER:  Okay.

Q.    (By Mr. Brewster)  So on that day, was it discovered that when Mr. Gray and Mr. Lancaster and Mr. Jones and Ms.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

45

Stephens were -- had the envelopes out on a table, was it discovered that notwithstanding this log, some of them were missing?

A.    No.   Not that I'm aware of.

Q.    I'm sorry?

A.    Not that I'm aware of until the prelim.

Q.    Okay.   Until the prelim.   Did you acknowledge in the prelim, as a matter of fact, that there were missing files that were logged in the log?

A.    There was.

Q.    Yeah.   Well, what -- what file -- what envelopes with money were logged in, but just weren't there?

A.    I don't recall the names.

Q.    How much did it total that was logged in the log, signed by you as logged in, but just not there when the inventory was made?

A.    I don't recall that either.

Q.    Over $10,000.00?

A.    I don't believe that much.   I don't recall.

Q.    Okay.   Let me ask you -- well, look at Exhibit No. 1 again.   And ask whether in fact Lisa Perez, who's not noted on here, but owned this money, that that was missing?   The --

A.    (Interposing)   Okay.

Q.    -- $1,636.00, that was not logged out, but it was gone?

A.    It wasn't gone.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

46

Q.    Where was it?

A.    Locked up in a filing cabinet.

Q.    Where was the filing cabinet?

A.    In the same Drug Task Force office.

Q.    Did -- when they -- when they got the folders that had this money, and this is only being one of them, they got them from the trunk of your car, didn't they, sir?

A.    No.

Q.    In addition to Ms. Perez's file, did you ever -- this particular entry here, this is James Carver's case, isn't it?  He logged it in; am I correct?

A.    My case.

Q.    Well, it says it's logged in by James Carver.

A.    He's the one who wrote it down.

Q.    Okay.  Not logged out by anybody, right?

A.    Right.

Q.    August of '03, right, logged in?

A.    Correct.

Q.    You have it in March of '04, right?

A.    Whatever date, yes.

Q.    You have it in your cabinet?

A.    Yes.

Q.    You never logged it out?

A.    No.

Q.    And just so do you know when this was ordered to be

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

47

forfeited, this money?

A.   No.

Q.   If the -- if the Cherokee County Court records reflect November 15th, '04, would you have any reason to dispute that?

A.   No.

Q.   Okay.   So it's forfeited a year and three months later, checked in by Mr. Carver, but taken out by you without any entry, and you have it, right?

A.   It's locked up, yes.

Q.   Why?

A.   Didn't go into the evidence room by myself or into the vault by myself, so it was probably tossed in my cabinet and locked up.

Q.   But Mr. Carver logged it in?

A.   That was a log for all the money that was seized.

Q.   Okay.   And so when he logged it in, he told us that he actually logged it in and placed on the envelope when he logged it in very careful to make sure.   Why would you take it out of there?   Are you saying that Mr. Carver didn't log it in?

A.   Mr. Carver logged it in, but that was money that was seized.   I can tell you it was my case.   And he's probably the one that logged it on the piece of paper because it was seized money.   But I can't tell you -- I mean, it was thrown

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

48

in my -- it was set in my filing cabinet with a padlock in the same Drug Task Force office and secured.

Q.    Where did you document that, sir, that you logged this money out that's unnamed?

A.    That is a money -- a log of all money seized.

Q.    Okay.  All right.  Now, was -- were there other files missing?

A.    Files?

Q.    Yeah.  The -- the envelopes.  The evidence envelopes.  We can call them envelopes if you choose that had money in them missing that were reflected on the log but just not there?

A.    Nothing missing.

Q.    Okay.  Were they in the safe?

A.    They were locked up in the filing cabinet.

Q.    Okay.  Were they in the safe as the log record reflects?

A.    This is a log of seized money.

Q.    Okay.  Well, was Ms. Perez's money seized money and forfeited?

A.    It was seized money.

Q.    But it was not -- it is logged in, but then logged in by another person, not logged out, but you have it, right?

MS. McCORMICK:  Objection.  Asked and answered.

MR. BREWSTER:  I think -- I think she's correct.

THE COURT:  Thank you.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

49

Q.   (By Mr. Brewster)  Let's go on to the next one.  Look at did you involve logging in a seizure for Juan Ramirez of $4,348.00 on March 1st, '04 in the evidence log, sir?

A.   On March -- I'm sorry.  On March?

Q.   Look at Exhibit No. 2.

A.   Okay.

Q.   Because that's the continued one, Exhibit No. 2.

MR. BREWSTER:  We'd move for the introduction of Exhibit No. 2, subject to tying up further testimony as to who put the additional entries on it, Your Honor.  It's a --

MS. McCORMICK:  (Interposing)  Same --

MR. BREWSTER:  It's a document that two people wrote on, so, or maybe three.  But it's still a record that he recognizes.  And he did make the entries on -- this entry on March -- March 1st.  Move for the introduction of Exhibit No. 2.

MS. McCORMICK:  Same objection, Your Honor.  May we approach?

THE COURT:  Yes, ma'am.

(The following was a quiet bench conference:)

MR. BREWSTER:  Your Honor, there's no reason for an objection to this.  This is the log.  He enters it on this log.  The only difference is when Mr. Gray confronts him, he filled it in on the same day.  And that's his handwriting.  We'll tie it up.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

50

MS. McCORMICK: But then when they tie it up, Your Honor, that would be the appropriate time for them to offer this unauthenticated document. We object.

MR. BREWSTER: It's authenticated.

THE COURT: I'm going to allow it. I think as between Mr. Carver and Mr. Johnson, it's sufficient. We'll allow it in.

MS. McCORMICK: And, Your Honor, with regard -- regarding writing that this witness can't identify, no one's identified, it's not been fully authenticated. We've had responses to questions that say they don't know who placed the writing on that document.

THE COURT: I've already ruled. Thank you.

(The following was had in open court:)

MR. BREWSTER: Your Honor, it's my understanding Exhibit No. 2 has now been received?

THE COURT: Yes, sir.

MR. BREWSTER: Mr. Jarvi, could you demonstrate Exhibit No. 2, Page 1?

Q.   (By Mr. Brewster)   After whatever happened, information was provided as to who the claimant was on these monies, right?

A.   There's writing on it, yes.

Q.   Yes, sir. And you're telling us under oath that's not your handwriting?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

51

A.    No, sir.

Q.    Okay.  You're not telling us under oath now?

A.    That's not my handwriting, yes, sir.

Q.    Okay.  All right.  Well, on your cases, who provided the information?  Clint Johnson.  I mean, did somebody talk to you about it?

A.    All I can tell you that's not my handwriting on that.

Q.    Whose is it?

THE COURT:  Mr. Johnson, that wasn't responsive to his question.  So please answer his question.

Q.    (By Mr. Brewster)  My question is if you didn't put it on there and it pertains to your cases, who do you suppose supplied the information?

MS. McCORMICK:  Objection.  Calls for speculation.

THE COURT:  If he knows, he can answer.

A.    (By the Witness)  No, I don't know.

MR. BREWSTER:  Turn to Page 2, please, Mr. Jarvi.

Q.    (By Mr. Brewster)  And I direct your attention to Page 2, please, Mr. Johnson.  You may choose to look at the screen or the one before you.  Second.  Same document.  We see now that it does not have an entry as to the 6,534 as to who owns it, right?

A.    Correct.

Q.    And, as a matter of fact, you -- you're making entries here, at least one 3-1-04, that same month, of $4,348.00,

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

52

right?

A.    It was logged on there, yes.

Q.    When the inventory and the -- the evidence envelopes are taken from the safe on March 25th, that one's missing, isn't it, from the safe?

A.    I believe that was one, yes.

Q.    Yeah, okay.

A.    It's not missing, though.

Q.    Okay.  Well, where did you log it out?

A.    It wasn't logged out.

Q.    You just logged it in and kept it?

A.    It was locked up in the filing cabinet with a padlock.

Q.    Yeah.  You logged it in and kept it, or did you log it in, later go take it back out?

A.    It was written down on here because that was money seized.

Q.    Well, this is the safe register, what goes in the safe, sir, doesn't it?

A.    That's also a paperwork showing what money was seized.

Q.    Okay.  Well, we see several days between the seizure on some of these than the actual logging in the safe.  But the log is not maintained until you put it in the safe; is that wrong?

A.    Yes.

Q.    Okay.  For you, in other words, you could log it in and

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

just keep it, right?

A.   I didn't keep it.  It was locked in the cabinet.

Q.   All right.  And was there another one, also, sir, and I direct your attention, if I could, that was missing 11-4-03, Kenny Miller, $3,782.00?  That wasn't in the safe either, was it?

A.   I don't recall that one.

Q.   Do you know where that went?

A.   Again, I don't recall that one.

Q.   So how many -- how much money do you recall having logged in the safe and it not being there when the inventory was taken?

MS. McCORMICK:  Objection.  Asked and answered.

MR. BREWSTER:  I don't think he's totalled it up.

THE COURT:  If you're able to answer, Mr. Johnson, please answer.

A.   (By the Witness)  I haven't totalled it up.

Q.   (By Mr. Brewster)  And you didn't know Mr. Gray was going there that day, did you?

A.   No.

Q.   And you didn't have the time to replenish the envelopes that you took money from, did you?

A.   I didn't take no money.

Q.   Did you ask Mr. Gray why he was taking this action?

A.   I believe he said he was going to the safety deposit box

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

54

with it.

Q.    Did you ask him why?  Don't you trust me?

A.    I don't think so.

Q.    Were you angry?

A.    No.

Q.    Did you tell Mr. Keeter that you were going to whip him?  Whip Mr. Gray?

A.    No.

Q.    Now, let's just concentrate, if we could, on a period of time from, let's say, oh, May of '03, or let's say May of '03 until November of '04.  How many insufficient checks do you think were returned on your accounts during that period of time in Tahlequah, Oklahoma?

MS. McCORMICK:  Objection, Your Honor.  May we approach?

THE COURT:  Yes, ma'am.

(The following was a quiet bench conference:)

MS. McCORMICK:  Your Honor, Counsel is once again getting beyond the scope of direct examination.  The pre- -- at the Court's previous ruling, you indicated the Defense wouldn't be able to put on their case at that time.  It's certainly not appropriate yet.  It's beyond the scope.  And the Court memorialized its ruling regarding how the guidelines, the boundaries that were going to be set for presentation of evidence.  And Counsel, who was not at the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

55

hearing, is far afoul of that ruling. We'd ask that the Court direct him to stay within the boundaries by the Court and not go beyond the scope of direct.

MR. BREWSTER: I believe she is correct. I am beyond the scope of direct. I'd ask the Court's latitude. I'm going to put this on in our case. It would seem needless to bring him back. This is a case of persuasion at this point. And it would be seemingly a waste of time.

MS. McCORMICK: Please whisper.

MR. BREWSTER: If the Court -- I'm sorry. I wasn't quite finished yet. But if he's willing to come back. I'd ask in Your Honor's discretion. You have control of this interrogation. You can expand the scope in light of the fact it's going to be put on anyway. Or I can limit it.

THE COURT: Okay. I've set out some guidelines that I thought was fair to both sides. He can just stay or come back. So if you'll --

MR. BREWSTER: (Interposing) Well, I'll keep it within the scope.

THE COURT: Thank you, sir.

(The following was had in open court:)

MS. McCORMICK: Your Honor, may I offer the witness water?

THE COURT: I guess if he wants some water.

MS. McCORMICK: Do you want some?

56

THE WITNESS:  Please.

Q.    (By Mr. Brewster)  We'll reserve those questions until we meet again, okay, Mr. Johnson?

A.    Okay.

Q.    All right.  Let me ask you this:  I'm curious.  If you were there on the 25th --

THE COURT:  (Interposing)  Mr. Brewster, is this a point where we could take just a short recess?

MR. BREWSTER:  Yes, sir.

THE COURT:  Is that okay with you?

MR. BREWSTER:  Absolutely.

THE COURT:  Folks, we'll take just a very brief recess.  If you could be back in at 10:30, please.  Again, same admonishments without me repeating those every one.

Folks, if you'd please rise while the jury steps out, please.

(The jury left the courtroom.)

THE COURT:  And we're in recess.  Thank you very much.

(A recess was taken.)

THE COURT:  We'll again reopen the record in CF-2007-28, STATE OF OKLAHOMA vs. RICHARD LOY GRAY, JR. Again acknowledge for the record the jury's returned to the jury box.  All parties are present.  Mr. Johnson has returned to the witness stand.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

MS. McCORMICK:  Your Honor, before Counsel resumes, may we approach?

THE COURT:  Yes, ma'am.

(The following was a quiet bench conference:)

MS. McCORMICK:  Your Honor, I'd just like to make the Court aware that during the beginning of the break, as Mr. Johnson was leaving the courtroom, Counsel made an unnecessary comment to him regarding any day, and gesturing. I'd just like it to be part of this record that Counsel's conduct is roguish and unprofessional.  It's unnecessary that he interact with the witnesses that way.  We'd ask that he be admonished.

MR. BREWSTER:  Actually she's mistaken.  I wasn't being roguish or unprofessional.  I was being defensive of my own client.  He came over there bolstering to Mr. Gray, puffing up.  And I said, hey, anytime, step back.  And then he came over towards you.  And you misunderstood.  Didn't see what happened.  That's what happened.  He was going to go over and confront Mr. Gray, bolster up to him.  Mr. Gray, I had him step back.  And told him anytime.  All right.

THE COURT:  Okay.  So we all know what we need to do.

MR. BREWSTER:  All right.

THE COURT:  Thank you.

(The following was had in open court:)

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

THE COURT: Mr. Brewster?

MR. BREWSTER: Yes.

Q.   (By Mr. Brewster)   Mr. Johnson, you did -- when were you in bogus check division of the DA's office?

A.   It would have been '96, I believe.   '97, somewhere.

Q.   And how long were you in that department of bogus checks?

A.   Probably eight months.

Q.   And -- and what is that?   What's that department do? What does it handle?

A.   Bogus checks.

Q.   In other words, checks that are written for insufficient amounts to people that purchase things?

A.   Yes.

Q.   And then they're turned in for prosecution?

A.   Yes.

Q.   And what did you do in connection with that function?

A.   I was the investigator that went out and arrested people.

Q.   Okay.   Now, getting back to this -- this day on March 25th, if I could briefly.   You were there.   Did you know what was going on?   Mr. Carver tell you?

A.   That the money was being removed from the safe.

Q.   In other words, the evidence envelopes were being taken in the presence of others, right?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

59

A.    Correct.

Q.    All right.    And -- and they were going to put them in a safety deposit box?

A.    My understanding, yes.

Q.    Okay.    And did you come forward and say, hey, guys, there's some more that I have that are logged in that -- that you need to take?

A.    No, sir, I didn't.

Q.    Oh.

MR. BREWSTER:    If I could have Exhibit 2 placed on the board, Mr. Jarvi.

Q.    (By Mr. Brewster)    In addition to those ones we've talked about, Ms. Perez, Mr. Ramirez, the $4,348.00 which you say you had but not logged out; am I correct?

A.    Correct.    I didn't have it.    It was locked up.

Q.    Now, I'm also puzzled about these three.    That these are your cases, aren't they?    Bigby, Coldwell, and Frakes?

A.    Frakes is not mine, no, sir.

Q.    Okay.    But you -- you checked these out of here, didn't you?

A.    Yes, sir.

Q.    So Frakes isn't your case, and you just check it out?

A.    I'm the one who checked it out, yes, sir.

Q.    Okay.    And could you tell the ladies and gentlemen of the jury -- gentlemen of the jury why would you check out

60

this money on -- all on July 16th, '03?

A.   Would have been forfeited and turned over to the DA's office for deposit.

Q.   Well, if I represented to you as an officer of the Court that the records of Cherokee County reflect that this money was forfeited in February of -- February 9th, 2004, why would you have checked it out in July of '03?  Proceedings weren't even close to being finished?

A.   Don't know.  It was checked out for forfeiture proceedings, I guess.

Q.   How many months would that be?  Five, seven months before the proceedings, the order is delivered, you check it out?

A.   Don't know.

Q.   Okay.

A.   And I can't tell you when the order was.

Q.   Well, why would you on one day pull all this money out of here, and including one that's not even your case you told us?

A.   I believe Frakes' was returned to him.

Q.   You believe that?  Have you -- have you talked to Mr. Frakes?

A.   I believe Frakes' was returned.

Q.   To whom?

A.   It was turned over to -- I believe James Carver took it

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

61

back.  He was ordered to give it back to Mr. Frakes is what I believe on the case.

Q.   Okay.  Well, this is checked out by Clint Johnson?

A.   Correct.

Q.   Do you know whether Mr. Frakes got his money?

A.   You have to ask Mr. Frakes that.

Q.   Okay.  And all of this money, these -- these -- let's talk about this.  Twenty-nine Kennedy half dollars, two Indian Head nickels, the $2.00 bills, why would you check this out on July 16th, and I'll tell you as an officer of the Court that it's not deposited until October of '04?

A.   I don't know.

Q.   A year and some months later?

A.   I can just tell you it was deposited.  I can't tell you anything else.

Q.   And -- and then, sir, when it is deposited, the amounts are much different.  There's no Kennedy half dollars or Indian Head nickels.  What happened to those, sir?

A.   I couldn't tell you.

Q.   Well, how long were they in your possession before that money was forfeited?

A.   I don't recall that.

Q.   Well, if I tell you it was forfeited by Court order on October 8th of 2004, and you check it out July 16th, '03, well, why?  Why?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

62

A. I don't recall. But I believe that those Indian Heads were sold at the -- at the public auction as a collector's edition.

Q. Why do you check this out in July of '03 when it's not -- how much money are we talking about? Sixty -- 6,324 in cash, right?

A. Yeah.

Q. $821.00 in cash. So that's 7,100, right, roughly? Am I correct?

A. Okay.

Q. And then some other denominations in -- in special currency, right?

A. Okay.

Q. Why do you check that out in July, sir, when it's not forfeited until the next year in October?

MS. McCORMICK: Objection. Asked and answered.

THE COURT: I don't believe he's answered that.

MR. BREWSTER: I don't believe he has.

A. (By the Witness) I don't recall.

Q. (By Mr. Brewster) Okay. Where did you put it?

A. Been left at the DA's office.

Q. Oh, so you checked this out in July, and leave it at the DA's office. Who with?

A. I don't recall. I never took money home, and I never stole money.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

63

Q.    What do you mean by steal?

A.    I never took money.

Q.    Yeah.

MR. BREWSTER:  Scroll up, please, sir, Mr. Jarvi, on Exhibit 2.

Q.    (By Mr. Brewster)  Who are these people, and how much money is there supposed to be in the safe?

A.    Redbird people's money is what it says.

Q.    How much money, and who are they, if it's in the safe?

A.    I can tell you what's on the paper, Redbird people's money.

Q.    I know.  But you checked it in, sir.  And what I'm asking you simply is this:  How would there be any accountability?  Like if I make a deposit at the bank, they know it's me, and I put certain amount of money in it, and they keep it for me.  This is a safe register.  You're checking in something that has nobody's name and no amount.

A.    Off a forfeiture sheet and the evidence return log from the search warrant.

Q.    Did there come to be times when the people whose money that were seized were claiming more was seized than you were writing down?

A.    No, sir.

Q.    You never heard that?

A.    I heard rumors once before.  But it came through a

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

64

individual that was a -- certain investigations of narcotics in Adair County.

Q. Okay. So, in other words, when you seized the money and the money is being seized from alleged drug dealers, you can't trust them by saying that you took more than you really are accounting for; am I right? You can't trust them?

A. Anytime that we seized money, there was two officers that logged it.

Q. Well, who logged Redbird people's money, and how much is it?

A. I'd have to look at the search warrant returns to tell you.

Q. Well, who logged it?

A. Different officers.

Q. Who logged it on the safe register?

A. My name's on there for the safe.

Q. Why would you not put the amount? I don't mean to belabor this. I'm just puzzled by it.

A. I wasn't the case agent on all these search warrants done.

Q. But you're going to take some envelope, that you talk about how careful the chain of custody is, with the amount on the outside, and you're going to go into this register, this log that's going to verify the chain of custody and the amount, and you're going to put it in there and just not put

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

65

the names of the people or the amount on it?

A.    All I can tell you is Redbird people's money went in the safe.

Q.    Would it be to your benefit to be vague and indefinite so you could take the money when you needed it and use it like your own private ATM?

A.    No.

Q.    Okay.  In the years that we're talking about here, did you attempt to borrow money from several lawyers around town?

MS. McCORMICK:  Objection.  May we approach?

THE COURT:  Yes, ma'am.

(The following was a quiet bench conference:)

MS. McCORMICK:  He's doing it again, Your Honor. He's getting into areas that are clearly not relevant to and are beyond the scope of direct examination.  If he's going to put this type of evidence on, he should have given the State notice.  And he can do it in his case in chief.

MR. BREWSTER:  The State has notice.  Furthermore, bias is always an issue.  This guy was trying to borrow money.  I've got six lawyers at least that will tell us that he came to them trying to borrow money.  He borrowed money from three of them.  I have checks from two of them.  So what I'm saying is this is a complete credibility issue.  Two of them are people whose money that represent people that he has on his log.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

66

MS. McCORMICK:  Your Honor, it doesn't go to bias. It's certainly an area that they've raised and the subject of our conversation or our discussion on the record on Friday where the Court clearly set out boundaries for the presentation.

MR. BREWSTER:  I'm going to do it in our case in chief.  So I'll tie it to this log, and then we can move on and do it in our case in chief.

THE COURT:  If you can, you can try.

MR. BREWSTER:  All right.

THE COURT:  Thank you.

(The following was had in open court:)

Q.   (By Mr. Brewster)  We'll reserve that till the next time we meet as well, sir.

Let me ask this question of you:  Drawing your attention to Exhibit No. 2 before you.

MR. BREWSTER:  Page 2, Mr. Jarvi.

Q.   (By Mr. Brewster)  This one here.  It's Juan Pablo Ramirez on the bottom.

MR. BREWSTER:  Excellent job, Mr. Jarvi.

Q.   (By Mr. Brewster)  Do you see this one?

A.   Yes, sir.

Q.   What happened to that?

A.   I don't know.

Q.   Let me ask you did you report that it was returned to

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

67

Mr. Monte Strout, who's a lawyer in Tahlequah?

A.   Not that I can recall.

Q.   Did you in fact tell Pam Stephens that that money was given to Monte Strout?

A.   No, not that I recall.

Q.   After March 25th did you actually receive a check from Monte Strout for $1,800.00?

A.   Probably.

Q.   Okay.   Why?

A.   Worked for Mr. Strout.

Q.   Mr. Strout's representing one of the people that you seized money from, right?

A.   Correct.

Q.   And then after it's released to Mr. Strout, you get a check from him that -- within a few months, right?

A.   I worked for his base -- in his basement, yes.

Q.   You worked in his basement?

A.   Yes.

        MR. BREWSTER:   May I approach briefly, Your Honor, just to refresh memory on 2611?

        THE COURT:   Yes, sir.

Q.   (By Mr. Brewster)   Does that refresh your memory as to whether you received a check in '04 from Mr. Strout?

A.   Okay.

Q.   What is it for?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

68

THE COURT:  Does it refresh your memory?

THE WITNESS:  Oh.  It appears to be a check from him, yes.

THE COURT:  Does it refresh your memory?

THE WITNESS:  Yes.  Yes.

THE COURT:  Thank you.

MR. BREWSTER:  Thank you.

Q.    (By Mr. Brewster)  If I could, directing your attention to exhibit -- check my numbers here.  Exhibit No. 4 before you, marked for identification purposes only.  Directing your attention to the third page.

MR. BREWSTER:  And this is pursuant to 2611, Your Honor, for memory refresh.

Q.    (By Mr. Brewster)  On the entry Juan Ramirez, $4,338.00, does it refresh your memory as to where that money went?

MR. BREWSTER:  If I may approach briefly, I can assist?

A.    (By the Witness)  Show me, please.

THE COURT:  Yes, sir.

A.    (By the Witness)  Right here.  I'm sorry.  It says gave money to Monte Strout.

Q.    (By Mr. Brewster)  How much?

A.    It shows four -- well, in the safe it shows 43 or 4,348.

Q.    $4,348.00.  And that's one of the files or envelopes that were missing?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

69

A.    It wasn't missing.

Q.    Well, it wasn't in the safe, notwithstanding the fact that you logged it in?

A.    It was locked up.

Q.    And you had it?

A.    I didn't have it.  It was in the Drug Task Force office.

Q.    And, as a matter of fact, later -- it never got turned in.  You just said the money went to Monte Strout, right?

A.    Best I can recall, it was returned to Monte Strout. That's what it says right here.

Q.    And how many months before you get a check from Mr. Strout?

A.    Whatever the date was.

Q.    Why would you give it to Monte Strout?

A.    Probably what the order said of the Court.

Q.    There's no order.

A.    Then I don't know.

Q.    Now, I'm trying to understand this meeting you had with Mr. Gray.  Did there come a time when these files that were locked up in your cabinet, you tell us, showed up for Mr. Gray?

A.    They were turned over to Mister -- or the Defendant, yes.

Q.    Did you tell him I put them in the backseat of your car?

A.    No.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

Q.    Where did you give them to him?

A.    At the Drug Task Force office.

Q.    Where did you -- how did you hand them to him?

A.    From my hand to his.

Q.    Who was present?

A.    I believe him and Jeff Lancaster was also there.

Q.    How many days did it take for those files to get returned?

A.    I don't recall.

Q.    And some of them never did, including Mr. Ramirez's money, right?

A.    All money was accounted for.

Q.    Yeah.  Never was returned to Mr. Gray or anyone else, Mr. Ramirez's money; am I correct?

A.    I don't know.

Q.    Well, it's your case.  Why don't you know?

A.    Because once I seize it and log it in, and then pick it back up and turn it over to the DA's office, I have nothing to do with it.

Q.    In the years of 2003 and 2004, did you have a practice of going to the bank and buying cashier's checks with cash?

MS. McCORMICK:  Objection.  Your Honor, may we approach?

THE COURT:  Yes, ma'am.

MR. BREWSTER:  If it's your previous ruling covers

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

71

that subject, I'll reserve it till I get to examine him later.

MS. McCORMICK:  It is the same objection.

MR. BREWSTER:  Okay.  Okay.

Q.    (By Mr. Brewster)  We'll save it for our next meeting, sir.

Now, when you saw Mr. Gray in connection with the Scarborough case, remember that?

A.    Yes.

Q.    Mr. Gray -- you said Mr. Gray came to you and said, hey, what's going on about this money, right?

A.    He asked me to come to his truck, yes.

Q.    And that was in Adair County?

A.    Correct.

Q.    How many offices was Mr. Gray attempting to supervise in that at that time period?

A.    There was four in District 27.

Q.    Actually --

A.    (Interposing)  ADA's offices.

THE REPORTER:  I'm sorry?

Q.    (By Mr. Brewster)  Actually it's eight, wasn't there?  I mean, there was eight offices.  I mean, there was the Drug Task -- or, I mean, there was the DA's offices.  There was the Drug Task Force office.  There was the domestic offices for -- for child support enforcement.  He had eight separate

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

72

offices at that time, didn't he?

A.   I can't tell you how many offices.  I know there was four main offices.

Q.   Okay.  So when you meet with him in Adair County, did he call you over and say I want to meet with you?

A.   No.  We were at the courthouse together.  Or not together.  But, I mean, I was there, and he was also there.

Q.   And are you telling us that this is not the envelope he showed you?

A.   That's correct.

Q.   And I'm referring to Defendant's Exhibit No. 13?

A.   That's correct.

Q.   Okay.  But it had Scarborough on it?

A.   Correct.

Q.   Okay.  So what you're suggesting is Mr. Gray got another envelope, wrote Scarborough on it, and for some reason showed that one to you?

A.   All I can tell you is testify that the baggy he showed me wasn't that one.

Q.   Did he show you the receipt that was signed by Mr. Carver and Mr. Lancaster when the money was opened?

A.   No.

Q.   And you told him if you think I took it, call the OSBI?

A.   No.

Q.   Oh, I thought that's what you said.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

73

A.    No.    I said if you think there's money missing, call the OSBI.

Q.    Okay.    And you know the OSBI well.    You knew Vicky Lyons well.    She was the OSBI agent, wasn't she?

A.    Correct.

Q.    And you guys lived together for a while, didn't you?

A.    No.

MS. McCORMICK:    Objection, Your Honor.

Q.    (By Mr. Brewster)    Are you're denying that, Mr. Johnson?

MS. McCORMICK:    Objection.    Relevance.

THE COURT:    Do you want to approach?

MS. McCORMICK:    Yes, Your Honor.

(The following was a quiet bench conference:)

THE COURT:    Go ahead.

MS. McCORMICK:    Once again, Counsel is getting into areas that are far beyond the direct examination and have no place in cross-examination today.    He is totally ignoring and mocking the Court's ruling with regard to how His Honor expects this proceeding to be carried out.    This is probably our fifth or sixth time to come up here on the same objection.

MR. BREWSTER:    Now, this is within the scope, Ms. McCormick, because you're the --

MS. McCORMICK:    (Interposing)    It's not my scope.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

74

THE COURT: Go ahead, Mr. Brewster.

MR. BREWSTER: The scope of your direct because you elicited from him that he suggested to call the OSBI. My position is that he did so is because he knew what would happen if it was through them; although, it went up to the AG's office.

So my position simply is this: Through Mike Littlefield and your superiors, whoever that is, inquired of Mr. Nigh. And he was mute. And it turned out to be true. So my position right now is since you elicited from his investigation to call the OSBI, that was a complete false red herring on his part because he knew they'd do nothing. And he was correct.

MS. McCORMICK: And, Your Honor, for him to ask this witness if he lived with an OSBI agent --

MR. BREWSTER: (Interposing) He did.

MS. McCORMICK: -- is inappropriate.

MR. BREWSTER: Okay. He did. And we have witnesses that will show it. He lived with her. He drove her vehicle. He had her cell phone. When he was confronted about missing property, she's the one that brought it back. It'll all come in our case in chief.

MS. McCORMICK: Well, he just said the magic words. It will come in in his case in chief if it gets in. It's certainly not appropriate here.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

MR. BREWSTER:  It's appropriate because --

THE COURT:  (Interposing)  Okay.  For the purpose of their case, you can ask, and you've already asked him, and I think he's answered.  And we'll go on.

MR. BREWSTER:  We'll show it --

MR. ROGERS:  Your Honor, can I ask a question?

THE COURT:  Sure.

MR. ROGERS:  Mr. Brewster was permitted to elicit testimony concerning Monte Strout.  Apparently now we need to call Mr. Strout to deny that.  Is that -- should that be in our case, or in his case, or in rebuttal?

MR. BREWSTER:  You can call Mr. Strout if you like.  I have no objection.

MR. ROGERS:  He certainly was not part of our case.

THE COURT:  Well, I'm going to let y'all put on your case, and then they can put on their case.  And if y'all have rebuttal, you can do rebuttal.

MR. ROGERS:  Okay.  Thank you very much.

THE COURT:  Thank you.

(The following was had in open court:)

THE COURT:  Okay, Mr. Brewster.

MR. BREWSTER:  Should I not go there now or --

THE COURT:  You can ask that one.  That one question he can answer, and then we'll move on.

MR. BREWSTER:  Okay.  Okay.  And I can reserve this

until another time.  Okay.

Q.    (By Mr. Brewster)  Did you know -- were you the agent for a seizure involving a gentleman named Roy Brewer in Adair County, Case No. CF03-304?

A.    I don't recall.  I remember the name, but I don't recall the specifics of it.

Q.    Did there come a time in that case, to your recollection, that the Court ordered in that case that the money be returned to Mr. Brewer?  You were the last in possession of it, and but it was never returned?

A.    And, like I said, I don't recall the case.

Q.    Were you involved in a case involving the City of Tahlequah in a seizure involving a gentleman named Blake Keeley?

A.    What year?

Q.    Well, we'll get exactly the year here.  January of 2003?

MS. McCORMICK:  Objection as to the time frame, Your Honor.  May we approach?

THE COURT:  Yes, ma'am.

(The following was a quiet bench conference:)

MS. McCORMICK:  Your Honor, you set specific guidelines with reference to matters we'd be able -- we'd be allowed to question regarding a time frame.  I believe the time frame you set out was January of '03 to January of '06. And I believe Counsel's last reference was to a case out of

77

'02.

MR. BREWSTER: Well, what happened was memos were sent to Mr. Johnson on this account. He was the last to have received. From the memos, the last -- it says the money's missing. But he says I gave the money to Michelle. I'm sorry. It's Ms. Kinsey, I believe. I'll give you the name. Misty Brinlee writes a memo to Jeff Sheridan in '05.

MS. McCORMICK: (Inaudible.)

MR. BREWSTER: Huh? Jeff Sheridan. Okay. And as a result of that memo, the questions of Ms. Brinlee of course she didn't get it. She's prepared to testify. In the preliminary hearing I asked her about the same account covering the same time period that's missing. He says -- he testified. Donovan Dobbs will testify notwithstanding -- (Inaudible). So it's just complete further lies from this witness. You should be as interested as I in exposing this.

MS. McCORMICK: Your Honor, can Counsel direct his argument to the Court as opposed to Counsel? We're up here to consult with Your Honor.

THE COURT: As long as both of you will do that, that's fine. Go ahead. Are y'all through?

MR. BREWSTER: Yeah.

THE COURT: I'd rather you bring that up in your case in chief.

MR. BREWSTER: Very well, sir.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

78

THE COURT:  Thank you.

(The following was had in open court:)

MR. BREWSTER:  Your Honor, based upon the Court's ruling that I'll get to examine this gentleman in my case in chief further on other issues, I have no further questions at this time.

THE COURT:  Thank you.

Ms. McCormick?

MS. McCORMICK:  Yes, Your Honor, just briefly.

MR. BREWSTER:  Could he be recognized back, Your Honor?

THE COURT:  That was a yes if you missed that.

REDIRECT EXAMINATION

BY MS. McCORMICK:

Q.   Sir, at the beginning of Counsel's cross-examination, Defendant's Exhibit No. 24 was shown to you.  And you were asked regarding the -- the manner in which you secured that bank bag.  Counsel's question was with regard to tape residue.  Do you know where that Defense exhibit has been since you last placed it into the safe register or safe at the Drug Task Force office?

A.   No, I don't.

Q.   Okay.  So you wouldn't have had any access to it whatsoever; is that correct?

MR. BREWSTER:  Objection.  Leading.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

Q.    (By Ms. McCormick)    Would you have had any access to that bank bag?

A.    No.

Q.    So as far as its condition, what can you explain to the jury regarding why there is or is not tape residue?

A.    I can't.

Q.    There were a number of cases that were referenced during cross-examination.  Perez, Ramirez, Bigsby (sic), Coldwell, and -- and -- and there were others.  But have you ever been confronted regarding monies missing in those cases?

A.    No.

Q.    There was some quarreling with Counsel regarding whether they were in the safe or the file cabinet.  But have you ever been accused or questioned regarding those funds being missing?

A.    No.

Q.    As you sit here today, are you aware as to whether or not those funds are missing?

A.    No.

Q.    Sir, you referenced or Counsel referenced a case in which the Defendant was represented by a Monte Strout.  Who's Monte Strout?

A.    He's an attorney in Tahlequah.

Q.    Okay.  Was there a point in time when he actually worked for District 27?

80

A.   Yes.

Q.   And what was his position?

A.   He was the First Assistant District Attorney.

Q.   Okay.  Was that during the Gray administration?

A.   Yes.

Q.   Sir, will you explain for this jury what work you were doing for Mr. Strout in his basement?

A.   Pouring concrete, redoing his basement for a workshop for him.

Q.   And is it your testimony that you were paid by Mr. Strout for doing that work?

A.   Yes.  I was paid by Mr. Strout for that.

Q.   How would you characterize your relationship with Mr. Strout?

A.   He's a friend.

Q.   There was some discussion regarding the combination and the access to the safe.  And you named a number of people who had access to the safe in the Drug Task Force office.  Do you know whether or not the Defendant had access?

A.   Yes, he did.

Q.   How do you know that?

A.   Because I gave him all the codes and a key.

Q.   You've referenced the log.  And Counsel questioned you extensively regarding information that's contained on the log, information that's left off of the log.  In addition to

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

81

the information you document on a log, do you also write reports with regard to your law enforcement work or your participation in an investigation?

A.    Yes.

Q.    And so with regard to the cases or each of the -- the cases that Counsel referenced, Ramirez, Perez, Miller, are there -- would there also be law enforcement reports that further detailed the handling of various evidence?

A.    Yes.

Q.    Sir, were there times where you were asked by different attorneys within the District Attorney's office to deliver evidence from -- from one place to another?

A.    Yes.

Q.    And who were some of those people who directed you to do so?

A.    Donovan Dobbs.  I believe Monte Strout asked me a couple of times.  And there would be other prosecutors that would ask me.

Q.    Did the Defendant ever ask you to make those types of transfers or deliveries?

A.    Not that I recall.

Q.    Was there anything unusual about you being -- that request being made of you, that type of request being made of you?

A.    No.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

Q.    Sir, when you described that you transferred a number of evidence envelopes to the Defendant at a point later in time than March 25th of 2004, explain or describe for the ladies and gentlemen of the jury how you did that.

A.    Went to the Drug Task Force office.  Removed the padlock from the filing cabinet.  Took it out.  The Defendant and I believe Mr. Lancaster arrived, and I handed it to them.

Q.    So this reference to having -- having -- you having placed the evidence envelopes in the Defendant's backseat or in his car, are you -- did -- was there ever an incident where that occurred?

A.    No.

Q.    In reference to the Dayberry case, Counsel questioned you regarding your involvement with the execution of the search warrant.  If you will, describe whether or not you were part of the team responsible for collecting evidence?

A.    I was not part of the team responsible for collecting any evidence.

Q.    And you described your role as being one of the people to secure the perimeter.  Explain for the ladies and gentlemen of the jury exactly what that means.

A.    Securing the outside of the residence, make sure no one comes upon us while we're inside or other officers while they're inside.  And just secure the area.

Q.    And so what level of interaction do you have with the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

people who are actually searching?

A.   Just talking.  Observing.  Like a meth -- I know that there was a meth lab found there.  And I just looked at some of the chemicals.  And then I left.  Told them, yeah, it was a meth lab.

Q.   And in light of the number of officers who were involved in that search, did you have an occasion to see each and every officer, and each and every officer see you during the time you were at that scene?

A.   No.

Q.   With regard to the logs that have been offered as State's Exhibit No. 2, Defendant's Exhibit Nos. 1 and 2, are those logs that where information was added to on a regular basis and kind of a living/breathing document that changed constantly?

A.   Correct.

MS. McCORMICK:  Your Honor, may I have a moment, please?

THE COURT:  Yes, ma'am.

MS. McCORMICK:  I have nothing further, Your Honor.

THE COURT:  Thank you.

Mr. Brewster?

MR. BREWSTER:  I'll reserve mine.

THE COURT:  Okay.  Mr. Johnson, you can step down.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

84

And you'll need to remain in attendance, subject to recall.

THE WITNESS:  Thank you, sir.

(Partial transcript concluded.)

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

85

IN THE DISTRICT COURT IN AND FOR CHEROKEE COUNTY
STATE OF OKLAHOMA

STATE OF OKLAHOMA,                    )
                                      )
                    Plaintiff,        )
                                      )
vs.                                   )    CASE NO. CF-2007-28
                                      )
RICHARD LOY GRAY, JR.,                )
                                      )
                    Defendant.        )

I, RUSSELL E. SIMMONS, C.S.R., OFFICIAL COURT REPORTER in the above-entitled cause, do hereby certify that the foregoing transcript is a true and correct Partial Transcription of shorthand notes taken of Jury Trial Hearing Proceedings had in captioned cause on the 4th day of June, 2008, before the Honorable H. Michael Claver, District Judge in and for Okmulgee County, State of Oklahoma.

Dated this ___31 st___ day of ___july___, 2008.

_Russell E. Simmons_

RUSSELL E. SIMMONS, C.S.R.
OFFICIAL COURT REPORTER
OKLAHOMA NO. 01633

Russell E. Simmons
Oklahoma Certified Shorthand Reporter
Certificate No. 1633
Exp. Date: December 31, 2008

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT