## Sheridan, Jeff

**From:** Gray, Richard

**Sent:** Monday, November 28, 2005 6:13 PM

**To:** Sheridan, Jeff

**Subject:** RE: DRAFT

Thanks for the update.

-----Original Message-----
**From:** Sheridan, Jeff
**Sent:** Monday, November 28, 2005 5:10 PM
**To:** Gray, Richard
**Subject:** FW: DRAFT

-----Original Message-----
**From:** Jeff sheridan [mailto:t63s2415@yahoo.com]
**Sent:** Friday, November 25, 2005 12:13 PM
**To:** jeff.sheridan@dac.state.ok.us
**Subject:**

I talked with D. Champlain concerning allegations of inappropriate conduct by investigators, Tommy Morgan and Jeff Landcaster. I met with DC at his place of business in Tahlequah at approximately 10:30 on 112505. I identified myself and ask him if he would allow questions concerning one of the DTF investigators. I ask him if he perceived any inappropriate conduct or questions by Jeff Lancaster or Tommy Morgan concerning bad checks written by CJ. He advised that "This is getting blown way out of proportion. TM and JL apparently came into his store and requested any bad checks, as they always do. One of the employees mentioned bad checks written by CJ. TM and JL ask the clerks if they would like to give the checks to them and have them collect the checks. DC was contacted by his employee and said "No, he would hang on to them for a while, and eventually, the checks cleared. I ask DC if he felt any pressure to give the checks to TM or JL. He said no, "CJ had just written the checks and should have come by and picked the up and now he has his fit in the ringer." He indicated the TM and JL treated these checks like any other checks were received with insufficient funds.

_Yahoo! Music Unlimited - Access over 1 million songs. Try it free._



695.

11-7-05
CJ called at approximately 0400 to advise that he was going to assist Mike Littlefield until about 1830. I advised him to make up the time on the 8th.

11-8-05
CJ called at 19:59 last evening. Courtney is going to the doctor about his back this morning. CJ should be making up the time off today, approximately three (3) hours.

CJ called and advised he was out until 1:30. He received information concerning a hydroponics lab. Wanted to do warrant. Said OK, just stay in touch. Advised him not to exceed 43 hours of work. CJ indicated he would take off today and maybe a vacation day on Thursday.

11-9-05
Jim and Courtney have called in 10-8, not heard from CJ. Could be making up excess work hours for previous days. I need to check on $705 which CJ had in possession. Waiting on more details concerning the money.

11-14-05
Jim called in and advised he would be here today. Tomorrow in OKC.
CJ called and advised he was going to OKC @ 1400 and would be there tomorrow. CJ has not turned in the CI files as requested over one week ago. He should have had those returned by 11-10-05. Called CJ and advised need originals and he can keep copies.

11-16-05
Talked with CJ and again advised that I need Confidential Informant files. Advised I needed Originals. If there were any deactivated, still needed the files. Advised if they were prior to July, update the files with finger prints and photos and turn them in to me. Additionally advised that I needed his memo on activity for last week and fuel record. He advised he would come to Sallisaw with the documents. (did not receive files)

CJ called and advised that he was waiting on DEA concerning a teacher at Bunch School Ordering RP. I said, I will get with you tomorrow on the files and memo, and do not work over 43 hours.

CJ called while I was on my way home concerned about Mr. Mark Fox. He did not want to produce documentation concerning his activity with the DTF and was unsatisfied with Donovan's position of documenting. I called Donovan and he told me that Judge Sewell was mad that Mark Fox was not going to jail. The documentation would insure unsupervised probation, without he will get supervised.

11-17-05
Talked with DD about Mark Fox. He indicated that Judge Sewell will want to see documentation of activity prior to sentencing. Without documentation, Mark Fox would receive a suspended supervised sentence as opposed to unsupervised. CJ advised that he



we do not comply with agreements with a CI, he will lose credibility. I told CJ of our conversation, he said he would talk with DD. CJ told me that DD had all confidential informant files. Called DD and he told me he had one file. I was under the distinct impression DD had several files.

CJ wanted $200.00 of funds for CI work. He filled out a CF-2 form and gave it to me. I called Chrissy and requested the money.

11-21-05
CJ TOLD ME THAT CI FILES PREVIOUS TO 2003 WENT WITH DIANE. HE ADVISED THAT $233 WAS GIVEN TO CI BY DONOVAN. ORIGINAL WAS SHOWN TO DONAVAN. WAS LOOKING FOR DOCUMENTATION OF $705. CJ IS STILL TO PROVIDE WITH DOCUMENTATION CI FILES USED IN 2003 IF CI WAS USED DURING THIS ADMINISTRATION. NEED TO SEND CONFRIMATION LETTER OF DISCUSSION. I NEED CALL DIANE FOR PRIOR TO 2003 FILES. CJ CALLED AND ADVISED HIS CHILD WAS SICK AND ASK OFF. I AUTHORIZED TIME OFF AND ADVISED HE NEEDED TO HAVE DOCUMENTATION BY WEDNESDAY ON CI FILES.

112205
CJ CALLED THIS AM AND ADVISED HE NEEDED MORE TIME TO REVIEW HIS CI FILES. I AGREED TO EXTEND THE TIME TO MONDAY. CJ ADDITIONALLY ADVISED HE WOULD BE WORKING WITH JUSTIN HUTCHISON AND A CI TODAY. CJ ASK IF I HAD TALKED WITH DD ABOUT CRUISE. I TOLD HIM I DID NOT KNOW THE NAME CRUISE. I ADVISED I HAD TOLD RICHARD ABOUT BRUSHY SCHOOL AND THE USE OF A COMPUTER TO ORDER PRECURSOR. CJ CALLED IN 22 MINUTES LATE. CJ TOLD ME THAT NO ONE WOULD WORK WITH HIM, NOT THE TPT, CCSO OR THE MARSHALS.

112305
CJ CALLED 20 MINUTES LATE TODAY. REMINDED HIM OF THE MEMO FOR 8:00. CJ ADVISED THAT HE WAS SET UP IN WAGONER. JIM AND HIS WIFE HAD TRIED TO SET HIM UP. HE WAS RELUCTANT TO GO TO WAGONER AND WORK WITH JIM. HE ALSO ADVISED THAT JEFF LANCASETER AND TOMMY MORGAN WERE PRESISTENT IN GETTING HIS HOT CHECKS FROM THE CONVIENCE STORE. I TOLD CJ THAT IT WAS MY UNDERSTANDING THAT THE CLERK HAD BROUGHT THE CHECKS TO THEIR ATTENTION. CJ ADVISED THAT JEFF AND TOMMY HAD CALLED THE OWNER AND WANTED THE CHECKS HE SAID THAT THE ISSUE WOULD BE TAKEN TO THE GRAND JURY. I ADVISED THAT IT WOULD BE NECESSARY FOR HIM TO GO TO WAGONER. HE WANTED TO GET TOGETHER AND DISCUSS THINGS THAT I NEEDED TO KNOW. I ADVISED THAT I DID NOT KNOW ABOUT CONFLICTS WITH JIM AND THAT I DID NOT WANT TO KNOW ABOUT OTHER ISSUES CONCERNING THE GRAND JURY. HE INSISTED WE NEEDED TO GET TOGETHER. I TOLD CJ TO THINK ABOUT HOW HE WOULD FEEL CONFORTABLE WORKING WITH THE DTF. HE ADVISED IF HE HAD

SOMEONE WITH HIMTO WORK A CI TO SIGN THE CR-5. I ASSUME THAT HE MEANT FROM CHEROKEE OR ADAIR COUNTIES. I MADE MENTION OF THE CI FILES NEEDED TO BE COMPLETE AND HE SAID THEY ARE DONE.

I TALKED WITH CJ ABOUT THE USE OF THE CHEROKEE COUNTY OFFICE AND ADVISED THE DD DID NOT LIKE US USING THE OFFICE. APPARENTLY HIS CONCERN WAS OVER TAKING UP ATTORNEY SPACE. I CALLED RG AND ADVISED THAT WE WOULD NEED TO MEET IN WAGONER ON OCCASION, THERE SHOULD NOT BE A PROBLEM, JUST MAKE PLANS FOR SPACE. CJ ADVISED THAT HE HAD ASK FIRST BEFORE USING THE OFFICE. I ADVISED THAT I WAS DOCUMENTING FILES ON LATE CALLS.

CJ CALLED AND WAS GOING TO TAKE OFF. HE WOULD TRY TO DO THE BUST ON BRUSHY NEXT WEEK. THE FEDS WOULD BE INVOLVED IN THE PROSECUTION AND THE JIM WOULD HELP HIM. I TOLD CJ I WAS CONCERNED ABOUT HIS DISCOMFORFT IN WORKING WITH THE DTF AND NEEDED TO TALK WITH HIM. I ADVISED WE COULD TALK WHEN I RECEIVED THE FILES ON MONDAY.

112805
RECEIVED CI FILES FROM CJ AT THE CHEROKEE COUNTY SHERIFF'S OFFICE. . TALKED AT LENGTH ABOUT HIS DISCOMFORT WITH WORKING WITH THE INVESTIGATORS. HE INDICATED THAT HE WAS IN A HOSTILE WORKING ENVIROMENT. I ASK WHAT COULD BE DONE TO ASSIST HIM. HE INDICATED ASSIGNMENT TO FEDS.

112905
RECEIVED CI FILES FROM CJ ON MONDAY. DISCOVERED WE NEEDED CF-5 FORMS FOR FILES AS WELL. CJ WENT TO TAHLEQAH AND COPIED THE FILES TODAY. I PROVIDED HIM WITH $200 FOR CI AND RECEIVED PROPER FORM. WE DISCUSSED ASSIGNEMENT TO OBN OR THE FEDS. HE SAID HE WANTED TO MAKE TO TRASITION ON A TEMPORARY BASIS. HE FEELS THAT HE IS IN A HOSTILE WORKING ENVIOROMENT. CONTACTED TOM AT DAC AND ASK WHAT DOCUMENTATION WILL BE NEEDED. HE SAID COOPERATIVE AGREEMENT. ADVISED RG, WAITING ON DOCUMENTATION FROM OBN.

120505
I HAD AN OPPORTUNTIY TO REVIEW CF-5 FORMS ON THURSDAY AND FRIDAY OF LAST WEEK. THERE ARE TOO MANY CR-5 FORMS FOR THE FILES THAT WERE PRODUCED. THERE ARE ONLY ONE SIGNATURE ON SEVERAL OF THE FILES (13 OF 28 APPOXIMATELY) TALKED WITH TOM CUNNINGHAM ON FRIDAY, HE ADVISED THAT HE HAS SEEN DEFECTS ON CF-5 FORMS, LIKE 1 IN 100 FILES. WE ARE AT APPROXIMATELY 50% FAILURE. CJ CALLED THIS MORNING AND SAID HE TALKED WITH TOM CUNNINGHAM ON FRIDAY AND THE FILES DID NOT REALLY NEED TO BE

UPDATED IF THEY WERE OLD FILES, OR FILES INITIATED WITH DBH. I WILL CALL TODAY AND TALK WITH CUNNIGNHAM.

121405
I HAVE ATTEMPTED TO OBTAIN ALL CI FILES FOR THE DTF FOR APPROXIMATELY ONE MONTH FROM CJ. THE ORIGINAL REQUEST WAS MADE ON AT THE MEETING WITH THE DTF WITH ALL PRESENT. THE PRODUCTION OF THE CI FILES WAS TO TAKE PLACE ON 111005. THAT DID NOT OCCUR FOR REASONS OF ILLNESS IN THE CJ FAMILY. THE DATE THEN WAS MOVED TO THE 111305 AND THEN 111505. AT THAT TIME PRODUCTION OF 12 FILES TOOK PLACE WITH PARTIAL INFORMATION PRODUCED AS TO A COUPLE OF OTHERS.
UPON FUTHER REVIEW OF THE FILES ON APPROXIMATELY 120305, I REALIZED THAT NONE OF THE FILES HAD CF-5 FORMS OR CRIMINAL BACKGROUND CHECKS. I REQUESTED ALL CF-5 FORMS FROM CJ AND RECIEVED APPROXIMATELY 28. APPROXIMATELY 50% OF THE FILES ONLY HAVE ONE SIGNATURE ON THE CF-5 FORM. I BROUGHT THAT TO THE ATTEMTION OF CJ AND HE ADVISED THAT I COULD SIGN THE FORM AS SUPERVISOR, THAT IS NOT THE CASE.
I CALLED ADN TALKED WITH TOM CUNNINGHAM CONCERNING THIS ISSUE. HE ADVISED THAT THERE HAVE BEEN OCCASSIONS WHERE AN OFFICER DID NOT OBTAIN THE SECOND SIGNATURE, BUT IT WAS "ONE IN ONE HUNDRED FILES. AGAIN, OUT OF THE TWENTY EIGHT CR-5 FORMS PRODUCED, THIRTEEN LACK A SECOND SIGNATURE. TOM CUNNINGHAM SAID THERE WERE WAYS OF ESTABLISHING THAT THE TRANSACTION TOOK PLACE, LIKE HAVE THE PURCHASED CDS. I HAVE NOT ATTEMPTED TO CONFIRM ANY OF THE FILES WITH ANOMILIES AT THIS POINT. I AM HESITANT TO SELF POLICE SUCH A SUBSTANTIAL DEVIATION IN POLICY.
TOM CUNNINGHAM CAME TO THE DTF OFFICE ON 120905 AND MET WITH ALL DTF MEMBERS TO REVIEW THE FILES AND TO PROVIDE INFORMATION CONCERNING CI FILES. TOM HAS TAKEN COPIES OF THE CF-5 FORMS AND COPIES OF CHECKS WERE WRITTEN FOR CONFIDENTIAL FUNDS. AT THIS POINT I HAVE NOT HEARD FORM TOM. HE DID INDICATE THAT WE MAY BE PLACED ON DRAW HOLD STATUS DUE TO OUR NON-COMPLIANCE. I ASK TOM HOW BAD THIS PROBLEM WAS COMPARITIVELY ON A SCALE FROM ONE TO TEN, HE SAID EIGHT.
IN THE HYPOTHETICAL, IF ONE WERE TO TAKE MONEY TO BE USED TO PURCHASE OF INFORMATION AND OR CDS AND MISAPPROPRIATE THOSE FUNDS, THE FOLLOWING COULD BE THE MANNER IT WOULD BE ACCOMPLISHED. BUY INFORMATION SO THAT THERE IS NO TANGIBLE EVIDENCE OF THE BUY OR ALLEGEDLY BUY CDS AND NOT LOG IT INTO EVIDENCE, SENT IT TO OSBI OR HAVE DOCUMENTATION CONCERING DESTRUCTION. THAT IS WHAT HAS HAPPENED HERE.
TOM ASK CJ IF HE HAD DOCUMENTATION AS TO DESTRUCTION. HE SAID NO. IT IS MY UNDERSTANDING THAT IN ORDER TO HAVE CDS DESTROYED; YOU MUST HAVE DOCUMENTATION PRESENTED TO OSBI.

WITHIN TWO HOURS OF OUR MEETING, CJ CALLED AND ADVISED HE HAD AFFIDAVITS FROM HIS CONFIDENTIAL INFORMANTS. I ASK HIM IF THE AFFIDAVITS WERE NOTORIZED. HE SAID NO. I ADVISED THAT ALL AFFIDAVITS MUST BE NOTORIZED WITH DATE AND AMOUNT OF PURCHASE. ADDITIONALLY, I REQUIRED A PRINT OF THE CI ON THE AFFIDAVIT. LATER IN THE SAME EVENING CJ TOLD ME THAT JAMES CARVER AND JERRY STEPHENS COULD SIGN ON MANY OF THE CF-5 FORMS. PREVIOUSLY HE HAD ADVISED THAT ONE REASON THAT THERE WAS NOT TWO SIGNATURES ON CF-5 FORMS IS THAT, " HE DID NOT TRUST SOME LAW ENFORCEMENT WITH HIS CONFIDENTIAL INFOMANTS". TODAY CJ CALLED ME AND TOLD ME THAT HE HAD TALKED WITH FRANK LOYD AND SAID THAT FRANK DID NOT BELIEVE THE TWO SIGNATURE ISSUE WAS "THAT BIG A DEAL". I TALKED WITH FRANK BEFORE LUNCH. HE ADVISED THAT THERE WAS A MEETING IN 2000 OR 2001 CONCERNING THE TWO SIGNATURE REQUIREMENT AND IT WAS AN ABSOLUTE REQUIREMENT. I ASK FRANK IF HE HAD TALKED WITH CJ LATELY CONCERNING CI FILES, HE SAID NOT IN A COUPLE OF YEARS.

AT THIS JUNCTURE, AS I REVIEW THE JAG GUIDELINES AND HAVE CONVERSATIONS WITH TOM CUNNINGHAM, I RECOGNIZE THAT THIS IS A SERIOUS ISSUE WITH FEDERAL REPROCUSSIONS. SINCE THERE IS AN INDICATION THAT NOT ALL FILES FOR THE PAST FIVE YEARS HAVE BEEN PRODUCED AND IN CONSIDERATION OF THE LACK OF A SECOND SIGNATURE ON SO MANY FILES, IAM FEEL I WOULD BE REMISS NOT TO REQUEST AN INDEPENDENT INVESTIGATION OF THE FILES. THEREFORE, I AM REQUESTING AN AUDIT OF THE CI FILES AND RECORDS RELEVANT TO THE USE OF THOSE FILES BY THE STATE AUDITORS OFFICE.

121405
I HAD LONG CONVERSATIONS WITH TOM CUNNINGHAM CONCERNING THE PROPER AVENUE TO SUPPLEMENT OUR DTF FILES. I CONVEYED MY CONCERN THAT SOMEONE OTHER THAT THE ONE THAT VIOLATED POLICY SHOULD ACTUALLY OBTAIN DOCUMENTATION. IT APPEARED TO ME THAT TOM WAS CONCERNED WITH DOCUMENTATION. I AM CONCERNED WITH VALID DOCUMENTATION. TOM SUGGESTED GETTING AN INDEPENDENT INVESTIGATOR TO SUPPLEMENT THE FILES, I AGREED. I ASSIGNED COURTNEY BATES TO THE TASK TO BE ASSISTED BY JIM JONES. CJ CAN BE PRESENT, BUT NOT PARTICIPATE IN THE PROCESS. ALL CONVERSATION IS CONTAINED IN MEMO TO DTF DATED ON THE 14TH.

121605
I TALKED TO CJ ON 121405, HE SAID HE WAS SICK AND TOOK OFF IN THE PM. ON THE 15TH HE SAID HE WAS SICK AND TOOK OFF ALL DAY. IN THE EVENING HE CALLED AND SAID HE WAS GOING TO DO A KNOCK AND TALK, I SAID OK, DO NOT GO OVER 43 HOURS. HE TOLD ME ON THE 16TH THAT HIS SISTER WAS GOING TO HAVE SURGERY (BRAIN) AND THAT HE WOULD BE OFF A COUPLE DAYS NEXT WEEK. I CALLED AND TOLD CJ

THAT WE NEEDED TO STAY FOCUSED ON GATHERING INFOMATION. HE
SAID OK. CB CALLED AND ADVISED HE IS HAVING TROUBLE GETTING CJ'S
CI'S. HE IS GOING TO CALL CJ AND HAVE HIM DELIVER THE CI'S TO THE
DTF FOR INTERVIEW. CJ CALLED AND ADVISED HE WAS TREATED LIKE A
CRIMINAL. TALKED WITH TOM, CLINT AND COURNEY. ALL SHOULD TRY
TO WORK TOGETHER TO DOCUMENT FILES. CJ WANTS AN OSBI
INVESTIGATION.

122305
I SPOKE WITH CJ ON 122005, HE ADVISED HE SISTER WAS SICK. HE HAD
SEVERAL DAYS PREVIOUSLY INDICATED THE SAME. SHE WAS TO
UNDERGO BRAIN SURGERY. IN THE MORNING, HE CALLED AND RELATED
THAT HE HAD JUST BEEN CALLED TO COURT. I ADVISED THAT HE SHOULD
HAVE BEEN SUBPOENAED. HE ADVISES HE WAS JUST CALLED. I ADVISED
THAT HOPEFULLY IT WOULD NOT TAKE LONG. I DID NOT RELEASE HIM
FROM HIS OBLIGATION. I WAS LATER CALLED BY JUDGE BROWN. SHE WAS
UPSET THAT CJ WAS NOT AT COURT, AND HE HAD CALLED. SHE WANTED
TO KNOW WHO TO TALK TO ABOUT CJ. I SAID TALK WITH ME. SHE SAID
SHE HAD DECIDEC TO HAVE ONLY PERSONAL SERVICE ON CJ. I ASSURED
HER HE WOULD BE IN COURT. CJ TOOK OFF THE 20TH-23RD.

CJ CALLED EARLIER IN THE WEEK, ADVISING THAT HE WANTED TO BE IN
THE INTERVIEW WITH HIS CI. I TOLD HIM THAT I AM GOING TO LET
COURTNEY CONDUCT THE INVESTIGATION AS HE SEES FIT. I WAS NOT
TRYING TO KEEP HIS THE CI FROM HIM, HE WAS DRIVING THE CI TO THE
INTERVIEW AND WITH THEM FOR 30 PRIOR AND AFTER THE INTERVIEW. CJ
TOLD ME THAT COURTNEY WAS TREATING HIM LIKE A FUCKIING
CRIMINAL. I ADVISED THAT WE WERE ONLY TRYING TO GATHER
DOCUMENTATION. PERSONALITILES WERE JUST GETTING INVOLVED AND
WE SHOULD ALL BE RESPECTFUL TO ON AND OTHER SO THAT WE CAN
WORK ON THIS IN AN EXEDITIOUS MANNER.

122605
TALKED WITH FRED ELLIS OF MCGJ. ADVISED OF MY CONCERNS
INVOLIVING THE DTF AND MISREPRESENTATION. CJ CALLED ON MY WAS
BACK FROM MCGJ AND HE ADVISED HE HAD A LETTER FROM IS
ATTORNEY. HE READ IT TO ME. I TALED WITH HIS ATTORNEY AND SHE
ADVISED THAT SHE HAD NOT WRITTEN A LETTER, JUST GIVEN CJ AN
ENVELOPE.

122805
I HAD A DISCUSSION WITH CJ IN THE DTF OFFICE. HE HANDED ME A
LETTER FROM HIS ATTORNEY. I SPOKE WITH HIM ABOUT HIS CONCERNS.
WE TALKED ABOUT JUDGE BROWN TELLING ME THAT SHE WAS GOING TO
HAVE HIM PERSONALLY SERVED. HE SAID THAT HE DID NOT GET HIS
SUBPOENA IN TIME. I WROTE A MEMO ASKING FOR ENUMERATION OF

EVENTS OF HARASSMENT, A LETTER FROM HIS DOCTOR. I ADVISED THAT WE HAD TO DOCUMENT THE FILES AND THEN WE COULD MOVE ON TO ASSIGNMENT WITH OBN OR DEA. HE TOLD ME THAT HE DID NOT BELIEVE I HAD IMPEADED HIS ASSIGNEMENT. HE SAID THAT HE HAD TOLD ME ON THE WEEK OF THE 12TH ABOUT MEETING ON THE 19TH WITH DEA. I TOLD HIM I HAD NOT HEARD ANYTHING ELSE FROM HIM ON THE MEETING. I ALSO ADVISED THAT HE NOW WANTS TO GO WITH OBN INSTEAD OF DEA.

I RECIEVED A CALL FROM MS. MEANS. SHE INDICATED THAT SHE WOULD FILE HER TORT CLAIM IN FEBRUARY. THAT SHE COULD NOT BELIEVE "HIS WITNESSES WERE TURNED OVER TO A LAYMAN." I ADVISED THE CI FILES WERE TURNED OVER TO INVESTIGATORS. I TOLD MS. MEANS THAT I WOULD DOCUMENT OUR CONVERSATION. SHE ADVISED THAT CJ NEEDED COUNSELING AND THAT OPERS COULD SUPPLY THAT COUNSELING.

123005
TALKED WITH CJ ABOUT THE CHAMPLAIN SITUATION. HE HAD INDICATED THAT HE HAD GONE BACK AND TALKED WITH HIM AGAIN. T HE HAD A WRITTEN STATEMENT FROM CHAMPLAIN. I CALLED CHAMPLAIN, HE SAID HE DID NOT WRITE A STATEMENT. CJ TOLD ME THAT MITTY MEANS HAD WRITTEN A LETTER TO ME. I ASK FOR CLARIFICATION AS TO WHO DRAFTED THE LETTER, CJ SAID MITTY MEANS. I TALKED WITH MITTY MEANS AND SHE SAID SHE DID NOT WRITE THE LETTER. I BELIEVE CJ IS LYING TO ME ABOUT CERTAIN THINGS. I CALLED TODAY AND TOLD HIM THAT PRIORITY IS OBN ASSIGNMENT ON TUESDAY AFTER THE HOLIDAY. I TALKED WITH FRED ELLIS AND ADVISED HIM OF THE MORE INCONSISTENCIES AND THAT I WOULD HAVE DIFFICULTY WORKING WITH CJ UNDER THESE CIRCUMSTANCES OF MISREPRESENTATION. CJ HAS NOT TURNED IN ANY REPORTS ON INVESTIGATIONS THAT HE WAS INVOLVED IN DURING NOVEMNBER AND DECEMBER OF 2005.

010306
I CALLED AND TALKED WITH LEE COHLMIA WITH DAC ABOUT CJ. SHE ADVISED THAT THERE ARE COUNSELING PROGRAMS THAT ARE OFFERED THROUGH THE STATE OF OKLAHOMA. THE EMPLOYEES BENIFIT COUNSEL PROVIDES FREE COUNSELING IN CONJUNCTION WITH EMPOYEES ASSISTANCE PROGRAM. I CALLED CJ AND ADVISED OF THE FREE SERVICE AND TOLD HIM IF HE NEEDED TIME OFF, TAKE ONE, TWO OR THREE WEEKS. HE SAID HE WOULD CALL MITTY AND LET ME KNOW.

TALKED TO LONNIE WRIGHT AT OBN. I ADVISED HIM THAT I HAD BEEN TOLD THAT CJ COULD BE ASSIGNED TO OBN. HE HAD NO IDEA WHAT I WAS TALKING ABOUT. HE WANTED TO KNOW IF I WANTED HIM TO DIRECT HIS MY DRUG TASK FORCE. I ADVISED I WAS NOT TRYING TO SHIRK MY RESPONSIBILITY, I WAS SIMPLY ATTEMPTING TO CONFIRM WHAT I HAD BEEN TOLD. WHAT CJ HAD TOLD ME WAS A COMPLETE LIE.

I CONACTED FRED ELLIS AND ADVISED THAT THE OBN OPTION WAS ALSO A MISREPRESENTATION.

1-5-06
CALLED FRED ELLIS AND ADVISED I MISSED HIS CALL, THAT I WAS IN WAGONER. I LEFT A MESSAGE THAT IT WOULD BE DIFFICULT TO WORK WITH CG. RECEIVED A MEMO FROM DD ABOUT JIM HINES CASE. THERE IS MISSING CDS IN THE CASE INVOLVING CJ.

December 27, 2005

Jeff Sheridan
Drug Task Force Director
120 E. Chickasaw
Sallisaw, OK 74955

Re: *Work Related Health Issues*

Dear Jeff,

Please allow this letter to serve as notification that due to continual, unwarranted harassments caused by the District Attorney's Office, I have developed a medical condition. My physician has advised me to consult with a counselor to deal with said working environment stress. It is the advise of my physician that due to my health issues being work related the cost could be at the expense of the District Attorney's Office. Please allow this letter to also serve as a formal request by myself for that expense to be provided to me.

I have a passion for my profession and the endorsement of many co-workers and agencies. I believe that there are no circumstances under which my employment with current administration will ever improve. While, I have made several suggestions to try to alleviate the tension with said administration, nothing has been resolved or attempted to be resolved.

Please provide me written correspondence as to the position the District Attorney's Office will take in regards to my proposed counseling services being paid for. Thank you in advance for your consideration and time. I look forward to a resolution to this matter.

Respectfully,

Clint Johnson

1.) Documentation for D.A.

2.) Enumeration of acts construed as harassment.

3.) Suggestions

DEFENDANT'S EXHIBIT

742

MEMO

TO:    CLINT JOHNSON
FROM: JEFF SHERIDAN
RE: LETTER OF 122705

PLEASE PROVIDE DOCUMENTATION FROM YOU DOCTOR INDICATIONING ANY MEDICAL CONDITION THAT MAY BE EXISITING AT THIS TIME. ADDITIONALLY, PLEASE IDENTIFIY ANY INCIDENTS OF HARASSMENT WHICH MAY HAVE OCCURRED, TIME, PLACE AND INDIVIDUAL INVOLVED.

AS YOU KNOW, I REMAIN CONCERNED ABOUT DOCUMENTATION OF THE FILES. I BELIEVE AT THIS POINT, IT INVOLVES DOCUMENTATION FOR COMPLIANCE WITH THE JAG. ONCE THAT IS COMPLETE, WE MAY MOVE ON WITH OTHER OPTIONS.

Ms. Yahodhara Mohanty-Means,

This is a confirmation of our discussion of December 28, 2005, wherein you called me concerning Clint Johnson. You called with concerns of harassment being incurred by Clint Johnson. I requested from you as well as from Clint Johnson on this day that you identify the source of any perceived harassment so that, if any exists, it may be addressed. You advised me that advised that you would file your Tort Claim in February of this year. You then made vague reference to Richard and Vyrl.

I again ask for specific information concerning any alleged harassment. That type of activity will not be tolerated and will be stopped. I do need direction as to the individuals specifically involved. Please reconsider you position as to your refusal to identifying specific instances of alleged misconduct.

I the issue of counseling was discussed by yourself as well as Clint Johnson. I ask Clint Johnson to provide me with documentation from his doctor prescribing counseling sessions. I advised Clint Johnson that I believed that insurance would be his avenue to pay for such treatment. I will explore other alternatives that may exist to pay for such counseling.

Finally, you called me in a representative capacity. I found no indication from our discussion of your desire to limit communication between Clint Johnson and this office. Please clarify you position as soon as possible.

# MEMO

TO: CLINT JOHNSON
ROM: JEFF SHERIDAN

DATE:112105

Clint,

Please find below a list of items which we need to provide clarification. Review documents relevant to these items and provide copies, or a narrative concerning any information you may have concerning the items. You may fax the documents to me at the Sequoyah County Office, 918-775-1215.

1. CP-03-381 (Blake Keely) $705.00 was forfeited by our office. Records from the Tahlequah Police Department show that you received the money on 012803. There is no history of deposit of the sum in any account for District 27.

2. CP-05-449 (Wesley Hathcoat) The original receipt of the money received from Hathcoat needs to be provided for clarification purposes.

3. CV-03-140 (Alfredo Rivera) Any and all documentation in relation to $233.00. Our files do not reflect Rivera receiving the money.

Please attempt to provide the above ASAP, and direct your attention on these items exclusively so that sufficent documentation may be provided for our files.

Additionally, you are aware that the DTF must maintain files for five (5) years, pursuant to JAG requirements. There must be a central depository for all files and I, as Director, will secure the files in a fire proof cabinet. All deactivated files, and active files should be maintained in the depository. You should maintain you personal copy for purposes of checks and balances. Any time that an active file needs to be updated, you must update your copy, as well as the original, that I will maintain. I thought we were to exchange the files last week. You advised that Donavan had the files, and when I called, he had only one file. After reflecting on our conversations, I realized you believed that only files for this grant period need be produced. Any CI that is currently being used, regardless of when the CI was originally avtivated, must have have all the proper documents in their file as listed in the 2005 JAG Guidelines. All deactivated files need not be updated, but must be returned to the depository.

I am especially concerned about the files absent from a depository after several months into the present JAG. This must be addressed



immediately. The CI files must be produced by Wednesday. We can meet in Wagoner and place the files in the depository, as you know, I will have exclusive access.

# MEMO

TO: RICHARD GRAY
FROM: JEFF SHERIDAN
RE: DRUG TASK FORCE

As you know, the DTF records maintained by the investigators were grossly inadequate. At the direction of Tom Cunningham, Courtney Bates has done an exemplary job of bringing us in to some symbolence of compliance with the JAG. The failure to keep proper records have resulted in two weeks of records searches, affidavit supplementation and attempts at corroboration, of various confidential funds records. After reviewing the information which was supplied, Tom Cunningham has requested additional information, which will take another week to accumulate, if possible. The prospect of our inability to properly document files is probable, and the request for repayment of some federal funds is possible.

When I first realized of the inadequacy of our records, I requested Clint Johnson to present me with confidential informant information. I then requested all of his CF-5 forms. After confirmation of the validity of my request with Tom Cunningham, Clint produced information. A substantial number of his CF-5 forms were lacking essential documentation to satisfy the JAG requirements. Late last week, two weeks after the initial production of the information, Tom Cunningham indicated that Clint had approximately eleven CF-5 forms missing. The purpose of those forms was to document the transfer of approximately one thousand dollars to confidential informants.

I have spoken with Clint on several occasions concerning the confidential informant files, as well as other aspects of the DTF. On several occasions he has provided me with information which was inaccurate, and without any factual basis. I perceive the representations to be intentionally misleading. It concerns me that I have encounter so many instances of misrepresentation from one individual over such a short period of time. I have no confidence in his ability to be truthful and forthright. I am not comfortable working with an individual with whom I have no trust, where investigators are working in a confidential capacity in undercover situations, where trust is essential.

One occasion of misrepresentation was when Clint Johnson had written insufficient fund checks to Champlain's Store in Tahlequah. Clint advised me that Jeff Lancaster and Tommy Morgan were out to get him. He advised they had learned of his checks after digging through the pouch of checks that were returned to the store. He advised they insisted on taking the checks. I contacted the owner and he advised that nothing inappropriate had occurred. It was simply that "He (Clint) had gotten his tit in a ringer, and he should have taken care of the checks. He has blown this all out of proportion." Later, Clint advised that he had talked with the owner, Dale Champlain and received different information, and advised he had a written statement of the owner. I again contacted Mr. Champlain and he advised, "he had written no statements".

Another situation involved the discussion of the importance of confidential fund records with Frank Loyd of Sequoyah County Sheriff's Department. Clint advised that he had talked to Frank and that "Frank did not think the CF-5 forms were any big deal either". I had an opportunity to talk with Frank about the CF-5 forms. He advised that in



641

the year 2000-2001 that he had attended a seminar on the forms and indicated that two signatures were important. I ask him when he last spoke to Clint concerning confidential fund records, he said, "I have not talked with Clint about CI records in two or three years".

When I was attempting to gather all of the confidential informant information Clint misrepresented the location of files. I had talked with Clint on two separate occasions about getting together to transfer the information he had in his notebook so that I may develop confidential informant files to be placed in a depository. I met with Clint in Tahlequah in the Sheriff's Office. Clint had his notebook with him, which is approximately two to three inches thick. I ask him if he had copies of the files for me, he told me that Donovan had copies of the files. I moved my hand toward his files and indicating with my hand I ask him, "Donovan has a copy of all of these files"? Clint said, "Yes". When I arrived back to my office, I called Donovan about the files. He indicated he had one file. Clint later gave me approximately twenty three separate individuals and some documentation for each file.

I decided to contact Ms. McCormick with the Multi County Grand Jury concerning my history with Clint. I spoke with Fred Ellis, an investigator with the Multi County Grand Jury. I advised as to the inadequate and missing CF-5 forms. I additionally advised him of instances which I perceived to be lying. I expressed my concern about the preception that any act to rectify the misrepresentations would be seen as retalilation. When I was on my way home from Oklahoma City Clint called me and told me he had a letter from his attorney, Mitty Means. I ask him what the letter concerned and he read it to me. Clint gave me a copy of the letter the next day. Soon thereafter, I spoke with Mrs. Means and inquired about the letter and ask her if she had written the letter his signature. She said she did not write the letter, only gave Clint an envelope. In an attempt at clarification, I again ask Clint if Ms. Means had drafted the letter, he said that "she wrote the letter". The envelope that he presented with the letter had a return address for Ms. Means, but her name was incorrectly spelled. The letter was addressed to me.

Finally, Clint had told me that he wanted to be assigned to OBN, I ask if he had it approved and everything was ready, and he agreed. He said that after the holidays, when everyone returned, all we needed to do was sign papers. I ask who the contact people were, and he advised, "Cindy Cunningham and Lonnie Wright". I called Lonnie Wright on the 3rd of January and addressed the situation. He advised that he was not aware of any such agreement and that he would be aware if one existed, because he would have to approve it". He went on to suggest that I wanted him to supervise my investigators. I assured him that was not the case, that I was not trying to shirk my responsibility and that I had received some incorrect information.

There is indeed an unfortunate pattern of inaccurate information. This list is not inclusive of all misrepresentations by Clint, hopefully it will suffice to show the basis for my concern. Based upon the foregoing, I would recommend the termination of Clint Johnson from his capacity as investigator for District Twenty Seven Drug Task Force.

642

MEMO

TO: RICHARD GRAY
FROM: JEFF SHERIDAN
RE: CONFIDENTIAL INFORMANT FILES

I HAVE ATTEMPTED TO OBTAIN ALL CI FILES FOR THE DTF FOR APPROXIMATELY ONE MONTH FROM CJ. THE ORIGINAL REQUEST WAS MADE ON AT THE MEETING WITH THE DTF WITH ALL PRESENT. THE PRODUCTION OF THE CI FILES WAS TO TAKE PLACE ON 111005. THAT DID NOT OCCUR FOR REASONS OF ILLNESS IN THE CJ FAMILY. THE DATE THEN WAS MOVED TO THE 111305 AND THEN 111505. AT THAT TIME PRODUCTION OF 12 FILES TOOK PLACE WITH PARTIAL INFORMATION PRODUCED AS TO A COUPLE OF OTHERS.

UPON FUTHER REVIEW OF THE FILES ON APPROXIMATELY 123005, I REALIZED THAT NONE OF THE FILES HAD CF-5 FORMS OR CRIMINAL BACKGROUND CHECKS. I REQUESTED ALL CF-5 FORMS FROM CJ AND RECIEVED APPROXIMATELY 28. APPROXIMATELY 50% OF THE FILES ONLY HAVE ONE SIGNATURE ON THE CF-5 FORM. I BROUGHT THAT TO THE ATTEMTION OF CJ AND HE ADVISED THAT I COULD SIGN THE FORM AS SUPERVISOR, THAT IS NOT THE CASE.

I CALLED ADN TALKED WITH TOM CUNNINGHAM CONCERNING THIS ISSUE. HE ADVISED THAT THERE HAVE BEEN OCCASSIONS WHERE AN OFFICER DID NOT OBTAIN THE SECOND SIGNATURE, BUT IT WAS "ONE IN ONE HUNDRED FILES. AGAIN, OUT OF THE TWENTY EIGHT CR-5 FORMS PRODUCED, THIRTEEN LACK A SECOND SIGNATURE. TOM CUNNINGHAM SAID THERE WERE WAYS OF ESTABLISHING THAT THE TRANSACTION TOOK PLACE, LIKE HAVE THE PURCHASED CDS. I HAVE NOT ATTEMPTED TO CONFIRM ANY OF THE FILES WITH ANOMILIES AT THIS POINT. I AM HESITANT TO SELF POLICE SUCH A SUBSTANTIAL DEVIATION IN POLICY.

TOM CUNNINGHAM CAME TO THE DTF OFFICE ON 120905 AND MET WITH ALL DTF MEMBERS TO REVIEW THE FILES AND TO PROVIDE INFORMATION CONCERNING CI FILES. TOM HAS TAKEN COPIES OF THE CF-5 FORMS AND COPIES OF CHECKS WERE WRITTEN FOR CONFIDENTIAL FUNDS. AT THIS POINT I HAVE NOT HEARD FORM TOM. HE DID INDICATE THAT WE MAY BE PLACED ON DRAW HOLD STATUS DUE TO OUR NON-COMPLIANCE. I ASK TOM HOW BAD THIS PROBLEM WAS COMPARITIVELY ON A SCALE FROM ONE TO TEN, HE SAID EIGHT.

IN THE HYPOTHETICAL, IF ONE WERE TO TAKE MONEY TO BE USED TO PURCHASE OF INFORMATION AND OR CDS AND MISAPPROPRIATE THOSE FUNDS, THE FOLLOWING COULD BE THE MANNER IT WOULD BE ACCOMPLISHED. BUY INFORMATION SO THAT THERE IS NO TANGIBLE EVIDENCE OF THE BUY OR ALLEGEDLY BUY CDS AND NOT LOG IT INTO EVIDENCE, SENT IT TO OSBI OR HAVE DOCUMENTATION CONCERING DESTRUCTION. THAT IS WHAT HAS HAPPENED HERE.



TOM ASK CJ IF HE HAD DOCUMENTATION AS TO DESTRUCTION. HE SAID NO. IT IS MY UNDERSTANDING THAT IN ORDER TO HAVE CDS DESTROYED; YOU MUST HAVE DOCUMENTATION PRESENTED TO OSBI.

WITHIN TWO HOURS OF OUR MEETING, CJ CALLED AND ADVISED HE HAD AFFIDAVITS FROM HIS CONFIDENTIAL INFORMANTS. I ASK HIM IF THE AFFIDAVITS WERE NOTORIZED.HE SAID NO. I ADVISED THAT ALL AFFIDAVITS MUST BE NOTORIZED WITH DATE AND AMOUNT OF PURCHASE. ADDITIONALLY, I REQUIRED A PRINT OF THE CI ON THE AFFIDAVIT. LATER IN THE SAME EVENING CJ TOLD ME THAT JAMES CARVER AND JERRY STEPHENS COULD SIGN ON MANY OF THE CF-5 FORMS. PREVIOUSLY HE HAD ADVISED THAT ONE REASON THAT THERE WAS NOT TWO SIGNATURES ON CF-5 FORMS IS THAT, " HE DID NOT TRUST SOME LAW ENFORCEMENT WITH HIS CONFIDENTIAL INFOMANTS". TODAY CJ CALLED ME AND TOLD ME THAT HE HAD TALKED WITH FRANK LOYD AND SAID THAT FRANK DID NOT BELIEVE THE TWO SIGNATURE ISSUE WAS "THAT BIG A DEAL". I TALKED WITH FRANK BEFORE LUNCH. HE ADVISED THAT THERE WAS A MEETING IN 2000 OR 2001 CONCERNING THE TWO SIGNATURE REQUIREMENT AND IT WAS AN ABSOLUTE REQUIREMENT. I ASK FRANK IF HE HAD TALKED WITH CJ LATELY CONCERNING CI FILES, HE SAID NOT IN A COUPLE OF YEARS.

AT THIS JUNCTURE, AS I REVIEW THE JAG GUIDELINES AND HAVE CONVERSATIONS WITH TOM CUNNINGHAM, I RECOGNIZE THAT THIS IS A SERIOUS ISSUE WITH FEDERAL REPROCUSSIONS.SINCE THERE IS AN INDICATION THAT NOT ALL FILES FOR THE PAST FIVE YEARS HAVE BEEN PRODUCED AND IN CONSIDERATION OF THE LACK OF A SECOND SIGNATURE ON SO MANY FILES, IAM FEEL I WOULD BE REMISS NOT TO REQUEST AN INDEPENDENT INVESTIGATION OF THE FILES. THEREFORE, I AM REQUESTING AN AUDIT OF THE CI FILES AND RECORDS RELEVANT TO THE USE OF THOSE FILES BY THE STATE AUDITORS OFFICE.

## Sheridan, Jeff

**From:** Dobbs, Donovan
**Sent:** Thursday, November 17, 2005 4:41 PM
**To:** Sheridan, Jeff
**Cc:** Gray, Richard
**Subject:** DTF seizures

Jeff,

Please get with Clint Johnson regarding the following cases:

1. CP-03-381- $705.00 was forfeited by our office. Records from the Tahlequah Police Department show that Johnson received the money on Jan. 28, 2003. There is no record that the money was deposited in any account in District 27. The defendant's name is Blake Keely

2. CP-05-449- Johnson produced a copy of a receipt that appeared to show that I received the money. The copy of the receipt does not appear to be in the proper form. Please look at the actual receipt and you make a copy of it. The defendant is The defendant's name is Wesley Hathcoat.

3. CV-03-140- It appears that Johnson and James carver took $233.00 and were to return it to the defendant Alfredo Rivera. There is no record that the money was given to Mr... Rivera.

Let me know as soon as possible. Thank you.

Donovan



11/17/2005

654

# INTEROFFICE MEMORANDUM

TO:       JEFF SHERIDAN

FROM:     COURTNEY BATES

SUBJECT:  CF-5 INVESTIGATION

DATE:     12-19-05

CC:

Jeff,

I looked up more forms to send to Tom. I also finished getting the packet ready to send to Tom. Clint also brought by Mark Fox for me to question about the CF-5 forms that had his name on them I managed to clear some of those up. On the CF-5 form in question about Donovan and Clint giving Mr. Fox $60.00, Mr. Fox gave me a written statement stating the Donovan was the one who gave him the money. If I add up the numbers they go as follows.

1. Total Checks found =            $12,320.00

2. Total money from CF-2 =         $9,780.00

     a. Checks I can place with CF-2 =  $7,650.00

     b. Checks I can't place with CF-2 = $4,670.00

     c. There are also several CF-2 forms that don't match checks.

3. Total money on CF-5 =           $6,755.00

     a. Out of these $3,395.00 worth of forms do not meet the grant criteria.

4. Total from Receipts =            $1,245.00

If you take the total checks that were written and subtract the amount from the CF-5 forms you get a total of $5,565.00. Then that total minus the receipts from were agents turned in money you get a total of $4,320.00 that is not accounted for in any way shape or form. If you notice that amount is only $350.00 different from the checks I can't place with any forms. If you take the total number of checks found and subtract it from the total number of CF-2 you get a difference of $2,540.00. Then take the amount of receipts from that you get $1,295.00 not accounted for. I don't know which is worse or what Tom will be looking at both number are very high. So in my opinion we are looking at anywhere from $1,295.00 to $4,320.00 that this office can not account for over the last three years. If I could find all the receipt books then I would have more of an explanation. Also I have been unable to get in touch with Edger so I have none of his CF-5 forms. Also the total from CF-5 forms should match the total from CF-2 but it does not. At this point I have no idea were the money is. As for the CF-5 Forms that don't meet grant criteria I think I have the sufficient explanations needed to confirm most of them with Tom at this time.

Respectfully,

*Courtney Bates*

DEFENDANT'S EXHIBIT

733



## *Richard Loy Gray D.A.*
## *Twenty-Seventh Prosecutorial District Drug Task Force*
## *Report of Investigation*

Date: 01-05-06                                   Case number: DTF-C06-001

Case Agent: Courtney Bates                          Status: pending/initial
File title:

Defendants: D1)

Violations: D1)

Identification of evidence: (see attached evidence log)

Money list: N/A
Description of vehicle: N/A
List of witnesses:

Primary:        1.) Courtney Bates, Investigator, District 27 Drug Task Force
                    307 W. Cherokee St. Wagoner, OK 74467
                    Telephone: (918) 485-9447

                2.) Jim Jones, Investigator, District 27 Drug Task Force
                    307 W. Cherokee St. Wagoner, OK 74467
                    Telephone: (918) 485-9447

Secondary:      1.) OSBI Chemist, OSBI Laboratory
                    1995 Airport Parkway Tahlequah, Ok. 74464
                    Telephone: (918) 456-0653

Summary:  While in the performance of my duty's as a Drug Task Force Agent (DTF) District
27 on 1-05-06 I, (Courtney Bates) did an inventory on a DTF agents (Clint Johnson) vehicle.
The reason the inventory was performed was because the agent's employment had been
terminated and all of the property in the vehicle had to be inventoried to determent what items
belong to DTF and what items were Agent Johnson's.



795

**Details:** While performing the inventory of Agent Johnson's vehicle I found several items that were submitted by me for testing by the OSBI lab in Tahlequah. The tests showed that several of the items tested positive for Marijuana. Also some of the residue found on several of the items tested positive for Methamphetamine. Then one of the items that was located in a pill bottle that had the name David Creech on the bottle came back as Alprazolam. David Creech is a subject that Agent Johnson has served several search warrants against. Also located in the vehicle were 5 syringes. These items were sent to the OSBI lab, but were never tested. As for a complete list of the items found in Agent Johnsons vehicle see attached evidence log. There is no clear way to tale if these items were evidence that was seized in a search warrant, or if these items were Agent Johnsons. Finally if these items were evidence seized in a search warrant they were never submitted to the evidence officer, or the OSBI by Agent Johnson.

**List of attachments:**

1.) Photocopy of OSBI Criminalistics Examination Report
2.) Photocopy of Evidence Log

_____
Agent's Signature

1-5-06
_____
Date

**Dissemination:**

1.) Cherokee County District Attorney

797

# DISTRICT 27 DRUG TASK FORCE

| 1. Date Booked | 2. Report No. |
|---|---|
| 01-05-06 | CN-05-066 |

| 3. Type of Offense | 4. Location of Offense | | 5. County |
|---|---|---|---|
| 6. Defendant's Name    LAST    FIRST    MIDDLE | 7. Defendant's Address    City/Zip | | 8. Ph # (Day) |

## PROPERTY BOOKED

9. Type of Property   Items 1-16 found by Courtney Bates in vehicle issued to Clint Johnson

☐ Search Warrant No.

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | | | | RED/BLK Box w/ Bullets, video tapes, film, photo, | | floor |
| | | | | | | Benzomatic torch | | |
| 2 | 1 | | | | | WHT Bucket (small) w/ items from alab | | floor |
| 3 | 1 | | | | | BRO Box - Sealed addressed to: Steve Allen | | floor |
| 4 | 1 | | | | | WHT Box - Sealed addressed to: Steve Allen | | floor |
| 5 | 1 | | | | | Bottle of Iodine | | floor |

## CHAIN OF CUSTODY

| 19. Item | 20. Relinquished By: | 21. Date | 22. Received By: | 23. Date |
|---|---|---|---|---|
| 1-16 | Clint Johnson | 1-5-6 | Courtney Bates | 1-5-6 |
| 1-16 | Courtney Bates | 1-5-6 | Evidence Room | 010506 |
| 2,7,8,9, 11,12 | Evidence Room | 010906 | Courtney Bates | 010906 |
| 7,8,9 14,11 r 12 | Courtny Bates | 1-9-06 | OSB I Cag | 1-9-06 |

| 24. Reporting Officer | 25. Badge(s) Delta 11 | 26. Page 1 of 2 |
|---|---|---|

# SUPPLEMENTAL PROPERTY SHEET

## PROPERTY BOOKED

Type of Property

☐ Evidence ☐ Forfeited ☐ Stolen ☐ Search Warrant No.

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 6 | 1 | | | | | WHT Plastic Baby bottle Toy | | floor |
| 7 | 1 | | | | | Blue Zippered bag "Pepsi" w/ needles, spoon & plastic bag w/ white substance | | floor |
| 8 | 1 | | | | | WHT Metal Box w/ needles, bullets spoon, plastic bag w/ WHT substance | | floor |
| 9 | 1 | | | | | BLUE Pill Bottle "David Creech" w/ 52 Xanax Bars & 3 Broken pcs | | floor |
| 10 | 1 | | | | | Clear plastic bottle — no lid | | floor |
| 11 | 1 | | | | | Pill Bottle "Peggie S. Johnson" w/ unknown plant mtl | | floor |
| 12 | 1 | | | | | Metal "Crayola" Box w/ pipe, 4 red pills, 1 rolled cigarette, plastic bag w/ partially consumed rolled cigarette & green leaf substance, safe razor blade, "NIK" Methamphetamine field test kit (used) | | floor |
| 13 | 1 | | | | | Red plastic Nose | | floor |

| 24. Reporting Officer | 25. Badge(s) | 26. Page 2 of 3 |
|---|---|---|

798

# SUPPLEMENTAL PROPERTY SHEET

## PROPERTY BOOKED

Type of Property

☐Evidence  ☐ Forfeited  ☐ Stolen          ☐ Search Warrant No. _____

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 14 | 1 | | | | | Bro Paper Bag w/ plastic Bag containing green leaf substance | | floor |
| 15 | 1 | | | | | Bro "Flambeau" Box w/ misc Ammunition ? .22 cal revolver ser # 24767 | | floor |
| 16 | | | | | | Letter addressed i "Tony Dickeson" | | floor |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| 24. Reporting Officer | 25. Badge(s) | 26. Page _3_ of _3_ |
|---|---|---|

799

11/01/05

Memo to Richard Gray

At approx. 11:30 hours, investigators Tommy Morgan and Jeff Lancaster stopped at Chaplin's Truck Stop at 16294 S. Hwy 62 in Tahlequah, County of Cherokee. We asked the clerks (Kelly and Linda) if they had any bad checks to turn into the DA's office. They replied that they had checks on one S.O.B. who works for the DA's office. When the clerks were asked the employee's name, it was Clint Johnson. We asked if they wanted us to turn the checks in. At that time, they called the owner of the store (Doyle Champlin). He responded to hold the checks for a couple more days. Checks in question were written on dates 9/15, 9/17, and two on 9/18. Total of the four check $309.83

Tommy Morgan

Jeff Lancaster

DEFENDANT'S EXHIBIT

# OKLAHOMA STATE BUREAU OF INVESTIGATION

## TAHLEQUAH REGIONAL LAB
1995 Airport Parkway
Tahlequah, Oklahoma 74464
(918) 456-0653

### CRIMINALISTICS EXAMINATION REPORT

| | | | |
|---|---|---|---|
| LAB NO.: | 06-405 | Reported To: | Courtney Bates |
| | | Address: | District 27 DTF |
| | | | 307 E. Cherokee Street |
| Date Received: | 01-09-06 | | Wagoner, OK 74467 |
| Date Reported: | 01-26-06 | | |
| Classification of Case: | Drugs | Submitted By: | Courtney Bates, District 27 DTF |

Suspect(s):  UNKNOWN                    Victim(s):

Description of Evidence:

One (1) sealed brown paper sack containing one (1) white bucket containing:
- T1, T2  two (2) sample bottles [C-1, C-2] each containing approximately thirty (30) milliliters of a two layer liquid.
- T3, T4  two (2) sample bottles [C-3, C-4] each containing approximately thirty (30) milliliters of a clear liquid.
- T5  one (1) brown glass bottle with a white lid [C-5] containing approximately thirty (30) milliliters of a liquid.

One (1) sealed evidence envelope containing:
- T6, T7  two (2) syringe tubes each containing two (2) plastic syringes.
- T8, T9  two (2) syringe tubes each containing three (3) plastic syringes.

one (1) sealed evidence bag containing one (1) sealed evidence envelope containing:
one (1) evidence bag containing one (1) metal tin containing:
- T10  three (4) ziplock bags, one (1) plastic bag, one (1) plastic syringe holder, four (4) syringe plunger caps, one (1) red rubber item and pieces of fibrous material all with residues.
- T11  one (1) metal spoon with a residue.
- T12  one (1) ziplock bag containing a residue.

one (1) evidence bag containing one (1) zippered case "PEPSI" containing:
- T13  one (1) piece of cardboard, one (1) piece of a cigarette butt and one (1) metal spoon.
- T14  one (1) ziplock bag.
- T15  one (1) ziplock bag containing a fibrous material.

one (1) evidence bag containing:
- T16  one (1) prescription bottle "JOHNSON, PEGGIE" "DOXEPIN" containing what appears to be grass.
- T17  one (1) prescription bottle "DAVID CREECH" "PENICILL VK" containing fifty-three and one-half (53.5) white rectangular tablets "GG 249".

One (1) sealed evidence envelope containing:
one (1) evidence bag containing one (1) "Crayola" metal tin containing:
- T18  one (1) metal blade and one (1) metal pipe with a residue.
- T19  one (1) hand-rolled cigarette containing a green leafy substance, net weight: 0.37 gram.
- T20  one (1) cellophane wrapper containing three (3) red oblong tablets "5112 V".
- T21  one (1) ziplock bag containing:
  - T22  one (1) partially burned hand-rolled cigarette containing a green leafy substance, net weight: 0.11 gram.
  - T23  one (1) cellophane wrapper containing seeds and a green leafy residue, net weight: 0.48 gram.

one (1) brown paper sack "AUG 28, 2005 McNIEL BARN" containing:
- T24  one (1) clear plastic bag containing a green leafy substance, net weight: 0.57 gram.

800

Analysis of Evidence:

| ITEMS: | ANALYSIS: |
|---|---|
| T1, T4 | No controlled dangerous substance identified. |
| T2, T3, T11, T12, T15 | Methamphetamine, Schedule II. |
| T5, T6 through T10, T13, T14, T18, T21 | Not analyzed. |
| T16 | Microscopic analysis was negative for Cannabis, no further testing performed. |
| T17 | Visual and literary analysis indicate Alprazolam, Schedule IV, not confirmed by instrumental analysis. |
| T19, T22, T23, T24 | Cannabis, (Marihuana containing tetrahydrocannabinol), Schedule I. |
| T20 | Visual and literary analysis indicate Propoxyphene, Schedule IV, not confirmed by instrumental analysis. |

Pursuant to Title 22 O.S. Section 751, I hereby
certify that I am maker of this document and
that it is a true and correct report of findings of
the Oklahoma State Bureau of Investigation
Criminalistics Laboratory.

*Michael W. Childers*

Michael W. Childers
Criminalist

MWC/slb

OKLAHOMA STATE BUREAU OF INVESTIGATION

TITLE OF
REPORT: INTERVIEW OF CLINT JOHNSON

CLINT JOHNSON, WM, DOB: ▓▓/72, SSN ▓▓▓-▓▓-2820, ▓▓▓▓
Stilwell, Oklahoma, 74960, 918/207-8400, provided the following information:

JOHNSON was currently employed as a Deputy Sheriff for the Adair County Sheriff's Department. Prior to that, JOHNSON was a Drug Task Force Agent for the District 27 District Attorney's Office, Drug Task Force (DTF). JOHNSON worked at the Drug Task Force for about nine and one half years. JOHNSON had been an Oklahoma CLEET certified peace officer since 1996.

During 2005, JOHNSON encountered several problems with operational procedures at the Drug Task Force. One of the Assistant District Attorney's (A. D. A.) for the District had stolen "Crank" from a house during one of JOHNSON'S search warrants. The A.D.A. was JANET BICKEL (phonetic). JOHNSON told the District Attorney, RICHARD GRAY what had happened. Nothing was done about the incident. There were also other problems within the District Attorney's Office and JOHNSON ended up having to testify before the Multi-County Grand Jury in Oklahoma City, Oklahoma. JOHNSON told the truth to the Jury and several indictments were handed down against co-workers.

JOHNSON believed that by testifying before the Grand Jury that GRAY and other co-workers were out to get him and wanted him to be fired. During late December 2005, JOHNSON took a medical leave from the District Attorney's Office, due to work related stress. On January 5, 2006, two co-workers showed up at JOHNSON'S residence and said that they were getting his state-owned vehicle. The two co-workers present were DTF Agent COURTNEY BATES and A.D.A. JEFF SHERIDAN. JOHNSON told them that was fine and went to where the car was. JOHNSON knew there were several drug related items in the car that needed to go to the OSBI Lab for destruction or to other Drug Enforcement Agencies.

JOHNSON knew that there were several things from different drug related investigations within the state car. JOHNSON kept the items in the back hatch compartment of the two-door car. JOHNSON did not have a key to the evidence locker that was located in Wagoner. JOHNSON also customarily maintained custody of the

Investigation On: 2/23/06    At: TAHLEQUAH, OKLAHOMA    By: SHAWN WARD (SW)    File: CR06-1103
Offense: OFFICIAL MISCONDUCT    Victim: STATE OF OKLAHOMA    Case Agent: WARD
Office: NERO    Date Reported: 2/24/06    Approved by: [signature]    Date Approved: 3-2-06 NO: 002

This document contains neither recommendations nor conclusions of the OSBI. It is the property of the OSBI and is loaned to your agency; it and its content are not to be distributed outside your agency.


DEFENDANT'S
EXHIBIT

001103

items that he knew were going to be sent to the OSBI Laboratory. JOHNSON would then take them to the OSBI Laboratory in Tahlequah for destruction.

END NOTE: During the interview of JOHNSON by OSBI Special Agent SHAWN WARD, JOHNSON was shown a list of items that had been made by COURTNEY BATES as a record of what items were within JOHNSON'S car on January 5, 2006. JOHNSON was also shown some of the actual items that had been submitted to the OSBI Laboratory in Tahlequah for drug and DNA analysis. DTF Agent COURTNEY BATES had submitted the items out of JOHNSON'S car to the OSBI Laboratory on January 9, 2006. BATES submitted the items to the lab before the OSBI was requested to conduct this investigation. (See Attached Copies of List of Items by BATES and O.S.B.I. Drug Analysis Report.)

JOHNSON gave OSBI Special Agent SHAWN WARD the following detailed recollection as to where most of the items had came from and why they were still within his car.

The following numbers are placed for reference to the same numbers utilized by BATES within his inventory.

Among the items within JOHNSON'S car:

ITEMS # 1, 2 and possibly 15 & 16: A lab bucket that contained some samples from a lab that JOHNSON and JERRY STEVENS had located in Adair County. The items were obtained from a house belonging to a male subject named "DIXON". DIXON was not home when they served the search warrant so they took the items and left. JOHNSON explained that the D.A.'S Office would not customarily file charges on drug related cases unless the subject was at the residence where the narcotics or lab was present. JOHNSON was going to take the items to the OSBI Lab for destruction. JOHNSON added that he believed Items 15 and 16 were possibly from the DIXON search. JOHNSON told BATES that the items needed to be taken to the OSBI Lab for destruction on January 5, 2006.

ITEMS #3, 4, & 5: There was a bottle of Iodine and also a box that contained several new bottles of Iodine crystals. DEA intercepted the package. The box was being shipped to a subject named STEVE ALLEN. ALLEN'S name was on the shipping address. ALLEN had purchased the Iodine on the Internet. ALLEN admitted he was going to deliver the Iodine to another guy so he could make drugs. JOHNSON was assisting the Drug Enforcement Agency out of Tulsa with the investigation. JOHNSON worked with an agent named "SHANNON" LNU. JOHNSON told BATES that he needed to take the Iodine to the DEA Agent in Tulsa so they could finish working the controlled delivery to a guy named TODD CRUISE. BATES told JOHNSON to leave

the items within the car. JOHNSON saw BATES write the name SHANNON on his hand.

ITEM #7: A blue Pepsi case. JOHNSON remembered the blue case but did not recall whom he had obtained it from. JOHNSON believed that it was seized on a traffic stop.

ITEM #8: A white metal box with paraphernalia. JOHNSON believed that the box was seized on a consent to search of a residence in Cherokee County. JOHNSON was with Cherokee County Sheriff's Office Investigator JASON CHENNAULT and other deputies when the item was located. JOHNSON did not remember the name of the subject but recalled that a white female with an infant child was at the residence that was located by the Sewer Plant on the left hand side. The white female gave consent to search the house. The white metal box was taken as evidence. The male subject that lived within the residence worked at the Quick Lube 'n Tahlequah and went in and talked to CHENNAULT the next morning. No charges were going to be filed on the case. The male subject agreed to be a cooperating witness.

ITEM #9: Pill bottle with Pills. JOHNSON was with several other officers when they did a search warrant at CREECH'S residence. They did not find "crank" at the residence and took the pills to "hold over" CREECH'S head. CREECH agreed to be a cooperating witness and told JOHNSON that he would initiate a drug transaction by telephone with BOB LEPPKE. LEPPKE was a major drug dealer. The other officers present were JAMES CARVER, JERRY STEVENS, and SCOTT CRAIG. CRAIG worked for the Cherokee Marshal's Service. CARVER and STEVENS were with the Drug Task Force.

ITEM #12: Crayola Box with paraphernalia. JOHNSON did not remember getting the box. JOHNSON felt he would remember it if he had because of the picture upon the box. JOHNSON explained that sometimes other officers took drug related items and put them in his car when they were doing drug investigations. JOHNSON felt the items had to have been seized on a drug investigation obviously because it contained a "NIK" drug field test kit that was used.

ITEM # 14: Brown Paper sack words 'MCNEIL BARN'; JOHNSON did not remember doing an investigation involving a MCNEIL BARN. The bag had the date August 28, 2005, on it. The writing was not JOHNSON'S handwriting. JOHNSON believed the handwriting was possibly JERRY STEVENS'.

Also during the inventory of the car on January 5, 2006, JOHNSON said that while getting the items out of the car he found a plastic baggy that contained a

001105

rolled marijuana cigarette and also a partially burned marijuana cigarette. JOHNSON believed the items were possibly taken off of someone during a traffic stop but no charges were going to be filed. JOHNSON got the items and handed them to BATES. JOHNSON told BATES that the items needed to go for destruction.

END OF DETAILED INFORMATION PROVIDED BY JOHNSON REFERENCE BATES' INVENTORY OF ITEMS WITHIN CAR.

According to a letter of request signed by District Attorney RICHARD GRAY, DNA analysis was requested upon the items within JOHNSON'S car. JOHNSON wanted to voluntarily provide his sample of DNA to be compared to the items within his car. JOHNSON believed that GRAY was insinuating that JOHNSON had actually used the drug paraphernalia.

CLINT JOHNSON'S DNA:

JOHNSON wanted to provide WARD two buccal swabs of JOHNSON'S DNA for analysis. WARD put on latex/rubber gloves and swabbed the inside of JOHNSON'S mouth with two swabs. WARD then placed the two swabs into an evidence envelope. WARD sealed and signed the envelope. On February 23, 2006, WARD entered the items into the OSBI Evidence Tracking System and then submitted the item to the OSBI Northeast Regional Laboratory for Analysis.

The DNA analysis was to be performed upon several syringes that were among the items within JOHNSON'S car. DTF Agent BATES had previously submitted the items. The items would then be compared to JOHNSON'S known DNA profile.

## OKLAHOMA STATE BUREAU OF INVESTIGATION

Page 1 of 2

TITLE OF
REPORT: SECOND INTERVIEW OF CLINT JOHNSON

CLINT JOHNSON, WM, DOB: ███ 72, SSN: ███-2820, ███
███ Road, Stilwell, Oklahoma, 74960, 918/207-6400, provided the following information:

JOHNSON had recently taken a job with DYNCORP, INC. as a security agent. JOHNSON would be stationed in Iraq for one year. JOHNSON had been employed as a Deputy Sheriff for the Adair County Sheriff's Department. Prior to that, JOHNSON was a Drug Task Force Agent for the District 27 D.A.'S Office, Drug Task Force. JOHNSON worked at the Drug Task Force for about nine and one half years. JOHNSON had been an Oklahoma CLEET certified peace officer since 1996.

JOHNSON had kept several copies of Drug Task Force related documents for his own personal files. JOHNSON voluntarily provided the documents to OSBI Special Agents VICKI LYONS and SHAWN WARD. JOHNSON believed that there were several documents within the file that could possibly assist WARD with the investigation related to the District Attorney's Office Drug Task Force funds. (See Attached Copies of Documents.)

One of the forms indicated that EDGAR YIDI had given Drug Funds to JOHNSON for unknown drug buys. JOHNSON adamantly denied ever receiving any monies from YIDI and believed that YIDI was trying to "cover his own ass" because he was always screwing up. JOHNSON had only been on a few operations with YIDI and did not want to work with him because he was such a "screw up". YIDI had been in trouble for doing unethical things on drug buys. JOHNSON did not sign for any money from YIDI and would have definitely made an official document if he had received or given any Drug Funds to YIDI.

JOHNSON also had a weekly activity log that he had kept for several of the weeks that he worked at the Drug Task Force. Upon the weekly log of November 15, 2004, through November 19, 2004, JOHNSON had detailed that he had used a confidential informant to purchase methamphetamine and marijuana. JOHNSON used Drug Funds and there should have been a form to verify it but there was not one with his documents. Several other weekly logs showed where JOHNSON had met with informants and had paid them but there was not a form to verify it. JOHNSON had provided drug funds on a few occasions to the informants without doing a drug form

Investigation On: 05/30/06 　　At: TAHLEQUAH, OKLAHOMA 　　By: SHAWN WARD (S.W.) 　 File: CR06-1009

Offense: OFFICIAL MISCONDUCT 　　Victim: STATE OF OKLAHOMA 　　Case Agent: WARD

Office: NERO 　Date Reported: 6/19/06 　Approved by: ____ 　Date Approved: 7-26-06 IND: 008

This document contains neither recommendations nor conclusions of the OSBI. It is the property of the OSBI and is loaned to your agency; it and its content are not to be distributed outside your agency.



DEFENDANT'S EXHIBIT

001132

CR 06-1009
SECOND INTERVIEW OF CLINT JOHNSON
PAGE 2

(CF-5). JOHNSON did so because he would sometimes meet the informant at the courthouse and did not want to let anyone see him talking to the informant because it would jeopardize the informant's life or ability to work for the drug task force. JOHNSON usually had one of the other drug agents or police officers in the area witness the transactions to cover him.

JOHNSON used several hundred dollars for undercover buys that he had performed in the Redbird, Oklahoma, area. JOHNSON bought drugs with $500 dollars of drug funds on or about July of 2004 that was not detailed on a CF-5 form. JOHNSON did not utilize the CF-5 because he had been the one that made the purchases. JOHNSON also gave the informant $100 dollars that did the introduction for him to make the purchases.

JOHNSON had two original CF-5 forms in his possession that he had an informant sign and put his fingerprint. One of the forms was for $80 dollars and two others were to the same informant but did not have the amount of money paid upon it.

001133



# RICHARD L. GRAY
### DISTRICT ATTORNEY

State of Oklahoma
27th District

Wagoner County
307 E. Cherokee
Wagoner, OK 74467
Telephone (918) 485-2119
Facsimile (918) 485-4220

January 5, 2006

Clint Johnson
Drug Task Force
27th Prosecutorial District

Dear Mr. Johnson:

Please be advised that your employment with the office of the District Attorney for the 27th Prosecutorial District is terminated as of this date.

Please turn in your December and January time sheets, all keys, cell phones, fire arms, and other related equipment. Any other access instruments to offices, safe keeping areas or safe deposit boxes must also be signed in along with your vehicle immediately. Jeff Sheridan will receive them on or before Friday, January 6, 2006 at 4:00 p.m.

I have taken the liberty of checking with DAC to ensure your insurance benefits will remain in effect until January 31, 2006; after which, you will have the option of continuing your benefits coverage at your own expense through COBRA. You will receive a separate notification regarding your COBRA options.

Please take your personal items with you immediately, as you will have no employee-status access to this office following today's date.

Sincerely,

Richard L. Gray, District Attorney
District 27

RLG\mb



DEFENDANT'S
EXHIBIT

644



**TO:** Richard / File
**FROM:** Misty
**DATED:** November 13, 2006

During or about the time the DAs office was audited, I received a phone call from Clint Johnson. At that time, I was vaguely aware of a pending investigation, although not informed or knowledgeable of any details. Unfortunately, at this time, I cannot remember the exact date or even the exact month. It would have been between September 2005 and February 2006.

Clint called in reference to a specific amount of money. Again, at this date, I cannot recall the exact amount he referred to. Clint began the conversations with pleasantries, and then proceeded to ask me if I remembered a time where he had given me money from a drug bust or something and then proceeded to tell me what I had done with the money and other details of the incident (I do not remember what he said specifically in reference to that either).

I recall very distinctly my reaction to that phone call. I did tell you about him calling because I was so angry about it. Clint had asked me a lot of leading questions and I remember his recollection of the event and his recollection of the money and what was done with it, was entirely false. I remember it made me so angry because I felt suspicious that he would call me on the phone and ask me to recall a specific incident, regarding a specific amount of money, but be so wrong as to everything else. I strongly felt that he was trying to either record me or get me to admit to something that I did not agree with, or my memory did not support for someone else's benefit. I felt like he was trying to manipulate me.

I had been present on a similar occasion in 2003 when Clint came into my office and was trying to support something he had going on and telephoned the police in Adair County with them on speaker phone and fed the officer there a lot of leading questions about an incident so that I would believe him on something. I remember the officer corroborated some of Clint's story and then told him to come see him in person so they could get the story straight. That last part of his statement made me think that Clint might have stretched his version of the incident to some degree. (Unfortunately, I cannot recall the topic of that conversation either).

Anyway, Clint named a specific amount of money that he says he counted to me, and I wrote him a receipt and he 'misplaced' his receipt. I told him I didn't remember it at all and that if there had been a receipt written, I would have a carbon copy in one of the books.... I looked and there was not one. He got agitated and then said he could find his receipt and prove it to me. I suggested he do so. He was feeding me more specific information of which I absolutely had no recollection.

He did not call me back about the money, or produce his misplaced receipt.



**EXHIBIT**

001388



# RICHARD L. GRAY
DISTRICT ATTORNEY

State of Oklahoma
27th District

Wagoner County
307 E. Cherokee
Wagoner, OK 74467
Telephone (918) 485-2119
Facsimile (918) 485-4220

January 17, 2006

Chuck Jeffries
Oklahoma State Bureau of Investigation
Northeast Regional Office
125 W. 15th St., Ste 100
Tulsa, OK 74119

RE:   District 27 Drug Task Force

Dear Inspector Jeffries:

Due to inconsistencies, incomplete, missing and questionable confidential fund records associated with the District 27 Drug Task Force, I am hereby requesting that an investigation be initiated into District 27 Drug Task Force concerning potential misappropriation of federal funds.

The records have been reviewed by Tom Cunningham of the District Attorney's Council. At his direction, new members of the Drug Task Force have gone about the business of attempting to reconstruct and verify certain activities. We have not been successful in our attempt to document our files, and many files have no tangible explanation of missing funds

Therefore, I would ask for an investigation into the transactions of the Drug Task Force for District 27.

Sincerely,

Richard L. Gray
District Attorney

RLG/krb



790



# RICHARD L. GRAY
## DISTRICT ATTORNEY

State of Oklahoma
27th District

Wagoner County
307 E. Cherokee
Wagoner, OK 74467
Telephone (918) 485-2119
Facsimile (918) 485-4220

February 3, 2006

Chuck Jeffries
Oklahoma State Bureau of Investigation
Northeast Regional Office
125 W. 15th St., Ste 100
Tulsa, OK 74119

      RE:    District 27 Drug Task Force

Dear Inspector Jeffries:

      This letter serves to supplement my previous letter of January, 17th, 2006, wherein I requested an investigation be initiated into the District 27 Drug Task Force, and setout the reasons therein.

      Please find attached an Oklahoma Bureau of Investigation Report of various sundry items and an offense report submitted by Courtney Bates, one of my Drug Task Force agents. As you will note, the lab analysis confirms the presence of methamphetamine, marijuana and Alprazolam. The items listed were found in the vehicle being utilized by Clint Johnson in performance of his duties as a drug task force investigator. The items were not marked as evidence and were in various locations in the vehicle.

      As you know, I requested an investigation of the District Twenty-Seven Drug Task force based on anomalies in confidential informant files and requisite documentation. One aspect of my concern in the confidential informant files was the fact that there were controlled substances purchased with federal funds with no record of those drugs ever being submitted for testing, logged into evidence or destroyed by the Oklahoma Bureau of Investigation. Now, there are drugs in the vehicle used by one of the agents involved with injection paraphernalia present.



I have requested that the Oklahoma State Bureau of Investigation perform testing on syringes found in the vehicle driven by Clint Johnson. Additionally, I have requested DNA testing of the syringes and the partially smoked marijuana cigarette found in the vehicle.

I appreciate your prompt attention to this matter. If there is anything further I need to do to better facilitate this request, please let me know immediately. I appreciate your cooperation.

Sincerely,

Richard L. Gray,
District Attorney

RLG\mb
enclosures

 COPY

# DISTRICT 27

# DRUG TASK FORCE

# OFFENSE REPORT

**CASE AGENT:** Courtney Bates
**DATE OF OFFENSE:** 01-05-06
**TYPE OF OFFENSE:** Unknown

809



### _Richard Loy Gray D.A._
### _Twenty-Seventh Prosecutorial District Drug Task Force_
### _Report of Investigation_

Date: 01-05-06

Case number: DTF-C06-001

Case Agent: Courtney Bates

Status: pending/initial

File title:

Defendants: D1)

Violations: D1)

Identification of evidence: (see attached evidence log)

Money list: N/A
Description of vehicle: N/A
List of witnesses:

Primary:    1.) Courtney Bates, Investigator, District 27 Drug Task Force
           307 W. Cherokee St. Wagoner, OK 74467
           Telephone: (918) 485-9447

          2.) Jim Jones, Investigator, District 27 Drug Task Force
           307 W. Cherokee St. Wagoner, OK 74467
           Telephone: (918) 485-9447

Secondary:    1.) OSBI Chemist, OSBI Laboratory
           1995 Airport Parkway Tahlequah, Ok. 74464
           Telephone: (918) 456-0653

Summary: While in the performance of my duty's as a Drug Task Force Agent (DTF) District 27 on 1-05-06 I, (Courtney Bates) did an inventory on a DTF agents (Clint Johnson) vehicle. The reason the inventory was performed was because the agent's employment had been terminated and all of the property in the vehicle had to be inventoried to determent what items belong to DTF and what items were Agent Johnson's.

810

**Report of investigation**
(Continued)

**Case number**

Page 2

**Details:** While performing the inventory of Agent Johnson's vehicle I found several items that were submitted by me for testing by the OSBI lab in Tahlequah. The tests showed that several of the items tested positive for Marijuana. Also some of the residue found on several of the items tested positive for Methamphetamine. Then one of the items that was located in a pill bottle that had the name David Creech on the bottle came back as Alprazolam. David Creech is a subject that Agent Johnson has served several search warrants against. Also located in the vehicle were 5 syringes. These items were sent to the OSBI lab, but were never tested. As for a complete list of the items found in Agent Johnsons vehicle see attached evidence log. There is no clear way to tale if these items were evidence that was seized in a search warrant, or if these items were Agent Johnsons. Finally if these items were evidence seized in a search warrant they were never submitted to the evidence officer, or the OSBI by Agent Johnson.

**List of attachments:**

1.) Photocopy of OSBI Criminalistics Examination Report
2.) Photocopy of Evidence Log

_____
Agent's Signature

_1-5-06_
Date

**Dissemination:**

1.) Cherokee County District Attorney

| 1. Date Booked | **DI...RICT 27 DRUG TASK FORC...** | 2. Report No. |
|---|---|---|
| 01-05-06 | | CN-05-066 |

| 3. Type of Offense | 4. Location of Offense | | 5. County |
|---|---|---|---|
| 6. Defendant's Name          LAST      FIRST    MIDDLE | 7. Defendant's Address                    City/Zip | | 8. Ph # (Day) |

### PROPERTY BOOKED

9. Type of Property   Items 1-16 found by Courtney Bates in vehicle issued to Clint Johnson

☐ Search Warrant No.

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | | | | RED/BLK Box w/ Bullets, video tapes, film, photo, | | floor |
| | | | | | | Benzomatic torch | | |
| 2 | 1 | | | | | WHT Bucket (small) w/ items from a lab | | floor |
| 3 | 1 | | | | | BRO Box - Sealed addressed to: Steve Allen | | floor |
| 4 | 1 | | | | | WHT Box - Sealed addressed to: Steve Allen | | floor |
| 5 | 1 | | | | | Bottle of Iodine | | floor |

### CHAIN OF CUSTODY

| 19. Item | 20. Relinquished By: | 21. Date | 22. Received By: | 23. Date |
|---|---|---|---|---|
| 1-16 | Clint Johnson | 1-5-6 | Courtney Bates | 1-5-6 |
| 1-16 | Courtney Bates | 1-5-6 | Evidence Room | 010506 |
| 2,7,8,9, 10,11,12 | Evidence Room | 010906 | Courtney Bates | 010906 |
| 2,7,8,9, 10,11,12 | Courtney Bates | 1-9-06 | OSBI lab | 1-9-06 |

| 24. Reporting Officer | 25. Badge(s)  Delta  11 | 26. Page  1 of 3 |
|---|---|---|

# SUPPLEMENTAL PROPERTY SHEET

## PROPERTY BOOKED

9. Type of Property

☐ Evidence  ☐ Forfeited  ☐ Stolen                    ☐ Search Warrant No.

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 6 | 1 | | | | | WHT Plastic Baby bottle Toy | | floor |
| 7 | 1 | | | | | Blue Zippered bag "Pepsi" w/ needles, spoon & plastic bag w/ white substance | | floor |
| 8 | 1 | | | | | WHT metal Box w/ needles, bullets spoon, plastic bag w/ WHT substance | | floor |
| 9 | 1 | | | | | Blue Pill Bottle "David Creech" w/ 52 Xanax Bars & 3 Broken pcs | | floor |
| 10 | 1 | | | | | Clear plastic bottle – no lid | | floor |
| 11 | 1 | | | | | Pill Bottle "Peggie S. Johnson" w/ unknown plant mtl | | floor |
| 12 | 1 | | | | | metal "Crayola" Box w/ pipe, 4 red pills, 1 rolled cigarette, plastic bag w/ partially consumed rolled cigarette & green leaf substance, safe razor blade, "Pile" methamphetamine field test kit (used) | | floor |
| 13 | 1 | | | | | Red plastic Hose | | floor |

| Reporting Officer | 25. Badge(s) | 26. Page 2 of 3 |
|---|---|---|

813

# SUPPLEMENTAL PROPERTY SHEET

## PROPERTY BOOKED

9. Type of Property

☐ Evidence  ☑ Forfeited  ☐ Stolen            ☐ Search Warrant No.

| 10. Item No. | 11. Quantity | 12. Article | 13. Brand | 14. Model # | 15. Serial # | 16. Descrip. (Color, Size, Style, Features, Caliber, etc.) | 17. Value | 18. Storage Location |
|---|---|---|---|---|---|---|---|---|
| 14 | 1 | | | | | Bro Paper Bag w/ plastic Bag containing green leaf substance | | floor |
| | | | | | | | | |
| 15 | 1 | | | | | Bro "Flambeau" Box w/ misc Ammunition & .22 cal revolver ser # 24767 | | floor |
| 16 | | | | | | Letter addressed : "Tony Dickeson" | | floor |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Reporting Officer | 25. Badge(s) | 26. Page 3 of 3 |
|---|---|---|

814



# OKLAHOMA STATE BUREAU OF INVESTIGATION
### TAHLEQUAH REGIONAL LAB
1995 Airport Parkway
Tahlequah, Oklahoma 74464
(918) 456-0653

## CRIMINALISTICS EXAMINATION REPORT

| | | | |
|---|---|---|---|
| LAB NO.: | 06-405 | Reported To: | Courtney Bates |
| | | Address: | District 27 DTF |
| | | | 307 E. Cherokee Street |
| Date Received: | 01-09-06 | | Wagoner, OK 74467 |
| Date Reported: | 01-26-06 | | |
| Classification of Case: | Drugs | Submitted By: | Courtney Bates, District 27 DTF |

Suspect(s):    **UNKNOWN**                              Victim(s):

**Description of Evidence:**

One (1) sealed brown paper sack containing one (1) white bucket containing:

T1, T2    two (2) sample bottles [C-1, C-2] each containing approximately thirty (30) milliliters of a two layer liquid.
T3, T4    two (2) sample bottles [C-3, C-4] each containing approximately thirty (30) milliliters of a clear liquid.
T5    one (1) brown glass bottle with a white lid [C-5] containing approximately thirty (30) milliliters of a liquid.

One (1) sealed evidence envelope containing:

T6, T7    two (2) syringe tubes each containing two (2) plastic syringes.
T8, T9    two (2) syringe tubes each containing three (3) plastic syringes.
one (1) sealed evidence bag containing one (1) sealed evidence envelope containing:
one (1) evidence bag containing one (1) metal tin containing:
T10    three (4) ziplock bags, one (1) plastic bag, one (1) plastic syringe holder, four (4) syringe plunger caps, one (1) red rubber item and pieces of fibrous material all with residues.
T11    one (1) metal spoon with a residue.
T12 ·    one (1) ziplock bag containing a residue.
one (1) evidence bag containing one (1) zippered case "PEPSI" containing:
T13    one (1) piece of cardboard, one (1) piece of a cigarette butt and one (1) metal spoon.
T14    one (1) ziplock bag.
T15    one (1) ziplock bag containing a fibrous material.
one (1) evidence bag containing:
T16    one (1) prescription bottle "JOHNSON, PEGGIE" "DOXEPIN" containing what appears to be grass.
T17    one (1) prescription bottle "DAVID CREECH" "PENICILL VK" containing fifty-three and one-half (53.5) white rectangular tablets "GG 249".

One (1) sealed evidence envelope containing:

one (1) evidence bag containing one (1) "Crayola" metal tin containing:
T18    one (1) metal blade and one (1) metal pipe with a residue.
T19    one (1) hand-rolled cigarette containing a green leafy substance, net weight: 0.37 gram.
T20    one (1) cellophane wrapper containing three (3) red oblong tablets "5112 V".
T21    one (1) ziplock bag containing:
T22    one (1) partially burned hand-rolled cigarette containing a green leafy substance, net weight: 0.11 gram.
T23    one (1) cellophane wrapper containing seeds and a green leafy residue, net weight: 0.48 gram.
one (1) brown paper sack "AUG 28, 2005 McNIEL BARN" containing:
T24    one (1) clear plastic bag containing a green leafy substance, net weight: 0.57 gram.



LAB NO.: 06-405

DATE: 01-26-06

PAGE: 2

Analysis of Evidence:

| ITEMS: | ANALYSIS: |
|---|---|
| T1, T4 | No controlled dangerous substance identified. |
| T2, T3, T11, T12, T15 | Methamphetamine, Schedule II. |
| T5, T6 through T10, T13, T14, T18, T21 | Not analyzed. |
| T16 | Microscopic analysis was negative for Cannabis, no further testing performed. |
| T17 | Visual and literary analysis indicate Alprazolam, Schedule IV, not confirmed by instrumental analysis. |
| T19, T22, T23, T24 | Cannabis, (Marihuana containing tetrahydrocannabinol), Schedule I. |
| T20 | Visual and literary analysis indicate Propoxyphene, Schedule IV, not confirmed by instrumental analysis. |

*Pursuant to Title 22 O.S. Section 751, I hereby certify that I am maker of this document and that it is a true and correct report of findings of the Oklahoma State Bureau of Investigation Criminalistics Laboratory.*

Michael W. Childers
Criminalist

MWC/slb

816



# RICHARD L. GRAY
### DISTRICT ATTORNEY

State of Oklahoma
27th District

Wagoner County
207 E. Cherokee
Wagoner, OK 74467
Telephone (918) 485-2119
Facsimile (918) 485-4250

February 22, 2006

Shawn Ward
Oklahoma State Bureau of Investigation
Northeast Regional Office
125 W. 15th St., Ste 100
Tulsa, OK 74119

Dear Special Agent Ward:

Pursuant to your discussion of February 22, 2006 with Jeff Sheridan, please consider this letter a supplemental request for investigation concerning seized funds which can not be located. There are two arrests and seizures money which are of concern, they are the following;

1. There was a seizure on January 28th, 2002 of $632.00 which was in the possession of Sandra Gable. The money was not logged into evidence, but is reflected on the return of search warrant. Charges were filed in Cherokee County, but were dismissed for lack of speedy trial. There was not a forfeiture filed. ........

2. On October 23, 2003, Roy Brewer was arrested and $634.00 was seized from his person. The money was mentioned in a report, but there is no further record to indicate the disposition of the money. A prosecution was initiated and plea entered, there is an indication that all property was to be returned to Roy Brewer. This is an Adair County case.

On both the cases, attorneys have been requesting the return of the money. Clint Johnson was the officer in both instances.



001099

Shewn Ward Letter
February 22, 2006
Page 2

     Additionally, it is my understanding that you are aware that there were certain items of concern taken from the vehicle assigned to Clint Johnsen. Pursuant to your conversation with Jeff Sheridan, there will be no further request for analysis of any of those items by this office. All requests will be deferred to you as you see fit, contingent on your investigation.

     Sincerely,

Donovan Dobbs
First Assistant District Attorney

DDD/rb

001100

To Jeff Sheridan

This is per our conversation as you wanted me to write up a statement:

I received your memo regarding certain cases in Cherokee and Adair County forfeiture cases. Reference to the $233.00 dollars this money was given back to the individual after consulting with Richard Gray due to this agent and agent Carver receiving information from this subject. Agent Carver is a witness that the money was returned back to the subject.

The original receipt for the $131.00 I have in my possession I took it up and presented it to Donovan Dobbs the original receipt is still in my possession.

The $751.00 that was taken in January of 2003 was taken to Misty Brinley which was shortly after Richard Gray took over office and they had me gathering up items for sale and forfeited items. We called Richard Gray approximately three times to find out where to put the money. This agent turned the money over to Misty Brinley.

If you have any questions please do not hesitate to contact me.

Thank You
Clint Johnson

