# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Petitioner/Defendant,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Respondent/Plaintiff.* | ) | |

**PETITIONER'S BRIEF IN SUPPORT OF
SECOND AMENDED § 2255 MOTION
AND IN SUPPORT OF
PETITIONER'S MOTION FOR EVIDENTIARY HEARING
AND MOTION FOR RECORD EXPANSION**

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone: 405-521-9600

DANIEL J. BRODERICK
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Counsel
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: 916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**TABLE OF CONTENTS**

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Statement Regarding Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.    Events Leading Up to the Raid on the Barrett Home . . . . . . . . . . . . . . . . . . . . . 9

        1.    Mr. Barrett's "Failure to Appear" and the Resulting Bench Warrant . . . . 9

        2.    The Search Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        3.    September 24, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    Three Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.    State Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.    Federal Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.    Points and Authorities Supporting Mr. Barrett's Grounds for Relief . . . . . . . . . . . . . . 18

    Ground 1    Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . 18

Judicial Interference with Defense Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Lack of Judicial Impartiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    Ground 2.    Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        1.    The Test for Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        2.    The Test for Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        3.    The Need for an Evidentiary Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . 38

Ground 2, Part A(1).   Defense Counsel's Unreasonable Omissions in Reurging Franks
                       Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Ground 2, Part A(2).   Trial counsel unreasonably failed to investigate and introduce
                       evidence of eyewitnesses as well as mental impairment and illness
                       that would have rebutted the prosecution's theory of the case,
                       supported the defense theory, and formed the basis for conviction
                       of a lesser offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Ground 2, Part A(3):   Defense Counsel's Unreasonable Failure to Investigate and Present
                       Evidence Showing Mr. Barrett was Incompetent to Stand Trial . 53
     1.     Deficient Performance.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
     2.     Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Ground 2, Part A(4).   But for trial counsel's unreasonable omissions it is reasonably
                       probable that the jury would have rejected the testimony of the
                       Government's eleventh hour "snitch" witnesses and, like the two
                       juries before them, refused to convict Mr. Barrett of
                       premeditated murder.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Ground 2, Part A (5).  Trial counsel were ineffective in failing to make appropriate and
                       timely objections to improper hearsay evidence of other
                       bad acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Ground 2, Parts A(6) and (10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

     1.     Defense Counsel's Failure to Obtain Expert Assistance . . . . . . . . . . . . 77

Ground 2, Part A (11).          Trial counsel unreasonably failed to contest the admission
                                of lengthy "expert" testimony which served no legitimate
                                purpose, but merely excused the inaccuracies and
                                inconsistencies in the fact witnesses' testimony.  Counsel
                                also unreasonably failed to seek an adequate remedy for
                                this improper testimony.  . . . . . . . . . . . . . . . . . . . . . . . . 92

Ground 2, Part A (12).          The verdicts reached at both stages of trial are unreliable
                                due to trial counsel's unreasonable failure to seek
                                appropriate instructions . . . . . . . . . . . . . . . . . . . . . . . . . 97

Ground 2, Part A (13).          The outcomes of the trial and appeal are unreliable due to
                                trial counsel's unreasonable failure to preserve a record of
                                error, resulting in numerous meritorious claims on direct
                                appeal being evaluated under the onerous plain
                                error standard.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Ground 2, Part A (14).    Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial. . . . . . . . . . . . . . . . . . . . . . . 101

Ground 2, Part B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

1.    Deficient Performance:  Mr. Barrett's defense counsel failed to fulfill duties to conduct a thorough background investigation, consult with experts, and prepare a two-stage strategy based on readily available information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

2.    Prejudice:  The readily available mitigation evidence regarding Mr. Barrett's background, the circumstances of the offense, impeachment of the Government's intent witnesses, and Mr. Barrett's mental problems would have changed the jury's assessment of his culpability. . . . . . . . 115

Ground 3.    Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Transcripts, Expert and Investigative Assistance under 18 U.S.C. §§ 3005 & 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . 125

1.    The Withholding of Funds for Transcripts. . . . . . . . . . . . . . . . . . . . . . 127

2.    Mental Health Assistance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

3.    Mitigation Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

4.    Fact Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

5.    Crime Scene Reconstruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

6.    Expert on Police Standards and Procedure. . . . . . . . . . . . . . . . . . . . . . 138

7.    Cumulative Effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Ground 4.    Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest. The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under Franks v. Delaware, 438 U.S. 154 (1978).  Appellate Counsel Were Ineffective for Failing to Raise the Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Ground 5.    Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

1.    The Government Suppressed Material Evidence
Favorable to the Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

    a.    The law relating to suppression of exculpatory evidence 149

        1.    What is "favorable to the accused" . . . . . . . . . . 149

        2.    What is "suppression . . . . . . . . . . . . . . . . . . . . . 151

        3.    What is "material" . . . . . . . . . . . . . . . . . . . . . . . 152

    b.    Exculpatory Evidence Suppressed by the
Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

        1.    Charles Sanders . . . . . . . . . . . . . . . . . . . . . . . . . 153

        2.    Travis Crawford 3.. . . . . . . . . . . . . . . . . . . . . . . 155

        3.    Cindy Crawford. . . . . . . . . . . . . . . . . . . . . . . . . 155

        4.    Brandie Zane Price . . . . . . . . . . . . . . . . . . . . . . 156

        5.    Karen Real . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

        6.    Randy Turman . . . . . . . . . . . . . . . . . . . . . . . . . . 157

2.    The prosecution's reliance upon false testimony . . . . . . . . . . . 159

3.    Newly Discovered Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . 161

4.    The Need for an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . 164

5.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Ground 5, Part C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Ground 5, Part D.    Mr. Barrett is Entitled to a New Trial Due to the Prosecution's
Improper Questioning of Witnesses . . . . . . . . . . . . . . . . . . . . . . . 168

Ground 6.    Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to
the United States Constitution were Violated Due to the Court's
Restrictions on the Use of his Statements . . . . . . . . . . . . . . . . . . . . . . . 175

Ground 7.    Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were
Violated when the Trial Court Permitted the Marshals to Restrain him
Without Justification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Ground 8.    Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth,
and Eighth Amendments to the United States Constitution. . . . . . . . . . 187

Ground 9.    Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the
United States Constitution were Violated When the Trial Court Failed to
Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel
Were Ineffective for Failing to Raise this Issue. . . . . . . . . . . . . . . . . . . 192

Ground 10.    Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the
United States Constitution were Violated Due to the Trial Court's Refusal
to Instruct the Jury that they Could Consider Residual Doubts as a
Mitigation Factor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

Ground 11.    Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated
When the Trial Court Excused for Cause a Juror Who, While  Personally
Opposed to the Death Penalty, Could Nonetheless Consider it as a
Punishment Option.  Appellate Counsel Were Ineffective for Failing to
Raise this Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

Ground 12.    The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights
under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the
Jury was Not Required to Find that Death was an Appropriate Punishment
Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were
Violated by Appellate Counsel's Unreasonable Failure to Raise
this Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

Ground 13.    Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth
Amendments were Violated Due to the Effects of Drugs he was Given in
Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial
Court's Removal of Mr. Barrett from the Courtroom in the Presence of the
Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical
Stages of the Proceedings without Valid Waiver; To the Extent Appellate
Counsel Failed to Raise the Issue on Appeal, Counsel were
Ineffective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Ground 14.    Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact. . . . . . . . . . . . . . . . . . . . . . . . 221

Ground 15.    Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Ground 16.    Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

Ground 17.    Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment  . . 228

Ground 18.    The Failure of Counsel to Raise or Effectively Argue on Appeal Grounds Which Are of Record Violated Mr. Barrett's Due Process Right to Effective Assistance of Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . 232

              A.       Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . 234

                       1.       Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

                       2.       Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under Franks v. Delaware, 438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

                       3.       Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character.  . . . . . . . . . . . . . 236

                       4.       Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn.  . . . . . . 237

                       6.       Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements. . . . . . . . . . . . . . . . . . . . . . . 238

7.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

8.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses . . . . . . . . . . . . 240

9.    Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred . . . . . . . . . . . . . . 240

10.   Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

11.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence . . . . . . . . . . . . . 241

12.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

13.   Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty. . . . . . . . . . . . . . . . . . . . . . . . 242

14.   Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment. . . . . . . 243

B.    A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

Ground 19.   Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case. . . . . . . . . . . . 245

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Adams v. Bertrand, 453 F.3d 428 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Ake v. Oklahoma, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Akwal v. Mitchell, 559 F.3d 456 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Alcorta v. Texas, 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

Allen v. Woodford, 395 F.3d 979 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Anderson v. Sirmons, 476 F.3d 1131 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Apprendi v. New Jersey, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 207, 208, 209, 241

Atkins v. Virginia, 536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229, 230, 231, 232

Balfour v. Haws, 892 F.2d 556 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Banks v. Dretke, 540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149, 152

Banks v. Reynolds, 54 F.3d 1508 (10th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Bates v. Bell, 402 F.3d 635 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Beck v. Alabama, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 193, 196

Bell v. Evatt, 72 F.3d 421 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Benn v. Lambert, 283 F.3d 1040 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Bishawi v. United States, 292 F. Supp. 2d 1122 (S.D.N.Y. 2003)
      aff'd, 109 Fed. Appx. 813 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

Bland v. Sirmons, 459 F.3d 999 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 54, 106, 189

Bowen v. Maynard, 799 F.3d 593 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

Bracy v. Gramley, 520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 32

Bracy v. Schomig, 286 F.3d 406 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Brady v. Maryland, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brecht v. Abramson, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brewer v. Aiken, 935 F.2d 850 (7th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Britt v. North Carolina, 404 U.S. 226 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 127

Brooks v. Tennessee, 406 U.S. 605 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Brown v. Sternes, 304 F.3d 677 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 109

Bryan v. Mullin, 335 F.3d 1207 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 230

Bundy v. Dugger, 816 F.2d 564 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Bush v. Gore, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Buttrum v. Black, 721 F. Supp. 1268 (N.D. Ga. 1989),
    aff'd, 908 F.2d 695 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

California v. Brown, 479 U.S. 538 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

California v. Trombetta, 467 U.S. 479 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125, 175

Carey v. Duckworth, 738 F.2d 875 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Carter v. Bowersox, 265 F.3d 705 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Chambers v. Mississippi, 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 179

Clark v. Crist, 335 F.3d 1303 (11th Cir. 2003),
    cert. denied, 540 U.S. 1155 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Clay v. Bowersox, 367 F.3d 993 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Combs v. Coyle, 205 F.3d 269 (6th Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Cone v. Bell, ___ U.S. ___, 129 S. Ct. 1769 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Cooks v. Ward, 165 F.3d 1283 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Cooper v, Oklahoma, 517 U.S. 348 (1996), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 188, 189

Correll v. Ryan, 539 F.3d 938 (9th Cir. 2008),
    cert. denied, 129 S. Ct. 903 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Crane v. Kentucky, 476 U.S. 683 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 179

Crivens v. Roth, 172 F.3d 991 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 153, 155, 156, 157

Cross v. United States, 325 F.2d 629 (D.C. Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Crowe v. Sanders, 864 F.2d 430 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 97

Cunningham, 549 U.S., at 281, 127 S. Ct. 856 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168, 174

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . . . . . . . 79, 93, 95, 137

Davis v. Alaska, 415 U.S. 308 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176, 179

Deck v. Missouri, 544 U.S. 622 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182, 183

Delaware v. Van Arsdale, 475  U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 179

Dennis v. United States, 384 U.S. 855 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . 149, 168, 174

Douglas v. Workman, 560 F.3d 1156 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . 150, 154, 156, 157

Draughton v. Dretke, 427 F.3d 286 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 90

Driscoll v Delo, 71 F.3d 701 (8th Cir. 1995),
    cert. denied, 519 U.S. 910 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 82

Drope v. Missouri, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Drope v. Missouri, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Duckett v. Mullin, 306 F.3d 982 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171, 246

Ducky v. United States, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 188, 191

Duhamel v. Collins, 955 F.2d 962 (5th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Duvall v. Reynolds, 139 F.3d 768 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Dzurgiot v. Luther, 897 F.2d 1222 (1st Cir 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Eagle v. Linahan, 279 F.3d 1283 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Eddings v. Oklahoma, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 150, 175, 238

Eddmonds v. Peters, 93 F.3d 1307 (7th Cir. 1996),
      cert. denied, 520 U.S. 1172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Estelle v. McGuire, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Estelle v. Williams, 425 U.S. 501 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182, 183

Estock v. Lane, 842 F.2d 184 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Evittts v. Lucey, 469 U.S. 387 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Felde v. Butler, 817 F.2d 281 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Felder v. Johnson, 180 F.3d 206 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Ferguson v. Georgia, 365 U.S. 570 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fero v. Kerby, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Ferrara v. United States, 456 F.3d 278 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 162

Fisher v. Gibson, 282 F.3d 1283 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 97

Gardner v. Florida, 430 U.S. 349 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 97, 174

Geders v. United States, 425 U.S. 80 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

Giglio v. United States, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Gilbert v. Mullen, 302 F.3d 1166 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Giles v. Maryland, 386 U.S. 66 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

Girts v. Yanai, 501 F.3d 743 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Godinez v. Moran, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Gonzales v. McKune, 247 F.3d 1066 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Gonzalez v. Pliler, 341 F.3d 897 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Goodman v. Bertrand, 467 F.3d 1022 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Gravely v. Mills, 87 F.3d 779 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 102

Gray v. Mississippi, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

Green v. United States, 972 F. Supp. 917 (E.D. Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

Greer v. Miller, 483 U.S. 756 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Gregory v. United States, 369 F.2d 185 (D.C. Cir. 1966),
    cert. denied, 396 U.S. 865  (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . 148, 165, 166, 167

Griffin v. Warden, Maryland Correctional Adjustment Center,
    970 F.2d 1355 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 109

Hadley v. Groose, 97 F.3d 1131 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Haliym v. Mitchell, 492 F.3d 680 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Hall v. Washington, 106 F.3d 742 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 112

Halliday v. United States, 380 F.2d 270 (1st Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Hamilton v. Alabama, 368 U.S. 52 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hardwick v. Crosby, 320 F.3d 1127 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

Harris v. Reed, 894 F.2d 871 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 109

Harris v. United States, 536 U.S. 545 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Harris v. Wood, 64 F.3d 1432 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 38

Hawkins v. Camparet-Cassini, 251 F.3d 1230 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 186

Hays v. Farwell, 482 F. Supp. 2d 1180 (D. Nev. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236, 238

Heath v. Alabama, 474 U.S. 82 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Heath v. Jones, 941 F.2d 1126 (11th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Herring v. New York, 422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 97

High v. Head, 209 F.3d 1257 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Hill v. Mitchell, 400 F.3d 308 (6th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Hodge v. Hurley, 426 F.3d 368 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 2000),
    cert. denied, 121 S.Ct. 332 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 197

Holbrook v. Flynn, 475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Holmes v. South Carolina, 547 U.S. 319 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Hooper v. Mullin, 314 F.3d 1162 (10th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Hull v. Kyler, 190 F.3d 88 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 57

Illinois v. Allen, 397 U.S. 337 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182, 215

Illinois v. Gates, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Imbler v. Pachtman, 424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

In re Murchison, 349 U.S. 133 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Irvin v. Dowd, 366 U.S. 717 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Jaffee v. Redmond, 518 U.S. 1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

James v. Gibson, 211 F.3d 543 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002),
    cert. denied, 539 U.S. 958 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 51

Jermyn v. Horn, 266 F.3d 257 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Johnson v. Bagley, 544 F.3d 592 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Johnson v. Bagley, 544 F.3d 592 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 87, 107, 111, 115

Johnson v. Zerbst, 304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

Jones v. Polk, 401 F.3d 257 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177, 178

Jones v. United States, 526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207, 225

Keeble v. United States, 412 U.S. 205 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

Kimmelman v. Morrison, 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Kubat v. Thieret, 867 F.2d 351 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . 79, 93

Kyles v. Whitley, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Lafferty v. Cook, 949 F.2d 1546 (10th Cir. 1991),
     cert. denied, 504 U.S. 911 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Lambright v. Schriro, 490 F.3d 1103 (9th Cir. 2007),
     cert. denied, 128 S. Ct. 882 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Lankford v. Idaho, 500 U.S. 110 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

Leonard v. Michigan, 256 F. Supp. 2d 723 (W.D. Mich. 2003) . . . . . . . . . . . . . . . . . . . 84, 85

Lindstadt  v. Keane, 239 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Lockhart v. Fretwell, 506 U.S. 364 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Lockhart v. McCree, 476 U.S. 162 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200, 204

Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Malicoat v. Mullin, 426 F.3d 1241 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Marshall v. Hendricks, 307 F.3d 36 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Martin v. Grosshans, 424 F.3d 588 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 75, 81, 97, 100

Mason v. Hanks, 97 F.3d 887 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

Mason v. Mitchell, 543 F.3d 766 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Massaro v. United States, 538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Mattox v. United States, 146 U.S. 140 (1892) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227, 228

Mayfield v. Woodford, 270 F.3d 915 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

McCleskey v. Kemp, 482 U.S. 920 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

McCracken v. Gibson, 268 F.3d 970 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

In re McDonald, 514 F.3d 539 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984) . . . . . . . . . . . . . . . . 227

McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 187

Media v. California, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

Mejia v. City of New York, 119 F. Supp. 2d 232 (EDNY 2000) . . . . . . . . . . . . . . . . . . . . . . . 147

Mickens v. Taylor, 535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Miles v. Stainer, 108 F.3d 1109 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 551109

Miller v. Anderson, 255 F.3d 455 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 84, 85, 86

Miller v. Anderson, 268 F.3d 485 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Miller v. Senkowsky, 268 F. Supp. 2d 296 (E.D. N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . 84, 85, 86

Mitchell v. Gibson, 262 F.3d 1036 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Mooney v. Holohan, 294 U.S. 103 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Moore v. Illinois, 408 U.S. 786 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38, 109

Moore v. United States, 432 F.2d 730 (CA3 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Morgan v. Illinois, 504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Mullaney v. Wilbur, 421 U.S. 684 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 197

Murray v. Carrier, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148, 159, 164, 246

Norhrup v. Trippett, 265 F.3d 372 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Nuckols v. Gibson, 233 F.3d 1261 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

O'Bryan v. Estelle, 714 F.2d 365 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

O'Neal, 513 U.S. at 437. [,O'Neal v. McAninch, 513 U.S. 432 (1995).] . . . . . . . . . . . . . . . . . 131

Odle v. Woodford, 238 F.3d 1084 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Outten v. Kearney, 464 F.3d 401 (3rd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110, 111

Owens v. United States, 387 F.3d 607 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Parker v. Dugger, 498 U.S. 308 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Patton v. Mullin, 425 F.3d 788 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Pavel v. Hollins, 261 F.3d 210 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 86, 106

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170, 173

Peltier v. Booker, 348 F.3d 888 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162, 163

Pennsylvania v. Ritchie, 480 U.S. 39 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Penry v. Johnson, 532 U.S. 782 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 173, 199

Phaneuf v. Fraiken, 448 F.3d 591 (2nd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 143

Phillips v. Woodford, 267 F.2d 966 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Polk County v. Dodson, 454 U.S. 312 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Porter v. McCollum, ___ U.S. ___, 130 S. Ct. 447 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Powell v. Alabama, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Powell v. Collins, 332 F.3d 376 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128, 130, 131

Profitt v. Waldron, 831 F.2d 1245 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Ramonez v. Berghuis, 490 F.3d 482 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Remmer v. United States, 347 U.S. 227 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Reynolds v. Bagley, 498 F.3d 549 (6th Cir.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Reynoso v. Giurbino, 462 F.3d 1099 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Richards v. Quarterman, 566 F.3d 553 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Richey v. Bradshaw, 498 F.3d 344 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Riggins v. Nevada, 504 U.S. 127 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177, 214, 219

Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 207, 208, 210, 225

Roche v. Davis, 291 F.3d 473 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185, 239

Rock v. Arkansas, 483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Rodriguez v. Hoke, 928 F.2d 534 (2d Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Roe v. Flores-Ortega, 528 U.S. 470 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Rojem v. Gibson, 245 F.3d 1130 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

Romano v. Gibson, 239 F.3d 1156 (10th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Rompilla v. Beard, 545 U.S. 374 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Roper v. Simmons, 543 U.S. 304 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229, 231, 232

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 200

Sassounian v. Roe, 230 F.3d 1097 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Schmuck v. United States, 489 U.S. 705 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Scott v. Mullin, 303 F.3d 1222 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 76

Sechrest v. Ignacio, 549 F.3d 789 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Seidel v. Merkle, 146 F.3d 750 (9th Cir. 1998),
     cert. denied, 525 U.S. 1093 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Silva v. Woodford, 279 F.3d 825 (9th Cir.),
     cert. denied, 537 U.S. 942 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Singh v. Prunty, 142 F.3d 1157 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Skaggs v. Parker, 235 F.3d 261 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Skipper v. South Carolina, 476 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 238

Smith v. Gibson, 197 F.3d 454 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Smith v. Phillips, 455 U.S. 209 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

Smith v. Roberts, 115 F.3d 818 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Snowden v. Singleterry, 135 F.3d 732 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 82, 97

Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Steidl v. Fermon, 494 F.3d 623 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Steinkuhler v. Meschner, 176 F.3d 441 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Stewart v. Wolfenbarger, 468 F.3d 338 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . 51, 61, 69, 90

Stouffer v. Reynolds, 214 F.3d 1231 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Strickler v. Greene, 527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149, 151, 160

Sullivan v. Louisiana, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

Tanberg v. Sholtis, 401 F.3d 1151 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Taylor v. Kentucky, 436 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Taylor v. Workman, 554 F.3d 879 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 196

Tennard v. Dretke, 524 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Tennard v. Dretke, 542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 150

Thomas v. Goldsmith, 979 F.2d 746 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Thompson v. Wainwright, 787 F.2d 1447 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Thornburg v. Mullin, 422 F.3d 1113 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 173, 246

Tumey v. Ohio, 273 U.S. 510 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Turner v. Duncan, 158 F.3d 449 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Turrentine v. Mullin, 390 F.3d 1181 (10th Cir. 2004),
    cert. denied, 545 U.S. 1106 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192, 197

United States v. Abeyta, 27 F.3d 470 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

United States v. Agurs, 427 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 159

United States v. Antone, 603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

United States v. Bagley, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151, 152

United States v. Baker, 432 F.3d 1189 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

United States v. Barrett, 469 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

United States v. Barrett, 496 F.3d 1079 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 177, 243

United States v. Beeks, 224 F.3d 741 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Benally, 146 F.3d 1232 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

United States v. Bernal-Obeso, 989 F.2d 331 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Biswell, 700 F.2d 1310 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

United States v. Blakely, 14 F.3d 1557 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Bridwell, 583 F.2d 1135 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

United States v. Brooks, 161 F.3d 1240 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

United States v. Broomfield, 201 F.3d 1270 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Bruce, 458 F.3d 1157 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

United States v. Burbage, 365 F.3d 1174 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 238

United States v. Burrows, 872  F.2d 915 (9th Cir. 1989)  . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 109

United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 194, 205

United States v. Cherry, 433 F.3d 698 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

United States v. Cheska, 202 F.3d 947 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Cook, 45 F.3d 388 (10th Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233, 234

United States v. Correas, 419 F.3d 151 (2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

United States v. Cronic, 466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 53

United States v. Davenport, 753 F.3d 1460 (9th 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Davis, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001) . . . . . . . . . . . . . . . . . . . . 199

United States v. Davis, 766 F.2d 1452 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

United States v. Davis, 960 F.3d 820 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

United States v. Dawkins, 17 F.3d 399 (D.C. Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 143

United States v. Durham, 287 F.3d 1297 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 182, 186

United States v. Ferra, 900 F.2d 1057 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

United States v. Foree, 43 F.3d 1572 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 143

United States v. Fulcher, 250 F.3d 244 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

United States v. Fuller, 938 F. Supp. 731 (D. Kan. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

United  States v. Garcia-Guizer, 160 F.3d 511 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Ghane, 490 F.3d 1036 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

United States v. Giovanelli, 945 F.2d 479 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

United States v. Hall, 113 F.3d 157 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 144

United States v. Haney, 318 F.3d 1161 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

United States v. Henandez, 975 F.2d 1035 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

United States v. Hernandez, 94 F.3d 606 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

United States v. Hernandez-Rodriguez, 443 F.3d 138 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . 163

United States v. Hill, 799 F. Supp. 86 (D. Kan. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Hogue, 827 F.2d 660 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

United States v. Honken, 378 F. Supp. 2d 1040 (N.D. Iowa 2004) . . . . . . . . . . . . . . . . . . . . . 199

United States v. Humphrey, 208 F.3d 1190 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 98, 193

United States v. Joe, 8 F.3d 1488 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

United States v. Johnson, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

United States v. Jones, 336 F.3d 245 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

United States v. Kauffman, 109 F.3d 186 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

United States v. Kennedy, 64 F.3d 1465 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 126, 133

United States v. Kennedy, 131 F.3d 1371 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

United States v. Kojayan, 8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

United States v. Kreutzer, 61 M.J. 293 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 134

United States v. Libby, 429 F. Supp. 2d 1 (D. D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

United States v. Lofton, 776 F.2d 918 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 197

United States v. Manning, 23 F.3d 570 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Martinez-Medina, 279 F.3d 105 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 169

United States v. Miller, 753 F.2d 1475 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 143

United States v. Morales-Quinones, 812 F.2d 604 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 71

United States v. Novaton, 271 F.3d 968 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

United States v. Osorio, 929 F.2d 753 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

United States v. Pinto, 755 F.2d 150 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

United States v. Quintanilla, 193 F.3d 1139 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 152, 162

United States v. Ramsey, 323 F. Supp. 2d 27 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 97

United States v. Reddick, 90 F.3d 1276 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 143

United States v. Resko, , 3 F.3d 684 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226, 228

United States v. Rich, 580 F.2d 929 (9th Cir.),
       cert. denied, 439 U.S. 935 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166, 167

United States v. Rivera, 900 F.2d 1462 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

United States v. Rosales-Rodriguez, 289 F.3d 1106 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 219

United States v. Sands, 899 F.2d 912 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

United States v. Scafe, 822 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 195

United States v. Scheer, 168 F.3d 445 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 155, 156

United States v. Serawop, 410 F.3d 656 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

United States v. Siddiqi, 959 F.2d 1167 (2nd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

United States v. Sinclair, 109 F.3d 1527 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

United States v. Sorrells, 714 F.2d 1522 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

United States v. Soundingsides, 820 F.2d 1232 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 50, 195

United States v. Temple, 862 F.2d 821 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 74

United States v. Thomas, No. CCB-03-0150,
       2006 U.S. Dist. LEXIS 3266 (D.Md. January 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 95

United States v. Toles, 297 F.3d 959 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 243, 246

United States v. Torres, 569 F.3d 1277 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Velarde, 485 F.3d 553 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Vigeant, 176 F.3d 565 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 144

United States v. Visinaiz, 428 F.3d 1300 (10th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

United States v. Wardell, 591 F.3d 1279 (10th Cir. 2009) . . . . . . . . . . . . . . . 182, 183, 184, 186

United States v. Warner, 23 F.3d 287 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

United States v. Wood, 207 F.3d 1222 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

United States v. Young, 470 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

Viereck v. United States, 318 U.S. 236 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Village of Willowbrook v. Olech, 528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Wackerly v. Workman, 580 F.3d 1171 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Wainwright v. Witt, 469 U.S. 412 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

Walton v. Arizona, 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Ward v. Village of Monroe, 409 U.S. 57 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Washington v. Hofbrauer, 228 F.3d 689 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Watts v. Singletary, 87 F.3d 1282 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Calderon, 52 F.3d 1465 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

Williams v. Quarterman, 551 F.3d 352 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williamson v. Reynolds, 904 F. Supp. 1529 (E.D. Okl. 1995) . . . . . . . . . . . . . . . . . . . . . passim

Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Witherspoon v. Illinois, 391 U.S. 510 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . 199, 200, 204

Wood v. Georgia, 450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 141

Woodson v. North Carolina, 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . 104, 199, 200, 210

**STATE CASES**

Anderson v. State, 992 P.2d 409 (Ok. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 112, 115

Burnside v. State, 858 N.E.2d 232 (Ind. App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

Commonwealth v. Alvarez, 740 N.E.2d 610 (Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Davis v. Polk, 2007 WL 2898711 (W.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Dunkle v. State, 139 P.3d 228 (Okl. Cr. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Gordon v. Kelly, 2000 WL 145144 (6th Cir. Feb. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Horton v. Massie, 2000 WL 107386 (10th Cir. Jan.31, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 69

Jennings v. State, 744 P.2d 212 (Okl. Cr. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Mitchell v. State, 379 S.E.2d 123 (S.C.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

Patton v. State, 784 So. 2d 380 (Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 109

State v. Garner, 36 P.3d 346 (Mont. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

State v. Saunders, 958 P.2d 364 (Wash. Ct. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

State v. Talley, 702 P.2d 353 (N.M. Ct. App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

United States v. Bodkins, 2005 WL 1118158 (W.D. Va. May 11, 2005) . . . . . . . . . . . . . . . . . 199

United States v. Rodham, 2007 WL 2031705 (4th Cir. Jul. 11, 2007) . . . . . . . . . . . . . . . . . . . . 56

Williams v. State, 669 N.E.2d 1372 (Ind. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 133

Wood v. Endell, 702 P.2d 248 (Alaska App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Wrinkles v. State, 749 N.E.2d 1179 (Ind. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

**DOCKETED CASES**

Boyd v. Allen, __F.3d__, No. 07-14908 (11th Cir. Jan. 8, 2010) . . . . . . . . . . . . . . . . . . . . . . 176

Stun-Technology, Inc. v. RACC Industries, Inc., Case No. 95-268 . . . . . . . . . . . . . . . . . . . . 184

United States v. Kenneth Eugene Barrett, Case No. 6:04-CR-00115-JHP-SPS . . . . . . . . . . . . . 3

**FEDERAL STATUTES**

18 U.S.C.
   § 1112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
   § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 33, 125
   § 3006A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 33
   § 3432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 166
   § 3591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207
   § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207
   § 3592(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150, 151
   § 3593(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150, 208, 225
   § 3599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
   § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

21 U.S.C. § 848(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207, 208

28 U.S.C. § 2255(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Federal Rules of Civil Procedure 26(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Federal Rules of Criminal Procedure
   16 ( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
   31( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
   33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

Federal Rules of Evidence
   403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 74
   404(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
   608(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 63, 64
   615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
   702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93, 137
   803(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

## MISCELLANEOUS

ABA Guideline 10.8 and Commentary, 31 Hofstra L. Rev. 913, 1028
(2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

ABA Standards for Criminal Justice 4-1.2(c) (3d ed. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Barlow, David H. , Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-
Step Treatment Manual, 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Blume John H. & Johnson, Sheri Lynn , Competent Capital Representation: the Necessity
of Knowing and Heeding what Capital Jurors Tell us about Mitigation, 36 Hofstra L.
Rev.1035 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

Garvey, Stephen P., Aggravation and Mitigation in Capital Cases: What Do Jurors Think?,
98 Colum. L. Rev. 1538, 1563 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

Goodpaster, Gary The Trial for Life: Effective Assistance of Counsel in Death Penalty
Cases, 58 N.Y.U. L. Rev. 299 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

The ABA Model Code of Professional Responsibility EC 5-23 (1980),
quoted in Wood, 450 U.S. at 270 n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

---

**PETITIONER'S BRIEF IN SUPPORT OF
SECOND AMENDED § 2255 MOTION
AND IN SUPPORT OF
PETITIONER'S MOTION FOR EVIDENTIARY HEARING
AND MOTION FOR RECORD EXPANSION**

---

## I.    Introduction

### A.    Statement Regarding Form

This brief is being filed pursuant to the Court's order filed October 7, 2009 (Doc. 81).  In keeping with the Court's description of the reasons for requiring Mr. Barrett to file a second amended petition on the form created for petitioners filing *pro se* this brief provides the legal support for the grounds set forth in that amended petition.  As stated in Mr. Barrett's prior filing (Doc. 94), pursuant to the Court's statements at the hearing held October 6, 2009, Mr. Barrett's First Amended § 2255 Motion is a valid pleading.  (Doc. 70.)  Mr. Barrett does not waive or abandon any basis for relief set forth in his First Amended § 2255 Motion.  However, as the Court has indicated it may not look further at the First Amended § 2255 Motion, Mr. Barrett repeats in this brief the introductory summary of argument from that pleading.  In other respects,

this brief supplements the legal grounds for relief set forth in the Second Amended § 2255 Motion.  (Doc. 95.)

As shown in Mr. Barrett's previous objections (Doc. 94), the procedure being used in this case is not the norm for cases in the Eastern District or elsewhere.  Mr. Barrett and his counsel have made every effort to ensure this brief meets the Court's expectations and requirements.  However, those requirements and expectations remain unclear.  In preparing this brief based on the October 7 Order and the hearing transcript, counsel understand that the Court intends for them to rely upon the facts set forth in the Second Amended § 2255 Motion (Doc. 95), upon the unsealed exhibits filed with the First Amended § 2255 Motion, and upon the redacted exhibits being filed contemporaneously with this brief.  Therefore, this brief assumes the reader is familiar with those facts, and the record and exhibits documenting them, and the absence of a fact or reference to a fact from this brief should not be construed as a waiver or forfeiture of any previously asserted basis for relief.

The arguments set forth in this brief are incomplete.  On January 12, 2010, the Court issued an order that enjoins Mr. Barrett's counsel from speaking publicly about certain evidence that supports Mr. Barrett's claims.  That evidence was disclosed, in whole or in part, to Mr. Barrett's counsel on January 28, 2010.  On February 11, 2010, Mr. Barrett filed a motion seeking to continue the briefing schedule so that he could seek relief from that injunction, investigate the newly discovered evidence, and amend his claims accordingly.  The Court has set the motion for hearing on a date after this brief is due.  The outcome of that hearing will affect the supplemental and additional merits briefing to be filed in support of Petitioner's claims.

In addition, Mr. Barrett respectfully submits this brief in support of his motion for an evidentiary hearing pursuant to 28 U.S.C. § 2255(b) and to expand the record pursuant to Rule 7 of the Rules Governing § 2255 Proceedings.

References to prior proceedings are as follows:

- References to the consecutively paginated trial transcripts:  R. *xxx*;

- References to hearing transcripts not consecutively paginated with the trial transcripts:  Tr. [date] Hr'g at *xxx*;

- References to documents filed with the court such as pleadings, motions, and orders cite the docket number for *United States v. Kenneth Eugene Barrett*, Case No. 6:04-CR-00115-JHP-SPS:  Doc. *xxx*

- References to the two state trials:  1st St. Tr. Tx at *xxx*, and 2nd St. Tr. Tx at *xxx*;

- References to the exhibits to the First Amended § 2255 Motion:  Exhibit *xx* (an index to the exhibits appears in Appendix B to that Motion);

- All other references are self-explanatory or based on the Blue Book.

### B.     Summary of Argument

Kenneth Eugene Barrett would not and did not intentionally kill Trooper David "Rocky" Eales.  Mr. Barrett defended himself from an unannounced attack on his home and his teenage son by individuals who failed to announce that they were law enforcement officers.  In recognition of these facts – although without the benefit of the evidence presented through this Petition – a jury of Oklahoma citizens acquitted Mr. Barrett of the murder for which he now sits on death row.  This Petition shows the Government succeeded in overturning that result through an unfair trial in this Court, a trial characterized by judicial misconduct, ineffective defense

representation (a product both of a failure to perform according to prevailing professional norms and judicial interference), the withholding of truthful information that would have impeached the Government's key witnesses, and other forms of misconduct by prosecutors and law enforcement officers. Mr. Barrett is a mentally ill, traumatized man under sentence of death for a death that, though tragic, was not murder.

In order to improve their chances of obtaining the desired result, the Government loaded the dice with seven drug-addict informants who were nowhere to be found during the five years Mr. Barrett's state case was pending, but who materialized at the last minute to provide the prosecution with much needed and inadmissible "evidence" of intent. A number of these noxious characters dutifully marched to the witness stand to recite "statements" from Mr. Barrett that he threatened to kill any law enforcement officer who stepped on his property. Some of these witnesses also sought to portray Mr. Barrett as a drug manufacturer, even though no drug lab was found on his property when it was searched after Trooper Eales was tragically killed.

In handling these witnesses, the Government used a carrot and stick approach. To get them to toe the mark, the Government employed intimidation and threats with at least two of them, Travis and Cindy Crawford. This strong-arm tactic was headed up by disgraced former Assistant United States Attorney David Michael Littlefield, who was charged in 2007 with beating his children, and whose has been reprimanded by the Oklahoma Supreme Court as a result of his child abuse case.

The carrot was undisclosed deals only vaguely hinted at during trial, or concealed altogether, and only consummated at or after the conclusion of Mr. Barrett's trial. The big winner in the snitch sweepstakes was Charles "Monk" Sanders, an eighteen-time (at least) convicted felon who was the alleged "C.I." for corrupt Drug Task Force officer Clint Johnson's

search warrant for Mr. Barrett's residence, which set this entire tragedy in train.  Sanders, who was permitted by Seqouyah County officials to run riot despite an almost unending series of convictions, saw any future jail time evaporate, had "split sentences" he never should have received in numerous felony cases reduced to straight *unsupervised* probation, and was even excused from paying any costs or fines in his cases, all courtesy of the Government and state prosecutors after he testified at Mr. Barrett's trial.

Others were also rewarded for their testimony.  Karen Real, who, at the time of her testimony was serving a fourteen-year federal sentence in a drug manufacturing and firearms case, saw her sentence reduced to time served on the Government's Rule 35 motion shortly after Mr. Barrett was convicted and sentenced to death.  Brandie Zane Price, a convicted felon who was depicted as having been delivered from her drug addiction at the time she testified against Mr. Barrett, was later charged in the Eastern District with being a member of a wide-ranging drug conspiracy.  In the indictment filed against her and others, Price was charged with having started her participation in the drug conspiracy just a few short weeks after Mr. Barrett was formally sentenced.  Randy Turman, a methamphetamine manufacturer who had a pending six-count drug case hanging over his head at the time he testified against Mr. Barrett, falsely testified on cross-examination that his case had "done been taken care of," when, in fact, it had not.  The Government surely knew Turman was lying, but sat silently and allowed him to perjure himself, in derogation of its duty to correct false testimony.  In 2007, after being inactive for years, Turman's case was dismissed by Sequoyah County prosecutors "in the interests of justice."

The Government knew it still had a shaky edifice on its hands.  With sufficient time and a competent defense investigation, it would take but a few prods for the whole ramshackle thing to come crashing down.  In order to prevent or forestall any effective investigation by the defense,

the Government contrived to keep the identity of these witnesses secret for as long as possible. As the general jury qualification process in Mr. Barrett's trial began, the Government filed a spurious sealed motion to delay identifying the names and addresses of the snitch witnesses. An improper *ex parte* hearing was conducted by the Court on the motion. As the court quickly realized, the Government had zero evidence for its request; none of these witnesses were in the least bit of danger. Outside the presence of defense counsel, their Government adversaries were allowed to speak for them on the question of whether the trial had already begun, thus precluding the informants from testifying under the applicable notice statute, and what steps the Government proposed so the defense would eventually have "access" to these witnesses. The Cout recognized a lengthy continuance would likely be necessary to permit proper time for defense preparation. In passing, AUSA Littlefield revealed to the Court, but not defense counsel, that he was aware of a witness who would contradict Charles Sanders.

When the hearing was eventually unsealed and defense counsel were allowed to "participate," neither the Court nor the Government informed the defense of what had gone on behind closed doors. What had occurred was misrepresented to defense counsel. There was no reason to keep what had transpired at the hearing secret, since there was no basis for the Government's motion to begin with. Defense counsel were led down the primrose path, hastily agreeing to an arrangement whereby they would be allowed, under Government supervision, to interview the informant witnesses. However, except in one instance, these witnesses refused to speak to the defense. Having agreed to what the Government presented as a *fait accompli*, the ability of defense counsel to investigate and impeach these witnesses and to marshal independent evidence contradicting them went up in smoke. Mr. Barrett shows by his motion and this brief

that with a competent investigation, the credibility of the Government's key witnesses would have been destroyed.

The Government's tactics of secrecy, obfuscation and misdirection, exemplified by what occurred at the *ex parte* hearing, typified the prosecutors' conduct of the entire case. Mr. Barrett shows in this motion that the Government routinely violated its duties to disclose exculpatory evidence, and sponsored or knowingly allowed materially false testimony.

Well before the *ex parte* hearing, Mr. Barrett found the sledding rough in his efforts to receive what every criminal defendant in this country is entitled to as a matter of fundamental constitutional right: a fair trial. Mr. Barrett had to contend not only with prosecutors who were determined to press every fair and unfair advantage at their disposal, but the Cout as well.

From the inception of the case, the Cout demonstrated concerns with and an interest in matters inconsistent with providing Mr. Barrett competent representation. Tulsa attorney John Echols successfully represented Mr. Barrett in state court. He was obviously the best choice to defend Mr. Barrett against the late-coming federal charges. The Cout only appointed Mr. Echols as a means of saving money, and rejected the Federal Defenders' recommendations of qualified co-counsel in order to give less-qualified local counsel experience needed to form the basis for a local panel of capital attorneys. The Cout's furtherance of these interests virtually forced Mr. Echols off the case, including by withholding compensation for the budgeting investigation the Cout required Echols to undertake.

After Mr. Echols threw up his hands in frustration and withdrew from the case, more compliant counsel saw it to its predictable end. Mr. Barrett demonstrates in his motion and this brief that trial counsel, due to a combination of interference from the Cout and their own unprofessional errors and omissions, rendered ineffective assistance at the guilt/innocence stage

of trial. Counsel failed to consult any experts, or even question the purported "expertise" of Government witnesses, whose qualifications and methods the Cout recognized as lacking.

Trial counsel, in part deceived by the Cout and Government following *ex parte* communications, failed to seek a continuance to investigate the seven secret informants. Mr. Barrett shows here that even moderate investigation would have shown these witnesses were unworthy of belief.

Counsel's ineffectiveness, again for the same combination of reasons, continued into the penalty phase. Because counsel were underfunded and failed to properly prepare, the prosecution was able to portray Mr. Barrett as nothing more than a mean, common criminal from an ordinary, unremarkable background, who had simply decided to embark on the path that led him to the courtroom. Defense counsel did virtually nothing to counter the prosecution's depiction of their client, putting on a superficial and misleading mitigation case that both played right into the Government's hands and failed utterly to reveal Mr. Barrett's true character, history and background.

Mr. Barrett was and is nothing like the prosecution argued. A competent mitigation investigation would have shown the truth about him. Severe mental illness has plagued Mr. Barrett's family for generations. As shown in his motion and this brief, Kenneth Barrett has struggled with severe organic, psychiatric, psychological and intellectual impairments his whole life. This evidence would have been relevant not only in the penalty phase, but in the first stage of trial as well.

Far from being a "bad person" who came from an ordinary background and simply chose to walk a twisted road, Kenneth Barrett is the product of a woefully dysfunctional marriage, a union that was rife with alcohol and other substance abuse, mental dysfunction, chaos, emotional

and, at times, physical abuse, and infidelity. Kenneth Barrett's upbringing was anything but normal. As he struggled from birth with his genetic inheritance, he was forced to grow up in the maelstrom of chaos and neglect created by his parents. The psychological and emotional abuse his parents visited on each other as their doomed-from-the-start marriage unraveled was, from the beginning of his life, visited on him.

The numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences.

## II.     Statement of the Case

### A.     Events Leading Up to the Raid on the Barrett Home

#### 1.     Mr. Barrett's "Failure to Appear" and the Resulting Bench Warrant

In March, 1997, Mr. Barrett was charged with unlawful delivery of a controlled substance arising from the alleged sale of $25 of methamphetamine to an undercover agent. In the court proceedings for that case, Attorney Bill Ed Rogers represented Mr. Barrett until September 11, 1998, when Mr. Rogers filed a motion to withdraw from the case. There is no record of a ruling on Mr. Rogers' motion. The court docket reflects that Mr. Barrett asked the Court for an appointed attorney on December 14, 1998; however, there is no indication that the Court ever did so. There was no other activity in the case until January 19, 1999, when the docket states that "subp's issued."

The court docket indicates that on January 28, 1999, a bench warrant was issued for Mr. Barrett for "failing to appear for jury trial" on January 27, 1999. This was the only notation in the criminal docket regarding the trial for which Mr. Barrett allegedly failed to appear. The only other information about this alleged trial date was elicited at the hearing on Mr. Barrett's Motion to Suppress Evidence on January 26, 2005, prior to his federal trial. At that hearing, Sequoyah

County Court Clerk Bernell Edwards testified that Mr. Barrett's state trial for the drug case had been scheduled for January 25, 1999. However, juror records examined by Sequoyah County Court Clerk Vickie Beaty show that no citizens were summoned for jury duty on January 25, 1999 or, indeed, for the entire month of January, 1999. Accordingly, the bench warrant issued for Mr. Barrett's arrest arose from his failure to appear for a trial for which no jurors had ever been summoned.

There was never any evidence that Mr. Barrett was aware of the bench warrant. Mr. Barrett's bail bondsmen, Martin Daggs, testified that he eventually became aware of the bench warrant but never saw a need to notify Mr. Barrett about the warrant. Mr. Daggs stated that he knew where Mr. Barrett lived and he could find him if he wanted to.

### 2.     *The Search Warrant.*

Eight months after the issuance of the bench warrant, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force) prepared an affidavit for a search warrant for Mr. Barrett's residence. The affidavit asserted that a confidential informant had seen Mr. Barrett sell drugs on one occasion between September 15 and 18, 1999; that he had seen Mr. Barrett engage in other drug transactions at his house; that he had overheard Mr. Barrett say "'if the cops try to raid me they will regret it because I'm going to kill the first cop through the door'"; that Mr. Barrett had guns in his house; and, that Mr. Barrett sold drugs at night because he believed search warrants could not be served at night. (At the federal trial in 2005, law enforcement for the first time identified the confidential informant as Charles "Monk" Sanders. Sanders testified and on cross-examination denied having seen, heard, done, and said the specific things attributed to him in Johnson's affidavit.)

On September 20, 1999, a District Court Judge signed the requested search warrant which authorized law enforcement officers to conduct the search at any time of the day or night and to enter Mr. Barrett's residence without the normally required knocking and announcing their presence. Inexplicably, there did not appear to have been any discussion about simply paying a visit to Mr. Barrett, despite the fact that law enforcement had visited Mr. Barrett in the recent past and even inspected his weapons without any violence.

In any event, Johnson considered the search warrant to be "high risk" in nature and contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. Johnson met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force and would then perform the actual search of Barrett's residence. The Tact Team and Task Force were accompanied by an entourage of local dignitaries. The Tact Team allegedly decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos that were unmarked and had extra antennae removed and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.

### 3.    *September 24, 1999*.

Until late in the night of September 23 and after midnight on the September 24, Mr. Barrett and his son Toby had worked in their garage on a Camaro which Mr. Barrett had promised to Toby if he returned to high school. After they finished up around 12:30 A.M., Toby cleaned up the garage and was walking to his trailer. At that time, the five Tact Team vehicles

headed towards Mr. Barrett's residence.  What happened next was the subject of conflicting accounts by the law enforcement officers involved.

The lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Mr. Barrett's residence.  The driver, Trooper John "Buddy" Hamilton, observed Toby as he entered the private drive to the east of Barrett's residence, but continued with the execution of the no-knock warrant.  Hamilton then turned his vehicle westward towards Mr. Barrett's house and entered a deep ditch that lay between Mr. Barrett's cabin and the property to the east, and drove straight towards the house.

Toby screamed, "Dad," as the unmarked Bronco continued toward the porch.

Mr. Barrett was eating a bowl of cereal when he heard Toby yell.  He went to the doorway and saw the high-beam bright headlights coming towards his cabin from the ditch on the side of his house.  Mr. Barrett ran inside, grabbed a gun and shoved it in his waistband and went to the window.  As Mr. Barrett approached the window, he was shot in the lower portion of his body.  Mr. Barrett  grabbed his Colt Sporter rifle, to which were attached two full and one partially full magazines of ammunition, and started firing out the doorway.

The lead Bronco hit the porch of the cabin.  As it had been approaching, the second and third vehicles entered the property.  They stopped slightly behind Hamilton's vehicle.  Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Mr. Barrett's house, and yelled at Toby to get on the ground.  Trooper Darst eventually took custody of Toby Barrett and determined he was unarmed.

The shooting lasted less than thirty seconds.  At some point, Hamilton's passenger, Trooper David "Rocky" Eales, opened the front passenger door, got out of the vehicle, and began

moving towards the rear of the vehicle.  Before he arrived at the rear of the vehicle, Trooper Eales was struck by three bullets or bullet fragments.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle.  Hamilton then moved towards the rear of his vehicle.  As he did so, he was struck by a bullet in the back of the left shoulder.  When he reached the back of the vehicle, Hamilton observed Eales face down on the ground with Trooper Ricky Manion attempting to assist him.

At some point in the melee, Manion shot Mr. Barrett in the lower body.  Hamilton approached and entered the house, told Mr. Barrett to get up, and Mr. Barrett responded that he could not because he had been shot.  Hamilton, with the assistance of Troopers Manion and Steve Hash, dragged Mr. Barrett out of the house and into the front yard and beat him.  Mr. Barrett had been shot at least four times.

After unsuccessfully attempting to provide first aid to Trooper Eales, Tact Team members transported him to a local hospital, where he was pronounced dead.  A search of Mr. Barrett's property, including his house and outbuildings, failed to yield methamphetamine. The government seized items that it contended were related to the production and use of methamphetamine, including coffee filters, pseudoephedrine, ephedrine tablets, red phosphorus, and iodine.

### B.    Three Trials

#### 1.    *State Trials.*

Mr. Barrett was tried in Oklahoma state court, twice, as set out more fully in the Procedural History (Appendix A hereto).  In the first state trial, the jury was deadlocked and

could not reach a verdict. The second state court jury rejected the first-degree murder charge and instead found Mr. Barrett guilty of the lesser-included crime of first-degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Mr. Barrett guilty of the lesser-included offense of assault and battery with a dangerous weapon. The jury acquitted Mr. Barrett on the two counts of discharge of a firearm with intent to kill. Mr. Barrett did not appeal his convictions or sentences.

### 2.    Federal Trial.

Mr. Barrett's federal trial was markedly different from his state trials. In the first phase the most notable difference was the testimony of seven informants, who did not testify in either of the state trials. The identity of these snitches was not made known to the defense until after the beginning of jury selection. These snitches came forward with statements that Mr. Barrett allegedly made about "going down in a blaze of glory" and the like.

At the sentencing phase of Mr. Barrett's trial, the government presented testimony with respect to victim impact and future dangerousness. In the category of future dangerousness, the government presented the following witnesses:

1.    Stanley Philpot, a Sequoyah County reserve deputy sheriff, who testified about an incident in which he stopped Mr. Barrett in his truck and informed him of the outstanding felony warrant for his arrest. Stanley followed Mr. Barrett home, at which time Mr. Barrett allegedly stood on the porch holding a gun. Stanley called for back up but neither Mr. Barrett nor the gun could be found.

2.    Johnny Philpot, former Sequoyah County Sheriff, who testified that he was called as back up for the above incident.

3.      Cindy Crawford, who testified that Mr. Barrett allegedly held a gun to her leg because she refused to sleep with him and said that he would "fucking kill her" if she came back to his place.

4.      Charles "Monk" Sanders testified that he was present when a female friend of Mr. Barrett's received a telephone call from Mr. Barrett while he was in jail. According to Sanders's second-stage testimony, he overheard Mr. Barrett, whose voice he recognized, tell the female friend they needed to find the person who got him arrested so they could "kill that son of a bitch."

5.      Larry Lane, a Sequoyah County Sheriff's Deputy, who stated that Mr. Barrett ran a police check point and he pursued him until he ran off the road and ran away on foot.

6.      Shannon Smith, a former Sequoyah County Sheriff's Deputy, who was present at the checkpoint. Smith testified that Mr. Barrett pulled off so fast that two police officers had to jump out of the way. Smith also testified that on a different occasion he saw Mr. Barrett slapping his wife. Smith said that he told Mr. Barrett to stop and Mr. Barrett allegedly told Smith "he was going to get his gun and kill him."

With respect to victim impact, the government presented the following witnesses:

1.      William DeWeese, Rocky Eales' best friend from the Marine Corps, who testified that Trooper Eales was an outstanding person, an outstanding marine and like a brother to him.

2.      Nancy Eales Stalcup, Rocky Eales' sister, who testified that Trooper Eales was a wonderful person and a wonderful brother. Ms. Stalcup stated that Trooper

Eales' death had a deteriorating effect on her health for which she had to receive medical care.

3.      Bobbie Eales, Rocky Eales' mother, who testified about her son and read a five-page written statement into the record that described her loss and pain.

4.      Gene Hise, an Oklahoma State Highway Patrolman and good friend of Rocky Eales, who testified about informing Kelli Eales of Rocky's death and his loss and Post-Traumatic Stress Disorder since Trooper Eales' death.

5.      Kelli Eales, Trooper Eales' wife, who testified about her husband's death and the loss she has suffered.  Mrs. Eales also read into the record statements her children had written about the loss of their father.

The mitigation stage of the sentencing hearing lasted less than three days.  There was no testimony regarding Mr. Barrett's mental health.

Mr. Barrett's counsel presented the following witnesses in mitigation:

1.      Maudeen Vann, First Deputy Court Clerk, Sequoyah County, Oklahoma, who testified as to the verdict in the state trial, the 30-year sentence Mr. Barrett received and was serving and the fact that he had no prior felony record.

2.      Kathy Trotter, Mr. Barrett's cousin, who briefly testified that everyone in the family grew up with guns and used guns. She also testified that she was a process server and familiar with the legal community and had no knowledge of Mr. Barrett's involvement in violent activities other than some instances of domestic violence.

3.      Jimmy Wilson, a case manager at the Oklahoma Department of Corrections, who testified as to the actual time Mr. Barrett would serve on his

state sentence, the type of facility in which he would serve his sentence, his restrictions and his possibility of parole.

4.      Abby Stites, Mr. Barrett's former wife, who testified about their troubled marriage and that it was not all Mr. Barrett's fault; she was equally to blame.

5.      Craig Edgmon, Mr. Barrett's neighbor, who testified that Mr. Barrett was a good mechanic and worked on his car, truck and farm equipment.

6.      Clyde Edgmon, Mr. Barrett's neighbor and Craig Edgmon's father, who also testified that Mr. Barrett was a good mechanic who charged a fair price and sometimes did work for no charge.  Mr. Edgmon also testified that law enforcement (John Owens and Sandy Gerdner) came by his house when Mr. Barrett was working on Mr. Edgmon's truck and talked to Mr. Barrett for some time.  This was a very friendly exchange that took place three to six months before the raid.

7.      Robert Gude, a former jailer at the Sequoyah County Jail, who testified about the conditions at the Sequoyah County Jail and Mr. Barrett's behavior at the jail.

8.      Courtney Burke, an assistant administrator at the Sequoyah County Jail, who testified regarding Mr. Barrett's behavior while housed at the jail.

9.      Martin Daggs, a bail bondsman in Sequoyah County who had bonded Mr. Barrett out of jail on the 1997 drug case.  Daggs testified that he was aware of the bench warrant but never did anything to make Mr. Barrett aware of the bench warrant because a judgment of forfeiture had never been ordered.

10.     Steve Barrett, Mr. Barrett's brother, who testified superficially about his

and Mr. Barrett's childhood.

11.    Roger Crawford, Mr. Barrett's uncle and neighbor, who testified that Mr.

Barrett was a good father, a good son, a good neighbor and good mechanic.

12.    Gelene Dotson, Mr. Barrett's mother, who testified superficially about Mr.

Barrett's childhood, his marriage and his adult life.

13.    Ernest Barrett, Mr. Barrett's father, who testified superficially about Mr. Barrett's

youth.

14.    Doris Barrett, Mr. Barrett's stepmother, who testified that Mr. Barrett was

like a son to her.

**III.    Points and Authorities Supporting Mr. Barrett's Grounds for Relief**

**Ground 1    Actions of the Trial Court Violated Mr. Barrett's Right to Due Process, his Sixth Amendment Right to Counsel and to Cross-Examine Witnesses, and his Right to Equal Protection of the Laws, and Federal Statutes and Guidelines for the Appointment and Compensation of Counsel; the Failure of Counsel to Raise this Issue on Appeal Violated Mr. Barrett's Right to Effective Assistance of Appellate Counsel**.

In Ground 1of the Amended § 2255 Motions, Mr. Barrett describes the factual bases for

this Court to vacate his conviction or death sentence for violations of several constitutional and

statutory rules.  The facts presented therein show actions of the trial court denied Mr. Barrett a

fair trial under conditions required or routinely provided to similarly situated defendants pursuant

to 18 U.S.C. §§ 3005, 3006A, and 3599, the Judicial Conference's Guidelines for

implementation of the Criminal Justice Act, prevailing professional norms of criminal defense

practice, and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution. As he will throughout this Brief, Mr. Barrett relies upon the factual averments of

the Amended § 2255 Motions and the exhibits thereto.

At the outset, Mr. Barrett reiterates his multiple objections to the Honorable James H. Payne deciding this claim. First, Ground 1 alleges on-the-record and off-the-record actions by Judge Payne. It is improper for a trial judge to decide a claim where he is at least a potential witness to extra-record matters. Judge Payne has made himself a witness by disputing on the basis of his personal knowledge the accounts of other witnesses. Resp. Pet. Mandamus by Hon. James H. Payne, Tenth Cir. Case No. 09-7096. Second, Ground 1 contains more than mere allegations of legal error; it presents evidence on which an impartial tribunal could find interference with defense counsel and the withholding of a ruling so that the prosecution could gain a strategic advantage. These actions were undisputed in the mandamus proceedings before the Court of Appeals. Even if these actions were taken in the well-intentioned, but mistaken belief that they were proper, the Due Process Clause recognizes that judges, like all other human beings, are susceptible to cognitive biases that render unreliable decisions reflecting on their own interests.

<strong>Judicial Interference with Defense Counsel</strong>

Judicial interference with defense counsel carrying out their constitutional function as opponents of the Government violates the Sixth Amendment. *Geders v. United States*, 425 U.S. 80, 91(1976) (trial court's order prohibiting defense counsel from consulting with defendant during recess between direct and cross-examination); *Herring v. New York*, 422 U.S. 853, 863, 865 (1975) (order barring defense counsel from summing up in bench trial); *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972) (rule requiring defendant to testify before any other witnesses denied defendant benefit of counsel's advice and guidance); *Hamilton v. Alabama*, 368 U.S. 52, 55 (1961) (denial of counsel at arraignment where defenses had to be raised); *Ferguson v. Georgia*, 365 U.S. 570, 596 (1961) (where state rule made defendant incompetent to give sworn testimony,

Constitution required that counsel be permitted to guide unsworn statement).  Where such interference is shown, the "[Supreme] Court has uniformly found constitutional error without any showing of prejudice . . . ."  *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984).[1]

The facts set out in Ground 1 show the trial court acting in contravention of guidelines for the administration of the Criminal Justice Act.  Those guidelines were developed by judges and personnel from the Administrative Office of the United States Court for the purpose of implementing the statutory requirements of the Criminal Justice Act while preserving the independence of criminal defense counsel that is protected by the Fifth and Sixth Amendments.

The Supreme Court granted certiorari in *Geders v. United States* in order to resolve a split in the circuits regarding whether a defendant had to show prejudice in order to prevail on a claim that the trial court interfered with his Sixth Amendment right to counsel by preventing counsel from conferring with the defendant during a recess that coincided with the defendant's testimony. 425 U.S. at 86. The Supreme Court in *Geders* recognized the broad powers of a trial judge to control the proceedings and make discretionary rulings in the course of a trial.  425 U.S. at 86. The Court held that where these important tools of the trial court conflict with a defendant's rights, "the conflict must, under the Sixth Amendment, be resolved in favor of the right to the assistance and guidance of counsel.  *Brooks v. Tennessee*,  406 U.S. 605 (1972)."  425 U.S. at 91. The Court in *Geders* distinguished the common practice of sequestering disinterested witnesses, which the Court described with approval, from the special case of keeping a defendant from speaking with his attorney.  425 U.S. at 87.  The difference, the Court emphasized, is that an attorney must be able to gather information from the defendant and discuss the trial with him

---

[1]  Although Mr. Barrett need not show prejudice before the Court would be required to vacate his conviction based on Ground 1, Mr. Barrett can show prejudice and does so through the facts and law addressed here, and in Grounds 2, 3, and 4.

because, during even a time as brief as the seventeen hours at issue, there are "tactical decisions to be made and strategies to be reviewed." 425 U.S. at 88. The key issue is whether the trial court's action denies the defendant, even temporarily, the "'guiding hand of counsel at every step in the proceedings'" that is at the core of the Sixth Amendment right. 425 U.S. at 89, quoting *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932).

In *Herring v. New York*, the Supreme Court considered a state law giving the trial judge discretion to dispense with closing arguments in bench trials. *Herring*, 422 U.S. at 853-54. In holding that this grant of judicial discretion violated the Sixth Amendment, the Court referred to two factors. First, was the historical role of closing argument in criminal cases. 422 U.S. at 860-61. Second, the Court focused on the core function of counsel for the defense:

> The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.

*Id.*, 422 U.S. at 862. In the present case, the trial court's discretionary, administrative rulings infringed upon the core defense functions of marshaling evidence and making informed strategic and tactical decisions.

The trial court here communicated to defense counsel (a) that counsel had been selected to represent Mr. Barrett over more qualified alternatives so that he could be appointed to future capital cases; (b) that the Court disapproved of investigative expenditures such as the use of experts to assist the defense in preparing various parts of the defense, even where those resources were routinely provided to other capital defendants; (c) that the Court would involve itself in defense decision-making to an unprecedented extent by requiring the defense to justify all investigative expenditures and proposing to allow prosecutors to challenge defense experts at the

Petitioner's Merits Brief                    21                    *Barrett v. U.S.*, 09-cv-105-JHP

point where they were first requested; (d) that the Court preferred Mr. Hilfiger to Mr. Echols, and that the Court would show that preference by compensating Mr. Hilfiger at a higher rate.  Mr. Hilfiger demonstrated through words and deeds that he recognized the trial court's displeasure with defense expenditures, and responded by refusing to join Mr. Echols' efforts to obtain resources for Mr. Barrett's defense.  After Mr. Hilfiger was elevated to lead counsel, he acknowledged that he had not been familiar with the work done in preparation for the prior trials.  Mr. Hilfiger also decided to forego use of expert and investigative resources the trial court had authorized, resources of which Mr. Hilfiger thought the trial court disapproved.  The consequence of these circumstances was that Mr. Barrett's defense counsel failed to employ resources that would have supported his defense and the marshaling of mitigation evidence, and that defense counsel made innumerable tactical moves in ignorance.

The trial court's stated interest in reducing costs, in using Mr. Barrett's representation to found a panel for appointments in future capital cases, and its communications with counsel created a conflict between the Court's interests, counsel's interests and Mr. Barrett's interest in a vigorous, independent defense.  *See Wood v. Georgia*, 450 U.S. 261 (1981).

In *Wood*, the solicitor for the State of Georgia brought to the attention of the trial court and Supreme Court that the attorney for the petitioners was burdened by a conflict between his own interests and the interests of his clients.  The conflict stemmed from the attorney's fee arrangement.  He was being paid by the former employer of the petitioners. When the petitioners had been employed by the lawyer's principal, they were arrested for distributing indecent materials.  The petitioners were convicted and ordered to pay fines.  They were ordered as a condition of their probation to make installment payments, and when they failed to make those payments, there was a parole revocation hearing.  The attorney retained by the former employer

Petitioner's Merits Brief                      22                *Barrett v. U.S.*, 09-cv-105-JHP

represented the petitioners at that hearing.  The petitioners told the judge they were unable to pay and had been lead to believe their former employer, their attorney's principal, would pay the fines.  Rather than advocate that the petitioners should not be jailed, or that the conditions of their parole should be modified, the attorney challenged the constitutionality of the fines.  *Wood*, 450 U.S. at 266-67.

In *Wood* the Supreme Court acknowledged that it was unclear whether the arrangement between the petitioners' attorney and their former employer created an actual conflict.  The Court did not need to find that the former employer was withholding payment of the petitioners' fines in order to create a test case.  It was sufficient for the incentive to create such a test case to exist.  at 267-68.  Similarly, in the present case, it is not necessary for Mr. Barrett to establish that the trial court was withholding funds from the defense for any particular purpose, or that Mr. Hilfiger refused to use the few funds that were available because the trial judge disapproved and Mr. Hilfiger's appointment was to be the first of many in capital cases.  The incentive structure was clear and, as discussed more *infra*, it had an actual, negative impact on Mr. Barrett's defense.

The Supreme Court in *Wood* found that the attorney's loyalty to his employer created an incentive for the attorney not to seek all remedies available from the trial court including leniency.  *Id.* at 268 n.14  In addition, the Court found "a danger that petitioners' lawyer was influenced in his strategic decisions by . . . improper considerations" stemming from the attorney's employment.  The Court noted the widespread condemnation of payment arrangements for defense counsel where "the party paying the fees may have had a long-range interest in establishing a legal precedent and could do so only if the interests of the defendants themselves were sacrificed."  Id. at 270.

Here, Judge Payne had a long-range plan that included establishing a panel of local attorneys to handle capital cases, and establishing precedent, or not permitting capital-case considerations to override precedent, for lower rates of compensation. Judge Payne expressed in his orders and letter to counsel that he wanted to limit compensation in this capital case to rates paid for non-capital cases, despite clear authority in statute and the CJA Guidelines as well as a national practice of paying higher rates in cases where the Government seeks the defendant's execution. Mr. Hilfiger was aware that he was personally selected for appointment to this case due to Judge Payne's first long-range plan. His communications with co-counsel Echols reflect he also was aware of Judge Payne's long-range plan to keep costs low, and not to establish a precedent for the future panel of the higher costs established by precedent in other capital cases.

Judge Payne illustrated the benefits of furthering his long-range agenda. At the point where disagreements between Mr. Echols and Judge Payne came to a head, that is when Judge Payne denied funds for investigative and expert assistance that had been granted to all other similarly situated capital defendants, Mr. Hilfiger refused to join his co-counsel in advocating for resources. Mr. Echols withdrew from the case over the denial of what he considered necessary resources. Shortly before this dispute, Judge Payne had refused to compensate Mr. Echols at the highest rate offered lead counsel in a capital trial. Immediately after Mr. Hilfiger refused to support Mr. Echols' request for funds and Mr. Echols withdrew, Judge Payne increased Mr. Hilfiger's compensation to the highest rate.

Federal Death Penalty Resource Counsel, Richard Burr had provided evidence that the funds sought for Mr. Barrett's defense were well within the range of funding for other federal death penalty cases. After he was made lead counsel, Mr. Hilfiger refused to communicate with Mr. Burr. As the trial date drew near, Mr. Hilfiger requested advice from Assistant Federal

Defender Julia O'Connell about a mitigation specialist. This was one of the investigative resources Mr. Echols sought in a request with which Mr. Hilfiger had refused to join. When Ms. O'Connell advised Mr. Hilfiger to contact Resource Counsel, Mr. Hilfiger did not follow through. The record of hearings in August and September, and the recollection of Jeanne Russell shows Mr. Hilfiger's reluctance to retain a mitigation specialist was not based on knowledge of the facts. Dr. Russell relates that co-counsel Bret Smith was philosophical about her inability to serve as a mitigation specialist, saying the trial court would not fund a thorough investigation anyway. Despite invitations from the trial court, defense counsel never sought to amend the budget. These circumstances show Mr. Barrett's counsel were not exercising independent professional judgment on what was in their client's interests.

As the ABA has long recognized,

Since a lawyer must always be free to exercise his professional judgment without regard to the interests or motives of a third person, the lawyer who is employed by one to represent another must constantly guard against erosion of his professional freedom.

The ABA Model Code of Professional Responsibility EC 5-23 (1980), quoted in *Wood*, 450 U.S. at 270 n.17. The Supreme Court has explicitly applied this principal to the work of publicly funded criminal defense counsel:

[A] public defender is not amenable to administrative direction in the same sense as other employees of the State. Administrative and legislative decisions undoubtedly influence the way a public defender does his work. State decisions may determine the quality of his law library or the size of his caseload. But a defense lawyer is not, and by the nature of his function cannot be, the servant of an administrative superior. Held to the same standards of competence and integrity as a private lawyer, see *Moore v. United States*, 432 F.2d 730 (CA3 1970), a public defender works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client. "A lawyer shall not permit a person who recommends, employs, or pays him to render legal

services for another to direct or regulate his professional judgment in rendering such legal
services." DR 5-107(B), ABA Code of Professional Responsibility (1976).

*Polk County v. Dodson*, 454 U.S. 312, 321 (1981).

This is not merely a matter of professional ethics. The administrative actions of the trial

court in this case, however well-intentioned they may have been, created incentives and

disincentives that, according to participants in the defense, influenced the actions of defense

counsel in ways that harmed Mr. Barrett's ability to marshal a defense based on a reasonable

investigation and expert assistance. These unique circumstances violated "the constitutional

obligation of the [trial court] to respect the professional independence of the public defenders

whom it engages." *Polk County*, 454 U.S.at 321-22. "Implicit in the concept of a 'guiding hand'

is the assumption that counsel will be free of state control. There can be no fair trial unless the

accused receives the services of an effective and independent advocate." *Id.*, 454 U.S. at 322.

Due to the administrative actions of the trial court, and the disincentives it created, defense

counsel in this case were not informed, for example, of available grounds for cross-examination

of prosecution "expert" Iris Dalley, of grounds for presenting a mental-state defense, of evidence

that Mr. Barrett was incompetent to stand trial, and of a wealth of lay and expert mitigation

evidence.

The trial court's express limitations on investigation, including the requirement, contrary

to CJA Guidelines, that all investigative expenditures be justified after the fact, interfered with

the defense's exercise of independent professional judgment by influencing the factual bases

upon which defense counsel could make judgments. The Supreme Court and Tenth Circuit have

repeatedly recognized that counsel cannot make reasonable, independent judgments in the

absence of information that can only be obtained through inquiry and investigation. *Rompilla v.*

*Beard*, 545 U.S. 374, 390 (2004) (counsel could not have made reasonable decision regarding

penalty phase having failed to examine record of prior conviction); *Wiggins v. Smith*, 539 U.S. 510, 532-33 (2003) (counsel could not have made reasonable decision regarding mitigation after having failed to investigate evidence of sexual abuse); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (counsel could not have made reasonable decision about penalty phase closing argument after having failed to investigate defendant's background); *Kimmelman v. Morrison*, 477 U.S. 365, 387 (1986) (counsel could not have made reasonable decision regarding suppression after failing to inquire into prosecutor's duty to produce evidence absent a discovery motion); *Strickland v. Washington*, 466 U.S. 668, 691 (1984) (choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

The evidence shows Judge Payne expressed deep skepticism about the need for any additional investigation after the two state-court trials. Exh. 65. The disagreement between Mr. Echols and Judge Payne over the need for further investigation was one ground on which Mr. Echols withdrew. Mr. Hilfiger stated in his fee budget prior to Mr. Echols's withdrawal, and in his motion for a continuance after the withdrawal, that he was unfamiliar with the prior record and with the extent of the investigation that had been done during the state court proceedings. The record and extra-record evidence also shows that Mr. Hilfiger and Mr. Smith did not even attempt to review whatever mitigation evidence had been developed for the state trials until the federal trial was underway.

Mr. Barrett does not rely solely upon the *potential* impact on defense counsel's actions from the trial court's incentive and disincentive structure. *See Mickens v. Taylor*, 535 U.S. 162 (2002). Defense counsel's actions (including the conversation with Dr. Russell) show counsel was conscious of the limitations imposed by the budget, but that counsel proceeded without

seeking additional funds even to the extent that counsel presented a witness who had promised to damage Mr. Barrett's case if he could rather than consult an court-funded expert.  Regardless of the trial court's intentions, the message communicated to defense counsel was that the court would look favorably on less spending, and this message had an actual impact on counsel's performance.  For example, although the trial court authorized defense counsel to retain George Kirkham, Ph.D., an expert in police procedures, based on prior counsel's explanation that former FBI agent Chuck Choney, a friend of the victim, was hostile to the defense, trial counsel never contacted Dr. Kirkham.  See Exh. 44.  During a hearing in October 2005, defense counsel dismissed the court's questions about the budget by stating that he had not used the funds authorized for Kirkham and other experts, and said he would rely upon Choney, instead.  As he had indicated, Choney reversed his prior position on aspects of the raid and provided more evidence favorable to the prosecution than it was favorable to Mr. Barrett.  It is difficult to imagine a more concrete adverse impact than presenting a witness who had an announced bias against the defendant rather than spend CJA funds on an independent expert.[2]

The evidence presented in the Amended § 2255 Motions demonstrates that the trial court's denial of attorney time and other resources for Mr. Barrett's defense was arbitrary and capricious, and denied Mr. Barrett resources provided to other defendants in federal death penalty cases.  The trial court's actions violated Mr. Barrett's rights to due process and equal protection by treating him as "a 'class of one,' . . . intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  *See also*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

---

[2]  Mr. Barrett's defense counsel never contacted Dr. Kirklham.  Therefore the decision to rely upon the biased Choney could not have been based on an informed judgment about their relative strengths or weaknesses.

Imposition of the death penalty through such an arbitrarily skewed process violates the Eighth

Amendment's prohibition on cruel and unusual punishment.

**Lack of Judicial Impartiality**

The fair trial guarantees of the Due Process Clause of the Fifth Amendment encompass a

litigant's right to have "a neutral and detached judge" preside over judicial proceedings. *Ward v.*

*Village of Monroe,* 409 U.S. 57, 62 (1972). This right includes a factfinder without either actual

bias or the appearance of bias. *In re Murchison,* 349 U.S. 133, 136 (1959). This constitutional

guarantee is sufficiently important that its denial is not subject to the harmless error rule. *See,*

*e.g., Tumey v. Ohio,* 273 U.S. 510 (1927); *Bracy v. Schomig,* 286 F.3d 406, 414 (7th Cir. 2002).

The trial court took actions and withheld action in violation of the Code of Judicial

Conduct and that demonstrated the judge was not impartial. "No matter what the evidence

against (a defendant), he had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510,

535 (1927). Partiality on the part of a judge in a civil appeal violates due process. *Aetna Life*

*Insurance Co. v. Lavoie*, 475 U.S. 813 (1985). The Supreme Court has "emphasized the special

importance of fair procedure" in death penalty cases, including giving adequate notice to the

defense of the judge's plans. *Lankford v. Idaho*, 500 U.S. 110, 125 (1991), quoting and citing,

*Gardner v. Florida*, 430 U.S. 349, 357 (1977). The trial judge's conduct violated Mr. Barrett's

rights under the Fifth and Fourteenth Amendments.

In order to establish a due process violation based on judicial bias, Mr. Barrett must show

the trial judge took actions adverse to his interest that were not based on legitimate concerns. *See*

*Bracy v. Gramley*, 520 U.S. 899 (1997). In *Bracy*, the judge who presided over the petitioner's

trial was convicted of taking bribes to fix the trials of other criminal defendants. Bracy alleged

that the judge's misconduct on behalf of those defendants who did bribe him "induced a sort of

compensatory bias" against those who did not so the authorities would not suspect the judge of being soft on all defendants. *Bracy*, 520 U.S. 905. This compensatory bias was manifest in numerous discretionary rulings the judge made. *Ibid.* The Supreme Court found, "difficulties of proof aside, there is no question that, if it could be proved, such compensatory, camouflaging bias on [the judge's] part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment." *Ibid.*

In *Tumey v. Ohio*, 273 U.S. 510 (1927), the Supreme Court invalidated the judgment rendered against a man convicted of violating a prohibition law. *Tumey* is generally cited for the proposition that due process is violated when the judge presiding over a cause has a personal pecuniary interest in the outcome. However, the Supreme Court held "the pecuniary interest of the mayor in the result of his judgment is not the only reason for holding that due process of law is denied to the defendant here." *Tumey*, 273 U.S. at 532. The Court held Tumey's due process rights also were violated due to the mayor's fiduciary interest in protecting and providing for the *public* fisc by convicting defendants. *Id.* at 532-33.

In Mr. Barrett's case, the facts show at least two ways in which the trial court demonstrated a lack of impartiality and made administrative or discretionary rulings, or withheld such rulings to Mr. Barrett's disadvantage and without a legitimate legal basis. As shown in the Amended § 2255 Motions, the trial court ignored, knowingly violated, or threatened to ignore numerous aspects of the Criminal Justice Act ("CJA"), the Judicial Council's Guidelines for administering the CJA, federal judicial practice in administering the CJA, and 18 U.S.C. § 3599. Mr. Echols, the local Federal Defender, and trial counsel Smith all have commented upon the extraordinary extent to which the trial judge's concern over the public fisc impeded the defense.

The CJA and CJA Guidelines were constructed to prevent concern over the fisc from crossing the line into interference with the defense's ability to function as the prosecution's adversary.

As argued *supra*, the trial judge's deviations from the CJA Guidelines and standard practice in federal death penalty cases also communicated to defense counsel that resources were not available and that the court would show favor towards defense counsel if he did not use those resources that were made available. But the trial judge manifested a lack of impartiality in other, more direct ways.

The record shows the trial judge participated in an *ex parte* hearing with prosecutors then misrepresented to defense counsel what occurred during the hearing. Thereafter, the trial judge took actions, and withheld judicial action in ways that the judge knew inured to the benefit of the prosecution and to the disadvantage of Mr. Barrett's dissent. Although the trial judge, during the *ex parte* hearing found the government presented insufficient grounds for delaying the release of witness names as required by 18 U.S.C. § 3432, the judge withheld judgment on the government's motion for a protective order while prosecutor's secured concessions from the defense. Although the judge stated during the *ex parte* hearing that the defense would have cause for a continuance based on the number of witnesses and their importance to the prosecution's case, the judge never communicated that information to the defense. In the post-conviction process, defense counsel has stated that he believed the trial judge would not grant a continuance. Additionally, although the trial judge recognized in the government's *ex parte* proffer that the withheld witnesses would testify to alleged prior bad acts of the defendant, the judge (a) permitted the prosecutor to make *ex parte* arguments against disclosure of that testimony, (b) misrepresented the content of the hearing by omitting reference to that discussion, and (c) stood

by while the prosecution delayed disclosures and the defense failed to object at trial to the testimony.

The trial judge's withholding from defense counsel of all the matters discussed in the *ex parte* hearing violated clearly established norms of judicial conduct.  Similar to the American Bar Association's Model Code of Judicial Conduct ("Model Rules"), the Code of Conduct for United States Judges ("Code of Conduct") provides:

> A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law.  Except as set out below, a judge should not initiate, permit, or consider ex parte communications, or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers.  If a judge receives an unauthorized ex parte communication on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested.  A judge may:
>
> (a) initiate, permit, or consider ex parte communications as authorized by law;
>
> (b) when circumstances require it, permit ex parte communication for scheduling, administrative or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;

Canon 3 Rule 4(a)(b);  *Cf.* Model Rules, Canon 2, Rule 2.9.[3]  The trial judge's failure to disclose all the matters discussed in the September 13, 2005 *ex parte* hearing violated  this rule.

As in *Bracy*, there can be no question that the trial judge's withholding of rulings and statements required by the Code of Judicial Conduct violated Mr. Barrett's right to due process of law.  This case is distinguishable, however, in that there is abundant evidence of the violation.  At a minimum, the files and records do not conclusively demonstrate that Mr. Barrett is entitled

---

[3]  Petitioner cited this Rule in his Motion to Disqualify and it is this Rule that Judge Payne addressed in his opinion.  For purposes of Judge Payne's disqualification, the Code of Conduct controls but is in all relevant ways effectively the same as the Model Rules.

Petitioner's Merits Brief                              32                              *Barrett v. U.S.*, 09-cv-105-JHP

to no relief.  Therefore, this Court should order an evidentiary hearing on sufficient notice so that

Mr. Barrett's counsel may make use of discovery and subpoenas to marshal all available

evidence.  R. Gov. § 2255 Proc. 8(c).  The trial judge should recuse himself from that hearing.

*Dzurgiot v. Luther*, 897 F. 2d 1222, 1227 (1st Cir 1990) (judge who presided at trial may

determine if evidentiary hearing is necessary but different judge should conduct evidentiary

hearing); *Halliday v. United States*, 380 F. 2d 270, 274 (1st Cir. 1967) (pre-section 2255 Rules

decision mandating assignment of section 2255 motion to judge other than trial judge, except

when difficult to do so because, for example, there is only one judge in district).  Following the

hearing, this Court should vacate the judgment against Mr. Barrett and order a new trial before a

different judge.

**Ground 2.    Mr. Barrett was Denied Effective Assistance of Counsel as Guaranteed by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution.**

Review of Ground 2 is governed by the familiar two-part standard set forth in *Strickland*

*v. Washington*, 466 U.S. 668 (1984), and its progeny: deficient performance and prejudice.

### 1.    *The Test for Deficient Performance.*

"The Sixth Amendment . . . envisions counsel's playing a role that is critical to the ability

of the adversarial system to produce just results.  An accused is entitled to be assisted by an

attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is

fair." *Strickland*, 466 U.S. at 685.  In general terms the Supreme Court has said that "[t]o

establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell

below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003),

quoting *Strickland*, 466 U.S. at 688.  Defense counsel may fail to perform according to Sixth

Amendment standards when they "undermine[] the proper functioning of the adversarial process." *Strickland*, at 686.

Beyond these general terms the Supreme Court has consistently relied upon codified and judicially recognized duties of counsel as guides to judging the reasonableness of attorneys' performance "'under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521, quoting *Strickland*, 466 U.S. at 688. The evidence proffered with Mr. Barrett's petitions shows that the attorneys who represented him at trial failed to follow these norms in numerous ways. At a minimum, an evidentiary hearing is required because the proffered evidence and the files and records of the case do not conclusively show that Mr. Barrett is entitled to no relief under *Strickland*'s standards.

*Strickland* requires that "a court deciding and actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Courts, including the Supreme Court, have repeatedly recognized that *Strickland*'s focus means that "[j]ust as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990), citing *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).[4]

---

[4] The Supreme Court has rejected efforts to portray a trial attorney's conduct as the product of a strategic decision because, when considered in light of the surrounding circumstances, the alleged strategy "resemble[d] more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations." *Wiggins v. Smith*, 539 U.S. 510, 526-527 (2003). Other courts have long been in accord. *See, e.g., United States v. Burrows*, 872

Because the focus of the Sixth Amendment claim is on the functioning of the adversarial process, *Strickland*, 466 U.S. at 686, reviewing courts should make "every effort to view the facts as a *defense* lawyer would have at the time." *Rompilla v. Beard*, 545 U.S. 374, 386 (2005) (emphasis added).

The Supreme Court has explained that a reviewing court generally should "assess counsel's overall performance throughout the case in order to determine whether the identified acts or omissions overcome the presumption that a counsel rendered reasonable professional assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1985) (internal quotations from, and citations to, *Strickland* omitted). This includes an examination of counsel's performance both "before and at trial." *Ibid.* It is not necessary for Mr. Barrett to show that his counsel completely failed to act as the prosecution's adversary; even a single objectively unreasonable act or omission may establish grounds for relief. *Fisher v. Gibson*, 282 F.3d 1283, 1306-07 (10th Cir. 2002).

The Supreme Court has cautioned against any "checklist" or "detailed rules for counsel's conduct" because they would "interfere with the constitutionally protected independence of counsel," and "distract counsel from the overarching mission of vigorous advocacy of the defendant's cause." *Strickland*, 466 U.S. at 688-689. At the same time, the Supreme Court has

---

F.2d 915, 918 (9th Cir. 1989) (holding district court committed reversible error by assuming trial counsel made a strategic decision although there was no evidentiary support for the assumption); *Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002) ("it is not the role of a reviewing court to engage in a *post hoc* rationalization for an attorney's actions . . . or engage in Monday morning quarterbacking"); *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999) ("Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all"); *Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355, 1358 (4th Cir. 1992) (citing *Strickland* and *Kimmelman* for proposition that "courts should not conjure up tactical decisions an attorney could have made, but plainly did not"); *Patton v. State*, 784 So.2d 380, 387 (Fla. 2000) (same as *Burrows*).

Petitioner's Merits Brief                    35                    *Barrett v. U.S.*, 09-cv-105-JHP

identified certain basic duties that must be met in every case.  First is "the duty of loyalty, perhaps the most basic of counsel's duties," *id.* at 692, which includes "a duty to avoid conflicts of interest."  *Id.* at 688.  Additionally, counsel have

> ...the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.  Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.

*Id.* at 688.  Criminal defense counsel have a "duty to investigate," *id.* at 690, and capital defense counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 523, quoting *(Terry) Williams*, 529 U.S. at 396.  This investigation must precede and inform counsel's actions, and "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports limitations on investigation."  *Strickland*, 466 U.S. at 690-91.  Included in the duty to investigate is the common-sense "notion that defense counsel must obtain information that the [prosecution] has and will use against the defendant," and investigate that information. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

### 2.      *The test for prejudice.*

Mr. Barrett "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A reasonable probability is less than a preponderance.  *Strickland*'s standard does not require to Mr. Barrett to "show that counsel's deficient conduct more likely than not altered the outcome in the case."  *Id.* at 693.  Claims such as Mr. Barrett's do not implicate the prejudice standard of *Lockhart v. Fretwell*, 506 U.S. 364, 369-370 (1993).  *(Terry) Williams*, 529 U.S. at 393.

> The question is not whether counsel's ineffectiveness must be demonstrated by showing the trial would have resulted in a defense verdict, but whether the omitted evidence "creates a reasonable doubt that did not otherwise exist." *See United States v. Agurs*, 427 U.S. 97, 112 (1976). Upon such a showing, constitutional error has been committed. *Id.* In this case, it cannot be fairly said that the omissions and failures of trial counsel, while argumentatively explainable, do not raise a reasonable doubt in the guilty verdict.

*Stouffer v. Reynolds*, 214 F.3d 1231, 1234-35 (10th Cir. 2000) (parallel citations and footnote omitted). *See also Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001) ("we think the chance of an acquittal would still have been significantly less than 50 percent; but it would not have been a negligible chance, and that is enough to require us to conclude that the lawyer's errors of representation were, in the aggregate, prejudicial") (citing *Strickland*, 466 U.S. at 694, and other authorities).

*Strickland*'s prejudice test requires the Court to consider the effects of all of trial counsels' unprofessional errors in light of "the totality of the evidence" adduced at trial and in post-conviction proceedings. *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 536; *(Terry) Williams*, 529 U.S. at 397. This Court must consider that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Strickland*, at 695-696.

Determinations of prejudice require a cumulative assessment of counsels' errors: "Taking the unaffected findings as given, and taking due account of the effect of the errors on the remaining findings, a court making a prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696; *Fisher v. Gibson*, 282 F.3d 1283, 1307-11 (10th Cir. 2002).[5]

---

[5] Accord *Wackerly v. Workman*, 580 F.3d 1171, 1176 (10th Cir. 2009); *Sallahdin v. Gibson*, 275 F.3d 1211, 1235 (10th Cir. 2002).; *Silva v. Woodford*, 279 F.3d 825, 834 (9th Cir.), *cert. denied*, 537 U.S. 942 (2002); *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001); *Lindstadt*

Petitioner's Merits Brief                    37                    *Barrett v. U.S.*, 09-cv-105-JHP

In making that determination, the Supreme Court looks not only at the evidence trial counsel failed to uncover, but what further effort by reasonable attorneys in their role as advocates would have produced with the evidence. *Rompilla*, 545 U.S. at 391-92 (describing chain of evidence a defense lawyer at the time could have developed following reasonable investigation). *See also Kyles v. Whitley*, 514 U.S. 419, 438, 441 (1995) (reasonable-probability standard looks at cumulative effect of "disclosure of suppressed evidence to competent counsel").[6]

Lastly, the Court must "proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision" whether to convict of a particular offense, or impose a sentence of death. *Id.* at 695.

### 3.     *The Need for an Evidentiary Hearing*.

This Court is required to conduct an evidentiary hearing on Mr. Barrett's claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b).  Because the record of the trial will rarely contain sufficient information for the Court to make a determination under the *Strickland* standard, it is generally necessary to consider extra-record evidence. *Massaro v. United States*, 538 U.S. 500, 05 (2003). "The evidence introduced at trial . . . will be devoted to issues of guilt or innocence, and the

---

*v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001); *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999); *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998); *Berryman v. Morton*, 100 F.3d 1089, 1101-02 (3d Cir. 1996); *Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992); *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir.1991).

[6]The same prejudice test is applied in ineffective-assistance cases and cases of suppressed evidence. *Stouffer, supra*, 214 F.3d at 1235 n.4 ("In a constitutional context, we see no principled distinction between whether that omission results from the acts of the prosecution or an ill-prepared defense counsel.").

resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis." *Ibid.* "Particularly where, as here, it is the pretrial . . . performance of counsel as well as the performance during trial that is specifically alleged to have been inadequate, it is not sufficient that the trial judge found counsel's performance as observed in the course of trial to be adequate." *Wood v. Endell*, 702 P.2d 248, 249 (Alaska App. 1985).[7]  At a minimum, the record of the trial cannot be said to conclusively refute the evidence proffered with the Amended § 2255 Motion and the argument presented herein.  Accordingly, this Court should enter an order providing Mr. Barrett adequate notice of a hearing so that his counsel may marshal all available evidence including through the use of discovery and this Court's subpoena power. R. Gov. § 2255 Proc. 8(c).

**Ground 2, Part A(1).      Defense Counsel's Unreasonable Omissions in Reurging *Franks* Issue**

Trial counsel were professionally unreasonable for failing to adequately re-urge the motion to suppress under *Franks v. Delaware,* 438 U.S. 154 (1978) following the first stage testimony of Charles "Monk" Sanders.  Counsel's failure in this respect undermines confidence in the jury's first stage verdicts.  Because it was shown during Sanders's cross-examination that the material averments made in the search warrant affidavit to secure a night-time, no knock

---

[7] *See also Clark v. Crist*, 335 F.3d 1303, 1311-1312 (11th Cir. 2003), *cert. denied*, 540 U.S. 1155 (2004) (where petitioner raised two distinct appellate ineffective-assistance claims, and state court held hearing on the second claim but not the first, it was improper for district court to rely on counsel's testimony regarding the second claim as a basis for finding reasonable performance on the first claim); *Marshall v. Hendricks*, 307 F.3d 36, 109-10 (3rd Cir. 2002) (resolution of *Strickland* claim unreasonable because based on "generalized assumptions" from trial record); *Bryan v. Mullin*, 335 F.3d 1207, 1216 n.7 (10th Cir. 2003) (no deference due state-court rejection of *Strickland* claim where state court refused to determine facts through evidentiary hearing).

warrant[8] were false, or were made in reckless disregard for the truth, and for other reasons, all evidence seized in the search of Mr. Barrett's cabin and property was subject to suppression. *See* Ground IV. The failure to competently argue the *Franks* motion obviously undermines confidence in the outcome of the first stage of trial. Because the search warrant was defective under *Franks,* the drug-related and firearms evidence which formed the basis for each of the three counts of conviction would have evaporated, leaving nothing upon which the jury could have returned guilty verdicts.

On cross-examination, Charles Sanders, the alleged "C.I." who supplied information to secure the search warrant, repudiated virtually all the claims attributed to him by District 27 Task Force Officer Clint Johnson in the warrant affidavit. ( R. 2518-21, 2596-2601, 2608-10, 2618-23, 2625-28) Sanders's wildly conflicting testimony, the content of which seemed to depend on which lawyer happened to be questioning him at the time ( R. 2531-38), not only served to disavow the "facts" supporting probable cause, let alone probable cause for a nighttime, no-knock warrant, but showed Sanders, due to his criminal record, including criminal acts of dishonesty (or that portion of his vast criminal record was revealed at trial, *see* Ground II A (4)(c)), the deals he had received in the past (to the extent that was explored incompletely and incompetently at trial, *see* Ground II A (4)(c)), his ongoing drug use even while working as an informant, and his reputation for honesty in the community (*See* Ground II A (4)(c)) made him so thoroughly disreputable that no police officer, in good conscience, could have relied on him to secure a search warrant of any kind, against anybody. In dealing with Sanders, Clint Johnson, who himself was thoroughly corrupt (*See* Ground V B (1)), either sponsored false information or acted in reckless disregard of the truth.

---

[8] Exhibit 194.

The usefulness of an informant witness such as Sanders depends "in large measure on the degree to which he both is and can be presented to the fact-finder as a reliable person." *United States v. Bernal-Obeso,* 989 F.2d 331, 335-36 (9th Cir. 1993). But for counsel's failings, Sanders could have presented as thoroughly untrustworthy, thus collapsing the foundation for the search warrant. There was nothing in the search warrant affidavit to show that Johnson, or anyone else, had corroborated the information purportedly received from the C.I. (Sanders). *United States v. Dawkins,* 17 F.3d 399, 404 (D.C. Cir. 1994) (where an informant's tips are concerned, the task turns in large part on the independent police work corroborating – or failing to corroborate – the details of the informant's claims). For all that was revealed by the search warrant affidavit, Sanders simply could have been making the information up. *Phaneuf v. Fraiken,* 448 F.3d 591, 597-99 (2nd Cir. 2006).

Instead of arguing the vast array of reasons provided by Sanders's testimony, his background and history (which were not disclosed in the search warrant affidavit), and the circumstances surrounding his supposed involvement in the case as grounds to suppress the fruits of the search under *Franks,* the defense, as the Government was quick to point out, argued only one discrepancy in his testimony, involving Sanders's alleged sighting of a white powder he believed to be methamphetamine during one of his "visits" to Mr. Barrett's cabin. (Doc. 231.) With the argument in this posture, the trial court was quick to deny the renewed motion to suppress without a *Franks* hearing, holding not only that the ground urged by the defense was inadequate, but improperly also relying upon the testimony of the other snitch witnesses, who only surfaced years after the warrant was executed, to "corroborate" Sanders. (Doc. 235.)

Had defense counsel urged all of the many grounds for suppressing the fruits of the search warrant under *Franks*, there is no question that Mr. Barrett would have been entitled to an

evidentiary hearing. *United States v. Ferra,* 900 F.2d 1057, 1058-59 (7th Cir. 1990) (where testimony of one officer at trial appeared to contradict the essential testimony of another officer as to when the search warrant was obtained, trial court should have conducted an evidentiary hearing on a renewed motion to suppress). Here, had counsel advanced all the reasons the search warrant was defective under *Franks,* the court would have been compelled to hold a hearing, which was avoided because of counsel's unprofessional re-urging the motion to suppress.

It is also abundantly clear that had defense counsel properly argued all the grounds for suppression under *Franks,* stemming not only from Sanders's contradictory testimony, but from the facts that had been omitted from the search warrant affidavit about Sanders's criminal history, deals, and ongoing drug use[9], which Clint Johnson deliberately blinded himself to, a

---

[9] The courts have held that search warrants are ripe for a *Franks* attack where, as here, the affiant omits crucial information bearing on an informant's credibility, leaving the magistrate in the dark in appropriately evaluating the information upon which a search warrant affidavit relies. *E.g., United States v. Vigeant,* 176 F.3d 565, 573 (1st Cir. 1999) ("First, and most important, Botehlo [the affiant] neglected to mention the confidential informant's long criminal history, his numerous aliases, his recent plea agreement, and other indicia of his unreliability."); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997) (in context of *Franks* challenge, police withheld information on the confidential informant's prior convictions, as well as the fact the informant had previously falsely reported a crime); *United States v. Sorrells,* 714 F.2d 1522, 1528 (11th Cir. 1983) ("We do not however recommend or endorse omissions in the affidavit of the confidential informant's credibility or reliability."). Likewise, just as counsel failed to mount a *Franks* attack on the warrant based on Sanders's extensive criminal history, acts of dishonesty, and the numerous deals he had received due to his work as an informant, counsel failed to challenge the unadorned statement in the search warrant affidavit that Sanders had provided "reliable" information on "at least" five prior occasions, a bald statement that is entitled to little if any weight in evaluating the sufficiency of the probable cause showing. *United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996) (magistrate judge correctly concluded officer's statement that the informant had provided reliable information in the past is an unsupported conclusion which does not support a probable cause finding); *United States v. Foree,* 43 F.3d 1572, 1575-76 (11th Cir. 1995) (allegation that C.I. had provided reliable information in the past entitled to little weight); *United States v. Miller,* 753 F.2d 1475, 1480 (9th Cir. 1985) (assertion that C.I. had provided reliable information in the past was entitled to only "slight weight," since such a statement is both unclear and conclusory; there, as here, there was no showing that any information provided by the informant in the past had led to any search, arrest, or conviction, nor whether the past information was vital or merely incidental to one or more police investigations).

*Franks* challenge would have been sustained.  No legitimate strategy excuses counsel's failure in this regard.  As noted, Mr. Barrett was grievously prejudiced by counsel's omissions.  Had the evidence obtained from the search warrant been suppressed, as it should have been upon a proper, competently argued renewed motion to suppress under *Franks*, the Government would have been left with virtually no case.  *Kimmelman v. Morrison,* 477 U.S. 365, 383-91 (1985) (counsel was professionally unreasonable for failing to litigate valid Fourth Amendment claim, which may be raised under the rubric of ineffective assistance of counsel in collateral proceedings, and remand was ordered to determine prejudice); *Owens v. United States,* 387 F.3d 607, 609-11 (7th Cir. 2004) (failure to make a proper Fourth Amendment objection to the admission of evidence can support later challenge to counsel's effectiveness); *Norhrup v. Trippett,* 265 F.3d 372, 382-85 (6th Cir. 2001) (counsel ineffective for failing to pursue meritorious motion to suppress).  Here, the prejudice from counsel's failures is clear.  Counsel was ineffective for failing to professionally and thoroughly re-urge a motion to suppress based on Sanders's trial testimony and other factors bearing on his credibility.

The *Franks* issue, and counsels' failure to effectively argue it, were at least partially framed by the record.  The issue was not raised on direct appeal.  Because the issue was obviously meritorious, even with the record that was made, there could be no reasonable strategic basis for omitting it.  The failure to raise this issue was professionally unreasonable and prejudicial.  *See* Ground 18.

**Ground 2, Part A(2).**    **Trial counsel unreasonably failed to investigate and introduce evidence of eyewitnesses as well as mental impairment and illness that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense.**

> Where, as here, a defendant claiming lack of criminal responsibility has a significant medical history that appears to have contributed to the underlying mental disease or defect, competent counsel would certainly investigate the full extent of that contributing medical history.  The possibility that a defendant's mental illness could be explained and confirmed by reference to some demonstrable physical illness or injury would be of such obvious value to the defense that one would expect counsel to explore it both promptly and thoroughly.  The opportunity to present the jury with a medical explanation for the defendant's mental illness, an explanation that could both corroborate the existence of the mental disease and portray the defendant's mental illness in a sympathetic light, should not have been squandered.

*Commonwealth v. Alvarez*, 740 N.E.2d 610, 616 (Mass. 2000).

Mr. Barrett's defense counsel were on notice of at least three things that triggered a duty to investigate his mental health prior to trial.  First,  based on the prior trials and discovery, defense counsel knew the Government's theory of the case would be that Mr. Barrett anticipated a police raid, prepared for it, and intended to use deadly force if the police came to his property.  Count 3 of the superseding indictment put defense counsel on notice that the Government would attempt to prove Mr. Barrett intentionally killed a state law enforcement officer in the performance of his official duties.  (Doc. 52.)  Conviction on Count 3 could, and did result in Mr. Barrett being sentenced to death.  Docs. 258, 285.  Jury instructions on Count 3 would require findings that Mr. Barrett intentionally killed the victim, knowing or having reason to know that the victim was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties.  Doc. 240; R. 4262-64, 4266-67.

Second, medical records, statements from Mr. Barrett's family and ex-wife, and prior mental health examinations available to defense counsel from the time of their appointment

showed Mr. Barrett had a history of mental health problems.  Mr. Barrett's family and friends informed prior counsel that he had attempted suicide by shooting himself in the chest, and had progressively become more paranoid and isolated in the years prior to the raid.  Medical records corroborated the account, showed Mr. Barrett had been diagnosed at different times with Major Depression and Bipolar Disorder, and showed he had been involuntarily medicated with antipsychotic drugs, and was prescribed them for the future.  A prior forensic examination had found him to be the most paranoid criminal defendant the examiner had ever seen.  That expert also reported that Mr. Barrett showed signs of organic brain damage that should be investigated by a specialist.  Accordingly, counsel sought funds for a neuropsychological evaluation.  Doc. 50 at 8.  Defense counsel had information from various sources, including the affidavit supporting the no-knock warrant, records from Mr. Barrett's incarceration, and witness accounts, that Mr. Barrett had been a long-time drug user, including the use of methamphetamine.[10]

Third, long established case law and professional norms of criminal practice, particularly in capital cases, informed Mr. Barrett's attorneys that they should investigate these matters and secure expert assistance.  ABA Guidelines 10.7, 10.10.1, and 10.11.  Defense counsel actually informed the trial court prior to trial expert testimony on "the psychology of individual responses to sudden life or death situations * * * is essential to Mr. Barrett's capital defense, which hinges on an understanding the human mind's response * * * [and] will negate the government's allegations of premeditation and malice aforethought relating to capital punishment."  Doc. 46 at 5.  *See also* Doc. 50 at 5-6, 8.

---

[10]  The evidentiary hearing support for these facts is documented in the Amended § 2255 Motions and the exhibits thereto.  As he has elsewhere in this Brief, Mr. Barrett relies upon and incorporates by specific reference those averments and exhibits.

Despite the recognition that mental health evidence could aid the defense at both stages of trial, defense counsel failed to retain any mental health expert to review Mr. Barrett's history or examine him prior to trial. Counsel's failures to have Mr. Barrett evaluated in connection with first-stage intent or mental state issues, in light of the defense arguments made at trial respecting how the shooting occurred, constitute deficient performance. In *Wiggins v. Smith*, 539 U.S. 510 (2003), for example, the Supreme Court found constitutional error where defense counsel's statements prior to and during trial reflected a contemporaneous intention to present evidence of sexual abuse, but counsel failed to investigate available documents showing the defendant had been a victim of such abuse. *Wiggins*, 539 U.S. at 526-27.

Similarly, in *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003), the court held the result of the trial was unreliable due to defense counsel's failure to investigate and present evidence that would have established a mental state defense. *Jennings*, 290 F.3d at 1014-19. Defense counsel's failure to investigate and explore expert advice regarding a mental state defense was found to be objectively unreasonable under *Strickland* where counsel knew the defendant had been a long-time methamphetamine user, the defendant's ex-wife would have reported prior diagnoses of mental illness, the defendant had been sent for a psychiatric examination by a court, and had exhibited other mental impairments. *Id.*, 290 at 1014.

The duty of capital defense counsel to conduct a prompt and thorough investigation of the defendant's background, to provide relevant personal history records to mental health experts, and to have the defendant evaluated by mental health experts is discussed more fully in the section of this brief addressing Part B of Ground 2, *infra*.

In assessing the prejudice from counsel's deficient performance, this Court must consider

the cumulative effect of all acts and omissions of counsel found to be deficient, and the favorable evidence presented at trial. *Rompilla*, 545 U.S. at 391-92; *Stouffer v. Reynolds*, 214 F.3d at 1235 & n.4. The results of an accurate and reliable mental health evaluation – summarized in the Amended § 2255 Motions and cited exhibits – demonstrate that trial counsel's failings were prejudicial. A reasonable investigation would have revealed the following:

• Mr. Barrett's mental functioning was impaired at the time of the offense by psychiatric illness and significant brain damage, which prevented him from knowing or deliberating on the nature of his responses to the police incursion before he acted;

• at the time of the charged offenses, Mr. Barrett suffered from several major brain disorders including Bipolar Disorder, Post Traumatic Stress Disorder and damage to his brain in the areas that are necessary to exercise judgment and reasoning;

• significant functional effects of Mr. Barrett's disorders are a heightened state of fear of imminent annihilation coupled with an inability to understand or regulate his reactions – including overreactions – to perceived threats (*see generally* Exh. 117 at ¶¶ 66-78);

• Mr. Barrett's organic impairments would negatively impact his abilities to "organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment," and these disabilities are exacerbated under "conditions of complexity and/or highly stressful situations" (Exh. 89 at 24);

• Mr. Barrett has difficulty processing visual information and is abnormally subject to feelings of fear and paranoia, with consequent tendencies to impulsiveness and aggressive outbursts (Exh. 89 at 13.)

- family witnesses would have described an individual who had been mentally and emotionally troubled from childhood on; who was subject to inexplicable and wild mood swings; who was paranoid, suspicious and overly vigilant; who had suffered from deep and prolonged episodes of depression; who reacted without thinking or correctly perceiving what was going on around him; who handled stress poorly and who reacted under stress; and who retreated to a safe place when he felt threatened. (*See, e.g.*, Exhibit 103; Exhibit 96; Exhibit 97; Exhibit 98; Exhibit 93; Exhibit 86; Exhibit 81; Exhibit 99; Exhibit 74; 101; Exhibit 79.)

Had Mr. Barrett's defense counsel retained and provided background information to the mental health professionals they recognized a need for, jurors would have heard a psychiatrist testify that

> Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer. It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

> [¶]    My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment. The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats,

neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions before they occurred.

Exh. 117 at ¶¶ 76-78.

This evidence – particularly when viewed in conjunction with the available evidence impeaching the prosecution's informant witnesses, the expert evidence impeaching the prosecution's "reconstruction" of events, eyewitness accounts, and expert evidence of the raid's fatal flaws – would have supported the first stage defense of lack of intent, and the arguments that Mr. Barrett was unaware that the police were on his property and was simply reacting in the moment in a fearful and panicked state to a perceived threat by criminal trespassers would have been strengthened immeasurably. Due to Mr. Barrett's inability to correctly process information, especially visual information, it could have been argued that even if, as the police witnesses claimed, some of the automobiles which converged on Mr. Barrett's property had their emergency lights engaged, Mr. Barrett did not recognize this and instead simply reacted by firing on the vehicle which all witnesses agreed looked like an ordinary automobile. At a minimum, this evidence would have been critical in contesting the intent element of Count 3 which, as noted, required Mr. Barrett to have a specific intent to kill someone who was known to him to be a law enforcement officer engaged in official duties.

The available evidence would have created reasonable doubt as to the intent element of Count 3, and would have established the basis for a defense of not guilty by reason of insanity, as well as an instruction on lesser included offenses, at least with respect to Count 3.[11]

---

[11]    As argued in Claim 9, Mr. Barrett was denied his due process rights under the Fifth Amendment when the court failed to give a defense theory instruction, and denied requests from both the government and the defense for a manslaughter instruction.

. Tenth Circuit Pattern Instruction 2.54 outlines the elements of voluntary manslaughter under 18 U.S.C. section 1112(a), § 2. Voluntary manslaughter is murder without malice, upon a sudden quarrel (which does not apply here) or heat of passion. Homicide is voluntary manslaughter where a defendant, in a sudden heat of passion and without malice, intentionally kills the victim, or acts recklessly with extreme disregard for human life. Heat of passion is defined as passion, fear or rage in which the defendant loses normal self-control, as a result of a circumstance or circumstances that provoke such a passion in an ordinary person, but which do not justify the use of deadly force. *United States v. Scafe*, 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides*, 820 F.2d 1232, 1242 (10th Cir. 1987).

The mental state required for voluntary manslaughter would apply to all three of the counts charged against Mr. Barrett, because it negates malice altogether. E.g., *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975); *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985) ("a defendant in a federal murder case who has sufficiently raised a heat of passion defense [is] entitled to instructions informing the jury of the theory of defense and the Government's duty to prove beyond a reasonable doubt the absence of a heat of passion in order to obtain a murder conviction."); *United States v. Serawop*, 410 F.3d 656. 660-70 (10th Cir. 2005) (citing *Lofton*'s holding that in order to establish malice, the prosecution must prove the absence of a heat of passion beyond a reasonable doubt when it is an issue in the case).

Expert and lay testimony would have raised the issue that Mr. Barrett, even if he had been able to know the difference between right and wrong (which he could not) when confronted with a strange vehicle barreling onto his property and striking his porch, would not have been aware of a police presence, but simply reacted out of a passion, fear or rage in which whatever self-control

he possessed was lost, due to the circumstance of the middle-of-the-night intrusion onto his property of automobiles he could not discern as police vehicles.

As in *Jennings v. Woodford, supra*, Mr. Barrett was prejudiced by his counsel's failure to conduct a reasonable investigation and preparation of a defense that counsel themselves viewed as viable. 290 F.3d at 1015-19 (concluding undiscovered evidence would have aided defense that accused lacked the capacity to form the intent to commit first degree murder; defendant was a long-term methamphetamine addict, had previously attempted suicide and was committed to a mental hospital, otherwise had a history of self-injury, and had been diagnosed as a schizophrenic); *Seidel v. Merkle,* 146 F.3d 750, 756-57 (9th Cir. 1998), *cert. denied,* 525 U.S. 1093 (1999) (counsel ineffective for failing to investigate and produce evidence of defendant's mental problems, including PTSD, which would have served to negate malice and support self-defense claim); *Williamson v. Ward,* 110 F.3d 1508, 1518-21 (10th Cir. 1997) (counsel ineffective for failing to investigate and present evidence of defendant's extensive mental health problems, which would have assisted a claim of incompetency to stand trial and aided in a first stage mental health defense); *Stewart v. Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006) (counsel ineffective for failing to call witnesses in support of defense theory (alibi)).

Mr. Barrett shows below that trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from eyewitnesses Toby Barrett and Alvin Hahn that would have rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting. Mr. Barrett also shows that the actions of the Tact Team fell outside professional standards for law enforcement and that one aspect of the team's recklessness was the use of unprofessional procedures that minimized the chances of being recognized as law enforcement. (Exhibit 44.) In addition to

these failings, a proper mental health investigation by a qualified expert, and testimony from readily available lay witnesses who could have testified to Mr. Barrett's mental and emotional state, would have revealed that the Government's portrait of Mr. Barrett was wholly inaccurate. Rather than the intentional and remorseless killer who deliberately *acted* according to a plan to "take out" any law enforcement officer who stepped onto his property, as depicted by the Government, Mr. Barrett is in fact a severely mentally ill individual whose cognitive deficits and mental impairments caused him to *react*, without reflection or deliberation, to what he reasonably perceived was a life-threatening attack by unknown criminals.  The testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case at both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses.

Defense counsel's consultation with a mental health professional in preparation for Mr. Barrett's trial was limited to retaining Dr. Jeanne Russell of Tulsa, Oklahoma, to reprise the risk assessment she had done in preparation for a second stage proceeding in state court, and to conduct research on memory loss stemming from traumatic events.  Due to counsel's failure to conduct a proper investigation, counsel never had Mr. Barrett evaluated with the full range of psychiatric and neuropsychological testing that would have shown him to be the antithesis of the Government's picture.[12]

---

[12]     Claims 1 and 3 show that Mr. Barrett had constitutional and statutory rights to expert assistance to refute the testimony of Government witnesses.

**Ground 2, Part A(3):**           **Defense Counsel's Unreasonable Failure to Investigate and Present Evidence Showing Mr. Barrett was Incompetent to Stand Trial**

In Part A(3) of Ground 1, Mr. Barrett pleaded the factual basis for finding that his trial counsel unreasonably failed to investigate and present evidence establishing a bona fide doubt as to his competence to stand trial. Such omissions lead to circumstances in which no attorney could be expected to perform competently.[13] The failure to ensure competence presents a structural defect in the trial process because an incompetent defendant is unable to assist in his own defense. As the Supreme Court has said,

> [c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's behalf or to remain silent without penalty for doing so.[14]

Thus, the failure of Mr. Barrett's trial counsel to gather and present evidence that he experienced neuropsychological dysfunction that impaired his ability to track the proceedings exacerbated by Bipolar mania, paranoia, and the effects of Post Traumatic Stress Disorder violated Mr. Barrett's rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

### 1.     *Deficient Performance*.

One of defense counsel's unreasonable omissions prior to trial, was the failure to use funds the trial court had authorized for a background investigation and mental health evaluation. The duty of capital defense counsel to conduct a thorough investigation of the defendant's background, and to do so well in advance of trial, is well established in law and codified norms of capital defense practice, and is described in detail in the argument supporting Ground 2, Part

---

[13] *See United States v. Cronic*, 466 U.S. 648 (1984).

[14] *Cooper v, Oklahoma*, 517 U.S. 348, 354 (1996), *quoting Riggins v. Nevada*, 504 U.S. 127, 139-140 (1992) (Kennedy, J., concurring in judgment).

B, of this brief, *infra*.[15]  It is equally well-established that capital defense counsel should, in every case, consider having the defendant evaluated by a qualified mental health professional.[16]  In Mr. Barrett's case the duties triggered by these conventions were also triggered by the information available to, or known by, defense counsel.

Exhibits submitted with Mr.Barrett's initial and amended § 2255 motions show defense counsel had, or should have had in their possession documents establishing that Mr. Barrett was paranoid and unstable, that he was prone to deep depression, had attempted suicide, was diagnosed with the major mental illness, Bipolar Disorder, and was prescribed antipsychotic medication.[17]  "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems."[18]  Mr. Barrett's defense counsel were aware that he had been evaluated in state court by Dr. Bill Sharp. Had counsel contacted Dr. Sharp they would have known that he found Mr. Barrett the most

---

[15]  The Supreme Court found defense counsel ineffective for omissions related to their background investigation in *Rompilla v. Beard*, 545 U.S. 374, 388-89 (2005) (failure to review file of defendant's prior conviction that prosecution intended to introduce in aggravation and which contained evidence of mental health problems); *Wiggins v. Smith*, 539 U.S. 510, 531-32 (2002) (defense counsel ineffective for failing to pursue evidence defendant had been victim of sexual abuse); *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (defense counsel ineffective for failing to undertake numerous tasks associated with background investigation).  The prevailing norm in capital defense practice at the time of Mr. Barrett's trial was to gather background information in the form of family history, school records, medical records, and employment records, *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007) (citing ABA Guideline 10.7 commentary), and to do so early so that the information could be supplied to mental health experts, and used to devise a consistent strategy for both phases of trial.  *Id.*, 476 F.3d at 1143.

[16]  *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).  *See also Anderson*, 476 F.3d at 1143 (noting "vital importance" of investigating possible mental health evidence for penalty phase); ABA Guidelines 10.7, 10.10.1, and 10.11.

[17]  See Exhs. 147 and 55.

[18]  *Williamson v. Ward*, 110 F.3d 1508, 1518-19 (10th Cir. 1997) (quoting *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990)).

paranoid criminal defendant he had ever evaluated.[19]  Defense counsel also knew, or should have

known, that Mr. Barrett had been involuntarily committed for psychiatric treatment, once

following a suicide attempt.[20]  Records of such a hospitalization would have been obtained by

any reasonably diligent attorney.[21]  Those records show Mr. Barrett was diagnosed with Bipolar

Disorder and that he was prescribed antipsychotic medication.[22]  A history of paranoia,

psychiatric hospitalization, and a need for psychotropic medication provides more than what an

objectively reasonable attorney would need before employing the already-authorized services of a

mental health expert to evaluate the defendant.  "'An attorney has expanded duties when

representing a client whose condition prevents him from exercising proper judgment.'"[23]

Numerous courts have recognized that a defendant's need for medication is relevant to

whether he is competent.[24]  The defendants in *Pate v. Robinson* and *Drope v. Missouri*,[25] and like

Mr. Barrett, had attempted suicide, and that was one factor the Supreme Court considered in

---

[19]  Exh. 55 at ¶ 33.

[20]  Exh. 34 (Decl of John Echols) at p. 13.

[21]  ABA Guideline 10.7 Commentary; *Anderson*, *supra*, 476 F.3d at 1142.

[22]  Exh. 147.

[23]  *Williamson*, *supra*, 110 F.3d at 1518 (quoting *Thompson v. Wainwright*, 787 F.2d 1447, 1451-52 (11th Cir. 1986)).  *See also Hull v. Kyler*, 190 F.3d 88, 112 (3rd Cir. 1999) ("Defense counsel's special role arises not only from the typical attorney-client relationship, but from the very fact that the defendant may be unable to appreciate the proceedings or to assist his attorney (or to make an intelligent decision on challenging his competency)").

[24]  See *Williamson*, *supra*, 110 F.3d at 1515-16 (defendant had been diagnosed with severe bipolar disorder and medicated, perhaps to excess); *McGregor v. Gibson*, 248 F.3d 946, 956 (10th Cir. 2001) (defendant could only maintain competence when medicated); *Miles v. Stainer*, *supra*, 108 F.3d at 1112; *State v. Garner*, 36 P.3d 346, 352 (Mont. 2001) (collecting cases); *United States v. Jones*, 336 F.3d 245, 260 (3d Cir. 2003); *Watts v. Singletary*, 87 F.3d 1282, 1287-1288 (11th Cir. 1996) ("The fact that a defendant is taking drugs (whether proscribed or prescribed) during trial should alert the court to a potential competency issue, but need not, in itself, necessitate a competency hearing.").

[25]  383 U.S. 375 (1966); 420 U.S. 162 (1975).

finding sufficient cause to question their competence.[26]  Due to the requirement that the

defendant have the present ability to work with counsel in a rational manner,[27] paranoia,

particularly when directed toward defense counsel, can be a sign of incompetence.[28]

Despite these duties, defense counsel advised the trial court in September and October

2005 that they had not consulted any mental health professionals, or had Mr. Barrett evaluated by

a psychologist or psychiatrist.  Due to defense counsel's failure to undertake these rudimentary

investigative tasks, counsel lacked information necessary to make informed decisions about Mr.

Barrett's mental condition.

The relevant ABA Standards clearly required defense counsel to secure an independent

assessment of Mr. Barrett's competence from the first time they had reason to doubt it.[29]

Because, in part, "judges must depend to some extent on counsel to bring [competence] issues

into focus,"[30] prevailing professional norms require that defense counsel bring evidence

suggesting incompetence to the attention of the court.[31]

---

[26]  *Pate*, 383 U.S. at 381; *Drope*, 420 U.S. at 170.

[27]  *Ducky v. United States*, 362 U.S. 402 (1960); *Drope v. Missouri*, 420 U.S. at 172.

[28]  *See, e.g.*, *Jones*, *supra*, 336 F.3d at 258; *United States v. Rodham*, 2007 WL 2031705 (4th Cir. Jul. 11, 2007) (unpublished) (finding of incompetence upheld despite defendant's ability to understand proceedings where paranoid delusions and bipolar symptoms rendered defendant incompetent to assist in own defense); *Williamson*, *op. cit.*; *Lafferty v. Cook*, 949 F.2d 1546, 1552 (10th Cir. 1991), *cert. denied*, 504 U.S. 911 (1992) ("while Lafferty physically knew the nature of the proceedings against him, and their possible consequences, he was unable as a result of his paranoid delusional system to interpret them in a realistic way"); *Estock v. Lane*, 842 F.2d 184 (7th Cir. 1988) (per curiam) (defendant incompetent at time of trial due in part to paranoia, attempt to kill himself shortly before trial).

[29]  ABA Criminal Justice Standards, ? 4-3.6 and commentary; ABA Standards, Mental Health, Standard 7-4.2 ("Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence").

[30]  *Drope v. Missouri*, 420 U.S. 162, 176-77 (1975).

[31]  *Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997).

### 2.    *Prejudice.*

To establish the prejudice of counsel's failure to seek a timely competency hearing, Mr. Barrett must show only a reasonable probability that he was incompetent at the time of his trial.[32] In making that determination, the Court must consider in aggregate all the information available. This is a requirement both of *Strickland*,[33] and the substantive standards governing competence to stand trial.[34]

"[T]he evidence of Mr. [Barrett's] mental state which we have recited at length throughout this [petition] establishes a reasonable probability that he was not competent to stand trial."[35]  As he understands the Court's instructions, Mr. Barrett relies upon the detailed description of the facts in, and the exhibits appended to, the initial and amended § 2255 motions to apprise the Court of the facts.  He summarizes some of the relevant facts here for the purpose of relating them to the case law previously cited.

- A reasonable investigation of Mr. Barrett's family history would have shown extensive evidence of Bipolar Disorder in his family;

- Interviews with witnesses known to defense counsel, such as Gelene Dotson (defendant's mother) and Abby Stites (defendant's ex-wife) would have produced

---

[32]  *Williamson*, *supra,* 110 F.3d at 1519; *Hull v. Kyler*, 190 F.3d 88, 105 (3d Cir. 1999) (citing *Eddmonds v. Peters*, 93 F.3d 1307, 1317 (7th Cir. 1996), *cert. denied*, 520 U.S. 1172 (1997); and *Felde v. Butler*, 817 F.2d 281, 282 (5th Cir. 1987)).

[33]  *Williams v. Taylor*, *supra*, 529 U.S. at 497.

[34]  *See Drope*, *supra*, 420 U.S. at 179-80 ("in considering the indicia of petitioner's incompetence separately, the state courts gave insufficient attention to the aggregate of those indicia"); *Jermyn v. Horn*, 266 F.3d 257, 292 (3d Cir. 2001) (*Drope* requires reviewing court to consider probative force of "indicia of incompetence . . . in the aggregate"); *Balfour v. Haws*, 892 F.2d 556, 560-61 (1989) (analyzing under *Drope* the "cumulative information in the record"); *Bundy v. Dugger*, 816 F.2d 564, 567 (11th Cir. 1987).

[35]  *Williamson*, *supra*, 110 F.3d,  at 1519.

extensive reports of his elevated (manic) episodes and depressive episodes including how they interfered with his daily functioning;

• Had defense counsel gathered the medical records normally obtained in capital cases, they would have found diagnoses of paranoia and Bipolar Disorder, and prescriptions for antipsychotic medications, and known that Mr. Barrett was unmedicated;

• Mr. Barrett showed marked distrust of his lead counsel, Roger Hilfiger, such that the Court had to encourage Mr. Barrett to communicate with counsel;

• Mr.Barrett had been attacked by the Government's case agent, was fearful of law enforcement, and was fearful of being electrocuted by law enforcement officers who controlled an electric shock belt strapped to his back or side throughout the trial;

• A qualified psychiatrist, duly advised of Mr. Barrett's performance on neuropsychological tests, would have advised defense counsel and the court of the following:

> • That Mr. Barrett showed functional impairments associated with the neurologically damaged areas of Mr. Barrett's brain were consistent with impairment of the domains necessary for trial competence, such as executive functioning; and that Mr. Barrett would not be able to track, focus or concentrate on the trial proceedings, or be able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights;

> • That Mr. Barrett was impaired by the cognitive effects of his paranoia and Bipolar Disorder;

- That Mr. Barrett was further impaired by the effects of Post Traumatic Stress Disorder;

- That PTSD and paranoia exacerbated the interference with Mr. Barrett's participation in his defense caused by the electric shock device and the fear it was designed to induce.[36]

At a minimum, the files and records of the case do not conclusively refute the evidence that Mr. Barrett's defense counsel unreasonably failed to investigate his mental health prior to trial. Therefore, this Court either should find that this "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process,"[37] or vacate the conviction and order a new trial.[38] If the Court deems an evidentiary hearing necessary, it should schedule the hearing at a time when Mr Barrett will have had sufficient notice to conduct discovery and subpoena witnesses, R. Gov. § 2255 Proc. 8(c), and thereafter vacate the judgment of conviction and sentence of death.

**Ground 2, Part A(4).** **But for trial counsel's unreasonable omissions it is reasonably probable that the jury would have rejected the testimony of the Government's eleventh hour "snitch" witnesses and, like the two juries before them, refused to convict Mr. Barrett of premeditated murder.**

The Government's case for the intent element of Count 3 and for the penalty phase "gateway" intent factors overwhelmingly rested on the shoulders of the seven informant witnesses. The same could also be said for the drug charges underlying Counts 1 and 2, in light

---

[36] *See* Exh. 117 (Decl. George W. Woods, M.D.) at ¶¶ 80-81

[37] *Williamson v. Ward*, 110 F.3d, at 1519.

[38] *Ibid.*

of the paucity of drug evidence found in the search of Mr. Barrett's cabin and property after Trooper Eales was shot and killed.

These witnesses were absent from the two state trials.  It was crucial to the defense case that they be impeached and discredited.  However, through a combination of 1) the machinations attending the improper *ex parte* conference, where the court recognized that a lengthy continuance would be necessary for the defense to prepare adequately for these witnesses, particularly in light of the fact that the Government's motion for a protective order was baseless (Tr. 9/13/05 Hr'g at 4-5, 7, 10-12, 20, 22-23, 27) (*See* Ground I); 2) deliberate obfuscation and delay on the part of the Government in revealing the identity of these witnesses and the substance of their testimony; 3) defense counsel's acquiescence in an arrangement (and the consequent time constraints) that doomed any effective investigation into these witnesses; and 4) the failure of the defense to move for the continuance the court itself recognized would be appropriate in light of the Government's conduct[39], the informant witnesses escaped the type of withering impeachment they would have faced had counsel conducted – or been allowed sufficient time to conduct – a professionally reasonable investigation into these witnesses and their stories.[40]

Counsels' failure to secure the time needed to competently investigate these witnesses, or to mount an investigation in the time permitted, was professionally unreasonable.  This is especially true due to the centrality of these witnesses to the Government's case in both stages of

---

[39]  Direct appeal attorney Mark Henricksen, who was assisted by lead trial counsel Roger Hilfiger on the direct appeal, questioned Mr. Hilfiger about why he did not seek a continuance. Mr. Hilfiger did not dismiss the merits of moving for a continuance, but instead stated that he simply did not think one would be granted, even though he recognized the importance of the seven snitches to the Government's case.  (Exhibit 29.)  Of course, as noted, the court's comments at the improper *ex parte* hearing, of which Mr. Hilfiger was never made aware during trial, indicate otherwise.

[40]  Any defense efforts to effectively attack the informant witnesses were also blunted by the Government's *Brady* violations, which are discussed in Ground V.

trial. *Rompilla v. Beard,* 545 U.S. 374, 387 (2005) (as noted in the introduction to this ground for relief, defense counsel are obligated to obtain the evidence the prosecution is going to use and to investigate it); *Strickland v. Washington,* 466 U.S. 668, 690 (1984) (counsel's overarching duty is to conduct a competent, reasonable investigation, and where such is not undertaken and no strategy exists for foregoing it, counsel's conduct is professionally unreasonable); *Stewart v. Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006) (counsel was professionally unreasonable for failing to investigate and produce witnesses who would have supported the accused's defense); *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003).

In his previous filings, Mr. Barrett has shown that abundant evidence which would have rendered these witnesses incredible could have been produced with a professionally reasonable investigation. In summary, this evidence consists of the following:

1.     Because Charles Sanders's criminal history was not adequately investigated, the defense omitted to bring out numerous other convictions suffered by Sanders, as well as a litany of dismissed charges and sweetheart deals. Put in context, this information showed not only that Sanders's criminal history, including acts of dishonesty, was far more extensive than revealed at trial, but that local law enforcement was complicit in simply allowing him to commit crime after crime with little consequence, so long as he was getting other people in trouble by informing on them. Had all of this information been imparted to the jury, not only Sanders's credibility, but that of his cynical sponsors in law enforcement, would have all but vanished. (*E.g.,* Exhibits 57, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 168, 183, 185, 186, 187.)

Likewise, counsel failed to investigate and produce evidence of a laundry list of bad and dishonest acts Sanders could have been confronted with on cross-examination. *United States v. Torres,* 569 F.3d 1277, 1282-83 (10th Cir. 2009); *United States v. Velarde,* 485 F.3d 553, 563

(10th Cir. 2007); Fed.R.Evid. 608(b).  Defense counsel failed to present witnesses, including one of Sanders's own relatives, who could have attested to Sanders's total lack of believability, both to them personally and in the wider community.  Fed.R.Evid. 404(a).  (Exhibit 13, Decl. of Janesse Thomas; Exhibit 76, Decl. of Billy Poindexter; Exhibit 90, Decl. of Rick Lunsford; Exhibit 94, Decl. of Sally Davis Johnson; Exhibit 95, Decl. of Sean Hill.)  Witnesses were also available to contest Sanders's seeming claim – latched onto by the Government in closing argument (R. 4299.) – that Sanders had been at Mr. Barrett's residence on the afternoon of September 23, 1999.  (Exhibit 37, Decl. of Robert Thompson; Exhibit 77, Decl. of Brandy Hill; Decl. 90, Decl. of Rick Lunsford.)  A witness was available to contradict specific portions of Sanders's testimony regarding his alleged drug-related visits to Mr. Barrett's property in the summer and early fall of 1999.[41]  (Exhibit 13, Decl. of Janesse Thomas.)

Not only would all this overlooked information, testimony, and evidence have impeached Sanders's trial testimony, it would have aided immeasurably in a competent *Franks* attack on the search warrant.  (*See* Ground II A (1).)

2.       The absence of a professionally reasonable investigation and preparation resulted in the omission of numerous impeaching facts and witnesses to discredit Travis Crawford.[42] Among the informant witnesses, only Mr. Crawford testified to an alleged contemporaneous statement by Mr. Barrett threatening law enforcement.  There were readily available witnesses who could have contradicted Crawford's account of the events on the afternoon and early evening of September 23, 1999, but the lack of a competent investigation, and/or the time to

---

[41]  The court and the Government are aware of other information reflecting adversely on Sanders's credibility from this particular witness.  (Docs. 100-02.)

[42]  As discussed in Ground V A (1)(b), Travis Crawford has recanted his testimony. (Exhibit 31, Decl. of Leonard Post; Exhibit 45, Decl. of Travis Crawford.)

perform one, meant that the jury never heard them. (Exhibit 77, Decl. of Brandy Hill; Exhibit 90, Decl. of Rick Lunsford.)

The jury never heard evidence regarding Mr. Crawford's history as an informant and an informant witness. (Exhibit 45, Decl. of Travis Crawfod; Exhibit 92, Decl. of Roger Crawford; Exhibit 90, Decl. of Rick Lunsford.) Crawford's mental health history and his criminal record in the military were not explored. (Exhibit 45, Decl. of Travis Crawford; Exhibit 143, sealed medical records of Travis Crawford; Exhibit 196, sealed military records of Travis Crawford.) Crawford could have been cross-examined at some length about past acts of dishonesty and other bad acts relevant to his overall credibility, but, because a reasonable investigation was not or could not be undertaken, he was able to skirt scrutiny in these areas. *United States v. Torres, supra*; *United States v. Valarde, supra.*; Fed.R.Evid. 608(b). (Exhibit 78, Decl. of Carolyn Joseph; Exhibit 90, Decl. of Rick Lunsford.) Omitted also were witnesses who could have testified that in their personal opinions, and in the community at large, Crawford was known for his self-serving dishonesty. Fed.R.Evid. 404(a). (Exhibit 78, Decl. of Carolyn Joseph; Exhibit 90, Decl. of Rick Lunsford.) The jury also never heard from available witnesses that, contrary to his testimony, Crawford's drug problems were ongoing at the time of his testimony against Mr. Barrett. (Exhibit 77, Decl. of Brandy Hill; Exhibit 78, Decl. of Carolyn Joseph.) It should also be noted that since the time of his testimony, Mr. Crawford has stated that he was rewarded for appearing as a witness against Mr. Barrett. (Exhibit 77, Decl. of Brandy Hill.)

3.      Much the same is true of Travis Crawford's wife, Cindy Crawford.[43]  Failure to competently and reasonably investigate her criminal record led to her not being impeached, for example, with the fact that she could have been charged with felonies instead of misdemeanors in her previous criminal cases and that she was, at the time of her testimony against Mr. Barrett, in violation of the terms of her Sequoyah County deferred sentence, which gave her a motive to tailor her testimony to the Government's liking.  (Exhibits 170, 204.)

Although, as if by accident, Cindy Crawford's mental health history was alluded to briefly in the penalty phase, where she made a return appearance to the witness stand, it was not brought up at all in the guilt phase, when the need to employ every means to discredit her was especially acute.  (Exhibit 144, sealed medical records of Cindy Crawford.)

As with Sanders and Travis Crawford, counsel, due to a lack of investigation, not only failed to cross-examine Ms. Crawford on numerous bad and dishonest acts that would have chipped away at her credibility, *United States v. Torres, supra*; *United States v. Valarde, supra*, Fed.R.Evid. 608(b), but failed to investigate and present a host of witnesses who could have testified to her history as an informant and her bad reputation for honesty in the community, as well as her continued drug use at the time of Mr. Barrett's trial.  Fed.R.Evid. 404(a).  (File in Sequoyah County Case No. P-03-458; Exhibit 176; Exhibit 77, Decl. of Brandy Hill; Exhibit 78, Decl. of Carolyn Joseph; Exhibit 83, Decl. of Gwendolyn Crawford; Exhibit 88, Decl. of Mike Mackey; Exhibit 92, Decl. of Roger Crawford; Exhibit 95, Decl. of Sean Hill.)  Likewise,

---

[43]  Like her husband Travis, Cindy Crawford recanted her testimony to defense investigators.  Unlike Travis, she refused to sign a declaration attesting to her recantation.  *See* Ground V A (1)( c).  *See also,* Exhibit 14, Decl. of Dale Anderson; Exhibit 31, Decl. of Leonard Post.

counsel neglected to develop a witness who could have completely discredited Ms. Crawford's second stage testimony. (Exhibit 104, Decl.of Richie Barrett.)

4.      Randy Turman was not only a key Government witness in connection with supposed threats Mr. Barrett hurled at law enforcement, but was the most important of the informant witnesses on the alleged drug crimes which underlay Counts 1 and 2. Turman testified that Mr. Barrett had manufactured methamphetamine.

Turman was allowed, without correction by the Government, to perjure himself about his 6-count Sequoyah County drug case, which he falsely informed the jury had "done been taken care of." In fact, it was still pending, and was to languish in the system for two more years before being dismissed by the Sequoyah County District Attorney's Office "in the interests of justice." With nothing apparently hanging over his head, Turman testified that he had nothing to fear from the Government, and had not worked as an informant. (Exhibit 195.)

Because defense counsel neglected to check Turman's court records in Sequoyah County, they were unable to expose his perjury about his then-pending felony case, the fact that little or no action had been taken on it in years, which strongly suggested he had been working as an informant, and that with these serious pending charges, he had a powerful motive to please the Government with his testimony in the hopes that he would be rewarded – as he ultimately was – with a favorable resolution of his case. Had Turman's perjury and his motives for testifying been revealed, his credibility as a whole would have been brought into serious question by any reasonable trier of fact. Moreover, Sean Hill was available as a witness who could and would have testified to Turman's poor reputation in the community for honesty, but he was not developed as a witness. (Exhibit 95, Decl. of Sean Hill.)

5.      As with the failure to impeach the other informant witnesses through cross-examination, independent evidence, or both, defense counsel failed to effectively attack the testimonies of Karen Real and Brandy Price.

Again due to the failure to investigate the relevant court records, counsel failed to confront Real with the fact that a number of state drug cases against her had been dismissed. Real had a motive to please the Government in order to maintain the status quo on her dismissed state drug charges.  (Exhibits 47, 48, 49, 50, 51, 52.)

Counsel failed to delve beyond a surface level into what Real wanted and expected to receive by way of benefit on her 14 year federal sentence, allowing Real to escape into expressing vague and ethereal hopes for a break she really did not expect to materialize.  Nothing beyond her statement that the prosecutor would "talk to" the sentencing judge in her case was testified to.  In fact, Real later received, pursuant to a Rule 35 motion filed by the Government, a sentence reduction to time served as the direct result of her testimony against Mr. Barrett.[44]

Defense counsel, due to the failure to take reasonable investigative steps, also omitted to call witnesses who could have testified to Real's poor reputation in the community for honesty. Fed.R.Evid. 404(a).  (Exhibit 95, Decl. of Sean Hill.)

The last statement is true also of Brandie Zane Price.  Fed.R.Evid. 404(a).  (Exhibit 95, Decl. of Sean Hill.)  In addition, counsel failed to call independent witnesses who could have testified that Price's automobile could not have navigated the terrain east of Mr. Barrett's cabin,

---

[44]  *See* Ground V A (e).

as she claimed she did when she allegedly drove out to visit Mr. Barrett.[45] (Exhibit 77, Decl. of Brandy Hill; Exhibit 95, Decl. of Sean Hill.)

6.        Due to the omission of a professionally reasonable investigation, trial counsel failed to convert Randy Weaver into a defense witness, which could have been done with one question.  Weaver was the only one of the informant witnesses to have consented to an interview with the defense (albeit in the presence of Government agents, per the ill-fated "arrangement" with defense counsel).  Had he been asked, Weaver would have testified that Mr. Barrett never threatened to harm law enforcement if they came to his property in response to is pending drug delivery case, and that such comments would have been completely out of character for Mr. Barrett.  (Exhibit 38, Decl. of Randy Weaver.)

The failure to explore this subject with Mr. Weaver was mirrored in defense counsels' failure to launch a professionally reasonable investigation to discover other readily available witnesses who could and would have testified, in complete contrast to six of the seven informant witnesses, that Mr. Barrett never threatened law enforcement, in relation to his pending drug case or under any other circumstances, and that, in fact, law enforcement patrols were a regular occurrence in his neighborhood, with no acts of violence from Mr. Barrett.  (Exhibit 37, Decl. of Robert Thompson; Exhibit 77, Decl. of Brandie Hill; Exhibit 90, Decl. of Rick Lunsford; Exhibit 96, Decl. of Toby Barrett.)

Just as there can be no question that defense counsel were professionally unreasonable for failing to investigate and introduce all of the impeachment evidence outlined above, and explicated in detail in Mr. Barrett's previous filings (in part, but not exclusively, because a

---

[45]  As with Karen Real, Price later received a huge break from the Government in a federal drug case in which she was charged shortly after Mr. Barrett's trial concluded.  *See* Ground V A (d).

reasonable and necessary continuance was not sought), it is crystal clear that counsel's failings, for which no strategic basis existed, were prejudicial to the outcome of both stages of trial.

It cannot be over-emphasized that the sole difference between the state prosecution against Mr. Barrett, in which he was acquitted of murder, and the federal case, in which he was sentenced to death, was the presence of the late-coming informant witnesses.  Effective investigation, cross-examination, and independent evidence would have neutralized them completely.  Despite the obvious importance of these witnesses to the Government's case for intent in both stages of trial, and to establishing the underlying drug charges, counsel failed to move for a continuance, and took virtually no steps to investigate and impeach these witnesses. *United States v. Fuller,* 938 F.Supp. 731, 733-34 (D. Kan. 1996) (counsel ineffective for, among other reasons, failing to insist on adequate time to prepare for trial).

In Mr. Barrett's case, counsel in effect agreed to a trial by ambush with respect to the seven critical informant witnesses.  Because of the crucial importance of these witnesses, whose credibility could have been devastated had proper investigative steps been taken, the failures of trial counsel were unquestionably prejudicial.  There is a reasonable probability, sufficient to undermine confidence in the outcome of trial, that but for counsels' indefensible errors and omissions, the result of the guilt stage of trial would have been different.  At a minimum, these failings also had a prejudicial effect on the punishment stage.  *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington,* 466 U.S. 668 (1984).

Mr. Barrett's case is analogous to *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002), where, in the context of a *Brady* claim, a capital conviction was vacated because exculpatory evidence which could have been used to impeach witnesses was not disclosed.  The evidence, there and in Mr. Barrett's case, would have shown that the witnesses had a motive to fabricate

and had colluded in their stories.  *See also, Stewart v. Wolfenbarger,* 468 F.3d at 357, 361 (failure to investigate and develop witnesses who would have contradicted prosecution case and supported the defense theory of alibi); *Cargle v. Mullin,* 317 F.3d 1196, 1222 (10th Cir. 2003) (counsel ineffective in part for failing to impeach immunized witness, and for failing to call available witnesses to contradict testimony of prosecution witnesses and prosecution's theory as to how the homicides occurred); *Steinkuhler v. Meschner,* 176 F.3d 441, 445 (8th Cir. 1999) (counsel ineffective for failing to use available evidence to impeach witnesses).

In Mr. Barrett's case, among other failings addressed here and in Mr. Barrett's previous filings, counsel failed to adequately investigate the criminal histories of the informant witnesses, particularly Sanders and Turman, and failed to research their court files, which would have produced devastating impeachment and demonstrated that they had motives to lie.  *See also, e.g., Reynoso v. Giurbino,* 462 F.3d 1099, 1114, 1120 (9th Cir. 2006) and *Driscoll v Delo,* 71 F.3d 701, 708 (8th Cir. 1995), *cert. denied,* 519 U.S. 910 (1996) (counsel ineffective for failing to impeach); *Horton v. Massie,* 2000 WL 107386 (10th Cir. Jan.31, 2000) (unpublished) (counsel ineffective for failing to call defendant's young daughter in murder case to support claim that while defendant was present, she did not participate in the offense; the prosecution's witnesses told inconsistent stories, and the prosecutor emphasized that defendant's version of events was uncorroborated; counsel was also ineffective for failing to investigate and present evidence that the state's chief witnesses were collaborating with each other and had motives to fabricate); *Hadley v. Groose,* 97 F.3d 1131 (8th Cir. 1996) (counsel's handling of police witness's testimony, which conflicted with his police report, constituted ineffective assistance; here, there was not just a single failure to impeach with a single document, but a wholesale failure to reasonably investigate and effectively confront a number of crucial prosecution witnesses).

**Ground 2, Part A (5).**          **Trial counsel were ineffective in failing to make appropriate and timely objections to improper hearsay evidence of other bad acts.**

Fed.R.Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the  prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

"The Federal Rules of Evidence generally preclude the use of evidence of crimes or wrongs unrelated to the conduct at issue if that evidence is offered to prove a propensity to behave in a particular manner." *Tanberg v. Sholtis,* 401 F.3d 1151, 1168 (10th Cir. 2005).  For evidence of other crimes or bad acts to be admissible under Rule 404(b), four factors must be satisfied: (1) the evidence is offered for a proper purpose; (2) the evidence is relevant; (3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) upon request, the district court provides an appropriate limiting instruction. *United States v. Cherry,* 433 F.3d 698, 700-02 (10th Cir. 2005).  *See also*, *United States v. Brooks,* 161 F.3d 1240, 1243 (10th Cir. 1998), *citing Huddleston v. United States*, 485 U.S. 681, 691-92 (1988).  In offering 404(b) evidence, the Government carries the burden of showing how the proffered evidence is relevant to one or more issues in the case; it must specifically articulate the evidentiary hypotheses by which a fact of consequence may be inferred from the other acts evidence.  *United States v. Biswell,* 700 F.2d 1310, 1317 (10th Cir. 1983).  There must be a clear and logical connection between the alleged earlier offense or misconduct and the case being tried.  *Id.* at 1317-18.

Before prior bad acts evidence is admissible, the trial court must find the evidence: (1) tends to establish intent, knowledge, motive, identity or absence of mistake or accident; (2) is related to the charge in that it serves to establish intent, knowledge, motive, identity or absence of mistake or accident; (3) has real probative value, not just possible worth; and (4) is close in time to the crime charged. If the trial court determines that the prior acts are admissible under 404(b), it must still conduct a separate balancing of the probative value of the evidence and its prejudicial impact under Fed.R.Evid. 403. *United States v. Temple,* 862 F.2d 821, 823-24 (10th Cir. 1988), *relying on United States v. Morales-Quinones,* 812 F.2d 604, 612 (10th Cir. 1987); *United States v. Hogue,* 827 F.2d 660, 663 (10th Cir. 1987).

On September 22, 2005, after the start of the trial, the Government filed a Notice of Intent to Offer Evidence of Other Crimes. (Doc. 206.) Aside from evidence regarding narcotics activity at Mr. Barrett's residence preceding the shooting of Trooper Eales, the Government stated it intended to offer testimony from the majority of its informant witnesses (Charles Sanders, Randy Turman, Cindy Crawford, Travis Crawford and Brandie Price) that in the weeks and months preceding the shooting of Trooper Eales, Mr. Barrett had made statements to the effect that if law enforcement came on his property, he would shoot them.[46] The Government argued these alleged statements were relevant to show Mr. Barrett's intent. (Doc. 206 at 1-3.) The Government's filing failed to give notice that informant witness Karen Real would offer similar evidence of supposed statements made by Mr. Barrett. Before Mr. Barrett could respond, the Government's filing said, "The defendant has not complained of lack of notice." (Doc. 206 at 4.)

---

[46] Mr. Barrett's argument concerns only the testimony offered by the informant witnesses regarding his alleged statements or actions related to those statements.

The Government's Notice was filed nine days after the trial court, during an *ex parte* hearing, advised the prosecutors that the testimony they intended to present from informants included evidence covered by Rule 404(b).  (Tr. 8/13/05 Hr'g at 22-23.)  The court permitted the prosecutors to argue outside the presence of Mr. Barrett and his counsel that the testimony was not within the scope of the rule.  *Ibid.*  Following the conclusion of that discussion, when defense counsel were present, the trial court described the content of the *ex parte* discussion without revealing that it included the court stating that the testimony described *in camera* included 404(b) evidence.  *Id.* at 25-27.

On September 27, 2005, trial counsel for Mr. Barrett filed a response to the Government's 404(b) Notice, contesting specifically the evidence of Mr. Barrett's alleged statements, and arguing that the proposed testimony from the informant witnesses was irrelevant propensity evidence; any marginal relevance or probative value it might possess was outweighed by the danger of unfair prejudice.  (Doc. 215.)

On the same day counsel for Mr. Barrett filed their response to the 404(b) Notice, the court stated it would rule on admissibility as the evidence developed, and directed the Government to approach the bench immediately before it intended to offer such evidence. Defense counsel were directed to submit an appropriate limiting instruction, should they desire to do so.  (R. 174.)  Defense counsel filed a proposed limiting instruction on September 28.  (Doc. 218.)

With virtually no objections or requests for appropriate limiting instructions, the informant witnesses (aside from Travis Crawford ( R. 462-66), who later recanted his testimony) were permitted to testify to alleged stale threats by Mr. Barrett to law enforcement, as well as evidence of drug activities that were not contemporaneous to the offenses charged in the

superseding indictment.  ( R. 412-15, 422-23, testimony of Randy Turman; R. 2515, 2612, 2614, testimony of Charles Sanders; R. 3068, 3070, 30732-73, testimony of Cindy Crawford; R. 3485-86, 3492-93, 3507, 3509, testimony of Brandie Zane Price; R. 3082-83, 3118-20, 3090, 3106, 3135-36, testimony of Karen Real.)

Evidence of Mr. Barrett's alleged statements to these witnesses, excluding Travis Crawford, was inadmissible, and wrongly argued and considered by the jury as propensity evidence in violation of Rule 404(b).  Trial counsel unreasonably failed (a) to seek reasonable pretrial disclosure of these statements, (b) to make appropriate objections to the Government's delay and to the admissibility of the statements, and (c) to seek an appropriate order limiting the jury's consideration of the evidence to Mr. Barrett's alleged state of mind at the time the statements were made.  *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1985) (counsel's failure to seek suppression of evidence unreasonable where counsel also failed to seek pretrial discovery).

Trial counsel were on notice by September 12, 2005, at the latest, that the Government intended to use informant witnesses, but made no request for notice under Rule 404(b).  To the extent earlier requests for discovery included requests for 404(b) notice, trial counsel unreasonably failed to assert that the Government had staged an ambush (as the trial judge himself thought likely, Tr. 9/13/05 Hr'g at 7, 10-12), failed to seek a continuance to investigate, and failed to object that the Government had not shown good cause for the late disclosures, as required by Rule 404(b).

The statements were hearsay, and pursuant to Fed.R.Evid. 803(3) were admissible only to show the declarant's state of mind at the time the statements allegedly were made.  The alleged statements made weeks, several months, or many months before the offense could not reliably or

relevantly evince Mr. Barrett's intent on the night Trooper Eales was fatally shot; they were injected into the trial simply to unfairly prejudice Mr. Barrett. *United States v. Temple, supra*; *United States v. Henandez,* 975 F.2d 1035, 1040 (4th Cir. 1992) (other crimes testimony that defendant told witness about special recipe for cooking crack, that the defendant used crack and used to sell it was inadmissible to show intent in conspiracy case; the testimony was not relevant to the defendant's conduct or mental state during the course and at the time of the alleged conspiracy).

Moreover, any time frame placed on these alleged statements by the informant witnesses was completely unreliable. Their memories were vague in the extreme due not only to the passage of time, but because of their own repeated use of mind-altering drugs. The alleged statements attributed to Mr. Barrett by Turman, Sanders, Cindy Crawford, Brandie Price and Karen Real *were not* close in time to the offense itself, and had only "possible worth," not real probative value. *Temple,* 862 F.2d at 823-24. Any slight probative value this evidence could arguably be said to possess was clearly outweighed by the danger of unfair prejudice. Fed.R.Evid. 403.

Even assuming for the sake of argument that Mr. Barrett made these statements (which he did not), they could not relate to any specific intent to do harm to law enforcement when the Highway Patrol Tact Team invaded his property unannounced in the middle of the night, with the lead vehicle having all the appearance of a civilian automobile. This evidence simply covered Mr. Barrett in a veil of unwarranted suspicion. With respect to Karen Real, no notice was given by the Government in its 404(b) filing that she would attribute any threatening statements to Mr. Barrett. *United States v. Temple, supra* (defendant was prejudiced by improper admission of other crimes or bad act evidence which did not show a common scheme or plan and was

otherwise inadmissible, and commenting that care should be taken to protect the accused as far as possible from being convicted simply because of past conduct rather than the crime for which he is being tried).

Although defense counsel filed a response the Government's 404(b) Notice objecting to the admission of Mr. Barrett's statements to these witnesses, and made, as outlined above, sporadic objections during the testimony of Randy Turman and Karen Real, the remainder of the evidence complained of here passed without a contemporaneous objection, and a contemporaneous request for a limiting instruction. *United States v. Davis,* 766 F.2d 1452, 1458 (10th Cir. 1985) (failure to lodge contemporaneous objections fatal to claim raised on appeal). Because the evidence addressed here was clearly inadmissible, and trial counsel recognized its inadmissibility in their response to the Government's 404(b) Notice, counsel were professionally unreasonable for failing to make adequate, contemporaneous objections. Since the testimony of the informant witnesses regarding Mr. Barrett's supposed statements was the centerpiece of the Government's case for intent, the failure to adequately object affected the trial outcome. *Strickland v. Washington,* 466 U.S. 668, 688, 694 (1984); *Martin v. Grosshans,* 424 F.3d 588, 591-92 (7th Cir. 2005); *Freeman v. Class,* 95 F.3d 639 (8th Cir. 1996); *Crowe v. Sanders,* 864 F.2d 430 (6th Cir. 1989) (counsel deemed ineffective for failing to properly object or seek proper curative measures, including moving for a mistrial).

Defense counsel were also professionally unreasonable, to Mr. Barrett's prejudice, for failing to object to Karen Real's other crimes or bad act testimony because no pretrial notice was given as required by Rule 404(b), and for failing to object to the prosecution's 404(b) Notice because it was filed untimely. Rule 404(b) states that upon request, reasonable notice in advance of trial of other crimes or bad act evidence must be given, absent good cause indicating notice

should be excused.  The prosecution did not file its 404(b) Notice until individual jury selection in the case was underway.

To the extent trial counsel did object to the other bad acts evidence addressed here, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.  *See* Ground 18, *infra*.

**Ground 2, Parts A(6) and (10)**

In Parts A(6) through (10) of Ground 2, Mr. Barrett sets forth the factual basis for finding that the judgment of conviction is unreliable due to the defense attorneys' failure to pursue mutually reinforcing evidence undermining the prosecution's theory of intent.  As these omissions are related, and must be considered cumulatively, *see Scott v. Mullin*, 303 F.3d 1222, 1230-31 (10th Cir. 2002); *Strouffer v. Reynolds*, 214 F.3d 1231, 1235 n.4 (10th Cir. 2000), they will be addressed together here.

In Ground 2, Parts A(6) and (7), Mr. Barrett describes the evidence showing that his trial counsel failed to consult with or present evidence from expert witnesses Edward Hueske and George Kirkham, whom this Court had found were reasonably necessary to the defense.  In Part A(8) of Ground 2, Mr. Barrett shows that his defense counsel unreasonably failed to show the jury that Tact Team members had made numerous inconsistent statements that called into question their account of the raid, especially the signs that they were law enforcement.  In Part A(9) of Ground 2, Mr. Barrett describes the eyewitness evidence that was available to dispute the accounts of law enforcement officers regarding the visibility of signs that the attack on Mr. Barrett's cabin came from law enforcement officers.  In Part A(10), Mr. Barrett sets out the evidence contradicting the theory that he was on notice that he faced arrest.  Together, these errors gave the jury an unchallenged and unreliable record upon which to decide the crucial

question whether the evidence showed beyond a reasonable doubt that Mr. Barrett had sufficient knowledge that he was under assault from law enforcement officers that the jury could infer he had an intent to kill.

### 1.    Defense Counsel's Failure to Obtain Expert Assistance

"A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is." *Richey v. Bradshaw*, 498 F.3d 344, 362-63 (6th Cir. 2007). In *Richey*, the court held that the outcome of the trial was unreliable because defense counsel failed to make use of an expert to challenge gaps in the prosecution's theory of how the crime (arson) occurred. 498 F.3d at 363. In *Adams v. Bertrand*, 453 F.3d 428 (7th Cir. 2006), the court held the state court had unreasonably applied *Strickland* by finding no deficient performance although the defense attorney "committed to a predetermined strategy without a reasonable investigation that could have produced a pivotal witness." 453 F.3d at 437. The same occurred in Mr. Barrett's case, where defense counsel committed to strategy at trial without consulting two experts who could have undermined key aspects of the prosecution's case.

Iris Dalley's crime scene reconstruction testimony, complete with animations and a power point presentation, was the key component of the prosecution's claim that the physical evidence demonstrated Mr. Barrett was not only firing from a vantage point that made it supposedly apparent that he was shooting at law enforcement officers, but that Trooper Eales had stepped out of the Bronco driven by Trooper Hamilton at the time Eales was shot. The inference was that, based on the way Trooper Eales was dressed, Mr. Barrett would have recognized him as a law enforcement officer. Thus, Dalley's testimony was important to the Government's case for the

intent factors in Counts 1 and 2, the specific intent requirement of Count 3, as well as the intent "gateway" factors in the sentencing stage.

Perhaps lulled into inaction by the trial court's earlier comment, in limiting the funding for a defense crime scene expert, that the court had never permitted crime scene reconstruction evidence in previous trials, counsel failed to utilize what resources had been made available to engage the services of their own crime scene analyst to critique and counter Dalley's testimony and presentation. Instead of seeking expert assistance to rebut Dalley's findings, counsel relied exclusively on cross-examination, which did virtually nothing to dent Dalley's testimony.[47]

Due to the importance of Dalley's testimony to the Government's case in both stages of trial, counsel were professionally unreasonable for failing to retain Mr. Hueske, who had previously worked on the case at the state level and had been contacted by Mr. Echols to assist in Mr. Barrett's defense in federal court. Trial counsels' unreasonable omission was prejudicial. Had counsel engaged the services of the independent expert authorized for Mr. Barrett's defense,

---

[47] The manner in which trial counsel handled expert witnesses as a whole raises troubling questions indicative of deficient performance and resulting prejudice. Although Dalley's testimony was ripe for attack by another, far more qualified expert in Mr. Hueske, such an attack was never mounted. The one expert the defense did call – Chuck Choney – was, as shown here, an ill-advised move from the beginning. Choney could only hurt the defense, and he did. Defense counsel were on notice that Choney would be a hostile witness.

Yet again symptomatic of counsel's deficient performance with expert witnesses was counsel's failure to object at the outset to the plainly inadmissible testimony of James Horn, which the court ultimately struck *sua sponte*, although not until the damage was done, taking measures inadequate to excise the prejudice flowing from Horn's testimony. Ground 2, Part A (11).

The one expert the defense retained for the second stage, Dr. Jeanne Russell, who has a PhD. in education, was approached on the eve of trial, in part to serve as a mitigation specialist, even though she was unqualified to undertake this task and had no time to work up a professionally reasonable mitigation case, even if she were qualified to do so. (Exhibit 56)

Finally, despite a wealth of evidence indicating that Mr. Barrett had serious psychological and psychiatric impairments, counsel failed altogether to secure the assistance of *appropriate* mental health professionals, whose testimony would have been critical in both stages of trial. Grounds 2, Part A (2)(3), Part B (1)(2), Ground 8.

it could have been shown that Dalley's analysis was amateurish, unscientific, seriously flawed, and did not comport with the necessary protocols for conducting a legitimate and reliable reconstruction. In connection with the current proceedings, counsel asked Mr. Hueske to review Ms. Dalley's testimony, the exhibits introduced in the case, her Power Point presentation, her animations, and other materials upon which she relied. Mr. Hueske, a nationally known expert whose credentials, training and experience far outstrip Dalley's meager qualifications, has concluded that Dalley's testimony was not worthy of belief. (Exhibits 109, 110.)

Had trial counsel obtained the services of a qualified forensic examiner, they could have challenged the admissibility of Dalley's testimony under Rule 702 of the Federal Rules of Evidence and under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993) and *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999). Dalley failed to adhere to the standard, recognized protocol in the particular discipline for conducting a crime scene reconstruction. She failed to take many steps that should have been taken, and failed to utilize the appropriate methodology. Due to these numerous failures, her conclusions, aimed at strengthening the Government's case, were scientifically unreliable. At a minimum, the jury would have heard evidence that Dalley's analysis, and her subsequent testimony based on that analysis, was outside the parameters of a proper, legitimate crime scene reconstruction and trajectory analysis. Had defense counsel hired an independent expert to advise them, a powerful motion to exclude Dalley's testimony altogether could have been presented. Dalley's testimony and analysis was little better, if at all, than the "expert" testimony of James Horn, which the court found so bereft of reliability and relevance that it was stricken because it failed to comply with *Daubert* and *Kumho Tire.*

It is not just Mr. Barrett's current lawyers who say Ms. Dalley is far from being an objective scientific witness, but is a partisan advocate who dresses up her personal opinions in the guise of "science." The Oklahoma Court of Criminal Appeals has chastised Ms. Dalley, reversing a first degree murder conviction due to Dalley's unreliable, unscientific testimony, including the improper use of computer-generated animations. *Dunkle v. State,* 139 P.3d 228, 249-51 (Okl. Cr. 2006). In that case, the defendant's murder conviction was reversed in large part because Iris Dalley's conclusions and computerized animations were not based on objective scientific findings, but simply restated the prosecution's theory of the case under a "scientific" gloss. Based on Mr. Hueske's report, Dalley did the same thing in Mr. Barrett's case. She used improper methodologies and techniques to "package" evidence already heard by the jury, offering conclusions based on an incompetent and unscientific evaluation of the evidence.[48]

Because Dalley's analysis was an important part of the Government's case, it was inexcusable for counsel to fail to hire an independent expert such as Mr. Hueske to evaluate her methods and conclusions and to testify for the defense. Had all the flaws in Dalley's testimony been exposed by independent evidence, there would be little if any "physical evidence" to support the prosecution's theory as to how the shooting occurred and the position of Mr. Barrett when he fired the .233 rifle. If an independent expert such as Mr. Hueske had been retained to critique Dalley's work, the defense would have been placed in a much stronger position to argue, as it did, that Mr. Barrett was inside his house rather than outside when he fired the weapon, and

---

[48] In addition to trial counsel's other failings with respect to Dalley's testimony, counsel were professionally unreasonable for failing to investigate Dalley's track record of giving scientifically groundless testimony. Although the *Dunkle* case was decided in 2006, after Mr. Barrett's trial concluded in 2005, it was tried some years before, the appellate briefs had been filed at the time of Mr. Barrett's trial, and Dalley's reputation was well known in the criminal defense community.

was thus unaware that the vehicle coming directly at his house was a police vehicle, especially due to the fact the Ford Bronco driven by Trooper Hamilton had no emergency lights engaged.

All of this is especially critical on the issue of intent with respect to Count 3 of the superseding indictment, the intent elements of Counts 1 and 2, and the intent elements in the penalty phase. Even if the trial court had received Dalley's testimony, there is at least a reasonable probability that the outcome of the trial would have been different. If jurors had been shown the chasm between what counts as a scientifically reliable claim and Dalley's testimony, they would have reached any of several conclusions adverse to the prosecution, from finding that Dalley just made things up in an effort to assist the prosecution, to finding that her conclusions were entitled to little credence or weight.

To obtain a conviction on Count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed a law enforcement officer in the performance of his official duties, that he knew or had reason to know he was shooting at a law enforcement officer, and that the shooting was precipitated by that knowledge. Absent Dalley's testimony, all the Government had to rely on were the often conflicting accounts and compromised memories of the Tact Team members who testified.

Thus, the prejudice under *Strickland* flowing from counsels' failure to effectively contest Dalley's testimony with expert assistance is readily apparent. The failure to prepare a reliable reconstruction of the crime scene, or to challenge an unreliable reconstruction, is ineffective assistance where the reconstruction is an important issue at trial. *See Draughton v. Dretke,* 427 F.3d 286 (5th Cir. 2005)(trial counsel ineffective for failing to present evidence on how fatal shooting occurred, which would have supported defense claims); *Martin v. Grosshans,* 424 F.3d 588, 590-92 (7th Cir. 2005)(counsel ineffective in part for failing to object to the inadmissible

testimony of two key prosecution witnesses); *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998)(counsel unreasonable and ineffective for failing to object to improper expert testimony); *Driscoll v. Delo,* 71 F.3d 701, 708 (8th Cir. 1995)(counsel professionally unreasonable and ineffective for failing to impeach serology evidence); *Jennings v. State,* 744 P.2d 212 (Okl. Cr. 1987)(counsel ineffective for failing to secure opinion from accident reconstruction expert who would have corroborated eyewitness testimony that defendant was not driving the vehicle involved in a fatal accident).  As in *Jennings,* defense counsels' unreasonable omission here lay in part in the failure to retain an expert, and in part in the failure to make use of lay testimony.  As set forth in Part A(9) of Ground 2, defense counsel failed to call Toby Barrett and Alvin Hahn, the only two percipient witnesses to the scene other than the law enforcement officers whose conduct was under review.

Defense counsel had requested authorization to retain the assistance of Dr. George Kirkham, a criminologist, sworn police officer, and expert in SWAT standards, methods, and procedures.  (Doc. 50.)  Counsel explained to the trial court in March 2005 that a former FBI agent, Chuck Choney, had given testimony favorable to Mr. Barrett during the second state trial, but had made it clear that he had been a friend of Trooper Eales and would not testify favorably for the defense.  *See* Tr. 3/22/05 Hr'g at 14-15.  Mr. Choney confirmed this in September and October 2005 by not returning calls from defense counsel and telling them he was, at best, reluctant to testify.  Tr. 10/3/05 Hr'g at 6-7.  Defense counsel did not speak with Dr. Kirkham before the trial started, and had only minimal contact with Mr. Choney.

In the prevailing professional norms of capital defense practice, counsel do not simply assume the accuracy of the prosecution's expert's findings, or rely upon their lay knowledge of a subject to get them through cross-examination.  Counsel acting in that manner fails to provide the

defendant with the "ample opportunity to meet the case of the prosecution" to which he is entitled, and undermines "the reliability of the adversarial testing process." *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (internal quotation marks and citations omitted). Rather, "[w]ith the assistance of appropriate experts, counsel should . . . aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence." ABA Guideline 10.7 Commentary. *See also* ABA Standard 4-4.1 Commentary ("resources of scientific laboratories may be required to evaluate certain kinds of evidence . . . Neglect of any of these steps may preclude the presentation of an effective defense"). Thus, the Supreme Court in *Kimmelman* found defense counsel's performance constitutionally deficient where counsel failed to conduct discovery and perform scientific testing on a bed sheet. *Kimmelman*, *supra*, 477 U.S. at 385-86.

Similarly, in *Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000), the court upheld the district court's grant of habeas corpus relief based, in part, on the district court's finding that defense counsel performed deficiently because they failed to consult with forensic experts prior to cross-examining the prosecution's experts. Defense counsel had "failed to file an application for funds to hire experts to examine the opinions of the State's expert witnesses. The district court found the result was an inability to 'develop the defense theory through cross-examination of the State's witnesses [which] was not strategic, but [a] total lack of preparation.'" *Id.*, 214 F.3d at 1234. As noted, the same could be said for Mr. Barrett's defense counsel's failure to have Mr. Hueske review Iris Dalley's prior testimony.

In *Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001),[49] the court held the Indiana Supreme Court had unreasonably rejected the petitioner's ineffective-assistance claim where defense counsel had failed to retain experts to challenge key aspects of the prosecution's case.  Judge Posner wrote that "it was irresponsible of the [defense] lawyer not to consult experts" in a case where so much turned on the prosecution's experts' testimony and there was little trial counsel could do to substantiate the defense without experts.  255 F.3d at 459.  As in this case, experts in different fields were available to substantiate the defense.  In *Miller*, the defense was that the defendant was not present at the crime scene, and a DNA expert, as well as a treadmark and footprint expert, would have testified there was no objective evidence he had been present.  *Ibid.*

In this case, there was no objective evidence that Mr. Barrett could have seen lights or other signs that the people attacking him were law enforcement officers.  Iris Dalley's testimony about the relative positions of the lead Bronco and Mr. Barrett were the product of unreliable methods and exaggeration.  Testimony from Dr. Kirkham would have informed the jury that the methods used by the Tact Team were so far outside the norms of safe police methods that they seemed calculated to make it impossible for Mr. Barrett to recognize them as law enforcement officers until the last possible moment.  Testimony from Mr. Hueske, and an informed cross-examination of Ms. Dalley, would have exposed her opinions as mere speculation.

In *Leonard v. Michigan*, 256 F.Supp. 2d 723 (W.D. Mich. 2003), defense counsel's performance was held ineffective where the case turned largely on weight to be given the prosecution's DNA evidence.  Defense counsel failed to secure the services of an expert prior to a suppression hearing, and the expert would have revealed many flaws in the testimony of the

---

[49] The order granting habeas corpus relief, but not the opinion itself, was withdrawn after the parties settled the case.  *Miller v. Anderson*, 268 F.3d 485 (7th Cir. 2001).

prosecution expert. There, as here, the failure to retain an expert prior to the suppression hearing, then conceding admissibility of the prosecution expert's testimony without the information the defense expert could have provided to bring that testimony into doubt, was unreasonable because the decision was based on incomplete investigation. 256 F. Supp. 2d at 731.

The *Leonard* court also found trial counsel acted unreasonably by failing to secure an expert to assist with cross-examination during the testimony of the prosecution's expert. *Id.* at 733. "How defense counsel could have proceeded to trial, knowing the critical piece of evidence against his client was DNA evidence, without first reviewing the experts' reports, protocol, and analysis is almost incomprehensible and certainly unreasonable." *Ibid.* One could say the same here. Although Mr. Barrett's defense counsel had reviewed Ms. Dalley's prior testimony, they simply threw away the opportunity to have their cross-examination informed by an expert in the field.

In other cases where defense counsel failed to make use of expert assistance the courts made available, their performance was found to be deficient. The court in *Miller* raised *sua sponte* the question whether trial counsel could have found the experts offered by post-conviction counsel, and the question whether the trial court would have provided funds for those experts. 255 F.3d at 457. Here, the record answers those questions. Defense counsel knew about Mr. Hueske and Dr. Kirkham, and the court authorized them to assist the defense. Similarly, in *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (*en banc*), the court found it significant that defense counsel "spent less than half the defense investigation budget authorized" to prepare for trial. 270 F.3d at 927. This was one factor reflecting counsel's lack of preparation.

Defense counsel's conduct in this case is similar to that of counsel in *Miller v. Senkowsky*, 268 F. Supp. 2d 296 (E.D. N.Y. 2003). There as here, defense counsel signaled that

he was aware there was a strategic need to retain the services of experts to challenge the prosecution's theory of liability. There as here, the trial court authorized counsel to retain experts to assist the defense, but defense counsel failed to retain the experts. 268 F. Supp. 2d at 311. There as here, defense counsel cross-examined the prosecution's expert about questionable matters in the expert's testimony. *Ibid.* But, there as here, defense counsel's failure to retain available experts denied the defense the opportunity to present the jury with an independent expert's opinion that contradicted that of the prosecution. *Id.* at 311-12. Relying on *Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001), and earlier decisions from the Seventh Circuit, the court concluded it was unreasonable for defense counsel not to seek an independent expert's opinion. *Id.* at 312.

Another theme echoed by courts in other cases is that defense counsel is professionally unreasonable for calling expert witnesses they know or should know will be hostile to the defense position and/or will give damaging testimony. This was certainly the case with Mr. Choney. In *Miller*, for example the Seventh Circuit found defense counsel had made a tactical decision to call a psychologist to testify that Miller "was incapable of the kind of violence that had been perpetrated against the victim." 255 F.3d at 458. There was no "coherent reason" for the tactic "given the inevitability of the destruction of the psychologist and of Miller himself if the jury was told about the prior convictions," which occurred during cross-examination. *Ibid.* This Court should similarly find there was no coherent reason for Mr. Barrett's defense counsel to call Chuck Choney to the stand given the inevitability that he would change his testimony to harm the defense. Whatever counsel hoped to accomplish, the risk to Mr. Barrett was too great given that it was entirely avoidable, and an independent expert who could have offered favorable testimony had already been approved by the court.

Similarly in *Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000), the court found defense counsel acted unreasonably when he decided to recall a mental health expert at a second trial after the expert's testimony at the first trial had been "rambling, confusing, and, at times, incoherent to the point of being comical." 235 F.3d at 264. The court found defense counsel acted unreasonably in part because, like Mr. Barrett's counsel, they waited until "the eleventh hour" to prepare for the second penalty trial. *Id.* at 270. The court continued, "Counsel's decision to call [the expert] at the retrial of the penalty phase, despite their belief that [his] testimony could realistically be more harmful than helpful, simply because counsel believed it would not be worth their time to request additional money from the court, cannot be deemed to have been a reasonable exercise of professional judgment." *Id.* at 270. In Mr. Barrett's case, the issue is not the competence of the witness *per se* but the witness's telling defense counsel that he would, if he could, harm the defense case. Here, defense counsel lacked even the unreasonable excuse proffered in *Skaggs,* because the trial court had authorized counsel to retain another expert. *See also Sechrest v. Ignacio*, 549 F.3d 789 (9th Cir. 2008) (ineffective assistance found for allowing pro-prosecution witness to testify where a defense witness was standing by).

> Defense attorneys, we recognize, are not obligated to shop for "the 'best' experts" who will testify in the most advantageous way possible. *Reynolds v. Bagley*, 498 F.3d 549, 557 (6th Cir.2007). But it is unreasonable, after an incomplete investigation, to put an expert on the stand who will "directly contradict[ ] the sole defense theory" and "render worthless" other helpful testimony. *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir.2000).

*Johnson v. Bagley*, 544 F.3d 592, 605 (6th Cir. 2008). *See also, Akwal v. Mitchell,* 559 F.3d 456, 464-68 (6th Cir. 2009)(where accused's defense was insanity, counsel ineffective for calling expert who testified defendant was sane at the time of the commission of the offense); *id.* at 466 ("presenting an expert witness whose testimony plainly contradicts and utterly destroys an individual's sole defense constitutes deficient performance by counsel"); *Combs v. Coyle,* 205

F.3d 269, 288 (6th Cir. 2000)(counsel ineffective for relying on expert witness who undermined defense).

### 2.    *The Failure to Impeach and Present Percipient Witness Testimony*

The failure to secure expert testimony to contradict the Government's theory was compounded by trial counsel's failure to impeach the version of events given by Government witnesses with the prior state trial testimonies of the Government witnesses and the testimony of reliable  eyewitnesses whose testimony rebutting the Government's recent version of events was readily available.  *See* Claims 2A.9 (Doc 95 at 143-149);  2A.10 (Doc 95 at 149-154).  The extensive record details of the factual bases for the claims is incorporated as if fully set forth herein.  In general, prior to the federal trial, there had been two state trials in which witnesses had testified.  Government witnesses had testified significantly differently at the state trials on the critical issues of (1) Mr. Barrett's knowledge that the onslaught of aggressive activity in the middle of the night was a police action and (2) who actually initiated the gunfire.  Had trial counsel insisted on securing the prior transcripts and compared the testimonies of the Government witnesses, including  Trooper Poe, Greninger and Hamilton and most importantly Clint Johnson, the Government's version of events would have been shown to be what it was – a concoction fabricated to avoid the same result as the state court trial.

Even more inexplicably, trial counsel did not call two eyewitnesses, Toby Barrett and Alvin Hahn, to rebut the law enforcement accounts of the raid.  *See* Doc. 95 at 149-154.  Toby Barrett, a witness relied upon by the State, raised reasonable doubts at the state court trial about the Government's version of events regarding the raid, including the prosecutor's argument that Mr. Barrett had an opportunity to observe the scene, see police lights and form the intent to kill before the shooting started.  (R. 4299-4302.)  Similarly, counsel failed to call Mr. Barrett's

neighbor, Alvin Hahn, to support the defense theory that the police assault occurred without indication that they were law enforcement, giving Mr. Barrett reason to believe he was being attacked by unknown trespassers.  (Exhibit 75.)

Trial counsel's omissions of these known witnesses were unreasonable and prejudicial. In *Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007), the court held the result of the trial was unreliable because the defense attorneys had failed to interview and present testimony from percipient witnesses who would have corroborated the defendant's account of events and supported acquittal.

In *Goodman v. Bertrand*, 467 F.3d 1022 (6th Cir. 2006), the court vacated the petitioner's conviction based on the cumulative effect of a few deficiencies in counsel's performance.  Of significance here, defense counsel failed to call as a witness an individual who had testified in a previous trial on the same charge.  In the prior trial, the witness failed to identify the defendant as the perpetrator.  That trial ended in a hung jury.  467 F.3d at 1024.  The court found it was unreasonable for the defense not to call the witness, although defense counsel defended the decision not to subpoena her because he believed the government would call her.  Similarly here, the prosecution had called Toby Barrett and Alvin Hahn in the state trials.  "There is little tactical wisdom in counsel resting on his hands and assuming the government would help make the defense case for him."  467 F.3d at 1029.

The testimony of Toby Barrett and Alvin Hahn would have conflicted sharply with the accounts of the Government's witnesses, and provided jurors with evidence that Mr. Barrett did not know, in the few seconds he had to act, that the people attacking his cabin in the middle of the night were law enforcement officers.  Viewed individually, and especially collectively, with all the evidence defense counsel failed to prepare and produce in the first stage of trial to counter

the Government's case, there is a reasonable likelihood of a different result had Toby Barrett and

Alvin Hahn been called as witnesses. *Strickland v. Washington,* 466 U.S. 668 (1984); *Stewart v.*

*Wolfenbarger,* 468 F.3d 338, 357, 361 (6th Cir. 2006)(counsel ineffective for failing to call

available witnesses who would have supported defense claim, specifically, in that case, an alibi

defense); *Draughton v. Dretke,* 427 F.3d 286 (5th Cir. 2005)(counsel ineffective for failing to

produce evidence supporting defense theory and in contrast to prosecution testimony on how

shooting occurred); *Cargle v. Mullin,* 317 F.3d 1196, 1120-22 (10th Cir. 2003)(counsel found

ineffective, among other reasons, for failing to call available witnesses to contradict testimony of

prosecution witnesses, and prosecution's theory as to how homicides were committed).

### 3.    *The Failure to Attack the Inference that Mr. Barrett was Aware of a Warrant*

In Part A(11) of Ground 2, Mr. Barrett describes the abundant evidence defense counsel

could have presented showing that he lacked knowledge of a bench warrant for failing to appear

for trial.  Defense counsel's presentation of the bail bondsman at the penalty phase demonstrates

that counsel were aware that doubts could be raised about the issue of notice.  Their failure to

investigate is materially indistinguishable from the circumstances of *Rompilla v. Beard*, *supra*.

The Court found one "obvious reason that the failure to examine Rompilla's prior conviction file

fell below the level of reasonable performance" was that counsel was aware the prior would be

used in aggravation.  545 U.S. at 383.  "It [was] also undisputed that the prior conviction file was

a public document" available at the local courthouse.  *Id.* at 384.

> With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation.

*Id.* at 385.

In Mr. Barrett's case the obviousness of the need to investigate was even greater. The alleged failure to appear was the *sine qua non* of the entire case. Yet defense counsel (a) failed to review the court records for January 25, 1999, the day of the supposed trial, and (b) failed to recognize that the warrant had been "issued" by a deputy clerk in violation of state law.

The available evidence defense counsel unreasonably failed to investigate shows the following, *inter alia*:

- Court records showed reason to believe Mr. Barrett had no reason to go to court in January 25 because the trial was not scheduled to occur, no jurors were summoned, and he was without counsel;

- The state court had found the District Attorney had not sought an arrest warrant, and the warrant had "issued" illegally under state law for that reason and because it was signed only by a deputy clerk;

- That Mr. Barrett's counsel on the charge had obtained an offer for him to plead guilty and receive no jail time;

- There was no official evidence of notice of the failure to appear and no record, such as a certified mail receipt, that notice had been received;

- That Mr. Barrett's attorney in that case had been upset with him and had cut off communication.

*See generally* Exhs. 31 and 182, and transcripts cited on pages 155-58 of the Second Amended § 2255 Motion.

In addition, defense counsel failed call a neighbor of Mr. Barrett's who would have testified that approximately three weeks before the raid, law enforcement officers visited Mr. Barrett's cabin, inspected his weapon, and left without either arresting him or mentioning a

warrant. ( Exh. 85.)  Sheriff Phipot also has told Mr. Barrett's investigator that he was present in late 1998 for a similar incident on the property.  (Exh. 108.)  Had defense counsel interviewed Mr. Barrett's family they would have testified, consistent with Dr. Kirkham, that the raid was foolish and unnecessary as Mr. Barrett could have been arrested without confrontation or violence.  (Exhs. 91, 93, 97.)

Cumulatively or individually, the evidence available but unpresented would have given jurors at least reasonable doubt about the Government's circumstantial theory, of notice and intent.  Defense counsel's failure to subject that theory to the available means of adversarial testing was a failure to function as counsel guaranteed by the Sixth Amendment.

At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief.  Other jurors, presented with impeachment of the Government's theory acquitted Mr. Barrett of intentional murder.  This Court must either vacate the judgments of conviction and sentence, or schedule an evidentiary hearing at such time that counsel may complete their investigation.  R. Gov. § 2255 Proc. 8(c).

**Ground 2, Part A (11).**     **Trial counsel unreasonably failed to contest the admission of lengthy "expert" testimony which served no legitimate purpose, but merely excused the inaccuracies and inconsistencies in the fact witnesses' testimony.  Counsel also unreasonably failed to seek an adequate remedy for this improper testimony.**

Mr. Barrett's trial counsel unreasonably failed to challenge the Government's use of irrelevant and prejudicial testimony of James H. Horn, a so-called expert in the area of "traumatic stress."  (R. 849.)   Trial counsel allowed the jury to hear Horn's testimony over a period of two days, failed to timely move to strike that testimony, and when the court did finally strike the testimony, failed to obtain an adequate curative instruction, or to move for a mistrial.  The facts

supporting the claim are set out extensively in the Amended Petition and fully incorporated herein.  (Doc. 95 at 163-176.)

Horn testified extensively before the jury without challenge from defense counsel, who elicited details of how law enforcement officers should be treated after a traumatic incident, and permitted Horn to establish that his work was not "interested in critiquing and facts, but in helping [officers] resolve their emotional response to these incidents."  Though the Court eventually struck the testimony (R. 1636), and instructed the jury not to consider the extensive testimony (R. 1740), it was too little too late.  Trial counsel's failure to aggressively seek an affirmative order striking the testimony and/or a mistrial was constitutionally indefensible.  Absent this error Petitioner probably would not have been convicted or, at a minimum, sentenced to death.

Horn's testimony was inadmissible under Fed. R. Evid. 702.  The fact was equally clear on the basis of the two state trial transcripts.   The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), charged trial judges with the "gatekeeper" function of excluding unreliable expert testimony and ensuring that the proposed testimony will assist the trier of fact in understanding or determining a fact in issue. To do so, first, the trial court must ensure that the evidence is reliable.  *Id.* at 592.  Second, the court must ensure that the evidence will assist the trier of fact and is thus relevant.  *Id.  Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137 (1999) further held that the principles enunciated in *Daubert* applied to all expert testimony, not merely scientific evidence.

Counsel were also ineffective for failing initially to challenge Horn's qualifications and the admissibility of his testimony despite ample opportunity to prepare for a challenge to Mr. Horn.  Defense counsel were also ineffective for failing to challenge Horn's testimony because it

was not helpful to the trier of fact.  The unopposed admission of his testimony, and counsel's

eventual need to have it stricken were "the result of inattention, not reasoned strategic judgment."

*Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005) (internal citation omitted) (counsel ineffective

for failure to review readily available court file concerning previous conviction).  Defense

counsel appear to have had no real strategy concerning Horn's testimony.  They conceded

admissibility, and reconsidered only when the court ruled the testimony inadmissible and

suggested moving to strike it.

Defense counsel's apparent acceptance without question of a privileged relationship

between Horn and the officers he was debriefing was insupportable.  While the federal courts are

authorized to define new privileges, and the "recognition of a privilege based on a confidential

relationship should be determined on a case-by-case basis," *Jaffee v. Redmond*, 518 U.S. 1, 5-7

(1996) (recognizing privilege in communications with licensed social worker), no "traumatic

stress debriefing" privilege has yet emerged, and counsel did not raise or argue Mr. Barrett's

right to effective representation through full discovery and cross-examination informed by

knowledge of what was said at the debriefings.[50]  Thus, counsel's ineffective performance in

accepting at face value Horn's claim of confidentiality spilled over into their cross-examination

of the tactical team officers.

Not only did counsel lack information from the debriefings with which to cross-examine,

but they also overlooked the critical fact that the group sessions were, in effect, a pre-emptive

---

[50]Strong policy arguments would militate against allowing law enforcement to conceal such debriefings on privilege grounds.  To do so would create the temptation to hold debriefings in every controversial case in order to chill defense counsel's ability to cross-examine effectively about the possibility of contamination of witnesses.  Moreover, since the officers in this case effectively waived any privilege by testifying as to the facts of the incident, shielding them from inquiry into earlier and possibly inconsistent statements would be decidedly unfair.

violation of Fed. R. Evid. 615:  an untrammeled opportunity for the officers to learn in advance what other officers would say and, consciously or unconsciously, adopt other officers' perspectives on the incident.  Defense counsel also did not question the narrative technique adopted by some of the officers, of speaking in the present tense - a recognized therapeutic technique in trauma counseling - when describing what they said had taken place.[51]  This not only suggested an unusual degree of synchronicity in the officer's testimony, but rendered it more powerful than a normal past-tense narrative.

Regardless of the court's instruction, Horn's testimony should not have been admitted and was highly prejudicial.  It was the court that recognized Horn had nothing legitimate to offer, hence the fact that his testimony was stricken.  This testimony must have had a tremendous impact on the jury, and the court's instruction to disregard it was an exercise in futility.

Horn's connection with the FBI alone would have been perceived by the jury as lending weight to what he said.  Another court, in holding that the testimony of a member of the FBI's Behavioral Analysis Unit failed to satisfy *Daubert*, noted: "In light of ... the considerable authority and even mystique in which these experts are cloaked due to their status within the FBI, it is essential to establish the reliability of such expert testimony."  *United States v. Thomas*, No. CCB-03-0150, 2006 U.S. Dist. LEXIS 3266 at * 90-94 (D.Md. January 13, 2006) (criticizing unreliability, lack of proven methodology and circular reasoning of agent's testimony).

This was not a case where an isolated and fleeting reference to an improper matter would have been easily cured.  It is normally presumed "that a jury will follow an instruction to disregard inadmissible evidence *unless* there is an overwhelming probability that the jury will be

---

[51]  *See* David H. Barlow, *Clinical Handbook of Psychological Disorders, Third Edition: A Step-by-Step Treatment Manual*, 71, Guilford Press (2001).

unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987) (internal quotation marks and citations omitted) (emphasis added);  *Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005) (single reference to defendant as an "ex-con" cured by instruction to disregard). The probability that the court's instruction prevented the jury from considering Horn's testimony in the ways stated herein is overwhelmingly small.  Horn's testimony stretched out over two days, and the supposedly curative instruction given by the court was late in coming.

Horn's testimony concluded on October 4, 2005, but the jury was not instructed to disregard it until three days later, on October 7, 2005.  This delay can only have allowed the evidence to sink into the jury's consciousness.  By contrast, in *United States v. Joe*, 8 F.3d 1488, 1498 (10th Cir. 1993), an erroneous reference to the defendant's prior incarceration was a "single isolated occurrence in the context of a larger explanation and the trial judge gave an immediate curative instruction."  Consequently, reversal was not required.  In this case, the nonchalant instruction downplayed its own importance and cannot be said to have effectively admonished the jury.

Notably, this was a case where the prosecution evidence had previously failed to convince two state court juries to convict Mr. Barrett of either first or second degree murder.  It can therefore be readily concluded that the evidence was otherwise "not overwhelming" and that the impact of Horn's testimony on the jury requires a new trial.  *See United States v. Sands*, 899 F.2d 912 (10th Cir. 1990) (new trial warranted where it cannot be said with reasonable certainty that the improper reference "had but very slight effect on the verdict of the jury").

As alleged in the Amended Petition, Doc. 95 at 176, there was no disadvantage to requesting  mistrial and therefore no strategic reasons for failing to make the motion.  Counsel's

failure to move for a mistrial clearly demonstrated deficient performance.  In a similar situation, where counsel only realized during the testimony of a government witness that his client's statement had been given after he had already invoked his rights, a trial court suppressed the statement.  However, only a cautionary instruction was given and counsel did not move for a mistrial.  *United States v. Ramsey*, 323 F.Supp.2d 27, 33  (D.D.C.  2004).  Counsel's performance was held to be deficient in the circumstances of that case, where "any reasonable defense lawyer would have jumped at the chance to start the trial afresh." *Id*. at 37.  Given Mr. Barrett's counsel's lack of preparedness, their failure to even attempt to obtain a mistrial defies explanation.  *See also Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir. 2005) (trial counsel ineffective for failing to move for mistrial after prosecutor's inflammatory closing argument); *Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996) (counsel ineffective for failing to move for mistrial after repeated references to defendant's exercise of right to remain silent); *Crowe v. Sanders*, 864 F.2d 430 (6th Cir. 1989) (counsel ineffective for failing to seek mistrial after court gave improper parole instructions); *Snowden v. Singleterry,* 135 F.3d 732, 738 (11th Cir. 1998) (counsel ineffective for failing to object to bogus "expert" testimony).

**Ground 2, Part A (12).**      **The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate instructions**.

Trial counsel's task in representing a criminal defendant is to giveg the jury a way to find reasonable doubt.  In this respect, closing argument is an indispensable aspect of the defense function.  *Herring v. New York*, 422 U.S. 853 (1975); *Gardner v. Florida*, 430 U.S. 349, 360 (1977).  However, the defense lawyer also must request jury instructions that frame the issues and enable the jury to give effect to the defense's theories.  Absent such instruction, defense evidence may not be given appropriate effect.

Mr. Barrett's trial counsel unreasonably failed to seek instructions that would have given the jury a way to give effect to the defense evidence and argument. The instructions trial counsel unreasonably failed to seek include an instruction on informant witness credibility, an instruction on drug-addict witness credibility, an instruction on self-defense, instructions on the theory of the defense, and instructions on lesser-included offenses.

The prosecution relied heavily on the testimony of seven informant witnesses. These witnesses, as the prosecutor has conceded, were critical to distinguishing the prosecution in this case from the two previous state-court prosecutions. Some of these witnesses acknowledged at trial, or have acknowledged since the trial, that they were involved in illegal activities before, during, and after their testimony or the events about which they testified. These activities included illegal drug possession, use, and/or distribution, various civil violations, making false statements, weapons violations, and violations of court orders.

An attorney has a duty to conduct legal research, and be informed about, and seek from the trial court, such orders as may be available to assist in the presentation of the defense.

Courts have long given instructions that inform the jury that the testimony of an informant "'must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.'" *See*, *e.g.*, *United States v. Humphrey*, 208 F.3d 1190, 1206 (10th Cir. 2000). *See also United States v. Bridwell*, 583 F.2d 1135, 1142 n.6 (10th Cir. 1978). Although trial counsel argued to the jury that the informant witnesses' testimony should not be credited, counsel unreasonably failed to seek a jury instruction to the same effect.

The informant witnesses also confessed to being drug addicts, either at the time of their testimony, or at the time they allegedly perceived the "events" they described in their testimony.

Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford, and Brandie Price were all drug addicts at relevant times.

Courts have long instructed juries that the testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. One such instruction reads:

> "You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt."

(Fifth Circuit Pattern Jury Instr. 1.16 (2001).)

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support." *United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir.2005) (citations omitted). The defense theories were (a) that at the point in time when Mr. Barrett fired his weapon he had no indication that the vehicle speeding toward him contained law enforcement officer (R 4314), and (b) that Mr. Barrett was not engaged in drug manufacturing or distribution when the raid took place. As evidenced by the state-court verdicts, the inconsistent testimony of the law enforcement percipient witnesses in federal court, and the jury's verdict in this case, there was evidence and legal support for a theory-of-defense instruction. *Richards v. Quarterman,* 566 F.3d 553, 568-70 (5th Cir. 2009) (defense counsel was ineffective not only for failing to introduce available exculpatory evidence, but also failing to request appropriate instructions, specifically on lesser included offenses.

**Ground 2, Part A (13).** **The outcomes of the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, resulting in numerous meritorious claims on direct appeal being evaluated under the onerous plain error standard.**

In Ground 2, Part A(13), Mr. Barrett sets forth the factual basis for finding his defense counsel were professionally unreasonable for failing to make proper objections in order to preserve the record for appeal in violation of his Fifth Amendment due process rights, his rights to effectively confront witnesses and to the effective assistance of counsel under the Sixth Amendment, and his right to a reliable sentencing determination under the Eighth Amendment. Trial counsel's failure to timely preserve complete objections are fully set out in the Amended § 2255 Motions and in the direct appeal decision in this case *United States v. Barrett,* 469 F.3d 1079 (10th Cir. 2007).

Trial counsel's failure to make full and timely objections to each of these errors constituted ineffective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668 (1984); *Cf. Martin v. Grosshans,* 424 F.3d 588, 590-92 (7th Cir. 2005); *Cargle v. Mullin,* 317 F.3d 1196, 1220-22 (10th Cir. 2003); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir. 1996). Analogously, in these cases, counsel were found ineffective, in whole or in part, for simply failing to object to prosecutorial misconduct. In Mr. Barrett's case, trial counsel's failures to lodge appropriate objections and to adequately preserve the record for appeal were numerous, were not a function of legitimate trial strategy, and prejudiced Mr. Barrett because the onerous "plain error" standard was applied to judging myriad meritorious issues.   Under prevailing professional norms, trial counsel had a duty to "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim." ABA Guideline 10.8 and Commentary, 31 *Hofstra L.Rev.* 913, 1028 (2003). Trial counsel must bear in mind "the importance of protecting the client's

rights against later contentions by the government that the claim has been waived, defaulted, not exhausted or otherwise forfeited." *Id.* Once counsel has made a decision that a clam should be made, counsel has the duty to "present the claim as forcefully as possible" and "ensure that a full record is made of all legal proceedings in connection with the claim." *Id.* at 1028-29.

Each of the claims that trial counsel failed to preserve had merit. Mr. Barrett would have suffered no adverse consequences had trial counsel made timely and complete objections. Had counsel made appropriate objections, Mr. Barrett would have obtained relief from his convictions and sentence of death based on each of these errors under the appropriate de novo standard of review. Accordingly, trial counsel's failure to preserve Mr. Barrett's objections on each of these grounds fell far below the standards expected of competent counsel in capital cases.

The constitutional violations set forth above warrant the granting of § 2255 relief without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abramson,* 507 U.S. 619, 638 n. 9 (1993). Furthermore, these constitutional violations, individually or cumulatively, so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the jury's determinations of guilt and punishment, rendering them fundamentally unfair and resulting in a miscarriage of justice.

**Ground 2, Part A (14).    Trial counsel unreasonably failed to object to numerous instances of prosecutorial misconduct in closing argument in the penalty phase of trial.**

Ground V, section C, details repeated instances of prosecutorial misconduct in questioning witnesses and in closing arguments in both the guilt/innocence and the sentencing phase. The specific instances will not be repeated but are incorporated herein by specific reference. Faced with arguments that could in no sense be termed appropriate, counsel failed

altogether to object.  The failure to object to clear prosecutorial misconduct can never be termed

a reasonable strategy.  Especially in light of the numerous, serious constitutional errors which

plagued Mr. Barrett's trial, this omission by counsel was prejudicial.  In this case, the prosecution

basically did whatever it pleased.  That abuse of the process continued unabated in second stage

closing arguments, to Mr. Barrett's clear detriment.  *E.g., Girts v. Yanai,* 501 F.3d 743, 755-58

(6th Cir. 2007); *Hodge v. Hurley,* 426 F.3d 368, 386-89 (6th Cir. 2005); *Washington v.*

*Hofbrauer,* 228 F.3d 689, 703, 709 (6th Cir. 2000); *Gravely v. Mills,* 87 F.3d 779, 785 (6th Cir.

1996) (finding counsel ineffective for failing to object to misconduct in closing arguments).

**Ground 2, Part B**

> **1.**   ***Deficient Performance:  Mr. Barrett's defense counsel failed to fulfill duties to conduct a thorough background investigation, consult with experts, and prepare a two-stage strategy based on readily available information.***

In general, the standard for evaluating an ineffective-assistance claim related to the

penalty phase of a capital trial is the same as that applied to the liability phase.[52]  However,

reviewing courts

> are particularly vigilant in guarding this right when the defendant faces a sentence
>
> of death. See *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir.1997) ("In
>
> assessing counsel's conduct, we are mindful of the Supreme Court's observation
>
> that '[o]ur duty to search for constitutional error with painstaking care is never
>
> more exacting than it is in a capital case.'") (quoting *Burger v. Kemp*, 483 U.S.
>
> 776, 785 (1987)).[53]

---

[52]  *Strickland*, 466 U.S. at 695; *Smith v. Mullin*, 379 F.3d 919, 938 (10th Cir. 2004).

[53]  *Smith*, 379 F.3d at 938-39 (parallel citations omitted).

The differences between first and second-stage claims relate to the different tasks trial counsel must perform in a capital case, and the law related to a capital sentencing decision.[54]  Of course, the tasks counsel must perform in order to prepare for a capital trial are, in large part, driven by the rules governing these unique proceedings.  The Court of Appeals for the Tenth Circuit has summarized these duties:

> "The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir.2001). To perform adequately in a capital case, trial counsel must undertake "'to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' " *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989) [hereinafter 1989 Guidelines] ); *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.7(A) (2003) [hereinafter 2003 Guidelines]. Counsel should consider, inter alia, medical history, educational history, social and family history, religious and cultural influences, and employment. *See* 2003 Guidelines 10.7, Commentary.[55]

---

[54]  *Strickland*, 466 U.S. at 694-95 (determination of prejudice must be based on assumption that jurors will follow the law applicable to decision); *Smith*, at 939 (citing ABA Standards for Criminal Justice 4-1.2(c) (3d ed. 1993) ("Since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused.")).

[55]  *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007).

Mr. Barrett had a constitutionally protected right to have his trial counsel investigate, develop and present, and have the jury give effect to, mitigation evidence related to his background and character and the circumstances of the offense.[56]  In order to guarantee enforcement of that right, trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice, such as the norms codified in the ABA Criminal Justice Standards ("ABA Standards") and the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines").[57]

Eighth Amendment law has long recognized that mitigation evidence exists in many forms.  The Supreme Court has "spoken in the most expansive terms" when describing the scope of mitigation evidence.[58]  "[M]itigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."[59]  In order to identify evidence from the defendant's background or the circumstances of the crime that a juror could find has mitigating value, trial counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'"[60]

---

[56]  *Williams v. Taylor*, 529 U.S. 362, 393 (2000); *Eddings v. Oklahoma*, 455 U.S. 104, 113-15 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion).

[57]  *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams*, 529 U.S. at 396; *Smith*, 379 F.3d at 942.  References to the 2003 Revised Edition of the ABA Guidelines are to 31 Hofstra L. Rev. 913 (2003) and are referenced as "ABA Guidelines" unless the 1989 Guidelines are intended.

[58]  *Tennard v. Dretke*, 542 U.S. 274,  284 (2004).

[59]  *Ibid.* (internal quotation marks omitted).  *See also Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (decision whether to impose death sentence must be informed by "compassionate or mitigating factors stemming from the diverse frailties of humankind").

[60]  *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 452-53 (2009), quoting *Williams*, 529 U.S. at 396; *Wiggins*, 539 U.S. at 522 (same).  *See also* ABA Guideline 10.7 (Investigation); ABA Guidelines, 31 Hofstra L. Rev. at 925 ("providing quality representation in capital cases requires counsel to undertake correspondingly broad investigation and preparation").

A central goal for this investigation is finding evidence that humanizes the defendant and provides an explanation for the crime.[61]  Both court decisions and codified norms of capital defense practice recognize the need for defense counsel to begin the mitigation investigation early.[62]  The ABA Guidelines, for example, recognize the importance of gaining sufficient trust with the defendant and his family that they will understand and cooperate with an investigation that presupposes the possibility of a conviction, and that is likely to involve highly personal and painful parts of the family's history.[63]

Prevailing professional norms called upon Mr. Barrett's defense counsel to speak with

> [w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . ., would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death.[64]

Because the entire process of investigation will take time, codified norms of capital defense practice have long recognized the need for counsel to start early and be persistent.[65]

Strategic concerns also recommend prompt investigation due to the need for counsel to have sufficient information far enough in advance of trial to develop a consistent strategy for the

---

[61]  *Smith*, 379 F.3d at 943.

[62]  *Anderson, supra*, 476 F.3d at 1143 (defense counsel's performance deficient where "penalty phase investigator[] spent only twenty-three hours in substantive investigation, all of which was undertaken in the month before trial"; citing ABA Guideline 10.7 and commentary); *Allen v. Woodford*, 395 F.3d 979, 1001-02 (9th Cir. 2005) (finding deficient performance based on defense counsel's delay in investigating potential mitigation until after guilt phase and finding "legal experts agree that preparation for the sentencing phase of a capital case should begin early and even inform preparation for a trial's guilt phase"); ABA Guidelines, 31 Hofstra L. Rev. at 925.

[63]  ABA Guideline 10.7, Commentary, 31 Hofstra L. Rev. at 1024 ("Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss.").

[64]  ABA Guideline 10.11(F)(1).

[65]  *Ibid*.; *id.*, 31 Hofstra L. Rev. at 925-26.

first and second stages.[66]  In order to complete a thorough background investigation it is routine for defense counsel to retain a mitigation specialist, an investigator with knowledge of the types of information considered mitigating and with the training or experience needed to gather this sometimes difficult information.[67]  The team, including the mitigation specialist, should be assembled "[a]s soon as possible."[68]

In Mr. Barrett's case, the observations of witnesses and even the trial record shows trial defense counsel unreasonably delayed an investigation of Mr. Barrett's background, never conducted a thorough investigation, and never learned enough about the available mitigation evidence to have made reasonable decisions about strategy.[69]  The evidence proffered with the Amended Motions shows the following with regard to counsel's duty to conduct a prompt and thorough background investigation:

---

[66]  ABA Guideline 10.10.1 ("Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."); 31 Hofstra L. Rev. at 926; Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L.Rev. 299, 320, 324 (1983).

[67]  ABA Guidelines 4.1(A)(2) and 10.7.

[68]  ABA Guideline 10.4(C).

[69]  It is well-established that defense counsel cannot make reasonable strategic decisions without first conducting an investigation into strategic alternatives.  *Wiggins*, 539 U.S. at 523 (where alleged deficiency relates to investigation court will "focus on whether the investigation . . . *was itself reasonable*") (emphasis in original); *see also*, *Strickland*, 466 U.S. at 691; *Anderson*, 476 F. 3d at 1145-46 (citing  *Hooper v. Mullin*, 314 F.3d 1162, 1170-71 (10th Cir.2002) (failure to pursue reasonable avenues of investigation without any idea of what the investigation might reveal was not an informed strategic decision and required relief from sentence of death); *Pavel v. Hollins*, 261 F.3d 210, 218 n. 11 (2d Cir. 2001) (collecting cases and discussing how decisions made in ignorance of relevant facts and law cannot be characterized as strategic under *Strickland*); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."); *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987) (noting that the "usual deference to tactical decisions is not relevant" when the decisions are based on "information that was faulty because of ... ineffective investigatory steps")).

• According to computer records and a motion to continue the trial, during the time lead trial counsel Roger Hilfiger was co-counsel with John Echols, he did not access the records of the state court trials or the files of the defense investigation of those files (Exh. 34 at p. 3);

• In court filings in February 2005, Mr. Echols advised that a prior effort to develop mitigation evidence was cut short after being conducted by a novice mitigation investigator who refused to prepare a report, and that the materials gathered by the investigator were in the possession of Steve Leedy (Exh. 64 at p. 2, 4; Doc. 113);

• In March 2005 the trial court found the services of a mitigation specialist were reasonably necessary to the defense and authorized trial counsel to use the services of Inquisitor, Inc. (Doc. 97);

• In late May 2005, after being made lead counsel, trial counsel informed the court that he was unfamiliar with the records accumulated by prior counsel during the state-court proceedings, and that he was obtaining them;

• By the end of June 2005 with the trial approximately six weeks away, trial counsel was only searching for a mitigation specialist (Exh. 67 at p. 3);

• In mid-August 2005 trial counsel asked Dr. Jeanne Russell to serve as a mitigation investigator, but she declined in part due to the lateness of the request (Exh. 56 at p. 2-3,);

• On September 9, 2005, trial counsel advised the court that they had contacted Mr. Barrett's prior counsel because they had been able to find "very little mitigation" in the materials they had received from state-court counsel (Tr. 9/9/05 Hr'g at 43,);[70]

---

[70] In *Johnson v. Bagley*, 544 F.3d at 600, the Sixth Circuit found trial counsel had been ineffective in part because they, like counsel here, had relied exclusively on inexperienced mitigation investigators who did an incomplete job.

- Trial counsel never retrieved the files of the mitigation investigator that were in the possession of Steve Leedy (Exh. 111 at p. 2), and did not confer with the attorney who had responsibility for presenting any second-stage evidence at the second state court trial (Exh. 82.);

- Trial counsel never contacted Inquisitor, Inc., the mitigation specialist the court authorized him to retain (Exh. 66.);

- Although trial counsel were aware that many family members and friends of Mr. Barrett lived nearby, no one from the defense interviewed them regarding Mr. Barrett's background or other mitigating factors (*see*, *e.g.*, Exhs. 37, 77, 78, 80, 81, 83, 84, 85, 86, 90, 95, and 96.)

It is not simply that a lawyer should conduct a mitigation investigation because prevailing professional norms say he should, or because the Supreme Court had reiterated this requirement three times shortly before Mr. Barrett's trial.[71] Nor is it merely that the Supreme Court, for nearly two decades before this trial, had reminded defense counsel that mitigation is important due to the "'belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse.'"[72] Nor was it necessary for Mr. Barrett's counsel to conduct a thorough background investigation solely because empirical evidence available to counsel and broadly cited and relied upon by courts and practitioners put trial counsel on notice that evidence of family dysfunction and mental illness were cited by jurors in

---

[71] *Rompilla*, *supra* (June 2005); *Wiggins*, *supra* (2002); *Williams*, *supra* (2000).

[72] *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).

studies as reasons to vote for a sentence less than death.[73]  While the presence of each of these factors is sufficient to compel a finding of deficient performance in this case, the evidence shows trial counsel were aware that mitigation evidence was obtainable upon reasonable investigation, and that the trial court found such an investigation was reasonably necessary.

This Court must "reconstruct the circumstances of counsel's challenged conduct, and . . . evaluate the conduct from counsel's perspective at the time."[74]  The trial record reflects counsel saw that mitigation evidence from Mr. Barrett's family would be valuable.[75]  The records and reports of prior investigators available to trial counsel showed that Mr. Barrett came from a broken home, that he had attempted suicide, that he had been diagnosed with and involuntarily treated for Bipolar Disorder, that a prior forensic evaluation and statements of witnesses cited evidence of paranoia and a mood disorder, Attention Deficit/Hyperactivity Disorder ("ADHD"),

---

[73] *See Smith*, *supra*, 379 F.3d at 942; *Brewer v. Aiken*, 935 F.2d 850, 862 (7th Cir.1991) (Easterbrook, J., concurring).

[74] *Strickland*, 466 U.S. at 689.  This requirement means both that the Court may not impose unreasonable expectations based on hindsight, *ibid.*, and that it is inappropriate to consider post-hoc rationalizations for counsel's challenged conduct.  *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990), citing *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).  *See Wiggins*, *supra*, 539 U.S. at 526-27 (rejecting theory proffered by government because it "resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing"); *United States v. Burrows*, 872 F.2d 915, 918 (9th Cir. 1989) (holding district court committed reversible error by assuming trial counsel made a strategic decision although there was no evidentiary support for the assumption); *Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002) ("it is not the role of a reviewing court to engage in a *post hoc* rationalization for an attorney's actions . . . or engage in Monday morning quarterbacking"); *Moore v. Johnson*, 194 F.3d 586, 604  (5th Cir. 1999) ("Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all"); *Griffin v. Warden, Maryland Correctional Adjustment Center*, 970 F.2d 1355, 1358 (4th Cir. 1992) (citing *Strickland* and *Kimmelman* for proposition that "courts should not conjure up tactical decisions an attorney could have made, but plainly did not"); *Patton v. State*, 784 So.2d 380, 387 (Fla. 2000) (same as *Burrows*).

[75] Trial counsel's opening statement at the penalty phase promised the jury "some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999."  Vol. 24 at 4704.

and other mental health problems affecting information processing and impulse control, especially under stress. Yet, as shown in the evidence summarized *supra*, defense counsel delayed for approximately nine months any investigation, then only made half-hearted efforts to obtain records of a previous investigation that they were on notice was incomplete. When defense counsel realized their predicament, they indicated to an Assistant Federal Defender and a psychologist that they wanted to conduct a mitigation investigation, only to learn it was too late. It was unreasonable for Mr. Barrett's defense counsel not to follow the leads that were available to them.[76]

A simple comparison between the personal history of Mr. Barrett presented at trial and that presented through records and witness declarations in the Amended Petition, plus the witnesses' statements that they were not contacted by trial counsel, or were only superficially interviewed, shows trial counsel's preparation for the penalty phase was objectively unreasonable.[77] Trial counsel presented testimony from seven members of Mr. Barrett's family: Kathy Trotter (cousin), Abby Stites (ex-wife), Steven Barrett (brother), Roger Crawford (uncle by marriage), Gelene Dotson (mother), Ernest Barrett (father), and Doris Barrett (step mother).

---

[76] *See Wiggins*, 539 U.S. at 526-27 (finding trial counsel unreasonably failed to follow lead related to defendant suffering childhood sexual abuse despite extent of other mitigation investigation); *Johnson v. Bagley*, 544 F.3d 592,605-606 (6th Cir. 2008) (trial counsel failed to conduct reasonable family background investigation despite interviewing and presenting at least one family member); *Mason v. Mitchell*, 543 F.3d 766, 768 (6th Cir. 2008) (trial counsel ineffective where conducted only limited background investigation).

[77] *See Outten v. Kearney*, 464 F.3d 401, 415-416, 418-419 (3rd Cir. 2006) (defense counsel ineffective for conducting superficial investigation and presenting six family members and friends to testify defendant was a good guy). *Compare*, *e.g.*, Vol. 24 at 4783-93 (testimony of Kathy Trotter) *with* Exh. 86; Vol. 24 at 4878-93 (direct examination of Abby Stites) *with* Exh. 103; Vol. 25 at 5030-51 (testimony of Steven Barrett) *with* Exh. 99; Vol. 25 at 5052-70 (testimony of Roger Crawford) *with* Exh. 92 at 1-2; Vol. 25 at 5071-5104 (testimony of Gelene Dotson) *with* Exh. 97); Vol. 25 at 5105-18 (testimony of Ernest Barrett) *with* Exh. 81; Vol. 25 at 5119-25 (testimony of Doris Barrett) *with* Exh. 80.

Ms. Trotter, Steve Barrett, Gelene Dotson, Ernest Barrett, and Doris Barrett report that the only work trial counsel did with them regarding the penalty phase was to speak with them for a few minutes shortly before they were called to testify. Exh. 86 at 3; Exh. 99 at 7; Exh. 97 at 16-17; Exh. 81 at 10; Exh. 80 at 1-2. Trial counsel did not even give Ernie Barrett or his wife a preview of the questions they would ask. Exh. 81 at 10; Exh. 80 at 2. Ms. Dotson and Ms. Barrett attended the trial and were available to be interviewed on many occasions.[78] Exh. 97 at 16-17; Exh. 80 at 1. Trial counsel on only one occasion visited Ms. Dotson's home, but failed to interview her about Kenny Barrett's background. Exh. 97 at 16-17. Ms. Stites reports that trial counsel did not interview her about Mr. Barrett's family history or mental health problems. Exh. 103 at 4. Mr. Crawford notes that although trial counsel questioned him on the witness stand about his daughter-in-law, Cindy Crawford, counsel never asked about Ms. Crawford's honesty or her troubles with the law. Exh. 92 at 1-2. Steven Barrett predicted that there would be questions about how he turned out different than Kenny, and even attempted to talk with trial counsel about the reasons for these differences, but trial counsel would only say they would ask him some questions.[79] Exh. 99 at 7.

The difference the commonplace of witness interviews would have made is set forth in the section of the Amended Petition and this brief addressing the prejudice prong of *Strickland*.

---

[78] It is objectively unreasonable for capital defense counsel to fail to interview the defendant's mother regarding potential mitigation when she is available and has information to disclose. *See Johnson v. Bagley*, 544 F.3d 592, 600 (6th Cir. 2008) (finding "[n]o reasonable professional judgment could have supported a decision not to interview [defendant's mother]") (internal quotations and citation omitted).

[79] The prosecution exploited trial counsel's unreasonable omission at great length, thereby furthering the misleading and incomplete image of Mr. Barrett that trial counsel presented to the jury. *See* Vol. 25 at 5042-51. Where defense counsel's failure to prepare witnesses for penalty phase leaves prosecution open to undermine mitigation, there is deficient performance. *See Outten*, *supra*, 464 F.3d at 421-423 (defense counsel's failure to interview mitigation witnesses lead to prosecutor eliciting statements about defendant assaulting them).

But there is much more to trial counsel's lack of preparation. Reasonable defense counsel would have known that a thorough investigation of the capital defendant's background, including collecting records regarding his education, medical treatment, psychiatric treatment, work history, and any criminal history is necessary for a competent assessment of mitigation by mental health experts.[80]

"Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance."[81] With regard to defense counsel's lack of investigation into mental health issues the evidence from record and extra-record sources shows the following:

- Prior counsel and a psychologist had identified potential areas of mental health mitigation including Mr. Barrett's prior diagnoses of paranoia, a mood disorder, ADHD,

---

[80] The failure to pursue obvious, readily available leads regarding aggravating and mitigating evidence has often been found to constitute deficient performance. *See*, *e.g.*, *Rompilla*, 545 U.S. at 383-84 (failure to investigate file on prior conviction that was maintained in courthouse was deficient); *Williams*, 529 U.S. at 396 (deficient performance found in part because "[c]ounsel failed even to return the phone call" of a potential mitigation witness"); *Anderson*, 476 F.3d at 1143 (defense counsel's performance deficient in part for failing to gather documents related to defendant's social history, citing ABA Guideline 10.7 and commentary).

[81] *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997). *See also Anderson*, 476 F.3d at 1143 (noting "vital importance" of investigating possible mental health evidence for penalty phase).

The trial under review in *Hall* occurred in the mid-1980's, *Hall*, 106 F.3d at 744 (citing direct appeal opinion decided in 1986), and the trial in *Anderson* occurred in 1997, *see Anderson v. State*, 992 P.2d 409, 412 (Ok. Crim. App. 1999). All of the trials under review in cases cited in this section of the present brief occurred long before Mr. Barrett's trial. While it is true that the purpose of Sixth Amendment review is not to improve the standards of defense counsel, *see Strickland*, 466 U.S. at 688, it is a reflection of how far below prevailing professional norms trial counsel's performance was that they failed to undertake the most rudimentary tasks decades after their importance was so well established in practice and in law.

and organic brain impairments, and trial counsel were on notice of those results (*see*, *e.g.*, Exh. 55);

• Trial counsel were aware that evidence of brain impairment could be helpful in both stages of trial due to the circumstances of the raid, and that Mr. Barrett had "used drugs and suffered significant head injuries during his life" (Doc. 50);

• In March 2005 the trial court found the services of a psychiatrist or psychologist were reasonably necessary to the preparation of a defense (Doc. 97), but trial counsel never retained a mental health expert to evaluate Mr. Barrett;

• In mid-August 2005 trial counsel contacted Dr. Jeanne Russell, who had performed a "risk assessment" of Mr. Barrett in 2003 (Exh. 56);

• Trial counsel obtained the report of Dr. Bill Sharp, but did not speak with him (Exh. 55);

• On September 9, 2005, with the start of jury selection less than one week away, the court described the defense's preparation as "still [a] work in progress" (Tr. 9/9/05 Hr'g at 42.);

Trial counsel's failure to have Mr. Barrett evaluated by a mental health expert fell below prevailing professional norms. As the United States Attorney himself observed at the time, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation (Tr. 9/9/05 Hr'g at 38). The facts of the case, and additional information about Mr. Barrett's background were the bases for defense counsel's request to retain mental health experts to prepare for trial. Trial counsel knew, or should have known, that Mr. Barrett had come from a dysfunctional family, had sustained head injuries, used drugs known to have a negative impact on brain functions, was considered

paranoid, had attempted suicide by shooting himself in the chest with a shotgun, was involuntarily hospitalized and treated with antipsychotic medicine, was diagnosed with Bipolar Disorder and ADHD, and that the shooting occurred during a surprise attack on Mr. Barrett's property in the middle of the night with his teenage son present. Like the United States Attorney, courts viewing less compelling cases have found deficient performance where trial counsel failed to obtain a thorough mental health assessment.[82]

Defense counsel's last-minute attempt to make use of Dr. Russell's prior assessment was unreasonable. Defense counsel themselves maintained that Dr. Russell's risk assessment was not a mental health examination, and Dr. Russell confirms that she did not see Mr. Barrett in connection with the federal trial. Exh. 56 at 4. Dr. Russell did not evaluate Mr. Barrett's neuropsychological functioning or explore the presence of other psychological conditions. *Id.* at 1-2. Merely contacting a doctor of education, or even having an examination performed, may not be reasonable where evidence suggests more work will produce more persuasive mitigation.[83]

> **2.    *Prejudice: The readily available mitigation evidence regarding Mr. Barrett's background, the circumstances of the offense, impeachment of the Government's intent witnesses, and Mr.***

---

[82] *See, e.g., Correll v. Ryan*, 539 F.3d 938, 945 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 903 (2009) (defense counsel's performance deficient where counsel knew defendant "came from a dysfunctional family, sustained a serious head injury, was committed to various psychiatric facilities, and that he was addicted to drugs; yet defense counsel did not obtain the records nor did he interview witnesses concerning these matters"); *Haliym v. Mitchell*, 492 F.3d 680, 716 (6th Cir. 2007) (defense counsel's knowledge that defendant attempted suicide by shooting himself in the temple "should have strongly suggested the need to investigate whether Petitioner had a mental defect"); *Lambright v. Schriro*, 490 F.3d 1103, 713 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 882 (2008) (finding deficient performance where defense counsel failed to conduct mental health investigation despite knowing that defendant had twice attempted suicide, been hospitalized, traumatized in Vietnam War, and used drugs).

[83] *See, e.g. Rompilla*, 545 U.S. at 391 (defense counsel ineffective despite initial unhelpful assessment from mental health experts because reasonable investigation would have revealed mental health problems); *Haliym, supra*, 492 F.3d at 715 (trial counsel acted unreasonably by allowing only for one and one half hour evaluation of defendant by psychiatrist).

**Barrett's mental problems would have changed the jury's assessment of his culpability**.

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant.  In a capital case, this standard is met if "there is a reasonable probability that at least one juror would have struck a different balance" between aggravating and mitigating evidence at the second stage of trial.[84]  Prejudice is established where "[c]ompetent counsel could have put on evidence that 'differ[ed] in a substantial way - in strength and subject matter - from the evidence actually presented at sentencing.'"[85]  Stated differently, the Sixth Amendment is violated in a capital sentencing proceeding where defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant's "unique personal circumstances"[86] and offer an explanation for his conduct.[87]

The test is not whether "a jury could have heard it all and still have decided on the death penalty." *Rompilla*, 545 U.S. at 393.  It is whether the totality of the mitigation evidence "might well have influenced the jury's appraisal of [the defendant's] culpability." *Williams*, 529 U.S. at 398.

As the Tenth Circuit stated in *Anderson*, *supra*, defense counsel are expected to recognize the importance of the penalty phase, and prepare accordingly.  The verdict from the second state court trial – which specifically rejected a finding that Mr. Barrett had an intent to kill – put Mr. Barrett's counsel on notice that rebutting evidence of intent was possible.  As shown in the

---

[84]  *Wiggins*, 539 U.S. at 537.

[85]  *Johnson v. Bagley*, 544 F.3d at 603 (quoting *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir.2005)) .

[86]  *Williams*, 529 U.S. at 415-416.

[87]  *Smith v. Mullin*, 379 F.3d at 929, 943.

preceding sections of this Brief, Mr. Barrett's defense counsel unreasonably failed to investigate and present readily available evidence to rebut the Government's theory of intent in the following ways:

- Court records and witness statements showing the seven key witnesses the government relied upon to establish intent could have been impeached because they (a) were liars; (b) were career criminals; (c) were testifying in exchange for implied or explicit promises of compensation or threats of retaliation; (d) were actively using narcotics either at the time they allegedly perceived the events described in their testimony, or at the time of their testimony, or both; (e) testified falsely, and/or (f) were discouraged from communicating with Mr. Barrett's counsel, or refused to be questioned before their testimony;[88]

- Expert testimony and cross-examination would have shown that the government's "expert" reconstructionist used unreliable methods and could not have provided any reliable opinion regarding Mr. Barrett's view of events;[89]

- Expert testimony and cross-examination of government witnesses showing that the raiding team used unorthodox methods and failed to follow standard practices in ways that made it extremely unlikely Mr. Barrett would recognize his attackers as law enforcement officers;[90]

---

[88] *See* evidence described in Ground 2, Part A(4) and the exhibits thereto.

[89] *See* evidence described in Ground 2, Part A(6) and the exhibits thereto, especially Exhibit 109, the report of Edward E. Heuske who, like other experts was found to be reasonably necessary to the defense, but was not retained until post-conviction.

[90] *See* evidence described in Ground 2, Part A(7) and the exhibits thereto, especially Exhibit 44, the report of George Kirkham, Ph.D., another expert the court found was reasonably necessary to the defense, but who was not retained until post-conviction.

- The prior inconsistent statements of members of the raiding team showing further reason to doubt that Mr. Barrett recognized his attackers were law enforcement officers;[91]

- Testimony of percipient witnesses Toby Barrett, Bubba Thompson, and Alvin Hahn who would have testified (a) that the sign on Mr. Barrett's gate had nothing to do with law enforcement; (b) that Trooper Hamilton's claim about the condition of the gate at the time of the drive-by was false; (c) that there were no police lights visible at the start of the shooting; (d) that Toby's cry of alarm was the first indication Mr. Barrett had of the raid; (e) that Mr. Barrett only had a split second view of the scene before he went inside; (f) and that there was only one car with its lights on visible within 15 seconds of the shooting;[92]

- Court records, the files of Mr. Barrett's attorney on the state drugs charge, and witness statements were available to show (a) that there was no trial scheduled for the day Mr. Barrett supposedly failed to appear, (b) that there is neither an official record nor any evidence in counsel's file that Mr. Barrett either knew of the court date or the warrant, (c) that Mr. Barrett had been offered a plea settlement that would have given him no rational reason to avoid court, (d) and that law enforcement officers had recently been to Mr. Barrett's home to inspect his weapons and left without incident.[93]

That the jury rejected the "future dangerousness" aggravating circumstance when the government offered the evidence impeached in the foregoing points demonstrates that even with

---

[91] *See* evidence described in Ground 2, Part A(8).

[92] *See* evidence described in Ground 2, Part A(9), and the exhibits thereto including the declarations of Toby Barrett (Exh. 96), Robert Thompson (Exh. 37), and Alvin Hahn (Exh. 75).

[93] *See* evidence described in Ground 2, Part A(10), and the exhibits thereto including Exhs. 39, 31, and 182. The record shows defense counsel believed it was important to present evidence that Mr. Barrett at least lacked notice of the trial and warrant as they presented witnesses on this issue.

the seven snitches, the question of intent was a close call.  It is at least reasonably probable that if defense counsel had marshaled this readily available evidence the jury would have had sufficient doubts about Mr. Barrett's intentions to vote for a sentence less than death.[94]

If Mr. Barrett's defense counsel had conducted the "requisite, diligent investigation into his client's troubling background and unique personal circumstances,"[95] the jury would have heard extensive mitigation evidence that, at a minimum, creates a reasonable probability of changing the balance for at least one juror.  The available evidence, described in detail on pages 195 through 230 of the Second Amended § 2255 Motion, and the exhibits cited therein, shows the following:

- Mr. Barrett lived, and was attacked on, land given him by his grandfather;

- The land was precious to the family as it represented the greatest wealth they had in the world;

- Mr. Barrett's family presents an extraordinary history of and hereditary predisposition for Bipolar Disorder extending over multiple generations, in addition to other relatives with severe mental illness;

- Mr. Barrett is a descendant of Cherokees; his grandfather, who gave him the property, acquired it after a life of hard work he began after leaving an Indian orphanage to which he was sent when his own father was killed in a gunfight;

- Mr. Barrett's mother Gelene grew up in poverty, and worked hard in the fields as a child; she sometimes missed out on school, but eventually graduated high school;

---

[94]  *See Anderson*, *supra*, 476 F.3d at 1146 (finding ineffective-assistance where aggravating evidence included that defendant said he wanted to "take care of" prosecution witnesses).

[95]  *Williams*, 529 U.S. at 415 (O'Connor, J. concurring).

- Mr. Barrett's paternal grandfather was mentally ill and an alcoholic; he and Mr. Barrett's grandmother also lived a hard-working life in extreme poverty;

- One of Mr. Barrett's father's earliest memories is of being taken out of school to work in the fields;

- Ernie Barrett feared his father and the erratic, angry outbursts his mental illness brought on;

- Ernie, Mr. Barrett's father, responded to these feelings of powerlessness by becoming emotionally numb, and as a boy he got into many fights, even treating his younger siblings cruelly;

- Ernie once attempted to prevent his father from beating his mother and himself sustained a large scar from a blow with a metal file;

- Ernie joined the Marines, but dealt with his memories of home by drinking to excess;

- Ernie and Gelene had a stormy marriage characterized by Ernie's emotional and physical absence, excessive drinking ("a fifth at a time"), and incessant philandering;

- Mr. Barrett's mother Gelene was miserable and suffered from alcoholism;

- From the time she was pregnant with Mr. Barrett, Gelene was humiliated and embarrassed by her circumstances and dealt with it by drinking "from the moment she woke up until she went to bed";

- Unsurprisingly, Mr. Barrett's early childhood development was marked by some significant delays including attending to someone speaking or observing their hands, playing peek-a-boo, and making associations between objects and events;

- He had trouble learning to walk, drink from a cup and play pat-a-cake;

Petitioner's Merits Brief                     119                    *Barrett v. U.S.*, 09-cv-105-JHP

- He exhibited early signs that he might develop Bipolar Disorder, including appearing "hyperactive," crying easily, and being "emotional about things that did not matter";

- Ernie and Gelene beat Mr. Barrett with a belt and Gelene in particular verbally abused him with habitually cruel or degrading speech;

- Mr. Barrett struggled in school and attended special education classes some of the time;

- Mr. Barrett's parents separated and got back together many times, at one point separating for three years;

- On at least one occasion, Ernie assaulted Gelene;

- Ernie "[h]ardly had anything to do with [Kenny] after the divorce" and Mr. Barrett suffered tremendously from the separation from the father he idolized;

- Mr. Barrett moved from Joliet, Illinois, to New Jersey, to Oklahoma and Indiana before settling in the Sallisaw area as a teenager;

- At age 14 Kenny Barrett lost his beloved grandmother, one of the few adults who visited nothing by love on him;

- At age 17, Mr. Barrett was assaulted by Sheriff John Philpot who broke his jaw;

- By this time, family and friends noticed Mr. Barrett's paranoia and "terrible mood swings" including periods of depression that lasted for days;

- His mother taught him to self-medicate with drugs and alcohol;

- Still, he earned the affection of his co-workers and neighbors, and the love of Abby, his wife;

- Abby and Kenny's marriage was stormy and involved violence on both sides and, like his parents' marriage, involved frequent separations and reconciliations;

- During the marriage, Ernie, Abby and Mr. Barrett's cousin Brandy observed Mr. Barrett's bouts of depression and sudden changes to being "manic, always on the go and upbeat," he would work all the time;

- Abby tried to get Mr. Barrett to seek psychiatric treatment;

- Abby felt that Mr. Barrett was unable to take care of himself;

- Then Mr. Barrett tried to kill himself by shooting himself in the chest with a shotgun;

- After the suicide attempt, he saw a psychiatrist who prescribed Elavil and Ascendin, but his mood swings continued;

- In October 1986 Mr. Barrett was involuntarily committed to Eastern State Hospital "as a result of mental disorder or impairment by chronic alcoholism or drug abuse" that created an immediate risk of harm to himself or others;

- After his release from the hospital nine days later Mr. Barrett was observed to be paranoid;

- In addition to the shotgun blast to the chest, Mr. Barrett experienced numerous head injuries;

- In January 1995 Mr. Barrett was again hospitalized, and this time he was diagnosed with Bipolar Disorder and placed on Haldol; hospital staff described him as "extremely agitated," and showing a "lack of concentration" and "rapid though process" characteristic of the disorder;

- His son Toby observed that Mr. Barrett was very paranoid and scared and "could be in the best of moods one minute, then the worst";

- Gelene hoped that if Mr. Barrett lived close to her "and just worked on his cars and fixed things for people, he might be able to make it";

- But Mr. Barrett became more paranoid and more dependent on his family;

- Still, as the jury heard somewhat at trial, Mr. Barrett was a beloved family member and neighbor, known for his mechanical skills and generosity, and who never caused anyone to fear him.

If this history had been given to mental health experts, as was expected practice under prevailing professional norms, they would have identified numerous risk factors for the development of mental illness and impairment in Mr. Barrett's life. These include multi-generational neurological impairments and affective mood disorders, as well a patterns of substance abuse, parental neglect, lack of appropriate boundaries, domestic discord, and inter-parental violence and abuse. (Exh. 117 at ¶ 22.) In addition to family members' moving descriptions of Mr. Barrett's struggles, experts would have explained that "neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the longest term and most pernicious effects of all such early traumatic experiences." *Id.* at ¶ 33.

As the state-court expert, Dr. Sharp had observed, Mr. Barrett shows symptoms of organic impairments due to his mother's alcohol abuse during pregnancy. (Exh. 55; Exh. 89 at ¶ 23; Exh. 117 at ¶ 37, ¶ 44.) From these early insults to his developing brain, Mr. Barrett moved on to head injuries at age eight or nine, being punched hard enough to break his jaw, a motorcycle accident in his early twenties, and the trauma of the shotgun blast to his chest.

This history, when considered by a competent mental health professional with appropriate testing and clinical evaluation, shows Mr. Barrett was, in September 1999, severely impaired by a combination of functional problems diagnostically described as Dysexecutive Syndrome, Bipolar Disorder, and Post Traumatic Stress Disorder. Taking into account these clinical assessments, the psychologist originally retained for the second state trial would have found that

> one could conclude that Mr. Barrett's response to the raid on his property was impulsive and not thought-out. I liken the situation to a person being surprised in the night by an unexpected phone call or alarm clock. In general, someone in those circumstances will experience some disorientation and difficulty understanding events. For someone with Mr. Barrett's mental impairments those experiences would be magnified many times over. For a normally functioning person to understand how Mr. Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

Exh. 55 at ¶ 24.

In making its prejudice determination, this Court also must consider the ways in which the prosecution was able to exploit defense counsel's lack of preparation for the penalty phase. As set forth in pages 243 through 247 of the Second Amended § 2255 Motion, defense counsel's inattention to developing a second stage case permitted the prosecution to portray Mr. Barrett in a false light. Now disgraced prosecutor Michael Littlefield mocked Mr. Barrett's parents for not seeing him enough and not knowing the difference between him being "hyper" and "hyped up." He exploited the fact that Mr. Barrett's son had not even testified regarding the impact an execution would have on him. He made much of the differences between Steven and Kenny Barrett, because defense counsel failed to heed Steven's concern about explaining the differences in their childhoods.

The Court also must consider the effect the undiscovered mitigation evidence would have had on the aggravating evidence. The jury rejected the idea that Mr. Barrett would present a

Petitioner's Merits Brief                    123                    *Barrett v. U.S.*, 09-cv-105-JHP

continuing threat to society.  The aggravating circumstances they found all related to the

circumstances of the offense.  The evidence discussed from Part A of Ground 2 would have

created serious doubts about the Government's portrayal of those circumstances.  And the mental

health evidence, summarized here by Dr. Woods, would have negated the aggravating

circumstances:

> Mr. Barrett's chronic PTSD had . . . become acute, faced with a new stressor.
> Acute symptoms of increased startle response, hyperreactivity, fight or flight,
> impaired judgment, and ruminative thinking, and affective dysregulation all came
> into play; and were compounded by his psychiatric disorder.
>
> [¶]      Mr. Barrett's bipolar disorder was, at this point in his life, at its most
> extreme.  He was profoundly depressed, and had been in a particularly steep
> downward spiral since his divorce.  Mr. Barrett had become increasingly
> withdrawn, by everyone's account.  He reported to me that the years from his
> divorce and the raid on his home were the darkest of his life.  He was self
> medicating more heavily than ever before.
>
> [¶]      Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid
> ideation augmented his affective dysregulation, hyperreactivity, and exaggerated
> startle response, setting the stage for his brain, with little executive functioning
> ability, to misprocess everything that was going on, to limit his ability to
> understand the input from each of these symptoms, and, eventually, to be shot
> himself multiple times and kill an officer.  It is my professional belief that Mr.
> Barrett, as a function of a mental disorder, believed his actions were right at the
> time of the police action on his property.  This distorted belief was further
> augmented by the symptoms of his bipolar disorder, his profound depression,
> isolation, impaired judgment, irritable mood, and paranoid ideation.  His belief
> that he was also doing the right thing was shaped by his hyperreactivity, a known
> stressor that was life threatening but unidentified, an exaggerated startle response
> and, again, extreme paranoia.

Exh. 117 at ¶¶ 75-77.

In sum, the mitigation evidence readily available to Mr. Barrett's defense counsel is of the

type and quantity that courts in the cases cited *supra* have consistently found to establish a

reasonable probability of jurors making a different decision at the second stage of trial.  At a

minimum, "the undiscovered mitigating evidence, taken as a whole, might well have influenced

the jury's appraisal of [this defendant's] culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (internal quotation marks and citations omitted).

> **Ground 3.    Mr. Barrett was Denied his Rights to Due Process and Equal Protection of the Laws, and his Right to Transcripts, Expert and Investigative Assistance under 18 U.S.C. §§ 3005 & 3006A**

In Ground 3 of his initial and Amended § 2255 Motions, Mr. Barrett seeks a new trial based on the failure of the trial court to provide him expert assistance necessary to his defense at both phases of trial. As set forth more fully in the amended petition, the record evidence shows the trial court denied in full, delayed, or denied to such a great part as to make use ineffectual, transcripts, investigative assistance, and expert assistance that are routinely provided to defendants in federal death penalty cases. Although the trial court found these resources were reasonably necessary to Mr. Barrett's defense, the court withheld funds necessary to make those resources useful to preparing the defense.

Due process guarantees a criminal defendant "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984); *see also Holmes v. South Carolina*, 547 U.S. 319 (2006). Where the government proceeds against an indigent defendant, due process requires that a defendant be provided "the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985); *see also Britt v. North Carolina*, 404 U.S. 226, 227 (1971). As the Supreme Court noted in *Ake*, Congress attempted to guarantee to due process to defendants in federal criminal cases through "subsection (e) of the Criminal Justice Act, 18 U.S.C. § 3006A," which "provide[s] that indigent defendants shall receive the assistance of all experts 'necessary for an adequate defense.'" *Ake*, 470 U.S. at 79-80. Reflecting the higher due process requirements of capital cases, Congress provided in 18 U.S.C.

Petitioner's Merits Brief                    125                    *Barrett v. U.S.*, 09-cv-105-JHP

§ 3005 that a capital "defendant shall be allowed, in his defense to make any proof that he can produce by lawful witnesses," and in § 3599 for funds for "investigative, expert, or other services [that] are reasonably necessary for the representation of the defendant."

In deciding whether the denial of investigative or expert assistance violated due process, the Court of Appeals for the Tenth Circuit follows the three-part test the Supreme Court applied in *Ake*:  (1) the effect on Mr. Barrett's private interest in the accuracy of the trial if the requested service is not provided;  (2) the burden on the government's interest if the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered. *United States v. Kennedy*, 64 F.3d 1465, 1473 (10th Cir. 1995).

In the sections that follow, we will address the second and third of these factors as to each deprivation with the exception of the transcripts which the Supreme Court has held are presumptively necessary to preparing a defense, particularly where prosecution witnesses' prior testimony will be offered.  As to each deprivation, however, the private interest at stake is the same.  As the Supreme Court said in *Ake* itself, "The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling."  470 U.S. at 78.  Mr. Barrett's interest in the outcome of the trial – his very life – "is obvious and weighs heavily in our analysis." *Ibid.  See also Williamson v. Reynolds*, 904 F. Supp. 1529, 1561-62 (E.D. Okl. 1995), *aff'd on other grounds by*, *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997).

As to the third factor – the probable value to the defense of the expert assistance – this Court should conduct a cumulative assessment of the error.  This case presents unique circumstances because the trial court did not simply deny Mr. Barrett the assistance of an investigator or expert.  It cut funding for each and every type of assistance counsel identified as

necessary to the development of the defense, including all funds for travel that would have

permitted an investigator, or in some instances an expert, to interview witnesses, observe the

crime scene, meet with counsel, testify, or observe the government's experts in order to assist

with cross-examination. This across-the-board restriction was devastating to the defense and

allowed key aspects of the prosecution's case to go unchallenged. The effect of these restrictions

under the third part of the *Ake* test must be considered cumulatively. However, each individual

denial will be discussed separately.

### 1. The Withholding of Funds for Transcripts.

By the time of *Britt v. North Carolina*, 404 U.S. 226 (1971), the Supreme Court's cases

left "no doubt that the State must provide an indigent defendant with a transcript of prior

proceedings when that transcript is needed for an effective defense or appeal." *Britt*, 404 U.S. at

227. *Britt* itself involved a retrial after the initial three-day trial ended in a mistrial. *Ibid.* The

Court majority agreed with the dissent that the Court's

> cases have consistently recognized the value to a defendant of a transcript of prior
> proceedings, *without requiring a showing of need tailored to the facts of the
> particular case*. [E]ven in the absence of specific allegations it can ordinarily be
> assumed that a transcript of a prior mistrial would be valuable to the defendant in
> at least two ways: as a discovery device in preparation for trial, and as a tool at the
> trial itself for the impeachment of prosecution witnesses.

*Id.*, 404 U.S. at 228 (emphasis added). Thus, the majority "agree[d] with the dissenters that there

would be serious doubts about the decision below if it rested on petitioner's failure to specify

how the transcript might have been useful to him."[96] *Ibid.*

---

[96] The Supreme Court found no due process violation in *Britt* because the state court had *not* required a showing of need, but had instead rested its denial of a transcript "on the second factor in the determination of need, that is, the availability of adequate alternatives to a transcript. The second trial was before the same judge, with the same counsel and the same court reporter, and the two trials were only a month apart. In these circumstances, the court suggested that petitioner's memory and that of his counsel should have furnished an adequate substitute for a transcript." *Britt*, 404 U.S. at 228.

Despite this precedent, the trial court initially denied Mr. Barrett and his counsel access to transcripts of pretrial hearings, including hearings in which witnesses testified who would later testify at trial, because they could not make a showing of special need sufficient to satisfy the court.  Order filed 3/18/05 (Doc. 97) at 6-7.  Although the trial court ultimately relented and allowed Mr. Barrett's counsel access to transcripts of the second state-court trial, the delay was prejudicial.  Lead trial counsel had explained to the court in February that he would need 160 hours to assemble and review the files and records of the case.  Doc. 51 at 4.  After Mr. Hilfiger was elevated to lead counsel, he reported to the court that he had not yet reviewed those transcripts.  As weeks and months went by, the lack of progress in obtaining the transcripts was a frequent topic of conversation between defense counsel and the court.  As shown in Ground 1 and Ground 2 section A(8), defense counsel failed to obtain and use the transcripts in a timely or effective manner.

### 2. *Mental Health Assistance*.

As stated *infra*, Mr. Barrett's interest in confronting the government's case was the most compelling imaginable – his life was at stake.  The importance of mental health testimony in a capital trial was stated in *Ake*, 470 U.S. at 80-82.  As to the third factor in the *Ake* analysis, the importance of mental health testimony, particularly in the penalty phase of a capital trial, is too well established in law and empirical research to be in dispute.  Numerous cases discussing the importance of mental health testimony in a capital sentencing proceeding are discussed in the part of this brief on Ground 2, *supra*.  *See also Powell v. Collins*, 332 F.3d 376, 395-96 (6th Cir. 2003).

Nevertheless, as to the third factor in the *Ake* analysis, defense counsel presented the court with sufficient grounds to find mental health assistance was reasonably necessary to the

defense.  Doc. 97 at 3.  The trial record reflects that the principal matter in dispute was Mr. Barrett's mental state at the time his home was attacked.  Trial counsel requested the assistance of a mental health expert in part based on the need to explain to the jury how his mind reacted to the sudden assault.  Doc. 50.  Trial counsel also informed the court that Mr. Barrett had "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders."  *Ibid.*  Trial counsel stated that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting."  *Ibid.*

In addition to these statements, as documented in the exhibits cited in support of Grounds 2 and 3, trial counsel had available evidence that Mr. Barrett had attempted suicide, was diagnosed with Bipolar Disorder, and had been involuntarily treated with psychotropic medications.  *See* Doc. 208, Exhs. 118 & 147.  As to the penalty phase at least, it is undisputed that Mr. Barrett's "mental condition [was] relevant to his criminal culpability and to the punishment he might suffer."  *Ake*, 470 U.S. at 80.  The United States Attorney said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation.  (Tr. 9/9/05 Hr'g at 38.)  It should be undisputed, therefore, that "the assistance of a psychiatrist may well [have been] crucial to the defendant's ability to marshal his defense."  *Ake*, 470 U.S. at 80.  The declarations of Dr. Myla Young (Exh. 89), Dr. George Woods (Exh. 117), and Dr. Bill Sharp (Exh. 55) show that with adequate funding -- both for a background investigation and for proper testing and clinical evaluation -- the defense could have developed both a mental state defense to Count 3 and extensive mitigation evidence.

However, the trial court would not permit this evidence to be developed.  First, the court denied most of the funds needed to conduct a routine background investigation, and denied all travel expenses.  In that defense counsel had identified a mitigation specialist from Tennessee to perform that work, the denial of travel expenses effectively negated the utility of the reduced amount available for hourly work.  Second, although Dr. Sharp had specifically recommended neuropsychological testing, which is performed by a psychologist, and defense counsel demonstrated a need for a medical doctor based on Mr. Barrett's prior treatment with antipsychotic medications, the trial court would permit counsel to retain "either a psychiatrist or a psychologist" but not both.  Doc. 97 at 3.  *Ake* requires the court, "at a minimum, assure the defendant access to a *competent* psychiatrist who will conduct an *appropriate* examination and assist in evaluation, preparation and presentation of the defense." *Ake*, 470 U.S. at 83 (emphasis added).  *See also Bell v. Evatt*, 72 F.3d 421 (4th Cir. 1995); *Buttrum v. Black*, 721 F.Supp. 1268, 1312 (N.D. Ga. 1989), *aff'd*, 908 F.2d 695 (11th Cir. 1990) (expert "failed to provide the scope of psychiatric assistance contemplated by *Ake*").  As a psychiatrist was not competent to do the testing Dr. Sharp identified as important, and a psychologist was not competent to assist the defense in presenting the significance of Mr. Barrett's medication, the court's provision for only one expert failed to satisfy due process.

Similarly, in *Powell*, *supra*, the court held the petitioner was entitled to a new capital sentencing trial due to the trial court's refusal to appoint an expert the defense needed to diagnose the petitioner's organic brain impairments.  Upon consideration of the evidence proffered from Drs. Young, Woods, and Sharp, this Court should reach the same conclusion *mutatis mutandis* as the Sixth Circuit said in *Powell*:

> the testimony of an independent psychiatrist – particularly one who was qualified
> to conduct the appropriate testing of which Dr. [Sharp] spoke – may have

provided facts and information for the jury to consider at mitigation, which may have led to a different recommendation by the jury at sentencing.  We therefore believe that the lack of the expert assistance which Petitioner sought, and [to] which he was entitled under *Ake*, "had a substantial and injurious effect or influence in determining the jury's" decision at sentencing, *see Brecht*, 507 U.S. at 637,[97] such that we are left in "grave doubt" as to the harmlessness of this error, thereby requiring that relief be granted to Petitioner on this issue.  *See O'Neal*, 513 U.S. at 437.[98]

332 F.3d at 395-96.

As to the second *Ake* factor – the burden on the Government of providing the services – this case is unique in showing that the cost to the Government of providing the assistance counsel requested was wholly in line with costs the Government absorbed in other capital cases.  Of course, *Ake* itself held that the burden of providing appropriate, competent mental health assistance in a capital case is minimal compared to the risks of an erroneous outcome.  But defense counsel also presented the court with declarations of Federal Death Penalty Resource Counsel, Richard Burr, who was able to place the funding in a national context.  Mr. Burr advised the trial court that Congress had allocated funds specifically for the purpose of defense preparation such as that sought for Mr. Barrett's defense, and that the "standard practice in federal capital trials is to provide the services of more than one mental health expert."  Exh. C to Doc. 107.  Mr. Burr also advised the trial court that the rates it was willing to pay were far below those authorized in other cases.  *Id.*

The record and extra-record evidence demonstrates that Mr. Barrett was denied due process due to the trial court's unique limitation on his counsel's access to expert assistance.  At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief.  Whether considered alone, or together with the other deprivations, this Court either

---

[97]    *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

[98]    *O'Neal v. McAninch*, 513 U.S. 432 (1995).

should vacate Mr. Barrett's conviction and sentence, or set this matter for an evidentiary hearing after affording counsel time to complete their investigation.  R. Gov. § 2255 Proc. 8(c).

### 3.    *Mitigation Investigation.*

As set forth more fully in relation to Part B of Ground 2, *supra*, the Supreme Court's capital sentencing jurisprudence, empirical evidence of what jurors value in mitigation, and the standards of capital defense practice make the assistance of a skilled mitigation investigator essential to developing a strategy for the penalty phase.  *See generally* ABA Guideline 10.4, § C(2), and Guideline 1.1 Commentary, 31 Hofstra L. Rev. at 925.  The ABA Guidelines' emphasis on mitigation investigation, and that of the Supreme Court in *Rompilla*, *Wiggins*, and *Williams*, *supra*, amply demonstrate that the first and third *Ake* factors weigh heavily in Mr. Barrett's favor.  Thus, the Court of Appeals for the Armed Forces has held, relying in part on *Wiggins*, that the denial of a mitigation specialist for the defense in a capital case violates due process and the defendant's right to compulsory process as secured by the Sixth Amendment. *United States v. Kreutzer*, 61 M.J. 293, 298 & n.7 (2004).

As to the second factor, again, the record shows the cost to the Government was minimal compared to the importance of conducting the "requisite, diligent investigation into [the defendant's] troubling background and unique personal circumstances."  *Williams*, 529 U.S. at 415 (O'Connor, J., concurring).  Defense counsel consulted with Inquisitor, Inc., a firm in Tennessee that could provide specialized mitigation investigative services.  Per Judicial Council Guidelines, Inquisitor's services were recommended by an experienced Assistant Federal Public Defender who had used the firm in another case in the Eastern District of Oklahoma.  Doc. 50 at 4.  Defense counsel also consulted with Resource Counsel Burr about the different needs of federal versus state trials.  Defense counsel also planned to rely upon the incomplete, preliminary

investigation that had been done years earlier, prior to the first state court trial. Doc. 50 at 5 n.3. Based on this work, defense counsel requested 300 hours of time, and $5,000.00 for travel.

Resource counsel advised the trial court that the time sought was well below the average of 600 hours worked by mitigation specialists in federal death penalty cases. Exh. C to Doc. 107 at 4. Nevertheless, the trial court would authorize only 100 hours, less than three weeks' work. Doc. 97 at 3. That was approximately one tenth the funds provided in other federal death penalty cases. Exh. C to Doc. 107 at 4. However, as indicated *supra*, even this insufficient amount was at best a symbolic gesture because the court denied all funds for travel. Under those circumstances, the mitigation investigator could not even be compensated for mileage driving to various family members' homes. *See Williams v. State*, 669 N.E.2d 1372 (Ind. 1996) (trial court's limitation of mitigation expert services to 25 hours per week was arbitrary and an abuse of discretion; however, error was harmless because sufficient mitigating evidence was presented at sentencing and jury deadlocked on punishment).

This case must be contrasted with *United States v. Kennedy*, 64 F.3d 1465 (10th Cir. 1995), in which the court found no abuse of discretion under the CJA where the trial court authorized the defense expert to fly from California to Denver in order to inspect documents there and prepare for trial. 64 F.3d at 1471-72. In this case, the denial of similar travel expenses prevented Mr. Barrett's counsel from bringing to court the mitigation specialist who would assist with the witnesses, if not testify to the social history she gathered.

Assuming *arguendo* the denial of a mitigation investigator is subject to a harmless-error analysis, the personal, medical, and social history available to be developed, and its consequences for an accurate mental health diagnosis, as set forth in pages 195 through 242 of the Second Amended § 2255 Motion, had a substantial and injurious effect on the verdict. The

record and declarations of Mr. Barrett's family members show defense counsel failed to conduct any interviews aimed at developing mitigation evidence.  In cases cited in the argument supporting Ground 2, *supra*, courts have often found similar social history evidence to satisfy the more burdensome reasonable-probability standard of *Strickland*.

This case is analogous to *United States v. Kreutzer*, 61 M.J. 293, 298 (2005), in which the Court of Appeals held that the trial court's denial of funds for a mitigation specialist was not harmless in light of the abundant mitigation evidence that was available, but that went undiscovered due to the absence of a qualified investigator.

At a minimum, the files and records of this case do not conclusively demonstrate that Mr. Barrett is entitled to no relief based on the trial court's unique withholding of essential resources from the defense.  This Court should either vacate the death sentence imposed on Mr. Barrett or set this case for evidentiary hearing at such a time when his counsel will be adequately prepared. R. Gov. § 2255 Proc. 8(c).

### 4.    *Fact Investigation*.

As the Supreme Court had repeatedly iterated in the years preceding Mr. Barrett's trial, *see cases cited supra*, fact investigation is the foundation for reasonable professional decision-making.  The centrality of investigation to defense preparation also is reflected in ABA Criminal Justice Standard 4-4.1 and ABA Guidelines 1.1 and 10.7.

Mr. Barrett's counsel sought 300 hours of investigative assistance at a rate of $50.00 per hour, which was the rate quoted for capital trial investigation.  Resource Counsel advised the Court that the "average number of hours approved for fact investigation in [death-penalty] authorized cases is closer to 500 hours." Exh. C to Doc. 107 at 3.  The trial court authorized only 100 hours at $30.00 per hour, the rate paid to state-subsidized investigators working with the

Oklahoma Indigent Defense System (Doc. 128 at 3 & n.1), although those investigators were prohibited from working on a federal death penalty case.  Exh. 111.

Moreover, the trial court announced that it would not follow Judicial Conference Guidelines and pay for previously authorized labor, but would condition payment on *ex post* "detailed statements regarding the exact factual issues investigated and the significance of those facts to the evidence which counsel anticipates will be admitted at trial."  Doc. 97 at 2 n.2.  This meant any investigation that did not produce significant admissible evidence would be uncompensated.  The Court's refusal to pay market rates, provision for 20 percent of the investigative time common to capital cases, and threat not to compensate the investigator for any work later deemed insignificant or inadmissible, created unprecedented disincentives for defense counsel to explore potential defenses and ways to test the prosecution's evidence.

The prejudice from the trial court's restrictions was compounded by defense counsel's decision, stated at the October 3, 2005 hearing, to forego the use of experts and instead rely upon a lay investigator.  This decision was likely influenced by the trial court's expressed desire to have the defense spend minimal amounts on expert assistance.

The prejudice from the trial court's withholding of investigative resources is seen most starkly in Parts A(4), A(6), and A(10) to Ground 2 of the Amended § 2255 Motions.  The evidence proffered there shows the failure to investigate had a substantial injurious effect on the trial in that nearly all key prosecution witnesses necessary to convict Mr. Barrett of first-degree murder could have been either excluded or impeached.

At a minimum, the files and records do not demonstrate that Mr. Barrett is entitled to no relief.  Therefore, this Court must either vacate his conviction or schedule an evidentiary hearing

after permitting counsel sufficient time to complete their investigation.  R. Gov. § 2255 Proc.

8(c).

### 5.   *Crime Scene Reconstruction.*

As this Court has previously held,

> when forensic evidence and expert testimony are critical parts of the criminal
> prosecution of an indigent defendant, due process requires the State to provide an
> expert who is not beholden to the prosecution.  The fact that forensic evidence and
> expert testimony are crucial to the prosecution is in and of itself a sufficient
> showing of the need for expert assistance and that the defendant would be
> prejudiced without it.

*Williamson v. Reynolds*, 904 F. Supp. 1529, 1562 (E.D. Okl. 1995), *aff'd on other grounds by*,

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997).  At trial, as the State had in the prior trials,

the Government relied upon purported "expert" Iris Dalley's "reconstruction" of events as

evidence that Mr. Barrett would have been aware that his attackers were law enforcement

officers.

Mr. Barrett's defense counsel requested authorization to retain Edward E. Hueske to assist

counsel in preparing to submit Dalley's testimony to the adversarial testing that due process and

the Sixth Amendment require.  The defense sought 80 hours of labor from Mr. Hueske and

$1,000.00 in travel expenses.  Doc. 50 at 7.  While Dalley had years to prepare and refine her

testimony, and unlimited resources to view the crime scene and the vehicles, the trial court

authorized for Mr. Barrett's defense 20 hours work and no travel expenses.  Doc. 97 at 3.

As this Court said *Williamson* was no different than *Ake*, so too Mr. Barrett's case is no

different.

> "The private interest in the accuracy of a criminal proceeding that places an
> individual's life or liberty at risk is almost uniquely compelling." *Ake*, 470 U.S. at
> 78.  The State's interest in the financial burden of providing expert assistance for
> Petitioner and its interest in prevailing at trial are clearly outweighed by the

interest of the "fair and accurate adjudication of criminal cases." *Ake*, 470 U.S. at 79.

*Williamson*, 904 F. Supp. at 1561.

Also as this Court said in *Williamson*,

Unless the defendant's attorney is learned in the expert's field, cross-examination will hardly suffice. Expert witnesses can stray outside the boundaries of their expertise, but a defendant's attorney may not be able to recognize misrepresentations or errors in methodology. Only the defendant's own expert can assure the indigent accused an adequate defense in cases where expert testimony plays a key role in the prosecution.

904 F. Supp. at 1562 (footnotes omitted). Due to the prohibition on travel, Mr. Barrett could not rely upon Mr. Hueske at trial when Dalley's testimony showed, *inter alia*,

• that she failed in many ways to follow accepted methods for conducting a reconstruction such that her testimony was inadmissible under Fed. R. Evid. 702 and *Daubert*, *supra*;

• that she falsely testified to having been unable to determine the caliber of bullets that struck the lead Bronco;

• that she exceeded the bounds of accepted methodology when testifying that the trajectories she described were "accurate";

• that she misrepresented both science and the evidence when she claimed there was "no means of sequencing any of the shots";

• that she exaggerated her ability to estimate the distance of a firearm from the cabin;

- that her conclusion regarding the location of Trooper Eales' arm when it was struck was unreliable due to her failure to examine the surrounding area for tissue or blood.

(Exh. 109.)

In short, Dalley's testimony was wholly unreliable, but, due to the defense's lack of access to an expert, the jury was permitted to consider it as the only forensic "science" to support a finding of intent. Due to this failure of the adversarial testing process, the jury was permitted to reach an unwarranted conclusion. The prosecution demonstrated at trial – through its use of Dalley and Horn and the seven informants – that it had serious doubts about its ability to obtain a conviction for murder based on the conflicting and unreliable accounts of the Tact Team members. The results of the two state trials show those fears were justified as the case against Mr. Barrett for intentional murder was weak at best.

Assuming *arguendo* that the impact of the denial of expert assistance on the adversarial testing process in violation of due process could be subject to harmless-error analysis, the report of Mr. Hueske appended to Mr. Barrett's Motion as Exhibit 109 demonstrates his absence from the trial had a substantial injurious effect on the verdict. At a minimum, the files and records of this case do not conclusively demonstrate that Mr. Barrett is entitled to no relief based on the trial court's unique withholding of essential resources from the defense. This Court should either vacate the death sentence imposed on Mr. Barrett or set this case for evidentiary hearing at such a time when his counsel will be adequately prepared. R. Gov. § 2255 Proc. 8(c).

### 6.    *Expert on Police Standards and Procedure*.

Based on success in the state trial that could not be repeated with the same witness, Mr. Barrett's defense counsel sought authorization to retain Dr. George Kirkham, a criminologist,

sworn law enforcement officer, and expert in police tactics. Doc. 50 at 5. Counsel informed the court that Dr. Kirkham charged a flat rate for pretrial review and preparation, and that he would need to travel from his residence in Florida. *Ibid.* The trial court, without explanation, refused to authorize Dr. Kirkham's rate, arbitrarily limited the defense to 40 hours of services at $100.00 per hour, and denied funds for Dr. Kirkham to travel. Doc. 97 at 3.

It was clearly error for the trial court tacitly to determine that saving the United States Government a few thousand dollars outweighed both Mr. Barrett's interest and society's interest in avoiding an erroneous assessment of the Tact Team's methods, including whether they afforded Mr. Barrett an opportunity to identify law enforcement officers. *See Williamson*, 904 F. Supp. at 1561, quoting *Ake*, 470 U.S. at 78, 79. Count 3, and the statutory aggravating factors found by the jury, required the jury to find, contrary to the state-court jury, that Mr. Barrett intended to kill law enforcement officers.

If the trial court had permitted Dr. Kirkham to testify, rather than excluding him through the use of purse strings, the jury would have learned, *inter alia*,

- that the raid was contrary to law enforcement standards and procedures in that it relied first and foremost on force and aggression, provoking force and aggression in return without attempting a peaceful resolution;

- that the Tact Team violated standards of law enforcement practice that are designed to protect officers by minimizing opportunities for Mr. Barrett to identify them as law enforcement officers; and

- that the Tact Team recklessly and unnecessarily exposed Troopers Hamilton and Eales to gunfire both from the cabin and fellow officers.

Exh. 44. Dr. Kirkham would have explained that everything about the information the Tact Team had made the raid exactly the wrong thing to do, and that the standards the team ignored were based on extensive experience of mistakes that lead to shootings that otherwise would not have occurred.

Assuming *arguendo* the denial of an adversarial testing through defense evidence attacking intent can be subject to harmless-error analysis, the withholding of funds for Dr. Kirkham's review of law enforcement officers' testimony and his own testimony had a substantial injurious effect on the verdict. Jurors informed of the facts would have rejected a finding of intent. At a minimum, they would have had sufficient doubts in the penalty phase to find Mr. Barrett was insufficiently culpable to be sentenced to death.

The files and records do not conclusively show that Dr. Kirkham's testimony would have had no effect. Therefore, if this Court does not vacate the judgments of conviction and sentence based on the extant or an expanded record, it should order an evidentiary hearing following an opportunity for further investigation and discovery. R. Gov. § 2255 Proc. 8(c).

### 7. *Cumulative Effect.*

As discussed herein and in relation to Ground 1 and Ground 2 of the Amended § 2255 Motions, the verdict in the criminal case was not the product of the adversarial testing process contemplated by the Fifth, Sixth, Eighth and Fourteenth Amendments. The trial court's refusal to authorize defense resources such as transcripts and time and travel for mitigation and other fact investigation – resources long deemed minimally necessary by Supreme Court precedent and routinely granted similarly situated defendants – undercut the adversarial testing process in at least two ways. First, the Court's demonstrated preference for minimal spending by the defense and its demonstrated willingness to provide future appointments and higher compensation to

counsel who worked within those limitations, and to dismiss counsel unwilling to work within them, created a conflict between Mr. Barrett's interests and counsel's interests. *See* discussion *supra* of *Wood v. Georgia*, 450 U.S. 261 (1981). From defense counsel's defeatist statement to Jeanne Russell only a few weeks before the trial started – that it was alright that it was too late to conduct a mitigation investigation because the Court would not fund it anyway (Exh. 56 at 2-3) – it is clear that counsel acutely felt the impact of these impediments.

Second, and independent of the disincentives created by the trial court's preferences, the Court imposed unprecedented limitations on defense resources that prevented Mr. Barrett from bringing witnesses to court, unless he subpoenaed various professionals and compelled them to appear for free. As a result, Mr. Barrett's defense were unable fully to challenge, *inter alia*, the testimony of law enforcement officers regarding the conduct of the raid, the testimony of seven informant witnesses about whom vast amounts of impeachment evidence was either suppressed or undiscovered by the defense, and the only forensic "science" evidence adduced to demonstrate intent. In addition, the defense was prevented from conducting the mitigation investigation, and mental health investigation the Supreme Court and Courts of Appeals have consistently held is essential to a fair and reliable capital sentencing proceeding. The across-the-board impact of the trial court's denial of routine expenses cannot be said to have been harmless under any standard.

**Ground 4.    Mr. Barrett's Rights Under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated by the Use of False Information in Obtaining the No-Knock Warrant for his Arrest.  The No-knock, Nighttime Search Warrant Obtained by Clint Johnson Was Invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Appellate Counsel Were Ineffective for Failing to Raise the Issue on Direct Appeal.**

As shown in Ground II, *supra*, in connection with the claim that trial counsel were ineffective for failing to argue all available evidence supporting the renewed motion to suppress, the trial record itself established the Clint Johnson warrant was invalid under *Franks v. Delaware,* 438 U.S. 154 (1978).  Suppressed *Brady* material and other evidence gathered in support of Mr. Barrett's §2255 petition which relates back to the credibility of the informant at the relevant time makes this conclusion even stronger.

Since the warrant was based solely on the word of the confidential informant, Charles Sanders, his reliability was the linchpin of probable cause.  There was no other information from any other source, and no other circumstances cited in the affidavit, that provided probable cause to search Mr. Barrett's residence and property.  The "totality of the circumstances" in this case *was* Sanders.  *Illinois v. Gates,* 462 U.S. 213 (1983) (totality of the circumstances test used to judge validity of search warrants; an informant's veracity, reliability, and basis of knowledge are all important considerations in determining whether information as a whole is sufficient to supply probable cause).  If Sanders is unreliable, his information is *per se* unreliable.  Because Sanders is the antithesis of a reliable source, Clint Johnson, at the very least, acted with reckless disregard for the truth in utilizing him as a source, and in omitting information from the search warrant affidavit that would have given an accurate picture of Sanders's credibility.

The unsupported statement in the search warrant affidavit that Sanders had given "reliable" information in the past, without more, does not establish the credibility of the

Petitioner's Merits Brief                    142                    *Barrett v. U.S.*, 09-cv-105-JHP

information contained in the affidavit and does not assist in establishing probable cause, since there is nothing in the affidavit to show that any of this information was corroborated by anyone else, let alone an independent law enforcement investigation. *United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996) (magistrate judge correctly concluded officer's statement that the informant had provided reliable information in the past is an unsupported conclusion which does not support a probable cause finding); *United States v. Foree,* 43 F.3d 1572, 1575-76 (11th Cir. 1995) (allegation in affidavit that informant had provided reliable information in the past is to be accorded little weight in the probable cause calculus); *United States v. Miller,* 753 F.2d 1475, 1480 (9th Cir. 1985) (statement in affidavit that C.I. had provided reliable information previously was entitled to only "slight weight"; such a statement is both unclear and conclusory; there, as here, there was no showing that any information provided by the informant in the past had led to any search, arrest, or conviction, nor whether the past information was vital or merely incidental to other law enforcement investigations). The total absence of any corroborating facts for the C.I.'s claims indicates that Sanders, with Clint Johnson's approval, could simply be fabricating the information. *Phaneuf v. Fraiken,* 448 F.3d 591, 597-99 (2nd Cir. 2006); *United States v. Dawkins,* 17 F.3d 399, 404 (D.C. Cir. 1994) (in evaluating whether an informant's tip furnishes probable cause for a warrant, magistrate must look to whether independent investigation has corroborated or failed to corroborate the informant's claims).

Sanders could not be relied upon to provide reliable information. No reasonable person could put stock in anything he says. Sanders is a professional criminal, who had racked up at least eighteen felony convictions at the time he testified against Mr. Barrett, and had surpassed double digits by 1999. Numerous other felony charges against him were dismissed because of his work as a snitch. He always had a motive to lie against others to get out of his own scrapes

Petitioner's Merits Brief                    143                    *Barrett v. U.S.,* 09-cv-105-JHP

with the law, and has largely been successful, continuing to land on his feet with probationary sentences so he could commit still more crimes in the community, when any sane system of justice would have flushed him ages ago.  His convictions for crimes of dishonesty are legion: repeated instances of forgery, burglary, concealing stolen property, larceny of merchandise from a retailer, and other forms of fraud and theft, not to mention an extensive list of other felonies. He has a history of promising to appear in court and then failing to appear.  He has a history of promising to adhere to terms of probation and then breaking them by committing still more crimes, after which he is given still more probation.  He is a long term drug addict.  Sanders could not give a straight and consistent answer to save his life at Mr. Barrett's trial, which reflects his almost congenital inability to tell the truth.  Yet he was rewarded for his testimony, as he has always been rewarded for informing on others, despite his wretched history of dishonesty, and despite the fact that he continued to victimize the community as a virtual one man crime wave.  All this was known about Sanders in 1999, and it has only gotten worse.  Johnson's affidavit was deliberately and egregiously misleading because all this information bearing directly on Sanders's credibility was omitted from the search warrant affidavit.  *United States v. Vigeant,* 176 F.3d 565, 573 (1st Cir. 1999) ("First, and most important, Botehlo [the affiant] neglected to mention the confidential informant's long criminal history, his numerous aliases, his recent plea agreement, and other indicia of his unreliability."); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997) (police withheld information on the confidential informant's prior convictions and the fact that the informant had previously falsely reported a crime).

At the time he signed the affidavit, Clint Johnson was aware of Sanders's lack of reliability, and Johnson himself intentionally ignored evidence of Sanders's then-current drug usage, crimes of dishonesty, and Sanders's inability to see evidence of drug activity at Mr.

Barrett's residence during the critical time.  Yet Johnson still relied on this miscreant as a "reliable confidential informant."

In connection with the claim of ineffective assistance of trial counsel for failing to produce witnesses to attack Sanders's honesty, Mr. Barrett has provided declarations from several people in the community, including one of Sanders's uncles, who say without reservation and in the strongest terms possible that Sanders is totally dishonest and unbelievable, and that this is the opinion by acclamation in the community as a whole.  (Exhibit 90; Exhibit 70; Exhibit 94; Exhibit 76; Exhibit 13; Exhibit 95.)  Sanders claimed that he and Janesse Thomas bought drugs at Mr. Barrett's a few days before the shooting incident.  Ms. Thomas says this is absolutely false.  (Exhibit 13.)

Is it to be believed that the community as a whole regards Sanders as thoroughly dishonest and untrustworthy, but that Clint Johnson could realistically think he was a reliable informant, about whom nothing had to be revealed to a reviewing magistrate?  It simply does not wash.  Johnson acted with reckless disregard for the truth, at a minimum, in relying on Sanders for information about Mr. Barrett or anyone else, let alone presenting that information in a search warrant affidavit.

The prosecution suppressed exculpatory evidence regarding Sanders's dishonesty.  As stated in Grounds I and II, Mike Littlefield informed the court of a witness who failed to corroborate Sanders.  This would have assisted in establishing a *Franks* claim, and in generally impeaching Sanders, but the evidence was never revealed to the defense.  The transcript of this hearing was, however, available to direct appeal counsel.

Then there is Clint Johnson himself.  The Government suppressed *Brady* evidence that before, during and after Mr. Barrett's trial, Johnson was caught in a web of his own bad acts,

deceit and corruption,  including abuse of his position of trust; passing hot checks; failing to control his informants and neglecting to properly supervise and document their activities; failure to account for funds and evidence; theft of drug fund money; kickback schemes; dishonesty with his superiors; and likely drug use, as he tooled around in his drug task force car with drug paraphernalia, marijuana and methamphetamine, none of it properly packaged and marked as evidence.  Johnson was fired from the District Attorney's Office a little over two weeks after Mr. Barrett was formally sentenced.  In sum, Johnson and Sanders were birds of a feather:  both liars, both drug addicts, both trading lies for favorable treatment from law enforcement.

With respect to Johnson's request for a no-knock, nighttime warrant, which was predicated on information from the " C.I".  that Mr. Barrett had threatened law officers, Johnson acted with reckless disregard for the truth by omitting mention of the fact that local law enforcement, including Sheriff John Philpot, had been to Mr. Barrett's residence less than a month before, and encountered no resistance.  (Exhibit 6.)

A search warrant must be voided and the fruits suppressed when 1) it is found the affiant knowingly or recklessly included false statements *or omitted material information from the affidavit in support of a search warrant,* and 2) it is concluded that after excising such false statements and considering such material omissions, the corrected affidavit does not supply probable cause to search.  *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978); *United States v. Correas,* 419 F.3d 151, 152, 155 (2nd Cir. 2005) (two federal courts, after conducting *Franks* hearings, found affiant made numerous assertions that were knowingly and recklessly false; after setting aside the false statements, probable cause was not established); *United States v. Kennedy,* 131 F.3d 1371, 1376 (10th Cir. 1997).

Here, at a minimum, when the omitted material information about the reliability of the informant is considered, probable cause could not have been found, because Sanders's history, character, actions and reputation would show him and his word to be totally unreliable. Johnson called Sanders "reliable," a deliberately false or reckless statement in itself, and omitted an avalanche of information, detailed above and elsewhere in this motion, that would have proved the exact opposite to any reasonable magistrate. Had Johnson given a true picture of his C.I.'s numerous crimes of dishonesty; his motivation to accuse others of wrongdoing in order to escape punishment for his own acts, for which he received deal after deal instead of the hard prison time he deserved, after which he continued to commit crimes; his violations of the terms of probation; his bond forfeitures and failures to appear; the number of arrests; the number of convictions; his chronic drug use; and his bottom-of-the-barrel reputation in the community for anything even remotely approaching honesty and trustworthiness, no neutral, detached magistrate would find probable cause. *Mejia v. City of New York,* 119 F.Supp.2d 232, 273, n. 38 (EDNY 2000) (like a prosecutor's knowing use of false evidence to obtain a tainted conviction, the use of false or reckless information in a search warrant affidavit works an "unacceptable corruption" of the truth seeking function).

Johnson's failure to mention that less than a month before securing the warrant, Sheriff Philpot and other officers had been to Mr. Barrett's without incident, was material to the request for a no-knock, nighttime search warrant. In failing to mention this crucial fact, Johnson acted with reckless disregard for the truth. Had the magistrate been informed of this, the averment in the affidavit that Mr. Barrett, according to the "reliable" C.I., had "threatened" law enforcement would have been rendered meaningless, and no cause for a no-knock, nighttime warrant would have been established, even aside from the question whether any warrant should issue at all.

Although defense counsel raised a *Franks* issue, however incompletely, at trial, and there were certainly indications of Sanders's deplorable criminal record and rampant dishonesty in the ever-shifting sands of his testimony, appellate counsel failed to raise the issue on direct appeal, either as a freestanding argument under *Franks*, or one coupled with an ineffective assistance of trial counsel argument.  (Exhibit 29.)  *See* Ground XVIII, *infra*.  Mr. Barrett is of course requesting an evidentiary hearing on each factual issue raised in his §2255 motion, and specifically requests a *Franks*  hearing, or its equivalent.  He has made more than the requisite showing.

**Ground 5.    Mr. Barrett was Denied his Fifth Amendment Right to Due Process, his Sixth Amendment Rights to Counsel and Confrontation, and his Eighth Amendment Right to a Fair and Reliable Capital Sentencing Process Due to the Government's Suppression of Exculpatory Evidence, Knowing use of Perjured Testimony, and Failures to Correct False Testimony; Mr. Barrett is Entitled to Relief from his Convictions and Sentences Based on Newly Discovered Evidence.**

**Introduction**

Ground 5 of the Amended § 2255 Motion describes evidence of constitutional and statutory violations  under a variety of rules.  In Parts A and B, Mr. Barrett describes evidence establishing violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, and *Mooney v. Holohan*, 294 U.S. 103 (1935), and its progeny, including *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972).  Parts A and B of Ground 5 also describe newly discovered evidence of criminal and other misconduct committed by the three law enforcement officials who were chiefly responsible for the investigation and prosecution of this case.  In Part C, Mr. Barrett describes evidence demonstrating a violation of due process under *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966) (Wright, J.), *cert. denied*, 396 U.S. 865

(1969). In Part D, Mr. Barrett sets forth the bases for finding prosecutorial misconduct rendered the trial unfair under the standard of *Donnelly v. DeChristoforo*, 416 U.S. 1974).

As he has throughout this brief, Mr. Barett relies upon the facts set out in the Amended Motion and the exhibits thereto.

### 1. The Government Suppressed Material Evidence Favorable to the Defense.

#### a. The law relating to suppression of exculpatory evidence.

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

#### 1. What is "favorable to the accused".

The scope of favorable evidence includes everything that is "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1967). *Brady*, 373 U.S. at 87. Evidence must be disclosed if it is favorable to the defense, *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995), and evidence is favorable "either because it is exculpatory, or because it is impeaching." *Strickler*, 527 U.S. at 281-82; *Bowen v. Maynard,* 799 F.3d 593, 610 (10th Cir. 1986) (*Brady* obligations extend to impeachment evidence); *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir. 1984); *United States v. Osorio,* 929 F.2d 753, 761 (1st Cir. 1991); *United States v. Libby,* 429 F. Supp.2d 1, 10-11 (D. D.C. 2006).

The case at bar presents an extraordinary amount of impeachment material of the type that has been found to be subject to disclosure requirements. For example, in *Banks v. Dretke*, 540 U.S. 668 (2004), the Court held the petitioner was entitled to a new capital sentencing trial because the prosecution withheld information showing that a key witness presented to show the

defendant would be a future danger was an informant. *See also United States v. Torres*, 569 F.3d 1277 (10th Cir 2009) (vacating conviction where government disclosed some but not all impeachment evidence related to informant witness). In particular, the Government was required to disclose any and all deals either the prosecutor or any of the law enforcement officers working on the case had made with a witness whether "explicit or tacit." *Douglas v. Workman*, 560 F.3d 1156, 1186 (10th Cir. 2009).

The scope of what could be considered favorable evidence for the defense is a function of the law applicable to the two potential phases of trial, liability and punishment. As to the issue of punishment, *Brady* requires the disclosure of evidence that could be used by the defense as mitigation evidence to be weighed against a possible death sentence. Indeed, *Brady* itself was a death penalty case in which the suppressed evidence related to Brady's relative culpability, not his liability for the murder. *Id.* at 88-89. *See also Cone v. Bell*, ___ U.S. ___, 129 S. Ct. 1769, 1786 (2009) (remanding capital habeas case to district court for hearing on suppression of evidence favorable to capital defendant at sentencing). When the Supreme Court has "addressed directly the relevance standard applicable to mitigating evidence in capital cases . . . [the Court] spoke in the most expansive terms." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004). *See, e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982) ("virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances"). Congress codified this conception of mitigation evidence in 18 U.S.C. §§ 3592(a)(8) and 3593©). A "defendant may present any information relevant to a mitigating factor . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials . . . ." 18 U.S.C. § 3593(c). Mitigating factors are broadly defined to include any "factors in the

defendant's background, record, or character or any other circumstances of the offense that mitigate against imposition of the death sentence."  18 U.S.C. § 3592(a)(8).

### 2.    What is "suppression"

Suppression is defined as the failure to produce favorable evidence.  Prosecutors have an "affirmative duty to disclose evidence favorable to the defense." *Kyles*, 514 U.S. at 432.  The prosecutor's "constitutional duty is triggered by the potential impact of favorable but undisclosed evidence . . . ." *Kyles*, 514 U.S. at 434.  Because it is the prosecutor's affirmative duty to seek out *Brady* material and produce it to the defense, the failure to produce evidence constitutes "suppression" "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  When the government possesses favorable evidence that is "material," the evidence must be produced to the defense.  Evidence is material when, "considered cumulatively, not item by item," *Kyles*, 514 U.S. at 436, it would create a "reasonable probability" of a favorable result for the defendant.  *Id.*, 514 U.S. at 434, quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985).

Because knowledge of all evidence in the possession of the government, and any state agency working with the prosecution, is attributed to the prosecutor, *United States v. Giglio*, 405 U.S. 150, 154 (1972), "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437.  Thus, "the rule encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler*, 527 U.S. at 280-81 (quoting *Kyles*, 514 U.S. at 438).  *See also United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979) (facts known to state law enforcement personnel imputed to federal prosecutors when "the two governments ... pooled their investigative energies to a considerable extent.").

This duty extended beyond the point in time when any individual witness testified, and has continued to the present day. *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla,* 193 F.3d 1139, 1146-49 (10th Cir. 1999) (citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987)); *Steidl v. Fermon,* 494 F.3d 623, 630 (7th Cir. 2007) ("For evidence known to the state at the time of trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *High v. Head,* 209 F.3d 1257, 1265 n.8 (11th Cir. 2000). *See also, Banks,* 540 U.S. at 696; *Giglio,* 405 U.S. at 155; *United States v. Kojayan,* 8 F.3d 1315, 1320, 1323-25 (9th Cir. 1993); *Thomas v. Goldsmith,* 979 F.2d 746, 749-50 (9th Cir. 1992) (prosecution has an obligation to turn over exculpatory evidence relevant to habeas proceedings, even if it was not discovered prior to the close of trial); Fed.R.Crim.P. 16 ( c); Fed.R.Civ.P. 26(g)(1). *Cf. Imbler v. Pachtman,* 424 U.S. 409, 427, n. 25 (1976) (under ABA Criminal Justice Standard 3-3.11, commentary, "A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case ... The duty of the prosecutor is to acquire all the relevant evidence ...").

### 3. What is "material"

Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed, the outcome of trial or sentencing would have been different. *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), citing *United States v. Bagley,* 473 U.S. 667, 682 (1985). To prevail, a Movant need not show that it is more "probable than not" that had the evidence been disclosed, the outcome would have been different. *Kyles*, 514 U.S. at 435-36. Rather, the question is whether, considering the cumulative effect of the suppressed evidence, *Kyles*, 514 U.S. at 436, "disclosure of the suppressed evidence to competent counsel would have made a

different result reasonably probable." *Id.*, at 441. That is, the court must consider the evidence

"not item by item," *Kyles*, 514 U.S. at 436, and not in the abstract or based on the evidence's own

inherent value, but "the cumulative impact of the withheld evidence; its utility to the defense as

well as its potentially damaging impact on the prosecution's case." *Banks v. Reynolds*, 54 F.3d

1508, 1518 (10th Cir.1995).

In establishing a *Brady* violation, Mr. Barrett need not refute every piece of evidence in

the prosecution's case. "*Bagley* materiality . . . is not a sufficiency of evidence test. A defendant

need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed

evidence, there would not have been enough left to convict." *Kyles*, at 434-35. Mr. Barrett is

entitled to relief if he can show that in the hands of competent defense counsel the suppressed

"favorable evidence could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict." *Id.* at 435.

### b.    *Exculpatory Evidence Suppressed by the Government.*

### 1. *Charles Sanders.*

The Government suppressed a wealth of exculpatory evidence which would have

impeached Charles Sanders. This evidence includes:

• Evidence of Sanders's complete criminal history, including his many felony

convictions, arrests, and dismissed charges. On direct examination, the Government permitted

Sanders to testify falsely that he had only four prior felony convictions, when, in fact, he has at

least eighteen. Sanders also had numerous charges dismissed in exchange for his work as an

informant. This was not revealed to the defense. *Crivens v. Roth,* 172 F.3d 991, 995-96 (7th Cir.

1999) (prosecution's failure to provide defendant with criminal records of its witnesses violated

*Brady*); *United States v. Hill,* 799 F.Supp. 86, 89-90 (D. Kan. 1992) (for purposes of

impeachment, a defendant is entitled to discovery of the adult criminal records of Government witnesses; in addition, the Government is required to disclose all promises or consideration given to a witness, and any threats made to a witness).

• Evidence of the breadth of Sanders's work as an informant, including the many favorable deals he received over his lengthy criminal career, all of which was relevant to his overall credibility and his motives for testifying against Mr. Barrett. *E.g., Singh v. Prunty,* 142 F.3d 1157 (9th Cir. 1998); *Crivins v. Roth, supra*; *United States v. Hill, supra.*

• Evidence of the nature of the deals Sanders's would receive directly as a result of his testimony against Mr. Barrett. The prosecution misled the jury by getting Sanders to agree that the prosecution would simply "talk to" state authorities in Sequoyah County in the several cases on which he was currently doing time, and would "talk to" authorities in Tulsa County in connection with a pending case Sanders had there. At and shortly after the conclusion of Mr. Barrett's trial, the sentences in Sanders's Sequoyah County cases were converted to straight suspended sentences with no supervision by the Oklahoma Department of Corrections. All this was done pursuant to a "plea agreement with feds." Later, Sanders's obligation to pay costs and fines in these cases was lifted. Sanders received straight probation on his Tulsa County case, despite his appalling criminal history. Sanders had another pending case in Cherokee County for which he later received favorable treatment. *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Douglas v. Workman,* 560 F.3d at 1186; and the other cases cited above.

• Based on what was revealed by AUSA Littlefield at the improper *ex parte* conference with the court on September 13, 2005, the Government was aware of a witness, whose identity has still not been disclosed, who would impeach Sanders's second stage testimony. *See generally, Kyles v. Whitley,* 514 U.S. at 433-34; *Brady v. Maryland,* 373 U.S. at 87.

### 2.    *Travis Crawford*

The Government suppressed the following exculpatory evidence with respect to Travis Crawford:

• The Government knew or should have known that, contrary to his trial testimony, Crawford was still an active drug user and was under the influence of drugs when he testified.

• Evidence of Crawford's criminal record in the military.  *Crivens v. Roth, supra*; *United States v. Hill, supra.*

• Evidence that AUSA threatened Crawford and coached or suggested what his testimony would be in connection with supposed threats Mr. Barrett had made to law enforcement on the afternoon before the shooting.  *United States v. Scheer,* 168 F.3d 445, 451 (11th Cir. 1999) (reversal required due to Government's failure to reveal prosecution's intimidation of a key witness); *United States v. Hill, supra* (among other exculpatory evidence required to be disclosed to the defense is any threats to witnesses by the Government or its agents).                    • Evidence of Crawford's history as an informant and an informant witness, which was relevant to Crawford's overall credibility and his motives for testifying against Mr. Barrett.

### 3.  *Cindy Crawford.*

The Government suppressed the following exculpatory evidence with respect to Cindy Crawford:

• That she had been threatened when interviewed by AUSA Mike Littlefield before trial, that the interview was otherwise conducted in an intimidating atmosphere, and that she had been coached to make Mr. Barrett appear more violent than he actually was.  Cindy Crawford was also threatened between her first and second stage testimony, because the prosecution was displeased that she had not provided evidence on alleged drug manufacturing by Mr. Barrett in her first

stage testimony. The prosecution also discouraged her from talking to the defense. *United States v. Scheer, supra*; *United States v. Hill, supra.*

• That, contrary to her trial testimony, Ms. Crawford was still an active drug user and was either high or "coming down" from a high when she was interviewed by the Government and testified against Mr. Barrett.

• That Ms. Crawford suffered from mental impairments which affected her ability to accurately recall and relate past occurrences, and which caused her to embellish and exaggerate.

• That Ms. Crawford had regularly worked as an informant in the past, and had received a break on a Sequoyah County drug case in which she could have been charged with a felony; that, at the time of her testimony against Mr. Barrett, she was in violation of her Sequoyah County five year deferred sentence, which gave her a motive to please the Government with her testimony; and that the probation violation was resolved favorably to her after her testimony against Mr. Barrett. *Giglio v. United States, supra*; *Douglas v. Workman, supra.*

### 4.    Brandie Zane Price

• In light of the fact that shortly after Mr. Barrett's trial, Brandie Price was charged in a federal drug conspiracy, the Government suppressed evidence it knew or should have known respecting Price's drug-related activities, including drug usage, at the time of her testimony at Mr. Barrett's trial. Much was made during Price's direct testimony that she had rehabilitated herself and was "clean" of drugs.

### 5.    Karen Real

• The Government suppressed evidence of Real's complete criminal record, including the dismissal of numerous state drug charges in Sequoyah and Cherokee Counties. *Crivens v. Roth,*

*supra*; *United States v. Hill, supra*.  Evidence regarding the dismissed state charges was relevant to Real's overall credibility and her motives for testifying.

• As with Charles Sanders, the Government soft-peddled the deal it had in the works for Real's testimony.  It was suggested at trial that the prosecutor would simply "talk to" her sentencing judge, and Real testified that while she may be hopeful for a break on her fourteen year federal sentence, she really was not expecting one.  Shortly after Mr. Barrett's trial, Real, courtesy of a Rule 35 motion filed by the Government, was rewarded for her testimony with credit for time served and immediate release from prison.  *Giglio v. United States, supra*; *Douglas v. Workman, supra*.

### 6.    *Randy Turman*

• The Government suppressed evidence regarding Turman's six-count Sequoyah County felony drug case which, contrary to Turman's trial testimony that the case had "done been taken care of," was still an open case, and had been pending resolution for some years.  With this case hanging over his head, Turman had a powerful motive to tailor his testimony to the Government's liking.  This evidence flatly contradicted Turman's testimony that he had nothing to fear from the authorities.  *Crivens v. Roth, supra*; *United States v. Hill, supra*.

### 7.    *Law Enforcement Witnesses*

The Government suppressed material exculpatory evidence with respect to law enforcement witnesses Clint Johnson, Vicki Lyons and Sequoyah County Sheriff John Philpot. These witnesses – and the Government's theory of the case – could have been impeached into oblivion but for the suppression of this evidence.

Clint Johnson, with his financial irresponsibility, hot check writing, kickbacks to select defense counsel, theft of drugs and drug money, likely drug use, mishandling of informants, and

overall abuse and misuse of his office, was the quintessential dirty cop.  This information was obviously known to the Government and its agents at the time of Mr. Barrett's trial, and defense counsel was entitled to it.  *Cf. United States v. Henthorn,* 931 F.2d 29, 30-31 (9th Cir. 1991). Shortly after Mr. Barrett's trial concluded, Johnson was fired from his law enforcement job. Johnson's corrupt and criminal behavior not only thoroughly discredited him, but, by clear implication, discredited Charles Sanders as well as the validity of the search warrant.  Johnson's recklessness, incompetence and corruption set this entire tragedy in motion.

OSBI Agent Vicki Lyons, Johnson's girlfriend, used her position of authority to help shield him from scrutiny of his illegal activities.  The Government knew or should have known this.  Had this evidence been placed before the jury, Lyons credibility would have been severely damaged, perhaps beyond repair.

Sequoyah County Sheriff John Philpot – and the Government – concealed the fact that approximately one month before the raid on Mr. Barrett's cabin, he had been to Mr. Barrett's property and encountered no problems.  Philpot's recent admission of this fact corroborates the accounts of other witnesses who were available to testify on this point, but were not called by the defense.  This fact alone fatally undercuts the Government's intent case against Mr. Barrett, not to mention the necessity for a no-knock, nighttime search warrant.

Consistent with the authority cited herein, there can be no doubt that the Government wilfully suppressed exculpatory evidence and that, but for the suppression of this evidence, there is a reasonable probability that the outcome of trial would have been different.  As the Government itself has acknowledged, the sole difference between the state proceedings, in which Mr. Barrett was acquitted of murder and convicted of manslaughter, was the late-coming appearance of the seven informant witnesses.  Their credibility, and the Government's case for

intent in both stages of trial, as well as its case for the underlying drug charges, would have been destroyed absent the Government's illegal conduct in shielding these witnesses from effective impeachment. The integrity of the investigation and the Government's theory of the case would have been shown to be entirely lacking had exculpatory evidence relating to Clint Johnson, Vicki Lyons, and John Philpot been revealed. The exculpatory evidence suppressed by the prosecution also would have shown that the search warrant was invalid and that all evidence seized in its execution should have been suppressed.

### 2.    *The prosecution's reliance upon false testimony*

> Prosecutors may not knowingly present perjured testimony. Thus, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

*Napue*, 360 U.S. at 269 (internal citations omitted).

As in other classes of cases, the law imputes to the individual prosecutor knowledge of the falsity of the witnesses' statements. In *Giglio*, the Court imputed to one Assistant United States Attorney knowledge of a promise offered to a witness by another Assistant United States Attorney, even though the trial prosecutor denied knowledge of the promise. *Giglio*, 405 U.S. at 154. Thus, prosecutors in the perjured-testimony context have the same duty to learn information showing the falsity of a witness's testimony that they have to discover exculpatory or impeachment evidence.

However, when, as here, the prosecution relied upon perjured testimony, the prejudice standard is different than for a *Brady* claim. In such cases, a "new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154, quoting *Napue*, 360 U.S. at 271; *see also United States v. Agurs*, 427

U.S. 97, 103 (1976). The Supreme Court has "treated 'reasonable likelihood' as synonymous with 'reasonable possibility' and thus ha[s] equated materiality in the perjured-testimony cases with a showing that suppression of the evidence was not harmless beyond a reasonable doubt." *Strickler*, 527 U.S. at 299 (Souter, J., dissenting) (collecting cases).

Some of these falsehoods the prosecution presented at trial were substantive. Others went to the witnesses' credibility. Either way, the prosecutors violated Mr. Barrett's right to due process of law:

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Ibid.*

Some of the *Brady* evidence discussed above, and the newly discovered evidence addressed below, is also relevant to Mr. Barrett's argument that the Government knowingly sponsored false evidence. The false evidence foisted on the jury by the Government includes: 1) failing to correct Charles Sanders's testimony on direct examination that he only had four felony convictions, *Giles v. Maryland,* 386 U.S. 66 (1966); *Alcorta v. Texas,* 355 U.S. 28 (1957); 2) failing to correct Charles Sanders's testimony that he only received a few favors from Clint Johnson and others in law enforcement over the course of his criminal career; 3) failing to correct Randy Turman's perjury that his six-count Sequoyah County drug case had "done been taken care of"; 4) sponsoring Charles Sanders as a second stage witness, even though the Government was aware of a witness who said Sanders's claims were false; 5) eliciting testimony from Sanders that he had been to Mr. Barrett's cabin on the afternoon preceding the shooting, and three days before the shooting to consummate a drug deal; 6) eliciting or failing to correct testimony from

Petitioner's Merits Brief                    160                    *Barrett v. U.S.*, 09-cv-105-JHP

Clint Johnson at the pretrial suppression hearing which falsely portrayed the confidential

informant's (Sanders's) drug activities and prior record; 7) fostering the false impression that the

Government would simply "talk to" state authorities about Sanders's cooperation, and would

"talk to" Karen Real's sentencing judge on her behalf, while leaving the false impression that

these witnesses may well receive nothing in consideration of their testimony; 8) sponsoring false

testimony from the Crawfords and Brandie Price regarding their ongoing drug use; and 9) giving

an overall false picture of the informant witnesses' records and motives for testifying.

Consistent with the authority cited here, and especially when the Government's knowing

use of false testimony is considered in the aggregate with the suppression of exculpatory

evidence and newly discovered evidence, there can be no serious debate that Mr. Barrett was

prejudiced and that relief is required.  Had the jury been given an accurate picture of the

prosecution's witnesses, the Government's case would have been on shaky ground indeed.

### 3.      *Newly Discovered Evidence*

Newly discovered evidence, *i.e.,* evidence which could not have been discovered by the

exercise of due diligence before or during trial, may also form the basis for relief under § 2255.

*E.g., United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996) (rejecting newly discovered

evidence claim raised in initial 2255 petition, which was filed during pendency of direct appeal,

on the merits); (Fed. R. Crim. P. 33.)  To warrant relief on a claim of newly discovered evidence,

it must be shown: 1) that the evidence was discovered after the trial; 2) that failure to learn of the

evidence was not caused by a lack of diligence; 3) the evidence is not merely impeaching in

character; 4) the evidence is material to the principal issues involved; and 5) the evidence is of

such a nature that, had it been disclosed to the jury, there is a reasonable probability of a different

outcome, *i.e.,* acquittal or a lesser sentence. *Peltier v. Booker,* 348 F.3d 888, 890 (10th Cir. 2003); *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997).

A *Brady* claim may be a subspecies of a newly discovered evidence claim. *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999). Whether the claims made below constitute *Brady* violations, newly discovered evidence, or both, Mr. Barrett is entitled to relief from his convictions and sentences.

Travis Crawford's recantation is newly discovered evidence, and could not have been uncovered prior to or during trial with the exercise of due diligence, because the Government sprung Crawford as a witness at the eleventh hour to forestall any effective investigation, and Crawford refused to speak with trial counsel about his testimony. Because he was the only witness to claim Mr. Barrett threatened law enforcement roughly contemporaneously to the shooting of Trooper Eales, his testimony was critical to the Government's intent case. Much the same is true of Cindy Crawford's revelation of improper Government conduct in connection with her testimony and the numerous impeaching facts she related to investigators currently working for Mr. Barrett. Crawford has also all but recanted her second stage testimony against Mr. Barrett. The newly discovered evidence respecting the Crawfords, either alone or in combination with the other newly discovered evidence addressed here, warrants relief under the standard of *Peltier v. Booker, supra. E.g., In re McDonald,* 514 F.3d 539, 542-47 (6th Cir. 2008) (post-trial recantation of key witness's trial testimony could not have been discovered previously with the exercise of due diligence and, if recantation was credible, defendant's constitutional rights would have been violated; defendant was permitted to file a second habeas challenge to his conviction); *Ferrara v. United States,* 456 F.3d 278, 290-98 (1st Cir. 2006) (defendant allowed to withdraw

plea ten years after the fact because informant witness recanted, and government concealed evidence of the recantation).

Other *Brady* evidence already discussed here also constitutes newly discovered evidence under the standards outlined above.  This evidence includes: 1) Charles Sanders's deals in exchange for his testimony against Mr. Barrett, which had to have been in the works all along but were only consummated at or shortly after the conclusion of Mr. Barrett's trial; 2) the deals, in state and federal court, respectively, accorded to Karen Real, Brandie Price, Randy Turman, and Cindy Crawford; and 3) Clint Johnson's firing shortly after Mr. Barrett's trial, and the revelations further damaging Johnson's credibility that surfaced at the trial of former Sequoyah County District Attorney Richard Gray, wherein Mr. Gray was acquitted on a directed verdict following Johnson's appearance as a prosecution witness.

Newly discovered evidence corroborating Travis and Cindy Crawford's claims that they were threatened and intimidated by then-AUSA Mike Littlefield has come to light with Littlefield's *Alford* plea to child abuse charges and the Oklahoma Supreme Court's private reprimand of his criminal conduct.  A child-abusing bully would hardly be above threatening witnesses, or engaging in the suppression of exculpatory evidence and the other forms of prosecutorial misconduct addressed throughout Mr. Barrett's pleadings.

All of this newly discovered evidence meets the *Peltier* factors and raises the reasonable probability of a different trial outcome had it been presented to the jury.  *United States v. Hernandez-Rodriguez,* 443 F.3d 138, 144-48 (1st Cir. 2006) (new trial ordered before a different judge where trial court abused its discretion in failing to assess the full impact of newly discovered evidence on the trial outcome; in Mr. Barrett's case, the combined effect of the newly discovered evidence, as well as the *Brady* violations and other related prosecutorial misconduct,

plainly mandates relief); *United States v. Fulcher,* 250 F.3d 244, 249-93 (4th Cir. 2001) To the extent that some – but most assuredly not all – of this newly discovered evidence could be called impeaching in character, it should be remembered that in some situations, such as in Mr. Barrett's case, newly discovered impeachment evidence could be so powerful that it renders the trial testimony of one or more witnesses incredible. *United States v. Davis,* 960 F.3d 820, 835 (9th Cir. 1992).

### 4.      *The Need for an Evidentiary Hearing*

As argued regarding Ground 2, *supra*, the governing law regarding *Brady*, *Giglio*, and *Napue* claims generally requires the Court to evaluate the cumulative effect of extra-record evidence. For that reason, hearings are generally required, and the prerequisite for denying such claims without a hearing, 28 U.S.C. § 2255(b), is less likely to exist. *United States v. Siddiqi,* 959 F.2d 1167, 1172-74 (2nd Cir. 1992) (remand to determine if defendant's submission of new evidence entitled him to a new trial).

### 5.      *Conclusion*

Considered together, the Government's wholesale suppression of exculpatory evidence, its knowing reliance on false evidence, and the new evidence Mr. Barrett has been able to discover during the course of these collateral proceedings demonstrates without question that Mr. Barrett's constitutional rights were violated and that he received a fatally flawed trial before this court. *United States v. Torres,* 569 F.3d 1277 (10th Cir. 2009: *Douglas v. Workman,* 560 F.3d 1156, 1186 (10th Cir. 2009); *Scott v. Mullin,* 303 F.3d 1222, 1232 (10th Cir. 2002) (habeas relief granted in §2254 case where exculpatory evidence, even if it could only be used for impeachment purposes, was suppressed); *Mitchell v. Gibson,* 262 F.3d 1036, 1059-60, 1062-63, 1065 (10th Cir. 2001) (vacating state death sentence for failure to reveal exculpatory results of testing of physical

evidence); *Nuckols v. Gibson,* 233 F.3d 1261 (10ᵗʰ Cir. 2000) (habeas relief granted where

prosecution failed to disclose material evidence impeaching key prosecution witness). This

evidence was relevant not only to the guilt-innocence determination, but to punishment as well,

because it reveals mitigating facts about the circumstances of the homicide.

**Ground 5, Part C**

"In our adversary system for determining guilt or innocence, it is rarely justifiable for the

prosecution to have exclusive access to a storehouse of relevant fact. Exceptions to this are

justifiable only by the clearest and most compelling considerations." *Dennis v. United States*,

384 U.S. 855, 873 (1966) (footnote omitted). "'No right of a defendant is violated when a

potential witness freely chooses not to talk....' *Kines v. Butterworth*, 669 F.2d 6, 9 (1st Cir.

1981), *cert. denied*, 456 U.S. 980 (1982). However, the prosecution may not interfere with the

free choice of a witness to speak with the defense absent justification 'by the clearest and most

compelling considerations.' *Id.*" *United States v. Pinto*, 755 F.2d 150, 152 (10th Cir. 1985).

"[W]hen the free choice of a potential witness to talk to defense counsel is constrained by the

prosecution without justification, this constitutes improper interference with a defendant's right

of access to the witness. Justification on the part of the prosecution to interfere with that right can

be shown only by the clearest and most compelling considerations." *Kines*, 669 F.2d at 9.

In *United States v. Gregory*, 369 F.2d 185 (D.C. Cir. 1966), *cert. denied*, 396 U.S. 865

(1969), the court, per Judge Skelly Wright, found the defendant's due process rights were

violated when the "prosecutor embarrassed and confounded the accused in the preparation of his

defense by advising the witnesses . . . not to speak to anyone unless he were present." 369 F.2d

at 187. The prosecutor said he had "instructed all the witnesses that they were free to speak to

anyone they like. However, it was my advice that they not speak to anyone about the case unless I

was present." *Ibid.* The statements of the court in *Gregory* apply to this case, although the misconduct here was more serious:

> The purpose of 18 U.S.C. § 3432 requiring that in capital cases the defendant be furnished a list of the names and addresses of the witnesses to be called by the Government is to assist defense counsel in preparing the defense by interviewing the witnesses. Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them. Here the defendant was denied that opportunity which, not only the statute, but elemental fairness and due process required that he have. It is true that the prosecutor stated he did not instruct the witnesses not to talk to defense counsel. He did admit that he advised the witnesses not to talk to anyone unless he, the prosecutor, were present.

*Gregory*, 369 F.2d at 187-88.

The *Gregory* court noted that the then-current canons of professional conduct provided that each party should have equal access to witnesses. *Id.* at 188. Today, professional standards provide that it is unprofessional conduct for prosecutors to impede defense counsel's access to prosecution witnesses. ABA Standard 3-3.1(c). "It is imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights." *United States v. Rich*, 580 F.2d 929, 934 (9th Cir.), *cert. denied*, 439 U.S. 935 (1978). Courts cannot tolerate "any governmental conduct that has the purpose or effect of discouraging witnesses from cooperating with the counsel of an accused." *Ibid.* Thus, "counsel may not make his or her presence a condition of the interview" between the defense lawyer and a witness. ABA Standard 3-3.1(c) Commentary.

The court in *Gregory* held the prosecutor's conduct was as pernicious as the suppression of evidence in violation of *Brady*. The court observed that there was not

> any direct suppression of evidence. But there was unquestionably a suppression of the means by which the defense could obtain evidence. The defense could not know what the eye witnesses to the events in suit were to testify to or how firm they were in their testimony unless defense counsel was provided a fair

opportunity for interview. In our judgment the prosecutor's advice to these eye witnesses frustrated that effort and denied appellant a fair trial.

*Id.* at 189.

In this case, the Government first sought through an *ex parte* motion for a protective order to prevent the defense from receiving the identifying information required by § 3432. During the *ex parte* hearing on that motion, the trial court made it clear that the Government failed to present anything close to the clearest and most compelling circumstances necessary to forestall compliance with the statute. (Tr. 9/13/05 Hr'g at 4-5, 9, 19.) Nevertheless, the Court withheld adjudication of the motion for a protective order. This enabled the prosecutors to rely upon the possibility of the protective order being granted when "negotiating" an "arrangement" with the defense. In the end, the prosecutors would secure, with the Court's tacit assistance, an arrangement more detrimental to the search for truth than the one the court condemned in *Gregory*, i.e., some witnesses would be interviewed but only after a delay and only in the presence of the prosecutor.

There were also more egregious violations of the defense's right to investigate. Prosecutors, through statements and/or actions, communicated to witnesses that they should not speak with defense personnel outside the presence of the prosecutor. ( Exh. 92; Exh. 31.) Karen Real has told Mr. Barrett's investigator that she was told not to speak with him. ( Exh. 43.)

As stated in the Amended § 2255 Motions, the performance of Mr. Barrett's defense counsel in relation to these witnesses also fell below prevailing professional norms. To the extent they acquiesced in the limitations on their access to information about the witnesses based on ignorance of *Gregory* and cases following it, their conduct was unprofessional. *Williams*, 529 U.S. at 395 (defense counsel's failure to obtain social service records on defendant based on erroneous belief state law made them unavailable was constitutionally deficient); *Kimmelman*,

477 U.S. at 385 (counsel's failure to move to suppress was constitutionally deficient because it was based "on counsel's mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense").  The evidence described in Ground 2, Part A(4) and in Ground 5, Part A, shows that if defense counsel had sought a continuance and investigated the informants, and if the prosecution had complied with its duty to disclose impeachment evidence, the informant witnesses' credibility would have been totally undermined.

At a minimum, in light of the evidence presented in the Amended Motion, and the legal arguments presented here, the files and records do not conclusively show Mr. Barrett is entitled to no relief.  This Court should order an evidentiary hearing on sufficient notice for Mr. Barrett to obtain discovery and make use of this Court's subpoena power to marshal the abundant evidence.  Thereafter, this Court should vacate the conviction.

**Ground 5, Part D.   Mr. Barrett is Entitled to a New Trial Due to the Prosecution's Improper Questioning of Witnesses and Closing Argument**.

Throughout the guilt and penalty phases of Mr. Barrett's trial the prosecutors repeatedly and in various ways violated rules of professional conduct regarding the questioning of witnesses.  (*See* ABA Standard 3-5.6.)  These improper questions, together with the prosecutors' "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

As shown in Mr. Barrett's previous filings, the Government engaged in the following forms of improper questioning of witnesses: 1) asking questions for which there was no good faith basis, or which were beyond the personal knowledge of the witness; 2) implying, through such questioning, that the prosecutor personally had knowledge of facts not testified to by the witness, making the prosecutor, in effect, a testifying witness; 3) commenting on Mr. Barrett's

exercise of his trial rights, as if he were somehow doing something wrong by demanding his constitutional right to a trial; 4) asking witnesses whether other witnesses had made false statements, when, again, such would be beyond the knowledge of the witness being examined; 5) utilizing questions as a form of closing argument by repeating, over and over, the testimony of the informant and other witnesses, thus in effect vouching for the testimony of the witnesses.

Each of these categories of questioning was improper. *United States v. Beeks,* 224 F.3d 741, 746 (8th Cir. 2000)(analyzing in detail and condemning repeated questioning by prosecutor for which no good faith basis existed); *United States v. Davenport,* 753 F.3d 1460, 1462 (9th 1985)(improper to make commentary or ask questions for which no good faith basis exists to "waft an unwarranted innuendo into the jury box"), Just as it is improper to engage in commentary in closing argument that is outside the record evidence, *e.g., United States v. Cheska,* 202 F.3d 947 (7th Cir. 2000); *United States v. Manning,* 23 F.3d 570 (1st Cir. 1994); *United States v. Blakely,* 14 F.3d 1557 (11th Cir. 1994), it is likewise improper, through the questioning of witnesses, to imply the existence of certain facts or evidence the witness has not testified to. In effect vouching for the testimony of witnesses, or treating their testimony as established fact in commentary or questioning of other witnesses, is equally beyond the pale. *United States v. Young,* 470 U.S. 1, 18-19 (1985)(vouching for witnesses vests them with the imprimatur of the government, and may induce the jury to trust the government's judgment rather than its own view of the evidence); *United States v. Martinez-Medina,* 279 F.3d 105 (1st Cir. 2002)(improper vouching for credibility of informant witness by implying that if informant were lying to curry favor with the government, he would have come up with more powerful testimony); *United States v. Broomfield,* 201 F.3d 1270, 1276 (10th Cir. 2000)(court condemned increased willingness of prosecutors to "push the envelope" with improper vouching); *United*

Petitioner's Merits Brief                           169                    *Barrett v. U.S.*, 09-cv-105-JHP

*States v. Garcia-Guizer,* 160 F.3d 511, 520 (9th Cir. 1998)(noting that the court had frequently observed that the government may not vouch for the credibility of its witnesses, either through putting the prosecutor's own prestige behind the witness's testimony, or indicating that extrinsic information not presented in court supports the witness's testimony).

The Government's conduct in the penalty phase closing arguments was even more egregious. In his portion of the penalty phase closing argument, AUSA Littlefield, taking unfair advantage of the court's erroneous ruling excluding Mr. Barrett's statements expressing his genuine remorse for Trooper Eales's death by wishing he had been killed rather than Mr. Eales, fastened on an ambiguous statement that had been allowed in evidence: that Mr. Barrett wished things had turned out differently. Knowing full well this isolated statement did not tell the whole story, Littlefield sarcastically told the jury that by this, Mr. Barrett simply meant he was sorry he got caught; what he regretted was that he would not have an opportunity to "kill more of the bastards." (R. 5356-57.) The Tenth Circuit has condemned similar tactics. *Paxton v. Ward,* 199 F.3d 1197, 1217 (10th Cir. 1999) (prosecutorial misconduct justified sentencing relief where, in connection with unadjudicated homicide introduced in the penalty phase, prosecution objection prevented defendant from showing the charge had been dismissed because he passed a polygraph test, and prosecutor took advantage of the ruling to argue "we don't know why" the case was dismissed, implying dismissal could have stemmed from a technicality).

United States Attorney Sperling strayed from the record and appealed to societal alarm, stating at one point the "hand of God" prevented Mr. Barrett from being a multiple murderer. This was "way over the capital murder line." (R. 5402-03.) Similarly, Sperling later asked, "Why wasn't this a double murder or a triple murder or a quadruple murder?" (R. 5412.) Denigrating Mr. Barrett's fundamental right to a fair trial, Sperling, in the form of a rhetorical

question, told the jury Mr. Barrett not only had no right to leniency, but really had no right to "fairness."  (R. 5408.)

Trotting out a variation on the old Bob Macy[99] "three hots and a cot" argument, which the Tenth Circuit has condemned on more than one occasion, Sperling repeatedly – and  falsely – characterized life without the possibility of release as Mr. Barrett simply being "sent to his room."  (R. 5412, 5423.)  Continuing in the same improper vein, Sperling told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation.  (R. 5412.)  Speculating outside the record simply to prejudice the jury, Sperling said that if given life, Mr. Barrett would be a "hero" to his fellow inmates.  (R. 5412.)  *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin,* 311 F.3d 1002, 1014-15 (10th Cir. 2002).  In the next breath, he engaged in improper name calling, referring to Mr. Barrett as the "executioner of the innocent."  (R. 5412.)

Attempting to create resentment among the jurors, as if Mr. Barrett, and not the jury, was in control of his fate, and again denigrating Mr. Barrett's right to a fair trial, Sperling falsely told the jury Mr. Barrett wanted to "choose his sentence."  Asking rhetorically, "How unjust is that?" the United States Attorney closed the circle on the "three hots and a cot" theme and appealed to lynch law by inquiring "What opportunity did he give Rocky Eales to live?"  The prosecutor again went outside the record when he stated Mr. Barrett wanted "the thrill of the kill."  (R. 5412-13.)

---

[99]  Mr. Macy is the former long-time District Attorney in Oklahoma County, who was well known, and often criticized by the courts, for his misconduct in death penalty cases.

Fueling alarm that Mr. Barrett was a threat to witnesses, when there was absolutely no evidence in the record to support such a claim[100], and misleading the jury all at once, the prosecutor commented that the state case was "grossly under-evidenced," because "no small effort was involved" in getting the drug-addicted, criminal, deal-swinging snitches "brave enough," to testify. (R. 5414-15.) *Gordon v. Kelly,* 2000 WL 145144 (6th Cir. Feb. 1, 2000) (unpublished) (pervasive efforts by prosecutor to portray defendant as being feared by witnesses required habeas relief).

Left unsaid, of course, was that these individuals, who supposedly knew so much, and were never once threatened by Mr. Barrett to keep them "quiet," were nowhere to be found in 1999 when the shooting occurred, or in 2002 and 2004 when the case was tried in state court. They only crawled out of the woodwork when the federal government put the arm on them. To say, as the prosecutor did, that the state juries got only a "small glimpse" of the whole case falsely implied the seven Johnny and Janie Come Latelys were ready, willing and able to testify back when, but were somehow prevented from doing so by the state prosecutors, or out of "fear."

The prosecutor grossly misled the jury when he referred to the victim impact witnesses and stated "[t]hey didn't testify in state court," as if this explained the state court outcome. (R. 5415.) This falsely implied the victim impact witnesses did not testify in the state trials only because the incompetent, "under-evidenced" state prosecutors did not have sense enough to put them on the stand. Sperling was well aware they *could not have testified by law* because the case never got past the first stage. Shielded by the court's erroneous ruling excluding Mr. Barrett's

---

[100] This was a knowing false statement on the prosecutor's part. As discussed in Ground 1, the Government failed to produce *any* evidence at the *ex parte* hearing on its motion to delay disclosing the identity of the informant witnesses that the witnesses had ever been threatened in any manner by Mr. Barrett. "Monk" Sanders testified in the second stage that Mr. Barrett wanted the snitch who landed him in jail harmed, but anything this pathetic witness had to offer was scarcely worthy of belief.

statements of remorse, and picking up where Mike Littlefield left off, the prosecutor ridiculed the "wish it had been different" statement, remarking this sentiment was "big of him [Mr. Barrett]." (R. 5419.) The prosecutor stated there was no evidence Mr. Barrett had "lost one wink of sleep" over what he did.  Mr. Barrett killed "remorselessly" and "selfishly," with no sympathy or empathy for anyone.  Mr. Barrett was so unfeeling and callous, it was almost as if he had done "nothing."  The "wrong choice" comment was likened to a meaningless mistake, nothing more than an "oops."  (R. 5420-21.)  There were additional comments on Mr. Barrett's supposed lack of remorse.  (R. 5419-20, 5421-22.)  *Paxton v. Ward,* 199 F.3d at 1217.

The United States Attorney improperly denigrated Mr. Barrett's right to put on mitigating evidence by stating he was using his family as "props," in contrast to Trooper Eales, who did not receive a similar chance to plead for his life.  (R. 5420.)  *Cf. Penry v. Lynaugh,* 492 U.S. 302, 319 (1989); *Lockett v. Ohio,* 438 U.S. 586 (1978).

Sperling aligned himself with the jurors as if he and they were on the same team, stating that "we" must not refuse to do "our" duty just because the victim's family and the community could not be made whole again.  (R. 5421-22.)  Remarks of this nature have always been deemed improper.  *Viereck v. United States,* 318 U.S. 236, 247-48 (1943); *Cargle v. Mullin,* 317 F.3d 1196, 1223 (10th Cir. 2003).

It is simply improper for a prosecutor to suggest that a jury has a civic duty to convict or to return a certain punishment.  *Thornburg v. Mullin,* 422 F.3d 1113, 1134 (10th Cir. 2005); *Malicoat v. Mullin,* 426 F.3d 1241, 1256 (10th Cir. 2005); *Spears v. Mullin,* 343 F.3d 1215, 1247 (10th Cir. 2003).

Continuing with the civic duty theme, the prosecutor talked of Mr. Barrett having "slaughtered an innocent soldier of the law," warning the jury they would make him a "hero" in

Petitioner's Merits Brief                     173                     *Barrett v. U.S.*, 09-cv-105-JHP

prison if they returned a life sentence, or "sent him back to his room" and merely gave him "more time." (R. 5423.)  This was little better than telling the jury that if they spared Mr. Barrett's life, they would be accomplices to any future crimes he might commit.  *Bates v. Bell,* 402 F.3d 635, 642 (6th Cir. 2005).

The misconduct in second stage closing arguments was so pervasive that Mr. Barrett's fundamental due process rights to a fair sentencing proceeding were violated, notwithstanding the lack of objections.  *See* Ground II.  *Darden v. Wainwright,* 477 U.S. 168 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).  The error stemming from prosecutorial misconduct cannot be termed harmless, even under the strict due process test of *Darden* and *Donnelly.*  This was not a runaway case for the death penalty.  The jury rejected death on counts 1 and 2, and also rejected the non-statutory aggravating circumstance that Mr. Barrett would pose a continuing threat.

"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."  *Gardner v. Florida,* 430 U.S. 349, 358 (1977)(plurality opinion); *Bland v. Sirmons,* 459 F.3d 999, 1028 (10th Cir. 2006).  The repeated misconduct of the prosecutors prevented the jury from evaluating the second stage evidence fairly, leading to a death verdict based on emotion rather than reason.  *Bland,* 459 F.3d at 1024.

Prosecutorial misconduct was not raised on direct appeal.  Because the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused the failure to raise the claim.  Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).  *See* Ground XVIII, *infra.*

Petitioner's Merits Brief                         174                         *Barrett v. U.S.*, 09-cv-105-JHP

**Ground 6.    Mr. Barrett's Rights Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Court's Restrictions on the Use of his Statements and Other Evidence.**

Mr. Barrett's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, to due process, to effective assistance of counsel, to a reliable sentence, to present defense evidence, and to rebut the evidence introduced against him were violated when the trial court unduly restricted defense counsel's opportunity to present significant, relevant and admissible *defense* evidence and facts to the jury, including various statements by Mr. Barrett around the time of his arrest that showed deep remorse for the death of Trooper David Eales.  The trial court also improperly restricted evidence regarding the previous state court trials and verdict.

The court's exclusion Mr. Barrett's statements expressing remorse for Trooper Eales's death during penalty phase proceedings violated Mr. Barrett's right to jury consideration, as a mitigating factor, of important evidence of Mr. Barrett's character, in violation of *Tennard v. Dretke,* 524 U.S. 274, 285 (2004); *Penry v. Johnson,* 532 U.S. 782, 797 (2001); *Skipper v. South Carolina*, 476 U.S. 1 (1976); *Eddings v. Oklahoma,* 455 U.S. 104 (1982); and *Lockett v. Ohio*, 438 U.S. 586 (1978).   The exclusion of this evidence also violated Mr. Barrett's Sixth Amendment right to offer evidence in support of his case.  *Rock v. Arkansas*, 483 U.S. 44 (1987); *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973).  The exclusion of this evidence deprived Mr. Barrett "of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986); *California v. Trombetta,* 467 U.S. 479, 485 (1984).  These restrictions also denied Mr. Barrett the opportunity to conduct an effective cross-examination of prosecution witnesses, in violation of Mr. Barrett's rights under the Confrontation Clause of the Sixth Amendment.  *Delaware v. Van Arsdale*, 475

U.S. 673, 678 (1986); *Davis v. Alaska,* 415 U.S. 308, 318 (1974). Finally, the trial court's

rulings fatally infected the proceedings and violated Mr. Barrett's due process rights. *Estelle v.*

*McGuire*, 502 U.S. 62, 70 (1991); *Moore v. Illinois*, 408 U.S. 786, 800 (1972).

During the course of Mr. Barrett's trial, counsel sought to admit a number of statements

made by Mr. Barrett shortly after his arrest that showed his deep remorse for the death of Trooper

Eales. For example, Mr. Barrett's counsel sought to admit the written statement of Trooper Glen

Smithson, who recorded that on September 29, 1999, Mr. Barrett told him, "The wrong person

got killed. I wished it had been me." (Exhibit 107.)

However, the prosecutor objected to these statements, and the court incorrectly excluded

them. It goes without saying that remorse is a proper mitigating factor, and that any evidence

bearing on it, particularly in light of the relaxed standards for the admissibility of evidence in a

federal capital trial, is admissible under the Eighth Amendment. The courts routinely note that

evidence of remorse, whether testified to by a defendant himself, or a defendant's expressions of

remorse to third parties, are appropriate considerations for a jury in a death penalty case. *Boyd v.*

*Allen,* ___F.3d___, No. 07-14908 (11th Cir. Jan. 8, 2010) (noting that a witness testified in the

penalty phase that the defendant had expressed remorse to her and told her that he never "meant

for it to happen"); *Smith v. Mullin,* 379 F.3d 919, 936 (10th Cir. 2004); *James v. Gibson,* 211 F.3d

543, 549 (10th Cir. 2000); *Cooks v. Ward,* 165 F.3d 1283, 1294 (10th Cir. 1998) (jury instructed

that, as a mitigating factor, defendant had repeatedly expressed remorse and shame for his

offense); *Duvall v. Reynolds,* 139 F.3d 768, 779 (10th Cir. 1998) (rejecting ineffective assistance

argument for failure to introduce evidence of remorse, when evidence of defendant's remorse

was in the trial record, including defendant crying during his statement to the police). Here, the

court instructed the jury on remorse as a mitigating factor, but excluded the evidence supporting

a finding of remorse. With evidence of remorse improperly excluded, the jury was left to believe that the opposite was true: that Mr. Barrett had no remorse for his crimes, and that this was a reason to sentence him to death. *United States v. Barrett,* 496 F.3d 1079, 1088 n. 4 (10th Cir. 2007) (noting that while all or some of the jurors found a number of mitigating factors, the jury *unanimously* rejected remorse as a mitigating factor).

The Government cynically exploited the court's ruling in closing argument, mocking the notion Mr. Barrett had any remorse at all. The prosecutor fastened on Mr. Barrett's statement to his mother that he wished things had turned out differently, which AUSA Littlefield stated meant Mr. Barrett had wished he had not gotten caught so he could "kill more of the bastards." (R. 5356.) During closing argument, Mr. Barrett's counsel argued, as a factor in mitigation, that Mr. Barrett expressed remorse. With Mr. Barrett's expressions of remorse excluded, the United States Attorney was able, without fear of contradiction, to call him a "common, cold-blooded murderer." (R. 5423.)

By refusing Mr. Barrett's attempts to present evidence of his contemporaneous expressions of remorse, the Court prevented Mr. Barrett from proving the existence of this factor in mitigation. In fact, Mr. Barrett's expressions of remorse were highly relevant and admissible. Remorse is "an important mitigating factor." *Jones v. Polk*, 401 F.3d 257, 264 (4th Cir. 2005). *See also Riggins v. Nevada*, 504 U.S. 127, 144 (1992) (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps be determinative of whether the offender lives or dies.") This is particularly true when, as in this case, the Government "emphasized the lack of remorse in closing argument." *Jones v. Polk*, 401 F.3d at 264.

"Short of a defendant taking the stand, often the only way to present evidence of remorse is through the hearsay statements of others." *Davis v. Polk*, 2007 WL 2898711, at *18 (W.D.N.C. 2007). Accordingly, the use of hearsay rules to prevent the admission of expressions of remorse violates the *Lockett* line of cases, which hold:

> that 'a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could not be part of the sentencing decision at all."

*Jones v. Polk*, 401 F.3d at 263 *quoting Johnson v. Texas*, 509 U.S. 350, 362 (1993) (court erred in excluding as hearsay at penalty phase letter in which capital defendant expressed remorse).

The court's error in excluding this evidence prejudiced Mr. Barrett. Had Mr. Barrett been allowed to present this evidence, there is a reasonable probability that he would not have been sentenced to death. The court clearly erred in excluding this evidence, because the rules of evidence, with respect to the introduction of both mitigating and aggravating evidence, do not apply in the sentencing stage of a capital case. Title 21 U.S.C. §848(j), in effect at the time of Mr. Barrett's trial, states that any other information a party may want to submit is not constrained by the rules of evidence, unless its probative value is substantially outweighed by the danger of unfair prejudice. Because a defendant must be allowed under the Eighth Amendment to introduce any relevant mitigating evidence, it beggars the imagination to believe that expressions of remorse are more prejudicial than probative. The court excluded highly relevant mitigating evidence of remorse, which opened the door for the Government to prejudicially deride Mr. Barrett as a cold blooded killer who wanted to take out more cops.

All of the constitutional violations alleged above warrant the granting of relief without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional

violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on Mr. Barrett's conviction and death sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

The trial court also violated Mr. Barrett's Fifth Amendment due process rights to a fair trial, and his Sixth Amendment rights to present a defense and to confront witnesses against him by excluding altogether, in the *first stage* of trial, evidence of the prior state court trials and verdict. *Crane v. Kentucky,* 476 U.S. at 690; *Delaware v. Van Arsdall,* 475 U.S. at 678-79; *Davis v. Alaska,* 415 U.S. at 318; *Chambers v. Mississippi,* 410 U.S. at 294. Although counsel did cross-examine some of the informant witnesses about why they only came forward shortly before the federal trial, the cross-examination lacked proper context. The credibility of these witnesses would have been severely damaged, and their motives for coming forward only years after the fact would have been exposed, had counsel been able to point out in cross-examination that Mr. Barrett had actually been tried for Trooper Eales's death not once, but twice in state court in 2002 and 2004, and that these "important" witnesses were nowhere to be found, even though they were in the community and the same state law enforcement officers (most particularly, Clint Johnson and Sheriff Philpot) who were assisting in the federal case had worked the state case. Evidence that these witnesses were totally silent at the time of the two previous state court trials also would have put the lie to Clint Johnson's testimony, elicited on cross-examination, that several individuals had reported threats from Mr. Barrett to law enforcement, and that this "fact" made execution of the warrant "high risk." (*See also,* Ground II A (8))

In *United States v. Giovanelli,* 945 F.2d 479, 486-490 (2nd Cir. 1991), the defendants were charged in a racketeering case. Some of the predicate acts for the racketeering charge were an attempted murder and two murders for which some of the accused had either been acquitted or which had resulted in hung juries in state court. Just as the trial court did here in the guilt phase, the trial judge in *Giovanelli* excluded all previous mention of the fact that there had been previous trials, and the outcome of those trials.

On appeal, the defendants argued that the information regarding the prior state trials was vital to the ability to cross-examine and impeach witnesses with the fact that their testimony had evolved since the state court prosecutions. It was held that while evidence regarding the outcome of the previous state prosecutions could perhaps have been excluded as being more prejudicial (to the Government's case) than probative, the defendant's rights to put on a defense and confront witnesses was violated by the trial court's ruling that any mention of the previous state court prosecutions was *verboten*. The appellate court held that before evidence of the state proceedings was introduced, the trial court could have and should have instructed the jury that under the dual sovereign doctrine, *Heath v. Alabama,* 474 U.S. 82 (1985), it was permissible for the Federal government to charge an individual for the same offense that had previously been prosecuted at the state level, and that the jury would hear references to testimony given in the prior state trials. Defense counsel should have been permitted to refer to the previous trials, but not their outcome. Because the trial court did not follow this course, the jury's findings of the predicate acts relating to the previous state prosecutions were vacated.

At the very least, counsel for Mr. Barrett should have been able to bring out, on cross-examination of the informants, that there had been previous state court trials and that these witnesses were suspiciously absent from them, raising the inference that their testimony had been

tailored and fabricated for the late-coming federal prosecution in order to "fill the gap" in the Government's proof.  Counsel also should have been permitted to refer to the previous state court trials in cross-examination of the law enforcement witnesses to raise the inference that their testimony had evolved after two jury trials.  As noted, information regarding the state court trials also would have been invaluable in impeaching Clint Johnson's false testimony that execution of the warrant was "high risk" because several individuals had reported threats by Mr. Barrett to law enforcement.  If that were the case, where were these witnesses in state court?

Mr. Barrett submits that not only the fact of the state court trials, but their outcome, should have been permitted in the guilt stage.  Evidence that one jury had deadlocked on the state murder charge, and that a second jury had acquitted Mr. Barrett of murder, convicting him instead of manslaughter, was highly probative to his defense at the federal trial, and would have exposed the impure motives of the Government for bringing a federal case simply because it did not like the outcome of the state prosecution.  The only "prejudice" the Government would have suffered had the result of the state court proceedings been placed before the jury was the exposure of its cynicism and the unfairness in launching a federal prosecution to begin with.

Appellate counsel were ineffective for failing to raise the issues addressed here, which were clearly framed by the record..  There could be no reasonable strategy for neglecting to raise these claims on direct appeal.  There is a reasonable probability that had the issues been raised, the outcome of the appeal would have been different.  *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).  *See* Ground XVIII, *infra*.

**Ground 7**.   **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments were Violated when the Trial Court Permitted the Marshals to Restrain him Without Justification.**

In Ground 7 of the Amended § 2255 Motion, Mr. Barrett sets out the evidence demonstrating that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the U.S. Marshal to place on Mr. Barrett a bulging electric shock apparatus and required him to wear the shock device during the trial without a finding that Mr. Barrett was or would be a security risk. Throughout the trial Mr. Barrett was forced to wear a "stun belt" around his waist. The belt left an unusual bulge that was visible through Mr. Barrett's clothing. The marshals' ability to send an electric shock through the belt intimidated Mr. Barrett and posed a danger to him that impaired his ability fully to observe and participate in the trial, including communicating with his attorneys.

The Supreme Court has long held that the use of visible or fear-inducing restraints on a defendant without a particularized finding of necessity violates due process and can impair a defendant's Sixth Amendment right to effective assistance of counsel, to a presumption of innocence, and to a fair and reliable capital sentencing proceeding as guaranteed by the Eighth Amendment. *Deck v. Missouri*, 544 U.S. 622, 632 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v. Williams*, 425 U.S. 501 (1976); and *Illinois v. Allen*, 397 U.S. 337 (1970). "'The use of stun belts, depending somewhat on their method of deployment, raises all of the traditional concerns about the imposition of physical restraints.'" *United States v. Wardell*, 591 F.3d 1279, 1294 (10th Cir. 2009), quoting *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003), and citing *United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002) (applying Supreme Court's restrictions to "stun belts").

The Tenth Circuit has "recognized the district court's legal obligation to consider *individualized* factors in determining whether to deviate from the general rule prohibiting physical restraints." *Wardell*, 591 F.3d at 1293 (emphasis added). *See also Deck*, at 633 ("determination must be case specific; that is to say, it should reflect particular concerns , say special security needs or escape risks, related to the defendant on trial"). In order to place Mr. Barrett in the electric shock device the trial court had to find it "serve[d] an 'essential' interest 'specific' to [the] particular case. Security needs or escape risks 'related to the defendant on trial' constitute such an interest." *Ibid.*, quoting *Deck*, 544 U.S. at 628, 633. The record shows there was no basis for finding Mr. Barrett posed any risk of escape, and the trial court made no such individualized finding. On the contrary, the trial judge stated that the decision to place Mr. Barrett in the electric shock device was *not* based on defendant-specific concern that he would pose a danger in court, but on generalized security concerns. Tr. 9/13/05 ex parte Hr'g at 13. *Cf. United States v. Baker*, 432 F.3d 1189, 1244 (11th Cir. 2005) ("the decision to use shackles to restrain a defendant at trial should rarely be employed as a security device"). "[B]ecause of the various constitutional concerns that flow from such a decision, it triggers 'close judicial scrutiny.'" *Wardell*, at 1293, quoting *Estelle*, 425 U.S. at 504. Here, during the September 9, 2005 hearing on the use of the device, the trial court failed to apply the required scrutiny when it expressly deferred to the judgment of the marshals.

Prejudice is presumed from the use of a shock restraint unless two conditions are met: "(1) the court makes a defendant-specific determination of necessity resulting from security concerns; and (2) it minimizes the risk of prejudice by, for instance, concealing the stun belt from the jury." *Wardell*, at 1294. As already shown, the trial court did not make any defendant-

specific finding and there was no basis in the record for one.  Thus, prejudice is to be presumed.

But there is evidence that the second precondition to requiring a prejudice showing also fails.

The electric shock device created a visible bulge in Mr. Barrett's clothing that was observable by the jury.  Exh. 80.  Indeed, the manufacturer of the device has distinguished its product from others because it is an "obvious" restraint.  Pet. Writ Cert. in *Stun-Tech, Inc. v. RACC Industries, Inc.*, Case No. 95-268, available at 1995 WL 17048059.

In addition, this is not the "ordinary" case posited in *Wardell*.  As the jury found, Mr. Barrett was known by the Government and trial court to be a victim of violent abuse by Sheriff Johnny Philpot and his deputy.  The Government and trial court also were aware that Mr. Barrett had been beaten, denied medical treatment, and threatened by law enforcement officers for his role in the death of David Eales.  Under the circumstances it was reasonable for Mr. Barrett to fear that he would be shocked by the marshals on the slightest perceived provocation, and as this issue was raised by defense counsel, the trial court was aware that the shock device would inhibit Mr. Barrett's movements and communications with counsel in court.  Since the trial, defense counsel have confirmed that Mr. Barrett felt intimidated wearing the stun belt throughout the trial.  (Exh. 29.)

> That experience is hardly surprising given what was known about the use of this device: Two nine-volt batteries connected to prongs that are attached to the wearer over the left kidney region power the belt. The belt may be activated from as far away as 300 feet and once activated it delivers an eight-second, 50,000 volt shock that cannot be stopped. This high-pulsed electrical current travels through the body along blood channels and nerve pathways. The belt's electrical emission knocks down most of its victims, causing them to shake uncontrollably and remain incapacitated for up to forty-five minutes. Activation may also cause immediate and uncontrollable defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. Activation may cause some wearers to suffer heartbeat irregularities or seizures.

> *Manufacturers of the stun belt emphasize that the belt relies on the continuous fear of what might happen if the belt is activated for its effectiveness.*

*Wrinkles v. State*, 749 N.E.2d 1179, 1193-94 (Ind. 2001) (emphasis added).

Defense counsel's performance fell below prevailing professional norms when they failed to bring these issues to the attention of the trial court during the trial. Defense counsel have a duty to develop a relationship of trust with the defendant and to take affirmative steps "at all stages of the case [to] engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case." ABA Guideline 10.5.C. In order to facilitate communication during trial, and to avoid impediments to Mr. Barrett's ability rationally to assist in his own defense, and to preserve the record, defense counsel were obligated to bring to the trial court's attention the bulge in Mr. Barrett's clothing, and the discomfort and fear it produced. ABA Guideline 10.8.A. Counsel's omissions constitute deficient performance.

In *Roche v. Davis*, 291 F.3d 473 (7th Cir. 2002), the court held the outcome of the capital sentencing proceedings was unreliable due to defense counsel's failure to object to the petitioner's shackling and the failure to ensure that the jury could not see the shackles. The state court decision was unreasonable because the court only considered counsel's efforts to reveal the shackles during his testimony but not when seated at the defense table when the record revealed the shackles were visible to the jurors. The court held there was prejudice – even though the final determination about the appropriate sentence rested with the trial judge – because there was considerable mitigation available and the jury deliberated for eight hours and was unable to recommend the death penalty. In the present case, this Court must consider the abundant mitigation evidence presented in Part B of Ground 2. Upon such consideration, defense

counsel's failure in this case to prevent Mr. Barrett from being restrained with an obvious and terrifying device undermines confidence in the verdict.

To the extent this Court finds the claim should have been raised on direct appeal, Mr. Barrett suffered prejudice from counsel's errors. Appellate counsel states that he did not believe the issue was preserved. Exh. 29. Mr. Barrett was prejudiced from prior counsel's omissions in that if the facts had been presented, prejudice would have been presumed, and Mr. Barrett would been entitled to a new trial.

As with the obviousness of the device, the element of fear cannot be denied as "the psychological toll exacted by such constant fear is one of the selling points made by the manufacturer of the belt." *Hawkins v. Camparet-Cassini*, 251 F.3d 1230, 1239 (9th Cir. 2001) (referring to Stun-Tech literature promoting "'total psychological supremacy [over] troublesome prisoners'"). Mr. Barrett's defense counsel informed the court that Mr. Barrett feared the device because he was at special risk from electrocution due to conductive steel wire in his chest and abdomen area. Tr. 9/9/05 Hr'g at 27. As courts have observed

> "[t]he fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial-including those movements necessary for effective communication with counsel.
>
> "... Wearing a stun belt is [also] a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case. It is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt."

*Wardell*, at 1296-97, quoting *Durham*, 287 F.3d at 1305-06.

The use of an obvious, fear-inducing device that gave marshals psychological dominance over Mr. Barrett during the trial requires that the conviction be vacated and a new trial held. At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief.

Accordingly this Court should give adequate notice of an evidentiary hearing so that Mr. Barrett may use discovery and this Court's subpoena power to prove either the denial of due process, the denial of effective assistance of counsel, or both. 28 U.S.C. § 2255(b); R. Gov. § 2255 Proc. 8(c). Thereafter, the conviction should be vacated and a new trial should be ordered.

**Ground 8.    Mr. Barrett was Tried while Incompetent in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**.

In Ground 8 of the Amended § 2255 Motions, Mr. Barrett sets out the factual basis for the Court to find that the judgment of conviction and sentence of death was rendered in violation of Mr. Barrett's constitutional rights to due process, a fair and reliable determination of guilt and penalty, to be physically and mentally present at trial, to present a defense, the effective assistance of counsel, the assistance of qualified mental health experts, and to a jury trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Mr. Barrett was tried, convicted and sentenced to death when he was in fact mentally incompetent to stand trial. The facts supporting the claim are set out in the Amended Motion and will not be repeated here.

It is "well-settled that the 'criminal trial of an incompetent defendant violates due process.'" *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001) (en banc), quoting *Media v. California*, 505 U.S. 437, 453 (1992). The Fifth and Fourteenth Amendment right not to be tried while incompetent includes the right to be present and rationally to participate in the proceedings. *Medina v. California*, 505 U.S. at 453; *Drope v. Missouri*, 420 U.S. 162, 172-173 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966).

Due process requires that when a trial court is aware of evidence sufficient to create a bona fide doubt about the defendant's competence, a hearing is necessary. *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975). Because competence can wax and wan over the course of the

Petitioner's Merits Brief                    187                    *Barrett v. U.S.*, 09-cv-105-JHP

proceedings, "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181; *see also United States v. Ghane*, 490 F.3d 1036, 1041 (8th Cir. 2007) ("competency finding is not static"). Thus the Court reversed in *Drope* because "the record reveal[ed] a failure [on the part of the trial court] to give proper weight to the information suggesting incompetence which came to light during trial." *Drope*, 420 U.S. at 179.

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's behalf or to remain silent without penalty for doing so.

*Cooper*, *supra*, 517 U.S. at 354, *quoting Riggins v. Nevada*, 504 U.S. 127, 139-140 (1992) (Kennedy, J., concurring in judgment).

In *Dusky v. United States*, 362 U.S. 402 (1960), the Supreme Court ruled that the test for determining whether a criminal defendant is competent to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him." In *Drope v. Missouri*, 420 U.S. 162 (1975), the Court further explained that a "person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." 420 U.S. at 171.

*Drope* and *Dusky* establish a two-part test. "The first prong of the competency test requires the district court to determine if the defendant has 'a rational as well as factual understanding of the proceedings against him.'" *Ghane*, 490 F.3d at 1040, quoting *Dusky*, *supra*. This first prong also has two components, and unless each is satisfied, the trial cannot proceed.

If the defendant has a factual understanding but lacks a rational understanding, for example, due to irrational beliefs about to personnel involved, he is not competent to stand trial. *Ibid.* (finding defendant was incompetent due to paranoid conspiracy beliefs although he had a factual understanding of the proceedings).

"The second prong of the competency test requires the district court to determine whether the defendant is able to assist properly in his defense." *Ibid.* If the defendant understands the proceedings, but, due to a mental disease or defect, cannot properly assist in his defense, the trial cannot proceed. 18 U.S.C. § 4241.

Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990).

The substantive due process violation that resulted from requiring Mr. Barrett to stand trial while he was mentally incompetent may be established by any relevant evidence, including both the evidence available at the time of trial, as well as any evidence developed since then. *Odle v. Woodford*, 238 F.3d 1084, 1090 (9th Cir. 2001) (determination whether defendant was incompetent in fact required consideration of "old" evidence of mental state evidence at trial and "new" evidence of post-conviction psychiatric evaluations); *Reynolds v. Norris*, 86 F.3d 796, 802 (8th Cir. 1996); see, also, *Gilbert v. Mullen*, 302 F.3d 1166, 1178 (10th Cir. 2002) (discussing different burdens of proof for substantive and procedural competency claims).

The factual allegations set forth in more detail in Grounds 2, 7, and 13, and incorporated by this reference as though fully set fort, and the supporting documentary and record evidence submitted with and/or incorporated by reference into this petition, irrefutably demonstrates that

Mr. Barrett was incompetent as a matter of clinical and medical fact at all stages of the trial proceedings.  At the time of his trial, Mr. Barrett had a documented psychiatric history, including medical diagnosis of Bipolar Disorder, a serious mental illness known to produce "bizarre behavior," impair judgment and distort perceptions.  *Williamson v. Ward*, 110 F.3d 1508, 1519 (10th Cir. 1997).

The evidence submitted with the Amended § 2255 Motions, in summary, establishes the following:

- Mr. Barrett was involuntarily committed to psychiatric hospitals on two occasions and forcibly treated with antipsychotic medication;

- in the months before his arrest, Mr. Barrett's disordered thinking became increasingly paranoid and delusional as he became preoccupied with the distorted belief that he was being monitored by some form of unknown aircraft;

- Mr. Barrett experiences brain dysfunction due to organic brain damage, particularly in the areas that are necessary to reason, exercise sound judgment and inhibit overreaction to stress situations.

- damage to Mr. Barrett's brain compromises his ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior; screen out interference and sustain attention; inhibit reflexive responses and return to ongoing activity; efficiently integrate multiple outputs; oversee the selection of verbal and non-verbal processing mechanisms; regulate emotional control; direct motor output; and adequately process and make use of new information (Exhibit 89 at ¶¶ 36-38;  Exhibit 117 at ¶¶ 57-58);

- Mr. Barrett was suffering the effects of Bipolar Disorder and Post Traumatic Stress Disorder (PTSD) (Exh. 117 at ¶ 81);

- Mr. Barrett's ability to rationally perceive and attend to legal proceedings was significantly compromised by the racing thoughts indicative of the disabling "manic form" of Bipolar Disorder (*cf. Williamson v. Ward*, 110 F.3d, at 1519; Exh. 117 at ¶ 80);

- these conditions were synergistically increased by the effect of his brain damage to produce a "ruminative" thought process, which caused Mr. Barrett to be "unable to get unstuck" (Exh. 117, at ¶ 80), which caused him to become preoccupied with an issue at trial and then be unable to shift his attention to other aspects of the proceedings (*id.* at ¶¶ 59, 80).

The record reflects times when Mr. Barrett could not regulate his verbal output or emotional control after he became agitated by some aspect of the prosecutor's closing argument. His involuntary remarks were heard by persons in the courtroom, and his reflexive motoric reaction of attempting to stand prompted intervention by the courtroom marshals. Once contained and redirected, Mr. Barrett was escorted from the courtroom without further incident. Mr. Barrett's uncontrolled behaviors, however, disrupted the proceedings and likely had a deleterious effect on the jury's deliberations. Mr. Barrett's reflexive, self-harming comments and actions occurred without regard to social context or the damage they threatened to inflict on his case, and demonstrate that he was unable rationally to assist with his defense. Because such behaviors were the product of Mr. Barrett's mental diseases and defects, he was incompetent to stand trial.

The trial and sentencing of Mr. Barrett while he was actually mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice. *Pate v. Robinson*, 383 U.S., at 386-387; *Dusky v. United States*,

362 U.S. 402 (1960).  The error deprived Mr. Barrett of a fair and reliable determination of guilt and penalty.  *Pate v. Robinson*, 383 U.S., at 386.

At a minimum, the files and records do not conclusively refute Mr. Barrett's grounds for relief.  Therefore, this Court must schedule an evidentiary hearing after permitting sufficient time for his counsel to complete their investigation, including through the use of discovery.  28 U.S.C. § 2255(b); R. Gov. § 2255 Proc. 8(c).  Thereafter, this Court should vacate the judgments of conviction and sentence and order that a new trial be held.

> **Ground 9.**     **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated When the Trial Court Failed to Instruct on a Lesser Included Homicide Offense.  Direct Appeal Counsel Were Ineffective for Failing to Raise this Issue.**

In a capital case, where the evidence supports it, a court must instruct the jury on a lesser- included homicide offense.  This "third option" between first degree murder and acquittal helps ensure the reliability of any death verdict if the defendant is convicted of first degree murder.  *Beck v. Alabama,* 447 U.S. 625 (1980).  As the Supreme Court explained in *Beck*:

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake.

*Beck,* 447 U.S. at 637.  *See also, Taylor v. Workman,* 554 F.3d 879, 885-894 (10th Cir. 2009); *Turrentine v. Mullin,* 390 F.3d 1181, 1192-94 (10th Cir. 2004), *cert. denied*, 545 U.S. 1106 (2005); *Hogan v. Gibson,* 197 F.3d 1297, 1305 (10th Cir. 2000), *cert. denied,* 121 S.Ct. 332 (2000) (in *Turrentine* and *Hogan*, the Tenth Circuit found *Beck* error for failing to instruct on lesser forms of homicide that were supported by some evidence; in *Taylor*, *Beck* was not satisfied

because the second degree murder instructions that were given were flawed and prevented the jury from accurately assessing whether the defendant was guilty of second degree rather than first degree murder).

In more general terms, a defendant is entitled to instructions on his theory of defense where the law and some evidence support them. *United States v. Haney,* 318 F.3d 1161, 1163 (10th Cir. 2003); *United States v. Benally,* 146 F.3d 1232, 1235-36 (10th Cir. 1998) (error for failing to instruct on involuntary manslaughter as a lesser-included offense of voluntary manslaughter). In *United States v. Bruce,* 458 F.3d 1157, 1162-66 (10th Cir. 2006), the Court noted that Fed.R.Crim.P. 31( c) provides "[a] defendant may be found guilty of ... an offense necessarily included in the offense charged[,]" and that this rule is mandatory "in the sense that if there is evidence to support a lesser included offense and the defendant requests such a charge, the court has no discretion to refuse such an instruction." *See also, United States v. Humphrey,* 208 F.3d 1190, 1206-07 (10th Cir. 2000).

Here, both the prosecution and the defense requested the trial court instruct on voluntary manslaughter. (R. 4212, 4213, 4215, 4218-19. 18 U.S.C. §1112.) The United States Attorney conceded there was evidence in the record that raised this lesser offense, because testimony indicated that before shots were fired, Trooper Hamilton's unmarked Bronco swerved toward Toby Barrett, and Mr. Barrett's actions in firing on the vehicle could be seen as an imperfect form of self-defense or defense of another, reducing the crime to voluntary manslaughter. Consistent with the reasoning behind *Beck v. Alabama, supra* the prosecutor stated that because this was a capital case, caution dictated a lesser-included offense instruction be given. The United States Attorney distinguished count 3 from counts 1 and 2 (which in essence charged felony murder), because count 3 had a specific knowledge and intent element. To be guilty of

count 3, Mr. Barrett had to have more than the intent required to commit an underlying felony, which alone would supply the necessary intent for first degree murder in the usual felony murder case. As suggested by the Government, and as the court ultimately instructed the jury, to be guilty of count 3, the Government was required to prove beyond a reasonable doubt that Mr. Barrett intentionally killed Trooper Eales, knowing or having reason to know he was a law enforcement officer, and that the victim was killed while engaging in and on account of the performance of his official duties. (R. 4215-19, *See also,* Doc. 240, first stage jury instructions; R. 4262-63, elements of count 3.) The court declined to instruct on voluntary manslaughter, ruling the case came down to "murder one or nothing." (R. 4211, 4222.)

The court's ruling violated Mr. Barrett's Fifth Amendment due process rights and his Eighth Amendment rights to a reliable sentencing determination, as well as his rights under federal law to be instructed on his theory of defense.

This circuit applies a four-part test to determine whether an instruction on a lesser-included offense is warranted: 1) there must be a proper request; 2) the lesser offense consists of some, but not all, of the elements of the greater offense; 3) the element or elements distinguishing the greater and lesser offense are in dispute; and 4) based on the evidence, the jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense. *United States v. Chanthadara,* 230 F.3d 1237, 1257 (10th Cir. 2000); *United States v. Abeyta,* 27 F.3d 470, 473 (10th Cir. 1994). "In the federal courts, it has long been beyond dispute" that a defendant is entitled to an instruction on a lesser offense if the evidence would permit a rational jury to find him guilty of the lesser offense and acquit him of the greater. *Keeble v. United States,* 412 U.S. 205, 208 (1974).

All four requirements for an instruction on voluntary manslaughter were met in Mr. Barrett's case.

There was a proper request, not only by Mr. Barrett, but from the Government as well.

The lesser offense consists of some, but not all, of the elements of the greater offense. The elements of voluntary manslaughter are: 1) the defendant killed the victim; 2) the defendant acted unlawfully; 3) while in a sudden quarrel or a heat of passion, and therefore without malice, the defendant either a) intentionally killed the victim, or b) intended to cause serious bodily injury, or c) acted recklessly with extreme disregard for human life. "Intentionally killed" means either 1) a specific purpose to take the life of another human being, or 2) a willingness to act knowing that the death of another human being is practically certain to follow from that conduct. "Heat of passion" is a passion, fear or rage in which the defendant loses normal self-control, as a result of circumstances that provoke such a passion in an ordinary person, but which did not justify the use of deadly force. Voluntary heat of passion manslaughter is "murder without malice." (Tenth Circuit Pattern Jury Instruction 2.54.) *See also, e.g., United States v. Scafe,* 822 F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987).

The pertinent elements of count 3 of the superseding indictment, which distinguish it from a "straight" felony murder because a specific intent in connection with the homicide is required (as opposed to simply the intent to commit an underlying felony) are the intentional killing of a state law enforcement officer, whom the defendant knew or had reason to know was a law enforcement officer, and who was killed while engaging in *and on account of* the performance of his official duties. (Doc. 240; R. 4262-63.)

The distinction between the elements of count 3 and voluntary manslaughter is intent. The elements of voluntary manslaughter are a subset of the greater offense, since it would be impossible to commit the greater offense without first committing the lesser offense, *i.e.,* the intentional killing of another human being. The lesser offense of voluntary manslaughter contains no element not required for the greater offense charged in count 3; again, the distinction lies in the level and nature of intent. *Schmuck v. United States,* 489 U.S. 705, 716 (1989).

In Mr. Barrett's case, the element or elements distinguishing the greater and lesser offenses were in dispute. The crux of the case was knowledge and intent. The Government contended Mr. Barrett intentionally killed Trooper Eales knowing or having reason to know he was a law enforcement officer engaged in the performance of his official duties, and on account of the performance of those duties. The defense theory was that when Mr. Barrett saw an ordinary, unmarked vehicle he had no idea contained police officers speed toward his house and his son, Toby, he reacted out of fear and fired. This circumstance, while perhaps not justifying the use of deadly force, would have aroused a "heat of passion" in any ordinary individual.

Finally, based on the evidence, a rational jury could convict Mr. Barrett of the lesser-included offense and acquit him of the greater offense. *This is exactly what happened in state court, where Mr. Barrett was convicted of heat of passion manslaughter based on the same defense theory that was advanced in the federal trial*.

Because all four of the elements for determining when a lesser-included offense instruction must be given were met in Mr. Barrett's case, the court committed constitutional error, at least with respect to count 3, in failing to charge the jury on the offense of voluntary manslaughter. *Beck v. Alabama,* 447 U.S. at 637 (1980); *Taylor v. Workman,* 554 F.3d at 885-

894; *Turrentine v. Mullin,* 390 F.3d at 1192-94; *Hogan v. Gibson,* 197 F.3d at 1305. The court also committed error, under the federal criminal cases cited above and under Fed.R.Crim.P. 31 (c), in refusing to instruct on this lesser offense, consistent with the evidence and Mr. Barrett's theory of defense.

Mr. Barrett also contends, as was discussed in Ground II, that a voluntary manslaughter instruction was appropriate as a lesser-included offense for counts 1 and 2. Although these were "straight" felony murder counts, heat of passion negates the element of malice, however it is defined. When one kills in a heat of passion, that act and the mental state underlying it removes the act from being committed in the course or in furtherance of the commission of a felony, which supplies the intent or malice element for felony murder. *Mullaney v. Wilbur,* 421 U.S. 421 U.S. 684, 704 (1975); *United States v. Lofton,* 776 F.2d 918, 920 (10th Cir. 1985).

As set forth in Ground 18, *infra*, appellate counsel were ineffective for failing to raise this issue on appeal, particularly because as the error was conceded by the Government at trial, appellate counsel were well aware that Mr. Barrett had been convicted of manslaughter in state court, and the factual basis for Mr. Barrett's federal court defense was the same as it was in state court. (Exhibit 29.) Had this issue been raised, there is at least a reasonable probability that the outcome of the appeal, particularly (but not exclusively) as to count 3, would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

> **Ground 10.** **Mr. Barrett's Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were Violated Due to the Trial Court's Refusal to Instruct the Jury that they Could Consider Residual Doubts as a Mitigation Factor.**

In Ground 10 of the Amended § 2255 Motion, Mr. Barrett describes the record and extra-record factual basis for concluding he was denied effective assistance of counsel, due process, and a reliable capital sentencing proceeding because his defense counsel failed to present, and the

Petitioner's Merits Brief                    197                    *Barrett v. U.S.*, 09-cv-105-JHP

trial court failed to give an instruction on, evidence casting a doubt on the manner in which the death of Trooper Eales occurred.

On September 26, 2005, the court entered an order that Mr. Barrett could not rely upon the prior proceedings in mitigation because they were not relevant to the circumstances of the offense, (Tr. 9/26/05 Hr'g at 10-11), and could not rely upon residual doubt as a mitigating circumstance. *Id.* at 11. This ruling compounded the trial court's prior rulings impairing the defense's ability to cross-examine prosecution witnesses with testimony given in the second state-court trial.

During the penalty phase conference on jury instructions, the court asked whether either party objected to leaving out a residual doubt instruction. (R. 5288.) Mr. Hilfiger stated that he did not object. (R. 5289.) This failure to object was professionally unreasonable.

Evidence from studying how jurors decide whether to impose a death sentence has shown that residual doubts about the defendant's conduct can be powerful factors in deciding to vote for life. Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998); John H. Blume & Sheri Lynn Johnson, *Competent Capital Representation: the Necessity of Knowing and Heeding what Capital Jurors Tell us about Mitigation*, 36 Hofstra L. Rev. 1035, 1044 & n. 35 (2008). Defense counsel's failure to seek a residual doubt instruction at the penalty phase denied Mr. Barrett his constitutional right to have the jury consider in its sentencing deliberations the doubt that first-stage cross-examination had cast upon the informants' testimony.

Mr. Barrett had a constitutionally protected right to introduce evidence, and have the jury give mitigating effect to evidence, that tended to cast doubt on the Government's theory of the manner in which the crime occurred. The trial ruling excluding such evidence treated the issue

as one of guilt or innocence.  Professionally diligent counsel would have pointed out that the evidence of the prior conviction showed that a prior jury was convinced that the death of Trooper Eales was not brought about in the manner which the Government claimed in the federal proceedings.

Capital sentencing instructions must "provide [the jury] with a vehicle for expressing its 'reasoned moral response'" to the defendant's background and character, and the circumstances of the crime.  *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).  That response is supposed to express the "conscience of the community." *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968).  *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976), prohibited mandatory death penalty statutes on grounds that they prevented the jury from making, and denied the defendant the right to,an individualized sentencing determination.  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), held that a jury instruction that fails to require the jury to give consideration to the circumstances of the offense violates the Eighth Amendment.  "*Woodson* and *Lockett* meant to ensure that the sentencing jury would function as a 'link between contemporary community values and the penal system.'" *Morgan v. Illinois*, 504 U.S. 719, 745 (1992) (Scalia, J. dissenting), quoting *Witherspoon*, 391 U.S. at 519 n. 15.  Knowledge that two prior juries had been unconvinced that the crime was committed in a manner consistent with capital murder would have been important to the federal jury's ability to perform this function.

District courts in other federal death penalty cases permitted the use of "residual doubt" evidence in mitigation.  *United States v. Davis*, 132 F. Supp. 2d 455 (E.D. La. Feb. 2, 2001); *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004); *United States v. Bodkins*, 2005 WL 1118158 (W.D. Va. May 11, 2005).  Mr. Barrett's defense counsel knew, or should have

known, about these cases.  Their existence was discoverable without the need of independent research.  Federal Death Penalty Resource Counsel knew of them and would have informed Mr. Barrett's trial counsel about them.

The Tenth Circuit has recognized repeatedly that residual doubt may be an appropriate strategy in the penalty phase of a capital case.  *Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002) (reasonable strategy for counsel, having argued defendant's innocence in the first stage, to a adopt a "residual doubt" approach in the penalty phase); *McCracken v. Gibson,* 268 F.3d 970, 979 (10th Cir. 2001) (counsel not ineffective in penalty phase; he tried to develop some mitigating evidence and also reasonably relied on a residual doubt argument); *Smith v. Gibson,* 197 F.3d 454, 462 (10th Cir. 1999) (citing *Lockhart v. McCree,* 476 U.S. 162, 181 (1986), and recognizing that residual doubt strategy can be extremely effective in a capital case).

The trial court's preclusion of  evidence and argument that would have cast doubt upon the Government's contention that Mr. Barrett acted out of a pre-established intention to shoot at law enforcement officers, and the court's refusal to instruct that jury that residual doubts about these circumstances could be considered in mitigation, was contrary to *Woodson*, *Lockett*, and *Witherspoon*, was contrary to the law observed in other federal death penalty cases, and was contrary to the law of the Tenth Circuit.  The error was compounded by the bizarre instruction telling the jury residual or lingering doubt about Mr. Barrett's guilt was not a mitigating factor, that it was bound by its first stage verdict, that it could not speculate on the reasons for the verdict in Sequoyah County, and that the sentence in that case could only be considered for any mitigating effect it might have on the sentence in the federal proceedings.  (Doc. 257, Instruction No. 19, R. 5320-21.)

Due to these errors, the Government was permitted to rely upon, and the jury was instructed to give effect to, the prosecution evidence adduced through the seven informant witnesses, while Mr. Barrett was prohibited from relying upon evidence presented in the first stage or trial that cast doubt upon that evidence, and from showing that in the absence of these eleventh-hour prosecutorial saviors, two previous juries declined to convict Mr. Barrett of murder.

For similar reasons, it was unreasonable for appellate counsel to fail to raise the trial court's denial of a residual doubt instruction on appeal. ABA Guideline 10.15.1. It is at least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would have followed its own precedent. *See* Ground 20.

The trial court's refusal to permit Mr. Barrett to rely upon mitigation that other similarly situated defendants were permitted to present was arbitrary and capricious, and violated Mr. Barrett's rights to due process, equal protection of the laws, and to be free from the cruel and unusual imposition of capital punishment. The death sentence should be vacated. At a minimum, the files and records do not conclusively show that Mr. Barrett is entitled to no relief. Therefore, this Court must conduct an evidentiary hearing on trial counsel's unreasonable failure to seek a residual-doubt instruction and appellate counsel's failure to raise the issue on appeal. 28 U.S.C. § 2255(b). That hearing should be scheduled for a time after Mr. Barrett's counsel have had an opportunity complete their investigation through discovery and other means. R. Gov. § 2255 Proc. 8(c). Thereafter, this Court should vacate the death sentence.

**Ground 11.    Mr. Barrett's Fifth, Sixth and Eighth Amendment Rights Were Violated When the Trial Court Excused for Cause a Juror Who, While Personally Opposed to the Death Penalty, Could Nonetheless Consider it as a Punishment Option. Appellate Counsel Were Ineffective for Failing to Raise this Issue on Direct Appeal.**

In Ground 11 of the Amended § 2255 Motion, Mr. Barrett sets forth evidence in the record to establish that his constitutional rights were violated when the trial court excused Juror 62 for cause because she was personally opposed to the death penalty, rather than because she would be prevented or substantially impaired from considering it.

When initially questioned by the Government, Juror 62 answered, "Yes, I do[]" when asked whether she had such objections that would "prevent [her] from considering the imposition of a death sentence[.]" (R. Individual jury selection, 819-21.)  Upon further questioning by the Court, however, Juror 62 answered as follows:

Q.    ...If I instructed you that the law requires you to consider both the death penalty and life imprisonment without the possibility of release, are your personal opinions about the death penalty so strong that you would not be able to follow my instructions?

A.    If you told me I had to, I would do it, because that's my duty, but I would probably live with it for the rest of my life. But if you told me I had to do it, and I thought that he actually -- the crime was so heinous that he should have the death penalty, because I was instructed to do it, and I thought it was, I could do it. I would do it. But I do not -- I would live --

Q.    So you understand, I realize that no one, probably, if they were asked, wants to serve on the jury where that's a possibility.

A.    I understand that.

Q.   And -- but if you were selected -- otherwise selected as a juror, would you be willing to put your, what I know are strong, personal beliefs aside, and fairly consider the imposition of the death penalty?

A.   I would consider it, yes.

Q.   And, of course, when you say "consider it," couched in the -- history of how you've answered these questions, it prompts me to say:  Would you consider it fairly? I mean, in this case, the first thing that would have to happen before we got to even a sentencing stage, is there would have to be a finding --

A.   Right.

Q.   --that justified-- I wouldn't turn the case over to you for sentencing until there had been a conviction for murder that, under the law, justified either death or imprisonment for life without the possibility of release. So, under these circumstances, the Government would have to follow through with their obligation and put on aggravating factors. And aggravating factors are those factors that would suggest that death is the appropriate punishment. Then the defendant would have the opportunity to put on what's called mitigating factors. And, as a juror, you'd be obligated to not exactly balance them, but give them serious consideration to whether or not the Government had put on sufficient aggravation, when compared to the mitigation, for you to arrive at a death penalty. So, do you think you could do that?

A.   I think I could. It would be very hard for me to do that, but if it was my duty.

Q.   Well, I think when you say it would be -- it encourages me, because you say it would be very hard. I agree. I don't disagree with that. It will be very hard. I mean,

> the people who end up sitting as jurors in any case, but particularly in this case,
>
> it's going to be very hard.
>
> A.    Un-huh.
>
> Q.    And it should be very hard.

(R. individual jury selection 826-28).

After further questioning by the Government defense counsel and the court, the Government moved to excuse Juror 62 for cause stating that she only answered "three or four questions in the right direction, under significant pressure." (R. individual jury selection 838). The court granted the Government's motion over objection by defense counsel, finding that Juror 62 was "substantially impaired." (R. individual jury selection 838-40).

The *Witherspoon* doctrine limits a trial court's power to dismiss prospective jurors based on their views about capital punishment. *Witherspoon v. Illinois*, 391 U.S.510, 519 (1968). "[T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). Unless a potential juror's opposition to capital punishment is so deeply entrenched that it "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath," the prospective juror is qualified. *Wainwright v. Witt*, 469 U.S. 412, 420-21 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). A prospective juror's views "prevent or substantially impair the performance of duties" when they "create an obstacle" to impartial consideration of law or facts. *See Witt*, 469 U.S. at 434. The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." *Dutton v. Brown,* 788 F.2d 669, 675 (10th Cir. 1986). "Where the court

finds that even one juror was improperly excluded, the defendant is entitled to a new sentencing, because the right to an impartial adjudication is 'so basic to a fair trial that [its] infraction can never be treated as harmless error.' " *Fuller v. Johnson*, 114 F.3d 491, 500 (5th Cir.1997) (quoting *Gray v. Mississippi*, 481 U.S. 648, 668 (1987)).

In *United States v. Chanthadara,* 230 F.3d 1237 (10th Cir. 2000), the 10th Circuit overturned a death sentence when it found that a district court erred by removing a juror for cause based on her questionnaire answers.[101] *See id.* at 1271. The potential juror indicated, "I believe the death penalty is proper in some cases although I don't think I would be able to vote for the death penalty in a case." *Id.* She clarified that this was because she didn't feel she would "ever be 100% sure that [death] was the proper verdict." *Id.* The juror also stated, "I feel the death penalty is proper in some cases but I don't feel I could ever think there was enough evidence to come to that conclusion even though I might feel the person has been proven guilty." *Id.* The 10th Circuit found that the juror's answers were ambiguous but not sufficient to determine that she should be removed for cause; thus, she was not substantially impaired. *Id.* The court noted that perhaps upon questioning it would have been determined that she was not fit to be a death penalty juror, but the court failed to make any such determination. *See id.* at 1272.

Similar to the prospective juror in *Chanthadara,* Juror 62 in Mr. Barrett's case was only ambiguous in her answers. She was improperly excused for cause solely because of her moral

---

[101]    It should be noted that the *Chanthadara* court did not base its holding on the fact that the juror's answers were on a questionnaire without an opportunity for voir dire. ("[W]e reserve for another day the question of whether a trial court has an obligation to voir dire prospective jurors before removing them for cause based on their views on the death penalty. . . . even if we assume the district court was not required to conduct voir dire before removing her, [the juror's] answers on the questionnaire do not support removing her for cause under the [*Witherspoon*] standard[.]" *Chanthadara,* 230 F. 3d at 1269.) Because there was no voir dire, however, the *Chanthadara* court used a de novo standard of review rather than abuse of discretion, based on the fact that the trial court did not make any credibility determinations with respect to this juror.

Petitioner's Merits Brief                              205                      *Barrett v. U.S.*, 09-cv-105-JHP

objections to the death penalty, not because she would be prevented or substantially impaired from considering it, even though it might be difficult or harmful to her conscience. This wrongful dismissal for cause violated Mr. Barrett's rights under the Fifth, Sixth and Fourteenth Amendments. *Gray v. Mississippi,* 481 U.S. 648, 668 (1987).

Based on this error, Mr. Barrett's death sentence must be reversed. *See Gray,* 481 U.S. at 668 (holding that the erroneous removal of potential juror based on her views on the death penalty was reversible constitutional error); *see also O'Bryan v. Estelle,* 714 F. 2d 365, 371 (5th Cir. 1983) ("The courts have required a death sentence to be set aside even if only one potential juror has been excluded for opposing the death penalty on grounds broader than those set forth in *Witherspoon.*") (citing *Davis v. Georgia,* 429 U.S. 122 (1976)).

It was unreasonable of appellate counsel to fail to raise this issue on appeal. Had this issue been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

> **Ground 12.    The Trial Court's Instructions to the Jury Violated Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue**.

Mr. Barrett's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, the Cruel and Unusual Punishment Clause of the Eighth Amendment, and the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment because the jury was not instructed that the reasonable doubt standard governed the

ultimate penalty determination in this case. *Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are set out in the Amended Motion to Vacate filed pursuant to court order on December 4, 2009. Doc 95 at 354-355. Simply put, Mr. Barrett's jury was not instructed to find and did not find beyond a reasonable doubt whether the aggravating factors sufficiently outweigh the mitigating factors – a fact necessary to elevate the punishment available from life to death.

In *Ring v. Arizona*, the Supreme Court held that the fundamental constitutional principle it had made clear three years earlier, in *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999), applies to capital cases like all others. *Ring*, 536 U.S. at 600. That constitutional principle is this: "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id., quoting Jones* 527 U.S. at 243 n.6. The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 455. The *Apprendi* principle applies to fact findings necessary to put a capital defendant to death. *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. 18 U.S.C. §§ 3591, *et seq.;* 21 U.S.C. § 848(g) (repealed). In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase. 18 U.S.C.§ 3591-3592; 3593; 21 U.S.C. § 848 (i),(j), (k),

(n).    These findings include a finding that the aggravating factors sufficiently outweigh any mitigating factors to justify the imposition of a sentence of death.  18 U.S.C. § 3593(e); 21 U.S.C. § 848(k).

Because additional factual findings are absolutely required in order to impose an increased punishment, under *Apprendi,* the additional facts must be proven beyond a reasonable doubt.  530 U.S. at 478.  In *Oregon v. Ice,* __U.S.__, 129 S.Ct. 711, 717 (2009), the Supreme Court clarified its application of *Apprendi* to particular situations as follows:

> Our application of *Apprendi*'s rule must honor the "longstanding common-law practice" in which the rule is rooted. *Cunningham,* 549 U.S., at 281, 127 S.Ct. 856. The rule's animating principle is the preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense. See *Apprendi,* 530 U.S., at 477, 120 S.Ct. 2348. Guided by that principle, our opinions make clear that the Sixth Amendment does not countenance legislative encroachment on the jury's traditional domain. See *id.,* at 497, 120 S.Ct. 2348. We accordingly considered whether the finding of a particular fact was understood as within "the domain of the jury ... by those who framed the Bill of Rights." *Harris v. United States,* 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (plurality opinion).

*Id.*  The Sixth Amendment principle of a "jury's role in finding facts that would determine a homicide defendant's eligibility for capital punishment was particularly well-established," by the time the Bill of Rights was established.  *Ring,* 536 U.S. at 599 (quoting *Walton v. Arizona*, 497 U.S. 639. 710 (1990) (Stephens, J., dissenting).  Under the *Apprendi* rationale, then, Mr. Barrett was entitled to a jury instruction that before a death verdict could be returned, the jury was required to find beyond a reasonable doubt that the aggravating  factors sufficiently outweighed the mitigating factors to justify a sentence of death.  *See* 18 U.S.C. §3593(e). [102]

Just as the finding of an aggravating circumstance is a "fact" that must be proved beyond a reasonable doubt under *Ring, supra*, the finding that one or more aggravating circumstances

---

[102] Or if no mitigating factors are found, that the aggravating factors are sufficient to justify a death sentence.  18 U.S.C. § 3593(e).

outweigh mitigating circumstances is a factual one.  Indeed, under the federal death penalty statutes applicable to Mr. Barrett's trial, the weighing process leads to the *ultimate* factual finding without which the death penalty may not be imposed.  Therefore, the "fact" that the aggravating factors outweigh the evidence in mitigation is *the indispensable factual finding* that "increases the penalty for a crime beyond the prescribed statutory maximum."  *Apprendi,* 530 U.S. at 490.  In other words, while the finding of one or more aggravating circumstances is a necessary precondition to the imposition of the death penalty, it is not sufficient for the death penalty to be imposed.  Before a death sentence can be returned, the jury must find, as a matter of fact, that the aggravating circumstances outweigh the mitigating circumstances.  Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Barrett's case was constitutionally invalid.

This conclusion is supported by the Tenth Circuit's holding in *Rojem v. Gibson,* 245 F.3d 1130, 1135-38 (10th Cir. 2001), where the Court vacated an Oklahoma death row inmate's capital sentence because the trial court failed to give a weighing instruction altogether.  If the weighing process is simply "icing on the cake" and does not require both a *necessary and sufficient* factual finding before a death sentence can be rendered, then the absence of a weighing instruction would be of little significance.  If, as in *Rojem*, it is constitutional error to forgo a weighing instruction altogether, then the flawed weighing instruction given in Mr. Barrett's case, which did not properly allocate the burden of proof, is equally erroneous.

By not requiring a standard for the certainty necessary to impose a death verdict, a defendant might be sentenced to death by jurors who believe it is simply more likely than not the defendant should be sentenced to death, rather than by a unanimous finding that death is

appropriate beyond a reasonable doubt.  Put another way, the trial court's weighing instruction permitted the jury to make the ultimate factual finding without which a death sentence cannot be returned by a preponderance of the evidence only.  This plainly violates the Supreme Court's *Apprendi* line of cases.

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).  The requirement of heightened reliability compels the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances before the death penalty may be imposed.

This Court's failure to instruct the jury to find the necessary fact of sufficient weight beyond a reasonable doubt renders Mr. Barrett's death sentence unconstitutional.  To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.  Ring, *supra*; Jones, *supra*.  The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function."  *Sullivan v. Louisiana,* 508 U.S. 275, 281 (1993).  It is, therefore, reversible per se.  *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668. 686 (1984).  Their performance fell far below the standards expected of competent counsel in capital cases.  Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Barrett would not have been sentenced to death.

Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial. *See* Claim 18, *infra*.

These constitutional violations warrant the granting of this Petition without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. These constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

> **Ground 13.  Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were Violated Due to the Effects of Drugs he was Given in Jail, Trial Counsel's Failure to Inquire about the Drugs' Effects, the Trial Court's Removal of Mr. Barrett from the Courtroom in the Presence of the Jury without Cause or Inquiry, and Mr. Barrett's Absence from Critical Stages of the Proceedings without Valid Waiver; To the Extent Appellate Counsel Failed to Raise the Issue on Appeal, Counsel were Ineffective.**

In Ground 13, Mr. Barrett sets forth evidence in support of his claim that his removal from the courtroom without hearing, warning or just cause violated his constitutional rights. The trial court further violated Mr. Barrett's rights by failing to determine whether he was competent to knowingly and willingly waive his constitutional right to be present at trial and instruct him about that right. Mr. Barrett sets forth evidence of further constitutional violations arising from the effects of the medication regime he was subjected to in jail, including the administration of contraindicated drugs and the discontinuation of necessary medication, all of which substantially exacerbated his neurological impairments and affected his judgment, self-control and behavior in front of the jury. Mr. Barrett's trial counsel's actions and omissions in response to these events were unreasonable and caused unfair prejudice to Mr. Barrett.

During the Government's penalty phase closing argument in the jury's presence, Mr. Barrett impulsively made audible remarks and began to rise from his chair so that he could leave the courtroom. This behavior was arguably due to the fact that Mr. Barrett was not being given medication for his psychological conditions and he was suffering from the effects of steroids. The marshals restrained him and asked the judge whether Mr. Barrett should be removed from the courtroom. The judge said yes. (R. 5421). After the Government finished its closing argument, the court held a hearing without Mr. Barrett present regarding whether the jury should be instructed regarding Mr. Barrett's removal. (R. 5430). Defense counsel requested no instruction and stated, "I don't really care one way or the other. I don't object, I don't approve," in response to the court's proposed instruction. (R. 5434-35).  Trial counsel did not confer privately with Mr. Barrett about this matter; instead, they spoke to him in the presence of a deputy marshal. (R. 5437.)

The court ordered Mr. Barrett placed in "minimum restraints." (R. 5438.) The court asserted that an unidentified deputy marshal "brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems." (R. 5438.)

Thereafter, Mr. Barrett's counsel requested to speak with him. (R. 5438.)  Mr. Barrett was brought into the courtroom, and the following took place:

> Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?
>
> Mr. Barrett:    Yes, Your Honor.
>
> The Court:    Do you have any questions of the Court about that?
>
> Mr. Barrett:    No, sir. I'll ask the marshal to return – (Interrupted)
>
> The Court:    One more. Does that include the verdict?

Mr. Barrett:     Yes, Your Honor.

The Court:     Since I anticipate there will be some time between now and the
verdict, if you have some change of mind, if you'll relay that to your
counsel.

Mr. Barrett:     Yes, sir.

(R. 5439).

Mr. Barrett was escorted out, and the jury escorted in. (R. 5439.)

The court then read the following instruction to the jury:

Members of the jury, you are instructed that neither the Defendant's conduct nor his
statements during closing arguments are evidence in this case and you should not
consider them in rendering your verdict.

(R. 5440).

As a result of these events, the trial court violated Mr. Barrett's constitutional rights by

(a) removing him from the courtroom without just cause, warning or hearing; (b) forcing Mr.

Barrett to unnecessarily wear additional restraints;  (c) failing to advise Mr. Barrett of his

constitutional right to be present at trial; (d) failing to determine whether Mr. Barrett was

competent to knowingly and voluntarily waive his constitutional right to be present at trial; (d)

failing to determine whether Mr. Barrett had in fact  knowingly and voluntarily waived that right;

and (e) failing to give the jury a curative instruction. Mr. Barrett's trial counsel acted

unreasonably (a) by failing to consult mental health or other medical experts regarding Mr.

Barrett's condition, including his competence to make a valid waiver; (b) by failing to raise a

doubt about Mr. Barrett's competence; (c) by failing to seek a hearing on his competence and/or

the effects of his not taking medication for depression or bipolar disorder and the affects of the

steroids; (d) by failing to object to the additional restraints; (e) by failing to object to the choice

the court gave Mr. Barrett (be present in unlawful restraints or absent); (f) by failing to advise

him about the risks of being absent immediately before the jury began to deliberate whether he would live or die; and (g) by failing to seek an appropriate instruction regarding the actions of the marshals, the court, and Mr. Barrett's absence.

Among the most prejudicial inferences likely affecting the jury's penalty determination, Mr. Barrett's apparent voluntary withdrawal from the proceedings likely conveyed a misleading sense of indifference to the outcome of the trial, callous disregard for the seriousness of the questions facing the jury, and even lack of remorse. The defendant's courtroom demeanor is always a relevant and important issue - fair game for either side. In *Riggins v. Nevada,* 504 U.S. 127 (1992), Justice Kennedy in his concurring opinion noted:

> It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause.

*Id.* at 142.

At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial. *See Riggins,* 504 U.S. at 142*; see also Williams v. Calderon,* 52 F.3d 1465, 1483 (9th Cir. 1995) ("Williams' trial demeanor was evidence the jury and judge could both consider."); *Kubat v. Thieret,* 867 F.2d 351, 373, n. 19 (7th Cir. 1989) ("We note again that mitigating factors are not necessarily limited to those adduced from specific evidence offered at the sentencing hearing . . . such as character testimony . . . . A juror might be disposed to grant mercy based on other factors, such as a humane perception of the defendant developed during trial.").

The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment guaranteed Mr. Barrett the right to be present during all critical stages of the case. *Illinois v. Allen,* 397 U.S. 337 (1970). Under controlling law,

> a defendant can lose his right to be present at trial if, *after he has been warned* by the judge that he will be removed if he continues the disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom.

*Id.* (emphasis added). The trial court's order that the marshals remove Mr. Barrett without warning did not comport with the requirements of law. (R. 5430, 5433-34). The trial court plainly ignored the requirement the requirement that "courts must indulge every reasonable presumption against the loss of constitutional rights[,] *Allen,* 397 U.S. at 343, when it (a) ordered that Mr. Barrett be placed in additional restraints beside the electric shock device he already wore on his belt, and (b) permitted him to be absent without informing him that his presence was a constitutional right and of the risks of giving up that right. Moreover, Mr. Barrett did not knowingly and intelligently waive his right to be present.

First, Mr. Barrett was not overly disruptive such that his removal was necessary. Any jurors who had been focused on the prosecutor before observing the marshals restraining and removing Mr. Barrett may have concluded prejudicially that the marshals perhaps acted in response to some threatening behavior of Mr. Barrett toward someone in the courtroom or an attempt to escape. This prejudice was only exacerbated by the court's order of the placement of additional restraints on Mr. Barrett.

Second, the court did not fulfill its duty to instruct Mr. Barrett that he was foregoing a constitutional right by being absent from the courtroom, and it did not assure that Mr. Barrett made a knowing and voluntary waiver of that right. Although the court asked Mr. Barrett whether he wanted to be present, it did not instruct him that he was waiving a constitutional

right. Further, it made no inquiry of his mental status or competency to make that decision. *See*

*Pate v. Robinson*, 383 U.S. 375 (1966); *Godinez v. Moran*, 509 U.S. 389 (1993).

Federal Rule of Criminal Procedure 43(a)(2) requires the presence of the defendant at "every trial stage, including . . . the return of the verdict." Although this requirement can be waived, "'[i]t has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' * * * This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused.'" *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938), quoted in *Carnley v. Cochran,* 369 U.S. 506, 514-515 (1962). This means that when the defendant is available, "the serious and weighty responsibility of determining whether he wants to waive a constitutional right requires that he be brought before the court, advised of that right, and then permitted to make 'an intelligent and competent waiver.'" *Cross v. United States,* 325 F.2d 629, 631 (D.C. Cir. 1963). The trial court did not carry out its "serious and weighty" responsibility in this case.

Mr. Barrett's trial counsel was wholly inadequate in this entire matter and acted unreasonably in two fundamental ways:  first, by failing to accurately assess Mr. Barrett's mental health and medication needs; and second, by failing to adequately advise their client, object to the trial court's actions including the ordering of additional restraints, and seek a proper curative instruction.

Mr. Barrett's trial counsel unreasonably failed to conduct a thorough investigation of his background, including his mental health problems. *See* Ground 2, *supra*. Nevertheless, Mr. Barrett's counsel knew, or reasonably should have known, (a) that Mr. Barrett had attempted suicide in the past; (b) that Mr. Barrett had been diagnosed with depression and bipolar disorder;

(c) that Mr. Barrett had been prescribed medications for these conditions; (d) that Mr. Barrett was not being given medication at the time of trial; (e) that Mr. Barrett was suffering the effects of steroids. Reasonably diligent counsel, informed about their client's condition, would have taken steps to obtain a competent mental health evaluation and judicial determination of the medical necessity for the drug regimen Mr. Barrett was being administered; the medical appropriateness of discontinuing his psychotropic medications; whether Mr. Barrett had psychiatrically decompensated since the termination of the medications; and the nature and severity of the functional impact of discontinuing and/or administering any medication on his ability to communicate and cooperate with counsel and on his affect and appearance before the jury.

In the face of a judicial determination that the drug regimen to which Mr. Barrett was subjected was justified by medical necessity, reasonably diligent counsel would have sought a further medical and legal determination of the degree to which the effects of such a regimen interfered with Mr. Barrett's ability to participate in trial proceedings, including any distortion or alteration of his demeanor, affect and presentation in front of the jury; his attitude toward participating in the proceedings; his ability to endure the disclosure and/or discussion of sensitive information; his capacity to understand his rights and make informed decisions regarding the exercise or waiver of such rights; and his ability and willingness to communicate and cooperate with counsel.

In the event the trial court made a judicial determination that Mr. Barrett's medication regimen was justified and that he was competent to proceed with trial, reasonably diligent counsel would have taken all steps necessary to prevent any untoward scenes in front of the jury, for example, by seeking appropriate medications and counseling Mr. Barrett regarding the prosecutor's likely arguments and preparing him for them. If Mr. Barrett nonetheless acted

Petitioner's Merits Brief                    217                    *Barrett v. U.S.*, 09-cv-105-JHP

inappropriately to his potential detriment in front of the jury, reasonably diligent counsel would have renewed the request for a medical evaluation and determination of the necessity for and functional impact of the medication regimen, as well as an assessment of Mr. Barrett's adjudicatory competency.

Trial counsel acted unreasonable in their failure to properly advise or convey to Mr. Barrett the repercussions of his absence from critical stages of his trial. Prevailing professional norms of criminal defense practice advise counsel to maintain close contact with the defendant in order to develop trust, (1 ABA Standards for Criminal Justice, Criminal Defense Function 4-3.1 and commentary (2nd ed. 1986)), and to "advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome." *(Id.*, Standard 4-5.1.) One reason for this professional norm is "to keep the client from making suicidal choices about the case." (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.2, commentary (Feb. 1989 ed.)). Mr. Barrett's counsel failed to follow these fundamental practices and, as a result, the jury was given a false impression of Mr. Barrett, and Mr. Barrett was denied his right to be present during trial.

Trial counsel's performance was ineffective because they willingly allowed Mr. Barrett to be absent from the courtroom during critical stages of the trial -- closing argument, jury instructions and the reading of the penalty phase verdict. They did so without ensuring that Mr. Barrett was making a knowing, informed decision.

The error in allowing Mr. Barrett's absence was not harmless. In his absence, factual matters were discussed, namely what he purportedly said and did that caused the marshals to remove him. His presence would have contributed to the fairness of the proceeding because Mr. Barrett could have advised his counsel about the facts. In the context of jury instructions,

prejudice has been found wherever a defendant and his lawyer were absent when the court instructed the jury, because counsel could have objected to the instruction or suggested an alternate instruction. *See, e.g. United States v. Rosales-Rodriguez,* 289 F.3d 1106, 1110 (9th Cir. 2002). Here, defense counsel was present, but refused to take a position on the court's proposed jury instruction. ("I really don't care one way or the other." (R. 5435.)  Had Mr. Barrett been present, he could have consulted with counsel about the proposed jury instruction.

> The fact that Mr. Barrett's counsel was present did not remedy the situation:

> Although the presence of counsel is certainly a relevant factor to be considered in determining whether a defendant's absence was harmless, the right to be present at trial - grounded in the Confrontation Clause and the Due Process Clause - is not a gossamer right inevitably swept away simply because a defendant is represented, in his absence, by counsel. The right to be present is distinct from the right to be represented by counsel. The right to be present would be hollow indeed if it was dependent upon the lack of representation by counsel. Furthermore, such a rule would ignore the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests.

*United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001). Similarly, Mr. Barrett need not demonstrate any particular issue that his counsel failed to raise in his absence. Forcing Mr. Barrett to make such a showing in order to demonstrate prejudicial error from his absence devalues the constitutional right to be present, and ignores the assistance that a defendant can provide to his counsel during trial. If we were to require that a defendant show with specificity how his presence might have changed the course or outcome of a trial, then the right to be present would cease to exist in many cases in which the evidence of guilt is strong. The right to be present at one's own trial is not that weak. *See Riggins,* 504 U.S., at 137. "Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different [in the absence of drugging] would be purely speculative." *United States v. Novaton*, 271 F.3d. at 1000.

Petitioner's Merits Brief                    219                    *Barrett v. U.S.*, 09-cv-105-JHP

Trial counsel also acted unreasonably by failing to seek an instruction necessary to avoid harm to the jury's deliberations. Trial counsel stated that he could not think of an instruction to give the jury. Unable to decide, he said, "I don't really care one way or the other." (R. 5434).

Upon due consideration, trial counsel would have recognized that the court's instruction failed to address the problem. In fact, the instruction given constituted prejudicial error. It was as if the court instructed everyone to ignore the elephant in the room -- the defendant's absence from the proceedings. Nonetheless, the court's instruction permitted the jury to consider the actions of the marshals in restraining Mr. Barrett and removing him from the courtroom, presumably, from the jury's perspective, upon the court's orders or with the court's blessing. Although trial counsel was adamant that Mr. Barrett had not made an aggressive move toward anyone, he permitted the jury to consider that marshals and the court were justified in removing Mr. Barrett. It is beyond reason that trial counsel failed to seek a modification of the instruction that would have communicated truthful information about Mr. Barrett not having made any aggressive moves, Mr. Barrett suffering the effects of poor or absent medical treatment, or an instruction that directed the jury not to consider or draw any inference from Mr. Barrett's absence from the courtroom.

Any of these individual factors would warrant reversal of Mr. Barrett's death sentence; the cumulative effect of this error substantially influenced the jury's verdict and, as a result, this Court should vacate the sentence of death imposed on Mr. Barrett in violation of the Constitution and laws of the United States.

To the extent the facts supporting this claim were apparent on the appellate record, appellate counsel unreasonably failed to raise this issue on appeal. Had counsel raised the issues

presented in this claim it is reasonably probable that the court would have found the numerous

violations of federal law were not harmless beyond a reasonable doubt, or constituted plain error.

**Ground 14.    Mr. Barrett Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

In Ground 14 of the Amended Petition, Mr. Barrett challenges the constitutionality of the

federal death penalty, as administered, because it is disproportionately applied according to the

race of the victim. Some twenty years ago, the federal death penalty was reintroduced; since then

it has been used as a tool of federal law enforcement with escalating frequency. Statistics

maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate

the effective defense of federal capital cases demonstrate that the authorization process by which

the Department of Justice (DOJ) selects those defendants who will face the death penalty, and

subsequent Government decision-making regarding whether to accept pleas to sentences less

than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection

Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth

Amendment.

A significantly higher percentage of cases involving white victims are authorized for

death than cases involving non-white victims. As Professor David Baldus reported in 2001 to

Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and

July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167)

in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point

difference that is statistically significant at the .001 level." (Exhibit 115.) Continuing the pattern,

during the administration of Attorney General Ashcroft, 32% of cases involving white victims

Petitioner's Merits Brief                        221                        *Barrett v. U.S.*, 09-cv-105-JHP

which were presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized. During the administration of Attorney General Gonzales, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[103]  (Exhibit 116.)

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence. According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases. Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference." (Exhibit 115.)

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases. This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008. (Exhibit 113.) Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403.  She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim. Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero." (Exhibit 112.)

---

[103]    Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzales.

Given these statistics regarding the application of the federal death penalty, it is no longer possible to dismiss this claim on the basis that the "small" number of cases renders statistical disparities inconsequential. The Supreme Court has held that a court may not infer from broad statistical studies involving different decision-makers (*i.e.*, prosecutors, judges, or juries across an entire state) that the decision to seek or impose the death penalty in a particular case was based on a racially discriminatory motive. *McCleskey v. Kemp,* 482 U.S. 920 (1987). However, *McCleskey* can be distinguished from the situation presented here. A single decision-maker - the Attorney General of the United States - is responsible for each and every decision to seek the death penalty in a court of the United States. This distinction alone renders the numbers revealed by the attached statistics all the more probative of discrimination. The Court should grant relief from Mr. Barrett's death sentence because the government's charging and plea practices are influenced by the race homicide victims, in violation of the Fifth, Eighth, and Fourteenth Amendments.

Although a portion of the statistics cited above are based in part on periods after Mr. Barrett's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.[104] Had counsel

---

[104] Defendant's Motion To Declare The Federal Death Penalty Statute Unconstitutional, (Doc. 78), does not address the disparate application of the statute according to race of the victim. Appellate counsel did not raise the issue on appeal. *See* Defendant/Appellant's Brief, C.A. No. 06-7005, Proposition VI. To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused," (Doc. 78 at 3), appellate counsel were ineffective in failing to pursue and develop the issue. *See* Ground 18, *infra.*

performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Barrett's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

Mr. Barrett has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act is the work of a single decision maker, i.e. the DOJ. This fact renders the above statistics all the more probative of discrimination. The Court should grant relief from Mr. Barrett's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

> **Ground 15.** **Mr. Barrett's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment; Mr. Barrett's Due Process Rights were Violated by Appellate Counsel's Unreasonable Failure to Raise this Issue on Appeal.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made in the Court-ordered Amended Petition [Doc 95 at 373-75] and the exhibits filed herewith.

Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case made no

mention of the federal death penalty or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

The indictment (and the death penalty statute) under which petitioner was tried and sentenced denied petitioner his right to notice in the charging document of the aggravating circumstances which would make him eligible to be sentenced to death.   United States Constitution, Fifth, Sixth, and Fourteenth Amendments; 18 U.S.C. §3593 (compelling Notice only a reasonable time before trial or acceptance of a guilty plea rather than in the indictment), *Ring v. Arizona, supra; Jones v. United States*, 526 U.S. 227 (1999).

As the Supreme Court has made clear in a line of cases:

[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).  In direct contravention of these principles, the Government failed to allege in the indictment  any non-statutory aggravating factors which the Government relied upon to urge death or that the aggravating circumstances proved were sufficient to justify a sentence of death. *See* 18 U.S.C. §3593.  By the Government's failure to allege that death was justified and identify non-statutory aggravating factors which the Government alleged were sufficient to justify a sentence of death, the jury was not appropriately instructed on the facts necessary before a death sentence could be imposed.  *See generally*, Claim 12, *infra*.  This structural defect in Mr. Barrett's capital proceedings requires that his death sentence be vacated.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Barrett's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

**Ground 16. Jurors in Mr. Barrett's Trial Engaged in Misconduct in Violation of Mr. Barrett's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In Ground 16, Mr. Barrett sets forth claims that various forms of juror misconduct violated his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

As set forth in the Amended § 2255 Motion, the juror misconduct that took place in Mr. Barrett's trial included improper consideration of matters extraneous to trial; improper exposure to publicity and community sentiment; improper exposure to witnesses and others who claimed to have knowledge about Mr. Barrett and the case; false or misleading responses of jurors on voir dire; improper biases which infected jury deliberations; improper exposure to the prejudicial opinions of third parties; improper communications with third parties and/or the trial judge; and improperly prejudging the guilt/innocence and penalty phases of Mr. Barrett's trial. In addition, the jury in this case was not sequestered in such a way as to avoid contact with prejudicial publicity.

The most serious cases of juror misconduct involve extraneous influences on the jury, such as jurors becoming privy to prejudicial information not introduced into evidence or having improper contacts with parties, witnesses, or third parties. *See United States v. Resko*,

3 F.3d 684, 690 (3d Cir. 1993) (finding improper intra-jury misconduct warranted new trial in this instance). The Sixth Amendment includes an impartial jury clause, such that "[p]rivate communications, possibly prejudicial, between jurors and third persons, ... are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States,* 146 U.S. 140, 150 (1892). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd,* 366 U.S. 717, 722 (1961) (internal quotation marks omitted). This rule resulted in what is colloquially called the *Remmer I* presumption:

> [A]ny private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer v. United States,* 347 U.S. 227, 229 (1954).

The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process. The Supreme Court has defined "an impartial trier of fact" as "a jury capable and willing to decide the case solely on the evidence before it." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). When jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment. *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). "It is vital in capital cases that the jury should pass upon the case free from

external causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox*, *supra*, 146 U.S. at 149. Mr. Barrett had no opportunity to confront the extraneous information to which the jurors were exposed, denying Mr. Barrett his rights to a fair trial and due process.

The introduction of extraneous materials or evidence has consistently been held to mandate a new trial. *See, e.g., Resko,* 3 F.3d at 690. Mr. Barrett should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Barrett's prejudice. Defense and appellate counsel had a duty to preserve Mr. Barrett's rights by asserting and preserving the record as to all potentially viable bases for relief. ABA Guideline 10.8. Due to the low standard for reversal in cases of extra-judicial influence on jurors, there can be no valid reason for prior counsel not to have raised this issue except to the extent it relies upon extra-record evidence not previously available. Counsel's ineffective assistance resulted in the deprivation of Mr. Barrett's rights under the Sixth, Eighth and Fourteenth Amendments. Relief is appropriate.

At a minimum, the files and records do not conclusively demonstrate that Mr. Barrett is entitled to no relief. Accordingly, this Court should set this matter for hearing after affording his counsel adequate time to engage in discovery and other investigation, and to use this Court's subpoena power to marshal all available evidence. R. Gov. § 2255 Proc. 8(c).

**Ground 17. Due to Mr. Barrett's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment**

In Ground 17, Mr. Barrett argues that the Eighth Amendment's prohibition of the execution of the mentally retarded and underage offenders should be expanded to preclude the execution of severely mentally ill individuals such as Mr. Barrett. Similar to people with mental

retardation and juveniles, the execution of the mentally ill serves no retributive or deterrent function and offends "evolving standards of decency."

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with mental retardation. The Court reasoned that a person with mental retardation is both less culpable and less able to be deterred because of his "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318.

In *Roper v. Simmons*, 543 U.S. 304 (2005), the Court held that the execution of juveniles who commit crimes while under age eighteen also violates the Eighth Amendment. Analogous to *Atkins*, the Court reasoned, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity. . . . [T]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Id.* at 571-72 (internal quotations omitted).

Although neither *Atkins* nor *Roper* explicitly addresses a categorical exception for persons who are severely mentally ill, the reasoning of the decisions makes necessary an expansion of Eighth Amendment protection to the mentally ill. *Atkins*' and *Roper*'s bar on the death penalty for the mentally retarded and underage offenders was levied to remedy those very wrongs inherent in the execution of the mentally ill.

People with mental illness, like Mr. Barrett, share the characteristics that make the execution of mentally retarded and underage individuals inconsistent with the retributive and

deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to engage in meaningful cost-benefit analysis. ABA, *Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 Mental & Physical Disability Law Rpt'r 668, 670 (2006).

This was specifically recognized by Judge Robert Henry of the 10th Circuit, who cited to the *Atkins* ruling and concluded that the imposition of the death penalty against a mentally ill individual likewise "contributes nothing" to the goals of retribution and deterrence and "also is not constitutional." *See Bryan v. Mullin,* 335 F.3d 1207, 1228 (10th Cir. 2003) (Henry, J., dissenting). In his dissent, which was joined by three other judges, Judge Henry stated:

> The Supreme Court has held that the deficiencies borne by the mentally retarded "do not warrant an exemption from criminal sanctions, but diminish their personal culpability." *Atkins,* 536 U.S. at 320, 122 S.Ct. 2242. The Court's logic applies no less to those in Mr. Bryan's shoes who suffer from severe mental deficiencies. *See Hardwick v. Crosby,* 320 F.3d at 1164 (2003) ("One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider.") (internal quotation marks omitted).

*Id.* at 1237.

Moreover, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment. That amendment's analysis is "informed by objective factors," such as the views of professional "organizations with germane expertise." *Atkins*, 536 U.S. at 312, 316 n.21. Here, the leading legal professional organization in the country, the American Bar Association, unequivocally express the view that "[d]efendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law." American Bar Resolution 122A,

unanimously passed on August 8, 2006; ABA, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R at

668. In addition, nearly every major mental health association in the United States has published

a policy statement addressing the issue of the execution of mentally ill offenders, and all of those

organizations advocate either an outright ban on executing *all* mentally ill offenders, or a

moratorium until a more comprehensive evaluation system can be implemented.[105]  Moreover,

just as in *Atkins* and *Roper*, where international law and opinion weighed against the execution of

persons with mental retardation, international law and opinion weigh against the execution of the

mentally ill.[106]

Mr. Barrett does not have, and never has had, an intact brain. (*See* Ground 2, § B.2.b.,

*supra*; Exhibit 117; Exhibit 89.) He suffers from severe mental illness in the form of Bipolar

---

[105]    *See* American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death Penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001). Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness." NMHA, *Death Penalty and People with Mental Illness.* Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill. APA, *Resolution on the Death Penalty in the United States.* Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association (AMPA). AMPA, *Moratorium on Capital Punishment in the United States.* Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without realizing that any illness existed and, therefore, without considering that illness as a mitigating factor. The National Alliance for the Mentally Ill (NAMI) advocates an outright ban on death sentences for individuals with any type of brain disorder. NAMI, *The Criminalization of People with Mental Illness*.

[106]    The International Covenant on Civil and Political Rights (ICCPR) specifically forbids the use of the death penalty in an arbitrary manner, International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), art. 6, and the Human Rights Committee of the United Nations has interpreted the treaty to forbid the execution of persons with severe mental illness. *See* William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Criminal Law Forum 95, 100 (1993). Although the United States issued a reservation to article six, the Human Rights Committee has concluded that the reservation is invalid. Moreover, customary international law also prohibits the execution of Mr. Barrett. *Id.*

Petitioner's Merits Brief                                231                          *Barrett v. U.S.*, 09-cv-105-JHP

Disorder, Post Traumatic Stress Disorder and Dysexecutive Syndrome, and his brain is organically damaged. Experts who have examined Mr. Barrett have opined that Mr. Barrett's functioning is compromised by multiple neurological and neuropsychiatric symptoms such that he mis-processes information and cannot understand the difference between right and wrong. (Exhibit 117.) Simply put, Mr. Barrett cannot think the way that other people think; he cannot experience and interact with the world the way other people do; and he cannot act in his own best interest in a rational manner. In light of these circumstances, *Atkins* compels that Mr. Barrett's sentence violates the Eighth Amendment.

Because of both his organic brain disease and severe mental illness, there is no meaningful way to distinguish Mr. Barrett from the people protected by *Atkins*. His execution would violate the Eighth Amendment. The holdings of *Atkins* and *Roper* should be extended to protect Mr. Barrett and those like him from a penalty disproportionate to his culpability.

As with mental retardation, Mr. Barrett's status as a person with significant mental illness is non-waivable and should preclude his execution without regard to waiver.

**Ground 18.   The Failure of Counsel to Raise or Effectively Argue on Appeal Grounds Which Are of Record Violated Mr. Barrett's Due Process Right to Effective Assistance of Appellate Counsel.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made in the Amended § 2255 Motions and the exhibits thereto and filed herewith.

As noted throughout there are numerous constitutional claims alleged in the Amended § 2255 Motions which were not raised on appeal that arguably could have been briefed and argued on the trial record.  To the extent a claim raised herein could have been and should have been raised on appeal, the failure of appellate counsel, one of whom was trial counsel as well (Mr. Hilfiger) to raise significant, substantive claims which probably would have resulted in a reversal

and remand on appeal violated Mr. Barrett's right to the effective assistance of counsel on appeal as guaranteed by the Due Process Clause of the Fifth Amendment.

The Due Process Clause of the Fifth Amendment guarantees to a defendant in a criminal case the effective assistance of counsel on appeal. *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *United States v. Cook*, 45 F. 3d 388, 392 (10th Cir. 1995). Where a petitioner challenges the outcome of his appeal, the question whether the result should be upheld is resolved based upon the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000). To make out this claim, Mr. Barrett must and can demonstrate that appellate counsel's performance fell below an objective standard of reasonableness and but for counsel's actions, the omitted issue would have a reasonable probability of success on appeal. *Duhamel v. Collins,* 955 F.2d 962, 967 (5th Cir.1992); *Heath v. Jones,* 941 F.2d 1126, 1132 (11th Cir.1991).

Here, Petitioner's counsel's performance on appeal fell below prevailing professional norms in that counsel either failed to recognize meritorious issues, failed to consult with Mr. Barrett regarding whether to raise meritorious issues or not, or both. The outcome of the appeal is unreliable; the issues appellate counsel could have raised, either individually or cumulatively, create a reasonable probability that the judgment or sentence would not have been affirmed.

Imposition of a death sentence without meaningful appellate review violates the Eighth Amendment. *Parker v. Dugger*, 498 U.S. 308, 321 (1991). As demonstrated *infra*, the record of this case presented numerous grounds for reversal, and for distinguishing this case from others in which a death sentence was imposed, and likening this case to cases in which a sentence less than death was imposed. To the extent the Court of Appeals prevented appellate counsel from

Petitioner's Merits Brief                            233                            *Barrett v. U.S.*, 09-cv-105-JHP

briefing those issues, there was a failure of meaningful appellate review in violation of Mr.

Barrett's rights to due process and to be free from arbitrary imposition of the death penalty.

While an action under 28 U.S.C. § 2255 is not intended as a second direct appeal, and

issues framed by the trial record are ordinarily considered waived if not raised on direct appeal,

*United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994), cause for excusing a procedural bar

exists where appellate counsel provides ineffective assistance. *Murray v. Carrier*, 477 U.S. 478

(1986). Mr. Barrett can establish cause for any alleged failure to present a previously framed

issue on appeal. Appellate counsel in this case unreasonably failed to recognize meritorious

issues for appeal. (Exhibit 29.)

For the reasons briefed here in support of Ground 1; Ground 2, Parts A.1, A.5, A.11;

Ground 3; Ground 4; Ground 5, Part D; Ground 6; Ground 7; Ground 9; Ground 10; Ground 11;

Ground 12; Ground 13; Ground 14; Ground 15; and Ground 19, there is at least a reasonable

probability that the conviction or sentence would have been reversed on appeal if these issues

had been raised. The allegations related to these claims in the Amended § 2255 Motions, as well

as the legal arguments in this Brief offered in support of the claims, are incorporated herein by

specific reference.

> **A.    Appellate Counsel's Failure to Raise Specific Issues Constituted Ineffective Assistance of Counsel.**
>
> **1.    Appellate Counsel Unreasonably Failed to Recognize the Due Process Violations Resulting from the Court's Partiality and Ex Parte Communications with the Government.**

To the extent the matters raised in Ground 1 could have been raised on direct appeal,

appellate counsel were ineffective which resulted in a violation of Mr. Barrett's right to Due

Process under the Fifth and Fourteenth Amendments. *See Evitts,* 469 U.S. at 396; *Cook*, 45 F.3d

at 392.  As set out in the Amended § 2255 Motions Judge Payne's disparate treatment of original lead counsel, John Echols, who had successfully defended Mr. Barrett in two state trials and Mr. Hilfiger, like Judge Payne, a former U.S. Attorney, which resulted in the ultimate withdrawal of Mr. Echols, was a matter of record which could reasonably have been presented on appeal.  *See* Doc. 95 at 382-83.  Mr. Hilfiger benefitted from Judge Payne's conduct towards him at the time, during the trial, and thereafter.  His client did not.  Despite the clear issues of partiality and issues surrounding the same, Mr. Hilfiger served as co-counsel on Mr. Barrett's appeal.  As a result, Mr. Hilfiger suffered from a conflict of interest.

Appointed counsel Henricksen believed that the issues related to the court's treatment of counsel required consideration of extra-record evidence.  Exhibit 29.  To the extent Mr. Barrett is entitled to a new trial without an extra-record showing, Mr. Henricksen's failure to recognize the relevant law fell below the prevailing professional norms of capital appellate work.  ABA Guidelines, *supra*, Guideline 10.15.1.  If counsel Henricksen is incorrect in his analysis that the issue can be later raised, his failure to raise it is not strategic but constitutionally defective.  *See generally, Bishawi v. United States*, 292 F. Supp. 2d 1122, 1127 (S.D.N.Y. 2003) *aff'd*, 109 Fed. Appx. 813 (7th Cir. 2004) (holding failure to file a consolidated appeal raising all issues after denial of a Motion for New Trial was not a strategic decision because counsel incorrectly believed petitioner could later challenge his conviction and sentence on direct appeal.)

Mr. Henricksen considered issues related to the Government's delayed disclosure of seven witnesses to be very important to the appeal.  Exhibit 29.  However, Mr. Henricksen failed to recognize the significance of the court's *ex parte* communications with prosecutors regarding those witnesses, and for that reason alone, did not raise the issue on appeal.  *Id.*  Appellate counsel's failure to recognize the legal significance of such *ex parte* proceedings fell below

prevailing standards. *See Hays v. Farwell,* 482 F. Supp 2d 1180, 1200 (D. Nev. 2007)(Failure to raise meritorious prosecutorial misconduct including improper argument was ineffective assistance of counsel on appeal.)  At a minimum, it is reasonably probable that the court would have granted Mr. Barrett a new trial if the issues raised in Ground 1 had been raised on appeal.

> **2.      Appellate Counsel Unreasonably Failed to Raise in Direct Appeal Issues that Arose under *Franks v. Delaware*, 438 U.S. 154 (1978).**

For the reasons stated in Ground 2, Part A.1, and Ground 4, *supra*, Mr. Barrett had at the time of appeal, a claim based on *Franks v. Delaware*, that was at least partially framed by the record.  Appellate counsel did not raise the issue because he felt trial counsel had failed to make an adequate record.  (Exhibit 29.)  The *Franks* issue, in conjunction with a claim of ineffective assistance of trial counsel for failing to competently argue it, would have made a difference in the outcome of the appeal, Mr. Barrett was prejudiced.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.  *Evitts, supra*; *Eagle v. Linahan,* 279 F.3d 1283, 1301-06, 1308 (11th Cir. 2002) (counsel ineffective on appeal for failing to raise error apparent on the record); *Carter v. Bowersox,* 265 F.3d 705, 709-10, 716 (8th Cir. 2001) (direct appeal counsel ineffective for failing to raise issue apparent on the record, even though not preserved or adequately preserved, under plain error standard); *Mason v. Hanks,* 97 F.3d 887, 897 (7th Cir. 1996)(direct appeal counsel ineffective for failing to raise issue apparent from the record).

> **3.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Government's Inappropriate Use of Hearsay Evidence used to Show Propensity or Character.**

In Ground 2, Part A.5, Mr. Barrett argued that improper "propensity" evidence concerning alleged statements made by him to various informant witnesses threatening violence

to the police if they showed up on his property was wrongly admitted, and that trial counsel were ineffective for failing to lodge appropriate, timely objections to this evidence.  To the extent trial counsel did preserve this issue by filing a response to the Government's 404(b) Notice (Docs. 206, 215), and by at least lodging some objections to part of this testimony, direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.  *See Argument under Ground 2(A)(5), hereinabove.*

Because the 404(b) issue was meritorious, even based on the record that was made, no reasonable strategic basis for excluding it from the appeal exists.  *See, e.g., State v. Saunders*, 958 P.2d 364, 366-67 (Wash. Ct. App. 1998);  *Mitchell v. State*, 379 S.E.2d 123, 125 (S.C.1989).  The failure to raise the issue was professionally unreasonable.  For the reasons briefed in relation to the substantive issues *supra*, had the issue been raised, a reasonable probability exists that the outcome of the appeal would have been different.

### 4. Appellate Counsel Unreasonably Failed to Raise on Appeal the Jury's Exposure to Phony Expert Jim Horn.

In Ground 2, Part A.11, Mr. Barrett showed that the testimony of Government "expert" Jim Horn was erroneously and prejudicially heard by the jury.  The fact that trial counsel failed to preserve error initially by moving to exclude the testimony of Mr. Horn, and only asked for his testimony to be stricken after the court's *sua sponte* expressions of concern, did not necessarily waive for appeal the issues of mistrial and a meaningful jury instruction to cure the error in permitting Horn to testify.  Appellate counsel could and should have raised the issue as falling under the plain error doctrine, since trial counsel had failed to raise them in a timely fashion. *United States v. Johnson*, 520 U.S. 461, 467 (1997);  *United States v. Olano*, 507 U.S. 725, 732 (1993).  "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial

rights, and which (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Burbage,* 365 F.3d 1174, 1180 (10th Cir. 2004).

The trial court itself had identified the existence of error, but had not remedied it with a more appropriate instruction or a mistrial. Mr. Barrett's right to a fair trial and, ultimately, a fair sentencing proceeding were thus affected and, particularly given the highly questionable nature of Mr. Horn's testimony, the integrity of these proceedings was unquestionably tainted.

> **5.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Prosecutors' Use of Improper, Inflammatory Argument in Violation of Mr. Barrett's Due Process Rights**

Prosecutorial misconduct through questions and argument as described Ground 5, Part D was not raised on direct appeal. The misconduct of the prosecutors in both stages of trial was glaring *See Hays v. Farwell*, 482 F. Supp. 2d at 1200-1201. No reasonable strategy excused the failure to raise the claim. Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Strickland v. Washington,* 466 U.S. 668 (1984).

> **6.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Restrictions on the Use of Mr. Barrett's Statements.**

As set forth in Ground 6, *supra*, the trial court placed unconstitutional restrictions on the introduction and use of Mr. Barrett's statements. This issue was clearly framed by the record. Appellate counsel acted unreasonably in failing to present this issue to the Court of Appeals. Because of the overriding importance of mitigating evidence in capital cases, the Supreme Court has been extremely vigilant in vacating death sentences where, as here, relevant mitigating evidence is excluded. *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455

U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978).  There could be no reasonable strategy for neglecting to raise this issue.  There is a reasonable probability that had it been raised, the outcome of the appeal would have been different.

Without considering the mitigating impact Mr. Barrett's statements would have had, the Court of Appeals could not conduct meaningful review of the death sentence.  The appellate court's view of the balance of aggravating and mitigating evidence was skewed, as was the jury's, in favor of death.

> **7.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Use of a Shock Belt on Mr. Barrett during Trial.**

As set forth in Ground 7, *supra*, the trial court, admittedly without constitutionally required justification, ordered Mr. Barrett to be fitted with an electric-shock belt during trial.  The shock pack created a large bulge under Mr. Barrett's clothes, induced fear in Mr. Barrett, distracted him from the trial, and prevented him from sitting normally or concentrating on the proceedings.

The trial court's lack of justification for the use of this restraint was apparent on the record, as were some of its affects on the trial.  To the extent the shock belt was used without sufficient justification, the constitutional violation was preserved for appeal, and the failure of appellate counsel to raise the issue constitutes deficient performance.  Appellate counsel believed the issue required extra-record development. Exhibit 29.  The unjustified use of visible restraints requires reversal absent the Government showing the error was harmless beyond a reasonable doubt.  *Roche v. Davis,* 291 F. 3d 473 (7th Cir. 2002).   In this case, where the issue of Mr. Barrett's alleged hostility to law enforcement was a central issue at trial, the Government could

not and cannot establish harmlessness. Therefore, there is a reasonable probability that Mr.

Barrett would have been granted a new trial if the issue had been raised on direct appeal.

> **8.** **Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Denial of a Jury Instruction on Lesser Included Offenses**.

As set forth in Ground 9, *supra*, the trial court unconstitutionally failed to instruct the jury

on the lesser included offense of voluntary manslaughter. The failure to argue on appeal that the

trial court had a responsibility to include an instruction on lesser included offense was ineffective

assistance of counsel. *See e.g., Burnside v. State*, 858 N.E.2d 232, 238 (Ind. App. 2006). In light

of the very clear circumstances set out in the Amended § 2255 Motions [Doc 70 at 350-54; Doc

95 at 387] and under Ground 9 above, *no* reasonable strategy excuses the failure to raise this

issue. Had this issue been raised, there is at the very least a reasonable probability that the

outcome of the appeal, particularly (but not exclusively) as to Count 3, would have been

different.

> **9.** **Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Refusal to Give an Instruction Permitting Jurors to Weigh Residual Doubts about the Way the Shooting Occurred**.

As set forth in Ground 10, *supra*, the trial court violated Mr. Barrett's rights under the

Fifth, Sixth, and Eighth Amendments by failing to instruct jurors that they could consider in the

second stage doubts regarding the raid. It was unreasonable for appellate counsel to fail to raise

the trial court's denial of a residual doubt instruction on appeal. ABA Guideline 10.15.1. It is at

least reasonably probable that if appellate counsel had raised the issue the Tenth Circuit would

have followed its own precedent and reversed the death judgment.

> **10.** **Appellate Counsel Unreasonably Failed to Raise on Direct Appeal the Trial Court's Unconstitutional Dismissal of Juror 62.**

Petitioner's Merits Brief                    240                    *Barrett v. U.S.*, 09-cv-105-JHP

The dismissal of Juror 62, as set out in detail in Ground 11, *supra*, was not raised on direct appeal, even though the error was plainly apparent from the record.  Because the petitioner's claim of the trial court's unconstitutional dismissal of Juror 62 was plainly apparent on the trial record, had a high probability of success, and was not foregone on the basis of a tactical decision, the failure to raise it on appeal fell below the objective standards of reasonableness required under *Strickland. See, e.g., United States v. Kauffman,* 109 F.3d 186, 190 (3d Cir. 1997); *see also*, *Green v. United States*, 972 F. Supp. 917, 919 (E.D. Pa. 1997) (defense compelled to use strike on juror who should have been removed for cause).  There was no reasonable strategic ground for omitting this argument.  Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

**11.      Appellate Counsel Unreasonably Failed to Raise on Appeal the Trial Court's Unconstitutional Failure to Require Proof Beyond a Reasonable Doubt as to the Weighing Factor Necessary to Impose a Death Sentence**.

As set forth in Ground 12, *supra*,  the Court's failure to provide an instruction to the jury regarding the Government's burden to prove beyond a reasonable doubt that the aggravating circumstances outweigh mitigating circumstances renders Mr. Barrett's death sentence unconstitutional.  To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.  The "fact" that the aggravating factors outweigh the evidence in mitigation is *the indispensable factual finding* that "increases the penalty for a crime beyond the prescribed statutory maximum." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Because the weighing instruction given by the trial court failed to impose the "beyond a reasonable doubt" standard to this factual finding, the weighing process in Mr. Barrett's case was

constitutionally invalid. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Barrett would have been granted a new penalty trial.

### 12. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Removal of Mr. Barrett from the Courtroom.

As set forth in Ground 13, *supra*, Mr. Barrett's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated due to the effects of drugs he was given in jail, trial counsel's failure to inquire about the drugs' effects, the trial court's removal of Mr. Barrett from the Courtroom in the presence of the jury without cause or inquiry, and Mr. Barrett's subsequent absence from critical stages of the proceedings without a valid waiver.  To the extent the matters surrounding the forceful removal and denial of presence at all critical proceedings are a matter of record, it was unreasonable for appellate counsel not to raise these issues on appeal.  It is at least reasonably probable that the conviction or sentence would have been reversed and new proceedings ordered if these multiple violations of the Constitution were presented on appeal.

### 13. Appellate Counsel Unreasonably Failed to Raise on Appeal the Unconstitutional Racial Bias in the Administration of the Federal Death Penalty.

As set forth in Ground 14, *supra*, trial counsel filed a Motion To Declare The Federal Death Penalty Statute Unconstitutional (Doc. 78), which addressed the disparate application of the statute but did not argue disparity based on the race of the victim.  Appellate counsel did not raise on appeal the issue of the unconstitutionality of the federal death penalty on the basis of arbitrary and capricious disparities in application of the penalty based on the race of the victim on appeal.  To the extent, if any, that trial counsel did properly raise and preserve the question with a reference to "arbitrary classifications based upon the race, sex, and economic class of the victim and the accused" (Doc. 78 at 3), appellate counsel acted unreasonably in failing to raise the issue.

There is a reasonable probability that the death sentence would have been vacated had the issue been raised.

To the extent the Court of Appeals prevented appellate counsel from raising this issue, the court's review of the death sentence imposed on Mr. Barrett was constitutionally inadequate. The Court of Appeals failed to consider the disproportionate use of the federal death penalty based on the race of the victim.

> **14.    Appellate Counsel Unreasonably Failed to Raise on Appeal Unconstitutional Deficiencies in the Indictment.**

As set forth in Ground 15, *supra*, Mr. Barrett was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case did not charge either the non-statutory aggravating factors relied upon by the government during the penalty phase or the allegation that the aggravating factors outweighed the mitigating factors. Appellate counsel unreasonably failed to raise this issue on direct appeal. There is a reasonable probability that Mr. Barrett would have been granted a new trial if counsel had raised this issue on appeal.

> **B.    A New Trial is Reasonably Probable Based upon the Cumulative Effect of the Errors Appellate Counsel Unreasonably Failed to Raise.**

The Court of Appeals reviewed the errors in this case cumulatively. *United States v. Barrett*, *supra*, 496 F.3d at 1121. "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" *Ibid.*, quoting, *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002). The review conducted on appeal was deficient due to

the unreasonable omissions of appellate counsel, the Court of Appeals' limitations on counsel, or both.

There is a reasonable probability that any two or more of the errors identified herein *supra*, if they had been considered cumulatively on appeal, would have resulted in reversal. Several of the errors appellate counsel unreasonably failed to raise, or did raise on appeal, complement each other such that the risk of harm is increased. For example, the harm from the trial court's withholding from trial counsel the contents of the *ex parte* hearing complements the continuance issue raised on appeal. As appellate counsel states, without knowing that Judge Payne had said he believed a continuance was likely, defense trial counsel failed to seek a continuance because he believed the court would deny the request. (Exhibit 29.) Issues related to the seven snitches would have been enhanced if trial and appellate counsel had argued the Government's violation of Fed. R. Evid. 404(b), particularly with regard to failure to disclose that Karen Real would testify to prior bad acts.

Multiple errors in the second stage had greater cumulative impact than their already prejudicial independent impact. The jury in this case, after being denied the opportunity to convict on manslaughter, were denied consideration of Mr. Barrett's statements, doubts about the raid, and were inflamed by improper argument and seeing Mr. Barrett in an electric shock belt. These errors, in and of themselves, or combined with the unconstitutional circumstances that removed Mr. Barrett from the courtroom, had a prejudicial influence on the penalty deliberations. While the errors alleged may not have been prejudicial, standing alone, they must be considered cumulatively, each of which "was one more thread with which to tie the knot of ineffective assistance of counsel." *State v. Talley*, 702 P.2d 353, 358 (N.M. Ct. App. 1985).

Prejudice at the very least is present when considering the "cumulative effect" of the errors.

Whether considered individually or cumulatively, appellate counsel's unreasonable failure to raise issues on appeal, and/or the Court of Appeals' failure to consider them, violated Mr. Barrett's rights under the Fifth, Eighth, and Fourteenth Amendments. The judgments of conviction and sentence should be set aside.

At a minimum, the files and records of the case do not conclusively demonstrate that Mr. Barrett is entitled to no relief. Therefore, this Court either should vacate the judgments or schedule an evidentiary hearing after providing sufficient notice and time for Mr. Barrett's counsel to complete their investigation and marshal all available evidence. R. Gov. § 2255 Proc. 8(c).

**Ground 19.    Mr. Barrett's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case.**

Mr. Barrett's convictions and sentences were unlawfully and unconstitutionally imposed, in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness. *E.g., Taylor v. Kentucky,* 436 U.S. 478, 487, and n.15 (1978) ("[T]he cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness.")

Mr. Barrett has amply demonstrated that numerous prejudicial errors of constitutional dimension, or otherwise, require vacation of his convictions and sentences.

However, should it be deemed that, individually, none of the errors asserted require relief, their combined impact clearly necessitates a new trial or, at a minimum, a new sentencing trial.

A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of trial is such that, collectively, they can no longer be determined to be harmless. *United States v. Toles,* 297 F.3d 959, 972 (10th Cir. 2002); *United States v. Rivera,* 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). Put a slightly different way, cumulative error is present when the "cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Duckett v. Mullin,* 306 F.3d 982, 992 (10th Cir. 2002), *quoting Rivera*, 900 F.3d at 1469. In the Tenth Circuit, a cumulative-error analysis is applied to review the impact of legally diverse claims. *E.g., Cargle v. Mullin,* 317 F.3d 1196, 1207 (10th Cir. 2003); *United States v. Wood,* 207 F.3d 1222, 1237-38 (10th Cir. 2000) (conviction reversed due to cumulative effect of mid-trial denial of acquittal on first and second degree murder and evidentiary error). In death penalty cases, the courts review whether the errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case[,]" *Thornburg v. Mullin,* 422 F.3d 1113, 1137 (10th Cir. 2005), unless the errors involve violations of specific constitutional rights, in which case "the principles governing those rights control." *Cargle,* 317 F.3d at 1207.

Mr. Barrett has demonstrated that, due to numerous errors and omissions, he was denied his rights to effective assistance of counsel in both stages of trial, and that the prosecution violated its *Brady, Giglio* and *Napue* obligations virtually wholesale. Prosecutorial misconduct was rampant in this case. These significant constitutional errors were aided and abetted by

judicial misconduct which permitted the Government to lay behind the log and conduct a trial by ambush.  The "materiality" standards of the tests for ineffective assistance of counsel and *Brady* violations are identical: to prevail, a defendant must show that but for counsel's errors or omissions, or but for the suppression of evidence and similar misconduct, there is a reasonable probability that the outcome of trial would have been different, *i.e.,* that confidence in the outcome of trial is undermined.  *Strickland v. Washington,* 466 U.S. 668, 694 (1984); *Kyles v. Whitley,* 514 U.S. 419, 435 (1995).  *E.g., Felder v. Johnson,* 180 F.3d 206, 214 (5th Cir. 1999); *Benn v. Lambert,* 283 F.3d 1040, 1053 (9th Cir. 2002); *Clay v. Bowersox,* 367 F.3d 993, 1000 (8th Cir. 2004).

Thus, in a cumulative-error analysis of *Strickland* and *Brady* violations, a court must first analyze the *Strickland* violations collectively to determine if the errors are "material."  If the claimed errors of trial counsel are not in combination found to meet the materiality standard of reasonable probability of a different outcome, the court must combine all *Strickland* and *Brady* violations collectively to determine whether the combination of errors meets the "reasonable probability" standard.  *Williams v. Quarterman,* 551 F.3d 352 (5th Cir. 2008) (remanding to district court for *de novo* consideration of *Strickland* claim and of the cumulative prejudice of *Strickland* and *Brady* claims); *Gonzales  v. McKune,* 247 F.3d 1066, 1078 (10th Cir. 2001) (court found that the outcome of trial "would likely have changed in light of a combination of *Strickland* and *Brady* errors, even though neither test would individually support a petitioner's claim for habeas relief."); *Phillips v. Woodford,* 267 F.2d 966, 975-76 (9th Cir. 2001)(court cumulated prejudice as a result of ineffective assistance of counsel with the materiality resulting from *Napue* violation where prosecution allowed its witness to falsely testify that he had no deals).

There can be no serious question that, even if the ineffective assistance claim and the *Brady* and similar errors which infected Mr. Barrett's trial are not judged individually to warrant relief, their combined effect warrants relief. This is particularly true because, as noted, judicial misconduct contributed to both constitutional errors. Moreover, additional constitutional and other serious errors marred Mr. Barrett's trial, as reflected in this brief and Movant's previous filings. The combined effect of all errors, if not determined to warrant relief individually, compels the granting of relief when viewed in the aggregate.

## CONCLUSION

For the foregoing reasons, as well as those stated in the Amended § 2255 Motions and all exhibits thereto, this Court should grant the following relief:

1.      Recuse himself and have all proceedings regarding Mr. Barrett's application for post-conviction relief randomly reassigned to another judge;

2.      Require Respondent to file an Answer to the Petition in the form prescribed by Rule 5 of the Rules Governing § 2255 Proceedings, identifying all proceedings conducted in Petitioner's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.      Permit Mr. Barrett to file a traverse to the Respondent's answer, at such time as to provide an adequate opportunity to respond to any affirmative defenses raised by the Answer;

4.      Permit Mr. Barrett to amend his motion with recently discovered evidence and any further evidence or grounds for relief that may arise through investigation of that evidence, discovery, or an evidentiary hearing;

5.      Grant Mr. Barrett's motion to expand the record;

6.      Grant Mr. Barrett's motion for evidentiary hearing to resolve any factual disputes

raised by the Respondent's Answer to this Petition, or by Petitioner's Reply to any

affirmative defenses raised by the Respondent;

7.      Permit oral argument as appropriate and required;

8.      Vacate Petitioner's convictions and sentences and order that appropriate retrial

and/or sentencing hearings be conducted; and

9.      Grant such further and additional relief as may be just.


DATED:   March 1, 2010

Respectfully submitted,
 /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

 /s/ Joan M. Fisher
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender

 /s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

**Certificate of Electronic Filing and Service**

I hereby certify that on this 1ˢᵗ day of March 2010 I caused the foregoing Petitioner's Brief in Support of Second Amended § 2255 Motion and in Support of Petitioner's Motion for Evidentiary Hearing and Motion for Record Expansion to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.


/s/ Tivon Schardl