IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,       )
                              )
            Plaintiff,        )
                              )
-vs-                          ) No. CIV-09-105-JHP
                              )
UNITED STATES OF AMERICA,     )
                              )
            Defendant.        )

TRANSCRIPT OF MOTION/STATUS HEARING

**BEFORE THE HONORABLE JAMES H. PAYNE
UNITED STATES DISTRICT JUDGE**

MARCH 31, 2010

A P P E A R A N C E S

**David B. Autry**, Attorney at Law, 1021 Northwest 16th Street, Oklahoma City, Oklahoma, 73106, and;
**Tivon Schardl**, Federal Public Defender, 801 "I" Street, Third Floor, Sacramento, California, 95814, attorneys on behalf of the Plaintiff;

**Douglas A. Horn**, Assistant U.S. Attorney, 1200 West Okmulgee, Muskogee, Oklahoma, 74401, and;

**Jeffrey B. Kahan**, U.S. Department of Justice, Capital Case Unit, 1331 F Street NW, Room 345, Washington, D.C., 20530, attorneys on behalf of the Defendant.

*REPORTED BY:  BRIAN P. NEIL, CSR-RPR, RMR, CRR
United States Court Reporter*

Wednesday, March 31, 2010

* * * * *

THE COURT:  Call Case No. 09-105, Kenneth Eugene Barrett v. United States of America.

Counsel for Mr. Barrett ready to proceed?

MR. AUTRY:  Yes, Your Honor.

THE COURT:  Counsel for United States of America ready to proceed?

MR. KAHAN:  Yes, Your Honor.

THE COURT:  Let me start by -- this is a sealed proceeding so I'd ask the security officer to lock the doors and seal the sound system.  And the record should reflect that there is no one in the courtroom other than counsel, the courtroom deputy, court reporter, the judge's law clerk, and court security officer.  The court officer has returned to the courtroom and the courtroom is secure.

The court has set this matter for status hearing today.  The first issue that I want to discuss with counsel relates to sealed document No. 101. That's the letter dated January the 11th, 2010, from the U.S. attorney to the court.  That letter is then the subject of a protective order, docket No. 102, dated January the 12th, that allowed limited disclosure of document 101 to counsel only.

We are now before the court on the joint motion to modify.  152 is before the court to disclose the information in the protective order at docket 102, and that joint motion was dated March 3rd, 2010.

Just as a general statement to counsel for both the government and the defendant, I realize it's a joint motion and there is an indication of agreement as to counsel as to who this information should be -- or perhaps should be released to additional parties and I think there is an agreement.

In the joint motion, there's an indication that the sealed letter, which is, I believe, document 101, indicates there's an agreement that the information should be released to former counsel and investigators for petitioner, including John Echols, Roger Hilfiger, Bret Smith, former assistant U.S. attorney Michael Littlefield, former drug task force agent Clint Johnson, drug task force personnel Larry Lane.

The court has some concern and I think that I have an obligation to inquire as to why the broad disclosure.  The court's perhaps first and most important issue is the protection of the person that's the subject of this matter.  As I understand the pleadings, that person is in state custody now.  There

are concerns for her.  The court has some -- and I think I have an obligation to learn from counsel as to -- and when I say "counsel," I mean counsel for the government and counsel for the defendant -- because the court has some concerns about why is it necessary to reveal to such a broad spectrum of people?

Admittedly they've been involved in this case, but when the purpose of this drill is to protect this person who's now in custody and perhaps in a vulnerable situation, so you understand, I think I have an obligation to learn why it is that we need to release this information to the array of people that you've agreed to release it to.

And it perhaps -- and let me just comment. The declaration that has been filed by Mr. Barrett's counsel from Ms. Thomas, on its face establishes from Mr. Barrett's perspective that his counsel did not speak with Ms. Thomas which would be a reflection of an argument, I assume, counsel for Mr. Barrett is going to make; that is, that therein he was incompetent at least in that regard and he didn't talk to this witness.  So that's before the court.  I mean, that is there loud and clear.

Now, I will suggest also that the letter; that is, sealed document 101, the letter from the U.S.

attorney to the court, did not give the court a great deal of information to determine how much risk is involved to this person who's been identified as a former undercover agent for the BIA and for the State of Oklahoma.  I don't have -- I can't tell from that letter how broad that person's involvement was or what areas she was involved in, but the alleged incompetence of trial counsel is before the court.

Now, how much further the investigation needs to go, perhaps the court would be enlightened by more information from the government and perhaps the court would be enlightened by additional information from counsel for Mr. Barrett as to why it might be necessary.

I want to say at the outset that this is -- and one of the mistakes that this court has made in this case to this point is not clearly outlining when discovery starts.  I don't necessarily view what we're going through now is a limitation on what discovery may come at some time in the future.  So I don't want counsel for Mr. Barrett to be concerned, Judge, are you limiting us to we can never, ever talk to these people?  That's not the point.  I'm suggesting to all of you maybe premature.

With that hint, I'll hear first comments

from the government.

MR. KAHAN:  Thank you, Your Honor.  Jeffrey Kahan on behalf of the government.  I'm hoping that by perhaps sharing some information and my impressions of what the defense is after here that maybe I can make some of this go away.

I have been in Mr. Wilson's company when he interviewed Ms. Thomas and he has also interviewed her independently.  What she told us was that for a period of time prior to the murder at the center of this case; that is, before 1999, she had a personal relationship with a District 27 task force officer named Larry Lane and that she would provide information to him on an informal basis when she became aware of situations in which she thought he might be in some sort of danger.

In a subsequent interview, an interview within the last couple weeks, Mr. Wilson asked Ms. Thomas if she knew Clint Johnson who is the officer, of course, who obtained the search warrant that started this whole ball rolling and who is also at the center of both a *Franks* claim and a *Brady* claim in this proceeding.  She told him without question she had never heard of Mr. Johnson, much less had she provided information to him.  At the time that we

agreed that the defense could speak to Mr. Johnson about Ms. Thomas we were unaware of that.

Certainly I think that there is no substance to either the *Brady* claim or the *Franks* claim, that she's provided any sort of information to anyone, particularly to Clint Johnson, that would have given rise in his mind to any doubt about the information he received from Sanders and it became the basis of the warrant. There was no information that had been provided informally to anybody that was owed a duty of disclosure under *Brady* at the time of trial.

Subsequent to the trial, she did enter a formal agreement with the district attorney and did begin providing information in exchange for, I assume, reduced sentencing. I don't think any of that comes into play with what's going on for her now. I think her current conviction is completely independent of that. She also told us that she did a couple of controlled buys for BIA.

THE COURT: When you say "her current conviction," when was her current conviction?

MR. KAHAN: Her current conviction, I couldn't give you the date. It was this summer. She pled guilty to burglary -- conspiracy to commit burglary, a series of crimes, all involving a single

transaction.

When we became aware that she -- that Ms. Thomas had operated as a CI, we believed that that information might be -- might be of some use to Mr. Barrett in that Mr. Barrett might at some point in the future attempt to premise an argument regarding Ms. Thomas' credibility. In essence, because the government had relied on her, she had a certain patina of credibility that we could not deny.

It was with that in mind that we provided that piece of information, why we wanted to provide that information, but at no point in time have we been aware of anything that suggests that Ms. Thomas provided any information to anybody about Mr. Barrett until she was contacted by Mr. Barrett's current counsel and we went out and interviewed her. She had no other involvement in the law enforcement aspect of this case.

THE COURT: Okay. Thank you.

MR. KAHAN: I hope that clarifies it.

THE COURT: Counsel.

MR. AUTRY: Your Honor, as to the reason we request disclosure to other individuals, that would help facilitate our investigation into whether or not agents of the government, particularly the District 27

tack force office, whether it be specifically Clint Johnson or Larry Lane who was this particular witness' handler, had information or could have had information developed from Ms. Thomas that would indicate, as her declaration indicates, that Mr. Sanders who was --

THE COURT:  When did Larry Lane become a part of the task force?

MR. AUTRY:  Your Honor, I don't know the specific answer to that.

THE COURT:  The reason I ask is that I thought he came late, later than our case, but I don't know.

MR. AUTRY:  That could very well be, Your Honor.  At any rate, she had a relationship with the District 27 task force.

Mr. Kahan indicates that Clint Johnson -- or excuse me -- that this witness says that she didn't know Clint Johnson and had no association with Clint Johnson.  We need to talk to Clint Johnson about that, and we need to talk also to the previous lawyers for Mr. Barrett and their investigators to see what they would have done with this information.

We are not intending to give copies of the actual letter that is now filed under seal to any of these individuals.  We would just discuss the content

of the letter, we wouldn't give them copies of it. And the proposed protective order, the joint protective order, that the government and ourselves have agreed to indicates that to the extent the information in the letter, the sealed letter, is disclosed to any of these potential witnesses or these other individuals who have worked on Mr. Barrett's case, they would be told there's a protective order in effect, not to discuss the contents of what we discussed with them in our investigation into this matter with anybody else.

So that's why we seek a lifting or modification of the protective order to allow us to --

THE COURT:  You understood, I think, my comments earlier.  I mean, I guess what I'm trying to proceed with some caution is is where the investigation stops and where discovery starts.  How do you view -- I'm not -- I mean, the way I may perceive it the major issue has been there's light all over it, and I'm not suggesting that there wouldn't be a time for discovery on this issue.

What you mean by investigate -- where investigation stops and discovery starts is a question I would like for you to address.

MR. AUTRY: Yes, sir. I guess this would not be in the nature of the court making a order under principles of discovery. This is a matter that was brought to the court's attention. The court issued an order and we feel that it definitely needs to be investigated.

So this is not really in connection with any formal discovery process that's been instituted by the court because the court, as the court has pointed out, has yet to institute that process. This is information we received that we believe should be investigated as quickly as possible.

THE COURT: And you understand my competing concern is for this person's safety?

MR. AUTRY: Yes, sir. Absolutely.

THE COURT: That's the balancing dilemma the court is in.

MR. AUTRY: Correct.

THE COURT: And so you're suggesting the failure of what appears to be the fairly obvious from your point of view, and yet for this court to determine, but the base issue is trial counsel had evidence before them that they could have investigated at the time of trial and used and they didn't? I mean, that's pretty obvious.

What else do you envision could be learned -- or you could say "I don't know" is one answer.

MR. AUTRY:  Sure.

THE COURT:  But do you envision some area of investigation other than counsel was incompetent?

MR. AUTRY:  Yes, Your Honor.  I think it's relevant to our claim that *Brady* material was suppressed in this case.  We also have a claim, as Mr. Kahan mentioned, that there was a *Franks* violation because the affiant on the no-knock, nighttime search warrant for Mr. Barrett's cabin failed to disclose numerous facts that he was aware of or should have been aware of or others in law enforcement were or should have been aware of that bore on the credibility or lack thereof of Mr. Sanders.

This is a witness who says that Mr. Sanders is not credible, that, in fact, he perjured himself when he made representations to the court during the jury trial and to the jury that he had been accompanied by her shortly before the incident in which Trooper Eales was shot.  She says none of that ever happened.  Many of the things he states never happened.

So this is somebody who at some point

anyway was working in the capacity of a confidential informant for law enforcement, somebody they should have been aware of, somebody they could have been aware of, even if at the particular time she wasn't working in that capacity, and somebody who could have said that this guy is not credible.

Now, we need to find out to what extent the government was or should have been aware of this person's existence. I mean, clearly they were if Mr. Sanders were debriefed before his testimony being interviewed by Mr. Littlefield or whoever else it was. In fact, he testified in front of the jury that he went out to Mr. Barrett's property with this particular witness, there was a drug transaction, and so on and so forth. They have an obligation, I think, to investigate this particular witness to see if she confirmed what Mr. Sanders was saying, and we submit that based on the record so far they've failed in that obligation.

So long story short, it ties in not only to the ineffective assistance of counsel claim, but also the *Brady* claim and Fourth Amendment claim.

THE COURT: Okay. Thank you.

MR. AUTRY: That's why we seek to broaden the net of disclosure. We would certainly not do

anything or say anything that would in any way endanger this particular individual's safety. But it's also something that when we interview her we need to confront her with or talk to her about -- "confront" is probably a bad word -- but talk to her about.

Your Honor, let me see if there are other concerns that the court raised that I haven't addressed yet. That's basically where we're going with this.

THE COURT: Okay.

MR. AUTRY: We would not endanger this witness' safety or do anything to endanger her safety. But I think it's important that we be allowed to talk about the contents of this letter to these various witnesses or potential witnesses in aid of the claims that we just discussed.

Whether or not, as Mr. Kahan says, this particular witness had anything to do with Mr. Barrett's case or provided law enforcement with any information related to Mr. Barrett's case is not really relevant to the reason we're seeking to expand or modify the protective order. It's in aid of a further investigation in support of the claims that I've already mentioned.

THE COURT:  Okay.  Thank you.

MR. AUTRY:  Thank you.

THE COURT:  Further comment from the government?

MR. KAHAN:  Just briefly, Your Honor.

To touch on your concern about security, when we agreed to this, it was our feeling that the best way to put this to bed would be to permit the defense to investigate this, what we believed will lead nowhere.  We are willing to agree to this to the extent that it involves these people in law enforcement and, you know, former defense counsel, but we are adamant that this information remain outside of Mr. Barrett's purview.

THE COURT:  These two task force agents -- Clint Johnson was the task force agent involved, I guess, in the state court proceedings with Mr. Barrett?

MR. KAHAN:  Johnson obtained the no-knock, nighttime warrant.

THE COURT:  Yeah.  And then Larry Lane, was he the person that came in after Clint Johnson?

MR. KAHAN:  To be honest with you, Your Honor, I count on Chris to keep track of all this.  I really couldn't tell you.

*16*

THE COURT:  Okay.  I'm trying to scan my brain and scan the records I have.  I didn't see Larry Lane -- my memory didn't put Larry Lane in and I didn't see anything that -- I didn't know if he came five years after is what I was concerned about.  But I'll leave it to the government if you think he's someone that's reasonable to talk to.

MR. KAHAN:  Thank you.

MR. AUTRY:  Briefly, Your Honor.

THE COURT:  You may.

MR. AUTRY:  Thank you.  One of the reasons, Your Honor, we're seeking modification of the order at this time before, as the court says, there's been any formal discovery process is if we need to amend or supplement our previous filings, we would rather do it sooner rather than later.

THE COURT:  Yes.  I've got that on my list of things to talk about.

MR. AUTRY:  Yes, sir.  And our understanding is that when Ms. Fisher talked to Mr. Wilson about this matter, he didn't have any problem -- or the government didn't have any problem with disclosure of this information to the individuals who are listed in our proposed order --

THE COURT:  No.  I'm the only one, that I

know of, that had any concern.  That's why I wanted to have a discussion to make it clear that I had concerns.  I wanted to express -- I appreciate you coming to an agreement, but at the same time I think I have an obligation overseeing this matter as a judge to be sure that I emphasize to counsel the importance of protecting the life of this person who has been involved in this matter.  I think that's clear now. I'm more satisfied with going forward about this matter now that we've had this discussion.

MR. AUTRY:  Okay.  Thank you, Your Honor.

And one of the things Mr. Wilson and Ms. Fisher discussed is that because the people to whom this information would be revealed, if the protective order were modified, were law enforcement primarily or previous counsel for Mr. Barrett.  I'm not saying lawyers are necessarily more trustworthy or anything, but because it's people who have --

THE COURT:  Well, I like to think that we are --

MR. AUTRY:  I would think so, yes.

THE COURT:  -- within the confines of this system.  If we don't understand it, then this country is in really bad shape.

MR. AUTRY:  Correct.  But we're not seeking

to disseminate this information to people on the street, for want of a better word.  These are responsible individuals who will treat the information responsibly.  I believe also Mr. Kahan --

THE COURT:  Well, I think this is probably because some of the things that have been said here in regard to Mr. Johnson may not be in that category.

MR. AUTRY:  Correct.

THE COURT:  I mean, do you backtrack a step there with me?

MR. AUTRY:  I certainly do.

THE COURT:  Okay.  So that's another thing that came in my mind, is that I'm assuming the lawyers in this room have more information about him than I do.

As you suggest, Mr. Echols, Mr. Hilfiger, Mr. Smith, and Mr. Littlefield should understand the significance, and more times than not law-enforcement professionals do also.  But because his name and the allegations suggest that maybe he may not be in that category of people, that raised an issue with her safety.

MR. AUTRY:  Correct, Your Honor.  And I believe -- I don't know if the government -- and I can't remember if Mr. Kahan mentioned it -- if the

government has talked to Clint Johnson about this matter. I assume they haven't because the protective order is obviously in effect and he's not one to whom they could disclose the information.

But sure, we would leave Mr. Johnson out of the credible, reliable category certainly.

THE COURT: I didn't think you would argue with me there.

MR. AUTRY: No. Not at all, Your Honor. And I apologize for misspeaking and including him in the group that I had talked about previously.

THE COURT: So do we need any special treatment of disclosure to him?

MR. AUTRY: I'm trying to think of how the court could fashion something that would further the interest in securing the safety of the witness.

THE COURT: And I'll let you all listen to me.

It could be that something might be gained from this -- I mean, I realize ultimately you're going to have an opportunity to talk with him, I think, but it could be from Echols, Hilfiger, Smith, and Littlefield you learn whatever it is you need to learn. I mean, you may feel confident, you may not. You may feel even more compelled to speak with him.

Is there anything to be gained by starting out with those four?

MR. AUTRY:  Starting out with those four and then --

THE COURT:  On application, Judge, we've determined there's no need for further interview in light of trying to protect this person, or we've learned information where it's more compelling now than ever that we talk to Mr. Johnson.

MR. AUTRY:  That's possible, Your Honor. We are just going to have to see what these individuals say or what they state.  It's difficult for me to predict now.

THE COURT:  No, I know.  But is it going to disturb your inquiry if we fashion the order that you do your investigation with these four, and then advise the court either we don't need to do any further or, Judge, it's more compelling now than ever?  One of those two extremes.

MR. AUTRY:  Can I consult with my co-counsel briefly on that question?

THE COURT:  Sure.

*(Discussion held off the record)*

MR. AUTRY:  Your Honor, I think one thing we could do is with respect to Mr. Johnson we could

actually serve him a copy of any modified protective order that the court would enter to make it very clear to him that this is a legal order you must abide by, you can't discuss this matter with anybody else.  It's important for us, as you say, at some point to talk to Mr. Johnson directly about this.

So we think that if the court did something like that, where he was served with a copy of the protective order and told in no uncertain terms that this is a court order, you've got to follow it, that that might diminish any concerns that the court might have.

The other individual, Your Honor, we asked in the joint proposed order that we disclose this material to is the witness herself when we talk to her.

THE COURT:  Okay.

MR. HORN:  May I approach?

THE COURT:  Counsel, you may.

MR. HORN:  Thank you, Judge.  And as the court knows, I'm Mr. Wilson for the day and I'm more of an observer than anybody.  But I would like to throw this out as a potential, as a solution that may take care of the court's concerns, serve counsel's concerns, and the government's concerns.

*22*

As I understand this issue, the threshold issue is, does Clint Johnson even know this lady?  If the answer to that is no and has had no dealings with it, it's really the end of story and there really isn't any need for further inquiry with respect to this lady and Clint Johnson.  I believe it's been represented that this lady has said she doesn't know who Clint Johnson is, so you already have half of that equation already taken care of.

Might I suggest than rather than a full-blown interview of Clint Johnson with a protective order that raises all sorts of questions that may provide the concerns the court has that puts this lady at risk, that we task an FBI agent with going out and -- FBI agents talk with these people in the counties all the time, they talk with local task force, and we have a long-term relationship that goes out there.  It would not be unusual for an FBI agent to go out and say, do you know this person, and not disclose what the investigation is.

Because that's how we often play our investigations.  We go out and say, do you know John Smith, and they say yes or no, and we walk out and don't tell them why we wanted to know that.  So it's not unusual, it doesn't raise the red flag, but it's

under penalty of perjury, a 1001 statement for a false statement to an FBI agent, all those bootstraps that we have from the federal government.

But if an FBI agent goes out there with the task of saying, do you know this lady, and Clint Johnson says no, again I think that completes the other half of the equation which confirms what the lady says is I don't know Clint Johnson.

Now, if Clint Johnson says yes or says that I've worked with her, then that FBI agent steps back, reports that to the court, reports that to defense counsel, and then I think that we're in the realm of probably a protective order and an inquiry is more appropriate.  Just somebody in the courtroom watching.

THE COURT:  Okay.

MR. AUTRY:  Briefly, Your Honor.  I don't think whether or not Mr. Johnson would say he personally knew this witness or handled her or had contact with her ends the inquiry.  It's a small task force.  That's what Mr. Wilson had told Ms. Fisher. The issue is not direct knowledge by Clint Johnson, but whether or not he got information from Larry Lane, for example, about this person and what she said or could have said about Mr. Sanders' credibility.

THE COURT:  Do you have any knowledge of

the time frame we're talking about when she -- and that may be -- I know you haven't talked to her about this disclosure obviously -- but the time frame that she was -- you've talked to her -- I mean, the time frame that she was involved?

MR. AUTRY:  The time frame she was involved, I don't think we have any information specifically on that.  I think Mr. Lane and Mr. Johnson certainly worked together.  I think based on what we've been able to determine that at the time of Mr. Barrett's trial she may have had an informal relationship with the task force with Mr. Lane.

So there's a number of connections here that could lead to relevant evidence that would further the claims we've made.  So I don't think that Clint Johnson, whether he personally knew her or not, has any real direct bearing on the issue.

THE COURT:  Do we know the time frame -- the central part of the disclosure -- I mean, one of the central parts of the disclosure is that she worked as an informant for the task force and for the BIA. Do we know when?

MR. AUTRY:  I don't.  Not specifically.

THE COURT:  And your concerns about the assistant U.S. attorney's suggestion?

MR. AUTRY:  Pardon?

THE COURT:  Your concerns about the suggestions of Mr. Horn?

MR. AUTRY:  My concern, Your Honor, is that the inquiry as presented by Mr. Horn doesn't go far enough, as I just indicated, that whether Johnson personally knew her or not is not the whole story. Did he know of her from somebody else in the task force?  Did he know of her otherwise?

Certainly he knew of her, or the government knew of her, based on Mr. Sanders' testimony at Mr. Barrett's trial.  If he were debriefed beforehand, then presumably the government would have known about her at that time.  So --

THE COURT:  In your mind, her status as an BIA informant or drug task force informant, the time frame of that work, if it occurred, is of course of critical importance.  Do you agree?

MR. AUTRY:  It's of some importance, yes, Your Honor.

THE COURT:  I mean, it happened -- I don't know -- if it happened -- I lost track of time -- but if it happened sometime significantly after the Barrett matter.

MR. AUTRY:  That might have some

significance, her work as an informant, if it was after or significantly after.

But the main point is, this is a person -- whether she was working as an informant or not, at the time of Mr. Barrett's trial the government --

THE COURT:  The status of an informant may not be all that important?

MR. AUTRY:  It might not be, Your Honor. It's somebody they knew about based on his testimony at the time of trial.

THE COURT:  It strengthens your position if she was obviously a known informant?

MR. AUTRY:  Yes, sir that's.  Correct.

THE COURT:  Okay.

*(Discussion held off the record)*

THE COURT:  Let me inquire of the government.

Relating back to sealed document 101, does the government have within its knowledge the period of time when Ms. Thomas was working as an informant for the BIA or for the task force?

MR. KAHAN:  I know that Mr. Wilson has recently and more specifically addressed this and I'm at quite a loss in these terms.  What I have in my notes is that she helped Lane out voluntarily with

*27*

regard to his safety, and then I have a note that I think at the time I didn't especially understand it and we never followed up on, she said "became CI." I think she meant CI after her conspiracy case. I don't have a date as to that. But she did state specifically in her first document in relationship with Lane, her first formal, had been in the last few years.

I just wanted to go back and address the concern regarding knowledge that Clint Johnson might have obtained from Lane regarding Mrs. Thomas. I hate to beat this to death, but to the extent that Johnson was obtaining information from Mr. Lane, then it seems to me that's a question that counsel is free to ask of Mr. Johnson and Mr. Lane right now without involving Ms. Thomas' name because the information wouldn't have that much to do with her identity.

So for that reason, it still seems to the government that having an FBI agent ask whether Mr. Johnson was personally acquainted with Ms. Thomas would potentially put this to bed.

THE COURT: Okay. So at this point the question I asked you don't know the answer to?

MR. KAHAN: I'm afraid I don't. I'm afraid the person in the best position to answer it really

can't be here today.

THE COURT: And he's not here to tell me whether he knows or not. You think that's within his scope of knowledge?

MR. KAHAN: I think that he and Ms. Thomas certainly discussed this more specifically than the last couple of weeks. Quite frankly because Mr. Wilson is so much better acquainted with the people and places, some of this goes by me when I'm in attendance. So as I said, I count on him to keep track of these details. I am not certain how specific his knowledge is.

THE COURT: Okay. Thank you.

MR. KAHAN: Sure.

THE COURT: The court's plan is to fashion an order to attempt to comply with what I've heard here this morning in the way of agreement and suggestion from counsel. I have expressed my concerns in regard to the task force issue and I'll try to elaborate in an order as to what limitations, if any, there are.

The attorneys, I think I have a comfort zone there that I don't have with Mr. Johnson and Mr. Lane. And whether my discomfort is because of lack of knowledge or lack of facts, I'm going to give

the government a period of time to address with the help of Mr. Wilson as to when the relationship between Ms. Thomas and Mr. Johnson developed; that is, her role as an informant for either the BIA or the task force, what was the time frame.  That will be under seal and disclosed to the defense, to Mr. Barrett's counsel, then with that information the court will fashion an order.

Now, I know that I'm perhaps asking the impossible of Mr. Barrett's counsel when I ask this question, but within the context of what you heard, knowing you're going to have -- and I'm thinking as I go.  It occurs to me that outside of -- and I want counsel to be cautious.  But on the other hand, there could be questions and investigation, if you will, continue that would not involve this protective order. I mean, there are issues that could be investigated without revelation of this information that would perhaps move the investigation along.  So I'm not trying to limit that.

But keeping in mind that within the context of this -- you're going to be talking to Mr. Echols, Hilfiger, Smith, Littlefield, and then to -- and I'm still thinking about how to deal with the Clint Johnson situation, and that will depend somewhat on

the information that Mr. Wilson discloses as to the time frame.

But as unclear as that might be, I am -- because I want to give this case as much order as I can for the sake of Mr. Barrett and his counsel and the government; that is, to keep it moving. So when I enter this order, I'm going to suggest that you be given time to amend to include anything that you learn that will be pertinent to the 2255 motion. I assume counsel, until you start the investigation, won't know. But as to -- let's talk about those first four. As to those first four attorneys, how long -- how much time --

MR. SCHARDL: Good morning, Your Honor. Tivon Schardl.

THE COURT: Good to see you.

MR. SCHARDL: Good to see you, sir. Thank you for calling us out here.

We had discussed possibly doing that within two weeks and filing a status report. Because as has been suggested, it may turn out that it does not lead to sufficiently different information or additional information that it would require amendment, and so we thought that we could take an initial stab at it and report back within two weeks.

THE COURT:  I think that's reasonable.

MR. SCHARDL:  Thank you, Your Honor.

THE COURT:  Now that I've said it's reasonable, do you want to argue with that?  You can.  Feel free.

MR. KAHAN:  I'm not sure I want to take -- better I think I'd like to clarify my own position in all of this.

THE COURT:  Okay.  You may.

MR. KAHAN:  I have been working under the impression that our answer to the existing petition, at least as the orders now stand, is due --

THE COURT:  April the 19th.

MR. KAHAN:  -- April the 19th.

THE COURT:  Well here, let me throw this out so maybe this will tell you at least where I am, then you can argue with me.

I anticipate softly holding you to that answer date.  This issue I view as -- the issue that's in this protective order, I'm looking down the road and anticipating as counsel just -- either nothing or an amendment.  If there's an amendment, obviously you'd be given an opportunity to speak.  But I would -- I'm endeavoring -- I want to move to -- the issues outside of this issue I'd like to get before

the court.

MR. KAHAN:  Okay.  I think we're all heading in the same direction.  A couple of things.

One, it was our feeling in discussing this -- and we may all be talking about the same thing -- this would best be treated as a supplement to the existing petition.  It sounds like that's what the court has in mind.

THE COURT:  Yes.

MR. KAHAN:  Because when I hear "amendment" at this point --

THE COURT:  Yeah.  Supplement.

MR. KAHAN:  -- I begin shaking, yeah.

THE COURT:  I know from my perspective -- and I've done a lot of looking at 2255 in the role that I find myself now -- there's no well-chalked path for us to follow.  So I don't have -- supplement, amendment, yes.

MR. KAHAN:  As to the April 19th date, the April 19th date reflects -- I don't know -- not an oversight, but when we initially talked about this --

THE COURT:  Okay.  Let me give you some comfort.  I'm not -- I want to get this issue over with, and I'll talk to you about the -- I haven't forgotten -- I've got a big circle around the day.

MR. KAHAN:  Then to the extent we're talking about a supplement rather than an entirely new petition, I have nothing else to add.  That seems completely reasonable.

THE COURT:  I may have some discomfort over here -- I'm not sure -- but I'll listen.

MR. SCHARDL:  I guess our only concern is with the local rule requiring that amendments be complete, a complete pleading.  So we had talked -- and I think Ms. Fisher may have talked with Mr. Wilson also about the possibility of maybe this would result in an additional declaration from the witness, Ms. Thomas that is, or something to that effect.

However, if it changed the facts, the factual basis, or added a factual basis, that that was our only concern, that we plead it appropriately and make sure that the pleading is complete in and of itself, but we would also delineate in that motion as the local rule requires exactly what is new.

And so if that alleviates the government's concern about an entirely new petition so that it would be clearer, what's new is just the fruits of this particular investigation.  I don't know if that helps the court or helps to --

*34*

THE COURT:  It could -- as I think about it, the information could supplement what you already have before the court.  I mean, it could expand it or it could create a whole new issue because we don't know what you're going to find.  That seems about as broad as it could go.  It could either be a supplement to something you already have or it could be a full-blown amendment that instead of having -- I can't remember -- 24 issues, you might have 25 issues and it would be a new issue to the petition that's been filed.

Am I helping you or hurting you or punishing you?  It might be -- as I understand it now, there are like twenty-two, three, or four issues; is that correct?

MR. SCHARDL:  I think it's 20, isn't it?

MR. KAHAN:  Nineteen.

THE COURT:  Nineteen.  Okay.  So this might be 20, depending, or it could be a supplement to what's already there.

MR. SCHARDL:  Right.  If I may, one other proposal I would make is that prior to filing a motion to amend, we would provide the government with the fruits of that and we could -- perhaps by seeking an agreement as to whether it relates back, we could, you

know, shorten the process informally or at least get the ball rolling, get the people thinking about those issues informally, or as to whether it relates back or whether the statute starts when we obtain the information.

That would just be something else to throw out there that would sort of maybe get folks thinking about the issues that would call for further litigation if there were an amendment as opposed to a supplement or something like that.

MR. KAHAN:  I want to be clear that my concern about the new amendment stems from what I view as -- and Mr. Schardl alludes to this -- the timeliness issue regarding anything new in this claim that at this point has me comparing 600 pages of pleadings to, you know, now what, the past 350 pages. The thought of doing that again in its entirety is just horrifying and I think it's a waste of everybody's time.  So if there is a way that we can make this discreet, that would certainly be my preference.

The court alludes to the lack of a well-chalked path.  I am aware of one case out of the Eastern District of Texas, *Egofske*, in which the court ordered a supplement for some new information.  I

realize that doesn't respond specifically to counsel's concerns about the pleading rules, but I can assure the court that there is at least one judge who's gone down that road.

THE COURT:  Well, I don't want to limit obviously Mr. Barrett's case in any way, that's not the goal.  To the contrary, I want to be sure that it gets -- I don't -- I don't want to -- that it all gets smothered in a procedural world that we can't address the issues adequately.  I don't want to put any unnecessary burden on if you find new information it -- and not knowing what we're talking about is one of the problems, but as it appears now it expands an issue.  It may be a new one but I can't help but think that the supplement is the best avenue to assume we're going to follow depending on what you find.

Once we get to the point where we have the investigation of this issue is over, then proposals on how to use that information -- it could be we don't find anything, we don't need to do anything further than what we've done.  We found -- Judge, we found this; therefore, we need to supplement or modify or -- I'll give you an opportunity to suggest what procedure to use before we do it.

I think your idea of the status so we move

forward in two weeks, we'll hear whether or not you think there's any reason to file further pleadings in this matter, then we'll give them a name when we get there.

I'm waiting on Mr. Wilson's remarks within -- I understand his wife is having surgery; is that correct?

MR. HORN:  Judge, since I'm Mr. Wilson today and I'm communicating on behalf of Mr. Wilson, how about the end of business Monday?

THE COURT:  That will be fine.

MR. HORN:  And if we can't meet that for some complication that's unexpected from today, we'll come back and ask the court for more.  But if he can't do it, I'll step in there and try to get this answered by the end of business Monday.

THE COURT:  Okay.  So we're keeping use of -- my thought is that since we're keeping use of the time ongoing, Echols, Hilfiger, Smith, and Littlefield, you can proceed.

MR. AUTRY:  Thank you, Your Honor.  That was going to be my inquiry whether the court would modify the order today as to--

THE COURT:  I'll include it, but orally by agreement you can go ahead with the attorneys.  Then

based on what I hear from Mr. Wilson, I'll enter an order and you can go forward with your investigation as to those two.

Now, let's go to Mr. Kahan's concern about April 19th.

MR. KAHAN:  I think, first, the April 19th deadline is a holdover from a prior order.

THE COURT:  I don't disagree with that.

MR. KAHAN:  Yeah.  The initial timetable had been 60 days from the filing of the brief in support which would put us roughly at May 1st.  My boss, who is going to have to read all of this, has asked me if I can move it another two weeks to the middle of May.

THE COURT:  I think that's reasonable.

MR. KAHAN:  All right.  Thank you.

THE COURT:  So we've agreed on May 15th? Is that a workday?

MR. SCHARDL:  No, Your Honor.  That's a Saturday.

THE COURT:  May 17th is a Monday.  Okay. That's what lawyers do, they always go to Monday, and I'm thinking Friday.

Okay.  Let me inquire:  Any other issues that we should talk about that would help facilitate

moving the case along from Mr. Barrett's counsel?

MR. AUTRY:  Your Honor, we would ask for -- and I know this is outside the parameters the court has earlier ordered our reply to be filed by -- we would ask for -- after the government files its response, we'd ask for 45 days to reply.

THE COURT:  Forty-five?  I had thirty written down here.  You jumped way out there.  Okay.

MR. AUTRY:  That's what we'd ask for, Your Honor.

THE COURT:  That would be July the 1st?

MR. AUTRY:  Approximately, yes, sir.

THE COURT:  Is that a workday, Carla?  I guess with electronic case filing, you can work on Sunday and Saturday.

MR. AUTRY:  Sure.

THE CLERK:  It's a Wednesday.

THE COURT:  Wednesday.

MR. AUTRY:  Your Honor, I have an inquiry, and I'm sorry, about the protective order.  May we speak to the witness about this?

THE COURT:  Let's hold her in that category of the other three and we'll -- I just want to see what Mr. Wilson says about the time frame.

MR. AUTRY:  All right.  Thank you, Your

Honor.

THE COURT:  Anything from the government?
Oh, did you have something, Counsel?

MR. SCHARDL:  Just two other things.

THE COURT:  Go ahead.  No.  Go ahead.

MR. SCHARDL:  We had just a question about
the order on record expansion, Your Honor.  Is that
intended to cover Exhibits 119 through -- I think 202
is the last one --

THE COURT:  The order we just recently
entered?

MR. SCHARDL:  Yes, sir.  There was some
ambiguity as to whether --

THE COURT:  I'm trying to clear up
ambiguity in those orders.  I don't know that I'm
having any success or not.

MR. SCHARDL:  It may be just our confusion
and that's why I raise the question.

THE COURT:  Okay.  What's the question?

MR. SCHARDL:  The question is, there's a
paragraph of the order that states that the record
expansion is granted as to Exhibits 1 through 57 and
then 59 through 118, and then there's a discussion of
the redacted exhibits and the exhibits we sought to
file under seal.  I just -- and in those paragraphs, I

believe it states that the court is going to consider those. I just wasn't sure if that language was intended to mean that they're included within the scope of record expansion.

(*Discussion held off the record*)

THE COURT: Our goal to you and the public was to say they're all here now and they're all included.

MR. SCHARDL: Thank you, Your Honor.

THE COURT: That's the purpose of that language, whether we conveyed it or not. We spent a lot of time trying to accomplish that task, and that's the --

MR. SCHARDL: I think the problem is between my ears, Your Honor, and not --

THE COURT: No. I don't necessarily -- I think the way I've let this case proceed is the problem. But the goal -- I might just say to go read it again, but the goal is tell the public it's all here, it's all -- at least in the mind of the court, it's all there. I'm trying to clarify for whoever comes next to look at the record for the appellate court to be sure we don't get lost.

But for the best I can do to give you comfort is that order was designed to say it's all

here, it's all been filed, and this is how you can find it.

MR. SCHARDL:  Thank you, Your Honor.  In light of that order, that we now understand that the petition on the form and the brief that's the operative petition in the case, we were wondering if the court might consider the order striking the amended petition just so it's part of the record, given that everybody understands that the operative petition, the petition we're working from, is the one filed on the form with the --

THE COURT:  I think that's appropriate.

MR. SCHARDL:  Thank you, Your Honor.  If I could just say one other thing.

I wanted to apologize for my error in filing the motion to file the oversized brief late.  I had it ready to go the day before and just got caught up in things and woke up at five o'clock in the morning realizing I had forgotten and ran down to my kitchen and filed it immediately.  But I just wanted to thank the court for the indulgence of considering the motion and filing the brief and apologize again for messing up on the local rule.

THE COURT:  Well, the young lady right in front of you is the one who suffers the most when

you --

MR. SCHARDL:  And knowing how efficient and how large an asset she is to this court, I will apologize to Ms. Trzcinski also.

THE COURT:  No, it's not -- I will tell her it's not necessary.  But I wanted to recognize that she's done a lot of work in trying to keep me straight and ultimately keep the attorneys straight in the case.  But I appreciate you acknowledging that.  Thank you.

MR. SCHARDL:  Thank you.

THE COURT:  Counsel.

MR. KAHAN:  There's one last issue the government had hoped certainly not to complete today, but at least to get some clarification on.

There is a new claim, at least insofar as the second amended petition is concerned -- I believe that's claim 17 -- regarding Mr. Barrett's apparent lack of capacity -- or an Eighth Amendment violation based on his mental health to execute him.  What we were simply hoping for -- and this is certainly without conceding any factual basis for this or any legal basis for it -- we simply would like to know whether it is currently the defense's position that Mr. Barrett lacks capacity because we believe that

could become the basis potentially of a legal attack on this proceeding. And so we were hoping if defense could shed some light on that.

THE COURT: Okay. Thank you.

MR. SCHARDL: I think we're talking -- Mr. Kahan said it was claim 17; I thought it was 18. But I believe this is a -- the challenge to the constitutionality of executing a person with a mental illness. Maybe if I could clarify.

It's not a claim raised under *Ford v. Wainwright*; that is, a competency-to-be-executed claim. Because it's my understanding of the law under *Stewart v. Martinez-Villareal* and the *Panetti* case out of Texas, *Panetti v. Quarterman*, that such a claim would be premature if brought now, and it's not a claim that Mr. Barrett is presently incompetent.

To the extent it's our understanding that there would be different legal standards for competence versus the constitutionality of sentencing somebody with a mental illness to death, I don't think the concern Mr. Kahan has raised is raised by the claim.

Certainly we monitor Mr. Barrett's mental health, and through our communications with him and consultation with experts we try to, as best we can,

*45*

stay on top of that given our distance and given the conditions at Terre Haute.  Should we have concern about his present competence to proceed in this matter, we would bring that to the court's attention by a separate motion as soon as that concern was raised with us.  Thank you.

THE COURT:  Counsel.

MR. KAHAN:  As I understand it, I think that's satisfactory to the government's question. Thank you.

THE COURT:  Okay.  Thank you.  When I receive information from Mr. Wilson, I will expand the order.

The court will be in recess.

*(The proceedings were concluded)*

C E R T I F I C A T E

I, Brian P. Neil, a Certified Court Reporter for the Eastern District of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in above-captioned case.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 12th day of May 2010.

s/ Brian P. Neil

_____

Brian P. Neil, CSR-RPR, CRR, RMR
United States Court Reporter

*Brian P. Neil, RMR, CRR*
**United States District Court**