# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| **v.** | ) | **Case No. CV-09-00105-JHP** |
| | ) | **Criminal Case No. CR-04-00115-JHP** |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| *Respondent.* | ) | |

### GOVERNMENT'S ANSWER IN OPPOSITION TO SECOND AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY

### (Answer Under 28 U.S.C. § 2255)

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma

CHRISTOPHER J. WILSON, OBA #13801
Assistant United States Attorney
Eastern District of Oklahoma
1200 West Okmulgee
Muskogee, OK 74401-6848
Tel: (918) 684-5100

JEFFREY B. KAHAN, PA Bar No. 93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 345
Washington, D.C. 20530
Tel: (202) 305-8910

**TABLE OF CONTENTS**

PROCEDURAL HISTORY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

BARRETT'S CONTENTIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FEDERAL COLLATERAL REVIEW OF PRESUMPTIVELY FINAL CRIMINAL
      JUDGMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      A.  Cognizable Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      B.  Time Barred Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      C.  Procedurally Defaulted Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      D.  Claims Previously Adjudicated on Direct Appeal. . . . . . . . . . . . . . . . . . . . 14
      E.  New Rule of Criminal Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      F.  Harmless Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

THE GOVERNMENT'S ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      I. THIS COURT PROPERLY ADMINISTERED THE CRIMINAL JUSTICE ACT AND
          FAIRLY DISCHARGED ITS JUDICIAL DUTIES. . . . . . . . . . . . . . . . . . . . . 16
          1. CJA Funding Decisions are not Subject to Review by Themselves, and the
             Funding Determinations in this Case did not Deprive Barrett of any
             Cognizable Right. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          2. The Court Engaged in Appropriate and Fully Disclosed Ex Parte Contact with
             the Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
             A.  Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
             B.  The Court Properly Met with the Government and Disclosed the
                Communication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      II. BARRETT RECEIVED THE ASSISTANCE OF CONSTITUTIONALLY
          ADEQUATE TRIAL COUNSEL
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          1. Counsel Provided Unconflicted Representation. . . . . . . . . . . . . . . . . . . . 25
          2. Counsel Effectively Re-Urged the Suppression of Evidence. . . . . . . . . . . 27
             A.  Trial Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
             B.  Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
          3. Trial Counsel Had No Duty to Investigate Barrett's Alleged Diminished
             Capacity to Form Intent
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          4. Trial Counsel Had No Duty to Challenge Barrett's Competence. . . . . . . . 37
          5. Trial Counsel Adequately Investigated the Civilian Witnesses. . . . . . . . . 40
             A.  Absence of Continuance Motion. . . . . . . . . . . . . . . . . . . . . . . . . . 40
             B.  Character Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
             C.  Individual Impeachment of Witnesses. . . . . . . . . . . . . . . . . . . . . . 45

        i.  Travis Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
       ii.  Cindy Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
      iii.  Charles Sanders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
      iv.  Randy Weaver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
       v.  Brandie Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
      vi.  Karen Real. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
     vii.  Randy Turman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

6.  Counsel Made Appropriate Evidentiary Objections and Arguments. . . . . . . 64
    A.  Time Barred Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
    B.  The Absence of Futile Objections did not Constitute Ineffectiveness
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
    C.  Appellate Counsel Provided Adequate Assistance. . . . . . . . . . . . . . 70
7.  Trial Counsel Properly Investigated the Crime Scene Reconstruction. . . . . . 70
8.  Trial Counsel Properly Investigated and Presented Evidence Concerning Police
    Tactics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
9.  Trial Counsel Reasonably Cross-Examined Law Enforcement Witnesses.. . . 78
    A.  Allegedly Forgone Impeachment. . . . . . . . . . . . . . . . . . . . . . . . . . 79
    B.  Allegedly Forgone Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
    C.  Eliciting Supposedly Damaging Evidence. . . . . . . . . . . . . . . . . . . . 85
10.  Trial Counsel Reasonably Omitted the Unpersuasive Testimony of Barrett's
    Son and Neighbor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
    A.  Toby Barrett. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
    B.  Alvin Hahn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
11.  Trial Counsel Reasonably Omitted Unpersuasive Evidence Concerning
    Barrett's Knowledge of the Arrest Warrant. . . . . . . . . . . . . . . . . . . . . . 91
    A.  Issuance of the Bench Warrant.. . . . . . . . . . . . . . . . . . . . . . . . . . . 92
    B.  Knowledge of the Bench Warrant and Wisdom of Seeking a No-Knock
      Search Warrant.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
    C.  Barrett's Supposed Cooperation with the Police.. . . . . . . . . . . . . . . 96
12.  Trial Counsel Reasonably Sought and Received an Order Striking the
    Testimony of a Government Expert Witness; No Further Response Was
    Prudent or Necessary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
13.  Trial Counsel did not Omit any Valid Requests for Guilt-Phase Jury
    Instructions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
14.  Trial Counsel's Failure to Make Futile Objections did not Constitute
    Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
15.  Trial Counsel did not Ineffectively Omit Objections to Prejudicial
    Misconduct.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
16.  Trial Counsel Presented Appropriate Mitigation Evidence in View of their
    Client's Wishes and the Available Facts. . . . . . . . . . . . . . . . . . . . . . 115
    A.  The Defense Evidence and Jury Verdict. . . . . . . . . . . . . . . . . . . . 116
    B.  Counsel Validly Elected a Mitigation Strategy, and Any Forgone
      Evidence Would have Been Counterproductive. . . . . . . . . . . . . 119

III. THE COURT PROPERLY PROVIDED NECESSARY ASSISTANCE TO THE DEFENSE
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
    1. Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
    2. Mental Health Experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
    3. Crime Scene Reconstruction Expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
    4. Miscellaneous Experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
    5. Pre-Trial Hearing Transcripts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
IV. THE SEARCH WARRANT IN THIS CASE WAS VALID, AND BARRETT
    CANNOT CHALLENGE IT ON COLLATERAL REVIEW. . . . . . . . . . . . . . . . 146
    1. Search and Seizure Claims are not Reviewable Under § 2255. . . . . . . . . . . 146
    2. Barrett's Attacks on the Warrant do not Justify Relief Under *Franks*. . . . . 148
    3. Appellate Counsel Provided Adequate Assistance. . . . . . . . . . . . . . . . . . . . 151
V. THE PROSECUTION HONORED ITS OBLIGATIONS TO DISCLOSE
    EXCULPATORY MATERIAL TO THE DEFENSE AND TO AFFORD
    BARRETT A FAIR TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152
    1. The Government did not Violate Any Duty of Disclosure. . . . . . . . . . . . . . 152
        A. The Standard of Review for Newly Discovered Evidence. . . . . . . . . 152
        B. The Government Disclosed All Necessary Evidence about Civilian
            Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153
            i. Charles Sanders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
            ii. Travis Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
            iii. Cindy Crawford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164
            iv. Brandie Zane Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168
            v. Karen Real. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169
            vi. Randy Turman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173
        C. The Government Possessed no Knowledge of a Witness who Would
            Contradict Charles Sanders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174
        D. The Government Disclosed All Necessary Evidence Concerning Law
            Enforcement Personnel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175
            i. Clint Johnson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175
            ii. Michael Littlefield. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180
            iii. Johnny Philpot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183
    2. The Prosecution did not Interfere with Defense Counsel's Investigation. . . . 185
        A. The Government Complied with the Law Regarding the Disclosure of
            Witnesses, and Barrett Cannot Raise that Issue in this Proceeding,
            Having Unsuccessfully Raised it on Appeal. . . . . . . . . . . . . . . . . 185
        B. The Prosecution did not Interfere with Defense Counsel's Access to
            Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187
    3. The Prosecutors Committed no Prejudicial Misconduct During the Trial. . . 189
        A. Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189
        B. The Prosecutors Properly Questioned the Witnesses and Argued for
            Death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
            i. The Prosecutors did not Ask Questions Designed to Imply

Personal Knowledge
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
ii.  The Prosecutor did not Improperly Comment on the
Defendant's Exercise of his Right to Trial.. . . . . . . . . . . 197
iii.  The Prosecutor did not Improperly Engage in Cross-
Examination Outside the Scope of Direct Exam. . . . . . . 198
C.  The Prosecutors Properly Argued that the Jury Should Impose a Death
Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
i.  The Prosecutors Properly Relied on this Court's Rulings. . . . 201
ii.  The Prosecutors Properly Characterized the Record. . . . . . 203
iii.  The Prosecutors Used Fair and Appropriate Rhetoric. . . . . . 208
iv.  The Prosecutor did not Commit Prejudicial Misconduct in his
Use of the First Person During Argument. . . . . . . . . . . . 213
v.  The Prosecutor Properly Argued that Prison Was Insufficient
Punishment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215
VI.  BARRETT HAS FAILED TO STATE A TIMELY, UNDERSTANDABLE OR
COGNIZABLE CLAIM THAT THIS COURT ERRONEOUSLY EXCLUDED
EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216
VII.  THIS COURT PROPERLY PERMITTED THE MARSHALS SERVICE TO USE
AN ELECTRONIC RESTRAINT ON BARRETT. . . . . . . . . . . . . . . . . . . 219
1.  Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219
2.  Barrett Fails to Identify the Pertinent Order or Demonstrate Any Error.. . . . 220
VIII.  BARRETT WAS COMPETENT TO STAND TRIAL. . . . . . . . . . . . . . . . . . 224
IX.  THE TRIAL COURT PROPERLY REFUSED TO INSTRUCT THE JURY ON
VOLUNTARY MANSLAUGHTER.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 227
1.  Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227
2.  Voluntary Manslaughter Was Not Available as a Lesser Included Offense in
this Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228
X.  THIS COURT PROPERLY INSTRUCTED THE JURY THAT RESIDUAL DOUBT
DID NOT CONSTITUTE A MITIGATING FACTOR. . . . . . . . . . . . . . . . . 233
1.  Barrett has Procedurally Defaulted his Claim that this Court Instructed
Improperly. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233
2.  The Law Provides no Right to a Residual Doubt Theory of Mitigation.. . . . 234
3.  Counsel Performed Competently. . . . . . . . . . . . . . . . . . . . . . . . . . . 237
XI.  THIS COURT PROPERLY EXCUSED A MEMBER OF THE VENIRE FOR
CAUSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238
1.  Barrett Procedurally Defaulted this Claim. . . . . . . . . . . . . . . . . . . . . 238
2.  The Excused Venire Member was Substantially Impaired as a Potential Capital
Case Juror and Properly Excused
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239
3.  Appellate Counsel Reasonably Omitted any Challenge to the Removal of Juror
62. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242
XII.  BARRETT CANNOT RELITIGATE HIS ARGUMENT THAT THE

CONSTITUTION REQUIRES CAPITAL JURIES TO APPLY A
REASONABLE DOUBT BURDEN OF PROOF TO THE PENALTY PHASE
WEIGHING PROCESS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

XIII.  BARRETT WAS PROPERLY REMOVED FROM THE COURTROOM AT HIS
OWN REQUEST THEN VALIDLY WAIVED HIS RIGHT TO RETURN. . . 243

1.  Barrett has Failed to State Cognizable or Meritorious Claims Regarding the
Court's Decision to Permit Him to Absent Himself. . . . . . . . . . . . . . . . 244

A.  Barrett Procedurally Defaulted these Claims.. . . . . . . . . . . . . . . . . 244

B.  Time Barred Sub-Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

C.  The Trial Court Properly Responded to Barrett's Demand to Leave the
Courtroom. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

D.  The Court Properly Ordered Barrett Held in Minimal Restraints During
a Hearing Outside the Presence of the Jury. . . . . . . . . . . . . . . . . 250

2.  Counsel Properly Represented Barrett's Interests with Regard to His Request
to Waive his Presence at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

A.  Counsel Bore no Duty to Respond to the Order that Barrett Appear in a
Minimum Physical Restraint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

B.  Counsel Bore no Duty to Investigate or Raise a Doubt About Barrett's
Competence Following his Request to Absent Himself from the
Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 252

C.  Counsel Advised Barrett not to Waive his Presence at Trial. . . . . . . 256

D.  Counsel Discharged their Obligation to Seek an Instruction Regarding
Barrett's Absence from the Courtroom. . . . . . . . . . . . . . . . . . . . . 258

XIV.  THE FEDERAL DEATH PENALTY IS NOT SOUGHT ON A RACIALLY
DISCRIMINATORY BASIS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

XV.  BARRETT WAS PROPERLY CHARGED BY SUPERSEDING INDICTMENT
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263

1.  Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

2.  The Superseding Indictment Adequately Alleged the Factors that Rendered
Barrett Eligible for the Death Penalty. . . . . . . . . . . . . . . . . . . . . . . . . . 264

A.  The Superseding Indictment Alleged all Necessary Eligibility Factors
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

B.  The Superseding Indictment Omitted Superfluous Information. . . . 267

C.  Collateral Relief Cannot Lie on the Theory Advanced by Barrett. . . 268

XVI.  BARRETT HAS NOT IDENTIFIED ANY JUROR MISCONDUCT, NOR HAS
HE DEMONSTRATED THAT THIS COURT SHOULD HAVE
SEQUESTERED THE JURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268

1.  Justiciability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

2.  Timeliness.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

3.  New Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

XVIII.  BARRETT RECEIVED THE ASSISTANCE OF CONSTITUTIONALLY
ADEQUATE APPELLATE COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

XIX.  THERE ARE NO ERRORS TO ACCUMULATE.. . . . . . . . . . . . . . . . . . . . . 274

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276

# TABLE OF AUTHORITIES

## A.  Federal Cases

*Aguilar v. Dretke*, 428 F.3d 526 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

*Ake v. Oklahoma*, 470 U.S. 68 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126, 127

*Alba v. Quarterman*, 621 F. Supp. 2d 396 (E.D. Tex. 2008). . . . . . . . . . . . . . . . . . . . . . . . 210

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . 33, 38, 47, 52, 120

*Allen v. Mullin*, 368 F.3d 1220 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Apprendi v. New Jersey*,  530 U.S. 466 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

*Arizona v. Evans*, 514 U.S. 1 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Atkins v. Virginia*, 536 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

*Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009). . . . . . . . . . . . . . 261

*Bacon v. Lee*, 224 F.3d 470 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Battle v. United States*, 419 F.3d 1292 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . 13, 225

*Beard v. Banks*, 542 U.S. 406 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 272

*Beck v. Alabama*, 447 U.S. 625 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231, 232

*Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*Bergman v. McCaughtry*, 65 F.3d 1372 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 80, 87

*Blockburger v. United States*, 284 U.S. 299 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*Bobby v. Van Hook*, 130 S. Ct. 13 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

*Bousley v. United States*, 523 U.S. 614 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Boyle v. McKune*, 544 F.3d 1132 (10th Cir. 2008). . . 49, 53, 58, 62, 64, 74, 75, 87, 89-91, 96, 99

*Brady v. Maryland*, 373 U.S. 83 (1963). . . 148, 149, 152-154, 156, 159-162, 166, 168, 175, 176, 178-180

*Bragg v. Galaza*, 242 F.3d 1082 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

*Branzburg v. Hayes*, 408 U.S. 665 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

*Brecht v. Abrahamson*, 507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 132, 237

*Brewer v. Reynolds*, 51 F.3d 1519 (10th Cir.1995). . . . . . . . . . . . 17, 132, 138, 140-142, 144, 145

*Bullock v. Carver*, 297 F.3d 1036 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

*Burger v. Kemp*, 483 U.S. 776 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 119

*Butler v. McKellar*, 494 U.S. 407 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

*Caldwell v. Mississippi*, 472 U.S. 320 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Campbell v. Reed*, 594 F.2d 4 (4th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*Cannon v. Gibson*, 259 F.3d 1253 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

*Castro v. Oklahoma*, 71 F.3d 1502 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*Castro v. Ward*, 138 F.3d 810 (10th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . 33, 37, 71

*Christian v. United States*, 398 F.2d 517 (10th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998). . . . . . . . . . . . . . . . . 154, 166, 167, 171, 174, 183

*Coe v. Bell*, 209 F.3d 815 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

*Coleman v. Brown*, 802 F.2d 1227 (10th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

*Cristini v. McKee*, 526 F.3d 888 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

viii

*Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . 270

*Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

*Daniels v. United States*, 254 F.3d 1180 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . 14, 21, 127, 245

*Darden v. Wainwright*, 477 U.S. 168 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190, 208

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). . . . . . . . . . . . . . . . . . . . . . . 101

*Davis v. Exec. Dir., Dept. Of Corrections*, 100 F.3d 750 (10th Cir. 1996). . . . . . . . . . . . . . . . 240

*Deck v. Missouri*, 544 U.S. 622 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

*Dever v. Kan. State Penitentiary*, 36 F.3d 1531 (10th Cir.1994).. . . . . . . . . . . . . . . . . . . . . . 31

*Dist. Atty's Office v. Osborne*, 129 S. Ct. 2308 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). . . . . . . . . 190, 197, 198, 201, 203, 205-213, 216

*Duckett v. Godinez*, 67 F.3d 734 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) . . . . . . . . . . . . . . . 179

*Duvall v. Reynolds*, 139 F.3d 768 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*Earhart v. Johnson*, 132 F.3d 1062 (5th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Flast v. Cohen*, 392 U.S. 83, 96-97 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Ford v. Wainwright*, 477 U.S. 399 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

*Foster v. Dugger*, 823 F.2d 402 (11th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Foster v. Ward*, 182 F.3d 1177 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 253

*Fox v. Ward*, 200 F.3d 1286 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Franklin v. Lynaugh*, 487 U.S. 164 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234, 235

*Franks v. Delaware*, 438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 146, 147

*Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

*Gamble v. Oklahoma*, 583 F.2d 1161 (10th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147, 148

*Gardner v. Galetka*, 568 F.3d 862 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Geders v. United States*, 422 U.S. 853 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Giglio v. United States*, 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153, 155, 156

*Green v. United States*, 262 F.3d 715 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hagner v. United States*, 285 U.S. 427 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . 26, 115, 218

*Hall v. Luebbers*, 296 F.3d 685 (8th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Hamling v. United States*, 418 U.S. 87 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

*Hawkins v. Comparet-Cassini*, 251 F.3d 1230 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 222

*Hawkins v. Hannigan*, 185 F.3d 1146 (10th Cir. 1999). . . . 30, 103, 107, 110, 115, 151, 228, 237, 252, 255, 263

*Hedrick v. True*, 443 F.3d 342 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Henderson v. Norris*, 118 F.3d 1283 (8th Cir. 1997). . . . . . . . . . . . . . . . . 37, 45, 49, 53, 58, 64, 98

*Herrera v. Collins*, 506 U.S. 390 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153, 165, 187

*Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

*Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

*Hopkins v. Reeves*, 524 U.S. 88 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228, 230, 231

*Horne v. Trickey*, 895 F.2d 497 (8th Cir.1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263

*Illinois v. Allen*, 397 U.S. 337 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220, 247, 250

*In re Charge of Judicial Misconduct*, 91 F.3d 1416 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . 22

*In re United States*, 397 F.3d 274 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

x

*James v. Borg*, 24 F.3d 20 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*Juan H. v. Allen*, 408 F.3d 1262 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Kennedy v. Block*, 784 F.2d 1220 (4th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Knowles v. Mirzayance*, 129 S. Ct. 1411 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 253

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Leeper v. United States*, 446 F.2d 281 (10th Cir. 1971). . . . . . . . . . . 191, 193, 194, 196, 199, 200

*Liles v. Saffle*, 945 F.2d 333 (10th Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . 128, 132, 134, 139

*Lowry v. Barnhart*, 329 F.3d 1019 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Luce v. United States*, 469 U.S. 38 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Massaro v. United States*, 538 U.S. 500 (2003). . . . . . . . . . . . . . . . . . . . . . . . . 72, 127, 245, 269

*McCleskey v. Kemp*, 481 U.S. 279 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261, 262

*McCleskey v. Zant*, 499 U.S. 467 (1991). . . . 21, 127, 189, 218, 219, 228, 234, 238, 245, 264, 269

*McDowell v. Calderon*, 107 F.3d 1351 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

*McElvain v. Lewis*, 283 F. Supp. 2d 1104 (C.D. Cal. 2003). . . . . . . . . . . . . . . . . . . . . . . . . 102

*McGee v. Higgins*, 568 F.3d 832 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 109

*McPartlin v. Comm'r*, 653 F.2d 1185 (7th Cir.1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Mills v. Singletary*, 63 F.3d 999 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 42, 59, 60, 62, 63

*Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126, 142

*Moore v. Marr*, 254 F.3d 1235 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80-85

*Moya v. United States*, 35 F.3d 501 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

xi

*Murray v. Carrier*, 477 U.S. 478 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Murtishaw v. Woodford*, 255 F.3d 926 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

*Neder v. United States*, 527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 231

*Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495 (10th Cir.1995). . . . . . . . . . . . 270

*Nooner v. Norris*, 499 F.3d 831 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Oregon v. Guzek*, 546 U.S. 517 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

*O'Dell v. Netherland*, 521 U.S. 151 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Palmer v. City of Monticello*, 31 F.3d 1499 (10th Cir.1994). . . . . . . . . . . . . . . . . . . . . . 45, 64

*Parker v. Scott*, 394 F.3d 1302 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Patel v. United States*, 19 F.3d 1231 (7th Cir.1994). . . . . . . . . . . . . . 83, 87, 92, 93, 95, 99, 101

*Paxton v. Ward*, 199 F.3d 1197 (10th Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202, 203

*Penry v. Johnson*, 532 U.S. 782 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Perillo v. Johnson*, 79 F.3d 441 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

*Pierce v. Blaine*, 467 F.3d 362 (3d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Pulley v. Harris*, 465 U.S. 37 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*Renne v. Geary*, 501 U.S. 312 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Rhoades v. Arave*, 2007 WL 1550441 (D. Id. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*Riggins v. Nevada*, 504 U.S. 127 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

*Ring v. Arizona*, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

*Rojem v. Gibson*, 245 F.3d 1130 (10th Cir. 2001). . . . . . . . . . . . . . . . . . 17, 19, 126, 128, 129

*Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*Roper v. Simmons*, 543 U.S. 304 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

*Saffle v. Parks*, 494 U.S. 484 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

*Sallahdin v. Gibson*, 275 F.3d 1211 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

*Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

*Schad v. Arizona*, 501 U.S. 624 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

*Schriro v. Summerlin*, 542 U.S. 348 (2004).. . . . . . . . . . . . . . 14, 15, 20, 262, 263, 268, 271, 272

*Scott v. Romero*,  2005 WL 2865173 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Shabazz v. Artuz*, 336 F.3d 154 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . 156, 158, 168, 169, 171

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

*Smith v. Murray*, 477 U.S. 527 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Smith v. Workman*, 550 F.3d 1258 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 95, 97, 253, 255

*Spaziano v. Florida*, 468 U.S. 447, 455(1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

*Steffel v. Thompson*, 415 U.S. 452 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

*Stewart v. Gramley*, 74 F.3d 132 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

*Strickland v. Washington*, 466 U.S. 668 (1984).. . . . . 25, 32, 37, 72, 73, 98, 99, 111, 120, 132, 252

*Stringer v. Black*, 503 U.S. 222 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

*Tarver v. Hopper*, 169 F.3d 710 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Teague v. Lane,* 489 U.S. 288 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 15, 237, 272

*Thomas v. Gilmore*, 144 F.3d 513 (7th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . 33, 75, 111, 119

*Toles v. Gibson*, 269 F.3d 1167 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

*Tompkins v. Moore*, 193 F.3d 1327 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Tucker v. Ozmint*, 350 F.3d 433 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v.  Horey*, 333 F.3d 1185 (10th Cir. 2003).  . . . . . . . . . 189, 218, 219, 234, 239, 264

*United States v. Allen*, 16 F.3d 377 (10th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Alvarez*, 137 F.3d 1249 (10th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Apodaca*, 843 F.2d 421 (10th Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . . 220, 250

*United States v. Armstrong*, 517 U.S. 456 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261, 262

*United States v. Ashley*, 2008 WL 1766868 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . 156

*United States v. Ballard*, 586 F.2d 1060 (5th Cir.1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*United States v. Banks*, 405 F.3d 559 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 190, 192

*United States v. Barajas-Diaz*, 313 F.3d 1242 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007). . . .  3, 4, 22, 23, 41, 108, 112-115, 147,
186, 188, 199, 243, 264

*United States v. Basham*, 561 F.3d 302 (8th Cir. 2009).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

*United States v. Baskes*, 649 F.2d 471 (7th Cir. 1980).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*United States v. Beckford*, 966 F. Supp. 1415, 1417-18 (E.D. Va. 1997). . . . . . . . . . . . . . 230, 232

*United States v. Beers*, 189 F.3d 1297 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . 160, 176, 177, 180

*United States v. Begay*, 144 F.3d 1336 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

*United States v. Bender*, 304 F.3d 161 (1st Cir. 2002).  . . . . . . . . . . . . . . . . . . . . . 154, 160, 161

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

*United States v. Bin Laden*, 126 F. Supp. 2d 256 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . 262

*United States v. Bishop*, 890 F.2d 212 (10th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*United States v. Blackwell*, 127 F.3d 947 (10th Cir. 1997) . . . . . . . . . . . . . . . 12, 17, 23, 86, 269

*United States v. Blount*, 502 F.3d 674 (7th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Bolden*, 355 F.2d 453 (7th Cir.1966).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

*United States v. Booker*, 981 F.2d 289 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 133

*United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Bowen*, 946 F.2d 734 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

*United States v. Brown*, 326 F.3d 1143 (10th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Browning*, 390 F.2d 511 (4th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

*United States v. Caballero*, 277 F.3d 1235 (10th Cir. 2002).. . . . . . . . . . . . . . . . . . . . . . 102, 103

*United States v. Caldwell*, 543 F.2d 1333 (D.C. Cir. 1974). . . . . . . . . . . . . . 135, 139, 141, 143

*United States v. Caldwell*, 560 F.3d 1202 (10th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Cameron*, 907 F.2d 1051 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Carr*, 80 F.3d 413 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Challoner*,  583 F.3d 745 (10th Cir. 2009). . . . . . . 31, 32, 70, 106, 151, 242, 273

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000). . . . . . 36, 228, 229, 231, 239, 242

*United States v. Chemical Foundation, Inc.*, 272 U.S. 1 (1926). . . . . . . . . . . . . . . . . . . . . . . 261

*United States v. Chirinos*, 112 F.3d 1089 (11th Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . 202

*United States v. Clingman*, 288 F.3d 1183 (10th Cir. 2002). . . . . . . . . . . . . . 25, 26, 218, 258, 268

*United States v. Connolly*, 504 F.3d 206 (1st Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*United States v. Cook*, 45 F.3d 388 (10th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Cook*, 608 F.2d 1175 (9th Cir.1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*United States v. Cook*, 997 F.2d 1312 (10th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . 146, 148

*United States v. Cornejo-Sandoval*, 564 F.3d 1225 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . 249

*United States v. Cousins*, 455 F.3d 1116 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Craycraft*, 167 F.3d 451 (8th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 92

*United States v. Crockett*, 435 F.3d 1305 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*United States v. Dago*, 441 F.3d 1238 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*United States v. Davis*, 953 F.2d 1482 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States v. Dazey*, 403 F.3d 1147 (10th Cir. 2005). . . . . . . . . . . . . . . . . . 204, 207, 208, 212

*United States v. DeFusco*, 949 F.2d 114 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 127, 245

*United States v. Duran-Moreno*, 616 F. Supp. 2d 1162 (D.N.M. 2009). . . . . . . . . . . . . . . . . . 181

*United States v. Erickson*, 561 F.3d 1150 (10th Cir. 2009). . . . 154, 155, 160-162, 166, 167, 169, 172, 175, 179, 180, 184

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000). . . . . 13, 65, 172, 217, 246, 271, 273

*United States v. Evans*, 224 F.3d 670 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . 153, 160, 165

*United States v. Fell*, 360 F.3d 135 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States v. Fisher*, 38 F.3d 1144 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . 25, 30, 32, 79

*United States v. Floyd*, 81 F.3d 1517 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269

*United States v. Frady*, 456 U.S. 152 (1982). . . . . . 13, 21, 186, 189, 218, 219, 227, 233, 234, 238, 264

*United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States v. Gabaldon*, 522 F.3d 1121 (10th Cir. 2008). . . 13, 66, 92, 172, 217, 246, 271, 273

*United States v. Galloway*, 56 F.3d 1239 (10th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Garcia*, 625 F.2d 162 (7th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*United States v. Gonzales*, 164 F.3d 1285 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*United States v. Gordon*, 172 F.3d 753 (10th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Guerrero*, 488 F.3d 1313 (10th Cir. 2007). . . . . . . . . . . . . . . 13, 65, 92, 171, 246

*United States v. Hack*, 782 F.2d 862 (10th Cir. 1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

*United States v. Haddock*, 12 F.3d 950 (10th Cir. 1993).. . . 25, 135, 138, 140-142, 144, 145, 258

*United States v. Harden*, 846 F.2d 1229 (8th Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Hardwell*, 80 F.3d 1471 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . 151, 181

*United States v. Harris*, 408 F.3d 186 (5th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . 93, 95

*United States v. Haynes*, 269 F. Supp. 2d 970 (W.D. Tenn. 2003). . . . . . . . . . . . . . . . . . . . . . 267

*United States v. Hemsley*, 2008 WL 2725857 (10th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . 111

*United States v. Henderson*, 461 F. Supp. 2d 133 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Henderson*, 485 F. Supp. 2d 831 (S.D. Ohio 2007). . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Henderson*, 584 F. Supp. 1037 (W.D. Pa. 1984).. . . . . . . . . . . . . . . . . . . 63, 158

*United States v. Herbst*, 565 F.2d 638 (10th Cir.1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

*United States v. Higgs,* 353 F.3d 281 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . 216, 232, 266

*United States v. Hollis*, 971 F.2d 1441 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

*United States v. Infante*, 404 F.3d 376 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

*United States v. Isaac-Sigala*, 448 F.3d 1206 (10th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Ivy*, 83 F.3d 1266 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

*United States v. Jackson*, 549 F.3d 963 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

*United States v. Jones*, 399 F.3d 640 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

*United States v. Jones*, 468 F.3d 704 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

*United States v. Kelly*, 35 F.3d 929 (4th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

*United States v. Kennedy*, 225 F.3d 1187 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . 25, 51, 57, 257

*United States v. Khan*, 835 F.2d 749 (10th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Lafayette*, 983 F.2d 1102 (D.C. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . 149

*United States v. Laymon*, 621 F.2d 1051 (10th Cir.1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Le*, 327 F. Supp. 2d 601 (E.D. Va. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Lee*, 374 F.3d 637 (8th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States v. Lipp*, 54 F. Supp. 2d 1025 (D. Kan. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Lujan*, 530 F. Supp. 2d 1224 (D.N.M. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 179

*United States v. Maden*, 114 F.3d 155 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Mahasin*, 442 F.3d 687 (8th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

*United States v. Marashi*, 913 F.2d 724 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

*United States v. Mathis*, 357 F.3d 1200 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. McCullough*, 457 F.3d 1087 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States v. McKissick*, 204 F.3d 1282 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . 220, 223

*United States v. McNally*, 485 F.2d 398 (8th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . 231, 232

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Meridyth*, 364 F.3d 1181 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Miguel*, 338 F.3d 995 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*United States v. Miller*, 907 F.2d 994 (10th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 97

*United States v. Moore*, 108 F.3d 270 (10th Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*United States v. Murray,* 751 F.2d 1528 (9th Cir.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Napue*, 834 F.2d 1311 (7th Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Natson*, 444 F. Supp. 2d 1296 (M.D. Ga. 2006). . . . . . . . . . . . . . . . . . . . . . . 267

*United States v. Nguyen*, 155 F.3d 1219 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*United States v. Nguyen*, 413 F.3d 1170 (10th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 259

*United States v. Nicholson*, 983 F.2d 983 (10th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . 107, 108

*United States v. Nolan*, 571 F.2d 528 (10th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

*United States v. Olano*, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258, 260

*United States v. O'Brien*, 131 F.3d 1428 (10th Cir.1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Paden*, 908 F.2d 1229 (5th Cir. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*United States v. Parker*, 553 F.3d 1309 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Pearson*, 159 F.3d 480 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*United States v. Pearson*, 203 F.3d 1243 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . 159, 165

*United States v. Peveto*, 881 F.2d 844 (10th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*United States v. Pinto*, 755 F.3d 150 (10th Cir. 1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*United States v. Preciado*, 336 F.3d 739 (8th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Prescott*, 221 F.3d 686 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

*United States v. Prichard*, 875 F.2d 789 (10th Cir. 1989).. . . . . . . . . . . . . . . . . . 14, 186, 243

*United States v. Prince*, 938 F.2d 1092 (10th Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 253

*United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Pursley*, 577 F.3d 1204 (10th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*United States v. Rivas*, 862 F. Supp. 208 (N.D. Ill. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Rivera*, 347 F.3d 850 (10th Cir. 2003). . . . . . . . . . . . . . . . . 15, 24, 188, 233, 251

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Robinson*, 530 F.2d 1076 (D.C. Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . 182

*United States v. Rodriguez*, 833 F.2d 1536 (11th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Rodriguez-Felix*, 450 F.3d 1117 (10th Cir. 2006). . . . 17, 18, 104, 126, 129, 136, 142, 143

*United States v. Rogers*, 556 F.3d 1130 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

*United States v. Runnels*, 93 F.3d 390 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Salazar*, 323 F.3d 852 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Sapp*, 989 F. Supp. 1093 (D. Kan. 1997). . . . . . . . . . . . . . . . . . . . . . . 83, 87, 92

*United States v. Scalf*, 725 F.2d 1272 (10th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*United States v. Sealander*, 91 F.3d 160, *15 (Table) (10th Cir. 1996). . . . . . . . . . . . . . . . . . 248

*United States v. Serawop*, 410 F.3d 656 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

*United States v. Shaffer*, 472 F.3d 1219 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Simpson*, 152 F.3d 1241 (10th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Smith*, 692 F.2d 658 (10th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . 107, 108

*United States v. Soderstrand*, 412 F.3d 1146 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Solomon*, 513 F. Supp. 2d 520 (W.D. Pa. 2007). . . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Sullivan*, 919 F.2d 1403 (10th Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

*United States v. Tanner*, 941 F.2d 574 (7th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . 90, 97, 100

*United States v. Tisdale*, 248 F.3d 964 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 149

*United States v. Torres*, 569 F.3d 1277 (10th Cir. 2009).. 154, 159, 164, 167, 171, 177-179, 183, 185

*United States v. Torrez-Ortega*, 184 F.3d 1128 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . 178

*United States v. Vasquez*, 985 F.2d 491 (10th Cir.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*United States v. Viefhaus*, 168 F.3d 392 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Walton (In re Baker)*, 693 F.2d 925 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . 18

*United States v. Wardell*, 591 F.3d 1279 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 220, 222

*United States v. Warner*, 23 F.3d 287 (10th Cir.1994). . . . . . . . . . . . . . . . . . . . . . 14, 186, 243

*United States v. Watson*, 409 F.3d 458 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Webster*, 162 F.3d 308 (5th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

*United States v. Weiss*, 930 F.2d 185 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

*United States v. Weller*, 238 F.3d 1215 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*United States v. Willis*, 202 F.3d 1279 (10th Cir. 2000). . . 12, 13, 65, 92, 171, 217, 245, 271, 273

*United States v. Wilson*, 493 F. Supp. 2d 364 (E.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . 266

*United States v. Wiseman*, 297 F.3d 975 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*United States v. Wolny*, 133 F.3d 758 (10th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*United States v. Young*, 470 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . 208, 209, 211

*United States v. Young*, 952 F.2d 1252 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . 163, 177

*United States v. Zuno-Arce*, 25 F. Supp. 2d 1087 (C.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . 262

*Uttecht v. Brown*, 551 U.S. 1 (2007) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239, 240

*Wainwright v. Witt*, 469 U.S. 412 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239, 242

*Walker v. Gibson*, 228 F.3d 1217 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . 39, 40, 224-227, 256

*Wallace v. Ward*, 191 F.3d 1235 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 120

*Whalen v. United States*, 445 U.S. 684 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Williams v. Allen*, 458 F.3d 1233 (11th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 98, 100

*Williams v. Bowersox*, 340 F.3d 667 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Willis v. United States*, 87 F.3d 1004 (8th Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 205, 208, 210

*Yarborough v. Gentry*, 540 U.S. 1 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

## B.  <u>State Cases</u>

*Hale v. State*, 750 P.2d 130 (Okla. Crim. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Malone v. State*, 168 P.3d 185 (Okla. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

*Powell v. State*, 995 P.2d 510 (Okla. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

## C.  <u>Constitutions</u>

U.S. Const. art. III, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

## D.  <u>Federal Statutes</u>

18 U.S.C. § 1111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

18 U.S.C. § 3282. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

18 U.S.C. § 3432. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 186

18 U.S.C. § 3591. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

18 U.S.C. § 3592. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235, 265, 266

18 U.S.C. § 3593. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

18 U.S.C. § 924. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 227, 228, 230

21 U.S.C. § 848. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 36, 165, 227, 230, 231, 235, 265, 266

28 U.S.C. § 2255 . .. 12, 14, 15, 17, 22, 65, 92, 146, 153, 160, 165, 171, 186, 217, 225, 244, 245, 262, 270, 271, 273

**E.  State Statutes**

21 Okl. St. Ann. § 11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**F.  Rules**

Fed. R. Crim. P. 33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152, 153

Fed. R. Crim. P. 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

Fed. R. Crim. P. 41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Fed. R. Crim. P. 43. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 69, 113, 182

Fed. R. Evid. 404. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66-70, 181, 182

Fed. R. Evid. 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Fed. R. Evid. 608. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 64, 177, 178

Fed. R. Evid. 609. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163, 172, 177, 178

Fed. R. Evid. 611. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Fed. R. Evid. 704. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Fed. R. Evid. 801. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Rule 2, Rules Gov'g § 2255 Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 218, 268

## G.  __Other Authorities__

Tenth Circuit Pattern Jury Instructions (Criminal) § 1.08 (2005) .. . . . . . . . . . . . . . . . . . . . . . . 104

Third Circuit Pattern Jury Instructions (Criminal) § 3.04 (2008). . . . . . . . . . . . . . . . . . . . . . . . 104

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT    )
                              )
       *Petitioner*,       )
                              )
v.                      )      Case No. CV-09-00105-JHP
                              )       Criminal Case No. CR-04-00115-JHP
UNITED STATES OF AMERICA    )
                              )
       *Respondent.*     )

**GOVERNMENT'S ANSWER IN OPPOSITION TO SECOND AMENDED MOTION TO
VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL
CUSTODY**

**(Answer Under 28 U.S.C. § 2255)**

**<u>PROCEDURAL HISTORY</u>**

On November 9, 2004, a federal grand jury for the Eastern District of Oklahoma returned

an indictment that charged Kenneth Eugene Barrett with using and carrying a firearm during and

in relation to drug trafficking crimes (18 U.S.C. § 924(c)(1)(A) & (j)); carrying a firearm in

relation to a crime of violence (18 U.S.C. § 924(c)(1)(A) & (j)); and intentionally killing, during

the commission of a drug trafficking crime, a state law enforcement officer engaged in the

performance of his official duties (21 U.S.C. § 848(e)(1)(B)).  (Trl. Doc. 9.)[1]  On February 9,

2005, the grand jury returned a superseding indictment containing the same three counts as the

original indictment.  (Trl. Doc. 52.)  On February 15, 2005, the government filed notice of its

intent to seek the death penalty with respect to all three counts.  (Trl. Doc. 60.)

---

[1]Throughout its Answer, the government refers to the documents in case no. 04-CR-115-JHP by docket number or date of entry and prefaces the citations with "Trl."  Citations to documents filed on the instant docket, case no. 09-105-JHP, have no preface.

1

On September 26, 2005, a jury trial commenced.  On November 4, 2005, the jury convicted Barrett of all three charged offenses.  (Trl. Doc. 241.)  On November 17, 2005, at the conclusion of the penalty phase hearing, the jury found that Barrett was at least 18 years old at the time of the offenses and that he intentionally killed the victim.  (Trl. Doc. 257.)  As statutory aggravating factors, the jury found, with respect to Counts 1 and 2, that Barrett killed or attempted to kill more than one person in a single criminal episode, and committed the offenses after substantial planning and premeditation to cause the death of a person.  (*Id*.)  As to Count 3, the jury found that Barrett knowingly created a grave risk of death to one or more persons in addition to the victim, and that Barrett committed the offense after substantial planning and premeditation.  (*Id*.)  As a non-statutory aggravating factor applicable to all three counts, the jury found that Barrett caused injury, harm, and loss to the victim's family.  (*Id*.)  Twelve mitigating factors were found true by at least one juror.  (*Id*.)  After weighing the aggravating and mitigating factors, the jury recommended a sentence of death as to Count 3 and sentences of life imprisonment without the possibility of release as to Counts 1 and 2.  (*Id*.)  On December 19, 2005, this Court imposed the recommended  sentences.

Barrett appealed his conviction and sentence to the United States Court of Appeals for the Tenth Circuit, raising the following claims of error:

1.  The trial court erroneously denied a motion to suppress evidence seized pursuant to a search warrant.

2.  The indictment was insufficient, it improperly charged multiple crimes and improperly joined offenses.

3.  The trial court admitted improper victim impact evidence.

4.  Juror misconduct violated Barrett's constitutional rights.

5.  The trial court erroneously permitted the government to exercise a race-based peremptory challenge during jury selection.

6.  The trial court erroneously failed to declare the statutory basis of the federal death penalty unconstitutional.

7.  The jury was improperly permitted to weigh a threshold intent factor when selecting the appropriate punishment.

8.  Insufficient evidence supported the jury's finding of intent to kill and, thus, Barrett's conviction.

9.  The government failed to timely disclose the names and addresses of seven witnesses.

10.  The trial court erroneously refused to dismiss the indictment based on double jeopardy, collateral estoppel and the statute of limitations.

11.  The trial court erroneously refused to dismiss the indictment based on the government's alleged failure to adhere to its own *Petite* policy.

12.  Cumulative error required reversal.

In a published opinion, the Tenth Circuit affirmed the conviction and sentence in full. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007).

On March 16, 2009 (364 days after the Supreme Court denied a petition for writ of certiorari from the Tenth Circuit's judgment), Barrett filed a 377-page Motion for Collateral Relief, asserting 17 enumerated claims of error.  (Doc. 1.)  On March 17, 2009, he filed a 379-page Corrected Motion for Collateral Relief, again asserting 17 enumerated claims.  (Doc. 2.)  On September 25, 2009, Barrett filed a 430-page Amended Motion for Collateral relief, asserting

19 enumerated claims for relief.  (Doc. 70.)  This Court subsequently ordered Barrett to file a second-amended motion that complied with the Rules Governing § 2255 Proceedings.  (Doc. 81.)  The order also permitted Barrett to file a brief in support of his motion.  (*Id.*)  On December 5, 2009, Barrett filed a 403-page Second Amended Motion, asserting 19 enumerated claims for relief (Doc. 95, hereinafter referred to as "Mot."), and on March 1, 2010, he filed a 277-page Brief in Support of his Motion (Doc. 149, hereinafter referred to as "BIS").  The Government now files this Answer.

## STATEMENT OF FACTS[2]

On January 28, 1999, the District Court of Sequoyah County, Oklahoma, issued a warrant for Barrett's arrest on charges of unlawful delivery of a controlled drug and failure to appear for jury trial.  Although Barrett managed to avoid arrest during the ensuing months, state law enforcement officials were aware of his presence and continued to investigate his activities.  In September of 1999, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force), which encompassed Cherokee, Wagoner, Adair and Sequoyah Counties in Oklahoma, received information from a confidential informant (CI) that Barrett was manufacturing and distributing methamphetamine at his residence.  Johnson, using the information provided by the CI, prepared an affidavit for a search warrant.  On September 20, 1999, the District Court of Sequoyah County issued the requested search warrant for Barrett's residence.  The warrant authorized law enforcement officers to conduct the search "at any time of the day and/or night," and to enter Barrett's residence "without the normally

---

[2]The Statement of Facts is drawn from the Tenth Circuit's opinion in this case.  *Barrett*, 496 F.3d at 1082-85 (record citations omitted).

required knocking and announcing ... due to the violent and unstable nature of ... BARRETT and the danger posed to law enforcement personnel by ... BARRETT and/or other unknown persons who may be present." The items to be seized included methamphetamine or other controlled dangerous substances, paraphernalia, drug manufacturing equipment and supplies, and written records and documents pertaining to drug manufacturing and distribution.

Johnson considered the search warrant to be "high risk" in nature. In particular, Johnson was aware that Barrett routinely carried firearms and had threatened to kill law enforcement officers if they "showed up at his residence." Further, Johnson was aware that Barrett's residence was accessible only by a dead-end road, that several of Barrett's relatives lived in residences nearby, and that there was little cover around the residence from which the search team could perform surveillance. Accordingly, Johnson contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. The Tact Team was "highly trained and specialized in [serving] ... high risk search warrants...." Johnson and another Task Force leader met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force would then perform the actual search of Barrett's residence.

The Tact Team met during the daylight hours of September 23, 1999, and developed a plan for entering and securing Barrett's residence. As part of this planning process, three members of the Tact Team drove by Barrett's residence in an unmarked Ford Bronco during the early evening hours. Travis Crawford, Barrett's cousin, was in the vicinity at the time of the drive-by and observed Barrett walk to the area of the front gate after the Bronco drove by his residence. Crawford spoke to Barrett and Barrett indicated he had seen the Bronco and knew it

belonged to law enforcement officers.  When Crawford told Barrett that the law enforcement officers would likely return to serve the warrant, Barrett responded by saying "D.G.F.," which, according to Crawford, meant "Don't give a fuck."  Further, Barrett told Crawford that "he was going out in a blaze of glory."

Using the information they observed during the drive-by, together with information provided by the Task Force, the Tact Team decided to execute the search warrant during the night with the hope that Barrett and any other occupants of the residence would be asleep.  The Tact Team further decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property.  The occupants of those three vehicles, six Tact Team members in total, would then get out of their vehicles, walk on foot to the house, and enter through the front door.  The Tact Team decided that a fourth unit, a marked highway patrol car, would stop at the locked front gate of the property and that one of the occupants of that vehicle would remain in that position to provide cover for the other team members, while the second and third occupants of that vehicle would climb over the gate, enter the property on foot, and watch the west side of Barrett's house to prevent him from escaping to his mother's residence, which was located adjacent to Barrett's house.  Finally, the Tact Team decided that a fifth unit, a white Ford Bronco, would enter the driveway of Barrett's mother's home.

At approximately 12:30 a.m. on the morning of September 24, 1999, the Tact Team met members of the Task Force at a highway intersection near Barrett's residence.  From there, the

five Tact Team vehicles headed towards Barrett's residence.  The Task Force vehicles waited approximately two minutes before heading towards Barrett's residence in order to give the Tact Team a chance to secure the area.

As the lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Barrett's residence, the driver, Trooper John Hamilton, observed a white male standing in the front yard of Barrett's residence.  Hamilton continued to observe the man, who was later determined to be Barrett's son Toby, as he drove past Barrett's residence and entered the private driveway to the east of Barrett's residence.  Hamilton then turned his vehicle westward towards Barrett's house and entered a deep ditch that lay between Barrett's residence and the property to the east, and approximately twenty to twenty-five yards away from Barrett's residence.

Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Barrett's house, and yelled at Toby Barrett to get on the ground.  Toby Barrett initially failed to comply, but ultimately got on the ground.  Trooper Darst then took custody of Toby Barrett and determined he was unarmed.  While Toby Barrett was on the ground being handcuffed, he turned his head towards the house and screamed "Dad!"

As Hamilton's vehicle exited the ditch and headed towards Barrett's house, it began to receive gunfire that hit the middle of the windshield, at approximately "head level" of Hamilton and his passenger, Trooper David Eales.[3]  The gunfire intensified as Hamilton drove closer to

---

[3]According to the record, Toby Barrett did not begin yelling "Dad" until after the gunfire began.

Barrett's residence, and Hamilton was hit in the face with some object, either bullet fragments or flying glass from the windshield.  As a result of the continuous gunfire, neither Hamilton nor Eales were able to turn on the vehicle's emergency lights, as the Tact Team had originally planned for them to do.

The second Tact Team vehicle, a Ford Bronco occupied by Troopers Raymond Greninger and Ricky Manion, was less than a car length behind the first Tact Team vehicle.  Unlike the first vehicle, the second vehicle had its emergency lights on, including a flashing strobe-type light on the sun visor and wig-wag headlights.  The third Tact Team vehicle, a marked highway patrol unit driven by Trooper Hash, also had its emergency lights on, including a full light bar on top. The lights from the light bar were bright enough to light up the entire area of Barrett's residence. This third vehicle was traveling less than a car length behind the second vehicle.

Hamilton's vehicle ultimately came to a stop at or near the southeast corner of Barrett's residence, and the second and third vehicles stopped slightly behind Hamilton's vehicle. Hamilton fell between the front seats of his vehicle in an attempt to avoid the gunfire. Hamilton's passenger, Eales, opened the front passenger door, got out of the vehicle, and began moving towards the rear of the vehicle.  At some point before he arrived at the rear of the vehicle, Eales was struck by three gunshots.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang.  The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle.  Hamilton then moved towards the rear of his vehicle.  As he did so, he was shot in the back of the left shoulder.  When he reached the back of the vehicle, Hamilton observed Eales face down on the ground, with

8

Manion attempting to assist him.

From the rear of the vehicle, both Hamilton and Manion were able to observe a man, later identified as Barrett, standing in the interior doorway of the residence holding a rifle. Hamilton fired two rounds at Barrett, but did not hit him. Manion moved from the rear of Hamilton's vehicle to the east side of Barrett's house. From a position behind a parked truck, Manion fired two short bursts of gunfire through the east window of Barrett's home. Some of the shots fired by Manion struck Barrett in the lower body. Hamilton observed Barrett fall face down through the front doorway and drop his rifle. Hamilton approached and entered the house, told Barrett to get up, and Barrett responded that he could not because he had been shot. Hamilton, with the assistance of Troopers Manion and Hash, dragged Barrett out of the house and into the front yard. As the three troopers were dragging Barrett, another trooper, Danny Oliver, yelled at them that Barrett had a pistol tucked in the front of his waistband. Manion pulled Barrett's arms out from underneath him, handcuffed him, and performed a quick pat-down. During the pat-down, Manion found the pistol that Barrett had tucked into the right side of his waistband. Hamilton, Manion and Greninger entered the house and confirmed there were no other persons inside.

After unsuccessfully attempting to provide first aid to Eales, Tact Team members transported him to a local hospital, where he was pronounced dead. An autopsy indicated that Eales suffered gunshot wounds to his chest, his left flank, and his right arm, all of which appeared to have occurred while Eales was facing away from Barrett. The gunshot wound to the chest entered the left side of Eales' upper back, broke four of Eales' ribs, perforated the left upper lung lobe, and ultimately struck Eales' aorta, causing a quarter-inch hole. The injury to Eales' aorta was determined to be irreparable and the cause of Eales' death.

Investigation of the crime scene by law enforcement officers determined that Barrett fired approximately nineteen shots at law enforcement officers using a Colt Sporter .223 rifle. The rifle, which had a lethal range of approximately 541 to 595 yards, was equipped with three magazines that Barrett had taped together, giving him a total of ninety-one rounds available for use at the time the shooting incident began. A search of Barrett's property, including his house and outbuildings, produced a variety of other firearms, including a fully loaded 12 gauge shotgun and a fully loaded .22 caliber pistol. The search also resulted in the seizure of a variety of materials related to the production and use of methamphetamine (e.g., coffee filters, hypodermic needles, digital scales, pseudoephedrine, ephedrine tablets, iodine, plastic tubing, toluene). A search of Barrett's person produced a plastic baggie containing red phosphorous, a lighter, and approximately $2100 in cash.

## BARRETT'S CONTENTIONS

1. The Court's administration of the Criminal Justice Act and its ex parte meeting with prosecutors demonstrates bias that requires relief without a showing of prejudice.

2. Barrett received ineffective assistance of counsel at trial.

3. The Court deprived Barrett of funding necessary to employ experts and purchase pre-trial hearing transcripts.

4. Newly discovered evidence requires this Court to grant a hearing to determine whether the police acted in good faith when they obtained a search warrant for Barrett's house.

5. The prosecutors committed misconduct, by suppressing evidence favorable to the defense, interfering with the defense, improperly examining witnesses, and unfairly arguing for a death sentence.

6. The Court erroneously excluded evidence of Barrett's remorse.

7. The Court improperly ordered Barrett to wear an electronic stun belt during the trial.

8. The Court permitted Barrett to stand trial while he was mentally incompetent.

9. The Court erroneously failed to instruct the jury on voluntary manslaughter as a lesser included offense to the three charged crimes.

10. The Court improperly failed to instruct the jury that it could consider residual doubt as a factor in mitigation during its penalty deliberations.

11. The Court improperly excused a juror based on her opinions about the death penalty.

12. The penalty phase instructions unconstitutionally relieved the jury of employing the reasonable doubt standard when it weighed the aggravating and mitigating factors.

13. Following Barrett's disruption of the trial, the Court and counsel improperly responded to the defendant's request to absent himself from the proceedings.

14. Statistical information demonstrates that the federal government disproportionately seeks the death penalty in cases involving White, rather than minority, victims.

15. The indictment in this case that did not refer to the death penalty and did not allege the aggravating factors upon which the prosecution relied at trial.

16. The Court failed to sequester the jury and, as a result, the jurors committed misconduct by consulting information outside the record.

17. Barrett is not competent to be executed.

18. Barrett received ineffective assistance of appellate counsel.

19. Cumulative error requires reversal.

## FEDERAL COLLATERAL REVIEW OF PRESUMPTIVELY FINAL CRIMINAL JUDGMENTS

Collateral relief under 28 U.S.C. § 2255 is strictly circumscribed. The grounds for relief under § 2255 are narrower than those for relief on direct appeal. With very limited exceptions, relief may not be based on (1) an error that is not of jurisdictional or constitutional dimension, (2) a procedurally defaulted ground, (3) a claim previously raised and rejected on direct appeal, (4) a "new rule" as defined by *Teague v. Lane,* 489 U.S. 288 (1989), or (5) an error that did not have a substantial and injurious effect or influence in determining the jury's verdict.

A.  Cognizable Claims

While § 2255 provides a "comprehensive remedy, 'it does not encompass all claimed errors in conviction and sentencing.'" *United States v. Khan*, 835 F.2d 749, 753 (10th Cir. 1987). Once a defendant has appealed his conviction, the court is "entitled to presume he stands fairly and finally convicted. . . . Our trial and appellate procedures are not so unreliable that we may not afford their completed operation any binding effect beyond the next in a series of endless postconviction collateral attacks." *Khan*, 835 F.2d at 753 (emphasis omitted). Errors of law or fact do not provide a basis for § 2255 relief unless they involve "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Blackwell*, 127 F.3d 947, 954 (10th Cir. 1997) (internal quotes omitted).

B.  Time Barred Claims

Statutory law imposes a one-year period of limitations in which federal prisoners may file motions to vacate, set aside or correct his sentence. 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000). The limitation period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from direct appeal, regardless of whether

12

the defendant seeks rehearing. *Willis*, 202 F.3d at 1280-81. The period of limitations bars untimely amendments that add new claims to a defendant's initial § 2255 motion. *United States v. Guerrero*, 488 F.3d 1313, 1316 (10th Cir. 2007). While § 2255 movants may file untimely amendments that clarify, amplify or expand the facts in their timely-filed motions, they may not use such pleadings to add new claims. *United States v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000). Section 2255 movants may, though, justify untimely pleadings by showing a need for equitable tolling, which is reserved for extraordinary circumstances beyond the defendant's control. *United States v. Gabaldon*, 522 F.3d 1121, 1124 (10th Cir. 2008).

C. Procedurally Defaulted Claims

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the movant omitted to appropriately raise on appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. Dago*, 441 F.3d 1238 (10th Cir. 2008). This doctrine applies even in death penalty cases. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). An exception lies for claims of ineffective assistance of counsel, which should be raised in a collateral attack rather than a direct appeal. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir.1995).

Apart from claims of ineffective assistance, courts may consider otherwise procedurally-defaulted claims in two instances. First , they may consider defaulted claims when a movant demonstrates "that the constitutional error 'has probably resulted in the conviction of one who is actually innocent.'" *United States v. Wiseman*, 297 F.3d 975, 979 (10th Cir. 2002) (quoting *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)). Second, courts may consider defaulted claims if the petitioner establishes cause and prejudice. *United States v. Allen*, 16 F.3d 377, 378

13

(10th Cir. 1994). "Cause" exists only in those cases in which a factor external to the defense prevented counsel from raising a claim at the appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A movant can show cause by demonstrating that a claim was "so novel that its legal basis [was] not reasonably available to counsel." *United States v. Barajas-Diaz*, 313 F.3d 1242, 1248 (10th Cir. 2002). A movant can also establish cause by showing that defense counsel provided constitutionally ineffective assistance. *Wiseman*, 297 F.3d at 979. To establish prejudice, a petitioner must show that the claimed errors "worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." *Daniels v. United States*, 254 F.3d 1180, 1191 (10th Cir. 2001) (emphasis original, internal quotations omitted).

D. Claims Previously Adjudicated on Direct Appeal

Generally, a claim raised and rejected on direct appeal cannot be relitigated in a § 2255 motion. *United States v. Warner*, 23 F.3d 287, 291 (10th Cir.1994). Relitigation of an appellate issue during § 2255 proceedings "may be proper when there has been an intervening change in the law of a circuit." *United States v. Prichard*, 875 F.2d 789, 790-91 (10th Cir. 1989); *United States v. Nolan*, 571 F.2d 528, 530 (10th Cir. 1978).

E. New Rule of Criminal Procedure

Collateral relief is further limited to claims based on established law. *Teague v. Lane*, 489 U.S. at 310. When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted). Generally, new procedural rules do not apply retroactively, while new

substantive doctrines – those that alter the range of punishable conduct or the class of punishable people – do.  *Id.* at 351-52.  A court employs a three-step analysis to ascertain whether a rule of criminal procedure applies.  *Beard v. Banks*, 542 U.S. 406, 411 (2004).  First, it determines when the judgment became final.  *Id.*  Second, it decides whether the pertinent rule of law was "new" at the time of finality by deciding whether a "court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution."  *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (internal quotations omitted).  Third, the court considers if a new rule is of "watershed" magnitude, and therefore applicable under an exception to *Teague*.  *United States v. Cousins*, 455 F.3d 1116, 1126 n.6 (10th Cir. 2006).

F.  Harmless Error

Even assuming a § 2255 motion demonstrates legal error, "[i]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis."  *United States v. Dago*, 441 F.3d at 1245.  Thus, absent a showing that the case involves one of a rare group of structural errors that affect the framework of the trial and require reversal without a showing of prejudice, a § 2255 movant cannot obtain relief without establishing that an identified legal error "had substantial and injurious effect or influence in determining the jury's verdict."  *United States v. Rivera*, 347 F.3d 850, 852 (10th Cir. 2003) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see Green v. United States*, 262 F.3d 715, 717-18 (8th Cir. 2001) (applying structural error analysis in a § 2255 case); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (collecting structural error cases).

**THE GOVERNMENT'S ARGUMENT**

## I. THIS COURT PROPERLY ADMINISTERED THE CRIMINAL JUSTICE ACT AND FAIRLY DISCHARGED ITS JUDICIAL DUTIES

Barrett claims that this Court's administration of the Criminal Justice Act ("CJA") was improper and requires relief without any showing of prejudice. Barrett's claim largely concerns what he perceives as the Court's disparate treatment of attorney John Echols, who withdrew from the case, and attorney Roger Hilfiger, who tried it with co-counsel, Bret Smith. Barrett characterizes the Court's actions as misconduct. He builds upon that theme to argue that the Court improperly engaged in an ex parte hearing with prosecutors, and the combined effect of the Court's actions requires recusal. (Mot. 7-32; BIS 18-33.) Barrett's theory that alleged errors under the CJA amount to structural error lacks any legal basis. Moreover, he has defaulted his claim that the Court improperly engaged in ex parte contact with the government and failed to establish that the contention has any merit.

1. CJA Funding Decisions are not Subject to Review by Themselves, and the Funding Determinations in this Case did not Deprive Barrett of any Cognizable Right

Barrett claims that this Court committed structural error, requiring automatic relief, when it placed unfair demands on counsel to account for their budgets and in making CJA funding decisions on the basis of improper criteria. Barrett's novel argument is legally and factually unsupportable. Barrett unsuccessfully analogizes this case to matters in which courts actively interfered in the relationship between defendant and defense counsel, requiring reversal without a showing of prejudice. (*See, e.g.*, BIS 19-21 (citing, inter alia, *Geders v. United States*, 422 U.S. 853 (1975).) But the claim of structural error under the CJA fails in view of the fact that the Tenth Circuit has held that the outright denial of defense services does not require per se relief.

16

*Brewer v. Reynolds*, 51 F.3d 1519, 1529 (10th Cir.1995). At most, Barrett might hope to show that the Court's CJA rulings resulted in a deprivation of necessary resources. *See generally United States v. Rodriguez-Felix*, 450 F.3d 1117, 1127 (10th Cir. 2006). But he only attempts to make such a showing in Claim Three.[4]

Even if he succeeded in showing he was deprived of a requested service, he bears the burden of establishing, inter alia, the "probable value of the additional service and the risk of error in the proceeding if such assistance is not offered." *Id.* at 1128. Indeed, he would also have to demonstrate that any actual error "caused him substantial prejudice." *See Rojem v. Gibson*, 245 F.3d 1130, 1139 (10th Cir. 2001); *see also Christian v. United States*, 398 F.2d 517, 519 (10th Cir. 1968) (holding that a defendant claiming denial of resources under the CJA must demonstrate actual prejudice by clear and convincing error). Thus, Barrett's theory of structural error is wholly without basis in the law.

In the present claim, Barrett simply challenges the process by which his trial attorneys were chosen and compensated. Such an argument does not state a claim amenable to relief under § 2255. As noted above, "Not every violation of federal law can be remedied under § 2255. . . . Only if the violation constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure; can § 2255 provide relief." *United States v. Gordon*, 172 F.3d 753, 755 (10th Cir. 1999) (citation omitted); *see United States v. Blackwell*, 127 F.3d at 954. Fee determinations under the CJA are administrative decisions that are not subject to review, even on appeal. *United*

---

[4]The government refutes Barrett's claims that he was deprived of necessary resources in Argument III, *infra*.

17

*States v. Davis*, 953 F.2d 1482, 1497 n.21 (10th Cir. 1992); *see also United States v. Rodriguez*, 833 F.2d 1536, 1538 (11th Cir. 1987); *United States v. Walton (In re Baker)*, 693 F.2d 925 (9th Cir. 1982).

Barrett, in his attack on the Court's administrative CJA rulings, makes no attempt to show he was deprived of resources necessary to the defense.  He therefore fails to show a fundamental defect resulting in a miscarriage of justice.  Instead, Barrett begins with a discussion of the selection of appointed counsel and intimates that this Court considered inappropriate criteria in choosing his attorneys.  (Mot. 8-9.)  Barrett also attacks the procedures the Court employed for counsel to submit and it to review budget proposals, and complains that attorney Echols was unfairly required to submit onerous and uncompensated accountings while co-counsel Hilfiger was not.  (Mot. 10-25.)  Again raising concerns about favoritism, Barrett observes that the Court paid Hilfiger more than Echols and permitted Hilfiger to hire a jury consultant after disallowing one to Echols.  (Mot. 24-25.)  On their face, none of these allegations even attempts to show that Barrett's defense was deprived of a necessary resource.  Accordingly, none of these arguments states a valid claim.  *See Davis*, 953 F.2d at 1497 n.21.

Barrett fares no better in complaining about the content of the Court's decisions concerning funds available to the defense.  For instance, Barrett claims that the Court calculated the defense investigator's fees on the basis of an inappropriate scale and that it drafted an order that misled counsel as to the necessity of retaining a crime scene reconstruction expert.  (Mot. 14-15)  Barrett's complaint about the investigator's pay scale is of no moment, because he makes no allegation – much less any showing – that the investigator refused to perform any necessary work.  *Cf. Rodriguez-Felix*, 450 F.3d at 1128.  Similarly, Barrett fails to show that the defense

18

detrimentally relied on the Court's statement, in dicta, that it had not previously permitted the testimony of a crime scene reconstruction expert. Barrett would be hard pressed to complain about the persuasiveness of that remark, given that the underlying order provided the defense with $4,000 for forensic trajectory analysis. (*See* Doc. 97 at 3.)

Barrett additionally argues that the Court ignored prevailing professional norms when it ruled on requests for a "mitigation specialist," an additional mental health expert and a jury consultant. (Mot. 15-16.) His argument that the Court deviated from supposed "norms" does not demonstrate error under the CJA, much less does it properly allege that he was prejudicially deprived of any necessary resource. There exists no authority for the notion that capital defendants are entitled to multiple mental health experts or to CJA rulings identical to other death penalty defendants.

Barrett also complains that the Court unduly delayed authorization for the purchase of transcripts from Barrett's second state court trial. (Mot. 16-17.) Barrett's claim that the Court issued an untimely order for the purchase of prior trial transcripts fails to show how the alleged delay substantially hampered the impeachment of witnesses. Furthermore the Court initially denied the requested funds on March 18, 2005 (Trl. Doc. 97), but granted them four days later on reconsideration (Trl. Dckt. entry Mar. 22, 2005). Barrett fails to show that the four-day delay had any impact on his defense.

In short, the Court's alleged errors in administering the CJA simply do not demonstrate that the defense was denied any necessary resource that substantially prejudiced the case. As such, these arguments fail to state a valid basis for relief. *Cf. Rojem v. Gibson*, 245 F.3d at 1139. Moreover, Barrett lacks any factual basis in alleging that the Court unfairly administered CJA

19

funds. As this Court has already found,

> Petitioner fails to acknowledge . . . that after Mr. Echols was allowed to withdraw at his request, this Court repeatedly encouraged defense counsel to submit supplemental budget requests if they felt they needed additional funding. The budget was not carved in stone but as the definition implies was an estimate of what might reasonably be required. Additionally, the record is clear that the Court encouraged defense counsel on numerous occasions to file amended budget requests and/or to advise the Court if it needed to amend its budget as the case proceeded.

(Doc. 66 at 18-19.)

Barrett has not attempted to assert a valid claim concerning the deprivation of defense funding. Instead, he has relied on a novel extension of inapposite case law to assert that the court committed per se reversible error in ruling under the CJA. His claim is therefore not merely meritless: because it lacks a basis in existing law, any relief would necessarily require the legally impossible – a retroactive application of a new rule of law. *Schriro v. Summerlin*, 542 U.S. at 351. Relief under Barrett's theory would require this Court to retroactively apply a new rule of Constitutional import, something it may not do. *Id.*

For the foregoing reasons, Barrett's attack on the Court's CJA rulings must fail.

2. The Court Engaged in Appropriate and Fully Disclosed Ex Parte Contact with the Government

As part of an overarching theme that this Court treated him unfairly, Barrett claims it improperly engaged in ex parte communications with the government and failed to fully disclose the matters discussed to the defense. (Mot. 25-32.) Barrett defaulted this contention by failing to raise it on appeal and cannot show that it has any merit at this juncture.

A. Procedural Default

In his contention that the Court engaged in improper ex parte communications with the

20

government, Barrett relies on facts within the four corners of the record – the transcript of the very hearing he claims as the basis of the error.  Barrett made no claim about the Court's conduct of the hearing on appeal and thereby defaulted the issue.  *See United States v. Frady*, 456 U.S. at 165.  Barrett attempts to explain his default by claiming as cause for it that appellate counsel was ineffective.  (Mot. 31, 382-83.)  Because the claim lacks legal merit, as shown below, appellate counsel had no obligation to raise it, and Barrett cannot establish cause for his  default.  *See McCleskey v. Zant*, 499 U.S. 467, 493 (1991).  Even if he could show cause, Barrett cannot establish prejudice to excuse his default.  In other words, he cannot show that the ex parte hearing worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimension.  *Daniels*, 254 F.3d at 1191.  Barrett makes no attempt to excuse his default through a showing of factual innocence.  Thus, he cannot obtain collateral relief here.  He has defaulted, without excuse, his claim that the Court engaged in improper ex parte contact with the government.

      B.  <u>The Court Properly Met with the Government and Disclosed the Communication</u>

As in his unsuccessful Motion to Disqualify and Recuse (Doc. 45), Barrett relies on non-binding guidelines to advance his claim that this Court improperly engaged in ex parte communications with the government and failed to make necessary disclosures to the defense.  Specifically, Barrett complains that this Court's conduct during and after a September 13, 2005 ex parte hearing "violated" the American Bar Association's Model Code of Judicial Conduct Canon 2, Rule 2.9, because it involved matters of substance and did not result in full disclosure to the defense.  Barrett further argues that the lack of disclosure placed him at an unfair disadvantage in obtaining witness information, but ignores the fact that the Tenth Circuit already

21

found that he timely received the requisite disclosures.  *See United States v. Barrett*, 496 F.3d at 1116-17.

In rejecting Barrett's recusal motion, the Court has already found that it properly held an ex parte hearing with the prosecution to consider allegations that the defendant had threatened witnesses:

> Based solely upon the government's allegations that Petitioner/Defendant had suggested that the informant on the search warrant needed "to be taken care of," the Court was obligated to hold an *ex parte* hearing to ascertain the basis for the government's safety concerns and to determine whether the government could prove "by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.". . . Although *ex parte* hearings should be avoided whenever possible, *id.*, one must question how a court would ever be able to consider a government claim that disclosure of a witness's identity would jeopardize that witness's life without holding an *ex parte* hearing.

(Doc. 66 at 8.)  The Court's finding in rejecting the recusal motion should also apply with equal force to the § 2255 Motion.

Assuming, arguendo, that the Court revisits the decision to hold the ex parte hearing, Barrett's arguments fare no better here than in his Motion to Disqualify.  Barrett fails to demonstrate that the Court was bound by the ABA's rule 2.9.  The ABA's Model Code created no "legally enforceable duties."  *Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003).  Indeed, the Judicial Conference's own Code of Conduct for United States Judges is merely "aspirational."  *In re Charge of Judicial Misconduct*, 91 F.3d 1416, 1417-18 (10th Cir. 1996).  "The fact that a judge's conduct violates the [Judicial Conference's] Canons . . . does not necessarily mean that it constitutes judicial misconduct."  *Id.* at 1418.  Violations of aspirational and unenforceable guidelines cannot provide a basis for § 2255, and certainly will not establish

22

"a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Blackwell*, 127 F.3d at 954.

Moreover, Barrett cannot show that this Court's ex parte hearing violated any legal principal, given that it concerned discussions about potential threats to witnesses whose identities were to be disclosed under 18 U.S.C. § 3432. "[W]here the government fears that disclosing a list of its witnesses would pose a threat to their safety, ex parte communications between the court and the government may be appropriate in determining whether or not the list should be provided." *United States v. Napue*, 834 F.2d 1311, 1318 (7th Cir. 1987); *see* Doc. 66 at 8.

Barrett also fails in arguing that this Court's alleged failure to disclose information about the ex parte hearing led the defense to forgo a meritorious continuance request under § 3432. Section 3432, requiring disclosure of witnesses at least three days ahead of a death penalty trial, was unquestionably honored in this case, as this Court has previously noted. *United States v. Barrett*, 496 F.3d at 1116-17; Doc. 66 at 16 & n.10. Accordingly, Barrett's argument that the Court somehow misled him into relinquishing a continuance amounts to a complaint that he was deprived of a basis for seeking an unfair advantage and a needless delay.

The record, moreover, undermines Barrett's fundamental factual claims that during the ex parte hearing the Court indicated it would deny a government motion to seal witness identities and that it impliedly betrayed a belief that the government's duty to disclose witnesses had already attached under § 3432. In fact, the Court began the hearing by noting it had reached no conclusion about the commencement of trial for § 3432 purposes and ended it with an extended discussion about the safety of witnesses and a statement that it would take under advisement the question of record sealing. (Tr. Hr'g on Gov't's Mot., Sept. 13, 2005: 4-5, 20-23; Doc. 66 at 11,

23

13.) "[B]efore the Court could issue a formal ruling on the government's motion, the parties announced to the Court that they had reached an agreement regarding these witnesses." (Doc. 66 at 13.) "Once an announcement was made that counsel had discussed those issues and had reached an agreed resolution, there was nothing left for the Court to decide." (*Id.* at 16.)

Even if Barrett had shown that the Court improperly discussed the matter ex parte or failed to properly disclose the substance of the hearing, he cannot establish prejudice. As noted above, Barrett essentially argues that had he heard the details of the Court's comments he would have been alerted to the possibility that he could seek additional time to obtain witness disclosure from the government. The government, however, timely disclosed the witness information to Barrett, foreclosing any possibility that defense counsel's absence from the meeting "had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Rivera*, 347 F.3d at 852. Furthermore, nothing prevented the defense from moving for a continuance if they believed one was necessary to investigate the government's witnesses. As discussed below, however, Barrett cannot show a reasonable probability that additional time to investigate the witnesses would have resulted in a more favorable verdict. *See, infra*, Arg. II, 5.

Because the Court properly engaged in a brief ex parte meeting with the government and did not hide any fact or finding from the defense, much less deny the defense any right under the law, Barrett cannot establish any basis for relief.

## II. BARRETT RECEIVED THE ASSISTANCE OF CONSTITUTIONALLY ADEQUATE TRIAL COUNSEL

Barrett makes a multi-pronged attack on defense counsel, raising 15 enumerated claims about the supposed failings of his attorneys. Fourteen of those claims arise primarily in the context of the guilt phase of trial and one concerns the penalty phase. (Mot. 33-249; BIS 33-

24

125.) As detailed below, none of Barrett's allegations have any merit under the prevailing standards for constitutional competency of counsel.

To demonstrate ineffective assistance of counsel, Barrett must show his attorneys' performance was deficient and that the deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). He bears the burden of demonstrating that counsel's performance fell below prevailing professional norms. *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009); *United States v. Salazar*, 323 F.3d 852, 857 (10th Cir. 2003). In so doing, he must overcome a strong presumption that counsel did provide effective assistance. *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000) (citation omitted). Any conclusory assertions will be insufficient to the task. *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994); *see also United States v. Clingman*, 288 F.3d 1183, 1186 (10th Cir. 2002) (petitioner must show-beyond mere allegations-that counsel's deficient performance "affected the outcome of the plea process") (citation and internal quotation marks omitted)). The prejudice prong is heavier than the harmless error test applied on direct appeal. *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993). Under that standard, the defendant must show that, absent his attorney's error, a reasonable probability exists that he would have received a more favorable verdict. *See id.*

Contrary to Barrett's assertions, the record demonstrates that his attorneys provided wholly adequate representation, and that none of their supposed errors likely altered the outcome of the trial. The government responds to the enumerated contentions in turn.

1. Counsel Provided Unconflicted Representation

In summary fashion, Barrett complains that the Court's management of defense funding created an actual conflict for trial counsel, which induced them to forgo necessary efforts on the

defendant's behalf.  (Mot. 34.)  Barrett's assertion is insufficiently pled and without merit.

In a collateral attack on a criminal judgment, the defendant must allege some factual basis for relief sought.  Rule 2(b)(2), Rules Gov'g § 2255 Proceedings; *see United States v. Clingman*, 288 F.3d at 1187; *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (holding that "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based" (citations omitted)).  Barrett's Motion simply asserts that the Court's desire to minimize costs and appoint local counsel created a conflict for trial counsel.  Barrett makes no effort to establish a nexus between the Court's asserted goal of cost saving and his attorneys' decisions.  Beyond that failing, Barrett does not identify any decisions that counsel supposedly made, as a result of the alleged conflict, and does not show how his attorneys' actions prejudiced him.  Barrett's wholly conclusory claim fails on its face.

More fundamentally, Barrett's claim lacks merit because it does not establish a conflict. An actual conflict of interest exists "if counsel was forced to make choices advancing other interests to the detriment of his client.  Without a showing of inconsistent interests, any alleged conflict remains hypothetical, and does not constitute ineffective assistance." *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir.1998) (citations omitted).  Barrett, however, makes no effort to demonstrate how the Court's supposedly erroneous funding choices forced counsel to make choices detrimental to the defendant.  Whatever limitations the Court may have placed on funding, it did not create any incentives for counsel to save money on its behalf – for instance, by promising a bonus if the attorneys chose to forgo reliance on court-funded expert witnesses. Quite the opposite, the Court expressly invited counsel to seek supplemental funding as needed. (*See* Doc. 66 at 18-19; Trl. Doc. 128 at 6, 133 at 2.)

Because Barrett has failed to identify the basis of any arguable conflict, much less to properly detail his contention, the claim should fail.

### 2. Counsel Effectively Re-Urged the Suppression of Evidence

Charles Sanders admitted during his trial testimony that he was the confidential informant whose observations formed the basis of the original search warrant served at Barrett's home. (Tr. 11: 2521.) Based on Sanders's testimony, Barrett's attorneys moved to suppress the drug evidence recovered at the crime scene, arguing that the warrant affidavit was not truthful. (Trl. Doc. 228.) Barrett claims, however, that his attorneys were ineffective in drafting that motion. Specifically, he argues that the motion should have explored, in greater detail, alleged inconsistencies within Sanders's trial testimony and between his testimony and averments in the search warrant affidavit. Barrett contends that such argument would have demonstrated that the warrant's affiant, Clint Johnson, was deliberately untruthful or recklessly indifferent to the truth. Barrett also claims that appellate counsel should have raised the issue on appeal. (Mot. 34-47; BIS 39-43.) Barrett's claim fails because this Court properly denied the motion to suppress in view of Johnson's good faith reliance on Sanders, rather than on the basis of Sanders's credibility. The Court specifically, and properly, rejected the argument that Sanders's truthfulness was a relevant consideration in its ruling on the motion.

### A. Trial Counsel

Barrett's trial attorneys relied on *Franks v. Delaware*, 438 U.S. 154 (1978), to argue that aspects of Sanders's testimony demonstrated that the search warrant that was being served at the time of the murder was based on false statements that Clint Johnson knowingly or recklessly included. (Tr. 12: 2677-80; Trl. Doc. 228.) The effort was unsuccessful – not because counsel

failed to identify any particular flaws in the warrant affidavit or inconsistencies in Sanders's testimony – but because *Franks* commands an evaluation of the affiant's truthfulness, not the informant's.

To satisfy *Franks*, a defendant must establish by a preponderance of the evidence that the affiant offered false information intentionally or with a reckless disregard for the truth. *United States v. Tisdale*, 248 F.3d 964, 973 (10th Cir. 2001). In view of that rule, this Court denied Barrett's *Franks* motion, specifically observing as follows:

> "It is important to emphasize that 'truthful' does not mean that 'every fact recited in the warrant affidavit is necessarily correct.' . . . since the information contained within an affidavit for a search warrant is based upon hearsay and information received from informants, the affidavit must be truthful 'in the sense that the information put forth is believed or appropriately accepted by the affiant as true.'"

(Trl. Doc 253 at 6 (quoting *Franks*, 438 U.S. at 165).) The Court rejected the motion based on its finding that Johnson acted appropriately: "because the affiant accepted as true what he was told by Sanders, and had found him to be reliable in the past, the Court finds the affidavit was properly supported." (Doc 253 at 7.) In a subsequent non-dispositive finding, the Court noted that Barrett had not shown Sanders's information to have been untrue. (*Id.*)

Even if Sanders's veracity had been a central issue in deciding the *Franks* motion, Barrett provides no reason for believing the arguments he now identifies would have altered this Court's ruling. For instance, Barrett contends that his attorneys should have attacked the affidavit's assertion that the defendant possessed large quantities of drugs at home by noting Sanders's testimony that he had never observed drug manufacturing at the house and did not observe drug activity there in July 1999. (Mot. 37, pts. a & b.) Neither of Sanders's statements contradict the assertion that Barrett possessed large quantities of drugs. Sanders need not have seen Barrett

28

manufacture drugs or possess them at any particular point in time to have observed him, as asserted in the affidavit, in possession at some other juncture. Moreover, the affidavit does not state that Sanders observed the large quantity of drugs, and implies that the informant merely repeated Barrett's own claim of nighttime possession. (*See* Trl. Doc. 253 Ex. A.) *See generally United States v. Mathis*, 357 F.3d 1200, 1205 (10th Cir. 2004) (holding that hearsay received through confidential informants may properly support a search warrant).

Barrett also claims his attorneys should have argued, on the basis of Sanders's testimony, that the affidavit was untruthful in reporting that the informant had seen the defendant with methamphetamine between September 15 and September 18, 1999. (Mot. 37-39, pts. c-f.) Sanders's cross-examination did reveal that – more than six years after providing information to Johnson – Sanders was unclear on the details and chronology of his observations. But given the passage of time, those inconsistencies were far less revealing than they might have been in 1999, when the informant spoke to Johnson. In fact, Sanders candidly admitted he could not recall precisely when he had observed Barrett selling methamphetamine. (Tr. 12: 2632.) Sanders did, however, remember that he provided Johnson with contemporaneous reports of Barrett's drug activity, when those observations were no doubt far fresher in his mind. (*See* Tr. 12: 2635-37.) Sanders's inability to recall, in 2005, the specific details of 1999 drug transactions did not show that he was untruthful in contemporaneously reporting his actions and observations to Clint Johnson. More importantly, Sanders's imperfect memory in 2005 did not demonstrate that, in 1999, Johnson had any reason to doubt his informant's reports.

Sanders's confusion about dates and events, no matter how pronounced six years after the fact, had no bearing on Clint Johnson's truthfulness at the time he prepared the search warrant

29

affidavit.  Sanders's inconsistencies at trial could not, and did not, undermine Johnson's basis for believing the informant– the accuracy and reliability of information Sanders had previously provided.  (Trl. Doc 253 at 7.)  Johnson's good faith reliance on Sanders precluded a *Franks* violation, and trial counsel's failure to further attempt to impeach Sanders's veracity with irrelevant observations about the witness's understandably faded memory could not have amounted to deficient performance.  *See Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999) (finding the failure to raise a futile issue does not constitute ineffectiveness); *United States v. Booker*, 981 F.2d 289, 294 (7th Cir. 1992) (holding that failure to fully research a motion does not constitute ineffectiveness if even "a brilliant analysis" would have failed).

Barrett also briefly argues that trial counsel, had they engaged in more significant investigation, could have prevented this Court from relying on witnesses to "buttress" the credibility of Sanders and Johnson.  (Mot. 46.)  Barrett's argument fails because it misconstrues the Court's ruling.  The Court denied the *Franks* motion because Johnson's prior reliance upon Sanders provided him with a basis for believing the informant in seeking the instant search warrant.  (Trl. Doc. 253 at 7.)  To the extent this Court referred to other witnesses in finding that Sanders was apparently truthful, the statements were mere dicta.  Barrett's attack on this Court's non-dispositive statement does not demonstrate error.  Moreover, his conclusory speculation that trial counsel might have forestalled the Court from making a statement in dicta falls far short of demonstrating prejudicial ineffectiveness.  *See United States v. Fisher*, 38 F.3d at 1147; *Booker*, 981 F.2d at 294.

B.  Appellate Counsel

In a perfunctory argument, Barrett claims that appellate counsel was ineffective for failing

to raise the *Franks* issue before the Tenth Circuit.  Barrett states that the issue "was at least partially framed by the record."  (Mot. 47, 383; BIS 236.)

The omission of a merely "viable" appellate issue does not in amount to ineffective assistance of counsel.  *United States v. Challoner*,  583 F.3d 745, 749 (10th Cir. 2009).  "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1537 (10th Cir.1994).  "[The] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986).  Only the omission of a "dead-bang winner" by counsel is deficient performance that prejudices the defendant.  *Challoner*, at 749 (citing *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995)).  A "dead-bang winner" is "an issue which was obvious from the trial record and one which would have resulted in a reversal on appeal."  *Id.*

In this case, Barrett has not demonstrated any error under *Franks*.  Furthermore, Barrett provides no hint as to what part of the issue was or was not framed by the record, and does not explain how appellate counsel could have demonstrated error under *Franks*, given this Court's factual finding that Johnson relied in good faith on Sanders.  Certainly, the Tenth Circuit would have viewed the evidence in the light most favorable to the Government and accepted the factual findings unless they were clearly erroneous.  *See United States v. Soderstrand*, 412 F.3d 1146, 1151 (10th Cir. 2005).  Barrett has not identified any evidence that appellate counsel might have relied upon to show that this Court clearly erred in finding that Johnson acted in good faith.  As such, he cannot establish any likelihood of success on appeal, much less show that the forgone

31

issue was a "dead-bang winner." In short, Barrett cannot demonstrate through his perfunctory argument, that appellate counsel's performance fell below an objective standard of reasonableness or prejudiced this case. *See United States v. Challoner*, 583 F.3d at 749 ; *see also United States v. Fisher*, 38 F.3d at 1147 (holding conclusory allegations of ineffectiveness legally insufficient).

3. Trial Counsel Had No Duty to Investigate Barrett's Alleged Diminished Capacity to Form Intent

Barrett claims that his trial attorneys provided constitutionally ineffective assistance of counsel because they failed to fully investigate and present evidence that the defendant suffered from mental illnesses that would have allegedly negated the government's showing of intent. Barrett theorizes that he would have been convicted of nothing more serious than manslaughter had his attorneys investigated and adduced the allegedly forgone evidence. (Mot. 47-58; BIS 44-52.) Barrett has located witnesses who appear prepared to offer evidence concerning his mental state. However, he has not shown that trial counsel was alerted, by facts reasonably known to them, to investigate this information. Regardless of counsel's cognizance of their client's supposed mental health issues, the relevance of this information hinges on Barrett's specious theory that he could have been convicted of manslaughter, which was not a lesser included offense of any charged crime. Counsel did not provide prejudicial ineffective assistance by omitting to investigate or present irrelevant mental health evidence.

Counsel, of course, had a duty to conduct a reasonable investigation. *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. A showing that counsel could have conducted a more

32

thorough investigation that might have borne fruit does not establish ineffectiveness.  *See Burger v. Kemp*, 483 U.S. 776, 794 (1987).  "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct."  *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998) (citing *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)).  The duty to investigate depends upon the facts known to the attorney.  *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); *see Hedrick v. True*, 443 F.3d 342, 350 (4th Cir. 2006).  The reasonableness of the investigation is determined by the information conveyed to counsel by his client, as well as other information in his possession, recognizing "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Chandler v. United States*, 218 F.3d 1305, 1318 & n.22 (11th Cir. 2000) (internal quotation omitted).  Where counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance.  *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003); *see Bacon v. Lee*, 224 F.3d 470, 481 (4th Cir. 2000).

In this case, Barrett has not shown that trial counsel had any basis in fact or reason for concluding that the diagnoses proffered in the § 2255 Motion might have been available.  Barrett cites a series of declarations from lay witnesses who make unschooled observations about the defendant's mental health.  (Mot. 56 (citing Mot. Exs. 74, 78, 81, 86, 93, 96-99, 101, 103).)  According to Barrett, his attorneys should have presented these witnesses to prove his diminished capacity.  However, the declarations overwhelmingly speak to Barrett's childhood and early adulthood, without even a vague reference to his mental condition at the time of the murder.  None of the declarants attempts to provide evidence that Barrett lacked the ability to form

specific intent at the time of the offense.  Indeed, the only eyewitness to the murder, Toby Barrett, avers that "Even though [the defendant] was scared, he was not dangerous and I was not afraid of him.  Dad did the best he could."  (Mot. Ex. 96 at 2.)  Similarly, Carolyn Joseph makes a vague assertion that Barrett hallucinated, apparently under the influence of illegal drugs, but states, "I have never known Kenny to hurt anybody.  He gets emotional, but as far as hurting anybody, he is not a dangerous person."  (Mot. Ex. 78 at 4.)  The declarations may describe a man who led a troubled life, and exacerbated his own difficulties with intoxicants, but they do not provide any relevant evidence about Barrett's capacity to form intent on the night he murdered David Eales.  At most, the declarations provide a basis for a finding that defense counsel should have investigated Barrett's mental health, something they unquestionably did.

Indeed, trial counsel consulted with a psychologist, Dr. Jeanne Russell, who "reprise[d] . . . the risk assessment she had done in preparation for a second stage proceeding in state court." (Mot. 48-49.)  Barrett provides no indication that Dr. Russell reported anything that might have led counsel to conclude that there might exist evidence of neurological and psychiatric impairments so profound that they could vitiate the government's evidence of intent.  Russell herself makes no such claim in the declaration she provided to Barrett.  (*See* Mot. Ex. 56.) Russell does imply that she limited her assessment to data from Barrett's state trial.  (*See id.* at 3-4.)  Her declaration in this regard appears inaccurate, as jail visitation records demonstrate that Dr. Russell and another psychologist met with Barrett on October 12, 2005, well before the conclusion of the guilt phase trial.  Barrett provides no indication that Dr. Russell suggested, or that the defense in either of his prior state trials, involved evidence of diminished capacity.

Certainly, Barrett's current reports, while identifying symptoms of supposed mental

34

illness, include no basis for concluding that lay counsel should reasonably have recognized the likelihood of the profound defects alleged here.  For instance, Barrett's current psychiatric expert observed, "There was no evidence of perceptual disorders, hallucinations, or delusions," though he finds that the defendant was delusional at the time of the crime.  (*Compare* Mot. Ex. 117 at 6 *with* Mot. Ex. 117 at 26.)  Significantly, the expert recognized that Barrett attempted to hide his supposed mental health issues: "Mr. Barrett is invested in appearing to be a high functioning individual, without significant past or present impairment, and who is in control of his life." (Mot. Ex. 117 at 7.)  Barrett's expert describes a defendant who would not have provided any outward appearance of mental illness that would have suggested he lacked the capacity to form intent.  On the facts apparently known or reasonably knowable to trial counsel, Barrett cannot show that a failure to investigate evidence of diminished capacity was objectively unreasonable.

Ultimately fatal to his claim, Barrett cannot establish that an investigation of his mental health could have led to the production of admissible evidence, precluding him from showing deficient performance or prejudice.  Evidence of mental illness is admissible to negate specific intent, but only if the "defendant clearly demonstrates how such evidence would negate intent rather than 'merely present a dangerously confusing theory of defense more akin to justification and excuse.'"  *United States v. Brown*, 326 F.3d 1143, 1147 (10th Cir. 2003) (quoting *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990)).  Courts carefully scrutinize such evidence to determine if it rests upon a legally acceptable theory for negating intent to avoid confusing the jury with improper justification theories.  *Brown*, 326 F.3d at 1147.  Significantly, the *Brown* court upheld the exclusion of mental health evidence intended to show that the defendant's could not form requisite intent because the proffer lacked a causal nexus:

Brown relied on Dr. Lindberg's conclusion that Brown did not have the capacity to conform his conduct to the requirements of the law. Specifically, Brown sought to rely upon testimony that he was unable to make "correct choices" because of his mental condition. . . . Dr. Lindberg's testimony did not address Brown's intent, or lack thereof, for conspiracy to possess with the intent to distribute and distribution of methamphetamine. Dr. Lindberg did not opine on how Brown's post-traumatic stress disorder, coupled with chemical dependency, was either related to or tended to negate the requisite specific intent element. Thus, Brown fails to connect his mental condition with any legally acceptable theory that he lacked specific intent.

*Id.* at 1148.

In view of *Brown*, Barrett cannot show a reasonable likelihood that his trial attorneys could have successfully obtained admission of the mental health evidence proffered in the § 2255 Motion. Like the defendant in *Brown*, Barrett appears to have identified evidence that at the time of the crime he suffered from supposed mental health issues, including hallucinations, prefrontal lobe dysfunction, bipolar syndrome, post-traumatic stress disorder, perceptual disorders, paranoid ideation, hyperreactivity, and affective dysregulation. (*See, e.g.*, Mot. Exs. 78 at 4, 117 at 26, 27.) But Barrett has not established the causal link between his supposed mental health issues and the mens rea required for conviction of the charged offenses.

To prove the § 848 offense that gave rise to the death penalty, the government had to establish, in pertinent part, that "Kenneth Eugene Barrett, intentionally killed . . . David Eales; . . . . [and] That the defendant, Kenneth Eugene Barrett, knew or *had reason to know* David Eales was a law enforcement officer." (Doc. 240, Inst. 15.) As to the § 924 homicide offenses, counts 1 and 2, Barrett concedes that those offenses were "'straight' felony murder counts." (*See* Doc. 240, Inst. 7; Mot. 337.) Thus, to establish malice aforethought for each of those crimes, the government relied on proof that Barrett committed the homicide during the perpetration of a felony. *See United States v. Chanthadara*, 230 F.3d 1237, 1259 (10th Cir. 2000); *see also, infra*,

36

Arg. IX, 2 (discussing the Tenth Circuit's felony murder doctrine).

As such, proof of the charged offenses did not rest, in any way, on Barrett's recognition of Trooper Eales as a police officer or his understanding that his actions were wrongful. At most, the jury had to find that Barrett *had reason to know* Eales was a police officer and killed him intentionally. Barrett could not have negated the mens rea of the charged crimes with a heat-of-passion theory, as he did in state court, because voluntary manslaughter is not a lesser included offense of any count of the indictment, as fully explored, *infra*, in Argument IX. Accordingly, the putative mental health evidence was irrelevant and inadmissible under *Brown*. The failure to investigate such pointless information did not constitute ineffective assistance. *See Tompkins v. Moore*, 193 F.3d 1327, 1334 (11th Cir. 1999); *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997). Furthermore, no reasonable probability exists that Barrett would have received a more favorable verdict had his attorneys explored, and presented, information about his mental health. *Strickland*, 466 U.S. at 691.

4. Trial Counsel Had No Duty to Challenge Barrett's Competence

Barrett claims that his trial attorneys provided ineffective assistance of counsel in failing to investigate and challenge his competency to stand trial. (Mot. 58-61; BIS 53-59.) The observations of trial counsel demonstrate that the lawyers were never alerted to facts that would have induced a reasonable attorney to investigate or challenge Barrett's competence. Moreover, counsel's recollections demonstrate that there is no reasonable probability a challenge to Barrett's competence would have resulted in a different outcome at trial.

As noted above, the reasonableness of counsel's actions are judged with regard to the information known to the lawyer. *See Chandler*, 218 F.3d at1318 & n.22. Counsel's ignorance

37

of facts that would have pointed to the need for investigation of some matter, explains the

absence of such an inquiry.  *Alcala v. Woodford*, 334 F.3d at 893.  By extension, no finding of

ineffectiveness will lie for failing to challenge a defendant's competence, if the record does not

show that a reasonable attorney would have been on notice of a need to assess competence.  *See*

*Foster v. Ward*, 182 F.3d 1177, 1186 (10th Cir. 1999); *United States v. Rivas*, 862 F. Supp. 208,

212 (N.D. Ill. 1994).

Furthermore, as more fully discussed below, the evidence available at the time of trial precludes Barrett from establishing that he was prejudiced by his attorneys' omission of a challenge to his competence. (*See, infra*, Arg. VIII.)  Given Barrett's demeanor and ability to effectively assist his lawyers with such matters as composing examination and choosing witnesses, he cannot show that he "was unable to consult with trial counsel with a reasonable degree of rational understanding or that he lacked a rational and factual comprehension of the proceedings." *Walker v. Gibson*, 228 F.3d 1217, 1231 (10th Cir. 2000) (internal quotes omitted), *abrogated on other grounds in Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001). Because Barrett cannot show any reasonable likelihood that the outcome of his trial was affected

by his attorneys' omission of any challenge to his competence, he cannot show prejudicial ineffectiveness. *Id.*

 5.  Trial Counsel Adequately Investigated the Civilian Witnesses

Barrett claims that his trial attorneys provided ineffective assistance by dint of their allegedly inadequate investigation of the government's civilian witnesses.  Barrett argues that, upon learning the identifies of these witnesses, his counsel should have moved for a trial continuance.  Further, he contends that trial counsel should have identified and presented evidence to contradict the civilian witnesses and demonstrate they had poor reputations for truthfulness.  (Mot. 61-120; BIS 59-69.)  Barrett has wholly failed to show that his attorneys' conduct was unreasonable or prejudicial.

   A.  Absence of Continuance Motion

Barrett argues that his attorneys were ineffective for failing to move for a trial continuance after they received timely disclosure of the government's civilian witnesses.  (Mot. 62-63.)  In this case, Barrett was satisfied with the provision of names, and agreed to the government's method of providing the names as well as with the opportunity the government provided for the defense to interview the witnesses.  Barrett's retrospective claim, that he would have fared better at trial had counsel filed more or different motions, requires evidence of resulting prejudice.  *United States v. Miller*, 907 F.2d 994, 1000 (10th Cir. 1990); *United States v. Rivera*, 900 F.2d 1462, 1472-74. (10th Cir. 1990) (en banc).

Here, Barrett cannot show that his attorney could have made a meritorious continuance motion.  The decision to grant a continuance is within the sound discretion of the trial court. *United States v. Pursley*, 577 F.3d 1204, 1229 (10th Cir. 2009).  The denial of a continuance

40

constitutes error only when it materially prejudices the defense. *Id.* at 1229 (citing *United States v. Simpson*, 152 F.3d 1241, 1251-52 (10th Cir.1998)).  In other words, a continuance is only legally necessary if its denial would prevent the development of "substantial favorable evidence." *United States v. Rivera*, 900 F.2d at 1476.  In this case, the government's disclosure of civilian witness names was unquestionably timely. *Barrett*, 496 F.3d at 1116-17.  The timing of the disclosures, as a legal matter, could not have given rise to a meritorious continuance motion.

Moreover, Barrett cannot show that the timing of the disclosures, as a logistical matter, prevented him from developing substantial favorable evidence.  The government's civilian witnesses were all friends and relatives of the defendant.  Barrett was necessarily familiar with the people and the incidents about which they testified.  In fact, the witnesses testified to extremely limited events or aspects of their relationships with Barrett.  During the course of the prosecution's case-in-chief, Barrett could have easily directed trial counsel to the witnesses he now claims would have contradicted or impeached the government's evidence. (*See, infra*, Arg. II, 2, B & C.)  Given Barrett's ties to the government's witnesses, he presumably would have been able to point his attorneys to potential character witnesses, to the extent his friends and relatives had reputations for dishonesty. (*Id*.)  In view of the investigation required of the defense, and the defendant's intimate knowledge of the things to be investigated, Barrett could not have shown at the time of a trial that a continuance was necessary for him to develop substantial favorable evidence.  Therefore, Barrett cannot show that he could have established, at the time of trial, a need for a continuance.

As explored below, Barrett fails to show that the evidence he has developed to this point is substantially favorable to the defense. (*See, infra*, Arg. II, 5, B & C.)  Because Barrett cannot

show that the allegedly forgone evidence would have resulted in a reasonable likelihood of acquittal, he cannot show that the omission of a continuance to develop that evidence was prejudicial ineffectiveness.

B.  Character Witnesses

Barrett complains repeatedly that his attorneys were ineffective for failing to identify and present character witnesses with which to attack the reputations of several of the government's civilian witnesses.  (Mot. 69, 71 (Travis Crawford); 77-80 (Cindy Crawford); 103-04, 107 (Charles Sanders); 110 (Brandie Price).)

Counsel  was not required to "pursue every path until it [bore] fruit or until all available hope whither[ed]." *Mills v. Singletary*, 63 F.3d 999, 1021 (11th Cir. 1995) (quoting *Foster v. Dugger*, 823 F.2d 402, 405 (11th Cir. 1987)) (internal quotes omitted); *see United States v. Carr*, 80 F.3d 413, 418 (10th Cir. 1996).   Failure to present evidence demonstrating witnesses' reputation for dishonesty does not constitute ineffectiveness if the attorney tried to impeach the witness by other means, and the forgone reputation witnesses would presumably have a bias for the defendant.  *See Kubat v. Thieret*, 867 F.2d 351, 364 (7th Cir. 1989).

Furthermore, the omission of the character witnesses identified by Barrett could not have caused a reasonable likelihood of prejudice to the defense.  The defense elicited concessions

42

from each of the witnesses that were potentially very damaging to their credibility.  The witnesses had extensive criminal records or long-time involvement with drugs.  (*See, e.g.*, Tr. 3: 456-57 (T. Crawford's drug use), 467-68 (T. Crawford's prior arrest, false testimony on direct exam, and drug-dulled memory), 472 (impact of drugs on T. Crawford's perception and recollection); 11: 2524-34 (Sanders's extensive criminal record), 12: 2581-82, 2586-87 (Sanders's drug use in spite of informant and probation status); 13: 3070-75 (C. Crawford's substance abuse and its deleterious impact on her memory and perception); 15: 3498-3502 (Price's extensive criminal record and prison sentence for crimes of moral turpitude), 3504, 3507 (Price's bad memory).)

The character flaws and questionable memories of the civilian witnesses was more than apparent from the cross-examination, requiring no further explication through putative character witnesses, virtually all of whom had a connection to the defendant that would have established their own biases.  (*See* Mot. Exs. 77 (declaration of Barrett's second cousin, B. Hill, as to C. Crawford's character), 95 (declaration of Barrett's cousin's spouse, S. Hill, as to Price and C. Crawford's character),78 (declaration of Barrett's aunt, C. Joseph, as to T. Crawford's character), 90 (declaration of Barrett's friend and drug associate, P. Lunsford as to Sanders's character), 92 (declaration of Barrett's uncle, R. Crawford as to C. Crawford's character).)  One remaining putative witness to Cindy Crawford's character,  Mike Mackey, was engaged in litigation with Ms. Crawford and therefore would have had his own personal interest in coloring his testimony. (*See* Mot. Ex. 176.)   Given the questionable credibility of the putative character witnesses, counsel would have acted quite reasonably to reject them.

In any event, character testimony would not have carried the day for the defense, because

the government's case did not rely on the individual credibility of its civilian witnesses. The jury likely credited the civilian witnesses' accounts of Barrett's drug use and hostility toward the police because the witnesses had no apparent opportunity to harmonize their observations of similar events occurring at different points in time. For instance, three of the civilian witnesses testified to Barrett's involvement in using and distributing drugs.[5] (Tr. 3: 366, 374-75, 8: 1838, 13: 3087.) Five of the government's witnesses offered cross-reenforcing testimony about Barrett's hostility to the police and willingness to resist them with force. (Tr. 3: 400-01, 466, 11: 2514-15, 13: 3068-69, 15: 3491-93.)

Beyond the cross-corroboration of the witnesses, Barrett's own conduct lent a high degree of plausibility to reports that he had made fatalistic and anti-authority statements: he had a home filled with property that demonstrated he was making, using and selling methamphetamine (*see, e.g.,* Tr. 10: 2131-32, 12: 2675, 2690-95, 2740-42, 2792-93, 2803-2807, 2817-18, 13: 2967-70, 2958-62, 3012-13, 3040-45), he failed to appear for a court hearing resulting in the issuance of an arrest warrant (Tr. 3: 323), he had a hostile relationship with the county sheriff (Tr. 8: 1809), he locked the gate to his isolated land (Tr. 3: 518), he kept dangerous dogs (Tr. 3: 517), he posted a threatening sign (Tr. 3: 399), and he kept an arsenal of weapons that he sometimes fired to the annoyance of his neighbors (*see* Tr. 8: 1812, 9: 1894-1901), he persisted in his attempt to attack the police with a firearm even as they attempted to handcuff him (Tr. 5: 1112-13). Counsel could

---

[5]Some of the putative character witnesses would have corroborated Barrett's heavy involvement in illegal drugs, lending strength to the government's theory that the defendant was manufacturing and selling methamphetamine. (*See* Mot. Ex. 90 at 2 (noting that the declarant spent 33 continuous hours with Barrett under the influence of drugs, curing which time Mot. Ex. 77 declarant Brandy Hill was present and apparently using drugs), 78 at 4 (noting declarant's assertions that she asked the police place Barrett in drug treatment).)

not brush aside these facts, which so clearly suggested that Barrett was a person who would indicate a willingness to die in a fight with the police. Barrett's conduct lent significant believability to the government's witnesses.

Of course, to the extent that Barrett claims that the so called "character" witnesses could have testified to specific acts of misconduct by the government's witnesses, including drug use and acts of dishonesty, such collateral evidence was inadmissible. *See* Fed. R. Evid. 608(b); *Palmer v. City of Monticello*, 31 F.3d 1499, 1507 n. 11. (10th Cir.1994) ("'Like the general rule barring the use of extrinsic evidence to impeach a witness on a collateral matter through contradiction, the purpose of Rule 608(b)'s prohibition of extrinsic evidence is to avoid holding mini-trials on irrelevant or collateral matters'"). Trial counsel was not ineffective for omitting to proffer inadmissible evidence. *Henderson v. Norris*, 118 F.3d at 1288 (holding defense counsel are not ineffective in failing to elicit inadmissible evidence); *see Parker v. Scott*, 394 F.3d 1302, 1326 (10th Cir. 2005).

In sum, on this record, no reasonable likelihood exists that Barrett would have received a more favorable verdict had his attorneys presented evidence that the government's witnesses had poor reputations for honesty, as other means of impeachment apparently failed in the face of a strong prosecution case. The decision to forgo unhelpful evidence was not prejudicial ineffectiveness.

C. Individual Impeachment of Witnesses

Apart from the alleged failure to adduce evidence of the civilian witnesses' poor reputation for truthfulness, Barrett also complains that his attorneys were ineffective for failing to adduce specific evidence to contradict or impeach them. As previously discussed, the individual

45

credibility of the witnesses was not critical to the persuasiveness of the government's case; rather, the corroboration provided by the witnesses and other evidence, as a whole, lent believability to the prosecution case. (*See, infra*, Arg. II, 5, B.) Putting that aside, Barrett has not shown that the evidence he has identified was reasonably known to counsel or helpful to the defense, especially given that the civilian witnesses were likely believed because they corroborated one another and offered testimony consistent with Barrett's other known conduct.

### i.  Travis Crawford

Barrett complains that his trial attorneys were ineffective in confronting the testimony of Travis Crawford. Specifically, Barrett argues that his attorneys should have elicited from Crawford the fact that he had acted as an informant in the past. Further, Barrett claims that counsel should have called Rick Lunsford, Brandy Hill, Toby Barrett and Robert Thompson to contradict Crawford's account of his conversation with the defendant. (Mot. 64-72.)

Crawford is Barrett's cousin and testified that on the evening of September 23, 1999, he observed a white SUV traveling west on the county road immediately south of Barrett's house. (Tr. 3: 463-64.) Crawford went to speak to Barrett. (Tr. 3: 465-66.) Barrett opined that the Bronco might contain police, and Crawford agreed. Barrett stated that they might return, prompting Crawford's further agreement. One of the pair mentioned Barrett's outstanding warrant, and Barrett stated, "Don't give a fuck," and that if they came back, "all hell would break loose." (Tr. 3: 466). Defense counsel elicited Crawford's admissions that the witness had passed bad checks, that he was $11,000 in arrears on his child support payments, that he used methamphetamine for 15 years, and that he had suffered from a failing memory and distorted perceptions as a result of drug use. (Tr. 3: 467-68, 471-72.) In fact, counsel elicited Crawford's

46

concession that he had misidentified the make and model of the vehicle he saw on the road. (Tr. 3: 472.)

Barrett has failed to show that his attorneys acted ineffectively for failing to discover and present any supposed impeachment evidence, because he has not shown that the lawyers had reason to know of it. Indeed, Barrett elsewhere complains that the government failed to apprise the defense of Crawford's prior cooperation with another law enforcement agency.[6] (*See* Mot. 278-83.) Likewise, Barrett gives no indication that he ever told his attorneys about any witnesses to his conversation with Crawford. Counsel were not ineffective in their presentation of evidence to the extent they were not provided with the information necessary to investigate and identify it. *Alcala v. Woodford*, 334 F.3d at 893.

Barrett also fails to show how the absence of the identified evidence actually prejudiced him. The failure to adduce evidence that Crawford had cooperated with unrelated law enforcement officials, at some prior point in time, concerning unrelated drug transactions provides no basis in reason for questioning his credibility in this case.

As to the eyewitnesses to Barrett's conversation with Crawford, they were unlikely to have meaningfully assisted the defense. Rick Lunsford apparently would have testified he had spent the 33 hours preceding the conversation with Barrett using methamphetamine. (Mot. Ex. 90 at 2.) Furthermore, he would have testified that he and that everyone present (apparently including the defendant's son) was in possession of drugs. (*Id.*) In fact, he states that Brandy Hill left the property after the police drove by because she possessed drugs. (*See id.*) For all the

---

[6]As discussed below, Barrett has failed to show that the government, itself, had reason to know of Crawford's prior informant activity. (*See, infra,* Arg. V, 1, C, ii.)

damage such testimony would have likely done, it does not appear that Lunsford would have provided much assistance. He, like Hill, could have testified that Barrett never told Crawford that he was "going down in a blaze of glory," but they do not appear to otherwise contradict Crawford's account of the conversation. (*See id*. at 3; Mot. ex. 77 at 1-2.) Hill avers that Crawford and Barrett did not discuss killing the police or "going down in a blaze of glory" (Mot. Ex. 77 at 2), but she does not specifically mention Barrett's elliptical remarks about not caring whether the Bronco held police officers or about "all hell breaking loose," if they returned. Whatever minimal assistance Hill and Lunsford might have provided, counsel had an obvious tactical reason for avoiding witnesses who would have testified to the defendant's drug activity, in a case where the government premised jurisdiction on precisely that issue.

Unlike Hill and Lunsford, Toby Barrett has not indicated that Crawford's testimony was false. (*See* Mot. Ex. 96.) Likewise, Toby Barrett's friend, Robert Thompson, concedes that he does not even know Travis Crawford. In fact, Thompson could not have observed Crawford's critical conversation with Barrett, which occurred after Tact Team members drove past the defendant's property. Thompson left Barrett's home around 3:00 or 3:30 p.m. (Mot. Ex. 37 at 2), but the Tact Team vehicle did not drive by Barrett's property until 5:30 p.m. (Tr. 3: 516.) Thompson's recollection of the remainder of his visit to the defendant's house was irrelevant and inadmissible as to Crawford's credibility.

Barrett fares no better with his complaints that his attorneys were ineffective for failing to call potential character witnesses. As explored above, Barrett fails to show that his attorneys had a duty to call such witnesses, much less that those identified in the § 2255 Motion could have created a reasonable likelihood of acquittal. (*See, supra,* Arg. II, 5, B.) Accordingly, counsel did

48

not act unreasonably or prejudicially in omitting such evidence.

Trial counsel's omission of the body of information identified here in no way constituted prejudicial ineffective assistance.  Barrett has not shown that they had reason to know of the evidence or valid reasons not to forgo it upon discovery.  Most significantly, he cannot demonstrate a reasonable probability that he would have been acquitted had his attorneys attempted to adduce the putative impeachment of Travis Crawford.  *See Boyle v. McKune*, 544 F.3d 1132, 1138 (10th Cir. 2008); *Henderson v. Norris*, 118 F.3d at 1288.  Thus, his claim of ineffective assistance should fail.

ii.  Cindy Crawford

Though the jury apparently rejected Cindy Crawford's penalty phase testimony, and she endured a substantial credibility attack during both trial phases, Barrett complains that his attorneys were ineffective for failing to adequately confront her.  Specifically, he claims his attorneys should have cross-examined Crawford regarding her mental health, her supposed motivations to please the prosecution, and several acts of misconduct.  He also claims his attorneys should have adduced evidence of Crawford's poor reputation for truthfulness.  Finally, Barrett claims his attorneys should have called Richard Barrett to contradict the assertion that the defendant assaulted Crawford with a shotgun.  (Mot. 72-81.)  Despite the number of his contentions regarding Crawford, Barrett does not show that his attorneys were prejudicially ineffective in responding to her testimony.

During the guilt phase, Cindy Crawford testified that she was a former user of marijuana, methamphetamine and alcohol with a criminal conviction for marijuana possession.  (Tr. 13: 3061.)  She reported that she had received drugs while at Barrett's home, but could not recall

from whom. (Tr. 13: 3063.) She identified Barrett's AR-15 and stated that he usually kept it in a gun case or by his desk. (Tr. 13: 3065-66.) Finally, she stated that around the time of the murder Barrett kept "protection" because he knew the police might come to his house and that he said he intended to "go out in a blaze of glory." (Tr. 13: 3068-69.)

On cross-examination, Crawford admitted she had used methamphetamine for nine years and was heavily involved with the drug at the time of the murder. (Tr. 13: 3070-71.) She specifically stated that Barrett had not provided her with drugs. (Tr. 13: 3072.) But she admitted that as a result of her drug use she lost her sense of time, that events were "pretty much a blur" because some things she could "remember clearly" and others she could not." As she elaborated, the drug took "a toll on [her] mind. It plays tricks on your mind." (Tr. 13: 3073.)

During the penalty phase, Crawford testified that around two weeks before the murder she visited Barrett's home and he made sexual overtures to her, which she rebuffed. (Tr. 22: 4576-77.) Reversing herself from her guilt phase testimony, Crawford stated that on this occasion she received drugs from the defendant. (Tr. 22: 4577.) Crawford said she left the house, under a ruse, in a car driven by Barrett's brother. Before the car pulled away, Barrett opened the vehicle's door, pointed a shotgun at Crawford's leg and told her never to return. (Tr. 22: 4578.) During cross-examination, Crawford was confronted with the contradiction between her guilt and penalty phase testimonies and stated, by way of explanation, that she had post-traumatic stress disorder. (Tr. 22: 4580-81.) Crawford then denied that she had falsely accused several people of wrong doing. (Tr. 22: 4582-83.) But she admitted that she never made a police report concerning Barrett's confrontation of her. (Tr. 22: 4585.)

Ultimately, the jury appears to have refused to rely on Crawford's penalty phase

50

testimony. The jury demonstrated its lack of reliance on Crawford by rejecting the future

dangerousness aggravator allegation, which was premised on Barrett's other acts of threatened

and real violence, including his armed assault on the witness. (Trl. Doc. 257 at 13-17.)

Crawford did not testify about any other aspect of Barrett's life during the penalty phase.

Given that the jury appears to have rejected Crawford's penalty phase testimony about the

shotgun assault, there is no reasonable probability that Barrett would have received a more

favorable verdict had his attorneys made more efforts to impeach her during the second stage of

trial. *United States v. Kennedy*, 225 F.3d at 1197 (noting a claim of ineffectiveness "may be

resolved on either performance or prejudice grounds alone"). Despite the patent effectiveness of

trial counsel's penalty phase strategy, Barrett nonetheless faults the attorneys for failing to call

his brother, Richard Barrett, to contradict Crawford as to the incident in which the defendant

threatened the witness with a rifle. But Richard Barrett was a twice-convicted felon with an

obvious bias based on his relationship to the defendant. (Resp. Ex 7.) At the time of trial,

Richard Barrett had a 1999 conviction for burglary and two counts of assault with a dangerous

weapon, and a 2001 conviction for possession of a controlled substance, possession/furnishing a

precursor substance, and using an offensive weapon in a felony. (Resp. Ex. 7.) Counsel did not

act unreasonably or prejudicially in failing to call such an easily impeached witness. *See United*

*States v. Harden*, 846 F.2d 1229, 1232 (8th Cir. 1988).

Barrett's complaints about counsel's response to Cindy Crawford's guilt phase testimony

are no more meritorious. As to the absence of mental health evidence concerning Crawford,

Barrett fails to identify facts that would have alerted his attorneys to that issue before the witness

revealed in the penalty phase that she had a diagnosed mental condition. Thus, he fails to show

51

that they acted ineffectively as a matter of law.  *See Alcala v. Woodford*, 334 F.3d at 893.

Moreover, Barrett fails to show how additional evidence of alleged mental illness would have

been anything other than cumulative to the other impeachment, given that Crawford conceded

that drug use degraded her memory and impacted her perception of events (Tr. 13: 3070-74).

*See, e.g., Hall v. Luebbers*, 296 F.3d 685, 694 (8th Cir. 2002).

Barrett's complaint that his attorneys should have confronted Crawford with evidence

that she had received favorable treatment in her state case, and therefore might feel beholden to

the government, lacks any substance.  Barrett simply speculates as to Crawford's motivations and

produces no evidence that she was promised any benefit from the federal government in

exchange for her testimony.  In fact, Barrett fails to explain what information should have alerted

counsel to the assertion that Crawford had previously provided assistance to another law

enforcement agency.  *Alcala v. Woodford*, 334 F.3d at 893.  Likewise, Barrett cannot succeed in

contending that Crawford should have been asked if she knew her misdemeanor marijuana case

could have been filed as a felony as there is no nexus between that issue and her testimony in this

case.  Indeed, Crawford did not testify that her conviction was a misdemeanor: she merely stated

that she had received a deferred sentence for a marijuana charge.  (Tr. 13: 3061.)

Barrett also cannot succeed in complaining that his attorneys were ineffective for failing

to call potential character witnesses Roger Crawford, Mike Mackey, Brandy Hill, Sean Hill,

Carolyn Joseph, and Gwendolyn Crawford or to confront the Crawford with prior bad acts.

Barrett fails to show what information would have led counsel to any of the witnesses except for

Mackey.  As previously discussed, Barrett does not overcome the strategic reason for omitting

such witnesses and does not show that such evidence would have led to a reasonable likelihood

of acquittal. (*See, supra,* Arg. II, 5, B.) Thus, he has not demonstrated that counsel acted

unreasonably or prejudicially in omitting the evidence.

Finally, Barrett complains that his attorney should have adduced the testimony of several

associates of the defendant. Barrett claims these putative witnesses would have testified that they

never heard him make threats directed at the police, supposedly contradicting Cindy Crawford's

testimony. (*See* Mot. 80-81 (citing Mot. Exs. 37, 38, 77, 90, 96).) However, none of those

supposed witnesses actually impeach Crawford. At most, they observe that they never heard

Barrett utter a statement like that attributed to him by Crawford and conjecture that he would not

make threats about the police. The assertions that Barrett would not make such a statement are

inadmissible speculation, and the declarants offer nothing to factually contradict Cindy

Crawford's account of her interaction with Barrett. *See United States v. Isaac-Sigala*, 448 F.3d

1206, 1210 (10th Cir. 2006) ("[A] jury will not be allowed to engage in a degree of speculation

and conjecture that renders its finding a guess or mere possibility.") (internal quotations and

alterations omitted). Barrett simply cannot establish a reasonable probability that he would have

been acquitted had his attorneys presented irrelevant and inadmissible information about the

likelihood he made a reported statement. *See Boyle v. McKune*, 544 F.3d at 1138; *Henderson v.

Norris*, 118 F.3d at 1288.

### iii. Charles Sanders

Trial counsel elicited evidence of Sanders's lengthy criminal record, his history of

assistance to law enforcement, and the favorable treatment he had received from prosecutors in

the past. Barrett, however, claims his attorneys were ineffective for failing to adduce still more

evidence of the witness's misconduct and prior relationship with law enforcement.   As previously noted, he also argues that counsel should have presented character witnesses to attack Sander's reputation for honesty and percipient witnesses to contradict his recollections.  (Mot. 81-108.)  The absence of cumulative evidence of Sanders's criminal history was entirely beside the point: if the admission that the witness had sustained 10 felony convictions did not give the jury cause to disregard Sanders's testimony, the elicitation of his misdemeanor convictions or a recitation of the 18 counts underlying the 10 felony judgments would not have carried the day. Similarly, the failure to present the testimony of the biased character witnesses identified by Barrett did not prejudice the defense, nor did the omission of testimony from percipient witnesses who would have provided more assistance to the prosecution than to Barrett.

### (A) Prior Criminal Activity and Character

Charles Sanders, the confidential informant described in the state search warrant affidavit, testified that Barrett often had methamphetamine at his residence and that he had observed Barrett sell methamphetamine from his residence.  (Tr. 11: 2511, 2515, 2520-22, 12: 2631-33.) Sanders further testified that Barrett knew of the warrant for his arrest, kept firearms, and had threatened to kill law enforcement officers if they attempted to serve the warrant.  According to Sanders, Barrett said that he hoped the first people through his door were either Sheriff Philpot or Drug Task Force Agent Frank Lloyd.  (Tr. 11: 2515).  On cross-examination, defense counsel elicited Sanders's 10 criminal convictions and the favorable treatment he had received from prosecutors.  (Tr.  11: 2524-34.)  Counsel then elicited Sanders's concession that he had informed on approximately a half dozen people and had received assistance from Clint Johnson. (Tr.11: 2534-37.)  Counsel adduced the fact that Sanders was using drugs during his association

54

with Clint Johnson.  (Tr. 12: 2582.)

During the cross-examination, the trial court held an extended hearing outside the presence of the jury regarding the propriety of questions aimed at uncovering the targets of Sanders's informant activity.  During that hearing, the Court agreed that there was no relevance to the identity of targets uninvolved with this case.  (Tr. 11: 2549.)

To the extent that Sanders received lenient treatment in other cases, Barrett simply speculates that the judgments reflected consideration for the witness's cooperation.  The omission of any examination about those sentences could not have amounted to unreasonable or prejudicial representation, given the lack of basis for believing they represented evidence of some benefit from law enforcement.  Indeed, when counsel attempted to draw such a blind inference from the cold record of Sanders's criminal history, he met with great resistance:

> Q.  But Clint Johnson was aware that you had in 1998 that you had possession of CDS, that you were charged in 1998 with possession of CDS. You didn't get convicted on that charge until August of 2001?
> A. That's right.
> Q.  And so, during this period of time, Clint Johnson was aware that you had this charge hanging over your head, wasn't he?
> A.  Clint Johnson couldn't do nothing about that.
> Q.  Except make recommendations to the DA?
> A.  I don't know if he could do that either.
> Q.  But you weren't sentenced until after – (Interrupted)
> A.  I hired an attorney to fight them cases for me. It  wasn't like Clint Johnson sat there and represented me during them cases.
> Q.  Well, I mean, you had 98 -- CF 98-346, CF 98-363, and CF 99-562. Those three cases, which are possession of CDS, uttering forged instruments and knowingly concealing stolen property, so on one hand you're out here doing your deal, doing whatever criminal acts you're doing, but on the other hand, you're helping Clint Johnson, aren't you?
> A.  Well, no.
> Q.  You aren't?
> A.   That's wrong again. No. Them charges happened just because they happened. It was -- the forgery charges is on my girlfriend. The fraud charge was on my girlfriend.  It wasn't like I was just committing crimes so I can see how

55

much trouble Clint Johnson could get me out of.
> Q, He sure got you out a lot of it, didn't he?
> A. No, sir, he didn't.

(Tr. 11: 2535-37.)  Barrett fails to show what effort his counsel spared to elicit further concessions by Sanders.

Putting aside counsel's attempts to impeach Sanders as a long time informant, the extent to which the witness may have provided assistance to the police in exchange for consideration in other matters was a largely secondary point.  The pertinent question was what benefit he might stand to gain from his cooperation in this case.  And Sanders's direct testimony provided no doubt that the government stood poised to intervene in his existing case if satisfied by his cooperation.  (*See* Tr. 11: 2494.)  Thus, the most salient basis of potential impeachment was before the jury.  Not only did the defense enjoy a substantial record upon which to attack Sanders's credibility, counsel did so during argument.  During the guilt phase summation, counsel noted that Sanders was committing crimes while providing information to Clint Johnson: "Kind of gives you a pretty smooth cover for whatever it is that you want to do, doesn't it?"  (Tr. 20: 4345.)  Counsel also noted that Sanders had trifled over the question of whether he had 10 or 11 convictions, and further observed that the witness expected to serve only 18 months on a 20-year sentence.  (*Id.*)  The omission of any cumulative impeachment evidence was not a prejudicial breach of counsel's duties under the Sixth Amendment.

Still, Barrett goes on to complain that his attorneys failed to adduce several specific instances of Sanders's criminal misconduct as impeachment evidence at the penalty phase trial. Sanders, like Cindy Crawford, provided very brief penalty phase testimony that went to the sole issue of future dangerousness.  (*See* Tr. 22: 4596-87.)  As noted with regard to Ms. Crawford,

56

that non-statutory aggravator was rejected by the jury (Trl. Doc. 257 at 13-17), obviating any argument that omissions by defense counsel in any way prejudiced Barrett.  Because the jury appears to have rejected Sanders's penalty phase testimony, there is no reasonable probability that Barrett would have received a more favorable verdict had his attorneys made further efforts to impeach him.  *United States v. Kennedy*, 225 F.3d at 1197.

As to the omission of character witnesses to attack Sanders's reputation for credibility in the community, Barrett has failed to show that counsel's strategies for attacking the witness were insufficient.  As fully explored above, Barrett has not shown that the omission of character testimony adduced from the defendant's friends and relatives was unreasonable or prejudicial. (*See, supra*, Arg. II, 5, B.)

(B)  Contradictory Witnesses

Barrett also complains that his attorneys did not contact Rick Lunsford, Brandy Hill, Janesse Thomas, and Robert Thompson to contradict Sanders's testimony that he visited the defendant's home on the day of the murder.  As was true with regard to Travis Crawford, Barrett again gives no indication that he informed his attorneys about the existence of any witnesses to his encounter with Sanders, thereby excusing any failure to discover such potential evidence.  In any event, Lunsford, Hill and Thompson were at Barrett's home the day before the murder, but Sanders was not nearly so specific as to the last time he bought drugs from the defendant.  (*See, e.g.*, Tr. 11: 2519 ("a week, three, four days maybe"),12: 2631 (stating he went to the house three or four days before the shooting).)  Furthermore, counsel had a valid tactical reason for avoiding Lunsford and Hill, who could have testified to significant drug activity at Barrett's home on the day of the murder.  (*See* Mot. Ex. 90 at 2; *supra*, Arg. II, 5, C, I.)

Similarly, Barrett now contends that another witness, Janesse Thomas, was available to contradict Sanders's account of his visit to the defendant's home on the day of the murder. In this instance, Sanders himself testified that he went to Barrett's home in Thomas's company, presumably placing them on notice about her existence. But Thomas would have been toxic to the defense, as she would have testified that she personally obtained methamphetamine from Barrett on several occasions. (*See* Resp. Ex. 3.) While she would have contradicted Sanders's assertion that she accompanied him to Barrett's house to purchase drugs in September 1999, she would have testified that she saw the witness there on other occasions, apparently buying drugs from the defendant. (*See id.*) Whatever benefit Thomas's contradiction of Sanders might have provided, the overall impact of her testimony would have served to corroborate the witnesses who testified that the defendant sold drugs. Moreover, given the use of drugs by Sanders and Thomas, Sanders's error concerning these non-critical facts could have been plausibly explained by confusion rather than purposeful falsity.

As to all of these witnesses, Barrett has failed to show that counsel acted unreasonably or that a reasonable likelihood exists that the jury would have returned a different verdict had they been called. *See Boyle v. McKune*, 544 F.3d at 1138; *Henderson v. Norris*, 118 F.3d at 1288.

iv. Randy Weaver

Barrett also fails to demonstrate ineffective assistance of counsel based on his attorneys' response to Randy Weaver. Weaver testified that Barrett had sold him drugs and that the defendant was aware of his outstanding arrest warrant. However, Weaver never testified that the defendant had expressed any desire to act violently toward the police or anyone else. (Tr. 8: 1834-40.) Barrett now claims that his attorneys were ineffective for failing to adduce from

58

Weaver the fact that Barrett had never made a "blaze of glory" comment to him or otherwise threatened the police in his presence. (Mot. 108-09 (citing Mot. Exs. 24).)

Counsel acted reasonably in omitting this line of questioning. The defense effectively neutralized Weaver by eliciting his testimony that he had only visited Barrett's home on three or four occasions and never after May 1999. (*See* Tr. 8: 1841, 1844.) Given the minimal contact between Barrett and Weaver, the witness's failure to recollect a violent or threatening statement by the defendant would have had almost no probity. Instead, the defense elicited Weaver's testimony, which was illustrative of Barrett's sociability and peacefulness. Under questioning by the defense, Weaver testified that he always found the defendant's gate open and was never threatened when entering the property. (Tr. 8: 1845.) Defense counsel's strategy was reasonable and effective.

The alleged failure to elicit from Weaver an assertion that he never heard the defendant make a threatening statement about the police, when it appears they never discussed the subject in their very short relationship, was not unreasonable or prejudicial. *See Mills v. Singletary*, 63 F.3d at 1021.

### v. Brandie Price

Barrett fails to demonstrate that trial counsel provided ineffective assistance of counsel in their response to Brandie Price. (Mot. 109-11.) Price, who admitted to nine felony convictions, testified that she had visited Barrett's house on four to six occasions. (Tr. 15: 3486-88.) On most of her trips to Barrett's home, she went through the open gate, but once had to go through the ditch to the east of his house when the gate was locked. (Tr. 15: 3489-90.) Price was at Barrett's home seven to ten days before the murder and heard the defendant state that the police

59

had a warrant for him and that if they came, "we would grab a gun and hit the floor." (Tr. 15: 3491-92.) Barrett said he would "take as many of them bastards with him as he could." (Tr. 15: 3493.)

On cross-examination, Price stated that she had traveled through the ditch to the east of Barrett's house with Ronnie Baldwin, who drove a Mazda very slowly through the area. (Tr. 15: 3504, 3506.) During the defense case in chief, counsel presented Baldwin, a felon with multiple convictions, who had no specific recollection of going to Barrett's house with Price. (Tr. 18: 4117, 4124-26.) Baldwin flatly denied ever driving through the ditch to the east of Barrett's house and said he was incarcerated seven to ten days before the murder. (Tr. 18: 4119, 4129-30.) Baldwin did admit to using methamphetamine with Barrett. (Tr. 18: 4135-36.)

Though counsel effectively contradicted much of Price's testimony, Barrett complains that they did not do enough because they did not present Shawn and Brandy Hill to testify that a car like the one described by Blair could not have traversed the ditch no matter how slowly it went. Barrett fails to show what information would have alerted his attorneys to the Hills, or why his counsel would not have reasonably rejected the putative testimony of an incarcerated felon like Shawn Hill. (*See* Resp. Ex. 8.) He also fails to show why counsel would have considered such testimony necessary after presenting a witness who denied going through the ditch in the first instance. The failure to adduce the ancillary testimony of the Hills was entirely reasonable, as counsel had no duty to exhaust every possible avenue of attack. *See Mills v. Singletary*, 63 F.3d at 1021. Regardless, given the substantial attacks the defense made upon Blair, no reasonable likelihood exists that Barrett would have received a more favorable verdict if counsel had called the Hills.

vi. Karen Real

Barrett also fails to show that his attorney's ineffectively attempted to impeach Karen Real. Real, was serving a 14-year sentence for conspiracy to manufacture, maintaining a house and a gun charge. (Tr. 13: 3079-80.) She was the ex-wife of Barrett's cousin. After her marriage ended, she occasionally visited Barrett's house over a two year period, ending nine to 10 months before the murder. During her visits, she consumed methamphetamine supplied by Barrett. She also saw him sell drugs to other people. (Tr. 13: 3081-83, 3087, 3091, 14: 3102, 3110-11.) Real frequently observed Barrett carrying a handgun in his waistband, and reaching for his rifle when people approached his property. (Tr. 13: 3086, 14: 3106.) During her acquaintance with Barrett, Real heard him consistently making hostile statements about law enforcement. (Tr. 13: 3089-90, 14: 3106.) Despite the fact that the government elicited Real's federal felony conviction at the outset of her testimony, a subject the defense returned to, Barrett argues that his attorneys were ineffective for failing to inquire of the witness whether she had cooperated with the government and provided information against her codefendants in exchange for leniency. (Mot. 123-24.) Barrett's speculative argument has no merit.

Barrett has not shown that the putative evidence about Real's conduct in her own case has even a grain of substance, nor does he show that it would have had any impeachment value. Barrett fails to provide any evidence that Real actually did cooperate with the government against her codefendants, instead relying on the baseless declaration of someone named Sean Hill, who is not employed by the Department of Justice. Mr. Hill is, as previously noted, a repeatedly convicted felon, whose inadmissable testimony defense counsel would have reasonably forgone. (*See* Resp. Ex. 8.) Indeed, he was incarcerated by the State of Oklahoma at the time of Barrett's

61

trial.  (*See id.*)  Certainly, no reasonable probability exists that his presence on the witness stand, concerning matters outside his knowledge, would have led to a more favorable verdict.  Furthermore, given the fact that Real admitted that she stood to benefit from her testimony in the present case, no reasonable probability exists that Barrett would have received an acquittal had the defense presented less-than-credible evidence that she had cooperated in an earlier one.  *See Boyle v. McKune*, 544 F.3d at 1138;  *Mills v. Singletary*, 63 F.3d at 1021.

Likewise, as explored above, Barrett's complaints that his attorneys omitted evidence about Real's reputation for honesty is without merit.  (*See, supra*, Arg. II, 5, B.)

Barrett also raises an untimely and meritless contention regarding his attorneys' omission of evidence about state prosecutions that had been dismissed prior to this trial.  He claims that evidence of the dismissed cases could have formed the basis of a tenuous argument about bias, premised on the factually-deficient notion that the cases could have been reinstituted by state or federal prosecutors.  Barrett theorizes that Real had a motive to testify favorably for the government because she would have been concerned that the State of Oklahoma could have revived her dismissed cases if she displeased the federal prosecutor.  Barrett argues his analysis is unaffected by the possibility that the state cases may have been dismissed in light of Real's federal prison sentence, as the doctrine of dual sovereignty would have permitted the State of Oklahoma to separately punish the witness.

Barrett is wrong – the State of Oklahoma bars double punishment as a statutory matter, and there is no showing here that Real's federal prison sentence would not have precluded further punishment in state court.  21 Okl. St. Ann. § 11; *cf. Hale v. State*, 750 P.2d 130, 139 (Okla. Crim. App. 1988) (noting propriety of punishment for state crimes defined differently than those

at issue in a prior federal prosecution).  More fundamentally, Barrett has not and cannot show that the federal government had any authority to order a local prosecution, a necessary premise to demonstrating the relevance of the dismissed state cases.  *See United States v. Henderson*, 584 F. Supp. 1037, 1038 (W.D. Pa. 1984) (noting independence of local and federal prosecutors). Moreover, the federal government could not have prosecuted the offenses itself, because they were all alleged to have occurred before or during 1999 (*see* Mot. 112-14), well outside the five-year statute of limitations applicable to non-capital offenses.  18 U.S.C. § 3282.

The omission of irrelevant and inadmissible evidence concerning dismissed state cases, about which Barrett has shown no viable chance of revival in any court, did not constitute ineffective assistance of counsel.  *See Mills v. Singletary*, 63 F.3d at 1021.

### vii.  Randy Turman

As he does with in regard to the other civilian witnesses, Barrett fails in his claim that trial counsel ineffectively failed to impeach Randy Turman.  (Mot. 115-20.)  Turman testified that Barrett intended to kill the police if they entered his property. (Tr. 3: 400-01, 412-15.)  On cross-examination, Turman conceded that had been arrested but said that the case had ended.  (Tr. 3: 435.)  Barrett's counsel clearly knew that Turman's case remained active and asked the witness about the case records, "I've got them right here.  I've looked at them.  You want to look at them?"  But Turman stated he probably could not understand the records, leading counsel to assert, "It's not over with."  (Tr. 3: 435-36.)  Barrett claims counsel was ineffective for failing to demonstrate the falsity of Turman's testimony and the fact that he would supposedly benefit from his cooperation with the government through the dismissal of the state charges.  (Mot. 124-27.) Barrett is wrong.

Counsel was foreclosed from proving by extrinsic evidence what Turman would not admit – the collateral question of the witness's case status. *See* Fed. R. Evid. 608(b); *Palmer*, 31 F.3d at 1507 n.11. As to the allegation that counsel should have adduced evidence that Turman had entered a cooperation agreement with the government, the underlying allegation has no substance. Barrett has not shown that Turman had any agreement with the government regarding the dismissal of charges. Counsel had no obligation to elicit what was not true and did not perform ineffectively by failing to do the impossible. Further, as previously noted, Barrett also cannot succeed in his complaints that his attorneys were ineffective for failing to call putative character witnesses to attack Turman's credibility. (*See, supra,* Arg. II, 5, B.)

Reprising an argument he made with regard to Cindy Crawford, Barrett complains that his attorneys should have adduced evidence that some of his friends never heard him make threats directed at the police. According to Barrett, this information would have impeached Turman's recollection of such a remark. (*See* Mot. 119 (citing Mot. Exs. 37, 77, 90, 96).) However, none of Barrett's friends mention, much less contradict, Turman. They do observe that they never heard Barrett utter a statement like those attributed to him by Turman and speculate that he would not make threats about peace officers. Speculation of that stripe is inadmissible, and the declarants offer nothing to actually impeach Turman's testimony. Barrett simply cannot establish a reasonable probability that he would have been acquitted had his attorneys presented the inadmissible and irrelevant information identified here. *See Boyle v. McKune*, 544 F.3d at 1138; *Henderson v. Norris*, 118 F.3d at 1288.

6.  Counsel Made Appropriate Evidentiary Objections and Arguments

Barrett claims that his trial counsel ineffectively omitted objections to evidence of his

statements that evinced enmity toward the police and desire to engage them in violence. He argues that the testimony was susceptible to objection under the rules governing hearsay, prior bad acts evidence, and the balancing of probity and prejudice. Finally, Barrett complains that to the extent his trial attorneys did interpose objections under Federal Rule of Evidence 404(b), his appellate attorneys were ineffective for failing to pursue the matter. (Mot. 120-27, 384; BIS 70-76.) Barrett failed to timely raise these arguments, which this Court should therefore disregard. In any event, he fails to show that the underlying testimony was inadmissible and, thus, that his lawyers provided prejudicially ineffective assistance in their response to it.

A.  Time Barred Claim

Barrett first raised his present claim, that trial and appellate counsel did not properly challenge the evidence of his prior statements, in the Amended § 2255 Motion, filed September 25, 2009. (Doc. 70 at 135-43.) The Amended Motion was filed well after the expiration of the one-year period of limitations applicable to his Motion to Vacate. *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at1280; *cf.* Docs 1 & 2. The limitations period began to run on the date the Supreme Court denied Barrett's petition for writ of certiorari, March 17, 2008. *Willis*, 202 F.3d at 1280-81. The year expired on March 17, 2009. Because over six months elapsed before Barrett filed the amendment, his new claim is barred. *See United States v. Guerrero*, 488 F.3d at 1316. The claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention. *Cf. United States v. Espinoza-Saenz*, 235 F.3d at 505. In short, the claim arises from different facts than those ineffective assistance of counsel claims set forth in the Corrected Motion (Doc. 2) and therefore does not relate back to that pleading. *See United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999).

65

Furthermore, Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the contention. *United States v. Gabaldon*, 522 F.3d at 1124. Of course, he cannot do so, as the claim is premised on the information available within the record. Thus, this Court should strike and disregard Barrett's untimely claim that trial counsel failed to properly respond to the prosecution's evidence concerning his remarks.

B. <u>The Absence of Futile Objections did not Constitute Ineffectiveness</u>

Prior to trial, the government filed a notice that it intended to adduce evidence that Barrett had made statements, prior to the murder, of his intent to attack police officers if they entered his land. The government argued that the proposed testimony was not prior bad act evidence subject to Federal Rule of Evidence 404(b) but information intrinsic to Barrett's crimes. (*See* Trl. Doc. 206.) Barrett filed a response, arguing that the evidence should be excluded under Rule 404(b). (Trl. Doc. 215.) The Court stated that it would decide the admissibility of the proposed evidence on an as-needed basis during trial. (Tr. 174.) Barrett now claims his attorneys failed to interpose timely objections on the grounds that it was inadmissible hearsay, prior bad acts evidence, and inordinately prejudicial information. *See* Fed. Rules Evidence 403, 404(b) and 802.

However, none of the forgone objections had any merit, and trial counsel had no obligation to raise a futile objection. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *see Scott v. Romero*, No. 04-2262, 2005 WL 2865173, at **2 (10th Cir. Nov. 2, 2005) ("Counsel is not ineffective for failing to advance a futile argument.").[7]

Barrett's statements to various witnesses, as adduced by the prosecution, did not

---

[7]The government has attached to this Answer copies of all cited unpublished opinions.

constitute hearsay as a matter of law.  Federal Rule of Evidence 801(d)(2)(A) provides that a statement is not hearsay if it "is offered against a party and is the party's own statement."  *See United States v. Maden*, 114 F.3d 155, 157 (10th Cir. 1997).  Because Barrett's extrajudicial remarks, as proffered by the government, were not hearsay, trial counsel's failure to interpose futile objections could not have constituted ineffective assistance.

Barrett fares no better in complaining that his lawyers should have objected to the testimony as under Federal Rule of Evidence 404(b), because that provision would not have provided any bar to the evidence.  Rule 404(b) does not apply to . . . evidence that is intrinsic to the crime charged."  *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009) (quotation and alteration omitted).  "Generally speaking, intrinsic evidence is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury.  Extrinsic evidence, on the other hand, is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense."  *Id.* (quotation and alteration omitted).  For instance, in a case involving a conviction for using a telephone to transmit racially-motivated bomb threats, the defendant's possession of racially inflammatory materials was deemed intrinsic to the crime and relevant to rebut a defense that the threats were not "true threats."  *United States v. Viefhaus*, 168 F.3d 392, 398 (10th Cir. 1999).  There, the Tenth Circuit held that "the need to demonstrate the context in which Viefhaus uttered his remarks rendered much of the evidence of Viefhaus' racial hostility intrinsic to the crime charged in the indictment."  *Id.* (citing *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir.1997)).

In this case, the defense announced from the outset of the trial that it would challenge the prosecution's proof of intent: "Kenneth Barrett's actions were a reaction to an unknown force in

67

self-defense of his son, himself, and the protection of his property. And all of his actions in firing at the Ford Bronco were without malice aforethought, intention, or premeditation. This was not murder." (Tr. 237.) The government met its burden of proof by presenting evidence of Barrett's express intent. The government's evidence included Barrett's statements to Randy Turman and Karen Real that he would shoot at police if they entered his property (Tr. 3: 412, 14: 3106), his statement to Charles Sanders that he would shoot the first police officer who attempted to serve an arrest warrant on him (Tr. 11: 2515), and his statement to Cindy Crawford that he would "go out in a blaze of glory" if the police attempted to arrest him (Tr. 13: 3068-69).

Barrett's statements of intent were just as intrinsic to his crime, and relevant to the government's case, as were the racist statements that Viefhaus impliedly adopted through mere possession. Thus, as argued prior to trial (*see* Trl. Doc. 206 at 4-6.), the statements attributed to Barrett were not subject to the limitations of Rule 404(b), and trial counsel's omission of meritless objections to them on such a ground was not ineffective assistance. The statements attributed to Barrett were apparently made after he failed to appear for his state trial, resulting in the issuance of a warrant for his arrest. As such, the statements reflected his pugnacious refusal to submit to authority and were highly probative of his thought process when the police did, in fact, come to arrest him.

Even if the statements were analyzed under Rule 404(b), their admissibility would be patent, despite Barrett's claim that some of them were attenuated by time from the murder. Rule Evidence is admissible under Rule 404(b) if it is offered for a proper purpose, relevant, and not unduly prejudicial. *United States v. Caldwell*, 560 F.3d 1202, 1212 (10th Cir. 2009). The evidence at issue here was unquestionably offered for a proper purpose. It involved Barrett's

68

express desire to engage peace officers in violence if they entered his land or tried to arrest him and was therefore patently relevant to his intent when the police did, in fact, attempt to execute an arrest warrant at his home.

Barrett complains that the statements were prejudicial because they were estimated to have occurred between a few hours and 10 months prior to the murder and were therefore attenuated from the crime.  Barrett is wrong: evidence of the fact that he harbored the intent to commit this crime over a long period is not prejudicial and would not have require exclusion of the evidence.  *See United States v. Runnels*, 93 F.3d 390, 393-94 (7th Cir. 1996) (finding six-year-old threat admissible because it was "part and parcel" of an ongoing relationship between the defendant and victim).  Barrett fares no better in arguing that his lawyers should have objected that they received late notice of the evidence under Rule 404(b).  The notice (Trl. Doc. 206) was, however, timely filed four days before the September 26, 1999 commencement of trial.  *See United States v. Blount*, 502 F.3d 674, 678 (7th Cir. 2007) (holding one week sufficient); *United States v. Watson*, 409 F.3d 458, 465-66 (D.C. Cir. 2005) (48 hours sufficient); *United States v. Preciado*, 336 F.3d 739, 745 (8th Cir. 2003) (several days sufficient).  The absence of futile objections on these grounds was not ineffective assistance.

Finally, Barrett cannot demonstrate ineffectiveness based on the omission of objections under Federal Rule of Evidence 403.  Barrett posits that the Court would have stricken the testimony under Rule 403 because the witnesses were not credible.  However, exclusion of evidence is not permitted on ground that judge does not find it credible.  *Gardner v. Galetka*, 568 F.3d 862, 876 (10th Cir. 2009).  Once again, the omission of patently futile objections did not constitute prejudicial ineffectiveness.

69

C.  Appellate Counsel Provided Adequate Assistance

Barrett claims, in a perfunctory manner, that his appellate attorneys provided ineffective assistance in failing to challenge some of his prior statements under Federal Rule of Evidence 404(b).  Barrett, as demonstrated above, has failed to show any evidentiary error in the admission of his statements, and thus any basis upon which the appellate court might have granted relief. Counsel's failure to raise a futile issue on appeal does not constitute deficient performance or prejudicial ineffectiveness.  *See United States v. Challoner*, 583 F.3d at 749.

7.  Trial Counsel Properly Investigated the Crime Scene Reconstruction

Barrett claims his attorneys provided ineffective assistance in failing to retain a crime-scene reconstruction expert to counter the evidence adduced by the government through Iris Dalley.  According to Barrett, Dalley was a key government witness who testified that the defendant had fired on the police from his porch and therefore could have seen the emergency lights on the police cars behind the Bronco that carried Trooper Eales.  Barrett also contends that if trial counsel had consulted with Edward Hueske they could have challenged the admissibility of Dalley's testimony, as Hueske would have allegedly demonstrated flaws in her methodology. (Mot. 127-39; BIS 77-88.)  Barrett's argument ignores counsel's entirely reasonable strategy for turning Dalley's testimony to the advantage of the defense.  The argument also grossly misstates the content and significance of Dalley's testimony, and therefore fails to demonstrate prejudice.

During questioning by the prosecution, Dalley provided limited opinions, corroborating existing evidence or drawing conclusions the jury would have naturally drawn from existing testimony.  Contrary to Barrett's assertion here, she never testified that Barrett fired on Eales from the porch.  Indeed, she conceded early in her direct testimony that she could not determine

70

the exact position of the shooter or the victim's vehicle:

> Q. Can you place exactly where the shooter was or where the Bronco was in relation to this location, for any of these trajectories, ma'am?
> A. No. My analysis does not tell me the exact position of either or both.

(Tr. 14: 3175.)  Though the foregoing testimony leaves no doubt that Dalley did not place the defendant on the porch, the prosecutor returned to the subject:

> Q. Okay. Are there any shots that would cause you problems in regards to the trajectories considering the path that we discussed and a shooter being located in or around the front door which would put him in potentially just outside the door on the porch to moving inside of the house?
> A. It would be possible for a shooter to be either on the porch or in the doorway if the Bronco is moving in the described path, could put the Bronco in the various positions that could account for the trajectories.
> Q. Okay. You can't say where the shooter was for any one of those given shots?
> A No, I cannot.

(Tr. 14: 3226.)  In view of these colloquies, Barrett's principal claim about Dalley – that she placed him on the porch – is an utter fiction.  Dalley drew only two significant conclusions about Barrett and his victim: the defendant could not have fired all the shots from a prone position inside his house and Eales's flank and elbow wounds were sustained after he exited the Bronco. (Tr. 14: 3228-29, 3247, 3254, 3259.)

Not only had defense counsel prepared to meet Dalley's limited testimony, they effectively elicited her concession that she could not exclude the possibility that Barrett had fired every shot from inside his home, thus confirming the viability of the defense theory.  As noted, the reasonableness of counsel's investigation is measured against information possessed by them. *Chandler*, 218 F.3d at 1318 & n.22.  In this case, it appears clear that defense counsel knew, on the basis of Dalley's prior testimony, that they could elicit her concession that Barrett may well have fired every shot from inside his house.  (*See* Tr. 14: 3264, 3280-91; *see also* Tr. March 22,

71

2005 at 17-18 (noting that counsel had elicited damaging admissions from Dalley).)  Defense

counsel adduced, in summary, a concise crystallization of that important point:

> Q.  Okay.  So, with the car at that location and the shooter inside the house, you know, moving in the house as long as the doorway's open, shooting out the doorway, would that be consistent with the -- and how you drove the car up to the porch, would that be consistent with all 18 trajectories into the car?
> A.  It is possible to have a path starting at this point and coming up to the porch in which you could have relative positions that could create all of those trajectories.

(Tr. 15: 3349-51.)  Presenting this favorable evidence, rather than attacking the admissibility of

Dalley's testimony with the assistance of Hueske, was an entirely reasonable strategic decision

on counsel's part.  *See Massaro v. United States*, 538 U.S. 500, 504 (2003) (observing that

*Strickland* requires defendants claiming ineffective assistance of counsel to show that their

attorneys' actions "were not supported by a reasonable strategy").  The decision to adduce

evidence helpful to the defense through Dalley, who's credibility the government would not

attack, was a valid tactical decision akin to counsel's reliance on Cloyce Choney as an expert in

police practices, discussed below.  (*See, infra*, Arg. II, 8)

Even if Barrett could show that counsel had not made an entirely reasonable decision to

exploit Dalley, rather than to challenge the admissibility of her testimony, he cannot demonstrate

prejudice.  Given the limited reach of her testimony, Barrett cannot show a reasonable likelihood

that he would have received a more favorable verdict, even if he had effectively challenged its

reliability or admissibility with the assistance of Edward Hueske.  While she had an extended

stay on the witness stand, Dalley provided only two conclusions from her analysis.  She opined

only that Barrett could not have fired all the shots from a prone position inside his cabin (a

conclusion that did not inculpate Barrett by itself or contradict any defense theory) and she found

72

that Trooper Eales's fatal left flank wound was not consistent with the trajectories of the shots into the Bronco.  (Tr. 14: 3228-29, 3247, 3254, 3259.)

Of Dalley's two conclusions, only the latter one was incriminating, in that it demonstrated that the defendant fired on a fleeing man, but the evidence presented to the jury would not have permitted any other conclusion.  The driver of the Bronco, Trooper Hamilton, testified that the shots fired at the vehicle struck the windshield traveling from the right.  (Tr. 3: 554, 605.)  When the Bronco stopped, Trooper Eales exited and moved to the rear.  (Tr. 5: 989-97, 996-98, 1033, 1096-1101, 1158-60, 1165-66.)  In so doing, Eales exposed his left side to Barrett's fire.  (Tr. 5: 997-98, 1101-02.)  According to the medical examiner, Eales was shot twice in his left side by bullets that passed through some intervening objects.  (Tr. 7: 1599, 1605-07, 1610-15.)  The fatal bullet entered "on the left side of the upper back" and traveling "slightly back to front and slightly downward."  (Tr. 7: 1611, 1614-15, 1619.)  Given the path of that bullet through Eales's body, the jury could have only inferred that, at the moment he was shot, the victim was turning from Barrett, not sitting in vehicle receiving fire from the right.  Dalley may have reached this conclusion based on her analysis of other evidence, but it merely corroborated an obvious fact about the shooting.  There was absolutely no evidence upon which the defense, even with the assistance of another expert, could have suggested that Eales had managed to expose his left side to a bullet wound while he was seated the Bronco.  (*See, e.g.*, Tr. 3: 541-43, 612-13 (explaining that Eales had a 20 pound ballistic shield between his legs that interfered with easy movement).)

Accordingly, even if counsel had successfully relied upon Edward Hueske to substantially impeach, or even foreclose, the testimony of Iris Dalley, no reasonable probability exists that Barrett would have received a more favorable verdict.  *See Strickland*, 466 U.S. at 691.

8.  <u>Trial Counsel Properly Investigated and Presented Evidence Concerning Police Tactics</u>

Barrett claims that his trial attorneys provided ineffective assistance when they relied on the testimony of Cloyce Choney in an effort to criticize the tactics of the Oklahoma Highway Patrol Tact Team.  According to Barrett, trial counsel should have retained expert witness George Kirkham, who would have identified supposed flaws in the Tact Team's planning and execution of the arrest warrant.  (Mot. 139-43; BIS 77-88.)  Barrett fails to demonstrate that his counsel's choice of witness was in any way deficient, as Choney had previously criticized the Tact Team's operation.  Moreover, Barrett cannot show that Kirkham's testimony would have altered the outcome of the trial.  While Kirkham is apparently more critical of the Tact Team than Choney, his opinion ultimately fails to reveal any relevant point.  He opines, with the advantage of hindsight, that the Tact Team should have used less confrontational techniques, but he fails to show that those the choice of tactics had any bearing on Barrett's intent or that alternative tactics were reasonably available to the police.

"[T]he decision of which witnesses to call is quintessentially a matter of strategy."  *Boyle v. McKune*, 544 F.3d at 1139.  Because such decisions are matters of strategy, counsel's choices are accorded a strong presumption of reasonableness.  *Williams v. Bowersox*, 340 F.3d 667, 669-71 (8th Cir. 2003); *see also United States v. Nguyen*, 413 F.3d 1170, 1181 (10th Cir. 2005) (holding that adequately informed strategic choices are "virtually unchallengeable").  To establish that a strategic decision constituted ineffectiveness, the defendant must show that it was completely unreasonable, such that it bore no relationship to any possible defense strategy.  *See Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000).  Assuming the defendant can meet that onerous burden, he must still establish prejudice by demonstrating a reasonable probability that

74

the forgone witness's testimony would have resulted in acquittal.  *See Boyle v. McKune*, 544 F.3d

at 1138; *see also Earhart v. Johnson*, 132 F.3d 1062, 1067-68 (5th Cir. 1998); *United States v.*

*Murray,* 751 F.2d 1528, 1535 (9th Cir.1985).

Barrett cannot show that trial counsel's decision to call Cloyce Choney was unreasonable.

Barrett concedes that counsel had a valid strategic reason for calling Choney: the witness had

testified for the prosecution in state court but provided testimony favorable to the defense during

cross-examination.  (Mot. 142.)  While Barrett now complains that his attorneys called a

reluctant, government-friendly, witness, his argument appears premised on the "inestimable

benefit of hindsight."  *Thomas v. Gilmore*, 144 F.3d at 515.  Apart from the fact that Choney had

previously provided evidence helpful to the defense, the defense stood to gain greatly by calling

him – rather than a retained expert – because his testimony could not be impeached on the basis

of his associations with, or payment by, the defense.  Choney's reluctance to testify for the

defense, and his association with the victim, were the hallmarks of his credibility for the defense,

something the defense recognized long before trial.  (*See* Tr. March 22, 2005 at 15 (defense

counsel describes Choney as "an eX-FBI agent, and he'd rather be drawn and quartered than

appear in court as a defense witness in Mr. Barrett's case.  He was extremely credible.  If you get

the Government to call him, we can save money on ours.").)  In fact, when called by the defense

Choney provided several criticisms of the Tact Team's conduct, observing that no-knock warrant

services were disfavored and inherently dangerous (Tr. 17: 3906-07, 3919), that the team's plan

should have included a contingency for compromised stealth (Tr. 17: 3907), that the team's plan

should have included a contingency for an injured officer (Tr. 17: 3908-09), that containment

was preferable to forced entry (Tr. 17: 3905-06), and that the lead vehicle should have had

illuminated emergency lights (Tr. 17: 3974-75). Trial counsel's decision to elicit this evidence through Choney was reasonable and cannot form the basis of a successful ineffectiveness claim.

Assuming, arguendo, that Barrett could show that his attorneys had a Sixth Amendment duty to call Kirkham, rather than Choney, he cannot show a reasonable probability that the paid witness's testimony would have led to acquittal. Most significantly, the relative professionalism of the Tact Team, the completeness of its tactical plan, and the ability of its leaders to predict the dangers of the operation had no bearing on Barrett's culpability. The government had no burden to prove that Barrett even recognized the victims as police – it merely had to show that he had reason to know that they were peace officers. *See, supra*, Arg. II, 2; *infra*, Arg. IX, 2; Trl. Doc. 240 Inst. 15. The absence of a defense-friendly expert to testify to irrelevant criticisms of the Tact Team's operation in no way reduced the likelihood of acquittal in this case.

Furthermore, Kirkham's analysis appears to exist in a vacuum that denudes it of any meaning. After setting forth empty platitudes about a preference for non-confrontational police practices, Kirkham concludes that the Tact Team should have initiated contact "from sufficient distance and cover to afford participating officers a reasonable degree of safety." (Mot. Ex. 44 at 3.) Kirkham provides no indication how the Tact Team could have practically accomplished his theoretical operation. Indeed, he appears to have formed his opinion in ignorance of circumstances that essentially forced the Tact Team to plan for direct confrontation. Barrett's home stood behind a substantial gate. (Tr. 7: 1479.) The surrounding land lacked concealment or good observation points.[8] (Tr. 3: 516.) Feral dogs roamed the area and could give away

---

[8]This simple fact wholly undermines Kirkham's naive supposition that the police should have used a bullhorn "from a position of cover to announce that officers were there . . . and to order [Barrett] to exit the cabin with his hands empty and in view." (Mot. Ex. 44 at 3.)

76

police positions. (Tr. 3: 516-017, 7: 1404, 1479.) Barrett was apt to shoot at the police and was armed with, what even Kirkham refers to, as a "formidable long range weapon." (Tr. 7: 1473-74; Mot. Ex. 44 at 2.) Barrett could have easily fled to his mother's nearby trailer. (Tr. 7: 1433, 1473.) And, in fact, Barrett's neighbors on three sides were related to him, sympathetic to his anti-authority views and potentially willing to use force against the arrest team. (Tr. 4: 684-85, 839-40.)

Given these facts, the Tact Team's plan represented a regrettable compromise with the reality at hand, rather than an ideal scheme based on wishful thinking. Unsurprisingly, several of Barrett's criticisms of the warrant service were undisputed at trial, such as the fact that the team lost the element of surprise (Tr. 3: 644, 676-77), the fact that the lead vehicle advanced from a tactically disadvantageous position (Tr. 3: 683), the fact that the lead Bronco was unmarked (Tr. 7: 1532, 1535-36), the fact that the lead Bronco would lack the coverage of surveillance team (Tr. 7: 1404-05) and the fact that the police provided no audible warning of their presence (Tr. 4: 837-38, 7: 1535). Barrett fails to explain how a paid defense expert's repetition of this evidence, which was conceded by the very officers who planned and executed the operation, would have placed him in better stead.

Kirkham does not improve Barrett's attempt to demonstrate error by offering an opinion about the defendant's mental state at the time of the shooting. In open court, Kirkham could not as he offers to do, testify that the tactics employed by the police rendered "unanswerable" whether the defendant realized he was firing on police (Mot. Ex. 44 at 1). The expert was not permitted to opine about Barrett's mental state. *Cf.* Fed. R. Evid. 704; *United States v. Shaffer*, 472 F.3d 1219, 1225 (10th Cir. 2007) (holding that district court appropriately excluded opinion

of computer expert that defendant did not necessarily intend to download illegal child pornography).  Putting aside the bar on improper expert opinions, a police tactics expert like Kirkham would have had no basis for opining about Barrett's intent, apart from the defendant's own assertions.  Barrett could not, however, utilize an expert as a conduit for the admission of inadmissible hearsay.  *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008).

Finally, Barrett argues that Kirkham could have testified that the manner in which the Tact Team approached the house minimized the likelihood that he recognized the troopers as police.  But such testimony was unnecessary, as the evidence as summarized above was more than sufficient to support that argument as presented in summation by Mr. Hilfiger.  (*See* Tr. 20: 4329-32.)  Barrett cannot show that the addition of cumulative evidence from a retained expert, susceptible to impeachment on the basis of bias, would have led to a reasonable probability of acquittal.  As such, he cannot show that his attorneys' decision to rely on Choney, rather than Kirkham, amounted to prejudicial ineffective assistance of counsel.

9.  Trial Counsel Reasonably Cross-Examined Law Enforcement Witnesses

Barrett claims his trial attorneys provided ineffective assistance of counsel by failing to adequately impeach the testimony of Tact Team members regarding the circumstances of the shooting.  He also complains that counsel failed to adduce exculpatory evidence.  In a tenuously related argument, Barrett also claims ineffective assistance based on an instance of cross-examination that led to supposedly damaging evidence from Clint Johnson.  (Mot. 143-49.)  Barrett's claims fail because counsel effectively cross-examined the witnesses despite the fact that they did not have complete transcripts of the defendant's second state trial, which supposedly would have formed the basis of the forgone impeachment.  Barrett cannot show a

reasonable likelihood that the supposedly forgone or mistaken questions he identifies had any impact on the outcome of this lengthy and complex trial.

    A.  Allegedly Forgone Impeachment

As of October 3, 2005, it appears that trial counsel had not received a complete transcript of Barrett's second state trial. (*See* Tr. 4: 670.) Significantly, Barrett has not shown that his attorneys had access to the evidence with which he claims they should have attempted to impeach various government witnesses. In fact, Barrett argues – in apparent contradiction of his ineffectiveness claim – that counsel did not receive the transcript in time to prepare. (Mot. 143.) Barrett cannot show that his attorneys acted unreasonably in omitting questions based on transcripts they did not have. Having failed at this foundational level to show that his attorneys were objectively deficient in their performances, he cannot show ineffective assistance, as conclusory assertions are insufficient to establish ineffective assistance of counsel.[9] *United States v. Fisher*, 38 F.3d at 1147.

Regardless of Barrett's access to the transcript, the supposedly forgone cross-examination about the circumstances of the crime had no impact upon the outcome of this trial, a fact that defeats his attempt to show that the omission of the questions was unreasonable or prejudicial. Indeed, "In hindsight, there are few, if any, cross-examinations that could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would pass muster." *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir.1996). The omission of impeachment evidence of negligible value does not prejudice the defense or, by

_____

[9]Barrett elsewhere claims this Court failed to properly fund his request for the transcript. (*See, infra*, Arg. III.) Because, as shown below, the transcript was of negligible value, any delay in receiving the document should not form a basis of relief.

extension, amount to ineffective assistance. *See Moore v. Marr*, 254 F.3d 1235, 1241 (10th Cir. 2001). The reasonableness of counsel's conduct in cross-examining a witness depends upon the importance of the witness to the government's case. *Tucker v. Ozmint*, 350 F.3d 433, 444 (4th Cir. 2003). Furthermore, the omission of impeachment on a collateral matter does not constitute ineffectiveness. *United States v. Lipp*, 54 F. Supp. 2d 1025, 1036-37 (D. Kan. 1999); *see Bergman v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995).

As explored below, the supposedly forgone impeachment centered on details about the activation of emergency lights on various vehicles. Such facts were of great significance to Barrett's trial defense. However, the same facts were understandably less important to, and therefore more easily forgotten by, the members of the Tact Team. Defense counsel could have hardly expected to alter the outcome of the trial by showing that police officers who witnessed the murder of a colleague could not recall with crystal clarity, six years after the crime, who activated overhead lights and when they did so. While Barrett argues that the activation of the lights was an important point of dispute for him at trial, he ignores the fact that it was an unlikely focus of attention for the police, as they found themselves caught in a hail of gunfire moments after entering the defendant's property. Any minor flaws in the officers' recollections would have been unsurprising under the circumstances in which they were perceived. Not only was the omission of the supposed impeachment non-prejudicial, Barrett cannot show that any decisions to forgo such meaningless evidence was unreasonable, especially given that he premises most of his claims on misinterpretations of the pertinent records.

Barrett first complains that his attorneys failed to challenge Trooper Poe's testimony that he initially observed emergency lights when he saw the first Bronco come into view from the east

80

(Tr. 7: 1412) with prior testimony that the witness saw the lights after shots erupted (Mot. 145 (citing 2nd St. Trial Tr. at 747).)  However, there is no meaningful contradiction between Poe's testimony at the two trials.  Poe explained on cross-examination that he did not recall seeing emergency lights from the time he left his car until he reached his assigned position by the fence. (Tr. 7: 1444.)  From that vantage, however, Poe observed the Bronco come into view and saw emergency lights sparkling off the glass that was being shot from the vehicle.  (See Tr. 7: 1412-13, 1444.)  As such, his testimony in the two trials was not inconsistent and no meaningful impeachment was available.  *See Moore v. Marr*, 254 F.3d at 1241.

Barrett next observes that Trooper Geringer testified in this trial that as he turned from the road to the driveway adjacent to the defendant's property, his partner, Trooper Manion, activated the emergency lights in their vehicle.  (Tr. 4: 732-33.)  Barrett claims his attorneys should have contradicted this statement with Greninger's prior testimony that he turned the lights on after turning to approach the defendant's home.  (Mot. 145 (citing 2nd St. Trial Tr. at 448, 461).)  The inconsistencies between these statements are minor, as they do not fundamentally impeach the evidence that the emergency lights on Geringer's vehicle were activated shortly after the car turned from the road in front of Barrett's home.  In fact, defense counsel elicited from Geringer an admission that he did not recall precisely where he was when the emergency lights came on: "I don't know exactly. [The lights were activated] somewhere in there prior to entering the property."  (Tr. 4: 771.)  By adducing Geringer's admission that his memory was unclear, defense counsel obviated the need to demonstrate as much by relying on evidence of a slightly inconsistent statement as to who in the vehicle activated the lights.  The omission of that evidence was neither unreasonable nor prejudicial.  *See Moore v. Marr*, 254 F.3d at 1241.

81

Barrett also notes that Geringer testified in this trial that he recalled Hash's emergency lights were activated (Tr. 4: 760), but was unsure if Hise's lights were activated and did not recall if Pettingill's lights were activated (Tr. 4: 772-73). According to Barrett, counsel should have impeached that testimony with Geringer's prior statement that he recalled seeing Hise's emergency lights on. (Mot. 145 (citing 2nd St. Trial Tr. at 448, 461).) Of course, that statement was not inconsistent with Greninger's testimony about Hash and Pettingill's vehicles, and might have only served to refresh the witness's recollection about a fact that was ultimately damaging to the defense. *See Moore v. Marr*, 254 F.3d at 1241. The defense certainly could not have anticipated much value in the potential impeachment, as Greninger readily admitted that his memory of the events was imperfect. (See Tr. 4: 736 ("I still have a blocked memory"), 741 (recalling a flashbang, but not when he heard it), 792 ("That's the best of my memory today."), 806 (failing to recall when he heard a pause in the shooting).)

Barrett also errs in asserting that trial counsel should have impeached Clint Johnson's testimony that he saw emergency lights by eliciting evidence of the witness's initial statement to Investigator Jones. (*See* Mot. 145-46 "counsel was caught flat-footed").) In fact, counsel examined Johnson about his statement to Jones, adducing his admission that he might not have told her about observing emergency lights because of the stress he was under. (Tr. 2: 361-62.)

Barrett similarly misreads the record when he claims that trial counsel failed to impeach Trooper Hamilton's testimony that he began receiving gunfire as he entered the ditch to the east of the defendant's home. (*See* Mot. 146-47.) Hamilton unambiguously testified during the federal trial his vehicle was initially hit by gunfire "[s]hortly *after* we came out of the ditch." (Tr. 3: 537 (emphasis added).) Barrett was not prejudiced by the failure to elicit a prior

82

consistent statement in this regard. *See Moore v. Marr*, 254 F.3d at 1241. Because Hamilton's recollection supported the defense theory that Barrett did not fire until the lead vehicle was relatively close to the house, and Hamilton was in the best position to know where he was when the shooting began, there was no need to further explore the issue with Trooper Greninger, as Barrett nonetheless complains. (*See* Mot. 146, 147; *see also, infra*, Arg. II, 9, B .)

Barrett again errs when he claims that defense counsel failed to contrast Trooper Poe and Trooper Greninger's testimony about guns in the defendant's house with the fact that neither man testified about such observations in a prior trial. (Mot. 147.) Given that Barrett does not demonstrate that the witnesses were previously asked about the guns, much less denied seeing them, he has not shown that the prior testimony was inconsistent with that offered here.

On this record, Barrett has failed to carry his burden of demonstrating that counsel unreasonably and prejudicially failed to elicit evidence with any impeachment value whatsoever.

B. Allegedly Forgone Evidence

Apart from complaining about his attorneys' supposed failure to impeach government witnesses, Barrett also contends that counsel did not effectively elicit potentially exculpatory testimony during cross-examination. But Barrett cannot show that the absence of the testimony created a reasonable likelihood of prejudice, and therefore cannot establish ineffective assistance. *See Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir.1994); *United States v. Sapp*, 989 F. Supp. 1093, 1099-1100 (D. Kan. 1997). Because the forgone evidence would not have assisted the defense, Barrett cannot show that the omissions demonstrate unreasonable performance.

Specifically, Barrett cannot demonstrate any prejudice based on his claim that defense counsel should have relied on a transcript of a prior trial to elicit evidence that Trooper Poe had

an unobstructed view of the defendant's house but still could not determine who had opened fire first, the police or the defendant. (Mot. 146.) Poe testified on direct examination that immediately after exiting his vehicle he heard shots and turned his attention, wholly and solely, to seeking cover behind a post:

> A. As soon as I got out of the car and started towards the post, I started hearing gunfire.
> Q. Okay. What did you do at that point?
> A. At that time I thought they were shooting at Gene, Doc and I because we were on the ground.
> Q. Okay.
> A. So I took cover behind the post.
> Q. Okay. What, at that point, did you see, if anything?
> A. Not really anything at that point. I just took cover.

(Tr. 7: 1410.) Because Poe explained that his focus was on his own safety, rather than the source of gunfire, the defense could not have relied on him to suggest who instigated the violence. As such, Barrett cannot establish any prejudice from the supposed omission. *See Moore v. Marr*, 254 F.3d at 1241.

Barrett similarly fails in arguing that trial counsel should have confronted Trooper Greninger with a prior statement that he "recalled hearing gunfire as Hamilton's vehicle approach the front of the house." (Mot. 146.) According to Barrett, the prior statement was inconsistent with Greninger's inability to recall the location of the lead Bronco during his testimony and implied that the witness observed gunfire only when Hamilton's Bronco "was almost literally in front of his house, with its headlights obstructing [the defendant's] view." (*Id.*) Barrett's interpretation of the ambiguous prior statement amounts to nothing more than wishful thinking. The prior statement gave no more indication as to Hamilton's location than did Greninger's trial testimony. The omission of such an imprecise statement from evidence could

84

not have created a reasonable probability of prejudice or constituted prejudicial ineffectiveness.

*See Moore v. Marr*, 254 F.3d at 1241.

> C. Eliciting Supposedly Damaging Evidence

Barrett also claims his trial attorneys provided ineffective assistance of counsel when they

elicited Clint Johnson's reasons for asserting that the service of the warrants was "high risk."

Though Barrett does not identify any of the allegedly offending examination, it appears that he

likely intended to fault his attorneys for a pair colloquies:

> Q. Okay. What advice did you give them to tell them that this was high risk?
> A. That we received information about Mr. Barrett and his threats to law enforcement, and him carrying firearms, and that he was going to kill law enforcement officers when they showed up at his residence.

(Tr. 2: 333.)

> Q What other information did you have that he's high risk?
> A That he was going to kill law enforcement officers, that he was making methamphetamine at the residence, which also makes it a substantial risk to law enforcement personnel due to explosive hazards when you're dealing with methamphetamine labs, and just all the information we received about him going to kill law enforcement officers. That makes it high risk.
> Q. Okay. And did you receive this information from more than the confidential informant?
> A. Yes.
> Q. How many more?
> A. I received it from Agent Loyd.
> Q. Who had received it from the confidential informant?
> A. No, sir. I believe that there were several people that came into the sheriff's office, reporting to the sheriff that Mr. Barrett was shooting across the road all the time, and they was wanting something done about it. And we received several tips that Mr. Barrett was going to kill law enforcement, from several -- several different people advised us of that.

(Tr. 2: 334-35.)

Barrett fails to show that the decision to elicit this testimony was unreasonable.

85

Certainly, it appears that counsel believed that Johnson had relied solely on his confidential informant in characterizing the warrant service as high risk. Barrett's counsel could not exploit that theory, and argue that Johnson was unreasonable in his reliance (essentially the same argument that Barrett makes in his Motion in Claims 2, sub. 2 and 5), without establishing the validity of its underlying premise. When he attempted to do so, Johnson apparently surprised him by citing other sources of information, but Barrett fails to show that trial counsel was on notice that Johnson might respond in this way. Barrett cannot show the inadequacy of counsel's actions using "the benefits of 20/20 hindsight." *United States v. Blackwell*, 127 F.3d at 955.

Furthermore, Barrett cannot show that Johnson's testimony, whether anticipated or not, prejudiced the defense. Indeed, he makes no effort to show that in the absence of these isolated comments it is reasonably likely that he would have been acquitted. He is foreclosed from doing so by the record, as the government substantiated the accusations mentioned by Johnson, using live witnesses. (*See, e.g.*, Tr. 3: 412 (establishing one of Barrett's threats against law enforcement), 1812 (noting complaints to the police about Barrett's use of firearms), 11: 2488-2524 (establishing the confidential informant's observations of Barrett), 12: 2653-95 (establishing the existence of a methamphetamine lab in Barrett's home), 13: 3075 (noting one of Barrett's threat to shoot the police), 14: 3106 (noting another Barrett's threats against the police).) Because all the assertions made by Johnson with regard to the warrant were eventually proved by extant evidence, Barrett's ineffective assistance claim should fail for lack of any possible prejudice.

Counsel's conduct of the cross-examination was neither unreasonable nor harmful to the defense, and any attempt to premise a Sixth Amendment violation on it should fail.

86

10.  Trial Counsel Reasonably Omitted the Unpersuasive Testimony of Barrett's Son and Neighbor

Barrett claims his attorneys provided ineffective assistance in failing to call as defense witnesses his son, Toby Barrett, and his neighbor, Alvin Hahn.  According to Barrett, those two witnesses could have undermined government evidence that, before he began shooting, the defendant could have seen illuminated emergency lights on some of the Tact Team vehicles. (Mot. 149-54; BIS 88-90.)  Neither Hahn nor Toby Barrett would have meaningfully undermined the prosecution's case, and counsel's omission of their testimony was not prejudicial ineffectiveness.

As noted above, "[T]he decision of which witnesses to call is quintessentially a matter of strategy." *Boyle v. McKune*, 544 F.3d at 1139.  Absent a showing that a forgone witness's testimony would have created a reasonable likelihood of adquittal, Barrett cannot establish ineffective assistance.  *See Patel v. United States*, 19 F.3d at 1237; *United States v. Sapp*, 989 F. Supp. at 1099-1100.

A.  Toby Barrett

Of the two putative witnesses identified in the Motion, the defendant's son was the only one who actually observed the police enter Barrett's land.  As a matter of trial strategy, counsel could well have determined not to call the defendant's son as a witness because he was so obviously susceptible to impeachment for bias.  *See Bergmann v. McCaughtry*, 65 F.3d at 1380. But more significantly, the defendant's son had nothing exculpatory to offer.  Indeed, Toby Barrett concedes he had limited recall of what he found to be a brief and confusing encounter: "I yelled 'Dad.'  I don't recall how many times I yelled it.  It all happened so fast."  (Mot. Ex. 96 at 3.)  He also admits that he does not know when the shooting began: "There may well have been

87

shots before [a police officer tackled me] – again it happened so fast and I was so scared, but my dad wasn't on the porch and I know for sure that nothing hit the Bronco before it came to a stop." (*Id.*)

What Toby Barrett does recall would not have assisted the defense. Toby notes that he looked toward his great grandmother's driveway and saw "an SUV and a Crown Vic . . . . I thought I saw my dad come onto the porch for just a second . . . . I looked at the porch again and my dad was already gone." (Mot. Ex. 96 at 3.) If Toby could identify the second vehicle as a Crown Victoria, it seems unlikely that his father could not have. The Crown Victoria must have been Trooper Hash's marked patrol car, which followed directly behind Trooper Greninger's Bronco. (*See* Tr. 5: 984.) Trooper Hash activated his emergency lights before turning onto the driveway (Tr. 5: 987) and Trooper Manion illuminated the emergency lights in Greninger's vehicle as the Bronco pulled on the defendant's property (Tr. 4: 732). The overall effect should have left little question in Barrett's mind that the police were entering his land. Assuming, arguendo, that neither vehicle illuminated emergency lights, it begs credulity to suggest that Toby Barrett was able to identify the make and model of Hash's vehicle, but his father did not notice the profoundly distinctive silhouette of emergency lights mounted on the roof of a marked police car. (*See* Tr. 5: 1021 (Hash testifies, "I have a patrol car . . . with the overhead lights.").)

Hash and Greninger's testimony regarding the activation of emergency lights is impliedly contradicted by Toby Barrett, who claims in his declaration, "The first police lights I seen [sic] was on the police car that crashed through the gate when the shooting was over." (Mot. Ex. 96 at 3.) However, that assertion would have had little persuasive value, given the fact that Toby was – by his own admission – confused by the fast-moving events and also pushed to the ground soon

88

after the police arrived. Simply put, his admission that he has difficulty recalling the pertinent events undermines the reliability of his putative testimony, especially when combined with his relationship to the defendant.

Toby Barrett supposedly would have also testified that the defendant did not fire into the lead Bronco until the vehicle had come to a stop in front of the house and Kenneth Barrett had vacated the porch. (*See* Mot. Ex. 96 at 3.) Presumably, such testimony would have tied to a theory that the defendant did not begin shooting until the Bronco posed a clear threat to his own safety inside the house. But that assertion is blunted by Toby Barrett's concession that he did not know when the shooting actually began: "There may well have been shots before [the Bronco stopped] – again it happened so fast and I was so scared, but my dad wasn't on the porch." (*Id.*) Whether or not the Bronco was hit, Toby's forgone testimony would have allowed for the conclusion that his father began shooting before the vehicle stopped. Furthermore, Toby's evident confusion and divided attention provides no basis for crediting his representation that his father "wasn't on the porch," particularly given the fact that he cannot say when the shooting began. Given the obvious limitations on Toby Barrett's recollection, as well as his clear exposure to impeachment based on bias, trial counsel could have reasonably omitted calling him to the witness stand and did not prejudice defendant in doing so. *See Boyle v. McKune*, 544 F.3d at 1139.

Barrett also argues, in conclusory fashion, that Toby Barrett could have contradicted the prosecution's inference that the defendant posted a threatening sign that reflected his intent. (*See* (Mot. 152 (citing Tr. 20: 4297, 4305).) According to Barrett, his son offered a sanitized synopsis of the sign during a state court proceeding, but did not opine as to the intent behind the posting.

89

(*See* Mot. 151.) Apart from inadmissible hearsay or speculation, contradicted by the contents of the sign itself, one cannot imagine what testimony Toby Barrett might have offered to undermine the government's rather intuitive position that Barrett meant exactly what he had written about shooting trespassers regardless of identity. *See United States v. Tanner*, 941 F.2d 574, 585 (7th Cir. 1991) (affirming exclusion of defense witnesses with no personal knowledge of pertinent events). Certainly, Toby Barrett's declaration makes no reference to the sign. (*Cf.* Mot. Ex. 96.)

The omission of Toby Barrett, whose putative testimony would not have created a reasonable likelihood of acquittal, did not constitute prejudicial ineffective assistance of counsel. *See Boyle v. McKune*, 544 F.3d at 1138.

### B. Alvin Hahn

The putative testimony of Barrett's neighbor, Alvin Hahn, would have had even less value than that of the defendant's son. According to Barrett, Hahn would have corroborated Toby's claim that only one police car had activated its emergency lights. Hahn, though, offers no such information. He states that he was awakened by gunfire, looked out his window 15 seconds after it stopped, and saw "*at least one* vehicle with its police lights on." (Mot. Ex. 75 at 1 (emphasis added).) Thus, he could have offered no evidence as to the visibility of emergency lights when Barrett began firing.

Apart from that fundamental flaw, Hahn's declaration clearly allows for the possibility that multiple vehicles had engaged their emergency lights. And Hahn gives no indication that he had an unobstructed view of Barrett's land, or that his vantage allowed him to see all possible emergency lights. The emergency lights on Trooper Geringer vehicles were not visible from the rear and Trooper Hash did not recall whether he had activated his rear-facing emergency lights,

90

potentially explaining any limitations in Hahn's perception. (Tr. 1021-22.)  Given the fact that

Hahn could not provide any exculpatory testimony, trial counsel reasonably omitted him from the

witness stand and did not prejudice defendant in doing so.  *See Boyle*, 544 F.3d at 1138.

11.  Trial Counsel Reasonably Omitted Unpersuasive Evidence Concerning Barrett's Knowledge
of the Arrest Warrant

Barrett claims his attorneys provided ineffective assistance in failing to present evidence

that he was unaware that the state court had issued a warrant for his arrest.  He argues that

counsel should have adduced evidence that his state trial could not have occurred on the day he

failed to appear and that the state court clerk mailed the warrant to him but did not request a

return receipt from the post office.  He also claims that counsel should have called bail bondsman

Martin Daggs during the guilt phase.  Supposedly, Daggs would have testified that he never

notified the defendant about the warrant.  Finally, Barrett complains that his attorneys should

have called some of his relatives to testify that the police had visited the defendant's home

without incident and that they could have convinced him to surrender.[10]  (Mot. 154-63; BIS 90-

92.)

Barrett's arguments all fail, as he cannot show that any of this evidence would have

assisted him or that the failure to adduce it was objectively unreasonable.  As previously noted,

absent a showing that a forgone witness's testimony would have created a reasonable likelihood

---

[10]Barrett notes in passing that his former attorney's widow, Mary Rogers, has reviewed
her late husband's file and found no record of a warrant.  The widow also reportedly assured
Barrett's present counsel that her husband, Bill Ed Rogers, would not have informed the
defendant of a warrant, had he received notice, because he was angered at having been fired.
(Mot. 158.)  Barrett does not fault his federal trial lawyers for failing to adduce any of this
material, nor could he.  Barrett's attorneys could not seriously have proffered a hearsay report of
Mary Rogers's hearsay interpretation of her husband's privileged file, which she presumably
could not have authenticated.

of prejudice, Barrett cannot establish ineffective assistance. *See Patel v. United States*, 19 F.3d at 1237; *United States v. Sapp*, 989 F. Supp. at 1099-1100.

    A.  <u>Issuance of the Bench Warrant</u>

Barrett argues that his attorneys should have introduced evidence that the Sequoyah County court had not summoned a venire for the date he failed to appear for a scheduled jury trial. He argues that proof of that fact would have implied some invalidity in the subsequently issued warrant, because it was premised on his failure to appear for a jury trial. Barrett goes on to observe that the warrant was issued by an unauthorized deputy clerk without a  motion from the prosecution. (Mot. 155-57.) Barrett's argument is untimely and without any merit, as the police acted in good faith on the basis of a facially-valid warrant.

Barrett first raised the argument about counsel's failure to attack the validity of the warrant in his Amended § 2255 Motion, filed September 25, 2009. (Doc. 70 at 173-74.) The Amended Motion was filed well after the expiration of the one-year period of limitations applicable to his Motion to Vacate. *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at1280; *cf.* Docs 1 & 2. The limitations period began to run on the date the Supreme Court denied Barrett's petition for writ of certiorari, March 17, 2008. *Willis*, 202 F.3d at 1280-81. The year expired on March 17, 2009. Because over six months elapsed before Barrett filed the amendment, his new claim is barred. *See United States v. Guerrero*, 488 F.3d at 1316. The claim arises from different facts than those alleged in support of Barrett's Corrected Motion (Doc. 2) and therefore does not relate back to that pleading. *See Craycraft*, 167 F.3d at 457. Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the contention. *United States v. Gabaldon*, 522 F.3d at 1124. Of

course, he cannot do so, as the claim is premised on the information available within the record.

Thus, this Court should strike and disregard Barrett's untimely claim that trial counsel failed to

adduce evidence concerning the validity of Sequoyah County's bench warrant.

Even if this Court found this claim cognizable, it still would lack any merit. As this

Court has already found, the police were authorized to enter Barrett's property by a search

warrant, wholly independent of the bench warrant. (Trl. Docs. 105 at 5 & 124; Tr. 7: 1471

(Trooper Pettingill notes the existence of two warrants.) Accordingly, any flaw in the arrest

warrant would have in no way called into question the propriety of the Tact Team's entry to

Barrett's property. But even if Barrett could show that the Tact Team relied on the bench

warrant to enter the property, any flaw in its issuance still would not have invalidated the entry

because the police were acting in good faith. The Supreme Court applies a good-faith exception

to the Fourth Amendment suppression rule, and will not exclude evidence if police officers relied

on a mistake made by a judicial employee in the issuance of a warrant. *See Arizona v. Evans*,

514 U.S. 1, 15 (1995). Indeed, this Court has already recognized that legal basis for denying

suppression in this case. (*See* Trl. Doc. 105 at 5-6 (citing, inter alia, *United States v. Bishop*, 890

F.2d 212, 216 (10th Cir. 1989)).)

Trial counsel's omission of irrelevant evidence about the validity of the bench warrant

was not ineffective assistance. *United States v. Harris*, 408 F.3d 186, 191 (5th Cir. 2005); *see*

*Patel v. United States*, 19 F.3d at 1237.

B.  Knowledge of the Bench Warrant and Wisdom of Seeking a No-Knock Search
    Warrant

Barrett makes three unrelated arguments that his attorneys failed to present circumstantial

evidence about his knowledge of the state court bench warrant and the necessity of seeking a no-

knock search warrant. (Mot. 157-59.) The government responds to these meritless points in order of presentation.

Barrett claims his attorneys acted ineffectively in failing to adduce evidence from a state court file that bench warrant was mailed to him without a return receipt requested. (*See* Mot. 157-58; Tr. Hr'g Jan. 26, 2005, at 29-30, 39-42.) Barrett's claim fails from the outset because the record of the mailing was subject to a legal presumption of delivery in the absence of any evidence to the contrary. *See Moya v. United States*, 35 F.3d 501, 504 (10th Cir. 1994); *McPartlin v. Comm'r*, 653 F.2d 1185, 1191 (7th Cir.1981) (noting presumption of receipt of properly addressed mail); *see also Hagner v. United States*, 285 U.S. 427, 430 (1932) ("The rule is well-settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed."). Indeed, when presented with the issue, this Court did not presume that the mailing provided insufficiently reliable notice:

> While the Defendant focuses primarily on the fact that he may not have received notice of the need to appear, the evidence presented at the hearing indicated that the Sequoyah County Court Clerk followed the usual procedures employed to effect such notice, *i.e.*, that notice was mailed to the Defendant's last known address, and that the underlying file fully documented these procedures. . . . it thus cannot be said that false information was intentionally or recklessly provided to the judge (e.g., that the Defendant was afforded notice when in fact he was not).

(Trl. Doc. 105 at 7-8.) Accordingly, production of the state court file would have simply served to provide further evidence that Barrett was aware of the warrant and the failure to elicit such harmful evidence was neither unreasonable nor prejudicial.

Barrett also complains that his attorneys should have presented information, which he located in his former attorney's file, to demonstrate that the state had offered to allow him to

94

plead guilty in exchange for a no-custody sentence in his drug case.[11]  According to Barrett, this information would have shown that the police later acted unreasonably in seeking a no-knock warrant.  Of course, the fact that a prosecutor offered a favorable disposition in Barrett's 1997 drug case has absolutely no bearing on how the police interpreted information obtained in 1999 about the defendant's subsequent conduct and attitude toward law enforcement.  Moreover, the necessity of seeking a no-knock warrant had no bearing on the document's validity or the Tact Team's reliance on it to properly enter Barrett's property.  Assuming that, in spite of the patent irrelevance of the plea offer, trial counsel still might have concluded that the matter was worth exploring, Barrett fails to show that his attorneys had any reason to investigate the issue.  In particular, he fails to aver that he advised them of the existence of the plea offer.  *Cf. Smith v. Workman*, 550 F.3d 1258, 1272 (10th Cir. 2008) (noting that counsel are not expected to be clairvoyant).  Trial counsel did not act ineffectively in omitting to present irrelevant evidence about a plea offer, in another case, about which they had no reason to have any knowledge. *United States v. Harris*, 408 F.3d at 191; *see Patel v. United States*, 19 F.3d at 1237.

Barrett is similarly unpersuasive in complaining that his attorneys ineffectively omitted the testimony of bail bondsman Martin Daggs from the guilt phase.  (Mot. 159.)  As Barrett notes, Daggs testified in the penalty phase that he did not detain the defendant or otherwise provide him notice about the bench warrant following the failure to appear.  (Tr. 25: 5008-29.)  The fact that Daggs had not informed Barrett of the warrant in no way foreclosed the possibility that the defendant learned of it from some other source.  Here the government presented evidence

---

[11]For the sake of argument, the government assumes that Barrett does not fault his attorneys for failing to adduce the hearsay documents in his former attorney's file and, instead, believes that trial counsel should have sought admissible evidence of the plea offer.

that Barrett made statements acknowledging the existence of the warrant or the likelihood the police would enter his property (*see e.g.,* Tr. 3: 400-01, 466, 13: 3068, 15: 3492), and Daggs's inaction does nothing to contradict that testimony because he was not the only possible source of information about the warrant.  Notably, Daggs's penalty phase testimony about his actions failed to persuade the jury that Barrett was unaware of the warrant, as it found true the substantial planning and premeditation factor.  That finding implied the jury's reliance on testimony that Barrett intended to kill police officers when they served a warrant that he had frequently discussed.  (*See, e.g.*, Tr. 3: 400-01, 466.)  Thus, there is no reasonable probability that Daggs's absence from the witness stand during the guilt phase in any way prejudiced the verdict.  The omission of his minimally probative testimony from the guilt phase was neither unreasonable nor prejudicial ineffectiveness.  *See Boyle*, 544 F.3d at 1138.

C. Barrett's Supposed Cooperation with the Police

Barrett also fails to demonstrate that his attorneys erred in omitting to call witnesses who would have testified that Sheriff Johnny Philpot had visited the defendant's home less than a month before the murder.  According to Barrett such evidence would have undermined the government's proof that the defendant was hostile to law enforcement.  Barrett's claim that Philpot was on his porch less than a month before the killing is based on the recollection of his cousin and neighbor, Janice Sanders, whose call to the police supposedly led the police to respond.[12]  (Mot. Ex. 85 at 1-2.)  Philpot testified at trial to a single instance in which he and

_____

[12]Barrett's mother also alludes to the incident in a declaration (Mot. Ex. 97 at 16), but she does not state that she actually observed it and is not simply repeating Sanders's representations. Barrett also proffers a hearsay report that Philpot recently told a defense investigator that the incident occurred less than a month before the murder, but that inadmissible evidence should not long detain this Court. (*See* Mot. Ex. 114.)

96

other deputies had gone to Barrett's home and inspected the defendant's weapons:

> Q. Sheriff Philpot, there has been reference to an incident in which Kenneth Barrett allowed officers to look at his firearms. Are you familiar with that incident?
> A. Yes, I am.
> Q. And when did that happen?
> A. It was in July, I think the 29th of 1998.

(Tr. 1789, *see also* Tr. 1809-10.)  Philpot has clarified that the July 1998 incident was the only one in which he visited Barrett's home and inspected a weapon.  (See Resp. Ex. 1.)

Significantly, defense counsel did not challenge Philpot on the date of the incident, though Barrett was present and clearly could have informed his lawyers whether the meeting had occurred just a month before the murder.  The fact that Philpot was not challenged indicates that Barrett said nothing because the sheriff's memory was accurate.  More to the point, Barrett's apparent silence on this subject deprives his ineffectiveness claim of any merit.  If Barrett did not inform his attorneys that he had met with Philpot shortly before the murder, he can hardly fault them for failing to investigate the subject or learn of it from some other source.  As noted above, "[C]ounsel cannot be faulted for failing to raise claims as to which the client has neglected to supply the essential underlying facts . . . [because] clairvoyance is not required of effective trial counsel." *Smith v. Workman*, 550 F.3d at 1272 (quoting *United States v. Miller*, 907 F.2d at 999 (internal quotations omitted)).

Barrett further fails in claiming his attorney should have adduced the testimony of his relatives that he would have willingly surrendered had the police had solicited his family for cooperation.  (Mot. 161-62.)  At best, such testimony would have amounted to inadmissible hearsay accounts of the defendant's statements.  At worst, it would have consisted of inadmissible speculation about the defendant's intent.  *See United States v. Tanner*, 941 F.2d at

97

585. Trial counsel did not act unreasonably, nor did they prejudice Barrett, by omitting to proffer patently inadmissible evidence. *See Williams v. Allen*, 458 F.3d 1233, 1250 (11th Cir. 2006); *Henderson v. Norris*, 118 F.3d at 1288.

Barrett also fails to demonstrate ineffectiveness when he faults his attorneys for omitting to adduce evidence that, some unspecified number years before the murder, his aunt had once convinced him to surrender to pursuing police officers. (See Mot. 162 (citing Mot. Ex. 91).) The incident was entirely irrelevant to Barrett's state of mind at the time of the murder, and cumulative of more concrete evidence that a little more than a year before the murder, the defendant had permitted Sheriff Philpot and several deputies onto his porch. Again, trial counsel did not act ineffectively or prejudicially by forgoing such unpersuasive and irrelevant evidence. *See Strickland v. Washington*, 466 U.S. at 687; *Williams v. Allen*, 458 F.3d at 1250.

On a related note, Barrett cannot demonstrate ineffectiveness by alleging his attorneys should have adduced, at the guilt phase, the penalty phase testimony of Clyde Edgmon. (*See* Mot. 162-63.) Edgmon testified that Barrett came to his house an indeterminate period of time prior to the murder to perform some mechanical work on a vehicle. During Barrett's visit, two police officers accosted the defendant, but Edgmon did not listen to the conversation. (Tr. 24: 4929-39.) Edgmon's recollections, devoid of any time frame, demonstrate nothing about the entirely distinguishable facts of this case, which turned on Barrett's intent toward police officers entering his land to arrest him. Indeed, Edgmon's testimony clearly failed to raise a reasonable doubt during the penalty phase that Barrett had substantially planned and premeditated the murder. (*See* Trl. Doc. 258.) As such, Barrett cannot show a reasonable probability that Edgmon's involvement in the guilt phase would have led to acquittal, when the government had

98

no burden to prove premeditation.  (*See* Trl. Doc. 240 at Inst. 7.)  The omission of Edgmon's

patently unhelpful testimony was not ineffective assistance of counsel.  *See Strickland v.*

*Washington*, 466 U.S. at 687; *Boyle v. McKune*, 544 F.3d at 1138.

Barrett also cannot establish ineffectiveness based on the omission of testimony that he

did not typically react to the presence of police officers when he observed them on the public

road outside his house.  (*Cf.* Mot. 162 (citing Mot. Exs. 77 & 95).)  According to Barrett, the

putative testimony would have established that, consistent with his indifference to the police, he

did not respond when told by Travis Crawford that officers had driven by his house in an

unmarked vehicle.  Such a strategy would have, however, lent credence to Crawford's testimony

that he made the report to Barrett in the first instance.  Presumably, Crawford would not have

thought to inform Barrett of the police presence unless he believed it constituted some sort of

threat to the defendant.  Putting that aside, evidence that Barrett was not hostile to the presence of

the police on public highways was irrelevant; the issue at trial was his intent toward them when

they entered his property to arrest him.  The omission of irrelevant evidence about Barrett's

response to the public presence of the police was neither unreasonable performance nor

prejudicial to the defense.  *See Strickland*, 466 U.S. at 687; *Patel v. United States*, 19 F.3d at

1237.

Barrett also fails to establish ineffective assistance based on a claim that his attorneys

should have adduced evidence that he hung a threatening sign on his gate shortly before the

murder in response to trespassers, not in anticipation of the police.  (Mot. 162 (citing Mot. Ex.

95).)  As evidence of this, Barrett points to Shawn Hill's assertion that "The sign on Kenny's

gate was put there on the 9/22/99 because meth fiends had climbed across his fence the night

before and awakened him. It had nothing to do with the police." (*Id*.)  Hill's averment lacks any apparent foundation and appears, at best, to repeat the defendant's hearsay statements. *See Tanner*, 941 F.2d at 585.  The failure to adduce inadmissible evidence is neither objectively unreasonable nor prejudicial. *See Williams v. Allen*, 458 F.3d at 1250.  Moreover, counsel could have validly concluded that any attempt to minimize the significance of the sign through Hill's testimony would have simply drawn further attention to the government's evidence and allowed the prosecution to explore it with a defense witness. *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (noting strong presumption that counsel makes decisions for tactical reasons, rather than out of neglect).

Assuming, arguendo, that counsel had no valid reason for omitting the putative defense evidence, the forgone evidence would have had little impact, as the prosecution did not rely on any fact that Hill's supposed testimony appears designed to contradict. (*See, e.g.*, Tr. 3: 398, 13: 3085.)  The prosecution certainly presented evidence of the sign, but it spoke for itself, expressing Barrett's universally profane and hostile sentiment, "Keep Out. I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot."  The sign was not, however, the object of enormous scrutiny or concern at trial.  The government adduced evidence about it from a handful of witnesses (Tr. 3: 398, 4: 726, 11: 2344-45 & 13: 3085) and mentioned it during argument (Tr. 20: 4297, 4381, 4382, 4396), never once claiming that Barrett had intended it specifically for the police or that he had hung it a particularly long time before the murder.  The sign was but one part of the proof of the defendant's intent, and the prosecution presented a constellation of evidence to establish mens rea.  (*See, e.g.*, Tr. 20: 4296-99 (argument about intent that relied on, in addition to the sign, the defendant's statements, his constant possession of

a handgun, and his decision to arm himself with a rifle when a man entered his property and said he was being pursued by the police), 4305-07 (premising intent on the defendant's locked gate, his easy access to a rifle, his shot pattern, his preparation of a spotting scope to view the natural point of entry to his land, and his attempt to reach his pistol after being taken into custody).)  As such, Barrett cannot show a reasonable probability that he would have been acquitted had his attorneys adduced Hill's putative testimony about the sign.  *Patel v. United States*, 19 F.3d at 1237.  Accordingly, Barrett cannot sustain his claim of ineffective assistance of counsel.  *Id.*

12.  <u>Trial Counsel Reasonably Sought and Received an Order Striking the Testimony of a Government Expert Witness; No Further Response Was Prudent or Necessary</u>

Barrett claims his trial attorneys were ineffective for failing to prepare for the government's expert witness, James Horn, and for failing to interpose a *Daubert* challenge to his testimony.[13]  Barrett further argues his trial attorneys were ineffective for omitting to seek a mistrial after they successfully moved to strike Horn's testimony.  In a related vein, he contends that his appellate attorneys were ineffective for failing to argue that the jury's exposure to Horn constituted plain error.  (Mot. 163-76, 384-85; BIS 92-97, 237-38.)  Trial counsel's successful motion to strike Horn's testimony moots his various complaints about counsel's alleged failures to prepare for the witness.  Regardless, the jury's exposure to Horn would not have supported a valid mistrial motion or an appellate claim of plain error.

As Barrett concedes, this Court granted a defense motion to strike Horn's testimony, holding that it was not based upon assertions that tested "in such a manner to make the evidence reliable under *Daubert*."  (Tr. 8: 1634-35.)  In fact, the Court commented that it could not

---

[13]*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

determine what methods Horn had employed or what conclusions he had reached.  The Court

commented that it did not believe that Horn had reached any opinions based on the facts of the

case.  (Tr. 8: 1635-36.)  It also noted counsel's strategic decision to challenge the witness before

the jury and observed, "Defense counsel did an admirable job in his cross examination of Mr.

Horn."  (Tr. 8: 1635.)  Later that day, the Court informed the jury that it had struck Horn's

testimony and instructed the jurors to disregard it in its entirety:

> As a matter of law, I have determined that the testimony which you heard on
> Monday afternoon and Tuesday morning of James Horn should not have been
> admitted into this trial. You should not speculate about the reasons for my ruling
> on this issue it is based solely on my interpretation of the law applicable in this
> case. Therefore, I instruct you that you should disregard Mr. Horn's testimony in
> its entirety and not consider it for any purpose in making your decision when
> reaching a verdict in this case.

(Tr. 8: 1739-40.)  The Court's ruling rendered Horn's testimony a nullity; the Court's findings

underscore the fact that Horn had not prejudiced the defense.

Federal courts "presume that jurors will follow clear instructions to disregard evidence

unless there is an overwhelming probability that the jury will be unable to follow the court's

instructions, and a strong likelihood that the effect of the evidence would be devastating to the

defendant." *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002) (internal quotation

marks omitted); *see also Penry v. Johnson*, 532 U.S. 782, 799-800 (2001) (noting general

presumption that juries follow instructions applies in habeas proceedings).  Accordingly,

Barrett's complaints that his attorneys failed to properly prepare for, and preemptively challenge,

Horn's testimony are moot, as that testimony was presumably disregarded by the jury under the

Court's instruction.  *See Caballero*, 277 F.3d at 1243; see *generally McElvain v. Lewis*, 283 F.

Supp. 2d 1104, 1127 (C.D. Cal. 2003) (finding no ineffectiveness where counsel did make an

allegedly omitted objection).

Barrett similarly fails in attempting to show that trial counsel should have sought a mistrial based on the jury's exposure to Horn's testimony. A motion for mistrial would have been futile, and therefore could not amount to ineffective assistance. *See Hawkins v. Hannigan*, 185 F.3d at 1152; *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994). Courts of this circuit may only grant a mistrial "when a defendant's right to a fair and impartial trial has been impaired." *United States v. Caballero*, 277 F.3d at 1242. "'Whether a motion for mistrial should be granted is within the discretion of the trial judge because he is in the best position to evaluate the effect of the offending evidence on the jury.'" *United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004) (quoting *United States v. Laymon*, 621 F.2d 1051, 1053 (10th Cir.1980)). In this regard, a motion for mistrial requires "an examination of the prejudicial impact of an error or errors when viewed in the context of an entire case." *Meridyth*, 364 F.3d at 1183. "Where evidence is later ruled inadmissible, a cautionary instruction is ordinarily sufficient to cure any alleged prejudice to the defendant and declaring a mistrial is only appropriate where a cautionary instruction is unlikely to cure the prejudicial effect of an error." *United States v. Peveto*, 881 F.2d 844, 859 (10th Cir. 1989).

Barrett cannot show that the jury's exposure to Horn's testimony impaired his right to a fair trial. Horn's testimony on direct examination was confined to intuitive and anecdotal observations about the nature of human memory. He made innocuous and non-controversial assertions – that memory is affected by emotion, that witnesses to stressful events require time to compose their emotions before reliably recounting events, and that the quality of a witness's perception and memory degrade in relation to the stress of the event to be recalled. (Tr. 4: 850-

103

51, 856-58, 860-61.)  These common-sense observations were not prejudicial to Barrett and required little creativity to turn to the defense's advantage in a prosecution built on the testimony of participants in a gun battle.  Indeed, similar evidence has frequently been proffered by defendants seeking to undermine eyewitness identifications.  *See generally United States v. Rodriguez-Felix*, 450 F.3d at 1123-25 (noting the refusal of most federal courts to create a per se rule of exclusion for experts in eyewitness identification who testify about, inter alia, the effects of stress on memory).

Horn made other statements about memory that are not subject to reasonable debate.  He testified that "triggers" can assist witnesses in recalling otherwise forgotten details.  (Tr. 4: 852, 854-55, 859.)  That observation was not only non-prejudicial, it is entirely consistent with the well-worn legal precept that litigants can refresh recollection with extrinsic evidence.  *See United States v. Weller*, 238 F.3d 1215, 1221 (10th Cir. 2001) (noting general rule that almost anything can be used to refresh a witness's recollection).  Horn also stated that inconsistencies are normal among witnesses to a stressful event.  (Tr. 4: 860.)  Again, his assertion reflects a widely-accepted concept in the courts, as the pattern jury instructions of this circuit and others effectively inform jurors of the same thing.  *See, e.g.*, Tenth Circuit Pattern Jury Instructions (Criminal) § 1.08 (2005) ("When weighing conflicting testimony . . . . you should keep in mind that innocent misrecollection – like failure of recollection – is not uncommon."); *see also* Third Circuit Pattern Jury Instructions (Criminal) § 3.04 (2008) ("Inconsistencies or discrepancies in a witness' testimony or between the testimony of different witnesses may or may not cause you to disbelieve a witness' testimony. Two or more persons witnessing an event may simply see or hear it differently. Mistaken recollection, like failure to recall, is a common human experience").

On cross-examination, defense counsel led Horn into a series of statements that tended to undermine the reliability of the government's witnesses, who were testifying six years after the shooting. For instance, Horn stated that the jury had to understand the "impact that trauma has on memory" because it was necessarily relying on recollections of traumatic events. (Tr. 4: 885.) Horn also conceded that memory degraded over time (Tr. 4: 911), that grief stemming from the death of a colleague could affect memory (Tr. 5: 955), and that a workshop he held for the Tact Team possibly led to cross-contamination of memory (Tr. 4: 906). He also reiterated that memory was distorted by trauma. (Tr. 5: 955.) Far from prejudicial to the defense, this testimony provided grist for a bevy of potential reasonable-doubt arguments.

Unable to demonstrate the existence of any prejudice resulting from the substance of Horn's testimony, Barrett instead attacks its tone, arguing that the witness's connection to the FBI and his references to the fraternal bond among police officers lent credibility to the government's witnesses. (Mot. 174.) Trial counsel apparently took a longer view, appreciating that the witness's connection to law enforcement lent credibility to statements the defense could use to attack the reliability of the government's witnesses. In fact, Horn's testimony about the familial bonds among police officers was also beneficial to the defense, because it referred to a stressor that might diminish the reliability of an officer's recollections of events like this shooting:

> A. . . . in critical incidents, it's very akin to the relationship I still have to this day with the Marines with whom I served in Vietnam because there is a bond when you face life-threatening situations that is formed, that is probably like no other bond. You become instant friends and you probably just stay that way the rest of your life because of that experience.
> Q. In that regard, if an officer shooting relates to a member of a tactical team, is that going to increase the difficulties of -- that we are talking about today or is that going to minimize it or what impact, if any impact, is it going to have?

105

A. I have never seen it where it didn't increase the impact that it had on the participants when it's a colleague.

(Tr. 4: 862.)

Horn's testimony was potentially very helpful to it and provided no basis for a mistrial. In fact, Horn's testimony provided so many potential benefits to the defense, that counsel had an obvious tactical reason not to challenge it in the first instance and had no colorable basis for a mistrial motion after the order striking the evidence. Certainly, trial counsel's omission of a futile motion for a mistrial was neither unreasonable nor prejudicial. Similarly, appellate counsel wisely chose to omit a claim of plain error based on the jury's exposure to plainly non-prejudicial evidence. *See United States v. Challoner*, 583 F.3d at 745 (noting that only the failure to raise a "dead-bang winner" amounts to effectiveness on appeal).

13. Trial Counsel did not Omit any Valid Requests for Guilt-Phase Jury Instructions

Barrett claims that his trial attorneys rendered ineffective assistance when they omitted to request jury instructions on informant credibility, drug-user credibility, self defense, two defense theories, and unidentified lesser-included offenses. (Mot. 176-78; BIS 97-99.) Barrett's claims all fail because adequate instructions were given, because counsel did make the supposedly forgone request, or because the omitted instructions were contrary to the law and evidence.

Barrett misreads the record when he complains that his attorneys did not request an instruction on informant witness credibility. The Court duly instructed the jury as follows:

The testimony of a witness who provides evidence against the defendant for some advantage that it may give to them or in contemplation of immunity or reduction from punishment or any other inducement, must be examined and weighed with greater care or greater scrutiny than the testimony of an ordinary witness. You must determine whether the witness's testimony has been affected as to its credibility by any interest they have in any special treatment they receive or any interest they have in the outcome of the trial or any prejudice they have against the

106

defendant.

(Trl. Doc. 240, Inst. 27.)  Barrett does not identify this instruction, nor does he make any attempt

to show how it failed to properly educate the jury about the credibility of informants.  Barrett's

attorneys could not have been ineffective for failing to request an instruction that was given by

the court.  *See Hawkins v. Hannigan*, 185 F.3d at 1152.

Barrett claims that his attorneys erred in failing to request an instruction on drug addict

credibility.  He is correct that such an instruction should be given upon request, when supported

by the record.  *United States v. Smith*, 692 F.2d 658, 660–61 (10th Cir. 1982).  However, the

absence of such a charge is not necessarily prejudicial.  *See id.*; *see also United States v.*

*Nicholson*, 983 F.2d 983, 991 (10th Cir. 1993).  In *Smith*, the Tenth Circuit held harmless the

omission of an addict instruction because the trial court had provided a general credibility

instruction in addition to charges on accomplice, informant, and felon testimony.  The court

found those instructions "sufficient to alert the jury to consider with special care and weigh with

caution the testimony of" the drug-addict witness and observed that the issue was extensively

explored during testimony.  *Smith*, 692 F.2d at 661; *see Nicholson*, 983 F.2d at 991 (similar

result).

In this case, the Court instructed the jury on credibility, impeachment, impeachment by

prior conviction, and informant testimony.  (*See* Trl. Doc. 240.)  Additionally, counsel for both

parties elicited testimony about the prosecution witnesses' involvement with drugs.  (*See, e.g*, Tr.

3: 428-31 (Randy Turman); 3: 468 & 471-72 (Travis Crawford); 8: 1836 & 1843 (Randy

Weaver); 11: 2511, 2515-24, 12: 2581-82 & 2604-05 (Charles Sanders), 13: 3061 & 3070-75

(Cindy Crawford); 13: 3081, 14: 3100 & 3117 (Karen Real); 14: 3486-88 (Brandie Price).)  On

107

this record, as in *Smith* and *Nicholson*, the jury charge and evidence as a whole preclude a finding of prejudice stemming from the absence of a addict-witness instruction. As such, Barrett's cannot demonstrate that his attorneys provided ineffective assistance in omitting to request such an instruction. *McGee v. Higgins*, 568 F.3d 832, 839 (10th Cir. 2009) (disposing of ineffectiveness claims on prejudice grounds alone "[b]ecause it is easier").

Barrett cannot show that his trial attorneys were ineffective in failing to request a self-defense instruction because he cannot demonstrate that the record supported the giving of such a charge. A defendant is entitled to an instruction on his theory of the case if such a charge is "a correct statement of the law, and if he [had] offered sufficient evidence for the jury to find in his favor." *United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006). The record here would not support a legally complete self-defense instruction. Such a charge would have informed the jury that Barrett is not entitled to use any greater force than he had reasonable ground to believe was necessary under the circumstances to save his life or avert serious bodily harm. *See United States v. Scalf*, 725 F.2d 1272, 1273-74 (10th Cir. 1984).

Here, as the Tenth Circuit noted, the evidence indicated that Barrett shot Eales three times as the victim sought cover behind a vehicle and was facing away from the defendant. *Barrett*, 496 F.3d at 1085; *see* Tr. 7: 1605-07, 1610-15. Even if the appearance of Eales and his fellow Tact Team members had arguably placed Barrett in a reasonable apprehension of his safety, the defendant had clearly become the aggressor when he shot a fleeing man three times in the back and could not have demonstrated that he was using reasonable force under the circumstances. *See Le v. Mullin*, 311 F.3d 1002, 1026-27 (10th Cir. 2002) (holding counsel was not ineffective for failing to request a self defense instruction because defendant was the initial aggressor); *see*

108

*also United States v. Garcia*, 625 F.2d 162, 170 (7th Cir. 1980) (finding self-defense claim unavailable to defendants who, following an altercation, chased victim, held him down and stabbed him 47 times).  Because self-defense was not a viable theory under the facts, counsel did not act unreasonably in omitting to request an instruction on the doctrine.

Furthermore, to convict Barrett of Counts 2 and 3, the jury had to find that the defendant had reason to know that the victim was a police officer.  (*See* Trl. Doct. 240 at Insts. 7 & 15.) That finding precludes the possibility that the jury could have also found that Barrett, in these circumstances, used no greater force than he had reasonable grounds to believe was necessary. By extension, the finding obviates the possibility that a self-defense instruction, even if requested and given, would have led to a reasonable probability of a more favorable verdict.  Accordingly, Barrett cannot establish prejudicial ineffectiveness based on the decision not to request an unnecessary instruction.  *See McGee v. Higgins*, 568 F.3d at 839 (10th Cir. 2009).

Barrett is no more successful in his conclusory argument that counsel should have requested instructions in support of two defense theories – first, that the defendant had no indication that the lead Bronco contained police officers and, second, that he was not engaged in drug manufacture or distribution when the Tact Team entered his land.  Barrett provides no hint what form the unrequested instructions might have taken.  At most, though, counsel might have requested instructions that admonished jurors to acquit Barrett if they harbored a reasonable doubt about facts that formed a necessary prerequisite to proof of the charged offenses.  Such an instruction was entirely unnecessary, because the charge adequately informed the jury that it must acquit on the basis of reasonable doubt as to any element of any charged crime, including whether Barrett had reason to know he was firing on police and whether he was involved in drug

offenses.  (*See* Trl. Doc. 240, Insts. 3, 4, 7, 8, 9, 10, 11, 12, 13, 15 & 16.)  The Court was not required to give a theory of the defense instruction "if it would simply give the jury a clearer understanding of the issues." *United States v. Wolny*, 133 F.3d 758, 765 (10th Cir.1998).  In view of that rule, defense counsel could not have provided ineffective assistance by failing to make a futile motion for a pointless instruction.  *See Hawkins*, 185 F.3d at 1152.

Finally, Barrett's contention that his attorneys were ineffective for failing to request lesser-included-offense instructions fails as a matter of law and fact.  Barrett's trial lawyers did ask for lesser offense instructions, as Barrett concedes later in his § 2255 Motion:

> MR. HILFIGER: Okay. Well, I just – I still feel it should be separated, murder first, murder second.  Also we're asking that voluntary manslaughter because it doesn't come under heat of passion as defined in theTenth Circuit.

(Tr. 19: 4212.)  In fact, Barrett elsewhere claims error based on this Court's denial of the request.  (*See* Mot. 336 ("the defense requested the trial court instruct on voluntary manslaughter").)  Even if defense counsel had not requested the instructions, the government did.  (*See* Tr. 19: 4213-21.)

The actions of all counsel notwithstanding, there was no lesser-offense instruction available as to the charged crimes as a matter of law.  *See, infra*, Arg. IX.  Furthermore, this Court found that the record would not support a lesser-offense instruction as to any of the charged crimes.  RT 4222-24; *cf. United States v. Moore*, 108 F.3d 270, 272 (10th Cir.1997) (requiring lesser-included-offense instructions only if, inter alia, "a jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense.").  Thus, Barrett could not even show, hypothetically, that the alleged absence of the request would have been anything but futile and non-prejudicial.

14.  Trial Counsel's Failure to Make Futile Objections did not Constitute Ineffective Assistance

110

Barrett claims his trial attorneys were ineffective for omitting objections that resulted in the "plain error" review of various appellate claims. (Mot. 178-79; BIS 100-01.) Barrett's argument fails as a matter of law, as the Tenth Circuit does not recognize the stated theory as asserting a valid claim of ineffectiveness. Even if Barrett had stated a legally valid claim, he cannot demonstrate prejudice in view of the Tenth Circuit's opinion, which states or implies that all the claims denied under the plain error standard of review would have similarly failed if considered de novo.

To demonstrate the existence of prejudicial ineffectiveness, Barrett must establish "a reasonable probability that but for" his counsel's failure to object, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687. He cannot properly premise a claim of ineffective assistance of counsel on an argument that the lack of an objection resulted in plain error review. *See United States v. Hemsley*, No. 07-4222, 2008 WL 2725857, at **1(10th Cir. July 11, 2008) (holding that *Strickland* analyses of omitted objections focuses on the impact at trial). The Tenth Circuit's refusal to contemplate such claims accords with the notion that courts strive to avoid analysis of counsel's conduct with the "benefit of hindsight." *Thomas v. Gilmore*, 144 F.3d at 515. Arguments that trial counsel's omission of an objection precluded reversal on appeal ignores the fact that a timely objection would likely have resulted in a remedy that foreclosed a subsequent appeal. Because any attempt to show that a timely objection would not have had such an effect is entirely speculative, the claimant can never show a reasonable likelihood of prejudice. *Strickland*, 466 U.S. at 687. Accordingly, this Court should simply reject his contention for failure to state a viable claim.

To the extent that the Court should review, in the alternative, the impact of plain error

111

review on the outcome of this case, the Tenth Circuit's opinion permits no showing that the standard of review had any prejudicial effect. Indeed, in rejecting a claim about the search warrant's failure to meet certain state law requirements, the court expressly concluded "there was no error on the part of the district court, let alone plain error." *Barrett*, 496 F.3d at 1089. While the court did not make a similar statement in rejecting challenges to the search warrant based on its execution by federal agents, its reasoning in no way demonstrates that it would have reached a different result had it applied de novo review. *See id.* at 1090-91. The Tenth Circuit rejected the argument that federal agents could not validly serve a state warrant by observing that Oklahoma state law specifically permitted such service. *Id.* at 1090. It rejected a claim that the warrant did not meet the requirements of Federal Rule of Criminal Procedure 41, based on a finding that the rule did not apply. *Id.* at 1091.

Barrett also fails in his complaints that the Tenth Circuit reviewed his challenges to the indictment under an unfavorable standard. In fact, the Tenth Circuit's rejection of his sufficiency claims was not dependent upon the plain error standard. While the court noted it would apply the standard, it ultimately found no error at all, obviating the concern that the standard applied was of any moment. *See, e.g., Barrett*, 496 F.3d at 1093 ("Counts 1 and 2 of the superseding indictment clearly gave Barrett fair notice of the charges he had to defend against, and likewise were sufficient to enable him to assert a double jeopardy defense "); *id.* at 1094 ("As for Barrett's second sufficiency-related argument, it is unnecessary for a criminal defendant charged with a § 924(c) offense to be separately charged with and convicted of the underlying offense."); *id.* at 1094-95 (rejecting a claim regarding the application of a Supreme Court decision because it did not apply to Barrett's indictment). The Tenth Circuit's rejection of Barrett's multiplicity claim

likewise noted the lack of objection below, but applied the same test to the indictment that it would have utilized under de novo review. *Barrett*, 496 F.3d at 1095 (quoting by reference to another case the test established in *Blockburger v. United States*, 284 U.S. 299, 302 (1932)). The Tenth Circuit rejected Barrett's misjoinder argument as "wholly lacking merit," leaving little doubt that the standard of review had any impact on the disposition of the claim. *Barrett*, 496 F.3d at 1097.

The court used similar language in rejecting claims about the admission of victim impact evidence. It rejected Barrett's legal interpretation of such evidence out of hand: "To the extent that Barrett is suggesting that all second-stage evidence must focus on the "characteristics" of the capital defendant, he is clearly wrong. " *Barrett*, 496 F.3d 1098. It left absolutely no doubt that admission of almost all the challenged evidence did not constitute error of any stripe: "we conclude there was no error, let alone plain error, arising from the admission of this victim impact testimony." *Id.* at 1099. With regard to this Court's decision to allow descriptions of a picture drawn by the victim's son and an essay written by the victim's daughter, the Tenth Circuit found that the legal bases for Barrett's challenges were inapplicable, that Barrett had fallen "far short" of establishing plain error, and that the evidence was not prejudicial under the Federal Rule of Evidence 403. *Id.* at 1099-1100. The Tenth Circuit rejected the final challenge to victim impact evidence, four photographs of Trooper Eales, by noting it was "not persuaded that the district court committed any error, let alone plain error. *Id.* at 1101. Given the Tenth Circuit's reasoning, no reasonable probability exists that Barrett would have received a more appellate outcome had his trial attorneys interposed more futile objections to the victim impact evidence.

The Tenth Circuit also would have rejected Barrett's *Batson* claim regardless of the

standard of review employed. It declined to adopt a rule applying plain error to the review of a *Batson* claim based on the lack of a contemporaneous challenge to the prosecutor's race-neutral explanation and stated, "even applying the standard of review more favorable to Barrett, his *Batson* claim fails. *Barrett*, 496 F.3d at 1105 n.1.

The Tenth Circuit's rejection of Barrett's challenges to the federal death penalty statutes referred to the plain error standard, but in no way depended upon it for the rejection of the defendant's claims. The court denied Barrett's challenge to non-statutory aggravators by reference to a binding precedent from a case decided on de novo review. *Barrett*, 496 F.3d at 1108 (citing *United States v. McCullough*, 457 F.3d 1087, 1106 (10th Cir. 2006)). Similar reasoning formed the basis of the court's rejection of claims regarding proportionality review (496 F.3d at 1109 (citing *Pulley v. Harris*, 465 U.S. 37, 43 (1984)), and the "relaxed" evidentiary standard (*id*. at 1109 (citing *United States v. Fulks*, 454 F.3d 410, 437-38 (4th Cir. 2006); *United States v. Lee*, 374 F.3d 637, 648-49 (8th Cir. 2004); *United States v. Fell*, 360 F.3d 135, 143-46 (2d Cir. 2004); and *United States v. Webster*, 162 F.3d 308, 354 (5th Cir.1998)). While the court referred to plain error in rejecting Barrett's challenge to allegedly vague aggravating factors, it made clear that Barrett had wholly failed to make out any claim of error, whatsoever: "§ 848's general allowance of non-statutory aggravating factors is constitutionally permissible. . . . Barrett has failed to explain how this alleged deficiency in § 848's scheme prejudiced him." 496 F.3d at 1110. The court's reasoning makes clear that the standard of review did not affect the resolution of Barrett's challenges to the federal death penalty statutes.

Plain error review also played no substantive part in the denial of a claim concerning the supposed "double counting" of intent to kill. Again, the Tenth Circuit again explained in certain

114

terms that plain error played no part in its decision: "Barrett has failed to establish any error, let alone plain error, resulting from the manner in which the jury was instructed to utilize the mental culpability aggravating factor in determining the appropriate sentence with respect to Count 3." *Barrett*, 496 F.3d at 1111.

Barrett's claim that the government provided late disclosure of evidence was decided with reference to the plain error standard, but failed on the basis of the Tenth Circuit's concrete finding that voir dire, rather than jury qualification, marked the commencement of trial for purposes of determining timeliness. 496 F.3d at 1116. As such, there is no basis in reason for concluding that the court would have reached different decision if it had invoked de novo review.

In short, Barrett wholly fails to demonstrate that the Tenth Circuit's references to the plain error standard had any impact on the outcome of the appeal, much less do they indicate that trial counsel were ineffective.

15.  Trial Counsel did not Ineffectively Omit Objections to Prejudicial Misconduct

Petitioner claims that his attorneys provided ineffective assistance in that they failed to timely object to instances of prosecutorial misconduct during argument. (Mot. 180; BIS 101-02.) Petitioner's failure to set forth, with any specificity, the factual basis of his argument deprives it of any merit. *See Hall v. Bellmon*, 935 F.2d at 1110 ("conclusory allegations without supporting factual averments are insufficient to state a claim"). But regardless of the flaws in Barrett's pleading, the prosecutors did not commit prejudicial misconduct during argument – as fully explored below – and the omission of futile objections could not have amounted to ineffective assistance. *See, infra*, Arg. V; *Hawkins*, 185 F.3d at 1152.

16.  Trial Counsel Presented Appropriate Mitigation Evidence in View of their Client's Wishes and the Available Facts

Barrett claims that his attorneys acted ineffectively in failing to present mitigating evidence that he had a dysfunctional childhood and suffered from bipolar syndrome and organic brain damage. (Mot. 185-248; BIS 102-25.) Defense counsel wisely presented internally consistent evidence meant to demonstrate that Barrett was a valuable member of his family and community who had been treated unfairly by the government. Barrett has failed to show that his attorneys were aware, or should have been aware of any evidence that he was mentally ill. Moreover, the putative evidence of Barrett's chaotic upbringing and mental illness would have undermined the defense strategy and violated the defendant's desire not to have the jury decide this case on the basis of sympathy.

A. The Defense Evidence and Jury Verdict

Given Barrett's outburst in response to the prosecution's penalty phase argument about his mother, discussed at in Argument XIII, it appears that counsel wisely chose to heed the defendant's wishes. Additionally, counsel had not discovered a factual premise for presenting substantial mental health evidence and wished to avoid premising the mitigation case on Barrett's drug abuse, as they thought such a theory was apt to be poorly received by the jury.

In view of the circumstances confronting defense counsel, they elected to present evidence from several of Barrett's friends and relatives, describing him as a good, generally non-violent, person who regretted Trooper Eales's homicide. Barrett's cousin, Kathy Trotter, who had many connections to the local community, was unaware of the defendant engaging in acts of violence but had heard rumors that he had engaged in mutual combat with his ex-wife. (Tr. 24:

116

4783-93.) The defendant's brother, Steven Barrett, testified that Barrett was not a violent person but was a loner. Steven knew that Barrett smoked marijuana, but did not have personal knowledge that the defendant used any other drug. (Tr. 25: 5030-51.) Roger Crawford, an uncle and neighbor, testified that Barrett was non-violent, a good nephew, a good father, and a hardworking mechanic. Crawford suspected Barrett might have used drugs, but had no personal knowledge. (Tr. 25: 5052-70.) Like Barrett's other relatives, his neighbors, Craig and Clyde Edgmon, described the defendant as non-violent and a good car mechanic. (Tr. 24: 4920-25, 4929-34.)

Barrett's mother and next-door neighbor, Gelene Dotson, described the defendant as an average, but hyper child, who quit high school after a disagreement with the superintendent over the need to get a hair cut. Dotson noted that her son went to work, first taking care of horses then laboring on oil facilities and performing carpentry and mechanical work. Dotson recalled that Barrett married at 18 and had a stormy relationship with his wife, marked by verbal – not physical – disputes. She said that she had never observed Barrett use drugs and could not tell with certainty whether he ever had. While Dotson and Barrett had disagreements, she never feared he would act violently. She described Barrett as "more settled down" since his arrest, something she attributed to his lack of activity. She also related Barrett's statements that he wished he had reacted differently when the Tact Team entered his property. (Tr. 25: 5071-5105.)

Abby Stites was married to Barrett for 14 years, and conceded that the pair did engage in mutual physical combat during their relationship. However, weapons were never used. (Tr. 24: 4877-81.) While Stites had observed Barrett boasting of a willingness to use violence outside their relationship, she had never seen him act on those threats. (Tr. 24: 4883-84.) Stites touched

117

on the fact that she had participated in an effort to have Barrett committed to a hospital in 1986, because she felt he had undefined "mental problems."[14]  Though Barrett discontinued the medications he received at the hospital, Stites agreed to share custody of their son with the defendant following their 1995 divorce.  (Tr. 24: 4893.)

Ernest Barrett, the defendant's father, conceded that he did not have a close relationship with his son after divorcing his mother.  But characterized the defendant as non-violent and said Barrett was sorry about the killing of Trooper Eales.  (Tr. 25: 5105-09.)  Barrett's step-mother, Doris Barrett, reported that after the defendant's arrest, she had developed a close relationship with him that she intended to maintain.  ( Tr. 25: 5119-25.)

The defense presented a separate body of evidence that demonstrated Barrett had been tried and convicted of manslaughter in Sequoyah County Court for the killing of Trooper Eales.  He was serving his sentence in the state's only maximum security facility, though he appeared under Department of Corrections regulations, to merit incarceration in only a minimum security facility.  (Tr. 24: 4823-27.)  Moreover, he had not engaged in any act of misconduct in prison and was considered moderately likely to succeed if provided with substance abuse treatment.  (Tr. 24: 4828, 4840-4843.)

The defense presentation was clearly persuasive, even if it was not ultimately successful.  The jury unanimously found in mitigation that Barrett was a father, a loved son and stepson, a person whose death would impact his child, family and friends, and a person with no prior felony convictions.  (Trl. Doc. 257.)  A majority of jurors also found that Barrett was a good neighbor

---

[14]During previous testimony, the hospital was characterized as a substance abuse treatment facility.  (*See* Tr. 24: 4830-31.)

118

and friend.  (*Id*.)  Additionally, five jurors found that Barrett had accepted responsibility for Eales's death from his prior conviction and that he had been punished and convicted for that death.  (*Id*.)  Finally, the jury not only rejected the prosecution's allegations that Barrett constituted a future danger, but two jurors found in mitigation that the defendant did not constitute a future danger to society.  (*Id*.)

B.  Counsel Validly Elected a Mitigation Strategy, and Any Forgone Evidence Would have Been Counterproductive

Barrett should not succeed in faulting his attorneys for failing to investigate and present evidence of his supposed mental illnesses, which allegedly include bipolar disorder and organic damage to the prefrontal lobe of his brain.  Nor should Barrett prevail by alleging that his attorneys failed to present proof that he was the progeny of a dysfunctional family.  Barrett had no interest in presenting such evidence.  Moreover, the records he relies upon to establish his alleged mental illness would have depicted him as a violent and inveterate drug addict, who repeatedly spurned the efforts of relatives and medical professionals to help him, in favor of a slavish abuse of marijuana and methamphetamine.

As previously noted, a showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness.  *See Burger v. Kemp*, 483 U.S. at 794.  Investigations are not evaluated in light of ideal conditions with the benefit of hindsight.  *Thomas v. Gilmore*, 144 F.3d at 515; *see Tarver v. Hopper*, 169 F.3d 710, 715 (11th Cir. 1999) (noting that counsel is not "required to investigate and present all available mitigating evidence to be reasonable").  A showing that additional evidence could have been adduced by trial counsel "usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction

119

counsel will inevitably identify shortcomings in the performance of prior counsel. . . . [B]ut perfection is not the standard of effective assistance. *Waters v. Thomas*, 46 F.3d at 1514.

In particularly, where counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d at 893. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691. Thus, notwithstanding a defense attorney's duty to investigate and present mitigating evidence, "counsel also has to be responsive to the wishes of his client." *Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) (citing *Wallace v. Ward*, 191 F.3d 1235, 1247-48 (10th Cir. 1999) for the proposition that counsel's performance during a capital sentencing was sufficient, though counsel acquiesced in his client's wish to forgo mitigating evidence or challenge the state's evidence).

120

Sharp claims to have informed prior counsel of his opinion that Barrett's mental health

merited investigation and to have faxed a report of unknown content to an unidentified person at

some unreported date in 2005.  (Mot. Ex. 55 at 3-4.)  Nonetheless, Barrett fails to present any

evidence that any specific information was ever provided to Messrs. Smith or Hilfiger that

suggested the need for further investigation.  Furthermore, counsel apparently arranged for

Jeanne Russell and another psychologist to meet with Barrett, as demonstrated by the defendant's

jailhouse visitation log.  (*See* Resp. Ex. 5.)  Russell omits this fact from her declaration, and

Barrett has not shown that the results of her contemporaneous evaluation merited further

121

exploration.

Assuming, arguendo, that Barrett could show that his attorneys unreasonably failed to investigate evidence that he was mentally ill and came from a dysfunctional background, he cannot establish a reasonable likelihood that the testimony would have led to a more favorable verdict.  Barrett claims his attorney should have presented evidence of the dysfunction in his upbringing, as a precursor to evidence that he was severely mentally ill.  Doing so would have utterly negated the jury's view that he was a loved son and stepson, a person whose death would impact his child, family and friends, and a good neighbor and friend.  (Trl. Doc. 257.)  As such, Barrett can only establish that defense counsel could have had to have presented a different mitigation case than they did, not one that was necessarily more successful.

[15]  Barrett currently relies on diagnoses of bipolar syndrome, post-traumatic stress disorder and organic brain damage, which he received in 2009, but claims were indicative of his mental condition in 1999.  (*See* Mot. Exs. 89 & 117.)  The government does not concede that any of these diagnoses is presently

---

[15]Respondent's Exhibits 13 to 20 are excerpted from Petitioner's Exhibit 147.  Given the volume of material in Exhibit 147, which is not paginated, the government elected to copy the pertinent pages rather than attempt to identify them in their original form by description.

accurate, but that is not the issue. Rather, Barrett must establish a reasonable likelihood that he would have been spared a death sentence had he presented this evidence. He cannot do so because his own medical records demonstrate that medical professionals who diagnosed Barrett far closer in time to the murder than his current experts did not perceive a neurological illness, bipolar syndrome or post-traumatic stress disorder. Rather, they observed a dangerous and assaultive drug addict. Those records substantially undercut the accuracy of Barrett's current diagnoses and would have shattered the counsel's attempt to characterize their client as a decent, hardworking member of his family and community.

Similarly, evidence that Barrett had experienced a dysfunctional upbringing at the hands of mentally ill relatives would have undermined the jury's finding that the defendant was valued by his family.[16]  Barrett cannot show that he was prejudiced by the omission of evidence that would have sabotaged his attorneys' efforts to characterize him as useful and loved member of his family and society.  *See Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (holding that omitted evidence "would have negated much of the mitigation evidence actually adduced by trial counsel and could have strengthened the prosecution's argument that Cannon represented a continuing threat to society.").

Had counsel taken the path identified in the § 2255 Motion, Barrett could argue that they were ineffective for failing to humanize him and blunt the allegation of future dangerousness. Because the forgone evidence could have only been presented as an alternative to the case Barrett's lawyers actually developed, the attack on counsel's strategy relies entirely on the

---

[16]Barrett goes to pains to demonstrate that many of his relatives, some quite distant, experienced hardships or the effects of mental illness. (*See, e.g.*, Mot. 196-209.)  Apart from asserting his genetic link to mental illness, Barrett fails to establish a nexus between the suffering of his relatives and any viable theory of mitigation. *See Rhoades v. Arave*, No. CV 93-0155-S-EJL, 2007 WL 1550441, at * 37 (D. Id. May 24, 2007) ("Petitioner is attempting to show a complete family history, going back several generations, but he has not explained how the rumored behavior of distant relatives has a causal or direct bearing on him.").

125

benefits of hindsight and should be rejected.

### III. THE COURT PROPERLY PROVIDED NECESSARY ASSISTANCE TO THE DEFENSE

Barrett argues that this Court violated his due process rights when it improperly deprived him of necessary funding to employ various experts and purchase pre-trial hearing transcripts. Specifically, Barrett faults the Court for refusing to pay the complete or partial costs of three mental health experts, a "mitigation" specialist, a ballistics expert, and independent fact investigator, an independent SWAT expert, a metallurgist, a drug expert, a crime scene reconstruction expert, and a jury consultant. (Mot. 249-62; BIS 125-41.) Barrett has defaulted these arguments by failing to raise them on appeal. But beyond that, he has failed to demonstrate that the Court's funding decisions were erroneous or prejudicial.

### 1. Procedural Default

The Constitution guarantees criminal defendants the assistance of necessary experts. Under *Ake v. Oklahoma*, when a defendant demonstrates that his mental capacity "is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). *Ake* is construed broadly to guarantee other services, so long as the defendant shows that they are basic tools necessary to an adequate defense. *United States v. Rodriguez-Felix*, 450 F.3d at 1127; *see, e.g., Rojem v. Gibson*, 245 F.3d at 1139 (finding defendant failed to make a sufficient showing to appoint an investigator); *see also Moore v. Johnson*, 225 F.3d 495, 503 (5th Cir. 2000) (finding the defendant failed to make a sufficient showing to appoint either a jury-selection expert or a mitigation expert).

126

Because *Ake* and its progeny require the defense to justify to the trial court the need for any government-funded services, Barrett's claim requires him to show that he presented this Court with valid reasons to purchase the services of which he now claims he was deprived. Thus, he cannot obtain relief without identifying facts that he could have included in the appellate record had he so chosen. Barrett, however, did not challenge the Court's funding of defense services on appeal. *See Massaro v. United States*, 538 U.S. at 504 (noting general rule that claims omitted from appeal may not be raised on collateral review); *United States v. DeFusco*, 949 F.2d 114, 120 (4th Cir. 1991) (noting § 2255 provides the appropriate vehicle for adjudicating a claim if the defendant has failed to create an adequate record for appeal).

Barrett attributes his default of the CJA claims to the supposed ineffectiveness of appellate counsel. (*See* Mot. 261.) That argument is inconsistent with the fact that Barrett resisted any scrutiny of his funding requests, and only allowed government scrutiny of his CJA motions on pain of forfeiting his claim entirely. (*See* Docs. 58, 61, 65, 67) Putting aside the fact that Barrett maintained a desire to protect the privacy of his funding requests long after his appeal was decided, he cannot demonstrate that he was entitled to any more services than he received. As a result, appellate counsel had no obligation to raise futile funding challenges, and Barrett cannot establish ineffective assistance of appellate counsel or, by extension, cause for his default. *See McCleskey v. Zant*, 499 U.S. at 493. Furthermore, Barrett has not shown the other element necessary for relief from his default – prejudice. In short, he fails to demonstrate he is actually innocent or that this Court's denial of services worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *Daniels*, 254 F.3d at 1191. Thus, he has defaulted any claim of error concerning the deprivation of defense services.

127

2. <u>Mental Health Experts</u>

Barrett claims that this Court erroneously denied him fair access to the services of a psychologist, a psychiatrist and a neuropsychologist. He claims, in the alternative, that if the Court did not err, his attorneys were ineffective in failing to adequately request assistance. Barrett's claims fail because he never made the specific requests for assistance he identifies at this juncture, nor did he properly justify the requests he did make. Given that Barrett bore the burden of justifying any CJA expenditures, he cannot demonstrate that the Court's refusal to grant him assistance he did not ask for amounted to error. His claim of ineffective assistance of counsel is equally unavailing, as Barrett fails to show that his attorneys possessed information upon which to premise more compelling requests for the funding of mental health professionals.

As previously noted, the onus rests squarely with the defense to show the need for government-funded assistance, and defendants must offer "more than undeveloped assertions that the requested assistance would be beneficial." *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1 (1985). "General allegations supporting a request for court appointment of [an] . . . expert, without substantive supporting facts, and undeveloped assertions that . . . assistance would be beneficial to the defendant will not suffice to require the appointment of [an expert] to aid in the preparation of a criminal defense." *Liles v. Saffle*, 945 F.2d 333, 336 (10th Cir.1991); *see Allen v. Mullin*, 368 F.3d 1220, 1236 (10th Cir. 2004); *Rojem*, 245 F.3d at 1139; *Castro v. Ward*, 138 F.3d 810, 826-27 (10th Cir.1998) (finding defendant failed to make a sufficient showing – one "with particularity" – to appoint an investigator). In assessing the necessity of a requested resource, the court considers three criteria:

> (1) the effect on [the defendant's] private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if

128

the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered.

*Rodriguez-Felix*, 450 F.3d at 1128 (quoting *Rojem*, 245 F.3d at 1139).

In this case, the Court made it eminently clear that it would require detailed showings to justify the appointment of defense experts. Indeed, the Court issued an Order in response to Barrett's request for pre-authorization of the defense budget (Trl. Doc. 24) that left little room for doubt as to the precise showing necessary for the funding of defense experts:

> The proposed litigation budget shall set forth separately and with specificity any expert witness counsel seeks to hire. A request shall: (i) identify the proposed expert and describe his credentials and experience; (ii) describe the subject matter to be covered by the expert; (iii) address why the expert is need [*sic*], i.e., explain both the facts indicating that further analysis is justified and the reason an expert witness is needed to interpret those facts; (iv) discuss the stage of the proceedings at which the expert is needed; and, (v) provide a specific time budget identifying the expert's billing rate and amount of time the expert anticipates spending on each portion of the investigation or analysis.

(Trl. Doc. 38 at 2.)  Barrett made another attempt to submit a pre-authorization budget request, prompting this Court to issue an Order that directed counsel to "submit a proposed defense budget that *strictly complies* with it previous Order." (Trl. Doc. 47 at 1 (citing Trl. Doc. 38).)

129

Despite Barrett's reliance on wholly undeveloped requests for a mental health experts, the

Court granted him between $4,000 and $6,000 to engage a psychiatrist or psychologist. (Trl.

Doc. 97 at 3.)

---

[17]

In rejecting Barrett's renewed request, the Court observed that counsel had, despite repeated reminders, failed to comply with orders regarding the submission of a proposed budget. (Trl. Doc. 128 at 2-3.) Specifically, the Court found that counsel had neglected to answer its five questions regarding potential experts. (*Id*. at 2.) The Court made clear that it sought this information to avoid a duplication of prior efforts: "[I]n light of the fact the basic underlying sequence of events involved in this particular case have been tried in courts of the State of Oklahoma twice before, the order sought detailed information from counsel regarding what factual issues *remained* to be investigated." (*Id*. (emphasis added).) While the Court explained that it would not expend funds simply because the case involved the potential imposition of the death penalty, it made clear that it would revisit the budget if Barrett submitted appropriately detailed requests. (*Id*. at 3 & 6; *see also* Tr. March 22, 2005 at 31-32 ("I'll give you leave to respond to the budget at your leisure.").) In a subsequent pre-trial Order, the court acknowledged the defense's asserted difficulties in retaining experts and it invited renewed requests that complied with previously-stated requirements. (Doc. 133 at 2.)

As shown above, those requests were non-specific and inconsistent with the specifications mandated by the Court. Barrett never attempted to correct or amend his prior

131

budget requests, and cannot fault this court for refusing to appoint experts on the basis of "general allegations" devoid of "substantive supporting facts." *Liles v. Saffle*, 945 F.2d at 336.

Even if Barrett could show that the Court or defense counsel had erred, he cannot demonstrate prejudice. As previously noted, the erroneous denial assistance to the defense is trial error subject to harmless error analysis under *Brecht*. *Brewer v. Reynolds*, 51 F.3d at 1529; *see, supra*, Arg. I. To merit relief Barrett must therefore show that any improper denial of funding for mental health experts "had substantial and injurious effect or influence in determining the jury's verdict." *Brewer*, 51 F.3d at 1529; *see also Toles v. Gibson*, 269 F.3d 1167, 1176-77 (10th Cir. 2001). Or, alternatively, he must show that absent counsel's allegedly inadequate budget requests, a reasonable probability exists that he would have received a more favorable verdict. *Strickland*, 466 U.S. at 687. Barrett cannot make either of these showings.

Barrett relies on a mistaken assumption in claiming that the allegedly erroneous denial of mental health evidence affected the guilt-phase verdict because it prevented him from rebutting the government's evidence of malice aforethought. As fully explored below, the malice element of counts 1 and 2 was satisfied by proof that Barrett committed the homicide during the course of a felony, and common law malice was not an element of count 3. (*See, infra*, Arg. IX, 2.) Accordingly, the absence of mental health evidence had no impact on the guilt phase verdict. As for the omission of any possible mental health evidence during the penalty phase, Barrett had no right to the psychiatrist of his choosing and has failed to show any reasonable likelihood that the funds he did receive were inadequate to develop any putative mitigating evidence. Certainly, Barrett has not shown that had he received more funding for financial assistance to hire mental health experts a reasonable probability exists the he would have received a more favorable

132

penalty phase verdict.

Barrett is equally unsuccessful in advancing his alternative, an entirely perfunctory, argument that counsel ineffectively failed to properly request mental health experts. (*See* Mot. 252.) Despite any failings in counsel's budget requests, the documents were persuasive enough to secure $4,000 to $6,000 to hire a mental health expert. (Trl. Doc. 97 at 3.) Barrett has not attempted to show, much less has he established, a reasonable probability that he would have received a more favorable verdict had counsel been provided with more money.

Barrett should be foreclosed from showing that counsel's initial failure to persuade this Court to provide more money for investigation the discovery of that evidence was prejudicial ineffectiveness. *See United States v. Booker*, 981 F.2d 289, 294 (7th Cir. 1992) (holding that a defendant cannot establish ineffectiveness based on the flaws in a futile motion).

3. Crime Scene Reconstruction Expert

Barrett alleges that the Court limited funding for the defense to hire Edward Hueske, an expert in ballistics and crime scene reconstruction with whom the defense could have challenged the government's witness, Iris Dalley. Barrett also complains that the funding order misled the defense because it observed that the Court had never previously permitted crime scene reconstruction testimony. (Mot. 256-59.) Regardless of the content of the order or the quantity of the funding, Barrett did receive $4,000 to retain the same ballistics and crime scene

reconstruction expert he relies upon now, Edward Hueske.  (*See* Trl. Doc. 97 at 3.)  The order

provided these funds despite the fact that Barrett's request for the monies wholly failed to

comply with the requirements for such motions.  While the order suggested that the Court would

not likely admit crime scene reconstruction evidence, Barrett does not demonstrate that it misled

his attorneys or that the funds provided by the court actually deprived him of necessary services.

Simply stated, he does not show that Hueske's input was necessary to the defense, much less that

the expert could not have provided useful guidance at the level of funding provided.

Barrett cannot fault this Court for refusing to

provide Hueske with an arbitrary sum of          on the basis of "general allegations" devoid of

"substantive supporting facts."  *Liles v. Saffle*, 945 F.2d at 336.

To the extent Barrett argues that the Court's funding order misled counsel into believing ballistics and crime scene experts were unnecessary, he fails to state a cognizable claim that the defense was deprived of a necessary tool. (*See, supra*, Arg. I.) Beyond the fact that inferences drawn from a funding order do not entail a fundamental defect in the trial amenable to collateral relief, the conclusion that the order placed the defense at some disadvantage is unfair. Barrett makes no effort to show that the Court ever refused a supplemental budget request after deciding to permit Dalley to testify.

*see also* Tr. March 22, 2005 at 17-18 (counsel refers to Dalley's prior testimony as "kind of embarrassing for [the state prosecution]").) Accordingly, counsel was not misled by the Court's order, nor did they act unreasonably in forgoing consultation with Hueske.

Putting aside the Court's valid reasons for rejecting the funding request, Barrett fails to show that the monies provided were inadequate for Hueske to have reviewed Dalley's findings and to have identified most, if not all, the flaws alleged here. (*See* Mot. 258-60.) Barrett makes no attempt to demonstrate what specific, outcome-determinative, assistance Hueske might have provided had counsel received all the requested funding,        , rather than the amount initially provided by the Court. Moreover, Barrett has made no effort to show that the funds provided were inadequate for an expert to engage in an analysis necessary for the defense or, at least, to justify supplemental CJA funding. Without such a showing, he cannot establish that this Court erred or that his attorneys were ineffective in requesting money to hire a crime scene expert. *See Haddock*, 12 F.3d at 958; *United States v. Caldwell*, 543 F.2d 1333, 1351 (D.C. Cir.

135

1974); *United States v. McNally*, 485 F.2d 398, 406 (8th Cir. 1973).

Barrett would have been unable to demonstrate that additional funding for a crime scene expert was necessary to his defense under *Rodriguez-Felix*, 450 F.3d at 1128. Apart from the fact that the defense had money to retain Hueske, Barrett wholly overstates Dalley's significance to the case. Dalley provided limited opinions, largely corroborative of existing evidence or conclusions the jury would have naturally drawn from it. Even on direct she conceded, with regard to the critical issue of Barrett's vantage, that she could not determine the exact position of the shooter or the victim's vehicle. (Tr. 14: 3175, 3226.) Ultimately, she opined only that Barrett could not have fired all the shots from a prone position inside the cabin and that Eales's flank and elbow wounds were not consistent with the trajectories of the shots into the Bronco when it was in motion. (Tr. 14: 3228-29, 3247, 3254, 3259.) Given the limited nature of this evidence, Barrett fails to demonstrate how he could have shown the necessity of expending more funds than he had received to impeach this witness. Certainly, the possibility exists that the defense might have relied on its own expert to identify otherwise unexplored flaws the crime scene reconstruction testimony, but Barrett cannot show any likelihood that such evidence would have affected the verdict, as the government did not require Dalley to prove any aspect of its case.

The government presented eyewitness testimony that the shots Barrett fired at Trooper Eales's Bronco, struck the windshield at around eye level, traveling from the victim's right. (Tr. 3: 554, 605.) When the Bronco stopped, Trooper Eales stumbled to the rear of his vehicle as a gunman fired through the front door of the Barrett home while simultaneously retreating inside. (Tr. 5: 989-97, 996-98, 1033, 1096-1101, 1158-60, 1165-66.) Eales exposed the left side of his

body to gunfire when he exited the Bronco. (Tr. 5: 997-98, 1101-02.) According to a pathologist, Eales received two wounds on his left side, both of which contained multiple fragments that indicated the bullets had passed through intervening objects. (Tr. 7: 1599, 1605-07, 1610-15.) One of the wounds to Eales's left side, which the medical examiner described as entering "on the left side of the upper back" and traveling "slightly back to front and slightly downward" was fatal. (Tr. 7: 1611, 1614-15, 1619.)

Given the path of the fatal bullet through Eales's body – left to right, slightly back to front, and slightly downward – the jury could have only inferred that the victim was turning from Barrett when he was shot and not sitting in a four-wheel drive vehicle that was receiving fire from the right. The testimony of other witnesses established facts that Dalley merely corroborated – that Eales was fatally shot as he fled from the Bronco. Thus, the evidence provided by Dalley may have assisted the prosecution in highlighting certain facts, but the jury did not require her testimony to deduce the circumstances of Barrett's lethal shot.

Putting aside the limited impact of Dalley's direct examination, Barrett fails to acknowledge the length and depth of the defense's cross-examination of her. Most significantly, trial counsel elicited Dalley's concession that the defendant could have fired every shot from inside his house, thereby using the government's own witness to support a defense hypothesis. (*See* Tr. 15: 3264, 3280-91, 3349-51.) Given that the defense so effectively exploited the government's retained expert, it had no need to expend further funds on an expert like Hueske. *Cf. Aguilar v. Dretke*, 428 F.3d 526, 534 (5th Cir. 2005) (finding no due process violation for failure to appoint a ballistics expert since the evidence was neither critical to the conviction nor subject to varying expert opinion). Thus, Barrett cannot show that the Court's funding level for

137

Hueske had a substantial and injurious effect on the verdict, much less can he show a reasonable probability that he would have received a more favorable verdict if his counsel had persuaded this Court to provide more money to hire the expert. *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958. Accordingly, both his alternative attacks on the court's funding and his trial attorneys' efforts on his behalf should fail.

4. SWAT Practices Expert

Barrett complains that the Court did not adequately fund his request for his chosen expert on SWAT tactics, George Kirkham. While Barrett requested          to hire Kirkham, the Court authorized an expenditure of $4,000. According to Barrett, the refusal to grant the requested sum prevented him from adducing evidence that the Tact Team's warrant-service procedure violated established police practices, minimized the chance that he could identify the victims as police officers, was likely to provoke a violent response and unnecessarily exposed team members to gunfire. (Mot. 260-61.) Once again, Barrett received public funds despite a failure to properly justify the level of funding he did receive, much less that which he requested. Barrett does not show that the amount of money the Court granted was inadequate to his needs or, at least, to justify further expenditures. Beyond the funding he received, or could have received, Barrett cannot show that any of the forgone testimony he hoped to elicit about the Tact Team's procedures would have altered the outcome of the case.

Barrett cannot fault this Court for refusing to provide            on the basis of his general

allegations. *Liles v. Saffle*, 945 F.2d at 336. Moreover, he has made no effort to show that the

$4,000 grant he did receive was inadequate to hire an adequate expert or, at a minimum, to

develop a more substantial showing in support of his desire for Kirkham. Certainly, Barrett has

not shown that another expert could not have provided the putative testimony for the amount

allotted, and he cannot show that he had a right to the appointment of Kirkham over some other

expert. *See United States v. Caldwell*, 543 F.2d at 1351.

Most significantly, Barrett fails to show how evidence of failings in the Tact Team's

operation was in any way exculpatory or mitigating. As discussed elsewhere, the government

bore no burden to prove during the guilt phase that Barrett actually recognized the victims as

139

police officers, and only had to show that he had reason to know. *See, supra*, Arg. II, 2; *infra*, Arg. IX, 2. Evidence that the Tact Team might have taken steps to better identify itself was therefore irrelevant. But assuming that such evidence did have some bearing on the trial, defense counsel adduced testimony critical of the Tact Team through an unpaid witness, Cloyce Choney. Choney observed, inter alia, that the Tact Team should have planned compromised stealth (Tr. 17: 3907), that containment was preferable to forced entry (Tr. 17: 3905-06), and that Hamilton's Bronco should have had illuminated emergency lights (Tr. 17: 3974-75). In sum, Barrett cannot show, under any relevant standard, that the Court's funding decision had a prejudicial effect on the trial. *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958. Thus, his alternative attacks on the court's decisions and his trial attorneys' efforts on his behalf should fail.

Indeed, during the penalty phase, the jury found that Barrett acted with substantial planning and premeditation. (*See* Trl. Doc. 258 at 9-11.) Thus, the jury must have found that Barrett recognized the Tact Team as police and shot at them in keeping with his repeated statements about killing peace officers who entered his land. Of course, Barrett made clear his desire to kill police officers, whom he must have recognized as such, when he reached for a pistol in his waistband as three uniformed troopers dragged him from his home. (Tr. 3: 548-50, 5: 1112-13.) Any putative testimony from a paid witness that the Tact Team might have better identified itself, or acted with greater circumspection, would not have had any mitigating effect. The fact that Barrett knowingly shot at the police reflected poorly on his character, regardless of whether the Tact Team could or should have planned the operation to further minimize the risk of confrontation. By no means has Barrett shown that the Court's provision of $4,000 for a SWAT expert had a prejudicial effect on outcome of this trial. *Brewer*, 51 F.3d at 1529

140

4.  Miscellaneous Experts

Barrett complains, without any supporting argument, that the Court improperly deprived him of a mitigation specialist, an independent fact investigator, a metallurgist, a drug analyst, and a jury consultant.  (Mot. 249-50.)

Furthermore, he has made no effort to demonstrate that the Court's drug analyst funding of $3,125 – which Barrett ultimately rejected, outright – had a prejudicial effect on the verdict that would support his alternative claims of judicial error and ineffective assistance of counsel.  *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958.

In this claim, Barrett also suggests the he did not have a jury consultant, but elsewhere concedes that he did receive the assistance of such an expert despite the Court's initial resistance

141

to the expense. (*See* Mot. 24-25.) Barrett gives no hint how the Court's initial reluctance to fund a jury consultant could have prejudiced him in light of the fact that he received the desired assistance. Regardless, Barrett could not show that he was entitled to such an expert under *Ake*, or that the Court would have erred if it had refused the expense. *See Moore v. Johnson*, 225 F.3d at 503 ("jury selection is not a mysterious process to be undertaken by those learned in the law only with the assistance of outside professionals"). Certainly, Barrett has failed to show that the level of public funding he received to hire a jury consultant had a prejudicial effect. *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958.

Finally, Barrett claims that this Court failed to provide adequate funding for his investigator and mitigation specialist. Barrett asserts that in requesting funds for these investigators, he relied upon typical practices in capital cases, apparently providing some preemptive deduction of needed resources in view of work done in anticipation of the prior state trials. However, Barrett does not establish that he ever demonstrated to this Court the likely value of the resources he requested or the risk of error if such assistance was not offered. *Rodriguez-Felix*, 450 F.3d at 1128. Indeed, he does not acknowledge that the Court informed him, prior to trial, that his requests for investigative funding were wholly inadequate. (Trl. Doc. 128 at 2-3.)

Rather than attempting to show that the Court erroneously refused a satisfactory demonstration of need, Barrett falls back on arguments that the Court's supposed parsimony deprived him of a factual investigation approaching the "average number of hours approved in similar cases." (Mot. 256.) However, he makes no attempt to show what information he actually would have obtained through the investment of greater investigative resources or how that

142

information might have changed the verdict.  Moreover, Barrett does not explain the significance of the "average" number of hours.

Barrett now vaguely argues the funding level prevented his attorneys from obtaining evidence about his "personal, medical, and social history."  (*See* BIS 133, citing Claim 2, B.)

However, Barrett has not shown what information was actually obtained by the defense, and what was forgone as a result of the funds provided.  *Cf. United States v. Caldwell*, 543 F.2d at 1351.  As to information of some arguable mitigating value – such as the impact of the defendant's drug use, his divorce or his supposedly dysfunctional family – Barrett does not

143

explain why he would have required substantial investigative resources to discover what he himself should have known.  *See Bobby v. Van Hook*, 130 S. Ct. 13, 18 (2009) (noting the presentation of effective mitigation concerning the defendant's dysfunctional upbringing and early adulthood); *see also* Tr. March 22, 2005 at 43-45 (in which the Court expressed the view that mitigation was an area in which defense counsel had substantial expertise and could have concomitant involvement in the investigation).  Furthermore, he makes no effort to show what information had been collected in anticipation of his state trials and how the provided funds prevented him from effectively enhancing the existing store of potential mitigation evidence.  Thus, he has not shown that the money he received was inadequate or prejudiced the outcome of this case.  *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958.

Any complaint that funding for the mitigation specialist impacted the investigation into Barrett's mental health should fail on its face, as the Court provided funds to hire a psychologist or psychiatrist, the expert presumably qualified to offer such evidence.  *See Castro v. Oklahoma*, 71 F.3d 1502, 1515 (10th Cir. 1995) (noting the limitations of expertise).  Barrett's implied claim that his attorneys could not assemble information about distant relatives – his so-called "social history" – should likewise fail.  Evidence about distant and long-dead relations was irrelevant to Barrett's character, history or the circumstances of the offense.  At best, it could have provided highly attenuated mitigation of de minimis weight.  *See Stewart v. Gramley*, 74 F.3d 132, 137 (7th Cir. 1996) ("The report of the mitigation specialist adds colorful details possibly relevant under a *tout comprendre* defense if one existed, but not calculated to make a judge or jury think Stewart less deserving of the death penalty."); *see also Bobby v. Van Hook*, 130 S. Ct. at 19 (finding in view of what was known about the defendant, "it was not unreasonable for his

counsel not to identify and interview every other living family member or every therapist who once treated his parents."). Even assuming that Barrett could now show that enhanced funding for a mitigation specialist would have led to the accumulation of additional evidence, he has not shown that it would have impacted the outcome of the case. *Brewer*, 51 F.3d at 1529; *Haddock*, 12 F.3d at 958. Moreover, he cannot make such a showing in view of the fact that he instructed his attorneys not to present evidence concerning his family and background. (Resp. Exs. 11 & 12.)

5. Pre-Trial Hearing Transcripts

Barrett complains that the Court denied him transcripts of pre-trial hearings, including those of his state-court trials. He contends that as a result of the funding decision, he was denied access to the September 13, 2005 ex parte hearing between the Court and prosecution. (Mot. 250; BIS 127-28.) Barrett's claim lacks any meaningful basis in fact.

As discussed above, and as Barrett concedes, the Court granted funds for a transcript of the second state-court trial. (*See, supra*, Arg. I.) Barrett asked for permission to purchase the transcript, which was denied on March 18, 2005 (Trl. Doc. 97), but granted on reconsideration, four days later, March 22, 2005 (Trl. Dckt. entry Mar. 22, 2005).

Barrett cannot show that he was denied funding for the very thing he, in fact, received. Indeed, as shown above, the fact that the transcript was delivered late despite the funds to purchase it had no impact on the outcome of this trial. (*See, supra*, Arg. II, 9, A.) As a result, he cannot demonstrate any prejudice concerning the level of funding.

On March 18, 2005, the Court also denied a request for a transcript of a pre-trial hearing, but not the ex parte hearing held six months later, on September 13, 2005. Rather the Court denied a request for a transcript of a hearing that was held on January 26, 2005. (*See* Trl. Doc. 97 (denying Eighth Ex Parte Motion – Trl. Doc. 57).) The Court never denied a transcript for the September 13th hearing, because Barrett never asked for one, and certainly was in no position to do so six months before it occurred. Barrett cannot show that the Court erred in refusing to grant something he never requested.

Because Barrett has not shown error or prejudice, his claim should fail.

## IV. THE SEARCH WARRANT IN THIS CASE WAS VALID, AND BARRETT CANNOT CHALLENGE IT ON COLLATERAL REVIEW

Barrett claims that newly-discovered information about the credibility of Charles Sanders and Clint Johnson requires this Court to grant an evidentiary hearing to determine whether the original search warrant in this case was sought in good faith under *Franks v. Delaware*. Barrett also complains that his appellate attorneys were ineffective for failing to raise the *Franks* issue on appeal. (Mot. 264-70; BIS 142-48.) The thrust of Barrett's claim, that his Fourth Amendment rights were violated, is not subject to a determination on collateral review. His derivative claim of ineffectiveness is patently without merit, as appellate counsel had no obligation to raise issues premised on extra-record evidence.

1. Search and Seizure Claims are not Reviewable Under § 2255

Barrett cannot raise his Fourth Amendment search and seizure claim on collateral review, having litigated it at trial. Courts considering motions for collateral review under § 2255 may not review Fourth Amendment violations when the defendant had a full and fair opportunity to litigate the claim at trial and present the issue on direct appeal. *United States v. Cook*, 997 F.2d

146

1312, 1317 (10th Cir. 1993). A full and fair opportunity to litigate the claim includes "the procedural opportunity to raise or otherwise present a Fourth Amendment claim. It also includes the full and fair evidentiary hearing . . . . [and] it contemplates recognition and at least colorable application of the correct Fourth Amendment constitutional standards." *Gamble v. Oklahoma*, 583 F.2d 1161, 1165 (10th Cir. 1978).

In this case, Barrett unquestionably received a full and fair opportunity to challenge the search warrant under *Franks*, 438 U.S. 154. On January 26, 2005, a magistrate judge held an evidentiary hearing at which Clint Johnson testified that he had drafted the search warrant application based on information from a confidential informant. (*See* Trl. Doc. 253 at 2.) Johnson further testified that he had, on at least five other occasions, relied on the same informant and found his information accurate. (*Id*.) Johnson stated that the warrant application accurately reflected the informant's statements about Barrett and Barrett's illicit activities. (*Id*.) In conformity with the magistrate's report and recommendation, this Court denied Barrett's motion to suppress. (*Id*.)

Shortly after Barrett's trial began, Charles Sanders admitted from the witness stand that he was Johnson's confidential informant. Barrett's attorneys relied on Sanders's trial testimony to challenge the search warrant under *Franks*. (*See* Trl. Doc. 253 at 2-5.) This Court denied the motion, because it was premised on the irrelevant question of Sanders's truthfulness, rather than on Johnson's. (*See* Trl. Docs. 184 & 253 at 5-6; *see also, supra*, Arg. II, 2) On appeal, Barrett presented several Fourth Amendment challenges to the warrant, though not the precise one raised here. *See Barrett*, 496 F.3d at 1088-91.

On this record, Barrett cannot dispute the fact that he received an opportunity to fully

147

litigate a *Franks* challenge to the search warrant.  He filed written briefing supported by an exhibit (Trl. Doc. 184), he premised his claims on evidentiary proceedings (*id.*; *see generally* Tr. 11: 2488 to Tr. 12: 2652), and he received correct application of pertinent Fourth Amendment doctrine (Trl. Doc. 253).  *See Gamble*, 583 F.2d at 1165.  Further, he challenged the warrant under the Fourth Amendment on appeal.  *See Cook*, 997 F.2d at 1312 (noting that the litigation of any Fourth Amendment claim on appeal indicates an opportunity to fully and fairly litigate all such claims).  Accordingly, Barrett may not revisit his *Franks* claim in this proceeding.

Barrett may argue that he was not provided with the opportunity to raise the precise claims he has stated here because the government allegedly suppressed the information necessary to recognize and assert the contentions.  Certainly, had the government suppressed material evidence favorable to the defense, Barrett could arguably avoid the bar on collateral litigation of his Fourth Amendment claims.  *See Smith v. Black*, 904 F.2d 950, 965 (5th Cir. 1990), *abrogated on other grounds in Stringer v. Black*, 503 U.S. 222, 227 (1992).  But such a claim should sound in *Brady*,[18] not under the Fourth Amendment.  *See id.*  Of course, none of that matters, as Barrett has not shown that the government improperly suppressed any material evidence in this case, particularly with regard to Sanders and Johnson.  (*See, infra*, Arg. V, 1.)  Accordingly, this Court should disregard Barrett's renewed attempt to litigate the *Franks* claim on collateral review.

2.  Barrett's Attacks on the Warrant do not Justify Relief Under *Franks*

Assuming, arguendo, that this Court determines that it should review the *Franks* claim in this § 2255 proceeding, Barrett should not succeed.  To justify a *Franks* hearing, as previously noted, Barrett must establish by a *preponderance of the evidence* that Johnson intentionally or

---

[18]*Brady v. Maryland*, 373 U.S. 83, 87 (1963).

recklessly included false information in, or omitted material information from, the warrant affidavit. *Tisdale*, 248 F.3d at 973 (emphasis added); *see, supra,* Arg. II, 1. Barrett has made no attempt to satisfy either of these conditions, much less has he established by anything approaching a preponderance of the evidence that they are true.

Barrett initially tries to show that evidence concerning Sanders's credibility should lead to suppression under *Franks*. But Sanders's credibility, as this Court has already found, is irrelevant. The fact that Barrett can elaborate on his previously-stated but meritless argument that Sanders was unreliable does not, as a matter of law, enhance the defendant's claim. Accordingly, this Court should disregard any allegations that Barrett possesses evidence with which to impeach Sanders's credibility. *See Tisdale*, 248 F.3d at 973.

Next, Barrett turns his attention to Johnson, claiming that the government failed to disclose the detective's alleged malfeasance – conduct that occurred largely after the trial. First, the government had no duty to disclose any information about Johnson because he and his agency did not fall within the ambit of the prosecution team for purposes of *Brady* discovery. (*See, infra*, Arg. V, 1, D, i.) Assuming Barrett could establish his allegations that Johnson was a thief and likely drug user, this Court should not rely on Johnson's post-trial conduct to revisit its *Franks* ruling. *See United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993) (holding newly discovered evidence refers to evidence that existed at the time of the trial proceeding); *United States v. Bolden*, 355 F.2d 453, 461 (7th Cir.1966). Regardless of any legal bars to relying on Barrett's allegations about Johnson, the defendant's indictment of the detective, as fully explored below, falls flat. (*See, infra*, Arg. V, 1, D, i.) Johnson may have been a poor administrator and financial manager, but no one has shown him to have been corrupt. Johnson's

149

poor skills as a manager of money and evidence simply do not establish by a preponderance of the evidence that he intentionally or recklessly included false information in the warrant affidavit.

In a final flawed attempt to attack the warrant, Barrett returns to his allegation that Sheriff Johnny Philpot visited the defendant's house mere weeks before the murder, supposedly undermining Johnson's sworn affidavit concerning the defendant's threats to law enforcement. Barrett himself does not appear to recall Philpot's putative visit to the cabin. He relies instead on his cousin and neighbor, Janice Sanders, whose call for help supposedly led the police to respond.[19] (Mot. Ex. 85 at 1-2.) As previously noted, counsel did not challenge Philpot on the date of his visit to the defendant's home, though Barrett clearly heard the sheriff's testimony and could have informed his lawyers of any inaccuracy in the witness's recollection. (*See, supra*, Arg. II, 11, C.) Of course, Barrett said nothing, because the sheriff was not at his home a few weeks before this killing. Philpot has clarified that the July 1998 incident about which he testified was the only occasion on which he visited Barrett's home and inspected a weapon. (*See* Resp. Ex. 1.)

But assuming, arguendo, that Philpot visited the defendant's home just three weeks before the murder, Barrett fails to show that the sheriff shared that information with Johnson prior to the preparation of the warrant affidavit. As such, he cannot show that Johnson was intentionally or recklessly untruthful in the warrant application. Even if Philpot did tell Johnson about such a contemporaneous incident, it does not appear that he would have mollified Johnson's view of the situation. Quite the opposite, Philpot testified that he initially resisted

---

[19]Barrett's mother also alludes to the incident in a declaration (Mot. Ex. 97 at 16), but she does not state that she actually observed it.

150

Johnson's plan for Tact Team involvement in the warrant service.   But after speaking to Johnson, Philpot became convinced of the need for tactical assistance.  (Tr. 8: 1793, 1808-09.) Thus, whatever information Philpot shared with Johnson, Johnson was not only sincerely convinced himself that the warrant service was a dangerous undertaking, but was capable of converting others who believed differently.

Accordingly, the baseless contention that Sheriff Philpot visited Barrett's home a few weeks before the murder does not establish by a preponderance of the evidence that Agent Johnson intentionally or recklessly included false information in the search warrant affidavit.

### 3.  Appellate Counsel Provided Adequate Assistance

Barrett claims that his appellate attorneys provided ineffective assistance in failing to raise the *Franks* claim on direct appeal to the Tenth Circuit.  Barrett, however, fails to show any way in which this Court erred, and thus any basis upon which the appellate court might have granted relief.  Counsel's failure to raise a futile issue on appeal does not constitute deficient performance or prejudicial ineffectiveness.  *See Hawkins v. Hannigan*, 185 F.3d at 1152. Certainly, to the extent Barrett complains that his attorneys failed to raise the precise claims raised here, which is largely premised on allegations and information that came to light after trial, he necessarily fails.  He cannot show that his attorneys had an obligation to raise a claim based on facts outside the record.  The appellate court could only consider issues "for which the record provides a factual basis." *United States v. Hardwell*, 80 F.3d 1471, 1485 (10th Cir. 1996) (citing *United States v. Vasquez*, 985 F.2d 491, 494-95 (10th Cir.1993)).  Barrett cannot show that counsel provided deficient performance by omitting to raise a facially non-cognizable claim on appeal. *See United States v. Challoner*, 583 F.3d at 745.

151

V. THE PROSECUTION HONORED ITS OBLIGATIONS TO DISCLOSE EXCULPATORY
MATERIAL TO THE DEFENSE AND TO AFFORD BARRETT A FAIR TRIAL

Barrett makes a multi-pronged attack on the government, claiming that it suppressed exculpatory evidence concerning six civilian witness, two law enforcement witnesses, and one trial prosecutor. Barrett also accuses the prosecutors of interfering with the defense and with improperly questioning witnesses and improperly arguing for a death sentence. (Mot. 270-322; BIS 148-74.) As detailed below, Barrett fails to demonstrate that any aspect of the prosecution's actions amounted to prejudicial misconduct.

1.  The Government did not Violate Any Duty of Disclosure

Barrett begins his attack on the prosecution with a two-part claim of non-disclosure. First, he asserts that the government failed to turn over impeachment evidence concerning six civilian witnesses, Charles Sanders, Travis Crawford, Cindy Crawford, Brandie Zane Price, Karen Real and Randy Turman, (Mot. 272-95; BIS 153-57.) Second, he argues that the prosecution suppressed information about three law enforcement officials, Clint Johnson, Michael Littlefield and John Philpot. (Mot. 296-310; BIS 157-59.) Not only does Barrett claim that the government violated the familiar *Brady* standard, he also argues that the supposedly newly-discovered evidence he presents here will give rise to relief pursuant to Federal Rule of Criminal Procedure 33. (BIS 161-64.) Barrett is wrong on all counts. The appropriate standard for analyzing his claims is that of *Brady* and its progeny. Under that jurisprudence, Barrett cannot show that the government failed to disclose any material evidence favorable to his defense.

A.  The Standard of Review for Newly Discovered Evidence

In addition to invoking the due process jurisprudence of *Brady*, Barrett argues that this

152

Court should construe his suppression claims as contentions involving newly discovered evidence under Federal Rule of Criminal Procedure 33. However, Rule 33 permits new trial motions based on newly discovered evidence for only three years after the jury returns its verdict. In this case, Barrett was convicted by jury verdict on November 4, 2005. He did not file the initial iteration of his § 2255 Motion, raising the Rule 33 claims, until March 16, 2009, four-and-a-half months after the deadline had expired for seeking a new trial under Rule 33. Accordingly, any attempt to invoke Rule 33 is untimely.

Moreover, the standard applicable to a new trial motion under Rule 33 has no place in this action. Rule 33 is meant to correct "factual injustice" rather than legal errors. *United States v. Evans*, 224 F.3d 670, 674 (7th Cir. 2000). Accordingly, Rule 33 allows for relief under a liberal "interests of justice" standard. *United States v. Prescott*, 221 F.3d 686, 688 (4th Cir. 2000). In contrast, § 2255 requires a demonstration of legal error, because collateral relief will not lie based solely on a showing of actual innocence. *Herrera v. Collins*, 506 U.S. 390 (1993); *Evans*, 224 F.3d at 674 ("A bona fide motion for a new trial on the basis of newly discovered evidence falls outside § 2255 ¶ 1 because it does not contend that the conviction or sentence violates the Constitution or any statute."). Thus, Barrett should not succeed in his attempt to invoke Rule 33 in this proceeding.

B.  The Government Disclosed All Necessary Evidence about Civilian Witnesses

Properly analyzed under § 2255, Barrett cannot succeed in his attempts to demonstrate that the prosecution violated its *Brady* obligation in regard to its civilian witnesses. Prosecutors must disclose all substantial material evidence favorable to the defense, whether it relates to guilt, punishment, or the credibility of witnesses. *Giglio v. United States*, 405 U.S. 150, 154

153

(1972); *Brady v. Maryland*, 373 U.S. at 87.  To establish a *Brady* violation, a defendant must show that "the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material." *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Torres*, 569 F.3d 1277, 1282 (10th Cir. 2009).

Prosecutors bear no obligation to volunteer information they do not possess. *United States v. Erickson*, 561 F.3d at 1163.  Likewise, prosecutors need not compile or seek evidence favorable to the defense. *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002); *United States v. Marashi*, 913 F.2d 724, 734 (9th Cir. 1990).  Thus, a successful *Brady* claim requires a showing that any allegedly suppressed evidence actually existed. *Erickson*, 561 F.3d at 1163. *Brady* does not compel disclosure if the defendant knew or should have known the essential facts permitting him to take advantage of the exculpatory evidence. *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998); *United States v. Kelly*, 35 F.3d 929, 937 (4th Cir. 1994); *see also Erickson*, 561 F.3d at 1163 (citing with approval *Coe*, 161 F.3d at 344).

Notwithstanding his substantial burdens in demonstrating error under *Brady*, Barrett presents claims that are a conglomeration of speculation, unreliable hearsay and flawed logic. Ultimately, he fails to show that the government suppressed any material evidence in its actual or constructive possession.

### i. Charles Sanders

Barrett claims the government failed to disclose Sanders's prior convictions.  Barrett also

claims that Charles Sanders received undisclosed consideration in exchange for his trial

testimony.  Specifically, Barrett alleges that after Sanders's testimony, a prison sentence that the

witness was serving at the time of trial was suspended.  Barrett further claims that a state court

entered an order after the trial, marked "per plea agreement with feds," which relieved Sanders of

any correctional supervision for the duration of his suspended sentence.  Still later, Sanders was

relieved of any fines or costs associated with the convictions.  Sanders, according to Barrett, also

received a trial delay in a misdemeanor case, in which he also received a suspended sentence.

(Mot. 259-64; BIS 153-54.)  Barrett's claim of undisclosed prior convictions is contradicted by

the record.  His theory of undisclosed benefits is built entirely on speculation that the government

had formed an agreement with Sanders that it had some obligation to disclose.

The record demonstrates the falsity of Barrett's claim that the government failed to

disclose all of Sanders's known prior convictions.  Defense counsel confronted Sanders with all

of his convictions, to date, identifying almost all of them by case number.  (*Compare* Tr. 11:

2524-34; *with* Resp. Ex. 6 (Sanders's Oklahoma DOC records).)  Furthermore, defense counsel

noted that he had obtained Sanders's criminal record from the Oklahoma Department of

Corrections.  (Tr. 11: 2524.)  To the extent the government did not make the disclosure to

counsel, it bore no obligation to provide the defense with publicly-available information.  *See*

*United States v. Erickson*, 561 F.3d at 1163.

Not only does Barrett fail to show that the government failed to disclose information

concerning Sanders's criminal record, he also cannot show that the prosecution suppressed

information concerning consideration promised to the witness.  Prosecutors must disclose

benefits promised to a government informants in exchange for testimony.  *See, e.g.*, *Giglio*, 405

U.S. at 150.  To show suppression of such evidence, a defendant must clearly establish  an

undisclosed agreement between the government and the witness that existed prior to the

testimony.  *See id.* at 152-53; *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008); *Campbell v. Reed*,

594 F.2d 4, 7 (4th Cir. 1979).  A mere showing that a witness hoped to benefit from his

testimony will not suffice to demonstrate a due process violation.  *United States v. Baskes*, 649

F.2d 471, 477 (7th Cir. 1980); *see United States v. Ashley*, No. 06-2258, 2008 WL 1766868, at

**3 (10th Cir. April 18, 2008) (declining to rely on speculation to infer the existence of *Brady*

material).  Evidence that a prosecution witness ultimately received favorable treatment does not,

by itself, demonstrate that the prosecution failed to disclose an agreement.  *See Shabazz v. Artuz*,

336 F.3d 154, 164-65 (2d Cir. 2003).  As the Sixth Circuit has observed,

> "The government is free to reward witnesses for their cooperation with favorable
> treatment in pending criminal cases without disclosing to the defendant its
> intention to do so, *provided* that it does not promise anything to the witnesses
> prior to their testimony."  *Shabazz v. Artuz*, [citation] (emphasis in original). To
> conclude otherwise would place prosecutors in the untenable position of being
> obligated to disclose information prior to trial that may not be available to them or
> to forgo the award of favorable treatment to a participating witness for fear that
> they will be accused of withholding evidence of an agreement.

*Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008).

Barrett fails to show that any benefits that Sanders may have received subsequent to trial

were the product of a pre-existing bargain with the prosecutors in this case.  The fact that state

prosecutors provided leniency does not demonstrate the existence of a bargain with federal

officials that was subject to disclosure.  *Shabazz*, 336 F.3d at164-65.  Sanders, had a long

criminal record.  (*See, e.g.*, Tr. 11: 2524-30.)  Sanders testified that the Assistant U.S. Attorney

would speak, or had spoken, to pertinent local officials about his cooperation:

> Q.  And I advised you of any assistance that I would provide to yourself in

relation – for your cooperation, testimony in this case, haven't I?

A. Yes, sir.

Q. What did I tell you I would do in your behalf?

A. You tell – you didn't make me no promises. You told me that you would talk to the prosecution upon completion. That – no, you haven't guaranteed me nothing.

Q. In relation to talking to the prosecutors, the conviction you're serving now is in Sequoyah County; is that correct?

A. Yes, sir.

Q. Did I advise you that I talked to the prosecutors in Sequoyah County and tell them of your cooperation?

A. Yes, sir.

Q. And since then you also had an application to revoke a misdemeanor sentence in Tulsa County, didn't you?

A. Yes, sir.

Q. And in fact, I called the District Attorney's Office in Tulsa County and advised them that you were cooperating in this case as well, didn't I?

A. Yes, sir.

Q. Beyond doing that, contacting the D.A.'s Office in Sequoyah County and the D.A. 's Office in Tulsa County and advising them that I anticipate you're going to cooperate, have I told you any promises in regards to what would happen to any sentence that you may be facing or any time you may be serving?

A. Have you advised me of what now?

Q. Have I told you anything about what would happen to any sentence you have?

A. No.

(Tr. 11: 2494-95.)  Any benefit that Sanders may have subsequently received in the state cases was entirely consistent with the facts disclosed to the jury and does not demonstrate the existence of another, more attractive, agreement subject to disclosure.

Barrett attempts to bootstrap the evidence of subsequently-conferred benefits into a showing of a prior agreement between Sanders and the government by noting entries in state court orders that refer to a "plea agreement with feds."  (*See* Mot. 259-62.)  Barrett's blatant reliance on that unadorned hearsay will not carry the day for him.  The term "plea agreement" clearly was not used in its ordinary meaning, as the federal government could not have entered into an agreement with Sanders that bound the terms of a state court judgment.  *See United States*

157

*v. Henderson*, 584 F. Supp. at 1038. Certainly, the "agreement" could refer in shorthand fashion to the fully-disclosed request for leniency made by the government on Sanders's behalf. Regardless of how the phrase was intended, it makes no specific reference to this case, much less does it show that an agreement existed at the time of Sanders's testimony, beyond that described at trial. Accordingly, Barrett is left to speculate about an agreement that he has not shown existed at the time of trial, forestalling his effort to obtain relief.

Barrett's only other attempt to show that the government failed to disclose a promised benefit to Sanders comes in the form of obviously unreliable multiple hearsay. Barrett has submitted a declaration from an investigator who claims to have spoken to Sanders's mother, Evelyn Sanders, who reportedly stated that the government failed to make good on "things" promised to her son in exchange for his testimony. (Mot. Ex. 14 at 5-6.) The investigator's declaration provides no foundation for Ms. Sanders's claim of knowledge about the case. Presumably, her source of information was her son, whose credibility Barrett otherwise takes pains to attack. But assuming Sanders made such a statement to his mother, who repeated it to the investigator, who reported it in the declaration, the house of hearsay cards still falls because there is no indication that the alleged promises were extended before Sanders testified. Because Barrett's claim rests entirely on speculation, hearsay and conclusory allegations, it fails to state a case for relief. *See Shabazz v. Artuz*, 336 F.3d at 164-65.

Assuming Barrett had identified competent evidence of undisclosed promises made to Sanders, he fails to show that any of it was material. Sanders testified to his extensive criminal record and the benefits he unquestionably did receive in exchange for his testimony. Sanders also admitted his lengthy record of drug use. (*See, e.g.*, Tr. 11: 2511, 2535, 2581.) Thus,

substantial evidence was adduced upon which the jury could have elected to discredit Sanders.

Any evidence of further promises to him, about which Barrett now speculates, would have

merely been cumulative to the testimony adduced.  The absence of such evidence does not

undermine confidence in this verdict, as Barrett fails to show a reasonable likelihood that further

efforts to impeach Sanders – by simply reenforcing existing evidence about him – would have

led to a different verdict.  *See Torres*, 569 F.3d at 1282.

### ii.  Travis Crawford

In the guise of a *Brady* claim, Barrett claims that Travis Crawford was coached by a

prosecutor and has recanted certain aspects of his trial testimony.  Barrett also alleges that the

government knew that Crawford had a criminal record in the military, had previously cooperated

with local law enforcement officials, and knew or "had reason to know" that Crawford was under

the influence of drugs during his testimony and  pre-trial interview.  (Mot. 278-83 (citing Mot.

Exs. 31, 45, 91, 92); BIS 155.)  Barrett has failed to state a claim under *Brady*, as he has not

demonstrated that the government possessed any material evidence that it had a duty to disclose.

Barrett's claim relies, in large part, on hearsay accounts of Crawford's alleged unsworn

statements.  (*See* Mot. Exs. 31, 91, 92.)  All that evidence is facially insufficient to demonstrate

error.  Hearsay accounts of supposed recantation do not demonstrate that a witness has forsworn

his testimony.  *See United States v. Pearson*, 203 F.3d 1243, 1275 (10th Cir. 2000) ("Sworn trial

testimony is generally not refuted by unsworn repudiation of that testimony."); *see also United*

*States v. Connolly*, 504 F.3d 206, 213 (1st Cir. 2007) ("[n]o inference of government knowledge

of perjury arises from the mere fact of a convict's hearsay report that a material witness recanted

testimony.").  Crawford, himself, only recants hearing Barrett say he would go out in a "blaze of

159

glory" (see Mot. Ex. 45), but otherwise appears to maintain that he heard the defendant make fatalistic comments about the likelihood that the police might return to his after they surveilled it on the afternoon before the shooting (Tr. 3: 463-66).

Putting aside the source of the allegations, and the fact that Crawford has not materially changed his recollection of the pertinent events, Barrett has failed to establish that the prosecutors knew, or should have known, of any supposed falsity in Crawford's testimony, a fact fatal to any claim under *Brady*.[20]  *See Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001). If Crawford, in interviews with government officials, attributed certain remarks to the defendant, Barrett has not shown why the prosecutors should have disbelieved him, much less had reason to disclose their skepticism.  *United States v. Erickson*, 561 F.3d at 1163; *United States v. Bender*, 304 F.3d at 164.

Apart from his direct attack on Crawford's testimony, Barrett asserts that the witness had spent two months in a military brig and had once cooperated with local law enforcement. Neither assertion demonstrates that the U.S. Attorney's Office knew of the activity and therefore had a duty to disclose it.  *Brady* requires the disclosure of only that evidence within the actual or constructive possession of the prosecution and its investigative team.  *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999).  The investigative team consisted of only the United States Drug Enforcement Agency, and Barrett provides no reason for believing the DEA or the U.S. Attorney was aware of local law enforcement's alleged involvement with Crawford.  (*See* Resp.

---

[20]Apparently cognizant of the weakness of his *Brady* claim, Barrett argues that the reports of recantation require relief as newly discovered evidence.  As discussed above, Barrett cannot rely on evidence of recantation alone, absent a showing of legal error, to obtain relief under § 2255.  *Evans*, 224 F.3d at 674.

Ex. 4.)  Likewise, Barrett provides no reason for the prosecution team to have learned the immaterial fact that Crawford was supposedly incarcerated in a military brig approximately 20 years before this trial for an unidentified offense that may or may not have reflected on his credibility.  *See United States v. Bender*, 304 F.3d at 164 (noting prosecution has no burden to seek out impeaching information).

Barrett also fails to show that the government should have known that Crawford may have testified falsely about his drug use.  Crawford testified that he had stopped using drugs nine months before taking the stand.  (Tr. 3: 457.)  According to a hearsay account, Crawford has since stated that "he and the other snitches were . . . high on drugs when the prosecutor . . . interviewed them . . . [and] that anybody who had been around drug addicts would have know that."  (Mot. Ex. 31 at 3; *but see* Mot Ex. 45 (making no such assertion).)  If Crawford admitted he was intoxicated when he met with a prosecutor, Barrett has failed to show that the interview occurred within nine months of trial and that the government therefore would have borne a burden of disclosure regarding false testimony.  More fundamentally, Barrett errs in speculating that the prosecutor had the skills and experience to recognize Crawford's supposed intoxication.  If Crawford's behavior during the alleged interview was merely suspect, the government was under no obligation to further investigate his drug use.  *United States v. Bender*, 304 F.3d at 164.  Barrett's speculation that the prosecutor knew or could have known of Crawford's alleged intoxication will not support a *Brady* claim.  *See United States v. Erickson*, 561 F.3d at 1163.

An exploration of the related claim that Crawford now claims he and the other civilian witnesses were intoxicated at the time of trial underscores the speciousness of Barrett's *Brady* arguments regarding drug use.  Crawford reports that he and other witnesses were under the

161

influence of drugs during their trial testimony.  (Mot. Ex. 45 at 2.)  Without conceding that

Crawford has any basis in knowledge for discussing the condition of other witnesses, the

government observes that Barrett's *Brady* claim fails as a matter of law, because the condition of

the witnesses was either obvious or it was not.  If the witnesses' intoxication was obvious, the

government had no obligation to disclose it, because the defense would or should have known

anyway.  *See Erickson*, 561 F.3d at 1163.  If the witnesses' intoxication was not obvious, the

prosecutors had no obligation to disclose what they did not know.  *Id.*

Barrett also fails in his claim that the government should have disclosed supposed threats

to Crawford, who reports that the prosecutor told him "all the bad things that would happen to

[him] if [he] 'lied.'"  (Mot. Ex. 45 at 2.)  The fact that the prosecutor encouraged Crawford, in

the strongest possible terms, to speak truthfully is not evidence that was favorable to the defense.

*See United States v. Paden*, 908 F.2d 1229, 1235 (5th Cir. 1990) ("Encouraging a defendant to

tell the truth . . . does not render a statement involuntary.  [Citation.]  Neither does a recitation of

the potential sentence a defendant might receive render a statement involuntary."); *United States

v. Ballard*, 586 F.2d 1060, 1063 (5th Cir.1978) ("[T]elling the [defendant] in a noncoercive

manner of the realistically expected penalties and encouraging her to tell the truth is no more than

affording her the chance to make an informed decision with respect to her cooperation with the

government.").

Assuming, arguendo, that Barrett had shown that the government flouted its duty of

disclosure, he has not identified any forgone information about Travis Crawford that would have

had a material effect on the verdict.  Crawford made substantial admissions on the witness stand

to potentially impeaching facts.  He admitted his lengthy use of methamphetamine (Tr. 3: 457),

162

he admitted his arrests for child support violations and check fraud (Tr. 3: 467-68), and he admitted that drug use had affected his memory and perception of events (Tr. 3: 471-72), and he admitted that six years had passed between the murder and his testimony in which he had never provided a written statement to law enforcement (Tr. 3: 481-82). Any further evidence designed to impeach Crawford as a general matter, such as with his record of decades-old military transgressions, would have been cumulative to that already adduced.

Indeed, any information about Crawford's military history is irrelevant. Crawford joined the military because he had "problems" in school. (Mot. Ex. 45 at 1.) He entered the army in 1983, and was discharged on January 23, 1985, more than 20 years before Barrett's trial. Barrett cannot demonstrate that any offense for which Crawford was sent to the brig occurred within 10 years of trial and could therefore have been the basis of impeachment evidence. Fed. R. Evid. 609(b); *see United States v. Begay*, 144 F.3d 1336, 1338 (10th Cir. 1998). By no means has Barrett made any effort to show that the military infraction was the sort of offense that this Court would find sufficiently probative of the witness's credibility to overcome an objection to its apparent age.

Barrett fares no better in claiming that the prosecutor withheld information about Crawford's prior intoxication. Had the prosecutor disclosed an opinion that Crawford was under the influence of drugs while testifying or within nine months of trial, Barrett cannot show the information would have led to admissible impeachment evidence. Presumably defense counsel could have cross-examined Crawford as to his state of sobriety while meeting with the prosecutor, but the attorneys were not free to adduce evidence about such a collateral matter had Crawford denied his supposed drug use. *See United States v. Young*, 952 F.2d 1252, 1259 (10th

Cir. 1991). Certainly, Crawford has not indicated he would have admitted he was under the influence of drugs, and Barrett fails to identify any extant evidence he could have developed on the basis of a "disclosure" about the condition of the witness before or during trial. Barrett has not shown that anyone who observed Crawford on the stand, or before, could have provided an informed and admissible opinion about Crawford's drug use.

Moreover, Barrett cannot show any likelihood that he would have received a more favorable verdict had the defense adduced evidence that the prosecutor told Crawford he would get in trouble if he was dishonest. Also, the supposedly undisclosed evidence of Crawford's cooperation with local law enforcement would have had de minimis impeachment value. Such information might have shown, generally, that Crawford was willing to help the police to escape criminal liability, but there was no indication he did so in the present case. Crawford is alleged to have previously testified about controlled drug buys though the police had initially told him he would not have to. (Mot. 281.) That evidence appears to enhance Crawford's credibility, because it shows he honored his commitments when he had no obligation to do so.

Barrett cannot show a reasonable likelihood that any of the supposedly suppressed evidence about Crawford would have led to a more favorable verdict, especially given that far more powerful evidence of impeachment did not lead to acquittal. *See United States v. Torres*, 569 F.3d at 1282. Accordingly, he has failed to demonstrate that the prosecution violated any duty of disclosure.

### iii. Cindy Crawford

Barrett relies exclusively on hearsay to argue that Cindy Crawford has recanted her trial testimony, that she was coached and threatened by law enforcement to provide false testimony,

and that she was "coming down off a two day meth high" when she testified at trial and provided an interview to the prosecutor. (*See* Mot. Exs. 14, 31.) Barrett also complains that the government suppressed information that Ms. Crawford suffered from post-traumatic stress disorder and that she was widely-reputed to have cooperated with other law enforcement agencies. Barrett also claims that Ms. Crawford received undisclosed benefits in exchange for her testimony. (Mot. 283-89; BIS 155-56.) Barrett's contention is without any substance and fails to state any meritorious claim that the prosecution was aware of evidence favorable to the defense that it failed to disclose.

The hearsay reports of Ms. Crawford's supposed recantation and claims of prosecutorial mistreatment are not sufficient to obtain relief or further review of this claim. *See Pearson*, 203 F.3d at 1275; *see also Herrera v. Collins*, 506 U.S. at 416 (noting that affidavits in a habeas action were "particularly suspect" because they were based on hearsay). The declarations of witnesses attesting to Ms. Crawford's alleged statements do not amount to cognizable evidence of recantation and this Court should disregard them.[21]

Barrett likewise cannot succeed with his speculative assertions that the prosecution withheld evidence that Ms. Crawford was mentally ill and an active user of methamphetamine at the time of trial. He fails to show that the government knew Ms. Crawford had been diagnosed with post-traumatic stress disorder, though she claimed to have received such a diagnosis during her penalty phase testimony (Tr. 22: 4580). He also fails to show that the government had any

---

[21]As in his claim regarding Travis Crawford, *supra*, Barrett argues that the reports of Cindy Crawford's recantation require relief as newly discovered evidence. Here again, Barrett cannot rely upon such a theory to obtain relief under § 2255 – he must demonstrate a legal error in addition to a factual one. *Evans*, 224 F.3d at 674.

knowledge that the witness was using drugs around the time of trial.[22]  Barrett's speculation that

the government knew of Ms. Crawford's mental condition and drug abuse does not state a

meritorious *Brady* claim.  *See United States v. Erickson*, 561 F.3d at 1163.

Regardless of the government's alleged failure to disclose, Ms. Crawford referred to her

supposed post-traumatic stress disorder during the penalty phase, undermining any argument that

Barrett did not learn of that fact in time to take advantage of it.  *See Coe*, 161 F.3d at 344.  The

information was, after all, potentially relevant only to Ms. Crawford's penalty-phase testimony.

During the penalty phase, she testified about a situation she would have found understandably

stressful – the defendant's attempt to coax her into sex and his subsequent assault on her with a

firearm.  (Tr. 22: 4576-79.)  Because she asserted that her disorder prevented her from

"handl[ing] stress very well" (Tr. 22: 4580), the condition arguably affected her perception and

recollection of the events she described.  But during the guilt phase, Ms. Crawford did not

describe any stressful event.  Instead, she testified that she had received drugs at Barrett's house

(Tr. 13: 3064), had once encountered a difficult situation with the defendant (Tr. 13: 3064-65),

had observed one of Barrett's guns (Tr. 13: 3067-68), and had heard Barrett express an

awareness that the police might come to his home and an intention to "go out in a blaze of

glory."  (Tr. 13: 3068-69.)  Thus, Barrett cannot show that he did not learn of the witness's

alleged mental condition in time to make use of it.  By extension, he cannot show that the

witness's supposed disorder was probative of her credibility during the guilt phase or that a

reasonable likelihood exists that he would have been acquitted had the evidence come to light

---

[22]As with Travis Crawford, if Ms. Crawford was manifestly intoxicated during trial, the
government would have had no duty to disclose her condition.  *See Erickson*, 561 F.3d at 1163.

during the first portion of the trial.  *See United States v. Torres*, 569 F.3d at 1282.

Barrett's claim that the prosecution had a duty to disclose the fact that Ms. Crawford was "well known" as a "snitch" is both self-defeating and without substance.  If Ms. Crawford's reputation was "well-known," as suggested by various declarants (*see, e.g.*, Mot. Exs. 83 at 2 ("It is common knowledge in the community that Cindy Crawford has worked as a 'snitch' for local law enforcement"), 88 ("It is common knowledge in the community that Cindy Crawford has worked as an informant for the police"), 92 ("I am aware that Cindy has worked as an informant for the local police")), the government bore no duty to disclose that fact, as defense counsel knew or should have learned of it, independently.  *See Coe*, 161 F.3d at 344.  Ms. Crawford's reputation aside, Barrett fails to show that the witness had – prior to her testimony – actually provided documented assistance to law enforcement in exchange for favorable treatment, much less that anyone in the prosecution team was aware of such facts.  The reported rumors about Ms. Crawford do not demonstrate that any supposed cooperation with law enforcement predated this trial, much less that the investigative team possessed information it should have disclosed. Absent proof that the prosecution suppressed information, Barrett's speculative claim fails.  *See United States v. Erickson*, 561 F.3d at 1163.  Of course, Barrett cannot show that the failure to disclose the vague rumors he reports here were in any way material to the outcome of the trial.

Finally, Barrett's accusations that Ms. Crawford received undisclosed benefits in exchange for her testimony lack any merit.  Barrett identifies what he perceives as lenient treatment provided in state court to Ms. Crawford.  Without attempting to show that her treatment was in any way influenced by federal prosecutors, Barrett speculates that she benefitted from some undisclosed bargain for her testimony.  Indeed, he goes so far as to claim that the

federal government influenced sentencing in a prosecution that the State of Oklahoma commenced almost three years after Ms. Crawford testified in this case. Even if Barrett could show that the federal prosecutor exercised some influence over the course of the state proceedings, he would still fall far short of demonstrating a *Brady* violation, as he has not shown the existence of an agreement with the witness at the time of trial. *Shabazz*, 336 F.3d at164-65. Barrett's speculative accusations are legally insufficient to show error. *Id.*

iv.  Brandie Zane Price

Barrett claims that Brandie Price received undisclosed benefits for her testimony. He premises the assertion on evidence that she received leniency in the prosecution of crimes she committed after this trial. Barrett further claims that the government knew or should have known that Price was involved in that criminal activity when she testified. (Mot. 289-92; BIS 156.) Once again, Barrett's speculative claims lack merit.

As with Barrett's previous attempts to elevate evidence of subsequently-conferred benefits into the basis of a *Brady* violation, this present collection of conjecture should fail. Barrett relies on a news report that indicates that in 2007, the government treated Price leniently when it prosecuted her for crimes committed in 2006. (Mot. 271.) According to Barrett's source, the basis of that treatment was Price's testimony at Barrett's 2005 trial. Barrett has not, however, shown that there existed an agreement for such leniency at the time of the witness's testimony. *Shabazz*, 336 F.3d at164-65. Indeed, Barrett provides no theory as to how the government might have induced Price's cooperation by promising leniency in a prosecution it had not undertaken for a crime the witness had not yet committed. Absent proof of some actual assurance to induce Ms. Price's testimony, Barrett fails as a matter of law to state a valid claim

168

that the government suppressed evidence. *Id.*

Barrett also fails in asserting the contention that the government failed to disclose evidence that Ms. Price was, in 2005, trafficking in drugs. Barrett speculates that the government's 2007 indictment, which charges crimes committed in 2006, somehow indicates that the U.S. Attorney knew of the activity in 2005. Quite the contrary, the charges suggest that even in 2007, the government lacked evidence that Price was trafficking in drugs at the time of Barrett's trial. Barrett has not shown that Price actually engaged in any unlawful conduct in 2005, much less has he shown that the government was aware of such activity. Absent such proof, Barrett's speculative claim should not succeed. *See United States v. Erickson*, 561 F.3d at 1163.

v. <u>Karen Real</u>

Karen Real, a convicted felon, acknowledged on the witness stand that the prosecutor had agreed to inform her sentencing court about her cooperation in this case, a fact Barrett does not dispute. After Barrett's trial, the prosecutor filed a motion on Real's behalf for a reduction of sentence. That motion, according to Barrett, was an undisclosed benefit to the witness. Barrett also adds, by way of summary allegation, that the government suppressed information regarding Real's criminal record, including the dismissal of numerous state drug charges. (Mot. 292-94; BIS 156-57.) Barrett fails to show that the benefit received by Real was not the one described by the witness in open court. Barrett's claim regarding the suppression of Real's criminal record is untimely and without merit, as the defendant fails to show that the government possessed any material information about Real's state prosecutions.

169

Real testified that she began using methamphetamine regularly in 1994 or 1995, and continued doing so until her arrest in 2000.  (Tr. 13: 3081.)  She admitted that she had been convicted in federal court of three offenses, including "conspiracy to manufacture," and was sentenced to 14 years in state prison.  (Tr. 13: 3079-80.)  Real explained the assurances she had received from the prosecution in exchange for her testimony:

> Q.  And did I indicate anything that I would do for you or attempt to do for you in relation to your cooperating with the Government in this case?
> A.  No, sir.
> Q.  Did I talk about anything I'd say to the Court?
> A.  Well, you just mentioned that, you know, you could tell the Judge, you know, what I did.  And then it would be up to the Judge.
> Q Okay.  Any relief from your sentence -- you're aware it's not going to come from me, its got to come for the court?
> A Yes.  The court.

(Tr. 13: 3080-81.)  Ultimately, the government moved to modify Real's sentence under Federal Rule of Criminal Procedure 35 without proposing any particular reduction.  The government informed the court that Real "was the first [civilian witness] and cooperated willingly and courageously.  Her assistance was substantial and created an environment in which others could cooperate as well.  She is clearly deserving of a reduction in her sentence in consideration of her efforts."  (Resp. Ex. 9.)  The court subsequently reduced the sentence to time served.  (Resp. Ex. 10.)

Barrett fails to demonstrate that the benefit Real expressly anticipated was not precisely the one she received.  Following her testimony, the prosecution moved to reduce her sentence by the only procedural means available – a Rule 35(b) motion – leaving the ultimate disposition entirely in the court's discretion.  Barrett fails to identify a benefit received by Real that went undisclosed to the jury, much less the defense.  Indeed, Barrett appears only to complain that

170

Real's testimony was insufficiently precise to accurately elucidate the agreement for the benefit of the jury, not that the government failed to disclose a benefit it promised to the witness. But Real's testimony provided the defense with the essential facts necessary to further explore the precise nature of the witness's agreement and thereby take any possible advantage of the evidence. *See Coe*, 161 F.3d at 344.

To the extent the benefit conferred was any greater than that described by the witness – because it involved a request to reduce Real's sentence rather than a mere notification to the court of her cooperation – Barrett has not shown that the witness was assured before she testified that the government would make such a motion. Any claim to the contrary is speculative and legally insufficient to establish that the government knowingly suppressed evidence. *See Shabazz*, 336 F.3d at164-65. Regardless, Barrett has not, and cannot, show a reasonable likelihood that he would have been acquitted had the government specifically and expressly disclosed an intent to file a Rule 35 motion rather than simply "tell the judge" what Real did. *See United States v. Torres*, 569 F.3d at 1282. No reasonable probability exists that the jury's credibility determination, much less its verdict, would have changed had it learned in greater technical detail what procedural steps the prosecutor would take to satisfy its end of the bargain with Real. *See id*.

Barrett also claims that the prosecution suppressed information about Real's criminal record. He first raised that claim that in his Brief in Support (BIS 156-57), which was filed March 1, 2010, well after the expiration of the one-year period of limitations applicable to his Motion to Vacate. *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at1280; *cf.* Docs 1, 2, 70, 81. His claim should be disregarded as untimely. *See United States v. Guerrero*, 488 F.3d

171

at 1316. The claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention. *Cf. United States v. Espinoza-Saenz*, 235 F.3d at 505. Furthermore, Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the contention. *United States v. Gabaldon*, 522 F.3d at 1124. Thus, this Court should strike and disregard Barrett's untimely claim that the government failed to disclose evidence regarding Karen Real's criminal record.

Even if Barrett had timely raised his claim that the government suppressed information about Real's criminal history, he fails to show that the prosecution team ever possessed the data or that it was material. According to Barrett, the undisclosed portions of Real's criminal history involve dismissed cases in Sequoyah and Cherokee Counties. Barrett fails to provide any basis for his speculation that the government had knowledge of these inchoate prosecutions. *See United States v. Erickson*, 561 F.3d at 1163. Not only does Barrett fail to show that the government had such information, he fails to explain how it would have resulted in admissible, material evidence. The prosecutions to which Barrett alludes apparently did not result in conviction, and therefore were not admissible as impeachment evidence, even assuming they involved felony prosecutions undertaken within 10 years of this trial. *Cf.* Fed. R. Evid. 609. Barrett also fails to explain why evidence of dismissed state prosecutions would have resulted in a reasonable likelihood of acquittal, given that Real admitted that she was presently incarcerated for a federal felony conviction and stood to benefit through her cooperation. *Erickson*, 561 F.3d at 1163.

In short, this Court should disregard Barrett's claims of non-disclosure, which are speculative, untimely and premised on a misinterpretation of the record.

172

vi.  Randy Turman

Barrett claims that the prosecution failed to disclose the fact that Randy Turman was a

defendant in a pending Sequoyah County prosecution and that the government "sponsored" the

witness's false testimony that the case had "done been taken care of."  (Mot. 294-95; BIS 157.)

Barrett's claim has no merit.

The government did not adduce the testimony that Barrett complains of – Barrett's own

lawyers did, and they clearly knew the status of Turman's case, as the cross-examination of the

witness demonstrates:

> Q.  And on that case, you're currently out on bond on another $100,000;
> aren't you?
>
> A.  No, 120,000.
> Q.  And the status of that case is what?
> A.  There's  –  there's nothing, no status.  I've done been to court, and it's
> done been taken care of.
> Q.   It's over with?
> A.  As far as I know.
> Q.  Have you looked at the records?
> A.  No, sir.
> Q.  Do you want to look at them?
> A.  I don't know what good it would do me.
> Q.  I've got them right here.  I've looked at them.  You want to look at
> them?
> A.  I probably wouldn't understand them.
> Q.  It's not over with --
> A.  The last time I went to court on that was two years ago, and I have
> never been made another court date.  That was when Kelly Karnes was fired from
> the sheriff's department. He brought in bogus charges on me  –

(Tr. 3: 435-36 (emphasis added).)

Barrett cannot establish a failure to disclose, for an instance in which his attorney

announced in open court that he possessed the relevant records to refute Turman's testimony.  In

short, no relief can lie, because the defense was armed with the essential facts permitting it to

take advantage of the potentially impeaching evidence.  *Coe*, 161 F.3d at 344.

> C.  The Government Possessed no Knowledge of a Witness who Would Contradict Charles Sanders

Barrett claims that the prosecution, during the course of an ex parte hearing, stated that it had knowledge of a witness who could contradict Charles Sanders's report that he had heard the defendant utter threats directed at Clint Johnson's confidential informant.  According to Barrett, the government never disclosed that witness to the defense.  (Mot. 295-96; BIS 154.)  Barrett's contention lacks any merit, as the prosecutor never stated that he had spoken to a witness who could or did contradict Sanders.

The statement to which Barrett appears to allude was not part of any discussion about Sanders's report of a threat to the confidential informant.  Rather, the colloquy between the Court and prosecutors concerned the existence of witnesses to events that occurred *prior* to the murder, who could "testify that Mr. Barrett knew there was an arrest warrant outstanding, . . . expected law enforcement to come to his residence at some point in time and advised that  – words to the effect of I'm going to shoot when they come."  (Tr. Hr'g on Gov't's Mot., Sept. 13, 2005, at 10.)  The Court asked whether disclosure of the anticipated testimony would alert the defendant to the identity of the witnesses, prompting Assistant U.S. Attorney Littlefield to respond as follows:

> If – Your Honor asks about does that notice them, the defense, as to who it is and my response would be yes and no.  Yes, because the defense could go back through his recollection of who he might have said that to and have an access to the names.  No, because it is my belief that the defendant said that to many, many more people than those that we have found.  I have learned of one person, for example, who through witnesses, who would have been a participant in a conversation with Mr. Barrett in which statements of this nature would have been made.  I talked to that person.  That person refused to acknowledge it, I think in large measure because of the fear.

(*Id*. at 11-12.)

174

The subject matter of the hearing subsequently changed, when Assistant U.S. Attorney Littlefield began to discuss a threat Barrett had made *after* committing the murder with regard to Sanders. (Tr. Hr'g on Gov't's Mot., Sept. 13, 2005, at 14.) Littlefield explained that "sometime after the defendant's arrest, [Sanders] was at the residence of a female associate of Barrett's when Barrett called and that's when Barrett advised the female that they needed to identify the informant and, quote, 'take care of him.'" (*Id*. at 17.) Thus, the record fails to demonstrate that any witness – in particular the aforementioned witness who was too scared to admit that Barrett had made *pre-offense* statements to her about the police – was in any position to contradict Sanders about a threat to his safety made *after* the murder.

Barrett's claim that the prosecution suppressed the identity of a witness is baseless. He has not shown the government suppressed the identity of any witness who could have contradicted any trial testimony, and his attempt to mount a *Brady* claim on this empty record must fail. *See United States v. Erickson*, 561 F.3d at 1163. The government violated no right of Barrett's by omitting to disclose evidence it did not possess. *Id.*

D.  The Government Disclosed All Necessary Evidence Concerning Law Enforcement Personnel

Barrett claims that the government suppressed evidence favorable to the defense about three law enforcement officials involved in the case – Agent Clint Johnson, Assistant U.S. Attorney Michael Littlefield, and Sheriff Johnny Philpot. (Mot. 296-310.) Barrett's contention regarding Johnson involves baseless allegations of largely post-trial misconduct of which the government had no knowledge. Barrett's contention regarding Littlefield involves irrelevant post-trial conduct. And his contention regarding Philpot is simply without a basis in fact or law.

i.  Clint Johnson

175

Barrett claims that the prosecution improperly suppressed evidence that Drug Task Force Agent Clint Johnson engaged in several acts of supposed misconduct, involving alleged check fraud and a misuse of office that included the failure to log drug evidence. Barrett contends that this conduct began prior to this trial, was discovered during the trial, and led to Johnson's firing shortly after the trial. Barrett also claims that Johnson mismanaged his personal finances, declared bankruptcy, and gave materially false testimony regarding his knowledge of Charles Sanders's criminal activity before September 24, 1999. (Mot. 297-303.) The government had no knowledge of this alleged misconduct, none of which has any substance.

As previously noted, *Brady* requires only the disclosure of evidence within the government's actual or constructive possession. *United States v. Beers*, 189 F.3d at 1304. The courts do not impute to the federal government exculpatory information in the possession of state agencies, when the two each separately investigate a crime. *Id.* at 1303-04. In this case, the government had no *Brady* obligation to disclose information concerning Johnson's activity because the witness and his employer were not a part of the prosecution team.

The U.S. Attorney, while it had contact with other police agencies during the course of this prosecution, relied on only one institution as its investigator – the DEA. Indeed, counsel was informed well before trial that the United States Attorney had no access to, or knowledge of, the personnel files in the possession of local police agencies. (*See* Resp. Ex. 4.) The U.S. Attorney had no association with Clint Johnson or the Drug Task Force that would have given rise to knowledge of the personnel matters alleged here. Given that the Task Force was not a part of the prosecution team during the course of this investigation or trial, this Court should not impute to the government any knowledge that the Task Force may have had regarding the witness's

176

supposed misconduct.  *Beers*, 189 F.3d at 1304.

Even assuming that the government had some institutional connection to the Task Force, the available evidence was immaterial.  Of the supposed misconduct attributed to Johnson, the only incident that allegedly occurred prior to sentencing in this case involved the passing of bad checks in September 2005, which the District Attorney apparently discovered on November 1, 2005.  The report did not constitute the conviction of any crime.  At most, defense counsel could have confronted Johnson with the allegation on cross-examination, but had the witness denied scienter, counsel could not have proved the misconduct through extrinsic evidence.  *See* Fed. R. Evid. 608 & 609; *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991); *see also United States v. Young*, 952 F.2d at 1259.

Johnson apparently would have stood on firm ground in denying fraudulent intent, as the matter has never been shown to reflect criminal wrongdoing.  The Oklahoma Attorney General investigated the matter and determined that Johnson's accuser, District Attorney Richard Gray,[23] exaggerated or fabricated Johnson's supposed misconduct.  The Attorney General determined that the recipient of the Johnson's checks did not perceive any fraudulent intent and had no desire to report the matter until Gray's investigator forced the issue.  (*See* Resp. Ex. 2.)  No reasonable probability exists that Barrett would have received a more favorable verdict had the defense elicited evidence that Johnson inadvertently wrote an overdraft on his checking account.  *See United States v. Torres*, 569 F.3d at 1282.

Johnson, according to Barrett, also misused his position as a police officer, though the

---

[23]It appears that District Attorney, Richard Gray, commenced an investigation of Johnson based on suspicions that the subordinate had reported to state officials his concerns that the elected official was embezzling money.

177

underlying allegations lack substance and were not discovered in time to constitute *Brady*

material.  Barrett concedes that Johnson's employer did not discover any errors in the logging of

drug evidence until January 5, 2006, roughly three weeks after the December 19, 2005 sentencing

in this matter.  (*Compare* Mot. 297-98; *with* Trl. Dckt. Dec. 19, 2005.)  The remaining

allegations concerning misuse of office did not come to light until 2008, during the State of

Oklahoma's prosecution of Richard Gray.  (*See* Mot. 300-01.)  The government had no

continuing duty to disclose any of the post-trial information.  *See Dist. Atty's Office v. Osborne*,

129 S. Ct. 2308, 2319-20 (2009); *see also United States v. Jones*, 399 F.3d 640, 646-47 (6th Cir.

2005) (holding that evidence that did not exist at the time of trial was not *Brady* material).  Even

if Johnson's actions had come to light during this trial, no reasonable likelihood exists that

Barrett would have received a more favorable verdict: the Attorney General performed an audit

of Johnson's use of official funds and, despite discovering sloppy bookkeeping, did not find any

misuse of monies (*See* Resp. Ex. 2).  *See United States v. Torres*, 569 F.3d at 1282.

Apparently aware of the fact that he does not identify any concrete allegation that anyone,

in any government agency, could show that Johnson was misusing his office during this trial,

Barrett claims that the witness's employer had suspicions as early as November 9, 2005.  (*See*

Mot. 284-85.)  *Brady* does not, however, require the disclosure of subjective suspicions.  *United*

*States v. Torrez-Ortega*, 184 F.3d 1128, 1137 (10th Cir. 1999).  As a result, Barrett fails to state a

meritorious claims with his sundry allegations that the Task Force had an unsubstantiated

"concern" about Johnson's financial accountings or truthfulness.  Mere suspicions of misconduct

would not have constituted admissible impeachment evidence.  *See* Fed. R. Evid. 608 & 609.

Thus, Barrett cannot show a reasonable likelihood that he would have received a more favorable

178

verdict had the hunches of Johnson's employer come to light.  *United States v. Torres*, 569 F.3d at 1282.

Barrett likewise fails in his assertion that Johnson's 2001 bankruptcy was *Brady* material. Assuming the defense could have used the bankruptcy to impeach Johnson, it was a public record available to Barrett through another source.  *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 789 (1985) ("federal law . . . makes the fact of the bankruptcy a matter of public record."); *see United States v. Infante*, 404 F.3d 376, 386-87 (5th Cir. 2005) (finding no duty under *Brady* to disclose public records); *United States v. Lujan*, 530 F. Supp. 2d 1224, 1258 (D.N.M. 2008).  Regardless of the availability of the bankruptcy records, no reasonable probability exists that irrelevant evidence of Johnson's personal financial problems, which occurred four years before this trial, would have resulted in a more favorable verdict.  *See United States v. Torres*, 569 F.3d at 1282.

Finally, Barrett speculates that Johnson testified falsely when he stated that he did not know whether the confidential informant sold or manufactured drugs.  Johnson did, however, testify that Sanders had participated in drug dealing prior to September 24, 1999.  (Tr. Jan. 26, 2005 at 92.)  The statement was completely consistent with Johnson's apparent knowledge of Sanders's conviction for delivery of cocaine and amphetamines.  Barrett, however, claims that Johnson must have known that Sanders was selling drugs, though he denied such knowledge during the hearing.  (*See id.* at 93.)   Barrett fails to support his supposition with any evidence of Johnson's actual knowledge, and therefore cannot demonstrate any failure of disclosure. Because Barrett merely speculates that Johnson knew of Sanders's narcotics activity, he lacks a basis in fact and fails to state a valid *Brady* claim.  *See United States v. Erickson*, 561 F.3d at

1163. Johnson was, in any event, a mere witness, not a part of the investigative team. Thus, his knowledge of Sanders's activity cannot be imputed to the government as the basis of a *Brady* claim. *See Beers*, 189 F.3d at 1304.

### ii. Michael Littlefield

Barrett claims that the prosecution suppressed evidence that Michael Littlefield was abusing his children around the time of trial. According to Barrett, evidence of this conduct would have demonstrated that the prosecutor intimidated witnesses. He also argues that the prosecutor used improper rhetoric during cross-examination to "expiate his own sins." (Mot. 303-07.) Barrett's claim lacks factual support or legal substance. He has failed to demonstrate that there was evidence of child abuse to disclose at the time of trial, or that the putative evidence was admissible and, therefore, material.

Barrett has provided no competent evidence that Littlefield abused his children prior to or during this trial. Instead, he relies on a search warrant affidavit to assert that Littlefield's conduct, which was punished two years after this trial, extended back to any time relevant to this case. (*See* Mot. 304-05 (citing Mot. Ex. 189).) Of course, the affidavit is nothing more than the basis of a probable cause determination, and not proof of a crime. In the absence of any reliable evidence that the claimed misconduct actually fell within the time frame of this case, Barrett has fallen far short of demonstrating that there was any evidence for the government to have disclosed. *See United States v. Erickson*, 561 F.3d at 1163.

Assuming, arguendo, that Barrett had shown that Littlefield abused his children during the investigation or trial of this case, he still could not establish materiality. Littlefield was not a witness to any aspect of this case. His alleged misconduct, first identified two years after trial

180

and eight years after the murder, is entirely irrelevant to the evidence adduced against Barrett.

Nonetheless, Barrett argues that he could have proven that Littlefield intimidated witnesses based on evidence of child abuse. Barrett's theory cannot survive scrutiny under Federal Rule of Evidence 404(b), which generally prohibits proof of prior misconduct to prove conduct in conformity at some later time. Admittedly, Barrett, as a criminal defendant, would have enjoyed greater latitude than the government in offering prior bad acts evidence, but he still could not have met the relevant four-part test for admissibility, which would have required him to show,

> (i) whether the evidence is introduced for a proper purpose; (ii) whether the evidence is relevant; (iii) whether the evidence has probative value that is not substantially outweighed by the potential for unfair prejudice; and (iv) whether the party introducing the evidence has precisely articulated the purpose for which the evidence is offered.

*United States v. Duran-Moreno*, 616 F. Supp. 2d 1162, 1172 (D.N.M. 2009) (citing *United States v. Hardwell*, 80 F.3d at 1488).

The putative child abuse evidence lacked any relevance and therefore could not have been offered for proper purpose, as Barrett cannot show that the prosecutor intimidated witnesses or that his trial attorneys had a basis for alleging that Littlefield had done so. To show Littlefield's supposed misconduct, Barrett simply refers to "Travis Crawford's and Cindy Crawford's claims they were threatened by Littlefield." (Mot. 306.) Barrett ignores the fact that Travis and Cindy Crawford have made no such accusations – indeed, Cindy has not even offered a declaration. (*See* Mot. Exs. 14, 31.) Moreover, only Cindy Crawford is reported to have accused Littlefield of intimidation (see Mot. Ex. 14 at 2-3), while according to Travis Crawford, Littlefield told him that "bad things" would happen if he lied. (Mot. Ex. 31 at 3.) The only arguably competent

181

evidence presented by Barrett with regard to Littlefield's allegedly threatening behavior toward witnesses comes from Janice Sanders, who claims that the prosecutor "got angry with" her when she expressed an opinion that Barrett's state sentence was adequate and the federal prosecution was un-American.  (Mot. 306 (citing Mot. Ex. 85 at 3).)  Strikingly absent from the declaration, however, is any indication that Littlefield – despite any supposed anger – attempted to intimidate Sanders.

Barrett has not only failed to identify any basis upon which his trial attorneys could have accused Littlefield of intimidating witnesses, he has also failed to demonstrate a nexus between witness intimidation and child abuse.  Assuming, arguendo, that Littlefield physically abused his wife's children, that conduct would not provide any proof of his motive, opportunity, intent, preparation, plan, knowledge, identity, or lack of mistake in intimidating witnesses.  Fed. R. Evid. 404(b).  Simply stated, Littlefield's domestic misconduct might have been pertinent to a claim that he was assaultive, but provides no basis in reason for concluding that he improperly influenced evidence, and thus cannot survive scrutiny under Rule 404(b).

Not only would evidence of Littlefield's misconduct have lacked probity, it would have been highly prejudicial, requiring testimony on an inflammatory, highly personal, yet entirely collateral matter.  Such evidence would have tended to unfairly reflect on the government's case though it involved Littlefield's personal conduct.  Given these flaws, any evidence of Littlefield's conduct at or around the time of trial would not have survived scrutiny under Federal Rule of Evidence 403.  *See generally United States v. Robinson*, 530 F.2d 1076, 1078-79 (D.C. Cir. 1976) (discussing prejudicial effect of child battery evidence to prove identification).

By the same token, Barrett cannot show that he could have relied on allegations of child

182

abuse as the basis for an objection to Littlefield's cross-examination of Abby Stites, though the defendant now offers a pseudo-Freudian theory about the supposedly cathartic nature of the prosecutor's questions. In point of fact, Barrett has not demonstrated that the prosecutor's examination was improper, much less has he shown that it was motivated by some inappropriate need to purge subconscious guilt.

Given the clear inadmissibility and irrelevance of the putative child abuse evidence, Barrett cannot show that the government failed to disclose a material fact, as there is no reasonable likelihood that he would have received a more favorable verdict had the defense possessed irrelevant information, to the extent it existed, about Littlefield's behavior. *See United States v. Torres*, 569 F.3d at 1282.

### iii. Johnny Philpot

Barrett claims that the prosecution suppressed evidence that Johnny Philpot had visited his home, and inspected his weapons just a few weeks before the murder. According to Barrett, evidence of this alleged incident would have undermined the government's proof that the defendant intended to kill peace officers who entered his land. (Mot. 307-10.) The government bore no duty to disclose the supposed encounter.

The Constitution does not compel the disclosure of information that was available to the defense from another source. *Coe*, 161 F.3d at 344. Obviously, information about a meeting between Johnny Philpot and Barrett was available to the defense from the defendant. For that reason, the government had no duty to disclose evidence of the alleged encounter.

In point of fact, the government did not disclose any evidence of this alleged incident for the simple reason that it did not occur. Philpot has clarified that he visited Barrett's home and

inspected rifles there, on a single occasion – July 29, 1998, over a year before Barrett murdered

Trooper Eales. (*See* Resp. Ex. 1.) Not only was that incident disclosed to the defense, it was

fully explored before the jury. (Tr. 8: 1789, *see also* Tr. 8: 1809-10.) The government bore no

duty to disclose evidence of an meeting inaccurately recalled by witnesses long after the fact. *See*

*Erickson*, 561 F.3d at 1163.

As proof of the supposed encounter, Barrett relies on the declaration of Rodney Floyd

(Mot. Ex. 6), in which the declarant asserts that Philpot told him about responding to the

defendant's home with other deputies in 1999. This incompetent hearsay is not reliable evidence

of anything, much less of a constitutional violation sufficient to overturn Barrett's murder

conviction, and this Court should disregard it. Elsewhere in his § 2255 Motion, Barrett claims

that Philpot's supposed 1999 visit to Barrett's home was witnessed by Janice Sanders. (*See* Mot.

160-61 (citing Mot. Ex. 85).) According to her declaration, Sanders called the police after

Barrett fired a bullet that nearly missed her mother. Sanders asserts, "That call to the sheriff

brought five law enforcement vehicles to Kenny's place and resulted in John Philpot inspecting

Kenny's rifle to see if it was legal. I watched them there from across the road." (Mot. Ex. 85 at

1.) Ms. Sanders's recollection is, as shown above, mistaken.

But even if the incident described by Sanders had occurred, and should have been

disclosed, Barrett has not demonstrated its materiality. As noted, Sanders claims that five police

vehicles responded to her complaint that Barrett had nearly shot her mother. Crediting Sanders's

account, it would appear that a few weeks before the murder, Barrett had demonstrated a gross

disregard for the safety of his own relatives in the handling of his weapons. Sanders's

recollection of a heavy police response, indeed on that may well have involved every active duty

sheriff's deputy in rural Sequoyah County, would have shown that local law enforcement considered Barrett dangerous, if not hostile.  Thus, the circumstances described by Sanders fall far short of proving that Barrett did not intend harm to police officers if he observed them entering his land to serve an arrest warrant.  Certainly, no reasonable likelihood exists that Barrett would have received a more favorable verdict had the government disclosed evidence of the 1999 incident recalled by Sanders.  *See United States v. Torres*, 569 F.3d at 1282.

2.  <u>The Prosecution did not Interfere with Defense Counsel's Investigation</u>

Barrett claims that the prosecution interfered with defense counsel's investigation by delaying disclosure of government witnesses and by advising witnesses not to communicate with the defense in the absence of a government representative.  (Mot. 310-14; BIS 165-68.)  Barrett's contention that the government unduly delayed disclosure of witness identities was already rejected on appeal, and there is no basis for revisiting it now.  His argument that the government actively interfered with witnesses has no basis in fact.

A.  <u>The Government Complied with the Law Regarding the Disclosure of Witnesses, and Barrett Cannot Raise that Issue in this Proceeding, Having Unsuccessfully Raised it on Appeal</u>

In the guise of an argument that the prosecution interfered with defense counsel's investigation, Barrett argues that the government did not timely disclose the identities of its civilian witnesses.  Barrett also revisits arguments he made in claims I and II, asserting that the actions of the Court and prosecutors, combined with the omissions of his own lawyers, deprived him of a deserved trial continuance.  (Mot. 310-14.)  Barrett unsuccessfully challenged the timing of the disclosure on appeal, and cannot revisit the issue in this proceeding.

On appeal, Barrett unsuccessfully argued "the government's 'failure' to timely provide

185

him the names of those witnesses 'amounted to an ambush, thereby denying [him] the opportunity to investigate and prepare cross-examination, as well as present a defense.'" *Barrett*, 496 F.3d at 1115. In rejecting that contention, the Tenth Circuit Court of Appeals held that trial began with voir dire on September 26, 2005, and that disclosure was timely made one week beforehand, on September 19, 2005. *Id.* at 1116-17 (finding disclosure timely under 18 U.S.C. § 3432). Additionally, the Tenth Circuit held that even if Barrett had demonstrated error, he had not shown substantial prejudice: "Barrett has fallen far short of establishing that he was substantially prejudiced . . . . [D]efense counsel expressly acquiesced in the disclosure schedule . . . and at no time thereafter complained about the timing of the disclosure, requested additional time to question the seven witnesses, or objected to the testimony of these witnesses . . .[under] § 3432." *Id.* at 1117. The Tenth Circuit's disposition of this issue precludes further review under § 2255.

As noted above, a defendant may not relitigate, under § 2255, any issues considered and rejected on direct appeal. *United States v. Warner*, 23 F.3d at 291. Relitigation of an appellate issue under § 2255 "may be proper when there has been an intervening change in the law of a circuit." *United States v. Prichard*, 875 F.2d at 790-91. In this case, Barrett has not demonstrated any intervening change of law that might permit this Court to revisit the claim that the government unduly delayed disclosure of its witnesses.[24] Even if Barrett could raise the claim anew, it would fail for the very reasons set forth in the Tenth Circuit's opinion.

As discussed above, Barrett had no legal right to a delay in trial and cannot show that his

---

[24]To the extent Barrett may argue that this claim depends on aspects of the record he did not cite in support of his appellate claim, he has defaulted any new argument by failing to raise it before the Tenth Circuit. *See United States v. Frady*, 456 U.S. at 165.

exclusion from an ex parte hearing deprived him of any entitlement. (*See, supra*, Arg. I, B.) Moreover, he cannot show that his attorneys' failure to move for an undeserved continuance upon learning the identities of the government's witnesses amounted to prejudicial ineffective assistance of counsel. (*See, supra*, Arg. II, 4, A.) This Court should disregard Barrett's attempts to revive these arguments in this context.

B. The Prosecution did not Interfere with Defense Counsel's Access to Witnesses

The other portion of Barrett's argument concerning alleged prosecutorial interference with the defense concerns allegations that the prosecutor improperly advised witnesses not to speak with members of the defense camp in the absence of a government attorney. (Mot. 310-11 (citing Mot. Exs. 31 & 92).) In asserting this claim, Barrett relies exclusively on incompetent multiple hearsay. His arguments lack any basis in fact or law.

Barrett's claim relies entirely on the declarations of Roger Crawford and Leonard Post, which report statements by Travis and Cindy Crawford, who supposedly related the remarks of a prosecutor. Such multiple hearsay should not inspire the confidence of, much less any relief from, this Court. *See Herrera v. Collins*, 506 U.S. at 416 (noting that affidavits submitted in a habeas action were "particularly suspect" because they were based on hearsay).

Even if this Court is inclined to rely on the multiple hearsay proffered by Barrett, it still should not find that the claim has any merit. Significantly, neither Roger nor Phyllis Crawford, report any mention of efforts by the prosecution to deter witnesses from speaking to defense attorneys or investigators. (Mot. Exs. 91 & 92.) The only possible basis for the claim of interference is found in the declarations of the investigators who interviewed Cindy Crawford. They report as follows:

187

> Cindy stated that Mr. Littlefield, and later John Philpot, told her that she did not have to talk to or be interviewed by Mr. Barrett's lawyers or anyone working with them if she did not want to. Cindy stated that it was implied she should not speak to the defense.

(Mot. Ex. 31 at 7; *see also* Mot. Ex. 14 at 3 (reporting virtually identical observation).)

That allegation does not, however, demonstrate prosecutorial interference with the defense. Certainly, the government was not permitted to interfere in Cindy Crawford's decision to engage in an interview with the defense. *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir. 1999). But witnesses have a right to refuse interviews with the defense, and the prosecution may advise them of that right. *See United States v. Pinto*, 755 F.3d 150, 152 (10th Cir. 1985). Here, Barrett has not shown that the prosecution exceeded its authority to advise Ms. Crawford that she did not have to speak with the defense. Her subjective interpretation of that neutral advice, as interpreted by hearsay witnesses a half a decade after the pertinent events is in no way an appropriate basis for determining that the government committed misconduct.

Even assuming that the prosecution's actions in this case were misinterpreted by Ms. Crawford as a command, Barrett could not show any prejudice. Ms. Crawford, as reported in the declarations of Barrett's investigators, gave no indication that she would have spoken to defense counsel in the absence of the prosecutor's admonition. Furthermore, although the prosecution agreed to make Ms. Crawford available to the defense, she apparently declined to be interviewed. (Trl. Dckt. entry Sept. 14, 2005; *see Barrett*, 496 F.3d at 1115.) Furthermore, Barrett makes no effort to demonstrate a reasonable likelihood that, absent the remarks attributed to Littlefield and Philpot, he would have received a more favorable verdict. *United States v. Rivera*, 347 F.3d 850, 852; *see also United States v. Cook*, 608 F.2d 1175, 1182 (9th Cir.1979) (holding prosecutorial violations of due process are not subject to reversal absent a showing of prejudice), *overruled on*

188

*other grounds by Luce v. United States*, 469 U.S. 38 (1984).  Simply put, Barrett fails to show that any forgone interview with Cindy Crawford would have likely led to his acquittal.  As such, his claim should fail.

3.  The Prosecutors Committed no Prejudicial Misconduct During the Trial

Barrett claims that during the penalty phase of trial, the prosecutors interposed a series of improper questions designed to imply falsehoods or to bolster the credibility of the case.  He further contends that the prosecutors made improper comments during argument.  (Mot. 315-20; BIS 168-74.)  Barrett procedurally defaulted his claim of misconduct by failing to raise it on appeal.  Beyond that, the prosecutor committed no misconduct.

A.  Procedural Default

Because Barrett's claim of prosecutorial misconduct at trial relies on facts wholly within the ambit of the record, he was required to raise the issue on direct appeal, and his failure to do so resulted in a procedural default.  *See United States v. Frady*, 456 U.S.  at 167-68.  To the extent Barrett attempts to explain his default by claiming appellate counsel were ineffective for failing to raise the issue (Mot. 385), the claims lack any legal merit, and the attorneys had no obligation to raise them.  (*See, infra*, Arg. V, 3, B & C.)  Because these claims would have been futile if raised on appeal, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default.  *See McCleskey v. Zant*, 499 U.S. at 493; *cf. United States v.  Horey*, 333 F.3d 1185, 1187-88 (10th Cir. 2003).  Apart from the fact that he has not shown cause and prejudice, Barrett makes no attempt to demonstrate actual innocence to excuse his default.  Accordingly, Barrett cannot obtain collateral relief based on the alleged

189

prosecutorial misconduct at trial.

      B.  The Prosecutors Properly Questioned the Witnesses and Argued for Death

Assuming that Barrett had not defaulted his claim, he could not succeed because he has

not shown that the prosecutors asked any improper questions in this case.

      i.  The Prosecutors did not Ask Questions Designed to Imply Personal Knowledge

In an utterly conclusory fashion, founded on a string citation, Barrett claims that the

prosecutor engaged in improper cross-examination of defense witnesses.  He claims the

prosecutors, in an effort to imply their own knowledge, asked questions for which they lacked a

good faith basis or for which they knew the witnesses lacked personal knowledge.   (Mot. 315.)

As shown below, the prosecutors did not engage in improper questioning of witnesses.  While

they occasionally elicited negative answers from witnesses, the prosecutors either clarified the

record or could not have intended to imply their personal knowledge based on the context or

content of the examination.  As such, they did not commit misconduct.

This Court analyzes claims of prosecutorial misconduct to determine whether the alleged

malfeasance violated due process.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Thus, it

examines the entire proceeding to determine whether the prosecutor's remarks so infected the

trial with unfairness as to make the resulting conviction a denial of due process.  *Donnelly v.*

*DeChristoforo*, 416 U.S. 637, 643 (1974).  Prosecutors may not ask a question that implies a

factual predicate which they know they cannot support or for which they have no reason to

believe there is foundation of truth.  *United States v. Banks*, 405 F.3d 559, 566 (7th Cir. 2005).

Cross-examination may properly embrace any matter germane to direct examination, qualifying

or destroying it, or tending to elucidate, modify, explain, contradict or rebut testimony given by

the witness.  *Leeper v. United States*, 446 F.2d 281, 288 (10th Cir. 1971).

In this case, the prosecutors did not ask questions designed to imply personal knowledge

of facts that they were unprepared to prove, and the government addresses Barrett's allegations to

the contrary in turn.

The prosecutor asked Deputy Court Clerk Maudeen Vann if records of Barrett's 1986

criminal case were available.  (Tr. 24: 4743.)  The question did not imply any special knowledge

on the prosecutor's part.  Instead, the innocuous inquiry was merely designed to explain the

absence from evidence of a protective order filed against Barrett in the 1986 matter.  (*See* Tr. 24:

4743-44.)  The question was part of a larger effort by the prosecution to show the limits of the

information concerning Barrett's criminal records (*see* Tr. 24: 4740-41).  *See Leeper*, 446 F.2d at

288.

The prosecutor also asked Vann if, in her experience, it was uncommon for someone who

received a 20-year Oklahoma state prison sentence to return to the community in two to four

years.  (Tr. 24: 4765.)  The question did not imply personal knowledge on the prosecutor's part.

Instead, it sought Vann's knowledge on the basis of her professional experience.[25]  Moreover, the

examination of Vann was a mere prelude to specific evidence adduced through Jimmy Wilson,

an employee of the state Department of Corrections:

---

[25]Barrett elsewhere complains that the prosecutor elicited evidence outside Vann's
personal knowledge when he asked her whether an inmate sentenced to 20 years imprisonment
"will" be released earlier.  (Mot. 300.)  Contrary to Barrett's claim, the prosecutor established
Vann's familiarity  with the state Department of Corrections from her work as a court clerk, then
elicited her agreement that "it's not uncommon for somebody to have a 20 year sentence and yet
be back in Sequoyah County within a matter of two, three or four years, is it, ma'am?"  (Tr.
4765-66.)  The witness did not lack foundation for her answer, and the prosecutor engaged in no
impropriety.

Q. All right. By the way, in DOC custody, 20 years doesn't mean 20 years, does it?

A. No, sir.

Q. Twenty years could mean lots less than that, correct?

A. Less than ten.

Q. And in fact, you have testified about the various rate at which the Defendant was accumulating credits at OSP, McAlester, correct?

A. Correct.

(Tr. 24: 4851.)  Thus, the examination of Vann implied nothing the prosecutor was unprepared to adduce through another witness.  *Cf. Banks*, 405 F.3d at 566.

The prosecutor asked Vann if she knew who actually received custody of Toby Barrett, given that the defendant's divorce decree indicated that he had received joint custody of his son. (Tr. 24: 4781.)  Barrett argues that this question implied that he was denied custody of his son. On its face, the question could not have implied knowledge of such a ruling, since it posited that he received joint custody.  At most, the question implied that despite a joint custody decree, the defendant did not take physical custody of his child.  As such, the question properly clarified for the lay jury that a joint-custody decree did not necessarily mean that both parents had custody and cared for the child.  Furthermore, the prosecutor was not only fully prepared to show who cared for the defendant's son, he did so by eliciting from the defendant's ex-wife that she had almost exclusive custody of Toby until the murder (Tr. 24: 4908-09).  *Cf. Banks*, 405 F.3d at 566.

The prosecutor asked process server Kathy Trotter a series of questions, testing her knowledge of Barrett and his associates.  (Tr. 24: 4788-92.)  These questions were not designed to imply any personal knowledge on the part of the prosecutor.  Rather, they were clearly designed to challenge Trotter's hyperbolic testimony, "It's a small community. I'm very aware of pretty much what goes on all the time."  (Tr. 24: 4785.)  Trotter's lack of personal knowledge about the topics of inquiry undermined the credibility of this assertion and did not imply any

192

particular knowledge on the part of the prosecutor.  *See Leeper*, 446 F.2d at 288.

The prosecutor asked Jimmy Wilson about an Oklahoma Department of Corrections document, which indicated that if Barrett escaped or was released from state prison, "notification is supposed to be given to the victim, that is, to Kelli Eales."  (Tr. 24: 4850.)  Subsequently, the prosecutor asked Wilson if the form provided for any right other than notification, such as "funding for a move."  (*Id*.)  Wilson answered that the form did not, but in response to a follow-up question regarding the form, the witness volunteered, "I really don't know what the victims' services do for them.  All I know is we handle, through the victim services and they notify the victims."  (*Id*.)  While the unrequested information clearly concerned a matter outside the witness's personal knowledge, the prosecutor did not attempt to elicit the response and could not have committed misconduct by eliciting an unexpected answer.

The prosecutor also asked Wilson whether an Oklahoma state prison inmate became technically eligible for parole on the first day of state custody.  Wilson said he did not know, and the prosecutor apologized for asking questions outside the witness's professional capacity.  (Tr. 24: 4852-53.)  The question was clearly designed to elicit a response within the witness's personal knowledge, but failed to do so.  But rather than leaving an ambiguous implication before the jury, the prosecutor later clarified that Wilson believed that Barrett became parole eligible in May 2006.  (Tr. 24: 4876.)  As such, the prosecution made its point that Barrett was eligible for parole after a very brief period of incarceration, denuding the prior inquiry of any possible prejudicial effect.

The prosecutor adduced from Wilson the fact that local jails did not necessarily report a prisoner's misconduct to the Department of Corrections when the inmate was sent to state

193

custody. (Tr. 24: 4859.) The questions were apparently intended to neutralize the impression that Barrett had not been assaultive while in jail. (*See* Tr. 24: 4813.) As such, the queries referred to a proper subject for cross-examination. *See Leeper*, 446 F.2d at 288. While the questions alluded to Barrett's misconduct in the county jail, the prosecution later adduced specific evidence of Barrett's assaultive and threatening misconduct in that facility. (*See, e.g.*, Tr. 26: 5220, 5233, 5252, 5264-65.) Accordingly, the prosecutor's question to Wilson clearly was not designed to elicit any fact the government was unprepared to prove.

The prosecutor subsequently attempted to identify inaccuracies in Defendant's Exhibit 247 (Tr. 24: 4862), a Department of Corrections screening form that the defense had introduced through Wilson's direct testimony. (*See* Tr. 24: 4727-28.) The prosecutor attacked the document by asking a series of questions designed to show omissions from the form concerning the facts of Trooper Eales's murder. (Tr. 24: 4861-62.) As such, the prosecutor properly attempted to elucidate the reach of a defense exhibit on cross-examination. *See Leeper*, 446 F.2d at 288. Furthermore, the government had already presented evidence of the murder to the jury, and it would be absurd to suggest that the prosecutor's examination was designed to imply personal knowledge of facts he was unprepared to prove.

The prosecutor also asked Wilson if he knew of Barrett's secret or illegal behavior and whether inmates committed undetected acts of misconduct in prison. (Tr. 24: 4866.) By their nature, these questions could not have implied personal knowledge, as there was no basis in reason for believing that anyone was aware of "secret" misconduct. The questions were properly intended to rebut the inference created by the defense that Barrett was a model inmate because his prison records did not reflect misconduct (*see* Tr. 24: 4828). *See Leeper*, 446 F.2d at 288.

194

The questions were also a preface to a broader exploration of the fallibility of prison security. (Tr. 24: 4866-68.)  The prosecutor asked a series of questions regarding the possibility that an inmate could put his best foot forward in order to lull officials into complacency.  (Tr. 24: 4869.)  By their nature, these questions could not have implied personal knowledge.  The prosecutor could not have implied personal knowledge by addressing the unknown.  Indeed, he pointed out that jailers could not "read the minds of prisoners."  (*Id*.)  The colloquy properly established that no one could truly know the intentions of prisoners, even those with good records of conduct.

The prosecutor asked Barrett's former wife, Abby Stites, a series of questions concerning her reports of an incident in which Barrett assaulted her.  The prosecutor asked Ms. Stites about specific statements she had made to Lynn Morris and Donna Hines.  (Tr. 24: 4911, 4913.)  These were not questions designed to imply information within the personal knowledge of the prosecutor, but queries designed to impeach Stites with prior inconsistent statements.  *See* Fed. R. Evid., rule 613.  While Stites denied some of the details of the incident, as the prosecutor understood them, her testimony as a whole demonstrated that she and Barrett had engaged in mutual physical combat and that he was an abusive spouse.  (*See, e.g.*, Tr. 4880-81, 4898, 4909-10.)  There is no basis for concluding that the prosecutor examined Stites in bad faith, as Barrett makes no effort to show that the prosecutor lacked a basis for the questions he asked of the witness.

The prosecutor asked Craig Edgmon whether he could speak to the character of Karen Real.  Edgmon said he could not.  (Tr. 24: 4925.)  The question was one in a series of inquiries about Edgmon's knowledge of the defendant's associates.  The entire line of inquiry was properly designed to show that the witness, who testified that the defendant was non-violent (Tr.

4924), had only a passing acquaintance with him.  *See Leeper*, 446 F.2d at 288.  To the extent

that the question could have inadvertently resulted in testimony that bolstered another witness, it

did not, as Edgmon had no real knowledge of Real.

The prosecutor asked jail employee Courtney Burk whether she knew if Barrett had any

communicable disease:

> Q.  And I'm not suggesting you necessarily know with regard to Mr.
> Barrett whether or not he has any transmittable disease like that, do you know?
> A.  I have no idea.
> Q.  Given the fact that there are 260 inmates at any given point in time,
> would you expect that Shirley Shores would have absolute recall as to who has
> what in terms of communicable diseases?
> A.  No, she wouldn't know at all times.

(Tr. 25: 5006.)  This evidence was relevant to demonstrate the fear and uncertainty Barrett would

have instilled in Shirley Shores when he spit at her.  (*See* Tr. 25: 5005.)  The prosecutor did not

imply any knowledge of Barrett's physical condition.  Quite the opposite, he suggested that, in a

confrontation with the defendant, a jail worker would not know Barrett's health status. As such,

the cross-examination properly elucidated the seriousness of Barrett's misconduct, which the

defense had attempted to minimize in importance (see Tr. 25: 4991-93).  *See Leeper*, 446 F.2d at

288.

The prosecutor engaged in the following colloquy with Doris Barrett:

> Q.  And so, if somebody's come in and talked about seeing guns around
> the house, his father having guns, that couldn't have been in the Sallisaw area,
> could it?
> A That was when we lived in Illinois and we lived in New Jersey and then
> when he (Interrupted)
> Q Could not have been around Sallisaw, could it?
> A No. But when he did go to his dad's, though his dad collects guns. There
> have always been guns.

(Tr. 25: 5092.)  The evidence clarified and corrected the testimony of Kathy Trotter, who had

created the impression that Barrett's father kept guns while living in Sallisaw.  (*See* Tr. 24: 4786-87.)  As such, the testimony adduced from Doris Barrett did not imply the personal knowledge of the prosecutor, but related to previously adduced evidence.

All of these lines of inquiry, whether judged separately or apart, were entirely proper. Moreover, the vast majority of the examination challenged by Barrett concerned the allegations of his future dangerousness, which the jury rejected.  (Doc. 257.)  As such, Barrett cannot hope to show that the questions at issue here infected his trial with unfairness.[26]  *See Donnelly v. DeChristoforo*, 416 U.S. at 643.

> ii.  The Prosecutor did not Improperly Comment on the Defendant's Exercise of his Right to Trial

Barrett claims that the prosecutor improperly commented on his exercise of his right to trial during cross-examination of Maudeen Vann.  (Mot. 315.)  However, the prosecutor did not make any improper comment, or even mention Barrett's election to go to trial in this case.

A prosecutor's remarks on a defendant's exercise of the right to trial amount to misconduct if they imply that the accused is more likely to be culpable if he pleaded not guilty. *See United States v. Hollis*, 971 F.2d 1441, 1454 (10th Cir. 1992).  Prosecutors likewise commit misconduct if they imply that the defendant had an ulterior motive for electing to go to trial.  *Id.*; *see Cunningham v. Zant*, 928 F.2d 1006, 1019 (11th Cir. 1991).  Neither of the aforementioned transgressions occurred here.

In this case, the prosecutor and Vann engaged in the following colloquy:

---

[26]Barrett also suggests that the prosecutor improperly implied knowledge at Tr. 25: 4980, but he is mistaken.  The prosecutor, at that juncture, examined Robert Gude about the accuracy of Defense Exhibit 244.  Gude never claimed a lack of knowledge about any asserted subject, and the prosecutor implied nothing.

Q. (By Mr. Littlefield) In regards to the felony information about which you've testified for the homicide of David Eales, Mr. Barrett didn't plead guilty, did he, ma'am?

A. No, sir.

Q. Put the government to the task of proving its case, didn't he?

A. Yes, sir.

Q. And ultimately Mr. Barrett was convicted of manslaughter and given a year sentence in that case?

A. Yes, sir.

(Tr. 24: 4765.) The prosecutor made no improper comment about Barrett's exercise of his right to trial. By simply pointing out that Barrett had gone to trial in state court, he did not imply that the defendant was more likely guilty in that case or this one. Rather, the prosecutor underscored the fact that the state had presented evidence in its prosecution of Barrett. That fact tied to a later colloquy in which the prosecutor established that Barrett's state court manslaughter conviction was based on different evidence than that presented by the government in this case. (Tr. 24: 4767.) For the government, this was an important point, as it forestalled the possibility that the jury might conclude from the state manslaughter verdict that a death sentence was unwarranted.

Because the prosecutor implied nothing untoward about Barrett's exercise of his right to trial, the defendant cannot show that the brief and isolated inquiries about that topic deprived him of a fair trial, especially given the fact that defense counsel had also elicited testimony that the state verdict was delivered by a jury (Tr. 24: 4737). *See DeChristoforo*, 416 U.S. at 643.

### iii. The Prosecutor did not Improperly Engage in Cross-Examination Outside the Scope of Direct Exam

Barrett complains that during the penalty phase, the prosecutors improperly engaged in cross-examination outside the scope of direct. He also complains that the prosecutors asked questions on cross-examination about which the witnesses lacked personal knowledge. (Mot. 315.) The prosecutors violated no applicable rule, and created no unfairness through their

198

actions.

Barrett's contentions rely upon Federal Rules of Evidence 602 (regarding the personal knowledge of witnesses) and 611(b) (regarding the scope of cross-examination). Neither of those rules, however, applied to the penalty phase trial. 18 U.S.C. § 3593(c); *see United States v. Basham*, 561 F.3d 302, 334 (8th Cir. 2009); *Barrett*, 496 F.3d at 1100. Accordingly, the prosecutor did not violate any applicable legal doctrine. Regardless of the applicability of the Rules of Evidence, the prosecution did not interpose any question that infected the trial with unfairness. As previously noted, cross-examination may properly seek to limit, explain or contradict any topic explored on direct. *Leeper*, 446 F.2d at 288.

All of the instances of supposed misconduct identified by Barrett involved questions designed to qualify the reach of the evidence adduced by the defense. As such, the queries properly demonstrated what the witnesses did not know. (*See* Mot. 315-16 (citing Tr. 24: 4767, 4788-92, 4925, 4926; 25: 5024-26, 5045, 5069, 5116).) None of the questions implied knowledge solely and wholly within the reach of the government. Instead, they blunted the impact of Barrett's witnesses by showing the limits of their knowledge. For instance, the prosecution elicited Maudeen Vann's concession that she did not know whether the state had relied on the same evidence in Barrett's prior trials that the federal government had in this one. (Tr. 24: 4767.) As noted above, that testimony clarified the fact that the state conviction records adduced by the defense (*see* Tr. 24: 4722-26) were not necessarily based on the same evidence presented in this trial. (*See, supra*, Arg. V, 3, B, ii.)

The prosecutor questioned Craig Edgmon about his knowledge of Barrett's associates (Tr. 24: 4925-26), to properly demonstrate the witness's lack of familiarity with the defendant

199

and, by extension, to undermine his characterization of Barrett as a non-violent person (*see* Tr. 24: 4924-25). *Leeper*, 446 F.2d at 288; *see, supra*, Arg. V, 3, B, i. Similarly, the prosecution adduced Steven Barrett's concession that he had limited knowledge of the defendant's failed marriage. (Tr. 25: 5045.) That testimony properly undermined the foundation for Steven Barrett's characterization of the relationship as involving "[m]ainly verbal disagreements" and only "one instance" he could recall of a physical altercation. (*See* Tr. 25: 5033.)

The prosecution cross-examined two witnesses about their limited knowledge of the defendant's prior criminal activity (Tr. 25: 5024, 5069) in response to direct testimony that Barrett was not threatening (Tr. 25: 5059), was a good person (Tr. 25: 5062), was a good son (*id*.), and was not known to have committed a violent offense against anyone but his ex-wife (Tr. 25: 5012). The government demonstrated Ernest Barrett's ignorance of the defendant's conduct during the two years preceding the murder (Tr. 25: 5116), to clarify his testimony that he saw the defendant "periodically" and that for "[a] couple of years before this incident[,] I hadn't saw much of him." (*See* Tr. 25: 5111, 5112.) And, as noted, the prosecution cross-examined Kathy Trotter about her ignorance of Barrett's associates and criminal record (Tr. 24: 4788-92) to undermine her claim of knowledge concerning the community (see Tr. 24: 4785). (*See, supra*, Arg. V, 3, B, i.)

All the examination disputed by Barrett was entirely appropriate and meant to test relevant portions of direct examination. *See Leeper*, 446 F.2d at 288. But notwithstanding any questions designed to show that the defense witnesses lacked substantial relationships with Barrett, the jury unanimously found that the defendant was a father, a loved son and stepson, a person whose death would impact his child, family and friends, and a person with no prior felony

convictions. (Trl. Doc. 257.) A majority of jurors also found that Barrett was a good neighbor and friend. (*Id.*) Furthermore, in spite of any question designed to show that the state prosecution involved different evidence than this trial, five jurors found in mitigation that Barrett had accepted responsibility for Trooper Eales's death and had been convicted and punished for it. (*Id.*) Thus, Barrett cannot show that he was in any way prejudiced, much less that the government's cross-exam infected his trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

> C. The Prosecutors Properly Argued that the Jury Should Impose a Death Sentence

Identifying isolated fragments of argument, divorced from the context of the case, Barrett argues that the prosecutors committed repeated misconduct during their penalty phase summation and rebuttal. He argues that they took unfair advantage of court rulings, argued outside the record and used improper rhetoric. (Mot. 316-22; BIS 168-74.) As demonstrated below, the prosecutors relied properly on this Court's rulings, used appropriate verbiage, and drew reasonable inferences from the record.

> i. The Prosecutors Properly Relied on this Court's Rulings

Barrett claims that the prosecution improperly took advantage of a supposed evidentiary ruling, in which the Court excluded Barrett's statement that he wished he had been killed instead of Trooper Eales. Barrett argues that, in view of the ruling, the prosecutor had no right to argue as follows: "[The defendant] expressed remorse. How? When? Well, he told his mom he wished it could have been different. Yeah, like not get caught. Yeah, like kill more of the bastards like I intended to." (Mot. 316 (citing Tr. 27: 5356).) Barrett likewise complains that the prosecution should not have attacked his other reported statements of regret as the follows: "[Barrett's mother] says Defendant knows he made a wrong decision as to how to react that

night.  If he could do it different, he would.  Now, that's big of him," and "There is no proof that this Defendant lost one wink of sleep over what he did.  It's almost as if he had done nothing, like nothing happened. . . . His mother quoted him as saying he made a wrong decision and would do it differently.  You know, it's almost an oops."  (Mot. 319 (citing Tr. 27: 5419).)

Barrett's claim fails for want of any support in the record.  Barrett has not identified the supposed evidentiary ruling that he claims should have acted as a bar to the prosecution's assertions during argument.  The putative ruling also appears to form the basis of Claim 6 of the § 2255 Motion, but, there again, Barrett has failed to specify the decision about which he complains. (*See, infra*, Arg. VI.)  Accordingly, Barrett has not shown that this Court excluded evidence of his remorse on the government's motion, though he premises his argument on precisely that assertion.

Regardless of Barrett's failure to identify a pertinent ruling, or even a government motion to exclude evidence of his remorse, he still could not gain relief on the basis of this claim.  Prosecutors "may rely in good faith on evidentiary rulings made . . . and make arguments in reliance on those rulings."  *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008) (citing *United States v. Chirinos*, 112 F.3d 1089, 1098 (11th Cir. 1997)).  As such, the prosecutors in this case did not commit misconduct by failing to acknowledge excluded evidence.

Barrett, however, argues that a finding of misconduct should lie based on supposed similarities between this case and *Paxton v. Ward*, 199 F.3d 1197 (10th Cir.1999).  But his attempted analogy does not succeed.  *Paxton* arose as a federal habeas attack on a state court death penalty judgment.  The state had sought to prove in aggravation that the defendant had committed a prior murder.  The prosecution of the prior case had been dismissed in light of the

defendant's performance on a polygraph test. The dismissal was a stipulated fact at trial, but the

court prohibited the parties from referring to the polygraph as a matter of state evidentiary law.

During argument, however, the prosecutor asserted that the defendant

> had the same opportunity to put evidence on that witness stand about that [earlier] killing that we did. Everything – if he had any evidence – if the defense had any evidence to show that that crime didn't happen exactly the way that our witnesses told you it did he could have put a witness on the witness stand. You didn't hear from anybody . . . . And there could be a lot of reasons as to why [the earlier prosecution was dismissed] . . . who knows. We don't know why it was dismissed.

*Id.* at 1212-13. The Tenth Circuit found that the prosecutor committed misconduct because he

"deliberately made two critical misrepresentations to the jury: he told the jury that Mr. Paxton

had been given the opportunity to present any evidence showing that he had not killed his wife,

and he told the jury that the reason for the dismissal was unknown." *Id.* at 1213.

The facts of this case bear no resemblance to those of *Paxton*. By expressly relying on

Paxton's failure to present evidence, the prosecutor alluded to the very subject the court had

forbidden the parties from mentioning. In this case, though, the prosecutors attacked evidence

that Barrett did adduce – his statements of apparent remorse to his parents. (*See* Tr. 27: 5356-57,

5419-22; *see also* Tr. 25: 5089 (Gelene Dotson's testimony about her son's regrets), 5115 (Ernest

Barrett's testimony about his son's regrets).) The prosecutors made no reference, however

elliptical, to supposedly excluded evidence, plainly distinguishing this case from *Paxton*. Having

failed to show that the prosecutors offended *Paxton* or flouted this Court's evidentiary rulings,

Barrett cannot show that the their actions infected his trial with unfairness and therefore

constitute prejudicial misconduct. *See DeChristoforo*, 416 U.S. at 643.

ii. The Prosecutors Properly Characterized the Record

203

Barrett argues that the government's attorneys made assertions unsupported by the record. (Mot. 316, 317.)  As shown below, the prosecutors made entirely appropriate inferences from the evidence, even if those inferences were unfavorable to Barrett.

A prosecutor's summation must rely on facts adduced in the record.  *See United States v. Ivy*, 83 F.3d 1266, 1288 (10th Cir. 1996); *United States v. Sullivan*, 919 F.2d 1403, 1425-26 (10th Cir.1991).  Prosecutors may, however, argue that the jury should draw reasonable inferences from the evidence in support the government's theory of the case.  *United States v. Dazey*, 403 F.3d 1147, 1170 (10th Cir. 2005).

Barrett unsuccessfully contends that the prosecution unfairly strayed from the record and appealed to societal alarm with an argument that the defendant intended to murder multiple police officers.  (Mot. 316 (citing Tr. 27: 5402-03, 5412).)  The record showed that Barrett had stated his intent to kill as many police officers as he could and to "go out in a blaze of glory." (*See, e.g.*, Tr. 400-01, 412-15, 463-66, 2514-15, 3068-69, 3491-93.)  When the Tact Team entered Barrett's land, he fired at least 18 rounds from an AR-15, wounding one trooper and killing a second.  (*See* Tr. 318-20, 539, 544, 56-57, 3168, 3236.)  Apart from the AR-15, Barrett carried a loaded pistol in his waistband, and was apparently reaching for the weapon just before troopers handcuffed him.  (Tr. 548-50, 1112-13.)  On this evidentiary record, the prosecutors were well within bounds in arguing that this incident very nearly resulted in multiple murders:

> I want to ask you two preliminary questions.  The first is this: What kept the Defendant from being a multiple murderer in this case?  Some may say the hand of God, Providence, fate, dumb luck.  The Defendant in this case intended to be a multiple murderer.  We'll examine the facts. But the second question I want to ask you is this: If 19 rounds . . . from this firearm . . . . 19 shots at highway patrolman, at officers of the law, at soldiers of the law, if 19 shots from this gun at point blank range, but extending farther out to begin, if that's not over the capital line, what is?  Must it have been 30 or 60 or the 91 that he had at the ready?

(Tr. 27: 5402.)

The prosecutor's presentation was free of any inappropriate and unprofessional epithets to describe Barrett. *Cf. Wilson v. Sirmons*, 536 F.3d 1064, 1118 (10th Cir. 2008) (finding the terms "animal" and "unadulterated evil" were "pejorative[], unprofessional, inappropriate, and unworthy of an officer of the court"). And while it made a passing reference to "God," the argument did not improperly invoke a higher power as a justification for seeking the death penalty. *Cf. Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000) (finding misconduct in argument that included "You are not playing God. You are doing what God says."). In fact, the prosecutor's argument was particularly apt here, given that the government alleged and proved a multiple-murder aggravator as to counts one and two (Trl. Doc. 257 at 8, 10). *See Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir. 1986) (finding penalty phase argument appropriate when relevant to factors before the jury). The finding was fully supported by the evidence of Barrett's express intent and his use of semi-automatic high-powered rifle to fire into a group of occupied police vehicles. Barrett cannot show that the prosecutor's argument amounted to anything but a fair inference from this record. In no way, has he shown that the summation unfairly infected his trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

Barrett also claims that the prosecutor improperly speculated outside the record when he argued as follows: "Don't let this Defendant – the evidence may reasonably infer and you may reasonably conclude – be a hero to his fellow inmates, to his fellow incarcerated criminals." (Mot. 317 (citing Tr. 27: 5412-13).) The statement was couched as a mere invitation to infer a fact supported by the record. By its very nature, the statement does not imply improper reliance on facts outside of evidence.

Indeed, the government adduced substantial evidence upon which the jurors could have made the inferential leap suggested by the prosecutor. The record demonstrated that Barrett exerted control over other inmates while incarcerated in jail. (Tr. 26: 5235.) The evidence further showed that Barrett had threatened a guard in front of other inmates. (*See* Tr. 26: 5249, 5251-52.) And the evidence showed, as a general matter, that prisoners harbored great animosity for inmates who cooperated with law enforcement. (*See* Tr. 24: 4866-67.) Given this testimony, the jury could have fairly inferred that prison inmates would look with favor upon someone who murdered a police officer. The record aside, the prosecutor could have properly urged this point as a matter of common knowledge, as the jurors could be expected to understand prisoners' tendency to identify, as incarcerated felons, against a common social adversary, law enforcement. *See United States v. Browning*, 390 F.2d 511 (4th Cir. 1968) (observing that counsel may argue matters of common knowledge). Accordingly, Barrett has failed to show that the prosecutor's argument amounted to misconduct, much less that the statement infected his trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

According to Barrett, the prosecutor also argued outside the record when he stated, "The Defendant didn't need to commit this murder. He wanted the thrill of the kill." (Mot. 302 (citing Tr. 27: 5412-13).) The prosecution had, though, adduced evidence that Barrett planned the murder as a suicidal gesture, stating he would "go out in a blaze of glory." (Tr. 3: 463-66; 13: 3068-69.) The government also adduced evidence that Barrett hoped in particular to kill people with whom he had an adversarial history. (Tr. 11: 2515.) Clearly, the evidence permitted a fair inference that Barrett looked forward to a confrontation with the police as a form of catharsis. The prosecutor's contention that Barrett wanted the "thrill of the kill" was a fair deduction from

206

the evidence and in no way infected the trial with unfairness. *See DeChristoforo*, 416 U.S. at 643; *Dazey*, 403 F.3d at 1170.

Barrett also argues unsuccessfully that the prosecution created a false impression that its civilian witnesses feared the defendant. (Mot. 318.) Barrett is wrong. The prosecutor made an utterly rational inference from the evidence in arguing as follows:

> You heard witnesses testify here that in the state proceeding they didn't – they were really grossly under-evidenced. Randy Turman didn't testify, nor did Travis Crawford, nor Charles Sanders nor Karen Real nor Brandie Price, Cindy Crawford, Randall Weaver. No small effort was involved in getting them brave enough to hit the stand. They didn't want to testify. We required their testimony.

(Tr. 27: 5414-15.) The prosecutor's assertion once again represented an appropriate inference from the record. All the witnesses conceded battles with addictive drugs, and all but two of them mentioned involvement in the criminal justice system. (*See, e.g.*, Tr. 2: 365-66; 3: 457; 8: 1835-36; 11: 2491-95; 13: 3061-62, 3079-81; 15: 3486-87.) Two of the witnesses, Karen Real and Charles Sanders, were incarcerated at the time of their testimony. (Tr. 11: 2491; 13: 3079.) As noted above, a defense witness explained that prisoners tended to look with homicidal intent on other inmates who cooperated with law enforcement. (*See* Tr. 24: 4866-67.) Consistent with that testimony, Charles Sanders testified that he overheard Barrett, while the pair were incarcerated, express a desire to seek vengeance against the confidential informant. (Tr. 22: 4587-88.) On that record, the prosecutor could appropriately infer that the witnesses had reasons to avoid the witness stand. Indeed, at least two of them – Travis Crawford and Brandie Price – specifically admitted their lack of enthusiasm for testifying. (*See, e.g.*, Tr. 3: 470; 15: 3497.) Given the evidence adduced at trial, and the fact that the prosecutor never stated or implied that the civilian witnesses all harbored a specific fear of Barrett, the comment did not infect the trial

207

with unfairness. *See DeChristoforo*, 416 U.S. at 643.

### iii. The Prosecutors Used Fair and Appropriate Rhetoric

Barrett makes a series of claims about the fairness of the prosecutors' use of terminology to characterize the evidence and the defendant's rights. (Mot. 316-20.) Once again, his claims are baseless – either entirely lacking in factual support or legal merit. The government used persuasive, but entirely appropriate language in arguing for a death sentence in this case, particularly in rebuttal to the defense argument.

As noted, prosecutors may urge reasonable inferences from the evidence. *Dazey*, 403 F.3d at 1170. They may not, however, utilize disparaging terms to make personal attacks on the defendant. *See, e.g.*, *Darden*, 477 U.S. at 180-81 (describing the prosecutor's use of the term "animal" as improper); *Wilson v. Sirmons*, 536 F.3d at 1118. But when supported by the record, the use of emotionally-freighted terms does not constitute misconduct. *See Wilson*, at 1118 (upholding use of the term "psychopath" in view of expert testimony that the defendant met some criteria for the diagnosis). Furthermore, courts analyze the prosecution's rebuttal in the context of the defense argument that preceded it. *See United States v. Young*, 470 U.S. 1, 12-13 (1985).

Barrett, putting words in the mouth of the prosecutor that were never spoken, claims that the government's attorney argued that Barrett had no right to "fairness." (Mot. 302 (citing Tr. 27: 5408). Barrett's contention relies upon a fabrication. The government, in point of fact, argued against leniency and the defense's assertion that a death verdict would be unfair:

> He was a fully conscious adult who substantially planned, who premeditated in a number of ways in the weeks and months prior to this murder. He expected, he watched, he surveilled and he slaughtered an absolutely innocent man who had done nothing to him. And they ask for increased leniency or fairness?

> This was game day for the murderer.  He clearly tried to murder at least two human beings, shots at the Bronco, the intentional killing of the passenger.  But he wasn't finished.  He saw the driver, Buddy Hamilton, getting out of the vehicle, didn't he?  Buddy was wounded.  He fired at him, too.  Buddy was wounded in the front, the face, in the front and back, and back, and back, of his shoulder.  *And they claim unfairness*.

(Tr. 5408 (emphasis added).)  As the prosecutor implied, the defense had argued – indeed, had argued passionately and at length – that a death verdict would be "unfair."  (Tr. 27: 5367-75, 5383 ("You've always learned that there will not be twice you'll be subject to jeopardy for the same offense.  And that's exactly what the Government is asking you to do here today.  They're asking you to be an instrument of death for the Government.  That, ladies and gentlemen, is fundamentally unfair.").)  In response to that argument, the prosecution properly asserted that a death sentence was eminently fair, but never implied or stated that Barrett had anything less than a right to a scrupulously fair trial on that question.  *See United States v. Young*, 470 U.S. at 12-13.  Accordingly Barrett has failed to identify any remark that was objectionable, much less that infected his trial with unfairness.  *See DeChristoforo*, 416 U.S. at 643.

Citing a different passage in the summation, Barrett again claims that the government argued he was not entitled to fairness, adding allegations that the prosecutor appealed to "lynch law" and falsely claimed the defendant was in control of his fate.  According to Barrett, these errors all occurred in the following passage: "The Defendant wants to choose his sentence.  He now wants to live.  And how unjust is that?  What opportunity did he give Rocky Eales to live?  How unjust is that?"  (See Mot. 317 (citing Tr. 27: 5413).)  As with the previous passage, this argument responded to the defense's oft-repeated assertion that a death sentence would be unfair.  (*See, e.g.*, Tr. 27: 5367-75, 5383.)  To the extent the prosecutor noted that the defendant wanted to choose his sentence, it responded to the defense request that the jury impose a term of

209

imprisonment. (*See* Tr. 27: 5382.) At no time did the prosecutor suggest or state that the jury should deny the defendant a fair trial, nor did he allude to the applicability of any extra-legal standard. Once again, his remarks did not infect the trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

Barrett further complains that the prosecutor engaged in improper name calling when he referred to him as "the executioner of the innocent." (Mot. 317 (citing Tr. 27: 5413).) Barrett's characterization of the record is inaccurate. The prosecutor did not label Barrett with an epithet, he attacked Barrett's conduct when he said, "All with a civilized core must have revulsion at what the Defendant did to have acted as the executioner of the innocent." (Tr. 27: 5413.) Assuming, arguendo, that the prosecutor relied upon an epithet, it was not the type of personal and pejorative labeling that amounts to a due process violation. *See Alba v. Quarterman*, 621 F. Supp. 2d 396, 425-26 (E.D. Tex. 2008) (holding defense counsel did not provide ineffective assistance in omitting to object to government argument, including characterization of defendant as "executioner"). Given the nature of the murder, in which Barrett repeatedly shot Trooper Eales as the victim attempted to flee from the confrontation, the nature of the murder was akin to an execution of a man who had done nothing other than his duty. The prosecutor's terminology, while connoting disdain for the defendant's actions, was appropriate on this evidence. *Wilson*, 536 F.3d at 1118.

Barrett claims that the prosecutor "grossly misled" the jury when he asserted that the victim-impact witnesses did not testify in the defendant's state court trials. According to Barrett, the argument implied that the witnesses had not testified due to the incompetence of the state prosecutors. (Mot. 318.) Certainly, the argument represented a fair inference from the record, as

Barrett's own attorneys adduced the fact that the victim's wife had never had a previous

opportunity to testify. (*See* Tr. 23: 4692; *see also* Tr. 25: 5122-25 (Doris Barrett testifies to

differences between the state and federal trials).) Furthermore, the prosecution's argument

responded to the defense contention that the existing state court sentence was ample punishment

for this murder. (*See* Tr. 27: 5367-75, 5383.) The prosecutor properly reacted to that view by

observing that this trial contemplated different evidence than its predecessor, distinguishing for

the jury why a harsher sentence might not be unfair in light of the evidence. *See Young*, 470 U.S.

at 12-13. In no way did this isolated and relatively insignificant statement infect the entire trial

with unfairness. *See DeChristoforo*, 416 U.S. at 643.

The defendant further complains that the prosecutor improperly referred to Barrett's

relatives as "props" and denigrated his right to present mitigating evidence by contrasting the

defense case with Trooper Eales's death. (Mot. 319 (citing Tr. 27: 5420.)

> The Defendant had sporadic contact, pretty much unwanted, particularly with his mother, until he committed murder and got arrested. They didn't visit him at his house. They hadn't seen the inside of his house by and large. And remember this, hear [*sic*] in court, the Defendant victimizes his own family by making them serve as props, as witnesses on his behalf. Remember, Rocky didn't get this similar chance to plead for his life.

(Tr. 27: 5420.) The prosecutor's statement in no way denigrated Barrett's right to present

evidence of any stripe. Rather, it accurately characterized the mitigation presentation as a

somewhat hollow gesture, given that Barrett's relatives had demonstrated lack of familiarity with

and affection for him. For instance, Steven Barrett conceded he and the defendant had different

social circles and had had infrequent contact in the preceding 16 years. (Tr. 25: 5041, 5044.)

Likewise, Barrett's mother, who lived next door to him, admitted she never visited his cabin and

did not deliver phone messages to him because she "wasn't running a message service" on his

211

behalf. (Tr. 25: 5082.)  The defendant's father stated he hadn't see Barrett for approximately two years prior to the murder and had never entered his home. (Tr. 25: 5116-17.)  On this record, the prosecutor accurately and appropriately characterized Barrett's testifying relatives as "props." *United States v. Dazey*, 403 F.3d at 1170.  Despite the evidence and argument, the jury found that Barrett was a loved son and stepson and a person whose death would impact his relatives. (Trl. Doc. 257.)  As such, the defendant simply cannot show that the prosecutor's argument was especially persuasive or that it infected his trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

To the extent the prosecutor urged the jury to disregard the testimony of Barrett's relatives in view of Trooper Eales's violent death, he did not commit misconduct.  In remarkably similar circumstances, the Ninth Circuit found that a prosecutor committed no misconduct when he argued that the defendant "had the right to present his mother's plea for his life," but added that the defendant had not permitted any one to plead for the victim's life. *McDowell v. Calderon*, 107 F.3d 1351, 1365 (9th Cir.), *opinion superseded and amended on other grounds at* 116 F.3d 364, *and judgment vacated in part on other grounds at* 130 F.3d 833 (1997).  The Ninth Circuit reasoned, "the prosecutor did not state that the jury could not consider the mother's plea.  The prosecutor simply asked the jury not to overlook the victim and not to make its sentencing decision based solely on sympathy for McDowell." *Id.*  The same analysis should apply here, and this Court should find that the prosecutor's comparison of the victim's death with the circumstances of the defendant's trial did not infect the proceeding with unfairness. *See DeChristoforo*, 416 U.S. at 643.

Barrett also contends that the prosecutor essentially argued that the jury would be

accomplices in any of the defendant's future crimes if they sentenced him to a prison term. (Mot. 319.) Barrett's characterization of the government's argument finds no support in the record. The argument about which he complains is as follows:

> The defense lawyer says that the Defendant is not a future danger. Ask yourselves, would any of us want to be in a prison cell next to a man who is capable of coldly attacking law enforcement officers? So he's a good prisoner, to those he can't manipulate or selectively attack.
>
> You did hear an emotional appeal from his lawyers. We predicted they asked for fairness. We ask, ladies and gentlemen in this venue, for justice. If we merely send this Defendant back to his room, you may reasonably infer that this cop killer will be a hero to many in the prison population he enters. He will have committed cold blooded murder, yet will have escaped the capital noose. This Defendant will have slaughtered an innocent soldier of the law and merely be given more time. Don't make him a hero.

(Tr. 27: 5423.) The prosecutor did not intimate that the jury might bear responsibility for any crime Barrett might commit in the future. In light of an aggravating factor allegation, he properly argued that Barrett was a future danger. (*See* Doc. 257 at Inst. 13.) The prosecutor then changed tacks and properly argued that any sentence short of death was insufficient in light of the crime and would actually enhance the defendant's status in prison. (*See, supra*, Arg. V, C, ii.) At no time did the prosecutor urge, expressly or impliedly, that the jurors should condemn Barrett to obviate any concern that they might somehow share culpability for his future crimes. As such it did not constitute misconduct or infect the trial with unfairness. *See DeChristoforo*, 416 U.S. at 643.

> iv. The Prosecutor did not Commit Prejudicial Misconduct in his Use of the First Person During Argument

Barrett claims that the prosecutor improperly aligned himself with the jury in his use of first-person pronouns during argument. (Mot. 319.) Specifically, the prosecutor argued as

follows:

> Remember the real victims.  It is not our job here to forgive.  We are not the victims of the Defendant's brutality.  It's not our job to feel guilty.  The murderer who mercilessly killed in this case as a matter of conscious, premeditation and planning ought to feel guilt and remorse, but he doesn't.  He is the one who put us all here.  What a sense of power he must feel, the narcissistic, selfish collection of reality that he is.  He's the one that put us all here. [¶]  But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole.

(Tr. 27: 5421-22.)  While the prosecutor's use of the first-person was ill-advised, the argument did not confuse the jury about its role and therefore did not amount to prejudicial misconduct.

In *Cargle v. Mullin*, the Tenth Circuit held that prosecutors commit misconduct when they confuse the jury about its role and suggest that the panel is part of the law enforcement "team" rather than impartial arbiters.  317 F.3d 1196, 1223 (10th Cir. 2003).  The *Cargle* court found that the prosecutor had likely committed reversible misconduct in arguing

> [Y]ou the jury, [assistant district attorney] Mrs. Smith and me, and the police, all fulfilled their roles in this case because that's our duty . . . . [T]his defendant ... committed a crime so vile, so vicious, so despicable, so unnecessary that the death penalty is the only answer.  Sure your job is hard, but you can do it.  Only you can do it.  The police department has done all that it can do. When I sit down, Mrs. Smith and I will have done all that we can do.  Only the 12 of you can finish the job by going up in that jury room and bringing back a verdict of death.  Unless you do that, the efforts of the police department and my office have all been in vain.

*Id.* at 1222-23.

The argument at issue in *Cargle* bears nothing more than the most superficial resemblance to statement at issue here, and Barrett misplaces his reliance on the use of first-person pronouns as a basis for analogizing the two cases.  The argument in *Cargle* offended the defendant's rights because it urged the jury to return a death verdict to avoid rendering moot the efforts of the police and prosecution.  As such, it implied that the jury bore some duty, or at least

214

allegiance to the government.

The prosecutor in this case made no similar argument. In fact, he made no attempt to directly tie the role of jury to that of law enforcement, apart from the use of the words "us" and "our." Those isolated uses of the first person did not prejudice the defendant. *See United States v. Jones*, 468 F.3d 704, 708 (10th Cir. 2006). In the context of the government's lengthy argument, the very occasional use of the first person was nothing more than an ill-chosen mannerism that the jury would have understood as such. *See id.* In fact, the prosecutor concluded his argument by observing that the jury's task involved a weighing under the law, rather than the performance of the government's wishes: "Under the standards of the law and the instructions by the Court, the Defendant should be as it were, weighed in the balance and found wanting." (Tr. 27: 5426.) Given the overall thrust of the argument, the brief resort to first-person pronouns did not serve to confuse the jury about its role, especially given that the Court instructed the jury on its role before and after counsels' presentations. (*See, e.g.* 27: 5296-97, 5440-43.)

v.  The Prosecutor Properly Argued that Prison Was Insufficient Punishment

Barrett claims that the prosecutors improperly argued that a prison sentence was insubstantial punishment for his crime. According to Barrett, the prosecutor's comments amounted to a variation of, what he terms a "three hots and cot," argument – an apparent reference to the coinage and doctrine of the Oklahoma Court of Criminal Appeals. (Mot. 316-17 (citing Tr. 27: 5412, 5423).) In fact, the prosecutor's argument was entirely appropriate under federal law, and would not have constituted a violation of the Oklahoma's "three hots" doctrine.

The prosecutor in this case argued that this crime merited greater punishment than a mere

215

prison sentence:

> You've heard the defense attorneys ask you to do something other than to render a capital sentence. The Defendant wants to be sentenced to his room as punishment. Justice cannot be served in the case by allowing the Defendant to live in prison. If he's allowed to live in prison, he will have perks like workouts and visitors and phone calls and mail, TV and recreation.

(Tr. 27: 5412.)  Later, the prosecutor returned to the "room" metaphor, arguing "We ask . . . for justice.  If we merely send this Defendant back to his room, you may reasonably infer that this cop killer will be a hero to many in the prison population he enters."  (Tr. 27: 5423.)

Prosecutors do not commit misconduct in arguing that incarceration is an inadequate, and arguably indulgent, form of punishment for the crime charged in a capital case.  *See United States v. Higgs,* 353 F.3d 281, 332 (4th Cir. 2003) (summarily rejecting a claim that the government improperly argued that imprisonment would be "soft" in view of the privileges available to the defendant as an inmate).  As in *Higgs*, in which the defense had argued that the defendant would face high security imprisonment, the prosecutor's argument in this case was an especially apt rebuttal to the defense contention that Barrett was already the subject of close confinement.  *See id.*; *see also* Tr. 27: 5368-69.  Moreover, the comments at issue would not offend Oklahoma's "three cots" doctrine, which defines as misconduct arguments that compare the relative comforts of prison with the fate of the dead victim.  *See Malone v. State*, 168 P.3d 185, 232 (Okla. Crim. App. 2007); *Powell v. State*, 995 P.2d 510, 539 (Okla. Crim. App. 2000).  The prosecutor in this case made no such inflammatory appeal, and certainly made no statement that infected the trial with unfairness.  *See DeChristoforo*, 416 U.S. at 643.

### VI.  BARRETT HAS FAILED TO STATE A TIMELY, UNDERSTANDABLE OR COGNIZABLE CLAIM THAT THIS COURT ERRONEOUSLY EXCLUDED EVIDENCE

Barrett claims that this Court erroneously excluded evidence of his remorse about the

murder of Trooper Eales.  (Mot. 322-26.)  Barrett reiterates that claim in his Brief in Support and also adds a new contention – that the Court improperly excluded guilt phase evidence that the defendant had been previously tried for Trooper Eales's homicide.  (BIS 175-81.)  Barrett's novel claim about the exclusion of evidence concerning his prior state trials is time-barred.  Moreover, Barrett offers no record citations for any supposedly erroneous ruling.  In fact, he gives no hint as to when or under what circumstances trial counsel supposedly sought the introduction of any evidence of remorse or of prior trials.  Given Barrett's failure to identify the facts that supposedly give rise to relief, his contention must fail.

A.  Time Barred Claim

Barrett first raised his claim that this Court improperly excluded evidence of his prior state trial in his Brief in Support (BIS 179-81), which was filed March 1, 2010, well after the expiration of the one-year period of limitations applicable to his Motion to Vacate.  *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at1280; *cf.* Docs 1, 2, 70, 81.  The claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention.  *Cf. United States v. Espinoza-Saenz*, 235 F.3d at 505.  Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the time-barred claim.  *United States v. Gabaldon*, 522 F.3d at 1124.  Thus, this Court should strike and disregard Barrett's untimely claim that this Court erroneously excluded evidence of his state court trials during the guilt phase of this federal proceeding.

B.  Inadequately-Pled Claims

Regardless of the application of the time bar, Barrett's claims concerning the exclusion of evidence are inadequately pled and, therefore, not amenable to consideration.  In a collateral

217

attack on a criminal judgment, the defendant must allege some factual basis for relief sought. Rule 2(b)(2), Rules Gov'g § 2255 Proceedings; *see United States v. Clingman*, 288 F.3d at 1187; *see also Hall v. Bellmon*, 935 F.2d at 1110 ("conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based" (citations omitted)).

Barrett's Motion identifies only one piece of allegedly excluded evidence, the report of Oklahoma State Trooper Glen Smithson that he heard the defendant state, "The wrong person got killed. I wished it had been me." (*See* Mot. 322 (citing Mot. Ex. 107).) While Barrett quotes the alleged statement, he does not identify the ruling that excluded it, much less show that the ruling was legally flawed in view of the facts and circumstances known to the Court. From the facts alleged, the government cannot identify any disputed ruling. Barrett's failure to cite a single instance in which the Court excluded evidence of remorse, much less erred, requires the denial of this facially deficient claims.

C. Procedural Bar

Because Barrett's claims that this Court erroneously excluded evidence would, to the extent they have any factual basis, rely on facts wholly within the ambit of the record, he was required to raise the issues on appeal. His failure to do so resulted in procedural defaults. *See United States v. Frady*, 456 U.S. at 167-68. Barrett attempts to explain his defaults by claiming that appellate counsel was ineffective. (Mot. 385-86.) Given that the claims lack any specificity, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, legal cause and prejudice to excuse his default. *See McCleskey v. Zant*, 499 U.S. at 493; *cf. United States v. Horey*, 333 F.3d at 1187-88. Apart from the fact that he has not shown cause and prejudice, Barrett makes no attempt to demonstrate actual innocence to excuse his default. Having failed to

raise the issue on appeal, Barrett cannot obtain collateral relief based on the Court's supposed

decision to exclude evidence of remorse or of prior state court trials.

VII.  THIS COURT PROPERLY PERMITTED THE MARSHALS SERVICE TO USE AN
ELECTRONIC RESTRAINT ON BARRETT

Barrett claims that this Court improperly issued an order that permitted the Marshals

Service to place him in an electronic stun belt during the trial.  He argues that the Court

inappropriately premised the decision to permit use of the belt solely because he faced the death

penalty.  According to Barrett, the belt was visible to the jury and interfered with his ability to

communicate with defense counsel.  (Mot. 326-35; BIS 182-87.)  Barrett defaulted this

contention by failing to raise it on appeal.  Regardless, he cannot show that the Court ruled on the

asserted basis, much less can he demonstrate error.

1.  Procedural Default

Because Barrett's claim that this Court erroneously ordered him to wear a stun belt relies

on facts wholly within the ambit of the record, he was required to raise the issue on direct appeal,

and his failure to do so resulted in a procedural default.  *See United States v. Frady*, 456 U.S.  at

167-68.  Barrett attempts to explain his default by claiming that trial and appellate counsel were

ineffective for failing to preserve or raise it.  (Mot. 386-87.)  Given that the claim lacks any legal

merit, Barrett's attorneys had no obligation to raise it.  (*See, infra*, Arg. VII, 2.)  Because an

appeal of this claim would have been futile, Barrett cannot establish constitutionally-cognizable

ineffectiveness or, by extension, cause and prejudice to excuse the default.  *See McCleskey v.*

*Zant*, 499 U.S. at 493; *cf. United States v.  Horey*, 333 F.3d at 1187-88.  Apart from the fact that

he has not shown cause and prejudice, Barrett makes no attempt to demonstrate actual innocence

to excuse his default.  Having failed to raise the issue on appeal, Barrett cannot obtain collateral

219

relief based on the Court's decision that he would wear a stun belt during trial.

2. Barrett Fails to Identify the Pertinent Order or Demonstrate Any Error

Barrett has failed to identify any portion of the record that substantiates his claim that this Court ordered him to wear a stun belt simply because he was facing the death penalty. Nonetheless, he baldly claims that this Court erroneously subjected him to the device based solely on his status as a capital defendant. Barrett's claim is contradicted by the record, which demonstrates that the Court properly determined to employ an unobtrusive means of restraint in view of evidence that the defendant presented a security risk.

Criminal defendants do not have an unqualified right to appear before the jury without restraints. *United States v. Hack*, 782 F.2d 862, 867 (10th Cir. 1986) (citing *Illinois v. Allen*, 397 U.S. 337 (1970)). If compelling reasons exist to justify the use of restraints, the general presumption against shackling "must necessarily yield to the competing interests of courtroom participants for the safe conduct and orderly progress of the trial." *Hack*, 782 F.2d at 867. The decision to impose appropriate restraints lies within the informed discretion of the trial court. *Id.*; *see United States v. Wardell*, 591 F.3d 1279, 1293 (10th Cir. 2009). The decision to employ restraints is made on an individualized, case-by-case, basis in consideration of such factors as the defendant's record, charged crime and physical condition. *Wardell*, 591 F.3d at 1293 (citing *Hack*, 782 F.2d at 868).

The unobtrusiveness of a particular restraint informs the reasonableness of its use. *United States v. Apodaca*, 843 F.2d 421, 431 (10th Cir. 1988). Thus, the Tenth Circuit does not presume prejudice from the use of a stun belt, absent evidence that a juror actually observed the device. *United States v. McKissick*, 204 F.3d 1282, 1299 (10th Cir. 2000). The Tenth Circuit's approach

220

appears similar to that of the Eighth Circuit: "We review the district court's security decisions for an abuse of discretion to determine whether the . . . reasons for the extra security justified the potential for prejudice that the restraints impose." *United States v. Mahasin*, 442 F.3d 687, 691 (8th Cir. 2006).

In this case, the decision to employ the stun belt was an appropriate exercise of discretion supported by substantial evidence that Barrett presented a security risk. The Court conducted an extensive hearing in which it heard evidence that the Marshals Service considered Barrett a potential escape risk. During the hearing, Deputy U.S. Marshal Louisia Murrow described seeing Barrett attempting to tamper with his handcuffs by twisting and pulling on them. He unsuccessfully attempted to conceal his efforts by turning away from a surveillance camera in his holding cell. (Tr. Sealed Hr'g, Aug. 31, 2005, at 10-11.) Murrow, who had nearly 10 years of experience transporting prisoners, described this behavior as "very extraordinary." (*Id*. at 6, 14.) Murrow reported that other experienced Deputy U.S. Marshals had expressed concerns about securing Barrett, because their observations led them to believe he was studying potential avenues of escape. (*Id*. at 14-15, 50-52.) Murrow's testimony aside, the Court noted that the government had submitted three declarations in support of its brief. (*Id*. at 73-74.)

At the conclusion of the hearing, the Court stated that it would take the matter under submission. (Tr. Sealed Hr'g, Aug. 31, 2005, at 114.) One week later, the Court issued a 19-page order authorizing the use of the stun belt. (Trl. Doc. 178.) In its order, the Court noted the evidence that Barrett constituted an escape risk. For instance, the order recounted the fact that "deputy marshals assigned to transport the defendant to court have reported observing the defendant giving his restraining devices undue attention as well as noting entrances and exits."

(*Id*. at 6-7.)  The order also noted Deputy Marshal Murrow's observations that Barrett had attempted to tamper with his handcuffs.  (*Id*. at 11.)  After extensively reviewing the pertinent law on the use of stun belts (*Id*. at 12-15), the order analyzed 10 individualized factors to determine the propriety of the stun belt in this case (*Id*. at 15-18).  Given that the belt was employed to thwart a potential security risk, rather than the threat of mere disruptions, its use reflects an entirely appropriate exercise of the court's discretion.  *See United States v. Wardell*, 591 F.3d at 1294 (refusing to presume prejudice where belt was appropriately used to ensure security and court made efforts to minimize prejudice); *cf. Hawkins v. Comparet-Cassini*, 251 F.3d 1230, 1242-43 (9th Cir. 2001) (vacating a preliminary injunction against the use of stun belts for security purposes, and noting that alternative restraints are potentially more prejudicial).

Barrett's claim that the Court relied solely on the nature of the charges to permit use of the stun belt ignores the Court's reasoning as articulated in the Order.  (*See* Mot. 326-27; BIS 183.)  Barrett attempts to demonstrate that the Court relied on an improper rationale because it made a non-dispositive statement *after* issuing its ruling.  One week after filing the order, the Court stated in passing that it would likely have employed a stun belt in any capital case.  (Tr. Hr'g on Gov't's Mot., Sept. 13, 2005, at 13.)  The statement does not demonstrate that the Court relied on mere sentence exposure to utilize the restraint in this case.  Quite the opposite, the statement clearly implies that the Court relied on additional grounds in restraining Barrett, as fully demonstrated by its detailed order.

Barrett also argues, without any evidentiary support, that use of the restraint impeded his movement and communication with counsel, because he felt especially susceptible to its use in light of metal implanted in his torso and prior violent encounters he had had with police.  Barrett

222

failed to raise either point during the hearing on the use of the belt, and therefore cannot show the Court improperly failed to take that information into account. (*See* Tr. Sealed Hr'g, Aug. 31, 2005, at 1-114.)  In fact, Barrett aired only one of those allegations – that he had a metal implant in his body – in open court.  He did so, not by way of objection, but with a post-ruling question. At the conclusion of a hearing held three days after the Court authorized the belt, defense counsel asked if the implant would enhance the effects of the device. (Tr. Status Hr'g, Sept. 9, 2005, at 27.)  The Court said that it would have the Marshals Service address this concern with the defense. (*Id*. at 27-28.)  Barrett has never shown the implant would have amplified the belt's impact, nor has he provided any evidence that his prior encounters with local law enforcement agencies made him especially fearful of the belt in the hands of the federal Marshals Service.

In a failed attempt to demonstrate prejudice from the belt, Barrett relies on the declaration of gallery spectator Doris Barrett to assert that the device created a visible bulge.  (Mot. 327; BIS 184.)  Ms. Barrett's declaration, however, does not assert that she saw a bulge resulting from the belt. (Mot. Ex. 80.)  Even if Barrett had presented evidence that a gallery spectator saw a bulge, he would not have shown that any juror actually observed it, undermining his effort to demonstrate prejudice. *See McKissick*, 204 F.3d at 1299.  Evidence that a bulge was visible in the gallery would not undercut this Court's finding that jurors were unlikely to see the belt's protrusion, as it received testimony that no panel member had reported seeing the belt in other cases in which it was used and ordered that Barrett would enter and exit the courtroom outside the presence of the panel.  (Trl. Doc. 178 at 16-17; Tr. Sealed Hr'g, Aug. 31, 2005, at 34.) Barrett also argues that the device was visible based on a description of "obvious" stun belts that appears in a petition for writ of certiorari filed 10 years prior to his trial.  (BIS 184.)  The request

for certiorari is entirely irrelevant, as Barrett makes no effort to show that he wore a belt similar to the one placed on the litigants in the earlier case.

This Court's multi-prong analysis of the request to utilize the stun belt was a reasonable balancing of interests, including the seriousness of the charges, the defendant's past conduct, the Marshals' view of the need for additional security, the potential prejudice to the defendant, and the availability of other means for securing the courtroom. (Trl. Doc. 178 at 15-18.) The Court's analysis was full, fair and in keeping with the Tenth Circuit's approach to in-court restraints. As such, Barrett has failed to demonstrate that the Court erred in issuing its decision to allow use of the stun belt.

## VIII. BARRETT WAS COMPETENT TO STAND TRIAL

Barrett claims that this Court permitted him to stand trial while he was mentally incompetent, in violation of his substantive due process rights. As support for his argument, Barrett relies almost exclusively on the reports of two experts who evaluated him more than three years after the trial. (Mot. 331-35; BIS 187-92.) The speculative, retrospective, evidence presented by Barrett does not satisfy the heavy burden for obtaining relief on a substantive claim of incompetence.

A defendant is competent if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and if] he has a rational as well as factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 402 (1960). On collateral review, defendants may allege they were tried while incompetent in violation of their substantive due process rights. *Walker v. Gibson*, 228 F.3d at 1229. Such claims may not

224

be procedurally barred.  *Id.*  To prevail on such a claim, the defendant "must demonstrate by clear and convincing evidence a real, substantial, and legitimate doubt regarding his competence to stand trial."  *Id.*; *see Battle v. United States*, 419 F.3d at 1298-99 (11th Cir. 2005) (applying clear and convincing standard under § 2255).  "This standard of proof is high; and the facts must positively, unequivocally, and clearly generate the legitimate doubt."  *Battle*, 419 F.3d at 1298-99.  The Tenth Circuit has held that speculative opinions of mental health experts, based on post-trial evaluations of a defendant, do not constitute clear and convincing evidence of incompetence. *Walker*, 228 F.3d at 1230.

In this case, Barrett offers little to show incompetence beyond the opinions of two retained experts, who performed post-trial evaluations of him.  (Mot. Exs. 89, 117.)  The first expert, neuropsychologist Myla Young, confines her conclusions to Barrett's organic brain function.  Only the second expert, psychiatrist George Woods, reaches a conclusion that would call into question Barrett's competence at the time of trial.  Woods states, "Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial."  (Mot. Ex. 117 at 28.) Woods's conclusion represents an extrapolation of his own 2009 evaluation of Barrett and the evaluation performed by Young.  Woods also claims to have considered mental health evaluations of the defendant in 1986 and 1995, respectively 19 and 10 years before trial.  (*Id*. at 17-18.)

Significantly, Woods appears to have ignored the fact that those historic reports repeatedly found that Barrett was oriented in all three spheres.  Furthermore, Woods did not consider evidence from any percipient source but Barrett in concluding that the defendant's alleged mental health issues affected his competence.  (*See id.* at 28.)  In other words, he did not

225

consult with former counsel, anyone present in the courtroom, or the psychologist who evaluated Barrett at the time of trial, to corroborate his hypothesis that the defendant was unable to meaningfully assist defense counsel. The declarations of the Barrett's retained witnesses – premised as they are on incomplete information – do not constitute clear and convincing evidence. *Walker*, 228 F.3d at 1230.

Even in his outburst, Barrett expressed a lucid outrage at the prosecutor's reliance on the testimony of the defendant's relatives, and one consistent with his desire to avoid scrutiny of his family and with his manifest understanding of the proceedings. (*See* Tr. 27: 5421.) Barrett's outburst provides no evidence that he did not understand the proceedings or lacked the capacity to assist his attorneys. Indeed, Barrett cannot point to any instance in which an attorney raised a doubt about his competence in a prior trial. The absence of prior concern about Barrett's competence is consistent with the historic record of mental health evaluations that found Barrett was a violent drug addict, but an otherwise lucid individual.

Even if his argument was not contradicted by counsel's observations and the historic record, Barrett could not succeed here. He cannot identify anything in the record, such as the opinion of this Court or any witness, that anyone harbored a "real, substantial, and legitimate doubt " about his competence. On this record, Barrett has fallen far short of meeting his "high" burden of proof. The supposition of his retained expert – based on evidence gathered years after

the trial, and largely from the self-interested defendant – does not overcome the observations of the prior mental health expert or the defense lawyers with whom Barrett so effectively interacted. In short, Barrett has failed to establish a bona fide doubt regarding his competency at the time of trial. *Walker*, 228 F.3d at 1228.

## IX.  THE TRIAL COURT PROPERLY REFUSED TO INSTRUCT THE JURY ON VOLUNTARY MANSLAUGHTER

Barrett claims that this Court erred in failing to instruct the jury on voluntary manslaughter as a lesser included offense to the three charged counts.  According to Barrett, he could have relied on a heat-of-passion theory to negate the malice element of count 3, intentionally killing a police officer during the commission of a drug trafficking crime (21 U.S.C. § 848(e)(1)(B)), and of counts 1 and 2, firearm murder during and in relation to drug trafficking crime and in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A) & (j)).  (Mot. 336-39; BIS 192-97.)  Barrett defaulted this claim by failing to raise it on appeal.  Regardless of the default, the contention has no merit as voluntary manslaughter is not a lesser offense of killing a police officer during a drug trafficking crime (count 3 of the indictment), and heat of passion will not act to negate the malice element of felony murder, the theory that supported the intent element of counts 1 and 2 of the indictment.

### 1.  Procedural Default

Barrett's claim that this Court erroneously omitted voluntary manslaughter instructions relies on facts wholly within the ambit of the record.  As such, he was required to raise the issue on direct appeal, and his failure to do so resulted in a procedural default.  *See United States v. Frady*, 456 U.S.  at 167-68.  Barrett attempts to explain his default by claiming that appellate counsel was ineffective.  (Mot. 387.)  Given that the claim lacks any legal merit, Barrett's

attorneys had no obligation to raise it.  (*See, infra*, Arg. IX, 2.)  Because an appeal of this claim

would have been futile, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by

extension, cause and prejudice to excuse the default.  *See McCleskey v. Zant*, 499 U.S. at 493;

*Hawkins v. Hannigan*, 185 F.3d at 1152.  Apart from the fact that he has not shown cause and

prejudice, Barrett makes no attempt to demonstrate actual innocence to excuse his default.

Having failed to raise the issue on appeal, Barrett cannot obtain collateral relief based on the

absence of a lesser-included offense instruction.

2.  <u>Voluntary Manslaughter Was Not Available as a Lesser Included Offense in this Case</u>

The Court could not have instructed the jury on voluntary manslaughter as a lesser

included offense of any of the charged capital offenses.  Courts must instruct on lesser included

offenses when "(1) there is a proper request for one; (2) the lesser included offense consists of

some, but not all, the elements of the offense charged; (3) proof of the element or elements

differentiating the lesser and greater offenses is a matter in dispute; and (4) a jury could rationally

convict on the lesser offense and acquit on the greater offense."  *United States v. Chanthadara*,

230 F.3d at 1257.  But courts need not instruct on lesser non-included offenses in capital cases

when such instructions would be impermissible in noncapital cases.  *Hopkins v. Reeves*, 524 U.S.

88, 95-96 (1998).

While Barrett and the prosecution both requested lesser included offense instructions, the

Court could not give them because voluntary manslaughter did not properly consist of some, but

not all, of the elements of the charged offenses.  Barrett was charged in count 1 with a firearm

murder during and in relation to drug trafficking, and in count 2 with a firearm murder during

and in relation to a crime of violence.  18 U.S.C. § 924(j).  As Barrett states, both of those

charges relied on a felony murder theory to provide the requisite malice. (*See* Trl. Doc. 240, Inst. 7; Mot. 321 ("these were 'straight' felony murder counts).) In other words, the offenses relied on proof that the defendant committed the homicide during the course of a felony to establish malice aforethought. *See Chanthadara*, 230 F.3d at 1259 (citing *Whalen v. United States*, 445 U.S. 684, 693 n.7 (1980)); *see also United States v. Nguyen*, 155 F.3d 1219, 1229 (10th Cir. 1998) (holding that a felony murder charge based on a killing during a robbery did not entitle the defendant to an instruction requiring additional or independent proof of state of mind). The felonies Barrett committed during the perpetration of the § 924 offenses would not have provided a legal basis for a conviction of first degree murder. *See* 18 U.S.C. § 1111. However, as Barrett apparently recognizes, the fact that he committed the homicide offenses during the perpetration of other felonies did satisfy the malice element for purposes of establishing second degree murder. *United States v. Pearson*, 159 F.3d 480, 486 (10th Cir. 1998) ("second degree murder's malice aforethought element is satisfied by: . . . commission of a felony when the felony in question is not one of those specified in the first degree murder paragraph of § 1111(a).").

Because "the malice aforethought required for second-degree murder is different in kind, as opposed to degree, than the malice required for [first degree] felony murder," the Tenth Circuit has concluded that second degree murder is not a lesser included offense of first degree felony murder. *Chanthadara*, 230 F.3d at 1258. Expressly relying and expanding upon that reasoning, the Ninth Circuit held that voluntary manslaughter is, likewise, not a lesser included offense of felony murder. *United States v. Miguel*, 338 F.3d 995, 1005 (9th Cir. 2003). As the Ninth Circuit noted, voluntary manslaughter requires an element that felony murder does not – the intent to inflict injury. *Id.* The Tenth Circuit impliedly extended that rule to second degree

229

felony murders, holding that the offense of voluntary manslaughter requires proof of heat of passion "with a mental state that would otherwise constitute second degree murder – either a general intent to kill, intent to do serious bodily injury, or with depraved heart recklessness." *United States v. Serawop*, 410 F.3d 656, 666 (10th Cir. 2005).

Consistent with the foregoing doctrine, this Court did not instruct the jury that it had to find such an intent to inflict injury as to counts 1 and 2. (*See* Doc. 240, Inst. 7.)  By extension, the Court correctly refused to instruct on voluntary manslaughter as a lesser-included offense of the § 924(j) crimes charged in counts 1 and 2.  *See Hopkins v. Reeves*, 524 U.S. at 95-96.

The Court likewise refused to instruct on manslaughter as a lesser included offense of the final charge in the indictment, count 3.  Barrett was charged in count 3 with the murder of a police officer during a drug trafficking crime, a homicide offense that contains no lesser included offenses as defined by 21 U.S.C. § 848(e).  *See United States v. Beckford*, 966 F. Supp. 1415, 1417-18 (E.D. Va. 1997).  In enacting § 848(e), Congress elected to omit any gradations of the homicide offense the statute defined, and this Court had no power to imply a lesser charge:

> The text of Section 848(e) confirms . . . that the statute neither substantively defines, nor contains penalties for, grades of homicide lesser than intentional killing which may be committed in furtherance of a CCE or a drug crime, as defined by the statute. . . . [O]ther, federal homicide statutes, such as voluntary manslaughter and second degree murder, 18 U.S.C. §§ 1111, 1112, cannot serve as lesser included offenses because offenses such as those must be committed within the maritime or territorial jurisdiction of the United States in order to be federally prosecuted.  By way of contrast, a Section 848(e)(1)(A) killing need not occur within federal territorial jurisdiction. . . . [¶] Finally, the courts cannot imply lesser included homicide offenses to Section 848(e)(1)(A) because there are no common law federal crimes.

*Beckford*, at 1418.

Barrett would stand on different footing had Congress chosen to define § 848 homicide

using a common law term like "malice aforethought," which is traditionally viewed as admitting

to a theory of heat of passion. *See Neder v. United States*, 527 U.S. at 21 ( "[W]here Congress

uses terms that have accumulated settled meaning under the common law, a court must infer,

unless the statute otherwise dictates, that Congress means to incorporate the established meaning

of these terms" (internal quotations and modifications omitted)). Given the statutory definition

of the charged offense, the Court could not find that heat of passion would negate the intent

requirement. In short, the Court could not have found that voluntary manslaughter consisted of

some, but not all, the elements of a § 848 homicide. *Cf. Chanthadara*, 230 F.3d at 1257. The

Court was, thus, precluded from instructing on voluntary manslaughter as a lesser offense of §

848 and properly refused the charge as to count 3. *See Hopkins v. Reeves*, 524 U.S. at 95-96.

3.  Any Error Should Be Considered Harmless

The Constitution prohibits the imposition of a death sentence if the jury did not have the

opportunity to consider a properly requested lesser included offense instruction. *Beck v.

Alabama*, 447 U.S. 625, 627 (1980). Such errors are never harmless. *See Hogan v. Gibson*, 197

F.3d 1297, 1312 n.13 (10th Cir. 1999). Thus, if this Court had erroneously rejected the requested

voluntary manslaughter instructions, Barrett would have no burden to demonstrate prejudice,

absent an intervening change of law. *See Hooks v. Ward*, 184 F.3d 1206, 1227 (10th Cir. 1999)

(disapproving dicta suggesting that rule of per se reversibility would not apply to convictions

under the Federal Death Penalty Act and similar procedures). The government observes,

however, that valid reasons exist for questioning *Beck's* application to federal death penalty

cases. *See generally United States v. McVeigh*, 153 F.3d 1166, 1197 (10th Cir. 1998),

*disapproved of in Hooks*, 184 F.3d at 1227. The government sets forth its theory of harmless

231

error to preserve it for potential appellate presentation, or in case the Tenth Circuit revisits its application of the *Beck* doctrine before this Court decides this case.

*Beck* should not apply to this case, given the procedural hurdles required to obtain the death verdict under federal law. *Beck's* "fundamental concern . . . was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." *Schad v. Arizona*, 501 U.S. 624, 646 (1991); *see Spaziano v. Florida*, 468 U.S. 447, 455(1984) ("The absence of a lesser included offense instruction increases the risk that the jury will convict . . . simply to avoid setting the defendant free). In this case, the jury was never faced with such a choice, and *Beck* should not apply to preclude a harmless error analysis. Under the procedures utilized here, Barrett was not convicted of a "capital" crime until the jury had found at least one threshold intent factor and one statutory aggravator. *See Beckford*, 966 F. Supp. at 1428; *see also United States v. Higgs,* 353 F.3d at 298 (noting a defendant is not eligible for the death penalty without such findings). As a result, the concerns that animate *Beck* do not apply, nor should the per se rule of reversibility. *See Beckford*, 966 F. Supp. at 1428-30; *see also McVeigh*, 153 F.3d at 1197.

If legally applicable to this case, harmless error analysis would defeat any argument in favor of relief. In this case, the penalty phase jury found that Barrett had committed the three charged offenses with substantial planning and premeditation. (*See* Doc. 257.) In finding premeditation, the jury presumably relied on the guilt-phase evidence of Barrett's stated intent to kill police officers , as the government presented no additional evidence about the circumstances of the crime during the penalty phase. (*See, e.g.*, Tr. 465-66, 3068-69, 3491-93.) The jury's

finding of premeditation forestalls any effort by Barrett to demonstrate that the jury would have convicted him of voluntary manslaughter on a heat of passion theory, if given the choice. *See United States v. Frady*, 456 U.S. at172-74 (1982) (discussing the inconsistency of a jury finding premeditation and heat of passion). Simply put, Barrett could not show a reasonable likelihood that the same jury that found he killed "only after thinking the matter over and deliberating whether to act," would have found on the basis of the same evidence that he acted in a heat of passion. (*See* Trl. Doc. 257, Inst. 12 (defining substantial planning and premeditation).)

Accordingly, if required to show it, Barrett could not establish that the absence of the manslaughter instructions had a substantial and injurious effect or influence on the jury's verdict. *United States v. Rivera*, 347 F.3d at 852.

## X. THIS COURT PROPERLY INSTRUCTED THE JURY THAT RESIDUAL DOUBT DID NOT CONSTITUTE A MITIGATING FACTOR

Barrett claims that this Court improperly ruled, at the outset of the trial, that the defense could not rely upon residual doubt as a mitigating circumstance. He also complains that his trial attorneys provided ineffective assistance in failing to challenge the Court's ruling and in failing to adduce evidence to support a residual doubt theory. He further argues that his appellate attorneys were ineffective for failing to challenge the jury charge because it instructed the jury that it could not consider residual doubt as a circumstance in mitigation. (Mot. 340-344; BIS 197-201.) Barrett defaulted the claim of instructional error. Because he cannot show that this Court bore any legal duty to instruct on residual doubt, Barrett cannot establish a flaw in the jury charge. Likewise, he cannot demonstrate that his attorneys provided ineffective assistance in omitting to request the charge or to present evidence in support of this flawed legal theory.

1. Barrett has Procedurally Defaulted his Claim that this Court Instructed Improperly

233

Because Barrett's claim that this Court erroneously omitted a residual doubt instruction relies on facts wholly within the ambit of the record, he was required to raise the issue on appeal, and his failure to do so resulted in a procedural default. *See United States v. Frady*, 456 U.S. at 167-68. Barrett attempts to explain his default by claiming appellate counsel was ineffective. (Mot. 387.) Given that the claim lacks any legal merit, Barrett's attorneys had no obligation to raise it. (*See, infra*, Arg. X, 2.) Because an appeal of this claim would have been futile, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default. *See McCleskey v. Zant*, 499 U.S. at 493; *cf. United States v. Horey*, 333 F.3d at 1187-88. Apart from the fact that he has not shown cause and prejudice, Barrett makes no attempt to demonstrate actual innocence to excuse his default. Having failed to raise the issue on appeal, Barrett cannot obtain collateral relief based on the absence of a residual doubt instruction.

2. The Law Provides no Right to a Residual Doubt Theory of Mitigation

Barrett cannot show that he had any entitlement to an instruction on residual doubt. In 1988, a plurality of the Supreme Court held that "[t]his Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor." *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988). The Court reaffirmed the *Franklin* plurality in *Oregon v. Guzek*, 546 U.S. 517 (2006). The Court observed that it had never found an Eighth Amendment right to present residual doubt evidence at a capital sentencing hearing, and rejected the notion that the exclusion of residual doubt evidence violated the Eighth Amendment. *See also United States v. Jackson*, 549 F.3d 963, 981 & n.24 (5th Cir. 2008) (noting that the Supreme Court has never found a right to an instruction on residual doubt). In

view of *Franklin* and *Guzek*, this Court did not err under the Constitution in omitting any instruction on residual doubt.

Like the Constitution, the relevant death penalty statutes also fail to support Barrett's claim that he had a right to a residual doubt instruction. Residual doubt is not among the enumerated mitigators listed in the statutes under which Barrett was tried. *See* 18 U.S.C. § 3592(a); 21 U.S.C. § 848(n). The provisions for non-statutory mitigators do not assist Barrett either. Section 3592(a)(8) provides for the consideration of "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." Similarly, section 848(m) allowed consideration of "other factors in the defendant's background or character." But that language does not contemplate residual doubt, given that the *Franklin* plurality stated, "[s]uch lingering doubts are not over any aspect of petitioner's character, record, or a circumstance of the offense." *Franklin*, 487 U.S. at 174 (internal quotations omitted). Thus, residual doubt is not a permissible non-statutory mitigator in the federal system, and Barrett cannot identify any basis in law upon which to premise a right to an instruction or the introduction of evidence to support such a theory.

Given the dearth of legal support for his claim, Barrett relies on a small selection of inapposite cases arising from state court judgments in which the Tenth Circuit has found that reliance on residual doubt was a reasonable defense strategy. (BIS 200 (citing, inter alia, *Sallahdin v. Gibson*, 275 F.3d 1211, 1240 n.10 (10th Cir. 2002).) The fact that reliance on residual doubt may be reasonable in other jurisdictions, where the theory is apparently available, did not require the Court to instruct on such a theory in this case.

Assuming, arguendo, the law vested Barrett with some right to a residual doubt

235

instruction, he has failed to show that the absence of one had any impact on his sentence. The circumstances of the offense, in which Barrett fired 18 rounds at a police vehicle left no doubt that he shot Eales to death, as the victim was attempting to serve a valid arrest warrant on the defendant for a prior felony drug offense. (*See, e.g.,* Tr. 20: 4330-31 (defense argument that Barrett fired on the police).) Indeed, Barrett argues only that a residual doubt instruction would have permitted him to attack the intent element of the charged crimes, which he erroneously identifies as the "pre-established intention to shoot at law enforcement officers." (*See* BIS 200.) In fact, the government bore only the duty to prove that Barrett "knew or had reason to know David Eales was a law enforcement officer." (Trl. Doc. 240 No. 15.)

The government proved mens rea through a combination of circumstantial evidence and the testimony of the defendant's associates, and did so despite the fact that the defense had amply, but unsuccessfully, identified reasons to disbelieve Barrett's friends. (*See* Tr. 20: 4339-47 (defense argument regarding the credibility of the civilian witnesses.) Barrett fails to note that the witnesses were believable, as discussed above, not because they were above impeachment, but because their testimony was cross-corroborating and consistent with evidence about Barrett's life. (*See, supra*, Arg. II, 4, B; *see also* Tr. 20: 4381-83 (prosecution argument conceding civilian witness character flaws but noting cross-corroboration and supporting circumstantial evidence).) Indeed, the mens rea evidence also supported the substantial planning and premeditation aggravating factor, which the jury found unanimously and beyond a reasonable doubt during the penalty phase. (Trl. Doc. 257 at 9-11.)

Barrett cannot show a reasonable likelihood that the same jury that found during the penalty phase that he killed with premeditation ("only after thinking the matter over and

236

deliberating whether to act") would have harbored residual doubts about the guilt phase evidence that meaningfully undermined its confidence in the conviction. (*Compare* Trl. Doc. 257, Inst. 12 (defining substantial planning and premeditation); *with* Trl. Doc. 240 No. 15 (defining Count 3.) Any supposed residual doubt in this case was therefore entirely illusory. Given the jury's apparent confidence in the evidence, and the heinousness of this crime, Barrett cannot demonstrate a reasonable likelihood that he would have received a more favorable penalty verdict had this Court permitted an appeal to residual doubt. *Brecht v. Abrahamson*, 507 U.S. at 638.

Because Barrett's claim that the Court erred in omitting a residual doubt instruction lacks any basis in existing law, any relief would necessarily require the retroactive application of a new rule of law, in derogation of Supreme Court authority. *Teague v. Lane*, 489 U.S. at 310. Given the existing legal landscape, no rational jurist could now or have ever concluded that this Court violated the law by failing to recognize residual doubt as a viable mitigation theory. Thus, relief in this matter would require this Court to retroactively apply a new rule of Constitutional import, something it may not do. *Id.*

3. Counsel Performed Competently

Trial and appellate counsel did not provide ineffective assistance by omitting to challenge the Court's jury instruction not to rely on residual doubt or by declining to proffer inadmissable evidence to support an improper lingering-doubt theory. The attorneys who represented Barrett at trial and on appeal had no obligation to raise futile arguments in favor of a mitigation theory that finds no favor in federal law. *See Hawkins*, 185 F.3d at 1152. Furthermore, trial counsel were obligated to limit the presentation of evidence and requested instructions based on this

237

Court's valid order precluding reliance on residual doubt. Even if the failure to pursue residual doubt amounted to error, Barrett still could not show a reasonable likelihood that he would have received a more favorable verdict had counsel made the omitted arguments, as this Court simply had no obligation to permit the jury to consider the theory.

## XI. THIS COURT PROPERLY EXCUSED A MEMBER OF THE VENIRE FOR CAUSE

Barrett contends that this Court violated his constitutional rights when it excused Juror 62 based on her expressed scruples against voting to impose a death verdict. Barrett also complains that his appellate attorneys failed to challenge the exclusion of Juror 62. (Mot. 354-57; BIS 202-06.) As reflected by his argument that counsel failed to address the dismissal of the juror on appeal, Barrett has defaulted his claim by failing to raise the issue on direct appeal. Because no reasonable likelihood exists that the Court of Appeals would have granted relief on the issue, Barrett cannot show that his appellate attorneys were ineffective for failing to raise it, and therefore cannot establish cause to excuse the default. Regardless, Barrett has not demonstrated that this Court erred in the first instance.

### 1. Barrett Procedurally Defaulted this Claim

Because Barrett's challenge to the exclusion of Juror 62 relies on facts wholly within the four corners of the record, he was required to raise the claim on direct appeal and his failure to do so resulted in a procedural default. *See United States v. Frady*, 456 U.S. at 165. Barrett attempts to explain his default by claiming that appellate counsel was ineffective. (Mot. 388.) Given that the claim lacks any legal merit, Barrett's attorneys had no obligation to raise it. (*See, infra*, Arg. XI, 2.) Thus, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default. *See McCleskey v. Zant*, 499 U.S. at 493; *cf.*

238

*United States v. Horey*, 333 F.3d at 1187-88.  Furthermore, Barrett  makes no claim of actual

innocence that might excuse his default.  Having failed to raise the issue on appeal, and having

failed to demonstrate any basis for overlooking that default, Barrett cannot obtain collateral relief

based on the striking of the juror.

2.  The Excused Venire Member was Substantially Impaired as a Potential Capital Case Juror
and Properly Excused

The lengthy questioning of the excused venire member, Juror 62, established that she was

substantially impaired in her ability to act as a panel member in a capital case.  A court may

exclude a member of the venire for cause if that person's "views would 'prevent or substantially

impair the performance of his duties as a juror in accordance with his instructions and his oath.'"

*Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *United States v. Fields*, 516 F.3d 923, 936 -937

(10th Cir. 2008).  "The crucial inquiry is whether the venireman could follow the court's

instructions and obey his oath, notwithstanding his views on capital punishment."  *United States*

*v. Chanthadara*, 230 F.3d at 1270.  A district court's determination of a venire member's bias

receives particular deference because it "is based almost exclusively on the trial judge's unique

ability to observe demeanor and assess credibility."  *Id.* at 1269-70.

Appellate courts recognize that, "when there is ambiguity in the prospective juror's

statements, the trial court, aided as it undoubtedly [is] by its assessment of [the juror's]

demeanor, [is] entitled to resolve it in favor of the State."  *Uttecht v. Brown*, 551 U.S. 1, 7 (2007)

(internal quotation marks omitted).  Thus, a trial court may properly strike a venire member even

"in the absence of clear statements . . . that he or she is impaired."  *Id.*  Indeed, even "assurances

that [the venire member] would consider imposing the death penalty and would follow the law . .

. d[o] not require the trial court to deny the [prosecution's] motion to excuse," *id.* at 18, if "these

239

responses were interspersed with more equivocal statements," *id.* at 15.  In fact, prospective jurors are properly excused if they could consider the death penalty in only limited circumstances not involved in the case at bar.  *See e.,g., United States v. Bernard*, 299 F.3d 467, 474-75 (5th Cir. 2002) (juror could impose death under "limited circumstances," although not "sure about this"); *Fuller v. Johnson*, 114 F.3d 491, 500 (5th Cir. 1997) (juror could consider death penalty only for multiple murders); *Davis v. Exec. Dir., Dept. Of Corrections*, 100 F.3d 750, 778 (10th Cir. 1996) (juror would not consider death penalty for alcohol-related murder).

In this case, it was not an abuse of the Court's discretion to conclude that Juror 62 was substantially impaired in her ability to impose a death sentence.  The venire member began her examination by informing the court, "I don't – I could not do it.  I could not say anybody to be sentenced to death."  (Tr. of Ind. Juror Qual., Sept. 14, 2005, at 820.)  When asked to elaborate, the venire member continued, "I couldn't even say that they deserve it, no.  I don't believe in it." (*Id.*)  Later, she answered affirmatively when asked by the Court if she had "moral, religious, philosophical, or personal opinions which would prevent [her] from considering the imposition of a death sentence."  (*Id.* at 821.)

During voir dire by defense counsel, Juror 62 stated that she had opposed the death penalty on religious grounds her entire adult life.  (Tr. of Ind. Juror Qual., Sept. 14, 2005, at 822-23.)  Juror 62 reiterated for counsel that she "could not say" that the defendant "needs the death penalty."  (*Id.* at 824.)  Finally, she told the defense attorney she could not imagine a circumstance so heinous that she could vote to impose the death penalty.  (*Id.* at 825.)  In the course of a follow-up examination by the prosecution, Juror 62 stated flatly that she could not sign a document that required the death penalty for the defendant.  (*Id.* at 826.)

On further questioning by the Court, Juror 62 equivocally allowed that, as a matter of duty, she thought she could consider the death penalty, but that it would be very difficult.  (Tr. of Ind. Juror Qual., Sept. 14, 2005, at 828.)   Juror 62 offered an ambiguous explanation of her position to the prosecutor, "If the judge told me that that was my options, either the death or – the death penalty and – I would do that, yes.  That would be my duty. I'm here, and that would be what I'm here for.  But I couldn't live with it, but I would do that, yes," then conceded, "I don't know whether I could or not." (*Id*. at 830.)  The most Juror 62 ever allowed about her possible involvement in the imposition of a death verdict was that "I possibly could do that."  (*Id*. at 832.) Asked to explain that possibility, Juror 62 responded with reference to very limited circumstances not involved in this case, saying the crime would have to involve extremely heinous facts, perhaps "torture" or "something very bad to a child."  (*Id*. at 832.)  Juror 62 concluded her questioning by again equivocally stating she thought she "probably could sign the death penalty" if instructed that it was her duty.  (*Id*. at 835-36.)

On this record of no more than ambiguous answers by Juror 62, and several specific denials concerning her ability to meaningfully participate in a death penalty case like this one, the Court did not abuse its discretion in finding her substantially impaired.  *See Uttecht*, 551 U.S. at 7-8; *Fields*, 516 F.3d at 937-38.  Indeed, the Court's consideration of Juror 62's in-court behavior, in addition to her remarks, demonstrates the propriety of its decison-making:

> Well, the time the Court has taken with this juror, I think it reflects the concern on both parties.  I took into consideration her demeanor.  I asked those questions twice, to try to study her. I agree with counsel for the Government.  I think she is substantially impaired, and I find that she is not qualified.

(*See* T. of Ind. Juror Qual., Sept. 14, 2005, at 839-40.)  The finding of substantial impairment on the stated basis was a completely appropriate: the stricken venire member was simply unable to

241

convince this Court by word or deed that she could meaningfully participate in a death penalty decision. As such, her excusal should not form the basis of relief.

3. Appellate Counsel Reasonably Omitted any Challenge to the Removal of Juror 62

While a record existed upon which appellate counsel could have challenged the excusal of Juror 62, Barrett cannot show that the failure to raise the issue amounted to ineffective assistance of counsel. As noted above, the Tenth Circuit would have reviewed a challenge to the strike of Juror 62 for abuse of discretion alone. *Chanthadara*, 230 F.3d at 1269-70. In its review, the appellate court would have deferred to this Court's discretion in such matters, and considered in support of the challenged ruling a record of "extensive individualized inquiry" conducted by the bench, "the presence of ambiguities within" the trial court's province to resolve, the court's "express reliance on its first-hand assessment of credibility." *United States v. Fields*, 516 F.3d at 938; *see also Wainwright*, 469 U.S. at 425-26 (recognizing "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law," and deference should be afforded the court's opinion).

Given the deferential review owed to this Court's decision, and the strong record to support it, no demonstrable likelihood exists that Barrett might have prevailed on appeal by challenging the removal of Juror 62. Appellate counsel wisely chose to omit such an obviously meritless contention from the appeal. *See United States v. Challoner*, 583 F.3d at 745 (noting that only the failure to raise a "dead-bang winner" amounts to effectiveness on appeal).

XII. BARRETT CANNOT RELITIGATE HIS ARGUMENT THAT THE CONSTITUTION REQUIRES CAPITAL JURIES TO APPLY A REASONABLE DOUBT BURDEN OF PROOF TO THE PENALTY PHASE WEIGHING PROCESS

242

In its instructions to the jury during the penalty phase, this Court did not require application of the reasonable doubt standard to the weighing of aggravating and mitigating factors. According to Barrett, this omission violated the Constitution. (Mot. 354-56; BIS 206-11.) On appeal, Barrett made essentially the same claim, which the Tenth Circuit rejected on the merits. Barrett cannot raise the contention again.

During the direct appeal in this case, the Tenth Circuit rejected Barrett's claim that the Constitution required application of the reasonable doubt standard to the jury's weighing of aggravating and mitigating factors during penalty selection. *Barrett*, 496 F.3d at 1107-08. Barrett may not revisit the claim during it this proceeding without demonstrating some intervening change in the circuit's law. *United States v. Warner*, 23 F.3d at 291; *United States v. Prichard*, 875 F.2d at 790-91. There has been no such change of law. Quite the opposite, the Tenth Circuit recently reaffirmed its rejection of Barrett's argument about the application of reasonable doubt to the death penalty selection process, rejecting precisely the claim that Barrett attempts to raise in this § 2255 litigation. *United States v. Fields*, 516 F.3d at 950. Even if this Court could consider the claim, the Tenth Circuit's opinions in *Barrett* and *Fields* would compel rejection of it. The non-cognizable argument must therefore fail.

To the extent that Barrett claims his appellate attorneys provided ineffective assistance for failing to raise this claim (Mot. 388-89), he is mistaken.

## XIII. BARRETT WAS PROPERLY REMOVED FROM THE COURTROOM AT HIS OWN REQUEST THEN VALIDLY WAIVED HIS RIGHT TO RETURN

During the prosecution's penalty phase rebuttal argument, Barrett stood, directed a complaint at the prosecutor, then asked to leave the courtroom. With the Court's assent, the Marshals Service escorted Barrett from the room. (Tr. 27: 5421.) After the argument, the Court

243

recessed to permit defense counsel to consult with Barrett, who expressed his desire not to return. (Tr. 27: 5432.) Barrett also warned a deputy marshal that he could disrupt proceedings if forced back to the trial. (Tr. 27: 5438.) At the Court's direction, Barrett was returned to the courtroom outside the presence of the jury, but in minimal restraints. During a brief hearing, he waived his right to be present at trial. (Tr. 27: 5438-39.) The Court subsequently instructed the jury it could not consider Barrett's conduct or statements during its deliberations. (*See* Tr. 5440.)

Barrett claims that the Court erred in permitting him to leave the courtroom without advising him of his right to stay. He also claims as error the Court's order to return him in restraints, his counsel's failure to consult an expert on competence, his counsel's failure to ensure he received appropriate medications, his counsel's failure to advise him of the risks of absence, and his counsel's failure to seek an appropriate instruction about his absence. (Mot. 357-403.) The government responds to these contentions in turn.

1. Barrett has Failed to State Cognizable or Meritorious Claims Regarding the Court's Decision to Permit Him to Absent Himself

Barrett defaulted his claims regarding any alleged error in permitting him to leave the courtroom and in returning him, outside the jury's presence, in minimal restraints. Barrett also failed to timely raise two of his sub-claims. Putting aside Barrett's failure to properly raise his contentions on appeal or under § 2255, none of his arguments has merit, as this Court properly balanced the defendant's rights against its duty to ensure orderly proceedings.

A. Barrett Procedurally Defaulted these Claims

Barrett defaulted his claims that this Court improperly responded to his demand to leave the courtroom and subsequently had him restrained for a hearing outside the presence of the jury. Both contentions rely entirely on facts found in the record. Because Barrett previously omitted to

244

raise them on appeal, they are defaulted.  *See Massaro v. United States*, 538 U.S. at 504; *United States v. DeFusco*, 949 F.2d at 120.  Barrett attempts to explain his default by claiming that appellate counsel was ineffective for failing to raise the issues.  (*See* Mot. 389.)  Given that the claims lack legal merit, as fully explored below, Barrett's appellate attorneys had no obligation to raise them.  (*See, infra*, Arg. XIII, B & C.)  Thus, Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, legal cause for his default.  *See McCleskey v. Zant*, 499 U.S. at 493.  Even if he could show cause, Barrett cannot establish actual prejudice to excuse his default – he cannot show that the Court's orders infected his entire trial with errors of constitutional dimension.  *Daniels*, 254 F.3d at 1191.  Having failed to raise the issue on appeal, or excused the omission here, Barrett cannot obtain collateral relief based on the Court's orders following his request to leave the courtroom.

    B.  Time Barred Sub-Claims

Barrett first raised his sub-claim that this Court failed to determine whether he was competent to waive his right to presence and failed to give a curative instruction[27] regarding his absence in his Brief in Support (*see* BIS 213), which was filed March 1, 2010, well after the expiration of the one-year period of limitations applicable to his Motion to Vacate.  *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at 1280; *cf.* Docs 1, 2, 70, 81.  The limitations period began to run on the date the Supreme Court denied Barrett's petition for writ of certiorari, March 17, 2008.  *Willis*, 202 F.3d at 1280-81.  Because nearly two years elapsed before Barrett

---

[27]Barrett elsewhere recognizes that this Court did provide a curative instruction.  (BIS 220.)  Indeed, he premises a claim of ineffective assistance of trial counsel on an argument that his lawyers failed to seek a better admonition.  (*Id*.)  As discussed below, the Court gave a perfectly acceptable and effective instruction.  (*See, infra*, Arg. XIII, 2, D.)

filed the brief, his claims are barred. *See United States v. Guerrero*, 488 F.3d at 1316. The claims are unrelated to the arguments raised in his prior pleadings because they attempt to blame the Court for what Barrett previously blamed his attorneys (*see* Doc. 2 at 336-51), and do not merely clarify, amplify or expand any timely-filed contention. *Cf. United States v. Espinoza-Saenz*, 235 F.3d at 505. Furthermore, Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the time-barred sub-claims. *United States v. Gabaldon*, 522 F.3d at 1124. Thus, this Court should strike and disregard Barrett's untimely claims that this Court failed to determine his competency and failed to give a curative instruction.

> C.  The Trial Court Properly Responded to Barrett's Demand to Leave the Courtroom

Barrett fails in claiming that the Court violated his rights by permitting him to leave the courtroom without first warning him of his right to remain and of the dangers of absenting himself. (Mot. 364.) During the government's final penalty phase argument, the prosecutor urged the jury to reject, as unpersuasive, statements of remorse attributed to the defendant by his parents. (Tr. 27: 5420-21.) Barrett rose from his chair and stated as follows:

> Get off my family, Sperling. This is about murder, not my family. You didn't mention the fact that I made two statements to OSBI Internal Affairs that you wouldn't let this jury hear, would you? I've heard enough of him talking about my family. Take me out of the courtroom. Take me out.

(Tr. 27: 5421.) With the Court's permission, deputy U.S. Marshals removed an unresisting Barrett from the courtroom, and the prosecutor concluded his argument. (*See* Tr. 27: 5421, 5430.)

In asserting that the Court should have warned him of his right to remain in the room before permitting him to leave, Barrett relies on inapposite authority concerning disruptive

defendants – not defendants, like him, who voluntarily absented themselves from their trials. Barrett had no right to any admonishment from the bench before he left the courtroom of his own accord.

In *Illinois v. Allen*, Barrett's principal authority, the Supreme Court held that a defendant can forfeit his right to presence in the courtroom if, "after he has been warned by the judge that he will be removed if he continues his disruptive behavior," he insists on disrupting the proceedings. 397 U.S. 337, 343 (1970); *see* BIS 215. *Allen* involved a pro se defendant who argued with the court, threatened harm to the judge, and promised to disrupt his trial, but never expressed a desire to leave the courtroom. *See id.* at 339-41. *Allen* does not require trial courts to warn obstreperous defendants of their right to presence – and makes no mention whatsoever of a warning about the potential pitfalls of voluntary absence. *See United States v. Romero*, 491 F.3d 1173, 1177 (10th Cir. 2007) (holding that cases are not authority for propositions not considered). *Allen* simply holds that no constitutional violation occurs when a disruptive defendant is removed following a warning, but does not and could not consider the effect of a failure to issue one. *See Allen*, at 340.

In fact, rather than setting bright line requirements for responding to disruptive defendants, *Allen* stated that trial courts should exercise appropriate discretion:

> We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.

*Allen*, 397 U.S. at 343-44. In view of that broad discretion, the Eighth Circuit has held that the

247

failure to warn a disruptive defendant of an impending removal from the courtroom does not necessarily constitute constitutional error. *United States v. Shepherd*, 284 F.3d 965, 967 (8th Cir. 2002).

However, neither *Allen* nor *Shepherd* controls here, because they concern the response to a defendant who is merely disruptive, rather than one who voluntarily leaves his trial. The Tenth Circuit, in an unpublished case, recognized precisely that distinction, and rejected a claim that the trial court had an obligation to warn the defendant of his right to remain before honoring his request to leave. *United States v. Sealander*, 91 F.3d 160, *15 (Table) (10th Cir. 1996). The accused may unquestionably absent himself from trial, and the Supreme Court has never held that trial courts must admonish defendants before permitting them to exercise that right. Indeed, in confronting an argument for such a duty from a defendant who was convicted in absentia after failing to return from a mid-trial lunch break, the Supreme Court held,

> It is wholly incredible to suggest that petitioner, who was at liberty on bail, had attended the opening session of his trial, and had a duty to be present at the trial, [citation], entertained any doubts about his right to be present at every stage of his trial. It seems equally incredible to us, as it did to the Court of Appeals, that a defendant who flees from a courtroom in the midst of a trial-where judge, jury, witnesses and lawyers are present and ready to continue-would not know that as a consequence the trial could continue in his absence.

*Taylor v. United States*, 414 U.S. 17, 20 (1973) (*per curiam*) (internal quotations omitted); *see also United States v. Newman*, 733 F.2d 1395, 1401 (10th Cir. 1984) (holding a trial may continue in a defendant's absence). Consistent with that jurisprudence, the applicable court rule permits a defendant to absent himself without any warning from the Court. Fed. R. Crim. P. 43(c)(1)(A); *cf. United States v. Mitchell*, 502 F.3d 931, 987-88 (9th Cir. 2007) (holding that portion of Rule 43 prohibiting absence from capital sentencing applies to the sentencing hearing,

not the penalty phase trial).

Barrett, like the defendant in *Taylor*, strains credulity in suggesting that he could demand to leave the courtroom while the prosecutor was arguing to the jury but not recognize that, as a consequence, the trial would continue without him. Given that Barrett said he wished to leave the courtroom in response to a prosecution argument he found distasteful, it appears that, not only did he understand that the trial would continue his absence, he hoped that it would. (*See* Tr. 4521 ("I've heard enough of him talking about my family. Take me out of the courtroom.").)

Moreover, Barrett's statement demonstrated that he had a rational and factual understanding – in fact, a fairly sophisticated understanding – of the proceedings. Barrett's obvious grasp of his circumstances defeats, rather than supports, any argument that his actions should have provided reasonable cause to believe that he was suffering from a mental disease or defect that rendered him incompetent. *See United States v. Cornejo-Sandoval*, 564 F.3d 1225, 1233 (10th Cir. 2009). The fact that Barrett's decision to absent himself may have reflected anger and frustration does not assist him in demonstrating some doubt about his competence, given the coherence of his remarks. *See id.* at 1236 ("Defendant's tirades reflect anger and frustration, but they are not incoherent.")

Under these circumstances, the Court had no obligation to admonish Barrett of his right to remain, as the defendant was expressly forfeiting precisely that right and obviously realized he could remain in court if he desired. Barrett's further contention, that the Court owed him a warning about the dangers of leaving his own trial finds no support in the law, whatsoever.

Accordingly, this Court should reject Barrett's argument that it improperly permitted him to absent himself from trial at his own insistence.

D.  The Court Properly Ordered Barrett Held in Minimal Restraints During a Hearing Outside the Presence of the Jury

Following his outburst, Barrett consulted with his attorneys and expressed his desire to remain absent from the trial.  (Tr. 27: 5432.)  He also apparently informed a deputy U.S. Marshal that he might become more disruptive if forced to return to the courtroom.  (Tr. 27: 5438.)  In view of these facts, the Court ordered Barrett produced in "minimum restraints" for a hearing outside the presence of the jury in which he personally confirmed his desire to remain absent from the proceedings.  (Tr. 27: 5438-39.)  Barrett argues that his appearance in court, while shackled, violated his rights.

Barrett is wrong.  He had a constitutional right to appear before the jury without visible restraints.  *Deck v. Missouri*, 544 U.S. 622, 629 (2005).  However, he can point to no analogous right for his appearances outside the presence of the jury.  Even if Barrett could identify such a right, he could not show that the decision to restrain him was improper in this instance.  Under certain circumstances, "shackling . . . may be appropriate because of the public's competing interest in courtroom security and the just administration of law."  *See Allen*, 397 U.S. at 344.  In this case, the defendant had disrupted his own death penalty trial and demanded removal from the proceedings, then issued a threat to disrupt the courtroom again if returned to the courtroom. In that context, the Court acted well within its discretion to maintain courtroom order and decorum when it ordered that Barrett wear a "minimum restraint" for his brief appearance to waive the right to remain present.  *See United States v. Apodeca*, 843 F.2d at 431.

Even if the Court had erred in deciding to restrain Barrett, the error was harmless.  Barrett has presented no basis for finding that the application of a "minimum restraint" during the brief hearing, in which he did nothing more than waive his presence, could have conceivably

250

prejudiced him. Indeed, Barrett presents no evidence that the restraint in any way discomforted him, much less interfered with his right to communicate with counsel. Neither has he shown that any member of the jury might have observed him in the restraint. He has not submitted a declaration of his own or one from counsel that provides even the slightest hint that the unidentified restraint in any way impacted his right to a fair trial. On this record, Barrett cannot establish that the order for him to wear the restraint had a substantial and injurious effect or influence on the verdict. *United States v. Rivera*, 347 F.3d at 852; *see Duckett v. Godinez*, 67 F.3d 734, 749 (9th Cir. 1995) (claim of unconstitutional shackling subject to harmless-error analysis).

2.  Counsel Properly Represented Barrett's Interests with Regard to His Request to Waive his Presence at Trial

Barrett makes a series of claims about the quality of his representation as it impacted the waiver of his presence at trial. He alleges that his attorneys were ineffective in responding to his appearance in restraints, in failing to challenge his competence, in failing to fully advise him of the risks of his absence, and in failing to seek an instruction concerning his absence from the proceedings. (Mot. 348-49.) As shown below, he has failed to demonstrate that his attorneys provided prejudicially ineffective assistance.

A.  Counsel Bore no Duty to Respond to the Order that Barrett Appear in a Minimum Physical Restraint

Barrett claims that his attorney provided ineffective assistance because they failed to object to the order that he wear a minimum restraint during a brief return to the courtroom outside the presence of the jury. Barrett further contends that counsel should have objected to the shackling order because it presented him with a choice of appearing in a restraint or not at all.

251

(Mot. 348.)  Barrett's arguments cannot succeed because he has not shown that this Court erred by ordering shackling, in the first instance, much less can he demonstrate prejudice.

As discussed above, Barrett has not identified any right to appear, outside the presence of the jury, without some form of restraint.  Even if he had such a right, his initial disruption of the trial and his threat to create more "trouble," justified the application of a minimal restraint before returning him to the courtroom.  (*See, supra*, Arg. XIII, 1, C.)  Given the legality and manifest necessity of the Court's order, counsel were not objectively deficient in failing to make futile objections to it.  *See Hawkins*, 185 F.3d at 1152.  By extension, of course, Barrett cannot show that counsel's alleged omission prejudiced him, because he cannot establish "a reasonable probability that but for" his counsel's failure to object, "the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 687.

B.  Counsel Bore no Duty to Investigate or Raise a Doubt About Barrett's Competence Following his Request to Absent Himself from the Trial

Barrett claims that his attorneys provided ineffective assistance when they failed to investigate or challenge his competence.  Ignoring his earlier claim that counsel acted ineffectively in failing to challenge his competence (*see* Mot. 72-76) , Barrett tries a new tack, asserting that his lawyers failed to properly investigate an allegation that the jailers deprived him of medications necessary to treat his supposed mental health issues while simultaneously providing him with steroids that exacerbated his presently-identified disorders.  Barrett also adds an argument that his attorneys should have consulted with medical or mental health experts to determine whether he was competent to waive his presence before the jury.  (Mot. 348-49.)

As discussed above (*see, supra*, Arg. II, A, 3), no finding of ineffectiveness will lie for failing to challenge a defendant's competence if the record does not show that a reasonable

252

attorney would have been on notice of a need to do so. *See Foster v. Ward*, 182 F.3d at 1186.

Even Barrett's outburst manifested an understanding of the proceedings. (*See* Tr. 27: 5421.) Barrett's outburst provides no evidence that he did not understand the proceedings or lacked the capacity to assist his attorneys. Indeed, Barrett cannot point to any instance in which an attorney raised a doubt about his competence in this trial or any prior proceeding. Barrett's demeanor in and out of court provided substantial evidence of his competence and undermines the notion that counsel was alerted to any reasonable basis for questioning it. *See Prince*, 938 F.2d at 1094.

Given the facts confronting counsel, Barrett cannot show that they were on notice to investigate his medical treatment or consult with experts as regarded the question of competence. Simply put, Barrett's obvious cogence forestalls any argument that his attorneys fell below prevailing professional norms in omitting to pursue a competence challenge, before or after the defendant absented himself from trial. *See Knowles v. Mirzayance*, 129 S. Ct. at 1420. Nonetheless, Barrett argues that reasonably diligent counsel would have investigated the drugs their client was receiving to determine whether he had psychiatrically decompensated and whether the drugs impacted his ability to cooperate with counsel. (Mot. 343-44, 349.) Barrett's argument places the cart before the horse – suggesting that counsel had a duty to investigate a potential source of incompetence when they did not question their client's competence to begin with. The law simply does not require such limitless investigation. *See Smith v. Workman*, 550

253

F.3d at 1270 (noting attorneys are "not required to investigate all leads as long as the decision not to pursue a particular lead . . . is reasonable under the circumstances."); *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.), *amended by* 253 F.3d 1150 (9th Cir. 2001) (observing that the duty to prepare a defense "is not limitless"). Because counsel had no duty to investigate a speculative theory of drug-induced incompetence, they had no concomitant obligation to challenge Barrett's competence on the basis of this undiscovered hypothesis.

Indeed, Barrett's lucidity also undermines his secondary argument that his attorneys' alleged ineffectiveness resulted in a violation of his rights under *Riggins v. Nevada*, 504 U.S. 127 (1992). The *Riggins* decision arose from a trial in which the defendant was forcibly medicated, over his express objection, with psychotropic drugs that unquestionably affected his behavior. But in this case, counsel had no indication from Barrett's conduct that some underlying medical treatment might be affecting their client's psyche. But beyond the fact that counsel had no basis for suspecting the impact of medication on the defendant's behavior, and therefore were not ineffective for failing to object, *Riggins* is wholly inapposite. The case stands for the "narrow[]" proposition that the state cannot forcibly medicate a defendant, over his objection, absent a necessity to "accomplish an essential state policy." *Id.* at 133, 138. Such facts simply do not exist in this case, in which Barrett can identify no evidence that he was forced to take or refrain from any drug, much less that any mediation he did take actually affected his behavior at trial.

Barrett fares no better with his argument that his lawyers should have consulted with experts to determine whether he was competent to waive his presence at trial. (Mot. 348-49.) As previously and repeatedly stated, counsel had no notice of any fact giving rise to a concern about Barrett's competence, and no duty to investigate the mere possibility that Barrett was

254

incompetent.  Barrett, without any apparent warning to his lawyers, disrupted the prosecutor's

argument and asked to be removed from the courtroom.  Counsel were in no position to have

predicted that Barrett would voluntarily absent himself from the proceedings, and could not

reasonably be expected to have consulted experts in anticipation of the possibility that their client

might surprise them with a request to leave the court.  *See Smith v. Workman*, 550 F.3d at1272

(holding trial counsel have no duty of clairvoyance).  Barrett also fails to identify any information

that might have come to his attorneys' attention when they consulted with him after his initial

outburst that might have led them to question his competence.

Indeed, to the extent that Barrett may argue that, by itself, his decision to absent himself

from court should have put counsel on notice of a basis to investigate or challenge his

competence, he cannot prevail.  Competence requires only an ability to consult with counsel

"with a reasonable degree of rational understanding" and "a rational as well as factual

understanding of the proceedings." *Dusky*, 362 U.S. at 402.  Barrett's brief outburst and request

to absent himself from an argument he found distasteful do nothing to suggest he lacked a

rational understanding of the proceedings or an impaired ability to communicate with his

attorneys.  In fact, Barrett's outburst demonstrated a cogent understanding of the prosecutor's

argument, upon which the defendant commented in detail.  (Tr. 27: 5421.)  On the basis of their

client's remarks, which obviously manifested a rational understanding of the proceedings, trial

counsel could not have fallen below prevailing professional norms by omitting to make a futile

argument about their client's competence.  *See Hawkins*, 185 F.3d at 1152.

By extension, the record simply does not provide a basis for finding a reasonable

likelihood of prejudice based on the omission of a competence challenge.  (*See, infra*, Arg. VIII.)

Barrett's demeanor and ability to effectively assist his lawyers in all phases of the trial preclude any showing that he "was unable to consult with trial counsel with a reasonable degree of rational understanding or that he lacked a rational and factual comprehension of the proceedings." *Walker v. Gibson*, 228 F.3d at 1231.  Because Barrett cannot show any reasonable likelihood that the Court might have found him incompetent, he cannot possibly show that his attorneys' omission of a challenge to his competence affected the outcome of his trial.  As such, he cannot establish the prejudice necessary for a successful claim of  ineffective assistance of counsel.  *Id.*

    C.  Counsel Advised Barrett not to Waive his Presence at Trial

Barrett claims, without any basis in the record, that his attorneys failed to appropriately advise him of the risks of waiving his presence in the courtroom for the court's final instructions to the jury.  Presumably, this allegation concerns counsel's consultation with Barrett after his sudden decision to leave the courtroom.  (Mot. 349.)  Barrett's claim is unsupported by the record and fails to establish prejudice that might give rise to relief.

The trial transcript strongly suggests that counsel did, indeed, attempt to advise their client that he should appear at his trial.  After Barrett left the courtroom, counsel spoke to him, and advised the court,

> Yes, we have talked to Mr. Barrett after this incident and he said he just – he didn't want anything further.  We talked about having instructions and he said he did not desire – didn't want to have any instructions and he didn't want to participate in the court proceeding now.  How much longer that will be I don't know, but I mean, his indication was he didn't want to be in the courtroom.

(Tr. 27: 5432.)  Co-counsel later added, "Like I say, some time may go by and he might have a change of heart. I think we ought to re-address that, Mr. Hilfiger and I ought to re-address that, with him at the appropriate time." (Tr. 27: 5436.)  The clear implication of the attorneys'

256

statements was that they believed Barrett should attend his trial, had advised him to do so and planned to advise him to do so again. In the face of this record, Barrett has made no effort to show that his attorneys' conduct fell below an objective standard of reasonableness.

Barrett has presented no affirmative evidence that his attorneys failed to warn him of the risks of refusing to appear in court. Barrett has not submitted a declaration of his own attesting to such an omission, nor has he submitted one from his lawyers claiming that they failed to provide adequate counsel as to the hazards of fleeing one's own trial. For want of any factual basis, Barrett's claim should fail. *See Kennedy*, 225 F.3d at 1197 (noting the defendant's burden to overcome the strong presumption that counsel provided adequate assistance).

Moreover, Barrett has made no effort to show that he would have heeded counsel's advice had he received any particular warning about the drawbacks of absenting himself from trial, much less has he shown a reasonable probability that he would have received a more favorable verdict had his lawyers given him different advice. Barrett attempts to sidestep the question of prejudice by arguing, in essence, that the Court should treat the issue as one involving structural error because any attempt to demonstrate prejudice would require speculation. (Mot. 348 (citing *United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001).) Barrett's argument does not avail him, as his own cited authority holds that a court applies a constitutional standard of harmless error analysis when confronted on appeal with a violation of a defendant's right to presence at trial. *Novaton*, 271 F.3d at 1000.

Barrett, of course, is not seeking appellate reversal on the basis of his absence from the courtroom. He is seeking collateral relief base on a claim of ineffective assistance of counsel. To succeed with that argument he must show a reasonable probability that but for counsel's

257

alleged error the outcome of the trial would have been different.  *See United States v. Clingman*, 288 F.3d at 1186.  Barrett can show nothing of the sort.  The proceeding that he refused to attend after his initial outburst  was brief and relatively perfunctory.  The jury received final instructions from the court and was sworn before deliberations.  (Tr. 27: 5440-44.)  Indeed, the jury received a specific instruction that it could not consider Barrett's conduct during the prosecution's argument – a charge that impliedly encompassed his decision to absent himself from trial.  (*See* Tr. 27: 5440.)  The jury had previously received an instruction that "[e]ven if you believe that the evidence reveals other aggravating factors, you may not consider them."  (Tr. 27: 5306-07.)  The jury is presumed to have followed these instructions, which precluded it from considering Barrett's voluntary absence against him.  *See United States v. Olano*, 507 U.S. 725, 740 (1993) ("'[It is] the almost invariable assumption of the law that jurors follow their instructions.'").

Given the contents of the jury charge and the brevity of the defendant's absence, Barrett cannot show that his decision to absent himself had any impact on the verdict.  By extension, he falls far short of his burden of demonstrating that, had he received different advice from his attorneys, a reasonable likelihood exists that he would have attended the final minutes of his trial, and the jury would have returned a different verdict.  *See Haddock*, 12 F.3d at 958.

D.  Counsel Discharged their Obligation to Seek an Instruction Regarding Barrett's Absence from the Courtroom

Barrett claims that his attorneys provided ineffective assistance in failing to specifically request that the court admonish the jury that it could not consider Barrett's absence from the courtroom or the actions of the Court and Marshal's Service in response to the defendant's outburst.  (Mot. 349.)  Counsel's actions, in declining to request a specific instruction, were the product of a valid strategic choice and therefore cannot constitute ineffective assistance.

258

Regardless, the absence of any further instruction on Barrett's absence did not prejudice the defense.

When an attorney's decision stems from an adequately-informed strategic choice, the presumption that the decision was objectively reasonable becomes "virtually unchallengeable." *Bullock v. Carver*, 297 F.3d 1036, 1044 (10th Cir. 2002). Specifically, an attorney may validly choose to forgo an instruction based on a concern that it will unduly highlight some aspect of the case. *See United States v. Nguyen*, 413 F.3d at 1181.

In this case, the Court proposed an instruction that would warn the jury it could not consider Barrett's statement or conduct in deliberations. (Tr. 27: 5435.) Speaking for both counsel, defense attorney Hilfiger responded, "I think I share the same opinion. Mr. Smith is sort of ambivalent to the instruction. It highlights it to an extent, but then it also, you know, cautions the jury. I don't really care one way or the other. I don't object, I don't approve." (*Id.*) Clearly, counsel had a valid tactical concern that it should not draw undue attention to Barrett's absence. Counsel also implied their satisfaction with the Court's proposed instruction, which walked a satisfactory middle ground – drawing minimal attention to the defendant's actions and providing ample protection against consideration of the defendant's absence. Counsel's decision not to seek a stronger or more comprehensive charge is wholly appropriate when viewed through the lens of reasonable strategic concerns.

Even if counsel had erred, Barrett cannot establish prejudice. As previously noted, the Court sua sponte instructed the jury that it could not consider Barrett's conduct during the argument. (Tr. 27: 5440.) Barrett's "conduct" necessarily encompassed his ongoing absence from the courtroom. But even if the jury had not received that instruction, the Court had already

259

limited its ability to consider only the aggravating factors alleged by the government. (Tr. 27: 5306-07.) Not only did the jury presumably follow its instructions, but its verdict bears out the fact that it did not improperly consider any aspect of Barrett's absence from the court. *See United States v. Olano*, 507 U.S. at 740 (regarding the presumption that juries follow their instructions). The jury found several alleged aggravating factors, but rejected the allegation that Barrett was a future danger to others – the one allegation that his flight from the courtroom, an obviously impulsive act of defiance to authority, might have supported had the jury improperly considered it. (*See* Doc. 257 at 14-17.) Because the charge provided by the court amply protected Barrett against consideration of his absence from court, and the verdict provides no basis for believing the jury considered Barrett's conduct, no reasonable likelihood exists that a more comprehensive instruction would have resulted in a different verdict.

## XIV. THE FEDERAL DEATH PENALTY IS NOT SOUGHT ON A RACIALLY DISCRIMINATORY BASIS

Barrett, citing statistical studies, claims that the federal death penalty is disproportionately sought in cases involving White, rather than minority, victims. To the extent the statistics proffered by Barrett do not warrant relief, he argues that they merit discovery and an evidentiary hearing. He also makes a conclusory claim that his trial and appellate attorneys were ineffective for failing to raise this issue. (Mot . 368-73, 389-90; BIS 221-24.) Barrett cannot obtain relief on his claim of racial bias, having premised it on bare statistical data of questionable reliability. Likewise, he has shown no entitlement to evidentiary proceedings on this meritless contention, and cannot premise claims of ineffective assistance of counsel on the failure to raise futile arguments.

If a prosecutor has probable cause to believe a defendant has committed a crime, "the

decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *In re United States*, 397 F.3d 274, 284 (5th Cir. 2005). That discretion is, though, guided by the Equal Protection Clause. *In re United States*, 397 F.3d at 284. The law presumes that prosecutors exercise their discretion in good faith and constitutional compliance. *See United States v. Armstrong*, 517 U.S. 456, 465-66 (1996). Only proof of discriminatory effect and purpose will overcome this presumption of regularity. *Id.* at 465 (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)). To establish a discriminatory effect, Barrett must show that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. at 465 (internal quotations and citations omitted).

Far from addressing similarly-situated defendants, the data presented by Barrett to support his argument lacks the barest indication of admissibility. Barrett relies on statistics generated by David Baldus and Lauren Cohen Bell. Barrett has not provided any foundation for these calculations. Neither has he demonstrated that the calculations have been tested, subjected to peer review, and published. He gives no indication that he is even aware of the known error rate of the studies he cites. In short he has not shown the reliability of the papers he proffered. *See Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009). On that basis alone, Barrett's claim should fail.

Assuming Barrett had shown the reliability of his data, the numbers he cites still would not carry the day. Statistics reflecting the application of the death penalty to different races cannot, without more, support a finding of discriminatory intent sufficient to strike down a death penalty system on equal protection grounds. *See McCleskey v. Kemp*, 481 U.S. 279, 292-97

(1987); *see also United States v. Bin Laden*, 126 F. Supp. 2d 256, 261 (S.D.N.Y. 2000) ("At its core . . . *McCleskey* stands for the notion that, by themselves, systemic statistics cannot prove racially discriminatory intent in support of an equal protection claim by a particular capital defendant."). *McCleskey* controls here and requires denial of this claim, as Barrett has not offered any evidence of discriminatory effect or intent. *McCleskey*, at 292-93. In short, Barrett has made no effort to show that similarly situated defendants have received different treatment. *See Armstrong*, 517 U.S. at 465; *see* Mot. Exs. 115 & 116. Instead, he has merely alluded to reports that address the administration of the federal death penalty generally. Under *McCleskey*, Barrett's data does not demonstrate that the Government pursued the death penalty for racially discriminatory reasons.

Barrett's bald assertion, premised on a selective review of federal death penalty cases, that a constitutional violation has occurred is insufficient to state a claim under § 2255, and will not support his pendant request for discovery. The Rules Governing § 2255 do not authorize "fishing expeditions," and "conclusory allegations unsupported by specifics . . . will not entitle one to discovery or a hearing." *United States v. Zuno-Arce*, 25 F. Supp. 2d 1087, 1118 (C.D. Cal. 1998) (quoting *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996)).

Assuming, for the sake of argument, that Barrett's claim did not fail for the reasons stated, this Court still could not grant relief because it would require the application of a new rule of law. Barrett's claim that statistical data will suffice to show a violation of the Equal Protection Clause lacks any basis in existing law. As such, any relief would necessarily require the retroactive application of a new rule of law – something this Court may not do. *Schriro v. Summerlin*, 542 U.S. at 351. Given the prevailing legal landscape, no rational jurist could now

262

or have ever concluded that Barrett's statistics demonstrate a constitutional flaw in the federal death penalty system. Accordingly, relief in this matter is forbidden. *Id.*

Moreover, the omission of this claim from the briefs and arguments of Barrett's trial and appellate counsel does not constitute ineffectiveness. Barrett cannot show that the absence of this futile claim, at trial or on appeal, constituted a deprivation of his Sixth Amendment right to the effective assistance of counsel. *See Hawkins v. Hannigan*, 185 F.3d at 1152. Given that Barrett concedes he has premised his current arguments on information and arguments never presented to the trial court (Mot. 371 n.49), his ineffective assistance of appellate claim is especially poorly taken. *See Horne v. Trickey*, 895 F.2d 497, 499-500 (8th Cir.1990) (rejecting ineffective assistance claim where appellate counsel considered the forgone issue but omitted it because the record did not contain sufficient support).

For all the foregoing reasons, this Court should reject Barrett's claim of racial discrimination in the federal government's administration of the death penalty, as well as the related claim of ineffective assistance of counsel and the alternative request for discovery and an evidentiary hearing to explore the legally baseless contention.

## XV. BARRETT WAS PROPERLY CHARGED BY SUPERSEDING INDICTMENT

Barrett claims that the government violated his constitutional rights by filing an indictment in this case that did not reference the death penalty and did not allege the aggravating factors – statutory and non-statutory – upon which the prosecution relied at trial. (Mot. 373-75; BIS 224-26.)[28] Barrett has not only defaulted this claim, but he is wrong – the government's

---

[28]Barrett's Motion claims that the government failed to allege "any of the aggravating factors," but his Brief in Support only addresses the failure to allege non-statutory aggravators. The government addresses the issue as articulated in the Motion.

superseding indictment properly alleged the statutory aggravating factors as required by law.

1.  Procedural Default

Barrett has defaulted his attack on the indictment in this case by filing to properly raise it in this Court or on appeal. *United States v. Frady*, 456 U.S. at 165. Barrett has not previously claimed the indictment in this case was infirm. *See generally Barrett*, 496 F.3d 1079. He attempts to explain his default by claiming that appellate counsel was ineffective. (Mot. 390.) Given that the claim lacks any legal merit or factual basis, Barrett's attorneys had no obligation to raise it. As such Barrett cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default. *See McCleskey v. Zant*, 499 U.S. at 493; *cf. United States v. Horey*, 333 F.3d at 1187-88. Additionally, Barrett makes no claim of actual innocence that might excuse his default. As a result, Barrett cannot obtain collateral relief based on the asserted flaw in the indictment.

2.  The Superseding Indictment Adequately Alleged the Factors that Rendered Barrett Eligible for the Death Penalty

Assuming, arguendo, that Barrett had not defaulted his complaint that the indictment was deficient, he still could not obtain relief. Barrett's claim is factually baseless, as it ignores the superseding indictment under which he was tried. A superseding indictment may generally be sought any time before trial on the merits of an earlier indictment. *See United States v. Herbst*, 565 F.2d 638, 643 (10th Cir.1977). If two indictments are pending simultaneously against the same defendant, the government may select which one to bring to trial. *United States v. Bowen*, 946 F.2d 734, 736 (10th Cir. 1991).

In this case, the government filed a superseding indictment on February 9, 2005, approximately eight months before trial. (Trl. Doc. 52.) The superseding indictment included

264

two Notices of Special Findings by the grand jury that alleged the defendant's age at the time of the crime, all threshold intent factors applicable to the charges (18 U.S.C. § 3591(a)(2) (counts 1 & 2) and 21 U.S.C. § 848(n)(1) (count 3)), and statutory aggravating factors applicable to the charges (18 U.S.C. § 3592(c)(5), (9), (16) (counts 1 & 2) and 21 U.S.C. § 848(n)(5), (8) (count 3)).  The superseding indictment was, in pertinent part, attached to the guilt phase jury charge and was liberally quoted in the penalty phase charge, leaving no doubt that the government elected to try Barrett under that pleading.  (*See* Trl. Docs. 240, 241, 257 & 258.)  Consistent with prevailing Supreme Court authority, the superseding indictment alleged all necessary factors to render Barrett eligible for the death penalty, but did not include allegations of non-statutory aggravating factors or any advice to the grand jury that the special factors would expose Barrett to the death penalty.

A.  The Superseding Indictment Alleged all Necessary Eligibility Factors

The Supreme Court has held that the facts necessary to render a defendant eligible for a death sentence "operate[] as 'the functional equivalent of an element of a greater offense.'"  *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (quoting *Apprendi v. New Jersey*,  530 U.S. 466, 494 (2000)).  Such eligibility-defining factors are subject to the Sixth Amendment's jury trial clause and must be proved to a jury beyond a reasonable doubt.  *See Ring*, 536 U.S. at 602 ("[i]f a State makes an increase in punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt").

Although the Supreme Court has not extended *Ring* to require grand jury findings of eligibility factors pursuant to the Indictment Clause, lower courts have consistently held that the eligibility factors – at least one threshold intent factor under § 3591(a)(2) or § 848(n)(1) and at

265

least one statutory aggravating factor under § 3592(c) or § 848(2) to (12) - must be charged in the indictment and found by the grand jury. *See, e.g., United States v. Higgs,* 353 F.3d at 298; *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir.), *cert. denied*, 543 U.S. 1005 (2004); *United States v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005), *cert. denied*, 127 U.S. 433 (2006). Assuming that *Ring* requires a grand jury finding as to eligibility factors, the indictment in this case was fully compliant with that constitutional mandate.

The Indictment Clause does not require the government to allege any non-statutory aggravating factors because they do not render defendants, like Barrett, eligible for the death penalty. Non-statutory aggravators must be proven beyond a reasonable doubt, but are not the functional equivalent of elements of the offense because they do not affect eligibility for punishment. *See United States v. Fields*, 516 F.3d at 944 ("non-statutory aggravators play no role in the eligibility determination under the FDPA, but are relevant only in the weighing process at the ensuing sentence-selection stage."). Given that non-statutory aggravators only impact the selection of punishment, they need not be presented to the grand jury. *See Higgs*, 353 F.3d at 298; *United States v. Brown*, 441 F.3d 1330, 1368 (11th Cir. 2006); *Purkey*, 428 F.3d at 749-50; *United States v. Bourgeois*, 423 F.3d 501, 507-08 (5th Cir. 2005); *United States v. Solomon*, 513 F. Supp. 2d 520, 530 (W.D. Pa. 2007); *United States v. Henderson*, 485 F. Supp. 2d 831, 869 (S.D. Ohio 2007); *United States v. Wilson*, 493 F. Supp. 2d 364, 387 (E.D.N.Y. 2006); *United States v. Henderson*, 461 F. Supp. 2d 133, 135 (S.D.N.Y. 2006); *United States v. Le*, 327 F. Supp. 2d 601, 614-15 (E.D. Va. 2004). In keeping with this authority, the government alleged, and the grand jury found, that Barrett committed the substantive death-eligible offenses, and that the threshold intent and statutory aggravating factors applied. The Indictment Clause

266

required nothing more.

> B.  The Superseding Indictment Omitted Superfluous Information

The superseding indictment properly omitted any reference to the death penalty.  The Indictment Clause has two purposes.  It acts as a check on prosecutorial power.  *See generally Branzburg v. Hayes*, 408 U.S. 665, 686-87 (1972) (explaining that "the ancient role of the grand jury ... [is a] dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions).  Additionally, it guarantees notice of the charges against which the defendant must defend.  *See Hamling v. United States*, 418 U.S. 87, 117 (1974).  "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished."  *Id*.

Here, the superseding indictment set forth the elements and their functional equivalents charged against Barrett.  Specifically, it provided Barrett with notice of the mental state and statutory aggravating factors that the government relied upon at the penalty phase.  Such an indictment was entirely sufficient, as it charged "the elements necessary to constitute the offense . . . not . . . the ultimate punishment sought for the offense committed."  *United States v. Haynes*, 269 F. Supp. 2d 970, 980-81 (W.D. Tenn. 2003) (citing *Hamling*, 418 U.S. at 117); *see also United States v. Natson*, 444 F. Supp. 2d 1296,1305 (M.D. Ga. 2006).

Because the superseding indictment alleged all necessary elements or eligibility factors, while omitting any unnecessary reference to the punishment sought in this case, it wholly complied with applicable constitutional mandates and formed a proper basis for the judgment in

267

this case.

### C.  Collateral Relief Cannot Lie on the Theory Advanced by Barrett

Putting aside the factual flaw in Barrett's claim, he advances an argument without any foundation in existing law – that a proper indictment in a capital case must include reference to the death penalty and allegations of the non-statutory aggravating factors.  Because Barrett's claim lacks any basis in existing law, relief would necessarily require the retroactive application of a new rule of constitutional law.  *Cf. Schriro v. Summerlin*, 542 U.S. at 351.  Given the prevailing legal landscape, no rational jurist could now or have ever concluded that the superseding indictment in this case was in any way deficient.  Because relief on this claim would require the retroactive application of a novel rule of constitutional law, this Court must reject the argument.  *Id.*

For all the foregoing reasons, this Court should reject Barrett's deficient and defaulted attack on the indictment.

## XVI.  BARRETT HAS NOT IDENTIFIED ANY JUROR MISCONDUCT, NOR HAS HE DEMONSTRATED THAT THIS COURT SHOULD HAVE SEQUESTERED THE JURY

Barrett claims – in an entirely conclusory fashion – that this Court failed to sequester the jury and, as a result, the jurors committed misconduct by consulting information outside the record.  Barrett offers no record citations for any supposedly erroneous ruling, nor does he specify any act of misconduct.  (Mot. 376-77; BIS 226-28.)  Barrett's failure to provide a basis for finding any error is fatal to his claim.

As previously noted, Barrett is obligated to allege some factual basis for the relief sought.  Rule 2(b)(2), Rules Gov'g § 2255 Proceedings; *see United States v. Clingman*, 288 F.3d at 1187.  Barrett's Motion identifies no erroneous ruling by the Court or any misconduct by a juror, and

the government is unaware of any request for jury sequestration in this case.  Barrett therefore

cannot show that this Court abused its discretion in refusing to sequester the jury.  *See United*

*States v. Floyd*, 81 F.3d 1517, 1528 (10th Cir. 1996).  He falls far short of demonstrating "a

fundamental defect" that resulted in "a complete miscarriage of justice."  *United States v.*

*Blackwell*, 127 F.3d at 954.  His failure to cite a single instance of error or misconduct requires

the denial of this facially deficient claim.

To the extent Barrett claims this Court erroneously failed to place adequate strictures on

the jury, his claim presumably relies on facts wholly within the record.  Having failed to raise on

appeal any sequestration issue, Barrett has defaulted such contentions.  *See Massaro v. United*

*States*, 538 U.S. at 504.  Barrett does not attempt to explain his default, but notes in passing

claiming that appellate counsel was supposedly ineffective for failing to raise it.  Given that the

underlying claim lacks any specificity, as does the contention of ineffectiveness, Barrett cannot

establish constitutionally-cognizable error on the part of his lawyer, much less can he show legal

cause for his default.  *See McCleskey v. Zant*, 499 U.S. at 493.  Furthermore, Barrett has made no

attempt to show prejudice that would excuse his default.  Accordingly, he cannot obtain

collateral relief based on any alleged error concerning sequestration.

### XVII.  BARRETT HAS FAILED TO STATE A TIMELY OR COGNIZABLE CLAIM THAT EXECUTING HIM WOULD BE CRUEL AND UNUSUAL PUNISHMENT IN VIEW OF HIS ALLEGED MENTAL HEALTH ISSUES

Barrett claims, without asserting he is incompetent, that given his alleged mental health

issues, it would be cruel and unusual to execute him.  (Mot. 379-80; BIS 228-32.)  Barrett's

claim is not ripe.  To the extent it is properly considered at this juncture, the argument is

untimely, as Barrett did not raise it until September 2010.  Moreover, Barrett's novel argument is

not amenable to relief under § 2255.

1. Justiciability

Barrett cannot challenge his prospective execution because the issue is not yet ripe. Article III of the Constitution extends the judicial power of the United States only to real cases or controversies. U.S. Const. art. III, § 1; *see Kennedy v. Block*, 784 F.2d 1220, 1222 (4th Cir. 1986). Thus, federal courts cannot give advisory opinions in hypothetical cases. *Flast v. Cohen*, 392 U.S. 83, 96-97 (1968). Among other issues, the question of ripeness bears on a federal court's subject matter jurisdiction under Article III. *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir.1995). Before a plaintiff may obtain an injunction against future enforcement of a law he must show some substantial hardship-the enforcement must be certain and the only impediment to the case's ripeness is delay before eventual prosecution. *Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (allowing an injunction against police when the plaintiff or his friends had twice before been arrested for distributing the same handbills at the same shopping center); *Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396, 1403 (7th Cir. 1993). The plaintiff bears the burden to allege facts sufficient to demonstrate the appropriateness of a judicial resolution. *See Renne v. Geary*, 501 U.S. 312, 316 (1991).

In this case, Barrett has made no effort to demonstrate ripeness of his complaints about his mental health, nor could he. While Barrett does not claim he is incompetent, his argument that he is too mentally ill to be executed under the Constitution is otherwise indistinguishable from a contention that he lacks the capacity to be executed. The courts have universally found that claims of incompetence to be executed are not ripe until the execution is imminent. *See, e.g., Nooner v. Norris*, 499 F.3d 831, 834 (8th Cir. 2007); *Pierce v. Blaine*, 467 F.3d 362, 367 n.2

270

(3d Cir. 2006); *Coe v. Bell*, 209 F.3d 815, 823 (6th Cir. 2000); *see also Stewart v. Martinez-Villareal*, 523 U.S. 637, 643 (1998) (recognizing that a defendant's claim of incompetence to be executed was "unquestionably ripe" after the state issued a warrant for the execution).

Barrett's execution is not imminent and his claim is therefore not ripe.

2. Timeliness

Assuming, arguendo, that this Court found Barrett's claim that he is too mentally ill to be executed under the Eighth Amendment was justiciable, the argument is time barred.  Not until he filed his Amended § 2255 Motion did Barrett first set forth the instant Eighth Amendment claim.  (Doc. 70 at 390-94.)  The Amended Motion was filed well after the expiration of the expiration of the one-year period of limitations applicable to this case.  *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at1280; *cf.* Docs 1 & 2.  The claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention.  *Cf. United States v. Espinoza-Saenz*, 235 F.3d at 505.  Furthermore, Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the contention.  *United States v. Gabaldon*, 522 F.3d at 1124.  Of course, he cannot do so, given that he premises the argument on information he set forth in his original Motion.  (*See* Doc. 2 Exs. 89, 117.)  Thus, even if the Court finds this issue justiciable, it should disregard it as untimely.

3. New Rule

Barrett's claim is not merely non-justiciable and time barred.  Because it lacks a basis in existing law, any relief would necessarily require the legally impossible – a retroactive application of a new rule of law.  *Schriro v. Summerlin*, 542 U.S. 348.  Barrett has conceded that

271

his Eighth Amendment claim is not an attempt to rely on the well-recognized rule that a defendant must be mentally competent to be executed. *See generally Ford v. Wainwright*, 477 U.S. 399 (1986). Instead, he seeks to derive his claim from other Eighth Amendment jurisprudence, specifically the bars on execution of retarded or juvenile offenders. (*See* BIS 229 (citing *Roper v. Simmons*, 543 U.S. 304 (2005) and *Atkins v. Virginia*, 536 U.S. 304 (2002).) Barrett's attempt to draw these parallels to precedent will not carry the day for him. Even if the result a defendant seeks is within the "logical compass" of Supreme Court authority or he can show that Supreme Court decisions "inform, or even control or govern, the analysis" of his contention, his claim still relies on a new rule unless the result is dictated by pre-existing precedent. *See Saffle v. Parks*, 494 U.S. 484, 491 (1990); *Butler v. McKellar*, 494 U.S. 407, 415 (1990); *see also Beard v. Banks*, 542 U.S. at 416 (holding that prior precedent may support a particular result, but if it does not mandate the outcome it is not an existing rule for *Teague* purposes). Because Barrett necessarily calls upon this Court to extend tenuously-related precedent in order to grant relief, his theory requires an impermissible application of a new rule of constitutional import. *Schriro v. Summerlin*, 542 U.S. 348.

Accordingly, if this Court finds that it can review Barrett's claim, it still should deny relief.

## XVIII. BARRETT RECEIVED THE ASSISTANCE OF CONSTITUTIONALLY ADEQUATE APPELLATE COUNSEL

In a separately enumerated ground, Barrett restates, from pertinent points in his Motion, a series of claims that his appellate counsel provided constitutionally deficient assistance for failing to raise a series of individual claims. (Mot. 382-90.) Because the government has responded to those claims elsewhere in its Answer, it declines to repeat its arguments here.

272

Barrett also claims that his appellate attorney provided ineffective assistance for failing to raise the cumulative effect of the forgone claims that he previously identified. (Mot. 391-92.) Barrett's claim is untimely and without merit.

Not until he filed his Amended § 2255 Motion did Barrett first premise a claim of ineffective assistance of appellate counsel on the omission of a cumulative error argument. (Doc. 70 at 405-06.) The Amended Motion was filed well after the expiration of the March 17, 2009 expiration of the one-year period of limitations applicable to this case. *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d at1280; *cf.* Docs 1 & 2. The claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention. *Cf. United States v. Espinoza-Saenz*, 235 F.3d at 505. Furthermore, Barrett has made no attempt to show that extraordinary circumstances beyond his control prevented him from raising the contention. *United States v. Gabaldon*, 522 F.3d at 1124. Of course, he cannot do so, and simultaneously maintain that the claim is premised on information available within the record that might have supported an appeal. Thus, this Court should strike and disregard Barrett's untimely claim that appellate counsel was ineffective for failing to seek relief based on the cumulative impact of other forgone issues.

Even if the Court found the issue timely, it still should not grant relief. As discussed throughout this brief, the claims allegedly omitted by appellate counsel were either futile, unsupported by the record or raised and rejected. Accordingly, there would have been no prejudice to accumulate by the Court of Appeals had counsel raised the cumulative error argument Barrett now identifies. The omission of a futile argument, derived from other meritless arguments, did not constitute ineffective assistance. *United States v. Challoner*, 583 F.3d at 749.

273

XIX.  THERE ARE NO ERRORS TO ACCUMULATE

Barrett argues that even if no single alleged error requires relief, the cumulative effect of the supposed errors does require the Court to grant his Motion.  (Mot. 357-58.)  As the Government has demonstrated, none of Barrett's contentions have merit, and many are procedurally defective.  Moreover, Barrett has failed to establish prejudice as to any of the claims he raises.  Accordingly, his contention of cumulative error should be rejected.  *See United States v. Rogers*, 556 F.3d 1130, 1144 (10th Cir. 2009).

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges this

Court to deny the Second Amended Motion to Vacate, Set Aside, or Correct a Sentence by a

Person in Federal Custody.

Respectfully submitted,

Dated: May 17, 2010

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma


/s/   Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA #13801
Assistant United States Attorney
Eastern District of Oklahoma
1200 West Okmulgee
Muskogee, OK 74401-6848
Tel: (918) 684-5100


/s/   Jeffrey B. Kahan
JEFFREY B. KAHAN, PA Bar No. 93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 345
Washington, D.C. 20530
Tel: (202) 305-8910

**CERTIFICATE OF SERVICE**

I, hereby certify that on 17th day of May, 2010, I electronically transmitted the attached REDACTED Answer and Attachments to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry, Attorney for Petitioner
Tivon Schardl, Attorney for Petitioner
Joan Fisher, Attorney for Petitioner

I, hereby further certify that on 17th day of May, 2010, I electronically transmitted a complete, unredacted Answer and Attachments to the following:

David B. Autry, Attorney for Petitioner
Tivon Schardl, Attorney for Petitioner
Joan Fisher, Attorney for Petitioner

s/    Christopher  J. Wilson
Assistant United States Attorney