Westlaw.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

H

Only the Westlaw citation is currently available.

United States District Court,
D. Idaho.
Paul Ezra RHOADES, Petitioner,
v.
A.J. ARAVE, Warden, Respondent.
**No. CV 93-0155-S-EJL (Bingham County).**

May 24, 2007.

Dennis Benjamin, Nevin, Herzfeld, Benjamin & McKay, Boise, ID, Joan M. Fisher, Federal Defender's Office, Oliver Winston Loewy, Federal Defenders of Eastern Washington and Idaho, Moscow, ID, for Petitioner.

Kenneth M. Robins, Office of Attorney General, Criminal Law Division, Lynn E. Thomas, Boise, ID, for Respondent.

### MEMORANDUM DECISION AND ORDER

Honorable EDWARD J. LODGE, U.S. District Judge.

**\*1** Paul Ezra Rhoades has been convicted of murder, and other associated felonies, for the shooting deaths of Stacy Baldwin, Susan Michelbacher, and Nolan Haddon, all of whom were killed during an approximately three week period in February and March of 1987. After separate jury trials, Petitioner was sentenced to death in both the Michelbacher and Baldwin cases. Petitioner entered a conditional guilty plea in the Haddon case, and he received two indeterminate life sentences. This habeas corpus matter arises from the state court's judgment in the Baldwin case.

The Court previously dismissed several claims as procedurally defaulted or otherwise lacking in merit. (Docket No. 149.) Currently at issue are the mer-

its of the following claims in the Third Amended Petition: 1-3, 5, 7-13, 15-18, 23, 27-29. After considering the pleadings, briefing, and record, the Court concludes that Petitioner is not entitled to relief. Accordingly, this cause of action shall be dismissed.

### I.

### FACTUAL BACKGROUND

In the late winter of 1987, Petitioner, described as a large man with a "pear shape" and long hair, was seen loitering around convenience stores in the Blackfoot and Idaho Falls area. In one instance, he was observed pulling a hood around his face and peering through a window at a female employee as she was preparing to close a store. On a different occasion, a clerk noticed the outline of a gun and a holster underneath Petitioner's sweatshirt. One particular store that Petitioner had visited was the Red Mini Barn in Blackfoot.

Around 9:45 p.m. on February 27, 1987, Stacy Baldwin arrived at the Mini Barn to assume her usual duties as the overnight clerk. Another employee continued to work with her for about an hour, leaving her alone after 11:00 p.m.

A little past midnight, three girls were approaching the Mini Barn when they saw a man hurriedly leave the store, get into a pickup, and drive away in a reckless manner. As the vehicle passed very near seventeen-year-old Carrie Baier, she could see that another person was sitting next to the driver. Neither she nor her friends would be able to identify the man who was driving, and although their initial descriptions of that person generally did not fit Petitioner's physical attributes, they would later positively match the pickup to a distinctive vehicle that was used by the Rhoades family in their snow plowing business. Petitioner frequently drove this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

truck.

When Baier arrived the Mini Barn, she noticed that no employee was present. The police were summoned, as was the owner, who discovered that $249 was missing from the cash register. The last recorded transaction occurred 12:15 a.m.

Around 2:00 a.m., Petitioner appeared at a restaurant in the vicinity of the Mini Barn, where he had a cup of coffee with an unidentified male. The waitress who served them remembered Petitioner because of his large size, his ponytail, and the construction dust on his clothes. Petitioner and his companion were not talkative, and they left after about thirty minutes.

**\*2** Baldwin was found dead the next morning near some garbage dumpsters on an access road leading to an archery range. She had been shot three times, but a pathologist would later conclude that she may have lived for a period of time after the fatal wound had been inflicted. Police officers photographed several large shoe prints in the snow, which appeared to be of the same pattern and size as prints that they had observed at the Mini Barn. At that time, however, law enforcement officers had no firm leads or suspects.

Two weeks later, Nolan Haddon was shot to death while he was working at a convenience store in Idaho Falls. Three days later, Susan Michelbacher was abducted from a store parking lot in Idaho Falls, taken to a remote location, raped, and shot to death.

Detective Dennis Shaw, assigned to the Haddon case, was reviewing the Baldwin crime scene photographs when his attention was drawn to the footprints left in the snow. Shaw believed that these prints matched known prints left by Petitioner's boots, which he had photographed during an unrelated investigation. Based on this evidence, a teletype was issued notifying all law enforcement officers in the area that Petitioner was wanted for questioning. Also around this time, Petitioner's

mother reported that her Ford sedan had been stolen.

On March 24, two truck drivers saw the Ford sedan parked on a highway median in Northern Nevada. A person matching Petitioner's description exited the car, fumbled with something in his hands, and then jogged off into the sagebrush. A highway patrolman who responded to the scene found a .38 caliber handgun laying on the ground near the open door of the car. Ballistics testing would confirm that this weapon had fired the bullets in all three Idaho homicides.

Idaho authorities proceeded to Nevada armed with a warrant for Petitioner's arrest for burglary. Once there, they processed Pauline Rhoades's car for evidence and found, among other items, a holster and ammunition that matched the type used in the homicides. Investigators would later learn that Petitioner had purchased this ammunition from a gun store in Idaho Falls.

On March 25, Nevada law enforcement officers arrested Petitioner while he was gambling at the Four-Way Truck Stop and Casino in Wells. Detective Shaw and another Idaho officer, Victor Rodriguez, arrived shortly thereafter; as they approached Petitioner, he looked up at them and blurted out, "I did it." Upon hearing this, Rodriguez read Petitioner his *Miranda* warnings. Detective Shaw then frisked Petitioner and discovered an inexpensive watch like that worn by Stacy Baldwin the night she was killed, which Petitioner claimed to have found in a "barrow pit."

Petitioner was transported from the truck stop to a highway patrol substation for processing, where Detective Shaw remarked that if he arrested him sooner, three murder victims might still be alive. Petitioner responded to this comment by again saying, "I did it."

**\*3** At the time of his arrest, Petitioner's boots were photographed and confiscated, and a criminalist working for the State would conclude that the pat-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

tern from these boots were consistent with the prints at the crime scene. A sample of Petitioner's hair was also taken, and another criminalist determined that the sample was consistent with a hair that had been found on Baldwin's blouse when her body was discovered.

The State charged Petitioner with the murders of Baldwin, Haddon, and Michelbacher, but it proceeded with separate prosecutions in Bonneville and Bingham Counties. The district court in Bonneville County severed the Michelbacher and Haddon charges for trial purposes, and Petitioner was first tried and found guilty of all charges in the Michelbacher matter.

Before trial in Bingham County, a jail inmate named David Holm came forward and told the prosecutors that Petitioner had confessed to him. According to Holm, Petitioner admitted that he had kidnapped Baldwin from the Mini Barn and took her to the archery range intending to rape her, but that he was unable to do so because she was hysterical and screaming. Petitioner allegedly told her to pray before he fired several shots at her, finally hitting her twice in the back. Holm claimed that Petitioner briefly considered throwing Baldwin in one of the nearby dumpsters, but he decided against that course of action because he did not want to get bloody.

The district court in Bingham County excluded evidence that was related solely to the Bonneville County murders, but it allowed all of the other evidence recited above. In his defense, Petitioner, who did not testify, presented his mother's testimony that he was at home babysitting on the night that Baldwin was killed. He called several witnesses who claimed that David Holm was a manipulative and untruthful person, and he presented evidence related to the general availability of boots that could have made the prints at the crime scene and watches similar to the one found on Petitioner. A psychologist also testified about the unreliability of eyewitness identification.

After all of the evidence had been presented, the jury found Petitioner guilty of murder in the first degree, kidnapping in the first degree, and robbery. After an aggravation and mitigation hearing, the state court sentenced him to death for murder and kidnapping, and to fixed life in prison for robbery. The court enhanced the sentences by an additional fifteen years for the use of a firearm during the commission of the crimes.

## II.

### STATE AND FEDERAL POST-CONVICTION PROCEEDINGS

In accordance with Idaho's special procedure applicable to capital cases, Petitioner sought post-conviction relief before completing his direct appeal. The Idaho Supreme Court consolidated the appeal from the district's denial of post-conviction relief with the direct appeal and affirmed in all respects. *State v. Rhoades,* 120 Idaho 795, 820 P.2d 665 (Idaho 1991) (*Rhoades I* ).

**\*4** In 1993, Petitioner filed a Petition for Writ of Habeas Corpus, which he amended twice, raising twenty-seven habeas claims. On April 10, 1997, after the parties had completed briefing on procedural default issues, the Court entered an order dismissing all or part of eleven habeas claims, one of which contained Petitioner's allegations of ineffective assistance of trial counsel.[FN1] (Docket No. 149.) One year later, the Court denied Petitioner's motion for an evidentiary hearing. (Docket No. 167.) Petitioner thereafter returned to state court in an effort to exhaust additional constitutional claims, but the Idaho Supreme Court concluded that his new post-conviction petition was untimely. *Rhoades v. State,* 135 Idaho 299, 17 P.3d 243 (Idaho 2001) (*Rhoades II* ). Subsequently, this Court granted Petitioner leave to amend his Petition yet again to add two new claims, which are included as Claims 28 and 29 in the Third Amended Petition, filed on September 27, 2001. (Docket Nos.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

251 & 252.)

> FN1. Claims of ineffective assistance of appellate counsel were not dismissed.

While this habeas case was pending, the Ninth Circuit Court of Appeals decided *Hoffman v. Arave,* 236 F.3d 523 (9th Cir.2001). In *Hoffman,* the Court of Appeals held that Idaho's forty-two day time limitation for bringing all post-conviction claims, coupled with the state court's failure to appoint new counsel during that time, frustrated the petitioner's right to raise claims of ineffective assistance of counsel in state court. *Id.* at 535. The procedural default of such claims under those circumstances would be excused. In light of *Hoffman,* this Court reconsidered its earlier decision to dismiss Petitioner's claims of ineffective assistance of trial counsel, and the parties were allowed to submit supplemental briefing to separate triable issues from issues that could be decided as a matter of law. (Docket No. 290.)

On May 18, 2006, the Court issued a Memorandum Decision and Order denying an evidentiary hearing on most allegations of ineffective assistance of trial counsel, but the Court reserved its decision in one limited area. (Docket No. 312, p. 1.) The Court then ordered supplemental briefing on the merits of all non-dismissed habeas claims. The parties have now submitted their supplemental briefing, and Petitioner has lodged numerous documents that he intends to comprise a factual proffer in support of his allegation of ineffective assistance of counsel at the penalty phase of the trial.

The Court has considered the pleadings, the record, and the parties' briefing, and it is now prepared to rule.

### III.

### HABEAS STANDARDS

Because this case was initiated before the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), it is not governed by AEDPA's provisions. *Lindh v. Murphy,* 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Under pre-AEDPA law, the Court must presume that the state court's findings of historical fact are correct and defer to those findings unless there is convincing evidence to the contrary or a lack of fair support in the record. 28 U.S.C. § 2254(d) (1994); *Mayfield v. Woodford,* 270 F.3d 915, 922 (9th Cir.2001). The Court exercises its independent judgment over questions of federal law and must resolve legal issues on the merits under ordinary rules. *Summerlin v. Schriro,* 427 F.3d 623, 628-29 (9th Cir.2005).

### IV.

### ANALYSIS

#### Claim 1: Jury Bias

**\*5** In first claim for relief, Petitioner alleges that he was deprived of his constitutional right to be tried by an impartial jury. The state trial court conducted a hearing to investigate this matter and concluded that all jurors could remain fair and impartial. Because this finding is fairly supported by the record, Petitioner is not entitled to relief.

1. *Standard of Law*

A criminal defendant has a fundamental right under the Sixth and Fourteenth Amendments to a fair trial by an impartial jury. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). To be impartial, the jury must be "capable and willing to decide the case solely on the evidence before it." *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). Actual bias is "the existence of a state of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

mind that leads to an inference that the person will not act with entire impartiality.' " *United States v. Gonzalez,* 214 F.3d 1109, 1112 (9th Cir.2000). Even if just a single juror is biased, the defendant has been denied his right to fair trial. *Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir.1998).

The determination whether a particular juror is biased is highly dependent on credibility and demeanor, and when a state court has conducted an investigation that is "reasonably calculated to resolve the doubts raised about the juror's impartiality," its ultimate determination on this issue is a finding of fact that is presumed to be correct in a federal habeas proceeding. *Dyer,* 151 F.3d at 974-75; *see also Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). A state court's finding that a juror can be fair and impartial will be upheld as long as it is fairly supported by the record. *Patton,* 467 U.S. at 1036-37.

2. *Discussion*

In the present case, prospective juror Dennis Webster was questioned during voir dire and passed for cause. At the conclusion of voir dire, the prosecution and the defense made their peremptory challenges and a recess was called. During that recess, Deputy Sheriff Edgar Smith allegedly overheard Webster say to another prospective juror, Roy Hinrichs, "you can just look at him and tell he's guilty. I think you ought to hang the sucker." [FN2] Webster was eventually seated on the jury, and Hinrichs was seated as an alternate. Deputy Smith reported the comment to his supervisor at the end of the day and submitted a written report.

> FN2. Deputy Smith was unsure whether Webster used the word "sucker" or a more profane expletive.

Upon being informed of Smith's report, the state trial court convened a hearing. The court and counsel examined Smith extensively about the circumstances surrounding Webster's supposed comment, including when the comment was made, who was present, and what was said. Following that testimony, Webster and Hinrichs were each questioned individually by the court; Webster denied making the comment, and Hinrichs denied overhearing it. Next, all other members of the jury panel were questioned individually. Each denied hearing the statement, and each claimed that they had not formed an opinion about the case. At every point in this process, the prosecuting attorney and defense counsel were given opportunities to ask questions of the witnesses.

**\*6** After finishing the inquiry, the trial court denied Petitioner's motion for a mistrial, concluding that Webster and Hinrichs would be fair and impartial jurors:

> There was a so called out of court statement-or in court statement that one of our officers overheard. Testified he overheard. There's some matters about that situation that I'm not really certain exactly when it was said. *And I do for this purpose assume there was something perhaps said. In other words, I'm not going to make a finding of fact as to who said what.*
>
> I am going to make a finding though as I look at these gentlemen that have testified that whatever might or might not have been said, that they are of the frame of mind that they have not formed or expressed an opinion as to the innocence of [sic] guilt of the defendant. That they can sit as fair and impartial jurors. And that's a requirement of the court to make sure that that's done.

(Tr. Vol.III, pp. 780-81.) (Emphasis added.)

Petitioner now argues that the trial court assumed that Webster had made the precise statement that Deputy Smith attributed to him but then erroneously concluded that Webster and Hinrichs could still be fair and impartial. (Docket No. 124, pp. 8-15; Docket No. 316, pp. 1-6.) The Court does not share Petitioner's interpretation of the record. While

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

it is true that trial court noted that "there was something perhaps said," it specifically declined to "make a finding of fact as to who said what." (Tr. Vol.III, pp. 780-81.) In other words, the trial court made no assumptions or findings as to the content of anything that might have been said.

Moreover, the trial court revisited this issue during the post-conviction proceeding and made additional findings. When confronted with new affidavits from Deputy Smith containing, in part, second-hand allegations of collusion in jury selection between the prosecutors, county sheriffs, and even the trial judge-accusations that were contradicted by other witnesses-the trial court noted that Smith "lacks credibility with the Court." (R. PCR., p. 147.) The court also found that "Smith was not in a position to hear the conversation that he claims he heard and that any conversation he heard did not include the jurors on the jury panel." (R. PCR, pp. 147-48.)

Therefore, the record shows that the state court conducted an investigation that was "reasonably calculated to resolve the doubts raised about the juror's impartiality," *see Dyer,* 151 F.3d at 974-75, and its ultimate finding of impartiality is presumed to be correct. That finding is also fairly supported by the record. *Patton,* 467 U.S. at 1036-37. Dennis Webster flatly denied making the comment that Deputy Smith said he made, and Hinrichs denied hearing it. All other jurors told the court that they did not hear the comment and that they could remain fair and impartial. To the extent that Smith's testimony may have conflicted with Webster's denial, the trial court was in the best position to gauge the demeanor and credibility of the witnesses and to resolve any conflicts. Petitioner points to no other evidence that rebuts the state court's factfinding on this issue.

**\*7** The thoroughness of the investigation in this case separates it from *Dyer v. Calderon.* There, after it became apparent that a juror may have been dishonest during voir dire, the trial court briefly questioned her in chambers. *Id.* at 974-75. This superficial inquiry lasted no more than five minutes,

and the court accepted the juror's implausible explanations at face value, without probing any deeper, despite being alerted to evidence that strongly suggested that she had lied. *Id.* Because the state court failed to develop the material facts, the Ninth Circuit held that the finding of impartiality was not entitled to deference on habeas review. *Id.* at 979. Liberated from this finding, the Ninth Circuit independently reviewed the record and determined that the juror had "lied, and lied repeatedly." *Id.* at 981.

Here, unlike *Dyer,* the state court conducted a thorough and complete investigation, which included the questioning of Deputy Smith, Webster, Hinrichs, and all other sitting jurors. Aside from Smith's allegations, which were examined in great detail, the court had no other reason to believe that Webster had been dishonest. This is in stark contrast to *Dyer,* where the trial court chose to ignore readily available evidence that was contrary to the juror's innocent explanations. *Dyer* does not control the result here.[FN3]

> FN3. Petitioner also cites *Fields v. Brown,* 431 F.3d 1186, 1194 (9th Cir.2005). *Fields* has since been withdrawn from publication and is awaiting review *en banc.* 465 F.3d 397 (9th Cir.2006). Regardless, *Fields* would not help Petitioner. In that case, the state courts made no factual findings on the issue of bias, so no deference was due on habeas. *Fields v. Woodford,* 309 F.3d 1095, 1103, 1106 (9th Cir.2002).

Petitioner alternatively contends that even if he cannot show actual bias, Webster's bias must be implied. Petitioner is correct in noting that the Ninth Circuit has held that bias can be implied in "extraordinary cases," such as when a juror has a close relationship with some aspect of the litigation, or, as in *Dyer,* when the juror clearly lied to secure a seat on the jury. *Id.* at 984; *see also Green v. White,* 232 F.3d 671, 675-76 (9th Cir.2000) (following *Dyer,* bias was presumed because the evidence presented in state court showed that the juror had engaged in a "pattern of lies"). But Peti-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

tioner's argument for implied bias suffers from the same flaw as his argument for actual bias; that is, contrary to his assertion, the trial court did not assume that Webster had actually said, "you can just look at him and tell he's guilty," and the court did not make contradictory findings.

As a result, Petitioner has not shown, based on the factual record developed in state court after a full and fair hearing, that he was denied his constitutional right to an impartial jury.

### Claim 2: Alleged Brady Violations

Relying on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Petitioner alleges that his constitutional right to due process of law under the Fourteenth Amendment was violated when the prosecution withheld the following items from the defense: (1) two police reports that included incriminating statements from an individual named Kevin Buchholz; (2) information regarding Buchholz's criminal and mental health history; (3) Detective Dennis Shaw's police report relating to a discussion that he had with Petitioner after his arrest; and (4) a videotaped statement by eyewitness Loretta Wallace.

**\*8** For the reasons that follow, the Court concludes that Petitioner has not shown a *Brady* violation.

#### 1. *Standard of Law*

It is well established that the prosecution has a duty under the due process clause of the Fourteenth Amendment to disclose exculpatory evidence to the defense that is material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A meritorious *Brady* claim contains three essential components: (1) the evidence must be favorable to the accused, either because it is exculpatory or impeaching; (2) the prosecution must have withheld the evidence, either intentionally or inad-

vertently; and (3) the evidence must be material to guilt or punishment. *Strickler v. Greene,* 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

Suppressed evidence is material under *Brady,* and its non-disclosure is prejudicial, when there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. *Bagley,* 473 U.S. at 682; *Kyles v. Whitley,* 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In assessing materiality, the court must review the evidence collectively, rather than item by item. *Kyles,* 514 U.S. at 433-34.

#### 2. *Kevin Buchholz*

##### (a) *Background*

Two weeks after Stacy Baldwin's murder, Kevin Buchholz was arrested on a drunk and disorderly charge in Firth, Idaho. Buchholz told the arresting officer, Joseph Love, that if he was going to jail on what he considered to be bogus charges, Love might as well add a murder charge, too, because he "was the one who killed the girl at the Mini Barn." (PCR Tr., pp. 254-55.) Love prepared a written statement that included this information.

After he had been placed in a holding cell, Buchholz continued his tirade, informing the jailor, Larry Christian, that he had shot "the girl" from the Mini Barn twice in the back, though he had fired at her several times with a .38 caliber or a nine millimeter handgun. (PCR Tr., pp. 145, 193.) He claimed to have stolen a green pickup, which he abandoned after committing the crime. (PCR Tr., p. 146.) Christian also prepared a report reflecting his exchange with Buchholz. (PCR Tr., p. 147.)

Within a few days, the lead investigator in the Baldwin case, James Jackson, learned of Buchholz's statements. (PCR Tr., p. 252.) Jackson brought Buchholz to the police station, where he was fingerprinted, photographed, and interviewed for two to three hours. (PCR Tr., p. 254.) Buchholz

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

admitted making some of the statements, denied others, and asserted that the entire "confession" was untrue and made out of anger because he believed the arresting officer was piling on charges. (PCR Tr., pp. 254-55.) He also claimed that he had been at the hospital for his daughter's emergency surgery on the morning that Baldwin was killed. (PCR Tr., p. 259.) Police officers confirmed Buchholz's alibi, found no other evidence tying him to the murder, and did not consider him to be valid suspect. (PCR Tr., p. 259, 261, 280.) At the conclusion of this investigation, another detective, Paul Newbold, wrote his own report that summarized, in great detail, Buchholz's incriminating statements to Christian. Newbold's report was disclosed to the defense during pretrial discovery, but the reports of Love and Christian apparently were not.

**\*9** Defense counsel attempted to subpoena Buchholz for trial but he could not be located. Instead of presenting his live testimony, then, counsel attempted to call Deputy Christian to testify about the confession. The State objected and requested that the court exclude this proposed evidence as hearsay. The trial court agreed, concluding that Buchholz's confession did not contain sufficient corroboration and trustworthiness to be admissible as a statement against penal interest under Rule 803(b)(3) of the Idaho Rules of Evidence.

When it became apparent during post-conviction proceedings that the reports by Christian and Love existed, Petitioner claimed that the State had not complied with its *Brady* obligations. Buchholz was located, and he testified. Consistent with his earlier police interview, he admitted that he made some of the statements attributed to him, but he denied others. He reiterated that he had fabricated the entire confession because he was simply intoxicated and angry at being arrested on what he perceived to be unfair charges. Buchholz's father corroborated his son's assertion that they were together on the night and morning that Baldwin was killed.

The trial court concluded that Buchholz "made a credible witness" and that Petitioner failed to show

that he was prejudiced by the non-disclosure of any material related to the confession. (PCR R., pp. 149-50.) On appeal, the Idaho Supreme Court affirmed, concluding that because the State had disclosed the Newbold report, the defense could have conducted additional inquiry into the matter had it chosen to do so. *Rhoades I,* 820 P.2d at 673.

(b) *Discussion*

Although Buchholz's claim of responsibility for Baldwin's murder is exculpatory for *Brady* purposes, Petitioner has not established that the prosecution actually withheld or suppressed that information from the defense. Instead, it is clear from the record that defense counsel was fully aware of the particulars of the purported third party confession from having received Newbold's report, which included Buchholz's claim that he shot at "the girl from the Mini Barn" several times with a .38 caliber or a 9mm, hitting her twice in the back, and that he abandoned a green pickup truck after the crime. While the reports by Officers Love and Christian on this same general subject may not have been disclosed, Petitioner has failed to explain how they differ in substance from that which had already been revealed. Indeed, Christian's report is fully summarized by Newbold, and defense counsel had spoken to Christian personally about the matter before attempting to introduce his testimony. (Parmenter Depo., p. 28.) Officer Love's undisclosed general statement that Buchholz had admitted that he "killed the girl at the Mini-Barn" does not add any new detail. When, as here, the defense is already aware of the essential facts that comprise the allegedly exculpatory information, the prosecution has not committed a *Brady* violation. *Raley v. Ylst,* 470 F.3d 792, 804 (9th Cir.2006) (citations omitted); *Lambert v. Blackwell,* 387 F.3d 210, 265 (3d Cir.2005); *Spirko v. Mitchell,* 368 F.3d 603, 611 (6th Cir.2004).

**\*10** In addition to the police reports, Petitioner also contends that the State withheld Buchholz's criminal history and his "serious personality disorder."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

(Docket No. 252, pp. 10-11.) Given that Buchholz did not testify at trial, Petitioner has not explained why the State had a duty to disclose his criminal or mental health history, or, even if such a duty existed, how that information would have led to the development of admissible exculpatory or impeachment evidence. Petitioner also mentions the result of a polygraph examination, but absent a stipulation polygraph results are inadmissible under Idaho law. *State v. Fain,* 774 P.2d 254, 256-57 (Idaho 1989). Information that the jury would never hear cannot be material for *Brady* purposes because, by definition, there is no possibility of a different outcome. *See United States v. Kennedy,* 890 F.2d 1056, 1059 (9th Cir.1989) (citing *United States v. Ranney,* 719 F.2d 1183, 1190 (1st Cir.1983)).

Petitioner suggests that disclosure of all of this material would have triggered a more vigorous effort to locate Buchholz. The record does not support this assertion. Buchholz's claim of responsibility for Baldwin's murder was not a secret, and defense counsel proffered to the trial court the efforts that he and the attorneys in the Bonneville County matter had made to locate him. (Tr. Vol.VIII, pp. 2148-50.) Petitioner's implicit argument that the defense team would have found Buchholz if it had only been given the largely cumulative police reports of Love and Christian and some information regarding Buchholz's criminal history is speculative. *See Wood v. Bartholomew,* 516 U.S. 1, 6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (finding no *Brady* violation based upon speculation that the disclosure of polygraph results would have lead to exculpatory and admissible evidence). However, in an abundance of caution, at the end of this section the Court will address why evidence relating to the Buchholz episode would not have been material to guilt or punishment.

### 3. *Shaw's Police Report*

Petitioner next contends that the prosecution failed to disclose a different police report written by Detective Dennis Shaw, in which Shaw recites a brief verbal exchange that he had with Petitioner at the time of his arrest in Nevada. In the report, Shaw indicates that he told Petitioner that he had lied to him about an unrelated burglary and that he should "get it off [his] chest," to which Petitioner responded by saying, "I don't want to talk about it." (Shaw Depo., Exhibit 5.)

Petitioner contends that this information reveals that he invoked his right to silence as to the murders, a fact that was not presented to the state courts. His argument as to how this information is exculpatory is less than clear, but he suggests that had the report been disclosed and used appropriately by defense counsel at a suppression hearing, his "I did it" statements would have been suppressed. Without that evidence, he contends, there is a reasonable probability that he would have been acquitted. He also makes a vague argument that the report contained impeachment material.

**\*11** Earlier in this proceeding, this Court denied an evidentiary hearing on this portion of the *Brady* claim after concluding that Petitioner had not demonstrated that Shaw's report was "newly discovered evidence." (Docket No. 167, pp. 12-13.) In reaching that conclusion, the Court relied on trial counsel's deposition testimony in which he seemed to indicate that he had seen the report before trial. (Docket No. 167, p. 12.) The Court subsequently denied Petitioner's motion to reconsider that decision, concluding that even if trial counsel now believed that he did not receive the report, Petitioner had not established that counsel was unaware of the *information* contained therein. (Docket No. 213, p. 4.) In other words, Petitioner did not, and has not, established that the prosecution suppressed or withheld this information from the defense. In the absence of prosecutorial suppression, there can be no *Brady* violation.

### 4. *Loretta Wallace's Videotaped Statement*

For the final component of his claim, Petitioner alleges that the State failed to turn over a recorded

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

statement made by eyewitness Loretta Wallace, which is contained on a videotape marked "Baldwin Crime Scene." (Docket No. 252, p. 11.) Petitioner asserts that Wallace can be seen, in and out of hypnosis, describing a man leaving the Mini Barn whose physical characteristics do not match Petitioner. Although this evidence may be favorable to Petitioner for *Brady* purposes, the Court previously determined that he had "failed to establish how this evidence, if proven, would entitle him to relief." (Docket No. 167, p. 10.) The Court reaffirms that decision here.

Initially, because Petitioner concedes that defense counsel had the videotape within his possession, it is debatable whether the prosecution can be said to have withheld or suppressed any of the information on that tape. Petitioner attempts to make that case by claiming that Wallace's statements are buried on the tape after a long pause during which nothing is shown. Consequently, he suggests that the prosecution had an independent duty to point out Wallace's statement.

Petitioner is correct that the prosecution may not play a game of hide and seek with exculpatory evidence. *See Banks v. Dretke,* 540 U.S. 668, 696, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). Conversely, it is unlikely that the due process clause would be offended by placing a minimal burden on the defendant to exercise some diligence in inspecting evidence that has already been disclosed. *Cf. United States v. Mulderig,* 120 F.3d 534, 541 (5th Cir.1997) (finding no *Brady* violation when the allegedly exculpatory information was contained within a larger mass of material). The facts, as Petitioner has alleged them, fall somewhere between these two extremes, but the Court need not resolve the matter, because even if Wallace's statement was suppressed, the Court concludes that the evidence was not material.

5. *Materiality/Prejudice Analysis*

**\*12** In applying the materiality standard, the Su-

preme Court has advised that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434. A court must review the impact that the withheld evidence would have had on the petitioner's right to a fair trial collectively, rather than item by item, to determine whether, had the evidence been disclosed, there is a reasonable probability of a different outcome. *Id.*

This Court will begin with a review of the evidence that was presented at trial, the most incriminating of which related to the murder weapon and the results of ballistics testing. That evidence demonstrated that the weapon that had fired the bullet that lodged in Stacy Baldwin's arm was found near the car that Petitioner had recently abandoned on a roadside in Nevada, and ammunition like that used in the murder was retrieved from inside of the vehicle. A witness had seen Petitioner with a similar handgun in his possession after Baldwin had been killed, and a gun store employee identified Petitioner as the purchaser of .38 caliber ammunition like that found in the abandoned car.

Other evidence built upon this strong foundation. During February and March of 1987, Petitioner was interrupted while he "cased" a convenience store, watching a female employee, and he was observed in a different store with a handgun under his sweatshirt. Petitioner had visited the Mini Barn before, and a distinctive pickup that he often drove was spotted driving recklessly away from the store at the exact time that Stacy Baldwin went missing. About two hours later, he arrived at a nearby cafe for a late night cup of coffee with an acquaintance.

Footprints in the snow at the location where Baldwin's body was discovered were consistent with the tread on Petitioner's large-sized boots, and a hair found on Baldwn's shirt was consistent with a sample of Petitioner's known hair. When Petitioner was arrested in Nevada, Detective Shaw retrieved a watch from his pocket that was similar to the one

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

that Stacy Baldwin wore the night she was killed, and when he was informed that Baldwin's homicide may have been avoided had he been apprehended sooner, Petitioner said "I did it."

Last, but certainly not least, David Holm testified at trial about Petitioner's admission of guilt, in which he allegedly claimed to have kidnapped Baldwin with the intent of raping her, told her to pray, and then shot at her several times, hitting her twice in the back.

While Petitioner's mother testified that he was at home babysitting on the night of the murder, he offered no other evidence to corroborate this alibi. He did call witnesses who painted David Holm as a manipulative liar, but the defense had no answer for why Holm knew certain details about the crime that were not widely known or that were not contained in police reports that Petitioner had with him in the county jail. Petitioner's other evidence related to eyewitness identification and the availability of watches and boots in the community was ultimately not persuasive.

**\*13** The picture to emerge at the end of the trial was a circumstantial but compelling case pointing toward Petitioner's guilt. Nothing about this picture would have changed in materially in his favor had information related to Buchholz and Wallace been presented.

First, as this Court has noted, the exclusion of the Buchholz confession was not due to the prosecution's suppression of that information but was instead the result of his absence from the jurisdiction. But even assuming, for the sake of argument, that Buchholz could have been located and that he would have testified similarly to his post-conviction testimony, this evidence would not have assisted Petitioner in a material way. The prosecution would have undoubtedly been permitted to explore the full circumstances showing that the confession was unreliable and most likely false.

In particular, the jury would have heard that Buch-

holz was belligerent, crying, and extremely intoxicated when he was arrested. (PCR Tr., pp. 145, 151-52.) The general tenor of his comments was that because he was being charged for other crimes that had no basis in fact, the police might as well charge him for murder. He recanted his statements when he was sober, claiming that he had been seeking attention and had been just spouting off because he was angry at being taken into custody. (PCR Tr., pp. 254-55.) The police later investigated his alibi and confirmed that he had been with his family and at the hospital during the time frame that Baldwin was likely killed, and officers could find no other evidence that linked him to the crime, despite having taken samples of his fingerprints, hair, and shoe prints. (PCR Tr., p. 259.)

Petitioner has not come forward with any evidence that undermines the alibi or that independently ties Buchholz to Baldwin's homicide. Though he makes much of Buchholz's knowledge of a few details of the crime, he has not shown that Buchholz would have been unable to gather these facts from the media, gossip, or other sources, given that the crime was a major source of interest in the community at the time.[FN4] Given all of these circumstances, the jury would have likely taken Buchholz's comments the same way that the police and the trial court ultimately did: the unreliable statements of a drunk person seeking attention.

> FN4. Petitioner also slightly overstates the degree to which Buchholz's confession was corroborated by other evidence. For instance, while it is true that a green pickup was found abandoned on the highway, an officer had stopped that same pickup on the night that Baldwin was killed, and the driver was not Buchholz. (PCR Tr. pp. 258-59.) Carrie Baier, who saw the suspect vehicle leave the Mini Barn, testified at trial that there was "no question" in her mind that the pickup that had been abandoned was not the one that she saw leave the Mini Barn. (Tr. Vol. V, p. 1326; Tr. Vol.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

IX, p. 2286.) Moreover, although tire tracks on the access road leading to the archery range, a well-traveled area, were similar to the tread on this pickup, they were also generally similar to the tread on Petitioner's pickup, and no positive match to any vehicle could be made. (Tr. Vol.IV, p. 912.)

> The same holds true regarding Petitioner's reference to Buchholz's alleged attempts to sell a handgun in March 1987. This assertion is based mainly on vague and second-hand information that has not been corroborated. Further, Petitioner has produced no reliable evidence linking the supposed handgun, if it existed, to this crime. The evidence adduced at trial fairly conclusively showed that Petitioner dropped the murder weapon himself when he abandoned his mother's car in Nevada.

With respect to Loretta Wallace, Petitioner presumably believes that if she had been called and testified similarly to her videotaped statement, the jury would have heard that her initial description of the man that she saw leaving the Mini Barn did not match Petitioner. But such evidence was already squarely before the jury. On cross-examination, Detective Newbold testified that the suspect was considered to be of average height, average build, between the ages of thirty five to forty, with short, grayish hair and no facial hair. (Tr. Vol.IV, pp. 919-930.) Defense counsel also cross-examined Carrie Baier regarding this issue, and though she claimed not to remember certain parts of her initial description to the police, she admitted that she had said that the man had short hair and was of average height. (Tr., Vol.V, pp. 1139-39.) As part of his closing argument, counsel emphasized how this initial description did not match Petitioner, and he argued that Carrie Baier, who was acquainted with Petitioner, was unable to identify him as the man who fled the Mini Barn. (Tr. Vol.IX, pp. 2424-25.)

As a result, the information that Petitioner believes that Wallace would have offered was cumulative to that which was already in evidence through Newbold and Baier. *Cf Williams v. Woodford,* 384 F.3d 567, 598-99 (9th Cir.2004) (holding that the failure to disclose cumulative impeachment evidence did not amount to a *Brady* violation).

**\*14** Accordingly, after taking all of the evidence into consideration, the Court concludes that Petitioner has not shown a reasonable probability that the result of the state court proceeding would have been different had this material been disclosed and used effectively. While Buchholz's incriminating statements, when viewed in isolation, may have been helpful to the defense, any initial benefit would have been negated by the circumstances in which the statements were made, the subsequent recantation and alibi, and the lack of independent evidence tying him to the crime. Wallace's videotaped statement, to the extent that it was reliable, was cumulative. The Court's confidence in the fairness of the proceeding has not been undermined, and Petitioner's *Brady* claim shall be denied.

### Claim 3: Reasonable Doubt Instructions

Petitioner next contends that the trial court's jury instructions lowered the constitutional standard of proof necessary to convict, in violation of his rights under the Sixth and Fourteenth Amendments.

1. *The Claim is not Barred by Teague*

As a threshold matter, Respondent argues that Petitioner's claim must be dismissed under the non-retroactivity principles set out in *Teague v. Lane,* 489 U.S. 289 (1989). (Docket No. 246, p. 16; Docket No. 370, p. 19.) In *Teague,* the Supreme Court held that a habeas petitioner is generally not entitled to the retroactive application of a new rule of constitutional law on collateral review. *Id.* at 301. A constitutional rule is "new" for *Teague* purposes if it was not dictated by precedent that existed at the time that the petitioner's conviction was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

final in state court. *Id.*

The applicable rule here is derived from the Fourteenth Amendment's due process clause. It has long been established that the due process clause requires the State to prove every essential element of the crimes charged beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1971). In *Cage v. Louisiana,* 498 U.S. 33 (1990), the Supreme Court held, for the first time, that a jury instruction will be deemed unconstitutional if there is a reasonable likelihood that the jury understood the instruction to allow a conviction without proof beyond a reasonable doubt. *See Id.* at 41; *Cf. Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (clarifying that a reviewing court must determine whether there is a likelihood that the jury actually misunderstood its instructions). Petitioner relies on *Cage,* and because *Cage* was issued over a year before the Idaho Supreme Court finally resolved his direct appeal, it is not "new" as applied to this case.

Nevertheless, Respondent also contends that because Petitioner is challenging an instruction that refers to the "presumption of innocence" (Instruction 17) [FN5], a matter that was ostensibly not at issue in *Cage,* he is still seeking the application of a new rule of law. (Docket No. 370, pp. 19-20.) The Court is not persuaded. Petitioner's argument is that this instruction, in conjunction with other instructions, made it reasonably likely that the jury based its verdict on a standard of proof below that which is required by the due process clause. This is a relatively straightforward application of the *Cage* rule, albeit to an instruction that is worded differently.

> FN5. All of the written jury instructions in the state court record are labeled as "preliminary instructions." (R. Vol III, pp. 617-687.) The trial court read portions of the complete set of instructions to the jurors at different times: before jury selection, before opening statements, and at the close of evidence. (Tr. Vol.IX, pp. 2306-2341.)

Upon the last reading, the court informed the jurors that all of the instructions that had been read to them throughout the trial would be provided in written form and that the written packet comprised the entire set of instructions. (Tr. Vol.IX, p. 2341.) Therefore, for simplicity, this Court shall drop the "preliminary" label.

**\*15** The timing of the *Cage* decision is also what separates the present case from the Ninth Circuit's conclusion that a similar argument was *Teague*-barred in *Leavitt v. Arave,* 383 F.3d 809, 817-818 (9th Cir.2004). Leavitt's conviction became final one year before *Cage,* so he was unable to use its rule to his benefit.

2. *The Reasonable Doubt Instructions*

Petitioner's initial complaint is about the trial court's references in Instruction 16 to the terms "moral evidence" and "moral certainty":

> Reasonable doubt is defined as follows: It is not mere possible doubt because everything related to human affairs, and depending upon *moral evidence,* is open to some possible or imaginary doubt. It is the state of the case which, after an entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction *to a moral certainty* of the truth of the charge.

(R. Vol.IIII, p. 637.) (Emphasis added.)

The trial court also used the term "moral certainty" again in Instruction 29:

> The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty for such degree of proof is rarely possible. *Moral certainty only is required,* which is that degree of proof which produces which produces conviction in an unprejudiced mind.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

(R., Vol.III, p. 651.) (Emphasis added.)

In *Victor v. Nebraska,* 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), the Supreme Court addressed similar complaints about the use of "moral evidence" and "moral certainty." There, the Court was untroubled by the phrase "moral evidence," because, when placed in the context of the words immediately surrounding it, the jury would have understood that "moral evidence" meant the same thing as "the proof introduced at trial." *Id.* at 13. The Court was further reassured by language that informed the jury that it must base its decision solely on the evidence that had been presented at trial. *Id.* This is equally true here; the trial court clearly and repeatedly informed the jury that its decision must be based upon the evidence presented in court and not on any other extraneous factor. ( *See* Instructions 2, 11, 14, 18, 23, 52.)

The Supreme Court was slightly more concerned with the phrase "moral certainty," which it noted may not bring the same archaic meaning to a modern jury (essentially, subjective certitude based on proof beyond a reasonable doubt). Yet the Court still did not find constitutional error, as it determined that the rest of the instructions provided content to that potentially ambiguous phrase. *Id.* at 14, 21. The jurors were told that they must have an "abiding conviction" of the truth of the charge, which, without reference to moral certainty, correctly states the prosecution's burden of proof and "does much to alleviate the concerns that the phrase 'moral certainty' might be misunderstood in the abstract." *Id.* This same qualifying remark was included in the set of instructions in the present case, and the requirement that the jury may rely only on evidentiary proof, as in *Victor,* was a recurring theme throughout the trial court's instructions. Petitioner's concerns about Instructions 16 and 29 are resolved by *Victor.*

**\*16** Nor has Petitioner established any defect with the trial court's instruction to the jury that "[i]t is not necessary that all the facts and circumstances surrounding the testimony and evidence which is given on behalf of the State shall be established beyond a reasonable doubt. All that is necessary is that all facts and circumstances in evidence, together, establish the defendant's guilt beyond a reasonable doubt." (R. Vol. III, p. 636; Instruction 27.) The Ninth Circuit has concluded that this instruction "is and always has been a perfectly correct statement of the law; the prosecution need not prove every *fact* in the case beyond a reasonable doubt so long as it proves every *element* beyond a reasonable doubt." *Leavitt,* 383 F.3d at 822 (emphasis in original). As an added protection in the present case, the trial court instructed the jury that the State must prove beyond a reasonable doubt all of the material elements of each crime, which it then listed separately. (R. Vol. III, p. 658; Instruction 36.)

For all of these reasons, Instructions 16, 27, and 29 pass constitutional muster. More problematic is the trial court's use of Instruction 17, which reads in its entirety:

The rule of law which clothes every person accused of crime with the presumption of innocence, and imposes upon the state the burden of proving his guilt beyond a reasonable doubt, is not intended to aid anyone who is in fact guilty to escape, but is a humane provision of the law, intended so far as human agencies can, to guard against the danger of innocent persons being unjustly punished.

(R., Vol.I, p. 590.)

Courts reviewing similar "protect the innocent" instructions have generally condemned them, though this is not a universal opinion. *See Reynolds v. United States,* 238 F.2d 460, 463 (9th Cir.1956) (holding, on direct review, that a similar instruction created prejudicial error); *Gomila v. United States,* 146 F.2d 372, 373 (5th Cir.1944); *United States v. Doyle,* 130 F.3d 523, 538 (2d Cir.1997); *but see DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002) (holding that no habeas relief under AEDPA was available on a similar instruction); *State*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

v. Schiappa, 248 Conn. 132, 728 A.2d 466, 486 (Conn.1989) (disapproving of instruction, but rejecting a constitutional challenge); Heald v. State, 492 N.E.2d 671 (Ind.1986) (noting that the instruction had been approved). The danger inherent in such an instruction is that the jury could conclude that it need not apply the presumption of innocence, nor hold the prosecution to its burden to prove the defendant's guilt beyond a reasonable doubt, if it has first determined by some undefined standard that the defendant is actually or "in fact" guilty. The presumption of innocence and the reasonable doubt standard, of course, apply at all criminal trials, and any implication to the contrary is improper. *See, e.g., Doyle,* 130 F.3d at 538.

On the other hand, a more benign interpretation of this instruction is that it simply explains to the jury *why* the presumption of innocence and the reasonable doubt standard must apply to *all* criminal defendants. *See Leavitt,* 383 F.3d at 844 (Fernandez, J., concurring). Even so, this Court does not doubt that the trial court's use of Instruction 17 in this case was unwise.

**\*17** It is not enough, however, for this Court to find that the instruction is " 'undesirable, erroneous, or even 'universally condemned.' " *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Instead, the Court must be convinced that there is a reasonable likelihood that the jury in this case understood the instructions as a whole to allow a guilty verdict based on proof less certain than beyond a reasonable doubt. *Victor,* 511 U.S. at 6. The Court is not persuaded that such a likelihood exists.

The jury would have been disabused of any misleading construction of Instruction 17 by the trial court's numerous other instructions that properly defined the jury's obligation to hold the State to its correct burden. The jury was informed of the following: (1) Petitioner is presumed to be innocent (Instructions 2, 16); (2) the State had the burden to prove every material allegation for each crime charged beyond a reasonable doubt (Instructions

15, 16, 36, 37, 39); (3) the jury's decision must be based solely upon the evidence presented in court, and not on any other consideration (Instructions 2, 11, 14, 18, 23, 52, 53.); (4) sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling must not be considered (Instruction 11); and (5) the jury must not convict solely on circumstantial evidence unless it was convinced that the circumstances could not be reconciled with any other rational theory of innocence (Instruction 28). When read together, these instructions notified the jury that the presumption of innocence and the reasonable doubt standard must be applied in the specific case before it, eliminating any potential ambiguity in Instruction 17 on that score.

Still, Petitioner cites Chief Judge Winmill's conclusion in *Leavitt* that an identical instruction, when viewed in light of other "confusing and ambiguous instructions" in that case, diluted the State's burden of proof. (*Leavitt v. Arave,* Case No. CV 93-24-S-BLW, Docket No. 141, p. 15.) Petitioner argues that even though the district court's granting of relief was reversed on *Teague* grounds, its merits-based decision should control here. The Court disagrees and finds several material distinctions between the instructions in this case and the instructions given in *Leavitt.*

Absent here was an instruction that the jury "should," rather than "must," require the prosecution to prove each element of the offenses beyond a reasonable doubt. (*Leavitt v. Arave,* Case No. 93-024-S-BLW, Docket No. 120, pp. 93-94.) The court also did not instruct the jury not to "create sources or material of doubt by trivial and fanciful suppositions or by remote conjectures." (Case No. 93-024-S-BLW, Docket No. 141, p. 11.) Also absent was an instruction that placed the burden of proving an alibi on the defendant. (Case No. 93-024-S-BLW, Docket No. 120, p. 97, n. 35.)

Furthermore, the district court's decision in *Leavitt* must now be viewed through the lens of the Ninth Circuit's decision on appeal, and while the appellate court ultimately decided that Leavitt's claim was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

*Teague*-barred, it made several observations on its way to this conclusion that betrayed its skepticism with the merits-based decision. Perhaps most relevant is that the *Leavitt* panel did not believe that the surrounding instructions were as confusing, ambiguous, or misleading as the district court found them to be. *Id.* at 821. The Ninth Circuit was not overly concerned with instructing the jury that it "should," rather than "must," require proof beyond a reasonable doubt. *Id.* at 822. It was equally untroubled by the trial court's use of "moral evidence," "moral certainty," and "not mere possible doubt," noting that a nearly identical reasonable doubt instruction was upheld in *Victor. Id.* It also found unproblematic an instruction that informed the jury that the prosecution need not prove every fact in the case beyond a reasonable doubt, only every element of the crimes charged. *Id.* Though the Ninth Circuit did conclude that the trial court's alibi instruction erroneously placed a burden on the petitioner, it determined that the instruction did not play a significant role in the jury's understanding of reasonable doubt. *Id.* at 823.

**\*18** Accordingly, given that the entire set of instructions in this case properly and repeatedly informed the jury that Petitioner was entitled to the presumption of innocence and that the State was required to prove his guilt beyond a reasonable doubt, and in light of dispositive differences between the present case and *Leavitt,* this Court concludes that there is no reasonable probability that the jury understood its instructions as allowing conviction under a lower standard of proof.

### Claim 5: The "I did it" Statements

In this claim, Petitioner contends that the admission of statements that he had made after his arrest violated his Fifth and Fourteenth Amendment rights, as interpreted by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

1. *Factual Record Developed in State Court*

Petitioner was arrested by two Nevada law enforcement officers, but those officers did not interview or interrogate him. When Idaho officers Victor Rodriguez and Dennis Shaw arrived at the scene, Petitioner was handcuffed and bent over the trunk of a patrol car. As they approached, Petitioner turned toward them and said, "I did it." Detective Rodriguez then advised Petitioner of his rights. A Nevada officer saw Petitioner respond to Rodriguez by first nodding his head as if he understood his rights, and then, after Rodriguez said something else that the officer could not hear, shaking his head from side to side.

After a brief stop at the local police station, Petitioner was transported to a highway patrol substation for processing. Once there, Detective Shaw made a comment to the effect that if he had arrested Petitioner earlier, three victims would still be alive. In response, Petitioner again stated, "I did it." [FN6]

> [FN6.] The state court record reflects that Shaw followed this remark with something similar to "the girl in Blackfoot, and the two in Idaho Falls," to which Petitioner repeated, "I did it." At trial, reference to other victims was excluded. For simplicity, the Court will refer to Petitioner's combined comments at the substation as the second "I did it" statement.

The "I did it" statements were admitted into evidence at the Michelbacher and Baldwin trials, over Petitioner's objection, and would have been presented at a trial in the Haddon matter had Petitioner not entered a conditional guilty plea.

On appeal, the Idaho Supreme Court determined that Petitioner's first statement, which he made at the scene of the arrest, was admissible as a voluntary and spontaneous comment, regardless whether it occurred before or after he had been read his *Miranda* rights. *Rhoades I,* 820 P.2d at 675. With respect to the second statement at the highway patrol substation, the court found that although Shaw had engaged in the "functional equivalent of interroga-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

tion" while Petitioner was in custody, implicating *Miranda,* Petitioner's statement was admissible because he had been advised of his rights, which he indicated that he understood, and he had not invoked his right to silence. *Id.* at 675-76.

2. *Discussion*

In *Miranda,* the United States Supreme Court set forth the now familiar rule that before a law enforcement officer interrogates an individual who is in custody, the officer must inform the individual of his right to silence and his right to have the assistance of an attorney. 384 U.S. at 475-78. Absent a knowing and voluntary waiver of those rights, any statement taken during custodial interrogation will be excluded from evidence. *Id.* at 476. The prosecution has the burden to show a valid waiver, but such a waiver may be implied, rather than expressed, based upon a totality of the circumstances. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). A spontaneous and voluntary statement that is not the product of police interrogation or its functional equivalent will be admissible regardless whether the individual was warned of his rights. *Miranda,* 384 U.S. at 478.

**\*19** In the present case, the Idaho Supreme Court's finding that the first "I did it" statement was voluntary and not the product of police questioning is supported by the record. The officers who claimed to have heard the comment all testified that Petitioner blurted it out as the Idaho officers approached him. In *Miranda* itself, the Supreme Court noted that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." 384 U.S. at 478.

Regarding the second statement, this Court concludes that the Idaho Supreme Court's factual determinations that Petitioner was warned of his rights when he was arrested, he understood those rights, and he did not assert his right to silence when he shook his head, are all reasonable findings based upon the record that was before the court and

are presumed to be correct here. *Rhoades I,* 820 P.2d at 675-76. Although Petitioner argues that he invoked his right to silence by shaking his head negatively in response to something that Rodriguez said to him, he has not presented any evidence that would rebut the state court's factual finding to the contrary. The Idaho Supreme Court noted that while one police officer assumed that Petitioner was indicating that he did not want to answer questions, there was no conclusive evidence in the record to support that assumption. *Id.* at 675.

This Court also concurs with the Idaho Supreme Court that Detective Shaw's comment, which the state court found was "made to the defendant," amounted to the functional equivalent of interrogation for purposes of *Miranda.* Shaw's comment carried an implied accusation that Petitioner had committed three homicides, which was reasonably likely to elicit an incriminating response. *Rhode Island v. Innis,* 446 U.S. 291, 300-01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

However, the Idaho Supreme Court's application of the rule of constitutional law relating to an individual's waiver of *Miranda* rights is more problematic. The state court declared that, "the *Miranda* rule does not require police to maintain total silence toward the suspect until they are presented with a valid waiver of *Miranda* rights ... [a]fter rights are read to and acknowledged by the detainee and until the right to silence or counsel is asserted, the police may initiate questioning." *Id.* at 675. To the extent that the Idaho Supreme Court applied a rule that requires a defendant to shoulder a burden to affirmatively prove that he had invoked his right to silence or counsel, this was an incorrect statement of law. Rather, the *prosecution* must demonstrate that a defendant has waived his rights before a statement that was made during custodial interrogation will be admissible. *Miranda,* 384 U.S. at 475; *Butler,* 441 U.S. at 373. To the extent that the state court's ultimate decision was perhaps a less than artful determination that Petitioner had implicitly waived those rights, this Court agrees.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

**\*20** A waiver need not be expressed orally or in writing but instead may be implied based upon the facts and circumstances of the case. *Butler,* 441 U.S. at 373. Though silence alone is insufficient, a waiver may be "inferred from the defendant's understanding of his rights coupled with a course of conduct reflecting his desire to give up his right to remain silent and have the counsel of an attorney." *Fare v. Michael C.,* 442 U.S. 707, 724, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). That situation exists here.

Petitioner had been advised of his rights at the time of his arrest, and he indicated that he understood those rights. The state courts acknowledged that Petitioner may have been under the influence of narcotics, but they credited the officers' testimonies that he was alert enough to understand what was going on around him. *See Rhoades,* 822 P.2d at 971. This is a reasonable finding of fact based upon the record, and the presumption of correctness has not been rebutted. 28 U.S.C. § 2254(d). Further, this Court will not disturb the state court's finding that Petitioner did not invoke his right to silence by shaking his head in a negative fashion when he was detained.

The second "I did it" statement occurred relatively soon, though not immediately, after Petitioner's arrest and the reading of *Miranda* warnings. And while his statement may have been elicited by Detective Shaw's remark, it was not the product of a coercive interrogation in the classic sense of a lengthy interview designed to extract a full and detailed confession, nor was it even in response to pointed questioning. Rather, it was uttered during a brief exchange during the preliminary phases of booking and processing in which the arresting officer made an offhand comment. There is no showing that any officer used force, pressure, or trickery to disgorge a waiver or a confession from Petitioner. Under the totality of the circumstances shown by the evidence presented in state court, this Court concludes that Petitioner waived his *Miranda* rights when, with an awareness and understanding of

those rights, he responded to Shaw's comment.

In order to avoid this conclusion, Petitioner seeks to present evidence that was not developed in the state courts. He relies on a police report written by Detective Dennis Shaw and testimony that Shaw gave during a 1996 deposition. In his report, Shaw indicates that he had a brief exchange with Petitioner about an unrelated burglary while he was transporting Petitioner to the substation, before he made his second "I did it" statement:

> On the way to the police station I continued to talk with him. He was very uncomfortable as he was so large and the car did not give him much room. I told him I was disappointed in him and he had lied to me about the burglary. I had tried to believe him and give him a chance but he had lied and conned me. I said we need to talk about it now so that you can get it off your chest. He said, "Aw bullshit, I don't want to talk about it. Get these fuckin cuffs off me."

**\*21** (Shaw Depo., Exhibit 5, p. 70.)

At his deposition, Detective Shaw described the situation as follows:

> When we were in the car and I started to talk to him about-I was talking about [the burglary of] Lavaunda's Lingerie and only Lavaunda's Lingerie in the car because I wanted to start chronologically and get this whole thing-you know, I wanted to start there because that's where my warrant was. And he said he didn't want to talk about it, get these handcuffs off of him because it was cramped in that car, and it was cramped. It was cramped for me and I'm pretty good sized, too, so I understood that, and so I-when we got inside I took the handcuffs off and then we, you know, proceed to talk.

(Shaw Deposition, pp. 81-82.)

Petitioner seeks to include this evidence to support his contention that rather than waive his rights, he specifically invoked his right to silence about the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

murders. This Court previously found that he had been given full and fair opportunities to develop these facts in state court and that he had not shown cause and prejudice for his failure to do so. (Docket No. 167, pp. 9-12.) The Court has since excused the default of Petitioner's allegations of ineffective assistance of trial counsel, opening the possibility that Petitioner could now argue that his counsel's ineffectiveness led to his failure to develop this evidence. He has raised an analogous claim in this proceeding based upon his trial counsel's alleged deficiencies with respect to litigating the motion to suppress. (Docket No. 252, pp. 32-33, Claim 23 (xvii)). Regardless, even if the new evidence is taken into consideration, the Court concludes that Petitioner would still not be entitled to relief.

The brief exchange in the patrol car involved an unrelated burglary, not the murder of Stacy Baldwin, and when Petitioner said that he "didn't want to talk about it, get these handcuffs off," he was apparently complaining about the cramped conditions of the car. Shaw understood Petitioner's comment to mean that he did not want to discuss the burglary charge until he was out of the car and free from the uncomfortable conditions. (Shaw Depo., p. 82.) This was a reasonable interpretation under the circumstances, and Petitioner's remark was at most an ambiguous or equivocal statement regarding his right to silence.

In a related context, the Supreme Court has held that an ambiguous reference to the assistance of counsel is insufficient to invoke that particular right under *Miranda* or to shut down further police questioning. *Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). While neither the Supreme Court nor the Ninth Circuit has yet concluded whether the *Davis* rule applies to an ambiguous invocation of the right to silence, several jurisdictions have so held, and this Court is persuaded by their reasoning. *See, e.g. Simmons v. Bowersox,* 235 F.3d 1124, 1131 (8th Cir.2001); *United States v. Hurst,* 228 F.3d 751, 759-60 (6th Cir.2000); *United States v. Banks,* 78 F.3d 1190,

1198 (7th Cir.1996), *vacated on other grounds by Mills v. United States,* 519 U.S. 990, 117 S.Ct. 478, 136 L.Ed.2d 373 (1996); *Medina v. Singletary,* 59 F.3d 1059, 1100 (11th 1995); *cf. Evans v. Demosthenes,* 98 F.3d 1174, 1176 (9th Cir.1996) (concluding that the issue need not be resolved). Because Petitioner's comment in the patrol car did not constitute a clear and unambiguous invocation of his right to cease all discussion, he has misplaced his reliance on *Michigan v. Moseley,* 423 U.S. 96, 103, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (holding that the police must "scrupulously honor" a suspect's invocation of his right to silence).

### Claim 7: *Idaho Code § 19-2719*

**\*22** Petitioner claims that the application of Idaho's special capital post-conviction statute, Idaho Code § 19-2719, violated his Fourteenth Amendment rights to equal protection and due process of law.

Idaho's special post-conviction statute requires a capital defendant to raise all known legal or factual challenges to his conviction or sentence in one application for post-conviction relief within forty-two days of sentencing. Idaho Code § 19-2719(3). The direct appeal is held in abeyance pending completion of the post-conviction proceeding, and the appeal from the post-conviction matter is consolidated with the direct appeal. Idaho Code § 19-2719(6). Claims that were known or reasonably should have been known at the time of the first post-conviction proceeding are forfeited if they were not included in that proceeding. Idaho Code § 19-2719(5).

Petitioner's equal protection challenge is based upon the discrepancy between the forty-two day statute of limitations for capital defendants and, at the time of his case, the five year statute of limitations for non-capital defendants. Petitioner has not shown that convicted capital defendants are a suspect or protected class, or that a particular type of state post-conviction procedure is a fundamental right, such that strict scrutiny must be applied to the statute. *See, e.g., Dickerson v. Latessa,* 872 F.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

1116, 1119 (1st Cir.1989) (holding that requiring a defendant convicted of a capital offense to obtain permission to appeal the denial of a post-conviction motion does not deny equal protection). Rather, the appropriate question is whether there is a rational basis for the State's decision to treat convicted capital defendants differently from non-capital defendants with respect to the time available in which to seek post-conviction relief. *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Under this standard, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440. Idaho's statute survives this modest review.

In enacting Idaho Code § 19-2719, the Idaho Legislature expressed the State's interest in eliminating unnecessary delay in carrying out a valid death sentence. The orderly and expeditious processing of collateral actions in capital cases is a legitimate governmental interest. *Cf. Barefoot v. Estelle,* 463 U.S. 880, 886-88, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983); *see also Murch v. Mottram,* 409 U.S. 41, 45-46, 93 S.Ct. 71, 34 L.Ed.2d 194 (1972). Because the timeliness and waiver provisions of the statute are rationally related to this legitimate interest, the provisions withstand Petitioner's equal protection challenge. *Fetterly v. Paskett,* 747 F.Supp. 594, 600-01 (D.Idaho 1990) *remanded on other grounds* by 997 F.2d 1295 (9th Cir.1993).

Petitioner next asserts that the shortened time period, apparently combined with the state court's failure to appoint new counsel for him during the post-conviction matter, deprived him of federal due process of law. Petitioner appears to argue that the interplay of the time limitation and the lack of new counsel prevented him from raising claims of ineffective assistance of trial counsel in state court. Whatever could be said about the operation of Idaho Code § 19-2719 to bar such claims, *see Hoffman v. Arave,* 236 F.3d 523 (9th Cir.2001), this Court has since excused Petitioner's default, and those issues are now being considered on the mer-

its. Thus, Petitioner can show no injury or prejudice. As to all other constitutional claims, the Court reaffirms its decision that the statute, as interpreted by the Idaho Supreme Court, comports with the due process baseline of providing capital defendants with adequate notice and a reasonable process in which to challenge their convictions and sentences. *Hoffman v. Arave,* 73 F.Supp.2d 1192, 1212-23 (D.Idaho 1998) *reversed and remanded on other grounds by* 236 F.3d 523 (9th Cir.2001); *Fetterly v. Paskett,* 747 F.Supp. 594, 600-01 (D.Idaho 1990) *remanded on other grounds by* 997 F.2d 1295 (9th Cir.1993).

**\*23** Accordingly, Petitioner has not shown that he is entitled to relief under either an equal protection or a due process theory.

### *Claim 8: Victim Impact Statements*

Petitioner next alleges that the "trial court, in imposing sentence upon Petitioner, relied upon inadmissible victim impact statements in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States." (Docket No. 252, p. 20.)

In *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Supreme Court held that the introduction of victim impact evidence at the sentencing phase of a capital trial violates the Eighth Amendment. Four years later, in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Court overruled *Booth* in part, holding that evidence regarding the personal characteristics of the victim and the impact of the victim's death on his or her family was not *per se* inadmissible. *Id.* at 829. The *Payne* Court did not decide whether statements from family members about the crime, the defendant, or the appropriate punishment would also be admissible. *Id.* at 829 n. 2. Thus, the portion of *Booth* that prohibited that type of evidence has apparently survived *Payne.*

In support of his claim, Petitioner relies on the fol-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

lowing statements by members of Stacy Baldwin's family, which were reported by the presentence investigator:

> [Stacy Baldwin's husband] states that he wants the maximum sentence given to the man who killed Stacy. He added that he believes in the death sentence. Mr. Baldwin further indicated "I don't want him ever to have the chance to do this to anyone else."

> * * *

> [Baldwin's mother-in-law] related that [the family] favors a death sentence in this case.

> * * *

> [Baldwin's mother] stated "I hope he burns in hell for what he did to Stacy. I'm glad she fought him." She added "I approve of Capitol [sic] punishment."
> (Presentence Investigation Report, pp. 2-3.)

The Idaho Supreme Court found that these comments fell within the category of statements that the United States Supreme Court had determined were improper under *Booth. Rhoades I,* 820 P.2d at 678-79. The state court did not discuss *Payne,* but because the portions highlighted above are opinions about the appropriate punishment, they would have still been inadmissible even after *Payne.*

The Idaho Supreme Court nonetheless found any error to be harmless beyond a reasonable doubt. *Id.* at 679. This Court agrees. It is of no small import that the sentencer in this case was a judge, who is presumed to follow the law and to exclude inadmissible evidence from his consideration. *See Beaty v. Stewart,* 303 F.3d 975, 985 (9th Cir.2002) ("[w]hen a judge, as opposed to the jury, reviews victim impact statements, we presume that the judge properly applied the law and considered only the evidence submitted"). Additionally, there is no indication that the family's statements influenced or

swayed the trial court beyond the evidence that it had already heard by presiding over the trial and the sentencing hearing. This Court is satisfied, beyond a reasonable doubt, that any error did not contribute to the trial court's decision to impose death sentences. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[FN7]

> FN7. Because the Court concludes that any error would be harmless under *Chapman,* it does not need to resolve whether the more stringent test under *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) is applicable to this claim.

### Claims 9, 10, 11, and 12: Challenges to the Aggravating Factors for Murder

**\*24** In these four related claims, Petitioner brings various challenges to the aggravating circumstances that the state court found to support a death sentence for first-degree murder.

Under Idaho law, a defendant convicted of first-degree murder is eligible to be sentenced to death if the sentencer finds at least one statutory aggravating circumstance beyond a reasonable doubt. Idaho Code § § 18-4004, 19-2515(c). In this case, the state court found five such circumstances: (1) based upon Petitioner's convictions in the Michelbacher and Haddon matters, Petitioner had been "previously convicted of another murder" (Idaho Code § 19-2515(g)(1) (1987));[FN8] (2) the murder in this case was "especially heinous, atrocious, or cruel, manifesting exceptional depravity" (Idaho Code § 19-2515(g)(5)); (3) Petitioner exhibited "an utter disregard for human life" (Idaho Code § 19-2515(g)(6)); (4) the murder qualified as "felony murder" accompanied "with the specific intent to cause the death of a human being" (Idaho Code § 19-2515(g)(7)); and (5) "by prior conduct or conduct in the commission of the murder at hand, [Petitioner] has exhibited a propensity to commit murder which will constitute a continuing threat to society" (Idaho Code § 19-2515(g)(8)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 22

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

FN8. The Court will cite the specific statutory subsections as they existed at the time of Petitioner's sentencing.

The state court concluded that "the mitigating circumstances did not outweigh the gravity of the statutory aggravating circumstances so as to make unjust the imposition of the death penalty." (R. Vol. III, p. 788.) During the post-conviction proceeding, the court clarified that it had weighed all of Petitioner's mitigating evidence against each aggravating circumstance found to exist individually, and it had concluded that each aggravating circumstance outweighed all of the mitigating evidence combined. (PCR R. III, pp. 144-145.)

1. *Heinous, Atrocious, or Cruel*

In Claim 10, Petitioner alleges that Idaho's "heinous, atrocious, or cruel" (HAC) statutory aggravating factor is unconstitutionally vague under the Eighth and Fourteenth Amendment.

To minimize the risk of wholly arbitrary and capricious infliction of a death sentence, states seeking to impose the death penalty must sufficiently narrow the sentencer's discretion. *See, e.g., Gregg v. Georgia,* 428 U.S. 153, 189, 206-207, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). A state's death penalty "system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing ... could occur." *Id.* at 195 n. 46. Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes assert that the challenged provision fails adequately to inform sentencers of what they must find to impose the death penalty. *Maynard v. Cartwright,* 486 U.S. 356, 361-62, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

By the time of Petitioner's sentencing in this case, the Idaho Supreme Court had placed a limiting construction on the words, "especially heinous, atrocious, or cruel, manifesting exceptional depravity."

In *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (Idaho 1981), the court concluded that:

**\*25** especially heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies-the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*Id.* at 200 (quoting *State v. Dixon,* 283 So.2d 1, 9 (Fla.1973)). In *Leavitt v. Arave,* 383 F.3d 809, 836-37 (9th Cir.2004), the Ninth Circuit turned aside a vagueness challenge and held that *Osborn's* limiting construction provided sufficient guidance to district courts in Idaho for making principled distinctions between those who deserve the death penalty from those who do not. That finding applies with equal vigor here, and Petitioner's claim is resolved by *Leavitt.*

Petitioner next contends that even if the HAC aggravator survives an attack on vagueness grounds, "nothing more than speculation" supported the trial court's finding that it was supported by the evidence in this case. This Court disagrees.

A reviewing court must uphold the application of a constitutionally valid aggravating circumstance if, after viewing the evidence in a light most favorable to the prosecution, the court concludes that any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Lewis v. Jeffers,* 497 U.S. 764, 781, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). Viewing the evidence in a light most favorable to the prosecution here demonstrates that Petitioner forcefully abducted Stacy Baldwin from her place of employment, took her to a secluded spot, attempted to attack her sexually, and, when that failed, shot at her numerous times

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

from behind, perhaps while she attempted to escape. Several of Petitioner's shots missed Baldwin, ricocheting into the ground around her, before he fatally struck her in the back. That wound caused internal bleeding and the accumulation of air in Baldwin's chest cavity while she continued to inhale for a period of time before she died. (Tr. Vol.VI, pp. 1459-60.)

Although Petitioner may be able to conceive of killings that are designed to inflict a higher degree of pain or involve a greater degree of torture, it is sufficient for present purposes that a rational trier of fact could find beyond a reasonable doubt that these facts amounted to a conscienceless or pitiless crime that was unnecessarily torturous to Baldwin. The trial court's finding of the HAC aggravator shall be upheld.

2. *Utter Disregard*

In Claim 12, Petitioner contends that the evidence was insufficient to show that Petitioner exhibited an "utter disregard for the value of human life."

In *Osborn,* the Idaho Supreme Court also applied a narrowing construction to this aggravating circumstance, limiting it to the "acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer." *Osborn,* 631 P.2d, at 200-201. In *Creech v. Arave,* 507 U.S. 463, 473, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993), the United States Supreme Court held that this limiting construction was sufficiently definite to comply with the Eighth Amendment. The Supreme Court noted that a "cold blooded, pitiless slayer" is one who kills without feeling or sympathy, and that a sentencer could find this fact objectively based upon the defendant's "attitude toward his conduct and his victim." 507 U.S. at 472-73.

**\*26** In finding the "utter disregard" circumstance in this case, the trial court noted that Baldwin lived for a significant period of time after she was shot.

(R. III, p. 780.) The evidence, again viewed in a light most favorable to the State, supports that finding, based upon the pathologist's testimony regarding Baldwin's aspiration of vomit and the accumulation of two quarts of blood and air in her chest. (Tr. Vol.VI, pp. 1455, 1458-59.) The evidence further shows that Petitioner briefly considered dumping Baldwin in a trash bin, but then decided against that course of action because he didn't want to get bloody, so he simply left her to die where she had fallen. (Tr. Vol.VI, p. 1533.) After committing this crime, he met an acquaintance at a local restaurant for a cup of coffee. (Tr. Vol. V, p. 1260, 1372; Tr. VI, pp. 1533.)

While Petitioner quibbles with the trial court's conclusion that Baldwin lived for ninety minutes after she was shot, it is reasonably clear from the record that the pathologist believed that Baldwin lived for some period of time. He testified that "it's difficult to estimate how long a person responds to a fatal injury," and that Baldwin may have lived for "an hour or so." (Tr. Vol.VI, p. 1460.) The evidence is therefore sufficient to support a finding that the victim died relatively slowly in the cold while Petitioner went about his business. On this record, a rational factfinder could conclude that Petitioner's "attitude toward his conduct and his victim" was that of a "cold blooded, pitiless slayer," one who killed without feeling or sympathy.

3. *Previously Convicted of Another Murder*

Petitioner contends that the statutory aggravating circumstance that the defendant has been "previously convicted of another murder" is unconstitutionally vague. (Claim 9). As an initial matter, the Court notes that the statutory language appears to be unambiguous and requires only that a previous *conviction* for a murder exist before the defendant is sentenced, regardless of the timing of the *commission* of the other murder. That is precisely what the trial court determined. (R. III, p. 779.)

Regardless, this Court has already concluded that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

the HAC and utter disregard aggravating circumstances are constitutional as limited by the Idaho Supreme Court and were supported by the evidence in this case, and Petitioner does not challenge the separate aggravating factor that he committed a felony murder with the specific intent to kill. Further, despite the ambiguity in the state's court's original findings after the sentencing hearing with respect to whether it had weighed all mitigating evidence against each aggravator individually (R. Vol.III, pp. 775-76, 788), during the post-conviction matter it clarified that it had "weighed the mitigating circumstances collectively against each separate aggravating circumstance found to exist." (PCR, p. 144.) Accordingly, even if this aggravating factor were eliminated from consideration, the result would be the same, and any error would be harmless. See *Pizzuto v. Arave,* 280 F.3d 949, 970-71 (9th Cir.2001).

### Claim 13: Double Counting of the Aggravating Circumstances

**\*27** Petitioner asserts that the trial court violated a state rule against relying on the same facts to support different aggravating circumstances, as set forth in *State v. Caudill,* 109 Idaho 222, 706 P.2d 456 (Idaho 1985) and *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (Idaho 1981). Petitioner has not provided any federal case authority for this claim. *Cf. Jones v. United States,* 527 U.S. 373, 398-99, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (noting that the Supreme Court has never before held that allegedly duplicative or double counted aggravating circumstances would pose a constitutional problem). But to the extent that the issue is reviewable, Petitioner has failed to show prejudicial error. He does not challenge the felony murder aggravator, and even if two of the four allegedly "double counted" circumstances were removed from consideration, three aggravators would remain undisturbed and supported by sufficient evidence. Because the trial court determined that the collective mitigating evidence did not outweigh any of the aggravating factors individually, Petitioner would not be en-

titled to relief either under state law, *Sivak v. State,* 127 Idaho 387, 901 P.2d 494, 499 (Idaho 1995), or federal law, *Pizzuto v. Arave,* 280 F.3d 949, 970-71 (9th Cir.2001).

### Claims 15, 16, 17, and 18: The Death Sentence for Kidnapping

In addition to imposing a death sentence for murder, the trial court sentenced Petitioner to death for first-degree kidnapping under the authority of Idaho Code § 18-4505. (Tr. X, pp. 2630-31.) Petitioner challenges this sentence, claiming that "[a] sentence of death for a crime less than murder is a violation of [his] rights under the Eighth Amendment to the Constitution of the United States, and grossly disproportionate to the offense. *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); *Edmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)." (Docket No. 252, p. 26.)

In *Coker,* the Supreme Court held that a death sentence for the offense of rape is prohibited by the Eighth Amendment because the penalty is excessive and grossly disproportionate to that crime. *Id.* at 598. The Court emphasized, though, that the scope of its decision was limited to circumstances involving the rape of an adult woman who was not killed:

> We have the abiding conviction that the death penalty, which 'is unique in its severity and irrevocability,' [citation omitted] is an excessive penalty for the rapist who, as such, *does not take human life.*
>
> * * *
>
> It is difficult to accept the notion, and we do not, that the rapist, with or without aggravating circumstances, should be punished more heavily than the deliberate killer *as long as the rapist does not himself take the life of his victim.*
> *Coker,* 433 U.S. at 598, 600 (emphasis added). In

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

a memorandum opinion issued the same day, the Supreme Court also found that a defendant's death sentence for kidnapping violated the Eighth Amendment, but, as in *Coker,* the victim had not been killed. *Eberheart v. Georgia,* 433 U.S. 917, 97 S.Ct. 2994, 53 L.Ed.2d 1104 (1977) (reversing *Eberheat v. State,* 232 Ga. 247, 206 S.E.2d 12 (Ga.1974)).

**\*28** Five years later, the Court applied *Coker* to conclude that the Eighth Amendment prohibits a death sentence for a defendant who aided and abetted the commission of another felony that resulted in death, but who did not kill, attempt to kill, or contemplate that a life would be taken. *Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *but cf. Tison v. Arizona,* 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (holding that a death sentence does not offend the Eighth Amendment when the defendant was substantially involved in the crime that led to the victim's death, and the defendant had at least a reckless disregard for human life).

Some courts have since construed *Coker* and its progeny as not erecting a *per se* bar on the death penalty for the crime of kidnapping when that crime resulted in the victim's death. In *State v. Coleman,* 185 Mont. 299, 605 P.2d 1000, 1017 (Mont.1979), the Montana Supreme Court rejected an Eighth Amendment challenge to the defendant's death sentence for aggravated kidnapping, noting that *Coker* "is relevant only to crimes for which the penalty has been imposed which did not result in the loss of a life." *Accord McKenzie v. Osborn,* 195 Mont. 26, 640 P.2d 368, 381 (Mont.1981); *see also State v. Keith,* 231 Mont. 214, 754 P.2d 474, 482-83 (Mont.1988) (reaffirming the analysis). Similarly, in upholding a death sentence for aggravated kidnapping, the Kentucky Supreme Court has distinguished *Coker* and *Eberheart* on the ground that "in neither of those cases was the victim of the rape and kidnapping also murdered." *Salinas v. Commonwealth,* 84 S.W.3d 913, 916 (Ky.2002).

This Court is persuaded that these subsequent cases

have correctly interpreted the proper scope of *Coker* and its progeny, and the Court concludes that the Eighth Amendment does not automatically prohibit a death sentence when a kidnapping results in an intentional death. Here, of course, Petitioner intentionally killed Stacy Baldwin, a fact that was found by the trial court in its written findings in support of the death sentence for kidnapping. (R., Vol.III, p. 783.) While this Court has little doubt that a death sentence could be imposed under Idaho Code § § 18-4504-4505 when the victim has not been killed, which would raise grave constitutional questions, this is not such a case. The Court will leave for another day the constitutional issues that would arise in that scenario.

Petitioner next contends that the aggravating circumstances that the trial court relied upon to impose the death sentence for kidnapping are unconstitutionally vague. The trial court found that three statutory circumstances from Idaho Code § 18-4505 existed for the kidnapping conviction:

(a) "The victim of the kidnapping was subjected by the kidnapper to torture ... the intentional infliction of grievous mental or physical injury." At the time the defendant kidnapped Mrs. Baldwin, he intended to take her to a secluded spot, rape her, and then shoot her.

\* \* \*

The transportation from the Red Mini Barn in Blackfoot to the secluded spot on Rose Road-a distance of several miles-inflicted grievous mental injury and the attack and subsequent shooting which caused Mrs. Baldwin to lay wounded for over an hour before she died, constitutes, beyond a reasonable doubt, torture and grievous physical injury. The defendant, at the time, intended to inflict the harm upon his victim. [Idaho Code § 18-4505(6)(a) ]

**\*29** (b) "The defendant knowingly created a great risk of death to any person, including the kid-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

napped." The defendant, without a doubt, intended at the time he abducted the victim that she would die. [Idaho Code § 18-4505(6)(b) ]

(c) "The kidnapping was especially heinous, atrocious, or cruel, manifesting exceptional depravity." The defendant did not know the victim. Considering the victim's sensibilities and fear of attack and the circumstances surrounding the un-called-for-abduction at gunpoint, and the purpose of the kidnapping, the Court finds beyond a reasonable doubt that, the abduction was especially heinous, atrocious, cruel, and manifested exceptional depravity. [Idaho Code § 18-4505(6)(d) ]

(R. Vol.III, pp. 782-83.) (Quotation marks in original.)

As noted, in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (Idaho 1981), the Idaho Supreme Court placed a limiting construction on "especially heinous, atrocious, or cruel, manifesting exceptional depravity," as that language appeared in Idaho Code § 19-2515(g)(5). The Ninth Circuit Court of Appeals has upheld the *Osborn* construction. *Leavitt v. Arave,* 383 F.3d 809, 836-37 (9th Cir.2004). Though *Osborn's* analysis was directed at the HAC aggravator found in Idaho Code § 19-2515, which was applicable to defendants who have been convicted of murder, and the court did not expressly mention Idaho Code § 18-4505(6), there is no reason that the limiting construction does not apply equally to the identical language in that statutory subsection.

Here, the state court cited *Osborn* in its findings (R. Vol.III, p. 780), and it is presumed to have known that it must find that the kidnapping and associated acts that resulted in the killing were conscienceless, pitiless, and unnecessarily torturous to the victim. Accordingly, the sentencer was provided sufficient guidance, and its discretion was sufficiently narrowed, to comply with the Eighth Amendment.

Additionally, contrary to Petitioner's argument, a rational finder of fact could have found this aggravating circumstance to exist beyond a reasonable doubt. That evidence showed that Stacy Baldwin was a random kidnapping victim selected by Petitioner. She would not willingly leave the Mini Barn, and it can be inferred that Petitioner forced her to do so at gunpoint. Petitioner told David Holm that he intended to sexually assault Baldwin while he held her against her will, but that he was unable to complete this mission because she was hysterical and fighting with him. There is some evidence of a struggle between Petitioner and Baldwin. Petitioner told Baldwin to pray, shot at her several times in the dark, and left her in the snow after she had been shot. A rational factfinder could have found that the kidnapping that resulted in the homicide was conscienceless, pitiless, and unnecessarily torturous to the victim. Additionally, because the court weighed all mitigating circumstances against each aggravating circumstance individually, any constitutional infirmities in the other aggravating circumstances would be harmless. *See Pizzuto v. Arave,* 280 F.3d 949, 970-71 (9th Cir.2001).

**\*30** Finally, Petitioner contends that the imposition of a death sentence for the crime of kidnapping, when kidnapping was an underlying felony supporting the felony murder charge, violated his right against "double jeopardy as guaranteed by Idaho law" under *State v. Sivak,* 112 Idaho 197, 731 P.2d 192, 206 (Idaho 1986). (Docket No. 252, pp. 27-28.) Petitioner's attempt to transform what appears to be a state law issue into a federal one simply by citing the Eighth and Fourteenth Amendments is unavailing. *Estelle v. McGuire,* 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

Assuming that there is a cognizable federal claim here, Petitioner still would not be entitled to relief. Though his argument is somewhat unclear, he seems to contend that: (1) to the extent that the murder conviction was based on a theory that a killing occurred during the course of a kidnapping (felony murder), the kidnapping conviction merged with the conviction for first-degree murder; (2) because of merger, the kidnapping could not be used to support the felony murder aggravating circum-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

stance; and (3) because there was insufficient evidence to show a robbery or attempted rape, the alternative bases for felony murder, the error was not harmless. This Court is not persuaded.

Petitioner was charged with murder in the first degree on alternative theories of premeditated homicide and felony murder (R. Vol.II, p. 123-24), and the jury found him guilty under both theories. (R. Vol.III, pp. 658-59, 688.) The felony murder verdict and the subsequent analogous aggravating circumstance were predicated on the commission or the attempt to commit the crimes of kidnapping "and/or" rape "and/or" robbery. (R. Vol.III, pp. 658-59, 688.)

Contrary to Petitioner's argument that the evidence was insufficient to support the non-kidnapping alternatives, at the very least a rational factfinder could determine beyond a reasonable doubt that Petitioner killed Baldwin during the perpetration of a robbery. His assertion that robbery was complete before Baldwin was murdered is not persuasive, and a more plausible interpretation of the evidence is that all of these crimes, including the taking of cash from the Mini Barn and the theft of Baldwin's watch, occurred during a continuous stream of events. *See State v. Fetterly,* 109 Idaho 766, 710 P.2d 1202, 1207-08 (1985) (holding that a felony murder conviction can be based upon an underlying crime that occurred first during a unbroken chain of events culminating the victim's death). As there was ample evidence to support robbery/felony murder, the Court sees no reason to discuss whether the evidence was also sufficient to establish an attempted rape.

Therefore, because Petitioner's conviction and punishment for first-degree murder, either as a premeditated homicide or as a felony murder, would stand independently of the kidnapping conviction, Petitioner has not established prejudicial error.

### Claim 23: Ineffective Assistance of Counsel

Petitioner raises twenty-eight separate instances of ineffective assistance of counsel at trial, sentencing, and on appeal. In a comprehensive Memorandum Decision and Order, dated May 18, 2006, this Court determined that Petitioner was not entitled to an evidentiary hearing on nearly all of these issues. [FN9] (Docket No. 312.) For most of these subclaims, the Court found that even if the factual allegations were proven to be true, Petitioner would not be entitled to relief. The Court will not cover this ground a second time. Thus, where noted herein, the Court incorporates that analysis and will deny relief on selected subparts or issues without further comment.

> FN9. The Court reserved its evidentiary hearing ruling regarding counsel's alleged failure to conduct a reasonable mitigation investigation. (Docket No. 312, p. 1.)

### 1. *Standard of Law*

**\*31** To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that his counsel's performance fell below an objective standard of reasonableness and that the defense was prejudiced as a result. *Strickland v. Washington,* 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In assessing whether counsel's performance was unreasonable, counsel's conduct must be viewed as of the time that the challenged act or omission occurred, and every effort must be made to eliminate the distorting lens of hindsight. *Id.* at 689. To prove prejudice, the petitioner must demonstrate that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different. *Strickland,* 466 U.S. at 684. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* at 694.

The *Strickland* standard also applies to claims of ineffective assistance of counsel on direct appeal. *Smith v. Robbins,* 528 U.S. 259, 286, 120 S.Ct. 746,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

145 L.Ed.2d 756 (2000). Generally, to show unreasonable representation, an omitted issue must have been "significant and obvious" on the record and clearly stronger than the issues that were raised. *See, e.g., Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1985); *Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir.1989). To show prejudice, the petitioner must demonstrate that had counsel presented the issue on appeal, there is a reasonable probability that the appellate court would have reversed. *Robbins,* 528 U.S. at 288.

Unless the petitioner can show both deficient performance and prejudice, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland,* 466 U.S. at 687.

### 2. *Handling of the Insanity Issue*

Petitioner first contends that his trial counsel, David Parmenter, "perpetrat[ed] a fraud upon the state courts by pursuing an insanity issue knowing there was no factual basis for the defense." (Docket No. 252, p. 30.) This Court previously determined that Petitioner has not established a colorable Sixth Amendment claim with respect to counsel's actions prior to trial, as he has alleged no specific facts showing that counsel's "pursuit" of the insanity issue was unreasonably deficient or, even if it were, that it resulted in actual prejudice. (Docket No. 312, pp. 4-5.) To the extent that Petitioner claims that Parmenter's focus on this issue prevented him from developing other psychological evidence in mitigation of punishment at sentencing, that matter is discussed below.

Petitioner also appears to argue that counsel should have excluded from the appeal an issue related to the abolition of the insanity defense. This argument lacks merit, as he has failed to show that had counsel not raised that issue, there is a reasonable probability that the Idaho Supreme Court would have reversed. *Robbins,* 528 U.S. at 288.

### 3. *Failure to Call Eyewitnesses*

**\*32** For his next subclaim, Petitioner contends that trial counsel was constitutionally ineffective in failing to call "critical eyewitnesses" to the Baldwin abduction. The scope of this claim has shifted through time, but Petitioner seems to argue primarily that counsel was remiss in not calling Loretta Wallace to testify about her description of the man that she saw leaving the Mini Barn.

The Court reaffirms its decision that Petitioner has failed to show a colorable claim of ineffective assistance of counsel. (Docket No. 312, pp. 7-8.) Through his cross-examination of Carrie Baier and Detective Newbold, Parmenter was successful in eliciting evidence that the three girls' initial descriptions of the suspect did not match Petitioner, and he emphasized that point during his closing argument. To the extent that Petitioner contends that Wallace would have added that she had described the suspect's vehicle as a green pickup, presumably similar to the pickup that was found abandoned on the highway, that information was also before the jury. (Tr. Vol.IX, p. 2426.)

Accordingly, Petitioner has not shown that counsel's performance was unreasonably deficient, nor has he demonstrated a reasonable probability of a different outcome had Wallace testified. The Court sees no reason to repeat its analysis from the May 18, 2006 Memorandum Decision related to any other potential eyewitnesses. (Docket No. 312, pp. 7-8.)

### 4. *Failure to Preserve Attorney/Client Privilege and Attorney Work Product*

The Court reaffirms its decision that this allegation is conclusory, especially related to prejudice. (Docket No. 312, p. 8.)

### 5. *Proposing or Failing to Object to Constitutionally Defective Jury Instructions (subparts iv, v, xix)*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

Petitioner contends that his counsel was ineffective in proposing jury instructions and in failing to object to the instructions that were given relating to the State's burden of proof. Because this Court has now determined that there is no reasonable likelihood that the jury understood the instructions as allowing a conviction on proof less certain that beyond a reasonable doubt, Petitioner can show no prejudice.

Even if trial counsel had objected to the "protect the innocent" instruction (Instruction 17), and assuming that the instruction would have then been omitted from the packet given to the jury, Petitioner has not shown there is a reasonable probability that he would have been acquitted or convicted of a lesser offense. Likewise, he has not established that there is reasonable probability that he would have prevailed on appeal had this issue been raised. (Claim 23, subpart xix.)

4. *Failure to Challenge the Aggravating Factors, Argue that the Sentences Were Imposed Under the Influence of Passion or Prejudice, or Argue that the Penalty for Kidnapping was Disproportionate (subpart vi)*

(a) *Aggravators for Murder*

Given that the Idaho Supreme Court had already narrowed the HAC and utter disregard aggravating factors, and in light of the evidence supporting those factors in this case, there is no reasonable probability that, had counsel objected, the trial court would have eliminated those factors from its consideration. Petitioner has also not demonstrated that a challenge to the "previously convicted of another murder" circumstance would have been sustained, as the trial court specifically found that timing of the commission of the other murder was irrelevant. Further, David Parmenter did, in fact, allege during the post-conviction proceeding that the trial court had "double counted" some of the aggravators, and the trial court indicated that it had not done so.

*33 In short, Petitioner has not alleged facts showing unreasonably deficient performance with respect to the aggravators for murder, or, more importantly, a reasonable probability of a different sentence.

(b) *Death Sentence for Kidnapping*

The United States Supreme Court has not held that a death sentence for kidnapping is unconstitutional when the victim has been killed, and at least the HAC aggravating circumstance, as interpreted by the Idaho Supreme Court, is not unconstitutionally vague and is supported by the evidence. Thus, even assuming that a reasonably competent defense attorney would have litigated these issues in state court, Petitioner has not demonstrated a reasonable probability the death sentence for kidnapping would not have been imposed or would have been vacated or reversed on appeal.

(c) *Failing to Argue Against a Death Sentence*

Contrary to Petitioner's argument, defense counsel put on evidence in an effort to show Petitioner's redeeming qualities, and he pressed several points that he believed mitigated the punishment and called for sentence less than death. The nature of an attorney's closing argument is generally considered to be a matter of trial tactics. *Bell v. Cone,* 535 U.S. 685, 701-02, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

Regardless, Petitioner has failed to establish a reasonable probability that the trial court would have been persuaded by a more frontal attack against the death penalty, particularly in light of the weight supporting the aggravating circumstances in this case.

7. *Failure to Call Inmate Witnesses to Impeach David Holm's Testimony*

The Court reaffirms its decision that counsel's per-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

formance in this regard was not unreasonably deficient and that Petitioner cannot show any prejudice from the absence of any marginal impeachment material, particularly given that Parmenter focused a large portion of the defense case on discrediting Holm. (Docket No. 312, pp. 8-9.)

8. *Failure to Call Witnesses at Trial to Testify that Detective Shaw Supplied Marijuana to David Holm While Holm was Incarcerated*

Petitioner has failed to name any witnesses who can confirm this claim. It is conclusory and will be denied on that basis. (Docket No. 312, pp. 9-10.)

9. *Permitting a Ballistics Report to be Disclosed to the State and Failing to Call and Expert to Rebut the State's Ballistics, Hair, and Footprint Evidence (subparts ix and xi)*

The Court reaffirms its decision that Petitioner has not alleged any specific facts from which the Court could find actual prejudice flowing from trial counsel's failure to shield from the prosecution the negative opinion of ballistics expert Ned Stuart, or from counsel's failure to call Richard Fox or another expert to rebut the State's ballistics, hair, or footprint evidence. (Docket No. 312, pp. 10-11.) The only matter that requires additional comment here is Petitioner's argument that Fox should have been called to testify solely about the hair and footprint evidence, irrespective of his testimony as to the ballistics, thereby removing the threat of rebuttal testimony from Stuart. (Docket No. 316, p. 40.)

**\*34** There is no indication in this record that Fox had significant training and experience in hair and footprint examination; rather, Parmenter has testified that Fox was more of a generalist with some unusual theories about ballistics testing. (Parmenter Depo. p. 49.) With respect to the hair evidence particularly, counsel testified that Fox would not have provided "a whole lot of help in that area." (Parmenter Depo., p. 49.) Additionally, Parmenter had already argued at trial that the hair evidence did

not show a "match" but only some consistencies between Petitioner's sample and a hair found on Baldwin. (Tr. IX, pp. 2406-07.) This is equally true regarding the footprint evidence: with the assistance of his investigator, trial counsel presented evidence that the tread that made the footprints could allegedly be found on several different styles and brands of footwear available in Eastern Idaho. (Tr. Vol.VIII, pp.2071-72.) Therefore, Petitioner has not established that the exclusion of Fox's potential testimony in these areas, testimony that is largely undefined, actually prejudiced him.

10. *Failure to Argue that the Trial Court's Refusal to Permit Deputy Christian to Testify Violated Petitioner's Constitutional Right to Present Evidence*

The Court will address this allegation in conjunction with Petitioner's contention in Claim 27 that trial court's exclusion of Christian's testimony violated his constitutional right to present evidence in his defense.

11. *Failure to Call Medical Examiner Donald Reay*

The Court adopts its previous decision that this allegation is not supported by specific facts.

12. *Failure to Investigate, Develop, and Present Mental State Issues at Trial and at Sentencing*

In the Court's May 18, 2006 Memorandum Decision, it determined that Petitioner had not supported this claim with facts showing the nature of the supposed "mental state issues." (Docket No. 312, p. 14.) The Court reaffirms that Petitioner has failed to allege how trial counsel was ineffective in choosing not to present a defense at trial aimed at showing Petitioner lacked the mental state necessary to commit these offenses.

Petitioner was given another opportunity, however, to persuade the Court that he had alleged a colorable claim related to counsel's performance at the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

penalty phase, and the Court left open the possibility of an evidentiary hearing on that issue. In response, Petitioner lodged numerous documents, records, and other papers with the Court. (Docket Nos. 317-354.) Little effort was made to winnow out relevant documents from irrelevant ones, or to otherwise connect the information in a coherent fashion for the Court. In Petitioner's Supplemental Merits Brief on Non-Dismissed Claims, he refers to the voluminous lodging as a "factual proffer of what evidence could have been shown in mitigation at the sentencing." (Docket No. 316, p. 41.)

In a short memorandum introducing the factual proffer, Petitioner suggests that Parmenter was constitutionally ineffective because he failed to offer a complete picture of Petitioner's social and family history, and because counsel failed to present expert testimony related to Petitioner's mental health. (Docket No. 317.) Petitioner has also submitted an illustrative exhibit that purports to lay out his family tree with descriptive labels indicating drug abuse, mental illness, and criminal history. The Court has reviewed this material and concludes that the factual allegations, even if proven to be true, would not establish a Sixth Amendment claim under the *Strickland* standard, and this claim shall be denied without an evidentiary hearing.

**\*35** Before trial, Petitioner's Bonneville County attorneys retained a psychiatrist, Dr. Kenneth Ash, to evaluate Petitioner's mental status. David Parmenter also spoke with Dr. Ash personally in preparation for the Bingham County case, and although Dr. Ash never prepared a written report, he indicated that the facts were not favorable with respect to Petitioner's competency and his sanity at the time of the offense. (Parmenter Depo., p. 85.) Based on that opinion, and based further on counsel's own experiences in working with individuals at a state mental hospital, Parmenter felt that he had a "pretty good handle" on Petitioner's mental state. (Parmenter Depo., p. 86.) As a result, he did not seek another evaluation.

In an effort to compile a mitigation case, Parmenter

spoke with Petitioner's family, friends, and a former employer. (Parmenter Depo., p. 89.) His primary contact was Petitioner's mother, with whom he "spent a lot of time." (Parmenter Depo., p. 89.) Parmenter did not hire a mitigation specialist to obtain records, develop background information, or to conduct interviews, and it appears that he relied on the investigator's work from the Bonneville County case and on his own independent investigation. (Parmenter Depo., p. 92.) He has since estimated that he expended probably 20 to 25 hours to prepare solely for the aggravation-mitigation hearing. (Parmenter Depo., 91.)

At that hearing, Parmenter called several witnesses on Petitioner's behalf. Some of these witnesses testified about Petitioner's bout with polio as a small child and how it left him with permanent disadvantages, including a limp, other coordination problems, and an inability to engage in normal childhood activities. Petitioner's witnesses also testified that he was a gentle, caring, and trustworthy person. In particular, female friends and family members claimed that they never felt threatened or uneasy around him and that he had been a good babysitter. Counsel also presented the testimony of jail officials, who indicated that Petitioner was a well-behaved inmate who had not caused any problems. Petitioner's work skills and dependability as a sheetrocker were also explored. (Tr. Vol.X, pp. 2474-2556.)

Distilled to its essence, the mitigation case that Parmenter chose to present can fairly be characterized as focusing on Petitioner's redeeming qualities and "good" character traits. Petitioner now contends that Parmenter failed to investigate and present evidence related to the darker aspects of his family background and upbringing, and that he was deficient in not presenting expert testimony, particularly related to the effect that longstanding drug abuse would have had on mental functioning.

In deciding whether a capital defense attorney's performance at the penalty phase fell below an objective standard of reasonableness, the relevant in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

quiry is not whether counsel should have presented a certain type of mitigating evidence, but whether the investigation supporting counsel's decision was itself reasonable, measured under prevailing professional norms. *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). The Supreme Court has "long referred [to the American Bar Association Standards for Criminal Justice] as 'guides to determining what is reasonable' " in these circumstances. *Wiggins,* 539 U.S. at 524 (quoting *Strickland v. Washington,* 466 U.S. at 688). According to the standards in effect in at the time of Petitioner's trial and sentencing, defense counsel had a duty "to conduct a thorough investigation of the defendant's background." *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1 (2d ed.1980)). Specifically, competent counsel would be expected to gather information about the defendant's "education, employment record, mental and emotional stability, family relationships, and the like." 1 ABA Standards for Criminal Justice, 4-4.1, commentary, p. 4-55 (2d ed.1980).

**\*36** Although Parmenter did conduct a mitigation investigation, and he called a number of witnesses at the sentencing hearing, by his own admission he devoted only an estimated 20 to 25 hours-the equivalent of about three work days-to prepare for the hearing. If accurate, this estimate strikes the Court as an exceedingly brief amount of time to conduct a "thorough investigation" into Petitioner's background. Petitioner has also submitted a new affidavit from Parmenter in which he asserts that he did not take "any steps to learn about [Petitioner's] mental health, emotional, social, and drug use background in preparation for the sentencing proceedings," not based on some strategic reason, but because he "just did not think to do it." (Docket No. 324, Exhibit 48.)

To some degree, the broadness of trial counsel's claim in his recent affidavit is undermined by the existing record, as he has previously testified that

he conferred with Dr. Ash regarding at least some aspects of Petitioner's "mental health" and that he discussed parts of Petitioner's background with friends, family, and an employer. But the Court takes the affidavit as an affirmation that the *scope* of counsel's mitigation investigation did not include the *type* of information that Petitioner has now proffered. The Court does not doubt that the Sixth Amendment would permit a capital defense attorney to emphasize, as a matter of trial tactics, a defendant's good character and redeeming attributes to the exclusion of other evidence with a less certain impact on the sentencer. But here Parmenter failed to investigate Petitioner's "mental health, emotional, social, and drug use background" because he simply did "not think to do it," an indication that the "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins,* 539 U.S. at 526. Consequently, this Court concludes that Petitioner has alleged sufficient facts to show at least a colorable claim that trial counsel's mitigation investigation fell below an objective standard of reasonableness for a capital case in the late 1980s.

This determination gets Petitioner only part of the way to his destination, however. He must still allege specific facts that, if true, would also show a reasonable probability that had counsel conducted the type of mitigation investigation that Petitioner now believes he should have, the outcome of the sentencing hearing would have been different. In assessing prejudice under these circumstances, the Court must reweigh the evidence in aggravation against the totality of the available mitigating evidence, including the mitigating evidence adduced in the federal habeas proceeding. *Wiggins,* 539 U.S. at 534. The aggravating circumstances in this case are simply too strong, and the new mitigating evidence, even if credible, adds too little, to create a reasonable probability of a different outcome.

By the time that Petitioner appeared before the court for sentencing in this case he had already been convicted in the Michelbacher matter of kid-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

napping, rape, the infamous crime against nature, and murder in the first degree. He had also entered a conditional guilty plea in the Haddon matter, albeit while maintaining his innocence, to murder in the second degree and robbery. Thus, regardless whether these facts supported the "previously convicted or another murder" aggravating factor or the aggravator based upon a "propensity to commit murder," or both, Petitioner's recent history of committing a string of violent felonies carried heavy weight on the aggravating side of the balance.

**\*37** Further, despite Petitioner's protestations to the contrary, there was sufficient evidence in the record to establish that the crimes in this case were especially heinous, atrocious or cruel, manifesting exceptional depravity, and that Petitioner exhibited an utter disregard for human life, as those terms have been defined and limited by the Idaho Supreme Court. Petitioner committed acts of random, senseless, and gratuitous violence against an innocent young woman who likely suffered extreme mental and physical anguish during the attack. Of course, the felony murder with specific intent to kill aggravating circumstance was also amply supported by the facts.

On the other side of the scale, the state court was already well aware of, but not swayed by, several mitigating circumstances that were individual to Petitioner, including his difficulties as a young child diagnosed with polio, which hampered his ability to fit in with his peers, and his limited education. The court also noted Petitioner's work skills, cooperative nature with those close to him, kindness to children, and good behavior while incarcerated. The court indicated that Petitioner's female friends trusted him and found him to be compassionate. (R. III, pp. 784-88.)

The additional facts that Petitioner has proffered in this proceeding would not have created a critical mass of mitigating evidence that might have tipped the scales toward life. Much of the new information pertains to remote or extended family members, and its probative force would have been marginal. The

Court recognizes that Petitioner is attempting to show a complete family history, going back several generations, but he has not explained how the rumored behavior of distant relatives has a causal or direct bearing on him.

Within his more immediate family, Petitioner has come forward with evidence that his father was an alcoholic with a relatively low IQ who had a criminal record and who attempted suicide at least once in the past. Petitioner has also submitted declarations indicating that his mother and father fought routinely, both verbally and physically, and that the children witnessed these fights. Clearly, poverty and substance abuse were prevalent throughout the family. (Docket No. 320, Exhibits 1-19.)

Notably absent, however, is any persuasive evidence that Petitioner was himself physically or violently abused as a child, abandoned, placed within the State's custody, or otherwise institutionalized. FN10 Petitioner has also provided no records showing that *he* has a documented history of emotional disturbances, mental illnesses, or organic brain disorders during his developmental years or later. Indeed, a persistent theme running through many of the declarations from family and friends is that Petitioner was a gentle, caring, and likable person until he started abusing drugs. (Docket No. 320, Exhibits 1-19.) This assessment of his character is largely consistent with the information that was already in front of the state court at sentencing.

> FN10. The proffer includes some vague claims of incest within the family, but Petitioner has not included those factual allegations in his Third Amended Petition. Additionally, in his Bonneville County capital habeas case, he asked the Court to delete similar allegations from his Petition, a request that was granted. (Case No. 93-156-S-EJL, Docket No. 154, pp. 3-5, Docket No. 174, p. 5.)
>
> Moreover, any sexual abuse seems to have involved primarily older male relat-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

ives and Petitioner's sisters, rather than Petitioner himself. There may have been an inappropriate relationship between Petitioner and one of his sisters, and perhaps between Petitioner and a female aunt, but reports of the latter are based on second-hand information and it appears that this relationship, if it occurred, began when Petitioner was an adult. (Docket No. 320.)

**\*38** The declarations that Petitioner has submitted from two mental health experts do not conclusively fill in the blanks about his mental or emotional state, either now or at the relevant time. Instead, they largely repeat the family history without providing firm conclusions. For instance, Dr. Craig Beaver, a neuropsychologist, writes that "Paul Rhoades grew up in a family context that deprived him of normal development," and that chronic methamphetamine use "may have well have damaged his brain in areas critical to impulse control and the ability to think clearly in highly pressured situations," but he ultimately concludes that "[f]urther neuropsychological testing has always been necessary to fully and adequately assess Paul Rhoades." (Docket No. 318, pp. 39-40.) Dr. Beaver reaches the conclusion that further neuropsychological testing is necessary despite the passage of twenty years since these crimes were committed.

Similarly, Dr. Pablo Stewart, a psychiatrist, admits that he has not conducted an evaluation of Petitioner, and he indicates that his opinion is a "limited" one based upon his review of selected records and Dr. Beaver's report. Although Dr. Stewart does list several possible diagnoses, including post-traumatic stress disorder, polysubstance abuse, mood disorder, cognitive disorder, substance induced mood disorder, substance induced psychotic disorder, he does not elaborate on these preliminary conclusions and qualifies even his limited opinion as a "working assessment." (Docket No. 319, p. 21.) Even at this late juncture, Petitioner's emotional and mental makeup remains inconclusive.

Recent cases from the Supreme Court that have addressed the quality and strength of undiscovered mitigating evidence further guide and inform this Court's decision. An illustrative example is *Wiggins,* in which the sentencing jury did not hear that the defendant was frequently abandoned as a small child and forced to beg for food before he was placed in foster care, where he was repeatedly sexually assaulted. *Id.* at 534-35, 537. The Supreme Court found that counsel's failure to develop and present that evidence was prejudicial, given that only a "halfhearted" mitigation case was offered. *Id.* Likewise, in *Rompilla v. Beard,* 545 U.S. 374, 392, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), defense counsel failed to unearth a treasure trove of mitigating evidence indicating that the defendant, who suffered from organic brain damage, was beaten often by his alcoholic father and left in a wire mesh dog pen filled with excrement. *See also Williams v. Taylor,* 529 U.S. 362, 370, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (defendant was borderline mentally retarded and had suffered through a nightmarish childhood of deprivation and abuse); *Stankewitz v. Woodford,* 365 F.3d 706, 716 (9th Cir.2004) (defendant was beaten by his alcoholic parents, became a ward of the state, was institutionalized and thereafter sexually abused).

While Petitioner's factual proffer may present a more complete family history of substance abuse, neglect, and general dysfunction, it simply does not depict the same "excruciating" life history that was found to exist in these other cases. More importantly, given the strength of the aggravating circumstances found to exist in this case and the incremental contribution that Petitioner's newly proffered facts, even if proven to be true and credible, would have added to the mitigation case, there is no reasonably probability that the result of the sentencing proceeding would have been different. This claim will be denied, and no evidentiary hearing is required.

13. *Presenting a Deficient Sentencing Memorandum*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

**\*39** Petitioner has not explained how eliminating or altering the defense sentencing memorandum would have led to a reasonable probability of a different sentence, and this claim shall be denied.

14. *Failure to Establish a Workable Discovery Procedure*

The Court adopts is previous decision that this claim is devoid of specific facts supporting either prong of the *Strickland* test. (Docket No. 312, p. 15.)

15. *Failure to Fully Investigate the Kevin Buchholz Confession*

In his briefing, Petitioner frames this sub-issue by arguing that counsel was deficient in failing to investigate the circumstances surrounding Buchholz's alibi. Petitioner has alleged no facts, however, casting doubt on that alibi, which was supported by Buchholz's father's testimony during the post-conviction hearing. Also, given that Buchholz was unavailable to testify at trial, Petitioner has not demonstrated how trial counsel could have introduced evidence casting doubt on his alibi, had he found any.

16. *Failing to Present Live Witnesses at the Motion to Suppress*

The Court reaffirms its previous decision that Petitioner has not alleged facts showing either deficient performance or prejudice. (Docket No. 312, p. 15.)

17. *Failure to Appeal the Trial Court's Exclusion of Deputy Christian's Testimony*

The Court will address this allegation in conjunction with Petitioner's contention in Claim 27 that trial court's exclusion of Christian's testimony violated Petitioner's constitutional right to present evidence in his defense.

18. *Failure to Argue the Constitutional or Factual Deficiencies of the Aggravating Circumstances*

To the extent that this claim addresses counsel's actions on appeal and does not duplicate Claim 23, subpart vi, Petitioner has not shown how a constitutional or factual challenge to the aggravating circumstances in the Idaho Supreme Court would have reasonably led to a reversal. Petitioner has not shown error, but even if he had, any error in a single aggravator would be harmless, given that the trial court clarified that it had weighed the mitigating circumstances cumulatively against each aggravator.

19. *Failure to Move to Withdraw Following Sentencing*

The Court adheres to its previous decision that Petition cannot show prejudice from this claim. (Docket No. 312, p. 16.)

20. *Failure to Require the Idaho Supreme Court to Comply with Its Statutory Automatic Review*

Petitioner has not established that there is a reasonable probability that the Idaho Supreme Court would have reversed had counsel argued that it was required to review whether the death sentences were the result of passion, prejudice, or any other arbitrary factor and whether the aggravating circumstances were supported by the evidence. Counsel's failure to press those issues in the appellate court was not ineffective.

21. *Failure to Raise, Develop, Brief, or Argue the Unconstitutionality of the Death Penalty for Kidnapping and the Aggravating Circumstances in Support*

**\*40** Even assuming, for the sake of argument, that a reasonably competent defense attorney would have litigated constitutional issues surrounding Petitioner's death sentence for kidnapping, Petitioner has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

not demonstrated a reasonable probability the state appellate court would have reversed his death sentence for that crime.

22. *Failure to Argue Residual Doubt*

The Court reaffirms its previous decision that counsel's decision to focus on the mitigating evidence rather than lingering doubt of guilt is a tactical one, and that counsel did, in fact, briefly touch on residual doubt and questions regarding the extent of Petitioner's role in the offenses. Further, Petitioner has not shown how a different argument would have had any material effect on the sentencer. (Docket No. 312, p. 17.)

23. *Failure to Raise on Appeal that the Aggravating Circumstances Had Been Double Counted*

Regardless whether appellate counsel raised this issue directly, the Idaho Supreme Court appears to have addressed it anyway. Before concluding that the "trial court completed the weighing process correctly," the Idaho Supreme Court cited with approval the trial court's language in its post-conviction decision that it had "avoided 'duplicating' or 'stacking' the statutory aggravating factors ..." *Rhoades I,* 820 P.2d at 680. In any event, Petitioner has not established that he was prejudiced by his counsel's failure to raise the issue more explicitly.

24. *Failure to Argue Evidentiary Rulings on Appeal*

The Court reaffirms that this claim is conclusory. (Docket Nos. 167, p. 18, 312, p. 17.)

25. *Failure to Raise on Appeal that the Sentencing Court Improperly Weighed All Mitigating Circumstances Against All Aggravating Circumstances*

The Idaho Supreme Court addressed this issue on appeal and concluded that it had no merit because the trial court had clarified that it had not, in fact, weighed all mitigators against all aggravators. *Rhoades I,* 890 P.2d at 680.

26. *Failure to be Present at the Presentence Interview*

The Court will address this claim with Claim 28, discussed below.

27. *Cumulative Errors*

The Ninth Circuit had held that although individual errors may not rise to the level of a constitutional violation, a collection of errors might violate a defendant's constitutional rights. *Harris v. Wood,* 64 F.3d 1432, 1438 (9th Cir.1995). But for any professionally unreasonable errors that Petitioner's counsel may have committed here, which are few, "the nature of the claims does not support a conclusion of cumulative prejudice." *Davis v. Woodford,* 384 F.3d 628, 654 (9th Cir.2004). As in *Davis,* "[c]ounsel's few missteps and misjudgments did not render [Petitioner's] trial fundamentally unfair." *Id.*

### Claim 27: Right to Present Evidence

Petitioner revisits the Kevin Buchholz issue in this claim and alleges that his Sixth and Fourteenth Amendment right to present a meaningful defense was violated when the trial court prevented him from calling Deputy Christian to testify.

**\*41** "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky,* 476 U.S. 683, 689-690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). A defendant's right to present evidence, however, is subject to reasonable restrictions based upon other legitimate interests in the criminal trial

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

process. *United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (citations omitted). States have broad latitude to establish rules excluding evidence from criminal trials, and such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *See Id.* (citing *Rock v. Arkansas,* 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

Here, Petitioner relies primarily on *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In that case, the Supreme Court held that the due process clause affords a criminal defendant the right to introduce into evidence a third party's declaration against penal interest when the circumstances surrounding the statement contain "persuasive assurances of trustworthiness." *Id.* at 300. But while Buchholz's statements in this case may have been against his penal interest, the circumstances in which he made those statements did not contain persuasive assurances of trustworthiness. He was intoxicated when he "confessed" to Christian, and he recanted those statements when he was sober. (PCR Tr., pp. 254-55.) The police confirmed that Buchholz had been with his family and at the hospital during the time frame that Baldwin was likely killed, and investigators could find no other evidence that linked him to the crime. (PCR Tr., p. 259.)

Thus, although it is true that hearsay rules must not be applied "mechanistically to defeat the ends of justice," *see Chambers,* 410 U.S. at 302, Petitioner has not shown that the rule in this case was applied mechanistically. Rather, the trial court considered the circumstances surrounding the statements, and it determined that the proffered evidence was not sufficiently trustworthy or reliable to be admissible. Idaho has an interest in excluding unreliable evidence from its criminal trials, *see Scheffer,* 523 U.S. at 308, and deference to a trial court's finding of unreliability is especially appropriate on federal habeas review. Furthermore, had Christian been permitted to testify, all of the other evidence that undermined the Buchholz confession would have certainly followed, and, as a result, Petitioner has not established that any error in excluding this hearsay had a "substantial and injurious influence or effect on the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

Similarly, Petitioner has not demonstrated that his state court counsel was constitutionally ineffective in failing to argue the due process claim to the trial court, or to raise that issue during the direct appeal (Claim 23, part x, xviii), as he has not shown that there is reasonable probability that the result of the trial or appellate proceeding would have been different if only his counsel had framed and argued the issue in the manner that he now believes it should have been framed.

### Claim 28: The Presentence Interview

**\*42** In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court held that a defendant in a capital case has a Fifth Amendment privilege not to incriminate himself during an interview with a psychiatrist who will testify for the state at sentencing. The Ninth Circuit has concluded that the reasoning in *Estelle* applies to an interview with a state official who is conducting a presentence investigation in anticipation of a capital sentencing proceeding. *Hoffman v. Arave,* 236 F.3d 523, 537-38 (9th Cir.2001). The Ninth Circuit further determined in *Hoffman* that a presentence interview in a capital case is a "critical stage" of the proceeding such that the defendant has the right to the assistance of counsel under the Sixth Amendment. *Id.* at 539.

Petitioner cites *Estelle* and *Hoffman* to allege that his Fifth and Sixth Amendment rights when the trial court relied on statements that he had made during the presentence investigation interview. But Petitioner made no statements during the interview that were used by the court in imposing the death

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)
**(Cite as: 2007 WL 1550441 (D.Idaho))**

penalty. Although he did respond to some questions, those responses were usually on benign subjects that the court ultimately considered to be mitigating. Petitioner did mention that he "liked doing drugs of any kind," but evidence of Petitioner's drug use was already in the record, and there is no indication that the admission to the presentence investigator was considered by the Court in aggravation of punishment. Instead, it appears that the trial court considered drug use to be a mitigating circumstance or, at worst, a neutral factor. (R. III, p. 13.)

Moreover, as in *Hoffman,* Petitioner's Fifth Amendment claim is undercut by the fact that he was aware of his right to remain silent, as he chose not to provide his version of the events. *Id.* at 538. With respect to the Sixth Amendment claim, there is no indication that Petitioner's counsel was prohibited from attending the interview, unlike *Hoffman.*

Finally, because Petitioner has not shown that any statements were relied upon by the state court, he has not established that any error prejudiced him. *Hoffman,* 236 F.3d at 540. This is equally true when the issue is recast as an ineffective assistance of counsel claim (Claim 23, subpart xxviii), because Petitioner has not shown a reasonable probability of a different outcome but for counsel's alleged failure to be present or to object to the trial court's consideration of Petitioner's mainly innocuous statements in the PSI.

### Claim 29: Weighing of Aggravation and Mitigation

Petitioner's final non-dismissed claim is based on *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (Idaho 1989). In *Charboneau,* the Idaho Supreme Court construed Idaho Code § 19-2515(c) as requiring district courts to weigh all mitigating evidence collectively against each aggravating circumstance found to exist individually. *Id.* at 323.

This is an issue of statutory construction. The United States Constitution does not impose this particular requirement, and the Supreme Court has left the development of weighing procedures largely to the states. *Kansas v. Marsh,* 548 U.S. 163, ----, 126 S.Ct. 2516, 2525, 165 L.Ed.2d 429 (2006). And, as noted herein, the trial court clarified during the post-conviction proceeding that it had weighed the collective mitigating evidence against each aggravator found to exist, which the Idaho Supreme Court acknowledged on appeal. *Rhoades I,* 820 P.2d at 680. Given this, Petitioner has not explained how prejudicial error occurred in his case.

### V.

### ORDER

**\*43** NOW THEREFORE IT IS HEREBY ORDERED that the Third Amended Petition for Writ of Habeas Corpus shall be DENIED.

IT IS FURTHER ORDERED that this cause of action shall be DISMISSED with prejudice.

D.Idaho,2007.
Rhoades v. Arave
Not Reported in F.Supp.2d, 2007 WL 1550441 (D.Idaho)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.