**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Movant/Defendant,* | ) | |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Respondent/Plaintiff.* | ) | |

**MOVANT'S REPLY TO UNITED STATES' RESPONSE
TO SECOND AMENDED § 2255 MOTION**

DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Counsel
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

GROUND 2:   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN BOTH
            STAGES OF THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            1.    Trial counsel operated under a conflict of interest. . . . . . . . . . . . . . . . . 9

            2.    Counsel were professionally unreasonable and ineffective in failing to
                  properly re-urge the motion to suppress under Franks v. Delaware, 438
                  U.S. 154 (1978). Appellate counsel were ineffective for failing to raise
                  the issue, to the extent it was framed by the record, on direct appeal. . . . 11

            3.    Counsel were professionally unreasonable and ineffective for failing to
                  investigate and introduce evidence of Mr. Barrett's diminished mental
                  capacity in the guilt/innocence stage of trial. . . . . . . . . . . . . . . . . . . . . . 15

                  a.    Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                  b.    Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            4.    Failure to raise competency issue was constitutionally ineffective
                  assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

            5.    Counsel were ineffective for failing to move for a continuance and for
                  failing to conduct a professionally reasonable investigation which
                  would have led to abundant impeachment evidence of the prosecution's
                  informant witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

                  a.    Failure to move for a continuance. . . . . . . . . . . . . . . . . . . . . . . . . 25

                  b.    Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                  c.    Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

            6.    Counsel were ineffective in failing to make appropriate and timely
                  objections to other bad acts testimony by the informant witnesses. . . . . 40

a.     Mr. Barrett's claim relates back and is, therefore, not time barred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

b.     Trial counsel's failure to object constituted ineffective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

7.    Trial counsel were professionally unreasonable for failing to engage the services of an independent crime scene reconstruction expert. . . . . . . . . 45

8.    Trial counsel were ineffective in their failure to secure an independent expert on police tactics who would have demonstrated that the midnight raid on Mr. Barrett's house was reckless and dangerous. . . . . . . . . . . . . . 47

9.    Failure to adequately cross-examine law enforcement witnesses was ineffective assistance of trial counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . 50

10.    Trial counsel were ineffective in failing to call Toby Barrett and Alvin Hahn, percipient witnesses, who could impeach government testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

a.     Toby Barrett. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

b.     Alvin Hahn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

11.    To Mr. Barrett's prejudice, trial counsel failed to conduct a reasonable investigation into evidence that he was not aware of the arrest warrant, could have been taken into custody without incident, and had not reacted violently to the police when they had been to his home shortly before the raid and on other occasions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

12.    Trial Counsel were ineffective for failing to adequately contest "expert" Horn testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

13.    The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate jury instructions. . . . 63

a.     Credibility instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

b.     Instructions on self-defense and theories of defense . . . . . . . . . . 65

15.    Trial counsel ineffectively omitted objections to prosecutorial misconduct in penalty phase closing arguments. . . . . . . . . . . . . . . . . . . 68

ii

B.    Movant Has Carried His Burden of Demonstrating a Sixth Amendment Violation as to Sentencing; at a Minimum, this Court Should Order an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    1.    Introduction and summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . 69

    2.    Undisputed facts and law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

    3.    The declarations of trial counsel support findings of deficient performance and prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

        a.    Internal inconsistencies and adoptive admissions. . . . . . . . . . . . . 78

        b.    Inconsistencies between Government's theory and other witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

        c.    Inconsistencies between the trial record and the Government's theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        d.    Inconsistencies between the Government's theory and the law of effective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . 89

    4.    The government's legal arguments have no merit. . . . . . . . . . . . . . . . . . 97

        a.    Neither case law nor the record supports the Government's theory on deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . 97

        b.    *Neither case law nor the evidence supports the Government's theory on prejudice.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

    5.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

GROUND 3:  THE COURT UNCONSTITUTIONALLY DENIED MR. BARRETT NECESSARY EXPERT SERVICES AND RESOURCES. . . . . . . . . . . . . . . . 112

    A.    The Issue Is Not Procedurally Defaulted. . . . . . . . . . . . . . . . . . . . . . . . . . 112

    B.    The Court Abused its Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

    C.    The Experts Requested Were Necessary and Relevant . . . . . . . . . . . . . . . . 114

    1.    Mental health. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

2.    Crime scene reconstruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

3.    Expert on police standards and procedure . . . . . . . . . . . . . . . . . . . . . . . 117

4.    Mitigation specialist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

GROUND 4:    THE NO-KNOCK SEARCH WARRANT WAS INVALID UNDER
             *FRANKS V. DELAWARE,* 438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . . . . . 118

GROUND 5(A) and (B): THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY
             EVIDENCE AND KNOWINGLY RELIED ON FALSE TESTIMONY.
             NEWLY DISCOVERED EVIDENCE ALSO
             WARRANTS § 2255 RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

1.    Charles Sanders -- *Brady,* newly discovered evidence, and
      false evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

2.    Travis Crawford -- *Brady*, newly discovered evidence, and use of false
      evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

3.    Cindy Crawford -- *Brady*, newly discovered evidence and false
      evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

4.    Brandie Zane Price -- *Brady*, newly discovered evidence, and false
      evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

5.    Karen Real -- *Brady,* newly discovered evidence, and false evidence . . 136

6.    Randy Turman -- *Brady,* newly discovered evidence, and false
      evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

7.    Law enforcement witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

8.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

C.    The Prosecution Interfered with the Defense's Right to Interview
      Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

D.    Mr. Barrett Was Prejudiced by the Prosecutors' Misconduct During Trial. . . . 142

1.    Mr. Barrett's claim is subject to collateral review . . . . . . . . . . . . . . . . . 143

2.    The prosecutors improperly questioned the witnesses. . . . . . . . . . . . . . . 143

3.     The prosecutors were especially egregious  . . . . . . . . . . . . . . . . . . . . . 145

GROUND 7:  THE USE OF THE ELECTRIC SHOCK DEVICE WITHOUT GOOD
CAUSE WAS ERROR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

A.     The September 13th Finding Made Clear the Court Permitted the Electric
Shock Device Because it Was a Capital Case. . . . . . . . . . . . . . . . . . . . . . . 148

B.     The Order Permitting Use of the Device Did Not Comply with Due
Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

1.     The hearing on the issue did not support the court's conclusion.  . . . . . 149

2.     The electric shock device was not "preferable" to other security
measures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

3.     The September 6th Order does not comply with *Deck v. Missouri*  . . . . 153

C.     Compelling Mr. Barrett to Wear the Electric Shock Device Was
Prejudicial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

1.     The electric shock device was visible and undermined the
presumption of innocence.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

2.     The Court did not consider the impact on Movant's ability to assist
his counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

3.     Mr. Barrett renewed his objection on September 9, 2005.  . . . . . . . . . . 154

D.     The Claim is Properly Reviewed in Collateral Proceedings. . . . . . . . . . . . . 155

GROUND 8:  MR. BARRETT HAD A CONSTITUTIONAL RIGHT NOT TO BE TRIED
WHILE INCOMPETENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

A.     This Court must Hold an Evidentiary Hearing on the Issue of
Incompetency.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

B.     The Expert Opinions Relied upon by Mr. Barrett Are Not
Speculative. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

C.     Trial Counsel's Opinions Are Not Controlling  . . . . . . . . . . . . . . . . . . . . . . 162

GROUND 9:  MR. BARRETT'S DUE PROCESS RIGHTS WERE VIOLATED BY
                 THE COURT'S FAILURE TO INSTRUCT ON VOLUNTARY
                 MANSLAUGHTER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

GROUND 10:  THE COURT GAVE AN IMPROPER INSTRUCTION DIRECTING THE
                 JURY THAT RESIDUAL DOUBT WAS NOT TO BE CONSIDERED AS
                 A MITIGATING FACTOR, AND WRONGLY PREVENTED EVIDENCE
                 AND ARGUMENT ON RESIDUAL DOUBT. . . . . . . . . . . . . . . . . . . . . . . . 175

GROUND 12: THE FAILURE TO INSTRUCT THE JURY ON THE BURDEN OF PROOF
                  REQUIRED FOR WEIGHING THE AGGRAVATING FACTORS
                 VIOLATED MR. BARRETTS CONSTITUTIONAL RIGHTS. . . . . . . . . . . 179

           A.    The Issue Was Not Raised or Adequately Resolved on Appeal. . . . . . . . . . . . 179

                 1.    The *Ring* issue was inadequately raised and argued on
                       direct appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

                 2.    Trial counsel failed to raise the issue properly on appeal. . . . . . . . . . . 180

           B.    The Constitutional Principle upon Which Ground 12 Relies Has
                 Been Wrongly Rejected. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

                 1.    The (Edward) Fields Decision wrongly relied on
                       *United States v. Barrett*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

                 2.    The Fifth Circuit's (Sherman) Fields Decision wrongly rejected the
                       application of *Ring* to the "weighing" element. . . . . . . . . . . . . . . . . . . 183

                 3.    The 5th, 6th and 8th Amendments require a jury finding beyond
                       a reasonable doubt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

           C.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

GROUND 17: THE EIGHTH AMENDMENT'S PROHIBITION OF THE
                 EXECUTION OF THE MENTALLY ILL IS A TIMELY-RAISED
                 COGNIZABLE CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

GROUND 18:  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL. . . . . . . . . . . 189

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Ake v. Oklahoma*, 470 U.S. 68 (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 162

*Alcorta v. Texas*, 355 U.S. 28 (1957)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 39, 178

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180, 184

*Atkins v. Virginia*, 536 U.S. 304 (2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Banks v. Reynolds*, 54 F.3d 1508 (10th Cir.1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

*Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Battle v. United States*, 419 F.3d 1292 (11th Cir 2005)... . . . . . . . . . . . . . . . . . . . . . . . . 158, 159

*Beck v. Alabama*, 447 U.S. 625 (1980)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Becker v. Kroll*, 494 F.3d 904 (10th Cir.2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

*Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131, 132

*Blackledge v. Allison*, 431 U.S. 63, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1976)... . . . . . . . . . . . . 160

*Blakely v. Washington*, 124 S. Ct. 2531 (2004)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

*Blystone v. Pennsylvania*, 494 U.S. 299 (1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

*Boyde v. California*, 494 U.S. 370 (1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Boyle v. McCune*, 544 F.3d 1132 (10th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Burger v. Kemp*, 483 U.S. 776 (1987)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 109

*Caldwell v. Mississippi*, 472 U.S. 320 (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 113, 147, 185

*Cargyle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147, 148

*Casey v. Frank*, 346 F. Supp. 2d 1000 (E.D. Wis. 2004)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 39

*Chicago, Milwaukee, and St. Paul & Pacific Railroad v. United States*,
585 F.2d 254 (7th Cir. 1978)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Crivens v. Roth*, 172 F.3d 991 (7th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Cunningham v. Zent*, 928 F.2d 1006 (11th Cir. 1991)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Darden v. Wainwright*, 477 U.S. 168 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*United States v. Davis*, 953 F.2d 1482 (10th Cir. 1992)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 177

*Deck v. Missouri*, 544 U.S. 622 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*Drope v. Missouri*, 420 U.S. 162 (1975)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162, 163

*Duckett v. Mullin*, F.3d 982 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

*Eddings v. Oklahoma*, 455 U.S. 104 (1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

*English v. Romanowski*, 589 F. Supp. 2d 873 (E.D. Mich. 2008)... . . . . . . . . . . . . . . . . . . . . . . . 178

*Evittts v. Lucey*, 469 U.S. 387 (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*Fero v. Kerby*, 39 F.3d 1462 (10th Cir. 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

*Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 190

*Fontaine v. United States*, 411 U.S. 213 (1973)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Foster v. Ward*, 182 F.3d 1177 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Franklin v. Lynaugh*, 487 U.S. 164 (1988)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 176

*Franks v. Delaware*, 438 U.S. 154 (1978)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Gamble v. State of Oklahoma*, 583 F.2d 1161 (10th Cir. 1978)... . . . . . . . . . . . . . . . . . . . . . . . 123

*Garrett v. Selby, Connor, Maddux & Janer*, 425 F.3d 836 (10th Cir. 2005)... . . . . . . . . . . . . . 181

*Giglio v. United States*, 405 U.S. 150 (1972)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 137

*Giles v. Maryland*, 386 U.S. 66 (1966)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Goodman v. Bertrand*, 467 F.3d 1022 (7th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Graham v. Florida,* --, U.S. -- 230 S. Ct. 2011 (2010)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Greer v. Miller*, 483 U.S. 756 (1987)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

*Gregg v. Georgia*, 428 U.S. 153 (1976)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

*Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*Greico v. Meachum*, 553 F.2d 713 (1st Cir. 1976)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Hamilton v. Ayers*, 583 F.3d 1100 (9th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . 30, 91, 103

*Herrera-Castillo v. Holder*, 573 F.3d 1004 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . 181

*Hill v. Bank of Colorado*, 648 F.2d 1282 (10th Cir. 1981)... . . . . . . . . . . . . . . . . . . . . . . . . . . 183

*Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . 164, 173, 174

*Holbrook v. Flynn*, 475 U.S. 560 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*Hopkins v. Reeves*, 524 U.S. 88 (1998)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168, 170

*Hopper v. Evans*, 456 U.S. 605 (1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*In re McDonald*, 514 F.3d 539 (6th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*Jacobs v. Horn*, 395 F.3d 92 (3rd Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Johnson v. Mitchell*, 585 F.3d 923 (6th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Jones v. Barnes*, 463 U.S. 745 (1983)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 191

*Karis v. Calderon*, 283 F.3d 1117 (9th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Kimmelman v. Morrison*, 477 U.S. 365 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 107, 123

*Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Kyles v. Whitley*, 514 U.S. 419 (1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 128, 140

*Le v. Mullin*, F.3d 1002 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

*Mandacina v. United States*, 328 F.3d 995 (8th Cir. 2003).... . . . . . . . . . . . . . . . . . . . . . . . . 41, 43

*Martin v. Estelle*, 583 F.2d 1373 (5th Cir. 1978)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

*Massaro v. United States*, 538 U.S. 500 (2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 141, 156, 157

*Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Mayle v. Felix*, 545 U.S. 644 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*McGahee  v. United States*, 520 F. Supp. 2d 723 (E.D. Pa. 2008)... . . . . . . . . . . . . . . . . . . . passim

*Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Moore v. Marr*, 254 F.3d 1235 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

*Napue v. Illinois*, 360 U.S. 254 (1959)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248 (10th Cir.2001)... . . . . . . . . . . . . . . . . . . . . . . 182

*Oregon v. Guzek*, 546 U.S. 517 (2006)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175, 176

*Osborn v. Shillinger*, 861 F.2d 612 (10th Cir. 1988)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 190

x

*Panetti v. Quarterman*, 551 U.S. 930 (2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

*Parker v. Dugger*, 498 U.S. 308 (1991)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 182

*Peltier v. Booker*, 348 F.3d 888 (10th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Penry v. Johnson*, 532 U.S. 782 (2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Penry v. Lynaugh*, 492 U.S. 302 (1989)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 185

*Phaneuf v. Franklin*, 448 F.3d 591 (2nd Cir. 2006)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 124

*Phillips v. Workman, ___F.3d___*, No. 08-7043 (10th Cir. May 12, 2010)
(slip op. at 29-30)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*Pillette v. Berghois*, 630 F. Supp. 2d 791 (E.D. Mich. 2009)... . . . . . . . . . . . . . . . 29, 32, 39, 178

*Porter v. McCollum*, 130 S. Ct. 447 (2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Powell v. Collins*, 332 F.3d 376 (6th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

*Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Rhoades v. Arave,* 2007 WL 1550441 (D. Id. May 24, 2007)... . . . . . . . . . . . . . . . . . . . . . . . 73

*Richards v. Quarterman*, 578 F. Supp. 2d 849 (N.D. Tex. 2008),
*aff'd* 566 F.3d 553 (5th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 99

*Ring v. Arizona*, 536 U.S. 584 (2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Romano v. Oklahoma*, 512 U.S. 1, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994)... . . . . . . . . . . . . . 147

*Rompilla v. Beard*, 545 U.S. 374 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Roper v. Simmons*, 534 U.S. 304 (2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Sallahdin v. Gibson*, 275 F.3d 1211 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

*Saranchek v. Beard*, 538 F. Supp. 2d 847 (E.D. Pa. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Shabazz v. Artuz*, 336 F.3d 154 (2nd Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 137

*Simmons v. South Carolina*, 512 U.S. 154 (1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Singh v. Prunty*, 142 F.3d 1157 (9th Cir. 1998)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

*Skipper v. South Carolina*, 476 U.S. 1 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

*Smith v. Black*, 904 F.2d 950 (5th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 122

*Smith v. Massey*, 235 F.3d 1259 (10th Cir.2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004)... . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 105, 112

*Smith v. Murray*, 477 U.S. 527 (1986)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 191

*Smith v. Robbins*, 528 U.S. 259 (2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

*Soffar v. Dretke*, 368 F.3d 441 *amended,* 391 F.3d 703 (5th Cir. 2004)... . . . . . . . . . . . . 20, 100

*Solesbee v. Balkcom*, 339 U.S. 9, 70 S. Ct. 457, 94 L. Ed. 604 (1950)... . . . . . . . . . . . . . . . . 162

*Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Stone v. Powell*, 428 U.S. 165 (1976)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 118, 122, 123, 124

*Stouffer v. Reynolds*, 168 F.3d 1155 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 190

*Stouffer v. Reynolds*, 214 F.3d 1231 (10th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

*Strickland v. Washington*, 466 U.S. 668 (1984)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Strickler v. Greene*, 527 U.S. 263 (1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Stringer v. Black*, 503 U.S. 222 (1992)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 122

*Taylor v. Workman*, 554 F.3d 879 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

*Town v. Smith*, 395 F.3d 251 (6th Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Thomas v. Horn*, 570 F.3d 105 (3rd Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*United States v. Antone*, 603 F.2d 566 (5th Cir. 1979)... . . . . . . . . . . . . . . . . . . . . . . . . 122, 128

*United States v. Bagley*, 473 U.S. 667 (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

*United States v. Banks*, 451 F.3d 721 (10th Cir. 2006)... . . . . . . . . . . . . . . . . . . . . . . . . . . 181

*United States v. Barajas-Diaz*, 313 F.3d 1242 (2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

*United States v. Barrett*, 496 F.2d 1079 (10th Cir. 2007)... . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Beckford*, 916 F. Supp. 1415 (E.D. Va. 1997)... . . . . . . . . . . . . . . . . . . . . passim

*United States v. Bernal-Obeso*, 989 F.2d 331 (9th Cir. 1993)... . . . . . . . . . . . . . . . . . . . . 12, 124

*United States v. Bolden*, 335 F.2d 453 (7th Cir. 1966)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*United States v. Bowie*, 392 F.3d 1494 (10th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Brown*, 326 F.3d 1143 (10th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Caballero*, 277 F.3d 1235 (10th Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Caldwell*, 560 F.3d 1202 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . 45, 140

*United States v. Challoner,* , 583 F.3d 745 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Chandler*, 218 F.3d 1305 (11th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . 177

*United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000)... . . . . . . . . . . . 165, 166, 170, 173

*United States v. Cook*, 45 F.3d 388 (10th Cir. 1995)... . . . . . . . . . . . . . . . . . . . . 8, 62, 63, 191

*United States v. Cook*, 997 F.2d 1312 (10th Cir. 1993)... . . . . . . . . . . . . . . . . . . . . 123, 191, 192

*United States v. Davis*, 132 F. Supp. 2d 955 (E.D. La. 2001)... . . . . . . . . . . . . . . . . . . . 176, 177

*United States v. Davis*, 953 F.2d 1482 (10th Cir. 1992)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Dawkins*, 17 F.3d 399 (D.C. Cir. 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. (Edward) Fields*, 516 F.3d 923 (10th Cir. 2008)... . . . . . . . . . . . . . . . . . 183, 185

*United States v. Erickson*, 561 F.3d 1150 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . 130

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000)... . . . . . . . . . . . . . . . . 36, 40, 56

*United States v. Evans*, 224 F.3d 670 (7th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*United States v. Foree*, 43 F.2d 1572 (11th Cir. 1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Frady*, 456 U.S.152 (1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

*United States v. French*, 556 F.3d 1091 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Fuller*, 938 F. Supp. 731 (D. Kan. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Hall*, 113 F.3d 157 (9th Cir. 1997)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 124

*United States v. Hernandez*, 94 F.3d 606 (10th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*United States v. Hill*, 799 F. Supp. 86 (D. Kan. 1992)... . . . . . . . . . . . . . . . . . . . . . . . . . 130, 133

*United States v. Hodge*, 554 F.3d 372 (3rd Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004)... . . . . . . . . . . . . . . . 176, 177

*United States v. Jackson*, 549 F.3d 963 (5th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . 175, 176, 177

*United States v. Johnson*, 403 F. Supp. 2d 721 (N.D. Iowa 2005)... . . . . . . . . . . . . . . . . . . . . . 177

*United States v. Lafayette*, 983 F.2d 1102 (D.C. 1993)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . 167

*United States v. McVeigh*, 153 F.3d 1166 (10th  Cir. 1998)... . . . . . . . . . . . . . . . . . 164, 170, 171

*United States v. Miller*, 753 F.2d 1475 (9th Cir. 1985)... . . . . . . . . . . . . . . . . . . . . . . . . . 13, 124

*United States v. Miller*, 907 F.2d 994 (10th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Nicholson*, 983 F.2d 983 (10th Cir. 1993)... . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Oliver*, 278 F.3d 1035 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*United States v. Owens*, 882 F.2d 1493 (10th Cir. 1989)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*United States v. Parker*, 553 F.3d 1309 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Quintinella*, 193 F.3d 1139 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . 128

*United States v. Reddick*, 90 F.3d 1276 (7th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 124

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Rodriguez-Felix*, 450 F.3d 1117 (10th Cir. 2006)... . . . . . . . . . . . . . . . . . . . . 60

*United States v. Scafe*, 822 F.2d 1232 (10th Cir. 1987)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*United States v. Scheer*, 168 F.3d 445 (11th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

*United States v. Serawop*, 410 F.3d 656 (10th Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . 172, 173

*United States v. (Sherman) Fields*, 483 F.3d 313 (5th Cir. 2007)... . . . . . . . . . . . . . . 183, 184, 185

*United States v. Sinclair*, 109 F.3d 1527 (10th Cir. 1997)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*United States v. Smith*, 692 F.2d 658 (10th Cir. 1982)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Sorrells*, 714 F.2d 1522 (11th Cir. 1983)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Soundingsides*, 820 F.2d 1232 (10th Cir. 1987)... . . . . . . . . . . . . . . . . . . . . . . 167

*United States v. Thomas*, 221 F.3d 430 (3rd Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 56

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 167

*United States v. Tisdale*, 248 F.3d 964 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Torres*, 569 F.3d 1277 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*United States v. Viefhaus*, 168 F.3d 392 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*United States v. Vigeant,* 176 F.3d 565 (1st Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 124

*United States v. Visinaiz*, 428 F.3d 1300 (10th Cir. 2005)... . . . . . . . . . . . . . . . . . . . . . . . . . 66, 68

*United States v. Wardell*, 591 F.3d 1279 (10th Cir. 2009)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*United States v. Durham*, 287 F.3d 1297 (11th Cir 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*United States v. Gutierrez*, 839 F.2d 648 (10th Cir 1988)... . . . . . . . . . . . . . . . . . . . . . . . . 159, 160

*United States v. Rivas*, 862 F. Supp. 208 (N.D. Ill 1994)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Walker v. Gibson*, 228 F.3d 1217 (10th Cir. 2000)... . . . . . . . . . . . . . . . . . . . . . . . 160, 161, 191

*Wallace v. Ward*, 191 F.3d 1235 (10th Cir. 1999)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Weems v. United States*, 217 U.S. 349 (1910)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

*Wiggins v. Smith*, 539 U.S. 510 (2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Williams v. Bowersox*, 340 F.3d 667 (8th Cir. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Williams v. Taylor*, 529 U.S. 362 (2000)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir 1997)... . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Wood v. Georgia*, 450 U.S. 261 (1981)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Woodward v. Williams*, 263 F.3d 1135 (10th Cir. 2001)... . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Workman v. Tate*, 957 F.2d 1339 (6th Cir. 1992)... . . . . . . . . . . . . . . . . . . . . . 20, 29, 178, 29

*Young v. Sirmons*, 551 F.3d 942 (10th Cir. 2008)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

## STATE CASES

*Frederick v. State*, 902 P.2d 1092 (Okl. Cr. 1995)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Johnson v. State*, 118 Nev. 787, 59 P.3d 450 (2002)... . . . . . . . . . . . . . . . . . . . . . . . . 187, 188

*State v. Whitfield*, 107 S.W.3d 253 (Mo. 2003)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

*Woldt v. People*, 64 P.3d 256 (Colo. 2003)(A)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

*Woodruff v. State*, 825 P.2d 273 (Okl. Cr. 1992)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

**DOCKETED CASES**

*State of Oklahoma v. John Joseph Romano and David Wayne Woodruff*, Oklahoma County Case No. CRF-86-3920... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

**FEDERAL STATUTES**

21 U.S.C. § 848(e)(1)(B)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

21 U.S.C. § 848... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

18 U.S.C. § 1111... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165, 166

18 U.S.C. § 1112... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167, 196

18 U.S.C. § 1114... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

28 U.S.C. § 2255(b)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 76, 159, 160

18 U.S.C. § 2332... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

18 U.S.C. § 3432... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 25, 141

18 U.S.C. § 3592(a)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

18 U.S.C. § 924(c)(1)(A)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 165, 167

Fed R. Civ. P. 15(c)(1)(B)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fed. R. Crim. P. 33... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Fed. R. Evid. 403... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Fed. R. Evid. 404(b)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43, 140

Fed. R. Evid. 608(b)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. Evid. 702... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Fed. R. Evid. 801(2)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 81, 169

U.S. Const. amend. V... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

**MISCELLANEOUS**

*Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What Do Jurors Think?,*
98 Colum. L. Rev. 1538 (1998)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Pursuant to Rule 5(d) of the Rules Governing Section 2255 Proceedings, Kenneth Barrett files this, his Reply to the Government's Response to his Motion to Vacate His Conviction and Sentence.

## I.     INTRODUCTION

As noted above, Mr. Barrett's Reply is filed pursuant to Rule 5 of the Rules Governing § 2255 Proceedings, which provides "[t]he moving party may submit a reply to the respondent's answer or other pleading within a time fixed by the judge." Rule 5(d), Rules Governing § 2255 Proceedings. The rule uses the word "reply" rather than "terms such as 'traverse[.]'" Commentary, Rule 5, 2004 Amendments. The Committee Notes further explain that "[t] here is nothing in § 2255 which corresponds to the § 2248 requirement of a traverse to the answer." *Id.* As also set out in the Notes, "numerous cases have held that the government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held." Rule 5, Advisory Committee Notes (citations omitted).

Mr. Barrett's § 2255 Motion raises numerous disputed issues of fact, many of which are made more apparent by the Government's response. He is entitled to a hearing on all of the grounds alleged. Any failure to specifically reply concerning a ground raised in Mr. Barrett's Motion and supporting brief [1], or any fact or argument within any ground in this reply, is not intended, nor shall it be construed, as an admission of any argument or assertion by the

---

[1]Mr. Barrett specifically stands on his Motion and supporting brief without further reply concerning the following grounds: Ground 2(A)(14) (Doc 95 at 178; Doc 149 at 100 ["Ground 2, Part A (13)]); Ground 6 (Doc 95 at 322, Doc 149 at 175); Ground 11 (Doc 95 at 345; Doc 149 at 202); Ground 13 (Doc 95 at 211; Doc 149 at 357); Ground 14 (Doc 95 at 357; Doc 149 at 211); Ground 15 (Doc 95 at 373; Doc 149 at 224); Ground 16 (Doc 95 at 376; Doc 149 at 226); Ground 19 (Doc 95 at 394; Doc 149 at 245).

Government or an abandonment of any ground of error set out in the Motion to Vacate and

Supporting Brief or argument or fact therein.

## II.      ARGUMENT

**GROUND 1:  THE TRIAL COURT UNCONSTITUTIONALLY INTERFERED WITH MR. BARRETT'S DEFENSE AND ENGAGED IN IMPROPER *EX PARTE* CONTACT WITH THE GOVERNMENT.**

Ground 1 of the Second Amended Motion and the supporting brief set out factual and

legal bases for the Court to hold that the trial court unconstitutionally interfered with the defense.

The interference occurred through a variety of actions including (a) misuse of the Court's

administrative responsibilities under the Criminal Justice Act to discourage expert assistance and

reward a willingness to forego assistance; (b) ignoring evidence that lead counsel – hand picked

by the trial judge – was neglecting work on the case, then giving that lawyer a raise; (c) engaging

in improper *ex parte* communications with prosecutors; (d) misrepresenting the nature and

content of those *ex parte* communications; and (e) withholding ruling on a meritless Government

motion knowing that prosecutors were using the outstanding motion to gain leverage against the

defense.

The Government contends issues related to CJA funds are not cognizable, even on

appeal, citing *United States v. Davis*, 953 F.2d 1482 (10th Cir. 1992).  Doc 175 at 17-18.  This is

a gross misrepresentation of the law and Mr. Barrett's claim.  *Davis* and the other cases cited in

the Response stated that "[f]ee determinations by the district judge pursuant to the Criminal

Justice Act are administrative in character and *do not constitute final appealable orders* within

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    2                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

the meaning of 28 U.S.C. § 1291."[2] *Davis*, 953 F.3d at 1497 n.21 (emphasis added). As Mr.

Barrett is not seeking review of the trial court's funding decisions as such, *Davis* and the other

cases the Government relies upon are inapposite.

The Government's claim that Mr. Barrett makes no attempt to show he was denied

resources necessary to the defense is false. Mr. Barrett makes that showing in Ground 3, and

refers thereto in Ground 1. 2nd Amend. § Mot. (Doc 95) at 7, 14-15. Moreover, the facts here

are not disputed by trial counsel. For example, in Ground 1, Mr. Barrett specifically relied upon

the declaration of Dr. Jeanne Russell in which she states that trial counsel Bret Smith told her the

defense would not be able to conduct a comprehensive mitigation investigation because the

Court would not fund it. *See* Discussion in Merits Brief (Doc 149) at 27-28. The declarations of

Mr. Hilfiger and Mr. Smith that are attached to the Response specifically state that trial counsel

have reviewed Dr. Russell's declaration. Resp. Exh. 11 at ¶¶ 8-9; Resp. Exh. 12 at ¶¶ 10-11.

They do not dispute her account of counsel's thinking at the time.

The Government wholly ignores the constitutional law underlying Mr. Barrett's claim.

The sleight of hand at work in the Government's citations to *Davis* is significant for what the

Response does not say. Rule 5 of the Rules Governing Section 2255 Proceedings provides that

an "answer *must* address the allegations in the motion." (Emphasis added.) Ground 1 alleges the

trial court abused its administrative role under the Criminal Justice Act to interfere with the

constitutionally protected independence of counsel. Contrary to the Government's assertion that

Mr. Barrett showed no effect, Ground 1 shows that the trial court's administrative abuses lead

---

[2] As the Court of Appeals later said, this quotation from *Davis* was dicta. It was adopted as law in *United States v. French*, 556 F.3d 1091, 1094 (10th Cir. 2009).

John Echols to withdraw from the case and influenced the conduct of successor counsel, Roger Hilfiger, who would not use the resources the Court authorized, unreasonably limited as they were.

The Government fails to respond to the facts and the law. Mr. Hilfiger specifically addresses his failure to retain the reconstruction expert authorized by the Court, Resp. Exh. 12 at ¶ 13, which is another example Mr. Barrett gave of interference. Doc 149 at 26. Yet neither counsel dispute Mr. Barrett's contention that the Court misused its administrative authority to create a disincentive for defense counsel to retain experts and investigators. Trial counsel's silence on these issues, in declarations prepared and filed by the Government, should be treated as adoptive admissions. Fed. R. Evid. 801(2). Surely, if Mr. Hilfiger or Mr. Smith did not perceive the trial judge's actions as creating a disincentive to expend resources they would have said so, particularly as they are quoted in declarations saying the opposite.

While the Government cites the trial judge's projection regarding whether his misrepresentation of the *ex parte* hearing, and his withholding ruling on the prosecution's motion for a protective order, influenced defense counsel, (Doc 175 at 23-24), the Government fails to submit any corroboration from defense counsel themselves. On the contrary, Mr. Hilfiger states that the Government's "method of investigation thwarted the defense investigation of the truthfulness of [the snitches] at trial." Resp. Exh. 12 at ¶ 14. Mr. Hilfiger "believed that the witnesses could be effectively impeached with evidence of their prior convictions and agreements with the Government for leniency." *Ibid.*

Mr. Hilfiger previously told appellate counsel Mark Henricksen that his ability to investigate the snitches' prior convictions and offers of leniency was curtailed by the short time

before trial.  Exh. 29 at 4, Amended Motion.  Mr. Hilfiger said he did not seek a continuance in part because "he did not want to antagonize the judge," and in part because "he believed that no continuance was possible due to Judge Payne's desire to stay on schedule."  *Ibid.*  Mr. Hilfiger also told Mr. Henricksen that he compromised on the snitches because he believed that was better than nothing.  *Id.* at 4-5.  The matter Judge Payne failed to reveal to Mr. Hilfiger on September 13, 2005 included his belief that a request for a continuance would have merit, and the prosecution's motion – the source of Mr. Hilfiger's concern that he had to compromise or get "nothing" – had no merit.

Under these circumstances, if the Government could respond to these allegations, as Rule 5 requires, it would have done so.  The Government's failure to proffer any refutation of the evidence, particularly after this Court granted Mr. Barrett's request to expand the record with Mr. Henricksen's declaration, should be taken as an adoptive admission.  The only factual basis now before the Court as grounds for denying relief on Ground 1 is the self-serving factual averment of the very judge who, it is conceded, was acting in his administrative capacity, and who caused the constitutional violation.

The facts show that the manner in which the Court administered funding in this case is virtually unprecedented in the annals of federal capital prosecutions.  These funding decisions prejudicially impacted the quality of Mr. Barrett's defense in the retention of necessary experts and other tools required for an adequate defense.  The Court's active and repeated interference in the defense constitutes structural error even without a showing of prejudice, but even if this were not so, Mr. Barrett has demonstrated prejudice.

The Government fares no better with its defense of the Court's *ex parte* hearing with the prosecutors on September 13, 2005.  Doc 175 at 21-24.  The Government states that the Court had no alternative but to hold an *ex parte* hearing when the prosecutors brought to its attention that they feared for witnesses safety.  However, because the Court found at the hearing that: 1) the prosecution's motion could have been filed much earlier and was dilatory; and 2) that the prosecution had produced no evidence to support its concerns, only naked speculation that the witnesses might have had some general, inchoate, and unsupported "fear," there was no reason to take the matter "under advisement" and shield what had been discussed from the defense.  Tr. Hr'g 9/13/05 at 2-4, 7, 12, 19-20, 21.

In other words, there was no basis for a sealing order, and the matters discussed *ex parte* should have been revealed to the defense.  Since the matter improperly remained sealed and there was no basis to take it "under advisement," the defense was never made privy -- as it should have been -- to the Court's concern that the trial had already started for purposes of 18 U.S.C. § 3432, that there was no showing of danger to witnesses, and, in light of the importance of the informant witnesses to the prosecution's case, a continuance would likely be reasonable and necessary for the defense to properly investigate.  Failing to reveal these matters permitted the prosecution to thrust on the defense the untenable "arrangement" for witness "interviews" that never took place, except in one instance, and that was under supervision of the Government.  As shown in Ground 2(5), the improper failure to unseal the earlier portion of the September 13 hearing so the defense could have learned that the security concerns were groundless and the Court itself believed a continuance was appropriate contributed directly to counsel's ineffectiveness in investigating and challenging the informant witnesses.  While the Government contends that Mr. Barrett merely

recites "aspirational" ABA standards showing the Court's conduct was improper (Doc 175 at 22), this is simply not true. There can be no question that the *ex parte* hearing in this case was improper, prejudiced the defense, and permitted the Government to secure an unfair tactical advantage. *E.g., Chicago, Milwaukee, and St. Paul & Pacific Railroad v. United States,* 585 F.2d 254, 263 (7th Cir. 1978); *Greico v. Meachum,* 553 F.2d 713, 719 (1st Cir. 1976) (*ex parte* hearing was prejudicial to one of the parties).

In addition to its procedural bar argument, the Government contends that this issue is foreclosed from consideration in these proceedings because the Tenth Circuit ruled that the prosecutors had complied with the 3-day notice requirement of 18 U.S.C. § 3432. *United States v. Barrett,* 496 F.3d 1079, 1115-16 (10th Cir. 2007). But the appellate court had no opportunity to consider this issue in its proper context, because appellate counsel was ineffective in failing to raise the issue. The Government is correct that since the issue is framed by the record that was available to counsel on direct appeal, it would ordinarily be forfeited in collateral proceedings. However, as lead appellate counsel candidly admits, he negligently overlooked this meritorious issue, and had no strategic reason for doing so. Exhibit 29, Amended Motion. Had the issue of the improper *ex parte* hearing and its prejudicial impact been drawn to the attention of the Court on direct appeal, there is a reasonable probability, sufficient to undermine confidence in the outcome of the appeal, that the result would have been different. *E.g., Strickland v. Washington,* 688 U.S. 668, 684, 696-97 (1984); *Neill v. Gibson,* 278 F.3d 1044, 1057 n. 5 (10th Cir. 2001) ("reasonable probability" standard governing assessment of prejudice under *Strickland* standard applies to evaluation of ineffective assistance of appellate counsel claims; *Neill* specifically disavowed the "dead bang winner" standard erroneously invoked in *United States v. Challoner,*

583 F.3d 745, 749 (10th Cir. 2009), which the Government cites at various points of its Response; *Challoner* relied on *United States v. Cook,* 45 F.3d 388, 395 (10th Cir. 1995), which the *Neill* Court specifically discussed and disavowed).  *See also,* reply to Ground 18.

**GROUND 2:  TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN BOTH STAGES OF THE TRIAL.**

### A.    Introduction.

Before addressing specifically the Government's arguments with respect to each sub-claim of ineffective assistance of trial counsel, it is important to note at the outset that Respondent filters its contentions through flawed and improper frameworks.

The Government incorrectly analyzes the claim as a whole by arguing that in order to prevail, Mr. Barrett must show prejudice under *Strickland v. Washington,* 466 U.S. 668, 684-88 (1984) with respect to each sub-claim of ineffective assistance.  This is manifestly incorrect. Where a number of claims of ineffective assistance are raised, a reviewing Court must determine prejudice collectively, or in the aggregate.  *Fisher v. Gibson,* 282 F.3d 1283, 1289 (10th Cir. 2002); *Stouffer v. Reynolds,* 168 F.3d 1155, 1164 (10th Cir. 1999); *Osborn v. Shillinger,* 861 F.2d 612, 625 (10th Cir. 1988). While it is certainly true that a single professionally unreasonable error or omission on the part of counsel could in and of itself warrant a finding of ineffectiveness, where, as here, numerous sub-claims of ineffective assistance are raised, their combined impact, or combined prejudice, must be examined.  And, Mr. Barrett has shown that several individual errors on the part of counsel by themselves warrant relief.

Throughout, the Government repeatedly invokes the phrase "reasonable likelihood" of a different outcome as a substitute for *Strickland's* prejudice test.  It is also claimed that in

assessing prejudice, the test is more strict than that for judging whether a constitutional error is harmless. The *Chapman* harmless error test requires a reviewing Court to determine whether an error of constitutional dimension is harmless beyond a reasonable doubt. But, properly stated and understood, the prejudice prong of *Strickland* is not as onerous as the incorrect "reasonable likelihood" standard cited by the Government, and is in fact no more exacting than the *Chapman* harmless error test. A defendant claiming ineffective assistance of counsel must show that, but for counsel's unprofessional errors or omissions, there is a "reasonable probability" that the trial outcome would have been different. A reasonable probability of a different outcome does not mean "more probable or likely than not," as the Government's misleading invocation of the non-existent "reasonable likelihood" standard implies. A "reasonable probability" of a different outcome is one that simply undermines confidence in the trial verdict, and is less than a preponderance of the evidence. *Strickland,* 466 U.S. at 693-94; *Stouffer v. Reynolds,* 214 F.3d 1231, 1234-35 (10th Cir. 2000) (*Stoffer II)*; *Miller v. Anderson,* 255 F.3d 455, 459 (7th Cir. 2001).

### 1.    Trial counsel operated under a conflict of interest.

The Government argues Mr. Barrett makes a conclusory and undeveloped claim that trial counsel operated under a conflict of interest detrimental to Mr. Barrett's defense because of the trial court's funding decisions, and counsel's evident unwillingness to "rock the boat" by seeking necessary and proper funding for defense services according to prevailing professional norms. It is argued that Mr. Barrett fails to establish a nexus between the Court's funding decisions and counsel's actions, or inaction, and that Movant has failed to show how counsel's actions with respect to funding prejudiced him. Similarly, the Government urges that the Court's funding

decisions did not create an incentive for trial counsel to save the Court money at the expense of Mr. Barrett's defense.  No such conflicting loyalties existed because, according to Respondent, the Court encouraged counsel to seek additional funding if they deemed it necessary.  Doc 175 at 25-27.

In Ground 1 and throughout Ground 2, Mr. Barrett showed that the Court's funding decisions indeed did create a conflict between counsel and Mr. Barrett, which resulted in prejudice to Mr. Barrett; the claim is not undeveloped.  Mr. Echols aggressively pursued sufficient funding to retain needed experts and investigators, and got little more than trouble and rock-bottom approvals for funding for his efforts.  Exh. 34, Declaration of John Echols; Exh. 64, letter from the Court to Mr. Echols; Exh. 65, response letter from Mr. Echols to the Court, Exh. 118, Declaration of Richard Burr, Amended Motion. Once Mr. Echols was off the case, counsel never challenged the inadequate funding that had been approved, never sought more funding, and, with respect to a crime scene reconstructionist, a mitigation specialist, and assistance from an *appropriate* mental health professional or professionals, did virtually nothing.  Counsel simply acquiesced in the unreasonable conditions imposed by the Court for Mr. Barrett's representation.  The Court wanted to use Mr. Barrett's case as a test case for a capital bar in the Eastern District (Exhs. 54, Declaration of Susan Otto; Exh. 67, Declaration of Julia O'Connell) rather than seeking the most suitable counsel for Mr. Barrett, and trial counsel were evidently part of this experiment.  Mr. Hilfiger received a raise after he was elevated to lead counsel.  All this demonstrates, contrary to the Government's argument, that there were indeed financial and other incentives for counsel to do it the Court's way, rather than seeking the resources to properly and zealously represent Mr. Barrett. *Cuyler v. Sullivan,* 446 U.S. 335, 349 (1980); *Wood v.*

*Georgia,* 450 U.S. 261, 271 (1981); *United States v. Bowie,* 392 F.3d 1494, 1500 (10th Cir. 1990).

> **2.** **Counsel were professionally unreasonable and ineffective in failing to properly re-urge the motion to suppress under *Franks v. Delaware,* 438 U.S. 154 (1978). Appellate counsel were ineffective for failing to raise the issue, to the extent it was framed by the record, on direct appeal.**

Respondent argues trial counsel were not ineffective due to the manner in which they raised a mid-trial motion to suppress the evidence seized in the search of Mr. Barrett's home and property under *Franks v. Delaware,* 438 U.S. 154 (1978). According to the Government, even if trial counsel had raised all the arguments in support of the motion based on Charles Sanders's trial testimony, which, as Movant has shown, conflicted sharply with virtually all the information he supposedly supplied Clint Johnson in support of the warrant affidavit, it would have made no difference. In denying the motion, the Court properly focused on the honesty of the affiant (Johnson), not the honesty or credibility of the informant (Sanders). The Government argues that simply because Johnson stated in the search warrant affidavit that Sanders had given "reliable" information in the past, Johnson had a "good faith" basis for crediting this information, and that Johnson's "good faith reliance" on Sanders is unassailable under *Franks*. Doc 175 at 27-28, 30.

If this were the law, *Franks* would collapse on itself. Essentially, the Government argues that so long as the affiant simply states he has a good-faith belief in the source's information based on a naked statement that the informant has provided reliable information in the past, a warrant is immune to attack under *Franks*. According to the Government, this is true regardless of whether the surrounding facts actually support such a belief, and regardless of what is actually

contained in or omitted from a warrant affidavit.  It is also true regardless of the honesty of the informant.  In support of its argument that the Court here rightly focused on the truthfulness of the affiant rather than the informant, the Government cites *United States v. Tisdale,* 248 F.3d 964, 973-74 (10th Cir. 2001), but this case nowhere supports the broad claim made by the Government, which is unsupported by the law in any event.  Doc 175 at 27.  In *Tisdale*, the Court was not even dealing with information from a confidential informant to provide the basis for probable cause, but a citizen witness who was at the scene of a fatal shooting and the defendant himself, who had been shot.  Any alleged omission of facts in the warrant affidavit was inadvertent and immaterial, and based on what the affiant learned at the scene of the shooting, it was reasonable to conclude that probable cause had been established for the search of an automobile.  *Tisdale* does not state that an informant's reliability, and information concerning the informant's reliability (if any) communicated to the magistrate is "irrelevant" under *Franks.* There was no such issue in the case.

The Government simply ignores the cases cited by Mr. Barrett which show that in assessing probable cause, the believability of a confidential informant, and the extent to which the information has been corroborated, is critical.  *United States v. Bernal-Obeso,* 989 F.2d 331, 335-36 (9th Cir. 1993); *United States v. Dawkins,* 17 F.3d 399, 404 (D.C. Cir. 1994); *Phaneuf v. Franklin,* 448 F.3d 591, 597-99 (2nd Cir. 2006).  Likewise, the Government ignores that information bearing on a confidential informant's believability -- such as motive (escaping their own troubles with the law), criminal record, drug use, and continuing criminal activities --  if deliberately or recklessly misstated or omitted from a warrant affidavit, which is exactly what happened here with Johnson's affidavit -- supports a *Franks* motion.  *United States v. Vigeant,*

176 F.3d 565, 573 (1st Cir. 1999); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997); *United States v. Sorrells,* 714 F.2d 1522, 1528 (11th Cir. 1983). An unsupported conclusion that the informant has given reliable information in the past, such as occurred here, not only fails to shield a warrant from an attack under *Franks*, but is virtually meaningless. *United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996); *United States v. Foree,* 43 F.2d 1572, 1575-76 (11th Cir. 1995); *United States v. Miller,* 753 F.2d 1475, 1480 (9th Cir. 1985).

Not only were trial counsel ineffective for failing to raise all the many contradictions between Sanders's trial testimony and the information contained in the warrant affidavit as a basis for the *Franks* motion, they were also ineffective for failing to argue that Johnson deliberately or recklessly omitted from the warrant affidavit any and all information bearing on Sanders's motives and credibility as a whole -- the many favors he had received for his informant work, his lengthy and continuing criminal history, including crimes of dishonesty, and his ongoing drug use. Similarly, counsel failed to argue that in this context, Johnson's statement that the C.I. was "reliable" carried no weight and that it was dishonestly and recklessly made. Counsel also failed to point out, because they had not sufficiently researched Sanders's criminal history, that Johnson gave false testimony before the magistrate judge as to whether Sanders's had a prior record for drug distribution or delivery. The totality of the facts and circumstances establishes that Johnson in no sense could place "good-faith" reliance on Sanders.

The Government argues in the alternative that "even if" Sanders's honesty or believability could form the basis for a *Franks* challenge, the contradictions and denials of the information contained in the warrant affidavit established by Sanders's trial testimony were insignificant, and could be chalked up to a faded memory. Regardless, according to the Government, nothing in

Sanders's trial testimony showed that Johnson had any reason to doubt his supposed information at the time the warrant was secured. Doc 175 at 28-30.

These arguments fail. The Government glosses over the numerous material contradictions between Sanders's testimony and the information contained in the search warrant affidavit, which were unreasonably overlooked by defense counsel in making the mid-trial *Franks* challenge. Doc 175 at 29-30. There is no need to repeat here the laundry list of contradictions, which were outlined in Mr. Barrett's Amended Motion. Doc 96 at 34-47; Doc 149 at 39-43. Suffice it to say, the contradictions which emerged between the information alleged in the warrant affidavit and Sanders's trial testimony undermined the entire factual basis for the affidavit, showing both that Sanders was a thoroughly unreliable source who would lie at the drop of a hat for his own self-serving purposes, and that any honest and reasonable law enforcement officer would have no reason to use anything he had to say as the foundation for a search warrant. The numerous and material contradictions between the information contained in the warrant affidavit and Sanders's testimony speak not to a "faded memory," but show he is a pathological liar who has not even a passing acquaintance with the truth. On this record, it is absurd to assert that Sanders's trial testimony does nothing to "undermine" Johnson's belief in him. In his trial testimony, Sanders repudiated virtually the entire factual basis for the warrant affidavit.

Finally, the Government dismisses as unimportant "dicta" the trial court's ruling that the inadequately urged *Franks* motion was without merit because, some six years after the fact, the Government's other informant witnesses "corroborated" Sanders. Doc 175 at 30. Contrary to

the Government's claim, Movant is not "speculating" that this was a basis for the Court's ruling; it is stated in the order itself as one reason for denying the motion.

Respondent argues that appellate counsel were not ineffective for failing to raise the *Franks* issue, to the extent it was framed by the record, because the issue lacks merit.  But the record shows that it is reasonably probable the outcome of the appeal would have been different had the issue been raised, even based on what was apparent on the record.  At the very least, it is reasonably probable that the matter would have been remanded for a proper *Franks* hearing. *Strickland v. Washington,* 466 U.S. 668, 684, 696-97 (1984); *See* Ground 18 and reply to Government's arguments respecting Ground 18.

> **3.    Counsel were professionally unreasonable and ineffective for failing to investigate and introduce evidence of Mr. Barrett's diminished mental capacity in the guilt/innocence stage of trial.**

The Government argues that trial counsel did not render deficient performance to Mr. Barrett's prejudice when they failed to investigate and present evidence of Mr. Barrett's mental illnesses in support of a diminished capacity defense, *i.e.,* that Movant lacked the intent to commit the offenses charged, or in support of a lesser included offense instruction.  Doc 175 at 32.  It is alleged that counsel had no reasonable duty to investigate, because they were unaware of Mr. Barrett's mental problems and had no reason to be aware of them.  Doc 175 at 32-33; Resp. Exhs. 11, 12.  The Government also argues that anything that could have been discovered about Mr. Barrett's mental state would have been irrelevant to the intent elements of the charges in the

superseding indictment. Doc 175 at 35-36. Being unsupported by both the facts and the law, these arguments should be rejected.[3]

### a.    Deficient performance.

Just as it does in connection with counsel's duties to investigate mitigating evidence, the Government badly misstates counsel's responsibilities to investigate Mr. Barrett's mental state in aid of the first stage defense. As it does throughout its response, the Government falsely asserts that counsel's investigative duties extend only to the information provided by the client, and their observations of him. The Government argues that because Mr. Barrett appeared to counsel not to have mental problems, there was no duty to delve into this area.

There is no support for this argument. For one, as is also discussed in the reply to the Government's arguments on penalty phase ineffectiveness, competent counsel in a capital case would never simply rely on what the client tells them, or their observations of the client, to assess the defendant's mental health. *Gray v. Branker,* 529 F.3d 220, 230-31 (4th Cir. 2008); ABA Guidelines, 10.7, 10.10.1, and 10.11. As it also does in its discussion of second stage ineffectiveness, the Government invokes Dr. Woods's observation that at first blush, Mr. Barrett evinces no obvious outward signs of mental illness. Doc 175 at 35. This simply underscores Mr.

---

[3] The Government's argument that there were no lesser included offenses to the charges in the superseding indictment will be deferred to Mr. Barrett's reply to the Government's arguments against Ground 9. Mr. Barrett showed in Ground 9, and shows below, that constitutional error was committed when the Court failed to instruct on voluntary manslaughter as a lesser offense to each of the three charges faced by Mr. Barrett. That being the case, the failure to investigate and present evidence of Movant's mental state to negate the intent requirements for the crimes charged, in connection with the request (made both by the prosecution and the defense) for a voluntary manslaughter instruction, was both professionally unreasonable and prejudicial under *Strickland* and its progeny.

Barrett's point: appearances mean nothing and counsel must *investigate. McGahee v. United States,* 570 F.Supp.2d 723 (E.D. Pa. 2008) (to investigate means to delve into areas at present unknown).

As Mr. Barrett reiterates later in his discussion of penalty phase ineffectiveness, the claim that counsel were unaware of a need to investigate Mr. Barrett's mental health is flatly belied by the record. The Government baldly ignores the facts.

Mr. Echols and Mr. Hilfiger requested expert psychiatric and psychological assistance, stating it was necessary to investigate the effects on Mr. Barrett of a life and death situation to support the defense that Mr. Barrett was unaware the police were on his property when he fired the shots ("the psychology of individual responses to sudden life or death situations ...is essential to Mr. Barrett's capital defense, which hinges on an understanding of the human mind's response...[and] will negate the Government's allegations of premeditation and malice aforethought relating to capital punishment." Messrs. Echols and Hilfiger also requested the assistance of a neuropsychologist. Doc 46 at 5; Doc 50 at 5-6, 8. Mr. Hilfiger, based on the requests for expert assistance, has thus already acknowledged that this type of investigation and assistance was required to counter the Government's theory of the case -- that Mr. Barrett was expecting a police raid and was ready to repel it with deadly force. This alone disproves the Government's claim that counsel were defensibly ignorant.

As it does in its second stage ineffectiveness argument, the Government dismisses Mr. Barrett's medical records as showing only that he was an ill-tempered drug addict Doc 175 at 34. The facts are otherwise. These records, which were in counsel's actual or constructive possession, put counsel on full notice that Mr. Barrett suffered from mental illness. Given the

facts of the case and the planned defense, an investigation and the development of evidence of mental impairments was crucial.  Even Mr. Barrett's use of methamphetamine put counsel on notice of mental or emotional problems, due to the well-known effects of the drug on the brain. The fact that Movant had attempted suicide by shooting himself in the chest with a shotgun and was, after recovery in the hospital, committed to the state mental facility in Vinita was more than a red flag.  Counsel were certainly aware of this or were on notice of it, since the records had been acquired by previous defense counsel.  The medical records show Mr. Barrett had been diagnosed variously with Major Depression, Bipolar Disorder, and had been medicated with anti-psychotic drugs, which were prescribed for future use.  Exh. 147 A-F, Amended Motion.   It is simply absurd to argue that counsel were legitimately ignorant of Mr. Barrett's mental problems, and had no reason to investigate.

Counsel were also aware of a prior diagnosis highly relevant to the overall defense theory of the case.  In their declarations accompanying the Government's response, counsel state that they recall nothing about Dr. Sharp and his report.  Resp. Exhs. 11, 12.  Dr. Sharp states otherwise.  Exh. 55, Amended Motion.  Dr. Sharp had examined Mr. Barrett for the defense in connection with the state proceedings.  He found Mr. Barrett suffered from serious mental illness  Dr. Sharp describes Mr. Barrett as the most paranoid person he had ever examined and concluded there were signs of organic brain damage that a specialist should further investigate. Dr. Sharp's diagnosis of extreme paranoia would have been extremely important to the defense that was offered at trial, as it would tend to negate knowledge and intent for the reasons described in the brief supporting Mr. Barrett's Amended Motion, and briefly below in the discussion of prejudice.  Doc 149 at 49, 52.  Based on this alone, since Dr. Sharp had examined

Mr. Barrett in relation to the same event that was being prosecuted in federal court, defense counsel were certainly aware or on notice of him and his report.

But there is more. Counsel were actually aware of Dr. Sharp. At various points in its response, the Government takes pains to argue that counsel had retained and consulted with Dr. Russell, and that this constituted a sufficient investigation of Mr. Barrett's mental state.[4] *E.g.*, Doc 175 at 34. Defense counsel knew about Dr. Sharp because the report written for them by their own expert, Dr. Russell, referenced Dr. Sharp's report explicitly and enumerated the testing instruments he employed. *See* Docs. 208, 210; Mot. Exh. 56 at 3-4. Dr. Sharp's diagnosis, particularly combined with all the other facts mentioned above, undoubtedly imposed on defense counsel a duty to investigate.

Defense counsel also failed to investigate Mr. Barrett's mental state with Movant's family members. Not only would this be a natural first step in any investigation, but it gave "real world" corroboration to medical findings in the records and Dr. Sharp's diagnosis, both of which counsel unreasonably ignored. The Government, skimming the surface of the family members's declarations, broadly claims that Mr. Barrett's family simply related old information that was irrelevant to his mental state at the time of the offense. Doc 175 at 33, 34. This is simply not true. Even a cursory reading of the declarations, particularly taken together, reveals the history of bizarre and paranoid behavior on Mr. Barrett's part, leading up to and including the time of the fatal incident. Exhs. 74, 78, 80-81, 85-87, 91, 93, 96-99, 101, 103, Amended Motion. Yet,

---

[4] This contention itself lacks persuasive force. As shown in Mr. Barrett's reply on the issue of second stage ineffectiveness, Dr. Russell, who simply updated the risk assessment she did in state court, and was neither a psychologist nor a neuropsychologist, was not an "appropriate expert" to diagnose the mental problems Mr. Barrett suffers from.

counsel never discussed these matters with the witnesses, a number of whom were called in the penalty phase.  Exhs. 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218.

No legitimate strategy animated counsel's decision not to investigate, since this evidence dovetailed and strengthened the planned defense.  In the absence of a competent investigation, no reasoned and informed tactical choice can be made.  *E.g., Soffar v. Dretke,* 368 F.3d 441, 474, *amended,* 391 F.3d 703 (5th Cir. 2004); *Workman v. Tate,* 957 F.2d 1339, 1345 (6th Cir. 1992).

### b.    *Prejudice.*

Although in assessing prejudice, the Court must accumulate the individual allegations of ineffective assistance, *e.g., Rompilla v. Beard,* 545 U.S. 374, 391-92 (2005); *Stouffer v. Reynolds,* 214 F.3d 1231, 1235 (10th Cir. 1999), it is clear that counsel's failure to investigate and present mental health evidence prejudiced Mr. Barrett in the first stage of trial.

Citing *United States v. Brown,* 326 F.3d 1143, 1147 (10th Cir. 2003),  the Government argues that even if counsel performed a professionally inadequate investigation, the omission of the mental health evidence created no *Strickland* prejudice because it would not have negated the intent elements of the offenses, which the Government seemingly analogizes -- incorrectly -- to strict liability offenses.  Doc 175 at 35-36.  *Brown,* which was not a murder case, excluded psychiatric evidence because there was no "nexus" between the diagnoses of post-traumatic stress disorder and chemical dependence and the intent element of conspiracy to distribute methamphetamine.  Instead of being relevant, the evidence proffered in *Brown* would only present a confusing defense more akin to justification than go to negating the intent element of the charged offense (which is completely unlike the intent elements in Mr. Barrett's case).

That is not the case here. Although with respect to count 3 of the superseding indictment (charging violation of 21 U.S.C. § 848(e)(1)(B)) the Government tries to downplay the intent element, emphasizing Mr. Barrett only "should have known" that the persons he was firing on were police officers, the intent required is actually quite specific. The Government had to prove beyond a reasonable doubt that Mr. Barrett had the specific intent to kill Trooper Eales, knowing or having reason to know that he was a law enforcement officer, and that the killing was committed on account of or during the performance of his official duties. In other words, Mr. Barrett was alleged to have intended to kill Trooper Eales because he was a law enforcement officer. Count 2 (charging violation of 18 U.S.C. §924(c)(1)(A) and (j)) also required a specific intent to kill a law enforcement officer. To be found guilty of count 2, which charged Mr. Barrett with using and carrying a firearm during and in relation to a crime of violence, the Government had to prove beyond a reasonable doubt the underlying crime of violence, *i.e.,* that he intentionally killed "any state or local law enforcement officer engaged in, or on account of such official duties." Thus, the intent elements of counts 2 and 3 are the same. To convict, the Government had to prove not only an intentional killing, but that the homicide was deliberately (knew or should have known) committed against a law enforcement officer in the performance of his official duties, or on account of those duties. *United States v. Barrett,* 496 F.3d 1097, 1112-13 (10th Cir. 2007). The Government's argument that the intent elements did not turn on Mr. Barrett's knowledge that he was shooting at the police conflicts with the law applicable to his case.

The defense in this case was that when he fired his rifle, Mr. Barrett was unaware that he was shooting at law enforcement, and that the Government could not prove that Mr. Barrett

harbored the intent required.  The defense relied on the circumstances of the police raid -- *e.g.,* the Tact Team entered the property late at night; the fact that the lead vehicle to all appearances was a civilian automobile which the physical evidence showed had run into Mr. Barrett's cabin; questions surrounding the lighting of the other police vehicles; Mr. Barrett's son yelling out a warning -- to argue that Mr. Barrett thought he was being invaded by trespassers rather than the police.  If sufficient doubt could be thrown on the specific intent elements of counts 2 and 3, which hinged on Mr. Barrett's knowledge that the people who had driven onto his property were the police, the Government would not be able to secure convictions.

Contrary to the Government's argument, there is a clear nexus between the intent elements of counts 2 and 3 and the omitted mental illness evidence.  Mr. Barrett's extreme paranoia, flight of ideas, sometimes delusional thinking, and inability to accurately process external stimuli and recognize what is going on around him, all manifestations of his mental illnesses, *went directly to the specific intent elements of counts 2 and 3, which required knowledge and intent to kill not just someone, but a police officer because he was a police officer.*  This evidence would have powerfully supported the defense that was offered at trial, had it been properly investigated and developed.  The upshot of Dr. Woods's diagnoses is that Mr. Barrett's mental illnesses prevented him from recognizing that he was firing at the police rather than in justifiable self-defense, and that he lacked the requisite intent.  Exh. 117, Amended Motion.  Even if it could be said, as the Government suggests, that an expert could not deliver such an opinion because it would invade the province of the jury -- a dubious proposition in any case, in light of FRE 704 -- an expert could testify to his or her diagnoses, their basis, and how Mr. Barrett's mental illnesses affected his perceptions.  Counsel would then be free in closing

argument to draw the inference from this and other testimony that Mr. Barrett lacked the required intent.[5]

This evidence was also relevant to the defense of count 1, which charged Mr. Barrett with violating 18 U.S.C. § 924(c)(1)(A) and (j) by using and carrying a firearm during and in relation to a drug trafficking crime, resulting in death. *United States v. Barrett,* 496 F.3d at 1112-13. To prove Mr. Barrett guilty of this offense, the Government had to establish a nexus between the drug offense and the shooting of Trooper Eales. It is not enough to say that coincidentally or temporally, drug offenses were being committed at the time Trooper Eales was killed. The use of the firearm had to be *in relation to* the drug trafficking crime. This is shown by a case cited by the Government itself in its response to Ground 9 discusses *Beck* error. *United States v. Beckford,* 966 F.Supp. 1415, 1418 (E.D. Va. 1997), *relying on United States v. Tipton,* 90 F.3d 861, 887 (4th Cir. 1996) (proof of temporal connection between homicide and underlying drug trafficking crime will not support conviction under 21 U.S.C. § 848(e)(1)(A), the CCE statute; a substantive connection between the offenses must be shown). If Mr. Barrett fired thinking he was acting in self-defense or defense of his son from illegal intruders, and not the police, his act would have no substantive connection to any drug trafficking crime.

---

[5]  The Government elsewhere criticizes the findings of Drs. Woods and Young as being irrelevant to Mr. Barrett's mental state at the time of the shooting. Doc 175 at 121. This argument has no merit. A court determining a post-conviction ineffective assistance claim must take into account evidence developed in the post-conviction proceedings. The diagnoses of Drs. Woods and Young relate back to the time of the offenses. Mr. Barrett cannot be penalized for bringing this evidence forward now, because trial counsel were ineffective for failing to investigate and develop it at the time of trial. *Gray v. Branker,* 529 F.3d at 236-37.

Counsel were ineffective for failing to investigate Mr. Barrett's mental illnesses, which were directly relevant to his trial defense. No reasonable strategy excuses the failure to investigate, and Movant was prejudiced. Ineffective assistance has been found in similar cases involving the failure to investigate mental illnesses similar to those suffered by Mr. Barrett, which aided in establishing a diminished capacity or lack of intent defense. *Jacobs v. Horn,* 395 F.3d 92, 102-07 (3rd Cir. 2005); *Jennings v. Woodford,* 290 F.3d 1006, 1014-19 (9th Cir. 2002), *cert. denied,* 539 U.S. 958 (2003); *Seidel v. Merkle,* 146 F.3d 750, 756-57 (9th Cir. 1998), *cert. denied,* 525 U.S. 1093 (1999); *Saranchek v. Beard,* 538 F.Supp.2d 847, 863-78 (E.D. Pa. 2008).

The prejudice from counsel's failure to investigate is compounded with other errors and omissions in investigating and developing evidence that would have been supportive of the defense theory, including evidence to impeach the informants, the testimony of eyewitnesses Toby Barrett and Alvin Hahn, and the failure secure proper expert assistance in SWAT tactics and crime scene analysis, all of which, taken together, would have refuted or tended to refute the Government's theory of the case.

### 4. Failure to raise competency issue was constitutionally ineffective assistance of counsel.

The Government's contention that because Mr. Barrett lacked noticeable psychiatric issues his counsel had no notice of his incompetency does not relieve counsel of their duty to know. Doc 175 at 37. When placed in context, the evolving communication actually supports counsel's responsibility to further investigate and litigate Barrett's mental health issues, including the impact that mental health would have on their client's ability to rationally assist in his defense. The mental health history which was known to trial counsel demanded further

inquiry.  Beyond that, as noted below, counsel did know that the Court-ordered stun belt which could send electric shock through their previously abused client was likely to interfere in his ability to assist.  *See* CR 04-115-P at 6; Tr Hrg at 8/31/05 at 95-96; *see also,* Ground 7 hereinbelow.

The Government's reliance on *Foster v. Ward,* 182 F. 3d 1177, 1186 (10th Cir. 1999) should be noted.  In *Foster*, the defendant had a pre-trial competency determination and actually testified at trial, which the Court found was "logical and coherent."  182 F. 3d at 1191.  There is nothing in the case which relieves counsel of the obligation to be alert to the mental health concerns of the client but simply finds counsel were not ineffective for failing to request a post-hearing competency exam because the substantive claim to the exam was non-meritorious.  *Id.* at 1186.  Similarly, in *U.S. v. Rivas*, 862  F. Supp. 208, 212 (N.D. Ill 1994), the Court found only that there was "no evidence that his attorney had reason to question his competence."  *Id.* Neither undermines the strength of the claim here.

> **5.     Counsel were ineffective for failing to move for a continuance and for failing to conduct a professionally reasonable investigation which would have led to abundant impeachment evidence of the prosecution's informant witnesses.**

> *a.     Failure to move for a continuance.*

The Government asserts that counsel were not ineffective for failing to move for a continuance after the seven informant witnesses, for which there was no discovery, were sprung on the defense shortly before the commencement of the trial proper.  It is maintained there were no grounds for a continuance because the prosecution technically complied with the 3-day notice requirement of 18 U.S.C. § 3432 as determined by the Tenth Circuit on direct appeal; that the

defense reached a reasonable agreement with the prosecution for interviewing the informant witnesses; that any continuance to permit investigation into the informants would have constituted an undeserved windfall for the defense, resulting in mere delay; and that any continuance would not have produced substantial evidence favorable to Mr. Barrett. *E.g.,* Doc 175 at 40, 41. None of these arguments has legal or factual support.[6]

The fact the Tenth Circuit ruled the prosecution complied with the 3-day notice requirement has nothing to do with whether a continuance should have been requested, would have been granted, or whether more time was necessary in order for counsel to conduct a reasonably professional investigation into the informant witnesses. There is no law stating a continuance is unavailable or would be unreasonable simply because the prosecution has complied with the 3-day notice requirement, and the Government cites none. The Tenth Circuit's ruling dealt with a matter of relatively straightforward statutory construction, *Untied States v Barrett,* 496 F.3d at 1115-17; the Court obviously had no opportunity to pass on evidence and arguments showing that notwithstanding compliance with the notice statute, counsel were professionally unreasonable for failing to secure additional time to properly investigate these crucial witnesses. At certain points in its response, the Government argues that these witnesses were not central to the Government's case, or at any rate, their individual credibility was not important (see below) (Doc 175 at 44), but this late-coming assertion conflicts with the statement of the United States Attorney himself, who credited the informants, and AUSA's Littlefield's

---

[6] Movant deals with the prejudice stemming from defense counsel's failure to move for a continuance and failure to investigate and present impeaching cross-examination and evidence relating to the informant witnesses below.

work in cultivating them, as the key to the conviction.  These witnesses were unquestionably the difference between the state trial, where Mr. Barrett was convicted of manslaughter, and the federal case.  Exh. 69, Amended Motion.  This constitutes an admission by a party opponent. FRE 801(d)(2).

The Government's argument that no grounds for a continuance existed is in stark contradiction to the trial court's own statement -- to which the prosecutors did not disagree -- at the *ex parte* hearing that the motion for a protective order was dilatory and that, based on the importance placed on these witnesses by the Government, the prosecutors were setting the case up for a "long continuance."  Tr. Hr'g 9/13/05 at 3-5, 7, 12, 19-20.  The Court recognized the obvious -- it was far too late in the day for the defense to adequately investigate and prepare to cross-examine these witnesses at trial, given their pivotal role in the Government's case. Although the Court ruled during the *ex parte* hearing that the prosecution's motion for protective order was not only late, but without merit, the Court strung the matter along by taking under "advisement" a motion it  already deemed lacked factual and legal support, thereby giving the Government the green light to manipulate defense counsel into a situation that would all but ensure the absence of a proper investigation due to a lack of time and the conditions for "interviewing" the witnesses under the prosecution's watchful eye.

The Government claims that defense counsel's acquiescence in this arrangement was reasonable (Doc 175 at 40), completely overlooking that nothing in the way of investigation was accomplished with it.  All but one of the informant witnesses refused to be interviewed, and the one interview that did take place, of Randy Weaver, occurred under close Government watch. No reasonable defense lawyer would agree to such an arrangement, which was designed to

frustrate, and did frustrate, any *independent* attempt to speak with these witnesses or investigate them further.

The Government is partially correct, so far as it goes, in stating that notwithstanding the *ex parte* hearing, the defense did not have to agree to the one-sided "arrangement," and could have moved for a continuance.  Doc 175 at 40-41.  But the effect of the *ex parte* conference and its aftermath on what counsel believed they could do is significant.  The fact counsel did not move for a continuance underscores Movant's ineffectiveness claim, rather than defeats it.  As shown in the Amended Motion, brief in support, and here, counsel's failure to move for a continuance or otherwise appropriately investigate the informant witnesses assured that the *substance* of their testimony would emerge largely intact, and that the impeachment would be "around the edges," concentrating (and even then in an incomplete fashion) only on previous convictions, drug use, and motive.  *United States v. Fuller,* 938 F.Supp. 731, 733-34 (D. Kan. 1996) (among other reasons counsel found ineffective was failing to insist on adequate time to prepare for trial).

### b.   *Deficient performance.*

Based in part on the declaration of Mr. Hilfiger, the Government argues counsel made a reasoned "strategic choice" to concentrate on impeaching the informant witnesses with their drug use, prior criminal records, and, with respect to some, their hopes of receiving leniency based on their testimony against Mr. Barrett.  Resp. Exhs. 12 ¶ 14; Doc 175 at 42.  But this ignores that, due to the failure to move for a continuance and in no small part the machinations of the Court and prosecution, this was all counsel believed they were left with.  Mr. Hilfiger unreasonably acceded to the arrangement due to his belief, according to the declaration of lead appellate

counsel Mark Henricksen (Exh. 29, Amended Motion) that it was better than nothing, and that nothing else could be done. "Better than nothing" is obviously not consistent with a reasonable investigation and reasoned strategic choices. Mr. Hilfiger states that he believed his ability to investigate the informant witnesses was frustrated by what can only be described as the prosecution's obstructionist tactics. Resp. Exh. 12, ¶ 14.

The Government's argument on this score not only ignores what is apparent from the declarations of trial counsel, but the record itself and the applicable law. A reasoned strategic choice under *Strickland* requires a knowing choice made after adequate investigation, not a *fait accompli* made in an investigative vacuum because counsel was painted into a corner that rendered effective investigation an impossibility. In the face of these obstacles, counsel still failed to utilize the time they had to launch an investigation or move for a continuance. Mr. Barrett has proved, and the Government cannot really contest, that no professionally reasonable investigation was conducted into the informant witnesses. The failure to investigate cannot be excused by after-the-fact rationalizations dismissing the importance of evidence that was never known. The specific claim made here -- that counsel made a "tactical choice" to proceed with the impeachment they had, believing it to be adequate -- is unavailing. *E.g., Wiggins v. Smith,* 539 U.S. 510, 526-27 (2003); *Workman v. Tate,* 957 F.3d 1339, 1345 (6th Cir. 1992); *Richards v. Quarterman,* 578 F.Supp.2d 849 (N.D. Tex. 2008), *aff'd* 566 F.3d 553 (5th Cir. 2009); *Pillette v. Berghois,* 630 F.Supp.2d 791 (E.D. Mich. 2009).

The Government contends, as it does in response to the second stage ineffectiveness claim, that because the witnesses who could have impeached the informants, and/or provided impeaching evidence to use on cross-examination, were friends and relatives of Mr. Barrett's,

counsel's duties to investigate went no further than what Mr. Barrett told them. Doc 175 at 43. If Mr. Barrett did not detail the witnesses to contact, counsel had no duty to independently investigate. As is also discussed in Mr. Barrett's reply to the Government's second stage ineffectiveness argument, this is not the law. Counsel had an independent duty to investigate, regardless of what they were told or not told by Mr. Barrett. Independent investigation must be undertaken even when the client is uncooperative or even obstructive. *E.g., Porter v. McCollum,* 130 S.Ct. 447, 453 (2009); *Rompilla v. Beard,* 545 U.S. 374, 381 (2005); *Hamilton v. Ayers,* 583 U.S. 1100, 1117-18 (9th Cir. 2009). The Government makes the same argument in connection with its claim that, with Mr. Barrett as a source (in the Government's wrongheaded formulation, the only source necessary) for information about these witnesses, counsel could not have made a meritorious motion for continuance. Doc 175 at 40-41. For the same reason stated immediately above and for the reasons stated in subpart 1 of this reply, the "no grounds for a continuance" claim fails.

Without a trace of irony, Respondent alleges that counsel did not render deficient performance (and that Mr. Barrett did not suffer prejudice) because, in the main, the independent fact witnesses who could have given helpful testimony on Movant's demeanor, absence of threats to law enforcement, and who could have contradicted the accounts of Charles Sanders and Travis Crawford as to what was said and what transpired on the afternoon before the shooting, would have had credibility problems because of drug use, prior criminal records (as with Sean Hill), or bias toward Mr. Barrett and against some of the informant witnesses (*i.e.,* Sean Hill, Brandy Hill, and Gwendolyn Crawford with respect to Cindy Crawford). Doc 175 at 43, 47, 57, 61. The same argument is made with respect to those witnesses (some of them the same), who could have

testified that the Government's informants were personally known to them to be dishonest, and had shabby records in the community for dishonesty, as well as witnesses who could have provided counsel with information about past bad acts of the informants which reflected on their dishonesty.[7]  Doc 175 at 43, 47, 57, 61..

Apparently the Government's informant witnesses, who had even more impeaching evidence in their criminal backgrounds than the witnesses omitted here; "came forward" six years after the fact; and in some cases (Sanders, Turman and Real, most prominently) had a powerful motive to please the prosecutors with the (ultimately realized) hopes of quick release from prison or dismissed charges, are above reproach from charges of bias, while Mr. Barrett's witnesses, because they were friends and family, are automatically suspect.  This classic pot-kettle argument cannot be accepted.

Even granting that some of Mr. Barrett's witnesses could have been attacked for bias, drug use[8], and the like, this in no way diminishes the ineffectiveness claim.  These witnesses

---

[7]  Setting up a strawman, the Government responds to an argument Mr. Barrett never made.  The Government states that witnesses who could have provided counsel with fodder for cross-examination on the informants' past bad acts exhibiting dishonesty could not themselves have testified to these facts.  Such would constitute the use of extrinsic evidence to impeach the witnesses on a collateral matter.  Doc 175 at 45.  Fed.R.Evid. 608(b).  The Government is correct.  That is why Mr. Barrett only argued that counsel were ineffective for not discovering this impeachment evidence for use on cross-examination of the witnesses only, a matter which lies in the discretion of the Court.  Doc149 at 61, 62, 64.

[8]  The Government argues that witnesses present at Mr. Barrett's property on the afternoon and evening of September 23 would have undermined Mr. Barrett's defense because they were using drugs there, which would have supported the prosecution's largely drug-based charges.  Doc 175 at 44.  But Mr. Barrett has never denied he was a drug user, or associated with drug users.  The question was whether he was manufacturing or trafficking drugs, and whether there was a substantial connection between the alleged drug crimes and the shooting of Trooper

(continued...)

were unquestionably helpful to the defense, both to impeach the informants' honesty and

substantive testimony, as well as support the defense of lack of intent and knowledge.  Questions

of credibility are to be resolved by a jury, not the Government.  *Anderson v. Johnson,* 338 F.3d

382 (5th Cir. 2003) (failure to call eyewitness who would have supported defense theory could

not be excused because counsel believed witness would not be credible, and holding that with

respect to an ineffectiveness claim grounded in a failure to interview a witness, the potential

persuasiveness of the omitted witness is largely immaterial); *Pillette v. Berghois, supra* (deficient

performance and prejudice found where counsel failed to interview four witnesses who would

have contradicted prosecution witnesses and would have corroborated defendant's testimony, at

least in part; prejudice was also established, because even though the jury could have possibly

discounted the witnesses due to bias and inconsistencies in accounts, there remained a reasonable

probability that the jury would not have rejected their testimony); *McGahee v. United States,* 570

F.Supp.2d 723 (E.D. Pa. 2008) (failure to investigate alibi witnesses could not be justified by

after-the-fact rationale, since counsel cannot downplay or dismiss evidence for which no

reasonable investigation was made; prejudice shown even though witnesses had their own

---

[8](...continued)
Eales.  With respect to Janesse Thomas, the Government argues that her testimony would have been "toxic" to Mr. Barrett's defense (Doc 175 at 58, Resp. Exh. 3), because she had "apparently" been to Mr. Barrett's residence on occasions when drugs were sold, and Ms. Thomas had, according to Resp. Exh. 3, bought drugs from Mr. Barrett in the past.  However, her latest declaration in no way diminishes her contradiction of Charles Sanders's accounts of being with her at Mr. Barrett's residence during the critical time period, and her alleged purchase of drugs from Mr. Barrett occurred approximately one year before the raid.  On balance, her testimony was helpful to Mr. Barrett, because it would have specifically impeached Charles Sanders.  It should be kept in mind that the Government had to show a substantive connection between the underlying drug charges and the shooting of Trooper Eales, at the time of the fatal act.

credibility problems and even contradicted one another to an extent; the credibility of these nonetheless helpful witnesses was for a jury to resolve); *Casey v. Frank,* 346 F.Supp.2d 1000, (E.D. Wis. 2004) (deficient performance and prejudice found where counsel failed to discover or utilize statements in previous counsel's file that undercut witness credibility, where credibility was the key issue in the case).

The bias and interest of the Government's own witnesses and the state of the law aside, the Government's "bias" argument is misplaced. Contrary to the Government's claim, a number of the impeaching witnesses had no bias for Mr. Barrett, or had "cross-biases" (if any) that canceled one another other out. For example, one of the witnesses who could have testified to Charles Sanders's totally lack of honesty was his uncle, Billy Poindexter. Exh. 76, Amended Motion. Sally Davis Johnson had no apparent allegiance to Mr. Barrett. Exh. 95, Amended Motion. Janesse Thomas was a friend of Charles Sanders's and Movant's. Exh. 13, Amended Motion. Witnesses who could have testified to impeaching information, or provided counsel with impeaching facts for cross-examination with respect to several of the witnesses (such as Travis Crawford and his wife, Cindy), were not only related to Mr. Barrett, but to the Crawfords as well. Exhs.77, 78, 83, 88, 92, 95, Amended Motion. As already shown, whether the Government could have impeached the omitted witnesses for bias or drug use does not show that counsel rendered constitutionally adequate performance, because there was a total failure to investigate. The informant witnesses certainly had their own biases and interests, and it would be up to a jury to resolve a credibility contest.

Questioning the informants superficially about their drug use, prior convictions, and hopes for leniency was not sufficient impeachment, based on all the other impeaching evidence

that was out there but never investigated.  The Government claims that the "strategy" employed by defense counsel was to impeach the informant witnesses with their prior criminal histories, drug use, and, on the part of some, hopes for leniency.  But the Government's survey of what these witnesses were asked in these areas, and what was left out, demonstrate that counsel even did an inadequate job in these impeachment efforts.  A few examples suffice.

The Government claims that Sanders was impeached with "all" his criminal convictions, but, the Government's arguments to the contrary, it is clear that only ten of Sanders's eighteen previous felony convictions were explored on cross-examination.  Doc 175 at 53-54.  *E.g.,* Exhs. 57, 72, 157-68, 175, 183-87, Amended Motion.   The Government claims the numbers make no difference, but this is inaccurate on its face and underlines the fact that counsel did not adequately examine the witness in an area that counsel "strategically decided" to focus upon in impeachment.

The Government states that counsel adequately cross-examined Sanders about the deals he received in previous cases, but then contradicts itself, quoting a portion of Sanders's cross-examination where the witness gave Mr. Hilfiger "great resistence," denying that he had actually received many favors at all.  Had counsel adequately researched Sanders's record, he could have confronted the witness with the many dismissed counts and cases that common sense shows could only have occurred due to Sanders's work as an informant.  Otherwise, he was usually looking at a minimum of 20 years and up to life imprisonment.  Exhs. 57, 72, 157-68, 175, 183-87.  The Government also claims the potential deal Sanders was to receive in this case was the only important one, but common sense dictates that if it could be conclusively demonstrated – as it could have been here – that the witness did practically nothing during his adult life but commit

crimes and get out of trouble because he was a snitch, a jury would see his testimony against Mr. Barrett was just one more sorry chapter in his career as an informant, and that nothing he said could be trusted in the slightest.

Likewise, the Government argues counsel was not ineffective for failing to question Travis Crawford about his prior work as a testifying informant and his mental problems, even aside from the effects of drug use, because counsel "had no reason to know about these things." Doc 175 at 46-47. The reason counsel did not know was because they conducted no investigation. The failure to inquire into these areas shows yet again that counsel did not even reasonably investigate the impeachment areas they purportedly decided to concentrate on. The same is true of the fact that Cindy Crawford had worked as an informant before, faced acceleration of a deferred sentence in a state drug case at the time of her testimony, could have been charged with a felony rather than a misdemeanor in a marijuana possession case, and had mental problems. The fact that she faced acceleration on her state drug case at the time she testified gave her an obvious motive to please the Government. Doc 175 at 52.

The Government claims that defense counsel effectively cross-examined Randy Turman on whether his multi-count Sequoyah County drug case had been "taken care of." When Turman denied it, all counsel did was state that he had the paperwork with him, but he let Turman slide with the answer that he would not "understand it," instead of confronting the witness directly with the documents and making him read them on the stand, or calling someone from the Sequoyah County Court Clerk's Office to impeach Turman. Contrary to the Government's argument, this would not have run afoul of FRE 608(b). The matter was not "collateral," but went to Turman's bias and motive for testifying: by pleasing the Government, he was hoping to

Movant's Reply to USA' Response
to Second Amended § 2255 Motion                    35                    *Barrett v. U.S.*, 6:09-cv-00105-JHP

get the charges dismissed, which is ultimately what happened. Doc 175 at 63-64. Evidence of bias and motive is never collateral. *E.g., Delaware v. Van Arsdall,* 475 U.S. 673, 678-79 (1986).

Trial counsel also failed to impeach Karen Real with a number of dismissed state drug cases. The Government argues that this aspect of Mr. Barrett's claim is time-barred, because it was first raised in the amendment filed in September, 2009, after the 1-year period of limitations expired. The Government also cites 21 O.S. 2001, § 11 for the claim that because of her federal drug conviction, Real could not also have been prosecuted in state Court. Doc 175 at 162. Both arguments fail. Reference to Real's dismissed state charges was not barred by the period of limitation, as it did not constitute a "new claim," only additional evidence supporting an existing claim that was timely. *Mayle v. Felix,* 545 U.S. 644 (2005); *United States v. Espinoza-Saenz,* 235 F.3d 501, 503-04 (10th Cir. 2000); *United States v. Thomas,* 221 F.3d 430, 436 (3rd Cir. 2000). Section 11 of Title 21 of the Oklahoma statutes bars multiple punishments in *state prosecutions only.* The Government also overlooks the dual sovereign doctrine, which permitted Mr. Barrett to be charged in federal court after he had already been acquitted of murder but convicted of manslaughter in state court.

### c.    *Prejudice.*

To the extent that the Government's "bias" argument is part of its assertion that Mr. Barrett suffered no prejudice because the witnesses would have been subject to impeachment by the prosecution, the above demonstrates this contention is legally untenable.

The Government cites a single case, from 1989, to the effect that where witnesses have been impeached by other means, counsel was not ineffective for failing to call "anti-character"

witnesses[9], particularly where they could be perceived as having a bias toward the defendant. Doc 175 at 42. *Kubat v. Thieret,* 867 F.2d 351, 364 (7th Cir. 1989). *Kubat* lacks persuasive force for several reasons. First, as shown above, the Government's "bias" argument misses the mark. Second, the far more recent authority cited above shows that even when defense witnesses are subject to impeachment for bias, or even occasional contradictory testimony, their helpful testimony or information outweighs whatever is lost through possible impeachment; it is for the jury to make credibility determinations. Third, *Kubat* does not describe the situation here. Taken as a whole, the impeaching evidence that was unreasonably omitted from Mr. Barrett's trial went not just to impeaching the credibility of the informant witnesses *per se* by showing they were dishonest people, but raised significant doubts about the *substance* of their testimony regarding threats to law enforcement and Mr. Barrett's statements and attitude on the afternoon before the shooting. Fourth, the "other means" used by counsel in an effort to impeach the informants have been shown inadequate and based on no reasonable strategy. Fifth, any impeachment the anti-character witnesses could have provided in *Kubat* was cumulative to trial impeachment that the prosecution witness in question had a perjury case. This type of direct evidence of dishonesty on the part of a prosecution witness or witnesses was absent from the impeachment offered by counsel at Mr. Barrett's trial. Again, the impeachment that was attempted was inferential only.

It is urged that the individual credibility of the witnesses was of no moment; the witness's accounts of Mr. Barrett's hyper-vigilance and threats to the police were consistent, and Mr.

---

[9] See Exhs.13, 76, 77, 78, 83, 88, 90, 92, 94, 95, Amended Motion.

Barrett's lifestyle bespoke a volatile recluse just itching for the opportunity to shoot a law enforcement officer. Doc 175 at 44. Whether the witnesses "corroborated" each other or not does not make them impervious to scrutiny through impeachment of their honesty, and impeachment of their accounts of Mr. Barrett's alleged statements and attitude. Yet again, the Government wants to sit in the jury box.

Mr. Barrett's lifestyle does not point unerringly, or even approximately, to the fact that he was at the ready to shoot it out with the police and was constantly on guard. It just as reasonably shows that Mr. Barrett liked the privacy of his small, rural community and kept to himself. The Government dismisses as insignificant the omitted testimony of Sean Hill and Toby Barrett explaining the purpose and origin of the "warning sign" attached to Mr. Barrett's gate (Exhs.88, 96 Amended Motion), stating that this was just one piece of evidence showing Mr. Barrett's violent propensity toward intruders (particularly, by implication, the police), but it was an important piece of evidence to the Government at trial. According to the prosecutors, the sign crystallized in microcosm Mr. Barrett's alleged violent propensities, to the public in general and the police in particular. There can be no question that the benign explanation for the sign that could have been offered by these two omitted witnesses would have undercut the prosecution's theory of the case.

The omitted witnesses were also "cross-corroborating": they described an individual much different from that sketched by the six-years-late-in-coming informants, a man who was not threatening toward the police or spoiling for a confrontation, and who was unconcerned with police presence in his isolated, rural neighborhood. *E.g.,* Exhs., 37, 77, 90, Amended Motion. The Government contends that just because these witnesses would say that Mr. Barrett was not

threatening or aggressive toward the police, that does not necessarily impeach the account of the informant witnesses, but this simply is not so. Doc 175 at 45, 48, 53. This is certainly not the case with the witnesses who could have impeached the accounts of September 23 offered by Travis Crawford about Mr. Barrett's supposed threats toward law enforcement and concern for an imminent raid, and Charles Sanders's claim -- repeated by the prosecution in closing argument -- that he was at Mr. Barrett's that afternoon. Exhs. 37, 77, 90, 96, Amended Motion. Nor is it true for the witnesses who could have testified that Mr. Barrett as, a matter of personality, demeanor and word, was not threatening toward the police. Exhs. 37, 77, 90, 96 Amended Motion. This testimony would have called into serious question the informants' claim that Mr. Barrett had this attitude or ever made such statements..

Mr. Barrett was clearly prejudiced by counsel's professionally unreasonable failure to investigate and present witnesses who could have impeached the Government's informants, and in failing to develop impeaching evidence during the cross-examination of these witnesses. Contrary to the Government's claim, this evidence was not simply "cumulative" to the surface impeachment that was undertaken. This was "substantially favorable" evidence that went to the heart of the Government's case. *United States v. Miller,* 907 F.2d 994, 1000 (10th Cir. 1990); *United States v. Rivera,* 900 F.2d 1462, 1472-74 (10th Cir. 1990) (en banc) The omitted impeachment witnesses and evidence went to the very substance of the informants' testimony. There is a reasonable likelihood that had these witnesses been called and had further impeaching cross-examination been undertaken, the result of the guilt phase would have been different. *E.g., Anderson v. Johnson, supra*; *Pillette v. Berghois, supra*; *McGahee v. United States, supra*; *Casey v. Frank, supra.* Accordingly, Mr. Barrett should be granted § 2255 relief.

**6.    Counsel were ineffective in failing to make appropriate and timely objections to other bad acts testimony by the informant witnesses.**

The Government attempts to dispute Mr. Barrett's argument regarding trial and appellate counsel's ineffectiveness in failing to properly challenge testimony by informants regarding Mr. Barrett's alleged animosity towards law enforcement officers and his desire to harm them if they came on his property.  The Government argues that:  1) Mr. Barrett's claim is untimely; and 2) the underlying testimony was admissible.  The Government is wrong.

**a.    *Mr. Barrett's claim relates back and is, therefore, not time barred.***

The Government argues that Mr. Barrett first raised this claim in his Amended § 2255 Motion filed on September 25, 2009 and, as a result, the claim is time barred because Mr. Barrett's one-year period of limitations expired on March 17, 2009.  The Government further contends that the claim does not relate back to Mr. Barrett's timely-filed motion because:

> [t]he claim is based on an entirely novel premise, and does not merely clarify, amplify or expand any timely-filed contention. *Cf. United States v. Espinoza-Saenz*, [235 F.3d 501, 505 (10th Cir. 2000)].  In short, the claim arises from different facts than those ineffective assistance claims set forth in the Corrected Motion (Doc 2) and therefore does not relate back to that pleading.

Doc 175 at 65.

Not only is the Government missing the point, its support for its argument is based on a case that pre-dates *Mayle v. Felix*, 545 U.S. 644 (2005), the United States Supreme Court case that definitively defines "relation back" in the habeas context. *Id*. at 664.

Under Federal Rule of Civil Procedure 15, a party may properly raise a new claim or defense that would have been barred by the statute of limitations if the claim or defense "arose out of the conduct, transaction, or occurrence set out-or attempted to be set out-in the original

pleading." Fed R. Civ. P. 15(c)(1)(B); *see also Mayle*, 545 U.S at 656.  *Mayle* defined "conduct, transaction or occurrence," holding that "[s]o long as the original and amended petitions state claims that are tied to a *common core of operative facts*, relation back will be in order." *Id.* at 664 (Emphasis added.)

In *Mayle*, the Court gave examples of claims that constitute a common core of operative facts in which relation back was appropriate.  *See id*. at 664, n.7.  For example, the Court noted an Eighth Circuit case in which the original petition alleged *Brady* violations and the amended petition alleged the Government's failure to disclose a particular document.  *See id. (citing Mandacina v. United States*,  328 F.3d 995, 1000-01 (8th Cir. 2003)).  Additionally, the Court pointed out a situation in which the original petition challenged the admission of recanted statements, while the amended petition challenged the Court's refusal to allow the defendant to show that the statements had been recanted.  *See id. (citing Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001); *see also United States v. Hodge*, 554 F.3d 372 (3rd Cir. 2009) (post-*Mayle* case in which an ineffective assistance of counsel claim was found to relate back to a right to appeal claim because both claims dealt with erroneous advice movant received from counsel regarding the right to file an appeal).

In this claim, Mr. Barrett is challenging his counsel's failure to make timely and appropriate objections to the testimony of the informant witnesses, who alleged that in the months before the shooting, Mr. Barrett engaged in drug activity and made inflammatory comments about law enforcement.  Prior to trial, the Government filed a notice that it intended to use this type of evidence and contended that it was not prior bad act evidence under Fed. R. Evid. 404(b).  Mr. Barrett's counsel objected, and the Court ruled that the admissibility would be

determined on an as-needed basis.  However, as the evidence came out, Mr. Barrett's counsel failed to object or request appropriate limiting instructions.  The informant witnesses were permitted to testify to alleged stale threats by Mr. Barrett to law enforcement, as well as evidence of drug activities that were not contemporaneous with the offenses charged.

The Government contends that this claim does not relate back to Mr. Barrett's previously-stated ineffective assistance of counsel claims.  Doc 175 at 65.  The Government's conclusory statement is wrong.  There is a common core of operative facts between this claim and Mr. Barrett's prior claims of ineffectiveness regarding the informant testimony.  In his timely-filed Corrected Motion (Doc 2), Mr. Barrett went into great detail setting forth his attorneys' ineffectiveness in dealing with the informant testimony.  For example, Mr. Barrett stated that "the defense was woefully unprepared to effectively cross-examine these witnesses, and failed to conduct whatever real investigation could have been accomplished in the little time that remained before the snitches hit the stand." Doc 2 at 78.  Mr. Barrett then discussed each of the informant witnesses individually and enumerated ways in which his counsel failed to adequately investigate, discredit or impeach them.  *See* Doc 2 at 77-129. Mr. Barrett's "new" claim is simply an expansion of his previous claims regarding his counsel's utter failure to mount any sort of defense against these very same witnesses.  Or put differently, Mr. Barrett's claim regarding counsel's failure to timely object to the informant testimony constitutes a common core of operative facts with his earlier claims of counsel's complete ineffectiveness in handling the informant witness testimony.

This situation is analogous to the example set forth in *Mayle*.  In that Eighth Circuit case, a cumulative *Brady* claim related back to movant's original *Brady* claim.  *See Mayle*, 545 U.S. at

664 n.7 (*citing Mandacina v. United States*, 328 F.3d 995, 1000-01 (8th Cir. 2003)).  Here,

likewise, Mr. Barrett's cumulative challenge to his counsel's ineffectiveness in dealing with the

informant testimony relates back to his original claims regarding the informant testimony.

Moreover, the issue of objections based on Fed. R. Evid. 404(b) is an obvious one, as pointed out

by the Court in an *ex parte* hearing: "there is 404(b) material obviously in the proposed motion, it

appears to me."  Tr. 9/13/05 Hr'g at 22.  In fact, Mr. Barrett raised the 404(b) issue in his

Corrected Motion in his claim regarding the *ex parte* hearing.  Doc 2 at 38.

Accordingly, this Court should find that Mr. Barrett's claim relates back to the date of his

Corrected Motion.

> **b.      *Trial counsel's failure to object constituted ineffective assistance of counsel.***

The Government argues that even if the Court considers the claim, "none of the foregone

objections had any merit, and trial counsel had no obligation to raise a futile objection." Doc 175

at 66.  Again, the Government's conclusory statement is wrong.

After Mr. Barrett's trial started, on September 22, 2005, the Government filed a Notice of

Intent to Offer Evidence of Other Crimes.[10]  Doc 206.  This was after the Government described

the testimony to the Court in an *ex parte* hearing and the Court noted that the testimony would

include 404(b) evidence.  Tr. 9/13/05 Hr'g at 22-23.  Mr. Barrett filed a response to the 404(b)

Notice and the Court ruled that it would not make a determination at that time but wait until it

actually heard the evidence or the effort to present the evidence, noting that, "[o]f course, I would

---

[10]   The Notice filed by the Government did not include information regarding informant
Karen Real. Mr. Barrett's counsel were ineffective for failing to object to that lack of notice.

caution counsel for the Government to approach the bench for conference when that evidence --
when an effort to introduce that evidence is appropriate."  R at174.

The Government first argues that Rule 404(b) does not even apply, because the other acts
evidence complained of was not other acts, but "intrinsic" to the offenses charged, relying on
*United States v. Parker*, 553 F.3d 1309 (10th Cir. 2009) and *United States v. Viefhaus*, 168 F.3d
392 (10th Cir. 1999).  The Government is attempting to profess that somehow the statements
made by the informants at unknown points in time were intertwined with the charged offense.
Because the Government at least realizes the problem with the timing of the statements, it
attempts to link them to the time Mr. Barrett "failed to appear for his state trial, resulting in the
issuance of a warrant for his arrest." Doc 175 at 68.  This is not a straight-faced argument.

*Parker* is completely distinguishable.  In that case, the defendant was accused of a
conspiracy involving the selling of defective airplane engines.  *See Parker*, 553 F. 3d at 1313.
The challenged 404(b) evidence was several sales that occurred within the conspiracy time frame
but were not charged as overt acts, and several sales that occurred before the conspiracy time
frame.  *See id.* at 1314.  The Tenth Circuit found that the sales that occurred within the
conspiracy time frame were not other bad acts because they were intrinsic to the offense charged;
however, the sales that occurred prior to the conspiracy time frame were subject to a 404(b)
analysis.  *See id*. at 1314-15.  This is a completely different situation from Mr. Barrett's, in which
the Government is trying to assert that his alleged statements that were made months previous to
the offense were somehow intrinsic to the offense charged.

The Government's reliance on *Viefhaus* is equally unimpressive.  That case only referred
to the "intrinsic" argument in dicta; it did not hold that the evidence in that case was intrinsic to

the offense charged such that a 404(b) analysis was unnecessary.  *See* 168 F.3d at 397.  Instead,

the Court performed a 404(b) analysis and held that the evidence does not offend Rule 404(b).

*See* 168 F.3d at 398.

The Government then argues that even if the statements are considered other acts and

analyzed under 404(b), "their admissibility would be patent." Doc 175 at 68. This is hardly the

case.  Evidence is admissible under Rule 404(b) if it is offered for a proper purpose, relevant, not

unduly prejudicial and accompanied by a proper limiting instruction if requested.  *See United*

*States v. Caldwell*, 560 F.3d 1202, 1211-12 (10th Cir. 2009).  Here, a proper 404(b) analysis was

never conducted because of counsel's ineffectiveness.  It is beyond question that there were

problems with the evidence involving hearsay, propensity and prejudice.  Moreover, any time

frame placed on the statements by the informants was completely unreliable.  The relevance of

the statements is further called into doubt by the situation -- if Mr. Barrett had in fact made the

inflammatory statements about law enforcement, those statements had nothing to do with law

enforcement showing up, unannounced, in unmarked vehicles in the dark of night.  Trial counsel

were professionally unreasonable by their unmitigated failure to object to any of these issues or,

at a minimum, request a limiting instruction.  This failure caused prejudice to Mr. Barrett.

To the extent that trial counsel did object to the other bad acts evidence addressed here,

direct appeal counsel were ineffective for failing to raise a substantive 404(b) issue.

### 7.     Trial counsel were professionally unreasonable for failing to engage the services of an independent crime scene reconstruction expert.

Trial counsel sought $17,000 for an expert to conduct crime scene reconstruction, in

anticipation that the Government would hire Iris Dalley, who appeared as a witness in both of

Mr. Barrett's state court trials. The Court authorized $4000. Trial counsel did not use those funds for a crime scene reconstruction expert; instead, counsel used the funds for an investigator who took photographs. Had trial counsel hired expert Edward Hueske, he would have testified that Dalley's testimony was completely unreliable and not worth of belief. *See* Exh. 109, 110, Motion.

The Government argues that trial counsel were not ineffective because Dalley's testimony was not damaging to Mr. Barrett. In fact, reading the Government's argument, one would believe that Dalley testified in Mr. Barrett's favor. Nothing is farther from the truth.

Dalley's testimony more than supported the Government's position, as evidenced by the Government's closing argument:

> And you'll remember where those trajectories were. They were directly -- at the drive. And when someone comes in and you're trying to stop them, when you're trying to stop the law, you take out the lead vehicle. And how do you do it? You take out the driver. And that's where all those shots were until it got parked right in front, 15 feet away. And he changed his focus because Buddy didn't go down between the seats. He changed his focus to the person trying to get out of the vehicle and he shot and killed Rocky at that point. The pattern of shots tells you his intention. It will show somebody who was thinking.
>
> \* \* \*
>
> Remember Iris Dalley. I believe -- I can't remember which shot, but there was one shot that passed through and hit the inside door molding on the driver's door and she testified that door had to be open when that shot was fired because the inside of the door covers the molding, covers that rubber molding when it's closed. He shot through that door as Buddy was exiting.

R at 4305-06. Moreover, as admitted by the Government, Dalley firmly concluded that Mr. Barrett could not have fired all the shots in a prone position from inside his house and that Trooper Eales' elbow and flank wounds occurred after he exited the vehicle. This was detrimental to Mr. Barrett's case.

The Government's assertion that trial counsel exercised reasonable strategy by turning Dalley's testimony to Mr. Barrett's advantage is ludicrous.  As set forth in Mr. Barrett's Amended § 2255 Motion and Brief in Support, trial counsel were constitutionally ineffective for denying Mr. Barrett his constitutional and statutory right to expert assistance to rebut Government witnesses.  This was a critical error; Dalley's testimony was arguably the most important factor in establishing the intent elements of the offenses charged.  As a result, Mr. Barrett can establish that he was prejudiced by counsel's failure.

> **8.     Trial counsel were ineffective in their failure to secure an independent expert on police tactics who would have demonstrated that the midnight raid on Mr. Barrett's house was reckless and dangerous.**

In Mr. Barrett's second state trial, Chuck Choney, a former FBI agent, testified for the prosecution and when effectively cross-examined, provided favorable testimony to Mr. Barrett regarding the recklessness of the police tactics that were used when Mr. Barrett's house was raided.  Choney was upset about this outcome and had absolutely no desire to testify for Mr. Barrett at the federal trial, a fact of which trial counsel were well aware.  Nonetheless, trial counsel conducted no investigation into what evidence could be presented by an independent expert and instead called as their expert the very reluctant Choney, who was harmful to Mr. Barrett's case.  If trial counsel had engaged Dr. George Kirkham, Dr. Kirkham would have testified that the raid was uncalled for and conducted in a way that provoked violence and minimized the chances that Mr. Barrett would see that he was being confronted by law enforcement officers.  Exh. 44, Motion (Doc 70).  However, the Government contends that Dr. Kirkham "fails to show that those the [sic] choice of tactics had any bearing on Barrett's intent or

that alternative tactics were reasonably available to the police." Doc 175 at 74. This statement is an outright lie or, perhaps, the Government did not read Dr. Kirkham's report.

Dr. Kirkham's report clearly and emphatically concludes that "it is my considered professional opinion that the violations of well established standards and procedures of the police profession discussed in this report were a significant cause of the preventable violence which occurred at Kenneth Barrett's residence on September 24, 1999." Exh. 44 at 1, Motion (Doc 70). Dr. Kirkham's report sets forth in great detail the alternative tactics that the Tact Team should have utilized, including establishing a safe perimeter, communicating with Mr. Barrett from a safe distance, the use of marked patrol cars with overhead flashing lights, the presence of negotiators and/or friends or family members who could talk to Mr. Barrett in the event he refused to surrender, just to name a few. Exh. 44 at 3, Motion (Doc 70). In fact, Dr. Kirkham states, "After reviewing the circumstances surrounding the incident, one is led inexorably to ask why the involved District 27 Task Force officers and OHP Tactical Team members would not have opted to use readily and available and vastly safer alternative methods of apprehension." Exh. 44 at 4, Motion (Doc 70). Certainly, Dr. Kirkham concluded that alternative techniques were available to the police. As for Mr. Barrett's intent, Dr. Kirkham's findings most assuredly would have cast reasonable doubt on whether Mr. Barrett knew that he was being raided by police officers. Dr. Kirkham concluded, "The manner in which this arrest operation was conducted renders unanswerable the important question of whether Barrett realized he was being confronted by law enforcement officers, as opposed to narcotics dealers or others whom he believed might do him harm." Exh. 44 at 1, Motion (Doc 70).

The Government further brushes off Mr. Barrett's claim, by stating that trial counsel's strategic choice of witnesses is virtually unchallengable, citing *Boyle v. McCune*, 544 F.3d 1132 (10th Cir. 2008) and *Williams v. Bowersox*, 340 F.3d 667 (8th Cir. 2003). The Government misses the point. Both cases cited by the Government stand for the proposition that counsel's adequately informed strategic choices are accorded a presumption of reasonableness. Trial counsel cannot exercise strategy in calling witnesses when they fail to perform adequate research and investigation. Moreover, the cases cited by the Government are easily distinguishable.

In *Boyle*, the Movant argued that counsel was ineffective for failing to call medical experts in a rape case where nurses testified. *See* 544 F.3d at 1138. However, the issue at trial was whether the victims consented and the nurses bolstered the victims' testimony. *See id.* Movant did not set forth any evidence indicating that other medical experts would have disagreed with the nurses; thus, additional medical testimony could have hurt his case. *See id.* at 1139. This is a far different situation than Mr. Barrett's, in which he has produced an expert who has set forth an opinion favorable to Mr. Barrett.

Likewise, *Bowersox* is distinguishable. In that case, the Movant claimed ineffective assistance for his counsel's failure to call two witnesses whom counsel had said he was going to call in his opening statement. *See* 340 F.3d at 670. After counsel investigated the witnesses further, he made the strategic decision to not call them. *See id.* at 670-71. In finding that counsel was not ineffective, the Court placed much emphasis on the fact that counsel investigated the witnesses before making that strategic decision. *See id.* at 672. Again, this is a different situation than Mr. Barrett's, in which trial counsel did not investigate the potential benefit of an independent expert on police tactics.

The Government also argues that it was a "strategic" decision for trial counsel to call Choney because he would be difficult to impeach. That is not "strategy"; that is cutting your nose off to spite your face. It is not within the bounds of reason for counsel to call a hostile witness rather than to even investigate the possibility of a favorable, respected expert witness, just because a hostile witness might be difficult to impeach.

The Government also takes conclusory pot shots at Dr. Kirkham's expert opinion and states that Dr. Kirkham cannot offer an opinion regarding Mr. Barrett's mental state. Doc 175 at 77. Dr. Kirkham's report does not offer an opinion regarding Mr. Barrett's mental state; instead, it offers an expert opinion about the reckless manner in which the raid was conducted. Dr. Kirkham believes that because of the reckless manner in which the raid was conducted, it's impossible to know, let alone prove, whether Mr. Barrett knew that it was law enforcement officers who were entering his property. This fact was more than critical to Mr. Barrett's case, in which the jury had to find, beyond a reasonable doubt, that Mr. Barrett had the requisite intent to kill a law enforcement officer in the performance of his official duties. Accordingly, trial counsel were wholly and prejudicially ineffective in their failure to retain an independent expert on police tactics.

### 9. Failure to adequately cross-examine law enforcement witnesses was ineffective assistance of trial counsel.

Despite later strenuously arguing that the Court's denial of timely production of the state trial transcripts was not error, (Doc 175 at 145), the Government here relieves trial counsel of its responsibility to adequately cross-examine critical witnesses *because* he did not have the transcripts. Doc 175 at 78. Nor does the fact that it was "a long and complex trial" lessen the

likely prejudice to Mr. Barrett. Doc 175 at 78. The guilt here is not overwhelming. The Government's evidence was susceptible to disbelief, and if disbelieved could have led the jury to a very different understanding of the events which led to the death of the trooper, and ultimately a very different verdict. Failure to adequately cross-examine and impeach state drug task force member Clint Johnson, who put the entire sequence of events into action, cannot be considered minor, no matter the length or complexity of the events which followed.

The Government's argument that the matter of emergency lighting, while important to the defense, "was understandably less important to, and therefore more easily forgotten by, members of the Tact Team," makes clear what the Government's argument would have been, had there been effective cross-examination. It does not, however, relieve trial counsel of his responsibility to secure critical testimony in support of his defense. The Government's admission that "such facts were of great significance to Barrett's trial defense," (Doc 175 at 80), effectively ends the inquiry, establishing both the deficient performance and the prejudice which resulted.

In *Moore v. Marr*, 254 F. 3d 1235, 1241 (10th Cir. 2001), a case relied upon by the Government, the Tenth Circuit notes that "counsel's failure to impeach a key prosecution witness is potentially the kind of representation that falls "outside the wide range of professionally competent assistance[.]" *Id., quoting Strickland,* 466 U.S. at 690. Rejecting a finding of prejudice, the Court says:

> Our review of the trial transcript, shows an overwhelming evidence against Moore was presented at trial, even absent Goudie's testimony. . . .Accordingly, even if Goudie had been impeached we cannot conclude that the outcome would have been different.

*Id.* Ignoring the failure of the Court to cite the correct *Strickland* standard of prejudice[11], here the evidence is not overwhelming, especially without the testimony of the state troopers who were present. Impeachment of the law enforcement was critical to Mr. Barrett's defense. The failure to impeach was constitutionally deficient and reasonably likely to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694.

> **10.    Trial counsel were ineffective in failing to call Toby Barrett and Alvin Hahn, percipient witnesses, who could impeach government testimony.**

Toby Barrett and Alvin Hahn were vital witnesses who would have testified that: 1) the sign on Mr. Barrett's gate had nothing to do with law enforcement; 2) Trooper Hamilton's claim about the condition of the gate at the time of the drive-by was false; 3) there were no police lights visible at the start of the shooting; 4) Toby's cry of alarm was the first indication that Mr. Barrett had of the raid; 5) Mr. Barrett only had a split second view of the scene before he went inside; and 6) there was only one car with its lights on visible within 15 seconds of the shooting. This evidence would have been critical to impeach the Government's contention that Mr. Barrett had an opportunity to observe the scene, see police lights and form the intent to kill before the shooting started. The Government argues that neither Toby Barrett nor Alvin Hahn would have meaningfully undermined the Government's case and the decision not to call them as witnesses was a proper exercise of counsel's trial strategy. Doc 175 at 87.

---

[11] "That there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694.

### a.   *Toby Barrett.*

Although the Government concedes that Toby Barrett was an eye-witness, the Government argues that Toby's recollection is limited. Doc 175 at 89. In support of this statement, the Government cites to Toby's declaration in a piecemeal manner to make it appear that Toby's knowledge of the raid was vague. The Government concludes that this weighs in favor of trial counsel's "strategy" in failing to call Toby Barrett as a witness.

There are two problems with the Government's theory.  First, before counsel decides to not call a witness, counsel must perform sufficient investigation to make a strategical call. *See Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007).  In *Ramonez*, the Court found ineffective assistance of counsel because the defense attorneys failed to interview percipient witnesses who could have corroborated defendant's account of the events.  *See id.*  The Court stated that "the investigation leading to the choice of a so-called trial strategy must itself have been reasonably conducted lest the 'strategic' choice erected upon it rest on a rotten foundation." *Id.; see also, Town v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) ("A purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.")

Here, the Government cannot assert that trial counsel made a strategic choice because counsel never properly interviewed Toby Barrett. Toby has stated:

> I spoke to Mr. Hilfiger once, I don't know where, and asked him if he was going to want me to testify at the trial. He said he was weighing whether it would be helpful or not, but expected I would. He never asked me about my father's problems, my home life or about me or my mom. I never spoke to him again.

Exh. 96 at 3-4, Motion (Doc 70). Thus, trial counsel had one brief conversation with Toby -- the only eyewitness to the beginning of the raid other than law enforcement -- before counsel made the determination that he was not going to call Toby as a witness at trial.

Second, Toby testified in the two prior state trials that resulted in a much more favorable manner to Mr. Barrett. That should have alerted counsel to the potential advantage of Toby's testimony. In *Goodman v. Bertrand*, 467 F.3d 1022 (7th Cir. 2007), the Court vacated a conviction based on the cumulative effect of counsel's errors. *See id.* at 1031. One of these errors was counsel's failure to call a witness who had testified in defendant's trial on the same charge. *See id.* at 1024. That trial ended in a hung jury. *See id.*

### b.  *Alvin Hahn.*

Likewise, the Government contends that Alvin Hahn had nothing of value to add to the evidence so that it was not ineffective assistance to fail to call him as a witness. Again, trial counsel failed to conduct a proper investigation to even determine whether Mr. Hahn would be an appropriate witness. *See Bertrand*, 467 F.3d at 1024.

The testimony of Toby Barrett and Alvin Hahn would have conflicted with the accounts provided by the Government witnesses and provide jurors with evidence that Mr. Barrett did not know that the raid conducted on his home was being performed by law enforcement officers. There is a reasonable likelihood that the trial would have ended differently had both Toby Barrett and Alvin Hahn testified.

**11.    To Mr. Barrett's prejudice, trial counsel failed to conduct a reasonable investigation into evidence that he was not aware of the arrest warrant, could have been taken into custody without incident, and had not reacted violently to the police when they had been to his home shortly before the raid and on other occasions.**

The Government's theory was that Mr. Barrett, aware of a felony arrest warrant, was anticipating a police raid on his property and was ever-vigilant to meet it with lethal resistence. If the defense could show that Mr. Barrett was either unaware of the warrant, that it was improperly issued, or that he was not worried about it and was simply going about his business, the credibility of the Government's theory, founded as it was on the seven informant witnesses, would have been thrown into substantial doubt.[12]  Likewise, had the jury heard evidence that Mr. Barrett had not reacted violently when he was sought by the police on an earlier occasion, the Government's theory would have taken another hit.

A competent investigation would have produced this evidence, but counsel unreasonably failed to look into these matters, which would have involved nothing more than checking the Court file, talking to family and friends of Mr. Barrett, and contacting his former lawyer and bail bondsman on the state drug delivery case.  Because there was no investigation, no "strategic choice" can excuse counsel's failings.  Trial counsel had "no reason to be aware" of the evidence because they never investigated it.  The Government claims that certain aspects of this evidence, such as Sheriff Philpot's visit to his cabin approximately a month before the raid, would have been known to Mr. Barrett, and counsel cannot be faulted if Movant did not tell them about it. Doc 175, 96, 97.  Mr. Barrett has shown that counsel's duty to investigate is not limited to

---

[12]  As noted, this evidence was also important to moving effectively for suppression of the evidence under *Franks v. Delaware,* 438 U.S. 154 (1978).

information gleaned from the client. Mr. Philpot's recent declaration claiming that this event did not occur should be taken with a grain of salt. His reversal of what he previously told a defense investigator (Exh. 6, Amended Motion) is simply an attempt to save the Government's theory of the case. The declaration of defense investigator Rodney Floyd is a proper part of these proceedings and this record, "hearsay" or not. Declarations are used to make a factual record, the facts are in dispute, and an evidentiary hearing is warranted.

The Government asserts that Mr. Barrett's arguments respecting the failure to even summon a jury on the day of his purported trial, which led to an arrest warrant being issued for him, was raised outside the one-year limitations period, as is the argument that this invalid arrest warrant to attend a trial that was never scheduled affected the validity of the no-knock search warrant. Doc 175 at 192. This does not represent a "new claim," but simply additional facts supporting a claim already made which clarify and amplify the argument. *Mayle v. Felix,* 545 U.S. 644 (2005); *United States v. Espinoza-Saenz,* 235 F.3d 503, 504 (10th Cir. 2000); *United States v. Thomas,* 221 F.3d 430, 436 (3rd Cir. 2000).

It is maintained that there was no significance to the fact that the notice of jury trial/arrest warrant was not sent certified mail, because it is "presumed" that a letter properly posted and deposited with the mail service reached the intended recipient. Doc 175 at 94. Regardless of this legal presumption, the fact that standard procedure was not followed supports the argument that Mr. Barrett never received the letter, and there is no real proof that he did receive it.

Respondent states that trial counsel did not render deficient performance in failing to present evidence that Mr. Barrett had nothing to worry about with respect to his drug delivery case, because his former attorney, Bill Ed Rogers, had secured a plea agreement that called for no

jail or prison time.  Doc 175 at 95.  The Government contends Mr. Rogers's wife, Mary Rogers, could not have testified to this or sponsored her husband's file, because any testimony she would offer would be "hearsay."  This ignores that Mr. Barrett had to rely in the current proceedings on Ms. Rogers to supply this information, because Mr. Rogers died in 2008.  He was alive at the time of Mr. Barrett's federal trial, and could have testified to this information himself.  Yet again, the Government argues that there was no reason for Mr. Barrett's lawyers to have been aware of this information, presumably because Mr. Barrett did not tell them.  This argument ignores what has already been established here and in Movant's earlier filings: that counsel have a duty to investigate beyond whatever they learn from the client.  Surely, counsel should have acquainted themselves with the facts surrounding the issuance of an arrest warrant for their client on a state drug charge that was one of the links in the chain that the Government argued led to Trooper Eales being killed.

In a similar vein, the Government argues that counsel did not perform deficiently for failing to call Mr. Barrett's bail bondsman on the state drug case, Martin Daggs, in the first stage of trial.  Doc 175 at 95-96.  Daggs testified in the penalty phase that he never alerted Mr. Barrett to the existence of the arrest warrant, because he knew where to find Movant if he needed him. The Government speculates that even if Mr. Daggs had not informed Mr. Barrett of the existence of the arrest warrant, this does not mean that Mr. Barrett could not have learned of it from another source or by other means.  This ignores that Daggs's testimony would have been one more piece of circumstantial evidence showing that the Government's theory of the case was off the mark.  It is argued that, in any event, Mr. Daggs's testimony would have made no difference, because jury found in the second stage that the offenses were committed after substantial

planning and premeditation.  This circular argument skirts the fact that had counsel effectively investigated this case and brought to bear all the omitted evidence conflicting with the Government's theory, a reasonable probability of a different result would have existed.

The Government claims that testimony from Mr. Barrett's relatives that there would have been no need for the type of raid that occurred, if only the authorities had simply contacted the family and asked that Movant be brought in, would be inadmissible hearsay.  Doc 175 at 98. But the family certainly could have testified to their observations of Mr. Barrett.  This is particularly true of Phyllis Crawford, to whom Mr. Barrett ran on an earlier occasion when he learned the police were after him.  Exh. 91, Amended Motion.  Ms. Crawford could have testified to Mr. Barrett's actions and demeanor on that occasion.  Such is not hearsay.

Finally, the Government argues that counsel did not perform deficiently for failing to introduce evidence from witnesses who could have testified that police patrols were routine in his isolated neighborhood, without any reaction from Mr. Barrett, that the police had visited him before when he was working on a car without incident, and that the sign posted on the gate to his property did not have the intent attributed to it by the Government, and was placed there because drug-using trespassers had been on the property a short time before the raid.  Doc 175 at 98-100. Exhibits 45, 77, 95, Amended Motion; second stage testimony of Clyde Edgmon.  The Government claims this evidence would have been irrelevant because it did not deal with how Mr. Barrett would react if his home was raided by police, and actually would have strengthened the testimony of Travis Crawford.  Again, this omitted evidence would have circumstantially shown that Mr. Barrett did not have the vigilant and hateful attitude toward the police as claimed by the Government, and would not have buttressed Travis Crawford's testimony in the slightest.

Counsel's failure to marshal the omitted evidence which is the subject of this sub-proposition is symptomatic and indicative of counsel's inadequate investigation as a whole, and the prejudice that inured to Mr. Barrett as a result, consistent with the authority cited in this reply brief and Mr. Barrett's opening brief.

### 12.   Trial Counsel were ineffective for failing to adequately contest "expert" Horn testimony.

Respondent's briefing concerning defense counsel's handling of the testimony of its so-called "traumatic stress" expert reveals the Government trying to have its cake at trial and to eat it in habeas proceedings:  At trial, the Government called James Horn as its own witness and elicited testimony replete with colorful references to his own, and others', military and law enforcement experiences and to the powerful emotional bonds created by such public service. This Court correctly pinpointed the fact that none of Mr. Horn's testimony was actually relevant to the facts of this case, and ultimately struck the evidence in its entirety when finally prompted to do so by defense counsel.  Now, in §2255 proceedings, in order to protect its unjustly obtained verdict, the Government asks this Court simply to ignore Mr. Horn's repeated references to military and law enforcement camaraderie in combat situations  (*see, e.g.,* R at 843-848, 852-4, 858-860; Doc 175, p. 105) arguing that Mr. Horn's spouting of "generalities" (R at 923-27) was both "innocuous and non-controversial" (Doc 175 at 103) and indeed actually helpful to the defense (Doc 175 at 105-06).  Therefore, the Government argues, no mistrial needed to be declared.

This approach is disingenuous.  Even if Mr. Horn's testimony had indeed been limited to the "innocuous and non-controversial," it would still have failed the basic test of admissibility:

Purported to be an expert, Horn did not in fact offer any expertise that met Fed. R. Evid. 702[13]

All he had to offer in terms of actual content, as the Government concedes, was "common sense

observations" and "intuitive and anecdotal observations about the nature of human memory".

Doc 175 at 103-04.  To dress up these platitudes as being somehow in the same category as

standard jury instructions (Doc 175 at 104), or like expert testimony in eyewitness identification

cases, where in some "*narrow* circumstances ... subject to the trial court's *careful supervision*,

*properly conceived* expert testimony may be admissible", assuming *Daubert* criteria are satisfied,

borders on the absurd.  *See United States v. Rodriguez-Felix*, 450 F.3d 1117, 1124-26 (10th Cir.

2006) (emphasis added).

Also straining the boundaries of logic is the assertion that Horn's testimony was

positively helpful to the defense and that defense counsel must have chosen for tactical reasons

not to challenge it.  Doc 175 at 105-106.  If that were so, defense counsel were truly irrational to

move, as they did, to strike evidence that was, according to the Government, "potentially very

helpful" to the defense.  Doc 175 at 106.  The fact is that defense counsel did move to strike the

evidence, recognizing the validity of the Court's opinion of the evidence's intrinsic

worthlessness.  Defense counsel's error was not in seeking to eliminate from the jury's

consideration Mr. Horn's testimony, but in failing to even attempt to fully wipe that slate clean.

*See Greer v. Miller,*  483 U.S. 756, 766  (1987) (trial counsel bears primary responsibility for

---

[13]**Rule 702   Testimony by Experts**: If scientific, technical or other specialized
knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience, training, or education, may testify
thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness
has applied the principles and methods reliably to the facts of the case.

seeing that error is cured in the manner most advantageous to the client).  Trial counsel's failure to move for a mistrial, when there was nothing to lose by such a motion, and much to gain, demonstrates an remarkable absence of strategic thinking on their client's behalf.

It is perfectly true that generally a jury is presumed to follow its instructions, but that presumption is rebuttable.  For example, in *Penry v. Johnson*, 532 U.S. 782, 799-800 (2001), cited here by the Government, the jury could not "logically and ethically" follow the internally inconsistent instructions it was given.  Similarly the Supreme Court of the United States has long recognized that in some circumstances "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994), *quoting Bruton v. United States*, 391 U.S. 123 (1968). Here, the jury had heard Mr. Horn's testimony over a two-day period and, far from being "innocuous", it had provided a ringing endorsement of the fortitude of law enforcement, and what was in effect an apologia for deficiencies in law enforcement testimony after a traumatic event, complete with overtones of victim impact testimony.  Trial counsel, having failed to probe the specific facts in Horn's possession because of their misapprehension that his discussions with the prosecution witnesses were privileged, (R at 881, Doc 95 at 165-66), also failed to secure a swift instruction to disregard -- the instruction given came three days later -- or to press for a more resounding instruction than the Court's statement that the instruction given was "not special" but "just an instruction in regard to some testimony that you have heard ..."  R at 1739. This was not, therefore, a case like *Greer*, 482 U.S. at 766, where an immediate objection to a single question, followed by two curative instructions sufficed to prevent violation of due process

rights.  These facts created the overwhelming probability that the jury could not follow the instruction given, and that the effect of Horn's testimony was calamitous to Mr. Barrett's case. *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002) (mistrial appropriate when probability that instruction will not be followed is overwhelming and there is strong likelihood that effect of the evidence will be devastating).  This was made all the more probable by the government's invitation to the jury to recall the testimony when it referred to the witnesses as "soldiers of the law telling you what they remembered, honestly recalling the circumstances of September 24th . . . Yes, many law enforcement officers responded, a soldier of the law had been murdered." R at  4379.  *See e.g.,* R at 844-45, 864-65 (testimony of James Horn discussing his military experience); 912 (testimony of Mr. Horn comparing ability of Vietnam veterans abilities to recall events).

Finally, the Government attempts to elevate to a rule of law the Tenth Circuit's catch-phrase for the degree of prejudice required to demonstrate that appellate counsel was ineffective for not raising a claim on appeal, declaring categorically that only a "dead bang winner" claim will suffice.   This reads too much into cases such as *United States v. Challoner,* 583 F.3d 745, 750 (10th Cir. 2009) by suggesting that only the failure by appellate counsel to raise a legal issue that, at first blush, mandates reversal can prove sufficient prejudice.  To limit appellate ineffectiveness claims solely to those cases where an issue is "obvious from the record, and must have leaped out upon even a casual reading of the transcript" *see United States v. Cook*, 45 F.3d 388, 394 (10th Cir. 1995) (internal quotation omitted) runs contrary to the law in this area: effective appellate counsel must, of course, "winnow out" weaker arguments on appeal - *see Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) - and exercise reasonable professional judgment in

deciding what issues to raise and how to argue them.   However, the traditional *Strickland* analysis of performance and prejudice applies, 466 U.S. 668, 690 (1984); *see also Smith v. Murray,* 477 U.S. 527 535 (1986)*; Cook*, 45 F.3d at 394-95, and must not be dispensed with simply because an issue requires consideration going further than a knee-jerk response.  *See* Ground 18 hereinbelow.

> **13.    The verdicts reached at both stages of trial are unreliable due to trial counsel's unreasonable failure to seek appropriate jury instructions.**

Mr. Barrett's trial counsel unreasonably failed to seek appropriate instructions regarding informant witness credibility, drug-addict witness credibility, self-defense, theories of defense and lesser-included offenses.  The Government attempts to refute this claim by stating that adequate instructions were given or counsel made proper requests or the omitted instructions were contrary to law and evidence.  Doc 175 at 106.

> ***a.    Credibility instructions***.

There is no question in this case regarding the importance of the testimony of the informant witnesses.  Their testimony was the distinguishing factor in this trial as opposed to the two state court trials, which turned out much more favorably for Mr. Barrett.  It was crucial that the Court adequately instruct the jury regarding the testimony of these witnesses so that the jury could properly evaluate this testimony.  Trial counsel unreasonably failed to seek an informant witness-credibility instruction and a drug-addict credibility instruction, both of which were necessary for proper evaluation of the informant witness testimony.

The Government first states that the Court did, in fact, give an informant witness credibility instruction, citing to Instruction 27 given by the trial court, "Witness -- Personal

Advantage." That instruction says, in pertinent part, that greater care or scrutiny must be given to the testimony of a witness who provides evidence against the defendant for some advantage that it may give to them or in contemplation of immunity or reduction from punishment or any other inducement.  Doc 240, Inst. 27.  Contrary to the Government's assertion, that was not an informant instruction.  An example of an informant instruction is as follows:

> An informant is someone who provides evidence against someone else for a personal reason or advantage.  The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence.  You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness.  You must determine whether the informant's testimony has been affected by self- interest, by an agreement he has with the government, by his own interest in the outcome of the case, or by prejudice against the defendant.

Tenth Circuit Pattern Criminal Jury Instr., 1.14 (2005).  This is the type of instruction the jury should have received to specifically alert it to pay special attention to the testimony of the informants.  The general instruction given by the Court did not accomplish this.

Trial counsel also unreasonably failed to seek a drug-addict credibility instruction.  The Government concedes that such a request should be given upon request when supported by the record.  Here, there is no doubt that such an instruction was supported by the record.  The evidence clearly established that Karen Real, Randy Turman, Randy Weaver, Charles "Monk" Sanders, Travis Crawford, Cindy Crawford and Brandie Price were drug addicts at the time of their testimony or at the time of the events to which they testified.  There is no excuse for counsel's failure to request an addict instruction in light of the evidence presented.

The Government argues that the absence of a drug addict credibility charge in this case was harmless because the Court gave other credibility instructions and testimony about the

informants' drug use came out in trial, relying on *United States v. Smith*, 692 F.2d 658, 660-661 (10th Cir. 1982) and *United States v. Nicholson*, 983 F.2d 983, 991 (10th Cir. 1993). The Government is missing the point. The *Smith* court approved the use of an addict instruction and held that the determination of when such an instruction is required turns on the particular facts of the case. *See* 692 F.2d at 661. In *Smith*, the Court found that the defendant was not prejudiced by the failure to give an addict instruction in that case because of the extensive testimony on drug usage and the fact that the Court gave credibility instructions on "accomplice, immune informant, and felon testimony, along with the general credibility instruction," which were sufficient to alert the jury. *Id*.; *see also Nicholson*, 983 F.2d at 991 (same).

Thus, the Government's cited authority instructs us that whether an addict credibility instruction is required turns on the particular facts of the case. In Mr. Barrett's case, an addict credibility instruction was required because of the paramount importance of the testimony of the informants and the fact that the trial court gave no special instruction to caution the jury about their testimony. The only instructions that the Court gave were general credibility instructions. Those instructions were not sufficient to alert the jury that the informants' testimony must be considered with special care. Counsel was unprofessionally deficient in failing to seek appropriate instructions; this failure prejudiced Mr. Barrett such that there is a reasonable likelihood that the outcome of his trial was unreliable.

b.      *Instructions on self-defense and theories of defense*.

The Government further contends that trial counsel were not ineffective for failing to request  instructions on self-defense and theories of defense because the record did not support the giving of such instructions. Doc 175 at 108-09. The Government mis-reads the record.

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support." *United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir. 2005). In this case, there was ample support for Mr. Barrett's theory of self-defense to warrant a jury instruction on the issue.[14] The record supports the following facts: an unmarked Bronco, without lights, came through Mr. Barrett's yard at 12:30 A.M. and hit or came right up against Mr. Barrett's porch. *See United States v. Barrett*, 496 F.3d 1079, 1084 (10th Cir. 2007). Mr. Barrett's son, Toby, was in the yard and screamed, "Dad!" *Id*. Mr. Barrett fired shots at the approaching vehicle and was seen at one point in the interior of his doorway. *See id.* at 1084-85. Mr. Barrett was shot through the window when he was inside the house. *See id.* at 1085. There is nothing that establishes that Mr. Barrett knew that it was law enforcement approaching his house. Thus, it was reasonable that Mr. Barrett was in fear for his life and the life of his son, after hearing his son scream and seeing an unmarked car, without lights, come barreling through his yard very late at night. There is no doubt that a self-defense instruction should have been requested and given in those circumstances.

---

[14] Such a charge would have informed the jury:

A person may use force which is intended or likely to cause death or great bodily harm only if he reasonably believes that force is necessary to prevent death or great bodily harm to himself.

To find the defendant guilty of the crime charged in the indictment, you must be convinced that the government has proved beyond a reasonable doubt:

Either, the defendant did not act in self-defense,

Or, it was not reasonable for the defendant to think that the force he used was necessary to defend himself against an immediate threat.

Tenth Circuit Pattern Criminal Jury Instr., 1.28 (2005).

The Government argues that even if Mr. Barrett had been in fear for his safety when the Tact Team members raided his home, a self-defense instruction was not warranted because "as the Tenth Circuit noted, the evidence indicated that Barrett shot Eales three times as the victim sought cover behind a vehicle," and that Mr. Barrett "had clearly become the aggressor when he shot a fleeing man three times in the back and could not have demonstrated that he was using reasonable force under the circumstances." Doc 175 at 108. The Government is grossly distorting the facts. The Tenth Circuit opinion stated that Eales "opened the passenger door, got out of the vehicle and began moving towards the rear of the vehicle. At some point before he arrived at the rear of the vehicle, Eales was struck by three gunshots," and that Eales' injuries "appeared to have occurred" while Eales was facing away from Barrett. *Barrett*, 496 F.3d at 1084-85.

There is absolutely nothing in the Tenth Circuit opinion, nor in any of the evidence in this case, stating that Eales was either "seeking cover" or "fleeing" from Mr. Barrett. This is pure extrapolation, speculation and fantasy on the part of the Government. Moreover, the Government fails to point out that it has never been ascertained where Mr. Barrett was standing when the shots were fired. If Mr. Barrett was inside his home, blindly exchanging gunfire when the Tact Team vehicle came up to his porch in the dead of night, it's very difficult, if not impossible, to assert that Mr. Barrett became the "aggressor" in the raid on his home, especially since law enforcement shot Mr. Barrett four times. And, as stated, it is very possible that Mr. Barrett had no idea that it was law enforcement raiding his home when the shooting began. The Government has said nothing that would indicate that a self-defense instruction was not warranted.

Along the same lines, Mr. Barrett was entitled to instructions on his other theories of defense. The Government argues that any instructions of this sort would have been covered in the regular jury charge, which instructed the jury that it must acquit on the basis of reasonable doubt as to any element of any offense charged. Doc 175 at 109. Again, the Government misses the point. Mr. Barrett is entitled to instructions on his theories of defense provided there is support in the record. *See Visinaiz*, 428 F.3d at 1308. The jury should have been instructed that as a defense, Mr. Barrett was asserting that he had no idea that the vehicles contained law enforcement officers. There was evidence in the record to support Mr. Barrett's contention (*i.e.*, the lead vehicle was unmarked, the vehicle was unlit, it was dark outside, there was no indication that law enforcement announced their presence) and, as such, counsel should have requested such an instruction and was unreasonable not to do so. Counsel also should have requested an instruction that Mr. Barrett was asserting as a defense that he was not engaged in drug manufacturing or distribution when the raid took place. There was evidence in the record to support this contention, most obviously, the fact that no drugs were found at Mr. Barrett's home or on Mr. Barrett's person during the raid -- the search revealed only so-called "precursor" items. Counsel were unreasonably ineffective in their failure to request these instructions.

In addition, counsel were ineffective by failing to request a lesser-included offense instruction as discussed more fully, *infra*, in Ground 10.

### 15. Trial counsel ineffectively omitted objections to prosecutorial misconduct in penalty phase closing arguments.

The Government alleges this particular claim should be rejected because it is stated in a conclusory fashion, and therefore fails to state a ground for relief. Doc 175 at 115. This is

incorrect.  Rather than repeat the same factual basis for this and the prosecutorial misconduct claim twice, Movant specifically incorporated by reference the facts and arguments stated in Ground 5(C), demonstrating that the prosecutors engaged in misconduct in closing argument. Mr. Barrett's supporting brief cited specific authority showing that the failure to object was professionally unreasonable and prejudicial.  Doc 95 at 180; Doc 149 at 101-02.

### B.   Movant Has Carried His Burden of Demonstrating a Sixth Amendment Violation as to Sentencing; at a Minimum, this Court Should Order an Evidentiary Hearing.

#### 1.   Introduction and summary of argument.

Part B of Ground 2 of the Second Amended § 2255 Motion and supporting brief set forth factual and legal bases for this Court to find the death verdict is unreliable due to defense counsel's failure to investigate and present evidence of Mr. Barrett's unique personal background and character, and the mental impairments he suffers.  Evidence substantiating the allegations is already before this Court following record expansion.  The Government disputes none of the material facts related to counsel's deficient performance, and none of the historical facts related to Mr. Barrett's background, his family history, social history, development, educational history, work history, suicide attempt, or neurocognitive impairments.  Nevertheless, the Government argues the death judgment should be sustained on the following theories:

(1)  Defense counsel's presentation at the penalty phase was a concession to Mr. Barrett's alleged desire that they not "beg for his life," permit "the outcome of the case to hinge on personal sympathy for him," "dwell on his childhood," or involve his family in presenting a mitigation case;

(2)  Defense counsel had no reason to be aware that Mr. Barrett and his family exhibited a long history mental illness;

(3)  Counsel "wisely chose" a "strategy" designed simply to show Mr. Barrett's good qualities, and this "strategy" was partially successful because the jury found a number of mitigating factors and rejected the non-statutory "future dangerousness" aggravator;

(4)  The mitigation evidence proffered in these § 2255 proceedings would have conflicted with and detracted from the evidence showing Mr. Barrett was a non-violent, loved and valued member of his family, and counsel reasonably chose to avoid evidence of Mr. Barrett's past drug use;

(5)  Even if counsel failed to conduct a reasonable investigation, there is no reasonable probability of a different outcome because the omitted mitigation evidence would have undermined the mitigation case that was presented.  Doc 175 at 116-125.

In this Reply, Mr. Barrett shows none of the Government's arguments has factual support either in the trial record or the expanded post-conviction record, or the slightest legal merit under the relevant case law.  The Government's factual theory is based on conjecture or inferences that are contradicted by the trial record.  The Government's legal theory wholly ignores Supreme Court cases contrary to the older cases from lower Courts, none more recent than 2001, on which it relies.[15]

---

[15]  The Government studiously ignores cases such as *Wilson v. Sirmons*, 536 F.3d 1064, 1074, 1083-85 (10th Cir. 2008) (noting that Supreme Court, beginning with *Williams v. Taylor*, 529 U.S. 362 (2000), has placed increased emphasis on counsel's obligation to investigate and present mitigating evidence, often on basis of family upbringing and mental health; due to crucial mitigating impact that evidence of deprived upbringing and mental illness can have in penalty phase of a capital case, counsel *must* pursue this area with due diligence).

As the expanded record amply demonstrates a violation of the Sixth Amendment under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, and the Response fails to set forth a factual dispute that could sustain the judgment, this Court should hold that Mr. Barrett has demonstrated his entitlement to relief. At a minimum, this Court should order an evidentiary hearing to resolve any material factual disputes. 28 U.S.C. § 2255(b).

> **2.      Undisputed facts and law**.

On the issue of deficient performance, the Second Amended Motion and the exhibits contained in the expanded record set out a detailed chronology of events related to defense counsel's lack of investigation and preparation for the penalty phase. 2nd Amend. Pet. (Doc 95) at 185-194; Merits Brief (Doc 149) at 106-14. The Government has filed declarations from defense counsel Bret Smith (Resp. Exh. 11) and Roger Hilfiger (Resp. Exh. 12). The following facts are not disputed by any evidence cited in the Government's Response or the attached exhibits:

- defense counsel's ability to investigate mitigation evidence was curtailed by the trial court's funding orders which provided far less resources than was routine in federal death penalty cases (Mot. Exh. 56 at 4-5);

- prior counsel John Echols advised Mr. Hilfiger and this Court that the mitigation investigation conducted prior to the state-Court trials was done by a novice who did not complete her work, and did not produce a report (Mot. Exh. 64 at 2, 4);

- this Court found the services of a mitigation specialist were reasonably necessary and authorized counsel to employ one for 100 hours (Doc 97 at 3);

- defense counsel inquired about a mitigation investigator in late June 2005, and in mid-August 2005 asked Dr. Jeanne Russell to perform that service, but counsel never actually retained anyone to investigate a mitigation case;[16]

- defense counsel never interviewed Mr. Barrett's family members about his personal history, the family history, or other matters related in their post-conviction declarations;[17]

- defense counsel possessed medical records showing Mr. Barrett had been diagnosed with and treated for head injuries, depression, bipolar disorder, and attempting suicide by shooting himself in the chest with a shotgun, and they possessed the report of Dr. Russell referring to the state-Court evaluation conducted by Dr. Bill Sharp, Ph.D.;[18]

- defense counsel retained Dr. Russell in August 2005 to update her risk assessment, but Dr. Russell did not perform any other type of mental health evaluation, and counsel otherwise did not consult any mental health expert in preparation for the penalty phase;

---

[16] Mr. Hilfiger and Mr. Smith state that they read Movant's Exhibit 56, the declaration of Dr. Jeanne Russell. Resp. Exh. 11 at ¶ 8; Resp. Exh. 12 at ¶ 10. Dr. Russell states that Mr. Smith asked her in mid-August 2005 to conduct mitigation investigation. Pet. Exh. 56 at 2. When she declined, it is undisputed that Mr. Smith told Dr. Russell the Court would not approve a comprehensive mitigation investigation, even if there were time to conduct one. *Id.* at 4-5.

[17] Mr. Hilfiger and Mr. Smith confirm in their declarations that they spoke with members of Mr. Barrett's family, but do not dispute the accounts of family members regarding the timing or content of those conversations. *Compare* Resp. Exh. 11 at ¶ 7; Resp. Exh. 12 at ¶ 9, *with* Mot. Exhs. 37, 77, 78, 80, 81, 83, 84, 85, 86, 90, 95, and 96.

[18] The Government has filed portions of those records, which it acknowledges were cherry-picked to illustrate a point, Govt Resp. at 122 n.15, to argue that doctors changed some of their diagnoses, or disagreed with each other. Govt. Resp. at 122-23. However, the Government has not presented any competent evidence disputing the opinions of Dr. George Woods or Dr. Myla Young, who reviewed the documents.

- on September 9, 2005, defense counsel advised the Court that they were contacting prior counsel "because we have been able to find very little on mitigation" in the files of the state trials, and this and other discussion led this Court to describe the defense's preparation as "still a work in progress;" [19]

- due to defense counsel's failures to investigate Mr. Barrett's life history and have him evaluated by a psychologist or psychologist counsel prior to trial counsel neither could have advised Mr. Barrett about the available options for the penalty phase nor could they have made a strategic choice between options of which they were ignorant;[20]

- the performance of counsel described here is below the prevailing professional norms of capital defense practice that are codified in the 2003 revised ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.[21]

---

[19] Although the Government does not, and could not, dispute the chronology set forth in the trial record and expanded record in these proceedings, including that defense counsel never retained the mitigation expert authorized by this Court, the Government argues defense counsel could have done more "'with the luxury of time.'" Govt. Resp. at 119, quoting *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995). That is Mr. Barrett's point. If defense counsel had acted according to prevailing professional norms and begun work on the penalty phase before August 2005, and made use of resources the Court made available, they could have adduced vastly more mitigation evidence than they did.

[20] The Government argues that defense counsel "elected" to present certain evidence from Mr. Barrett's family and friends, "[i]n view of the circumstances confronting defense counsel," but fails to present any evidence that this alleged election was an informed choice. On the contrary, neither Mr. Hilfiger nor Mr. Smith state in their declarations that they either knew about the mitigation evidence proffered in these proceedings or, if they knew the facts, that they elected not to present them. Consequently, the Government has failed to create a disputed issue of material fact on this issue.

[21] The Response contains no references to any evidence or legal authority regarding the professional norms of capital defense practice that were prevailing at the time of trial. The Government cites only one case decided after 2001, and that is on the issue of prejudice, not deficient performance. Doc 175 at 125 n.15, citing *Rhoades v. Arave*, No. CV 93-0155-S-EJL,

(continued...)

For the reasons stated in the Merits Brief (Doc 149) and herein, these facts are sufficient to establish that defense counsel's preparation for the penalty phase fell below an objective standard of reasonableness. This Court should hold Mr. Barrett satisfied the first prong of *Strickland*.

As to the prejudice prong of *Strickland*, the Government does not dispute any of the historical facts set forth on pages 195 to 230 of the Second Amended Motion. Although these facts are drawn from the accounts of family members, and their releases of personal information to support Mr. Barrett, the Government argues these facts would have undercut the jury's finding that Mr. Barrett was loved by his family. Govt. Resp. at 125. This is a matter of pure conjecture that runs contrary to the declarations before this Court which express love for and devotion to Mr. Barrett, and it is contrary to the holdings of numerous Supreme Court decisions that were cited in Mr. Barrett's supporting brief and completely ignored by the Government. *See Porter v. McCullum*, 130 S. Ct. 447, 455 (2009) (holding it was unreasonable for state Court applying *Strickland* to entirely discount mental health mitigation presented post conviction merely because "State's experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them" and to discount childhood abuse and military record because they included negative information about defendant); *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (prejudice established "although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty" because "that is not the test"); *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (rejecting alleged strategic excuse for omitting mitigation

---

[21](...continued)
2007 WL 1550441 (D. Id. May 24, 2007).

evidence and finding prejudice where historical facts were not disputed because "there is a reasonable probability that at least one juror would have struck a different balance"); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (unreasonable for state Court to discount mitigation evidence from defendant's background and lay mental health evidence even though "not all of the additional evidence was favorable to Williams").  Consequently, there is no genuine dispute as to any material fact regarding Mr. Barrett's life history.

As to mental health issues, the Government admits that its disputation of the facts consists solely of cherry-picked excerpts from Mr. Barrett's medical records that are subject only to the interpretation of the Government's lawyers.  Govt. Resp. at 122 n.15.  The Government opines that evidence of Mr. Barrett's mental health problems would not have been mitigating because "his entire mental health history was inextricably tied to his use of illegal drugs."  Govt. Resp. at 124.  However, the Government does not dispute the evidence that Mr. Barrett's parents and grandparents modeled alcohol and drug abuse, *see* Exh. 117 at ¶¶ 42 & 44, Motion (Doc 70) or Dr. Woods' scientific conclusion that Bipolar Disorder and Post Traumatic Stress Disorder *predisposed* Mr. Barrett to develop chemical dependency problems, *id.* at ¶ 44, or his conclusion that Mr. Barrett was, particularly at the time before the raid, self-medicated for pre-existing problems, *id.* at ¶¶ 46 & 76.  The Government ignores this evidence placing Mr. Barrett's drug use in a mitigating, not aggravating, framework.  In this respect, too, the Government's defense is essentially identical to the unreasonable error found in *Porter v. McCullum*, *supra*, i.e. there could be no prejudice because the prosecution opines the mental health mitigation is weak.  It is

reasonably probable the undisputed evidence is sufficient to have persuaded at least one juror to spare Mr. Barrett's life.[22]

The Government also does not dispute Mr. Barrett's showing that the available mitigation evidence – both that adduced in support of Part A of Ground2, and the undisputed facts adduced in support of Part B – would have undercut the statutory aggravating circumstances and the jury's finding that Mr. Barrett intended to kill Trooper Eales.  Likewise, the Government does not dispute the record evidence that the prosecution was able to exploit defense counsel's lack of preparation and investigation by eliciting damaging testimony from family members that would have been avoided or rendered harmless if counsel had conducted the most cursory of investigations or made reasonable use of the facts from the skeletal state mitigation investigation.[23]

Taking into account the jury's rejection of the future-dangerous aggravating factor, and "the totality of the evidence" adduced at trial and in post-conviction proceedings, *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 536; *(Terry) Williams*, 529 U.S. at 397, this Court should find the evidence  "might well have influenced the jury's appraisal of [the defendant's] culpability," *Williams*, 529 U.S. at 398, and vacate the death sentence.

To say the least, the Government has failed to show the trial record conclusively refutes Mr. Barrett's allegations and the expanded record substantiating those allegations.  28 U.S.C. §

---

[22]  The Government never acknowledges (or disputes) this is the standard for prejudice in a federal death penalty case.

[23]  The Government's two-sentence characterization of Steven Barrett's testimony pales in comparison with the pages of cross-examination that could have been avoided if defense counsel had listened to him prior to trial.  *Compare* Doc 175 at 117 *with* Mot. Exh. 99 *and* Merits Brief (Doc 149) at 111 & n.79.

2255(b).  The Government's primary defense asserts that Mr. Barrett's counsel either "elected" not to present evidence of Mr. Barrett's background, or that they lacked information to trigger an investigation of mental health issues.  Govt. Resp. at 116.  However, as indicated *supra* and discussed at greater length *infra*, the Government's evidence fails to support its contentions and fails to establish a legally viable defense.  Therefore, if the Court does not vacate the death judgment and order a new penalty trial, it must at least conduct an evidentiary hearing.

### 3. The declarations of trial counsel support findings of deficient performance and prejudice.

The Government places great emphasis on the declarations of Mr. Hilfiger and Mr. Smith, citing them ten times in the ten pages of the Response devoted to Part B of Ground 2. Doc 175 at 116-25.  The Government argues that defense counsel knowingly chose not to present evidence like that proffered with the § 2255 Motion because "Kenneth Barrett did not want to present a case in mitigation that centered on sympathy for him or dwelled on his family."  Doc 175 at 116.  (We say "like" because the Government never identifies any particular witness or document to which trial counsel or Mr. Barrett objected.)

For at least five reasons addressed in detail *infra*, the Government's theory is distinguishable from the post-hoc rationalization the Supreme Court rejected in *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003), only insofar as the theory in this case constitutes additional evidence of deficient performance.  First, the declarations of counsel are internally inconsistent, at least if given the meaning the Government imputes to them.  Second, neither declaration specifically endorses, or even refers to, the theory the Government advances.  Third, the declarations (as interpreted by the Government) are inconsistent with the statements of numerous

other witnesses whose accounts Mr. Hilfiger and Mr. Smith do not dispute. Fourth, the declarations are contradicted by the trial record, including statements of trial counsel. Fifth, assuming the declarations mean what the Government argues, they are independent evidence that Mr. Hilfiger and Mr. Smith did not understand mitigation, and unreasonably failed to carry out routine responsibilities of capital defense counsel.

### a.    Internal inconsistencies and adoptive admissions.

The Government relies upon argument that embellishes and distorts the statements of defense counsel. The paragraphs of each declaration to which the Government seems to refer are verbatim identical. They say the following:

> Mr. Barrett did not want the defense to "beg for his life" during the penalty phase of the trial. He did not want the outcome of the case to hinge on personal sympathy for him.

> Mr. Barrett did not want the mitigation case to dwell on his childhood. He also wanted to minimize the amount of testimony elicited from his relatives, particularly his son, mother and ex-wife, though he understood that decision could work to his detriment.

> * * *

> I did not want to premise our case in mitigation on Mr. Barrett's drug use because I did not believe that the jury would be sympathetic to such a strategy.

Resp. Exh. 11 at ¶¶ 11, 12, 14; Resp. Exh. 12 at ¶¶ 15, 16, 18. Each attorney also states that he was not familiar with Dr. William Sharp's evaluation of Mr. Barrett prior to the second state trial. Resp. Exh. 11 at ¶ 10; Resp. Exh. 12 at ¶ 12.

From these statements, the Government argues, implicitly at least, that defense counsel were under no duty to investigate Mr. Barrett's background because he "solemnly and adamantly wished to avoid presenting a mitigation case based on personal sympathy for him," and "as a

point of pride, he wanted to minimize reliance on his relatives to avoid bringing them unnecessary embarrassment." Doc 175 at 120. The unspoken premise in the Government's argument is that defense counsel wanted to conduct a background investigation, and could have done so prior to trial, but Mr. Barrett precluded them from doing so. The declarations contradict that inference in several ways.

First, neither Mr. Hilfiger nor Mr. Smith relate the alleged statements of Mr. Barrett to any tactical or strategic decisions they actually made in the case. Trial counsel simply do not assert that their failure to investigate Movant's background was influenced by any statement Mr. Barrett made to them. The declarations show Government counsel provided defense counsel with exhibits proffered with the § 2255 Motion, Resp. Exh. 11 at ¶¶ 8-10; Resp. Exh. 12 at ¶¶ 10-12, but neither defense attorney says he could not have investigated or presented a single witness or fact based on the alleged statements from Mr. Barrett.

In fact, the declarations contradict the Government's inference that Mr. Barrett interfered with his counsel. Mr. Smith states, "Mr. Barrett impressed me as among the most cooperative criminal defense clients I have ever had." Resp. Exh. 11 at ¶ 3. Mr. Smith and Mr. Hilfiger "did not find Mr. Barrett disruptive in any way." *Id.* at ¶ 13; Resp. Exh. 12 at ¶ 17 (using same language). Whereas the Government argues that Mr. Barrett's outburst during the penalty argument of Mr. Sperling shows "he was manifestly disinterested in relying on mitigation evidence premised on any alleged dysfunction in his upbringing," and cites trial counsel for this proposition, Doc 175 at 120, according to Mr. Hilfiger, "Mr. Barrett's outburst . . . was a very unusual and *unanticipated* event." Resp. Exh. 12 at ¶ 17 (emphasis added).

Nor do trial counsel state the evidence they actually presented was influenced by Mr. Barrett's alleged statements.  Neither trial attorney asserts that he knew the facts of Mr. Barrett's background and elected not to present them.  Each counsel asserts that he was unaware of the evidence of mental impairments developed by Dr. Sharp prior to the second state trial.  Consequently, counsel could not have made any decision regarding those facts.  And while the Government claims the mitigating evidence presented in these § 2255 proceedings would have contradicted the case that was presented at trial (Doc 175 at 121), neither Mr. Hilfiger nor Mr. Smith endorse that view.

The Government cites the declarations of counsel for the proposition that they would not have presented mental health mitigation because "records demonstrate that his entire mental health history was inextricably tied to his use of illegal drugs."  Doc 175 at 124.  Again the declarations are inconsistent with the Government's theory.  Mr. Hilfiger and Mr. Smith state that they read Dr. Sharp's report prior to giving their declarations.  Resp. Exh. 11 at ¶ 10; Resp. Exh. 12 at ¶ 12.  Neither attorney so much as suggests he would not have presented Dr. Sharp's testimony.  Similarly, it appears defense counsel were provided with the reports of Dr. Woods and Dr. Young before they signed their declarations.  As noted *supra*, Dr. Woods finds that Mr. Barrett, like many individuals discussed in the scientific literature, was predisposed to develop chemical dependency problems due to his underlying Bipolar Disorder and PTSD.  Mot. Exh. 117 at ¶ 44.  Yet neither attorney says the opinions expressed in those declarations would have been excluded by their desire not to premise mitigation on drug use.

On the contrary, counsel's statement that they "did not want to *premise* our case in mitigation on Mr. Barrett's drug use" (emphasis added), suggests they would have welcomed

evidence that premised his drug use on underlying mental illnesses.  Given that the jury would already have convicted Mr. Barrett of a drug offense prior to the penalty phase, and likely credited the informants' testimony about his drug use, the only rational course for counsel would be to explain the drug use as something other than pleasure-seeking or bare defiance of the law.

To the extent defense counsel were apprised of the allegations in the Amended § 2255 Motion, and the supporting exhibits, and either did not dispute them, or failed to endorse the Government's theories, the Court should view the omissions as adoptive admissions by silence.[24] *See*  Fed. R. Evid. 801(d)(2)(B) (discussing adoptive admissions: "a statement of which the party has manifested an adoption or belief in its truth"); 5 Joseph M. McLaughlin et al., *Weinstein's Federal Evidence* (2d ed. 2009) (noting that "[a] party can adopt another's statement by responding to it with silence," and that Courts must look to the circumstances including whether the party "understand[s] the statement" and is able or "unable ... to reply to it").  The identical language used in the two declarations shows either collusion between the witnesses, or more likely, that the Government's lawyers prepared the declarations.  If the Government had been able to substantiate its theories in counsel's declarations, it would have done so.

### b.     *Inconsistencies between Government's theory and other witnesses.*

The Government's expansive interpretation of trial counsel's declarations to suggest Mr. Barrett's alleged statements influenced defense counsel's decision whether to investigate

---

[24]  There is no reason for Mr. Barrett to admit or deny the statements attributed to him by Mr. Hilfiger and Mr. Smith because the declarations of counsel support Mr. Barrett's grounds for relief.  For the reasons stated herein, any such statements either did not influence counsel's conduct, or counsel responded to any such statements in a manner that constitutes ineffective assistance.

conflicts with the testimony from at least two disinterested witnesses. Dr. Jeanne Russell has given this Court a declaration recounting that in mid-August 2005, Mr. Smith contacted her and asked her to perform a mitigation investigation. She states that she told Mr. Smith she was not qualified to perform that role, and in any event, with the trial only one month away, it was too late. She states that Mr. Smith told her the Court would not fund a comprehensive mitigation investigation. Exh. 56 at 2, 4-5, Motion.

Mr. Smith and Mr. Hilfiger state that they have reviewed Dr. Russell's declaration. While they dispute her recollection regarding the presentation of the risk assessment she performed,[25] neither Mr. Hilfiger nor Mr. Smith disputes Dr. Russell's statements about the lack of mitigation investigation. Resp. Exh. 11 at ¶ 9, Resp. Exh. 12 at ¶ 11. If Mr. Barrett had indicated to counsel that they should not, or need not, investigate his background, there was no reason for counsel to ask Dr. Russell to do just that one month before the trial. Similarly, there could be no reason for Mr. Smith to complain about the lack of funding for a mitigation investigation if, per Mr. Barrett's wishes, one was unnecessary.

Similarly, Mr. Hilfiger's declaration does not dispute the declaration of Federal Defender Julia O'Connell in which she states that Mr. Hilfiger left her a voicemail message on June 30, 2005, in which he asked whether he could meet with a mitigation specialist she had used. Mot. Exh. 67 at 3-4. Neither does Mr. Hilfiger dispute that Ms. O'Connell advised him by e-mail on July 3, 2005 to contact resource counsel, Richard Burr. *Id.* at 4. Mr. Hilfiger does not dispute

---

[25] This dispute is not material. Mr. Barrett does not allege it was unreasonable for defense counsel not to present Dr. Russell. As she states, the sole purpose of her evaluation was to combat evidence of future-dangerousness. Mot. Exh. 56, at 1-2. As the jury rejected that non-statutory aggravating factor, there could be no prejudice.

Mr. Burr's declaration stating that he had only one contact with Mr. Hilfiger after Mr. Echols left the case, and that was not on a substantive matter. Mot. Exh. 118 at ¶¶ 13-15.

Dr. Russell and Federal Defender O'Connell are disinterested percipient witnesses who can document their contacts with defense counsel in contemporaneous records. Dr. Russell's undisputed account is corroborated by the contemporaneous trial record, discussed in the next section of this Reply. These witnesses contradict the Government's post-hoc claims by showing that throughout the summer of 2005 defense counsel were acting as though they wanted to conduct a thorough mitigation investigation but were hampered only by their own neglect and the Court's funding decisions.

Mr. Hilfiger and Mr. Smith state that they met with various members of Mr. Barrett's family "including (but not limited to)" his mother, father, step-mother, uncle Roger, and son Toby. Resp. Exh. 11 at ¶ 7; Resp. Exh. 12 at ¶ 9. These same family members, and many more, have provided this Court with declarations in which they describe the timing and content of their conversations with defense counsel, if any. Mot. Exhs. 37, 77, 78, 80, 81, 83, 84, 85, 86, 90, 95, and 96. As set forth on pages 110 to 111 of Mr. Barrett's merits brief (Doc 149), in those instances where defense counsel interviewed family members at all (in the sense of asking questions rather than telling them the questions that would be asked on the stand), defense counsel either did not ask about Mr. Barrett's family history, mental health history, or they actively dissuaded family members from providing such information. Only Gelene Dotson was interviewed prior to the trial. Defense counsel's declarations are silent on the timing and content of their conversations with Mr. Barrett's family under circumstances where they would be

expected either to deny their accounts, or explain them in terms of Mr. Barrett's alleged statements.

Still more evidence conflicts with the Government's claim that Mr. Barrett resisted a mitigation case based on dysfunction, abuse and mental illness. State court counsel began interviewing Mr. Barrett's family members and obtaining releases in order to present evidence about Mr. Barrett's background. John Echols and Jack Gordon, Mr. Barrett's state lawyers, received no direction that certain areas of mitigating evidence were not to be investigated or presented. Mr. Echols has informed this Court that

> Mr. Barrett cooperated with all of our requests to be examined by a mental health professional, provided us with potential sources of background information and helped us to locate significant witnesses who knew the details of his upbringing. Because of the attorney-client relationship we established with him and, which in my opinion, any qualified lawyer would endeavor to establish with a capital client, Mr. Barrett did not place any restrictions on the evidence we were permitted to investigate or prepare to present in the event of a penalty phase.

Mot. Exh. 34 at 14.

### c.   Inconsistencies between the trial record and the Government's theory.

There is a glaring inconsistency between the Government's theory and reality: defense counsel's penalty phase case actually dwelled upon testimony from the very family members whom the Government contends Mr. Barrett did not want to testify. *See* Doc 175 at 116-19.

To the extent the Government argues defense counsel knew the facts about Mr. Barrett's family and personal history adduced in these proceedings and "elected" not to present those facts but to present other facts through the same witnesses, the record refutes the argument. After counsel's contacts with Ms. O'Connell and Dr. Russell, on September 9, 2005, Mr. Smith

advised the Court that he was contacting "Mr. Echols[] because we have been able to find very little on mitigation" in the files from the past trials. Tr. 9/9/05 Hr'g at 43. This Court generously described the state of the defense's preparation for the penalty phase as a "work in progress," at that time, and that characterization was confirmed less than one month later when counsel advised the Court they were still attempting to develop mitigation evidence. Tr. 10/3/05 Hr'g at 7. These statements and the other evidence before this Court overwhelmingly demonstrate that Mr. Hilfiger and Mr. Smith could not have chosen to exclude facts from their presentation, because they had not investigated the facts.

The Government contends it was reasonable for defense counsel not to conduct any mental health investigation because "Barrett has not shown that the results of [Dr. Russell's] contemporaneous evaluation merited further exploration." Doc 175 at 121-22. Defense counsel's current reliance upon Dr. Russell to give them an indication whether "Mr. Barrett suffered from a significant mental health condition," Resp. Exh. 11 at ¶ 8; Resp. Exh. 12 at ¶ 10, is contradicted by the statements they made at the time of trial regarding the purpose for which they retained Dr. Russell. On September 9, 2005, Mr. Smith advised the Court that the defense was not relying upon Dr. Russell as a mental health expert. Tr. 9/9/05 Hr'g at 41. On October 3, 2005, defense counsel advised the Court that they had not consulted with a psychiatrist or psychologist. Tr. 10/3/05 Hr'g at 7.

The contemporaneous statements of defense counsel are consistent with Dr. Russell's declaration in which she states, "I did not evaluate Mr. Barrett's neuropsychological functioning or focus on his psychological make-up, as the referral request was specific to risk assessment.

The instruments I used were solely for the purpose of this assessment."[26]  Mot. Exh. 56 at 1-2.

The implications of counsel's post-conviction declarations, except to the extent that they do not

dispute Dr. Russell's account, are inconsistent with their trial-time statements.  To the extent

defense counsel relied upon Dr. Russell to guide them regarding Mr. Barrett's competence to

stand trial or mitigation evidence unrelated to future-dangerousness, their decision-making

reflects an unprofessional lack of understanding of the issues.  *See Haliym v. Mitchell*, 492 F.3d

680, 715-16 (6th Cir. 2007) (counsel ineffective for relying solely upon one and one-half our

evaluation of defendant by psychiatrist); *cf. Starr v. Lockhart,* 23 F.3d 1280, 1289-1290 (8th Cir.

1994) (competency evaluation did not satisfy due process right to assistance for defense as it was

inappropriate to purpose of developing mitigation case based on defendant's functional deficits);

*Frederick v. State,* 902 P.2d 1092, 1098 (Okl. Cr. 1995) (prejudicial error in capital case to deny

a continuance where expert appointed under *Ake* lacked the competence to diagnose and assess

the disorder defendant apparently suffered from).

Dr. Russell states that when Mr. Smith contacted her in mid-August 2005 he did not have

a copy of her 2003 report, Mot. Exh. 56 at 2, and throughout their interactions he gave the

impression that he lacked knowledge of Mr. Barrett's background and the investigation of it that

was done prior to the second state trial.  *Id.* at 5.  Although defense counsel do not dispute her

account, it is worth noting that the trial record substantiates it.  Three weeks after their initial

discussions, Mr. Smith indicated that he did not know that Dr. Russell had examined Mr. Barrett,

but he believed she had "reviewed records and what have you."  Tr. 9/9/05 Hr'g at 41.

---

[26]  This statement conclusively refutes the Government's contention that Dr. Russell's visit with Mr. Barrett constituted a mental health mitigation investigation.  Doc 175 at 121 and Resp. Exh. 5.

Counsel's statements in a later hearing corroborate Dr. Russell's statement that Mr. Smith wanted her to be a mitigation expert.  During a hearing held that day, Mr. Hilfiger referred to the $15,000.00 the Court had authorized for a mitigation specialist, and said "when he [Mr. Smith] talked to *her* about doing it," he did not think they were "*going to get* to $10,000.00."  Tr. 10/3/05 Hr'g at 6:17-21 (emphasis added).  *See also id.* at 7:15-21 (referring to female expert who is also a psychologist who "has provided us extensive questions for their psychologist, Mr. Horn").[27]  Counsel's statements conclusively show that, contrary to long established standards of practice, they had not investigated a mitigation strategy prior to trial.  *See authorities cited in* Doc 149 at 105-06 & nn. 62-69.

The September 9, 2005 hearing also places in context defense counsel's current statements about when they gathered information from the state cases.  Mr. Hilfiger's declaration confirms the trial record insofar as he states that he first collected files from Mr. Echols and OIDS in May 2005, after he was elevated to lead counsel.  *See* Doc 138.  He does not dispute Mr. Echols contemporaneous records showing Mr. Hilfiger had not consulted the online database of state-Court files Mr. Echols had made available.   Mot. Exh. 34 at 13.  While Mr. Hilfiger says he had believed he received all the materials in May 2005, the record shows that in September 2005, Mr. Smith was not sure and was contacting Mr. Echols.  Tr. 9/9/05 Hr'g at 43.  Counsel did not follow this Court's order to give the case the "highest priority."  Doc 31

---

[27]  In *Wiggins v. Smith*, the Supreme Court found "counsel's decision to hire a psychologist sheds no light on the extent of their investigation into petitioner's social background."  *Wiggins*, 539 U.S. at 531.  In this case, counsel's decision to hire Dr. Russell illuminates the issue and reveals that prior to August 2005 counsel had done nothing to investigate Mr. Barrett's background, and when Dr. Russell declined to perform that role, counsel did nothing afterward, either.

The trial record also refutes the Government's contention that counsel were not on notice of a need to investigate Mr. Barrett's mental health problems because Mr. Hilfiger and Mr. Smith say they were "not familiar with Dr. [William] Sharp." Resp. Exh. 11 at ¶ 10; Resp. Exh. 12 at ¶ 12. Mr. Hilfiger states, "I was not aware that there was any . . . contact between Dr. Sharp and Kenneth Barrett" such as a mental health evaluation. Resp. Exh. 12 at ¶ 12. Mr. Smith, who worked most closely with Dr. Russell, Resp. Exh. 12 at ¶ 10, says he "did not ask Dr. Sharp to provide me with a report in 2005, nor did I direct anyone else to do so." Resp. Exh. 11 at ¶ 10. The Government contends these statements show there were no "documents in the defense file that would have suggested the need to investigate the possibility of serious mental illness." Doc 175 at 121.

However, in the risk assessment obtained by defense counsel on September 15, 2005, and filed on September 23, 2010, Dr. Russell specifically states on page 3 that she reviewed the "Psychological Evaluation completed by psychologist, William Sharp, dated September 28, 2002." *See* Docs. 208, 210. Dr. Russell goes on to list the "Assessment Tools used" by Dr. Sharp. Most of Dr. Russell's 2005 report, including the reference to Dr. Sharp's evaluation, is identical to her 2003 report which Mr. Smith obtained in August 2005. *See* Mot. Exh. 56 at 3-4. If defense counsel never heard of Dr. Sharp and never requested his report, it is because they were not paying attention to the very person whom Mr. Hilfiger described as the defense mitigation expert. Tr. 10/3/05 Hr'g at 6.

To the extent the Government argues that the statements counsel attribute to Mr. Barrett contradict defense counsel's statements that he was cooperative, the trial record also contradicts the Government's claims. On June 2, 2005, Mr. Hilfiger advised this Court that Mr. Smith had

been speaking with Mr. Barrett and "he indicated that everything's okay; he's on board."  Tr. 6/2/2005 Hr'g at 7:2-6.  On June 6, 2005, this Court confirmed through a colloquy with Mr. Barrett that issues between himself and defense counsel had been resolved.  Tr. 6/6/05 Hr'g at 2:19 - 3:14.  That Mr. Barrett was cooperative with counsel also is confirmed in Exh. 36, Motion (Doc 70), a letter Mr. Barrett wrote to Mr. Hilfiger around the time of these hearings in which he promised to work with and support his counsel.  If counsel had acceded to any desire of Mr. Barrett's that they believed was "to his detriment," they had every reason and opportunity to put that issue on the record, but they gave exactly the opposite representation.

In sum, the record shows trial counsel informing this Court in June 2005 that Mr. Barrett was cooperating with counsel, and Mr. Barrett confirmed that in the presence of counsel without being contradicted.  In September and October 2005 counsel informed this Court that their mitigation investigation was ongoing, and although they identified another impediment (the prior files), they did not suggest Mr. Barrett objected to any form or area of investigation.  Disinterested percipient witnesses also confirm that trial counsel expressed no concerns about the scope of investigation at the time of trial, and counsel's current declarations do not dispute those accounts.

> ### d.    *Inconsistencies between the Government's theory and the law of effective assistance of counsel.*

The record shows that whatever statements Mr. Barrett may have made to defense counsel, their unreasonably delayed and fleeting effort to gather mitigation evidence, and the evidence they actually presented, was not influenced by those statements.  As the Supreme Court has repeatedly held, counsel cannot make a strategic (or client-directed) decision about what

evidence to present, if they failed to learn through investigation what the evidence would show. *Wiggins*, *supra*, 539 U.S. at 526 (record shows mitigation presented at trial was not strategic choice but "resulted from inattention"); *id.* at 536 ("counsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable"). Nevertheless, as the Government has raised the defense, we will assume for the sake of this Reply the statements were made, and address whether the evidence indicates defense counsel acted reasonably under *Strickland* and its progeny.

The test is familiar: "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Wiggins*, 539 U.S. at 521, quoting *Strickland*, 466 U.S. at 690. Due to the lack of explanation in the declarations regarding what, if anything, Mr. Barrett's alleged statements meant to defense counsel, it is necessary to proceed hypothetically.

While the Government treats counsel's declarations as a shibboleth that precludes a finding of deficient performance, Supreme Court and circuit precedent shows that under a variety of circumstances, statements like those attributed to Mr. Barrett do not obviate the duty to investigate. *Porter*, *supra*, 130 S. Ct. at 453. In *Porter*, the Court found ineffective assistance for failing to investigate and present mitigation evidence although "counsel described Porter as fatalistic and uncooperative. But he acknowledged that although Porter instructed him not to speak with Porter's ex-wife or son, Porter did not give him any other instructions limiting the witnesses he could interview." 130 S. Ct. at 453. The Court assumed what counsel said about Porter was true, and held counsel's "decision not to investigate did not reflect reasonable professional judgment." *Ibid.* Similarly, in *Rompilla v. Beard*, *supra*, the Supreme Court found

ineffective assistance of counsel where the defendant at times had been "uninterested in helping" and "even actively obstructive" of counsel's efforts, 545 U.S. at 381. The Court also found counsel ineffective because a wealth of mitigation evidence was available from another source the defense attorneys failed to explore, 545 U.S. at 390-93. *See also Hamilton v. Ayers,* 583 F.3d 1100, 1117-18 (9th Cir. 2009); *Gray v. Branker,* 529 F.3d 220, 230-31 (4th Cir. 2008) (retained counsel not excused from developing and introducing mental health evidence because the client said he did not want to spend the money for an expert).[28] In this case, it is undisputed that counsel were free to speak with any member of Mr. Barrett's family about anything they chose, *see* Resp. Exh. 11 at ¶ 7; Resp. Exh. 12 at ¶ 9, that they possessed "Mr. Barrett's medical, educational and mental health records," Resp. Exh. 12 at ¶ 4, and that they failed to ask about family history, or seek a mental health evaluation.

Assuming Mr. Hilfiger and Mr. Smith understood Mr. Barrett's statements to mean they should not investigate evidence of his family's history of mental illness, alcoholism, infidelity, broken marriage, separations, violence, and abuse, because that would be begging or seeking sympathy, counsel exhibited a lack of understanding of mitigation.[29] *See Anderson v. Sirmons,* 476 F.3d 1131, 1144-45 (10th Cir. 2007); *Smith v. Mullin,* 379 F.3d 919, 943 (10th Cir. 2004); *Mayes v. Gibson,* 210 F.3d 1284, 1298 (10th Cir. 2000) (mitigating evidence provides the

---

[28] Indeed, it has been held that even where a client forecloses certain avenues of mitigation, it is arguably more incumbent on counsel to seek out alternative sources of mitigating information. *Hamilton, supra.*; *Karis v. Calderon,* 283 F.3d 1117, 1136 (9th Cir. 2002).

[29] Mr. Hilfiger and Mr. Smith both place the phrase "beg for his life" in ironic quotation marks. That counsel are dubious about the meaning of this phrase suggests, in addition to other evidence, that this alleged statement was not perceived as a direct impediment to any specific area of investigation or mitigation evidence.

opportunity to humanize the defendant and explain the offense in the context of the defendant's life).  Decisions based on an erroneous understanding of an issue constitute deficient performance.  *See*, *e.g.*,  *Williams*, 529 U.S. at 395 (defense counsel's failure to obtain social service records on defendant based on erroneous belief state law made them unavailable was constitutionally deficient); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (counsel's failure to move to suppress was constitutionally deficient because it was based "on counsel's mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense").

Mr. Barrett has already cited numerous cases explaining the object and purpose of mitigation evidence in a capital trial.  *See* Merits Brief  (Doc 149) at 104-05.  As resource counsel Richard Burr states in his supplemental declaration,

> Defense counsel who are familiar with mitigation explain to their clients early on that mitigation does not involve begging for the defendant's life or relying on sympathy.  Begging for mercy is not allowed in federal death penalty cases and a "generic" plea for mercy has been found by the Supreme Court to be evidence of ineffective assistance of counsel. [30] * * *
>
> * * * Mitigation evidence involves humanizing the defendant, making his life experiences familiar to jurors, and helping jurors to see that the life they are being asked to end amounts to more than the crime of conviction.  Mitigation also involves offering the jury an explanation for the defendant's actions.  Nearly every initially-reluctant capital defendant allows this evidence to be presented.
>
> It is not necessary for the jury to see either the defendant's background or an explanation of his actions as grounds for sympathy.  Experienced capital defense counsel know it is not even desirable to present mitigation as a basis for sympathy because such a strategy is likely to be ineffective or backfire by causing jurors to weigh sympathy for the victim against sympathy for the man who took his life.  Both the experience of capital trial attorneys and scientific studies of how capital jurors decide whether to vote for life or death show that mitigation

---

[30]  Citing *Williams v. Taylor,* 529 U.S. 362, 369 n.2, 397-98 (O'Connor, J., concurring).

succeeds when jurors are able to identify with the defendant because of something in his background, or to understand his actions as something other than the product of a will to do harm. *See*, *e.g.*, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538 (1998); Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. Rev. 76 (2000).

Defendants to whom mitigation has been explained do not object on grounds of "begging" or "sympathy" because they understand, if they have the capacity to understand, that mitigation is mostly telling their story. The statements attributed to Mr. Barrett about dwelling on his childhood and not relying on members of his family reflect a similar lack of insight into capital defense norms of practice particularly in that Mr. Hilfiger and Mr. Smith do not indicate that they made any effort to correct the misunderstanding. Dwelling on a defendant's childhood could be seen as a plea for sympathy. That kind of one dimensional penalty phase case is not the norm in federal death penalty cases. Presenting the defendant's childhood experiences as a reason for his later use of drugs, or a contributing factor in a mental disorder, enables jurors to understand his criminal behavior as more than the isolated decision of the defendant not to comply with social norms. That kind of multi-dimensional understanding of mitigation is fundamental to death penalty defense practice.

Exh. 219 at ¶¶ 13-16.

As already noted, the declarations of defense counsel do not support the expansive arguments the Government bases on them. Assuming *arguendo* counsel understood Mr. Barrett's alleged statements to be a barrier to investigation, their response, like that of counsel in *Porter* and *Rompilla* was unreasonable. As Mr. Burr states in his supplemental declaration, this sort of occurrence is "death penalty defense 101," and the 2003 ABA Guidelines provided counsel with a variety of responses, none of which they pursued. The 2003 Commentary on ABA Guideline 10.5 (Relationship with the Client) provides the following:

Some clients will initially insist that they want to be executed as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. *It is ineffective assistance for counsel to simply acquiesce to such wishes*, which usually reflect overwhelming feelings of guilt or despair rather than a rational

decision. Counsel should initially try to identify the source of the client's hopelessness. Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates. Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time. One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison.

(Emphasis added). These guidelines and advice to counsel suggest a much more serious problem than what trial counsel imply in the statements they attribute to Mr. Barrett. Even so, it does not appear that Mr. Hilfiger or Mr. Smith took any of the recommended steps that are commonly used by capital defense counsel in similar situations.

Neither Mr. Hilfiger nor Mr. Smith indicates that he made any effort to identify the source of their client's alleged concern. Mr. Barrett's family were very close to him and supportive during the trial. They have been reinterviewed to ascertain whether Mr. Hilfiger or Mr. Smith ever told them Mr. Barrett did not want mitigation evidence presented. The evidence shows defense counsel never sought assistance from Mr. Barrett's family. Indeed, they never mentioned the issue. Exh. 217 at 1, 3 (federal trial counsel never contacted her ahead of trial; Mr. Barrett stated he only disagreed with counsel's failure to call certain witnesses); Exhs. 216, 212; Exh. 207 at 3; Exh. 206 at 2-3; Exhs. 208, 214. These declarations, like those submitted with the initial and amended § 2255 Motions show Mr. Barrett's family were extraordinarily supportive of him and his defense, that they were meeting with him regularly prior to the federal trial, and, if an issue arose, could have assisted defense counsel in helping Mr. Barrett understand the nature and importance of his story.

The record shows this Court authorized counsel to retain a mitigation specialist, a person who "possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (*e.g.*, family sexual abuse) that the defendant may have never disclosed." Commentary to ABA Guideline 4.1 (The Defense Team and Supporting Services). It was standard for a competent defense counsel at the time of this trial to rely upon a mitigation specialist's skills and training to develop mitigation evidence. Exh. 219 at ¶¶ 17-20. Although the Court authorized the use of a mitigation specialist and counsel knew how to find one, they did not make use of this resource to address the alleged problem with Mr. Barrett.

Although recommended by the ABA Guidelines, the prior and supplemental declarations of Richard Burr show defense counsel failed to heed the contemporaneous advice of Julia O'Connell and seek the assistance of more experienced capital trial counsel. Exh. 219 at ¶ 22. According to defense counsel's declarations any lack of cooperation from Mr. Barrett would have been unusual. Yet the trial and expanded records show defense counsel never sought the assistance of a mental health professional regarding Mr. Barrett's alleged concerns, or any other matter.

Assuming (contrary to all evidence) that defense counsel in this case, like counsel in *Porter* unreasonably took the alleged statements of Mr. Barrett as an excuse for failing to investigate, their performance was unreasonable for additional reasons. As Mr. Burr explains, if defense counsel had investigated, they could have pursued a variety of means of presenting evidence about Mr. Barrett's family history without "dwelling" on the testimony of family members themselves. Exh. 219 at ¶¶ 10, 23.

Defense counsel state that Mr. Barrett was aware that limiting testimony of his family members "could work to his detriment." Resp. Exh. 11 at ¶ 12; Resp. Exh. 12 at ¶ 16. Counsel's advice on this issue could not have been reasonable. Long before the ABA Guidelines, the ABA Criminal Justice Standards codified the norm of investigating first so that any advice to the defendant about the risks of pursuing a particular strategy. Standard 4-5.1(a) (counsel should advise client "[a]fter informing himself or herself fully on the facts and the law."). The trial record and undisputed post-conviction evidence overwhelmingly shows defense counsel could not have investigated prior to advising Mr. Barrett because they were still attempting to locate an investigator as the trial was beginning, the person they turned to (Dr. Russell) turned them down, family members were not interviewed or consulted, counsel were unfamiliar with past mental health evaluations, and counsel consulted no mental health experts.

Moreover, counsel do not pretend they strictly adhered to Mr. Barrett's other ideas about the case, and it is clear that decisions such as which witnesses will testify are consigned to counsel's judgment. ABA Criminal Justice Standard 4-5.2. While counsel state that Mr. Barrett made suggestions, they do not say they followed them. Res. Exh. 11 at ¶¶ 3-4; Res. Exh. 12 at ¶ 5. Indeed, counsel do not dispute the account of Doris Barrett who observed Mr. Hilfiger on several occasions refuse to make objections urged by Mr. Smith. Mot. Exh. 80 at 2.

The Commentary to ABA Guideline 10.5 establishes that at the time of this trial the phenomenon of defendants expressing resistance to mitigation evidence was well known, and effective strategies were also known and available to address the problem. Taking these codified norms as guides to whether defense counsel acted reasonably, *Wiggins*, 539 U.S. at 523, this

Court must find that the declarations of trial counsel do not refute Mr. Barrett's showing of deficient performance; they corroborate and enhance that showing.

### 4.     The government's legal arguments have no merit.

#### a.     Neither case law nor the record supports the Government's theory on deficient performance.

The Government relies on *Wallace v. Ward,* 191 F.3d 1235, 1246-49 (10th Cir. 1999), as a case analogous to its theory of what occurred in this case.  Doc 175 at 120.  *Wallace* is readily distinguishable on its facts, and in particular the trial record in this case.  In *Wallace,* the defendant waived jury trial and entered a blind plea of guilty.  At the sentencing hearing, he objected to his counsel cross-examining state's witnesses, and affirmatively stated to the Court he wanted no mitigating evidence put forth.  Wallace himself insisted on testifying, however, and stated that if free he would continue to commit crimes.  Wallace not only affirmatively waived the presentation of mitigating evidence, but practically begged for the death penalty.

Assuming counsel's assertions are consistent with the Government's theory, this case is more closely analogous to those in which Courts found deficient performance.  *See*, *e.g.*, *Young v. Sirmons,* 551 F.3d 942, 957-68 (10th Cir. 2008) (due to counsel's deficient performance in investigating and preparing a mitigation case, defendant could not be held to decision to forego live testimony in favor of stipulated facts, although no prejudice could be shown; this was not a case where the defendant adamantly refused to permit mitigation evidence at trial); *Battenfield v. Gibson,* 236 F.3d 1215, 1226-35 (10th Cir. 2001) (case remanded for resentencing where counsel was found to have performed deficiently, to defendant's prejudice, by failing to investigate and present mitigating evidence; counsel stated after the fact that client had instructed him not to

present anything in mitigation, but this could not be credited absent knowing and voluntary

waiver of right to put on a mitigation case; purported "waiver" entered by defendant before the

trial court was not knowing and voluntary, in part because there was a failure to investigate);

*Thomas v. Horn,* 570 F.3d 105, 121-25 (3rd Cir. 2009) ("waiver" of right to present mitigating

evidence was invalid; it could not be said that defendant would have blocked any attempts by

counsel to put on mental health evidence; defendant only told Court that he waived right to

testify personally).

The Government also relies on *Romano v. Gibson,* 239 F.3d 1156, 1174-82 (10th Cir.

2001), but it too is distinguishable.  Doc 175 at 120.  In *Roman*o, co-appellee Woodruff claimed

that counsel was ineffective for failing to introduce evidence that he had been abandoned and

abused by his birth mother before being adopted as an infant, and that counsel neglected to

introduce evidence that he had the judgment of a teenager and was a follower rather than a

leader.  According to trial counsel, Woodruff did not want family and friends called as mitigation

witnesses, but despite that, counsel put on a mitigation case anyway, consisting of Woodruff's

adoptive mother, friends, and the defendant himself.  Counsel conducted a reasonable

investigation.  He investigated Woodruff's background, but was told he had a normal upbringing.

Post-conviction evidence did not show that Woodruff suffered from any mental illness, and a

previous competency examination had failed to disclose any evidence of mental impairments.[31]

---

[31] *Romano* is interesting for what the Court did not say.  Mr. Woodruff and his co-defendant, Romano, were convicted of two murders in separate trials and sentenced to death in both.  Woodruff's conviction on one of these murders was reversed for new trial.  *Woodruff v. State,* 825 P.2d 273 (Okl. Cr. 1992); *State of Oklahoma v. John Joseph Romano and David Wayne Woodruff,* Oklahoma County Case No. CRF-86-3920.  Current lead counsel for Mr. Barrett and another lawyer represented Woodruff at the retrial.  Woodruff was sentenced to life

(continued...)

At most, the Government's argument that trial counsel shied away from presenting unidentified aspects of the available mitigation evidence presents a post-hoc excuse that carries no legal weight. As in *Wiggins,* this argument is simply a belated rationalization to explain away the absence of a competent investigation by lawyers who still apparently do not understand the function of mitigating evidence in a capital case. *See also, Richards v. Quarterman,* 578 F.Supp.2d 849  (N.D. Tex. 2008), *aff'd.* 566 F.3d 553 (5th Cir. 2009) (counsel's alleged strategic choice deemed afterthought based on false premise and disputed by other portions of record), cases cited in Merit Brief (Doc 149) at 34-35 & n.4.

As an alternative to the claim that counsel were merely following the instructions of their client, the Government argues that counsel made a reasonable tactical choice in presenting the second stage case they did. The evidence and the case law show that trial counsel's alleged "strategic decision" to concentrate on a skeletal presentation of scattered "good guy" evidence, rather than present evidence of dysfunction, abuse and mental illness, in combination with what actually was presented, was unreasonable *ab initio* for the reasons already discussed and the following.

---

[31](...continued)
without parole at the retrial after counsel presented the evidence he complained on habeas review had been omitted from the second stage of the other murder case. After hearing this evidence, the jury rejected death, even though it heard evidence of the other murder Woodruff had been convicted of committing, as well as evidence that Woodruff had a previous conviction for solicitation to commit murder involving a plot to blow up a coin shop and kill the proprietors and any customers who happened to be on the premises. While all cases must be judged on their own merits, the result in the Woodruff retrial demonstrates the powerful effect evidence of past abuse and dysfunction can have on a jury's punishment decision, even where, unlike Mr. Barrett's case, the defendant is a multiple murderer with other convictions for crimes of violence.

In a capital case, counsel's investigative duties are both broad and deep with respect to a defendant's family history and personal background, including mental, emotional and physical impairments. Counsel is required to investigate, prepare and present all relevant mitigating evidence. *Porter*, 130 S.Ct. at 453-54; *Rompilla* 545 U.S. at 387-89; *Wiggins*, 539 U.S. at 522-23; *Williams*, 529 U.S. at 329; *Wilson v. Sirmons,* 536 F.3d 1064, 1074, 1083-85 (10th Cir. 2008), *aff'd on rehearing en banc, Wilson v. Workman,* 577 F.3d 1284 (10th Cir. 2009); *Anderson v. Sirmons,* 476 F.3d 1131, 1141-48 (10th Cir. 2007). Counsel's investigative duties are not "client-centric." To "investigate" means to look for and uncover evidence as yet unknown. *McGahee v. United States,* 570 F. Supp.2d 723, (E.D. Pa. 2008). An actual failure to investigate such as occurred here "cannot be excused by a hypothetical decision not to use its unknown results." *Soffar v. Dretke,* 368 F.3d 441, 474 (5rh Cir. 2004), *amended,* 391 F.3d 703 (5th Cir. 2004).

Counsel's failure to undertake a professionally reasonable second stage investigation is deficient performance. There can be no reasoned "strategic choice" in the absence of a competent investigation that would permit a reasoned tactical choice to be made. A strategic decision requires a conscious and knowing choice between one or more alternatives. Such a decision must be borne of deliberation, not happenstance. A cursory investigation does not automatically justify a tactical decision with respect to sentencing strategy. *Wiggins v. Smith,* 539 U.S. at 526 (counsel's failure to investigate stemmed from inattention, not a reasoned strategic judgment). *See also* cases cited in Merits Brief (Doc 149) at 106 n.69 *and* 110-11 nn. 76-79. Counsel cannot abandon a mitigation investigation after gaining only rudimentary

knowledge about a client's background, which the evidence shows is what counsel did here. *Wiggins,* 539 U.S. at 524.

As with the lack of anything approaching an adequate investigation into Mr. Barrett's personal and family background, the Government argues that counsel had no reason to be aware of any mental illness on Mr. Barrett's part because he was helpful and engaged in the defense, and did not present himself as someone who was clearly laboring under the weight of mental and emotional impairments.  Doc 175 at 116, 119.  But no competent death penalty defense counsel simply relies on their observations and interaction with the client to gauge whether he has a mental illness. *Gray v. Branker,* 529 F.3d at 231.  Equally specious is the Government's reliance on Dr. Wood's statement in his report that at first blush, Mr. Barrett presents himself as a competent, "in control" person with no mental illness.  Doc 175 at 121.  It obviously takes appropriate expert assistance to get beyond surface appearances to discover a person's true mental state.  Despite this surface and misleading appearance, there is no question that Mr. Barrett suffers from a constellation of debilitating mental illnesses, and the Government's criticism of what it terms a late-coming "post-conviction" set of diagnoses carries no weight.  Doc 175 121. As shown in the declaration of Dr. Sharp (Mot. Exh. 55), and the declarations of Dr. Young and Dr. Woods, these diagnoses were available at the time of trial and are based on documents that counsel either admit they had, or that they could have had on reasonable investigation.

> **b.     Neither case law nor the evidence supports the Government's theory on prejudice.**

Contrary to the Government's argument that the mental health records in existence at the time of trial simply showed Mr. Barrett to be a "violent drug addict," the current diagnoses of Mr.

Barrett are fully consistent with his history.  As shown *supra*, the Government's theory fails as a matter of law for the same reason the same arguments failed in *Porter*, *Wiggins*, and *Williams*: under the reasonably probability standard, a post-conviction prosecutor's ability to poke tiny holes in a mental health mitigation case is insufficient to rebut or dispel prejudice.  *See also Gray v. Branker,* 529 F.3d at 236-27 (holding that state habeas Court unreasonably rejected any real consideration of diagnoses of mental illness proffered in collateral proceedings; defendant was forced to rely on such a diagnosis because his counsel were ineffective for failing to investigate and present mental health evidence at time of trial; rejecting out of hand post-trial reports on a defendant's mental state would contravene "uncontroversial" requirement that Court must assess an ineffective assistance claim based on evidence developed in post-conviction proceedings, citing *Williams v. Taylor,* 529 U.S. at 398).

The Government's contention that defense counsel had no reason to be aware of Mr. Barrett's mental problems is specious as a matter of law and refuted by the record.  As shown *supra*, the only expert trial counsel consulted, Dr. Russell, specifically referred to Dr. Sharp's 2002 evaluation in both her 2003 and 2005 reports which were provided to counsel.  The issue was simply never discussed with Mr. Barrett's family, who could have provided insight into Mr. Barrett's erratic, delusional and paranoid behavior.  Mr. Barrett's documented history of a serious suicide attempt, which led to him being committed to the state mental hospital in Vinita, as well as his other contact with mental health facilities, were more than "red flags" demanding additional investigation and expert assistance.

The Government argues that Mr. Barrett's medical records simply showed he was a violent drug addict.  Doc 175 at 119-121.  The assertion is incorrect on its face and the

Government's argument is devoid of any competent evidentiary basis. At one time or another, Mr. Barrett had been diagnosed as suffering from Bipolar Disorder, organicity, and depression, and had been placed on anti-psychotic drugs. Mot. Exh. 174. The declarations of Dr. Sharp, Dr. Woods, and Dr. Young show that Mr. Barrett's medical records contain abundant support for expert testimony. Defense counsel at trial simply never presented those documents to an expert. If the Government had its experts review these medical and mental health reports, they have apparently been unable to obtain an opinion to substantiate their claims, or they surely would have referenced it.

Viewed in the context of case law and the ABA Guidelines (ignored by the Government), the evidence defense counsel possessed was more than sufficient to trigger consultation with mental health experts. *See* cases cited in Merits Brief (Doc 149) at 51, 54-55, 114. Where counsel were aware or should have been aware of a client's mental problems, counsel have been found to have rendered deficient performance for failing to engage the services of appropriate experts and in failing to conduct further, reasonable investigation. *Wilson v. Sirmons,* 536 F.3d at 1085-87 (counsel ineffective for failing to engage services of mental health expert in timely fashion and to provide him with sufficient time and background materials to effect proper diagnosis); *Hamilton v. Ayers,* 583 F.3d at 117-18 (counsel failed to properly investigate defendant's mental health, where client had documented psychological problems and had attempted suicide in jail); *Gray v. Branker,* 529 F.3d at 229-30 (counsel were confronted repeatedly with fact that defendant had mental problems and had an expert who had offered her assistance, but needed additional time and information to make competent diagnosis).

As the Courts – including the Supreme Court – have recognized, long experience and empirical study show that the type of truncated and misleading case that was presented here (focusing exclusively on the defendant's "good qualities") is almost invariably doomed to failure. *See*, *e.g.*, *Rompilla*, 545 U.S. at 38 (unreasonable not to investigate defendant's prior crimes because investigation may produce abundant mitigation evidence); *Williams*, 529 U.S. at 397-98 (unreasonable not investigate prison records and juvenile records that contained mitigating evidence and evidence of past offenses); *Johnson v. Mitchell,* 585 F.3d 923, 942 (6th Cir. 2009) ("Obviously, confining investigation in the defense of a capital case to only the 'good things' that could be said about the client cannot be considered a reasonable investigation.").

The *most compelling mitigating evidence to which juries respond in deciding to spare a defendant's life is precisely the type of evidence that went un-investigated and un-produced here: evidence of an abusive and dysfunctional background and mental illness.*  This is so because of "the belief, long held by this society, that defendants who commit criminal acts that are attributable to ... emotional or mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California,* 494 U.S. 370, 382 (1990); *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989).  *See particularly, Wilson v. Sirmons,* 536 F.3d at 1085 (Courts have repeatedly found evidence of mental problems and an abusive background to be "powerful" mitigating evidence; counsel's performance was deficient where counsel relied on superficial evidence of defendant's "good qualities" and limited testimony from an expert who did not have the time or background materials to reach a definitive diagnosis); *Anderson v. Sirmons,* 476 F.3d at 1141-48 (counsel's performance was deficient where he put on a skeletal second stage limited to vague evidence about the defendant's "good qualities" and omitted evidence, due to an inadequate

investigation, of defendant's abusive background, mental illness, and use of methamphetamine, which exacerbated the defendant's mental problems; the omitted evidence was exactly the sort of evidence that garners the most sympathy from the jury, because it humanizes the defendant and explains and puts in context a defendant's behavior and actions that the jury would otherwise view as simply the product of a lack of caring or "meanness"); *Smith v. Mullin,* 379 F.3d 919, 942 (10th Cir. 2004) (it was "patently unreasonable" for counsel to fail to investigate and present evidence of defendant's borderline retardation, organic brain damage, and troubled childhood; this is the type of evidence juries respond to in deciding to spare a defendant's life).

The Government argues that Mr. Barrett was not prejudiced because the omitted mitigating evidence would have "utterly negated" the case that was presented, which was aimed at showing Mr. Barrett was a loved and valued family member. According to the Government, a mitigation case that included testimony about Mr. Barrett's mental illness and neurocognitive impairment also would have by necessity focused on his drug problem and episodes of violence. Doc 175 121-125. No evidence or case law is offered to support the novel contention that neither family members nor jurors could find a reason to spare a man who resorted to illegal drugs when he was not being treated for a major mental illness. The declarations of Mr. Barrett's family members, especially those who testified at trial, show both that they were aware of his cycling from depression to mania and back, and his drug use, and that they loved and cared for him as any family would.

It is equally nonsensical to contend that jurors would have found *Mr. Barrett* was not a good person, and was a future danger, because *his parents* were alcoholics whose marriage fell apart and who neglected and abused him. At trial, the Government heavily stressed the

sometimes mutually abusive relationship between Mr. Barrett and his ex-wife Abby Stites. Evidence of Mr. Barrett's serious mental impairments would have explained his sometimes volatile, suspicious conduct, particularly because Ms. Stites herself viewed his behavior in that context.  Mot. Exh. 103 at 2-3.  In other words, the Government has it backwards:  It was the defense case itself that permitted the jury to view Mr. Barrett as a violent drug user, (a) by ignoring the pleas of family members like Steve Barrett and Abby Stites who wanted to explain Mr. Barrett's background and illness, and (b) by failing even to read the report of Dr. Sharp much less consult with a mental health expert.  The defense left Mr. Barrett's drug use and bouts of domestic violence unexplained, and ripe for prosecutorial argument that Mr. Barrett was simply an unrepentant drug addict with virtually no redeeming qualities.

The Government's argument – unsupported by evidence – confuses cause and effect.  Dr. Woods, like Abby Stites, and any informed person familiar with Mr. Barrett's history, explains that Mr. Barrett's mental illness was not "premised" on his drug use, his drug use was premised on having untreated mental illnesses.  Mot. Exh. 117 at ¶¶ 42-46 & 76.

Before the penalty phase began, the jury was already well aware Mr. Barrett had been involved with drugs; his convictions were predicated on drug crimes.  The defense omitted a mitigation case that would have explained, in a manner that reduced Mr. Barrett's degree of moral culpability, his involvement in drugs.

The Government argues that counsel adopted a "reasonable strategy" -- a conclusion that has no substance in light of the obvious lack of a proper investigation -- in focusing on Mr. Barrett's "good qualities," and points to jury findings to say the mitigation case was partially successful. Doc 175 at 118.  The Supreme Court rejected the Government's line of argument in

*Kimmelman v. Morrison*, 477 U.S. 365 (1986).  Morrison challenged his conviction for raping a 15-year-old girl on grounds that his trial attorney unreasonably failed "to file a timely motion to suppress evidence allegedly obtained in violation of the Fourth Amendment."  *Kimmelman*, 477 U.S. at 368.  The State responded, notwithstanding the failure to move to suppress, "defense counsel's vigorous cross-examination attempts to discredit witnesses, and effort to establish a different version of the facts lift[ed] counsel's performance back into the realm of professional acceptability."  477 U.S. at 385-86.  The Supreme Court rejected the argument saying, "Counsel's performance at trial, while generally creditable enough, suggests no better explanation for []his apparent and pervasive failure" to investigate a possible suppression motion.  477 U.S. at 386.

Since at least 1986 it has been clear that an ineffectiveness claim is analyzed on what counsel failed to do, not what they did.  *See also Wilson v. Sirmons,* 536 F.3d at 1084-85 (trio of Supreme Court cases -- *Williams, Wiggins,* and *Rompilla* – focus not on what was presented at trial, but on the adequacy of the penalty phase investigation; "the question is not whether counsel did *something*; counsel must conduct a full investigation and pursue reasonable leads when they become evident.") (emphasis in original).  Consequently, the Government cites absolutely no authority for the proposition that so long as a jury finds some mitigating circumstances and rejects one or more aggravating factors, counsel's performance is immune to an ineffectiveness challenge.[32]  This dovetails with what Mr. Barrett showed in his Amended Motion: that counsel's wholly ineffective penalty phase presentation permitted the Government, in arguing for death,  to

---

[32]  The Government pulls the rug out from under its own argument by later maintaining, in connection with Movant's claim that the prosecutors committed misconduct in second stage closing argument, that the prosecutors rightly ridiculed the weak mitigation case that had been put forward.  A respondent cannot have it both ways.  Either the mitigation case was "effective" or it was ripe for the type of disdain that was heaped on it in the prosecutors' closings.

run roughshod over the anemic, skeletal mitigation case that was put forward. 2nd Amend. § 2255 Mot. (Doc 95) at 243-47.

The Government cannot and does not explain how any fact presented in mitigation now would have caused otherwise rational jurors to find "utterly negated" the "partial success" of the mitigation case that was presented. It beggars the imagination to say that the *addition* of what the Courts recognize as the most persuasive type of mitigating evidence would have harmed Mr. Barrett, particularly because it would have been consonant with what was presented. Despite his many problems, Mr. Barrett had "good qualities" and did the best he could.

Not only would the omitted mitigating evidence have not conflicted with the evidence that was presented, but it would have supported the defense argument that Mr. Barrett was unfairly treated by the Government. Doc 175 at 116. He was all the more susceptible to such unfair treatment due to his mental illness.

In aid of its "no prejudice" claim, the Government makes a series of boilerplate arguments that have no relation to the facts. Citing *Burger v. Kemp,* 483 U.S. 776, 794 (1987),[33] among other inapplicable cases, the Government contends that Movant has done no more than show that a more thorough investigation "might have borne fruit," and that "unlimited time" to investigate "might have" turned up more under "ideal conditions." The adequacy of counsel's investigation and the evidence presented as a result should not be judged under a standard of "perfection." Doc 175 at 120.

_____

[33] *Burger* is inapposite. In that case, counsel conducted a reasonable investigation but ran into the brick wall of one potential witness after the next having harmful things to say about the defendant. In Mr. Barrett's case, the omitted evidence would have put an entirely different light on the case in a humanizing, mitigating light.

The Government's theory is most often raised, and recognized when "additional" investigation would only yield cumulative evidence to what the jury actually heard, which was the case in *Burger*. But here the Government itself argues the mitigation case that was not presented conflicted with the mitigation that was presented. Neither contention is correct. The evidence available to trial counsel would have supported the showing that Mr. Barrett is a beloved member of his family and community, and would have dramatically increased the value of that evidence by showing how he and his family struggled to overcome generations of mental illness, alcoholism, poverty, violence, and deprivation.

The Government's claim that defense counsel were not acting under ideal conditions rings particularly hollow given that the undisputed record shows they failed to begin preparation for the penalty phase until the month before trial, and failed to obtain the expert assistance this Court authorized.

Among the many cases cited in Mr. Barrett's brief in support of his Amended Motion and here showing that he was prejudiced by trial counsel's professionally unreasonable errors and omissions, two cases from the Tenth Circuit stand out.

In *Anderson v. Sirmons,* 476 F.3d at 1141-48, the defendant was convicted of *three* brutal murders during what can only be described as an exceedingly violent rampage. In addition to the murders, Anderson also shot or participated in the shooting of another individual who managed to survive, was involved in a kidnapping, and was involved in burning down a dwelling. Just as in Mr. Barrett's case, counsel in *Anderson* relied on a superficial "good guy" mitigation case. The mitigation case consisted of evidence that although Anderson had drug and alcohol problems, he worked and provided for his family; that he was the son of a "good woman" and had a family that

loved him; and that his daughter loved him and he could still be of help to her while he was incarcerated.

The mitigating evidence omitted in *Anderson* is almost a mirror image of what was left unsaid in Mr. Barrett's case. Because the mitigation investigation in *Anderson*, such as it was, was inadequate, the jury never learned that Anderson had a "borderline" I.Q. and organic brain damage stemming from multiple causes, including heavy drug use from a young age and head injuries. Like Mr. Barrett's mental impairments, Anderson's brain damage affected his reasoning, problem solving, and judgment. The Court noted that while these problems could be perceived by laymen as "meanness" or anti-social behavior, with expert evaluation, they were properly explained as deriving from disruptions and impairments to the nervous system. Anderson's mental impairments, like Mr. Barrett's, were exacerbated by his use of methamphetamine. Attempts to get off the drug were unsuccessful, and Anderson was involved in a co-dependent relationship with his wife, who was a drug user herself. The jury in *Anderson*, as in Mr. Barrett's case, never learned that his family history was replete with abuse and neglect. Both parents were alcoholics, and the mother was abusive both to her husband and her children. The children in *Anderson* were whipped with extension cords and struck with hammers. Anderson's mother and stepfather engaged in drunken brawls in front of the children, and the mother carried on extramarital affairs in the home. The Tenth Circuit stated all this was "just the kind of mitigating evidence that trial counsel is obligated to investigate and develop as part of building an effective mitigation case." *Anderson v. Sirmons,* 476 F.3d at 1144.

The Court's determination that Anderson was prejudiced by counsel's deficient performance despite his conviction for multiple murders and a host of other violent crimes –

offenses far more aggravated than Mr. Barrett's – applies *exactly* to the assessment of prejudice here:

> [R]ather than offering the jury a potential explanation for Anderson's actions relating to the murders he participated in, trial counsel's case in mitigation was limited to a simple plea for mercy.
>
> * * *
>
> Against this backdrop, trial counsel mounted an extraordinarily limited case in mitigation. As noted above, trial counsel adduced the testimony of Anderson's family and co-workers to support the theory that Anderson was a kind, hard-working, normal man who could be of some help to his daughter if his life were spared. Unfortunately, the case in mitigation presented by trial counsel played into the prosecution's theory that the only explanation for the murders was that Anderson was simply an "evil" man. The prosecution seized on Anderson's case in mitigation to assert during closing arguments that there was no excuse for Anderson's conduct because he grew up in a good family and was never abused as a child. Thus, relying on the exceedingly limited nature of trial counsel's case in mitigation, the prosecution was able to argue convincingly to the jury that there was nothing in the case to diminish Anderson's moral culpability for the murders.
>
> * * *
>
> In this particular case, the absence of this readily available mitigating evidence left the jury with no explanation for the murders other than the assertion that Anderson was "evil." Although the case against Anderson was strong, and the murders in this case were horrific, Courts have not hesitated to grant relief in similar circumstances where the absence of available mitigating evidence left the jury with a "pitifully incomplete" picture of the defendant. [Citation omitted] Had the jury been presented with a complete picture of Anderson's background and history, there is a reasonable probability at least one juror would have struck a different balance between the aggravating and mitigating factors. [Citation omitted'

*Anderson v. Sirmons,* 476 F.3d at 1144, 1147, 1148.

In light of the fact that sentencing relief was given in *Anderson*, on facts far more aggravated than those here, can it be said that Mr. Barrett – who was spared the death penalty on two counts, and whose jury rejected the proposition that he would be a continuing danger – was

not prejudiced by trial counsel's all but identical failures to present all but identical evidence? The answer has to be "no."

In *Smith v. Mullin,* 379 F.3d at 938-44, the defendant was convicted of five murders. Four of the victims were children. The case for death was obviously strong. However, he was granted sentencing relief because trial counsel presented a skeletal mitigation case bereft of any evidence of his borderline retardation, organic brain damage, and troubled upbringing. It cannot reasonably be said that the omission of analogous evidence in Mr. Barrett's far less aggravated case – a case for which he acquitted of murder conviction in state Court – caused no prejudice.

### 5.   Conclusion.

The facts, argument, authority and exhibits presented in Mr. Barrett's Amended Motion, brief in support, and here demonstrate that counsel's penalty phase performance was both professionally unreasonable and prejudicial. The Government's arguments fall wide of the mark, lacking both factual and legal support. Mr. Barrett's death sentence must be vacated.

### GROUND 3: THE COURT UNCONSTITUTIONALLY DENIED MR. BARRETT NECESSARY EXPERT SERVICES AND RESOURCES.

#### A   The Issue Is Not Procedurally Defaulted.

Contrary to the Government's assertions, the issue is not defaulted. Movant has alleged and set out supporting facts that the failure to raise the issue on appeal was caused by the ineffective assistance of appellate counsel, one of whom was trial counsel, whose conduct, if the Government's position has any legitimacy, is responsible for failing to provide the Court with the demanded "detailed" substantive showing. Doc 95 at 127-39; Doc 149 at 104-115. It was again

fully argued in the opening Motion and Brief.   Doc 95 at 249-263; Doc 149 at 125-141 and supporting documentation.  *See also,* Ground 2(A)(7), (8) and 2(B), hereinabove.

Movant has further fully laid out the prejudice to Movant by the Court's denial of the funding to provide a minimal defense to the capital charges pending against him.  The Court abused its discretion in denying the funding and used its position and control of the administration of the CJA funding to bludgeon the defense into submission and control by the Court, the result of which was a denial of a fair trial and the right to present a defense.[34]  While the Government, like the Court, seeks to nitpick the detail with which trial counsel supported its requests for funding, the record is clear that the Government's case demanded expert response and the Court refused to give Mr. Barrett the ability to do it.  While *Caldwell v. Mississippi*, 472 U.S. 320 (1985) at 323-24 n.1, requires a defendant to make a threshold showing for expert assistance, the Court here demanded a full and complete substantive presentation.  Cr 04-115 Doc 38 at 2.  Even then the Court's unreasonable reduction of fees and denial of travel effectively denied Mr. Barrett the right to present a defense.  Movant provided the trial court with the necessary particularized facts sufficient to trigger *Ake's* requirement of assistance.  *Powell v. Collins,* 332 F. 3d 376 (6th Cir. 2003).   Even the Government's Response sets out the satisfactory threshold for mental health experts requested.  *See, e.g.,* Doc 175 at 129-130.

---

[34] As noted in Ground 1(A) hereinabove,  Movant alleges the trial court abused its administrative role under the Criminal Justice Act to interfere with the constitutionally protected independence of counsel.  Contrary to the Government's assertion that Mr. Barrett showed no effect, Ground 1 shows that the trial court's administrative abuses led John Echols to withdraw from the case and influenced the conduct of successor counsel, Roger Hilfiger, who would not use the resources the Court authorized.  The facts and arguments set out in Movant's Motion to Vacate (Doc 95 at 7-25), Brief (Doc 149 at 46-56) and hereinabove under Ground 1, are relevant to the denial of expert assistance and as such are incorporated herein as if fully set out herein.

**B.** **The Court Abused its Discretion.**

The Court's demands for detailed showings to justify CJA experts were an abuse of discretion, an unconstitutional interference with the defense, and a blatant attempt to bludgeon the defense into submission, an effort that was ultimately successful. The evidence presented amounts to more than an mere abuse of discretion, it amounts to judicial interference with Mr. Barrett's right to present a defense and the use of the "purse" to effect it. *See* Exh. 34, Motion (Doc 70). Not only did the Court demand unreasonable justification for expert and investigative assistance but refused to pay counsel for preparing the justification. Exh. 34 at 5, Motion (Doc 70). ("In April 2005 the Court held that [Mr. Echols] would not be compensated for any of the time [he] spent preparing the detailed budgets on which Judge Payne insisted.")

Contrary to the Government's assertions otherwise, Movant has sufficiently alleged and supported its allegations of prejudice.

**C.** **The Experts Requested Were Necessary and Relevant.**

**1.** **Mental health.**

On the issue of mental health, the Governments baldly asserts that "Barrett relies on a mistaken assumption in claiming that the allegedly erroneous denial of mental health evidence affected the guilt phase-verdict because it prevented him from rebutting the Government's evidence of malice aforethought." Doc 175 at 132. The Government does not refer to any cite in the Motion to Vacate or the Brief upon which it draws the conclusion stated above. Review of Movant's pleadings show that Movant asserts the prejudice from lack of appropriate mental health experts to rebut the prosecutions' theory of malice aforethought *and intent.*" Doc 95 at 252. (Emphasis added). The convenient omission of the prejudice to Movant's ability to negate

the "intent" element illustrates the weakness of the Government's argument.  In its Brief in support of the Motion to Vacate, Movant again argued prejudice from the Court's arbitrary denial of funds for appropriate mental health experts by it adverse impact on Mr. Barrett's ability to "develop a mental health defense."  Doc 149 at 129.  Indeed, the Government's argument that because Counts 1 and 2 require only an underlying felony to establish "malice aforethought," and "common law malice" was not an element of Count 3, "the absence of mental health evidence had no impact on the guilt phase verdict," Doc 175 at 132,  can only be true if Mr. Barrett has been convicted of strict liability offenses.  Though the Government now asserts no element of "malice aforethought" was necessary, it argued otherwise before the jury.  *See, e.g.,* CT vol 20 at 4375 ("We've become used to coming here day after day and seeing a man that I respectfully suggest the evidence proved beyond a reasonable doubt not only committed all three of the crimes with which he is charged but is a *cold-blooded malice aforethought premeditated murderer*.") (Emphasis added.)  Mental health evidence is relevant to any element of intent, and certainly here, where a specific intent was required for the fatal act itself, as the United States conceded at trial, at least with respect to count 3.  *See also* Argument Ground 2(A)(3) hereinabove and Ground 9, hereinbelow, both of which are incorporated herein as if fully set forth herein.

Similarly, Movant incorporates the relevant arguments concerning ineffective assistance of trial counsel hereinabove to specifically deny the Government's unsubstantiated assertion that "counsel ultimately made a strategic decision not to present any mental health evidence, apparently out of concern for the strength of the Government's potential rebuttal evidence."  Doc 175 at  133 (relying on Mot. Ex 56 at 4; Resp. Exhs. 11 & 12.)  There is nothing in Exhibit 56

(Declaration of Jeanne Russell) or the trial attorneys' declarations, (Resp. Exhs. 11 and 12), which indicate a strategic decision not to pursue a mental health defense. At best, it can be said counsel elected not to pursue the "risk assessment" which had been made much earlier without the necessary social, medical and family history required for a full mental health evaluation and related only to "future dangerousness."

### 2.    Crime scene reconstruction.

To avoid the prejudice finding as a result of the Court's abusive denial of funds for a crime scene reconstruction, the Government downplays the significance of the evidence upon which it relied for a conviction presented through witness Dalley. Doc 175 at 136. ("Dalley provided limited opinions, largely corroborative of existing evidence or conclusions the jury would have naturally drawn from it.") The testimony of a witness presented as an expert to "corroborate" eyewitnesses, whose testimony was at best inconsistent, lends credibility to the witnesses themselves. If it was irrelevant and unnecessary, as the Government now contents, Mr. Barrett's expert could have succeeded in keeping it out. The record is clear that Ms. Dalley testified at length upon a critical issue and the Government pointed to her testimony in both opening and closing arguments urging the jury's reliance on it in its deliberation. R at 207-208 (Testimony will show that officer was shot when the vehicle stopped in front of the house and he turned to exit out the passenger door); R 20 at 4377 ("Well, no way would that account for the testimony of the trajectory analyst,"); s*ee also,* R at4306-06 (argument quoted at length in Claim 2(A)(7) hereinabove). Ms. Dalley's testimony attempted to piece the sketchy, frequently unclear eyewitness testimony into a scientific package of intentional killing. *See* Argument, Ground 2(A)(7) hereinabove, incorporated fully herein. The Government's attempt to minimize the

impact of her testimony invades the jury's role. *United States v. Oliver*, 278 F. 3d. 1035, 1043 (10ᵗʰ Cir. 2001) (noting that "it is solely within the province of the jury ...to weigh... expert testimony.") The inability of Mr. Barrett to counter that evidence with his own expert who could have debunked her entire testimony was prejudicial and had a substantial injurious effect on the verdict.

**3.     Expert on police standards and procedure**.

Similarly, denial of funds and the ability to produce for trial an expert who would have made clear law enforcement's serious missteps in planning and executing the raid, which effectively created a lethal situation, cannot be dismissed as irrelevant. Contrary to the Government's argument otherwise, Doc 175 at 140, the jury finding that Barrett acted with substantial planning and premeditation, which illustrates Barrett's knowledge that the attack was an attack by law enforcement, does not undermine the importance of the defense testimony. It is precisely that jury finding which illustrates the harm caused by denying Mr. Barrett an opportunity to show Mr. Barrett's state of mind as it was impacted by poor judgments made by law enforcement. The jury had a right to hear from an expert for the defense before it was charged with determining Mr. Barrett's state of mind. Presented with a more accurate picture of the events which transpired on the date of the shooting would have likely compelled a different finding of *mens rea* and verdict. *See* Argument 2(A)(8) hereinabove and incorporated fully herein.

**4.     Mitigation specialist**.

The Government's argument that Mr. Barrett's claim that he was entitled to a mitigation expert should fail because he has not shown "what information was actually obtained by the

defense, and what was forgone as a result of the funds provided," Doc 175 at 143, is undermined

by the Government's own exhibits in which neither of trial counsel's declarations filed on behalf

of the Government support its position. Resp. Exh. 11, 12. Beyond that, the declaration of

Jeanne Russell illustrate trial counsel's inability to conduct the necessary sentencing

investigation. Exh. 56. The evidence now before the Court on the family, social and medical

history of Mr. Barrett amply illustrates the harm to Mr. Barrett by the Court's denial of adequate

funding for mitigation. Nor does the fact that trial counsel may have done some mitigation

investigation deprive Mr. Barrett of the right to a professional who would have conducted an

adequate investigation and presentation. *See Sears v. Upton*, 561 U.S. --, *6 (S.Ct. No. 09-8854,

June 29, 2010) ("We certainly have never held that counsel's effort to present *some* mitigation

evidence should foreclose an inquiry into whether a facially deficient mitigation investigation

might have prejudiced the defendant.) *See also,* Argument 2(B) hereinabove and incorporated

fully herein.

**GROUND 4:  THE NO-KNOCK SEARCH WARRANT WAS INVALID UNDER *FRANKS V. DELAWARE,*438 U.S. 154 (1978).**

*Stone v. Powell,* 428 U.S. 165 (1976) does not preclude Mr. Barrett from raising the

Fourth Amendment *Franks* issue in these collateral proceedings. Doc 175 at 147-48.

Respondent concedes that if exculpatory evidence regarding Clint Johnson's honesty was

suppressed by the Government, Mr. Barrett could raise a *Brady* claim, but that it does not permit

a frontal Fourth Amendment attack on the no-knock warrant under *Franks*. This is incorrect.

The suppression of exculpatory evidence regarding Johnson's honesty as a law enforcement

officer shows that Mr. Barrett was denied a full and fair opportunity to litigate the issue at trial.

*Smith v. Black,* 904 F.2d 950, 965 (5th Cir. 1990), *abrogated on other grounds, Stringer v. Black,*

503 U.S. 222, 227 (1992). This is particularly true in light of the Government's argument

(incorrect though it is), raised in response to the ineffective assistance of counsel claim

respecting the *Franks* issue, that it was Johnson's honesty, not Charles Sanders's, that is the focus

of the *Franks* inquiry. Doc 175 at 147. Thus, *Stone's* bar against raising a Fourth Amendment

argument does not apply; material evidence bearing on Johnson's honesty, as Movant has shown,

was suppressed [35].

Rather than defer discussion of the Government's *Brady* violation with regard to Johnson

to the reply to the Respondent's arguments on Ground 5, Mr. Barrett addresses it now, because it

is pertinent to his *Franks* claim. In its response to Ground 5, the Government argues in essence

that Johnson was victimized by a crooked District Attorney (Richard Gray) with a vendetta

against him. The Government claims that Johnson may have been bad with money or a poor

manager, but that he was not corrupt. For this baseless claim, the Government relies on a

---

[35] The Government contends that the exculpatory evidence regarding Johnson's improper and illicit activities does not constitute *Brady* material because much of it was developed following Mr. Barrett's trial, and thus could not have been used to attack Johnson's credibility and the search warrant. The Government cites *United States v. Lafayette,* 983 F.2d 1102, 1105 (D.C. 1993) and *United States v. Bolden,* 335 F.2d 453, 461 (7th Cir. 1966) for this proposition. Both are distinguishable. In *Lafayette*, the evidence pressed by the defendant related to events that were purely post-trial and long after the fact. Here, the investigation into Johnson's corruption pre-dated the conclusion of Mr. Barrett's trial, and he was terminated less than two months after trial. Exhs. 181 A, 181 B, Amended Motion. In *Bolden,* the defendant claimed newly discovered evidence of a witness's counterfeiting conviction was material evidence that would have impeached the witness's testimony. The Court rejected this claim not only because the conviction occurred after the defendant's trial, but also because, even if the conviction was in existence at the time of trial, it was merely cumulative to the impeachment that was accomplished with the witness. He was cross-examined at length about the counterfeiting case, for which he had been indicted at the time of the defendant's trial. In Mr. Barrett's case, the ongoing investigation into Johnson was never revealed.

declaration from Joel-Lyn McCormick (Resp. Exh. 2), the Oklahoma Assistant Attorney General who prosecuted Mr. Gray in Cherokee County on corruption charges.  Her view of Johnson's honesty, whether based on an internal investigation she was involved in or not, is entitled to no weight.  McCormick lost the case against Mr. Gray in spectacular fashion.  Clint Johnson was her star witness, and his testimony was so impeached and riddled with improbabilities that the trial judge took the rare step of directing an acquittal.  In these circumstances, McCormick's vouching for Johnson's honesty has the totally hollow ring of a *post-hoc* attempt to salvage some small measure of integrity out of a failed prosecution based on a disreputable witness.  The old saying holds: McCormick and Johnson got run out of town, and they act like they're leading a parade.

The evidence submitted by Mr. Barrett shows the Government's claim that Johnson is simply a sloppy administrator and poor money manager is simply untrue.  He was fired from the District 27 Task Force mere weeks after Mr. Barrett's trial concluded not because he was a well-meaning but poor manager, but because he was corrupt.  He placed no proper control over his informants, a fact particularly relevant here.  Money went missing.  He passed hot checks, the Government's contention that these were simply "oversights" notwithstanding.  Drug evidence and funds were not properly accounted for.  He used state property for personal reasons.  Johnson lied to his superiors.  He did not account for drug evidence properly; at the time he was fired, he was riding around with drugs and drug paraphernalia, purported "evidence" that had not been sealed.  Most serious of all, there was evidence uncovered in District Attorney Gray's investigation that Johnson was running a kickback scheme among favored individuals, some of them attorneys.  Exhs. 181 A, 181 B, Amended Motion.  All this transpired before, during and

shortly after Mr. Barrett's trial; Johnson was fired in January, 2006.  This is not "after the fact" information, as the Government claims.

It has also been shown that the Government suppressed evidence regarding Charles Sanders's motives for testifying against Mr. Barrett (the deal he ultimately received, Ground 5(A)(1), Amended Motion at 273-78) and the numerous favors he had received from state law enforcement and prosecutors for his work as an informant, which Sanders's falsely denied during cross-examination.  All this was relevant to a *Franks* determination.

In its response to Grounds 5, the Government attempts to overrule *Brady* and its progeny. Without a shred of support in the law, Respondent contends it could adopt a "see no evil" attitude toward Johnson (and everything else) because the DEA, and not local law enforcement, was the "case agency." *E.g.,* Doc 175 at 149.  The Government cannot unilaterally limit the prosecutions' *Brady* duties, which extend to information held by all its agents in law enforcement, regardless of what agency they work for.  That is especially true here, because this case was investigated not by the DEA or some other federal law enforcement agency, but state law enforcement -- the District 27 Drug Task Force, the Sequoyah County Sheriff's Office, and the Oklahoma Highway Patrol.  Against what the Government claims now, the prosecutors designated Sequoyah County Sheriff John Philpot as the case agent at trial.  The informant witnesses were developed by Sheriff Philpot, assisted by AUSA Littlefield.  The case was originally prosecuted in state Court. State law enforcement and their informants provided the overwhelming bulk of the evidence against Mr. Barrett.  The search warrant that led to this tragedy was secured by Johnson himself. The state dog was wagging the federal tail.

Movant's Reply to USA' Response
to Second Amended § 2255 Motion

121

*Barrett v. U.S.*, 6:09-cv-00105-JHP

The DEA ruse will not fly.  The DEA did virtually nothing in this case, except conduct the search of Mr. Barrett's property after Trooper Eales was killed.  For *Brady* purposes, the Government was on notice of evidence in possession of state law enforcement.  *Kyles v. Whitley,* 514 U.S. 919, 937 (1995); *Giglio v. United States,* 405 U.S. 150, 154 (1972); *United States v. Antone,* 603 F.2d 566, 569 (5th Cir. 1979) (facts known to state law enforcement imputed to federal prosecutors, particularly in a case where they pooled resources and acted in concert).

Because evidence regarding Johnson's dishonesty was known or should have been known by the Government before or at the time of Movant's trial, and was directly relevant to the *Franks* claim, Mr. Barrett was denied the opportunity for a full and fair hearing on the issue, and is not precluded from raising the issue in these proceedings.  Again, the Government concedes that if exculpatory evidence regarding Johnson's honesty was suppressed, the *Stone v. Powell* bar would not apply, but contends the issue "sounds under *Brady,*" not the Fourth Amendment.  (Doc 175 at 148)  However, the case cited by the Government demonstrates that a *Brady* violation is relevant to a motion to suppress under *Franks*.  *Smith v. Black,* 904 F.2d 950, 965 (5th Cir. 1990), *abrogated on other grounds, Stringer v. Black,* 503 U.S. 222, 227 (1992) (holding *Brady* claim that evidence relevant to *Franks* issue had been suppressed was not "foreclosed by *Stone*," and proceeding to determine whether non-disclosure of *Brady* material affected outcome of suppression hearing).

The opportunity for a full and fair hearing was denied for other reasons as well.  The Government points out that the magistrate judge held a suppression hearing at which Clint Johnson testified, and where he was questioned about the C.I. who supplied information for the warrant affidavit.  Doc 175 at 147.  But at this time, the identity of the C.I. was still unknown,

Movant's Reply to USA' Response
to Second Amended § 2255 Motion

122

*Barrett v. U.S.*, 6:09-cv-00105-JHP

and Mr. Echols's attempts to discover his identity, his complete criminal record, and whether he was continuing to commit crimes, went nowhere when the Government objected.  Johnson testified falsely that the C.I. had not been involved in dealing drugs; Sanders had a previous conviction for distribution or delivery.  When a *Franks* claim was raised during trial at the conclusion of Sanders's testimony, no hearing was held, and counsel were ineffective for failing to marshal all facts bearing on Sanders's credibility.  *Gamble v. State of Oklahoma,* 583 F.2d 1161, 1165 (10th Cir. 1978) (full and fair opportunity to raise Fourth Amendment issue includes a full and fair evidentiary hearing, where warranted).

The Government contends the *Franks* issue has now been waived because a number of Fourth Amendment issues were raised.  Doc 175 at 147-48.  However, the case cited by the Government for this argument actually supports Movant.  In *United States v. Cook,* 997 F.2d 1312, 1317 (10th Cir. 1993), aside from making the uncontroversial statement that *Stone v. Powell* bars re-litigation of a Fourth Amendment claim where a full and fair hearing has been conducted, the Court remanded the case to the district Court to determine whether appellate counsel was ineffective for failing to raise certain Fourth Amendment arguments.

Obviously, *Stone v. Powell, supra* does not bar a *Franks* issue from being raised in a § 2255 motion where it is argued counsel was ineffective for failing to properly raise it in the trial court.  *E.g., Kimmelman v. Morrison,* 477 U.S. 365, 38391 (1985); *United States v. Owens,* 882 F.2d 1493, 1498-1500 (10th Cir. 1989).  In order to prevail on such a claim, a movant must first show that the underlying Fourth Amendment claim is meritorious.  That is what Mr. Barrett has done in Ground 4.

Based on the above and what Movant has previously shown, there was no full and fair opportunity to raise the *Franks* issue at trial.  The suppressed evidence and counsel's ineffectiveness in raising all grounds for *Franks* suppression that were available based on Sanders's trial testimony precluded both the procedural opportunity to raise the claim, and a full and fair evidentiary hearing.

In the alternative to its *Stone v. Powell* argument, the Government contends Mr. Barrett cannot show, and has made "no effort" to show  by a preponderance of the evidence, that Johnson intentionally or recklessly included materially false information, or intentionally or recklessly omitted material information from the warrant affidavit necessary to the magistrate making an informed decision.  Doc 175 at 149.

The Government simply ignores Mr. Barrett's showing in this regard, which obviously meets the preponderance of the evidence standard.  The Government again parrots its claim that Sanders's credibility was not at issue, ignoring that Johnson, at a minimum, intentionally omitted material information on Sanders's lengthy criminal record, including crimes of dishonesty and continuing criminal acts, not to mention the many favors he had received from law enforcement and local prosecutors for his work as an informant.  Johnson also deliberately or recklessly omitted any information -- because there was none -- that would have corroborated Sanders. *E.g., Phaneuf v. Franklin,* 448 F.3d 591, 597-99 (2nd Cir. 2006); *United States v. Bernal-Obeso,* 989 F.2d 331, 335-36 (9th Cir. 1993); *United States v. Vigeant,* 176 F.3d 565, 573 (1st Cir. 1999); *United States v. Hall,* 113 F.3d 157, 159 (9th Cir. 1997).  The unadorned conclusory statement that Johnson had found the informant "reliable" on past occasions is meaningless. *E.g., United States v. Reddick,* 90 F.3d 1276, 1280-81 (7th Cir. 1996); *United States v. Miller,*

753 F.2d 1475, 1480 (9th Cir. 1985). As argued in the ineffective assistance of trial counsel claim, the Government is simply wrong when it states that the credibility of the informant is irrelevant to a *Franks* question.

The magistrate thus could not make a neutral and detached finding of probable cause because all evidence respecting the awful credibility of the informant was omitted, and there was nothing to show the informant's account had been corroborated in any way. As shown elsewhere in Movant's arguments, Johnson at the very least acted with reckless disregard for the truth because and knowingly supplied false information regarding the substantive basis for the warrant since, against the Government's arguments in response to Ground 2, Part A (1), Sanders's repudiated in his trial testimony the information Johnson relied upon to secure the warrant in the first place.

The Government argues the *Franks* claim is not affected by omission of the fact that Sheriff Philpot visited Mr. Barrett without incident approximately a month before the fatal raid. The Government claims Philpot was never there at that time; otherwise, counsel would have been so informed by Mr. Barrett. Doc 175 at 150. This is pure speculation and is irrelevant to Mr. Barrett's claim. The issue is not what Mr. Barrett knew, but whether, in September, 1999, Johnson made material omissions in the search warrant affidavit for the no-knock, nighttime warrant. Had this information been supplied to the magistrate, there would be absolutely no need for a no-knock, middle-of-the-night warrant.

The Government claims Sheriff Philpot was not at Mr. Barrett's residence a month before the raid, and that family members who attested to this are mistaken. Doc 175 at 151. The Government now offers a declaration from Sheriff Philpot stating that the only time he was at

Movant's cabin to inspect his weapons was in 1998.  Resp. Exh. 1.  However, Janice Sanders's and Gelene Dotson's accounts (Exhs. 85, 97, Amended Motion) are supported by Sheriff Philpot himself, according to the declaration of Rodney Floyd, who interviewed Sheriff Philpot about this subject.  Exh. 6, Amended Motion.  The Government dismisses this declaration as "hearsay," but it is Sheriff Philpot's about-face in his declaration that is suspect.  It can be inferred easily that when he spoke to Mr. Floyd, Philpot did not recognize the significance of what he was saying.  Mr. Philpot's latest statement occurred only when the significance of his statement to Mr. Floyd was brought to his attention by the Government.

Hedging its bets, the Government contends in the alternative that "even if" Sheriff Philpot visited Mr. Barrett's cabin a month before the raid, there is no reason to suppose that Johnson would have known this at the time he sought the warrant.  There was no reason for him to not know, since, as the Government states, he consulted with Sheriff Philpot about the warrant and the need to bring in the OHP Tact Team, and did not agree, at least initially, with the approach being taken by Johnson.  Doc 175 at. 151.  The Government then goes a step further, arguing that even if the month-before incident occurred, and even if Philpot informed Johnson of it, Johnson was still "sincere" in his belief that a no-knock, nighttime warrant spearheaded by the OHP SWAT team was necessary.  Johnson's alleged "sincerity" is irrelevant.  The issue is whether Johnson made false statements or omitted material information in seeking the warrant.  Again, it is clear that if the magistrate were supplied with information that a month before Johnson sought the search warrant, law enforcement had been to Mr. Barrett's property without incident, the "case" for a no-knock search warrant to be served at night due to the "danger" posed to officers by Mr. Barrett would have collapsed.

Finally, the Government argues that appellate counsel was not ineffective for failing to raise the *Franks* issue on appeal because the issue is "meritless." Doc 175 at 151. The Government's arguments respecting this claim's alleged lack of merit have been conclusively refuted here and in Mr. Barrett's Amended Motion and brief in support. It is also urged that appellate counsel could not be ineffective for failing to raise arguments in support of a *Franks* claim based on extra-record evidence. This is certainly true, but Mr. Barrett never made that argument. He argues that *to the extent the issue was framed by the record*, appellate counsel were ineffective for failing to raise the issue. Brief in Support of Amended Motion at 147. At the very least, based on what was contained in the trial record, an appeal of the Court's *Franks* ruling should have been raised, coupled with a request to remand for a proper evidentiary hearing. There is a reasonable probability that had the issue been raised, the result of the appeal would have been different. *Strickland v. Washington,* 466 U.S. 668, 697 (1984). The entirety of the physical evidence which supported the charges stemmed from an illegal warrant.

Accordingly, the Government's arguments should be rejected, a proper *Franks* hearing should be conducted, and Mr. Barrett should be granted § 2255 relief.

**GROUND 5(A) and (B):**     **THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY EVIDENCE AND KNOWINGLY RELIED ON FALSE TESTIMONY. NEWLY DISCOVERED EVIDENCE ALSO WARRANTS § 2255 RELIEF.**

As stated in the reply to Ground 4, the Government responds to Mr. Barrett's *Brady* claim through a false framework. In direct conflict with the applicable law, the Government seeks to unilaterally limit its *Brady* duties by arguing it had no obligation to be aware of exculpatory evidence known to or in the possession of state and local law enforcement because the DEA was

the only law enforcement agency on the prosecution's "team." *E.g.,* Doc 175 at 160, Resp. Exh. 4 (unilateral declaration by United States Attorney's Office that DEA was the only member of the prosecutor's "investigative team").  Not only is this assertion empty as a matter of law, *Strickler v. Greene,* 527 U.S. 263, 280-81 (1999); *Kyles v. Whitley,* 514 U.S. 419, 438 (1995); *United States v. Antone,* 603 F.3d 566, 569 (5th Cir. 1979), but it is untrue in fact.  As noted in the reply to Ground 4, this case was investigated almost entirely by state and local law enforcement and the prosecution relied on local agencies heavily, extending even to its designated case agent at trial, Sheriff Philpot.  Evidence known to or in the possession of state or local law enforcement is imputed to the federal government in this case, and to argue otherwise is wholly disingenuous.

In attempting to counter Mr. Barrett's newly discovered evidence claims, the Government states that he cannot rely on Fed.R.Crim.P. 33, since at the time the issue was presented in these collateral proceedings, the period for filing a Rule 33 motion had expired.  Doc 175 at 153.  The Government also states that the standard for granting relief under Rule 33 is lower than that in a § 2255 proceeding.  Doc 175 at 153.  A newly discovered evidence claim is cognizable in a § 2255 proceeding.  *United States v. Hernandez,* 94 F.3d 606 (10th Cir. 1996). *See also, Peltier v. Booker,* 348 F.3d 888, 890 (10th Cir. 2003) (discussing previous § 2255 petition filed by Peltier premised in part on newly discovered evidence).  It is a legal basis for seeking collateral relief, and affects the due process fairness of the underlying trial.  U.S. Const. amend. V. Additionally, the interconnectedness of the *Brady* and newly discovered evidence claims raises a Fifth Amendment due process claim, not simply a claim of "factual injustice."  Doc 175 at 153. *United States v. Quintinella,* 193 F.3d 1139, 1148 n. 9 (10th Cir. 1999).  To the extent Tenth Circuit authority recognizes the viability of newly discovered evidence issues in § 2255

proceedings, the Seventh Circuit case cited by Respondent is inapplicable. *United States v. Evans,* 224 F.3d 670, 674 (7th Cir. 2000).

<strong>1.    Charles Sanders -- <em>Brady,</em> newly discovered evidence, and false evidence.</strong>

The Government's claim that the prosecution did not suppress Sanders's criminal history -- including records of all convictions, the numerous deals he had obviously received one time after the next preceding Mr. Barrett's trial, and his record of dismissed charges, which were obviously related to his work as an informant (despite the Government's attempt to argue this is "speculation") ignores the facts. Doc 175 at 154-55. Respondent fails to address the fact that the prosecutors permitted Sanders to testify falsely on direct examination that he had a mere four convictions, and failed to correct his false testimony on cross-examination as to the actual number of his convictions and his false denial of a Muskogee County conviction. The Department of Corrections sheet filed as an exhibit by the Government (Resp. Exh. 6) is apparently the one used by defense counsel to cross-examine Sanders, and Movant has demonstrated conclusively that it does not represent his true number of convictions, let alone his many dismissed charges and deals. Exhs. 57, 72, 157-68, 175, 183-87, Amended Motion.

Respondent maintains that the Government had no duty to disclose any of this, because it was "public record," and that Mr. Barrett, through counsel, also had access to it. This could be said of practically any witness's criminal records, but it is well-recognized that the prosecution has an affirmative duty to disclose a witnesses criminal record and other impeaching information associated with it. Relatedly, the Government has an affirmative duty to reveal the full extent of leniency a witness has received, not only in the case at bar, but in the past. A history of receiving

favorable treatment in exchange for information or testimony would tend to impeach the witness. *Crivens v. Roth,* 172 F.3d 991, 995-96 (7th Cir. 1999); *Singh v. Prunty,* 142 F.3d 1157 (9th Cir. 1998); *United States v. Hill,* 799 F. Supp. 86, 89-90 (D. Kan. 1992).

The case primarily relied upon by the Government for its argument, *United States v. Erickson,* 561 F.3d 1150, 1164-65 (10th Cir. 2009), does not support its claim.  The alleged suppressed *Brady* material in *Erickson* consisted of an audit report of  the company (a private concern) that the prosecution never had, either actually or constructively under *Brady*, and another financial document that was actually made available to the defense through the prosecution's "open file" policy.  The criminal records involved here are classic *Brady* impeachment material within the control of the prosecution and its agents.  Mr. Barrett's argument that the prosecution sponsored false testimony and failed to correct false testimony given by Sanders respecting his criminal record stands unrefuted.  *Giles v. Maryland,* 386 U.S. 66, (1966); *Alcorta v. Texas,* 355 U.S. 28 (1957); *Napue v. Illinois,* 360 U.S. 254, 269 (1959).

The Government argues that it fulfilled its *Brady* duties by disclosing the only deal it had made with *Sanders*, namely, that the prosecutor would "speak to" state authorities about his cooperation, implying that there was no specific *quid pro quo* that would actually result in favorable treatment.  Doc 175 at 155-57.  The fact that Sanders received deliverance from prison, conversion of sentences to straight probation without supervision, and the rest was something that just happened at a future time, but was not set in stone or even broadly hinted at, according to the Government.  Movant submits that there was much more to the arrangement between Sanders and the Government.  Despite its semantic contortions, the Government cannot escape the fact that the favors Sanders received in Sequoyah County carried the imprimatur "per plea

agreement with feds," which, contrary to the Government's speculation, should be taken to mean what it says: that Sanders got his get out of prison card, "paperless," painless probation, and freedom from financial obligation on his cases due to an agreement, whether explicit or tacit, that preceded or was contemporaneous with his testimony. The statement that the Government was only going to "speak with" state authorities, both in Sequoyah County and Tulsa County suggested in a misleading fashion much less than what actually transpired. Movant asserts, and the evidence shows, this was deliberate. *United States v. Torres*, 569 F.3d 1277 (10th Cir. 2009); *Douglas v. Workman,* 560 F.3d 1156, 1186 (10th Cir. 2009). Mr. Barrett is certainly entitled to an evidentiary hearing to test his claims.

The cases cited by the Government in alleged support of its argument that no *Brady/Giglio* error occurred in the manner Sanders's deal was handled are readily distinguishable. Doc 175 at 156. In *Bell v. Bell,* 512 F.3d 223, 224-25 (6th Cir. 2008), the incarcerated witness, on his own initiative, called the prosecutor asking for favors in exchange for his testimony. The prosecutor declined, and there were no explicit or even tacit agreements entered into for any leniency whatever. After the defendant's trial, the prosecutor wrote a letter on behalf of the witness to the parole board, which did the witness "no good" at all. Although the witness's cooperation in the case against the defendant was mentioned, the primary reason for the letter seemed to be that because of his informant status, the witness was in danger of retaliation from other inmates and should be protected. The witness had a separate pending criminal case, and received a beneficial plea bargain, but the disposition of that case was totally independent of the witness's involvement in Bell's case. Thus, there was never any agreement at all, of any sort, that the witness would receive any favor for his cooperation against Bell.

*Shabazz v. Artuz,* 336 F.3d 154, 164-66 (2nd Cir. 2003) is likewise distinguishable. The prosecution completely and forthrightly revealed the plea bargain it had entered into with one of the cooperating witnesses, which called for a certain sentence. When the witness was sentenced, he received a lower sentence than that specified in the plea agreement. However, this was not due to any side agreement between the witness and the prosecutor, or at the urging of the prosecutor. The sentencing judge made a unilateral decision to impose a lower sentence than that called for by the plea agreement. Two other witnesses were told by the prosecution there would be no promises, explicit or tacit, for their cooperation. Because they decided to cooperate anyway, their lawyers continued their sentencing dates until after their testimony against the defendant, so the fact of their cooperation could be brought to the attention of the sentencing judge. The witnesses were ultimately rewarded with breaks on their sentences due to their cooperation, but there was no preceding agreement of any sort that such would be the case. In addition, the prosecutor had opposed an "own recognizance" release for one of these witnesses, but the judge authorized it anyway.

In contrast to *Bell* and *Shabazz,* the evidence shows that the prosecution here made an agreement with Sanders for leniency well beyond what was revealed to the jury -- that the prosecutor would simply "talk to" state authorities. The Government also delayed disposition of Sanders's Tulsa County case until he testified against Mr.Barrett so his cooperation could be made known to the Court there. This benefit was likewise not revealed to the jury. *Shabazz, supra* (noting that delaying a witness's sentencing until after his cooperation against a defendant is a form of favor or leniency).

The Government states the prosecution did not suppress evidence of the existence of a witness who would impeach Sanders (Doc 175 at 174-75), but the transcript of the *ex parte* hearing of September 13, 2010, shows the prosecutors clearly discussing a female witness they or their agents had interviewed who denied that Mr. Barrett had threatened law enforcement.  Tr. Hr'g 9/13/05 at 11-12.  This would not only impeach Sanders, but the informant witnesses as a whole.  This impeachment evidence was clearly *Brady* material, but the identity of this witness is still unknown.

### 2.    Travis Crawford -- *Brady*, newly discovered evidence, and use of false evidence.

Respondent disputes that any *Brady* evidence existed with respect to Travis Crawford.  The Government alleges that Mr. Crawford's recantation (Exh. 45, Amended Motion) does not show that he was threatened and intimidated by AUSA Littlefield, but was simply told "bad things" would happen to him unless he told the truth.  Doc 175 at 162.  A fair reading of Mr. Crawford's declaration[36] shows the opposite.  Mr. Crawford was basically given a road map of what to say, backed up by threats if he decided not to play ball.  Threats against witnesses by prosecutors or Government agents constitute *Brady* material.  *United States v. Scheer,* 168 F.3d 445, 451 (11th Cir. 1999); *United States v. Hill, supra.*  This *Brady* evidence was certainly known to the Government, since it stemmed from the conduct of one of the prosecutors.  Additionally, the fact that Crawford had previously acted as an informant, which itself is *Brady*

---

[36]  The Government routinely dismisses the witness declarations relevant to Mr. Barrett's *Brady*, false evidence and newly discovered evidence claims as unsworn hearsay which should be given little consideration.  But declarations of the sort used by Movant are recognized as appropriate vehicles for bringing matters to the Courts attention in § 2255 proceedings.  These declarations are now a matter of record, as the record has been expanded on this Court's order.

material was in constructive possession of the Government, because this fact was known to its agents in state law enforcement, who were unquestionably part of the prosecution team.

The Government dismisses Mr. Crawford's "unsworn" recantation as newly discovered evidence, but, again, declarations of this type are appropriate in these proceedings, and raise questions of fact which should be resolved at an evidentiary hearing. As discussed in Mr. Barrett's opening brief, Crawford's recantation meets the legal standards for newly discovered evidence. *United States v. Sinclair,* 109 F.3d 1527, 1531 (10th Cir. 1997). Doc 95 at 161-62. Contrary to the Government's arguments that the statements in Mr. Crawford's declaration do not really constitute a recantation, the declaration shows that in many of its particulars and in its tone, Crawford repudiated his testimony with respect to his trial description of Mr. Barrett's demeanor, attitude, and statements on the afternoon of September 23, 1999. *In re McDonald,* 514 F.3d 539, 542-47 (6th Cir. 2008) (credible recantation of key prosecution witness would show defendant's constitutional rights to a fair trial were violated). The Government argues there was no reason for it to know that Crawford gave false testimony, but this is belied by the fact that he was intimidated into giving his story by AUSA Littlefield.

### 3. Cindy Crawford -- *Brady*, newly discovered evidence and false evidence.

Although Ms. Crawford refused to sign a declaration attesting to the statements she made to defense investigators, the declarations of the investigators themselves put the factual matters recited there in issue, requiring an evidentiary hearing. Crawford told the investigators she had been intimidated and threatened by AUSA Littlefield, both before trial and during her trial testimony, and that this intimidation affected and colored her testimony against Mr. Barrett.

Exhs. 14, 31, and 43, Amended Motion. In accordance with the authority cited above, Littlefield's threats were *Brady* material that was required to be disclosed to the defense. This is also a species of newly discovered evidence and use of false evidence, because, again, Littlefield's threats shaped Ms. Crawford's testimony and they were not revealed at trial.

Again based on its specious argument that the prosecutors could turn a blind eye to anything known by state and local law enforcement about their witnesses, the Government argues there was no need to inform the defense of Cindy Crawford's history as an informant. Doc 175 at 167. This argument, for the reasons and authorities already stated, should be rejected. Equally without merit is claim that the prosecution had no duty to disclose Crawford's informant history because, according to various declarants, it was "well known" that Crawford had acted in such a capacity. Doc 175 at 167. This does not diminish the Government's *Brady* obligations.

The Government suppressed impeaching evidence that at the time of Mr. Barrett's trial, Cindy Crawford was in violation of a deferred sentence and thus had a motive to curry favor with Government authorities, particularly prosecutors. A sufficient factual question has also been raised as to whether she received favor as a result of her testimony, since her problems with the deferred sentence disappeared after Mr. Barrett's trial.

### 4.   Brandie Zane Price -- *Brady*, newly discovered evidence, and false evidence.

The Government contends Mr. Barrett engages in speculation when he argues the prosecution knew or should have known that Price was engaged in drug activities at the time of Mr. Barrett's trial. Doc 175 at 168-69. The fact she was charged in a federal drug indictment involving acts occurring, at the latest, shortly after Mr. Barrett's trial raises the inference of

earlier drug activity and knowledge on the part of the Government that, contrary to her trial testimony, she was involved in drug activities at the time of Mr. Barrett's trial. In her federal drug case, she received a significant sentencing break not due to the facts of that case, including any cooperation she might have given, but due to her testimony in Mr. Barrett's totally unrelated case.

### 5.      Karen Real -- *Brady,* newly discovered evidence, and false evidence.

As with its argument respecting the leniency Charles Sanders received following his testimony, the Government argues the prosecutors fully revealed Karen Real's expectations of leniency, but this is incorrect. Doc 175 at 169-72. The prosecutors soft-peddled the lengths they were willing to go in exchange for her testimony against Mr. Barrett by allowing Real to state that the only thing she had been promised was that the prosecutor would tell her judge she cooperated, that it would be up to the Court as to whether she would actually receive any leniency for her cooperation, and that she was not really expecting to get anything. The Government comes close to conceding, but does not, that this exchange misrepresented the true nature of the consideration she was being given in exchange for her testimony against Movant. Doc 175 at 170-71. The Government should concede the point. The prosecutors did not just "talk to" Real's sentencing judge, they filed a Rule 35 motion and strongly recommended that she be given a *substantial* reduction in sentence. Thus, the Government's claim that "no ... particular reduction" was recommended by the Government is untrue. The "substantial reduction" affirmatively sought by the Government  materialized when Real's sentence was reduced to time served.   The prosecutors clearly concealed the deal they had with Karen Real, and cannot hide behind the claim that so long as a vague assurance is made, acted on only after trial, no *Brady* or

*Giglio* violation occurred. The misleading spin placed on what the prosecutors were prepared to do for Real also constituted the sponsorship of materially false evidence. Real's deal is also newly discovered evidence, because it was consummated after Mr. Barrett's trial. For the reasons stated in the above discussion of the undisclosed deal given to Charles Sanders, the Government's reliance on *Bell v. Bell, supra* and *Shabazz v. Artuz, supra* to turn back a *Brady/Giglio* attack with respect to Karen Real fails.

The prosecution also suppressed *Brady* evidence when it failed to disclose that a number of state drug charges had been dismissed against Real. Doc 175 at 172. Exh. 47-52, Amended Motion. Mr. Barrett showed in his reply to Ground 2(5) that issues concerning Real's dismissed state charges do not constitute time-barred "new issues," but merely amplify or clarify issues already raised. The Government's argument that an Oklahoma state statute absolutely barred her prosecution in state Court because she had been charged in federal court was also shown to be without merit. The dismissed state charges gave Real a motive to please the federal prosecutors in Mr. Barrett's case lest they possibly be revived if she displeased the Government. The authority cited above in relation to the suppression of Charles Sanders's criminal records applies equally here. The Government's argument that there was no reason for the prosecution to know about these charges due the supposed "Chinese wall" between federal and state authorities has no merit for reasons already stated, and is especially unconvincing because Real was prosecuted federally in the Eastern District. The prosecutors were obviously aware of her state charges.

6.    **Randy Turman --** *Brady,* **newly discovered evidence, and false evidence.**

The Government argues that the prosecution committed no violations with respect to Randy Turman's pending Sequoyah County drug case because defense counsel were aware of that case and cross-examined Turman about it. Doc 175 at 173. The evidence indicates Turman was working as an informant, which is the only reasonable explanation for why his case lay fallow for years. Turman's informant status was not revealed to the defense. When Turman falsely denied that his multi-count felony drug case was still ongoing, despite counsel's ineffective attempt to establish this, the Government sat idly by, allowing Turman to perjure himself.

Newly discovered evidence raises the factual issue of whether Turman was acting as an informant and was given an explicit or tacit assurance that his testimony against Mr. Barrett would lead to favorable resolution of the witness's case, which is what occurred since it was dismissed outright after no action for a significant period of time. As reflected in comments made by the prosecutors during the September 13 *ex parte* hearing, the Government was especially solicitous of Turman's plight. The Government told the Court that Turman feared physical retaliation from drug dealers due to his cooperation, one of whom was involved in the Karen Real federal drug case and was currently imprisoned. Tr. Hr'g 9/13/05 at 13-14.

7.    **Law enforcement witnesses.**

In his reply to Ground 4, Mr. Barrett discussed the suppression of *Brady* evidence relating to Clint Johnson. That analysis and argument applies equally here. It is clear that since Johnson was an important prosecution witness and part of the Government's team, the prosecution knew or should have known of the ongoing corruption investigation into him. The self-serving

declaration of the Oklahoma Assistant Attorney General who utilized Johnson as the star witness in the failed prosecution of Richard Gray is entitled to little, if any credence.  The Government's argument that much of the evidence relied upon by Mr. Barrett to show Johnson's corruption in office was developed after Mr. Barrett's trial does it no good, because the investigation leading to Johnson's firing from the District 27 Drug Task Force, which occurred shortly after the conclusion of Mr. Barrett's trial, was ongoing.  Any post-trial evidence bearing on Johnson's honesty, which is critical in assessing the credibility of his trial testimony and, particularly, the validity of the no-knock search warrant, constitutes newly discovered evidence under the authority cited in Movant's opening brief and above.

The Government argues Johnson testified truthfully at Mr. Barrett's suppression hearing regarding the then-anonymous C.I.'s involvement with drugs, but the record disputes this.  Doc 175 at 179.  Johnson denied the C.I. was a drug dealer or had been involved in dealing drugs, stating only there was evidence of "some" drug use on the C.I.'s part.  Tr. Hr'g 1/26/05 at 92.  The prosecution suppressed evidence to the contrary, and permitted Johnson to testify falsely.

A disputed factual issue has been raised respecting Sheriff Philpot's uneventful visit to Mr. Barrett's property approximately a month before the raid.  As noted elsewhere in this reply, Sheriff Philpot's current denial that such an incident occurred is entitled to little credence because it is made in the context of an earlier admission that the event in fact took place, and he is now forced to backtrack only because the significance of his earlier admission has been brought to his attention by the Government.  Even aside from Mr. Barrett's *Brady* claim respecting this evidence, it is readily apparent that the Government sponsored false testimony, since this event

itself disproves the theory that Mr. Barrett was a danger to law enforcement, and had to be approached in the way he was in the early morning hours of September 24, 1999.

Former AUSA Mike Littlefield's child abuse case, and the facts surrounding it, constitutes both *Brady* material and newly discovered evidence.  Littlefield's abuse of his children was ongoing at the time of Mr. Barrett's trial, as indicated by the search warrant affidavit for his residence.  Exh. 189, Amended Motion.  Littlefield's abusive conduct is plainly relevant to Mr. Barrett's claim that he used his authority to bully and intimidate witnesses.  The Government argues that this evidence would have been inadmissible at trial under Fed.R.Evid. 404(b), but this is not correct.  Evidence of Littlefield's pattern of intimidation was relevant to show his motive, intent, and  "common scheme and plan" toward those over whom he had authority.  *E.g., United States v. Caldwell,* 560 F.3d 1214, 1217, 1220 (10th Cir. 2009).  Although, to be sure, the evidence would have been prejudicial to the Government's case, it would not have been *unfairly* prejudicial.  Fed.R.Evid. 403.

### 8.    Conclusion.

In assessing *Brady* error, the Court must consider the effect of the suppressed evidence cumulatively, not item by item.  *Kyles,* 514 U.S. at 436.  The prosecution's repeated suppression of exculpatory evidence, use of false evidence, and the newly discovered evidence bearing on both entitle Mr. Barrett to relief from his convictions and sentences.  Because the suppressed evidence, false evidence and newly discovered evidence would have undercut the entire basis for the prosecution's theory of the case, there is at the very least a reasonable probability that the outcome of trial would have been different absent to prosecution's constitutional violations.  *See*

*United States v. Bagley,* 473 U.S. 667, 682 (1985); *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir. 1994), and the other cases cited in Mr. Barrett's opening brief.  Doc 95 at 149-65.

      C.      **The Prosecution Interfered with the Defense's Right to Interview Witnesses.**

The Government's claim that this issue was decided on appeal, misapprehends which issue is actually before the Court.  Admittedly, a claim that the late disclosure by the Government of the identities of seven "snitch" witnesses violated the statutory requirement for disclosure and was prosecutorial misconduct was raised.  *See* Appellant's Brief on Appeal at 65-89; Further, the issue of the timeliness of that disclosure under 18 U.S.C. §3432 was resolved on appeal. *United States v. Barrett*, 496 F.3d at 1116.

The issue now before the Court, however, is not the timeliness of the disclosure.  The factual background of that interference does indeed include the untimely disclosure, but the error in question is the Government's interference with, and misrepresentation to, the witnesses that they could not talk with the defense or that any contact by the defense had to occur under the watchful eye of the prosecution.  *See* Doc 95 at 310-314; Doc 149 at 165-168.  The claim rests on extra-record, newly discovered evidence which could not have been raised on appeal and is appropriately brought under Section 2255.  *Massaro v. United States*, 538 U.S. 500, 505 (2003).

The conduct by the prosecutor in insisting that the witnesses be interviewed at his office was an unreasonable interference with the defense.  *See e.g.,* Exh. 91, (Doc 70) (Declaration of Roger Crawford regarding statements made by Travis Crawford that his testimony was the result of fear and intimidation of Government agents); Exh. 31 (Doc 70) (Declaration of Investigator regarding statements made by Travis Crawford that he felt fear and intimidation through Philpot and Littlefield); Exh. 43 (Declaration of Investigator that Karen Real was told not to speak to the

defense.)  *See also* section B hereinabove; Ground 2(A)(15) above.  Without addressing the direct statement by Ms. Real that she was expressly told not to speak to the defense, the Government does concede Ms. Crawford's belief that she could not speak to them which the Government downplays as being the witness' "subjective interpretation."  Doc 175 at 188.  By that concession alone (and the lack of any denial regarding Ms. Real), Mr. Barrett is entitled to further discovery and an evidentiary hearing.  The discovery process including the right to depose the critical witnesses and an evidentiary hearing which should be held will undoubtedly lead to additional evidence to support this claim.

The Government's argument that "simply put, Barrett fails to show that any foregone interview with Cindy Crawford would likely led to his acquittal,"  Doc 175 at 189, again misstates the prejudice requirement.  Here Mr. Barrett was denied a fair opportunity to interview the witnesses which "elemental fairness and due process require that he have." *Gregory v. United States,* 369 F. 2d 185, 188 (D.C. Cir. 1966).  Mr. Barrett is entitled to a new trial or, at a minimum, the right to full discovery and an evidentiary hearing on the issue.

> **D.    Mr. Barrett Was Prejudiced by the Prosecutors' Misconduct During Trial.**

During both the guilt and penalty phases of the trial, the prosecutors blatantly interposed improper questions designed to imply falsehoods or bolster the credibility of witnesses. Additionally, the prosecutors made egregious, inflammatory statements during closing arguments.  The overall effect of these questions and comments so infected that trial that Mr. Barrett was denied due process of law.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The Government argues that Mr. Barrett procedurally defaulted this claim and beyond that, the

Government valiantly attempts to twist the prosecutors' inflammatory behavior into some semblance of reasonableness.

### 1.    Mr. Barrett's claim is subject to collateral review.

Prosecutorial misconduct was not raised on direct appeal.  However, Mr. Barrett can establish constitutionally-cognizable ineffectiveness based on the fact that the misconduct of the prosecutors in both stages of trial was so glaring, no reasonable strategy excused their failure to raise the claim.  Especially because the Government's case for the death penalty was not overwhelming, there is a reasonable probability that, had this issue been raised, the outcome of the appeal would have been different.  *Evittts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).  This claim has not been procedurally defaulted.

### 2.    The prosecutors improperly questioned the witnesses.

There are numerous examples of the prosecutors' improper questioning of witnesses, as set forth in Mr. Barrett's Amended § 2255 Motion and Brief in Support.  These include: 1) asking questions for which there was no good faith basis, or which were beyond the personal knowledge of the witness; 2) implying, through such questioning, that the prosecutor personally had knowledge of facts not testified to by the witnesses, making the prosecutor, in effect, a testifying witness; 3) commenting on Mr. Barrett's exercise of his trial rights, as if he were somehow doing something wrong by demanding his constitutional right to a trial; 4) asking witnesses whether other witnesses had made false statements, when, again, such would be beyond the knowledge of the witness being examined; 5) utilizing questions as a form of closing argument by repeating, over and over, the testimony of the informant and other witnesses, thus in effect vouching for the testimony of the witnesses.  For each of the examples in each of these categories, the

Government goes to great lengths in an attempt to explain the prosecutors' supposedly legitimate reasons for the challenged questioning. The Government's convoluted explanations fall woefully short.

For example, Mr. Barrett challenges the prosecutors' line of questioning regarding his right to go to trial. In questioning Deputy Court Clerk Maudeen Vann, Prosecutor Littlefield engaged in the following:

> Q.   In regards to the felony information about which you've testified for the homicide of David Eales, Mr. Barrett didn't plead guilty, did he, ma'am?
>
> A.   No, sir.
>
> Q.   Put the government to the task of proving its case, didn't he?
>
> A.   Yes, sir.
>
> Q.   And ultimately Mr. Barrett was convicted of manslaughter and given a year sentence in that case?
>
> A.   Yes, sir.

(Tr. 4765.)

The Government contends that the point of this questioning was somehow tied to later testimony indicating that Mr. Barrett's state manslaughter conviction was based on different evidence than that presented by the Government in this case. Doc 175 at 198. This argument defies logic. There is no connection between Mr. Barrett's plea of not guilty and the evidence presented in his state trial. The Government is reaching -- albeit feebly -- to explain its inappropriate questioning. Prosecutors commit misconduct if they imply that the defendant somehow abuses the legal system by exercising his Sixth Amendment right to trial. *See*

*Cunningham v. Zent*, 928 F.2d 1006, 1019 (11th Cir. 1991).  That's exactly what the prosecutor was attempting to do here.

> **3.      The prosecutors were especially egregious in arguing that the jury should impose a death sentence.**

The examples of prosecutorial misconduct in the penalty phase closing argument are numerous and set out in full in Mr. Barrett's Second Amended § 2255 Motion and Brief in Support.  Again, the Government unsuccessfully tries to find justification for the prosecutors' outrageous statements.

The prosecutors made unsubstantiated and inflammatory statements about Mr. Barrett's alleged lack of remorse, such as "There's no proof that Defendant lost one wink of sleep over what he did.  It's almost like nothing happened . . . You know it's almost a oops."  Tr. 5419.  This is complete speculation on the part of the prosecutors, only meant to inflame the jury.  The prosecutors continually pushed the bounds of reasonableness, arguing that it was only the "hand of God" that prevented Mr. Barrett from being a multiple murderer and that this was "way over the capital murder line."  R at5402-03.  Amazingly, the prosecutors told the jury that Mr. Barrett not only had no right to leniency, but really had no right to "fairness."  R at 5408.  It only gets worse.  Prosecutors told the jury justice could not be served by allowing Mr. Barrett to spend the remainder of his life in prison, where he would have "perks" like workouts, visitors, phone calls, mail, television and recreation.  R at 5412.  Speculating outside the record simply to prejudice the jury, prosecutors said that if given life, Mr. Barrett would be a "hero" to his fellow inmates.  R at 5412.  Inflammatory phrases without any evidentiary support were continually used, such as "executioner of the innocent," how unjust was it that Mr. Barrett wanted to "choose his

sentence," Mr. Barrett wanted "the thrill of the kill," (R at 5412-13), and Mr. Barrett "slaughtered an innocent soldier of the law." R at 5423.

And yet again, the Government tries to rationalize this hyperbole. For example, in support of its statement to not let Mr. Barrett be made a "hero" to his fellow inmates, the Government argues that there was "substantial evidence adduced upon which the jurors could have made the inferential leap suggested by the prosecutor." Doc 175 at 206. This substantial evidence pointed out by the Government included the fact that Mr. Barrett allegedly exerted control over other inmates, that he allegedly threatened a guard and, "as a general matter, that prisoners harbored great animosity for inmates who cooperated with law enforcement." Doc 175 at 206. First, the Government exaggerates the "substantial evidence." Mr. Barrett's alleged control over other inmates was actually the fact that he had been incarcerated in that particular location the longest. R at 5234. The alleged threat Mr. Barrett made to a guard was hearsay evidence that Mr. Barrett used some "cuss words" when a television set was removed from his cell and told a guard "he would get him when he got out." R at 5252. Accepting even these exaggerated facts, this is much more than the inferential leap the Government suggests; it's an intergalactic flight to get from those facts to the inference that "prison inmates would look with favor upon someone who murdered a police officer," and "jurors could be expected to understand prisoners' tendency to identify, as incarcerated felons, against a common social adversary, law enforcement." Doc 175 at 206. This "inference" is so ludicrous it does not even warrant a response. It simply goes without saying that the prosecutor's statement most assuredly did not rely on facts adduced in the record. *See Duckett v. Mullin*, F.3d 982, 992 (10th Cir. 2002); *Le v. Mullin*, F.3d 1002, 1014-15 (10th Cir. 2002).

The prosecutors further improperly aligned themselves with the jury by the use of first person pronouns during their argument.  The Government admits that "the prosecutor's use of the first-person was ill-advised," but contends that the argument did not confuse the jury so Mr. Barrett was not prejudiced.  The Government attempts to distinguish *Cargyle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003), in support of its argument but in so doing, misstates the holding of *Cargyle*.  The Government contends that in *Cargyle*, the prosecutor offended the defendant's rights because "it urged the jury to return a death verdict to avoid rendering moot the efforts of the police and prosecution.  As such, it implied that the jury bore some duty, or at least allegiance to the government."  Doc 175 at 214-15.  In *Cargyle*, the offending language contained some of the sentiment the Government cites.  However, Cargyle held:

> We agree with the district court that "[t]his is an extremely improper argument" because "it profoundly misleads the jury" about its role in the criminal process "by suggesting that jurors are part of 'the team' of the prosecution and police, rather than impartial arbiters between the State and the defendant." The Supreme Court has stressed repeatedly "that the jury must not be misled regarding the role it plays in the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 8, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (following *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)); *see also Young*, 470 U.S. at 18, 105 S.Ct. 1038 (holding prosecutor's effort "to exhort the jury 'to do its job' ... has no place in the administration of justice").

317 F.3d at 1223.  Thus, *Cargyle* stands for the proposition that it is prejudicial for a prosecutor to  suggest that jurors are part of the prosecution team.

That is exactly what happened in Mr. Barrett's case.  The prosecutor stated:

> Remember the real victims.  It is not our job here to forgive.  We are not the victims of the Defendant's brutality.  It's not our job to feel guilty.  The murderer who mercilessly killed in this case as a matter of conscious, premeditation and planning ought to feel guilt and remorse but he doesn't.  He is the one who put us all here.  What a sense of power he must feel, the narcissistic, selfish collection of reality that he is.  He's the one that put us all here.

> But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole.

Tr. 5421-22.  The prosecutor was attempting to make the jurors feel a part of the prosecution team, i.e., "our job, " "put us all here," "our duty," and "we can't make the victim's ... whole." Mr. Barrett's case is directly on point with *Cargyle.*

**GROUND 7:  THE USE OF THE ELECTRIC SHOCK DEVICE WITHOUT GOOD CAUSE WAS ERROR.**

**A.     The September 13th Finding Made Clear the Court Permitted the Electric Shock Device Because it Was a Capital Case.**

The Government complains that Mr. Barrett "attempts to demonstrate that the Court relied on an improper rationale because it made a non-dispositive statement *after* issuing its ruling."  Doc 175 at 222.  On September 13, 2005, the Government sought to do precisely what it is now trying to do: to bootstrap the grant of leave by the Court to the U.S. Marshal to use an electric shock device or  "stun belt" during the trial into a finding by the Court that Mr. Barrett was "dangerous."  Thus, on the 13th of September the Government argued that the Court's order regarding the "stun belt" supported the Government's request to be relieved of its duty to timely disclose six previously unidentified witnesses and one previously unused witness.  The Court advised the Government that "probably in any capital case where [he] was the presiding judge a stun belt would be used just because of the nature of the potential punishment." Tr Hrg at 9/13/05 at 13.  That finding by the Court was a specific affirmation of the prior finding and rejection of the premise of the Government's argument here.

**B.**      **The Order Permitting Use of the Device Did Not Comply with Due Process.**

The Government's assertion that the claim "ignores the Court's reasoning as articulated in the Order" is simply not accurate.  Doc 175 at 222.  The Court's September 13th conclusion that the use of a "stun belt" in a capital case was just "common sense" was a cogent summary of the Court's September 6th Order.  Tr Hrg 9/13/05 at 13.

**1.**      **The hearing on the issue did not support the court's conclusion.**

It is true that the Court held a hearing and entered an Order regarding the use of the electric shock device during the trial.  Tr Hrg at 8/31/05; Order at 9/6/05.  It is not true, however, despite the Government's insistence otherwise, that the Court found that "the belt was employed to thwart a potential security risk, rather than mere disruptions,"  or that "its use reflects an entirely appropriate exercise of the Court's discretion."  Doc 175 at 222.  *See* Order, 9/6/05.  The Court's order was not an exercise of discretion, but rather an abdication of its responsibility to exercise discretion; a matter made clear by both the Order itself, and the Court's clear articulation of the basis at the September 13th hearing.

While the Court Order notes the testimony of the deputy U.S. Marshal, it made no findings regarding credibility or the conclusions regarding the facts.  For instance, as the Government notes, Deputy U.S. Marshal Louisia Murrow testified that she saw Mr. Barrett attempting to tamper with his handcuffs, turning his back on the security camera at one point.  The deputy also testifies, however, that she believes the electric shock device is necessary because it is a death penalty case and she thinks they should be used in every death penalty case.  Tr Hrg 8/31/05 at 39 *ll* ll-12.  Murrow also testified, however, that handcuffs can cause irritation if too tight, and then acknowledged that Mr. Barrett's wrists showed signs of redness and

irritation. Tr Hrg 8/31/05 at 43, *ll* 1-20.  She also acknowledged that Mr. Barrett was locked in a cell block at the time she observed him "tampering" with the handcuffs and that she had no information that he was an escape risk.  Tr Hrg 8/31/05 at 44 *ll* 5-17.  Nor in the eleven months in which the U.S. Marshal's Office had custody of Mr. Barrett and transported him past numerous "avenues" of escape had she observed Mr. Barrett make any action suggesting an escape.  Tr Hrg 8/31/05 at 48, *ll* 8-10.  Murrow admitted she was not aware of any violent actions by Mr. Barrett in either of his two state trials, both of which had been capital trials.  Tr Hrg 8/31/05 at 45 *ll* 16-21.  Beyond that Murrow testified that there was already increased security in the presence of two additional deputy marshals in the courtroom, making a total of four simply because it was a death penalty case.  Tr Hrg 8/31/05 at 44.  Indeed, the testimony showed a lack of concern for security specific to Mr. Barrett by permitting the Sheriff's deputies to take him to the doctor at which time he was unhandcuffed and unshackled.  Tr Hrg 8/31/05 at 49.  Though the deputy marshal speculated that Mr. Barrett "is thinking in his mind possibly of escaping somewhere else," she confirmed that there was nothing to show that he "tried to do anything to escape from a courtroom."  Tr Hrg 8/31/05 at 52 *ll* 10-12, 13-16.  Murrow testified that the three reasons to put restraints on Mr. Barrett were that it's a death penalty case, "that he looked around the sallyport" and "that he fiddled with his handcuffs."  Tr Hrg 8/31/05 at 53.

The Court's "statement of facts" identifies the testimony and argument received but makes no specific fact-finding based on the testimony.  Order,  9/6/05.  Indeed, the Court notes the defendant's argument as well.  *See* Order, 9/6/05 at 5-6.

> On August 30, 2005, the defendant through counsel, filed a brief objecting to the **use of any type of restraint** during the upcoming trial (docket No. 173).  The defendant argues he has not previously attempted to escape or exhibited any non-compliant behavior while

in custody of the United States Marshal. Additionally, the defendant argues there has been no violence exhibited by the defendant, either in front of the Court or defense counsel. Finally, the defendant argues, despite the facts recited above and the allegations currently lodged against him, because he was not restrained by Sequoyah County deputies during his state proceedings, he does not pose an increased risk of danger before this Court such that he needs to be restrained in any way in his upcoming trial herein.

Order, 9/6/05 (emphasis in original). Nothing in the factual recitations which preceded or followed or the Court's ultimate conclusions refuted those statements. *See* Order, 9/6/05 at 15.

### 2. The electric shock device was not "preferable" to other security measures.

While the Court finds that the "use of the stun belt preferable to the use of other security measures, "including additional Marshals within the courtroom, leg irons, leg shackles, or the use of weapons other than the stun belt to subdue the defendant in the event of behavior posing a risk to courtroom security" (Order, 9/6/05 at 19), it makes no finding that any additional security is actually *necessary* at all. Other than the fact of the capital charges pending against Mr. Barrett, there is nothing in the Court's findings which suggest additional security is necessary. Indeed, the Court specifically finds "if the stun belt" is not used, additional Marshals would have to be present and the Court "***might*** entertain the possibility of using leg irons on the defendant, at a minimum while being transported to and from the courtroom". Order 9/5/05 at 18. (Emphasis added.) If the Court could not say that leg irons would be required if there were no electric shock device, there was no actual finding of a security risk. The Court's finding that the electric shock device was "preferable" to additional marshals does not support the finding that the use of an electric shock device was appropriate since additional marshals were already employed. Tr Hrg 8/31/10 at 44 *ll* 18-22.

Beyond that, the Court's finding that the electric shock device was "preferable" to additional personnel is simply not supported in law. 9/6/05 Order at 19. In *Holbrook v. Flynn*, 475 U.S. 560, 568-69(1986), Justice Thurgood Marshal speaking for a unanimous Supreme Court found that the "conspicuous or at least noticeable deployment of security personnel in a courtroom during trial is [not] the sort of inherently prejudicial practice that, like shackling should be permitted only where justified by an essential state interest specific to each trial." Similarly, the Tenth Circuit has found that the electric shock device raises the same concerns as shackling or other physical restraints. *United States v. Wardell,* 591 F. 3d 1279, 1294 (10th Cir. 2009) (finding no violation of due process in the use of the stun belt where the Court made a defendant-specific determination of necessity including two prior convictions for escape-related crimes). The Court's finding here that the electric shock device was *less* intrusive than additional security personnel or shackling was legally incorrect.

The Court failed to appreciate that the electric shock device, is in fact, more intrusive and "far more likely to have an impact on a defendant's trial strategy than are shackles, as a belt may interfere with the defendant's ability to direct his own defense." *U.S. v. Durham*, 287 F. 3d 1297, 1306 (11th Cir 2002). In this case, defense counsel explained that the prejudice from the interference with the ability to participate in the proceedings was greater than in the ordinary case. Tr Hrg 8/31/05 at 95 ("[A]ny kind of inhibition that is placed on Mr. Barrett to freely be able to converse and talk to us is very crucial because again, while this is so different -- Mr. Barrett knows more about this case, knows more about the testimony in this case than anybody here because he has been involved in two trials.") The anxiety induced by the belt recognized in *Durham* is substantially compounded by Mr. Barrett's prior beatings by law enforcement and his

fear that the metal in his chest from a prior attempted suicide would create a lethal force through use of the shock device.

### 3.    The September 6th Order does not comply with *Deck v. Missouri*.

The September 6th Court Order following the August 31st hearing made no finding that Mr. Barrett was dangerous, an escape risk, threatening or likely to cause any security problems. Order, 9/6/05 at 1-12.  The Order, therefore, does not comply with *Deck v. Missouri,* 544 U.S. 622, 632 (2005).  The Court's reliance on the fact that the U.S. Marshal used the electric shock device in two prior capital cases in the district supports the Court's later statement that it was just "common sense" to order it in a capital case, Tr Hrg 9/13/05 at 13, and illustrates the lack of defendant-specific findings.  The failure to address the specific issues raised by the defense including the interference with Mr. Barrett's ability to fully participate in the defense and communicate with counsel, as well as, the numerous courtroom appearances, in both state and federal court, without disruption illustrates the lack of individualized determination required in *Deck*, 544 U.S. at 642.

### C.    Compelling Mr. Barrett to Wear the Electric Shock Device Was Prejudicial.

As argued in the opening brief, because of the deficiencies in the Court's Order, prejudice is presumed.  Beyond the presumption, the evidence on this record shows clear prejudice to Mr. Barrett.

### 1.    The electric shock device was visible and undermined the presumption of innocence.

The Order further relies on a finding that the electric shock device will preserve the "presumption of innocence" based on a ***belief*** that it was ***not likely*** jury will not see the electric

shock device. Order, 16, 19 (emphasis added). The Court's obligation was to require the Government to *prove* that the jury would not be able to see the belt. Absent a ***finding*** by the Court that the jury could not see the two inch bulge the belt caused, the "presumption of innocence" was not preserved. Mr. Barrett has shown that the Court's belief was not well founded by Doris Barrett's declaration that she could see the bulge from the gallery. Contrary to the Government's claim that the visibility from the gallery is irrelevant, the record establishes the likelihood that the jury observed the bulge. If seen, the belt 'may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant.'" *U.S. v. Durham*, 287 F. 3d 1297, 1305 (11th Cir. 2002) *quoting State v. Flieger,* 955 P.2d 872, 874 (Wash. 1988). Had the Court not recognized the visibility of the bulge and the prejudice it would cause, it would not have ordered Mr. Barrett be escorted in and out of the courtroom outside the presence of the jurors "in an effort to minimize the prejudice to the defendant." Order at17. (Emphasis added.)

### 2. The Court did not consider the impact on Movant's ability to assist his counsel.

Defense counsel specifically argued that the electric shock device would adversely affect Mr. Barrett's ability to communicate and assist counsel was essential to his defense. Tr Hrg 8/31/05 at 95-96. The Court makes no mention in its findings of the defense-interference the device could create.

### 3. Mr. Barrett renewed his objection on September 9, 2005.

The Government misstates the record when it argues that Barrett only aired the concerns with use of the electric shock device as a result of "metal implanted in his torso" "not by way of

objection, but by a post-ruling question." Doc 175 at 223. Mr. Barrett's counsel specifically renewed the objection to the use of the electric shock device as a result of the free-floating metal implants. Tr hrg 9/9/05 at 27. ("We are – you know--*renew our objection* to the stun– use of the stun belt.") (Emphasis added.) The specific objection was that Mr. Hilfiger understood "[t]hat there would be an examination to determine if there was any medical problems that the stun belt may effect him on." The Government's response was that it was confident that the marshal's service can address this area of concern. The Court directed the marshal to "address it and report to [the court], a copy of which [he would] provide to counsel." Tr hrg 9/9/05 at 28. No such report was made available to Court or counsel. The failure to rule on the renewed objection to the use of the electric shock device in light of Mr. Barrett's specific physical and psychological health was error. While the failure to pursue the ruling was ineffectiveness of trial counsel, it was error for the Court not to insist that his orders be followed and the ensuing reports made available to him for consideration of the objection.

### D. The Claim is Properly Reviewed in Collateral Proceedings.

The Government contends that the issue has been procedurally defaulted relying on the general rule that claims not raised on direct appeal may not be raised on collateral review unless the movant shows cause and prejudice. *United States v. Frady*, 456 U.S.152, 167-68 (1982). Doc 175 at 219. Mr. Barrett's medical history including the floating bullet fragments and Mr. Barrett's mental illnesses, as well as at least two prior physical beatings by law enforcement, the factual basis of which were not developed at the hearing, raise special concerns regarding the Court's deferral to the United States Marshal's office in the decision to compel Mr. Barrett to wear a electric shock device. *See* Exhs. 89 ¶66 at 24 ("His disabilities would be further

exacerbated under conditions of [] highly stressful situations."); 117 ¶74 at 26 (Persons, like Mr. Barrett, suffering from Post Traumatic Stress Disorder, are more likely to experience a more severe acute emotional reaction," including emotions such as fear, anxiety"); ¶79 at 27 ("Mr. Barrett's reactivated Post Traumatic Stress Disorder had built-in reminders, namely the bullet fragments that continued to cause him significant pain[.]).  Notwithstanding the Court's finding that there was no substantial risk of accidental discharge, the record is clear that there was a risk, a risk which, because of his physical condition and prior experience with law enforcement officials, would necessarily induce significant fear and agitation in Mr. Barrett and negatively affect his ability to freely confer with counsel and participate in his defense.

Unconstitutional restraints during trial are generally considered an issue which should be brought on direct appeal.  Given the significant development of the issue in this case, it was ineffective assistance of appellate counsel not to raise the issue on appeal.  Nonetheless, additional extra-record evidence was reasonably necessary to fully understand the impact of the electric shock device on this particular defendant makes consideration of the substantive constitutional issues in collateral proceedings appropriate.  *See Massaro v. U.S.,* 538 U.S. 500, (2003) (failure to raise trial counsel's failure to take offer of continuance on late disclosure which rested *in toto* on record evidence was not procedurally defaulted and could be properly presented in a § 2255 motion.)  "The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments."  *Massaro v. U.S.,* 538 U.S. at 506.   In this case, however, requiring Mr. Barrett to bring the constitutional claims related to the Court's permission to the Government to utilize a "weapon" of their choice to satisfy the

speculative and unsubstantiated concerns regarding Mr. Barrett's behavior on direct appeal, where additional extra-record evidence significantly strengthens the claim, does not promote these objectives.  Mr. Barrett's electric-shock-device-related claims should be permitted in a collateral proceeding under §2255, whether or not he could have raised the due process and eighth amendment claims on direct appeal.  *See Massaro v. U.S.,* 538 U.S. at 506.

In this case, without additional factual development including the visibility and, more importantly, the impact of the electric shock device on Mr. Barrett as a result of his psychological and mental health exacerbated by a history of abuse by law enforcement, the appellate court may not have been able "to ascertain whether the alleged error was prejudicial."  *Id.*  Presentation of the claim on appeal would have resulted in a duplication of time and a waste of resources and ultimately been an inefficient way to present the issues, ...unnecessarily burden[ing] both the parties and the court . . .".  *United States v. Galloway*, 56 F. 3d 1239, 1241(10th Cir. 1955).

The substantive due process issue arising from the electric shock device is properly before the Court on collateral review.

In any event, the issue is properly before the Court as substantive constitutional violations caused by the ineffective assistance of counsel at trial and on appeal.  *Massaro v. U.S.,* 538 U.S. at 506.  Even if the Court finds the question of the electric shock device as an unnecessary security measure should have been brought on appeal, Mr. Barrett alleges the failure of its presence on appeal as ineffective assistance of counsel at both trial and appeal.  To the extent that the record supports a finding of a due process violation, the failure to raise it on appeal fell below the prevailing professional norms and was objectively unreasonable under *Strickland,*, 466 U.S.

at 687. These ineffectiveness claims establish cause and prejudice for the due process claim as well as serving as independent claims for relief. *See also,* Ground 18 hereinbelow.

There was no adequate security reason to permit the U.S. Marshal to restrain Mr. Barrett with the threat of electric shock in a manner visible to the jury and destructive of Mr. Barrett's ability to communicate with his counsel and participate in his defense. He is entitled to a new trial.

## GROUND 8: MR. BARRETT HAD A CONSTITUTIONAL RIGHT NOT TO BE TRIED WHILE INCOMPETENT.

The Government overstates its evidentiary support of its three arguments in opposition to Mr. Barrett's substantive due process claim that he was incompetent during trial: 1.) The Motion to Vacate does not present "clear and convincing evidence" of incompetency; 2.) That the opinions of Mr. Barrett's mental health experts are speculative and do not constitute clear and convincing evidence of incompetence; and, 3.) Mr. Barrett's trial counsel's declarations contradict and defeat the claim. The Government overstates its evidentiary support for each argument. While the Government's concerns are relevant to the ultimate determination of the claim on the merits, they are neither controlling nor grounds for summary dismissal.

### A.      This Court must Hold an Evidentiary Hearing on the Issue of Incompetency.

The Government relies on the standard of proof set out in *Battle v. United States,* 419 F. 3d 1292, 1298-99 (11th Cir 2005). Doc 175 at 224. Its reliance is misplaced. As set out by the Government, the Court of Appeals for the Eleventh Circuit in *Battle* held that to prevail on a claim of having been tried while incompetent, the defendant must present by clear and convincing evidence a real, substantial and legitimate doubt regarding his competence to stand

trial.  419 F. 3d at 1298-99.  See Doc 175 at 225.  The *Battle* opinion, however,  rested on a complete record developed in an extensive pre-trial hearing in which the Court was faced with "diametrically opposite expert testimony."  419 F. 3d at 1299.

Nothing in the Government's response refutes the fact that at the very least, Mr. Barrett is entitled to a hearing on the issue.  Section 2255 provides that "[u]nless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to no relief, the Court *shall* . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  28 U.S.C. §2255 (emphasis added).  *See e.g., Fontaine v. United States,* 411 U.S. 213, 215 (1973) (reversing summary dismissal and remanding for hearing because "motion and the files and records of the case [did not] conclusively show that the petitioner is entitled to no relief").  In *U.S. v. Gutierrez*, 839 F. 2d 648, 653 (10th Cir 1988) the Tenth Circuit Court of Appeals remanded the issue of competency for an evidentiary hearing under 28 U.S.C. §2255 "where the record did not conclusively show that defendant [was] entitled to no relief."  In *Gutierrez,* the petitioner claimed "he was suffering from the symptoms of withdrawal from heroin addiction at the time of his plea and hence was incompetent to enter a knowing and voluntary plea.  *Id.* at 649.  In remanding for an evidentiary hearing the Tenth Circuit relied on *Sanders v. United States,* 373 U.S. 1, 64820 (1963), where the Supreme Court had ordered an evidentiary hearing under similar factual circumstances.  *Guttierez,*839 F.2d at 652.

> In *Sanders,* the petitioner alleged that he was mentally incompetent at the time of his guilty plea due to the administration of narcotic drugs during his incarceration. "However regular the proceedings at which [petitioner] ... pleaded guilty might appear from the transcript, it still might be the case that petitioner did not make an intelligent and understanding waiver of his constitutional rights. (Citations omitted)

> For the facts on which petitioner's claim in his second application is predicated are outside the record." *Id.* at 20, 83 S. Ct. At 1079; *Blackledge v. Allison,* 431 U.S. 63, 74, 97 S. Ct. 1621, 1629, 52 L.Ed. 2d 136 (1976) ("the barrier of the plea of sentencing proceeding record, although imposing, is not invariably insurmountable").

*Gutierrez,* 839 F. 2d at 652.  Here, too, the facts upon which Mr. Barrett's claim is predicated are outside the record and were unknown to Court and counsel at the time of trial.  An evidentiary hearing is warranted.

Mr. Barrett has produced an expert medical opinion that Mr. Barrett was "unable to rationally assist his attorneys" before and during trial because he is a brain-damaged individual who during the trial was suffering from "a triad of neuropsychiatric impairments, including "acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder" and "Dysexecutive Syndrome." Exh. 119 at 24, 26, 27.  That information was not known to trial counsel or the Court, though it presumably *should* have been known to counsel.  Beyond that, as pointed out in Claim 7, the added stress caused by the U.S. Marshal's insistence that he wear an electronic shock device throughout the trial inhibited his ability to participate in the proceedings, an impact specifically argued by his trial counsel.  *See Objection to Use of Restraint and Brief in Support,* CR 04-115-P at 6; Tr Hrg 8/31/05 at 95-96. The record and files simply do not conclusively show that Mr. Barrett is entitled to no relief in light of the evidence now before the Court.

**B.       The Expert Opinions Relied upon by Mr. Barrett Are Not Speculative.**

Relying on *Walker v. Gibson,* 228 F. 3d 1217, 1229 (10th Cir. 2000), *abrogated on other grounds*, *Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001), to defeat the otherwise unrefuted medical opinion of Mr. Barrett's trial-time  incompetence, the Government dismisses the expert

opinion as a "retrospective, speculative post-conviction evaluation which does not meet the clear and convincing evidence standard." Doc 175 at 26. In *Walker,* the Court of Appeals determined the opinions of experts, conducted over seven years after trial, did "not establish by clear and convincing evidence a real, substantial, and legitimate doubt as to Mr. Walker's competency at the time of trial" because one of two post-trial experts offering an opinion on competency "had no medical records regarding Mr. Walker's response to treatment and thus, [] merely speculated any symptoms of somnolence and ataxic gait were side effects of medication and because the other expert's opinion was patently speculative."[37]  228 F. 3d at 1230.

Here, the Government itself speculates that Dr. Woods "appears to have ignored" prior medical records which found Barrett was "oriented in all three spheres." Doc 175 at 225 (without record citation). Dr. Woods unambiguously states that he reviewed *and considered* "significant institutional records, to include available academic, medical and custodial records; declarations and/or social records of various family members." Exh. 117 at 5 ¶14 . The expert opinion here is not speculative but based upon specific findings which the expert psychiatrist attests he finds to a reasonable medical certainty.  Exh. 117 at 28 ¶¶81, 82.

Dr. Woods' consideration and review of the extensive medical and social records and history in reaching his expert opinion may be fodder for cross-examination but it does not change the fact that no trial-time competency evaluation was undertaken in Mr. Barrett's case. Dr. Woods has stated to a reasonable medical certainty that Mr. Barrett's mental health conditions, uninvestigated by and thus unknown to trial counsel, precluded Mr. Barrett's rational assistance

---

[37]The expert's opinion stated the he" *believed* the use of the medications *'appear[ed]* to raise issues of competency[,]'" *Walker v. Gibson*, 228 F. 3d at * (emphasis added).

in his defense.  Evidence of mental health is relevant to a competency claim.  *Drope v. Missouri,* 420 U.S. 162, 179 (1975).  Dr. Woods' declaration raises serious concerns about Mr. Barrett's mental illness and its effect on Mr. Barrett at the time he was tried.   As the United States Supreme Court observed in *Ake v. Oklahoma,*  470 U.S. 68, 80-81(1985):

> [T]he assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, *Solesbee v. Balkcom*, 339 U.S. 9, 12, 70 S.Ct. 457, 458, 94 L.Ed. 604 (1950), and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

*Id.*    An expert's evaluation, even post-trial, is no less relevant or critical to the question of competency.  Dr. Woods' medical opinion, based on comprehensive review of relevant historic records, complete neuropsychological testing and evaluation and his own psychiatric evaluation that Mr. Barrett was incompetent to be tried, at the very least, entitles Mr. Barrett to a hearing.

**C.    Trial Counsel's Opinions Are Not Controlling.**

The Government would have this Court wholly disregard Dr. Woods' opinion because it "appears" to contradict the Government's assessment of Mr. Barrett's courtroom demeanor

(while wearing an electric shock belt) and trial counsel's declarations (also made years after the fact and subsequent to Mr. Barrett's allegations of ineffectiveness). Doc 175 at 227. In support of its argument, the Government attaches declarations by both trial counsel each of which states:

> In view of my interaction with Mr. Barrett, I harbored no doubts concerning his mental competence to stand trial and was unaware of any symptom that suggested he suffered from a significant mental health condition.

Doc 175, Exh. 11 at 1 ¶6 (Smith); Exh. 12 at 1 ¶7 (Hilfiger). Mr. Barrett's motion makes clear trial counsel were wholly unaware of their client's mental health. *See e.g.,* Amended Motion to Vacate at 48-56; Ground 2(A)(3) hereinabove. Trial counsel's opinions or observations regarding competency are undoubtedly relevant. *See Drope v. Missouri, supra*. They are, however, not dispositive. Lawyers are not experts when it comes to medical or psychological diagnoses. *See Panetti v. Quarterman*, 551 U.S. 930, 970 (2007) (Thomas, J. dissenting); *see also*, *Martin v. Estelle*, 583 F.2d 1373 (5th Cir. 1978) (rejected incompetency claim where "slender evidence" of the "*lay* testimony of [the petitioner's] attorney was not a sufficient predicate on which to make a decision that" "would be anything more than speculation." (Emphasis added.)). Here the fact that trial counsel face serious well-documented allegations of ineffectiveness including a substantial record of their absymal failure to develop the mental health issues of their client, necessarily weaken the reliability of their confidence in their client's competence. *See, e.g., Williamson v. Ward,* 110 F. 3d 1508, 1517 (10th Cir 1997). The "proclamation of competence" by Messrs. Hilfiger and Smith merits close scrutiny and certainly does not dispose of the issue. At issue is not whether trial counsel harbored a doubt concerning their client's mental competence but whether Mr. Barrett was, in fact, incompetent. Dr. Woods' opinion, when considered with the mental health records and diagnoses now before the Court, as

Movant's Reply to USA' Response
to Second Amended § 2255 Motion
163
*Barrett v. U.S.*, 6:09-cv-00105-JHP

well as trial counsel's own concern about the inhibition of Mr. Barrett's participation in the trial and communication with counsel if the U.S. Marshal's were permitted to use the "stun belt," defeats the Government's effort to conclusively show that the prisoner is entitled to no relief.

Mr. Barrett is entitled to a hearing on the issue.

**GROUND 9:  MR. BARRETT'S DUE PROCESS RIGHTS WERE VIOLATED BY THE COURT'S FAILURE TO INSTRUCT ON VOLUNTARY MANSLAUGHTER.**

Quick work can be made of two of the Government's arguments.  The Government maintains that if there is *Beck*[38] error, it can be deemed harmless.  Doc 175 at 231, 233. Respondent recognizes this is not the law in the Tenth Circuit.  *Beck* error is automatically deemed prejudicial.  *Hogan v. Gibson,* 197 F.3d 1297, 1312 and n. 13 (10th Cir. 1999); *Hooks v. Ward,* 184 F.3d 1206, 1227 (10th Cir. 1999).  The Tenth Circuit recently reaffirmed this principle.  *Phillips v. Workman,* ___F.3d___, No. 08-7043 (10th Cir. May 12, 2010) (slip op. at 29-30).  This is not only the law in the Tenth Circuit; the Supreme Court has so decreed.  *Hopper v. Evans,* 456 U.S. 605, 610 (1982).

It is argued that *Beck* does not apply to the federal death penalty scheme because the jury was not confronted with an "all or nothing" choice between acquittal and a conviction automatically leading to the death penalty.  Before Mr. Barrett could be death-eligible upon conviction, the jury first had to find one or more of the "gateway" intent factors and at least one statutory aggravating circumstance.  Doc 175 at 232-33.  Again, the Government recognizes this is not the law of the circuit.  *Hooks v. Ward,* 184 F.3d at 1126-27 (explicitly disapproving as against circuit precedent the reasoning of *United States v. McVeigh,* 153 F.3d 1166, 1197 (10th

---

[38]  *Beck v. Alabama,* 447 U.S. 625 (1980).

Cir. 1998), which tracks the argument the Government makes here, and noting that *Beck* extends to capital schemes, such as Oklahoma's (and, by implication, all similar statutory schemes), where the defendant is not automatically eligible for or subject to the death penalty on conviction, because aggravating circumstances must first be found in the penalty phase).

The Government asserts lesser degrees of homicide could not apply to count 2 (which charged violation of 18 U.S.C. § 924(c)(1)(A) and (j)), because the crime has no intent elements independent of the underlying felony.  Doc 175 at 228-29.  For this, the Government cites *United States v. Chanthadara,* 230 F.3d 1237, 1257-59 (10th Cir. 2000).  Chanthadara was convicted under 18 U.S.C. § 924 (j) for using a firearm during and in relation to a crime of violence (in his case, a Hobbs Act armed robbery), resulting in death to the victim (which amounted to first degree murder under 18 U.S.C. § 1111).  The elements of the offense were: 1) the armed robbery of a restaurant as charged in the first count of the indictment; 2) knowingly using or carrying a firearm during and in relation to the robbery; 3) during the robbery, the defendant directly caused the victim's death by use of the firearm; and 4) the killing was murder with malice aforethought. *Id.*

On appeal, Chanthadara contended he was entitled to a second degree murder instruction, but the Court ruled that based on the charges and the facts of his case, second degree murder was not a lesser included offense of the first degree murder alleged under § 924(j). The "malice" required for first and second degree murder in *Chanthadara* were different in kind, rather than degree.  Thus, the elements of second degree murder were not a "subset" or subsumed within the top charge; one could commit the higher offense without necessarily committing the lesser.  The commission of the underlying felony -- armed robbery -- supplied the "malice" for the first

degree murder charge.  There was no independent intent requirement other than that required for the commission of the robbery.  In other words, in proving first degree murder, the prosecution needed only to show the commission of the felony of armed robbery (felony murder).  On the other hand, the "malice" for second degree murder goes to the intent or *mens rea* with which the killing itself is done.  *Id.*

*Chanthadara* did not foreclose a voluntary manslaughter instruction on count 2 of Mr. Barrett's superseding indictment.  While no specific intent or *mens rea* in association with the killing was required to prove first degree murder in *Chanthadara,* because the commission of the robbery supplied the necessary malice, this was not so with respect to count 2.  As stated in Mr. Barrett's reply to Ground 2(3), in order to convict Mr. Barrett of count 2, the jury had to find that he committed the "crime of violence" in count 3, which was a specific intent murder with knowledge that the victim was a law enforcement officer in the performance of his official duties, or on account of those duties.  *United States v. Barrett,* 496 F.2d 1087, 1112-13 (10th Cir. 2007).

Thus, count 2 was not the type of felony murder committed in *Chanthadara.*  In Mr. Barrett's case a specific intent was required for the fatal act itself, as the United States conceded at trial, at least with respect to count 3.  (See below.)  Killing in the heat of passion, and without knowledge that the person or persons being fired upon were law enforcement officers (which was the defense) would diminish or negate the intent element of count 2, which relates to the killing itself, not an underlying felony.  Heat of passion is different in degree, but not in kind, from the specific intent to kill required to establish the *mens rea* of count 2.  A heat of passion negates a the malice of a specific intent murder.  It is murder without malice.  *United States v. Scafe,* 822

F.2d 1232, 1242 (10th Cir. 1987); *United States v. Soundingsides,* 820 F.2d 1232, 1242 (10th Cir. 1987); Tenth Circuit Pattern Instruction 2.54. Though not dispositive (see below), 18 U.S.C. § 924(j)(1)(2) provides for both murder and the lesser offense of manslaughter, as defined by 18 U.S.C. §§ 1111, 1112.

Voluntary manslaughter was also a lesser offense of the crime charged in count 1, which alleged that Mr. Barrett used or carried a firearm during and in relation to a drug trafficking crime, resulting in death. 18 U.S.C. § 924(c)(1)(A) and (j). *Barrett, supra.* While the intent or "malice" required for this offense was supplied by commission of the drug trafficking crime, the offense requires, as noted in the reply to Ground 2(3), a nexus between the drug trafficking crime and using a firearm, resulting in death. *E.g., United States v. McCullah,* 76 F.3d 1087, 1102 (10th Cir. 1996) (discussing requirement of a nexus between the homicide and the continuing criminal enterprise); *United States v. Tipton,* 90 F.3d 861, 867 (4th Cir. 1996). Mere temporal coincidence is not sufficient; the firearm must be used *in relation to* the drug trafficking crime. Evidence severing the substantive connection between "use of a firearm" and "during and in relation to" a drug trafficking offense, *i.e.,* Mr. Barrett's acting in a heat of passion because he did not believe the individuals on his property were police, or in the United States Attorney's formulation at trial, was acting in imperfect self-defense and defense of his son, should reduce the crime to voluntary manslaughter. Again, while not conclusive, § 924 (j) provides for a manslaughter conviction.

The Government cites the non-binding and unpersuasive district Court opinion in *United States v. Beckford,* 916 F.Supp. 1415, 1424-33 (E.D. Va. 1997)[39] as support for its argument that no error occurred in refusing to give a voluntary manslaughter instruction as a lesser included offense of count 3. Construing the CCE statute (21 U.S.C. § 848(e)(1)(A); intentional killing during and in relation to a drug trafficking crime), and not the § 848(e)(1)(B) offense charged against Movant, the district Court held that because Congress had not provided for lesser homicide offenses in the statute, there was no lesser included offense as a matter of law. *See also, Hopkins v. Reeves*, 524 U.S. 88, 90-91(1998) (where defendant was convicted of felony murder, with rape being the underlying felony and supplying the"intent," and the Nebraska Supreme Court had ruled for the last hundred years that there were no lesser included offenses of this species of felony murder, there was no *Beck* error in refusing to instruct on second degree murder and manslaughter; by state law, they were not lesser offenses of the main charge).

*Beckford* does not apply here. First, unlike Mr. Barrett's case, where the jury had no "third option" between conviction and sending the case into the penalty phase, a third option did exist in *Beckford*. The jury could have rejected the CCE charge and convicted the defendants of drug conspiracy, which did not carry the death penalty. Second, the *Beckford* Court ruled, against Tenth Circuit law, *Hooks v. Ward, supra*, that the federal death penalty scheme did not present the type of "all or nothing" choice the Supreme Court confronted in *Beck*, since conviction would not automatically make the defendant eligible for the death penalty or would

_____

[39] Moreover, there was no appeals Court opinion on the district Court's ruling in *Beckford*.

not automatically lead to a death sentence. The jury was required to find one or more intent factors and a statutory aggravating circumstance before the defendant became death-eligible.

Third, as alluded to, the Court, reading the CCE provision of § 848 strictly, held that Congress provided for no lesser included offenses in the statute. Therefore, none existed as a matter of law. Additionally, the *Beckford* Court also held that other federal homicide statutes, such as second degree murder and voluntary manslaughter, 18 U.S.C. §§ 1111, 1112, could not serve as lesser included offenses because these offenses "must be committed within the maritime or territorial jurisdiction of the United States to be federally prosecuted." *Beckford,* 966 F.Supp. at 1418. These rationales find no support in Tenth Circuit law.

Before addressing the inapplicability of the last two mentioned portions of *Beckford* to the law of the circuit, and Mr. Barrett's case, it should be pointed out that the Government's current position conflicts with the United States Attorney's position at trial. The prosecution, along with the defense affirmatively requested, in connection at least with count 3, a voluntary manslaughter instruction, as there was evidence in the record to negate the specific intent required in count 3 -- in essence, intentionally killing a police officer because he is a police officer. R at 4212-13, 4215, 4218-19, 18 U.S.C. § 1112. This constitutes an admission by a party opponent that forecloses the Government's current argument. Fed.R.Evid. 801(d)(2)(A)-(D). In any sense, it is a concession that Mr. Barrett was entitled to a voluntary manslaughter instruction.

The *Beckford* "statutory language provides for no lessers" and "no federal territory and maritime nexus, no § 1112 instruction" arguments have evidently found no takers in the Tenth Circuit, and in fact conflict with circuit precedent. Taking the latter point first, invocation of the

federal murder statutes is not dependent on a homicide being committed on federal land or within federal maritime jurisdiction. For instance, in *Chanthadara*, the charge alleged that the offense constituted murder under § 1111, which obviously could not be the case if the federal murder statutes are applicable only on federal land. The murder in Chanthadara was committed during a Hobbs Act robbery, which was charged in count 1, but federal jurisdiction was also proper under § 924 because a firearm was involved. In Mr. Barrett's case, federal jurisdiction for the murder charged in count 3 was predicated on the commission of a federal drug offense. (Doc 52)

The fact that lesser included offenses are not specifically mentioned in § 848(e)(1)(B) does not mean they do not exist, and Respondent can point only to a lone, thirteen-year old district Court opinion to support its argument. This is not a situation like *Hopkins v. Reeves, supra*., where there was a century of unbroken authority from the highest Court in the state holding there were no lesser included offenses to the rape-murder charged against the defendant.

The Tenth Circuit implicitly rejected the conclusion the Government draws from *Beckford* in *United States v. McVeigh,* 153 F.3d at 1192-98. McVeigh argued that *Beck* error occurred where the Court refused to instruct on second degree murder with respect to both the use of a weapon of mass destruction charge in violation of 18 U.S.C. § 2332a and federal first degree murder charges under 18 U.S.C. § 1114. While *Hopkins v. Reeves, supra* was cited, the denial of lesser included offense instructions on the weapon of mass destruction charge did not turn on a finding that the statute precluded any lesser included offenses, even though, as in *Beckford*, the statute being construed did not provide in its text for any lesser included offenses. Rather, the Court rejected McVeigh's argument that there were number of gradations of the offense based on differing levels of intent. McVeigh argued that conviction on this count

required an intent to kill or specific intent to kill. The statute was silent on the required intent, so the Court read into it a "knowingly" mental state based on the language of the statute as a whole. Because no intent or specific intent to kill was required, there were no gradations of intent respecting the commission of the fatal act. Therefore, as there were no different degrees of mental state based on the level of intent, there were no intent-based lesser offenses.

The clear implication from *McVeigh* is that had the weapon of mass destruction statute contained a specific intent provision, there would be lesser included homicide offenses in cases where such intent was lessened or negated (but still criminal), regardless of whether the language of the statute itself provided for lesser included offenses. Mr. Barrett's case is unlike *McVeigh* because the statute under which Movant was charged required a specific intent to kill a person or persons he knew or had reason to know was a law enforcement officer engaged in or on account of his duties. The Government's argument that this was not a specific intent crime (Doc 175 at 231) is belied by the statutory language, the Government's arguments at trial, and the Court's instructions. The Courts generally reject the argument that a lesser offense of homicide has been committed when the charge is felony murder or something like it, and there is no specific intent to kill required, thus making the mental state with which the killing was done irrelevant. *Hopkins, Chanthadara* and *McVeigh* all stand for this proposition. Where, as with count 3, specific intent is required -- which necessarily implies gradations of *mens rea* and criminal

responsibility -- § 848(e)(1)(B) would be unconstitutional as applied in violation of *Beck*[40] if it were held the statute provided for no lesser included offenses.

The Government seemingly comes close to conceding as much, stating that if the statute had employed a common-law term like malice, gradations of intent, and therefore lesser included offenses, could be discerned in the statute despite its silence. Doc 175 at 230. This is merely playing with semantics. The Tenth Circuit looks to common law terms like "malice" in determining the intent elements of federal homicide statutes. *United States v. Serawop,* 410 F.3d 656, 658, 661 (10th Cir. 2005). Section 848(e)(1)(B) is a federal homicide statute. Though the word "malice" is not used in the statute, that is what its intent element amounts to. The type of homicide proscribed by the statute is not just one committed with an intentional (as charged here) or reckless mental state, but one done without justification, excuse, or mitigation. *Id.* (defining malice in these terms). The homicide committed under § 848(e)(1)(B) clearly is one, as charged, which is done both intentionally and without justification or excuse. Otherwise, it wouldn't amount to the equivalent of first degree murder. For all intents and purposes, a § 848(e)(1)(B) killing is done with specific intent malice, and therefore admits to gradations of the offense based on the quality of the offender's intent or mental state.

Accordingly, with respect to count 3, Mr. Barrett was entitled to an instruction on voluntary manslaughter as an alternative to the specific intent murder charged. As the Government agreed at trial, there was sufficient evidence in the record that Mr. Barrett was

---

[40] *Beckford* is also distinguishable from Mr. Barrett's case because the intent required for the commission of a § 848(e)(1)(B) homicide is more specific than that required for a CCE murder -- an intentional killing. The mental state required here was not simply an intentional killing, but one tied to knowledge and intent with respect to the victim's status as a law officer.

unaware or could have been unaware that he was firing at the police, though not in self-defense, to warrant the manslaughter instruction. Of course, the case for *conviction* of manslaughter or acquittal, sufficient to undermine confidence in the outcome of trial, would have been made much stronger had counsel conducted a proper investigation and brought to bear the wide array of evidence, discussed specifically elsewhere in Mr. Barrett's opening brief and here, that challenged the Government's theory of the case. But that is not the point here. There was sufficient evidence in the record, as the prosecution conceded, to warrant a manslaughter instruction.

The Government is simply wrong when it argues that the elements of heat of passion manslaughter consists of some, but not all, of the elements of the charged offense. Doc 175 at 228. *Chanthadara,* 230 F.3d at 1257. Heat of passion manslaughter clearly negates a specific intent to kill. Heat of passion is shown where there is a general intent to kill (or knowledge that the likely result of the act will be the death of another), the intent to do serious bodily injury, or depraved heart recklessness. In other words, there must be a heat of passion coupled with an intentional or reckless mental state. *Serawop,* 410 F.3d at 658. There was a dispute at trial as to Mr. Barrett's mental state and intent. Voluntary manslaughter is "actually" a lesser included offense of § 848(e)(1)(B). *Hogan,* 197 F.3d at 1306.

The Government claims that if error in the failure to give a lesser included offense instruction could ever be harmless, it was harmless here because the jury, relying on guilt phase evidence, found in the second stage that the murder was committed with substantial planning and premeditation. Doc 175 at 232. This argument does the Government no good because it has conceded that in the Tenth Circuit, *Beck* error is never harmless. Additionally, based on the request for a lesser included instruction by the prosecution at trial, the Government has in fact

conceded what the trial evidence showed -- that a jury could rationally have convicted Mr. Barrett of the lesser offense and acquitted him of the main charge or charges. *Taylor v. Workman,* 554 F.3d 879, 888 (10th Cir. 2009). The fact that, as the Government argues, the shooting might be characterized as heinous, in that it involved multiple gunshots from a high-powered rifle, fails to show the jury could not still conclude that the shooting was a response to what Mr. Barrett perceived as adequate provocation, and that he fired the weapon in a heat of passion as the result of fear and terror. *Hogan,* 197 F.3d at 1310 (fact that victim received approximately 25 stab wounds did not foreclose a rational decision to convict of manslaughter).

Of course, the Government argues that this issue is procedurally defaulted because it was not raised on direct appeal, even though it was established by the record, and that the issue is meritless in any case. Doc 175 at 228. Cause and prejudice exist for excusing any procedural bar, because counsel were clearly ineffective for failing to raise this record-bound claim. It was obviously meritorious; both parties agreed the instruction should be given, and the evidence unquestionably supported it. As shown conclusively above, voluntary manslaughter is a lesser offense of a § 848(e)(1)(B) murder. No legitimate strategy explains the omission of this preserved issue, particularly in light of the fact that numerous issues were raised on appeal that had to be reviewed under a plain error standard. Counsel's unprofessional omission clearly prejudiced Mr. Barrett. As the Government acknowledges, *Beck* error can never be harmless. *E.g., Strickland v. Washington,* 466 U.S. 668, 694, 696-97 (1984). *See also,* reply to Ground 18.

The Government's arguments should be rejected, and Mr. Barrett should be granted § 2255 relief from his convictions. The failure to give the proper lesser included offense instructions

clearly enhanced the risk of unwarranted convictions on the charged offenses, particularly, but not exclusively, with respect to count 3. *Beck,* 447 U.S. at 637.

**GROUND 10:** **THE COURT GAVE AN IMPROPER INSTRUCTION DIRECTING THE JURY THAT RESIDUAL DOUBT WAS NOT TO BE CONSIDERED AS A MITIGATING FACTOR, AND WRONGLY PREVENTED EVIDENCE AND ARGUMENT ON RESIDUAL DOUBT.**

The Government claims no constitutional error occurred when the Court ruled before trial that Mr. Barrett could not rely on the result of the state case as a mitigating circumstance and, relatedly, could not rely on residual doubt as a mitigating circumstance. The Government's primary argument is that a defendant in a capital case has no right to rely on residual doubt to argue against the death penalty, citing *Franklin v. Lynaugh,* 487 U.S. 164, 174 (1988), *Oregon v. Guzek,* 546 U.S. 517, 523-27 (2006) and *United States v. Jackson,* 549 F.3d 963, 981 and n. 24 (5th Cir. 2008). Doc 175 at. 234.

These cases do not stand for what the Government claims. The Supreme Court has never held that a defendant in a capital case is barred from introducing residual doubt evidence and/or argument. The plurality opinion in *Franklin* has been read to mean that there is no constitutional basis for a residual doubt *instruction*, but it did not rule that residual doubt could not be used as a mitigating factor. In fact, the Court in *Franklin* pointed out that the defendant could have suffered no prejudice from the absence of a residual doubt instruction, because he was allowed to introduce residual doubt evidence and argue it without limitation.

*Guzek* likewise affords the Government no help. The issue there was not whether the defendant could introduce residual doubt or argue it as a basis for rejecting a death sentence, since Oregon law permits the defendant in the penalty phase to introduce any evidence and make any

argument that the defendant is in fact innocent, or that doubts about guilt remain.  The issue in *Guzek* was whether, on *resentencing*, the defendant could introduce "new" alibi evidence that had not been heard in the previous guilt/innocence stage of trial.  Guzek was permitted to rely on transcripts of alibi evidence that were already a matter of record.  *Guzek,* like *Franklin,* passed on ruling whether there was a constitutional right to present evidence and argument of residual doubt.

*United States v. Jackson, supra.,* supports the Government's argument not at all.  Though ruling, in line with *Franklin*, that there was no constitutional right to a residual doubt instruction, the *Jackson* Court held the defendant, like the defendant in *Franklin*, suffered no prejudice from the lack of a specific instruction because he was not obstructed in the slightest from arguing residual doubt as a reason to reject the death penalty.  In footnote 24 to the opinion, the Fifth Circuit noted Jackson had cited numerous cases holding that a jury can consider residual doubt in determining sentence; there simply is no constitutional right to an instruction.

Here, not only did the Court's pretrial ruling preclude evidence and argument of residual doubt (Tr. 0/26/05 Hr'g at 10-11), the Court affirmatively instructed the jury that residual doubt could not be considered a mitigating circumstance.  Doc 257, Inst. 19, R at 5320-21.  This goes well beyond what the Supreme Court and other Courts have sanctioned.  Mr. Barrett submits he not only  had an Eighth Amendment right to introduce evidence and make argument on residual doubt, *cf. Skipper v. South Carolina,* 476 U.S. 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104 (1982), but that such was sanctioned by the applicable federal statutes, 18 U.S.C. § 3592(a) and 21 U.S.C. § 848(m).  *United States v. Honken,* 378 F.Supp.2d 1040, 1041 (N.D. Iowa 2004); *United States v. Davis*, 132 F.Supp.2d 955, 456-67 (E.D. La. 2001).  The trial court's instruction, in violation of the Eighth Amendment as construed in the *Lockett* line of cases, prevented the jury

from considering a relevant mitigating circumstance.  This alone requires vacation of Mr. Barrett's death sentence.

The Government dismisses the Tenth Circuit state habeas cases cited by Movant which held, against ineffective assistance of trial counsel attacks, that counsel were effective for concentrating on a residual doubt penalty phase strategy, which is often highly effective. *E.g., Sallahdin v. Gibson,* 275 F.3d 1211, 1240 n. 10 (10th Cir. 2002).  The Government states this just reflects that the practice is permitted in Oklahoma.  Doc 175 at 235.  But there is no Oklahoma state law respecting residual doubt evidence and argument, one way or the other.  Numerous Courts have held that a defendant has a right to raise residual doubt, through both evidence and argument.  *E.g., United States v. Honken, supra.* (§ 848 case); *United States v. Davis, supra*; *United States v. Jackson, supra*; *United States v. Johnson,* 403 F. Supp.2d 721, 782 (N.D. Iowa 2005) (§ 848 case); *United States v. Chandler,* 218 F.3d 1305 (11th Cir. 2000) (§ 848 case).  The *Davis* Court (collecting cases) noted that both the Fifth and Eleventh Circuits (as does the Tenth Circuit) had routinely approved or commented on residual doubt evidence and argument introduced in state capital cases.  The Government cites no case where a Court has affirmatively prevented residual doubt evidence and argument by way of instruction.

The Government states that trial counsel failed to challenge the Court's ruling or introduce evidence supporting a residual doubt argument (Doc 175 at 233), but this is not altogether correct. The Court ruled before trial that such evidence and argument were off-limits, and in defending appellate counsel's failure to raise the issue*,* the Government, contradicting its earlier argument, says counsel were bound to obey the Court's order.  Doc 175 at  237.  Evidence that Mr. Barrett

had been convicted of manslaughter in state Court was introduced, but the Court's ruling prevented a residual doubt argument in connection with it.

Moreover, as Mr. Barrett has argued, counsel were ineffective for conducting a professionally unreasonable investigation to unearth evidence that would have impeached the informant witnesses, as well as mental health evidence and testimony from percipient witnesses (Toby Barrett and Alvin Hahn) who could have supported the defense that Mr. Barrett fired without realizing law enforcement officers were on his property. Counsel also failed to secure the services of expert witnesses who could have cast doubt on the prosecution's theory of the case, and failed to lodge appropriate objections to the instructions. So, in large measure, any failure to introduce evidence supporting a residual doubt theory was due to ineffective assistance, even aside from the fact that the Court's pretrial order affirmatively prevented counsel from doing so.

Counsel's failures undermine the Government's circular argument that any error was harmless because the evidence was "strong," the jury found the "gateway" intent factors, and also found the substantial planning and premeditation aggravating circumstance. Doc 175 at 236. Due to counsel's failures, the jury never heard a great deal of countervailing evidence that would have conflicted with the Government's case. Elsewhere, the Government dismisses evidence that could have been used to impeach the informant witnesses, arguing the informant's were "cross-corroborating," and that Mr. Barrett's witnesses would have been subject to impeachment for bias. As Movant has argued, it is not up to the Government to resolve the question of credibility, which is the lone province of the jury. *E.g., Anderson v. Johnson,* 338 F.3d 382, 393 (5th Cir. 2003); *Workman v. Tate,* 957 F.2d 1339, 1346 (6th Cir. 1992); *Pillette v. Berghuis,* 630 F.Supp.2d 791 (E.D. Mich. 2009); *English v. Romanowski,* 589 F.Supp.2d 873, 902 (E.D. Mich. 2008); *McGahee*

*v. United States,* 520 F.Supp.2d 723 (E.D. Pa. 2008).   Movant need only show a reasonable

probability that only a single juror would have rejected the death penalty.  *Wiggins v. Smith,* 529

U.S. 510, 537 (2003).

The Government asserts that in any event, consideration of this issue is procedurally

barred because it was defined by the record and not raised on direct appeal (Doc 175 at 234), and

that appellate counsel were not ineffective for failing to raise the issue, because it was meritless.

Doc 175 at 236.  Movant has shown that the issue was meritorious, particularly in light of a fact

the Government ignores -- the trial court affirmatively instructed the jury that it could not consider

residual doubt as a mitigating factor, a state of affairs that is all but unprecedented in federal death

penalty law.  Since the issue was framed by the record, counsel had no excuse for failing to raise

it.  Because of the significance of this Eighth Amendment and statutory error, there is a reasonable

probability the result of the appeal would have been different.  *Strickland v. Washington,* 688 U.S.

668, 696-97 (1984).

The Government's arguments should be rejected.  Relief should be granted from Mr.

Barrett's death sentence.

**GROUND 12:**    **THE FAILURE TO INSTRUCT THE JURY ON THE BURDEN OF
PROOF REQUIRED FOR WEIGHING THE AGGRAVATING
FACTORS VIOLATED MR. BARRETTS CONSTITUTIONAL
RIGHTS.**

**A.    The Issue Was Not Raised or Adequately Resolved on Appeal.**

**1.    The *Ring* issue was inadequately raised and argued on direct appeal.**

The Government here attempts to dismiss the claim by asserting that "[o]n appeal, Barrett

made essentially the same claim, which the Tenth Circuit rejected on the merits."  Response, at

243. On appeal, Mr. Barrett's counsel, one of whom was trial counsel, asserted "The District Court Erred by Failing to Declare the Federal Death Penalty Act Unconstitutional."  Appellant's Opening Brief, 2006 WL 3099220 at 32 (Proposition VI).  The first of six arguments concerning the statute's unconstitutionality alleged:

> The Federal Death Penalty Act is unconstitutional and violated Mr. Barrett's right to due process; his 6th Amendment right to a jury trial as interpreted by *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington,* 124 S. Ct. 2531 (2004); and violates the 8th Amendment prohibition against cruel and unusual punishment.  Barrett filed a pretrial motion seeking to have the federal death penalty statute declared unconstitutional, but the motion was denied.  Doc 78, 147, 153.

*Id.*  That is the entire issue and argument on appeal relating to ground 12.

### 2.   Trial counsel failed to raise the issue properly on appeal.

As explained in Mr. Barrett's Motion and Brief, the failure to adequately raise this issue was ineffective assistance of appellate counsel.  *See* Movant's Motion to Vacate, Claim 12 (b) at 355.  Movant's Brief on the Merits, Doc 149 at 206.   Despite the lack of any specific argument on direct appeal the Tenth Circuit Court of Appeals addressed the catch-all argument made by appellate counsel *de bene esse*.  The Court of Appeals noted,

> In his appellate brief, Barrett cites to *Ring* and generally alleges that the federal death penalty scheme is violative of the Sixth Amendment, but does not otherwise flesh out his argument.  Because, however, he submitted a more detailed argument on this point to the district court, we have proceeded to analyze that argument on the merits.

496 F. 3d at 1107-08 n.12.  Though appellate counsel had cited the motion made below, counsel cited no argument or constitutional principles or even reference pages supporting the argument made therein.  Cr-04-115, Doc 78.  Indeed, as the Court noted, Mr. Barrett was not actually convicted or convicted under the Federal Death Penalty Act.  *Barrett,* 496 F. 3d at 1106

("Obviously [Barrett] lacks standing to challenge the FDPA because he was not sentenced to death under that Act.").

Nonetheless, the Court chose to address the claim "out of an abundance of caution" and "because Barrett challenged the constitutionality of both the FDPA and §848 in the district court[.]" 496 F. 3d at 1107.  The Court assumed for purposes of appeal that [Barrett] intended to attack the constitutionality of the relevant death penalty statute in 21 U.S.C. §§848 (g)-(p).  *Id.*  The Court then took up the issue of "Section 848's scheme for weighing of aggravating and mitigating factors."  *Id.*  496 F. 3d at 1107 n.12.[41]

Due to counsel's deficient performance, the issue was not properly before the Court, and ought not to have been decided without full and adequate briefing.  See F.R.A.P. Rule 28 (9).  The Tenth Circuit has recognized, even in the case of *pro se* litigants, that it cannot "fill the void by crafting argument and performing necessary research."  *Garrett v. Selby, Connor, Maddux & Janer*, 425 F. 3d 836, 841 (10th Cir. 2005).  An issue may be waived where, as was the case here, an appellant's statement in support of the issue "consist [] of mere conclusory allegations with no citations to the record or any legal authority . . . ."  *Id.  See also United States v. Banks,* 451 F. 3d 721, 728 (10th Cir. 2006) (declining to address issue for which the appellant provided no supporting legal authority), *cert. denied,* 129 S. Ct. 952 (2009).  Likewise, in *Herrera-Castillo v. Holder*, 573 F. 3d 1004, 1010, the Court of Appeals found that where the brief lacked an

---

[41]  Trial counsel's briefing on the argument was particularly deficient for its failure to recognize and emphasize the distinction between the fact of whether the "aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death" and the ultimate discretionary decision of life or death.  *See* Doc 78 at 8-9.

argument and did not "articulate [the] specific contentions" the issue was deemed waived.   The

Court said:

> We have previously declined "[to] make arguments for [the appellant] that it did not make
> in its briefs," *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1257 n. 1 (10th Cir.2001),
> and decline to do so here as well. Herrera has therefore waived his equal protection
> argument. *See Becker v. Kroll,* 494 F.3d 904, 913 n. 6 (10th Cir.2007) (an issue
> "insufficiently raised in the opening brief is deemed waived").

*Id.*

In this case, the Court's attempt to address an un-briefed and unspecified argument did not

satisfy Mr. Barrett's right to have the claim adequately raised by competent counsel before it was

considered by the Court.  The Tenth Circuit's decision in itself illustrates the deficiency in

performance by appellate counsel.  *Id.*  Counsel's actions in raising the issue without briefing the

same was ineffective and therefore led the Tenth Circuit to devise and reject its own issue and

argument.  Mr. Barrett ought to be able to have the issue considered after full briefing.  The failure

to do so denies him his right to meaningful appellate review required in capital cases under the

Due Process Clause of the Fifth Amendment and the right to be free of cruel and unusual

punishment guaranteed by the Eighth Amendment.  *See Parker v. Dugger*, 498 U.S. 308,  321

(1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in

ensuring that the death penalty is not imposed arbitrarily or irrationally.").

> **B.      The Constitutional Principle upon Which Ground 12 Relies Has Been
>      Wrongly Rejected.**
>
> **1.      The (Edward) Fields Decision wrongly relied on *United States v.
>      Barrett*.**

The Government argues that the "Tenth Circuit recently reaffirmed its rejection of

Barrett's argument about the application of reasonable doubt to the death penalty selection

process, rejecting precisely the claim that Barrett attempts to raise in this §2255 litigation." Doc 175 at 243, citing *United States v. (Edward) Fields,* 516 F. 3d 923, 950 (10th Cir. 2008).[42] That reaffirmation, however, was not based upon consideration and adjudication of the arguments supporting the jury fact-finding requirement but instead, a superficial deference to the previously decided case. 516 F. 3d at 950 ("The issue is controlled by our decision in *Barrett*, which followed the Fifth Circuit in holding that a reasonable doubt standard is not required in the weighing process.") The snowball effect of a court's failure to consider an important constitutional issue which has not been properly raised and argued cannot bootstrap that ruling into a decision worthy of stare decisis. *Hill v. Bank of Colorado,* 648 F.2d 1282 (10th Cir. 1981) ("The rule of stare decisis does not require any Court to follow a judicial rule which is erroneous.")

### 2. The Fifth Circuit's (Sherman) Fields Decision wrongly rejected the application of *Ring* to the "weighing" element.

Because it had no actual briefing or argument before it, the Court of Appeals looked to a Fifth Circuit case and adopted the reasoning therein to reject the jury fact-finding requirement on the weighing procedure in this case. *United States v. Barrett,* 496 F. 3d at 1108, adopting *United States v. (Sherman) Fields,* 483 F. 3d 313, 346 (5th Cir.2007) ("Although not binding on us, we find this decision highly persuasive. Accordingly, we reject Barrett's argument for the same reasons stated by the Fifth Circuit in *Fields*.") The *(Sherman) Fields* analysis, however, was fatally flawed in ways which were not brought to the Tenth Circuit's attention because the Tenth Circuit was acting on its own and not pursuant to any specific argument.

---

[42]Since two different decisions, both styled *Fields v. United States*, are discussed here, the first names of the appellants are given to avoid confusion.

In *(Sherman) Fields,* the Court of Appeals held, "[s]ince the Constitution does not require a jury to do the weighing, we cannot conclude that the showing required must be proof beyond a reasonable doubt."  483 F. 3d at 346.  It is true that the Constitution does not require a jury to make a separate decision of life or death after the weighing process.  *Blystone v. Pennsylvania,* 494 U.S. 299, 301(1990) (finding constitutional a Pennsylvania's death penalty statute which required a sentence of death if a jury unanimously found at least one aggravating circumstance and no mitigating circumstances or one or more aggravating circumstances that outweigh any mitigating ones).  In that case, the Supreme Court found that "[t]he fact that other States have enacted different forms of death penalty statutes which also satisfy constitutional requirements casts no doubt on Pennsylvania's choice."  *Id.* at 309.  Similarly, here it is the statute which controls and 21 U.S.C. Section 848 made clear that the weighing of aggravating factors against mitigating facts was required *before* consideration of the life or death decision could be made.  Under 848k a jury was required to make the finding of fact that the aggravating factors sufficiently outweighed any mitigation found to justify a death sentence before it could, if it decided to, impose the death penalty.

> If an aggravating factor set forth in subsection (n)(1) of this section and one or more of the other aggravating factors set forth in subsection (n) of this section are found to exist, the jury, or if there is no jury, the court, *shall then consider* whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death.

21 U.S.C. §848(k) (emphasis added).  *Apprendi* and *Ring* do not control what fact finding is constitutionally required, but once a statutory scheme does require specific fact finding which elevates the potential punishment, that fact-finding must be made by a jury.  *Apprendi v. New*

*Jersey*, 530 U.S. 466, 491 (2000); *Ring v. Arizona,* 436 U.S. 584, 589 (2002)(extending the

*Apprendi* holding to capital defendants). As Justice Scalia stated,

> [All] facts essential to imposition of the level of punishment that the defendant
> receives – whether the statute calls them elements of the offense, sentencing
> factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.

*Ring*, 436 U.S. at 610 (Scalia, J., concurring). Because it was not dealing with §848, *Fields* did

not address the statute's clear provision that death does not automatically follow the weighing

process. The Tenth Circuit's failure to appreciate the difference, or to fully apprehend the effect

of 848k's mandate of full discretion following the weighing renders its hasty embrace of the

*(Sherman) Fields* decision erroneous.

> The Fifth Circuit Court of Appeals also erred when it found,

> Moreover, the *Apprendi*/*Ring* rule should not apply here because the jury's decision
> that the aggravating factors outweigh the mitigating factors is not a finding of fact.
> Instead, it is a "highly subjective," "largely moral judgment" "regarding the
> punishment that a particular person deserves ...." *Caldwell v. Mississippi,* 472 U.S.
> 320, 340 n. 7, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In death cases, "the sentence
> imposed at the penalty stage ... reflect[s] a reasoned *moral* response to the
> defendant's background, character, and crime." *Penry v. Lynaugh,* 492 U.S. 302,
> 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (emphasis in original). The
> *Apprendi*/ *Ring* rule applies by its terms only to findings of fact, not to moral
> judgments. *See Ring,* 536 U.S. at 602, 122 S.Ct. 2428.

483 F. 3d at 346. As noted below, the "weighing process" is a fact necessary before a jury can

make the "highly subjective," "largely moral judgment" "regarding the punishment that a

particular person deserves ...." The jury must first determine whether the aggravating factors

outweigh the mitigating factors sufficiently to justify the death penalty. If and only if the jury

finds that they do, it must then make that moral judgment for which the constitution does not

impose a standard of proof. The fact of weight, however, must be decided prior to the discretionary exercise of the highly subjective life or death decision. 21 U.S.C. §848k.

### 3. The 5th, 6th and 8th Amendments require a jury finding beyond a reasonable doubt.

It is the weighing process which leads the jury to decide whether or not the sentence should be death. In *Gregg v. Georgia*, 428 U.S. 153, 189 (1976), the Supreme Court stated, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* The death penalty statute under which Mr. Barrett was sentenced to death clearly separated the weight finding and the ultimate punishment decided. 21 U.S. C. §848 (k)(repealed). Immediately following the directive on the jury's obligation to consider the weight of the aggravating factors outweigh the mitigating factors, if any, sufficiently to justify a death sentence, the statute provides:

> The jury or the court, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed.

*Id.* The elements of capital murder include decisions right up to the point where it makes a fact-finding that the aggravating circumstances actually outweigh the mitigating circumstances to a sufficient degree that a sentence of death is justified. In truth, the "selection" decision is not made until the jury reaches the final decision-point of determining whether the aggravating factors found to exist sufficiently outweigh all the mitigating factors found to exist to justify a death sentence of death . . . ." 21 U.S.C. §848k (now repealed); *see and compare,* 18 U.S.C.

§3593(e))(emphasis added).  A simple outweighing is not enough.  It is not difficult to imagine a conscientious juror finding that, although the aggravating circumstances do tip the balance in favor of death, the degree to which that balance tips is not *sufficient* to *justify* imposition of a sentence of death.  It is not until the actual finding is made that the defendant's potential punishment increases to death.

Ultimately, the question presented must be decided by the United States Supreme Court.[43] A number of states have already determined the Constitution does indeed require a jury finding on the weighing question.  *State v. Whitfield*, 107 S.W.3d 253, 261 (Mo. 2003) (finding step where, as in 848, the jury has full discretion *after* the required weighing to impose or not impose the death penalty, the weighing is a fact-finding necessarily to be made by a jury); *Woldt v. People*, 64 P. 3d 256, 265-66 (Colo. 2003) (finding Colorado's statute unconstitutional under *Ring* because it permitted a three-judge panel to engage in the fact finding including determining whether "[t]here are insufficient mitigating factors to outweigh the aggravating factor or factors that were proved." 6 C.R.S. §11-103(2)(b)(II)(A)-(B) (2000));  *Johnson v. State,* 118 Nev. 787, 802-03, 59 P. 3d 450 (2002) ("[A]s applied to Nevada law, *Ring* . . . requires [a] jury to weigh mitigating and aggravating factors under Nevada's statute requiring the fact finder to further find whether mitigating circumstances are sufficient to outweigh the aggravating circumstances.)  848 makes clear that the death penalty scheme establishes the same 4-step process, the first three of which,

---

[43]The fact that this issue is not yet decided by the United States Supreme Court does not prevent its consideration by this Court, since the issue was raised at Mr. Barrett's trial which occurred three years after the *Ring* decision, which was issued in 2002.  Consequently no problems of retroactivity are raised, the issue having been presented to the Court before Mr. Barrett's case became "final".  *See United States v. Barajas-Diaz*, 313 F.3d 1242 (2002)(Court does not generally apply new constitutional rules of criminal procedure to cases on collateral review).

including the weighing, are fact finding and the last of which is the exercise of discretion on the ultimate decision.

The Court's failure to instruct the jury on all fact-finding requirements of capital murder, including the weighing, means the conviction of "death" must be set aside.

### C.     Conclusion.

As a result of the deficient performance of appellate counsel, the decision of the Court of Appeals on direct appeal was not based on adequate briefing and argument.  The issue can and should now be considered, and Mr. Barrett's death sentence vacated as a result.

**GROUND 17:**          **THE EIGHTH AMENDMENT'S PROHIBITION OF THE EXECUTION OF THE MENTALLY ILL IS A TIMELY-RAISED COGNIZABLE CLAIM.**

The Government asserts that the ground of error which asserts that Mr. Barrett's execution is barred by the Eighth Amendment because he is severely mentally and suffers from organic brain impairments is "otherwise indistinguishable from a contention that he lacks the capacity to be executed" and that such claims of incompetence are not ripe until execution is imminent.  Doc 175 at 270.  Because execution in this case is not yet imminent, the Government asserts the claim is not ripe.  *Id.*  Secondly, the Government argues the claim is not cognizable because it lacks a basis in existing law.  Doc 170 at 271.

The claim, however, is rooted in the Eighth Amendment's preclusion from the death penalty of certain classes of individuals for whom execution is prohibited, including the mentally retarded, *Atkins v. Virginia*, 536 U.S. 304 (2002) and persons whose crimes were committed before their eighteenth birthday, *Roper v. Simmons,* 534 U.S. 304 (2005).  *See*  Doc 95 at 379; Doc 149 at 228-29.  In neither *Atkins* nor *Simmons* did the United States Supreme Court find the

issue untimely because execution was not imminent nor that the claim was non-cognizable, but addressed the claims under the constitutional precept that "punishment for crime should be graduated and proportioned to [the] offense." *Graham v. Florida*, -- U.S. --, 230 S. Ct. 2011, 2021 (2010) (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)).  The claim at issue here arises specifically under the need to continuously review the Eighth Amendment's "evolving standards of decency" which in this case extend to Mr. Barrett a "status" based on "categorical rules" that define Eighth Amendment standards and which preclude his execution. *Graham*, 130 S. Ct at 2022 (identifying two subsets of rules precluding execution: those concerning the nature of the offense and those considering the characteristics of the offender) .  The classification upon which this claim rests turns on a characteristic of Mr. Barrett, that he is a severely mentally ill and organically brain-damaged individual.

The claim is timely and cognizable.  Because the Eighth Amendment precludes Mr. Barrett's execution, the sentence of death must be vacated and Mr. Barrett, sentenced anew in conformance with the Eighth Amendment's "evolving standards of decency."

**GROUND 18:       INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.**

The Government argues that Mr. Barrett's claim that the cumulative impact of appellate counsel's errors and omissions violated his constitutional right to the effective assistance of counsel is untimely because it was not asserted until he filed his Amended §2255 Motion.  The argument is without merit.  Whether asserted affirmatively or not, the standard for prejudice in an ineffective assistance of counsel claim is determined by sum total of the errors of counsel.  The standard for determining prejudice in an ineffectiveness claim is a cumulative weighing of the deficient performance and its impact on the reliability of the verdict and/or result on appeal.

*Strickland v. Washington*, 466 U.S. 694 (Claimant must show "there is a reasonable probability that, but for counsel's *errors*, the result would have been different") (Emphasis added.)   Where a number of claims of ineffective assistance are raised, a reviewing court must determine prejudice collectively, or in the aggregate.  *Fisher v. Gibson,* 282 F.3d 1283, 1289 (10th Cir. 2002); *Stouffer v. Reynolds,* 168 F.3d 1155, 1164 (10th Cir. 1999); *Osborn v. Shillinger,* 861 F.2d 612, 625 (10th Cir. 1988).

Beyond that Mr. Barrett asserted the claim in his first 2255 Motion.  While the organization of the Amended Motion included the separate claim of Ineffective Assistance of Counsel on Appeal, the original Motion expressly asserted:

> Mr. Barrett's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eight, and Fourteenth Amendments to the United States Constitution, because the *cumulative effect* of the errors involved in Mr. Barrett's guilt and penalty phases violated his rights to a fair trial, trial by jury, *due process*, *effective assistance of counsel,* presentation of a defense, and a reliable determination of guilt and penalty and fundamental fairness.
>
> * * * *
>
> If none of the claim [sic] presented in this Motion individually justifies reversal, when considered cumulatively, these errors denied Mr. Barrett his constitutional rights.

Doc 2 at 376.  At worst, the cumulative error claim under the failure to provide the effective assistance of appellate counsel is a known subset of the original claim.

Finally, the Government throughout it's Response relies on the wrong standard of the prejudice which must be shown to proceed on an ineffective assistance of appellate counsel claim. It attempts to elevate to a rule of law the Tenth Circuit's catch-phrase for the degree of prejudice required to demonstrate that appellate counsel was ineffective for not raising a claim on appeal, declaring categorically that only a "dead bang winner" claim will suffice.   This reads too much

into cases such as *United States v. Challoner,* 583 F.3d 745, 750 (10th Cir. 2009) by suggesting

that only the failure by appellate counsel to raise a legal issue that, at first blush, mandates

reversal can prove sufficient prejudice.  To limit appellate ineffectiveness claims solely to those

cases where an issue is "obvious from the record, and must have leaped out upon even a casual

reading of the transcript" *see United States v. Cook*, 45 F.3d 388, 394 (10th Cir. 1995)(internal

quotation omitted) runs contrary to the law in this area.  Effective appellate counsel must, of

course, "winnow out" weaker arguments on appeal - *see Jones v. Barnes*, 463 U.S. 745, 751-52

(1983) - and exercise reasonable professional judgment in deciding what issues to raise and how

to argue them.   However, the traditional *Strickland* analysis of performance and prejudice applies,

466 U.S. 668, 690 (1984).  *See Smith v. Robbins,* 528 U.S. 259, 285-286(2000) (applying

*Strickland* when considering claim of ineffective assistance of appellate counsel claims); *see also*

*Smith v. Murray,* 477 U.S. 527 535 (1986)*; Cook*, 45 F.3d at 394-95, and must not be dispensed

with simply because an issue requires consideration going further than a knee-jerk response.

Notwithstanding the inclination of *Challoner*, to revert to the old, unconstitutional

standard, *Strickland* is the standard in the Tenth Circuit as stated in *Neill v. Gibson*, 278 F. 3d

1044, 1062 (10th Cir 2001) (relying on *Smith v. Robbins*, *supra* and applying *Strickland* standard

to claims of ineffective assistance of appellate counsel).  In *Neill*, the en banc court specifically

addressed the standard of the "dead-bang winner" expressed in *Cook*.

> This court has expressed this test in terms of appellate counsel's omitting a "dead-bang winner," often defined in part as a claim that "would have resulted in a reversal on appeal." *United States v. Cook,* 45 F.3d 388, 395 (10th Cir.1995). To the extent this language can be read as requiring the defendant to establish that the omitted claim would have resulted in his obtaining relief on appeal, *see, e.g., Smith v. Massey,* 235 F.3d 1259, 1274 (10th Cir.2000), *cert. denied,* 534 U.S. 904, 122 S.Ct. 235, 151 L.Ed.2d 169 (2001) (No. 01-5117); *Walker v. Gibson,* 228 F.3d

1217, 1237 (10th Cir.2000), *cert. denied,* 533 U.S. 933, 121 S.Ct. 2560, 150 L.Ed.2d 725 (2001), rather than there being only a reasonable probability the omitted claim would have resulted in relief, *see Banks v. Reynolds,* 54 F.3d 1508, 1515 n. 13 (10th Cir.1995), this language conflicts with *Strickland. See* 466 U.S. at 694, 104 S.Ct. 2052. The en banc court, therefore, **expressly disavows** the use of the "dead-bang winner" language *to imply requiring a showing more onerous than a reasonable probability* that the omitted claim would have resulted in a reversal on appeal.

*Neill,* 278 F. 3d at 1057 n. 5 (emphasis added). In light of the express repudiation of the standard cited in *Cook*, the reliance on *Cook* by a panel of the 10th Circuit in *United States v. Challoner,* 583 F. 3d at 749, and reiteration there of the "dead-bang winner" is inexplicable. To the extent the Government relies on *Challoner* as a revival of the old standard, it is "dead-bang" wrong.

Moreover, here, the errors and omissions of Mr. Barrett's appellate counsel were pervasive and included the omission of issues in which trial counsel properly objected to clear constitutional violations (*see e.g.,* Claims 7, 12) as well as numerous constitutional errors which were plainly apparent on the record, and yet appellate counsel still did not find these issues important enough to brief. Instead, appellate counsel chose to assert evidentiary challenges or statutory challenges that had no likelihood of success or which were briefed so poorly, they failed to preserve Mr. Barrett's right to a meaningful appeal (*see e.g.,* Claim 12). Appellate counsel's failure to raise the issues which - whether raised alone or together - presented a reasonable probability that Mr. Barrett would have prevailed on appeal, *see Neill v. Gibson*, 278 F. 3d at 1062, renders counsel's assistance constitutionally ineffective.

## II.   CONCLUSION

For the foregoing reasons, together with those alleged in Mr. Barrett's Motion To Vacate Under 28 U.S.C. Section 2255 (Doc 95) and the Original, Corrected and Amended Motions filed

previously thereto (Docs 1, 2 and 70) and the Brief filed in Support of his Motion (Doc 145), this Court should grant Mr. Barrett relief in the manner requested in his Motion (Doc 95 at 400-401) and Supporting Brief (Doc 149 at 248-249) including but not limited to:

1.      That United States District Judge James H. Payne recuse himself and have all proceedings regarding the Motion to Vacate randomly reassigned to another judge;

2.      Permit Mr. Barrett to amend his motion with any newly discovered evidence or grounds for relief which may arise through investigation of that evidence, discovery  or an evidentiary hearing;

3.      Permit Mr. Barrett to utilize the processes of discovery set forth in the Federal Rules of Civil Procedure Rules 26-37, to the extent necessary to fully develop and identify the facts that support his Motion and refute any defenses raised by the Government's Response;

4.      Permit Mr. Barrett to expand the record, if necessary and appropriate;

5.      Grant Mr. Barrett's motion for evidentiary hearing to resolve any and all of the factual disputes raised by the Government's Response to the Motion and this Reply;

6.      Permit oral argument as appropriate and/or required;

7.      Vacate Mr. Barrett's convictions and sentences and order that appropriate retrial and/or resentencing hearing be conducted; and,

8.      Any such further and additional relief as may be just.

DATED:  July 1, 2010

Respectfully submitted,
 /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender
 /s/ Joan M. Fisher
JOAN M. FISHER, Idaho SB #2854
Assistant Federal Defender

 /s/ Tivon Schardl
TIVON SCHARDL, Fla. Bar No. 73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

## INDEX OF EXHIBITS

**VOLUME I**

Exhibit 206                Supplemental Declaration of Ernie Barrett

Exhibit 207                Supplemental Declaration of Doris Barrett

Exhibit 208                Supplemental Declaration of Issac Barrett

Exhibit 209                Supplemental Declaration of Phyllis Crawford

Exhibit 210                Supplemental Declaration of Gelene Dotson

Exhibit 211                Supplemental Declaration of Mark Dotson

Exhibit 212                Supplemental Declaration of Ruth Harris

Exhibit 213                Supplemental Declaration of Carolyn Joseph

Exhibit 214                Supplemental Declaration of Linda Riley

Exhibit 215                Supplemental Declaration of Janice Sanders

Exhibit 216                Supplemental Declaration of Abbie Stites

Exhibit 217                Supplemental Declaration of Kathy Trotter

Exhibit 218                Supplemental Declaration of Leonard Post re Supplemental

                          Declaration of Toby Barrett

Exhibit 219                Supplemental Declaration of Richard Burr

**Certificate of Electronic Filing and Service**

I hereby certify that on this 1st day of July 2010 I caused the foregoing Movant's Reply to United States' Response to Second Amended § 2255 Motion to be filed with the Clerk of the Court using the ECF System for filing.  A copy will be served electronically to Christopher J. Wilson, AUSA, 1200 W. Okmulgee Street, Muskogee, OK 74401, and Jeffrey B. Kahan, U.S. Dept. of Justice, 1331 F Street, NW, Washington, DC 20530.

/s/ *Joan M. Fisher*
Joan M. fisher