# EXHIBIT  219

## DECLARATION OF RICHARD H. BURR

Richard H. Burr, under penalty of perjury, declares the following:

### *Qualifications and Experience of Declarant*

1.      I am an attorney in private practice in Houston, Texas.  My practice has been devoted entirely to the trial, appellate, and post-conviction representation of defendants in capital cases since 1979.  I have represented persons in well over one hundred capital cases in twelve states and in the federal courts during this time.  Although my work has been heavily oriented toward post-conviction and habeas corpus proceedings, I have been trial counsel in three capital prosecutions, including *United States v. Timothy James McVeigh*, No.  96-CR-68 (D. Colo.) (the Oklahoma City bombing case), where I was lead counsel for the penalty phase and for penalty-related work.  I have argued two capital cases in the Supreme Court of the United States, *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Selvage v. Lynaugh*, 494 U.S. 108 (1990), and served as co-counsel on two others, *Hitchcock v. Dugger*, 481 U.S. 393 (1987), and *Tennard v. Dretke*, 542 U.S. 274 (2004).

2.      Because of my experience, I have been retained by the Office for Defender Services of the Administrative Office of the United States Courts, along with eight other similarly experienced attorneys, to serve through the Federal Death Penalty Resource Counsel project as an advisor and consultant to court-appointed and federal defender attorneys engaged in the defense of capital cases in the federal courts.  Through this project, I work extensively with counsel appointed to represent people charged in federal capital cases.  In a report by the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998) (hereinafter

"Judicial Conference Recommendations") – which was adopted by the Judicial Conference – the work of our project was found to be "essential to the delivery of high quality, cost-effective representation in death penalty cases...." *Id.* at 50.

3.    I have submitted several other declarations to the Court regarding Mr. Barrett's case. In the declaration dated March 3, 2009, I recounted my contact with trial counsel for Mr. Barrett in my role as resource counsel.

### *Referral Questions and Response*

4.    Mr. Barrett's current attorneys have asked me to address the government's assertion that defense counsel in this case were not under a duty to investigate or present mitigation evidence. Mr. Barrett's current counsel informed me that Roger Hilfiger and Bret Smith have made the following statements in relation to the penalty phase of the trial:

> Mr. Barrett did not want the defense to "beg for his life" during the penalty phase of the trial. He did not want the outcome of the case to hinge on personal sympathy for him.

> Mr. Barrett did not want the mitigation case to dwell on his childhood. He also wanted to minimize the amount of testimony elicited from his relatives, particularly his son, mother and ex-wife, though he understood that decision could work to his detriment.

Mr. Barrett's current counsel have asked me whether I was aware of Mr. Barrett's counsel ever having similar concerns at the time of trial, and how I would have advised trial counsel if they had asked me for assistance regarding this alleged position of Mr. Barrett.

5.    As I stated in my previous declaration in this case, I spoke with John D. Echols about this case beginning in October 2004. At the time Mr. Echols was emphatic about the need to secure enough mitigation investigative and expert resources to develop mitigation fully. I communicated on the phone and through e-mail with Mr. Echols on several occasions from

2

October 2004 through April 2005.  The topics of those discussions included the need to investigate Mr. Barrett's background and mental health issues.  Mr. Echols never indicated that Mr. Barrett disapproved of any form of mitigation investigation.

6.      As I said in my previous declaration, neither Mr. Hilfiger nor Mr. Smith ever approached me for assistance as resource counsel in Mr. Barrett's case.  My only contact with Mr. Hilfiger after Mr. Echols was relieved was in late August 2005.  I sent an email to a federal death penalty defense list serve requesting information on turnaround time for payment of CJA 30 and CJA 31 vouchers.  On August 29, 2005, Mr. Hilfiger responded with information concerning his experience on such time.  I emailed him back asking him to bring me up to date on the case and offering my assistance.  However, I never heard back from Mr. Hilfiger.

7.      If Mr. Hilfiger or Mr. Smith had contacted me and made the statements quoted above, I would have told them clients often express concerns like that at some point in time, and they most often get over it.  While the statements attributed to Mr. Barrett would have confirmed my concerns that Mr. Hilfiger and Mr. Smith lacked the death penalty experience and history of quality work that is called for in federal death penalty trials, reaching out to me for help in working with Mr. Barrett would have been a sign of dedication.  However, in the context of what occurred earlier in the case, and later, the quoted statements tend to confirm the concerns Mr. Echols expressed to me regarding Mr. Hilfiger's lack of involvement in the work on the case that was ongoing prior to his withdrawal.

8.      If Mr. Hilfiger or Mr. Smith had contacted me regarding the statements in their declarations, I would have advised them, if the statements were made prior to or during the investigation, that Mr. Barrett should be advised that the first step is to learn what his family knows about his history.  After we learn from them, a decision can be made about who should

3

testify.  It may be unnecessary for specific family members to testify.  Such an explanation often satisfies the client's concerns sufficiently to enable the investigation to move forward.  In this case, it appears from Mr. Hilfiger's declaration that he had the cooperation of Mr. Barrett's family, and he had "Mr. Barrett's medical, educational and mental health records."  That is, Mr. Hilfiger appeared to have the ability to conduct an investigation that would allow him to explore various options for trial and explain those options to Mr. Barrett so that he could make an informed decision.  If Mr. Hilfiger had responded to my offer of assistance, I would have advised him that he should follow the leads he had.  I also would have noted that early in 2005, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the Supreme Court found ineffective assistance of counsel where the defendant at times had been "uninterested in helping" and "even actively obstructive," 545 U.S. at 381, but a wealth of mitigation evidence was available from another source the defense attorneys failed to explore, 545 U.S. at 390-93.

9.    If Mr. Barrett's trial counsel had informed me that Mr. Barrett's statements were made after the investigation, and before the presentation of evidence, I would have asked them what other avenues they explored for presenting Mr. Barrett's life history, such as the use of a mitigation specialist with qualifications to testify as an expert or the use of a mental health professional.  I also would have asked whether the attorneys had presented these possibilities to Mr. Barrett.  The declarations of trial counsel do not suggest they took any of these steps.

10.    When Mr. Barrett's current counsel informed me about the statements of trial counsel, my initial reaction was, "that's death penalty defense 101."  By this I meant that every experienced capital defense attorney knows defendants sometimes express feelings like those attributed to Mr. Barrett.  The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases that were revised in 2003 specifically refer to the phenomenon suggested

in the statements counsel attribute to Mr. Barrett.  The Commentary on Guideline 10.5 offers a variety of responses to such concerns.  I will address those responses in later paragraphs.  At the outset, it is essential that counsel must assure his client that his views count, and will be considered, but that the first priority is to investigate, to learn what the story is, and later to decide who will testify and what the mitigation case will be.

11.    This common-sense practice is codified in Defense Standard 4-5.1(a) of the ABA Criminal Justice Standards which provides that a defense attorney should discuss the risks of different strategies only "[a]fter informing himself or herself fully on the facts and the law."  Standard 4-5.2 explains that decisions about what evidence should be presented are for the attorney to make.

12.    While reports of capital defendants not wanting certain types of mitigation to be investigated or presented are not uncommon, it is uncommon for an experienced or skilled capital defense attorney to feel the scope of his work must be limited by statements like those attributed to Mr. Barrett.  As the commentary to ABA Guideline 10.5 says, "Often, so-called 'difficult' clients are the consequence of bad lawyering – either in the past or present.  Simply treating the client with respect, listening and responding to his concerns, and keeping him informed about the case will often go a long way towards eliciting confidence and cooperation."  I do not mean to imply that Mr. Barrett was a "difficult" client.  Nothing from my experience working with Mr. Echols suggested Mr. Barrett was difficult, and the statements attributed to him by Mr. Hilfiger and Mr. Smith do not suggest he was difficult to work with.  On the contrary, both Mr. Hilfiger and Mr. Smith stated in their declarations that Mr. Barrett "was very involved in his defense," and cooperated with them.

13.    The statements attributed to Mr. Barrett are more indicative of a problem with

5

counsel than a defendant who is opposed to mitigation evidence. Defense counsel who are familiar with mitigation explain to their clients early on that mitigation does not involve begging for the defendant's life or relying on sympathy. Begging for mercy is not allowed in federal death penalty cases and a "generic" plea for mercy has been found by the Supreme Court to be evidence of ineffective assistance of counsel. *See Williams v. Taylor*, 529 U.S. 362, 369 n.2, 397-98 (2000) (majority opinion quoting closing argument and mitigation evidence not presented); *id.* at 415 (O'Connor, J., concurring) ("The consequence of counsel's failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances manifested itself during his generic, unapologetic closing argument, which provided the jury with no reasons to spare petitioner's life").

14.    The *Williams* decision reflects a capital defendant's common misunderstanding of mitigation evidence that can be, and routinely is, dispelled by investigation, thereafter allowing counsel to present the evidence, even in cases where a defendant expresses reluctance to "beg" for "sympathy" or rely upon his family to get sympathy from jurors. Mitigation evidence involves humanizing the defendant, making his life experiences familiar to jurors, and helping jurors to see that the life they are being asked to end amounts to more than the crime of conviction. Mitigation also involves offering the jury an explanation for the defendant's actions. Nearly every initially-reluctant capital defendant allows this evidence to be presented.

15.    It is not necessary for the jury to see either the defendant's background or an explanation of his actions as grounds for sympathy. Experienced capital defense counsel know it is not even desirable to present mitigation as a basis for sympathy because such a strategy is likely to be ineffective or backfire by causing jurors to weigh sympathy for the victim against sympathy for the man who took his life. Both the experience of capital trial attorneys and

6

scientific studies of how capital jurors decide whether to vote for life or death show that mitigation succeeds when jurors are able to identify with the defendant because of something in his background, or to understand his actions as something other than the product of a will to do harm. *See*, *e.g.*, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538 (1998); Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. Rev. 76 (2000).

16.    Defendants to whom mitigation has been explained do not object on grounds of "begging" or "sympathy" because they understand, if they have the capacity to understand, that mitigation is mostly telling their story. The statements attributed to Mr. Barrett about dwelling on his childhood and not relying on members of his family reflect a similar lack of insight into capital defense norms of practice particularly in that Mr. Hilfiger and Mr. Smith do not indicate that they made any effort to correct the misunderstanding. Dwelling on a defendant's childhood could be seen as a plea for sympathy. That kind of one dimensional penalty phase case is not the norm in federal death penalty cases. Presenting the defendant's childhood experiences as a reason for his later use of drugs, or a contributing factor in a mental disorder, enables jurors to understand his criminal behavior as more than the isolated decision of the defendant not to comply with social norms. That kind of multi-dimensional understanding of mitigation is fundamental to death penalty defense practice.

17.    The norm in federal death penalty cases tried in 2005 was to follow the 2003 ABA Guidelines and employ a mitigation specialist to gather information about a defendant's family history over several generations, review that information with experts qualified to identify facts relevant to mitigation, and integrate the themes developed through that process into a consistent strategy for both phases of trial. The process of developing a trial strategy includes

taking into account the client's concerns.  However, as noted, advising a defendant without conducting an investigation is unprofessional conduct.

18.    Recognizing that appeals to sympathy, relying solely upon family witnesses, and dwelling on a bad childhood are ineffectual strategies, the ABA Guidelines codified the norm in capital defense practice of involving experts in the process of gathering background information, interpreting it, and presenting it to jurors.  Mitigation specialists are trained and experienced at avoiding problems like those implied in the statements attributed to Mr. Barrett.  In 1998, the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, published recommendations including the use of a mitigation specialist.  The Subcommittee recognized that mitigation specialists have the training and knowledge necessary to perform "work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal."  (Judicial Conference Recommendations.)

19.    Mitigation specialists can explain the different purposes of mitigation evidence, and, as the Subcommittee found, they are relied upon in some cases to testify about family history, educational records, work and military records.  The Commentary to ABA Guideline 4.1 (The Defense Team and Supporting Services) adds the following:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have.  They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf.  [¶]  Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict.

20.    "Without exception, the lawyers interviewed by the Subcommittee stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase. Judges generally agreed with the importance of a thorough penalty phase investigation, even when they were unconvinced about the persuasiveness of particular mitigating evidence offered on behalf of an individual defendant." (Judicial Conference Recommendations.)  I am aware that Mr. Echols requested funding for a mitigation specialist in this case, and Judge Payne authorized some funds.  If Mr. Hilfiger and Mr. Smith did not make use of those funds, they missed an opportunity to avoid the problem they seem to be attributing to Mr. Barrett.

21.    Misunderstandings, or a lack of understanding, like what Mr. Hilfiger and Mr. Smith have stated Mr. Barrett expressed, were seen often enough in cases that the ABA provided guidance for counsel faced with clients who truly oppose the presentation of mitigation evidence.  The Commentary on Guideline 10.5 (Relationship with the Client) provides the following advice:

> Some clients will initially insist that they want to be executed as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to simply acquiesce to such wishes, which usually reflect overwhelming feelings of guilt or despair rather than a rational decision.  Counsel should initially try to identify the source of the client's hopelessness.  Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates.  Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time.  One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison.

These guidelines and advice to counsel suggest a much more serious problem than what trial counsel imply in the statements they attribute to Mr. Barrett.  Even so, it does not appear that

9

Mr. Hilfiger or Mr. Smith took any of the recommended steps that are commonly used by capital defense counsel in similar situations.

22.     As I have already indicated, neither Mr. Hilfiger nor Mr. Smith contacted me to seek assistance with the problem they are alleging in their declarations.  Assuming their statements are true, and inferring that the statements they attribute to Mr. Barrett influenced their investigation or trial strategy, their decision not to seek assistance confirms the sense I had in 2005 that Mr. Hilfiger was not interested in obtaining assistance from resource counsel.

23.     I am aware that Mr. Echols received some funding for a psychiatrist or psychologist to be employed as part of the mitigation investigation.  Mr. Hilfiger's declaration suggests that he did not retain a mental health professional either to talk with Mr. Barrett about the penalty phase, or to testify in mitigation.  Mental health professionals, like those I recommended to Mr. Barrett's trial counsel, can advise counsel about what is significant in records or the accounts of family members, and rely upon hearsay when testifying to their opinions.  Experienced capital defense counsel understand, and are able to explain to their clients, that dwelling on the past is not the point, and the accounts of family members can be presented through experts who, in any case, are able to place a traumatic or disadvantaged background in an objective context.

24.     Reliable information about a defendant's family, medical, and social history is one aspect of the forensic mental health evaluation typically carried out in a capital case.  *See* Liebert and Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 AM. J .FORENSIC PSYCHIATRY 43 (1994).  Mr. Hilfiger's declaration indicates that he had access to information about Mr. Barrett from family members and records gathered during Mr. Echols' representation, but he does not indicate that he provided those records to any experts, or

10

explained to Mr. Barrett that expert testimony was available.

25.    I also read in the declarations of Mr. Hilfiger and Mr. Smith that they felt they had a good rapport with Mr. Barrett, and that they met with several members of Mr. Barrett's family. The declarations do not indicate that Mr. Hilfiger or Mr. Smith spoke with Mr. Barrett or his family about the penalty phase, or any concerns they had that Mr. Barrett's views would be detrimental to their efforts. As the commentary above states, an attorney who feels his client is reluctant to allow mitigation evidence to be investigated or presented should speak with family members about the problem.

26.    In conclusion, if Mr. Barrett told his attorneys not to present his background to the jury because it would involve begging, dwelling on his childhood, placing his family in a vulnerable position, or an appeal to sympathy, that suggests Mr. Hilfiger and Mr. Smith either did not understand the nature or purpose of mitigation evidence, or the various methods of presenting it, or they allowed Mr. Barrett to harbor an inaccurate understanding of the penalty phase. The declarations from Mr. Hilfiger and Mr. Smith indicate that they took none of the actions commonly taken in similar situations. They did not speak with more experienced counsel, a mitigation specialist, a mental health professional, the court, family members, or anyone else who could have explained the process of developing mitigation evidence in a way that diffused the alleged concerns. The declarations also do not offer any reason for failing to take the steps outlined in the ABA Guidelines including those that were available under the court's March 2005 funding order.

Under penalty of perjury, I declare on June 27, 2010, that the representations made in the foregoing declaration are true and correct.

11

Richard H. Burr