# EXHIBIT 5

# Report on Multi-County Grand Jury Partial Report SC-99-56

*OIA-01-04*



September 2001

Prepared for Commissioner Bob A. Ricks
By Department of Public Safety
Office of Internal Audits

Filename: c:\docs\audits\oia-01-04\finalreport_v1

# Oklahoma Department of Public Safety

OFFICE of INTERNAL AUDITS
Review of Management Practices
Preliminary Report OIA 01-04
June 3, 2001

The DPS Office of Internal Audits was directed by Commissioner Bob A. Ricks to conduct a review of DPS management practices on April 4, 2001, in response to recommendations made by a Multi-County Grand Jury Partial Report. This review is not yet complete; however, a preliminary report was requested by the administration to enable it to take action on certain critical areas in a timely manner.

**FINDING #1:**    *Misinterpretation and application of the state's "official duty" status.*

The audit found the misunderstanding of "official duty" to be the common thread in all of the findings. "Official Duty" is the term used by the state to describe job duties and latitudes of activities for employees responsibilities. It is a guide as to how we expend the resources provided by our state. DPS created, but has not sufficiently defined, the terms of "subject to call," "on call," and "on standby" and employees do not share a common understanding of these terms and applications. This misunderstanding crosses all ranks and divisions. These terms impact the appropriate use of state equipment and the expectation of compensation in some cases, under the Fair Labor Standards Act.

RECOMMENDATION:

Define "subject to call," "on-call," and "on standby" in respect to official duty status. DPS should conduct a review emphasizing the progression of each call status with regard to employees being restricted, receiving compensation and the use of state resources. The review should consider the Fair Labor Standards Act, Merit Rules for Employment, retraining issues and revisions to the DPS Operations Manual.

DPS should develop pro-active initiatives to minimize future such instances by reinforcing core values and ethics in the mind set and daily activities of all personnel. The critical component of this adjustment is for all employees to understand risk in the existing practice and understand that a general practice does not supercede the law.

**FINDING #2:**    *Poor management and a lack of supervisory oversight.*

Many of the problems found by this audit result from some managers failing to do their jobs with a high level of consistency. The likelihood of anyone discovering inaccuracies and indiscretions was practically nil. This is not to say that every document was riddled with errors. However, it is important that the quality of any report should be scrutinized by staff and command personnel whose job it is to oversee their commands and ensure that things are being done correctly. That simply did not happen.

RECOMMENDATION:

Review DPS Operations Manual Sub-chapter 2: Conduct. Assure that all patrol members are familiar with these guidelines and understand that consequences exist for failure to obey and uphold this standard.

**FINDING #3:**     *Erratic submission and retention of Outside Employment Request forms.*

Current DPS policy appears to be sound, however, in application, internal controls at the Troop level to assure compliance are absent.

RECOMMENDATION:

Provide an addition to the annual Performance Management Process form of each employee, requiring supervisory personnel to ask and record whether the employee is currently employed outside the agency. If so, the supervisor should assure that an Outside Employment Request Form is submitted at that time or is currently on file in the employee's personnel files.

DPS Administration should revisit the issue of outside employment for those members who are self-employed or business owners, and clarify requirements for reporting purposes.

**FINDING #4:**     *Inconsistent personnel file content and integrity.*

DPS Operations Manual 1.1.8 states that the DPS will maintain two "201" (personnel) files on each member of the Oklahoma Highway Patrol. The official 201 file is to be housed in the Personnel Division and the permanent 201 File is maintained at Troop level.

A third 201 file is housed in the Major's Office, possessing data not available elsewhere. The auditors found varied interpretations of instructions for file maintenance leading to non-standard entries, mishandling of date-sensitive materials, constant handling of files, and duplication of effort.

RECOMMENDATIONS:

Merge the 201 file currently being kept at the Major's office with the official file in the Personnel Office.

Provide training to supervisory and secretarial personnel regarding the appropriate maintenance of 201 files.

A digital imaging solution should be pursued whereby personnel data is scanned and stored in one digital file and accessed through a relational database complete with security levels and computer-triggered edits.

**FINDING #5:**     *Inconsistent standards for reporting and recording time worked and work assignments for employees.*

Obscure standards and weak controls have compromised the appropriate recording and reimbursement of time as promulgated by the Fair Labor Standards Act. Some exempt employees may be incorrectly classified.

Ongoing changes in the Fair Labor Standards Act are not being sufficiently researched and implemented by DPS to stay abreast with current opinions and rulings.

The absence of formalized training has left newly promoted personnel to their own devices in formulating and administering time accountability issues. Written instructions for the proper completion of time reports have been lost or forgotten over time.

RECOMMENDATIONS:

A thorough review by the DPS Personnel Division of the Fair Labor Standards Act and Merit Rules to establish the Department's position with regard to:
1.    Correct classification of non-exempt and exempt employees
2.    Reporting and recording of all employee time elements
3.    The lawful range of the Departments ability to restrict employees with "call" definitions

Explore the possibility and feasibility of integrating the Department's computerized time records program with the Office of Personnel Management payroll system currently used by DPS.

Devise a comprehensive time accountability retraining curriculum for all employees and a method to reinforce the lessons throughout employees' careers.

Develop a training program to assure that employees who move from a non-exempt to an exempt status are trained in reporting and recording their time correctly.

Conduct periodic audits of division and individual time reports to assure that rules and procedures are being followed.

**FINDING #6:**        *Inadequate guidelines for the use of state equipment.*

DPS lacks specific rules and guidelines to assure lawful compliance with state statutes governing the use of state resources. These resources include, but are not limited to: fuel credit cards, mobile telephones, turnpike "PikePasses," telecommunication terminals, and state vehicles.

RECOMMENDATION:

While state law is clear regarding the use of state equipment, its actual application is not as simple. DPS should establish written guidelines and audit controls to assure compliance with state statutes.

## CONCLUSION

It is important to remember that the vast majority of our personnel are hardworking, honest and responsible individuals who come to work every day with a sincere desire to serve the State of Oklahoma. However, as an organization we must recognize that a failure to carefully review reports, a failure to examine events closely to identify patterns, and a failure to provide effective oversight and auditing creates the opportunity for inappropriate behavior. DPS can do much better in providing employees with written policies and guidelines to minimize confusion and encourage proper work ethics. At the same

time, management control by superiors is essential to ensure that employees do not stray into unlawful or unethical areas.

With a very tight time frame, certain areas of this review are incomplete. We feel this work should be continued to ensure that a full and complete analysis has been conducted, and to ensure that there are no additional problems left unaddressed.

# DEPARTMENT OF PUBLIC SAFETY

## *"Don't Say It - Write It"*

**TO**        Commissioner Bob A. Ricks                **DATE** July 13, 2001

**FROM**      LTC Jerry N. Cason #4

**SUBJECT**   Internal Audit Directive

On June 11, 2001 this office was directed to put a committee together to review areas of deficiency in the agency brought about by an internal audit. Committee members were:

| | |
|---|---|
| LTC Jerry Cason | 1LT John Matlock |
| 1LT Don Stockton | 1LT George Green |
| Bill Hollars | Gene Thaxton (Telecommunications) |
| John Lindsey | Brad Long (OLETS) |
| Major Garry Thomas | Captain Gerald Davidson |
| Judi Burton | Donna Hardridge (Chief's Office) |

The following areas were addressed:

IX.    **Description #1**: PikePass Policy & Procedures
       **Criteria**: *What should exist?* A policy informing members of the intent and official procedures for use of the PikePass issued to the member's patrol unit.

X.     **Description #4**: Define "Subject to Call," "On Call," and "Standby" status within DPS.
       **Criteria**: *What should exist?* A criteria that defines the difference and a clearly stated policy for members to follow.

XI.    **Description #5**: Use of State Vehicles
       **Criteria**: *What should exist?* Clear understanding of state statutes and DPS policy regarding use of DPS vehicles.

XII.   **Description #6**: Outside Employment Requests
       **Criteria**: *What should exist?* Supervisory personnel should possess current Outside Employment Request forms for all subordinates who have outside jobs.

XIII.  **Description #7**: 201 Files Content & Integrity
       **Criteria**: *What should exist?* File maintained in accordance with OPM Rules and Operations Manual 1.1.8.

XIV.   **Description #8**: Time sheet vs. Assignment reconciliation
       **Criteria**: *What should exist?* A Department-wide standard for recording time worked and assignment for exempt employees, clearly addressing the appropriate recording and reimbursement of time according to FLSA.

Commissioner Bob A. Ricks
Internal Audit Directive
July 13, 2001

Page 2


XV.    **Description #9**: Policy & Procedure for Mobile Phone Usage
**Criteria**: *What should exist?*  A policy whereby all employees who are assigned a mobile phone has a clear understanding of the proper use of state equipment and resources.

XVI.   **Description #10**: Restate OLETS Policy
**Criteria**: *What should exist?*  Every member of DPS with access to the OLETS system should possess a clear understanding of the law and department policy with respect to the use of the system.

JNC/dh

## INTERNAL AUDIT RECOMMENDATIONS
July 13, 2001

I.    **Description #1**: PikePass Policy & Procedures

**Criteria**: *What should exist?*  A policy informing members of the intent and official procedures for use of the PikePass issued to the member's patrol unit.

The Oklahoma Transportation Authority (OTA) policy states that any Oklahoma law enforcement officer, while in the performance of their official duties, are not subject to paying associated tolls when utilizing and properly displaying a law enforcement PIKEPASS tag.  Applicable toll charges incurred by the use of a law enforcement PIKEPASS for purposes not associated with official business shall be reimbursed by the agency. Personal use of law enforcement PIKEPASS tags is strictly prohibited. Re-education of all personnel will be conducted as to the regulations via an Informational Bulletin. The agency and/or OTA will conduct random audits to ensure strict compliance with the policy.  A change to the operations manual has been prepared under "Use of State Equipment" to note compliance with established OTA guidelines.

II.   **Description #4**: Define "Subject to Call," "On Call," and "Standby" status within DPS.

**Criteria**: *What should exist?*  A criteria that defines the difference and a clearly stated policy for members to follow.

The *Department of Public Safety Patrol Divisions Operation Manual* currently states in the minimum qualifications for troopers, "...a willingness to be on call 24 hours per day..." This statement clearly conveys to employees, who have accepted the responsibilities of being a member of the Patrol, they will be "subject to call."  A change should be made to the wording to indicate, "...a willingness to be **subject to call** 24 hours per day..."

"On call" and "On standby" are already defined in the *Definition of Terms* section of the manual.  Historically in the agency, "on call" has been less restrictive for employees than "on standby."

A change in the wording of the Operations Manual should show:

Current wording:  On call - the time before or after a scheduled work shift, when a member is required to be available for a specified time to respond to calls and notify his troop office where he can be contacted by telephone.

New wording: On call - time the member is somewhat restricted in his/her movement and should be ready to be respond to call should the need arise.  The members are not necessarily restricted to a specific location, but must provide information as to how to be contacted. This time is not considered as compensatory time.

Internal Audit Recommendations
July 13, 2001

Page 2

Current wording: On standby – the time when a member is off duty but required to be available to go on duty quickly and to notify his troop office where he can be contacted.

New wording: On standby - **time that is more restrictive than "On call" time, wherein a member must be ready to be respond at a moments notice.   The member's movement is restricted and this time is considered as compensatory time.**

III.    Description #5: Use of State Vehicles

   Criteria: *What should exist?*  Clear understanding of state statutes and DPS policy regarding use of DPS vehicles.

   Title 47 §156.1.B.2 provides any DPS commissioned employee be permitted use of a state-owned vehicle from his residence to place of employment, or places other than employment when in the scope of their assignment.   It is the interpretation of Legal that this statute provides sufficient legal authority for members on call to use their vehicle as necessary to remain available to the agency.  A review should be conducted of any civilian employee who has use of a state vehicle to their residence to ensure they meet compliance with Title 47 §156.1.B.1.   Individual approvals should be granted by the Commissioner's Office on a case-by-case basis as recommended by division directors.

IV.    Description #6: Outside Employment Requests

   Criteria: *What should  exist?*  Supervisory personnel should possess current Outside Employment Request forms for all subordinates who have outside jobs.

   A draft policy has been prepared which clearly defines the agency's position on outside employment and places the responsibility of our employees to comply with the provisions thereof.   An informational bulletin will be distributed to educate all employees to the new provisions of the policy.

V.    Description #7: 201 Files Content & Integrity

   Criteria: *What should exist?*  File maintained in accordance with OPM Rules and Operations Manual 1.1.8.

   It has been determined that an employee's permanent 201 file will be maintained in the agency's Personnel Division and a working file may be maintained at the individual troop headquarters.   The only release for records will come from our Personnel Division.  All divisions have been

Internal Audit Recommendations
July 13, 2001

Page 3

instructed to ensure all documents maintained in their files are forwarded to Personnel in a timely basis. We will continue to make an effort to ensure no documents are maintained locally which are not on file in the permanent, official personnel file. It is not practical to eliminate all files throughout the agency. But, better effort will be made to ensure consistency between the files.

VI.    **Description #8:** Time sheet vs. Assignment reconciliation

**Criteria:** *What should exist?* A Department-wide standard for recording time worked and assignment for exempt employees, clearly addressing the appropriate recording and reimbursement of time according to FLSA.

The time recording method for exempt employees currently in place meets the standards of FLSA. What is probably a more accurately identified problem is the proper completion of the *Individual Daily Time Report* by exempt employees. The form and instructions were developed in 1986. Through time and lack of instruction, employees are not aware of the correct procedure to follow when completing the report. This can be remedied through training of the procedures and forms.

Also recommended is a change in exempt status for all First Lieutenants and Second Lieutenants to a non-exempt status. This would allow for better accountability at the troop level.

It has been determined that the TIME program on our mainframe can be modified to show actual hours and non-scheduled hours work by exempt employees. However, it will not accurately calculate the hours.

VII.   **Description #9:** Policy & Procedure for Mobile Phone Usage

**Criteria:** *What should exist?* A policy whereby all employees who are assigned a mobile phone has a clear understanding of the proper use of state equipment and resources.

The Department of Public Safety (DPS) has determined that its functions and responsibilities require certain employees to be accessible by telephone from remote locations and at hours other than normal business hours. Certain employees are required to have access to telephones from locations other than their normal workstations and at hours other than normal business hours in order to adequately and efficiently perform their duties.

Employees who are assigned DPS mobile phones shall reimburse DPS for the following: (1) all non-governmental long distance charges, roaming charges, directory assistance charges and taxes attribute thereto and (2)

Internal Audit Recommendations
July 13, 2001

Page 4

charges for all personal local calls in excess of the "flat rate" if the employee's use of local calling exceeds the 'flat rate' amount of local calling permitted by the particular plan to which the employee is assigned.

The Telecommunication Division, will review the mobile telephone bill and shall notify any employee who is required to reimburse DPS for any of the charges set forth in the preceding paragraph. The Telecommunication Division shall also notify any employee of an unexplained call(s) and request an explanation for the call(s). The employee shall reimburse DPS for personal calls or calls which cannot be verified as relating to the employee's duties within 30 days of receipt of the request from the Telecommunication Division. Falsification of statements concerning mobile telephone usage or failure to provide reimbursement may result in disciplinary action up to and including termination.

VIII.    **Description #10**: Restate OLETS Policy

**Criteria**: *What should exist?* Every member of DPS with access to the OLETS system should possess a clear understanding of the law and department policy with respect to the use of the system.

Appropriate OLETS Rules and Regulations governing the access and dissemination of OLETS information should be reviewed yearly as part of the PMP evaluation process for all DPS sworn and non-sworn employees having access to the OLETS system.

The OHP Training Bulletin Number 92-13, though dated November 20, 1992, is still appropriate. It is proposed that this policy be updated and distributed to all personnel with OLETS access.

The investigation of our Internal Affairs and Special Investigations Division is being handled by Captain Bill Hughes and 1LT Todd Blish, and will be addressed under a separate report.

## TIME ACCOUNTABILITY INQUIRY RESULTS

The following issues were addressed in a Chief's Inquiry conducted by Capt. Bill Hughes #17 and 1Lt. Todd Blish #41 concerning personnel of the IASI Unit. The findings and recommendations are as follows:

**ISSUE #1: Time reporting improprieties by personnel of IASI**

**FINDINGS: This inquiry has determined that previous high ranking officials of the Oklahoma Highway Patrol approved a practice, sometime between 1989 and 1996, which allowed IASI personnel to claim weekends while "on-call" as days worked. This practice was established because the assignment in IASI was determined to be highly restrictive and for longer than normal periods of time creating a substantial interference on the employee's ability to use the time for personal purposes. It is the opinion of the personnel conducting this inquiry that no malicious intent to defraud this agency or the people of the State of Oklahoma of time or other compensation has occurred in the IASI Unit.**

**RECOMMENDATION: The agency should clearly define terms such as "on-call", "subject-to-call", and "on-standby", and create internal written policies which clarify an employee's status for each assignment for reporting purposes.**

**ISSUE#2: Perjury by members of the IASI Unit before the Grand Jury**

**FINDINGS: This inquiry was unable to resolve this issue due to the Attorney Generals Office denying DPS Legal Division's request to access the sealed testimony.**

**RECOMMENDATION: At the conclusion of the current litigation involving the testimony in question DPS should again request copies of said testimony to rectify this issue.**

I.    Intelligence phase

The initial portion of the Chief's inquiry focused on the Audits and Inspection Unit where 1LT Don Stockton and 1LT John Matlock were interviewed. Both Members were involved in an audit of time accountability records where discrepancies developed in the Internal Affairs Division. There were indications of possible bias in the initial briefing they gave us regarding audit of time records from IASI. 1LT Stockton, when interviewed by 1LT Blish, indicated that this particular issue was his opportunity to prove himself to the current administration. This, as well as 1LT Matlock's indication of his friendship with former 2LT Paul Gordon, indicates the possibility of personal bias being involved in the interpretation of the findings of the internal audit of IASI time records. Despite these indicators the appearance of improprieties does exist in regard to time accountability practices within IASI. These practices include showing "on-call" time as time worked, then using the accrued time as leave on a later date.

We recovered time accountability reports from both current and past Members assigned to the Internal Affairs Division as well as a partial report from the Multi-County Grand Jury of Oklahoma County (SC-99-56). The Grand Jury wished to address the supervisory and internal audit mechanisms within the Department of Public Safety as well as the existing management practices as it applies to oversight of work assignments.

The Internal Audit personnel also indicated possible perjury before the Grand Jury on the part of CPT Rodney Burris and 2LT George Randolph. DPS Legal Division was contacted in an effort to obtain copies of Grand Jury testimony as it related to our inquiry. The Office of Attorney General refused to supply copies of testimony related to the case because of ongoing litigation.

Base questions were developed which addressed time accountability questions within the Division. Those questions focused on the use and completion of monthly time accountability records and any Troop policies regarding the accrual and use of compensated time. The following represents a sample of baseline questions presented during each Member's interview with minor variances;

| 1. | (Qualifying questions related to time in grade, current and past assignments, Supervisor's name, etc.) |
|----|----|
| 2. | When you were initially assigned to the Internal Affairs/Special Investigations Division were you instructed in the completion and use of the monthly time accountability report? (If so) By whom?, (If not) Knowing you were not instructed, how did you complete the report? |
| 3. | What instructions have you received in showing "on-call" time while in other assignments? |
| 4. | (Presented with time report if available) Is this an accurate copy of a time sheet completed by you on _____? Is this your signature? |
| 5. | Was it the accepted practice to show a "W" (representing a day worked) on the weekend days that you were scheduled to be "on-call" whether called out or not? |
| 6. | What explanation was provided for this? (Question 5) |

| 7. | The nature of your position in Internal Affairs requires specialized training and skills. What type of training have you received as it relates to internal affairs? (how, why) Are these skills unique to the function of IASI versus other Divisions? |
|---|---|
| 8. | What is the Troop "Z" policy concerning restrictions while "on-call"? Is this policy written or verbally passed from one member to another? |
| 9. | What, if anything, is the difference between being "on-call" in your IASI assignment versus a traffic related assignment? |
| 10. | Have you ever signed another member's time accountability report, as a supervisor, when they may have shown "on-call" time as a "W" indicating time worked? |
| 11. | Is this practice a violation of Department policy or State law? Can you see where it may be construed as such? |

## II.    Identification phase

We identified four (4) current members of IASI and up to five (5) previous members of the division that may have an internal knowledge of the time accountability practices within IASI.

CPT Hughes interviewed current IASI personnel CPT Rodney Burris, 1LT George Randolph, and former IASI investigator 1LT Rick Fagan. 1LT Blish interviewed current IASI Members 2LT Doug Deryckere, 2LT Leanne Spears, and previous member 2LT Donnie Robins. Attempts were made to contact retired IASI Investigator Larry Punneo who did not return phone messages. Retired IASI Troop Commander Larry Rutherford was contacted and interviewed by 1LT Blish as to time management practices during his assignment to the division. Current 1LT Jeff Griffith, a former IASI investigator, was on vacation at the time of the interviews.

Because of the general issues which we were instructed to address and the limited time frame, not every past member of this unit was contacted nor were specifics as detailed as the Internal Auditors presented to us noted. The information passed to us along with tapes of the interviews we conducted are included for review in this file.

## III.    Interview phase

### A.    2LT Donnie Robins #111

LT Blish conducted an interview with 2LT Donnie Robins #111 in his office at 1143 hours on July 4th. 2LT Robins was transferred to the Internal Affairs and Special Investigations Division (IASI) from Troop "A" in late 1999 and remained approximately 18 months.

2LT Robins states that he was instructed jointly by 1LT George Randolph and Captain Rodney Burris in the completion of his monthly time accountability report. 2LT Robins continued by stating that persons assigned to IASI were on call for a period of two (2) weeks at a time. The "on-call" IASI Investigator was subject to call after business hours including 24 hour responsibility on weekends.

2LT Robins was instructed jointly by 1LT Randolph and Captain Burris to take "make up" days off to replace the weekends lost while "on-call". It was an accepted practice while assigned to IASI to use the "make up" days as time off on a routine basis.

2LT Robins confirmed that "on-call" time was managed differently in other Divisions he had worked. LT Blish inquired of him to explain the difference in being on call in a traffic assignment as opposed to Internal Affairs. Robins stated that he was told to show the weekend "on-call" days as "worked" due to their being subject to call for a complete 48 hour period on a statewide basis. Robins stated it was verbally understood he would be subject to travel anywhere in the State of Oklahoma at any given moment. He states that IASI policy required him to carry a cellular telephone and pager on weekends. 2LT Robins furthered his explanation that IASI investigators routinely worked more than 40 hours during the week and that the nature of the assignment required a quick response when called. He felt compelled by the nature of the assignment to be readily available for deployment on weekends.

2LT Robins did not maintain any subordinates while assigned to IASI; thus he was not responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

When asked if he ever witnessed the IASI Secretary, Carolyn Rawlings, make changes to time accountability reports, Robins replied, "Not to my knowledge".

### B.    2LT Doug Deryckere #103

LT Blish conducted an interview with 2LT Doug Deryckere #103 on July 5th, at 1330 hours, in the Captain's conference room. 2LT Deryckere was transferred from Troop "S" into IASI in July of 2000. 2LT Deryckere stated he was never instructed in the completion of the time accountability report while in Troop "S" but was instructed upon his transfer into IASI by the Secretary, Carolyn Rawlings. 2LT Deryckere confirmed 2LT Robins statement that IASI Investigators were on call for a period of two weeks at a time where they were subject to all calls after business hours including a full 48 hours on weekends. He was instructed by Mrs. Rawlings to show the "on call" weekends as time worked.

2LT Deryckere noted that the current time accountability report provides space for indicating time taken not time "accrued". <u>This portion of the issue is invalid as there is a "remarks" section available for indicating accrued time.</u>

2LT Deryckere indicated that the Troop "Z" policy concerning "on-call" time was verbally expressed to him by his superiors. The general policy of the Division, however un-written, indicated that Investigators were to be restricted during their "on-call" periods to being available for travel statewide at any given moment. He stated that he was verbally instructed to refrain from the consumption of alcoholic beverages during his on-call period and required to carry both a telephone and pager at all times. He felt that he was unduly restricted during these "on-call" periods.

2LT Deryckere did not maintain any subordinates while assigned to IASI, thus he was not responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

C.    2LT Leanne Spears #116

LT Blish conducted an interview with 2LT Leanne Spears #116 on July 5th, at 1817 hours in the Captain's conference room. 2LT Spears has been assigned to IASI for approximately five (5) months. She stated that she was verbally instructed by 1LT Randolph to inscribe a "W" on her time report for weekend days of which she was on call. 2LT Spears stated she was on call for two weeks at a time. LT Blish inquired whether she showed comp time for time spent on call during her previous assignments. She stated no. LT Blish asked Spears to clarify the call out system in the Internal Affairs Division, she stated that she did not clearly understand some of the time policies being used as she only had limited experience in the division.

2LT Spears states that she was instructed to be "10-8" in time to make it to the office by 0800 and remain until 1645 hours each day, with total time spent 10-8 to be a 10 hour shift. Her impression was these hours equated to a 50 hour work week which would encompass the two make up days used for time spent "on-call". She confirmed that it was accepted practice within IASI to reflect a "W" for weekend days (Saturday & Sunday) spent on call, whether called or not.

2LT Spears stated that the Troop "Z" policy changed around May 1, 2001 (She was unsure of the exact date). She was verbally instructed not to use her Department issued vehicle for local-personal trips when "on-call", despite the assumption that members of the division were required to travel at any given moment. She confirms that the nature of the position caused her to feel highly restricted when off duty and "on-call".

When asked to define "on-call" time versus "on-stand by" time, 2LT Spears defined "on-call" as being subject to work within a reasonable time while "on-stand by" as being uniformed or dressed for an event, fueled, and awaiting an imminent call. 2LT Spears was also instructed to carry her Department pager and phone when off-duty.

2LT Spears did not maintain any subordinates while assigned to IASI; thus she was not responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

D.    Larry Rutherford (Ret.)

LT Blish interviewed *Retired* 1LT Larry Rutherford who was assigned as Troop Commander in IASI between 1989 and 1997. Rutherford stated that during his term as Troop Commander he was directly responsible to either Colonel Kenneth Vanhoy (then LT. Colonel), or LT COL Bob Shaw. Rutherford recalled a meeting with Shaw but could not recall the exact date. The meeting focused on responsibilities of IASI members as it relates to call-out time and reporting procedures. It was decided that IASI members would be restricted to the OKC area while on call in order to facilitate travel to any portion of the State without delay. The centralized location of the OKC area was ideal for response given any incident that may occur in any other portion of the State. He also added that Captains during this period of time also showed time spent at "duty officer" as time worked as well. The rationale behind their decision was based on the fact that when "on-call" they were subject to travel at any given time and restricted to the OKC area. Members were also to report their location at all times to the Communications Center and remain "on alert" for incidents that may arise during their assigned call-out period. Rutherford recalls Colonel Vanhoy conducting classes in the completion of the time accountability report and management of time within IASI. The practice of showing "on-call" time as time worked began under the command of Larry

**Rutherford, as well as using the time as "make up" days off under the direction of LT Col. Bob Show (Ret.)**

E.    1LT Rick Fagan #25

Capt. Bill Hughes interviewed 1LT Rick Fagan #25 on July 9th at DPS Headquarters. LT Fagan was assigned to IASI from Troop J  January of 1998 and served in that capacity until June of 1998. Also assigned to IASI at that time were Capt. Rodney Burris, 1LT Eddie Davenport, and 1LT Jeff Griffith. LT Fagan advised that after he submitted his first time sheet report it was returned to him. He was unable to remember if it was CPT Burris or LT Davenport who instructed him to show the on-call weekends as days worked. He stated this was the standard practice in IASI at that time. LT Fagan could not recall the reason given to him to report his time this way. He indicated  he was instructed to wear civilian clothes by CPT Burris. He felt the verbal instructions he received relating to on-call time were more restrictive than other assignments he has had with on-call requirements.
1LT Fagan did not maintain any subordinates while assigned to IASI; thus he was not responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

F.    1LT George Randolph #22

1LT George Randolph was interviewed by Capt. Hughes on July 13th at DPS. LT Randolph is currently assigned to IASI as Office Manager. He has been in IASI for approximately three years and one month after transferring from the Training Division. CPT Burris was in command over IASI at that time as he currently is. LT Randolph advised that he was not instructed on how to complete his time sheet in IASI until after he had turned in his first one. He stated CPT Burris  instructed him after he had turned it in to count weekends on-call as days worked. He told CPT Burris he had not done that on his first one and CPT Burris told him he had fixed his previous one. LT Randolph told CPT Hughes that this did not seem to be any type of violation of policy or law because this on-call time seemed highly restricted. It was his impression that his travel from his residence and other activities during this time were extremely limited knowing that the on-call person was expected to respond anywhere in the state at a moments notice. He advised that this reporting practice had ceased in May 2001 when he was told his status was subject-to-call by LT COL Jerry Cason. He further  stated he was told at that time, for the first time, that the restrictions under which they had all operated under did not exist. He was told that restrictions such as limited travel from his residence and consumption of alcoholic beverages are not in place during subject-to-call time. LT Randolph said he operated until May by the instructions he was given when he arrived in IASI. LT Randolph stated that he felt written directives should be issued to clarify this situation.
1LT Randolph does maintain subordinates while assigned to IASI; thus he was responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

G.    CPT Rodney Burris #16

CPT Burris was interviewed July 12, 2001, by CPT Hughes at DPS. CPT Burris has been assigned to the IASI Unit for approximately seven (7) years. At the time of receiving his assignment from the Training Division to that unit CPT Burris reported directly to 1LT Larry

Rutherford. LT Rutherford reported directly to LT COL Bob Shaw. CPT Burris could not remember specifically if it was LT Rutherford or LT COL Shaw who instructed him to wear civilian clothing for this assignment. CPT Burris initially did not receive any instructions regarding the time sheet because it was the same one he had used at Training. CPT Burris stated 1LT Rutherford came back later and told him to show the weekend days he was on-call as days worked. He said he did not question his orders. He did not recall an explanation for the different reporting method. He elaborated that whoever was on call had to respond instantly and was considered the lead investigator on the case. Typically, all IASI personnel respond to a call. CPT Burris felt strongly that there was a difference for IASI personnel and their restrictiveness due to the timely response and the types of calls they receive. CPT Burris went on to explain that the practice of reporting the on-call weekends continued until he received word of this inquiry. He stated he did not at any time feel they were violating a policy or law the way they were reporting their time or he would have stopped. He did indicate he had several meetings with LT Rutherford and LT COL Shaw over shift differential and clothing allowance issues which he thought were justified because of what the IASI personnel are expected to do.

CPT Burris does maintain subordinates while assigned to IASI; thus he was responsible for signing time accountability reports where a subordinate may have shown "on-call" time as time worked.

## IV.   Summary

## ISSUE #1 - TIME REPORTING

While the initial auditors (Matlock, Stockton) discovered improprieties in the management of time accountability, it is important to acknowledge that the accepted practice before May 2001 was established prior to the assignment of any current Members to the division.

Current and past members of the division confirm they were instructed by Members of a superior rank to show their time accountability as indicated in the audit. This was explained on several different avenues within our investigation. One explanation, which is prevalent among current IASI Members, is they feel highly restricted by the nature of their assignment. The "on-call" investigator must be prepared to travel statewide at any given time in the event of an internal crisis. Current and past members of the division were under the impression they were restricted in their ability to perform certain personal activities or travel far from home while in "on-call" status.

Another avenue of explanation for the practice centers around regular work hours during the week. The desire that members of the division be in the office by 0800 and remain until 1645, unless out of the office on official business, was interpreted by 2LT Deryckere to be a fifty hour work week. Because of his lengthy travel time he interpreted that the time would be compensated through the "on-call" weekends.

The DPS Operations Manual does not give a solid definition of "on-call" or "on-standby" duty status. Additionally, the current time accountability report use by exempt members of the Department does not provide a clear definition of how to reflect overtime work. This is a source of confusion for some, despite the provision of a "remarks" section.

There were no obvious indications of any malicious intent to deceive in this case. Despite the appearance of abuse, time accountability practices within the Internal Affairs Division were acceptable through several different commanders.

The issue is obviously in need of direct attention in order to clarify "on-call" or "subject-to-call" policies within the Internal Affairs Division.    Initially the definition of "on-call" or "subject-to-call" versus "on-standby" should be clarified within the DPS Patrol Divisions Operations Manual or in the form of a memorandum from the Chief's Office. Subsequently it is highly recommended that time accountability practices, including an "on-call" policy, a shift coverage policy, and scheduling policy be clearly defined in writing and distributed to the members of the division.

It should also be noted that the current Captain's time sheets were reviewed by the Internal Auditors. They reported CPT Burris and CPT Rick Adams were the only two current Captains who have shown weekends as worked while in "Duty Officer" status. CPT Adams was assigned under CPT Burris while he was a lieutenant in the CID Unit.

There were numerous times in the IASI Division when two members claimed the same weekend days as days worked. Some of this occurred when CPT Burris was Duty Officer and an additional IASI member was "on-call". Clarification in this area would be recommended.

## ISSUE #2 - PERJURY

As previously noted the Internal Auditors made note of possible perjury on the part of CPT Burris and 1LT Randolph. This investigation was unable to either prove or disprove these allegations due to the fact that the Attorney General's Office denied the request by DPS Legal Division for copies of the Grand Jury testimony. This issue can be resolved at the time that testimony is released.

AUDIT RESPONSE TO
CHIEF'S INQUIRY
RE: OIA-01-04

The audit team would like to resolve some disturbing discrepancies found in the Internal Affairs and Special Investigation Units handling of the case involving 2Lt. Paul Gordon that were not explained or addressed in the Chief's Inquiry.

The Department of Public Safety Operations Manual's Implementation Order states, "Any provision within this Manual contrary to law is void, and if any provision herein is declared invalid by a court of competent jurisdiction, such holding shall not affect remaining valid provisions."

| | |
|---|---|
| Fact: | When the letter referring the Gordon matter for further investigation to the Attorney General was sent, no mention is made of the application or accrual of comp. time, or the fact that Gordon was or may have been on authorized comp. time when he was alleged to have been working for the State Insurance Fund. |
| Fact: | There are no internal memo's or other notice's given regarding the application or accrual of comp. time in the Gordon matter, or it's use inside I.A.S.I. until the Office of Internal Audits exposed the practice. |
| Conclusion: | Had either of these simple facts been conveyed to the Commissioner or Attorney General it is highly likely this incident would have never escalated beyond that point. Failing to do so casts a dim light on the motivation to omit that information by the management of I.A.S.I. Statements made by current and former I.A.S.I. personnel did affirm that the practice was perpetuated by unwritten rules and verbal instructions. |

---

| | |
|---|---|
| Fact: | DPS and I.A.S.I. management violated a basic rule of ethics and segregation of duties by proceeding with an investigation of serious wrongdoing by an employee within that division. |
| Conclusion: | Again, this decision casts doubt upon the objectivity of the investigator and his motives for not referring the matter to outside investigators. |

---

| | |
|---|---|
| Fact: | The I.A.S.I. investigation of 2Lt. Gordon centered around his working a part-time job while indicating on duty with DPS. His superiors are required to approve accrual and application of comp. time (DPS Operations Manual 1.1.6.A.4d) as well as, assuring that the off-duty job does not interfere with DPS activities. (DPS Operations Manual 1.1.10.10) I.A.S.I. managers cannot absolve themselves from these responsibilities. (DPS Operations Manual 2.1.3.B) |
| Conclusion: | I.A.S.I. managers were directly responsible for 2Lt. Gordon's daily activities. Their |

Audit Response
August 9, 2001

2

omission of the fact that they approved the accrual and application of Gordon's significant amount of comp. time, appear to be an attempt to deny the Commissioner that information which ultimately led to the order to send the informational letter to the Attorney General. Should they deny knowledge of Gordon's activities they would be forced to admit gross dereliction in their duties to properly supervise a subordinate. (DPS Operations Manual 2.1.3.B)

---

**Fact:** The I.A.S.I. captain, troop commander, and other similarly ranked personnel, who were directly responsible for Gordon's activities, signed his time sheets as accurate and correct. This indicates that I.A.S.I. managers either were extremely negligent in overseeing his daily activities or had approved his application for, and use of, comp. time and the method he was using to report it.

**Conclusion:** It appears that 2Lt. Gordon may have been misinstructed in the proper method to report comp. time used. Many other members have reported similar instructions regarding the application of comp. time. No mention of this is made in the I.A.S.I. official investigation or the Chief's Inquiry, nor has any notation been found that 2Lt. Gordon's time sheets were ever returned or corrected by I.A.S.I. managers.

---

**Fact:** When 2Lt. Gordon's excess time, such as annual, sick leave and comp. time was settled upon his departure from the agency, no record is found of I.A.S.I. managers mentioning or reporting any comp. time accrued by 2Lt. Gordon as required in DPS Operations Manual 1.1.6.A.4f

**Conclusion:** Troop commanders are required to complete "Notice of Personnel Action" forms that inform the Personnel Division when members resign. Included on these forms are the resigning members remaining annual, sick and overtime data which is used to determine the official departure date and any additional payment due the member. Lt. Randolph did not record or mention any accrued comp. time for 2Lt. Gordon, yet according to records compiled by Internal Audits from 1/18/99 to 4/23/2000 Gordon had accumulated 288 hours of "on call" comp. time and taken 24 hours. This leaves a balance of 264 hours, or 6.6 weeks, which was not reported by Lt. Randolph. An explanation should have been reported by the Chief's Inquiry.

---

**Fact:** Lt. Randolph's time records reflect a number of "U's" indicating that they have been updated since originally input. It is curious why this has occurred as 2Lt. Gordon's time records do not show similar frequency of updates.

**Conclusion:** Lt. Randolph's time records indicate that it was a common practice to adjust or

Audit Response
August 9, 2001

correct time records after they were input.  It is curious why Gordon was not given the same courtesy?

---

**Fact:**  Information was provided to the Chief's Inquiry team of the possible existence of a taped statement by Captain Burris to a meeting of the O.S.T.A. in which he denied the practice of providing compensatory time to I.A.S.I. employees while they were on an "on call" status.  This information, critical to a complete investigation, does not appear to have been pursued by the Chief's Inquiry or mentioned in their final report.

**Conclusion:**  The failure of the Chief's Inquiry to pursue this lead casts doubt on the value and completeness of the report.  It also places them in favor with the possible conspiracy to mitigate the effects of the fraudulent behavior by justifying the act and discrediting the internal auditors with unsubstantiated, out of context comments of bias. Unwittingly, the Chief's Inquiry has now proven, without doubt, that the I.A.S.I. division has been violating state law by allowing members to claim time worked when in fact they were only "on call" which has been determined a non-pay status.  The report also reveals that subordinates within I.A.S.I. are not thoroughly informed regarding the reporting of time and left to their own to justify why they are suddenly able to claim an additional eight hours for every day they show "on call." (RE: Interviews of 2Lt.s Spears and Deryckere) This begs the question why did they stop at eight hours and not claim the entire 48 hour weekend?  Obviously, this practice would have required them to take so much comp. time as to never be at work during the week, thus causing the fraud to be understood by superiors who would, and did, stop the practice once it was exposed by the internal audit.

---

**Fact:**  The Chief's Inquiry reported unwritten rules and verbal instructions by I.A.S.I. managers regarding the accrual of "on call" comp. time.  Some I.A.S.I. members admitted being confused by the unusual practice and offered a variety of explanations to justify it.  They also expressed a feeling of being restricted but in every instance admitted to being issued a Department mobile phone and pager to further reduce the restriction beyond what it was when the practice was begun in the early 1990's.

**Conclusion:**  Neither state statutes nor DPS Operations guidelines afford members the ability to accrue comp. time while in an "on call" status.  The Department has long held that members be on call to quickly respond to situations.  The Commissioner, Assistant Commissioner, Chief, Assistant Chief, Duty Officers, Public Information Officers and other administrators are held to the same standard.  Even field troopers who are required to respond to emergency life or death situations have traditionally been held to this standard.  The advent of pagers and mobile phones have afforded an even greater flexibility to the restrictions placed on members who must serve in these capacities.

Audit Response
August 9, 2001

4

---

Fact:   The Chief's Inquiry reports having interviewed a previous commander of I.A.S.I. who related a verbal decision by either Lt. Col. Vanhoy or Lt. Col. Shaw to allow the accrual of comp. time while on call for the I.A.S.I. division. The Inquiry does not indicate that the statement or decision was ever confirmed by interviewing Vanhoy or Shaw.

Conclusion: A prudent and complete investigation should have included such an interview and the Chief's Inquiry is remiss in its duties for not obtaining this information.

The fact remains that 2Lt. Gordon was investigated by his immediate supervisor regarding charges of obtaining funds by false pretense and the fact that the supervisor omitted crucial information regarding Gordon's ability to accrue and apply comp. time. At best, this displays a conflict of interest since the supervisor too was accruing a great deal of comp. time. However, the fact that the supervisor and his commanding officer failed to properly inform their superiors and report the possibility that 2Lt. Gordon may have been using comp. time while he was alleged to be working off duty is incomprehensible, cowardly and prima-facie evidence of a conspiracy.

These circumstances imply that a conspiracy to commit fraud has been perpetrated by certain individuals who were over-reporting time worked. In the course of concealing their behavior, they withheld information regarding the accrual and usage of compensated time and provided a misleading report to the Commissioner and Attorney Generals Office. The individuals continued the practice even after a fellow trooper resigned and was subsequently indicted by a multi-county grand jury. There is no indication they would have stopped until the practice was revealed by an audit.

**BURRIS 1999**
**$28.81**

| DATES | CALL MAKEUP DAYS CLAIMED | DATES | CALL MAKEUP DAYS TAKEN | BALANCE | COST |
|-------|--------------------------|-------|------------------------|---------|------|
| 01-09 | 8 | 01-15 | 8 | 96 | $2,765.76 |
| 02-06 DO | 8 | 02-12 | 8 | | |
| 02-07 DO | 8 | 03-18 | 8 | | |
| 03-27 DO | 8 | 03-19 | 8 | | |
| 03-28 DO | 8 | 04-16 | 8 | | |
| 04-25 VINITA | 8 | 05-13 | 8 | | |
| 05-22 DO | 8 | 05-14 | 8 | | |
| 05-23 DO | 8 | 06-29 | 8 | | |
| 06-12 VINITA | 8 | 06-30 | 8 | | |
| 07-10 DO | 8 | 07-02 | 8 | | |
| 07-11 DO | 8 | 10-21 | 8 | | |
| 08-21 DO | 8 | 10-22 | 8 | | |
| 08-22 DO | 8 | | | | |
| 09-25 EALES | 8 | | | | |
| 11-06 DO | 8 | | | | |
| 11-07 DO | 8 | | | | |
| 11-13 SHTING | 8 | | | | |

**BURRIS 2000**
**$28.81**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-01 Y2K | 8 | 02-11 | 8 | 144 | $4,148.64 |
| 01-17 MLK | 8 | 03-13 | 8 | | |
| 01-22 52ND ACAD | 8 | 03-14 | 8 | | |
| 01-23 52ND ACAD | 8 | 03-15 | 8 | | |
| 02-05 DO | 8 | 03-16 | 8 | | |
| 02-06 DO | 8 | 03-17 FOR 01-01 | 8 | | |
| 04-01 DO | 8 | 04-18 | 8 | | |
| 04-02 DO | 8 | 05-05 | 8 | | |
| 05-13 | 8 | 06-13 | 8 | | |
| 05-20 DO | 8 | 06-19 | 8 | | |
| 05-21 DO | 8 | 08-25 | 8 | | |
| 08-12 DO | 8 | 09-15 | 8 | | |
| 08-13 DO | 8 | 09-29 MUDO | 8 | | |
| 08-25 SHTING TISH | 8 | 11-05 IRVING TX | 8 | | |
| 09-17 CHICAGO | 8 | 11-17 | 8 | | |
| 09-23 DO | 8 | 12-15 LAS VEGAS | 8 | | |
| 09-24 DO | 8 | 12-28 | 8 | | |
| 10-21 LANSTON | 8 | 12-29 | 8 | | |
| 11-10 VET DAY | 8 | | | | |
| 11-11 DO | 8 | | | | |
| 11-12 DO | 8 | | | | |
| 12-10 LAS VEGAS | 8 | | | | |
| 2-23 DO | 8 | | | | |
| 12-24 DO | 8 | | | | |
| 12-25 DO CHRISTMAS | 8 | | | | |
| | 8 | | | | |

**BURRIS  01   $28.81**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-27 DO | 8 | 03-16 | 8 | 16 | $460.96 |
| 01-28 DO | 8 | 04-06 | 8 | | |
| 02-03 ACLU FT WORTH | 8 | | | | |
| 03-10 DO | 8 | | | | |
| 03-11DO | 8 | | | | |
| 04-14 DO | 8 | | | | |
| 04-15 DO | 8 | | | | |
| 04-21 GUTHRIE 89ER PARADE | 8 | | | | |

## RANDOLPH  98  $26.51

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 06-20 OC | 8 | 09-23 MUD | 8 | 88 | $2,332.88 |
| 06-21 OC | 8 | 09-24 MUD | 8 | | |
| 06-27 OC | 8 | 09-25 MUD | 8 | | |
| 06-28 OC | 8 | 11-20 MUD | 8 | | |
| 09-05 OC | 8 | 11-23 MUD | 8 | | |
| 09-06 OC | 8 | 11-24 MUD | 8 | | |
| 09-07 OC LABOR DAY | 8 | 12-21 HOL | 8 | | |
| 09-12 OC | 8 | 12-22 HOL | 8 | | |
| 09-13 OC | 8 | 12-23 HOL | 8 | | |
| 10-31 | 8 | 12-28 HOL | 8 | | |
| 11-01 OC | 8 | 12-29 HOL | 8 | | |
| 11-07 OC | 8 | | | | |
| 11-08 OC | 8 | | | | |
| 11-27 THANKS. FRIDAY | 8 | | | | |
| 11-28 OC | 8 | | | | |
| 11-29 OC | 8 | | | | |
| 12-12 OC | 8 | | | | |
| 12-13 OC | 8 | | | | |

**RANDOLPH 99    $26.51**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-24 OC | 8 | 05-21 MUDO | 8 | 232 | $6,150.32 |
| 01-30 OC | 8 | 06-14 MUDO | 8 | | |
| 01-31 OC | 8 | 06-15 MUDO | 8 | | |
| 03-06 OC | 8 | 06-16 MUDO | 8 | | |
| 03-07 OC | 8 | 06-17 MUDO | 8 | | |
| 03-13 OC | 8 | 07-02 MUDO | 8 | | |
| 03-14 OC | 8 | 07-05 INDEP. DAY | 8 | | |
| 04-03 OC | 8 | 07-06 MUDO | 8 | | |
| 04-04 OC | 8 | 07-07 MUDO | 8 | | |
| 04-10 OC | 8 | 07-08 MUDO | 8 | | |
| 04-11 OC | 8 | 07-09 MUDO | 8 | | |
| 05-08 OC | 8 | 07-12 MUDO | 8 | | |
| 05-09 OC | 8 | 07-13 MUDO | 8 | | |
| 05-15 OC | 8 | 07-14 MUDO | 8 | | |
| 05-16 OC | 8 | 07-15 MUDO | 8 | | |
| 06-19 OC | 8 | 07-16 MUDO | 8 | | |
| 06-20 OC | 8 | 07-21 MUDO | 8 | | |
| 06-26 OC | 8 | 07-28 MUDO | 8 | | |
| 06-27 OC | 8 | 11-15 MUDO | 8 | | |
| 07-31 OC | 8 | 11-16 MUDO | 8 | | |
| 08-01 OC | 8 | 11-17 MUDO | 8 | | |
| 08-07 OC | 8 | 11-18 MUDO | 8 | | |
| 8-08 OC | 8 | 11-19 MUDO | 8 | | |
| 09-04 OC | 8 | 11-22 MUDO | 8 | | |
| 09-05 OC | 8 | 11-23 MUDO | 8 | | |
| 09-06 OC LAB( | 8 | 11-24 MUDO | 8 | | |
| 09-11 OC | 8 | 11-25 THANKS. DAY MUI | 8 | | |
| 09-12 OC | 8 | 12-21 MUD | 8 | | |
| 09-25 EALES S | 8 | 12-22 MUD | 8 | | |
| 10-16 OC | 8 | | | | |
| 10-17 OC | 8 | | | | |
| 10-23 OC | 8 | | | | |
| 10-24 OC | 8 | | | | |
| 11-13 EDMONI | 8 | | | | |
| 11-26 THANKS | 8 | | | | |
| 11-27 OC | 8 | | | | |
| 11-28 OC | 8 | | | | |
| 12-24 CHRISTI | 8 | | | | |
| 12-25 OC | 8 | | | | |
| 12-26 OC | 8 | | | | |

**RANDOLPH 2000  $26.51**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-01 OC Y2K | 8 | 01-13 MUDO | 8 | 264 | $6,998.64 |
| 01-02 OC | 8 | 01-14 MUDO | 8 | | |
| 02-05 OC | 8 | 04-07 MUDO | 8 | | |
| 02-26 OC | 8 | 05-19 MUDO | 8 | | |
| 02-12 OC | 8 | 06-26 MUDO | 8 | | |
| 02-13 OC | 8 | 06-27 MUDO | 8 | | |
| 03-18 OC | 8 | 06-28 MUDO | 8 | | |
| 03-19 OC | 8 | 06-29 MUDO | 8 | | |
| 03-25 OC | 8 | 06-30-MUDO | 8 | | |
| 03-26 OC | 8 | 07-03 MUDO | 8 | | |
| 04-16 OC | 8 | 07-04 MUDO INDEP DAY | 8 | | |
| 04-22 OC | 8 | 07-05 MUDO | 8 | | |
| 04-23 OC | 8 | 07-06 MUDO | 8 | | |
| 05-06 OC | 8 | 07-07 MUDO | 8 | | |
| 05-07 OC | 8 | 08-04 MUDO | 8 | | |
| 05-13 OC | 8 | 08-07 MUDO | 8 | | |
| 05-14 OC | 8 | 08-08 MUDO | 8 | | |
| 06-10 OC | 8 | 08-09 MUDO | 8 | | |
| 06-11 OC | 8 | 08-10 MUDO | 8 | | |
| 06-17 OC | 8 | 08-11 MUDO | 8 | | |
| 06-18 OC | 8 | 08-14 MUDO | 8 | | |
| 07-15 OC | 8 | 08-15 MUDO | 8 | | |
| 7-16 OC | 8 | 08-16 MUDO | 8 | | |
| 07-22 OC | 8 | 08-17 MUDO | 8 | | |
| 07-23 OC | 8 | 08-18 MUDO | 8 | | |
| 08-20 JOHNSTON CO. | 8 | 09-08 MUDO | 8 | | |
| 08-26 OC | 8 | 10-20 MUDO | 8 | | |
| 08-27 OC | 8 | 12-01 MUDO | 8 | | |
| 09-02 OC | 8 | 12-19 HOLIDAY MUDO | 8 | | |
| 09-03 OC | 8 | 12-20 HOLIDAY MUDO | 8 | | |
| 09-04 OC | 8 | 12-21 HOLIDAY MUDO | 8 | | |
| 10-07 OC | 8 | 12-22 HOLIDAY MUDO | 8 | | |
| 10-08 OC | 8 | 12-27 MUDO | 8 | | |
| 10-14 OC | 8 | | | | |
| 10-15 OC | 8 | | | | |
| 11-11 OC | 8 | | | | |
| 11-12 OC | 8 | | | | |
| 11-23 OC THANKS HOLIDAY | 8 | | | | |
| 11-24 OC THANKS HOLIDAY | 8 | | | | |
| 11-25 OC | 8 | | | | |
| 11-26 OC | 8 | | | | |
| 12-28 OC | 8 | | | | |
| 12-29 OC | 8 | | | | |
| 12-30 OC | 8 | | | | |
| 12-31 OC | 8 | | | | |

**RANDOLPH 2001    $26.51**

| DATES | CALL MAKEUP HOURS CLAIMED | DATES | CALL MAKEUP HOURS TAKEN | BALANCE | COST |
|---|---|---|---|---|---|
| 01-01 NEW YEARS DAY OC | 8 | 01-16 MUDO FROM 2000 | 8 | 72 | $1,908.72 |
| 01-06 OC | 8 | 01-17 MUDO FROM 2000 | 8 | | |
| 01-07 OC | 8 | 01-18 MUDO FROM 2000 | 8 | | |
| 01-27 OC | 8 | 01-19 MUDO FROM 2000 | 8 | | |
| 01-28 OC | 8 | 01-22 MUDO FROM 2000 | 8 | | |
| 02-03 OC | 8 | 01-23 MUDO FROM 2000 | 8 | | |
| 02-04 OC | 8 | 01-24 MUDO FROM 2000 | 8 | | |
| 02-10 OC | 8 | 03-09 MUDO | 8 | | |
| 02-11 OC | 8 | 03-14 MUDO | 8 | | |
| 03-24 OC | 8 | | | | |
| 03-25 OC | 8 | | | | |
| 03-31 OC | 8 | | | | |
| 04-01 OC | 8 | | | | |