# EXHIBIT 7

STATE OF OKLAHOMA    )
                     )SS.
COUNTY OF OKLAHOMA   )

I, Raymond Greninger, of legal age, being first duly sworn upon oath, deposes and states.

That the facts, events and circumstances contained in the attached narrative statement are accurate, true and correct to the best of our recollection, knowledge, information and belief.

_____
RAYMOND GRENINGER

SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 1999.

_____
Notary Public

My Commission expires:

_____

STATE OF OKLAHOMA     )
                    ) SS
COUNTY OF OKLAHOMA    )

RAYMOND GRENINGER
TROOPER
OHP

**AFFIDAVIT**

This is 2Lt Paul Gordon #67 of the Internal Affairs and Special Investigations Division of the Department of Public Safety, Oklahoma Highway Patrol. Today's date is 11-02-99. The time is 1:07. I am in the Internal Affairs office in Oklahoma City at 3600 Martin Luther King. Present in the room with me is Trooper Raymond Greninger.

GORDON:       Trooper Greninger, is you would, I'm handing you the Disciplinary Interview Advice of Right, could you please read that out loud for me sir?

GRENINGER:       I understand that I am being questioned as part of an official investigation of the Oklahoma Department of Public Safety and will be asked questions specifically directed and narrowly related to the performance of my official duties or fitness for office. I also understand I am entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate myself. In addition, I

1

KEB203353

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

understand if I refuse to testify or to answer questions relating to the performance of my official duties or fitness for duty, I will be subject to departmental charges which would result in my dismissal from the Oklahoma Department of Public Safety. If I do answer, neither my statements nor any information or evidence which is gained by reason of such statements can be used against me in any subsequent criminal proceeding. However, these statements may be used against me in relation to subsequent departmental charges.

GORDON:    Okay sir, would you please sign where it says signature of affected employee and date it please. Could you please state your complete name?

GRENINGER:    Raymond C Greninger, Jr.

GORDON:    Sir, could you spell your last name for me?

GRENINGER:    G R E N I N G E R

2

KEB203354

STATE OF OKLAHOMA )         RAYMOND GRENINGER

) SS                TROOPER

COUNTY OF OKLAHOMA )       OHP

### AFFIDAVIT

GORDON:       Could you state your date of birth?

Greninger:       ▮▮▮▮▮▮

GORDON:       Your social security number?

Greninger:       ▮▮▮▮▮▮▮

GORDON:       How long have you been on the patrol?

Greninger:       Ah, since March of 1984.

GORDON:       Where are you currently assigned at?

Greninger:       Ah, I'm assigned to the Bomb Squad Division out of Pryor area.

GORDON:       Ah, sir, are you on the Tac Team?

Greninger:       Yes sir.

GORDON:       What is your assigned position on the Tac Team?

Greninger:       Ah, building entry.

GORDON:       Can you please tell me what happened at

3

KEB203355

STATE OF OKLAHOMA    )                          RAYMOND GRENINGER
                     ) SS                        TROOPER
COUNTY OF OKLAHOMA   )                          OHP

AFFIDAVIT

approximately 0038 on September 24, 1999?

Greninger:    Okay, you just want to start when it happened, you want the background as to what we did up til this

GORDON:    If you could start with, specifically in reference to what happened in that event from the time you got off the Interstate.

GRENINGER:    Okay, we were going to execute a search warrant and a felony arrest warrant and we also had a misdemeanor warrant for an individual for named Kenneth Barrett, ah, we exited Interstate 40 on to ah I believe it's Dwight Mission Road was the name of it, when we exited the Interstate we were to link up with a task force group of Sequoyah Personnel, ah which was supposed to consist of ah, two investigators, ah, and a small group to actually take care of the, the scene once we secured the residence with a search warrant. Ah, when we pulled off the Interstate and turned north ah there was a large group of people ah, probably rough guess and I don't really know how many was there, maybe 15 or 20 people which consisted of the D.A., ah a Sheriff from another county ah, and other people that I'm not familiar with who it was.  We paused there for a minute, ah, advised them that we were en route and they were told wait, to give us two minutes and ah they could follow the procession, follow in behind us but to give us two minutes which we felt was more than enough time to get in and take care of the

4

KEB203356

STATE OF OKLAHOMA ) 

                  )SS

COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

## AFFIDAVIT

situation that we had, our part of the situation.  We left there and went northbound which consisted of Trooper Hamilton's unit was in front, my unit, ah, Trooper Hise's unit, ah, Trooper Hash's unit and Lt Pettingill's unit, we had five units, we continued north to the intersecting road that turned us east to go to the residence that we were going to execute the search warrant on.  As we crossed the final intersection ah to go to the house, there was another 200 or 300, 400 yards to ah the residence which had a gate which from the Intel that we had done the prior two days and we knew that the gate was was locked and having double strand of log chain around it and two padlocks.  The plan was is for Trooper Hamilton's unit, my unit and Trooper Hash's unit to continue on a very short distance 20 - 30 yards on up, there was another road that went to another residence that ah, was not, that did not have a gate and there was, from the aerial photos, and from the drive by there was another road that we could turn into to make entry into the house to get there as quickly as possible.  As we turned into the other road, Trooper Hise's was going to peel off and stop at the gate which consisted of three people, their objective was to ah provide cover for us, also to ah, get to the site of the residence, we had information that the guy would run and try to make it to his mother's house which was next door, and also Lt Pettingill and Lt McBride ah pulled into the mother's residence and that was also their job there to take down anybody that would come.  The other three units led by Trooper Hamilton's unit, my unit was second and Trooper Hash's unit was third, was to enter the next road ah, make

5

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

an approach to the house and make entry into the house and secure the residence. As we turned into the road, and turned off of that road into the little lane that would take us into it, there ah, I, as Trooper Hamilton's unit dropped down in it, there was a ditch that was quite a bit deeper than we anticipated, I can remember seeing Trooper Hamilton's unit, the rear end of it, his bumper rear bumper bottoming out in that ditch, there was no pause though it was just a continuous motion and as I knew that I had to hit the gas, I hit the gas and we went through the ditch and we started our approach and I have drawn a blank from the time I hit the ditch up until we actually came up, I can actually hear rounds going off as we're pulling up to stop, I can see Buddy's car still moving but the distance in there I don't exactly know where in relation to where we were when we started hearing the rounds. As we pulled up to stop, I could see debris and stuff coming up, I could hear automatic, sounded like automatic gun fire and I could see debris coming up from the area of ah Trooper Hamilton's vehicle and I'm thinking, I initially my thoughts are, it's dirt, why are we shooting in the ground and ah, I can see ah, ah debris coming up, I'm sure what I was seeing was the windshield off his vehicle, fragments of glass going up in the air from the bullets, it took a few seconds to ah determine if the shots were coming from them, if the shots where coming from there and as we stopped Trooper Manion, I was driving, Trooper Manion was my passenger, ah, we stopped our vehicle in the area of where ah in relation to Trooper Hamilton, we both exited the vehicle as Trooper Manion came around first as I

6

KEB203358

STATE OF OKLAHOMA    )
                     ) SS
COUNTY OF OKLAHOMA   )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

was still putting it in park, getting it stopped and as I come out we met Trooper Eales who had made it to the rear of the Trooper Hamilton's Bronco and he dropped face down on the ground.  Trooper Manion dropped and was asking "Rocky, are you okay, are you okay", and I ran back to my unit and grabbed the mike and yelled "Officer down, need help, man down" and we were gonna make entry with a hand gun, my rifle was laying right there, I grabbed my rifle and came back around the front of the car and Trooper Manion had, while he was looking Rocky, had seen movement inside the house and the guy stepped across into a window on the east side and Trooper Manion was going around to that side, I continued around the front of the car to go with him and as he got to the window, he seen the individual ah inside the room, or movement or whatever he seen and he fired a burst from an MP5 into the window, ah, as I'm coming around I can see Trooper Hamilton stepping up on the porch and I'm thinking, I can hear him yelling something at somebody, has his pistol pointed towards the door and I can hear him saying something, he's stepping up to the door, and I start yelling at Rick "Buddy's going in, Buddy's going in" ah, my intent was so Rick wouldn't fire anymore rounds because I didn't want him to, to shoot our own person.  Rick heard me, he, he did not fire anymore, Buddy steps in the door, I go to Buddy and as Buddy, as I get to Buddy he's got the individual, he's drug him out and he's placed on the ah, he's placed there on the ground ah, Trooper Manion's made it back there to us then, he takes him and they place the handcuffs on him and our focus immediately, at that point, ah turns to Trooper

7

STATE OF OKLAHOMA     )
                      ) SS
COUNTY OF OKLAHOMA    )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

Eales to what we can do for him. Trooper Poe had made it up to the vehicle, he has the house, he has a, his A2K rifle and he has, he is holding ah, he's maintaining cover on the residence so we can do what we need to do to get Trooper Eales out of there, ah, Trooper Hise has also made it there, Trooper Hise and Trooper Hamilton and Trooper Manion are, have, we've all got to Rocky, they start working on Rocky, I look up and see that Lt Pettingill's vehicle has made it into the yard, I run down to him and tell him we need an ambulance, we need something and he tells me to get him in to one of the Broncos and get him out of there. I run back to Trooper Hamilton's Bronco which I ah, tried to roll the back glass down from the inside, the driver's door was still open, it wouldn't go down, I ran behind it, I took my rifle I beat the back glass out of it to try to get the tailgate down and it dawns on me that the vehicle is disabled, that we can't do it, so I yell at them to get him to my vehicle, I get the tailgate down, I get everything ready, we get Rocky over, put him into the back of my vehicle and Trooper Hise get's in it and he drives it ah and takes it out, the Sheriff of, of, of Cherokee County, I can't remember her name off the top of my head and she's an RN, and a D.A.'s investigator, Clint Johnson, ah, she had gotten in, she is a registered Nurse, she's gotten in the back and she's working on Rocky and Clint Johnson's helping her and Trooper Hise and we get them out of there and they leave. We immediately focus back on the job that we have to do and that is to secure the residence because at that point and time we don't know whether we have the shooter or the only shooter, or or

8

KEB203360

STATE OF OKLAHOMA    )
                     ) SS
COUNTY OF OKLAHOMA   )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

whether there's more, so we go back to the residence, ah Trooper, myself and Trooper Poe and Trooper Manion and Danny Oliver, who is a retired Trooper, and I don't remember if, Trooper Hash was there somewhere, I don't remember, I know the four of us made entry into the residence, secured the residence and when we got to the area that we knew had an upstairs, a small room, we needed a mirror to look up there to see if anybody was there, we yelled for a mirror and Trooper Hamilton brought the mirror in, which I took from him, handed to Trooper Manion who actually did the deal, and at that time I noticed blood on Trooper Hamilton and I could see ah, some debris in his eye, I can see some blood under his eye, and I, he was still holding his pistol and I, I ask him "Buddy, are you okay" and I reached down and touched him on the shoulder and he flinched, and when he did I felt blood and noticed here was blood on his shoulder and I did a quick physical scan of him to see if there was, I could see any other injuries to him and he says "no, I think that's all there is" I took his Sig from him, placed it in my waistband and told him "com on, I'm gonna get you to the hospital" and I took him out as I went by Lt Pettingill I told him what I was doing and I took him back out to the fence that was on the road and there was a Sheriff's deputy, I don't recall his name, I put him inside his Ram Charger and told him to get him to the hospital in Sallisaw as fast as he could get him there. I came back up to Lt Pettingill and told him that I had got Buddy out of there and got him headed toward a hospital, told him that I had Buddy's service weapon, which was his Sig, and ask him what he wanted me to do with

9

KEB203361

STATE OF OKLAHOMA    )                    RAYMOND GRENINGER
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                    OHP

AFFIDAVIT

it and he told me to place it ah, on the porch of the residence and to advise whoever showed up to do the investigation, that that's what had been done, that that weapon, how that weapon come to be on the porch. Ah, at that time we backed out of it, placed the crime scene around it and waited for the appropriate people to get there to process the crime scene.

GORDON:    You fire any rounds during the confrontation?

GRENINGER:    No sir.

GORDON:    Did you assist in taking the suspect Kenneth Barrett into custody, in any way, did you touch him in any way?

GRENINGER:    I never physically touch him.

GORDON:    Did you see anybody else touch him or do anything mean to him?

GRENINGER:    No sir, I did not.

GORDON:    Basically just our Troopers touched, did we keep control of him or did we pass him off to

GRENINGER:    No sir, at some point and time into the process of of, getting Trooper Eales out and securing the residence and that

10

KEB203362

STATE OF OKLAHOMA    )                      RAYMOND GRENINGER
                     ) SS                   TROOPER
COUNTY OF OKLAHOMA   )                      OHP

AFFIDAVIT

from the proximity of where he was laying in front of it, there was also a residence, which I stated was his Mom's, at some point and time the deputies for Sallisaw ah, obtained custody of him and moved him around to the east side of the house. When that happened or who moved him, or what I have no idea, I was not there, I didn't see anything, I don't know the time frame that it was, we were still in the process of finishing what we were sent there to do and that was to secure the residence and, and I have no idea when he was moved.

GORDON:        Okay.  And you know what the suspect looked like, you know the suspects name?

GRENINGER:     Ah, I do now, the suspects name is Kenneth Barrett.

GORDON:        Okay, did you know what he looked like prior to the entry being attempted.

GRENINGER:     No sir.

GORDON:        Did you have any kind of physical description or anything of him.

GRENINGER:     They gave us a rough physical description, but it didn't really match and right off the top of my head right now, I

11

KEB203363

STATE OF OKLAHOMA )
)SS
COUNTY OF OKLAHOMA )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

drew a blank as to what it was, it seemed like they told us he was 5'6" or 5'7" and weighed around 150 or 160 lbs which is not, the first time that I actually seen him to look him in the face was at his arraignment in Sallisaw. We ah, something off the question that you ask, we ask for pictures we were told that there was no pictures of Kenneth Barrett off the other arrests or or the things that he had been in trouble because they had always found a way to slide him out before the actual booking and the arrest photos could be made. We were under the impression that there were no arrest photos of Kenneth Barrett from any other times dealing with law enforcement personnel.

GORDON:        You know how many suspects were in the house or on the property prior to being there?

GRENINGER:        Prior to

GORDON:        Prior to your getting to the house er, or prior to your making entry to the house.

GRENINGER:        There was, the only thing that was told during our, I'm gonna have to back up a couple of days now, okay, we started from the deal, Trooper Hamilton and I, three days, two days prior, did a, we met with the District Attorney, er the D.A.'s Task Force which was Clint Johnson and Frank ah, I can't remember Frank's last name right now, we met with them at the Sallisaw Airport on

12

KEB203364

STATE OF OKLAHOMA        )
                         ) SS          RAYMOND GRENINGER
COUNTY OF OKLAHOMA       )             TROOPER
                                       OHP

AFFIDAVIT

instructions from Lt Pettingill to do a fly over of the area and take some aerial photos and also a video of, during that time Trooper Hamilton and I ah, we did the fly over, out pilot was Kenneth Stafford, we did the fly over, took some aerial photographs and still photos and used a video camera which was my personal video camera and and took a video of the area to attempt to formulate some sort of a plan, to look at the area to see what would be our best option to be able to maintain the element of surprise off this deal.  At that time the questions that was ask, is, you know, is he there, who lives with him, ah, all this information, we were led to believe under the assumption that he was a real recluse, he never left the property, he lived by himself, and that ah, to distribute his drugs that the people came to him, that there was nobody that lived there with him.  Ah, that was two days, in the afternoon before we executed the raid after midnight that night, Trooper Hamilton, Trooper Manion and myself did a drive by of the residence to ah, to look at it a little closer just to maintain that all the information that we had was accurate and true and that we had that we had the best plan, we had met when we arrived that morning and formulated a plan and we just wanted, we always attempt to do a drive by to make sure what we're looking at from the air is actually what we're looking at from the ground.  Ah, our initial plan was to deploy snipers across the road, they were gonna come up and cut the gate for us, but after we did the drive by the area was so tight there's so many houses, so many dogs and everybody is there, that there was no place to deploy

13

KEB203365

STATE OF OKLAHOMA    )
                     )SS
COUNTY OF OKLAHOMA   )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

those people without taking an extremely high risk of compromising them and ah causing us problems other than that. Ah, at that time when we did the drive by, at the residence, there was two male individuals in the outside of the residence. There was a bunch of cars out front and there was two male individuals out there, we still didn't know because we did not have a photograph, all we had was a physical description of the individual, whether one of them was Kenneth Barrett or not at that time, ahem, so to answer your question, we at that point and time, we took under the assumption that there was possibly gonna be more because we had seen people, that we were led to believe by the people that we were actually executing the warrant for that he was a recluse that lived by himself, and there would probably be nobody else there.

GORDON:    You know how many and what type of weapons were inside the house?

GRENINGER:    The only type of weapons that I can, there was a, when we made entry into the residence to secure it after he had been brought out, course he had a handgun on him, there was a, in the, as you go into the door there's, ah, this is an extremely, extremely small place, there's a living room type area or whatever in the front and there a, immediately to the right there's a, a little nother type room, I mean it's too little to be, my closet in my house is bigger than that, but it's a real small room, in the floor of that residence when we did make entry the stairway to go

14

STATE OF OKLAHOMA     )
                      )SS
COUNTY OF OKLAHOMA    )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

up was right there, there was a M-16/AR15 type rifle laying on the, in that floor, there was a sawed off double barrel shotgun laying in that floor that was not picked up and not disturbed in any way by any of the people that we had there so what they were, caliber or anything like that I don't know, but there was two weapons laying there and that is the only weapons that I seen inside the house.

GORDON:        Okay.  Were you all advised of the criminal history of the suspect?

GRENINGER:     Ah, yes, we were advised that, off the warrants were advised that he'd made, we'd been advised that he'd been making statements that he wouldn't be taken alive, we knew that the ah, the felony arrest warrant that we had ah, was a felony arrest warrant for ah, unlawful delivery or something of ah, of a controlled substance and that the misdemeanor warrants were, had occurred then they attempted to arrest him on that deal and he had pulled weapons, we were familiar about this criminal history, yes.

GORDON:        Do you know who provided intelligence for this mission to the patrol tactical team?

GRENINGER:     Ah, yeah, I believe it would be the people that I stated earlier, it was Clint Johnson, and Frank, I can't remember

15

KEB203367

STATE OF OKLAHOMA       )
                        )SS
COUNTY OF OKLAHOMA      )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

Franks last name right now, they are the D.A.'s Task Force for Sequoyah/Cherokee County, that type, that area.

GORDON:        Do you think that the intelligence that they provided the TAC team was okay?

GRENINGER:        Well, that's ah, that's a rough question, ahem, I think, I think, Franks last name I think is Lloyd, I'm not sure, but I think that's what it is, but the information that we were given, I think that there was other information that we didn't receive ah, and the only reason I say that is because after the fact information has surfaced and I don't know whether that information is accurate or whether or whether it's people talking. At that particular time when we did the warrant, we believe that we had the most up to date and accurate information that we could go off of, ah, so not knowing whether all the speculation and the talk and the rumors and all of that are true, I would have to say from doing the actual warrant that day, I felt that we had the most up to date information and not knowing whether everything else is true or not  and you know, it's hard for me to answer that question.

GORDON:        Okay.  Do you know what type of vehicles were used to conduct surveillance on the residence, either by the patrol or the D. A.'s Task Force?

GRENINGER:        The only vehicle on the patrol side that was used to

16

KEB203368

STATE OF OKLAHOMA       )                           RAYMOND GRENINGER
                        )SS                         TROOPER
COUNTY OF OKLAHOMA      )                            OHP

AFFIDAVIT

do surveillance on it was a white 1985 Ford Bronco which was Trooper Hamilton's Bronco, it was totally unmarked, it does have antennas on the top but we stopped and removed all the antennas off the vehicle before we made the drive by.  Ah, there was no markings, it has a plain tag on it, that was the only vehicle that we used, used by patrol personnel that I am aware of other than the aircraft to do any surveillance on it.

GORDON:      Did you say '85 or '95?

GRENINGER:   I mean ah, I'm sorry it's '95, drives like an '85.

GORDON:      Do you know, do you know why the interior lights were not deactivated, on Hamilton's vehicle?

GRENINGER:   Well, I'll tell you Lieutenant, I've, the interior light on that vehicle had no bearing on what happened there in my opinion.  I've been a firearm instructor a long time and I've done that and I walked into the (inaudible) and he had a pet peave for me I walked into the garage and Darrell at the garage, when I pulled my vehicle with Trooper Hamilton in it, I'm sorry, it was Trooper Hise, when we come up he walks out there and I'm trying to get something worked on on mine and he looks into mine, when the door opens on it and he looks in there and says "that light right there it's working in here, that's what killed Trooper Eales".  I'm

17

STATE OF OKLAHOMA   )
                    ) SS
COUNTY OF OKLAHOMA  )

RAYMOND GRENINGER
TROOPER
OHP

AFFIDAVIT

sorry, that's not what killed Trooper Eales, that light had no bearing whatsoever, they were taking fire a long time before that, you can look at the patterns on the windshield and when that, when that door opened, the man was already shooting, the pattern was aiming at the center of the windshield coming that way, I'm sure he seen the door open, I don't believe there was enough light off of that that it made a difference. Why it was not deactivated, I do not know, why is not every passenger dome light on ever patrol car we have across the state deactivated, but they work, and that's an individual preference, up to the Trooper. I do not believe that that light had any bearing over what happened.

GORDON:      Okay. Can you think of anything else that might help me conclude my investigation of the events that occurred in Sallisaw on September 24, 1999.

GRENINGER:      No.

GORDON:      Trooper Greninger, are you aware that our conversation has been recorded and may be reduced to a typed sworn affidavit for your signature at a later date sir?

GRENINGER:      Yes sir.

GORDON:      Sir, with your permission, I'm gonna turn off the tape recorder at this time.

18

KEB203370

STATE OF OKLAHOMA    )                    RAYMOND GRENINGER
                     )SS                  TROOPER
COUNTY OF OKLAHOMA   )                     OHP

AFFIDAVIT

19

KEB203371