**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Movant/Defendant, | ) | **DEATH PENALTY CASE** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | NO.  6:09-cv-00105-JHP |
| | ) | |
| Respondent/Plaintiff. | ) | |

---

**SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE UNDER 28 U.S.C. § 2255**

---

**TABLE OF CONTENTS**

TWENTIETH GROUND.

      THE GOVERNMENT SUPPRESSED EXCULPATORY EVIDENCE WHICH WOULD
HAVE COMPLETELY UNDERMINED ITS THEORY OF THE CASE AND
SUPPORTED MR. BARRETT'S CLAIM OF SELF-DEFENSE.  THE GOVERNMENT
KNOWINGLY SPONSORED FALSE EVIDENCE IN CONFLICT WITH THE
EXCULPATORY EVIDENCE IT SUPPRESSED.  MR. BARRETT WAS THEREFORE
DENIED HIS FIFTH AMENDMENT DUE PROCESS RIGHTS, HIS RIGHT TO A
FAIR TRIAL, AND HIS EIGHTH AMENDMENT RIGHTS TO A RELIABLE
SENTENCING DETERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    2.    Facts supporting the claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TWENTY-FIRST GROUND.

      APPOINTED TRIAL COUNSEL'S FAILURE TO REASONABLY INVESTIGATE
THE RELEVANCY AND MATERIALITY OF INFORMATION KNOWN TO THE
OKLAHOMA HIGHWAY PATROL INTERNAL AFFAIRS INVESTIGATOR AND
TO CALL HIM AS A WITNESS TO  TESTIFY TO THE FALSE VERSION OF
EVENTS PRESENTED BY THE GOVERNMENT WAS PREJUDICIAL TO AND
DEPRIVED MR. BARRETT HIS CONSTITUTIONALLY AND STATUTORILY
GUARANTEED RIGHTS TO THE EFFECTIVE ASSISTANCE OF QUALIFIED
AND COMPETENT ATTORNEYS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    1.    Availability of Mr. Gordon to Testify. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    2.    Summary of Paul Gordon's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    3.    Specific Acts of Prejudicial Deficient Performance by Trial Counsel. . . . . . . . 16

        a.    Mr. Barrett's Counsel unreasonably failed to investigate and
present the testimony of Paul Gordon to refute the affidavit
supporting the Search warrant to support the *Franks v. Delaware*
reconsideration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        b.    Trial counsel failed to investigate, interview, and present
testimony of a critical material witness,  Mr. Paul Gordon, retired
OHP Internal Affairs Investigator, that would have rebutted the
prosecution's theory of the case, supported the defense theory,
and formed the basis for acquittal or conviction of
a lesser offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i.     The Mission Should Have Been Aborted. . . . . . . . . . . . . . . . . . 19

ii.    There was No Emergency Lighting Activated Identifying Law
       Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

iii.   There is credible substantive and impeaching evidence
       through Paul Gordon's Interviews and Investigation that a
       member of the OHP East Tact Team, not Mr. Barrett. initiated
       the gunfire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

iv.    Information known to OHP indicated Mr. Barrett would run
       from  to law enforcement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

v.     Credible evidence undeveloped by trial counsel would have
       shown that Mr. Barrett did not have a pill bottle with red
       phosphorous residue in his pocket. . . . . . . . . . . . . . . . . . . . . . . 24

vi.    After arrest, Mr. Barrett was beaten by the Sheriff and two of
       his deputies. Denials that a beating was administered
       were false. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

c.     Trial Counsel was constitutionally ineffective for failing to call Mr.
       Gordon to refute the legitimacy of the experiment of Iris Dally
       both as a fact witness and expert witness. . . . . . . . . . . . . . . . . . . . . . 27

d.     Trial Counsel's failure to interview, prepare and present the
       testimony of Mr. Gordon regarding the OHP witnesses and the
        lack of adherence to any reasonable protocol, including their own,
       in the execution of the High Risk Warrant which created Mr.
       Barrett's reasonable belief that he was being attacked by unknown
       criminals and the OHP witnesses's continuous efforts to avoid
       disclosing the same fell far below prevailing norms and wholly
       undermined the reliability of the verdicts and sentence
       in this case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

TWENTY-SECOND GROUND.
       MR. BARRETT'S COUNSEL UNREASONABLY FAILED TO INVESTIGATE AND
       PRESENT THE TESTIMONY OF THE HONORABLE JOHN GARRETT, WHO
       COULD HAVE TESTIFIED TO THE REPUTATIONS FOR TRUTH AND VERACITY
       OF SANDERS AND JOHNSON. THE TESTIMONY WOULD HAVE REASONABLY
       LED TO A DIFFERENT OUTCOME ON THE *FRANKS* ISSUE. . . . . . . . . . . . . . . . . 29

TWENTY -THREE GROUND.
THE COURT'S FAILURE TO CONSIDER  SIGNIFICANT AND READILY AVAILABLE EVIDENCE TO SUPPORT A FINDING THAT USE OF A  STUN BELT WAS UNNECESSARY, AND TRIAL COUNSEL'S FAILURE TO URGE CONSIDERATION OF THE SAME, DEPRIVED MR. BARRETT OF DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . 30

TWENTY-FOURTH GROUND.
MR BARRETT WAS UNCONSTITUTIONALLY PREJUDICED BY THE TRIAL COURT'S INTERFERENCE WITH HIS DEFENSE WHICH COMPELLED MR. JOHN ECHOLS TO WITHDRAW BECAUSE MR. ECHOLS KNEW OF AND WOULD HAVE PURSUED THE POTENTIAL TESTIMONY OF RETIRED TROOPER GORDON. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TWENTY- FIVE GROUND.
MR. BARRETT'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**APPENDICES INDEX**

Appendix A
        Audio Tape at Crime Scene by Paul Gordon on September 24, 1999 . . . . . . . . . . . . . A-1

Appendix B
        Crime Scene Videotape by Paul Gordon on September 24, 1999    . . . . . . . . . . . . . . . B-1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA


KENNETH EUGENE BARRETT,                  )
                                          )
            Movant/Defendant,            )        **DEATH PENALTY CASE**
      vs.                                 )
                                          )
UNITED STATES OF AMERICA                 )        NO.  6:09-cv-00105-JHP
                                          )
            Respondent/Plaintiff.        )

---

**SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT A JUDGMENT, ORDER AND/OR SENTENCE UNDER 28 U.S.C. § 2255**

---

COMES NOW, Movant, KENNETH EUGENE BARRETT, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence based on the Grounds previously alleged in Mr. Barrett's Amended §2255 Motion to Vacate Judgment/Order/Sentence (Doc 95) supplemented by the Grounds alleged herein which specifically relate back to the Grounds raised in the § 2255 Motion to Vacate (Doc 95) now pending.

Mr. Barrett states for relief requested the following supplemental grounds:

## TWENTIETH GROUND

**THE GOVERNMENT SUPPRESSED EXCULPATORY EVIDENCE WHICH WOULD HAVE COMPLETELY UNDERMINED ITS THEORY OF THE CASE AND SUPPORTED MR. BARRETT'S CLAIM OF SELF-DEFENSE.  THE GOVERNMENT KNOWINGLY SPONSORED FALSE EVIDENCE IN CONFLICT WITH THE EXCULPATORY EVIDENCE IT SUPPRESSED.  MR. BARRETT WAS THEREFORE DENIED HIS FIFTH AMENDMENT DUE PROCESS RIGHTS, HIS RIGHT TO A FAIR TRIAL, AND HIS EIGHTH AMENDMENT RIGHTS TO A RELIABLE SENTENCING DETERMINATION.**

**1.  Introduction**

The Government's theory of the case, based on the testimony of the OHP Tact Team members, was that Mr. Barrett knew full well that the individuals who entered his property on the night of September 24, 1999 were law enforcement officers, because the emergency lights on at least some of the vehicles were engaged from the very inception of the raid.  Therefore, Mr. Barrett shot Trooper Eales knowing or having reason to know that he was a law enforcement officer, and killed him based on this knowledge while Trooper Eales was engaged in his official duties.   Several of the informant witnesses, who testified that Mr. Barrett had threatened to shoot or kill any law enforcement officer or officers who came on his property, lent support to this theory.  Taking these witnesses together, the Government argued that Mr. Barrett made good on his alleged threats because he knew, at the time he fired his weapon and shot and killed Trooper Eales, that he was firing at law enforcement officers.  The Government also relied on the testimony of Charles Choney, an expert on SWAT tactics who was inexplicably called by the defense.  Choney testified that the raid was properly conducted and that the members of the OHP Tact Team "did nothing wrong."

Charges of manufacturing and/or attempting to manufacture methamphetamine provided jurisdiction for this federal prosecution.  One of the key pieces of evidence for the underlying

drug charges was that a quantity of red phosphorous, an ingredient in the manufacturing of methamphetamine, was found on Mr. Barrett's person by local law enforcement when he was searched following the shooting.

The defense argued that due to the manner in which the raid was conducted, Mr. Barrett was unaware that law enforcement was on his property, and that he reasonably believed he was acting in defense of himself and his son, Toby Barrett. With respect to the underlying drug charges, the defense argued that the evidence was insufficient to support them because no working lab was found on the property and only trace amounts of methamphetamine were found.

These arguments foundered because critical exculpatory evidence which would have supported them and thoroughly discredited the Government's version of events was not disclosed by the prosecution. The exculpatory evidence suppressed by the Government, which went to the manner in which the raid on Mr. Barrett's property was actually conducted, would have shown that Mr. Barrett reasonably believed that trespassers, not law enforcement, were on his property, and that he justifiably used lethal force to repel them. Along with discrediting the "official" version of events, this exculpatory evidence would have rendered irrelevant the testimony from the informant witnesses that Mr. Barrett had threatened to shoot or kill any law enforcement officer who came on his property.

**2. Facts supporting the claim**

Paul Gordon was the OHP internal affairs investigator who responded to Mr. Barrett's property at the direction of his superiors on the night of the shooting. Mr. Gordon has extensive experience both with OHP and other law enforcement. (Declaration of Paul D. Gordon in Support of §2255 Motion to Vacate (Doc 95) and Supplemental 2255 Motion herein ("Gordon Dec") at 1-2 ¶ 4) He was responsible for investigating the shooting and reconstructing the crime

scene.  The Government failed to disclose exculpatory facts and conclusions from his

investigation, and, along with agents of State government relied upon in the Government's case,

acted improperly to prevent Gordon from being a credible witness.  The exculpatory facts and

conclusions the Government failed to disclose include:

• Contrary to the testimony of the OHP Tact Team witnesses, including Trooper Kerry

Pettingill, Pettingill told Mr. Gordon that he believed members of the Tact Team *fired weapons*

when they "rolled up" on Mr. Barrett's property.  (Gordon Dec at 3 ¶ 8)  This would obviously

support Mr. Barrett's claim of self-defense.  The prosecution knowingly introduced false

evidence from the OHP witnesses which portrayed any shooting by the OHP Tact Team as purely

defensive in character.

• Contrary to the testimony of the OHP Tact Team witnesses (and defense witness Chuck

Choney, who was quickly converted into a prosecution witness both on direct and cross-

examination), the raid was poorly planned, lacked adequate intelligence and surveillance, and

directly violated OHP policies and procedures for an arrest of an alleged "high risk" fugitive.

Tact Team vehicles entered Mr. Barrett's property without warning that law enforcement was on

the premises.  This violated OHP policy that an announcement should be made for the safety of

all concerned.  Otherwise, just as occurred in this case, the target might believe trespassers (for

example, rivals from the drug world) are invading his property and react violently in apparent

self-defense.  (Gordon Dec at 3, 6, 9-10, 15, 17, 19 ¶¶ 10, 15, 22-24, 43, 50, 56)  Mr. Barrett's

belief that trespassers had roared onto his property was heightened by the fact the OHP "drive

by" on the afternoon preceding the raid was made in what appeared to be a civilian vehicle.

(Gordon Dec at 11 ¶ 24)

In brief, Mr. Gordon concluded "[t]he Manual and Training Videos available to the East Tact Team at the time make it clear that on September 24, 1999, the manner of serving or executing the High Risk Warrant/s on Kenneth Barrett was against protocol, grossly unprofessional and created far greater risk of injury or death than the situation would have presented if appropriate planning and measures had been taken." (Gordon Dec at 19 ¶ 56)

This conclusion from Mr. Gordon's investigation clearly conflicted with the prosecution theory and testimony, and supported Mr. Barrett's defense that he acted in self-defense while thinking criminal trespassers had invaded his property. To the extent OHP witnesses testified that the raid was properly planned, was based on adequate intelligence and surveillance, and was executed "by the book," the prosecution knowingly sponsored false testimony.

The problems with the planning, intelligence and surveillance in connection with this raid were so pronounced that OHP Lieutenant McBride, who was delegated from his usual position on the West Tact Team to the East Tact Team for this particular operation, advised that the raid be aborted. Lieutenant McBride was told to go back to the West Tact Team if he disagreed with the way the raid was going to be conducted. Lieutenant McBride was extremely upset and emotional when he related this to Mr. Gordon. (Gordon Dec at 17 ¶ 50)

It is Mr. Gordon's view that had the OHP conducted adequate, real-time surveillance as directed by policy, Mr. Barrett could have been arrested, likely without incident, while he and his son Toby were working on a vehicle the day of the raid. (Gordon Dec at 11 ¶ 24) Based on the limited intelligence that was available, Mr. Barrett's likely reaction to law enforcement presence on his property would be to attempt to flee on foot. This was supported not only by the fact that OHP personnel were stationed at adjoining residences at the time of the raid, but by statements made to Mr. Gordon by Troopers Manion and Hise. (Gordon Dec at 11-12 ¶ 24) Therefore, a

sudden confrontation without warning involving numerous vehicles charging onto the property in the middle of the night was an ill-advised and improper tactic, aside from the fact that it violated OHP protocol to begin with.  (Gordon Dec at 3, 6, 9-10, 15, 17, 19 ¶ 10, 15, 22-24, 43, 50, 56, )

• Against the testimony of the OHP Tact Team witnesses, the members of the Tact Team *did not* engage their emergency lights during the raid.  Indeed, no vehicle lights were engaged. The Tact Team "rolled in dark."  (Gordon Dec at 10, 12 ¶¶ 23, 25)  The Government knowingly sponsored false testimony to the effect that Mr. Barrett was "warned" of the law enforcement presence because emergency lights were activated on some of the vehicles from the inception of the raid.

Trooper Hamilton, who drove the lead Ford Bronco in which Trooper Eales was a passenger, initially told Mr. Gordon that the "flip lights" on the vehicle's visor had been engaged, but later admitted he did not engage these or any other emergency lights.  The physical evidence itself showed that the "flip lights" had not been activated.  Had the visors been lowered and the "flip lights" engaged, they would have been shot out by the rounds fired by Mr. Barrett through the windshield of the Bronco, but this did not happen.  (Gordon Dec at 10, 12 ¶¶ 23, 27-28 )

Task Force Agent Frank Lloyd, who arrived on the scene in the immediate aftermath of the shooting, told Mr. Gordon that he could see the tail lights of the OHP vehicles when they turned onto Mr. Barrett's drive, but mentioned nothing about seeing any emergency lights. (Gordon Dec at 12 ¶ 26)

One of the key "facts" elicited and argued by the prosecution at trial for the proposition that Mr. Barrett "knew" law enforcement officers rather than trespassers were on his property was that Trooper Hash, who was in a marked unit, drove onto the property with his lights and flashing bar on.  This is what Trooper Hash initially told Mr. Gordon, and what he testified to at

trial, but Hash ultimately admitted to Mr. Gordon that "somebody just flipped the lights on after the shooting to give needed light during the wounded trooper's evacuation." (Gordon Dec at 13 ¶ 26)

Likewise, Mr. Gordon's investigation revealed that no emergency lights on Lieutenant Pettingill's vehicle were engaged. Had emergency lights on Pettingill's vehicle been activated, they would have been seen by Mr. Barrett had he looked in that direction. However, when Mr. Gordon examined Pettingill's vehicle, the flip lights were in the "up" position. These lights would not have been engaged because they would have impaired the view Trooper McBride, the assistant team leader, who was stationed near Mr. Barrett's mother's residence. (Gordon Dec at 13 ¶ 30)

• Mr. Gordon's evaluation of the physical evidence, coupled with interviews of the troopers, supports Mr. Barrett's claim that he was unaware law enforcement was on his property because he was not at a vantage point to see the vehicles, including the lead Bronco driven by Trooper Hamilton, which entered from the east. Most of the shots fired by Mr. Barrett were fired from inside the cabin. For the brief period of time he was on the porch, his attention was directed to the west where his son was crying for help. Mr. Barrett first fired his weapon after Trooper Hamilton struck his cabin with the lead Bronco. (Gordon Dec at 13, 15-16 ¶¶ 31-32, 44)

• Mr. Gordon's analysis of the crime scene confirmed what the defense attempted to argue at trial – that Hamilton's vehicle indeed struck the cabin, and was later moved back. Lieutenant Pettingill confirmed this to Mr. Gordon, as did the location of various items of physical evidence. Government testimony to the effect that Trooper Hamilton's Bronco did not strike Mr. Barrett's cabin was knowingly false. The after-the-fact placement of the Bronco away from Mr. Barrett's cabin compromised, and rendered false, the crime scene reconstruction and

trajectory analysis done by the OSBI's Iris Dalley, as well as the processing of the vehicle itself done by the OHP's Vernon Phillips. When Mr. Gordon tried to advise his supervisors, Lieutenant George Randolph and Captain Rodney Burris, that "the vehicle was being processed in the wrong place and would give the wrong evidentiary information about location and bullet angle(s)," he was brushed off and told to stay out of it, because it was the OSBI's investigation. (Gordon Dec at 14-15 ¶¶ 33- 40)

   • The conclusions drawn by Mr. Gordon in his investigation also would have critically undermined the drug charges against Mr. Barrett. Even taken in their most flattering light, the drug charges were weak. There was no working lab on the property. Only a trace amount of methamphetamine was found, and this was located in the trailer used by Mr. Barrett's son, Toby. The overwhelming majority of the instrumentalities the Government claimed could be used for a meth lab were ordinary household goods or mechanical implements.

   As alluded to above, Sequoyah County Sheriff John Philpot testified at trial that during a search of Mr. Barrett's person conducted by his officers after he was removed from the cabin by OHP officers, a quantity of red phosphorous, an ingredient in the manufacture of methamphetamine, was found in his pants pocket. However, when Sheriff Philpot was interviewed by Mr. Gordon on the night of the raid and was asked whether he or his officers found anything dangerous on Mr. Barrett, he replied "no," even though it is well-recognized by any experienced law enforcement officer that red phosphorous is a highly toxic, dangerous substance. Had Philpot stated red phosphorous was found on Mr. Barrett, Mr. Gordon would have immediately alerted the troopers to this fact and advised them to begin decontamination procedures. Philpot admitted to Mr. Gordon that he and his deputies severely beat Mr. Barrett after he was removed from the cabin, and would have done more had there not been other people

around.   Significantly, the "red phosphorous" *was not found* when Mr. Barrett was searched by Trooper Manion after he was removed from the cabin by Trooper Hamilton.  (Gordon Dec at 16-17 ¶¶ 45-49)

According to Mr. Gordon, the manner in which the scene was searched and processed completely belied the Government's later claim that Mr. Barrett was manufacturing or attempting to manufacture methamphetamine.  None of the precautionary measures used by law enforcement for taking down a meth lab or a suspected meth lab were undertaken.  (Gordon Dec at 18-19 ¶¶ 57- 55)

• The conduct of the powers that be at the Oklahoma Highway Patrol toward Mr. Gordon and his internal affairs investigation was also exculpatory evidence suppressed by the Government.  As stated in Mr. Gordon's declaration, his efforts to conduct an objective investigation, going wherever the facts led him, were blocked at virtually every turn by his superiors at OHP.   OHP administration in effect embarked on a cover-up of the actual events of September 24, 1999.

Against policy, Mr. Gordon was denied timely access to the Tact Team members for formal interviews.  He had to wait ten or more days after the incident to interview them.  While Mr. Gordon was prevented from doing timely interviews, the members of the Tact Team "lawyered up" with OHP outside counsel Gary James.  (Gordon Dec at 4, 6 ¶¶ 11, 16)  In violation of standard policy for internal affairs investigations involving a shooting, the Tact Team members initially refused to turn over their weapons for forensic testing.  (Gordon Dec at 4 ¶ 11)  When Mr. Gordon was finally permitted to interview the Tact Team members, questions he would ordinarily ask in any investigation involving a law enforcement raid which resulted in a shooting were ruled out of bounds by his superiors, and he was limited to asking a set of

questions "pre-approved" by Lieutenant George Randolph, which were designed to obscure the truth rather than reveal it. (Gordon Dec at 6-9 ¶¶ 17-19)  If Tact Team members did not like any question asked by Mr. Gordon, they were not required to answer. (Gordon Dec 8-9 ¶ 19)  Mr. Gordon tape recorded the interviews he was eventually able to conduct with the Tact Team (Gordon Dec 8-9 ¶ 19), but these tapes were apparently not turned over to the defense by the Government. Mr. Gordon was constantly exhorted to be a "team player," and his attempt to conduct an objective investigation was met with hostility and roadblocks within OHP. (Gordon Dec at 3, 6, 19-20 ¶¶ 10, 15, 57-58,) At one point, a summary of Mr. Gordon's report was taken from his office computer without permission. (Gordon Dec at 19 ¶ 58) Mr. Gordon was at a loss to explain this resistance if, as was claimed, the Tact Team had done nothing wrong when it attempted to serve the warrant on Mr. Barrett. (Gordon Dec at 4 ¶ 11) Because Mr. Gordon attempted to conduct a thorough, objective investigation and was perceived as not being a "team player," he was even told that he could not attend Trooper Eales' funeral. (Gordon Dec at 4 ¶ 11)

Mr. Gordon was also admonished for tape recording his interview of Sequoyah County prosecutor Diane Barker-Harrold, one of the "dignitaries" who tagged along with the Tact Team to observe the raid, even though the use of tape recorders in interviews was standard procedure. When asked by Mr. Gordon about the informant who supplied information for the warrant, Barker-Harrold stated "we" were aware of the informant's identity, but she refused to reveal it. Barker-Harrold complained about her interview being tape recorded to OHP, and OHP Captain Rodney Burris told Mr. Gordon he was to have no further contact with her. (Gordon Dec at 5-6 ¶¶ 13-14)

Significantly, OHP administration even refused to provide Mr. Gordon with the policy manual for the East Tact Team, a document which was, to say the least, highly relevant if Mr.

Gordon were to conduct a competent investigation into whether the Tact Team had acted appropriately or against training and policy.   Kerry Pettingill told Mr. Gordon that the Tact Team manual was "not available" and that he would "never see this book."  A few days later, the policy manual or handbook mysteriously appeared in Mr. Gordon's office among debris and trash that had been placed on the floor.  Mr. Gordon's review of the handbook showed that the Tact Team had failed to adhere to policy in its raid on Mr. Barrett's home.  Against policy, the Ford Broncos used in the raid were unmarked, no warning that law enforcement was on the premises was given, and emergency lighting was not engaged on the vehicles.  (Gordon Dec at 9-10 ¶¶ 20-23)

Due to the fact that Mr. Gordon tried to conduct an objective, fact-based investigation into the circumstances which led to Trooper Eales' death, he was constantly harassed by his superiors at OHP and ultimately decided to retire.  In further retaliation for his efforts, the State of Oklahoma manufactured bogus criminal charges against Mr. Gordon for misappropriation of state funds for taking unapproved "comp time" and misuse of a state telephone, even though the comp time taken by Mr. Gordon and his use of a state telephone had been approved by his superiors and was authorized by informal policy within OHP.  An internal audit later revealed that two of the witnesses against Mr. Gordon, Lieutenant Gordon and Captain Burris, had given false testimony before the grand jury investigating Mr. Gordon.  In order to bring his ordeal to an end, Mr. Gordon ultimately entered a no contest plea to the charges in exchange for a five year deferred sentence, which has since been expunged.  (Gordon Dec at 20-26 ¶¶ 59-82)

The politically motivated criminal charges against Mr. Gordon were brought in retaliation for his internal affairs investigation of Trooper Eales's shooting and to adversely affect his credibility as a witness in any trials involving Mr. Barrett.  State authorities thus sought to prevent Mr. Barrett from having exculpatory evidence in aid of his defense.  Mr. Gordon did not

testify in Mr. Barrett's state trials, although he shared at least some of the information he gleaned from his investigation with state trial counsel John Echols and Judge John Garrett, who presided at the trials.  (Gordon Dec at 25-26 ¶ 81-84)

Former Assistant United States Attorney Mike Littlefield also acted to suppress Mr. Gordon's exculpatory evidence by threatening him in connection with the federal trial.  In a telephone conversation, Littlefield sought to intimidate Mr. Gordon, telling him that because of his deferred sentence, Littlefield was going to tear Mr. Gordon up on the stand and that Mr. Gordon did not know what he was talking about because he was not a trained in SWAT tactics and procedures.  After being berated by Littlefield in this initial phone call, Mr. Gordon later called him back and informed him that he had received training in these areas by the United States Marshal's service.  After being told this, Littlefield told Mr. Gordon that he did not need to worry about having to testify in the federal trial.  (Gordon Dec at 27 ¶ 85)

The above facts, and the facts recited in Mr. Gordon's declaration, show that the prosecution suppressed material exculpatory evidence.  There is a reasonable probability that had this evidence been heard by Mr. Barrett's jury, the outcome of the guilt-innocence stage of trial would have been different.  At a minimum, this evidence also undermines the reliability of Mr. Barrett's death sentence.

This supplemental ground for relief relates back to Ground 5 of Mr. Barrett's amended § 2255 motion.  (Doc. 95)  There, it was alleged that in numerous respects, the Government suppressed exculpatory evidence and sponsored false testimony, including with respect to law enforcement officers.

**TWENTY-FIRST GROUND.**

**APPOINTED TRIAL COUNSEL'S FAILURE TO REASONABLY INVESTIGATE THE RELEVANCY AND MATERIALITY OF INFORMATION KNOWN TO THE OKLAHOMA HIGHWAY PATROL INTERNAL AFFAIRS INVESTIGATOR AND TO CALL HIM AS A WITNESS TO TESTIFY TO THE FALSE VERSION OF EVENTS PRESENTED BY THE GOVERNMENT WAS PREJUDICIAL TO AND DEPRIVED MR. BARRETT HIS CONSTITUTIONALLY AND STATUTORILY GUARANTEED RIGHTS TO THE EFFECTIVE ASSISTANCE OF QUALIFIED AND COMPETENT ATTORNEYS.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Barrett was denied his statutory and constitutional rights to the effective assistance of counsel by his trial counsel's failure to competently and reasonably investigate, engage, interview, prepare, corroborate and present the testimony of Retired OHP Internal Affairs Investigator Paul D. Gordon, now submitted and proffered to the Court by Notice of Filing the same in support of Mr. Barrett's pending Sec. 2255 Amended Motion to Vacate (Doc 95), his Motion to Supplement the Pending Sec. 2255 Amended Motion to Vacate and this document, his Supplemental Motion to Vacate, to be lodged with the Court pending his Motion to Supplement. Had trial counsel interviewed Mr. Gordon in any meaningful way, they would have known that Mr. Gordon's testimony would credibly and materially support Mr. Barrett's substantive defense that Mr. Barrett did not know the trespassing vehicles carried law enforcement officials. Counsel would have acquired significant corroborating evidence from Mr. Gordon to show that, from the time of Trooper Eales' death and throughout the federal trial, OHP engaged in unethical and illegal conduct to hide the truth of the planning and execution of the raid.

The testimony of Mr. Gordon would have irreparably undermined the Government's case substantively and through the impeachment of its law enforcement witnesses to such an extent

that there is a reasonable probability that Mr. Barrett would now not stand convicted of capital murder and the charges which resulted in sentences of death and life without parole.  Had this evidence been reasonably investigated and produced at trial, there is a reasonable probability that Mr. Barrett would have been acquitted or, at a minimum, been convicted of lesser charges.  Alternatively, counsels' failure to reasonably investigate and introduce this evidence led to an unreliable death sentence.

This claim relates back to Mr. Barrett's Ground Two, which raises numerous acts of constitutionally ineffective assistance of counsel.  Doc 95 at 33 *et seq*.

## 1.    Availability of Mr. Gordon to Testify.

The record is clear that Mr. Gordon was available to testify at Mr. Barrett's trial in this case. (Gordon Dec at 31 ¶ 93)  Defense counsel was aware of Mr. Gordon, listed him as a defense witness and subpoenaed him.  According to Mr. Gordon, he was contacted by an investigator for the defense, who asked no substantive questions.  (Gordon Dec at 27 ¶ 85)  When he received a subpoena from the defense, it was Mr. Gordon who called Mr. Hilfiger, not the other way around.  *Id.*  The conversation was extremely short and insubstantial and was prematurely aborted by Mr. Hilfiger's dismissive remark about Mr. Gordon's "relationship" with Barrett.  (Gordon Dec at 27 ¶ 85)  Had trial counsel made even minimal effort in his defense of Mr. Barrett, he would have been aware that Mr. Gordon's knowledge of the events resulting in Trooper Eales' death had served Mr. Barrett well in his state trials through Mr. Gordon's non-testimonial cooperation with Mr. Echols.

Mr. Gordon was available to testify for Mr. Barrett at the federal trial.  (Gordon Dec at 27 ¶ 93)  He had relevant, material information which he would have presented to the jury if called to testify.  That testimony would have revealed a continuing conspiracy on the part of law

enforcement to misrepresent their actions and avoid responsibility for the death of Trooper Eales. Defense counsel were woefully uninformed by inadequate preparation and resources and failed to understand the facts and circumstances leading to Mr. Barrett's deadly predicament.  By not calling Mr. Gordon as a witness, the defense lost their best opportunity to persuade the jury that Mr. Barrett's actions were in defense of himself and his son under the circumstances.  Mr. Barrett had only a very few seconds to comprehend the nature of the attack on his home in the middle of the night by unknown and unidentified persons wielding automatic weapons.

**2.      Summary of Paul Gordon's Testimony**

If called and questioned accordingly, Mr. Gordon shown would have testified that the planned execution of the no-knock nighttime warrant was based on insufficient intelligence and realtime surveillance and thus, should not have taken place at all. (Gordon Dec at 10 ¶ 24 (f))  As outlined above in Ground Twenty, and contrary to testimony presented at Mr. Barrett's trial, the information known to the troopers when they intruded onto Mr. Barrett's property was that Mr. Barrett was likely to run away individuals he knew to be law enforcement, not respond with violence.

Beyond supporting Mr. Barretts claim that no emergency lighting was activated and there was no meth lab on Mr. Barrett's property (Gordon Dec at 17 ¶¶ 51-55) , Gordon's interviews of the troopers confirm the very real possibility that the gunfire was initiated by OHP and not Mr. Barrett.  According to Jim McBride and Danny Oliver, the initial gunfire heard was from an automatic weapon. ("Gordon Dec" Exh 11 at p. 7 (McBride interview); Exh 15 at 8 (Oliver Interview))  Mr. Barrett had no automatic weapons.  When Lt. Pettingill spoke to Mr. Gordon on the scene shortly after the shooting, he specifically said that he thought it was his people firing. Exhibit A, referenced in Gordon Dec at  30 ¶ 93 (a) (a hard copy of which will be submitted to

the Court).

**3.  Specific Acts of Prejudicial Deficient Performance by Trial Counsel.**

> **a.       Mr. Barrett's Counsel unreasonably failed to investigate and present the testimony of Paul Gordon to refute the affidavit supporting the Search warrant to support the *Franks v. Delaware* reconsideration.**

The failure to competently investigate and reargue the *Franks v. Delaware* motion after it was disclosed that Monk Sanders was the alleged informant, and after Sanders testified, as alleged in the Amended § 2255 Motion to Vacate (Doc 95) is particularly egregious based on the testimony that would have been available to counsel had they simply taken the opportunity to talk to Mr. Gordon, a named defense witness.  Mr. Gordon's observations of the entry into Mr. Barrett's home and buildings made clear that the law enforcement on the scene had no reason to believe that Mr. Barrett was manufacturing meth on the premises.  *See* Gordon Dec at 17 §§51-55.

Mr. Gordon would have testified:

> Mr. Barrett's property was thoroughly searched the morning of the shooting. This included agents going layer by layer through the ashes in his burn barrel behind the cabin.  There was nothing found that  I observed which indicated drug activity nor was I ever advised that anything had been found by anyone.
> I was never advised that there was any information to support an anticipated finding of drug manufacturing at Barrett's residence but rather was informed that Mr. Barrett was believed to be an enforcer, *i.e.,* he facilitated sales of drugs between buyers and sellers who might not want to deal directly with each other.
> There was no air monitoring device at the scene and I did not see any of the investigators wearing special gear consistent with an active meth lab.
> Prior to entering the premises to videotape the inside of the cabin, the property was cleared by Vernon Phillips, who was an OHP tactical team member and Explosive Ordinance Disposal ["EOD"]  expert and per meth lab requirements, would have alerted everyone to any possibility of booby traps or dangerous drug activity in the residence.
> I entered the premises without any special personal protective equipment, such as eye protection, vinyl rubber gloves, special protective clothing, or rubber boots.  Where exposure levels are unknown, persons entering a potentially dangerous area would wear a full-face, positive-pressure, and air-supplied

respirator.   I was not instructed to discard contaminated clothing or shoes, which would have been the case if a meth lab was present in any one of its three forms: boxed; set-up not functional; or, set up functional cooking.

The Manual and Training Videos available to the East Tact Team at the time make clear that on September 24, 1999, the manner of serving or executing the High Risk Warrant/s on Kenneth Barrett was against protocol, grossly unprofessional and created far greater risk of injury or death than the situation would have presented if appropriate planning and measures had been taken.

(Gordon Dec at 17-18 ¶¶ 51-56); *see also*, Gordon Dec Exh Nos. 2, 3, 4.

Mr. Barrett was seriously prejudiced by the constitutional shortcomings of his appointed counsel by their failure to challenge the alleged drug evidence in a *Franks v. Delaware* hearing. Had trial counsel properly prepared and reasonably interviewed Mr. Gordon, together with the available testimony and documentation set out in Mr. Barrett's Motion to Vacate (Doc 95 at 33-47) and the available testimony of Judge Garrett, set out below in Claim 23, there is a reasonable probability that upon reconsideration, the Motion to Suppress would have been granted, the result of which would have been either a likely refusal of further federal prosecution, or an acquittal of the same.

This subclaim relates back to sub-claim 2(A)(2), *i.e.*,  Failure to Competently Reargue *Franks v. Delaware* Claim (Doc 95 at 34) and if merged in the pending Second Amended §2255 Motion to Vacate, would be inserted prior to the first full paragraph at page 46 of Doc 95.

**b.     Trial counsel failed to investigate, interview, and present testimony of a critical material witness,  Mr. Paul Gordon, retired OHP Internal Affairs Investigator, that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for acquittal or conviction of a lesser offense.**

In the transcripts and records of Mr. Gordon's interviews and investigation lies a treasure trove of impeachment untapped by trial counsel.  Portions of the interview transcripts were very effectively used by state trial counsel, John Echols, to impeach law enforcement witnesses in the state trial.  They were not used ineffectively, or not at all, by defense counsel in Mr. Barrett's

federal trial.  Counsel's failure to effectively present the contents of the interviews, including and beyond the content of the transcripts themselves, to impeach the law enforcement witnesses through the testimony of Paul Gordon is indefensible and far below the minimum standards of prevailing professional norms.  The factual issues raised at trial, which could have been resolved in Mr. Barrett's favor by reasonable lawyering include: whether the no-knock nighttime warrant was justified based on the information conveyed to the troopers; when, if at all, the emergency lighting was activated during the warrant execution; who initiated the gunfire; where did the lead OHP Bronco eventually stop and why it was moved prior to the trajectory analysis experiment; and once moved, was the Iris Dalley dowel rod scientific experiment reliable or accurate; and, whether Mr. Barrett was severely beaten at the time of his arrest, with "red phosphorous" planted on him.

Trial counsel was professionally unreasonable for failing to investigate, prepare and introduce testimony from then 2d Lt. Gordon that would have seriously undermined and rebutted the Government's theory as to how the shooting occurred, and whether the police made their official presence known by the use of emergency lighting.  Mr. Gordon's proffered testimony also shows that the actions of the Tact Team fell outside professional standards for law enforcement and that the use of unprofessional procedures that minimized the chances of being recognized as law enforcement was reckless and cost Trooper Eales his life.

Trial counsel failed to reasonably investigate and present credible evidence, including the testimony of Mr. Paul Gordon and the witnesses and documents to which his testimony or information would have led, that would have substantively supported Mr. Barrett's defense and credibly refuted the testimony of law enforcement regarding the controverted issues.

### i. The Mission Should Have Been Aborted.

If appointed defense counsel had contacted Mr. Gordon and questioned him in a manner which reflected the theory of the defense and a working knowledge of the Government's case, counsel would have discovered that Lt. McBride told Mr. Gordon and others that the mission should have been aborted due to insufficient intelligence and surveillance. Mr. Gordon would also have testified that after the formal interview,

> McBride became very emotional and told [Gordon] that he had recommended that East Tact Team abort the mission because the raid was going to be undertaken with inadequate information and planning and no real surveillance had been conducted, but his advice was not taken. McBride was advised by the East Team to go back to the West Team if he did not want to participate. McBride was so upset over what happened that he began crying by the end of the interview.

Gordon Dec at 16 ¶ 50.

Had the statements of Mr. McBride been presented to the jury either through admissions extracted from McBride, or ultimately through Mr. Gordon and others, the jury would have realized that it was not simply the "trauma" of the event which caused the lapses in memory and inconsistencies with the troopers' testimony but the cover-up of tactical errors known before the mission was ever begun. The cowboy-like insistence in executing a warrant with insufficient intelligence and/or real-time surveillance could reasonably benefit Mr. Barrett's on every other fact issue raised in the trial, creating a reasonable probability that the jury would not have convicted Mr. Barrett.

### ii. There was No Emergency Lighting Activated Identifying Law Enforcement

If defense counsel had contacted Mr. Gordon and questioned him in a manner which reflected an informed theory of defense and a working knowledge of the Government's case, counsel would have discovered that Mr. Gordon could and would have testified that his investigation revealed that the troopers "rolled in dark" and did not activate any emergency

lighting until after the shooting was over, when Trooper Hash's overhead lights were activated to help illuminate the scene. (Gordon Dec at 9 - 12, ¶¶ 23 -28) Specifically Mr. Gordon would have testified that in an interview with Trooper Hamilton, Hamilton at first insisted that he had activated his emergency lights. Like the question of whether he fired his weapon, when confronted with physical evidence disproving his version of events, Hamilton admitted to Gordon that he had not activated the lights. (Gordon Dec at 9 ¶ 23, 11 ¶ 28) Trooper Hash, who was in a marked unit, also claimed he drove onto the property with his lights and his emergency overhead bar activated but ultimately admitted that somebody just flipped the lights on after the shooting to give needed light during the wounded troopers' evacuation. (Gordon Dec at 12 ¶ 30)

Mr. Gordon would have testified that "[t]he physical evidence supported the conclusion that the officers did not have their emergency vehicle lights on." ("Gordon Dec" at 11 ¶ 27; *see also* Gordon Dec at 9 ¶ 23, 11 ¶ 27, 12 ¶ 30) Even Frank Lloyd's brief encounter with Mr. Gordon shortly after the shooting confirms the lack of emergency lights.

Sheriff John Philpot's testimony that he saw the emergency overhead bar flashing and illuminating the area (Tr 8:1797 *ll* 14-15), though elicited by Prosecutor Littlefield in a manner intended to misrepresent the facts, is consistent with Frank Lloyd's statement that they came over the hill when the shooting was over and saw taillights. Appendix A. Tr v. 8 at 1797 *ll* 5-7. The question by Littlefield about the emergency lights refers to a later time when Philpot is in the yard, a time at which Hash admitted the shooting was over. (Gordon Dec at 12 §12)

It is undisputed that the question of the activation of emergency lights was critical to the Government's case. Mr. Gordon's testimony, at the very least, would have been admissible to impeach by prior inconsistent statements the testimony of the troopers and other law enforcement officers. *See e.g.*, (Gordon Dec at 12 ¶ 29 Exh 7) (Greninger makes no mention in his interview

of any lighting); (Gordon Dec  Exh 15) (Oliver, who is the car with Greninger, also makes no mention of activating or observing activated lights.).

Had trial counsel reasonably investigated the case and interviewed Mr. Gordon in a substantive way, he could have presented credible evidence that the OHP troopers did not activate their lights during the approach or shootout, and that they were lying, or at the very least, intentionally misleading the jury, when they testified that they did. The importance and impact of credible evidence showing that Mr. Barrett did not know the vehicles invading his property and charging his front porch were law enforcement is incalculable.  There is a reasonable probability that this testimony alone, or together with the corroborating physical evidence and adequate expert testimony on that physical evidence, would have resulted in a directed verdict, an outright acquittal or, at the very least, consistent with the state verdict, a conviction for manslaughter.

Mr. Gordon's testimony of his investigation and the troopers' clear admissions that they had not had their emergency lights on would have corroborated and cemented the truth of the testimony of Toby Barrett and Alfred Hahn.  See Doc 95 Ground 2(A)(10).  If the jury believed Gordon, Barrett and Hahn, that there was no indication that the charging vehicles were law enforcement, there is little doubt the jury's verdict would have been different.  In light of Mr. Gordon's status as an OHP Trooper trained in and trusted with the most sensitive investigations, there is little doubt the jury would have placed significant stock in his testimony.

> iii.    *There is credible substantive and impeaching evidence through Paul Gordon's Interviews and Investigation that a member of the OHP East Tact Team, not Mr. Barrett. initiated the gunfire.*

Had counsel actually interviewed Gordon, he would have been able to impeach or raise serious questions of the veracity the testimony and inferences throughout the trial that Mr. Barrett initiated the gunfight.  Mr. Gordon's testimony could also have shown that even the OHP

troopers, including the team leader, believed their people started the firefight.

Trooper Hise in his interview with Mr. Gordon describes that what he hears is automatic gunfire. (Gordon Dec  Exh 10 at 4)  And as recorded by Mr. Gordon, the team leader, Kerry Pettingill, said he initially thought it was "our folks" who fired.  Appendix A.  And later in his interview with Paul Gordon, Pettingill says "it sounded to me like automatic gunfire." ("Gordon Dec" Exh 14 at 11)  As noted in the Amended Motion, at the second state trial, Trooper Poe testified he did not know who fired or where the gunfire was coming from, despite having an unobstructed view of the house.  (2nd St. Tr. Tx at 757, 766.)  Greninger's description comes the closest to admitting that the gunfire was begun presumably by Hamilton.

> As we pulled up to stop, I cold see debris and stuff coming up, I could hear automatic, sounded like automatic gun fire and I could see debris coming up from the area of Trooper Hamilton's vehicle and I'm thinking, I- initially my thoughts are, it's dirt, why are they shooting in the ground, it took a few seconds to ah determine if the shots were coming from them.

("Gordon Dec" Exh 7 at 6)  None of this was brought out on cross-examination at Mr. Barrett's federal trial.  The Government's decision not to call Jim McBride as a witness in the federal trial is telling, since McBride was certain he heard automatic gunfire.  (Gordon Dec Exh 11 at 7)  The failure of the defense to call McBride is inexplicable.  With credible testimony that the gunfight was begun by automatic gunfire and thus was necessarily commenced by the trooper(s) and not Barrett, there is a reasonable probability that a different result would have occurred, *i.e.*, a not guilty verdict or at the very least, a conviction on the lesser included offense.

This section supplements Claim 2(A)(9), Doc 95 at 146, again by the testimony of an available witness, Mr. Gordon.  As noted in the Amended Motion, "[t]here obviously was a critical question as to whether Mr. Barrett or the police opened fire first."

> iv.    *Information known to OHP indicated Mr. Barrett would run from*
> *to law enforcement.*

The most consistent of all the responses to Mr. Gordon's pre-scripted questions was about the intelligence the East Tact Team had on Kenneth Barrett's level of dangerousness. Steve Hash said the only criminal history of which he was aware was that Mr. Barrett had barricaded himself in his house and he had shot *himself* once before. (Gordon Dec Exh 9 at 14) Hash could not recall any use of violence against any police officers or anybody else. *Id.* Similarly Robert Darst recalled the "standoff" with local law enforcement and the attempted suicide. (Gordon Dec Exh 6 at 11) Gene Hise was aware that Mr. Barrett had been arrested before and "turned himself in." (Gordon Dec 10 at 7) Asked by Gordon if they had been told about any threats against law enforcement, Hise did not remember any statement Mr. Barrett may have made. *Id.* at 9. Oliver told Gordon they had been given information about threats but offered none that he had been given. (Gordon Dec Exh 15 at 15) Hash recalled no information regarding violence against law enforcement, though recalled that Mr. Barrett had barricaded himself in the house and had a "habit of running to mom." (Gordon Dec Exh 9 at 14) Pettingill noted the barricading and attempted suicide as well, and then noted that "he was a big talker[.]" (Gordon Dec Exh 14 at 17) McBride noted that the information they received that "those statements are probably the same statements made on 90% of the people we arrest." and indicated the scenario is generally given to secure the Tact Team's involvement. (Gordon Dec 11 at 11) Greninger told Gordon that the information they had was that "the guy would run and try to make it to his mother's house which was next door[.]" (Gordon Dec Exh 7 at 5) Ricky Manion characterized the threats by Barrett as: "That, that he would ah, that he would mainly run from law enforcement.." (Gordon Dec Exh 12 at 12) Mr. Gordon's testimony or impeachment of the troopers would have made known to the jury that the OHP acted contrary to the known

intelligence in the manner the Tact Team executed the warrant. Trial counsel's failure to develop the testimony was constitutionally inexcusable.

> v.   *Credible evidence undeveloped by trial counsel would have shown that Mr. Barrett did not have a pill bottle with red phosphorous residue in his pocket.*

The testimony that Mr. Barrett had red phosphorous in his right front pocket is highly suspect in light of prior searches by OHP without any mention in the Gordon interviews of having found or felt the pill bottle. The saga of the supposed seizure of a pill bottle from the pocket of Mr. Barrett's jeans is rife with inconsistencies and outright perjury. At trial, Hash testified that he and Manion searched Mr. Barrett and he felt the pill bottle but did nothing with it. Sheriff Johnny Philpot testified that he searched Mr. Barrett afterwards and pulled the bottle out of Mr. Barrett's front pocket, looked inside and saw a baggie with red powder, held it up for Stanley Philpot to see, and then put the pill bottle with the baggie back into Mr. Barrett's pocket.

If called to testify, Mr. Gordon would have stated that Ricky Manion and Steven Hash both searched Mr. Barrett before turning him over to the custody of the local sheriff. Both mentioned the handgun and neither mentioned a pill bottle. Mr. Gordon is familiar with the standard OHP searches at the time a suspect is arrested, especially after a firefight. If there was a pill bottle on Mr. Barrett's person, the OHP search would have uncovered it.

The likelihood that Mr. Barrett was nonchalantly walking around with red phosphorous in his pocket is patently incredible. The two prior searches by OHP troopers, the dangerous nature of red phosphorous, the failure of Hash to mention the pill bottle in his interview with Lt. Gordon, the incredible testimony of Stanley and John Philpot and the information and belief that Mr. Barrett was a middle man, not a drug manufacturer, when considered with the prior other evidence produced regarding the purported discovery, confiscation and chain of custody of the

pill bottle, would have led a reasonable juror to totally discredit the testimony regarding the red phosphorous.

Mr. Gordon would also have testified that he is trained in the execution of high risk warrants and the appropriate protocol for clearing and searching a building in which the manufacture of methamphetamine is suspected. Included in that training is an understanding of the dangers of red phosphorous. The very real and substantial danger attached to handling or mishandling red phosphorous renders the events described by Hash and the Philpots in relation to the manner in which they handled the pill bottle inherently incredible. No red phosphorous, no meth. No meth, no conviction.

With competent and reasonably well-prepared counsel, any testimony regarding the red phosphorous would have been either suppressed or rendered incredible, leaving the jury with the incredible and thoroughly self-serving testimony of the seven snitches. The drug trafficking was the purported basis for the federal prosecution. Without it, the prosecution itself is suspect and raises double jeopardy concerns for vindictive prosecution of a capital crime which has no elements not present in the state prosecution. There is a reasonable possibility no federal prosecution would have or could have occurred but for the fabricated "red phosphorous" story by Trooper Hash that he felt the pill bottle but did nothing with it. There is a very reasonable probability that the jury would have returned an acquittal or at worst convicted on a lesser included offense.

> vi. *After arrest, Mr. Barrett was beaten by the Sheriff and two of his deputies. Denials that a beating was administered were false.*

At trial, Sheriff Philpot denied having observed any physical action taken toward Mr. Barrett while he was in custody. However, if Mr. Gordon had been called as a witness, he would have testified that on September 24, 1999, he interviewed Sheriff Philpot in Mr. Gordon's

vehicle and Philpot admitted that he and his men had beaten Mr. Barrett and would have caused greater injuries but for the number of people around. In short, Sheriff Philpot lied to the jury. Had defense counsel showed the sheriff to be a liar, as well as to have violated the Mr. Barrett's rights, it would have undermined all of the Philpots' testimony, including, most importantly, the pill bottle tale.

Sheriff Philpot's interview with Mr. Gordon was recorded and the recording placed with the investigation results, which he left in the custody of Lt. George Randolph when he retired from the OHP in May, 2000 as a result of the extreme pressures placed upon him by members of the Oklahoma Highway Patrol as a result of his investigation. The failure of trial counsel to discover the existence of that recording and demand disclosure of the same was consistent with trial counsel's continual constitutionally substandard representation.

As set out in the Amended Motion to Vacate, Doc 95 at 58, this evidence would have raised a reasonable doubt with respect to Mr. Barrett's knowledge and intent, especially as to Count 3, and refuted any evidence of actual drug trafficking required in Counts 1 and 2, compelling a dismissal of the same, or resulting in outright acquittal or a finding that, at most, Mr. Barrett was guilty of voluntary manslaughter. This subclaim relates back to Claim 2(A)(3), of the § 2255 Motion (Doc 95) which asserts failure to present testimony of witnesses Toby Barrett and Alfred Hahn that would have rebutted the prosecution's theory of the case, supported the defense theory, and formed the basis for conviction of a lesser offense, and Claim 2(A) (9) which asserts that Mr. Barrett's trial counsel unreasonably and prejudicially failed to impeach law enforcement witnesses with prior inconsistent statements from the state trials. Doc 95 at 143.

> **c.    Trial Counsel was constitutionally ineffective for failing to call Mr. Gordon to refute the legitimacy of the experiment of Iris Dally both as a fact witness and expert witness.**

As alleged in the §2255 Motion to Vacate (Doc 95), trial counsel were professionally unreasonable for failing to hire an independent crime scene analyst or reconstruction expert in order to rebut the testimony of OSBI agent Iris Dalley.  Trial counsel's failure to interview, prepare and present the testimony of Mr. Gordon as both a fact and expert witness to undermine the reliability of Ms. Dalley's experiment fell far below prevailing professional norms.

Had trial counsel acted in a professionally reasonable manner, Mr. Gordon would have testified to the unreliable manner and necessarily inaccurate results of Ms. Dalley's trajectory dowel-rod experiment.  Mr. Gordon would have testified that the Bronco which Ms. Dally used to determine and demonstrate the projectile paths of the various shots directed at it had been moved from the position it had been in when Mr. Barrett shot at it.  Indeed, Mr. Gordon would have testified that he warned OHP of the inaccuracy.  Mr. Gordon would also have produced and authenticated the videotape which he took the evening of September 24 when the experiment was being concocted, which showed Dalley's actions were obviously unreliable and unscientific. (Appendix B)  (Dowel-Rod Experiment videotape, a copy of which will be delivered to the Court for filing.)

This claim is filed in conjunction with and to supplement, Claim 2(A)(7) of Mr. Barrett's §2255 Motion to Vacate which alleges "[d]ue to trial counsel's unreasonable failure to engage the services of an independent crime scene reconstruction expert, the jury considered and relied upon unscientific, unreliable evidence."  Doc 95 at 127.  Specifically, Mr. Gordon's testimony would support the allegations of Mr. Barrett set out in Claim 7 (k).  If a single amended Motion were filed, this claim would be inserted at Doc 95 at 135 immediately following and within

subsection k.

> **d.      Trial Counsel's failure to interview, prepare and present the testimony of Mr. Gordon regarding the OHP witnesses and the lack of adherence to any reasonable protocol, including their own, in the execution of the High Risk Warrant which created Mr. Barrett's reasonable belief that he was being attacked by unknown criminals and the OHP witnesses's continuous efforts to avoid disclosing the same fell far below prevailing norms and wholly undermined the reliability of the verdicts and sentence in this case.**

Mr. Gordon was well-qualified to investigate the events of September 24, 1999.  (Gordon Dec 1-2 ¶ 4; *see also,* Exh 1)  He had the qualifications, experience and was professionally familiar with Mr. Barrett's residence and the events leading up Rocky Eales death.  At a minimum, a reasonable defense in a case of this seriousness, particularly in light of the limitations the court placed on defense resources, would have mandated interviewing Mr. Gordon.  It is not only in hindsight that it becomes apparent Mr. Gordon would have provided trial counsel far more to support the defense than Mr. Choney, who was in effect a prosecution witness.

This claim is intended to and does supplement the factual basis for Movant's subclaim 2(A)(8) which alleges that "[t]he outcome of the trial is unreliable due to trial counsel's unreasonable failure to present an independent expert to demonstrate that the raid on Mr. Barrett's house was rife with tactical errors and poor planning, and that these failures in the "rules of engagement" contributed to Trooper Eales's death.  Doc 95 at 139.

**TWENTY-SECOND GROUND .**

**MR. BARRETT'S COUNSEL UNREASONABLY FAILED TO INVESTIGATE AND PRESENT THE TESTIMONY OF THE HONORABLE JOHN GARRETT, WHO COULD HAVE TESTIFIED TO THE REPUTATIONS FOR TRUTH AND VERACITY OF SANDERS AND JOHNSON. THE TESTIMONY WOULD HAVE HAVE REASONABLY LED TO A DIFFERENT OUTCOME ON THE *FRANKS* ISSUE.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

To compliment and corroborate the compelling and detailed testimony of Mr. Gordon, which would have been available to refute the "meth" evidence, there was also available to defense counsel the Hon. John Garrett, the state judge who presided at the state capital trials of Mr. Barrett. Judge Garrett could have, and presumably would have, testified that he was familiar with both Mr. Monk Sanders and Mr. Clint Johnson and neither of them were credible persons. (Declaration of Leonard Post ("Post Dec"), filed herewith in support hereof and in support of Mr. Barrett's §2255 Motion to Vacate (Doc 95)) Mr. Barrett was denied his statutory and constitutional rights to the effective assistance of counsel by the trial counsels' failure to competently and reasonably investigate, prepare, corroborate and present the testimony of the Hon. John Garrett to impugn the credibility of Clint Johnson, affiant on the critical nighttime no-knock search warrant, and Charles "Monk" Sanders, purported confidential informant, upon whose information the affidavit in support of the search warrant relies.

Had Judge Garrett been called to testify on the lack of trustworthiness of both Johnson and Sanders, there is a reasonable probability that the Court would have granted Mr. Barrett's *Franks v. Delaware* motion and/or that the jury would have disbelieved the drug-related evidence, as well as the numerous law enforcement officers and drug informants testifying to drug related evidence, and returned a verdict of not guilty or guilty of a lesser included offense.

Trial Counsel was remiss in failing to interview Judge Garrett concerning his knowledge of the truth and veracity of Mr. Sanders, be it by reputation or specific acts.  Judge Garrett would have testified that Mr. Sanders was a totally incredible person.  It is indisputable that the testimony of the judge who presided over the two state cases that he wouldn't believe Monk Sanders farther than he could throw him would have impacted the jury's assessment of Mr. Sanders' credibility.  (Post Dec)

This claim expands, explains, supplements and relates back to Claim 2(A)(1) (Doc 95), described above. In his Amended §2255 Motion, Doc 95 at page 103, Mr. Barrett alleges '[c]ounsel unreasonably failed to interview and present at trial some of the witnesses discussed immediately above, and others who could have testified that Sanders is a pathological liar whose word should not have been relied upon by Clint Johnson or the jury."

## TWENTY -THREE GROUND.

**THE COURT'S FAILURE TO CONSIDER  SIGNIFICANT AND READILY AVAILABLE EVIDENCE TO SUPPORT A FINDING THAT USE OF A  STUN BELT WAS UNNECESSARY, AND TRIAL COUNSEL'S FAILURE TO URGE CONSIDERATION OF THE SAME, DEPRIVED MR. BARRETT OF DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Judge John Garrett presided over the two state trials in which Mr. Barrett faced essentially the same capital murder charge.  Had Judge Garrett been called to testify to Mr. Barrett's good behavior in the courtroom despite facing the death penalty, there is a reasonable probability that this Court would not have acceded to the U.S. Marshal's unreasonable request that Mr. Barrett be restrained by the use of a visible stun belt, which unconstitutionally

undermined Mr. Barrett's presumption of innocence.

The Court was well aware that Mr. Barrett had been tried twice before for the same capital murder in state court. Easily available to the court was Judge Garrett, to whom this Court needed only make an administrative inquiry as to the conduct of Mr. Barrett and the likely necessity of restraint. Judge Garrett would have advised the Court that Mr. Barrett was at all times respectful and submissive to court procedures and security. Judge Garrett would also have advised the Court that Mr. Barrett was extraordinarily polite and helpful to both the judge and his secretary during the proceedings. (Post Dec)

This Claim supplements Mr. Barrett's Section 2255 Motion to Vacate, seventh ground in which he alleges that his "[r]ights under the Fifth, Sixth, and Eighth Amendments were [v]iolated when the Trial Court Permitted the Marshals to [r]estrain him [w]ithout [j]ustification." Doc 95 at 326. To the extent that an affirmative showing of the evidence of Mr. Barrett's behavior in Judge Garrett's courtroom should have been presented by trial counsel, the failure to present the testimony of Judge Garrett, or even to interview or inquire of him, fell below prevailing professional norms, and prejudiced Mr. Barrett by denying or adversely affecting the presumption of innocence and Due Process, in violation of the Sixth Amendment right to the effective assistance of counsel. This claim relates back to Claim 7 of the Amended §2255 Motion to Vacate which is supplemented by the same. Doc 95 at 329.

<u>**TWENTY-FOURTH GROUND.**</u>

**MR BARRETT WAS UNCONSTITUTIONALLY PREJUDICED BY THE TRIAL COURT'S INTERFERENCE WITH HIS DEFENSE WHICH COMPELLED MR. JOHN ECHOLS TO WITHDRAW BECAUSE MR. ECHOLS KNEW OF AND WOULD HAVE PURSUED THE POTENTIAL TESTIMONY OF RETIRED TROOPER GORDON.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The result of the Court's interference with and unreasonable imposition upon original lead counsel Mr. John Echols, who had represented Mr. Barrett in two prior unsuccessful prosecutions for capital murder in state court, was a denial of a likely verdict of acquittal or conviction on a lesser included offense, or, at the very least, a sentence less than death.

During the course of the first trial, Mr. Echols was contacted by Mr. Paul Gordon, Because of matters which Mr. Gordon read in the paper summarizing testimony by the troopers which Mr. Gordon knew to be untrue, he contacted Mr. Echols. Mr. Echols used some of what Mr. Gordon reported to him about the troopers activities in his cross-examination of the troopers and other witnesses in the state trials. Indeed, during the first state trial, Mr. Gordon ultimately produced for Judge Garrett the East Tact Team Manual, which Lt. Pettingill insisted did not exist. Had Mr. Echols remained as lead counsel, he would have known he had available to him a source who knew that the testimony of the troopers given in federal court was false in the many significant respects discussed above. Mr. Echols' previous use of information from Mr. Gordon and his cooperative relationship with him would have alerted Mr. Echols to search Mr. Gordon out when faced with drug evidence which had not been an element of the charges or admitted in state court.

If the Court had not interfered with Mr. Echols' defense of Mr. Barrett to such a degree that Mr. Echols felt compelled to withdraw, the defense would likely have produced Mr. Gordon as a fact and expert witness – and justice would have prevailed.  There is a reasonable probability that Mr. Gordon's testimony, as set out in his declaration, would have resulted in a verdict of not guilty on all three counts as alleged in the indictment, or a conviction of lesser offenses, and unquestionably would not have resulted in a sentence of death or even in life without parole.

This Claim expands, explains, supplements and relates back to Mr. Barrett's Claim 1, i.e., "Mr. Barrett was Prejudiced by the Trial Court's Actions and Interference and Ultimate Deprivation of Prior Qualified Counsel, John Echols, in violation of Mr. Barrett's Right to Due Process, his Sixth Amendment Right. . ."

<u>**TWENTY- FIVE GROUND.**</u>

**MR. BARRETT'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.**

Mr. Barrett incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

To the extent the Claims and subclaims set out above add considerable weight to the constitutional errors leading to the convictions and sentences of Kenneth Barrett, the cumulative impact of the errors now alleged for purposes of supplementing the claims set forth in Mr. Barrett's Amended §2255 Motion to Vacate Judgment/Order and Sentences (Doc 95) compels the reversal of Mr. Barrett's convictions and sentences and dismissal of the same, or alternatively, an order granting a new trial on each and every count charged, or vacation of each and every sentence imposed and an order for new sentencing proceedings.

This ground of error relates back to Ground Nineteen of Doc 95.

## PRAYER FOR RELIEF

Therefore, Kenneth Barrett asks that the Court grant the relief requested in his pending

Amended Sec. 2255 Motion to Vacate (Doc 95 at 400) including but not limited to:

Vacate Movant's convictions and sentences and order that appropriate retrial and/or

sentencing hearings be conducted; and or any other relief to which Movant may be entitled.

DATED:   March 16, 2012

Respectfully submitted,

    /s/ David B. Autry
DAVID B. AUTRY, OBA #11600
Attorney at law
1021 N.W. 16th Street
Oklahoma City, Oklahoma 73106-6405
Telephone:  405-521-9600

DANIEL J. BRODERICK
Federal Defender

 /s/ Joan M. Fisher
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  916-498-6666

Attorneys for Defendant
KENNETH EUGENE BARRETT

## CERTIFICATE OF SERVICE

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was electronically filed on March 16, 2012 . This document will be served electronically to all counsel in this case.

<u>   /s/ Joan M. Fisher         </u><br>
Signature of Movant's Attorney

## VERIFICATION

I am an attorney licensed to practice law by the State of Idaho, and I am a member in good standing of the bar of the United States District Court for the Eastern District of Oklahoma. I am an Assistant Federal  in the Office of the Federal Defender for the Eastern District of California.  Pursuant to the appointment of the Federal Defenders of the Eastern District of California to represent Mr. Barrett in this proceeding, I filed a Notice of Appearance as co-counsel for Kenneth Eugene Barrett with David B. Autry as lead counsel.

I am authorized by Kenneth Eugene Barrett to file the foregoing amended motion to vacate, set aside, or correct the sentence pursuant to 28 U.S.C. § 2255.  I am filing the amended motion on Mr. Barrett's behalf.  Mr. Barrett is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing amended motion for collateral relief, to vacate, set aside, and correct the conviction and death sentence is made pursuant to 28 U.S.C. § 2255.  I declare that the contents of the foregoing amended motion are true except for those matters based upon information and belief, and I believe the latter matters to be true.  The sources of my information include, but are not limited to, official court records, various documents obtained or prepared during investigation of this amended motion, and items in the possession of other

lawyers, investigators and/or experts connected with the preparation of this amended motion. I make this verification pursuant to Rule 2(b)(5) of the Rules Governing § 2255 Proceedings because these matters are more within my knowledge than Mr. Barrett's knowledge.

Dated this 16th day of March, 2012.

/s/ Joan M. Fisher
Joan M. Fisher