# EXHIBIT C

**<u>Declaration of Scott E. Sundby</u>**

I, Scott E. Sundby, of Miami, Florida, do hereby swear and affirm the following:

1.      I am a Professor of Law and Dean's Distinguished Scholar at the University of Miami, School of Law in Miami, Florida.

2.      I have been involved as a primary investigator with the Capital Jury Project (CJP) since 1992.  The CJP is funded by the National Science Foundation as an ongoing study to determine how jurors in capital cases decide between life and death sentences.  The CJP has conducted in-depth standardized interviews (lasting on average three to four hours) with approximately 1200 jurors from 353 capital cases from 14 different states.

3.      Since its inception, CJP researchers have published over fifty articles and two books based on the data.  I personally have written one book (A LIFE AND DEATH DECISION: A JURY WEIGHS THE DEATH PENALTY) and six articles looking at various aspects of capital jury decision making.  I also have lectured widely to judges through the National Judicial College and other programs (such as Florida's Advanced Judicial Studies) about the death penalty, including the CJP's findings.  The CJP has been cited in a number of judicial opinions, including by the United States Supreme Court (Florida v. Nixon, 543 U.S. 175, 192 (2004)).

4.      In assessing the likely impact of mitigating evidence, the Capital Jury Project (CJP) has found that the critical inquiry is how the mitigation would fit into the overall "case for life" that would have been presented to the jury. Jurors are most likely to return a life sentence in cases where the defendant's life story is one where the defendant is seen as having ended up committing the murder because of events or influences that were largely beyond his control.  As a result, mitigating evidence such as mental illness or an abusive childhood that left a defendant without the guiding hand of an adult are particularly powerful because a juror is likely to find that such mitigation meant that the defendant lacked full control over his decision making and the events that eventually culminated in the murder.

One of the CJP's key findings, therefore, is that mitigating evidence cannot be evaluated in isolation or in the abstract, but must be assessed within the context of an overall case.  This finding is particularly important when it comes to mitigation that is sometimes described as "double-edged" mitigation on the theory that it might also have the potential to make a juror less sympathetic to the defendant.  A mitigating factor like drug abuse, for example, in the abstract might not appear to be a powerful mitigator because some jurors might see drug abuse as something that the defendant brought upon himself.

In fact, however, a defendant's drug abuse can be a critical component of a properly presented case for life.  If the defendant's drug use, for example, was an effort by the defendant to "self-medicate" because he suffered from mental illness and was not receiving adequate medical or psychiatric treatment, the drug use becomes an important part of the overall mitigation case by reinforcing the theme that the defendant was suffering from an untreated

mental illness.  Likewise, jurors have found drug abuse to be critical mitigating evidence in cases where the defendant is perceived as not having received the help from his family, community or medical facilities that could have helped him overcome the underlying causes of his actions.

5.    Based on the CJP's findings, therefore, an essential lesson for lawyers is to not exclude mitigation that would help establish the most powerful theme of a case for life (i.e., that a defendant was subjected to influences beyond his control) because it might also lead to evidence of "bad" behavior.  After hearing that a defendant grew up in a highly dysfunctional family, jurors are not surprised that the defendant then became involved with drugs or acted in a manner that resembles the dysfunction he grew up in.  Indeed, such evidence often critically reinforces for the jurors that the defendant was raised in circumstances that deprived him of the chance of ever choosing the "high road."  As noted earlier, jurors are most likely to vote for life in cases where a defendant is battling against circumstances not of his own making, such as mental illness and a dysfunctional family.  Moreover, and very importantly, this type of mitigation can often be developed through the testimony of non-expert witnesses (for instance, family members, teachers, coaches, etc), and these are the types of witnesses to which jurors respond most favorably, making expert testimony unnecessary.

6.    The CJP also has found that a case for life built primarily around "good character" evidence (e.g., the defendant was a good father or brother) is not very persuasive mitigating evidence.  Rather, such evidence generally becomes effective only in the context of showing that an individual who has been struggling against difficult circumstances (such as being raised in a dysfunctional household) still has managed to do some good and has the potential for positive acts in the future.  The failure of "good character" evidence to work as the primary theme of mitigation is not surprising when one considers that the jurors have just convicted the defendant of a terrible crime.  From the juror's perspective, therefore, a defendant's "good deeds" are rarely if ever going to outweigh the harm that has been caused.  Instead, what jurors are looking for is some reason to find that the defendant's actions were influenced by factors beyond his control (such as mental illness or an abusive childhood), such that the ultimate penalty of death is not deserved.  Now, if the jurors find that the defendant was battling against factors like mental illness, evidence that the defendant also has positive attributes to contribute if allowed to live can be helpful complementary evidence that the defendant should be allowed to live; as stand-alone mitigation, however, the evidence is unlikely to be fully persuasive on its own.

7.    Another aspect of mitigation that the CJP has found is that a particular piece of mitigation does not have to persuade all twelve jurors of its importance in order to have an impact on the sentence.  The United States Supreme Court has held that each individual juror must be allowed to assess for himself or herself whether a particular piece of mitigation is persuasive. Mills v. Maryland, 486 U.S. 367(1988)(finding unconstitutional any requirement that jurors unanimously agree on a mitigating factor to give it effect).  The CJP data give strong support to this ruling.

Individual jurors often react differently to the same evidence of mitigation in deciding how much weight it should be given.   Importantly, however, because of the nature of jury deliberations at the penalty phase, mitigation evidence that persuades only one or two jurors can still change the outcome from a death to life sentence.  This is because it generally takes only four or five jurors voting for life to dictate a life sentence for the entire jury, and, of course, the jurors voting for life may be doing so for different reasons.  See generally Sundby, War and Peace in the Jury Room: How Capital Juries Reach Unanimity, 62 Hastings L.J. 403 (2011) (CJP data shows that only four to five jurors favoring life is the threshold that almost always produces a unanimous life sentence or a deadlocked jury); see also Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, Forecasting Life and Death: Juror Race, Religion, and Attitude Toward the Death Penalty, 30 J. Legal Studies 277 (2001) (finding similar threshold based on South Carolina death penalty juries).

As a result, mitigating evidence even if it was found to be persuasive by only one-third of the jurors, is evidence that carries with it the strong probability of producing a life sentence. Indeed, the distinct possibility exists that mitigating evidence that persuades even just a single juror to vote for life can tip the balance in a case from death to life if several other jurors are already leaning towards a life sentence.  Moreover, because jurors consider mitigating evidence as part of the "overall" case for life, the impact of any mitigating evidence should be assessed based on its contribution in conjunction with the other evidence in mitigation.  Thus, the likely effect on a juror of evidence that the defendant battled a drug abuse problem or mental illness must be considered in tandem with other mitigating evidence, such as evidence of a dysfunctional family.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 13, 2012.


/s/
Scott E. Sundby

# APPENDIX A

Appendix

Publications of Scott E. Sundby

Presented by Counsel for Kenneth Barrett

**BOOKS**

- A Life and Death Decision: A Jury Weighs the Death Penalty (Palgrave Macmillan/St. Martin's Press - April 2005; paperback October 2007); finalist for 2006 ABA Silver Gavel Award.

**ARTICLES/ESSAYS**

- *Listening at the Jury Room Door*, Hofstra Law Review (2008) (with John Blume and Sheri Lynn Johnson). (Paper for Symposium in "Guidelines for Mitigation in Death Penalty Cases.")
- *Capital Punishment in the 21st Century*, Forthcoming 2008, (Book Chapter) (with William Bowers).
- *The Death Penalty's Future: Charting the Crosscurrents of Declining Death Sentences and the McVeigh Factor*, 84 Texas Law Review 1929 (2006) (Paper for Symposium on Punishment Law and Policy).
- *Protecting the Citizen Whilst He is Quiet: Suspicionless Searches, Special Needs and General Warrants*, 74 Mississippi Law Journal 501 (2005) (Paper for Symposium on The Tools to Interpret the Fourth Amendment, National Center for Justice and the Rule of Law, University of Mississippi).
- *Moral Accuracy and Wobble in Capital Sentencing*, 80 Indiana Law Journal 56 (2005) (Comments/Essay for Symposium on Toward a Model Death-Penalty Code: The Massachusetts Governor's Council Report, Indiana University School of Law).
- *The Capital Jury and Empathy: The Problem of Worthy and Unworthy Victims*, 88 Cornell Law Review 343 (2003). (Paper for Symposium on Victims and the Death Penalty.)
- *Fallen Superheroes and Constitutional Mirages: The Tale of Brady v. Maryland*, 33 McGeorge Law Review 643 (2002). (Essay/Lecture for McGeorge Law School Distinguished Lecture Series).
- *Burden of Proof*, Encyclopedia of Crime and Justice, 2001 (with Barbara Underwood).
- *The Limits of Privacy*, 570 Annals of the American Academy of Political and Social Science 202 (2000). (Book review of Amitai Etzioni's *The Limits of Privacy*).
- *Mean Justice*, 1999 Trial 95 (Sept. issue) (book review of Edward Humes' *Mean Justice*).
- *An Ode to Probable Cause*, 72 St. John's Law Review 1133 (1998) (Paper for Symposium on the Thirtieth Anniversary of *Terry v. Ohio*).
- *The Jury and Absolution: The Intersection of Trial Strategy, Remorse and the Death Penalty*, 83 Cornell Law Review 1557 (1998) (Paper for Symposium on How the Death Penalty Works: Empirical Studies of the Modern Capital Sentencing System).
- *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert Testimony*, 83 Virginia Law Review 1109 (1997).
- *The Education of Law Professor*, 1996 Virginia Lawyer 24 (April issue)
  *Everyman's Fourth Amendment: Privacy or Mutual Trust Between Government and Citizen?*, 94 Columbia Law Review 1751 (1994).
- *The Lockett Paradox: Reconciling Guided Discretion and Unguided Mitigation in Capital Sentencing*, 38 U.C.L.A. Law Review 1147 (1991).
- *Is Abandoning State Action Asking Too Much of the Constitution?*, 17 Hastings Constitutional Law Quarterly 139 (1990) (Paper for Symposium on the California Constitution).
- *The Virtues of a Procedural View of Innocence - A Response to Professor Schwartz*, 41 Hastings Law Journal 161 (1989).
  *The Reasonable Doubt Rule and the Meaning of Innocence*, 40 Hastings L.J. 457 (1989).
- *A Return to Fourth Amendment Basics: Undoing the Mischief of Camara and Terry,* 72 Minnesota Law Review 383 (1988).
- *The Felony-Murder Rule: A Doctrine at Constitutional Crossroads*, 70 Cornell Law Review 446 (1985) (with Roth).