**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| KENNETH EUGENE BARRETT, | ) | CASE NO. CV-09-00105-JHP |
|---|---|---|
| Petitioner, | ) | |
| | ) | PETITIONER'S COMBINED MOTION |
| vs. | ) | IN LIMINE TO EXCLUDE TESTIMONY |
| | ) | FROM, AND ANY EVIDENCE |
| UNITED STATES OF AMERICA, | ) | RELATED TO, PROPOSED EXPERT J. |
| | ) | RANDALL PRICE AND BRIEF IN |
| Respondent. | ) | SUPPORT |
| | ) | |

1

## TABLE OF CONTENTS

MOTION.................................................................................................................... 1

BRIEF ...................................................................................................................... 2

I.   PROCEDURAL HISTORY ........................................................................... 2

II.  OBJECTED TO EVIDENCE.......................................................................... 4

III. LEGAL GROUNDS FOR EXCLUDING THE EVIDENCE ........................... 4

   A.   Dr. Price's Testimony Should Be Excluded Because it Is Not Being Used to Rebut Dr. Russell's Risk Assessment and Therefore Violates this Court's Order and Mr. Barrett's Fifth and Sixth Amendment Rights.................................................................................... 4

   B.   Dr. Price's Testimony Must Be Excluded Because there is No Reliable Scientific Basis for It, and Thus His Testimony is Inadmissible Under Federal Rule of Evidence 702............... 5

   C.   Dr. Price's Testimony Should Be Excluded Because its Probative Value is Outweighed by the Danger of Unfair Prejudice, Confusion of the Issues, and Misleading the Jury Pursuant to 18 U.S.C. § 3593(c) ............................................................................................ 12

   D.   Dr. Price's Testimony Should Be Excluded Because it Violates Due Process and the Eight Amendment ........................................................................................................ 15

CERTIFICATE OF CONFERENCE.......................................................................... 17

CONCLUSION....................................................................................................... 17

CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY............................. 19

**TABLE OF AUTHORITIES**

**Federal Cases**

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ...................................................................... 17

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ........................................... 6, 7

*Estelle v. Smith*, 451 U.S. 454 (1981) ......................................................................... 6

*Flores v. Johnson*, 210 F.3d 456 (5th Cir. 2000) ........................................................ 6

*Ford v. Wainwright*, 477 U.S. 399 (1986) .................................................................. 16

*Hernandez v. Johnson*, 213 F.3d 243 (5th Cir. 2000) ................................................ 17

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ................................................... 16-17, 17

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................ 7

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................................ 16

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) ......................................... 4

*United States v. Beckford*, 962 F. Supp. 748 (E.D. Va. 1997) ................................... 6

*United States v. Edelin*, 134 F. Supp. 2d 45 (D.D.C. 2001) ...................................... 6

*United States v. Perez-Vega*, 250 F. Supp. 429 (M.D. Pa. 1966) .............................. 16

*United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004) ......................... 6, 18

*Zant v. Stephens*, 462 U.S. 862 (1983) ..................................................................... 16

**Federal Statutes**

18 U.S.C. § 2255 ...................................................................................................... 4, 15

18 U.S.C. § 3593(c) .................................................................................................. 16

18 U.S.C. § 3593(c) (2012) ............................................................................... 2, 13, 18

**Other**

Eighth Amendments to the U.S. Constitution .............................................................. 2

Fed. R. Crim. P. 12.2 ................................................................................................. 3

Fed. R. Evid. 702 ............................................................................................... 2, 6, 13

**MOTION**

Petitioner, Kenneth Eugene Barrett, by and through undersigned counsel, respectfully moves this Court for an order precluding the Government from adducing at the evidentiary hearing any evidence from or related to its proposed expert J. Randell Price, including his prior psychological evaluation/risk assessment report dated October 25, 2005 and filed with the Court on November 1, 2005; Price's concomitant videotaped interview of Mr. Barrett; and any testimony by Dr. Price. The Government did not and could not present such evidence at trial as rebuttal to Dr. Jeanne Russell—as intended—because trial counsel never opened the door by calling Dr. Russell as a witness.

Such evidence is not contained within the evidence Mr. Barrett now presents in mitigation, nor is it relevant to proving an aggravating circumstance of which the government gave notice prior to trial and that the jury did not reject.

And, critically, there was no reliable scientific basis for this proposed testimony by Dr. Price regarding risk assessment and psychopathy in 2005; at present, there remains no reliable basis for such testimony. Dr. Price's testimony would also prove grossly misleading: his misuse of the certain personality tests and his use of construct of "psychopathy" would cause unfair prejudice that would outweigh his testimony's utter lack of probative value.

Therefore, all testimony by or evidence relating to proposed expert Dr. Randall Price must be excluded pursuant to the Federal Rules of Evidence 702, 104 (a), 18 U.S.C. § 3593 (c), and the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution.

1

**BRIEF**

## I.    PROCEDURAL HISTORY

On September 23, 2005, trial counsel Roger Hilfiger and Bret Smith provided pre-trial notice of expert evidence to the government, pursuant to Federal Rule of Criminal Procedure Rule 12.2  Trial counsel indicated that Jeanne Russell, Ed.D., had conducted a risk assessment of Kenneth Barrett and that she would testify "if necessary" at his sentencing proceedings. Trial counsel did not maintain that Dr. Russell's report or testimony qualified as expert evidence of a mental condition under Rule 12.2. Instead, trial counsel averred that Dr. Russell's risk assessment "could possibly implicate" Rule 12.2, and they filed their notice merely to remove any chance of unfair surprise or unnecessary delay in the proceedings.

In response, the Government requested to have Randall Price, Ph.D., examine Mr. Barrett in order to rebut Dr. Russell. The Government emphasized repeatedly that the only permissible use of Dr. Price's report would be rebut Dr. Russell—if, in fact, Mr. Barrett later confirmed his intent to offer her at the sentencing proceedings. The Government acknowledged:

> [a]s provided by Rule 12.2(c)(4), the Government would be able to use . . . evidence it obtains [through Dr. Price's examination] only to rebut . . . evidence introduced by the defendant in his case-in-chief at second stage. If the defendant does not introduce the evidence [from Dr. Russell], the government will not introduce mental health evidence. The government merely seeks discovery . . . in order to rebut this anticipated evidence.

The Court concurred that the only permissible use of risk assessment evidence by Dr. Price was in rebuttal to Dr. Russell, and any other contemplated use would violate Mr. Barrett's constitutional rights. In its Order permitting rebuttal testing, the Court cautioned:

> [t]o allow the government to use the results of the defendant's mental examination [by Dr. Price], or any information derived therefrom for a purpose other than rebuttal at sentencing would violate the defendant's Fifth Amendment right against self-incrimination . . . . Further, to require the defendant to reveal his

2

strategy or disclose materials he provided to his experts would violate defendant's Sixth Amendment right to the effective assistance of counsel. (citations omitted).

Accordingly, the Court allowed the requested examination by Dr. Price, while delineating that "the sole purpose of the government's examination shall be to confirm or rebut evidence presented by the defendant" prior to trial. To safeguard defendant's constitutional rights, the Court ordered the results of Dr. Price's risk assessment findings to be served on a "fire-walled" Assistant United States Attorney pursuant to Rule 12.2, and placed under seal. Absent notice by defendant indicating his intent to offer Dr. Russell during sentencing proceedings, the results would remain sealed with the Court and would not be disclosed to any trial Assistant United States Attorneys or any other attorneys for the government or defense counsel. As defense counsel never indicated its intent to offer Dr. Russell, the results of Dr. Price's examination remained under seal at Mr. Barrett's sentencing proceedings.

Mr. Barrett has never suggested he would call Dr. Russell as an expert witness or rely upon her risk assessment as part of any case-in-chief.

On August 19, 2015, the Tenth Circuit of Appeals remanded Mr. Barrett's post-conviction claim of ineffective assistance of counsel due to failure to mitigate for an evidentiary hearing. *United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015). Dr. Russell's risk assessment was not a part of the mitigation presentation Mr. Barrett proffered with his § 2255 Motion or in his presentation to the Tenth Circuit. Nevertheless, in its December 6, 2016, Discovery Order in anticipation of the upcoming evidentiary hearing, the Court deemed Dr. Price's report relevant to Mr. Barrett's post-conviction claim of ineffective assistance of counsel. Accordingly, the court ordered its unsealing, and directed the Clerk of the Court to make available Dr. Price's videotaped interview of Mr. Barrett. Mr. Barrett again refrained from evincing any intent to call Dr. Russell as a mental health expert witness at the hearing. Nevertheless, the Government has

expressed an intention to introduce testimony by Dr. Price at the evidentiary hearing.

## II.   OBJECTED TO EVIDENCE

The Government's exhibit list indicates the Government intends to rely on theories of aggravation, and evidence, that either was not available to the trial prosecutors at the time of sentencing or that would not have been presented in Mr. Barrett's mitigation case. Among such theories and evidence, Mr. Barrett objects to any testimony from, and evidence related to, the psychological evaluation/risk assessment of Dr. J. Randall Price.

The Government now proposes to have Dr. Price testify consistent with his 2005 report. Therein, Dr. Price concluded that Mr. Barrett's "emotional and behavioral traits result[] in unpredictable and violent outbursts of violence" and that he is a psychopath. Dr. Price based such conclusions chiefly on one risk assessment instrument, the Psychopathy Checklist-Revised ("PCL-R"). Consistent with his report, Dr. Price would testify to the asserted strong relationship between psychopathy and criminal behavior, violence, substance abuse, and recidivism. Dr. Price would also attest to the PCL-R as a reliable and valid measure of psychopathy and a "robust predictor of criminal behavior, including violence, in a variety of populations and contexts."

## III.   LEGAL GROUNDS FOR EXCLUDING THE EVIDENCE

### A. Dr. Price's Testimony Should Be Excluded Because it Is Not Being Used to Rebut Dr. Russell's Risk Assessment and Therefore Violates this Court's Order and Mr. Barrett's Fifth and Sixth Amendment Rights

The trial record establishes that the only permissible use of Dr. Price's testimony was to rebut testimony by Dr. Russell in the penalty phase case-in-chief. Defense counsel did not call

4

Dr. Russell in 2005, and Mr. Barrett has never endorsed her as a mental health witness in any subsequent proffer of his mitigation case.[1]

Accordingly, the introduction of Dr. Price's risk assessment testimony as part of the government's case-in-chief would exceed the scope of its permissible use under this Court's prior order. As this Court previously observed, the government's use of Dr. Price's testimony in the absence of opinion testimony by Dr. Russell violates Mr. Barrett's rights under the Fifth and Sixth Amendments. *See Estelle v. Smith*, 451 U.S. 454 (Fifth Amendment); *United States v. Sampson*, 335 F. Supp. 2d 166, 242 (D. Mass. 2004) (Sixth Amendment); *United States v. Beckford*, 962 F. Supp. 748, 764 n. 16 (same); *United States v. Edelin*, 134 F. Supp. 2d 45, 52 (D.D.C. 2001) (same).[2]

### B. Dr. Price's Testimony Must Be Excluded Because there is No Reliable Scientific Basis for It, and Thus His Testimony is Inadmissible Under Federal Rule of Evidence 702

Federal courts have routinely applied *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to evaluate the reliability of expert predictions of future violence in capital sentencing proceedings. *See, e.g., Flores v. Johnson*, 210 F.3d 456, 463-70 (5th Cir. 2000) (Garza, J., concurring); *United States v. Sampson*, 335 F. Supp. 2d 166, 218-23 (D. Mass. 2004).

---

[1] Dr. Russell remains a potential percipient witness as to trial counsel's deficient performance, and, in the somewhat topsy-turvy circumstances, a potential rebuttal witness.

[2] As demonstrated in Mr. Barrett's Motion in Limine to Exclude Novel Theories in Aggravation and Brief in Support filed herewith, the Government is not now permitted to use Dr. Price to introduce new theories in aggravation—such as Mr. Barrett's "psychopathy" as asserted by Dr. Price—that were not previously presented at his original sentencing proceedings. Dr. Price's testimony also exceeds the scope of Mr. Barrett's original and new mitigating evidence regarding Mr. Barrett's mental health: "psychopathy" is not a generally accepted diagnosis in the relevant community of mental health professionals and proves irrelevant to the psychiatric diagnoses of Dr. George Woods and to the neuropsychological opinions of Dr. Deborah Miora. *See, e.g.,* Exhibit B (2-1-2017 Declaration of Thomas J. Reidy, Ph.D., ABPP) at pp. 18-19. Accordingly, Dr. Price's testimony must necessarily be excluded.

The *Daubert* Court established that expert testimony must be both relevant and reliable to be admissible. *Daubert*, 509 U.S. at 589; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (per *Daubert*, expert testimony admissible only if relevant and reliable).

The *Daubert* Court enumerated five factors to aid trial courts in making determinations whether expert evidence is reliable and relevant, and thus, admissible: (1) whether the reasoning or methodology underlying the testimony is scientifically valid, and whether that reasoning or methodology can be applied to the facts in issue; (2) whether the theory or technique can be and has been tested; (3) whether the theory or technique has been subject to peer-review and publication; (4) the known or potential error rate of the particular scientific technique; and (5) whether the technique has garnered general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 592-595. The *Daubert* Court emphasized that the inquiry is a flexible one, with the overarching subject being the "scientific validity and thus evidentiary relevance and reliability" of proffered expert submissions. *Id.* at 594-95.

Dr. Price's risk assessment methodology fails to satisfy any of the five *Daubert* factors. In particular, Dr. Price's use of the PCL-R in assessing violence risk in a prison has never been validated; psychopathy, as measured by the PCL-R, has never been probative of, or a valid predictor of, an individual's risk of committing serious violent acts during incarceration, and it has never been recognized as confirming or disconfirming of any psychiatric or neuropsychological diagnosis. This is a position that has received full support by the forensic psychology community.[3]

---

[3] For instance, in *United States v. Willis Haynes*, No. PJM-98-0520 (D. Md.), which was tried in 2000, five prominent clinical and forensic psychologists submitted affidavits that variously attested there was no scientific basis for claiming that a high PCL-R score accurately predicted persons with a high risk of committing prison violence. Those affidavits are attached hereto as Exhibit A. Since 2000, little has changed in the relevant scientific community. Mr.

In support of this Motion, Mr. Barrett submits and incorporates herein the attached Declaration of Thomas J. Reidy, Ph.D., ABPP. Exhibit B. Dr. Reidy is a licensed clinical psychologist and board-certified forensic psychologist with extensive experience in violence risk assessment. He is one of the leading experts in the country on this topic.

After review of Dr. Price's report, Dr. Reidy has concluded the state of the science indicates Dr. Price's report lacks reliability. In hazarding his opinions about Mr. Barrett's future violence, Dr. Price eschewed validated risk assessment methodology in favor of the PCL-R, MMPI-2, and PAI, which were used to reach highly misleading conclusions inapposite to the appropriate context—namely, capital inmates.

Dr. Reidy notes that Dr. Price failed to consider

> the defendant's jail or prison records, which are critical to an assessment of prison violence risk in a similar context (e.g., Cunningham & Reidy, 2002). Instead, Dr. Price relies upon findings from the PAI, MMPI-2, and principally the PCL-R to make conclusions about general violence potential and implying but never directly stating the specific context and population related to his opinions. * * * While these test based descriptors may describe the defendant, there is no scientific basis for attributing these traits to risk of violence in a prison context, especially when a large percentage of inmates display similar traits. Rates of serious violence resulting in death or serious injury within prison are quite low, despite a large proportion of prison inmates with significant criminal histories and convictions for felonies and with half of the inmate populations incarcerated for violent offenses. [Ex. B at 5-6.]

A fundamental flaw in Dr. Price's report is his failure to acknowledge that the testing instrument he used—the PCL-R—has never obtained scientific validity for the specific context in which he is applying the purported results, namely a high-security prison population. As Dr.

---

Barrett has retained leading forensic psychologist Thomas J. Reidy, Ph.D., ABPP, to assess Dr. Price's opinions, in particular his use of the Psychopathy Checklist-Revised (PCL-R) in assessing violence risk in a prison, using the state of the science at the time of Mr. Barrett's trial, in 2005; also, Dr. Reidy has examined Dr. Price's opinions using post 2005 scientific developments. *See generally* Exhibit B. As discussed hereinafter, there remains no scientific basis for asserting that a PCL-R score accurately forecasts a high risk of violence in prison. *Id.*

Reidy observes, Dr. Price

cites the PCL-R as a reliable and valid measure of psychopathy and a "robust predictor of criminal behavior, including violence, in a variety of populations and contexts" but never specifies the particular contexts for which it has been validated by scientific studies. Seemingly in support of using the PCL-R for predicting violent or criminal behavior in an institutional setting, Dr. Price offers only a vague conclusionary statement pointing to "a few studies" demonstrating "relatively modest correlation between psychopathy and institutional misconduct" without further comment concerning the reliability and validity of these "studies" to the appropriate context. This general statement is misleading when applied to institutional violence because the entire body of empirical evidence available in 2005 and at present does not support use of the PCL-R in the assessment of prison violence, particularly in a capital context (see Edens et al., 2001, 2005; Guy et al., 2005). For example, Edens et al., provide a table of 15 studies examining the relationship between psychopathy and institutional misconduct. Only one of these studies pertains to a very small sample (N=98) of adult inmates incarcerated in the U.S. and yielded nonsignificant correlations for both violent and nonviolent discipline reports. The remainder of the studies involved populations and contexts far different than inmates incarcerated U.S. prisons, that is, adolescents, mentally disordered offenders, Canadian inmates, sex offenders, and females; sample sizes were very small.

Validity refers to inferences derived from test scores in reference to a specific outcome criterion. Hence the question of validity for the PCL-R in the capital context should be framed around the violence risk for a capital population in prison. Dr. Price does not specifically mention use of the PCL-R in the capital arena, but declares a "few studies have demonstrated a relatively modest correlation between psychopathy and institutional misconduct." He does not define "relatively modest" or "institutional misconduct" and does not cite references. The scientific literature available in 2005 and to date suggests that Dr. Price's stated general conclusions about the results of the PCL-R are highly misleading with regard to any valid application of these findings to a prison population, and particularly to capital murderers, life without parole inmates, and related behavior in maximum security prisons. In fact, a large number of studies have pointed out that when assessing the risk of future institutional violence the predictive validity of the PCL-R has not been demonstrated in a capital context either prior to 2005 of thereafter (e.g., Edens, 1999, 2001, 2007, 2017; Edens, Buffington-Vollum, Keilen, Roskamp, & Anthony, 2005; Edens & Cox, 2012; Edens, Petrila, & Buffington-Vollum, 2001; Freedman, 2001; Edens, Smith, Davis, & Guy, 2012; Guy, Edens, Anthony, & Douglas, 2005). For example, the meta-analysis of 38 datasets by Guy et al. (2005) found extremely low correlations (.11 and .10) between physical violence and general aggression and PCL-R total scores for U.S. prisons meaning that the PCL-R made a negligible (1%) contribution to the violent outcomes. Such findings call into question the use of the PCL-R in the context of capital death penalty trials. [Ex. B at 6-8.]

8

Dr. Reidy identifies more aspects of Dr. Price's report that fail to meet basic scientific criteria for reliability. To wit:

Dr. Price's analysis of violence potential was based solely on his use of the PAI, MMPI-2, and PCL-R and did not address other correlates of prison violence that were well known in 2005. Although he generally alluded to moderating factors such as age reducing violence potential in the free world, he did not address a similar phenomenon occurring in prison. Dr. Price did not address base rates (frequency and prevalence) influencing the expression of violence in prison and that such rates vary by the population of interest and decrease as the definition of violence narrows. (Marquart et al., 1989; Cunningham & Reidy, 1998; Cunningham et al., 2005). Cunningham and Reidy (1998) summarized data showing that the prevalence of violent behavior dropped dramatically with age both in the community and in prison and subsequent studies across the last two decades have supported such trends. There are no data reflecting any relationship between psychopathy and age with regard to decreasing rates of prison violence. Seemingly, he did not review jail or prison records to assess the defendant's behavior in a similar context. These components of an institutional risk assessment and related methodology were widely known in 2005, routinely presented at federal and state capital trials, and generally accepted by the scientific community (Cunningham & Reidy, 1998a, b, 1999; 2002; Edens et al., 2005; Marquart, 1989). These studies and others over the past 25 years demonstrate that former death row inmates and capital inmates sentenced to life without parole who were described by mental health professionals at trial as a continuing threat to society demonstrated equivalent rates of violence toward inmates and staff, and in some instances were better behaved than comparison groups in high security prisons (e.g., Cunningham & Reidy, 2002; Cunningham et al., 2005a, b, 2016; Edens et al., 2005, Marquart et al., 1989, 1994; Reidy et al., 2001). These studies demonstrate low base rates of serious violent behavior that made it extremely difficult to determine exactly which capital defendants would engage in future acts of violence without identifying a large number of false positives. For example, Marquart et. al (1989) demonstrated that capital murderers serving a life sentence exhibited a rate of 2.6 serious violent infractions per 100 inmates in contrast to nearly 12 per 100 committed by general population inmates. Similarly, Cunningham, Reidy, & Sorensen (2005) provided evidence that approximately 10/100 life sentenced prisoners engaged in violent misconduct of some type in contrast to nearly half of parole eligible inmates and murder was nearly negligible with one homicide among 1,054 inmates. Any consideration of psychopathy in relation to prison violence must consider such moderators. Studies conducted subsequent to 2005, including one international perspective, further demonstrate the low base rates of prison violence for capital offenders and those serving a life sentence, and elucidate empirically derived correlates of prison violence, (e.g. Cunningham, 2010; Cunningham, Reidy, & Sorensen, 2008, 2016; Lucioni-Arbach et al., 2012). Empirically supported risk factors such as violence

base rates, age, prison context, and restrictive housing are critical components necessary for violence risk assessment at capital death sentencing as demonstrated by inclusion of this methodology in textbooks and by eschewing the use of instruments like the PCL-R that have poor applicability to capital case assessments (see e.g., Conroy & Murrie, 2007; DeMatteo, Murrie, Anumba, & Keesler, 2011). [Ex. B at 8-10.]

Dr. Price's failure to take into account validated risk assessment factors such as use of prior conduct during incarceration, base rates of violence, and capital context, all contribute to his methodological failings and grossly misleading conclusions.

Dr. Price's reliance on the PCL-R, MMPI-2, and PAI for his forecasts of Mr. Barrett's violence warrants the exclusion of his testimony under *Daubert*. As Dr. Reidy has concluded, "to a reasonable degree of scientific certainty, . . . the PCL-R" and other instruments employed by Dr. Price, the MMPI-2, and PAI , "do not meet *Daubert* standards for use in a decision making in a capital death penalty case." Exhibit B at 24. In fact, Dr. Price's "methodology" fails to satisfy each and every one of the five *Daubert* standards:

> Whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. The scientific validity of psychopathy as measured by the PCL-R is not valid for purposes of capital sentencing. Validity refers to the usefulness of inferences that can be derived from specific test scores. When considering capital risk assessment, validity necessarily involves predictive validity with regard to a population of capital offenders given life sentenced inmates, and placed in secure housing. No studies have demonstrated such predictive validity attributed to PCL-R scores and the related construct of psychopathy. The use of PCL-R methodology cannot be applied to violence risk assessment for prison violence because no studies have demonstrated reliability and validity for such a purpose.

> Whether the knowledge or technique can be or has been tested by scientific methods. The above cited studies demonstrate that psychological test profiles cannot be reliably and validly associated with long-term prison violence. There is no direct scientific evidence that the PCL-R in particular is predictive of institutional violence by correctional offenders in the United States. Use of the term psychopath alone increases perceptions that a defendant will be a "future danger" in prison when no evidence supports such an assertion for capital inmates housed in maximum security prisons. A 2005 meta-analysis that considered all available research studies examining the relationship of psychopathy and violence

in US prisons concluded that there is weak evidence or no significant findings for the relationship between psychopathy and institutional misconduct. Although the predictive accuracy of the PCL-R has been studied, albeit insufficiently, in other settings, including psychiatric hospitals, that research does not provide an adequate basis on which to generalize the results to a different population, namely criminal offenders, in a different custodial setting. Conclusions about the predictive validity of the PCL-R  with capitally convicted inmates housed in the secure correctional institution differ considerably from civil forensic psychiatric patients retained in a psychiatric hospital. Also, at this time, there is insufficient research to make generalizations from psychopathy ratings associated with violence from community behavior to prison behavior, and from psychiatric settings to life or death-sentenced correctional populations. These instruments fail to demonstrate a scientifically reliable and valid standard of performance in a capital death penalty case requiring jurors to make life or death decisions.

Whether the theory has been subjected to peer review and published in scientific journals. Research concerning the PCL-R, MMPI-2, and PAI through the year 2005 indicates no published, peer-reviewed studies examining the predictive validity of these instruments with respect to the institutional violence by capital offenders housed in high security prisons, or inmates serving a life sentence. No studies of the PCL-R and these other instruments have considered the influence or interaction of such moderating variables as base rates, aging, empirical correlates of violence, and risk management strategies to the actual expression of different forms of violence.

Whether there is a known or potential error rate associated with the theory or technique. There are no studies using the PCL-R, PAI, and MMPI-2 that permit establishment of error rates for the prediction of violence for in-custody populations of capital inmates serving life sentences in maximum security prisons. A 2001 study by Freedman specifically addressed "excessive false positive rates" related to the prediction of violent behavior by the PCL-R and reported the complete absence of significant findings for the few prison samples available at that time. Studies subsequent to this one through 2005 and beyond similarly report the absence of a relationship between psychopathy and personality traits with prison violence, which precludes the determination of error rates. Alhough error rates are unavailable for the PCL-R, the use of base rates can be used as an anchor to estimate meaningful probability of prison violence. Base rates differ according to the group being studied and definition of violence applied. To illustrate from the outer margin of prison base rate continuum, the rate of homicide of a correctional officer is 1 per 1,000,000 inmates per year, which is an exceedingly rare event. Over varying followup periods (ranging from 2-53 years) the rates of assault in the institution by death row, former death row, capital life, life-without-parole, life-with-parole inmates were relatively low ranging from 0% to 31% (Reidy et al., 2001) and these findings have been replicated in numerous studies over the years. Considering the low base rates, only estimates of improbability can be calculated because the error rates would range from 70-

100% depending on the definition of violence and the population studied. Hence, the false positive rate will be extraordinarily high.

The degree to which the expert's theory or method is recognized and accepted as valid within the relevant scientific community. The terms "psychopath" and "psychopathy" are not generally accepted diagnoses and the methodology used to to attach those labels, the PCL-R, is not part of the generally accepted methodology and diagnostic criteria used by the DSM [*Diagnostic and Statistical Manual of Mental Disorders*]. The PCL-R is not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in capital offenders in the United States, or inmates incarcerated for life in a maximum security prison. Currently, insufficient research has been conducted to justify the use of the PCL-R for assessing "future dangerousness" or future risk for aggression amongst populations of capital criminal offenders during their prison incapacitation from a life sentence. While it is possible to conduct scientific studies to assess the validity of the PCL-R in predicting future violent behavior in such correctional settings, only a small number of studies have addressed the institutional adjustment of any forensic population (e.g., civil psychiatric, forensic psychiatric, jail, or prison) through 2005. These studies do not investigate the pertinent population of relevance and the particular environment in which the defendant would be incarcerated if not given a death sentence (i.e., a maximum security prison). Until more relevant research has been completed and sufficient data are available in the published, peer-reviewed literature to assess the instrument's predictive capacity in a prison setting, the PCL-R should not be used to judge a capital defendant's risk of future violence in such a prison setting. In fact, to do so would risk violating ethical and professional standards concerning the use of procedures and instruments not shown to be scientifically reliable and valid for a capital context. [Ex. B at 20-24.]

In sum, Dr. Price's evaluation must be excluded under Federal Rule of Evidence 702.

**C. Dr. Price's Testimony Should Be Excluded Because its Probative Value is Outweighed by the Danger of Unfair Prejudice, Confusion of the Issues, and Misleading the Jury Pursuant to 18 U.S.C. § 3593(c)**

The Federal Death Penalty Act affords stricter protection than the Federal Rules of Evidence by excluding information "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). Dr. Price's testimony must be excluded on statutory grounds. It would be misleading and of no probative value for the jury to hear testimony about the label "psychopathy" from an expert. As Dr. Reidy states and can readily be verified by reviewing the texts, the scientific community has

repeatedly excluded the "diagnosis" of psychopathy from successive editions of the DSM.

Psychopathy and the PCL-R are not part of the methodology of mental health diagnosis, known

as differential diagnosis. That is, how an individual is said to have scored on the PCL-R has no

bearing on whether that person suffers from a disorder that is included in the DSM.

> Neither the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) applicable in 2005, nor the edition in use today, DSM-5, identifies psychopathy as a diagnosis or mental disorder. Certain traits associated with the psychopathy construct are mentioned as part of Antisocial Personality Disorder (APD) in both editions, but APD is not the same as psychopathy. Although some similarity exists, APD and psychopathy are not interchangeable concepts yet have the same pejorative potential in an adversarial legal setting. The reliability and validity of an APD diagnosis has been questioned (e.g., Cunningham & Reidy, 1998, 1999). A diagnosis of APD with or without psychopathy describes little about the prison behavior except that an individual is similar to most prison inmates, and thus does not specifically lead to a conclusion that a particular inmate is incorrigible or "dangerous" in a prison environment (see Cunningham & Reidy, 1998, 1999, 2002). This conclusion is best exemplified in a recent study by Edens, et al. (2015) that determined a DSM 5 diagnosis of APD did not significantly predict prison misconduct. Additionally, the presence of APD and/or psychopathy does not preclude a diagnosis of major mental disorders (e.g., Schizophrenia) listed in the DSM. Mental disorders, apart from psychopathy ratings, can have a significant and disinhibiting effect on a person's proclivity for violence and other forms of maladjusted behavior in a prison context (Felson et al., 2012; Walters & Crawford, 2014).

> The use of the terms "psychopath" and "psychopathy" used or implied as a diagnosis by witnesses who have been deemed experts by courts is inaccurate and misleading. Diagnostic labels with widespread scientific acceptance are catalogued DSM.  Psychopathy is not included in the DSM. Despite repeated efforts by supporters of the PCL-R to have psychopathy included in the DSM, it has been rejected. Lay jurors are unlikely to understand the significance of the American Psychiatry Association's decisions to reject the label as a diagnosis. It means that PCL-R and psychopathy fall outside  the model of differential diagnosis which is the generally accepted model for diagnosing mental health disorders. Differential diagnosis is the central feature of generally accepted practices in psychology and psychiatry. Allowing a mental health expert to testify that PCL-R supports a diagnosis of psychopathy misleadingly implies that the witness's methods and conclusions are in keeping with generally accepted practices in the field although they are not. [Ex. B at 18-19.]

> Just as the PCL-R is not part of the process of differential diagnosis related to the

13

disorders about which Mr. Barrett intends to introduce psychiatric testimony, the PCL-R has no

probative value in assessing the neuropsychological testimony Mr. Barrett intends to offer. As

stated in the attached declaration of Deborah S. Miora, Ph.D., none of the three tests mentioned

in Dr. Reidy's declaration shed any light on the findings of Dr. Myla Young that were proffered

with the § 2255 Motion. Exhibit C (Decl. Deborah S. Miora).

At the same time, studies show that the bare use of the term "psychopath" in capital

proceedings has a strong prejudicial effect on juries and sentencing authorities. Dr. Reidy

expounded on this prejudicial effect, in light of the empirical literature:

> The use of the PCL-R in this legal context poses a number of concerns. First and most importantly is the use of the term "psychopath" and the traits underlying the concept such as "remorselessness, callousness, grandiosity" etc. Such terms have a strong connotation that is stigmatizing and evokes frightening images of brazen killers such as Ted Bundy or Jeffrey Dahmer that have the potential to prejudice jurors. In a series of studies up through 2005, Edens and colleagues (2003, 2004, 2005) demonstrated that using evidence of psychopathy presented to mock jurors in a capital case, independent of expert testimony, revealed subjects merely labeled as psychopaths were considered more dangerous and death-worthy than others not so labeled (60% v. 38%) when all other facts remained the same. These studies demonstrate that attributions regarding undesirable personality traits can have a profound adverse influence on a potential juror's attitudes toward defendants perceived to exhibit psychopathy or its associated characteristics, particularly lack of remorse. The mere presentation of the psychopathic personality label and related traits, even if not directly connected to "future dangerousness" by an expert witness has a strong prejudicial effect causing jurors to be more supportive of a death sentence. Post 2005, another study by Edens et al. (2011) revealed similar findings that "… rating a defendant's perceived level of psychopathy strongly predicted support for executing him." [Ex. B at 16.]

In summary, Dr. Price's report has no probative value because, *inter alia*, (a) it was

prepared and intended solely as rebuttal for testimony that will not be presented; (b) it lacks

scientific testing, validity and reliability in the relevant context; (c) the PCL-R and the label it

generates are not generally accepted in the scientific community for confirming or disconfirming

mental health diagnoses made by Dr. George Woods or the neuropsychological findings of Dr.

14

Myla Young. Allowing an expert to present findings "psychopathy" in this case would be misleading and confusing in that it would suggest scientific reliability and relevance where none exists. Finally, the Court has been presented with evidence of a strong prejudicial effect from the label "psychopath." Therefore, Dr. Price's testimony is inadmissible under § 3593(c). Therefore, it can play no role in this Court's prejudice determination under *Strickland v. Washington*, 466 U.S. 668, 696 (1984).

### D. Dr. Price's Testimony Should Be Excluded Because it Violates Due Process and the Eight Amendment

Time and again, the U.S. Supreme Court has held that the Eighth Amendment mandates the need for "heightened reliability" in determining that death is the appropriate sentence in an individual case. *See, e.g., Zant v. Stephens*, 462 U.S. 862, 884 (1983); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). Accordingly, federal courts often invoke the "heightened reliability" requirement to exclude evidence that fails to satisfy the Federal Rules of Evidence. *See, e.g., United States v. O'Driscoll*, 250 F. Supp. 432, 436 (M.D. Pa. 2002) ("[W]here the government attempts to use unadjudicated acts of violence and misconduct the heightened standard of reliability applicable to capital sentencing proceedings requires that the hearsay rule be fully applicable to the penalty phase proceeding"). "Heightened reliability" cannot be satisfied by the admission of expert evidence that fails all *Daubert* standards and that proves even more unreliable than evidence admitted in civil litigation where the stakes are lower. Falling well short of the dictates of "heightened reliability," Dr. Price's evaluation and testimony must be excluded. *See, e.g., Zant*, 462 U.S. at 884; *Ford*, 477 U.S. at 411.

However, even if "heightened reliability" need not require the strict application of *Daubert* as a constitutional matter, the Eighth Amendment's bar on materially inaccurate evidence also stands to exclude unreliable expert testimony. *Johnson v. Mississippi*, 486 U.S. at

590 (no materially inaccurate evidence); *Hernandez v. Johnson*, 213 F.3d 243, 252-54 (5th Cir. 2000) (extending rule of *Johnson v. Mississippi* to expert testimony; inaccurate expert testimony that undermines confidence in the outcome of proceedings derogates the Eighth Amendment). In assessing expert testimony for material inaccuracy, the Fifth Circuit has applied a less stringent *Daubert*-review to the post-conviction phase of proceedings. *Hernandez*, *op. cit.* Such a flexible, post-conviction *Daubert*-review also proves broadly consistent with clearly-established federal law. *See Barefoot v. Estelle*, 463 U.S. 880 (1983) (presaging framework of *Daubert*; Eighth Amendment review of expert testimony for constitutional infirmities looking at error rate, later articulated as a factor under *Daubert,* methodological errors, and errors of application of method or technique to the facts of the case).

Any flexible, post-conviction *Daubert*-review as mandated by the Eighth Amendment dictates that Dr. Price's testimony cannot be admitted. *See, e.g., Barefoot,* 463 U.S. at 899-900 & n.7, 902-04; *Johnson*, 486 U.S. at 590; *Hernandez*, 213 F.3d at 252-54. Without any known error rate for the use of PCL-R in predicting prison violence, the Government cannot establish that the PCL-R falls within the constitutionally permissible error rate of two-thirds or less. As Dr. Reidy has demonstrated, even if an error rate for the PCL-R could be shown, very low base rates of violence in prison effectively guarantee constitutional difficulties: "[c]onsidering the low base rates, only estimates of improbability can be calculated because the error rates would range from 70-100% depending on the definition of violence and the population studied. Hence, the false positive rate [for the PCL-R] will be extraordinarily high . . . ." Exhibit B at 23. Accordingly, as the PCL-R has no known error rate, and any such error rate would necessarily be unacceptably high; Dr. Price opinion is entirely unreliable and must be excluded. *See Barefoot*, 463 U.S. at 899-900 & n.7, 902-04.

16

Rife with methodological errors that altogether ignore the state of the science and disregard known correlates of prison violence—including *inter alia* failure to use base rates for prison violence, failure to define severity of violence, misapplication of psychological testing, failure to consider measures used to prevent violence during incarceration—Dr. Price's report and testimony completely lack any scientific validity. *See, e.g.*, Exhibit B at 11-15. The Eighth Amendment mandates the exclusion of Dr. Price.

Additionally, the Due Process Clause dictates the exclusion of unreliable expert predictions of future violence during sentencing that are at variance with federal evidentiary law. *See Sampson*, *supra*, 335 F. Supp. 2d at 218-23 (applying federal evidence law, including *Daubert* factors and balancing test of 18 U.S.C. 3593(c), to conclude unreliable expert predictions of violence should be excluded; Due Process violation). As demonstrated *supra*, Dr. Price's evaluation fails all five *Daubert* factors, and the balancing test of 18 U.S.C. § 3593(c); accordingly, the Due Process Clause further mandates the exclusion of Dr. Price.

## CERTIFICATE OF CONFERENCE

Mr. Barrett's counsel conferred with opposing counsel by email in an effort to resolve this issue. The Government opposes this Motion.

## CONCLUSION

For the foregoing reasons, Mr. Barrett respectfully requests this Court enter an order precluding the Government from adducing at the evidentiary hearing testimony from, and any evidence related to, its proposed expert J. Randall Price.

///

///

///

17

DATED:  February 1, 2017

Respectfully submitted,

/s/ *David Autry*
DAVID AUTRY
Attorney at Law

*/s/ Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

 */s/ Tivon Schardl*
Tivon Schardl
Capital Trial & Habeas Attorney

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

This is to certify that on this 1st day of February 2017, I caused the foregoing Petitioner's Motion in Limine to Exclude Testimony from, and Evidence Related to, Proposed Expert J. Randall Price, and Brief in Support to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL