# Exhibit B

I, Thomas J. Reidy, Ph.D., ABPP, hereby declare, under oath, as follows:

1. Counsel for Kenneth Barrett requested that I review the Psychological Report/Risk Assessment authored by Randall Price, Ph.D., ABPP at the behest of the U.S. Attorney's Office dated October 26, 2005. I was asked to specifically address the appropriateness of Dr. Price's risk assessment methodology in general, and in particular his use of the Psychopathy Checklist-Revised (PCL-R) in assessing violence risk in a prison, especially in a capital case context. I was also requested to address the scientific basis for the application of the PCL-R science in relation to *Daubert* standards as articulated in *Daubert v. Merrell-Dow Pharmaceuticals, Inc.* (1993), and as applied to violent risk predictions for prison in capital cases. The state of the scientific literature will be reviewed through 2005 and supplemented by studies completed post-2005 to date.

2. I am a clinical and forensic psychologist licensed and qualified to practice psychology in the states of California, Idaho, and Illinois (inactive). I have personal knowledge of the facts contained in this affidavit and am competent to testify about them. I received a Master's degree in Psychology from DePaul University in 1973, and a Doctorate degree in Clinical Psychology from DePaul University in 1976. For the past 40 years, I have maintained a private practice in clinical and forensic psychology in Monterey and Salinas, California. My work history is documented on the attached resume. (Appendix II).

3. I was Board Certified in Forensic Psychology in 1995 by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology. Only 325 psychologists in the United States hold this distinction.

This credential is intended to signify the highest levels of expertise in practice in forensic psychology. Requirements for Board Certification include extensive education, training, submission of work samples, and a rigorous examination process. I have participated in extensive continuing education in the area of forensic psychology and violence risk assessment methods. I received initial training on the use of the PCL-R from its author, Robert Hare, and provided through the Darkstone Research Group.

4. I received the first annual Nelson Butters Award from the National Academy of Neuropsychology for research contributions to the field of neuropsychology in 1993.

5. I have qualified and testified as an expert witness in state and federal courts across the nation concerning various topics in forensic psychology, and specifically, assessment of prison violence risk, particularly in capital cases.

6. I have published extensively in the leading forensic journals in my field on violence risk assessment for prison in capital cases. I co-authored 26 articles in peer-reviewed psychology journals, including 18 scientific articles and two book chapters pertaining to the issues of inmate adjustment and the assessment of violence risk assessment for prison within a capital context.

7. I have served as an *ad hoc* peer reviewer for journal articles submitted to the following publications: *Journal of Personality Assessment*, *Violence and Victims*, and *Justice Quarterly*.

## Psychopathy and PCL-R: Broad Overview

8. I am familiar with the published research literature regarding the Psychopathy Checklist-Revised (PCL-R) measuring psychopathy as a construct for maladaptive personality features and socially deviant behaviors that is used by evaluators in forensic and legal contexts. The PCL-R is a 20-item checklist of prototypically psychopathic traits (e.g., remorselessness, callousness, grandiosity, superficial charm, and antisocial/criminal behavior) scored on a scale ranging from 0 to 40 with higher scores considered more psychopathic and scores greater or equal to 30 generally considered evidence of a psychopath. I have specifically examined the relationship between PCL-R scores and violence in a correctional setting, published scientific articles and testified as an expert witness concerning the use and misuse of the PCL-R in the assessment of violence risk for prison adjustment, particularly with a capital population (see Cunningham & Reidy, 1998 a,b, 1999).

9. Situations in which decision making about "future danger" and potential for prison violence in life-or-death cases have emerged as relevant to the use of the PCL-R, but the scientific basis for rendering such conclusions is lacking at present. Only a small number of studies have addressed the PCL-R related to prison violence (see Edens et al., 2005) with the results ranging from very weak to mostly nonsignifcant association. These studies were further criticized for methodology limitations, overly broad definition of violence, absence of physical violence as an outcome measure, and use of non-U.S populations. Despite the absence of scientific support, use of the PCL-R has emerged in capital murder

cases, but this has occurred nothwithstanding the utter lack of scientific basis for this application of the psychopathy construct.  There is a total absence of studies relating psychopathy to violence risk for capital offenders and inmates incarcerated for a term of life without parole in a maximum security prison. Moreover, there have been no research studies from 2005 to the present investigating the use of the PCL-R in capital sentencing to address "future danger" and acts of prison violence (see e.g., Patrick, Handbook of Psychopathy, 2007 and 2017 revision). In fact, new problems with the use of the term psychopathy measured via the PCL-R have arisen in recent years regarding jury perceptions, prejudicial effect of the term psychopath with related increase in death verdicts, reliability of examiner ratings, and lack of predictive validity that will be explored in the sections below (e.g., see Edens, Petrila, & Kelley in Handbook of Psychopathy, 2017).

## Other Test Measures Used: Broad Overview

10. I am also familiar with the Personality Assessment Inventory (PAI) and the Minnesota Multiphasic Personality Inventory-2 (MMPI-2). Both are self-report measures well established in the professional community for personality assessment and related mental health concerns. While the MMPI-2 is useful for many psychological assessment applications, the instrument has practical utility in assessing future risk for violence in a prison setting due to profile instability over time, context influences, and distortion potential. Similarly, the use of the PAI in prison populations has limitations for considering violence risk in prison. I have co-authored two recent peer reviewed articles concerning the PAI concluding that

instrument adds very modest predictive validity to estimating prison violence but other risk correlates contribute far more to violent behavior in prison. While both of these instruments are well known and accepted in the field of psychology and mental health, currently there is little scientific evidence to warrant general acceptance of these measures as predictors of institutional violence particularly with a capital inmate population, or inmates facing life without parole, or housed in a high security context (see Cunningham & Reidy, 1998, 1999a,b; Edens et al., 2005). For these instruments to be generally accepted for use as predictors of institutional violence, a more extensive and significant body of evidence must be gathered and vetted through the peer review process.

## Dr. Price's Risk Assessment Methods

11. Dr. Price's report is labeled "Report of Psychological Evaluation/Risk Assessment." The methodology underlying his opinions includes a review of certain records, background history, description of current mental status, and findings from six assessment instruments administered (PCL-R was omitted from the "Evaluation Methods" section but described in the text). It is noteworthy that he did not list the defendant's jail or prison records, which are critical to an assessment of prison violence risk in a similar context (e.g., Cunningham & Reidy, 2002). Instead, Dr. Price relies upon findings from the PAI, MMPI-2, and principally the PCL-R to make conclusions about general violence potential and implying but never directly stating the specific context and population related to his opinions. Dr. Price utilized significant score/scale elevations or codetypes on these test instruments to identify a range of adverse psychological and behavioral

6

factors related to potential for violence. For the PAI, he wrote that chronic substance abuse "interfered with…his ability to control his acting out behaviors," and mentioned paranoid tendencies, and suspicious or hostile demeanor perceived others. The MMPI-2 clinical profile yielded descriptions of the "low frustration tolerance, poorly controlled anger, and generally poor self-control, which results in outbursts of physical aggression." The MMPI-2 codetype (4/6) is interpreted as "poor judgment, impulsiveness, anger, and suspiciousness combine to foster unpredictable, irrational and violent cyclical outbursts of violence." He also uses codetype (4/1) to further highlight violence potential, "his cyclical pattern of violent outbursts with intermittent episodes of appropriate behavior represents a chronic and stable personality disorder that is extremely difficult to change." While these test based descriptors may describe the defendant, there is no scientific basis for attributing these traits to risk of violence in a prison context, especially when a large percentage of inmates display similar traits. Rates of serious violence resulting in death or serious injury within prison are quite low, despite a large proportion of prison inmates with significant criminal histories and convictions for felonies and with half of the inmate populations incarcerated for violent offenses.

12. Dr. Price's report contains considerable detail about his findings from the PCL-R. He states that this instrument, as a measure of personality traits and behaviors associated with psychopathy is "an integral component of a risk assessment." He describes strong associations between psychopathy and criminal behavior, violence, substance abuse, and recidivism. He cites the PCL-R as a reliable and

valid measure of psychopathy and a "robust predictor of criminal behavior, including violence, in a variety of populations and contexts" but never specifies the particular contexts for which it has been validated by scientific studies. Seemingly in support of using the PCL-R for predicting violent or criminal behavior in an institutional setting, Dr. Price offers only a vague conclusionary statement pointing to "a few studies" demonstrating "relatively modest correlation between psychopathy and institutional misconduct" without further comment concerning the reliability and validity of these "studies" to the appropriate context. This general statement is misleading when applied to institutional violence because the entire body of empirical evidence available in 2005 and at present does not support use of the PCL-R in the assessment of prison violence, particularly in a capital context (see Edens et al., 2001, 2005; Guy et al., 2005). For example, Edens et al., provide a table of 15 studies examining the relationship between psychopathy and institutional misconduct. Only one of these studies pertains to a very small sample (N=98) of adult inmates incarcerated in the U.S. and yieled nonsignificant correlations for both violent and nonviolent discipline reports. The remainder of the studies involved populations and contexts far different than inmates incarcerated U.S. prisons—that is, adolescents, mentally disordered offenders, Canadian inmates, sex offenders, and females. Sample sizes were very small.

13. Validity refers to inferences derived from test scores in reference to a specific outcome criterion. Hence the question of validity for the PCL-R in the capital context should be framed around the violence risk for a capital population in

prison. Dr. Price does not specifically mention use of the PCL-R in the capital arena, but declares a "few studies have demonstrated a relatively modest correlation between psychopathy and institutional misconduct." He does not define "relatively modest" or "institutional misconduct" and does not cite references. The scientific literature available in 2005 and to date suggests that Dr. Price's stated general conclusions about the results of the PCL-R are highly misleading with regard to any valid application of these findings to a prison population, and particularly to capital murderers, life without parole inmates, and related behavior in maximum security prisons. In fact, a large number of studies have pointed out that when assessing the risk of future institutional violence the predictive validity of the PCL-R has not been demonstrated in a capital context either prior to 2005 of thereafter (e.g., Edens, 1999, 2001, 2007, 2017; Edens, Buffington-Vollum, Keilen, Roskamp, & Anthony, 2005; Edens & Cox, 2012; Edens, Petrila, & Buffington-Vollum, 2001; Freedman, 2001; Edens, Smith, Davis, & Guy, 2012; Guy, Edens, Anthony, & Douglas, 2005). For example, the the meta-analysis of 38 datasets by Guy et al. (2005) found extremely low correlations (.11 and .10) between physical violence and general aggression and PCL-R total scores for U.S. prisons meaning that the PCL-R made a negligible (1%) contribution to the violent outcomes. Such findings call into question the use of the PCL-R in the context of capital death penalty trials.

14. Dr. Price's analysis of violence potential was based solely on his use of the PAI, MMPI-2, and PCL-R and did not address other correlates of prison violence that were well known in 2005. Although he generally alluded to moderating factors

such as age reducing violence potential in the free world, he did not address a similar phenomenon occurring in prison. Dr. Price did not address base rates (frequency and prevalence) influencing the expression of violence in prison and that such rates vary by the population of interest and decrease as the definition of violence narrows. (Marquart et al., 1989; Cunningham & Reidy, 1998; Cunningham et al., 2005). Cunningham and Reidy (1998) summarized data showing that the prevalence of violent behavior dropped dramatically with age both in the community and in prison and subsequent studies across the last two decades have supported such trends. There are no data reflecting any relationship between psychopathy and age with regard to decreasing rates of prison violence. Seemingly, he did not review jail or prison records to assess the defendant's behavior in a similar context. These components of an institutional risk assessment and related methodology were widely known in 2005, routinely presented at federal and state capital trials, and generally accepted by the scientific community (Cunningham & Reidy, 1998a, b, 1999; 2002; Edens et al., 2005; Marquart, 1989). These studies and and others over the past 25 years demonstrate that former death row inmates and capital inmates sentenced to life without parole who were described by mental health professionals at trial as a continuing threat to society demonstrated equivalent rates of violence toward inmates and staff, and in some instances were better behaved than comparison groups in high security prisons (e.g., Cunningham & Reidy, 2002; Cunningham et al., 2005a, b, 2016; Edens et al., 2005, Marquart et al., 1989, 1994; Reidy et al., 2001). These studies demonstrate low base rates of serious violent behavior that

made it extremely difficult to determine exactly which capital defendants would engage in future acts of violence without identifying a large number of false positives. For example, Marquart et. al (1989) demonstrated that capital murderers serving a life sentence exhibited a rate of 2.6 serious violent infractions per 100 inmates in contrast to nearly 12 per 100 committed by general population inmates. Similarly, Cunningham, Reidy, & Sorensen (2005) provided evidence that approximately 10/100 life sentenced prisoners engaged in violent misconduct of some type in contrast to nearly half of parole eligible inmates and murder was nearly negligible with one homicide among 1,054 inmates. Any consideration of psychopathy in relation to prison violence must consider such moderators. Studies conducted subsequent to 2005, including one international perspective, further demonstrate the low base rates of prison violence for capital offenders and those serving a life sentence, and elucidate empirically derived correlates of prison violence (e.g. Cunningham, 2010; Cunningham, Reidy, & Sorensen, 2008, 2016; Lucioni-Arbach et al., 2012). Empirically supported risk factors such as violence base rates, age, prison context, and restrictive housing are critical components necessary for violence risk assessment at capital death sentencing as demonstrated by inclusion of this methodology in textbooks and by eschewing the use of instruments like the PCL-R that have poor applicability to capital case assessments (see e.g., Conroy & Murrie, 2007; DeMatteo, Murrie, Anumba, & Keesler, 2011).

## Common Errors in Violence Risk Assessment in Dr. Price's Report

15. Cunningham and Reidy (1999) published a peer-reviewed article identifying 11 common errors made by mental health professionals at capital sentencing and Edens et al., (2001, 2005) offered similar practical considerations for assessing capital inmate risk for violence. The 11 errors include: inadequate reliance on base rates (frequency or prevalence of a particular behavior in a population); failure to consider context; susceptibility to illusory correlation (when a clinician believes two events are correlated, when, in fact they are not or are correlated in the opposite of the predicted direction); failure to define the severity of violence; overreliance on clinical interview; misapplication of psychological testing; faulty implications of antisocial personality disorder; ignoring the effects of aging; misuse of patterns of behavior (patterns of behavior can reliably estimate future behavior but only when the pattern is sufficiently established in a similar context); and neglect of preventive measures (e.g., prison security, restrictive housing). This article and others describe the need for use of empirically validated risk methodology in capital sentencing. Dr. Price's report includes some of these methodological errors in considering risk of future violence in prison such as failure to use base rates and consider context, failure to define severity of violence, and misapplication of psychological testing. He did not consider patterns of behavior in a similar context. He described prevention of recidivism for criminally violent offenses in the community by virtue of imprisonment, but did not consider preventive measures as playing a role in reducing prison violence.

16. Contrary to concerns and cautions raised by Cunningham & Reidy (1998a,b, 1999, 2002), and Edens et al., (2001a,b, 2005), Dr. Price's report heavily emphasizes violence related traits so as to leave the reader with the distinct impression that the defendant would likely engage in violence in any context and that such behavior would be difficult to change. He never specifically states that the defendant would have a high probability for prison violence but alludes to this possibility by mentioning that a few studies show a modest link between PCL-R scores and institutional violence as well as more general comments about violence proclivity such as "unpredictable and violent outbursts of violence." As a risk assessment methodology for institutional violence, Dr. Price's report focusing on test-based personality traits associated with violence potential to the extent that prison violence is an anticipated outcome is a misapplication of test data and a methodological flaw (Cunningham & Reidy, 1999). Dr. Price's approach to violence risk assessment in this capital context is lacking in scientific rigor for his failure to accurately describe the state of the science in 2005 with regard to the known correlates of prison violence, and for the total lack of validity of the PCL-R as utilized in a capital risk assessment. Risk assessment methodology highlighted in recent textbooks (Conroy & Murrie, 2007; DeMatteo et al., 2011) broadly supports and cites the methods proposed prior to 2005 (Cunningham & Reidy, 1998; Cunningham et al., (2005); Edens et al., 2005), which were not considered by Dr. Price in his evaluation of Mr. Barrett. Specifically, these authors call for the use of base rates of violence and disaggregated definitions of violence by type and severity, consideration of context, and use of other empically

supported risk factors such as as age, sentence length, education, behavior in a similar setting.

17. Dr. Price's use of self-report instruments, PAI and MMPI-2, suffer from the same flaws as the PCL-R with regard to estimating future acts of violence from capital inmates serving a life term in a maximum security institution. Through 2005 and up to the present time, these instruments have shown very little to no practical utility in differentiating inmates likely to engage in serious prison maladjustment, particularly violence, in a population of capital inmates in high security prisons.

18. Guy et al. (2005) conducted a meta-analysis that combined the findings across 38 independent studies investigating the relationship between PCL-R and prison violence utilizing samples from civil psychiatric, forensic psychiatric, and correctional facilities. More specifically, the Guy et al (2005) study revealed that the correlation between the total PCL-R score and all institutional infractions was marginally moderate (.29) but this effect size was substantially lower when considering physical violence (e.g., correlation of .11 for physical violence for studies of five U. S. prisons). The meaning of these correlations is based on understanding that a perfect correlation is 1.0 with correlations below .3 considered small. Furthermore, a correlation of .29 means that only 8% of institutional infractions (violent and non-violent) is accounted for by the PCL-R, leaving 92%  influenced by other factors. More importantly, a very low correlation of .11 between PCL-R scores and physical violence means that the PCL-R score accounts for only a negligible 1% of  prison violence, leaving 99% of prison violence attributable to other sources—for example, age, violent

conviction history, and prior prison behavior. Similar weak effect sizes regarding the association of psychopathy and institutional violence were reported in later investigations (e.g., McDermott et al., 2008). Guy et al. (2005) concluded that their results called into question the use of the PCL-R in the context of capital murder trials in the United States, especially considering the lower rate of prison violence among death row and life sentenced inmates relative to general population offenders.

19. The MMPI-2 suffers from similarly weak statistical association to predictive validity as the PCL-R, and from a lack of studies evident in 2005 and at present related to assessing future violence potential within a capital context and specifically related to prison violence (Cunningham & Reidy, 1998a, b). When considering the PAI in a correctional setting only post-2005 investigations are available (e.g., Edens & Ruiz, 2006, 2008; Gardner et al., 2015); that is, there was no accepted scientific basis for its use in this context in 2005. A recent study by Reidy, Sorensen, & Davidson (2016) testing the predictive validity of the PAI in relation to inmate misconduct and violence revealed a modest relationship of certain scales adding incremental validity of only 2-4% to the outcome criteria consistent with other studies (Edens & Ruiz, 2006, 2009). The authors cautioned that such instruments were not designed as risk instruments and the scales accounted for only a small portion of the variance in the criterion measures with other sources accounting for considerably more of the institutional misconduct. These findings demonstrated that institutional violence is a complex and multi-determined behavior that interacts with mental health variables and other

individual and institutional/facility level factors that have been shown to mediate prison misconduct.

## Psychopathy and Violence Risk Assessment

20. As of 2005 relatively few studies examined the relationship between the PCL-R and the occurrence of violent acts among incarcerated individuals, and there were no peer-reviewed studies regarding death sentenced or capital inmates serving a life without parole term.  That is, although the PCL-R has been subjected to hundreds of studies in a variety of contexts, in 2005 the PCL-R had not been validated for use in the population of capital offenders. Those studies considering the link between psychopathy and institutional violence among prison inmates found either a nonsignificant, weak, or inconsistent association between being identified as a "psychopath" (i.e., PCL-R score $\geq$ 30) and engaging in higher rates of various forms of prison violence. Moreover, I am unaware of any published studies that have examined specifically the utility of the PCL-R to predict violence among inmates in a maximum-security correctional facility in the United States or those sentenced following capital trials to death or life imprisonment. The dearth of studies demonstrating an association between the PCL-R and the specific outcome criterion for capital risk assessment has continued post 2005 (see e.g., Patrick, 2007, 2017). The only conclusion that can be drawn from the absence of valid and empirically sound studies relating the PCL-R to prison violence in a capital context is that the use of the term psychopathy as measured by the PCL-R has no probative value in determinations of "future danger" or violence risk as those constructs are applied in capital trials.

## Psychopathy, Jury Perception, & Prejudicial Effect

21. Prosecutors have continually used the "psychopath" label in capital trials to assert that an inmate will be dangerous in the future or commit criminal acts of violence. The use of the PCL-R in this legal context poses a number of concerns. First and most importantly is the use of the term "psychopath" and the traits underlying the concept such as "remorselessness, callousness, grandiosity" etc. Such terms have a strong connotation that is stigmatizing and evokes frightening images of brazen killers such as Ted Bundy or Jeffrey Dahmer that have the potential to prejudice jurors. In a series of studies up through 2005, Edens and colleagues (2003, 2004, 2005) demonstrated that using evidence of psychopathy presented to mock jurors in a capital case, independent of expert testimony, revealed subjects merely labeled as psychopaths were considered more dangerous and death-worthy than others not so labeled (60% v. 38%) when all other facts remained the same. These studies demonstrate that attributions regarding undesirable personality traits can have a profound adverse influence on a potential juror's attitudes toward defendants perceived to exhibit psychopathy or its associated characteristics, particularly lack of remorse. The mere presentation of the psychopathic personality label and related traits, even if not directly connected to "future dangerousness" by an expert witness has a strong prejudicial effect causing jurors to be more supportive of a death sentence. Post 2005, another study by Edens et al. (2011) revealed similar findings that "… rating a defendant's perceived level of psychopathy strongly predicted support for executing him."

## Reliability of PCL-R Scores

22. Anecdotal reports about scoring discrepancies between prosecution and defense experts were noted prior to 2005. However, the first scientific study of this issue only appeared in 2006 and subsequently a number of scientific investigations have emerged indicating that PCL-R scores are highly unreliable in real world criminal cases. The first studies substantiated the anecdotal findings regarding disparities in PCL-R scores across experts testifying about the same defendant (Edens, 2006). Recent field studies with actual legal cases further highlight discrepancies in adversarial settings with prosecution experts providing "high" PCL-R scores, whereas defense experts find "low scores" (Boccacini et al., 2008, 2012; Edens et al., 2010; Jeandarme et al., 2017; Murrie et al., 2008). Additional evidence suggests that variation in PCL-R scores can also be a function of the expert conducting the exam without adversarial influence. Some PCL-R items call for subjective ratings that are most difficult to reliably assess in a forensic setting even though items such as remorselessness have a significant prejudicial effect on jurors (Edens et al., 2010) but without any systematic data regarding the relationship between remorse and violent prison conduct, particularly for capital inmates serving a life term. Levels of inter-rater reliability in real world studies are typically lower than in nonadversarial, controlled studies conducted in research settings (Boccaccini et al., 2012, 2013; DeMatteo et al., 2014; Edens et al., 2006, 2010, 2017; Heilbrun, 1992; Murrie et al., 2008, 2009; Sturup et al., 2013). For example, Murrie et al. (2018) cites an "alarming" 8-point discrepancy between defense and prosecution experts scoring the PCL-R with higher scores attributed to prosecution retained experts. Even more

concerning are the results reported more recently by DeMatteo et al. (2014) showing that in 50% of cases evaluated by prosecution retained experts PCL-R scores reached 30 or more points (defined as a psychopath) compared to defense experts that reached such scores in only 10% of the cases. Research suggests this low reliability among examiners may be due to a variety of factors including adversarial allegiance, level of training, and subjective judgment in scoring of interpersonal and affective traits, and individual evaluator differences.

## Psychopathy and Mental Disorders

23. Neither the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) applicable in 2005, nor the edition in use today, DSM-5, identifies psychopathy as a diagnosis or mental disorder. Certain traits associated with the psychopathy construct are mentioned as part of Antisocial Personality Disorder (APD) in both editions, but APD is not the same as psychopathy. Although some similarity exists, APD and psychopathy are not interchangeable concepts yet have the same pejorative potential in an adversarial legal setting. The reliability and validity of an APD diagnosis has been questioned (e.g., Cunningham & Reidy, 1998, 1999). A diagnosis of APD with or without psychopathy describes little about the prison behavior except that an individual is similar to most prison inmates, and thus does not specifically lead to a conclusion that a particular inmate is incorrigible or "dangerous" in a prison environment (see Cunningham & Reidy, 1998, 1999, 2002). This conclusion is best exemplified in a recent study by Edens, et al. (2015) that determined a DSM 5 diagnosis of APD did not significantly predict prison misconduct. Additionally, the presence of APD and/or psychopathy does not preclude a diagnosis of major mental

disorders (e.g., Schizophrenia) listed in the DSM. Mental disorders, apart from psychopathy ratings, can have a significant and disinhibiting effect on a person's proclivity for violence and other forms of maladjusted behavior in a prison context (Felson et al., 2012; Walters & Crawford, 2014).

24. The use of the terms "psychopath" and "psychopathy" used or implied as a diagnosis by witnesses who have been deemed experts by courts is inaccurate and misleading. Diagnostic labels with widespread scientific acceptance are catalogued DSM. Psychopathy is not included in the DSM. Despite repeated efforts by supporters of the PCL-R to have psychopathy included in the DSM, it has been rejected. Lay jurors are unlikely to understand the significance of the American Psychiatry Association's decisions to reject the label as a diagnosis. It means that PCL-R and psychopathy fall outside  the model of differential diagnosis which is the generally accepted model for diagnosing mental health disorders. Differential diagnosis is the central feature of generally accepted practices in psychology and psychiatry. Allowing a mental health expert to testify that PCL-R supports a diagnosis of psychopathy misleadingly implies that the witness's methods and conclusions are in keeping with generally accepted practices in the field although they are not.

## *Daubert* Considerations

25. Briefly, it is my understanding that the Supreme Court in *Daubert* held that expert testimony by a preponderance of the evidence must demonstrate a) whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue; b) whether the knowledge or technique can be or has been tested by scientific methods;

c) whether the theory has been subjected to peer review and published in scientific journals; d) whether there is a known or potential error rate associated with the theory or technique; e) the degree to which the expert's theory or method is recognized and generally accepted as valid within the relevant scientific community. The following reasons set forth my conclusions according to *Daubert*:

    a.  <u>Whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.</u> The scientific validity of psychopathy as measured by the PCL-R is not valid for purposes of capital sentencing. Validity refers to the usefulness of inferences that can be derived from specific test scores. When considering capital risk assessment, validity necessarily involves predictive validity with regard to a population of capital offenders given life sentenced inmates, and placed in secure housing. No studies have demonstrated such predictive validity attributed to PCL-R scores and the related construct of psychopathy. The use of PCL-R methodology cannot be applied to violence risk assessment for prison violence because no studies have demonstrated reliability and validity for such a purpose.

    b.  <u>Whether the knowledge or technique can be or has been tested by scientific methods.</u> The above cited studies demonstrate that psychological test profiles cannot be reliably and validly associated with long-term prison violence. There is no direct scientific evidence that the PCL-R in particular is predictive of institutional violence by correctional offenders

in the United States. Use of the term psychopath alone increases perceptions that a defendant will be a "future danger" in prison when no evidence supports such an assertion for capital inmates housed in maximum security prisons. A 2005 meta-analysis that considered all available research studies examining the relationship of psychopathy and violence in US prisons concluded that there is weak evidence or no significant findings for the relationship between psychopathy and institutional misconduct. Although the predictive accuracy of the PCL-R has been studied, albeit insufficiently, in other settings, including psychiatric hospitals, that research does not provide an adequate basis on which to generalize the results to a different population, namely criminal offenders, in a different custodial setting. Conclusions about the predictive validity of the PCL-R  with capitally convicted inmates housed in the secure correctional institution differ considerably from civil forensic psychiatric patients retained in a psychiatric hospital. Also, at this time, there is insufficient research to make generalizations from psychopathy ratings associated with violence from community behavior to prison behavior, and from psychiatric settings to life or death-sentenced correctional populations. These instruments fail to demonstrate a scientifically reliable and valid standard of performance in a capital death penalty case requiring jurors to make life or death decisions.

c.  <u>Whether the theory has been subjected to peer review and published in scientific journals</u>. Research concerning the PCL-R, MMPI-2, and PAI

22

through the year 2005 indicates no published, peer-reviewed studies examining the predictive validity of these instruments with respect to the institutional violence by capital offenders housed in high security prisons, or inmates serving a life sentence. No studies of the PCL-R and these other instruments have considered the influence or interaction of such moderating variables as base rates, aging, empirical correlates of violence, and risk management strategies to the actual expression of different forms of violence.

d.  <u>Whether there is a known or potential error rate associated with the theory or technique</u>. There are no studies using the PCL-R, PAI, and MMPI-2 that permit establishment of error rates for the prediction of violence for in-custody populations of capital inmates serving life sentences in maximum security prisons. A 2001 study by Freedman specifically addressed "excessive false positive rates" related to the prediction of violent behavior by the PCL-R and reported the complete absence of significant findings for the few prison samples available at that time. Studies subsequent to this one through 2005 and beyond similarly report the absence of a relationship between psychopathy and personality traits with prison violence, which precludes the determination of error rates. Athough error rates are unavailable for the PCL-R, the use of base rates can be used as an anchor to estimate meaningful probability of prison violence. Base rates differ according to the group being studied and definition of violence applied. To illustrate from the outer margin of prison base rate continuum, the rate of

homicide of a correctional officer is 1 per 1,000,000 inmates per year, which is an exceedingly rare event. Over varying followup periods (ranging from 2-53 years) the rates of assault in the institution by death row, former death row, capital life, life-without-parole, life-with-parole inmates were relatively low ranging from 0% to 31% (Reidy et al., 2001) and these findings have been replicated in numerous studies over the years. Considering the low base rates, only estimates of improbability can be calculated because the error rates would range from 70-100% depending on the definition of violence and the population studied. Hence, the false positive rate will be extraordinarily high.

e.  The degree to which the expert's theory or method is recognized and accepted as valid within the relevant scientific community. The terms "psychopath" and "psychopathy" are not generally accepted diagnoses and the methodology used to to attach those labels, the PCL-R, is not part of the generally accepted methodology and diagnostic criteria used by the DSM. The PCL-R is not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in capital offenders in the United States, or inmates incarcerated for life in a maximum security prison. Currently, insufficient research has been conducted to justify the use of the PCL-R for assessing "future dangerousness" or future risk for aggression amongst populations of capital criminal offenders during their prison incapacitation from a life sentence. While it is possible to conduct scientific studies to assess the validity of the

PCL-R in predicting future violent behavior in such correctional settings, only a small number of studies have addressed the institutional adjustment of any forensic population (e.g., civil psychiatric, forensic psychiatric, jail, or prison) through 2005. These studies do not investigate the pertinent population of relevance and the particular environment in which the defendant would be incarcerated if not given a death sentence (i.e., a maximum security prison).  Until more relevant research has been completed and sufficient data are available in the published, peer-reviewed literature to assess the instrument's predictive capacity in a prison setting, the PCL-R should not be used to judge a capital defendant's risk of future violence in such a prison setting. In fact, to do so would risk violating ethical and professional standards concerning the use of procedures and instruments not shown to be scientifically reliable and valid for a capital context.

26. It is my opinion, which I hold with a reasonable degree of scientific certainty, that PCL-R, MMPI-2, and PAI used by Dr. Price do not meet *Daubert* standards for use in decision-making in a capital case.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, and under the laws of the State of California, that the foregoing is true and correct and was executed this 1st day of February at Monterey, California.

_____

Thomas J. Reidy, Ph.D., ABPP

Board Certified, Forensic Psychology

American Board of Professional Psychology

**Appendix I**

<u>References</u>

Arbach-Lucioni, K., Martinez-Garcia, M., & Andres-Pueyo. (2012). Risk factors for violent behavior in prison inmates: A cross cultural contribution. *Criminal Justice and Behavior, 39*, 1219-1239. doi:10.1177/0093854812445875

Boccaccini, M.T., Turner, D.T. & Murrie, D.C. (2008). Do some evaluators report consistently higher or lower scores on the PCL-R?: Findings from a statewide sample of sexually violent predator evaluations. *Psychology, Public Policy, and Law, 14,* 262–283.

Boccaccini, M.T., Turner, D.T. & Murrie, D.C. (2008). Do some evaluators report consistently higher or lower scores on the PCL-R?: Findings from a statewide sample of sexually violent predator evaluations. *Psychology, Public Policy, and Law, 14,* 262–283.

Boccaccini, M.T., Turner, D.T. & Murrie, D.C., & Rufino, K. A. (2012). Do PCL-R scores from state or defense experts best predict future misconduct among civilly committed sex offenders? *Law and Human Behavior, 36*, 159-169. doi: 10.1037/h0093949

Conroy, M. A., & Murrie, D. C. (2007). Forensic assessment of violence risk: A guide for risk assessment and risk management. Hoboken, New Jersey: John Wiley & Sons, Inc.

Cunningham, M. D. (2010) *Evaluation for capital sentencing*. New York: Oxford University Press.

Cunningham, M. D., & Reidy, T. J. (1998a). Antisocial personality disorder and

psychopathy: Diagnostic dilemmas in classifying patterns of antisocial

behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 331-

351.

Cunningham, M. D., & Reidy, T. J. (1998b). Integrating base rate data in violence risk

assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M. D. & Reidy, T. J. (1999).  Don't confuse me with the facts:  Common

errors in violence risk assessment at capital sentencing.  Criminal Justice and

Behavior, 26, 20-43.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life and death: Special

considerations and heightened practice standards in capital sentencing

evaluations. Behavioral Sciences & the Law, 19, 473-490.

Cunningham, M. D. & Reidy, T .J. (2002).  Violence risk assessment at federal capital

sentencing:  Individualization, generalization, relevance, and scientific

standards.  Criminal Justice and Behavior, 29, 512-537.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005a). Is death row obsolete? A

decade of mainstreaming death-sentenced inmates in Missouri. Behavioral

Sciences & the Law, 23, 307-320.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005b). An actuarial model for

assessment of prison violence risk among maximum security inmates.

Assessment, 12, 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2008). Assertions of "future

dangerousness" at federal capital sentencing: Rates and correlates of subsequent

prison misconduct and violence. *Law and Human Behavior*, *32,* 46-63. doi: 10.1007/s10979-007-9107-7

DeMatteo, D., Edens, J.F., Galloway, M., Cox, J., Smith, S.T., & Formon, D. (2014a). The role and reliability of the psychopathy checklist-revised in sexually violent predator evaluations: A case law survey. *Law and Human Behavior*, *38*(3), 248-255.

DeMatteo, D., Murrie, D. C., Anumba, N. M., & Keesler, M. E. (2011). *Forensic mental health assessments in death penalty cases.* NY: Oxford University Press.

Edens, J. F. (2001). Misuses of the Hare psychopathy checklist-revised in court. *Journal of Interpersonal Violence, 16*, 1082-1093.

Edens, J. F. (2006). Unresolved controversies concerning psychopathy: Implications for clinical and forensic decision-making. *Professional Psychology: Research and Practice*, *37*, 59-65. doi:10.1037/0735-7028.37.1.59

Edens, J.F., Desforges, D., Fernandez, K., & Palac, C. (2004). Effects of psychopathy and violence risk testimony on mock juror perceptions of dangerousness in a capital murder trial. *Psychology, Crime & Law*, *10,* 393-412.

Edens, J. F., Poythress, N. G., & Lilienfeld, S. O. (1999). Identifying inmates at risk for discipolinary infractions: A comparison of two measures of psychopathy. *Behavioral Sciences and the Law, 17*, 435-443.

Edens, J. F., & Cox, J. C. (2012). Examining the prevalence, role, and impact of evidence regarding antisocial personality, sociopathy and psychopathy in capital cases: A survey of defense team members. *Behavioral Sciences and the Law, 30*, 239-255. doi:10:1002/bsl.2009

Edens, J. F., Buffington-Vollum, J. K., Keilen, A., Ruskamp, P., and Anthony, C. (2005). Predictions of future dangerousness in capital murder trials: Is it time to "disinvent the wheel." *Law and Human Behavior, 29,* 55-86.

Edens, J.F., Desforges, D., Fernandez, K., & Palac, C. (2004). Effects of psychopathy and violence risk testimony on mock juror perceptions of dangerousness in a capital murder trial. *Psychology, Crime & Law*, *10,* 393-412.

Edens, J. F., Kelley, S. E., Skeem, J. L., Lilienfeld, S. O., & Douglas, K. S. (2015). DSM-5 Antisocial Personality Disorder: Predictive validity in a prison sample. *Law and Human Behavior, 39*, 123-129. Do.10.1037/lhb0000105

Edens, J.F., & Petrila, J. (2006). Legal and ethical issues in the assessment and treatment of psychopathy. In C. Patrick (Ed.), *Handbook of psychopathy*. New York: Guilford.

Edens, J.F., Petrila, J., & Buffington-Vollum, J.K. (2001). Psychopathy and the death penalty: Can the Psychopathy Checklist-Revised identify offenders who represent "a continuing threat to society?" *Journal of Psychiatry and Law, 29,* 433-481.

Edens, J. F., Magyar, M., & Cox, J. (2010). Taking psychopathy measures "out of the lab" and into the legal system: Some practical concerns. In K. Kiehl & W. Sinnott-Armstrong (Eds.) *Psychopathy and law*. New York: Oxford University Press.

Edens, J.F., & Petrila, J., & Kelly, S. E. (in press). Legal and ethical issues in the assessment and treatment of psychopathy. In C. Patrick (ed.). *Handbook of psychopathy*, 2nd edition. New York: Guilford.

Edens, J.F., Poythress, N.G., Lilienfeld, S.O., & Patrick, C.J. (2008). A prospective comparison of two measures of psychopathy in the prediction of institutional misconduct. *Behavioral Sciences and the Law, 26*, 529-541.

Edens, J.F., & Ruiz, M.A. (2006). On the validity of validity scales: The importance of defensive responding in the prediction of institutional misconduct. *Psychological Assessment, 18*, 220-224.

Edens, J. D., & Ruiz, M. A. (2008). Identification of mental disorders in an in-patient prison psychiatric unit: Examining the criterion-related validity of the personality assessment inventory. *Psychological Services, 5*, 108-117. doi:10.1037/1541-1559.5.2.108

Edens, J. F., Smith, Davis, Guy

Felson, R. B., Silver, E., & Remster, B. (2012). Mental disorder and offending in prison. *Criminal Justice and Behavior, 39*, 125-143. doi:10.1177/0093854811428565

Freedman, D. (2001). False prediction of future dangerousness: Error rates and psychopathy checklist-revised. *American Journal of the Academy of Psychiatry and Law, 29*, 89-95.

Gardner, B.O., Boccaccini, M.T., Bitting, B.S., & Edens, J.F. (2015). Personality Assessment Inventory Scores as predictors of misconduct, recidivism and violence: A meta-analytic review. *Psychological Assessment, 27*, 534-544. doi:10.1037/pas0000065

Guy, L.S., Edens, J., Anthony, C., & Douglas, J. (2005). Does psychopathy predict institutional misconduct among adults? A meta-analytic investigation. *Journal of Consulting and Clinical psychology, 73*, 1056-1064.

Heilbrun, K. (1992). The role of psychological testing in forensic assessment. *Law and Human Behavior, 16,* 257-272.

Jeardarme, I., Edens, J. R., Habets, P., Bruckers, L. Oei, K., & Bogarts, S. (2017). PCL-R field validity in prison and hospital settings. *Law and Human Behavior, 41*, 29-43.

Marquart, J. W., & Sorensen, J. R. (1989).  A national study of the Furman-commuted inmates: Assessing the threat to society from capital offenders. Loyola of Los Angeles Law Review, 23, 5-28.

Marquart, J.W., Ekland-Olson, S., & Sorensen, J. R. (1989). Gazing Into the crystal ball: Can jurors accurately predict dangerousness in capital cases? Law & Society Review, 23, 449-468.

Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994).  *The rope, the chair, & the needle:  Capital punishment in Texas, 1923-1990*.  Austin:  University of Texas Press.

McDermott, B.E., Edens, J.F., Quanbeck, C.E., Busse, D., & Scott, C.L. (2008). Examining the role of static and dynamic risk factors in the prediction of inpatient violence: Variable- and person-focused analyses. *Law and Human Behavior, 32,* 325-338*.*

32

McDermott, B.E., Quanbeck, C.E., Busse, D., Yastro, K., & Scott, C.L. (2008). The

    accuracy of risk assessment instruments in the prediction of impulsive

    versus predatory aggression. *Behavioral Sciences and the Law, 26,* 759-777.

Murrie, D.C., Boccaccini, M., Johnson, J. & Janke, C. (2008). Does interrater

    (dis)agreement on Psychopathy Checklist scores in sexually violent predator

    trials suggest partisan allegiance in forensic evaluations? *Law and Human*

    *Behavior,* 32, 352–362.

Murrie, D.C., Boccaccini, M., Turner, D., Meeks, D., Woods, C., & Tussey, C.

    (2009.Rater (dis)agreement on risk assessment measures in sexually violent

    predator proceedings: Evidence of adversarial allegiance in forensic

    evaluation? Psychology, Public Policy and Law, 15, 19-53.

    doi:10.1037/a0014897

Patrick, C. J. (2007). *Handbook of psychopathy*. New York: Guilford

Patrick, C. J. (2017). *Handbook of psychopathy*. New York: Guilford

Reidy, T. J., Cunningham, M. D., & Sorensen, J. R. (2001). From death to life: Prison

    behavior of former death row inmates in Indiana. <u>Criminal Justice and</u>

    <u>Behavior, 28</u>, 62-82.

Reidy, T. J., Sorensen, J. R., & Davidson, M. (2015). Testing the predictive validity of

    the Personality Assessment Inventory (PAI) in relation to inmate misconduct

    and violence. *Psychological Assessment, 28*, 871-884.

    doi:10.1137/pas0000224

33

Walters, G. D., & Crawford, G. (2014). Major mental illness and violence historya

predictors of institutional misconduct and recidivism: Main and interactive

effects. *Law and Human Behavior, 38*, 238-247. doi:10.1037/lhb0000058

34

**Appendix II**

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

## Contact Information

Address:     20 Deer Stalker Path, CA  93940
Telephone:   (831) 757-6673

## Education

Undergraduate: 1968 BS Biology, Fairfield University, Fairfield, CT

Graduate:     1973 MA Clinical Psychology, DePaul University, Chicago, IL

              1976 Ph.D. Clinical Psychology, DePaul University, Chicago, IL

Certification:  Board Certified (Forensic), American Board of Professional Psychology, 1995

## Professional Experience

1972-1973:    Internship - Singer Mental Health Center & Rockford Memorial Hospital, Rockford, IL

1974-1975:    DePaul University Mental Health Center Fellowship

1974-1975:    Consultant to House of Good Shepherd for delinquent adolescents

1975-1977:    Staff Psychologist - Rehabilitation Institute of Chicago, Evaluation & treatment of brain-injured & physically handicapped adults & children

1977-1980:    Community Hospital of the Monterey Peninsula, Staff Psychologist:  Evaluation & treatment of inpatients & outpatients exhibiting a variety of psychological, neuropsychological, & medical diagnoses

1980:         Monterey County Office of Education, Consultant to AB Ingham School:  Behavior management of brain damaged and developmentally delayed students

1980-1981:    Western Pulmonary Services, Consulting Psychologist

1980-1981:    Community Hospital of the Monterey Peninsula Substance Abuse Program, Consulting Psychologist:  Psychological & neuropsychological assessment & treatment

1990-92:      Steinbeck Chemical Dependency Treatment Program, Community Hospital of Salinas, Consulting Psychologist

1

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

1985-1994:    US Army, Fort Ord, CA, Consultant

- *Department of Psychology*

- *Trial Counsel (Prosecution)*

- *Defense Counsel*

2007-Present:  US Air Force, Staff Judge Advocate –Forensic Consultant

- *Trial Counsel (Prosecution)*

- *Defense Counsel*

- *Consultations for violence risk, sex offender behavior, child pornography, child physical and sexual abuse, alcohol abuse, dependence & blackouts*

1980-Present:   Independent Practice

- *Forensic psychological assessment of juveniles & adults*

- *Court appointed expert forensic psychologist for Monterey, Santa Cruz & San Benito Counties:*

  - Violence risk assessment

  - Sex offender risk assessment

  - Child sexual abuse and child pornography

  - Mental health factors for sentencing evaluations

  - Competence for trial

  - Criminal responsibility

- *Expert forensic psychologist: Federal and state capital homicide cases*:

  - Violence risk assessment

  - Developmental risk assessment

2

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

1995-Present:    Law Enforcement Psychological Services, Inc.

- *Psychological screening of police & public safety applicants*

2006-2010        South Bay Regional Public Safety Training Consortium

- *Instructor, Background Investigators Course*

2006-Present    Monterey County Sheriff's Office & Soledad Police Dept.

- *Post Shooting Fitness for Duty Evaluations*

## Professional Recognition

1993 *Nelson Butters Research Award*
Presented by the National Academy of Neuropsychology for research contributions to the field of Clinical Neuropsychology

Journal Peer Reviewer: Justice Quarterly, Journal of Personality Assessment, Violence & Victims

## Licensure and Board Certification

California State Psychology License PSY 5575

Idaho State Psychology License PSY 203011

Illinois State Psychology License 0071-002109 (Inactive)

Board Certified 1995 in Forensic Psychology, American Board of Professional Psychology

## Professional Memberships

Fellow of the American Academy of Forensic Psychology

American Psychological Association

- *Law & Psychology Division*

International Association for Correctional & Forensic Psychology

## Community and Teaching Activities

- Forensic psychology lectures at Monterey College of Law

3

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

- Continuing Education for Attorneys: National Legal Aid Association
- Invited Address, California Public Defenders Association, 1995

- Invited Address: Monterey County Public Defenders 2005

- Invited Address, Monterey County Sheriff's Department, 1997 & 1998

- Invited Address, California County Counsel's Association, 1997

- Invited Address, Santa Cruz County Sexual Assault Investigators, 2000

- Invited Address, Monterey County Family Law Attorneys, 2005

- Instructor-Background Investigator's Course: South Bay Regional Public Safety Training Consortium, 2006-11

- Invited Continuing Education Lecture: *What the Forensic Neuropsychologist Needs to Know about Death Penalty Litigation*. American College of Professional Neuropsychology, Las Vegas, NV, 2010

- Invited Address: Nevada Bar Association Annual Meeting, *Born to be Bad? Developmental Pathways to Resilience or Deviance*, Monterey, CA, June 2010

- Invited Continuing Education Lecture: *What the Forensic Neuropsychologist Needs to Know About Death Penalty Litigation: Research, Ethics, and Professional Issues,* National Academy of Neuropsychology, Vancouver, BC, Canada, October 2010

- Invited Address: Staff Judge Advocate Office. *Causes and Correlates: Violence, Domestic Violence, and Stalking*, Tyndall Air Force Base, FL, December, 2011

- Invited Address: *Mass murderers: Mental status of suicide bombers and rampage shooters*. Monterey Institute of International Studies- A Graduate School of Middlebury College. September 11, 2014

- Invited Address: Supermax prison: A clean version of hell for terrorists. Monterey Institute of International Studies- A Graduate School of Middlebury College. March 31, 2015

## Conference Presentations

*Reidy, T., & Tracy, R. (1974, May)*
**The effects of neonatal illness and separation from mothers on subsequent maternal attentiveness.**

4

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Paper presented at the Midwest Psychological Association Annual Convention, Chicago, IL.

*Reidy, T., & Lamb, W. (1976, April)*
**S.O.A.P. System:  A proposed model of parent education.**
Paper presented at the American Personnel and Guidance Association National Convention, Chicago, IL.

*Reidy, T. (1976, April)*
**Child abuse:  A problem in the schools.**
Paper presented at the American Personnel and Guidance Association National Convention, Chicago, IL.

*Reidy, T., McLean, I., & Toerge, J. (1976, November)*
**Motivational factors for selecting the specialty of Physical Medicine and Rehabilitation.**
Paper presented at the American Congress of Rehabilitation Medicine, San Diego, CA.

*Reidy, T. (1977, November)*
**A case study of appropriate eating behavior in a rehabilitation setting.**
Paper presented at the American Congress of Rehabilitation Medicine, San Diego, CA.

*Reidy, T. (1977, May)*
**Accountability in the delivery of psychological services in a pediatric hospital setting.**
Paper presented at the Association for the Care of Children in Hospitals, Detroit, MI.

*Reidy, T. (1978, April)*
**Establishing a behavioral treatment approach in a rehabilitation setting.**
Paper presented at the Western Psychological Association, San Francisco, CA

*Reidy, T. (1979, May)*
**Psychological Child Abuse.**
Paper presented at the Western Psychological Association, San Diego, CA.

*Reidy, T. (1983, June)*
**Forensic applications of psychological principles.**
Paper presented at DePaul University, Department of Psychology and La Rabida Children's Hospital, Chicago, IL.

*Carstens, C., & Reidy, T. (1985, February)*
**Behavior problems discussed in pediatric settings:  Do researchers study the problems pediatricians confront?**

5

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Paper presented at the American Psychological Association Annual Convention, San Francisco, CA.

*Reidy, T., Silver, R., & Carlson, A. (1987, August)*
**Child custody decisions:  A survey of judges.**
Paper presented at the American Psychological Association Annual Convention, New York, NY.

*Reidy, T., Bowler, R.M., Pedroza, G.I., & Rauch, S.S. (1988, August)*
**Neuropsychological sequelae of pesticide exposure.**
Paper presented at the American Psychological Association Annual Convention, Atlanta, GA.

*Rauch, S.S., Bowler, R.M., Reidy, T., & Pedroza, G.I. (1989)*
**Neuropsychological symptoms one year following neurotoxic exposure and after award of compensation.**
Proceedings of the 8th Annual Meeting of the National Academy of Neuropsychology, 4, 152-153.

*Reidy, T. (1989)*
**Reaction time slowing after solvent exposure.**
Paper presented at the American Psychological Association Annual Convention, New Orleans, LA.

*Reidy, T., & Bolter, J. (1990, November)*
**Neuropsychological toxicology of Methylene Diphenyl Diisocyanate.**
Paper presented at the Annual Meeting of the National Academy of Neuropsychology, Reno, NV.

*Reidy, T., & Bolter, J. (1991, August)*
**Long-term outcome after exposure to Methylene Diphenyl Diisocyanate.**
Paper presented at the American Psychological Association Annual Convention, San Francisco, CA.

*Reidy, T. (1997, August)*
**Legal issues in police and public safety fitness for duty evaluations.**
Paper presented at the American Psychological Association Annual Convention, San Francisco, CA

*Reidy, T., Sorensen, J., & Davidson, M. (2015, March)*
**Predictive validity of the PAI for institutional misconduct.**
Poster session, American Psychological-Law Society Conference, San Diego, CA

## Peer Reviewed Professional Publications 1977 - 2016

*Reidy, T. (1977)*
**The aggressive characteristics of abused and neglected children.**

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Journal of Clinical Psychology, 33 (40), 1140-1145.

*Reidy, T. (1979)*
**Teaching appropriate eating behavior in a rehabilitation setting:  Case study.**
Archives of Physical Medicine, 60, 226-230.

*Reidy, T., Cotler, S., Tracy, R., & Anderegg, T. (1980)*
**Child abuse and neglect:  Cognitive, social and behavioral correlates.**
In J. Money and G.J. Williams (Eds.), Traumatic Abuse and Neglect of Children at Home.  Baltimore, MD:  John Hopkins University Press.

*Reidy, T., Silver, R., & Carlson, A. (1989)*
**Child custody decisions:  A survey of judges.**
Family Law Quarterly, 23 (1), 75-87.

*Reidy, T., & Carstens, C. (1990)*
**Stability of the Millon Adolescent Personality Inventory.**
Journal of Personality Assessment, 55, 692-697.

*Reidy, T., Bowler, R.M., Rauch, S.S., & Pedroza, G.I. (1992)*
**Pesticide exposure and neuropsychological impairment in migrant farm workers.**
Archives of Clinical Neuropsychology, 7, 85-95.

*Reidy, T., & Hochstadt, N. (1993)*
**Attribution of blame in incest cases:  A comparison of mental health professionals.**
Child Abuse and Neglect, 17, 371-381.

*Reidy, T., Bolter, J., & Cone, J. (1994)*
**Neuropsychological sequelae of methyl bromide:  A case study.**
Brain Injury, 8 (1), 83-93.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Integration of base rate data in violence risk assessment at capital sentencing.**
Behavioral Sciences and the Law, 16, 71-95.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Antisocial personality disorder and psychopathy:  Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations.**
Behavioral Sciences and the Law, 16, 333-351.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Antisocial personality disorder versus psychopathy as diagnostic tools.**

7

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Prosecutors Brief, California District Attorneys Association, Vol. XX, No. 4, 9-11.

*Cunningham, M. D., & Reidy, T. (1999)*
**Don't confuse me with the facts:  Common errors in violence risk assessment at capital sentencing.**
Criminal Justice and Behavior, 26, 20-43.

*Reidy, T.J., Cunningham, M. D., & Sorensen, J. R. (2001)*
**From death to life:  Prison behavior of former death row inmates in Indiana.**
Criminal Justice and Behavior, 28, 62-82.

*Cunningham, M.D., & Reidy, T. J.* (2001). **A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations.**
Behavioral Sciences and the Law, 19, 473-490.

*Cunningham, M. D., & Reidy, T. J. (2002)*
**Violence risk Assessment in federal capital sentencing: individualization, generalization, relevance and scientific standards.**
Criminal Justice and Behavior, 29, 512-537.

*Cunningham, M. D., Sorensen, J. R. & Reidy, T. J., (2004)*
**Revisiting future dangerousness revisited: Response to DeLisi and Munoz (2003).**
Criminal Justice Policy Review, 15, 365-376.

*Cunningham, M. D., Sorensen, J. R. & Reidy, T. J., (2005)*
**An actuarial model for assessment of prison violence.**
Assessment, 12, 40-49.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R.  (2005)*
**Is death row obsolete: A decade of mainstreaming death-sentenced inmates in Missouri.**
Behavioral Sciences and the Law, 22, 1-14.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R.  (2008)*
**Assertions of "future dangerousness" at federal capital sentencing: Rates and correlates of subsequent prison misconduct and violence.**
Law and Human Behavior, 32, 46-63.

*Cunningham, M.D., Sorensen, J.R., & Reidy, T.J. (2009)*
**Capital jury decision-making: The limitations of predictions of future violence.**
Psychology, Public Policy and Law, 15, 223-256.

8

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

*Reidy, T.J., Sorensen, J.R., & Cunningham, M.D.* (2012). **Community violence to prison assault: A test of the behavioral continuity hypothesis** Law and Human Behavior, 36, 356-363.

*Reidy, T.J., Sorensen, J.R., & Cunningham, M.D.* (2013) **Probability of Acts of future violence: A test of jury accuracy in Oregon.** Behavioral Sciences and the Law, 32, 286-305.

*Reidy, T., Sorensen, J., & Davidson, M. (2016)* **Testing the Predictive Validity of the Personality Assessment Inventory (PAI) in Relation to Inmate Misconduct and Violence** Psychological Assessment, 28, 871-884.

*Davidson, M., Sorensen, J. R., & Reidy, T. J. (2016)* **Gender responsiveness in corrections: Estimating female inmate misconduct using the Personality Assessment Inventory (PAI)** Law and Human Behavior, 40, 72-81.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2016)* **Wasted Resources and Gratuitous Suffering: The Failure of a Security Rationale for Death Row** Psychology, Public Policy, and Law, 22, 185-199.

*Reidy, T. J., & Sorensen, J. R* (In Press) **Prison Homicides: A Multidimensional Comparison of Perpetrators and Victims** Journal of Forensic Psychology Research and Practice

*Sorensen, J. R., & Reidy, T. J. (in press)* **Incapacitation and life without parole.** In Bohm, R. M., & Lee, G. M. (eds.). Routledge Handbook on Capital Punishment. New York: Taylor & Francis

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (in press)* **The failure of a security rationale for death row.** In Acker, J. R., & Toch, H. (eds.). Living on death row

Reidy, T. J., Sorensen, J. R., & Bonner, H. S. (In Review). **Prison homicide: An extension of violent criminal careers?** Violence & Victims

Sorensen, J. R., & Reidy, T. J. (In Review) **Nothing to lose? An Examination of Serious and Assaultive Prison Misconduct among Life-Without-Parole Inmates** Journal of Interpersonal Violence

9