**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
Federal Defender's Office of Eastern District of California
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:  (916) 498-6666
Facsimile:  (916) 498-6656
Joan_Fisher@fd.org

Attorneys for Petitioner
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S PROPOSED |
| | ) | FINDINGS OF FACT AND |
| UNITED STATES OF AMERICA, | ) | CONCLUSIONS OF LAW |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Kenneth Eugene Barrett, Petitioner, pursuant to the Scheduling Order (Doc 270) files this

his Proposed Findings of Fact and Conclusions of Law.

1

## I.   PROPOSED FINDINGS OF FACT

### A.   DEFICIENT PERFORMANCE

#### 1.   *Prevailing Professional Norms*

*Strickland* and its progeny require this Court's assessment of trial counsel's performance be guided by objective standards such as those codified in the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (rev. ed. Feb. 2003), 31 Hofstra L. Rev. 913 (2003) ("ABA Guidelines"). *Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003).

1.      In 2005, one of the prevailing professional norms of capital defense practice that was both codified in the ABA Guidelines and practiced locally, was for the defense to work as a multi-disciplinary team including attorneys, investigators, a mitigation specialist and experts in fields indicated by the evidence, including the client's medical and mental health history. Guideline 4.1, 31 Hofstra L. Rev. at 956, 1003.

2.      A prevailing professional norm of capital defense work that was well-established at the time of this case was for defense counsel to "seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." ABA Guideline 10.10.1, 31 Hofstra L. Rev. at 1059 (commentary on Guideline 10.11).

3.      Investigation is a core function of defense counsel, and the prevailing professional norms expressly call for "prompt investigation."  American Bar Association, Standards for Criminal Justice ("ABA Standards"), Defense Function, Standard 4-4.1.

4.      Under the prevailing professional norms, Mr. Barrett's trial attorneys "had an

2

obligation to investigate carefully before setting out on a course of action." Counsel's duty to investigate included a duty to conduct a thorough investigation of the client's background.

5.    The prevailing professional norm at the time of this federal death penalty trial was for defense counsel, or more often a mitigation specialist acting on their behalf, to speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . . would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death." ABA Guideline 10.11(F)(1), 31 Hofstra L. Rev. at 1055-56.

6.    The prevailing professional norms of capital defense practice at the time of this case recognized a need for defense counsel to develop and maintain a relationship of trust and confidence with the client due to the extraordinary stress and psychological strain the case can impose. ABA Guideline 10.5, 31 Hofstra L. Rev. at 1005-1011.

7.    Mr. Echols supported his funding requests with declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants.  (Exhibit 118.)

8.    The recommendations Richard Burr made in the declarations he provided in support of Mr. Echols's motions for defense funding reflect the prevailing professional norms of capital defense practice in federal cases tried before and at the time of Mr. Barrett's trial.

3

### 2.   *Selection and Funding of Trial Counsel*

#### a.   Appointment of Counsel

*Strickland* requires that the Court make every effort to reconstruct the circumstances of counsel's challenged conduct and to view that conduct from counsel's perspective at the time. *Strickland*, 466 U.S. at 689.

9.      In this case, the circumstances of counsel's challenged conduct include the extent of penalty-phase preparation done by state trial counsel, John D. Echols, and those supporting him in the Oklahoma Indigent Defense System.

10.     In this case, another circumstance of counsel's challenged conduct was the availability of funds for the defense including investigative and expert resources. The record shows Mr. Echols advised the court that the court's delay in authorizing funds for the defense to retain a mitigation specialist, and the amount of funding were inadequate to complete the necessary work prior to the start of trial.

11.     The record and witness statements point to a connection between the defense funding issue, the selection of defense counsel, and who ultimately represented Mr. Barrett at trial. For example, during discussions about Mr. Barrett's representation, Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation. (Exhibit 54; Exhibit 67.) Judge Payne resisted Echols's funding requests and ultimately granted them only to a limited extent. Echols withdrew from the case for the stated reason that he believed those cuts made it impossible to provide Mr. Barrett effective representation.

12.    The Judicial Conference's Guidelines for the Application of the Criminal Justice Act ("CJA Guidelines") state that district judges should consider the recommendations of the Federal Defender when appointing counsel, and should appoint counsel who are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation.

13.    Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Exhibit 54; Exhibit 67; Exhibit 34.)

14.    Judge Payne rejected the defender's recommendation in part because he wanted to give local counsel more experience so that more local lawyers would be qualified to handle capital cases. (Exhibit 54; Exhibit 67; Exhibit 34.)

15.    According to the Government, time limitations prevented defense counsel from developing the mitigation evidence presented by post-conviction counsel. The record shows Judge Payne expressed an interest in having the case proceed to trial quickly (Exhibit 34), and he instructed defense counsel to give the case the highest priority. (Doc. 31 in No. 05-cr- 115.)

16.    Both the ABA Guidelines and the Judicial Conference's CJA Guidelines urge that defense functions be funded promptly so that the defendant's representation is not harmed by delay.

17.    Mr. Echols expressly relied upon the ABA Guidelines relevant to penalty-phase preparation in seeking funds from the court.

5

18.     As relevant here, defense counsel filed an initial budget request on January 31, 2005 (Doc. 46), and an amended budget requests on February 7, 2005. (Docs. 50, 51.) On February 22, 2005, the court sent Mr. Echols a letter seeking further clarification. On February 28, 2005, Mr. Echols replied and advised the court that delay in providing funding was endangering counsel's ability to be effective. (Ex. 65.)

19.     On March 18, 2005, the trial court ruled on defense counsel's budget requests, including providing funds for investigative and expert services. At that point, the scheduling order called for discovery to close on May 11, 2005, and for trial to begin on July 11, 2005.

20.     Attorney Bret Smith was appointed as second chair when Mr. Echols was relieved and Mr. Hilfiger was made lead counsel.

21.     Mr. Smith began working on the case on May 18, 2005.

22.     The trial court did not consult the Federal Defender before appointing Mr. Smith

23.     Mr. Smith had no experience with a capital case before his appointment to represent Mr. Barrett.

24.     Despite Mr. Smith's complete lack of experience with capital defense work, Mr. Hilfiger gave him primary responsibility for preparing for the penalty phase of trial.

### b.  Julia O'Connell

25.     Julia O'Connell is an attorney licensed to practice law in the State of Oklahoma. She is an experienced criminal defense lawyer and currently serves as Federal Defender for the Northern and Eastern Districts of Oklahoma.

26.     As part of her duties as Federal Defender, Ms. O'Connell administers the

Criminal Justice Act panel for the Northern and Eastern Districts of Oklahoma.

27.    At the time the government indicted Mr. Barrett, Ms. O'Connell was an Assistant Federal Defender and the only attorney in her office with experience defending a capital case. At that time, she was assigned to represent the defendant in United States v. Edward Leon Fields, No. CR-03-73-RAW.

28.    Ms. O'Connell and then-Federal Defender Paul Brunton met with Judge Payne to discuss Mr. Barrett's representation. Judge Payne expressed a desire that the Federal Defender represent Mr. Barrett but, due to the office's resources already being over-stretched by the Fields case, the defenders prevailed upon Judge Payne to appoint CJA counsel.

29.    Ms. O'Connell had been concerned that Mr. Hilfiger lacked the experience necessary to understand the role of mitigation in a capital trial. That concern led her, on June 21, 2005, to send Mr. Hilfiger an order dealing with individual capital voir dire that had recently been filed in United States v. Donald Fell, No. 2:01-CR-12-01 (D. Vt.).

30.    On June 30, 2005, Mr. Hilfiger telephoned Ms. O'Connell. He left a voicemail message asking if the mitigation specialist who was working with the Federal Defender Office on the Fields case would be in Muskogee in the future and whether she would be willing to meet with him to discuss mitigation.

31.    Mr. Hilfiger's message left Ms. O'Connell with the impression that Mr. Hilfiger did not know what was expected of defense counsel during the penalty phase of a capital trial. The impression was sufficiently strong that she was alarmed by the message.

32.    Mr. Hilfiger's message suggested to Ms. O'Connell that Mr. Hilfiger thought a

7

mitigation investigation could be accomplished based on a short conversation with a mitigation specialist roughly ten weeks before trial.

33.    The timing of Mr. Hilfiger's call contributed to Ms. O'Connell's sense of alarm. At that time, Mr. Barrett's trial was scheduled to start in a few weeks. In Ms. O'Connell's experience a minimum of six months is necessary to investigate a capital defendant's background for purposes of developing a mitigation case. Ms. O'Connell believed it was too late by that time to conduct an adequate investigation of Mr. Barrett's background.

34.    On July 3, 2005, Ms. O'Connell responded to Mr. Hilfiger's message by emailing him. She sent him contact information for attorney Richard Burr of the Federal Death Penalty Resource Counsel Project. Ms. O'Connell knew Mr. Burr to be an extremely competent lawyer in the area of death penalty cases who was willing to help any lawyer who sought his assistance.

35.    Ms. O'Connell and those with whom she practiced recognized that the ABA Guidelines codified the prevailing professional norms of their practice in the Eastern District of Oklahoma.

### 3.    Richard Burr

36.    Attorney Richard Burr was retained by the Defender Services Office of the Administrative Office of the United States Courts to serve on the Federal Death Penalty Resource Counsel Project as an adviser and consultant to court-appointed and federal defender attorneys engaged in the defense of capital cases in the federal courts. *United States v. Barrett* was one of the cases that came within the purview of Mr. Burr's responsibilities to the Project.

37.    The Federal Death Penalty Resource Counsel Project ("Project") is a program of

8

the Defender Services Office designed to assist the federal courts, federal defenders, and appointed counsel in connection with matters relating to the defense function in federal capital cases at the trial level. In a report by the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Judicial Conference of the United States, the work of the Project was found to be "essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation at 50 (May, 1998).

38.    Through the provision of consultative and other services the Project seeks to ensure that defense counsel in federal death penalty cases provide representation consistent with prevailing professional norms such as those set out in the ABA Guidelines.

39.    Members of the Project meet with personnel from Defender Services and with members of the Judiciary to discuss the needs of defense counsel and the concerns judges have when administering the Criminal Justice Act in capital cases.

40.    The Project collects data on federal death penalty cases including, as relevant here, the extent to which defense teams retain the services of investigators, mitigation specialists, and mental health experts. The relevant data the Project collects also include the rate at which investigators, mitigation specialists, and mental health experts are paid as part of their work for the defense in federal death penalty cases.

41.    At the time he worked on this case, Mr. Burr had been representing people facing the death penalty for more than 25 years and had represented more than 100 clients in those circumstances.

42.     Mr. Burr's experience with federal death penalty cases included serving as lead penalty phase counsel in *United States v. Timothy McVeigh*, No. 96-CR-68 (D. Colo.). Mr. Burr's familiarity with the scope and role of mitigation in capital cases also is reflected in his work on *Tennard v. Dretke*, 542 U.S. 274 (2004), and *Hitchcock v. Dugger*, 481 U.S. 393 (1987). Mr. Burr also had participated in meetings with Defender Services and representatives of the Judicial Conference committees whose work includes Defender Services and death penalty cases in particular.

43.     One of the Project's responsibilities is assisting Federal Defenders in their statutory duty under 18 U.S.C. § 3005 to recommend to the district courts appointment of counsel in federal capital prosecutions.  In this case, the Project, through Federal Defender Julia O'Connell, recommended that the court appoint Robert Nigh of Tulsa to be Mr. Echols's co-counsel.

44.     After the court decided to appoint Roger Hilfiger, Mr. Burr was concerned about the appointment because he did not meet the criteria to be learned counsel under the CJA Guidelines. Mr. Burr believed that Mr. Barrett's case required more capital-case experience than Mr. Hilfiger had.

45.     Mr. Echols consulted Mr. Burr about various issues including what investigative and expert resources the defense would need to prepare for a penalty trial. Mr. Echols shared with his co-counsel, Mr. Hilfiger, the information he received from Mr. Burr.

46.     Mr. Burr's first direct contact with the *Barrett* case came on October 1, 2004, when Mr. Echols called him to discuss the case. They discussed the process through which the

10

Department of Justice would decide whether to seek the death penalty and the case budgeting process. During that conversation, Mr. Echols recounted at length his previous representation of Mr. Barrett in the state case. Mr. Echols stressed that his mitigation investigation in the state case was not at all adequate. Mr. Echols was emphatic about the need to secure enough mitigation investigative and expert resources to develop mitigation fully.

47.     After the first telephone call with Mr. Echols, Mr. Burr arranged for the Project to send a letter of introduction and a CD of materials to each of Mr. Barrett's counsel, Mr. Echols and Mr. Hilfiger. The letter introduced Mr. Burr and explained the kind of assistance the Project offered.

48.     Over the course of November and December 2004, and January 2005, Mr. Burr communicated by email or telephone with Mr. Echols several times. The contacts were always initiated by Mr. Echols who focused the conversation on experts or investigators that he needed, motions that he was filing, and his ongoing relationship with co-counsel. Mr. Echols informed Mr. Burr that his relationship with Mr. Hilfiger was not developing very well in that he perceived Mr. Hilfiger to be unable or unwilling to take on his share of the work on the case.

49.     In February, March, and April 2005, Mr. Burr had numerous contacts with Mr. Echols.

50.     In early 2005 Mr. Echols set up a secure website for the case documents. Mr. Echols provided Mr. Hilfiger and Mr. Burr access to the website and its contents. and provided access for me to the website.  Mr. Echols solicited Mr. Burr's views about all the work he was doing. Mr. Echols often needed more time than Mr. Burr was able to offer.  Mr. Burr consulted

11

most heavily on difficulties Mr. Echols was having with the court in getting his budget requests funded adequately.

51.     In April 2005, Mr. Burr provided four declarations for Mr. Echols in support of his budget submissions to the court. These declarations concerned various aspects of attorney services, expert and investigative services, and the use of jury experts in federal capital cases.

52.     Each of those declarations was provided to Mr. Hilfiger.

53.     The declarations Mr. Burr provided to Mr. Echols in April 2005 responded to a case budgeting order the Court entered on March 18, 2005, and the report and recommendation of the Magistrate Judge that Mr. Echols should not be compensated for time spent seeking authorization for funds. Mr. Burr informed the court that Mr. Barrett's case was the only federal death penalty case in which the Project was aware of a defense attorney being denied compensation for seeking funds, and that this recommendation was contrary to the governing state and judiciary policies, in that the order infringed upon counsel's ability to exercise independent professional judgment. Mr. Burr informed the court that its cuts to Mr. Barrett's budget were unique in the experience of the project and that the court's estimate of the time reasonably necessary for Mr. Barrett's representation was far below projections made by the Spencer Committee.

54.     As to the preparation for a penalty phase, Mr. Burr advised the Court that the non-attorney funds Mr. Barrett had been granted were far below those courts granted other similarly situated defendants. Mr. Burr also informed the court that the Defender Services Committee had recently reaffirmed the principle that generalized concerns about the judiciary's budget should

12

not be met by cutting back on reasonable and necessary requests for defense funding.

55.    Mr. Burr informed the court that the number of hours requested by Mr. Barrett's attorneys for a mitigation specialist was well below average. The average number of hours worked by mitigation specialists in federal capital cases was 600 hours.  In a number of cases, mitigation specialist services have exceeded 1000 hours.  Investigating a client's life history thoroughly - through gathering and reviewing documents and interviewing scores of witnesses who are often difficult to find - and working with counsel and other experts to develop the themes of mitigation and the way in which mitigation will be presented, is extremely labor intensive.  The modest number of hours requested by the defense in Mr. Barrett's case reflects the hope that the mitigation investigation previously conducted, but not completed in the state prosecution, will be of use in the current investigation. (Decl. Richard H. Burr re Non-Attorney Costs, dated April 4, 2005, paragraph 7. a, page 4.)

56.    Mr. Burr's declaration also informed the court, and Mr. Hilfiger, that he was unaware of any federal capital case in which he court had refused to authorize the defense to hire a mitigation specialist.

57.    During the same period of time--the first third of 2005--Mr. Echols told Mr. Burr that he was increasingly frustrated with Mr. Hilfiger's lack of involvement in the ongoing work on Mr. Barrett's case. Mr. Echols told Mr. Burr that due to the lack of work by Mr. Hilfiger he was quite worried that he would not be able to prepare Mr. Barrett's case effectively by the then-scheduled trial date.

58.    Mr. Echols told Mr. Burr he decided to withdraw from the case because he

13

believed he could not provide Mr. Barrett effective representation due to the lack of funds available and the lack of work from Mr. Hilfiger. Mr. Echols expressed his belief that there was a great deal of work to be done on the case and he did not believe it could be accomplished under the circumstances.

59.    After Mr. Echols's withdrawal from the case, no one working on Mr. Barrett's defense contacted Mr. Burr.

60.    In late June 2005, after Mr. Hilfiger asked Julia O'Connell if he could meet with her mitigation specialist, Ms. O'Connell suggested Mr. Hilfiger contact Mr. Burr for assistance. Ms. O'Connell believed Mr. Burr was qualified and available to assist Mr. Hilfiger in preparing a mitigation case.

61.    In August 2005, Mr. Burr queried an internet list serve for federal death penalty attorneys about their experience of turnaround time for CJA 30 and CJA 31 vouchers. Mr. Hilfiger responded to the query by providing his experience. Mr. Burr replied with an inquiry about Mr. Barrett's case and an offer of assistance.

62.    Mr. Burr's experience at the time was that he was more effective in assisting those attorneys who wanted to consult with him than he was with attorneys who did not respond to his offers of assistance. On the basis of that experience, and his own caseload, Mr. Burr did not make further efforts to contact Mr. Barrett's defense counsel.

63.    None of Mr. Echols's communications with Mr. Burr indicated that Mr. Barrett disapproved of any form of mitigation investigation. In his communications with Mr. Burr, which occurred after Mr. Echols had represented Mr. Barrett through two state trials and during

14

the early months of the federal case, Mr. Echols was emphatic about the need to secure enough mitigation investigative and expert resources to develop mitigation fully. Mr. Echols's communications indicated he intended to investigate Mr. Barrett's background and mental health issues.

64.    Responding to a client who expresses concerns about mitigation and his family's role in presenting it is so rudimentary as to be considered "death penalty defense 101." If Mr. Barrett had expressed such concerns to his counsel, the prevailing norms of practice in 2005 would have provided his counsel several strategic and client-focused responses. These included the following:

a.    Continue investigating and wait to see if the client, like many others, simply gets over it;

b.    Consult more experienced capital defense counsel about how they responded to similar issues;

c.    Advise the client that it is best to wait until all the facts are in and all the options for presenting the evidence have been explored because, *inter alia*, it may be unnecessary for specific family members to testify;

d.    Investigate those sources of information that are readily available such as court and law enforcement records, medical, educational, employment, and mental health records, and explain to the client that those sources are available;

e.    Explore the extent to which information can be presented to the

15

jury through a qualified mitigation specialist or mental health expert;

      f.  Inform the client once other sources of testimony have been identified;

      g.  Speak with family members about the problem.

65.    Capital defense counsel in 2005 were aware that the Supreme Court in *Rompilla v. Beard*, 545 U.S. 374 (2005), had found trial counsel ineffective for failing to uncover and present mitigation evidence despite having had a client who at times had been "uninterested in helping" and "even actively obstructive."

66.    Capital defense attorneys in 2005 recognized that under ABA Criminal Justice Standard 4-5.2 defense counsel has the authority to decide what evidence should be presented.

67.    The commentary on ABA Guideline 10.5 is accurate when it states, "Often, so-called 'difficult' clients are the consequence of bad lawyering – either in the past or present. Simply treating the client with respect, listening and responding to his concerns, and keeping him informed about the case will often go a long way towards eliciting confidence and cooperation."

68.    Assuming for the sake of a hypothetical that Mr. Barrett expressed concerns about mitigation evidence, Mr. Hilfiger and Mr. Smith's statements that Mr. Barrett was very involved with his defense and cooperated indicate that trial counsel could have been successful and presented available mitigation evidence if they had employed any of the well-known strategies for responding to such concerns.

69.    The statements attributed to Mr. Barrett are more indicative of a problem with counsel than a defendant who is opposed to mitigation evidence. Defense counsel who are

16

familiar with mitigation explain to their clients early on that mitigation does not involve begging for the defendant's life or relying on sympathy. Begging for mercy is not allowed in federal death penalty cases and a "generic" plea for mercy has been found by the Supreme Court to be evidence of ineffective assistance of counsel.

70.     The statements attributed to Mr. Barrett are consistent with those of an ill-informed or misinformed defendant.

71.     Defendants to whom mitigation has been explained do not object on grounds of "begging" or "sympathy" because they understand, if they have the capacity to understand, that mitigation is mostly telling their story. The statements attributed to Mr. Barrett about dwelling on his childhood and not relying on members of his family reflect a similar lack of insight into capital defense norms of practice particularly in that Mr. Hilfiger and Mr. Smith do not indicate that they made any effort to correct the misunderstanding.  Dwelling on a defendant's childhood could be seen as a plea for sympathy. That kind of one dimensional penalty phase case is not the norm in federal death penalty cases. Presenting the defendant's childhood experiences as a reason for his later use of drugs, or a contributing factor in a mental disorder, enables jurors to understand his criminal behavior as more than the isolated decision of the defendant not to comply with social norms. That kind of multi-dimensional understanding of mitigation is fundamental to death penalty defense practice.

72.     Mitigation evidence involves humanizing the defendant, making his life experiences familiar to jurors, and helping jurors to see that the life they are being asked to end amounts to more than the crime of conviction. Mitigation also involves offering the jury an

17

explanation for the defendant's actions. Nearly every initially-reluctant capital defendant allows this evidence to be presented.

73.     It is not necessary for the jury to see either the defendant's background or an explanation of his actions as grounds for sympathy. Experienced capital defense counsel know it is not even desirable to present mitigation as a basis for sympathy because such a strategy is likely to be ineffective or backfire by causing jurors to weigh sympathy for the victim against sympathy for the man who took his life. Both the experience of capital trial attorneys and scientific studies of how capital jurors decide whether to vote for life or death show that mitigation succeeds when jurors are able to identify with the defendant because of something in his background, or to understand his actions as something other than the product of a will to do harm.

74.     The norm in federal death penalty cases tried in 2005 was to follow the 2003 ABA Guidelines and employ a mitigation specialist to gather information about a defendant's family history over several generations, review that information with experts qualified to identify facts relevant to mitigation, and integrate the themes developed through that process into a consistent strategy for both phases of trial. The process of developing a trial strategy includes taking into account the client's concerns. However, as noted, advising a defendant without conducting an investigation is unprofessional conduct.

75.     Recognizing that appeals to sympathy, relying solely upon family witnesses, and dwelling on a bad childhood are ineffectual strategies, the ABA Guidelines codified the norm in capital defense practice of involving experts in the process of gathering background information,

18

interpreting it, and presenting it to jurors. Mitigation specialists are trained and experienced at avoiding problems like those implied in the statements attributed to Mr. Barrett. In 1998, the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, published recommendations including the use of a mitigation specialist. The Subcommittee recognized that mitigation specialists have the training and knowledge necessary to perform "work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." (Judicial Conference Recommendations.)

76.     Mitigation specialists can explain the different purposes of mitigation evidence, and, as the Subcommittee found, they are relied upon in some cases to testify about family history, educational records, work and military records.

77.     "Without exception, the lawyers interviewed by the Subcommittee stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase. Judges generally agreed with the importance of a thorough penalty phase investigation, even when they were unconvinced about the persuasiveness of particular mitigating evidence offered on behalf of an individual defendant." (Judicial Conference Recommendations.)

78.     Misunderstandings, or a lack of understanding, like what Mr. Hilfiger and Mr. Smith have stated Mr. Barrett expressed, were seen often enough in cases that the ABA provided guidance for counsel faced with clients who truly oppose the presentation of mitigation evidence. If Mr. Barrett's trial counsel had felt the concerns they related in their declarations, they could have turned to the advice found in the commentary to ABA Guideline 10.5:

> Some clients will initially insist that they want to be executed as punishment or because they believe they would rather die than spend the

rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to simply acquiesce to such wishes, which usually reflect overwhelming feelings of guilt or despair rather than a rational decision. Counsel should initially try to identify the source of the client's hopelessness. Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates. Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time. One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison.

79.    The ABA Standards, Guidelines and the advice in the commentary suggest a much more serious problem than what trial counsel imply in the statements they attribute to Mr. Barrett. Even so, it does not appear that Mr. Hilfiger or Mr. Smith took any of the recommended steps that are commonly used by capital defense counsel in similar situations.

80.    Mental health professionals, like those Mr. Burr recommended to Mr. Barrett's trial counsel, can advise counsel about what is significant in records or the accounts of family members, and rely upon hearsay when testifying to their opinions. Experienced capital defense counsel understand, and are able to explain to their clients, that dwelling on the past is not the point, and the accounts of family members can be presented through experts who, in any case, are able to place a traumatic or disadvantaged background in an objective context.

81.    Reliable information about a defendant's family, medical, and social history is one aspect of the forensic mental health evaluation typically carried out in a capital case. *See* Liebert and Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 AM. J .FORENSIC PSYCHIATRY 43 (1994). Mr. Hilfiger's declaration indicates that he had

access to information about Mr. Barrett from family members and records gathered during Mr. Echols' representation, but he does not indicate that he provided those records to any experts, or explained to Mr. Barrett that expert testimony was available.

### 4.    Kenneth Barrett

82.    Defense counsel described Mr. Barrett as fully cooperative.

83.    Mr. Barrett fully cooperated in the preliminary work done before the state trials to comprehensively document his family and social history.

84.    Mr. Barrett fully cooperated in the evaluation conducted by psychologist Bill Sharp and the risk assessment performed by Jeanne Russell.

85.    Mr. Barrett did not instruct his trial attorneys not to present any specific witness's testimony. He did not prevent them from asking any specific questions. He did not prevent them from calling any category of witnesses.

86.    Trial counsel were unaware of the mitigation case laid out in the § 2255 motion. Therefore, defense counsel could not have given Mr. Barrett advanced notice that they would present the information contained there. Therefore, Mr. Barrett could not have objected to it. Therefore, trial counsel were never called upon to counsel Mr. Barrett on the reasons he should allow the testimony.

### 5.    Mitigation Investigation: Ron Lax, Jeanne Russell, Trial Counsel

#### a.    Mitigation Specialist

87.    Mr. Echols advised the Court that he had contacted Ron Lax of Inquisitor, Inc.

21

about serving as a mitigation specialist in this case and that Mr. Lax had agreed to do the work.

88.    Mr. Lax's firm was referred to Mr. Echols by an assistant federal defender.

89.    On March 18, 2005, this Court found that Mr. Lax's services were reasonably necessary to the defense and authorized trial counsel to have him work 100 hours.

90.    Mr. Lax had a brief conversation or conversations with Mr. Echols prior to the latter's withdrawal from the case.

91.    No one from Mr. Barrett's defense team ever contacted Mr. Lax or anyone from his company about performing the services the Court had authorized.

92.    In late June 2005, Mr. Hilfiger telephoned then-Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation specialist. Ms. O'Connell believed that at that time it was already too late to conduct a thorough investigation of Mr. Barrett's background for purposes of developing a mitigation case.

### b.  Jack Gordon

93.    Jack Gordon is an attorney licensed to practice law in the state Oklahoma.

94.    Mr. Gordon was the second chair in the second state court trial of Kenneth Barrett for the murder of Trooper Eales.

95.    Mr. Gordon was primarily responsible for preparing for the penalty trial in state court, if one occurred.

96.    Mr. Gordon worked with Dr. Jeanne Russell. It was he who obtained the risk assessment Dr. Russell did in 2003. Mr. Gordon had provided Dr. Russell investigative reports, including those prepared by Roseann Schaye.

97.    Neither Mr. Hilfiger nor Mr. Smith every contacted Mr. Gordon about the work he did in relation to Mr. Barrett's second state-court trial. Neither Mr. Hilfiger nor Mr. Smith, nor anyone acting on their behalf contacted Mr. Gordon for his files on the case.

### c. *Steve Leedy*

98.    Steve Leedy is a former law enforcement officer who for many years has been employed as an investigator with Capital Division of Oklahoma Indigent Defense System. He works out of OIDS's Sapulpa office.  As part of his duties, Mr. Leedy was assigned to work with Mr. Echols on Mr. Barrett's defense.

99.    Mr. Leedy was part of the defense team during both state trials. Mr. Leedy was assisted on Mr. Barrett's case by investigator Jack Stringer.

100.    As part of his work on the defense, Mr. Leedy retrieved the files of Roseann Schaye, an investigator who was not an OIDS employee, but who did work on Mr. Barrett's defense under contract with OIDS prior to the first state trial. The files Mr. Leedy retrieved from Ms. Schaye included school records, medical records, psychiatric records, employment records, birth, marriage and divorce records related to Mr. Barrett's social history.

101.    Mr. Leedy does not consider himself a mitigation expert. His and Mr. Stringer's responsibilities in the state case primarily involved the investigation of guilt/innocence issues.

102.    In addition to his guilt/innocence investigation, Mr. Leedy reviewed the documents collected by Roseann Schaye and her reports, and he interviewed some potential mitigation witnesses.

103.    Mr. Leedy assembled the complete investigative file from Mr. Barrett's state case,

including the materials compiled by himself, Mr. Stringer and Ms. Schaye.

104.    Mr. Hilfiger never contacted Mr. Leedy about his work on Mr. Barrett's case. No one from Mr. Barrett's federal trial defense team retrieved the full investigative file from OIDS. It remained in Mr. Leedy's custody until it was retrieved by federal post-conviction counsel in 2008.

### d. Jeanne Russell

105.    In mid-August 2005, Mr. Smith asked Jeanne Russell to serve as a mitigation specialist for Mr. Barrett's defense. Dr. Russell advised Mr. Smith that she was not qualified to fill that role and that, in any case, it was too late to complete a mitigation investigation. Mr. Smith replied that the court would not pay for such an investigation, anyway.

106.    Dr. Russell was not asked to conduct a mental health evaluation for the purpose of identifying mitigation evidence such as the existence of a serious mental illness or organic brain dysfunction.  (Exhibit 56.)

107.    Dr. Russell's work towards the penalty phase of the federal case consisted of the following:

   a. On August 29, 2005, Dr. Russell spent two hours consulting with attorneys and a previous investigator from the state case.

   b. On September 7, 2005, Dr. Russell spent 3.5 hours reviewing records and gathering additional information on the federal case.

   c. On September 14, 2005, the day jury-selection began, Dr. Russell spent 5.3 hours updating the 2003 risk assessment and writing a report.

24

d.  On September 16, 2005, spent 3 hours finishing her draft report and discussing it with Mr. Barrett's attorney.

e.  On September 18, 2005, Dr. Russell spent 2 hours revising the draft risk assessment and consulting with Mr. Barrett's counsel.

f.  On October 7, 2005, Dr. Russell copied her testing materials and delivered them to the U.S. Attorney's Office in Tulsa.

g.  On October 11, 2005, Dr. Russell spent a total of 7 hours traveling to and from Muskogee, interviewing Mr. Barrett, and meeting with his attorney.

### 6.  Trial Counsel's Mitigation Investigation

#### a.  Roger Hilfiger

108.  Roger Hilfiger had tried only one federal capital case prior to his work on Mr. Barrett's case.

109.  The district court appointed Mr. Hilfiger against the recommendation of the Federal Defender for the Northern District of Oklahoma.

110.  John Echols and Mr. Hilfiger did not work well together.

111.  Mr. Echols informed the district court and Mr. Hilfiger before trial that the defense had not done a complete mitigation investigation during the state court cases at least in part because neither state trial went to a penalty phase.

112.  Prior to his work on this case, Mr. Hilfiger had only defended one federal client in a case where the prosecution sought the death penalty. Mr. Hilfiger was not the lead attorney in that case, but he did work for the penalty phase.

25

113.    Mr. Hilfiger believed that Judge Payne put limitations on mitigation testimony so that it would only be about Mr. Barrett's future dangerousness as a prisoner. Mr. Hilfiger's pursuit of mitigation evidence was influenced by this perceived limitation.

114.    When Mr. Hilfiger referred to Dr. Jeanne Russell as a "mitigation expert" it was in the context of his belief that Judge Payne had limited the scope of mitigation to testimony that would be about Mr. Barrett's future dangerousness as a prisoner. Thus in his February 17, 2006, letter to the court regarding the CJA 31 voucher for Dr. Russell he referred to the "mitigation experts" consulted by "[b]oth sides" in the case.

115.    Mr. Hilfiger's view that Dr. Russell had not conducted a mental health evaluation is reflected in his contemporaneous statement to the court that the defense was not required to provide notice of Dr. Russell under Fed. R. Crim. P. 12.2 because she would not be testifying about Mr. Barrett's mental condition. Tr. Sept. 9, 2005, Hr'g at 41.

116.    Mr. Hilfiger's investigation for the penalty phase was limited to reviewing those materials from the state court case that he had and a few brief interviews with family members.

117.    Mr. Hilfiger cooperated with the government in its Response to Mr. Barrett's § 2255 Motion by providing the government a declaration that responded to Mr. Barrett's allegations of ineffective assistance of counsel. The government manifested that it adopted Mr. Hilfiger's statements when relied upon his declaration in its Response.

118.    Mr. Hilfiger's declaration specifically responded to Mr. Barrett's allegation that his trial counsel unreasonably failed to pursue mental health evidence. Mr. Hilfiger described his interactions with Dr. Jeanne Russell and declared that he had not been aware of the evaluation

26

performed by Dr. Bill Sharp prior to the second state trial.

119.    Mr. Hilfiger did not attribute his failure to have a mental health expert examine Mr. Barrett for purposes of mitigation to his reliance upon any previous examinations or opinions such as those performed by Dr. Faust Bianco and Dr. Kathy LaFortune.

120.    In light of Mr. Hilfiger's response to Mr. Barrett's allegations, if Mr. Hilfiger had relied upon Dr. Bianco or Dr. LaFortune, he would have said so in his declaration. Accordingly, the court finds that Mr. Hilfiger's failure to have a mental health expert examine Mr. Barrett for purposes of mitigation was not based on his consideration of any prior evaluation.

121.    Mr. Hilfiger stated in his declaration that Mr. Barrett wanted to minimize the amount of testimony elicited from his immediate family and ex-wife. Those are the very witnesses the defense called in the penalty phase.

122.    Other family member were available to testify but were not called.

123.    Mr. Hilfiger stated in his declaration that although he interviewed members of Mr. Barrett's family he was not aware of any information indicating Mr. Barrett had mental health problems. Therefore, Mr. Hilfiger could not have counseled Mr. Barrett on whether family members should be called to testify about mental health issues.

124.    Mr. Hilfiger stated in his declaration that nothing in Dr. Russell's 2003 report suggested that Mr Barrett "suffered from a significant mental health condition unrelated to his use of drugs."

125.    Mr. Hilfiger first saw Dr. Russell's 2003 report sometime in late August or early September 2005, at the earliest.

27

126.    Dr. Russell's report states that Mr. Barrett was struck in the head with an iron ball.

127.    Mr. Hilfiger did not consult any mental health experts regarding Mr. Barrett's use of drugs. Therefore, Mr. Hilfiger had no informed opinion about how Mr. Barrett's drug use was or was not related to his mental health condition. Mr. Hilfiger knew the jury would hear about Mr. Barrett's drug use. Mr. Hilfiger conducted no investigation or inquiry to determine whether Mr. Barrett's drug use was mitigated by his social history or an underlying mental health condition.

### b. Bret Smith

128.    In mid- to late August 2005, Mr. Smith first contacted Jeanne Russell about her work on Mr. Barrett's case. At that time, jury selection was only a few weeks away.

129.    As of September 9, 2005, when jury selection was a few days away, Mr. Smith did not possess all the files related to the mitigation investigation that was conducted in preparation for the state court trials.

130.    Mr. Smith never obtained all the files associated with the state court mitigation investigation.

131.    Mr. Smith did not attempt to get help or guidance from the Federal Death Penalty Resource Counsel Project.

132.    Mr. Smith was the primary contact with Dr. Jeanne Russell. He contacted her in mid-August 2005.

133.    Mr. Smith cooperated with the government in its Response to Mr. Barrett's §

2255 Motion by providing the government a declaration that responded to Mr. Barrett's allegations of ineffective assistance of counsel. The government manifested its adoption of Mr. Smith's statements and its belief in their truth when it relied upon Mr. Smith's declaration in its Response.

134. Mr. Smith's declaration specifically responded to Mr. Barrett's allegation that his trial counsel unreasonably failed to pursue mental health evidence. Mr. Smith described his interactions with Dr. Jeanne Russell and declared that he had not been aware of the evaluation performed by Dr. Bill Sharp prior to the second state trial.

135. Mr. Smith did not attribute his failure to have a mental health expert examine Mr. Barrett for purposes of mitigation to his reliance upon any previous examinations or opinions such as those performed by Dr. Faust Bianco and Dr. Kathy LaFortune.

136. In light of Mr. Smith's response to Mr. Barrett's allegations, if Mr. Smith had relied upon Dr. Bianco or Dr. LaFortune, he would have said so in his declaration. Accordingly, the court finds that Mr. Smith's failure to have a mental health expert examine Mr. Barrett for purposes of mitigation was not based on his consideration of any prior evaluation.

137. Dr. Russell's 2003 report states that Mr. Barrett suffered a head injury when he was struck in the head with an iron ball.

138. Mr. Smith did not consult any mental health experts regarding Mr. Barrett's use of drugs. Therefore, Mr. Smith had no informed opinion about how Mr. Barrett's drug use was or was not related to his mental health condition. Mr. Smith knew the jury would hear about Mr. Barrett's drug use. Mr. Smith conducted no investigation or inquiry to determine whether Mr.

29

Barrett's drug use was mitigated by his social history or an underlying mental health condition.

### 7.    Time and Resources Available to the Defense

139.    Judge Payne expressed a desire that the case rapidly proceed to trial.

140.    Judge Payne's desire that the case rapidly proceed to trial was one factor that influenced him to reject the Federal Defenders' recommendations of a defense lawyer with more training and experience than Roger Hilfiger.

141.    Judge Payne admonished trial counsel that "this is a death penalty case, which should be given the highest priority by counsel." (Doc. 31.)

142.    In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the files and records related to the case. (Doc. 50 at 4; Exhibit 64 at 1 n.1.)  On March 18, 2005, the court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to complete these tasks. (Doc. 97 at 2.)

143.    On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals. (Docs. 50, 51.)  On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but not about Mr. Hilfiger's representation. (Exhibit 65).

144.    Mr. Echols responded by letter on February 28, 2005. (Exhibit 64.)

145.    In his February 22, 2005, letter to defense counsel, Judge Payne expressed the view that no further investigation should need to be done after the previous trials. (Ex. 65.)

146.    On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett

30

citing five circumstances that prevented him from providing effective representation: (1) the trial was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment.  (Doc. 113.)

147.    Mr. Hilfiger had urged Mr. Echols not to file the motion to withdraw from the case. (Exhibit 118; Exhibit 34.)

148.    During a hearing on Mr. Echols's motion to withdraw, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order.  (Exhibit 34.)

149.    In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work.  (Order filed 5/5/05 at 5.)

150.    On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005. The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done to prepare for a penalty trial. (Exhibit 64; Exhibit 34; Doc. 113; Exhibit 118.) Mr. Hilfiger did not seek an amendment of the budget.

151.    On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date.

31

(Doc. 138.) Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such material needs to be reviewed to determine its value for defensive purposes, in this new action." (Doc. 138 at 1.) Mr. Hilfiger received these materials at some point during the ten days from May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion.

152.    Before Mr. Hilfiger obtained the 10 boxes, Mr. Echols had given Mr. Hilfiger access to a password-protected website through which defense counsel could access much of the same information about the case. Mr. Echols maintained and administered the website which included assigning log-on credentials and monitoring who accessed the defense materials. He could tell when one of the log-on credentials had been used. At no time did Mr. Hilfiger use his log-on credentials to access the website.

153.    In mid-August 2005, Mr. Smith asked Dr. Russell for a copy of the risk assessment report that she had provided Mr. Echols in 2003. Mr. Smith's request indicated he had not seen Dr. Russell's 2003 report.

154.    During a hearing held on September 9, 2005, Mr. Smith revealed that Mr. Hilfiger had not assembled or reviewed all the files and records related to the mitigation investigation that had been done in state court. (Tr. 9/9/05 Hr'g at 43.)

155.    Based on the foregoing timeline, at the time of the hearing on Mr. Echols's motion to withdraw, when Mr. Hilfiger declined to join Mr. Echols's statement of concern about the

adequacy of the defense budget, Mr. Hilfiger did not know the quantity or the quality of the work that had been done to prepare for a penalty trial.

156.    On June 8, 2005, the court granted a defense motion for a continuance and resent jury selection to August 29, 2005, and  the start of trial to September 6, 2005.

157.    On July 22, 2005, the court granted a defense motion for a continuance and reset the individual portion of jury selection to September 12, 2005.

158.    During the September 9, 2005, hearing, Judge Payne described the defense's trial preparation as "still work in progress." Tr. Sept. 9, 2005, Hr'g at 42.

159.    From the time of his appointment on October 25, 2004, until October 3, 2005, lead defense counsel Hilfiger had worked approximately 300 hours on Mr. Barrett's case. (Tr. Oct. 3, 2005, Hr'g at 5.) That is an average of just over 6 hours per week, or seven and one half full work-weeks over a period of 49 weeks. That time included all research, investigation, meetings and time spent in court, including, by then, one full week of jury selection and three and one half days of trial.

160.    Defense counsel did not request a continuance beyond those mentioned.

### 8.    *Information Available to Mr. Hilfiger and Mr. Smith Regarding Mr. Barrett's Mental Health History*

161.    Trial counsel Hilfiger and Smith were aware of the risk assessment performed by Jeanne Russell in 2003 at the request of Echols.

162.    Dr. Russell stated in her 2003 report that Mr. Barrett reported a head injury in which he was struck in the head with a steel ball and lost consciousness.

33

163. Trial counsel Hilfiger and Smith were aware that Mr. Barrett had attempted suicide in 1986 by shooting himself in the chest with a shotgun.

164. Trial counsel Hilfiger and Smith did not have all of the files created by Echols and other members of the Oklahoma Indigent Defense System team that represented Mr. Barrett in state court.

165. Mr. Hilfiger and Mr. Smith were aware, prior to trial, that expert testimony regarding the mind's response to threats such as an unmarked S.U.V. driving off-road toward Mr. Barrett's cabin was important so that the jury could understand Mr. Barrett's reactions. (Doc. 50.) Trial counsel were aware that Mr. Barrett "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders." Ibid. Trial counsel were aware that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting." Ibid.

166. In response to the foregoing concern, the trial court authorized defense counsel "to hire a psychiatrist or psychologist for up to 40 hours." Order (Doc. 97).

167. Dr. Russell was the only expert consulted by the defense that Mr. Hilfiger characterized as a "mental health expert." Mr. In a letter to Magistrate Judge Shreder dated February 17, 2006, Mr. Hilfiger stated that the only work performed by Dr. Russell that he would characterize as the work of a mental health expert was the work Dr. Russell did to help defense counsel cross-examine the prosecution's first-stage "expert" Dr. Horn.

34

168.    The report of psychologist Bill Sharp, Ph.D., prepared before the second state court trial, was available to Mr. Hilfiger and Mr. Smith.

169.    Dr. Sharp's report indicated that Mr. Barrett suffered from extreme paranoia and long-term memory problems (Ex. 55 at ¶¶ 3, 14)

170.    Dr. Sharp's report identified numerous sources of mitigation, and recommended further testing and treatment.  (Ex. 55 at ¶¶ 9-14.)

171.    Trial counsel did not review Dr. Sharp's report and they were wholly unaware of its contents at all relevant times.

172.    The United States Attorney, who was not aware of the contents of any prior mental health evaluations of Mr. Barrett, nevertheless said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation.  (Tr. 9/9/05 Hr'g at 38.)

173.    Neither Mr. Hilfiger nor Mr. Smith, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history. At most, they spoke with members of Mr. Barrett's family for a few minutes. There were no follow-up interviews. Had a professionally reasonable investigation and preparation for the penalty phase been undertaken, these family members could have provided abundant evidence of Mr. Barrett's dysfunctional and abusive background; his parents' problems with alcohol and drugs; a family history of alcoholism, mental illness, and suicides, and their own mitigating opinions on Mr. Barrett's mental state.  (See, e.g., Exhibit 77; Exhibit 78; Exhibit 84; Exhibit 80; Exhibit 81; Exhibit 83; Exhibit 86; Exhibit 85; Exhibit 90; Exhibit 95; Exhibit 96; Exhibit 37.)

35

174.    Neither Mr. Hilfiger nor Mr. Smith nor anyone working on their behalf asked members of Mr. Barrett's family to sign releases for documents such as medical, education, employment or legal records.

175.    Neither Mr. Hilfiger nor Mr. Smith nor anyone working on their behalf provided documents related to Mr. Barrett's social history to Dr. Russell.

176.    The files of Roseann Schaye, the mitigation investigator who worked on the case before the first state trial, were readily available. (Exhibit 111; Exhibit 34.) However, Mr. Hilfiger and Mr. Smith never obtained those files.

177.    Mr. Hilfiger and Mr. Smith did not timely confer with the attorneys who worked on penalty-phase issues in preparation for the second state trial.

### B.    PREJUDICE

178.    Trial counsel informed the jury that four categories of "mitigation evidence" would be presented:  (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration"; (4) "Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999."  (R. 4704).

**Had trial counsel conducted a reasonable mitigation investigation, there was abundant, available evidence that a life sentence was sufficient for Mr. Barrett because of his neglectful upbringing, parental drug abuse and mental illness, the genetic components of his mental illness, and his organic brain impairments.**

179.    The evidence of Kenny Barrett's life that was presented was incomplete and not "an accurate representation of Mr. Barrett."

36

### a.    The family, social, and medical background of Kenny Barrett.

180**.**    A reasonable mitigation investigation would have produced a social history that revealed the following:

181.    Many of Mr. Barrett's family members, in previous generations, his generation, and those that followed struggled with profound mental illness and its attendant chaos.

182**.**    Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life.

183.    As a result of the genetic predisposition, Mr. Barrett was vulnerable to developing major psychiatric illness.

184.    Mr. Barrett  was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families.

185.    His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

### Family History of Mental Illness

186.    Mr. Barrett meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.

187.    Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases.

188.    Although people on both sides of the family carried genetic-based risk factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people.  Other

37

family members required psychiatric institutionalization.  Several committed suicide.

189.    This spectrum of impairment included family members who functioned marginally, but were unable to meet their responsibilities to their families and community.

190.    The nature and severity of Mr. Barrett's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

191.    Mr. Barrett's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders, including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities.

192.    Mr. Barrett's mother's family "had to deal with mental illness for a long time."

193.    Petitioner's mother, Gelene Dotson, has suffered from clinical depression, mood swings and anxiety since her teenage years.

194.    Gelene Dotson's sister, Carolyn Joseph, (Mr. Barrett's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with a regimen of mood stabilizers and antidepressants.  One of Carolyn Joseph's daughters manifests signs of mood-related psychiatric distress and is unable to rear her children.

195.    Gelene Dotson's brother Mark, the youngest child in her family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments."

196.    One of Mr. Barrett's maternal cousins, Gwendolyn Crawford, also has bipolar mood disorder that necessitates ongoing treatment and medication.  Gwendolyn Crawford's two children both have significant mental impairments.  Her 26 year old son Brandon has a

38

developmental disability and is unable to speak or live independently.  Gwendolyn Crawford's

daughter Brandy Hill reported that her family "learned first- hand about bipolar disorder and

depression" and that Brandy herself "battle[d] with depression," experienced episodes of "high

euphoria" and underwent treatment for her mood disorder until she could no longer tolerate

chemical regimens.

197.    Travis Crawford, another of Mr. Barrett's first cousins, also receives medication

for anxiety and reports a history of depression.  Travis Crawford has had "a long struggle with

drugs and ha[s] anxiety and panic attacks" and his "mind does not work that well."  Travis

Crawford struggled and did not succeed in the Army, or in his employment.   "[P]sychological

problems run in [his]family" and Travis Crawford's  oldest daughter, now "a grown young

woman" has bipolar disorder and one of his sons "seems a little slow and is having a tough time

of it."

198.  Gelene Dotson's uncle, Warren Dotson, Has two daughters who "each have a son

who is bipolar.

199.    In the maternal family, depression and mood disorders trace back to at least

Kenny's grandmother's (Hattie Gertrude Dotson) generation.

200.    Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the

Twentieth Century.  Another relative, Wallace Dotson, was involuntarily hospitalized at the state

mental institution on a petition brought by his father, Tom Dotson, who described Wallace as

being "completely out of his mind," suffering from  "some kind of spells" and not having slept

for "three days and nights."

201.    Mental disease and its effects on family life were transmitted down at least four generations of Barretts. Illness affected Mr. Barrett's great great grandfather, his great grandfather, his grandfather and finally Mr. Barrett himself.

202.    Mr. Barrett's cousin Kathy Trotter observed that while her children are fine there was a time she was not and, "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression."

203.    Mr. Barrett's great great grandfather, A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918.

204.    Mr. Barrett's great grandfather, Issac Clifford Barrett ended his life by suicide.

205.    Issac Barrett's oldest son, Andrew Jackson "A.J." Barrett, Petitioner's paternal grandfather, was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety. A.J. terrorized his wife who hid "in the woods" from him, raped one of his daughters who became pregnant and placed the baby for adoption, and went on drunken rampages through town. A.J. Barrett's Certificate of Lunacy documents auditory hallucinations, persecutory delusions and paranoid ideation. (Exhibit 27.) In fact, there are more certificates of lunacy in the Barrett family than college degrees. A.J. Barrett's family believed he "was bipolar." He was only able to work sporadically. At one point A.J. Barrett was involuntarily committed to the state hospital for one month.

206.    A.J. Barrett's maternal family also faced mental illness. His mother (and Mr.

40

Barrett's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," wandered the ranch at night talking to herself and believed that she was canning goods for the winter when she washed bottles in the middle of the night. She "died very confused." Mary's brother Howard was described as "Loony Tunes." Howard's son, Billy Dean Mall, who was a disabled veteran with a history of schizophrenia, committed suicide. Before committing suicide, Mr. Maxwell was committed to the state hospital four times in a ten year period.

207. Mr. Barrett's great aunt, Elnora Long, is bipolar and requires significant doses of medication. Elnora Long, who has a complicated lineage, is "very emotionally unstable" and "unpredictable." Elnora Long is bi-polar.

208. Kathy Trotter, Mr. Barrett's cousin, experienced anxiety and a depressive episode and was hospitalized.

209. Mr. Barrett has one paternal aunt (Linda Riley) and three paternal cousins who suffer from depression and bipolar disorder. Ms. Riley is treated for depression, and both her adult daughters have been diagnosed with bipolar disorder  Ms. Riley's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.

210. Mr. Barrett's paternal grandparents, A.J. Barrett and his wife, Ada Mae "lived a hard life." (Exhibit 84.) Three children "died at or near childbirth; the oldest was two weeks old. The oldest of the five children born to A.J. and Ada Mae who survived is Ernest ("Ernie") Barrett, Kenneth Barrett's father.

211. Ernie Barrett and his four siblings who survived, (Margaret, Issac, Gary and Linda), lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with

"a dirt floor and no electricity or running water. [W]ell water was not usable for humans, although it was all right for animals and crops." Because A.J. Barrett, due to his mental impairments, was only able to work sporadically, "[t]he entire family had to work in the fields traveling from one crop to the next."

212.    Ernie Barrett had a dismal upbringing.  One of his "earliest memories is being taken out of school to work in the fields."   Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell [sic], and picked beans in Moffitt [sic], Oklahoma.
> It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

213.    A.J. Barrett was unable to ameliorate the harshness of poverty and its impact on his family.  His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month. None of his children "wanted him to be at home because of the crazy things he did."

214.    A.J. Barrett suffered from mood swings that he attempted unsuccessfully to self-medicate with copious amounts of alcohol, to which he became addicted.  His alcoholism only aggravated his behavior.  His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen."  When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb," but he "was difficult to figure out because he was also a decent guy when he was sober."

42

215.    A.J. Barrett spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption.  A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Mr. Barrett's father Ernie, tried to "stay out of [his] way."  The children left home as soon as they could.  Family members reported that A.J.  Barrett had "two different personalities" and "angry spells about three times a week."  A.J. Barrett had "enormous moods swings from being an alright guy to being totally out of control."  A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers."  A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were] going to kill him."  A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality."

216.    A physician examining A.J. Barrett when he was admitted to the state hospital, reported his findings:

> His memory for past and remote past is poor.  He can retain a number of five digits but is unable to repeat them in reverse with any degree of facility.  Serial subtraction of eight from one hundred is done with much hesitation and inaccuracy.  His general intelligence seems in average [sic] and dull normal.  His reasoning and judgement are limited.  His insight is poor.

217.    Ernie and his siblings were powerless to protect themselves or their mother from A.J.'s assaults and terror.  A.J.'s wife, Ada Mae, was an old fashioned woman who "would not divorce" him, even though "nothing could stop him from attacking them."  Ernie Barrett believed his mother "was as good a woman as there is, but she had a hard life between my father being half crazy and always poor."  Ernie tried, "[a]s the oldest boy in the family," to protect his mother and the other children, but he was "no match" for his father until he was "half grown."

43

Because Ernie tried to "get between" his father and mother when A.J. attacked her, he "got beaten more than the other children."

218.    Ernie Barrett developed characteristic responses to the life threatening trauma that he witnessed and experienced.  He "learned never to cry" when his father hit him and he does not remember "feeling a hell of a lot."  In a community known for its poverty, Ernie's family stood out as still poorer than most.  Other students "made fun of [Ernie] and laughed at [him] because of the way [he] dressed."  Ernie responded to the taunts with fighting "every boy in [his] high school class to hold any respect."   Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out."  Ernie's brother described him as "pretty cruel."  He treated his younger siblings "pretty rough," and when he made them  cry, "he thought it was funny."  Ernie's brother. Ike,  thought Ernie was "a lot like [his] father," A.J.  An aunt of Mr. Barrett, Ruth Harris, who taught Ernie in elementary school. described him as "a mean child."

219.    Ernie Barrett left home without graduating from high school and joined the U.S. Marines, from which he was honorably discharged in 1960.  Ernie  kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess.

220.  Ernie Barrett was three months short of 17 the last time he stepped between his father and mother to try and protect her.  His father hit him across the shoulder with a "19-inch metal file that busted [his] shoulder wide open."  He still had a scar from it at the time of his sworn  declaration.  Ernie described that day: "I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others.  I was 6'3" and

44

weighed 187 pounds."

221. Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, alcoholism, and little understanding of the demands of parenting. They met in high school, dated briefly before Ernie left to join the U.S. Marines, reunited by accident when both were back in their home town. and married July 8, 1960, without much thought. Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

222. Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning. Although Ernie was very "determined not to live in the kind of poverty [he] knew as a child growing up," he had little notion of family life or fatherhood. In his declaration, Ernie acknowledged that he "did not give much thought to fatherhood" and "did not think about Gelene or, later on, the boys, other than working and supporting them."

223. Ernie Barrett "almost immediately started running around with other women" and was gone for days at a time. He had his "mind set on doing whatever" he wanted, as long as he worked. After Mr. Barrett's father finished his shift at the plant, he went to bars and got "into as many brawls as there were" before coming home. Ernie "did pretty much whatever [he] wanted to. [He] would go out, drink as much as [he] wanted, and chase women," a pattern he maintained until well after his marriage with Gelene ended. He "drank a fifth at a time."

224. Before he died, Ernie Barrett was deeply ashamed of his behavior towards his children and wished he "could take it back and do for [his] children what they needed and be the kind of parent they deserved."

225.   At the time Ernie Barrett and Petitioner's mother Gelene started their family, his only measurement of success was being able to work himself "up from pushing brooms to production manager."

226.   Gelene Dotson Barrett was "pretty depressed" and "miserable" in the marriage. She was "a heavy drinker with dramatic mood swings." She had planned on going to college but discovered she was "crazy about Ernie" who "came home kind of like a knight in shining armor." Looking back, she "never imagined that life with Ernie could be so terrible, not just for [her], but for the children [they] had together."

227.   Ernie Barrett's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing." Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar "looking for him – he would be out drinking," but barkeepers would tell her he was not there. Throughout their 13-year marriage, Ernie "had his other women." There was never a time that Ernie Barrett did not have other women.

228.   Gelene "drank right from the beginning of the marriage," according to Ernie Barrett. One of Gelene's sisters, Phyllis Crawford, who visited Gelene when she was pregnant with Kenneth Barrett, reported that "Gelene drank from the moment she woke up until she went to bed." Phyllis Crawford was available to testify at the sentencing proceeding. In fact, she was at the courthouse during the second-stage proceedings. In the years since the sentencing proceeding, Phyllis Crawford has become demented and is no longer available to testify.

229.   Mr. Barrett's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife

with recrimination.  Ernie Barrett was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children. Gelene Dotson Barrett says that "[I]t drove [her] crazy," and that she "begged, pleaded, threatened, and cried with Ernie."  Mr. Barrett's parents "always had a difficult time of it, "split[ting] up and [getting] back together and threaten[ing] to leave each other over and over."  Petitioner Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  He was followed by his younger brother, Richard, born June 24, 1964.

230.    Shortly after Richard's birth, Gelene left Ernie Barrett for almost three years and returned home to Sallisaw with the boys.  Ernie Barrett "felt bad about leaving" his sons but he "could not take Gelene anymore."  Ernie Barrett admitted that he "was still young and immature" and not " much of a husband" who "just put the boys out of [his] mind as much as [he] could." The three-year separation ended when Ernie was not able to "keep the boys out of [his] mind" and he reunited with Gelene in 1967.  Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend.  The nature of the marriage did not change after Gelene and the boys returned to Illinois.  Gelene gave birth to her third and last child with Ernie Barrett, Stephen, January 1, 1969.  Gelene and Ernie "both drank as much as [they] could," and Ernie "still stayed away from home."  Ernie Barrett was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence.

231.    Ernie Barrett contacted a friend in New Jersey who found him a job at a glass plant.  Leaving Joliet allowed Ernie Barrett to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting.        The family moved, living first in

47

Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time." Gelene Barrett's humiliation at Ernie's hands continued. Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey. Ernie Barrett had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened."

Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys. Gelene contracted gonorrhea twice from Ernie. Although Ernie Barrett had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her] lip." Gelene "was at the end of her rope" and left Ernie for good in Lake Hopatcong, returning home to Sallisaw with her three young boys in 1972. Ernie and Gelene divorced June 20, 1973.

232.   Kenneth Barrett has long standing neurologic deficits that were apparent early in his infancy, continued throughout his childhood and adolescence, and affected his behavior and understanding over the course of his life. Although it is difficult if not impossible to determine with precision the etiology of his neurological deficits, there is no doubt that they are present and significant.

233.   These deficits can well be the result of his mother's ingestion of alcohol or other neurotoxins during her pregnancy, head trauma he sustained during childhood and young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one or more of these factors. Gelene Dotson Barrett was stressed throughout her pregnancy with Kenneth Barrett, which she describes as "very difficult." She was in "constant pain,"

48

uncomfortable, and depressed.        She described her pregnancy as "battling with Mr. Barrett before he was born."

234.    Gelene Barrett drank throughout her pregnancy with Kenneth Barrett, unaware of alcohol's potentially devastating effect on a developing fetus's brain. Gelene's in-laws commented on her early alcoholism and stated she "was a drunk right out of high school."  After Kenneth Barrett's birth, he was breast-fed by his mother.

235.  Kenneth Barrett had a difficult infancy and "exhausted" his mother. His "days and nights were mixed up," and he "was colicky" and unable to be comforted.  He cried and fussed "all the time," making Gelene think all babies must be like him.  After she had her other two children and observed their development, she "realized something was wrong with Mr. Barrett."  Gelene received no help from her husband who acknowledged he "was not around the house much when Mr. Barrett was a little baby" but "he heard all about how hard it was to sooth him.

Kenneth Barrett was born with a large lump on the back of his head.

236.    Gelene Barrett faithfully recorded Kenneth Barrett's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital.  Although it appears that he met most of his three and six month milestones, he lagged in some.  At three months, Mr. Barrett did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched."  At nine months, Mr. Barrett did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave "bye-bye"

49

or play "peek-a-boo" instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say "ma-ma" or "da-da" or equivalent," or "make stepping movements when feet are touched to floor." He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play "pat-a-cake," or "show preference for one hand in reaching."

237. Kenneth Barrett early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyperactivity. Gelene Barrett recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active." Gelene described him as "a handful" who "could not be still" and "was more than hyper." An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still." Ada Blount, Mr. Barrett's maternal great aunt, agreed, describing him "as a hyper little boy who could not sit still." Ernie Barrett recollected that when Mr. Barrett "got a little bigger, he could not sit still. Even if I could get him to watch television, his feet were always moving, and he was bouncing." Janice Sanders, a maternal cousin, remembered that "Mr. Barrett was a hyper little boy, the most hyper child" she had have ever seen. Ms. Sanders also noticed that Mr. Barrett "had strong feelings," a common symptom of children who develop bipolar mood disorder.

238. Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children." Kenny Barrett "was extremely sensitive and

50

cried over every little thing from the time he was small until he was a grown man . . . . He would break down and cry easily." His cousin Kathy Trotter remembered that "back then we called Kenny hyper. He was erratic and temperamental. His mother reported that "any little thing could upset him, but it took a lot to calm him." Ernie Barrett also recognized that his son Kenny was "a sensitive little boy...who cried if you hurt his feelings."

239.    When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything." He had to have his stomach pumped twice when, on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax." Mr. Barrett's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot."

240.    Gelene Barrett was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to her son Kenny's impairments by punishing him. Gelene Barrett admitted that she decided "to be especially hard on Kenny because he went from one thing to the next" and "was never still." It "almost drove [her] crazy." She thought he "was emotional about things that did not matter. He would cry and scream like there was no tomorrow."

241.    Gelene Barrett physically punished Kenny Barrett by beating him with a thin belt and degraded him verbally. In his declaration, Ernie Barrett remembered that Gelene  Barrett "used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too." Gelene Barrett's niece by marriage,

51

Kathy Trotter "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to . . . kids was angry." Children were "afraid of her." Kenny Barrett suffered "more verbal abuse from her than her other two children."

242.    Kenneth Barrett's neurologic impairments and his chaotic home life took their toll on his school work. Gelene Barrett stated he "had a difficult time in school and was in special classes part of the time." Kenneth Barrett had difficulty almost immediately in school. He failed reading and arithmetic in the first grade and was barely able to keep pace with his peers. He had difficulty learning to read.

243.    Ernie Barrett "hardly had anything to do with [his son Kenny] after the divorce, and everyone could see how much it hurt Mr. Barrett." Even when Ernie made semi-annual trips to town to see his sons, family reported he was insensitive to his children's needs. He came "by to show off his new Corvette when his children did not have shoes or decent clothes to wear." Ernie's sister-in-law did not think Ernie was "a good husband or father. Ernie did not come around and visit his children the way he should have. He was absent in their lives. Ernie has always been for Ernie." Ernie Barrett "went his way and let Gelene take care of the kids."

Ernie Barrett remembered that his son Kenneth "kicked and screamed to stay" with him and "did not want to go with his mother back to Oklahoma." Kenneth Barrett "wanted to stay" with his father, but Ernie felt he "was not set up to take care of him and work."

244.    As viewed by her sister, Phyllis Crawford, Gelene Barrett's emotional needs took precedence over her son Kenneth's. Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected Kenny badly."

52

Gelene Barrett brought different men into the house when Mr. Barrett was entering his teenage years, and "it was very confusing for him." Kenneth Barrett's mother "seldom gave Kenny a kind word" and "screamed at him over anything." Gelene once asked her sister Phyllis Crawford to intervene and help her get Kenny Barrett out of his room. Phyllis and her husband, Roger Crawford, went to Gelene's house and talked to Ken. Ken Barrett told them "he could not get his mom's voice out of his head. The only time Gelene talked to him was to scream."

245.    Gelene Barrett's "ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability. She had a hard enough time dealing with her own needs, let alone having to deal with Mr. Barrett's hyperactivity and mood swings." Steve Barrett, Kenneth Barrett's youngest brother states that when his mother "lost control of herself," she whipped the boys, but "there was no real parenting." Gelene was harsher with Ken Barrett, "verbally and physically," than she was with her other two sons. According to Steve Barrett, their mother used a strap to whip Kenny and Kenny "hated" it. Mr. Barrett had a German shepherd that Ernie had given him, and the dog was very protective of Mr. Barrett. When Gelene "would try to beat" Mr. Barrett, he would hide behind the dog and the dog would growl at Gelene and not let her near him. The dog was run over by a car.

246.    Steve, Mr. Barrett's youngest brother, lived at home with Mr. Barrett, Richard, and his mother, but found refuge and support with the extended family.    Steve, an educator and principal at a junior high school, has given great thought to understanding how he "was able to overcome many of the challenges" he faced and "how those challenges affected Mr. Barrett." Steve and Kenny Barrett "were exposed to vastly different environments and experiences"

53

during their formative years due to Steve's much younger age.  Steve  benefitted from the guidance, support, and structure of an extended family that "Kenny never experienced in his developmental period."

247.    Mr. Barrett's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children.

248.    While Gelene Barrett's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for from his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Mr. Barrett was repeating eighth grade.  Steve Barrett was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson.

249.    Steve Barrett believes "another critical factor" is that "Ernie . . . abandoned Mr. Barrett when Mr. Barrett most needed him" but that Steve, at the age of two, had no real relationship with Ernie.  Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him] in their love and guidance."

250.    Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education."  "Kenneth Barrett "failed in school."  School became the focal point for Steve and provided "the value system" that was absent at home. Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had."

54

251. Gelene Barrett was unable "to have meaningful conversations about day-to-day problems, to figure out how to solve normal problems that arise in the course of everyday life, or to tolerate the routine activity of growing boys." Steve Barrett once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness." Gelene Barrett "did not know how to respond to Mr. Barrett's special needs as a youngster with profound psychological problems."

252. Mr. Barrett begged his father to allow him to live with him, and Ernie Barrett relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana," where Mr. Barrett tried to complete ninth grade. Kenneth Barrett resented his father's Ernie's then wife, Diana, and "it got the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest. Petitioner went flying, slamming against the wall." After his father's assault, Kenny Barrett went back to Sallisaw and soon withdrew from school.

253. Gelene Barrett knew that "Mr. Barrett never adjusted" after the family moved back to Sallisaw when Mr. Barrett was in the seventh grade. Kenneth Barrett "got pretty depressed and lost interest in school." Kenneth Barrett's youngest brother Steve realized that Mr. Barrett "idolized Ernie." Steve Barrett could tell "how much Kenny missed [their] dad by the way he acted when Ernie was around him. Kenny made sure to stay in close proximity. . . Ernie was a god to Mr. Barrett." Extended family members knew that "Kenny never had much of a father," and "never had any guidance."

254. Kenneth Barrett had "a hard time with lessons" and repeated the eighth grade. In the fall of 1976, at the age of 14, Kenneth Barrett enrolled in eighth grade for the second time at

55

Tommy Spear Junior High in Sallisaw. Kenneth Barrett was placed in special education classes in English and staff made "some adjustments to the curriculum" for him.

255. It was a very difficult year for Kenneth Barrett, whose beloved grandmother, Ada Mae, died in 1976. According to Kenneth Barrett's cousin Kathy Trotter, Ada Mae "adored" him, and "[w]hen she died . . . Kenny was just 14. Kathy Trotter states, "It was as if the only adult who ever cherished him had gone."

256. Kenneth Barrett moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976. His grades declined in three of the five subjects (general math, comm arts, and life science). Ken Barrett returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time."

257. When Mr. Barrett was 17, he was assaulted and beaten by Sallisaw police officer John Philpot, who hit Mr. Barrett so forcefully, it broke Officer Philpot's hand. The assault had long term consequences on Kenneth Barrett who could not understand the reason for the assault. Kenneth Barrett had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars." The incident only added to Kenneth Barrett's already burgeoning paranoia.

258. The traumatic impact of the assault on Mr. Barrett – then a youth with manic-depressive illness and brain damage. – affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him.

56

259.    Kenneth Barrett entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits.  According to his mother, Kenneth Barrett battled "terrible mood swings" and periods of depression that lasted for days.  He hoped that hard work would make his pain go away.  It did not.

260.    Kenneth had worked steadily since he left high school, and "his bosses liked him."  He was "a good worker, strong, and able" and was "proud of his work."  By the time Kenneth Barrett was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

261.    Kenneth Barrett married his wife Abby in 1980 when he was 19 and she was almost 16.  Kenneth and Abby's only child, Toby, was born December 1, 1980.

262.    Kenneth Barrett and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other."  Kenneth Barrett "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene Barrett for the first few years of their marriage.  Kenneth Barrett's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs.

Kenneth Barrett's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment.  Abby Barrett reported that "Gelene made Kenneth Barrett get up from bed and party with crack and pot."  Kenneth's mother Gelene never treated "her other sons the way she treated Kenneth Barrett."  His mother

57

Gelene and Kenneth Barrett had a "terrible relationship."

263.   Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated."  Kenneth Barrett tried "to bury his problems under constant work and activity."

264.   Kenneth Barrett measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own.  Depressive episodes overtook him, and he would "get real depressed and sleep all the time."   Abby Barrett observed that the only antidote to his depression was drugs.  Abby knew that Kenneth Barrett "smoked a lot of pot, but without it he never got motivated.  He turned to drugs to make himself feel better."  He used methamphetamine as an antidepressant and discovered that he could work well under its influence.  Abby observed that Kenneth Barrett "would work hard and then sleep all the time. . . .[He] did the drugs to make himself feel better, because otherwise he would just sleep."

265.   Kenneth Barrett's behavior easily fit the pattern of bipolar mood disorder, and his family knew he was "deeply troubled."  (Exhibit 86.)  Kenneth's wife thought he was "like a manic depressive, hot one minute and depressed and even immobile the next."  He had "racing thoughts," did things without thinking, and "then regretted them."  Abby knew that Kenneth Barrett "did not act the way normal people act" and that he "got swept away in his emotions."  When Kenneth Barrett lost control of himself, he hit Abby and later "would come back crying, begging" Abby to take him back.  He was genuinely "remorseful" and would "be good as he could be—he would go the extra mile, . . . but he could not keep it up."

266.   Kenneth Barrett's cousin, Brandy Hill, recognized Kenneth Barrett's bipolar

58

mood disorder created severe problems for his marriage.  Brandy compared Kenneth Barrett's behavior to her own behavior and reported that her "mood swings" made it "hard" on her husband because she "used to attack him, kind of the way Kenneth Barrett and Abby fought."

267.    Kenneth Barrett and Abby separated and reunited frequently; his mood fluctuations and deep depressive episodes made him irritable, agitated, paranoid, and suspicious.

268.    During one of the separations, he went to his father's home where Ernie found work for him.  Ernie Barrett described his observations of the effect of Kenneth Barrett's mental impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic, always on the go and upbeat.  Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it.  In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me.  I got him a job with Kerr Glass and he was making real good money.  Kenny Barrett had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve.

(Exhibit 81.)

269.    Abby knew that Kenneth Barrett "had mental issues" and tried to persuade him to seek psychiatric treatment.  Abby recognized that she "was the only stable thing he ever had in his life" and that she "kept him together."

Abby opposed his drug use but stayed with him in their fitful marriage to try "to keep him from falling off the deep edge."

270.    Kenneth Barrett's brother Steve testified, "[a]s troubled as Kenneth Barrett was,

59

he worked all the time."

271.    Kenneth Barrett's use of drugs allowed him to keep working, despite his serious

mental illness.  Kenneth Barrett increased the amount of drugs he ingested in direct response to

the symptoms of depression he experienced; his goal was very simple.  He needed

methamphetamines in order to work.

272.    In 1986, Kenneth Barrett attempted suicide and nearly succeeded in killing

himself with a shotgun blast to his chest.  Kenneth Barrett's brother Steve was home at their

mother's and witnessed Kenneth Barrett's suicide attempt:

> In a terrible episode of depression, he tried to kill himself.  I was home with
> Monty and Podgy in the living room watching Carl Sagan kind of stuff on
> television.  Kenneth Barrett came in to borrow my 12-gauge that Dad had lent me.
> It was loaded with 00 shot. I looked out and I saw Kenneth Barrett leaning against
> the truck, but I didn't see the shotgun. I don't remember hearing the actual shot,
> but I must have. Mom and Paul were in bed sleeping. I woke them up and told
> them to call an ambulance, and then I went outside. You couldn't see the hole all
> the way through because of the wadding. . . .Kenneth Barrett was in and out of it,
> mumbling, making no sense.  Kenneth Barrett was in ICU in Sparks Medical
> Center in Fort Smith for 11 days.

(Exhibit 99.)

273.    Abby Barrett convinced Kenneth Barrett to see a psychiatrist after he survived the

shooting, and he briefly took Elavil and Ascendin.  Kenneth Barrett's dramatic mood swings

continued to be "like a roller coaster."  Elavil was extremely helpful and made a big difference in

Kenneth Barrett, but he discontinued his treatment.

274.    Kenneth Barrett continued to decline and was involuntarily committed to Eastern

State Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic

60

alcoholism or drug abuse" that created "an immediate likelihood of serious harm to self or others." The admitting psychiatrist provisionally diagnosed Kenneth Barrett with "depressive neurosis with suicidal potential extremely high." The nursing assessment reported that Kenneth Barrett did "not recognize problems." Kenneth Barrett had a nine year history of polysubstance abuse at the time. Kenneth Barrett hand wrote on a printed questionnaire, "I wish I was back home in the woods."

275.   On the mental status examination, Kenneth Barrett was noted to be "labile" and to laugh "inappropriately at times." His insight and judgment were impaired. Staff found Kenneth Barrett to be "courteous, cooperative." Kenneth Barrett acknowledged that he had "a hot temper." Kenneth Barrett's highest level of functioning in the preceding year was "poor." He reported being anxious and depressed. He was paranoid and blamed his wife and mother for his being hospitalized. Kenneth Barrett was discharged early on October 17, 1986 to his cousin. His discharge summary noted he "wants to return to work." Kenneth Barrett was not able to return to work.

276.   Kenneth Barrett sustained repeated head injuries from his work and from car accidents. Ken Barrett was preoccupied and distracted by depression and mania and unable to focus his attention. Petitioner Ken Barrett applied for disability due to his mental impairments, and was denied but evaluators found him to be "moderately depressed" and periodically unable to "think clearly."

277.   Petitioner made repeated trips to the hospital after falling down stairs, sustaining a contusion to the right periorbital region of his head, being involved in a motor vehicle accident,

61

experiencing rib and chest pain, and suffering a rash "all over."

278.   When Kenneth Barrett's marriage ended after 14 years, he "never recovered." Ken Barrett and Abby Barrett had wanted the marriage to work for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and severe mood swings that came at unpredictable times and derailed their lives.

By the end of their marriage, Abby "felt like [they] were more like brother-sister than wife and husband because [she] was always bailing him out of trouble and taking care of him" and "trying to keep up with his mood swings."

Kenneth Barrett was too impaired to take care of Abby, and she recognized that "he was mentally ill." It pained Abby to leave Kenneth Barrett because "[t]here were times he could be good. . . .and would try so hard to be good." She also knew that "he could not function without her."

279.   After their final separation, Kenneth Barrett spiraled downward, as Abby had predicted. His multiple impairments made it impossible for him to function independently. He was hospitalized January 20, 1995, given "10 mg of Haldol IM," and diagnosed with bipolar mood disorder after telling hospital staff,     "I'm losing my mind." Hospital staff noted he was "extremely agitated."

During his three day hospitalization, staff reported he was "very agitated" and not able to sleep "for a few days." He demonstrated "lack of concentration" and "rapid thought process." Kenneth Barrett was discharged to his mother with "outpatient follow-up at the Bill Willis Community Mental Health," but he did not follow through.

280.    Kenneth Barrett "moved back home" and "built a little shack" next door to his mother's trailer.  His brother visited it and observed that the shack was "almost Waldenish in its own way."  The shack was constructed from discarded and used materials, did not have electricity or plumbing and only had "the essential stuff."  Kenneth Barrett "ran an electrical cord from (his mother Gelene's) trailer to his shack for electricity."  Gelene prepared his meals for him, and he ate at her trailer.

281.    Kenneth Barrett's son, Toby, visited often, but knew that his father had "some problems inside his head" and "always thought he had a chemical imbalance."  Even as a teenager, Toby "knew something was wrong with him because he had mood changes that were not normal."  Toby observed that his "dad could be in the best of moods one minute, then the worst" and was "a very paranoid" and "a very scared person."

282.    Everyone in the family and Kenneth Barrett's ex-wife knew he could not "live on his own."  During Ken's and Abby's frequent separations, "Kenneth Barrett always came home" to his mother.  An aunt explained that Kenneth Barrett's "only security was with Gelene because he did not have anybody else" to care for him.

283.    Kenneth Barrett's son who had to come to terms with his father's mental illness "had to bring things to him" after his father "stopped leaving his property."  Gelene Barrett "knew [Ken Barrett] had serious mental problems" but "hoped if he lived close to [her] and just worked on his cars and fixed things for people, he might be able to make it."  Ken stayed more and more to himself and became more and more paranoid, but he was not a loner at all because many friends visited him.

284.   Kenneth Barrett told a neighbor, Alvin Hahn, "he thought there were satellites watching him."

285.   As Kenneth Barrett's paranoia increased, so too did his dependency on family. His friends knew his paranoia was in full force and was the reason he "hardly left his property for several years."  Ken Barrett's aunt Phyllis understood that he "was never able to be independent as a grown man.  Mr. Barrett's emotions got in the way of his being able to live too far from home."  His aunt, Phyllis Crawford, described an incident that explained how Mr. Barrett relied on family when his emotions overcame him:

> [A] couple of years before the incident, Kenneth Barrett had run to my house in tears, crying,  "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenneth Barrett had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail.

(Exhibit 91.)

286.   Despite the limitations created by his mental impairments, Kenneth Barrett "would give you the shirt off his back if you needed it."  He "tried to stay close to home, always worked hard and took pride in his work."  Kenneth Barrett's family and friends uniformly reported that Kenneth Barrett was not violent or dangerous to them.  His great aunt Ada Blount stated, "I never felt threatened by Kenny.  He did not bother me any, but I worried about him."  Janice Sanders, his cousin, grew irritated and impatient with Kenneth Barrett on more one occasion for playing his music too loud and called the police to Kenneth Barrett's, but she loved Kenneth Barrett and "was never afraid of him."  Kenneth Barrett's maternal aunt Ruth Harris

64

found him to be "sweet person, nice, and respectful" whose drug use "may have hidden his mental illness." Ruth and her husband, who visited Kenneth Barrett "to talk about the Bible and how he could straighten out his life" were "never afraid of him" and did not "believe he would intentionally hurt anyone."

287. Relatives visited and talked with Kenneth Barrett. His second cousin Nona, who "got along wonderfully" with him counseled him about religion. Nona described the last conversation she had with Kenneth Barrett:

> The last conversation I had with Kenny was in 1995-96 when my husband at the time and I visited Gelene. Kenny came by to visit. It was clear to me that Kenny was studying life and thinking deeply, trying to figure things out. I remember he said, "'Aunt Nona, how do you know there's a God?" I took him to the window and said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says we should worship God in spirit and we will see His truth.

(Exhibit 101.)

288. Friends and family thought at times Kenneth Barrett would be alright. A friend and neighbor reported that "Kenny had a reputation in the community as an excellent mechanic who was fair." A cousin, Brandy Hill, remembered that "Kenny was very generous, and his auto repair business was getting more solid every day. People would pay him hundreds of dollars in cash to replace an engine or a transmission."

289. Despite Kenneth Barrett's mental illness, his son Toby had "a lot of fond memories of . . . going canoeing, and helping him work on cars." Toby was intimate with his father's fears but knew that father "was not dangerous," and Toby "was not afraid of him." Toby thought that Kenneth Barrett "did the best he could" and saw that his father "had a tender side to

65

him" that helped "offset the pain of having a dad with mental problems."

290.   The family hoped that Kenneth Barrett could recover.  His mother described their observations:

> As time went on, he did a little better, built a garage and fixed everything from appliances to cars, trucks, and trailers for friends and neighbors.  He stayed more and more to himself, though, and did not like to leave the property.  Friends bought him food and went grocery shopping for him.  He ate most of his meals at my trailer, and I cooked for him.  I hoped and prayed he was going to make it.  At least, I believed, with him living right next door, he was safe and I could keep an eye on him.  We had our arguments; that's for sure.  He was so paranoid and crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Exhibit 97.)

291.   Both father's and mother's sides of Kenneth Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family.  Kenneth Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children.

292.   Kenneth Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse. These factors likely potentiated Kenneth Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

293.   An expert presented with the available background data would have informed the jury that Kenneth "Barrett's own genetically based potential for developing a mental illness was

66

significantly increased by the circumstances of his upbringing, especially his parents' chemical dependency."

294.    Mr. Barrett's parents' dependency and their different, unpredictable behaviors while intoxicated, further compromised Kenneth Barrett's ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate perception of social cues and interpersonal interactions.

295.    Ernie Barrett was frequently physically absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered emotionally distant and neglectful by her intoxication.  These behaviors left Kenneth Barrett's parents ill equipped to develop the primary attachments or provide the basic physical and emotional nurturing necessary for a young child's normal, healthy neurocognitive development.

296.    As Dr. George Woods explains, research published by the National Academy of Science documents the impact of such parenting on a child's developing brain:

From Neurons to Neighborhoods, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that affect the developing brain. They also determined that chronic stress is detrimental to the normal development of the brain. ***

[¶]    Parental neglect of the type suffered by Kenneth Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the longest term and most pernicious effects of all such early traumatic experiences.

[¶]    The brain is only starting to grow, mature, and differentiate at the time of birth.  Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated. The newborn child's interpersonal and environmental experiences determine the

rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment.  The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Kenneth Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

(Exhibit 117 at ¶¶ 33-35.)

297.    Documents and family history also present experts with data that are important to understanding what chemical and other physical insults touched Kenneth Barrett's development. His mother drank when she was pregnant with him.  Alcohol use during pregnancy is known to be associated with abnormal brain development and brain dysfunction.

298.    The history of maternal drinking of alcohol during pregnancy and Kenneth Barrett's cognitive and behavioral impairments are consistent with fetal alcohol syndrome, a possible condition worthy of further exploration.

299.    Kenneth Barrett's brain continued to be affected by alcohol and other drugs in adolescence and young adulthood.  His father initiated his drinking at age seven, and drinking and drug use, modeled by his parents, continued from there until it included a vast array of substances and prolonged exposure.  Research informed mental health clinicians that childhood and adolescent intoxication has damaging neurological consequences.

300.    Kenneth Barrett's chemical dependency history is consistent with the high incidence of substance use secondary to the increased neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar disorder. Kenneth Barrett's combination of traumatic stress and bipolar disorder predisposed him to chemical dependency.

301.    PTSD and bipolar disorder each have a co-occurring incidence with chemical dependence greater than 40% in the clinical literature.

302.    Jurors would want to, and have a right to, know whether there were signs that these sources of trauma and potential impairment had an effect on the young Kenneth Barrett. Records kept contemporaneously, when considered by clinicians, showed evidence of harm.

303.    As a child, Kenneth Barrett exhibited signs of impaired neurological growth, failing to meet developmental milestones expected of healthy infants.    During his first year, Kenneth Barrett exhibited increasing delays in areas associated with creating interpersonal relations and emotional development.

304.    Dr. George Woods testified by declaration and at the hearing as he or a similarly qualified expert would have testified at sentencing, that:

> Kenneth Barrett failed reading in the first grade, was required to repeat the eighth grade and was eventually referred to special education classes before he dropped out of school in the ninth grade.  By pre-adolescence his hyperactivity, irritability, isolation, and impaired academic functioning introduced the prodromal symptoms associated with major mood disorder.  He became more hyperactive, intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally decompensate without apparent provocation.

(Exhibit 117 at ¶¶ 38-39.)

305.    The life history information that was available to trial counsel includes evidence of other sources of trauma that placed Mr. Barrett at risk for organic brain impairment.  He was hit in the head with a steel ball when he was eight or nine years old; at age 17, Johnny Philpot beat Kenneth Barrett about the face and head, including a blow that broke his jaw; in his early twenties, he was involved in motorcycle accidents; at age 24, he shot himself in the chest with a

shotgun.  *Id.*

306.    As explained by Dr. Myla Young in her sworn declaration:  "The hallmark of Kenneth Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex."

307.    The prefrontal cortex is responsible for executive functioning, which allows an individual to think and reason; solve problems; adapt to circumstances; accurately receive, process and organize information; make rational decisions; and, based on the information that is received, adapt behavior based on experience and make appropriate choices of action.

308.    More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Kenneth Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

309.    Dr. Myla Young's findings submitted by declaration and available at the time of sentencing and testified to by a similarly qualified neuropsychologist are based on approximately 16 hours of neuropsychological testing, including intelligence testing, a clinical interview including the taking of a history, review of educational records, and a review of psychiatric and

70

medical records.  The objective testing and historical study performed by Dr. Young constitutes an accepted, reliable method for assessing cognitive function.  Based on the historical data available at the time of trial and the scientific literature, Dr. Young opines that the damage to Kenneth Barrett's prefrontal cortex likely stems from abnormal prenatal development, traumatic brain injuries Kenneth Barrett suffered, and drug abuse.

310.    Like any other person, Kenneth Barrett has areas of weakness and areas of strength in the many brain functions evaluated by a neuropsychological test battery.  However, testing shows Kenneth Barrett, is and was at the time of the offense, impaired in some areas which means that he functions at a level below the average person, and sometimes far below.

311.     Kenneth Barrett's hypergraphia is consistent with the finding of  has temporal lobe dysfunction.

312.    The testing data and congruent findings on psychiatric study show Kenneth Barrett experiences dysfunction in areas of his brain

a.    that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity;

b.    interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information;

c.    directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing;

71

d. monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing the use of working memory resources;

e. directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved;

f. directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage;

g. regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing.

313. Kenneth Barrett suffers significantly impaired functioning in all these domains. In less scientific terms, Kenneth Barrett has brain damage that makes him less able than a normal person to process information and formulate a rational response.

314. Kenneth Barrett's temporal cortex is also damaged or otherwise dysfunctional, and in ways that complement (aggravate) his other impairments, as they relate to culpability in the death of Trooper Eales. The temporal cortex controls verbal and visual memory, as well as learning, interpreting and processing speech and the emotional tones and meaning in speech. The temporal cortex is also responsible for processing visual information. Dysfunction of the

72

temporal cortex is associated with, among other things, amnesia, fear, paranoia, impulsivity, and outbursts of aggression.

315.    Based on Dr. Young's findings and his own assessment, psychiatrist George W. Woods, Jr., M.D. concludes that:

a.  Kenneth Barrett experiences dysfunction in the areas of the brain that are necessary to sound reasoning, judgment and planning.  That is, "Kenneth Barrett . . . suffers from a Dysexecutive Syndrome, which would be categorized on Axis III" of the DSM-IV-TR™.

b.  In other words, Kenneth Barrett's ability to accurately and appropriately process, retain, integrate and respond to information and events as they unfold is significantly compromised.

c.  The areas in which Kenneth Barrett experiences impairment make understanding his functioning a necessary part of understanding him as a unique human being trying to get along in the world, and for understanding the events of September 24, 1999.

d.  The problems Kenneth Barrett has experienced from organic brain impairments are compounded and exacerbated by severe psychiatric illness.

e.  Kenneth Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.

f.  Kenneth Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

73

316.    As Dr. Woods states it, Kenneth Barrett's cognitive functioning and behavior "is severely compromised by overlapping symptoms of depression and mania ... and impairments in [the] higher cortical regions necessary for inhibition, reasoning and judgment."

317.    The development of Kenneth Barrett's bipolar disorder was strongly influenced by his familial predisposition to this and other mental illnesses.  Kenneth Barrett comes from a family plagued with bipolar disorder.  The onset of his organic brain damage can likely be traced not only to early head trauma, but his mother's drinking while pregnant, and other factors.

318.    Dr. Woods explains that people with frontal lobe damage, and people with Bipolar Disorder share suffering in significant areas of daily functioning.  "Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become [sic] incorrect."

319.    Kenneth Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

320.    Kenneth Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses.  Kenneth Barrett's personal and family history, is replete with incidence of major mental illness, including Bipolar Disorder.  A qualified clinician would have explained the significance of this remarkable history to jurors.

　　　　a.    Although the severity of damage to the frontal and temporal lobes

74

of Kenneth Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult.  The consistent pattern of impaired cognitive functioning observed since Kenneth Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

b.      The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

c.      Kenneth Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Exhibit 117 at ¶¶ 63-65.)

321.    Dr. Woods further states that "Ample anecdotal and congruent documentary evidence confirm that Kenneth Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial."

322.    If trial counsel had informed themselves regarding Kenneth Barrett's history, and consulted relevant experts, the jury too would have been informed that

a.  Kenneth Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.

* * *

75

b.  Kenneth Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder.  The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Kenneth Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

c.  Kenneth Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Kenneth Barrett had multiple individual stressors which qualified for a stressor that was life threatening.  Over the course of his life, he had been beaten multiple times by his caregiver and the police.  He had shot himself in the chest, at close range, almost losing his life.

d.  He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid.  Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Kenneth Bartlett's reality, raising his traumatic thinking to a psychotic level.

e.  Kenneth Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

f.  Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction.  This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

g.  Kenneth Barrett's chronic PTSD had now become acute, faced with a new stressor.  Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

h.  Kenneth Barrett's bipolar disorder was, at this point in his life, at its most extreme.  He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce.  Kenneth Barrett had become increasingly withdrawn, by everyone's account.  He reported to me that the years from his divorce and the raid on his home were the darkest of his life.  He was self medicating more heavily than ever before.

i.  Kenneth Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Kenneth Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property.  This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation.  His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

j.  My belief that Kenneth Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Kenneth Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Kenneth Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Kenneth Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

323.    Trial counsel had available to them some resources for obtaining mental health evidence to present in mitigation.  If trial counsel had contacted Dr. Bill Sharp, who had done a preliminary evaluation during the state-court proceedings, he would have been able to rely upon the additional social history data and neuropsychological findings.  (Exhibit 55 at ¶ 16.)  Dr. Sharp concurs in the findings of Dr. Young and Dr. Woods.  (*Id.* at ¶ 23.)

324.    Dr. Sharp states,

Taking the social history information into account and Kenneth Barrett's assessment by myself, Dr. Young, and Dr. Woods, a jury could conclude that

> Kenneth Barrett's response to the raid on his property was impulsive and not thought-out, similar to person being surprised in the night by an unexpected phone call or alarm clock. In general, someone in those circumstances will experience some disorientation and difficulty understanding events. For someone with Kenneth Barrett's mental impairments those experiences would be magnified many times over. For a normally functioning person to understand how Kenneth Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

(*Id*. at ¶ 24.)

325. Dr. Pablo Stewart, or an equally well experienced and credentialed psychiatrist specializing in substance abuse, could have and would have testified at sentencing to the addictive nature, and the adverse pharmacological effect, of methamphetamine on perception, judgment, discernment and volition.

326. Armed with the available mitigating information, trial counsel would have been able to persuade the jury on multiple fronts including the mitigating facts or circumstances of the offense.

327. The evidence produced at trial and sentencing and postconviction leaves room for the mitigating impact of doubts about the truthfulness and motivations of the prosecution's informants having shown that:

a. doubts about the need for a no-knock warrant (including whether Kenneth Barrett could have failed to appear for a trial that was not going to happen);

b. the inappropriate nature of the raid and the tactics that call into doubt whether Kenneth Barrett could have seen that his attackers were law enforcement officers, especially in view of the inconsistent, contradictory, potentially perjurious testimony by law enforcement

78

regarding whether the emergency or any lights were engaged at the time of entry onto Mr. Barrett's property;

c. that the Tact Team recklessly approached a man who was hyper-reactive, who had been suicidal, who was extremely paranoid, and whose teenage son was threatened;

d.that Kenneth Barrett had pre-existing, organically induced impairments in the abilities to solve problems, the ability to engage in goal-directed behavior, the ability to plan strategically, the ability to anticipate the consequences of his actions, the ability to see the "big picture," and the ability to be mentally flexible rather than rigidly persist in an action that new information indicates is inappropriate;

e. that apart from the conditions existing at the time of the offense, Kenneth Barrett grew up in an environment of alcoholism, violence, selfishness, abuse, and neglect;

f. that he struggled to overcome the burdens of his background and mental impairments but in doing so fell into drug abuse that exacerbated these problems.

328.    Children of alcoholic parents are at higher risk for developing drug dependence than are children of non-alcoholic parents. Increased risk is due not solely to genetic predispositions but to environmental factors including modeling by custodians, neglect, early child abuse and poverty. The alcohol and substance abuse of one family member often influences the alcohol and substance abuse behavior in other family members and understanding these complex relationships. The Barrett family perpetuated multigenerational alcoholism and addiction, at least partly in response to pressing mental health symptoms not otherwise ameliorated by proper intervention and care.

79

329. The inaccurate, incomplete and misleading portrayal of Kenneth Barrett and his background and character given by the extremely superficial and unprofessional "mitigation case" that was placed before the jury was the prosecutors in closing arguments.

330. Because of trial counsel's professionally unreasonable failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Kenneth Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance. (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22).

331. Because the jury never learned of Kenneth Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Kenneth Barrett as a prime candidate for the death penalty.

332. Going down the list of the few, bare-bones mitigating circumstances that were instructed upon based on the evidence presented, AUSA Littlefield noted the jury had been told Kenneth Barrett was simply a "father," which involved no more than a biological process. Left unsaid was what kind of father he was. The prosecutor also ridiculed the claim that Kenneth Barrett was a loved son and stepson, remarking that what was missing was any feelings Kenneth Barrett had for his parents. It was pointed out that Ernie Barrett had not seen his son for two years before the shooting of Trooper Eales, and that his stepmother had only had contact with him after he was in jail. As to Kenneth Barrett's relationship with his mother, Gelene Dotson, the prosecutor pointed out that they had a tumultuous relationship with frequent arguments,

80

fights and threats between them.  Kenneth Littlefield remarked that Kenneth Barrett's parents cared so much for him that they could not tell the difference between him being "hyper" and being "hyped up" on drugs.  As to Kenneth Barrett being a good neighbor and friend, the prosecutor reminded the jurors that all they heard was that he fixed cars cheaply.   Dismissing the mitigating circumstance that Kenneth Barrett's execution would have an impact on his child, family and friends, the prosecutor was quick to point out that since Toby Barrett had not testified, there was no evidence that Kenneth Barrett's death would have any negative impact on his own child.  Indeed, the only testimony regarding the impact of Kenneth Barrett's execution on his family came from his stepmother, Doris Barrett, who would no longer be able to visit Kenneth Barrett in prison.  Making short work of the claim that Kenneth Barrett had expressed remorse, Littlefield told the jury that Kenneth Barrett only told his mother that he wished things had turned out differently.  This ambiguous statement was used as a springboard for the prosecutor to argue that by this, Kenneth Barrett simply meant that he was sorry he had gotten caught and was prevented from "killing more of the bastards."  Finally, the "catch-all" instruction on any other factors the jury might find to be mitigating opened the door for more negative characterizations of Kenneth Barrett, whom the prosecutor described as having dropped out of school because he did not want to get a haircut; as a user and seller of methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that he allowed him to remain on the property knowing full well that a police raid, which was going to be met by lethal force, was imminent.

333.    Since virtually nothing of Kenneth Barrett's background, history and upbringing

81

was placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Kenneth Barrett.

334.   Picking up the theme that Kenneth Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.

335.   Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."

336.   Kathy Trotter was dismissed as a witness who knew very little about her cousin, Kenneth Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.

337.   Kenneth Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Kenneth Sperling contrasted Kenneth Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."

338.   Government prosecutor Sperling pointed out that Kenneth Barrett had only sporadic contact with his mother until his arrest, hinting that he was a bad and neglectful son.

82

339.    Ernie Barrett, being the good father that he was, gave Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow] them."

340.    Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication being that her loyalty was more a tribute to her than anything positive or redeeming about Kenneth Barrett.

341.    Whatever Kenneth Barrett had done for his family was vague and undetermined, and was in any event far outweighed by the crimes he had committed.

342.    If the jurors were tempted to feel any sympathy for Kenneth Barrett's family at all, they should remember that Kenneth Barrett abandoned his family by his own conduct.

343.    Prosecutor Sperling stated that Kenneth Barrett had "victimized" his own family by making them serve as "props" or witnesses on his behalf in the penalty phase.

344.    Concluding his remarks on Kenneth Barrett's mitigation case, Sperling told the jury that Kenneth Barrett had paid for his membership among "the worst of the worst."  Kenneth Barrett was simply a murderer who had killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for his victim.

345.    Despite the mania and paranoia, the hypervigilence, hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local sheriff and Sallisaw City police chief, all knew that Kenneth Barrett would have gone peacefully into custody if someone he knew had simply asked him to.

346.    In the 2255 postconviction proceedings, Dr. George Kirkham, a criminologist, sworn law enforcement officer and expert in police tactics (Doc 50

at ), which, if heard by the jury at trial and/or sentencing would have been mitigating.

347.    Dr. Kirkham, or a similarly qualified expert, could have and would have testified that the raid on Mr. Barrett's home

a. violated – indeed, was converse to – established law enforcement standards and procedures in that it relied upon force and aggression before any other methods were explored;

b. was carried out in a way that minimized the chances of Mr. Barrett having visible evidence that his attackers were law enforcement officers and no audible evidence of law enforcement's presence;

c. was carried out in a way that trained law enforcement officers would expect to provoke a violent response from the target; and

d. unnecessarily exposed Troopers Hamilton and Eales to gunfire from the cabin and other law enforcement officers.

348.    Dr. Kirkham, or a similarly qualified expert, called to testify at trial and/or sentencing would have explained how Mr. Barrett's perception of the these things are just as true if the jury credited the testimony of the Government's seven informants, as they were when the second state court jury, without the testimony of those witnesses, acquitted Mr. Barrett of first-degree murder.

349.    That is, with expert assistance, Mr. Barrett would have been able to show that at a minimum there was a residual doubt that Mr. Barrett did not have the intent to kill law enforcement officers, or, at a minimum, that there was every reason to doubt the Government's

84

claim that he had such intent.

350.    Dr. Kirkham could have and would have explained how the poorly planned and executed raid on Mr. Barrett's property was tailor made to exacerbate the impaired judgment and perceptions of Mr. Barrett and invited a misunderstanding and over-reaction by Mr. Barrett.

351.    Jurors at the second stage or trial would have had ample grounds to vote for a sentence less than death if they had known of the errors made in deciding upon, planning, and conducting the ill-fated attack.

352.    Paul Gordon, former Internal Affairs Investigator for the Oklahoma Highway Patrol, well qualified and experienced in investigations was available to testify and would have testified to the following mitigation:

a.  That he was called to the scene at Mr. Barrett's residence on September 24, 1999 shortly after the fatal attempt to execute the search and arrest warrants in question.

b.  That he spoke to Lt. Kerry Pettingill who told him that when everything started he thought it was his men (OHP East Tact Team and DEA agent liaison Danny Oliver) who started shooting at the Barrett cabin as they rolled up on it.

c.  That during the course of his investigation of the incident, it was clear that (1) the East Tact Team of the Oklahoma Highway Patrol had failed to follow appropriate protocol in the execution of the warrants at the residence of Kenneth Barrett on September 24, 1999; (2) neither the Oklahoma Highway Patrol nor the Oklahoma State Bureau of Investigation desired or pursued a through objection investigation of the incident and events following the incident; and that his efforts to conduct a thorough objective investigation of the incident resulted in attempts

85

by the State of Oklahoma to undermine the investigation and his ability to credibly conduct and report the same.

d. That on the afternoon of September 24, 1999, with the exception of Trooper Ricky Manion who shot Kenneth Barrett, all of the involved troopers denied firing their weapons and none were willing to give up their state-issued weapons for analysis and testing, despite being routine in any officer-involved shooting;

e. The investigation made clear that the OHP East Tactical Team failed to follow the OHP handbook protocol, at the very least in that the lead Bronco vehicles were unmarked and the troopers did not activate their emergency lights to warn Barrett he was dealing with the police.

f. When 2d Lt. Gordon arrived at the shooting scene on September 24, the vehicle that was fired upon had its visor flip and emergency lights in the up position as were Lt. Pettingill's, the team leader.

g. During the investigation, 2d Lt. Gordon asked Trooper Hamilton specifically about the lights. At first, Trooper Hamilton said the emergency lights were down.

h. When confronted with the fact that the flip lights would have been shot up if they had been down, Trooper Hamilton admitted that they did not activate the lights; in fact that they did not have any lights on at all – a circumstance consistent with executing an anytime, no knock warrant.

i. OHP Trooper Hash, who was in a marked unit, also claimed he drove onto the property with his lights and his flashing bar on but ultimately admitted that someone flipped the lights on

86

after the shooting to give needed light during the wounded troopers' evacuation;

j.  Under the circumstances admitted to and observed by Investigator Gordon, Mr. Barrett would not have known the incoming vehicles were law enforcement

k.  Mr. Barrett would not have seen the other vehicles approaching from the side because when he reportedly was outside the residence, he was on the porch looking where his son was yelling for help.

l.  The physical evidence and interviews made it clear that Mr. Barrett never left the porch and never went into the yard and that he only responded to the first tactical vehicle when it was accelerating towards the front of the residence, after making a circle in the yard from the side of the cabin.

m.  The vehicle then ran or slid into the front of Mr. Barrett's cabin, stopping with engine still running. Barrett was on the porch, shooting at the vehicle from a 45 degree angle, slightly elevated position and hit the vehicle's transmission lines which, under engine power, caused a major transmission fluid leak that emptied the transmission fluid onto the ground exactly where the vehicle originally stopped and the shooting occurred.

n.  The OSBI with the assistance of OHP Vernon Phillips,  inappropriately processed the Eales /Hamilton vehicle at the place where the vehicle had been moved, rather than where it had been positioned during the shooting.

o.  Neither the scene nor Mr. Barrett were handled by law enforcement in the manner in which they would have been had there been any red phosphorous on Mr. Barrett's person.

p.  Mr. Barrett's property was thoroughly searched the morning of the of the shooting and

87

nothing which indicated drug activity was observed or reported to Investigator Gordon.

q.  Mr. Barrett was not suspected of drug manufacturing at his residence but was suspected of being an enforcer, i.e., of facilitating sales of drugs between buyers and sellers who did not want to deal directly with each other;

353.    Properly interviewed and prepared for trial and/or sentencing, Paul Gordon's testimony would have been mitigating, at the very least, giving the jury significant reason to sentence Mr. Barrett to less than death.

354.    After hearing the evidence and observing the defendant's own conduct, the jury unanimously found that the defendant was not likely to commit future acts of violence.

.    355.    The Government's case for death was not overwhelming.

356.    The jury rejected the death sentence on Counts 1 and 2.

357.    The statutory aggravating circumstances the jury did find with respect to Count 3 all revolved around the circumstances of the commission of the offense which would have been viewed in an entirely different way had counsel presented the jury with the mitigating testimony of Internal Affairs Investigator Paul Gordon and presented an expert such as George Kirkham.

358.    The prosecution's penalty phase case did not indicate much additional "moral egregiousness" above and beyond the circumstances of the crime itself.

## II.    PROPOSED CONCLUSIONS OF LAW

1.    Trial counsel Hilfiger and Smith unreasonably delayed preparation for the penalty phase. Although Mr. Echols had been adamant that the work done in state court was incomplete and inadequate, Mr. Hilfiger and Mr. Smith did not begin the process of completing that work

until mid-August 2005.

2.      The prevailing professional norms of criminal defense practice in general and capital defense in particular required Mr. Hilfiger or Mr. Smith to advise Mr. Barrett of the risks and benefits of trial strategies "[a]fter informing himself . . . fully on the facts and the law." ABA Standard 4-5.1(a). That norm is further codified in Strickland's statement that an uninformed decision not to investigate is not reasonable.

3.      Trial counsel Hilfiger and Smith unreasonably failed to obtain the services of a mitigation specialist or otherwise to conduct the requisite thorough investigation of their client's background. Although this Court had found that the services of a mitigation specialist were reasonably necessary for Mr. Barrett's defense, authorized trial counsel to retain a mitigation specialist, and directed trial counsel to devote their full attention to the preparation of this case, trial counsel never contacted the authorized mitigation specialist. Far too late, trial counsel asked Dr. Russell to serve in that role but she declined.

4.      Trial counsel unreasonably failed to follow up on information indicating Mr. Barrett had a history of mental problems including Dr. Russell's notation of a head injury and Dr. Sharp's report of paranoia and likely cognitive impairment.

5.      To the extent Mr. Barrett believed that mitigation necessarily or predominantly entailed appeals to sympathy or begging for his life, trial counsel's advice to him fell below prevailing professional norms. As a matter of law and practice, mitigation evidence does not necessarily or predominantly entail appeals to sympathy and begging for the defendant's life is not permitted in federal capital cases.

89

6.      Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." ABA Guideline 10.11(A).  The Supreme Court has found the performance of capital defense attorneys deficient for failing to investigate a single file, for failing to follow-up on reports of abuse, and for failing to complete an investigation into known aspects of a defendant's background.

7.      To the extent trial counsel's failure to consult mental health experts was based on their view that Mr. Barrett's mental condition was related to his drug use, their omission fell below prevailing professional norms. Trial counsel unreasonably failed to consult a mental health professional about their alleged concern even though funds were available for that consultation and the court urged trial counsel to amend the budget if necessary. Trial counsel knew the jury would hear about Mr. Barrett's drug use. Trial counsel's failure to investigate whether there was evidence to mitigate that information, such as whether Mr. Barrett had suffered trauma or from a mental illness, fell below prevailing professional norms.

8.      Contrary to 18 U.S.C. §§ 3005 and 3599 and the Judicial Conference's CJA Guidelines, the trial court did not consult the Federal Defender about a replacement for Mr. Hilfiger when he became lead counsel and there was a need to appoint a second lawyer for Mr. Barrett. Therefore, the appointment of Bret Smith, a lawyer with no previous experience in the defense of a capital case, fell outside the norms of legal practice.

9.      The two-and-one-half-month delay in authorization to retain a mitigation specialist--from January 31, 2005, when the request was first made, until March 18, 2005, when

the request was granted in part--was contrary to prevailing professional norms which call for assembly of the defense team "[a]s soon as possible after designation" of lead counsel. ABA Guideline 10.4(C). The Supreme Court has held that constitutionally deficient performance can occur when the omissions of defense counsel are due to restrictions imposed by the trial court. E.g., Genders v. United States, 425 U.S. 80 (1976). Thus, to the extent trial counsel's preparation for the penalty phase was adversely affected by the delayed authorization for expert and investigative services, their performance was constitutionally deficient.

10.     Trial counsel unreasonably delayed seeking the assistance of a mitigation specialist until late June 2005 and again in mid-August 2005. Trial counsel ultimately failed to retain the services of a mitigation specialist, although the court had authorized funds to retain one. The Supreme Court has found that delaying preparation for the penalty phase until shortly before trial is evidence of deficient performance. Williams (Terry) v. Taylor, 529 U.S. 362, 395 (2000). The Court also has found that the failure to obtain readily available assistance with mitigation evidence is evidence of deficient performance. Ibid. Both trial counsel's delay and their failure to retain a mitigation specialist at all fell below prevailing professional norms of practice in federal death penalty cases.

11.     Trial counsel unreasonably failed to obtain and review all the records gathered as part of the mitigation investigation that had been conducted prior to the two state trials. Due to trial counsel's failure to obtain and review all those materials, counsel were unaware that a mitigation specialist and a psychologist had identified areas of mitigation including Mr. Barrett's neglectful parents and his history of mental problems. Trial counsel's failure to obtain and review

91

the records from the state-trial investigation fell below prevailing professional norms.

12.    Trial counsel's unreasonable failure to obtain and review the files of the state-trial investigation meant trial counsel were unaware of the leads to further investigation contained in those files. Trial counsel's self-imposed ignorance of the files rendered them unable to make reasonable strategic decisions about what mitigation they could pursue.

13.    Trial counsel unreasonably believed that the only mitigation evidence that could be presented was evidence related to whether Mr. Barrett would be a future danger as a prisoner. It was clearly established long before Mr. Barrett's trial that the Eighth Amendment requires a capital sentencing jury to hear and consider any evidence that could be relied upon in support of a sentence less than death. The Supreme Court has held that a failure to take action that is based on a misunderstanding of the law constitutes deficient performance. Williams (Terry), 529 U.S. at 395; Kimmelman v. Morrison, 477 U.S. 365, 385 (1986). Trial counsel's misunderstanding of Mr. Barrett's constitutional right to present mitigation evidence fell below prevailing professional norms.

14.    Trial counsel's unreasonable belief about the limited scope of mitigation evidence had an adverse influence on their preparation for the penalty phase and the evidence they presented. Under Williams and Kimmelman, trial counsel's performance was constitutionally deficient.

15.    To the extent trial counsel believed that Mr. Barrett wanted to limit the scope of mitigation evidence they could present, counsel's response to Mr. Barrett fell below prevailing professional norms. It was common knowledge among capital defense attorneys at the time that

capital defendants often expressed reservations about revealing painful parts of their childhoods or mistreatment by their parents. Trial counsel had available to them an expert attorney, Richard Burr, who had offered to help through such difficulties, but trial counsel unreasonably failed to respond to Mr. Burr's offers of assistance. Again, trial counsel's failure to return a phone call, or in this case emails from the Federal Defender and Mr. Burr offering assistance, constitutes deficient performance.

16.     Trial counsel's penalty phase investigation fell below prevailing professional norms. It was well understood by capital defense counsel at the time that developing evidence of a neglectful or abusive childhood and its effects very often required the use of expert interviewers. Trial counsel in this case had such expertise at their disposal but unreasonably failed to use it. It was well understood at the time of the trial in this case that defense counsel would need to spend many hours developing the trust and confidence of a client and his family members in order to discover and develop evidence of childhood neglect and abuse. Trial counsel in this case unreasonably failed to spend time needed to investigate and present readily available evidence that Mr. Barrett experienced neglect and abuse as a child.

17.     It was commonplace at the time of this trial for prosecutors to contrast one sibling who was successful with the defendant who was convicted of murder. Trial counsel in this case unreasonably failed to anticipate that the prosecution would use this tactic when the defense presented Mr. Barrett's brother Steve as a penalty phase witness. Trial counsel failed to interview Steve about the difference between his childhood and Mr. Barrett's. Trial counsel's performance fell below prevailing professional norms.

93

18.     Kenneth Barrett's trial counsel had a professional duty to investigate and learn of the foregoing facts.

19.     Kenneth Barrett's trial counsel had a professional responsibility to make the jury fully aware of the story of who Kenneth Barrett was and how he came to be that unique person.

20.     Due to trial counsel's incompetence, the jury was not informed of the mitigating circumstances in Kenneth Barrett's background, including, the alcoholism of his parents, his mother's use and abuse of alcohol the entire time she carried him, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging, and harsher treatment than his brothers, he received from his mother, his father's abandonment of the family, this constant uprooting throughout his childhood, his abandonment by his mother due when she was most depressed, his mother's abuse of him in encouraging him to party with drugs with her ever-changing boyfriends and other friends, his early childhood and other head injuries, his potential early childhood exposure to chemicals from the glass works in which both his parents worked, and that his suicide attempt was a symptom of mental disease.

21.     If trial counsel had gathered these readily available facts and provided them to qualified experts, as prevailing professional norms required, the jury would have understood how Kenneth Barrett's life history, while intrinsically compelling and heartbreaking, also had profound implications for understanding the scientific underpinnings of Mr. Barrett's s mental health and actions.

22.     If trial counsel had followed prevailing professional norms and had timely retained appropriate mental health experts to assist the defense, Kenneth Barrett's jury would

94

have heard extensive evidence of his mental illness and impaired brain functions due to organic damage.

23.     Residual doubt is a reasonable mitigating circumstance to be presented at sentencing in a capital case.

24.     The evidence of the impact the dead of night raid had on a drug-addicted, paranoid, mentally-ill person like Kenneth Barrett, and his inability to assess and appropriately react to the situation would have been mitigating in nature.

25.     The contradictory and potentially perjurious testimony of law enforcement witnesses regarding whether or not the lights of the vehicle were on prior to the raid was mitigating.

26.     The factual impossibility of Kenneth Barrett having continuously fired, or fired at all, on law enforcement vehicles as they came across his property was mitigating.

27.     The overwhelming weight of the mitigating evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation before the raid, and in its conduct of the raid itself, which made it likely that there would be a firefight and that someone might die.

28.     Had the jury heard all of the evidence in mitigation including Kenneth Barrett's cultural and family and personal history, the medical, psychological and psychiatric history, the mitigating facts, (known to the Drug Enforcement Agency, the Drug Task Force, the Oklahoma Highway Patrol and local law enforcement),surrounding the raid, which was opposed by the Sequoia County Sheriff, that led to the death of Trooper Eales, the jury would probably have

95

made findings that ultimately concluded that just as Trooper Eales should not have been put in danger, Kenneth Barrett should not have been sentenced to death.

29.    Had counsel presented the powerful case in mitigation that could have been marshaled, but which Kenneth Barrett's jury never heard, at least one juror would have opted not to impose the death penalty.

30.    Trial counsel had a clearly defined duty to investigate, develop and present the now-known mental health evidence in the penalty phase of trial.

31.    The mental health evidence that could have and should have been presented on Kenneth Barrett's behalf was not only powerful evidence in mitigation of punishment, as the Supreme Court has recognized repeatedly, but was also directly relevant to refuting the statutory aggravating circumstances that Kenneth Barrett knowingly created a grave risk of death to one or more persons in addition to Trooper Eales, and that Kenneth Barrett committed the offense after substantial planning and premeditation.

32.    The evidence presented at the § 2255 proceedings shows both that trial counsel's lack of investigation and expert consultation fell below the objective standards of reasonableness codified in the ABA Standards and Guidelines and in case law that predated the guidelines.

33.    There was abundant "undiscovered mitigating evidence [that], taken as a whole, might well have influenced the jury's appraisal" of Kenneth Barrett's culpability.

34.    Had the jury been able to weigh the evidence that should have been presented in both phases of the trial "on the mitigation side of the scale, there a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537

96

(2003).

35.    The totality of the available mitigation evidence – both that adduced at trial , and the evidence adduced in the [§ 2255] proceeding" outweighs the evidence in aggravation and would have affected the jury's consideration.  *United States v. Barrett,* 797 F. 3d 1207, 1229 (10th Cir. 2015).

36.    Prejudice from trial counsel's failures to properly investigate and present available evidence in mitigation is manifest.

37.    Mr. Barrett has shown by the preponderance of the evidence that he was prejudiced by trial counsel's deficient performance.

38.    Accordingly, the sentence of death should be vacated and a new sentencing proceeding held.

DATED: February 16, 2017                          Respectfully submitted,

/s/ _David Autry_____
DAVID AUTRY
Attorney at Law

*/s/ Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

Attorneys for Kenneth Eugene Barrett

97

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 16ᵗʰ day of February, 2017, I caused the foregoing

Petitioner's Proposed Findings of Fact and Conclusions of Law to be filed with the Clerk of the

Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J.

Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To

counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER