**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| KENNETH EUGENE BARRETT, | ) |
| | ) |
| Petitioner/Defendant, | ) |
| | ) |
| vs. | ) Case No. 09-CIV-105-JHP |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent/Plaintiff. | ) |

**<u>ORDER</u>**

This matter comes before the Court on the Government's Motion to Exclude Proposed

Witnesses (Dkt. # 289).   Petitioner filed his response on February 8, 2017 (Dkt. # 323).  The

Government filed its reply on February 15, 2017 at 9:13 p.m. (Dkt. # 336).

In this motion, the Government requests this Court enter an order excluding testimony

for twenty-two named witnesses; *i.e.* Paul Gordon, Edward Hueske, George Kirkham,

Charles Sanders, Janesse Thomas, Mike Mackey, Billy Poindexter, Dewey Padgett, Hon.

John Garrett, Erin Bigler, Thomas Kosten, Deborah Miora, Thomas Reidy, Pablo Steward,

Gaylan Warren, Richard Burr, Julia O'Connell, Susan Otto, Gary Philpot, John Philpot,

Amanda Grizzle and Christine Calbert.  In addition, the Government requests this Court

order Barrett to provide an offer of proof as to proposed testimony of seventeen (17) more

witnesses, *i.e.*, Dale Anderson, Isaac Barrett, Tamara Bedwell, Faust Bianco,[1] Courtney

---

[1]In response to the Petitioner's Motion to Exclude Novel Theories of Aggravation (Dkt. # 304), the Government indicates it "intends to adduce the affidavit of Faust Bianco to demonstrate that trial counsel possessed a sworn expert's statement that Barrett did not suffer from any significant neurological deficit."  To the extent the government intends to introduce such an affidavit, the Court is puzzled as to the Government's request for an offer of proof regarding this witness's proposed testimony.

Burke, Cindy Crawford, Martin Daggs, Sharon Greenfeather, Robert Gude, Scharlette Holdeman, Judy House, Gary Nelson, Steven Sinyard, Geoffrey Standing Bear, Ellen Stovell, Jan Walkingstick and Randy Weaver.

### PROCEDURAL HISTORY

On November 4, 2005, Defendant was convicted of three counts, *i.e.* Count I and II, Committing a murder through the use of a firearm during or in relation to a drug trafficking crime, or possession of a firearm in furtherance of such crime; and, Count III, Intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties (Cr. Dkt. # 241). On December 19, 2005, defendant was sentenced in accordance with the Penalty Phase Special Verdict (Cr. Dkt. # 258) to Life without the possibility of release on Counts I and II and to Death on Count III. The Judgment was filed of record on December 29, 2005 (Cr. Dkt. # 285). These convictions and sentences were affirmed in *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 522 U.S. 1260, 128 S.Ct. 1646, 170 L.Ed.2d 359 (2008).

Thereafter, petitioner moved for relief under 28 U.S.C. § 2255. This Court denied relief. Dkt. # 214. Petitioner filed an appeal and, after consideration of the merits, the Tenth Circuit affirmed all but one claim: "that his trial attorneys were ineffective by failing to properly investigate his background and mental health in preparation for the penalty phase of his case." *United States v. Barrett*, 797 F.3d 1207, 1223 (10th Cir. 2015), *cert. denied*, 137 S.Ct. 36 (2016). In its opinion, the Tenth Circuit made several findings of fact regarding

2

evidence presented by Petitioner in support of his allegations that his trial attorneys failed to

investigate his background and/or mental health.  These findings include the following:

> There is evidence, . . . . , that Dr. Russell's work was restricted to an assessment of Defendant's future dangerousness.  According to her declaration in these § 2255 proceedings, she "did not evaluate [Defendant's] neuropsychological functioning or focus on his psychological make-up, as the referral request was specific to risk assessment." Am. Mot. for Collateral Relief, to Vacate, Set Aside, or Correct Sentence & for a New Trial, Ex. 56 at 1–2, Barrett, No. 6:09–civ–105–JHP (Sept. 25, 2009). She states that in mid-August 2005, about a month before the federal trial began, she was approached by Bret Smith, one of Defendant's trial attorneys, to be a mitigation investigator. She declined, stating that she was unqualified to perform such an investigation and there was not time to do so. She updated her risk assessment on Defendant and submitted it to Defendant's trial attorneys on September 15. On October 12 she visited Defendant in prison but this was after she had already submitted her updated report.
>
> . . . . . . .  According to the declaration of Julia O'Connell, Federal Defender for the Northern and Eastern Districts of Oklahoma, defense attorney Hilfiger called her office less than three months before the start of trial to ask if her mitigation specialist would be willing to meet sometime in the future. O'Connell referred him to Dick Burr, a federal death-penalty resource attorney. Burr declares that he never heard from Hilfiger or Smith on anything of substance. Similarly, the firm that was approved by the court for mitigation services, Inquisitor, Inc., was contacted only once by John Echols (an attorney for Defendant who withdrew and was replaced by Smith) and was never asked to perform any mitigation work.
>
> . . . . . . . . .  According to the declarations of the family members who testified during the sentencing phase, the trial attorneys' preparation for their testimony consisted more or less of five-minute interviews before going on the stand, and none were asked about Defendant's background, mental health, or family history.
>
> . . . . . . . . .  Also, the record suggests that Defendant's trial attorneys had indications that Defendant's mental health and background merited further investigation. According to Echols, Defendant's previous attorney:
>
>> At the time I withdrew from the case, I advised Mr. Hilfiger that he needed to immediately undertake extensive investigation and preparation for a possible penalty phase. I explained to him that the work performed by Roseann Schaye, the mitigation

investigator in the state case, was very preliminary in nature and far from complete. Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt. In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family illness.

R., Vol. 1a pt. 1 at 547. . . . . . . . . . .Further, it is undisputed that six months before trial Echols and Hilfiger requested funding from the court for an expert on diagnosing organic brain disorders resulting from Defendant's drug use and significant head injuries, and that even earlier Echols copied Hilfiger on a letter to the court discussing the use of Schaye's mitigation-investigation services during the state proceedings and stating that she and another psychologist "disagreed completely concerning Mr. Barrett's mental well being." *Id.* at 967. In addition, Hilfiger admits that Echols gave him Defendant's medical, educational, and mental-health records. Those records reveal that Defendant developed at a delayed pace as an infant, struggled in school, attempted suicide with a shotgun in January 1986, was subjected to a mental-health proceeding in October 1986 and committed to a hospital after complaints from his mother and ex-wife that he was violent and very suicidal, and was hospitalized for three days in 1995 after arriving in the emergency room complaining of "losing his mind." *Id.*, Vol. 2d pt. 8 at 358. During his hospital stay in October 1986 he was diagnosed with substance abuse and mixed personality disorder, and during his hospital stay in 1995 he was diagnosed with substance abuse and organic affective disorder. Also, the report prepared by Dr. Russell and given to Hilfiger and Smith includes a list of records she relied upon, which included records noting Defendant's suicide attempt in January 1986, hospital stays in October 1986 and in 1995, and a psychological evaluation completed in 2002 by psychologist William Sharp, who found that Defendant was paranoid and had a family history of depression and mental illness, and who said that his behavior warranted investigation for organic brain damage. Defendant's trial attorneys never contacted Dr. Sharp.

\* \* \* \* \*

Defendant's family has a long history of mental-health problems, alcoholism, and abuse. On Defendant's maternal side, several members of his extended family suffer from mental-health problems and relatives of his grandparents committed suicide or were involuntarily committed for psychiatric treatment. On his paternal side, several members of the extended family have mental-health problems, his great-great-grandfather was once

4

committed to a psychiatric hospital, his great-grandfather committed suicide, and his grandfather was an alcoholic who spent time in a mental hospital under a Certificate of Lunacy and who chronically abused his family members, including Defendant's father.

Defendant's childhood was less than ideal. His father supported the family financially but was largely absent. Throughout Defendant's childhood and adolescence his father drank, fought constantly with Defendant's mother and others, and engaged in numerous extramarital affairs. He once had a violent altercation with Defendant's mother. He also punched Defendant once when Defendant was in ninth grade. Defendant's parents separated when he was 10 or 11 years old. His mother drank constantly and subjected him to physical and emotional abuse and neglect. (case citations omitted)

Defendant's own history suggests mental illness. His mother drank alcohol while pregnant with him, he was developmentally delayed as an infant, repeated a grade in school, and dropped out after being referred to special-education classes. He suffered various incidents of head trauma while growing up and as a young man. He began consuming alcohol, tobacco, and other drugs between the ages of 11 and 14, when the brain's frontal lobes are first beginning to develop. In January 1986, at the age of 24, he attempted suicide by shooting himself in the chest with a shotgun, after which he received psychiatric intervention and was prescribed antidepressants. Later that year he was involuntarily committed to a hospital after complaints from his mother and ex-wife that he was violent and suicidal; he was diagnosed as suffering from substance abuse and mixed personality disorder. In 1995 he was again hospitalized for three days after arriving in the emergency room complaining of "losing his mind." R., Vol. 2d pt. 8 at 358. He was discharged with diagnoses of substance abuse and organic affective disorder. According to Dr. Woods, throughout Defendant's life he has had a significantly impaired ability to function normally and live independently and has suffered from irritability, racing thoughts, paranoia, and cognitive impairment.

Drs. Young, Woods, and Sharp concluded that Defendant labors under substantial mental impairment. Dr. Woods diagnosed Defendant with bipolar disorder and posttraumatic stress disorder. Dr. Sharp's evaluation from 2002 (during the state-court proceedings) found that Defendant had avoidant personality disorder, long-term memory problems, a tremor in his hands, and buzzing in his ears.

. . . . . . . . . . . Dr. Young said (1) that Defendant's history suggests he has sustained brain damage that inhibits his ability to process new information and (2) that tests she administered likewise indicated that Defendant's executive functioning—which involves the ability to reason, anticipate

5

consequences to actions, and respond to new information and act accordingly—was significantly impaired. She stated that Defendant's "brain dysfunction ... would particularly impair his abilities to organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment. His disabilities would be further exacerbated under conditions of complexity and/or highly stressful situations." R., Vol. 1a pt. 1 at 1105. Dr. Woods concurred with Dr. Young's findings. He determined that Defendant suffers from brain damage sustained early in his life, which impairs his inhibition, reasoning, and judgment. He opined that Defendant's "frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder." *Id.* at 1297. Dr. Sharp's 2002 evaluation found Defendant to be fearful and paranoid, and he agreed with Dr. Young's findings and Dr. Wood's diagnosis.

*United States v. Barrett*, 797 F.3d 1207, 1225-1230 (10th Cir. 2015), *cert. denied*, 137 S.Ct.

36, 196 L.Ed2.d 48 (2016).

Additionally, the Circuit Court noted the following evidence which was introduced

in the trial of this matter:

. . . . . . . .when Defendant was involuntarily committed for psychiatric treatment in 1986, his then-wife executed a sworn statement describing Defendant as "a very dangerous person to himself and others" and stating that he was abusing drugs and had sexually abused her, had kidnapped their son, had destroyed and burned her possessions, and had threatened to kill her and to take away their son. R., Vol. 2d pt. 8 at 350. A medical history sheet completed at that time stated that he had no symptoms of neurological problems and that he denied having suffered any head injuries. Although his discharge summary from that stay diagnosed him with a "[m]ixed personality disorder," it also described him as a drug abuser who had failed to continue taking his medication after his suicide attempt. Also, it offered a prognosis of "[g]uarded, because of the unpredictability of his behavior, depending on the circumstances and depending on whether or not he is taking drugs at the time." Id. at 353. A few months after his release from the hospital, Defendant had a claim denied by the Social Security Administration. The denial letter stated that "[m]edical reports show that you are moderately depressed but there are no signs of a severe mental illness. Most of the time you are able to think

clearly and to carry out your normal activities." Id. at 362. As for Defendant's 1995 hospitalization, . . . . . a physician's evaluation found him to be calm, normal, and free of any paranoia, delusions, hallucinations, or homicidal ideation, but still addicted to drugs. And finally, the government could have introduced evidence that Defendant had amphetamines and marijuana in his system on the night of the shooting.

. . . . . . . . . the jury heard extensive testimony of Defendant's abuse of his ex-wife, including her requests for and his violations of multiple protective orders, an incident in which he destroyed her furniture and other items, and his threat after their separation to "blow off her head." Id., Vol. 5 pt. 2 at 3486. Their divorce was granted, the jury learned, on grounds of physical abuse. The jury was also presented with significant evidence of Defendant's drug use, including the testimony of a drug addict that he took methamphetamine with Defendant, and the testimony of a state prison employee that Defendant self-reported first using alcohol at age 12, cocaine and heroin at age 14, and methamphetamine at age 20, and had been using marijuana, methamphetamine, heroin, tranquilizers, and other drugs up until the time of the shooting.

*Id*., at 1231-1232.[2]

Moreover, in its opinion, the Tenth Circuit found that the "Defendant has presented a case that his defense team did little to investigate his background and mental condition." *Id*., at 1225. The Court then discussed the governments response to the defendant's case which included counsel "had no indications that Defendant suffered from a mental impairment, so there was no reason to pursue that line of inquiry;" "Defendant opposed a mitigation strategy based on personal sympathy or his childhood;" and counsel "had a

---

[2]Clearly, the government will have the opportunity in the upcoming evidentiary hearing to contest any of these factual findings. However, to the extent the government does not rebut these findings, the Court will rely upon these findings in making its final decision herein. Petitioner need not introduce evidence on facts which have already been found by the Tenth Circuit Court of Appeals.

7

reasonable mitigation strategy." *Id.*, at 1226. Finally, the Circuit indicated the government's response was "questionable on this record." *Id.*

Based upon these findings, the Tenth Circuit remanded the matter to this Court for an evidentiary hearing on "whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial." *Id.*, at 1232.

## MOTION IN LIMINE

Following issuance of a scheduling order herein, Petitioner provided the government with a list of 71 proposed witnesses. *See*, Dkt. # 289-1. The list of witnesses indicates some will be offered solely by declarations which have previously been submitted in this case. Before this Court had an opportunity to rule upon the litany of motions filed within the past few weeks, including reviewing the responses and replies, the parties submitted a Joint Pre-Hearing Statement which lists 49 witnesses to be called on behalf of the petitioner and 4 witnesses to be called on behalf of the government. In addition, Petitioner proposes submitting 270 exhibits and the government proposes submitting 54 exhibits. In this same pleading, the Court was advised the parties anticipate the evidentiary hearing will take 13 days. The parties should be aware that this Court intends to strictly limit the evidence which will be admitted in the upcoming evidentiary hearing to evidence which is relevant to the issues which are currently before the Court. The Court has previously advised the parties it

"expects to hear live testimony from trial counsel whose conduct is at issue but otherwise encourages the submission of written exhibits in lieu of live testimony."  Dkt. # 246.

The Federal Rules of Evidence will be applied in the upcoming evidentiary hearing. *See*, *United States v. Francischine*, 512 F.2d 827, 829 (5th Cir. 1975).  Where a witness is unavailable, their affidavit will not be allowed unless the opposing party has had the opportunity to cross examine the witness.  *See*, *West v. United States*, 2009 WL 1043962 (M.D.Fla. 2009) (unpublished).  One exception to this will be where the petitioner is presenting evidence which would have been admissible under 18 U.S.C. § 3593(c), *i.e.*, "any information relevant to a mitigating factor."  In the context of this § 2255 proceeding, however, the Court finds relevant information regarding a mitigating factor is limited to the mental health or background of the defendant since that is only issue currently before this Court.

Based upon the Joint Pre-Hearing Statement filed herein, the Court finds that Petitioner does not intend to introduce testimony from the following witnesses originally listed on his exhibit list which the government asked this Court to prevent from testifying herein:  Edward Hueske, Dewey Padgett, Hon. John Garrett, Gaylan Warren, Johnny Philpot, Amanda Girzzle, Christine Calbert, Mike Mackey, Dale Anderson, Tamera Bedwell, Faust Bianco, Courtney Burke, Cindy Crawford, Robert Gude, Scharlette Holdman, Judy House, Gary Nelson, Steven Sinyard, Geoffrey Standing Bear, Ellen Stoval, Jan Walkingstick, and

Randy Weaver, Charles Sanders. Therefore, this Court finds the government's motion moot as to these individuals.

Next, the government requests Petitioner not be allowed to call four more witnesses who can offer testimony relevant only to guilt phase issues, to-wit: Paul Gordon, George Kirkham, Janesse Thomas, and Billy Poindexter. The Court has reviewed the declaration of each of these witnesses and finds none of their testimony is relevant to the issues which have been remanded to this Court. Therefore, Paul Gordon, George Kirkham, Janesse Thomas and Billy Poindexter will not be allowed to testify at the upcoming evidentiary hearing either in person or by declaration.

The government also requests this Court limit the expert mental health testimony which can be presented at the upcoming evidentiary hearing. In particular, the government objects to the testimony of Erin Bigler, Thomas Kosten, Deborah Miora, Thomas Reidy, and Pablo Stewart. According to the government, these witnesses will "offer testimony about present-day evaluations and opinions that Barrett has never claimed were available to trial counsel or constitutionally necessary for his case." Dkt. # 289, at p. 12. Throughout the pleadings filed since this case was remanded to this Court, Petitioner's counsel has repeatedly attempted to resurrect issues which have been finally determined herein. *See*, Dkt. # 269. Since the Circuit has already made a finding regarding the mental health evidence which was available to trial counsel, this Court does intend to hear additional evidence in this regard. Certainly, this Court does not need to hear from six different mental health

professionals to make a determination of the mental health evidence which was available to trial counsel nor to decide the issues which remain in this case. This Court finds the witnesses proposed by petitioner appear to involve the needless presentation of cumulative evidence and the Court will exclude such evidence pursuant to Rule 403 of the Federal Rules of Evidence. Accordingly, this Court grants the government's motion to exclude the testimony of Erin Bigler, Thomas Kosten, Deborah Miora, Thomas Reidy,[3] and Pablo Stewart.[4]

Third, the government asks the Court to exclude the testimony of proposed witnesses whose testimony does not relate back to an existing claim. While the government listed a number of witnesses, the only witnesses objected to and still contained on the Joint Pre-Hearing Statement that Petitioner intends to call in this category are: Isaac Barrett, Martin Daggs, Sharon Greenfeather. According to the declarations listed on the joint pre-hearing statement (Dkt. # 340), both Isaac Barrett and Sharon Greenfeather will detail family history which the Tenth Circuit has already made factual findings about. This Court finds that history was adequately described in the Tenth Circuit's opinion remanding this case and further direct testimony on this issue is not necessary.

---

[3]*See also*, Dkt. # 360.

[4]As to Stewart's proposed testimony regarding Petitioner's "ability to perceive, understand, assess or evaluate and make judgments under the conditions on September 24, 1999," this Court finds this evidence is irrelevant to the issues before the Court. *See*, *United States v. Barrett*, 496 F.3d 1079, 1112-1115 (10th Cir. 2007) and *United States v. Barrett*, 797 F.3d 1207, 1218-1219 (10th Cir. 2015).

In response to the government's motion to exclude Martin Daggs, Petitioner states his testimony would complement the testimony of Paul Gordon and George Kirkham "by casting doubt on the propriety and necessity for a police raid that was ill-advised and was executed in a manner that increased the chances of a violent response . . . . ." Dkt. # 323, at p. 13. This Court finds this evidence is not relevant to any issue currently before this Court. Accordingly, this Court hereby grants the government's motion to exclude the testimony of Isaac Barrett, Sharon Greenfeather, and Martin Daggs.

Additionally, the government requests this Court to exclude the testimony of proposed witnesses whose testimony does not relate to any current issue. The witnesses whom the government objects who are still contained on the Joint Pre-Hearing Statement include: Richard Burr, Julia O'Connell, Susan Otto, and Gary Philpot. According to the government, these witnesses "will not illuminate the narrow ineffectiveness claim before the Court." Dkt. # 289, at p. 12. This Court tends to agree. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth the proper standard to be applied in all ineffective assistance of counsel claims. Thus, this Court finds it does not need to hear Mr. Burr's opinion, as an attorney, as to what was reasonable in this particular case. This Court is intimately acquainted with the legal standards governing ineffective assistance of counsel claims. Expert testimony purporting to advise this Court how to apply those legal standards to the facts of this case would invade the court's province as a trier of the law, and are not helpful to the court in determining the facts of this particular case. Because the

12

proposed expert testimony of Mr. Burr goes beyond the appropriate boundaries of expert testimony and is unhelpful to this Court in its role as trier of fact, this Court finds his testimony will not be allowed.

Moreover, to the extent the government has never contested that Ms. O'Connell had a brief conversation with Mr. Hilfiger in which she referred him to Mr. Burr, this Court finds Ms. O'Connell testimony would not assist this Court in deciding any issues currently pending before this Court. Additionally, assuming Mr. Hilfiger did not follow through and contact Mr. Burr, that is irrelevant in ascertaining the reasonableness of counsel's performance in this particular case. Similarly, Ms. Otto's testimony regarding the process by which trial counsel came to be appointed has absolutely no bearing on any issues currently pending before this Court, *i.e.,* "whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial." *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015), *cert. denied*, 137 S.Ct. 36, 196 L.Ed2.d 48 (2016). Accordingly, the Court hereby grants the government's motion to exclude the testimony of Mr. Burr, Julia O'Connell and Susan Otto.

Finally, the government has asked to exclude the testimony of Gary Philpott. Based upon a review of Mr. Philpott's declaration listed in the Joint Pre-Hearing Statement, this Court finds this witnesses purported testimony is not relevant to the issues before the Court. Therefore, the government's motion to exclude the testimony of Gary Philpott is granted.

## CONCLUSION

Based upon the Court's rulings herein, this Court finds the testimony of a majority of the witnesses listed in the Joint Pre-Hearing Statement are irrelevant to the issues currently pending before this Court. Similarly, a majority of the exhibits are not relevant. For instance, marriage certificates, birth and death certificates, divorce files and criminal records dating back to 1915 are irrelevant and would never have been admitted for any purpose in the criminal jury trial herein. Additionally, criminal files related to witnesses who testified below are not relevant to these proceedings. Moreover, the jury heard testimony in the second stage of trial regarding the findings in the state court trial. While the Court is aware that the defendant was tried twice in state court on state charges before being indicted in federal court, the transcript of the first and second trial is not relevant to the issues before this Court. Therefore, this Court orders the parties to redo the Joint Pre-Hearing Statement to incorporate all of the legal rulings made herein and in the other orders filed simultaneously this date. Moreover, the Court anticipates the evidentiary hearing should be completed within no more than five (5) days. The Amended Joint Pre-Hearing Statement shall be filed no later than close of business on March 3, 2017.

It is so ordered this 24th day of February, 2017.

James H. Payne
United States District Judge
Eastern District of Oklahoma