DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:    dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:    Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

### PETITIONER'S PROFFER OF EXPERT TESTIMONY

### FROM THOMAS REIDY, Ph.D

## DECLARATION OF THOMAS J. REIDY, PH.D., ABPP

I, Thomas J. Reidy, Ph.D., ABPP, hereby declare, under oath, as follows:

1.      Postconviction counsel for Kenneth Barrett requested that I provide expert consultation and analysis pertaining to: (1) Violence risk assessment: State of the science in 2005; (2) Capital jury vulnerability to error: State of the science 2005; (3) Individualized risk assessment of Kenneth Barrett's risk for prison violence related to his 2005 federal trial; (4) and Individualized risk assessment of Kenneth Barrett's risk for prison violence further encompassing his current imprisonment in BOP within the Special Confinement Unit. This information—excepting his incarceration in the federal BOP which post-dated his federal trial—was readily available and accessible in 2005 and if called to testify about issues of "future danger" I would have informed the jury about this science and analysis.

2.      I am a clinical and forensic psychologist licensed and qualified to practice psychology in the states of California, Idaho, and Illinois (inactive). I have personal knowledge of the facts contained in this affidavit and am competent to testify about them. I received a Master's degree in Psychology from DePaul University in 1973, and a Doctorate degree in Clinical Psychology from DePaul University in 1976. For the past 40 years, I have maintained a private practice in clinical and forensic psychology in Monterey and Salinas, California.  My work history is documented on the attached resume.  (Appendix I)

3.      I was Board Certified in Forensic Psychology in 1995 by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology.  Only 325 psychologists in the United States hold this distinction. This

credential is intended to signify the highest levels of expertise in practice in forensic psychology.  Requirements for Board Certification include extensive education, training, submission of work samples, and a rigorous examination process. I have participated in extensive continuing education in the area of forensic psychology and violence risk assessment methods.

4.     I received the first annual Nelson Butters Award from the National Academy of Neuropsychology for research contributions to the field of neuropsychology in 1993.

5.     I have qualified and testified as an expert witness in state and federal courts across the nation concerning various topics in forensic psychology, and specifically, assessment of prison violence risk, particularly in capital cases.

6.     I have published extensively in the leading forensic journals in my field on violence risk assessment for prison in capital cases.  I co-authored 26 articles in peer-reviewed psychology journals, including 18 scientific articles and two book chapters pertaining to the issues of inmate adjustment and the assessment of violence risk assessment for prison within a capital context.

7.     I have served as an *ad hoc* peer reviewer for journal articles submitted to the following publications: *Journal of Personality Assessment*, *Violence and Victims*, and *Justice Quarterly*.

8.     Materials related to Mr. Barrett's case that I reviewed in forming my opinions are attached hereto as Appendix II.

## APPROACHES TO UNDERSTANDING VIOLENCE RISK OF CAPITAL OFFENDERS: STATE OF THE SCIENCE 2005

9.      Analysis of a defendant's past behavior pattern (in a similar setting) and the application of group statistical data are the two approaches that are most reliable in assessing likelihood of violent behavior in a prison context.

10.      Behavior pattern analysis in violence risk assessment at capital sentencing can be a very reliable method for estimating risk assuming that there is sufficient behavior to form a pattern and the context of prediction is sufficiently similar (Morris & Miller, 1985; Cunningham & Reidy, 1998a, 1999, 2002; Cunningham, Reidy, & Sorensen, 2005). This latter similarity of context is particularly important to attend to if the risk assessment is to be accurate. As studies sponsored by the U.S. Justice Department concluded: a community pattern of violence has not been found to be reliably predictive of violence in prison (Alexander & Austin, 1992; National Institute of Corrections, 1992). This same discontinuity between community violence and prison violence has been confirmed in samples of former death row inmates (e.g., Marquart, Ekland-Olson, & Sorensen, 1989, 1994; Marquart & Sorensen, 1989; Reidy, Cunningham, & Sorensen, 2001) and incarcerated murderers (Sorensen & Pilgrim, 2000). Thus consideration of violent behavior by an inmate housed previously in a similar context, namely jail and prison, can be an important indicator of future aggression.

11.      The application of group statistical data has been repeatedly identified as the most reliable method of assessing violence risk in a prison setting. Because of the fundamental differences between the community and prison settings, violent behavior in the community does not reliably predict violent behavior prison. Forensic scientists and

U. S. v. Kenneth Barrett                                                                      4

practitioners, using group statistical methods emphasizing scientific data in estimating violence risk assessment, in contrast to clinical/intuitive methods, have a long history as fundamental to reliable violence risk assessments at capital sentencing (see e.g., Cunningham & Reidy, 1998a, 1999, 2001; Hall, 1987; Marquart et al., 1989; Marquart & Sorensen, 1989; Monahan, 1981; Morris & Miller, 1985; Serin & Amos, 1995; Sorensen & Pilgrim, 2000).

12.    Group statistical data forms the foundation for all violence risk methods and is typically described in terms of the base rate (i.e., frequency of a specific type of violence in a particular group, over a set period of time, and in a specific context). Use of base rates in a relevant group is the single most reliable method for assessing violence risk in the community or in prison (see e.g., Monahan, 1981, 1996; Cunningham & Reidy, 1998a; Harer & Langan, 2001).

13.    In order to scientifically address the question of the likelihood that Mr. Barrett will seriously assault a staff member or another inmate during a capital life term, knowledge and application of the relevant group statistical data are essential. There is no *individualized* assessment of a particular person that does not rest on group data of one sort or another (Cunningham & Reidy, 1998a, 2002).

14.    All scientifically derived (as distinct from personal or experiential) expert knowledge in psychology and psychiatry consists of published observations and research on various groups of individuals, e.g., capital offenders. Scientific evaluation, treatment, or behavioral prediction regarding a specific person relies on these group observations and research data from a specified context rather than unstructured and scientifically inadequate clinical opinion (Cunningham & Reidy, 1998a, 2002).

15. As consistent results are obtained from research on multiple groups that share a particular characteristic (e.g., capital murder conviction), the individualized application of group scientific data becomes more reliable when applied to the individual.

16. Group statistical methods have been widely cited as superior to clinical methods in predicting the behavior of individuals (Dawes, Faust, & Meehl, 1989; Grove, Zald, Lebow, Snitz, Nelson, 2000; Meehl, 1954; Monahan, 1981, 1996; Showalter & Bonnie, 1984; Tonry, 1987).

17. There was a substantial conceptual and research database describing acceptable methods of violence risk assessment available in 2005, the time of Mr. Barrett's federal trial. Some thirty-nine years ago Saleem Shah (1978) wrote what is now considered a seminal article on the assessment of dangerousness and common pitfalls in a forensic context. Faulty methods of risk assessment in capital sentencing associated with unsystematic methods frequently employed by clinicians in their decision-making have been further criticized over the subsequent years (e.g., Ewing, 1983; Monahan, 1981, 1996; Morris & Miller, 1985; Dawes et al., 1989). Also, Serin and Barbaree (1993) reported the unacceptably high false-positive error rate in estimates of future violence with uncritical reliance on simplistic factors. A series of papers published in 1998 were critical of unreliable approaches to violence risk assessment at capital sentencing, and described how scientifically sound methodologies and data could be brought to bear in this testimony (Cunningham & Reidy, 1998a, 1998b). Subsequent research through 2005 has substantially validated and expanded this body of knowledge (e.g., Cunningham & Reidy, 2001; Edens, Petrila, & Buffington-Vollum, 2001; Sorensen & Pilgrim, 2000).

U. S. v. Kenneth Barrett                                                                        6

### Importance of Context in Assessing Prison vs. Community Violence

18.     Context is critically important to understanding violence in a prison setting. A frequently heard proclamation by prosecutors at trials is that "past behavior is the best predictor of future behavior" while citing all manner of community misconduct. However, such statements are only partially correct. The context of prison is fundamentally different than free society. Prison aggression, however, is not solely the function of the individual inmate. Rather, the likelihood of violence involves the interaction of individuals with their environment at a certain time, place and setting and in response to situational factors.

a.     Many of the factors that increase the risk of substance dependence, criminality, and violence in the community are not replicated in prison, are negated by prison security and restrictions, and/or are not predictive of violence in prison.

b.     Although intuitively attractive to lay jurors, perpetrator characteristics such as impulsivity and lack of remorse, manipulative behavior, criminal lifestyle, and/or aberrant personality characteristics are not predictive of serious violence in prison (see e.g., Cunningham & Reidy, 1998a,b & 1999; Edens et al., 2001; Marquart, Ekland-Olsen, & Sorensen, 1989).

### Correlates of prison violence

19.     Only a small number of factors actually serve to increase or decrease the risk of violence relative to the known base rates of violence (i.e., prevalence of a particular type of violence, over a set period of time, and in a specific context). These correlates of prison violence began emerging in the 1980's with large-scale studies of violent behavior among capital offenders and other related inmate groups (e.g., Marquart

& Sorensen, 1989; Marquart et al, 1989). This research greatly accelerated over the subsequent decade (e.g., Cunningham, Reidy, & Sorensen, 2005a,b; Reidy, Cunningham, & Sorensen, 2001; Edens et al., 2001, 2005; Harer & Langan, 2001).

20.     Large scale group studies of prison violence have routinely demonstrated:

a.     Correlates of prison violence are often counter-intuitive. Predictors considered as "common sense" factors are not reliably predictive of serious prison violence. These factors could include being a convicted murderer or multiple murders, exhibiting antisocial personality features, and serving a life-without-parole sentence (Cunningham & Reidy, 1998a, 1998b, 1999; Edens et al., 2001).

b.     Most capital offenders do not engage in serious prison violence and are not more likely than other high-security inmates to be involved in prison violence (Cunningham et al, 2005a, b; Edens et al., 2005; Marquart et al., 1989; Marquart & Sorensen, 1994; Sorensen & Wrinkle, 1996; Sorensen & Pilgrim, 2000; Reidy et al., 2001).

c.     Rates of serious violence resulting in death or serious injury within prison are quite low, despite a large proportion of prison inmates with significant criminal histories and convictions for felonies. Any factor such as felonious criminal conduct that is pervasively present in a prison inmate population will fail to predict a rare event, with a low base rate, such as serious violence.

d.     Moreover, prison violence does not reliably follow from community behavior (Harer, 1992; Reidy et al., 2001). Studies sponsored by the U.S. Department of Justice (Alexander & Austin, 1992; National Institute of Corrections, 1992) concluded that past community violence is not strongly or consistently associated with prison

violence; current offense and prior convictions are only weakly associated with prison misconduct; severity of offense is not a good predictor of prison adjustment. Behavioral continuity from community to prison is neither simple nor intuitively discernible, depending on the type, recency, and pattern of community criminality. This determination was true prior to 2005 and has been replicated more recently (Reidy, Sorensen, & Cunningham, 2012).

e.        Homicide as the offense of conviction in particular is not a reliable indicator of prison misconduct or violence (Marquart et al., 1989). Prevalence rates among capital offenders committing in-prison homicide have varied from 0.002 (one-fifth of one percent) to 0.01 (one percent) (Cunningham et al., 2005; Edens et al., 2001; Marquart et al., 1989, 1994; Sorensen & Pilgrim, 2000; Sorensen & Wrinkle, 1996).

f.        Evidence relating to the violence-potential of death-sentenced inmates was first gauged over fifty years ago by examining the behavior of those who had been released from death row through commutation, retrial, or other remedy. This body of research dates back decades and covers a variety of jurisdiction, but its consistent finding is that former death row inmates commit serious and violent rule violations at a much lower rate than the general prisoner population into which they are released (Marquart et al., 1989, 1994; Sorensen & Wrinkle, 1996). Studies of "violence-predicted" former death-sentenced inmates found them to have cumulative rates of serious assault (not prison homicide) below 10% over the course of several years (Edens et al, 2005; Marquart et al., 1989).

g.        Antisocial personality disorder (APD) and related traits of impulsivity, manipulation, lack of empathy, deceptiveness, and lack of remorse, are not predictive of

serious violence in prison (Cunningham & Reidy, 1998b; 2002; Edens et al., 2001; Edens et al., 1999, 2004). Cunningham and Reidy (1998b, 1999) estimated that 75% of inmates in prison meet criteria for APD. The interaction of this high prevalence rate with the low base rate of serious prison violence explains why using APD and related traits do not predict serious violence in a prison setting. Any trait or characteristic that is present in the majority of people in a particular setting will not predict a highly infrequent behavior such as serious assaultive behavior.

h.      Age is inversely related to prison misconduct of all types, including violence, in virtually every study conducted (e.g., Cunningham & Reidy, 1998a,b; Flanagan, 1989, 1995; Hirshi & Gottfredson, 1989; Marquart et al., 1989; Sorensen & Wrinkle, 1996). Research has shown that younger inmates commit most prison infractions, but misconduct and violence rapidly decline as inmates reach their late 20's and 30's. No matter the age when a prisoner enters prison, the rates of violence fall over the course of a capital term. The following graph entitled *Dangerous Rule Violations by LWOP Inmates Decreases with Age* shows results of a federal study that I co-authored in 2008 (Cunningham, Reidy, & Sorensen, 2008) based on federal data from 1991 to 2005. The results clearly detail the declining nature of serious infractions with age no matter the age when an LWOP offender enters federal prison.

U. S. v. Kenneth Barrett                                                                    10



i.      Components of the capital offense are not reliably predictive of prison violence (Marquart & Sorensen, 1989; Marquart et al., 1989; Reidy et al., 2001). Cooper and Werner (1990) demonstrated that federal Bureau of Prisons psychologists and prison professionals exhibited extremely low levels of predictive accuracy when emphasizing current offense, offense severity, and history of violence—none of which were significantly correlated with actual inmate violence during the first six months of federal confinement.

j.      The probability of prison violence will vary depending on the type of violence forecasted. Studies of prison infractions consistently demonstrated that the prevalence and frequency of violence-related misconduct is inversely related to severity. For example, a study of 39 former death sentenced inmates in Indiana (Reidy, et al., 2001) revealed that the prevalence rates (percent of inmates involved) decreased dramatically depending on the level of harm involved. Consistent with prior research

only a small minority of former death sentenced inmates committed a serious assaultive offense after sentence commutation. None of these assaults resulted in life threatening injuries and the greater majority of these assaults were minor in nature. A striking finding in this study is the low rates of assault, especially serious assaults by a group of inmates predicted by capital juries to be so violent as to warrant a death sentence. More specifically, after entering the general prison population, these former death row inmates committed violent acts at an annual rate of 2.8 per 100 inmates.

### Behavior of Former Death Sentenced Inmates:

21.      Although the conditions of confinement in the SCU are more restrictive than general population, the available literature is informative about future conduct should Mr. Barrett be released to the general population of the BOP. Results from studies in multiple states show that death-sentenced inmates present equivalent, and often lower rates of serious and violent prison misconduct, relative to other inmates sentenced to life or a term of years serving time under similar conditions of confinement.

a.      For example, John Edens and colleagues (2005) examined the behavior of 155 inmates sentenced to death after state-sponsored psychiatrists or psychologists testified that the defendants would pose a "future danger" to society. The retrospective review of records extended to 2002, including a subsample of 48 who had received relief from their death sentences and spent an average of nearly 21 years in prison, with the majority of their tenures being served in the general prison population. Contrary to expert opinions, only 4.2% of the "violence-predicted" former death-sentenced inmates committed serious assaults (those resulting in injury requiring more than first aid treatment) during their combined time on death row and the general prison population.

U. S. v. Kenneth Barrett                                                                 12

Six additional studies of former death row inmates since 1907 variously spanning 2 to 53 years of follow-up interval revealed equal (two studies) or lower prevalence (% inmates; four studies) and rates of violence compared to controls.

      b.      Perhaps the strongest evidence to date that death-sentenced inmates could safely be managed under less restrictive conditions of confinement comes from Missouri, the only jurisdiction to have fully "mainstreamed" its death-sentenced population (Lombardi, Sluder, & Wallace, 1997). As a result of a consent decree, Missouri Department of Corrections (MDOC) began integrating Capital Punishment (CP) inmates into the general inmate population of Potosi Correctional Center (PCC), a maximum security prison. Since then, all CP inmates in PCC have been eligible for the same programming, activities, and housing as general population inmates. They share cells, meals, recreation, work details, and are subject to the same incentives and sanctions. Other than their sentence, CP inmates in Missouri are subjected to equivalent conditions of confinement, allowing for one of the best "natural" experiments to test the possible influence of their predispositions or sentences on behavior while incarcerated. Three studies with this population (1996, 2005, 2016), including the recent 25 year follow-up investigation (Cunningham, Reidy, Sorensen, 2016), have consistently concluded that CP inmates have committed violent rule infractions at lower or equivalent rates compared with LWOP inmates and both groups were far better behaved and significantly less violent than controls consisting of non-capital murderers.

      c.      Another important study examined the behavior of 80 capital offenders in Arizona who obtained relief from their death sentences during 1975 through 2005 (Sorensen & Cunningham, 2009) and averaged 13 years in general population. The study

found that 16.3% of the former death-sentenced inmates committed a serious assaultive violation while incarcerated in the general prison population during an average time served of 13.1 years. Only 3.8% (3 of the 80) committed an assault resulting in great bodily injury or death. Available comparison data showed that maximum custody general population inmates (N = 2,545 average daily population) committed staff assaults at an annual rate of 37.6 per 1000 during 2003 through 2008, a rate three times higher than that of 12.4 per 1000 for staff assaults exhibited by the group of former death-sentenced inmates while serving time under similar conditions of confinement. Moreover, a death sentence alone does not indicate whether an inmate presents such a risk. The strongest correlate of disciplinary misconduct generally and of violence specifically is age (Steiner *et. al.*, 2014); the correlation however is inverse, and as age increases the risk of misconduct and of violence decreases. In this Arizona study most relevant to the Barrett case, age was also found to correlate inversely with violent disciplinary misconduct. Two other factors were associated with violent misconduct in the general population after release from death row: prior behavior and time served on death row. Overall, three risk factors (High Risk being under the age of 25, having served less than 5 years on death row, and having committed an assaultive violation while on death row) increase the likelihood that a death row inmate will commit future acts of misconduct and violence in the prison setting. Low Risk death-sentenced inmates lacked these risk factors – specifically, having served more than five years on death row, no prior assaultive behavior on death row, and over the age of 45 – are less likely to commit future misconduct and violence in a general prison setting. Indeed, Mr. Barrett falls well within these Low Risk criteria. The following table derived from AZ DOC demonstrates the

U. S. v. Kenneth Barrett                                                                14

rates of serious and assaultive disciplinary infractions by High, Medium, and Low risk
groups.

### Rate/100 of Violent Rule Infractions among Former Arizona Death Row Inmates

| Risk Level | Dangerous Violations | Assaultive Violations | Assaults with Serious Injuries |
|---|---|---|---|
| Low | 6.3 | 1.8 | 0.0 |
| Medium | 13.6 | 6.4 | 0.0 |
| High | 23.0 | 5.3 | 1.5 |
| Base Rate | 14.7 | 4.8 | 0.5 |

**Summary: State of the Science in 2005**

22.    The use of group statistical approaches had emerged as the most reliable
basis of violence risk assessment at the time of Mr. Barrett's trial in 2005. Numerous
authors have discussed this methodology in peer-reviewed publications (Monahan, 1981,
1996; Morris & Miller, 1985; Hall, 1987; Serin & Amos, 1995; Cunningham & Reidy,
1998a, 1999; Cunningham et al., 2005a,b; Edens et al., 2001; Reidy et al., 2001). Studies
prior to 2005 produced highly consistent data regarding the low violence rate of capital
offenders regardless of victim or weapon features of the murder, the decades of follow-
up, the particular prison setting, and the sentence of the convicted capital murderer.  In
other words, none of these individual case variables influenced the rate of prison violence
for the broad category of murderers sentenced to multiple years of confinement.
Similarly, group statistical data from over two decades of research up to 2005 point to

capital offenders, especially older ones serving a life-without parole sentence, as posing far less of an assault risk than inmates serving shorter sentences and are certainly not a disproportionate risk for violence. Because these correlates of violence in prison are often counter-intuitive and the methodology of violence risk assessment largely unknown to lay jurors, educating the jury about reliable assessments of "probability of criminal acts of violence" is necessary for reasoned decision-making.

## CAPITAL JURY VULNERABILITY TO ERROR PRIOR TO 2005

23.     Scientific studies published before Mr. Barrett's 2005 trial reliably demonstrated that capital juries are prone to significantly over-predict the future violence of capital offenders. Such alarming error rates are influenced by juror susceptibility to seriously flawed intuitive risk methodologies and clinical approaches. Illusory correlations—that is, an intuitive but scientifically incorrect belief that capital inmates would be exceptionally prone to violence based on such factors as the heinousness of the capital offense and knowledge of other aggravating factors—are unrelated to actual correlates of prison violence (Cunningham & Reidy, 1998a, b; Cunningham & Reidy, 1999).

24.     Capital jurors are likely to be uninformed about the conceptual and research literature regarding prison violence risk and violence risk assessments of capital offenders unless assisted by expert testimony. For example, a capital jury is not likely to know about the actual rates of prison violence, and the role of inmate characteristics, criminal histories, prison confinement options, and security procedures on inmate behavior. They have difficulty incorporating all of the available data and tend to emphasize variables that are most memorable or most consistent with personal bias,

resulting in faulty weighting. The conceptual and research literature may have significant implications to the trier of fact both in avoiding misconceptions and error, and in approaching the capital sentencing risk assessment task with a greater degree of scientific understanding. In the absence of this knowledge, the jury is quite vulnerable to making faulty assumptions and conclusions regarding violence risk.

25.     The predictive accuracy of capital jurors prior to 2005 has been specifically examined in two studies. (1) Marquart et al. (1989) reported over a 15-year period that only 5% of the violence predicted capital inmates had committed serious assault in prison, which reflected a 95% error rate, but when jurors rejected future violence, the prevalence of serious assaults was exceedingly low at 7.5%. (2) Marquart et al. (1994) using a Texas sample of 421 capital offenders sentenced to death (1974-1988) discovered predictive error rates between 90% or 99.6% depending on the type of violence forecasted. These studies have uniformly demonstrated that the prevalence of serious assaultive behavior in prison is less than 10% among violence predicted capital offenders. Assaults with life threatening injury are even less prevalent (1-2%). Such low base rates of serious violence make it nearly difficult, if not impossible, to predict which inmates are prone to engage in such behavior.

26.     Jury outcome findings related to serious prison violence extend to future homicide. Marquart et al. (1989) point out that of 90 inmates having served an average of 6.3 years in the prison population following release from death row, the annual rate is 1.8 per 1000 inmates. These death row releases, compared to other groups, were not more violent or predatory, or a disproportionate risk to other inmates and prison staff. Similarly, Sorensen and Pilgrim (2000) reported the yearly rate of in-prison homicide by

murderers was determined to be 2 per 1000 or less. Moreover, this rate remained constant when capital murderers sentenced to death were mixed with those serving life without parole in the same general population (Sorensen & Wrinkle, 1996).

27.     The vulnerability of jurors to making errors in violence risk assessment when uninformed by scientific methodology and data was known at the time of Mr. Barrett's penalty trial in 2005 (Shah, 1978; Marquart et al., 1989; Morris & Miller, 1985; Dawes et al., 1989; Serin & Barbaree, 1993; Sorensen & Wrinkle, 1996). Subsequent to Mr. Barrett's trial, Cunningham and Reidy (1999) also cautioned that predictions of future violence are subject to multiple faulty conceptual strategies when such predictions are made from uninformed assessments. These authors identified common errors made by mental health professionals in conducting violence risk assessments in capital sentencing and noted that many of these errors had been described in scientific articles well before 2005.

28.     Capital Jury Project studies funded by the National Science Foundation have determined that jurors find "future danger" a compelling argument for imposing a death sentence (Blume, Garvey & Johnson, 2001; Costanzo & Costanzo, 1994). Research with actual capital jurors and mock jurors has clearly demonstrated that these jurors are prone to make erroneous inferences regarding future violence risk based on illusory correlations that are without predictive validity in assessing actual risk of prison violence (Cunningham & Reidy, 1998a, b; Cunningham & Reidy, 1999). Such errors can include factors as viciousness of the offense, perceived personality pathology, and lack of remorse (Cunningham & Reidy, 1998b; Garvey 1998; Marquart & Sorensen, 1989; Sundby, 1998).

U. S. v. Kenneth Barrett                                                        18

## KENNETH BARRETT: VIOLENCE RISK ASSESSMENT BASED ON SCIENCE AND METHODS AVAILABLE IN 2005

29.     If I had been called to individualize Mr. Barrett's specific risks for "future danger"—better understood as the probability that the defendant would commit future acts of criminal violence—I would have testified consistent with the general state of the science offered in the above sections that are particularized to Mr. Barrett in the following discussion.

30.      Individual factors combined with group statistical approaches have been the most reliable method for conducting a risk assessment (Monahan, 1981; Morris & Miller, 1985; Hall, 1987; Smith, 1993; Serin & Amos, 1995; Cunningham & Reidy, 1998a, 1999). With these two approaches in mind (i.e., past pattern in confinement and group statistical data), there were a number of factors that could have been analyzed regarding Mr. Barrett's likelihood of adjusting to a capital life term in the federal Bureau of Prisons (BOP) without serious violence in 2005. These factors each reflect characteristics for particularizing the assessment to Mr. Barrett. Again, these address either a mitigating factor and/or illuminate the risk-implication of factors intuitively employed by the jury and/or inferred in the State's arguments. These perspectives are specified below.

**Individual Violence Risk Factors for Kenneth Barrett:**

a)     *Age*:  Mr. Barrett was 44-years-old (DOB 6/29/61) at the time of the sentencing phase in 2005 and is currently age 55 yrs, 7 months.  Every study of prison violence finds that age at entrance to prison, and progressive aging over a prison term, have consistently been identified as the most powerful predictors of prison disciplinary

U. S. v. Kenneth Barrett                                                                                          19

infractions and adjustment. Studies show that as inmates age through a life term the general and violent misconduct rates become progressively lower in both state and federal prisons (see for example Cunningham & Reidy, 1998; Cunningham, Reidy, & Sorensen, 2005; Hirschi & Gottfredson, 1989) and assaultive misconduct (Sorensen & Pilgrim, 2000; Reidy, Cunningham, & Sorensen, 2001). Thus, holding other factors constant, Mr. Barrett, at age 44, had a far lower risk of violence in prison than inmates in their 20's or 30's. This low risk was expected to further decrease as Mr. Barrett continued to age across a capital life term.

        b)      *Correctional behavior in the Federal Bureau of Prisons 2006 to date:* Indeed, while incarcerated in the federal Bureau of Prisons on the SCU for nearly 11 years Mr. Barrett committed eight non-violent infractions involving 6 incidents. All of these violations were minor[1] and no violent behavior of any kind was reported. The following chart shows the percentage of death-sentenced cases involved in serious/violent disciplinary infractions (total sample is 67 inmates) from 1997 to 2016.

---

[1] BOP infractions are categorized with four levels: 100, 200, 300, 400 representing degrees of seriousness. Mr. Barrett compiled 7 infractions within the 300 level for insolence and disobeying orders, and one 208 level infraction for painting walls and cell doors and for painting over a security camera lens.

U. S. v. Kenneth Barrett                                                                20





| | SERIOUS ASSAULT | MINOR ASSAULT |
|---|---|---|
| SCU | 10.4 | 31.3 |
| Barrett | 0 | 0 |

      c)      When comparing Mr. Barrett's disciplinary record in BOP for the years 2009 to 2014 when he was in the SCU, the pattern of results is similar to the expanded years in the preceding graph.



d)    This minimal disciplinary history reflected a pattern of generally cooperative and nonviolent adjustment to incarceration, and pointed to a continuing nonviolent prison adjustment in the future. Progress reports regarding Mr. Barrett's work performance during incarceration emphasized his satisfactory to mostly exceptional work ethic and cooperative behavior. This correctional appraisal is critically important as an indication of positive behavior adjustment in a context of confinement apart from his actions in the free community.

e)    *Pre-trial behavior in Oklahoma county jails & Oklahoma DOC:* Since Mr. Barrett's 1999 arrest, he was in pretrial custody or Oklahoma prison confinement for a total of 6 years until sentencing on December 19, 2005 on the federal charges (i.e., BOP Sentence Monitoring Computation data, as of 7-27-15). Specific disciplinary records of Mr. Barrett's behavior in pretrial or prison confinement were not available to me prior to the deadline date for this report. However, the testimony from the transcript of the penalty phase and accompanying exhibits altogether lack any serious violence disciplinary infractions during that entire time frame for Mr. Barrett. The prosecution would surely have introduced such incidents at trial if they existed. As evidence of "future danger" the government introduced jail incidents purportedly indicative of his potential for prison violence.

  i.    Throwing a potato at the groin of a deputy

  ii.   Involvement in a fracas

  iii.  Possession of contraband razors, pens, and threats for going through his belongings

  iv.   Dropping a food tray in protest and threats to guard

v.   Engaging in sexual activity with two female inmates with guard acquiescence.

f)      There is no scientific evidence to show that such behavior as listed above is predictive of serious prison violence. In fact, upwards of 90% inmates commit infractions in prison but violence rates are extraordinarily low. The jury rightly rejected a unanimous finding of future dangerousness at the penalty phase of Mr. Barrett's federal capital murder trial.

g)      *Length of Sentence:* If Mr. Barrett received a sentence of life-without-parole (LWOP) in the penalty phase of his capital trial in 2006, a substantial body of research available up to that time revealed that only a minority of capital offenders serving an (LWOP) is disciplined for serious prison violence. These studies demonstrate that LWOP offenders are not a disproportionate risk to other inmates whether convicted capital murderers housed on death row or in the general prison population as a result of a life sentence at trial or relief from their death sentences. For example, Marquart et al., 1989 reported on a sample of 107 Texas inmates sentenced to capital life terms after their juries had rejected the Texas capital sentencing "special issue." Averaging over seven years in prison, only 12% of these inmates had been disciplined for violent misconduct. Marquart and Sorensen (1989) reported that among commuted capital offenders the study found a cumulative prevalence of serious assaults to be 8.6% among 453 commuted capital murderers over a 16-year follow up period. Similarly Sorensen and Wrinkle (1996) examined assaultive rates of life sentenced capital murderers  showing they committed violent rule infractions, including murder/manslaughter, attempted murder, forcible sexual assault, major assault, and minor assault, at a rate of 6 per 100 inmates

annually. Other studies of inmates receiving relief from death sentences in this era had

comparable rates of assaults (Cunningham & Reidy, 1998a; Bedau 1964).

     h)     *Prison gang membership:* Prison gangs are associated with a substantial

proportion of inmate assaultive misconduct (DeLisi, Berg, & Hochstetler, 2004; Ralph &

Marquart, 1992; Sorensen & Pilgrim, 2000). Mr. Barrett has never been involved with

street or prison gangs. The absence of gang involvement significantly reduces his risk of

violent disciplinary infractions.

     i)     *Community violence:* Mr. Barrett has an alleged history of domestic

violence with his former wife resulting in multiple protective orders. The penalty phase

transcript also notes several witnesses describing "bad acts" in the community over many

years that the prosecution alleges are indicative of future danger in prison.

     i.  Slowly approaching a checkpoint and driving away followed by a high-speed chase. The prosecutor in this case did not file Assault with a Dangerous Weapon charge.

     ii.  Being pulled over for a warrant—later shown to be invalid—but when allowed to drive his car home, he ultimately escaped. Upon returning to his home, he stood in the doorway with a handgun as a reserve deputy reached a locked gate outside; after the reserve deputy called for back up, Mr. Barrett eluded law enforcement. No threats were made and shots were not fired. Mr. Barrett later turned himself in of his own accord.

iii.  Holding a shotgun to the leg of a female and threatening her when she refused sex with him.

iv.  As a teenager in custody, Mr. Barrett refused to get off the phone and resisted a deputy who punched him. The deputy had "fractures in the bones of [his] hands" from the incident; Mr. Barrett sustained injuries to his nose, jaw, and collarbone.

v.  Allegedly made a threat relating to an informant who had supplied information for the 1999 search warrant on his residence. A jail snitch—later shown to be the very informant in question—overheard a phone conversation between Mr. Barrett and an unknown person containing this alleged threat.

j)      While these above incidents, if true, might prove predictive of community maladjustment, no scientific data exists to support the above listed behaviors as being predictive of future prison violence as the context of community violence is far different that the context of confinement. Violence does not reliably follow from community behavior due multiple factors, including differences in context, security features, and other institutional factors (Alexander & Austin, 1992; Harer, 1992; Reidy et al., 2001; Reidy et al., 2012). Again, the jury was right to reject a unanimous finding of future dangerousness based on the incidents alleged, for they altogether lack any scientific foundation.

U. S. v. Kenneth Barrett                                                                25

k)        **Group Base Rate Data applicable to Kenneth Barrett:**

l)        *Group base rate individualizing factors* can be specified in forecasting Mr. Barrett's likelihood of serious violence. I have reviewed scholarly literature and correctional statistics relevant to violence risk assessment at capital sentencing prior to and including 2005. Data from Oregon and other state and federal correctional agencies were a part of this review. Such correctional data is relevant in demonstrating the relationship (or lack of relationship) between commonly asserted predictive factors and actual prison violence. Such data and sources reasonably relied upon by clinical and forensic psychologists, as well as criminal justice scholars, in coming to conclusions on relevant issues in criminology.

m)        *Convicted capital murderer:* Multiple group statistical studies dating back decades (see Cunningham & Reidy, 1998a) indicate that the majority of individuals convicted of capital murder are not cited for violent misconduct in prison. These studies represent national and state samples tracking the frequency of serious violence in the general prison population by inmates convicted of murder, including former death row inmates. Some studies follow murderers sentenced to life-without-parole (LWOP) and/or life-with-parole (LWP). A number of rationales support generalizing from these studies to capital offenders in other correctional settings, including the Federal Bureau of Prisons.

n)        *Former death row inmate status:* Compared to risk factors identified for former death row inmates released from Arizona death row 1975-2005 (Cunningham & Sorensen, 2009) Mr. Barrett falls in the low risk category, that is, having served more than five years on death row, no prior assaultive behavior on death row, and over the age

of 45. Inmates in this category like Mr. Barrett are less likely to commit future misconduct and violence in a general prison setting. Indeed, Mr. Barrett falls well within these Low Risk criteria.

o)      *Preventive measures:* The assessment of risk is not simply a static enterprise. It also involves consideration of what preventive measures can be undertaken that would modify or reduce the level of violence risk posed by a particular inmate (Serin & Amos, 1995). Accordingly, Heilbrun (1997) identified two broad forensically relevant models of violence risk assessment (a) accurately forecasting the probability of violence, and (b) managing risk to reduce violence incidence. Heilbrun et al. (2000) described the importance of linking violence risk assessment results to intervention planning. In a prison setting, violence risk reduction interventions include medication or treatment for psychological disorders, application of disciplinary contingencies, rehabilitation programming, isolation from co-defendants or fellow gang members, special management provisions, or modified confinement. Should Federal BOP determine that Mr. Barrett is disproportionately likely to perpetrate serious institutional violence or otherwise pose a risk to inmates or staff, mechanisms are available to confine him under heightened security procedures such as single-celling, application of restraints with any movement, solitary or small group recreation, and other security measures. Under such conditions any opportunity to engage in serious violence is substantially negated.

p)      ***Conclusion***: Scientific data demonstrate that identifying the small percentage of capital offenders that engage in serious prison violence is an extremely unreliable process prone to unacceptable high errors in prediction. Studies consistently demonstrate that serious prison violence is a low base rate event—that is, it occurs

infrequently. As the severity of the forecasted violence increases, the probability of that act dramatically decreases. The more severe the projected prison violence, the increasingly improbable is its occurrence. When violence risk estimates substantially deviate from or ignore these base rates, significant errors in prediction occur. Hence, it is only the assessments of the varying degrees of improbability of prison violence among these offenders that are reliable. Particularizing factors applicable to Mr. Barrett point to him having a risk of prison violence that is below the known base rates of capital, life-sentenced, and/or high-security/general population inmate groups. Based on the above scientifically sound methodology and group statistical data, Kenneth Barrett represents a low risk for future violence if confined to the Bureau of Prisons for a term of life-without-parole. Any competent expert could have presented this information and had I been called, I would have done so.

31.     *Institutional misconduct among death sentenced inmates under less restrictive conditions of confinement.* The super-maximum security conditions under which most death-sentenced prisoners are currently housed are not universal. Both historically and in the present day, death-sentenced inmates have been housed in far less restrictive custody than is typical today. These historic and contemporary experiments have found that death-sentenced inmates as a class do not present an especial risk of violence or other serious misconduct in comparison with other inmate populations. Results show that death-sentenced inmates present equivalent, and often lower rates of serious and violent prison misconduct, relative to other inmates. Perhaps the strongest evidence to date that death-sentenced inmates could safely be managed under less restrictive conditions of confinement comes from Missouri, the only jurisdiction to have

fully "mainstreamed" its death-sentenced population (Lombardi, Sluder, & Wallace, 1997). It did so in January 1991, fully integrating the "capital punishment" (CP) inmates into the general inmate population of Potosi Correctional Center, a high security facility. Since then, all CP inmates in PCC have been eligible for the same programming, activities, and housing as general population inmates. They share cells, meals, recreation, work details, and are subject to the same incentives and sanctions. Other than their sentence, CP inmates in Missouri are subjected to equivalent conditions of confinement, allowing for one of the best "natural" experiments to test the possible influence of their predispositions or sentences on behavior while incarcerated. I co-authored one of the most comprehensive studies of this innovative housing arrangement which included the time era 1991 through 2002, and thereby restricted the sample to all 149 "mainstreamed" CP inmates and comparison groups of all 1,054 LWOP inmates, and 2,199 other term-sentenced (TS) inmates who had been transferred to PCC for disciplinary reasons (Cunningham, Reidy, & Sorensen, 2005). Results showed that the annual rate of violent institutional misconduct among CP inmates was similar to LWOP inmates (7.6 and 9.6 per 100 annually), and significantly lower than other TS prisoners housed in PCC, whose rate of violent infractions was 42.5 per 100 annually. Controlling for other relevant variables the LWOP inmates were shown to be about half as likely to commit a violent rule violation in comparison to TS inmates (Cunningham, Reidy, & Sorensen, 2005). In summary, the mainstreaming of capital punishment inmates has not increased the level of threat to the institution from violence committed by death-sentenced inmates and, in fact, the CP inmates presented the lowest level of violent threat to PCC staff and inmates in comparison to the LWOP and TS inmates. A 25 year follow-up published in 2016

revealed similar findings showing that that both death sentenced and life sentenced inmates did not represent a disproportionate risk for violence and were significantly less disruptive than term-sentenced inmates.

32.    *Applicability of study findings to Mr. Barrett:* I have reviewed Mr. Barrett's BOP prison file, including his disciplinary history. He is 55 years at the time of this report and was sentenced to death eleven years ago. His disciplinary record is minimal and includes no discipline for assaultive or violent behavior. These factors and the findings outlined above suggest that if death row inmates were held under less restrictive conditions of confinement, Mr. Barrett's likelihood of committing acts of misconduct and violence would be well below the base rate for the entire cohort of current death row inmates. These factors also suggest that Mr. Barrett would have a low likelihood of committing serious or violent rule infractions relative to the general prison population.

33.    I was available to consult with defense counsel and to testify at the time of Mr. Barrett's federal trial. Had I been called as a witness, I would have testified consistent with the foregoing.

34.    I am being paid $300 per hour for my work on this case. My contract caps my compensation at $29,500 without further approval of the Federal Defender.

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Signed at Monterey, California, on March 2, 2017.



_____

**Thomas J. Reidy**, Ph.D., ABPP

Board Certified in Forensic Psychology

American Board of Professional Psychology

References

Alexander, J. & Austin, J. (1992). *Handbook for evaluating objective prison classification systems.* San Francisco: National Council on Crime and Delinquency.

Bedau, H. A. (1964). Death sentences in New Jersey, 1907-1960. *Rutgers Law Review, 19,* 1-64.

Blume, J. H., Garvey, S. P., & Johnson, S. L. (2001). Future dangerousness in capital cases: Always "at issue." *Cornell Law Review, 86,* 387-399.

Cooper, R. & Werner, P. (1990). Predicting violence in newly admitted inmates. *Criminal Justice and Behavior, 17,* 431-477.

Cunningham, M. D., & Reidy, T. J. (1998a). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 331-351.

Cunningham, M. D., & Reidy, T. J. (1998b). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M. D. & Reidy, T. J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life and death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Cunningham, M. D. & Reidy, T .J. (2002).  Violence risk assessment at federal capital

sentencing:  Individualization, generalization, relevance, and scientific

standards.  Criminal Justice and Behavior, 29, 512-537.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005a). Is death row obsolete? A

decade of mainstreaming death-sentenced inmates in Missouri. Behavioral

Sciences & the Law, 23, 307-320.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005b). An actuarial model for

assessment of prison violence risk among maximum security inmates.

Assessment, 12, 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2008). Assertions of "future

dangerousness" at federal capital sentencing: Rates and correlates of subsequent

prison misconduct and violence. *Law and Human Behavior*, *32,* 46-63. doi:

10.1007/s10979-007-9107-7

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2016). Wasted resources and

gratuitous suffering: The failure of a security rationale for death row. *Psychology,

Public Policy and Law, 22,* 185-199. doi:10.1037/law0000072

Dawes, R. M., Faust, D., & Meehl, P. E. (1989).  Clinical versus actuarial judgment.

*Science, 243,* 1668-1674.

DeLisi, M., Berg, M. T., & Hochstetler, A. (2004) Gang members, career criminals and

prison violence: Further specification of the importation model of inmate

behavior, *Criminal Justice Studies, 17*, 369-383.

Edens, J. F. (2001). Misuses of the Hare psychopathy checklist-revised in court. *Journal

of Interpersonal Violence, 16*, 1082-1093.

Edens, J.F., Desforges, D., Fernandez, K., & Palac, C. (2004). Effects of psychopathy and violence risk testimony on mock juror perceptions of dangerousness in a capital murder trial. *Psychology, Crime & Law*, *10,* 393-412.

Edens, J. F., Poythress, N. G., & Lilienfeld, S. O. (1999). Identifying inmates at risk for disciplinary infractions: A comparison of two measures of psychopathy. *Behavioral Sciences and the Law*, *17*, 435-443.

Edens, J. F., Buffington-Vollum, J. K., Keilen, A., Ruskamp, P., and Anthony, C. (2005). Predictions of future dangerousness in capital murder trials: Is it time to "disinvent the wheel." *Law and Human Behavior, 29,* 55-86.

Edens, J.F., Desforges, D., Fernandez, K., & Palac, C. (2004). Effects of psychopathy and violence risk testimony on mock juror perceptions of dangerousness in a capital murder trial. *Psychology, Crime & Law*, *10,* 393-412.

Edens, J.F., Petrila, J., & Buffington-Vollum, J.K. (2001). Psychopathy and the death penalty: Can the Psychopathy Checklist-Revised identify offenders who represent "a continuing threat to society?" *Journal of Psychiatry and Law, 29,* 433-481.

continuing threat to society?" *Journal of Psychiatry and Law*, *29*, 433-481.

Ewing, C. P. (1983). "Dr. Death" and the case for an ethical ban on psychiatric and psychological predictions of dangerousness in capital sentencing proceedings. *American Journal of Law & Medicine, 8,* 408-428.

Flanagan, T. J. (1980) Time served and institutional misconduct: Patterns of involvement in disciplinary infractions among long-term and short-term inmates. *Journal of Criminal Justice, 8,* 357-367.

Flanagan, T. J. (1995) (Ed.). *Long term imprisonment: Policy, science, and correctional practice*. Thousand Oaks, CA: Sage Publications.

Garvey, S. P. (1998). Aggravation and mitigation in capital cases: What do jurors think? *Columbia Law Review, 98,* 1538-1576.

Grove, W., Zald, D. Lebow, B. Snitz, B., Nelson, C. (2000). Clinical versus mechanical prediction: A meta-analysis. *Psychological Assessment, 12,* 19-30.

Guy, L.S., Edens, J., Anthony, C., & Douglas, J. (2005). Does psychopathy predict institutional misconduct among adults? A meta-analytic investigation. *Journal of Consulting and Clinical psychology, 73*, 1056-1064.

Hall, H. V., (1987). *Violence prediction: Guidelines for the forensic practitioner*. Springfield. Il: Charles C. Thomas.

Harer, M. (1992). Assaults on BOP staff and inmates: Where and when they occur. *Research Forum, 2,* 1-19.

Harer, M. D., & Langan, N. P. (2001). Gender differences in predictors of prison violence: Assessing the predictive validity of a risk classification system. *Crime & Delinquency, 47,* 513-536.

Heilbrun, K. (1997). Prediction versus management models relevant to risk assessment: The importance of legal decision-making context. *Law and Human Behavior, 21,* 347-359.

Heilbrun, K., O'Neill, M. L., Strohman, L. K., Bowman, Q., & Philipson, J. (2000). Expert approaches to communicating violence risk. *Law and Human Behavior, 24,* 137-148.

Hirschi, T., & Gottfredson, M. (1989). Age and the explanation of crime. *American Journal of Sociology, 89,* 552-584.

Lombardi, G., Sluder, R., & Wallace, D. (1997). Mainstreaming capital punishment inmates: The Missouri experience and its legal significance, *Federal Probation, 61,* 3-11.

Marquart, J. W., & Sorensen, J. R. (1989). A national study of the Furman-commuted inmates: Assessing the threat to society from capital offenders. Loyola of Los Angeles Law Review, 23, 5-28.

Marquart, J.W., Ekland-Olson, S., & Sorensen, J. R. (1989). Gazing Into the crystal ball: Can jurors accurately predict dangerousness in capital cases? Law & Society Review, 23, 449-468.

Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994). *The rope, the chair, & the needle: Capital punishment in Texas, 1923-1990.* Austin: University of Texas Press.

Meehl, P. E. (1954). *Clinical versus statistical prediction.* Minneapolis: University of Minnesota Press.

Monahan, J. (1981). *Predicting violent behavior: An assessment of clinical techniques.* Beverly Hills, CA: Sage.

Monahan, J. (1996). Violence prediction: The past twenty years. *Criminal Justice and Behavior, 23,* 107-120.

Morris, N., & Miller, M. (1985). Predictions of dangerousness. *Crime and justice: An annual review of research,* In M. Tonry & N. Morris (Eds.) (Vol. 6). Chicago: University of Chicago Press, 1-50.

National Institute of Corrections (1992). *Jail classification system development: A review of the literature* (rev. ed.). Washington, DC: U.S. Department of Justice, National Institute of Corrections.

Ralph, P. H., & Marquart, J. W. (1991). Gang violence in Texas prisons. *The Prison Journal, 71,* 38-49.

Reidy, T. J., Cunningham, M. D., & Sorensen, J. R. (2001). From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Reidy, T. J., Sorensen, J. R., & Cunningham, M. D. (2012). Community violence to prison assault: A test of the behavior continuity hypothesis. *Law and Human Behavior, 36*, 356-363. doi:10.1037/h0093934

Serin, R. C. & Amos, N. L. (1995).  The role of psychopathy in the assessment of dangerousness.  *International Journal of Law and Psychiatry, 18,* 231-238.

Serin, R. C., & Barbaree, H. E. (1993). Decision issues in risk assessment. *Forum on Corrections Research, 5,* 22-25.

Shah, S. (1978).  Dangerousness: A paradigm for exploring some issues in law and psychology. *American Psychologist, 33,* 224-238.

Showalter, C. & Bonnie, R. (1984). Psychiatrists in capital sentencing: Risk and responsibilities in a unique legal setting.  *Bulletin of the American Academy of Psychiatry and Law, 12,* 159-167.

Sorensen, J. R., & Cunningham, M. D. (2009). Once a killer always a killer? Prison misconduct of former capital punishment inmates in Arizona. *Journal of Psychiatry and Law*, *37* (2-3), 237-267.

Sorensen, J. R. & Pilgrim, R. L. (2000).  An actuarial risk assessment of violence posed

by capital murder defendants. *Journal of Criminal Law & Criminology, 90*, 1251-

1270.

Sorensen, J. R., & Wrinkle, R. D. (1996). No hope for parole: Disciplinary infractions

among capital punishment and life-without-parole inmates. *Criminal Justice and

Behavior, 23,* 542-552.

Steiner, B., Butler, H. D., & Ellison, J. M. (2014). Causes and correlates of prison inmate

misconduct: A systematic review of the evidence.  *Journal of Criminal Justice,

42,* 462-470. doi: 10.1016/j.jcrimjus.2014.08.001

Sundby, S. (1998). The capital jury and absolution: The intersection of trial strategy,

remorse, and the death penalty. *Cornell Law Review, 83,* 1557-1598.

# Appendix I

## Curriculum Vitae of Dr. Thomas Reidy

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

## Contact Information

Address:      20 Deer Stalker Path, CA  93940
Telephone:    (831) 757-6673

## Education

Undergraduate: 1968 BS Biology, Fairfield University, Fairfield, CT

Graduate:      1973 MA Clinical Psychology, DePaul University, Chicago, IL

1976 Ph.D. Clinical Psychology, DePaul University, Chicago, IL

Certification:  Board Certified (Forensic), American Board of Professional Psychology, 1995

## Professional Experience

1972-1973:    Internship - Singer Mental Health Center & Rockford Memorial Hospital, Rockford, IL

1974-1975:    DePaul University Mental Health Center Fellowship

1974-1975:    Consultant to House of Good Shepherd for delinquent adolescents

1975-1977:    Staff Psychologist - Rehabilitation Institute of Chicago, Evaluation & treatment of brain-injured & physically handicapped adults & children

1977-1980:    Community Hospital of the Monterey Peninsula, Staff Psychologist:  Evaluation & treatment of inpatients & outpatients exhibiting a variety of psychological, neuropsychological, & medical diagnoses

1980:         Monterey County Office of Education, Consultant to AB Ingham School:  Behavior management of brain damaged and developmentally delayed students

1980-1981:    Western Pulmonary Services, Consulting Psychologist

1980-1981:    Community Hospital of the Monterey Peninsula Substance Abuse Program, Consulting Psychologist:  Psychological & neuropsychological assessment & treatment

1990-92:      Steinbeck Chemical Dependency Treatment Program, Community Hospital of Salinas, Consulting Psychologist

1

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

1985-1994:    US Army, Fort Ord, CA, Consultant

- *Department of Psychology*

- *Trial Counsel (Prosecution)*

- *Defense Counsel*

2007-Present:  US Air Force, Staff Judge Advocate –Forensic Consultant

- *Trial Counsel (Prosecution)*

- *Defense Counsel*

- *Consultations for violence risk, sex offender behavior, child pornography, child physical and sexual abuse, alcohol abuse, dependence & blackouts*

1980-Present:   Independent Practice

- *Forensic psychological assessment of juveniles & adults*

- *Court appointed expert forensic psychologist for Monterey, Santa Cruz & San Benito Counties:*

  - Violence risk assessment

  - Sex offender risk assessment

  - Child sexual abuse and child pornography

  - Mental health factors for sentencing evaluations

  - Competence for trial

  - Criminal responsibility

- *Expert forensic psychologist: Federal and state capital homicide cases*:

  - Violence risk assessment

  - Developmental risk assessment

2

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

1995-Present:   Law Enforcement Psychological Services, Inc.

- *Psychological screening of police & public safety applicants*

2006-2010      South Bay Regional Public Safety Training Consortium

- *Instructor, Background Investigators Course*

2006-Present   Monterey County Sheriff's Office & Soledad Police Dept.

- *Post Shooting Fitness for Duty Evaluations*

## Professional Recognition

1993 *Nelson Butters Research Award*
Presented by the National Academy of Neuropsychology for research contributions to the field of Clinical Neuropsychology

Journal Peer Reviewer: Justice Quarterly, Journal of Personality Assessment, Violence & Victims

## Licensure and Board Certification

California State Psychology License PSY 5575

Idaho State Psychology License PSY 203011

Illinois State Psychology License 0071-002109 (Inactive)

Board Certified 1995 in Forensic Psychology, American Board of Professional Psychology

## Professional Memberships

Fellow of the American Academy of Forensic Psychology

American Psychological Association

- *Law & Psychology Division*

International Association for Correctional & Forensic Psychology

## Community and Teaching Activities

- Forensic psychology lectures at Monterey College of Law

3

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

- Continuing Education for Attorneys: National Legal Aid Association
- Invited Address, California Public Defenders Association, 1995

- Invited Address: Monterey County Public Defenders 2005

- Invited Address, Monterey County Sheriff's Department, 1997 & 1998

- Invited Address, California County Counsel's Association, 1997

- Invited Address, Santa Cruz County Sexual Assault Investigators, 2000

- Invited Address, Monterey County Family Law Attorneys, 2005

- Instructor-Background Investigator's Course: South Bay Regional Public Safety Training Consortium, 2006-11

- Invited Continuing Education Lecture: *What the Forensic Neuropsychologist Needs to Know about Death Penalty Litigation*. American College of Professional Neuropsychology, Las Vegas, NV, 2010

- Invited Address: Nevada Bar Association Annual Meeting, *Born to be Bad? Developmental Pathways to Resilience or Deviance*, Monterey, CA**,** June 2010

- Invited Continuing Education Lecture: *What the Forensic Neuropsychologist Needs to Know About Death Penalty Litigation: Research, Ethics, and Professional Issues,* National Academy of Neuropsychology, Vancouver, BC, Canada, October 2010

- Invited Address: Staff Judge Advocate Office. *Causes and Correlates: Violence, Domestic Violence, and Stalking*, Tyndall Air Force Base, FL, December, 2011

- Invited Address: *Mass murderers: Mental status of suicide bombers and rampage shooters*. Monterey Institute of International Studies- A Graduate School of Middlebury College. September 11, 2014

- Invited Address: Supermax prison: A clean version of hell for terrorists. Monterey Institute of International Studies- A Graduate School of Middlebury College. March 31, 2015

## Conference Presentations

*Reidy, T., & Tracy, R. (1974, May)*
**The effects of neonatal illness and separation from mothers on subsequent maternal attentiveness.**

4

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Paper presented at the Midwest Psychological Association Annual Convention, Chicago, IL.

*Reidy, T., & Lamb, W. (1976, April)*
**S.O.A.P. System:  A proposed model of parent education.**
Paper presented at the American Personnel and Guidance Association National Convention, Chicago, IL.

*Reidy, T. (1976, April)*
**Child abuse:  A problem in the schools.**
Paper presented at the American Personnel and Guidance Association National Convention, Chicago, IL.

*Reidy, T., McLean, I., & Toerge, J. (1976, November)*
**Motivational factors for selecting the specialty of Physical Medicine and Rehabilitation.**
Paper presented at the American Congress of Rehabilitation Medicine, San Diego, CA.

*Reidy, T. (1977, November)*
**A case study of appropriate eating behavior in a rehabilitation setting.**
Paper presented at the American Congress of Rehabilitation Medicine, San Diego, CA.

*Reidy, T. (1977, May)*
**Accountability in the delivery of psychological services in a pediatric hospital setting.**
Paper presented at the Association for the Care of Children in Hospitals, Detroit, MI.

*Reidy, T. (1978, April)*
**Establishing a behavioral treatment approach in a rehabilitation setting.**
Paper presented at the Western Psychological Association, San Francisco, CA

*Reidy, T. (1979, May)*
**Psychological Child Abuse.**
Paper presented at the Western Psychological Association, San Diego, CA.

*Reidy, T. (1983, June)*
**Forensic applications of psychological principles.**
Paper presented at DePaul University, Department of Psychology and La Rabida Children's Hospital, Chicago, IL.

*Carstens, C., & Reidy, T. (1985, February)*
**Behavior problems discussed in pediatric settings:  Do researchers study the problems pediatricians confront?**

5

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Paper presented at the American Psychological Association Annual Convention, San Francisco, CA.

*Reidy, T., Silver, R., & Carlson, A. (1987, August)*
**Child custody decisions:  A survey of judges.**
Paper presented at the American Psychological Association Annual Convention, New York, NY.

*Reidy, T., Bowler, R.M., Pedroza, G.I., & Rauch, S.S. (1988, August)*
**Neuropsychological sequelae of pesticide exposure.**
Paper presented at the American Psychological Association Annual Convention, Atlanta, GA.

*Rauch, S.S., Bowler, R.M., Reidy, T., & Pedroza, G.I. (1989)*
**Neuropsychological symptoms one year following neurotoxic exposure and after award of compensation.**
Proceedings of the 8th Annual Meeting of the National Academy of Neuropsychology, 4, 152-153.

*Reidy, T. (1989)*
**Reaction time slowing after solvent exposure.**
Paper presented at the American Psychological Association Annual Convention, New Orleans, LA.

*Reidy, T., & Bolter, J. (1990, November)*
**Neuropsychological toxicology of Methylene Diphenyl Diisocyanate.**
Paper presented at the Annual Meeting of the National Academy of Neuropsychology, Reno, NV.

*Reidy, T., & Bolter, J. (1991, August)*
**Long-term outcome after exposure to Methylene Diphenyl Diisocyanate.**
Paper presented at the American Psychological Association Annual Convention, San Francisco, CA.

*Reidy, T. (1997, August)*
**Legal issues in police and public safety fitness for duty evaluations.**
Paper presented at the American Psychological Association Annual Convention, San Francisco, CA

*Reidy, T., Sorensen, J., & Davidson, M. (2015, March)*
**Predictive validity of the PAI for institutional misconduct.**
Poster session, American Psychological-Law Society Conference, San Diego, CA

## Peer Reviewed Professional Publications 1977 - 2016

*Reidy, T. (1977)*
**The aggressive characteristics of abused and neglected children.**

6

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Journal of Clinical Psychology, 33 (40), 1140-1145.

*Reidy, T. (1979)*
**Teaching appropriate eating behavior in a rehabilitation setting:  Case study.**
Archives of Physical Medicine, 60, 226-230.

*Reidy, T., Cotler, S., Tracy, R., & Anderegg, T. (1980)*
**Child abuse and neglect:  Cognitive, social and behavioral correlates.**
In J. Money and G.J. Williams (Eds.), Traumatic Abuse and Neglect of Children at Home.  Baltimore, MD:  John Hopkins University Press.

*Reidy, T., Silver, R., & Carlson, A. (1989)*
**Child custody decisions:  A survey of judges.**
Family Law Quarterly, 23 (1), 75-87.

*Reidy, T., & Carstens, C. (1990)*
**Stability of the Millon Adolescent Personality Inventory.**
Journal of Personality Assessment, 55, 692-697.

*Reidy, T., Bowler, R.M., Rauch, S.S., & Pedroza, G.I. (1992)*
**Pesticide exposure and neuropsychological impairment in migrant farm workers.**
Archives of Clinical Neuropsychology, 7, 85-95.

*Reidy, T., & Hochstadt, N. (1993)*
**Attribution of blame in incest cases:  A comparison of mental health professionals.**
Child Abuse and Neglect, 17, 371-381.

*Reidy, T., Bolter, J., & Cone, J. (1994)*
**Neuropsychological sequelae of methyl bromide:  A case study.**
Brain Injury, 8 (1), 83-93.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Integration of base rate data in violence risk assessment at capital sentencing.**
Behavioral Sciences and the Law, 16, 71-95.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Antisocial personality disorder and psychopathy:  Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations.**
Behavioral Sciences and the Law, 16, 333-351.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Antisocial personality disorder versus psychopathy as diagnostic tools.**

7

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Prosecutors Brief, California District Attorneys Association, Vol. XX, No. 4, 9-11.

*Cunningham, M. D., & Reidy, T. (1999)*
**Don't confuse me with the facts:  Common errors in violence risk assessment at capital sentencing.**
Criminal Justice and Behavior, 26, 20-43.

*Reidy, T.J., Cunningham, M. D., & Sorensen, J. R. (2001)*
**From death to life:  Prison behavior of former death row inmates in Indiana.**
Criminal Justice and Behavior, 28, 62-82.

*Cunningham, M.D., & Reidy, T. J.* (2001). **A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations.**
Behavioral Sciences and the Law, 19, 473-490.

*Cunningham, M. D., & Reidy, T. J. (2002)*
**Violence risk Assessment in federal capital sentencing: individualization, generalization, relevance and scientific standards.**
Criminal Justice and Behavior, 29, 512-537.

*Cunningham, M. D., Sorensen, J. R. & Reidy, T. J., (2004)*
**Revisiting future dangerousness revisited: Response to DeLisi and Munoz (2003).**
Criminal Justice Policy Review, 15, 365-376.

*Cunningham, M. D., Sorensen, J. R. & Reidy, T. J., (2005)*
**An actuarial model for assessment of prison violence.**
Assessment, 12, 40-49.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R.  (2005)*
**Is death row obsolete: A decade of mainstreaming death-sentenced inmates in Missouri.**
Behavioral Sciences and the Law, 22, 1-14.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R.  (2008)*
**Assertions of "future dangerousness" at federal capital sentencing: Rates and correlates of subsequent prison misconduct and violence.**
Law and Human Behavior, 32, 46-63.

*Cunningham, M.D., Sorensen, J.R., & Reidy, T.J. (2009)*
**Capital jury decision-making: The limitations of predictions of future violence.**
Psychology, Public Policy and Law, 15, 223-256.

8

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

*Reidy, T.J., Sorensen, J.R., & Cunningham, M.D.* (2012). **Community violence to prison assault: A test of the behavioral continuity hypothesis** Law and Human Behavior, 36, 356-363.

*Reidy, T.J., Sorensen, J.R., & Cunningham, M.D.* (2013) **Probability of Acts of future violence: A test of jury accuracy in Oregon.** Behavioral Sciences and the Law, 32, 286-305.

*Reidy, T., Sorensen, J., & Davidson, M. (2016)* **Testing the Predictive Validity of the Personality Assessment Inventory (PAI) in Relation to Inmate Misconduct and Violence** Psychological Assessment, 28, 871-884.

*Davidson, M., Sorensen, J. R., & Reidy, T. J. (2016)* **Gender responsiveness in corrections: Estimating female inmate misconduct using the Personality Assessment Inventory (PAI)** Law and Human Behavior, 40, 72-81.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2016)* **Wasted Resources and Gratuitous Suffering: The Failure of a Security Rationale for Death Row** Psychology, Public Policy, and Law, 22, 185-199.

*Reidy, T. J., & Sorensen, J. R* (In Press) **Prison Homicides: A Multidimensional Comparison of Perpetrators and Victims** Journal of Forensic Psychology Research and Practice

*Sorensen, J. R., & Reidy, T. J. (in press)* **Incapacitation and life without parole.** In Bohm, R. M., & Lee, G. M. (eds.). Routledge Handbook on Capital Punishment. New York: Taylor & Francis

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (in press)* **The failure of a security rationale for death row.** In Acker, J. R., & Toch, H. (eds.). Living on death row

Reidy, T. J., Sorensen, J. R., & Bonner, H. S. (In Review). **Prison homicide: An extension of violent criminal careers?** Violence & Victims

Sorensen, J. R., & Reidy, T. J. (In Review) **Nothing to lose? An Examination of Serious and Assaultive Prison Misconduct among Life-Without-Parole Inmates** Journal of Interpersonal Violence

9

# Appendix II

Background Materials sent to Dr. Thomas Reidy

BACKGROUND MATERIALS FOR THOMAS REIDY

Barrett v. USA, US District Court,
Eastern District of Oklahoma Case Nos.
6:04-cr-00115 JHP
6:09-cv-00105 JHP

Federal Defender's Office

January 13, 2017

*These materials were prepared by legal counsel for Kenneth E. Barrett in anticipation of litigation and to facilitate a confidential evaluation by Thomas Reidy. These materials are CONFIDENTIAL and are PRIVILEGED as attorney-client confidential communications and/or attorney work product. They may not be divulged without the written prior consent of counsel for Mr. Barrett.*

Joan M. Fisher
Karl Saddlemire
Tivon Schardl
Federal Defender's Office
801 I Street, Third Floor
Sacramento, California 95814
(916) 498-6666

**Index to Materials Provided on CD**

**Pleadings**
1. Tenth Circuit Court of Appeals Remand Order Setting an Evidentiary Hearing on Our Ineffective Assistance of Counsel Claim Due to Failure to Investigate and Present Mitigating Evidence, *U.S. v. Barrett*, 797 F.3d 1207, 1223-31 (10th Cir. 2015)
2. Excerpt from December 4, 2009 Amended 2255 Motion (Social history excerpt from the ineffective assistance of counsel mitigation claim.)

**March 16, 2009 2255 Motion – Exhibits**
3. Declaration of Ada Blount, Exhibit 74
4. Declaration of Brandy Hill, Exhibit 77
5. Declaration of Carl Cook, Exhibit 102
6. Declaration of Carolyn Joseph, Exhibit 78
7. Declaration of Doris Barrett, Exhibit 80
8. Declaration of Ernest Barrett, Exhibit 81
9. Declaration of Gelene Dotson, Exhibit 97
10. Declaration of Gwen Crawford, Exhibit 83
11. Declaration of Issac Barrett, Exhibit 84
12. Declaration of Janice Sanders, Exhibit 85
13. Declaration of Kathy Trotter, Exhibit 86
14. Declaration of Linda Riley, Exhibit 87
15. Declaration of Mark Dotson, Exhibit 98
16. Declaration of Nona Reich, Exhibit 101
17. Declaration of Phyllis Crawford, Exhibit 91
18. Declaration of Roger Crawford, Exhibit 92
19. Declaration of Ruth Harris, Exhibit 93
20. Declaration of Shawn Hill, Exhibit 95
21. Declaration of Steve Barrett, Exhibit 99
22. Declaration of Travis Crawford, Exhibit 45
23. Declaration of Toby Barrett, Exhibit 96
24. Declaration of Warren Dotson, Exhibit 100

**September 25, 2009 Amended 2255 Motion – Select Exhibits**
25. Declaration of Alvin Hahn, Exhibit 75
26. Declaration of Paul Lunsford, Exhibit 90
27. Declaration of Abby Stites, 103

**School Records**
28.  Tommie Spear Junior High School & Jay County High School

**Medical Records**
29. Sequoyah Memorial Hospital

30. Eastern State Hospital
31. Saint Francis Hospital
32. Wagoner Community Hospital
33. Bill Willis Community Mental Health Center
34. Miscellaneous Hospital Records
35. State of Oklahoma Disability Determination Unit


**Additional Documents**
36. 2000 Faust Bianco testing
37. 2002 Psychological Evaluation of Bill Sharp, Ph.D.
38. 2003 Faust Bianco's affidavit
39. 2003 Psychological Evaluation – Risk Assessment of Jeanne Russell, Ph.D.
40. 2005 Risk Assessment of Jeanne Russell, Ph.D.
41. 2005 Psychological Evaluation / Risk Assessment by Dr. J. Randall Price
42. 2009 Declaration of Bill Sharp, Ph.D.
43. 2009 Declaration of George Woods, M.D.
44. 2009 Declaration of Myla Young, Ph.D.
45. Raw Data from Dr. Young's testing
46. BOP Records for Kenneth Barrett
47. Penalty Phase transcript (Vols. 22-27), Defense exhibits 240-249; Abby Barrett exhibits

# Appendix III

## Rule 26 Case List

Dr. Thomas Reidy - State and Federal Capital Trial Testimony 2012-17

1) Vincent Guarino, AZ, CR2010-120027-001
2) Gary Watland, Federal, 1:11-CR-00038 JLK,
3) Dayton Rogers, OR, CR-8800355,
4) McDonnell, Michael, OR, 08C24379
5) Joshua Turnidge, OR, O8C51758
6) Robert Langley, OR, 88C21624
7) Corey King, CA MA043389
8) Donald Fell, Federal, 5:01-CR-00012
9) Martin Johnson, OR, 06C16178
10) Robert Blurton, MO, 09BE-CR00405
11) Jeffrey Compton, OR, 03C10543
12) David Taylor, OR, 201216842
13) Eric Running, OR, 05C10295