**DECLARATION OF RICHARD H. BURR**

Richard H. Burr, under penalty of perjury, declares the following:

1.      I have been asked by counsel for the Petitioner, Kenneth Eugene Barrett, to serve as an expert witness on ineffectiveness of trial counsel in connection with the penalty phase of Mr. Barrett's capital trial.  In this declaration, I will first recount my qualifications to serve as an expert in this capacity, then explain what materials I have reviewed, and then provide my opinion and the basis for my opinion.

### *Experience and Qualifications*

2.      I graduated from the University of Kentucky law school in 1976.  Thereafter, I was admitted to the bar in Kentucky (1976), New York (1977), Florida (1984), and Texas (1996).  Because I no longer practice in the courts of Kentucky, New York, and Florida, I have recently retired from the bars in those states.

3.      I began my career as a death penalty defense lawyer in 1979 with a non-profit legal organization with offices in Nashville, Tennessee, and New Orleans, Louisiana, called Southern Prisoners Defense Committee (which in the 1980's moved to Atlanta, Georgia, and became the Southern Center on Human Rights).  I then served as an assistant public defender in West Palm Beach, Florida, from 1981 to 1986, working exclusively on death penalty state post-conviction and federal habeas cases.  From late 1986 to 1994, I served as the director of the capital punishment project for the NAACP Legal Defense and Educational Fund in New York City.  From 1994 through 1995, I served as the litigation director of the Texas Appellate Practice and Educational Resource Center (a federally funded community defender for federal capital habeas clients in Texas).  From 1996 through the present, I have been in a private practice with Mandy Welch devoted entirely to the defense of capital clients.  As a contractor through my

private practice, I served from 1997 through 2014 as a member of the Federal Death Penalty Resource Counsel project, initiated by the Defender Services Committee of the Judicial Conference of the United States to recruit, train, and provide assistance to defense counsel appointed in federal capital prosecutions.  Again as a contractor through my private practice, I have served from 2010 through the present as a member of the Texas Habeas Assistance and Training Counsel project, also initiated by the Defender Services Committee, to recruit, train, and provide assistance to defense counsel appointed in federal capital habeas proceedings in Texas.

4.     In addition to consulting in approximately 300 capital cases over the course of my career, I have served as counsel for more than 100 capital clients in twelve states and in the federal courts during this time.  Although my work has been heavily oriented toward post-conviction and habeas corpus proceedings, I have been trial counsel in three capital prosecutions, including *United States v. Timothy James McVeigh*, No.  96-CR-68 (D. Colo.) (the Oklahoma City bombing case), where I was lead counsel for the penalty phase and for penalty-related work. I have argued two capital cases in the Supreme Court of the United States, *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Selvage v. Lynaugh*, 494 U.S. 108 (1990), and served as co-counsel on two others, *Hitchcock v. Dugger*, 481 U.S. 393 (1987), and *Tennard v. Dretke*, 542 U.S. 274 (2004).

5.     In addition to representing capital clients continuously since 1979, and consulting on capital cases since the 1980's, I have also played a role in teaching colleagues in capital defense seminars.  I have participated regularly as a faculty member in numerous national conferences and meetings sponsored by the American Association on Mental Retardation (now American Association on Intellectual and Developmental Disabilities), the NAACP Legal

Defense and Educational Fund, the National Legal Aid and Defender Association, Capital

Resource Centers, Federal Public Defenders, and the National Association of Criminal Defense

Attorneys.  I have also taught in state and local death penalty defense conferences and seminars

in numerous states, including Georgia, South Carolina, North Carolina, Tennessee, Kentucky,

Pennsylvania, New York, Massachusetts, Indiana, Illinois, Louisiana, Texas, New Mexico,

Nevada, Oregon, Arizona, California, Florida, Alabama, and Missouri.  The subjects of my

presentations have included Supreme Court case review, emerging constitutional issues, federal

habeas corpus practice, investigation and development of post-conviction/habeas issues, mental

illness/mental retardation/brain damage (investigation, utilizing experts, presentation of

evidence), investigating and litigating racism, investigating and presenting mitigation, and

defense-initiated victim outreach.

6.      Over the course of my career, I have written five law review articles related to

various aspects of death penalty defense and helped write and edit two litigation guidebooks

concerning intellectual disability and mental illness, *A Practitioner's Guide to Defending

Capital Clients Who Have Mental Disorders and Impairments* (2008), and *A Practitioner's

Guide to Defending Capital Clients Who Have Mental Retardation* (1st ed. 2004, 2nd ed. 2006, 3rd

ed. 2010).

7.      From 2012 to 2015, I served as the death penalty defense lawyer member of the

American Bar Association's Task Force on Criminal Justice Mental Health Standards.  *See*

Slobogin, C., *The American Bar Association's Criminal Justice Mental Health Standards:

Revisions for the Twenty-First Century*, 44 Hastings Const. L. Qtly. 1, 2 nn. 5, 6 (2016).

*Familiarity with the Case and Materials Reviewed*

8.      I am familiar, in part, with Mr. Barrett's case, because I served as the member of the Federal Death Penalty Resource Counsel project who consulted with defense counsel in Mr. Barrett's case.  That consulting relationship, however, covered only the part of Mr. Barrett's case in which John Echols was lead counsel.  During that time, I consulted regularly with Mr. Echols but had no contact with his co-counsel Roger Hilfiger.  After Mr. Echols was allowed to withdraw as counsel, I had no consulting contact with Mr. Hilfiger or Bret Smith.  I offered to continue consulting with Mr. Hilfiger but never heard back from him.

The materials I have reviewed are the following:

> Second Amended Motion to Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody [hereafter, "2255 Motion"], filed 12/4/09, Doc. No. 95
>
>> Exhibits 1-118 to the 2255 Motion
>>
>> Sealed Exhibits 119-205 to the 2255 Motion
>
> Government's Answer in Opposition to Second Amended Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody, filed 5/17/10, Doc. No. 174, with Attachments 1-4 and Exhibits 1-2, 4-8, 11-13, and 15-19
>
> Movant's Reply to United States' Response to Second Amended § 2255 Motion, filed 7/1/10, Doc. No. 178, with Exhibits 206-219
>
> Volumes 22-27, Transcript of Proceedings, *United States v. Kenneth Eugene Barrett*, No. CR-04-115-P (E.D.Ok.)
>
> *United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015)

*Opinion and Basis for Opinion*

I am of the opinion that trial counsel, Roger Hilfiger and Bret Smith, provided ineffective assistance by failing to reasonably investigate Mr. Barrett's life history and mental health in

4

preparation for the penalty phase of his trial. The basis for my opinion is as follows.

**1.     In preparing for the penalty phase of a capital trial, defense counsel must understand the competing narratives underlying the penalty phase.**

Prosecutors know that jurors, in fact most people, are deeply reluctant to kill another person. Thus, to be able to persuade jurors to condemn the defendant in a capital trial, prosecutors know that they have to overcome jurors' innate reluctance to kill. Prosecutors do this by seeking to define the defendant as nothing more than a murderer, who for that reason, no longer deserves to live. To do this prosecutors develop a narrative that, in every way possible, de-humanizes the defendant – to have him seen as not only violent at his core, but also unrepentant, manipulative, self-centered, without empathy and compassion, unable to feel or express love, aggressive, unkind, quick to take offense, without industriousness or perseverance, and disrespectful of and not feeling bound by prevailing social norms and ethics. In short, prosecutors seek to demonstrate that the capital defendant is the personification of all the traits we think of when we consider a person evil.

The essence of the prosecution's narrative for the penalty phase of a capital case has been eloquently captured in a poem by Sam Keen, "To Create an Enemy," in a book by Mr. Keen, *Faces of the Enemy* 9 (Harper Collins 1991):

> Start with an empty canvas.
> Sketch in broad outline the forms of
> men, women, and children.
>
> Dip into the unconscious well of your own
> disowned darkness
> with a wide brush and
> stain the strangers with the sinister hue
> of the shadow.
>
> Trace onto the face of the enemy the greed,

hatred, carelessness you dare not claim as
your own.

Obscure the sweet individuality of each face.

Erase all hints of the myriad loves, hopes,
fears that play through the kaleidoscope of
every finite heart.

Twist the smile until it forms the downward
arc of cruelty.

Strip the flesh from bone until only the
abstract skeleton of death remains.

Exaggerate each feature until man is
metamorphosed into beast, vermin, insect.

Fill in the background with malignant
figures from ancient nightmares–devils,
demons, myrmidons of evil.

When your icon of the enemy is complete
you will be able to kill without guilt,
slaughter without shame.

The thing you destroy will have become
merely an enemy of God, an impediment
to the sacred dialectic of history.

The defense in the penalty phase of a capital trial must develop a narrative to counter this narrative.  It is one that must fully humanize the defendant.  In Keen's words, it must be a narrative that *brings into sharp focus*, "... the sweet individuality of each face... [and] ... the myriad loves, hopes, fears that play through the kaleidoscope of every finite heart."  And it is a narrative that draws jurors into understanding that "the greed, hatred, carelessness you dare not claim as your own," is in fact a set of characteristics that, sometimes in our lives, we all manifest and thus do not distinguish a capital defendant from any of the rest of us.

This essential defense narrative has its constitutional foundation in *Woodson v. North*

*Carolina*, 428 U.S. 280 (1976), where a plurality of the Supreme Court overturned a statute that required the imposition of a death sentence on conviction of a capital crime. The constitutional flaw that the Court found in such a mandatory-death statute amounted to a clarion call to capital defense lawyers to individualize and humanize their clients in the capital sentencing proceeding:

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

*Id*. at 304 (plurality opinion). To present the "relevant facets of the character and record of the individual offender" that constitute "compassionate or mitigating factors stemming from the diverse frailties of humankind," *id*., defense counsel must investigate their clients' lives deeply and broadly. Only with such investigation can the defense be in a position to persuade capital juries to treat their clients as "uniquely individual human beings," instead of the stereotype of the enemy that prosecutors portray them to be.

The penalty phase of Mr. Barrett's trial reveals starkly that the prosecution understood and presented its narrative with chilling effectiveness. It also revealed that the defense failed miserably to develop and present the essential counter narrative. The reason was that the defense failed to conduct the kind of mitigation investigation called for by the Supreme Court's application and interpretation of the Eighth Amendment, from *Woodson* forward.

    **2.**    **The prosecution's penalty phase narrative portrayed Mr. Barrett as an enemy, whom the jury would "be able to kill without guilt, slaughter without shame." The narrative of the defense did nothing to counter this narrative**.

The government began building its penalty phase narrative in its penalty phase case-in-

chief, then continued to do so in the defense case, turning the superficiality of the defense case to its advantage, then put the narrative together in closing arguments.

The government initially introduced the theme that others were afraid of Mr. Barrett. Calling Sequoyah County Deputy Sheriff Larry Lane to testify about Mr. Barrett's having abruptly sped through a traffic checkpoint, the government first introduced the idea that law enforcement had been trying surreptitiously to gather information about Mr. Barrett prior to this incident:

> Q    Had you endeavored by virtue of your duties as a Sequoyah County Deputy to obtain certain information on [Barrett]?
>
> A    Yes, I did.
>
> Q    Had you endeavored to have people visit him undercover?
>
> A    Yes....
>
> Q    .... Have you been successful in running anyone into his house?
>
> A    No, I had not.
>
> Q    Why not?
>
> A    They were – they feared him.  They were scared of him.

Transcript of Proceedings, Vol. 22: 4593 (hereafter set forth as "Tr. 22:4593").

Thereafter, Mr. Lane and the next witness Shannon Smith recounted the incident concerning the traffic checkpoint, emphasizing Mr. Barrett's disdain for and indifference to the well-being of police officers.  Mr. Lane described Mr. Barrett's mean-spirited demeanor and wanton disregard for the officers:

> Q    .... What did you see the Defendant do as he approached you?
>
> A    He looked at me and smiled and then accelerated.

Q      All right.  When you say smiled, please describe the smile.

A      More of a smirk.

Q      As he did so, what did he then do?

A      He accelerated the truck and fled from us.

Q      When you say accelerated the truck, at what rate of speed did he accelerate away from you?

A      Very high rate.  I would say he floor boarded the truck.

Tr. 22:4597.  Shannon Smith then described the danger that Mr. Barrett's behavior created for other checkpoint officers.  Mr. Barrett's truck was "fish tailing" due to his sudden acceleration, coming within 5 inches to 1 foot of hitting two officers who had to jump across a ditch to avoid being hit.  *Id*. at 4617-18.

Continuing with the examination of Mr. Smith, the government began fleshing out the violence, anger, and dangerousness of Mr. Barrett.  Seventeen years before the traffic checkpoint incident, Mr. Smith, who was then eighteen years old, saw Mr. Barrett attacking his then-wife Abby Keyes:

Q      What was [Barrett] doing?

A      He was slapping his wife at the time[,] ... Abby Keyes....

Q      As you drove by, what was the Defendant's position with regard to Abby?

A      He had a hold of one of her arms.

Q      What was he doing?

A      He was slapping her ... [with an] [o]pen [hand].

Tr. 23:4632.  Mr. Smith stopped, *id*., and "told him he needed to stop what he was doing."  Tr. 23:4633.  Mr. Barrett responded with anger, yelling at Mr. Smith that "he was going to go in his

9

house and get a gun and shoot me." *Id*. Ms. Keyes was crying and told Mr. Smith "I needed to get in my truck and leave." *Id*. Mr. Smith then left, having no question in his mind that "[Barrett] was very serious." *Id*.

In its penalty phase case, the defense began by informing the jury that Mr. Barrett had already been convicted in the state court of Manslaughter in the First Degree and sentenced to 20 years for the killing of Rocky Eales, and convicted of Assault and Battery with a Dangerous Weapon and sentenced to 10 years, to run consecutive to the 20-year sentence. Tr. 24:4724-25. The defense then explained that, even though Mr. Barrett was eligible based on the prison classification process for confinement in a minimum security prison, *id*. at 4818-24, because he was convicted of highly publicized crime, he was administratively assigned to confinement in a maximum security prison. *Id.* at 4808-16.

The defense then focused on the prison system's assessment of Mr. Barrett's history of drug use and his needs for treatment. Starting with a form assessing "mental health history," there was "none listed ... no mental health [history]" for Mr. Barrett. Tr. 24:4830. The form did note "drug health" problems, *id*., which included use of "marijuana, meth, heroin, other obituates [sic], tranquilizers...," *id*. at 4844, resulting in the determination that he had a "moderate" history of substance abuse. *Id*. at 4843. With that history, he would be required to be in "a substance abuse treatment program" that would "[h]opefully" lead to his not "us[ing] drugs again." *Id*.

On cross-examination, the government immediately drew into question the likelihood of success of any drug treatment program for Mr. Barrett. The Oklahoma Department of Corrections (DOC) witness called by the defense conceded the likelihood of success for any prison-based drug treatment program is "not very good." Tr. 24:4846. And, for "people who have used a variety of drugs over the[ir] adult life, as this Defendant acknowledged," *id*., the

witness agreed that "the likelihood of success in drug treatment is really, really small...." *Id*.

The government then demonstrated with this DOC witness that the sentences Mr. Barrett received in state court were likely to result in a much shorter term of incarceration than the 30 years his consecutive sentences called for because of the various ways in which Mr. Barrett could accumulate good time credits:

> Q     .... By the way, in DOC custody, 20 years doesn't mean 20 years, does it?
>
> A     No, sir.
>
> Q     Twenty years could mean lots less than that, correct?
>
> A     Less than ten.
>
> Q     And in fact, you have testified about the various rate [sic] at which the Defendant was accumulating credits at OSP McAlester, correct?
>
> A     Correct.
>
> Q     That rate could be very significantly accelerated, couldn't it?
>
> A     Yes, sir.  If he got a job, he'd be on level four, earning 44 days a month, plus the day[s] he does.
>
> Q     Okay.
>
> A     And not for – less than half.

Tr. 24:4851-52.  The government then got the DOC witness to agree that there is at least a possibility that Mr. Barrett's "highly publicized case" administrative classification to maximum security could change, which could, along with other program activities Mr. Barrett might then become involved in, allow him to accumulate even more good time credits and get out even sooner.

The government then closed its cross-examination of the DOC witness with a warning to the jury about the distinct possibility that Mr. Barrett could easily escape if his administrative

classification were changed to allow him to be placed in the minimum security facility that he

qualified for on the basis of the DOC's classification assessment when he entered the DOC:

> Q    And at that minimum security prison, there are no fences to speak of, are there?
>
> A    None.
>
> Q    In fact, the ability to walk away is dependent on the Defendant's will or motive or interest in walking away, isn't it?
>
> A    Correct.
>
> Q    No guard towers?
>
> A    None.
>
> Q    No electrical fences?
>
> A    No.
>
> Q    No ankle bracelets around prisoners' legs?
>
> A    No, sir.
>
> Q    Nothing that would indicate when a prisoner has strayed?
>
> A    No.

Tr. 24:4861.

The next witness the defense called was Abby Stites, Mr. Barrett's former wife. Abby

was 15 years old, and Kenny, 18, when she and Kenny married in 1980. Tr. 24:4878. They

remained married for fourteen years. *Id*. Asked if "the marriage was not a regular domestic

marriage in the sense of you getting along the whole 14 years," Abby responded, "we had our

ups and downs, just like everybody else." *Id*. 4878-79. She also acknowledged that she and

Kenny had confrontations with each other that involved "physical violence" on "[m]aybe a few

occasions." *Id*. at 4879. Asked if these altercations were "one-sided" or whether "both of you

sort of got into physical violence," she said, "[b]oth." *Id*. Asked if she ever filed charges against Kenny for any of these incidents, Abby recalled that she had done that once and that "a couple of times maybe" she had "called the cops on him." *Id*. 4880. Abby also acknowledged that the prosecutor talked to her about "certain domestic abuse charges or ... protective order charges." *Id*. at 4881. Explaining further, she testified that the prosecutor "talked about a lot of things I guess people told him that wasn't true." *Id*. Abby then did acknowledge that she was "sometime, maybe" concerned about Kenny's violence. Asked if she was "concerned about his violence against anybody else other than you," she testified, "No. I'm the only one he basically probably ever hurt or, you know, would get mad at." *Id*. at 4883. Acknowledging that Kenny was "always ... running his mouth [and talking tough], but he never went through with it ... usually," *id*., Abby said that his being "mouthy" was mostly directed toward her. *Id*. at 4883-84.

The defense then asked Ms. Stites to talk more about her marriage to Mr. Barrett. She testified that "[w]e were probably separated more than we were together.... We'd split up and we'd go back together quite a bit." Tr. 24:4885. Asked again if she filed charges against Kenny for domestic abuse, Abby acknowledged, "Well, every time I got mad, I would go – you know, if he wouldn't leave me alone or call me and aggravate me, I'd just call and tell them, you know." *Id*. at 4889. Counsel then went over the record of four domestic abuse-relate charge Abby made against Kenny, which she acknowledged but could not recall in any detail. *Id*. ay 4889-92. She then described an incident in March, 1986, that led her to have Kenny committed to Eastern State Hospital, "because I felt like he was ... he had mental problems and he needed some help...." *Id*. 4893. Following Kenny's release from the hospital, they got back together. "[H]e did pretty good when he got out – they got him on some medi[c]ation and he did pretty good for awhile. Then he quit taking it." *Id*. Not long thereafter, they divorced. *Id*.

13

On cross-examination, the government brought out more details of the abuse Mr. Barrett inflicted on Ms. Stites. In 1995, prior to the divorce, Abby was living separately from Kenny because "I didn't feel like fighting with him[any more]." Tr. 24:4903. During this time, Kenny called Abby and told her that she "ought to go check [her] trailer because everything in it was destroyed." *Id*. at 4903-04. She returned to her trailer and found that her large aquarium filled with fish was "busted" and all the fish were dead, and that all the new furniture she had gotten "was tore up." *Id*. at 4904. A few months later, Kenny confronted Abby in a grocery store and wanted to talk with her. She told him to leave and that if he did not, "I was calling the cops, and he left." *Id*. at 4907. The government asked about another incident in which Abby went to Kenny's house because she thought he had taken some car keys. "We got into a fight," then "[h]e got me in the truck with him and we went to Webber Falls and that's where we got into it again and I got out of the truck and called the police on him." *Id*. at 4912-13. Asked why Kenny was taking her to Webber Falls, this colloquy followed:

> A    Cause he wanted to discuss getting back together and I told him that we were not getting back together and he begged me to just get a motel and just talk to him and just try to discuss things and work things out and I told him no.
>
> Q    Was it easy to get away from him in Webbers?
>
> A    Yeah, because when he went to get the room I left.
>
> Q    Where did you go?
>
> A    I went to somebody's door, knocked on the door and called the cops.

*Id*. at 4913. Finally, the government asked more about the fights Abby and Kenny had and what happened to her in the fights:

> Q    .... He hit you, didn't he?
>
> A    Yes.

14

Q      A bunch, didn't he?

A      When we were fighting, yes.

Q      He hit your hard, didn't he?

A      Yes.

Q      And in fact, you had to get medical attention on occasion, didn't you?

A      No.

Q      Never got any – did you have any bloody noses?

A      Well, yes, I take that back.  I had a fractured nose.

*Id*. at 4909-10.

Despite the revelation of frequent, serious violence that Mr. Barrett inflicted upon Ms. Stites, the defense did nothing to put it into the context of Mr. Barrett's life – no effort to connect it to difficulties he was having in his life, no effort to explore and examine the significance of Abby's belief that Kenny suffered mental illness and that Eastern State Hospital apparently found that he did, no explanation about the medication he was taking that seemed to help, no probing of the deep feelings of love and need for companionship that Kenny had for Abby and that produced good times for them as well as fueling his obsessive need to get back together whenever their relationship fell apart.

The first witness in Mr. Barrett's immediate family that the defense called was Mr. Barrett's younger brother Steven.  The superficiality of information elicited from Steven was typical of all the witnesses the defense called.  In response to being asked what kind of relationship he had with his brother while growing up, Steve testified it was "a normal relationship, older brother.  Got picked on a little bit, but I would consider it normal."  Tr. 25:5031.  Steve was asked if Kenny had "any kind of violent actions ... toward outsiders," and

15

Steve remembered only one incident in which got into "a hand to hand" quarrel with someone over automotive parts, *id*. at 5032, though he heard from others about other fights Kenny was involved in.  *Id*. at 5036-37.  With respect to Kenny's and Abby's marriage, Steve remembered, "It was good at times and they struggled at times."  *Id.* at 5033.  Steve recalled that they had "physical fights," *id*., but only observed one, in which Kenny "grabbed her from the back [while she was sitting at the dining table] and pulled her to the ground."  *Id*. at 5034.  The defense made no effort to probe the "good times" or the "struggle[s]" in Kenny's and Abby's marriage.  Steve left the area in 1989 to pursue a college education and become an educator and school principal, and did not have much contact with Kenny in the ensuing ten years (when Kenny was arrested for the killing of Trooper Eales in 1999).  *Id*. at 5035, 5043-45.  He had "basic conversations" with his parents during this time and learned of their "slight concern" that Kenny had drug problems, but he never discussed this with Kenny.  *Id*. at 5039-40.

The defense concluded the direct examination of Steve by asking, during the time Steve was growing up in their parents' home, "what kind of person ... Kenny Barrett [was] as far as getting along with other people."  *Id*. 5040.  Steve's answer raised more questions than it answered:

A       I would say that he's fairly antisocial.

Q       Antisocial – he's a loner?

A       Yes.

Q       Wants to be by himself, isn't that right?

A       Yes.

Tr. 25: 5040.

On cross-examination, the government contrasted Steve Barrett's life with the life of his

16

brother, emphasizing that they both "grew up in the same household."

> Q  Shortly after that , Kenny made choices in his life that took him in a different direction than the choices you made in your life?
>
> A  Yes.
>
> Q  You all grew up in the same household?
>
> A  Yes .
>
> Q  Same parents?
>
> A  Yes.
>
> Q  Kenny dropped out of school when he was in the ninth grade, didn't he?
>
> A  Yes.
>
> Q  And you didn't make that same decision, did you?
>
> A  No.
>
> Q  You completed high school?
>
> A  Yes.
>
> Q  And then went to Tulsa after the completion of high school?
>
> A  Yes....
>
> Q  What did you do in Tulsa, sir?
>
> A  I worked for a year and went to junior college.... I think I got somewhere around 36 hours and then transferred to OU.
>
> Q  ... and got your degree at the University of Oklahoma?
>
> A  That's correct.

Tr. 25:5042-43. The prosecutor then established that Steve's bachelor's degree was in science education, that he worked in the Norman, Oklahoma school system for ten years, that he then got a master's degree in educational administration, and eventually became a school principal. *Id*. at

17

5044-45.

The defense made no effort to try to answer the fundamental question raised by the prosecution through their cross-examination of Steven Barrett: Why would two kids raised in the same family turn out so differently? The implied answer raised by the government's question – because Kenny was a bad actor and not a good person – was left hanging by the defense, but was undoubtedly filled in by the jury.

The defense also called one of Mr. Barrett's uncles, Roger Crawford. The shallowness of the information elicited from Mr. Crawford was forecast by the following colloquy with defense counsel:

Q      Now, how long have you been around Kenny Barrett?

A      I don't know. Approximately the last 15 years maybe.

Q      You feel like you know quite a bit about him?

A      Not a whole lot, but some.

Tr. 25:5054. Thereafter, the defense elicited information from Mr. Crawford that was positive but was not amplified by stories or incidents that would have deepened the jury's understanding of Mr. Barrett as a person. Moreover, it was in conflict in important respects with the testimony of Abby Stites, Kenny's former wife, raising even more questions about what Mr. Crawford knew about Kenny:

Q      What sort of qualities do you think in Kenny are admirable?

A      I think Kenny's a good person. He could help people if they needed help.
He's always been good at that. He's got a wife – I mean, a son, and an ex-wife
that need him.

Q      Have you seen him interact with his mother, Gelene?

A      Yes, sir.

18

Q    Is he helpful to Gelene?

A    Yes, sir.

Q    Have you seen him interact with his son, Toby?

A    Yes, sir.

Q    What sort of relationship do they have?

A    They had a good relationship.

Q    Would you – how would you characterize in terms of father/son relationship?

A    I think it was good.

*Id*. at 5063.

Similarly superficial testimony was evoked from Mr. Barrett's mother, Gelene Dotson.

Tr. 25:5071-5105. Tellingly, the defense stumbled onto signs of one of the mental illnesses Mr.

Barrett suffered with the following colloquy:

Q    Were there ever indications that [Kenny] had been using drugs by his actions or anything like that that you could tell?

A    It was kind of hard to tell. I told you that Kenny was always a real, real hyper person and sometimes kind of moody – his moods changed. But I couldn't really say – pinpoint that there was difference at that time.

*Id*. at 5082. Apparently unprepared to develop this information, defense counsel went on to a

different subject and never in the course of the penalty phase returned to the signs of Mr.

Barrett's mental illness that his mother had observed and was clearly able to recount.

On cross-examination, the prosecution continued its unrelenting effort to trivialize and

discount any struggles and difficulties – "the diverse frailties of humankind," *Woodson v. North*

*Carolina* – that Kenny had in his life:

Q    Kenny quit school because he didn't wan to get a haircut?

19

A    Well, that wasn't the only thing.  It was just –

Q    Just what?

A    You would – you would have to talk to his – the superintendent to find out what all the reasons were.  We tried and we tried to get him to go and it wouldn't work.

Q    Kenny have other difficulties in school?

A    No.

Q    So the only difficulty you can point to at school that caused him to quit was because he refused to get a haircut?

A    That was the excuse that he – that he gave at that time but there were other things.

Tr. 25:5093.  Clearly, Kenny's mom had more insight and knew there were other difficulties in her son's life then, but the defense was too uninformed to help her tell her story about Kenny.

The government's closing arguments pulled all of these pieces together to tell the story of Kenny Barrett as the government perceived him – as violent from his teenage years on, as particularly violent with his wife, as contemptuous of and holding grudges against law enforcement officers, as violent toward anyone who did not give him what he wanted, as intolerant of others even in small ways, as not even feeling or expressing love and empathy, as having no genuine remorse for what he had done to Rocky Eales and his family, as having all the family-of-origin benefits that his brother Steven had yet choosing a far different course for his life – in short, as no longer worthy of living among us.

Several excerpts from the government's closing arguments show how vividly the government told their story of Mr. Barrett:

In Cherokee County we say fool me once, shame on you, fool me twice shame on me.  The best predictor of human behavior is past human conduct.  And I submit to you that when you examine past human behavior as it relates to that man he is

20

a future danger.

> Consider first, 17 years old and Johnny Philpot arrests him and he's ordered by a judge to take him to jail....  And as they do, this man is fighting and struggling as they're going up a narrow stairway with a wooden banister and Johnny Philpot pops him in the nose.  Hard enough to break his hand.  Is it an overreaction?  Don't know.  I do know that Mr. Philpot testified the FBI examined it and cleared him of it....   We hear from the defense well Mr. Philpot held a grudge.  Wait a minute, folks.  Who held the grudge?  Who – 18 – no, 21 years – pardon my math – who, 21 years later wanted to kill Johnny Philpot?

Tr. 27:5345.

> His marriage to Abby Stites, then Abby Barrett, was a marriage filled with violence.  Seventeen years ago, Stanley – or Shannon Smith observed this man in the front yard of the residence holding her by the arm, slapping her around with an open hand.  Seven different cases of domestic abuse or violation of domestic abuse in the court of Sequoyah County as to this man against his former wife.

> He broke into her trailer and destroyed – broke her aquarium, flooded the trailer, killed her exotic fish and slashed up her furniture.  He abducted her, took her to Webbers Falls.  He broke her nose.  And what was their response?  On redirect they got Abby to admit that, yeah, after he hit me I hit him back.  After he struck me, I returned blows.  This man's history establishes violence is how he responds to someone who does not do as he wishes.

Tr. 27:5346.

> Consider his recent behavior.  The road block incident.  He slows down and then floors it, just missing Cindy Smith and Michael Readner, who have to jump over a ditch to avoid being hit.  And then goes through the county at speeds in excess of 100 miles an hour for a couple of miles until he ditches the car in a ditch to escape....  Is this man just idle threats?  Certainly law enforcement didn't think so.  Johnny Philpot told his deputies don't go out there by yourself because I fear a shootout, a gunfight and he proved him right.

> Consider Karen Real.  When unknown persons came up he would retrieve his gun until he knew who they were.

Tr. 27:5347-48.

> Cindy Crawford testified that when she refused his sexual advances – when she wouldn't put out and started to leave with his brother Richie, he grabbed the shotgun, stuck it to her leg and said never come back here, I'll blow your leg off.

Tr. 27-5348.

> He thumped a prisoner, Donald ... Fear, [who] is characterized as a cold blooded killer. And, yeah, he was. But Kenneth Barrett thumped him, popped his head against the wall hard enough that a jailer on the other side heard it. And why? Because he was a cold blooded – because Donald Fear was a cold blooded killer? Was it because of Kenneth Barrett's repulsion at his acts? No. He cut his toenails one too many times.

Tr. 27:5349.

> The government then responded to and pointed to the flaws in the mitigating factors

argued by the defense:

> He is a father. And do you know what's missing? There's no adjective. He's not described as a loving father, a carrying [sic] father, a nurturing father, a good father. He is a father. That, folks, describes nothing more than a biological process....

> A loved son and stepson. That is their feelings for Kenneth Barrett. Notice what's missing? Any feelings they receive back.

Tr. 27:5355.

> Good neighbor, good friend? The only testimony there is he fixed cars cheap. Death would impact his child, his friends and his family. And there was no testimony of impact upon his child. No testimony of what impact his death would have upon his friends. And the only impact coming from his family was his stepmother who said that I could no longer have my relationship with him in jail. I'm sorry. I submit that that mitigating factor does not exist.

Tr. 27:5356.

> He expressed remorse. How? When? Well, he told his mom he wished it could have been different. Yeah, like not get caught. Yeah, like kill more of the bastards like I intended to. Where's the remorse? He told his dad that, well, I'm sorry that two children had lost their daddy. What are you going to say to your dad? Damn, Dad, I wanted to kill more than that. I didn't do a good enough job. Come on.

*Id.*[1]

The government then drew the direct comparison between Kenny Barrett and his brother

Steven that had been suggested by their cross-examination of Steven and reduced the differences

between them to a simple conclusion – choices:

> [Compare] Kenneth Barrett with his brother, the defense witness Steven Barrett.
> Kenneth Barrett dropped out of school because he didn't want to get a haircut.
> Steven Barrett chose to remain in school and graduate[] and go to college and get
> a masters. Kenneth Barrett chose drugs. Steven Barrett chose football and an
> education. Kenneth Barrett's life revolved around cooking, making and using
> dope. Steven Barrett's life revolved around educating and nurturing our children.
> Same house, same circumstances, same parents, same conditions. The difference
> is choices made. Choices made by Steven Barrett versus choices made by
> Kenneth Eugene Barrett. And you saw where Steve Barrett's choices have taken
> him. And you have seen in this trial the choices Kenneth Barrett continually
> made through his lifetime and where it has taken him.

---

[1]The government's lack of remorse argument was fueled by a response that defense counsel ineffectively
invited on cross-examination of Rocky Eales' widow, Kelli Eales:

> Q        And when Mr. Barrett was convicted for the death of Mr. Eales in another proceeding you
> weren't happy with the result, were you?
>
> A        I'm not happy. I don't think he's remorseful. He's never told me he's sorry through his
> mouth, through a letter, through his family. He has never gotten up on the stand and said he didn't
> mean to. He has never said I'm sorry. I don't think he is.
>
> Q        Mr. Barrett has never been on the stand, has he, ma'am?
>
> A        No.
>
> Q        He's never had an opportunity in an official proceeding to say anything to you?
>
> A        He's had the opportunity. He's chosen in my opinion to be a coward and not stand up
> and say why he did what he did.

Tr. 23:4691. While this testimony is not mentioned to divert the Court into another aspect of trial counsel's
ineffectiveness, it must be noted that defense counsel's ill-planned questions invited the very kind of victim impact
testimony that the Supreme Court has refused to allow. *See Payne v. Tennessee*, 501 U.S. 808, n.2 (1991) (explicitly
not overruling the holding in *Booth v. Maryland*, 482 U.S. 496 (1989), "that the admission of a victim's family
members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the
Eighth Amendment").

23

Tr. 27:5358.

And finally, the government distilled their narrative about Mr. Barrett to two elements – choices and a complete lack of empathy for other people, which in keeping with Sam Keen's insight in the poem, "To Create an Enemy," led the government to argue that Mr. Barrett "lacked an essential[] ingredient of the community of people," Tr. 27:5411:

> The Defendant elected to suppress his conscience.  He chose a criminal path in this case.  His murderous actions were conscious, knowing, intentional, deliberate and a premeditative result of thoughtful choice.  You know, he lacked an essentially [sic] ingredient of the community of people. He doesn't have empathy for other people.

*Id*.

The defense had no narrative about Mr. Barrett to counter this narrative from the government.  They argued, instead, impersonal, non-individualizing, non-humanizing matters. They argued that the federal government was unfair to pursue more severe punishment for Mr. Barrett than the state court had already imposed, Tr. 27:5366-76, 5382, summed up by Mr. Hilfiger as follows:

> It is impossible to be just if one is not generous.  Be just and generous, ladies and gentlemen. Sentence Kenneth Barrett to a term of imprisonment for the federal portion of the crimes he has not already been punished for.

Tr. 27: 5382.  They argued against the substantial planning and premeditation aggravating factor by re-arguing the crime scene facts and the credibility of the government's snitch witnesses.  *Id*. at 5361-66, 5383-84.  They argued against future dangerousness by trying to minimize the recurring acts of violence that threaded through Mr. Barrett's life – the "scuffle" with the Sheriff when Mr. Barrett was 17, the road block incident, the threatening warning sign Mr. Barrett posted on his property, Mr. Barrett's taping bullet clips together, Mr. Barrett's assaults on and threats against jail guards.  *Id*. 5676-77, 5385-89.  They not only tried to minimize but also tried

24

to normalize the incidents of violence within Mr. Barrett's marriage:

> But that [violence within the marriage] is the instance of violence that they want to bring in to you and say this is a dangerous guy over here. That's a bunch of hog wash.
>
> Protective order violations. You all aren't expected nor required to check in your common sense at the door. You know people that have been in divorces. You know people that have brought protective orders. You know people who have been accused of protective order violations. Put that evidence in the context in which it should be in.

*Id*. at 5385. They dismissed the government's arguments that Mr. Barrett would be sent to a minimum security facility or released as "scare tactics." *Id*. at 5380.

In the only two pages of transcript in which the defense mentioned mitigating factors, they focused primarily on two factors that were ambiguous and without much mitigating weight, because they were not revelatory of Mr. Barrett as a human being with the "myriad loves, hopes, fears that play through the kaleidoscope of every finite heart," Keen, "To Create an Enemy," *supra*, or whose difficulties in life "stemm[ed] from the diverse frailties of humankind," *Woodson*, 428 U.S. at 304. Mr. Smith addressed the mitigating factors as follows:

> The mitigating factors and there's several of them and it was pointed out [by the government] th[e] reasons why you shouldn't give them heed. Well, I want to go back through a couple of them and one is the very first one about acceptance of responsibility from the previous conviction. They say, well, if he appealed it and its overturned and he come [sic] back for trial and he might get life for manslaughter. Yeah, he could get death. Yeah, he could get acquitted. There's all sorts of things that could happen. You weren't told whether or not there were any appealable issues in that case. You don't know. But what you do know is that Mr. Barrett accepted that verdict and was doing his time....
>
> How about the no prior felony convictions? They say, well, he ran from that case. He didn't stand prosecution. Oh, he stood prosecution. He had a lawyer. The lawyer withdrew. The bondsman knew that there was a bench warrant, but he never came out to get him, never notified him of it. That was Marty Daggs that told you that.
>
> The bottom line is whatever the circumstances of that '97 case is [sic], that the

25

question is not did he run from prosecution.  The question is had he ever been convicted of a felony.  Well, ladies and gentlemen, that's a slam dunk. Because you know if he had, you'd have heard about it.  The Defendant is a father. There's no question about that, a loved son and a stepson.  All these mitigating factors you can find.  And I suggest that you will find.

Tr. 27:5397-98, 5399.

> **3.**    **Defense counsel did not understand what the requirements were for providing effective assistance of counsel to a client in connection with the penalty phase of a capital trial, or if they did understand them, were indifferent to them.  In any event, Mr. Barrett's counsel's investigation of mitigation was grossly deficient.**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the axiomatic principle for assessing the performance of defense counsel in connection with a claim of ineffective assistance: whether counsel's performance falls "below an objective standard of reasonableness" in light of "prevailing professional norms." 466 U.S. at 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970)).  In determining the applicable "prevailing professional norms," the Court explained:

> Prevailing norms of practice as reflected in American Bar Association standards and the like, *e.g.*, ABA Standards for Criminal Justice 4- 1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides.  No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

*Id*. at 688-89.

While continuing to note that no statement of prevailing professional norms is definitive, the Supreme Court has at the same time utilized the ABA standards for various criminal defense functions as important benchmarks for determining the reasonableness of counsel's performance. Thus, in *Williams v. Taylor*, 529 U.S. 362 (2000), the Court, relying on the ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2nd ed. 1980), held that counsel's failure to

investigate the client's life history "demonstrate[d] that trial counsel did not fulfill their

obligation to conduct a thorough investigation of the defendant's background."  529

U.S. at 396 (citing the ABA Standards).  Thereafter, in *Wiggins v. Smith*, 539 U.S. 510 (2003),

the Court explained that

> [o]ur opinion in *Williams v. Taylor* is illustrative of the proper application of
> these standards.  In finding Williams' ineffectiveness claim meritorious, we
> applied *Strickland* and concluded that counsel's failure to uncover and present
> voluminous mitigating evidence at sentencing could not be justified as a tactical
> decision to focus on Williams' voluntary confessions, because counsel had not
> "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's
> background." 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1,
> commentary, p. 4- 55 (2d ed.1980)).

529 U.S. at 522.

Drawing upon the 1989 ABA Guidelines for the Appointment and Performance of

Counsel in Death Penalty Cases, the Supreme Court went on to note:

> Counsel's conduct similarly fell short of the standards for capital defense work
> articulated by the American Bar Association (ABA)—standards to which we long
> have referred as 'guides to determining what is reasonable.' *Strickland*, *supra*, at
> 688; *Williams v. Taylor*, *supra*, at 396.  The ABA Guidelines provide that
> investigations into mitigating evidence 'should comprise efforts to discover all
> reasonably available mitigating evidence and evidence to rebut any aggravating
> evidence that may be introduced by the prosecutor.'  ABA Guidelines for the
> Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p.
> 93 (1989) (emphasis added).  Despite these well-defined norms, however, counsel
> abandoned their investigation of petitioner's background after having acquired
> only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins v. Smith*, 539 U.S. at 524 (emphasis in original).

Thus, by the time Roger Hilfiger and Bret Smith became Mr. Barrett's counsel, the

constitutional duty to "to conduct a thorough investigation of the defendant's background" was

well-established.  Moreover, a thorough investigation of the defendant's background meant

making "efforts to discover all reasonably available mitigating evidence and evidence to rebut

any aggravating evidence that may be introduced by the prosecutor." Mr. Hilfiger and Mr. Smith not only failed to conduct any such investigation, they rejected the need to do so.

Neither Mr. Hilfiger nor Mr. Smith had any meaningful experience representing clients in a capital case that had gone to trial. Despite this, they rejected efforts by more learned counsel to help them learn what they needed to do. John Echols was the first such lawyer to offer guidance. When Mr. Echols was allowed to withdraw as learned counsel, he provided the necessary guidance to Mr. Hilfiger:

> At the time I withdrew from the case, I advised Mr. Hilfiger that he needed to immediately undertake extensive investigation and preparation for a possible penalty phase. I explained to him that the work performed by Roseann Schaye, the mitigation investigator in the state case, was very preliminary in nature and far from complete. Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial[,] had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt. In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family mental illness....

> I therefore stressed to Mr. Hilfiger the importance of completing a mitigation investigation so that he would be able to make informed decisions and able to advise Mr. Barrett of possible defenses.

> After I withdrew from the federal case and gave Mr. Hilfiger this report on the status of the prior investigation, he never again consulted me on the legal and factual issues surrounding Mr. Barrett's case.

2255 Motion, Exhibit 34 at 13, 14-15.

I was the second learned counsel whose assistance Mr. Hilfiger declined to accept. I was then a part of the Federal Death Penalty Resource Counsel project, created by the Defender Services Committee of the Judicial Conference of the United States to provide the very kind of assistance to counsel appointed in federal death penalty cases that Mr. Hilfiger and Mr. Smith needed. The work of our project was described in a report by the Subcommittee on Federal

Death Penalty Cases of the Committee on Defender Services of the Judicial Conference, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998) – which was adopted by the Judicial Conference – as "essential to the delivery of high quality, cost-effective representation in death penalty cases...." *Id*. at 50.

At the outset of the case, I reached out to both Mr. Echols and Mr. Hilfiger, but heard back only from Mr. Echols. Thereafter I had extensive consultation with Mr. Echols until he withdrew as counsel. *See* 2255 Motion, Exhibit 118. Despite my offer of assistance at the beginning of the case and after Mr. Echols withdrew, Mr. Hilfiger never responded.

In section 2 of my declaration, *supra*, I have detailed the extraordinarily deficient quality of the representation of Mr. Barrett by Mr. Hilfiger and Mr. Smith in the penalty phase of the trial as evinced solely by the record of the trial itself. Looking past the record itself, it is quite apparent that Mr. Hilfiger's and Mr. Smith's deficient representation stemmed either from ignorance about their duties in representing a capital client in connection with the penalty phase of his trial or deliberate indifference.

Mr. Hilfiger and Mr. Smith have suggested in their declarations that Mr. Barrett discouraged their investigation of mitigation by not wanting the outcome of the case to depend on sympathy for him and by wanting to minimize the testimony from close relatives and his former wife. *See* Government's Answer in Opposition to Second Amended Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody, Exhibits 11 and 12. The short answer to this concern – if it is accurate that Mr. Barrett even expressed such a concern – is that this is no reason to diminish the effort to investigate mitigation. Several months before Mr. Barrett's trial, the Supreme Court made clear what prevailing professional norms had long made

29

clear: The constitution requires a thorough investigation of mitigation even if a capital client is "uninterested in helping" or "even actively obstructive," *Rompilla v. Beard*, 545 U.S. 374, 381 (2005), so long as there are avenues available for mitigation investigation. My declaration of June 27, 2010, submitted as Exhibit 219 to Movant's Reply to United States' Response to Second Amended § 2255 Motion, fully addresses this issue and is incorporated as if fully set forth herein.

The truth is Mr. Hilfiger and Mr. Smith did nothing to investigate mitigation in Mr. Barrett's case. Required under the Sixth Amendment to conduct a "thorough investigation" of mitigation, they conducted none. They failed to use the services of a mitigation specialist to help them investigate mitigation even though the services of such an investigation firm had been approved by the Court. *See* 2255 Motion, Exhibit 34 and Exhibit 66. When they apparently realized approximately one month before trial commenced that they needed mitigation investigation, they attempted to persuade Dr. Jeanne Russell to conduct such an investigation. 2255 Motion, Exhibit 56. She told counsel "there was not time to complete a mitigation investigation, and as a doctor of education and not a mitigation investigator I was not in a position to perform that role." She also observed in this Court, "Based on Mr. Smith's comments and his description of materials he had, it is my belief that he did not have access to much of the material, including interviews of background witnesses that had been done in connection with the state prosecution." *Id*. She did not know, of course, that counsel did have access to those materials.

The most telling evidence of trial counsels' indifference to investigating mitigation has been provided by the very people that counsel should have been interviewing or had a mitigation specialist interviewing – the potential mitigation witnesses. Every one of them who testified

30

recounts that trial counsel met with them only briefly before their testimony and never asked anything about Mr. Barrett's life history. Most of the potential mitigation witnesses, however, were not called to testify and never had any contact with the trial defense team. Those who did have contact provide accounts of trial counsels' stark indifference to even learning about matters in mitigation.

Thus, for example, Carolyn Joseph, one of Mr. Barrett's maternal aunts, recounts the following:

> Kenny's trial attorney only met me for a few minutes. He asked me about Kenny threatening to burn down Janice's house. I confirmed that I heard the threat, and the attorney did not ask me any other questions so he never learned that no one believed it for a second. He never gave me a chance to tell him. The attorney just told me my testimony would not be required. The attorney never asked whether Kenny had attempted to carry out the threat or whether anyone believed that he would. My answer would have been no. Kenny never had done anything to anyone. The attorney did not ask anything about what Kenny was like as a person, what kind of life he had growing up, or what kind of mental illness runs in our family. I would have answered any questions the attorneys asked and I would have answered them truthfully.

2255 Motion, Exhibit 78 at 5. And Doris Barrett, Kenny's stepmother, recounts:

> I had some contact with Kenny's lead federal lawyer, Roger Hilfiger, before and during Kenny's trial, but we never discussed Kenny's family life or history. Mostly, he just outlined the day for me, told me who was going to testify that day. In fact, he only told my husband Ernie and me that we were going to testify on the day we testified in the penalty phase of Kenny's trial. He did not even tell Ernie or me what questions he was going to ask us. No investigator or investigators working for the defense in Kenny's federal case spoke with us.

2255 Motion, Exhibit 80 at 1.

Steve Barrett, Kenny's brother, even warned trial counsel about how the prosecutor might try to compare his life to Kenny's and use that as a way of further demeaning Kenny – which is of course exactly what happened. However, counsel were not interested in anything about Kenny's life history or any of Steve's insight into his brother:

31

Kenny's trial attorney, Mr. Hilfiger, spoke to me briefly, maybe for five minutes, on the day I testified. I tried to tell Mr. Hilfiger my concern that the jury would likely wonder how if Kenny and I grew up in the same home I turned out so well. Mr. Hilfiger and Mr. Smith, Kenny's other attorney, just told me they were going to ask me some questions. They did not ask about our family history, about any insight I may have into why Kenny and I led such different lives, or about significant events in our lives. They never asked me about Kenny's mental and emotional problems or what steps could have been taken to avoid the tragic loss of the police officer's life that night at Kenny's. I know that if law enforcement officers were concerned about Kenny's reaction to being arrested they could have approached him, my Aunt Phyllis, or other family members and been assured he would follow the law and turn himself in peacefully. The brief conversation I had with the attorneys prior to my testimony afforded me no opportunity to talk with them about my concerns. The conversation was very perfunctory and unsettling, but I had no idea if the story of Kenny's life was relevant, and, if it was relevant, how to get it before the jury for their consideration.

2255 Motion, Exhibit 99 at 7-8.

Finally, Abby Stites, Kenny's former wife, also tried to provide insight into Kenny's life but was also rebuffed by counsel:

Mr. Hilfiger and Mr. Smith were interested in my stay-away orders and in my marriage, but not in the underlying issues of Kenny's mental health, at least not from anything they ever talked to me about. They did not ask me anything about his family history either....

I knew the prosecution didn't call me to talk about Kenny's problems. I knew they only wanted to talk about the restraining orders.

That was all Mr. Hilfiger wanted to talk about too. I wanted to talk to him about Kenny's problems, but he said he didn't want to hear about it. I thought Kenny's problems were important to the case and I tried to tell him. I tried to bring up Vinita, the mental hospital which I had pick up Kenny once because the doctor at Bill Willis thought Kenny might hurt himself. They kept Kenny two weeks and would have kept him longer, but his mother came and got him. If she had let him stay, he might have gotten better. He was doing real good.

2255 Motion, Exhibit 103 at 4; Movant's 2255 Reply, Exhibit 216 at 1-2.

The evidence of trial counsels' failure to investigate mitigation is thus stark. They did not investigate mitigation and were indifferent to mitigation when potential mitigation witnesses

32

tried to give them mitigating information. Thus, defense counsel failed to learn the "myriad loves, hopes, fears that play[ed] through the kaleidoscope of" Kenny Barrett's heart, and failed to learn that the difficulties in his life and the difficulties that he sometimes created for others "stemm[ed] from the diverse frailties" readily apparent in his life. These are the reasons the defense failed so completely to rebut the prosecution's narrative about Mr. Barrett and allowed him to be presented to the jury as "merely an enemy of God, an impediment to the sacred dialectic of history." Keen, "To Create an Enemy."

**4.     The defense had the potential to counter the prosecution's narrative and to persuade the jury to impose a life sentence if counsel had conducted the kind of investigation the Sixth Amendment required them to conduct.**

The 2255 motion has attached to it the declarations of people that the defense could have interviewed had counsel conducted a mitigation investigation. None of these people was difficult to find or interview. All knew Kenny Barrett quite well and had much insight into his life – his traumatic upbringing, his sweet and kind nature alongside his fearful and paranoid and impulsive nature, his kindness and generosity, his love for his wife and son despite his inability to be a steady and good husband and father, the mental illness that afflicted him from the time he was a toddler. All could have humanized Kenny and shown that the government's effort to reduce him to a violent non-empathetic person who chose only to meet his own desires was false. Highlighted below are the witnesses that counsel should have interviewed and the life-affirming narrative that these witnesses could have helped defense counsel tell.

Kenny's father, Ernie Barrett, would have been able and willing to testify "about the family history of mental problems, about myself, my marriage to Gelene, and Kenny and me ... so the jury could understand the role I played in Kenny's life." Movant's 2255 Reply, Exhibit 206 at 2. Mr. Barrett "assumed that was why [Kenny's trial counsel] called me to testify, but it

wasn't." *Id*., at 2-3.  Had he been interviewed with the goal of trying to understand his son, Mr.

Barrett would have recounted the following:

> My family had some pretty serious mental problems that folks whispered about back in those days.  My father, A.J. (Andrew Jackson), had enormous moods swings from being an alright guy to being totally out of control where nothing could stop him from attacking us.  He was sent to the mental hospital in Vinita for a month and was in and out of jail in Sequoyah County for public drunkenness.  My father's father, Isaac Clifford Barrett, managed a big ranch until he committed suicide by taking cow black leg medicine.  My brother Ike and my sister Linda also have mental problems.

2255 Motion, Exhibit 81 at 3.  As to himself and his marriage to Gelene, Mr. Barrett would have

recounted:

> At the time I married Gelene, even before we had children, I almost immediately started running around with other women.  When Gelene and I started having children, I did not give much thought to fatherhood and I was mostly an absent father....
>
> I did pretty much whatever I wanted to and did not think about Gelene or, later on, the boys, other than working and supporting them.  I would go out, drink as much as I wanted, and chase women.  I kept that up for years until I met Doris, my third wife in 1985.

*Id*. at 1, 5.

> Mr. Barrett then explained how Gelene was in their marriage and how he responded:
>
> Marriage brought out the worst in Gelene.  She drank right from the beginning of the marriage and straight through when she was pregnant.  She was miserable and complained constantly about how unhappy she was.  She got mad over any little thing and had foul moods.  When she got pregnant, she was miserable.  Her bickering was constant.  I stayed away from home as much as I could, working 16 hours [sic] shifts....  I preferred staying at the plant rather than facing Gelene and her drinking.

*Id*. at 5.

These patterns continued throughout their marriage.  A times, Mr. Barrett left to live with

another woman, for two years one time, and though he "felt bad about leaving my two boys,

Kenny and Richie, ... I could not take Gelene anymore." *Id*. at 7.  Drawn back to his marriage by

his boys, "neither Gelene nor I had changed any.  We both drank as much as we could, and I still

stayed away from home." *Id*.  Thereafter, they moved to New Jersey, but Mr. Barrett "kept up

drinking, fighting, and running around with women, staying gone from home two or three days

at a time." *Id*.

> Recalling Kenny's early years, Mr. Barrett recounted:

> I was not around the house much when Kenny was a little baby but I heard all
> about how hard it was to sooth him.  He was colicky and cried all the time.  When
> he got a little bigger, he could not sit still.  Even if I could get him to watch
> television, his feet were always moving, and he was bouncing.  I cannot sit
> around either, but I am not as bad off as Kenny was.  Even though he was a
> handful, he was a beautiful little boy.

*Id*. at 6.  By the time Kenny was 10 or 11 years old, "Gelene left me for good [when they lived in

New Jersey].... She was at the end of her rope, but I did not much care."  *Id*. at 7.  "Kenny

kicked and screamed to stay with me ... and did not want to go back with his mother to

Oklahoma." *Id*. at 8.  But he did.  And by this point, Gelene

> used to whip the boys over any little thing and whipped them all the time.  She
> had a bad habit of saying cruel things not just to me but to the boys, too.  Kenny
> was always upsetting her because he could not sit still and was always into
> everything.

*Id*. at 7.

> Along the way, Ernie Barrett took note of Kenny's vulnerabilities:

> I liked taking Kenny with me hunting.  Sometimes his little legs would give out
> and I had to carry him on my shoulders.  Boy, he loved that.  Kenny was fearless,
> but ... he was a sensitive little boy too who cried if you hurt his feelings.

*Id*. at 6.  Kenny was drawn to his father even though being with him often led to Kenny being

hurt:

> Kenny always wanted to live with me.  I let him come three times after the

35

divorce, the first time in Dunkirk, Indiana, where Kenny completed ninth grade. Kenny resented my wife Diane and it got the best of me. I lost control when he sassed her, and I hit him pretty hard in the chest. He went flying slamming against the wall. One time I overheard Kenny and some boys talking about running from a fight. I told Kenny, "That's not the way to live your life. If you want, I'll teach you how to fight." Kenny did not show any interest in learning to fight or any interest in fighting. Kenny was not much of a fighter. Now his brother Steve, he was different. He would have taken your lights out. Kenny went back to Sallisaw after that summer and soon quit school for good. He had a hard time with lessons but could do anything with his hands.

*Id*. at 8-9. As an adult, Kenny's father continued to see Kenny's vulnerabilities, which caused

him to be depressed, then manic, and always deeply dependent on others to help him live:

Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic, always on the go and upbeat. Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it. In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me. I got him a job with Kerr Glass and he was making real good money. Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve. Kenny worked hard when he worked, but he never seemed to be able to live on his own. He lived with his wife and lots of times they lived with Gelene, he lived with me, or he lived right next to Gelene. He was not an independent person and had to be close to home.

*Id*. at 9-10.

The themes articulated by Ernie Barrett resonated in the accounts and insights Kenny's

mom, Gelene Dotson, could have provided to the jury. She would have recounted the same

continuous infidelity by Ernie and absence as a father that he recounted. 2255 Motion, Exhibit

97 at 7-8. She acknowledged drinking alcohol through her pregnancy with Kenny, and lamented

not "know[ing[ then what we know now about how having just a little beer can affect your

baby...." *Id*. at 8. Echoing Ernie's account of Kenny being a difficult baby who could not be

comforted, Gelene said that "[a]t first I thought all babies must be like this, but after I had my

other two sons I realized something was wrong with Kenny. He was very, very active and moved around without thinking about what he was doing." *Id*. As Kenny developed, Gelene later came to recognize other differences – an inability to be still and easily being upset – between Kenny and her other sons:

> When he was a toddler, he had to go to the hospital for several different accidents. He got into everything.... He could not be still. Any little thing could upset him, but it took a lot to calm him. I know that babies falling and hitting their heads is not so uncommon, but Kenny had far more than his share of accidents no matter how hard I tried to protect him. This was not true with my other boys.

*Id*. at 8-9.

As Kenny grew into childhood, Kenny was especially vulnerable to his father's neglect. "Kenny really loved his dad and missed him a lot when we were separated.... He really missed his dad, but his dad did not show him any affection." *Id*. at 9, 12. Ernie's infidelity, absences, and neglect led to "some pretty bad fights [with Gelene].... There were terrible scenes with us screaming at each other, Kenny and his brothers crying and scared and not knowing how to make us stop fighting, and then the time he hit me ... [and] gave me two black eyes and split my lip." *Id*. at 10-11.

Ernie's essential abandonment of Gelene and their boys led Gelene to treat her boys harshly, but this was especially true for Kenny because of his hyperactivity and emotional instability:

> When Kenny and his brothers were growing up, I had my hands full with three boys and basically no husband. A woman is not cut out for discipline, and it is not a good role for a woman to play.... I had to make up for the discipline Ernie would not give the boys. I had to be especially hard on Kenny because he went from one thing to the next, was never still, and almost drove me crazy. He was more than hyper. He was emotional about things that did not matter. He would cry and scream like there was no tomorrow.

*Id*. at 11-12.

In the meantime,

> Kenny had a difficult time in school and was in Special Ed classes part of the
> time.  He failed reading and arithmetic in the first grade and had a hard time
> keeping up with the other kids.  It was very difficult for him to read.  In the
> second grade, when they taught phonics he never grasped it.  He never did well in
> school and he finally gave up.  I didn't know what I could do.

*Id*. at 10.

As Gelene was describing Kenny's growth into adulthood, she recalled the details of an

incident with Sheriff Johnny Philpott, who had testified briefly about the same incident at trial.

Tr. 22: 4566-68.  The prosecutor used this incident in closing argument as showing the

beginning of Kenny's life of violence and dangerousness.  Tr. 27:5345.  Gelene saw this incident

from a much different perspective.  She saw the incident as having made Kenny fearful of law

enforcement officers from that point on:

> When he was 16 or 17, Kenny was beaten up by police officer John Philpot who
> broke his own hand while breaking my boy's face after Kenny was arrested for
> squealing his tires.  The FBI investigated the whole thing.  Kenny always loved
> working on cars.  They were his pride and joy. He was out driving one of his
> souped-up cars and got arrested, taken to jail, and beaten all over his face.  His
> nose was bloodied, and his jaw and collarbone broken.  A highway patrolman
> held my son's head back by the hair while John Philpot beat him.  An assistant
> district attorney said he just stepped out of the room and missed what happened.
> Everyone in law enforcement interviewed by the FBI gave a different story.  You
> should have seen the pictures of his face, made you so mad and want to cry at the
> same time.  I think they would have brought a case, but Kenny wanted the FBI to
> drop it he was so afraid.  It was a big thing in Kenny's life and really traumatized
> and terrified him.

*Id*. at 12-13.

Gelene then provided an insightful account into Kenny's and Abby's marriage, which she

summed up in the following terms:

> Kenny met and fell in love with Abby Stites, a wonderful girl.  I love her like a
> daughter to this day.  Kenny was 19 and Abby was 16 when they married in
> 1980.  Kenny and Abby's marriage was always rocky, though, and they were

38

> more unhappy than happy even though they loved each other. They were too young and Kenny was far too mentally unstable.

*Id*. at 13. Gelene then provided more detail of the marital problems stemming from Kenny's

mental instability:

> Kenny had terrible mood swings and periods of depression that lasted for days. He withdrew – anything upset him – and he was paranoid about everything. Abby tried to stay with him, but he needed help for his mental problems and she could not figure out what to do for him. She begged him to go to doctors, and he tried it a time or two, but he went downhill further and further.
>
> He tried to kill himself in January 1986 in my front yard. He came right into the house, got Steve's shotgun, went back to the front yard by his truck and shot himself. We all ran out of the house and thought we had lost him for sure. He almost died in the hospital but he survived and returned home after losing a lung and suffering other internal damage. Abby had him committed to a psychiatric hospital in early October 1986 to try and get him help, and for a while he did better, but he could never hold on to happiness. Abby and Kenny wanted the marriage to work for the sake of their son, but Abby finally ended the marriage in the fall of 1995. Kenny never recovered.

*Id*. at 13-14.

Echoing Ernie's realization that Kenny could not live independently, Gelene recalled

how Kenny's life devolved after the divorce:

> Kenny was not able to live on his own. When he and Abby would separate, Kenny always came home to me. After he and Abby broke up for good, he moved back home. He was a lost soul. Nothing in his life ever mattered but Abby and Toby. Sometimes I could see how hard he was trying to hold it together for them, but he couldn't do it. He just couldn't do it no matter how hard he tried. It was so sad, so he came home to me.

*Id*. at 14. Thereafter, Kenny's life revolved around being near his mom. He got permission from

his grandfather to build a place to live on land next to his mom. *Id*. And,

> With $150.00 and whatever scraps he could find, he built himself a little shack. He was so proud. He showed it off to everybody, but it was nothing much, pretty bare, three tiny rooms and an attic space for sleeping. It had no water, or toilet, or electricity. He put a porch on it though.

> He ran an electrical cord from my trailer to his shack for electricity, and he ate his meals and showered at my trailer.

*Id*. at 14-15.  Thereafter, he withdrew deeper and deeper into his life in his shack:

> He became more and more reluctant to leave our family's property and he became more and more paranoid, although plenty of friends visited him so you could never call him a loner....
>
> Friends brought him food and went grocery shopping for him.

*Id*. at 15.

Gelene profoundly believed – as did many other family members – that the incident in which Rocky Eales was killed never needed to happen, because Kenny's family would have helped Kenny turn himself in if they had known the police had a warrant for his arrest:

> I never believed there would come a time when the police would come in the middle of the night to arrest him.  If they had told me or my other family members or even Kenny, we would have brought him to the jail or the police could have come out and taken him to the jail without any trouble at all.  They had come on his property before and sat on his porch talking to him and inspected his rifles, which were legal, and Kenny never gave them any trouble.

*Id*.

Kenny's former wife, Abby Stiles, understood Kenny better than anyone and saw the struggle in him between mental illness and a very kind, good hearted nature:

> I learned in my marriage to Kenny that Kenny had mental problems.  He would do bad things and then have remorse.  He did things on impulse and then regretted them....
>
> Kenny was like a manic depressive, hot one minute and depressed and even immobile the next.  He would work hard and then sleep all the time.  I don't know if he was doing drugs then, but I think he did the drugs to make himself feel better, because otherwise he would just sleep.  Kenny did not act the way normal people act.  Kenny took good care of his own stuff, but then he would destroy it too when he just got swept away in his emotions.

2255 Motion, Exhibit 103 at 2.

Kenny's and Abby's relationship was defined by his mood swings:

> I spent 14 years trying to keep up with his mood swings. There were times he could be good, but every time I got a new car he would tear it up; every time I got new furniture he would tear it up. He would get very upset over any little thing, but then he would try so hard to be good. He would mow the lawn and take care of things and fix things and it would last for two months....

*Id.* at 2-3. But despite these swings and their painful consequence, Abby continued to love

Kenny:

> I got the stay-away orders, not to just keep him from trying to come back, but to keep me from going back. He would come back crying, begging me to take him back, so remorseful. He could be good as he could be – he would go the extra mile, trim the tree if it meant my taking him back, but he could not keep it up.

*Id* at 3.

Reiterating Gelene's and Ernie's observations about Kenny's inability to live

independently and how difficult life was for Kenny, Abby summed up hers and Kenny's

relationship:

> The whole 14 years we were together, I was always trying to help Kenny. I felt like we were more like brother-sister than wife and husband because I was always bailing him out of trouble and taking care of him. He was never able to take care of me....
>
> I was the only stable thing he ever had in his life. I kept him together. Without me, he could not function.

*Id.* at 2, 4. This last observation, that Abby was "the only stable thing he had in his life," has

even more meaning in light of Abby's observation about Gelene: "Gelene was always cussing

Kenny and had a terrible relationship with him. I never saw Gelene treat her other sons the way

she treated Kenny." And yet, after Abby's and Kenny's divorce, Kenny had only his mom to

return to for the support he so desperately needed just to live from one day to the next.

Ernie, Gelene, and Abby have identified the threads that ran through Kenny's life – the

41

suffering he experienced as an infant that went beyond normal, the profound neglect of his father and his mother, the cruelty of his mother especially directed toward him, the sweetness that he embodied and expressed to others, his extreme restlessness and activity, his emotional sensitivity, his sudden and extreme mood shifts, his paranoia and fear, his struggle to understand life, his dependence on others to help him day-to-day and to help him know what to do. Together, these threads revealed the "sweet individuality of [his] face," *To Create an Enemy*, and the "myriad loves, hopes, fears that play[ed] through the kaleidoscope of [his] heart." *Id.* These threads were seen and noted by many others in Kenny's life, each of whom could have helped the jury understand that Kenny Barrett was far better, and far more deserving of compassion, than the violent, dangerous, non-empathetic person portrayed by the prosecution.

Kenny's maternal aunt, Phyllis Crawford, says that her sister Gelene, Kenny's mom, is "a bona fide alcoholic, although she denies it." 2255 Motion, Exhibit 91 at 2.

> Gelene, who is three years older than I am, started drinking in high school. She used to beat me up with her fists. Now, Gelene drinks beer from the time she gets up until she goes to bed. She screams all the time, and I can hear it in my house after it's gone through her walls and across our yards. She cannot control her emotions. Gelene takes after our father, who was also a heavy drinker who generally wanted to fight when he was inebriated.

*Id*. Gelene also suffered from depression during Kenny's early childhood and neglected him when he needed her the most. As recounted by Kenny's paternal aunt, Linda Riley,

> In 1964, when Gelene left Ernie for the first time, she brought the two babies back to Oklahoma. It was the winter and she moved in with my mom and dad.
>
> Mom worked and daddy would go squirrel hunting every day. Gelene would stay in bed all day with Richie, every day. She did not get out of bed until my mother had dinner on the table. Kenny was three and a half. He would cry when my mother went to work. My mother showed Kenny so much love and tenderness. Kenny would just wander around in the cold house alone without a wood fire to warm the place....

> Gelene was depressed.... She ignored Kenny. He was neglected. I would come out there and find him with a cold fried egg in his hand. I would take him to my apartment and run the tub – he was filthy. He would play with the Ivory soap like it was a boat. I got him a haircut. Kenny had nothing to eat. Gelene would not even get out of bed to feed him.

*Id*., Exhibit 87 at 5.

Together, Gelene's alcoholism, depression, and betrayals by Ernie led her to take out her frustrations and emotions on Kenny. "Kenny was just yelled at by Gelene. Kenny's whole life she screamed at him." *Id*. at 6. As Phyllis Crawford observed,

> Gelene never gave Kenny a kind word, and she screamed at him over anything. When Kenny was about 11, Gelene called me because Kenny was crying and would not come out of his room. My husband Roger and I went over to their house and talked to Kenny. Kenny told us that he could not get his mom's voice out of his head. The only time Gelene talked to him was to scream.

*Id*., Exhibit 91 at 1-2. Gelene's younger brother, Mark Dotson, saw the same thing:

> Gelene was constantly bickering with Kenny, which must have been humiliating for him. He stayed away from the house a lot just to stay away from Gelene. My dad said sometimes when Gelene would get going he would put a hand over her mouth to shut her up. She was the worst with Kenny.
>
> .... Gelene clashed with Kenny and took her frustrations with life and with Ernie out on Kenny. She put him down over insignificant things. Gelene was always lit up from alcohol. When she got going and her face got red, you had better watch out. It was extremely unpleasant, especially because she always targeted Kenny.

*Id*., Exhibit 98 at 2. The long term consequences for Kenny were concisely summed up by his maternal aunt, Carolyn Joseph:

> Kenny had low self-esteem. He would duck his little head a lot and act like he was not as good as those around him. His mother put him down a lot rather than build him up and make him feel good about himself. I do not think you should condemn a child and Kenny had a lot of that....
>
> Kenny did not have much of a chance. Gelene always took out on him the frustrations she had about Ernie. Kenny was defenseless. The damage gets done and there's not much to do about it. A child should not have to be raised like that.

*Id.*, Exhibit 78 at 3.

While Kenny's mom actively hurt Kenny emotionally over many years, the absence of Kenny's father also scarred Kenny. Kenny's paternal grandmother, Ada Mae Barrett, is often thought of as the adult within Kenny's family who loved him the most. She took care of him as a child when his mom went out to party. *Id.*, Exhibit 86 (Declaration of Kenny's paternal cousin Kathy Trotter) at 2. As Linda Riley, Kenny's paternal aunt, explained, "[Kenny] didn't have anybody looking out for him after my mom [Ada Mae Barrett] died." *Id.*, Exhibit 87 at 6. The consequences of Ada Mae Barrett's death were thus devastating for Kenny:

> Kenny's grandmother, Ada Mae, adored him. When she died in 1976 Kenny was just 14. It was as if the only adult who ever cherished him had gone. The family split apart when she died, but for Kenny it was worse because his father had recently deserted him at the age he most needed direction.

*Id.*, Exhibit 86 at 3. The pain of Ernie's desertion was captured poignantly by Ernie's brother Isaac Barrett:

> Once when Ernie came to visit after his divorce from Gelene, Ernie was driving a new Corvette and he passed his children on the street. I was riding with him. The children were wearing worn, ragged clothes. I said, 'Let's stop; there's your kids." He refused to stop and said, "All they want out of me is money." I think Kenny was 15 or 16 then. It was right pitiful. The less Ernie wanted Kenny, the more Kenny worshipped [sic] him.

*Id.*, Exhibit 84 at 5.

The familial environment in which Kenny was raised was one that would have been hard for anyone to survive intact. However, Kenny had a special vulnerability – he was at once extremely hyperactive and emotionally sensitive. As his aunt Phyllis Crawford recounted,

> We knew that Kenny was different because he needed so much more attention as a child than the other children. He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man. He was always hyperactive, on the go, into everything, and could not sit still. He would break down and cry easily.

44

*Id.*, Exhibit 91 at 1.  Kenny's aunt Carolyn Joseph described the same little boy fluctuating between two extremes:

> Kenny was more than a hyper child.  I think he had ADD or something; you could not pin that boy down.  He was the most hyper kid I have ever seen.  I remember when he was little, he was so loving.  He would climb up on you and put his arm around your neck and say, "I love you."  He was the sweetest little boy, and then he would change to being loud and kicking for no reason I could see.

*Id.*, Exhibit 78 at 2.

This "hyper child" who was also "the sweetest little boy" grew into a man whose life was also defined by extremes.  As Abby Stites explained, he was "hot one minute and depressed and even immobile the next."  *Id.*., Exhibit 103 at 2.  "He would get very upset over any little thing, but then he would try so hard to be good."  *Id.* at 2-3.  As Gelene explained, "Kenny had terrible mood swings and periods of depression that lasted for days.  He withdrew – anything upset him – and he was paranoid about everything."  *Id.*, Exhibit 97 at 13-14.  His paranoia included a belief that "satellites were watching him."  *Id.*, Exhibit 75 (Declaration of Kenny's neighbor Alvin Hahn).  Insight into how helpless it felt to be Kenny Barrett could have been provided by his maternal second cousin Brandy Hill, who also suffers mood swings:

> My mood swings make it hard on my husband.  I used to attack him, kind of the way Kenny and Abby fought.  Kenny told me to stop beating on Shawn because it was embarrassing.  On more than one occasion, I took all of Shawn's belongings, piled them outside, and burnt them.  This parallels Kenny's behavior toward Abby, both to lesser and greater degrees.  My husband understands now that my mood swings control me more than I control them.

*Id.*, Exhibit 77 at 1.

Notwithstanding Kenny's mental illness and the deep emotional trauma that has scarred his life, Kenny Barrett is not at all without empathy, kindness, and generosity.  As Linda Riley recalls, "Kenny was the cutest boy.  He had the sweetest smile.  He loved everybody."  *Id.*,

Exhibit 87 at 6.  As Kathy Trotter recalls, "[Kenny] could be very kind and generous and he could be very agitated and mischievous.  I had to be a tough girl to hang with him, but it was something I wanted to do.  I love Kenny; I care about him."  Kenny's maternal cousin and neighbor, Janice Sanders, recounts two stories that reveal Kenny's profound empathy and concern for others' well-being:

> Kenny would never hurt anyone or anything.  In fact, one of Kenny's dogs once attacked a poodle I owned and Kenny put his own dog down for doing it although he loved that dog, and he couldn't have been more apologetic.  The vet fixed my dog up fine, but Kenny often asked about the dog and never stopped saying how sorry he was that it happened.[ ]

> About two weeks before the raid, Kenny drove up to everybody's property in the area and told them that he had lost a gun while riding in a pasture on his four-wheeler.  He was warning folks to keep their children out of that pasture until he found his gun so that they would not pick it up and accidentally hurt themselves.

*Id.*, Exhibit 85 at 1-2.  Kenny's aunt Phyllis Crawford described Kenny succinctly but with the insight into him that many others had: "Kenny tried to stay close to home, always worked hard and took pride in his work.  He would give you the shirt off his back if you needed it."  *Id.*, Exhibit 91 at 3.  Capturing Kenny's pride in and the quality of his work – coupled with the poignant insight that even in his adulthood Kenny's mother could not see him in a positive light – Kenny's maternal uncle Mark Dotson observed, "Kenny was the best shade tree mechanic you can find, but you would never know it from Gelene."  *Id.*, Exhibit 98 at 2.

Another side to Kenny that the defense and the government never helped the jury understand was that, like many of us, Kenny searched for meaning in his life.  Nona Reich Kenny's paternal second cousin, captured both Kenny's search for meaning and his genuine gratitude for another person's wise counsel with the following story:

> The last conversation I had with Kenny was in 1995-96 when my husband at the

> time and I visited Gelene. Kenny came by to visit. It was clear to me that Kenny was studying life and thinking deeply, trying to figure things out. I remember he said, "Aunt Nona, how do you know there's a God?" I took him to the window and said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says that if we worship God in spirit that we will see His truth. I explained God was just like the wind. We can see the leaves blowing in the wind but we cannot see the wind. God is the same thing as the wind in those leaves. Kenny told me that no one had ever explained it that way to him before, in a way that he could understand it. He thanked me.

*Id*., Exhibit 101 at 2-3.

Recalling that his father was helping him work on his car the night of the police raid because "[h]e wanted me to return to school," *id*., Exhibit 96 at 1, Toby Barrett – Abby's and Kenny's son – put his father's mental illness, traumatized childhood, and humanity into perspective:

> My father was too much of a mess to raise me, and I felt resentful toward him for a while, but I do not anymore. I know he has some problems inside his head.... When I was a teenager, before the incident, I knew something was wrong with him because he had mood changes that were not normal. Looking back over the years, I can see he was not dealing with a full deck. My dad could be in the best of moods one minute, then the worst.

> Dad was a very paranoid person. He was also a very scared person – he always thought people were out to get over on him and, of course, the police out here were crooked.... Dad stopped leaving his property and we had to bring things to him. Even though he was scared, he was not dangerous and I was not afraid of him. Dad did the best he could. I have a lot of fond memories of being with Dad, going canoeing, and helping him work on cars. He had a tender side to him. These memories help offset the pain of having a dad with mental problems.

*Id*. at 2.

A reasonable mitigation investigation would have led trial counsel to discover the foregoing thoroughly humanizing information about Kenny Barrett – which on its own, without more, would have fully countered the government's death penalty narrative, and with reasonable probability led to the imposition of a life sentence. However, the foregoing information would

47

also have called for mental health evaluation of Mr. Barrett. That evaluation would have provided an even greater understanding of the difficulties that Kenny encountered in daily life and a particularly helpful understanding of why he reacted as he did when felt threatened by the raid against him.

The evaluation by Dr. George Woods, 2255 Motion, Exhibit 117, relying on and incorporating the neuropsychological assessment by Dr. Myla Young, *id*., Exhibit 89, would have allowed the defense to establish that Kenny suffered from

a.        Bipolar Disorder, for which he was genetically vulnerable due to a long history of Bipolar Disorder in both his mother's and father's families, *id*., Exhibit 117 at 7-11;

b.        Post-Traumatic Stress Disorder (PTSD), due to severe neglect and abuse by his alcoholic and mentally ill parents, *id*., at 11-12, a severe beating by the police when he was 17 years old, and a near-death experience by shooting himself in the chest with a shotgun; and

c.        damage to the frontal cortex of his brain resulting in a Dysexecutive Syndrome, *id*., 24, due to exposure *in utero* to his mother's use of alcohol, his mother's "unpredictable beatings and his parents frequent domestic disputes that were known to end in violence," numerous head injuries in which he lost consciousness, and the use of alcohol, marijuana, and other drugs beginning at the age of 11 or 12 when the frontal lobe development of the brain is just beginning, *id*., at 12, 14, 15.

Clinically, these disorders presented as "cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment." *Id*.

These overlapping disorders fully explained all the difficulties Kenny experienced in his

developmental period, early adulthood, and later adulthood – in learning and keeping up in

school, being married, keeping a job, and living independently, as well as the acute mental health

crises that led him to be hospitalized twice. *Id*. at 16-18. "In the years and months preceding the

commitment offense," *id*., at 19, these disorders accounted for Kenny's growing difficulties and

turning inward as he

> expressed increasingly paranoid thoughts, experienced intolerable irritation at
> perceived surveillance and harassment by law enforcement authorities and felt
> threatened by illicit drug users and dealers, some of whom he suspected of being
> police informants. He disclosed to others his belief that he was being monitored
> by satellites and became increasingly withdrawn until he stopped leaving his
> mother's property. He relied on others to shop and run errands in the nearby town
> for him. At other times, he believed the unidentified aircraft "hovering" over his
> property were "dirigibles," similar to "the ones the U.N. uses," and reinforced
> with "steel plates on their bottoms." He described shooting at one and causing it
> to flee.

*Id*., at 19.

> These overlapping disorders also explained how and why the capital crime took place:
>
> Mr. Barrett's chronic PTSD became acutely activated by the event leading to his
> arrest. As previously noted, Mr. Barrett had multiple individual stressors which
> qualified for a stressor that was life threatening. Over the course of his life, he
> had been beaten multiple times by his caregiver and the police. He had shot
> himself in the chest, at close range, almost losing his life.
>
> He was hypervigilant, having put up a sign warning people to stay away. He was
> extremely anxious and paranoid. Delusional thinking and perceptual disorders,
> beliefs that helicopters were hovering, watching him, eroded Mr. Barrett's reality,
> raising his traumatic thinking to a psychotic level.
>
> Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation
> primed his inability to accurately perceive the nature of the police officers'
> assault on his property, particularly the inability to recognize the action as a
> police action and to gauge his reaction to unfolding events.
>
> Studies of the acutely traumatized have found that those individuals who are at
> increased risk for chronic PTSD are relatively more likely to experience a more
> severe acute emotional reaction. This includes not only the intensity of emotions
> such as fear, anxiety, and/or despair, but also dissociative experiences and

cognitive disruption.

Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.

*Id.*, at 26-27.

The effect of all these disorders on Kenny were distilled in an incident that occurred about two years before the raid. As recounted by his aunt Phyllis Crawford,

Kenny was never able to be independent as a grown man. His emotions got in the way of his being able to live too far from home. As an example, a couple of years before the incident, Kenny had run to my house in tears, crying, "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail.

2255 Motion, Exhibit 91 at 2-3.

Because they knew Kenny, understood him, and had compassion for him, Kenny's mom and her sisters tried to help him not long before the raid, worried that something unfortunate might soon happen. As Carolyn Joseph recounted, however, their efforts went unheeded:

Kenny was going downhill, and because I have experience with bipolar disorder I recognized some symptoms in Kenny. I thought if he stopped using drugs, he

could improve. Gelene and I met with Kenny in my kitchen to talk about how to get him help. We called the sheriff, asking for help but received none. I am sure that Kenny hallucinated and believed that he was constantly under surveillance. I called the authorities because I thought they could get Kenny off the drugs, that they would get him help. I wanted them to get him in a drug program. I did not want them to hurt him. They would not do anything to help. I made my last call to OSBI just days before the raid on Kenny's property, but I never got past a dispatcher.

*Id.*, Exhibit 78 at 4. As reiterated by his aunt Phyllis, who had helped Kenny peacefully be

arrested when he was in a panic two years earlier,

This whole tragedy with the police officer did not have to happen. Instead of raiding Kenny's house in the middle of the night, all they had to do was come to me and I would have walked over to his house and told him that he had to come with me and be arrested and he would have come.

*Id.*, Exhibit 91 at 3. And as his aunt Ruth Harris observed,

This entire tragedy could have been avoided if the police had let the family know they needed to arrest Kenny. Kenny is a very kind person who does not want to bring harm to others.

*Id.*, Exhibit 93 at 3.

Finally, had defense counsel conducted a reasonable mitigation investigation, they would

have removed one of the most dehumanizing tools in the government's arsenal – the devastating

comparison of Kenny to his successful brother Steve, who grew up in the same household. Steve

himself could have provided much information as to how he was far more fortunate than Kenny:

The biggest factor missing in Kenny's life that was present in mine is I benefitted from the guidance, support, and structure of an extended family that Kenny never experienced in his developmental period. Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children.... I was literally surrounded by aunts, uncles, cousins, and most importantly for me, my maternal grandparents, Hugh and Hattie Dotson.

Another critical factor is that our father walked out and abandoned Kenny when Kenny most needed him. Kenny idolized Ernie, while I barely knew him. My parents divorced when I was two, and my two brothers and I stayed with our

51

> mother.  I could tell when Ernie visited how much Kenny missed him, that Kenny was enamored.  Kenny made sure to stay in close proximity, while I would wander off.  Ernie was a god to Kenny.  I have no recollections of being close to my father in childhood....  My father's absence in my childhood and adolescence was replaced by attentive older men and women relatives who rooted me in their love and guidance.
>
> Finally, while I was able to succeed academically, Kenny had great difficulty with his education. Kenny failed in school, but I was one of those lucky students who was always good at school and a decent athlete.

*Id*., Exhibit 99 at 1-2.

Both Abby Stites and Kenny's aunt Carolyn Joseph could have added another extremely important distinction: Kenny was subject to far greater abuse from Gelene than were her other sons.  As Abby recounts, "Gelene was always cussing Kenny and had terrible relationship with him.  I never saw Gelene treat her other sons the way she treated Kenny."  *Id*., Exhibit 103 at 1. Similarly, Ms. Joseph recalls:

> Kenny did not have much of a chance.  Gelene always took out on him the frustrations she had about Ernie.  Kenny was defenseless....  It was easier for Steve because Gelene treated him better than Kenny.  She babied him when he was little, spoiled him rotten, even in high school.  She took him and gave him whatever he wanted.

*Id*., Exhibit 78 at 3.

The differential toll that the differential treatment of Kenny and Steve exacted on Kenny is also reflected in the seriousness of the mental disorders that afflicted Kenny – all in some way arising from or exacerbated by the unique ways in which Kenny was treated.

### *Conclusion*

For these reasons, my opinion is that Mr. Barrett's trial counsel failed not only to conduct a reasonable investigation of mitigation, they failed altogether to conduct any mitigation investigation of the "relevant facets of the character and record of the individual offender" that

constitute "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v, North Carolina*, 428 U.S. at 304.  As such, their performance was constitutionally deficient.  Had they conducted a constitutionally adequate investigation, they would have found an abundance of evidence with which to rebut the government's efforts to dehumanize Mr. Barrett and to move the jury to sentence Mr. Barrett to life.

Under penalty of perjury, I declare the foregoing to be true, this 25th day of March, 2017.

_____
Richard H. Burr