IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,          )
                                 )
          Plaintiff,             )
                                 )
     -vs-                        ) No. CIV-09-105-JHP
                                 )
UNITED STATES OF AMERICA,        )
                                 )
          Defendant.             )


*  *  *  *  *

TRANSCRIPT OF EVIDENTIARY HEARING
VOLUME I
**BEFORE THE HONORABLE STEVEN P. SHREDER**
UNITED STATES MAGISTRATE JUDGE

MARCH 27, 2017

*  *  *  *  *

A P P E A R A N C E S

     MR. DAVID B. AUTRY, 1021 Northwest 16th Street,
Oklahoma City, Oklahoma, 73106, and,
     MS. JOAN M. FISHER, Federal Public Defender,
Sacramento, 801 I Street, Third Floor,
Sacramento, California, 95814, Attorneys on behalf of the
Defendant;

     MR. CHRISTOPHER WILSON, 520 Denison Avenue, Muskogee,
Oklahoma, 74401, Assistant United States Attorney, and,
     MR. JEFFREY B. KAHAN, U.S. Department of Justice,
Capital Case Unit, 1331 F Street Northwest, Room 345,
Washington, D.C., 20530, attorneys on behalf of the
Plaintiff;


REPORTED BY:             KEN SIDWELL, CSR-RPR
                         United States Court Reporter
                         P.O. Box 3411
                         Muskogee, Oklahoma  74402

I N D E X

WITNESS                                                  PAGE

**Ruth Harris**
     (Direct Examination by Ms. Fisher)          41
     (Cross-Examination by Mr. Kahan)            47

**Mark Dotson**
     (Direct Examination by Ms. Fisher)          53
     (Cross-Examination by Mr. Wilson)           65
     (Redirect Examination by Ms. Fisher)        76

**Stephen Wayne Barrett**
     (Direct Examination by Mr. Autry)           78
     (Cross-Examination by Mr. Kahan)           107
     (Redirect Examination by Mr. Autry)        118
     (Recross-Examination by Mr. Kahan)         122

**Doris Barrett**
     (Direct Examination by Ms. Fisher)         123
     (Cross-Examination by Mr. Kahan)           133
     (Redirect Examination by Ms. Fisher)       140

**Jack E. Gordon, Jr.**
     (Direct Examination by Mr. Autry)          145
     (Cross-Examination by Mr. Kahan)           159
     (Redirect Examination by Mr. Autry)        171

**George Woods, M.D.**
     (Direct Examination by Mr. Autry)          176

<u>MARCH 27, 2017 PROCEEDINGS</u>

*(On the record at 9:04 a.m.)*

THE COURT:  Call case number CIV-09-105-JHP, Kenneth Eugene Barrett versus United States of America. Would the attorneys enter their appearances for the record, please?

MR. WILSON:  Christopher Wilson and Jeff Kahan for the United States, Your Honor.

MS. FISHER:  Joan Fisher, David Autry for the movant, Mr. Barrett.

THE COURT:  Very well.  We're set for hearing today on Mr. Barrett's petition for post conviction relief. The government ready to proceed?

MR. WILSON:  Government's ready, Your Honor.

THE COURT:  Is Mr. Barrett ready to proceed?

MS. FISHER:  Mr. Barrett's ready, Your Honor.

THE COURT:  Go ahead and call your first witness then.

MS. FISHER:  Your Honor, we'd like to start with a proffer of the unobjected-to exhibits if I may.

THE COURT:  Okay.

MS. FISHER:  Your Honor, at this time, Mr. Barrett would offer Exhibit Number 1, which is a document In the Matter of Mental Illness of Billy Dean Maxwell, case number MH8212, record of the mental health proceeding dated May

5th, 1982.

THE COURT:  Is there any objection?

MR. WILSON:  No objection, Your Honor.

THE COURT:  Very well.  That one's admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 3, In the Matter of the Sanity of A.J. Barrett, case number 709, mental health record and petition for order of admission to state hospital.

MR. WILSON:  No objection.

THE COURT:  Very well.  It's admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 5, in the matter of the sanity of Wallace Dotson, lunacy record, case number 366, dated May 4th, 1948.

MR. WILSON:  No objection.

THE COURT:  Plaintiff's Number 5 is admitted.

MS. FISHER:  Mr. Barrett offers In the Matter of Mental Illness of Kenneth Barrett, case number 481, record of mental health proceeding.

MR. WILSON:  No objection.

THE COURT:  It's admitted.

THE CLERK:  What exhibit number?

MS. FISHER:  That was Exhibit 6.  Mr. Barrett would offer Exhibit Number 8, which are excerpts from Mr. Barrett's baby book.

MR. WILSON:  No objection, Your Honor.

THE COURT: Number 8's admitted.

MS. FISHER: Mr. Barrett would offer Exhibit Number 12, a letter from John Echols to The Honorable James H. Payne dated February 28th, 2005.

MR. WILSON: No objection.

THE COURT: Number 12 is admitted.

MS. FISHER: Mr. Barrett would offer Exhibit Number 13, a letter from the Honorable James H. Payne to John Echols dated February 22nd, 2005.

MR. WILSON: No objection.

THE COURT: Number 13 is admitted.

MS. FISHER: Mr. Barrett would offer Exhibit Number 14, a letter from Ronald Lax to Tivon Schardl dated September 24th, 2008.

MR. WILSON: No objection.

THE COURT: Number 14 is admitted.

MS. FISHER: Mr. Barrett would offer Exhibit Number 41, educational records for Kenneth Barrett.

MR. WILSON: No objection.

THE COURT: Number 41 is admitted.

MS. FISHER: Mr. Barrett would offer Exhibit Number 45, medical records of Kathy Trotter, a relative of Mr. Barrett's.

MR. WILSON: No objection, Your Honor.

THE COURT: Number 45 is admitted.

MS. FISHER: 46. Mr. Barrett would offer --
Mr. Barrett would offer Exhibit Number 46, medical records
of Brandy Hill, a relative of Mr. Barrett.

MR. WILSON: No objection.

THE COURT: Is that Number 46, is that what it
was?

MS. FISHER: Yes, Your Honor.

THE COURT: That one's admitted.

MS. FISHER: Mr. Barrett would offer Exhibit
Number 47, the medical records of Toby Barrett.

MR. WILSON: Also no objection.

THE COURT: Number 47 is admitted.

MS. FISHER: Mr. Barrett would offer the medical
records for Travis Crawford, cousin to Mr. Barrett.

MR. WILSON: No objection.

THE CLERK: What number is that?

MS. FISHER: I'm sorry. It's Exhibit Number 48.

THE COURT: Number 48 is admitted.

MS. FISHER: Number 49, Mr. Barrett would offer
the medical records of Linda Riley, Mr. Barrett's aunt.

MR. WILSON: No objection.

THE COURT: Number 49 is admitted.

MS. FISHER: Mr. Barrett would offer Exhibit
Number 50, the medical records of A.J. Barrett, Mr.
Barrett's grandfather.

MR. WILSON:  No objection.

THE COURT:  Number 50 is admitted.

MS. FISHER:  Mr. Barrett offers medical records for Kenneth Barrett, Exhibit Number 51.

MR. WILSON:  No objection.

THE COURT:  Number 51 is admitted.

MS. FISHER:  Mr. Barrett offers Exhibit 53, Sylvia Gelene Dotson's genealogy memorandum.

MR. WILSON:  No objection, Your Honor.

THE COURT:  Number 53 is admitted.

MS. FISHER:  Mr. Barrett offers Exhibit Number 54, the military records for Travis Crawford, Mr. Barrett's cousin.

MR. WILSON:  No objection, Your Honor.

THE COURT:  Number 54 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 55, the educational records for Kenneth Barrett.

MR. WILSON:  No objection.

THE COURT:  Number 55 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 56, the medical records of Gwen Crawford, Mr. Barrett's cousin.

MR. WILSON:  Judge, the government has no objection.  I just want to make sure that we're talking about the same person.  Gwen Crawford also be Gwen Holt; is

that correct?

MS. FISHER:  Yes.

MR. WILSON:  No objection.

THE COURT:  Number 56?

MS. FISHER:  56, Your Honor.

THE COURT:  That's admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 57, the medical records of Carolyn Joseph, Mr. Barrett's aunt.

MR. WILSON:  No objection.

THE COURT:  Number 57 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 58, Social Security records for Travis Crawford.

MR. WILSON:  No objection.

THE COURT:  Number 58 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 72, which are the billing records of Roger Hilfiger and Bret Smith.

MR. WILSON:  No objection.

THE COURT:  Very well.  Number 72 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 73, the additional education records for Kenneth Barrett.

MR. WILSON:  No objection.

THE COURT:  Number 73 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 77, sealed budget conference minutes.

MR. WILSON:  No objection.

THE COURT:  Number 77 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 78, sealed order by Magistrate Judge Steven Shreder regarding the defendant's ex parte motion for approval of preauthorization budget for the defense.

MR. WILSON:  Your Honor, government has no objection.  I think maybe we can streamline this a little bit if you want to do this as a group, counsel.

MS. FISHER:  On the sealed budget orders?

MR. WILSON:  That's correct.

MS. FISHER:  Mr. Barrett would offer the following exhibits:  78, 79, which is letter from James Payne to Mr. Echols; 80, which is a letter from Mr. Echols to Mr. Payne -- to Judge Payne; 81, 82, 83, all of which are sealed budget hearing minutes; 84, 85, 86, which are also sealed minute orders.

MR. WILSON:  The government has no objection to those -- those exhibits.

THE COURT:  Those exhibits are admitted.

MS. FISHER:  Mr. Barrett would offer into evidence Exhibit Number 87, childhood photos of Kenneth Barrett.

MR. WILSON:  No objection.

THE COURT:  Number 87 is admitted.

MS. FISHER:  Mr. Barrett would offer into evidence the defendant's pro se motion for change of appointed counsel filed in the trial of the underlying matter.

MR. WILSON:  No objection.

THE COURT:  Is that Number 88?

MS. FISHER:  That is Number 88, Your Honor.

THE COURT:  Number 88's admitted.

MS. FISHER:  Exhibit Number 89, Mr. Barrett would offer into evidence, which is the order by Judge James Payne denying Mr. Barrett's pro se motion for change of appointed counsel.

MR. WILSON:  No objection.

THE COURT:  Number 89 is admitted.

MS. FISHER:  Following that, Your Honor, Mr. Barrett would offer into evidence Exhibit Number 16, the declaration of Ada Blount.  And I'd ask that, Your Honor, for the opportunity to read that declaration into the record.

THE COURT:  Is there any objection?

MR. WILSON:  I'm sorry, Judge.  I was looking down at my notes.

THE COURT:  She's offered Number 16, which is the declaration of Ada Blount.

MR. WILSON:  Your Honor, as to the remaining

declarations, it's the government's position that they are admissible for this hearing so long as they comply with the provisions of 3593.  Other than that, the government would object to any statements in those declarations which do not fall within the parameters of 3593.

MS. FISHER:  And it's our position, Your Honor, that the declarations that I would like to read into the record do, in fact, comply with the statutory requirements for admission of exhibits or evidence into a capital phase capital sentencing.

THE COURT:  Well, I'm going to go ahead and allow you to do that, and if there's anything in particular the government objects to, let me hear about it then.

MS. FISHER:  Thank you, Your Honor.

MR. WILSON:  Just for -- sorry.  Excuse me, counsel.  For clarification, do you want me to make those contemporaneous objections, Judge?

THE COURT:  Yes.

MR. WILSON:  Okay.

MS. FISHER:  Declaration of Ada Blount, Petitioner's Exhibit 16.  I, Ada Blunt, declare as follows: I am Kenneth Barrett's maternal great aunt.  My sister is Gelene Dotson's mother.  I live with my daughter, Janice Sanders.  Kenny was a hyper little boy who could not sit still.  He grew up and built a shack next to his mother's

and tried to make a living fixing cars.  I never felt threatened by Kenny.  He did not bother me any, but I worried about him because I thought drugs made him do things he wouldn't do otherwise.  He was living by himself and got mad at himself sometimes.  Once he shot himself.  Kenny never had much of a father.  Never had any guidance.  We all still love him very much.  An investigator working on Kenny's case asked me to provide this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.  I declare under penalty of perjury that the foregoing one page declaration is true and correct. Executed on the 27th day of February of 2009 in Sequoyah County, Oklahoma.  Signed by Ada Blount.  For the record, Your Honor, Ms. Blount is deceased.

THE COURT:  Is there any objection?

MR. WILSON:  No, Your Honor.

THE COURT:  Number 16 is admitted.

MS. FISHER:  We offer into evidence Petitioner's Exhibit Number 20, Declaration of Ernest Barrett.  For the record, Your Honor, Mr. Barrett, Kenneth Barrett's father is now deceased.  Declaration of Ernest Eugene Barrett.

I, Ernest Eugene Barrett, declare as follows: I am the father of Kenneth Edward Barrett -- Kenneth Edward Barrett, the oldest of three sons born to me and Gelene

Dotson Barrett during our marriage.  At the time I married Gelene, even before we had children, I almost immediately started running around with other women.  When Gelene and I started having children, I did not give much thought to fatherhood and I was mostly an absent father.  Today, these many years later, I wish I could take it back and do for my children what they needed and be the kind of parent they deserve.

MR. WILSON:  Judge, going to object to that particular statement.  And, Your Honor, there are about -- about the first four and a half pages of this particular declaration, it's the government's position, fall outside the parameters of 3593.  And I guess I'm asking the Court, for purposes of judicial economy and time, I would just ask the Court to consider these declarations only -- only what the Court believes is admissible under 3593.  Because it's going to take all week if we're going to sit here and just read through each one of these and I have to contemporaneously object to every sentence.  I'm just asking the Court for some guidance on this particular issue.

THE COURT:  Is there any reason why we have to read them if I admit them all into evidence?

MS. FISHER:  There is, Your Honor.  The purpose of that is because of two reasons.  One, you have to make a decision as to whether or not counsel were ineffective, and

part of that is the prejudicial effect.  It's much too easy to pile in -- and especially given the number of exhibits that we have -- to pile in what is testimonial in nature into the exhibit category.

And to Mr. Wilson's objection I would simply state that all of the declarations deal with the background, personal history, and mental history and have an impact on Mr. Barrett's growing up and his mental health.  And, thus, we would content are fully admissible under the statute.

THE COURT:  Well, I'm going to admit the declarations for the purpose of the hearing.  I am going to bear in mind the strictures of Section 3593 as I consider them.  And we can go ahead and read them if you want to read them.  I promise you, though, that I will review all of them in preparing findings and recommendations.  So if it's possible to dispense with the reading in open court, I'd like to do that.

MS. FISHER:  Your Honor, I'm not going to read every declaration that we filed in this matter, but there are four that I would like to read at this point.

THE COURT:  Go ahead then.

MS. FISHER:  Thank you, Your Honor.

Today, these many years later, I wish I could take it back and do for my children what they needed and be the kind of parent they deserved.  At the time, though, I

had my mind set on doing whatever I wanted as long as I was working. I always worked -- excuse me -- I was -- this may cut the reading short. I always -- excuse me. I always worked and was determined not to live in the kind of poverty I knew as a child growing up. I went into the glass business and worked myself up from pushing brooms to production superintendent. When I retired, I was earning about $76,000 a year and had a good life. It was a far cry from the way I lived as a youngster. I grew up dirt poor in a log cabin with a dirt floor and no running water and an outhouse in Akins, Oklahoma outside of Sallisaw. We had a wood stove for heat and a wood cook stove. We all worked and barely scratched out a living -- thank you -- barely scratched out a living for my mother, father, two brothers, and two sisters. I was the oldest child who survived and was born August 8th, 1938. Three other babies were born but they died. The next oldest who survived, Margaret, was born December 26th, 1941. She died from cancer in 1995. After Margaret, there was Ike, born May 31st, 1944, Linda, born May 30, 1946, and then came Gary, who was born January 23rd, 1948.

One of my earliest memories is being taken out of school to work in the fields alongside my parents. As my brothers and sisters got big enough to walk and carry a load, they joined us in the field. Every year we pulled

cotton in western Oklahoma, picked strawberries in Stilwell, and picked beans in Moffitt, Oklahoma. It was back breaking work, even for little children because we had to stoop, bend and carry our loads up one long row and down the next from sun up to sundown. It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it. When cotton season came, we worked or we starved. When we went back home after cotton season, we ate mostly beans potatoes and commodities that were handed out as public assistance to farm families.

In those days, school was a luxury that came only after work was done. I went to school when I could during the times when my family came back to Akins from working cotton and other crops. I went to school off and on through the eighth grade in Akins, and then started high school. High school was different for me than for most of the other students. I met Gelene in high school before I had to quit after finishing the eleventh grade. We sort of dated twice, but I did not have any money to date and my family lived a good 12 miles from town in the country. I made the football team but had to quit because I could not get to -- get to it after school practices. We lived far out in the country and no one could pick me up and drive me back and forth. Lots of students came from poor families, but my family had it even tougher. Other students made fun

of me and laughed at me because of the way I dressed.  I wore shoes and clothes until they were worn out and then we had to patch them up and keep wearing them.  I figure I had to fight every boy in high school class to hold any respect.

My family had some pretty serious marital -- mental problems that folks whispered about back in those days.  My father A.J. Andrew Jackson had enormous mood swings from being an out -- an all right guy to being totally out of control where nothing could stop him from attacking us.  He was sent to the mental hospital in Vinita for a month and was in and out of jail in Sequoyah County for public drunkenness.  My father's father, Isaac Clifford Barrett, managed a big ranch until he committed suicide by taking cow black leg medicine.  My brother Ike and my sister Linda also have mental problems.

As the oldest boy in the family, I tried to protect my mother and the other children, but I was no match for my father until I was half grown.  My father beat my mother and us children with his fists and with anything he could get his hands on.  I tried to get between him and my mother when he attacked her.  I got beaten more than the other children and learned never to cry when my father -- my father hit me.  I figure I have a very high pain threshold because I do not remember feeling a hell of a lot.  Gary was the only child to hit my father back and that happened when

Gary got bigger than dad.  My father was five-foot-eleven, weighed 185.  Gary was five-foot-eleven and weighed 270.  Gary's nickname was Hoss.

I was three months short of 17 the last time I stepped between my father and mother to try and protect her.  My father hit me across the shoulder with a 19 inch metal file that busted my shoulder wide open.  My father *(sic)* still has a scar.  I left home that day just running because I knew that if I stayed home I would have to kill my father to protect the others.  I was six-foot-three and weighed 187 -- 187 pounds.  My mother stayed with him all those years and put up with his abuse but I could not.  My mother, Ada, was churchgoing and devout.  She did not believe in leaving a marriage no matter how bad it was.  Plus, my father was difficult to figure because he also a decent guy when he was sober.  He worked on a pipeline for two to three weeks and then came home, went on a bender, and just went crazy.  There was no stopping him.  He died at the age of 52 sitting on the back porch with a cup of coffee in his hand.  He just laid his head back and died.  The coffee didn't spill.

When I left home, I knew what hard work was and was not afraid of it.  I moved to Tulsa where I got a room in a house and got a job in the Hartley Cabinet Shop in May 1955.  In March 1957, I lost my job because of a

recession and had to return home for two months. I joined the Marine and got my first lesson in drinking and chasing women. I was in such good physical shape that basic training was a walk in the park for me. I'd been tossing hay bales since I was 12. I got an honorable discharge in 1960 and met up with my family in Clinton, Oklahoma where they were picking cotton.

After I came home, I saw Gelene in Sallisaw. She was back home for a visit and had been living with her aunt and uncle in Joliet, Illinois. They had helped her get a job at Walgreens. I had been planning to apply for a job at Oklahoma Highway Patrol, a civil service job, when I ran into her. She had dark brown hair and dark brown eyes and because I didn't just fall off a cabbage wagon, I knew she had had a lot of experience with men. I was swept away with how beautiful she was. Gelene called her aunt and uncle in Joliet and they talked me into coming to Joliet. They told me I could make a lot of money and Kerr Glass and they could get me a job.

When we got married, I was a physical supernatural. I could work eight hours, go to a bar, get into as many brawls as there were, come home, sleep, and go back to work. I was strong as a bull and would fight anybody that wanted to fight. I did not beat them up so that they couldn't work. Once I knocked them down I did not

kick them in the head or anything.

I did pretty much whatever I wanted to and did not think about Gelene or, later on, the boys, other than working and supporting them. I would go out, drink as much as I wanted, and chase women. I kept that up for years until I met Doris, my third wife, in 1985. I tried to keep my drinking away from the house and in bars. I was a Canadian Club whiskey straight with a water chaser drinker and drank a fifth at a time. Marriage brought out the worst in Gelene. She drank right from the beginning of the marriage and straight through when she was pregnant. She was miserable and complained constantly about how unhappy she was. She got mad over every little thing and had foul moods. When she got pregnant, she was miserable. Her bickering was constant. I stayed away from home as much as I could, working 16 hours shifts. I'd rather work a straight 16 hours than listen to her. I was a trouble shooter at the plant and could memorize machinery blueprints. At the end of seven years, I was a supervisor, spurred on by never wanting to be as poor as I was growing up. I preferred staying at the plant rather than facing Gelene and her drinking. I was not around the house much when Kenny was a little baby but I heard all about how hard it was to sooth him. He was colicky and cried all the time. When he got a little bigger, he could not sit still. Even

6:09-cv-00105-RAW    Document 429    Filed in ED/OK on 05/10/17    Page 21 of 250

21

if I could get -- get him to watch television -- television, his feet were always moving and he was bouncing. I cannot sit around either, but I'm not as bad off as Kenny was. Even though he was a handful, he was a beautiful little boy.

When the boys got older, I took the boys with me when I hunted and fished. I liked taking Kenny with me hunting. Sometimes his little legs would give out and I had to carry him on my shoulders. Boy, he loved that. Kenny wags fearless, but then he was a sensitive little boy who cried if you hurt his feelings.

When I went home, I never know which Gelene I would get, what condition she would be in. I did not want to turn into my father and beat my wife and children. One time Gelene cut up the front of my shirt with a knife when I was wearing it. I slapped her twice and messed up her nose pretty good, gave her two black eyes and split her lip open. It was around 1963 or 1964.

I discovered women when I was in the Marines and I just thought I had to be with different women until I finally met up with Doris in 1985. When I was married to Gelene, I stayed away from home every few months for a night or two with other women. Once, in 1966, I moved in with a woman for a couple of years and left Gelene and the two boys. Gelene was always running back to Sallisaw where she was her daddy's number one girl.

**United States District Court**

I felt badly about leaving my boys, Kenny and Richie, but I could not take Gelene anymore. I was still young and immature myself so I wasn't much of a husband either. I just put the boys out of my mind as much as I could. After a couple of years I could not keep the boys out of my mind and I went back with Gelene in 1967. We moved into the same mobile home I had been living in with my girlfriend. Even though we were back together, neither Gelene nor I had changed any. We both drank as much as we could and I still stayed away from home. I was arrested time after time and went before the same judge for drunk and disorderly conduct and fighting. The judge told me if he ever saw me again, he was going to jail me for over a year. It was my nature and I was out of control and when it came -- when it came to fighting and drinking.

I called a friend in New Jersey he knew where I could get a job. I left Kerr Glass and moved my family to New Jersey. My new job was at a plant in Wharton, New Jersey, and we lived in Stanhope first and then pretty soon moved to Lake Hopatcong. I kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time. Gelene left me for good in Lake Hopatcong. She was at the end of her rope, but I did not much care. She used to whip the boys over any little thing whipped them all the time. She had a bad habit of saying

cruel things not just to me but to the boys too. Kenny was always upsetting her because he could not sit still, and was always into everything. He loved my tools he was always getting into them. I would find them all over the yard and in the woods. It made me pretty mad. Kenny always had a mechanical aptitude that was out of this world.

When Gelene left me, Kenny wanted to stay with me but I was not set up to take care of him and work. Besides Gelene would never hear of it. Kenny kicked and screamed to stay with me. He was 10 or 11 years old and did not want to go with his mother back to Oklahoma. The day Gelene left, she took my paycheck, two of my friends' paychecks that I had won in a draw poker game which she returned to their wives and left me with 47 cents.

I stayed single for five years before I married my second wife, and then for six years before I married Doris. I was married to Diane Kay Wilson from 1977 to 1979 and we lived in Dunkirk, Indiana. I paid Gelene child support, $150 per month until each reached 18, and also gave Gelene extra money for the childrens' school -- school clothes every fall.

MR. WILSON: Judge, just for the record, I believe that should read $150 per child until each reached 18, instead of $150 per month.

MS. FISHER: Thank you. I does say that.

24

THE COURT: Go ahead.

MS. FISHER: I also paid their medical, dental and life insurance but Gelene told the children I never gave her any money. Years later I showed Kenny cancelled checks to prove I had paid because he did not believe me. I came back to Sallisaw at least once a year for a week to spend time with the boys.

Kenny always wanted to live with me. I let him come three -- three times after the divorce, the first time in Dunkirk, Indiana where Kenny completed ninth grade. Kenny resented my wife Diane and it got the best of me. I lost control when he sassed her and I hit him pretty hard in the chest. He went flying slamming against the wall. One time I overheard Kenny and some boys talking about running from a fight. I told Kenny that's not the way to live your life. If you want, I'll teach you how to fight. Kenny did any interest in learning to fight, or any interest in fighting. Kenny was not much of a fighter. Now his brother Steve, he was different. He would have taken your lights out. Kenny went back to Sallisaw after that summer and soon quit school for good. He had a hard time with lessons but could do anything with his hands.

Diane and I moved to Sand Springs, Oklahoma around 1979. I was still drinking but no longer getting drunk or getting into fights at bars. I worked and made a

decent living.  We got Kenny a job and made down payment on a Camaro for him.  Kenny did all right for two or three months but he could not stay away from Sallisaw.  Kenny quit his job and went home.  I had to take the Camaro back when Kenny could not meet the payments.  It hurt Kenny that I took the car back.  Diane and I divorced and I lived by myself a while until Doris moved in with me in Sand Springs around 1985.  Doris and I married in Fort Smith, Arkansas on December 28th, 1990.

Kenny had bouts of depression and did things that did not make any sense.  Sometimes he would be very down but other times he would be manic, always on the go and upbeat.  Kenny cried a lot when he and Abby were separated.  He bawled like a baby when he talked about it.  In 1986 when Kenny was separated from Abby and was very depressed, he stayed with Doris and me.  I got him a job with Kerr Glass and he was making real good money.  Kenny had a truck.  He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running.  Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his young brother Steve.  Kenny worked hard when he worked but he never seemed to be able to live on his own.  He lived with his wife and lots of times they lived with Gelene.  He lived with me or he lived right next to Gelene.  He was not

an independent person and had to be close to home.

My father died in 1969 and my mother died in 1977. She was as good a woman as there is, but she had a hard life between my father being half crazy and always poor. I believe in calling a spade a spade and I would never call myself a good father. I still kick myself over the way I lived my life and the way I treated my children. I can't help but -- I can't help but ask myself if I had been a good father or if I had stayed with Gelene if Kenny would be where he is. I've tried to make it up to him by standing by him since all this trouble. I went to both state trials every day. I had just started a new job when the federal trial happened so I could only go that -- go to that once or twice a week.

The next paragraph I believe the judge granted a motion in limine on, which is -- so I won't read it, Your Honor --

THE COURT: Very well.

MS. FISHER: -- into the record. An investigator working on Kenny's case asked me to provide declaration. I did not write the declaration but I read it carefully and it says what I told the investigator when we talked. I declare under penalty of perjury that the foregoing ten page declaration is true and correct. Executed by me this 10th day of 2009 in Creek County, Oklahoma. Ernest E. Barrett.

For the record, Your Honor, Petitioner's Exhibit 20 actually does have that one paragraph redacted.

THE COURT:  Very well.

MS. FISHER:  Mr. Barrett would offer into evidence declaration of Carl Cook, Exhibit Number 36, which I'd like to read into the record.

I, Carl -- did you want me to wait, Mr. Wilson?

MR. WILSON:  Judge, it would just be the government's same objection.

THE COURT:  Go ahead.

MS. FISHER:  I, Carl Cook, declare the following: I married into the Dotson family on December 31st, 1939 when Christine Dotson became my bride.  We were married 61 years before her death March 31st, 2001.  Christine was Hugh Dotson's sister and Hugh was Gelene Dotson's father, so that makes me Gelene Dotson's uncle and Kenny Barrett's great uncle.  Through the years I learned the Dotson family history.

The Dotson family history was passed down to the generations orally.  I was naturally interested in history so I paid attention to it.  I am telling it now because an investigator who is working for the attorneys on Kenneth Barrett's behalf asked me to tell what I knew of the family history.  I should start with something of my own

history however as it explains how I came to meet and marry Christine.

I was born on October 8, 1918 in Sequoyah County, Oklahoma. My mother was a Latimer and my father was a Cook. One of my mother's ancestors was a colonel in the Revolutionary War. Some of her family fought for the Confederacy in the Civil War. After the Civil War, they were allotted land. My father, Lewis Cook, died in 1928. He was gassed in World War I, got TB, went to Arizona to recuperate where he died. I followed the military tradition of my family and served in World War II. I fought under General Patton in Czechoslovakia and liberated several concentration camps. The most horrible thing I ever saw was a flat car piled high with dead bodies. I was saved by Jesus in Le Havre, France during the war and credit Jesus with my long life. I do not look down on people who are not saved but I cannot help but feel sorry for those who have not found salvation.

The Dotson family history goes -- also goes back to the Civil War. The Dotsons moved from North Carolina to Arkansas, south of Huntsville in 1835. Their old grandma at the time claimed to have been a friend of Davey Crockett's. They learned the town, now Huntsville, the money to incorporate. They loaned the town, now Huntsville, the money to incorporate. According to family

lore, the Dotsons were money -- moneyed slaveholders. The head of the Dotson clan and his two sons fought for the Confederacy leaving the youngest boy at home with his mother. Towards the end of the war, a gang of scalawags showed up at the Dotsons to rob the defenseless woman. She had buried the family savings but told the scalawags she was penniless. They hung her two different times but still she denied having any money. Then they drug her behind a horse through the creek and her son begged her to tell them where the money was hidden. She relented and they took the entire Dotson fortune. The Dotsons came to Oklahoma in 1900. Imagine they were poor. They moved to Marble City. It was wild territory back then, still Indian. The area was riddled with bank robbers and it was a profession many took to. Even I had an uncle who did ten years for bank robbery, Monroe Cook from Muldrow. The Dotsons were tenant farmers. Christine and Hugh's dad, Abe, was killed in 1925. He was shot by a man in a fight over a woman they were both seeing even though both of the men were married. Abe's wife, Minnie, could not raise her six children alone. There was no welfare back then. Minnie put four of her children, including Hugh and Christine, in the Dwight Mission school, a Presbyterian school established by missionaries in 1820 in Indian Territory. I think the school went up to the eighth grade. People at the school told Minnie not to visit her

children once she left them at the mission because it would make them want to come home. The four children were Hugh, Christine, John E. and Eleanor. Mattie kept the other two children, Warren and a girl. Minnie never came around to the school. It turned out children against Minnie because they felt in the back of their minds that Mattie deserted them. Eventually all the siblings connected up. I liked all of them. John E. was an alcoholic and Hugh drank quite a bit when he was young. Hugh raised his four kids, one of them, Gelene, is Kenny's mother. They were dirt poor and had to work in the fields all the way out to California and back. Hugh had a fairly close family and we visited quite a bit. Hugh loved to tease and so did I. We got along good. You could depend on what he said. He told the truth, quite an attribute now. Now you don't know what people are thinking. When Hugh first brought his family back, they bought a farm as I recall, but the farm didn't support the family. Hugh had some cattle like everybody did. People farmed everywhere then. Most of it was arable, even in the mountains. Someone told me that it was a fact that there was corn raised in Sequoyah County in 1920 than in the county in the -- than any county in the United States, although I have never checked it out. Hugh was forced by finances to get a job as a laborer in a creosote plant in Sallisaw. He kept that job until they closed the plant in

the early 1990s. I think what Kenny got, what affected him more than anything, was their mother. I don't think Gelene knew how to raise a child. As far as I know, Ernie wasn't a father. I blamed him for a lot of it. I know Gelene was a drinker. It's hard on children not to have a father, but when their mother is a drinker too, it takes a toll on them. After I told the investigator working on Kenny's case about my family, he came back to me with the declaration. I've read this declaration over carefully and it says what I told the investigator during our meetings. I would have testified to these things at Kenny's trial if anyone had asked me to.

MR. WILSON: Judge, I'm going object to that last sentence specifically.

THE COURT: Overruled.

MS. FISHER: The next exhibit Mr. Barrett offers into evidence is Petitioner's Exhibit 27, which is declaration of Phyllis Crawford. For the record, Ms. Crawford now suffers from dementia. It's my understanding that government does not object to the fact of her unavailability.

MR. WILSON: That's correct, Your Honor.

THE COURT: Good.

MS. FISHER: I, Phyllis -- I, Phyllis Crawford, declare the following: I am Kenneth Barrett's maternal

aunt. Gelene Dotson, who is Kenny's mother, is my sister. I lived with my husband Roger. I live with my husband, Roger. My son, Travis Crawford, has lived here on and off for many years. Our home is adjacent to Gelene's home and in front of Mark Dotson's home. I can see Kenny's old shack from my -- from my home. My family grew up on this land and many of us still live around are here. We are a close knit family and like all families have our quarrels and disputes, but we try hard to help each other out. We feel guilty that we did not do more for Kenny. We did not do anything to get him the kind of mental health treatment he needed even though our family has had to deal with mental illness for a long time. Neither Gelene nor Ernie was ready to be a parent. I lived with Gelene and Ernie in Joliet for a few months when Roger was in the service at Fort Ord. Gelene was four months pregnant with Kenny. Even at that time Gelene drank from the moment she woke up until she went to bed. When Ernie came home from work Gelene immediately started in on him. Often he would turn around and leave. I had intended on staying longer but I could not stand it. We knew that Kenny was different because he needed so much more attention as a child than the other children. He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man. He was always hyperactive, on the go, into everything, and could

not sit still.  He would break down and cry easily.  Kenny had a very difficult relationship with both his parents, but he loved them dearly.  Gelene never gave Kenny a kind word and she screamed at him over everything.  When Kenny was about 11, Gelene called me because Kenny was crying and would not come out of his room.  My husband, Roger, and I went over to their house and talked to Kenny.  Kenny told us that he could not get his mom's voice out of his head.  The only time Gelene talked to him was to scream.  That is so sad.  Gelene had a lot of problems, especially with alcohol and men, that affected Ken badly.  Gelene had different men in the house all the time when Kenny was entering his teenage years and it was very confusing for him.  Gelene was and is a bona fide alcoholic although she denies it. Gelene, who is three years older than I am, started drinking in high school.  She used to beat me up with her fists.  Now Gelene drinks beer from the time she gets up until she goes to bed.  She screams all the time and I can hear it in my house after it's gone through her walls and across our yards.  She cannot control her emotions.  Gelene takes after our father, who was also a heavy drinker who generally wanted to fight when he was inebriated.  My dad's relatives were drinkers as well.  Ernie, Kenny's father, was also a drinker.  He hardly had anything to do with him after the divorce and everyone could see how much it hurt Kenny.

Ernie used to come to town once a year and I remember him coming by to show off his new Corvette when his children did not have shoes or decent clothes to wear. Kenny was never able to be independent as a grown man. His emotions got in the way of his being able to live too far from home. As an example, a couple of years before the incident, Kenny had run into my house in tears crying, the laws after me, they're coming, what should I do. I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail. I have never been afraid of Kenny. Kenny tried to stay close to home, always worked hard and took pride in his work. He would give you the shirt off his back if you needed it. Kenny was crazy about Abby, his wife. They married young and had a little boy in no time. After Kenny married, he and his wife lived off and on with his mother. And after his divorce, he moved back home building a little shack next door to his mother's. His suicide attempt tells it all. A friend and I witnessed it from my front window. I almost passed out. Kenny pulled his truck into his mother's driveway, went in her house, got Steve's gun, came outside and shot himself. We rushed over to him and heard him mumbling and not making any sense. An ambulance came and

took him to the hospital where he stayed almost two weeks. We have learned a lot about depression and mental illness as our children grow up. It runs in our family. I have depression and I get treated for it. My daughter, Gwen, is bipolar, and her son has a rare disorder that makes him unable to talk or mature. He's like a little child. My son, Travis, also has to have psychiatric treatment for anxiety and panic attacks and lives with me and my husband. This whole tragedy with the police officer did not have to happen.

MR. WILSON: Objection, Your Honor. Objection to this whole next paragraph. There's no relevance under the factors under the 3593. Specifically, the definition there of what mitigation is.

MS. FISHER: The paragraph goes on which does tie into mitigation, Your Honor. She said, Instead of raiding Kenny's house in the middle of the night, all they had to do was come to me and I would have walked over to his house, told him that he had to come with me, be arrested, and he would have come. I know that my son Travis -- that paragraph probably doesn't have anything to do with -- well, I know that my son Travis testified in the federal trial against Kenny. I was here in December 2008 when an investigator working on Kenny's case listened to what Travis had to say about his testimony. My husband Roger was here

and listened to the conversation too. I have had part of Roger's declaration -- I have read part of Roger's declaration where he talks about what Travis told the investigator, and I agree that is what Travis told him.

This declaration I am giving includes what I told the investigator when he asked me about Kenny, our family, Kenny's upbringing, and his interview with Travis. I did not write the declaration myself but it says what I told the investigator. I declare under penalty of perjury that the foregoing four page declaration is true and correct, executed by me on this 22nd day of February in Sequoyah County, Oklahoma.

THE COURT: I'm going to admit all of that, but --

MS. FISHER: Thank you, Your Honor.

THE COURT: I may very well determine that some of it is irrelevant under Section 3592.

MS. FISHER: If I can have a moment, Your Honor?

THE COURT: Yes.

MS. FISHER: This is the last declaration, Your Honor, for the moment. Petitioner offers into evidence Exhibit Number 34, the declaration of Warren Dotson.

I, Warren Dotson, declare as follows: I am Hugh Dotson's younger brother which makes me Gelene Dotson's uncle and Kenneth Barrett's maternal great uncle. An investigator for Kenny asked me to tell him about myself and

the family.  He wrote this declaration of what I told him. I have read it carefully and it says what I told the investigator during our meeting.  I am ordained evangelical minister in the First Baptist Church in Kellyville but I do not believe in denominations.  I was saved when I was 34 years old.  I live with my daughter Nona in Kellyville, Oklahoma about 25 miles outside of Tulsa in a house my wife -- in a house my wife -- my wife and moved into in 1965.  Another daughter, Linda Rogers, lives several miles away.  Linda is my only daughter to have married just once. She married Rodger Dan Rogers.  The family refers to him as Rodger Dan the mountain man because Dan is something of a recluse.  He likes to hunt and trap.  My family is very fond of Dan.  Nona has been married five times but is single now and after my wife died two years ago, Nona moved in with me. I have four daughters who are all good women but too often pick the wrong men to marry.  I've been married twice.  My first marriage was to Lela Warren whose father was a U.S. marshal.  The Dotsons and Morgans are mentioned in a book, The Outlaws of Cooks and Hill.  Lela divorced me around 1939 or 1940 when I was in the Army before the war.  I was in the 69th infantry and stationed at Camp Roberts in California. I spent most of my time in the guard house for hitting a lieutenant.  I had been leading the company in the rifle prize for the best shot I had -- best shot.  I had 13 bulls

eyes but I only fired ten shots.  The soldier who stood next to me had missed his own target but the captain counted them.  However I had tripped on the way to the range and hurt my hip.  I could hardly walk.  When I had to shoot from a kneeling position, I could not do it.  I got mad at myself.  They took me to the hospital and x-rayed me.  I was designated for limited service.  I could never be sent overseas.  Took years to heal completely.  My second wife, Ruby Elizabeth Fogle, stood by me for 61 years.  She loved me and I didn't have sense enough to know it when we were first married in Muskogee in 1945.  She died January 7, 2007.  The Dotsons originally came from Tennessee and were slaveholders.  William Abraham Mark Dotson was off with two -- with his two oldest sons fighting for the Confederacy.  Carpetbaggers came to the plantation right after the war before the men had come home.  They drug Clarisse Cook Dotson, William's wife, through the creek until they killed her because she would not tell where the money -- where the family money was hidden.  They killed her youngest boy, too, my granddad's brother.  My father was killed by gunfire in circumstances that vary depending on who is telling the story.  The newspapers accounts reports that dad was drunk and pulled a knife.  The other man grabbed his shotgun and fired.  When the first round did not kill dad, the man pumped in a second.  I heard it as the way

the sheriff had come to the house looking for stolen bridles that dad knew and none was found. Dad later found them hidden in his barn and turned them into the feds. Mama always thought he was killed over the bridles and that he knew more about those bridles than he told. Dad's death left mama with six children to raise. She gave four of the to Dwight Mission School to raise. Hugh, Elnora who later married Gene Masterson, John E. who later married Jackie Morgan, and then Christine who married Carl Cook. Mama kept me and my sister Lela, but she was not able to keep us long. I was only four years old and Lela was two. Mama had to give me to her sister Francis Stites who was married to Andrew Payne. They lived in Muskogee. When I was 14 I went out on my own. Lela was first given -- was first given to welfare people and then to uncle George Dotson my dad's brother who was married to Nancy Kennedy. Lela was married at 15 to Jack Combs and later to Thomas McClendon. I was never mad at my mother. What choice did she have? If I had to forgive her, that would be a wrong way of thinking. It hurts to lose your family. I remember crying when I saw her so many years later because she was a stranger. I worked my whole life. I was a welder and factory repairman and learned never to stay at a job for more than a few years. I found a company that would pay me more I went there. If management insulted me, I would move even if it was less

money.  I worked as a helper for four years in Muskogee for 75 cents an hour.  I then hired on as an acetylene welder and later working welding gas and steam lines.  I also have done heavy maintenance work that involved welding.  I went where I could -- where I could make better.  Nobody paid overtime.  My brother Hugh was a shy man who liked to hunt and fish.  I was at Hugh's bedside when he died.  Hugh worked all his life so he could buy land and have something to leave his children.  They live on land he left them. Kenny, Hugh's grandson, lived out there on Hugh's land. Kenny was a good worker and was never disrespectful.  My daughters took care of him after he got out of the mental hospital.  The law did not have to go to Kenny's place in the middle of the night to arrest him.  Our people live around Kenny's place and know that he was not dangerous. Breaks my heart what happened out there that night.  I declare under penalty of perjury that the foregoing four page declaration is true and correct best of my knowledge.

MR. WILSON:  Judge, just specifically, the government would object to that last paragraph about the law did not have to go out to Kenny's place.

THE COURT:  Very well.  Overruled.

MS. FISHER:  At this time, Your Honor, we'll call our first witness.  May I have a moment, Your Honor?

THE COURT:  Yes.

MS. FISHER:  Your Honor -- oh.  Your Honor, I don't know that it's a concern, but we would ask that the Rule be invoked.

MR. WILSON:  Just going to do the same thing, Judge.  No objection.

THE COURT:  Very well.  Rule has been invoked.  Is there anyone in the courtroom who's going to be a witness in this proceeding?  Good.  I'll count on counsel to keep me apprised if you see anybody coming in that you think is going to be a witness.

MS. FISHER:  I will, Your Honor.

THE COURT:  Very well.

MS. FISHER:  We'll call Ruth Harris.

THE CLERK:  Ma'am, step up to the box.  Raise your right hand.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  Yes.

THE CLERK:  Please be seated.

RUTH HARRIS,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MS. FISHER:

Q.  Would you state your, please?

A.  Ruth Harris.

Q. Will you spell your last name for the record?

A. H-a-r-r-i-s.

Q. Ms. Harris, do you know Kenny Barrett?

A. Yes.

Q. How do you know him?

A. He's my nephew.

Q. And on paternal or maternal side?

A. What do you --

Q. How are you related to Kenny, through his mother or father?

A. His -- his mother is my sister.

Q. So Gelene is your sister?

A. Yes.

Q. And where are you in the family? Can you -- can you describe the family order of children?

A. Gelene is the oldest, then Phyllis, then me, then Carolyn, then Mark.

Q. How much -- what's the age difference -- what's your age?

A. I'm 72.

Q. Do you know how old Gelene is?

A. She'll be -- she's 76.

Q. And Phyllis?

A. Seventy-four. And Carolyn is 70. And Mark is 53.

Q. Can you describe growing up? Or let me ask you this.

Can you describe the marriage of your mother and father?

A.   Very good.

Q.   And what were their names?

A.   Hugh and Hedy Dotson.

Q.   And did your father drink?

A.   Yes.

Q.   A lot?

A.   He -- he didn't get drunk.  He just kind of drank a lot.
He kind of hid it in the barn.

Q.   Did it impact the family at all?

A.   No.  Well, he -- he held down his job and he had cattle.
And he just kind of drank on weekends.  And you never
noticed him being drunk.

Q.   So you don't know what impact the amount of alcohol that
he drank had on him?

A.   Had on him?  He was very cranky.

Q.   And your mother, did she drink?

A.   No, not at all.  I don't think she ever drank a beer.

Q.   Can you describe growing up with Gelene?

A.   Well, it was pleasant.  We were the four girls, grew up
together.

Q.   What kind of person was Gelene growing up?

A.   Just fine, you know.

Q.   Okay.  Well, let's start here.  Are you married or
single?

**United States District Court**

A.   Married.

Q.   To whom are you married?

A.   Jerry Harris.

Q.   And how long have you been married to Mr. Harris?

A.   Will be 54 years.

Q.   During the -- during the time -- well, have you been around Gelene since she was an adult?

A.   Yes.

Q.   And did you -- were you around Gelene after she had Kenny?

A.   Yes.

Q.   Can you describe what you observed about the relationship between Gelene and Kenny?

A.   No, not really.

Q.   Do you know Ernie Barrett?

A.   Yes.

Q.   Can you describe Ernie Barrett?

A.   I really don't know what to say about him.

Q.   Let me ask you this:  What kind of -- did you -- did you have opportunity to observe Gelene and Ernie with Kenny?

          Can you describe what kind of -- let me ask you, did you have an opportunity to talk with an investigator and submit a declaration in this case?

A.   Yes.

Q.   All right.  And in talking with that investigator, do

you remember discussing what you -- what Ernie Barrett, as a father?

A.   Well, Ernie wasn't there.  So when they divorced and Ernie wasn't around, and Kenny -- really hurt Kenny when he left, when they divorced.

Q.   And how did you observe -- or what did you observe as far as Kenny being hurt insofar as Gelene and Kenny's relationship was concerned?

A.   Gelene was -- had three boys, and they were all hyper.  Well, Kenny was very hyper and Steve and Richie wasn't.  But Gelene had to work and she was so busy, and handling the boys, it was just really hard.

Q.   So she had a difficult time raising the children --

A.   Yes.

Q.   -- by herself?

A.   Yes.

Q.   And when you say that Kenny was hyper, what do you mean by that?

A.   Kenny was probably the most hyper child I had ever seen when he was very little.  I was real crazy about him.  I kept him a little bit in Illinois.  He was really sweet, but he was so hyper.  Like he came -- they came to see me one day, and after they left, I didn't have any curtains on the wall, there was nothing in any drawer, no pictures.  That's just -- he was just all over the place.  But he was really

sweet.

Q.   Did you, at that time, think there was anything wrong with him?

A.   Well, I thought -- you know, later in life I noticed kids, that they give them something when they're hyper like that.  But at that time, they didn't.  And he just had more energy than any -- any little child I'd ever seen.

Q.   In the -- did Gelene provide structure and support for the boys?

A.   Gelene didn't have time.

Q.   That would be no?

A.   She tried.

Q.   Did she drink?

A.   Yes.

Q.   A lot?

A.   Sometimes.

Q.   What else can you tell the Court about Kenny?

A.   Well, I love Kenny very much, and I -- I just wanted him to have the best.  And I feel that he didn't get a chance mainly because of the situation.  And I always felt he had a sweet heart.

Q.   And would you have come to testify in his behalf had you been called?

A.   I didn't hear you.

Q.   Would you have come to testify -- when Kenny was

sentenced in this case, would you have come to the sentencing hearing to testify for Kenny?

A. Would I have? I wasn't asked.

Q. Right. But had you been asked, would you have?

A. Yes.

MS. FISHER: Thank you, Ms. Harris. That's all I have, Your Honor.

THE COURT: Cross-examination.

MR. KAHAN: Thank you, Your Honor.

THE COURT: Mr. Kahan.

CROSS-EXAMINATION

BY MR. KAHAN:

Q. Good morning, Ms. Harris.

A. Good morning.

Q. Ma'am, isn't it true that you avoided Mr. Barrett's family during his upbringing?

A. We weren't around each other.

Q. Okay.

A. We kind of had our own life.

Q. All right. In fact, you lived in -- in Fort Smith, Arkansas, didn't you?

A. Yes.

Q. Okay.

A. Well, we lived in Sallisaw at that time.

Q. Okay. Mr. Barrett's family actually lived out of state

until he was about 11; is that correct?

A.   He was nine I think when he came back.

Q.   Okay.  So during that time, that is from his birth until 11, you didn't go visit him out of state, did you?

A.   No.

Q.   Okay.  And when his family returned to Oklahoma, you actually avoided your sister, didn't you?

A.   No.

Q.   No?

A.   I've always been close to my sister.

Q.   Could I ask -- well, let me ask you this:  You recall writing a declaration, do you not?

A.   Yes.

Q.   Okay.  And do you recall writing, "Jerry and I are deeply religious and are Jehovah's Witnesses.  We raised our children in the faith, and they are raising their children in the congregation.  Jerry and I protected our family from being around those who are not Jehovah's Witnesses, so we were not around our sisters and their families very much when our children are growing up.  Bad associations spoil useful habits.  If we were around people who are cursing and doing bad influence of us, peer pressure can make children do bad things, and I tried to keep my children from that."
Did you -- do you recall writing that?

A.   Yes.

Q.   Okay.  So did you, in fact, then avoid your sister and her children growing up?

A.   One of the things that just didn't fit in, our life was busy and theirs was busy, so we weren't together.  The boys had their friends and our children had theirs.

Q.   So before, on direct examination, when you were discussing your sister's drinking, is that something you actually observed?

A.   Yes.  We went on trips, the family did.

Q.   How frequently was that?

A.   Usually just once a year.

Q.   And how long were those trips?

A.   How long did they last?

Q.   Yes.

A.   Maybe four or five days, three days.

Q.   So then, in truth, you saw your sister approximately once a year?

A.   Maybe more.  I would go to my mother's, she would be there.

Q.   Now, I believe you stated on direct that you have always thought highly of Mr. Barrett; is that correct?

A.   Yes.

Q.   Do you recall talking to a newspaper reporter around the time of the crime?

A.   I don't remember.

MR. KAHAN: Your Honor, Can I approach the witness --

THE COURT: Yes.

MR. KAHAN: -- to refresh recollection?

Q. (BY MR. KAHAN) I'll ask you -- you can look that over. But what I'm interested in is on the third page of that document.

A. Where?

Q. On the third page in the second column, did you tell the reporter it was a decent neighborhood until Kenny put up that shack next to his mother's place? It says, when asked, identified herself only as Ruth?

A. I don't remember that.

Q. And do you recall telling the reporter that your sister had tried several times to sell her trailer just to get away from him, but every time a prospective buyer showed up, Kenny run them off?

A. I don't remember that.

Q. Do you recall talking to the reporter?

A. I think I do. I don't know where.

Q. Is it possible you talked to her in -- or him in your sister's home?

A. It might have been.

Q. Okay. And do you recall, when you spoke to the reporter, having any reason to lie?

A.   I don't remember this.  I don't remember this.

Q.   But you can't think of any reason why you would have made that up, can you?

A.   No.

Q.   Now, you wrote in the declaration that was filed in 2010, so this is the second declaration, do you recall stating that no one from the legal team ever came to visit you?

A.   Yes.

Q.   Now, as you sit here today, do you recall at any point being interviewed by a woman named Roseann Schaye?

A.   No.

Q.   No?  If I could ask Government's Exhibit 24?

THE CLERK:  24?

A.   I don't remember this, but looks like something I said.

Q.   (BY MR. KAHAN)  It does appear to you to be an accurate statement of things that --

A.   Yes.

Q.   -- you would have said?

A.   Uh-huh.

Q.   In looking at this, you don't recall an interview in your own home?  You don't recall an interview --

A.   No.

Q.   -- in your home with Ms. Schaye?  But you would agree that the statements contained in here are an accurate

representation of what you believed at the time?

A.  I guess.

MR. KAHAN:  Could I have a moment, Your Honor?

THE COURT:  Yes.

Q.  (BY MR. KAHAN)  If I could, ma'am, at the top of this document, there's an address, Route 1, Box 238, Arkoma, Oklahoma.  Is that accurately your address as of May 24th, 2001?

A.  It was Arkoma.  It wasn't a route.  It was a street.

Q.  Okay.  That is your Social Security Number, though, at the top?

A.  Yes.

Q.  Okay.  And do you happen to recall, was that your phone number at the time?

A.  Yes.

MR. KAHAN:  With that, Your Honor, I have nothing further at this time.

THE COURT:  Any redirect, Ms. Fisher?

MS. FISHER:  Your Honor, at this time we proffer Government's Exhibit Number 24.

THE COURT:  I assume there's no objection.

MR. KAHAN:  No, Your Honor.

THE COURT:  Government's Number 24 is admitted.

MS. FISHER:  We have no further questions, Your Honor.

THE COURT:  Is there anything further?

MS. FISHER:  We have no further questions of Ms. Harris, Your Honor.

THE COURT:  Ms. Harris, you can step down.  Thank you.

MS. FISHER:  Call Mark Dotson.

THE CLERK:  Sir, if you'll step up to the box. Raise your right hand.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  I do.

THE CLERK:  Please be seated.

MARK DOTSON,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MS. FISHER:

Q.  Please state your name, spelling your last name for the record, please.

A.  Mark Dotson.  D-o-t-s-o-n.

Q.  Where do you currently live, Mr. Dotson?

A.  In Vian, Oklahoma.

Q.  Are you married or divorced?

A.  Married.

Q.  Married or single.  I don't know why I -- and are you related to Gelene Dotson?

A. Yes.

Q. In what manner?

A. Her brother.

Q. And you are what relationship to Mr. Kenneth Barrett?

A. His uncle.

Q. Do you currently have any children?

A. Yes.

Q. How many children?

A. Three.

Q. And can you describe your children?

A. The oldest is my daughter, 28. She's a nurse. Middle one is Caleb, and he's 25. He's a manager at Taylor Rental. And my youngest is 19, and he's in college right now.

Q. And how are you employed, sir?

A. Through the Mercy Health Care.

Q. And is your wife employed?

A. Yes.

Q. And how is she employed?

A. She's a -- has a private practice as a dentist.

Q. What is your profession with Mercy?

A. Podiatrist.

Q. Do you -- are you aware of any mental illness or mental health issues among your sisters?

A. The youngest has, I guess, clinical depression.

Q. And what is her name?

A.   Carolyn.

Q.   And Gelene, does she have any serious impairment?

A.   I don't think it's ever, as far as I know, not been medically stated.  But I think she's had some problems with alcohol.

Q.   And mood swings?

A.   Yes.

Q.   Can you describe her behavior as you observed it?

A.   It would be, at times she would be pleasant, and at other times she would be sort of frustrated-acting and didn't -- seem to be zoned-out sometimes.

Q.   And when you say frustrated-acting, how would you describe that behavior?

A.   I guess just not in a good mood.

Q.   Would you have referred to her as unpredictable and unpleasant?

A.   At times.

Q.   Did you know Kenny when he was a child?

A.   Yes.

Q.   And what is the age relationship between you and Mr. Barrett?

A.   I think Kenny is two years older than I am.

Q.   You are how much younger than Gelene?

A.   Twenty -- 23.

Q.   Can you describe Kenny as a child, if you recall?

A.  He's -- he was hyper.  Of course I was younger, and a lot of my memories are as we were older.  I don't -- I don't remember too much when we were real young.

Q.  Do you remember him joining in with you and doing any activities with you?

A.  Not that much.  By the time we were teenage, he had sort of doing his own thing, and, no, we didn't do a lot.  I mean, we did some, but not -- not as much probably as some of my other nephews, like my second sister's sons.

Q.  Would you describe Kenny as a person who stayed to himself?

A.  Yes, I would say it's true.

Q.  In your observations of three boys -- Gelene had three boys; correct?

A.  (Witness nodded head.)

Q.  Kenny was the oldest?

A.  Yes.

Q.  And then came Richie?

A.  Yes.

Q.  And then came Steve?

A.  (Witness nodded head.)

Q.  In observing the behavior of the three boys, how would you describe it?

MR. WILSON:  Objection, Your Honor, unless we can set sort of a time frame when we're talking about.

THE COURT:  Can you do that?

MS. FISHER:  I will, Your Honor.

Q.  (BY MS. FISHER)  Well, let me ask you this:  Were you around them when they were in their -- when were you around the boys?

A.  Probably from the age of -- with Kenny probably from -- some when he was very young, and then back -- when they moved back from -- from New Jersey, I would say he was probably around 10 or 12 I'm guessing, from there on up.

Q.  And do you know how old that would make Richie?

A.  Richie probably was about eight or nine.

Q.  And Steve?

A.  Steve was young, probably around five or six.

Q.  Did you ever observe Kenny have difficulty figuring out social situations?

MR. WILSON:  I'm going to object to that question, Your Honor.  It's so expansive.  Social situations.  I'm going to object to the form of the question.

THE COURT:  Overruled.

A.  I -- I thought he was -- like, he stayed to himself a lot.  But -- but I didn't know if it was because he was older than me, and you know how sometimes the older will -- don't want to hang out with the younger ones because maybe it's not cool.  But he was -- he stayed to himself.  And I guess Richie -- Richie -- sort of the same way with Richie.

You know, he was older than us.

Q. (BY MS. FISHER) Do you recall ever watching Andy Griffith with Kenny?

A. Uh-huh. Yeah.

Q. And did you make any observations of Kenny's reaction to that show that relates to his perception of social situations?

A. Well, I -- I just recall the situation with Barney as the deputy and how he was inept at his job and -- and you find -- we found humor in that, how the show was revolved around him. And I think Kenny -- to Kenny, it frustrated him, and he couldn't quite understand the humor I don't think with Barney Fife.

Q. Did you observe Gelene relationship with Kenny?

A. Yes.

Q. And how would you describe it?

A. They -- they had -- you know, it was -- they would -- they would argue a lot.

Q. And when you say argue, what do you mean?

A. I think it was more she would sort of pick at him just -- and start an argument and keep going at it, and she would never let up on him.

Q. Were you aware of whether or not Kenny's mother drank?

A. Yes.

Q. And did she?

A.  Yes.

Q.  To any particular degree?

A.  She would get -- you know, as beer.  I don't think she ever drank anything harder than that.  But she would start drinking probably fairly early, and by the end of the day, she had quite a few.

Q.  Were you aware of Gelene's social habits with men?

A.  It was hearsay.  I -- you know, I wasn't there, I didn't see that.  But it was hearsay.  Yes.

Q.  And what was that?

MR. WILSON:  Objection.

THE COURT:  Sustained.

MS. FISHER:  Your Honor, if I might, the ordinary rules of the admissibility do not apply to this particular aspect of a capital sentencing so that he could testify to information that he'd heard.

THE COURT:  Well, is he going to tell us where he heard it and give us some indication of reliability?

MS. FISHER:  I can ask him, Your Honor.

THE COURT:  Well, let's hear it then.

Q.  (BY MS. FISHER)  From where did you hear the information about her social habits with men?

A.  I guess I would hear it from my youngest sister, Carolyn.

Q.  And where does Carolyn live in relationship to Gelene?

A.   She -- well, they were neighbors for a long time.

Q.   And would she be in a position to observe the activity?

A.   Yes.

Q.   And to your knowledge, was Carolyn -- were Carolyn and Gelene in contact with each other?

A.   Yes.

Q.   And what had you heard?

MR. WILSON:  Judge, same objection, Your Honor. 3593 allows expansive evidentiary rules, but it has to be specifically relating to the defendant.  And this is talking about the defendant's mother and some behavior of his mother, so I think that that's not admissible in this particular hearing.

MS. FISHER:  If I could respond, Your Honor.  A mother's behavior with a minor -- while a minor child is in the home is particularly relevant to the child's ultimate character and mental health.

THE COURT:  Well, we haven't narrowed it down to behavior while Mr. Barrett was at home.  Just kind of general what does he know about her relationship with men. So if you can confine it to that period, maybe this witness knows something about that, and maybe he doesn't, but --

Q.   (BY MS. FISHER)  In the information that you've received, was there any reason to believe that Kenny was in

the home at the time that Gelene was engaging in the social activities of which you heard?

A.  I really don't know on that.  Couldn't say.

Q.  So when you put in your declaration that Kenny's home life was a mother drinking a lot and having men in and out, you had no knowledge of that?

A.  It was from my sister.

Q.  Do you know when Kenny lived in the home?

A.  Up until he was 16, 17.

Q.  Are you aware of any mental health issues in Phyllis' family, Phyllis being your sister, Kenny's aunt?

A.  Her son, Travis --

MR. WILSON:  Judge, I'm going to object again. We're talking about -- unless counsel can establish independent knowledge of this and this particular witness's competence and ability to diagnose mental illness.  This is all, sounds to be, based upon hearsay and beyond the competence of this witness.

THE COURT:  Well, to the extent that it is hearsay, we do need to hear from him how he knows about this to at least establish some base line for reliability.

Q.  (BY MS. FISHER)  And given the information that you know, how do you know that?

A.  I think he has been clinically diagnosed with attention deficit disorder.

Q. Do you know Travis?

A. Yes.

Q. And how would you describe him?

A. That describes him pretty well.

Q. Thank you. Do you know of any other of Phyllis' sons that have been similarly diagnosed?

A. The youngest one, Monty, is similar. But, now, I don't know if he's been clinically diagnosed with that.

Q. Do you know if your sister, Phyllis, has required any sort of psychological treatment?

A. I don't think so.

Q. Do you recall signing a declaration in March of 2009 in Sequoyah County?

A. Vaguely.

Q. And would reviewing that declaration refresh your recollection?

A. It could.

Q. Can you put Petitioner's Exhibit 32?

A. Are you referring to this Ruth and Phyllis, that one?

Q. Referring -- I was specifically referring to Page 3, last sentence of the -- the paragraph that begins on Page 2.

A. Well, we've got a contradiction here because, on that, we've got Phyllis' psychological problems that required treatment. And then up here at the front on Page 1, we've got two of my sisters, Ruth and Phyllis, had been relatively

mentally healthy.

Q.   Would you -- would you say that everyone who requires psychological treatment is, by definition, not relatively mentally healthy?

A.   Yes.

Q.   You would?  Here's what I'm asking you, Mr. Dotson. In -- in submitting the declaration at the time, was there any reason for you to believe that because Phyllis, at one time, required psychological treatment, that she was not, in fact, relatively mentally healthy?

MR. WILSON:  Objection, Your Honor, unless we can establish, once again, some basis for his knowledge of information about Phyllis.  And now he admits he has a contradiction within his own declaration.

THE COURT:  Well, I think she's trying to get him to explain the apparent conflict that we have here, so objection is overruled.

MS. FISHER:  Thank you, Your Honor.

A.   She had some depression, and that may be what I was referring to.  But whether or not she actually had medical treatment for that, I don't know.

Q.   (BY MS. FISHER)  And how about your sister, Carolyn?

A.   She's several times had some depression problems.

Q.   And do you know anything about your nieces, Carolyn's two daughters?

A.   As far as I know, the youngest one I think has had to have treatment for depression.

Q.   You have a history of alcoholism in your family?

A.   Uh-huh.  Yes.

Q.   Can you describe that to any extent?

A.   Well, as far back as I know, it goes to my grandfather. I was told he drank pretty heavily.  And my father I think had a tendency for that.

Q.   Do you recall -- when were you married?

A.   1986.

Q.   Did Ruth attend your marriage -- your wedding?

A.   No.

Q.   Did anyone from the family attend your wedding?

A.   I believe Carolyn and Phyllis did.  And -- and Travis and Kenny was there.

Q.   And did it surprise you when Kenny was there?

A.   Yeah, a little bit.  Yeah.

Q.   And did it mean anything to you when Kenny came?

A.   Yeah, it did.  It did.

Q.   What?

A.   I was glad to see him there.

Q.   Are you aware of Kenny's abilities as a mechanic?

A.   Yes, he's very, very good, especially for being sort of self-trained.  He's got a natural talent for it.

Q.   Did Kenny ever help you or your family out with his

skill?

A.   Yes, he did.  One instance, my wife was -- had to -- she was driving back and forth to Tulsa, and she had car problems.  And he called and got a part and had it put on and had her ready to go.

Q.   Did you -- did you interact with Kenny a lot during that period of time?

A.   Sort of -- sort of occasional at that time.

Q.   Did anyone from the defense during the trial of this case talk with you, of the federal case?

A.   I don't recall that.

Q.   And if they had talked with you, would you have -- and asked you to testify on behalf of Mr. Barrett at sentencing, would you have done so?

A.   Yes.

        MS. FISHER:  I have no -- I'll pass the witness, Your Honor.

        THE COURT:  Cross-examination, Mr. Wilson.

                    CROSS-EXAMINATION

BY MR. WILSON:

Q.   Good morning, Mr. Dotson.  My name is Chris Wilson.  I'm going to ask you a few questions.  It's true, Mr. Dotson, that you're a podiatrist; is that right?

A.   Yes.

Q.   How long have you been practicing in the field of

podiatry?

A.   Almost 30 years.

Q.   And you're about two years younger than the defendant; is that correct?

A.   Correct.

Q.   And how close in relation, as far as distance-wise, did you grow up from the defendant?

A.   Eight miles.

Q.   And did you spend a lot of time at the defendant's home?

A.   Not a lot.

Q.   Okay.

A.   Occasional.

Q.   And you would agree with me that basically you spent most of your time with Steve; correct?

A.   No.  No, I can't say that's true, either.

Q.   Did you spend most of your time with Mark?  I mean -- excuse me -- not Mark, but --

A.   Richie.

Q.   -- Richie?

A.   Probably out of the three, it would be between him and Kenny.

Q.   You don't suffer from any mental illness; is that correct?

A.   No.

Q.  And you'd would agree with me that your wife does not?

A.  No.

Q.  Nor do any of your three children?

A.  No.

Q.  You considered Kenny to be a hyper child; is that correct?

A.  Yes.

Q.  And that's based upon your looking back now; is that correct?

A.  Yes.

Q.  Hard for you to judge that when you were -- when you first knew him when you all were first were very, very small; right?

A.  Right.

Q.  And I believe you said, when you were teenagers, Kenny the defendant, spent most of his time to himself.  You didn't have a lot of contact with him; is that right?

A.  Right.  Right.

Q.  Was he still hyper then when he was a teenager and you were a teenager, or do you know?

A.  I wouldn't say, no.  He wasn't any more than I was.

Q.  As a matter of fact, I believe you thought Steve was even more hyper even than your brother, Kenny; isn't that right?

A.  Yeah, Stevie could take it to a whole nother level.

Q.   And Steve was, I believe, a number of years younger than Kenneth Barrett; correct?

A.   Right.  Right.

Q.   As a matter of fact, I believe you said you thought Steve was retarded, didn't you?

A.   I don't know if I said quite that harsh, but he --

Q.   Would you like to look at your declaration?

A.   -- he had -- he had no fear of getting hurt as a young kid.  I remember that.

Q.   Look at the Defense Exhibit Number 32.  Specifically look at Page Number 2.  Did you say, at the top of that page, "Grandma used to" -- "Grandpa used to say, if there was a knob, they would turn it.  I thought Steve was retarded, but he turned out not to be and he is now a principal."  Is that your declaration?

A.   Yes.

Q.   So you agree with me that your original assessment of Steve was wrong; right?

A.   By far.  He's extremely intelligent.

Q.   But you still believe that he was even more hyper than his brother Kenneth; correct?

A.   Uh-huh.  I do.

Q.   Is that a yes?

A.   Yes.  But can I say something on that, too, though?  That may be the fact that I was older than -- than him, and

observing him as, you know, an older child. And then the opposite with Kenny. I'm the younger observing him.

Q. All right. Did you know or were you aware that -- back up. Let me strike that for a second, Judge.

You said that Steve was very intelligent; is that correct?

A. Yes.

Q. Became a football coach and then an administrator at the school; is that correct?

A. Right. Yes.

Q. Were you aware that Steve also had problems with illegal drugs?

A. No.

Q. Weren't aware of that?

A. I was not aware of that.

Q. Didn't know that he overdosed when he was a teenager?

A. No.

Q. Would you agree with me that Steve made some good choices in his life eventually; correct?

A. Yes.

Q. Were you aware that Steve spent time with his father, Ernie, and worked at the glass plant?

A. Yes. I did -- well, I don't know if he worked at the glass plant. I was thinking that was Richie. But I thought Stevie had spent some time with Ernie.

Q.  Did you know that his father helped with his tuition?

A.  No.  I didn't know that.

Q.  But you agree with me that Steve chose to further his education?

A.  Yes.

Q.  And if, in fact, the evidence is that Steve also had a problem with drugs and overdosed, that he obviously made some different choices about how to use drugs and whether to use drugs or not use drugs?

A.  Yes.

Q.  Would you agree with that?

A.  Yes.

Q.  Were you aware that the defendant, Mr. Barrett, had a problem with narcotics?

A.  Yes, but I -- I can't say I ever saw him -- I never saw him do drugs.

Q.  Did you ever go to his house?  And when I'm talking about his house, I'm talking about the cabin next to his mother's place.

A.  No.

Q.  The defendant shot and killed a trooper in September of 1999.  Are you aware of that?

A.  Yes.

Q.  Prior to that date, when was the last time you had been to either Gelene's trailer or that particular area?

A.  Four months.  But that's -- that's -- I couldn't say for sure.  Four months maybe.

Q.  So it was within a year?

A.  Yes.

Q.  And did you go to Gelene's place, or where specifically did you go?

A.  It would be Gelene's.

Q.  So you didn't go to Kenny's cabin?

A.  I don't -- I don't think I've ever been in the cabin.

Q.  Was the cabin there?

A.  Yes.

Q.  Was Kenny, the defendant, was he at his mom's place when you were visiting?

A.  No.

Q.  So when was the last time before September of 1999 when you actually had contact with the defendant?

A.  I guess the last time I recall was my wife actually helped Kenny with one of his -- with a dental problem, and that that was probably eight months previous maybe to that incident.

Q.  And you saw him that time?

A.  Yes.

Q.  Well, it's interesting that -- would you agree with me that you never mentioned in this -- in this declaration anything about Kenneth Barrett's drug use?

A.   If I didn't, I don't -- I wouldn't -- I don't know why.
Maybe it wasn't asked.  I don't know.

Q.   Do you have any specialized training in the field of
psychiatry or psychology?

A.   I do not.

Q.   So your testimony about persons in your family having
mental problems, that's not based upon any specialized
training, is it?

A.   No.

Q.   As a matter of fact, you've not consulted with any
physicians regarding any of your family members and their
mental health condition; is that correct?

A.   That's correct.

Q.   Now, in your declaration, you mentioned or mention Ruth,
and was that Ruth Harris?

A.   Yes.

Q.   Is that the same Ruth Harris who testified in this
courtroom just a few minutes ago?

A.   Yes.

Q.   And I believe you, as part of your declaration,
indicated that, at some point, Ruth actually had contact
with the defendant regarding changing his lifestyle; isn't
that correct?

A.   Yes.

Q.   Now, when you say changing his lifestyle, were you

referring to his use of illegal drugs?

A.   Yes.

Q.   It had gotten so bad that his own family was scared of him; isn't that correct?

A.   Well, I think Ruth -- Ruth cared a lot about Kenny and wanted to try to help him.  And I think she sat down with him, talked to him, was concerned.

Q.   Because he had become real paranoid; is that right?

A.   Well, you know, his -- his life was -- just seemed to be a little chaotic.  You know, he didn't -- I don't think he was working at that time.  And his -- just his general lifestyle, she was concerned about him.

Q.   And when was that in relationship to the shooting and killing and the murder of the trooper?

A.   I think it was probably within a year of that time, close to it.

Q.   And you agree with me that, obviously, Mr. Barrett did not change his lifestyle?

A.   I'd say no.

Q.   You would agree with me that, when she spoke with him, it wasn't you need to go to a mental hospital; isn't that correct?

A.   I don't know the specifics, but I don't think that was her -- her suggestion to him.  I think it was just more, you know, counseling trying to -- to -- I think mainly just to

convey that we -- that we cared about him.

Q.   And that he had a significant drug problem, he needed to get off -- get off the drugs; is that right?

A.   Yes.

Q.   Are you aware of the effects which methamphetamine has on the human body?

A.   Very well.

Q.   It causes significant dental problems; isn't that correct?

A.   Uh-huh.  Yes.

Q.   It also causes problems with paranoia; is that correct?

A.   I believe so.

Q.   It can cause persons to go many, many hours without sleep; isn't that correct?

A.   Correct.

Q.   Even into the days.  Would you agree with that?

A.   Yes.

Q.   And were you aware that Mr. Barrett, Kenneth Barrett, was, in fact, using methamphetamine on the day of the murder?

A.   I don't know -- I don't know that to be true.

Q.   You testified in direct that the defendant and his mother argued a lot; is that correct?

A.   Yes.

Q.   And what time frame are we talking about when you made these observations?  What was the age of Mr. Barrett, Kenneth Barrett at that time?

A.   The teenage years mainly.

Q.   And was he still in school at that time, or had he already dropped out of school at that time?

A.   He was still in school.

Q.   And was that when he was living in the Sallisaw, Vian area?

A.   Yeah, Sallisaw.

Q.   In your declaration, you comment that you wanted to stay away from the family because of your sister, Gelene; is that correct?

A.   Yeah, I guess there's, yeah, some truth to that, yes.

Q.   There's some truth to that?

A.   Yeah.  Well, you know, she's my sister.  But at the same time, she was -- she -- she could get hard to get along with.

          MR. WILSON:  May I have just one moment, Your Honor?

          THE COURT:  Yes.

Q.   (BY MR. WILSON)  So just so I'm clear, when you were very young, you did not live with Mr. Barrett up in Illinois; is that correct?

A.   Correct.

Q.    And so the only -- any contact you would have with him when you were very young is when they would come to visit?

A.    Correct.

Q.    And then he moved back here, and I believe your testimony was 10, 12 years old; is that correct?

A.    Somewhere in that, yes.

Q.    And that he began to basically stay by himself quite a bit; is that correct?

A.    Yes.  But, you know, again, that he was older than I was, and I lived out in the -- in the country and they were living in town.  So back then, we didn't have as much contact.

            MR. WILSON:  Okay.  I believe that's all I have. Pass the witness, Your Honor.  Thank you.

            THE COURT:  Any redirect?

            MS. FISHER:  Yes, Your Honor.  Very quickly.

                    REDIRECT EXAMINATION

BY MS. FISHER:

Q.    Mr. Dotson, are you aware when you -- when you say that methamphetamine causes a person to be paranoid, are you aware that when a person is paranoid, they can misconstrue a situation that arises in the middle of the night?

A.    Yes.

Q.    Are you familiar with the concept of self-medication?

A.    No.

Q.  So have you -- have you never understood that a person who is suffering from a mental illness might take drugs in order to take care of himself because he doesn't understand what's happening to him?

A.  I guess I could see that, yeah.

Q.  And as you indicated, you're not an expert in the effects of methamphetamine, are you?

A.  No.

Q.  You would defer to any expert that could more readily explain the effects of methamphetamine on an individual; would you not?

A.  Oh, yes.

Q.  And, finally, do you wish you had been able to better help Kenny?

A.  Yes.

MS. FISHER:  I have no further questions, Your Honor.

THE COURT:  Mr. Dotson, you can step down.  Thank you, sir.  Let's take a 15 minute break.

*(Off the record at 10:56 a.m.)*

*(Back on the record at 11:13 a.m.)*

THE COURT:  Ms. Fisher, call your next witness.

MR. AUTRY:  Steve Barrett.

THE COURT:  Mr. Autry.

THE CLERK:  Sir, raise your right hand.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  Yes, sir.

THE CLERK:  Please be seated.

STEPHEN WAYNE BARRETT,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. AUTRY:

Q.  Could you state your name for the Court, please, sir?

A.  Stephen Wayne Barrett.

Q.  Where do you live, Mr. Barrett?

A.  I live in Noble, Oklahoma.

Q.  And how long have you lived there?

A.  Approximately eight years.

*(Reporter Interruption)*

THE WITNESS:  S-t-e-p-h-e-n.

Q.  (BY MR. AUTRY)  And what do you do for a living, sir?

A.  I'm the high school principal in Noble.

Q.  Is that Noble High School?

A.  Yes, sir.

Q.  And how long have you been the principal there?

A.  I've been the head principal for about three years, but I've been with the district for about 15.

Q.  All right.  Before you were the head principal of the high school, what did you do in the previous years for the

school district in Noble?

A. Assistant principal at the high school. Head middle school principal. Before that, taught chemistry and physics and coached football.

Q. Okay. Was that at Noble High School?

A. Yes, sir.

Q. Before that, did you -- did you go directly into education after you went to college, or did you have any other kind of jobs --

A. No.

Q. -- before you started in the education field?

A. I worked in a factory for a year before I started school.

Q. All right. And could you tell the Court what your education consists of, sir?

A. Obviously graduated high school. Went to junior college for a little bit at Tulsa Junior College, and transferred to OU. I think I got my bachelor's from University of Oklahoma in '93, and my master's in '05 I believe.

Q. What was your undergraduate degree in?

A. Science education.

Q. And what did you get your master's degree in?

A. Educational administration.

Q. Do you have any military experience?

A. Spent 11 years in the Army National Guard.

Q. Are you married?

A. Yes.

Q. How long have you been married?

A. Five years.

Q. Do you have any children?

A. Two.

Q. How old are they?

A. They're from my previous marriage.  I have an oldest boy that's 23 and a younger one that's 21.

Q. Okay.  Do you know Kenneth Barrett?

A. Yes, sir.

Q. How do you know him?

A. He's my brother.

Q. Is he an older brother?

A. Yes, sir.

Q. About how much older is Ken than you are, Mr. Barrett?

A. Seven years.

Q. Did you have the same parents?

A. Yes, sir.

Q. What's your mother's name?

A. Sylvia Gelene Dotson.

Q. And what was your father's name?

A. Ernest Eugene Barrett.

Q. Is your father now deceased?

A. Yes, sir.

Q.  Do you have any other brothers or sisters besides Kenneth Barrett?

A.  There's a middle brother, Richard, that's five years older than me.

Q.  All right.  Let me ask you a general question, and then we'll try to break it down more specifically.  Based on what you know growing up with the family, was Kenneth Barrett raised in an environment that was different from yours growing up?

A.  The same early, but adolescent years were drastically different.

Q.  Okay.  Can you describe that?

A.  When I got to be an adolescent, we had moved to the country and basically the family land that belonged to my grandfather, and I lived in an area probably with, you know, five relatives houses within a, you know, quarter mile proximity.

Q.  And can you describe what kind of environment, to your knowledge, Kenneth had when he was growing up?

A.  I can't say the early parts before we moved back to Oklahoma.  I would describe the years, especially probably late '70s when we lived on Meadowlark as being very unstable.

Q.  Okay.  Could you explain that to the Court, or describe the instability you're talking about?

A.   Well, I think my mother had just gotten divorced, was struggling herself, and I think trying to raise three boys. And I think that, you know, there was a lot of, you know, I'd say family drama within the house, you know, on different occasions.

Q.   All right.  When you say family drama, what do you mean exactly?

A.   It could range anywhere from verbal arguments to, you know, physical altercations.

Q.   And who would the verbal arguments be between?

A.   Typically, it would be Kenny and mom, or even Richie. He was close enough in age.  So those three.

Q.   And what would they argue about?

A.   It may be simple things.  It may be dinner.  It may be what someone said to the other one.  It was really typically wasn't a specific topic.

Q.   Do you know who generally instigated the arguments?

A.   I can't remember.

Q.   Okay.  Is your mother an alcoholic?

A.   Yes.

Q.   I'm going to be asking you some questions, some personal questions about your family.  Do you understand why we're doing that?

A.   Yeah.

Q.   And when did it become evident to you that your mother

had a drinking problem?

A.   I don't think I -- you necessarily perceive that when you're younger, but --

Q.   Yes, sir.

A.   -- I can't remember a time that there wasn't alcohol involved growing up.

Q.   And could you describe generally her drinking habits, your mother's drinking habits?

A.   She drank beer on a regular basis.  But, I mean, obviously weekends were spent -- a lot of times she came home late at night, so she would -- she frequented the bar scene I would say.

Q.   And how old were you at that time?

A.   It would have been late '70s, so I'm eight or nine.

Q.   All right.  And Ken would have been a teenager at that time?

A.   Yes.

Q.   Do you know, based on what you know about the family, whether that was a problem with your mother while Ken was a young child growing up?

A.   I can't -- I don't have any memories of that.  I don't remember.  I was born in Illinois and then we moved to New Jersey, so I don't -- but I don't remember any part of that part of our life.

Q.   Okay.  How did drinking affect your mother?

A.    She's a very boisterous individual, opinionated.  So as she drank, it became -- she was more overt in her -- in her verbiage.

Q.    Okay.  What do you mean by that exactly?

A.    Argumentative, or she would -- and if it was a conversation, she would chime in and she'd seem to have, you know, strong opinions about particular things, whatever it may be.

Q.    All right.  Did she confront Ken a lot with her strong opinions, as you put it, after she had been drinking?

A.    Yeah.  I can't recall that she was drinking every occasion.  I know there was a lot of arguments about -- you know, I would say arguments where she was trying to control his behavior.

Q.    All right.  Do you think your mother's drinking habit adversely affected your brother, Ken, and you to some degree?

        MR. KAHAN:  Objection as to speculation, Your Honor.

        THE COURT:  Overruled.

A.    I think in any case like that where there's heavy drinking, the absence of the parent is going to have some form or effect on kids.  I felt it.  I'm sure that Kenny did.

Q.    (BY MR. AUTRY)  All right.  How did you feel it?

A.   Had to rely heavily on other people as far as school activities, you know, as far as to and from transportation, trips from sports.  So that was, I felt, neglectful.

Q.   Do you know how it affected your brother, Ken?

A.   No, I think it's probably a question for him.  Obviously it was trying times.  Dad wasn't there, so --

Q.   All right.  Well, let me ask you about that.  How old were you when your parents divorced?

A.   I believe I was two.

Q.   And Ken would have been about nine?

A.   Yes, sir.

Q.   So did you ever -- were you ever really raised with or around your father?

A.   No, sir.

Q.   Okay.  And what kind of relationship did Ken have with his father?

A.   I would think very close, you know, from my perspective, especially, you know, when we would see dad in the late '70s, Kenny would always stay close to dad.

Q.   All right.

A.   Very fixated on dad.

Q.   Were you fixated on your father the same way Ken was?

A.   No, I don't believe so.  I mean, just because I -- that absence was always there for me, so it was the norm basically for me.

Q.  Did Ken miss his father a great deal?

MR. KAHAN:  Objection as to speculation.

THE COURT:  If he knows.

Q.  (BY MR. AUTRY)  Do you know -- well, I'll just ask you. Mr. Barrett, did your brother, Ken, have problems because your father wasn't around?

A.  I would say yes.

Q.  Okay.  Can you describe those a little bit?

A.  I think that in us growing up, anything that was associated with dad, Kenny was fixated on.  I can remember distinctly a dog that we got.

Q.  Did your father have a drinking problem?

A.  Not that I'm aware of.  I mean, he drank on occasion, I'd seen him at times, but that was when I was older.

Q.  Okay.  Do you think your mother had or has mental or emotional problems?

A.  It's my opinion, yes.

Q.  Okay.  Can you describe that or explain that a little bit?

A.  Well, being in the house, I think that, you know -- or the mood swings would go from extreme.  I've seen her extremely happy, I've seen her crying and depressed, withdrawn, so -- and then -- and then anger also.  So I saw -- it was a roller coaster per se.

Q.  Would it be fair to say that she had some pretty

significant mood swings?

A.  I think that would be -- categorize it correctly.

Q.  And you experienced those, or you were around when those kind of things --

A.  Yes.

Q.  -- were going on with your mom?  And was Ken also around to see that kind of stuff?

A.  Especially -- I mean, I'm speaking from my reference point.

Q.  Yes.

A.  The Meadowlark years probably more than anything.

Q.  Did those kind of problems that you thought she had affect her behavior in any other way that you can think of, other than what you've already described?

A.  No.  She was functioning in some, you know, I guess aspects.  She always maintained employment.  She worked. She got up every day and went to work.

Q.  Would she -- was she a daily drinker?

A.  Yes.

Q.  Seven days a week?

A.  Yes.

Q.  Would she drink to excess every day?

A.  No.

Q.  Okay.

A.  Mainly weekends.

Q.  So it was usually drink to excess on the weekends, but drink throughout the week?

A.  Yes.

Q.  Do you know, sir, whether or not there's a history in your family of mental or emotional problems?  I'm talking about not just the immediate family, but the wider family as well.

A.  None that I've personally seen or been aware of.

Q.  Okay.

A.  It's just information I may have gained from the investigated -- you know, from Mr. Post.

Q.  Do you have any opinion as to whether or not your brother, Ken, has any kind of emotional or mental problems?

MR. KAHAN:  Objection.  Foundation.

THE COURT:  Sustained.

Q.  (BY MR. AUTRY)  Based on your observations of your brother, Ken, growing up, did you think he had special needs?

MR. KAHAN:  Again, objection.  Foundation.

THE COURT:  Overruled.

A.  Based on my experience in the job that I do --

Q.  (BY MR. AUTRY)  Yes, sir.

A.  -- I see very similar behavioral patterns from Kenny's early years to the students that I deal with on a daily

basis.

Q.   Can you describe that a little bit?

A.   Impulsive behavior.  Act out physically over maybe small things.  Inability to moderate themselves, to identify triggers and refrain from behavior that causes more damage.

Q.   And what do you attribute that to?

A.   I don't -- I don't know the answer to that.

Q.   But you see that in students that you've had in high school that you've taught, or that are in your school while you've been the principal?

A.   I deal with it daily.

Q.   And what kind of -- what kind of help do you try to give the students in your school that had those kind of problems?

A.   Of course it depends on the disability, you know, but we basically work out individualized plans and kids that have, you know, anger issues or are dealing with -- you know, we have a lot of kids that are in counseling, you know, on a weekly basis.  And then we basically make strategic plan to how they can manage their day and how they can get through the day and still be successful in school, whether it be identifying triggers or give them a safe place to go relax for a little bit and then re-enter into the population of the school.  So there's varied strategies.

Q.   Okay.  Do you know if Ken got that kind of help or that

kind of assistance when he was growing up?

A.   Not that I'm aware of.

Q.   All right.   Now, you did well in school; is that correct?

A.   I had my moments, but, yeah, I made it.

Q.   All right.   And you were an athlete in school?

A.   Yes, sir.

Q.   You played football in high school?

A.   Yes, sir.

Q.   Okay.   Do you know what kind of experience your brother, Ken, had during his school years?

A.   I don't recall.   I mean, I know he dropped out in ninth grade.   I think it was ninth, so -- but other than that, I don't know any of the experiences he had as far as school.

Q.   Okay.   Now, you did a declaration back in 2009; is that correct, sir?

A.   Yes, sir.

Q.   You were talked to by an investigator for Ms. Fisher and I back then?

A.   Yes, sir.

Q.   Do you remember stating in that declaration that Ken failed at school?

A.   Yes.

Q.   Is that accurate?

A.   Yes.

Q.  Do you know why he failed?

A.  I don't know specifically.  I mean -- I mean, I have my opinions.

Q.  What -- well, tell us.

A.  Well, I just -- I think probably he was reeling from the -- you know, from the breakup of the family, and had some -- needed some help, and help he never got as far as from a counseling perspective or from a special needs perspective.  There might have been some interventions could have been done to help him stay in school.

Q.  How did your parents' divorce affect Kenny?

A.  I can just speak from me seeing visual things far as he very emotional, distraught at times, angry at times.

Q.  Did you see in Ken the type of mood swings maybe you saw in your mom as you all were growing up?

A.  I'd say there's some similarities, yes.

Q.  Would Ken's moods change radically or frequently or unpredictably, anything like that?

A.  I don't remember specifically.  I mean, obviously I remember outbursts from a violent standpoint.

Q.  I'm sure the prosecutor is going to ask you this.  You turned out to be successful.  You went to college.  You had two college degrees.  You're a high school principal.  And you're aware of Ken's problems with the law and why we're here today; correct?

A.   Yes, sir.

Q.   Do you have an explanation that you can give to the Court as to why you think you turned out the way you did versus the way Ken turned out?

MR. KAHAN:  Object to --

Q.   (BY MR. AUTRY)  Or the problems he's had?

MR. KAHAN:  Objection as to speculation, Your Honor.

THE COURT:  Overruled.

Q.   (BY MR. AUTRY)  You can answer.

A.   I think my brother had psychological issues growing up. I think part of those were due to the absence of a father. And I think that he made some choices, you know, as far as drugs and alcohol are concerned that compounded those, in which, you know, I commonly see in some of the families I deal with.

Q.   Okay.  And you've had some history with drug use yourself; is that correct?

A.   Late adolescent, yes.

Q.   Okay.  And how were you able to overcome that?

A.   Well, I think partly I was -- I was getting promoted pretty rapidly in the military, so there's certain guidelines you have to follow in order to maintain.  You know, it's not -- once you become a noncommissioned officer, you can't be -- obviously you can't test positive for

anything. And now I think the change in geography helped me immensely. I moved from Sallisaw to Tulsa.

Q. Okay. Were you aware that your brother, Ken, at some point started using drugs?

A. I learned that in the first trial at least. I mean, I always knew that he had experimented with marijuana growing up, but I only learned of the other drug use once -- in the first trial.

Q. Okay. Was there a difference between you and Ken when you were growing up with respect to the structure you had within the larger family, or the wider family, and the structure he had when he was growing up?

A. No. Obviously I had lots of relatives in close proximity. I spent a lot of time with my grandfather and my uncle Mark and Phyllis and Roger, and my uncle Tom and Janice. I spent, you know, cases where I would, you know, spend my days with them as opposed to being in the home. So I think that helped me. And I had some cousins that were, you know, very close in age, so we were able to spend a lot of time together, and our actives were more hunting and fishing and outdoor activities.

Q. Okay.

A. Which I think the time that Kenny struggled the most, we were living in town at Meadowlark, and I think that he didn't have access to the same people and the same

activities.

Q. Okay. And what kind of effect did that have on him, if you know?

A. I don't know.

Q. Let me go back and ask you a couple of more questions, Mr. Barrett, about your mother. How would you describe her parenting abilities?

A. I think she struggled. Which, you know, I don't blame her per se. You know, I think in small town Oklahoma and you're a divorced mother of three, I think she struggled. Struggled to establish -- you know, to fill the role of both mom and dad, which is common I would think.

Q. Did she get kind of overwhelmed with all the responsibilities and things like that?

A. I would I think so. She had moments where she broke down, yes.

Q. Do you know whether or not she singled your brother, Ken, out for discipline?

A. I wouldn't say singled out necessarily, but he was the oldest and he was exhibiting, you know, behavior patterns that were defiant, and I think she struggled to try to get a hold on that. I think that's why she tried to rely on, you know, Ruth's husband, Jerry. I think there was some -- she tried to intervene, but I think it may have been a little too late.

95

Q.   Do you know of any instances or any experiences where your mother lost control?

A.   Well, I mean, what do you mean, lost control?

Q.   Lost control.  Just kind of flipped out as far as discipline or yelling at the kids or anything like that.

A.   Yes.  I've seen my mother and Kenny in a physical altercation.

Q.   Okay.  When was that, approximately?

A.   We were living on Meadowlark.  I don't know specifically what year it was --

Q.   Okay.

A.   -- but we were fixing to go out to eat, and they had gotten into an argument and ended up in a wrestling match on the floor.

Q.   Okay.  Would you describe your brother as being hyperactive when he was growing up?

A.   Yes, sir, much so.

Q.   You were probably hyperactive yourself, weren't you?

A.   Unfortunately, yes.

Q.   Okay.  Would it be fair to say that Ken grew up in a dysfunctional immediate family?

A.   I would think during the adolescents years, yes.

Q.   And is that based on the stuff you've already talked about or described to the Court, or is there anything else?

A.   I mean, I have different instances -- I mean, specific

instances at the Meadowlark house.  But I would say it was a very volatile time.

Q.  Did your mother suffer from depression, in your opinion?

A.  Yes.

Q.  How severe?

A.  Well --

MR. KAHAN:  Objection, Your Honor.  It's well beyond this witness's --

THE COURT:  Are you asking for a clinical opinion?

MR. AUTRY:  No, sir.  I can rephrase it, Your Honor.

THE COURT:  Please do.

Q.  (BY MR. AUTRY)  Did your mother, in your experience from observing her, seem to have a depressed or sad mood a lot of the time?

A.  Not a lot of time, but she struggled with depression.  She would come in my room late at night and cry.  And then I found some writings of hers years later.

Q.  And what did those consist of?

A.  Basically she wanted to die.

Q.  Did you try to help her with that?

A.  No.

Q.  How often would she be in these kind of moods where she was very sad and, I guess, depressed?

A.  I don't -- I don't remember specifically, you know.  I just know she had moments.

Q.  Do you remember how old Ken was when he left home?

A.  I'm guessing 19 maybe when him and Abby moved out of the house.

Q.  All right.  And at that time, was your mom married to a gentleman named Paul Dudley?

A.  Not yet.

Q.  That was afterwards?

A.  That was afterwards.

Q.  What did you think of Mr. Dudley?

A.  He compounded the issue.  Massive alcoholic.  So that caused issues in the house.

Q.  Did your brother, Ken, after he left home, did he work?

A.  Kenny worked, at least mechanic stuff.  He worked for my dad for quite a while.

Q.  Okay.

A.  And then moved back to Sallisaw.

Q.  Did you two ever work together anywhere?

A.  We did, as I got -- I think probably right as I was right out of high school.

Q.  And where did you work at that time?

A.  We were packing stalls at the local race track.

Q.  Blue Ribbon Downs?

A.   Yes, sir.

Q.   Okay.  And how long did you all do that for?

A.   I think that was really just about a week, two week stint.

Q.   Okay.  And did you ever work with Ken after that particular job?

A.   No.

Q.   Did Ken try to work pretty steadily?

A.   I mean, once I left Sallisaw, I really -- I don't know.

Q.   Okay.

A.   I don't, because we didn't -- I didn't stay in touch that well.

Q.   Was Ken, based on your knowledge and your experience with him, was he able to live on his own or live independently for significant stretches of time?

A.   I wouldn't say any extended times.  I think he was fairly mobile.  I think there were -- would be long periods where he would be stable and working and something would happen, and then there would be a change in the environment or he would have to move.

Q.   Okay.  Do you remember when your brother, Ken, tried to kill himself?

A.   Yes, sir.

Q.   Can you describe to the Court what happened when that occurred?

A.   He came in and asked to borrow my shotgun.

Q.   And where was this, by the way?

A.   At my mother's trailer, which is next door to the property where Kenny lived after the fact.

Q.   Okay.

A.   Him and -- what I could tell, him and Abby were having problems.  It was early in the morning.  He came in, borrowed my shotgun.  I looked outside and saw him leaning on the truck, but I didn't see the weapon.  And then, of course, he pulled the trigger.  And my cousin, Roger, and Monty were outside, so they came over, and then I ran and got mom.  And we got out there to him.  And my aunt was there to -- her friend is a nurse, and so we just kept a blanket on him and waited for the ambulance to get there.

Q.   Okay.  And do you know why he attempted suicide?

        MR. KAHAN:  Objection.  Calls for speculation.

        MR. AUTRY:  If he knows.

        THE COURT:  If you know.

A.   He never told me why.

Q.   (BY MR. AUTRY)  Do you know what kind of mood he'd been in, or how his mood was or his affect was preceding the suicide attempt?

A.   No, I can't.  He -- there wasn't a lot of verbiage that morning.  He came in and I was watching a TV show, and he just came in and asked me to use it, and went back to my

bedroom and retrieved it.

Q. Okay. And he had been having problems with his wife, Abby?

A. I believe they were split up at the time.

Q. Okay. Were they divorced yet, or did the divorce come later on?

A. I don't -- I do not remember.

Q. Do you know how the divorce affected Ken?

A. Obviously he tried to kill himself, so I think greatly.

Q. How long was he in the hospital, if you know, after the suicide attempt?

A. I want to say about ten, eleven days maybe.

Q. When is it that you left home and moved away?

A. It would have been around 1988.

Q. How old were you at that time?

A. Nineteen.

Q. And is there any particular reason that you moved away?

A. Well, I still wanted to go to school. And then my father invited me to come live with him, so I took him up on the offer.

Q. And where was your father living then?

A. Prattville, which is just across the river from Sand Springs, Oklahoma.

Q. Was it something of a relief for you to leave the --

that environment out there when you finally left home at 19?

A. Well, obviously that was the same point in which I was exhibiting some risky behavior, so it really stabilized me a lot. I got enrolled in school at Tulsa Junior College. And the household -- my father had remarried, and so it was pretty -- his wife stayed home as a housewife, and that provided me some good stability. It helped me get through that first year and a half of college.

Q. Now, let me ask you, Mr. Barrett, about your contact with lawyers for your brother, Ken, during the federal trial that was back in 2005. Do you recall testifying at the trial?

A. Yes, sir.

Q. And do you recall testifying in the penalty phase after Ken had been found guilty and they were -- the jury was going to decide punishment?

A. Yes, sir.

Q. All right. Do you recall how you were contacted by the federal defense lawyers or anybody working for them to testify in the penalty phase?

A. No face-to-face meetings. I think I got a phone call telling me where to be and what day to be there. And then obviously I got subpoenaed, so --

Q. Okay. And had you been interviewed by the federal trial

lawyers before you went to the courthouse, this courthouse here to testify back in 2005?

A.  No, sir.

Q.  How soon before you came to the courthouse to testify did you get the call that you talked about a minute ago?

A.  It was a few weeks before maybe.  I don't recall specifically.

Q.  And kind of describe what happened when you got to the courthouse on the day you were going to testify.

A.  We were taken to a room similar to today, and placed with other witnesses.  And basically they told us the order that we would testify in.  And, you know, I just came in when they called my name.

Q.  Did they tell you what kind of questions they were going to ask you?

A.  No.

Q.  Did they interview in any kind of depth about your background, your brother's background, your family background, or anything else like that?

A.  No, sir.

Q.  How long were you on the stand do you think?

MR. KAHAN:  Objection, Your Honor.  The record speaks for itself.

THE COURT:  Overruled.

A.  Maybe 15 to 30 minutes.

Q.   (BY MR. AUTRY)   Do you remember what you testified about?

A.   Yes, sir.

Q.   What did you testify about?

A.   Asked questions similar to today as far as my educational background and the environment I grew up in. They asked some specifics about some incidences of violence with Kenny and Abby.

Q.   Okay.  Did they ever interview you or ask you about any problems Ken had based on your parent's divorce?  Did they talk to you about that at all?

A.   No, sir.

Q.   Did they talk to you about your mother's drinking?

A.   No, sir.

Q.   Did they talk to you about the effect on Ken when your father left the house?

A.   No, sir.

Q.   Did they talk to you about the effect your mother's drinking had on her and the environment in the home?

A.   No, sir.

Q.   Did they ask you anything about your mother's emotional problems or mood problems, or any kind of behavioral anomalies, or anything like that?

A.   No, sir.

Q.   Did they interview you about any kind of history of

mental illness in the family or emotional problems in the family?

A. No, sir.

Q. The kind of questions that we've been going over here today, Mr. Barrett, did they ask you anything really about any of that kind of stuff?

A. No.

Q. Do you think your testimony in the federal trial was helpful to your brother, Ken?

MR. KAHAN: Objection, Your Honor.

THE COURT: Sustained.

Q. (BY MR. AUTRY) Now, in 2009, were you interviewed -- and I think we've kind of alluded to this before. Were you interviewed by an investigator working for Ms. Fisher and I?

A. Yes, sir.

Q. Okay. And did he go into a lot greater depth about your background and history and the family background and history and your brother Ken's background and history than the federal trial lawyers did?

A. Definitely.

Q. Did you have any difficulty discussing those matters with him?

A. At times. I mean, obviously some of these situations are very emotional, but -- and I learned a lot, that there

was some -- a lot of family history I was unaware of.

Q. Okay. And you signed a declaration I believe back then in 2009?

A. Yes, sir.

Q. Have you had a chance to review that in preparation for your testimony today?

A. I read through it.

Q. Okay. Is it -- is it accurate?

A. Yes, sir.

Q. Now, if the -- if the federal trial lawyers had asked you the type of questions you were asked back then by our investigator and the type of questions I've asked you here today, would you have told them about all that?

A. Yes, sir.

Q. Okay. Did they ask you any of those kinds of questions?

A. No, sir.

Q. Okay.

        MR. AUTRY: Can I have just a second, Your Honor?

        THE COURT: Yes.

Q. (BY MR. AUTRY) Would it be fair to say that when you were growing up, Mr. Barrett, you were able to stay with an extended group of family and friends to get some more structure than you had had there in the immediate family with your mom?

A.   Yes, sir.

Q.   Okay.  And did Ken have that opportunity?

A.   Not from the years, you know -- you know, like I spoke to before, the adolescent years.

Q.   Okay.  And when you were staying with kind of the extended family and friends, you would not be in the home environment obviously with your mom and all that kind of deal; correct?

A.   Correct.

Q.   Go ahead.  I'm sorry.

A.   I was just going to say I relied on -- I had good a friend base also of good family, stable family, so I stayed not only with my relatives, but I had a good peer group.

Q.   Okay.  Was the same true for Ken so far as you know?

A.   I don't know.  I mean, I can only speak of what I saw in those early years.

Q.   Okay.  Now, I asked you this a little bit before, and I'm sorry to bounce around but somebody reminded me of something so that's why I'm going back.

We talked about how you were an athlete in high school.  You played football; right?

A.   Yes, sir.

Q.   Did you also -- were you also on the track team?

A.   Yes, sir.

Q.   Did your mom come to many of your athletic events?

A.   No.  She -- I think I spoke about this in the first trial where I'd started last -- my junior and senior year every game, and I think she came to two games my entire career.  I was a top hurdler on the east side of the state my senior year.  She finally came to the state track meet, but that was the only one.

Q.   Okay.  Do you know why she stayed away?

A.   Yeah.  At that point, in my latter years of high school, she and Paul were married, so they owned a bar, so she worked at the bar most nights.  And so, you know, it just became common that she wasn't there, so I didn't -- I didn't fish for -- I was surprised she showed up when she did, so in those kind of cases, you just take what you can get.

MR. AUTRY:  Okay.  All right.  Could I have just one second, Your Honor?

THE COURT:  Yes.

MR. AUTRY:  That's all.  No further questions, Your Honor.

THE COURT:  Cross-examination, Mr. Kahan.

MR. KAHAN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. KAHAN:

Q.   Mr. Barrett, if I could refer you for a moment to your declaration, the one you signed in 2009.  I noticed you had a comment in there.  You stated that you were lucky because

you were always good in school.  Do you recall that statement?

A.  I remember that.

Q.  Would you agree with me that, based on your own career as an educator, luck actually has very little to do with academic success?

A.  Well, I think, in that particular case, I was alluding to the fact that I was -- I felt like I was fairly intelligent and school became -- it was easy for me.  I felt fortunate to be, you know, fairly smart in at least that school's concerned.

Q.  Okay.  But at some point, you went on in your education; correct?

A.  Yes, sir.

Q.  And I gather that you had to apply yourself; is that correct?

A.  Yes, sir.

Q.  And is that, would you agree, the same advice you would give any student who was struggling in school?

A.  Yes, sir.

Q.  Now, you've already stated you and the defendant had the same parents; is that correct?

A.  Yes, sir.

Q.  And I noted that, in your declaration, you also pointed out that, I believe the verb you used was whipped.  Your

mother whipped both you and your brothers; is that correct?

A.   Corporal punishment was normal in the house, yes.

Q.   And you've also said that your mother's parenting abilities were compromised by her alcohol; is that correct?

A.   I think they had an effect, in my opinion.

Q.   And by her mood swings; is that correct?

A.   Yes, sir.

Q.   So she was not a model parent for you, was she?

A.   No.

Q.   Did your mother encourage your education?

A.   There was very little talk of that.  I mean, it's -- it was more day-to-day survival stuff I would say.

Q.   Okay.

A.   I never received any counseling or anything like that about which direction I should go.  She was -- she was upset that I was joining the military.  She's Jehovah Witness so she didn't believe in it, so I had to press her a little bit on that, but she gave in.

Q.   And after your brother left the house, your mother became involved with Paul Dudley.  Do I have that chronology correct?

A.   Yes, sir.

Q.   Okay.  And I believe you stated in your declaration that

you saw Paul Dudley assault your mother with a firearm; is that correct?

A.   Held it to her head.  He never punched her or anything. I never saw him hit her.  Had another case where they were in the kitchen and were squaring off.  She had a knife and she was at the phone, and then he end up leaving without an incident taking place.

Q.   But at this time, your brother was out of the house?

A.   That's correct.

Q.   But you were -- you were still living at home as an adolescent?

A.   Yes, sir.

Q.   Now, you've also mentioned, both in your declaration and here, that you believe that you had a better outcome than your brother because of your access to extended family.  Is that true?

A.   I think that was assistive to me, yes.

Q.   All right.  And in your declaration, and I don't think this came up here, you mentioned a particularly close relationship with Phyllis Crawford?

A.   Yes, sir.

Q.   Were you aware that she has at least stated that she suffered from clinical depression?

A.   She didn't speak to me about it, and I'm not aware of it.

Q.  So it didn't affect your relationship with her?

A.  Not in my interactions with her, no.  She -- you know, in those kind of cases like that, you know, I felt like -- always like she baked cookies and she was a good cook, so, I mean, it was simple things that maybe I didn't have before that there was always something to eat there.  So it wasn't necessarily my interaction with Phyllis.  I mean, I interacted mainly with my cousins.  But she was very supportive, at least from a housewife standpoint.

Q.  And one of those cousins was Travis, Travis Crawford?

A.  Travis.  I think he may be -- he's the oldest boy.

Q.  Were you ever told that Travis had mental health issues?

A.  No.  I know, just by talking to the family, he had some issues later.  But when we were growing up, I didn't notice anything.  I was -- I was -- Roger, the middle boy, and I were -- he was probably my closest friend through high school.  One of my closest.

Q.  So nothing about Travis' alleged mental health issues affected your relationship with him?

A.  Not with him.

Q.  And would actually appreciate some clarification.  My understanding is that your mother moved you and your brothers to Oklahoma when the defendant was about 11 years old; is that correct?

A.   I think that's fairly -- I remember that I was just -- I was in kindergarten.  I attended kindergarten at Sallisaw, so we had moved prior to me going into kindergarten.

Q.   I'm sorry, what was that?

A.   I'm saying I went to kindergarten at Sallisaw, so I know we moved -- I'm not dead certain on the timing before, but I think it was fairly close to the time I was to start school.

Q.   You made a reference earlier coupled to the Meadowlark years.  Is that Meadowlark Street?

A.   Meadowlark Street.  We had -- we'd lived off South Wheeler and, you know, I'm just -- I'm going off what my mom told me, that my grandpa had loaned her some money and she was able to get a brick home, three bedroom home in a new neighborhood.  It was a small house.  But we stayed there until, well, Kenny left, and then, you know, Richie left thereafter.  And then we moved -- that's when we moved -- we actually moved into an apartment in town, and then we ended up moving out into the country.

Q.   Okay.  So I had Wheeler and I had the apartment.  Where is Meadowlark in there?

A.   Meadowlark's in the middle.  After we moved, we stayed in a couple of houses when we came from New Jersey.  And after that, she purchased the home and we stayed in that until the early '80s.

Q.   And your brother would have moved out then while you were still living in Meadowlark?

A.   Yes.  His -- you know, Abby got pregnant with Toby, and that would have been around 1980.  And then they moved out, tried to get their own place and be a husband and wife I would assume.

Q.   Now, how far is the, as you refer to it, the country -- let me back up.  The country we're referring to, you're talking about the area where your brother was living at the time of the murder?

A.   Yes, sir.

Q.   And how far is that from Sallisaw?

A.   I'd say approximately nine miles maybe.

Q.   How frequently were you visiting that area as a --

A.   Prior to moving out there, not -- not very much.

Q.   Now, were you under the impression that your relatives had -- by relatives, I mean your extended relatives -- they didn't reject your brother, did they?

A.   I -- I never saw anything that would allude to that.

Q.   Were you aware that your brother had the opportunity to live with your Aunt Ruth for a period of time?

A.   I remember a little bit about that move.  I think Uncle Jerry -- Jerry Paul was -- he's a bigger man in stature, so I think my mom felt his physical nature would -- would be able to control Kenny.

Q.  But it was your brother who rejected that opportunity; isn't that true?

A.  I don't know.  I mean, he obviously came back in the home, so --

Q.  Do you recall a time when Kenny Barrett went to live with another relative, Eleanor Long, in his teens?

A.  I don't remember that specifically.  We spent -- I mean especially when my dad would come down, we would spend extended amounts of time with Eleanor.

Q.  Now, when you testified at the trial, you testified that you were unaware of the extent of your brother's drug use. Do you recall that?

A.  Yes, sir.

Q.  Does that remain true today?

A.  I mean, only from the information I got from the report that they showed from the, I believe it was Lexington intake center.

Q.  So based on what you now know, his drug use was actually very extensive, wasn't it?

A.  According to the document, yes, it was during that time.

Q.  And you'd agree with me that drug use does interfere with making positive life choices, doesn't it?

A.  Yes, sir.

Q.  All right.  Like studying?

A.   Can, yes.

Q.   Athletic practice as well?

A.   Yes, sir.

Q.   All right.  I understand you're a conditioning coach; is that correct?

A.   I'm nationally certified, yes.

Q.   And going to guess that you would not encourage your students to use illegal drugs; that fair?

A.   That's fair.

Q.   All right.  But at some point, and I know the defense alluded to this, you, yourself, had a drug problem; is that right?

A.   I experimented, yes.  I was never -- I was never habitually addicted to anything.

Q.   You did, as I understand it, experience an overdose; is that right?

A.   I -- I never lost consciousness or anything.  I just -- and I was the one that requested that I go to the hospital.  So --

Q.   And is it fair to say that that was a decision point for you?

A.   It was a turning point, yes.

Q.   And you made the choice to change direction in your life; is that right?

A.   I made the choice to remove myself from being around

drugs, yes.

Q. All right. So while you did maintain close relationships to the extended family, none of that actually prevented you personally from getting involved in illegal drugs for a period of time. Is that -- is that fair to say?

A. It was. But I felt like my -- it never was with my immediate family. I mean, we drank some beer in high school, but never any drug use as far as my family members were concerned.

Q. Now, you've observed here that your brother was capable of hard work; correct?

A. Yes, sir.

Q. And in the time that you -- you left to go first to Tulsa, and then on to OU, your brother remained in the Sallisaw area; is that correct?

A. As far as I know, yes.

Q. And you're not aware of anything that prevented him from developing any positive relationships with your extended family, are you?

A. I wouldn't know.

Q. And certainly no one prevented your brother from quitting drugs; correct?

A. I think that would be true for anyone.

Q. Now, you made a comment during your direct examination

about you recalled your brother's outburst from a violent perspective. Could you elaborate on that?

A. I don't know which year it was. I mean, it was a case where, you know, I saw explosive kind of behavior where, me personally, two particular incidents. One, I want to say it was my fourth grade picture. It was we got in an argument and my head was put into a dresser, and so eye was swollen shut and I still got scar from it. And then other instance where we got in an argument and he exploded and pushed me into a bed post, and I had to get stitches in the back of my head. So I think those -- those all occurred at Meadowlark. I think those were, to me in retrospect, my opinion, were the most critical years where I think he could have got some intervention that might have worked.

Q. Now, you mention that you did not have extensive interview with your brother's attorneys prior to testifying in the federal trial; correct?

A. Yes, sir.

Q. All right. But you don't know the extent of whatever investigative materials were available to them, do you?

A. No.

Q. And you don't know what your brother told them about his life growing up with you, do you?

A. No, sir.

MR. KAHAN: Pass the witness, Your Honor.

THE COURT: Any redirect, Mr. Autry?

MR. AUTRY: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q. Mr. Barrett, you talked about these two incidents of violence, I guess, with your brother, Ken; correct?

A. Yes, sir.

Q. And that was during what you termed the Meadowlark years?

A. Yes, sir.

Q. And what was going on in the household during that period of time? What was the environment like?

A. Well, I just think that was -- it was common to see -- you know, to have an explosive incident where either mom or Kenny got into it. I think that was a real pivotal time where she was struggling to maintain some type of discipline over the household with three boys.

Q. And you made the remark when you were discussing that, that this would have been an important time or pivotal time for some kind of help or some type of intervention?

A. I see that. I mean, I can give -- obviously I can't give any information, but, you know, I have several cases working right now where I'm trying to get kids that's -- you know, as far as manage their behavior, some of which have already entered, you know, Office of Juvenile Affairs. And,

you know, it's my job, I feel like, to get those kids strategies that they could use so they can be productive citizens. Because in a lot of cases, once that -- especially if there's any mental illness involved, once they leave that school, it's -- they're not going to receive the same benefit, not going to receive those same interventions when they get out in the real world. Which I will say that it's very difficult from a police standpoint I would say. It's easy for me because if I know the background on a kid, and I go in to discipline a kid, I know certain techniques I can use to get that kid in a better place. But that's not always the case with -- you know, I don't think the law enforcement's offered that, you know, benefit.

Q. Was there ever any intervention or help given to Ken during this period of time, outside help?

A. Not that I'm aware of. I don't remember any counseling or anything. I don't know what took place from his school perspective. But I just know about the behavior that took place in the home.

Q. All right. Did you get along with him generally pretty good in the home?

A. Oh, Kenny and I are very similar in nature, at least from work ethic and the way we think. But obviously there's some differences, too.

Q. Okay. Based on your experience as a high school

principal -- they asked you about choices, people making choices, choosing whether to use drugs, choosing whether to do this or that.  In your experience as a high school principal, is the ability to make a choice, does that differ with different individuals?

A.  Yes, sir.

Q.  And can you explain that a little bit?

A.  Well, I think once you get into special services, which is, at least in my case, about ten percent of my population, there's -- there's other factors that may affect.  If the kid's autistic, depending on the disorder they have, they might -- you know, may not have that same ability to make positive choices.

Q.  All right.  And as someone who has an underlying emotional problem, for example?

A.  Those are probably my most difficult to deal with at school.

Q.  Okay.  Or somebody who has an underlying mental health issue?

A.  Depending on what it is, yes, it can be very bad.

Q.  That can affect the ability to make a choice or make choices?

A.  Yes, sir, in my opinion.

Q.  You spoke a little bit, both on direct and cross-examination about Paul Dudley.  Do you remember

that?

A.   Yes, sir.

Q.   When you were growing up, were there a lot of men in and out of the house with your mom?  Did she bring a lot of men in and out?

A.   She had some consistent relationships.  But, you know, like I had alluded to before, she would spend weekends at the bar, so there were, you know, many occasions where I woke up and there was a man in the house, yes.

Q.   Okay.  Do you know whether or not your brother, Ken, had a real hard time due to the fact that your father wasn't around anymore after the divorce?

A.   Oh, I think he missed him greatly.

Q.   What kind of impact did that have on him?

        MR. KAHAN:  Objection.  Speculation.

        MR. AUTRY:  If you know.

        THE COURT:  From your observation.

A.   From my observation, just what I saw, I had mentioned to it earlier which I kind of choked up a little bit, but we had received a dog from dad.  It was a German Shepherd he got from the Chicago area.  And I remember Kenny was -- I think it was one of those deals where it was an attachment link to dad, and he really -- I know that they were coming home one day, and they were out walking on the highway north of town and the dog got hit and killed.  And I know he

didn't go to school for at least a couple of days, so I think it had a very emotional effect.

Q.  (BY MR. AUTRY)  Okay.  Obviously since he was older, would it be fair to say that Ken had a deeper attachment to your father than you did?

A.  I only knew my dad through the intermittent contacts I had growing up.

Q.  Okay.

MR. AUTRY:  Thank you, Mr. Barrett.

THE COURT:  Anything further from this witness?

MR. KAHAN:  Very briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. KAHAN:

Q.  Mr. Barrett, did you attend the same high school as your brother?

A.  Well, I think it was the junior high we would have, but he quit in ninth.  So our high school was 10 through 12, so same school system though.

Q.  Okay.  Based on your experience then, did you feel that they were negligent in their outlook toward their students?

A.  No.  From my experience, I -- I had a positive experience.

Q.  And your brother elected to drop out on his own, didn't he?

A.   I don't know the circumstances around it, but obviously he chose to quit.

Q.   And you've mentioned that mental health can affect the ability of a student to make choices; correct?

A.   Yes, sir.

Q.   But that's also true of drug abuse, too; isn't it?

A.   Yes, sir.

MR. KAHAN:  Pass the witness, Your Honor.

THE COURT:  Mr. Barrett, you can step down.  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Let's see.  Why don't we go ahead and take our lunch break before we get on with that next witness.  Let's say be back at 12:45.

*(Off the record at 12:11 p.m.)*

*(Back on the record at 1:01 p.m.)*

THE COURT:  Plaintiff's call next witness.

MS. FISHER:  Mr. Barrett calls Doris Barrett.

THE CLERK:  Ma'am, if you'll raise your right hand.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  I do.

THE CLERK:  Please be seated.

DORIS BARRETT,

being first duly sworn to testify the truth, the whole

truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MS. FISHER:

Q. Will you state your name, please?

A. Doris Barrett.

Q. Mrs. Barrett, are you married?

A. I'm widowed, yes.

Q. To whom were you married?

A. Yes.

Q. And to whom were you married?

A. Ernie Barrett.

Q. And is Ernie Barrett -- do you know Mr. Kenneth Barrett?

A. Yes.

Q. How do you know him?

A. He's my stepson.

Q. Where do you currently reside, Mrs. Barrett?

A. I live in Sapulpa, Oklahoma.

Q. And how long have you lived there?

A. Twenty-five years, or more.

Q. When did Kenny's dad die?

A. June the 4th, 2012.

Q. And how long had you and Ernie been married?

A. A little over 28 years.

Q. During that time, did you come to know about the Barrett

family, about Kenny and his relationship with his dad?

A.   Yes.

Q.   And can you describe that?

A.   Yes.  They had an on and off relationship.  It was --
you know, after this all happened, it was I think probably a
better relationship.  Ernie visited with Kenny every weekend
that we could make it down here.  I think -- I think they
ultimately had a really good relationship.

Q.   So breaking it down a little bit, when -- when did you
meet Ernie Barrett?

A.   1985.

Q.   And from 1985 to the date of the incident, which is
September 24th, 1999, how much contact did you have with
Kenny?

A.   I didn't have a lot at the beginning.  He lived in
Sallisaw, we lived in Sand Springs.  I had more contact with
him after -- after this happened.

Q.   And did you observe the relationship between Kenny and
his dad before this happened?

A.   Some.  Yes.

Q.   And would you describe it as good or bad, or what?

A.   It was good and bad.

Q.   Did you become acquainted with Kenny's mom?

A.   Yes.

Q.   Did you have a good relationship with her?

A.  No.

Q.  How did you and Ernie come to know about the incident?

A.  We heard it on the TV.  Actually my niece called me and told me I needed to turn the TV on.

Q.  And describe, if you would, your interaction with Kenny after the incident.

A.  I think we had a really good relationship.  We talked almost every night.  I was in -- you know, he called me for anything he needed.  I think we had a really good relationship.

Q.  Be fair to say that you came to know Kenny following the incident much better than you knew him before?

A.  Yes.

Q.  And how about Ernie's relationship with Kenny, did you notice, were there any noticeable changes before and after the incident?

A.  Yes.

Q.  And can you describe those?

A.  Yes.  I think, after the incident, that the times that they got to sit down and talk, I think they become closer.  I think they learned more about each other and their relationship with each other.

Q.  Did Ernie ever express regret for the type of father that he'd been?

A.  Always.

Q. Did you or Ernie visit with Kenny during the -- after the incident in jail?

A. After the incident?

Q. Yeah, in jail.

A. Yes.

Q. Did you ever visit with Kenny in jail?

A. Yes.

Q. And would you visit with him or would Ernie?

A. Ernie.

Q. Did you come to know Mr. Barrett -- well, Mr. Barrett was tried twice in state court?

A. Yes.

Q. And did you come to know his attorneys in state court?

A. Yes.

Q. And they were whom?

A. John Echols and Jack Gordon in one trial, and John Echols and Geoffrey Standing Bear.

Q. And can you describe the relationship that you had with the attorneys in the state court trials?

MR. KAHAN: Objection as to relevance, Your Honor.

THE COURT: What is the relevance as to this testimony?

MS. FISHER: Well, Mr. -- Mr. Echols continues into federal trial, Your Honor, so it does go to the issue

of ineffective assistance of counsel, and how the case progresses. Most of -- I will say that, on appeal, on the guilt-innocence issue, most of the Mr. Hilfiger's and Mr. Smith defense to the failure to do anything was based on the fact that they followed Mr. Echols' floorplan for the trial. And so obviously -- and they -- obviously it becomes relevant how he's represented in state trial as compared to federal trial from Mrs. Barrett's point of view.

THE COURT: I'm not sure I see the connection.

MS. FISHER: I can try to confine it, Judge.

THE COURT: Okay.

Q. (BY MS. FISHER) Were you able to observe Kenny's relationship with his attorneys in state trial?

A. Yes.

Q. And how would you describe that?

A. They were very close. They -- I think he communicated with him all the time.

Q. Describe for me, did you have any -- did you have any involvement in the federal trial?

MR. KAHAN: Objection, Your Honor, as to relevance.

THE COURT: Overruled.

A. Yes.

Q. (BY MS. FISHER) And what was that?

A. Well, I would just go pick up paperwork sometimes for

Mr. Hilfiger.  I never really associated much with Mr. Hilfiger.

Q.  Did you observe the federal trial?

A.  Yes, I was here every day.

Q.  Did you testify at the federal trial?

A.  Yes.

Q.  When you testified at the federal trial, were you interviewed by Mr. Hilfiger at all?

A.  No.

Q.  Based on your -- you say that you were at the trial every day.  Based on the fact that you were there every day and obviously spoke with him, did you -- had he ever talked with you about Kenny's life?

A.  No.

Q.  Were you aware of the interaction that your husband, Ernie, had with Mr. Hilfiger?

            MR. KAHAN:  Objection as to hearsay, Your Honor.

            THE COURT:  Overruled.

A.  Would you repeat that?

Q.  (BY MS. FISHER)  Were you aware of the -- of any interaction that Mr. Hilfiger had with your husband?

A.  He didn't have any.

Q.  Did your husband testify at trial?

A.  Yes.

Q.  Did you have -- did Mr. Hilfiger interview your husband

130

before he put him on the stand?

A.   No.

Q.   Did you have any idea when you went on the stand as to what you or your husband would be called to do?

A.   No.

Q.   Did you have any interaction with co-counsel, Bret Smith?

A.   Yes.

Q.   What was the nature of -- describe that relationship.

A.   Well, my husband and I would -- we would have some questions as to some things that we would want Mr. Hilfiger to bring up, and I would go to Mr. Smith with it, and he would take my concerns to Mr. Hilfiger.

Q.   Did you observe the relationship between Kenny Barrett and Bret Smith during the hearing at all?

A.   Yes.

Q.   And how would you describe that?

A.   I really couldn't say.  I mean, I could just see them talking, yeah.

Q.   Did you -- when you talked with Kenny when you visited with Kenny, approximately how long a period of time did that -- and talk with him on the phone when you visited -- observed him at trial, how long a period of time did that cover?

A.   Well, I talked to Kenny several times a week.  He would

call.

Q.   And that began in 1999?

A.   Yes.

Q.   And it continued through the federal trial?

A.   Yes.

Q.   Which was -- and ended in 2005, 2006?

A.   Yes.

Q.   Did you notice any growth or any change in Kenny during that period of time?

A.   No, not --

Q.   When you talked with him, did you --

A.   Well, I think he -- you know, during the federal trial, he had several concerns that he would bring to me to bring up with Mr. Hilfiger.

Q.   So was -- so was your relationship with Kenny during that period of time mostly just about the trial, or was there a personal relationship?

A.   It was mostly about the trial.

Q.   Okay.  So you didn't observe any changes in his attitude towards Ernie?

A.   Well, just, you know, because of Ernie, you know, talking to me, how he felt like he had gotten closer to Kenny.

Q.   So most of the relationship was between Ernie and --

A.   Yes.

Q.  -- Ernie and Kenny?

A.  Yes.

Q.  And so you -- do you have any doubt that, had Mr. Hilfiger spoken with Ernie about his parenting or about Kenny's childhood, that Ernie would have been cooperative in that effort?

MR. KAHAN:  Objection.  Speculation, Your Honor.

THE COURT:  Can you get her to answer based on some personal knowledge she has rather than just speculating on his state of mind?

MS. FISHER:  I will, Your Honor.

THE COURT:  Okay.

Q.  (BY MS. FISHER)  Did you and Ernie discuss matters during this incident -- or during the trials following the incident?

A.  Yes.

Q.  And did Ernie ever express to you whether or not he was willing to help Kenny?

A.  Always, yes.

Q.  And did he have any concerns about testifying in the federal trial?

A.  No.  Other than the fact that he didn't -- you know, we were unprepared.

Q.  So he was concerned --

A.  Yes.

Q.  -- about being unprepared?

A.  Yes.

Q.  And do you have any doubt that had either Mr. Hilfiger or Mr. Smith discussed with Ernie the failing -- his failings as a father, or Kenny's early life, that Ernie would have been cooperative based on your knowledge of Ernie?

A.  Oh, yes, he would have been cooperative.

MS. FISHER:  I have no further questions, Your Honor.

THE COURT:  Cross-examination, Mr. Kahan.

MR. KAHAN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. KAHAN:

Q.  Good afternoon, Ms. Barrett.

A.  Good afternoon.

Q.  Ms. Barrett, you've described a fairly distant relationship with Mr. Hilfiger; is that correct?

A.  Yes.

Q.  And you generally found him less talkative than Mr. Echols; is that correct?

A.  Yes.

Q.  Okay.  Mr. Hilfiger at no point in time invited you to his planning meetings, did he?

A.  No.

Q.   Nor I'm assuming did he invite you to his private conversations with Mr. Smith, did he?

A.   No.

Q.   Or his conversations with Mr. Echols?

A.   No.

Q.   Or, frankly, his conversations with your stepson; correct?

A.   Correct.

Q.   Okay.  So when you stated in your declaration that Mr. Hilfiger, in your opinion, did not have strategy for this trial, that is simply your speculation, isn't it?

A.   Yes.

Q.   Now, you've mentioned that you testified at trial; correct?

A.   Yes.

Q.   And you pointed out that you did not have any particular preparation with Mr. Smith or Mr. Hilfiger; correct?

A.   Correct.

Q.   Okay.  And you've even gone so far as to say in your declaration that you were nervous; is that correct?

A.   Yes.

Q.   By the same token, did you have any difficulty answering Mr. Hilfiger's questions on the stand?

A.   No.

Q.   You didn't, at any point, ask to refresh your

recollection while you were on the stand, did you?

A.   No, I didn't.

Q.   And you never had to ask for a break?

A.   No, sir.

Q.   Now, you made a comment in your declaration about Mr. Hilfiger asking you to help convince Kenneth Barrett to testify on those -- on his own behalf.  Do you recall that?

A.   In my declaration?

Q.   Yes.  Do you -- or let's make it simpler.  Do you recall that Mr. Hilfiger asked for your assistance in asking Kenneth Barrett to testify at trial?

A.   Yes.

Q.   And am I correct in my understanding that you refused to do so?

A.   Yes.

Q.   Okay.  And are you aware for what reason Mr. Hilfiger wanted Kenneth Barrett to testify?

A.   No.

        MR. KAHAN:  Your Honor, at this point I would like to play what the government has marked as Exhibit 53, which are three recordings of phone calls.

Q.   (BY MR. KAHAN)  Ms. Barrett, I'm going to ask you to listen to these three calls.

A.   Sure.

*(Government's Exhibit 53 played)*

Q.   (BY MR. KAHAN)   Ms. Barrett, do you recognize the voices on that recording?

A.   Yes.

Q.   Whose are they?

A.   Kenny and mine.

Q.   And when you say Kenny, you're referring to the defendant, Kenneth Barrett?

A.   Yes.

Q.   And do you recall that conversation?

A.   Yes.

Q.   Okay.  And is that a true and accurate recording of that conversation?

A.   Yes.

*(Government's Exhibit 53 played)*

Q.   (BY MR. KAHAN)   Ma'am, once again, do you recognize voices on that recording?

A.   Yes.

Q.   Were those, again, yours and defendant's?

A.   Yes.

Q.   Okay.  And do you recall the conversation?

A.   Yes.

Q.   And is that a true and accurate recording of the complete conversation?

A.   Yes.

*(Government's Exhibit 53 played)*

Q.   (BY MR. KAHAN)   Ms. Barrett, with regard to the conversation you just heard, do you recognize the voices there?

A.   Yes.

Q.   And, again, are those your own voice and that of the defendant, Kenneth Barrett?

A.   Yes, sir.

Q.   And do you recall that conversation?

A.   Yes, sir.

Q.   Is that a true and accurate recording of that conversation?

A.   Yes, sir.

Q.   Now, in that set of recordings, you refer to a gentleman, John.   Am I correct in my understanding of that as John Echols?

A.   Yes, sir.

Q.   You also mention that you spoke to Roger regarding appeals.   Do you recall that?

A.   Hearing it, I guess.   I don't remember.

Q.   You recall hearing that --

A.   Yes.

Q.   -- is that right?   Do you recall having conversation with Mr. Hilfiger regarding appeals?

A.   To tell you the truth, I don't.

Q. Okay. You have no reason to doubt that the -- your 2005 you had those conversations?

A. No, I have no -- no doubts, no.

Q. Okay. You also made mention, do you recall in that conversation, about conversation with Mr. Hilfiger regarding manslaughter instructions. Do you recall that?

A. Yes.

Q. Do you recall that conversation?

A. I really don't. Today I don't.

Q. But, again, you have no reason to doubt that you would have misrepresented that --

A. No, I --

Q. -- in that conversation?

A. No.

Q. There was also a discussion in the very first phone call, a comment I believe Mr. Barrett made about Bret saying, "Where's the dope?" Do you recall that comment?

A. Yes.

Q. Do you recall, was that a conversation that you were present for with -- with Mr. Barrett and Mr. Smith?

A. No.

Q. In the second phone call, there was an interchange with Mr. Barrett regarding his preference for the death penalty. Do you recall that?

A. Yes.

Q.   Do you recall that conversation?

A.   Yes.

Q.   And it certainly sounds like that was not the first time you had heard that comment; is that correct?

A.   That's correct.

Q.   Okay.  So you heard that more than once?

A.   Yes, sir.

Q.   Okay.  Do you recall, prior to the federal trial, a conversation you had with an investigator named Steve Leedy?

A.   I don't.  Sorry.

Q.   If I could ask to show the witness Government's Exhibit 49.  If I could, I would like to turn your attention to Page 5748 at the bottom.

A.   Yes.

Q.   Okay.  And reading that, does that help you recall a conversation you might have had with an investigator?

A.   I don't remember this conversation.  I'm sorry.

          MR. KAHAN:  Quite all right.  Your Honor, the government would move Exhibit 53 into evidence.  Apart from that, I would pass the witness.

          THE COURT:  Is there any objection to Government's Number 53?

          MS. FISHER:  No objection, Your Honor.

          THE COURT:  Very well.  The Government's 53 is

admitted.  Ms. Fisher, you have redirect?

MS. FISHER:  I do, Your Honor.

REDIRECT EXAMINATION

BY MS. FISHER:

Q.  Mrs. Barrett, you were -- you were asked whether it was just speculation that Roger Hilfiger had no strategy -- that you thought he had no strategy.

A.  Correct.

Q.  And you answered yes.  Did you have any reason to -- to make the statement that he had no strategy?

A.  Yes.  I -- excuse me.  I just felt like he was all over the place with -- you know, I would ask him -- I would ask Bret to ask him, you know, different things that we wanted brought out in the trial, and they would always come back and tell us that -- or Bret would say no, he brought it to Mr. Hilfiger but he didn't want to do it.

Q.  Well, when did you come to learn that the role that strategy plays in a trial?

A.  Probably right from the beginning -- beginning of the federal trial.

Q.  Did you -- did you, at any time, observe the strategy in the state trials?

A.  Oh, yes.

Q.  Would it be -- would it be fair to say that it wasn't speculation, but it was a comparison of the two trials where

141

you saw strategy in one and no strategy in the other?

A. Yes.

Q. In the first recording that Mr. Kahan asked you to refer to, it seemed as though you and Mr. Barrett were quite happy?

A. Yes.

Q. Had something happened in the trial?

A. We just felt like that, that day, we had had a good day at trial.

Q. And what happened that made you think it was a good day?

A. I can't remember.

Q. Would that have been the day that Mark Sanders testified that he hadn't been there?

A. Yes.

Q. Was that based on Mark Sanders' --

A. Yes.

Q. -- testimony?

A. Yes.

Q. And is that what Bret meant when he said, "Where's the dope?"

A. Yes.

Q. Did -- to your knowledge, did Mr. Hilfiger ever follow up on that particular issue?

A. No.

MR. KAHAN: Objection, Your Honor. It's in the record.

MS. FISHER: Well --

THE COURT: Isn't this cumulative of what's in the record?

MS. FISHER: No, Your Honor. It's based on the motion to -- it probably is. I'll go to a different -- it may be.

THE COURT: Okay.

Q. (BY MS. FISHER) Have you since come to learn Mark Sanders has recanted his testimony?

MR. KAHAN: Objection, Your Honor. Relevance.

THE COURT: Overruled.

A. I didn't know that, no.

Q. (BY MS. FISHER) You didn't know that Mark Sanders recanted his testimony?

A. No.

Q. Okay. In the second conversation -- let me go back for just a moment. Did you, at any time in your dealings with Mr. Hilfiger or Mr. Smith, learn that Mr. Hilfiger or Mr. Smith went to interview Mr. Sanders at any time?

A. I don't recall that.

Q. Okay. In your second conversation -- if I could find what that conversation -- that was about taking the stand, did -- did Mr. Hilfiger ask you to persuade Kenny to take

the stand?

A.  Yes.

Q.  And did you do that?  I mean, did you attempt to do that?

A.  Yes.

Q.  Did you -- is there -- and at the end of that conversation, Kenny seemed agreeable at that point; wasn't that true?

A.  That's true.

Q.  And, in fact, one of the reasons that you gave him for taking the stand was because, if they had to understand that the snitches -- the seven snitches that came in at the last minute were rehabilitatable because of drugs, that Kenny too, was rehabilitatable?  Is that --

A.  Yes, that's exactly what I told him.

Q.  The third conversation I believe is the one where Kenny sounds depressed.  Is that the one that he's depressed?  I'm a little confused on the conversation.

A.  Yes.

Q.  And that's based on his interaction with Mr. Hilfiger as far as you can tell?

A.  Yes.

Q.  And Mr. Hilfiger doesn't encourage him on the appeal or on sentencing?

A.  No.

Q.  Did, at any time following any time -- I think you testified that Kenny -- it was not -- that you had heard it before, that Kenny would sometimes get depressed and say he wanted death over life?

A.  Yes.

Q.  And there would be other times when it was clear that he was willing -- willing to fight for life?

A.  Yes.

Q.  Did Kenny ever tell you or Ernie not to testify or not to help him at sentencing?

A.  No.

MS. FISHER:  I have no further questions.

THE COURT:  Anything further from this witness?

MR. KAHAN:  No, Your Honor.

THE COURT:  If not, Ms. Barrett, you can step down.  Thank you.

THE WITNESS:  Thank you.

MR. AUTRY:  Jack Gordon, Your Honor.

THE COURT:  Very well.

THE CLERK:  Sir, if you'll step into the box, raise your right hand.

THE WITNESS:  Sorry, I came with too much gear.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  I do.

THE CLERK:  Please be seated.

THE WITNESS:  Thank you.

JACK E. GORDON, JR.,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. AUTRY:

Q.  Could you state your name for the Court, please, sir?

A.  My name is Jack, middle initial E, Gordon, Junior.

Q.  Where do you live?

A.  Claremore, Oklahoma.

Q.  What do you do for a living?

A.  I'm a criminal defense lawyer.

Q.  How long have you been a lawyer?

A.  I'm four days short of 45 years of practice.  And graduated in 1969, so add two and a half years in the United States Army.

Q.  Okay.  And where did you go to law school?

A.  University of Arkansas.

Q.  Have you always practiced criminal defense law during your 45 years?

A.  Oh, no, sir.  I did a variety of things over the years to make a living.  Claremore is a little town.

Q.  Yes, sir.  When you say that you have an extensive and have had an extensive criminal practice?

A.  It's been since 1984 is when I took my first death

penalty case, and that led me into criminal defense.

Q. Okay. How many death penalty cases have you handled over the years?

A. Ten.

Q. How many of those went to trial?

A. Nine.

Q. Do you know Kenneth Barrett?

A. I do. Know him well.

Q. And how do you know Mr. Barrett?

A. I defended Kenny at his second trial. I think it was in 2004.

Q. Is that in state court?

A. Yes.

Q. In Sequoyah County?

A. Yes.

Q. Had there been a previous trial to the one you were involved with?

A. There had.

Q. And what was the result of that trial?

A. Result of that was a hung jury and a mistrial.

Q. Who was the lead counsel in that trial?

A. John Echols.

Q. Do you know who he was assisted by in that first trial in state court?

A. A fellow from Pawhuska whose name now escapes me, but I

think he's now the chief of the Osage Nation.

Q.   Geoffrey Standing Bear?

A.   Yes.

Q.   Does that ring a bell?

A.   Thank you.

Q.   And were you appointed to assist Mr. Echols in the second state trial?

A.   Yes, I was.

Q.   And what was your duty supposed to be, or what was your concentration or job supposed to be with respect to the second state trial?

A.   I was marshalling mitigating evidence.

Q.   Okay.   What -- what type of investigation are you supposed to do, in your opinion, to develop mitigating evidence in a capital case?

A.   First thing you do is you gather up all the records that exist concerning your client.  You do that with an investigator, specifically a mitigating investigator -- mitigating evidence investigator.  You start with birth records if you can get them, then you go to school records, then you go to mental health records, then you go to DHS records, and get every bit of written evidence that ever -- written material that you can find.

Q.   Do you look into the defendant's upbringing and background and his family history?

A.  Well, after you gather up all the -- all that written evidence --

MR. KAHAN:  Your Honor, if I may, if the witness could constrain himself to what he did in this case as opposed to what should be done generally.

MR. AUTRY:  Okay.  That's fine.  I'll move on specifically to this case.

Q.  (BY MR. AUTRY)  In this particular case, Mr. Gordon, had there been an investigator or mitigation investigator on the case before you were appointed on the case?

A.  Yes, there was.

Q.  And do you know who that was?

A.  A lady named Roseann Schaye.

Q.  And what did she do, to your knowledge?

A.  She interviewed family, interviewed Kenny, getting background on his life.

Q.  Do you recall what kind of -- what kind of interview she did and what kind of information she got in the interviews that she did with Mr. Barrett and his family?

A.  She was looking for how he was reared by his mother and father.  What she found was that he had an abusive father, had a drunk mother.  Sometimes the father got drunk.  They had an abusive relationship.  Kenny was in the middle of it and was influenced dramatically by what he saw and what he heard.

Q.  Now, the second state trial did not go to a penalty phase; is that correct?

A.  That's right.

Q.  What was the result of the first stage?

A.  Kenny -- the jury put the murder -- murder was off the board very quickly, or the death penalty murder was off the board very quickly as I understand it.  And the jury ended up giving him 30 years on first degree manslaughter, and ten years on something, shooting with intent to kill or assault with a dangerous weapon or something.

Q.  All right.  Now, had the case gone into a penalty phase, were you going to put on the type of evidence you just spoke about a moment ago that Roseann Schaye had discovered?

A.  I was going to put on that and a lot more.

Q.  Okay.  What else were you planning to put on?

A.  I would have put on Kenny's mother.  I would have made her tell that jury that she'd bring men -- she'd bring men home and make him get up and do drugs and drink with them.

Q.  Okay.  What else?

A.  That she was abusive.  She beat on him.  That at one point, he got arrested for something when he was 16 or 17 and was severely beaten at the police station by police officers which traumatized him awfully.  That he suffered PTSD.  He became more and more withdrawn.  I'm sorry, this brings back a lot of memories.

THE COURT:  Just take your time.

A.   There was so much mitigating evidence in this case.

Q.   (BY MR. AUTRY)  Were you aware that Mr. Barrett had a mental health history?

A.   Oh, yes.  He had been in three separate mental institutions.  We didn't have any of those records.

Q.   Now, were you planning to put on evidence related to any kind of mental health history or contacts with mental health system --

A.   Yes.

Q.   -- Mr. Barrett may have had?  Okay.  Do you know a lady named Jeanne Russell?

A.   I do.

Q.   And who is she?

A.   She's a psychologist.  Worked for a long time for the Department of Corrections.

Q.   And what was her role in this case?

A.   Her role was, as a psychologist, she did -- John asked her to do a risk assessment, and I asked her to go further and go into Kenny's background.  She -- she understands that very well and could convey that to a jury.

Q.   Had the case gone to a second stage, were you planning to call Dr. Russell to testify to the results of the risk assessment she did?

A.   Absolutely.

Q.  Do you recall what her findings were with respect to whether Mr. Barrett posed some kind of risk, in a prison environment in particular?

A.  She -- she was -- would have testified that he was not psychopathic, and that he was minimum risk had he been put in a prison population.

Q.  Okay.

A.  A minimum risk to do something bad.

Q.  Were you aware that, in 1986, Mr. Barrett attempted to commit suicide?

A.  Yes, sir.

Q.  And were you planning to do anything with that in any penalty phase that might have occurred in the state case?

A.  We would talk -- we would have talked about that in relationship to his reclusive personality, his paranoia, his sense of failure in everything that he did.

Q.  Okay.  You were aware, of course, that Mr. Barrett had a history of drug abuse?

A.  Yes, sir.  That added a lot to the paranoia.

Q.  Were you planning on trying to present to the jury in the state case a mitigating explanation for Mr. Barrett's drug use?

A.  Well, yes, sir.  Yes, you -- that all has to be explained.

Q.  All right.  And do you think you would have been able to

explain why Mr. Barrett became a drug user --

MR. KAHAN: Objection as to what he thinks, Your Honor.

MR. AUTRY: I'm sorry, what was the objection?

MR. KAHAN: Objection as to what he thinks.

Q. (BY MR. AUTRY) Okay. Would you have put on evidence to try to help explain Mr. Barrett's drug use and why he became a drug user to the jury?

A. I would anticipate that any psychologist could have put that testimony on in spades in this case.

Q. Now, was Mr. Barrett cooperative with you when you and Mr. Echols represented him in the state case?

A. Absolutely.

Q. Did he ever tell you I don't want any kind of investigation into mitigating evidence?

A. Certainly not.

Q. Did he ever tell you I don't want you to talk to my family and I don't want you to go into my family background?

A. No. He encouraged it.

Q. Did he ever tell you I don't want -- if it gets to a second stage, I don't want any evidence put on, just give me the death penalty?

A. Answer is no.

Q. Did he ever tell you that, if it came down to it, he'd

rather have a death sentence than a life sentence?

A.  No, sir.

Q.  Okay.  Did he ever prevent you or discourage you or Mr. Echols from developing the types of mitigating evidence that we've talked about here a little bit today, Mr. Gordon?

A.  No.

Q.  Okay.  Do you know who Steve Leedy is?

A.  Yes, sir.

Q.  What was his role in the second trial in the state case?

A.  Steve had to become a mitigating investigator, which is not his -- not his forte.

Q.  What was Mr. Leedy's primary role before he was thrust into that particular role in this case?

A.  He was a fact investigator.

Q.  Do you know what his professional background is?

A.  He's a policeman.

Q.  Had he been trained to be a mitigation investigator, somebody who was adept at putting together a case in mitigation in the second stage?

A.  No.  The OIDS has a fellow named Dale Anderson that is a mitigating expert.

Q.  Was Mr. Anderson available to work on Mr. Barrett's case?

A.  No, sir.  He had two or three other cases going and

couldn't get there.

Q. Okay. Would you say that the development of the mitigation case in the state case still had some work to be done?

A. Oh, yeah.

Q. Okay. And can you explain that a little bit more?

A. I can't remember when I got in the case, but it was late. I couldn't get Dale Anderson because he was busy. I've worked with Dale on five of these cases. He's the best I've -- you've ever seen. And so had to work with Steve to get him all facts and into gathering up evidence -- mitigating evidence.

Q. So would it be fair to say, you tell me, was the second stage investigation at the time he went to trial in the second state case complete?

A. No.

Q. All right.

A. But it would have been.

Q. And that brings up a good point. Do you know what Judge Garrett, who tried the state case, was going to do about when you were going to have to start the penalty phase if there was a first degree murder conviction?

A. I think he said two weeks or three weeks.

Q. Okay. Would that have given you additional time to put together the remainder of the mitigation case?

A.  Yes, it would have.

Q.  Now, notwithstanding the fact that the investigation was incomplete, did you still have what you considered to be significant mitigating evidence to put on on Mr. Barrett's behalf had he been convicted of first degree murder?

A.  I could have started that afternoon and gone on for a long time.

Q.  Okay.  Thank you, sir.  Now, after Mr. Barrett's state case concluded, did you become aware that he was charged in federal court?

A.  I did.

Q.  And how soon do you think you learned that he had been charged in federal court after the state case was completed?

A.  John Echols called me, I think.

Q.  And did Mr. Echols have any involvement in the federal case?

A.  I think he was appointed lead counsel.  I was kind of disappointed that I didn't get asked to be mitigating evidence person, but I wasn't.  I didn't have any federal experience in death penalty, and they wanted Rob Nigh.  And Paul Brunton was the chief federal defender at that time.

Q.  Was -- I'm sorry.  Go ahead.  I interrupted you.  I'm sorry.

A.  I'm finished.

Q.   Okay.  Was Mr. Nigh appointed to assist Mr. Echols in the federal case, to your knowledge?

A.   The answer is no.

Q.   Do you know who was appointed?

A.   Steve somebody or other.

Q.   Does the name Roger Hilfiger ring a bell?

A.   Roger Hilfiger.

Q.   Okay.  Did you have any involvement at all in the state case?

A.   Federal case?

Q.   The federal case.  I'm sorry.

A.   No.

Q.   Did you become aware at some point that Mr. Echols withdrew from representing Mr. Barrett in the federal case?

A.   He called me and told me.

Q.   Did he indicate why he was getting out of the trial?

A.   Got sick of it.

Q.   Okay.  And was there any other -- was there any reason in particular that he was sick of it?

A.   He couldn't get anything from -- he couldn't get any financial support from the court to do the things that he needed to do to get the federal case ready to go to trial. He got frustrated with the system.

Q.   Okay.  After Mr. Hilfiger was elevated to first chair in

the federal case, did he ever contact you?

A. No.

Q. Do you know a lawyer from Muskogee named Bret Smith?

A. No.

Q. Did a lawyer named Bret Smith, to your recollection, ever contact you about Mr. Barrett's state case?

A. No.

Q. Did any representative of Mr. Hilfiger or Smith ever retrieve from you any files you had in the state case?

A. No.

Q. Do you know where the investigative file in the state case was kept?

A. Which one?

Q. Mitigating evidence.

A. My files in my storage bin.

Q. Okay. Do you know whether or not there was ever an investigative file at the OIDS office in Sapulpa?

A. John had extensive files. I don't know what happened to those.

Q. Okay.

A. I would assume they went to Sapulpa, but I don't know.

Q. You just don't know; is that correct?

A. I don't know.

Q. At any rate, you never heard from anybody on the federal case after Mr. Echols withdrew?

A.   No.

MR. AUTRY:  Could I have just a second, Your Honor?

THE COURT:  Yes.

Q.   (BY MR. AUTRY)  Mr. Gordon, did anybody ever discuss with you the ballistics evidence that had been presented in Mr. Barrett's state court trials?

A.   We talked about it a lot in the state court.

Q.   And what was -- what was the focus there?

MR. KAHAN:  Your Honor, objection as to relevance.

THE COURT:  What is the relevance of this testimony?

MR. AUTRY:  Well, Your Honor, I think it goes to the circumstances of the offense, which can be mitigating under *Lockett vs. Ohio* and the succeeding Supreme Court cases.  The circumstances of the offense can mitigate the punishment.

MR. KAHAN:  Your Honor, the case was remanded for specific fact finding as to a different theory of mitigation, not as to ballistics.

THE COURT:  Yeah.  Objection sustained.

Q.   (BY MR. AUTRY)  Mr. Gordon, had either Mr. Hilfiger or Mr. Smith contacted you and asked to look at your files, or sit down with you to talk about what you all were going to

present in the second stage of the state case had you gotten there, would you have been more than happy to talk to them?

A.  You bet.

Q.  Okay.  And give them whatever they needed, whatever materials, whatever guidance, answer all their questions?

A.  You bet.

Q.  But that never happened?

A.  No, sir.

MR. AUTRY:  Okay.  Thank you, sir.

THE COURT:  Cross-examination, Mr. Kahan.

CROSS-EXAMINATION

BY MR. KAHAN:

Q.  Good afternoon, Mr. Gordon.  Mr. Gordon, fair to say you take capital -- capital defense seriously, isn't it?

A.  I certainly do.  It scares me sometimes.

Q.  Now, during your preparations for the second state trial, you told us you were in contact with a psychologist named Jeanne Russell; is that correct?

A.  That's right.

Q.  And did she prepare a report for you?

A.  She did.

Q.  Okay.  If I could ask you to take a look at Government's Exhibit 34.

A.  Is that what's in front of me?

Q.   I hope so.

A.   I have it, sir.

Q.   Pardon?

A.   I have it.

Q.   You have seen it?

A.   I've seen it.

Q.   Is that a true and correct copy of the report Dr. Russell provided to you?

A.   It appears to be.

Q.   And do you recall you and I had a conversation by phone a few weeks ago?

A.   Yes.

Q.   And at that time you told us that Jeanne Russell was your sole mental health witness; is that correct?

A.   At -- whenever we went to trial, yes.  There was one other guy that I -- that I liked that I thought could put some of this -- some of this together to make sense to a jury.

Q.   Okay.  But, in fact, you had other mental health reports, didn't you?

A.   I did.

Q.   Okay.  If I could ask you, please, to turn to Tab 37.

A.   All right, sir.

Q.   Now, is this a report you received from Kathy LaFortune at OIDS?

A.  I didn't receive it.

Q.  You're not familiar with this report?

A.  But I know about the report.

Q.  You do know about the --

A.  I didn't receive it.

Q.  Okay.  How do you know about the report?

A.  Because I read it.

Q.  You read it but did not receive it?

A.  John Echols got it.  I didn't get it.  I didn't ask for it.

Q.  So -- but you did read the report?

A.  Yes, sir.

Q.  Now, did you receive the report at Tab 42?  Oh, and before I go there.  Based on your reading of this report, is this a true and accurate copy of the report you read in John Echols' files?

A.  It was.

Q.  Okay.  Move on to Tab 42.

A.  Okay.

Q.  Is this a report you received?

A.  You know, I don't remember this one.

Q.  You don't recall this?

A.  No.

Q.  John Echols never showed you this report?

A.  I didn't say that.

Q.  Okay.

A.  I said I don't recall it.

Q.  Okay.  Now, when we spoke a few weeks ago, you told me that you did not recall Roseann Schaye.  Do you remember that?

A.  Yes.

Q.  Okay.

A.  Since that time, I've read her reports.

Q.  Okay.  So why don't we, if you will, check to see that we're talking about the same reports.  If you could turn to Tab 18.

A.  May I look at some notes that I made, what I have reviewed for this testimony?

Q.  I'm assuming we get a copy of those?

A.  I don't know that --

THE COURT:  If you're going to use it to refresh your memory, you do need to make it available to them.

THE WITNESS:  Certainly.  I just --

THE COURT:  Go ahead.

THE WITNESS:  Would you like to make --

THE COURT:  No, you can go ahead and go ahead and use it, and then give them a copy.

A.  I got a -- I read a copy of Roseann Schaye's report dated 7-23-2000, and 9-4-2000.  And I think your Exhibit 18 is probably -- the information is contained in one those

reports.

Q.  (BY MR. KAHAN)  This is contained in the report that you have.  Now, the notes that you're referring to, those -- what do those refer to, the yellow notes in your hand?

A.  Reports from Roseann Schaye that were submitted to Mr. Echols.

Q.  Okay.  And where do those exist?  Apparently since I spoke to you about a month ago, you've reviewed these reports.  I'd like to know where the reports are.  Where?

A.  I don't know.

MR. AUTRY:  I sent them to him to refresh his recollection.

Q.  (BY MR. KAHAN)  Okay.  So these are documents that you received from Mr. Barrett's current lawyers?

A.  Yes.

Q.  Okay.  So sitting here today, do you have an independent recollection of the information contained in Government's Exhibit 18 as information you received from Roseann Schaye?

A.  I believe there's a synopsis of this in one of those reports that I received from Mr. Autry.

Q.  I'm sorry, that you received from Mr. Autry?

A.  Mr. Autry, yes.

Q.  Okay.  Do you recall receiving this document prior to Mr. Barrett's second state trial?

A.   No.  No, I do not recall.

Q.   Okay.  Exhibit 19.

A.   I do not recall seeing anything about your Exhibit 19.

Q.   Okay.  And when you say you don't recall, you don't recall receiving that prior to Mr. Barrett's second state trial?

A.   The answer is yes, I do not recall.

Q.   Exhibit 20, please.

A.   I have not seen this.

Q.   Okay.  So you've never seen this document ever?

A.   Ever.

Q.   Exhibit 21, please.

A.   The information contained in that is contained in one of the reports that I read from Dr. Schaye.

Q.   Okay.  And you recall seeing this information prior to Mr. Barrett's second trial?

A.   I'm sure I did.  I don't have an independent recollection of that.  I read a lot of stuff.

Q.   I understand.  If I could ask you to look at Exhibit 22.

A.   Some of this information is contained in a report from Dr. Schaye.  Not all of it.

Q.   Okay.  So when you refer to that report, is that the report you recently obtained from Mr. Autry?

A.   Yes.

Q.   Okay.  Do you have any independent recollection of

receiving this information prior to Mr. Barrett's second

state trial?

A.   No.

Q.   Turn to Tab 23, please.

A.   I don't remember seeing that report.

Q.   You don't recall ever seeing the information contained

in this report?

A.   No.

Q.   All right.  If I could ask you to turn to Tab 24.

A.   The contents of that report are contained in one of the

reports that Mr. Autry gave me.

Q.   But do you recall receiving this information --

A.   I did not receive this specific document.

Q.   Do you recall receiving the information contained within

this document?

A.   That which is contained in Roseann Schaye's report --

two reports actually.

Q.   If you will, did you obtain this information while you

were representing Mr. Barrett during the second state

trial?

A.   I don't recall.

Q.   Okay.  Finally, ask you to take a look at Tab 25.

A.   I have not seen that report, and I don't believe that

report -- the information contained in that report -- in

that report is in either of the reports that I received from

Mr. Autry.

Q.  Okay.  Now, you'll agree with me, about a month ago, you do not remember Ms. Schaye at all; is that correct?

A.  That's correct.

Q.  Okay.  And as you sit here today, you do not recall any of the reports that I've shown you purporting to be Ms. Schaye's work product.  Is that also correct?

A.  Yes.

Q.  Okay.  Could you please turn to Tab 29?

A.  Okay.

Q.  Is this a report you received from Steve Leedy?

A.  I don't recall whether I did or not.

Q.  Okay.  Do you recall whether you received this information from Mr. Leedy?

A.  I know the information that's contained in it, I've -- I know personally, so, therefore, I must have seen it.

Q.  If you'd turn to Tab 30.  Is this a report that you received from Steve Leedy?

A.  I haven't seen this.  No reason to, actually.

Q.  Pardon?

A.  I've -- I haven't seen it.

Q.  Okay.  Had you received this information in any form or fashion through Mr. Echols from Mr. Leedy?

A.  No.

Q.  Okay.

A.  I was not involved in the case in 2001.

Q.  If I could ask you to look at Tab 45.

A.  I haven't seen that.

Q.  This is a document that you -- you don't -- you don't recall or you never have seen before?

A.  I haven't seen this.

Q.  Okay.  And is that true of Tab 46 as well?

A.  I haven't seen any of those.

Q.  Okay.  What about Tab 47?

A.  I haven't seen that.  I know the contents are true.

Q.  And how do you know that the contents are true?

A.  My -- one of my investigation that Steve Leedy did.

Q.  Okay.  So this information was imparted to you by Mr. Leedy?

A.  Yes.

Q.  Tab 48, is this a report you received from Mr. Leedy?

A.  No.

Q.  Are you familiar with any of the information in it?

A.  Familiar with every bit of it.

Q.  Okay.  And how are you familiar with it?

A.  Mr. Leedy told me.

Q.  If you could turn to Tab 49, please.  Is this a report you received from Steve Leedy?

A.  No.

Q.  No, you've -- you've been through the entire thing?

A.   I haven't seen it.

Q.   And you're not familiar with any of the information?

A.   I'm familiar with some of the information, but I haven't seen this report.

Q.   Now, you intended to present some of Mr. Barrett's relatives during any necessary penalty phase trial in state court; is that correct?

A.   Those which -- who could relate the information necessary to get some penalty other than death.

Q.   Understood.  And was one of the facts you intended to adduce from those witnesses that, in their opinion, Mr. Barrett was not a dangerous person?

A.   No.

Q.   No?  That is not a thing you told me when we spoke a month ago?

A.   Put me -- I'm sorry.  Put it in context.  Do I think Kenny Barrett is a dangerous person?

Q.   No.

A.   That's not your question?

Q.   That is not my question.

A.   What is your --

Q.   My question is:  Did you intend to try and prove that Kenny Barrett was not a dangerous person?

A.   Yes, but not quite like that.

Q.   Now, did you tell me, am I remembering this correctly,

that you did not, at any point in time, share your files with Mr. Echols?

A.   Well, I didn't -- they were right there if he wanted something.

Q.   Okay.  But there was never a point in time when you said I produced this investigative report, here's a copy; is that correct?

A.   Yes.

Q.   You did not freely share the information that you --

A.   Wrong.  We freely shared everything.

Q.   Okay.  Did you provide him with copies of -- let's back up.  What did you provide him with copies of?

A.   Anything he wanted.

Q.   Okay.  What was that?

A.   I don't have any idea.

Q.   Do your files in this case exist today?

A.   They do.

Q.   They do?

A.   Or I think they do.  I think they are in my storage shed.

Q.   Okay.  You did not tell me a month ago -- did you not tell me a month ago that they did not exist?

A.   The answer is no.

Q.   The answer is -- okay.

A.   I think I keep all my death penalty cases forever.

Q.   Okay.

A.   Now then, have I laid my eyes on the file?  I can't tell you that I haven't, but I didn't go look.  Just my -- it's my custom and habit.  Well, not only death penalty cases, all my murder cases, and I've tried a lot, I try to keep those files because something might come up at some point or another.

          MR. KAHAN:  Could I have a moment, Your Honor?

          THE COURT:  Yes.

Q.   (BY MR. KAHAN)  Mr. Gordon, are you familiar with a computer database that Mr. Echols maintained in which he kept his defense files?

A.   Yes.

Q.   You are?

A.   He did everything on the computer.  It was -- he's quite computer literate.  I'm not.

Q.   Okay.  Did he provide you with access to that?

A.   Yes, but I didn't know how to do it.  If I needed something, I asked him for it.

Q.   Okay.

A.   I had much of the hard copy.  I'm a paper man, okay?  I like paper.  This thing makes me nuts.  I'm old.  Look, I can't help it.  So I -- I got a lot of the stuff on paper that he had on computer.  He could -- he could access his a lot quicker than I could access my paper, but that's what we

did.

Q.  And at the end of your participation in the second trial, you do not recall providing your files to Mr. Echols; is that correct?

A.  I do not think I did.  I believe I kept my personal files.  He had his on a thumb drive, I assume.  I don't know.

MR. KAHAN:  Pass the witness, Your Honor.  Thank you.

THE COURT:  Redirect, Mr. Autry.

MR. AUTRY:  Yes, briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q.  Mr. Gordon, how many years have passed now since you participated in Mr. Barrett's second state trial?

A.  Sixteen, seventeen, fifteen.  Something.  Long time.

Q.  Over ten years?

A.  Yes.

Q.  Okay.  And you've been pretty busy during that period of time I guess; correct?

A.  That's right.

Q.  And you think you still have your file, but you haven't reviewed your file; is that correct?

A.  I have not.

Q.  And you were asked a series of questions by Mr. Kahan

when he went through various reports saying did you receive this, did you have access to it, etc.  I sent you some materials; right?

A.  That's right.

Q.  And do you know why I sent those to you?

A.  For my review.

Q.  Okay.  Do you know why I wanted you to review them?

A.  To see if I could recall having that same information in my own database.

Q.  All right.  So regardless of what the source was for the information you had, you had information about the types of mitigating evidence that you were going to present for Kenneth Barrett from one source or another.  Is that fair to say?

A.  That's right.

Q.  Whether it be a report from Roseann Schaye, a report from Steve Leedy, Jeanne Russell, whoever it was?

A.  Doesn't make any difference, I had them -- I had the information.

Q.  All right.  With respect to whether you have a specific report or a specific piece of paper, due to the passage of time, do you have a clear recollection --

A.  I do not.

Q.  -- of that?  What you do recall is the information that you had?

A.   The information I had -- with the information I had, I was going to present a very good mitigating case.

Q.   Okay.  And we discussed those facts on direct examination?

A.   Yes.

MR. AUTRY:  Okay.  Thank you, sir.

THE COURT:  Mr. Gordon, you can step down.  Thank you.

THE WITNESS:  Thank you, Judge.

MR. KAHAN:  Your Honor, the government would ask that Mr. Gordon supply not only a copy of the notes, but also any documents that were provided by Mr. Autry to refresh his recollection.

THE COURT:  Yes, we need to do that, Mr. Gordon.

MR. AUTRY:  Your Honor, I can send the email that I sent to Mr. Gordon that has the attachments that I sent to him if that would be --

THE COURT:  That will help.  And if you would, just let Nick take that little note you refreshed with and we'll make a copy of it.

THE WITNESS:  And I apologize, the writing on that is not very good.  I had carpal tunnel surgery and this is the hand that works.  Doesn't work very well with a pen anymore.  Knock on wood, whenever this is over, it will again.  I'd like to be able to shake hands with my old

client.

THE COURT:  Mr. Gordon, you do have an extra copy of those things that Mr. Autry sent you?  Perfect.

THE WITNESS:  Let me see -- be sure there's everything in there that you need that I got.  Yes, sir.

THE COURT:  Okay.

MR. KAHAN:  Your Honor, as long as I'm asking for things, could we please have him ordered to produce the file that's in Mr. Gordon's possession?

MR. AUTRY:  We would object to that on the grounds of attorney/client privilege and attorney work product privilege if they're asking him for his old file from the state case from ages ago.  Privilege still applies.

MR. KAHAN:  Well, I believe the privilege is waived with regard to second stage.  We're trying to establish what federal counsel knew and where they got it from.  And there is a dispute over whether or not Mr. Gordon provided the documents in his file to Mr. Echols that would have flowed to Mr. Hilfiger and Mr. Smith.

MR. AUTRY:  The privilege isn't waived, Your Honor, because Mr. Barrett has not attacked the effectiveness of Jack Gordon.  He's attacked the effectiveness of Mr. Hilfiger and Mr. Smith.  To that extent, his attorney/client privilege with Mr. Hilfiger and Mr. Smith has been breached.  But there's been no waiver of

either the work product privilege or the attorney/client privilege with respect to Mr. Barrett and Mr. Gordon from the state case.

THE COURT: Has Mr. Echols produced his file in this case?

MR. AUTRY: Produced it?

THE COURT: For the government. Yes.

MS. FISHER: I can answer that, Your Honor. There was a discovery order, and it limited disclosure to the government of any penalty related. But Mr. Echols was counsel for federal trial. And the only files of Mr. Echols that flowed through that discovery order were files that had gone from Mr. Echols to Mr. Hilfiger, so they were actually Mr. Hilfiger's files at that point.

THE COURT: Okay. Well, I'm going -- I'm going to deny the request at this time. We can think about it between now, and maybe revisit before we get back together in June.

MR. KAHAN: Thank you, Your Honor.

THE COURT: You got everything back you came with, Mr. Gordon?

THE WITNESS: No, sir.

THE COURT: Just give him back his original.

THE WITNESS: I got the original yellow paper.

THE COURT: Okay. Great. You're free to go then.

THE WITNESS:  May I say hello to my client before I leave?

THE COURT:  From right there.

THE WITNESS:  I love you, Kenneth.

THE DEFENDANT:  Appreciate you.

THE WITNESS:  Thank you, sir.

THE COURT:  Thank you, Mr. Gordon.

THE WITNESS:  You need me any longer?

MR. AUTRY:  No, sir.  Thank you, Jack.

THE WITNESS:  Free to go from everybody?

THE COURT:  Yes.

MR. AUTRY:  Dr. George Woods, Your Honor.

THE CLERK:  Raise your right hand.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  I do.

THE CLERK:  Please be seated.

<u>GEORGE WOODS, M.D.</u>,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

<u>DIRECT EXAMINATION</u>

BY MR. AUTRY:

Q.  Could you state your name, sir, for the Court, please?

A.  Yes, if you could just give me one moment to -- my name is George Woods.  G-e-o-r-g-e.  W-o-o-d-s.

Q.  And where do you live?

A.   Oakland, California.

Q.   How long have you lived there?

A.   Since -- off and on since 1968.

Q.   And what do you do for a living, sir?

A.   I'm a physician specializing in psychiatry and neuropsychiatry.

Q.   And how long have you done that?

A.   I graduated from medical school in 1977.  I started my practice in 1983.

Q.   Can you tell the Court where you got your undergraduate degree from?

A.   Sure.  Westminster College in Salt Lake City, Utah.

Q.   And what year was that?

A.   1969.

Q.   And where did you receive your medical degree from, Doctor?

A.   May I put this aside?

Q.   Yes, sir.

A.   Okay.  The University of Utah Medical Center in Salt Lake City, Utah.

Q.   And what year was that?

A.   1977.

Q.   And you're a psychiatrist?

A.   That's correct.

Q.   Are you also a neuropsychiatrist?

A.   That's correct.

Q.   What's the difference between a psychiatrist and a neuropsychiatrist, if any?

A.   Neuropsychiatry is a subspecialty of psychiatry.  And in neuropsychiatry, we focus more on the relationship between brain behavior -- brain and behavior, brain functioning and behavior, brain anatomy and behavior.

Q.   And did you receive -- well, let me ask you some more about your qualifications.  Did you do a residency in psychiatry?

A.   I did.

Q.   And where was that?

A.   At Pacific Medical Center in San Francisco, California.

Q.   And did you receive specialized training in neurological matters either there or somewhere else?

A.   Yes.  I took special electives at -- they were part of the residency at the Kaiser Permanente Hospital in both Oakland and San Francisco, California.

Q.   All right.  And did you have any fellowships or anything during your training as a psychiatrist?

A.   Yes.  I did a fellowship with the National Institute of Mental Health and the American Psychiatric Association in geriatric psychopharmacology.

Q.   Have you had any hospital appointments?

A.   Yes.

Q.   Could you describe those for the Court, please?

A.   Yes.  I've been -- I've been practicing at Doctors' Hospital in California, and I've also practiced at East Bay Hospital.  I've also practiced at Goodwin Hospital in Oakland, California.  Those have been -- I was chief of staff at all three of those hospitals at one time or another.

Q.   All right.  Does your specialty of neuropsychiatry have any significant -- have any special significance I guess with respect to your examination of Kenneth Barrett?

A.   Yes.

Q.   And could you explain that briefly?

A.   Well, over the last 25 years, we've come to understand that many psychiatric disorders have neurological components.  At one time we thought that there was this clear kind of brain-body dichotomy, and that psychiatric disorders did not really -- did not have a template of brain functioning.  Now we know that's not true.  In certain, we've known that for the last 20 years, where the brain is very relevant in the manifestation of symptoms of psychiatric disorders, as well as ongoing brain -- just regular brain neurological disorders.

Q.   All right.  And I should have asked you this first.  Do you know Kenneth Barrett?

A.   Yes, I do.

Q.   Okay.  And how do you know him?

A.   I was retained to examine Mr. Barrett in 2009.  I examined him on two occasions at that time, and again this year.

Q.   All right.  And we'll talk about the specifics of that here in a minute.  But let me ask you some more about your experience and qualifications.

A.   Sure.

Q.   Do you have any experience working in drug abuse or chemical dependent centers, or things of that nature?

A.   Yes.  I was the clinical director of the New Beginnings Clinical Dependency Program in the mid 1990s.  This was what was briefly called a dual diagnosis program.

Q.   Okay.  And what is a dual diagnosis?

A.   Most chemical dependent persons -- many chemical dependent persons have an underlying psychiatric disorder.  And many psychiatric disorders have what we call comorbid or co-occurring disorders where there's a chemical dependency component as well as a psychiatric or neurological component.  So this program was one of the first programs in California to really look at both the chemical component -- chemical dependency component as well as the psychiatric component in order to try to parse those out and to see what that relationship was all about.

Q.  All right.  With respect to your examination or evaluation of Mr. Barrett, did your experience in that program have any special significance?

A.  Well, it was particularly relevant in Mr. Barrett's case because he has a long history of chemical dependency, as well as a long history of psychiatric disorders, as well as a long history of cognitive impairment.  So it was absolutely necessary to try to gain some understanding of how those related.

Q.  All right.  Are you board certified?

A.  Yes, I am, in psychiatry.

Q.  All right.  And what does board certification entail?

A.  I'm sorry?

Q.  I'm sorry, I should speak into this microphone.  What does board certification, what does that mean specifically?

A.  Okay.  Board certification is a specialized voluntary testing that one can do that's primarily important certainly in academic areas if you're going to teach in an academic setting.  But you can become board certified in specific areas.  For example, the certification for psychiatry is really held by the American Board of Psychiatry and Neurology.  And on that particular test, it's about -- if you're going to become board certified in psychiatry, it's about 70 percent psychiatry, 30 percent neurology.  If

you're going to become board certified in neurology, it's about 70 percent neurology, 30 percent psychiatry. So it's a combination of psychiatry and neurology. And you have to pass that in order to have the certification.

Q. All right. Do you have any faculty appointments at any medical schools?

A. Currently?

Q. Currently.

A. Yes.

Q. And what are those, please?

A. I am teaching at Morehouse College of Medicine in Atlanta, Georgia. I'm currently on sabbatical for another reason that I'll talk about at another time. I've been teaching there since 2000. I teach two classes, introduction to forensic psychiatry, and introduction to geriatric psychiatry.

Q. All right. Any others in the past?

A. Yes. I -- in terms of medical schools, I've taught at the University of Washington in Bothell. I've taught at the University of California, Davis. In the University of California, I taught in the department of forensic psychiatry. At the University of Washington, I taught a course, again, on mental health and the law. But it was not within the forensic fellowship.

Q. Could you describe briefly for the Court the nature of

your current medical practice?

A.   Sure.  Part of my practice is -- part of my medical practice is, again, teaching.  I teach at the University of California, Berkeley, in the department of -- in the law school.  And there I teach a course on mental health and the law.  I also have a clinical practice where I see patients, primarily patients that we describe as having neurodevelopmental disorders, patients that suffer from fetal alcohol, from Fragile X Syndrome, from other type -- Marfans Syndrome.  M-a-r-f-a-n-s.  Other types of syndromes that really typically develop in the -- in the gestation period, the period of pregnancy, or early acquired disorders.

Q.   Okay.  What percentage of your practice, Doctor, is devoted to forensic evaluations or examinations?

A.   I'd say about 60 to 65 percent of my practice is devoted to forensic examinations, and about 35 percent to clinical practice.

Q.   And when you say clinical practice, does that mean seeing and treating patients?

A.   Yes, I see patients.

Q.   Have you testified as an expert witness before in court?

A.   Yes, I have.

Q.   Does that include state and federal court?

A.   Yes, I have.

Q.   Have you testified as an expert witness previously in capital cases?

A.   Yes, I have.

Q.   And have you testified previously as an expert witness in capital cases in Oklahoma?

A.   Yes, I have.

Q.   All right.  And who retained your services in this case?

A.   The federal defender's office here.

Q.   In Sacramento?

A.   In Sacramento, yes.

Q.   All right.  And you understand that they represent -- that office represents Mr. Barrett in this case?

A.   That's correct.

Q.   Now, are you paid for your time?

A.   Yes, I am.

Q.   Okay.  And what's your rate?

A.   $350 an hour.

Q.   Okay.  Now, Doctor, what were you asked -- just let me ask you briefly.  What were you asked to do in this case back in 2009?

A.   I was asked to examine Mr. Barrett, and to determine -- looking at a variety of materials, to determine Mr. Barrett's cognitive functioning, if there, in fact, were psychiatric disorders that were relevant.  And if either of

the -- of his cognitive functioning or other psychiatric disorders that he may have would be relevant at the time of the offense, and also during the course of his legal proceedings.

Q. All right. Did you perform what could be termed a comprehensive psychiatric examination of Mr. Barrett?

A. Yes.

Q. And when was that done?

A. There were two days in 2009. And I saw Mr. Barrett again earlier this year.

Q. And where did these examinations or evaluations take place?

A. At Terre Haute, Indiana.

Q. Is that the federal prison there?

A. That's correct.

Q. Where Mr. Barrett has been on death row?

A. That's correct.

Q. Okay. Now, let me ask you this, Doctor: Based on your view of records and materials in this case, before you examined Mr. Barrett in 2009, had there ever been a comprehensive psychiatric examination of him by anybody, to your knowledge?

A. In my professional opinion, no.

Q. Why do you say that?

A. There have been risk -- limited risk assessment

evaluations.  There have been limited what we call psychometric examinations where there had been personality testing, MMPI, that type of thing.  There had really not been a comprehensive neuropsychological examination, although there had been neuropsychological screening instruments had been provided.  And I think most relevantly, a comprehensive understanding of his social history had not been developed.  And social history is really the most scientific tool one has in understanding both medical and psychiatric disorders.

Q.  All right.  Can you give the Court an idea of what types of records you reviewed in aid of your examination of Mr. Barrett in 2009, and I guess this year in 2017 --

A.  Sure.

Q.  -- when you went back to see him?

A.  I reviewed material of Dr. Russell's, of Dr. Sharp's, of Dr. Price's, his neuropsychological -- neuropsychological screening instrument report.  Of Dr. Bianco.  I reviewed medical records of Mr. Barrett, as well as his family over multiple generations.  I've reviewed declarations that were available from his family.  I reviewed records of the -- of offense itself from police records, etc.  I reviewed the neuropsychological testing of Dr. Myla Young.

Currently, I reviewed other neuropsychological testing and critiques of other doctors,

Dr. Erin Bigler, Dr. Deborah Miora.  I reviewed medical records of Mr. Barrett's hospitalization on the three various hospitalizations.  I reviewed his early medical records.  I reviewed his academic records, his school records that were available.  I may be missing something, but I think that's the broad spectrum of things that I looked at.

Q.  And I think you said some of the records -- or some of the materials you reviewed went to Mr. Barrett's background and upbringing and family history?

A.  That's correct.

Q.  All right.  Now, why is that important to look at in doing a psychiatric evaluation?

A.  Because psychiatric evaluations -- psychiatric disorders are very similar to medical disorders in that they are familial, and often we know, certainly for the last 15 years or so, that there can be a genetic component of that as well.  So apples don't fall far from the tree, and over time you're able to look back and see symptoms, and occasionally diagnosis, but certainly symptoms and behaviors in families that give you a real understanding of what may be occurring with the person that you are examining.  That's number one.

Number two, similarly, you may be able to look at patterns of behavior and patterns of symptoms such as multigenerational chemical dependency or multigeneration

hypersexuality that, again, gives you a much better clue as to what may be going on. So when you gather scientific information, like neuropsychological testing for example, it has more relevance.

Q. In looking at the medical records and other materials you were given to review regarding Mr. Barrett's family history, was there anything significant that struck you in looking at all that kind of material?

A. Yes.

Q. Can you explain that to the Court, please?

A. When one looks at Mr. Barrett's history, family history, one sees what's called an affectively-laden family.

Q. What does that mean?

A. What Schultz really describes is the best of this, is a family that has generations of symptoms and behaviors that are consistent with psychiatric disorders.

When one looks at to make a psychiatric diagnosis or to look at psychiatric symptoms, you want to look at the family history because if you see these symptoms, for example in this case, bipolar disorder or chemical dependency or mood disorders, you -- if you see symptoms of those behaviors in family members, that really gives you clues to the potential of those -- of those occurring within your -- the client that you're seeing.

For example, Mr. Barrett's family has a long

family history of suicidal behavior and actually completed suicides that goes back three or four generations. He has a family history of diagnosed bipolar disorder which is a significant mood disorder that, again, goes back three or four generations. He has a history dating back at least from 1918 of family members that have been hospitalized. At that time it was called lunacy. And at least two family members that were, in fact, certified and hospitalized within the psychiatric hospitalization for behaviors that are very, very consistent with the types of difficulties we see with Mr. Barrett. Difficulty with sleeping for long periods of time, problems with mood swings, problems with mood, what we call lability. Reactive violence. And so being able to look at this family history, he has paternal aunts that have children, both of whom have been diagnosed with bipolar disorder. He has other aunts and grandparents that have been diagnosed with depression. We see a long history of hypersexual behavior.

And we also see a lack of what we call perceptual disorders, auditory hallucinations, sensory misperceptions. So that allows you to not think as much about schizophrenia, for example, but perhaps to think more about mood disorders, things that disrupt one's mood. So this family history is very, very rich.

And it's the same way that one would look for

a family history of diabetes or a family history of hypertension. All of these are -- all these disorders are what are called heterogeneous disorders. These are disorders that are on multiple genetic islands. And as time goes by, you can look at those different islands and put them together and really make a good sense of what you're seeing in front of you.

Q. All right. Is there a significance -- for example, in bipolar disorder, is there -- is there a genetic component to that?

A. Yes. And maybe I should take a moment and describe what bipolar --

Q. Sure. I was going to ask you that. Could you describe briefly for the Court what's bipolar disorder, and what kind of effect does it have on somebody?

A. Sure. A bipolar disorder is a disorder of mood. It's a disorder where someone's ability to control their mood, their feelings of anxiety, of depression, sometimes of being elated are problematic, are really pathological, and can cause problems that can disrupt a person's life.

Bipolar disorder historically, meaning in the 1920s and 1930s, was really thought of having this classic up and down picture. People -- a person would become elevated, what we call euphoric, and then a person might become depressed. And it was thought that it was just that

up and down pattern.  We now have known since about 1947 that that's not really the classic pattern of bipolar disorder.  That bipolar disorder actually shows up more with irritability than mania.  That -- and it can be significantly disruptive to one's life.  By definition, it has to be significantly disruptive to one's life to be -- to be termed a psychiatric disorder.

One of the other things that we know is that, over the course of a person's life that suffers from bipolar disorder, they will meet the criteria for chemical dependency.  About 65 percent of people that have -- carry a diagnosis of chemical dependency of one substance or another also meets the diagnosis of bipolar disorder.  So they go hand in hand.

Q.  Is there a genetic component to both bipolar disorder and substance abuse disorder?

A.  There's a greater genetic component to bipolar disorder. If -- and it's not just to bipolar disorder.  It's also to depression.  So if a family member has any mood disorder -- typically nuclear families, but you can have both second and third generation families.  If there's an incidence of a recognition of a mood disorder within the family, that increases the potential of a child inheriting some aspect of that mood disorder.

Q.  And is bipolar disorder -- I think you indicated this

earlier.  Do you see indications or diagnoses of bipolar disorder in Mr. Barrett's wider family --

A.  That's correct.

Q.  -- or within generations of the family on both sides --

A.  That's correct.

Q.  -- of the family?

A.  I'm sorry.

Q.  Is the same true for substance abuse disorder?

A.  Certainly substance abuse.  And --

Q.  With respect to his family history?

A.  Yes.  I can't say necessarily that the diagnosis of substance abuse disorder has been made, and when we're looking at records from 1919, 1930s, we didn't have the classification systems that we have now.  But what we do see are serious drinkers that destroy their lives.  And that's what substance abuse is about.  We see pictures of serious drinkers that were very successful.  Andrew Jackson Barrett, for example, who was a very successful man, yet at the same time, over time, drinking and hypersexuality undermined his life and destroyed his life.

So that's what you're looking for.  You're looking for not just is someone a drinker, is someone a heavy drinker, but are they drinking -- are they using to the point where it undermines their functioning.  And we see that -- it's replete in his family history, including his

mother and father.

Q.   All right.  Was Mr. Barrett genetically predisposed to developing a mood disorder?

A.   Yes.

Q.   I'm going to get into this a little bit more detail later, but have you diagnosed Mr. Barrett as suffering from bipolar disorder?

A.   Yes, I have.

Q.   Okay.  Along with the genetic predisposition to that, is the way a person is raised or the way their background unfolds, does that have any relevance at all to developing bipolar disorder or mood disorder or any other mental illness?

A.   Yes, it does.

Q.   Okay.  And what can you tell the Court about what you learned about Mr. Barrett's background, his upbringing, and things of that nature?

A.   Mr. Barrett -- if I could perhaps just kind of describe --

Q.   Sure.

A.   -- this relationship for a moment before I become specific --

Q.   Yes, sir.

A.   -- about Mr. Barrett.  There is a wonderful book called Formative Experiences, and it talks about childhood

development. And one of the things that it talks about in childhood development is that, when a child's brain -- when a child is born, about 40 percent of their brain is really ready to roll. As opposed to a cat's brain who's about 65 percent. An ant's brain is about 95 percent ready to function in every way. And one wonders why a child's brain -- a human child's brain is so unready. And one of the reasons that the geneticists believe is because a child's brain has so much to do. It has to learn language. It has to learning coping skills. It has to learn how to function within a family environment. It has to develop academic skills. And so it has -- it has to do a number of things that, in fact, other species do not.

That can work either way. So if you are -- if you are born into a family that is supportive and active and helpful and try to help you do those things and make a difference, that really makes your brain grow. That really changes the way your brain works. However, if you're born into a family, as Mr. Barrett was, where even before he was born, he was subjected to alcohol abuse within the -- within the womb --

Q. Okay. Let me stop you there, Doctor. Do you have -- do you have information that, during the period of time Mr. Barrett's mother was pregnant with him, she drank?

A. Yes.

Q.   All right.

A.   And -- and continued to drink.  That in itself is a neurological insult.  And then you have the environment of Mr. Barrett's father who was a violent man, who was violent to Mr. Barrett, who struck Mr. Barrett, who hit Mr. Barrett, who created a violent environment.  His mother describes being beaten by Mr. Barrett, Senior.  And occasionally the children would try to break into that violence.  They were unsuccessful at doing -- at doing so.

And so what you have here is an environment that is not conducive to the best development of brain functioning, to the best development of coping mechanisms that really allow you to -- for your child to do well.

Q.   Let me kind of cut to the chase a little bit.  You've mentioned earlier -- and I asked you kind of a general question about whether you diagnosed Mr. Barrett with bipolar disorder, you said yes?

A.   Yes.

Q.   Can you tell the Court briefly what you base that diagnosis on?

A.   Sure.  First of all, I base it on Mr. Barrett's own description of a lifetime history of depression and suicidal ideation.  He's told me, as well as other experts, that he's had a lifetime history of being suicidal.  And we know that he's had at least one significant suicide attempt.  We also

know that Mr. Barrett has had at least three psychiatric hospitalizations, the first in 1986 where he attempted to shoot himself -- he did shoot himself in the chest with a shotgun.  In 19 -- later in 1995 where he was hospitalled again -- hospitalized again on two occasions, in 1994, and I believe in 1995.  The hospitalization in 1995, he was actually diagnosed with bipolar disorder and was started with psychiatric -- on psychiatric medications, a very -- he was started on Haldol which --

Q.   What is Haldol?

A.   Haldol is an antipsychotic medication.  And it can be used for the most extreme presentation of bipolar disorder, but it most commonly is not the direct medication that one would use for psychiatric -- for bipolar disorder.

The importance of these three hospitalizations, besides the fact in each one -- the first one he was described as having a depressive neurosis with psychosis.  The second one he was, again, hospitalized.  The third one he captured the bipolar disorder.  Is that he was also using substances during these times.  And even, in spite of the fact that he was using substances during these times, we see that he -- they made psychiatric diagnoses. They didn't just say, oh, well, he was using, so it must not be seriously psychiatric.  In each case, they took it very seriously and they prescribed him psychiatric medications.

The second time they prescribed him antidepressants, Asendin I believe, and -- A-s-e-n-d-i-n.  And the third time they again prescribed him antipsychotic medications.  So, clearly, during that period of time, they saw him as having a psychiatric disorder and they attempted to treat that psychiatric disorder.

Q.  So they didn't just see it as a function of Mr. Barrett being a drug user or a drug addict, and that's his only problem?

A.  That's correct.

Q.  And what else do you base your diagnosis of Mr. Barrett having bipolar disorder on besides what you just discussed?

A.  I base -- as I've already described, I base it on the family history, bipolar disorder, and the symptoms that one sees as you look through those records.  There are code words like lability.  Mood lability is a term of art that is used when describing bipolar disorder.  And it describes this swinging of mood that one often sees.  This was described in family members of him.  We also see that -- I saw that with Mr. Barrett.

There's also another symptom that is pretty classic called pressured speech.  Pressured speech is a type of talking that it -- most people think of it as rapid speech, but that's not really it.  It's a type of talking

that one has to break into.  Mr. Barrett will start and he'll continue and he'll continue and he'll continue, and one feels as though you have to kind of break into it. There are multiple types of speech, but we see that as being consistent with bipolar disorder.

And then we see the history of his significant drug use, a drug use that started at 10 or 11, that continued his entire life.  Primarily methamphetamines, but he used a number of other -- of other drugs as well. And, again, that's what we see.

So certainly the mental status that I performed is consistent with bipolar disorder.  The diagnoses of psychiatric professionals at a time when he was not at all involved in the criminal justice system are diagnostics of a mood disorder.  They treated him for a mood disorder.  A family history of mood disorders, multiple generations, these are all internally consistent with bipolar disorder.

Q.  How can you distinguish between Mr. Barrett having bipolar disorder as an underlying mental illness rather than just exhibiting symptoms that might be indicative of bipolar disorder --

A.  Yes.

Q.  -- through being habituated to using drugs?

A.  Yes.  Any psychiatric disorder has to undermine your

ability to function.  Any of us can have certain symptoms. Lots of people throw around terms like narcissistic, etc., but if it doesn't undermine your ability to function then, you know, it doesn't really speak to a psychiatric disorder.

And what we see with Mr. Barrett over time with his ex-wife Abby, you know, examples of hypersexuality. He describes, and she described him having multiple partners that destroyed their relationship.  We -- we see other people describe him -- lay people describing him as having mood swings.  And we see this chronic irritability, and this -- an irritability that is really classic.  If you were to -- I think the foremost source would be Kaplan and Sadock's Comprehensive Textbook of Psychiatry.  If you were to look at the chapter that talks about bipolar disorder, they talk about irritability is really the foremost symptom that one sees in bipolar disorder.

However, we also -- and this has only been true probably since 1996 or 1997.  We also know that there are ways in which the brain does not work well in bipolar disorder.  People have difficulty weighing and deliberating effectively.  People have difficulty understanding context, the context of a situation.  They have problems effectively picking up cues.  And this is because we now know that bipolar disorder affects that front part of the brain in the same way that other neurological conditions do.

Q.  And did you see that in Mr. Barrett?

A.  Yes, I did.

Q.  You probably already answered my question, but can you distinguish between Mr. Barrett having bipolar disorder and just being a drug abuser?

A.  Yes.

Q.  Okay.

A.  The -- the distinction really has to do with certain types of symptoms that are consistent with a mood disorder that aren't necessarily consistent with drugs.  For example, pressured speech is not a symptom of really any --

Q.  What is pressured speech by the way?

A.  Pressured speech is this rapid ongoing type of speech that is very, very rush, rush, rush.  It's not fast speech, but it's rushed.  And you have to enter -- you have to intervene.  If one reviews some of the other reports and transcripts, you see that other experts have had to stop Mr. Barrett and say hold it, hold it, you know, let me -- let me -- let me get my point across.  Because that pressured speech continues to roll and continues to roll.

And the same thing is true in terms of the significant depression that one has.  Now, it's true that depression and chemical dependency can go hand in hand.  But what we see with Mr. Barrett is a depression that -- I was going to say borders on -- but actually it results in kind

of a chronic suicidality.  He describes to myself and other experts being suicidal most of his life, and having not only the one known suicidal attempt, but other times that he's tried to overdose on drugs with the intent to -- to kill himself.  Well, those really distinguish you -- a person with a mood disorder.  And there are others, but -- and then the family history, of course, from just chemical dependency.

Q.  All right.  In any of Mr. Barrett's previous contacts before the offense was committed in 1999, previous contacts with the mental health system, whether it be at Eastern State Hospital, the Bill Willis mental health facility, Wagoner Hospital, was he ever diagnosed by any doctors who saw him in those settings as having antisocial personality disorder?

A.  No, he was not.

Q.  All right.  And was he treated with some of these medications -- some of these antidepressants when he was seen at these facilities in a manner that exacerbated his problem with bipolar disorder?

A.  There is that potential, Mr. Autry.  He was, in his second hospitalization, treated with antidepressants.  And antidepressants can really cause problems and with people that are bipolar.  And if I could just take a moment to --

Q.  Sure.

A.    -- explain that.  Sure.  Because there are two poles, the depressive pole and the manic pole.  Many people present with a depressive pole.  They present as depressed.  And yet, if you give that person antidepressants, about 30 percent of them can develop what's called the manic switch.  It will actually flip them into a state of mania or certain irritability.

If you look on the black box -- or the black box warning on many antidepressants, it warns about this.  It warns about watching for this manic switch which occurs in about 30 percent of people that are bipolar.  Mr. Barrett describes that sense of increased irritability.  Even within the current facility at Terre Haute, he has been very hesitant to take antidepressant medications because they have not been a benefit.  If anything, they may have undermined his mood.

Q.    All right.  If somebody's got bipolar disorder, is that something that affects their day-to-day life and their daily living?

A.    It certainly can.  And in order to make the diagnosis, it can.  It depends upon the environmental -- the environment in which they're in.  If someone is in, for example, a much more closed environment, they can do better.

Up until 1937 we didn't have psychiatric medications, and people did better when they were in

cloistered environments.  But, by definition, you should look for irritability, reactivity, intrusive behavior, impulsiveness, snatching defeat from the jaws of victory.

Q.  And did you see those things in your evaluation of Mr. Barrett and in looking at all the records you looked at?

A.  I think it was a fairly consistent pattern, not only after 1999, but when you look at his academic record, he did very poorly in school.  He failed the first grade.  He dropped out in the eighth grade.  He did poorly in math.  He did poorly in reading.  His academic record was -- was not good.

Q.  Do you attribute that to anything, the fact that he did poorly in school?

A.  Well, certainly, when we look at his brain functioning, we see that those parts of the brain, the temporal lobes particularly, that monitor and control academic functioning were -- are impaired.  However, when you think about the math -- particularly the math learning disability -- and I believe it was Dr. Sharp that identified him with a learning disability as well.  When you think about the math learning disability, about 42 percent of folks that have fetal alcohol spectrum disorder -- and I did not make that diagnosis -- but about 42 percent of people that have impaired brain secondary to drinking by the mother also have

specific math disabilities.  So that -- those could be related.

Q.  Are there indications that Mr. Barrett has ADD or ADHD?

A.  There are indications that Mr. Barrett has attentional problems --

Q.  Okay.

A.  -- which is different than ADD or ADHD.  ADD is attention deficit disorder.  ADHD is attention deficit hyperactivity disorder.  He was certainly described as hyperactive as a child.  However, the neuropsychological testing --

Q.  I'm going to get to that --

A.  Okay.

Q.  -- here in a minute.

A.  I'm sorry.  Okay.

Q.  Well, let me just ask you this:  Somebody with an attention deficit disorder or people who are on that spectrum or have ADHD, is methamphetamine used to treat -- or not methamphetamine -- but are amphetamines or uppers, I guess, used to treat that sort of -- that sort of disability?

A.  Yes, it's one of these long-term treatments of amphetamine salts.  Amphetamines have been used to treat that, yes.

Q.  Okay.  Are you familiar with the concept of self-medication?

A.  Yes.

Q.  And what does that mean briefly?

A.  Self-medication -- thank you.

Q.  I'm not --

A.  I got you.

Q.  I'm not trying to cut you off.

A.  I got you.

Q.  Okay.

A.  Okay.  Self -- self-medication is really the use by people that have chemical dependency that would have psychiatric disorders to medicate their symptoms.

Q.  Did you find that to be true in Mr. Barrett's case, that he self-medicated his psychiatric symptoms through drug use?

A.  His description of his chemical dependency, both in quality and quantity, would be consistent with self-medication.

Q.  Is that something that you see frequently in your practice?

A.  Oh, yes.  Because psychiatric -- psychiatric medications don't really do the job --

Q.  Okay.

A.  -- so you do see that often.

Q.   All right.  Is there anything else about what you've diagnosed as Mr. Barrett's bipolar disorder that you think the Court needs to hear about or you think is significant?

A.   No.  Your Honor, I think that that pretty much covers it.

Q.   All right.  Did you also look to -- look at Mr. Barrett to see whether or not he suffered from posttraumatic stress disorder?

A.   I did not look to see whether he did, but his --

Q.   That was bad.  I didn't phrase it correctly, so please -- please correct me.

A.   Sure.  But in reviewing his symptoms and reviewing his history, it was a symptom pattern and an environmental pattern that was consistent with posttraumatic stress disorder.

Q.   And why do you say that?

A.   Again, we see a family history of pretty significant violence by the father that lasted up until about the age of 13.  But we also see another pattern that is consistent in posttraumatic stress disorder, and that is, sadly, neglect by the mother.  The mother was unavailable.  She was a heavy drinker.  She continued to drink throughout his life and -- and just, on a consistent basis, was not available, really providing a lack of coping resources that one sees in posttraumatic stress disorder.

Q.   Okay.   Now, let me ask you, Doctor, about Mr. Barrett's neuropsychiatric or neuropsychological profile.  Do you know who Myla Young was?

A.   Yes, I do.

Q.   Okay.   Could you tell the Court who she was?

A.   Dr. Myla Young was a board certified neuropsychologist. She was a -- about 20 years, she was the chief psychologist for the Vacaville State Prison in California where she did hundreds, if not thousands of neuropsychological examinations over the course of her 20 year career.  She was also certified in the -- in the administration of the Hare Psychopathy Index.

Q.   All right.  And was she a competent neuropsychologist?

A.   She was one of the few board certified neuropsychologists in the country.  They are rare.  About less than ten percent of the neuropsychologists in the United States are actually board certified.

Q.   Now, in connection with, or in conjunction with your psychiatric examination of Mr. Barrett, did Dr. Young do a neuropsychological battery or neuropsychological tests --

A.   Yes, she did --

Q.   -- on Mr. Barrett?

A.   -- a battery of tests, yes.

Q.   Okay.  And based on what you know, were the tests that she administered to Mr. Barrett appropriate?

A.   Yes.   Dr. Young gave the Halstead-Reitan Battery, which was first developed in 1984 -- I mean, 1948.   She then gave a series of tests from Delis-Kaplan Executive Battery, as well as some other separate tests.

Q.   Okay.   And did you find her results to be valid and reliable in reviewing them?

A.   Yes.

Q.   Now, you're not a neuropsychologist yourself; is that correct?

A.   That's correct.

Q.   You don't administer the battery of tests that a neuropsychologist administers; correct?

A.   That's correct.

Q.   Okay.   Can you interpret the results and look at the results to see if they're valid?

A.   Yes.

Q.   All right.   And you're familiar with -- enough with the field, certainly, to do that sort of thing?

A.   Oh, yes.   I've taken courses in all of the neuropsychological tests that she administered.

Q.   All right.   And based on the testing that Dr. Young did on Mr. Barrett, can you tell the Court what her findings were with respect to any neuropsychological deficits?

A.   Yes.   Doctor -- first of all, Dr. Young found her testing of Mr. Barrett to be -- as she said, Mr. Autry, to

be reliable and valid. Reliability means if you were to give that testing to another neuropsychologist, there's an excellent chance that they would agree with her findings. Valid means that it's true.

So in both cases, her testing was reliable, meaning you could pass it on, and valid, meaning it was an accurate representative of Mr. Barrett's neurological functioning.

She found two areas of weakness, and both of those were on the left side of his brain. The -- the orbital, over the eye, frontal part of the frontal lobe had significant impairments. This is an area that grows late in life after -- usually after about 10 up until the age of 25. It's an area that is a seat for what we call executive functioning, being able to weigh and deliberate, meaning you could sequence one's behavior being able to pick up cues in social situations, being able to understand the context of situations. And the other part of that was impaired was the left temporal lobe. The temporal lobe is really -- one of the things that is the seat of the temporal lobe is academic functioning, being able to read effectively. Not that you can't read, but being able to read effectively. Being able to do math effectively. These are all part of the functioning of the left temporal lobe.

Now, at the same time, she found that

Mr. Barrett's right parietal lobe functioned very well.  And the right parietal lobe is really the part of the brain that we kind of put things together.  It's the part of the brain that would make Mr. Barrett able to function as a mechanic. It was a part of the brain that would allow him to fix things.  And consistent with his history, we see that part of the brain actually working pretty well.

Q.  What is executive functioning?  What is that?

A.  Executive functioning is -- if I could just maybe tell a quick story?

Q.  Sure.

A.  I don't know if any of you have had the opportunity to watch this television show, Are You Smarter Than a Fifth Grader.  I admit that I do watch it and fail fairly often at the questions, but it's -- it looks to be a test -- kind of an educational test.  But interestingly enough, it's a test of how your brain works.  Because before -- before the fifth grade, before you're, say, nine or ten years old, you're given these rote questions, what's the capital of Oklahoma, what -- what's the -- how many states and what are the -- what are those states.  You're given these very rote questions, and that's what your brain can handle until that time.  But after about nine or ten, your brain, and particularly this frontal part of your brain, starts to grow and you start to develop executive functioning.

And so, instead of these kind of rote questions, you get abstractions. If you've got one car coming at 40 miles an hour and another car coming -- going at 60 miles an hour, when are they going to meet, and this requires working memory, can you remember the problem, processing speed, how quickly does it work, weighing and deliberating, one car is coming at one speed, one car is coming at another. And so executive functioning is really what allows us to abstract. It's what allows us to effectively figure things out. It allows us to understand the context of a situation and say, wow, I probably shouldn't say that in this situation, or I probably shouldn't do that in this situation. It allows us to pick up social cues so that we know that certain behaviors may not be appropriate. And that's why it's called executive.

Q. Was it found by Dr. Young in her testing that Mr. Barrett had what's termed dysexecutive syndrome?

A. Yes.

Q. What is that?

A. Dysexecutive syndrome are problems in those areas. And it does not mean that you can't do those things at all. But it does mean that you have problems in those areas. And the -- really the guru of executive functioning, Godefory, G-o-d-e-f-o-r-y, really talks about those problems occurring most commonly in new and novel and stressful situations.

Q. All right.

A. Right. So what you see in the neuropsychological testing is tests of those areas, and particularly two tests, the Wisconsin Card Sorting Test and the Category Test, that Mr. Barrett did extremely poorly in.

Q. Would it be fair to say that Mr. Barrett has significant dysfunction in his prefrontal lobes, or at least one of his prefrontal lobes?

A. Yes.

Q. All right. And does that cause an inability to inhibit stimuli or react appropriately to stimuli or to accurately take in information as it's happening?

A. It can. And I'm not trying to imply -- and I think Dr. Young said this, it doesn't mean that it can't happen at all.

Q. Sure.

A. It doesn't mean that. But it does mean that, particularly in stressful situations, in novel situations, those skills are undermined.

Q. Does dysexecutive syndrome or a problem with executive functioning impair somebody's ability to engage in reasoned and goal-directed behavior?

A. It can, yes.

Q. Now, were there indications in Mr. Barrett's history that would explain, or help to explain the damage to his

frontal lobes?

A.   Yes.

Q.   All right.  Can you talk about those briefly, Doctor?

A.   Well, there are two, Mr. Autry.  I think the first one that we would have to consider is his mother's drinking.  Drinking can impact the brain in every trimester.  It impacts the brain in the first trimester.  I'm sorry.  Drinking can impact the body in every trimester.  It can impact the brain.  Usually from the neck up.  The first trimester from the neck through the genitalia.  In the -- or to the stomach in the second trimester.  And then the genitalia, legs in the third trimester.  And it doesn't take a lot of drinking.  I mean, it doesn't take just a lot of drinking.  And so we know that Ms. Barrett was a regular drinker during the pregnancy and, actually, during her entire life.

However, we also know Mr. Barrett had a series of head injuries.  When he was very young, he was hit in the head with a steel ball.  He had several assaults, physical assaults where he was taken to the hospital.  On two of these occasions, he actually had a loss of consciousness.  You don't have to have a loss of consciousness in order to suffer concussions or that type of injury.  But in his particular case, he did.  And so what we see are a series of potentially acquired head injuries, as

well as a potential vulnerability of brain impairment during the pregnancy period.

Q.  Let me ask you about a couple of these neuropsychological tests you talked about that Dr. Young gave to Mr. Barrett.  One of them was this Wisconsin Card Sorting Test.  What is that exactly?

A.  The Wisconsin Card Sorting Test is a test where you have a series of cards.  Each card -- there are ten of them. There are six sets of ten cards.  And each card has an image on it, like a star or a diamond.  There are multiple card sorting tests, but this particular one a star or diamond. And the idea is -- and I might add, too, that the Wisconsin Card Sorting Test is normed such a way that a ten-year-old should be able to do this test very easily.

So you turn over a card.  And the -- if it has the image that the examiner wants you to think about, like a diamond, they will say yes.  And so then you'll turn over another card, and let's say that card has a star. They'll say no.  And so then you turn over another card and there's diamond.  They'll say yes.  So you've got the pattern now, so there's something about diamonds that are important.  You'll go through ten of those diamonds, and then the examiner changes the orders so that, the next time you turn over a diamond, they'll say no.  You've got to figure out what the next set is.  So it may be you have to

go through all the diamonds, all the stars, all the squares. And once you get it, it's pretty straightforward and you go through these six sets of cards.

And it's really a test of can you switch your thinking, can you pick up the idea, can you respond to cues effectively, can you understand what the directions are, and can you change your thinking in the process of doing a task.

Q.   And how did Mr. Barrett do on that?

A.   Mr. Barrett was -- 99 percent of those that were normed did better than Mr. Barrett on this particular test.  He not only what we call perseverated, in that he got stuck.  He kept doing the same thing over and over in spite of getting cues to do something differently.  But he also exhibited what's called a failure to learn.  Meaning even after he got one or two of the -- of the stages, he lost it.  He didn't -- he couldn't get the other one.  So he did very poorly on that test.

Q.   And I think you mentioned another one of the tests that Dr. Young gave, and I'm not bringing it to mind.

A.   The Category Test.

Q.   The Category Test.

A.   Right.

Q.   What is that a test of, or what is that designed to discover or reveal?

A.   Sure.  The Category Test, again, is a test of executive functioning, of left frontal lobe functioning.  And it's very important because, in the Category Test as opposed to the Wisconsin Card Sorting Test, you go down into layers of complexity.  You have -- the first things that you do are relatively easy.  However, as time goes by, they become more difficult.  The cutoff for norm, what we would say normal is about 35.  Mr. Barrett had 54 errors on this test, which put him into the mild to moderately impaired area.

The other thing that's important about those tests is that both of those tests look at the same area.  So this gives you an opportunity to kind of really hone in on specific areas where a person may have difficulty, as opposed to other areas where they may have some strengths.

Q.   All right.  Did Mr. Barrett's neurological deficits that you discussed and that Dr. Young found, and his psychiatric illnesses, the bipolar and the PTSD that you've discussed, did those predate the offense in this case which occurred in 1999?

A.   There's no indication, Mr. Autry, of any illness, any head injury, any type of difficulty that would -- since that time that would speak to this type of specific head injury problem.  And the kinds of problems that one gets with this kind of brain difficulty are the kinds of problems that others have described about Mr. Barrett his entire life,

including his academic record. When we look at that left temporal lobe, you know, we're talking about math and reading. When we look at his hyperactivity, his difficulty in school, we're talking about that executive functioning. So we see these occurring long before the offenses for which he was tried and convicted.

Q. All right. And did your conclusion change from 2009 when you saw Mr. Barrett again earlier this year in January of 2017?

A. No, sir, it did not.

Q. All right. Now, are you familiar, Doctor, generally with what the facts of this case are as to how the offense was committed, under what circumstance it was committed, and things of that nature?

A. Yes, sir.

Q. You understand that there was a raid on Mr. Barrett's property by the TAC team or the SWAT team of the Oklahoma Highway Patrol to serve a warrant?

A. Yes, sir.

Q. And that they came on his property around midnight, or in the middle of the night?

A. Yes, sir.

Q. And there were multiple vehicles involved?

A. Yes, sir.

Q. Okay. And one of the vehicles I think even ran into the

front of the little cabin he built there on the family property?

A.  I -- I believe so, yes.

Q.  All right.  And shots were fired?

A.  Yes, sir.

Q.  Trooper Eales was killed?

A.  Yes, sir.

Q.  There was an exchange of gunfire.  Mr. Barrett himself was shot?

A.  Yes, sir.

Q.  Okay.  Now, keeping that in mind, that this is a sudden event that occurred where the police -- or the Oklahoma Highway Patrol run up on his property to serve a warrant?

A.  Yes, sir.

Q.  What sort of effect or impact do Mr. Barrett's neurological deficits and his psychiatric illnesses have in his ability to perceive and react to that kind of situation?

A.  I -- I think the first thing we have to take into consideration, Mr. Autry, is that these symptoms of psychiatric and neurological disorder are comorbid.  And what that means is that they interact with each other, and they undermine each other so that his brain impairments really do a job on his psychiatric disorder.  And vice versa.  And they create circumstances that, at thinking,

that is even worse than would be from day-to-day.

The idea of a hyperreactive response is completely consistent with both his history, his mood disorder, as well as what we would see in someone that have these kinds of brain impairments, this misperception of -- of the circumstances. Once again, we talk about executive functioning, being able to weigh and deliberate -- effectively weigh and deliberate. And this clearly was an example of misperceiving and not being able to effectively weigh and deliberate.

Q.  Do you hold, to a reasonable degree of medical certainty, that Mr. Barrett has bipolar disorder?

A.  I do.

Q.  Do you hold, to a reasonable degree of medical certainty, that Mr. Barrett has PTSD?

A.  I do.

Q.  Do you believe, to a reasonable degree of medical certainty, that Mr. Barrett has neurocognitive or neuropsychological problems and deficits with his frontal lobes?

A.  I do.

Q.  Okay.  Now, from what you've learned in speaking to people about what Mr. Barrett's life was like back around the time the offense was committed in 1999, what kind of mental state was he in, generally?  Was he barely stable for

220

him, was he spiraling downward, was he getting better?
What?

A.   There appears to be a deterioration in his mental state
in the -- in the weeks and perhaps the days before this
event in 1999.  He had become increasingly withdrawn.  It
was noted that he was actually not leaving his mother's
property where the home that he had created was -- was
located.  That other people are going into town for
different types of, you know, errands and that kind of
thing.  He had become increasingly isolated.  And
Mr. Barrett had always had a quality of paranoia that was
significant.  And it appears as though that paranoia had
increased during this period of time.

Q.   Did he believe that his actions on the night Trooper
Eales was killed were justified?

A.   That is Mr. Barrett's belief.

Q.   All right.  Would Mr. Barrett's paranoia and
hyperreactivity, in your opinion, stem solely from the fact
that he was a methamphetamine user?

A.   No.

Q.   And why not?

A.   Because we have seen those same symptoms with
Mr. Barrett actually get him hospitalized.  We've seen those
same symptoms take him -- have him try to kill himself.
We've seen those same symptoms being described in

psychiatric hospitalizations. We see his high level of paranoia being described in psychiatric hospitalizations. We see his high level of paranoia being described after he was arrested and had been sober for a significant period of time with Dr. Sharp's evaluation. We saw Mr. Barrett as being significantly paranoid. So many of the symptoms that we see with Mr. Barrett were there regardless of whether he had been using drugs or not.

Q. All right. And did Dr. Sharp preliminarily find, anyway, that Mr. Barrett had what appeared to be neurocognitive or neuropsychological deficits that led him to suggest that further testing be done?

A. That's correct.

Q. And the further testing of the sort that Dr. Young did --

A. That's exactly right.

Q. -- for example?

A. That's correct.

Q. You mentioned earlier in your testimony a Dr. Miora and Dr. Bigler. Who are they?

A. Dr. Deborah Miora is a neuropsychologist in California. And Dr. Erin Bigler is a neuropsychologist and head of the brain behavior program at Brigham Young University in Provo -- not Salt Lake -- in Provo, Utah.

Q. Did they review Dr. Young's testing protocol and the

testing that she gave to Mr. Barrett back in 2009?

A.  Yes, they did.

Q.  And what did they say about the testing done by Dr. Young?

MR. WILSON:  Objection as to this witness's testifying about these other persons' evaluations that does not enter into his evaluation or his opinions in this particular case.

THE COURT:  Is it going to be the basis for some opinion he renders in this case?

MR. AUTRY:  Well, Your Honor, doctor -- Dr. Woods examined Mr. Barrett in 2009 and 2017.  Dr. Bigler and Dr. Miora did record reviews of Dr. Young's testing, and they also looked at some of the testing done by other people. They concluded that she gave valid tests, the results were valid.  I mean, he's not basing his opinion on that because he's basing it on what he sees or saw for himself that Dr. Young did in 2009.  But it's further corroboration for the fact that she did valid tests.  Now, so that's why I'm asking him about it.  He's familiar with what their findings are, and I think an expert can rely on other experts regardless of where they come down the line or at what time to give testimony or render an opinion.

THE COURT:  Well, objection sustained.

MR. AUTRY:  All right.

Q.   (BY MR. AUTRY)   What is malingering, Doctor?

A.   Malingering is the manufacturing or exaggeration of symptoms for secondary gain.

Q.   Okay.  In other words, let's say that I'm -- somebody is faking an illness, for example?

A.   It's faking, yeah.

Q.   Did you find in your examination of Mr. Barrett that he was trying to exaggerate facts, exaggerate symptoms, or fake some sort of mental illness or neurological impairment?

A.   I'm -- I'm less able to speak to the facts as I am able to speak to the psychological testing and the neuropsychological testing.

Q.   Okay.

A.   There's obviously a convergent set of facts.

Q.   Say that again.  I'm sorry?

A.   I say there's obviously a convergent set of facts.

Q.   Yes, sir.  Okay.  So you didn't find him to be faking or malingering?

A.   That's correct.

Q.   All right.  Would it be fair to say that Mr. Barrett's drug use, if anything, exacerbated or made worse the symptoms of his mental illness and neurocognitive deficits?

A.   It couldn't have helped.

Q.   All right.

A.   Yes.  It couldn't have helped.

Q.   But you don't find that the basis for his neurocognitive problems or his bipolar or PTSD is drug use; correct?

A.   Well, I couldn't, Mr. Autry, because what we see is that a period of time recently, 2009 when he did the neuropsychological testing, we see that these symptoms still were present.  I certainly saw them in my examination; the pressured speech, the flight of ideas, etc.  We certainly saw them in 2017 as well.  And we see them when he was a kid, you know.  And so before he's -- even before he started using.  So are they relevant?  Yes.  Are they the basis?  No.

Q.   Okay.  Are you familiar with the testimony that was had in Mr. Barrett's federal trial back in 2005 with respect to the mitigating evidence that was put on?

A.   Yes.

Q.   Are you familiar with that?

A.   Yes.

Q.   Was any evidence put on in 2005 regarding Mr. Barrett's bipolar disorder?

A.   No.

Q.   Was any evidence put on in 2005 regarding Mr. Barrett's PTSD?

A.   No.

Q.   Was any evidence put on at the federal trial in 2005 about Mr. Barrett's neurological problems or brain damage?

225

A.   No, sir.

Q.   Was any evidence put on at the federal trial in 2005 about his, what I would term a chaotic and dysfunctional and abusive background in the immediate family?

A.   I think that's an accurate characterization.  And no, sir.

Q.   And was anything put on, to your recollection from reading the record, about Mr. Barrett's family history of mental illness, suicidality, drug and alcohol abuse, and in a multigenerational sense?

A.   No, sir.

Q.   All right.  Do you know a Dr. Steven Pitt?

A.   Yes, sir.

Q.   Okay.  Have you looked at a report that Dr. Pitt did of his examination of Mr. Barrett?  I think it was on January the 19th of 2017.

A.   Yes, sir.

Q.   All right.

A.   And I -- I also had the opportunity to review his transcript.

Q.   All right.  The transcript of the interview?

A.   Yes.

Q.   All right.  Dr. Pitt I guess videotaped his interview with Mr. Barrett?

A.   That's correct.

226

Q.   Is there a debate or a dispute in the psychiatric and
psychological community about the efficacy or the
appropriateness of the video or audiotaping psychiatric
evaluations or interviews?

A.   Yes, sir.

Q.   And could you explain what that is, what the debate or
the dispute is?

A.   The concern -- and it really started about 2002, McLehr,
M-c-L-e-h-r, and Roney, R-o-n-e-y, are the primary
proponents of -- for the third party -- and audiotaping and
videotaping is considered to be a third party -- potential
third-party intrusion.  Whether it changes the quality of
the interaction between the examiner and the examinee, it's
a debate that is still going on and has not been resolved.

Q.   All right.  Is that similar to like the effect cameras
in the courtroom might have?

A.   That's exactly correct.

Q.   Okay.  Instead of being yourself, you might tend -- some
people, anyway, might tend to become actors and actresses or
be self-conscious about being recorded --

A.   That's correct.

Q.   -- in some way?  Okay.  Now, in your review of Dr.
Pitt's report, does he seem to agree that, from all the
evidence and all the accounts, that Mr. Barrett had a
dysfunctional, neglectful, and traumatic upbringing?

A.  Dr. Pitt certainly agrees that it was dysfunctional and chaotic.

Q.  Okay.  Did Dr. Pitt agree that it was likely that Mr. Barrett was subjected to adverse prenatal effects by his mother's drinking?

A.  Yes.

Q.  Did Dr. Pitt in any way question the effect Mr. Barrett's head injuries might have on him, or the fact that he's received head injuries throughout his life?

A.  He certainly acknowledged that he had received, and documented that he had received head injuries.

Q.  Okay.  Would it be fair to say that Dr. Pitt does not question that, on both sides of Mr. Barrett's family, there's a history of major psychiatric illness, including mood disorders?

A.  Dr. Pitt documented that -- much of that history in his report.

Q.  All right.  And would it be fair to say that, in Dr. Pitt's report, he does not question or seem to question that Mr. Barrett has learning disabilities as reflected by his school performance?

A.  He -- again, Dr. Pitt did not -- did document Mr. Barrett's failure of the first grade and dropping out of school in eighth grade, and having problems with math and reading.

Q.  Okay.  Does Dr. Pitt say in his report that he does not contest the findings of the neuropsychologists that looked at Mr. Barrett?

A.  He actually referred that to -- he said that he referred that to the neuropsychological expert.

Q.  All right.  Even though there may be some disagreement or dispute among them potentially?

A.  Well, there's going to be because there hasn't been done a comprehensive neuropsychological battery except for Dr. Young's.

Q.  All right.  And you're talking about anybody who looked at Mr. Barrett during the state case, such as Dr. Bianco?

A.  That's right.

Q.  Okay.  And Dr. Bianco failed to give complete neuropsychological testing; is that correct?

A.  That's correct.

Q.  And he failed to give a complete test that would gauge or measure Mr. Barrett's executive functioning; is that correct?

A.  Among other areas, but certainly his executive functioning.

Q.  Okay.  And did you see any other problems with Dr. Bianco's testing of Mr. Barrett?

A.  Well, Dr. Bianco -- it's not clear that Dr. Bianco's testing was complete, even the -- even the testing that he

did because we don't have the raw data for that testing. And, also, Dr. Bianco did not describe what we call the normative sample. He did not describe that group of persons by which you compare your examinee to make sure that you're comparing apples to apples and oranges to oranges.

Q. And if you don't have this normative sampling or normative comparison group, can you really draw any validity or any conclusions from the testing?

A. It's very difficult.

Q. All right.

A. It's very difficult.

Q. Did Dr. Bianco seem to ignore evidence of Mr. Barrett's previous head injuries?

A. Mr. Autry, I can't say that he ignored because I don't know if he had it.

Q. All right.

A. But he certainly didn't present it.

Q. Okay. Did Dr. Bianco mention anything about Mr. Barrett's background and upbringing and the character of that?

A. Not to my recollection, sir.

Q. Do you recall whether or not he said, based on Mr. Barrett's self-report, that he had no problems growing up, or something like that?

A. That's correct.

Q.  Are self-reporting instruments -- this is a little off track.  But are these self-reporting instruments the most reliable means of determining whether somebody's got some kind of psychiatric or psychological problem or illness?

A.  Self-reporting instruments are difficult because people both -- there's a broad area called dissimulation, and dissimulation is inaccurate reporting.  And you can dissimulate both by saying too little and saying too -- or exaggerating.  So self-reporting instruments are difficult. You want to make sure that, if you are giving self-reporting instruments, you have a comprehensive social history and you have other types of testing that allows you to judge the value of that self-report finding.

Q.  Okay.

THE COURT:  Mr. Autry.

MR. AUTRY:  Yes, sir.

THE COURT:  How much longer do you think you have?

MR. AUTRY:  Another 10, 15 minutes maybe.

THE COURT:  Okay.  Well, let's go ahead and take a brief recess.

THE WITNESS:  Thank you.

THE COURT:  And be back here at 4:15.

MR. AUTRY:  Thank you, Your Honor.

*(Off the record at 4:02 p.m.)*

*(Back on the record at 4:17 p.m.)*

THE COURT: Go ahead, Mr. Autry.

MR. AUTRY: Thank you, Your Honor.

Q. (BY MR. AUTRY) Dr. Woods, did Dr. Young take into account Dr. Bianco's testing and any records that he generated in her analysis of Mr. Barrett or her examination of Mr. Barrett?

A. I believe so, yes.

Q. All right. And are you aware that Dr. Bianco concluded that Mr. Barrett suffered from no significant neuropsychological deficits, and that further testing was unnecessary?

A. Yes.

Q. Did Dr. Young, even taking his testing into account, agree or disagree with that?

A. Well, she obviously disagreed. She did a comprehensive battery with multiple tests looking at multiple areas. I think -- I think that may have been the difficulty with Dr. Bianco's testing is that, having done such a sparse battery, he probably captured strengths and didn't capture the significant weaknesses that we see.

Q. Okay. Do you know whether or not Dr. Bianco in his testing took into account Mr. Barrett's previous contacts with the mental health system?

A. I don't believe that he did.

Q. All right. Do you know whether or not he ignored

certain parts of testing he did do that indicated neurological problems or neuropsychological deficits?

A.  Again, I can't say that he ignored them, but it certainly did not -- it was not reflected in his comments on his testing.

Q.  All right.  Now, I don't think I made this clear earlier.  Dr. Steven Pitt is a psychiatrist who was retained by the government to examine Mr. Barrett back in January.  Is that your understanding?

A.  That's correct.

Q.  Okay.  Do you recall Dr. Pitt saying in his report that any neuropsychological deficits or problems Mr. Barrett had played no role in the offense, and that Mr. Barrett was still perfectly capable of making choices?

A.  Yes.

Q.  Do you agree or disagree with that?

A.  Well, it's -- it's a difficult -- it's hard for me to quite understand Dr. Pitt's findings given that he deferred any comment on the neuropsychological testing.  So by not really understanding what the neuropsychological testing meant, how can you say, in fact, that it had no role?

Q.  All right.  Are the types of neuropsychological problems that Mr. Barrett has, are they something that affects a person who has them in their day-to-day functioning and in their day-to-day lives?

A.  The answer is yes and no.  Yes --

Q.  Okay.

A.  -- they do affect -- affect you in your day-to-day life.
However, they are more significant in stress situations, new
situations, unusual situations.

Q.  Such as the raid on Mr. Barrett's property?

A.  That would be a very good example.

Q.  All right.  Now, Dr. Pitt does not diagnose Mr. Barrett
with antisocial personality disorder, does he?

A.  No, he does not.

Q.  Okay.  And do you know why that is, based on his
report?

A.  Because in order to make the diagnosis of antisocial
personality disorder, you have to meet the criteria for
conduct disorder typically before the age of 15.  And Mr. --
Dr. Pitt felt, appropriately so, that Mr. Barrett did not
meet that criteria.

Q.  All right.  Dr. Pitt states that, while Mr. Barrett does
not have -- or he doesn't diagnose him with antisocial
personality disorder, that he has committed or engaged in
antisocial acts; is that correct?

A.  That's correct.

Q.  Is there a significant incidence of people with bipolar
disorder engaging in antisocial behavior?

A.  Unfortunately, yes.  Antisocial behavior can lend itself

to impure judgment, can lend itself to grandiosity by definition. And you see people with bipolar disorder that really get themselves into trouble, both in terms of criminal and civil legal proceedings.

Q. Okay. Is it true or untrue that drug use or drug addiction, in and of itself, cannot lead to a diagnosis of antisocial personality disorder?

A. That's correct.

Q. All right. Now, even though Dr. Pitt acknowledges that Mr. Barrett had a troubled childhood, or a somewhat chaotic childhood and a dysfunctional upbringing, he concludes that Mr. Barrett does not suffer from PTSD because Mr. Barrett made no such complaints during the psychiatric interview that Dr. Pitt did with Mr. Barrett. Do you recall reading that --

A. Yes.

Q. -- in his report? What's your reaction or response to that, if any?

A. Well, again, it goes back to what we talked about in terms of self-report. And it's why the psychiatric evaluation of the person in a forensic setting is often of -- is not as valuable as being able to have other corroborating information. Mr. Barrett minimized to Mr. -- to Dr. Pitt this history until Dr. Pitt started asking him more specific questions about how did -- how did his father

235

hit him, and where did his father hit him, and how much did his mother drink.  And once he started asking those questions, actually answers that would be consistent with traumatic stress were irrelevant, but they are -- they're clearly relevant in the history.

Q.  Okay.  Correct me if I'm wrong, but what I got from reading Dr. Pitt's report was that, basically, any problems Mr. Barrett had or has stem pretty much exclusively from drug use and abuse rather than an underlying mood disorder, and that he concludes Mr. Barrett does not have bipolar disorder.  Am I accurately summarizing what he said?

A.  Yes, sir.

Q.  And I take it you disagree with that?

A.  I would have to disagree with that.

Q.  Okay.  For the reasons you've already stated, or is there anything else?

A.  Well, certainly for the reasons that I already stated. But I also would suggest that, within the context of the interview itself, you see problems with pressured speech, you see problems with flight of ideas.  You see Dr. Pitt having to repeatedly stop Mr. Barrett and say, hold on, let me get this idea, let me -- let me finish my thought.  So as you look at the transcript, you're actually looking at symptoms.

Q.  Okay.  I guess Dr. Pitt's order concludes that

236

Mr. Barrett doesn't have any underlying mental illness that was exacerbated by drug use or drug dependence because there's nothing to indicate the symptoms of bipolar disorder before the onset of his drug use?

A.    That's correct.

Q.    Okay.  Do you agree or disagree with that, and if you disagree, why do you disagree?

A.    I'd have to respectfully disagree --

Q.    Okay.

A.    -- with Dr. Pitt.  And, to me, the proof is really in the hospital -- the three hospital settings where clearly these are after the onset of his drug use.  They clearly -- he was there for 28 days on at least two occasions, I believe, and they made psychiatric diagnoses.  They had the opportunity to say, look, you know, this is all drugs, he cleared up.  He's been here a couple of days, he's been here a week, he's cleared up, he's doing better.  Or they could have said, let's just way wait and see.  It could be chemical dependency, it could be psychiatric.  Let's not treat him.  Let's just kind of wait and see what happens and see how he clears up.  And what we see on at least two of the three circumstances is they treated him, and they treated him with very, very powerful psychiatric drugs, antidepressants the second time, antipsychotics the third time.  And they treated him and recommended that he continue

these -- these medications.  So this is someone that's outside of the forensic setting.  It's in that period of time when there are both drugs -- he was both using drugs, and he presented with psychiatric diagnoses.  And they did not make the call that this was purely a chemical dependency issue.

Q.  All right.  Even though Dr. Pitt acknowledges a history of mental illness and mood disorders in Mr. Barrett's family, both immediate and his extended family, does he take sufficient account of that kind of genetic influence in his conclusions in your opinion?

A.  Dr. Pitt actually focuses on only the nuclear family. He really speaks only to that first generation nuclear family, which is genetically not correct.  And the literature doesn't support that you can only look at one family.  I mean, you look at grandparents and great grandparents.  You look back as far -- you look at cousins. You look back as far as you can.  And -- but even within that family, you see depression with his mother.  You see drug use and hypersexuality with his father.  So I respectfully understand what Dr. Pitt is saying, but I have to disagree with him.

Q.  Okay.  Do you think Dr. Pitt took into sufficient account how Mr. Barrett's upbringing might have influenced or been a contributing factor to the mental illness that you

diagnosed him as having?

A.  No.

Q.  Okay.  And why is that?  Just because it's not in the report or not discussed, or why?

A.  Well, Dr. Pitt makes a very good point in his report that his report does not capture the entirety of his findings, and so he strongly recommends that you review that 325 page transcript of the interview.  So when you actually review the transcript of the interview, you have the opportunity to see the conversation between the two of them, and you -- it really gives you a chance where Dr. Pitt is actually fleshing out what's going on at home.  How did your father beat you, you know, how did your mother -- what impact did her drinking have on you, and other -- and his two other brothers as well.  So I think if you look at the transcript, you really get a much broader picture of Dr. Pitt's and his -- and his examination of the family.

Q.  Do you think Dr. Pitt took sufficient account of Mr. Barrett's past hospitalizations and contacts with the mental health system in arriving at his conclusions?

A.  No, sir, I don't.

Q.  And is that because you don't see it emphasized or discussed at any length in his report?

A.  Well, I don't see what we described as the differential diagnosis.  I don't see where, if Dr. Pitt felt as though

the findings in those three hospitalizations were erroneous, or that somehow them describing Mr. Barrett as having labile mood or being significantly irritable, or making the diagnosis of bipolar disorder, or treating him with medications that are for mood disorders, I don't see the analysis that says, well, you know, I think they were wrong there, and this is where I think -- I think this is where -- this is where I think they probably missed it.

Q.   Okay.  One of Dr. Pitt's conclusions is that Mr. Barrett, in his opinion, doesn't have either bipolar disorder or PTSD because the institutional records in the Federal Bureau of Prisons do not indicate that any mental health person within the Bureau of Prisons ever diagnosed him with any of that.  Do you recall that statement in his report?

A.   I do.  And I've had the opportunity to review those records as well.

Q.   All right.  Was Mr. Barrett, within the Bureau of Prisons, ever given a comprehensive neuropsychological battery or a comprehensive psychiatric evaluation or examination?

A.   The records are voluminous, and I apologize, but I don't recall.  I certainly know there was no neuropsychological evaluation.  I also don't recall a psychiatric -- a comprehensive psychiatric evaluation.  Dr. Pitt and

240

Mr. Barrett talked about that, in fact, in the -- in the transcript.

Q.   Okay.  Would it be fair to say that -- well, in your opinion, would anything in the Bureau of Prisons records about Mr. Barrett's mental state be dispositive as to whether or not he has bipolar neurological damage, or any of that?

A.   Well, if there was -- if there were anything there, it would be helpful.  It could help.  I mean, everything is helpful.

Q.   Sure.

A.   So it could be useful for us to get some understanding of how he looked in a confined, very restricted environment. As I said earlier, you know, before we had medications, that's how we treated people were in confined, restricted environments.  But that has not been the case.  And Mr. Barrett has not -- as he said, Dr. Barrett -- I mean, Dr. Pitt when he asked him, well, you know, what about your symptoms in here?  And Mr. Barrett said, well, you know, I'm in a cage so it's hard to know what my symptoms are because I'm in a cage.

Q.   All right.  Is there a high incidence -- I don't know if you know this or not, so let me just ask you.  Is there a high incidence of undiagnosed and untreated mental illness among inmates in the prison system?

A.  Well, I can only go excluding my personal experience, we now know that the three largest psychiatric facilities in the United States are the Los Angeles County Jail, Rikers Island, and Cook County.  We also know that, according to the Department of Justice newsletter, 2009, greater than 50 percent of the prisoners in the federal, state, and local prison system suffer from symptoms of mental illness.  And just three weeks ago, the Center for Disease Control came out with a monograph on traumatic brain injury, as well as mental illness.  And in that monograph, they identified three vulnerable populations; geriatric population, the pediatric population, and the incarcerated population.  And their statistics state that approximately 60 percent of those that are within our prison walls have a history of traumatic brain injury.  So I think the literature is pretty solid that the population -- the current incarcerated population is one with significant mental illness, and also significant cognitive impairment as well.

Q.  All right.  Now, I've asked you this series of questions about Dr. Pitt's examination and the conclusions he's drawn. Is there anything else, as you sit here today, that stands out to you as being problematic in Dr. Pitt's conclusions?

A.  No, I think that we've covered them.

Q.  All right.  Are you familiar with a Dr. Randall Price?

A.  Yes, I am.

Q. Are you familiar with the fact that, during the pendency of the federal case against Mr. Barrett, Dr. Price examined him?

A. Yes.

Q. Okay. And is Dr. Price a psychologist?

A. He's a neuropsychologist.

Q. Neuropsychologist. And are you familiar with the PCL-R?

A. Yes.

Q. Is that one of the tests that Dr. Price gave to Mr. Barrett?

A. The Hare Psychopathy Index is actually not a test.

Q. Okay.

A. Okay. I just wanted to --

Q. I apologize.

A. Okay. It is not a test. It is an interview that is used to look at the construct of psychopathy.

Q. All right. Is psychopathy even recognized as a diagnosis in the Diagnostic and Statistical Manual?

A. It's not -- it's not a diagnosis. It's a construct. It's not even a syndrome. It's a construct that has been trying to get into the DSM for several iterations, probably starting since 1983.

Q. Okay. Does Dr. Price's diagnosis of psychopathy conflict with the records of Mr. Barrett's previous contacts

with the mental health system?

A.   Well, first, Mr. Autry, and I --

Q.   I apologize.

A.   -- is that it's not a diagnosis.

Q.   Right.  This is a designation or a labeling, I guess?

A.   That's correct.

Q.   Okay.

A.   That's correct.

Q.   Does that conflict with what previous mental health professionals who've looked at Mr. Barrett in the community before this offense found?

A.   Well, he has never been labeled as a psychopath before. He's been given the Hare Psychopathy Index before.  But certainly, in clinical settings, he was not labeled a psychopath.

Q.   And is psychopathy kind of a harder-edged term for antisocial personality disorder?

A.   Well, the history of psychopathy is very interesting because when Robert Hare versus developed the Hare Psychopathy Index around 1970 -- 1974, he and Reid Meloy -- Dr. Reid Meloy at the University of San Diego said that it was not antisocial personality at all.  That they were actually very, very separate.  Over the years, Dr. Hare and Dr. Meloy have reconsidered that and have thought that perhaps they are, in fact, more closely aligned.  However,

244

when you look at the studies on the Hare Psychopathy Index, as well as studies on antisocial personality disorder, they are among the lowest in what we call inter-rater reliability.

Q.  What is that?

A.  That means that people don't agree when they -- when they see the same set of symptoms, they don't agree.

Q.  All right.  And in this particular case, are you familiar with the fact that Dr. Jeanne Russell also administered this Hare Psychopathy Interview to Mr. Barrett during the state case?

A.  Yes.

Q.  Were her conclusions consistent with Dr. Price's at all?

A.  They were actually very, very different.  They were actually 19 points different on a scale that you can only get 24 points different.

Q.  Oh, really?  So Dr. Russell, no psychopathy; is that correct?

A.  That's correct.

Q.  Dr. Price, psychopath?

A.  That's correct.

Q.  All right.  Are you aware of any studies that have been done showing that the Hare Psychopathy Index is not a reliable predictor of future dangerousness or violence in

prison --

A.  Yes.

Q.  -- in a prison setting?

A.  That's correct.

Q.  And what do those -- what do those studies say basically?

A.  The best studies were completed in 2000 to 2007 and 2008.  They came out of Michigan State, although there were some really excellent studies that came out of Norway.  And those were studies that really talked about the -- because the Hare Psychopathy Index was normed on a correctional setting, but not --

MR. WILSON:  Judge, I'm -- I need to object.  The witness is talking about some findings which took place in 2007 and 2008.  We're talking about a trial which occurred back in 2005.  I believe that would be the relevant time period that we're talking about.  And so I would object to this -- this line of questioning and this answer.

THE COURT:  What would the relevance be if it postdates the trial we're talking about?

MR. AUTRY:  The relevance would be that, to any extent that it would seem to have any validity at all in predicting future dangerousness in a population that's incarcerated, that validity has been dissipated or disproved by subsequent studies.  And it's now 2017 and we're here.

So I think that the validity of Dr. Price's conclusions is subject to attack because the question here would be to the jury, and the jury rejected the continuing danger or the continuing threat aggravating circumstances as to Mr. Barrett. But the question is, is somebody liable to be violent in the community versus whether they're going to be violent in a maximum security prison setting serving a life without parole sentence, which is the only alternative to the death penalty -- or life without release, excuse me, which is the only alternative to the death penalty in this federal case. So that's what I'm trying to get at, is whether or not Dr. Price, who we haven't heard from yet of course, whether his testing or whether this Hare Psychopathy Index has any kind of predictive value in a maximum security prison setting.

THE COURT: Well, to the extent that we're -- you're trying to criticize Dr. Price's conclusions, I guess I'm going to go ahead and allow it. But in terms of what, if any, impact it would have had if it had been presented at the trial, it's minimal at best.

MR. AUTRY: I understand, Your Honor.

THE COURT: Very well. Go ahead.

Q. (BY MR. AUTRY) Let me just cut to -- cut to the bottom line here, Doctor. Have the studies that have been done in recent years, over the last decade or so, indicated that the

Hare Psychopathy Index is not a valid predictor of violence in a maximum security prison setting?

A.   The studies that have been done in the last 10 to 12 years cast out upon the Hare Psychopathy Index being able to make those predictions at anything better than chance.

Q.   All right.  Did Dr. Price do a full psychological or mental health examination of Mr. Barrett?

A.   No, he did not.

Q.   All right.  Do you know whether or not Dr. Price took into account Mr. Barrett's family history of mental illness and family history of substance abuse and that sort of thing?

A.   There are no indications that he did.

Q.   Does Dr. Price acknowledge, at least to a limited degree, that Mr. Barrett has some neuropsychological or neurological deficits?

A.   Yes.

Q.   Okay.  Do you know whether or not the PCL-R often mistakes indicators of bipolar disorder or other significant mood disorders for what's termed psychopathy?

A.   Absolutely.

Q.   Okay.  And is that -- is that established in the relevant literature -- the relevant medical literature?

A.   Yes.

Q.   Would you agree or disagree with this statement, Doctor,

248

that the most reliable predictor of whether or not somebody is going to be a violent inmate or violent in prison, and present a threat to other inmates or staff is the person's behavior in prison?

MR. WILSON:  Objection to this particular witness's competence to answer that question, Judge.

THE COURT:  Sustained.

MR. AUTRY:  Okay.

Q.  (BY MR. AUTRY)  Doctor, had Mr. Barrett been examined back in 2005 -- 2004, 2005 during his federal trial in the manner you examined him in 2009, in the manner Dr. Young examined him in 2009, could the information that you've given the Court here today had been imparted to the jury?

A.  Absolutely.

Q.  Okay.  Do you ever do any work with police departments?

A.  Yes, sir.

Q.  Okay.  And what -- what is that exactly?

A.  I teach in San Francisco and Alameda County in the critical incident training program.  I teach usually officers that have just completed their training in the academy trauma, and also brain -- kind of a primer on brain functioning.

Q.  All right.  And how long have you done that for?

A.  About two years.

MR. AUTRY:  All right.  Could I have just a

second, Your Honor?

THE COURT:  Yes.

Q.  (BY MR. AUTRY)  Doctor, is there anything I haven't asked you that you find to be significant with respect to Mr. Barrett's neuropsychological makeup or his mental illnesses?

A.  No, sir.

MR. AUTRY:  Okay.  Thank you, Doctor.

THE WITNESS:  Thank you.

MR. AUTRY:  No further questions.

THE COURT:  Mr. Wilson, how long do you anticipate cross-examination will take?

MR. WILSON:  Longer than 15 minutes, Judge.

THE COURT:  Yeah.  Longer than -- longer than 30 minutes?

MR. WILSON:  I would expect, yes.

THE COURT:  Yeah.  So I think we probably should just pick this up first thing in the morning at 9:00 o'clock.  Anything further I'll want to consider tonight?

MS. FISHER:  Not from the movant, Your Honor.

MR. WILSON:  I don't believe so at this time, Your Honor.  Thank you.

THE COURT:  Very well.  We're in recess.

*(Off the record at 4:45 p.m.)*

250

C E R T I F I C A T E

I, Ken Sidwell, Certified Shorthand Reporter for the Eastern/Northern Districts of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in the above-captioned case.

I further certify that I am not employed by nor related to any party to this action, and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 9th day of May, 2017.

                                   s/Ken Sidwell
                                   Ken Sidwell, CSR-RPR
                                   United States Court Reporter