IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,          )
                                 )
          Plaintiff,             )
                                 )
     -vs-                        ) No. CIV-09-105-JHP
                                 )
UNITED STATES OF AMERICA,        )
                                 )
          Defendant.             )


* * * * *


TRANSCRIPT OF EVIDENTIARY HEARING
VOLUME II
**BEFORE THE HONORABLE STEVEN P. SHREDER**
UNITED STATES MAGISTRATE JUDGE

MARCH 28, 2017

* * * * *


A P P E A R A N C E S

     MR. DAVID B. AUTRY, 1021 Northwest 16th Street,
Oklahoma City, Oklahoma, 73106, and,
     MS. JOAN M. FISHER and MR. TIVON SCHARDL, Federal
Public Defender, Sacramento, 801 I Street, Third Floor,
Sacramento, California, 95814, Attorneys on behalf of the
Defendant;

     MR. CHRISTOPHER WILSON, 520 Denison Avenue, Muskogee,
Oklahoma, 74401, Assistant United States Attorney, and,
     MR. JEFFREY B. KAHAN, U.S. Department of Justice,
Capital Case Unit, 1331 F Street Northwest, Room 345,
Washington, D.C., 20530, attorneys on behalf of the
laintiff;


REPORTED BY:                KEN SIDWELL, CSR-RPR
                            United States Court Reporter
                            P.O. Box 3411
                            Muskogee, Oklahoma  74402

I N D E X

WITNESS                                                      PAGE

**George Woods**
     (Cross-Examination by Mr. Wilson)              253
     (Redirect Examination by Mr. Autry)            330
     (Recross-Examination by Mr. Wilson)            359
     (Redirect Examination by Mr. Autry)            369

**Steve Leedy**
     (Direct Examination by Mr. Autry)              379
     (Cross-Examination by Mr. Wilson)              384
     (Redirect Examination by Mr. Autry)            424

**John Echols**
     (Direct Examination by Mr. Autry)              426
     (Cross-Examination by Mr. Wilson)              470
     (Redirect Examination by Mr. Autry)            497
     (Recross-Examination by Mr. Wilson)            510

253

<u>MARCH 28, 2017 PROCEEDINGS</u>

*(On the record at 9:02 a.m.)*

THE COURT:  Call case number CIV-09-105-JHP, Kenneth Eugene Barrett versus United States of America. Attorneys enter their appearances for the record, please.

MR. WILSON:  Christopher Wilson and Jeffrey Kahan for the United States.

MR. SCHARDL:  Good morning, Your Honor.  Tivon Schardl from the federal defender office, Eastern District of California for Mr. Barrett.

MR. AUTRY:  David Autry for Mr. Barrett, and also Joan Fisher is seated in the spectator section, Your Honor.

THE COURT:  Very good.  Parties ready to proceed?

MR. WILSON:  Yes, Your Honor.

MR. AUTRY:  Yes, sir.

THE COURT:  Excellent.  You may cross-examine, Mr. Wilson.

MR. WILSON:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILSON:

Q.  Good morning, Dr. Woods.

A.  Good morning, Mr. Wilson.  How are you?

Q.  I'm fine.  Thank you.  And you?

A.  I'm good.

**United States District Court**

Q.  Good.  Dr. Woods, you're a neuropsychiatrist; is that correct?

A.  Yes.

Q.  And are you board certified in forensic psychiatry?

A.  No, I'm not.

Q.  That requires some additional testing; is that correct?

A.  One additional test, yes.

Q.  Okay.  But you are board certified in psychiatry?

A.  That's correct.

Q.  All right.  And you would agree with me that neuropsychiatry is a field that studies psychiatry, but also the neurological effects and neurological disorders; is that correct?

A.  That's correct.

Q.  All right.  And, specifically, I guess you would agree with me that you focus on the links between neuroscience and any behavior in a patient; is that correct?

A.  Yes.

Q.  Now, you would also agree with me that neuropsychiatrists and/or psychiatrists or psychologists can disagree or have differing opinions about a diagnosis of a patient; is that correct?

A.  Sure.

Q.  Happens routinely; isn't that correct?

A. Yes.

Q. Are you familiar with an organization known as the American Academy of Psychiatry and Law?

A. Yes, I am.

Q. Have you ever been a member of that?

A. I am a member of it.

Q. You are a member of that organization?

A. Yes.

Q. And being a member of that organization, I'm sure you're familiar with the ethical guidelines that govern that particular organization?

A. I've read it, and I've obviously seen it in court here on a number of occasions.

Q. Okay. And you'd agree with me that, when psychiatrists function as experts within the legal process, they should adhere to principles of honesty and objectivity; is that correct?

A. Yes, I do.

Q. Okay. And you would agree that that's what the guidelines for that particular organization set forth; is that correct?

A. Yes.

Q. And you would agree with me that, being retained by one side or the other, can give rise for the potential that a person's objectivity could be compromised. Would you agree

256

with that?

A.   Potentially.

Q.   And you'd also agree with me that, in order to minimize that potential, that it's important to examine all the available data when you're performing your evaluation and review of a particular patient?

A.   Well, that's one part.  The other part, of course, is to understand what's going on clinically, as well as to understand the literature that's available.  So often what happens is, it gets focused on the forensic issue, and people don't treat the client in a forensic setting like they would their patient.

Q.   And so a part of that process is to take a complete social history; correct?

A.   Yes.

Q.   You also will examine other evaluations performed on that particular person in the past; isn't that correct?

A.   Yes.

Q.   You'll look at medical history which is available to you; is that correct?

A.   Yes.

Q.   You'll interview family members, if that's possible; is that correct?

A.   Yes.

Q.   Or you'll examine or review declarations or statements

of family members; is that correct?

A.  Yes.

Q.  In addition to that, you'll actually perform, as you did in this particular case, an in-person interview or evaluation of the patient; is that correct?

A.  Yes.  I think those are certainly some components. There are other components, but those are some of them.

Q.  Okay.  Thank you.  And when you evaluate a particular patient, it's important to consider the environment in which that evaluation takes place; is that correct?

A.  Yes.

Q.  Because that can have an impact on the current status of that patient at the time that you're evaluating them; is that correct?

A.  Yes.

Q.  For instance, it might be different of a person who is incarcerated versus a person who is not incarcerated?

A.  That's true.

Q.  And you'll agree with me that there are certain stressors that involve incarceration which are not typically present outside incarceration?

A.  That's correct.

Q.  And you would agree with me that someone who is on death row, there are additional stressors in that person's life that are not present in a person who's not on death row.

258

Would you agree with that?

A.   I would agree with that.

Q.   Okay.   Thank you.

A.   Okay.

Q.   Now, in this particular case, Dr. Woods, you reviewed a number of documents; is that correct?

A.   Yes.

Q.   You reviewed declarations of family members in this particular case; is that correct?

A.   Yes.

Q.   And do you recall all of the declarations that you reviewed?

A.   I don't recall all of them.   I know there were his mother.   I know there are other family members.   I don't recall all the declarations.

Q.   And those are documents that are provided to you by Mr. Barrett's counsel; is that correct?

A.   That's correct.

Q.   Because you were hired by Mr. Barrett's counsel; isn't that correct?

A.   That's correct.

Q.   And you are charging, I believe you testified yesterday, $350 an hour for your services --

A.   Yes.

Q.   -- is that correct?   Does that include your testimony?

A.   Yes.

Q.   And it's the same flat fee of $350 per hour regardless of what you're doing --

A.   That's correct.

Q.   -- is that your testimony?

A.   Yes.

Q.   Okay.  And, currently, how much have you made in this particular case?

A.   Oh, I don't know.  I'd say that I probably billed over the course of the last 17 or 18 years -- I mean, let's see. 2009.  So that's seven or eight years.  I probably have billed at least 60 hours, 70 hours, at least.  I would probably say more than that.

Q.   Okay.  Dr. Woods, you've never testified for the government, have you?

A.   I've only recently testified for a county case in Alameda County in the last month.  But I -- and that was a county case.

Q.   But you've never testified for the federal government; is that --

A.   I've never been asked to.

Q.   Okay.  You've testified, I believe, roughly 80 or 90 times for the defense, is that correct --

A.   Yes.

Q.   -- in capital cases?

A.   That's correct.

Q.   Now, in addition to the documents that you -- as far as the declarations that you reviewed, I believe you testified earlier that you reviewed medical reports; correct?

A.   Yes.

Q.   And you received -- you reviewed medical history of the defendant, Mr. Barrett; is that correct?

A.   Yes.

Q.   Did you review medical history of other family members that were provided to you by counsel?

A.   I certainly saw records of his great-great-grandparents, just records of where they had talked about his lunacy.

Q.   Let's talk about that one just for a second.  In your report, you reference a 1918 lunacy certificate of great-great-grandfather A.J. Barrett; is that correct?

A.   I believe that's correct.

        MR. WILSON:  And, Your Honor, I'd ask the witness be provided -- this would be defendant's exhibit or movant's exhibit number -- need to make sure I've got the number right.  I apologize, Your Honor.  There's so many different numbers in this particular case, I'm trying to keep them all straight.  Judge, it might be easier if I just -- may I ask, may I approach the witness?

        THE COURT:  If you can just tell us what it is, maybe we can find it.

MR. WILSON: Well, it is the -- what's purported to be the August 12, 1918 lunacy record of A.J. Barrett. And in the original petition -- the amended petition, it was Exhibit Number 27 back at that time, but there's been a different -- a number of different numbers, and so I'm trying to cross-reference in my mind, Judge, which one that particular is, and I apologize.

THE COURT: Okay. Is it in Number 50?

MR. WILSON: Judge, it is actually Movant's Exhibit Number 2. Thank you.

THE COURT: Okay.

Q. (BY MR. WILSON) Dr. Woods, have you had an opportunity to take a look at Movant's Number 2?

A. Yes.

Q. And is that the document that you refer to in your report of the lunacy record of great-great-grandfather A.J. Barrett?

A. I believe so. It's been a while, but I believe that is correct.

Q. Would you agree with me, Dr. Woods, that this document says absolutely nothing about an admission or a discharge?

A. Well, no, I would disagree. It notes here on the right side, order of admission, it says, received at hospital by medical superintendent, so I would assume that that would be when he was received at the hospital.

262

Q.  Are you looking at the Petitioner's Number 2?

A.  Yes, lunacy record in the matter in the sanity of A.J. Barnett, State of Oklahoma, County of Sequoyah, Number 141, order on the right -- left side, it says petition.  On the right side, it says order of admission, received at hospital by medical superintendent.  It has the --

MR. WILSON:  Judge, may I approach, because maybe I just have a poor copy because I can't read -- there's nothing on my copy.

THE COURT:  Go ahead.

MR. WILSON:  Thank you.

THE WITNESS:  Received at hospital by medical superintendent.  It has two physicians appointed.

MR. WILSON:  Hold on.  Let me get back to --

THE WITNESS:  Okay.

MR. WILSON:  -- podium before you start talking.

THE WITNESS:  Oh, okay.  I'm sorry.

MR. WILSON:  Judge, may I inquire from here just for a moment?

THE COURT:  That's fine.

MR. WILSON:  Thank you.

Q.  (BY MR. WILSON)  Now, Dr. Woods, we were both looking at Petitioner's Exhibit Number 2; correct?

A.  Yes.

Q.  And you're referring to the right-hand side of this

particular document under the heading of order of admission; is that correct?

A. Correct.

Q. And you would agree with me that this appears to be a preprinted form document; correct?

A. That's correct.

Q. And the language that you're referring to, received at hospital by medical superintendent, is part of the preprinted form, is it not?

A. That's correct.

Q. And it has no date of any admission; isn't that correct?

A. That's correct.

Q. It has no date -- or any notes at the bottom, does it?

A. No.

Q. No minutes of the proceedings; correct?

A. Not on this record, no.

Q. So in this particular record, there is nothing to show that A.J. Barrett was ever admitted for any type of lunacy in 1918; isn't that correct?

A. It only shows it is petition, that's correct.

Q. So that petition very well could have been denied; isn't that correct?

A. There is that possibility.

MR. AUTRY: Your Honor, I'm going to object. He's

misleading.  If he looks at Exhibit Number 3, it talks about an admission at Eastern State, Vinita.  And then it goes on to have journal entries regarding Mr. A.J. Barrett.

MR. WILSON:  Okay.  Judge, in response to that, counsel is mistaken.  His own exhibit --

THE COURT:  Excuse me.  Excuse me, Mr. Wilson. You can do your cross the way you want and you can do redirect.

MR. AUTRY:  I apologize, Your Honor.

THE COURT:  Very well.  No problem.  Go ahead.

MR. WILSON:  Okay.  Thank you.

Q.  (BY MR. WILSON)  All right.  So you would agree with me that this particular record, Petitioner's Exhibit Number 2, there's nothing on here referring or referencing any admission; is that correct?

A.  On that particular record, that's correct.

Q.  Thank you.  And so you're basing the fact that great-grandfather A.J. Barrett was admitted to some facility for lunacy based upon what you've been told by the family; isn't that correct?  Because this document does not say it, does it?

A.  That particular document, that's correct.

Q.  Okay.  Now, let's talk about the document which counsel was referring to just a few moments ago as Petitioner's Exhibit Number 3.

A.  Sure.

Q.  Now, this is a mental health record.  Would you agree with that?

A.  Yes.

Q.  But it's from 1966; correct?

A.  That's correct.

Q.  And it's from another A.J. Barrett.  That would be granddad, not great-granddad; correct?

A.  That's correct.

Q.  And on this particular one, there are, in fact, at the bottom -- bottom of the page, minutes of the proceedings, is that correct, in handwritten notes?

A.  That's correct.

Q.  And it shows the fact that there was an admission and a discharge; correct?

A.  That's correct.

Q.  So we have a complete record and we can say that, in fact, in 1966, granddad was admitted to Eastern State; is that correct?

A.  That's correct.

Q.  You would agree with me that, if family information is inaccurate, that can have an impact on your evaluation, isn't it?

A.  Well, it depends upon the inaccuracy.  For example, in this particular --

Q.  I didn't ask you that.  I asked you --

A.  You asked me --

Q.  -- isn't it true, sir, that that can make a difference --

A.  And I --

Q.  -- yes or no?

A.  No.  That I'm responding to exactly what you asked.

MR. WILSON:  Okay.  May I rephrase the question, Judge?

A.  No.  I mean, maybe have it re-read, because that's exactly what you asked and I was answering your question.  May I finish?

THE COURT:  Go ahead and restate your question, please.

Q.  (BY MR. WILSON)  Dr. Woods, relying upon inaccurate information from family can affect your diagnosis; true or false?

A.  It may.  That's not a true or false question, sir.

Q.  Okay.  Thank you.

A.  No, wait.  I'm sorry, I'm not finished with my answer.

Q.  Sir, I asked you a question, you answered it.  Thank you.

A.  But I didn't complete my answer.

MR. AUTRY:  Can he answer the question, Your Honor?

THE COURT: Well, if that's an objection, it's overruled. We can -- we can allow your explanation when somebody asks you for an explanation.

THE WITNESS: Thank you, Your Honor. Okay.

Q. (BY MR. WILSON) Now, getting back to Petitioner's Exhibit Number 3, which is what we've agreed is the lunacy record of granddad, A.J. Barrett; correct?

A. Correct.

Q. Now, you reference that particular record in your report, do you not?

A. Yes.

Q. And that would be specifically in Paragraph 27 of your report; is that correct?

A. I'm not sure. That may well be. Let me look and see.

Q. Okay. So do you have it with you?

A. Yes.

Q. Okay. And I'm referring to the report which you created as a result of your evaluation in 2009.

A. Sure. Yes.

Q. All right. And specifically at the latter portion of Paragraph 27, when you're talking about this particular commitment, you refer to the fact that the psychiatric symptoms documented in his -- referring to grandfather A.J. Barrett -- in his certificate of lunacy, contemporaneously with his commitment to a state psychiatric hospital, include

268

auditory hallucinations; is that correct?

A.  Yes.

Q.  Now, I want you to look, if you will, at the document that you're referring to, and that would be Page 2 of Petitioner's Number 3; correct?

A.  That's correct.

Q.  And can you show me where, on this particular document, there's a reference to auditory hallucinations?

A.  I don't see it here.

Q.  So let's -- so you have included in your report, which is going to be provided to counsel and ultimately provided to the Court, something which is inaccurate; is that correct?

A.  In that particular -- yes, sir.

Q.  Thank you.  Now, yesterday you testified that Mr. Barrett has a history of auditory hallucinations; isn't that correct?

A.  Yes.

Q.  Isn't it true, Doctor, that that has never been documented by anyone that he has auditory hallucinations?

A.  He has both told me and -- excuse me -- and Dr. Pitt that, at times, he has had auditory hallucinations.  It's been rare.

Q.  Okay.  So in your 2009 evaluation, this gentleman seated here in the orange --

269

A.   Yes.

Q.   -- told you that he had auditory hallucinations?

A.   As a child, yes.

Q.   But you'd agree with me that, in reviewing all of the previous medical records of all the other admissions that you testified about yesterday, there's no mention of auditory hallucinations?

A.   That's correct.

Q.   So evaluations done in 2002, 2000, roughly 2003 all denying that, are you saying those are inaccurate?

A.   No.   No, I'm not saying they're inaccurate.

Q.   So what Mr. Barrett now tells you in 2009 is in addition to what he was telling the providers at the time of the crime; correct?

A.   That's correct.

Q.   And, once again, if you rely upon inaccurate information, that can, yes or no, impact your evaluation?

A.   It can.

Q.   Thank you.   And in providing information in a report which is incorrect can also impact how people review your report; isn't that correct?

A.   That's correct.

Q.   Now, you testified just a moment ago, and you correct me if I'm wrong, I believe you said that the defendant told Dr. Pitt that he experienced auditory hallucinations?

270

A.   When he was young, yes, correct.

Q.   Isn't it true -- and you've reviewed his report, did you not?

A.   Yes.

Q.   And you reviewed the transcript of the interview of Mr. Barrett; isn't that correct?

A.   That's correct.

Q.   Isn't it true, sir, that in the interview, which is transcribed and videotaped --

A.   Yes.

Q.   -- that the defendant said, no, I've never -- I've never heard voices I don't think?

A.   That's correct.   However, if you will also go through the transcript, he talked about being younger and hearing things.   Not voices.   But hearing things and seeing things.

Q.   So that's a difference in your mind, hearing things versus hearing voices?

A.   Yes.   They were both auditory hallucinations.

Q.   But, again, that would be the first time, to you in 2009, that any reference to auditory hallucinations; correct?

A.   Correct.

Q.   And that's after he's been convicted of murder; correct?

271

A. Yes.

Q. That's after he'd been sentenced to death?

A. Yes.

Q. And that's after he has new counsel that are trying to find reasons to set aside that death verdict; isn't that correct?

A. And after there was no evidence of malingering in any of his testing.

Q. But adding additional information is evidence that you're potentially lying; correct? Isn't embellishment a factor which is considered in whether or not someone is being truthful?

A. And, in fact, it was taken into consideration, and he's never been found to malinger, including with Dr. Pitt, including with Dr. Sharp.

Q. My question, sir, is this: Isn't it true that adding additional information, embellishing, is a factor which is considered in determining whether someone is being honest with you?

A. It could be if it's found.

Q. Thank you. Speaking of embellishments, you talk with the defendant about previous medical problems that he had encountered in his life; is that correct?

A. That's correct.

Q. And specifically you had a discussion with him about

head injuries; correct?

A.  Yes.

Q.  And did he report -- and I say he, the defendant --

A.  Sure.

Q.  -- did he report to you potential -- or past head injuries?

A.  Yes.

Q.  Now, what head injuries did he tell you that he had experienced?

A.  He told me about getting hit in the head with a steel ball.

Q.  Let's talk about that one for a second.

A.  Okay.

Q.  When did he say that took place?

A.  It was when he was very young.  I don't recall exactly, but it was when he was very young.

Q.  And where did it take place?

A.  I don't recall.  I think it was in his home, or perhaps -- I think it may have involved his brother.  I don't recall exactly.

Q.  Okay.  Well, I think both of those would be incorrect.  I think it was at school.

A.  Okay.

Q.  Is that correct?  Do you recall that now?

A.  It may have been.  I don't recall.

Q.  He reports that he was hit in the head by another kid throwing a steel ball on the playground.  Does that ring a bell?

A.  If you could show me that.  I don't recall that exactly.

MR. WILSON:  Judge, may I approach?

THE COURT:  Yes.

Q.  (BY MR. WILSON)  For the record, Dr. Woods, you're looking at a copy of your 2009 report; is that correct?

A.  Yes.

Q.  And specifically what paragraph did I refer you to?

A.  41.

Q.  Take a moment if you will and just take a look at that language in Paragraph 41.

A.  Sure.

THE COURT:  Is that an exhibit?

MR. WILSON:  It is.  I'm not sure if it's been admitted yet.

MR. AUTRY:  It hasn't.

A.  Sure.

Q.  (BY MR. WILSON)  Does that refresh your memory?

A.  Yes.

MR. WILSON:  Sometimes these screens have to warm up I think, Judge.

THE COURT:  I've got it.

Q.  (BY MR. WILSON)  All right.  Dr. Woods, would you agree

with me that what's being displayed on the monitor to your left is a portion of Paragraph 41 of your report?

A.   Yes.

Q.   And it says, "In a playground accident that occurred when Mr. Barrett was eight or nine, he was struck in the head by what he describes as a steel ball with indicated loss of consciousness"?

A.   Yes.

Q.   Does that refresh your memory about what the defendant said took place?

A.   Yes.  I think I was correct about the age.  I was wrong about the location.

Q.   Okay.  And I think you were also incorrect that it was involving his brother?

A.   Yes.

Q.   And that it didn't take place at home?

A.   That's correct.

Q.   Would you agree with me that there's absolutely no medical records to support that allegation?

A.   Sure.

Q.   And I believe he told you that he lost consciousness; correct?

A.   He remembers waking up, yes.

Q.   And he told you that he woke up with his -- he recalls only waking up as he was being lifted off the ground after

275

being struck?

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   Now, you also reviewed, again, the transcript of Dr. Pitt and his interview of same person, the defendant; correct?

A.   Yes.

Q.   And you recall -- or do you recall what the defendant told Dr. Pitt about this steel ball incident?

A.   I don't recall.  I do recall he described it to him, but I don't recall the specifics.

Q.   Isn't it true that he -- he described it taking place and that waking up in the doctor's office with the doctor testing his reflexes?

A.   If you could show that to me, I'd appreciate it.

        MR. WILSON:  May I just use the projector, Judge?

        THE COURT:  That's fine.

        MR. WILSON:  Thank you.

Q.   (BY MR. WILSON)  Dr. Woods, in order to kind of get a context of what we're talking about, would you agree that, just looking at this document, this appears to -- let me zoom out a little bit so you can see more of the page.  You would agree with me that this is a transcript of the forensic psychiatric evaluation of Mr. Barrett which was

276

conducted in January of 2017 by Dr. Pitt; correct?

A.  Yes, sir.

Q.  And you'd agree, by looking at this, you recognize this as being transcript of the interview of the defendant, Kenneth Barrett?

A.  Yes, sir.

Q.  Now, specifically, at Line 15 of this transcript, there's a heading which says head injuries.  Would you agree with that?

A.  Yes.

Q.  Now, I want you to direct your attention -- and I'm going to flip the page over.  Now we're looking at Page 163. Do you see that?

A.  Yes.

Q.  And I want to direct your attention to specifically beginning at Line 7.  I'm going to ask you if you'd just take a moment and read Line 7 through 25.

A.  Sure.

Q.  Did you have a chance to look at it?

A.  Yes.

Q.  Does that refresh your memory of your review of Dr. Pitt's report?

A.  Yes.

Q.  And you'd agree with me that -- that when Mr. Barrett was telling Dr. Pitt about this same alleged incident, that

277

it took place on the playground when someone had throwed a steel one, speaking of a ball, one of those big steel balls and it hit me in the head. Is that right?

A. Yes.

Q. And he says, "I woke up in the doctor's office. My dad had picked me up and they were -- they had to -- when I woke up, they had the hammer on me"?

A. That's correct.

Q. That's not what he told you.

A. Well, that's not what he told me in terms of waking up.

Q. Thank you. That's not what he told about the terms of waking up; correct?

A. Yes, correct.

Q. And, again, this is something which shows up in no medical records; correct?

A. Correct.

Q. Before we leave this particular area of head injuries, you used -- strike that. As part of your testimony here yesterday, and as part of your report that you generated in '09 and in '17, you looked at testing performed by Dr. Myla Young; is that correct?

A. That's correct.

Q. And Dr. Young used the history of head trauma as a basis of part of her evaluation; correct?

A.  She certainly referred to it.

Q.  And you did, too; correct?

A.  As a basis of part of my evaluation, I would say that. But she certainly referred to it.  And I think it's relevant.

Q.  Okay.  Thank you.  But if the steel ball never -- incident never happened, that would impact the validity of that evaluation; isn't that correct?

A.  I'm not sure what you mean by validity of the evaluation.

Q.  All right.

A.  Do you mean would it change the neuropsychological testing?

Q.  Let me just move on.

A.  Okay.

Q.  You would agree with me that Ernie Barrett never reported this incident; is that correct?

A.  As far as I know.

Q.  Gelene Dotson Barrett never reported this steel ball incident; isn't that correct?

A.  As far as I know.

Q.  As a matter of fact, no family member, other than the defendant himself, ever reported a steel ball incident?

A.  As far as I know, that's correct.

Q.  Which would be a traumatic event; correct?

279

A.   It would be a traumatic event.

Q.   You've got a child on a school playground getting hit in the head with a steel ball, losing consciousness, being taken to the hospital -- to the doctor; correct?

A.   Yes.

Q.   But when discussions are being made by investigators with the family, there's never a mention of this incident; correct?

A.   Not that I recall.

Q.   Thank you.  But in addition to that, what additional head injuries, other than the steel ball, did you consider as part of your evaluation?

A.   Well, he had said that he had been in fights.  He had said he had been assaulted by the police.  Those are the ones that I considered.

Q.   You also considered a traffic accident; correct?

A.   Correct.

Q.   Did you consider the traffic accident in his medical where he got hit from behind?

A.   I don't recall him getting hit from behind.

Q.   You're not -- are you saying that didn't happen or you just don't recall?

A.   I'm saying I don't recall.

Q.   Well, did you consider a head injury that the defendant reported to Dr. Woods about having his head crushed by a

car?

A.  You mean Dr. Pitt?

Q.  I'm sorry.  You're Dr. Woods.  Sorry.  Dr. Pitt.

A.  I don't recall him taking that into consideration.

Q.  Well, you'd agree with me that the defendant, that gentleman seated right there, never told you about having his head crushed by a car?

A.  I don't recall that.

Q.  And that would be important; right?

A.  It could be, yes.

Q.  I mean, if you're talking about significant head injuries?

A.  Sure.

Q.  But do you recall the defendant telling Dr. Pitt that he had a vehicle, a tire, land on his head and crush his head into the dirt?

A.  I do recall that.

Q.  So that would be in addition to what he told you?

A.  Yes.

Q.  That would be in addition to what he's told everybody else in the past; isn't that correct?

A.  Yes.

Q.  And this particular evaluation was done after -- well, we're in 2017 -- like many years after the crime; correct?

A.  That's correct.

281

Q.   Many years after your evaluation; correct?

A.   Sure.

Q.   Just a few months before this evidentiary hearing;
correct?

A.   Yes.

Q.   Dr. Woods, you -- and as part of your evaluation in this
particular case, we were talking about things that you
considered?

A.   Yes.

Q.   And in your reports, you -- you made a list of the --
not itemized list but in generalities, the documents that
you reviewed; is that correct?

A.   That's correct.

Q.   And in that report, you reference the fact that you
considered the declaration of Myla Young?

A.   Correct.

Q.   That you looked at Mr. Barrett's institutional records;
correct?

A.   Yes.

Q.   Now, when you say institutional records, what are you
referring to?

A.   I was referring primarily to the records that -- well,
it depends upon the year.  If we're looking at 2007, some of
those were Bureau of Prison records.  If we're looking
earlier, those were the jail records.  The jail records of

282

the -- of the -- while he was incarcerated.

Q. Okay. So regardless of the time frame, we're talking about records when he was incarcerated?

A. Yes.

Q. And you would agree with me that there are no records during incarceration, as far as of the facility, which indicates that the defendant is suffering from a mental disease?

A. That's correct.

Q. Now, you also said that you -- you reviewed available academic records?

A. Yes.

Q. And I believe that in your report you reference the fact that the defendant failed the first grade --

A. Yes.

Q. -- in one area. Reading?

A. Correct.

Q. But you saw in his second grade that he was all satisfactory in the second grade year; right?

A. That's correct.

Q. And as a matter of fact, the educational records reviewed -- prepared and that you reviewed -- I'm sorry --

A. Yes.

Q. -- indicated that -- well, let me just look at them for a second.

283

MR. WILSON: Got too many notebooks, Judge. Sorry.

Q. (BY MR. WILSON) All right. Let's look, first of all, at, I believe it's going to be Petitioner's -- or Movant's Exhibit Number 41.

A. Thank you.

Q. Have you had a chance to look at that, Dr. Woods?

A. Yes.

Q. And do you recognize that as being one of the documents that you -- that you reviewed as part of your evaluation of the defendant in this particular case?

A. Yes, sir.

Q. And you would agree with me that, on Page 1, this appears to be a record from Portland, Indiana.

A. That's correct.

Q. Jay County High School; is that correct?

A. Yes, sir.

Q. And this would be Mr. Barrett's ninth grade year in the year 1976-1977; is that correct?

A. Correct.

Q. Mr. Barrett made an A in first semester in math that year, didn't he?

A. Yes, he did.

Q. Made a B the second semester; correct?

A. Yes, sir.

284

Q. As a matter of fact, he made Cs and Bs and made one D; correct?

A. That's correct.

Q. Now let's look at another one very quickly. That would be Movant's -- or Petitioner's Number 55. It's in another book.

A. Thank you.

Q. And, Dr. Woods, I'm going to direct your attention specifically to Page 3 of that exhibit. And you'd agree with me, Dr. Woods, that this is, in fact, what appears to be an official transcript from Sallisaw High School; correct?

A. Yes, sir.

Q. And would you agree with me that this indicates a transfer of records from the document we just looked at, from Jay County High School up in Indiana?

A. Yes, sir.

Q. And it reflects the same ninth grade year and the same grades that the defendant received back up in Indiana; is that correct?

A. That's correct.

Q. Now, I believe it's your testimony, and I believe it's been the history that this same grade year, the ninth grade, is when the defendant dropped out?

A. That's correct.

285

Q.  He didn't fail out, did he?

A.  He achieved those grades, that's correct.

Q.  Okay.  As a matter of fact, there's not a failing grade on that transcript, is there?

A.  Not on that transcript, that's correct.

Q.  He dropped out because superintendent told him to cut his hair and he refused; correct?

A.  I don't recall that, sir.

Q.  Did you not look at the transcript of the -- of the trial in this case?

A.  I did, but I don't recall that statement.  I'm sorry.  I may be wrong.  If you could show that to me.

Q.  Well, I believe -- I'll see if I can help refresh your memory.  Do you recall Gelene Dotson testifying in the second stage?

A.  I believe so.

Q.  And she was asked about why the defendant dropped out. Do you recall that?

A.  If you could refresh my -- if you could show that to me. I don't recall it.

Q.  Well, let me just ask you this:  If the transcript reveals that Ms. Dotson testified that her son dropped out because he didn't -- refused to cut his hair, do you have any reason to doubt that?

A.  You mean that the principal --

286

Q.   That that's what she testified to.

A.   That the principal told him to cut his hair and he didn't?

Q.   My question is:  Do you have any reason to doubt that Gelene Dotson testified that way in the second stage?

A.   I don't have any reason to doubt that she testified that way.

Q.   And you would agree with me that she was there with him at that time --

A.   Sure.

Q.   -- correct?  One other education record I just want to refer your attention to, and, quite frankly, I don't know that I can find it in the petitioner's exhibits.  But let me see if -- I'm just going to display it to you and see if you recognize it.  And counsel may be able to direct me to where this is, and I apologize.  Let me zoom in to the top so you can kind of get a reference of what we're talking about. Top right-hand corner appears to be from Plainfield, Illinois.  Do you see that?

A.   Yes.

Q.   W.G. Nighow, superintendent.  That would be from a school system up in Illinois; correct?

A.   That's correct.

Q.   And you'd agree with me, in the top left-hand corner of this document, this is the educational record of Kenneth

287

Eugene Barrett; correct?

A.   Correct.

Q.   And it shows that he entered school in September of 19 -- excuse me -- 1967 in the first grade, and he withdrew in June of 1969; correct?

A.   Yes.

Q.   And at the bottom of that document, and I believe this may be where you were getting the information regarding his first grade achievement, indicates that, in the first grade, he received an F in arithmetic; correct?

A.   And in reading.

Q.   And in reading; correct?

A.   That's correct.

Q.   But it also shows that he was promoted on to the second grade; correct?

A.   Yes.

Q.   And then in his second grade year, satisfactory across the board; isn't that correct?

A.   That's correct.

Q.   Let me show you another document, and this appears to be from the Tommie Spear Junior High in Sallisaw, Oklahoma; is that correct?

A.   Yes, sir.

Q.   And this would be, once again, Kenny Barrett.  That would be the defendant --

288

A.  Yes.

Q.  -- his educational record; correct?

A.  Yes.

Q.  And does this appear to be a document that you reviewed as well as part of your evaluation?

A.  Yes.

Q.  And this would be from his eighth grade year; correct?

A.  That's correct.

Q.  And that would be the year before he went back up to Indiana for a period of time; correct?

A.  Correct.

Q.  And in this particular record, it shows he had an English class of learning disability; is that correct?

A.  That's correct.

Q.  And he made straight As in that environment; correct?

A.  In the learning disability environment, which, of course as you know, from an academic point of view, is not graded in the same way that normal schools are graded.

Q.  I appreciate that.  But in this particular document, he received an A; correct?

A.  Yes, in the learning disability class.

Q.  And then you would agree with me that he had a C in science, and then a D-plus in science; correct?

A.  That's correct.

Q.  Had a couple of Ds, one in math and one in social

289

science and brought those up to Cs the second semester;
correct?

A.   That's correct.

Q.   And he got a C in PE?

A.   Yes.

Q.   Didn't fail out of the eighth grade; correct?

A.   I'm not sure what happened in the eighth grade.  He got
those grades.

Q.   Does it show that he had to repeat the eighth grade?

A.   It does not show that he had to repeat the eighth grade.

Q.   As part of your -- the information which you reviewed,
Dr. Woods, you also looked at medical -- and we've already
talked about some medical records; correct?

A.   Yes, sir.

Q.   And you looked at custodial records?

A.   Yes.

Q.   When you refer to custodial records, is that something
different from his institutional records?

A.   No.

Q.   So that would be a duplication?

A.   Yes.

Q.   And I believe it says that you reviewed -- and we talked
about this a minute ago -- declarations and/or medical and
social records of various family members; correct?

A.   That's correct.

Q.  And you list including Ernie Barrett, his father, and his mother, Gelene Dotson, and his former wife, Abby Stites; correct?

A.  Yes.

Q.  Now, as part of your initial evaluation, did you have an occasion to review the examination of a doctor by the name of Faust Bianco?

A.  I believe I did.  I certainly know that I saw records of Dr. Bianco.  Whether I reviewed the transcript, I don't recall.  But I certainly do recall seeing records of Dr. Bianco.

Q.  And do you recall specifically what records you reviewed of Dr. Bianco?

A.  Certainly I must have reviewed records of his testing. It may have been his testimony in which he described that. I don't recall raw data of his particularly.  I just recall there was limited testing.

Q.  So you reviewed more than just a single page affidavit saying that the defendant does not have any mental disease. Would you agree with that?

A.  I recall that, yes.

Q.  Did you review more documents than just the one page affidavit?

A.  I'm just saying I seem to recall looking at more documents than that.

MR. WILSON:  Your Honor, at this time the government would make a request of counsel for Mr. Barrett to provide any additional documents from Dr. Bianco which has not been previously provided to the government.

MR. AUTRY:  I don't know of any documents that haven't been provided to the government with respect to Dr. Bianco.

THE COURT:  If you find any, will you hand them over?

MR. AUTRY:  Yes, sir.

THE COURT:  Thank you.

Q.  (BY MR. WILSON)  And the reason I ask that question, Dr. Woods, is because yesterday during your testimony you criticized the findings of Dr. Bianco; isn't that correct?

A.  Yes.

Q.  And you wouldn't have criticized his findings if all you looked at was just the single page affidavit; correct?

A.  I'm not sure what the affidavit said, and I'm not sure what the transcript said -- his testimony said.

Q.  I want to direct your attention -- and I apologize to the clerk, but I need to have you look at Government's Number 12.

A.  Thank you.

Q.  Doctor, have you had a moment to look at Government's Exhibit Number 12?

292

A.  Yes.

Q.  Do you recognize that, sir?

A.  Yes.

Q.  And is that one of the documents that you reviewed in reference to Faust Bianco, Ph.D.?

A.  Yes.

Q.  And do you recall seeing additional documents other than this one page affidavit?

A.  I may be incorrect, sir, but I also thought that I had access to Number 14 as well, but I may -- I may be incorrect about that.

Q.  And are you referring to an authorization for release of confidential information and records?

A.  No, I'm --

Q.  And then a second page with some questions and some numbers?

A.  No, sir.  I'm referring to 14, which has a list of testing on the right-hand side.  And some -- what test did you give to match your memory and impairment index.

Q.  You're talking about Page 2 of Government's Number 14; correct?

A.  I believe so.

Q.  So you believe you may have reviewed that as well?

A.  I may have, yes, sir.

Q.  Do you recall any other documents that you may have

293

received in reference to Dr. Bianco?

A.   No, I'm not actually -- I don't -- I'm not sure of this, but I seem to recall this particular document.  But I don't recall any others that I -- right off the bat, no.

Q.   But for purposes of today at this point, we've established that you, in fact, did review the affidavit, which is Government's Number 12; correct?

A.   That's correct.

        MR. WILSON:  Move for admission of Government's Number 12.

        THE COURT:  Any objection?

        MR. AUTRY:  I don't object.  No objection.

        THE COURT:  Government's Number 12 is admitted.

        MR. AUTRY:  Well, Your Honor, let me -- let me amend that.  It's not a report, so we object to the characterization that it's a report.

        THE COURT:  It's an affidavit.  But with that objection noted, it's admitted.

        MR. AUTRY:  Thank you.

Q.   (BY MR. WILSON)  Dr. Woods, just for a moment, let's talk briefly about Number 14 again.

A.   Sure.

Q.   So I'm clear, you don't know whether or not you reviewed this or not?

A.   I'm not sure that I am, but given the array of testing

294

and my discussion of this testing, I would say that I reviewed this document as well.

Q. And so based upon your review of this document, you would agree that Dr. Bianco issued a series of tests to Mr. Barrett; correct?

A. That's correct.

Q. And I believe you testified yesterday that those tests were not -- were not complete?

A. That's correct.

Q. So, in fact, you did base your opinion and your testimony yesterday on the results of Government's Exhibit Number 14; correct?

A. I'm not sure. But I -- but because I don't recall exactly the data that I had of Dr. Bianco. But I certainly know that that one paragraph didn't include any of the discussions. It would not give you opportunity to say that whether it was complete or not. And looking at -- looking at 14, it's clear to me that this is a type -- this is also an incomplete battery of testing. And so -- and it was a type of discussion that I -- I made, and so I'm assuming that I looked at this document as well.

Q. All right. You would agree that -- even though you criticize the incomplete testing of Dr. Bianco, you would agree that Dr. Bianco, in an affidavit, stated that, "It is my opinion that any further neurological testing is

unwarranted at this time"?

A. That's correct.

Q. And that that took place as a result of an evaluation in around 2000, 2001; is that correct?

A. I believe so, yes, sir.

Q. That would be significantly closer in time to when you evaluated the defendant; correct?

A. It would be closer in time. I'm not sure what you mean by significantly closer.

Q. Okay.

A. Sure.

Q. Thank you. Now, I notice in your report that you didn't refer to that, reviewing Dr. Bianco's, but you also didn't refer to the fact that Mr. Barrett, the defendant, was evaluated by a Dr. Kathryn LaFortune; is that correct?

A. That's correct.

Q. And did you review Dr. LaFortune's report as part of your 2009 evaluation?

A. I don't recall Dr. LaFortune.

Q. I direct your attention to what's going to be labeled as Government's Exhibit Number 37.

A. All right.

Q. Take a moment if you will, look at that and see if you recognize that document. I believe it should be five pages in length.

A.   I do recall this, yes.

Q.   Okay.  So you did review this?

A.   Yes.

Q.   And you'll agree with me, sir, that at the time of this particular evaluation, there was a discussion about posttraumatic stress; correct?

A.   Yes.

MR. AUTRY:  Your Honor, I'm sorry, I guess I didn't hear.  I didn't hear whether or not Dr. Woods had actually seen this document and relied on it.  I don't know if they --

MR. WILSON:  I can ask the question again.

Q.   (BY MR. WILSON)  I believe -- Dr. Woods, I believe you testified that he did -- that you did, in fact, look at this document; is that correct?

A.   That's correct.

MR. AUTRY:  Okay.  Thank you.

Q.   (BY MR. WILSON)  And you'll agree with me that there was a discussion regarding posttraumatic stress disorder?

A.   Yes.

Q.   And would you agree with me that, in this evaluation, it was determined that Mr. Barrett was not suffering from posttraumatic stress?

A.   Well, I would -- I would say that she -- no, I would not agree with that.

297

Q.   Okay.  Would you agree with me it says, and on the last page, Page 5, in the third paragraph of the summary, "He did report difficulties with concentration, but because he endorsed no other symptoms related to posttraumatic stress disorder, it is likely that his trouble concentrating has other causes"?

A.   That's part of what it says, yes.

Q.   Thank you.  Isn't it true, Dr. Woods, that no other psychiatrist or psychologist has diagnosed Mr. Barrett with posttraumatic stress?

A.   I don't recall whether Dr. Young did or not.  But other than Dr. Young, I think you're -- that's correct.

Q.   So are you saying Dr. Young did?

A.   No.  I'm saying I don't recall whether she did or not, but I'm saying --

Q.   Well, you relied upon her findings, did you not?

A.   Yes.

Q.   So you don't remember whether she found he had posttraumatic stress?

A.   I don't recall whether she -- I think that's what I said was I don't recall whether she did or not.  But other than her, I don't -- I don't remember anyone else.

Q.   And you would agree with me that you made no reference to Dr. LaFortune's report in your report; correct?

A.   That's correct.

Q.  You testified, I believe, yesterday being familiar with a Dr. Jeanne Russell?

A.  Yes.

Q.  And you reviewed some reports from Dr. Russell; correct?

A.  That's correct.

Q.  And that would include a 2003 psychological evaluation risk assessment; correct?

A.  Yes.

MR. WILSON:  And, Your Honor, for the record and for counsel, this is Government's Exhibit Number 34.  I'd ask the witness to look at that.

Q.  (BY MR. WILSON)  Have you had an opportunity to look at that, Dr. Woods?

A.  Yes, sir, I have.

Q.  And do you recognize that particular document?

A.  I do.

Q.  And is that a document that you reviewed as part of your evaluation in this particular case?

A.  Yes, it is.

MR. WILSON:  Move for admission of Government's Exhibit Number 34.

MR. AUTRY:  No objection.

THE COURT:  Government's Number 34 is admitted.

Q.  (BY MR. WILSON)  Now, Dr. Woods, I would direct your

299

attention to Page 9 of that report, sir.

A.   Yes.

Q.   And the top of the page, you'll agree with me that there's a heading which says personality assessment; correct?

A.   That's correct.

Q.   And you would agree with me, as part of this report, Dr. Russell found that, at the present time, and that being specifically December the 15th of 2003; correct?

A.   Correct.

Q.   That Mr. Barrett is not exhibiting symptoms of a major mental illness, and puts in parenthesis, schizophrenia, schizoaffective disorder, bipolar disorder, or major depression?

A.   That's what that first line says, yes.

Q.   Thank you.  And you'd agree with me that Dr. Russell, as part of her evaluation, reviewed the mental health admissions that you testified about yesterday?

A.   Yes.

Q.   And you'll agree with me that Dr. Woods -- excuse me -- that Dr. Russell did not diagnose the defendant with bipolar disorder; isn't that correct?

A.   Although she described history of symptoms of bipolar, she did not make that diagnosis, you're correct.

Q.   Thank you.  Nor did Dr. Bianco, correct?  He didn't

300

diagnose the defendant with bipolar; correct?

A.   He didn't diagnose with anything, that's correct.

Q.   Dr. LaFortune, no diagnosis of bipolar; is that correct?

A.   That's correct.

Q.   And, again, you -- the Bureau of Prison records, there's no diagnosis in the Bureau of Prisons of bipolar; correct?

A.   That's correct.

Q.   No treatment for bipolar in BOP; correct?

A.   That's correct.

Q.   Bipolar.  You'd agree that bipolar is not a condition which just simply comes and goes; is that correct?

A.   Well, it does come and go.

Q.   I mean, it manifests itself in episodes; correct?  But you don't have it today and don't have it tomorrow, and then have it Thursday and don't have it next Sunday; correct?

A.   Well, no, you don't not have it, but that doesn't mean that it doesn't manifest itself or not manifest itself.

Q.   So a person has it, but it just may not be apparent by manifestation at a particular time; correct?

A.   Yes.  Particularly in a prison setting as you mentioned.

Q.   And is it your testimony that, in a prison setting, it's less likely that a person will manifest bipolar characteristics?

301

A.  No.  What I'm -- what I'm saying --

Q.  I believe you testified yesterday that --

A.  May I --

        MR. AUTRY:  Excuse me.

        MR. WILSON:  I'm sorry, Judge.

        THE COURT:  Yeah, let him finish answering,
please.

        MR. WILSON:  Sorry, Mr. Sidwell.

A.  No, what I'm saying is that, within a prison setting,
you often may not see the symptoms manifest themselves as
significantly or at all because you're in a much more
structured setting.

Q.  (BY MR. WILSON)  Well, doesn't bipolar -- or, excuse
me -- isn't bipolar triggered by stressors many times?

A.  It can be, yes.

Q.  And you'd agree with me that, being in a death
penalty -- death row, that is a significant stressing
situation; correct?

A.  Well, I agree with you because you didn't let me
complete my question.  The answer is that's correct.
However --

Q.  Thank you.  I didn't ask you for an explanation, sir.
Did you agree with me?

A.  Okay.  Well, then yes.

Q.  Thank you.

A.   Okay.

Q.   And so is it your testimony that Mr. Barrett is not exhibiting characteristics of bipolar because he's on death row?

A.   No.  What I'm saying is that the symptoms --

Q.   I didn't ask you what you're saying.  My question is: Did you say that?

MR. AUTRY:  Your Honor, could he answer the question?

THE COURT:  He answered the question no.  That's good enough.  Let's get on with it.

MR. AUTRY:  Thank you.

Q.   (BY MR. WILSON)  Dr. Woods, you're not claiming that being incarcerated on death row is a treatment for bipolar, are you?

A.   I can't answer that question yes or no.  I'd have to explain it.

Q.   Dr. Woods, I believe that your testimony in this particular case, that you believe that the defendant, back in 1999 and as recent as 2017 when you evaluated Mr. Barrett, that he is suffering from bipolar disorder; correct?

A.   Yes.

Q.   Dr. Woods, you would also agree with me, sir, that as part of the diagnosis, it's important to eliminate other

303

possible causes of behavior; correct?

A.   Sure.

Q.   And do we refer to that as differential diagnosis?

A.   Yes.

Q.   And I believe that, specifically in your report, it's your belief that Mr. Barrett meets the diagnostic criteria for bipolar disorder, severe, 296.4x from the DSM-IV; correct?

A.   Correct.

Q.   DSM-IV-TR?

A.   Yes.

Q.   Would you agree with me, Dr. Woods, that in order to reach a primary -- and is that a primary diagnosis of Bipolar 1?

A.   I'm not sure what you mean by primary.

Q.   Well, isn't it true that, in order to reach a primary diagnosis of bipolar disorder, it must be established based on symptoms that remain once substances such as methamphetamine or cocaine or any other substances are no longer being used?

A.   I would like to see that, sir.  I don't recall no longer being used.

        MR. WILSON:  And, Judge, may I approach?

        THE COURT:  Yes.

Q.   (BY MR. WILSON)  Are you familiar with the DSM-5?

A.   Yes.

Q.   And what, for the record, is the DSM-5?

A.   The Diagnostic and Statistical Manual Fifth Edition, which is classification system for looking for what we call inter-rater reliability.  It is not comprehensive textbook of psychiatry.

Q.   I appreciate that, Doctor.  But you referred to the DSM-IV-TR in your report; correct?

A.   Correct.

Q.   And it's a reference which is used throughout the neuropsychiatry community; correct?

A.   It is used, yes.

Q.   And it's used to diagnose mental illnesses; correct?

A.   From a reliability point of view, yes.

Q.   Thank you.

A.   Is that the DSM-IV-TR?

Q.   I'm going to show you the 5 first, okay?

A.   Okay.

          MR. WILSON:  May I inquire from here, Judge, for a moment?

          THE COURT:  Yes.

          MR. AUTRY:  Judge, I'm going to object on relevance grounds to the use of DSM-5 which postdates Dr. Woods' examination of Mr. Barrett in 2009.

          THE COURT:  Yeah, why were we looking at this

edition?

MR. WILSON:  I'm going to go to that one, and I'm going to go to the IV, Judge, if you'll just give me a moment.

THE COURT:  Okay.

THE WITNESS:  Yes.

Q.  (BY MR. WILSON)  Do you -- did you have an opportunity to look at that?

A.  I did.

Q.  And would you agree with me that's from the DSM-5?

A.  That's correct.

Q.  And that's from the DSM-5 dealing with bipolar?

A.  That's correct.

Q.  And talking about differential diagnosis; correct?

A.  Yes, sir.

Q.  Talking about specifically substance/medication induced bipolar disorder?

A.  Yes.

Q.  And is that what you believe that --

A.  I'm sorry --

Q.  -- Mr. Barrett has?

A.  -- that's not correct.  That's a no.  Can I have that again, please?  Thank you.  That's correct.  Yes.

Q.  So it is correct?

A.  Yes.

Q.   And, again, will you agree with me that DSM-5 says a primary diagnosis of bipolar disorder must be established based on symptoms that remain once substances are no longer being used?

A.   Yes.

Q.   Now, counsel mentioned another version of the DSM. There's been a number of versions over the years of DSM; correct?

A.   There have been five.  There have been seven.

Q.   Because there was a IV, and then a IV-TR --

A.   That's correct.

Q.   -- specifically; correct?

A.   And a III and a III-R.

Q.   Now, I'm looking at the DSM-IV-TR.

A.   Yes.

Q.   And would you agree with me that that's, in fact, the document or the manual that you referenced in your report back in 20 -- 2009?

A.   That's correct.

Q.   And would you agree with me, from the -- from the DSM-IV-TR, that when a substance -- when the substance use or medication is judged not to fully account for the episode, for example, the episode continues for a considerable period autonomously after the substance is discontinued, the episode would count toward a diagnosis of

bipolar 1 disorder?

A.   That's correct.

Q.   And that's straight from --

        MR. WILSON:  May I approach again, Judge?

        THE COURT:  Yes.

        THE WITNESS:  Thank you.  Appreciate that.

Q.   (BY MR. WILSON)  And just so we're clear, you would agree with me that the part we just talked about is from the DSM-IV-TR under bipolar disorders; correct?

A.   Correct.

Q.   And specifically under the same heading of differential diagnosis; correct?

A.   That's correct.

Q.   And under the same subheading of substance induced mood disorder; correct?

A.   That's correct.

Q.   So in essence -- I mean, not in essence, but do you agree with me that, in order to make a diagnosis of bipolar, a person has to be separate from the use of substances for a period of time?

A.   Yes.

Q.   But you would agree with me that the defendant was not separate from the use of substances at the time back in 1999?  He was on methamphetamine daily at the time of this murder; isn't that correct?

A.   Well, that is what he reports, but that certainly isn't what his testing in the -- if you look at the medical records from his hospitalizations, you will find that, even though even then he reported, his toxicology screens were negative for methamphetamines.  They were positive for cannabis, but they were negative for methamphetamines even when he reported being on -- being on methamphetamine.

Q.   What about his hospitalization in 1986?

A.   Yes, if you look at -- and I think that's one particularly.  If you look at -- if you look at his hospitalization in 1986, what you see is there's one urine test that is positive for methamphetamines.  A urine toxicology means that it's a presence, but you're not under the influence.  If you look at his blood urine test, they are all negative for methamphetamines.

Q.   Dr. Woods, are you trying to tell this Court that, in 2000 -- excuse me -- in 1999, the defendant was not using methamphetamine?

A.   Well, you were just asking about 1986, sir.

Q.   Well, you said, in 1999, looking at the medical records, he was not using methamphetamine?

A.   No, what I said was --

Q.   I'm sorry.  In 1999 at the time of the crime.

A.   You asked me about 1986.

Q.   The last series of questions was about '86.

A.  Right.

Q.  But I believe you testified, at the time of the murder --

A.  Right.

Q.  -- which was in September of 1999; correct?

A.  Correct.

Q.  That you testified that the medical records show that he was not using methamphetamine?

A.  I did not see a toxicology report for the 1999 medical records.  If you could show me that, I'd appreciate it.

Q.  I apologize, maybe I just missed something.  Did you not just testify a few moments ago that the medical records did not show that the defendant was using methamphetamine in 1999?

A.  No, you asked me about 1986.  We talked about the hospitalization in 1986.  Then you switched to 1999.  We did not talk about whether he was on methamphetamines in 1999. He said that he was on methamphetamines also in 1986 and 1995.  When you look at the toxicology panel, there was no methamphetamines that were found in his blood during that time, and only once in 1986 was it found in his urine.  I did not find toxicology panels for 1999, so I don't know --

Q.  Okay.

A.  -- in fact if he was using methamphetamines during that time.

Q.   Isn't it true that in the medical history in 1999, the defendant says, "I was using methamphetamine daily"?

A.   And he told me that.

Q.   Okay.  You have no reason to doubt that, do you?

A.   In fact, the records -- the records do not reflect that. That's the point I'm trying to make.

Q.   You looked at Dr. Woods --

A.   I'm sorry, I am Dr. Woods.

Q.   I'm sorry.  Long morning already.  Long night.

A.   I understand.

Q.   Dr. Pitt, you looked at his evaluation; correct?

A.   Yes.

Q.   And the transcript; correct?

A.   Yes.

Q.   And you agree with me the defendant told Dr. Pitt numerous times there was never a time I wasn't using methamphetamine?

A.   And he told me the same thing.  However, when you look at the toxicology panels, that's not accurate.

Q.   And the toxicology pattern in 1999, what does it say?

A.   There is no toxicology panel so we can't tell.

Q.   So if there's not a record that you looked at, you did not rely upon Mr. Barrett's own admission he was using methamphetamine daily?

A.   Well, I'm caught in the same situation that you present

311

before -- before Mr. Wilson.  I can't rely upon it sometime and not rely upon it other time.  To the degree that I can, I've got to look at the records.

Q.  Dr. Woods, look at Government's Exhibit Number 11 for me, please.

A.  Sure.

Q.  Do you recognize that, sir?

A.  Yes, I do.

Q.  Would you agree with me that that's a record that you reviewed as part of your evaluation in this case?

A.  Yes, sir.

Q.  And you'd agree with me that this is an emergency room report from Sequoyah Memorial Hospital back in January of 1995?

A.  I absolutely do.

Q.  And that this is a situation where the defendant showed up with his mom saying, "I'm losing my mind"; correct?

A.  That's correct.

Q.  And there was a -- there was a drug screen that day; correct?

A.  Urine drug screen.

Q.  That's correct?

A.  Correct.

Q.  And the findings of that's on Page 2; correct?

A.  Right.

Q.  And it shows positive for amphetamine; correct?

A.  On the first of the urine drug screen --

Q.  Thank you.

A.  -- that's correct.

Q.  Did you find any other drug screens which were --

A.  Yes.

Q.  -- which were --

A.  There was a blood drug -- there was a blood drug screen that followed this urine drug screen which, in fact, showed cannabinol but no methamphetamine.  So what we see is a urine drug screen which doesn't talk about being under the influence.  A blood drug screen only speaks to being under the influence.  A urine drug screen only speaks to the presence of methamphetamines.  It does not speak to being under the influence.  And so we see that.  And particularly, with amphetamines, which is a drug that will last sometimes for weeks in a system.  So you're absolutely correct that he was -- there was a presence of methamphetamines there.  But when you look at the blood, which was within the next couple of pages, you'll see that the blood drug screen was negative.  It was only cannabinol.  There was no evidence of methamphetamine in his blood.

Q.  And you'd agree with me, in 1995, there was no diagnosis of bipolar; correct?

A.  That's correct.  But there were symptoms of bipolar but

no diagnosis.

Q. As a matter of fact, the doctor found it was substance abuse disorder; correct?

A. There were two. Dr. Herndon noted that it was -- the person that admitted him said that it was major depressive disorder with a high potential for suicidal diagnosis. Dr. Ramirez described it as a marital problems and a mixed substance abuse. However, if you look at, in fact, the -- they looked at both drug and medical, but they treated him for -- with Haldol, which is an antipsychotic, which is not used for chemical dependency. And they describe symptoms of bipolar disorder. So you're right, there's no diagnosis even though there was symptoms.

Q. And he was discharged with no medications; correct?

A. After the Haldol, that's correct.

Q. So is it your testimony that, based upon your review, that in 1986 Mr. Barrett was, in fact, suffering from bipolar disorder?

A. It's my testimony absolutely.

Q. And you made that finding understanding that there needs to be a period of time where there is no -- there is no drug or substance affecting that diagnosis; isn't that correct?

A. That's part of the differential diagnosis, that's correct. There are other aspects of it that make it very clear that he was suffering from a bipolar disorder and I'm

sure -- and we can talk about those if you like.

Q. As part of your evaluation, you also discuss looking at a report from Dr. Sharp; is that correct?

A. Correct.

Q. And would you agree with me that, at the time that Dr. Sharp was evaluating Mr. Barrett, that he was still using illegal drugs?

A. I'm not clear.

Q. Are you aware that that's what the defendant reported to Dr. Pitt?

A. I am aware of that, yes.

Q. Now, as part of your report, Dr. Woods, you also made a finding that Mr. Barrett could not rationally assist his attorneys in the preparation of his defense; isn't that correct?

A. In my 2009 report, that's correct.

Q. Did you interview John Echols as part of your evaluation?

A. Yes.

Q. And did Mr. Echols report to you that his -- his client could not rationally assist him?

A. He did not report that to me, no.

Q. Did you interview Geoffrey Standing Bear?

A. No, I did not.

Q. He was also Mr. Barrett's counsel back in early 2000s;

correct?

A.  Yes.

Q.  Did you interview Jack Gordon?

A.  No, I did not.

Q.  Did you interview Roger Hilfiger?

A.  No, sir, I did not.

Q.  Did you interview Bret Smith?

A.  No, I did not.

Q.  And despite the fact that you didn't interview all but one of his lawyers, it's your opinion that he was unable to rationally assist his lawyers in the preparation of his defense; is that correct?

A.  That's correct.  That was the finding I made in 2009.

Q.  And you still stand by that finding; is that correct?

A.  If you notice in my second addendum, I didn't add that in my second report.  I -- you know --

Q.  That's exactly right.  That's why I'm asking that question.  And for the record, there was a long pause before you answered; is that correct?

A.  Yes.  Yes.

Q.  Question again:  Do you still stand by your 2009 report that the defendant was unable to rationally assist his attorneys in the preparation of his defense?

A.  Yes, that's my belief.

Q.  Now, you understand, Dr. Woods, and you've done -- been

316

involved in capital cases in the federal system for a number
of years; correct?

A.   Yes.

Q.   And non-capital cases in the federal system for a number
of years; correct?

A.   That's correct.

Q.   Have you been involved in state cases in the state of
Oklahoma?

A.   I don't -- I don't know that I have.

Q.   Okay.  Well, let's exclude those for a second.  But you
understand that, under the law in the federal system, that
if an attorney believes that his client is unable to assist
him, there's a mechanism where the attorney can file a
motion for determination of competency in that particular
case.  Are you aware of that?

A.   Yes.

Q.   And that can be done by the defense counsel?

A.   Yes.

Q.   It can be done by the government; correct?

A.   Yes.

Q.   It can be done by the court in the court's own
observations; correct?

A.   That's correct.

Q.   And you'd agree with me that Mr. Echols never filed any
motion for determination of competency in this case, did

he?

A. No. That's correct.

Q. Mr. -- Mr. Smith never filed one; correct?

A. That's correct.

Q. Mr. Hilfiger never filed one; correct?

A. That's correct.

Q. Now, I know you testified that you're not familiar necessarily with the state system, but in the state system here in Oklahoma, the same basic procedure applies.

A. Sure. I understand.

Q. Okay. And based upon your review, you would agree with me that Mr. Echols did not file one either in the state case or in the federal case; correct?

A. That's correct.

Q. Nor did Mr. Gordon or Mr. Standing Bear; correct?

A. That's correct.

Q. Now, you also, as part of your report in 2009, believe that, at the time, the defendant believed his actions were right?

A. Yes.

Q. And I believe you also find that Mr. Barrett could not understand the difference between right and wrong on September -- in September of -- excuse me -- of 1999; isn't that correct?

A. And again there's a long pause. I certainly believe

318

that he believed his actions were right, that's correct.

Q.   Well, I want to direct your attention to your own report.

A.   Sure.

Q.   And I want to direct your attention to specifically Paragraph Number 78.

A.   That's correct.  Yes, sir.

Q.   So you would agree with me that, in your report, you say that you believe he did not understand the difference between right and wrong?

A.   Correct.  Because he thought that his actions were right.

Q.   And I assume you're aware that Mr. Barrett, to this day, contends he didn't actually shoot Trooper Eales; isn't that correct?

A.   I'm aware that he knows that he shot, but I'm not clear that differentiating that he shot Trooper Eagles *(sic)*.  He acknowledges that he shot, but he doesn't believe that he -- I guess that would be correct -- that he shot Trooper Eagles, that's correct.

Q.   As a matter of fact, he told Dr. Pitt that just recently, that he didn't -- he didn't shoot -- actually shoot the trooper, Trooper Eales; isn't that correct?

A.   I'm sorry, Mr. Wilson, I'm struggling with that because I know that he says that he shot -- that he acknowledges

319

that he shot.  I don't recall him saying specifically that he doesn't -- doesn't believe he shot Trooper Eagles.  It's the specificity of it that I'm not clear about.

MR. WILSON:  Have just one moment, Your Honor?

THE COURT:  Yes.

MR. WILSON:  Thank you.

Q.  (BY MR. WILSON)  Dr. Woods, we've been talking about, again, your report.  I want to direct your attention back to Paragraph 22 at this point.

A.  Yes, sir.

Q.  A significant portion of your report and also your testimony yesterday dealt with genetic loading?

A.  Yes, sir.

Q.  And the, if you will in my terms, genetic predisposition, if you will, to certain both substance related abuse and also bipolar or mood disorder; correct?

A.  Yes, sir.

Q.  And as a matter of fact, in your report you spend a number of paragraphs setting forth some of the family history of mood disorders and depression, anxiety, and possible bipolar; correct?

A.  Yes.

Q.  And then at the bottom of page -- excuse me -- on the latter portion of Paragraph 22, you make a statement, "These factors likely potentiated Mr. Barrett's genetic

320

predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning"; is that correct?

A.   Yes, sir.

Q.   And you still stand by that belief; is that correct?

A.   Absolutely.

Q.   Now, you would agree with me that that same genetic predisposition would apply to Stephen Barrett?

A.   Potentially, yes.

Q.   When you say potentially, that would indicate some qualifications of your response; correct?

A.   Well, yes.

Q.   He's the brother; correct?

A.   Correct.

Q.   And he has the same father, same mother?

A.   Yes.

Q.   But we understand genetics, not everyone is exactly the same; correct?

A.   Well, and particularly when you're talking about these are -- and I think I said this yesterday -- these are the types of disorders that are, when we have a heterogeneous distribution like this, like diabetes.  So one family member may have full-blown type 1 diabetes, another family may have type 2, another family member may not have diabetes at

321

all.

Q.  But the potential was there for Stephen to have the same predisposition; correct?

A.  There's that potential, yes.

Q.  But you understand that Stephen testified here yesterday; right?

A.  Yes.

Q.  And you weren't in the courtroom at that time, were you?

A.  That's correct.

Q.  But you've -- have you reviewed any statements of Mr. Barrett?  And I'm referring to Mr. Barrett, Stephen Barrett?

A.  I think so, but I have some understanding of who he is and how well he's done, etc.

Q.  Okay.

A.  Sure.

Q.  And you agree with me that Stephen went to college?

A.  Yes.

Q.  Got a degree and a master's; correct?

A.  Yes.

Q.  Became a football coach and a school administrator; correct?

A.  That's correct.

Q.  He had an episode in his life regarding narcotics, too;

Q. Almost or -- almost overdosed; correct?

A. I think so. I don't -- I don't recall exactly, but I know he did have a period of time of both heavy drinking and narcotics, yes.

Q. Yesterday when you were testifying about the previous medical actual in-patient treatments that Mr. Barrett has had in his past --

A. Yes.

Q. -- I believe one of the items that you talked about was the fact that the facilities prescribed him certain medications which were consistent with treating the effects of bipolar; correct?

A. Of a mood disorder.

Q. A mood disorder?

A. Yes. In fact, I said they were not consistent with bipolar. We talked about the manic switch.

Q. And so it's your testimony that they just -- they missed it; right?

A. They didn't have all the data that I had.

Q. And each time you would agree with me that every one of those diagnosis contained substance abuse; isn't that correct?

A. Oh, as they should. As they -- in terms of their

differential diagnosis, absolutely.

Q.  And I believe you agree with me that, after the '95 discharge specifically, there was no medications prescribed to the defendant; is that correct?

A.  As I recall, he left involuntarily and -- and of course that you would not prescribe medications if someone were to leave.  His mother came and picked him up.  So that's correct.

MR. WILSON:  Almost done I believe, Judge.  May I have just a moment?

THE COURT:  Yes.

Q.  (BY MR. WILSON)  Just one thing I want to make sure that I'm clear on, Dr. Woods.  You testified that you are not aware of any testing regarding -- or strike that.  On the 1999 event --

A.  Yes.

Q.  -- the shooting --

A.  Yes.

Q.  -- Mr. Barrett himself was shot; correct?

A.  Correct.

Q.  And he was hospitalized; correct?

A.  Yes.

Q.  And you would agree that there was a urine sample taken at that time?

A.  I would assume there was.  And, in fact, I looked and

324

there was a tox -- a sheet that said tox panel.  I was not able to find the results of that tox panel.

MR. WILSON:  May I approach, Judge?

THE COURT:  Yes.

Q.  (BY MR. WILSON)  Well, better yet, just turn to Government's Exhibit Number 7.

A.  Sure.

Q.  And specifically I'd direct your attention -- it's a multipage exhibit, so look at Page Number 28, which is also DISC 000409.  And would you agree with me, Dr. Woods -- well, I'm sorry.  Go ahead and take a look at that.

A.  Yes, I see it right here.

Q.  Now, would you agree with me that this is a report from Saint Francis Hospital?

A.  That's correct.

Q.  And Saint Francis is the treating facility for Mr. Barrett's gunshot wounds; correct?

A.  Yes, sir.

Q.  And you would agree with me that is a report of a urine sample screening; correct?

A.  That's correct.

Q.  And which shows positive for amphetamines; correct?

A.  And cannabinoids, that's correct.

Q.  And cannabis?

A.  That's correct.

325

Q.  But it also specifically says high levels of structurally related amines may cross-react with the amphetamine/methamphetamine test; correct?

A.  Correct.

Q.  So a urine screen done on day of the shooting --

A.  Yes.

Q.  -- or maybe actually the next day, early morning hours --

A.  Right.

Q.  -- positive for methamphetamine; correct?

A.  That's correct.

Q.  So now having shown you that, does that change your opinion that Mr. Barrett was, in fact, using methamphetamine as he told you on a daily basis on the day of the shooting?

A.  Well, what it tells me is that he was using it on that day.  That's a -- that's a urine test, so you're correct.

Q.  And he told you that he had been using it every day consistently; isn't that correct?

A.  Well, he said he had been using it all his life, and we know better now.

Q.  All right.  I would agree with that.  But he told you that, at the time of this shooting, he was daily using methamphetamine; correct?

A.  Yes.

Q. And despite that, you're still testifying in this court that, on that day, he was, in fact, bipolar?

A. Of course. Of course. People --

Q. And you're making that diagnosis even though, according to the DSM-IV and the DSM-5, there needs to be a period when substances are not present; isn't that correct?

A. When the diagnosis is made. But people that are bipolar also use drugs. That's what chemical -- that's what substance -- dual diagnosis is all about.

Q. And again --

A. If I may finish.

Q. Thank you.

A. So the idea that someone is using drugs and is not bipolar is -- just doesn't make sense.

Q. And, again, you're the first person to do a discharge summary diagnosis of bipolar?

A. But not the first person to see the symptoms.

Q. Thank you. But my question again -- do you understand my question?

A. I got the question. I hope answered it correctly.

Q. All right. And so my question is yes or no. Yes or no, you are the first person to diagnose that gentleman seated there with bipolar?

A. Yes.

Q. And you would agree with me that the other persons who

evaluated him in 1986, 1986, 1995, 2000, 2002, and 2003 were all much -- were all closer in time to your 2009 evaluation?

A. With less data, that's correct.

Q. Thank you.

A. Thank you.

Q. And you agree with me, Doctor, that you don't base your diagnosis on what another medical provider prescribed; isn't that correct?

A. I'm not sure -- I'm not sure what you mean.

Q. You testified yesterday that you looked at what the other doctors prescribed back in 1986 and 1995 to determine he had bipolar. Isn't that what you testified in here yesterday?

A. No, because they didn't treat him for bipolar.

Q. But you said that you looked at that as the basis of saying this guy was obviously suffering from bipolar because they gave him those prescriptions. Isn't that what you testified to yesterday?

A. Because they treated his mental illness rather than his chemical dependency.

Q. And so you base your diagnosis --

A. Wait, wait, wait. Let --

        THE COURT: Let him finish.

        MR. WILSON: Sorry, Judge. Thank you.

A. Because they gave him psychiatric medications rather than the kinds of medications that you would give someone that was, say, in a drug-induced psychosis, or that was withdrawing from medication. They didn't give him any antabuse. They didn't give him the kinds of drugs that you would give someone that was chemically dependent only and treating the chemical dependency only. You would never give someone that was chemically dependent only Haldol. You would never give someone that was chemically dependent only Asendin. You would never give someone that was chemically dependent only any antidepressants. So the idea that they would treat this person with medications that are used in a psychiatric setting says that they spoke to the psychiatric disorder that he had. And if you look, sir, through all of these records, the symptoms that they -- they discuss are symptoms of bipolar disorder that are inconsistent with chemical dependency.

Q. And each time the doctors, when they looked at him, they determined it was a personality disorder; correct?

A. Not each time. That's not correct. In 1986, they -- they rule out was a mixed personality disorder. And if you look at the discharge diagnosis, the -- on that particular, the toxicology panel was negative at the time that they were making the diagnosis of a mixed substance abuse.

Q. So this missed the diagnosis?

329

A.   They didn't have all the data that we have.  That's the difference.

Q.   And even though he reported on daily using drugs at this time?

A.   He obviously didn't.

Q.   And he was exhibiting behavior consistent with someone who was high on methamphetamine or other substance; correct?

A.   And that's the point, Mr. Wilson.  The behaviors that are described in 1986, in 19 -- in 1995 are not the behaviors that are consistent with someone that's high on methamphetamines.  If you recognize the symptoms of methamphetamines, they don't include mood lability, they don't include mood swings, they don't include rapid thinking, exactly the kinds of symptoms that they described in those hospitalizations.

Q.   But despite that, all of these other physicians didn't diagnose him with bipolar; correct?

A.   That's correct.  They didn't have the data.

        MR. WILSON:  I have no further questions.  Pass the witness, Judge.

        THE WITNESS:  Thank you, sir.

        THE COURT:  Dr. Woods, we've been going a long time.  Would you like to take a break before we go to redirect?

        THE WITNESS:  I need to take a break.

THE COURT: We'll take 15 minutes.

*(Off the record at 11:00 a.m.)*

*(Back on the record at 11:17 a.m.)*

THE COURT: Mr. Autry, you may redirect.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q. Dr. Woods, toward the end of Mr. Wilson's cross-examination and other parts of his cross-examination, he asked you repeatedly whether or not you were the only doctor or mental health professional ever to diagnose Mr. Barrett with bipolar disorder. Do you remember those questions?

A. Yes.

Q. Could you look at Government's Exhibit Number 9. Do you have that, sir?

A. Yes, sir.

Q. What is that?

A. This is the Bill Willis Community Mental Center referral form.

Q. Is that a record that you're familiar with?

A. Yes, sir.

Q. And is that a record that you reviewed --

A. Yes, sir.

Q. -- in preparation for your reports and etc.?

A. That's correct.

Q. Could you look where it says provisional diagnosis?

A. Yes, sir.

Q. What does it say as to Axis I?

A. Bipolar.

Q. That's from the Bill Willis Community Mental Health Center 1-20-95; is that correct?

A. That's correct.

Q. All right. Could you look at the reason for referral?

A. Yes. Client was brought into the ER at Sequoyah Memorial by his mother. He reportedly is complaining of he is, quote, losing his mind. He denies being suicidal, homicidal, but relates he doesn't know what he might do. Extremely agitated. Came in, was given Haldol.

Q. And Haldol is an antipsychotic?

A. That's correct.

Q. So Mr. Wilson was incorrect when he said to you that you're the only doctor or mental health professional ever to diagnose Mr. Barrett with bipolar; is that correct?

A. That's correct.

Q. You were asked about Dr. Sharp --

A. Yes.

Q. -- do you remember that?

A. Yes.

Q. Asking whether or not, in Dr. Sharp's report, Mr. Barrett indicated to him that he was still using

drugs?

A. Yes.

Q. Do you recall that?

A. Yes.

MR. AUTRY: Could you turn to -- well, excuse me. First of all, Your Honor, we would move to introduce into evidence Government's Exhibit Number 9, the Bill Willis Community Health Center referral form.

MR. WILSON: No objection, Your Honor.

THE COURT: Government's Number 9 is admitted.

MR. AUTRY: Thank you. And I apologize I got a little out of order.

Q. (BY MR. AUTRY) Could you turn, Doctor, to Government's Exhibit 16?

A. Yes, sir.

Q. What is that?

A. This is the report of Mr. -- of Dr. Sharp, assessment dated September 28, 2002.

Q. All right. Could you turn to Page 7 of that report?

A. Yes.

Q. Do you have that?

A. Yes, I do.

Q. Under Section 6, Diagnostic Impressions, Axis I, do you see that?

A. Yes, sir.

Q.  What does it say with respect to amphetamine dependence?

A.  Sustained full remission in a controlled environment.

Q.  What does that mean?

A.  That means that he was not using methamphetamines and his methamphetamine disorder had been -- it's under remission, it was gone in a sustained environment.

Q.  All right.  And does it say the same with respect to cannabis dependence, alcohol dependence?

A.  That's correct.

Q.  All right.  And if you could turn back to the first page of Government's 16.

A.  Yes.

Q.  What's the date of the assessment?

A.  September 28, 2002.

Q.  Was Mr. Barrett in custody at that time?

A.  That's correct.

Q.  Was Mr. Barrett in custody since Trooper Eales was killed in September of 1999?

A.  That's correct.

Q.  Okay.  So when Mr. Wilson asked you about Mr. Barrett's drug use at the time Dr. Sharp examined him, his finding was full remission because he's in custody?

A.  That's correct.

Q.  All right.

334

MR. AUTRY:  We would move for the admission of Government's Exhibit 16.

MR. WILSON:  No objection, Your Honor.

THE COURT:  Government's 16 is admitted.

Q.  (By MR. AUTRY)  You were asked a series of questions about this steel ball incident where Mr. Barrett was struck in the head when he was in elementary school?

A.  Yes.

Q.  And it was emphasized to you on cross-examination that there was no medical report indicating that this event occurred; is that correct?

A.  That's correct.

Q.  Does the absence of a medical report indicate that the incident Mr. Barrett described never occurred?

A.  No.

Q.  Okay.  He told you about it; right?

A.  That's correct.

Q.  He told Dr. Pitt about it?

A.  Yes.

Q.  He told Dr. Price about it?

A.  Yes.

Q.  He told Dr. LaFortune about it?

A.  Yes.

Q.  Did he tell Dr. Russell about it?

A.  I don't recall.

Q.  Okay.  Could you look at Government's Exhibit 34?

A.  Yes.

Q.  And what is that?  What is government's --

A.  This is the evaluation of Dr. Russell.

Q.  All right.

A.  Dated December 16th, 2003.

Q.  See if I can find it here.  Would you look at page -- at page -- let's see here -- Page 5 of that report --

A.  Yes.

Q.  -- where it says medical --

A.  Yes.

Q.  -- at the bottom of the page, do you see that?

A.  Yes.

Q.  Could you read the first sentence of --

A.  Mr. Barrett reported having a head injury while in grade school when he was knocked unconscious after being hit by a steel ball.

Q.  All right.  So pretty much every mental health professional or doctor that he's talked to after his arrest in this case, he gave the same information about his head injury?

A.  Yes.

Q.  Are you also aware that Mr. Barrett reported head injuries when he was about 16 or 17 years old when he was beaten by the police and had his jaw broken?

A.    That's correct.

Q.    Is that a head injury?

A.    Yes.

Q.    Now, Dr. Young found that Mr. Barrett had neuropsychological deficits; correct?

A.    That's correct.

Q.    Brain damage?

A.    That's correct.

Q.    Damage to the frontal lobes of his brain?

A.    And to the temporal lobes.

Q.    All right.  Did Dr. Price find neurological deficits in Mr. Barrett?

A.    Yes.

Q.    And part of what Dr. Young relied upon in making that finding was Mr. Barrett's history of previous head injuries; is that correct?

A.    She relied upon that, yes.

Q.    All right.  Did the results speak for themselves with respect to Dr. Young's neuropsychological and neurological findings with respect to Mr. Barrett?

A.    Well, they don't necessarily speak to the steel ball being true or not.

Q.    Sure.

A.    But what they do speak to is that he clearly has neurological impairments that are consistent with the type

of head injuries that he describes.

Q.  Okay.  Thank you.  You were asked about Mr. Barrett's school records.  Do you recall those questions?

A.  Yes.

Q.  Okay.  Did Dr. Sharp find that learning disorder or learning disability was a rule-out that required further testing in his opinion?

A.  Yes.

Q.  Did Dr. Price, one of the government's own doctors, find that Mr. Barrett had a learning disorder not otherwise specified?

A.  That's correct.

Q.  Did Dr. Young find that Mr. Barrett had a learning disorder or learning disabilities?

A.  That's correct.

Q.  Okay.  Has there been any doctor, really, who's looked at Mr. Barrett since this case started back in 1999 who has said that he has no learning disabilities?

A.  I think the only one would be Dr. Bianco, who did an incomplete battery in my opinion.

Q.  All right.  Speaking of Dr. Bianco, I asked you some questions about him yesterday; correct?

A.  Yes.

Q.  And you're familiar with the fact that Drs. Myora and Bigler have looked at Dr. Bianco's testing; is that

338

correct?

A.   That's correct.

Q.   And they found that his testing was incomplete, didn't they?

        MR. WILSON:  Objection to what these other doctors found.

        THE COURT:  Well, we got -- we have the record, so the record speaks for itself.  Objection sustained.

        MR. AUTRY:  All right.

Q.   (BY MR. AUTRY)  You were asked some questions, Dr. Woods, about the DSM-IV-TR versus the DSM-5?

A.   DSM-IV-TR, correct.

Q.   Okay.  TR?

A.   Yes.

Q.   Is there a difference between the DSM-IV-TR and the DSM-5 with respect to what's known as a manic shift?

A.   I believe the DSM-5 used -- subsumes that under the area that doctor -- that Mr. Wilson was describing in terms of the medication or substance induced bipolar disorder.

Q.   All right.  Now, what's the distinction there between the IV-TR or the TR-IV and the 5?

A.   Well, the distinction is that -- and the distinction is that the substance induced medication -- medication bipolar disorder refers to substance that it can, in fact, induce symptoms that are consistent with a bipolar disorder.

Q.   All right.

A.   Methamphetamine is not a substance that can induce symptoms consistent with a bipolar disorder.  It can induce symptoms of paranoia, which everyone has acknowledged Mr. Barrett to have had, even when he was incarcerated, that he continues to have.  And it's also consistent with the -- the anger and reactivity.  But methamphetamine doesn't fit under that medication substance induced because it doesn't induce symptoms that are consistent with a bipolar disorder.

Q.   All right.

A.   It doesn't induce mood lability.  It doesn't induce pressured speech.  It doesn't induce the kind of mood swings that are described by family members in Dr. Russell's report, and other situations where, in fact, they had no idea of bipolar disorder.

Q.   All right.  Could you just summarize, if you could, what you found in Mr. Barrett's medical records and the reports of analysis by various doctors that indicate symptoms of bipolar disorder in Mr. Barrett?

A.   Sure.  If we look at Exhibit 34, Page 9 for doctor -- this is a -- this is Dr. Russell, she notes under personality assessment, even though as doctor -- Mr. Wilson said, at this first sentence says, at the present time Mr. Barrett is not exhibiting symptoms of a major mental

illness.  She goes on to note, persons close to Mr. Barrett at different times in his life report observing symptoms of what they believe to be mental illness.  For example, his ex-wife described him as too emotional and believed he had marital problems due to his mood swings.  She --

Q.  Does that say mental problems or marital problems?

A.  Mental.  I'm sorry.  Mental problems due to his mood swings.  She further described him as suffering deep depressions during which time he couldn't work.  His son, Toby, described him as having dramatic mood fluctuations and believed he was -- he has some type of chemical imbalance. Mr. Barrett's mother also described her son as having intense emotions and dramatic mood fluctuations.

Again, these are family members, but these are family members that describe specific symptoms that are consistent with bipolar disorder that one does not see in methamphetamine -- in a methamphetamine use.  And so they are completely different than one might think.  You can't just say all drugs create symptoms.  We are talking about specific types of symptoms.

Q.  Okay.

A.  If you look at the -- and, I'm sorry, I don't -- I've got the page numbers here, but I don't have the exhibit.  I think it's Exhibit 51, perhaps, of the medical records.

Q.  Is that petitioner's exhibit or --

341

A.   I believe it is.  It's the records that I had.  It's the medical records from the hospitalizations.

Q.   Okay.  51 Petitioner's.

A.   Thank you.  This is it.  Got it.  Okay.  I apologize.  Try to find these.  On page -- these are not paginated.  Well, let me just review these records.

Q.   Okay.

A.   In the 19 -- I'm sorry.  In the records for 1995, it's noted that he was not sleeping for a few days.  He had lack of concentration.  He had rapid thought -- rapid thought responses.  Again, yesterday I talked about the pressured speech and the flight of ideas that are part of a bipolar disorder.  This was at a time when his urine tox panel was negative.  And, again, in 1995 they talk -- his mother, on the admission, talks about classic symptoms of bipolar, mood swings, etc.  He's described, again, as a drug abuser.  However, a major depression.  Emotionally labile.  We see those terms of art, emotionally labile, in the January 20 -- I mean, January 20, 1995.  We also see a consent for drug therapy and depression.  So what we see, in fact, is a doctor in 1995, and through today, you have to have a patient sign in order to give them medications, and you have to tell them what the risks and benefits of those medications are, of what use those medications will be.  You have to identify the medications they are given.  And what

342

we are seeing is that he's given medications for a mood disorder. He's not given medications for methamphetamine withdrawal. He's not given medication for the type of paranoia or reactivity that you might see in methamphetamines. Again --

THE COURT: Excuse me, Dr. Woods. What is that you're reading from there?

THE WITNESS: I'm reading from notes that I took on the medical records, Your Honor.

THE COURT: When did you take those notes?

THE WITNESS: I took these notes last night.

THE COURT: Okay.

MR. AUTRY: Can he continue, Your Honor?

THE COURT: Yes.

MR. AUTRY: Okay. Thank you, sir.

THE COURT: Go ahead.

A. Okay. Again, when he was hospitalized in 1985, he was described as having a depressive neurosis with suicidal potential that was extremely high. If you look at the discharge summary of that 28 day, Dr. Ramirez does say that he diagnosed him with a mixed substance abuse and marital problems. But also within that, with the discharge summary, the tox screen was negative.

So what we're seeing and what I think was a bit confusing when we talked about the DSM and that

substance induced medication symptoms, it has to be a medication or a drug that, in fact, creates symptoms that are consistent with a bipolar disorder. If the symptoms aren't consistent with a bipolar disorder, that helps you differentiate whether the drugs or the -- whether the drugs that are perhaps being taken are the cause for the behaviors that you're seeing. And the part that was confusing in my colloquy with Mr. Wilson was that it's not that any drug can -- has to be eliminated. It has to be a drug that creates those symptoms of bipolar disorder. And, in fact, methamphetamines do not create the constellation of symptoms that are described from 1986 on two occasions, in 1995, and can -- even through Dr. Russell's report, Dr. Sharp's report that are consistent with bipolar disorder.

Q. (BY MR. AUTRY) All right.

A. The important thing to me is for 1986, 1995, even 2003, you may have -- and in 1986 and 1995, these are captured in the medical records. But in 2003 when Dr. Russell describes, very clearly, the symptoms of -- that his son, his ex-wife, and his mother described, this is at a time when, again, bipolar disorder was not considered.

Q. Okay. I think one of the points Mr. Wilson was trying to make with those questions and that series of questions is if you had somebody who is a drug user, okay?

A. Yes.

344

Q.   According, I guess, to the DSM-5 -- and I'm probably butchering this -- you had somebody is a drug user, you can only make a diagnosis, or a proper diagnosis of bipolar disorder, for example, when the person is not on drugs.  Is that --

A.   That's an incorrect reading of it.

Q.   All right.  Well, let me ask you this:  In 2009 you examined Mr. Barrett; correct?

A.   Yes.

Q.   And you concluded that he had bipolar disorder?

A.   That's correct.

Q.   And Mr. Barrett was on federal death row at the United States penitentiary in Terre Haute, Indiana; correct?

A.   That's correct.

Q.   And he had been there since 2006 at least --

A.   That's correct.

Q.   -- correct?  And he had been incarcerated preceding that beginning in 1999; correct?

A.   That's correct.

Q.   And there was no evidence that he was on methamphetamine or any other drugs in 2009 and for the preceding years when you examined him --

A.   That's correct.

Q.   -- is that correct?

A.   That's correct.

Q.  So when you examined Mr. Barrett in 2009, concluded that he had bipolar disorder, he was free of drugs; correct?

A.  That's correct.

Q.  Now, is that significant?

A.  Of course it is.  I mean, that's -- that's another circumstance in that he had been incarcerated for a significant period of time, he was free of drugs, and he manifested symptoms that he had manifested before; mood lability, pressured speech.  He had manifested those symptoms before.  However, that doesn't speak to the point that Mr. Wilson was trying to make.  The point that Mr. Wilson was trying to make is, that differential diagnosis doesn't mean that person has to be on no drugs. That differential diagnosis means that person has to be on a drug that causes those symptoms.

Q.  All right.

A.  If the drug doesn't cause those symptoms, then that's not what the differential is really about.

Q.  All right.  And isn't it true that a high percentage of people who have bipolar disorder -- who have been diagnosed as having bipolar disorder are drug users?

A.  Sixty-five percent of people that carry the diagnosis of bipolar disorder will also meet the diagnosis of a substance abuse disorder sometime in their life.

Q.  All right.

346

A.    It's the highest -- along with PTSD, it is the highest comorbid diagnostic category.

Q.    All right.  Let me ask you about PTSD since you mentioned it.  You were asked by Mr. Wilson about Dr. LaFortune?

A.    Yes.

Q.    And I believe that was Government's Exhibit 37?

A.    Do I have that here?  Okay.  Thank you.

Q.    Do you have that?

A.    Yes, I do.

Q.    Is that Dr. LaFortune's report, Doctor?

A.    Yes, it is.

Q.    Dated July 13th, 2003?

A.    That's correct.

Q.    Okay.  Could you look at the fifth page -- the fifth and final page of that report?

A.    Yes.

Q.    Okay.  It says Lisa Sneddon or Sneddon, psychology intern next to Dr. LaFortune's name; correct?

A.    Yes.

Q.    Okay.  Do you know on who wrote this report?

A.    Ms. Sneddon, I believe.

Q.    Okay.  And did this report rule out PTSD in Mr. Barrett?

A.    It notes that it is unlikely that these events have

caused trauma leading to posttraumatic disorder -- stress disorder as Mr. Barrett endorsed few symptoms related to this disorder.  However, that first sentence notes Mr. Barrett reported several -- experiencing several stressful life events such as being beaten by police and having relatives die.  Those, which of course are the criteria A for posttraumatic stress disorder.  Although he reported these experiences as traumatic on a psychological test, he did not report these events during the clinical interview when asked about traumatic experiences in his life.  He did report difficulties with concentration.  But because he endorsed no other symptoms related to PTSD, it is likely his trouble concentrating has other causes.

Q.  All right.  Now, what kind of testing was done by Ms. Sneddon and Dr. LaFortune that went into this report?

A.  The testing was a self-report test.  Actually, the way it's described is an unpublished instrument to assess posttraumatic stress.

Q.  All right.  And what other testing was done?

A.  A personality assessment inventory and an unpublished -- it looks like a Hare Psychopathy Index.

Q.  Is PCLP unpublished?

A.  That's correct.

Q.  Okay.  And also a personality assessment inventory?

A.  That's correct.

348

Q.   Are these all self-reporting tests?

A.   They are different, yes.  They are all self-reporting. Obviously two of these are unpublished tests which haven't been subjected to any kind of norming circumstance.  The personality assessment inventory is a very well-known, well-normed psychometric test, test of personality assessment.

Q.   Okay.  Was there are a comprehensive psychological or psychiatric examination done by Dr. LaFortune and Ms. Sneddon?

A.   No, those are the only two tests that were given.  Those are the only two tests that were -- I mean, besides the personality assessment inventory.  It might be noted, however, that the personality assessment inventory is a well-normed test that found him not malingering.

Q.   Okay.  Let me ask you about what Mr. Wilson asked you about with respect to Mr. Barrett's brother, Stephen Barrett.  Do you remember that series of questions on cross-examination?

A.   Yes.

Q.   He was asking you to differentiate, or asking how you could differentiate Stephen Barrett from Kenneth Barrett?

A.   Sure.

Q.   Okay.  Does the fact that Stephen Barrett is a successful person who's a high school principal, went to

college, has a master's degree, had the same parents -- the same genetic parents, does that mean that the lack of those things in him has some kind of a qualifying effect on your diagnosis of Mr. Barrett, Kenneth Barrett?

A.   It has -- it has no type -- it has no meaning at all to the development of symptoms in Mr. Barrett.  As I said before, psychiatric disorders are heterogeneous, and they can appear in families.  We know of many, many families that are not in legal situations where one person in the family may have a significant psychiatric disorder and others may not.

Q.   All right.  Now, the way somebody is raised and the environment they grow up in could have an effect on the development of a mental disorder such as bipolar; is that accurate?

A.   Sure.

Q.   Are you aware of information from Mr. Stephen Barrett's declaration that the environment in which he was raised differed significantly from the environment in which Kenneth Barrett was raised with respect to structure, support, and things of that nature?

A.   I do -- I do recall that.  I don't recall the specifics, though, but I do recall that, yes.

Q.   All right.  Can that make a difference?

A.   Of course.  And we talked about that.

Q.    All right.  I'm sorry to skip around --

A.    That's quite all right.

Q.    -- but let me ask you about the questions Mr. Wilson put to you regarding Mr. Barrett's competency.

A.    Yes.

Q.    Okay.  And could you explain why you found that Mr. Barrett could not rationally assist his lawyers?

A.    First of all, Mr. Barrett has bipolar disorder.  A diagnosis in and of itself does not meet competency.  He also has -- and we didn't talk about this -- he has significant brain impairments.  And I said before that both of those impair his ability to weigh and deliberate effectively, to understand content -- context effectively.  And, also, to -- he has a tendency to get stuck.  And the neuropsychological testing reinforced it, reinforced that tendency to get stuck.

Q.    All right.

A.    It's very clear that Mr. Barrett has that tendency.  And that tendency was clear at the time of the offense and during the legal proceedings as well.

Q.    All right.  And related to that -- not identical, but related, you were asked a series of questions by Mr. Wilson about whether Mr. Barrett could distinguish right from wrong.  And I think the bottom line of your testimony with respect to that area of questioning was that he believes

that he was in the right, or was right -- doing right at the time Trooper Eales was shot and killed?

A. That's right.

Q. That he was defending himself and defending his son?

A. That's correct.

Q. Okay. So is that the basis of your opinion about right-wrong?

A. Yes, sir.

Q. Okay. Just going back to Dr. Bianco briefly. I think I asked you this yesterday. Does Dr. Young's declaration where she sets forth her examination of Mr. Barrett and her conclusions refer to the fact that she relied on, or looked at what Dr. Bianco had done previously?

A. Yes.

Q. Okay. The fact that Dr. Bianco did not find Mr. Barrett to be bipolar, does that have any meaning since he only did incomplete neuropsychological tests?

A. Well, actually, Mr. Autry, I think that the neuropsychological testing is only a part of it.

Q. Sure.

A. It doesn't appear as though he had the comprehensive family history or medical records that I -- that I did.

Q. Okay. And Dr. Russell's examination and her testing, was that primarily in the form of a risk assessment?

A. That's correct.

352

Q.   Okay.  But she notes symptomatology of bipolar disorder?

A.   That's correct.

Q.   And she also notes indications of head injuries and neuropsychological deficits?

A.   That's correct.

Q.   Okay.  And Dr. Sharp indicated that he found evidence of neuropsychological deficits?

A.   A learning disability -- rule out learning disability, that's correct.

Q.   All right.  You were asked about the report of hallucinations -- auditory hallucinations --

A.   Yes.

Q.   -- on the part of Mr. Barrett?

A.   Yes.

Q.   And he talked about -- what did he say exactly?  Not just hearing voices, but hearing things?

A.   Yes, as a child, that's correct.

Q.   Okay.  And does that qualify?

A.   Of course.

Q.   All right.  You also had indications in the materials you've reviewed that Mr. Barrett believed he was being surveilled by dirigibles or blimps --

A.   That's correct.

Q.   -- or things of that nature?

353

A.   That's correct.

Q.   Does that speak to some sort of paranoia or an inability to accurately perceive information?

A.   Yes.  And that's what I think was so relevant.  Because those are kinds of symptoms that one might see in methamphetamines, but not necessarily see in a bipolar disorder.  And when you look through his hospitalizations, he doesn't describe those.  In those times when he is treated with psychiatric medication, he doesn't describe those.  He's always been described as suspicious or paranoid.  But when you really differentiate what one sees, it's not like all drugs commit all kinds -- create all kinds of symptoms.  The symptoms that got Mr. Barrett consistently hospitalized were symptoms of a mood disorder and some -- and some paranoia, but mostly the kinds of symptoms that you do not see with a methamphetamine induced psychosis and mental illness.

Q.   All right.  You were asked by Mr. Wilson whether or not the fact that you examined Mr. Barrett in the setting of a maximum security federal prison while he was on death row skewed the results or led to an inaccurate finding.  Did the fact that this was in a prison environment invalidate what you were doing?

A.   It certainly did not -- it certainly did not invalidate it, but it -- it may have minimized the presentation of

symptoms that were seen in the community.

Q. Okay.

A. Certainly it would have minimized the symptoms that you would have seen, say, during the things that got him hospitalized. But it did not -- but he still presented with those personal symptoms that one could continue to see.

Q. And every other mental health professional, including Dr. Pitt, Dr. Price, Dr. Russell, Dr. Sharp, and etc., who examined Mr. Barrett examined him in a correctional setting after he was charged in this case; correct?

A. That's correct.

Q. Whether state or federal?

A. That's correct.

Q. Okay. You were asked whether or not you had ever testified for the government before?

A. Yes.

Q. And you said they'd never asked?

A. That's correct.

Q. You testified for the defense in some 80 death penalty cases?

A. Yes.

Q. Or was that -- okay. And do you know why people representing people charged with capital crimes hire you?

A. I hope it's because I'm a good clinician.

Q. All right. Have you ever had a case where you were

355

asked to examine a defendant in a case and said, look, I
can't help you?

A.   I actually only testify in about eight percent of the
cases that I'm consulted on.

Q.   Eight percent?

A.   Eight percent.

Q.   All right.  So there's 92 percent of the time you're
retained or hired by defense counsel to examine a defendant,
whether they are charged with capital murder or some other
criminal offense, okay?

A.   That's correct.

Q.   And you say, hey, man, I looked at this guy, there's
nothing wrong with him, I can't help you.  He doesn't have
major mental illness.  He doesn't have neuropsychological
deficits.  He's not bipolar, schizophrenic, whatever.
Correct?

A.   More commonly, my findings -- I may have findings, but
they feel as though they aren't helpful.

Q.   Okay.

A.   In my civil practice, I testify for both plaintiff and
defense.

Q.   All right.  So the fact that somebody hires you, or one
side hires you, that doesn't influence the way you examine
somebody, and that doesn't influence the results that you
come up with.  Would that be fair?

356

A.  I try to examine someone the same way I would in my clinical practice.

MR. AUTRY:  All right.  Could I have just a second, Your Honor?

THE COURT:  Yes.

Q.  (BY MR. AUTRY)  I forgot to ask you this, Doctor.  We were talking about head injuries with the steel ball.

A.  Yes.

Q.  You're also aware, and you discussed this yesterday, that Mr. Barrett attempted suicide in 1986 by shooting himself in the chest with a shotgun; correct?

A.  That's correct.

Q.  Can that cause a closed head injury?

A.  Oh, absolutely.

Q.  Okay.  Could you explain that?

A.  Closed head injuries are -- closed head injuries are -- what we call contrecoup injuries are injuries where the head goes forward and backwards, and the brain goes forward and backwards.  The brain sits inside the skull.  And when you have any kind of forward and backward movement, you can have that type of injury to the brain.  And that's why you separate out impairment from damage, because you can have a brain that's impaired and it not really show any physical damage at all.  You can have a brain that's impaired without having a concussion.  So that's the kind of injury that

could possibly cause that forward and backward.  We don't know what caused his injuries.  What we do know, however, is that, when we're talking about prenatal injury to the brain perhaps with alcohol, that's in the middle of the brain. That's not consistent with the frontal injury that we're talking about.

Q.  And that's consistent with the history that's been reported, that Mr. Barrett's mother drank while she was pregnant?

A.  That's correct.

Q.  Bottom line is Dr. Young found that he had neuro -- significant neuropsychological deficits; correct?

A.  Yes.

Q.  Can you fake that?

A.  You can try to fake it.  But what we see with Dr. Young's testing is, again, Mr. Barrett did very well in certain areas.  But the test that tested these particular areas are the tests where he did not do well.  The test where -- the test where you look at his academics, for example, Mr. Barrett, regardless of his grades, has not been able to pass the GED.  He has taken the GED in the past. He's taken the GED on several occasions.  So we see in that area of the brain, the temporal lobe and the frontal lobe, those specific areas, the test that test those specific areas are consistent.  Testing other areas show that he does

very well.  You would have to be a Ph.D. in neuroanatomy and a Ph.D. in test construction in order to just isolate those areas as being the only ones that are injured.

Q.  All right.  And you, Dr. Young, Dr. Pitt, everybody who's looked at Mr. Barrett since this case began back in 1999, would it be correct to say, found that, on any testing that they did, that he was not malingering?

A.  That's correct.

Q.  All right.  Does the fact that Mr. Barrett made decent grades in some subjects and some classes over his educational career rule out learning disability or neurological damage?

A.  Obviously it doesn't.  He was -- it was captured that he was learning disabled in school in certainly that one particular class.  We don't know what those grades mean.  We do know what his academic testing that Dr. Young did.  We do know what his neuropsychological testing that he -- that Dr. Young did.  We do know that Dr. Sharp even described him as being learning disabled and recommended the type of testing that Dr. Young did to further clarify what his -- what his impairments were.

MR. AUTRY:  Okay.  Thank you, Doctor.  Thank you.  No further questions.

THE COURT:  Mr. Wilson, I don't want to replow any old ground.

359

MR. WILSON:  Absolutely, Judge.

THE COURT:  And I want to confine it anything that may have been raised on redirect.

MR. WILSON:  Absolutely.

THE COURT:  Very well.

RECROSS-EXAMINATION

BY MR. WILSON:

Q.  Dr. Woods, counsel was asking you about the question that I posed to you about -- and I believe my question was, isn't it true that no final diagnosis or discharge diagnosis that had been given to Mr. Barrett was for bipolar?

A.  I don't think that was your question, sir.  Is that your question now?

Q.  And I apologize if -- that is my question now.

A.  Okay.  I'm not clear in terms of the final diagnosis for 1995.  But, otherwise, I believe it was organic affective disorder was the diagnosis.

Q.  So, and the point I'm making is, the document which counsel brought to your attention, Government's Exhibit Number 9, that was a provisional diagnosis when the person first appeared at the facility; isn't that correct?

A.  Yes.

Q.  And then after -- and that took place in January the 20th of 1995; correct?

A.  Yes.

360

Q.   Does that sound about right?

A.   That's correct.

Q.   And you'll agree with me that was at Bill Willis

Community Hospital; correct?

A.   That's correct.

Q.   Mental Health Center?

A.   Yes.

Q.   And that particular hospitalization, was it -- there was

a discharge on February the 13th of 1995?

A.   Yes.

Q.   And at the discharge, the summary at the time of the

discharge, the final discharge diagnosis was not bipolar;

correct?

A.   I don't recall.

MR. WILSON:  May I approach, Judge?

THE COURT:  Yes.

A.   Oh, that's correct.  Yes.  Organic affective disorder,

yes.

Q.   (BY MR. WILSON)  And so the final diagnosis, organic

affective disorder, polysubstance abuse, marital conflict --

A.   Yes.

Q.   -- correct?  And so I apologize if I was misleading.  I

didn't intend to be.

A.   Oh, no, no.  I'm sure.  I understand.

Q.   So you would agree with me that there have been no

361

final, at the time of someone's discharge from a facility, of a diagnosis of bipolar?  Not in -- you would agree with me, not in 1986; correct?

A.  Right.  Well, let me -- let me just -- the reason I'm just thinking about an organic affective disorder -- and you may want to look at this in 1995 -- really subsumes a mood disorder.  What they really capture there, it's an excellent diagnosis, because what they are saying is, this person has an organic brain problem and they have a mood disorder.  So the question of whether it's bipolar or not is very, very -- it's still up in the air.  It's not like they moved away from bipolar disorder.  What they actually did was they're saying, look, this person has a mood disorder and there's something wrong with their brain.  So it's, in fact, more accurate diagnosis than even bipolar.

Q.  All right.  Thank you.  In reference to the questions that counsel was asking you about the evaluation done by Dr. Sharp?

A.  Yes.

Q.  The report of Dr. Sharp, his diagnosis was, is that substance abuse was in remission --

A.  Yes.

Q.  -- is that correct?

A.  Correct.

Q.  However, that would be inconsistent with the defendant's

362

reporting to Dr. Pitt that the fact that he was, in fact, still using illegal substances at the time?

A.   Once again, that's correct.

Q.   And in reference to counsel's asking you questions about no medical reports regarding the steel ball incident?

A.   Yes.

Q.   Okay.  There's no -- there were no MRIs done, correct, to your knowledge of the brain?

A.   I'm trying -- I'm trying -- if he were eight years old, the MRIs weren't developed until 1978, so there probably would not have been any MRIs done.

Q.   Got me there.  Thank you.  No MRI done in 2009?

A.   That's correct.

Q.   No CT scan done in 2009?

A.   That's correct.

Q.   No CT scan done, to your knowledge, in this case; correct?

A.   And shouldn't have been.

Q.   Okay.  I appreciate that.  My question:  There was not one done?

A.   That's correct.

Q.   Now, you were asked about the section from the DSM-IV-TR and the DSM-5 that I talked with you about --

A.   Yes.

Q.   -- about differential diagnosis?

363

A.   Yes, sir.

Q.   And the particular section we were looking at was under substance induced bipolar; correct?

A.   Yes.

Q.   But is it not still true that, when you're going to make a diagnosis of a mood disorder, specifically bipolar --

A.   Yes.

Q.   -- that you need to consider the substance -- or the use of other substances; correct?

A.   The use of other substances specific to the presentation of symptoms, yes.

Q.   Okay.  What other substances, based upon your expertise, would manifest themselves in behaviors consistent with bipolar?

A.   Primarily antidepressants, steroids, inhalers.  There are certain oncological drugs, heavy drugs that could do that.  Occasionally PCP might do that.  But not amphetamine based.  In fact --

Q.   What about cocaine?

A.   Not really.  See -- and, see, because when you look at the biological -- biochemical structure of drugs like cocaine and methamphetamines, what you get is the paranoia, and you might get the psychosis, but you don't get the mood lability.  You don't get the rapid -- you don't get the mood swings.  You don't get the pressured speech.

Q.   And the mood swings --

A.   Yes.

Q.   -- you would agree with me that, during your evaluation in 2009 and in 2017, Mr. Barrett wasn't exhibiting mood swings; correct?

A.   At that time?

Q.   That's correct.

A.   Yeah, I would agree with that.

Q.   Your diagnosis was -- on your personal evaluation was based upon pressured speech; correct?

A.   And flight of ideas.

Q.   Flight of ideas.

A.   And grandiosity.  And -- oh, okay.  You're just talking about at 2009 and 2017?

Q.   That's correct.

A.   Okay.

Q.   In addition to the drugs you've talked about, mushrooms, would that --

A.   No.

Q.   Okay.  Just asking.  Thank you.

A.   I understand.  But absolutely not.

Q.   Because Mr. Barrett reports basically a litany of different substances he was taking; correct?

A.   Yes, that's correct.

Q.   What all substances did he say he was taking?

A.   Well, he certainly talked about Xanax and other types of barbiturates.  Toluene.  He's talked about, at one time or another, taking -- drinking, but he said he didn't really -- he kind of stopped drinking.  Talked about cannabis.  Talked about cocaine.  I don't recall heroin.  But as you said, he talked about the psychedelics.

Q.   And none of those, according to your testimony, would manifest themselves in characteristics of mood swings?

A.   Absolutely not.

Q.   Okay.  How about pressured speech?

A.   Not -- rapid speech, yes.  Pressured speech, no. Pressured speech -- pressured speech, flight of ideas, mood lability are terms of art that one really looks at when you think about bipolar disorder.  There are drugs that certainly can cause paranoia.  In fact, amphetamines were the chemical equivalent of schizophrenia for many years starting about 1956.  So certainly there are drugs that can create those.  Even in his hospitalization, we didn't find any of those other drugs.  You know, we found the methamphetamines on urine but not in blood.  Found primarily cannabis.  Cannabis is not one that would create those kinds of symptoms, and methamphetamine certainly would not, either.

Q.   And you said cocaine wouldn't do it?

A.   That's correct.  Cocaine would be very similar to

methamphetamine.

Q. Xanax wouldn't do it?

A. Xanax is a downer. It would be just the opposite.

Q. All right. Now, counsel asked you about your report finding that the defendant was unable to rationally assist your -- his attorneys, and I believe you said it's because he was getting stuck?

A. Yes.

Q. Having problem getting stuck?

A. Yes.

Q. A person that can discuss with his counsel the difference between murder and manslaughter, would that that be someone that cannot rationally assist their attorney?

A. It could well be, because what you're -- what you're describing is really looking at one of the prongs, which is do they understand the nature and consequences of their action, do they understand what they are being charged with, you know what I mean? So perhaps.

Q. Okay. I believe counsel asked you about your finding that the defendant didn't know the difference between right and wrong?

A. Right.

Q. I believe that's what your report said, he didn't know the difference between right and wrong?

A. Understand.

Q.   Didn't understand the difference between right and wrong.   But you agree with me that, when the defendant was discussing that particular set of questions with Dr. Pitt, that Dr. Pitt asked him, do you understand it was wrong to shoot a trooper?

A.   Yes.

Q.   And he said what?

A.   Yes.

Q.   He understood it was wrong?

A.   That's correct.

Q.   He understood it in wrong to sell or to manufacture methamphetamine; correct?

A.   Absolutely.

Q.   And you agree with me, at the time of this particular -- and I don't want to make light of the facts of the particular event -- but Mr. Barrett didn't throw a pizza at the troopers?

A.   No.

Q.   He didn't shoot him with a cap gun?

A.   No.

Q.   He didn't display psychotic behavior at the time of the event?

A.   That's an interesting question.   You said psychotic behavior as opposed to psychotic thinking.   Certainly his behavior was -- I'm not sure what you mean by psychotic

behavior.

Q.  Okay.  And I guess I go back to he didn't throw a pizza at them?

A.  Oh.  No.

Q.  As a matter of fact, he had secured the gate to his property; correct?

A.  Prior, yes.

Q.  And posted signs to stay away from his property; correct?

A.  I believe that was the -- was a term -- I never saw the signs or never saw -- but I -- I do know that it was said that he had -- he had either told people or posted signs.

Q.  And that he fired multiple rounds into vehicles approaching his house; correct?

A.  Yes.

Q.  Counsel asked you about the times when you did not testify for the government.  You're not testifying today that 92 --

A.  I've never testified for the government.  I've never been asked to testify for the government.

Q.  Okay.  Thank you.  You're not saying that 92 percent of the time you tell defendants that I can't help you, are you?

A.  What I'm saying is that I testify in eight percent of the cases that I'm asked to consult on.  Now, that doesn't

369

mean that every case I do a complete, thorough comprehensive examination, because often I don't have to do that.

Q. And, again, what I'm saying is 92 -- you're not saying that 92 percent of the time you find that, when the defense calls you, that you're saying, I'm sorry, I can't help you?

A. I don't have to.

Q. You're not saying that?

A. I don't have to. I can often look at the records and tell that there's nothing I can do to help.

MR. WILSON: Okay. That's all I have.

THE WITNESS: Thank you.

THE COURT: Anything further from Dr. Woods?

MR. AUTRY: Could I ask one question, Your Honor?

THE COURT: Yes.

MR. AUTRY: And I promise, just one.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q. Doctor, is a neuropsychological battery of tests more sensitive than like an MRI or these scans and showing what the effects of neurological deficits on behavior are?

A. According to the American Academy of Neurology, neuropsychological testing is the gold standard of brain function.

MR. AUTRY: All right. Thank you, sir.

370

THE COURT:  Dr. Woods, you can step down.  Thank you, sir.

THE WITNESS:  Thank you very much.

THE COURT:  Let's go ahead and break for lunch. Come back at 1:00 o'clock.

*(Off the record at 12:11 p.m.)*

*(Back on the record at 1:20 p.m.)*

THE COURT:  Okay.  Before we move on to the next witness, I'd like to take up the government's motion to compel just filed and just referred to me by Judge Payne.

My understanding, if my understanding is correct, the basis of your motion is you received some documents yesterday that were represented to have been given to Mr. Gordon by Mr. Autry, and those are documents that you feel like should have been already produced and haven't been, and so you want to know if there's any more.

MR. KAHAN:  That is the long and short of it I'm afraid.  Yeah, obviously we're, generally speaking, unaware of what's in trial counsel's file.  And we believed, until yesterday, that we had seen clients.  Now, if there was some other source for those documents or if we just failed to find them in 8,000 pages, we would understand that as well. But we'd like a little direction here.

THE COURT:  Mr. Autry.

MR. AUTRY:  Yes, Your Honor --

371

THE COURT:  The records that got produced yesterday came from your file; is that correct?

MR. AUTRY:  They came from a defense file from the state case is where they came from.  I mean, we did not obviously generate it because it was reports from Ms. Schaye back in 2000, 2001.

THE COURT:  And it's your position that none of that is responsive to the discovery order that was entered in this case?

MR. AUTRY:  Your Honor, we turned over everything that we had that was in trial counsel's file.  We also turned over what was in a file -- an investigative file that was kept at OIDS that Mr. Hilfiger and Mr. Smith never picked up.  I picked that up in 2008.  So back when I was getting ready for this hearing, I asked the people at the Eastern District of California to send me all the Roseann Schaye reports.  I forwarded those to Mr. Gordon so he could refresh his recollection.  I mean, I'm happy to give them -- we're happy to give them everything, and we certainly weren't holding anything back.  But there's a lot of documents in this case, and there's been, I guess, some small degree of confusion.  But I apologize if they didn't get all of her reports earlier, but we can certainly produce those.

We do object to the motion.  Beyond that, we

372

object to the motion.  They raised this issue yesterday when Mr. Gordon was on the stand asking that we be compelled to do -- to turn things over.  The Court denied it.  So we re-urge that objection.  I don't know if you want us to file a written response to their motion, which we can certainly do.

THE COURT:  I don't need --

MR. AUTRY:  And I think we've been in compliance with discovery.

THE COURT:  Well, the thing you just told me you're willing to produce, I want you to produce.

MR. AUTRY:  Okay.

THE COURT:  Okay.  Now, with regard to Gordon's file.

MR. AUTRY:  That we do object to.

THE COURT:  Okay.  And tell me again why you object.

MR. AUTRY:  Because there's an attorney/client privilege that still exists between Mr. Barrett and Mr. Gordon.  There's attorney work product privilege that pertains to Mr. Gordon.  I have not gotten Mr. Gordon's file.  We have not got Mr. Gordon's file.  He thinks it's in storage somewhere.  But we don't see the necessity for turning it over based on those two grounds of privilege.

THE COURT:  Well, trial counsel is being

criticized for not doing as good a mitigation investigation as Mr. Gordon did, no?

MR. AUTRY:  Well, that's -- that's --

THE COURT:  I mean, he showed up here yesterday criticizing them for not doing as good a job as he did.

MR. AUTRY:  Well, they're being criticized for not getting the state file -- the state investigative file following the leads that were developed in the state case, even though the state mitigation investigation was incomplete.

THE COURT:  Well, in which case, why don't they have a right to look at that?

MR. AUTRY:  Well, Your Honor, we'll stand on our objection and let the Court rule.

THE COURT:  What's it -- what's it going to take to get those files from Mr. Gordon?  Do you all have the ability to make him do that, or is it going to take a subpoena?

MR. AUTRY:  I can call him, see what the deal is.

THE COURT:  Okay.

MR. AUTRY:  I don't know whether he's going to want a subpoena or not.  They are his files, and I feel a little uncomfortable speaking on his behalf --

THE COURT:  I understand.

MR. AUTRY:  -- with respect to that.

THE COURT:  I understand.  Well, I'm going to grant -- I'm going to grant the motion.  I want you to see if we can get him to do it cooperatively.  And if he won't, then we'll just have to do it with a subpoena, I mean, because he is a third party.  He's not party to this lawsuit.

MR. AUTRY:  Right.

MS. FISHER:  Your Honor, I wonder if I might be heard just for a moment?  Our -- part of our objection goes to Judge Payne's order was not an order of production of the trial counsel files.  It was an order that, once it's produced to us, and that's -- you know, we'll try to get Mr. Gordon's file.

THE COURT:  I don't think Mr. Gordon's file was covered by the discovery order in this case.  I mean, he's a third party, and so I'm not faulting you all for that.  But having found out we've got some files here that are relevant to the testimony we heard yesterday, I think they do have a right to have them.

MS. FISHER:  Well, Judge, the problem is we don't know what's in the file and not every document in trial counsel's files is discoverable.

THE COURT:  But you're criticizing -- you're criticizing the trial counsel in this case for not getting those from him, so we need to know what they missed by not

getting them, no?

MS. FISHER: No, Your Honor.

THE COURT: Why not?

MS. FISHER: Because constitutionally, the only -- there's a limit on the discoverability of defense counsel's files because they are, by nature, privileged. So we have weighed only to the extent of the penalty phase. We don't know what's in Mr. Gordon's file. What I'm asking, or we're asking is to be able -- we'll attempt to produce that file to us. We will then indicate to the Court whether or not there are discoverable documents. Certainly we will turn over any discoverable documents that relate to penalty phase, but we can't turn over the file carte blanche because there could be all sorts of communications in there that are not covered by the allegations made.

THE COURT: If -- if before this case got tried in federal court Mr. Hilfiger Mr. Smith had asked for those files, they would have turned them over, no?

MS. FISHER: They would turn them over to Mr. Hilfiger just as I'm sure Mr. Gordon will turn them over to us.

THE COURT: All right.

MS. FISHER: But then, following that, when we got Mr. Hilfiger's files on an allegation of ineffective assistance of counsel, we would not turn over those files

376

without having first pulled out those documents that remain constitutionally protected under the attorney/client privilege.

THE COURT:  Well, they are not constitutionally protected.

MS. FISHER:  They are, Your Honor.

THE COURT:  Privilege is a matter of statute, it's not a matter of constitutional law.

MS. FISHER:  Well, the Sixth Amendment protects those files, Your Honor.

THE COURT:  Not under the circumstances of this case as I understand it.

MS. FISHER:  Your Honor, a waiver and an ineffective assistance of counsel claim is limited to the claim, it's not a carte blanche opening of all of the communications between counsel and his client or her client.

So it's -- I mean, I'm not -- you know, I agree we should -- you know, that Mr. Gordon should produce his files if there are documents, and it sounded from the testimony that there are indeed documents that relate to penalty phase preparation.

THE COURT:  All right.  All right.  If you want to do it that way, this is how we're going to do it.  You guys are going to get that stuff forthwith.  You're going to look through it.  You're going to produce what you think is

produceable, and you're going to prepare a detailed privilege log as to everything else. That's how you do that sort of thing. And a privilege log is going to have to be, according to our rules, detailed enough so that we can evaluate your claim of privilege with whatever you don't produce. Now, that's a lot of work, isn't it?

MS. FISHER: It's a lot of work, Your Honor, but it's worth protecting the defendant's rights.

THE COURT: Okay. Well, that's how we're going to do it then. Motion is granted to the extent we discussed here. We have any idea how long any of this will take?

MS. FISHER: We'll try to contact Mr. Gordon right now.

THE COURT: If nothing else, I guess it will be in time for the government to have looked at everything before we come back together in June at least, right?

MS. FISHER: That's correct, yes.

THE COURT: Okay. Very good.

MR. SCHARDL: May I address one other matter, Your Honor?

THE COURT: Yes.

MR. SCHARDL: I just wanted -- during the examination of Dr. Woods, there was a question about files he obtained from Dr. Bianco. I just wanted to state for the record, the Court asked for those -- or counsel asked for

those, and I gave them to him.

THE COURT: Okay. Great.

MR. WILSON: That is correct, Your Honor.

THE COURT: Great. One other thing just as long as we're talking about this. The stuff that was produced yesterday by Mr. Gordon that you all provided to him, those weren't things that have been previously provided to the government?

MR. AUTRY: I was under the understanding that they had all these Roseann Schaye reports.

THE COURT: Oh, okay.

MR. AUTRY: There were a couple that I think Mr. Wilson said they did not have or did not recognize. I've got them all right here in this notebook.

THE COURT: If you can figure that out by referring them to a Bates document that you've already produced, then you don't have to produce it again obviously. But talking about things that haven't been previously produced, you'll need to produce them I guess.

MR. AUTRY: Okay. My copies here are not Bates stamped. I'll try to find out if any are Bates stamped. And I've got all of her reports right here.

THE COURT: Okay.

MR. AUTRY: And they're welcome to them.

THE COURT: Good. Plaintiffs, call your next

witness.

MR. AUTRY:  Steve Leedy.

THE CLERK:  Sir, if you'll raise your right hand.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  I do.

THE CLERK:  Be seated.

STEVE LEEDY,

being first duly sworn to testify the truth, the whole

truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. AUTRY:

Q.  State your name for the Court, please, sir.

A.  It's Steve Leedy.

Q.  Where do you live?

A.  Tulsa.

Q.  What do you do for a living?

A.  An investigator for the Indigent Defense System.

Q.  Is that Oklahoma Indigent Defense System?

A.  Yes.

Q.  Where is your office located?

A.  Sapulpa.

Q.  And how long have you worked as an investigator for the

Indigent Defense System?

A.  About 25 years.

Q.  All right.  Now, do you know Kenneth Barrett?

380

A.  I do.

Q.  How do you know him?

A.  We represented him in a case early 2000.

Q.  All right.  And what was your assigned role in Mr. Barrett's state case?

A.  It was investigation.  It varied from first stage to second stage matters depending on what happened.  I collected the information for Mr. Echols if he needed.

Q.  All right.  And did you maintain an investigative file?

A.  We kept a file at the office, and that would be the one that we had.

Q.  All right.  Now, what kind of materials would that file contain?

A.  The best of my recollection, it would be memorandums and items like that.

Q.  All right.  Would there be reports of investigation such as you did or you conducted?

A.  There should be, yes.

Q.  All right.  Would there be reports of investigation going to potential mitigating witnesses or mitigating evidence?

A.  I -- there should be, yes.

Q.  All right.  Do you remember executing a declaration, Mr. Leedy, back in 2009 -- March 12th of 2009?

A.  Not until you came -- called me about a month ago --

Q.  All right.

A.  -- and said, remember this, and I --

Q.  All right.  Have you reviewed that in preparation for your testimony?

A.  I looked over it the day we were with -- together.

Q.  Okay.  Could you hand Mr. Leedy -- it would be Petitioner's Exhibit 39.  Do you have that in front of you, sir?

A.  Yes.

Q.  Okay.  Could you read to yourself the first paragraph.

A.  Okay.  That's the first paragraph.

Q.  Yes, sir.  Could you go to Page 2 and read the, I guess, the first paragraph of Page 2?

A.  To myself or out loud?

Q.  Yes, sir.

A.  Okay.

Q.  All right.  Can you describe briefly to the Court what the investigative file that you had at OIDS contained in Mr. Barrett's case?

A.  The file at that time consisted of -- based on my -- my note here, that it had like Roseann Schaye, she did mitigation work, myself and another investigator doing information -- collecting information on the case, as well as some historical things like Bill Willis Mental Health I believe it referred to.  Or, I'm sorry, Willis Community

Health Center.  And so it was hospital records -- some hospital records, things like that.

Q.  All right.  And where was that file maintained?

A.  It was maintained somewhere at our office.  I didn't -- I don't remember -- or I don't recall maintaining the file after we finished with -- when I finished the state case, it may have gone into storage somewhere or something.

Q.  All right.  Okay.  Now, were you aware that Mr. Barrett, after his state case was concluded, was charged in federal court?

A.  That was brought to my attention.

Q.  Okay.  Do you know who initially represented him as lead counsel in federal court?

A.  John Echols.

Q.  Did you become aware at some time that Mr. Echols withdrew from the representation of Mr. Barrett in his federal case?

A.  I had heard that, yes.

Q.  Did you become aware of who was then made first chair counsel for Mr. Barrett in the federal case?

A.  Mr. Hilfiger.

Q.  All right.  Do you know Mr. Hilfiger?

A.  It's been many years since I've seen him.

Q.  Okay.  Did you ever become aware that a lawyer here in Muskogee named Bret Smith was appointed to represent Mr.

Barrett as second chair to Mr. Hilfiger after Mr. Echols was allowed to withdraw?

A.  I don't remember that.

Q.  Okay.  Well, let me ask you this, Mr. Leedy:  Did either Mr. Hilfiger or Mr. Smith ever contact you, while they represented Mr. Barrett in the federal case, to acquire any materials or any files you had in the case?

A.  As stated in this, I -- I don't recall being contacted by them.

Q.  All right.  Were you ever contacted by me?

A.  Yes.

Q.  Okay.  And that would be back in 2008?

A.  Or whenever this was done.

Q.  Do you recall that, back in 2008, I went to your office in Sapulpa and retrieved the investigative file, the contents of which you described earlier?

A.  And as I explained to you before, I -- when we met four -- three, four weeks ago, I had asked you what become of that file --

Q.  Right.

A.  -- and you explained to me that I had given it to you. I had totally forgot that I had given it to you.

Q.  Well, does your declaration that you signed back in 2009 reflect that in 2008 -- well, it says this file was retrieved in, I believe, 2008 by David Autry, one of Mr.

Barrett's current lawyers.  Is that accurate?

A.  Yes.

Q.  Okay.  But the only person you ever gave the file to after the state case was over would have been me, not Mr. Hilfiger, not Mr. Smith?

A.  Yes.

Q.  You have no recollection of ever being contacted by either Mr. Hilfiger or Mr. Smith?

A.  No.

        MR. AUTRY:  Okay.  Thank you, sir.

        THE COURT:  Cross-examination, Mr. Wilson.

        MR. WILSON:  May I proceed?

        THE COURT:  Yes.

        MR. WILSON:  Thank you.

                    CROSS-EXAMINATION

BY MR. WILSON:

Q.  Good afternoon, Mr. Leedy.  My name is Chris Wilson. How are you?

A.  Fine, thank you.

Q.  Mr. Leedy, I understand that you -- are you currently employed with OIDS?

A.  Yes.

Q.  Is that correct?

A.  Yes.

Q.  And I'm sorry, I'm having a hard time hearing you.

385

A.   Yes.

Q.   Very good.  Thank you.  And, Mr. Leedy, it's my understanding that, prior to your work with OIDS, you were a police officer; is that correct?

A.   I was a deputy.

Q.   A deputy?

A.   Uh-huh.

Q.   Okay.  And where was that?

A.   In Tulsa County.

Q.   Okay.  And you've been working for OIDS and -- excuse me -- were working with OIDS back in 1999, 2000 range; is that right?

A.   Yes.

Q.   And specifically at the time that Mr. Echols was representing the defendant, Kenneth Barrett, in two state trials; is that right?

A.   Yes.

Q.   And I believe you testified a moment ago that, as part of your duties with OIDS, you were tasked to perform certain roles of investigation to assist Mr. Echols; is that correct?

A.   Yes.

Q.   Isn't it true that, at that time, Mr. Echols was not employed by OIDS; right?

A.   At -- yes.  I just don't know the mechanics of when he

**United States District Court**

wasn't an employee and things like that.

Q.  But he was representing the defendant on an indigent contract; correct?

A.  As far as I know.  I -- I don't have any information about the contracts or anything.

Q.  And there's no issue about the fact that you were allowed to work with him to assist him; correct?

A.  As far as I know, there wasn't.

Q.  Very good.  And I believe you testified that, as part of your duties, you collected information for both the guilt phase, but also the punishment phase in the state trials; correct?

A.  Yes, sir.

Q.  And you agree with me, isn't it true that there were actually two state trials?

A.  Yes, sir.

Q.  And that your role was involving both the first trial and the second trial; correct?

A.  Yes, sir.

Q.  And it's my understanding that, part of your duties, you came to know a person by the name of Roseann Schaye; isn't that correct?

A.  I had had conversations with her on the phone.

Q.  And was that while she was working for Mr. Echols as well?

A.    It's my understanding that they had some kind of problem, and I don't know what the specifics of it were.

Q.    Okay.  So --

A.    And so -- I'm sorry.  Go ahead.

Q.    That's all right.  So it's my understanding then that that your involvement with Ms. Schaye was after her separation from the defense team; correct?

A.    I believe so.

Q.    All right.  And it's my understanding that that separation took place before the first state trial; correct?

A.    That's my recollection.

Q.    And you were tasked with contacting her to get the information that she had generated herself; isn't that correct?

        MR. AUTRY:  Your Honor, just for the record, I want to enter an objection to this line of cross-examination being beyond the scope of direct.

        THE COURT:  Overruled.  Go ahead.

Q.    (BY MR. WILSON)  Do you remember the question?

A.    No.  Please repeat.

Q.    That's fine.  I'll try to repeat it.  Isn't it true that you were asked by Mr. Echols to contact Ms. Schaye to obtain the information that she had accumulated as part of her mitigation investigation?

A.    It's either I did or Mr. Echols did.  I just don't remember if I specifically -- I may have.  I may have.  I just don't -- I don't specifically remember making the call.

Q.    Do you recall receiving a fax from Ms. Schaye indicating about this conversation that you had had with her?

A.    If -- if there is a fax, I don't recall it.

Q.    And would looking at a letter -- a fax letter, would that help refresh your memory?

A.    Probably.

          MR. WILSON:  Your Honor, I'm going to be providing a document to the witness.  It's from Government's Exhibit Number 43, and I'd ask if the witness can look at Government's Exhibit Number 43, please.

Q.    (BY MR. WILSON)  Mr. Leedy, if you'll look at Tab Number 43, and then flip over to what -- there's some numbers circled in the bottom right-hand corner, the number, Page Number 6.

A.    Okay.

Q.    And do you see that, sir?

A.    Yes, sir.

Q.    And you'd agree with me that there's an indication at the top of the page that this particular letter had been faxed; is that correct?

A.    Yes.

MR. AUTRY:  Your Honor, I'm going to object to this.  This is a letter, I guess, from Ms. Schaye to Mr. Echols.  It's not anything that was authored by or sent to Mr. Leedy.

MR. WILSON:  Page 6, counsel.

MR. AUTRY:  Oh, Page 6.  Okay.  Thank you.  I'm sorry, I was looking at the wrong page.  I apologize.

MR. WILSON:  May I proceed, Judge?

THE COURT:  Yes.

Q.  (BY MR. WILSON)  Looking at Page 6, this is a letter that was addressed to Steve Leedy; is that correct?

A.  Yes.  It is.

Q.  And it has indication that it was faxed.  And are you familiar with the numbers at the top of that page?

A.  I'm looking for an Oklahoma fax number, and I don't see that it's just a 420 number, which, apparently, is the same as the bottom of the page there from Ms. Schaye.

Q.  Okay.  But do you recall receiving this fax letter?

A.  Independent recollection, no.

Q.  Okay.

A.  But I -- it's the best I can do.  I can't --

Q.  I appreciate that.  But would you agree with me, sir, that as a result of some communication you had with Ms. Schaye, you actually received some documents from her; isn't that correct?

A.   Yes.

Q.   And, Mr. Leedy, can you tell the Court what documents that you received from the investigator, Roseann Schaye?

A.   Because she's a mitigation investigator, I'm going to assume it had everything to do with mitigation investigation that she conducted.

Q.   When you were looking down at something, are you looking at your declaration?

A.   No, sir.  I was looking at your Page 6.

Q.   Okay.  Well, if you'll flip over to Page 7 for me, please.  Okay.  This appears to be a fax transmission sheet from you; correct?

A.   Yeah, it's going to be from me.  I didn't write it, but it's from me.

Q.   Okay.  And it's to John Echols; correct?

A.   Right.  Correct.

Q.   And what was the purpose of this fax transmission?

A.   Received this letter from Ms. Schaye today, copies to Nina, or I'm not sure what that -- I can't read that writing.  Anyway, to our -- to us.  Please call her. Okay.

Q.   Okay.  Do you have any independent recollection of that fax?

A.   Sorry, I don't.

Q.   That's fine.  It's been a number of years ago.  Would

you agree with me that this appears to be faxing over to Mr. Echols the letter that you received from Roseann Schaye?

A.   It appears that way.

Q.   Now, I know you testified a moment ago that you're not for certain the documents that you received, but likely they were mitigation related; correct?

A.   Yes.

Q.   Did you assist -- and I think I know the answer to this. But did you assist Ms. Schaye in any of the investigation that she did on her own?

A.   No.

Q.   Okay.  You didn't go with her or anything like that?

A.   No.

Q.   Didn't set up any of the interviews?

A.   Don't recall doing that, either.

Q.   Okay.  But as part of this mitigation information, I believe you testified that it would likely be interview summaries; is that correct?

A.   I would think it would be -- I would think it would be interview summaries and either documentation from facilities, hospitals, schools maybe.

Q.   Okay.  Now, you specifically put in your declaration Eastern State Hospital, Bill Willis Community Health Center, the Wagoner Community Hospital.  You specifically itemize those; is that correct?

A.   That is correct.

Q.   And how is it that you were able to itemize those at the time you created this declaration?

A.   The only thing I can think of is that it was something that we had generated ourselves, not through Ms. Schaye.

Q.   Okay.

A.   I -- that's the only thing I can think of, just as kind of --

Q.   Let me ask you this:  Do you know why Mr. -- or how Mr. Autry knew to call you?  Did you have any discussion with him?

A.   If I -- if he did, I don't remember -- I don't remember why he contacted me back in 2008, '9.

Q.   Well, at the time that he contacted you, did you create an inventory of the investigative file?

A.   If I did, I don't know where it's at.  I -- I just -- I think he asked the same question, do you have a copy of what was taken or given or anything like that, and I don't recall generating one.  I'm not saying -- I just don't recall.

Q.   Have you had an opportunity to look?

A.   I wouldn't even know where to look.

Q.   So to your knowledge, there is no inventory?

A.   To my -- yes, to my knowledge, I can't say that there is.

Q.   Now, are you saying, Mr. Leedy, that the information in

your investigative file at Sapulpa was never given over to
Mr. Echols?

A.   No.   I think he should have it.

Q.   He should have everything in that file, shouldn't he?

A.   I would think so.

Q.   You provided everything you received from Roseann
Schaye; correct?

A.   Yes.

Q.   You provided him copies of all the interviews, summaries
that you performed; correct?

A.   Yes.

Q.   You provided him all the copies of all the medical
records that you accumulated; correct?

A.   It was -- yes.

Q.   And did you have an occasion to also consult with
Geoffrey Standing Bear during the first trial?

A.   Yes.   Yes.

Q.   Provided him documents, too; correct?

A.   I'm not sure if he relied on documents from Mr. Echols
or -- I just don't know.

Q.   You don't know whether you provided him documents or
not?

A.   Right.

Q.   You agree that Mr. Standing Bear was on the first
trial?

A.   Yes.

Q.   And that Mr. Gordon, Jack Gordon was the second stage attorney for the second trial; correct?

A.   Yes.

Q.   And did you provide Mr. Gordon documents?

A.   Again, if I did --

Q.   Don't know?

A.   -- I don't recall.  And I apologize.

Q.   You don't need to apologize.  You could have or maybe you didn't --

A.   I just can't --

Q.   -- fair enough?

A.   I don't recall.

Q.   Were you going to testify in the second stage, if there would have been a second stage of the second state trial?

A.   I have no knowledge that that was a plan.

Q.   And I'm going to tell you up front this may be an exercise in futility, but I'm going to go through some documents with you, okay?

A.   Okay.

Q.   We're going to start with that notebook that you're looking at.  I'm going to start with Tab Number 3.

A.   Is it a copy of a copy of something?

Q.   Looks like it to me.  Looks like a voluntary statement attached to a peace officer's affidavit.  Do you see that?

A.    Yes.

Q.    Do you recognize that document?

A.    Not from outside -- I don't -- I don't recognize it from anywhere else.

Q.    Do you recognize it as part of this investigation?  Have you ever seen it?

A.    Sir, I wish I could recall, I really do.  I just don't recall if it is or not.

Q.    Let's go to Tab Number 4.  This appears to be part of some medical records from Eastern State Hospital in Vinita from October the 8th of 1986.  Do you see that?

A.    Yes, sir.

Q.    Do you recognize that being any of the documents that you obtained that were in your investigative file?

A.    I don't recognize the documents.  I don't remember them. I'm sorry.

Q.    How about Tab Number 5?  Also from Eastern State Hospital in Vinita, same date, October 8th of -- excuse me -- of 1986.  Recognize that document?

A.    Not independently, no.

Q.    But you did receive documents from Eastern State Hospital?

A.    That's the best I can tell you is that, based on that -- what I read from Ms. Schaye and from the affidavit that I -- that obviously there was something from Eastern State.  I

just don't know specific what it was.

Q. All right. Once again, quickly, Tab Number 6. A discharge summary from Eastern State Hospital, October of 1986, two page document. Do you recognize that as being the records -- any of the records that you obtained?

A. Again, I cannot.

Q. Tab Number 7. And I will say that this is a rather lengthy exhibit. It's 35 pages in length. But it is a number of records from Saint Francis Hospital from 1999, the date of the -- Mr. Barrett's hospitalization after the shooting incident. Are you familiar with these particular records?

A. No. I'm not sure how we obtained them if -- I don't recall. I'm sure it was through a release or something. I'm not sure. But I don't recognize them independently, no.

Q. Tab Number 8, two page document. Actually, three page document. This being from -- the first two pages being from the Wagoner Community Hospital. Do you see that?

A. Yes.

Q. Do you recognize those as being documents that you received as part of your investigation?

A. No.

Q. But as part of your declaration, you do say that you collected documents from Wagoner Hospital; correct?

A. That is, again, the -- I can tell you that, based on the declaration, that there were documents obtained, but what those documents were, I haven't a clue. I don't recall.

Q. Fair enough. And Page 3 of that same exhibit is a document from Bill Willis. And, again, you can't say whether this is a document you received or not; is that correct?

A. That is correct.

Q. The same hold true for Tab Number 9, which is another document from Bill Willis Community Mental Health Center?

A. Yes, sir.

Q. This is a document -- Tab Number 10. This is a document from the Social Security Administration involving Mr. Barrett. Do you know whether or not you received this information from Ms. Schaye or from your own investigation?

A. I don't.

Q. Do you recall receiving information from the Social Security Administration regarding Kenneth Barrett?

A. Independently from -- no.

Q. So you can't say it was in your investigative file or not?

A. I cannot. I don't know what I -- I don't recall.

Q. But, again, if it was, you would have provided that to Mr. Echols; correct?

398

A.   Absolutely.

Q.   Tab Number 11, would that be the same, the documents from the Sequoyah Memorial Hospital, do you recognize those?

A.   No, not independently, no.

Q.   Now, that's from January of 1995.  You didn't include, I don't believe, in your declaration documents from Sequoyah Memorial Hospital?

A.   May have been received by someone else other than myself.  I don't --

Q.   Could it be an oversight in your declaration?

A.   Either that, or somebody else obtained it.

Q.   Did you prepare this declaration yourself, sir?

A.   Mr. -- the attorney did.

Q.   Mr. Autry?

A.   Yes.

Q.   And so there very well could have been Sequoyah Memorial Hospital records in your information.  You just don't know?

A.   Correct.

Q.   Tab Number 12 is an affidavit from a Dr. Faust Bianco, Ph.D.  Do you see that?

A.   Yes.

Q.   Do you know who that is, Faust Bianco?

A.   I am familiar with Mr. Bianco.

Q.   As a matter of fact, Dr. Bianco does evaluations

routinely for OIDS; is that correct?

A.   He used to, yes.

Q.   Okay.  And do you recall if this particular document was part of your investigative file?

A.   I would -- I would think it would be, but I can't say for sure -- for certain today.  I mean, just -- I met with Dr. Bianco on multiple cases.

Q.   Did you -- do you recall meeting him specifically about the defendant, Kenneth Barrett?

A.   I don't -- I can't -- I'll confuse cases if I do that. I can't say one way or the other if it was Mr. Barrett or anybody else.

Q.   Flip over to Tab Number 14, please.  This appears to be a release of records to Mr. -- or to Dr. Bianco from Mr. Barrett.

A.   Okay.

Q.   Do you recognize either of the pages of that particular exhibit?

A.   No.  Somebody else had to get this because this is not my handwriting.

Q.   So you don't recognize it; is that correct?

A.   Yes.

Q.   And you don't -- you do not, of your independent knowledge, know whether this document was in your investigative file?

A.   I do not.

Q.   Now flip over to Tab Number 49 for me, please.

A.   Okay.

Q.   Take a moment if you will.  I know this is a rather lengthy document, 11 pages.  But take a moment and just thumb through that and see if you recognize it, please.

A.   Okay.

Q.   All right.  Having an opportunity to look at that, do you recall this interoffice memo?

A.   I'm trying to figure out how to phrase this correctly. I had forgotten about this memo until David had -- the attorney had shown me is this -- you know, asked me this, that it appears to be with my name on it.  I mean, I -- I just don't remember creating it.

Q.   Okay.  So according to your testimony, counsel for Mr. Barrett, David Autry, sent this to you and asked you to look at it?

A.   Yes.

Q.   Asked you if you remember it?

A.   Yes.

Q.   And I guess you told him the same thing you told us today, independently I don't remember it; is that right?

A.   Pretty much, yes.

Q.   Well, do you remember conducting a number of interviews of people and collecting a summary of those interviews and

Q. providing that to JDE?  First of all, who is JDE?

A.  Mr. Echols.

Q.  Would you agree this appears to be a memo that you created?

A.  Yes.

Q.  And this would be, in fact, in the case of the State of Oklahoma versus Kenneth Barrett; correct?

A.  Yes.

Q.  And it's dated September of 2002; correct?

A.  Yes.

Q.  Specifically 11th?

A.  Yes.

Q.  Would this particular docket -- document had been in your investigative file?

A.  I would -- I would believe it would have been because Mr. Autry gave it to me.  And I assume that that's where it came from.

Q.  You're making that assumption; correct?

A.  Yes.

Q.  All right.  But obviously this is something you provided to John David Echols; correct?

A.  Yes.

Q.  Now, if I understand it correctly, looking --

        MR. WILSON:  First of all, move for admission of Government's Exhibit Number 49, Your Honor.

THE COURT:  Mr. Autry, is there any objection?

MR. AUTRY:  To 49, Your Honor?

THE COURT:  Yes.

MR. AUTRY:  No.  No objection.

THE COURT:  Government's 49 is admitted.

Q.  (BY MR. WILSON)  Since you've had an opportunity to look at it, would you agree with me, sir, that this appears to be a memo outlining a number of interviews that you performed?

A.  Either myself or stated by Ms. Schaye from her memos, and I combined the two.

Q.  And specifically, if you're looking at Page 8 of that document, you set forth a list of particular interviews that Ms. Schaye performed herself; correct?

A.  Yes.

Q.  That would be Richard Barrett, Linda Riley, Elnora Long, Carolyn Joseph, Mark Dotson, and Tracy Swearingen?

A.  Yes.

Q.  Now, I'm going to ask you do a little bit of gymnastics for me, okay?

A.  Okay.

Q.  I want you to hold the tab there at 49, but I want you to flip back over beginning to Tab Number 18, because we're going to look at a number of additional documents.  All right.  Are you at 18?

403

A.   Yes, sir.

Q.   Do you recognize what Number 18 is, sir?

A.   It's a report by Roseann Schaye.

Q.   And do you recognize that being a report that you received from Roseann Schaye, the former mitigation specialist?

A.   Again, I couldn't tell you if it came from Ms. Schaye or not.  I just -- you know, I just don't recall.  I mean, it's been very -- a long time.  And I -- I just don't recall independently from --

Q.   I understand that, sir.  But you did receive documents from Roseann Schaye?

A.   I did -- I can -- yes, I did.  I do recall that.

Q.   And you do recall receiving actual memorandums of interviews that she conducted; correct?

A.   The reason that I -- this is going to sound -- that little diagram thing that she uses on her reports sparked my memory that, yes, those came from her.

Q.   And I'm not sure what diagram you're talking about, but is it on this document?

A.   It's not on this document, but it was on other documents we had spoken of.  It looks like some kind of southwest design.

Q.   On the letterhead?

A.   Yes.

404

Q.   Okay.

A.   Yeah.

Q.   The Government's Exhibit Number 18 appears to be an interview of a Carolyn Joseph; is that correct?

A.   Yes.

Q.   And would this interview of Carolyn Joseph have been in your investigative file, if you know?

A.   I would hope.  I just -- I don't know.  I just don't know.

Q.   But you would also agree with me that, if you received this document from John Echols, you would have provided that to Mr. Echols; correct?

A.   If I had received it from Ms. Schaye?

Q.   I'm sorry.  From Ms. Schaye, you would have provided it to Mr. Echols?

A.   Yes.

Q.   And based upon your knowledge, do you know who Carolyn Joseph was?

A.   I do not.  I can't recall.

Q.   Tab Number 19 appears to be another memo of an interview conducted by Roseann Schaye of a person by the name of Elnora Long.  Do you see that?

A.   Yes.

Q.   Do you remember receiving this particular document from Ms. Schaye?

405

A.   Not independently.

Q.   And so you cannot say whether or not that was in your investigative file?

A.   I don't recall.  I really just don't recall.

Q.   But you would agree with me, sir, that if you received this document from Ms. Schaye, you would have surely turned it over to Mr. Echols?

A.   Yes.

Q.   Number 20 purports to be an interview -- a third interview of Gelene Dotson.  Do you see that?

A.   Yes.

Q.   Conducted by Ms. Schaye?

A.   Yes.

Q.   And do you recall who Gelene Dotson was, or is?

A.   I think it's his mom.

Q.   The defendant's mom; correct?

A.   I'm sorry.  Yes.

Q.   All right.  Do you, of your independent knowledge, remember receiving this particular document from Ms. Schaye?

A.   No.

Q.   Yesterday we received some additional information we had not received before of some additional interviews of Gelene Dotson, two additional ones.  Do you have any independent recollection of those?

A.   Unless one of them -- I may -- I'm thinking I may have interviewed her at one time, but I just don't recall. That's -- I just don't recall.

Q.   We'll get to that.

A.   Okay.

Q.   I believe you did, actually.

A.   Okay.

Q.   But if there's two additional interview summaries from Ms. Schaye of Gelene Dotson, you don't know whether or not they were in your investigative file?

A.   I do not.  I can't say.

Q.   But, again, if you would have received those, you would have given those to Mr. Echols; correct?

A.   Yes.  Yes.

Q.   You would have given those to Mr. Gordon; is that correct?  Is that right?

A.   I gave everything to Mr. Echols --

Q.   Okay.

A.   -- is the best of my recollection.

Q.   Number 21, another document appears to be a summary of an interview conducted by Ms. Schaye of the defendant, Kenneth Barrett.  Do you see that?

A.   Yes.

Q.   Do you recognize that document?

A.   It's -- I have the same answer.  I don't independently

from seeing it, other than this, know if it was in the group of things that Ms. Schaye gave us or not.

Q.   Okay.  Were you aware that Ms. Schaye interviewed Kenneth Barrett multiple times?  Do you recall that?

A.   I don't recall.

Q.   And if we received additional documents yesterday of other -- another interview, you have no reason to -- your answer would be any different; correct?

A.   Correct.

Q.   But if you would have received those, you would have given them to Mr. Echols?

A.   Yes.

Q.   They wouldn't have just been in your investigative file only?

A.   I would think so.

Q.   I'm sorry?

A.   I would think that that's correct, I would have given them and he would have been familiar with them.

Q.   Let me tell you this -- or let me ask you this.  Well, we'll move on, then I'll come back to that.

         22, I expect I know what the answer is going to be, but same answers?

A.   Yes, sir.

Q.   23, would that be the same?

A.   Yes, sir.

408

Q.  And for the record, 22 was an interview of Linda Riley; is that right?

A.  Number 22?

Q.  I'm sorry, yes, 22.

A.  Yes.

Q.  And 23 was an interview of Richard -- Richard Barrett -- Richie Barrett, the defendant's brother; correct?

A.  Yes.

Q.  24, an interview of Ruth Harris by Ms. Schaye?

A.  Yes.

Q.  And were you here yesterday, sir?

A.  No.

Q.  Okay.  So the Ruth Harris who testified yesterday, you don't know whether that's the same person or not?

A.  I wasn't here.

Q.  Okay.  Would the answer still be the same, you don't know whether you got this document or not?

A.  Oh, I -- I don't know if it was in that file or not.

Q.  But you would have given it to Mr. Echols; correct?

A.  Yes.

Q.  Tab Number 25.

A.  Yes.

Q.  This would be interview of Tracy Swearingen.  Do you recall that document?

A.  Same answer.

Q.  Same answer.  Tab Number 26 is a declaration of Roseann Schaye.  Have you ever seen that document before?

A.  I don't recall it.  I -- I don't recall it.

Q.  Now, let's go back to 49, and we're going to talk a little bit about your interviews that you conducted yourself.

A.  Okay.

Q.  Earlier you said, I think I might have -- I might remember interviewing Gelene Dotson?

A.  I think I did.  I think I --

Q.  This memo, Page 1.

A.  Yes.

Q.  First person listed, Gelene Dotson.  Did that indicate that you interviewed her?

A.  I don't know if this came from something that Mr. Schaye had written or I had written.  I -- I can't -- I can't say.

Q.  All right.  But you would agree with me, sir, that in this particular document, it contains information that was obtained from Gelene Dotson; is that correct?

A.  Apparently so, yes.

Q.  And you'd agree with me that, at the time it was created in September the 11th of 2002, that Ms. Dotson had told either you or some other investigator working on the case that she drank while Mr. Barrett -- while she was pregnant with Kenneth Barrett?

A.   It appears that, yes.

Q.   That he had a knot on his head at the time of his birth?

A.   That's what it says.

Q.   That he was a hyper child?  Fifth line down, KB was always hyper and displayed a temper.  Do you see that?

A.   Yes.

Q.   That the separation that she had with Ernie Barrett affected KB, which is Kenny Barrett.  Sorry.  Correct?

A.   What line was that?

Q.   The next line down, numerous separations of parents had effect on KB.

A.   Yes.

Q.   That after second grade he had trouble in school, had reading problems; is that correct?

A.   That's what it says.

Q.   And mentions the fact that Gelene's sister has been suffering from bipolar disorder, next to the last sentence in the interview?

A.   Yes.

Q.   And that KB suffers from hypochondria?

A.   Yes.

Q.   All that information was obtained by the investigation in September of 2002; correct?

A.   I don't know if it was actually obtained that day or --

Q.   You already had it by that time?

A.   -- it was generated that day.  That the report was just generated that day.  But either myself or Ms. Schaye or -- may have been persons who --

Q.   And all that information was turned over to Mr. Echols; correct?

A.   Yes.  Yes.

MR. WILSON:  And, Judge, I'm going to try to speed this up.  I apologize.

THE COURT:  Yeah, I don't know why we need to go through everything that's in here if he doesn't remember specifically.

MR. WILSON:  Absolutely, Judge.

Q.   (BY MR. WILSON)  Would you agree with me that all this information of all these particular witnesses was available to Mr. Echols in September of 2002?

A.   Yes.

Q.   And it was an interview of Ms. Dotson, of Gwen Holt, who was a cousin; is that correct?

A.   I -- let me -- does it say that she's a cousin?  I don't --

Q.   Yeah, right there -- right there next to her name.

A.   Oh, cousin.  Okay.  Sorry.

Q.   And if you move on down to Page Number 6, Doris Barrett. Page Number 6 lists Ruth Harris.  Page Number 7, Abby

Stites; correct?

A.   Yes.

Q.   Page Number 10 being Toby Barrett, and Page Number 11 being Phyllis Crawford; correct?

A.   Yes.

Q.   And this was all information that was done as part of the mitigation before the state trial; correct?

A.   I believe so.

Q.   And all this information was provided to Mr. Echols?

A.   That's my knowledge, yes.

Q.   Mr. Leedy, as part of your duties at OIDS, do you know a person who formerly was intern -- a psychological intern, a guy by the name of Peter Rausch?

A.   Yes.

Q.   Dr. Peter Rausch?

A.   Yes.

Q.   And Dr. Rausch now is -- now works for the Oklahoma Forensic Center up in Vinita; correct?

A.   Yes.

Q.   He's on staff there; correct?

A.   Yes.

Q.   And are you aware that Peter Rausch was -- reviewed some documentation in this particular case regarding Mr. Barrett?

A.   No, I wasn't.  I was told that there was a report by him

by Mr. Autry, but I've not seen it, so I don't -- I can't attest one way or the other.

Q.  Turn to Tab Number 42, please.  I believe it's actually three pages in length; correct?

A.  Yes.

Q.  And do you recognize this memo that was from Peter Rausch to Steve Leedy?

A.  I don't independently recognize it, but I'm sure this is something Peter wrote to me.

Q.  And do you have any independent recollection of the circumstances upon which Peter Rausch, now Dr. Peter Rausch prepared this document?

A.  It appears that I had requested him -- he reviewed the record and attached a summary.

Q.  At the bottom of page -- of that first page, there appears to be some handwritten words.  Do you see that?

A.  Yes.

Q.  And do you recognize that handwriting?  Is that yours?

A.  It appears to be.

Q.  So that appears to be your own handwriting; correct?

A.  Yes.  It -- I'm trying to -- I don't know what PA style is.  But it appears to be similar to my handwriting.

Q.  Okay.  Do you know whether this particular document was in your investigative file?

A.  I do not independently.  I don't recognize.  I would

414

assume that, since it's here, it was. But I don't -- I don't know.

Q. Okay. Now, you correct me if I'm wrong, but it's my understanding that you were taking orders from Mr. Echols, who was the lead counsel in the case; correct?

A. Well, yes.

Q. And he asked you to reach out to Peter Rausch; is that correct?

A. I don't recall the circumstances as to why I did this or made this request. I don't know if it was on the behalf of someone. I just don't know.

Q. Do you know whether or not you provided this information -- if it was in your investigative file, if you provided this to Mr. Echols?

A. If it was in a file at our office, it should have been given to Mr. Echols.

MR. WILSON: Move for admission of Government's 42.

MR. AUTRY: Your Honor, to the extent that nobody has shown yet -- I'm sorry. To the extent that nobody has shown yet that either Mr. Hilfiger or Mr. Smith were aware of this document and relied on it, we object on the grounds of relevance, at this time anyway.

THE COURT: Are you going to be able to connect that up?

415

MR. WILSON:  We'll see, Judge.  I'm just trying to see what persons knew about this particular document in the chain.

THE COURT:  Well, and you've asked him about all that, but why -- why are we admitting it if --

MR. WILSON:  I can ask to admit it later, Judge.

THE COURT:  Okay.

MR. WILSON:  Thank you.

Q.  (BY MR. WILSON)  In reference to what's at this point labeled as Government's Exhibit Number 42, do you recall having discussion with Peter Rausch about his findings from his evaluation -- or his review of the records?

A.  I don't recall if I did or didn't have a conversation on what he discovered or wrote, or anything like that.

Q.  But he prepared this memo for you; correct?

A.  He did.  Apparently he did.

Q.  And he told you --

A.  Some --

Q.  -- that, as far as he knows, this information wouldn't be helpful to the defense; isn't that correct?

MR. AUTRY:  Going to object to hearsay, Your Honor.

MR. WILSON:  Judge, this --

THE COURT:  He doesn't recall any of this, Mr. Wilson.  I mean, you're asking him to say what does the

416

memo say, and we can see what the memo says.

MR. WILSON: Fair enough. I'll move on. Thank you, Judge.

Q. (BY MR. WILSON) Do you know a person by the name of Jeanne Russell?

A. I am familiar with Ms. Russell.

Q. And how are you familiar with Jeanne Russell?

A. She has contracted with our agency multiple times to represent multiple clients in the field of psychology.

Q. And as part of your duties in the mitigation investigation, do you have an occasion to assist Ms. Russell in any way, to your recollection?

A. The only way I would assist her is to provide any records that we have obtained from someone, or from an entity like a hospital or jail or whatever.

Q. And so you would have provided her records; is that correct?

A. Either my office would have or I would have. I mean, it -- sometimes they just call and say -- you know, there was an arrangement. I'm not even too sure at this time if we had a gatekeeper. I don't know if the gatekeeper at that time was arranging some of these records and stuff, so I just don't know.

Q. Do you recall Jeanne Russell interviewing you as part of the preparation of her report?

A.  I do not recall -- have an independent recollection of that.

Q.  If her report reflects that, you have no reason to doubt that?

A.  Correct.

Q.  Now, you mentioned earlier that you were aware of Jack Gordon, that he was the mitigation second chair -- or handled mitigation for the second trial.  I'm sorry.  Is that correct?

A.  I'm not sure how it broke down.  I knew he was participating in the second trial.  I -- I want to say that he probably did -- was preparing some of the mitigation. But as far as what records he had obtained or how he had obtained them, I -- I'm not sure.

Q.  All right.  You would agree with me that there was a state trial, that it resulted in a hung jury; correct?

A.  Yes.

Q.  Then there was a second state trial that actually went through a verdict; correct?

A.  Yes.

Q.  But no second stage; is that correct?

A.  Correct.

Q.  So you didn't have to testify in either one of those cases; correct?

A.  I did not.

418

Q. At the completion of the state case, obviously your involvement was done at that point; correct?

A. That is correct.

Q. Now, counsel asked you during direct about the fact that you were aware that the defendant was indicted here in federal court for crimes arising from the shooting of and killing of the trooper; is that correct?

A. Yes.

Q. And also crimes involving shooting of another trooper; is that correct?

A. All I remember is that he was indicted for federal crimes resulting -- the specifics of the indictment, I have no clue.

Q. And isn't it true that Mr. Echols contacted you and asked for your assistance in conducting investigation for him in the federal case; isn't that correct?

A. And I told him I couldn't.

Q. That you were too busy. And that you referred -- gave him some names of other people to seek out; is that correct?

A. That is correct.

Q. At the time that Mr. Echols contacted you, I'm sure that you told him, Mr. Echols, I have this investigative file, you come get it?

A. I can't say that I did or didn't make that comment.

419

I -- I would -- again, the file itself would have probably

been a -- just a file, not necessarily an investigative

file, but a file.  Those documents would have been in there,

I guess.  But I don't know -- I don't recall having any

conversations about that with Mr. Echols.

Q.  Well, and the reason I'm using the word investigative

file, that's coming from your declaration.

A.  That's what I referred to it as because that's the best

of my recollection was.

Q.  And I guess I'm going to talk about the white elephant

in the room here.  When we say investigative file, are we

talking about ten boxes, are we talking about a file folder

like this?  What are we talking about?

A.  I think that it was just one -- one box if my -- I think

there was only one box.  Again, I -- and that's a guess more

than --

Q.  I don't want you to guess.  I want you, of your

independent knowledge, what did you turn over to David

Autry?

A.  Well, based on the information from Mr. Autry about the

box, I had assumed that there was just one box.

Q.  And when we say a box, are we talking --

A.  A legal box.

Q.  -- a regular file box?

A.  Yes.

Q.  And was that box completely full, or did it have just five or six pieces of paper in it?

A.  I don't have -- I don't have independent knowledge, and I apologize.

Q.  You were also aware that Mr. Echols withdrew from the representation of the defendant, Kenneth Barrett, in the federal case; isn't that correct?

A.  I had heard that.

Q.  And you testified that you became aware that Roger Hilfiger became lead counsel for the defendant; isn't that right?

A.  I'd heard that.

Q.  When did you hear that?

A.  After it occurred.  Probably -- I don't know if it was in a newspaper.  I don't know if it was something Mr. Echols had mentioned.  I just don't recall.

Q.  Okay.  But it wasn't before -- it was before the trial, correct, the federal trial?

A.  Oh, yeah.  Oh, yes.

Q.  It wasn't after the conviction?

A.  I don't believe it was.

Q.  And you had a box of important information; correct?

A.  Apparently so.  I had -- I had a box of reports and things, yes.

Q.  And you didn't call Roger Hilfiger?

A.   No.

Q.   Didn't call Bret Smith?

A.   No.

Q.   Didn't call John Echols?

A.   Not that I recall.  I don't -- I don't remember -- I don't recall independently having conversations with any of those three about a box.

Q.   Quite frankly, I believe you testified on direct you didn't even know where the box was?

A.   I had forgotten that I had provided it to Mr. Autry when he asked -- we talked about it, and I said where is the box?  And he said, you gave it to me back in 2000 whatever it was.

Q.   Look at Tab Number 16 for me, please.

A.   Okay.

Q.   Do you recognize that particular document, sir?

A.   Is this a Bill Sharp, Ph.D. document?

Q.   Absolutely.  That's correct.  Do you know who Bill Sharp, Ph.D. is?

A.   He is a doctor that has been used when it comes to areas -- different areas of --

Q.   And when you say used, used by OIDS?

A.   Hired by OIDS to provide information as far as evaluations and things like that.

Q.   Of your independent knowledge, do you recall this particular document?

A.   Again, I -- independently, no.  I mean, I just don't.

Q.   Can you say whether or not it was in your investigative file?

A.   I cannot.  I would hope it would have been, but I can't say.

Q.   All right.  Fair enough.  Mr. Leedy, you'd agree that Mr. Hilfiger was not part of the state trial?

A.   No.

Q.   And, again, your interaction with Mr. Autry in giving him this -- this investigative file was not initiated by you?

A.   No.

Q.   It was initiated by Mr. Autry?

A.   To the best of my knowledge, it is to what I can recall. I -- as I said, I didn't -- I didn't recall the whereabouts of the box until he reminded me I had given it to him.

Q.   I want to show you one other document and then I'm finished.  Government's Number 29.

A.   Intentionally kills or counsels.

Q.   It should say in bold at the top Gelene Dotson.

A.   Oh.  Okay.

Q.   Okay.  Do you see that?

A.   Yes.

Q.   Do you recognize what that is?

A.   Have no idea where this came from.  I don't -- it's

nothing that I think I -- there's some fonts in here that I don't think are familiar with my computer.

Q. Okay. I appreciate that. Thank you.

MR. WILSON: May I have just one moment, Your Honor?

THE COURT: Yes.

MR. WILSON: Apologize, Judge. I have to look at one more document.

Q. (BY MR. WILSON) Go back to 49 very quickly.

A. Okay.

Q. Earlier you testified, when I showed you this document, that these interview -- these summaries are either -- you said they're either mine or another investigators or maybe Roseann Schaye. Is that what your testimony was?

A. And the reason I said that was, is because the information of these crude outlines are from my interviews unless otherwise noted.

Q. Well, unless otherwise noted in this document --

A. Right.

Q. -- would be from your interview; correct?

A. Yeah. And I'm not sure if I used the correct explanation when I sent this to Mr. Echols either. I can't say. But I would assume that they would be if I said that.

Q. Because there are certain persons that are identified as being interviewed by Ms. Schaye?

A.   Yes.  And it could be -- it could be a mistake on my part from that.  I just don't recall.

MR. WILSON:  Okay.  That's all I have.  Thank you, Judge.

THE WITNESS:  Thank you.

THE COURT:  Redirect, Mr. Autry?

MR. AUTRY:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q.   Mr. Leedy, as an investigator, when you put together information through interviews or the acquisition of records or whatever it was, it goes to the lawyers; correct?

A.   Correct.

Q.   And that would be true of Ms. Schaye in working with Mr. Echols; correct?

A.   I would think so, yes.

Q.   All right.  You just don't keep a box to yourself or a file to yourself of your investigative work in the case and not share it with the lawyers; correct?

A.   Correct.

Q.   All right.  Now, did Mr. Echols maintain a computerized file that was accessible via the Internet of the materials in Mr. Barrett's case?

A.   He may have back then.  He's pretty computer-oriented, so he may have.  I don't recall if he had a network set up

425

then or not.

Q.  All right.  And had Mr. Hilfiger or Mr. Smith called you, you would have been happy to let them have whatever you had; correct?

A.  Yes.

Q.  And Mr. Echols would have done the same, wouldn't he?

A.  Again, I would assume so, but you'd have to ask him.

Q.  Well, you've known him for a long time; right?

A.  I would think so, yes.

Q.  All right.  You don't have any reason to believe that he would hold back or hold back information from lawyers who succeed him in the case, do you?

A.  No, I do not.

        MR. WILSON:  Calls for speculation, Judge.

        MR. AUTRY:  Well, he's been speculating now for an hour and a half under cross-examination.

        THE COURT:  Well, he wasn't speculating about somebody else's motives.

        MR. AUTRY:  All right.  Thank you, Your Honor.

Q.  (By MR. AUTRY)  So any information you had, whether it's generated by Ms. Schaye, whether you generated it, whether you acquired it via record, the lawyers in the case you are working on would have access to it and would have it; right?

A.  Yes, that is correct.

        MR. AUTRY:  No further questions.

MR. WILSON:  Nothing further, Judge.

THE COURT:  Mr. Leedy, you can step down.  Thank you, sir.

THE WITNESS:  May I be excused?

THE COURT:  Yes.

THE WITNESS:  Thank you.

THE COURT:  Defendant, call your next witness -- I mean, plaintiffs, call your next witness.

MR. AUTRY:  John Echols, Your Honor.

THE CLERK:  Sir, if you'll raise your right hand.

*(The witness was duly sworn by the Clerk)*

THE WITNESS:  I do.

JOHN ECHOLS,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. AUTRY:

Q.  State your name for the Court, please.

A.  John Echols.

Q.  What do you do for a living?

A.  I'm an attorney.

Q.  How long have you done that?

A.  Since 1978.

Q.  What does your practice primarily consist of?

A.  Almost exclusively criminal defense.  Some personal

injury and some civil rights.

Q.   All right.  Do you know Kenneth Eugene Barrett?

A.   Sure do.

Q.   How do you know him?

A.   I represented him for several years.

Q.   Was that in -- initially in state court?

A.   Yes.

Q.   And what was he charged with in state court?

A.   Murder and assault with a deadly weapon and shooting with intent to kill, two counts.

Q.   All right.  And how many trials were there in Mr. Barrett's state case?

A.   Two.

Q.   What was the result of the first trial?

A.   It was a hung jury.

Q.   How about the second trial?

A.   Mr. Barrett was acquitted of first degree murder, acquitted of second degree murder, convicted of manslaughter and got a 20-year sentence.  He was acquitted of assault with a deadly weapon, and convicted of a lesser offense.  I don't recall the precise name of it.  And then there were two counts of shooting with intent to kill that he was acquitted on both counts.

Q.   All right.  Was the State of Oklahoma seeking the death penalty in that case?

428

A.   Yes.

Q.   And suffice it to say, due to the verdict in the second state trial, you never went to a penalty phase?

A.   That's correct.

Q.   All right.  Was a mitigating investigation done in preparation for any potential second stage in the state case?

A.   Yes.

Q.   Was it complete or incomplete?

A.   I'd say it was -- it was incomplete.

Q.   And why do you say that?

A.   The first trial it was hampered by a change in investigators and by some decisions made by the indigent defense system.

Q.   All right.  Did you have a mitigation investigator before the first state trial?

A.   Yes.  And I -- it's hard for me to keep in my mind the differences between the two trials --

Q.   Yes, sir.

A.   -- but I believe Roseann Schaye was before the first trial.

Q.   All right.  How did you find her to help you work on the case?

A.   She was recommended by one of the prominent national mitigation investigator specialists.

Q.   All right.  And did she complete her work -- her mitigation work for the state case?

A.   No.

Q.   And did she leave the state case at some point?

A.   Yes.

Q.   Do you know why?

A.   She was unhappy with me and said so, and wrote a letter to the judge and he put the letter in the file.

Q.   All right.  Now, during the time she did work on the state case, had she interviewed various witnesses who could potentially testify in the penalty phase?

A.   Yes.  She'd interviewed I think most of Mr. Barrett's relatives who lived in the area in Oklahoma.

Q.   And did she also interview Mr. Barrett?

A.   Yes.

Q.   What kind of things did she find out in her interviews, just generally, if you can recall?

A.   Well, Mr. Barrett's mother and father had divorced under less than ideal circumstances.  Mr. Barrett had remarried. I don't recall whether Ms. Dotson had remarried or if that was her maiden name.  But he had some -- his relatives and acquaintances expressed their opinions about his mental state.

Q.   All right.  Was there evidence regarding, to your recollection, Mr. Barrett's mother drinking while she was

430

pregnant?

A.   Yes.

Q.   Was there evidence regarding domestic discord in the home between Mr. Barrett's parents?

A.   Yes.

Q.   Was there evidence regarding physical and emotional abuse of Mr. Barrett by one or more of -- one or both of his parents?

A.   I don't recall about his mom, but there was as to Mr. Barrett, Senior.

Q.   All right.  To summarize it, was there evidence of a turbulent and chaotic upbringing?

A.   Yes.

Q.   All right.  And was that according to both the parents and other relatives of Mr. Barrett?

A.   Yes, there was a consistent picture painted of the family.

Q.   And was there also a consistent picture painted of the family that there had been mental problems, or suspected mental problems in the family -- in the wider family?

A.   Yes.  I don't -- I don't recall the specifics, but that's my -- that's the impression I have.

Q.   All right.  Is that the kind of evidence you would want to develop and put on if you got to the second stage of the capital case?

431

A.  Yes.

Q.  Okay.  Now, did Ms. Schaye do reports of her interviews?

A.  Yes.

Q.  Did you have access to those reports?

A.  Yes.  I think they were mailed to me or emailed to me.

Q.  And so you possessed the reports; is that correct?

A.  I mean, I've seen them, so I possessed them at some point.

Q.  Okay.  And after Ms. Schaye left the case during the pendency of the first trial, what happened with the mitigation investigation at that point?

A.  Best I can recall, it was taken over by Steve Leedy.

Q.  All right.  And who was Mr. Leedy?

A.  He was a -- formerly a Tulsa County sheriff's deputy who been assigned to the Drug Enforcement Administration and had been active in prosecuting or apprehending drug offenders, and then had become an investigator for the indigent defense system.  I think back when there was a -- in 1990 or '91, there was a state-wide capital trial defense team that was assembled, and I believe Mr. Leedy joined that group.  And then he was working with OIDS when I represented Mr. Barrett.

Q.  All right.  Was he primarily a first stage investigator?

432

A.  He had been, yes.

Q.  All right.  Do you know how much training he had as a mitigation investigator?

A.  I would say that Mr. Leedy was unusually receptive to the idea of mitigation investigation.  Some former police officers don't really take to that side of the -- of the investigation, and Mr. Leedy was always open to it.

Q.  Okay.  Let me ask you this:  At the time of the state trial, I think you indicated a little bit earlier that the mitigation investigation had not been completed; is that correct?

A.  Correct.

Q.  All right.  And what was -- have I asked you what was left to be done?

A.  No.  I think -- again, I'm trying to separate the two trials.

Q.  Yes, sir.

A.  My recollection is that we just hadn't assembled the information and we just didn't have a good handle on it when we were coming up to the first trial.  And my recollection is that I revealed that to Judge Garrett and to Darrell Dowty.  And that that was when -- I believe that's when Judge Garrett said that we would -- if there was a conviction on the capital offense, that we would then have a pause before we -- on the order of two weeks or more before

the second stage would begin.

Q.   All right.  Well, let me ask you if you can remember any specifics about this.  At the time you went to trial, and I know that he was going to give you a continuance to complete the mitigation investigation or attempt to complete it, do you know whether or not a complete multigenerational family history, including mental history of the family going back some generations had been done in Mr. Barrett's case to that point?

A.   I know it had not been done.

Q.   All right.  Had a comprehensive mental health workup, comprehensive neurological workup, and a comprehensive psychological and psychiatric workup been done of Mr. Barrett to that point?

A.   No.  The agency -- the agency was unwilling to do that.

Q.   All right.  When you say the agency, what are you referring to?

A.   The indigent defense system.  Oklahoma Indigent Defense System, which I call OIDS.

Q.   Okay.  And why were they unwilling to do that?

A.   And I don't have a recollection of this but I've seen documents that refer to these things.  There was a psychologist and also -- who also has a J.D. named Kathy LaFortune, and she had interviewed Mr. Barrett I believe before the first trial, and had recommended that we not

pursue further psychological evaluations.  That may have been after I received an opinion from a psychologist named Faust Bianco.

Q.  Okay.  Did Kathy LaFortune sort of have a gatekeeper role at OIDS in terms of expending funds for expert witnesses and the like?

A.  Yes.

Q.  All right.  Do you know if she ever did a comprehensive evaluation of Mr. Barrett?

A.  I know that she interviewed him.  I assume that she gave him some tests, you know, that psychologists use, but I don't -- I don't recall what precisely.

Q.  You mentioned Faust Bianco a minute ago, Mr. Echols.

A.  Yes.

Q.  Who was he exactly?

A.  He was a -- I believe a -- either a forensic or a neuro psyche that we retained to form an opinion about Mr. Barrett's mental state.

Q.  All right.  Did he, to your recollection, do neuropsychological tests or neuropsychological screening?

A.  I don't recall what he did.

Q.  All right.

A.  I know he called me and told me his opinion.

Q.  Okay.  Is he somebody you chose, or is he somebody that OIDS told you you were going to use -- going to have to use?

A.   I think it's unlikely that I picked him out.

Q.   Why is that?

A.   Well, I just don't have a recollection of it.  But I --
if I had been selecting, I might have gone elsewhere.

Q.   All right.  What was your impression of the work that he
did on Mr. Barrett's case, if you can recall?

A.   He was -- I believe I only talked to him once or twice
on the phone, and he had a very deep voice and was sort of a
stentorian manner, and he was convinced that Mr. Barrett
didn't need any further evaluation because he felt that
Mr. Barrett was not suffering from any relevant illness or
factor -- psychological factor, personality factor.

Q.   When you made expert requests -- now, let me back up
just a minute.  After the state case, Mr. Barrett was
charged in federal court?

A.   Correct.

Q.   And were you initially appointed?  And we're going to
talk about that a little bit here in a moment --

A.   Yes.

Q.   -- but were you initially appointed lead counsel in the
federal case?

A.   Yes.

Q.   Did you make requests in the federal case for funding
for a psychologist and a psychiatrist?

A.   Yes, I -- yes.

Q.  Okay.  Were you guided in any sense in making those requests by anything that Dr. Bianco had found?

A.  No.

Q.  All right.  Why not?

A.  Well, Dr. Bianco was -- like I said, he was very dismissive and he saw no -- no reason to do anything.

Q.  Okay.  And did you have a different view, based on your knowledge of Mr. Barrett and your association with him in representing him?

A.  Well, I had a good relationship with Mr. Barrett.  But, for instance, I knew that Mr. Barrett had attempted suicide earlier.  And from the training that I had received, I know or knew that oftentimes there are organic brain difficulties that have to be diagnosed by specialists that may have a bearing on mitigation evidence.

Q.  All right.  Now, when you made the request in federal court for a psychiatrist and a psychologist, what were you looking for or looking to develop?  What kind of evidence were you looking to develop?

A.  Well, it -- I mean, I don't think I would put it that way.

Q.  Okay.

A.  What I wanted was them to use their expertise and tell me what needed to be developed.

Q.  All right.

A.    Particularly I -- I -- again, I don't recall the circumstances directly from memory, but I've looked at the budget requests and things that I made, and I know that we were interested in finding someone who could evaluate Mr. Barrett to determine whether or not there was reason to believe that there might be some organic brain dysfunction that would relate to mitigation.

Q.    Okay.  Do you recall a gentleman named Dr. Bill Sharp?

A.    Yes.

Q.    Did he look at Mr. Barrett in connection with the state case?

A.    In connection with the second trial, I believe.

Q.    All right.  Do you recall whether he suggested that further testing be done?

A.    Yes.  My recollection is that Mr. Leedy and I met with him I think in his -- in his home in Oklahoma City and discussed the case with him.  And he -- he believed that there was evidence of psychological in his -- I believe his principal concern was that Mr. Barrett exhibited paranoid symptoms, and he thought that that might be an area to further investigate.

Q.    Okay.  Do you recall whether or not his report indicated that Mr. Barrett suffered from avoidant personality disorder as well as paranoid personality disorder?

A.    I don't -- I don't recall, but if that's what they say,

that's what they say.

Q.  Okay.  Do you know whether or not Dr. Sharp found any neurological deficits that he thought merited further -- further study or further testing?

A.  I don't recall.

Q.  All right.  Let's see here.

A.  I believe he gave us a written report.

MR. AUTRY:  Could you give Mr. Echols Government's Exhibit 16, please?  It's been admitted.

Q.  (BY MR. AUTRY)  Do you have that, Mr. Echols?

A.  Yes, I do.  I'm sorry.

Q.  Take a second to look over that.

A.  Well, it's eight pages, single spaced.

Q.  Let me get my copy and see if I can orient you to the precise page.  Could you go to Page 7 of Government Exhibit 16.

A.  Okay.

Q.  Do you see on Axis I where Dr. Sharp recommends ruling out learning disorder not otherwise specified?

A.  All right.  That's still on Axis I.  Yes, I do.

Q.  Yes, sir.  And attention deficit hyperactivity disorder, predominantly hyperactive impulsive type --

A.  Yes, I see that.

Q.  -- to rule it out?  Axis II, avoidant personality disorder?

A.   Yes.

Q.   Paranoid personality disorder?

A.   Yes.

Q.   Axis III, rule out organic impairment relative to tremor and long-term memory difficulty?

A.   Yes, I see that.

Q.   Okay.  Did Dr. Sharp's report indicate to you, thinking back on it now, that in the federal case you needed to further examine Mr. Barrett's mental state?

A.   Yes.  I believe this was prior to the second trial, though.

Q.   Prior to the second state trial?

A.   Second state trial, yes.

Q.   Is Dr. Sharp somebody you might have used in mitigation of punishment in the second state trial had it gone that far to the second stage?

A.   Yes.

Q.   Okay.  Now, I'm kind of jumping around here a little bit, but when you were on the federal case, who was your second chair?

A.   Roger Hilfiger.

Q.   Okay.  Did Mr. Hilfiger ever ask you anything about Dr. Sharp?

A.   I don't recall.

Q.   Okay.  Did you ever discuss Dr. Sharp with him?

A.   I don't believe I ever did discuss Dr. Sharp with him.

Q.   All right.  How about Dr. Bianco?

A.   I have no recollection of talking with him about Dr. Bianco.

Q.   Or, for that matter, Dr. LaFortune?

A.   Same answer.

Q.   Okay.  Do you know who Jeanne Russell is?

A.   Yes.

Q.   Who is she?

A.   She's former, I think head of one of the departments at what was once known as Eastern State Hospital, and has been in private practice as a psychologist for many years.

Q.   All right.  Did she do a risk assessment of Mr. Barrett before the second state trial?

A.   Yes.

Q.   And what was the purpose of her doing that?

A.   Well, one of the aggravators -- I don't want to discuss the law of capital cases -- but one of the aggravators that is involved is future dangerousness, and it's a very slippery subject.  And this -- it was an attempt to gain some evidence that could be used to counter any claim that Mr. Barrett represented a threat to anyone.

Q.   Okay.  And do you recall what the nature of her report was to you?

A.   Generally speaking, I recall that her report was

favorable.  That is, that if Mr. Barrett was in prison, and there wouldn't be a second stage without a conviction and a minimum sentence being life, that if Mr. Barrett was in prison, that he would adjust to life in prison and not be a threat.

Q.  Okay.  Is it your recollection that she determined he was not a, quote-unquote, psychopath?

A.  I think that would be part of the same -- I don't recall that specifically, but that that would be consistent with what I do recall.

Q.  Okay.  Could you look at State's Exhibit 34?  It's in that book.  I believe it is.

A.  Yes.

Q.  Is that Dr. Russell's 2003 risk assessment report on Mr. Barrett?

A.  It appears to be.

Q.  Could you go to Page 4?

A.  I assume you mean the numbers that are sort of written on?

MR. AUTRY:  Could I approach the witness, Your Honor?

THE COURT:  Yes.

THE WITNESS:  Discovery Bates is 8248.

MR. AUTRY:  Okay.  No, sir.

THE WITNESS:  Oh, okay.  Up here.  I'm sorry.

442

MR. AUTRY:  I'm sorry.

THE WITNESS:  I was looking at the wrong end of the document.

Q.  (BY MR. AUTRY)  Well, I oriented you to the wrong page. If you could turn back one page to Page 3.  Do you see, at the bottom of the page, where it talks about family history?

A.  Yes.

Q.  Now going over to Page 4, is that the information from Mr. Barrett that was given to Dr. Russell where he talks a little bit about his background?

A.  Yes.  I mean, she certainly received the information, yes.

Q.  Okay.  And it talks about a series of separations from his father when his mother would simply move him and his siblings back to Oklahoma with no warning?

A.  Yes.

Q.  And reports that his father ran around with other women, and his mother drank a lot, and he thinks she still continues to drink a lot?

A.  Yes.

Q.  Okay.  He describes his mother drinking on a daily basis, and reported she was often hateful when drinking?

A.  Yes.  And smoked marijuana and used drugs with him.

Q.  All right.  Had a very permissive home life.  He never

had to lie to her because she really didn't care what he did?

A.   Well, haven't read that specifically here, but if it's here, I don't have any disagreement with that.

Q.   All right.  Were you aware from various reports in the investigation done in the state case that Mr. Barrett had some educational difficulties?

A.   Yes, but my recollection of that is very vague.

Q.   Okay.  If you could go down on Page 4 of Dr. Russell's report where it says education.

A.   Yes.

Q.   Dr. Russell reports that Mr. Barrett describes himself as having a short attention span, which is confirmed by statements made by other relatives who were around him as a child?

A.   I see that, yes.

Q.   Okay.  Denies being a troublemaker in school?

A.   Correct.

Q.   And in the second paragraph, second sentence says he had average grades, and records show he attended learning disabled classes?

A.   Yes.

Q.   Okay.  Could you go to Page 5?  At the top of the page, does that talk about the suicide attempt in 1986 that you spoke of a bit ago?

444

A.   At the top of the page?

Q.   Page 5.

A.   It -- yeah, I think it begins -- pardon me.  Yes, I think it begins at the bottom of Page 4.

Q.   Okay.  I'm sorry about that.  And at the bottom of Page 5, does it talk about a medical history involving head injuries?

A.   Yes.

Q.   Going over to Page 7, does it talk about Mr. Barrett's mental health treatment, previous contacts with the mental health system, hospitalizations and such?

A.   Excuse me a moment.  Forgive me.  I believe that that information is, for the most part, on Page 6.

Q.   Page 6.  I'm sorry.  Yes, sir.

A.   Yes, sir.  There's a reference to his self-reporting to the Sequoyah Memorial emergency room.

Q.   And does it also talk about contact with Bill Willis and other mental health providers?

A.   I haven't spotted Mr. Willis' name here yet, but I'm sure it does.

Q.   All right.  It's in the records, so I'm not going to belabor it any further.  But let me ask you this:  Did Jeanne Russell conduct a comprehensive mental health assessment of Mr. Barrett in the state case?

A.   No.

Q.   All right.   Was she the mitigation investigator on the state case?

A.   No.

Q.   Okay.   Is she a mitigation investigator?

A.   Not to my knowledge.

Q.   Okay.

A.   I mean, she works in the mitigation area in capital cases, but she's not an investigator.

Q.   All right.   When you talk about works in the mitigation area, do you mean, as a doctor of education, someone who can give risk assessments and give other psychological tests?

A.   Yes.   And then, I think also, based on her background as having been one of the leaders at least in the treatment program at Eastern State Hospital.

Q.   All right.   Had the state case gone to a penalty phase, would you have used the type of information Dr. Russell developed in mitigation of punishment?

A.   Yes.

Q.   Okay.   Now, you represented Mr. Barrett for a number of years --

A.   Yes.

Q.   -- from I guess 1999 or 2000 until the conclusion of the state case in approximately 2004; is that correct?

A.   Correct.   And then through the spring of the next year.

Q.   All right.

A.   Or to the spring of the next year.

Q.   And that would be in the federal case?

A.   That's correct.

Q.   Now, during that period of time, did Mr. Barrett ever say I'm not going to cooperate with you in the development of mitigating evidence?

A.   Not -- I have -- I have -- I want to say no.  And of course I can't recall anything like that ever being said, and that would surprise me.

Q.   All right.

A.   We had complete cooperation from Mr. Barrett.

Q.   Did he ever foreclose any attempts by you to develop evidence regarding his mental health?

A.   No.

Q.   Did he ever foreclose any attempts by you or Mr. Gordon or Mr. Standing Bear, or anybody else, to develop evidence relative to his background and upbringing?

A.   No.

Q.   Okay.  Did he ever tell you that he didn't want family members to testify for him if the case got to a penalty phase?

A.   I don't recall him ever saying anything like that.

Q.   All right.  Did you ever have any resistance from him about any kind of lines of investigation or strategies that you might have wanted to pursue or did pursue in either the

447

state or the federal case?

A.   We had a close relationship, and he was -- he was actively interested in his case and we talked about it at length.

Q.   Okay.

A.   I don't remember specifics of our conversations.

Q.   Sure.   I know it's been a lot of years.   Let me ask you how it was you came to be appointed in the federal case for Mr. Barrett?

A.   I received a phone call from the chief public defender in Northern District of Oklahoma, Paul Brunton, and he asked me to meet him at a restaurant.

Q.   All right.   And he asked you to accept an appointment to represent Mr. Barrett in federal court?

A.   Yes.   He and Rob Nigh and I had lunch, and we discussed the case and discussed what could be done to defend the case on legal grounds, and then what could be done to defend the case in the normal way that you would defend a case.

Q.   All right.   And what happened after that with respect to your appointment?

A.   I was --

          MR. WILSON:   Objection, Your Honor.   This calls for a narrative.

          THE COURT:   Overruled.

A.   I was appointed.

448

Q. (BY MR. AUTRY) All right. Were you appointed lead counsel?

A. Yes.

Q. Who did the federal public defender want to be appointed as second chair counsel?

A. Rob Nigh.

MR. WILSON: Objection to relevance, Your Honor.

THE COURT: Overruled.

Q. (BY MR. AUTRY) Go ahead and answer.

A. Rob Nigh.

Q. Okay. Why did they want that?

A. Mr. Nigh had just completed the defense of Mr. McVeigh and was available. He, I think, had gone to work for Clark Brewster in Tulsa by that time.

Q. Okay.

A. And his -- his extensive experience in the McVeigh case was a good fit with my experience.

Q. Was Mr. Nigh appointed?

A. No.

Q. Why not?

A. Well, my -- I was informed that Judge Payne believed that it was important to develop a capital defense bar.

MR. WILSON: Object, Your Honor, to the relevance of this as to why Mr. -- somebody else other than Mr. Nigh was appointed.

449

THE COURT:  What is the relevance?

MR. AUTRY:  The relevance of this is that I think I'm going to try to develop through Mr. Echols various limitations and restrictions in terms of funding, time, etc., that were placed on him by the federal court here in representing Mr. Barrett.  And I think that ties in, or is relevant to the development of the mitigation case that was ultimately not done by counsel that did wind up representing Mr. Barrett at trial.  It's all a continuum.

THE COURT:  Well, what does that have to do with whether or not the representation fell below the standard applicable -- go ahead.

MR. AUTRY:  Not given the resources, not given the time basically.

THE COURT:  Well, that wouldn't be malpractice on the attorney's part, would it?

MR. AUTRY:  No, it wouldn't be.  But there's also court-induced ineffective assistance of counsel.  And I think what we have here in play is an interplay between court-induced ineffective assistance of counsel in terms of the funding that was allowed and counsel's own efforts.  So that's our argument.

THE COURT:  Well, I'll give you a little bit of latitude on it.

MR. WILSON:  Judge, just so I could say for the

450

record, that particular issue was raised, an Eight claim.

That's been denied by this court and by the circuit.

THE COURT:  Right.  I understand.  Go ahead, Mr.

Echols -- or, I'm sorry, go ahead Mr. --

THE WITNESS:  Echols is right.

Q.  (BY MR. AUTRY)  I'm sorry.  Do you remember the

question?

A.  Yes.

Q.  Okay.  Go ahead.

A.  I was -- I was told that Judge Payne thought it was

important that he develop a capital qualified defense bar in

this district, in the Eastern District, and that he wanted

to -- for that reason, he chose to appoint Mr. Hilfiger as

second chair.

Q.  All right.  And what was the division of labor in Mr.

Barrett's federal case going to be between you and Mr.

Hilfiger?

A.  We -- Mr. Hilfiger and I never really reached a division

of labor.  Mr. Nigh and I had talked about one, but Mr.

Hilfiger and I never really had an agreement.

Q.  Okay.  How much contact did you have with Mr. Hilfiger

during the time you represented Mr. Barrett in federal

court?

A.  I would say not a lot of contact.  It was intermittent.

Mr. Hilfiger was -- if I recall correctly, was involved in

some church mission work in Central America and was out of -- out of the country on one or more occasions during the time from -- I guess, what are we talking about, October or November?

Q.  Yes, sir.  October of 2004 until you withdrew in April of 2005.

A.  In April.  Yeah, my recollection is Mr. Hilfiger had a couple of trips out of the country and that we -- we never really had a time when we sat down and discussed things.  I just -- I did most of the work.

Q.  All right.  How much work, during the time you and Mr. Hilfiger were on the case, did he do on the first stage part of the case, to your knowledge?

A.  I believe he -- I believe there was an occasion when I was out of town and he presented a motion to the court.  I believe he had -- it seems to me that he had some success on a motion directed towards suppression of evidence.  He was not a regular contributor on the other work that took place.

Q.  Okay.  How much work was he doing during the period of time you both worked together on the federal case on the penalty phase?

A.  I'm not aware of any work that he was doing on the penalty phase.

Q.  In terms of percentage of work on the case while you and

452

Mr. Hilfiger were together on the case, what percentage of the work were you doing on the case as opposed to Mr. Hilfiger?

A.  I was doing, I mean, I would say virtually all the work. I was doing a high percentage of the work.

Q.  All right.  Were you also doing the administrative work in the case?

A.  Yes, that was a big part of the work in the case.

Q.  And what did that consist of?

A.  The federal rules require that, if you're going to have a budget of more than, I think, at that time was $7,500 or $10,000, that the budget had to not only be approved by the judge before whom you're practicing, but also the chief judge in the circuit.  And so in order to facilitate that, we filed numerous motions ex parte -- ex parte motions addressing the securing experts and other services for the defense.

Q.  Okay.

A.  And then also attorneys fees.  Judge Payne felt that that it was my responsibility, or our responsibility to -- to predict with some degree of precision the different activities that would be -- that would -- that attorneys would be involved in over the course of the case.

Q.  All right.  Do you recall how much time on the case you had to devote to administrative matters?

A.   At the beginning, it was a lot.  The two big issues for me were the administration of the case, and then researching the death penalty, double jeopardy, and the Department of Justice policy known as the Petite Policy.

Q.   All right.  How many different budgets did you have to submit?

A.   I never got one approved.  I submitted five or six budgets for experts.  Ultimately I broke the attorneys budget out from the experts in the hopes that we could get approval of our expert budget and consultant budget in anticipation of trial.

Q.   Why does budgeting -- or why did budgeting in this particular case use up so much time, in your opinion?

        MR. WILSON:  Objection, Your Honor, to relevance, once again, to this determination for this Court.

        THE COURT:  Sustained.

Q.   (BY MR. AUTRY)  Let me get -- I'll ask you maybe something about the budgeting and the administrative work here in a little bit, but let me switch gears for a second.

        What kind of files did you maintain on Mr. Barrett's state case?

A.   Well, I had most of -- almost everything that I had been involved with was in computer form.  And then we also had a dozen boxes of paper.

Q.   All right.

A.  Various printed -- exhibits that had been printed out and were file stamped and other things.

Q.  And did you maintain those files, both the computer files and the printed files, after you were appointed in the federal case?

A.  I didn't have the paper files.  They -- those had been surrendered to OIDS.

Q.  All right.  And why did you surrender the paper files to OIDS?

A.  I didn't want them.

Q.  All right.  Would that include the state investigative file that would --

A.  Everything -- everything that was not reflected in a computer -- on a computer.

Q.  All right.  And would that include mitigating evidence in the mitigation file in the state case?

A.  I think it's likely that those files, for instance the Roseann Schaye files?

Q.  Yes, sir.

A.  I think it's likely that those existed both in the computer and then also in paper form.  I scanned everything that I --

Q.  Okay.

A.  -- could get a hold of.

Q.  And the paper form, the paper files would have been at

the OIDS office?

A.   Right.  And when we retrieved them, they were mixed, you know, jumbled.  There was no rhyme or reason to them.  Or no -- there was no consistent rhyme or reason to them.

Q.   All right.  When you say you retrieved them, what are you talking about?

A.   I believe Mr. Leedy went to Norman and physically took the files and brought them to my house.

Q.   All right.  Is that when you were on the federal case?

A.   That would have happened once I was appointed to the federal case.

Q.   All right.

A.   I guess Mr. Leedy might not have done that.  Perhaps I did it myself.  I don't recall how I got them back.

Q.   Okay.  So at some point during the federal case, you had paper files from OIDS that had been commingled?

A.   Correct.

Q.   Okay.  You also had files on a computer database; is that right?

A.   Yes.

Q.   And who had access to the computer database while you were on the federal case?

A.   I did.  Mr. Hilfiger did.

Q.   Okay.

A.   And we may have -- I don't think we ever gave access to

456

anyone else.

Q.  All right.  Could you --

A.  Ultimately I gave access to Bret Smith who was Mr. Hilfiger's second chair after I was -- after I withdrew from the case.

Q.  All right.  And is there a way that you could track who looked at the computer files in Mr. Barrett's case?

A.  The computer files were kept on a secure web server, and the system was designed, and it was my design, I had a coded system, and it was -- it would send me an email when someone accessed a file and say this file has been accessed on such and such date, and it would give the time.  So I was paranoid about security and I wanted to know whenever files were being accessed by anyone other than me.

Q.  Okay.  And how many times did Mr. Hilfiger access the computer database?

A.  At most -- I mean, I remember none.  But at most, I would say just one or two.

Q.  All right.

A.  Very minimal.

Q.  Did Mr. Hilfiger have copies of the files, the paper files, that you got from OIDS after you got appointed in the federal case, before your withdrawal anyway?

A.  I don't -- I don't believe he ever copied them.  And I know I had them at the time that Mr. Smith picked them up at

my house.

Q.   All right.  Do you recall when it was that Mr. Smith picked the paper files up from your house?

A.   It would have been after I was allowed to withdraw and after his appointment.

Q.   Okay.  Is it your recollection that you withdrew in April of 2005?

A.   Yes.

Q.   Would it be fair to say that Mr. Smith picked up the paper files from your house sometime in mid May to late May of 2005?

A.   That's -- I don't have any reason to believe that that's not correct.

Q.   Is that -- does that sound about right to you?

A.   Right.  He drove his car right up to my front door and we loaded them out.

THE COURT:  Mr. Autry, let's break right there for about 10 minutes.

MR. AUTRY:  Yes, sir.  Thank you.  Sorry.  Thank you, Your Honor.

*(Off the record at 3:20 p.m.)*

*(Back on the record at 3:34 p.m.)*

THE COURT:  Go ahead, Mr. Autry.

MR. AUTRY:  Thank you, Your Honor.  Sorry.

Q.   (BY MR. AUTRY)  Mr. Echols, I think, when we left off,

458

we were talking about the files in the case, both the computerized file and the paper files.  And I believe you indicated that, after Bret Smith was appointed to assist Mr. Hilfiger after you withdrew, that you gave him access to the secured website that had the computerized files; is that correct?

A.  Right.  It would need a user name and password to --

Q.  All right.

A.  -- access it.  It's encrypted in transmission.

Q.  All right.  How many times, to your recollection, did Mr. Smith access the secured website that had Mr. Barrett's files on it?

A.  I don't recall either he or Mr. Hilfiger doing so.

Q.  All right.  Now, when you received the paper files, did that include investigative files that had reports of interviews that Ms. Schaye did or Mr. Leedy did or any other investigator did in the case?

A.  Yes.

Q.  All right.  And when Mr. Smith came and picked up the files in May of 2005, was every file you had given to him?

A.  Yes.

Q.  Do you know whether or not OIDS maintained a copy of the investigative file at the Sapulpa office?

A.  I don't -- I don't believe they did.

Q.  All right.  My question really -- let me get to the

459

bottom line -- is this.  Did you ever withhold, after you withdrew from the case, any paper files that you had on Mr. Barrett's case from either Mr. Smith or Mr. Hilfiger?

A.  No.

Q.  They got everything?

A.  Yes.

Q.  Okay.  I asked you earlier, Mr. Echols, whether or not you had requested a psychiatrist and a psychologist be appointed to assist the defense in Mr. Barrett's federal case.  Do you remember me asking you that before we broke?

A.  Yes.

Q.  And what was the result of your request, or what happened to your request?  Do you recall?

A.  Ultimately Judge Payne entered an order.  He didn't reject our budget.  He entered an order specifying what he would permit.

Q.  Okay.  And did he permit you both a psychologist or a psychiatrist, or just one?

A.  Again, I -- of course his order speaks for itself, but my recollection is just a psychiatrist.

Q.  Okay.

A.  Or a psychologist.  I just -- I just don't remember.

Q.  Was it an either-or situation, you can have one or not both, to your recollection?

A.  Yes.  And I think the -- I think the funding was at a

460

level which would indicate more psychologist than psychiatrist.

Q. Do you recall whether or not the number of hours that were approved by Judge Payne for either a psychiatrist or a psychologist was 40 hours?

A. I don't recall that, but I think that's -- that's consistent with my recollection.

Q. All right. Did you consider -- however many hours that were approved, did you consider the number of hours that were approved to be adequate to the task?

A. I didn't, no.

Q. Why not?

A. Because what I was interested in was finding someone who could determine whether or not additional testing was needed for organic brain damage, and whether or not other testing was needed, someone who could explore the fetal alcohol and other things. And I thought that that was a larger undertaking than the court did.

Q. All right. Did you ask for a mitigation investigator?

A. Yes.

Q. And do you recall approximately how many hours you asked for a mitigation investigator?

A. It was a company on the east coast and I -- 200 seems right, but whatever the documents show.

Q. Okay.

461

A.   I mean, I think we can resort to these documents and determine just exactly what I asked for.

Q.   Sure.  Do you recall how many hours were approved for a mitigation investigator by Judge Payne?

A.   I -- I've looked at the order since -- since I became aware of this hearing, and I believe he approved a higher rate than I had requested, and for a smaller number of hours -- a correspondingly number of or hours.

Q.   Does 100 hours sound accurate?

A.   Yes.

Q.   Okay.  And what rate did you ask for?

A.   I think my -- the original request I made was probably for $125 an hour.  But ultimately I -- Julie O'Connell, I believe is her name, a lady who's a federal defender in Tulsa had worked with a company on the east coast, and she referred that company to me.  And they requested only $75 an hour.

Q.   All right.  And was any provision made in the order Judge Payne made for expenses for the mitigation investigator?

A.   I don't believe so.

Q.   Were any -- was any provision made for either a psychologist or a psychiatrist for their expenses in the order that Judge Payne issued?

A.   I don't recall any such provision.

Q.   All right.  Now, you entered Mr. Barrett's federal case shortly after he was charged in October of 2004.

A.   I think it probably would have been several weeks, but --

Q.   All right.  Do you recall whether or not the budget -- the order on the budget came out somewhere around March 18th, 2005?

A.   Are you speaking of Judge Payne's order?

Q.   Yes, sir.  I'm sorry.

A.   Yes.

Q.   All right.  And at that time, do you recall when the trial was set to begin?

A.   In July I believe.

Q.   And did that create time problems for you?

A.   Yes.

Q.   Could you explain those?

A.   Well, the -- we had been in the case since the late fall of the previous year, and until the funding was approved by Judge Payne, it couldn't be sent to the circuit for the circuit's approval.  And until the circuit approved it, we couldn't actually expend any funds.  So it wasn't a case where you could say to somebody, go ahead and start working now.  We were being held at the starting gate.

Q.   All right.  Even after there was some kind of approval of some funds in March of 2005, had any mitigation

investigator done any work on the federal case?

A.   No.  I'm trying to remember the name of the company.

Q.   Inquisitor, Inc.?

A.   That's correct.

Q.   Had Inquisitor, Inc. or any other mitigation investigator done any work on the federal case as of March 18th?

A.   Nothing other than talking to me about their -- you know, the expectations and fees.

Q.   All right.  And had any psychologist or psychiatrist actually been retained to examine Mr. Barrett as of March of 2005?

A.   No.

Q.   All right.  Now, at some point, Mr. Echols, did you move to withdraw from representing Mr. Barrett in the federal case?

A.   Yes, I did.

Q.   Okay.  And why did you move to withdraw?

A.   I was -- I wasn't getting anything -- I wasn't accomplishing anything.  And I was concerned that -- I was concerned that the case was not going to be permitted to be aggressively presented.

Q.   All right.  Did you consult with anybody about your motion to withdraw before you filed it?

A.   Yes.

464

Q.   Who?

A.   I consulted with Paul Brunton, the chief federal public defender in Tulsa.  I consulted with Richard Burr, who is one of several capital defense resource counsel provided to attorneys -- appointed attorneys in capital cases in the federal system.  And I consulted with Mr. Hilfiger.  And I probably consulted with a gentleman whose name I want to think is Kevin Nally.

Q.   McNally?

A.   Is it McNally?  I may have -- I may have talked with him or he may have sent word through Richard Burr.  I consulted with Richard Burr on a regular basis.

Q.   Okay.  And what did Mr. Burr tell you with respect to your motion to withdraw or whether you should even file one?

         MR. WILSON:  Objection, Your Honor, as to hearsay and relevance of this inquiry.

         THE COURT:  What is the relevance of it?

         MR. AUTRY:  It explains what he did and why he did it with respect to the withdrawal.

         THE COURT:  What does all that have to do with what we're here to address, which is performance by the trial counsel?

         MR. AUTRY:  Your Honor, I think it's relevant to the performance of trial counsel, and I think I'll be able

to link it up.  But because of all the restrictions that were placed on the budgeting and the time crunch and all that, that obviously, in our view, had an effect on the representation that was ultimately given to Mr. Barrett in the second stage of the trial.

THE COURT:  But what does what somebody told him about withdrawal have to do with that?

MR. AUTRY:  Okay.  Well, I can move on.

THE COURT:  Okay.  Go ahead then.

Q.  (BY MR. AUTRY)  Okay.  What did Mr. Hilfiger say to you with respect to the motion to withdraw?

A.  He was opposed to it.

Q.  Why?

A.  Well, I can't say why he was opposed to it.  He felt that it was -- it was not necessary for him.  I had asked him to join in the motion, and he did not -- he chose not to do so.

Q.  Okay.  At the time you asked for or got approval for 100 hours of work by a mitigation investigator, in your opinion what was left to be done insofar as the mitigation case was concerned?

A.  Just -- just about everything.  The -- in consultation with the capital resource counsel, I became more fully aware --

MR. WILSON:  Objection, Your Honor, as to that

consultation.  Counsel was asked what did he believe needed to be done, and they're going into some consultation with someone else.  And so I'm going to object to hearsay, and also relevance.

THE COURT:  Overruled.

Q.  (BY MR. AUTRY)  Go ahead.

A.  I consulted with -- primarily with Richard Burr, and he provided me with information and case law that left no doubt in my mind that mitigation investigation that we had actually completed in state court was insufficient for meeting the standard of representation in a capital case.

Q.  All right.  At the time you moved to withdraw, or earlier during your representation of Mr. Barrett in the federal case, was the court, Judge Payne, made aware that the mitigation investigation from the state case was incomplete?

A.  Well, I -- I believe he was made aware of it, yes.

Q.  All right.  What about Mr. Hilfiger, was he aware of that?

A.  I just do not recall ever having a conversation about mitigation with Mr. Hilfiger while he and I were both counsel.

Q.  All right.  When you filed your motion to withdraw, what happened on it?

A.  Judge Payne granted it.

Q.   Okay.  And what happened after that?  Who was appointed lead counsel?

A.   Mr. Hilfiger was given the lead counsel position and Mr. Smith was appointed as second chair.

Q.   All right.  At the time you left the case in April of 2005, how much work had Mr. Hilfiger done on the case overall?

A.   Again, in my opinion, very little.

Q.   Had he ever discussed with you a mitigation investigation, or strategy for a mitigation investigation?

A.   Prior to my withdrawal?

Q.   Yes, sir.

A.   Again, I don't -- I don't recall.

Q.   All right.  Between the two of you in the federal case, who was supposed to be in charge of doing the work to develop any mitigation case that would have to be presented?

A.   Well, I was in charge of everything.

Q.   All right.  And why is that?

A.   I was lead counsel.

Q.   Okay.  At the time you left the case in April of 2005, did you think it was ready to go to trial relatively soon --

A.   No.

Q.   -- as to the first stage?

A.   No.  I didn't think it was -- no.  The answer is no.

468

Q.  Why not?

A.  The federal trial was different in character -- or the anticipated federal trial was different in character from the state court trials.

Q.  Okay.  And what about the penalty phase?

A.  It was not ready any more than it had been in either of the state court trials.

Q.  All right.

    MR. AUTRY:  Could I have just a second, Your Honor?

    THE COURT:  Yes.

Q.  (BY MR. AUTRY)  Could you look at Government's Exhibit 37, Mr. Echols?

A.  Yes.

Q.  Okay.  And what is that?

A.  It's a psychological evaluation from 2003.

Q.  Okay.  And who did that particular evaluation?

A.  Kathy LaFortune.

Q.  Okay.  And what's the date of the report?

A.  July 8, 2003.  I'm sorry, that's the date of the evaluation.  The date of the report is July 13, 2003.

Q.  All right.  And could you look at Exhibit 34, please?

A.  Yes.

Q.  What is that?  Is that Dr. Russell's risk assessment?

A.  Yes, it is.

469

Q. What's the date on that?

A. December 15, 2003.

Q. All right. Could you look at Government Exhibit Number 16?

A. Yes.

Q. And what is that?

A. It's a psychological evaluation by Bill Sharp.

Q. And what's the date on that?

A. The assessment date is September 28, 2002. I don't know if it has a date of report. Report is signed on October 3rd, 2002.

Q. Okay. Is it your recollection that Dr. Bianco looked at Mr. Barrett in connection with the state case in 2000?

A. It was in connection with the first trial, I believe.

Q. Yes. Okay. Now, when was the case tried the second time, the second state trial?

A. 2004.

Q. And when was the first state trial?

A. I believe 2002.

Q. See if I can find something here real quick. I asked you this earlier, or alluded to it, Mr. Echols. Was it your view that Kathy LaFortune was there sort of as a keeper of the purse for the indigent defense system?

A. She was what might be the equivalent of a triage type person. The agency had little funding, and she was sort of

a choke point on funding.  The OIDS of course all dealing -- the office I worked in was always dealing with murder cases, and psychological issues are always present in murder cases.

Q.  Okay.  When you say choke point, do you mean choke it off, choke off the funding, or what do you mean exactly?

A.  Well, I mean that there's only so much money to be distributed, and I believe she made her decisions in aid of preserving those funds.

Q.  All right.  And was her -- she's a psychologist; is that correct?

A.  And also a J.D.

Q.  And a J.D.  So would it be her job to do an initial screening, or some kind of screening test short of any kind of comprehensive evaluation, and then say yea or nay as to whether additional experts could be hired with any funding available to OIDS?

A.  After -- after I left the federal case, later that same year, I went back to work for OIDS in the Sapulpa office where she worked, and that was the role that she played.

MR. AUTRY:  All right.  Okay.  Thank you, Mr. Echols.

THE COURT:  Cross-examination, Mr. Wilson.

CROSS-EXAMINATION

BY MR. WILSON:

471

Q.  Mr. Echols, you have been involved in capital litigation for how many years?

A.  The first case I ever tried was a first degree murder case.

Q.  And that was in what year?

A.  Probably 1979 or '80.

Q.  All right.  And you -- and I believe your previous testimony was you've been involved and was part of a specialized unit that only handled capital cases; is that correct?

A.  I've done that twice.

Q.  During your representation of Mr. Barrett, isn't it true that you never -- you never asked the court to authorize an evaluation of Mr. Barrett for purposes of determining his competency to assist you; isn't that correct?

A.  That's correct.

Q.  You had no concerns that Mr. Barrett was -- that he was not rationally able to assist you in your defense; isn't that correct?

A.  I may have had concerns, but never to the point that I felt that it was something that I had to address.

Q.  Because if you did, then, under the state system, there was a procedure where you could have filed a motion asking the court for an evaluation; correct?

A.  That's correct.

Q.   And the same holds true in the federal system; right?

A.   I don't -- I'm not sure.  I don't know.

Q.   Okay.  Well, if you -- I assume that when you represented Mr. Barrett in the federal side, if you would have had some concerns, you would have done the research to find that provision which allowed a motion to be filed to determine competency.  Would you agree with that?

A.   Sure.

Q.   Okay.  Because I believe you believed and considered Mr. Barrett, and I'm sure you do to this day, that Mr. Barrett is a bright man?

A.   Mr. Barrett has -- has, I think, a very good mind in many areas, yes.  I think he was interested in his case. Mr. Barrett demonstrated recall to me, for instance.  We would be sitting discussing this case and he would remember something that a witness had said, and I think, my experience was, he was invariably correct.

Q.   I believe you told the Court that exact same thing; correct?  That he wasn't an educated man but a bright man; is that correct?

A.   Yes.  I think his skill sets may have been more narrow than some others with a high intellect.  But Mr. Barrett was always -- I was always able to talk to him.

Q.   And as you said, while you were representing him in the first trial and the second state trial, he had amazing

recall of previous testimony of witnesses, and would draw your attention to that and you would check it and, sure enough, he was right; is that correct?

A.  I don't think I said amazing recall.  I think what I said was that invariably, when he did bring something up, it was -- it was good insight into the case.

Q.  All right.  And so when Dr. Sharp evaluated him and said that he noticed a problem with Mr. Barrett's being able to recall information, that would be inconsistent with your personal dealings with Mr. Barrett; correct?

A.  It would depend on what information he was being asked to recall.

Q.  Fair enough.  But information that was relevant to this particular investigation, he was able to recall it?

A.  He was able to recall the events that occurred in court when we were together.  He was able to recall those, had a good handle on those.  He was interested in his case.  He wanted to participate in his case.

Q.  He was able to recall events of the evening of September of 1999; is that correct?

A.  I don't know to what degree I'm required or permitted to discuss my private conversations with Mr. Barrett on -- in specifics.

Q.  Mr. Barrett has raised an issue regarding ineffective assistance of counsel, and you've been called as a witness

on behalf of Mr. Barrett; is that correct?

A.  Yes.

MR. WILSON:  Your Honor, I'd ask the witness to answer the question.

MR. AUTRY:  And we object, Your Honor, because any waiver of the privilege goes to questions of ineffective assistance of counsel in the second stage with respect to Mr. Hilfiger and Smith.  Not necessarily to Mr. Echols' attorney/client relationship with Mr. Barrett.

THE COURT:  What was the question again?

MR. WILSON:  I was asking about his -- Mr. Barrett's recollection of the events of the crime.

THE COURT:  You're not asking him for the substance of my communications I take it?

MR. WILSON:  No.

THE COURT:  Okay.  It's overruled.

Q.  (BY MR. WILSON)  Was he able to recall the events?

A.  He was able to recall events that were not associated with being under the influence of drugs, yes.

Q.  I'm not sure that I quite understand that answer.

A.  Well, I -- may I amend my answer, and I'll just say he was able to recall the events that -- relevant events relating to the charges against him, yes.

Q.  Thank you.  Prior to your representation of Mr. Barrett in the federal system, you would agree with me that you had

475

no previous federal capital litigation experience;
correct?

A.   That's correct.

Q.   Mr. Hilfiger, who was appointed your second chair, had
been involved in a previous capital litigation case in
federal court; is that correct?

A.   He had prosecuted a case in federal court.

Q.   Was involved in a litigation?

A.   Yes.  Yes.

Q.   Now, there's been some testimony about staff that was at
your disposal or that you could use to assist you in the --
excuse me -- in the defense in the state cases.  You had a
co-counsel the first case, that being Mr. Standing Bear;
correct?

A.   That's correct.

Q.   And you had -- I believe you testified about Steve Leedy
who did some investigative work for you; is that correct?

A.   That's correct.

Q.   You had retained the services of Roseann Schaye?

A.   Yes, sir.

Q.   You okay?

A.   Yes.

Q.   Okay.  And you obtained her services specifically for
the purpose of gathering mitigation information; correct?

A.   Yes.

476

Q.   And isn't it true that Ms. Schaye went through her
budget and wanted an additional $100,000 to complete her
investigation?

A.   I don't remember what the -- what the money was.  She --
she burned through the budget that I had available for her,
and her position was that she needed to do tremendous amount
of additional work and needed to travel to meet with various
relatives to form one of these multigenerational assessments
of the family history.

Q.   And I believe the expression you used in dealing with
the court was that she bailed out?

A.   Well, she -- she was unhappy with me.  She wrote a
letter to the judge and said I -- you know, I have never
quit before, but I'm quitting now.  And as I recall, there
was a cover letter that said please don't put this in the
court file, and of course that's where it went.

Q.   But at the time that she had -- that she ended her
services with you -- we've gone through a number of
documents with other witnesses that were generated by
Ms. Schaye --

A.   Yes.

Q.   -- and are you aware that she did conduct a number of
different -- excuse me -- interviews of family members?

A.   Yes.

Q.   Conducted multiple interviews of your client,

477

Mr. Barrett?

A.  Yes.

Q.  And she provided you all that information?

A.  Yes, either to me or there was -- there was some controversy about money being owed to her and her retaining the files for a period of time.  Ultimately, I -- I received everything that -- I believe I received everything that she had done.

Q.  Okay.  As a matter of fact, I believe you had to have Steve to contact her, Steve Leedy, and ultimately you did get the stuff; correct?

A.  As far as I know, it was Steve who retrieved the -- I don't know whether she was ever paid any additional money or not.

Q.  And the information that you received from her would also be medical records that were obtained; correct?

A.  No, I don't -- I don't recall her -- I know when -- I just don't recall what was done about obtaining medical records then.  I don't recall whether that was something she did, or whether that was something being done by the staff at OIDS.

Q.  Okay.  But someone did it; right?

A.  Yes.

Q.  I mean, you were aware of the 1986 suicide attempt?

A.  Yes.

478

Q.  You were aware of the 1986 commitment in October for a mental health evaluation or treatment; correct?

A.  A separate incident, yes.

Q.  Yes.  You were aware of another incident in 1995, another hospitalization for mental health treatment; correct?

A.  Yes.  I couldn't tell you the details of those now. But, yes, I was generally -- I recall generally that Mr. Barrett had had multiple encounters with the mental health system.

Q.  And I believe Mr. Leedy, who testified a few minutes ago -- actually more than a few minutes -- but earlier today, talked about additional interviews that he performed after Ms. Schaye's services were ended with you?

A.  Yes.

Q.  And you requested he to do that; correct?

A.  Yes.

Q.  And I believe you said that he was -- he was welcoming of the opportunity to help out with mitigation; correct?

A.  He's -- he was then and is now open to the idea of a mitigation investigation as opposed to a first stage fact investigation.

Q.  And you went to trial on the first time, and not knowing that there was going to be a hung jury.  You would agree with that?

**United States District Court**

A.    Absolutely.

Q.    There was a possibility that there could have been a conviction and a second stage; correct?

A.    And an acquittal, yes.

Q.    But going into that trial, it was your understanding from Judge Garrett that you were going to get two weeks, roughly, before the second stage began; correct?

A.    Yes.

Q.    Now, Mr. Echols, you're not telling us that, in that two week period, you were going to retain a psychologist, you were going to do a full battery of tests, and you were going to do more testing of Mr. Barrett to begin the second stage? You're not telling us that, are you?

A.    No.  What I'm describing is we weren't ready -- we weren't ready to present the second stage.  It wasn't organized.  We didn't have our witnesses lined up.  We didn't -- we couldn't present the case that we had on the day of trial.  And rather than postpone the entire trial, the result -- the agreement was that we would -- we would try the case, and, if necessary, I would be given additional time to manage that part of the presentation.  We didn't, for instance, settle jury instructions for the second stage.

Q.    Okay.  But what I'm asking is, you weren't going to be able to hire --

480

A.  Of course not.

Q.  -- someone to evaluate and do all that in two weeks; correct?

A.  That's correct.

Q.  So if there had been a conviction, you were going to go in with what you had?

A.  I would be in Mr. Hilfiger's shoes.

Q.  Okay.

A.  I would have done an inadequate job.

Q.  Based upon your belief; correct?

A.  Based upon my -- my continuously evolving understanding of what's necessary in such a case, yes.

Q.  Well, you're talking about your continued involvement and understanding of a federal case; right?

A.  No, I'm talking generally.  I mean, I have -- I think like a lot of lawyers, there was a time when mitigation wasn't on the front burner with me either.

Q.  I understand that.  Was that the case in 2000?

A.  Looking back, I think it was, yes.

Q.  Okay.  Well, there's a second trial; correct?

A.  Correct.  Yes.

Q.  The only thing that was done differently between the first trial and the second trial was Roseann -- was Jeanne Russell; correct?

A.  No, that's not correct.

481

Q.   Okay.  You had hired a psychologist?

A.   I'm pretty sure Bill Sharp's opinion came in after the first trial.

Q.   But then you had Kathryn LaFortune after Bill Sharp saying that he doesn't -- you don't need anything else; correct?

A.   You know, I didn't read these exhibits.  I was just asked when they were -- when they were given.

Q.   Well, isn't it true you never mentioned Bill Sharp to the court when you were asking for additional funding in the federal system; is that correct?

A.   I -- I would have to go back and look, but I think that's correct.  I think what I asked for is the position to be filled by someone, and that person would then be able to rely on what had been done previously.

Q.   So just so I'm sure on the time line, the crime took place in September of '99; correct?

A.   You want me to say it's a crime?  We argued it was self-defense.

Q.   He was convicted in the state system; correct?

A.   That's correct.

Q.   He was convicted in the federal system; correct?

A.   Yes.

Q.   Would you agree that there was a crime committed?

A.   The jury found that a crime was committed, that's

482

correct.

Q.  Thank you.  The Faust Bianco evaluation took place in August of 2000.  Do you have any reason to doubt that?

A.  No.

Q.  The first state trial was in September of 2001; is that correct?

A.  I thought it was 2002, but you may be right.

Q.  Dr. Sharp's evaluation was in September of 2002; right?

A.  Yes.

Q.  Kathryn LaFortune's was in July of 2003; correct?

A.  Yes.

Q.  Jeanne Russell's risk assessment was done in December of 2003; correct?

A.  Yes.

Q.  And the second trial was in January of 2004; correct?

A.  I'm sure.

Q.  And you went into that second trial, and you said things were different on the second stage; is that right?

A.  Yes.  I think we had additional interviews.  I think we were -- I think we were in better shape the second trial than we were the first trial.

Q.  Mr. Echols, I'm not going to go through all of the information that you had, but as counsel asked you in direct, you were aware of Mr. Barrett's family history prior

to the first state trial; correct?

A.  Yes.

Q.  You were aware of allegations of mental disorders in the family prior to the first state trial; correct?

A.  I don't recall, as I sit here, mental disorders in the family.

Q.  Were you aware of that before the second trial?

A.  I don't recall.  Same answer.  I know there was a lot of drug abuse and violence and neglect.

Q.  And you were aware that there was a lot of drug abuse on behalf of Mr. Barrett; correct?

A.  Yes.

Q.  That he was evaluated in '86 and in '95, and he admitted drug use during those times; is that correct?

A.  Certainly.

Q.  And when we say drug abuse, multiple different drugs; methamphetamine, heroin, marijuana, cocaine?

A.  I don't remember anything about heroin, but it may have been.

Q.  Okay.  And all that information, according to your testimony, was in your database?

A.  I don't know if it was all in my database.  The information was available to me, yes.

Q.  And when you say it was available to you --

A.  Right.

484

Q.   -- either in hard copy or in your database, is that what your testimony is?

A.   Yes.

Q.   And when you retained Jeanne Russell prior to the second trial, counsel referred you to her report, and that would be Government's Number 34, Mr. Echols?

A.   Yes.

Q.   You would agree with me that Ms. Russell determined that, at the present time, Mr. Barrett was not exhibiting symptoms of a major mental illness; isn't that correct?

A.   I'd have to read her report to see whether that's what she said or not.

Q.   If it's in her report, you wouldn't have any reason to doubt that?

A.   No, I don't -- I don't quarrel with the documents. You're asking me if I recall that, and I don't.

Q.   Okay.  Fair enough.  Thank you.  Now, we talked about Mr. Standing Bear being your co-counsel in the first trial. Jack Gordon was your co-counsel in the second state trial; correct?

A.   That's correct.

Q.   And Mr. Gordon was in charge of the mitigation, the second stage; isn't that correct?

A.   That's my recollection.  Jack and I were -- Mr. Standing Bear and I, and then, in the second trial, Jack and I were

in regular communication, and I certainly shared responsibility for everything.

Q. And how is it that you provided information to Mr. Gordon as far as the documents for the -- from the file? Did you give him access to your database?

A. I don't recall.

Q. You don't recall whether you made him hard copies? Just don't know -- remember how that happened?

A. I just don't recall.

Q. But you would provide him the mitigation interviews that Roseann Schaye conducted; correct?

A. I mean, if he -- if that's what he was doing. I don't recall an agreement that he was going to be the second stage and I was going to be the first stage. But if he -- if that's -- if that was our agreement, then certainly I'm sure he acquired the documents somehow.

Q. Okay. Well, if he testified that that was his understanding, that he was in charge of the second stage, any reason to doubt that?

A. No, no. No, not at all.

Q. Okay. You testified that, at the time of your employment as lead counsel in the federal case, that there was some discussion about Rob Nigh being involved as well; is that correct?

A. That's correct.

Q.   Okay.   And you would agree with me that Rob Nigh had a conflict?   He couldn't be involved?

A.   I'm not -- I don't know.

Q.   You're not aware of that?

A.   No, I'm not aware of that.

Q.   Okay.   But, Mr. Echols, would you agree with me that you weren't in agreement that Mr. Hilfiger should be the second chair?

A.   I was not in agreement.   That if Mr. Nigh was not going to be second chair, I would have rather had input into selecting the second chair.   Perhaps Mr. Brunton.

Q.   Okay.   And did that affect your relationship with Mr. Hilfiger?

A.   I suppose, in one sense, it necessarily has an effect on it.   My relationship with Mr. Hilfiger was always cordial. We just didn't agree in some areas.

Q.   All right.   Ultimately you filed a motion to withdraw; correct?

A.   Yes.

Q.   And Mr. Hilfiger didn't enter into that?

A.   That's correct.

Q.   And you can disagree with my characterization.   But I characterize that motion as more of -- it was a power play.

A.   Well --

Q.   Would you agree or disagree with that?

487

A.   It certainly wasn't a successful power play.

Q.   I'll give you that.

A.   Our feeling was -- and this is -- earlier I was talking about Richard Burr and Paul Brunton when we discussed this. Our feeling was that we had a train wreck heading down the track, and that, if the motion to withdraw were denied, that we could seek a review in the circuit court about the level of compensation for counsel and the level of budgeting for experts.  That was the -- we were trying to figure out a mechanism by which we could gain appellate review before trial.

Q.   And that didn't work out the way you had hoped; correct?

A.   It did not work out.  My preference would have been for the court to deny the motion and for us to take the matter to the circuit.

Q.   And when the motion was denied, then Mr. Hilfiger became lead counsel; correct?

A.   Yes.

Q.   And I believe it was your testimony that Bret Smith became second chair; correct?

A.   Yes.

Q.   And that Bret Smith came to your house and picked up all the files; correct?

A.   Yes.

488

Q.  And in anticipation of Mr. Smith coming to get those files, I assume that you made sure that everything that was on your database was in a copy -- in hard copy so that Mr. Smith and Mr. Hilfiger could have them?

A.  No.  No, I didn't make that effort.

Q.  You knew that Mr. Hilfiger was not computer -- didn't have computer savvy; correct?  Kind of same way Jack Gordon didn't?

A.  Well, Jack Gordon is a -- is a unique individual.  Mr. Hilfiger, I believe, had -- was capable of acquiring information from a computer.

Q.  Okay.  Did you ever talk about that?

A.  We talked about giving him access to everything that was on there.  Showed him how to do it.  We gave him all the paper files, yes.

Q.  So do you know what was in your database that was not in hard copy at the time that you provided those records to Bret Smith?

A.  There would be a good deal of information related -- for instance, there would be a page or a card, or whatever metaphor you want to use to describe it.  There would be a place where information about a certain person would be kept.  And that's where any notes that I had taken or put in anything, anything that I had done, that would be associated with that page.

489

Q.  For instance, look at Government's 29, that tab, Mr.
Echols.

A.  Yes.  That's a printout of -- from my -- my computer.

Q.  And so is this what you're talking about?  In your
database, there would be a listing of a witness, and then
how that witness applies to this particular case?

A.  Yes.

Q.  All right.  Now, you would agree with me that this is in
paper form?

A.  Yes.

Q.  Do you know how it got from your database into a paper
form?

A.  There's --

Q.  Push print?

A.  It -- it creates a PDF document rather than just
printing to a printer.  And then the PDF document would be
printed.

Q.  Okay.  And so at the time that you provided your files
to Mr. Hilfiger and Mr. Smith, did you create those PDF
documents and print them out?

A.  I don't believe so.

Q.  Did you do that at the request of Mr. Autry or any
subsequent counsel representing the defendant, Mr.
Barrett?

A.  No.  I think I gave them access to the computer files.

490

I don't believe I ever supplied any of his current counsel with paper documents.

Q. After you were allowed to withdraw and Mr. Hilfiger was appointed -- well, back up. I believe you testified that, prior to your motion to withdraw, that you and Roger did not have any specific discussion of your recollection regarding mitigation?

A. I just don't -- I have no recollection of talking with him prior to -- to withdrawing, that's correct.

Q. Does that mean it didn't happen or you just don't recall?

A. It means I don't recall it.

Q. Okay. So it could have?

A. It may have been. I certainly -- I'd certainly be happy if there was some.

Q. Okay. After you were allowed to withdraw, do you have an independent recollection of any conversation you had regarding mitigation?

A. I spoke with Roger and with Bret and described for them what I thought still needed to be done and what I thought the path would be to bring in a case to trial.

Q. And specifically what did you tell Mr. Hilfiger and Mr. Smith that needed to be done?

A. Well, that they needed to complete the budgeting process. They needed to retain the experts. They needed to

have the experts go to work immediately.

Q.   And did you say specifically what experts should be retained?

A.   I don't -- I don't believe I did.  I mean, I don't -- I don't recall the details of the conversation.

Q.   Okay.  Now, in reference to the request to have an expert hired to evaluate the defendant regarding organic brain issues --

A.   Correct.

Q.   -- I believe you testified that that was one of the things that you made a request for in the federal case; correct?

A.   Yes.

Q.   And I believe that you did that, isn't it true, because you wanted to just -- you wanted to touch that base; is that correct?

A.   No.  I did it because I have been taught and have, through discussions with other lawyers, come to believe that juries, given life or death choices over an individual, are frequently persuaded by something that can be shown on a screen or handed to someone, something that can be seen or evaluated, or a doctor who says this part of the brain is functioning this way and that's why this individual behaves that way.

Q.   And I appreciate that, Mr. Echols.  And the reason I ask

that question specifically is, do you recall in a hearing with this Court, with Judge Shreder, making the comment, "I would like to at least be able to touch that base"?

A. Yes. I mean, I don't recall making the comment, but I -- I adopt the comment. If that's -- that's something that needs to be done in order to exclude the possibility that Mr. Barrett would go to trial and no one would have discovered something that would have been useful.

Q. Isn't it true that you had a full discussion with the Court about what had taken place on the state side, and that Kathy LaFortune wouldn't allow you to do it, and you asked her to get an affidavit from Dr. Bianco just to cover yourself? Isn't that right?

A. Well, when you say just to cover yourself, I think -- I don't -- I don't adopt that -- that point of view. I may have said those words, but I think, in the context, I would -- I would be describing the responsibility I have to look at all of the things that are known to be effective in capital litigation.

Q. Well, I don't want to characterize that you made that comment. Specifically do you remember saying, "Kathryn LaFortune said, based upon -- based on that, we are not going to give you any further testing. Of course he had tested Barrett before the first trial. There wasn't anything new. Instead of arguing with them, I made her get

an affidavit from him that said that, so that when I was challenging the habeas after Mr. Barrett's conviction and death sentence, when they said, you know, why in God's name didn't you have his brain checked as a mitigator, and I just didn't go any farther with it -- with that -- I probably should have, I think -- I would like at least to be able to touch that base"?

A.  I think that's an accurate statement.  I don't recall the word for word.  But Judge Shreder and I had several discussions about this, and --

Q.  But at the time that you made those requests, Dr. Bianco had rendered an opinion saying that Mr. Barrett didn't suffer from any mental illness; correct?

A.  I don't know what he was evaluating Mr. Barrett for specifically, but his -- his report to me was negative in the sense that there's nothing I have to say that can be useful to you in defending Mr. Barrett.

Q.  In addition to that, you had Dr. Sharp who said he had problems with memory?

A.  And said -- also indicated the possibility of organic brain dysfunction.

Q.  Okay.  But then you had a subsequent evaluation by Kathy LaFortune saying no other experts needed; correct?

A.  Yes.  I mean, I see the documents here.

          MR. WILSON:  May I have just a moment, Your Honor?

THE COURT:  Yes.

Q.  (BY MR. WILSON)  Mr. Echols, just so I'm clear, I want you to look at, for instance, Government's 22.

A.  Yes.

Q.  And do you recall -- by just looking at that document, do you recall that document specifically?

A.  I don't know what you mean when you say do I recall this document specifically.

Q.  Do you remember seeing that document before?

A.  I don't know that I've ever seen it before.  It looks familiar to me.  It looks to me as though it's one of Roseanne Schaye's reports.

Q.  And the format in which it's currently in, is that a format that she prepared, or is that something your database would have prepared?

A.  This would have been prepared on her format.

Q.  And so in order for it to get into your database, it would be scanned in and put into your database?

A.  If it's in the database.  I don't know that it is.

Q.  So you don't know whether it is or not; correct?

A.  Right.  I would have to look to see.

Q.  And you can't say if it was in the boxes given to Mr. Smith?

A.  That's correct.  I mean, I -- we gave -- I gave Mr. Smith everything that I had that was in paper form.

Q.  And are you aware of anything at OIDS that was in addition to what you gave Mr. -- Mr. Smith?  Any additional investigative files or anything?

A.  I asked them to provide everything that these -- these paper files had been in my possession at the end of the second trial.  They were boxed up and sent to OIDS and OIDS retained them.  And then, when the federal case was filed, they came back to me.

Q.  And those same boxes, then you loaded up into Bret Smith's car when he pulled up in front of your house?

A.  That's -- that's correct.

Q.  Government's Exhibit Number 26 is a declaration of Roseann Schaye.  Would you mind looking at that that for me, please?

A.  Yes.

Q.  Do you know -- excuse me.  Do you know the circumstances about which this particular document was created?  Did you ask her to prepare a declaration?

A.  I don't believe so.

Q.  And so any of the exhibits that -- or documents that we -- when I say we, myself and Mr. Kahan -- have reviewed that look like the one that we talked about earlier that has the heading of the witness and has, at the top, do not duplicate, confidential attorney work product, and has your name, John David Echols, that would be a document which was

496

generated --

A.   What was that number?  I just want to look at it again and I can tell you what I recognize as.

Q.   I'm looking at Number 30.

A.   30.  All right.  I recognize that as a document that is generated by my computer.  It's a content management system. There will be a field in there that says what the file is, and that will be 2001, Kenny Barrett.  And there will be a field in there that which lists issues, and 001, family and friends.  And then there would be a summary field.  And then there would be other fields, more than one normally, that would be different inputs into the database.  When the -- what the computer does is it draws them out and then adds, for instance, the little, what, eight slashes in front of the word summary, and prints the word summary in bold face, etc.  That's all done -- that's all generated by the computer.  And if it says do not -- the heading across the top, do not duplicate, confidential attorney work product, and a copyright, that is -- I recognize that as being generated by my computer.

Q.   So any document that we have reviewed -- that government's reviewed that looks like this that has the heading on it, that would have been generated by your database?

A.   Unless -- unless somebody tried to fabricate one, but I

497

have no reason to believe that that would be the case.

Q.  Okay.  To your knowledge, did Mr. Gordon, your co-counsel in the state case -- second state case, did he accumulate any information that was not shared with you or that he kept on his own?

A.  I wouldn't know, obviously.

Q.  For instance, would he say, well, I've got some information over here that I'm keeping that --

A.  I don't recall anything like that.

Q.  Okay.  So you would think that, anything he had in his files, he would provide you a copy?

A.  Well, I don't -- I mean, I don't know what files he kept personally.

MR. WILSON:  Pass the witness, Your Honor.  Thank you.  Thank you, Mr. Echols.

THE WITNESS:  Yes, sir.

THE COURT:  Redirect, Mr. Autry?

MR. AUTRY:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q.  Mr. Echols, do you know if OIDS was in the habit of keeping duplicate paper files on a capital case?

A.  OIDS kept duplicate files of -- I mean, on top of duplicate files.  There were -- that was a problem until they switched to scanning.

Q. All right. You were asked about your request for expert assistance -- mental health expert assistance in the federal case and conversations you had with Judge Shreder. And the way Mr. Wilson was trying to make it sound is that you were only requesting mental health expert assistance for Mr. Barrett in the federal case as a CYA maneuver.

A. I heard it.

Q. Okay. Is that what you were doing?

A. No. I was -- I was representing Mr. Barrett.

Q. And this is a person you knew who had attempted to commit suicide in 1986 by shooting himself in the chest; correct?

A. I thought it was the abdomen, but --

Q. Somewhere -- well, he shot himself with a shotgun?

A. It was with a shotgun. Leaned over a shotgun and pulled the trigger.

Q. All right. And somebody who had been committed to mental health hospitals in the past; correct?

A. Yes.

Q. Somebody who had significant contact with the mental health system in the past; correct?

A. Yes. And I think it's -- from the point of view of litigating his defense, we're talking about what was his state of mind as of the night that all of this occurred, the night that Mr. Eales died. After that time, Mr. Barrett was

no longer able to acquire the drugs that had -- he habituated previously. And I think, as this went on, we were trying to look back into his state of mind back at that time.

Q. And you were also trying to develop, if you could, mitigating evidence that went to his overall mental state, whether he had mental illness, neurological damage, and any of that sort of thing. Would that be correct?

A. Yes.

Q. And this is a person who, during prior mental health contacts, based on the records, had been prescribed --

MR. WILSON: Objection, Judge, as a leading question.

THE COURT: Sounding a lot like argument at this point, Mr. Autry.

MR. AUTRY: I'm sorry, Your Honor. I was just trying to -- I was trying to save time, but I'll rephrase it.

Q. (BY MR. AUTRY) Do you recall whether or not the medical records for Mr. Barrett indicated he had been placed on antidepressants in the past?

A. Yes.

Q. Do you recall whether or not his mental health records indicated whether he had been prescribed antipsychotic medication in the past?

A.  I believe both.

Q.  All right.  Could you look at Exhibit 34, Mr. Echols, in the government's book?

A.  Yes.

Q.  And it would be Page 9 of Dr. Russell's report.

A.  Yes.

Q.  Do you see the heading, personality assessment?

A.  Yes, I do.

Q.  And Mr. Wilson asked you about the first sentence where it says, "At the present time, Mr. Barrett is not exhibiting symptoms of a major mental illness, i.e. schizophrenia, schizoaffective disorder, bipolar disorder, or major depression."  Do you see that?

A.  Yes.

Q.  And it goes on to say, "Although he is anxious and concerned about his current situation, he remains logical and focused on the events around him.  Persons close to Mr. Barrett at different times in his life report observing symptoms of what they believe to be mental illness.  For example, his ex-wife described him as too emotional and believed he had mental problems due to his mood swings.  She further described him as suffering deep depressions during which time he couldn't work.  His son, Toby, described him as having dramatic mood fluctuations and believed that he had some type of chemical imbalance.  Mr. Barrett's mother

has also described her son as having intense emotions and dramatic mood fluctuations. As described previously, Mr. Barrett completed one serious suicide attempt in 1986." Is that kind of information a red flag that you would want to investigate further through the use of a mental health expert?

A. Certainly.

Q. All right. And the paragraph after that --

A. And also through a mitigation investigator because the -- what you're trying to document is the impressions that family members and friends and relatives, both local and distant, have about the person.

Q. Yes, sir. And the paragraph after that talks about records indicating paranoia?

A. Yes.

Q. And it talks about Dr. Bill Sharp?

A. Yes.

Q. Where Dr. Sharp described Mr. Barrett as being extremely paranoid during his initial interview?

A. Yes, I recall that.

Q. And, also, that prior hospital records indicate that Mr. Barrett had at least some evasiveness while talking to doctors?

A. Yes, I see that.

Q. And that he had isolating behaviors before his arrest

502

indicating he rarely left his home and would ask family members to pick up needed items in town?

A.   Yes.

Q.   Is that something you would want to investigate further through a mental health expert and a mitigation investigator?

A.   Yes.  And it related also to the -- to what I would call the first stage defenses, too.

Q.   Okay.  And how so?

A.   Because the state of mind that he was in when his home was assaulted by the TAC team would be affected by these things.

Q.   Okay.  And could you look at Government's Exhibit 16 again?

A.   I have it.

Q.   Go to the last page, Page 8.

A.   Yes.

Q.   Under C -- this is Dr. Sharp's report; is that correct?

A.   Yes, it is.

Q.   Under C, does it say, "It is recommended that the client", meaning Mr. Barrett, "seek information and/or assessment and referral services regarding the possibility of organic neurological damage"?

A.   Yes.  I don't recall whether Dr. Sharp is a

neuropsychologist or not.

Q. Okay. Do you know whether -- well, it's an exhibit that's been admitted. Do you recall whether he did any kind of neuropsychological test or found any indications of --

A. I don't believe he's a neuropsyche. He says here, licensed clinical psychologist.

Q. Yes, sir. Okay. And D, also on Page 8 of Dr. Sharp's report, talks about a recommendation that Mr. Barrett seek mental health services in order to address the existence of obstructive personality related issues and/or family and origin related issues?

A. I see that.

Q. Okay. And does that go along with some of the things Dr. Russell talked about in her report that would be worthy of further investigation?

A. I think it's -- it's consistent with that, yes. I'm not sure what a family of origin related issues are unless they describe his nuclear family.

Q. Okay. Now, just because a mental health professional might diagnose or not diagnose somebody with an Axis I disorder, does that mean that there's not mitigating evidence that can be developed based on somebody's mental state or potential mental problems?

A. It does not mean that. It does not foreclose. One opinion does not, in my mind, foreclose the possibility that

a different professional might have a different view.

Q. Okay.  In the extensive budgeting process you went through in the federal case, did you lay out in detail what you thought needed to be done and what services were necessary to properly represent Mr. Barrett?

A. Yes.

Q. And --

A. Although I think the list was incomplete.  It would have had to develop as we received information back from those people.

Q. Yes, sir.  But you talk about the need for a mitigation investigator; correct?

A. Yes.  Of course.

Q. And you talk about the need for expert assistance from a mental health professional because you're requesting funds for that?

A. Yes.

Q. And Mr. Hilfiger certainly would have been privy to or aware of what the budget requests in the case in which he was a lawyer were?

A. Yes.  He received copies of everything I wrote.

Q. Do you recall filing a motion for an expert on organic brain disorders because Mr. Barrett is known to have suffered significant head injuries during his life?

A. Yes, that's a reference back I think to when he was hit

505

by, it was like a steel ball or something like that, a steel bat.  Something.

Q.  Okay.  And would that be an ex parte budget request that you made in this particular case that was referred to Judge Shreder?

A.  I would have to look at it to see.  But the requests that I filed were generally referred to Judge Shreder initially.

Q.  Okay.

A.  And then his recommendations were I think, generally speaking, approved by Judge Payne.

Q.  Okay.  Now, you filed a declarations for Mr. Burr in this case; is that correct?

A.  Several.

Q.  And why did you do that?

A.  Well, again, Richard Burr was a tremendous asset.

MR. WILSON:  Judge, I'm going to object.  This is well beyond my cross-examination.

THE COURT:  I would agree.  Why are we going into new territory now?

MR. AUTRY:  Because it goes to what Mr. Echols understood the standard of care as a lawyer representing a defendant in a capital case was as to why he was asking for what he was asking.

THE COURT:  Well, what does his understanding of

that matter with regard to the counsel that we're looking into here?

MR. AUTRY:  Pardon?

THE COURT:  Well, what he thinks about it is irrelevant, isn't it?

MR. AUTRY:  Well, I think that it's -- it's relevant to the extent that he's talking about an overall standard of care for a capital defense practitioner that would apply across the board as to what the minimum required is, but --

THE COURT:  The objection is sustained.  I'd like to see you get back to covering what's been raised in cross.

MR. AUTRY:  Yes, sir.  I apologize.

Q.  (BY MR. AUTRY)  Now, you were asked about whether or not you copied everything on your database for Mr. Hilfiger and Mr. Smith after you withdrew.  Do you remember Mr. Wilson asking you about that?

A.  Yes, I do.

Q.  Why did you feel it was unnecessary to copy each and every page from your computerized database or the secured website for either Mr. Hilfiger or Mr. Smith?

A.  Because the user is able to re-format and print by pushing a button.

Q.  Okay.  Now, was this some kind of really elaborate

507

complicated deal that only a computer genius could figure out how to access your website or read the material on it, or hit a button to print off a written copy of what's reflected on it?

A.   It's a -- it's a website that has several choices.  One choice is index that gives you a list of all the people. Then below that, a list of all the places.  And below that, a list of all the things, and then others.  And then there's another category -- five categories of things.  It has a, what we called on the Internet in the old days, a blog section, so there are recordings of -- and that can all be printed out.

Q.   Okay.

A.   You can print it off the screen just by doing a screen capture.  But if you want to print it out with the little notation that says do not duplicate, etc., then it's printed out from the interior of the program.

Q.   All right.  And you have files on there that include reports -- police reports, investigative reports, things of that nature; correct?

A.   There's a section for documents, and some documents would be there.  I'm sure the Clint Johnson warrant would be there, etc.

Q.   All right.  So when you take the computer file you had on the secured website, plus the paper files that you got,

508

would that encompass everything in the case?

A.   I hope so.

Q.   All right.  And that was --

A.   That was -- that was the intent.

Q.   All right.  So somebody should be able to fairly easily use the computer database or the secured website.  If you can use the Internet, could you use it?

A.   Well, yes.  But all Roger would have had to do would be to call me on the phone or send me an email, or Bret could have called me on the phone and sent me an email and I would have printed it out for them.

Q.   Okay.  You were asked about Dr. Sharp -- or you were asked about whether or not Mr. Barrett had a good memory, and you talked about how he could relate things that had been said in court and he was invariably correct when he talked to you about those things?

A.   Yes, that's my experience.

Q.   Do you recall whether or not Dr. Sharp stated in his report that Mr. Barrett had problems with long-term as opposed to short-term memory?

A.   I don't recall that, but that's consistent with what Dr. Sharp's report says.

Q.   All right.  Now, you never filed, either in state or federal court, any kind of motion challenging Mr. Barrett's competency; correct?

A.   That's correct.

Q.   Okay.  You said I think, and correct me if I'm wrong, when Mr. Wilson was asking you about that, that you might have had concerns about it?

A.   Well, I think at the outset -- you know, when I first met Mr. Barrett, he was still suffering from his gunshot wounds --

Q.   Yes, sir.

A.   -- in a city jail in Sallisaw.  And I certainly would have been concerned at the outset of the case.  And after working with Mr. Barrett and after -- after establishing a relationship with him, I think he and I had a solid relationship, and I was not concerned with his ability or desire to assist me in defending him.

Q.   All right.

A.   He wanted to be defended.

Q.   Sure.  You understand there's a difference between competency -- evidence that would go to competency and evidence that can mitigate punishment?

A.   Yes.

Q.   Okay.  Were you looking, if you could find one, for a mitigating explanation for Mr. Barrett's drug use?

A.   Yes.

Q.   All right.  Were you dissuaded in any sense by anything Dr. Bianco did or Dr. LaFortune did in further trying to

pursue evidence regarding Mr. Barrett's mental health or mental state?

A.   No.

Q.   Why not?

A.   I don't -- my job -- you know, my job is to defend Mr. Barrett.  And I don't -- I don't concede -- certainly with Faust Bianco, I don't concede his expertise.  And Ms. LaFortune was involved with the agency.

Q.   All right.  Ms. LaFortune had sort of a dual role, both as a screener and a keeper of the purse.  Would that be accurate?

A.   I don't know when she started.  She was -- she was working full-time for OIDS when I went to work there at the end of 2005.

Q.   All right.

        MR. AUTRY:  Could I have just a second, Your Honor?

        THE COURT:  Yes.

        MR. AUTRY:  Okay.  Thank you, Mr. Echols.

        THE WITNESS:  Thank you.

        THE COURT:  Let's keep it on redirect.

        MR. WILSON:  Absolutely.

                    RECROSS-EXAMINATION

BY MR. WILSON:

Q.   Mr. Echols, counsel asked you about Dr. Sharp's report,

and I believe you testified that you did not talk with Mr. Hilfiger or Mr. Smith about Dr. Sharp's report; isn't that correct?

A.  I said -- I think I said I don't recall talking with him about that.

Q.  So you don't know whether he did or not?  You're not saying your testimony is I didn't, you just don't remember?

A.  No, I don't have a categorically accurate memory of the things that occurred there, so I can't say it didn't happen. I don't have any recollection of discussing it with him.  I would have been happy to discuss it with him if he had brought it up.

Q.  But it's not your testimony today that you had a discussion with them and told them about Dr. Sharp's report and pointed out the deficits which Dr. Sharp found?  That's not your testimony; correct?

A.  That's not my testimony.  My testimony is I don't recall whether or not such a conversation occurred.

Q.  And the database that you have, I take it that still exists?

A.  Yes.  It's gone through many, many iterations, and one of the things, it's something that I program myself, and it's -- the version of it that existed back in 2005 is largely broken now when it's put up against the current

state of the CMS system.  But the data remains, yes.

Q.  And all of the information in your database was provided to Mr. Barrett's current counsel?

A.  They've had access to the website since -- I think Tim was probably the first one to get it.

Q.  You're referring to Mr. Schardl?

A.  Yes.  I have trouble with his last name.  I'm sorry.  I apologize.  I didn't mean to be informal.  Yes, that's who I was referring to.

MR. WILSON:  That's all I have.  Thank you, Judge.

THE COURT:  Mr. Echols, you can step down.  Thank you, sir.

THE WITNESS:  Am I -- I have a subpoena from the government also.  Am I excused?

MR. WILSON:  Yes, Your Honor.

THE COURT:  You are excused.

THE WITNESS:  All right.  Thank you, Judge.  Good to see you again, Judge.

THE COURT:  Good to see you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Thank you.  I think we're going to go ahead and break for the day.  Anything we want to take up before we close for the day?

MR. WILSON:  May I have just a moment, Your Honor?

THE COURT:  Yes.

513

MR. WILSON: Judge, the only thing is, prior to beginning of this hearing, the government prepared a stipulation, and both counsel have signed off on that. I would present that to the Court for consideration. It deals with the -- with Peter Rausch, Ph.D. that there's been some testimony. I would just ask the Court to consider the stipulation.

THE COURT: Very well.

MR. WILSON: And I think that's all the government has at this time.

THE COURT: Okay. All right. I accept the stipulation. And we're in recess until 9:00 a.m.

*(Off the record at 4:57 p.m.)*

514

C E R T I F I C A T E

I, Ken Sidwell, Certified Shorthand Reporter for the Eastern/Northern Districts of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in the above-captioned case.

I further certify that I am not employed by nor related to any party to this action, and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 10th day of May, 2017.

s/Ken Sidwell
Ken Sidwell, CSR-RPR
United States Court Reporter

**United States District Court**