DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | CASE NO. CV-09-00105-JHP |
| Petitioner, | |
| vs. | **PETITIONER'S  MOTION TO EXCLUDE WITNESS STEVEN PITT** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

# Exhibit C

Sealed Ex. Pet'r's Mot. Exclude Pitt                    *Barrett v. U.S.*, CV-09-00105-JHP



**U.S. Department of Justice**

Criminal Division

_Capital Case Section_                                    _Washington, D.C. 20530_

January 5, 2017

Dr. Steven Pitt
15849 N. 71st Street; Ste 100
Scottsdale, Arizona 85254-2179

RE: _Barrett v. United States_, E.D. Okla. case no. 09-CIV-105-JHP

Dear Dr. Pitt:

As you know, the U.S. District court in the above-referenced matter has scheduled an evidentiary hearing to consider Kenneth Barrett's claim that his trial attorneys ineffectively investigated and presented mental health and social history evidence.

As excerpted from the Tenth Circuit's review of facts in this case, Barrett's conviction and death sentence arise from his murder of an Oklahoma Highway Patrolman:

In January of 1999, a warrant was issued for Barrett's arrest for failure to appear at a state criminal trial on drug charges. That September, an agent for [the local] Drug Task Force learned from a confidential informant that Barrett had methamphetamine at his residence. The informant also told the agent that Barrett had promised to kill any officer who came to arrest him and that he was operating his drug business at night because of his belief that law enforcement could not execute a search warrant at night. The agent obtained a no-knock, day-or-night search warrant for Barrett's residence. Viewing the execution of the two warrants as high-risk, he obtained assistance from the Oklahoma Highway Patrol Tactical Team (the Tact Team).

On the evening of September 23, three troopers surveilled Barrett's residence in a white, unmarked Ford Bronco. Travis Crawford, Barrett's cousin, was with him at the time. According to Crawford, Barrett saw a white vehicle pass by and recognized it as belonging to law enforcement, but he said that he did not care and that he "was going out in a blaze of glory."

The Tact Team devised its plan to secure te residence: Two white Broncos and a marked patrol car with its emergency lights activated, each containing two troopers, would approach Barrett's residence single-file from the east while three troopers in another patrol car would approach the fence south of Barrett's residence. A fifth vehicle would drive to a trailer occupied by Barrett's mother, which was west of the house, to

provide security and protect her. The six troopers approaching from the east would enter and secure the residence.

Shortly after midnight on September 24 the Tact Team met with members of the Task Force, who planned to follow two minutes after the Tact Team. The Tact Team then began to execute its plan. The lead Bronco approaching from the east was driven by Trooper John Hamilton with Trooper David ''Rocky'' Eales as passenger. Its emergency lights were not on. The second Bronco and patrol car followed closely behind. The patrol car and perhaps the second Bronco had emergency lights on. As the vehicles drove toward the residence, the lead Bronco began receiving gunfire at "approximately head level, middle of the windshield." The gunfire intensified as the vehicle drew closer. Hamilton was struck in the face with glass or bullet fragments.

Meanwhile, the troopers coming from the south arrived at the fence. Two of them scaled it and headed toward the residence. They saw Barrett's son, Toby Barrett, outside the residence and ordered him to get on the ground. Toby eventually complied. The gunfire erupted either shortly before or while they were shouting at Toby. After Toby was handcuffed he yelled for his father.

The lead Bronco continued to receive gunfire until it reached the residence. The driver, Hamilton, ducked between the bucket seats. The passenger, Eales, exited and was shot three times while attempting to get behind the Bronco. Hamilton threw a stun grenade out the window, which temporarily stopped the gunfire. He exited the Bronco and was shot in the shoulder as he moved toward Eales, who was lying face-down. Trooper Ricky Manion joined him behind the vehicle. Hamilton saw Barrett standing in his doorway holding a rifle, and Manion saw him entering the house. Hamilton fired two shots at Barrett that missed, but Manion shot him through a window and hit his legs. Barrett was dragged to the front yard. He tried to move his hand toward the front of his body, where he had a pistol in his waistband, but he was subdued and the gun removed.

Eales was fatally wounded. An autopsy indicated that one of the three bullets entered his upper back, broke four ribs, and perforated his left lung and aorta. Later investigation showed that 18 bullets struck the lead Bronco and that Barrett probably fired 19 shots from a Colt Sporter .223 rifle (there were 72 rounds remaining in a set of three magazines taped together to hold 90 rounds). A search of the premises revealed several firearms, including two that were loaded, and various items used to manufacture methamphetamine. A later search of Barrett's clothes at a police laboratory revealed $2120.10 in cash and plastic bags holding red phosphorus, an ingredient for manufacturing methamphetamine.

The government has retained you to evaluate Barrett in light of his claims of mental illness. I have every confidence that you will perform a thorough and exhaustive evaluation of Barrett's mental health, but further hope that you will please respond to the following concerns:

1.    At or around the time of the crime, did Barrett, in your professional opinion, suffer from any serious mental illness or defect?

2.    Please comment on whether any mental illness or defect diagnosed in response to question 1 was a byproduct of substance abuse.

3.    At or around the time of the crime, could Barrett distinguish right from wrong?

Any consideration of Barrett's mental health will involve the application of the standard for determining ineffective assistance of counsel, requiring the court to decide whether a reasonable likelihood exists that any allegedly omitted evidence would have led to a more favorable verdict. Accordingly, the government will seek to rebut or impeach the defense's proffered evidence, and I ask that you please provide your impressions and/or criticisms of the mental health findings and evaluations submitted by Barrett in this case. Again, I know you will perform an exhaustive evaluation and my hope that you will comment on the mental health issues you feel are relevant.

Thank you for your service. Should you have any questions or concerns, please do not hesitate to contact me or AUSA Chris Wilson.

Sincerely,

JEFFREY B. KAHAN
Trial Attorney