IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )

            Plaintiff,             )

VS.                                )          NO. CIV-09-105-JHP

UNITED STATES OF AMERICA,          )

            Defendant.             )

*     *     *

MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE STEVEN P. SHREDER

UNITED STATES MAGISTRATE JUDGE

MARCH 29, 2017

*     *     *

A P P E A R A N C E S:

FOR THE PETITIONER:  MR. DAVID B. AUTRY, Attorney at Law, 1021 NW 26th Street, Oklahoma City, Oklahoma 73106

FOR THE PETITIONER:  MS. JOAN M. FISHER and MR. TIVON SCHARDL, Federal Public Defender - Sacramento, 801 I St. Third Floor, Sacramento, California 95814

FOR THE RESPONDENT:  MR. CHRISTOPHER J. WILSON, Assistant United States attorney, 520 Denison Avenue, Muskogee, Oklahoma 74401

FOR THE RESPONDENT:  MR. JEFFREY B. KAHAN, US Department of Justice – Capital Case Unit, 1331 F St NW, Room 345, Washington, DC 20530

COURT REPORTER:                KARLA S. McWHORTER, CSR-RPR

                               United States Court Reporter

<u>I N D E X</u>

<u>PAGE</u>

<u>WITNESS CALLED ON BEHALF OF THE PETITIONER:</u>

<u>BRET SMITH</u>

Direct Examination by Mr. Schardl . . . . . . . . . .    518

Cross Examination by Mr. Kahan . . . . . . . . . . . .    593

Redirect Examination by Mr. Schardl . . . . . . . .    624

Recross Examination by Mr. Kahan   . . . . . . . . . .    636

Recessed until March 30, 2017  . . . . . . . . . . .    642

<u>COURT IN SESSION</u>

(9:13 a.m.)

THE COURT:  Morning, everybody.  Call case number CIV-09-105-JHP,  Kenneth Eugene Barrett versus United States of America.  The attorneys enter their appearances for the record, please.

MR. KAHAN:  Your Honor, Jeff Kahan and Chris Wilson for the government.

MR. SCHARDL:  Morning, Your Honor.  Tivon Schardl from the Federal Defender's office, with Joan Fisher and David Autry for Mr. Barrett.

THE COURT:  Very well.  Are the parties ready to proceed?

MR. KAHAN:  We are, Your Honor.

MR. SCHARDL:  Yes, Your Honor.

THE COURT:  Go ahead and call your next witness then.

MR. SCHARDL:  All right.  The petitioner calls Bret Smith.

<u>BRET SMITH, PETITIONER'S WITNESS, SWORN</u>

<u>DIRECT EXAMINATION</u>

BY MR. SCHARDL:

Q     Good morning, Mr. Smith.

A     Good morning.

Q     I bet you never get to spell your name for the record.

A       B-R-E-T, Smith, S-M-I-T-H.

Q       There's a first for everything.  How are you employed, sir?

A       Self-employed as an attorney.

Q       How long have you been doing that work?

A       27 years.

Q       And were you acting as a lawyer -- what kind of lawyer were you practicing -- what kind of law were you practicing in 2005?

A       I have a general practice of law, personal injury work, criminal defense work.

Q       And what's your relationship to this case?

A       I was one of Kenny Barrett's attorneys.

Q       Do you recall when you were appointed to this case?

A       I believe in May of 2005, would be my guess, around in there.

Q       Do you recall the circumstances that led to your appointment?

A       I do.  I was pulling into a restaurant and I received a call from Judge Payne's office, it was his secretary and she said that he would like to meet with me.  She indicated he was available then, so I turned around and came to the courthouse and had a meeting with him.

Q       And prior to your appointment to this case, had you worked on any capital cases?

A    No, sir.

Q    In state court?

A    No, sir.

Q    In federal court?

A    No, sir.

Q    Had you worked on any homicide cases in federal court?

A    No, sir.

Q    Had you worked with Roger Hilfiger before?

A    I have.

Q    As a co-counsel?

A    Yes.

Q    What were the circumstances of that case?

A    We represented a fellow in the first carjacking case that was filed in the Eastern District of Oklahoma.

Q    So just that one case?

A    I worked with a fellow, Bill Haworth, and Roger performed a lot of or a some legal services for Bill.  So I would have interaction with him due to that relationship and I want to say that there were cases that we mutually worked on then.

Q    Had you had any training in capital litigation before your appointment to this case?

A    No, sir.

Q    During your meeting with Judge Payne did you discuss your training and experience with capital cases?

A    We would have discussed that I had not been involved in a capital case to that point.

Q    Did you express any reservations about your appointment due to that lack of experience?

A    No, sir.  I was honored that Judge Payne would consider me to be appointed in a case that he knew was very difficult and that I knew would be very difficult.

Q    Now, let me just preface, I am going to ask you a lot of questions about your knowledge of the law and the facts at the time.  If I ever forget to say at the time of your work on this case, I hope you will understand that that is what we are focused on here, your knowledge of the circumstances at the time of your representation of Kenneth Barrett in this case.

A    Yes, sir.

Q    At the time of your representation of Kenneth Barrett, were you familiar with the work of the Capital Jury Project?

A    I don't recall, I don't recall that name.

Q    Were you familiar at the time of your work on this case with the Supreme Court's case law concerning mitigation circumstances?

A    I reviewed a lot of materials in the very beginning of my appointment that would have included case law, as well as ABA guidelines for capital defense work.

Q    When did you review the ABA guidelines?

A     Maybe the evening of my conversation with Judge Payne. It wouldn't have been -- because I think it was a day or two before I was actually appointed after my conversation with him, but it would have been in the very beginning of my representation.

Q     At the time you were appointed do you recall what the trial date was in this case?

A     I believe it was in July, in a couple of months.

Q     Did that raise any concerns for you?

A     Sure it did.

Q     Were you concerned about whether you had enough time to get ready for trial?

A     Yes.

Q     At the time of your work on this case were you familiar specifically with the Supreme Court's decision in Green versus Georgia?

A     I can't tell you whether I had reviewed that or not because it has been so long ago.

Q     The same question with regard to the Supreme Court's decision in Woodson versus North Carolina.

A     Specifically I couldn't tell you, no, sir.

Q     What about the -- without asking about the specifics of the case, does the phrase the "frailties of humankind," does that ring a bell with you?

A     Specifically I can't recall.  It has been too long ago.

Q    Did you agree to accept the appointment at the time of that first meeting with Judge Payne?

A    Yes, sir.

Q    So had you talked with Mr. Hilfiger before you agreed to take the case?

A    No.

Q    When do you believe you first met with Mr. Hilfiger to discuss the case?

A    It would have been probably the next day after I was appointed or the day I was appointed.  It would have been very quickly, I would have thought.

Q    Do you recall what you discussed in that meeting?

A    That we had a lot of work ahead of us.

Q    Did Mr. Hilfiger lay out a strategic plan for the case at that time?

A    I am sure that we had discussed the posture that the case was in and the approach that he and Mr. Echols had been taking prior to my appointment.

Q    But as you sit here, do you recall him saying this is our strategy for the case?

A    This case had been tried before and it was heavily publicized.  I don't think a strategy -- there was surely -- that there was going to be a new strategy per se.

Q    It had been successfully litigated in state court?

A    That's correct.  There wasn't the drug allegations,

which changed some strategy, and there was not a second phase in those cases, which obviously demanded a strategy.

Q    Specifically with regard to the second phase, --

A    Yes, sir.

Q    -- did Mr. Hilfiger lay out for you a strategic vision for the second phase of trial at that first meeting?

A    I wouldn't go so far as to call it a strategic vision. I had mentioned to Mr. Hilfiger at our first meeting that, among other things, a mitigation specialist was required from my reading of the guides.  And from my understanding, he was relying on work that had been prepared by Mr. Echols in both the first two trials and what they had done up until Mr. Echols' departure and my appearances.

Q    With regard to the guidelines, --

A    Yes, sir.

Q    -- did you accept them as a statement of the prevailing professional norms that would apply to your work in this case?

A    I took them for what they were called, guidelines.

Q    And having had no experience yourself with capital litigation, did you look to them as a source of ideas for what you would need to do to prepare for trial?

A    I looked to them to understand that at a minimum this case required two trial lawyers, an investigator and a mitigation specialist.  Beyond that how much I turned to the

ABA guides for guidance, I can't tell you.  I had mounds of -- and volumes of paperwork to get through.  So I am going to say my focus shifted pretty close to the facts of this case.

Q    At that first meeting with Mr. Hilfiger did you all discuss what your role in the case would be?

A    I was there to assist him.  I was not there to develop a strategy.  I was not there to fix something that was broke. I was there to help him in whatever direction or area he felt like that he needed assistance in.

Q    Did he assign you general responsibility for the penalty phase, should there be one?

A    I don't know that I can answer as to a general responsibility.  I was shown that I gave the opening state-ment from the penalty phase.  I didn't have any recollection of that at all until I read recently the transcript that I think you provided to me.

Q    So when you say you were shown that, you were shown that recently, not -- it is not -- you are not saying that Mr. Hilfiger said on -- whatever date that was -- May 18th of 2005, you are going to do the opening for the penalty phase?

A    I imagine that after we closed the first phase of trial -- I know we both needed a -- some time to reflect. We probably took a day or two to do that before we met

again.  I don't know when it would have been decided that it was helpful for him for me to take over the opening state-ment, but Roger and I would meet at a minimum of once weekly and he would delegate tasks to me then and I had quite a bit of responsibility in terms of the trial in general.  He allowed me to participate often.  So I can only imagine that this opening statement bit would have been why don't you take that over, that would help me, I could focus on something else, so I did it.

Q    And to the best of your recollection, that conversation occurred after the verdict in the first phase of trial?

A    I don't know.  That probably occurred a week before the beginning of the second phase.

Q    Now, do you recall an issue arising in the course of the case with regard to your billing to the Court?

A    Judge Payne had a couple of conversations with me about my billing.  One was I needed to submit it and I think it was probably August when he told me that.  Then after I did submit it, I think he told me he wanted more detail, but that's about all I remember about it.

Q    Do you recall a conference with you and Mr. Hilfiger regarding budgeting that took place on -- I believe it was October 3rd of 2005?

A    No.  And I've seen in my notes that I have a notation about a conversation regarding budget, but I don't recall

ever seeing a budget for this case.  Those are my notes, it's my handwriting, but I don't have any independent recollection of what that would have been about.

Q    When you got into the case did you ask Mr. Hilfiger or did you go to the files to look at the budget that Judge Payne had approved for litigating the case?

A    I don't know that I ever saw a budget.  With the work I had in front of me, that wouldn't have been my concern.

Q    You mentioned earlier, I believe, if I have your testimony correct, that when you brought up the idea of retaining a mitigation specialist, Mr. Hilfiger brought up the work that Mr. Echols had done previously.  Is that correct?

A    I would have -- his comment definitely was not, yes, we need to hire a specialist, go find one today.  That didn't happen.  I do think it was I think that area has been worked up and -- not that he was dismissive of it, but that he felt confident that those materials could be taken from what Echols had done and whipped into shape for trial. That's the impression that I have certainly today.

Q    Did you go and look at the budget requests -- not the order, but the requests that Mr. Echols and Mr. Hilfiger had filed before you got into the case?

A    No.  Really the only thing I remember about budget and experts that may have not been approved had something to

do with a ballistics expert.

Q    Did Mr. Hilfiger mention to you that the Court had approved for the defense to hire a mitigation specialist?

A    I don't recall that conversation.

Q    At the time of your work on this case did you know that funds were available for the defense to hire a mitigation specialist?

A    I don't know that I did.  I don't know that I didn't. I just don't have a recollection of that.

Q    Is the name Ron Lax, R-O-N L-A-X, familiar to you?

A    No, sir.

Q    Is the name Inquisitor, Inc. familiar to you?

A    Only from information I have recently read.

Q    Recently meaning since this evidentiary hearing was scheduled?

A    Yes.

Q    So at the time you were appointed in mid-May, the case is scheduled to go to trial at that point in late July, I believe.  What did you set about doing first to get ready?

A    Reading the first trial transcripts.

Q    How much of your time would you say from that date of appointment until the start of jury selection -- if you could break it into percentages, how much of that was devoted to the first stage of trial versus the second stage of trial?

A    The majority of my work, certainly in the beginning,

6:09-cv-00105-RAW   Document 446   Filed in ED/OK on 06/04/17   Page 15 of 128

would have been getting ready for trial, the first phase

of trial. We've got to get that covered, you know. As far

as percentages of time, I can't tell you. I know I worked

a lot of long days, but my division of labor between those

two, I can't tell you.

Q    Well, would you say it was -- you say the majority. Do

you think it was roughly, you know, 51 percent of your time

was getting ready for the first stage or something closer to

75 percent?

A    I was not the mitigation guy. Okay? I was not tasked

with developing this mitigation case; the same that Roger

wasn't I'm just the first stage guy. We -- he would divide

the work up and then I would do what I was assigned. So when

the -- when that work was done on the second stage, it did

not begin in the beginning of our conversation. You know, the

conversation about the mitigation specialist did, but as

far as the work that I was involved in, I don't recall doing

that in the beginning.

Q    Were you familiar -- let me give you a time frame.

From the date of your appointment until the start of jury

selection, focusing in on that time of preparing for trial --

A    Yes, sir.

Q    Were you familiar with the work that had been done by

Rosanne Shay?

A    I don't know when I became aware of Ms. Shay, if it was

529

then or if it was fairly recently or if it was at the meeting with Ms. Russell.  I don't know.

Q    When you say Ms. Russell, are you referring to Jeannie Russell?

A    Correct.

Q    At the time you started work on the case did Mr. Hilfiger or anybody mention to you the availability of the Federal Death Penalty Resource Counsel Program?

A    I don't recall.

Q    Are you familiar or at the time of your work on this case were you familiar with an attorney named Richard Burr?

A    No.

Q    Mr. Hilfiger never mentioned Mr. Burr to you?

A    I am not going to say that.  It has been a long time. I know that we reached out -- Roger reached out to the Northern District Public Defender's office for help on mitigation and it is my belief from that that they referred him to some other resources because their office was involved in another capital case that was going on then or fixing to start.  So was that Dick Burr?  I can't tell you, but I know that he had some resources then that they had referred him to.

Q    Did you at the time of your appointment in this case meet with -- and again I am focusing on that period of time in May of 2005.  Did you get together with Mr. Echols?

A      Yes.  Roger and I went to, I believe, Sapulpa and met at his office.

Q      Did you collect his files there?

A      Roger had his files from my understanding.  We may have brought some other things back, but Roger had a library full of files, banker boxes of files and transcripts.

Q      And it was your understanding that those had come from Mr. Echols?

A      Well, they were regarding Kenny's first two trials and trial materials, so I've got a -- I mean, I don't know where they came from, but Echols was involved in those, so...

Q      Fair enough.  The work that Mr. Echols did, did you understand or did you know at the time whether he was assisted by the Oklahoma Indigent Defender System?

A      I think that is -- that he performed work for them.

Q      Like under a contract or something like that?

A      I would think so.

Q      At the beginning of your work on the case did you reach out to -- I say OIDS.  I don't know if that is like offensive to folks around here, but is that like an okay way to refer to the defender --

A      Yes, sir, it is.  That is how it is commonly known.

Q      Okay.  So at the time that you got into the case did you reach out to OIDS to see what materials they had available to you from the state trials?

A    Not that I recall.

Q    Was it your understanding that Mr. Hilfiger had the materials from their work on the case?

A    My understanding was that Mr. Hilfiger had -- I can't say all of the materials, but I don't remember us searching for things that should have been there that weren't.

Q    So let me ask you just a few questions about -- more questions about where you were at in your training and exper- ience at the time you were appointed to this case.

A    Yes, sir.

Q    At the time of your appointment did you have training or experience in how to speak to witnesses, how to ask witnesses about things like childhood abuse?

A    Specific training?  I don't know that I ever had a class that -- you know, you have a law school class about interviewing people, but I was a political science major for my Bachelor's degree, then your training as a lawyer, but as far as my practical experience, it is what I do every day.

Q    Ask people about things like that?

A    Well, you are learning about the backgrounds of their case and the facts and circumstances surrounding their case and the defense that you need to provide them.

Q    And I think you said before as far as presenting a penalty case in a capital case, that is not something you had done before?

A     No, sir.

Q     I want to ask you about the declaration that you gave previously in this case.  Do you recall that?

A     If I see it, I may.

Q     Let me ask you some questions and if you need to refresh your recollection, I am happy to give that to you.

A     Sure.

Q     At the time of your work on this case was it your understanding that the standard for competence to stand trial was the same as the standard for determining whether mental health problems could be used in mitigation?

A     Might I answer that this way.  Kenny had stood trial twice.  I had no reason to question whether or not he was competent.  Surely Mr. Echols would have covered that bridge in those two previous trials.  I had volumes of work to get through to re-strategize, so to speak.  So I don't know that I ever entered into that mental gymnastics of competence versus what otherwise may be mitigating type events.

Q     So if you did not have a reason to questions his competence, are you saying that if there was no reason to question his competence, then there was no reason to investigate mental problems as a mitigating circumstance?

A     I am not saying that.  As it relates to comparing the two and whether or not there should be a question of his competence for trial, that had already been decided.  And

533

from my perspective, just because -- heck, he had the best lawyer in Oklahoma in his state case.  I mean, surely that was explored.

Q    So if there is no reason to question his competence to stand trial, that wouldn't mean there is no reason to investigate his mental state or his mental condition for purposes of a penalty phase?

A    Surely everybody didn't wait until May of 2005 for Bret to get appointed in this case to begin investigating Kenny Barrett's mitigation factors.  You know, surely that didn't happen.

Q    And you -- at the time did you go through the files that Mr. Hilfiger had to determine the extent of the investigation that had gone on previously?

A    On mitigation?

Q    Yes, sir.

A    I was not tasked with mitigation per se.  I was given some specific duties, like contacting Jack Gordon, who was Echols' second phase attorney, to find his materials, if any.  I was asked to contact Ms. Russell.  I probably set up the meeting with Echols.  And then I was given specific tasks like preparing the opening statement for the second phase, but as far as Bret being the mitigation guy, I was not that guy.

Q    With regard to Mr. Gordon, do you recall when you

contacted Mr. Gordon to get his files on the case?

A     Probably June, July, somewhere in there.  I knew it took some attempts to get a hold of him.

Q     Do you recall a hearing before Judge Payne on the Friday before the start of jury selection?

A     Not specifically I don't.

Q     Do you think it might refresh your recollection to review a transcript?

A     Sure.

        MR. SCHARDL:  With the Court's permission, I would like to approach the witness and show him the transcript of the status hearing that was held in this case on September 9th, 2005.  And specifically to ask him to look at Pages 42, Line 16 through Page 43, Line 17.

        THE COURT:  Is that an exhibit or...

        MR. SCHARDL:  It is a part of the record in the case, Your Honor.

        THE COURT:  That's fine.  You can approach.

        MR. SCHARDL:  Thank you, Your Honor.

        MR. KAHAN:  I am sorry.  Do you want to read the...

        MR. SCHARDL:  Well, it is the record.

        MR. KAHAN:  I appreciate that, but I -- I even have -- I just want --

        MR. SCHARDL:  Sure.  Page 42 --

        THE COURT:  Guys, you need to pull that microphone

535

in so we can catch what you are talking about, if you want it on the record.

MR. SCHARDL:  Oh, sorry about that.

MR. KAHAN:  42 to 43?

MR. SCHARDL:  Yes, Line 16 to Line 16.

(PAUSE)

THE WITNESS:  16 to 16?

MR. SCHARDL:  Yes.

THE WITNESS:  Okay.

(PAUSE)

THE COURT:  Is that a docket item in 0415?

MR. SCHARDL:  Yes, Your Honor, it is.

THE COURT:  What is the docket number you have?

MR. SCHARDL:  Well, I gave up the transcript, so I can't...

THE COURT:  It has got the docket stamp, I guess?

DEPUTY CLERK:  There is not, Your Honor.

THE COURT:  Okay.  Well, when you figure it just let us know.

MR. SCHARDL:  Yes, I apologize.  It does not have the CMECF stamp on that.

THE COURT:  That's fine.

BY THE WITNESS:

A    I have reviewed those materials.

BY MR. SCHARDL:

536

Q    Mr. Smith, does that refresh your recollection at all as to when you met with Mr. Gordon?

A    Well, I think that was consistent with what I had said. I would assume it was July or so of -- prior to the start of the trial.

Q    Does that refresh your recollection as far as how much material you had found in the files of prior counsel as far as the work that had been done in state court on the mitigation case?

A    I don't know why I was the one addressing the Court specifically. I would have to probably read the whole thing and reflect on it for a while, but I don't remember undertaking a search to find Echols' material. I think that's something Roger may have told me, "I'm having a hard time, can you run this down" or something like that. And then because I -- I am assuming this is referencing Ms. Russell when we are talking about she and previous work product. I don't know because her name is never mentioned. It just says she, but if that's the case, then we would have been addressing whether or not her report was going to be available in time for the government to have time to react to it basically.

Q    So do you believe that your representations to the Court in that transcript on September 9th, 2005, do you think that would be a better reflection of your understanding

537

of where things were at that time than your recollection is today?

A   Sure, you bet.

Q   So if you told the Court on September 9th, 2005, that y'all had found very little on mitigation to that point, that you believe that that would have been an accurate representation?

A   Sure.

Q   Was it your plan to review the work that had been done in preparation for the state trials and to use that as a sort of jumping off point for what you would need to do to get ready for the second stage of the federal trial?

A   Yes, build on information that had already been compiled.

Q   Was it your belief that you and Mr. Hilfiger had no independent duty to develop a mitigation case for the federal trial, that is, independent of what had been done in state court?

A   No, that's not my belief.

Q   You mentioned Ms. Smith and you're correct that the hearing on September 9th, 2005, was about the production of her report.  Do you have any recollection now of a dispute that arose about whether you needed to produce a report pursuant to Federal Rule of Criminal Procedure 12.2?

A   So the record is clear, I think you are referring to

Ms. Russell because you said Ms. Smith?

Q     Oh, did I say Ms. Smith?

A     Just so the record is clear.

Q     I am sorry.

A     And just so I can make sure we are on the same page.

Q     I'm sorry.

A     There was concern, yes, that we had to be in compliance with Rule 12.  There is no doubt about that.  I think we were trying to comply, particularly to avoid the court having to postpone matters because we were waiting to finish our work to be able to comply with Rule 12.  That's my recollection.

Q     And do you recall addressing the government's request for a report at this hearing?  Do you recall a colloquy between yourself and Judge Payne about it?

A     I don't.  I read a moment ago that it referenced that they should have had that from previous litigation, but that's -- but I don't have any independent recollection other than what I just read that you showed me.

Q     In this transcript the record will reflect that Mr. Sperling referred to that date, September 9th, as the eleventh hour because jury selection was about to start. Would you agree or disagree with that characterization?

A     I don't know in what context he was referring to.  Are you talking about was this on the eve of trial?

539

Q    It was the Friday before the start of death qualification.

A    I could agree on that.

Q    Do you recall what position the defense took with regard to whether Dr. Russell's work fell within the scope of Rule 12.2?

A    I don't know.

Q    Let me ask you to review --

MR. SCHARDL:  If I may approach the witness, Your Honor, and ask him to review Page 41 and specifically Lines 17 to 23.  I will wait to allow Mr. Kahan an opportunity to bring up that page of the transcript.

THE COURT:  Is it the same transcript you showed him a minute ago?

MR. SCHARDL:  Yes, Your Honor.  This is the transcript of the September 9th, 2005, hearing.

THE COURT:  Okay.

MR. SCHARDL:  Mr. Kahan, is it --

MR. KAHAN:  I have it.

MR. SCHARDL:  Okay, thank you.

BY THE WITNESS:

A    17 TO 23?

BY MR. SCHARDL:

Q    Yes, sir.

                              (PAUSE)

BY THE WITNESS:

A    I've reviewed it.

BY MR. SCHARDL:

Q    Does that refresh your recollection as to the defense's position on whether Dr. Russell's work fell within the scope of Rule 12.2?

A    It doesn't refresh my recollection.  I can read what the transcript says, but I don't have any independent recollection of this conference, to be honest with you.

Q    If you said at the time that Dr. Russell had not done an examination of Mr. Barrett for purposes of mental health as -- or mental health mitigation as defined in Rule 12.2, would you fall back on what you said at the time?

A    Sure.

        MR. SCHARDL:  May I approach and retrieve the transcript?

        THE COURT:  Yes.

BY MR. SCHARDL:

Q    Do you have a recollection as you sit here today of when you first contacted Dr. Russell in this case?

A    I don't know.

Q    Do you think it might help to look at her billing records to refresh your recollection?

A    I would say August, but I don't -- that would be my recollection.

Q    Sometime in August of 2005?

A    I would think so.  I remember it was summer and hot, so...

Q    At the time of your work on this case were you familiar with the ABA guidelines regarding developing a consistent defense strategy for both phases of the capital trial?

A    My recollection has probably been tainted by my recent work because -- I mean, it only makes sense that you are going to have a consistent theme from first stage to second stage, but I have read some materials recently, which has probably contaminated my memory as it relates to 2005.

Q    Do you recall meeting with Mr. Hilfiger to discuss sort of what the guidelines recommend, having a consistent theory or theme that would carry you through both stages of the trial?

A    No, I don't have a recollection of that.

Q    If on September 9th, 2005, y'all were still gathering the mitigation case that had been prepared in state court and that was going to be your jumping off point for completing whatever investigation you all needed to do for the federal trial and jury selection, death qualification, was starting on the 12th to be immediately followed by opening statements, would it be fair to say that the time to have developed that strategy, the two stage strategy, had passed?

542

A       There was a strategy and that was developed with Ms. Russell at that meeting that we had in her office with myself, Mr. Hilfiger and Earnst (sic).

Q       There was a strategy for the penalty phase?

A       Correct.

Q       Do you recall the date of that meeting?

A       I think it was August whenever we met with her.  I don't know.  It was in her office.  I think we only went up there one time.

MR. SCHARDL:  May I have just a moment to locate something, Your Honor?

THE COURT:  Yes.

MR. SCHARDL:  Thank you.

(PAUSE)

BY MR. SCHARDL:

Q       Mr. Smith, do you recall whether you and Mr. Hilfiger asked Dr. Russell to assist you with anything else in the case besides whatever work she did toward the penalty phase?

A       I remember her offering her help on a prosecution witness that dealt with memory, memory and recall, as it relates to these troopers that were involved in the shooting and the actual incident.

Q       Would that be Mr. Horn?  Is that the witness?

A       That sounds familiar, but...

MR. SCHARDL:  Your Honor, may I ask Mr. Davis to

show the witness Government's Exhibit Number 33?

THE COURT:  Yes.

BY MR. SCHARDL:

Q    Looking first at the first page of that exhibit, Mr. Smith, do you recognize that letter?

A    No, this is a letter written by Mr. Hilfiger.  I don't know that I ever saw this.

Q    Could I ask you to turn a couple of pages to -- there is a little 3 with a circle around it in the bottom right-hand corner.

A    Yes, sir.

Q    Okay.  That is what purports to be a statement from Dr. Russell addressed to you; correct?

A    Yes.

Q    Do you recall having seen that document before?

A    No, sir.

Q    Could I ask you to please review those two pages of records and see if they refresh your recollection as to the work you did with Dr. Russell?

(PAUSE)

A    It doesn't help me recollect anything.  I guess it confirms my belief that we initially met with her in August. I see in here there are different notations where she consulted with the lawyers.  It says with "attorney," but I don't have any independent recollection of those meetings

with her.

Q    How many times do you recall meeting in person with Dr. Russell?

A    I recall meeting with her once.

Q    And was Mr. Hilfiger present at that meeting?

A    Yes.

Q    And is that the meeting you were referring to before where a defense strategy for the penalty phase was discussed?

A    Yes.

Q    And so the first consultation that is referenced in Government's Exhibit Number 33, that would -- that you mentioned, I think, in August, that was dated August 29th?

A    Correct, two hour meeting.

Q    As best you can recall, do you believe that was an in-person meeting --

A    Yes.

Q    -- or a telephone consultation?  Because it says "consult."

A    I had contacted Dr. Russell to set up a meeting for me, Mr. Hilfiger, and for Dr. Russell at her office in Tulsa. So I think this was that meeting.

Q    You think that was that meeting?

A    Yes, sir.

Q    On August 29th, 2005?

A    Correct.

Q    And then y'all agree with me that the record reflects that on September 9th, 2005 -- and I would say how many days that is, but I don't remember how many days there are in August, but whatever, eleven, twelve days later, the defense had not produced the report from Dr. Russell to the government; correct?

A    Well, if you are asking me on the basis of what I see on Page 3 here, I can't tell that.

Q    No, I was referring back to the transcript that we were discussing earlier.

A    Oh, we didn't have -- if we would have had that report, I wouldn't have told Judge Payne that we didn't.

Q    Could I ask you to turn to the next page of Government's Exhibit Number 33?

A    Yes, sir.

Q    And you will see that the billing record reflects two consultations with attorney or -- no, I am sorry -- three consultations with attorney, one on the 19th of September -- oh, I am sorry, four -- the 25th of September, the 4th of October, and the 11th of October; correct?

A    I see the 19th, the 25, the 4th, and October the 11th, yes, sir.

Q    But as far as you recall, you only met with Dr. Russell one time?

A      That's all I recall, but I would think that second entry on Page 4, the September 25th entry, I would have probably met with her because she was -- I am the one that wound up cross examining, if it was Horn, and that's what those materials were referencing.  Now, it would make sense that I met with her, but I -- I have an independent recollection of meeting with her that initial time in her office with Mr. Hilfiger.

Q      Turning back to the issue of strategy in the penalty phase, was your strategic objective in the penalty phase to get a sentence less than death?

A      Well certainly.

Q      Is that the context in which we should understand the statement in your declaration when you said, "Mr. Barrett impressed me as among the most cooperative criminal defendant -- defense clients I've ever had?"

A      I think that would go more towards his competence.

Q      That's what you were referring to in that statement?

A      I think so, just his general mental state.  The guy was -- you've seen his notes.  He was very helpful during the trial to me.  He knew as much about it as I did.

Q      Did Mr. Barrett ever try to prevent you from carrying out an investigation towards the penalty phase?

A      I have a belief that Mr. Barrett did not want his family members begging for his life.

Q      Let me stop you there.  Were you familiar with case law that precluded witnesses in a penalty phase from expressing any opinion about the appropriate sentence?

A      I don't recall that.

Q      Were you familiar with case law that said penalty witnesses/defense witnesses begging for a client's life or the defendant's life would fall within that prohibition?

A      I don't have an independent recollection of that.

Q      Did Mr. Barrett ever tell you that he did not want you to pursue a -- the best possible sentence that he could get?

A      I attempted to broker a life sentence for Mr. Barrett.

Q      Let me ask you, do you agree or disagree with the ABA Criminal Justice Standards regarding -- well, I'll read it to you --

          MR. KAHAN:  Objection as to relevance, as to whether he agrees with the ABA guidelines.

          THE COURT:  Overruled.

BY MR. SCHARDL:

Q      I am going to read to you, Mr. Smith, from the ABA Criminal Justice Standards.  And for the record, I am not reading from the guidelines for the performance of counsel in death penalty cases, but rather from the Criminal Justice Standards Defense Function Standard 4-5.2B.

      Quote:  "The decision on what witnesses to call, whether and how to conduct cross examination, what jurors to accept

or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client."

Would you agree with that statement?

A    I mean, I don't recall reading it before, so I don't know what the context -- I understand what you read to me. Do I agree that that's the standard?  I don't know.  I don't know that I -- I can't recall having read that before, but it only makes sense to me.

Q    It makes sense to you as a criminal defense lawyer, that's the way it has to be?

A    I mean, it's -- you would hope that your client trusts that you have his best interest at heart and you are doing the best for him and that he is going to let you do your job. And, you know, I think that's what that says.  The lawyer is the professional.

Q    You said in your declaration that during your initial meeting with Mr. Barrett he was suspicious of your identity, but over the course of your initial few meetings you found it easy to build a rapport with him.  Do you stand by that?

A    Sure, I do.  Our first meeting was not the most pleasant for either one of us.

Q    Specifically referring to what you said about him being suspicious of your identity, what did you mean by that?

A    Kenny had a relationship, I believe from what I've

gathered, with Mr. Echols and Echols had recently departed the case and now walks in somebody that he doesn't know.  He has never heard of me before, I presume, and I'm telling him I'm one of your new lawyers.  I think it took a while for that to sink in to him, you know, the fact that Echols is gone and look what he has been replaced with.

Q     Well, I'm sure at this first meeting he didn't look at you say look what I've been -- look what Echols has been replaced with, but that being said --

A     No, but I think that's what -- I think that's what the theme was, you know.  I've lost a guy that has all of this momentum in my case.  For two years he has tried or for two different trials he has put my case on.  He knows all of the nuances and now I get a guy that all he knows is what he has read in the newspaper about it.  I mean, I think that was -- that was the meeting that we had.

Q     So when you said in your declaration that he was suspicious of your identity, that's what you were referring to, that he was --

A     Well, I mean, he is going to want to know that I am not some agent, I suppose, you know.  I've got a Bar card and a driver's license and I tell him who I am, but I -- I'm sure we went through that.  Here, let me prove to you who I am. You don't know me from any previous contact.  And with what was at stake for Mr. Barrett, he would rightfully demand

that.

Q    The fact is as criminal defense lawyers, we often wish our clients were a little more paranoid --

A    Yes, you --

Q    -- of people who approach them in the jail?

A    You bet you, you bet you.

Q    But you were able to, after some time, develop a rapport with him?

A    Yes.

Q    But immediately his initial reaction to you was guarded and suspicious?

A    I think he filed a motion to fire me.

Q    Did that occur after the meeting?

A    I'm sure because he didn't know anything about me until I met with -- I'm sure I met with him in the very beginning upon learning of my appointment.  I mean, I don't think I probably delayed much.

Q    So his initial reaction to you again was one of suspicion and guarded?

A    Yes.

Q    Let me ask you about that.  So about how much time would you say it took before that suspicion subsided and you had this rapport?

A    Not long.

Q    Not long?

A    Not long at all.

Q    Days?

A    Probably the second meeting we began on a different track and I would say that it just improved -- I had a better relationship with Mr. Barrett than Mr. Hilfiger did.  And when I say that, Kenny and I could communicate more easily than him and Mr. Hilfiger could.

Q    In your declaration you also state that through your interactions with Mr. Barrett you were, quote, "...unaware of any symptom that suggested he suffered from any significant mental health condition."

A    I think that would be true.

Q    Now, was that just based on your interactions with him?

A    Yes, yes.

Q    And at the time did you consider yourself to be qualified by training or experience to screen individuals for the presence of mental or psychological disorders or impairments?

A    You kind of know it if you see it, sort of deal, was what I am getting at in that declaration.  I've got a guy that's got good recall, a guy that's got a lot of details about his case that I'm interested in hearing.

Q    Okay.  But let me ask you again...

A    Sure.

Q    At the time did you consider yourself to be qualified

by training and experience to screen individuals for the presence of mental or psychological disorders or impairments?

A    I just have on-the-job training as a lawyer in doing what you are asking me about.  I don't have -- I had a basic psychology class in college, so I am not a mental health expert.

Q    I understand that.

A    So, no, I don't have special training in that area. I've got on-the-job training dealing with people every day for -- you know, for the purpose of what I do.

Q    I understand that and I don't mean to embarrass you or belabor the point, but I have to ask you --

A    I don't feel embarrassed.

Q    Fair enough.  Did you know at the time the diagnostic criteria for bipolar disorder, for example?

A    No.

Q    Did you know at the time the diagnostic criteria for post-traumatic stress disorder?

A    No.

Q    Did you know at the time how to identify impairments in neuro cognitive functioning?

A    Other than something that would be obvious to you just from visiting with somebody, no.

Q    So you said in your declaration that Mr. Barrett did not demonstrate signs of irrational suspicion or an abnormal

553

degree of paranoia.  Do you recall that?

A     I think that was true.

Q     Is that referring back to what you were saying before, that you kind of hope your criminal defense clients have some rational suspicion of people who approach them in the jail?

A     Yes.

Q     Did you intend for that statement to be taken as an indication that you were ruling out the possibility that Mr. Barrett experienced paranoia that could be a problem for him?

A     No, I didn't mean it to -- I meant that -- just based on what it said, based on my interaction with Kenny that him and I were able to converse and education ourselves about his case.

Q     Now, when you said in your declaration that you were unaware of any symptom that suggested Mr. Barrett suffered from any significant mental health condition, could you -- well, let me ask you before I get into the meaning of that.  Did you offer that language to the government or did the government offer that language to you?

A     It has been my experience in this process usually that's -- those declarations are offered to you after an interview.

Q     Is that what happened in this case?

A       I am going to guess it probably did.

Q       So the phrase significant mental health condition, do you recall having used that phrase yourself when you communicated to the government?

A       It almost seems a little lofty for a guy from Wainwright, you know.

Q       And a guy from Tallahassee, Florida, to be honest.

A       But what I mean by what I wrote is we deal with people often times that have serious mental health problems and I never experienced that with Mr. Barrett.  So I don't know that you can read more or less into that declaration than that.

Q       Fair enough.  So if I -- it would be wrong then to read into it that you believed based on your interactions with him that he had no mental or emotional problems that could stand as a mitigating circumstances?

A       I don't think that offers an opinion on his background. I think that offers an opinion on my interaction with him.

Q       Do you recall how you first learned about Dr. Russell's work in state court?

A       No, I don't know.

Q       Now, in your declaration you also said that you were unfamiliar or not familiar with Dr. Bill Sharp at the time of your work on the case.  Do you stand by that?

A       I am still not familiar with him.

Q    You are still not familiar with him.  Let me -- so if you had known anything about Dr. Sharp at the time of your work on this case -- are you saying that your memory of that has lapsed or you never had a knowledge of Dr. Sharp?

A    I don't know which of those two avenues would be more accurate.  I don't have knowledge of Sharp and I don't believe it is a situation that I just can't recall.

MR. SCHARDL:  Could I ask Mr. Davis to please show the witness Government's Exhibit Number 34?

THE COURT:  Yes.

(PAUSE)

BY MR. SCHARDL:

Q    Let me know when you've had a chance to look through it.

A    I've looked through it.

Q    Okay.  Do you recognize that document, sir?

A    I don't have an independent recollection of it.  I doubt that this is the first that I've seen it, but I don't have an independent recollection of it.

Q    So let me ask you to turn to Page -- it would be good if I knew -- well, let's go with Page 9.

A    Yes, sir.

Q    Oh, wait, I am sorry, I'm wrong.  Strike that.  Could you please look at Page 2 of that document?  And about half-way down Page 2, do you see above the word "interviews" that

is underlined and in italics?  And then going up three lines there is a reference to interview reports by Rosanne Shay?

A     Yes, sir, I see that.

Q     Do you recall having reviewed interview reports by Rosanne Shay?

A     No.

Q     Do you just not recall it or do you believe you didn't review them?

A     I believe that that was Mr. Hilfiger's area that he was working on.  I don't know what I duplicated efforts with him on reviewing psychological records on Mr. Barrett.

Q     Do you recall the name Steve Leady in relation to this case?

A     No, sir.

Q     So looking at the next line below the reference to Rosanne Shay, do you see that you recall having reviewed any interview reports by Steve Leady?

A     No, sir.

Q     Do you have any contact with Steve Leady?

A     No, sir.

Q     Do you, as you sit here today, know Steve Leady?

A     I couldn't pick him out of a line-up of two.

Q     Then looking at the next line below that where it says psychological evaluation completed by Dr. Bill Sharp, do you have any recollection of having read this or becoming aware

of that evaluation prior to trial?

A     No, sir.

Q     Looking at this document as a whole, Government's Exhibit Number 34, you don't have an independent recollection of this right now?

A     No.  When I scan through it there are some things that I seem to remember about Mr. Barrett, whether or not it came out of this or not, but like his references to school and things he liked and didn't like.  I mean, there are some -- the more I worked with it, I am sure I would -- I don't know that I could tie it to this or not, but there are some things that seem familiar to me.

Q     Do you recall whether you asked Dr. Russell to provide you with a copy of this document?

A     Either myself or Mr. Hilfiger.

Q     Asked for this?

A     During that first meeting.  I mean, we discussed with her at that first meeting, from what I believe, what had been done, what needed to be done, and what she was willing to do.  And certainly her report -- because I don't believe I had this report prior to meeting with her and I don't know that Mr. Hilfiger did.

Q     And do you recall asking Dr. Russell or whether you asked Dr. Russell to update this report for purposes of the federal trial?

A    When I say a strategy was developed, I don't mean to say that there was a new strategy. I don't want you to take my testimony as that. But when we met with her, her and Mr. Hilfiger had the majority of the conversation because they both are the most familiar with the materials. I set up the meeting. I am there learning what I can, but the things that they were talking about I didn't have familiarity with. So what I remember about that meeting is this strategy being conducted that would limit the government's intrusion into Kenny's past and their exploitation of that and proceeding along the lines of dangerousness as opposed to a full-blown mitigation strategy. And all of that was done, from my recollection, at that meeting with Dr. Russell saying this is what I'm trained to do, this is what I can do, this is what I have done in the past, and this is what I can do going forward.

Q    And that would be the meeting on August 29th, 2005?

A    Yes, building off of what had been done previously with Echols and Mr. Hilfiger while he was affiliated with Mr. Echols.

Q    So you said a second ago -- and I want to be sure I understood that --

A    Yes, sir.

Q    -- that you made a distinction between focusing on future danger and a full-blown mitigation case. Is that

correct?

A    That's my recollection of what her and Mr. Hilfiger were zeroing in on, yes, sir.

Q    Do you recall anything about Judge Payne having limited the defense case in the penalty phase to a rebuttal of future dangerousness?

A    I don't have a recollection of that.

Q    Do you recall any conversations with Mr. Hilfiger along those lines?

A    I don't recall.

Q    Let me ask you, if you still have the binder there, to look at Government's Exhibit Number 32.  First of all, have you ever seen that document before?

A    If you would give me a moment to review it...

(PAUSE)

A    I've reviewed it.

Q    Do you recall whether you've ever seen that document before?

A    No.

Q    Looking at Page 2 of that document, does it reflect or -- I am sorry.  Does it refresh your recollection at all as to whether the defense in this case believed there were limitations on the mitigation testimony that could be presented?

A    Mr. Hilfiger wrote this without my participation, so

I can't tell you whether what's in here is accurate or not. I don't have any independent recollection of restrictions that Judge Payne put on us as it relates to mitigation.

Q    There is a phrase used in this correspondence which is mitigation expert.

A    Yes, sir.

Q    Did you view --

MR. KAHAN:  Your Honor, I am going to object to further questions on this.  The witness made it clear that this is not his letter.

THE COURT:  Well, what is it you are looking for from this witness with regard to this letter?

MR. SCHARDL:  I can rephrase the question.

THE COURT:  I understand -- I mean, I don't think there is anything wrong with taking him through...were you aware of this, were you aware of that, but unless it is something along those lines, there is really not a whole lot he can tell us about this, is there?

MR. SCHARDL:  About the letter?  That's fine, Your Honor, that's fine.

THE COURT:  Okay.

BY MR. SCHARDL:

Q    Mr. Smith?

A    Yes, sir.

Q    The phrase mitigation expert, what does that signify

to you or what -- I am sorry.  What did it signify to you at the time of your work on this case?

A    I think it is self-explanatory, that it's a person who is an expert in mitigation.  They hold themselves out as such.

Q    Did you equate that at the time of your work on this case with mitigation specialist as we have been using that term previously in your examination?

A    If you ask me what I think a mitigation specialist is, I think that is a person that is trained specifically to provide those services.  So that may differ from what I'm talking about generally in terms of mitigation, if that makes sense.

Q    So what services would a mitigation specialist provide?

A    They would interview the defendant and family members to ascertain mental health histories, backgrounds, education, hospitalization records, school records, everything about the background of that individual, his family, his extended family, great-grandparents, maybe great-great-grandparents.  It goes -- from what I understand, the tentacles are pretty deep on what they do, how far they search.

Q    And what is the purpose of that investigation?

A    Well, in a case like this ultimately you hope it is used to save a fellow's life.

Q    So it is used to gather whatever information might be

presented in a penalty phase?

A    Correct.

Q    Dr. Russell?

A    Yes, sir.

Q    Do you recall what the scope of her work was on this case?

A    Yes, it was limited.

Q    To?

A    Dangerousness.  She -- I have seen her declaration. I don't remember her saying during our meeting she is not a mitigation specialist.  I don't remember her saying that during our meeting.  It has been too long ago.  I know that she has maintained that in a declaration that you've shown me.  I do know that she told us she didn't have time to prepare on the eve of trial work that otherwise might be done by a mitigation specialist.  And that's when -- in talking about this strategy that was then further developed between her and Mr. Hilfiger about what makes sense with the time that we had, with the information that has previously been gathered, and in light of trying to protect the government from exploiting Kenny's past.  I think there were several moving parts in that equation, but I don't think anybody had an idea when we left that meeting that she was our mitigation specialist.  This letter reads a little different than that, but I am not -- I don't know Mr. Hilfiger's

thinking as he wrote that because it is all in the area of mitigation. So that's the distinction that I draw between my conversation about mitigation and a mitigation specialist. Fair enough?

Q    Fair enough. Thank you, sir. And I think we covered this before but just to be sure, if you told the Court on September 9th, 2005, that Dr. Russell's work on this case would not involve an examination of the defendant, that -- would that have been the best recollection we have available as to the scope of her work?

A    Knowing what happened, I don't know that that statement is accurate. It may have been accurate when it was made, but I know that she was going to go back and re-interview Kenny. We knew that whenever we met with her or I believe we did anyway at the end of September or -- excuse me -- at the end of August. But it is also my recollection that that interview was going to be to update her records with what she had done and she -- she hadn't seen him in a while.

Q    Mr. Smith, let me ask you to turn in that binder to Government's Exhibit Number 33. Specifically, sir -- I am sorry, Page 4 of Government's Exhibit Number 33.

A    Yes, sir.

Q    I'll direct your attention to the last entry on that table there for October 11th, 2005.

A    Yes, sir.

Q    Do you believe that was the interview that Dr. Russell did with Mr. Barrett?

A    Yes.

Q    Okay.  And do you recall the date on which you disclosed her report to the government in this case?

A    I don't know.  Let me ask you to turn back to Page 3 of Government's Exhibit 33.  Looking at the last three lines there -- well, we know from the record it was after September 9th, 2005, correct, that she gave her report to the government?

A    Based on what you've shown me with that previous testimony, yes, sir.

        MR. SCHARDL:  Excuse me one moment.

                    (PAUSE)

BY MR. SCHARDL:

Q    Could I ask you to turn to Government's Exhibit Number 35, please, and specifically to Page 7 of that Exhibit Number 35.  Have you got that?

A    I do.

Q    Do you see the date of the report is September 15th, 2005?

A    Yes, sir.

Q    Do you have any reason to question that that is the date that she prepared this report?

A    I don't know.  I don't have any reason to question

what's on there, but I don't have any independent

recollection of it.

Q    Okay.  So if her billing records reflect that she

evaluated or -- I don't want to say evaluated.  Strike that.

If she met with Mr. Barrett on October 11th of 2005 and she

submitted her report on September 15th of 2005 -- your

statement to the Court on September 9th of 2005, was that

the work you would be offering pursuant to Rule 12.2 did not

involve an examination of the defendant; correct?

A    You know, it has been a while since I've reviewed Rule

12.2.  So I --

Q    Well, I --

A    And when I say that, I context that in terms of my

answer.  I know that she wanted to update the records and

visit with Kenny.  Whether or not that was going to involve

an examination that implicated 12.2, I can't tell you sitting

here today.  I think my statement that I made to Judge Payne

on September 9th was accurate as it states.  I don't have

any reason -- and I won't mislead you or the Court.  What she

did in October as it relates to an examination or not, I

don't -- I don't know if it -- and the way it implicates

Rule 12.2, I just can't tell you sitting here right now.

Q    Do you believe that you had any communications with

Dr. Russell after October 11th, 2005?

A    If you would let me see her billing record?  What

566

exhibit was that, 33?

Q    I think so.  That sounds correct.

A    You want to know whether I had contact with her after September --

Q    Well, after her meeting, I guess, with --

A    Mr. Barrett?

Q    Yes, Mr. Barrett.

A    Well, she visited with a lawyer on October 11th --

Q    Well -- and just to avoid any hearsay problems --

A    Yes, sir.

Q    This document purports to represent that she interviewed Mr. Barrett on October 11th; correct?

A    Yes, sir, and interviewed with a lawyer then to --

Q    Met with an attorney --

A    -- or met with a lawyer.

Q    Do you recall meeting with her at that time?

A    I want to believe that was Mr. Hilfiger because I don't have a recollection of that.

Q    Thank you.

                        (PAUSE)

BY MR. SCHARDL:

Q    Turning back to your declaration, Mr. Smith, do you recall stating in there that Dr. Russell never, quote, "...suggested anything to me that indicated she believed that Mr. Barrett suffered from a significant mental health

condition?"

A    I remember reading that in my declaration and I guess it is two degrees as to how you want to interpret that.  To me Kenny was higher functioning than most criminal defendants that I run across.  So from that context, I think that is accurate.  I don't think it excludes the fact that he may have had some mental health issues certainly in his past and maybe that he was struggling with, but they certainly were not obvious to me or in a conversation with her that we had that they were patently obvious.

Q    Do you recall -- you said previously that you don't recall her 2003 report; is that correct?

A    No.

Q    So in that statement in your declaration did you intend for it to be taken as representing that there was nothing in her report that suggested to you that she believed there was no mental health condition that could be presented in mitigation?

A    No.

Q    It did not?

A    No.

Q    You are saying that you did not intend to mean that your -- that her report never suggested the possibility of a mental health condition that could be presented in mitigation?

A    I think that language was a politer way of saying nothing in our conversations indicated to me that Kenny is nuts, you know, as we take it -- as we relate to people whether it is on the street or professionally.  It doesn't exclude the fact that he may have some underlying mental health issues that meet these psychological criteria that you asked me about earlier.

Q    Thank you.  I apologize.  I am just looking for something.  (PAUSE)  Going off of what you just were talking about, at the time of your work on this case I assume that you had worked with mental health professionals in the past?

A    Some.

Q    Some.  Do you mean by that that your work with mental health professionals in the context of criminal defense work was limited?

A    I would say that my work with mental health profession-als professionally would be related primarily to competence.

Q    To competence?

A    Whether a defendant is competent to stand trial.

Q    In the course of that work --

A    Yes, sir.

Q    I am sorry?

A    Yes, sir, I am listening.

Q    Did you have an understanding of the difference, if any, between a mental status exam and an evaluation of the

defendant's condition over time?

A    I would think one would be how are you doing today and the other is let's take a look at your life history and see what that indicates.

Q    Would you agree with me that competence is sort of a snapshot of the defendant's mental condition at the time he is being evaluated?

A    Yes.

Q    And would you agree that when we are talking about mitigation, we are talking about looking back over somebody's life at how a mental or emotional condition may have affected their behavior in the past?

A    Their life and their family history.

Q    Let me ask you about some specific things, facts about Mr. Barrett's life and history.  Do you recall whether prior to trial you were aware that he had repeated the eighth grade?

A    I don't know if I knew then or not.  I mean, I know I've read that since.  So my recollection, I am sure, has been tainted.  I am not going to tell you that, oh, yeah, I knew that then.  I don't know why I wouldn't, but I know my memory has been tainted from recent readings.

Q    Do you know whether you knew prior to trial that he had been in a class for children with a learning disability?

A    I can't tell you.  I don't know.

Q     Prior to trial what did you know about Mr. Barrett's home life as he was growing up?

A     I knew that him and his mother were very close.  He lived next door to his mother.  I knew that he had a step-mother who was involved in his cases in terms of communicating with his father.  I can't tell you why she was the point person as it relates to his father, but...you know, Kenny's house is not very far from his mother's.  That indicates to me he has a close relationship with his mother and I don't know that she ever indicated differently to me.

Q     So do you know whether you knew at the time of trial the circumstances of him owning that property and building that cabin?

A     I am sure we talked about that.  That's one of the first things I wanted to do, was go lay eyes on this crime scene.

Q     And you did, in fact, go out to look at the crime scene?

A     More than once.

Q     Did you speak with Mr. Barrett's mother when you were out there?

A     Yes.

Q     What was the purpose of those conversations?

A     It would change over time.  Initially it would be an introduction.  This location was very rural and you didn't

pull into that area unnoticed and they had heard by the time that I had gone out there that I was involved in the case. So there was some eagerness and apprehension, I am sure, on my part and their part to meet each other and to do the work that I had to do.

Q    Did you meet with other members of Mr. Barrett's family over the course of your representation?

A    Sure I did.

Q    In the course of those meetings did you ask the kinds of questions that you described earlier that a mitigation specialist would ask?

A    I certainly did not go into the depth that those people do and how they are trained to get responses on a subject matter that most people don't want to talk about.  I guarantee you Kenny's mother did not want to talk about her past of drinking too much.

Q    That's the sort of topic that you would have deferred to a mitigation specialist, a person trained to get into that sort of thing?

A    My understanding is that is what they are experts at.

Q    And you are not?

A    No.

Q    Prior to trial did you know or were you aware of how much the Barrett family during his childhood had either been stable in one place or had moved around?

A    I remember the -- and I've read it here recently just reviewing those records that-- the Joilet, Illinois farm stuff.  I mean, that's something that Kenny and I would have talked about.  You know, how long have you been in Sallisaw, what all have you done, what's your background, you know, what are you -- so in some regards -- I mean, we more than just touched on it.  Heck, I want to know about him like you do with your criminal defendants in general.

Q    So did you then communicate that information about the family moving around to somebody who could tell you whether it could have affected him, his development, his sense of place in the world, anything that could have served as a mitigating circumstance?

A    No, and I reference what I said earlier.  Surely it is not in May of 2005 that we are developing mitigation.

Q    And yet in September of 2005, you were telling the Court that you were surprised that there wasn't much in the way of mitigation in the files that you had from Mr. Echols?

A    And what Mr. Hilfiger had from Mr. Echols.  They were working together.  I mean, I was making those statements to the Court, but it's, it's -- I can't believe those two didn't discuss what had been done prior whenever they get together in January or December, whatever it was, of 2004.

Q    You raised a point that I think we should clarify.  The files that Mr. Hilfiger got from Mr. Echols, who had physical

custody of those during the course of your representation?

A    Mr. Hilfiger has a library at this office.  The same location he offices today.  Those boxes were lined up along the wall in his library and I would go to his office and would have that meeting and I would take what materials that I needed to work on.

Q    You would make a copy of them or you would just take physical possession of the documents?

A    Just take them.

Q    And then presumably return it?

A    That's correct.

Q    Prior to trial did you know whether Mr. Barrett had worked construction at any time?

A    I've read that, read it recently, so I can't --

Q    You can't discriminate between what you've learned and --

A    Correct.

Q    I see.  Do you recall ever trying to contact any of his past employers to be witnesses?

A    It is my impression that Mr. Barrett had gone through a period of time where he primarily stayed at the house and worked as a mechanic, self-employed.

Q    Before that however, were you familiar with his employment history before the period when he was working as a mechanic there at the cabin?

574

A     You know, I want to say that I was or would have been, but I don't have any independent recollection of that.

Q     I believe you said that Mr. Barrett had a good ability to recall things that had happened in the past in the case.

A     Yes, sir, and previous trials, that's right, and the incident itself I felt like.

Q     Did Mr. Barrett ever tell you not to contact Dr. Russell?

A     Not that I recall.

Q     Did Mr. Barrett ever tell you that he didn't want Dr. Russell to testify?

A     I don't have any recollection of that.

Q     That decision was made independently?

A     I'm not going to say that either.  We had -- Kenny was a participant in his case and anything of significance would be discussed with Mr. Barrett.  I would think that would be significant.

Q     You also said that the strategy for the penalty phase was decided at that August 29th meeting; correct?

A     Based on the work that had previously been done and in the timing that was remaining.

Q     And that is also the meeting at which you obtained Dr. Russell's report?

A     I don't know that.

Q     You may have obtained the report sometime before then?

A    Or after, I don't know.  And I don't know when Mr. Hilfiger may have received it.  I just don't know.

Q    Now, with regard to your declaration again, you -- do you recall saying in there that Mr. Barrett wanted to minimize the amount of testimony elicited from his relatives, particularly his son, mother and ex-wife?

A    Yes, sir.

Q    Do you recall whether you and Mr. Hilfiger called his ex-wife and mother as witnesses?

A    I didn't have a recollection of that until I read what was in my opening statement, that I would have absolutely argued with you as to whether or not I prepared that presentation.

Q    Did you and Mr. Hilfiger investigate ways to present information about Mr. Barrett's family background through witnesses other than his relatives?

A    Well, we had other witnesses testify.  So...

Q    Fair enough.  Specifically did you do any legal research, for example, on the ability to present a mitigation specialist as a witness on family history in lieu of presenting the relatives themselves?

A    I don't recall that.

Q    Did you recall having any discussions with Mr. Hilfiger about using a psychologist to present evidence about family history in lieu of having the family members themselves

describe events?

A     Well, that's what Dr. Russell is and was.  So...

Q     Well, I think you testified earlier that her role in the case was to redo the risk assessment that she had done in state court; is that correct?

A     It was to discuss our alternatives that we believe existed at that time and I would think certainly we discussed whether or not she would be a witness that would testify then.  And when I say then, I mean on that August 29th date.  I think that was encompassed within that when I say we were fine tuning that strategy.

Q     Of course, by then she had already done the risk assessment requested by Mr. Barrett's state court counsel.

A     Had done one previously, yes, sir.

Q     So whatever -- I am trying to find a more eloquent word than baggage, but you get my meaning.  Whatever baggage she came with, you had to take that into consideration when you discussed using her as a witness who could bring in that family information without the family members testifying; correct?

A     You are slicing and dicing things here pretty finely and I -- and I can't sit and tell you that we had that specific conversation about her testimony versus family members.  But I can tell you that when we had that initial meeting with her, it was discussed what she would be willing

to do and what she could do and what she had done in the past and how all of this would work in the best strategy to help Kenny.

Q    Well, let me ask you, Dr. Russell was not the only psychologist doing forensic work in this area?

A    That's correct.

Q    Were you aware prior to your meeting with Dr. Russell that Mr. Echols and Mr. Hilfiger had asked Judge Payne for resources to hire an expert in organic brain dysfunction?

A    I don't know that.

Q    You don't know whether you were aware or you don't think you were aware?

A    I don't think that I was aware of that.

Q    Do you know whether you knew at the time of trial that Mr. Barrett had reported significant head injuries?

A    I don't know.  I mean, I -- what reports had been generated and then the specifics that are contained within those, I am sure that we reviewed them, but so much time has gone by.  Did Kenny ever tell that to me?  I certainly don't have any recollection of that.  Has he told it to others?  I think there is evidence that he has.

Q    Did you know that he had shot himself in the chest with a shotgun in 1986?

A    I think I had forgotten that detail and I became aware of it again, I think, whenever I reviewed the Court's opinion

when there's reference to it.

Q    But you think you did know it at the time of trial?

A    Yeah, I -- yes, certainly.

Q    Did you yourself come to the conclusion that there was no reason to have somebody evaluate Mr. Barrett for organic brain dysfunction?

A    I didn't make that determination one way or another.

Q    Did you have any conversations with Mr. Hilfiger about whether that should be done?

A    No, sir.

Q    Going back to your declaration in this case, you said -- I apologize, I'm trying to find it.  You said that Mr. Barrett did not want the outcome of the case to hinge on personal sympathy for him; is that correct?

A    I believe so.  I believe that is what is in the declaration and I think that's consistent with Kenny's wishes at the time.

Q    Now, did you yourself believe that an appeal to sympathy for a convicted murderer would be an effective mitigation strategy?

A    You know, what we had to weigh is knowing or having a belief that we had a very conservative jury, we had a victim who was as all American guy as you can get, you know.  That in and of itself presents a difficult circumstance in which to gain sympathy for a fellow when the jury has been told of

drug use and abuse and other acts committed, say, against Abby. So you are trying to weigh all of that and it is not in a vacuum and that's what we were wrestling with.

Q    Do I understand you correctly to say that you are saying that a raw appeal to sympathy for Mr. Barrett, especially after the government's case on victim impact, that that was going to be, in basketball terms, a low percentage play?

A    It is very, very difficult and you have got to be very careful in how you proceed.

Q    Is it your understanding that the goal of presenting a social history in a penalty phase is to engender a sense of sympathy for the defendant?

A    I think that is one strategy, yes, sir.

Q    That is a strategy or that is the point?

A    I think that I would have to say there is a certain strategy to showing the troubled life that a defendant has had and if he does have some sort of organic brain injury, maybe he has difficulty in discerning between right and wrong or making impulsive decisions. So sympathy, does it come into that family -- his life, his upbringing, his parents' treatment of him? I mean, that's to me where that comes in. I think that is a definite strategy.

Q    Were you prior to your -- at the time of your work on this case, were you familiar with the idea of mitigation as

humanizing the defendant?

A    Yes.

Q    Do you make any distinction between humanizing the defendant and an appeal to sympathy?

A    I can't answer that.

Q    Could I ask you to hand Mr. Davis that binder?

A    Certainly.

Q    And may I ask Mr. Davis, after he has dealt with that, to hand you Petitioner's Exhibit Number 95?  (PAUSE)  Do you have the document, sir?

A    I do have.

Q    Mr. Smith, do you recognize this document?

A    No, but based on my review of my notes, I would -- it looks like Kenny's writing to me.

Q    The handwriting appears to be Mr. Barrett's handwriting?

A    Yes.

Q    So let me ask you, do you have any recollection, as you sit here, of Mr. Barrett ever offering suggestions to you or Mr. Hilfiger about closing arguments in the penalty phase?

A    I don't know.

Q    Do you think it might refresh your recollection to review a document from that time?

A    Certainly.

Q    Okay.  Have you read Exhibit 95?

A      I've scanned through it, yes, sir.

Q      Let me ask you to read that just to see if it refreshes your recollection as to any advice that Mr. Barrett offered you for the penalty phase closing argument.

(PAUSE)

A      This doesn't trigger an old memory.  Okay?

Q      Okay.  So you don't recall having seen that before or receiving advice to the effect of what is presented in this document?

A      I think this is consistent with what we presented, but do I remember Kenny giving me that, no, but I think that's his handwriting.  I think he wrote that.

Q      As you were preparing for the penalty phase in this case, did you consult any expert in capital defense work regarding the problem that you were articulating a few minutes ago, how to present a mitigation case without a raw appeal to sympathy?

A      We had a conversation with Mr. Echols and I was trying to be like a sponge because there was so much information that he had that -- and I know this prosecution had changed and we now had death on the table.  So how much of that was discussed with Echols?  I've got to think probably some.  How much I discussed it with Donny Baker here I have lunch with fairly frequently and talk about cases that we had, the difficulties to overcome in those cases?  I mean, those are

certainly two guys that I would call experts in that area. As far as some other panel or resource group or anything like that, no.

Q    I want to be sure I understood what you said.

A    Yes, sir.

Q    You said you spoke with Mr. Echols because we now had death on the table.  Did you mean that that conversation occurred after the verdict in the first stage?

A    No, sir.  The first meeting we had with him.  I only remember meeting with Echols one time.

Q    One time?

A    And just like with Dr. Russell, a lot of that conversation was between him and Roger because Roger is now stepping into his shoes and they know a lot more about it than I do.  They weren't there -- Echols wasn't there -- I didn't go there expecting him to educate me, but I'm there to learn as much as I can from him about this case.  Part of it was the -- in stage one, the drug evidence that was going to be encountered that they didn't have to deal with before, which was a different prosecution.  And then the fact that death was on the table, I'm going to have to deal with those challenges, you know.

Q    And as best you can recall, that conversation with Mr. Echols took place early in your representation?

A    May, the first part of June.

Q    May, the first part of June?

A    Yes, sir.

Q    Would it be fair to say, sir, that a part of your case in the first stage of trial was to ask the jury in some way to sympathize with Mr. Barrett's position as it stood that night in September of 1999 when he was attacked?  Is that fair to say?

A    Yes.

Q    And that was a strategy with which Mr. Barrett agreed?

A    It was the strategy which was employed during his first trial.

Q    Successful?

A    Yes.

Q    Did you discuss either -- well, did you discuss with Mr. Hilfiger how you might present mitigation evidence that was consistent with that first stage strategy of Mr. Barrett having been taken by surprise in the middle of the night when an unmarked vehicle drove at speed toward his cabin?

A    I can't recall that specifically.  I mean, the theme I don't think verified from the first stage to the second stage.  It is not like, oh, well now that you've found us guilty we have got to change our direction.  That certainly never occurred.  So -- but I can't tell you that I remember having a specific conversation.  I just can't recall that or not.

Q    So there was no conversation that you can recall between yourself and Mr. Hilfiger that excluded the possibility of presenting mental health evidence that would have supported that first stage theme of him being taken by surprise and responding to what he perceived as an assault on him and his son?

A    I don't know that I understand what you are asking me.

Q    Okay.  Well, let me try to rephrase it.

A    Okay.

Q    Well, let me ask you this.  In that meeting with Dr. Russell --

A    Yes, sir.

Q    Do you recall any discussion of whether anything that she saw in Mr. Barrett's background or records could be presented in a way that would be consistent with your first stage strategy?

A    And I think we did that the best that we could.  When we talked about Kenny Barrett being a mechanic and a good neighbor and a good son and living out there remotely and not bothering people and he was in the sticks --

Q    I mean, specifically mental health conditions.  Any mental health condition that --

A    I can't recall that, no.

Q    You don't recall a conversation along those lines?

A    Well, when you are talking about him being a good

friend and a good father and -- I mean, I think that's what we are talking about or that's what -- you know, I think we developed that through those witnesses that were called in the second stage.

Q    Thank you.

MR. SCHARDL:  May I have just a moment to confer, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. SCHARDL:  Your Honor, we have been at it for several hours.  May I request we take at least a brief recess, if not the lunch recess, so that I can sort of figure out where I am at and how much more time there is to go in the direct?

THE COURT:  Sure.  Let's take a 15 minute recess.

MR. SCHARDL:  Thank you, Your Honor.

(11:27 a.m.)

(SHORT RECESS)

(11:50 a.m.)

THE COURT:  Mr. Schardl, what did you all decide about how much longer?

MR. SCHARDL:  I think probably 15 or 20 minutes to finish the direct.  It should take us just past the noon hour.  And I wanted to say that over the course of the break, my colleagues were kind of enough to provide me the docket

number of that transcript in the criminal case.  So I think -- and I think probably Mr. Davis was on top of that, but it is Docket Number 419.

THE COURT:  He is, in fact.  He handed me a note probably an hour ago.  He is all over it.

MR. SCHARDL:  And I am very longwinded, so I gave him plenty of opportunity.

THE COURT:  Go ahead.

MR. SCHARDL:  Okay.

DIRECT EXAMINATION CONTINUED

BY MR. SCHARDL:

Q    I want to return, Mr. Smith, to your declaration, if I may.  Turning to, I believe, the final paragraph -- we will all be happy to hear -- you said in your declaration that you did not want to premise your case in mitigation on Mr. Barrett's drug use because you did not believe that the jury would be sympathetic to such a strategy.  Do you recall saying that?

A    Yes.

Q    So let me ask you again, was that something that you offered to the government or that the government offered to you as an explanation for your activities?

A    I believe the government prepared that after an interview with me, but I think it is consistent with our theme.  I don't think it is inaccurate by any means.

Q     Okay.  Did you prior to trial conduct any investigation aimed at understanding why Mr. Barrett used drugs?

A     No.

Q     You understood that the jury was going to hear evidence that he was a drug user; correct?

A     Yes.

Q     In fact, as you said earlier, one of the differences between this case and the state case was that the government was trying to convict him of a drug trafficking crime.

A     Correct.

Q     So would it be fair to say that if you did not conduct an investigation into why Mr. Barrett used drugs, you were not in a position to say whether the circumstances of his life after he started using drugs were premised on that drug use or premised on some offense that preceded his drug use, is that correct, or was that just too elliptical of a sentence for anybody to understand it?  Let me try that again.

A     Okay.

Q     Were you familiar with the term comorbidity as it is used in the medical or psychiatric literature at the time you were working on this case?

A     The term again, please?

Q     Comorbidity.

A     No.

Q     Did you consult any experts about whether Mr. Barrett's

drug use might be a response to an underlying mental or emotional problem that he had?

A    No.

Q    Did you consult any experts to determine whether Mr. Barrett's drug use was a response to any traumatic experiences he had had earlier in his life?

A    No.

Q    Prior to trial did you conduct any investigation into whether somebody with a learning disability might turn to illegal drugs?

A    No.

Q    Prior to trial did you know whether family members described Mr. Barrett as a hyperactive child?

A    I can't recall that, whether they did or not.

Q    Is that something that you inquired into as far as you recall when you were meeting with his parents?

A    I don't know, I don't recall.

        MR. SCHARDL:  Your Honor, before court today, I had my paralegal print out some pages from Petitioner's Exhibit Number 75.  So 75 is all of the materials that Mr. Barrett's counsel has provided to the government in discovery, and more specifically it is the contents of Mr. Smith's file and Mr. Hilfiger's file, which includes the files that Mr. Hilfiger got from Mr. Echols.  So what I did prior to the start of court today is provide some copies of bates numbered

pages from Exhibit 75.  So I -- I am not sure if the Court has all of that printed out, but what I would like to do is show the witness some of those printed out pages and I have extra copies of those excerpts for the Court.  Would that suffice to give you a reference?

THE COURT:  Sure.  Do you have one to give to the defense as well?

MR. SCHARDL:  To Mr. Kahan, yes, I have, Your Honor.

THE COURT:  Okay, then that's fine.

MR. SCHARDL:  Your Honor, if I may, I would like to approach the witness and present him with a packet of papers from Exhibit 75 consisting of bates numbers DISC-008273 through DISC-008299.

THE COURT:  Okay.

MR. SCHARDL:  Thank you, Your Honor.  And for the record, I am going to hand Mr. Davis a copy so that Your Honor has something to refer to.

THE COURT:  Okay.

BY MR. SCHARDL:

Q     Mr. Smith, if you would, leaf through those pages and tell me when you've had a chance to finish that.

(PAUSE)

A     I've had a chance to review these records.

Q     Thank you, sir.  Are they familiar to you?

A      No.

q      Do you recall whether you looked at those documents prior to the trial in this case?

A      I don't believe I've ever seen them.

Q      I am going to hand you --

MR. SCHARDL:  If I may approach, Your Honor?

THE COURT:  Yes.

BY MR. SCHARDL:

Q      -- another group of documents.  This is, for the record, from Petitioner's Exhibit 75.  This is DISC-008300 through DISC-008314, obviously inclusive.  And I am going to hand a copy to Mr. Smith and a copy to Mr. Davis.  Same thing, Mr. Smith, please look through those and let me know what you think.

(PAUSE)

A      I've had a chance to review those.

BY MR. SCHARDL:

Q      Sir, are those documents familiar to you?

A      No, sir.

Q      Do you recall ever having seen those documents before?

A      No, sir.

Q      I'll just retrieve those, for the record.  Mr. Smith, at the time of your work in this case were you familiar with the phrase executive functioning as it is used in the field of neuropsychology?

A      I think I am.  I mean, it has a meaning to me.

Q      And do you know whether it did at the time?

A      Sure.

Q      Did you have any sense, at the time of your work in this case, of how a defendant's -- a murder defendant's executive functioning might be relevant to either a defense or a case in mitigation?

A      Specifically, no.  I think that intertwines though with -- you know experts, particularly in this case psychological experts, put a label on something that otherwise we may recognize as a guy functioning at a level that you deem as sufficient.  So a lawyer is not trained to put those labels, as you are asking me, or certainly I haven't been.

MR. SCHARDL:  Can I have just one moment to confer, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. SCHARDL:  Thank you, Your Honor.  I appreciate the forbearance and with that, I will pass the witness. Thank you, Mr. Smith.

MR. SMITH:  Yes, sir.

THE COURT:  Well, that was a brief session, but we might as well go ahead and break for lunch considering what time it is.  Let's be back at 1:00.

(12:06 p.m.)

(LUNCH RECESS)

(1:02 p.m.)

COURT IN SESSION

THE COURT:  Mr. Kahan, are you ready to cross examine?

MR. KAHAN:  I am.  Thank you, Your Honor.

THE COURT:  Go ahead.

CROSS EXAMINATION

BY MR. KAHAN:

Q    Good afternoon, Mr. Smith.

A    Good afternoon, sir.

Q    I believe you stated on direct that you've been an attorney for 27 years; is that correct?

A    I think that's correct.

Q    And you indicated that you had a general practice at this point; is that right?

A    Correct.

Q    Now, about what percentage of that, do you think, has been criminal law over the years?

A    Criminal law has probably comprised half of what I do, maybe a little more.

Q    Is it fair to say it is 2017 right now, so you would have started practicing in 1990?

A    Somewhere in there, '90, '91, yes, sir.

Q    So about the time you got involved with this particular

case, you had been practicing about 15 years?

A    Correct.

Q    Okay.  Up to that point was it still true that you -- that about 50 percent of your practice was dedicated to criminal law?

A    I'm sure it has changed over the years, but I would say primarily half has always been a criminal practice.

Q    Would you agree with me that pretty much everybody who has ever done a second death penalty trial did a first one?

A    That's exactly correct.  You've got to start somewhere.

Q    And here in Oklahoma it is my understanding that in a state court practice you have jury sentencing; is that correct?

A    That's correct.  The jury recommends, the judge sentences.

Q    Well, as a part of that practice presenting before a jury with regard to sentencing in non-capital cases -- and I am speaking about non-capital cases.

A    Yes, sir.

Q    You would have had some experience in eliciting testimony from witnesses that would have concerned sentencing.  Am I correct in that understanding as well?

A    Ask that again for me, please.

Q    You would have elicited evidence in court in non-capital cases with regard to sentencing.  Is that --

A     Sure.

Q     Okay.  And is it fair to say you would have done that more than once?

A     Yes.

Q     Any estimate how many jury trials you might have been involved in by 2005?

A     Criminal cases?  It would just be a guess.  I don't know if it would be 20, 25, I don't know.  That would just be a wild guess.

Q     Okay.

A     We are talking to a conclusion of jury trial.

Q     Right.  And for many, if not all of those, you would have been responsible for sentencing as well as any concern with regard to guilt.  Is that right?

A     Yes, sir.  There are not many occasions that I've had co-counsel.

Q     Now, along the way, as between your criminal and civil practice -- I know you mentioned that you've had some experience interviewing witnesses.

A     Correct.

Q     How much of your day-to-day practice would you say involves interviewing witnesses?

A     Well, when you include my client in that category, it is probably half of what I do during the day.

Q     And is every one of those conversations a walk in the

park?  Are they all easy?

A    No.

Q    Do you sometimes talk about difficult subjects?

A    Yes, sir.

Q    Fair to say that most people by the time they are in court, they are dealing with some sort of difficulty in their lives; is that right?

A    Few of my clients come to me because they have got a great deal to discuss.

Q    So you have -- you had had a -- you have had some time getting information out of people when they did not want to give it; is that fair?

A    Yes, sir, you bet.

Q    Now, when Judge Payne assigned you to this case did he provide you with any specific role?

A    No, sir.

Q    Were you led to believe at any point in time that you were going to be solely responsible for this case?

A    No.  I mean, the role that I was delegated to was co-counsel, second chair to Mr. Hilfiger who had assumed Mr. Echols first chair position.  I mean, that role, yes, but I --

Q    And that was consistent with your understanding with Judge Payne?

A    That's what we had discussed.  He wasn't putting me in

596

place to be the lead dog.

Q    And that was also consistent with your understanding with Mr. Hilfiger, as I understand it?

A    Oh, yes, most definitely.

Q    At some point did Mr. Hilfiger ask you to obtain any records from any prior attorney in this case?

A    Yes.

Q    And who was that?

A    Jack Gordon.

Q    And what did you do in an effort to obtain those records?

A    Excuse me, sir?

Q    What did you do in an effort to obtain records from Mr. Gordon?

A    Contacted him.

Q    By phone?

A    Yes, sir.

Q    All right.  And were you able to actually reach him?

A    Yes, sir, I did.

Q    Okay.  And what did he tell you about records when you asked him for them?

A    He advised that he didn't have any records, that what he had had been turned over, my recollection is, to Echols. I saw something earlier in a transcript that referenced Mr. Woods, who was the court reporter for Judge Garrett in

the state case.  I tend to question that.  I don't know what the reporter would do with -- why he would have mitigation records in a case that didn't go to a second stage, but nonetheless I saw that in the transcript that counsel had me read earlier.

Q    Okay.  In either event, Mr. Gordon was clear with you that he did not have any records to provide to you?

A    That's correct.

Q    And were you aware of what role Jack Gordon might have played in his prior representation of Kenny Barrett?

A    My understanding was that he was Echols mitigation guy, that he did not participate or have responsibilities in the case-in-chief.

Q    And I think you've already testified that it was your understanding that any records that had been in the possession of Mr. Echols had been previously provided to Mr. Hilfiger when he became a part of this case.  Is that what you --

A    That's correct.

Q    Now, Mr. Schardl asked you a few questions about the Oklahoma Indigent Defense System.

A    Yes, sir.

Q    I believe I am getting that right.  Otherwise known as OIDS.

A    That's correct.

Q    And you are not employed by OIDS; is that correct?

A    No, sir.

Q    And have you ever been?

A    No, sir.

Q    Are you familiar with the staff there?

A    Yes, sir.

Q    You are?

A    The executive director is a friend of mine.  He has recently retired, but he was a friend of mine.

Q    Were you led to believe that at any point in time that there were records related to Kenny Barrett's state case --

A    No, sir.

Q    -- in the possession of OIDS?

A    I am sorry.  No, sir.

Q    And you had no reason to suspect that they would have possession of such records; is that correct?

A    No, I would have thought Echols would have had everything.

Q    Now, ultimately the universe of records that was available to you, it sounds like, resided largely with Mr. Hilfiger.  Am I understanding that correct?

A    I don't know when he obtained them, but, yes, that's where I went to retrieve the documents.

Q    And do you know the complete contents of those files?

A    No.  I mean, obviously we had trial transcripts from

the first trial and we had partial transcripts from the second trial and then a host of other materials.

Q    Now, I know there were some questions about your relationship with the defendant.  I would like to follow up on that a bit.  Who, between you and Mr. Hilfiger, communicated for the most part with Mr. Barrett?

A    Once I got in the case I probably visited with Kenny more than Mr. Hilfiger did, particularly at the jail.  I mean, in the courtroom he would sit in between us, so we would both visit with him, but if we needed to go discuss something with him after hours, it would probably be me that would go do that primarily.

Q    And did you generally have an easy time talking to him?

A    Sure.

Q    Did he also communicate with you by way of notes?

A    During trial?  Yes, sir.

         MR. KAHAN:  If I may ask the clerk, please show Mr. Smith a copy of Tab 38.  I want him to take a look at Number 38, Government's 38 and 39.

BY MR. KAHAN:

Q    Have you had a chance to take a look at those?

A    I'm thumbing through them now.

                    (PAUSE)

A    Some I remember.  It is Kenny's notes.

Q    And have you looked at both 38 and 39 or...

A       No, sir, 38.  Let me go to 39.

(PAUSE)

A       Yes, sir.

Q       And would you agree with me, certainly it is my understanding that these are notes written by the defendant during the course of trial.  Is that fair to say?

A       It has been a long time, but some of these particular notes I remember whenever they were passed to me.

Q       And in your recollection of the events, were these notes generally responsive to what was going on in court at the time?

A       Kenny would take notes during the trial and that's where I think these were generated.

Q       Normally I would ask you if these were a complete set of notes and -- and I will.  As far as you know, is this all of the notes written to you during the course of trial?

A       I don't know.  It's -- I had forgotten -- if I may -- I had forgotten that -- Kenny would give me his notes at the end of the day.  I would have to bring him something to write on and they had a special type of pen they wanted him to use, a felt type pen.  And when -- I think Ms. Fisher was asking me about Kenny's notes and insisted that I had them. It really surprised me and sure enough I located a file with my notes and Mr. Barrett's.  So to the extent that what was in my possession is a complete copy, yes.  But is that every

note that Kenny took?  I don't know.

Q    But all of those notes in these two exhibits were passed to you by the defendant during the course of the trial?

A    Well, I can't say that, but...

Q    Would it be fair to say then to say that all of those notes were passed to you by the defendant at some point during the course of your representation of him?

A    His notes would be in general, yes.  Whether this is all or what, I don't know, but...

Q    Okay.  Did you find some of those during the course of trial were of occasional assistance to you?

A    Yes.

Q    And I don't want to be unfair to you, but I am wondering if any in particular stand out to you?  I know you mentioned one or two seemed to spark a memory.

A    I think it would be fair to say that some testimony might have particularly affected Kenny in a way that he would write a note to me to maybe question what was being said and through better judgment I wouldn't ask that question.  I hope we don't get into those, but I think the references in there are obvious.  Those are the bad.  The good are he is taking -- making note of things that are positive and helpful.  I think there is both in there, but mainly positive.

Q    Kind of change course here for a moment.  I am going to

pick on the declaration. I know it has been picked over pretty well here today. There was some discussion about your declaration and there are some remarks regarding competence. More to the point -- well, let me back up, if I could.

There is a comment that you made in the declaration about Kenneth Barrett believing he was being unfairly targeted by the government. Do you recall that?

A    I recall it being in the declaration. I would have to think a little bit more about the context in which it --

Q    Well, if it would help you to refresh your recollection, turn to Tab 2, Government's Exhibit 2. I would point you to Paragraph 5.

A    Yes, sir.

Q    Was it your understanding in that declaration that Mr. Barrett felt unfairly targeted by the government and that remark referred to his feelings about having to stand trial repeatedly for a crime for which he had been convicted in state court?

A    Yes.

Q    And did it in a sense reflect Mr. Barrett's understand-ing of the principle of double jeopardy?

A    His and mine at the time.

Q    He was not expressing any concern about imaginary forces and it wasn't an irrational response to things you were unaware of, it was simply his response to the

circumstances; is that fair?

A  Yes.

Q  So there was nothing about his emotional state in that regard that led you to believe that he was unduly paranoid; is that fair to say?

A  No, I think this was a feeling about the subsequent prosecution in federal court.

Q  Did any of Mr. Barrett's beliefs with regard to this subsequent prosecution lead you to question his competence to stand trial?

A  No.

Q  Did any of his other beliefs lead you to believe that he was incompetent to stand trial?

A  No.

Q  Did any of his behavior lead you to believe that he was incompetent to stand trial?

A  No.

Q  Now, at that point you had been practicing law, as you said, for about 15 years.

A  Yes, sir.

Q  Had you ever at that point dealt with a defendant who you suspected of being incompetent?

A  You know, it is -- yes, I am sure I have, but that standard is so easily overcome that it -- sometimes it almost seems pretty meaningless, you know.

Q    I want to opine on that.  My question is more to your experience in the court system representing defendants when you believed there was a question of competence.  That had occurred?

A    Yes.  When I say that, what I mean is -- and I said it earlier.  I think you know it when you see it, particularly when you apply the standard for competence to stand trial.  It is a pretty low hurdle to jump over.

Q    Was that -- I won't call it a gut sense of competency formed at all by your experience in representing people in the criminal justice system and then going through the process of referring them to mental health experts and learning from what they told you about your clients?

A    Yes, sir.

Q    Now, the defense pointed out that your declaration refers to competence; correct?

A    I don't know.  I mean, I am not staring at it, but --

Q    I believe it was discussed at some length on direct the extent to which this declaration refers to competence to stand trial.

A    Right.

Q    It also refers more generally to your sense of Mr. Barrett's general mental health; correct?

A    Yes.

Q    Now, at the time you executed this declaration, did

you understand the procedural posture this case was in?

A    I'm sure I did then.  I don't know that I could necessarily repeat it to you now, but...

Q    Fair.  I would be happy to.

A    No, I am saying that I don't know that I could.

Q    Do you recall that at the time the government had not answered Mr. Barrett's pending 2255 motion and that Mr. Wilson and I reached out to you to discuss your recollections in regard to a series of subjects.

A    And I am not trying to be evasive, but I have had a couple of conversations with your office and I don't know when that declaration -- I don't have it in front of me, so I don't know when that was executed.

Q    Okay.  Well, I would ask you to turn to Tab 2 again on the second page.

A    All right.  Yes, that would be my understanding, this was during the 2255 response.

Q    And is it -- do you have any recollection of your meeting with Mr. Wilson and me prior to the preparation of this declaration?

A    Yes.

Q    And do you recall that we did, in fact, discuss kind of a wide range of subjects?

A    Sure.

Q    And we didn't necessarily make all of our reasons for

that known to you, did we?

A    Well, I wouldn't think so.  I mean...

Q    So the fact that you may have mentioned one subject versus another, that doesn't reflect on the accuracy of the statements in your declaration, does it?

A    If I didn't think something was accurate and certainly at the time that I signed this, I wouldn't have signed it.

Q    Now, at some point in your repetition of Mr. Barrett, it is my understanding that you contacted a psychologist named Jeannie Russell?

A    That's correct.

Q    And do you recall now how you came to speak to Dr. Russell?

A    I don't know how I became aware that she was involved in the state prosecutions.

Q    But at some point you did become aware and as I under-stand it, I believe you mentioned on direct that Mr. Hilfiger asked you to contact Dr. Russell; is that correct?

A    Yes.  I located her and contacted her by telephone.

Q    And about how much prior to your meeting which you said was August 29th -- do you know how much time passed there?

A    I don't, maybe a week.  I don't -- it would have taken a few days to coordinate three folks' schedules.

Q    If I could ask you to turn to Tab 34...

A    Yes.

Q      I know Mr. Schardl asked you a good bit about this document.  Do you recall that?

A      Yes, sir.

Q      And I think you mentioned you really did not have much memory of it.  Does that remain the case?

A      That's correct, yes, sir.

Q      Do you have a general recollection that Dr. Russell provided you with a report of her findings for purposes of the state trial?

A      I don't have an independent recollection of that, but I am sure she did.  And I say that, Mr. Kahan, but I don't know that it wasn't produced -- I can't tell you that I showed up at her office with Mr. Hilfiger with it in hand, but if not, it may have been produced then.

Q      At that meeting?

A      It may have been, yes.  I mean, there wouldn't be any reason for it not to be if I didn't have it.

Q      I'm just saying, do you think there is much likelihood that you would have had a meeting with Dr. Russell and not left without a copy?

A      Right.

Q      Okay.  Now, during the status conference on September 9th, 2005, --

A      Yes, sir.

Q      -- you made reference to a report.

A       Yes, sir.

Q       I would ask you to look at Tab 35.  The report there also purports to be authored by Dr. Russell.  Is it this update that you were referring to during that September 9th hearing?

A       Yes, sir.

Q       And it was your belief at that time that Dr. Russell was going to address largely the question of future dangerousness were she to testify; is that correct?

A       I didn't hear that last part.

Q       Would you agree with me that as of September 9th that it was your plan if Dr. Russell were going to testify she would principally address the question of future dangerousness?

A       I believe it was the plan, not my plan, and the plan probably would have involved her not testifying is my recollection.

Q       And why is it your recollection that she would not testify?

A       It seemed that she was -- my recollection is it seemed that she was trying to have a limited role, to be the most effective that she could on behalf of Mr. Barrett, incorporating what she had previously done, and also as a part of the plan to help minimize the government's ability to exploit Kenny Barrett's mental health background.

Q    When you say the government's ability to exploit, is that a concern that you raised or a concern that Dr. Russell raised?

A    I think that's a conversation that her and Mr. Hilfiger had because they were the most informed on Mr. Barrett's previous evaluations.

Q    Looking back on that conversation, was there anything in particular that Dr. Russell was focused on?

A    I can't recall.  I know there was a conversation about it and we weighed the good and the bad, so to speak.

Q    Did you ever at any point in time in your interaction with Dr. Russell and Mr. Hilfiger discuss a concern about the possible testimony of a government expert named Dr. Price?

A    Yes.

Q    And what was the concern with regard to Dr. Price?

A    That he was going to be a dangerous witness.

Q    And was that your concern or was that the concern of someone else?

A    I had no independent knowledge of Dr. Price.  I don't know -- I can't recall how much Mr. Hilfiger had, but it is my belief that Dr. Russell was familiar with him.  So couple that with what she knew about Kenny's background from her previous work, I think is what led us to shift away from presenting a mental health expert, so to speak.

Q    And in fairness, you were aware that future dangerous-
ness was one of the allegations that the government had made
against your client; correct?

A    Yes.

Q    Now, at the time of the September 9th hearing, jury
selection was -- I think you said a week, a week and a half
away?

A    I don't know.

Q    Do you recall when the penalty phase actually started?

A    My guess is November, maybe the middle of November,
November 9th or -- I don't know, sometime in November, I
believe.

Q    And the government actually put on a case in
aggravation before the defense was able to present its
evidence; correct?

A    Yes.

Q    Have you ever had the opportunity during any of your
trial practice to have investigated or continued an
investigation while testimony was going on?

A    Often times.

Q    So while close to jury selection may be last minute,
it is not necessarily without any time at all to continue
an investigation.  Is that fair?

A    I don't -- we had an investigator Lloyd Cobb hired.
There was work that was done in this case, I think,

611

throughout the whole -- both stages of it.

Q    Looking back to Tab 35, do you have an independent memory of this document?

A    No.

Q    Now, in Dr. Russell's billing there was a notation about her meeting with the defendant; correct?

A    Yes, sir.

Q    Okay.  And there was also a note on the same line item about a meeting with an attorney.  I believe you testified you thought that had probably occurred between Dr. Russell and Mr. Hilfiger.  Is that also correct?

A    Yes, sir.

Q    Did Mr. Hilfiger at any point in time tell you of some change in mental status that Dr. Russell had observed in your client?

A    Not that I can recall.

Q    Now, given the government's case going into this trial, how did you want to -- in portraying the defendant to the jury, did you want to focus on his drug use?

A    Did I want to focus on drug use?

Q    Yes, sir.

A    No, sir.

Q    Did you want to avoid any focus on his volatility?

A    Certainly.

Q    And was that in part a response to the fact that the

government had alleged that Mr. Barrett was a future danger?

A    Yes.

Q    Going into the penalty phase, is it fair to say that one of your goals was to establish what the defense thought of as the unfairness of this subsequent prosecution?

A    Certainly.

Q    You also wanted to demonstrate Mr. Barrett's lack of dangerousness?

A    Correct.

Q    And did you, in fact, in service of that, aim to adduce evidence of his good conduct while in custody?

A    Yes.

Q    And I think -- as you've said, we have had a couple of meetings.  Did you at one point say to me one of your goals was also to show that Mr. Barrett was a decent enough person not to execute?

A    That's correct.

Q    Now, you stated on direct that this was a conservative jury panel; is that right?

A    Yes, sir.

Q    Do you recall that there were three charges in this indictment?

A    Yes.

Q    And one of them was for a Title 21 offense, right, a drug enterprise count; is that correct?

613

A    Yes, sir.

Q    And there were two others that were charged under 18 USC 924; is that correct?

A    Yes, sir.

Q    And those were firearm charges; right?

A    Right.

Q    Do you recall as you are sitting here today which if any of those -- well, obviously one of those charges -- which of those charges the jury returned a death verdict on?

A    Count 3.

Q    Which was...

A    The drug enterprise.

Q    And they, in fact, returned life sentences for the 924 counts; is that correct?

A    That's correct.

Q    So when Mr. Schardl asked you about -- the question of comorbidity, do you have any experience with comorbidity between drug use and mental health issues?

A    That term is not familiar to me.

Q    Have you ever encountered in your criminal law practice a defendant who you suspected of taking illicit drugs or even licit drugs -- well, no, no, let's limit this to elicit drugs to medicate his or her own mental health issues?

A    Yes, sir.

Q    Could you distinguish in your own mind that client from

Mr. Barrett?

A    Yes, sir.

Q    What did that client say to you?

A    I am not accustomed to telling the government what my client says to me.

Q    Would it be fair to say --

A    And I don't know --

MR. SMITH:  Judge, I am not trying to overstate my bounds, but I think there is some privilege that still exists with my other client as it relates to what was said.

THE COURT:  I agree.  Is there some way to get at what you are doing that --

MR. KAHAN:  I think so.

BY MR. KAHAN:

Q    Was that client involved with multiple substances or simply one?

A    Methamphetamine.

Q    And no other?

A    Not that I can recall, no, sir, and I just had contact with him recently on the same case.  He was back for a probation violation.

Q    Now, you stated in your declaration, correct, that Mr. Barrett did not want the defense to dwell on this child-hood.  Do you recall that?

A    Yes, sir.

615

Q    And do you still have an independent recollection of his sentiments in that regard?

A    Yes, I do.

Q    Can you elaborate a bit on what Mr. Barrett said to you in that regard?

A    I think it fits with the general theme of this case and your belief in it is going to depend on whether you are, you know, on the prosecution side or the defense side, but certainly Mr. Barrett's theme and position was that he was a private individual who, in the middle of the night, was confronted with an unexpected and -- an unexpected threat that he could not ascertain who it was and that his son was in the vicinity of his home, he was outside, and he acted to protect himself and his family.  That's the theme that -- and an unfortunate -- and it's unfortunate that such a wonderful person had died in this incident, but I don't -- I think from Kenny Barrett's perspective it wasn't him versus Mr. Eales or him versus the tact team.  I think it was him confront a threat that presented itself in the middle of the night from the east end of his property across a ditch.

Q    And that was the case he was interested in presenting; is that correct?

A    Yes.  I think that's consistent with his state trials and what we intended to present in the federal case.

Q    Mr. Barrett wanted to avoid putting his parents in a

bad light?

A    He didn't want to put anybody in a bad light.

Q    Did he say that to you specifically?

A    Yes.  He was concerned about Abby, his ex-wife.  The last thing he wanted to do was bring her back into this.

Q    You mentioned on direct that you attempted to broker a life sentence for Mr. Barrett; is that correct?

A    That's correct.

Q    Was Mr. Barrett interested in that?

A    No, sir.

Q    Mr. Barrett ever say to you that he would prefer the death penalty?

A    It was all or nothing.

Q    Did you ever visit the crime scene?

A    Yes, sir, more than once.

Q    I think you mentioned that several of Mr. Barrett's relatives live in the vicinity; correct?

A    Yes, sir.

Q    Did you find them generally welcoming?

A    Not at first.

Q    Did they volunteer a great deal of information on --

A    Not at first.

Q    Isn't it true that one of Mr. Barrett's cousins who lived out in that area testified against him?

A    Yes.

Q    Now, as an attorney, you agree with me you make judgments about potential witnesses?

A    All of the time.

Q    You decide who will and will not be persuasive?

A    That's correct.

Q    You agree with me also that persuasiveness is extremely important in a death penalty phase witness?

A    Crucial.

Q    You interview Mr. Barrett's family members?

A    Yes.

Q    Would you say more than once?

A    Yes.

Q    Would you also agree with me you can -- you can make a witness come to trial, correct, you can subpoena a witness?

A    Yes, sir.  I can subpoena them.

Q    Yes.

A    I can't make them do a thing.

Q    Would you agree with me you can make them answer questions, you can make them sit in the witness stand and answer questions?

A    I've had a federal trial here where a guy was subpoenaed and we couldn't do anything about it and my guy got convicted I felt because of it, you know.  So I can't -- I can subpoena them, but that's all I can do.

Q    So it sounds like -- we would agree then that you can

not force a witness to be persuasive?

A    Oh, no.

Q    Mr. Schardl asked you a few questions about social history.

A    Yes, sir.

Q    Is it your understanding that the defendant's social history can be used during a penalty phase trial to establish facts that might connect to the crime?

A    Yes.

Q    But we both agree then that that is not the only necessary use for social history; correct?

A    Correct.

Q    All right.  Social history in a penalty phase trial could be used largely to elicit sympathy; correct?

A    That's correct.

Q    Not necessarily, but likely?

A    That is a reason to use it, yes, sir.

Q    And you understood that to be the case in 2005; is that fair to say?

A    Yes, sir.

Q    All right.

THE COURT:  I have, Your Honor, the -- in view of the Court's forbearance, I understand the limitations of Mr. Smith's memory at this point, but I would like to go through some of these documents marked.

BY MR. KAHAN:

Q    I would ask you to look at Tab 37, Government's 37.

                          (PAUSE)

A    I have reviewed it.

Q    Do you have any independent memory of this document?

A    No, sir.

Q    Okay.  Are you familiar with Cathy LaFortune?

A    No, sir.

Q    I know you mentioned you had a friend at OIDS.  Do you know what role Cathy LaFortune might have played at OIDS?

A    No.

Q    Can you say, as you sit here today, that you did not -- that you were unaware of this document in 2005?

A    I don't recall.  I haven't seen this document previously.

Q    If I could ask you to look at Government's 42...

                          (PAUSE)

A    I've reviewed it.

Q    Is this a document that you recognize?

A    No, sir.

Q    And you can't say, as you sit here today, whether you were familiar with this document in 2005?

A    Yeah, one way or another I can't say.

Q    Okay.  Just to speed us along, would you, please, look at the group of documents marked from Tab 18 to Tap 25.  And

620

I think Mr. Schardl probably showed you the majority of these documents under a separate cover.

                              (PAUSE)

A      I've reviewed them, sir.

Q      Do you have any independent memory of that group of documents?

A      No, sir.

Q      Since they are contiguous, would you please take a look at Tabs 29 and 30.

                              (PAUSE)

A      I've reviewed them.

Q      Do you have any memory of these two documents?

A      No.

Q      There was -- were you familiar with Mr. Echols secure web site?

A      I understand that he had one.  I don't know that I was ever given access to it.  I don't know that I -- Mr. Hilfiger though had access.  I remember talking about it with him.

Q      You don't recall a meeting at which you were provided with access to that web site?

A      No, sir.

Q      And I don't mean to imply that I was denied access. I am just --

A      As you sit here today, is it fair to say you just simply don't remember?

A    Yeah.  I mean, I don't think I ever accessed it.

Q    And finally, I would ask you to take a look at Tabs 45 through 49.

                        (PAUSE)

A    I've reviewed them.

Q    Do you have any independent recollection of that group of documents?

A    No, sir, I don't.

Q    Is it fair to say that your memory has faded over the last 12 years?

A    Yes, there's no doubt about that.  It has been a long time.

Q    Would you say you had a better memory of this case when you signed that declaration than you do now?

A    I had a better recollection when I signed the declaration, but I -- if I can offer this, because I don't want the record to seem like I've got a memory problem.

Q    Please.

A    On the first stage issues I read trial transcripts of the first trial, partial transcripts of the second trial, was aware of what was in the newspapers and the reporting of that, and then when I got involved to do the work to prepare for Kenny's trial on the testimony that was had.  Just through the repeat process of that testimony and that -- that is burned fresher in my mind than it is the second stage that

occurred over a couple of weeks that there wasn't a prior presentation on.  There wasn't -- you know, I might have read psychological reports, but there was not the repetition that you had with the first stage.  So I distinctly have a better recollection of what happened on the first -- on the front end of this case.

Q    So when you say psychological reports, you are referring to some of the reports in the government's exhibits; is that correct?

A    I am sure.  I can't believe, you know, that we didn't -- that we had access to those things, but sitting here telling you today, some of that stuff just doesn't ring a bell.

MR. KAHAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. KAHAN:  Thank you, Your Honor.  We pass the witness.

THE COURT:  Redirect, Mr. Schardl?

MR. SCHARDL:  Yes, Your Honor.  May I have just a minute?

THE COURT:  Yes.

(PAUSE)

MR. SCHARDL:  May I proceed, Your Honor?

THE COURT:  Yes.

MR. SCHARDL:  Thank you.

## REDIRECT EXAMINATION

BY MR. SCHARDL:

Q    Mr. Smith, are you familiar with the changes to capital trial proceedings that were brought about by the Supreme Court's decision in Furman versus Georgia?

A    Sitting here today, I can't discuss that with you unless I read that opinion again, you know.

Q    Well, if I asked you whether -- to the best of your recollection, was one of the changes brought about by Furman that capital sentencing was made different from non-capital sentencing in that there was the advent of a penalty trial?

A    I understand the second phase was created, yes, for that purpose.

Q    And are you familiar with the arguments that went into why it was necessary to have a second stage trial as opposed to the way non-capital sentencing is conducted.

MR. KAHAN:  I am going to object as to relevance, Your Honor.

MR. SCHARDL:  I believe the questioning on cross examination was whether the witness had done non-capital jury sentencing trials.

THE COURT:  Overruled.

BY THE WITNESS:

A    It would be helpful for me to read that opinion.  If we

624

are going to have a conversation about a case that it has been years ago since I've read it, I'm a little bit at a disadvantage.

BY MR. SCHARDL:

Q     You certainly are, sir, and I wouldn't want to inflict that on you.  Until recently I believe it was the longest opinion from the Supreme Court in the history of the Republic and there are nine separate opinions, so I wouldn't do that to you.

Suffice it to say, that from the perspective of a criminal defense lawyer, when you conduct a trial in which the jury makes a sentencing recommendation and it is a one shot deal, it is a one page trial, you are, as a defense attorney, at a certain disadvantage; is that not correct?

A     Why sure.

Q     And that disadvantage is what?

A     One, you are fighting both the guilt or innocence and then at the same time you've got to try to -- how do you present mitigation whenever you are claiming you are innocent?  I mean...

Q     And when you are presenting a case to a jury, the integrity that you present as a lawyer is important?

A     Sure.  You can't undermine your own defense.

Q     So in your non-capital criminal practice here, your trial practice prior to 2005, how often did you get up in

front of juries, would you say, and concede guilt and put on a case that was focused on penalty?

A   I don't know that I've ever done that.

Q   You were asked some questions about your experience in interviewing witnesses, not just in your criminal case work but in your civil cases. Does that line of questioning change any of your responses on direct regarding the use of a mitigation specialist in a capital case?

A   No, sir.

Q   In Oklahoma law when you have jury sentencing in the non-capital context, does that sentencing recommendation have to be unanimous?

A   Yes, in felony cases and it is jury recommendation, judge sentencing.

Q   And in a federal capital trial, the verdict for death, does that have to be unanimous?

A   It has been 12 year since I've looked at that, so I don't want to make an inaccurate statement.

Q   Fair enough. With regard to investigation and you spoke of your skill and your experience of interviewing witnesses, is it your sense of -- was it your sense in 2005 that your duty to investigate was contingent upon somebody coming up to you and saying, hey, Bret, you better go over there and look over there because that's where the evidence is?

A     I am a lawyer and I was hired to represent Mr. Barrett and I had a -- and I have a responsibility towards him.  So I don't mean to -- by any of my comments today to take away from my responsibility as his advocate.  Okay?  I was involved in a case that involved numerous documents and I was given a task to complete.  Does that mean that there were some tasks that could have been done better or maybe I should have taken on my own?  You know, we can all second guess, but this fellow came out on the short end of this trial and don't think that I haven't lost a lot of sleep over the fact that -- thinking that there is probably something else I could have done.

Q     You were asked whether Mr. Barrett felt that he was being treated unfairly by being prosecuted after he was acquitted of first degree murder, acquitted of second degree murder in state court.  Did you share that feeling that he was being treated unfairly by being prosecuted after that?

A     Yes.

Q     You were asked some questions about your declaration and how it was prepared.  Am I right that, just as Mr. Kanan said, you didn't know all of the information that the government knew necessarily and you also didn't know the purposes for which the government would use your declaration?

A     I think that's fair.

Q     You said during your cross examination that there was

627

concern that the government might exploit Mr. Barrett's mental health at sentencing.

A    Correct.

Q    Do you recall any specifics regarding how his mental health could be exploited by the government at sentencing?

A    The more that the government talked about Kenny's violent past, the more that I felt like it would have undermined his defense and presentation.

Q    And did you at that time have a mental health evaluation independent of the risk assessment that was performed by Dr. Russell?

A    When you say "I"...

Q    That's a fair comment.  Did the defense, did the team...

A    I mean, I've seen records through this proceeding that go back to Echols' first involvement in 2003 that address a mental health history.  So I...

Q    Well, let me rephrase that.

A    Okay.

Q    Was the discussion that you were referring to a discussion of mental health evaluations other than Dr. Russell's?

A    In reference to what?  I may have lost you here.

Q    I am sorry, that's fair.  Okay.  So you were asked some questions about the meeting with Dr. Russell and Mr.

Hilfiger.

A    Yes, sir.

Q    I think I said mental health evaluation in relation to Dr. Russell.  I stand corrected.  She did a risk assessment, but in that conversation that you had with Dr. Russell and Mr. Hilfiger, on cross examination you were asked if in the course of that conversation there was concern about minimizing the extent to which the government might exploit Mr. Barrett's mental health background.

A    Sure, I remember that.

Q    Okay.  So my question is, in that conversation were you talking about any evaluation other than Dr. Russell's?

A    Yes.

Q    What evaluation?

A    I don't know.  I can't recall and, as I said earlier, I was the least informed of the three as to Kenny Barrett's past mental health workup.

Q    Okay.  You were asked some questions on cross about your experience in non-capital cases, that sometimes you don't have discovery prior to trial, things come out at trial, you scramble, you do investigations after court, over the weekends.  Do you recall that line of questioning?

A    Yes.

Q    In this case did an issue arise shortly before the trial, the start of the trial proper, that required a great

deal of the defense's investigative resources?

A    Sure.

Q    What was that?

A    The snitches.

Q    And specifically you are referring to the delayed identification of the seven snitches who were new to the federal trial?

A    And who would not interview with us.  One did at the U.S. Attorney's office.  The others chose not to.

Q    All of the other investigation that you and Mr. Hilfiger, the defense, did regarding their testimony, had to be something that y'all scrambled to do after you learned the identity of those witnesses?

A    Certainly.  Their identities were kept from us, as well as their locations, and from what I remember, a lot of the cross was developed through their prior criminal histories, which were provided to us by the government, which were extensive.  There was plenty of impeachment material, but it would have been kind of nice to have had a private conversation with those folks like Mr. Littlefield did.

Q    And the investigator that you had retained prior to trial, was he tasked with investigating those snitches after you received notice of them?

A    I am sure.  He was tasked with a lot of different things.

Q    Do you recall whether you ever -- you personally ever saw the report of Dr. Price?

A    No.

Q    Do I understand your testimony to be that the discussion of Dr. Price that took place between Dr. Russell and Mr. Hilfiger, that took place on August 29th, 2005?

A    I believe so.  I could be mistaken, but there was -- whether it was Price specific or not, I know that it was an area that we were concerned about.  There is no doubt as to that.

Q    I apologize.  I think this is like a slightly unfair question given some of your previous responses, but I just need to ask it so that the record is clear.  Were you aware that Mr. Echols had sought to retain a different expert on future dangerousness than Dr. Russell?

A    No, sir.

Q    At the time of your work on this case were you familiar with the name Mark Cunningham?

A    I don't know.

Q    Did you ever have -- to the best of your recollection today, did you ever have any discussions with Mr. Hilfiger about Mark Cunningham?

A    About that time I represented a fellow by the name of Cunningham.  So with the time that has gone by, I, I, I -- I accurately cannot say.

631

Q     At the penalty phase you presented evidence of Mr. Barrett's conduct while in custody.

A     Yes, sir.

Q     For the purposes of showing that he would not be a future danger in custody?

A     That he could exist behind prison walls safely.

Q     And would you say that that went as planned, that testimony?

A     I -- I think with the prison employees it definitely did or the employee.  I can't remember if it was more than one.  I can think of a couple of Sequoyah County deputies or jailers that -- I think there was testimony about one getting hit with a potato that I thought was pretty silly, but yet there was a lot made of it.  And the other one was that Kenny Barrett tried to grab him and I thought that was kind of silly.  So outside of those two -- and that wasn't during our case, I think that was during Mr. Sperling's --

Q     Rebuttal?

A     Yeah, but I -- I think all and all we achieved what we wanted to as it relates to his ability to exist safely behind the walls.

Q     You were asked a question about other clients who you thought were using illicit drugs as a response to their pre-existing mental health issues.  Do you recall that?

A     I have one in particular that I -- that I made an

632

argument to the court about that very fact.  The fellow was self-mediating with methamphetamine.

Q    Now, if Mr. Barrett didn't look exactly like that other client, was it your testimony that you would not have any concerns about whether he had done something like that?

A    I don't particularly understand --

Q    Let me --

A    My other client expressly discussed with me the effects that methamphetamine had on him and how he was without and how he was with it and why he took it even though he knew it was against the law.  Mr. Barrett and I never had that kind of discussion.

Q    And you were asked -- I think you said that Mr. Barrett did not want his ex-wife Abby to testify, he didn't want her dragged into it.

A    I think he felt sorry about their past and she had moved on with her life, had a new family, and the last thing he wanted to do was bring embarrassment upon her and involve her in any of his dealings.  That was my impression of what he was concerned about.

Q    And the defense called her as a penalty phase witness?

A    Yes, sir.

Q    You were asked whether Mr. Barrett's family was welcoming when you first showed up out there -- the area where his family lived and where he had lived.  Do you recall

633

that?

A    I don't think it had anything to do about them in particular as it had to do with Eastern Oklahoma.  You don't just go pulling into somebody's place and get greeted with a "How are you doing."

Q    Did his family become welcoming to you as they got to know you in the course of the case?

A    Yes, yes, sir, they did.

Q    You were asked some questions about when family members or any witness are subpoenaed to court and you said you can't make a witness testify and you certainly can't make them testify well.

A    Correct.

Q    Again, referring back to the direct examination did you and Mr. Hilfiger ever discuss the possibility of using a mitigation specialist to present information about Mr. Barrett's family rather than having the family members themselves testify to that information?

A    I can't tell you the specifics of the conversations we had regarding mitigation specialists.  I know in my notes, as you found, that I had that circled as one of our topics to discuss, but that's me saying I am aware this is our obligation and duty and it was a topic to be discussed.  I never felt like it was my -- I was there to assist.  I wasn't there to lead.

634

Q    And just again asking solely about your recollection of what was discussed, did you -- do you recall any conversations about, say, bringing in a licensed social worker to testify about family background?

A    I can't recall specifics of those conversations or I certainly can't be accurate about it.

Q    So are you saying there were conversations, you just don't recall the specifics of them or you don't recall whether there was a conversation?

A    Yes, we didn't ignore mitigation.

Q    So specifically with regard to whether you could have a social worker testify, do you recall there being any discussion about that?

A    No.

Q    Towards the end of your cross examination, you were describing how you had gone over the testimony from the first state trial and what you could obtain of the testimony from the second state trial.  Did you also compare the testimony of, say, the troopers between the two trials and for --

A    Yes.

Q    I am sorry.

A    I cut you off.  You finish your question, please.

Q    Did you compare their testimony?

A    Certainly.

635

Q     And is that the process of reading and re-reading, in part, that you were describing earlier?

A     Exactly.

Q     And would you say that that consumed much of your time preparing for the trial in this case?

A     Yes.  In some regards it may have been easier to try this case if there hadn't of been two other proceedings, other than a strategy had been developed that apparently worked in the first two.

MR. SCHARDL:  May I have just a moment to confer, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. SCHARDL:  At this point, Your Honor, I have nothing further on redirect.

THE COURT:  Very well.  Anything further from Mr. Smith?

MR. KAHAN:  Very briefly, Your Honor.

THE COURT:  All right.

RECROSS EXAMINATION

BY MR. KAHAN:

Q     Mr. Smith, you were asked why -- well, you were asked whether the defense called, I believe, Abby Stites to the stand.  Do you recall that?

A     Yes, sir.

Q      Do you recall what your strategy was, for what reason you might have called Ms. Stites?

A      First off, I don't believe I ever visited with Abby Stites.  Okay?  Mr. Hilfiger would have, I think, had all of the contact with Abby.  He would best know the reason why he wanted to call her, but she was the mother of their son, Toby, who was present during this incident and to help humanize Mr. Barrett.

Q      Was there also evidence adduced by the prosecution during the course of the trial about incidents of domestic violence?

A      Yes.

Q      Was there some effort on your part to neutralize that by calling Abby Stites?

A      Yes.

Q      And was that effort to show that she was a mutual combatant?

A      It has been a while, but that would certainly seem logical.

Q      And is it fair to say that placed in the position where you were going to present that evidence, it would have either had to come from Abby Stites or their son, Toby?

A      Correct.

Q      You were also asked about the liability of witnesses, the persuasiveness of witnesses.  Do you agree with me that

you don't instruct your witnesses what to say; is that correct?

A    No, sir, not at all.

Q    You ask your witnesses to tell the truth?

A    Always.

Q    Do you recall that the defendant's mother testified?

A    I don't have an independent recollection of her testimony, but I would -- but I believe she testified, yes.

Q    Do you recall the defendant's mother was asked about the defendant's childhood?

A    I am sure she was, but I don't have any -- it has just been too long and I haven't seen any transcripts that relate to that.  So --.

Q    Fair.

A    -- I would be assuming something.

Q    Okay.  But is it fair to say that neither you, nor Mr. Hilfiger, instructed the witness how to testify?

A    No.

Q    And regardless of the date, did Dr. Russell express to you some concern about government rebuttal to her potential testimony?

A    Yes.

Q    And would you agree with me that at the end of the trial presentation and the jury's verdict, the jury rejected the government's future dangerous allegation?

A      That's my understanding.

MR. KAHAN:  I have nothing further of this witness.

THE COURT:  Anything further?

MR. SCHARDL:  No, Your Honor.  Thank you.

THE COURT:  If not, Mr. Smith, you can step down.
Thank you.

THE WITNESS:  Thank you.

MR. SCHARDL:  So, Your Honor, I think at this point
the next witness we would be calling is Dr. Jeannie Russell.
However, in a way that Mr. Autry is more familiar with than
I am, she is unavailable due to an illness and I believe
there have been some consultations with the government about
deferring her testimony until June.  Other than that, we have
proffers of a number of witnesses, which we can handle
electronically by filing them.  They are all in declaration
form and they include the declarations of Richard Burr and a
number of family members, who have -- and with regard to
Mr. Burr, he was excluded by Judge Payne and I believe some
of these other family members were or are otherwise
unavailable.

THE COURT:  And all of the proffers would be for --
in the nature of an Offer of Proof or...

MR. SCHARDL:  Yes, Your Honor.  And there is, you
know, an accompanying argument as to their relevance and
so forth.

THE COURT: Okay. Is the government ready to present any witnesses today?

MR. WILSON: Your Honor, the government listed four witnesses, Mr. Hilfiger, Mr. Smith, and two experts, and we have previously addressed the issue regarding the two experts.

THE COURT: Are you done with Mr. Smith?

MR. WILSON: Yes, Mr. Smith -- the government has no reason to call Mr. Smith back as a witness.

THE COURT: And Mr. Hilfiger is not available until tomorrow in any event; right?

MR. WILSON: That is my understanding, Your Honor.

THE COURT: So is there any reason we shouldn't just recess for today and start in the morning with Mr. Hilfiger?

MR. WILSON: The government has no reason to continue this -- any more evidence today.

MR. SCHARDL: Nothing from Mr. Barrett.

THE COURT: And when will know whether Dr. Russell is going to have to come in June rather than -- can you address that, Mr. Autry?

MR. AUTRY: Yes, Your Honor. Sunday afternoon, after I got into town, early Sunday afternoon, a friend of Dr. Russell's called me and said that she had taken Dr. Russell to the hospital, that they were at the emergency

room, and that she would not be available Monday when she was originally supposed to be here. I have called Dr. Russell's phone number every day, Monday through today, to see if I can get ahold of her. I have not been able to get ahold of her. She is always really good about calling me back. I can only presume she is in the hospital.

When I talked to her on the telephone last week, preceding the phone call I got by several days from a friend, she was very ill at that time. It was obvious that her breathing was very labored. She said she was sick. She was driving to do something with her work, and then I got that call Sunday. I've not heard from her. So we would ask that her testimony be moved to June because I can only assume or presume that she is in the hospital or very ill. Otherwise, she would have called me back.

THE COURT: Well, that's fine with me. I mean, we have to come back to take that testimony in June anyway. So we will just do Mr. Hilfiger tomorrow and then I guess we will recess until June.

MR. AUTRY: Thank you, Your Honor.

MR. WILSON: Judge, one other matter, if I may. Obviously Mr. Hilfiger has been in South Africa for the last two weeks and my office -- Ms. Speaker has contacted Mr. Hilfiger's office and been advised that he will be available in the morning. So I am hopeful that is the case. I have

not had an opportunity to visit with him since he has been back in the country, but so far as I know, we will be ready for him in the morning.

THE COURT:  Well, we can start a little later, if you think you need some time.

MR. WILSON:  Well, Judge, that would be helpful, if we could.  If we could start at 10:00 or 10:30, that would be great.

THE COURT:  Well, let's make it 10:30.

MR. WILSON:  Thank you, Judge.

THE COURT:  I wouldn't imagine that he will take more than the rest of the day, would he?  No promises, I know, but...

MR. WILSON:  It will take a while, I expect.

THE COURT:  Right.  Okay, very well.  Then we are in recess until tomorrow morning at 10:30.

MR. SCHARDL:  Thank you, Your Honor.

MR. WILSON:  Thank you, Your Honor.

(RECESSED UNTIL MARCH 30, 2017)