IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )

        Plaintiff,              )

VS.                                )            NO. CIV-09-105-JHP

UNITED STATES OF AMERICA,          )

        Defendant.              )

\*       \*       \*

MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE STEVEN P. SHREDER

UNITED STATES MAGISTRATE JUDGE

MARCH 30, 2017

\*       \*       \*

A P P E A R A N C E S:

FOR THE PETITIONER:  MR. TIVON SCHARDL & MS. JOAN M. FISHER,

Federal Public Defender - Sacramento, 801 I St., Third Floor,

Sacramento, California 95814

FOR THE PETITIONER:  MR. DAVID B. AUTRY, Attorney at Law,

1021 NW 16th Street, Oklahoma City, Oklahoma 73106

FOR THE RESPONDENT:  MR. CHRISTOPHER J. WILSON, Assistant

United States Attorney, 520 Denison Avenue, Muskogee,

Oklahoma 74401

FOR THE RESPONDENT:  MR. JEFFREY B. KAHAN, US Department of

Justice - Capital Case Unit, 1331 F St. NW, Rm 345,

Washington, DC 20530

COURT REPORTER:          KARLA S. McWHORTER, CSR-RPR

                         UNITED STATES COURT REPORTER

I N D E X

PAGE

WITNESS ON BEHALF OF THE RESPONDENT:

ROGER HILFIGER

Direct Examination by Mr. Wilson  . . . . .  647

Recessed until June 12, 2017  . . . . . . . . . . . . .  762

E X H I B I T S

|                                           | IDENTIFIED | ADMITTED |
| ----------------------------------------- | ---------- | -------- |
| Governments' Exhibit No. 4 – 11,          |            |          |
| 31, 32, 33, 35 & 44  .                     | 700        | 700      |
| Government's Exhibit No. 15 & 18  . .      | 678        |          |
| Government's Exhibit No. 19 – 23, 25.      |            | 758      |
| Government's Exhibit No. 54 - 62  . .      | 698        | 758      |
| Government's Exhibit No. 49 . . . . .      | 703        |          |
| Government's Exhibit No. 34 . . . . .      | 720        | 758      |
| Government's Exhibit No. 35 . . . . .      | 727        | 758      |
| Government's Exhibit No. 72 . . . . .      |            |          |
| Government's Exhibit No. 32 . . . . .      | 757        | 758      |
| Government's Exhibit No. 33 . . . . .      | 757        | 758      |
| Petitioner's Exhibit No. 25 . . . . .      | 759        | 761      |

645

                              COURT IN SESSION

                               (10:35 a.m.)

          THE COURT:  Good morning, everybody.  Call case

number CIV-09-105-JHP, Kenneth Eugene Barrett versus United

States of America.  Attorneys enter their appearances for

the record, please.

          MR. WILSON:  Christopher Wilson and Jeffrey Kahan

for the United States.

          MS. FISHER:  Joan Fisher, David Autry and Tivon

Schardl for Mr. Barrett.

          THE COURT:  Very well.  I think we are ready for

Mr. Hilfiger today; is that right?

          MR. WILSON:  That's my understanding, Your Honor.

          THE COURT:  Great.  Go ahead and call him then.

          MR. WILSON:  We would call Roger Hilfiger, Your

Honor.

          MR. HILFIGER:  Your Honor, before we start, I would

like -- you may be aware that I was on a trip.  And from

that trip I brought back a little something I didn't

anticipate.  I am okay, I think, but I --

          THE COURT:  Should we get you a mask?

          MR. HILFIGER:  No, it's not -- I feel okay.  It is

just I -- I was on a plane for 24 hours of different plane

rides and I handled it okay, but when -- you know, I may just

have to say I need to take a break real quick.

THE COURT:  Okay.

MR. HILFIGER:  But I did pretty good on the plane, so I think I will be okay.

THE COURT:  Well, we are planning on indulging you.

MR. HILFIGER:  Okay.

ROGER HILFIGER, RESPONDENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WILSON:

Q    Can you state your name for the record, please?

A    Roger Hilfiger.

Q    Mr. Hilfiger, can you tell us what is your business or occupation, sir?

A    I am an attorney.

Q    And how long have you been practicing law here in Oklahoma.

A    Since 1972.

Q    And Mr. Hilfiger, I understand that you've had some experience both in the state and federal system; is that correct?

A    Yes.

Q    What experience have you had in trying cases in the federal system?

A    In the federal system?  Since about 1972 or '73, I've tried a number of cases in criminal defense in the federal system.  I've only done a few civil cases in the federal

system.

Q    And I believe you also have experience in federal prosecutions; is that correct?

A    Yes.

Q    What is your experience in federal prosecution?

A    From 1985 until 1990, I was here with the U.S. Attorney's office.

Q    You also have experience in handling cases with the state system; correct?

A    Yes.

Q    And do you have specific experience in handling cases in the state criminal system?

A    Yes.

Q    And how long have you been handling cases in the state system as far as criminal cases?

A    Since about 19 -- since I started practicing in 1972. The basis back then was a little different than it is now. Back then the -- if you wanted to do criminal cases, you just went to the judge and told the judge you wanted to do some criminal cases and he would appoint you, if you didn't get hired, and it was a very open system. I mean, it was just whoever wanted to do it could do it and I started doing it about from the start, from about 1972. I also had a civil practice and did a lot of civil stuff and the occasional criminal stuff from '72 to 1985 in the state system. And

then back in 1990, '91, they -- they changed the criminal defense system as far as court appointments so that you had to bid on the contract. And since 19 -- I think it was '92 or '93, I've been the chief contractor for Muskogee County on the Oklahoma Indigent Defense System.

Q    When you say you've been the chief contractor, what do you mean by that?

A    Well, the contract -- I am the one that bids on the contract and I'm the one that has the contract, but then I have other attorneys that work under that contract.

Q    As the chief contractor, do you handle cases yourself under that contract?

A    Yes, yes. I handle -- because under -- the way that system is set up, you don't handle a number of cases, you handle a percentage of cases. So from '92 or '93, whenever we first got the contract, Muskogee County became a little different than a lot of the other counties on how we did it. In other counties somebody may -- may bid on doing 25 percent of all criminal stuff and another person would do 25 percent of criminal stuff, but they would be separate contracts. In Muskogee I felt like it would be more efficient if we just had one contract and I would be responsible for 100 percent of it, but I had other attorneys that would do certain percentages.

Q    Okay.

A    And under that system, for a long time, I was doing 30 -- I think I always did about 30 percent, maybe 30 or 35 percent, and then I've cut down to 20 percent now.  And I also do another county besides Muskogee too.

Q    And that would be Haskell County?

A    That would be Haskell County.

Q    Let's go back in time a little bit --

A    Okay.

Q    -- in reference to your criminal trial experience back to 2004.

A    Okay.

Q    And back in 2004, I believe you were appointed to represent Kenneth Barrett in the federal case; is that correct?

A    Yes.

Q    And were you the contractor at that time for OIDS for the indigent defense in Muskogee County?

A    Yes, I was.

Q    And were you doing 30 percent or 20 percent back then, or do you recall?

A    I think it was probably 30 percent.

Q    Were you doing Haskell County at that time?

A    Yes.

Q    And did you have other attorneys working with you as far as the Haskell County contract?

A    Yes, I did.  As far as Haskell County, really I was more of just the contractor on Haskell County and there was another attorney that really was doing the individual work down there.

Q    All right.  So during your multiple years of criminal experience, have you had occasion specifically to handle capital litigation, death penalty cases?

A    Yes.

Q    Have you had that experience in the state system?

A    Yes.

Q    Approximately -- well, if you know, how many death penalty cases have you been involved in on the state side?

A    I can't tell you exactly how many.  I can tell you -- because there are -- there are a number of them that may have started out as death penalty cases that didn't -- you know, they didn't make it all of the way to death penalty, they changed before we even got to a jury trial.  So I don't know whether you count that or not.  I would say somewhere in the neighborhood of 10.

Q    How many of those were capital cases that went through full-blown litigation, through trial?

A    I think approximately five.

Q    And you also had that same experience handling death penalty cases in the federal system?

A    Yes, but not as much.

Q      How many cases have you handled, excluding Mr. Barrett, in the --

A      One other one.

Q      One other one?

A      Yes.

Q      Was that before or after your assistance with Mr. Barrett?

A      Before.

Q      And approximately the time frame between Mr. Barrett and when you had that previous federal experience?

A      It was probably 1993 or '94.

Q      Did you ever prosecute any capital cases as the U.S. Attorney, to your knowledge?

A      I can't -- I know there was another similar case to the '93-'94 case that we prosecuted in '88, I think, but I don't think at that time that we had the death penalty involved, but it was a similar type case, but it didn't provide for the death penalty.

Q      Okay.  In addition to specifically death penalty cases, have you had an occasion in the state system to handle murder non-capital cases?

A      Yes.

Q      All of the way through jury trial?

A      Yes.

Q      Would that be true of cases involving illegal

narcotics, for instance methamphetamine, cocaine, other illegal narcotics?  And when I say that, I mean not a death resulting from those but just a case involving distribution or manufacture of a controlled substance.

A    As a death penalty offense?

Q    Non-death penalty.

A    I can't recall.  I mean, just about any of the murder cases that I've been involved with involved illegal drugs in the sense that, you know, some was being taken, some was being used, but whether it was directly a part of the case, I really can't recall that.

Q    I would assume that in your many years that you've handled cases that didn't involve a death, but involved illegal substances, controlled substances?

A    Yes.

Q    Does the same hold true of cases involving firearms?

A    Yes.

Q    Would that be true on the state and the federal system?

A    Yes.

Q    Mr. Hilfiger, in your experience have you had occasion when dealing with clients -- and let's talk about the state system first and then we will move to the federal system. Have you ever had an occasion to deal with a client in the state system that you believed was unable to assist you, rationally unable to assist you?

A    Numerous times.

Q    And what type of -- when you had those concerns, what would you do?

A    Well, the normal procedure that I would do would be to request a competency evaluation.

Q    And I believe in the state that would be ordered through the court; is that correct?

A    Yes.

Q    And that person would be evaluated by a mental health professional; correct?

A    Well, normally it is done by Northeast Oklahoma Forensic.

Q    Okay.  But they have mental health professionals; correct?

A    Right.

Q    And why is it that you would make that determination that I need to ask the court for an order to have this person evaluated?

A    Well, usually it is just, you know, based on talking to the individual and listening to what, you know, the individual had to say and making that determination that we need to have something additional here to determine whether he knows and understands what's going on.

Q    And I believe your testimony is that you've had that happen a number of times in the state system?

A    Yes.

Q    Would the same hold true in the federal system?  Have you had a situation where you've had clients that you were concerned about their ability to rationally assist you in their defense?

A    Yes.  I can't tell you that it has happened that often, but I -- because I can only remember one time that we did have someone sent to Springfield, but I -- you know, for an evaluation, but I think it might have been more than that. I mean, I can -- in my mind I can remember one time.

Q    And just for the record, so that the record is complete, when you say sent to Springfield...

A    Uh-huh.

Q    What do you mean by that?

A    Well, that's where I understood where they did the mental evaluation.

Q    So the process would be if you had a concern about a federal client that you were representing, you could file a motion with the Court and ask the Court for an evaluation of that person; is that correct?

A    Yes.

Q    And again, what would be the basis of your decision to say I think I need to file a motion to ask for this person to be evaluated?

A    The contact with that person.

Q    And would you be using your experience over the last 20 plus years or 30 years?

A    Yes, yes.

Q    And --

A    Well, let me -- and, you know, not only that, but in a lot of occasions it is somebody -- a relative, a friend, something along that line would make some comment, you know, to me that --

Q    A relative or a friend of the defendant?

A    Of the defendant would make a comment, you know, that he doesn't know what he is doing or, you know, that...

Q    All right.  And if you have that information and you consulted with your client and had some concerns, then you would file a motion; is that correct?

A    Yes, uh-huh.

Q    Are you familiar with the expression NGRI?

A    Yes.

Q    Not guilty by reason of insanity?

A    Yes.

Q    In your experience as a defense attorney on the state side, have you ever had an occasion where that particular defense has presented itself?

A    Yes, but I've never had it where we've gone all of the way through a jury trial.

Q    Have you had it where -- to the point where you felt

there was a need to have that person evaluated to determine whether or not they understood the difference between right and wrong?

A    Yes.

Q    And why did you believe that that was a necessity and thinking -- and using that case as a focal point or cases, why in that case or cases did you believe that it was necessary to have your client evaluated to determine whether or not they understood right and wrong?

A    Because of responses -- well, basically because of the contact with that person and responses or lack of responses from that person and actions that the person did too.

Q    Would you also look at the circumstances involving the alleged crime?

A    Yes.

Q    And the behaviors that that person exhibited at the time of the alleged crime?

A    Yes.

Q    And in those situations -- well, let me just ask you this:  Are you a psychologist?

A    No.

Q    Are you a psychiatrist?

A    No.

Q    Have you any specialized training in the field of either psychiatry or psychology?

A    No.

Q    So, I take it, you are using just your own personal on-the-job history and experience; is that correct?

A    Yes.

Q    Mr. Hilfiger, we are looking at 2004 and specifically your representation of Mr. Barrett.

A    Yes.

Q    Do you recognize Mr. Barrett today?

A    He looks very different, but we have all aged a little bit.

Q    Is that him seated right there in the orange?

A    Yes.

Q    And do you recall meeting Mr. Barrett back in 2004?

A    2004-2005, yes.

Q    All right.  And did you ever have an occasion to meet with him while he was incarcerated in Muskogee County?

A    Yes.

Q    And did he appear in the same -- I believe you made the comment that we've all aged, but how does he look different now than he did when you first met him back in 2004 or 2005?

A    I really can't recall.  I mean, just -- I can't tell you.

Q    Okay.  At the time that you met him had he just recently been incarcerated?

A    Yes.  He had been -- I think he had been incarcerated

and had just recently been released from the state prison system.

Q     Okay.  And what I'm getting at is when you first saw him, had he just come off the street or had he been in prison for a period of time?

A     He had been in prison.

Q     It's my understanding he had been in custody since September of 1999; is that correct?

A     I don't know.  I mean, I would tend to believe that's right, yes.

Q     All right.  At the time that you first encountered Mr. Barrett, were you aware that Mr. Barrett had previously been tried two separate times in Sequoyah County District Court?

A     Yes.

Q     And at the time that you were appointed to represent him, were you appointed solely to represent him or with another attorney?

A     I was appointed along with John Echols to represent him.

Q     Mr. Echols.  How long had you known Mr. Echols at that point?

A     You know, I am not sure that I had actually met him before then.  I don't -- I am not sure.

Q     Okay.  So you had not worked with him in defending

659

anyone prior to Mr. Barrett; is that correct?

A    Not that I recall, no.

Q    Did you have any knowledge of Mr. Echols' trial experience?  Even though you may not have met him before, had you heard of him by reputation at the time that you got appointed along with him to represent Mr. Barrett?

A    I can't recall that.  I mean, I can't say that, yes, I recall him as the trial attorney or no.  I don't know.

Q    Okay.  It is my understanding that you were appointed in approximately October of 2004; is that correct?

A    Yes.

Q    And at the time that you were appointed I take it that you and Mr. Echols had an opportunity to get together and to meet and to talk about the case; is that correct?

A    Yes, but I can't give you a specific answer as to when, where, and what all of the discussion was.

Q    I know we are talking about something that took place just a few years ago.

A    Uh-huh.

Q    Actually several years ago.  But you did, I am sure, meet and talk about the case?

A    Yes.

Q    Did you -- of your own independent recollection, do you recall if you entered into some agreement between the two of you as to how you were going to work together to represent

Mr. Barrett?

A    I can't recall if there was a specific agreement.  I know on my part my feeling was that Mr. Echols had been involved in the case for five years or so, four or five years, he had the knowledge of the case and I would sort of defer to whatever he wanted to do and how he wanted to do it.

Q    When you say he had the knowledge, what do you mean by that?

A    Well, he had been involved in the case for five years, four or five years, whatever, had done two trials, knew all of the information about the witnesses and everything.  So I just -- I more or less deferred to what, you know, his ideas were, what he wanted to do.

Q    So you were aware that Mr. Echols had represented Mr. Barrett in the two previous state cases; correct?

A    At the time I was appointed, yes, I was aware of that.

Q    And so you don't recall if there was any division of responsibilities or division of labor that you agreed upon when you began working with Mr. Echols?

A    I can't recall any agreement.  I mean, again, he was the one -- he had been involved in that case, so he knew sort of what positions he wanted to take and what he wanted to do and I was just trying to learn the case.

Q    I understand.  And one of the reasons I asked that question, Mr. Hilfiger, is Mr. Echols and another attorney by

the name of Jack Gordon have testified in this case and Mr. Gordon testified that in the state case basically he was the second chair lead counsel.

A    Uh-huh.

Q    And that Mr. Echols was more of the first stage, the guilty/innocence stage and Mr. Gordon was more the penalty phase.  Did you and Mr. Echols have that type of division of responsibility?

A    No.

Q    Due to the fact that Mr. Echols had been involved in this litigation on the state side, were you aware that Mr. Echols had access to much of the investigative files in this matter?

A    Yes.

Q    And do you know where they were physically located?

A    No, I really don't know where they were physically located.  I mean, I assume that he had them at his office, which I sort of learned later that his office is really his home, and also he was very involved in having everything on a computer.  So most of the information, he had it in his computer.

Q    It's my understanding that he had developed some sort of website or internet web browsing system where a person could log -- well, I am showing my ignorance, sorry, Judge -- where a person could log in and access information.  Are

you aware of that?

A    Yes.  He had something set up that you could log in to or that you could get in to.  I hate to say log in because I am not sure how -- I can't recall logging in, but he had something set up.

Q    And you were made aware of that?

A    Yes.

Q    And were you given access to that?

A    Yes.

Q    Do you recall accessing that system?

A    I know I did, but I can't recall.  I mean, I can't say I remember I got -- that I accessed the system to get this information because most of the information at that time, that I was getting, was a hard copy to try to understand what the case was about and that was from transcripts.  There were preliminary hearing transcripts and trial transcripts from the Sallisaw cases.

Q    Now, when you say you were looking at hard copies, were you looking at hard copies of discovery provided by the United States Attorney's office or from the files that Mr. Echols had or do you know or do you recall?

A    I believe it was the files that John Echols had.

Q    So I take it from your previous answer when you said I didn't realize until later that his office was his house, I take it you had not gone up to his place and picked up

663

information?

A     Not until later, you know, after he left the case.  I didn't go to his house and pick up information.  I can't tell you how I got the transcripts and everything prior to that time.  I assume he must have brought them to me, but I really don't know.

Q     We talked a moment ago about you meeting Mr. Barrett initially.

A     Yes.

Q     Did you -- during the time that you were assisting with Mr. Echols, did you have an opportunity to talk with Mr. Barrett about what your trial strategy or defense strategy was going to be?

A     Me individually or John and myself?  I don't -- at some point, yes, but I can't tell you that, you know, I sat down with Mr. Barrett and said, okay, Mr. Barrett, this is what the trial strategy is going to be because most of the trial strategy is coming from John Echols based on his two previous trials.  So it wasn't something that -- where I'm saying this is the trial strategy that I'm developing.  I was sort of following along with John Echols.

Q     I understand that.  But when you would visit with Mr. Barrett, did you ever talk with him specifically about issues that he was focused on, concerns that he had?

A     Well, I know early on Mr. Barrett was concerned, as I

664

was concerned, and I think John Echols was concerned, about the issue of should the federal prosecution be able to go forward after the conviction in Sallisaw.

Q    And it is my understanding that there was an attempt made to litigate that particular issue on the double jeopardy grounds?

A    Right, right.

Q    Is that correct?

A    Yes.

Q    Did you, as a part of your initial or early on representation, have an occasion to begin doing research on the issue of trying to get the case dismissed on the federal side?

A    Yes.

Q    Well, in part of your discussions with Mr. Barrett early on and him expressing issues about fairness on -- about being prosecuted by two different entities or sovereigns, did you detect any concerns or any issues with Mr. Barrett that gave you a concern about whether or not he could rationally assist you in the preparation of your defense in this case?

A    No.

Q    Did you ever have any discussions with Mr. Echols in which Mr. Echols gave you some concerns that he may foster or harbor regarding Mr. Barrett's ability to represent or --

excuse me -- assist you in his representation?

A    No.

Q    Any time -- from the time that you became involved in this case until the time that Mr. Echols exited, did your concerns about Mr. Barrett or your position regarding Mr. Barrett ever change concerning his ability to assist you in the case?

A    You mean as far as mental issues?

Q    Yes.

A    No.

Q    After you became lead counsel, after Mr. Echols departed the case, up until the end of this litigation, did you ever have a concern in your mind that Mr. Barrett could not rationally assist you in his defense?

A    No, I did not.

Q    If you had had that concern, would you have filed a motion with the Court?

A    If there was a concern as to his ability to stand trial on a competence issue, yes, I would.

Q    Mr. Hilfiger, as a part of the representation of Mr. Barrett, I understand that there were certain requests made of the court for funding for different means of defense; is that correct?

A    Yes.

Q    Budgeting issues; is that correct?

A     Yes.

Q     And can you tell us what your initial involvement was in making those requests of the court to get funding for certain experts and certain information that would assist you in the representation of Mr. Barrett?

A     I think Mr. Echols is the one that actually made those determinations or, you know, made those requests.

Q     Did he --

A     Now, I was signed on it, but, I mean, I -- I don't -- I can't recall really -- you showed me some budget things and I can't really recall having independent conversations with John Echols talking about this is how much we ought to put on for this, this is how much we ought to put on for this because those budget issues were during the early part and John Echols had been involved in that case for five or six years and I was still trying to get caught up to under-stand what the case was about.

Q     At the time that Mr. Echols was preparing these budget requests, did you and he have any discussions regarding what specific assistance you should request from the court as far as budgeting assistance?

A     I really can't recall that.

MR. WILSON:  Your Honor, I thought, quite frankly, that this was a part of the Petitioner's exhibits and I don't know that it is.  I've looked and I don't know that I can

find it, but this is Document Number 16 from the criminal case, Your Honor.

THE COURT:  Whether it is an exhibit or not, the Court can take judicial notice of it since it is a part of the record in the case.

MR. WILSON:  Thank you, Your Honor.

BY MR. WILSON:

Q    Mr. Hilfiger, this purports to be a document which was filed in the criminal case on November the 29th of 2004. Can you see that on the screen there?

A    Yes, uh-huh.

Q    And I am going to zoom in so that you can see it better.

A    Okay.

Q    Do you have any independent recollection of seeing this particular document before, sir?

A    I don't have an independent recollection of having seen it other than when you showed it to me a while ago, but I -- I mean, I know I did see it.

Q    Okay.  And would you agree with me, sir, that this was a first ex parte request for some expenses to be provided to assist in Mr. Barrett's defense?

A    Yes.

Q    And specifically looking at Page 2, which is now up on the screen...

A       Yes.

Q       Do you see under Paragraph 5, Subparagraph D, it refers to an expert in the psychology of individual responses to sudden life or death situations with a preliminary estimated cost of $3,000.00 to $4,000.00.  Do you see that?

A       Yes.

Q       And once again, did you and Mr. Echols have any specific discussion that you recall about the need for an expert that meets that specific description on this ex parte request?

A       No.

Q       Based upon, at that point, your limited knowledge of the case, did you independently have any concern in your mind that you might need an expert in that field?

A       No.

Q       You did not have that concern?

A       I didn't know enough about the case to have a concern one way or the other frankly.

Q       Fair enough.  Thank you.  On Page 3 of this document what appears to be Paragraph 5 --

THE COURT:  Mr. Wilson, we are having a technological issue here, so can you hold on for a second?

MR. WILSON:  Oh, I am sorry, sure.

(PAUSE)

THE COURT:  Go ahead, Mr. Wilson.

669

BY MR. WILSON:

Q    Do you see there, Mr. Hilfiger, at the top of Page 3, Subparagraph 5G an expert in forensic prediction of future dangerousness?  Do you see that?

A    Yes.

Q    Did you have any discussion specifically with Mr. Echols that you can recall about the need for someone -- an expert to help you in that particular field?

A    At this particular time?

Q    Yes.

A    No.

Q    Would the same hold true of -- well, let's move down to Subparagraph I, a mitigation investigator and expert -- do you see that?

A    Yes.

Q    What -- well, first of all, do you know what that is, a mitigation investigator?

A    Yes.  Somebody that would, you know, investigate to see what possible defenses there are on mitigation that a person would have.

Q    And that would be more specifically going to the second stage; correct?

A    The second stage, yes.

Q    And at this stage in the representation of Mr. Barrett had you and Mr. Echols had any specific discussion that you

670

recall regarding the need for a mitigation investigator?

A     No.

Q     Did you have any reason at this point to say -- to think you didn't need one?

A     No.

Q     Okay.  And under J, an expert psychiatrist or psychologist qualified to determine whether Mr. Barrett suffers from psychological disabilities or physiological deficits.  Had you had any discussion with Mr. Echols at that stage as to why you might need that particular type of expert?

A     No.

Q     It's my understanding, Mr. Hilfiger, that that was not the first, nor the only, request for or a budget request being made in this case; is that correct?

A     That's right.

Q     I want to show you another one quickly.

        MR. WILSON:  Your Honor, and for counsel, this would be Number 46, Document Number 46 in the criminal case. It is not Exhibit 46, but Document 46 in the criminal case.

        THE COURT:  All right.

BY MR. WILSON:

Q     Mr. Hilfiger, I am displaying that one on the monitor next to you.  Do you see this also being as an ex parte motion for approval of the overall budget?

A    Yes.

Q    And just so the record is clear, would you agree with me that this is dated January 31st of 2005?

A    Yes.

Q    Now, I am going to be displaying for you from Page 4 of that document and it shows Subparagraph E and it lists a mitigation investigator and expert to develop, organize and present mitigation evidence.  Do you see that?

A    Yes.

Q    And this particular request now identifies a particular expert, Inquisitor Incorporated.  Do you see that?

A    Yes.

Q    Do you know or were you involved in making any contact with this particular agency, Inquisitor Incorporated, to become a mitigation specialist to assist you in this particular case?

A    No.

Q    To your knowledge, did Mr. Echols do that?

A    I didn't.

Q    Okay.  So you don't know?

A    I don't know.

Q    Okay.  On Page 5, Subparagraph G, right up at the top, it shows an expert in the psychology of individual responses to sudden life or death situations.  It is very similar to the previous request I showed you; is that correct?

672

A    Yes.

Q    Do you have any independent recollection of having any additional discussions or having any discussions as to why this has continued to be requested?

A    No.

Q    Anything at this point in your mind that would either support or did -- did you agree or disagree with this particular request at that time?

A    At that time I didn't have any opinion on this request.

Q    And that would be based upon your lack of information; is that correct?

A    Yes.

Q    Now, on Page 7 of that document, Subparagraph L, there is a listing for an expert on assessing future dangerousness. And now would you agree with me that there appears to be a particular person identified or requested to be hired; is that correct?

A    Yes.

Q    And do you see the name Jennie Russell?

A    Yes.

Q    Mr. Hilfiger, do you -- and I know this is a difficult question, but do you know that at that particular time in January -- in January of 2005, did you know who Jeannie Russell was?

A    No.

Q    And we will talk more about Dr. Russell here in a few minutes, but the next entry is Subparagraph M, an expert on diagnosing organic brain disorders.  Do you see that?

A    Yes.

Q    Now, would you agree with me that that is a more specific or actually a different request than the previous budget item that I showed you?

A    You are not talking about 'L'?  You are talking about in the previous --

Q    I am talking about 'M' now.

A    Okay.  But, I mean, previous -- do you mean in the previous budget request?

Q    Yes, that's correct.

A    Yes, that is different.

Q    All right.  Now that we are talking about diagnosing a organic brain disorder specifically, do you recall any discussion with Mr. Echols as to why an expert was needed for that specific reason?

A    No.

Q    Now, I want to direct your attention specifically to the information under Subparagraph M.  Would you agree with me that this particular ex parte request says that there is no expert he identified.  Is that right?

A    Yes.

Q    Now, the second or actually the third paragraph where

674

it begins, "The estimate..." do you see that?

A     Yes.

Q     Can you just read that to yourself for a second?

A     Okay.  (PAUSE)  Okay.

Q     Apparently there was some communication in this document that this particular issue had been raised in the state trials; is that right?

A     I don't know whether -- I mean, I can't get -- I don't get from this that it was raised in the state trials.  I get from this that it was considered to be raised.

Q     And that no funding was ever generated, nor was there any evaluation done; is that correct?

A     Right.

Q     Do you know what the circumstances were, why that took place?  Do you know why no evaluation was done by the criminal defense in the state cases?

A     No, I do not.

Q     Do you recall any discussion with Mr. Echols about what took place, why there was no expert on diagnosing organic brain disorders?

A     No.

Q     At this particular time in January of 2005, did you have any independent opinion as to whether or not that particular request should be made of the court?

A     No, I did not.

Q    Did your opinion ever change on that?  Did you ever come to having an opinion as to whether or not an expert needed to be hired to diagnose organic brain disorders?

A    My opinion, you know, based on further discussions with Kenny Barrett and just as time went on was that it wasn't something we needed.

Q    Why?

A    Because I didn't see -- there wasn't any apparent need for a -- to look into organic brain disorders.  There wasn't any appearances that it was needed.

Q    Did Mr. Echols ever say, hey, this guy has got some problems and we need to have him evaluated?

A    I can't recall that he ever did.

Q    Do you believe if he would have made that request that you would have the same opinion that you currently do?

        MS. FISHER:  Objection, Your Honor, that calls for speculation.

        THE COURT:  Overruled.

        MS. FISHER:  Your Honor, it also calls for an ad hoc rationalization of what he might have done in trial under the circumstance that did not exist at that time.

        THE COURT:  Overruled.

BY MR. WILSON:

Q    Do you remember my question?

A    No.

Q    Okay.  I previously asked you if Mr. Echols and you had had a discussion about him saying, hey, this guy has a problem, we need to have him evaluated and I believe you said I don't recall any discussion like that; is that correct?

A    Right, yes.

Q    If there had been a discussion and Mr. Echols would have said, hey, this guy needs to be evaluated, would you have followed Mr. Echols's advice?

A    At that time, before Mr. Echols left the case?

Q    Yes.

A    I probably would have evaluated his request and made a decision, but I can't tell you whether I would have followed what he said.

Q    Fair enough.  And is it true that as you continued to represent him, even as the lead counsel, that you continued to have interaction with Mr. Barrett?

A    Yes.

Q    Did you continue to do your own self-evaluation, if you will, of Mr. Barrett?

A    Yes.

Q    Did Mr. Barrett ever indicate to you that he had had brain damage or significant head injuries?

A    I can't recall if that ever came to -- that he ever told us about that and I can't recall that I ever saw any-thing about it.

MR. WILSON: Your Honor, I would ask the clerk to provide the witness with Government's Exhibit Number 15, please. (COMPLIED)

BY MR. WILSON:

Q Mr. Hilfiger, I would ask you if you would just take a moment and look at that and see if you recognize that document, sir?

A I can't say that I recognize it, no. I mean, I see what it is, but I can't -- I can't say that I recognize it in the sense of having seen it before.

Q I would direct your attention to Page 7 of this particular document.

A Yes.

Q And it appears that you were carbon copied on this letter; is that correct?

A Yes.

Q And would you agree with me that this is a letter that Mr. Echols sent to Judge Payne, who was the presiding judge of the federal criminal case; is that correct?

A Yes.

Q Now, look at Page 2, if you will, and specifically I am referring to -- there is no numbered paragraphs, but it appears to be bullet point 4. It says, "Psychologist Faust Bianco..." do you see that?

A Yes.

MR. WILSON: And just so the record is clear, Judge, it is Page 2 of the letter, but Page 3 of the exhibit.

THE COURT: All right.

BY MR. WILSON:

Q    Do you know a person by the name of Faust Bianco?

A    I cannot recall that, no.

Q    That same paragraph refers to a person by the name of Ms. Schaye, S-C-H-A-Y-E. Do you see that?

A    Yes.

Q    And that same name is a couple of bullet points above, Outside Mitigation Investigator Rosanne Schaye. Do you see that?

A    Yes.

Q    Do you know a person by the name of Rosanne Schaye?

A    No, I do not.

Q    As a part of your representation of Mr. Barrett while you were assisting Mr. Echols, did you have an occasion to meet Rosanne Schaye?

A    I don't believe so.

Q    I guess the same would be true of Faust Bianco; is that correct?

A    Yes.

Q    Would you agree with me that in this particular letter to the court that Mr. Echols represents the fact that Ms. Schaye had performed some mitigation investigation as a part

of the first or previously prepared some mitigation investigation; is that correct?

A    That's what that bullet point states, yes.

Q    Okay.  And under the bullet point referring to Faust Bianco, it talks about a disagreement between Ms. Schaye and Dr. Bianco; is that correct?

A    Yes.

Q    Do you have any independent knowledge of this disagreement which took place between Ms. Schaye and Dr. Bianco?

A    No, I do not.

Q    And just so that I am clear, when you say you don't know, you do not remember it at this point or you just -- or that you never knew that?

A    Well...

Q    I know, that's a tough question.  I am sorry.

A    I can't tell you that I never knew it, but I can tell you that I don't know it now.  Whether I ever did, I don't -- I can't tell you.

Q    Do you recall ever seeing any of the investigation -- investigative reports or interview summaries that were generated by Rosanne Schaye?

A    I cannot recall seeing them, no, not at this point.

Q    Would that be true any time during the representation of Mr. Barrett?

A    Not necessarily.

680

Q    Okay.  Well, we will come back to that in a second. There is also a reference in this letter on the same page, Page 2 of the letter, of OIDS in-house psychologist Kathy LaFortune.

A    Yes.

Q    Do you know who that is?

A    Kathy LaFortune?  I mean, I -- what do you mean who that is?

Q    Well, do you know who Kathy LaFortune is?

A    I know who she is, yes.

Q    Okay.  And do you know that she was employed by OIDS back in 2005?

A    I mean, I remember her name.  I remember there was a discussion between Bret Smith and myself about Kathy LaFortune, and that's about what I can remember.

Q    So that would have been later on in the representation, is that correct, as far as your discussion with Mr. Smith?

A    That would have been in 2005, yes.

Q    Okay.  Well, we will come back to that.  Mr. Hilfiger, as a part of the initial representation of the defendant, we talked about you began working on a motion to dismiss; is that correct?

A    Yes.

Q    It is my understanding also that there was the involve-ment that you and Mr. Echols had in the decision of whether

or not the Department of Justice was going to determine this case eligible for the death penalty.

A    Yes.

Q    Were you aware of that?

A    Yes.

Q    And were you involved in traveling to Washington to discuss the case?

A    Yes.

Q    And you went with Mr. Echols; is that correct?

A    Yes.

Q    Would you agree with me that at some point the judge authorized certain expenditures to be made in helping to represent Mr. Barrett; is that correct?

A    That's right.

Q    As a matter of fact, the judge authorized the hiring of a mitigation specialist; is that correct?

A    I mean, we did hire one.  I assume he authorized it. I don't have an independent recollection of that right now, but yes, I believe that happened.

Q    And would you agree with me that the judge also authorized the hiring of an expert to look into organic brain disorder?

A    I'm assuming.  I don't -- I haven't seen that order and I don't -- and I have not reviewed everything in this case. So I can't -- you know, if it is in there, it was done.

Q    Okay.  So you don't have any reason to disagree that the order was put in place?

A    No.

Q    All right.  We talked about the fact that there were multiple requests made for budgeting; correct?

A    Yes.

Q    And at some point in this litigation Mr. Echols actually withdrew; is that right?

A    Yes.

Q    And do you know why that took place?  What was your understanding of why Mr. Echols got to the point where he asked the Court to allow him to withdraw?

A    Well, my understanding was because he was frustrated with not receiving all of the money that he felt like he ought to get in the budget.

Q    Did you agree with all of Mr. Echols's requests that he made of the Court?

A    No, I did not.

Q    Why not?

A    Some of them -- some requests, I thought, were excessive and in particular I can't tell you which ones right now.  Some I thought were repetitive and some, I thought, were not necessary.

Q    Okay.  The need for a mitigation specialist.  Would that have fallen into any of those categories that you

thought we don't need one of those?

A    No.

Q    The need for an expert on organic brain disorder.  Did you believe, based upon what you knew at the time of Mr. Echols' withdrawal or at the time he withdrew, that you needed one of those?

A    No, I did not.

Q    You did not?

A    I did not believe --

Q    You did not know or you did not agree?

A    I did not believe we needed one.

Q    And again, is that based upon your interaction with Mr. Barrett?

A    Yes.

Q    Was it based upon anything else other than your interaction with Mr. Barrett?

A    Well, you know, this -- some of this stuff comes back to me when I --- like when I see this letter here.  There were some reports, as I recall, that didn't indicate that he had a mental health problem.  Those, of course, were done way back before I even, you know, got in the case.  They were done back with John Echols.

Q    Was your idea of budgeting in this case and Mr. Echols' the same?

A    No.

Q    And what was the major difference in your perception of what needed to be requested versus what Mr. Echols' thought needed to be requested?

A    Well, I felt I was more conservative and he was more liberal.

Q    And when you say conservative, you mean just spend less or...

A    Well, I mean, I felt like what he was asking to do was sort of a shotgun approach to a defense and I felt like we needed to, you know, aim the defense a little bit more precise and we didn't need to waste time and effort and money in some other areas.

Q    Well, ultimately I guess you would agree with me that Mr. Echols was allowed to withdraw?

A    Yes.

Q    And did you support Mr. Echols and his request to withdraw?

A    No.

Q    Did you and he discuss the potential impact his withdrawal might have on the defense in this case, if you recall?

A    I can't recall that.  I mean, did we discuss his withdrawal?  I think, yes, we did.  The impact of his withdrawal?  I can't specifically remember that.

Q    Well, once Mr. Echols was out of the case you were

appointed lead counsel; correct?

A    Yes.

Q    And it's my understanding that Bret Smith was appointed to assist you; correct?

A    Yes.

Q    Had you worked with Mr. Smith on any cases before that, to your recollection?

A    I can't recall any particular cases that I've worked with him. I would almost believe that I worked with him in cases where he may have a co-defendant that I have a co-defendant, but working directly with him in one case I can't recall that. I mean, you know, where he and I were working with a client. I can't recall that.

Q    And for the record, Mr. Smith was an attorney here in Muskogee; correct?

A    Yes.

Q    And you are also an attorney here in Muskogee?

A    Yes.

Q    And had you known him for a number of years prior to your working together in this case?

A    Yes.

Q    To your knowledge, had Mr. Smith or did Mr. Smith have any previous capital experience?

A    I do not know.

Q    Okay. Do you recall when it was specifically that

-- when Mr. Echols was allowed to withdraw, when the date was?

A    I can't remember the date.  I think it was sometime in March or April of 2005.

Q    If the record reflects April of 2005, would that be about right?

A    Yes.

Q    And when Mr. Echols was allowed to withdraw, at that time did you have a trial date already set?

A    I am not sure we did at that time.

Q    Well, I take it you are now in the case along with Mr. Smith, no longer having Mr. Echols to rely upon the previous state litigation; correct?

A    Right.

Q    Did you continue to consult with him after his withdrawal?

A    If I did, it was only immediately afterwards, you know, to pick up hard copies of things.  I do know at one time I went to his house and got a number of boxes.

Q    Okay.  Well, let's talk about that transition period for a second.

A    Okay.

Q    When he gets out of the case obviously then you've got to get the information he has; correct?

A    Right.

Q    And your testimony about going to his house and picking it up, is that what you are talking about?

A    Yes.

Q    And can you tell the Court what you picked up from Mr. Echols?

A    Just a number of boxes of things that he had, the hard copies of things that he had from his trials.

Q    And did you receive materials from any other source other than Mr. Echols at his house?

A    Yes.  I believe OIDS sent me a number of boxes.  And how they got there, I don't know, but I know they sent me a number of  things.

Q    And just so we are all clear, when you say OIDS, you are talking about the Oklahoma Indigent Defense System?

A    Yes.

Q    And I believe they have an office up in Sapulpa and they have one in Norman; correct?

A    Yes, and I can't tell you whether it was Sapulpa or Norman.

Q    Do you know a guy by the name of Steve Leavy?

A    I recognize the name, but, you know, other than that, I can't say that I know him, no.

Q    Do you recall anything specifically about Mr. Leavy's involvement in this particular investigation?

A    I can't recall anything right now.  I mean, I do recall

his name and we may have had discussions with him.

Q    Well, after you obtained the information from Mr. Echols and from OIDS, did you and Mr. Smith have an occasion to get together and start game planning your representation of Mr. Barrett?

A    Absolutely.

Q    And do you recall specifically conversations that you had with Mr. Smith about the division of responsibilities or the division of tasks on how to represent Mr. Barrett?

A    I can't recall that we actually, you know, said you do this and I'll do this.  I can't recall that.  I mean, I think over a period of time, you know, something would happen and he would go ahead and develop, you know, that information or he would ask about something and I would develop the information, but I don't think there was a real hard and fast separation of what we did.

Q    All right.  Well, let me go back to the example that I used earlier with Mr. Echols and Mr. Gordon in the state case.  Mr. Echols was counsel for the first stage and Mr. Gordon was more the counsel for the second stage.  Now, you and Mr. Echols didn't have that arrangement; correct?

A    No.

Q    Did you and Mr. Smith have that arrangement?

A    No, not really.

Q    Okay.  At the time that you became lead counsel did

you have an occasion to go talk with Mr. Barrett about the fact that Mr. Echols was no longer in the case and that you were taking over, along with Mr. Smith?

A       Yes.

Q       And do you recall the reaction that Mr. Barrett had to that news?

A       I do not recall.  I know, you know, that I talked to him about it, but I don't know what reaction there was.

Q       As a part of your discussions -- and I believe you said you don't necessarily have any independent recollection of discussions with Mr. Smith, but as a defense attorney for years, what does -- what's a trial strategy?  What does that mean to have a trial strategy?

A       Well, what I have understood and what -- is that you need to have some kind of idea of a -- of how you are going to treat the case based on what the facts are and that's what your trial strategy is.  And you need to sort of develop that upfront, you know, as quick as you can find out what your -- you know, what the evidence is that you anticipate and then you need to try to get everything consistent with that trial strategy.  That's my view point of it.

Q       Did you and Mr. Smith have any disagreements about that -- your idea of trial strategy?

A       No.

Q       I assume you would try to identify the strengths in the

defense case and identify weaknesses as well; correct?

A    Yes.

Q    And I assume you would do that as you are evaluating the government's case; correct?

A    Yes.

Q    Now, I know that Mr. Barrett had been tried in the state, there was a hung jury, and then a retrial and some convictions on lesser included charges; correct?

A    Yes.

Q    And some acquittals of some charges; is that correct?

A    Yes.

Q    And the federal prosecution was going to be somewhat different from the state; is that correct?

A    Yes.

Q    And there was the inclusion of the fact that this was going to be a drug case and a death resulting from; is that right?

A    Yes, that drugs were going to be brought up in this case and they weren't brought up in the Sallisaw case.

Q    Okay.  Now, did that pose some unique issues or concerns for you?

A    It brought up concerns, yes.

Q    Okay.  What kind of concerns did that bring up in your mind as you are trying to identify strengths and weaknesses in handling this defense?

A     Well, let me explain.  I cannot tell you who this person was because I can't remember.  I just remember it was a woman.  When I became involved in the case after John Echols left, she contacted me and I -- and I don't think she was a juror, but she may have been a juror or she was somebody who had been in -- you know, been at the trial, the trial or trials, and I just -- you know, I was -- and she wanted to talk to me about it, so I talked to her.  The concern that I had on the drugs was she basically was saying that if drugs had been made known in the Sequoyah County case, the Sallisaw case, that she felt that the result would have been different and not an acquittal.

Q     So that would pose a unique challenge?

A     Right.

Q     Was there any concern in your mind about trying to limit the amount of discussion about narcotics or drugs before the jury?

A     Yes.

Q     Why was that --

A     Just the -- well, we didn't want to have a lot of discussion or involvement of drugs in the case because we felt that that would, you know, prejudice Mr. Barrett with the jury.

Q     And I apologize, but I am going to go back in time just a little bit.  During the transition period --

A    Yes.

Q    -- when Mr. Echols is leaving and you are taking over, --

A    Yes.

Q    -- did you and Mr. Echols have a discussion regarding the status of the litigation and what his recommendation was about going forward?

A    I cannot recall -- I know we had a discussion as to, you know, him leaving the case after he had already left, about him leaving the case.  My impression from him was that he had just been too involved in it, too wrapped up in it for five or six years and he wanted to get out, other than the budget deal.  That he had just been too -- he had been too much involved in it and just didn't want to have anything to do with it anymore and that's why I didn't really go back with him, you know, and ask him about certain things because he just -- he sounded like he has had it, he is finished with the case.

Q    All right.  I guess what I am specifically asking you about is, did Mr. Echols say I think going forward you need to do this, this and this, which hasn't been done?

A    If he did, I cannot recall it.

Q    Mr. Hilfiger, in addition to evaluating the case of representing Mr. Barrett on the guilt or innocence, --

A    Yes.

Q    -- you would agree with me that there was potentially a second component, a second stage since this was death penalty eligible?

A    Yes.

Q    Did you and Mr. Smith have any discussions regarding a strategy not just for the first stage, but a strategy for the second stage or the potential of a second stage as well in the case?

A    I can't say we had a discussion.  I can say that we discussed it from time to time.

Q    Okay.  As far as sitting down and that being the topic of that particular discussion, you don't recall that?

A    I can't recall a -- you know, hey, let's get together and let's talk about what we are going to do on the second stage.

Q    Did you -- do you recall talking about the second stage during your representation?

A    Absolutely.

Q    Now, earlier I was asking you about a person by the name of Rosanne Schaye.

A    Yes.

Q    And I asked you about whether or not you remembered that person and you said -- and you were limiting it at that point to while you were working with Mr. Echols.  Do you recall that, about seeing any documents of hers?

A    Yes.

Q    Well, let's now talk about -- now you are in charge, you and Mr. Smith are working together.

A    Yes.

Q    You receive information from Mr. Echols.  Do you recall at that point ever seeing any documentation, review notes, review summaries generated by a person by the name of Rosanne Schaye?

A    I really cannot recall seeing anything.  Now, that doesn't mean I didn't, but I just can't recall it at this point.

Q    And what I am going to need to do for a few minutes is just show you some documents and just see if that refreshes your memory.  Okay?

A    Yes.

Q    I want to direct your attention, first of all, to Tab Number 18.  If you will take a moment and look at that document, please.

                    (PAUSE)

A    Okay.

Q    Having had an opportunity to look at that, do you recall seeing that particular document?

A    No, I do not.

Q    Do you recall knowing that specific information from a person by the name of Carolyn Joseph?

695

A      No, I do not.

Q      Can you tell the Court whether or not this particular document was provided to you by Mr. Echols?

A      If it was in -- I gave to the public defender here, I think, nine or ten boxes of everything I had.  If it was in those boxes, then it was there.

Q      If it was in those boxes, did you review it?

A      I would say at some point, yes.

Q      Now, when you say "at some point," I mean, that could have meant the day before they picked them up.

A      Oh, no.  At some point before the trial, yes.

Q      And I am going to try to do this as in a group, so it may take you a little bit.  The next several tabs would be 19 through 25.  If you will just take a moment and look through those and see if you recognize -- once again, I believe these are all interviews conducted by -- or summaries of interviews conducted by Ms. Schaye.

                    (PAUSE)

          MR. WILSON:  Your Honor, may I consult with the clerk while Mr. Hilfiger is looking at those documents for a moment, please?

          THE COURT:  Yes.

          MR. WILSON:  Thank you.

                    (PAUSE)

BY THE WITNESS:

696

A     25?  Is that the last --

BY MR. WILSON:

Q     Yes.

A     Okay, yes, I've reviewed them.

Q     I'm going to ask you the same thing.  Do you have any independent recollection of seeing those reports after Mr. Echols was out of the case and you were in charge of the case, along with Mr. Smith?

A     I don't have an independent recollection of seeing them, but after reviewing them, I tend to think they had to be in those boxes someplace that I got from John Echols.  I believe --

Q     And why do you believe that?

A     Well, because some of the information given here is what we used to talk to the people that Rosanne Schaye talked to herself.

Q     Can you give me an example of what you are talking about?

A     Well, it's just like this Elnora Long, Sylvia Dotson...I can't remember Linda Riley.  (PAUSE)  Those names sort of, you know, bring back to memory that we did, you know, make some contact with them.

Q     Okay.  And we've been talking about Government's Exhibit Numbers 18 through 25; correct?

A     Right.

Q    Now, some of these names are going to be duplicated, but I want you to look --

MR. WILSON:  I would ask the clerk if he would hand Mr. Hilfiger, please, Government's Exhibit Numbers 54 through 62.

BY MR. WILSON:

Q    Mr. Hilfiger, these appear to be additional interview summaries conducted by Ms. Schaye.  I would ask you to take a moment and look at those as well.

THE COURT:  Mr. Wilson, once he has had a chance to look at those, let's finish this thought and then we will take our lunch break.

MR. WILSON:  Okay, thank you, Judge.

(PAUSE)

BY THE WITNESS:

A    Okay, I've reviewed them.

BY MR. WILSON:

Q    Do you recall seeing those particular documents as a part of your representation of Mr. Barrett?

A    I can't say specifically that I recall seeing them. If they were in the boxes, then I probably did.

Q    The names on these particular interviews, Toby Barrett.

A    Yes.

Q    You know who Toby was; right?

A    Yes.

Q     Who is Toby?

A     The son of Kenneth.

Q     Obviously Kenneth Barrett would be the defendant; correct?

A     Right.

Q     Sylvia Jolene Dotson?

A     Mother.

Q     Ernie Barrett.  Do you know who Ernie Barrett was?

A     Father.

Q     Do you remember Phyllis Crawford, who Phyllis was?

A     The name sounds familiar.  Yes, I see in here it is an aunt.  That sounds right.

Q     Does the name Roger Crawford also ring a bell with you?

A     I believe it was her husband.

Q     Okay.

        MR. WILSON:  Your Honor, I know we are going to take a break.  Before I do that -- because I forgot to do this before I started, counsel -- both counsel had a list of exhibits to which there were no objections, and I intended to do this before I started my questioning.  I would move to admit Government's Exhibits 4 through 11, 28, 32, 33, 35, and 44.  I believe all of those there was no objection listed by the defense -- or excuse me -- by the petitioner.

        THE COURT:  Are there any objections?

        MS. FISHER:  I don't know, Your Honor.  We don't

699

have the list.

MR. WILSON:  And we can do this after lunch.  I will give counsel an opportunity to do that.

THE COURT:  All right.  Then let's do that.  Are we good to go then, Mr. Wilson?

MR. WILSON:  I am ready to take a break at this point.  I asked the questions about that particular area.

THE COURT:  Great.  Let's go ahead and take our lunch break and be back at 1:00.

(12:12 a.m.)

(LUNCH RECESS)

(1:06 p.m.)

COURT IN SESSION

THE COURT:  Go ahead, Mr. Wilson.

MR. WILSON:  Judge, as we were about to recess a moment ago, we had a discussion regarding moving to admit some documents and I believe through the lunch hour we've looked at those and the government moves to admit Government's Exhibits 4 through 11, 29, 31, 32, 33, 35, and 44 at this point.

MR. FISHER:  No objection, Your Honor.

THE COURT:  Very well.  Those exhibits are admitted.

MR. WILSON:  Thank you, Your Honor.  May I proceed?

THE COURT:  Yes.

MR. WILSON:  Thank you.

DIRECT EXAMINATION CONTINUED

BY MR. WILSON:

Q    Mr. Hilfiger, prior to the lunch break we were talking about some documents and I had shown you some documents, specifically from Rosanne Schaye.  Before we go any further, I need to ask, in addition to documents that you received from Mr. Echols and also from OIDS -- do you know a person by the name of Jack Gordon?

A    I don't know him.  I know of him, yes.

Q    Okay.  Were you aware that Jack Gordon -- and I think we talked about the name earlier -- was second stage or, excuse me, second chair in the second state case?

A    I knew he was involved in the Sallisaw case, yes.

Q    All right.  As a part of the transition of you getting access to documents, did you have an occasion to receive any documents from Mr. Gordon or make contact with Mr. Gordon to obtain documents?

A    There was a -- I am pretty sure there was contact made with Jack Gordon.  I can't tell you that I made the contact or if Bret Smith made the contact.

Q    And was the purpose of it in order to obtain information or documentation?

A    Yes, yes.

Q    And to your knowledge, did you, in fact, receive any

documentation from Jack Gordon?

A    I really don't have an independent recollection right now.  If there is -- if there was information we got from Jack Gordon, then that's how we got it.

Q    Okay.

A    I don't have, you know, an independent recollection of it.

Q    Okay.  So you don't specifically remember talking to him yourself?

A    I sure don't.

Q    Okay.  Earlier we had a conversation regarding a gentleman by the name of Steve Leavy.  Do you recall that?

A    Yes, and the name sounds familiar.

Q    And I believe you said he was an investigator for OIDS; is that right?

A    Yes.

Q    And do you recall as a part of your representation of Mr. Barrett, once you became lead counsel along with Mr. Smith, if you had an occasion to review any reports of investigation conducted by Mr. Leavy?

A    I cannot recall.  I mean, if there was any hard written information that was supplied, then we did look at it, yes.

Q    Okay.  I would asked the witness -- do you still have the book there?

A    No.

MR. WILSON:  I would ask if the clerk would provide the witness with Government's Exhibit Number 49, please.

(COMPLIED)

BY MR. WILSON:

Q    Mr. Hilfiger, I would ask you just to take a look at that, if you will.  It's several pages long.

A    Okay.

(PAUSE)

BY THE WITNESS:

A    Okay, I've reviewed it.

BY MR. WILSON:

Q    Do you recall seeing that particular document, that memo from Mr. Leavy to John Echols?

A    I have no independent recollection of seeing the document.  Some of the information in it, you know, I recall hearing and understanding, but I can't tell you that, yes, I actually saw this document.

Q    And can you give me an example, sir, of information that you recall hearing about or knowing about as a part of your representation?

A    Well, the Jolene Dodson information, the Sheriff Philpot information, the...I thought I saw something in here about Toby.  Toby Barrett, some of the information on that. You know, I can't tell you whether the information that I received came from this document or just from some other

information we got.

Q    I understand.  Now, earlier we talked about certain mental health information.  I ask that you look at Tab Number 12, please.

A    Yes.

Q    An affidavit from a Dr. Bianco.  We talked earlier about Dr. Bianco.

A    Yes.

Q    Do you recall seeing this particular document, sir?

A    I can't recall this document.

Q    Okay.

A    If it's in that box of stuff, then we had it and we saw it.  Most of that -- the boxes were given over to the Public Defender two or three years ago.  I don't remember when it was that they picked them up.  And prior to that, a number of boxes went to the appellate defender.

Q    That would be Mr. Hendrickson?

A    Hendrickson.  So, you know, we are looking at -- if it was there and it was in the boxes, then we saw it.  I can't say, yeah, I remember seeing this one for sure.  I don't.

Q    Okay.  Well, let me ask you -- and I am sure this may lead to the same answers, but for the record, can you look at Tab Number 16 for me, please.

A    Yes.

Q    And it appears to be an evaluation from a Dr. Bill

704

Sharp, PhD.  Do you see that?

A     Yes.

Q     Mr. Hilfiger, do you recall if you ever reviewed this particular document as a part of your representation of Kenneth Barrett?

A     I cannot specifically recall reviewing it.  If it was in the boxes, then we looked at it, yes.

Q     Do you have any independent recollection of Mr. Echols specifically talking with you about any evaluation by a Dr. Bill Sharp?

A     No, I cannot recall that.

Q     Okay.  I would like to direct your attention specifically to this document to Page Number 7, if you will, in this evaluation.  The bottom of the page under Roman Numeral VI says diagnostic impressions.  Do you see that?

A     Yes.

Q     And based upon your experience in dealing with clients who have had evaluations, are you -- have you seen evaluations in the past?

A     Yes.

Q     And are you familiar with evaluations that have axis diagnoses, Axis I, II, III?

A     I am familiar with those terms, yes.

Q     Well, I want to direct your attention to Axis III, which is labeled -- which is right at the very bottom of

Page Number 7.

A     Yes.

Q     Take a moment and look at that, if you will.

A     Okay, I see it.

Q     All right.  Organic impairment relative to tremor and long-term memory difficulty.  Do you see that?

A     Yes.

Q     Now, I understand you testified a moment ago that you have no independent recollection of seeing this particular document; is that correct?

A     That's right.

Q     Let me ask you this.  If you are representing Mr. Barrett and you review this particular document and you see where it says "rule out organic impairment relative to tremor and long-term memory difficulty..." in your dealing with Mr. Barrett did you have any concerns regarding Mr. Barrett's ability to recall events long-term?

A     No.

Q     Was he able to relate to you events which took place on the date of the crime in September of 1999?

A     Well, I mean, we discussed them, yes.

Q     Okay.  Did you have any discussion with him regarding inconsistencies between testimony at the first trial and the second trial and even the third trial?

A     You mean testimonies of the different officers?

706

Q    That's correct.

A    Yes.

Q    And did you determine whether or not Mr. Barrett was able to give you accurate information regarding those prior testimonies?

A    For the most extent, yes.

Q    Would long-term memory issues be consistent or inconsistent with your impressions of Mr. Barrett?

A    Whether he had a long-term memory loss or...I didn't think so.

Q    Okay.  And seeing this report, would that have given you rise to request the court to -- or to hire an expert to determine whether or not Mr. Barrett had organic impairment?

        MS. FISHER:  Objection, Your Honor, calls for speculation and ad hoc rationalization of the actions made by counsel.

        THE COURT:  Repeat the question.

        MR. WILSON:  If looking at this particular document, based upon what he knew about Mr. Barrett, would this document have led him to request an expert to evaluate Mr. Barrett on the issue of long-term memory difficulty?

        THE COURT:  Well, we know it didn't; right?

        MR. WILSON:  Well, Judge, the question that -- the witness testified that he didn't have an independent recollection of seeing this particular document.  My question

707

is if, in fact, he had seen this document would that have led him to make that request?

THE COURT:  All right.  I'll allow him to answer the question.

BY THE WITNESS:

A      Well, based on just the diagnostic impressions or based on the whole document?

BY MR. WILSON:

Q      Based upon the whole document.

A      Okay.  Based on the whole document, I wouldn't see any reason to.

Q      Turn to Tab Number 37.  Earlier you and I had a discussion about a person by the name of Kathy LaFortune.  Do you recall that?

A      Yes.

Q      And I believe you testified earlier that during the course of your working with Mr. Smith that you recall some discussion you had regarding Kathy LaFortune.  Is that what your testimony was?

A      Yes.

Q      Do you recognize or do you recall seeing this particular psychological evaluation?

A      I do not recall seeing it from an independent recollection, but if it is in the boxes, then it was there and we saw it.

Q      Well, let me ask you this:  Having seen this evaluation at this point, does that in any way refresh your memory as to the content of your discussion you had with Bret Smith, if you know?  That's all I'm asking.

A      Having seen the document?  No.  Just the name Kathy LaFortune recalls, you know, a discussion with Bret Smith that...

Q      But what the content of that discussion was, you don't know?

A      No.

Q      Okay, fair enough.

A      But to say that it -- it didn't lead to any openings for further development.

Q      I don't follow your answer.

A      Okay.  There wasn't anything that we discussed on Kathy LaFortune that -- you know, what she found that would lead us to go do anything additional.

Q      So any discussions you had with him didn't motivate you to do anything further.  Is that your testimony?

A      Right, right.

Q      Look at Tab Number 42, please.

A      Okay.

Q      Again, this appears to be a memo to Steve Leavy from a person by the name of Peter Rausch.  Do you see that?

A      Yes.

Q    Do you -- we know who Steve Leavy is; correct?

A    Yes.

Q    Do you know who Peter Rausch is?

A    You know, the name is familiar, but right off the top of my head, no, I can't recall.

Q    If you will just take a look at that document and see if looking at it refreshes your memory at all.

                         (PAUSE)

BY THE WITNESS:

A    You know, I -- other than what I've told you before, I don't recall seeing the document.  Steve Leavy and Peter Rausch name are familiar.  I don't recall that I had any direct contact with Peter Rausch.

Q    Thank you.

A    Yes.

Q    All right.  I am going to try to go chronologically at this point, if I can.

A    Okay.

Q    You are -- and the point in time where I am going to start is you and Roger -- you and Bret are now working together.

A    Yes.

Q    And you are beginning to put together the case.  As a part of your duties, you are required to maintain records of your time that you spend in the litigation; is that correct?

A      If I want to get paid.

Q      Fair enough.  And when you keep those records, then you submit those monthly or they are kind of kept monthly; is that correct?

A      I think we did submit them monthly, yes.

Q      All right.

MR. WILSON:  I would ask the clerk to provide the witness -- this will be Petitioner's Number 72.

BY THE WITNESS:

A      Yes.

Q      All right.  And it might be easier --

MR. WILSON:  Your Honor, I didn't realize that the individual pages -- well, maybe they are numbered.  Let's see.

THE COURT:  Mine aren't.

MR. WILSON:  I don't think they are.  So I may just have to project them for the witness, Judge.

BY MR. WILSON:

Q      Mr. Hilfiger, instead of just having you try to figure out where in that book to look and coming to you and showing you page after page, I am just going to use the projector.  Okay?

A      Okay.

Q      And I will zoom in a little bit in a second to maybe make this easier, but looking at the top of this document,

do you recognize this as being a document which you prepared
from Cook & Hilfiger?

A    Yes.

Q    And you would agree with me that it is a reflection
of your time in May of 2005; is that correct?

A    Yes.

Q    Now, for instance, just for explanation purposes so I
can make sure I understand what this reveals, the first entry
-- and I am going to zoom in a little bit.  Can you see that
better, Mr. Hilfiger?

A    Yes.

Q    The first line being Wednesday, May 4th of '05.

A    Yes.

Q    For instance, what is that telling us?

A    At about 7:30 in the evening for about two hours, I
did a review of the first trial transcript covering
Franchini, Morgan, Shelly, Howard, Hoyt and Porter.

Q    All right.

A    Oh, I am sorry.  First trial transcript, Franchini,
Morgan Chelly (sic), Howard, Hoyt and Porter.

Q    It is my understanding that those would be witnesses
who testified during the state trials; is that correct?

A    In the first trial.

Q    Okay.  And you would be reviewing the trial transcript
trying to learn what they testified to during the first

trial; is that correct?

A    Right.

Q    All right.  Now, I want to show you another page from the same month.  And specifically I want to direct your attention down here to 5-24-05.  Do you see that?

A    Yes.

Q    It appears that on May 24th, you began looking at some records; is that right?

A    Yes.

Q    And when it says OIDS records, are those the records that you received from Indigent Defense?

A    I would say from the way -- it is OIDS records from John Echols.

Q    Okay.  So those would be files that you picked up when you went to Mr. Echols' home?

A    Yes.

Q    So you've got the same entry on the 24th, the 25th, the 27th.  Would you agree with that?

A    Well, I don't see the 27th.  You will have to move it up.

Q    Oh, I am sorry.  I can see it, but you can't.  Sorry.

A    Yes, that's it.

Q    All right.  And then again, the last one I will show you very quickly is May 30th, same type of investigation; correct?

713

A    Right.

Q    All right.  I want to move ahead in the records to the month of June.  Once again, this appears to be one of your billing records; correct?

A    Yes.

Q    And I want to direct your attention to the last entry, dated entry, of June -- excuse me -- the first entry of June 28th of 2005.  Do you see that?

A    Yes.

Q    And it references a PH/Jolene.  PH refers to...

A    Phone call.

Q    So a phone call to Jolene?

A    Yes.

Q    And who would Jolene be?

A    The mother.

Q    Okay.  That would be Mr. Barrett's mother; correct?

A    Yes.

Q    And basically you are telling her that we've had a change of date and we need to get some clothes for the trial; is that right?

A    Yes.

Q    The next entry is June 29th; correct?

A    Yes.

Q    And there are two different entries, one at 2:00 and one at 4:00.

714

A    Yes.

Q    Look at the 4:00.  Can you tell us what that's about?

A    With Bret Smith on mitigation expert and work assignments for next week.

Q    All right.  With Bret Smith on mit expert.  That's mitigation?

A    Yes.

Q    Do you have any independent recollection of that particular meeting when you discussed mitigation?

A    Well, a mitigation expert.  No, I don't.

Q    Okay.  Do you have any recollection of when you talked about a mitigation expert what that discussion was about?

A    No, I can't tell you whether it was about a detail of what a particular mitigation expert would -- you know, that we would want to try to find or whether it was trying to find a particular mitigation expert.  I don't know.

Q    Okay, very well.  Fair enough.  I want to move now to July and I want to refer you to an entry dated July the 18th. Do you see that?

A    Yes.

Q    And there are actually a number of different entries on that date, but specifically I want to direct your attention to -- I believe it is the 3:00 entry.

A    Okay.

Q    Can you take a look at that and tell me what that's

715

about?

A    Bret Smith and Doris, we talked about the status of the jury panel, the mitigation expert and the need for additional time and we raised issues -- we talked about issues raised by Kenneth and Doris on investigation needs and southern panel.

Q    Do you have an independent recollection of that particular conversation?

A    No.

Q    And when you and Doris -- who is Doris, by the way?

A    Doris is, I believe, his step-mother.

Q    Mr. Barrett's step-mother?

A    Yes.

Q    And was Mrs. Barrett, Doris Barrett, was she actively involved in assisting Mr. Barrett?

A    Yes.

Q    Did you have multiple conversations with her during your representation of Kenneth Barrett?

A    Yes.  I probably had more conversations with her than I did with any other of the Barrett family.

Q    And just looking at this particular entry...

A    Yes.

Q    It appears to me, and you correct me if I am wrong, that Bret Smith and Doris were involved in the same discussion regarding the mitigation expert; is that correct?

716

A    Yes, that's the way it appears to me, yes.

Q    Mr. Hilfiger, I want to direct your attention now to August. And by the time we are getting to August, we are getting closer to trial; is that correct?

A    Yes, yes.

Q    And trial actually began, I believe, in September; is that right?  Do you --

A    I would have thought -- I thought we did something in August, but it doesn't appear that way.

Q    Looking specifically at the first entry, Friday, August the 12th.

A    Yes.

Q    It refers to a call to Doris and Jolene.  Would that be Doris Barrett and Jolene Dotson?

A    Yes.

Q    And then the entry on the same day at 4:00 p.m.  Can you see that?

A    Yes.

Q    All right.  It appears to be another phone call, once again with Doris and Jolene; is that right?

A    Yes.

Q    Now, I want to move -- stay in the month of August, but move a couple of days forward to August the 19th.

A    Okay.

Q    Do you see that entry?

717

A    Yes.

Q    It appears at 11:00 a.m. an appointment and it says meeting with Jeannie Russell and B.S. in Tulsa.

A    Yes.

Q    All right.  Let's talk about that meeting.  Looking at some of the previous time records we've looked at there had been some discussions about mitigation; correct?

A    Yes.

Q    And were you and Mr. Smith talking about mitigation as you are preparing for trial?

A    Yes.

Q    And at that point had you actually secured a mitigation specialist to do an additional investigation?

A    At the August 19th point?

Q    Prior to August 19th.

A    Yes.  I mean, I felt -- you see, Jeannie Russell had already done some stuff and I think we had already made contact with her on it.

Q    Okay.  Well, had you already retained -- is it your understanding that you had retained her already -- prior to that time?

A    That's what I thought, yes.

Q    Okay.

A    You see, I would think Bret was the one that was really, you know, talking to her at that point prior to this

718

August 19th date.

Q     Well, if the records of -- and we can look at these a little bit later.  If the records of Ms. Russell show the initial contact between you and Mr. Smith being August the 19th of 2005, is there any reason to doubt that?

A     No.  I really thought that we had already done -- you know, that there had already been some contact ahead of that time.

Q     As far as --

A     But I had not.

Q     Okay.  When you say contact, you mean just talking about making initial contact or actually retaining that person and having that person do services for you?

A     Having that person do services.

Q     Okay.  Well, if that is inconsistent with her billing records...

A     Then I am wrong.

Q     Okay.  Do you believe that her billing records would be more accurate about what she actually did and the times at which she did those things?

A     Yes.

Q     All right.

A     Except this statement down here where it says she has already done presentation.

Q     Okay.

A     Which indicates to me she has already done a
presentation on August 19th.  Now, whether she did it under
our contract or under previous trial stuff, I don't know, but
there was already something done.

Q     Well, that's what we are going to talk about.  Okay?

A     Okay.

Q     I want to direct your attention to Tab Number 34 of
Government's -- I am sorry -- Government's Exhibit Number
34.  Different book, sorry.

A     Yes.

Q     All right.  Have you had a chance to look at that, sir?

A      Not all of it.

Q     All right.  Well, take a look at it, please, if you
don't mind.

A     Okay.

                              (PAUSE)

BY THE WITNESS:

A     Okay.

BY MR. WILSON:

Q     Do you recall this particular document, sir?

A     I don't independent recall this document, but if it was
in the box, you know, the box of information, then we
probably had it.

Q     Okay.  Well, let's talk about it for a second.  You
would agree with me that it's dated December the 16th of

2003; is that right?

A    Yes, yes.

Q    And on that date, December 16th, 2003, were you representing Mr. Barrett?

A    No.

Q    That would be during the state prosecution; is that correct?

A    Yes.

Q    The name Jeannie Russell...

A    Yes.

Q    Is that the same name of Jeannie Russell that showed up on Mr. Echols's request for the budgeting of an expert?

A    I would assume, yes.

Q    Looking at those billing records that we looked at earlier, there was a meeting with Ms. Russell on August the 19th; correct?

A    Yes.

Q    Do you remember that meeting?

A    I remember the meeting, yes.

Q    Okay.  Where did it take place?

A    In Tulsa in her office.

Q    And who was present for that meeting?

A    She was, Bret Smith, and myself.

Q    And do you know how that particular meeting got arranged or scheduled?

A    Well, Bret was the one that arranged it.

Q    Okay.  And was that the first time that you had actually -- you, yourself, had actually spoken to Jeannie Russell, Dr. Jeannie Russell?

A    Yes.

Q    And during that discussion that you had with Dr. Russell, did you have a discussion with her about retaining her for purposes of providing services in Mr. Barrett's defense?

A    I would assume.  I can't really recall independently on that.

Q    Okay.  Do you know whether or not you discussed with her what she had previously done in the state case?

A    Yes.

Q    And do you recall whether or not you would have discussed the contents of this 2003 evaluation?

A    Yes.

Q    Now, this 2003 evaluation contains a number of -- a list of a number of records that Dr. Russell had reviewed in preparation of this assessment; is that correct?

A    Yes.

Q    And there appears to be records from Eastern State Hospital of an admission of October of 1986; is that correct?

A    Yes.

Q    On page 2 there appears to be records from Bill Willis

Community Mental Health Center; is that right?

A     Yes.

Q     And Wagoner Community Hospital?

A     Yes.

Q     St. Francis records; correct?

A     Yes.

Q     And specifically those St. Francis records deal with a gunshot wound; is that correct?

A     Yes, at the time of his arrest.

Q     That would be the September of 1999 arrest involving this particular crime; is that correct?

A     Yes, yes.

Q     There was also -- the next entry is from Sequoyah Memorial Hospital of another gunshot incident from the year 1986; is that correct?

A     Yes.

Q     And that would be a self-inflicted gunshot wound; correct?

A     Yes.

Q     It also refers to interview reports by Rosanne Schaye. Do you see that?

A     Yes.

Q     And also interview reports by Steve Leavy, an OIDS investigator; is that right?

A     Yes.

Q    And a psychological report or evaluation by a Dr. Bill Sharp; correct?

A    Yes.

Q    Now, Mr. Hilfiger, do you recall during the representation of Mr. Barrett the government giving you notice of an intent to call a person by the name of -- the last name of Horn?

A    The name sounds familiar, yes, and then I saw something that I've seen just recently where it mentioned something about Mr. Horn.

Q    And do you recall the government wishing to elicit testimony in the trial about inconsistencies of memory regarding the testimony of the troopers in the state cases?

A    Yes, yes.

Q    And did you at any time have a discussion with Dr. Russell about seeking her assistance in that area as well?

A    I can't really recall, but now that you mention it, it seems like there was -- you know, that we did talk about it, but I can't -- I mean, if you are asking me to say positively can I remember that, no, I can't.

Q    Okay.  Did you have a discussion with Dr. Russell about using her services in the second stage?

A    Yes.

Q    Can you tell us what the nature of that discussion was and what she was able to provide to you and what decision

was made in reference to what she could provide?

A    Well, my recollection is that because she had already done some evaluation, some assessment and that she could pick up where that assessment left off basically and do an assessment for risk assessment --

Q    Are we talking about -- let me interrupt you for just a second.  I am sorry.  When we talk about risk assessment, what impact or what is the relevance of risk assessment in reference to mitigation?

A    Well, you know, in the future how bad is this person going to be, what kind of risk do you run in the future with this person.

Q    Was there an aggravator which the government was trying to use of future dangerousness?

A    Well, I think there was.  I can't -- you know, if it's there, it's there.  I can't remember whether that was an aggravator or not at this point.

Q    Okay, all right.  So you believe you had some discussion regarding her being able to provide you some services in reference to this risk assessment; is that correct?

A    Right, right.

Q    Did you reach an agreement that she, in fact, was going to testify consistent with the findings of this report or an amended report?

A    Well, it would be an updated report, yes.

Q    Okay.  And was she actually going to be called as a witness to testify for you?

A    She advised that it would not be beneficial.

Q    And when you say she advised it would not be beneficial, did that take place at this August meeting, if you know?

A    I can't -- I mean, I think there were indications made at this August meeting that it may not be beneficial, but I am not positive that the actual determination wasn't made until a later date.

Q    All right.  Well, let me ask you about the reasoning for that.  What was the reasoning that Dr. Russell gave that using the information in her evaluation might be detrimental?

A    Well, because she felt -- my recollection is that she felt that the government would also be able to have a counter to her assessment that would be more detrimental to him than hers.

Q    Do you know -- do you remember any specifics as to what areas the government might be able to capitalize on, if you will?

A    No, I do not.

Q    Did you follow her advice?

A    Yes.

Q    Did you do that in consultation with anyone else?

A    Bret Smith.

Q    Did you do that in consultation with Dr. Russell?

A    Yes.  I mean, she was the one that brought it up and then Bret Smith and I discussed it.

Q    Well, I'll direct your attention now to Tab Number 35, please, Government's Exhibit Number 35.

A    Yes.

Q    Would you agree with me the first page appears to be a CV of Dr. Russell?

A    Yes.

Q    Flip on over to the beginning of Page Number 7.  You will see a Number 7 in a circle at the bottom right.

A    Okay.

Q    I will ask you if you will just take a moment and look at the next -- well, to the end of this document.

(PAUSE)

A    Yes.

BY MR. WILSON:

Q    Now, do you have an independent recollection of this particular document?

A    Not really, no.

Q    Okay.  Would you agree with me that it's another risk assessment?

A    Yes.  Well, it's -- it is an updated risk assessment.

Q    Okay.  Different date?

A    Different date.

Q   Okay.  And that would be September the 15th of 2005; is that correct?

A   Yes.

Q   And does it list the defense attorneys at this time?

A   Bret Smith and myself.

Q   And did you receive this risk assessment from Dr. Russell?

A   At some point I would assume, yes, I did.

Q   And to your knowledge, was that risk assessment -- well, let me back up.  Mr. Hilfiger, are you familiar with Federal Rule 12.2 of the Federal Rules of Criminal Procedure?

A   Tell me what it is.

Q   Okay.  It deals with if a defendant intends to present evidence regarding mental health --

A   That you have to --

Q   -- that notice has to be provided.

A   Sure.

Q   And give the government an opportunity to have the person evaluated.

A   Yes.

Q   Does that ring a bell?

A   Yes, yes.

Q   Do you recall in the representation of Mr. Barrett if there came an issue regarding notice under 12.2?

A   Well, the question was whether we wanted to have the

government assess him.

Q    What do you mean by that?

A    Well, I mean, whether it would be beneficial for his case to have the government assess him.  We just didn't feel like it would be a good idea.

Q    Okay.  And if you were to present mental health evidence, would that have allowed the government an opportunity to have him independently evaluated and use independent evidence in the second stage?

A    Yes.

Q    Did that enter into your discussion with Dr. Russell as well?

A    Yes.

Q    Mr. Hilfiger, I would direct your attention -- I am going to show you another one of your time sheets.  And this would be August 29th.  Do you see that on the screen, sir?

A    Yes.

Q    Top entry shows 7:30 in the morning on August the 29th, discussed with KB jury instructions, defendants testifying and DP issues.

A    Yes.

Q    Do you have any specific recollection of that event?

A    No.

Q    All right.  And what -- having looked at that, what does that mean to you?

A    You know, we are getting ready to start the trial.  I usually like -- in all of the trials that I do, I usually will talk to the person I am representing about their ability to testify if they want to testify or they don't have to testify.  And then try to raise -- let them know of any issues that I see coming up for the trial and that's what the death penalty issues are.

Q    And did you have a discussion with Mr. Barrett about testifying either on the first or the second stage?

A    Yes, at both times.

Q    Okay.

A    I mean, at both stages.

Q    And I am not going to talk about the first stage, but later we are going to talk about the second stage, about him testifying there.  But before we do that --

        CLERK:  Mr. Wilson, for the record, can I get that exhibit number, please?

        MR. WILSON:  I believe these are Petitioner's Exhibit 72.  Thank you.  Sorry about that, thank you.

BY MR. WILSON:

Q    Showing you another document from Petitioner's 72, this would be a time record from September the 7th.  Do you see that?

A    Yes.

Q    And specifically looking at the entry dealing with

730

travel to Sallisaw, do you see that?

A    Yes.

Q    What does that indicate to us?

A    That I went to Sallisaw.

Q    And what did you do there?

A    I talked to Jolene, Ms. Crawford, Sanders, and Toby Barrett.  And then I looked at the house and -- Kenneth Barrett's house.

Q    All right.  And is this getting ready for trial, I take it?

A    Yes.

Q    When you talk to these people, are you talking to them about potential testimony or do you know?

A    A little bit of -- to let them know what is coming up and then potential testimony.  Most of them, I think, we already had some idea of what their testimony was going to be.

Q    Another document from Petitioner's Number 72.  I want to direct your attention to the entry of October the 1st.

A    Yes.

Q    Can you tell me what that means, if you know?

A    I don't -- apparently I did talk to some of Kenneth Barrett's relatives, but I don't -- but I didn't list who they were.

Q    And I take it you don't have an independent

recollection of what the topic was of that discussion?

A   No, I don't.

Q   Now, I want to move ahead in that same month to October 12th.  Do you see this entry right there?

A   Yes.

Q   It shows meet with Jeannie Russell and Norma Gay. Waited at jail, no arrival.  Do you recall that?

A   No, I don't recall it, but apparently I waited at the jail and they did not show up.

Q   Okay.  Do you know whether or not Dr. Russell had an opportunity to go back and to visit with Mr. Barrett after your August 19th meeting with her?

A   Do I know?

Q   Yes.

A   Not unless she said something about in her report, in her October...

Q   Without looking at a report, do you have any independent recollection of that?

A   No.

Q   And if I were to show you her time records in a little bit, would those time records accurately reflect the services that she performed?

A   I would assume, yes.

Q   Okay.  Same page from Petitioner's Number 72, the next entry, October the 13th.

A     Yes.

Q     The second line, 4:00 p.m.  Discussed case and mental health interviews with K.B.

A     Yes.

Q     K.B. obviously being Kenneth Barrett; correct?

A     Yes.

Q     And do you know or do you remember when it talks about discussing the case and mental health interviews with Mr. Barrett what that refers to?

A     I have no independent recollection of what it is.  I would assume that it is --

MS. FISHER:  We will object to his assumption as to what it is or what happened because he said he does not have an independent recollection.  He would not be testifying from his memory.

THE COURT:  Sustained.

BY MR. WILSON:

Q     Would this time record -- is that an accurate repre-sentation of an event which took place there in October?

A     Yes.

Q     And your description of having a meeting with Mr. Barrett about mental health issues, would that be accurate based upon your looking at this document?

A     Except it says mental health interviews.  That is sort of what throws me off.

733

Q    I am sorry, interviews.

A    Yes.

Q    Okay.  Now, you will agree with me that by October, we are in trial now?

A    Yes.

Q    We started jury qualification in September and we move on into trial and we are in trial in September and October; correct?

A    Yes.

Q    Another time sheet from Petitioner's Number 72, just to try to get a time frame in mind.  Look at the last entry on this page.

A    11-4.

Q    11-4 of 2005?

A    Yes.

Q    And that would show jury deliberations began at 9:00 a.m.; is that correct?

A    Yes.

Q    And do you know if that's -- that would be jury deliberation from the first stage; is that correct?

A    Yes.

Q    And the jury deliberated and as we know, there was a guilty verdict -- guilty verdicts; is that correct?

A    Yes.

Q    And, of course, that would necessitate a second stage;

734

right?

A    Yes.

Q    Another document from Petitioner's Number 72.  The first entry on the page, Tuesday, November the 8th, it shows a status conference with the judge to talk about the penalty phase; correct?

A    Yes.

Q    Down lower on this same page an entry of November the 12th.  Do you see that?

A    Yes.

Q    Sorry, skip back up to that to November the 10th.  Second entry deals with witness interviews.  Do you see that?

A    Yes.

Q    And those names there, do you recognize any of those names?

A    Not right off.

Q    And I am referring to right here where it says witness interviews in McKee.  Is --

A    I am sorry.  I thought you were looking at 9:00.

Q    Oh, I apologize.  We are looking at the 6:00 p.m. --

A    Right, okay.

Q    When it says "witness interviews in McKee," what is McKee?

A    (PAUSE)  You know, I don't -- I really don't know right off.  I am assuming that's a place, but I -- it doesn't ring

a bell with me.

Q    Okay.  G. Dotson, does that ring a bell?

A    Right.

Q    Who would that be?

A    That would be his mother.

Q    R. and P. Crawford?

A    That would be the aunt -- the aunt and uncle, I guess.

Q    All right.  J. Sanders?

A    Off the top of my head, I can't think of a J. Sanders.

Q    Okay.  C. Foster, does that ring a bell?

A    No.

Q    What about A. Stites?

A    That may have had something to do with the jail.

Q    Okay.  Which one, the Foster?

A    The Stites.

Q    Do you remember -- do you know who Abby Stites was?

A    That was -- okay, now that you say it was Abby Stites...the name is familiar.  I can't -- it is a relation to Kenneth's, I thought.

Q    Well, the next entry, November the 12th, witness phone interviews, Harris, S. Barrett, and C. and C. Edgemans.  Do those names ring a bell?

A    S. Barrett I think is his brother, I think.

Q    Okay.

A    C. and C. Edgemans, I think, may be neighbors.  I am

736

not sure on C. and C. Edgemans.

Q    Do you know why you would be talking to those individuals?

A    Yes.  What we are trying to do -- what Bret and I had discussed trying to do is do a risk assessment using live witnesses as opposed to opinion.

Q    And for second stage?

A    Yes.

Q    For mitigation?

A    Yes.

Q    Let's talk about that, let's talk about that strategy. Going into the trial -- and we talked earlier about not wanting to use the information from Dr. Russell because of the potential detrimental information; correct?

A    Right.

Q    So what was your plan?  What were you --

A    Well, one of the things that I recall that we discussed -- and I think we may have even discussed it with Dr. Russell also -- because he already had been in jail for a length of time and in prison for a length of time, in order to -- why do opinion on risk assessment when we can do actual evaluation of risk assessment by his jail time and prison time.  So we have, you know, those people testify.

Q    To accomplish what goal?  What is that -- what does calling somebody from the jail -- what is that going to

737

accomplish for you?

A     Well, how good a prisoner he was, how good of an inmate he was, you know, in jail.

Q     Okay.

A     And in prison.

Q     All right.  At the time that you were visiting with the family members during the representation and even before the second stage as well, did any of the family members indicate to you specifically that Mr. Barrett suffered from any serious mental illness?

A     No.

Q     Was there a discussion with -- to your knowledge, did any family members have that discussion with Mr. Smith that he shared with you?

A     Not that I know of.

Q     Okay.  Did the family report any pass significant head injuries that Mr. Barrett had sustained?

A     I cannot recall that.

Q     And would that also be true of -- to your knowledge, had they shared that information with Mr. Barrett that he shared with you?  And that was a terrible question.  Sorry.

A     But I would also say, I can't recall that Mr. Smith ever, you know, said anything about that.

Q     Are you familiar with the principle or the legal concept of lingering doubt, asking for an instruction for

lingering doubt?

A    I am not familiar with that.

Q    Okay.  Mr. Hilfiger, you have got a client who has been convicted of a death eligible crime.

A    Yes.

Q    And as a part of your defense of this individual, it is your obligation obviously to provide mitigation; correct?

A    Yes.

Q    You had a budget which allowed for the hiring of or employing of a mitigation specialist; is that right?

A    Yes, yes.

Q    And under this budget in the federal court, there was not one hired; is that correct?

A    Yes.

Q    It begs the question, Mr. Hilfiger, why not?

A    We just didn't feel like that a mitigation opinion expert would do us any good when we could -- when we used the information we had from previous reports and talked to those people and had them testify.

Q    I want to go back to the other issue regarding in the budget there was permission to hire an expert on diagnosing organic brain disorders.  You remember, we talked about that earlier.

A    Yes, yes.

Q    And there was money in the budget for that; right?

739

A    Yes.

Q    But you didn't do that; right?

A    I didn't see any need to.

Q    Why not?

A    In all of the discussions that we had, you know, Bret Smith and I with Mr. Barrett, we didn't -- and even with his family, we didn't see any need to.

Q    We talked about the decision to not call Dr. Russell; is that right?

A    Yes.

Q    I am going to direct your attention to Government's exhibit under Tab Number 33, please.  I would ask you to just take a moment.  I believe this is a four page document.  Take a moment and look at that, if you will, sir.

A    Okay.  (PAUSE)  Yes.

Q    Do you recognize this communication between you and office of the Federal Public Defender in Tulsa?

A    Yes.

Q    And what is the nature of this communication, sir? Why did you create it?

A    Because Jeannie Russell had applied for, you know, payment and we -- but we split it to explain part of it was for mitigation and part of it was for mental health.

Q    And when you say part for mitigation and part for mental health, what was the difference?  What applied to --

because you reference Dr. Horn in here.  Is that the same doctor that you and I had discussed earlier?

A    Yes.

Q    Okay.  So you did, in fact, retain her for purposes of dealing with the Dr. Horn testimony; is that right?

A    Yes.

Q    But you also retained her for purposes of potential future dangerousness or risk assessment; is that correct?

A    Right.

Q    Now, Page 3 and Page 4, would you agree with me, appears to be a statement from Dr. Russell?

A    Yes.

Q    Have you had a chance to look at that?

A    Just briefly.

Q    All right.  And it itemizes a number of services that she provided to the defense team in this particular case; is that correct?

A    Yes.

Q    I don't see an entry for August the 19th, the day of your initial meeting with her; is that right?

A    She starts with August 29th.  I don't se -- I don't see a date either.

Q    Do you know if that's accurate or if there was an additional meeting of two hours ten days after the initial meeting?

A    I can't answer that.  I don't know.

Q    All right.  Look at the second page of that, please.

A    Yes.

Q    The last entry, October the 11th...

A    Yes.

Q    It appears to be an entry for travel and also meeting with the defendant.

A    Yes.

Q    And would that be Mr. Barrett, to your knowledge?

A    Yes.

Q    And meeting with an attorney.

A    Yes.

Q    Do you know whether or not on the 11th of October you actually had an opportunity to meet with Dr. Russell or if that was Mr. Smith?

A    I don't -- I don't know.  That may have been Bret.  I don't know.

Q    Was Dr. Russell called at all in this particular case? I mean, was she called to have to testify regarding the Dr. Horn business at all?

A    No, no.

Q    And you did not call her in mitigation; correct?

A    No, we did not call her in mitigation.

Q    Okay.  Now, look at Tab Number 32, Government's Exhibit Number 32.

A    Okay.

Q    And just so that the record is clear, this is another document that you prepared; correct?

A    Yes.

Q    And it is dated February 17th of '06; is that right?

A    Yes, yes.

Q    And this is actually a letter to the court; correct?

A    Yes.

Q    Can you take a look at that and tell me what the purpose of this particular communication was, sir?

A    I am -- at this point I would say it was because -- to split up what her payments were for.

Q    Okay.  An explanation or justification for payment? Would that be a fair assessment?

A    Well, as to what category.

Q    All right.  Direct your attention to the second page of this communication.

A    Okay.

Q    And have you had a chance to read it specifically.

A    No.

Q    All right.  I would ask you to just take a moment and read that.

                              (PAUSE)

BY THE WITNESS:

A    Yes.

743

BY MR. WILSON:

Q    All right.  I want to ask you a couple of things about this last paragraph.  This is obviously a continuation from the first page talking about the service that she provided and you say, "The remaining balance of her time was spent in the area of mitigation."  And you say that she was consulted during the state trials as a mitigation expert.  And you are referring to the state trials of Mr. Barrett in Sequoyah County; correct?

A    Yes.

Q    You make the statement, "Judge Payne" -- well, I am sorry.  You say, "Dr. Russell was able to begin discussions with us with a tremendous knowledge of the particulars of this case and Kenneth Barrett."  Do you see that?

A    Yes.

Q    "Which has not been charged as any of her fees."

A    Right.

Q    And when this discussion -- this discussion that you are talking about, is this the discussion you had regarding all of the background of Mr. Barrett?

A    Yes.

Q    Talking about medical situations, mental health situations, all of those things in the risk assessment report?

A    In the original report, which was not done for us.

744

Q    Right.  The 2003 report?

A    Right.

Q    Now, you say she was also familiar with the Department of Corrections and information like that, but then you say Judge Payne put limitations on mitigation testimony so that it would only be about Barrett's future dangerousness as a prisoner.  What do you mean by that?

A    Well, not future dangerousness to society as a whole because it would be just as to him as a prisoner.

Q    No, I am sorry, that was a terrible question.  I am referring to the Judge Payne part of it, that Judge Payne limited your use of mitigation.  Did the judge say you can't present information about Kenneth Barrett's family?

A    No, I didn't say that about his family.  I am just saying -- you would have to look at the record to see what he said for sure, but my recollection, based on this, is we don't need to make a determination as to Kenneth Barrett's future dangerousness to the society as a whole because he is going to be looked up in prison.

Q    Okay.

A    So we only need to limit it to how he would be as a prisoner.

Q    Oh, I see, okay.  I see what you are saying.  All right.  So the judge didn't say you can't talk about Mr. Barrett's social history or his educational history or is

mental health history; is that correct?

A    No, he didn't say that.

Q    But you didn't go into that information, did you?

A    No.

Q    And was that based upon your discussions with Dr. Russell?

A    Yes.

Q    Now, it goes on to say that, "Both sides discussed the use of mitigation experts and we, Dr. Russell" -- and that would mean Jeannie Russell; correct?

A    Yes.

Q    --" Bret Smith, Kenneth Barrett and myself, determined that the information assembled by Dr. Russell and the anticipated counter information from the government -- that mitigation expert would be more detrimental than advantageous to Kenneth Barrett."  Do you see that?

A    Yes.

Q    Do you recall that?  Do you recall -- is that -- do you recall that thought process?

A    Yes.

Q    And is that based upon, once again, your discussion with Dr. Russell?

A    Yes.

Q    And this letter indicates that you had a discussion with the defendant, Mr. Barrett, about your concerns; is

that correct?

A    As to the future dangerousness, yes, because we felt we could accomplish that through the testimony as to how he was as an inmate and a prisoner for the past six years.

Q    All right.  We are about to begin the second stage mitigation portion.  You've already heard evidence from the government in aggravation; is that right?

A    Yes.

Q    And you've lined up witnesses; is that correct?

A    Yes.

Q     To testify regarding this issue of his dangerousness in the future; correct?

A    Yes.

Q    Mr. Barrett had previously been convicted obviously in the state case.  Was that going to be communicated to the jury in the second stage about that -- about that previous punishment?  In other words, that he had already been punished?

A    Yes.

Q    Why did you want to let the jury know about the fact that he had just been -- that he had already been previously punished for this crime?

A    Well, because I thought it was important in this case to show that he has already been punished for it.

Q    What did you hope to accomplish in mitigation by that

particular strategy of saying ladies and gentlemen of the jury, this gentleman is already doing 30 years in the Department of Corrections?

A    Well, just the hope to get some kind of mitigation or sympathy, empathy or something from the jury that he has already been convicted of the same thing -- convicted and serving time of the same thing that they are convicting him of again.

Q    I believe there was discussion during the second stage about Mr. Barrett receiving a different or a higher classification from another inmate who was convicted -- or other inmates convicted of the same crime, that he was actually at OSP in maximum security; is that correct?

A    Yes.

Q    Why did you think it was important to tell the jury that Mr. Barrett was not in a medium security facility, but he was actually at OSP on 23 hours a day lockdown?

A    I don't think the point was that he was -- you know, to show that he was in maximum security as much as it was to show the penalty that he was serving.

Q    In other words, did it have anything to do with the fact that he had previously been punished?

A    Yes.

Q    Okay.  You earlier testified that as a part of the preparation -- I believe you did -- as preparation for the

748

second stage you had interviewed people from the jail or from DOC.

A    Yes.

Q    And when I say DOC, Department of Corrections?

A    Yes.

Q    And what was the purpose of calling someone from the jail?

A    Well, because he had been an inmate at the jail from the time of this incident until after the second trail, so that's a period of about four years, three or four years, and as to the issue of dangerousness, you know, we talked to the jailers about how -- you know, what kind of a problem was he.

Q    And for purpose of mitigation, what did you hope to attain by that particular evidence?

A    That he is not a dangerous person.

Q    That if he were to be given life, that he is not going to hurt anybody within the prison?

A    Right.

Q    Earlier you talked about the fact that -- we looked at the time records of talking to family members, neighbors; is that right?

A    Yes, yes.

Q    S. Barrett, his brother?

A    Yes.

Q    Why were -- why was S. Barrett, Steve Barrett, why was

he called, if you recall?

A    Well, he was the brother and he knew Kenneth and he was a very -- my recollection was he -- I think he was in the school system or something and, you know, he was a fine citizen and we were just trying to show that just being a Barrett is not a bad character.

Q    Okay.  And showing that Mr. Barrett is not a bad character, what did you hope, as far as mitigation, to accomplish?

A    To show that he deserved life.

Q    Now, you mentioned the neighbors, the Edgemans.  Do you remember the purpose of their testimony?

A    For some reason, I think Bret Smith was more familiar with them than I.  I really can't remember.  It seems like he was -- the Edgemans, it may have been that there was -- that he had a -- that he, Kenneth Barrett, had a mechanical ability and had taken care of some of his automobiles.  So he had things he could do, Kenneth Barrett had a life that he could do.

Q    All right.  Based upon your discussions with persons during this investigation, did you determine that about Mr. Barrett, that he had very good mechanical skills?  I mean, he could help -- he could work on cars?

A    Yes.

Q    And by calling these neighbors that he had done work

for, what did you hope to accomplish as far as mitigation?

A    To show that he has reason for a life.

Q    Earlier we talked about the fact that you had had a discussion with Mr. Barrett about testifying both at -- regarding the first stage, guilt or innocence, or --

A    Yes.

Q    And I didn't go into that.

A    Yes.

Q    But you also had a discussion with him, I believe, about testifying in the second stage; is that correct?

A    I am positive we did, yes.  I can't independently recall it, but I am almost positive we did, yes.

Q    Do you know why it -- why you would have wanted to call Mr. Barrett as a witness in the second stage?

A    Again, to show that he is a person that deserves a life.

        MR. WILSON:  Can I have just a moment, Your Honor?

        THE COURT:  Yes.

                    (PAUSE)

BY MR. WILSON:

Q    Mr. Hilfiger, again, I know we are talking about something from a number of years ago, but do you know or do you recall whether or not Mr. Barrett was -- or you thought that Mr. Barrett was going to testify in the second stage?  Do you recall that?

A     No, I don't recall that.

Q     Do you recall there being a hearing and a record made in front of the Court regarding Mr. Barrett's decision whether to or not to testify in the second stage?

A     I think there was, yes.

Q     Would looking at a transcript of that refresh your memory about that event?

A     Yes.

MR. WILSON:  May I approach, Your Honor?

THE COURT:  Yes.

MR. WILSON:  Your Honor, for the record, I will be providing counsel -- excuse me -- the witness -- it is Volume 25 of the court record beginning on Page 5126.

THE COURT:  What's the date on that transcript?

MR. WILSON:  It is dated November the 15th, 2005.

THE COURT:  Thank you.

BY THE WITNESS:

A     Yes.

BY MR. WILSON:

Q     Does that refresh your memory about the whole issue of Mr. Barrett testifying in the second stage?

A     Well, he didn't testify.

Q     Okay.  About -- do you recall whether or not there was apparently an understanding that he was going to testify at some point?

752

A    Well...and that does indicate that maybe, you know, somewhere down the line we had talked about him testifying at the second stage.

Q    But he chose not to?

A    He chose not to.

Q    And he had absolutely a constitutional right not to; is that correct?

A    Absolutely.

MR. WILSON:  May I approach and get the transcript again, Your Honor?

THE COURT:  Yes.

BY MR. WILSON:

Q    Well, as you are discussing with Mr. Barrett about him testifying, but also about the whole idea of mitigation, what was Mr. Barrett's position on what kind of evidence he wanted you to present?

A    Well, the only thing I can -- and maybe this is putting it my own words and not what he said actually, but he didn't want us to plead for his life.  And that may have been beg for his life, along that line.  He didn't necessarily say he didn't want mitigation, but he didn't want us to beg for his life.

Q    Was there ever a discussion about I would rather have death than life?

A    I wasn't --- no, I don't think he ever said anything

like that.

Q     He never said anything to you about that?

A     I can't recall anything like that.

Q     Okay.  Mr. Hilfiger, I am just about finished, but as a part of this particular litigation, the post-conviction litigation, you were -- you prepared a declaration; is that correct?

A     Yes.

Q     And in that declaration there was a discussion about Mr. Barrett's competency to assist you.  Do you recall that?

A     I remember there was, yes.

Q     Okay.  During the trial, first stage and second stage, did Mr. Barrett participate with you in the defense?

A     Yes.

Q     Did he participate with Mr. Smith?

A     Well, I would say -- I mean, the participation, the way it was set up was I sat at the head of the table, Bret sat to my left and Mr. Barrett sat to his left and he had a -- he had a notepad and paper -- I mean, paper and a pencil and was -- and did take notes, I believe.  Now, I don't know how extensive, but he did take notes.  If he had questions, you know, we saw the questions.

Q     So if he had a concern, he would interact with you about any concern he might have?

A     Yes.

Q  Did he suggest questions to you, if you recall?

A  I can't say that he really suggested questions.  I mean, this is during the trial that we are talking about, I mean the actual trial itself.  Now, most nights after the trial we talked, you know, outside the jury and everything we talked and at breaks we talked.

Q  And during any of those discussions, either during trial or after trial, again was there anything that would change your opinion as to whether or not he could rationally assist you?

A  No.

Q  Tab Number 38 of Government's exhibits, please.  Mr. Hilfiger, this is a multi-page document.  I am not asking that you read it word-for-word, but if you will just look through it, if you will, and see if you recognize what this is.

(PAUSE)

A  This appears to be notes during the trial.

Q  And when you say notes, are those your notes?

A  No.

Q  Are those Bret Smith's notes?

A  No.

Q  Would those be Mr. Barrett's notes?

A  I -- I mean, I -- I can't tell you that I recognize his handwriting, but that's what I would assume from...

MS. FISHER:  Objection, that would be an assumption, Your Honor.

THE COURT:  Sustained.

BY MR. WILSON:

Q     Mr. Hilfiger, you looked at those and you said you had a belief.  Okay?

A     Yes.

Q     Looking at the substance of the first page...

A     Yes.

Q     No, strike that.

MR. WILSON:  Your Honor, I would move for admission of Government's Number 38, the handwritten notes, based upon the testimony of Mr. Smith yesterday regarding identifying these as being the notes of Mr. Barrett.

THE COURT:  Any objection?

MS. FISHER:  Can I have one moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

MS. FISHER:  Your Honor, we will object.  They have not shown any relevance of this document to issues here. The question of competency was ruled on by the Tenth Circuit Court of Appeals.  We are not here on a competency issue. That's his only -- and that appears to be his line of questioning.  We will object on relevance.

THE COURT:  How would it be relevant if what it

shows is that he was competent at the trial?

MR. WILSON:  Well, Judge the Petitioner's expert witness, who testified here, testified that Mr. Barrett was incompetent.  He was unable to rationally assist with his witnesses.

THE COURT:  But that testimony wasn't necessarily relevant either.

MR. WILSON:  Well, but it goes to his credibility and for the accuracy of his diagnosis and his evaluation of this particular defendant.

THE COURT:  Well, for that purpose, I will admit it.

MR. WILSON:  Thank you.

MR. WILSON:  Judge, I would also --

MS. FISHER:  Your Honor, we will object.  He never showed the document itself to Dr. Woods.  Dr. Woods' opinion may have changed had he seen the documents, but until Dr. Woods has an opportunity to challenge -- to at least be confronted with the evidence that they are attempting to impeach Dr. Woods' expertise with, we will object.

THE COURT:  Well, I note your objection.

MR. WILSON:  Judge, I would also move for admission of Government's Exhibit Numbers 32 and 33, which were the letters that Mr. Hilfiger previously talked about.

MS. FISHER:  No objection, Your Honor.

THE COURT: Very well. Government's Exhibit Numbers 32 and 33 are admitted.

MR. WILSON: And I apologize, Your Honor, but if they have not been admitted, I would also move for the admission of Government's Exhibit Numbers 34 and 35.

MS. FISHER: No objection, Your Honor.

THE COURT: Very well. Those are admitted as well.

MR. WILSON: Can I have just one moment to consult with counsel?

THE COURT: Yes.

(PAUSE)

MR. WILSON: That's all I have. I would pass the witness, Your Honor. Thank you, Mr. Hilfiger.

THE COURT: Very well. Let's go ahead and take our afternoon break and be back about 3:10.

(SHORT BREAK)

COURT IN SESSION

(3:15 p.m.)

THE COURT: Ms. Fisher, you may go ahead.

MS. FISHER: Your Honor, Mr. Barrett would move to admit Government's Exhibit Numbers 19 through 23, 25, 54 through 62.

THE COURT: Any objection?

MR. WILSON: No objection, Judge.

THE COURT: Those are all admitted.

758

MS. FISHER:  Next, Your Honor, Mr. Barrett would move to admit Exhibit -- Petitioner's Exhibit Number 25, which is Myla Cain's declaration -- Myla Young.

MR. WILSON:  Your Honor, that particular declaration, as I recall, was subject to a Motion to Exclude and was previously excluded and the government would maintain its previously position on that exhibit.  That's my under-standing.

MS. FISHER:  Since that time, Your Honor, Dr. Woods has testified and relied upon Dr. Young's declaration.

THE COURT:  Well, of course, it doesn't have to be admitted for him to rely on it.

MS. FISHER:  True, but we are offering it, Your Honor.  She is unavailable, she died.  You know, she is well-regarded.  Her CV is a part of the exhibit.  She is certainly a well-known expert.

THE COURT:  Are we going to hear anything else about it or is this just in support of Dr. Woods?

MS. FISHER:  Your Honor, I do not know because we haven't heard from the government's experts yet.

THE COURT:  All right.  Well, I am going to reserve a ruling on that.  If it comes up again, we can take it up then.  If not, I probably will admit it just for purposes of supporting Dr. Woods.

MS. FISHER:  Thank you, Your Honor.  At this time,

6:09-cv-00105-RAW    Document 447    Filed in ED/OK on 06/04/17    Page 118 of 120

Your Honor, Mr. Barrett has no questions.  We will pass the witness.

THE COURT:  Well, that would mean we are done for this phase of it.  I was looking at my calendar when we were in there during the break and one of the questions that came up was whether we thought we might get the three doctors' testimony done in two days.  What do you all think about that?

MR. WILSON:  Judge, I am not real optimistic of that.

MS. FISHER:  It is unlikely, Your Honor.

THE COURT:  What did you say?

MS. FISHER:  It is unlikely.

THE COURT:  Unlikely.  Well, that's what I was thinking as well.  So I actually do have the 14th, which would be a third day consecutively, if we need it.  Does that work for everybody else?

MR. WILSON:  That's fine, Your Honor.

MS. FISHER:  Yes, sir.

THE COURT:  And if working late in two days will get it done, I will do it, but if not, we will have the other day available to finish it.

MR. WILSON:  Can Mr. Hilfiger step down now?

THE COURT:  Yes, he can.

MR. HILFIGER:  Thank you.

THE COURT:  Well, anything further we need to take up before we recess until June the 12th?

(PAUSE)

MR. FISHER:  That's all right, Your Honor.  We have proffers to make, but we will do it electronically.

THE COURT:  Okay.  I am going to go ahead and admit Exhibit Number 25 for the purpose I said, --

MS. FISHER:  Thank you, Your Honor.

THE COURT:  -- since it doesn't look like we will be coming back to it today anyway.

All right.  If nothing further then, we are in recess until June the 12th.

MR. WILSON:  Thank you, Your Honor.

(PAUSE)

THE COURT:  Are you all -- you all are aware that we have got a minute order regarding those files that -- from Jack Gordon?

MR. SCHARDL:  Yes, April 21st?

THE COURT:  Is that -- that's not too soon, is it?

MR. SCHARDL:  Well, we haven't looked at them.  So provisionally, I will say we will devote every --

THE COURT:  I bet it is more like this than this.  Wouldn't you?

MR. SCHARDL:  I sure hope so.

THE COURT:  Okay, great.  Thank you.

(RECEESSED UNTIL JUNE 12, 2017)

"I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter."

                         s/Karla S. McWhorter

                         _____

                         KARLA S. McWHORTER


                         June 3, 2017

                         _____

                         DATE

762