IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                   )
            Plaintiff,             )
                                   )
-vs-                               )   No. CIV-09-105-JHP
                                   )
UNITED STATES OF AMERICA,          )
                                   )        VOLUME V
            Defendants.            )

TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE STEVEN P. SHREDER

UNITED STATES MAGISTRATE JUDGE

JUNE 12, 2017

A P P E A R A N C E S

        David B. Autry, Attorney at Law, 1021 N.W. 16th
Street, Oklahoma City, Oklahoma, 73106, and
        Joan M. Fisher and Tivon Schardl, Federal Public
Defenders, 801 I Street, Third Floor, Sacramento, California,
95814, attorneys on behalf of the Plaintiff;

        Christopher J. Wilson, Assistant U.S. Attorney, 520
Denison Avenue, Muskogee, Oklahoma, 74401, and
        Jeffrey B. Kahan, Attorney, U.S. Department of
Justice, 1331 F Street N.W., Room 345, Washington, D.C., 20530,
attorneys on behalf of the Defendant.

REPORTED BY:       BRIAN P. NEIL, RMR-CRR
                   United States Court Reporter

I N D E X

WITNESSES

PAGE

JEANNE RUSSELL, PH.D.

  Direct Examination by Mr. Autry                765
  Cross-Examination by Mr. Kahan                 793
  Redirect Examination by Mr. Autry              808


J. RANDALL PRICE, PH.D.

  Direct Examination by Mr. Wilson               812
  Cross-Examination by Mr. Schardl               896
  Redirect Examination by Mr. Wilson             927
  Recross-Examination by Mr. Schardl             936

Monday, June 12, 2017

* * * * *

THE COURT:  Morning, everybody.  Call Case No. CIV-09-105-JHP, Kenneth Eugene Barrett v. United States of America.  Would the attorneys enter their appearances for the record, please.

MR. WILSON:  Christopher Wilson and Jeffrey Kahan for the United States of America.

MR. AUTRY:  David Autry and Tivon Schardl and Joan Fisher for the defendant, Your Honor, and we apologize for the delay.

THE COURT:  Very well.  Are you ready to proceed?

MR. AUTRY:  Yes, Your Honor.

THE COURT:  Call your witness then.

MR. AUTRY:  Dr. Jeanne Russell.

JEANNE RUSSELL, PH.D.,

after having been first duly sworn, says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION

BY MR. AUTRY:

Q.   Could you state your name for the court, please, ma'am?

A.   Yes.  It's Anita Jeanne Russell.

Q.   And where do you live?

A.   Where do I live?

Q.   Yes, ma'am.

A.    In Tulsa, Oklahoma.

Q.    And what do you do for a living?

A.    I am a licensed psychologist in private practice.

Q.    And could you tell the court a little bit about your educational background?

A.    Yes.  I went to undergraduate school at Northeastern State University.  At that time it was a college, not a university.

Q.    Okay.

A.    I moved on to University of Tulsa, where I completed my master's and my doctorate in psychology.

Q.    Okay.  And how long have you been practicing as a psychologist?

A.    I was licensed in 1991 so I've been practicing since then.

Q.    Are you currently in private practice?

A.    Yes.

Q.    And before you were in private practice, what other kind of jobs did you do as a psychologist?

A.    Well, not as a psychologist, but I started with Department of Corrections in probation and parole and did work for the court there conducting presentence investigations and evaluating people charged with crimes and supervising them. Then I went on to become a supervisor of other probation officers and then moved on into administration of a work

release center there as assistant superintendent.

Q.    Okay.  Do you conduct psychological testing as part of your job?

A.    Yes.  I have since going on to work at Eastern State Hospital, which is now the Oklahoma Forensic Center, in 1990.

Q.    Okay.  Do you do forensic work in your profession or in your job?

A.    Yes.

Q.    Have you ever been involved in a -- preceding this case or aside from this case, have you been involved in death-penalty cases where you've examined people?

A.    Yes, I have.

Q.    Approximately how many?

A.    I don't know the number.  It has been numerous death-penalty cases while I was working at the Oklahoma Forensic Center and Eastern State Hospital, and since I went into private practice I have probably completed 20 to 25.

Q.    All right.  Have you been recognized as an expert witness in the field of psychology in the state courts?

A.    Yes, I have.

Q.    Approximately how many times; do you know?

A.    I don't.  In excess of a hundred.

Q.    All right.  Have you ever testified in federal court before?

A.    No.

Q.    Okay.  Do you know what, in connection with a death-penalty case, a mitigation investigator is?

A.    Yes, I do.

Q.    And what does -- based on your experience in death-penalty cases, what does a mitigation investigator do?

A.    Well, as I understand it, the mitigation expert is actually an advocate and works on the defense team and gathers information for them regarding all aspects of the defendant's life such as family, school history, criminal history, interviews people, finds all that he -- he or she can find about them, and then provides that information to the attorneys.

Q.    All right.  And does that include gathering records such as mental health records, school records, employment records and that kind of thing?

A.    Yes.

Q.    Talking to family members about the defendant, things of that nature?

A.    Yes.  My experience is all that they can find in those areas.

Q.    Okay.  In your experience with death-penalty cases, how soon should a mitigation investigator begin work on a case?

A.    Well, in my experience, they usually are assigned right after the attorneys are assigned and begin work at that time.

Q.    Okay.  Are you a mitigation investigator?

A.    No.

Q.    Have you ever in any case worked as a mitigation investigator for a defendant in a capital case?

A.    No.  Not in any type of case.

Q.    Did you serve as a mitigation investigator in Mr. Barrett's state case?

(Discussion held off the record)

Q.    (BY MR. AUTRY)  Did you serve as a mitigation investigator in Mr. Barrett's state case?

A.    No.

Q.    Did you serve as a mitigation investigator in Mr. Barrett's federal case?

A.    No.

Q.    Okay.  Do you know Kenneth Barrett?

A.    Yes.

Q.    In what capacity do you know him?

A.    I have met him on at least two occasions when I was asked to conduct a risk assessment for the state back in -- I interviewed him -- back in November of 2003 I first interviewed him.

Q.    And was that in connection with his state murder case?

A.    Yes, it was.

Q.    And who hired you to do that?

A.    The defense attorney, John "Echoes."

Q.    John Echols?

770

A.    Echols.

Q.    Do you know Mr. Echols pretty well?

A.    I know him, yes.

Q.    Do you know about what his experience is or the extent of his experience in capital cases?

MR. KAHAN:  Objection as to hearsay and relevance.

THE COURT:  Overruled.

A.    Yes.  He has extensive experience in capital and all criminal cases that I know of.

Q.    (BY MR. AUTRY)  Okay.  Have you worked on capital cases with him on more than one occasion?

A.    I don't recall.

Q.    But you're familiar with the kind of work he does and his reputation --

A.    Yes.

Q.    -- as a lawyer?

Okay.  And when you were asked to do a risk assessment in the state case, was that the limits of what you were asked to do?

A.    Yes.

Q.    Okay.  What is a risk assessment?

A.    Well, a risk assessment involves determining in what situations or in what context a person will be dangerous, if you know.

Q.    Okay.

A.    It is based -- you look at background records, criminal records are important, you conduct testing -- or some testing if it's available, and you combine that and complete your assessment.

Q.    Okay.  And you did that for Mr. Barrett in the state case?

A.    Yes.

Q.    Okay.  Were you ever asked in the state case to do any kind of neuropsychological testing of Mr. Barrett?

A.    No.

Q.    Are you a neuropsychologist?

A.    No, I'm not.

Q.    Do you know what a neuropsychologist does?

A.    Yes.

Q.    Could you briefly explain to the court what they do?

A.    Well, in addition to being a psychologist and having skills in that area, they also study the brain in terms of conducting testing and then evaluating that testing to determine if there might be brain damage or problems in that area.

Q.    All right.  And do neuropsychologists, to your knowledge, as a psychologist, do they run various tests or perform various tests to see what a person's neuropsychological functioning is?

A.    Yes.  Primarily cognitive testing.

Q.    All right.  And have you ever worked with

neuropsychologists or in association with neuropsychologists in a case, in a criminal case?

A.    Yes.  I'm currently working with one right now.

Q.    All right.  And let's see.  Are they supposed to do complete testing or complete neuropsychological testing when they examine somebody?

A.    Yes.  Basically, that's what they do, they -- they go through a number of tests to determine if they see indicators of brain damage.

Q.    Okay.  And if they don't do adequate testing, is that a problem?

A.    I think it -- it could be.  There's other ways to determine if you have brain damage, such as MRI's or CT scans, but we count on the neuropsychologists initially to do -- to do the testing.

Q.    Okay.  Now, would it be fair to say that since your participation in Mr. Barrett's state case was limited to doing a risk assessment, would it be fair to say that you did not do a comprehensive mental health examination of Mr. Barrett?

A.    That's correct.

Q.    Okay.  Did you write a report in the state case of your risk assessment or what your findings were on your risk assessment?

A.    Yes, I did.

Q.    And who did you give that report to?

A.    To Mr. Echols.

Q.    Did you testify at either of Mr. Barrett's state trials?

A.    No.

Q.    Why is that?

A.    The testing was done -- the evaluation was done for second stage so -- in a murder case, you have first and second stage, and since he was not found guilty of murder in the first stage, then the second stage was not relevant.

Q.    But during the state case, did you consult with Mr. Echols and Mr. Gordon who were Mr. Barrett's lawyers?

A.    Yes, I did.

Q.    Would you have been prepared to testify in the penalty phase of Mr. Barrett's state case had it gone to a penalty phase?

A.    Yes.

Q.    Now, at some point, Dr. Russell, did you come to learn that Mr. Barrett in approximately 2004 was charged in federal court with offenses arising out of the same incident that he was charged with in the state courts?

A.    Yes.

Q.    Okay.  And did you ever have any contact during the federal case with either -- I'm sorry.

A.    I'm sorry.

Q.    Need a drink?

A.    I have a very dry mouth.

Q.    I need one too.

(Discussion held off the record)

Q.    (BY MR. AUTRY)  Did you ever have any contact with either Bret Smith or Roger Hilfiger, Mr. Barrett's lawyers, in this federal case?

A.    Yes, I did.

Q.    And do you recall when that was, that you first heard from either one of them?

A.    I believe it was in August of 2005.

Q.    Mid August, early August, or late August?

A.    I think it was around mid August.

Q.    And who was it that contacted you?

A.    Mr. Smith.

Q.    How did he contact you?

A.    By telephone.

Q.    Okay.  Before approximately mid August of 2005, had you been contacted by either Mr. Smith or Mr. Hilfiger?

A.    Not that I recall.

Q.    Okay.  Did you come to understand how far away the trial was from beginning to start, the federal trial, when Mr. Smith first contacted you in mid August of 2005?

A.    He said they were very limited with the amount of time that they had, so I think it was starting in September.

Q.    Okay.  When Mr. Smith contacted you in August of 2005, what did he ask of you?

A.    Well, he asked me if I could do the risk assessment, since I had already done work in that -- on this case, if I could do additional work.  So I told him I could update the risk assessment if there was anything new.  And then we talked about Mr. Horn's testimony and I said -- that was in first stage -- and I said that I was familiar with evidence of that nature but I would need to do some research and complete questions for Mr. Horn.

Q.    Okay.  Did Mr. Smith ask you to serve as the mitigation investigator for Mr. Barrett in this federal case?

A.    No.

Q.    He didn't ask you to serve as a mitigation investigator?

A.    Not that I recall.

Q.    Okay.

      MR. AUTRY:  Could I approach the witness, Your Honor?

      THE COURT:  Yes.

Q.    (BY MR. AUTRY)  Before I do that, Dr. Russell, back in 2009, did you sign a declaration as to what you'd done in the state case and what your contact with the defense lawyers in the federal case was?

A.    Yes.

      MR. AUTRY:  Could I approach, Your Honor?

      THE COURT:  You may.  Is that the declaration you're bringing her?

MR. AUTRY:  Yes, sir.

THE COURT:  Has that already been admitted --

MR. AUTRY:  It's in the record.  I mean, it was admitted into the record --

THE COURT:  Okay.

MR. AUTRY:  -- with respect to the 2255 filing.  We have separate ones we can introduce as exhibits, if the court wants us to do that.

THE COURT:  Well, let's just see where it goes.

MR. AUTRY:  Okay.

Q.   (BY MR. AUTRY)  Dr. Russell, let me show you this document here.  Do you recognize what that is?

A.   Yes.

Q.   All right.  Now, what is it?

A.   That is a declaration regarding my experience and involvement in Mr. Barrett's case.

Q.   Okay.  If you could go over to page -- I guess that would be page 2 -- could you read silently to yourself this paragraph at the bottom of page 2 of the declaration?

A.   (Witness complies).

Q.   Have you read that, ma'am?

A.   Yes.

Q.   Okay.  Does that refresh your recollection as to whether or not Mr. Smith asked you to be the mitigation investigator in the federal case when he contacted you in mid August of 2005?

A.    It does.

Q.    Okay.

A.    It indicates that he asked me to do that and that I was unable to do that.  I have to admit that at the time I thought he was asking me to do mitigation --

Q.    Okay.

A.    -- in terms of the risk assessment.

Q.    All right.  What did you tell Mr. Smith with respect to whether or not you could serve as a mitigation investigator or do anything beyond updating your risk assessment and helping maybe with the cross-examination of Dr. Horn in the first stage?

A.    What I told him was that I could update the risk assessment, although there probably wouldn't be any changes other than his behavior in prison or in jail, and that I could review Mr. Horn's testimony and conduct research and provide questions for Mr. Horn for the future trial.

Q.    Okay.  And just to make it clear on the record, what was the nature of Mr. Horn -- or Dr. Horn's testimony or what was he doing in the case?

A.    As I recall, he interviewed the highway patrol and then provided information regarding what they had told him.

Q.    Okay.  When Mr. Smith asked you about being a mitigation investigator or performing that task, did you feel there was enough time to do that before the federal trial was going to

start?

A.    Well, once again, I don't think I fully understood what he was asking in terms of an investigation.  I did not feel there was time to do a full psychological and --

Q.    Okay.

A.    -- other types of mental health evaluations in the month that we had, but I did feel there was time that I could update my risk assessment.

Q.    Okay.  Did you interview any witnesses in the federal case?

A.    I talked with a couple of the guards or officers, correctional officers, at -- I believe it was at Lexington.

Q.    Okay.

A.    I have that in my notes.

Q.    All right.

A.    And he was also in another prison and questioned them regarding his behavior during his incarceration.

Q.    Okay.  Did you interview any other witnesses?

A.    Not that I recall.

Q.    Okay.  Now, when you talked on the phone with Mr. Smith in mid August of 2005, did you later meet with him in person?

A.    Yes, I did.

Q.    Okay.  Did he ask you for a copy of the risk assessment that you had done for the state case back in 2003?

A.    I don't recall him asking for one but he may have.

Q.    He may have.  Okay.  Did you get an impression one way or another whether he had seen the risk assessment you had done for the state case in 2003 at the time he contacted you in mid August of 2005?

A.    I got the impression he was certainly aware of it.  I don't know how.

Q.    Okay.

MR. AUTRY:  Could I approach the witness, Your Honor?

THE COURT:  Yes.

Q.    (BY MR. AUTRY)  Doctor, let me show you from that same document you looked at previously, this declaration.  Could you read the first couple of sentences on page 3, the first full paragraph?

A.    Out loud?

Q.    Just to yourself.

A.    Yes.

Q.    Okay.

A.    According to my declaration, which has been several years ago, I did -- he did ask me for a copy and I did inform him I could not do a new risk assessment but could update the old one.

Q.    Okay.

MR. KAHAN:  Your Honor, I'd strike that as hearsay.

THE COURT:  What was the question again?

MR. AUTRY:  As to whether or not Mr. Smith asked her in mid August of 2005 for a copy of the risk assessment she did in 2003 in connection with the state case.

THE COURT:  Overruled.

Q.    (BY MR. AUTRY)  Did he ask you for a copy?

A.    According to my declaration at that time, yes, he did.

Q.    Now, I understand, Doctor, that there's been many years that have passed during the time litigation in this case has been going on.  Would your memory have been better in 2009 when you did this declaration in connection with Mr. Barrett's federal postconviction application than it is now in 2017?

A.    I certainly hope so.

Q.    Was your declaration accurate when you submitted it in 2009?

MR. KAHAN:  Objection.  The witness just stated she couldn't remember.

THE COURT:  That is what she testified to.

MR. AUTRY:  All right.  Thank you, Your Honor.

Q.    (BY MR. AUTRY)  Did Mr. Smith ever write you a letter around August or September of 2005 about the work they wanted you to do in this federal case?

A.    If he did, I do not have a copy of that letter.

Q.    Okay.  After your initial meeting with Mr. Smith or your initial conversations with him, did you have any contact with Mr. Hilfiger?

781

A.    I think I had contact with both of them very minimally during that time.

Q.    Do you recall what the nature of your contacts were with them, the minimal contacts you had with them?

A.    It was primarily an update on the court dates and when I would be needed.

Q.    Okay.

A.    And then we talked about Mr. Horn quite a bit.

Q.    All right.  In between updating the risk assessment you did for the state case and the work you did in helping them prepare for cross-examining Dr. Horn, how much time was spent on each if you had to put a percentage on it, if you recall?

A.    On both the 2003 and the 2005?

Q.    Well, no.  In 2005, when you were doing the updated risk assessment, you obviously spent time on that; right?

A.    I -- I spent some time just asking -- or checking the -- an update on if he had been in trouble --

Q.    Okay.

A.    -- since this time.  The rest of the risk assessment would not have changed because it was historical and he had been in prison since then.

Q.    Did you spend an equal or greater amount of time when you assisted the lawyers in the federal case on helping them cross-examine Dr. Horn as you did in updating the risk assessment?

A.    I did not spend time on Mr. Horn in the state case.

Q.    In the federal case because he only testified in federal court.

A.    In the federal case, I spent a lot of time because I did need to read the transcripts and I had to research it, and then I wrote questions for the attorneys that I thought were important to be brought out in the trial.

Q.    All right.  Would it be fair to say that the only things you did on the federal case were, one, update the risk assessment; and two, help prepare them to cross-examine Dr. Horn?

A.    Yes.  That's all I recall.

Q.    I might have asked you this before but I've forgotten already:  Did you act as a mitigation investigator in the federal case for Mr. Hilfiger or Mr. Smith?

A.    I've never been a mitigation specialist.

Q.    Okay.  Did Mr. Smith ever discuss with you why you were approved to do some limited work in the federal case by the court, why the court approved you to do that?

A.    Yes.  As I understood it, the court had provided limited funds for the case for experts, and since I already knew or had done testing and interviewed people for my risk assessment, that I would not have to do that again so it would take less time for me to do that.

Q.    Did Mr. Smith ever discuss with you any limitations that

had been placed on the defense with respect to --

MR. KAHAN:  Objection as to hearsay.

THE COURT:  Sustained.

MR. AUTRY:  Okay.  Could I make an offer of proof?

THE COURT:  Yes.

MR. AUTRY:  Your Honor, my question was going to be whether or not Mr. Smith ever told Dr. Russell about limitations that had been placed on the defense with respect to any mitigation investigator or investigation.  If she were allowed to answer, Dr. Russell would testify that Mr. Smith told her that even if there were time to do so, and even if she were qualified to be a mitigation investigator, the court would not approve funding for a comprehensive mental -- or excuse me -- a comprehensive mitigation investigation.

So that's our offer of proof with respect to that question.

THE COURT:  Very well.  I'll accept your offer but the objection's sustained.

MR. AUTRY:  Thank you, Your Honor.

Q.   (BY MR. AUTRY)  Now, Dr. Russell, based on the work that you did in Mr. Barrett's state case, did you have materials and investigative reports and things of that nature that you could review on Mr. Barrett's background and upbringing?

A.   Yes, I did.

Q.   Okay.  And what did those documents and interviews show

with respect to Mr. Barrett's upbringing, how he was raised?

A.    Well, based on my interview with him and the documents that I reviewed or just the documents reviewed?

Q.    All of it.

A.    Basically, he was raised by his mother after his mother and father divorced, and she both drank and used drugs and had little time to observe what he was doing or pay attention to him while he was growing up.  He never ran away because no one would notice was his statement.  It seemed to appear in other documents or other mental health evaluations that he was basically neglected a lot growing up.

Q.    Okay.  There were drug and alcohol problems in the family?

A.    There were drug and alcohol problems.  And he told me that his mother would get him to do drugs and alcohol with him and then the next day would get mad at him because he had done it.

Q.    Okay.  Was it your understanding that the marriage between Mr. Barrett's parents had been fairly tumultuous based on the records that you reviewed of interviews and things of that nature?

MR. KAHAN:  Your Honor, I'm going to object because it's not clear to me whether at this point Dr. Russell's testifying as an expert and is therefore appropriately discussing records she's read.  But this is hearsay.

MR. AUTRY:  Well, she's testifying as an expert. She's a psychologist.  She's examined Mr. Barrett.  She did a risk assessment.  She's reviewed records.  She's reviewed reports of interviews.  All of those matters can be taken into account by an expert witness in offering testimony.

MR. KAHAN:  Well --

THE COURT:  We do need to know that whatever she testifies to she relied on in issuing her risk assessment.

MR. AUTRY:  All right.

Q.    (BY MR. AUTRY)  In issuing your risk assessment -- and we're talking about the state case now, Dr. Russell --

A.    Yes.

Q.    -- did you rely on background information from his records, his mental health records, witness interviews, and witness interviews -- or excuse me -- and your interview of Mr. Barrett?  Did you rely on all of that in coming to a conclusion with respect to your risk assessment?

A.    Yes.  I relied on mental health records -- and I have a list of those in my report -- as well as interviews with jail personnel and with his attorney and his investigator at the time and reports by Roseann Schaye, who conducted a thorough background investigation, as I understood it.  I looked at Saint Francis records.  I looked -- well, I think I already said Eastern State Hospital records and Bill Willis Community Mental Health Center records.

Q.    Did you rely on all that in reaching your conclusions with respect to the risk assessment?

A.    Yes, I did.

MR. AUTRY:  Could I have just one second to consult with co-counsel, Your Honor?

THE COURT:  Yes.

(Discussion held off the record)

Q.    (BY MR. AUTRY)  Was it your understanding, Doctor, from reviewing all that stuff, all the stuff you reviewed, that Mr. Barrett -- his parents had a fairly tumultuous marriage?

A.    Yes.  They divorced because they did not get along and because he -- as I understood what was told to me, that his father was involved with other women.

Q.    Okay.  Do you know whether or not the federal attorneys, Mr. Smith or Mr. Hilfiger, had access to all of those materials that you reviewed, including the reports that were done of the interviews conducted by Roseann Schaye?

A.    I don't know.

Q.    Okay.  Did you summarize some of the information that you gleaned from reviewing Mr. Barrett's medical records and the interview witness reports of Roseann Schaye in your risk assessment report that you gave to the lawyers in the state case?

A.    Yes.

Q.    Did Mr. Hilfiger or Mr. Smith ever ask you about any of

that background information or ask you about the reports that Ms. Schaye had done?

A.    Not that I recall, no.

Q.    Do you know if they ever followed up on any of that information that was included in your risk assessment that talked about Mr. Barrett's mental health history, his upbringing, and his background?

A.    I don't know.

Q.    Okay.  Do you know who Dr. Bill Sharp is?

A.    Yes.

Q.    Who is he?

A.    He's a psychologist in Norman, Oklahoma.

Q.    Okay.  Did he do any work on Mr. Barrett's state case?

A.    He completed -- yes.  He completed a psychological evaluation.

Q.    Okay.  And did he make certain findings about Mr. Barrett?

A.    Yes, he did.

Q.    Do you recall him talking about Mr. Barrett's extreme paranoia?

A.    Yes.

Q.    And that, in Dr. Sharp's opinion, Mr. Barrett had avoidant and paranoid personality disorders?

A.    Yes.  It is in his report.

Q.    Okay.  And did he also indicate that there were signs of

neurological damage potentially to Mr. Barrett and that further testing was recommended?

A.    Yes, he did.

Q.    All right.  And was Dr. Sharp and his report mentioned in your risk assessment report?

A.    It wasn't mentioned.

Q.    It was or was not?

A.    It was not included in -- let me review my --

Q.    I think you're misunderstanding me and I can clear this up pretty quick.

A.    Okay.

Q.    You did not include Dr. Sharp's report in your report. All I'm asking you is whether the fact that Dr. Sharp did an evaluation of Mr. Barrett was mentioned in your risk assessment report?

A.    I would have to look.

Q.    Okay.  Do you have that with you?

A.    Yes.

Q.    Okay.

A.    I am aware that Dr. Sharp did an evaluation.

Q.    Okay.

        MR. AUTRY:  Could I approach the witness, Your Honor?

        THE COURT:  Yes.

Q.    (BY MR. AUTRY)  Dr. Russell, let me show you a copy of

789

the risk assessment you did in connection with Mr. Barrett's federal case. Could you just look at that document?

A.    Okay. I'm sorry. I thought you were referring to his state case.

Q.    No. Federal. Does that look to be the first page of the risk assessment you did in the federal case?

A.    The federal case?

Q.    It's dated --

A.    September 15th, 2005?

Q.    Yes, ma'am.

A.    Yes. That does appear to be --

Q.    Okay. And do you see this --

A.    -- the report.

Q.    Okay. On page 6, do you see a reference to Dr. Sharp?

A.    Yes. It shows that I reviewed the psychological evaluation completed by Dr. Sharp.

Q.    Okay. Were you ever asked by Mr. Smith or Mr. Hilfiger -- did they ever ask you about Dr. Sharp and what he did at the time of the state case or any report that he issued?

A.    No. Not that I recall.

Q.    Did they ever ask you for a copy of Dr. Sharp's report?

A.    Once again, I don't believe so. I don't recall them asking me for a copy.

Q.    Okay. Did they ever ask you if you had a copy of

Dr. Sharp's report?

A.    Not that I recall.

Q.    Okay.  Did your risk assessment detail the previous mental health records for Mr. Barrett that you had reviewed in compiling your risk assessment?

A.    Are you referring to the federal risk assessment?

Q.    Yes.  That you reviewed his previous mental health records; for example, from Eastern State, Bill Willis, Wagoner Hospital, things of that nature.

A.    Yes.

Q.    Did Mr. Hilfiger or Mr. Smith ever discuss Mr. Barrett's mental health history as reflected by those records with you?

A.    No.  Not that I recall.

Q.    Do you know if they ever followed up or did any kind of investigation based on those previous mental health records?

A.    I'm not aware of any.

Q.    Okay.  Would it be correct to say, Dr. Russell, that because the only thing you did in the federal case was update your risk assessment and assist with the cross-examination of Dr. Horn, would it be fair to say that you were not a mental health expert for Mr. Barrett in the federal case?

A.    Well, I did not testify in that case.

Q.    Okay.  Did you do a comprehensive mental health evaluation of Mr. Barrett in connection with the federal case?

A.    No.  I did a risk assessment updated from my previous

risk assessment.

Q.    Okay.  So you were not a mental health expert in terms of being somebody who came in to do a comprehensive mental health evaluation; would that be correct?

MR. KAHAN:  Objection as to whether this witness would fall within the --

THE COURT:  We've pretty well covered what her role was in all that, Mr. Autry.  Let's move on.

MR. AUTRY:  All right.  I apologize, Your Honor.

Q.    (BY MR. AUTRY)  Did you ever tell, Dr. Russell, either Mr. Hilfiger or Mr. Smith not to pursue a mental health mitigation case for Mr. Barrett?  Did you ever tell them, don't do that?

A.    No.

Q.    Okay.  Did you testify in the federal case?

A.    No.

Q.    Okay.  Did you submit a bill for your work in the federal case?

A.    Yes.

Q.    Okay.  Now, based on your knowledge of capital cases and what mitigation investigators do, would a competent mitigation investigation consist solely of doing a risk assessment or updating a risk assessment?

A.    No.

Q.    Why not?

A.   Well, as I stated before, the investigator is an advocate for the defense and works with the lawyers in preparing their case and gathers information that is needed to provide a thorough mitigation.

Q.   Okay.  To your knowledge, was that kind of investigation -- that kind of mitigation investigation done for Mr. Barrett in his federal case?

A.   From reviewing the records, I am not aware of any mitigation investigation or other witnesses.

Q.   Okay.  Did you ever discuss with either Mr. Smith or Mr. Hilfiger the mitigation case they planned to put on, if it came to that, in Mr. Barrett's federal trial?

A.   No.

Q.   Did they ever ask your advice on how to investigate a mitigation case and how to put it together, anything like that?

A.   No.

          MR. AUTRY:  Can I have just a second, Your Honor?

          THE COURT:  Yes.

          MR. AUTRY:  Thank you.

               (Discussion held off the record)

Q.   (BY MR. AUTRY)  Did you ever advise either Mr. Hilfiger or Mr. Smith not to investigate Mr. Barrett's mental health further?

A.   No.

Q.   Okay.  Thank you, Doctor.

MR. AUTRY:  That's all I have.

THE COURT:  Cross-examination, Mr. Kahan.

MR. KAHAN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. KAHAN:

Q.    Morning, Dr. Russell.

A.    Good morning.

Q.    Now, Dr. Russell, you've testified here today that you performed a risk assessment on Mr. Barrett at the behest of John Echols; is that correct?

A.    Yes.

Q.    And do you recall that John Echols' co-counsel during the state trial was a man named Jack Gordon?

A.    Yes.

Q.    And do you, in fact, recall meeting with both Jack Gordon and Mr. Echols?

A.    Yes.

Q.    All right.  And it's true, isn't it, that you actually corresponded at some point with Mr. Gordon?  Is that correct?

A.    I don't recall.

MR. KAHAN:  If I could ask the clerk to please provide the witness with Government's Exhibit 63.

Q.    (BY MR. KAHAN)  Have you had a moment to review that, ma'am?

A.    I did.

Q.    Okay.  And --

A.    It apparently was a fax that I sent them where I had prepared questions I felt important that they ask in order to bring out the issues of the risk assessment and my qualifications.

Q.    Okay.  And does that appear to be a true and correct copy of the document you sent to Mr. Gordon?

A.    It looks like it, yes.

Q.    And the answers that appear in that document, those are answers that you had come up with on your own; correct?

A.    Yes.

Q.    Okay.  And as I understand it, those are answers that you were prepared to provide during testimony; is that correct?

A.    Yes.

Q.    Now, I believe in that document you note that for a risk assessment it's not necessary to meet with the defendant; is that correct?

A.    It's not necessary to what?

Q.    Meet with the defendant, to interview the defendant.

A.    You can do a risk assessment without interviewing the defendant.  It is more helpful if you can interview them.

Q.    And in this case, you've testified that you did, in fact, meet with him at least twice; correct?

A.    Yes, I did.

Q.    Okay.  Now, in terms of the information that you reviewed

-- and I believe Mr. Autry went over this -- but isn't it true that you, in fact, reviewed records from Eastern State Hospital -- what was then Eastern State Hospital?

A.   Yes, I did review their records.

Q.   And also from the Bill Willis Community Mental Health Center?

A.   Yes.

Q.   And the Wagoner Community Hospital?

A.   Yes.

Q.   And the Saint Francis Hospital?

A.   Yes.

Q.   And Mr. Autry touched on some interview reports by an investigator named Roseann Schaye.  Is that -- do you recall that?

A.   Yes.

Q.   I'd like you, if you could, in that book to look at tabs 18 through 25, and what I'd like to know is if those are among the reports that you reviewed for purposes of the risk assessment?

A.   I can honestly say I'm not sure if these are the exact records that I reviewed.  I did review her records so I assume they were but I don't know.

Q.   You don't know.  Okay.  If you could then, please turn to tab 42.  This is a report by Steve Leidy.  I'd like to know if this is a report you recall reviewing?

A.    I don't recall the report but it looks fairly accurate as far as I know.

Q.    Okay.  Well, let's -- let's move on to, if you would, Government's Exhibit 35.  Now, I believe you covered this with Mr. Autry, but is this a true and correct copy of the report you received from Dr. Sharp and reviewed for purposes of the risk assessment?

A.    Well, this is my curriculum vitae.

Q.    Well, that's embarrassing.

A.    It could be at the back of it but it's not.  Did you say 35?

Q.    I did.

            (Discussion held off the record)

A.    I have a copy of his report with me.

            MR. KAHAN:  I'm sorry.  Apologies, Your Honor.

Q.    (BY MR. KAHAN)  Exhibit 16.

A.    This does appear to be a copy of the evaluation that I reviewed.

Q.    Okay.  Now, when you corresponded with Mr. Gordon in the fax marked at 63, isn't it true that you reported to him that Mr. Barrett had a substance abuse problem but no major mental illnesses?  I direct your attention to question 24.

A.    It's in No. 63?

Q.    Yes.

A.    According to what I'm reading, the question is, "When did

you learn about his criminal record?"

Q.    I'm sorry.  Questions 24 and 25.  Question 24 asks, does it not, "You also reviewed his mental health records; is that correct?"

A.    Yes.

Q.    And your response was?

A.    Yes.

Q.    It was affirmative.  And then the next following question:  "What did you learn from these records that were important to you in conducting this assessment?"  And isn't it true that your response was, "Records consistently indicated a substance abuse problem, no major mental illness was noted"?

A.    Yes.

Q.    Okay.  Now, in 2005, you updated your risk assessment; am I correct in my understanding?

A.    Yes.

Q.    And with regard to that, you relied on Dr. Sharp's psychological evaluation again; is that correct?

A.    For the risk assessment.  I believe I included that, although I wasn't assessing his mental health at the time.

Q.    Okay.  Well, if you could bear with me, back on document 63, question 20, there is a review of documents -- there's a list of documents that you reviewed.  Is this an accurate list?

A.    Could you tell me which number we're on again?

Q.    We are in Exhibit 63, question 20.

A.    I believe that is an accurate list, yes.

Q.    And you'd agree with me that that includes a psychological evaluation by Dr. Sharp; correct?

A.    Yes.

Q.    Now, Dr. Sharp, as I understand it, in performing his evaluation administered an MMPI.  Do you recall that?

A.    I believe so.

Q.    And, in fact, if you would go to Exhibit 35.  And I know that I have taken you there erroneously before but this time I really mean it.

A.    Yes.

Q.    Do you recognize this document?

A.    That is my curriculum vitae.

Q.    Okay.  And if you were to continue back into the pages, would you agree with me that, in addition to your curriculum vitae, there is also a copy of the report you authored for Mr. Smith and Mr. Hilfiger regarding the updated risk assessment?

A.    Yes.

Q.    Okay.  Is that a true and correct copy of that document?

A.    Yes.

Q.    And at the bottom of the pages, you'll see page numbers.  If you were to flip over to page 823 -- 8235 --

A.    Yes.

Q.    -- you'd agree with me that again the MMPI is listed --

and that's Minnesota Multiphasic Personality Inventory -- is listed as one of the documents you reviewed?

A.    Yes.

Q.    Now, in your report, isn't it true that you observed that Mr. Barrett's mood was normal?

A.    I believe so, yes.

Q.    Okay.  And did you also observe that his affect was congruent with his mood?

A.    Let me get to that page.  You're referring to the mental status exam?

Q.    Yes, ma'am.

A.    I wrote that he did not appear anxious or depressed, his mood was euthymic, which is normal; and his affect, which is the expressed emotion at that time, was congruent with his mood.

Q.    And you further noted that Mr. Barrett did not express any delusional beliefs during your time with him?

A.    Yes.

Q.    And this is based on the interview you conducted for the 2003 report; is that correct?

A.    Yes.  For just that period of time when I was observing him.

Q.    And isn't it true that you did not observe that Mr. Barrett was exhibiting any symptoms of a major mental illness?

A.    Not when I saw him, that is true.

Q.    And would you agree with me that bipolar disorder is a major mental illness?

A.    Yes.

Q.    Isn't it true that Dr. Sharp as well did not observe a major mental illness?

A.    In his mental status?  Are you referring to that?

Q.    In Dr. Sharp's report.

A.    He provided diagnostic impressions that did not include a major mental disorder but personality disorders and drug problems and a learning disorder.  He also observed organic impairment.

Q.    Do you agree with me that in your report at pages 8240 to 8241, you wrote that neither Dr. Sharp's assessment or the previous risk assessment found symptoms of a major mental illness, and you go on to list schizophrenia, schizoaffective disorder, bipolar disorder, and major depression?

A.    I have no idea what you're referring to right now.  Which report?

Q.    This is your 2005 report, Exhibit 35.

A.    Okay.  I'm sorry.  It's a long report.  Do you have a page?

Q.    It's at the bottom of page 8240.

A.    I wrote, "Neither Dr. Sharp's assessment nor the previous risk assessment found symptoms of a major mental illness, such

as schizophrenia or schizoaffective disorder or bipolar or major depression, at the time of his assessment."

Q.    Okay.

A.    Is that what you were asking?

Q.    Yes.  So we agree that you did write that in the 2005 report?

A.    Yes, I did.

Q.    All right.  Now I'm going to make you flip again.  I'm going to try and keep you up with me.  We're going back to 63.

A.    Okay.

Q.    All right.  Now, at question 30 -- and let me be clear about this.  I think you said that you wrote both the questions and the answers; am I correct in that?

A.    Yes.  I wrote the questions I wanted him to ask me and then what my responses would be.

Q.    Okay.  And you'd agree with me that you informed him that you had administered a PCL-R test, an HCR-20 test, and had reviewed the results of an MMPI-2; is that correct?

A.    Yes.

Q.    Now, with regard to the PCL-R, am I correct in my understanding that is a test that is sometimes referred to as the Hare Psychopathy Checklist?

MR. AUTRY:  Objection; outside the scope of direct. We didn't go into any of her testing with the PCL or use of the PCL-R or anything else.

MR. KAHAN: Well, Your Honor, I would answer that Mr. Autry represented that she was here testifying as an expert and by that means was able to introduce hearsay through her and is now backing away from that. If that's his position, then we would just simply ask to strike all the hearsay responses.

MR. AUTRY: And that's fine, he can strike the hearsay. She's offered as an expert to the extent that an expert can testify about what they reviewed in forming an opinion or doing an analysis. The point of the examination on direct was you had all these materials about Mr. Barrett's background, upbringing, things of that nature. Did Mr. Smith and Mr. Hilfiger ever ask you about any of that or pursue any of that? But if the court wants to strike all the hearsay, that's fine.

THE COURT: No, I'm not going to strike any hearsay. The objection is overruled. Go ahead.

MR. KAHAN: Thank you, Your Honor.

MR. AUTRY: Thank you.

Q.    (BY MR. KAHAN)  Now, in your administration of the PCL-R, what score did you come to? What score did you evaluate Mr. --

A.    His overall score was a 14.1 percentile rank.

Q.    Okay. And that is a relatively low score, is it not?

A.    It is not considered real low. It's kind of right in the middle.

Q.    Now, your administration of the Hare was based on

semi-structured interview; is that correct?

A.    It was based on the background information that I had an interview with him --

MR. AUTRY:  Your Honor, we're going to object again on the same basis, going into the details of all this.  We didn't touch on any of that in direct.

THE COURT:  Overruled.

MR. AUTRY:  Thank you.

A.    -- his criminal history, and I can go through each of the components of the Hare Psychopathy Checklist.

Q.    (BY MR. KAHAN)  Well, in that regard, if I could now ask you to look at Government's Exhibit 64.

THE COURT:  Have we admitted 63?

MR. KAHAN:  No.  And, Your Honor, I would move to move that into evidence.

THE COURT:  Any objection?

MR. AUTRY:  Only to relevance, Your Honor.  Otherwise, we don't have an objection.

THE COURT:  Government's 63 is admitted.

A.    Yes.

Q.    (BY MR. KAHAN)  Do you recognize that document, ma'am?

A.    Yes.

Q.    All right.  And what is that?

A.    Those are notes I wrote on the back of the PCL-R.

Q.    Okay.  You'd agree with me this is the -- these are your

notes from your PCL-R administration to Mr. Barrett; is that correct?

A.    Yes.

Q.    Now, in looking through that, if you were to flip to questions 99 and 100, would you agree with me those are blank?

A.    Ninety-nine and 100 are blank.

MR. AUTRY:  Your Honor, I'm going to object again because he's attacking the validity -- or trying to attack the validity of a PCL-R test or the raw data going into the test that we haven't even offered and don't intend to offer as evidence, nor did we ask Dr. Russell about any of this on direct.

MR. KAHAN:  Well, Your Honor, I -- we believe the administration of this test and some of Dr. Russell's other results go to bias and ultimately to credibility.  For that reason, we'd ask to explore this.

MR. AUTRY:  I don't see how it goes -- sorry, Your Honor.  I don't see how it goes to bias or credibility as to anything we asked her about her contacts with Mr. Hilfiger or Mr. Smith, which was the thrust and the basis of the direct examination, not all this other stuff.

THE COURT:  Yeah, the objection's sustained.  Let's move on.

MR. KAHAN:  Thank you, Your Honor.

Q.    (BY MR. KAHAN)  Going back to Exhibit 63 then, you asked

Mr. Gordon to ask you to describe the experience, tests, interviews, and documents reviewed and then the results; is that correct?

A.   What was the number of the question?

Q.   That is question 31, the last question.

A.   Describe each test and the results, referring to the PCL-R, the HCR-20, and I had reviewed the MMPI-2 results but I did not administer that test.

Q.   Okay.  And you'd agree with me that in your proposed responses to Mr. Gordon, you did provide a response regarding the PCL-R on the next following page?

A.   Yes, yes.

Q.   And also for the HCR-20?

A.   Yes.

Q.   Okay.  But not for the MMPI?

A.   No.  I did not administer that.

Q.   Okay.  Isn't it true, however, that in Dr. Sharp's MMPI findings he found a supplementary scale elevated to a statistically significant degree regarding any social attitude?

MR. AUTRY:  That's an objection, Your Honor, we've made before to this line of questioning.  It's just irrelevant and a waste of time, got nothing to do with the questions she testified to on direct.

THE COURT:  What is the relevance of Dr. Sharp's findings in this regard?

MR. KAHAN:  The relevance, Your Honor, we believe is that Dr. Sharp omitted certain testing results that would have run counter to her ultimate findings in this case and goes again to her bias and credibility.

MR. AUTRY:  We haven't even asked her about what her ultimate findings in the case were.  The thrust of the direct examination was her contact and the extent of it with Mr. Hilfiger and Mr. Smith.

MR. KAHAN:  Well, then, again, Your Honor, I would say she's not testified here as an expert and that any hearsay that's come in through her should be stricken.

MR. AUTRY:  That's fine.

THE COURT:  Well, it's up to you guys.  Do you want me to strike all the hearsay testimony and you'll be done?  Is that right?

MR. AUTRY:  That's fine.

THE COURT:  I mean, if she's just a fact witness, that would be fine.

MR. KAHAN:  All right.  May I have just a moment to look for --

THE COURT:  Yes, yes.

MR. KAHAN:  I'll move on then, Your Honor.

THE COURT:  Okay.  Go ahead.

Q.   (BY MR. KAHAN)  You testified on direct that you ultimately did not testify in the federal trial; correct?

A.    Correct.

Q.    And didn't you advise Mr. Smith and Mr. Hilfiger that your testimony would result in rebuttal evidence by Dr. Price?

A.    No, I did not.

Q.    Were you familiar with Dr. Price?

A.    Yes.  I have reviewed his reports.

Q.    Were you then familiar with Dr. Price in 2005?

A.    I was familiar that he was a psychologist, I believe, practicing in Texas.

Q.    Okay.  And you had reviewed his reports at that time?

A.    I don't recall when I reviewed his report but I have done extensive review of his report.

Q.    Okay.

A.    I don't believe I had a copy of it at that time.

Q.    All right.  Were you then familiar with Dr. Price's professional reputation?

A.    I didn't know him and I hadn't read his reports but, as far as I knew, he was a good psychologist.

Q.    Okay.  And you were certainly aware in your conversations with Mr. Smith and Mr. Hilfiger that Dr. Price would testify if you did in the federal trial; is that correct?

A.    No.

Q.    No.  All right.

A.    They did not tell me until the day of the trial when I was driving there that they had decided not to include the

information on the risk assessment.

Q.    All right.

THE COURT:  Are we talking about the federal trial here or the state trial?

MR. KAHAN:  This is the federal trial.

THE COURT:  Okay.

MR. KAHAN:  Your Honor, at this point I pass the witness.

THE COURT:  Very well.  Redirect.

MR. AUTRY:  Very brief, Your Honor.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q.    Dr. Russell, you were asked by Mr. Kahan here about whether or not you stated in your report, and whether or not Dr. Sharp stated in his report, that based on the mental status examination of Mr. Barrett at the time you talked to him, whether he suffered from a major mental illness.  Do you remember those questions?

A.    Yes.

Q.    Okay.  Now, you did not do a comprehensive mental health assessment to determine whether or not Mr. Barrett had a major mental illness; correct?

A.    Correct.

Q.    A mental status exam is something that's done to see if somebody is oriented as to time, place, and person and can

communicate with you; correct?

A.    It is a picture of how he is responding at the current time.

Q.    Okay.  You did not rule out whether or not Mr. Barrett had a major mental illness such as bipolar; correct?

A.    No.  I did not make a diagnosis, as I recall.

Q.    Okay.  And that's because your work in this case, both as to the state case and the federal case, was to do a risk assessment; correct?

A.    Correct.

Q.    You did not do a comprehensive mental health evaluation of Mr. Barrett; true?

A.    True.

Q.    And would it be fair to say that if somebody has a major mental illness, such as just, for example, bipolar, that's something that has to be charted or observed over a period of time; correct?

A.    Yes.  It has to meet the requirements of the DSM-V now. At that time it was the DSM-IV.

Q.    Okay.

A.    I don't think it was the DSM-III, but there's a list of criteria that it has to meet for a diagnosis.

Q.    And Dr. Sharp, when he examined Mr. Barrett, he also did a limited evaluation of him and recommended that further testing be done to rule out various things; is that accurate?

A.    As far as I recall, it is.

Q.    Okay.

A.    He wanted to rule out long-term memory difficulty and organic impairment relative to a tremor on Axis III.  We no longer have axises but that was one area he wanted to rule out.

Q.    Okay.  Well, my point is, Dr. Russell, that neither you nor Dr. Sharp in your evaluations of Mr. Barrett ruled out the fact or stated definitively that he did not have a major mental illness, it was just based on your observations of him at the time; is that right?

MR. KAHAN:  I'm going to object as to hearsay to Dr. Sharp.

MR. AUTRY:  Okay.  Well, I'll just limit it to Dr. Russell then.

THE COURT:  That's fine.

Q.    (BY MR. AUTRY)  The testing you --

A.    I conducted a risk assessment.  That does not include a diagnosis nor is that included in the PCL-R --

Q.    Okay.

A.    -- to make that assessment.

Q.    Additional testing of different types would have to be done to rule in or rule out a major mental illness; true?

A.    Additional testing or a comprehensive review of his mental health history.

Q.    Okay.  And you never ruled out definitively that he had a

major mental illness, true, based on the limited work you did in this case?

A.    I did not.

Q.    Okay.  Thank you, ma'am.

THE COURT:  Anything further from Dr. Russell?

MR. KAHAN:  Nothing further, Your Honor.  Thank you.

THE COURT:  If not, Dr. Russell, you can step down.  Thank you.

THE WITNESS:  Thank you.  Sorry I was late.

THE COURT:  No.  Petitioner have another witness?

MR. AUTRY:  Your Honor, we rest our direct case of Mr. Barrett.

THE COURT:  Very well.  The defendant prepared --

MR. AUTRY:  One second, Your Honor.

MR. SCHARDL:  Well, would do.  We just would renew our objection to the court's exclusion of all the evidence that the government moved to exclude.  Strickland v. Washington and subsequent cases require the court to consider all available mitigation evidence.

At the government's request, this court has excluded numerous lay witnesses and all of Mr. Barrett's expert witnesses, save one, so the court is not conducting a prejudice analysis consistent with Strickland and its progeny.  We renew our objection to the court disallowing all of that mitigation evidence.

THE COURT:  Those are the rulings that Judge Payne's previously made?

MR. SCHARDL:  Yes, Your Honor.

MR. AUTRY:  Yes, Your Honor.

THE COURT:  Very well.  Is defendant ready to proceed?

MR. WILSON:  Yes, Your Honor.

THE COURT:  Very well.  Call your first witness.

MR. WILSON:  Call Dr. Randall Price.

MR. SCHARDL:  Your Honor, may I ask, could we take just a five-minute recess before we start with Dr. Price?

THE COURT:  Why?

MR. SCHARDL:  Call of nature, Your Honor.

THE COURT:  Very well.  We'll take a brief recess.

MR. SCHARDL:  Thank you.

(Short break)

J. RANDALL PRICE, PH.D.,

after having been first duly sworn, says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION

BY MR. WILSON:

Q.    Good morning.

A.    Good morning.

Q.    Can you state your name, please, for the record?

A.    Sure.  My name is Randall Price.

Q.    And, Mr. Price, what is your business or occupation, sir?

A.    I'm a psychologist.

Q.    And how long have you been a psychologist?

A.    Thirty-four years.

Q.    And, Dr. Price, where do you currently practice your trade?

A.    Well --

Q.    Where's your office located?

A.    My office is located in Dallas, Texas.

Q.    And are you a licensed psychologist?

A.    I am.

Q.    And can you tell the court about your education and background to become a psychologist?

A.    Sure.  I have a bachelor's degree, a master's degree, and a doctoral degree, all in psychology and all from the University of North Texas in Denton, Texas.  I did a postdoctoral internship at the Baylor Institute for Rehabilitation in Dallas.  Later, I did a postdoctoral fellowship at the University of Kentucky.  Recently, I completed a graduate certificate in veterinary forensic science.  I've been a licensed psychologist since 1983 in Texas.  I'm also licensed in the state of Oklahoma and Arkansas.

Q.    Dr. Price, I'm going to ask you some additional questions about your education and certain certifications that you have.

MR. SCHARDL:  Your Honor, if I may, the defense will stipulate that he's qualified by training and experience to offer expert opinions, not necessarily -- we're not stipulating to the admissibility of his opinions but to his qualifications to offer them.

THE COURT:  Do we need to go through it all?

MR. WILSON:  Judge, if counsel will stipulate to that -- I've got his CV and his report -- I'll just move to admit that.

THE COURT:  Any objection to the admission of his CV?

MR. SCHARDL:  Well, I've never seen it, Your Honor, so I can't say whether I would object to it or not.

THE COURT:  Well, take a look at it and see if we can --

MR. WILSON:  It's Exhibit 51, Counsel.  It's in the original exhibits from last time.

MR. SCHARDL:  That's all right.  Your Honor, there's no objection to the CV.

THE COURT:  Very well.  Government's Exhibit 53 is admitted and we'll dispense with the qualifications.

MR. WILSON:  And I'll take a deep breath.  Thank you.  Appreciate that, Counsel.

Q.   (BY MR. WILSON)  Dr. Price, it's my understanding that back in 2003 you became board-certified as a forensic

psychologist.  Is that correct?

A.    Yes, that's correct.

Q.    Okay.  And what does that entail to become board-certified in forensic psychology?

A.    Well, first, you have to have a certain number of years experience -- I don't remember if it was five or ten but I had more than that -- and then passing first an exam that was written over the field of forensic psychology and then submitting two samples of your work in cases and those had to be approved as being complete and then having an oral examination by your peers over primarily the work samples but also anything in the field of forensic psychology.

Q.    Okay.  Now, also it's my understanding based upon your CV back in 2000 -- excuse me -- in 1990, that you became board-certified in neuropsychology; is that correct?

A.    Yes, that's correct.

Q.    And what were the requirements for that certification?

A.    A certain number of years of experience.  At that time it didn't require a written exam but an oral examination by your peers over the field of neuropsychology.

Q.    Okay.  Let's talk about that for a second.  We've talked about psychology.  We've talked about neuropsychology.  We've talked about forensic psychology, okay?

In layman's terms, what's the difference between the three, if any?

MR. SCHARDL:  Your Honor, I'm going to interpose an objection at this point about Dr. Price testifying in the field of neuropsychology.  Mr. -- as I understand it, Dr. Price is a rebuttal expert.  Mr. Barrett has been barred from presenting an expert in neuropsychology.  He's asked to offer two.  The Tenth Circuit said that testimony from a neuropsychologist that was proffered was one of the most important things they considered in remanding this case but Mr. Barrett is not allowed to present neuropsychological testimony.  So we would object to the government offering rebuttal to neuropsychological testimony that we're not allowed to admit.

THE COURT:  Who was the -- who's your expert in neuropsychology that Judge Payne excluded?

MR. SCHARDL:  There were two, Your Honor.  Just for Your Honor's benefit, with the petition, the 2255 petition, Mr. Barrett submitted a report -- a declaration actually -- from a Dr. Myla Young and that was in 2009.  Dr. Young herself succumbed to a neurological condition and died in 2013.  So Mr. Barrett's counsel had her work reviewed by two neuropsychologists, one, a Deborah Miora; and the second one is a Dr. Erin Bigler.  We offered to present Dr. Young's work through these other neuropsychologists to do exactly what the government is trying to do right now with Dr. Price, to explain the difference between a neuropsychologist and a regular psychologist or forensic psychologist, and Judge Payne excluded

all evidence from Dr. Miora and Dr. Bigler.

THE COURT:  Well, Dr. Russell told us what the difference was.  So haven't we gone there already?

MR. SCHARDL:  Well, the difference.  But, again, we're objecting to the substance of any testimony from this witness because the defense -- she did not offer any opinions about his neuropsychological functioning, she offered no testimony about it, period.

THE COURT:  He didn't ask him for an opinion, just what the difference was, so I think we can go there.  But let's look ahead a little bit.

What do you say about the argument that Judge Payne has excluded neuropsychological testimony in this regard?

MR. WILSON:  Well, Judge, there was a -- there was a ruling by this court excluding the testimony of Dr. Miora and Dr. Bigler.  However, as this court sat through hours of testimony in this last set of hearings, there was extensive testimony by Dr. Woods relying upon Myla Young's testing and it was the basis of his opinion and he used it throughout his testimony about dysexecutive syndrome.  So all of that information has been presented to this court for the -- the petitioner is asking this court to consider it and I believe it's within the purview of this witness to present testimony rebuttal to that.

But also, Judge, we're here on a two-prong analysis,

whether there was a deficient performance but also whether or not there was a prejudice to that.  Counsel argues that the attorneys were deficient in not presenting mental health evidence, and it's the government's position that we look at the prejudice issue because the Tenth Circuit looked at it itself.  The Tenth Circuit said, well, if they would have presented this information, then the testimony of Dr. Price would potentially have been devastating, and it's what the government intends to do is go through that potential devastating testimony.

THE COURT:  But we have to know what they would have heard from the petitioner to know what -- to weigh it against what we're going to hear from the government, though.

MR. WILSON:  Well, we know through Dr. Woods he used all of that information from Dr. Myla Young's testing as part of his evidence and part of his opinion.

THE COURT:  Very well.

MR. SCHARDL:  May I respond to that, Your Honor?

THE COURT:  Yes.

MR. SCHARDL:  I don't mean to interrupt the court, though.

THE COURT:  Go ahead.

MR. SCHARDL:  When the government asked for an opportunity to have Mr. Barrett evaluated by Dr. Pitt, it said to this court that they needed a psychiatrist because Dr. Woods

is a psychiatrist. So the court said, very well, the defense has a psychiatrist, the government should have a psychiatrist. So the government was authorized to have Mr. Barrett evaluated by Dr. Pitt for the purpose of rebutting Dr. Woods because they're both psychiatrists.

Mr. Barrett has not had the opportunity to present a neuropsychologist, and the government represented to this court in support of the motion to have Dr. Pitt evaluate Mr. Barrett that they needed a psychiatrist to rebut a psychiatrist. Now we're having a neuropsychologist rebut the neuropsychologist who wasn't allowed to testify.

MR. WILSON: Judge, this exact argument was presented before Judge Payne and he denied this exact request.

THE COURT: All right. Well, go ahead.

MR. SCHARDL: I'm sorry.

THE COURT: No. Go ahead.

MR. SCHARDL: Just for purposes of the record, the case law, such as Ohler v. United States and Luce v. United States, those kinds of in-limine rulings must be revisited at the time of trial, at the time of this hearing, so we renew the objection.

THE COURT: Well, suppose I changed the court's mind on that and decided to let you present testimony from those two doctors, are you going to have the ability to do it?

MR. SCHARDL: Well, we just, you know, rested with

that objection having been made.

THE COURT:  I understand.

MR. SCHARDL:  We can certainly bring them at another time.  We don't have them here.  They were excluded.

THE COURT:  But, I mean, this week while we've got time blocked out for this hearing.

MR. SCHARDL:  I could not bring them from California on such short notice, Your Honor.

THE COURT:  All right.  Well, I'm going to take that under advisement but I'm going to overrule the objection for now.

MR. SCHARDL:  Thank you, Your Honor.

THE COURT:  Go ahead, Mr. Wilson.

Q.    (BY MR. WILSON)  Getting back to, I believe, my question originally, in layman's terms what's the difference between forensic psychology, neuropsychology, and psychology?

A.    Okay.  Well, first of all, psychology's a very broad field, including all kinds of experimental psychologists and applied psychologists.  The most frequent type of applied psychologist is a clinical psychologist who's involved in the diagnosis and treatment of problems, mental, emotional, behavioral problems.  That's what most people think about when they think of a psychologist.

A forensic psychologist is also involved in doing primarily evaluations to determine the presence or absence of a

mental disorder or other conditions relevant to some question before the court or in a case, and so forensic psychology could be described as clinical psychology applied to the legal system.

Neuropsychology is another subspecialty under clinical psychology that's involved in evaluation and sometimes treatment of mainly neurological problems, traumatic brain injury, strokes, tumors, and it's an assessment of potential deficits an individual might have acquired through either some illness or injury.  The deficits would mainly be in the area of cognitive or thinking but they could be also in emotions and behavior as well.  So it's a subspecialty of clinical psychology focusing on conditions that are directly involving, or known to involve, some brain issue.

Q.    All right.  And do the fields of neuropsychology and forensic psychology sometimes overlap?

A.    Yes.

Q.    And if it is alleged potentially that a person who is -- within the parameters of the criminal justice system may have some neurological issue, they could then overlap; is that correct?

A.    Yes, that's correct.

Q.    All right.  Now, Dr. Price, I know you've been involved in this case for some time.  There was a lapse in the midst. But can you tell the court how you first became involved in the

case involving an individual by the name of Kenneth Eugene Barrett?

MR. SCHARDL:  Excuse me, Your Honor.  If the government is going to offer this witness as an expert, I'd like an opportunity to voir dire him.

THE COURT:  I thought you stipulated to his --

MR. SCHARDL:  Oh, I stipulated to his qualifications.  That's why I specified that I was not stipulating to his ability to testify to opinions necessarily, just that prong of the 702 analysis.  I do agree he's qualified by training and experience.  There are other issues as to whether he may offer the opinions -- he may offer opinions, however.

THE COURT:  What do you want to voir dire him about?

MR. SCHARDL:  I want to voir dire him about what opinions he was asked to offer, whether his report is a complete statement, a summary, of the opinions he's been asked to offer.  I want to ask him about the government's representation -- about whether his opinions are scientifically valid for the purposes, as Mr. Wilson was just saying, that are directly responsive to the allegations that are before this court, following up just on the last question that Mr. Wilson asked about the types of allegations.

THE COURT:  Well, I think I'm going to let you do all that on cross.  If, as a result of cross, I want to strike

some of his testimony, I will.

MR. SCHARDL:  Thank you, Your Honor.

THE COURT:  Okay.  We don't have to worry about a jury hearing something we don't want them to hear so we'll do it that way.  Sound good?

MR. SCHARDL:  Well, I would like the opportunity to voir dire him and raise the objection, but the court has ruled and I accept that.

THE COURT:  Very well.  And maybe you can cover some of this stuff for us, Mr. Wilson.

MR. WILSON:  I'll try, Your Honor.

Q.   (BY MR. WILSON)  How is it that you first became involved in the case involving Kenneth Eugene Barrett?

A.   I received a call in late September 2005 from Sheldon Sperling asking me to review a file and -- at that time it was potentially conduct -- but ultimately to conduct an evaluation of Mr. Barrett, and that would occur in October sometime of 2005, and to do a psychological -- a forensic psychological evaluation for the purposes of potentially testifying in rebuttal to Dr. Russell's testimony.  And so it was to do a psychological evaluation and diagnosis of any mental behavior problems that I saw, including those that would be under the umbrella of neuropsychology and conduct a risk assessment or offer opinions about the risk of future violent behavior.

Q.   Of Mr. Barrett?

A.    Yes.

MR. SCHARDL:  I'm sorry to do this, Your Honor, but I have to interpose another objection.  Mr. Sperling was supposed to be walled off.  There was supposed to be a firewall in place so that Mr. Sperling should not have known what was in Dr. Russell's report such that he could have retained the witness in that way.  I think if that's what happened, we need to have a hearing about why that happened because that should not have happened.

The court's order was that the trial attorneys, Mr. Sperling and Mr. Littlefield, were not to know what was in Dr. Russell's report.  That was given only to the assistant United States attorney for the Northern District in Tulsa.  Now the witness is saying he was contacted by Mr. Sperling.  That is a huge violation of this court's order.

THE COURT:  Well, I'm going to -- for now I'm going to take that under advisement.  We'll raise that when we're done with his testimony.  You're suggesting that I ought to exclude him because somehow or another it violated a rule during the original trial?

MR. SCHARDL:  Well, I'm suggesting that there was a violation of the court's protective order, Your Honor, and that if the government was not complying with that order, that could be a basis for excluding the witness' testimony.

THE COURT:  But that's not an issue that's been

raised in this 2255, as I understand.

MR. SCHARDL: We just learned about it at this moment.

THE COURT: Well, I know you did. But I'm here to determine something that this witness has relevant testimony on, which is not that, and we're going to have to raise that some other way, maybe at the end of the proceeding, but I need to hear his testimony.

MR. SCHARDL: Thank you, Your Honor.

THE COURT: Very well.

Q. (BY MR. WILSON) Dr. Price, as a result of your conversation you had with Mr. Sperling -- and for the record, Mr. Sperling was the United States Attorney back in 2005 of the Eastern District; is that correct?

A. Yes.

Q. Okay. And as a result of that discussion with Mr. Sperling, did you, in fact, conduct an assessment, an evaluation, of Mr. Barrett?

A. Yes.

Q. And did that, in fact, take place in October of 20 -- excuse me -- 2005?

A. Yes.

Q. And in order to conduct that evaluation, what specifically did you collect, as far as records and information, to review and then did you also conduct an

interview of Mr. Barrett in anticipation of preparing your report? And that's a two-part question, I understand, so let me break it out into single questions.

Did you review some records?

A.    Yes.

Q.    And do you recall where you received the source of those records?

A.    From another attorney for the USA that was the firewall attorney.

Q.    Okay. And was that a person by the name of Scott Woodward?

A.    Yes, it was.

Q.    And do you recall the records that you were asked to review and that you received from Scott Woodward from the United States Attorney's Office? And I believe he was in the Northern District of Oklahoma; is that correct?

A.    Yes.

Q.    What records did you receive to review?

A.    I received the records from Eastern State Hospital, from the Bill Willis Community Mental Health Center, from the Wagoner Community Hospital, some school records, the psychological evaluation and risk assessment from Dr. Russell that was authored in 2003, and the -- also the psychological evaluation risk assessment that Dr. Russell authored in 2005, the psychological evaluation from Dr. Sharp, and the criminal

investigation file from the U.S. Attorney General's Office.

Q.    And as part of your evaluation in this case, did you review all the records that you received from Mr. Woodward or from the United States Attorney's Office in Muskogee?

A.    Yes.

Q.    And I'm not going to get into a lot of detail, but you mentioned records from Eastern State Hospital.  Those would be records of Kenneth Eugene Barrett; correct?

A.    Yes, that's correct.

Q.    And Eastern State Hospital, is that -- what type of facility is that?

A.    It's a state psychiatric hospital.

Q.    And so I take it that you reviewed some psychiatric records from that facility involving Mr. Barrett?

A.    Yes.

Q.    And as part of your evaluation of Mr. Barrett, did you consider those records as part of your evaluation?

A.    Yes, I did.

Q.    And as -- and in those records from Eastern State Hospital, do you recall whether or not Mr. Barrett had ever been diagnosed with bipolar disorder?

A.    From the Eastern State Hospital records?  They did not indicate a diagnosis of bipolar disorder, as I recall.

Q.    Okay.  You mentioned records from a Bill Willis Mental Health Center.  You reviewed those as well?

A.    Yes.

Q.    Okay.  From the Wagoner Community Hospital?

A.    Yes.

Q.    And, again, those are for Mr. Barrett?

A.    Yes.

Q.    You also discussed specifically records from -- or a report, an evaluation, from a Dr. Sharp; is that correct?

A.    Yes.

Q.    Did you know Dr. Sharp at that time or were you aware of him?

A.    No.

Q.    When you reviewed Dr. Sharp's report of his evaluation, did Dr. Sharp diagnose Mr. Barrett with bipolar disorder?

A.    He did not.

Q.    And I apologize going back just a hair, but back to the records from Eastern State, do you recall any diagnosis of posttraumatic stress disorder?

A.    No, I don't.

Q.    Okay.  From Bill Willis, any diagnosis -- a discharge summary or a diagnosis -- let me back up.

      Any final diagnosis from any records in Bill Willis of bipolar disorder?

A.    No.

Q.    What about posttraumatic stress?

A.    No.

Q.    What about from Wagoner Community Hospital; any final diagnosis of bipolar disorder for Mr. Barrett?

A.    Not that I recall.

Q.    Okay.  Same true of posttraumatic stress?

A.    That's true.

Q.    And you also reviewed the criminal investigative file; correct?

A.    I did.

Q.    Okay.  So you were aware of the circumstances involving the 1999 event; is that correct?

A.    I was.

Q.    Okay.  Now, I asked you specifically if there had been any diagnosis in those mental health records of posttraumatic stress disorder or bipolar.  But did you see any reference in the records from Eastern State Hospital regarding substance abuse?

A.    Yes.

Q.    Would the same be true from Bill Willis Mental Health?

A.    Yes, it would be.

Q.    And also Wagoner Community Hospital?

A.    Yes.

Q.    What was the common thread running through all of those mental health records in reference to substance abuse?

A.    That Mr. Barrett had problems with substance abuse, with several substances, with alcohol and with methamphetamines and

with cannabis.

Q.    And based upon those records, how far back in his life did that substance issue occur?

A.    Early in his life, I think by the beginning of adolescence.  As I recall, he began having problems with substance abuse very early, like around the age of 13.

Q.    And was that an issue solely related to his adolescent years?

A.    Oh, no.  It continued into his adult years.

Q.    And was that information consistent with the information you received directly from Mr. Barrett during your clinical interview of him?

A.    Yes, it was.

Q.    Now, you mentioned it was a number of different substances and you listed marijuana, you listed methamphetamine.  Were there other substances, if you recall, specifically?

A.    Yes.  Those were the most problematic ones, as I recall. But there was also a lot of experimentation with other substances and that this went on for years and a lot of at least experimentation or trying several different substances. I think I noted a few of the ones that we talked about when I conducted an interview with Mr. Barrett, that he at least told me that he had at least tried cocaine, PCP, heroin, LSD, downers, mushrooms, and angel dust, but that the biggest

problems were with alcohol and methamphetamines and with cannabis.

Q.    In your review of the mental health records from Eastern State and Bill Willis and Wagoner Community, did those records have any reference to substance abuse as part of their diagnosis or diagnoses?

A.    Yes, they did.

Q.    And was that consistent throughout?

A.    It was the one thing that was really consistent in this file was a history of what at that time was called polysubstance abuse or dependence, which means a problem, an addiction, to more than one substance.

Q.    As part of your review of the records, did you also determine whether or not Mr. Barrett had a history of a suicide attempt or attempts?

A.    I did.

Q.    And what did -- what did you learn about that from the records?

A.    Well, I learned of one suicide attempt, I believe in the mid-80's, wherein he shot himself in the chest.

Q.    Now, we'll circle back to that in just a second.

Now, I know that you reviewed the records and then you also conducted an interview of Mr. Barrett; is that correct?

A.    Yes.  Yes, sir.

Q.    Now, where did that interview take place and when did it

take place?

A.    Well, it took place October the -- on two dates, October the 13th and 14th of 2005.  As I recall, it took place in the county jail here but I'm not -- I mean, it was a facility, it was a correctional facility, and that's where I believe it to have been.

Q.    And so Mr. Barrett would have been in custody at the time of the interview?

A.    Yes.

Q.    And were you -- or was Mr. Barrett accompanied by anyone during that interview other than yourself?

A.    No.  It was just he and I in the room together.

Q.    Was the environment or the circumstances surrounding the interview conducive to perform the mental health evaluation that you were seeking to perform?

A.    Well, it was a jail.

Q.    Sure.

A.    But as compared to other jail environments that I've conducted an evaluation in, it was adequate.  As I recall, it was relatively private, that the doors were closed, etcetera, it wasn't overly noisy or anything that would be really problematic like that.

Q.    If there would have been a situation like that, would you have reflected that in your report?

A.    Yes, that's correct.

Q.     Okay.  And did Mr. Barrett cooperate with you as part of your evaluation?

A.     He did.

Q.     And can you tell the court, when you conduct one of these in-person evaluations, what are the parts or components of that evaluation?

A.     Well, it may vary slightly.  But, of course, it would -- first of all, typically if it's an evaluation where I'm retained by attorneys that are opposing the person's attorneys that are in the case, I like to get one of -- like in this case -- one of the defense attorneys to be there at the very beginning of the evaluation to introduce me to his or her client and then leave the room and either while the attorney is there, or if I've already shown the attorney the informed consent, maybe it's after the attorney left.

        As I recall, his attorney was there in the room when I gave Mr. Barrett the informed consent, which is the first part, to answer your question, of an evaluation like this.  It's where I tell the person who I am, what I'm there to do, who it is that retained me, I give them the limits of confidentiality and privilege in a forensic evaluation, tell them they can talk to their attorney at any time, if they don't want to answer something, they can just say they don't want to, and how the results will be used or could be used.  And so that's just to make sure we're all on the same page and in agreement about the

context of the evaluation.  That's the first part.

Q.    And I believe in reference specifically with Mr. Barrett, that that took place; is that correct?

A.    That's correct.

Q.    And I believe your testimony was that one of his lawyers -- or one or more of his lawyers was present at that time?

A.    I know there was one of his lawyers there to introduce me.  I don't recall if I showed the lawyer the informed consent beforehand or if the lawyer was there when I went over that informed consent, I don't recall, but it was one of the two.

Q.    Okay.  But that procedure was performed as far as giving Mr. Barrett notice of what you expected and what was going to take place as part of this interview; is that correct?

A.    Yes, that's correct.

Q.    Okay.  Now, did Mr. Barrett's attorney stay in the room while the interview --

A.    No.

Q.    Okay.  And I believe you testified earlier there was no other -- there were no guards present during the interview; is that correct?

A.    That's correct.

Q.    Any other staff, either from your office or from Mr. Barrett's lawyers' office?

A.    No.  Just Mr. Barrett and me and a video camera.

Q.    Okay.  And so this interview and the testing procedure was captured on video; is that correct?

A.    Yes.

Q.    Now, the person that you interviewed back in 2005, is that person here in court today?

A.    He is.

Q.    Okay.  Can you describe where he's sitting and what he's wearing today and point him out for me, please?

A.    Yes.  He's sitting at counsel table dressed in orange coveralls and I recognize him, even though at the time of this evaluation both he and I had hair, as I remember.

MR. WILSON:  Okay.  The record would reflect the witness identified Mr. Barrett, Your Honor?

THE COURT:  The record will so reflect.

Q.    (BY MR. WILSON)  Speaking of that, what was your initial observation of Mr. Barrett when you first met him, just overall initial observation?

A.    Well, he was very cooperative and friendly and open about answering things and it was -- as I recall, there was nothing confrontational about my interactions with him.  On the testing I gave, he was involved in it, he put forth good effort.  When I asked him things in the interview, he answered them.  And as I recall, he and I got along fine during this evaluation and he was very cooperative.

Q.    Okay.  We talked earlier about a report that you had

reviewed and an evaluation that you reviewed of Dr. Bill Sharp; correct?

A.    Yes.

Q.    And it's my understanding that Dr. Sharp, one of the findings of his evaluation was that Mr. Barrett was exhibiting very paranoid behaviors?

A.    Yes, that's correct.

Q.    When you observed Mr. Barrett, did you observe those same issues regarding elevated paranoia?

A.    Yes, I would say that I did, at least like a kind of chronic suspiciousness about a lot of things.  He certainly voiced feeling as if he had not been treated fairly by the police, by the legal system, and it had a paranoid quality to it which was part of what I diagnosed him with is having the traits and features of a paranoid personality, which is that kind of very suspicious, attributing motives to others that they were out to get him, treat him unfairly, etcetera.  He was pretty free in voicing those things, as I recall, during my evaluation of him.

Q.    So I take it that someone can be cooperative but yet voice some paranoia during the same interview?

A.    Yes.

Q.    They can coexist?

A.    Yes, that's true.  If -- I did not notice -- like I said, as I recall, he and I got along fine.  He didn't seem very

suspicious or distrustful of me or what I was asking him, but he talked about in the interview feeling that way about the system and about other things that had a paranoid quality to it.

Q.    Now, we earlier -- and I digress and I apologize -- we were talking about the process that you typically follow.  You said you began with the informed consent; is that correct?

A.    Yes.

Q.    And then once you get that completed, what's the next step in this on-site, face-to-face evaluation?

A.    A clinical interview and history, where I'm asking for the person's perceptions of their life and their present circumstances and any symptoms they might be having.  At the same time I'm making behavioral observations of them and including those that would pertain to a mental status evaluation.  So that would be the next part, grouping those together, the clinical interview and history, behavioral observations, mental status examination.

Q.    And that portion of that interview or this evaluation, is that a -- is that standard or accepted practice within your field of psychology?

A.    Yes, it's standard.  It would be considered what we've come to call a best practice in psychology, and that even though there might be an occasion that that might be impossible to do or an attempt was made and it didn't work out but that,

if at all possible, a face-to-face interview where I'm asking questions and the person is answering them is a best practice in clinical and forensic psychology.

Q. We'll talk specifically about the information that you received during the interview. But once you complete that clinical interview and receive social history, psychosocial history, what's the next step in the process?

A. To conduct any standardized testing that I would have determined was important to do, to gather additional information to be used in a psychological evaluation and a diagnosis, and any opinions that I might have been asked to address in either a clinical or a forensic evaluation. So it would be the administration of standardized tests.

Q. And is there a battery of tests that you give regardless of the situation?

A. No.

Q. What's the basis upon which you make the decision of what test or tests you are going to provide to this particular subject or person during that evaluation process?

A. Well, a lot of factors go into that, but it's basically from either what is the referral question or questions. That would be one factor that would go into it.

Another would be if -- and, again, it's highly desirable to have records of past treatment, school history, et cetera, and to have had a chance to review those to see what

other mental health factors might be important to address with standardized testing.

And then it -- in most circumstances, it would be also probably what was learned during the clinical interview and history might impact what test I was giving.  As I recall in this case, I was asked to provide the test -- a list of the tests that I was to give prior to the evaluation.

Q.    And so how was it -- based upon that answer you just gave us, how was it that you decided which particular test you were going to administer during this evaluation?  If you were required to give those in advance, what went into your decision-making process of why you decided on these particular tests?

A.    Well, first, it was a referral, it was very general, and that it was to conduct a psychological evaluation, to identify any mental or personality disorders that might be present, and to offer opinions about the risks that the individual might pose in the future.  Then that was -- of course the first part was what I was asked to do, which was pretty open-ended in general, but I also looked at the records and determined that I should do a neuropsychological screening to determine if there was potentially a problem with cognition or thinking that might be present.  And in his case, it could have been present from some indication of some accidents that had occurred with him in the past, where he hit his head or something hit his head.

Also, the substance abuse for all those years would be a red flag to do a neuropsychological screening that would include a screening battery and an IQ test or to -- a standardized test to assess intellectual functioning and the neuropsychological screening to assess other cognitive areas to see if there was a problem there.

Q.    Okay.

A.    Then with regard to the general psychological evaluation, to administer self-report psychological tests, a personality emotional functioning, so I chose two of those.  And then in any forensic evaluation, you need to at least address the potential that the person is not being forthright, that's not -- that's exaggerating their problems or in some cases to minimize them.

And so I gave one test that was a test to see if there was either faking or gross exaggeration of problems that were mental problems.  In a criminal forensic evaluation where the charge -- the situation involves violence and the question is there about the risk the person might pose, I administered this Psychopathy Checklist Revised to assess the presence of psychopathic traits and features.

Q.    Staying with my theme of the general typical procedure, review the records, do the informed consent, you do the clinical interview, you administer testing, and then after you do that what is the next step in the process?  Do you go back

and have additional interviews as a result of those tests?

A.    Well, if it's possible.  You know, it's certainly --
although it's not always possible, it's good if there's a
chance to ask the person questions on another occasion, other
than just the one time, which I was allowed to come back the
second day with a follow-up and ask questions or complete the
testing and that's what happened in this case.

Q.    Any other steps in the process involving the evaluation?

A.    Well, then the scoring of the test, the interpretation of
the test, and an integration of all the information that I had
been able to acquire.

Q.    Then you generate a report; is that correct?

A.    That's correct.

Q.    Okay.  Now, going back to the clinical interview, did you
have an occasion to discuss with Mr. Barrett about his
childhood?

A.    Yes.

Q.    And as part of your interview with Mr. Barrett regarding
his childhood, what, if anything, was significant that you
observed or found out from Mr. Barrett that would be relevant
to an issue of your mental evaluation?

A.    Well, while not every detail of that part of the
evaluation would appear in the report that I gave, certainly he
gave me a history of a childhood where there was family
dysfunction, ultimately the separation and divorce of his

parents, a lot of relocations due to his father's job, and even though it's a separate part of this, the problems he had in school and early substance abuse. But just about his childhood, that there was family dysfunction present, he ultimately resided with his mother but expressed when he was a child that that was disturbing to him, that he -- his father was not as present as he would have liked.

And then he was married early in life and that his wife was young as well. They had a child. He still -- they're both young. So there was -- it continued and he had problems with his wife, he and she had some dysfunction as well. You know, his life in general was not very -- it was not one that was very predictable or organized and --

Q. You mentioned the fact that Mr. Barrett related to you that they moved around a lot; is that correct?

A. Yes.

Q. And I think you characterize it as dysfunction between his mother and father; is that correct?

A. A lot of fighting and that sort of thing, as I recall.

Q. And did Mr. Barrett relate to you, inform you, that he had siblings of this -- of his same mother and father or his parents?

A. You know, I don't recall us discussing how he related to his siblings but that he had siblings.

Q. Okay. Did you discuss how he related specifically to his

father?

A.    The only thing I recall is him talking about that there was fighting between his parents and that he was separated from his father.

Q.    How did he characterize his relationship with his mother?

A.    I think it was -- that it could be described as variable over the years.  By the time I saw him, he and she had -- had a positive relationship, in his mind, but I think it had been variable in his life.

Q.    Did Mr. Barrett report any substance abuse, either alcohol or drugs, by either his mother or his father?

A.    As I recall, both had problems with alcohol.  I know his father did and I believe -- I'm not certain of this, I don't recall -- but I think so did his mother.

Q.    Now, you mentioned earlier, as part of the records going into the interview, it's sometimes necessary or beneficial to look at educational records or school records; is that right?

A.    Yes.

Q.    And you had some to review of Mr. Barrett; is that correct?

A.    I had some, yes.

Q.    Okay.  And based upon the review of those records, going into the clinical interview, did you have any concerns of potential deficits involving Mr. Barrett that are revealed through the educational records?

A.    Yes.

Q.    What were those concerns that you had going in?

A.    Well, he didn't too well in school and as time went on in school he grew less and less interested and his school performance not good.  He -- he failed eighth grade and then dropped out of school shortly thereafter and went to work.  And so I expected to see, you know, problems with academic abilities.  I think that is the case with him, yes.

Q.    Now, once you got into the clinical interview, began talking with him about his education, was that consistent with what you observed in the records?

A.    It was consistent, yes.

Q.    Did Mr. Barrett indicate to you why he -- why he actually had to -- why he failed the eighth grade?

A.    Mainly he reported to me that he just wasn't interested in school anymore and he would skip school a lot and that there was some placement into some special classes after that eighth grade retention, I believe, and, you know, he said he just wasn't interested and was truant frequently.

Q.    Did he ever indicate to you specifically, I just couldn't do the work, it was just -- I wasn't intellectually capable of performing the tasks that I was asked to do as an eighth-grader?

A.    No.  I don't think that was the case and he didn't think that was the case either.

Q.    It was more just a lack of interest and skipping school?

A.    Yeah.  He just -- those were the problems in school, I think.

Q.    Did he relate to you any problems he had regarding a conflict with administration regarding his hair?

A.    Yes.  He wouldn't cut his hair then and was ultimately either suspended or expelled from school because of that.

Q.    Having that information regarding education, you said it was consistent with the records; correct?

A.    Yes.

Q.    Okay.  Did you also talk with him specifically about his employment history as well?

A.    I did.

Q.    Okay.  You said he dropped out of school in ninth grade, went to work; is that right?

A.    Yes.

Q.    Did he report to you a consistent work history beginning in the ninth grade or was it spotty, times where he just didn't work at all?

A.    Well, he had a lot of different jobs, and some of which didn't last long, but he had a lot of job skills.  He could --

Q.    For instance?

A.    He was a skilled mechanic, according to him, and he had had jobs in that.  He worked in different types of jobs that would require at least a semiskilled level, it wasn't just

labor.  He had jobs early in life most of the time, just quite a few different jobs.

Q.    Did he report to you that he had a history of being very active or even hyperactive?

A.    Yes.  From an early age, he described himself as being hyperactive and it interfering with paying attention when you had to sit still in school and listen to somebody else or attend to an academic task.  That's -- I think that was a factor in his withdrawal from school as well.

Q.    Did you see symptoms of that hyperactivity during your evaluation of him?

A.    No.  Not that I recall.  He did have trouble on testing when it came to attention --

Q.    We'll get to that.

A.    Yeah.

Q.    But as far as not being able to sit still, not being task-oriented, did you observe any of those characteristics?

A.    No.  Like I said, he was cooperative, he got involved in the testing that I did.  You know, I don't remember any problems with not being able to sit still or anything like that.

Q.    You mentioned -- we were talking about employment history.  I believe you said he had a number of different jobs; is that correct?

A.    Yes.

Q.    Did he ever indicate to you any problems that he experienced with employment and substance abuse?

A.    Well, he did say that there were certain jobs that he would go to work and perform his job while he was high.  Mainly those are the ones when he started to use methamphetamines.  I don't recall, as I sit here, if there were times when he had a job that he went to the job intoxicated on alcohol, but he did describe that he -- he had jobs that he could do and do well when high on methamphetamines.

Q.    Well, talking about being a mechanic or doing mechanic work, Mr. Barrett reported that he did quite a bit of that; is that correct?

A.    Yes, that's correct.

Q.    Did Mr. Barrett indicate to you whether or not he had -- was going to actually begin a business or open a garage and do work for the public?

A.    Yes.  He had kind of -- as I recall, he had already started to work on other people's cars at -- I believe at his house, and I think he certainly would have been performing in what we would probably, at one time anyway, refer to as a shade-tree mechanic.  So he was -- had a clientele that he was building up and had a plan to expand that and to have his own auto garage for working on cars.

Q.    Did you discuss with Mr. Barrett about his ability to spend money or deficiencies with spending money?  Did you ever

talk about that?

A.    Yes.

Q.    And what do you recall about your discussion involving finances and his ability or inability to spend money?

A.    While he had a lot of different jobs but -- and was kind of self-employed and had income, he said to me that he was broke before payday and that, I guess, money management was not one of his long suits, and that was a fact that he -- that he told me about.

Q.    Okay.  Did he talk -- did he discuss with you about trying to generate revenue to build up his business, his mechanic business?

A.    Yes.

Q.    And what did he tell you about that?

A.    Well, during that time period when he was planning to open the garage, that --

MR. SCHARDL:  I'm going to object; vague as to time.

MR. WILSON:  I'll try and narrow it down, Your Honor.

THE COURT:  Okay.

Q.    (BY MR. WILSON)  Did Mr. Barrett indicate to you a time frame that we're talking about -- and let's use the day of the crime in September of 1990 -- when it was that he was building up this business, this mechanic business?

A.    Well, as I remember, it was in the months -- at least the

months before the instant offense.

Q.    So in the months leading up to September 1999?

A.    Yeah.  It might have been further back in time than that, and that's as -- I don't recall.

Q.    But based upon your recollection of the months leading up to, what did he tell you about what he was doing to build up finances to build up that business?

A.    He was selling drugs.

Q.    And did he tell you specifically what type of drug he was selling?

A.    Selling mainly -- as far as I know and recall, it was methamphetamines.

Q.    And did he indicate to you that that was on the rise or that that was on the decrease leading up to September of 1999, if you recall?

A.    I don't -- I don't recall.  I know that the plan was -- that he had was to stop doing that.  I don't know if it had slowed down or whatever in that time period.

Q.    Okay.  His plan was to stop that and then support himself doing mechanic work?

A.    Yes.

Q.    And we'll talk more about substances in a second but we talked about employment.  Did he also talk about -- more about his marital history?  You mentioned that he got married early, got married young; is that correct?

A.    Yes.

Q.    What did Mr. Barrett tell you about his marital history and relationship history with other women as well?

A.    Okay.  He told me that he had several --

MR. SCHARDL:  Excuse me, Your Honor.  I'm going to interpose an objection here.  What's the point?  Dr. Price took a history.  Okay.  Is this -- if this is getting to something, if the government is offering this in support of the PCL-R results, then I would renew my request to voir dire on that subject.  Because this is within the scope of what Dr. Price reported on that subject and I have an objection I would like to present to the results of the PCL-R coming in and I would need to be able to voir dire the doctor as to -- for purposes of that.

Again, we don't object to him testifying on some issues, but that particular issue, there's been no testimony offered from the defense on that subject and so I have an objection.  So all of this area that Mr. Wilson is going into at this point may be completely irrelevant.

THE COURT:  What's the government say?

MR. WILSON:  Well, Judge, I can break it into pieces.  I mean, there's been prior testimony by the petitioner regarding a relationship with Abby and so I'm going to inquire of that -- about that.

But also, as counsel mentioned, there is a part of the

PCL-R interview that deals with relationships and how that factors into the scoring of that assessment. And so I can do it in part, but it all goes as part of what his report is and the results of his report.

THE COURT: Just doing background at the moment; right?

MR. WILSON: That's correct.

THE COURT: Okay. Well, the objection is overruled for now. When we do get into the PCL-R you can renew your objection.

MR. SCHARDL: Well, I guess, Your Honor, if the testimony is -- if this testimony is about, for example, Mr. Barrett's relationships with women, I don't see the relevance of that except as to the PCL-R. So why are we going into that?

MR. WILSON: I can ask the witness that question, Judge.

THE COURT: Sure.

Q.    (BY MR. WILSON)  When you're doing an evaluation similar to this, the question regarding marital history -- let's talk about that first -- is that relevant to your evaluation, a person's marital history?

A.    Yes.

Q.    Okay. And I'm going to try to separate this in my mind and also in your mind, the psychopathy screening. Setting that

aside for a second, would the questions regarding marital history, would that be relevant to the rest of your evaluation?

A.    Yes.

Q.    Okay.  Would questions regarding other relationships that Mr. Barrett was involved in, would that be relevant to your evaluation?

A.    Yes.

Q.    Okay.

THE COURT:  Before we go any further, why don't we go ahead and take our lunch break.  Is this a good time to break?

MR. WILSON:  That's fine, Judge.

THE COURT:  Before he gets into the substance of what you're about to ask him about.  And let's be back at 1:30.

MR. WILSON:  Thank you.

THE COURT:  We're adjourned.

(Lunch recess was taken)

THE COURT:  Go ahead, Mr. Wilson.

MR. WILSON:  Thank you, Your Honor.

Q.    (BY MR. WILSON)  Dr. Price, prior to the recess, we were beginning to talk about the marital history of Mr. Barrett. Did Mr. Barrett indicate to you or talk with you about his marital history in relationships specifically with a person by the name of Abby?

A.    Yes, he did.

Q.    What did he tell you about his relationship with his former wife Abby?

A.    Well, again, they were married early, had a child soon thereafter.  They had problems.  He attributed a great deal of the problems to his mainly at that time consumption of alcohol and they fought and argued and he wasn't faithful to her but he had a son with her and they -- they separated at some point.  That's kind of an overview of what he told me.

Q.    Now, when you talked -- when you mentioned the fact that he said that they fought, did you drill down into that anymore or ask more specific questions about the nature of their fights?

MR. SCHARDL:  Objection; relevance to the rebuttal.

THE COURT:  Overruled.

A.    Somewhat.  There was -- he told me that she on more than one occasion took out a temporary restraining order against him.  He said we had our fights, we hit each other, and I believe there was some discussion about the time in which he was charged with domestic violence or -- but not much of a discussion of that.

Q.    (BY MR. WILSON)  Okay.  And I believe you testified that ultimately they separated and actually divorced; is that correct?

A.    That's correct.

Q.    And based upon your interview and/or your review of the

records, did you determine what his marital status was at the time of the offense in September of 1999?

MR. SCHARDL:  Objection; relevance.  Also, Your Honor, this line was gone into during the penalty phase itself.  Abby testified, the government brought out all of this information, so this is cumulative of the existing record from the trial.

Again, if this is relevant to the PCL-R, we have an objection to whether that is proper rebuttal.  I think if I can ask the witness a few questions, we could get a ruling on that.

THE COURT:  Overruled.

A.    Could you repeat the question, please?

Q.    (BY MR. WILSON)  Based upon your interview of Mr. Barrett and/or the records, did you determine what his marital status was at the time of the offense of the crime in September of 1999?  Was he divorced at that time?

A.    I do not think he was formally legally divorced.  I'm not certain.

Q.    Okay.  Do you know whether or not they were residing together, if Abby was living there at the time?

A.    They were at least separated, if not divorced.

Q.    Okay.  Dr. Price, earlier we talked about Mr. Barrett financially and I believe he made the statement -- or you made the statement that he told you that at the end -- he was always broke at the end of the month; is that correct?

355

A.    Yes.

MR. SCHARDL:  Same objection, Your Honor.  That is from the doctor's report on the PCL-R.  The government is just trying to get this in without getting a ruling on whether it's admissible.

THE COURT:  Overruled.

Q.    (BY MR. WILSON)  Did Mr. Barrett indicate to you that he experienced episodes of where he just spent money uncontrollably?

MR. SCHARDL:  Same objection, Your Honor.

THE COURT:  Overruled.

Q.    (BY MR. WILSON)  What I mean by that is, would it -- did he indicate to you characteristics which would be consistent with a manic episode of someone who spends money in a manic episode?

MR. SCHARDL:  Objection, Your Honor.  The witness has not offered any opinions in his report on the subject of mania or bipolar disorder.  The court made a ruling that we were entitled to a report under Rule 16 as to whether -- summarizing any opinions.  We have no such report on that subject.

THE COURT:  Is this something that is contained in his report?

MR. WILSON:  About whether or not he -- well, Judge, in his report, which for the record is Exhibit No. 51, which is

the CV and the report, in page 9 of that report -- and actually page 36 is the exhibit, Your Honor.

DEPUTY COURT CLERK:  Government's exhibits?

MR. WILSON:  Yes.  Government's Exhibit No. 51, page 36, the second paragraph -- well, numbered paragraph No. 2 at the bottom, there is a conclusion and an opinion that deals with psychological testing.

THE COURT:  Right.

MR. WILSON:  Also testing indicates traits consistent with antisocial and a paranoid personality disorder. That goes -- the questions I'm asking go to the basis of that opinion.

THE COURT:  All right.  Well, with that limitation, the objection's overruled.

MR. SCHARDL:  Just for the purpose of the record, Your Honor, the limitation is that the witness is not to testify in rebuttal to a diagnosis of bipolar disorder; is that correct?

THE COURT:  Are you planning to offer that testimony?

MR. WILSON:  May I consult with counsel for a second, Your Honor?

THE COURT:  Yes.

(Discussion held off the record)

MR. WILSON:  Your Honor, I believe this witness is

prepared to testify as to his own observation and his own diagnosis of Mr. Barrett when he saw him in 2005.

THE COURT: Well, as I look at the diagnostic formulation here, it doesn't say anything about bipolar disorder. He's not going to testify that he didn't have bipolar disorder, I assume?

MR. WILSON: He's going to give his opinion as to what his diagnosis would have been of Mr. Barrett at that time.

THE COURT: But not as to something that's not in this report?

MR. WILSON: That is correct, Judge.

THE COURT: Okay. Very well.

MR. WILSON: I'm not going to ask him specifically a question about direct rebuttal as to Dr. Woods' testimony.

THE COURT: Okay. Go ahead.

MR. SCHARDL: My objection then would be why is the doctor testifying if not to rebut Dr. Woods?

THE COURT: Overruled.

Q.    (BY MR. WILSON)  Do you remember my question?

THE COURT: Does anybody?

MR. WILSON: I sort of do, Judge. I'll ask it again.

THE COURT: Go ahead and ask it again.

Q.    (BY MR. WILSON)  I was asking you about, did he during your interview tell you that he had experienced behaviors

involving spending that were consistent with a manic episode?

A.    No.

Q.    Did you discuss with Mr. Barrett about his own reports of mental health history?

A.    In the past?

Q.    Yes, yes.  I mean, I know you reviewed mental health records; correct?

A.    Yes.

Q.    But did you discuss with him individually about his reports of any mental health treatment or problems that he was having?

A.    Yes.

Q.    Okay.  And did he report to you consistent with what you saw in the report -- in the -- in the reports from the -- from, say, for instance, Eastern State and Bill Willis?

A.    Yes.  His report was consistent with those in terms of the problems being primarily due to substance abuse and that history.  Yes, it was consistent.

Q.    Okay.  In your report, you use the expression that he was hospitalized for depression and behavioral dysfunction.

A.    Yes.

Q.    What do you mean by that?  I mean, I know what substance abuse is obviously -- or, I mean, I know what depression is. But when you say "behavioral disfunction," what do you mean by that?

A.    He was at that time, before he went to Eastern State Hospital, he was agitated, he was angry, he was threatening people, he was tearing up property, and doing things that were not the kind of behaviors that you would call within the normal spectrum they were.  It involved at least anger, agitation, and were related to substance abuse.

Q.    Okay.  Did he also indicate to you about an admission in 1995 to Bill Willis Community Health Center?  Did he talk with you about that?

A.    A little bit.  He told me that he was there, yes.

Q.    Did he tell you why he was there?

A.    I don't recall that he did.  I don't recall that.

Q.    Okay. From the review of the records, did you determine why he was there?

A.    Yes.

Q.    And what was that?

A.    That was at the time -- that was in 1986, I believe, at the time of the suicide attempt or just before.

Q.    I'm talking about 1995, Bill Willis in 1995.

A.    That was -- as I recall again, it was related to behavioral problems and substance abuse, and I don't remember him and I discussing that, though.

Q.    During your discussion with Mr. Barrett, did you talk with him about injuries that he may have sustained in his past consistent with a head injury?

A.    I did, yes.

Q.    Okay.  And did you also review the records for anything consistent with head injury?

A.    I did.

Q.    Okay.  Based upon -- and let me see if we can separate this, if you can -- based upon your review of the records, were there any reference in any of those records about potential head injuries that Mr. Barrett had suffered?

A.    I think there was a reference to those in other people's reports, but there were no records of evaluation or treatment following any head injury.

Q.    Okay.  Now, specifically I'm referencing a report of an event which took place in Mr. Barrett's childhood regarding being struck in the head with some steel ball.  Do you recall that?

A.    Right, I do.

Q.    And do you recall if Mr. Barrett actually told you about that?

A.    He did.

Q.    And can you tell the court what he related to you about this incident in his childhood?

A.    Well, he said it was sometime in the 1960's.  That was as close to the time frame as we could get.  He said that he did go to the hospital.  He said that he was -- had a period of loss of consciousness for hours.  He said that it came about

from getting hit in the head with some kind of steel ball on the playground.  And he said that he did not experience any cognitive problems from that.

Q.    And when you said he said I didn't experience any cognitive problems, was that the words that he used?  Did he say, "I didn't experience cognitive problems"?

A.    No.

Q.    Or is that your summary of it?

A.    The word he used was "no" when I asked him if he had any cognitive problems following that.

Q.    Okay.  Did he -- did he appear to understand your question?

A.    Oh, yes.

Q.    Now, you're a neuropsychologist; correct?

A.    Right.

Q.    If someone reports to you that they sustained a brain injury resulting in hours of unconsciousness --

A.    Okay.

Q.    -- would that give you any concern?

A.    Well, if somebody -- the principle is that if there is a loss of consciousness, it's an -- it's an indicator of a more problematic head injury that may have caused a brain injury. The longer the period of unconsciousness the more severe the deficits are likely to be from that injury, and hours of unconsciousness would be very significant in that that would

constitute a severe brain injury at the time and it more than likely would result in very serious deficits in more than one area of cognitive functioning.

Q.    First, were you provided any documentation, medical records, reflecting this hospitalization for a ball -- steel ball injury to the head?

A.    No.

Q.    Based upon your observations of Mr. Barrett, did you see any characteristics or deficits which would be consistent with someone who had a brain injury resulting in multiple hours of unconsciousness?

MR. SCHARDL:  Objection.  Unless we have the scientific basis for being able to observe someone and say whether based on observation what, 25, 30 years later you could do that.

THE COURT:  That's a subject for cross.  So the objection is overruled.

MR. SCHARDL:  Well, it is an opinion.  There's no scientific basis for it, Your Honor.

THE COURT:  Overruled.

A.    If someone -- let's see.  The answer to your question is, no, I didn't see that.

Q.    (BY MR. WILSON)  Okay.  What would you expect -- you said you would expect to see significant impairment; is that correct?

A.    Yes.  With that kind of period of unconsciousness, there would likely be signs that you could observe by -- or that you could tell by observation in terms of problems with motor functioning or speech or comprehension and that -- but I didn't rely upon that.  The neuropsychological testing that I did did not reveal evidence of a severe brain injury.

Q.    And we'll get to the test in a second.  Okay.  Thank you.

You reviewed the records and there were -- we talked about this earlier -- references to substance abuse throughout the records; correct?

A.    That's correct.

Q.    And did Mr. Barrett when you talked with him, did he tell you or give you information consistent with what you observed in the records?

A.    Yes.

Q.    And I apologize if I've asked this before and I -- but when you talked with him did you discuss with him specifically about the 1986 suicide attempt?

A.    Yes.

Q.    And did you ask him what brought this about, if you recall, or what led up to his trying to take his own life?

A.    You know, I don't recall us discussing that.  I probably did but I don't recall what the details of that was.  I did -- he did tell me about his history of either suicide attempts or ideation, but I don't remember what his perception was of the

causes of that at that time.

Q.    Well, his reporting regarding suicide attempts or ideation, did that -- did that have any relationship to substance abuse?

A.    Yes.  And that this attempt was the only attempt that he said he'd ever had or the only time he thought about it.

Q.    How long approximately did the actual interview take, if you recall?

A.    I don't remember.  It was several hours but I don't remember how long.

Q.    And also then after the interview, then you began to perform some tests; correct?

A.    Yes.

Q.    Okay.  And are you trained to perform psychological testing?

A.    Yes.

Q.    And is that a function that you typically use as part of your evaluation?

A.    It is.

Q.    Okay.  And I believe we talked about the fact that you had made some decisions in advance on some tests that you were going to provide; is that correct?

A.    That's correct.

Q.    We're going to talk about those tests.  The first one that I want to visit with you about is a test known as the

Reynolds Intellectual Assessment "System," the RIAS.  Are you familiar with that test?

A.    I am.

Q.    And is that a test that you're trained to perform?

A.    Yes.

Q.    And when I say that, was that a test that you were trained to perform back at the time that you did that back in 2005?

A.    Yes.

Q.    And what is the -- what's the purpose of this particular test?

A.    To determine a general level or range of general intellectual functioning, intelligence, and to look at both verbal and nonverbal intellectual functions, verbal being the use of language and nonverbal being more the use of visual-spatial skills and that sort of thing.

Q.    Is that a test that's generally accepted within the scientific community specific to psychology?

A.    Yes.

Q.    And had you performed this test on persons prior to the test that you performed on Mr. Barrett?

A.    Yes.

Q.    Approximately was it -- approximately how many times?

A.    I have no idea, but it was, you know, numerous occasions.

Q.    Okay.  And how is this particular test performed?  Is it

a series of questions?  What do you do?  Or what do you ask Mr. Barrett to do?

A.    Well, on the verbal part, it's questions where the evaluator asks certain questions to which the person taking the test responds orally and --

Q.    Let me interrupt you for a second.  Are these standardized questions or are these just questions you come up with at the time?

A.    No, these are standardized questions.  On any objective psychological test, there's -- you ask the same questions.  The administration of it is standardized so the person can be compared to other people similar to him.

Q.    Okay.  And did you follow that procedure in administering this test to Mr. Barrett?

A.    Yes.

Q.    So you asked him questions on the verbal part and he responds; is that correct?

A.    Right.

Q.    And do you record those responses?

A.    Yes.

Q.    And plus, the whole testing is actually being videotaped; is that correct?

A.    In this case, yes.

Q.    And so you have verbal.  What is the nonverbal component of this test?

A.    It's the administration of problems that I ask him to solve that were not verbal.  You don't -- you don't say the answer but rather you solve something, kind of like a puzzle or something that's done with a response other than words.

Q.    Would this test be beneficial to you in your realm as a neuropsychologist?

A.    Yes.

Q.    And based upon Mr. Barrett's -- first of all, let me ask you this:  Did Mr. Barrett attempt to perform all the tasks that you asked him in reference to the -- to this particular test?

A.    Yes.

Q.    Was he able to perform and complete the test?

A.    Yes.  And it -- I just have to say yes, yes.

Q.    I guess what I mean is, did he just quit and say, no, I'm not going to do that?

A.    Oh, absolutely not.

Q.    And based upon his performance, did you have an opportunity to score that -- that test?

A.    I did.

Q.    And what was -- what was your conclusions or the scoring of this particular test?

A.    Well, overall what it showed was he tested in the range of average intellectual functioning and that there was not a significant difference between his verbal and nonverbal

intellectual functioning.

Q.   Is this one of the tests that you were talking about earlier when you were -- when we were discussing the issue of a significant brain injury?  Is this one of the tests that you were talking about that you considered?

A.   Yes.

Q.   Someone who had sustained a significant head injury with loss of consciousness for a number of hours, would that person typically score in the range that Mr. Barrett scored?

A.   No.  With a severe brain injury, there's typically a consequence of impairment in general intellectual functioning and it would not likely be -- if it was a mild brain injury, potentially overall intellectual functioning could be average but not in the case of a severe.

Q.   Okay.  Is that the only intellectual functioning test that you performed?

A.   Well, it's the only one for general intelligence, yes.

Q.   Let's talk about the next test you performed.  That would be the Repeatable Battery for the Assessment of Neuropsychological Status; is that correct?

A.   Yes.

Q.   The RBANS?

A.   That's correct.

Q.   Once again, is this a standardized test?

A.   It is.

Q.   Is this a test regularly accepted within the scientific community?

A.   Yes.

Q.   And had you had training to administer this particular test?

A.   Yes.

Q.   And did you have that training prior to 2005 when you saw Mr. Barrett?

A.   I did.

Q.   And had you performed this test on persons prior to Mr. Barrett?

A.   Yes.

Q.   And would the answer be the same, that it would have been many, many folks prior to Mr. Barrett?

A.   Yes.  On many occasions.

Q.   And what is the purpose of this particular assessment or test?

A.   It is a test that tests a number of important neurocognitive functions, especially attention, memory, language functioning, and the visual-spatial nonverbal kinds of tasks as well.  It is a screening test that is done to determine if further testing is needed.

Q.   Again, did Mr. Barrett cooperate with you in the administration of this test?

A.   He did cooperate, he was involved in this, he even

appeared to enjoy the challenge of some of them, and, you know, he put forth good effort.

Q.    So he didn't say, no, I'm not going to do that, or quit midway through?

A.    No.  Not at all.

Q.    I noticed that this particular test scores different functions or characteristics.  Is that correct?

A.    Yes.

Q.    And did you have an opportunity to score Mr. Barrett's result or the results of the testing?

A.    I did.

Q.    Okay.  Before we get there, this particular test, how is it administered?  The other one we talked about we had verbal questions and answers and we had problems that Mr. Barrett was asked to solve.  How is this particular test performed?

A.    In the same way.  It's an individually-administered test. It's not one that I would hand to the person and them complete it, but rather I'm asking the questions, I'm presenting the problems for him to solve, and he responds based on the instructions of the test.

Q.    And are you recording the responses?

A.    Yes.

Q.    And, again, are these standardized questions, these are not just questions you come up with at the time?

A.    Right.  It's standardized so he can be compared to others

of his chronological age and education level.

Q.    Now, as to the particular parts of the test, as far as the results of the test, one of the factors that is scored is immediate memory; is that correct?

A.    Yes.

Q.    And how did Mr. Barrett score in reference to immediate memory?

A.    He scored in the average range, towards the bottom of the average range, at what we would refer to as the 25th percentile, which means that he scored higher than 25 percent of the people in the normative sample of his age and education.

Q.    The fact that 75 percent of the population scored better than him, did that give you any pause in reference to your evaluation of Mr. Barrett?

A.    No pause.  It's also consistent with the fact that he has a history and on this test evidenced problems with attention to a task that requires sustained attention.  That was consistent with his history and consistent with the other findings.

Q.    The fact that he scored 25th percentile, would that be consistent with or -- consistent or inconsistent with someone who had a brain injury?

A.    Well, it -- a -- it could be.  If there wasn't a history of problems with attention and concentration and, you know, the kinds of problems he had in school, it could be consistent with

a mild traumatic brain injury.

Q.    Okay.  Well, let's look at the next portion of the test, the visual-spatial constructional ability.  What does that mean?

A.    Well, again, it's solving problems that don't require language.  It's solving problems kind of like -- in as much as we can, it's kind of like a mechanical problem as opposed to a problem involving just language.  It's something that you do.  You have them draw, copy a complex figure and identify pictures of things so it's nonverbal.  And it's more like -- what I said, it's kind of like the things that people who are good at fixing things, solving problems that don't require language.

Q.    And how did Mr. Barrett score on that aspect of the test?

A.    He did very good.

Q.    I believe he was 96th percentile; is that correct?

A.    That's correct.

Q.    Would that be consistent with his self-reporting of his ability to work on cars and to fix things?

A.    It would be.

Q.    This test also looks at language and language functioning; is that correct?

A.    Yes.

Q.    And how did Mr. Barrett score in that regard?

A.    In the average range at the 42nd percentile.

Q.    Okay.  We've talked about attention before, but it also

looks at specifically attention; correct?

A.    Yes.

Q.    And Mr. Barrett scored poorly on attention?

A.    He scored at the 5th percentile.

Q.    So 95 percent of the population have better attention; is that correct?

A.    Right.  That's on a tedious kind of a task that is timed and that it requires the sustained attention of someone, and he scored poorly on that.

Q.    The next component is delayed memory.  How did he score on that?

A.    He scored well, higher than immediate memory.  He scored at the 58th percentile.  And it's the same -- the same stimulus or the same things I asked him to recall but it's after 20 minutes at least.  That happens sometimes that if they're given time for that to consolidate, they score better showing that it's -- that the immediate memory was more related to attention and that there's not a deficit with his longer term recall of things.  He scored at the -- at the 58th percentile.

Q.    Before we move on from that, one of the reports that you looked at was Dr. Sharp's evaluation; is that correct?

A.    Correct.

Q.    And I believe the Dr. Sharp found deficiencies regarding long-term memory; is that right?

A.    That's what the report said, yes.

Q.    Well, is this test consistent or inconsistent with what Dr. Sharp found?

A.    Well, it wouldn't be either because what Dr. Sharp is talking about is a person's ability to recall their own life and their own life history.  So, you know, there's really, really short-term recall, immediate, and then real long term, which means over the years.  That's what he said concerned him is his difficulty in recalling his own life events.

Q.    Well, when you talked with Mr. Barrett, did you notice a problem with him recalling his long-term life events?

A.    In some areas he did not recall the details of his life events, especially the time line and the dates and that sort of thing, so there was some problem with that that I saw.

Q.    All right.  And then this particular test, the RBANS, comes up with a total scale; correct?

A.    Correct.

Q.    And where did Mr. Barrett score on the total scale?

A.    At the 42nd percentile.  So that's also an average range.

Q.    Okay.  Did you -- and this particular test would have dealt with neurological functioning; correct?

A.    Yes.

Q.    Did you perform any other screening test specifically focused on neurological functioning?

A.    No.

Q.    Based upon the screenings that you provided, this one --

or that you had performed, this one and the Reynolds Intellectual Assessment, did you have a concern about Mr. Barrett's neuropsychological functioning?

A.    No.

Q.    Why not?  I mean, he scored on the 5th percent on attention and 25th percent on immediate memory.

A.    Well, in terms of it being something acquired that would be significant in his life, the attention problems are there. He was -- he could relate that history to me and how it affected him in school and that's -- as we know now, having a child with problems with regard to attention and a learning disorder is not that uncommon and it wouldn't be of concern in terms of a severe traumatic brain injury to me, but it was consistent with his history.

Q.    If Mr. Barrett would have scored at some level which gave you concern about brain injury, would you have done something different?

A.    I would have asked that I be able to return, re-evaluate him with a more comprehensive battery of neuropsychological assessments, and I would have had -- but that's what I would have done.

Q.    You also performed another test, a Personality Assessment Inventory, PAI.  What is that?

A.    Well, that is an inventory which means -- and it's a self-report inventory.  It's a test that you give the person

and they read a series of statements of various kinds about themselves and say -- or they have a place to answer if that is entirely false, entirely true, and then on the PAI it has ones in the middle that says that it's mostly true, mostly false. And so it's their own perception, their own self-assessment of those questions and how they apply to him.

Q.    Again, is this a standardized test?

A.    It is.

Q.    A test accepted within the community?

A.    Yes.

Q.    A test that you had been trained to perform prior to 2005?

A.    Yes.

Q.    A test that you had given to other patients or clients or people that you evaluated?

A.    Correct.

Q.    And did Mr. Barrett give you genuine effort in completing this task?

A.    Yes.  I certainly can tell that in addition to observing him.  This, the PAI, has scales that allow us to tell if they're trying to exaggerate problems they have or trying to hide problems.  It didn't show any of those tendencies indicating that the clinical scales then are valid.

Q.    And this particular test, did you have an opportunity to score the results?

A.    Yes.

Q.    And what, if any, results did you find in reference to Mr. Barrett?

A.    Well, the most clear thing was his perception of himself and his problems is that they were mainly due to alcohol and to drugs, to substance abuse.  That was the main finding here.

There's also some level of depressive symptoms and some level of paranoia, and those were the main findings that I thought were relevant in his case.  So in his own perception, his biggest problems in his life have been related to substance abuse.

Q.    And was that consistent with the medical records that you reviewed?

A.    Sure, it was.

Q.    And was that consistent with his own statements he made during the clinical interview.

A.    It was.

Q.    The next test, the MMPI-2, once again, that's a standardized test; is that correct?

A.    That's true.

Q.    And had you received training on that test?

A.    Yes.

Q.    And had you performed that -- or had the training prior to giving it to Mr. Barrett back in 2005?

A.    Yes.

Q.    And did Mr. Barrett attempt to complete this particular task?

A.    He did.

Q.    And correct me if I'm wrong, Doctor, but this particular test is pretty long, a pretty exhausting test; is that right?

A.    Can be.  People generally don't enjoy taking it.

Q.    Okay.  It's a number of standardized questions and you -- it's a written response; is that right?

A.    Yes.

Q.    As far as filling in the circle?

A.    Right.  It's about over 560 statements that they respond true or false for them.  There's no right or wrong answer.  Again, a self-report inventory.

Q.    And did you have an opportunity to score Mr. Barrett's results?

A.    I did.

Q.    And does this test also have built in within it a malingering scale to determine whether a person is exaggerating or trying to minimize symptoms?

A.    Yes.

Q.    And any indication that Mr. Barrett was trying to do that?

A.    No.  There was not an indication that he was trying to fake anything or grossly exaggerate any problem he might have had.

Q.    Did he -- he didn't quit in the middle or anywhere during the test and say, I'm tired, I'm not going to do this anymore?

A.    That's correct, he did not.  He was cooperative.

Q.    What were the results of the scoring of this particular test, personality inventory?

A.    Three things.  The first is, a score that indicated antisocial attitudes and behaviors; the second indicated paranoid thinking or chronic suspiciousness; and the third being a combination of three scales that indicated that at that time he was very concerned about his physical medical problems, that he was focusing on things such as pain, discomfort with his body.

Q.    Let's talk about those individually for a second.  The portion you talked about, this antisocial behavior --

A.    Yes.

Q.    -- tell me -- tell me more about that.  How is that determined from this particular test?

A.    Well, again, there's certain items that are known to correlate to people with antisocial attitudes and behaviors and he answered those in that direction.  Antisocial doesn't mean that the person doesn't like people or is -- would rather be alone.  It means that those are attitudes and behaviors that are against society, that are those that are correlated to criminal conduct to other traits and behaviors of -- it's the opposite of prosocial.  It's against the rules and laws of

society.

Q.    Now, earlier we've talked about paranoia, but this test indicates some characteristics consistent with paranoid behavior or thought; is that correct?

A.    That's right.  It's a -- you know, there's several types of disorders that have the element of paranoia.  A paranoid schizophrenic believes very bizarre things are happening only against them, that people are following them, people have cameras and outlets on the wall, they've implanted something, a chip, in their brain, you know, bizarre things such as that.  That's a paranoid schizophrenic disorder.

A paranoid delusional disorder is, again, one where the person has -- has ideas that are false that they believe, and it pertains to things that are -- that, again, can be bizarre, that people are doing things to them, perhaps it's something in the room, in the kind of lights in the room that are planted there.

And then there's a paranoid personality disorder. That's -- one, that's a person that is suspicious of other people but also more than that is very sensitive to criticism, easily slighted, somebody can say something to them and they take it more seriously than it really is, a paranoid personality disorder.

And so he does have those kind of traits and it's more consistent with the paranoid personality disorder.  And we have

seen that, too, on other evaluations, such as the one from Dr. Sharp and others, where there's these features of being overly sensitive to what other people think about them and do to them and suspicious of others and think that the -- that elements of society are out to get them.

Q.   Okay.  The next test we refer to is a specific test involving the issue of malingering; is that right?

A.   That's correct.

Q.   That would be the Structured Inventory of Malingered "Systems"?

A.   That's correct.

Q.   Once again, that's a standardized test; right?

A.   It is.

Q.   And if I were to ask you the same questions about your experience with that, would all the answers be the same?

A.   That's correct.

Q.   And did Mr. Barrett during the performance of this test -- or excuse me -- did this test reveal that Mr. Barrett was malingering in any -- during -- let me just ask:  What were the results of this test?

A.   The results of this test did not indicate that he was trying to fake anything for his own gain in terms of psychological problems, that he was not grossly exaggerating his problems, and so I could rule that out.

Q.   All right.  And the final test that you performed is

known as the PCL-R or the Psychopathy Checklist Revised; is that correct?

MR. SCHARDL:  Your Honor, we have an objection to the relevance of this as to rebuttal.  There's no -- again, I would request the opportunity to voir dire the witness as to whether this is proper rebuttal to the testimony offered by Dr. Woods, which is the only mental health evidence before this court.

THE COURT:  What's the government say?

MR. WILSON:  Can I have just one moment, Your Honor?

THE COURT:  Sure.

(Discussion held off the record)

MR. WILSON:  Your Honor, this particular issue was raised in a motion filed by counsel.  In the government's response to that motion, we cited an Eighth Circuit case of United States v. Lee, where the Eighth Circuit allowed the government to present evidence broader than the testimony that it was sought out to rebut.

In this particular case, the whole basis of this 2255 -- or this portion of the 2255 is dealing with the mental health issues, dealing with failure to present evidence in a second stage involving issues of mental health.  I think this goes to Mr. Barrett's characteristics.  It goes to a number of the aggravators that were listed in the notice of intent to present aggravating evidence, including the substantial

planning, the fact that there are multiple murders of the great risk to others, and also the future dangerousness. So I think it's all relevant, Your Honor.

THE COURT: Well, what do you say to the argument that if I hear testimony regarding the PCL-R I heard from this witness, they have a right to put on their witness who would rebut the evidence regarding the psychopathy?

MR. SCHARDL: That witness has been excluded already, Your Honor.

THE COURT: I know that. But he's basically saying that if I let this testimony come in, I need to hear from their witness too. What do you say to that?

MR. WILSON: May I have just a moment, Your Honor?

THE COURT: Yes.

MR. SCHARDL: May I also add, Your Honor, that the government is talking about presenting this witness as part of its case in chief in the penalty phase. This is supposed to be rebuttal. Mr. Wilson was just talking about the aggravating circumstances in the notice of intent. This witness could not have testified to those circumstances because he was only allowed to see Mr. Barrett for purposes of rebutting the PCL-R that was done by Dr. Russell. That has not been offered in this case. This case is very distinguishable and easily distinguishable from the Lee case, in that the type of evidence offered in that case the court found opened the door.

In this case, there is no evidence of a nexus -- which is the language that court used -- there's no evidence of any nexus between the PCL-R and the specific mental health evidence that was introduced in these 2255 proceedings.

THE COURT:  Didn't Dr. Russell testify about that at the trial?

MR. SCHARDL:  Dr. Russell didn't testify at the trial.

THE COURT:  No.

MR. SCHARDL:  Our position in this 2255 is that trial counsel were ineffective for only going to Dr. Russell and only asking her to update the risk assessment rather than doing the sort of mental health evaluation that the 2255 experts did.

THE COURT:  But you did the PCL-R.

MR. SCHARDL:  And that evidence didn't come in in this proceeding and it didn't come in in the trial proceeding. That's why it's not relevant.  She didn't testify to any of those opinions.

THE COURT:  Let me hear from the government.

MR. WILSON:  May I have just a moment, Your Honor?

(Discussion held off the record)

MR. SCHARDL:  If I may, I wanted to wait until opposing counsel was done.  I just wanted to add that if the government is offering this, the PCL-R, as rebuttal to the

885

diagnoses that Dr. Woods testified to, again, there is nothing in Dr. Price's report that in any way suggests that it is rebuttal to those opinions. We're entitled to notice of how this evidence is going to be used, what the summary of his opinions are. There's absolutely nothing in this report that suggests in any way that the PCL-R findings are rebuttal to the diagnoses of Dr. Woods.

THE COURT: You're talking about for purposes of this hearing; right?

MR. SCHARDL: Well, for purposes of this hearing --

THE COURT: Presumably, there wouldn't be any prohibition against them using all of this in another trial; no?

MR. SCHARDL: Oh, yes, I believe there would be. If the defense did not introduce the sort of testimony that was contemplated by trial counsel with Dr. Russell, if the defendants did not introduce testimony to which the PCL-R is relevant, then it would have been excluded.

THE COURT: Well, the PCL-R is a future dangerousness issue, isn't it?

MR. SCHARDL: Yes.

THE COURT: Part of the complete risk assessment; no?

MR. SCHARDL: Yes, Your Honor. And that was done because the defense in this case did a risk assessment, not a

mental health assessment.  The jury in this case acquitted Mr. Barrett of future dangerousness.

THE COURT:  Okay.  But what you're saying is, you should have got to put on a lot of evidence you haven't put on; and if you had, this would be rebuttal evidence to it.

MR. SCHARDL:  No, Your Honor.  I'm saying the exact opposite.

THE COURT:  No, I'm saying that.  Tell me what's wrong with that.

MR. SCHARDL:  Well, what's wrong with it is that the -- that's why I asked for the opportunity to voir dire the witness, that the PCL-R is not a rebuttal to a diagnosis of bipolar disorder or posttraumatic stress disorder or any form of brain damage.  It is simply a separate sort of construct that is used for future dangerousness, correct, but it is not used in the context of psychiatric diagnoses.

THE COURT:  Now, you're -- one of these -- the two witnesses you mentioned earlier that were excluded by Judge Payne --

MR. SCHARDL:  Yes, sir.

THE COURT:  -- which one was the one that was going to bring forward Dr. Young's work?

MR. SCHARDL:  Primarily, Dr. Miora, Your Honor.

THE COURT:  Okay.  And is there anything that Dr. Miora or Dr. Young would have testified to that would make

this relevant?

MR. SCHARDL:  No, Your Honor.  I think if I were to ask Dr. Price whether the PCL-R can be used to exclude brain damage or neurocognitive impairment, his answer would be, no, it cannot.

THE COURT:  What's the government say to that?

MR. WILSON:  I haven't asked Dr. Price that question so I don't know the answer to that question.

THE COURT:  Well, I'm going to save all of this -- I'm going to save all of this for cross-examination.  If it turns out that there's any evidence -- any direct evidence I want to exclude, I'll exclude it.  But for now -- so for now your objection is overruled.

I'll tell you -- as long as we're talking about it, I'll just tell you.  I'm seriously considering letting you guys bring those two doctors at a later date.  I hate to put this thing off even further, but I am feeling like I need to hear testimony from those two doctors so that I have a complete picture of what could have been presented at trial in order to determine whether it would have made a difference.  Because that's really what I'm addressing here, is it not?

MR. SCHARDL:  It is, Your Honor.  And I would say that if the court's ultimate ruling is that -- well, first, I would say we would welcome the opportunity to bring the experts back.  We would have loved to have the opportunity to present

them before this expert in our case in chief, of course.  I would also say that if the court's ultimate ruling is that the PCL-R testimony is admissible, that we have an opportunity to bring our expert on the PCL-R --

THE COURT:  That's Reidy?

MR. SCHARDL:  That's Dr. Reidy.

THE COURT:  I'm talking about Miora and Reidy.

MR. SCHARDL:  Oh, I'm sorry.  I thought you were referring to Dr. Miora and Dr. Bigler.  I apologize.

THE COURT:  No, Miora and Reidy.  And what I'd like for you all to do, since I'm thinking about that, is get together with counsel for the government and figure out when you can get them here and see if we can't put that on my calendar as well.

MR. SCHARDL:  In all candor, Your Honor, I have to say that Dr. Reidy is actually sitting right there.  I did not bring Dr. Miora with me because it wasn't necessary but I hoped you would help me with the cross-examination.  So -- but he's -- I haven't prepared him to testify.  He's here to help me with my cross-examination.  But Dr. Reidy is present.

THE COURT:  If we had time on Wednesday, could you get him prepared?

MR. SCHARDL:  If we had time on Wednesday?  Well, again, if that's the court's ruling, I suppose I could.  But, again, I think that the correct ruling would be that the

testimony on that should be concluded.  But if that is the court's ruling, I suppose so.

THE COURT:  All right.  Well, objection's overruled for now.  Let's go ahead and proceed.

MR. WILSON:  Your Honor, we've had a lot of discussion here and I'm going to maybe short-circuit some of this.  I'm just going to move on.

THE COURT:  Okay.

Q.    (BY MR. WILSON)  Dr. Price, based upon your evaluation of Mr. Barrett, did you have a diagnosis of Mr. Barrett at the time that you -- as a result of your evaluation of him back in 2005?

A.    I did.

Q.    And what was that diagnosis, sir?

A.    Well, there were several things.

Q.    Okay.

A.    The first is a learning disorder, which would have been long-standing, that in my case was not otherwise specified.  I couldn't say what particular areas of academic functioning were impaired with him but there was a history of this.  And also, that learning problem included, at least in the history, signs and symptoms of attention-deficit disorder and hyperactivity that was supported.  So that's more by history than from my evaluation of him other than what was in the records and him saying.

The second was polysubstance dependence, which was at the time in remission secondary to incarceration.

Third, dysthymic disorder, d-y-s-t-h-y-m-i-c, which is a form of depression, a type of a depressive disorder that's long-standing and chronic.  That means that it's gone on for a long time and may increase and decrease but it's relatively mild, not a major depressive disorder at the time.

And then I diagnosed him with a personality disorder with antisocial and paranoid traits and features.

Q.    And what do you mean by that?

A.    A personality disorder is not a mental disorder.  It is -- a mental disorder is where someone is developing or was functioning without problems and then something happens that causes them to have problems.  That's a mental disorder, a mental illness, a mental disease.

Whereas a personality disorder refers to the way the person is.  It's more of a long-term characterological condition that is either a source of distress for that person that it interferes with their functioning and it's always been there, at least since adolescence, early adulthood, or it may not be a source of distress for that person but it is for other people.

And so his personality disorder has those traits and features of both antisocial, against society, and then the easily angered, easily slighted type of paranoia.

Q.   Okay.  Now, I know that as of today in 2017 -- and I believe that Dr. Russell said this a moment ago -- we no longer have axises in diagnoses; is that correct?

A.   Right.

Q.   But what you've been talking about in your report, you actually put those Axis I, Axis II, Axis III; is that correct?

A.   That's correct.

Q.   At the time you performed this evaluation back on Mr. Barrett back in 2005, in the scientific community was it still accepted to have axis of diagnoses?

A.   Right.  That was the standard in what is referred to as the DSM-IV, that Axis I is mental disorders, Axis II is personality disorders or mental retardation, and those are those issues that are developmental, the way they develop is not a decline in functioning.  And then they had Axis III, which is general medical conditions.  Axis IV was to describe any psychosocial environmental problems the person had.  And Axis V was to assess their global functioning.  So we now don't have those five axises in the DSM-V.

Q.   Okay.  But at the time, DSM-IV -- DSM-IV-TR would have had those; is that correct?

A.   Yes, that's correct.

Q.   And in your reports, you actually have an Axis IV diagnosis; is that correct?

A.   Well, it's a -- it's not -- it's part of the formulation.

Q.   Right.

A.   It's a description of the problems that may have been affecting him at the time.

Q.   Which you list as the fact that he was incarcerated?

A.   Right.

Q.   And obviously facing murder charges?

A.   Yes.

Q.   Okay.  And then Axis V, the global assessment --

A.   Yes.

Q.   -- in layman's terms, what do we get from that?

A.   Not much.

Q.   Fair enough.

A.   It's a -- part of the reason we don't have these is that what we were asked to do is to put a number or a range of number that would say how are they doing in life, and it was just too many variables involved but -- so you're trying to function in life regarding everything, where's this person fall in terms of how the problems they have are affecting them.

Q.   Okay.  As a neuropsychologist, are you familiar with a term of "dysexecutive syndrome"?

A.   I am.

Q.   What is that?

          MR. SCHARDL:  Objection.  There's nothing in his report about this.  And, in fact, he did not administer any tests of executive functioning and he's just testified to that

a little while ago.

THE COURT:  What's the government say?

MR. WILSON:  May I just ask a foundational question about that, Judge?

THE COURT:  Sure.

Q.    (BY MR. WILSON)  As part of your evaluation of Mr. Barrett, did you -- are there -- first of all, are there tests specifically designed for executive functioning?

A.    Yes.

Q.    Did you perform any tests specifically designed for executive functioning?

A.    No.

Q.    The tests that you performed as a screening tool, do those have any impact on your assessment of executive functioning?

A.    Yes.

Q.    In what capacity?

MR. SCHARDL:  Objection.  It's not in the report. There's nothing in the report about executive functioning. There's no opinion about it whatsoever.

THE COURT:  Where are we going with this?

MR. WILSON:  Well, Judge, I'm looking at the fact that Mr. -- or excuse me -- Dr. Price was asked to do a general assessment because he didn't know exactly where defense was going, and we can resolve the issue later about firewall

counsel and things like that.

But suffice it to say, Your Honor, I believe the facts are going to bear out the fact that Dr. Price was given very limited instruction because the government knew very limited information about what the defense was going to call and so he was asked to give an analysis, a broad examination.

And as part of the -- of this particular 2255, there have been allegations made that there was information that was available to counsel regarding deficiencies with intellectual functioning that they should have had additional testing and presented evidence on.

At the time that Mr. -- that Dr. Price evaluated Mr. Barrett, he was asked to look at an overall assessment and he was given -- and he gave these foundational or -- I don't know the exact phrasing or wording that he used -- but criteria that he looked at and determined he didn't need to go any further than that.

And I just wanted to talk with him and ask him questions about at the time that he gave those official assessments, was he looking at or considering the idea of executive functioning at that time.

THE COURT:  So why isn't that in the report, or is it?

MR. WILSON:  Judge, the wording "executive syndrome" or "dysexecutive syndrome" or "executive functioning," no, it

is not in this particular report.

THE COURT:  Okay.  Objection's sustained.

MR. WILSON:  Thank you.  May I have just one moment, Your Honor?

THE COURT:  Yes.

(Discussion held off the record)

MR. WILSON:  Your Honor, I'm prepared to pass the witness.  Before I do that -- and we've had a long discussion regarding the PCL-R and the court also inquired of counsel about the fact that Dr. Russell performed that test as part of her assessment.  The government has made a decision to not go there.

However, I want to -- I want to ask the court, if the court will, to inquire of counsel.  There have been a number of allegations made about trial counsel, Mr. Hilfiger and Mr. Smith, failing to present evidence and the petitioner has made a decision today to avoid that in their direct testimony of Dr. Russell.  The government doesn't want to find itself in a situation where it has now not gone there itself and now the petitioner wants to come back and say, well, they were -- they should have done this, they had Dr. Russell there, they could have called her, she could have presented all this evidence about the PCL-R, he was really low on the scale and he was not -- he did not meet criteria for psychopathy.

So if they're abandoning that argument in totality,

then the government's prepared to pass this witness.

THE COURT:  Well, what do you say?

MR. SCHARDL:  There's no argument to abandon. That's never been an allegation in the case.  It's not ever going to be an allegation in the case.

THE COURT:  All right.  And I'm not going to hear any evidence about it so case closed.

Let's go ahead and take our afternoon break.  Be back here at, oh, 3:05 and we'll commence with cross-examination.

(Short break)

THE COURT:  Go ahead, Mr. Schardl.

MR. SCHARDL:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SCHARDL:

Q.    Good afternoon, Dr. Price.

A.    Good afternoon.

Q.    We've never met.  So I'm Tivon Schardl.  I'm with the federal defender's office in Sacramento, California, and I represent Mr. Barrett.  Let me ask you just a few questions here.

You said in your direct examination that you considered the criminal investigation file from the government.  Do you have that with you today?

A.    I do.

Q.    Okay.

MR. SCHARDL:  Could I take a look at that, the contents of that file, Counsel?

A.    It's in that gray clear box below your table there, all the records are.

MR. SCHARDL:  If I can have just a minute, Your Honor?

Q.    (BY MR. SCHARDL)  Dr. Price, did you read all of that file, all the transcripts and everything that were in there?

A.    Transcript -- it was offense reports, investigation of the offense.  That part I did read, yes.

Q.    Okay.  Now, when you were testifying about head injuries and so forth -- now, the reason you give a battery of neuropsychological tests is because there are different brain functions that are measured by those different tests that go into the battery; correct?

A.    Yes.

Q.    And the reason you measure different areas of brain function is because different areas of the brain are responsible for, or involved in, those different areas of functioning?

A.    Correct.

Q.    So a person can have damage to one area of the brain and perform -- function perfectly in other areas of the brain?

A.    Yes.

Q.    A person could have -- for example, if he sustains a blow

to the back of the head, it could destroy the visual cortex leaving the patient blind?

A.    It could, among other things.

Q.    It could, among other things.  But it wouldn't necessarily function -- affect, say, memory functions that are mediated in the amygdala?

A.    It might not.

Q.    Similarly, or conversely, a person can suffer an injury to, say, the temporal lobe that is very specifically located, say from a lesion, and the areas of dysfunction that you would find would be those related to that part of the brain?

A.    That's correct.  Especially, as you said, if it's a lesion, a focal part of the brain is injured, as opposed to a generalized brain injury.

Q.    Well, when we speak of brain injury, there's diffuse brain injury?

A.    Correct.

Q.    And then there's localized brain injury?

A.    Correct.

Q.    And when you -- let me ask you just a couple questions about that neuropsychological testing that you did.

      You administered the RBANS and that's, as you said, I think, a screening battery; correct?

A.    Right.

Q.    And the reason it's called the repeatable battery is it's

specifically made to measure people's functioning over time?

A.    No.  That's -- that's not what I would -- that's not how I would describe it.

Q.    Well, it was originally designed for use in elderly patients to detect evidence of dementia; correct?

A.    That's the original design.  And by "over time," that you can administer it or the equivalent form to see if there's been improvement, if that's what you meant.

Q.    Yes, that's exactly what I meant.

A.    Okay.  Yes, I agree with that then.

Q.    Or conversely, to see if there's decline?

A.    Correct.

Q.    And the reason is that there's a big practice effect in some neurological tests and the RBANS is repeatable because there's less concern about practice effect in the RBANS?

A.    Because there's an equivalent form that measures the same things but doesn't have the same items on it.

Q.    And when we talk about neuropsychological testing, what we're looking at is, as you were testifying to, how far a person's scores are from the norm -- from the standardized norm; correct?

A.    From the norm that is most similar to them, yes.

Q.    So when you were scoring Mr. Barrett on the RBANS, you're looking at a set of norms that is related to his -- his age, his educational level, I think is what you said?

A.    Yes.

Q.    Is it in your raw data?  I didn't see what norms you used.  Could you tell me where to find that in your raw data?

A.    Well, it's not in the raw data, per se.  The raw data is raw but then you choose the normative group and there's a table.  And so in his case, it would be -- the category you compare him to would be people with -- that were in a range of age, close to 44.  That was the age he was at the time.  And then there's an education range for the highest grade completed, which for him would have been in probably the lowest category of -- because -- and I don't know what the range of education level is, but he -- he would be at like the seventh or eighth grade level.  So that would be the group that I would compare his raw score to.

Q.    Now, when you -- and when you're comparing him, you're looking at -- or the tests -- the standardized norms that you're looking at, they produce a bell curve; correct?

A.    Could you ask me that in a different way?  I'm not sure how to answer that.  I'm not sure I understand your question.

Q.    Well, for each subtest on the RBANS --

A.    Okay.

Q.    -- we talk -- you reported results; right?

A.    Yes.

Q.    And you report them in two ways.  You report them as an index score?

A.    Correct.

Q.    Why don't you tell the court what that means.

A.    Okay.  Now I think I understand.  It doesn't produce a normal curve or a bell-shaped curve, but you use a bell-shaped curve to make the comparison in terms of the standard score is a transformed raw score so that we can compare and that -- it is based on a normal curve, where a standard score of 100 is right in the middle, and then it goes out each way.  Above 100 would be on the positive side of average; if it's below 100, below average.  That interpretation is based on an assumption of a normal curve or, as you said, a bell-shaped curve.

Q.    And when we talk about percentages -- I'm sorry -- percentiles, as you said, that's a comparison to the number of people in the population that they perform better than or worse than, they being the individual you're examining?

A.    Yes.  It indicates where that person on that scale fell in the normative sample, what percentage of people fall below and above him.

Q.    And in general in neuropsych testing, you look at the whole picture.  That's why you give a battery; correct?  You wouldn't want to just say give somebody a test of visual-spatial constructional ability, you gave that to Mr. Barrett, and then you just walked away, you'd say, this guy, man, he's, you know, 96th percentile, end of story?

A.    Correct.

Q.    There's a lot more to brain functioning than that?

A.    Correct.

Q.    And when neuropsychologists talk about whether a person is normal or not normal, they're looking at the differences between scores on a battery like this in part?

A.    Yes.  That's part of the analysis, yes.

Q.    It's a big part of neuropsychological assessment, is comparing strengths and weaknesses?

A.    Yes.

Q.    That's -- going back to what we were talking about before, you give a battery because everybody has strengths and weaknesses?

A.    Everybody.  Everybody would have low -- if you gave a large enough battery of neuropsychological tests to anybody, there would be a good chance they would have some -- some -- low scores on some of the tests, a small percentage of the tests.  So everybody has strengths and weaknesses.

Q.    Right.  Nobody is just going to be uniform across the board on all areas of functioning?

A.    I wouldn't go so far as to say "nobody."  But it would be much more common for people to have strengths and weaknesses.

Q.    So Mr. Barrett, his performance on the attention subtest on the RBANS was in the 5th percentile?

A.    Correct.

Q.    How many standard deviations from the mean would that be?

A.    Two and a half or so.

Q.    Two and a half standard deviations below the mean?

A.    Correct.

Q.    That's a significant impairment?

A.    It is.  I mean, it's a -- it's certainly an impairment and the 5th percentile is low, yes, sir.

Q.    So when we're talking about -- again, that means he's performing worse than 94 -- or yeah, yeah -- 94 percent of the population?

A.    Well, I think it's 95 percent of the population.

Q.    You're right, 95 percent.

A.    Yes.

Q.    And then on Mr. Barrett's score on the visual-spatial constructional ability, that's the 96th percentile?

A.    Correct.

Q.    How many standard deviations from the mean would that be?

A.    Well, the 96, gosh, that would be over three standard deviations above the mean.

Q.    And the difference between those two scores, attention and visual-spatial constructional ability, you can combine those -- or a neuropsychologist would look at the overall distance between those two abilities?

A.    You could.

Q.    Don't neuropsychologists often do that, compare and look for vast deviations like that?

A.    Well, yes.  It would be more in -- as opposed to taking the percentile or the standard score on attention and comparing it directly how far apart it is from the visual-spatial, it would be more how far above -- it's the same thing but they just wouldn't do the subtraction.  They would say the visual-spatial was this far above average and the attention was this far below.  And so you could say there's a difference between the two, but it's more or less comparing it to the mean or the average is a more typical way.

Q.    For each individual area of functioning you're saying?

A.    Yes.

Q.    Right.

A.    Yes.

Q.    But if you're looking at whether the person, the brain you're examining, is itself normal, it's not normal to see a brain that has a difference of more than five standard deviations between two subtests?

A.    Well, I wouldn't do the analysis like that, but I'm not going to -- going to just disagree with the conclusion that that strength is very strong, that weakness is very weak.  But to compare the number of standard deviations between the two, I just wouldn't do it that way but I'd come to the same conclusion.

Q.    Well, there are studies, aren't there, that examine just that issue, how much difference there is in scores on various

subtests?

A.    Probably so.

Q.    And it's not a standard sort of conception of normality in neuropsychology that a person be less -- or within two-thirds of a standard deviation across subtests?

A.    Could you ask me that again?  I'm sorry.

Q.    Normality in neuropsychological terms is in part defined as a person who's -- for whom the difference in subtests is within two-thirds of a standard deviation?

A.    I've not seen that type of, you know, approach to analyzing the scores that in terms of deciding if it's normal or abnormal.  But I'm not disagreeing that his strength is very strong and his weakness is very weak and that's out of ordinary.  That is abnormal in terms of the frequency of that happening.

Q.    Yes, that's what I'm asking.  How frequently do neuropsychologists see people where the difference between two subtests is as great as more than five standard deviations?

A.    Well, it's not typical.  Again, I don't analyze it like you're saying, the five and a half between the two, but arrive at the same conclusion that that isn't typical.

Q.    There's something going on with that brain?

A.    Yeah.  I would say there's a problem with attention.  The strength with the visual-spatial, I mean, isn't abnormal in and of itself, but there's a problem with attentional functioning

with this brain.

Q.    And with regard to this testing, you didn't have a baseline of his functioning before the incident that you are discussing with Mr. Wilson?

A.    No previous neuropsychological testing as a baseline.  We estimate the baseline mainly from level of education completed and so that would be the way it was done here.  I didn't have anything else besides that.

Q.    If the injury occurred in the midst of childhood at some point -- and I believe you testified that it happened sometime in the 1960's -- you couldn't have a premorbid baseline based on the level of education he completed?

A.    It would be unusual for there to have been testing before an incident that occurred in childhood.  I've seen it but it would be unusual.

Q.    That wasn't my question.

A.    Okay.  Sorry.

Q.    If you take as his baseline the level of education he completed, that's not a premorbid baseline for this injury?

A.    It would not be an indication of the way he was functioning before this head injury that he described to me happened, correct.

Q.    You did not have a complete set of Mr. Barrett's medical records, did you?

A.    Okay.  As far as I know, no, I did not.  I had the

records that I was given and they're in the box and I don't remember seeing -- well, I don't know what was complete or not concerning that.

Q.    Did you ask the attorneys for the government with whom you were working for additional medical records?

A.    I asked for all the records about anything, school, medical, employment files, anything that they had or could get, yes.

Q.    Do you happen to recall how far back in time the last medical record was that you looked at?  Like at the time of your evaluation, how old was it at the time of your evaluation?

A.    As far as I recall, there was nothing from before in terms of medical records only.  There may have been some incidental physical medical records in the file from Eastern State.  But other than that, it would have been after the offense in terms of medical records that I would have seen, as far as I recall.

Q.    Oh, okay.  Let me ask:  So in terms of the mental health records, what's the span in time between the most recent mental health -- mental health record you looked at and your evaluation?

A.    Okay.  Are you asking for, what is the earliest mental health record I have or the latest one?

Q.    The latest one, the one that was most -- that was the closest in time to your evaluation.

A.    Like a psychological evaluation?

Q.    (Nods head).

A.    Okay.  I'm sorry.

Q.    I mean, the hospital records, like the -- the Eastern State, the Bill Willis, the Wagoner.  Which of those was closest in time to your evaluation?

A.    I gotcha now.  Well, if you exclude the reports from Dr. Russell, it would have been the report from Dr. Sharp.

Q.    Okay.  And then if you were looking just at the hospitalization or clinic records, what's the --

A.    Well, the --

Q.    Which one?

A.    That would have been the -- the most recent would have been the file from Eastern State Hospital, I think.

Q.    I think if you look at page 2 of your report, that might help.

A.    So, again, the question is, what is the report closest in time before my evaluation?

Q.    (Nods head).

A.    Well, again, that would be that of Dr. Sharp who was in 2002.

Q.    Okay.  And then before that, it would be the Wagoner Hospital records from January of 1995?

A.    Yes.

Q.    And then also Bill Willis, same time period, and then the

Eastern State ran through 1986?

A.    Correct.

Q.    And your evaluation was in 2005?

A.    Yes.

Q.    Okay.  And you said that you asked for all the records. If the government didn't have or hadn't gone out to try to get Mr. Barrett's medical records, say, from his childhood, you just have no access to them?

A.    Right.

Q.    And nobody ever presented -- represented to you that you had a complete set of Mr. Barrett's medical records from birth through the time of your evaluation?

A.    That was never represented to me, only that that was all the records that were available to them.

Q.    Now, you testified that the impairment that you saw on the RBANS, I believe your testimony was essentially that it is inconsistent with the severity of head injury that Mr. Barrett described to you?

A.    Essentially, I think that's what I testified to, that if this was a severe brain injury that he experienced, I would expect more than just attention problems.

Q.    So you're comparing it, your assessment of his functioning, to the description of the injury and its aftermath and that's it?

A.    No.  I am comparing it to that but that's not it.  I'm

also comparing it to the evidence about his problems in school with learning problems and attention, that it was consistent with that. And then I'm saying it's inconsistent with a severe brain injury in childhood.

Q. Let me ask you a few questions about the PIA, the personal -- is it assessment inventory?

A. The personality assessment.

Q. The personality assessment inventory. Thank you.

One of the findings there was that he was -- he had a T-score of 70 on the depression scale; correct?

A. A 74, yes.

Q. Oh, 74. Thank you.

A. Yes.

Q. How many standard deviations above the mean is that?

A. Well, it's approximately -- it's a little over two.

Q. A little over two.

A. Uh-huh.

Q. Is that a significant finding?

A. Yes, it is.

Q. And his subscale on drug use was the same as depression; correct?

A. Yes.

Q. But alcohol up, way up there?

A. Correct.

Q. Ninety was the --

A.    Yes.

Q.    What was Mr. Barrett's score on the aggression subscale of the PAI?

A.    It was 55.

Q.    That's about average?

A.    That's an average range, yes.

Q.    Did Mr. Barrett report anything to you during your interview that was consistent with depressive symptoms?

A.    Yes.

Q.    What was that?

A.    Well, he reported that he had a history of being depressed at times.  Let me check exactly what he reported concerning that.

Okay.  He -- he reported that he -- he thought he was depressed in his mid 20's.  And currently at the time I saw him he reported that -- he wouldn't really say he was depressed.  He said, "I just have a lot of worries, uncertainty," and it was about his legal situation at the time.  He reported that he thought that his mood at the time I saw him was okay.

Q.    He also reported a sleep disturbance?

A.    He did report problems with both sleep onset and with maintenance of sleep and that he would wake up but he would go back to sleep.

Q.    You testified on direct about Mr. Barrett's score on the antisocial scale, the PD scale, on the MMPI.  Do you recall

that testimony?

A.    Yes.

Q.    There's also an antisocial scale on the PAI; correct?

A.    Yes.

Q.    What was Mr. Barrett's score on that, the T-score?

A.    It was 58.

Q.    And maybe we should state for the court's benefit, and probably mine too, what is a T-score?

A.    Well, a T-score is a standard score, where the average is 50 and then the standard deviation is 10.  And so, again, it puts the raw score into context so that you can see what level it is.

Q.    And so looking at your raw data, when we look at the full-scale profiles on the PAI, there are these dotted lines. There's like a dotted line across the 50 level and then there's a dotted line across the 70.  That's because if we see something within that 50 to 70, that's considered within two standard deviations, and if it's -- if it's high, you know, it's a little elevated, but it's the things that are above 70 that are -- you flag as the biggest problems?

A.    Right.  Those would be scores high enough to be statistically significant.  There could be scores, like you said, under that that would be clinically significant.  But those are the big ones, if it's above 70.

Q.    And the antisocial, these things are -- they're divided

-- then there's subscales, right, that go into each of these scales?  And on the MMPI in particular, they divide them up like crazy all different ways?

A.    There's hundreds of subscale scores.

Q.    Do they say that, "like crazy," in the literature?

A.    That's what it says, yes.

Q.    Good, good.  I want to use the right terms of art.

On the antisocial subscale, do you have that page of the PAI raw data in front of you?

A.    I do.

Q.    Okay.  So to get to that T-score of 58 for the scale itself, that's sort of an average of antisocial behaviors, egocentricity, and stimulus-seeking; right?

A.    Yes, yes.

Q.    Is that right?

A.    Yes, yes.  Those are the three things, the three subscales, that the PAI uses to combine into their antisocial scale.

Q.    And they average out to that 58?

A.    Correct.

Q.    And all -- well, except for egocentricity, which was a 39, the other two were within that two standard deviation range?

A.    Yes.  The antisocial behaviors was close.  It was, again, clinically significant, a T-score of 66.

Q.    Right.  Presumably, we wouldn't be here if Mr. Barrett hadn't engaged in some antisocial behavior; correct?

A.    I'd agree with that.

Q.    Now, the PAI, when you give that, the computer, I think, gives you back a sort of narrative report about the results; is that correct?

A.    Yeah.  It is a narrative report, an interpretative report, that is to assist the evaluator in a determination of what in that narrative report is supported in other parts of the information that's available to see if it's valid or not. It's an hypothesis, in other words.

Q.    And it's an hypothesis the way -- or it contains hypotheses just as your clinical judgment about the results contain hypotheses?

A.    It's the same idea, yes.

Q.    And both just in terms of the score and the clinical features described in the report, everyone notes that alcohol is a particular problem for Mr. Barrett?

A.    Yes.

Q.    The report also mentioned that he may have limited social skills; is that correct?

A.    It does say that, yes.

Q.    And particular difficulty interpreting the norms, nuances, and interpersonal behavior that provide the meaning to personal relationships?

A.    That's what the PAI interpretive report says.

Q.    Do you disagree with that?

A.    I certainly would about the poor social skills.  I did not see that in interacting with him at all.

Q.    You had a very positive interaction with him, you'd say?

A.    Yeah.  I think so.

Q.    Now, the PAI also has an aggression -- oh, we talked about that.  I'm sorry.  Never mind.  I don't want to make you go over things you've already done.

Now, at the end of that report, there's a section -- or towards the end anyway -- treatment consideration -- oh, wait.  That's not what I meant.  Never mind.  Critical item endorsement.

A.    Yes.

Q.    And what was the last thing mentioned under that?

A.    The traumatic stressors.  Is that what you're asking?

Q.    Yeah.  Is that the last one listed?  Yeah, that's it.  Is that it?

A.    Yes.

Q.    And what was the basis for the computer -- or this is a computer-generated report; is that correct?

A.    Yes.

Q.    What were the -- what was the basis for the computer flagging traumatic stressors as a critical item?

A.    Well, the basis is the critical items on the PAI are, I

believe, identified by both the content of them, but also how -- these are items that are rarely endorsed by people so they're unusual.

Q.    And when we say "endorsed," it's because, as you were saying before, the PAI has a gazillion questions and it asks you like those annoying Internet surveys, do you strongly agree, strongly disagree, somewhat true?  What are they?  You tell me.

A.    Well, those are -- on the PAI, it's very true, mostly true, somewhat true, or false.

Q.    Okay.  And there's also a subscale for traumatic stress on the PAI?

A.    When you say "subscale for traumatic stress," traumatic stress is a subtest that's under the anxiety-related scale.  So I don't -- I don't think the traumatic stress subscale -- I mean, it's a subscale itself.

Q.    And what was Mr. Barrett's score on the traumatic stress subscale?

A.    Seventy-five.

Q.    That's two and a half standard deviations above the mean?

A.    Correct.

Q.    Outside that normal range we talked about?

A.    Yes.

Q.    Did you include that in your report?

A.    That -- no, I did not include a discussion of the

traumatic stress subscale.

Q.    Now, the things as to which Mr. Barrett answered very true that caused the computer to list traumatic stressors as a critical item endorsement, am I correct, one of those was, I keep reliving something horrible that happened to me, very true?

A.    Yes.

Q.    And then the second was, I've been troubled by memories of a bad experience for a long time.  What was his response?

A.    That was very true.

Q.    And I've had some horrible experiences that make me feel guilty.  What was his response?

A.    Somewhat true.

Q.    And I've had some very bad -- I've had a very bad experience -- oh, since I had a very bad experience, I am no longer interested in some things that I used to enjoy.  And the response was?

A.    Somewhat true.

Q.    Somewhat true.  Did you mention those experiences that he referred to there in your report?

A.    I did not mention it in the report about what experience it is that he's referring to.  I had an impression in the interview but I did not put that in the report.

Q.    Did you follow up specifically in the interview?

A.    Well, follow up to the score --

Q.    Yes.

A.    -- or to the critical items?  No.

(Discussion held off the record)

Q.    (BY MR. SCHARDL)  Going to the MMPI, Dr. Price, in your raw data -- let me help you find it.  I think it's on page 6 of the extended score report.

A.    Okay.

Q.    Oh, you found it that quick.

A.    Yes.

Q.    Wow.  Again, the PK scale there, what's that?

A.    That's a scale that relates to posttraumatic stress disorder.

Q.    What was Mr. Barrett's score on that?

A.    A T-score of 72.

Q.    And is that in your report?

A.    No.

Q.    There was also on the -- I want to ask you about this -- on the validity and clinical scales profile, page 2 of the extended score report --

A.    Yes.

Q.    -- there was the FB.

A.    Yes.

Q.    What's that?

A.    It's a set of items on the MMPI that relate to some form of exaggeration that's towards the last part of the MMPI.

Q.    Form of exaggeration, you're saying?

A.    Yes.

Q.    And what was Mr. Barrett's T-score on the depression scale on the MMPI?

A.    Seventy-six.

Q.    Is that a significant finding, indication?

A.    Yes, it is.

Q.    Again, that's two and a half -- more than two and a half standard deviations above the mean on that?

A.    Yes.

Q.    And that's consistent with your diagnosis of dysthymic disorder?

A.    Yes, correct.

Q.    I'm sorry.  I should have asked you this before:  Could you go back to that page 6 of the extended score report?

A.    Okay.

Q.    What's the MT scale next to the PK scale?

A.    I don't know.

Q.    Let's move on then to the next page.  Are you familiar with any literature about the relationship between the MT scale and the PK scale?

A.    No.

Q.    So the next page of that extended score report, those five scales -- have you found it?

A.    Yes.

Q.    -- that's like called the big five, as I understand it; is that right?

A.    Yes.

Q.    And is the idea there that they've taken all these gazillion scales and they've come up with sort of five categories from those different scales?  Is that a fair way to describe it?

A.    The big five is a factor analytic -- it's a series of factor analytics studies where they've analyzed all the studies about personality traits and tried to see what are the most -- or the personality traits that explain things the most -- in the simplest way because there's so many studies.  And so what they've come up with are the five that all these studies tend to load on those five personality traits.

Q.    So let me see if I understand.  So the -- they take studies using these other scales and they say -- if we take groups -- we group these scales, according to these five personality traits, we can produce T-scores on those; is that right?

A.    Kind of.  What they did was they looked at the groupings of all of the research that they could use in this approach and those that had the most studies loaded on them they looked to those and to see what the studies were about and then came up with the name of that kind of meta personality trait.

Q.    Yeah, yeah.  Meta personality.  That's perfect.

Okay.  So Mr. Barrett's score on the aggression meta personality trait was what, his T-score?

A.    You know, I'm looking at this and I'm not sure that these are the big five that is the most talked about in the field, but I think these are the big five on the PAI.  But anyway, to answer your question --

Q.    I'm sorry.

A.    Well, it's like on the big five that --

Q.    Wait.  No.

A.    I'm sorry.

Q.    You said "PAI."  But this is the MMPI score; right?

A.    I'm sorry.  On the MMPI.

Q.    Okay.  I just wanted to clarify that.

A.    Okay.

Q.    So the T-score that's listed here for aggression is what?

A.    The T-score on this scale for aggression is 54.

Q.    And so that's pretty much average?

A.    That would be the case.  His perception of himself is that his aggression is average.

Q.    Based on his responses to the questions on the MMPI?

A.    Correct.

Q.    And it doesn't ask, "Do you see yourself as aggressive," and that produces a score of 54?

A.    No.  The items on the MMPI haven't got a lot of face validity.  In other words, you can't look at that and see what

scale that's going to load on.

Q.    So when you say he sees himself that way, he's not saying, it doesn't say, how aggressive do you think you are, and he says, I'm about average, and it says that's a 54?

A.    No.  It's not that kind of face validity to it.

Q.    And then the next scale there that's PSYC, that's -- as I understand it, is that like -- that's like weird thinking, bizarre thinking?

A.    Yeah.  It's like psychotic, like out of touch with reality.

Q.    So he's a little -- a little more elevated there, a T-score of 59; am I reading it right?

A.    Yeah.  There wouldn't be a significant difference between a 54 and a 59.  It's still within the average range.

Q.    The one score on this profile that was above the average range was in what category or what scale?

A.    That's the INTR, which I believe to be introversion.

Q.    Introversion.  Let me ask you to go back and look at the SI scale on the validity and clinical scales profile.

A.    Yes.

Q.    Yes.  So his T-score there is what, a 64?

A.    A 64, yes.

Q.    And am I correct that if you go then -- so the way this works -- correct me if I'm wrong or just come up with a great expression like the meta characteristic that you came up with

before -- the way this works is you get these scores and then these are the Harris-Lingoes -- is that correct? -- scales.

A.    Not -- no.  The scale that we're talking about, the SI, is among the basic clinical scales.  The Harris-Lingoes scales -- again, there's hundreds of these -- are subscales.

Q.    Oh, I see.  But there are these like sort of interpretative tables, where if you see a scale -- a number, a T-score, within a certain range, it gives you a way to interpret that score; correct?

A.    As to how elevated it is, yes.

Q.    As to what it -- thank you.  Also, there's sort of a description of what that person is like?

A.    Yes.

Q.    So in an SI -- that's the social introversion -- that would describe a person, as I understand it, who's shy, timid, lacks self-confidence, reliable, dependable.  Does that sound right to you?

A.    Yes.

Q.    And then on the SC scale -- and normally these are given by number; is that correct?

A.    That's what we do more commonly than using these labels that are old.

Q.    And that's in part because of the PD scale; is that correct?

A.    I don't understand.

Q.    Well, that there was a feeling in the -- in the field, I guess, that some of these -- the names were a little prejudicial or misleading, and that's part of what tended towards using the numbers instead of the word?

A.    Yeah.  I don't know about the prejudicial part.  But about the misleading part, that you wouldn't look at the SC scale, which stands for schizophrenia, and say his is elevated so he's schizophrenic.

Q.    You're right.  Same with the hysteria scale, like that's --

A.    Right.

Q.    We don't use that word anymore?

A.    That's right.

Q.    So the schizophrenia scale is more about like just their -- how unusual their beliefs or thinking is?

A.    It can mean that.  It can mean also -- it can indicate some confusion.  It can indicate a belief in things that most people don't believe in.  It can indicate any of those things.

Q.    So on Mr. Barrett, he had a T-score there of 70 on the schizophrenia or the 8, whatever we want to call it.  And as I understand it, based on those scoring tables, that would be a person of schizoid lifestyle, unusual beliefs, eccentric behavior, confused, fearful, sad, somatic complaints, uninvolved, excessive fantasy, and daydreaming.  Does that sound accurate?

A.    Those would all be possibilities for an elevation here. In addition, just general being distressed can elevate almost any of those, and that's led to another way to interpret the -- the answers that we have, that tries to get rid of that general level of distress.  But those would all be descriptors that you would use as a hypothesis in the rest of the information to see which one fit.

Q.    And then on the scale 6, PA, paranoia, his T-score there is a 79?

A.    Yes.

Q.    So that's almost three standard deviations above the mean; right?

A.    Yes.

Q.    And that would be consistent with somebody who experienced some psychotic symptoms, including delusions of persecution, ideas of reference?

A.    Well, it could be.  It could be that the paranoid thinking is really bizarre like that that's delusional.  Or it could be also feeling like you've been treated unfairly and people aren't really your friends that you thought were and things like that.

Q.    Now, in your interview with Mr. Barrett, did he talk about some dirigibles?

A.    I have no idea.  I don't remember that.

Q.    You don't recall a discussion with him telling you that

he believed that he was being surveilled by dirigibles?

A.    I don't remember that.

MR. SCHARDL:  May I have a moment to confer with counsel, Your Honor?

THE COURT:  Yes.

MR. SCHARDL:  Thank you, sir.

(Discussion held off the record)

MR. SCHARDL:  If I could have just another minute, Your Honor.

Just for the record, you know, when I asked for his materials, and the court's ruling earlier was that we could see them when the witness came to court, so this box would contain, I would estimate, 300 pages of material

THE COURT:  I hope you're fast.

MR. SCHARDL:  Have I mentioned my neurological condition that affects my vision?  Could we maybe have five or ten minutes so I can just skim through them and see if there's anything there?

THE COURT:  Yeah.  Let's take a brief recess while you do that.

MR. SCHARDL:  Thank you very much, Your Honor.

(Short break)

MR. SCHARDL:  Thank you for that opportunity, Your Honor.  I'll pass the witness at this point.

THE COURT:  Good.  Redirect, Mr. Wilson.

REDIRECT EXAMINATION

BY MR. WILSON:

Q.    Dr. Price, counsel asked you a series of questions early on in the cross-examination regarding the testing that you performed in reference to brain function, and I believe he asked you that there are a battery of different tests that can be focused on particular types of brain function; is that correct?

A.    Yeah.  There's hundreds of different tests that can be administered.

Q.    Okay.  And at the time that you evaluated Mr. Barrett, the screening mechanism that you used were the tests that we previously talked about; is that right?

A.    That's correct.

Q.    And based upon your evaluation of those tests, did you determine that there was a need for a full-blown evaluation or screening of -- a full battery of additional psychological tests -- neuropsychological tests?

A.    I did.

Q.    And what was your determination on that?

A.    That it was not needed for my evaluation at that time.

Q.    Okay.  And as a result of questions that counsel has asked you about today, have you changed your opinion on that?

A.    No.  Not -- I have not.

Q.    There was a series of questions regarding obviously the

raw testing data, and that raw testing data was not part of the report that you generated in this case; is that correct?

A.    The only -- the only thing that was a part of it would not be raw data but would be the profile of the scores on the PAI and the MMPI.

Q.    Okay.  And when you say profiles, explain what you mean by that.

A.    It's the graph of the -- the T-scores on the basic scales of each of those tests.

Q.    Well, specifically counsel asked you about -- on the MMPI-2 about a subset or subscale involving the MT --

A.    Yes.

Q.    -- designation.  I believe he asked you, do you know what that is, and you said you didn't know.

A.    That's correct.  I just -- I don't know what that scale is.

Q.    Okay.  Are you familiar with the expression -- or are you familiar with the -- I'm not sure what you call it, whether it's a disorder or what it is -- but a college maladjustment?

A.    Well, that's one of the many, many scales available on the MMPI.

Q.    Okay.  Do you know whether or not the MT references a college maladjustment?

A.    I don't know what "MT" stands for as I sit here.  I don't know.

Q.    Okay.  On those set of subscales, the college maladjustment, what would that have to do with Mr. Barrett?

A.    It wouldn't have anything to do with him.

Q.    Now, he also referenced -- and I say "he" -- counsel referred to the PK scale.  And what is the PK scale?

A.    It relates to posttraumatic stress disorder.

Q.    Okay.  And I believe that on one of the raw -- in the raw data of the testing, that particular subscale was elevated; is that correct?

A.    Yes.

Q.    And it was above the standard deviation; correct?

A.    Right.  It was above two standard deviations.

Q.    I'm sorry.  Two standard deviations.

A.    Yes.

Q.    Is that significant to you in your -- or was that significant to you in your mental evaluation of Mr. Barrett?

A.    That elevation on that scale was not -- not significant to me at that time.

Q.    Why not?  I mean, it's above the standard deviation.

A.    Well, it shows stress in relationship to something, but I did not -- as far as it might relate to posttraumatic stress disorder, I did not see anything in my evaluation that would indicate that he was suffering from posttraumatic stress disorder.

Q.    What type of things would you look at or would be

important to you in making that determination if someone was suffering from posttraumatic stress disorder?

A.    Well, you would look at, is there something they're trying to not think about, avoid.  That's kind of the -- well, in the first place, a stressor would be there that would be life-threatening for the person or the possibility of serious injury to them or to somebody else close to them and that it caused them to have flashbacks of that event, to avoid things that reminded them of that event, to be kind of numb to their future and to certain things that they used to do and like to do.  It could be a host of things.  But I didn't see anything, other than his situation at the time, that would be something -- and it was causing him stress.  I mean, he was in trial and that was the main stressor in my evaluation that I saw on his life at that time.

Q.    Did he report any episode in his past that he complained of having flashbacks concerning?

A.    No.

Q.    And I notice when we went through the evaluation -- excuse me -- the diagnosis there was no posttraumatic stress disorder diagnosed.

A.    Correct.

Q.    Let me ask this, Doctor:  If on one of these subscales if you have an elevated trait -- or excuse me -- an elevated subscale, does that necessarily require a diagnosis?

A.    No.  You put the results of the objective testing into context of the rest of the information, the records, the interview, and combine and integrate the information.  And just because there is an elevation on a scale, it doesn't mean one thing and one thing only, it can mean several things.  That's why it's a part of the evaluation, not the end result or the only thing you rely upon.

Q.    Well, during your interview of Mr. Barrett, did he discuss with you an incident in his teenage years involving law enforcement and having being arrested or being beaten up by law enforcement?

A.    Yes, he did.  He certainly told me that.  I don't remember much in the way of detail but it did come up.

Q.    Did he indicate at any time during your interview that he had flashbacks of that event?

A.    No.

Q.    Did he indicate he had any symptoms consistent with posttraumatic stress as a result of that event?

A.    No.

Q.    Did Mr. Barrett indicate any other events in his past of significance which would potentially result in a stressor of post -- that would result in posttraumatic stress disorder?

A.    Well, the event that he -- he discussed the most that was distressing to him, not that he was having flashbacks or wouldn't talk about it, was the offense itself and how it

happened.

Q.    And we're talking about the event in September of 1999; is that correct?

A.    Yes, correct.

Q.    The crime that we're here on today; correct?

A.    Yes.

Q.    In the raw testing data, there was also an elevation -- or excuse me -- in the MMPI, there was reference to his alcohol consumption, alcohol had a negative impact in his life; is that correct?

A.    Yes.  Did you say that that was on the --

Q.    I'm sorry.  The PAI.

A.    The PAI has a scale on alcohol impact.  And so there's more than one scale on the MMPI that relates to alcohol abuse.

Q.    And do you recall whether those were elevated in reference to alcohol abuse?

A.    Well, it's the one that's on the MMPI, the scale that relates to whether they just admit having a problem with alcohol, it was slightly elevated.  There's another scale that has been thought in the past it's been -- it's not used as much -- that's about having the personality traits that predispose one to addiction.  It was not elevated, as I recall.

Q.    Well, do those same scales, the PAI and the MMPI, both of those tests, do they have scales in reference to drug abuse --

A.    Yes.

Q.   -- or drug usage?

A.   Yes.  The PAI does.

Q.   And was that elevated in reference to drug use?

A.   Yes.

Q.   And when you talked with Mr. Barrett, did you have an indication or did he give you an indication when he quit drinking?

A.   I think so.  It seemed like he quit drinking sometime -- or he told me that he did -- sometime prior to this offense.

MR. WILSON:  May I have just one moment, Your Honor?  I'm sorry.

THE COURT:  Yes.

MR. WILSON:  Thank you.

Q.   (BY MR. WILSON) Dr. Price, I apologize.  I meant to ask you this a moment ago when we were talking about stressors.

I think counsel asked you a question that after you scored the -- I believe it was the PAI that had a traumatic stressor -- and that may have been the MMPI -- but did you do a follow-up with him, a follow-up interview with him, regarding that?  I believe that question was asked.

A.   Yes.  If I followed up on an interview based on the critical items.

Q.   Okay.  And I believe your answer was no?

A.   That's correct.

Q.   And did you score those -- the MMPI and the PAI -- did

you score those while you were sitting there with him?

A.    No.

Q.    But that scoring was done after the interview and after the testing obviously?

A.    Yes.

Q.    Okay.

A.    That's true.

Q.    And so you spend your two days doing interview and testing and then you went back and you scored them; is that correct?

A.    Correct.

Q.    And no follow-up interview?

A.    Correct.

Q.    And based upon your observations of the information in those -- in that testing and that testing data, did you believe there was a necessity of doing a follow-up interview to talk with him more about the testing results?

A.    Not -- not that I recall.  I did not think -- while it's nice to be able to have unlimited access to somebody, it wasn't an issue here and I didn't feel it was to interview him about the critical items.

Q.    And counsel asked you some questions about the records, the mental health records, that you reviewed.  Did you review all the records that you were provided?

A.    Yes.

Q.    And did you consider all those records in your diagnosis you've talked about here today?

A.    Yes.

Q.    And the medication records, did you review all those that were provided to you?

A.    Yes.

Q.    And did you consider those?

A.    Yes.

Q.    And the substance abuse records, did you review those?

A.    Yes.

Q.    And did you consider those in your diagnosis that you made back in 2005 in which you testified about here today?

A.    I did.

Q.    Dr. Price, did you intentionally leave out information about these traumatic stressors from your report?

A.    No.  I mean, I intentionally did because I didn't think those -- every scale that was relevant to what I was opining about.  I didn't see a posttraumatic stress disorder, for example, so I didn't comment on that scale that relates to that being high.

Q.    Counsel also asked you about whether or not Mr. Barrett reported to you that he observed dirigibles surveilling him.

A.    Yes.

Q.    And I believe you said you don't recall that?

A.    I don't.

Q.    Okay.  If that had been reported to other professionals, and may have even been reported to you, does that in any way change your assessment or your diagnosis of Mr. Barrett?  I mean, if he, in fact, reported that I saw dirigibles and they were real, I saw them, obviously that's bizarre paranoid behavior.  Would you agree with that?

A.    Yes.

Q.    Okay.  Would that change your opinion regarding Mr. Barrett and what you've testified here today?

A.    No.

MR. WILSON:  May I have just one moment, Your Honor?

THE COURT:  Yes.

(Discussion held off the record)

MR. WILSON:  Your Honor, I believe that's all the questions I have.  I'll pass the witness.  Thank you.

THE COURT:  Anything further from Dr. Price?

MR. SCHARDL:  Yes.  A little bit, Your Honor.  Thank you.

THE COURT:  Okay.

RECROSS-EXAMINATION

BY MR. SCHARDL:

Q.    Doctor, you testified that you didn't see a reason to do any additional neuropsychological testing?

A.    Right.

Q.    Is that the same thing as saying you ruled out the

possibility that if you did additional testing you would find dysfunction?

A.    No.   There would always be a possibility of that.

Q.    Counsel referred to the name of the MT subscale as "college maladjustment."  If there is a subscale that should not be factored in, the MMPI report will tell you that -- is that right? -- there's a problem, throw this one out.

A.    I'm not sure of that.  I know that there are the validity scales that would say the clinical scales are invalid, but there would be certainly scales that wouldn't apply to that individual that the program wouldn't tell you to do that but you would know to do that.

Q.    I see.  And we discussed before how the labels, like schizophrenia, isn't really about schizophrenia.  So college maladjustment might not be about college maladjustment?

A.    That's true.  It -- it doesn't -- again, I don't -- I'm not accustomed to looking at that scale in any case so I don't know.

Q.    Now, I've been through your interview with Mr. Barrett at least a couple times.  Can you help me?  Where did you ask him if he ever experienced flashbacks?  At what point do you think that came up?

A.    I don't know at what point that came up.

Q.    Did you ask him that?

A.    I'm pretty sure I didn't say, "Do you have flashbacks

about some traumatic experience?"  I'm pretty sure I didn't ask that question.

Q.    You did not ask that question?

A.    Yeah.  That wouldn't -- I wouldn't have asked that question if there wasn't some indication.

Q.    But Mr. Barrett did respond "very true" when asked "I keep reliving something horrible that happened to me"?

A.    He did.

Q.    Now, in lay terms we talk about a flashback, but in psychological terms we talk about reliving or re-experiencing the trauma.

A.    Re-experiencing, yes.

Q.    And a lay person might take reliving to be the same thing as re-experiencing?

A.    I think so.

Q.    And you didn't specifically ask him if he had numbing experiences; correct?

A.    I wouldn't have asked do you have that experience -- I wouldn't have asked that.

Q.    But he said it was somewhat true that after his very bad experience he's no longer interested in some things that he used to enjoy?

A.    That's -- that's true, he did answer that question like that.

Q.    And similarly, you didn't ask him about avoidance, you

Q.   didn't ask him if he tried to avoid things that reminded him of this traumatic stressor, which you never asked about?

A.   I wouldn't have asked that in that way in any case.

Q.   You were asked about the elevated subscale that does not lead inextricably to the diagnosis; right?

A.   Right.

Q.   And you were asked earlier today about his elevated scales on the -- elevated scores on the PD scale, the antisocial scale; correct?

A.   Yes.

Q.   And you also did not diagnose Mr. Barrett with antisocial personality disorder?

A.   That's correct.

Q.   And you mentioned that Mr. Barrett did talk about the events; correct?

A.   To a certain extent, yes.

Q.   And he described his experience of it?

A.   Yes.

Q.   He described hearing his boy screaming in the yard?  He said that several times over, didn't he?

A.   I don't remember if he said it several times but I do recall him saying that.

Q.   Did he appear to be experiencing some distress about that memory?

A.   Oh, he was -- he was distressed about the whole

experience, about other aspects as well, yes.

MR. SCHARDL:  Can I have just one minute, Your Honor?  I'm forgetting something.

THE COURT:  Yes, yes.

(Discussion held off the record)

Q.    (BY MR. SCHARDL)  The last thing, Your Honor, with regard to -- I'm sorry -- I mean, Dr. Price, with regard to the thoughts that Mr. Barrett endorsed, you were asked about dirigibles and strange thinking and everything, Mr. Barrett also answered true when asked on the MMPI if someone has been trying to poison him; is that correct?

A.    I can look and see.  I'm not --

Q.    Would you mind?  It's on page 15 of the extended score report.

A.    He answered true to that, yes.

MR. SCHARDL:  I think that's all I have, Your Honor.  Thank you.

THE COURT:  Dr. Price, you can step down.  Thank you, sir.

Very well.  I think we'll go ahead and adjourn for the evening and resume tomorrow morning at 9 a.m.  Anything you all want me to think about overnight or --

MR. SCHARDL:  Why we should win.

THE COURT:  I'm thinking about that.

MR. KAHAN:  Your Honor, I just want to clean this

up.  I think counsel will agree.  There was some discussion about Mr. Sperling having had an elicit copy of Jeanne Russell's report and I think we've put that to bed.

MR. SCHARDL:  Yes.  If I may, Your Honor, I'd like to clarify.  Thank you, Mr. Kahan, for doing that, for bringing that up.

Mr. Kahan pointed out to me during one of the breaks that -- so there was a fax cover sheet indicating that Mr. Sperling had sent Dr. Russell's report to Dr. Price and that fax cover sheet was dated September 20th.  Mr. Kahan pointed out to me that Judge Payne sua sponte invoked the firewall procedure, that the defense hadn't asked for it, and that Judge Payne did not invoke that procedure until September 29th, I think.

MR. KAHAN:  Yeah.  And my representation we are in sua sponte is based largely on my reading of the moving papers from the government, but it is my understanding that the judge on his own decided to go ahead with that.  But more than that, Mr. Sperling made clear in his own papers that he had custody of Jeanne Russell's report and he had received it from defense counsel so there's nothing that was unknown to the court previously.

THE COURT:  Good.  One other thing.  I guess we probably don't need to hear from Dr. Reidy anymore, but what about Dr. Miora?  What would we hear from Dr. Miora that is not

essentially cumulative of what Dr. Woods told us?

MR. SCHARDL:  Well, Your Honor, Dr. Miora would testify about the methods and procedures used by Dr. Young. And in particular in light of the testimony we heard today about doing something less than a complete battery, I think that she would provide a lot of valuable testimony about why the results Dr. Young obtained are valid and reliable and important considerations in ways that Dr. Woods can't.  Because Dr. Woods, although he is trained to rely on neuropsychological testing to assess how they're significant for his job as a neuropsychiatrist, he's not -- he's not trained in the administration, the scoring, the norming, and everything of these tests.

And so I think that she could provide a lot of valuable testimony about why this comprehensive battery that Dr. Young administered was appropriate and is valuable.  And to the extent the government is going to argue that based on the RBANS that there was no evidence of any brain dysfunction in Mr. Barrett, she could explain why that would be an invalid and unreliable conclusion based on the difference between the two test batteries.

THE COURT:  And Dr. Woods didn't give that opinion?

MR. SCHARDL:  I don't think -- I have to apologize because I wasn't here for Dr. Woods' testimony.  But to the best of my understanding, he did not testify about the

difference between the batteries administered by Dr. Price and Dr. Young.

THE COURT: All right. Well, I'm going to let you all think about that tonight. And if you really -- I mean, I would really like to wrap this up by Wednesday, if possible. But you might check into whether Dr. Miora would be available, and then I'll decide whether I want to leave it open longer than Wednesday or not.

MR. SCHARDL: I'll contact her right away. Thank you, Your Honor.

THE COURT: Very good. All right. So we'll be in recess then.

MR. SCHARDL: Thank you.

(The proceedings were recessed)

C E R T I F I C A T E

I, Brian P. Neil, a Certified Court Reporter for the Northern District of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in above-captioned case.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 13th day of June 2017.

s/ Brian P. Neil
_____
Brian P. Neil, RMR-CRR
United States Court Reporter