IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                   )
            Plaintiff,             )
                                   )
-vs-                               )   No. CIV-09-105-JHP
                                   )
UNITED STATES OF AMERICA,          )
                                   )        VOLUME VII
            Defendant.             )

TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE STEVEN P. SHREDER

UNITED STATES MAGISTRATE JUDGE

JUNE 13, 2017

A P P E A R A N C E S

David B. Autry, Attorney at Law, 1021 N.W. 16th Street, Oklahoma City, Oklahoma, 73106, and
Joan M. Fisher and Tivon Schardl, Federal Public Defenders, 801 I Street, Third Floor, Sacramento, California, 95814, attorneys on behalf of the Plaintiff;

Christopher J. Wilson, Assistant U.S. Attorney, 520 Denison Avenue, Muskogee, Oklahoma, 74401, and
Jeffrey B. Kahan, Attorney, U.S. Department of Justice, 1331 F Street N.W., Room 345, Washington, D.C., 20530, attorneys on behalf of the Defendant.

REPORTED BY:       BRIAN P. NEIL, RMR-CRR
                   United States Court Reporter

6:09-cv-00105-RAW    Document 453    Filed in ED/OK on 06/15/17    Page 2 of 53   1085

I N D E X


WITNESSES


PAGE

STEVEN E. PITT, D.O.

Continued Cross-Examination by Mr. Autry        1086
Redirect Examination by Mr. Kahan               1112
Recross-Examination by Mr. Autry                1125

*Brian P. Neil, RMR-CRR*
*U.S. District Court - NDOK*

Tuesday, June 13, 2017

* * * * *

THE COURT:  Go ahead, Mr. Autry.

MR. AUTRY:  Okay.  Thank you, Your Honor.

CONTINUED CROSS-EXAMINATION

BY MR. AUTRY:

Q.    Doctor, before I forget to ask you about it, you obviously tape-recorded audio and video the interview you did with Mr. Barrett; correct?

A.    Yes, sir.

Q.    And there's some controversy --

(Discussion held off the record)

Q.    (BY MR. AUTRY)  With respect to videotaping a psychiatric interview, audiotaping a psychiatric interview, there's some controversy in your field as to whether that's appropriate or not; true?

A.    First of all, I -- it's a forensic psychiatric evaluation.

Q.    Yes, sir.

A.    And there's different camps and different schools of thoughts about the -- whether or not this is something that should be part of best practices.  Some people think not, some people think it should be.

Q.    All right.  Are you aware of what an observation effect is?

A.    Sure.

Q.    That's where somebody may tailor their responses or their demeanor if they're being videotaped or audiotaped?

A.    Sure.

Q.    Okay.  And that's one of the reasons that videotaping a forensic psychiatric interview is somewhat controversial within the field.  Would you agree with that?

A.    I think people who are opposed to it, I think that's one of the explanations that they offer.

Q.    All right.  And let me ask you about these BOP records.

A.    Yes, sir.

Q.    One of the reasons you state that Mr. Barrett has neither bipolar disorder nor PTSD is because within the Bureau of Prisons, where he's been since 2006, there's never been a diagnosis by a prison mental health professional of either of those maladies; correct?

A.    That's just one of the many places where there's no diagnosis, yes, sir.

Q.    Okay.  But we're focusing now just on the Bureau of Prisons.

A.    Yes, sir.

Q.    Do you know whether or not the Bureau of Prisons did any kind of comprehensive mental health evaluation of Mr. Barrett since he's been there?

A.    I don't -- hang on one second here, okay?  I know that

Drs. Eckert, Noble, Bleier, and Profitt have seen him.  Whether or not they've ever done a comprehensive evaluation, I don't know.

Q.    All right.  So it could be one of these drive-by deals that they frequently do in prison, where they come up to your cell or see you while you're at work and say, how are you doing, you feel okay today, or some kind of quick mental status evaluation; true?

A.    I can't frankly tell you one way or the another how it might be.  I can tell you that there's at least four mental health professionals who have said no psychiatric or psychological issues.

Q.    But what they base their opinion on and whether they actually did a competent or thorough mental health evaluation of Mr. Barrett, you don't know; correct?

A.    I think that's a fair statement.

Q.    All right.  Now, Mr. Barrett, when you did your forensic psychiatric interview with him, you asked him whether or not he thought he needed some mental health treatment in prison; right?

A.    Yes.

Q.    And he said that there are times that he wanted to talk to someone or felt like he needed to talk to someone?

A.    Yes.

Q.    But it wouldn't be anybody with the Bureau of Prisons --

A.    Yes.

Q.    -- right?

A.    Yes.

Q.    Okay.  And did you ask him to explain that?

A.    I don't know if I did or didn't.  I recall the dialogue and I recall Mr. Barrett telling me that he would be loathe to talk with someone at the Bureau of Prisons.

Q.    All right.  Now, you indicated that to the extent Mr. Barrett may have presented by demeanor some kind of affect that might indicate something was going on, that the fact that he was in prison increased his stress level.  Do you remember saying words to that effect or something about that on direct examination?

A.    The second half of your sentence I agree with completely.  The first half, I didn't understand the nexus between the two components of your sentence.

Q.    Okay.  That -- okay.  That his stress level might have been increased above what it normally would be because of the prison environment; is that what you were trying to get across?

A.    Well, I think -- I think the response had to do with questions that were asked by Mr. Kahan that spoke about how emotionally people do if they're in a more -- more confined or stressful environment versus those people that have, say, more privileges or more open-ended environment.  And I said I would -- I don't know if I say -- there's literature that supports

that the more constrictive the environment is, the more solitary life the environment is, the more likely you're going to see an exacerbation of, or a development of, emotional problems.

Q.    But the particular prison unit Mr. Barrett was on in Terre Haute he's not in general population?

A.    Certainly is not.

Q.    And general population would probably increase an inmate's stress level over the type of setting that Mr. Barrett was in at Terre Haute; true?

A.    It depends.  I think there's a body of literature out there that talks about the stress associated with being a condemned inmate.  I think there's a -- I can't pull it for you right now, but it talks about because of the privileges that he has are really -- I think what he told me he's in phase two, I think, which allows him to periodically go out into a caged area with another inmate.

But the bigger -- the bigger point is that if what you're suggesting is in a general population where there are different factions and gangs and what have you, could that be more stressful?  Theoretically it's possible.  But what I'm here to tell you is that there's a good body of literature that talks about the stress associated with protracted confinement in a -- for a condemned inmate.

Q.    All right.  And it's a very structured environment on

death row at Terre Haute; correct?

A.    Yes, sir.

Q.    And Mr. Barrett is able to have a job, though, isn't he, he's able to work?

A.    You're asking the question so the answer must be yes.

Q.    Oh, okay.

A.    I'm not -- I'm not -- I'm forgetting what he's -- it's escaping me but I think the answer is yes.

Q.    Okay.  Now, let me ask you a few questions, Doctor, about PTSD.

A.    Yes, sir.

Q.    Do you acknowledge that some of the trauma Mr. Barrett underwent as a child in growing up with his abusive or dysfunctional background and things of that nature could be a precursor to PTSD?

A.    Could be.

Q.    Okay.  And I think you discount that because Mr. Barrett did not adopt or did not endorse certain symptoms of PTSD such as avoiding thoughts that would trigger it and things of that nature?

A.    Well, you're -- you're -- you're quoting from the DSM on the second part of that sentence.  But why I -- why I -- why I discount that diagnosis, there are multiple reasons.  Those reasons include the fact that I'm having a hard time figuring out what the -- notwithstanding the fact that there was some

childhood trauma and some physical abuse, which I'm certainly not condoning, but on a continuum I didn't see anything that rose to the level of a traumatic event that would really qualify for PTSD.  That's reason number one.

Reason number two was, when I met with Mr. Barrett I spoke with him about PTSD and Dr. Woods' conclusion that he has PTSD, and I think it's on pages 116 and 117 on the transcript of my interview.  At the end of, I think, the bottom of page 117 you get to the spot where he says -- I'm paraphrasing now -- but I'm not quite sure how he got to that diagnosis.

The third reason I discount is because the testing I talked about that Dr. LaFortune did.

The fourth reason I discount it is because based on my training, experience, and knowledge as a psychiatrist and as a forensic psychiatrist, you don't include the diagnosis of -- you don't -- you don't -- if there's a better explanation for some of the symptoms, to the extent they exist, and it's better explained by, say, substance use or some other organic process, then you need to consider that.

And then the last reason is that nowhere else in any other records has Mr. Barrett been diagnosed with PTSD.  It's just -- it's nowhere in any of the records that we've discussed.

Q.    Well, you don't dispute that he went through a significant amount of trauma growing up in one form --

A.    I think -- no.  I completely concede that.  I did -- I did earlier.

Q.    Sure.

A.    I'm not going to debate that with you.

Q.    And in addition to that, as we mentioned before, when he was about 17 years old he was beaten by the police?

A.    Yes.

Q.    Had his jaw broken?

A.    Yes.

Q.    Potentially threatened with death and all this stuff?

A.    Yes, potentially.

Q.    Yeah.  That could be a triggering event for PTSD?

A.    Could be.  Could be, sure.

Q.    Okay.  Were you aware that during his interview with Dr. Price, Mr. Barrett said, "I keep reliving something bad that happened to me"?  Do you recall that?

A.    No.  You'll have to -- I don't recall that.  You'd have to show that to me.

Q.    Okay.  It's not in his report.  But were you aware -- I don't know if they've talked to you, but were you aware that he was asked about that yesterday?

A.    Was I aware that who was asked what?

Q.    Dr. Price was asked about that statement that Mr. Barrett made.

A.    No, I was not aware of that.

Q.    Okay.  And it was Dr. Price's impression that he was possibly or probably talking about the incident that led to this charge and the state charges, but he didn't follow up and ask, well, what are you talking about, what experience are you talking about.  Did the government lawyers makes you aware of that?

A.    No.  Here's what they made me -- here's what they made me aware of.

Q.    Well, that's fine.  If they didn't, they didn't.

A.    Well, it's a "no" with a qualifier.

Q.    Okay.

A.    Can I -- do you want me to qualify it?

Q.    Sure, sure.

A.    Here's what I recall.  They made me aware there was some discussion about the incident itself of September 24, 1999, that Dr. Price was asked about could that meet the criteria for PTSD.  That's the essence of what I recall about the conversation.

Q.    Okay.

A.    And I would -- yeah, look, that incident -- certainly, I would -- it could.

Q.    Okay.  You stated throughout -- and everybody concedes -- that Mr. Barrett had a severe drug problem, right, polysubstance abuse over a period of many years?

A.    Yes.  Yes, sir.

Q.    Okay.  And can drug use exacerbate an underlying mental condition just as a general matter?

A.    In certain situations, yes.

Q.    Okay.  Can drug use of the sort Mr. Barrett engaged in affect the structure of the brain or the --

A.    Yeah.

Q.    -- neurological functions of the brain?

A.    Depending on the use and the time of use, sure, that's a possibility.

Q.    And as you indicated before, Mr. Barrett had genetic loading to develop a substance abuse problem based on his family history; correct?

A.    Well, you're -- I didn't quite say it that way.  What I said was -- no, you're shaking your head like this.  Let me -- no, let me finish --

Q.    All right.

A.    -- because you kind of merged a couple concepts.

      There's no dispute that he had genetic loading, that there was a strong family history of substance use.  There's no dispute that there's genetic loading for substance use in Mr. Barrett's family history.

Q.    Okay.  Thank you.  Doctor, you helpfully provided -- and it's one of the exhibits; I don't remember the number -- a chart or a series of charts detailing your court testimony over the years; correct?

A.    Yes, sir.

Q.    From like 1990 to 2016; correct?

A.    That sounds about -- until January 3 of 2017 I think is what it says.

Q.    And I think you list 182 instances of where you've given court testimony?

A.    No, that's not accurate.  You misread that.  It says court or deposition testimony.

Q.    Court or deposition.  Okay.  Well, let's just change it to testimony, whether court or deposition.

A.    Okay.  All right.  I'm okay with that.

Q.    All right.  And about 65 of those cases, give or take -- and please correct me if I'm wrong -- were criminal cases, the rest of them were civil cases?

A.    I haven't bothered to count them up.  But if that's what you count, then I'm not going to sit here and count right now.  I'm not going to quibble with you.

Q.    All right.  And as a percentage of those 65 cases, how often did you appear as a witness on behalf of the government versus for a criminal defendant?

A.    So, again, without counting all the -- all the numbers up and looking at the different issues, whether it was a motion-practice hearing or an actual trial or a competency-to-stand-trial hearings, there's a number of those that make up that 65.

Q.    Yes, sir.

A.    A number of those, at least a dozen of those, are competency-to-stand-trial hearings when I was working as a forensic psychiatric at the state hospital.

In the -- in my private practice, I would say it's probably 15 percent, 10 percent retained by defense and the rest prosecution.

Q.    Okay.  You have some pretty close associations with various law-enforcement agencies and district attorney's offices around the country; correct?

A.    I have consulted to different law-enforcement agencies and district attorney's offices, yes, sir.

Q.    Okay.  Can you -- you've worked with the Phoenix Police Department?

A.    Yes.

Q.    And do you still work with the Phoenix Police Department on occasion?

A.    I consult to the Phoenix Police Department, yes, sir.

Q.    Okay.  How about Tucson or anywhere else in Arizona?

A.    I've done some consulting with an agency up in Flagstaff, the Coconino County Sheriff's Office, but largely the consultation is with the Phoenix Police Department.

Q.    Okay.  And you've also had associations or consultation arrangements with district attorney's offices in Colorado; is that correct?

A.    I've done consultation to district attorney's offices in Colorado, yes, sir.

Q.    Okay.  And how many different district attorney's offices in Colorado?

A.    Well, I've been -- let me be specific here.  I've been retained by district attorney's offices in Colorado.  I was a consultant to district -- to two district attorney's offices, one for the Columbine tragedy, what ended up being what's called the Columbine Psychiatric Autopsy Project, where me and a number of colleagues came together and worked with A&E and did a psychiatric autopsy on Dylan Klebold and Eric Harris and it was made into a documentary.  The other one is with the Boulder District Attorney's Office as it related to the homicide investigation of JonBenet Ramsey.

Those are the only two consulting district attorney office agencies that I've worked with in that capacity.

Q.    All right.  And are you involved with the sheriff's office in Phoenix?

A.    No.

Q.    Okay.  Just the police department?

A.    "Involved with" is an overly broad statement.  There are cases that I've consulted with the police department on.

Q.    All right.  And you've made a number of professional presentation to legal groups or lawyer groups or whatever over the years, haven't you?

A.    Legal groups and lawyer groups, yes.

Q.    Okay.  Let's see.  Do you remember giving a presentation entitled:  "The Insanity Defense and You:  Are you Ready?" to the Arizona Prosecuting Attorneys' Advisory Council back in 2014?

A.    Yes.  I think I did that with Jonathan Mosher, yes.

Q.    Okay.  And also a presentation "Insane in the Brain: Rebutting the Insanity Defense," 2013, Arizona Prosecuting Attorneys' Advisory Council?

A.    Yes.  That one I definitely did with Jonathan Mosher, yes.

Q.    Okay.  "Using Mental Health Experts to Rebut Mitigation," 2012 Association of Government Attorneys in Capital Litigation --

A.    Yes.

Q.    -- Summer Conference in San Francisco?

A.    Yes.

Q.    "Understanding and Meeting Mental Defenses," 2012 Arizona Prosecuting attorneys' Advisory Council Summer Conference in 2012?

A.    That is true.

Q.    Okay.  "The Art of Interviewing," the University of Arizona College of Medicine?  That had no law enforcement.

A.    No.  But there's an interviewing course that I taught for years to the Phoenix Police Department.

Q.    Have you ever taught interrogation techniques to any police departments?

A.    No, no.  I don't do interrogation.  I leave that up to the police officers.

Q.    Okay.  Do you assist them in formulating questions or means of questioning suspects or interrogating suspects?

A.    I think that's an overly broad generalized statement of what I do.  What I do with them largely has to do with if they have a potential suspect or suspect that's been developed as a person of interest, and it looks like there may be mental health issues in play, working with them to ask the right kinds of questions about that person's mental state so that in the beginning the truth comes out and so that we're not chasing this issue five, six years down the road.  The idea being, if someone was seriously mentally ill when they committed an offense and truly couldn't appreciate the wrongfulness of their conduct or conform their conduct to the requirement of law, it's in the best interest of everyone that that person goes to a mental facility as opposed to prison.

Q.    All right.  Are you ever present, either in the room or looking through a glass window or looking at a video thing, when the police are interrogating a suspect?

A.    It would be -- it would be unethical for me to be in a room with police while they're interrogating a suspect.

Q.    All right.  Do you recall giving a presentation in 2006

3101

entitled:  "Interview and Interrogation Techniques" --

A.    Yeah.

Q.    -- boulder Police Department --

A.    Yes.

Q.    -- looking Beyond the Obvious Training Program?

A.    Yes.

Q.    Okay.  So you talked about interrogation techniques to the Boulder Police Department?

A.    You know what, I probably shouldn't have used that title because I don't consider myself an expert in interrogation.  I do consider myself an expert in interviewing.

Q.    Okay.  And on that particular seminar or presentation, you were the only one giving it?  It wasn't somebody else that gave it that title, it was you that gave --

A.    Yeah, yeah.  What I probably did was talked about the differences between interrogation and interviewing, but I doubt -- there's no way I would lecture on interrogation.  It's not my area of expertise.  I wouldn't be giving guidance on how to -- interrogation.

Q.    Okay.  And another presentation in 2001 to the Phoenix Police Department homicide unit, it says, "Pitt S.E. Interview/Interrogation Techniques."  Is that the same program?

A.    Yeah, same program.

Q.    Okay.  Do you recall giving a presentation in Steamboat Springs, Colorado, in 2001 entitled:  "Mental Defenses - The

Importance of the Forensic' Examination" to the Colorado District Attorneys' Council?

A.    Yes.

Q.    And you gave another presentation in 2000, "Anticipating and Investigating the Insanity Defense," to the Maricopa County Attorney's Office Advanced Trial Advocacy Course?

A.    Yes.

Q.    Okay.  Another presentation to the Maricopa County Attorney's Office in 1999, "Recognizing Lethality in Investigations from a Psychiatric Viewpoint," Threat Management Seminar, do you remember that?

A.    Yes.

Q.    Okay.  "Addressing Mental Defenses," Maricopa County District Attorney's Office Advanced Trial Advocacy Course in June of '99?

A.    Yes.

        THE COURT:  Are we going to go through all of them, Mr. Autry?

        MR. AUTRY:  No.  They're in the record, I guess.

Q.    (BY MR. AUTRY)  Let me -- let me kind of cut to the chase.

A.    You go ahead.

Q.    You do quite bit of work in terms of consulting, presentations, and all that with police departments, sheriff's offices, and prosecuting authorities; true?

A.    I have done presentations to police agencies, prosecuting attorney's offices, and law enforcement authorities, I would agree.

Q.    All right.  Have you ever had any consulting relationship or arrangement with any public defender's office, either federal or state?

A.    Not federal.  There was a -- there was a time period in Arizona where there was some folks in the public defender's office in Phoenix who -- I don't want to say they had me as a consultant -- but there was -- there was some type of an arrangement there.  It wasn't a paid arrangement.  And indeed, that office still sends me work to this day.

Q.    Okay.  Do you have a large number of friends who are police officers or law-enforcement officers?

A.    Friends?  Like friends friends?

Q.    Friends friends.

A.    The kind of people we --

Q.    Social acquaintances and friends.

A.    The kind of people we count on just with a couple three fingers or the kind of people we count on like having a party?

Q.    Just combine them, I guess.

A.    Okay.  I probably have one person who I consider to be a good friend who's a law-enforcement officer and I have other acquaintances that are law-enforcement officers.

Q.    Okay.  Now, this case involves the shooting death of a

law-enforcement officer obviously; is that correct?

A.    Sadly, yes, yes.

Q.    Does your longstanding association, whether as a consultant or giving presentations or anything of that nature, tend to skew your approach at all?

A.    No.  My association and my work with law-enforcement does not at all skew the evaluation.  What I've -- what I've learned about law-enforcement officers is the same thing I've learned about physicians and experts and lawyers, which is there can be really good police officers and there can be really bad police officers.  I've been fortunate enough by and large to work with mostly what I thought were pretty stand-up people and the cases I've been involved in I thought were pretty stand-up folks.

Q.    Okay.  You've made quite a number of media appearances over the years?

A.    I have.

Q.    Okay.  And that's listed on your Web site?

A.    It is.

Q.    Okay.  Let's see.  You've been on CNN; right?

A.    I have.

Q.    Dateline?

A.    Yes.

Q.    NBC?

A.    Well, that's Dateline NBC.

Q.    Oh, okay.

A.    Yeah.  It's all one word, Dateline NBC.

Q.    Thank you.  Fox?

A.    FoxNews, yes.

Q.    ABC News Primetime?

A.    Yes.

Q.    The Today Show?

A.    Yes.

Q.    And then you -- I'm glad you're not just sticking with NBC.  Then Good Morning America, that's ABC; right?

A.    Yes.

Q.    Okay.

A.    Don't forget some of the cable channels too.  I'm just kidding.

Q.    Okay.

A.    Okay.  And The Today Show thing, I'm not quite sure exactly what that was.  It might have been something in the periphery.  But, yeah, those are all accurate.

Q.    All right.  And you've been quoted or had articles written about you, in one way or another, I guess, in various print publications; true?

A.    That is true.

Q.    USA Today?

A.    Yes, sir.

Q.    The LA Times?

A.    Yes, sir.

Q.    New York Times?

A.    Yes, sir.

Q.    Newsweek?

A.    Yes, sir.

Q.    FAHM Magazine?

A.    Yes.

Q.    The Boston Globe?

A.    Yes.

Q.    The Washington Post.

A.    Yes.

Q.    Huffington Post?

A.    Yes.

Q.    U.S. News?

A.    U.S. News & World Report.

Q.    Yes, sir.  And so on, I guess?

A.    Yes.

Q.    Now, when you were on these programs, were you talking about specific cases or what -- what was the -- what's the thrust of your media appearances basically?

A.    Part of it is it's something I've always been interested in and I've always enjoyed doing and tried to learn how to do if over time.  Often times it may be about some newsworthy -- something that's newsworthy in the media about a particular case.  There's -- in only one that I -- or maybe two that I know of has it been about specific cases that I've been

involved in.

Q.    Would you say that in your media appearances you're there primarily to give the point of view of law enforcement or a prosecution office?

A.    No.  Not at all.

Q.    Okay.

A.    No.  I disagree with that.

Q.    All right.  Your Web site states that you have media relations expertise; is that correct?

A.    On some days, I think I do; on other days, it's a little scary at times.

Q.    Oh, okay.

A.    Okay.  But yes.

Q.    And is that you talking to prosecutors or spokesmen for law-enforcement agencies on how to best present themselves to the media?

A.    No, no.

Q.    Okay.  Does this just talk -- does this just concern your own personal media appearances?

A.    Yes.

Q.    Okay.  And your firm also deals in sports security management; right?

A.    Yes.  I have a retired Secret Service agent who was in charge of -- I forget which Super Bowl -- but one of the Super Bowls in Phoenix and that's where that referral comes from --

Q.    Okay.

A.    -- or reference comes from.

Q.    And that -- okay.  I'm sorry I interrupted you.  That particular retired Secret Service officer or agent, is he actually there in your office as part of your firm?

A.    No, no.  Everyone is an independent contractor and they're in different parts of either Arizona or different parts of the country.

Q.    All right.  And your Web site also lists areas of expertise; correct?

A.    Yes.

Q.    And that's for you?  Steven Pitt & Associates, that's the name of your firm; right?

A.    It is.

Q.    Okay.  And do you recall listing 60 different areas of expertise in the section of your Web site that talks about areas of expertise?

A.    I know that there's a lot of areas of expertise listed there.  I didn't know it was 60 but that sounds about right.

Q.    Okay.  It goes all the way -- you know, have you heard of the A to Z law firm, admiralty to zoning?  Have you ever heard about that?

A.    I never -- never heard about that.

Q.    Okay.

A.    But -- but go ahead.

Q.    Okay.  The areas of expertise that you list on your Web site goes from -- starting at the A's, arson and fire-setting, to -- you don't quite get to Z -- but W, wrongful termination?

A.    Right.

Q.    Okay.

A.    So yeah, that's all accurate.

Q.    And everything in between?

A.    Yes.

Q.    Okay.

        MR. AUTRY:  Could I have just a second, Your Honor?

        THE COURT:  Yes.

        (Discussion held off the record)

Q.    (BY MR. AUTRY)  Doctor, you mentioned reviewing a report by Dr. Kathy LaFortune?

A.    Yes.

Q.    Okay.  Do you know whether or not Dr. LaFortune actually ever met personally with Mr. Barrett or whether it was an intern who did it?

A.    It's two signatures on the report.

Q.    Okay.

A.    There's the -- there's the intern and then there's her signature as well.

Q.    Okay.  Does her signature necessarily denote that she personally met with Mr. Barrett?

A.    I don't think it indicates one way or another, I don't

think.  Let me take a look at it and I can tell you.

Q.    Okay.

A.    I'll tell you in one second.  It says "clinical supervisor."  It doesn't tell us whether or not she met personally.

Q.    Okay.  And the tests, I guess, that were given to Mr. Barrett on that occasion were screening instruments; would you agree with that?

A.    Well, I don't know that the PAI -- you'd have to ask the neuropsychologist.  I don't know think of the PAI as a screening instrument.  It's a personality assessment inventory.

Q.    Are these all self-reporting examinations?

A.    The PAI is.  I don't know what other -- let me just see. Hang on.  I think so, yes, sir.  Two out of the three for sure.

Q.    Okay.

            MR. AUTRY:  Could I have one more second, Your Honor?

            THE COURT:  Yes.

            (Discussion held off the record)

Q.    (BY MR. AUTRY)  Thank you, Doctor.  I appreciate it.

A.    Thank you, sir.

            MR. AUTRY:  Your Honor, before I turn the lectern back over to Mr. Kahan, we would request at this time, based on Dr. Pitt's testimony emphasizing the effect of drugs and excluding any underlying mental condition, that we be

permitted, as we requested before, to call Dr. Kosten and/or Dr. Stewart who are drug experts basically.  They filed -- or we filed proffers on their behalf back on March 3rd of this year as to what they would testify to with respect to the effects of drug use and things of that nature and the interplay between that and underlying mental illnesses.

THE COURT:  Those doctors have already examined Mr. Barrett?

MR. AUTRY:  Well, Dr. Stewart, we asked permission for him to examine Mr. Barrett at Terre Haute, and Judge Payne denied that on the grounds that anything done in 2017 is not really relevant to the issues.  Dr. Kosten has not examined -- neither one of them have examined Mr. Barrett, but they've reviewed numerous records and could be, at the very least, prepared to talk about Dr. Pitt's testimony, particularly as it relates to drug addiction and the effects, causes, and whys and wherefores of all that.

THE COURT:  And this is a request that you previously made that Judge Payne ruled on?

MR. AUTRY:  Yes, sir.

THE COURT:  Okay.  Well, at this time anyway I'm going to deny the request.

MR. AUTRY:  All right.  Thank you, sir.  Thank you, Your Honor.  Thank you, Dr. Pitt.

THE WITNESS:  Thank you, sir.

THE COURT: Redirect?

MR. KAHAN: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. KAHAN:

Q.    Dr. Pitt, during your cross-examination, you were asked some questions about genetic loading. Do you recall that?

A.    Yes, sir.

Q.    Okay. Can you explain why the evidence of genetic loading, of mood disorders, other emotional disturbances in Mr. Barrett's family are inadequate to convince you of diagnosis of bipolar disorder or posttraumatic stress disorder?

A.    So the way I can explain this is, is I've used the expression "data points" or "data." We look at all kinds of different data, whether it's the autopsy report, whether it's the video of the crime scene, whether it's correctional records, whether it's declarations, whether it's medical records, or psychiatric records as the case may be.

And what you're looking for is an aggregate of data, or more specifically, if we were to kind of take it numerically, 10 is the most important piece of data, 1 is the least. And ultimately what you're looking for -- and I've used this analogy before -- if you think of a football field, and we think of the 50-yard line being at the center, we're looking for where is the aggregate of the data, where does it make the most sense? To be sure there's going to be some data out at

the 10-yard line, there's going to be some data at the 40-yard line, there's going to be some data in the stands, and there's even going to be some data in the parking lot.

So when we look at data like family history, it's a piece of data, it is something that being not be ignored.  But that piece of information in and of itself does not mean that, therefore, it goes that just because Mr. Barrett's family history, whether it's the first-degree relatives or the extended relatives, therefore, it goes that he's going to have bipolar disorder or, therefore, it goes that he's going to have a substance abuse disorder.  In the same way that there are families that have a history of diabetes, it doesn't mean that the offspring for sure is going to have diabetes.  It's really no different.

And so my point is that is this a piece of data?  It is.  Do I put it around the 50-yard line or at the 40 or somewhere in there?  It's an important piece of data, one that can't be ignored.  But does it carry the day that, therefore, it goes just because this family had these particular things that it automatically means that Mr. Barrett has bipolar disorder, is going to have bipolar disorder, or has a substance use disorder?  No.

Q.    Would you have a similar response to the information that you discussed regarding history of family dysfunction and/or abuse?

A.     Yeah, same exact answer.  Look, we're not going to ignore that he came from a family of dysfunction.  To do so, again, would be intelligently dishonest, it just wouldn't be truthful.

Q.     And, in fact, aren't there examples of people in Mr. Barrett's immediate family who appear to decidedly not suffer from mental health issues?

A.     His brother, Steve, would be Exhibit A.  Steve had, I believe, some alcohol problems and some other difficulties but he went on to become -- I think it's a principal at a junior high school, if my memory is correct.

Q.     Okay.  Now, with regard to the documentation use of the drug Haldol -- and I know we talked about this before on direct --

A.     Yes.

Q.     -- why, again, does that not get you to the point of a bipolar disorder diagnosis?

A.     We don't make the diagnosis on the basis of just the medication alone.  That -- that's just completely unprofessional and inappropriate.  We just -- we don't do that. I used to be a board examiner for the American Board of Psychiatry and Neurology and we talked about that.  I would never -- I would be really concerned about a candidate who said, well, based on these medications, this person has this diagnosis.

Q.     Okay.

A.    That's like saying someone has a cast on their leg, and therefore, it means they broke their tibia.  Well, they might have broken their fibula.  You don't know.

Q.    So that would be true also of, say, the Elavil or Asendin.

A.    Yes, yes.

Q.    Would it be fair to say -- well, defense counsel spoke to you at some length about a lot of issues in Mr. Barrett's background.  Do any of those by themselves or an aggregate necessitate a diagnosis of bipolar disorder?

A.    You don't make the diagnosis simply based on that information alone.  You just don't do that.

Q.    Now, with regard to Mr. Barrett's time at Eastern State Hospital --

A.    Yes, sir.

Q.    -- what did he tell you about how he came to be there?  And I don't want to play guessing games with you.  I think that's referenced at page 121 of your transcript.

A.    It starts on page 121, it's line 9, and it says, "Now, what were the events, though" -- this is me talking -- "Now, what were the events, though, that got you to Eastern State?  You don't remember what got" - and he said, "I was nutted out.  I was doing -- fighting with everybody and stuff, eating mushrooms a lot."

Q.    Okay.  That's generally consistent with a pervasive theme

of substance abuse running through Mr. Barrett's behavior, is it not?

A.    Yes, sir.

Q.    Okay.  There was some discussion about learning disabilities.

A.    Yes, sir.

Q.    If Dr. Price related some of that potentially to attention issues, would you be inclined to agree with that -- that sort of finding?

A.    It's certainly possible that his explanation is reasonable.

Q.    Okay.  Now, with regard to the issue of comorbidity -- and correct me if I'm wrong -- but I understand comorbidity to be something like -- I think you used the example of diabetes sometimes leading to arteriosclerosis; is that right?

A.    Yeah, exactly.

Q.    Okay.  And is it your point that if you see someone with arteriosclerosis, you would not thereby deduce that the person had diabetes, that those things can happen independently?

A.    I -- that's terrifically stated.  In fact, it's so good that I think I will use that down the road as an analogy.

Q.    It's a 50-cent --

A.    Okay.  The point is, you could have -- there's other causes is your point and it's well made.

Q.    There was also -- and we played a clip -- there was

discussion about drugs being used in pretrial custody by Mr. Barrett.

A.    Yes.

Q.    And did Mr. Barrett specify what period in his pretrial custody he was using that?

A.    I think --

Q.    Or wasn't it his statement that the drug use was during the period leading up to his state trial?

A.    Yes.

Q.    Okay.

A.    Yes, sir.

Q.    And was not Dr. Sharp's report rendered during that period?

A.    Yes.

Q.    With regard to self-medication, why did you disagree with the statement that Kenny Barrett was self-medicating to improve his mood?  I know Mr. Autry asked you a question about that and you wanted an opportunity to expand on your reasoning for that.

A.    To the extent Kenny Barrett was self-medicating to improve his mood, it was more likely than not, given the extent of substance use history, to medicate the low that was associated with the previous cycle of drug use.

In other words, if you look at what some of the typical symptoms are in someone who uses amphetamines or methamphetamine, you get initially this euphoria and this high

amount of energy and a pressured speech and a go, go, go, go, go and you don't need to sleep, but eventually there's going to be a crash.  And to kind of overcome that crash, it's not uncommon for people who are regular users of -- a regular user of amphetamine to reload, so to speak, and therefore the cycle goes.

Q.    Now, to the extent Mr. Barrett's family members might have reported mood swings --

A.    Yes.

Q.    -- is there any evidence you are aware of that they would have been in a position to distinguish what effect on his mood substances were having at any given point in time?

            MR. AUTRY:  That calls for speculation.  We object.

            MR. KAHAN:  It only went to what evidence the doctor was aware of.

            THE COURT:  Overruled.

A.    Can you just ask the question again there, please?

Q.    (BY MR. KAHAN)  For everybody's benefit.  Are you aware of any reason to believe that Mr. Barrett's family members would have been able to track his mood swings with his substance abuse?

A.    No.  And these are the same family members, mind you, that were -- that talk about his chronic substance use so I don't know how they would be able to ferret out the timing and the sequencing.

Q.    Okay.  So when -- when they, for instance, say "chemical imbalance," that could be speculation on their part?

A.    Yes.

Q.    Now, with regard to Mr. Barrett's truthfulness, during your interview, how did he characterize himself?

A.    Mr. Barrett characterized himself as a pretty truthful person.  He told me that -- I asked him at the end of the interview, I said, a lot of people have -- I've asked you to describe a lot of people.  How would you describe yourself?  We went through a series of descriptors, but the short version is that he said he was an honest person and he said that -- and I also asked him if everything he was telling me at the time of the evaluation was honest, and he said it was.

Q.    Now, counsel asked you about Dr. Price's findings regarding paranoia.

A.    Yes.

Q.    During a break, did you have an opportunity to take a look at those findings?

A.    Yes.

Q.    And what was it that Dr. Price found?

A.    What Dr. Price --

Q.    What did he report?

A.    What Dr. Price says in his report, he says that there's features of antisocial and paranoid personality disorders.  He doesn't say the full disorder.  He says -- excuse me -- he says

there's features of the disorder -- disorders.

Q.    And how do features differ from actual disorders?

A.    So everyone has certain features -- or traits, I should say, of different personality characteristics.  Some of us are a bit more obsessive/compulsive, some of us are a bit more narcissistic, some of us are a bit more paranoid.  It's only when those -- those features become so maladaptive that they interfere with your day-to-day functioning that they become a disorder.

And so the point is, is that you work with a lot of people, I work a lot of people who have features of paranoid personality, they have some of those features.  Hopefully, you don't work with too many people that have features of an antisocial personality disorder.

But the point is, is that the features alone, they're features.  Frankly, I would expect those features in someone with Mr. Barrett's legal history and someone with Mr. Barrett's drug use history.

Q.    You were asked about self-medication.  Why did you reject that as -- and self-medication for specifically bipolar disorder or PTSD.  Why did you reject that as the reason for the substance --

A.    Because when we look at the totality of the information, when we look at that aggregate of data, when we look at that football field, and we look at where all the data accumulates,

it's right smack on the 50-yard line, that it's drugs, drugs, and more drugs.  We can't ignore the fact that you have all these mental health professionals, whether it's Social Security disability, whether it's Dr. Sharp, Dr. LaFortune, Dr. Price, even Dr. Russell in the testing that she initially did, nobody is saying bipolar disorder.

When you look at the -- when you look at the records from Wagoner Community Hospital, when you look at the records from Eastern State Hospital, when you look at the records from Bill Willis community hospital, everyone is saying the same thing and they're all seeing the same thing or variants of it.

The only person who gives this provisional diagnosis of bipolar disorder is a -- I don't mean to disparage her.  Mental health counselors are terrific assets in a community mental health system but she gave a provisional diagnosis, and the best I can tell she's certainly not a physician and she's probably some type of mental health counselor, who then recognized the error of her ways and changed her diagnosis after he was discharged from Wagoner Community Hospital.

So when I look at the aggregate of all this information, I say to myself, based on my years of experience, my training, my expertise, what I know about psychiatric illnesses, what I know about substance use, what I know about bipolar disorder, what I know about PTSD, and I say, wait a minute, you can't be giving these diagnoses as the primary

diagnosis without first giving strong consideration and mentioning and weighing heavily the chronic methamphetamine use that you have someone like Mr. Barrett, who said to me there was never a day that he wasn't -- there wasn't a time when there was an absence of.  There's a reason why I asked him that question, because when you're doing the interview, you want to make sure -- you have to rule out the substance use in terms of getting to those different symptoms.  That's the basis for my answer.

Q.    Okay.  Now, when you were asked about Dr. Price's responses with regard to specific scales -- and recognizing that you were not here for his testimony -- you said you would not look at a specific scale in isolation.

A.    Can you mind taking into the microphone just --

Q.    Sure.

A.    Okay.

Q.    Is that also true with regard to a specific response to a single question on the --

A.    Yes.

Q.    -- MMPI?

A.    Yes.

Q.    You would not look at that?

A.    No.  That's just not how -- that is not how you interpret like an MMPI or a PAI.  You don't isolate questions that are -- that's just not how it's done.  That's not -- again, I am not

here to profess my great knowledge of psychometric testing or personality testing, but I've used the PAI, I've used the MMPI, I used another test called the MCMI, and you don't look at an answer in isolation, you look at the totality of the information. I think in the case of the MMPI, I think it's 500 and -- it's either 63 or 67 -- I think 67 -- true/false questions.

Q.    You discussed some records regarding -- that reflected Mr. Barrett's depression and mood lability.

A.    Yes.

Q.    Why were those insufficient to change your diagnosis with regard to bipolar disorder?

A.    The same reason I've been saying all along, which is you can have -- you can have substance-induced mood disorders that mimic drug use. The mental health manuals allow for -- the textbooks allow for conditions that are a substance-induced mood disorder and then they give subcategories, manic, depressed, or mixed. So you -- so there's an allowance for, say, an amphetamine-induced mood disorder that could either be manic, depressed, or mixed. The idea is that that's -- that drug can have people experience symptoms that are manic, depressed, or mixed.

Q.    In discussing the records from Eastern State Hospital --

A.    Yes.

Q.    -- there was some mention of suicidality in those

records; is that correct?

A.    Yes, sir.  Yes, yes.

Q.    Is it fair to attribute that to the fact that those records were actually made shortly after, first, Mr. Barrett's suicide attempt; and second, immediately after family members brought him to the hospital with reports of suicidality?

A.    Yes.

Q.    All right.  Does that necessarily mean that suicidality is an ongoing and pervasive problem going forward?

A.    No.

Q.    And, again, that would be inadequate to change your diagnosis with regard to bipolar disorder?

A.    Right.  There's no bipolar disorder.

Q.    Now, have all your presentations to outside groups been to law enforcement?

A.    No.

Q.    And have you actively solicited law-enforcement groups?

A.    No.  The role with law enforcement -- in fact, there's just an article that some colleagues and I wrote that's in line with all these presentations that we've given to law enforcement.  It's all about -- it's all about educating law enforcement that when you have an individual -- it's what I said earlier -- when you have an individual who commits an offense and there's an issue that looks like a mental illness or serious mental illness, we're trying to educate

law-enforcement officers and detectives to really get these questions out in the beginning during the course of their interview or interrogation.  Again, the idea being that nobody wins if we have someone that's caught up in the correctional system pretrial for years if, in fact, it turns out they were seriously mentally ill at the time and a better disposition could be made for them.  It saves taxpayer money, it saves time all the way around, and it's better for the defendant/suspect.

Q.    And with regard to your Web site, which has an extensive list of areas of expertise --

A.    Right.

Q.    -- is that a reflection, among other things, of just the breadth of human behavior?

A.    A lot of it is that and a lot of it is it's not all my expertise.  There's a number of things listed in there that really belong to my associates in terms of their expertise.

MR. KAHAN:  Your Honor, I have nothing further at this time.

THE COURT:  Anything further from Dr. Pitt?

MR. AUTRY:  Just briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. AUTRY:

Q.    With respect to these presentations, Dr. Pitt, that you've done to nonlaw-enforcement groups and things of that nature, do you have transcripts or recordings of any of that?

A.    No.

Q.    Do you have the handouts or any of that sort of thing?

A.    No.

Q.    Okay.  So you wouldn't be able to provide us with that?

A.    No.

Q.    Okay.  Now, you indicated near the beginning of redirect examination that despite the fact that Mr. Barrett has genetic loading for mental illness and mood disorders and despite the fact that he has genetic loading for substance abuse or substance abuse disorder and the fact that he has family dysfunction, that none of those things individually are sufficient to make a diagnosis of any mental illness; is that correct?

A.    You don't make -- what I think I said -- and if I didn't, I'll say it now -- you don't make the diagnosis on the basis of family history.  If your dad, for example, has a history of high cholesterol, I don't go and say you have high cholesterol.

Q.    Okay.  But nonetheless, all of those things that we've talked about increase the chances, either environmentally or genetically, of developing a mental illness or a mood disorder such as bipolar; right?

A.    I think I said that I don't discount the weight of those when I was giving that analogy of different data points.

Q.    All right.  And you indicated with respect to comorbidity that -- and I forget the example that Mr. Kahan used exactly --

something about liver damage and something else.  Or what was it?

A.    No.  It was arteriosclerosis and diabetes.

Q.    Okay.  But there was also a high rate of comorbidity with mood disorders and the use of narcotics or drugs; right?

A.    I think we've been through that, yes, sir.

Q.    All right.  Would you agree with me, Doctor, that neither Dr. LaFortune nor Dr. Russell nor Dr. Bianco nor Dr. Price nor Dr. Sharp gave a comprehensive mental health examination -- or did a comprehensive mental health examination of Mr. Barrett?

A.    I can't tell you what they consider to be comprehensive or not.  What I can tell you is that I certainly feel that I did.  I interviewed him for 4.8 hours.

Q.    Sure.

A.    And whatever they did in their evaluations, they did enough to render diagnostic opinions that they attached their name to.

Q.    Well, for example, Dr. Russell, she did a risk assessment; right?

A.    Right.

Q.    Is that a comprehensive mental health examination or evaluation?

A.    Well, you'd have to ask Dr. Russell.  But regardless of whether she did a risk assessment or not, she still came to certain conclusions in her report that indicated that

Mr. Barrett did not have a serious mental -- a major mental illness.

Q.    All right.  Well, let me ask you this:  Did any of those people I mentioned do the type of examination you did?

A.    I don't know that any of them did a 4.8-hour evaluation and had the benefit of seeing six Bankers Boxes of records that I had the benefit of seeing.

Q.    All right.  Did you see anywhere in the reports of those individuals that they actually did a comprehensive mental health evaluation, regardless of whether they did an examination that they thought was sufficient for their particular purposes?

A.    I don't know that I've seen the words "comprehensive mental health evaluation" in their --

Q.    But you know what a comprehensive mental health evaluation is; right?

A.    I would say -- well, first of all, I think there's -- I think to be clear, there's a comprehensive psychiatric evaluation that's typically done in a hospital setting or a mental -- or a community mental health center that's an initial evaluation that's usually typically about an hour or so.  I think there's comprehensive forensic psychiatric evaluations that are along the lines of something along -- akin to what I did.

What these other professionals did, they did it for

whatever reasons they had to do but they felt -- the point is, that they felt they had enough information to render the opinions that they did; and more importantly, even rendering those opinions, their data matches up with people that had a longer period of time to see him, such as the records at Eastern State Hospital, such as the records at Wagoner Community Hospital, such as the records at Bill Willis Community Mental Health Center.

Q.    All right.  You indicated that despite the presence of genetic loading or genetic predisposition toward mood disorders or developing some kind of substance abuse disorder, that Steve Barrett would be an example of somebody -- that's Mr. Barrett's brother --

A.    Yes.

Q.    -- who didn't have any of those things.  Did you read Steve Barrett's declaration?

A.    Yes.  And let me just -- I left out Social Security disability evaluation before, the ones that -- I just want -- just want to be complete.

Now, with respect to your question, I did read Steve Barrett's declaration.  What Steve Barrett said, to be fair, he said that he had a different type of upbringing than Mr. Barrett had.

Q.    Right.

A.    Yes.

Q.    He was raised in a much more stable environment?

A.    He did say that, yes.

Q.    Daddy -- abusive daddy really wasn't around because he --

A.    He said that it was a much more -- I forget the word he used -- but we'll go with stable.

Q.    Okay.  And that was unlike Mr. Barrett's, Kenneth Barrett's, right, unlike his --

A.    I think Kenneth Barrett's -- as I've stated before under oath -- and I'll state it again -- I think to say that Mr. Barrett's upbringing was not dysfunctional would be completely intellectually dishonest.

Q.    Okay.  Now, you were asked about when Dr. Sharp saw Mr. Barrett in the Sequoyah County Jail when he was awaiting his state murder case.  Do you remember Mr. Kahan asking you about that?

A.    Yes, sir.  Yes, sir.

Q.    Do you know whether or not that during that period of time when Dr. Sharp examined Mr. Barrett, whether or not Mr. Barrett was in the general population, where he might be able to get access to elicit drugs, or whether he was in isolation which would pretty much eliminate that possibility?

A.    I don't know where he was.  I just know what Mr. Barrett told me about the drug use that he engaged in prior to his state trials.

Q.    Okay.  You were asked about whether or not Mr. Barrett's

family members, when they describe his mood swings, could distinguish whether or not the wild swings in mood that they observed were a function of drug use or some other underlying cause.  Do you remember being asked about that?

A.    Yes.

Q.    Now, you indicated these are the same family members, of course, who talked about Mr. Barrett's drug use, his extensive drug use; right?

A.    Yes.

Q.    But when they are talking about his mood swings, they're talking about regardless of his drug use, we thought something was wrong with him because of these wild swings in mood. That's the tenor of their remarks, isn't it?

A.    Oh, I can't talk about tenor of remarks.  You'll have to show me that.

Q.    Okay.  Did they say, well, we think he had wild mood swings because he's a druggy?

A.    No.  They didn't draw that nexus.

Q.    Okay.  Did they draw the nexus, yeah, he's got wild mood swings but that's because, to use your phrase, he's hopped up all the time?

A.    No.  But these are the same people -- these are the same people who readily acknowledged, either in voluntary statements or petitions to hospitals or who acknowledged it in declarations, his chronic use of substances.  They didn't say

it quite exactly it that way, but they're not ignoring or denying his chronic history. And frankly, most importantly of all, Mr. Barrett is the one that says he's using substances all the time. So why can't we believe him who said he said he was honest with me?

Q.    I don't doubt that he used substances all the time. My only point is that in these declarations from the family members, they attribute his moodiness and his wild mood swings to something beyond -- above and beyond drugs, don't they?

A.    I don't -- you'd have to show me where they say that. I don't know that they gave attribution.

Q.    Now, you indicated that Dr. Price talked about Mr. Barrett having features of antisocial and paranoid personality disorder; correct?

A.    Yeah. Yes, sir.

Q.    So he had features of paranoia or features of paranoid personality disorder?

A.    Yes, sir.

Q.    Okay. As we've been over probably more times than anybody cares to remember, is it true or untrue that the drug of choice for somebody who has attention problems, such as AD or ADHD or some kind of attention-deficit, that the drug of choice for people who have that is methamphetamine? True?

A.    Certainly to treat ADHD the drug of choice is amphetamines. Whether methamphetamines is the drug of choice

for people that have ADHD, I'm not sure of exactly the answer of that.

Q.    Okay.

MR. AUTRY:  Could I have just a second, Your Honor?

THE COURT:  Yes.

(Discussion held off the record)

Q.    (BY MR. AUTRY)  Thank you, Dr. Pitt.

A.    Thank you sir.

THE COURT:  Dr. Pitt, you can step down.  Thank you, sir.

THE WITNESS:  Thank you, Judge.

THE COURT:  Anything further from the government?

MR. KAHAN:  Your Honor, at this point, and pending whatever evidence may come back in a reopened case, the government's prepared to rest.

THE COURT:  Very well.  I understand we've got rebuttal; is that correct?

MR. SCHARDL:  May we have just a moment to confer, Your Honor?

THE COURT:  Yes.

MR. SCHARDL:  Sorry.

MR. AUTRY:  We may or may not, Your Honor, at this stage.

(Discussion held off the record)

MR. AUTRY:  We're not going to call Dr. Woods in

rebuttal, Your Honor.  But we do, of course, have Dr. Miora that we want to call as a -- sorry.  I'm sorry, Your Honor.  I apologize.

We're not going to call Dr. Woods in rebuttal, but we desire to call Dr. Miora for the reasons previously stated.

THE COURT:  And did you figure out when she'd be available?

MR. SCHARDL:  Yes, Your Honor.  She's available on the 26th.  We could be here then.

THE COURT:  How long do you think it will take?

MR. SCHARDL:  I don't think it will take more than a day.

THE COURT:  Okay.  So if we started at ten, we'd get it done on Monday --

MR. SCHARDL:  I believe so.

THE COURT:  -- the 26th?

Okay.  Well, if there's nothing else to do today, then I guess we'll just be adjourned until the 26th at ten.

MR. SCHARDL:  I think that we did 102 -- that's acceptable to the defense, Your Honor.

THE COURT:  Mr. Wilson.

MR. WILSON:  Your Honor, I would just renew our request for the raw data, testing data.

THE COURT:  Yeah.  You guys need to make that available to them --

MR. SCHARDL:  By the end of the week.  It may be that my paralegal e-mailed it while we were sitting here.  I don't know.  But it will certainly be e-mailed by the end of the week.

THE COURT:  That would be great.

MR. WILSON:  Thank you, Judge.

THE COURT:  Very well.  We're adjourned.

(The proceedings were concluded)

C E R T I F I C A T E

I, Brian P. Neil, a Certified Court Reporter for the Northern District of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in above-captioned case.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 14th day of June 2017.

s/ Brian P. Neil
_____
Brian P. Neil, RMR-CRR
United States Court Reporter