945

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,           )
                                  )
            Plaintiff,            )
                                  )
      -vs-                        ) No. CIV-09-105-JHP
                                  )
UNITED STATES OF AMERICA,         )
                                  )
            Defendant.            )


* * * * *

TRANSCRIPT OF EVIDENTIARY HEARING
VOLUME VI
**BEFORE THE HONORABLE STEVEN P. SHREDER**
UNITED STATES MAGISTRATE JUDGE

JUNE 13, 2017

* * * * *

A P P E A R A N C E S

    MR. DAVID B. AUTRY, 1021 Northwest 16th Street,
Oklahoma City, Oklahoma, 73106, and,
    MS. JOAN M. FISHER and MR. TIVON SCHARDL, Federal
Public Defender, Sacramento, 801 I Street, Third Floor,
Sacramento, California, 95814, Attorneys on behalf of the
Plaintiff;

    MR. CHRISTOPHER WILSON, 520 Denison Avenue, Muskogee,
Oklahoma, 74401, Assistant United States Attorney, and,
    MR. JEFFREY B. KAHAN, U.S. Department of Justice,
Capital Case Unit, 1331 F Street Northwest, Room 345,
Washington, D.C., 20530, attorneys on behalf of the
Defendant;


REPORTED BY:              KEN SIDWELL, CSR-RPR
                          United States Court Reporter
                          P.O. Box 3411
                          Muskogee, Oklahoma  74402

946

I N D E X

WITNESS                                                    PAGE

**Steven Pitt, D.O.**
      (Direct Examination by Mr. Kahan)                    956
      (Cross-Examination by Mr. Autry)                     1016

JUNE 13, 2017 PROCEEDINGS

*(On the record at  9:07 a.m.)*

THE COURT:  Call case number CIV-09-105-JHP, Kenneth Eugene Barrett versus the United States of America. Would the attorneys enter their appearances for the record, please.

MR. KAHAN:  Jeffrey Kahan and Chris Wilson for the government, Your Honor.

MR. AUTRY:  David Autry, Tivon Schardl, Joan Fisher for Mr. Barrett, Your Honor.

THE COURT:  Very good.  Teka tells me there's a question about recalling Dr. Woods.

MR. AUTRY:  Yes, Your Honor.  Potentially in rebuttal to Dr. Pitt.

THE COURT:  When would he be available?

MR. AUTRY:  He's here.

THE COURT:  Oh, okay.

MR. AUTRY:  He's in the courtroom, so he's available today and tomorrow.

THE COURT:  Okay.  Great.  Well, that shouldn't be an issue then.  If we do hear from Dr. Woods further, are you going to still want to bring that other doctor, or no?

MR. AUTRY:  Yes, Your Honor, because Dr. Woods is a psychiatrist, Dr. Miora is neuropsychologist.  Dr. Woods can sort of explain neuropsychology, but he is not -- he is

not a neuropsychologist. And Dr. Miora can certainly better explain, from neuropsychological standpoint, Dr. Young's findings and how she supports Dr. Young's findings.

THE COURT: But they are both testifying about organic brain injury; correct?

MR. AUTRY: Yes. But Dr. Miora is actually the person who looked at Dr. Young's work, peer reviewed it, looked at all the raw data, and confirmed that what Dr. Young did was a correct diagnosis, that she used appropriate tests, scored the tests correctly, and things of that nature.

THE COURT: I don't think we've admitted the exhibit, but is Dr. Young's affidavit in -- or declaration in the record?

MR. AUTRY: I believe, toward the end of the hearing last time, the Court did admit it into the record. Isn't that right, Ms. Fisher? Yes, it's been admitted.

THE COURT: Okay. That would be, I think, Exhibit 25; is that right?

MR. AUTRY: And there's also an issue with respect to some of Dr. Price's testimony yesterday that Dr. Miora could address.

THE COURT: When would she be available?

MR. SCHARDL: Good morning, Your Honor. I spoke to her yesterday, and she's not available to come tomorrow.

She would have had to leave today.  She had patients and other things scheduled.  She could come next week.  However, I'm not available to come next week because I have a prior commitment.  So I think perhaps the week after would be the earliest that we could come back.

THE COURT:  Well, that's doable on my calendar.  What's the government say about that?

MR. WILSON:  Your Honor, a couple of things.  One, we still do not have any of the raw testing data which we requested, and we would obviously need to review that.  Also, if, in fact, they are going to call Dr. Miora -- is that right, or Young?

MR. SCHARDL:  Miora.

MR. WILSON:  Okay.  The government would, at that time, make a request for an opportunity to have a neuropsychologist to evaluate Mr. Barrett and be able to review the raw data, testing data, which the government still does not have.  So, obviously, we're not going to be able to -- would not be ready in two weeks.

THE COURT:  Correct me if I'm wrong here, but I thought that Dr. Price was a neuropsychologist?

MR. WILSON:  He is, Your Honor.

THE COURT:  So why do you need another one?

MR. WILSON:  Well --

THE COURT:  I mean, here's what it boils down to,

you guys have an M.D. and a neuropsychologist, and they've got an M.D. and they want a neuropsychologist, too. And I think I understand the point.

MR. WILSON: I'm sorry, I was consulting with counsel. I'm sorry. Yes, Dr. Price is a neuropsychologist, that is correct.

THE COURT: Okay.

MR. WILSON: And -- well, that's going to be the government's request.

THE COURT: Okay. How soon can you guys make that raw testing data available to them?

MR. SCHARDL: I think we could make it available very quickly, Your Honor. It would simply be a matter of, you know, putting the PDF in a -- you know, sending it to them. The reason it wasn't disclosed is because the witness wasn't going to testify. And the Court's order was, prior to the testimony -- we got Dr. Price's raw data in the middle of the week last week and had just a few days to review it. But we're happy to make it available to the government prior to Dr. Miora's testimony.

THE COURT: Let me go get calendar off my desk.

MR. SCHARDL: Okay. And I can't say the specific date for Dr. Miora. I apologize I don't have all of her available dates. So rather than have the Court shift -- possibly shift anything, I apologize for not having --

951

THE COURT:  Well, I have to tell you which days I could do it anyway.

MR. SCHARDL:  Okay.  I just didn't want to create a problem for the Court.  You look querulous, Mr. Wilson.

MR. WILSON:  Well, just for the record, Judge, counsel made a comment that they weren't going to disclose that information because the doctor wasn't going to testify.  However, that information was used as part of Dr. Woods' testimony, and we've made repeated requests for that raw data.  And so --

THE COURT:  Well, if you don't have it by then, we're not going to hear from Dr. Miora.

MR. SCHARDL:  And I apologize, I certainly would have provided.  I didn't realize that was a miscommunication, but --

THE COURT:  I can do it Monday, Wednesday, Thursday, or even Friday if I had to.  But I prefer to do it Monday, Wednesday, or Thursday.  So 26th, 28th or 29th.

MR. SCHARDL:  26th, 28th or 29th.

THE COURT:  And I understand we're trying to sync calendars with a busy professional, but we need -- we need to get this -- need get to the evidentiary part of this completed anyway.

MR. SCHARDL:  Understood, Your Honor.  And those dates are available for me.  And at the earliest

opportunity, I'll contact Dr. Miora and ask her to be available on one of those dates.

THE COURT:  Okay.  Are we ready to go?

MR. KAHAN:  Ready, Your Honor.

THE COURT:  Go ahead and call your next witness then.

MR. AUTRY:  Your Honor, before they call Dr. Pitt, could I make a brief record?

THE COURT:  Yes.

MR. AUTRY:  Thank you.  Your Honor, at this time we would renew new our motion in limine as to Dr. Pint's testimony.  Dr. Pitt was allowed to examine Mr. Barrett in order to rebut evidence Mr. Barrett could have developed and presented in 2005.  And Judge Payne was very careful in his various orders to state that this hearing is supposed to recreate, as closely as possible, what could have been testified to at the time of Mr. Barrett's trial in 2005. However, Dr. Pitt relies on information in forming his opinions on evidence that did not exist in 2005, specifically Bureau of Prisons' records from the time that Mr. Barrett has been on death row in Terre Haute.  None of that obviously was available.

He reaches an opinion as to Mr. Barrett based in part on these Bureau of Prisons' records stating that, because the Bureau of Prisons has not diagnosed Mr. Barrett

with a major mental illness, that is highly suggestive or proof that he does not have a major mental illness. And, of course, those Bureau of Prisons' records were not in existence in 2005 at the time of the trial.

And Judge Payne has also stated that Mr. Barrett's mental health as of 2017 is simply not relevant.

Also, the report by Dr. Pitt relies on the DSM 5, which was not in existence at the time of Mr. Barrett's trial in 2005. And we believe that Dr. Pitt's reliance on these materials, and the government's reliance on these late-coming or after-the-fact materials are irrelevant because they don't go to what Mr. Barrett's mental condition was in 2005 and the types of evidence that could have been introduced both by Mr. Barrett and by the government at the trial.

And, of course, the government, as we note in our motion, has taken inconsistent positions. We sought to have Dr. Pablo Stewart examine Mr. Barrett in 2017 not to rely on new information, but based on information that was in existence in 2005. That request was denied. Similarly, our request to call Dr. Kosten, Dr. Bigler -- I know Dr. Miora is taken care of for now -- and the other people whose proffers we filed back on March 3rd, they were all excluded on the theory that they didn't have anything relevant to say because it's based on 2017. However, all of those experts

that we sought to call were basing their opinions on information that was available at the time of Mr. Barrett's trial in 2009.

So the government is trying to have it both ways. They say, on the one hand, you shouldn't allow any new experts to examine Mr. Barrett in 2017 because it's not relevant, yet they want to call Dr. Pitt to testify to opinions based on materials that were not available at the time of trial.

So in addition to all that, we believe that Dr. Pitt's evidence is more prejudicial than probative because he's relying on stuff that couldn't have been relied on back in 2005.

So we reiterate the arguments that we made in the written motion and incorporate that, of course, into this oral request today.

THE COURT: If there is to be a resentencing in this case, aren't your doctors going to rely on evidence that was adduced since the trial?

MR. AUTRY: Your Honor, I don't know. That's a possibility. However, the posture this case is in, and based on the Tenth Circuit mandate and the orders Judge Payne has issued is that, under *Strickland* and under the Supreme Court authority that follows *Strickland*, when you have a claim of ineffective assistance of counsel and you

have an evidentiary hearing some years down the line after the trial, everything has to be looked at from counsel's perspective at the time.  So regardless of what happens at any potential resentencing --

THE COURT:  That's true with respect to whether there was a breach of duty.  But it's not true with respect to whether there's prejudice or not, is there?

MR. AUTRY:  I think it's apples and oranges, Your Honor.

THE COURT:  I mean, one of the things the Tenth Circuit sent this back for was consideration of whether anything the government might have presented but didn't would change the outcome.

MR. AUTRY:  And that was limited, I believe, in the Tenth Circuit's opinion to Dr. Price.  They discussed Dr. Price, that he could have potentially testified in rebuttal.

THE COURT:  Right.  All right.  Well, objection is overruled.  We are going to hear from Dr. Pitt.  You can obviously attack his opinion based on a lot of things that you just mentioned as you went through that.

MR. AUTRY:  All right.  Thank you, Your Honor.

THE COURT:  Very well.

MR. KAHAN:  Government calls Dr. Steven Pitt.

THE CLERK:  Please raise your right hand.

956

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  I do.

THE CLERK:  Please be seated.

THE WITNESS:  Thank you.

THE COURT:  Dr. Pitt, we've got plenty of stuff and it looks like you brought more.

THE WITNESS:  It's all good.

STEVEN PITT, D.O.,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. KAHAN:

Q.  Good morning, Dr. Pitt.

A.  Good morning.

Q.  Ask you please state and spell your name for the record.

A.  My name is Dr. Steven, S-t-e-v-e-n, Pitt, P as in Peter, i, T as in Tom, T as in Tom.

Q.  And what do you do for a living?

A.  I am a board certified psychiatrist with subspecialty training and board certification in the discipline of forensic psychiatry.

Q.  How long have you been so employed?

A.  I finished my fellowship in forensic psychiatry in 1991. So since 1991, I've been working as a forensic psychiatrist.

Q.  Where are your offices located?

A.   My main office is in Scottsdale, Arizona, and I have another office is Century City in Los Angeles, California.

Q.   Okay.  And I know you mentioned that you're currently employed in forensic psychiatry.  Was there a time when you treated patients?

A.   Yes.  Certainly during my residency in psychiatry at the University of Michigan, I treated patients in a mood disorder unit, in the outpatient unit, as well as in the Ann Arbor Veteran's Hospital on the posttraumatic stress disorder unit.  Subsequent to completing my fellowship in forensic psychiatry, I worked for a year in Colorado on a forensic unit there where I also was doing evaluations and treating patients.  And then I moved to Arizona where, for the first 18 months, I worked in a community mental health center seeing about 16 to 18 patients a day.  And then worked at the Arizona State Hospital on the forensic unit there where I was the director of forensic psychiatric services for about four, four and a half years.  And then shortly after that, I worked at a county facility for a year.  But ever since I've been in Arizona, I've also had my own private practice in general psychiatry, which I essentially stopped about three years ago.

Q.   Can you describe your training to -- let's -- why don't we start with schooling.  What sort of schooling did you require to become a forensic psychiatrist?

958

A.  So subsequent to graduating from Michigan State University where I received my bachelor degree in psychology, I went to Michigan State University's College of Osteopathic Medicine.  I graduated there in 1986.  I then did a one-year rotating internship at Oakland General Hospital in Madison Heights, Michigan.  And then I did my residency in psychiatry at the University of Michigan's Hospital at Ann Arbor, Michigan.  And then I did fellowship at the University of Maryland School of Medicine under -- in forensic psychiatry under the supervision of Dr. Jonas Rappaport.

Q.  And is Jonas Rappaport a person of particular significance?

A.  He is to me and a lot of other people, but he's considered the father of modern forensic psychiatry.  He's now retired.  But, yes.

Q.  And how did he become to be so regarded?

A.  He's an extraordinarily intelligent, bright man who was working as a psychiatrist and was doing some forensic work, and realized that other people around the country were doing forensic psychiatry, and he was -- gathered a group of people together to form essentially the American Academy of Psychiatry and Law.

Q.  And are you board certified as a forensic psychiatrist?

959

A.   Yes, I'm board certified as -- in psychiatry as well as in the subspecialty of forensic psychiatry.

Q.   What was the process to become board certified?

A.   Well, the board certification in general psychiatry, back when I did it was, you passed -- you took a written exam.  And if you had proficiency in the written exam, then you went on and did an oral exam where you were brought into a room to interview a patient that was unknown to you, and there were board examiners in the room.  And you would interview that patient and then get questioned about your assessment.

And then the second part was a -- watching what they called a stimulus interview which was a video of an interview that was done by a psychiatrist, and then you had to come up with your differential diagnosis and treatment plan.

You can't take the forensic psychiatry board exam until you pass the general psychiatry board exam.  And the forensic psychiatry board exam is a written exam that's heavily weighted in legal nuance, landmark cases, issues having to interface with the psychiatry and the law both in a civil, criminal, legislative and correctional context.

Q.   And did you ever participate in the board examining process as an examiner yourself?

A.   Yes.  I was a board examiner for the American Board of

960

Psychiatry and Neurology for ten years.

Q.  Have you held any teaching positions?

A.  Yes.  I'm currently on the faculty at the -- I have a --
I'm a clinical associate professor in the Department of
Psychiatry at the University of Arizona Health Sciences
Center in Phoenix.  And before that time, I was on the
faculty at the University of Arizona Medicine -- Medical
School in Tucson.  They since opened up a school in Phoenix,
so I changed my faculty appointment to there.

Q.  And I know the Court will be relieved to hear that there
is I think only one piece of evidence I need to deal with
today.  But if I could ask the clerk to please show the
witness Exhibit 52, which is the gigando binder.

THE CLERK:  Government?

MR. KAHAN:  Government's 52.  Thank you.  It's
actually the separate binder.

THE COURT:  That's the one?

MR. KAHAN:  That's the one.  We didn't want to
leave anything out.

Q.  (BY MR. KAHAN)  If you could, ask you to turn your
attention to Section 7 of that binder.

A.  Yes, sir.

Q.  Do you recognize that document?

A.  Yes, sir.

Q.  And what is that document?

A.   That's a copy of my curriculum vitae dated January 3, 2017.

Q.   And that is a true and accurate copy of your CV up to that point?

A.   Yes, sir.

Q.   And did you prepare it?

A.   Yes, sir.

Q.   And is it an accurate statement of your training and experience?

A.   Yes, sir.

Q.   At pages 8 to 22, does that -- does that include a list of your professional presentations?

A.   Yes, sir.

Q.   And then at pages 22 to 24, does that contain a complete and accurate list of your publications?

A.   Yes, sir.

Q.   And pages 3 to 4, is that a complete and accurate list of professional honors and other recognition?

A.   Yes.  And all of this is as of January -- January 3, 2017.  We just submitted an article to the Police Chief magazine, and there's a lecture I recently gave at the medical school.

          MR. KAHAN:  Your Honor, with the Court's indulgence, I'd like to do this section by section of the exhibit, and move the CV into evidence.

962

THE COURT:  Is there any objection to Section 7 of Exhibit 52?

MR. AUTRY:  Just subject to our previous objections to Dr. Pitt's testimony as a whole, Your Honor.

THE COURT:  Very well.  Objection is overruled. Section 7 of Exhibit 52 is admitted.

Q.  (BY MR. KAHAN)  Dr. Pitt, have you previously been recognized as an expert in state or federal court?

A.  Yes, sir.

Q.  Okay.  So specifically in state court, do you recall which states?

A.  In state court, it's Colorado, Arizona, California. Without looking at the list, I can't tell you.  It's probably a couple of more.

Q.  Okay.  And also in federal court?

A.  Yes.

Q.  And have you been retained as an expert in capital cases?

A.  Yes.

Q.  And specifically in any federal capital cases?

A.  Yes.

Q.  Turning your attention to Section 9 of the -- of Exhibit 52, do you recognize that document?

A.  Yes, sir.

Q.  And what is that document?

A.   That's a list of court and deposition testimony that I've maintained since my fellowship in forensic psychiatry.

Q.   And that accurately recounts your experience as a witness?

A.   As of January 3, 2017.  I think -- since then, I think there was a deposition in a civil case that I was involved in this year.

MR. KAHAN:  Your Honor, government would move Section 9 into evidence.

THE COURT:  Any objection?

MR. AUTRY:  Yes, Your Honor, based on our previous objection, and on the grounds of relevance.  In particular, Dr. Pitt's recitation of his previous testimony doesn't say which side he testified for or who he testified for, so we question the relevance of it.

THE COURT:  Objection is overruled.  Section 9 is admitted.

MR. KAHAN:  Your Honor, at this point, I would move for the Court to recognize Dr. Pitt as an expert in forensic psychiatry and psychiatry.

THE COURT:  Is there any objection to that?

MR. AUTRY:  No, Your Honor.

THE COURT:  Very well.  Dr. Pitt is so recognized and can offer expert testimony.

964

MR. KAHAN:  Thank you, Your Honor.

Q.  (BY MR. KAHAN)  Dr. Pitt, when did you become involved in this case?

A.  I was first contacted by you and Mr. Wilson back on December 15 of 2015.

Q.  And since that time, have you been paid for your time?

A.  Of course.

Q.  And turning your attention to Section 8 of Exhibit 52, do you recognize that document?

A.  Yes, sir.

Q.  And is that a true and accurate copy of your fee schedule?

A.  Yes, sir.

MR. KAHAN:  Your Honor, we move Section 8 into evidence as well.

THE COURT:  Is there any objection?

MR. AUTRY:  Just note the same overriding objection.

THE COURT:  Very well.  Section 8 is admitted.

Q.  (BY MR. KAHAN)  Dr. Pitt, how many hours have you devoted to this case since you've been contacted by Mr. Wilson and myself?

A.  Not including getting ready for appearing today, about 60 hours.

Q.  And how much has your office billed to date?

965

A.  Total, not including me but the office staff as well in terms of records, chronologies, probably about $70,000.

Q.  And how much do you expect to bill overall?

A.  The contract I think was for $105,000.  I think I have probably another 40 hours of time into this myself.  So it will come close to that.  A little under that.

Q.  Now, at some point after you heard from Mr. Wilson and myself, formalized our agreement, how were you ultimately directed to evaluate -- to perform your evaluation in this case?

A.  Well, I was provided a referral letter from your office.

Q.  Okay.  And if I could ask you to turn to Section 2, do you recognize that document?

A.  Yes, sir.

Q.  And what is that document?

A.  That's the referral letter that your office sent me.

Q.  And that appears to be a true and correct copy of that letter?

A.  Yes, sir.

MR. KAHAN:  Your Honor, the government moves Section 2 into evidence.

MR. AUTRY:  Same objection.

THE COURT:  Very well.  I'll show your general objection to all of these.

966

MR. AUTRY:  Okay.  So I don't have to keep getting up?

THE COURT:  No, you don't.  Save wear and tear on your knees.  The Section 2 is admitted.

MR. KAHAN:  Thank you, Your Honor.

Q.  (BY MR. KAHAN)  Does the referral letter provide any specific direction?

A.  No, it doesn't provide direction.

Q.  Well, does it make any specific requests of you?

A.  Yes.  There's referral questions.

Q.  And could you describe those questions?

A.  Well, the first question was whether or not Mr. Barrett suffers from a mental illness or defect.  The second question was, if he does suffer from a mental illness or defect, is it a byproduct of substance use.  And the third question was, at or around the time of the crime, could Mr. Barrett distinguish right from wrong.

Q.  Okay.  And did the government ask you to perform any other task?

A.  You asked me to do an evaluation, and I was asked to write a report.

Q.  Right.  And were you have asked to provide any other general opinions regarding the other --

A.  Well, the only other thing, I was not limited in terms of I could add anything else I felt was relevant.

967

Q. Thank you. In preparing to provide your opinion in this case, did you review any documents?

A. Of course.

Q. And did you prepare a report of both your findings and the bases of those findings?

A. Yes, sir.

Q. All right. And I would ask you to turn to Section 1 of Exhibit 52 -- Government's Exhibit 52. Do you recognize that document?

A. Yes, sir.

Q. And is that a true and accurate copy of the report that you prepared?

A. Yes, sir.

MR. KAHAN: Your Honor, I would move Section 1 into evidence.

THE COURT: Over the petitioner's objection, it's admitted.

MR. KAHAN: Thank you, Your Honor.

Q. (BY MR. KAHAN) Looking at pages 7 and 19 of that report, do you recognize that as a list of the documents you reviewed?

A. Yes, sir.

Q. And since authoring that report, have you reviewed any additional documents?

A. Yes, sir.

968

Q.  Do you recall what those were?

A.  Yes, sir.

Q.  Could you please tell the Court?

A.  I reviewed some documents from the office of Dr. Bianco.
I reviewed Dr. Woods' second declaration.  And I also
reviewed records from Sparks Regional Medical Center.

Q.  What was your goal in reviewing that documentary
material?

A.  Well, you mean the totality of all the information?

Q.  Yes.

A.  It's part and parcel of doing a forensic psychiatric
evaluation.  It's looking at collateral sources of
information, everything that includes, but is not limited
to, offense reports, supplemental offense reports, crime
scene photographs, autopsy reports, various declarations,
medical records, mental health records, correctional
records, previous contacts with the law, other reports
composed by other experts.  It's part and parcel of doing
this work.

Q.  Did you ultimately have the opportunity to interview
Kenneth Barrett in person?

A.  Yes, sir.

Q.  And do you see him in the court today?

A.  Yes, sir.

Q.  And can you describe him for the record?

969

A.  He's the gentleman sitting right next to counsel, dressed in an orange jumpsuit.

MR. KAHAN:  May the record reflect that the witness has identified the defendant?

THE COURT:  Record will so reflect.

MR. KAHAN:  Thank you.

Q.  (BY MR. KAHAN)  Now, is it accurate to describe your interview with Mr. Barrett as a semi-structured interview?

A.  Yes, sir.

Q.  Okay.  And is that a method that's generally accepted in the field of forensic psychiatry?

A.  Yes, sir.

Q.  Okay.  And is it one for which you've received training?

A.  Yes, sir.

Q.  And had you had experience performing semi-structured interviews in the past?

A.  Yes, sir.

Q.  And as far as you could tell, does it appear that Mr. Barrett was providing genuine effort during that interview?

A.  Yes.

Q.  Where did the interview take place?

A.  At the federal prison in Terre Haute, Indiana.

Q.  And when was it?

A.   It took place on January 19, 2017.

Q.   Now, given the nature of this interview, did you warn Mr. Barrett of limits in confidentiality?

A.   Of course.

Q.   And did you record the interview in any way?

A.   Yes.

Q.   And is that your normal practice?

A.   Yes.  I've been video and audio recording evaluations for -- since about 1999, 1998.  Maybe 1997 even.

Q.   Okay.  And why is that?

A.   Because I believe that video recording forensic psychiatric evaluations is the best way to preserve the integrity of the process.  It leaves no doubt as to who said what.  It holds me up to scrutiny, and it holds the person I'm evaluating up to scrutiny.

Q.   And in your opinion -- well, let me ask you this:  Was Mr. Barrett, during the time of your interview, in restraints?

A.   Yes.

Q.   And you've already said that the interview occurred in a prison setting?

A.   Yes.

Q.   Did you, nonetheless, consider the circumstances to be adequate?

A.   Yes.

Q.  Now, with regard to your recording -- and I would ask you to flip to Section 10 of Government's Exhibit 52.

A.  Yes.

Q.  I realize, from the outside, it's difficult to tell. But is that the portion of the -- that book in which you attached the DVDs memorializing your interview?

A.  Yes, sir.

Q.  And those video recordings, those were true and correct copies of the interview?

A.  Yes, sir.

Q.  And you have since reviewed those recordings?

A.  Yes.

Q.  Okay.  And who appears on screen in the interview?

A.  Mr. Barrett.

Q.  Anyone else?

A.  No.

Q.  Is anyone else's voice audible during the recording?

A.  No.  I think, later in the evaluation, there's some -- something going on in the hallway about chow.  But, no, there's no one else's voice that's audible.

Q.  Okay.  I don't want to ruin the surprise, but is your voice audible?

A.  Oh, sorry about that.  Yeah, my voice is -- my voice is audible.  Forgot about that.

Q.  Yeah.  But you do not appear on screen?

A.   No.

MR. KAHAN:  Your Honor, I would move Section 10 into evidence.

MR. AUTRY:  Your Honor, we'd object to that based not only on our previous objection, but because the video recording -- the video-audio recording of Dr. Pitt's structured interview of Mr. Barrett does not show Dr. Pitt evidently.  It only shows Mr. Barrett.  So I don't think the Court or anybody viewing it can get a full idea or the full flavor of the interview without seeing both participants.

THE COURT:  Very well.  Objection is overruled, and Section 10 is admitted.

Q.   (BY MR. KAHAN)  After the interview was completed, did you cause to be created a transcript of the interview?

A.   Yes.

Q.   Okay.  And I would ask you to turn to Section 3 of Government's Exhibit 52.

A.   Yes, sir.

Q.   Do you recognize that document as a true and accurate transcription of the interview you conducted with Mr. Barrett?

A.   Yes.  It's a representation of the best efforts of my transcriptionist to accurately record the evaluation and the interview that was conducted by myself with Mr. Barrett.

MR. KAHAN:  Your Honor, the government would move

973

Section 3 into evidence.

MR. AUTRY:  We would object to that because it's not done by a court reporter and there's no certification. So there's no way -- that's our objection.

MR. KAHAN:  In response to that, I would say that it is verifiable with the recording.

THE COURT:  Right.  With that in mind, the objection is overruled, and Section 3 is admitted.

Q.  (BY MR. KAHAN)  During the course of your evaluation with Mr. Barrett, did you conduct -- or, rather, ask of him for a psychosocial history?

A.  Well, I -- as part of the evaluation, I conducted a psychosocial history, yes, sir.

Q.  Okay.  And what topics did you cover?

A.  Oh, everything that includes his personal history, his educational history, his employment history, his legal history, his relationship history, his family history, his family mental health history, his own psychiatric history. All the different topics that I covered I put into a table of contents in the transcript, and they are all listed there.  But what I just shared with you is a sample representation of a number of the topics that were covered.

Q.  Okay.  And did you then summarize that psychosocial history in your own report?

974

A.   Yes, sir.

Q.   And then did you also take a psychiatric history from the defendant?

A.   Well, of course.

Q.   Okay.  And did that include a history of substance abuse?

A.   Yes, sir.

Q.   And when in Mr. Barrett's life did that substance abuse history begin?

A.   About age ten.

Q.   Okay.  And what was the duration of that history?

A.   Throughout his life.

Q.   And did you get a flavor for the frequency of his abuse of substances?

A.   Yes.

Q.   And what was that?

A.   Well, it -- his frequency was such that Mr. Barrett shared with me essentially that there was never a time -- there was essentially never a time that he was abstinent from drugs, and that he was using drugs regularly.

Q.   And did he state with any specificity what substances he was abusing in the years immediately leading up to September 24th, 1999?

A.   Yes.

Q.   And what were those?

A.   The primary drug was amphetamine -- or methamphetamine. The secondary drug, there was marijuana use as well.

Q.   Did you have a sense that Mr. Barrett minimized his drug use at all during your interview?

A.   No.

Q.   Now, as part of that psychiatric history, did you also review the defendant's treatment for any mental health issues?

A.   Yes, sir.

Q.   And did that begin with a review of documents from the Sparks Regional Medical Center?  Let me save you that effort and prove myself a liar.  If I could ask the clerk to show the witness Defendant's Exhibit 102.

        THE CLERK:  Defendant's Exhibit?

        MR. KAHAN:  102.

Q.   (BY MR. KAHAN)  Dr. Pitt, do you recognize that document as a copy of records from Sparks Regional Medical Center?

A.   Yes, sir.

Q.   Okay.  And does that appear to be a true and accurate copy of the documents that were provided to you and that you reviewed?

A.   Yes, sir.

        MR. KAHAN:  Your Honor, partially at the request of counsel, I'd go ahead and move Defendant's 102 into evidence.

THE COURT:  Any objection?

MR. AUTRY:  No, sir.

THE COURT:  Defendant's 102 is admitted.

Q.  (BY MR. KAHAN)  As you understand it, what events are recounted in these documents?

A.  When you say these documents, you're talking about --

Q.  About Defendant's 102.

A.  Well, essentially what happens is that Mr. Barrett tried to kill himself and he shot himself in the chest.  He -- he had come home from work.  He -- he thought that he had been laid off from work when, in fact, it turned out he learned after the fact that that wasn't the case.  But, regardless, he shot himself in the chest.  He was transported to Sequoyah Memorial Hospital where he was stabilized.  And then from Sequoyah Memorial Hospital, he was transported to Sparks Regional Medical Center where he remained.  He was admitted there on January 19, 1986, and then he was discharged on January 27, 1986.

Q.  Within those records within Defendant's Exhibit 102, are you familiar with a report by a psychiatrist named Rowland Vernon?

A.  Yes, sir.

Q.  If I could ask you to look, and I am aware that it's not paginated.  If I could ask you to please find that report.  I believe it's about the 14th page?

A.   I'm -- I'm looking at the report.

Q.   Okay.  And what conclusions does Dr. Vernon draw?

A.   His impressions were, one, probable antisocial personality.  Two, drug abuse.  And then he has a hyphen, marijuana currently.  And history of hallucinogenic drugs such as LSD and PCP.  Three is alcohol abuse, and then he's got a hyphen, current.  And then, four, is probable major depressive disorder.

Q.   Now, the hospital records in general, do they reflect a history of substance abuse?

A.   Yes.

Q.   Within the records, however, do you find any evidence of a blood test confirming that substance abuse?

A.   I don't think in these particular records, if my memory is right.

Q.   Notwithstanding the absence of such a test, do you -- do you still credit the report?

A.   Sure.

Q.   And why is that?

A.   Well, I credit it for -- for a couple of reasons.  One, the history was gathered by medical personnel.  Two, medical personnel recorded it.  And, three, the assumption is that the medical personnel got that information either from family or from Mr. Barrett directly.

          MR. KAHAN:  If I could, Your Honor, I would ask

978

the clerk to remove Defense 102, and please provide the witness with Government's Exhibits 3 through 6.

Q. (BY MR. KAHAN) Dr. Pitt, have you had a moment to review Exhibits 3 through 6?

A. Yes, sir.

Q. And do you recognize those as records from Eastern State Hospital?

A. Yes, sir.

Q. And in particular, do you recognize them as documents from Eastern State Hospital that you reviewed in connection with this case?

A. Yes, sir.

MR. KAHAN: Your Honor, I would move Government's 3 through 6 into evidence to the extent we have not before. Okay. We think only 4 is not in.

THE COURT: Looks like 4, 5 and 6 have been admitted. Three is not. Any objection to 3?

MR. AUTRY: No, Your Honor.

THE COURT: Three is admitted.

Q. (BY MR. KAHAN) Dr. Pitt, what events do these records reflect to the best of your understanding?

A. Well, essentially what happens here -- this is back in October 8 of 1986. What the records reflect is you have some voluntary statements that were authored by Mr. Barrett's spouse as well as his mom. And what his spouse

979

relates is that she had -- she claiming that he was -- she was sexually abused by him. That he threatened to kill her. That he threatened to kill himself. And that he has come and kidnapped her son and threatened to keep him away where -- where she couldn't find him. She also talks about the fact that he was abusing drugs.

And then the voluntary statement by his mother says that, in part, Kenneth Barrett, my son is -- I think there's a word missing. But essentially it's about threatening to harm himself. And she says, I know that he's using drugs.

And then there's a professional's statement that talks about Mr. Barrett's history, and ultimately he's admitted -- admitted to the hospital. And the admitting diagnoses are marital problems, mixed substance abuse, alcohol abuse, and mixed personality disorder. And they also note the previous history of the gunshot wound from the previous suicide attempt.

Q. Now, I believe you've touched on reports of -- or a history of substance abuse in these documents. Do you credit these reports of substance abuse here?

A. Yes.

Q. And is there any evidence of a blood test to confirm --

A. No, sir, not in these records.

Q. Why then do you credit the reports of substance abuse?

980

A.  Well, I credit them because we have his wife at the time saying he's using drugs, his mom at the time saying he's using drugs, the doctor coming up with the diagnosis that he's got a history of drug use.  And what I'm not completely sure about in these records is whether or not there's an admission by Mr. Barrett that he was using drugs, but if I had to take a guess, there probably is.

Q.  Specifically, looking at Exhibit 5.

A.  Yes, sir.

Q.  What does that appear to be?

A.  Exhibit 5 is a -- I think it's basically a review of systems document.

Q.  Roughly speaking, kind of an abbreviated medical history?

A.  Yes.

Q.  And what does it reflect with regard to head injury?

A.  You know, in the -- denies -- denies head injury.  It's down on the bottom right-hand corner.

Q.  You also spoke briefly about diagnoses here?

A.  Yes, sir.

Q.  What was the diagnosis on discharge from Eastern State Hospital?

A.  The diagnosis -- the diagnosis on discharge on Axis I was marital problems and mixed substance abuse.  The diagnosis on Axis II was mixed personality disorder.

Q.   Okay.  Any indication of a mood disorder?

A.   No, sir.

Q.   Now, let me ask you this:  Did the discharge report in this case include results of a drug screen?

A.   I don't believe so.  I don't believe there's a discussion of a drug screen in these records.  But I could be mistaken, but I don't think so.

Q.   If I could turn your -- I'm sorry -- turn your attention to the second full paragraph of Exhibit 6.

A.   Oh, I stand corrected.  Thank you.  It says a drug screen -- a complete drug screen was requested on admission and was negative.

Q.   Now, the fact that that was negative, does that lead you to doubt that Mr. Barrett was a long-term substance abuser?

A.   No.

Q.   And why is that?

A.   Well, again, because we have the two voluntary statements, we have the history of drug use, and I have Mr. Barrett telling me that he has a history of drug use.

Q.   Dr. Pitt, I'd ask you to turn to Government's Exhibit 10 in that book.

A.   Yes, sir.

Q.   Do you recognize that document as a true and accurate copy of a record from the Social Security Administration

982

that you reviewed in connection with this case?

A.   Yes, sir.

MR. KAHAN:  Your Honor, to the extent not already -- we haven't already done so, we move Exhibit 10 into evidence.

THE COURT:  It's already been admitted.

MR. KAHAN:  Okay.  Thanks.

Q.   (BY MR. KAHAN)  As you understand it, what events are memorialized in this document?

A.   Well, essentially it's Mr. Barrett went for an application, or applied for Social Security disability.  And what the report states in part -- I'm looking at the third from the -- well, working from the bottom up where it starts with you said, you said you're unable to work because of a gunshot wound to the chest and a mental disorder.  And then the report says, "The medical evidence shows that your gunshot wound was healed.  Medical reports show that you are moderately depressed, but there are no signs of a severe mental illness."

Q.   Now, is bipolar disorder a severe mental illness?

A.   I think so, yes.

Q.   Is posttraumatic stress disorder?

A.   Yes.

Q.   And did you rely on these Social Security findings?

A.   Well, it's certainly a data point.  It's a piece of

information.

Q.  Okay.  And why rely on these records?

A.  Well, because it's a -- it's an independent evaluation that was done some time ago by mental health professionals who relied on a series -- not only relied on an evaluation of Mr. Barrett, but relied on other documents which they list at the top of that document.  And like I say, it's a piece of information.  It's another data point.

Q.  What did Social Security conclude about Mr. Barrett's ability to think clearly?

A.  What it said is, most of the time you are able to claim -- claim -- excuse me.  Most of the time you are able to think clearly and to carry out your normal activities.  Medical evidence does not show any other medical evidence which would keep you from working.

Q.  Is that a sort of finding that is symptomatic of neurological health?

A.  I think it's -- I think it's representative of overall general health, whether it's neurological or mental health.

Q.  If I could ask you to turn to Government's Exhibit 11.  Do you recognize this as a true and accurate copy of a report you reviewed in connection with this case from Sequoyah Memorial Hospital?

A.  Yes, sir.

        MR. KAHAN:  And once again, to the extent we've

not already moved into evidence --

THE COURT:  That one has been admitted as well.

MR. KAHAN:  Thank you.

Q.  (BY MR. KAHAN)  As you understand it, what events are memorialized in Government's Exhibit 11?

A.  So this is the beginning of a series of events that essentially transpire over a period of, largely, three days. And it starts with at Sequoyah Memorial Hospital back on January 20, 1995 where Mr. Barrett presents to the emergency room.  And his mother states that he is, quote, losing -- quote-unquote, losing his mind.  And then further down below, I can't make out the age, but it says blank-year-old white male complains of, quote-unquote, losing his mind.

Q.  And what does this document reflect about Mr. Barrett's drug usage?

A.  Well, they go ahead and they do -- they, being the facility, do a toxicology screen, and it comes back positive for amphetamines and THC.

Q.  What sort of screening was that?

A.  That's a urine drug screen.

Q.  And urine, not blood, do you still find it credible?

A.  Yes.  Why wouldn't I?

Q.  Is the -- are the results of that test generally consistent with Mr. Barrett's statements to you?

A.  Yes.

985

Q. And in your opinion, the reliability not affected by the lack of a confirming blood screen?

A. Yes.

Q. Why not? Why is that?

A. Well, again, the reason is Mr. Barrett's history of using -- his admitted history to me of using amphetamines, the fact that you have urine drug screen that's popping for the presence of these two drugs. And, to me, it makes perfect sense.

Q. Does that record reflect that the hospital or medical staff administered any sort of prescription drug to Mr. Barrett?

A. On this particular visit, they gave Mr. Barrett a drug that's referred to as Haloperidol or Haldol.

Q. What sort of drug is that?

A. Well, it's considered an antipsychotic drug. It's used commonly in emergency rooms to treat agitation.

Q. And based on the administration of that drug, do you conclude that Mr. Barrett suffered from a mood disorder of any kind?

A. No. That would be -- that would not be a responsible conclusion to reach because Haldol is used for a number of different reasons. And, frankly, that Haldol is also used in the treatment of Tourette's disorder. So you don't make the diagnosis on the -- on the basis of a medication that

someone has been administered.

Q.   Let me ask you, if you would, to please turn to Exhibits 8 and 9.  If you would review those for a moment.  Government's Exhibits 8 and 9.

A.   Yes, sir.

Q.   And do you recognize those as true and accurate copies of documents you reviewed in connection with this case from Bill Willis and Wagoner Hospital?

A.   Yes, sir.

Q.   As you understand it, what events do these two documents memorialize?

A.   Well, this is a -- there is a sequence here of -- of what takes place.  Mr. Barrett first shows up at Sequoyah Memorial Hospital.  He is then transferred -- or evaluated by a woman by the name of Barbara Hughes from Bill Willis Community Mental Health Center.  And I believe that would be your Exhibit Number 9.  And she recounts the history.  And she gives a provisional diagnosis of bipolar disorder.  And she makes a referral to Wagoner Community Hospital where Mr. Barrett is ultimately transferred to and hospitalized for a period of three days.

He's then discharged on the 23rd of January, 1995.  And then, as an outpatient, he's under the auspices of the Bill Willis Community Mental Health Clinic up until, I believe, February 13, 1995, at which point he's discharged

987

from the program for noncompliance.  And the same woman,
Kimberly Hughes --

Q.  I'm sorry.

A.  -- discharges -- gives a discharge.

Q.  Barbara Hughes?

A.  Did I say Barbara?  I misspoke before.  I meant Kimberly
Hughes.  But, anyhow, she writes a discharge summary that
says noncompliant -- reason for discharge, noncompliancy.
And then she gives the diagnoses that he was given at
Wagoner Community Hospital.

Q.  Okay.  Now, if we can roll back a bit?

A.  Sure.

Q.  The Hughes diagnosis.

A.  Yes.

Q.  First, as you understand it, is Ms. Hughes a physician
or mental health professional of some sort?

A.  Well, I'm assuming, at a minimum, she's probably a
mental health counselor.

Q.  Okay.

A.  But she's not a physician.

Q.  And she provides, as you said, a diagnosis for bipolar
disorder; correct?

A.  A provisional diagnosis.

Q.  Okay.  And did you credit that diagnosis?

A.  Well, I certainly considered it.

988

Q.  Okay.  Do you, as a result, conclude that, at the time, Mr. Barrett was suffering with bipolar disorder?

A.  No.

Q.  And why not?

A.  Well, that's a -- there's -- there's just a lot of different data points out there to argue against bipolar disorder.  But starting its most basic and fundamental reason is that --

Q.  Well --

A.  -- is that he has a history of drug use.

Q.  Okay.

A.  And you don't make that diagnosis -- if the symptoms -- if his symptoms can be better explained through the physiological effects of a substance, it's incumbent upon you to have the substance use diagnosis first.

Q.  And let me take you more immediately in time -- that time to Exhibit 8.

A.  Yes, sir.

Q.  What was Mr. Barrett's final diagnosis during this episode?

A.  So when he is discharged from Wagoner Community Hospital, he's given a diagnosis of organic affective disorder, polysubstance abuse, amphetamine dependence, and urine drug screen positive for cannabis, and then marital conflicts.

989

Q.    Okay.   And do you find that to be a reliable diagnosis?

A.    For that period of time, I think that was a reasonable -- I think the differential diagnosis that they presented is certainly reasonable.

Q.    Okay.   Do these records reflect contemporaneous substance abuse?

A.    Yes.

Q.    Okay.   And also a history of substance abuse?

A.    Yes.

Q.    And that all appears to be consistent with the final diagnosis?

A.    Yes.

Q.    Okay.   Now, the final diagnosis of organic affective disorder --

A.    Yes.

Q.    -- does that give you reason to believe that the diagnosticians here suspected some sort of brain damage?

A.    No.

Q.    Okay.   And why don't we back up a bit.   What is the -- or was the meaning of organic affective disorder?

A.    So back in the day, this term was used globally to represent a mood disorder that was a byproduct either of some medical condition or a substance -- a substance.   And what they did in, I belive it's DSM-IV TR, they got rid of

990

the term, organic affective disorder, because, implicit in that diagnosis, you could not separate a functional illness, such as a pure bipolar disorder, from another condition that would be -- that would be causing the same kinds of symptoms.  In other words, a substance-induced bipolar disorder or a brain injury that was mimic -- or causing symptoms of bipolar disorder.

So in the next iteration of DSM, DSM-IV TR, they did away with that and they have something called substance abused or medically induced -- or medical condition to identify the condition that would cause the bipolar disorder.

Back in the day here, when this was done in 1995, this would have been a reasonable diagnosis to give given his substance use.  It does not mean that this is a byproduct of a head injury.  Is it possible that that's what they meant?  Sure, it's possible.  But there's nothing in the records to suggest head injury.

Q.  Okay.

A.  So what they meant was, I believe, this was substance use and a substance-induced mood disorder.

Q.  If I could ask you to turn your attention to Exhibit 7 -- Government's Exhibit 7.  Do you recognize this as a true and correct copy of documents you reviewed in connection with this case from Saint Francis Hospital?

A.   Yes, sir.   Just hang on one second.   Yes, sir.

Q.   As you understand it, what events do these documents purport to memorialize?

A.   Well, Saint Francis Hospital is where Mr. Barrett goes following the incident following the instant offense.

Q.   Okay.

A.   And he's -- he's transported there.   And that's why he's at Saint Francis Hospital.

Q.   And why was he taken to the hospital, as you understand it?

A.   Well, because he had -- he had an injury.   He had gunshot wounds.

Q.   And upon his admission there, did he -- or, rather, I should ask, while he was there, do the records reflect that Mr. Barrett made any sort of admission regarding his drug use?

A.   Yes.

Q.   And would you agree with me that on page 2 of these documents, there is just such an admission memorialized?

A.   Yes, sir.   It says, the patient reports using methamphetamine tonight, and smoking marijuana earlier in the day.

Q.   Okay.   Do these records also reflect a so-called serum test?   And specifically it's page 7 of these records.

A.   Yes, sir.

Q.   And what is a serum test?

A.   Well, in the diagnostic studies in what I think this is, the ER note, it says, included serum drug screening positive for cannabinoids, and positive for high levels of amphetamines.

Q.   But the serum test, are we talking about a blood test here?

A.   Yes, sir.

Q.   What, if at all, do the records reflect, and specifically page 7, about the state of Mr. Barrett's hygiene?

A.   You're going to have to -- I don't have my eyes on it right now.  But essentially his hygiene was poor.

Q.   And is that, in your experience, a description consistent with long-term drug use?

A.   It could be.  But -- but he was also, you know, dragged out of the home and it certainly -- there's a couple of explanations for that.  I can't commit to that one way or another.

Q.   Now --

A.   Certainly -- wait, wait.  But the poor oral hygiene piece is common with chronic methamphetamine use.

Q.   Looking at these hospital records overall, these medical records starting from '86 and ending in 1999, do they give you reason to suspect an undiagnosed mood disorder of any

993

sort?

A.  Well, I think -- I think, to be precise, Mr. Barrett was appropriately, I think, diagnosed with some possible mood disorder following his attempted suicide.  But do these records give me any pause or make me think that there's anything to suggest that he has bipolar disorder?  The answer is absolutely not.

Q.  Okay.  And posttraumatic stress disorder?

A.  No.

Q.  Now, going back -- or I guess moving forward in time to January of this year --

A.  Yes, sir.

Q.  -- did Mr. Barrett report to you any suicide attempts other than the one for which you reviewed records in 1986?

A.  He -- he talked about there were times when he felt chronically suicidal.  And I asked him to give me some examples.  And he talked about just doing things like driving his car at a high rate of speed, or using lots of drugs, you know, as much as he could possibly use at a given time.  He talked about doing that on several occasions as well.

Q.  Is it your impression that all of the attempts that he discussed with you were -- occurred at a time when he was also abusing drugs?

A.  My impression is that the thread that runs throughout

Mr. Barrett's life, beginning at at least around age ten, is chronic substance use. And in the years leading up to the instant offense, it was amphetamine use primarily.

Q. And did you reach any sort of conclusion that his admission to these suicide attempts made a diagnosis of bipolar disorder more likely?

A. No. I think it actually makes it less likely.

Q. And why is that?

A. Again, for the -- for the reason that I stated, which is the DSM 5, DSM-IV TR, I believe even the several iterations of the DSM indicate that you don't make a diagnosis of something like bipolar disorder if the symptoms can be better explained by the physiological effects of a medical condition or a substance. It would be just irresponsible to do that.

Q. Now, in connection with this case, did you have the opportunity to review any records from the Bureau of Prisons?

A. Yes, sir.

Q. And which records were those?

A. Records from the Bureau of Prisons. Records from the -- I looked at the records from the federal Bureau of Prisons up until 2015.

Q. Okay.

A. And I also looked at records from the Oklahoma state

correctional -- Department of Corrections. Those were largely medical records -- largely reception records.

Q. Any of those reflect a diagnosis for bipolar disorder?

A. No, sir.

MR. AUTRY: Your Honor, we're going to object to that because he's basing that opinion on these -- or these records from the Bureau of Prisons, rather, that were not obviously in existence at the time of Mr. Barrett's trial in 2005. So we object to anything from Dr. Pitt based in whole or in part on these after-the-fact Bureau of Prisons records.

THE COURT: Objection is overruled.

MR. AUTRY: Thank you.

Q. (BY MR. KAHAN) Just to address that point. Dr. Pitt, in reaching your ultimate opinions in this case, did you rely on the records from the Bureau of Prisons?

A. Look, I looked at the records from the Bureau of Prisons. It's a -- it's a data point in the same way that the records from Saint Francis Hospital are a data point, in the same way that the Social Security records are data point. It's a piece of information.

Q. And in the absence of the records from the Bureau of Prisons, would you have reached a different conclusion?

A. No. My diagnostic opinion does not rise and fall with the Bureau of Prisons records. All the Bureau of Prisons

records do is validate and confirm my impression that, when seen by at least four different psychologists, none of them gave a diagnosis of a mental condition.

Q. Now, generally speaking, is confinement considered a stressful event in a person's life?

A. Yes.

Q. Okay. And does the stress of confinement tend to vary in proportion with the security of the institution?

A. Yes.

Q. And in your experience, does stress make it more difficult to hide or otherwise suppress the symptoms of a mental illness?

A. I can tell you that, in general, the more stress you're under, the more likely you're to exhibit emotional problems or mental health symptoms.

Q. Do the records from the Bureau of Prisons, with that in mind, reflect a diagnosis for bipolar disorder?

A. No, sir.

Q. Do they reflect a diagnosis for posttraumatic stress disorder?

A. No, sir.

Q. Now, during the course of your interview with Mr. Barrett, did he express to you that he could not recognize his own symptoms of mental illness?

A. He did.

997

Q. And how do you -- how do you interpret that statement?

A. Well, it's a hard one for me to take in because I actually thought Mr. Barrett when we met was articulate, verbally competent, fairly insightful, and was up to speed on, you know, various issues related to his history and his case.

Q. So do you credit his statement that prison somehow left him unable to perceive any -- any mental -- mental symptoms of his own?

A. No.

Q. And why is that?

A. For the reasons I just stated. I think he -- I think if he was really experiencing -- I think he had the capacity to recognize when he's not feeling well or doing well.

Q. During the course of the interview, did Mr. Barrett mention to you any auditory hallucinations?

A. He denied -- he denied experiencing auditory hallucinations.

Q. During the interview, did you review a history of Mr. Barrett's head injuries?

A. I reviewed with him his history of head injuries, yes, sir.

Q. Okay. And how many did he report?

A. I think there were five that he told me about.

Q. Okay. Any particularly serious?

A.   Well, there's a couple.  There's a motor vehicle accident back in June of 1986 from Sequoyah mental health hospital where there was no loss of consciousness.  There's another one from July 18, 2013 at Sequoyah Memorial Hospital.  There's a contusion in the right orbital area.  I'm not sure on that one if he experienced a loss of consciousness.

There's an incident that happens, I believe it's in childhood.  It could be as a teen.  Something happens on a playground with a steel ball.  Mr. Barrett told me, if my memory is right, that he had two times where he lost consciousness.

Q.   Okay.  Did you receive any records for an incident involving a steel ball?

A.   No.

Q.   Now, I believe you stated, with regard to the records from Eastern State Hospital, that there had been a denial of head injury; is that correct?

A.   I believe that's what you -- yes, that was one of the exhibits that was in -- in that one document, yes, sir.

Q.   Okay.  And did you review any records from the Oklahoma Department of Corrections?

A.   Yes, sir.

Q.   Do those include some sort of medical history?

A.   Yes.

Q. And what had did the medical history indicate with regard to head injury?

A. Well, there's -- there's a form that I -- it's a personal health history form that I believe is actually signed by Mr. Barrett.

Q. Okay. If I could ask you to turn to Government's Exhibit 66.

A. Oh, there it is. Sorry about that. Yes, sir.

Q. Does that appear to be a true and accurate copy of the document you reviewed from the Oklahoma Department of Corrections?

A. Yes, sir.

MR. KAHAN: Your Honor, the government would move Government's 66 into evidence.

MR. AUTRY: No objection.

THE COURT: Government's 66 is admitted.

Q. (BY MR. KAHAN) And, again, that record appears to contain a denial of head injury. If you could look at the third page --

A. Yeah, I have it. It says, periods of unconsciousness, no. Blurred vision, No.

Q. In your opinion, did Mr. Barrett have any sort of motive to exaggerate his head injuries when he was received at Oklahoma Department of Corrections?

A. Sure.

1000

Q.  And let me just back up a piece.  That checklist --

A.  Yes, sir.

Q.  -- what is -- what is the heading just above that checklist?  What does it ask the person responding under system review?

A.  Yes, sir.

Q.  What does that ask the respondent to -- as a --

A.  Yes.  I see where you're at.  It's a terrific question. It says, have you ever had or do you now have, and then it lists a series of symptoms, everything from periods of unconsciousness, blurred vision, double vision, depression or excessive worry, frequent thoughts of suicide, paralysis, etc.

Q.  Okay.  And those are in the negative?

A.  Yes, sir.

Q.  Thank you.  Now, during the course of your interview, did you have an opportunity to review Mr. Barrett's history of drug abuse with him?

A.  Yes.

MR. KAHAN:  Your Honor, with the Court's permission, government would like to play a couple of excerpts from the interview.

THE COURT:  Are the monitors on?

MR. AUTRY:  Ours is.

MR. KAHAN:  And for the record, the first of these

excerpts is taken from Dr. Pitt's transcript starting on Page 85 at Line 10.

MR. WILSON:  Judge, are you ready?

THE COURT:  Yes, go ahead.

*(Video played)*

MR. KAHAN:  And then a second excerpt beginning on transcript Page 91, Your Honor, Line 12.

THE COURT:  Go ahead.  Yes.

*(Video played)*

Q.  (BY MR. KAHAN)  Dr. Pitt, do you recognize the two recordings we heard as excerpts from your interview with Mr. Barrett?

A.  Yes, sir.

Q.  What do those statements by Mr. Barrett lead you to believe about the extent of his substance abuse?

A.  He had a serious problem with substance use.

Q.  During another portion of the interview, did he say to you there was no absence of drug abuse?

A.  Yes.

Q.  Did he also tell you that, during a typical day leading up to the murder, that he used meth every morning?

A.  Yes.

Q.  And to be clear, by meth, I'm speaking of methamphetamine.

A.  Yes.

1002

Q.  Didn't he also repeat that he was high every day, though there were moments when he first awoke when he was not yet under the influence?

A.  Yes.

MR. KAHAN:  And Court's permission, we'd play another excerpt.  This is from transcript Page 154.

THE COURT:  Go ahead.

*(Video played)*

Q.  (BY MR. KAHAN)  Dr. Pitt, do you recognize that as accurate recording of part of your interview with Mr. Barrett?

A.  Yes.

Q.  Did Mr. Barrett, in another portion of the interview, indicate to you that he had had access to methamphetamine and OxyContin while in pretrial custody?

A.  Yes.

Q.  What do -- what do these admissions indicate to you about the severity of his drug abuse?

A.  Mr. Barrett had a serious problem with drug addiction.

MR. KAHAN:  And if we could, we'd like to play one last excerpt from the interview.  This is reflecting portion of the interview beginning at transcript Page 108, Line 25.

THE COURT:  Go ahead.

*(Video played)*

Q.  (BY MR. KAHAN)  Dr. Pitt, do you recognize that as an

1003

accurate recording of a portion of your interview with Mr. Barrett?

A. Yes.

Q. During that segment, does he endorse symptoms of a mood disorder?

A. No.

Q. In fact, to what does he attribute changes in his own mood?

A. Drug use.

Q. Let me ask you this: Is there agreement in the mental health and medical community that drugs can mimic the effects of a mood disorder?

A. Yes.

Q. And, in particular, are there drugs that can make a person appear manic?

A. Yes.

Q. Okay. And are there drugs that will make a person appear irritable?

A. Yes.

Q. Can they create pressured speech?

A. Yes.

Q. Can they create mood lability?

A. Yes.

Q. To be specific, is methamphetamine a drug that can make a person irritable?

1004

A.   Yes.

Q.   Give a person pressured speech?

A.   Yes.

Q.   And mood lability?

A.   Yes.  And make them feel euphoric and -- yes.

Q.   Is cocaine a similar drug?

A.   Yes.

Q.   During your interview with Mr. Barrett, did you detect pressured speech?

A.   No.

Q.   Okay.  What is -- first, at the time of trial, 2005?

A.   Yes.

Q.   -- familiar with Diagnostic and Statistical Manual?

A.   Yes.

Q.   And that's a book that has had several iterations over time?

A.   Yes.

Q.   In 2005, what version of that manual was in effect?

A.   DSM-IV TR.

Q.   What does DSM-IV TR say about the effects of methamphetamine use?

     MR. AUTRY:  Your Honor, we're going to object because there's nothing in Dr. Pitt's report in which he discusses the DSM-TR IV, or IV TR, whatever, as everything is based off the DSM 5 so far as I can determine in his

report.

MR. KAHAN: Dr. Pitt, is recognized as an expert in this area. He's -- he was -- he's long been in practice, including the period of time in which DSM-IV TR was in effect. And we're prepared ultimately to address the differential -- or not the differential -- those few distinctions between DSM 5 and DSM-IV here today.

THE COURT: Well, what do you say, though, about the claim that that discussion wasn't contained in his report?

MR. KAHAN: I think it is an accurate statement that there is no specific citation to DSM-IV TR, but the distinction here is one without difference.

THE COURT: Well, objection is sustained.

Q. (BY MR. KAHAN) Dr. Pitt, does the DSM 5 recognize any sort of consensus about intoxication and how it might mimic --

A. Well, first of all, in footnote number 39, I talk about the changes that have gone through the DSM-IV. And the reality is that, what I say in footnote number 39, is that, since 1999, the Diagnostic and Statistical Manual mental disorders has been revised --

MR. AUTRY: Your Honor, objection.

THE COURT: Sustained.

Q. (BY MR. KAHAN) With regard to DSM 5, does it reflect a

consensus of --

A.  Yes.

Q.  Thank you.  And that consensus is that mania can be mimicked by the --

A.  Yes.

Q.  Now, is it your understanding that Mr. Barrett was using drugs on September 24th, 1999?

A.  Yes.

Q.  All right.  And why is that?  What do you base that on?

A.  I'm sorry, say that again.

Q.  What do you base that on?

A.  His self-report.

Q.  And how would you respond to any criticism that the historical record lacks confirming blood tests?

A.  I don't -- I think you've already established that that's not true.

Q.  In your opinion, at the time of the crime, was Mr. Barrett suffering from bipolar disorder?

A.  No.

Q.  All right.  And why do you reject that diagnosis?

A.  I reject that diagnosis because it -- whether you're looking at the DSM-IV TR or the DSM 5 or even the DSM-IV --

        MR. AUTRY:  I object again to any comment about the DSM-IV TR.

THE COURT:  Sustained.

Q.  (BY MR. KAHAN)  With regard to the current version of the DSM, would you -- would you diagnose -- or using DSM 5, what is your opinion regarding bipolar disorder in Mr. Barrett's case?

A.  It's my opinion, based on my practice that goes way beyond DSM 5, that it -- historically, you don't make a diagnosis of bipolar disorder if, in fact, there is evidence that the symptoms are better explained by a -- the physiological effects of a substance or the physiological effects of a medical condition.  That concept has been in place for years.

Q.  Do you maintain that opinion in the face of evidence of suicide attempts?

A.  Yes.

Q.  And why is that?

A.  Same -- same reasoning.

Q.  And do you maintain that opinion -- let me back up.  In your review of records, did you consider a history of mental illness in Mr. Barrett's family?

A.  Of course.

Q.  And what did that history appear to be?

A.  There's an extensive family history in the immediate family as well as in the extended family of mental illness.

1008

Q.  Do you maintain your rejection of bipolar disorder nonetheless?

A.  Mr. Barrett does not have bipolar disorder, nor did he have it at the time of the offense.

Q.  Based on your review of the BOP records, has anyone over the last, I guess 12 years, observed bipolar disorder symptoms?

MR. AUTRY:  Same objection as previously to reliance on BOP records, Your Honor.

THE COURT:  Overruled.

A.  Whether you look at -- the BOP records don't diagnose bipolar disorder.  Nobody diagnoses Mr. Barrett with bipolar disorder.  There's one provisional diagnosis that was done by, as best I can tell, a mental health counselor who ultimately changes her diagnosis after Mr. Barrett is discharged from the Wagoner Community Hospital.  There is no one who has treated Mr. Barrett, to my knowledge, who has given a diagnosis of bipolar disorder.

Q.  (BY MR. KAHAN)  And is bipolar disorder a life-long ailment?

A.  Yes.

Q.  Fair to say that symptoms might come and go, but the underlying disease is always there?

A.  Yes.

Q.  In your experience, can a person suffering from bipolar

1009

disorder hide the symptoms for a protracted period of time?

A.  No.

Q.  And I think you've already said this, but hiding those symptoms is especially difficult in a stressful environment; correct?

A.  Yes.

Q.  Now, are you familiar with a textbook of psychiatry by Kaplan and Sadock?

A.  Yes.

Q.  Now, you're aware I believe that Dr. George Woods has previously testified in this case; correct?

A.  Yes.

Q.  And if, during his testimony, Dr. Woods cited Kaplan and Sadock to say that irritability was the touchstone of bipolar disorder, would you agree with that or disagree?

A.  Well, there's been multiple editions of Kaplan and Sadock.  So to be fair to Dr. Woods, I'm not sure which edition he's referring to.  But I can tell you that, in the 2003 edition, elevated, expansive, or irritable mood is the hallmark of manic episode.

Q.  Now, in your opinion, on September 24th, 1999, was Mr. Barrett suffering from posttraumatic stress disorder?

A.  No.

Q.  Now, you reviewed Mr. Barrett's social history?

A.    Yes.

Q.    Did you take into account reports of abuse or neglect, poverty?

A.    Yes.

Q.    Okay.  And why reject the posttraumatic stress disorder?

A.    Well, because abuse, neglect, poverty doesn't get you to PTSD per se.  I mean, there are certain criteria that one has to consider.

Q.    Was there any specific point where he was asked to endorse any of the symptoms of posttraumatic stress disorder during your interaction with him?

A.    Well, during the course of the interview, I -- there are different places where I asked him about some of the symptoms of PTSD, and he didn't endorse those things.  But more importantly, there's no threshold event in my mind that kind of qualifies for meeting the initial criteria for having posttraumatic stress disorder.  So nowhere in any records that I saw was he diagnosed with PTSD.

            The only notation early on that I saw was by Dr. LaFortune who said one of the tests that she gave --

            MR. AUTRY:  To which we object, Your Honor, because Dr. LaFortune's report was nothing that was relied on by Dr. Woods, and it wasn't available.

            THE COURT:  Overruled.

1011

A.   Doctor -- Dr. LaFortune did not come up with a diagnosis of PTSD.  In fact, she said that there wasn't -- there wasn't any information there to support that diagnosis.

Q.   (BY MR. KAHAN)  And, again, you've worked with PTSD patients in the past?

A.   Yes.

Q.   In your opinion, did you detect any evidence of brain damage that might have affected Mr. Barrett on September 24th, 1999?

MR. AUTRY:  To which we object because Dr. Pitt's report states that, with respect to the neuropsychological examinations that have been done in this case, he's going to defer to the neuropsychologists.

MR. KAHAN:  Well, Your Honor, the government would disagree with that characterization.  Lost my page.  We would -- well, Dr. Pitt said that he is aware of the varied opinions regarding and to the extent Mr. Barrett had neurocognitive deficits, and would defer to the neuropsychologists to argue their respective positions, I do not believe that any such deficits, to the extent they existed, interfered with choices that Mr. Barrett made as it pertained to the events that occurred on September 24th, 1999.

THE COURT:  Objection is overruled.  Do you remember the question?

1012

THE WITNESS:  No, I don't.

Q.  (BY MR. KAHAN)  As of September 24th, 1999, is it your opinion that Mr. Barrett suffered from some sort of brain damage?

A.  Well, as I said in my report and as counsel here has pointed out, I'm aware that there are conflicting opinions about the -- to what extent, if any, Mr. Barrett has brain damage.  And for me to say -- outright dismiss and ignore -- I'm blanking on her name right now.

Q.  Dr. Young?

A.  Dr. Young's -- thank you -- report, that would be intellectually dishonest, which I'm not going to be.  So the point is, am I aware that there are varied opinions here, and the answer is yes.  Regardless, I don't know what that deficit would be that would somehow render Mr. Barrett either, A, incapable of appreciating the wrongfulness of his conduct, or, B, more importantly, go with the Mr. Barrett whose history I know.

For example, Mr. Barrett is someone who built his own home.  He's mechanically inclined.  He worked in the oil fields.  He told me that he was not frivolous with his money.  He told me that he could look at a floor plan and, quote, pop out a slab and build a home.  He told me that he could build motors.  He's a verbally competent person.  He's someone who is able to talk a jailer into giving him the

keys, so to speak, of the jail so that he and the jailer could have sex with other inmates. This is someone who's got, for lack of a better term, some, quote-unquote, game to him. He's a verbally competent guy.

May he have something going on in his head that Dr. Young picked up? I'll let other people fight about that. But to the extent that whatever that is that exists, I don't believe it affects the totality of his behavior in the choices that he made around the time of the offense.

Q. Let me ask you about antisocial personality disorders. There's some discussion in your report about antisocial personality disorder?

A. Yes.

Q. And what is antisocial personality disorder?

A. Well, briefly, essentially it's a condition where someone, for a protracted period of time, disregards the rules and laws of our society, engages in a host of antisocial behavior and conduct, whether that's stealing, lying, fighting, being irresponsible with jobs, engaging in sexual assaults. You name it.

Q. Did you assess Mr. Barrett for ASPD?

A. Yes.

Q. And what did you determine?

A. Well, I thought, in order to have the -- to technically meet the criteria for whether it's DSM-IV TR or DSM 5 --

Q.   Let me stop you.  If you'd please restrict the -- your answer to DSM 5.

A.   Okay.  You have to have the diagnosis of a conduct disorder.  And I was aware that Mr. Barrett had the burglary incident when he was I think around 15.  There may have been some other juvenile conduct -- misconduct.  But I didn't feel like he had met the conduct disorder criteria, and I just didn't think it was a responsible diagnosis for me to make.  And I thought that saying that he had features of an antisocial personality disorder was much more honest.

Q.   In your opinion, could Mr. Barrett distinguish right from wrong at the time of the murder?

MR. AUTRY:  Objection.  Irrelevant.

THE COURT:  Overruled.

A.   Yes.  He told me he -- yes.

Q.   (BY MR. KAHAN)  And what do you base that on?

A.   Well, he told me.

Q.   Okay.  Anything else?

A.   It sounds like there's something else you're getting at that I'm --

Q.   Is there anything else about his mental health, his presentation that we --

A.   Well, no.  Well, again, he's clearly someone -- Mr. Barrett is clearly someone who -- who had previous run-ins with the law.  He was conversant with what constitutes

unlawful behavior.  He had been previously arrested.  He had been previously involved in charges of domestic violence.  He was aware that it's unlawful to manufacture and distribute methamphetamine.  He's aware that it's unlawful to kill a police officer.  Those are all things that he shared with me.

Q.  How would you diagnose the defendant as of September 24th, 1999?

A.  Amphetamine dependence with physiologic dependence, features of an antisocial personality disorder, cannabis dependence, and I'd rule out a learning disorder not otherwise specified.

Q.  Would rule out?

A.  Yeah.  It would be like -- there's -- again, this goes to the issue of the neuropsychologists.  There's some debate as to whether or not he has a learning disorder as I understand it.  And so I'm saying I'm considering it.  I don't know if it's in or out.

MR. KAHAN:  Your Honor, at this time the government would pass the witness.

THE COURT:  Very well.  Let's go ahead and take a 15 minute recess and come back at 11:10.

*(Off the record at 10:54 a.m.)*

*(Back on the record at 11:11 a.m.)*

THE COURT:  Mr. Autry, go ahead.

MR. AUTRY:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. AUTRY:

Q.  Hello, Dr. Pitt.

A.  Good morning, sir.

Q.  You indicated to Mr. Kahan a little bit ago during direct examination that you had no doubt that there's a extensive history of mental and emotional problems in Mr. Barrett's family; correct?

A.  Yes, sir.

Q.  And that would include his immediate family?

A.  Yes, sir.

Q.  His father?

A.  Yes, sir.  I believe there's some history of issues there.

Q.  Okay.  As well as his mother; correct?

A.  Yes.  Yes.

Q.  And there's also a multigenerational history on both sides of Mr. Barrett's family of --

A.  I concur.

Q.  -- mental and emotional problems?

A.  Yes.

Q.  Including mood disorders?

A.  Yes.

Q.  Okay.  And also including suicides and suicide

attempts?

A. Yes. There is -- in the declarations, there is history of that, yes, sir.

Q. Yes, sir. And did you also see in the declarations and in the history and various records that there's a history in Mr. Barrett's family of people being committed to mental institutions?

A. There's at least singularly for sure. If you say plural, I'll take your word for it.

Q. Would you agree that mood and affective disorders on Mr. Barrett's mother's side of the family go back at least to Mr. Barrett's grandfather, Hugh Dotson?

A. I think that's fair to stay.

Q. All right. And there's also a history, as we kind of alluded to a little bit before, of mental commitments and suicides on the mother's side, specifically two individuals named Ingram Goodwin and Wallace Dotson?

A. Yes.

Q. Okay. And there's also a history of mood disorders, as I think you indicated a little bit ago, in Mr. Barrett's paternal line?

A. Yes.

Q. And would that also include neurocognitive deficits?

A. That one I do not recall.

Q. All right. Do you recall reading in the voluminous

1018

materials you reviewed, Dr. Pitt, that one of Mr. Barrett's aunts, Linda Riley, suffers from depression, has two children with bipolar disorder?

A. Yes. Yes. And she has the grandpa -- or grandson with Aspergers.

Q. Yes, sir.

A. And she thought her dad was bipolar. And the grandfather was in a psyche hospital I believe.

Q. Okay.

A. That's who you're talking about, right?

Q. Yes, sir.

A. Yeah.

Q. And also another aunt, Elnora Long, has bipolar disorder and is on high doses of medication. Do you have any reason to question that?

A. No, sir.

Q. Okay. Would you have any reason to question that the mood disorders in Mr. Barrett's paternal line go back at least four generations?

A. They go back a while.

Q. All right. For example, Mr. Barrett's great-great-grandfather, A.J. Barrett --

A. Right.

Q. -- there was a certificate of lunacy?

A. And I think -- I think that's -- I think is A.J. Barrett

the one who committed suicide?

Q.   I'm about to get to him.

A.   Okay.

Q.   There's a great-grandfather --

A.   Okay.

Q.   Isaac Barrett.

A.   Okay.

Q.   Okay.  But the great-grandfather was committed under what used to be called --

A.   Lunacy.

Q.   -- way back --

A.   Yes.

Q.   -- under a certificate of lunacy, and he was hospitalized --

A.   Yes.

Q.   -- for that?  And the great-grandfather, Isaac Barrett, committed suicide?

A.   Yes.

Q.   Are you familiar with materials that Mr. Barrett's paternal grandfather, A.J. Barrett, had a severe mood imbalance according to family reports?

A.   Yes.

Q.   And that he had disordered thinking?

A.   Yes.

Q.   He was also committed at one point under a certificate

of lunacy?

A.   I believe that's correct, yes.

Q.   And that the grandfather, A.J. Barrett, had auditory hallucinations?

A.   I don't recall that specifically, but I'm not going to quibble with you.

Q.   Okay.  And also suffered from paranoid thinking and what could be termed, I guess, paranoid delusions?

A.   I recall paranoid thinking.

Q.   That he had poor judgment and reasoning?

A.   Sounds true.

Q.   Okay.  That he had wild mood swings?

A.   Yes.

Q.   And that he self-medicated by drinking heavily?

A.   Yes.

Q.   And are you aware of materials, among the things that you reviewed, that the brother of Mr. Barrett's paternal great-grandfather was described by family members as looney, for want of a better term?

A.   So walk me through the tree on that one again.

Q.   Okay.  I'm sorry.  The brother -- and this is complicated.

A.   Right.

Q.   The brother of Mr. Barrett's paternal great-grandfather, Isaac Barrett, the guy who committed suicide.

A.   Right.

Q.   Okay.  Was described in the family lore as looney?

A.   I think I saw something along those lines.

Q.   And he had a son who committed suicide?

A.   Yes.

Q.   Would you agree that Ernie Barrett, Mr. Barrett's father, grew up in a really bad, abusive environment?

A.   That's what was said, yes.

Q.   All right.  Now, can growing up in an abusive environment affect somebody's neurocognitive development?

A.   Theoretically, sure.

Q.   Okay.  And I think you said earlier that you agreed that Mr. Barrett's father, Ernie Barrett, exhibited signs of a mood disorder?

A.   Yes.

Q.   And Mr. Barrett's mother, Gelene Barrett, suffered from severe depression -- or suffers from severe depression and has some kind of mood disorder?

A.   Well, I think -- I think it's depression and alcohol --

Q.   Okay.

A.   -- issues.  And I think the father, Ernie, had drinking issues as well.

Q.   Yes, sir.  So both Mr. Barrett's mother and his father --

A.   Yes.

Q.   -- had substance abuse and/or drinking issues?

A.   Yes.   That's true.

Q.   And Mr. Barrett's mother was a really bad -- or is a really bad alcoholic?

A.   That is what is said, yes, sir.

Q.   Okay.   Do you recall Mr. Barrett telling you, during the structured interview you had with him, that he thought his son had some mental health issues?

A.   Yes.   Semi-structured interview, yes.

Q.   Yes, sir.   I'm sorry.   And that's consistent with what you learned from reviewing all these materials about Mr. Barrett's family history?

A.   That is true.

Q.   Okay.   Now, a multigenerational history of mental impairments, mood disorders, and things of that nature, suicidality --

A.   Yes.

Q.   -- and all that stuff, that's relevant to mitigation of punishment potentially, isn't it?

        MR. KAHAN:   Objection, Your Honor.   We're here to rebut George Woods' testimony.   Not -- not for mitigation.

        THE COURT:   Well, he's asking for his opinion. Overruled.

Q.   (BY MR. AUTRY)   Potentially relevant to mitigation, that family history --

A.  Can you repeat the question?

Q.  Okay.  The family history of mental illness and substance abuse could potentially be relevant to mitigation of punishment?

MR. KAHAN:  And, again, I object.  He's asking for a legal conclusion.

MR. AUTRY:  I'll just move on, Your Honor.

THE COURT:  Go ahead.

Q.  (BY MR. AUTRY)  Okay.  Are you familiar with the term, Dr. Pitt, as I'm sure you are, of genetic loading?

A.  Yes.

Q.  Okay.  Could you describe briefly for the Court what that is?

A.  Well, essentially, you have -- let's use alcohol as an example because it's probably the easiest to use.  You have a multigenerational family that has a history of alcohol use or alcohol -- or problems with alcohol.  Alcohol dependence I should say.  And it would not be -- it certainly sets up that there could be a genetic load in offspring to have that same problem.  Same way there could be a problem with someone that has -- there's a familial history of diabetes.  There could be a genetic load for that in offspring.

Q.  All right.

A.  Or dementia, whatever.

Q.  Did Mr. Barrett have genetic loading for mental illness

1024

and mood disorders based on the lengthy history of such in his family on both sides?

A.   Yes, I think that's an accurate statement.

Q.   All right.  And you've indicated earlier that there's a history of mood disorders in the family.  Are you familiar with literature that indicates that somebody who has a lot of bipolar or other mood disorders in the family history has a dramatically increased chance, to the tune of about 60 percent, of developing those kind of maladies?

A.   I'm not sure about 60 percent.  What I am sure about is the incidence -- I can't give you the statistic exactly, but the incident is far greater in first degree relatives, and then it exponentially decreases the further away you move from generation.

Q.   All right.  But in this case I think you've indicated that Mr. Barrett's parents had these problems?

A.   Yes.

Q.   So that increases, maybe not 60 percent, but significantly?

A.   I would say that, given the familial history in the first degree relatives, that it -- that would put an increased risk for Mr. Barrett.  I don't dispute that.

Q.   Okay.  And as well as having a lengthy family history of multigenerational mood impairments, mental disorders, there was also, in Mr. Barrett's family, a multigenerational

1025

history of alcohol and/or substance abuse.  Would you agree with that?

A.  I concur.

Q.  Well, you mentioned before that his mother is a severe alcoholic, and his father was a heavy drinker?

A.  I don't think I used the word alcoholic, but I will acknowledge that the parents had issues with alcohol.

Q.  Okay.

A.  Problems with alcohol.

Q.  All right.  Is substance abuse categorized as a disease?

A.  Yes.

Q.  And because of the family history, Mr. Barrett also had not only genetic loading for mood disorders, mental illness, he also had genetic loading for substance abuse disorder, the addiction or abuse of alcohol and/or drugs; true?

A.  I concur.

Q.  Do you know what modeling is, or modeling behavior?  Is that something you're familiar with?

A.  I think, a little bit.

Q.  Okay.  Mr. Barrett's parents had drinking problems --

A.  Yes.

Q.  -- at the very least; right?

A.  Yes.

Q.  Did you also read in the materials you reviewed that Mr.

Barrett's mother was a drug user herself?

A.  I believe that is true.  I -- I -- either I read that or Mr. Barrett shared it with me, one or the other, yes.

Q.  All right.  And do you recall -- I know you reviewed a lot, but do you recall Mr. Barrett's ex-wife, Abby Stites, saying that there were times Gelene Dotson, Mr. Barrett's mother, would get him up in the middle of the night to do drugs with her?

A.  That's -- I read that somewhere, yes.

Q.  Okay.  And you don't have any reason to dispute that --

A.  No.

Q.  -- correct?  And is it true that, in addition to have a genetic predisposition to developing substance abuse problems, somebody whose parents have alcohol or substance abuse problems kind of learn to do that based on the parents' behavior, or the parents' model that behavior for the child?  Does that make sense?

A.  Well, I think, talking in general terms, it's certainly possible.

Q.  Okay.  And I believe you indicated that, by the time Mr. Barrett was ten years old, he had -- was developing substance abuse issues?

A.  No, I didn't say it quite like that.

Q.  Okay.

A.  What I said --

1027

Q.   Correct me.

A.   What I said was that he began using alcohol at age ten.

Q.   All right.  Do you recall reading anything in the materials you reviewed, Dr. Pitt, about an incident when Mr. Barrett was seven years old --

A.   Yes.

Q.   -- and his father made him drink or --

A.   Yes.

Q.   -- got him drunk as some kind of form of punishment?

A.   Yes.

Q.   Okay.  Do you recall reading in the materials you reviewed that, when he was growing up, Mr. Barrett's mother was very lax on discipline?  Didn't really care what he did. If he wanted to use drugs, if he wanted to drink, no problem.

A.   I don't know about the second half of that sentence, or the second half of the question, but I will acknowledge that Mr. Barrett, as well as declarations that I read, indicated that there was really no discipline imposed by the mother.

Q.   All right.  I think you referred to a little bit, and correct me if I'm wrong, Dr. Pitt, during direct examination that Mr. Barrett's upbringing and background show a history of mental, emotional, and physical abuse.  Do you disagree with that?

A.   You're saying I said that in the direct exam exactly

like that?

Q. Well, no. You know, in general terms. Do you agree that he comes from an abusive background?

A. I agree that he comes from a dysfunctional background that had elements of emotional abuse and some physical abuse, yes, sir.

Q. All right. Can that kind of thing, that kind of a background affect neurocognitive or neurological development in a child?

A. Theoretically, yes.

Q. Okay. I think I asked you that before, didn't I?

A. Something along those lines, you did.

Q. Okay. I apologize for the repetition.

A. Well, at least I was consistent with my answer.

Q. All right. Well, great. Were you also aware, from the materials you reviewed, that Mr. Barrett's parents were pretty much selfish, did their own thing, and kind of left the kids to fend for themselves?

A. What I -- what I recall is, I think either in Steve Barrett's declaration or in his testimony, that it was a very permissive environment for Mr. Barrett.

Q. Okay. Thank you. And were problems created within the home because Mr. Barrett's father cheated on mom --

A. Yes.

Q. -- and ran around with other women all the time --

A.   Yes.

Q.   -- and was something of a barfly I guess?

A.   He was definitely a philanderer.

Q.   Okay.  And on at least one occasion, Ernie Barrett beat up Gelene, the mother?

A.   Yes.

Q.   Okay.

A.   Yes.

Q.   Gave her black eyes and a busted lip?

A.   I don't recall that.  What I recall is that Mr. Barrett told me that he didn't see any abuse, but in I think the -- in Gelene's declaration, she talks about at least one incidence of physical abuse.  I can't remember if it was a black eye and split lip or not.

Q.   All right.  And was Mr. Barrett, when he was growing up, subjected to frequent separations --

A.   Yes.

Q.   -- by the parents --

A.   Yes.

Q.   -- and reconciliations?

A.   Yes.

Q.   And they moved around a lot, at least up until the time Mr. Barrett was 13 years old?

A.   Yes.

Q.   Did the information that you reviewed indicate that

Mr. Barrett kind of viewed his father as an idol to him, way up here, you know, on the mountain?  But that Mr. Barrett's father pretty much neglected him, especially after the divorce?

A.  I think that there is testimony or declaration -- I can't recall who said it.  But at least one person said that Mr. Barrett did look up to his father and really idolized him.  And that -- and that after the divorce, there was very little contact, if I recall.

Q.  Okay.  And you're aware that Mr. Barrett's father was physically abusive toward him on occasion; correct?

A.  Yes.

Q.  He would hit him in the chest?

A.  That's what he told me.

Q.  Okay.  And you don't have any reason to discount that, or disagree with it?

A.  No.  I -- I took him for his word on that.

Q.  Speaking of taking him for his word, you did not find that Mr. Barrett was a malingerer during your examination of him; correct?

A.  No, I didn't think that Mr. Barrett was intentionally producing false or grossly exaggerated psychological symptoms in furtherance of his case.  I did, however -- there are a couple of inconsistencies, the biggest being the claim of loss of consciousness when, in fact, there's no

records that indicate that.

Q.   Okay.

A.   Or he -- I mean, sorry -- his claim.  But then at the Oklahoma State Department of Corrections reception area, there's no history of a loss of consciousness.  But, no, I didn't -- I found him to be -- he answered all my questions.  He was largely cooperative.  He told me at one point, towards the end, that things were getting a little dicey.  I was amping him up a bit.  But, no, he was completely cooperative and answered everything that I asked him.

Q.   Okay.  Going briefly into the matter of head injuries.

A.   Yes.

Q.   Just because, on a DOC form, it's not indicated that he had previous head injuries, I mean, that doesn't mean that they didn't occur or didn't exist; right?

A.   Well, there's -- that -- that answer requires more than just a yes or no.  Can I give one?

Q.   Sure.

A.   Okay.  So it's not -- it's a piece of information, it's a piece of data.  That's number one.  But more importantly, it's a piece of data that Mr. Barrett himself I believe signed and filled out.

Q.   All right.

A.   Now, having said that, does that mean that there wasn't any head injuries?  Obviously the answer is no because I

1032

have two records from Sequoyah Memorial Hospital that indicate two ER visits.  So could the truth be somewhere in between?  Probably so.

Q.  All right.  Now, did you read accounts from family members that corroborated Mr. Barrett's statement about having been hit with a steel ball in the --

A.  There was --

Q.  -- head on a playground?

A.  Right.  I don't recall.  I think it's maybe Gelene talks about that.  I'm not sure.  But I think it's Gelene talks about the steel ball incident.

Q.  Okay.  And you don't really doubt that Mr. Barrett suffered head injuries, do you?

A.  Well, look, I just talked about two ER records.

Q.  Yes.

A.  I'm not going to deny those --

Q.  Okay.

A.  -- that those do.  No, I don't deny that.

Q.  All right.  Now, let me ask you a couple of more questions about the types of physical abuse Mr. Barrett was subjected to by his father.  We talked about being hit in the chest?

A.  Yes.

Q.  His father, as a form of discipline at the dinner table, would also hit him in the head with a fork --

A.  Yes.

Q.  -- on occasions?

A.  Yes.

Q.  On another occasion, he shoved Mr. Barrett's head through a wall?

A.  Yes.

Q.  Or knocked it up against a wall?

A.  Yes.

Q.  And on another occasion, he inflicted a severe beating on Mr. Barrett over some missing coins, and had to pull him out from under a bed, and then went to whipping on him, right, beating him?

A.  Well, yes.  With the caveat that Mr. Barrett had stolen his father's silver dollars and half dollars, yes.

Q.  Okay.  Yeah.  And that's what I said, in relation to coins.  Do you think that stealing or taking, you know, some silver dollars or half dollars justifies daddy, you know, beating him up?

A.  I don't know, my parents would have done a pretty good whipping on me.

Q.  Okay.  There's a difference between a whipping and being physically beaten; correct?

A.  Sure.

Q.  Okay.  And Mr. Barrett suffered some other trauma when he was about 17 years old when he was beaten by the police

1034

and had his --

A.   Yes.

Q.   -- jaw broken?  You would agree with that; correct?

A.   Yes.

Q.   And speaking of a head trauma, you indicated, and all the records show that, in 1986, Mr. Barrett put a shotgun to his chest, pulled the trigger; right?

A.   Yes.

Q.   Very serious suicide attempt; correct?

A.   Yes.

Q.   And the force of that could have caused a head injury potentially; right?

A.   I think -- I think I recall Dr. Woods saying something about this in his testimony.  That's a tough one for me to -- to tie together.  I can't give you an answer on that.

Q.   Okay.  I think you state in your report that you don't have any doubt that Mr. Barrett's mother, Gelene, drank heavily while she was pregnant with him?

A.   Well, to be precise on that, I know I have a footnote on that issue.  Do you have the page number you're referring to?

Q.   I really don't, Doctor, and I apologize.

A.   Give me a second here.  What -- what she said in her -- well, let me just read from my report, footnote number 13.

1035

And I said that much of the information that Mr. Barrett shared with me was largely consistent with the information contained in his medical records and the declarations that I reviewed. In addition, it appears that, A, Mr. Barrett's mother did, in fact, have, and likely still does, a severe alcohol addiction. B, Mr. Barrett was, more likely than not, exposed to alcohol in utero. And then I put in parens, in her declaration dated March 9, 2009, Gelene Dotson said, quote, I wish we had known then what we know now about having just a little beer can affect your baby, none of us would have had a drop, end quote. And then, C, there is an extensive history of mental illness and/or substance use in Mr. Barrett's immediate and extended family.

Q. Okay. Do you say in there -- and let me see if I can find it at footnote 13 -- Mr. Barrett was more likely than not exposed to alcohol in utero; right?

A. Yeah, I just read that.

Q. Oh, okay. I was looking at something else and I must have --

A. Okay.

Q. -- misheard you.

A. That's all right.

Q. And that can certainly have an effect on the brain's development and things of that nature --

A. Sure.

Q. -- true?

A. Sure.

Q. Okay. Now, you said that you would need to rule out, I think and correct me if I'm wrong, whether or not Mr. Barrett has a learning disorder or learning disability?

A. What I said was learning disorder not otherwise specified.

Q. All right. And that's consistent with some of his educational records, isn't it?

A. Right.

Q. It's consistent with what Dr. Price found I think, at least in part?

A. I think Dr. Price found something along those lines, yes.

Q. Okay. And maybe also Dr. Sharp?

A. Yes.

Q. Okay. Mr. Barrett I guess did poorly in school?

A. There were times when he did well, but there were other times that he did not so well.

Q. Okay. I think his mom described first grade as being very difficult for him because he was not good at either reading or math, and fell behind the other kids pretty rapidly. Do you recall that?

A. I don't recall that. But what I do recall is that Mr.

Wilson, during Dr. Woods' testimony, pointing out some other records where -- academic records where Mr. Barrett actually did pretty well in school.

Q. Okay. And that just depends I guess on what kind of teacher you have and what school it is maybe; right?

A. I detect a little bit of cynicism with that.

Q. Just a tad.

A. And for the record, we're both chuckling. But my point is, is that do I -- do I acknowledge the possibility that there was some type of learning disorder based on what the neuropsychologists are saying? The answer is yes, I do.

Q. Okay.

A. But I'm also aware that, notwithstanding that, that there were time periods where he actually did do well in school.

Q. He was placed in special education classes, at least at one point?

A. Yes.

Q. And he failed the eighth grade, you're aware of that?

A. He repeated the eighth grade, but he went on to go to ninth grade.

Q. Okay. Mr. Barrett has deficits in attention, do you agree with that, concentration and attention?

A. Well, he says that he does. But, yet, in the screening mental status examination I did with him during my

1038

evaluation, he did actually remarkably well.

Q.   Okay.  Did you see the materials for Dr. Price which indicated that he had an attention problem --

A.   Yes.

Q.   -- and a concentration problem?

A.   I mean, he talks about a concentration and attentional problem, yes.

Q.   Now, Doctor, you're familiar with the term comorbidity, are you not?

A.   Yes, sir.

Q.   And that indicates two different mental illnesses at play, or two different things that might affect how somebody is diagnosed and things -- well, why don't you explain it to me.  You're the expert.

A.   Two co-occurring conditions.  So, for example, you could have diabetes, a chronic history of diabetes and a comorbid condition, because of the effects of the diabetes on the arterial system, on the vascular system could cause you to start to have some perhaps early onset dementia, so comorbid conditions.

Q.   And there can be comorbidity with, for example, bipolar and substance abuse; right?

A.   Yes.

Q.   In fact, people who have bipolar illness are frequently substance abusers, heavy users of alcohol, or heavy users of

1039

drugs.  Do you agree with that?

A.  I agree with the statement that you will see comorbid conditions of substance use and bipolar disorder.

Q.  And is the same true also for PTSD?

A.  Same true what?

Q.  Where you often find comorbidity with substance abuse and posttraumatic stress disorder?

A.  Yes.

Q.  Because you're self-medicating I guess.  Would that be the correct term for it?

A.  We can work with that term.

Q.  Okay.  Now, you indicated that Mr. Barrett had antisocial features; correct?

A.  Yes, sir.

Q.  Did he also have paranoid features to his personality?

A.  When?

Q.  Throughout.  Throughout most of his life.

A.  I think he had paranoid features to his personality when he was hopped up and using all kinds of different drugs.  I didn't find him to be that particularly paranoid or overtly suspicious when I evaluated him.  I think back in 1999, yeah, he had paranoid features, you bet.  I would, too, if I was all hopped up on amphetamines.

Q.  All right.  Well, you're familiar with Dr. Price's report; correct?

1040

A.  I am.

Q.  And Dr. Price noted paranoia, and, in fact, said that he had both antisocial and paranoid features?

A.  And he may.

Q.  And that was an evaluation that was done in 2005 --

A.  Okay.

Q.  -- while he was in the Muskogee County jail.

A.  All right.

Q.  And I think you indicated on direct examination that Mr. Barrett told you about abusing drugs from time to time when he was in the Sequoyah County jail awaiting trial in state court; right?

A.  What -- what was played in the video clip was Mr. Barrett saying that, while he was in state court -- or while he was in jail awaiting the state trials, that he was using, what he told me was crank.  The word -- the phrasing was opioids, crank, methamphetamine.

Q.  All right.

A.  Notwithstanding crank and methamphetamine can be --

Q.  But he said nothing about drug use while he was in the Muskogee County jail awaiting federal trial; correct?

A.  I'd have to go back and look at that.

Q.  Okay.  And Dr. Price's evaluation was done while Mr. Barrett was in the Muskogee County jail awaiting his trial in federal court; true?

1041

A.  Yes.

Q.  Okay.  And if there's no indication that Mr. Barrett was using drugs while he was in the Muskogee County jail, Dr. Price's finding of paranoid features or possible paranoid personality disorder in Mr. Barrett would not be affected by any drug use; correct?

A.  I don't know that I agree with that statement.

Q.  Okay.

A.  You want to know why?

Q.  Not really.

A.  Okay.

Q.  They can get up here and ask you here in a minute.

A.  Fair enough.

Q.  And then I'll probably ask you about it.

A.  Okay.  Fair enough.

Q.  Now, you do not diagnose Mr. Barrett as having antisocial personality disorder --

A.  Yes.

Q.  -- do you?

A.  Yes, sir, that's correct.

Q.  And the primary reason, or the reason you do not diagnose him with antisocial personality disorder is a lack of evidence of conduct disorder before the age of 15?

A.  Yes.

Q.  Okay.  You say he has antisocial features; correct?

A.   Yes.

Q.   Okay.  A lot of people have antisocial features, don't they?

A.   They do.

Q.   Okay.

A.   But not a lot of people beat their wife and flee police, and --

Q.   Okay.  Well, let's talk about the wife beating.  You read Abby Stites' declaration, didn't you?

A.   Yes.

Q.   And she indicates that she thought, regardless of drug use, that Mr. Barrett was mentally ill; true?

A.   I don't recall that specific verbiage, but I'm not going to dispute.

Q.   Okay.  That he had wild mood swings which she attributed to some sort of mental illness; right?

A.   That, I believe, is correct, yes.

Q.   All right.  And there were also instances of mutual combat between the two?

A.   She did say that.

Q.   Now, with respect to this kidnapping incident with his son that you discussed on direct examination, were you aware that Ms. Stites later stated that she exaggerated what had happened because she wanted to get revenge on Mr. Barrett, and basically get him out of her life?

1043

A.   Somewhere in the recesses, I recall something along those lines, but I can't pull that up for you.

Q.   All right.  And Mr. Barrett was never, in fact, convicted of domestic abuse; right?

A.   I don't know that he -- he was definitely charged with some domestic violence.  I believe there were some charges.

Q.   There was never any conviction, was there?

A.   I don't have a reason to question what you're telling me.  I'm certain you wouldn't make a misrepresentation to me like that, so I will take your word at it.

Q.   All right.  And you're aware that Abby Stites testified as a defense witness in the penalty phase --

A.   Yes.

Q.   -- of Mr. Barrett's case?

A.   Yes.

Q.   And the jury was aware of this history of domestic violence or domestic incidence; correct?

A.   Yes.

Q.   Okay.  And yet they rejected the aggravating circumstance that --

        MR. KAHAN:  Objection as to relevance.

        MR. AUTRY:  I'll move on, Your Honor.

        THE COURT:  Go ahead.

Q.   (BY MR. AUTRY)  You didn't find Mr. Barrett to be

1044

deceitful or overall dishonest; right?

A.   With me?

Q.   Yes.

A.   I don't know that I would say he was deceitful per se. I think he had a stilted sense of himself and his -- and his role in this particular situation.

Q.   And when you say stilted role, you're talking about his version of the offense?

A.   No, I'm not.  I'm talking about, at the end of the evaluation where I asked him to describe himself, and I'm talking about in the beginning of the evaluation when he describes himself and his son as the victims.

Q.   Okay.  You're aware Mr. Barrett was tried in state court --

A.   Yes, sir.

Q.   -- for the killing of a police officer or highway patrolman?

A.   Yes.

Q.   And was charged along with that with several counts of shooting with intent to kill?

A.   Yes.

Q.   And it's always a serious, serious matter when somebody is charged with murdering a law enforcement officer; right?

A.   You bet.  Charge is a serious matter when you're charged

1045

with murdering anybody.

Q.  Sure.  But the emotions and things like that tend to rise when you talk about the death or the murder of a law enforcement officer.  Would you agree with that?

A.  I can't tell you what the general emotions are for most people when it comes to regarding law enforcement officer versus you getting killed.

Q.  All right.

A.  I mean, I would -- people will be upset.

Q.  Okay.  Well, I don't know about that.  Okay.  But at any rate, you're aware that, when Mr. Barrett was tried in state court, the first trial ended in a hung jury?

A.  Yes.

Q.  The second trial, he was acquitted of first degree murder?

A.  Yes.

Q.  He was also acquitted of second degree murder?

A.  Yes.

Q.  He was convicted of first degree manslaughter?

A.  Yes.

Q.  He was acquitted of shooting with intent to kill?

A.  Yes.

Q.  So Mr. Barrett's view of the offense that you were talking about where his son and he were the victims is at least somewhat validated by that state court verdict, isn't

it?

A.   I'm not sure I agree with you --

Q.   Okay.

A.   -- on that.

Q.   And he raised self-defense, and that's --

A.   I think that's awfully disrespectful to the -- to the people who were shot and to the victim and the victims' families.  I don't know that I --

Q.   Well, I think you misunderstand me.

A.   Okay.

Q.   What I'm saying is, that the jury, in effect, found in convicting him of manslaughter --

A.   Yes.

Q.   -- that he acted in imperfect self-defense basically; right?

A.   Right.  But we're not here to talk about the state case.

Q.   All right.  And the reason I asked you all that stuff is about this statement that you referenced earlier about Mr. Barrett feeling his son and himself were the victims --

A.   Right.

Q.   -- right?  Okay.  Would you agree, Doctor, that having antisocial personality traits does not preclude somebody from having bipolar disorder?

A.   I would agree.

1047

Q.  Nor does it preclude somebody from having PTSD?

A.  I would agree.

Q.  Do you remember Mr. Barrett talking to you about being surveilled by dirigibles?

A.  Yes.

Q.  And you found no evidence to indicate that there were actually any dirigibles that were surveilling him; true?

A.  What I said in the report is I didn't find evidence of dirigibles.  But I think in one of the police reports there's evidence that they did a flyover with a surveillance plane.

Q.  All right.  But he was talking about seeing dirigibles on a fairly frequent basis that he thought were surveilling him; true?

A.  Yeah, he was pretty paranoid because he was hopped up on amphetamines.

Q.  Okay.  He wasn't paranoid just because he's paranoid, in your opinion?

A.  No.

Q.  Even though Dr. Price, just to cite one example, talked about Mr. Barrett's paranoia after he was off drugs when he examined him in 2005?

A.  No, I disagree.

Q.  Did Mr. Barrett also tell you during the interview you had with him, that, on occasion, he would see motions that

nobody else saw?

A.  Yes.

Q.  And he gave you an example of I think grass being three feet high when it was actually --

A.  Yes.

Q.  -- mowed?

A.  Yes.

Q.  Okay.  Is that a visual hallucination?

A.  Yes.

Q.  All right.  You talked about reviewing -- wait just a second here.

        MR. AUTRY:  Could I have just a moment, Your Honor?

        THE COURT:  Yes.

        MR. AUTRY:  Thank you.

Q.  (BY MR. AUTRY)  Do you recall Dr. Sharp having looked at Mr. Barrett and concluded, at least based on his testing, that Mr. Barrett had paranoid and avoidant personality disorders?

A.  Let me just take a look at that real quick.

Q.  Okay.

A.  Well, the Dr. Sharp evaluation I'm reading talks about amphetamine dependence, cannabis dependence, alcohol dependence, nicotine dependence, rule out learning disorder not otherwise specified, rule out attention deficit

hyperactivity disorder, and then avoidant and paranoid personality disorder.

Q.   Okay.  So that was a rule-out; right?

A.   No.  I think the avoidant and paranoid personality disorder was -- was just how I read it, not a rule-out.  I think the ones before that were rule-out.

Q.   Okay.  So the avoidant and paranoid personality disorders that Dr. Sharp discusses were actual diagnoses?

A.   I believe so, yes, sir.

Q.   Okay.  Your bottom line, as I understand it, Doctor, is that Mr. Barrett does not have bipolar, nor does he have PTSD, that any and all of his problems stem from drug use or drug addiction or can be attributed to that.  Is that -- is that accurate?

A.   That requires a little bit more than a yes or no answer.

Q.   Okay.  We'll move on.  No, go ahead.

A.   It's largely my opinion that, based on my years of training, experience in evaluating individuals who have bipolar disorder, amphetamine problems, antisocial personality disorders, bipolar, major depressive disorders, that when you look at the totality of this man's history, when you look -- when you look at his history of amphetamine use, when you look at his behavior during the hours, days, weeks, and years leading up to the commission of the

offense, and when you look at the records from a bunch of different providers, and we can throw out the Bureau of Prisons since you object to that one, nobody, nobody has diagnosed him with bipolar disorder.  Nobody has diagnosed him with PTSD.

And so, yes, it is my opinion that the most honest way, and to a reasonable degree of medical certainty that the way you would diagnose Mr. Barrett if he, say for example, came into my clinic, it would be amphetamine abuse or dependence, first and foremost.

Q.  Okay.  Would you say, though, that his behavior patterns over a period of years mirrored the symptoms of bipolar disorder, but you just attribute it to drug use?

A.  Well, it's not just.  It's -- I don't just attribute it. I attribute it.  But you don't --

Q.  You --

A.  Wait a minute.  Wait a minute.

Q.  Yes.

A.  This is very important.

Q.  Okay.

A.  You don't have to take my word for this.  Look at what I relied on.  Look at the records --

Q.  We'll get --

A.  -- that I am relying upon, because what I'm relying upon, it speaks for itself.

1051

Q.  All right.

A.  That's -- that's the basis for my opinion, in addition to my years of experience and training.

Q.  Okay.

A.  It's not just.

Q.  Right.  Well, we'll talk about those records here in a little bit.  By the way, did you have access to trial counsel's files when you were preparing your report, trial defense counsel?

A.  I don't think so.

Q.  Okay.  Did anybody assist you in writing your 75-page report?  Approximately 75 pages.

A.  I think you're shortchanging me a few pages here.

Q.  Okay.

A.  No, nobody assisted me.  Actually, you're right.  It's 76 pages.

Q.  Okay.

A.  No, nobody assisted me.

Q.  All right.  Did anybody assist you in reviewing all the voluminous records --

A.  Yes.

Q.  -- that you looked at?

A.  Yes.

Q.  And who would that be?

A.  I have someone in my office, Brian Chapman, yes, sir.

Q.  Okay.  And he summarizes the records, gives you the summary, or points out records that you need to read personally, or how does that work?

A.  Yeah, let me -- there's actually a two-part answer.

Q.  Okay.

A.  First of all, I wrote the report myself and I own the typographical errors in the report as well, which includes a couple of places where I said -- I misspoke and I used the word psychological instead of physiologic dependence.  But, yeah, Brian goes through the records and he goes through those, summarize them, and I go in and I look at the source documents of the documents that I want to look at that I believe are relevant.

Q.  Okay.  Now, with respect to the conclusion that you stated here several times about Mr. Barrett's drug dependence or drug addiction versus bipolar or PTSD --

A.  Yes.

Q.  -- do you recall writing in your report at page 61, in this particular case, whether or not the defendant's emotional complaints predate his substance use or his substance use was an attempt to self-medicate his complaints is unknown?

A.  Right.

Q.  Remember writing that?

A.  Right.

1053

Q.  Okay.  Well, if it's unknown whether he had mental or emotional problems before he used or was habituated to using substances, that could well mean, based on the language you use on page 61 of your report, that he did have an underlying mental or emotional condition that he was medicating or self-medicating with alcohol or drugs; true?

A.  I don't agree with that in terms of what that statement means.

Q.  Okay.  It says that it was unknown whether his emotional complaints predate his substance use; right?

A.  It does say that, yes.

Q.  So that means, logically, and just as a matter of pure English -- just looking at the English language, that if it's unknown whether he had some kind of preceding or underlying condition, he could have had some sort of underlying or preexisting condition?

A.  He -- he could have had.  But when you look at the totality of the information, the totality of the information argues against that.  I'm putting that sentence out there to be as intellectually honest and as balanced as I can be.

Q.  But you don't disagree with me as to how I characterize the import of that particular statement; true?

A.  I disagree with you in terms of how you characterize the import.  I agree with you in terms of how you may have interpreted it.

1054

Q.   Okay.   That statement does not say it's known that he had absolutely no emotional complaints that predate his substance use?

A.   That is true.

Q.   All right.   Dr. Woods and Dr. Young found that Mr. Barrett self-medicated; true?

A.   That's what their opinion is, yes.

Q.   All right.   Is it true that self-medication is common in people who have untreated or inadequately treated mental illness?

A.   I'm sorry, say that --

Q.   Self-medication is common with people who have untreated mental illness --

A.   Yes.

Q.   -- or inadequately treated mental illness; correct?

A.   Yes.

Q.   They use the substances -- the illicit substances in lieu of prescription medications or psychotropic medications in order to feel good; right?

A.   I agree.

Q.   All right.   And Mr. Barrett sort of indicated to you during your interview with him that he was self-medicating, didn't he?

A.   I think I used the word -- I may have introduced the word when I spoke to him.   I'm not sure.   But basically,

yes.

Q.   Okay.  You asked him whether he had periods of like two weeks or so where he was just so down that he could do very little, if anything, other than just lay around?

A.   Right.

Q.   Okay.

A.   Right.

Q.   And he said it never went for a period of two weeks; correct?

A.   Yeah.

Q.   And that was because he started using drugs; right?

A.   Right.  But he's not saying he's self-medicating.  The proof is in the pudding.  If Mr. Barrett was self-medicating his bipolar disorder, how do you explain the last 11 or 12 or 13 years --

Q.   Well, I'm just --

A.   -- where Mr. Barrett here, who's on no medications at all, exhibits no signs whatsoever, or symptoms whatsoever of bipolar disorder?

Q.   We'll get into that.

A.   Okay.  Good.

Q.   If somebody is able to feel normal by using drugs, otherwise they're just laying around, that's self-medicating, isn't it?

A.   If -- say that one again.  I want to make sure I heard

it right.

Q. Okay. He indicated to you that there were times where he was depressed, listless --

A. Yes.

Q. -- just laying around?

A. Yes.

Q. And the way he got over that was to use drugs?

A. Right. But the flaw isn't --

Q. Okay. You've answered the question.

A. No. There's a flaw in your -- your argument --

Q. Okay. Tell me --

A. -- but I'm sure it will be cleaned up later. Are you going to let me do it?

Q. Well, later.

A. Okay.

Q. Okay. Did he indicate that he felt straightened out when he used drugs? He felt --

A. Yes.

Q. Okay. Is that an indication of self-medication?

A. Could be.

Q. All right. Would you agree or disagree with the fact that, Doctor, you did not take sufficient account of the history of mood disorders and mental illness in Mr. Barrett's family in concluding that, basically, he's just a drug addict?

1057

A.   No.  And, first of all, I didn't call him just a drug addict, number one.  Number two, I disagree with that assumption.

Q.   All right.  You took all of that into account notwithstanding the --

A.   Yeah, you don't --

Q.   -- significantly increased chance of acquiring a mood disorder due to family history?  It's just the fact that he's a druggie?

A.   Look, my -- both my parents had dementia.  Am I at increased risk to have dementia?  The answer is I am.  Do I look like I'm demented right now, or I'm acting like I'm demented?  The answer is no.  So the point is, does the -- does the history -- family history, is that relevant and important?  The answer is absolutely yes.  It's a piece of data.  It's a piece of information.  But we don't make the diagnosis based on the family history.

Q.   Is that part of the diagnosis, though?  You look at the whole picture and you say, hey, this guy has got a multigenerational history with substance abuse, not only substance abuse, but mood disorders --

A.   Yeah.

Q.   -- mental illness and all of that?

A.   Right.  And I say that in my report.

Q.   And that's a pretty significant factor, isn't it?

A.   It's a data point.  It's a piece of information, sure.

Q.   Okay.  Is it a significant piece of information rather than being just a mere data point?

A.   Well, it's significant -- I think it's more significant piece of information to you than it is to me, because I look at other pieces of data that argue the point the other way such as the fact that no one's diagnosing him with any type of mood disorder or no one's diagnosing him with bipolar disorder, PTSD, with the exception of that one provisional diagnosis by that non-physician during any of the time that he received treatment.  And, to me, the significant and overarching theme and thread is the -- is the data point that speaks to his chronic amphetamine use.  You can't ignore that.

Q.   Well, speaking of mood disorders, when he went to Eastern State Hospital, he was diagnosed with fairly significant depression, wasn't he?

A.   At Eastern State, he's diagnosed with -- hang on one second.  No, Eastern State, it's marital problems, mixed substance use, and mixed personality disorder.

Q.   Okay.  Do they talk about depression also?

A.   Remember, Eastern State is where his wife and mom are filling out petitions about his drug use.  And, no, it's the doctor who talks about the previous history of depression.

Q.   All right.

1059

A.   But he's not given a diagnosis of a mood disorder at Eastern State Hospital.

Q.   He's prescribed Asendin and Elavil, isn't he?

A.   I can't remember if he gets it there or someplace else.

Q.   Those are major antidepressants; correct?

A.   They were anti -- well, they're still antidepressants. But back in the day, those were popular antidepressants.

Q.   All right.  They just didn't say -- they acknowledge, certainly, that he's got a drug problem, but they just don't say, oh, it's just drugs, let him dry out or whatever.  They actually prescribe antidepressants; right?

A.   I'm not -- I'm not seeing that in the discharge -- I'm not seeing that in the discharge summary.

Q.   Okay.  All right.  Would you agree, Doctor, that methamphetamine is similar to the types of drugs that are given to somebody who's suffering from ADHD or ADD?

A.   Amphetamines are, yes.

Q.   And there are indicators that Mr. Barrett suffered from attention problems; right?

A.   Yes.

Q.   Okay.  Do you disagree, and I guess you do, that suicidality -- Mr. Barrett's consistent thoughts of suicide, at least one serious attempt and other attempts to kill himself, indicates a mood disorder?

A.   I will certainly concede that the suicide attempt that

occurred where he shot himself in the chest, and notwithstanding drugs or drug use was in play there as well, that I think it would be reasonable to consider a diagnosis of depressive disorder.

Q.  All right.  And that's something that he talked to you about that has been with him since he was a kid basically, suicidal ideation and things of that nature; true?

A.  He talked about, at different times, having thoughts of kind of chronic suicidal thoughts.  And I used the examples on the direct exam that he spoke about.

Q.  And the reason he attempted to kill himself in 1986, I believe you stated on direct examination, was that he was depressed or agitated because he thought he lost his job; right?

A.  Well, that's what I said on the direct exam, and that is correct.  What happened in the evaluation was, I was asking Mr. Barrett about -- there's always two questions you want to try to figure out is why and why now.  And I couldn't figure out what was the why now, because he was saying that he was chronically depressed for a period of time.  And finally, after a little bit of discussion, it comes out that it sounds like the why now was the fact that he thought he had lost his job.

Q.  Okay.  Do you recall that, in his testing, Dr. Price, on one of the personality inventories he gave Mr. Barrett,

indicated that Mr. Barrett was high on the depression scale or the depression score?

A.   You'll have to show me where he says that.

Q.   Okay.  Do you agree or disagree that, on some of the personality inventories that Dr. Price did with Mr. Barrett, that his testing showed he was high on the schizophrenia scale?

A.   You'll have to show me where he says that.  I don't interpret individual scales.

Q.   Okay.

A.   And if he said that in his report, you'll have to show that --

Q.   Or in his testimony.  Are you aware of any of that?

A.   I don't know what he talked about on scales.

Q.   All right.

A.   And I'm sure what he talked about is that you don't just look at a scale in isolation.  That I'm sure he said.

Q.   Yes, he did.

A.   Okay.

Q.   But nonetheless, that these scales showed increased or significantly increased depression --

A.   Yeah, but --

Q.   -- the schizophrenia scale indicating schizoid lifestyle --

A.   Right.  And while you could -- you could put on the tip

1062

of this pinky finger how much I know about psychological --

Q.  Okay.

A.  -- testing, I will tell you that it would stun me if he didn't -- if he didn't stand strong --

Q.  Yes.

A.  -- and say you don't look at this in isolation.

Q.  Sure.  And he did say that.  But that would be a -- those -- the two things we just asked you about, those would be data points I guess, right, to use your terminology?

A.  Well, they're data points, but they're -- what he will tell you is, by not looking at that -- you don't look at that data in isolation --

Q.  Sure.

A.  -- so they're like -- they're really soft data.

Q.  There are plenty of drug addicts, polysubstance abusers and all that who never attempt suicide or have suicidal ideation for considerable periods of time; correct?

A.  Depending on what drugs they're doing.

Q.  Plenty of meth addicts and are perfectly happy using meth.  They had no thoughts of suicide, never attempted suicide; right?

A.  I can't talk to you about all meth addicts.  I can talk to you about this particular person.

Q.  Well, let's put it this way, the type of suicidality you see in Mr. Barrett is not characteristic of most

1063

methamphetamine addicts, is it?

A.   Mr. Barrett's suicidality -- keep in mind that he starts using substances at age ten.

Q.   I understand that.

A.   So as he himself said, and as the video itself said, he was -- he was always using drugs.

Q.   All right.  But there are plenty people who had always used drugs, who started off using drugs at a young age who are not suicidal all the time, or had suicidal ideation all the time --

A.   I'm not here to talk to you about plenty of people.  I'm talking about Mr. Barrett.

Q.   Well, I'm talking about, you know, a comparison with a general population.  That's something that you look at, isn't it?

A.   Sure.  But I can't tell you right off the top of my head what the general population is.

Q.   Okay.  Well, you've examined a lot of methamphetamine users, haven't you?

A.   I've examined a number of people who have used methamphetamine, yes.

Q.   Okay.  Are all -- do all of them have the type of suicidality that Mr. Barrett's exhibited?

A.   No.  But some of them talk about feeling suicidal when --

1064

Q.  Okay.

A.  -- they're coming off the methamphetamine.

Q.  All right.  Is there an interplay between organic brain damage and mood disorders; yes or no?

A.  Ask that question one more time.

Q.  All right.  Is there an interplay or a potential interplay between organic brain damage and mood disorders?

A.  Yes.

Q.  All right.  Is there a potential interplay between attention problems, or ADHD, and mood disorders?

A.  Potential, yes.

Q.  All right.  Do you recall Mr. Barrett's family, in observing him and describing him over the years, said that he was the most hyperactive kid they'd ever seen?  Do you -- do you remember seeing that?

A.  I recall that.  But I also recall in another declaration someone said that Steve was actually more hyperactive than -- his brother, Steve, was more actually hyperactive than him.  But I do recall that a lot of people talked about him being very hyperactive, yes.

Q.  Okay.  That he couldn't sit still?

A.  Yes.

Q.  Always had to be doing something?

A.  Yes.

Q.  Or into something?

A.   Yes.

Q.   Is that kind of condition relevant to a potential mood disorder?

A.   No.  I wouldn't say it's irrelevant.

Q.   Okay.  Now, you indicated earlier, Dr. Pitt, that you read a number -- or all of the declarations that were submitted in support of Mr. Barrett's 2255 petition?

A.   Well, first of all, I'm not sure that I used the word all, because I'm always loathe to use that word --

Q.   Okay.

A.   -- in situations like this.

Q.   A great number.

A.   The declarations that I reviewed I listed in the source of information section of my report.

Q.   At any rate, you looked at a great number of declarations from Mr. Barrett's family and other people who knew him?

A.   I looked at 18 declarations.

Q.   All right.

A.   And if we -- and included in there is Dr. Bianco, so let's just say 17.

Q.   Okay.  And his family consistently described Mr. Barrett, and I think we talked about this a little bit earlier, of having severe mood swings and deep depressions; right?

A.   I concur.

Q.   His wife and son and mother all talked about his dramatic mood swings; right?

A.   Yes, sir.

Q.   And his son thought that Mr. Barrett, because of his mood swings, had a chemical imbalance, in his lay opinion I guess; right?

A.   He said -- I don't recall if he used those words.  But he definitely said that he thought there was something wrong, yes.

Q.   All right.  And that Mr. Barrett's mother described him as having intense emotions and dramatic mood shifts or mood swings?

A.   Yes.

Q.   And Mr. Barrett's father and other relatives talked about how overly sensitive and moody he was as a kid growing up?

A.   Yes.

Q.   Okay.  And are racing thoughts characteristic or could be a characteristic of a mood disorder?

A.   Could be.

Q.   And Mr. Barrett described racing thoughts to you, didn't he, that he had racing thoughts?

A.   Yes.

Q.   And that was also indicated by Dr. Young and Dr. Woods;

1067

correct?

A.   Yes.

Q.   Now, let's talk about, if we could, Doctor, the hospitalizations that Mr. Barrett's had which you talked about some on direct examination, okay?

He has a significant or fairly significant history of hospitalizations and contacts with the mental health system; true?

A.   Well, I think it really depends on your reference point. In my world, I wouldn't consider this significant contact with the mental -- I mean, I'm -- it's a little skewed sample.  But I'm used to seeing people that have a long-standing history of purely bipolar disorder or purely major depressive disorder, where they're in and out of facilities and institutions, and their mental health records take up literally --

Q.   Okay.

A.   -- three and four banker boxes.

Q.   Okay.  Well, let me ask you this:  How many capital cases have you testified in?

A.   I've been involved in ten capital cases.

Q.   All right.  Both federal and state?

A.   Both, including federal and state.  And only one was in I think the case in chief.  The other were in post-conviction issues.

Q. Okay. Was that testifying for the government each time, or most of the time?

A. Out of the ten, two were by the defense.

Q. Okay.

A. I was retained. And eight is by the government -- or the state.

Q. Okay. And you've had cases where you testified for the government where a defendant, in post-conviction proceedings, is claiming some kind of mental illness and that the lawyers were ineffective I guess for not finding this mental illness, who had no history whatsoever of any kind of contacts with the mental health system; right?

A. First of all, I don't testify for the government. I'm retained by the government.

Q. Okay.

A. And I don't testify about counsel being ineffective.

Q. All right. Well, my point is this: You have had cases where there's been a claim that somebody has -- a defendant has some kind of mental illness and they have no history whatsoever of any contacts with the mental health system; true?

A. Yes.

Q. Okay. Oh, by the way, there was never any --

A. Wait, wait. Ask me that question one more time. I want to be precise. Sorry. One more -- sorry.

Q. Okay. Let me kind of rephrase it. A defendant -- a capital defendant --

A. Yes.

Q. -- files a post-conviction application.

A. Yes.

Q. All right. They claim that they have some kind of a mental illness --

A. Yes.

Q. -- that was undetected --

A. Yes.

Q. -- or evidence was undeveloped; right?

A. Yes.

Q. Yet they have no history of mental health commitments or contacts with the mental health system.

A. Yes. So I stand by my answer, yes.

Q. Okay. All right. Now, preceding Mr. Barrett going to Eastern State back in 1986 -- well, let me back up. Well, I'm sorry. I can't read my own writing here. All right.

Now, preceding Mr. Barrett going to Eastern State Hospital in 1986, there was initially a 72-hour emergency commitment for him. Do you recall that?

A. You're talking about in -- well, let's back up. Where are you talking about?

Q. I'm talking about when he was sent to Eastern State Hospital in 1986.

1070

A.  Yes.

Q.  Okay.  Preceding him actually entering Eastern State Hospital, he was under a 72-hour emergency commitment.  Do you remember that?

A.  I -- certainly I see the voluntary statements, but I don't know that I've seen records, or I can't pull up in my memory records from the actual commitment itself.

Q.  Okay.  Do you recall ever seeing a document dated October 10th, 1986 from the Sequoyah County District Court ordering Mr. Barrett's admission to a medical facility -- that he's admitted to a medical facility for treatment of a mentally ill person.  Did you see any records like that?

A.  So multiple responses.  One, I don't recall seeing it.

Q.  All right.

A.  Two, it doesn't mean that I don't have it.  And, three, it wouldn't surprise me, because he was court ordered for treatment.

Q.  All right.  Do you remember telling Mr. Barrett during your semi-structured interview with him that it's unusual for somebody to be committed to a mental hospital on a 28-day commitment just for drug use --

A.  Yes.

Q.  -- or drug issues?

A.  Yes.

Q.  Do you stand by that, or was that an accurate reflection

of --

A. Yeah, it's highly -- it's -- it varies from jurisdiction to jurisdiction. But most jurisdictions, generally speaking, don't civilly commit someone on the -- simply on the basis of drug use. Usually there has to be some -- some connection or nexus to some alleged emotional problem, along with either a danger to self or danger to others or -- different jurisdictions have some other phraseology as well.

Q. Okay. Now, do you recall that when Mr. Barrett was discharged from Eastern State Hospital, he was referred to an outpatient mental health center?

A. Oh, by the way, you kept talking about Asendin and Elavil.

Q. Yes.

A. I'm looking at the discharge summary. It says he was released to his mother with no medications.

Q. Okay.

A. And then it says he will reside at the Cherry Hill Apartment, and gives the address. And will be seen at -- I can't read the -- Crecks maybe. C-r-e-c-k-s Mental Health Center. And I can't make out the city, but -- obviously.

Q. Okay.

A. And he was supposed to be seen in follow-up on November 18, 1986.

Q.  Do you recall whether he was prescribed with Asendin and/or Elavil when he was supposed to go to outpatient treatment following his discharge from Eastern State Hospital?

A.  I know that somewhere in his history, there is him being treated with -- or being prescribed Asendin and Elavil.  But it's clearly not connected to the Eastern State Hospital visit.

Q.  All right.  In 1986, is it true that Mr. Barrett was found to be -- and I never can pronounce this word, l-a-b-i-l-e.  How do you say that?

A.  Labile.

Q.  Labile.  Okay.  That he was found to be emotionally labile?

A.  Where are you talking about now?

Q.  I'm asking if you recall it.

A.  There are records where it says he was emotionally labile in different -- in different mental health records, yes.

Q.  All right.  And what does emotionally labile mean?

A.  I think Dr. Woods did a nice job describing that.  Just your emotions are up and down.

Q.  Okay.  And also that he had impaired insight and judgment?

A.  I believe, seeing in some record, but you'll have to

point me where that is.

Q. Okay. Do you recall, in the Eastern State records, that Mr. Barrett was found to have depressive neurosis with a high risk of suicide?

A. You'll have to show me that document.

Q. Did you -- do you recall in looking at the Bill Willis --

A. Oh, I see it. I see it, yes.

Q. Okay.

A. It says -- it talks about being emotionally labile, and then it talks about depressive neurosis with suicide potential extremely high. Yes, you're correct.

Q. All right. And do you recall whether or not the medications I keep talking about, Asendin and Elavil, were prescribed while Mr. Barrett was being treated or seeing somebody at Bill Willis before he went into Eastern State?

A. I think that's closer to more accurate --

Q. Okay.

A. -- because when you look at the nursing history and assessment of the same Eastern State hospitalization, it says, was prescribed Elavil but reportedly stopped taking after several weeks. Prescribed Asendin by doctor -- I can't make out the name. But patient never returned to clinic for meds. So the point is, to your point --

Q. Uh-huh.

1074

A.  -- yeah, he was prescribed Elavil.  Doesn't sound like he really took it.  And Asendin, it sounds like he never picked it up.

Q.  Okay.  Well, are Elavil and Asendin prescribed just for somebody who's a drug addict or has a drug problem, or doesn't there have to be some kind of underlying depression?

A.  Well, there could be some type of --

Q.  Okay.

A.  -- underlying depression, sure.

Q.  All right.  And the tox screen, I think you indicated on direct examination, from Mr. Barrett's stay in Eastern State Hospital, was negative; is that correct?

A.  I concur.

Q.  All right.  So that at the time he was presenting these symptoms of having depressive neurosis with a high risk of suicide, his tox screen was negative; right?

A.  Yes.

Q.  And that's even for cannabis; right?

A.  Yes.  And yet he still discharged with a diagnosis of mixed substance abuse.

Q.  Sure.  Nobody is denying that he had substance abuse, okay?

A.  But there's no depressive diagnosis in here either.

Q.  Well, they talked about, and you just talked about it --

A.  No, but it's not on the discharge summary.

1075

Q. All right. Whether it's on the discharge summary or not, the records talk about depressive neurosis with a high risk of suicide; correct?

A. They talk about that in the -- there's one document that discusses that on the admission form of the professional's statement that's basically designed to get him into the hospital.

Q. Okay. And he was referred not to a drug rehabilitation facility. He was referred, after his discharge from Eastern State Hospital, to a mental health facility on an outpatient basis; correct?

A. I concur.

Q. All right. Now, jumping to 1995, that's when Mr. Barrett was initially at Sequoyah Memorial Hospital, and ultimately referred to the -- I guess the mental health unit at Wagoner hospital; is that correct?

A. Well, you left out a step.

Q. Okay. Go ahead.

A. It goes Sequoyah mental health, and then he goes -- there's a referral to Bill Willis.

Q. Yes, sir.

A. And then, from Bill Willis, they make the referral to the -- to Wagoner Community Hospital.

Q. All right. And he was given Haldol?

A. Yes, sir.

1076

Q.   And Haldol is an antipsychotic?

A.   Yes, sir.

Q.   And he was actually prescribed on an outpatient basis, after he was discharged from the Wagoner Hospital, Haldol; right?

A.   I don't agree with that.  It says, discharge instructions, medications, none.  Page 2 --

Q.   All right.

A.   -- on the discharge summary, right there at the top.

Q.   So you're aware of --

A.   That would be, I think, the government's, or whatever exhibit was, was Number 8.

Q.   So you're not aware of any record that indicates he was prescribed any kind of a psychotropic medication after his discharge from Wagoner Hospital?

A.   Well, that's a different question.  You used any twice, and there's a lot of records here, so --

Q.   Okay.  Do you recall anything about that?

A.   Not -- look, there's a lot for me to recall.  But what I'm telling you in specific response to your question, he was discharged, like he was from Eastern State Hospital, with no medications.

Q.   All right.  Was he referred to an outpatient mental health center in 1995 after he got out of Wagoner Hospital?

**United States District Court**

1077

A.   Which he was -- which he was noncompliant with, and then he didn't show up, and then he was ultimately discharged from Bill Willis on February 13, 1995.

Q.   And that's not all that uncommon where somebody who is supposed to be undergoing some kind of mental health treatment is noncompliant?  That's not unusual, is it?

A.   I think it depends on what your mental issue -- mental health issues are.

Q.   Okay.

A.   If you're abusing drugs and you need to be hopped up and you need your fix, it's pretty common not to show up.

Q.   What about if you're bipolar?  A lot of bipolar people use street drugs.  That's very common, isn't it?

A.   But he wasn't diagnosed with --

     MR. KAHAN:  Objection as to relevance to other people.

     THE COURT:  Overruled.

A.   He wasn't diagnosed with bipolar disorder --

Q.   (BY MR. AUTRY)  Well --

A.   -- that's the point.

Q.   I understand.

A.   You're coming up -- you keep inserting bipolar, but nowhere in any of these records is he diagnosed with that.

Q.   I'm asking generally about people with bipolar disorder. A lot of them are medication noncompliant, a lot of them do

1078

not seek or get the mental health treatment they're supposed to get; right?

A.   Look, sadly in this country, lots of people have mental illness.  Sadly, lots of people are referred for treatment.  Sadly, lots of people are not compliant.  I'm not here to talk about lots of people.  I'm talking -- here to talk about Kenneth Eugene Barrett.

Q.   Well, I know.  But when you say Kenneth Eugene Barrett was noncompliant, you act like that's some kind of unique feature with him, or something like that, that people with mental illness --

A.   But only because --

Q.   -- don't do.

A.   -- your question presupposes that there's this bipolar disorder.

Q.   Well, I think my question about bipolar disorder, at least this time, just talked generally about people with bipolar disorder who are not medication compliant, who don't go to the doctor or the outpatient place like they are directed to.

A.   Right.

Q.   Okay.  That's common, isn't it?

A.   Some people will not show up for their treatment.  I think everybody in this room knows that.

Q.   Okay.  Do the Wagoner records describe Mr. Barrett as

being agitated, unable to sleep, suicidal, and that kind of thing?

A.  Well, see there, you say that kind of thing, I've got to -- I have to go and check.  Where exactly are you referring to?

Q.  I'm asking you.

A.  Well, what were the words you used?

Q.  Agitated, unable to sleep, suicidal, depressed, irritable.  I added depressed and irritable to that last question.

A.  In the physician H and P, he says, admitted secondary to anxiety, depression, and ineffective coping skills, along with the history of alcohol and drug abuse.

Q.  Okay.  Let me stop you right there.  So they talk about depression, ineffective coping skills, in addition to alcohol and drug abuse?

A.  Right.

Q.  Not based on or stemming from alcohol and drug abuse, but independent of alcohol and drug abuse; right?

A.  That that particular physician who did the history and physical, that is correct.

Q.  All right.  And is that a different physician than the person -- and I guess you indicated that you thought this person was not a physician who provisionally diagnosed Mr. Barrett in 1995 -- January of 1995 with bipolar

1080

disorder?

A.   Yeah, you're conflating the records.  You --

Q.   Okay.  Let's break it down.

A.   Go ahead.  I'll do it again.

Q.   Let's break it down.

A.   He starts at Sequoyah Memorial Hospital.  From there, he's referred to Bill Willis.

Q.   Right.

A.   That's where he sees Kimberly Hughes.

Q.   And she says?

A.   And she gives the provisional diagnosis of bipolar disorder.  She then makes the referral to Wagoner Community Hospital --

Q.   Right.

A.   -- where he is for three days where he is not discharged --

Q.   Uh-huh.

A.   -- with bipolar disorder.  But he's discharged with organic affective disorder, polysubstance abuse, amphetamine dependence, and a urine drug screen that's positive for cannabis, and then marital conflicts.  Subsequent to being discharged from Wagoner, he then is under the care, on an outpatient basis, of Bill Willis.

Q.   Right.

A.   And that's where he becomes noncompliant.  And that's

**United States District Court**

where she, the same woman, she -- Kimberly Hughes writes the document that mirrors -- she no longer has bipolar disorder in her diagnosis.  She mirrors the diagnosis that he was given from Wagoner Community Hospital.

Q.  All right.  Organic affective disorder can connote, or did connote, I guess, according to you, it's kind of an outmoded phrase now, or an outmoded diagnosis, more than drug abuse; right?

A.  I read what Dr. Woods said, and I already said on direct testimony where I respectfully disagree.  The term, organic affective disorder, back then, using those mental health manuals, and based on my years of experience and training, could have meant one of two things.  It could have meant either a medical issue causing the mood problem, or it could have meant a substance use issue, which is why they changed the terminology going forward.

Q.  All right.

A.  To be more clear, to separate it from true bipolar disorder.

Q.  Okay.  When Mr. Barrett was discharged from Wagoner, he was supposed to go, on an outpatient basis, to Bill Willis; right?

A.  Yes.

Q.  And he was noncompliant there; correct?

A.  Yes.

Q.   Bill Willis is a mental health facility, isn't it?

A.   My sense is it's an outpatient mental health center.

Q.   It's not a drug abuse center, or somewhere you go to do the 12 steps or, you know, a rehab facility; right?

A.   I don't know one way or another.  It's possible they had a drug program.  But I'm assuming it's a mental health clinic.

THE COURT:  Mr. Autry, how much longer do you think you have?

MR. AUTRY:  Your Honor, it's not -- well, it's going to be probably another 30 minutes or so.

THE COURT:  Let's go ahead and break for lunch then --

MR. AUTRY:  Thank you.

THE COURT:  -- and be back here at 1:30.

*(Off the record at 12:29 p.m.)*

**United States District Court**

1083

C E R T I F I C A T E

I, Ken Sidwell, Certified Shorthand Reporter for the Eastern/Northern Districts of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in the above-captioned case.

I further certify that I am not employed by nor related to any party to this action, and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 15th day of June, 2017.

s/Ken Sidwell
Ken Sidwell, CSR-RPR
United States Court Reporter