IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,          )

      Plaintiff,               )

VS.                              )          NO. CIV-09-105-JHP

UNITED STATES OF AMERICA,        )

      Defendant.               )


                *     *     *

MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE STEVEN P. SHREDER

UNITED STATES MAGISTRATE JUDGE

JUNE 26, 2017

VOLUME VIII

                *     *     *

A P P E A R A N C E S:

FOR THE PETITIONER:  MR. TIVON SCHARDL & MS. JOAN M. FISHER,

Federal Public Defender - Sacramento, 801 I St., Third Floor,

Sacramento, California 95814

FOR THE PETITIONER:  MR. DAVID B. AUTRY, Attorney at Law,

1021 NW 16th Street, Oklahoma City, Oklahoma 73106

FOR THE RESPONDENT:  MR. CHRISTOPHER J. WILSON, Assistant

United States Attorney, 520 Denison Avenue, Muskogee,

Oklahoma 74401

FOR THE RESPONDENT:  MR. JEFFREY B. KAHAN, US Department of

Justice - Capital Case Unit, 1331 F St. NW, Room 345,

Washington, DC 20530

COURT REPORTER:          KARLA S. McWHORTER, CSR-RPR

                         UNITED STATES COURT REPORTER

<u>I N D E X</u>

                                                                    <u>PAGE</u>

WITNESS CALLED ON BEHALF OF THE PETITIONER:

        Direct Examination by Mr. Schardl . . . . . .    1140

        Voir Dire Examination by Mr. Wilson . . . . .    1145

        Direct Examination Continued by Mr. Schardl .    1151

        Cross Examination by Mr. Wilson . . . . . .      1253

        Redirect Examination by Mr. Schardl . . . .      1333

        Recross Examination by Mr. Wilson . . . . .      1355


End of Proceedings  . . . . . . . . . . . . . . . . . .    1366

1139

<u>COURT IN SESSION</u>

(10:08 a.m.)

THE COURT:  Good morning, everybody.  Call Case Number CIV-09-105-JHP, Kenneth Eugene Barrett versus United States of America.  Would the attorneys enter their appearances for the record, please?

MR. WILSON:  Christopher Wilson and Jeff Kahan for the United States, Your Honor.

MR. SCHARDL:  Tivon Schardl and David Autry and Joan Fisher for Mr. Barrett.

THE COURT:  Very well.  Is the defendant ready to proceed, Mr. Schardl?

MR. SCHARDL:  Yes, Your Honor.

THE COURT:  Go ahead and call your witness then.

MR. SCHARDL:  The petitioner calls Dr. Deborah Miora.

<u>DR. DEBORAH S. MIORA, PETITIONER'S WITNESS, SWORN</u>

<u>DIRECT EXAMINATION</u>

BY MR. SCHARDL:

Q    Good morning.

A    Good morning.

Q    You will need to have that microphone in front of you so that the court reporter can pick it up.

Would you, please, state your name and spell it for the record?

1140

A      Yes, my name is Deborah S. Miora.  That's D-E-B-O-R-A-H, middle initial 'S', and then M-I-O-R-A.

Q      What's your occupation?

A      I am a clinical and neuropsychologist.

Q      Where do you do that?

A      In Los Angeles, California.

Q      How long have you been working in neuropsychology?

A      I have been doing neuropsychologist for 30 plus years.

Q      Could you describe your education beginning with your undergraduate work?

A      Yes.  My undergraduate work was done at Ithaca College in Ithaca, New York, with majors in psychology and sociology. It was research oriented psychology.  I then went on to graduate work in California.  So I traveled to the wild, wild west to study at the California School of Professional Psychology, now known as Alliant.  I got -- I earned by my Master's and PhD degrees there between 1979 and 1987.  While I was in my graduate program, I studied what neuropsychology was made available to me, as well as doing or performing neuropsych assessments at internships.

Q      Did you move on -- did you do a residency or anything after that?

A      I was going to say during and after my graduate work I did internships pre-doctorally, which was before I did my dissertation and then after.  Before I got my doctoral

dissertation, I worked at an out-patient program for offenders coming out of state hospitals who had been declared not guilty by reason of insanity and mentally disordered sex offenders.  I had to do risk assessments and treatment and write quarterly progress reports to the courts.  As well during my pre-doctoral internship years, I was training in pediatrics.  So I learned a lot about the pediatric brain and development and was assessing and treating children.

Q    Can you tell the Court what your training is in the administration of neuropsychological tests?

A    In addition to the training that I obtained while I was in graduate school and at my internships, I then went on and got a post-doctoral certificate in neuropsychology, which required two years of training in neuro anatomy, administration of tests, being supervised on a number of cases, and I continue with continuing education and training.  I was accepted to sit for the American Board of Pediatric Neuropsychology.  My work samples were accepted and all, but I've just been too busy.

Q    And do you have any other work experience related to neuropsychological testing?  For example, teaching or anything like that.

A    Oh, yes.  First of all, I've done over 300 to 400 cases in and out of the criminal justice system and the juvenile justice system.  As well, I was program director and then

taught as a full-time faculty person at a program -- a

forensic graduate program where we emphasized

neuropsychological assessment, as well as other ways of

evaluating within the forensic world.

Q      And are you a licensed psychologist in California?

A      Yes.

Q      Could you describe the nature of your work on this

case, what you were asked to do on this case?

A      Yes.  In this case I was asked to review the work of

the neuropsychologist who was no longer alive and in so doing

there are a number of elements involved in the actual review

of the work.

Q      Let me ask you first, is that something that in the

field of neuropsychology is considered an acceptable thing

to do, to review another neuropsychologist's work?

A      Yes.  In many contexts that is done.  And, in fact,

I've done that for over 13 years for the California Appellate

Project where I review data, yes.

Q      And before I forget, just going back to your

experience, you mentioned that you've worked on a number of

cases.  Have you been accepted as an expert in

neuropsychology to testify in court?

A      Yes.

Q      In state courts in California?

A      Yes.

Q     In federal courts?

A     Yes.

Q     What federal courts?

A     Oh, federal courts in Los Angeles, federal courts in New Mexico, hopefully here.

Q     Okay.  So going back to your work on this case, what -- when you were asked to review another neuropsychologists work, what does that entail, what does that review entail?

A     The review is complex.  It has a number of dimensions starting with securing all of the data from the actual testing that was administered, if there were clinical inter-views done, mental status examinations done.  Reviewing records from other neuropsychologists, psychologists, medical records, declarations of relevant involved persons.  So reviewing as much as possible in order to have the background information.  Once I have all of that, then I will actually rescore the tests that were administered to make sure that the numbers that were derived and the kinds of conclusions that were reached were based on sound data.  I consider whether the tests themselves were appropriate for the individual, the examinee, the person being evaluated, whether they are generally peer accepted and scientifically sound tests.  And I look at the entire battery of tests, which is the group of tests administered, to determine whether they actually would be sufficient to evaluate brain function in

the number of dimensions that we as neuropsychologists evaluate.

Q    Did you feel like you had sufficient information in this case to do what was asked of you, to review the other neuropsychologist's work?

A    Yes.

Q    And who was the other neuropsychologist whose work you were being asked to review?

A    The other neuropsychologist was Dr. Myla Young.

Q    And is that somebody you were familiar with prior to your work on this case?

A    Yes.  I had seen her work before and had contact with her, but not about this case.

Q    Very well.

        MR. SCHARDL:  At this time, Your Honor, the defense would tender Dr. Miora as an expert in neuropsychology.

        THE COURT:  Is there any objection?

        MR. WILSON:  Your Honor, may I just briefly voir dire this witness, please?

        THE COURT:  Okay.

                    VOIR DIRE EXAMINATION

BY MR. WILSON:

Q    Dr. Miora, counsel asked you about being qualified as an expert witness in federal court.  I believe you testified that that took place in federal court in Los Angeles; is that

correct?

A      Yes.

Q      How many times have you been qualified as an expert in federal court in Los Angeles?

A      If I may ask you, are you talking about how many times I have been qualified to testify or appointed by the court as a neuropsychologist to evaluate --

A      How many times -- well, counsel asked you the question and you responded.  So I am just trying to find out what your qualifications are.  Let me ask you specifically, have you been -- how many times have you been qualified to testify as an expert in a court of law in Los Angeles?

A      Yes.  The reason I asked is that --

Q      The questions is very simple, Doctor.

A      Yeah, okay.  I have testified probably a handful of times, maybe five to six times in federal court.

Q      And each one of those times you have been qualified as an expert?

A      Yes.

Q      And were those in felony criminal cases?

A      Yes.

Q      And they were not juvenile matters, they were adult matters?

A      Right.

Q      And you also testified that you  had been qualified as

an expert in federal court in New Mexico; is that correct?

A    Yes.

Q    And would that be the same, that you were actually qualified to testify as an expert witness in federal court?

A    Yes.

Q    And those would be in adult matters?

A    Yes.

Q    And in any of those handful of times -- well, how many times in New Mexico?

A    It was in one case.

Q    So of those five or six times total that you've been qualified, how many times have you testified as an expert witness in reviewing another individual's work?

A    That's a difficult question to answer because I am always reviewing other people's work.  If you are asking specifically solely for that purpose, this is the first time. I have consulted in many matters as a neuropsychologist, but only this one time in testimony.

Q    And is there any particular process for peer review to testify as an expert reviewing another expert's testimony or -- excuse me -- another expert's testing and data and to testify about that?  Is there any peer reviewed process of that?

A    Not that I'm aware of, no formal peer review process for that.

MR. WILSON:  May I have just one moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

BY MR. WILSON:

Q    Dr. Miora, I was provided by counsel a list of cases where you've testified as a witness and I believe -- if I can't correctly, I only count two federal cases that you've testified as a witness.

A    Um, which cases are those?  I mean, I don't have the list in front of me, so I can't speak to that.

MR. WILSON:  May I approach, Your Honor?

THE COURT:  Yes.

THE WITNESS:  Thank you.

MR. SCHARDL:  Can the defense know what is being shown to the witness?

THE COURT:  Yes.

(PAUSE)

MR. WILSON:  May I proceed, Your Honor?

THE COURT:  Go ahead.

MR. WILSON:  For the record, Your Honor, this is -- the document which I handed the witness is from the defense's -- it is docket number 376-1, which is a document which was filed earlier in this particular case, and it is purported to be a list of cases in which Dr. Miora testified

as an expert.

BY MR. WILSON:

Q    Have you had an opportunity to review that list, Dr. Miora?

THE COURT:  What exhibit is that a part of?

MR. WILSON:  It is -- I believe it is the defendant's -- the Petitioner's 105, Your Honor.

THE COURT:  Oh, okay.  Have we admitted that already?  We have, okay.

Go ahead, Mr. Wilson.

MR. WILSON:  May I approach again, Your Honor?

THE COURT:  Yes.

BY MR. WILSON:

Q    Doctor, just so we are at the same context, I have handed you what has been marked as Petitioner's 105 and that's your entire CV; is that correct?

A    Um, I am not sure what the date of it is.  There are research papers that have been accepted and may not be listed, but it -- to whatever date this was, this is my CV.  I didn't answer your question.

Q    Well, I'll get there.

A    Okay.

Q    I just want to make sure we are all on the same page.

A    All right.

Q    Well, this particular document that I showed you, and

it is the list of the cases, what is the date of that list?

A    I am not sure.  I don't know when I submitted that.

Q    All right.  Well, is that list accurate?

A    That list is accurate.  What is not accurate on the list perhaps is that in one of the cases I went in several times, but I listed it as one case.  So I was qualified each time.  I didn't need to be re-qualified, but it was one case, USA versus Choi.  You have that down there.  There were other cases where I was qualified and then the case settled, but I don't put those down as cases if I didn't actually testify.  So I...

Q    All right. So this particular document, which shows the list of cases, these are cases where you were qualified as a witness and actually testified?

A    Yes.

Q    And you would agree with me that there is actually two in which that took place in?

A    Yes, on that list, yes.

Q    That would indicate to me that there are some other cases in which you've actually testified that are not on this list?

A    No.  Federal cases there are the two and one of the two I went in two or three times at different points in the proceedings.

Q    Thank you.

1150

A    I am on a Los Angeles Superior Court panel --

Q    I didn't ask a question.

A    Okay.

MR. WILSON:  Your Honor, I have no further questions and I have no objection.

THE COURT:  No objection, very well then.  Dr. Miora will be allowed to testify as an expert for purposes of this hearing.

MR. WILSON:  May I retrieve 105?

THE COURT:  Yes.

DIRECT EXAMINATION CONTINUED

BY MR. SCHARDL:

Q    So, Dr. Miora, before we get too far into the details of your work in this case, let's take a step back.  Let me ask you, what is a neuropsychological evaluation?

A    A neuropsychological evaluation is the assessment of an individual's brain behavior relationships through the administration of tests, clinical interview, neuro behavioral status examination, record review and whatever other relevant sources are available to generate information and opinions.

Q    What is the -- what's the purpose of the neuro in neuropsychological?  What is that meant to tell us?

A    What one is doing is establishing the status of an individual's brain function.  So it is based on the neurology, the neuro anatomy, the neuro chemistry of an

individual's brain.

Q      Is that different than a test of personality?

A      Yes.

Q      Is it different than a psychiatric evaluation?

A      Yes.  It is beyond a psychiatric or a psychological evaluation.

Q      And I think you mentioned testing.  How -- what's the -- what are neuropsychological tests?

A      Neuropsychological tests are those that are developed to evaluate function.  We infer behavior based on performances on these tests.  So the tests are very carefully developed to evaluate a variety of brain functions that we all hopefully possess.

Q      Well, in this case did Dr. Young administer neuropsychological tests?

A      Yes.

Q      And are they -- how many did she administer?

A      I have a list, if you would like to put that up.

Q      Well, if you -- I will make it simple for you.  Did she administer more than one?

A      Yes, she administered what's called a battery of tests.

Q      Okay.  Why does a neuropsychologist administer a battery?

A      For a number of reasons.  First of all, one is hoping to evaluate the status of the brain overall which involves a

number of different areas of the brain, neuroanatomically, as well as a number of brain functions that contributes -- that contribute to a person's behavior, their cognition, their emotions, and how they think.

Q    So are different -- the different tests, are they geared toward -- within this battery, are different tests geared towards different functions or different areas of the brain?  How does that work?

A    Yes.  They are -- the tests are oriented toward different brain functions, some of which localize to particular areas of the brain and some of which may cover a variety of brain regions, but they are actual functions such as attention or verbal learning or memory.

Q    So can you tell us, like, what areas of the brain are associated with different functions that Dr. Miora tested in her battery?

A    That Dr. Young tested?

Q    Oh, sorry, you are Dr. Miora.

A    And I evaluated.

Q    I am probably going to make that mistake a lot over the course of the day.  So, okay, yes, you can?

A    Yes.  The temporal lobe, for example -- should I...

        MR. SCHARDL:  Your Honor, we have prepared some power point slides to help the doctor describe this.  They are Exhibit 107, I think.  With the Court's permission, we

would like to show the first -- or actually the second slide in that deck?

THE COURT:  Well, give us a little foundation before we launch into it.

MR. SCHARDL:  Okay.

BY MR. SCHARDL:

Q    Doctor, you -- can you show us through an image, to help us sort of get oriented into the brain that you are going to be talking about, the areas of the brain that you are going to be talking about in your testimony?

A    Yes.

Q    Do you think it would help us to understand the tests and how each test relates to another test and to an area of the brain if you could show us a brain?

A    Yes.

MR. SCHARDL:  With that, Your Honor, I would like to show the Court a brain.

THE COURT:  Okay, go ahead.

BY MR. SCHARDL:

Q    Dr. Miora, looking at the second slide in Petitioner's Exhibit 107, what's this showing us?

A    Well, this is showing us a pretty image of a brain. The blue area on the left side is what we call the frontal lobe, which comprises 20 to 25 percent of what we've got going on in the brain.  The frontal lobe --

1154

Q    Let me ask you first --

A    Yes.

Q    You say 20 to 25 percent, is that by volume or in terms of function?

A    That is by volume.

Q    Okay, thank you.

A    Yeah.

Q    Okay.

A    I apologize.

Q    Go ahead.

A    The frontal lobes are considered to be the seat of reason, the capacity to think, to make decisions, to weigh the consequences of one's actions, to anticipate and -- I mean, essentially to think and it is supposedly what distinguishes us from the rest of the animal kingdom.  What is important as well about the frontal lobe is that it is associated with the output of behavior or responses. Whereas, most of the rest of the brain receives information and stores information or does something with its senses. The temporal lobe, that yellow region, for example, has to do with memory and learning and -- go ahead.

Q    Let me stop you for just a second because I think that the printouts of the slides are in black and white.  So when you say the yellow area, could you locate that for us sort of within that oblong shape there?

A    Thank you.  Somebody just pointed me to the screen. I am busy in my notes.

Q    Oh, okay.

A    The temporal region is below the left side where it juts out, which is the frontal lobe.  And that region underneath extends from the left side all of the way back.  So the temporal lobe, as I was saying, has to do with learning, verbal learning, language, understanding both verbal and nonverbal language, and it is receiving information as well as learning and -- so that is the temporal lobe.

Q    Okay.

A    It is related to motivation and emotion as well.

Q    Let me ask you --

A    Yes.

Q    We are looking at the sort of exterior surface of the brain.  Are each of these lobes one sort of separate functioning area the way like a ventricle of the heart is separate and does one thing?

A    Yes and no because the ventricles of the heart are related to other arteries and ventricles and systems.  So while they do comprise separate sections like the ventricles, they are also a system and the picture that we are looking at here is of the outermost layer of the brain, which is the cerebral cortex.  And way at the bottom where you see a sort of half-moon area down on the right-hand side, that is called

the cerebellum and that is related to the rest of the cerebral cortex as well.

Q    So we are seeing -- when you use this word cortex, that is the sort of outer area of the brain?

A    Yes.

Q    Okay.  So I stopped you.  You had described the temporal lobe.  What are the other lobes that we should be concerned with in this case?

A    We also have to the right of the front lobe the parietal lobe.  The parietal lobe is very involved with visual attention and sensation of one's self in space and one's kinesthetic perception and seeing objects in perspective.  Very important again in relationship to the frontal lobe.

Q    They have to work together as a --

A    Exactly, as a system.

Q    Finally, on the right-hand side where you see the tip, not at the bottom but to the right most area, that is called the occipital lobe and it has to do with the processing of visual information.  Whereas, the temporal lobe is more involved with auditory kinds of information, the occipital lobe is involved with the reception and processing of visual kinds of information.

Q    Now, are there areas beneath the cortex that you have been describing that are also relevant to understanding

Dr. Young's testing?

A    Yes.

Q    And did you prepare an image to sort of orient the court and to show us those structures?

A    Yes.

Q    And would it assist the court in understanding Dr. Young's results if we could describe those different areas and functions?

A    Yes.

MR. SCHARDL:  So at this point, Your Honor, I would like to show the witness the next slide in the deck.

THE COURT:  Go ahead.

BY MR. SCHARDL:

Q    Okay.  Dr. Miora, what are the components, the brain components that we are looking at here that are -- well, let me ask you first -- that are relevant to Dr. Young's testing?

A    Yes.  This is called the neocortex.  A lot of what you are seeing here is called the neocortex rather than the iso or cerebral cortex.  So we are down a layer or two internally.  Relevant specifically to Dr. Young's testing are the hippocampus -- which is considered to some extent the seed of memory, the storage of memory or the orchestrator of locating memories if they are not in the hippocampus itself.  The amygdaloid body is -- amygdaloid, A-M-Y-G-D-A-L-O-I-D.  Sometimes it is also referred to as

the amygdala, almond shaped.  That is the -- this the seat of

what we call the limbic system.  The limbic system is the

oldest system in the brain and is very connected with

fight/flight reactions, you know, the perception of danger.

Now, not so much the perception of it, but the reaction.

Q    So when you say limbic, is that like from the Latin

limbis, like a shore, a coast type of --

A    Yes.

Q    And what's the -- why -- why that metaphor?

A    That metaphor because of its relationship with the other

areas of the brain.

Q    Okay.  So you were describing the amygdaloid.  Are

there other areas within this -- these internal brain

components that are going to be described in Dr. Young's

test results?

A    I don't recall specifically if she referred to the

corpus callosum, but it is important.  It is the area just

under the top rim of the picture there, the top portion

of the rim, the next area down the corpus callosum.  That is

the connective tissue that links the right and left side of

the brain and it has to do with the transfer of information

and communication of information between the two sides of the

brain, and it is very important.

Q    You mentioned sides.  I guess for the record we should

say we are looking at -- you say we are describing internal

structures.  This is a cross section of sorts?

A     Yes.

Q     And what kind of cross section?

A     This is a -- I am trying to think of its Latin --

Q     Sagittal?

A     Sagittal, exactly.  It is a sagittal section.  So we are actually seeing what would be a brain cut in half so that you get to see one side.

Q     So it is cut into half down the midline of the body, vertically down the midline?

A     Yes.

Q     Okay.  Are there other areas illustrated here, internal brain structures that you will talk about in Dr. Young's testing that you want to point to for the Court's benefit?

A     No.  What's most important about this image and understanding the internal workings of the brain beneath the cerebral cortex is the idea of emotion, fight/flight reaction and the idea that there is circuitry that permits for the communication between the different levels and areas of the brain.

Q     So how do neuropsychologists, neuroscientists know what these different functions do?  It is not like I can -- obviously I can see that my arm is grabbing the microphone. I can't see what part of my brain is making me talk.  How do you know?

A       Well, through pathological populations, in other words people who have had brain injuries, people who have had strokes, people who have had traumatic accidents.  What you see is what is not working anymore.  So, for example, if an individual has a stroke and the right side of his body is not functioning or is drooping, we know that that is a left-side stroke because the right side of the body is associated in a motor sense with the left hemisphere of the brain.  If an individual is no longer able to speak after having a stroke, that is more evidence that in all likelihood it is a left-sided stroke because language in large part is represented in the left side of the brain, not wholly but to some extent.  And there have been famous cases, like Fineas Gage, who was a railroad worker who had a pipe in an accident pierce his orbital frontal right behind the eye and pierced his entire -- it pierced through his brain and he was -- his behavior changed in ways that were unusual.  He was very reserved, well-mannered soft-spoken person who became disinhibited and -- and what that indicated was, oh, these areas of the brain might be associated with frontal function with certain behaviors and -- and, of course, there have been experiments done with people who have epilepsy where they took out portions of the brain, whether it be frontal areas or temporal areas, and if they saw repeatedly that people who had those kinds of surgeries or those injuries to

particular areas and those areas were damaged, language was taken out, for example, you see that over time and you have a sample large enough to be able to say, oh, okay, so the frontal area -- the left frontal area has to do with language expression.  And if the individual -- yeah, okay.

Q    So over time, I guess, science accumulates these accounts of stroke, disease, accidents and intentional lobectomies, I guess, and you accumulate a body of -- okay, well, we took this bit out, now he no longer does this, so we know this bit did that.  Is that sort of the way it works?

A    That's correct.

Q    And then how do neuropsychologists, without taking bits of the brain out, figure out that the area of the brain -- or that the thing they are testing is working or not?

A    Through the administration of a battery of tests, clinical observation, records available, but through the tests themselves one gets a sense of an individual's strengths and weakness, where they are able to function, where they are adequately able to function, and in some cases where they are not able to function well at all.

Q    When you say strengths and weaknesses, if a person is tested and they present results on the test, are those tests only relevant to them?  In other words, is the strength relative to their weaknesses or relative to their norm or is it relative to a larger group of people?

A    Well, the process of test development is such that the tests are normed.  We develop a sense of what is an average performance on an intelligence test, for example, or at what points is the person better than average and to what extent are they better than average.  So the tests are developed by administration to different populations, numbers of people, different ages, different educational levels, and then, you know, the tests are refined and they are reviewed to -- they are subject to peer review and ultimately they are put out as tests that measure certain kinds of functions.

So, for example, we have tests that measure certain kinds of language functions, we have a variety of tests that measure different aspects of attention.

Q    Let me -- let me stop you for a second.

A    Sorry.

Q    So within any given area that is being tested, you are saying that the test is given to a bunch of people to kind of figure out what is a normal range of functioning for that specific thing?

A    Yes, and to be sure that the test is measuring what it is designed to measure.  So in the process of test develop-ment, they will throw out items that do not measure that function that they are working to assess.  So, yes, once all of that is done, then you have a sound test.

Q    Do they also administer the same test to people --

going back to what you were describing before -- who have known injuries or lesions or something to that area of the brain?

A    Yes, and those are called special interest groups.  So you want to look at language in, you know, normal populations and then you will look at language in individuals who have known damage to the areas that affect language.

Q    And then how do you know or how does a neuropsychologist know what is a normal score versus a high score or a low score?

A    Well, we -- we look at the tests -- there are cut-off sets for what is considered to be an average performance, what is considered to be low average, high average, superior.  So those cut-offs are established in the process of test development and we also are using -- if we could put up a slide -- a --

Q    Yeah.  Well, let me ask you -- so when they administer these tests to people, is there a particular distribution of results that they see during this norming process?

A    Yes, and during that norming process they are then able to establish --

Q    Well, wait.

A    Yeah.

Q    What is that distribution, what does it look like?

A    It is called a normal distribution.  And if a quality

or a behavior is considered to be normally distributed throughout a population, then we are able to place levels of performance according to that normal curve.

Q    And did you prepare a slide to illustrate that for the Court and --

A    Yes.

MR. SCHARDL:  If I could, Your Honor, could I move to the next slide in that deck?

THE COURT:  Yes, go ahead.

BY MR. SCHARDL:

Q    So is this the normal curve, looking at the fourth slide in Petitioner's Exhibit --

A    Yes.

Q    Number 107?

A    Yes.

Q    So this -- is this is what is called a bell curve?

A    Yes.

Q    And I see some -- so there is a vertical line down the center of this -- the highest point of the bell curve. Underneath that there are some numbers written along the -- below the X axis there --

A    Yes.

Q    Okay.  So what do those -- so the first row there along the X axis, what does that mean?  Where it says standard deviations from the mean, what are we talking about ---

A    Yes.  Standard deviations are a statistical way of describing the extent to which a person's performance, on any number of kinds of measures, deviates from the mean, the average performance.  So when we see standard deviations, minus one on the left side -- you see minus one, minus two, minus three, you are talking about degrees -- statistically determined degrees to which an individual's performance is weaker than or lesser than the average performance.

Q    And at what point do you -- or do neuropsychologists say something is above or below average, like outside of that range of normal?

A    Okay.  Once you are beyond one standard deviation, either above or below, you are talking about a performance that may be mildly above to moderately above, mildly to moderately below or -- we use the term impairment when we are talking about -- we are looking for impairment.  We are interested in whether there is impairment and what kind of impairment.  That's what brings a neuropsychologist in.  And so we may find relative strengths where a person is doing exceptionally well, so to the right of average we have standard deviations above the mean, and if a person is performing 1.5 to more standard deviations above the mean there, exceptional in a positive way perhaps...

Q    Let me stop you.  So I think as we get into the testing results, we will see these different expressions, I guess is

how to phrase it, of how he does, but I just want to orient us all here.  So if we see -- looking down the Y axis here of this graph, going below standard deviations in the next row there, it says cumulative percentage.  So these are -- and then below that, Z score.  These are all essentially the same values?  Is that how I am supposed to understand that?

A    Yes, and there is another term you may see from Dr. Young's data, T scores, but they are all ways of describing performances relative to a mean or average.

Q    Thank you.  Lastly with regard to neuropsychological testing, how do we know that -- or do we know that a person's performance on one of these tests tells us anything about how they do out in the real world?

A    One of the ways we assess the value of the test is its -- what's called ecological validity.  So in other words, we want to know whether the performance on the test reflects something about adaptation or behavior in the outside world.  So, for example, there is one test where an individual has to switch -- drawing a line they have got to switch between numbers and letters alternating.  That test has been shown to be -- performance on that test has been shown to be related to driving ability.  So in older adults, at least in the state of California -- I can't speak for other places -- that is one of a number of tests that might be given where there is some concern about an older adult's capacity, for

example, to drive.

I am desperate for some water.  I apologize.

Q    I am sorry.  No, no, please, I am glad you said that.

A    Sorry about that.

(PAUSE)

A    Thank you very much.

Q    So do researchers then take these tests and they look at people's results and then they actually go out and explore whether somebody's daily functioning, I guess, correlates with their test results?  Is that what you are describing, like with the example of driving and drawing the lines?

A    Yes, and in the process of test development.  So at the front end you want to be sure that the test you have constructed is measuring a function that you want to measure and that comes from what is the behavior that you are wanting to -- or the function, the brain function, that you are wanting to assess.

Q    So that process of ecological validity is part of what gets a test accepted as good or something that is relied upon in the field?

A    Yes, exactly.

Q    So moving on to this case and the work done by Dr. Young in this case, in your review of the materials was there anything that caused you to think it was appropriate to do neuropsychological testing in this case?

A    Yes.

Q    What, what gave you an indication that it would be appropriate to test Mr. Barrett?

A    There were a number of what we often refer to as triggers for a neuropsychological evaluation from the time that he was in utero where there may have been maternal alcohol exposure and according to some of the declarations from individuals who knew Mr. Barrett, indeed his mother was drinking.  She was know to be a drinker.  So that right away is a trigger.

A    Let me --

Q    The fact -- I am sorry.

A    Let me ask you this.  So a mother's ingestion of alcohol while she is pregnant, that can have neuropsychological consequences for her fetus?

A    Yes, it is considered teratogenic and that toxicity can influence the development of the brain in utero.

Q    Were there any indications related to Mr. Barrett as a child that suggested it might be appropriate to test him?

A    Yes.  I was going to go on and say that during childhood he had some difficulties at school and was diagnosed with learning disorders, which are another indication for neuropsychological testing.

Q    Were there reports of any injuries to Mr. Barrett as a child that might also trigger testing?

1169

A     Yes.  One of the things I would like to say is that the more triggers you see, the more important it becomes to consider --

Q     Why is that?

A     -- what the effects might be.

Q     Why is that?

A     Because insults to the brain are cumulative or in some ways exponential.  So the more signs and symptoms there are, the more likely there is brain damage, brain dysfunction.

Q     What do you mean it is cumulative?  What does that mean?

A     Well, if you think about the National Football Players, for example, we have now learned that when there is a concussion, if there is another concussion and another concussion, the effects become cumulative.

Q     So we were talking about reports of injury.  Was there any particular report of an injury in childhood that you saw in your review of the materials that were a trigger?

A     Yes.  There were a number of references to Mr. Barrett having been hit with some kind of a steel ball as a child and having been knocked down.  It doesn't really matter, but it is not clear whether he lost consciousness or not, but there can be brain insult even if somebody doesn't lose consciousness.  Additionally, later on there was a record of a motorcycle accident in which there was damage to a right

frontal -- what is called the periorbital area of the brain. And sometimes while you may not see any marked effect, there can be affect internally. So I would consider that to be a trigger as well.

Q    Do you --

A    There was a further incident noted of Mr. Barrett having shot himself and I might then be thinking about hypoxia to the brain, loss of oxygen to the brain, possibly a fall. So, you know, you put that altogether and that's absolutely sufficient for -- actually there was one other factor. Early substance use in Mr. Barrett himself. And when I say substance, I am referring to drugs and alcohol. I do a lot of juvenile justice work, which opposing counsel must know from the list of my testimony, and in juveniles, in -- you know, up until the early twenties, the brain is still developing. So the use of alcohol and other substances is a serious insult to the brain.

Q    Backing up then to the possible prenatal exposure, does it matter when in the course of a person's life and development an injury or an insult happens?

A    Yes.

Q    In what way?

A    Well...

Q    Taking for example, in utero exposure, is that a greater or a lesser risk?

1171

A    It is a greater risk for more diffuse and ongoing difficulties, if indeed it is determined there was that teratogenic effect, because it effects development of the brain in utero and then that individual's capacity to learn and develop outside of the uterus once they are born.

Q    What about an injury sustained at say age eight or nine?

A    It can effect learning and memory, language development.

Q    Why that specifically?

A    Well, those are the times where children are learning. Language is developing exponentially and they are in school and, yeah, they -- and there is the social learning, interacting with other people.  So there is learning to understand language, there is learning to express one's self.

Q    And you are saying that occurs at a different time of life, like that area of the brain develops at a different time of life?

A    That area of the brain is undergoing additional development.  So when you are born, you have a brain and then it is a question -- yes, across the course of one's life and particularly during childhood the brain is continuing to develop.  Synaptic connections are being made, so, yes, indeed.

Q    And you mentioned in adolescence.  What areas are undergoing the greatest development during that period?

A     During that period what is really left in a big way to continue to develop into young adulthood, we now know, are the frontal lobes, the area of the brain that has to do with decision making, thinking, planning, intending, deciding when to do something, when not to do something, being able to orchestrate all of the information that is coming.

Q     So that area of the brain that is responsible for that is undergoing development in adolescence?  Is that what you are trying to --

A     Yes, oh, yes.

Q     And it is, therefore, more vulnerable to damage from something like alcohol or drugs at that stage?

A     The -- yes, the final stages.  Front lobe development is really going on from zero to two, early -- sort of in latency into adolescence and then from late adolescence into early adulthood.  So, yes, if an adolescence is substance using with regularity and excessiveness, it is quite likely that judgment, impulse control, the areas inside of the brain that are subsumed under the front lobes are going to be injured.

Q     Was there anything else in accounts of Mr. Barrett that you read that raised a concern or that suggested it would be appropriate to do neuropsychological testing?

A     Well, as a forensic neuropsychologist, the circumstances of the offense would certainly trigger a

neuropsychologist evaluation because neuropsychological --

neurocognitive function is related to culpability, I mean,

both from a legal perspective obviously with Roper and

Atkins and so forth, but also, you know, from a

neurocognitive perspective.

Q     From a neurocognitive perspective, how does brain

function relate to culpability?

A     Well, if there is --

          MR. WILSON:  Objection, Your Honor, as to the

relevance of this.

          THE COURT:  What is the relevance?

          MR. SCHARDL:  Of culpability in a capital

penalty...

          THE COURT:  Well, I think you are asking for

something that is kind of outside her area of expertise.

Culpability is a legal concept versus the psychological

concepts that she has been testifying about.

          MR. SCHARDL:  Right.  That's why I was asking how

she can relate them to each other, if they can be.

          THE COURT:  Well, all right, let me go ahead and

hear what she has to say about that.

          MR. SCHARDL:  Thank you, Your Honor.

BY THE WITNESS:

A     I understand the difference in the term and maybe

responsibility would be a better term since it does have the

legal connotation, although they are related.  If somebody is intellectually disabled, previously we called that mental retardation, they are considered less culpable because of psychological phenomenon --

Q     That's what --

A     -- which have to do with -- yeah, I am sorry.

Q     That's not really my question, Doctor.

A     Okay, sorry about that.

Q     So my question is -- let me be more specific about it. These areas of frontal lobe function that you were describing, what areas of frontal lobe functioning would be implicated by the circumstances of this case?

A     Do you want me to state specific areas of the brain in the frontal lobe or how would the frontal lobe be implicated?

Q     No.  How, if at all, would the frontal lobe be implicated in the circumstances of this case?

A     The frontal lobe has to do with planning, decision making, deciding, being able to inhibit oneself or deciding that one is going to do something.  So it is very much about thinking about what one might do, what one does, as opposed to simply reacting.

Q     I think you mentioned earlier that the frontal lobe is involved in output of -- is that what you said?

A     Yes.

Q     So it is behavior?

1175

A    Yes.

Q    So how does -- well, strike that.  I apologize.  Let's move on to Dr. Young's evaluation.  Were you able to tell what the circumstances of her evaluation were in terms of where she did it and when?

A    Yes.

Q    And were you able to identify the tests that she administered?

A    Yes.

Q    Were you able to tell whether the tests she administered, the battery that she put together, was that appropriate to the circumstances?

A    Yes.

Q    In what way?

A    Um, the -- okay.  In what way were the tests appropriate?

Q    Well, were they dictated by anything in his background or how --

A    Okay.

Q    Were you able to tell how she chose the battery?

A    Yes.  They were normatively appropriate.  The battery of tests covered the variety of brain functions, so it was comprehensive.

Q    Let me stop you right there.  When you said normatively appropriate, what does that mean?

A      Oh, sorry about that.  Meaning they were age appropriate, they were appropriate to his cultural context, and he would be -- one would be able to compare his performances to the populations on which the tests were normed.

Q      So is there, like, a sort of shelf-life for these tests?

A      Yes, some of them in particular.

Q      Like they should be used by a certain date and like after that you throw them away or what -- is that how it works?

A      It is not quite like that, but, for example, with a test of intelligence, the Wechsler tests have been around for decades.  It will be a century soon enough, but they get updated, they get updated because populations change, society changes.  They also get updated to reflect better technology, better ways of assessing brain function.  The field of neuropsychology is constantly undergoing change.  So we need to update the tests to reflect the most current representation of the population.

Q      Is that so that you know, looking back at the slide, that when you see a result that it fits within the population that is being tested?

A      Yes.

Q      Okay.

1177

A    And I wanted to mention one more thing in answering your question.  Mr. Barrett's hands were not shackled; thus, in that regard the testing and the tests selected were appropriate.

Q    Where was the testing done?

A    The testing was done, I believe -- I believe it may have been at Terre Haute.

Q    And did --

A    In a private face-to-face interview room, which is important so that the standardized testing conditions are met and there won't be confounding variables, such as somebody else sitting in on the testing, which can alter performances, or if it is an open area with others around and that noise can affect the test results.  So it was appropriate.

Q    And were you able to tell the amount of time that Dr. Young devoted to the evaluation?

A    Yes.  I could have estimated it based on having reviewed her test date, but more importantly she noted that she had spent approximately 16 hours with Mr. Barrett.

Q    Let me ask if I could --

MR. SCHARDL:  Your Honor, she said that she noted...if I could ask the clerk to show the witness Petitioner's Exhibit Number 25.  I hope I got that right.

BY THE WITNESS:

A     Thank you.  Would it be acceptable for me to look at my own copy or do I need to look at this copy?

BY MR. SCHARDL:

Q     Just for the time being, if you would look at that one.

A     Yes.

Q     So do you recognize that document?

A     I do.

Q     And is that the document that you looked at to understand what Dr. Young's findings were?

A     Yes.

Q     Did you -- in addition to looking at that document, her declaration, did you have an opportunity to look at other materials that she relied on?

A     Yes, I did.

Q     What were those?

A     I looked at her raw data.

Q     What does that mean, "her raw data?"

A     That's a very good question.  I was provided the numbers that she generated based on having conducted the testing, some of which was on score sheet protocols that one purchases in order to use the tests and some were her reports of numbers when there isn't necessarily a score sheet, but I was able to look at all of the notes on the test protocols and administered tests -- yes, go ahead.

Q     So these tests, are they all, like, paper and pencil

tests?

A    No.

Q    But some are?

A    Yes.

Q    And are they -- so I assume did you -- where there was a pencil and paper test, is that included into the category of raw data?

A    Yes.  So, for example, if drawings were rendered...

Q    Okay.  So you were able to determine the amount or she reported an amount of time that she devoted to the evaluation.  And what was that?

A    16 hours.

Q    And did that seem inappropriate to you as far as the number of tests that were administered and the time it takes to do that?

A    No, not at all.

Q    Now, did Dr. Young do anything to tell whether Mr. Barrett was trying to game the tests?

A    Are you referring to whether he attempted to malinger or for any other number of reasons had suspect effort?

Q    Yes.

A    Yes, she did evaluate his effort throughout the time that she was evaluating him.

Q    How do neuropsychologists figure out whether an individual is putting forth their best effort?

A    We and the leading neuropsychological bodies recommend highly that any neuropsychological evaluation should include what we call embedded effort tests and standalone effort tests. Standalone effort tests are measures that are developed simply to determine if a person is exerting full effort. It doesn't necessarily tell you why because somebody could have back pain, for example, and not able to pay attention or somebody could be feigning, but in administering those standalone tests one has actual measures of whether a person made his best effort. In addition, within existing tests, neuropsychological tests, there are elements in the tests that we can look at to determine whether a person is making his best effort. For example, if it is a test of increasing difficulty, you would expect to see what is called a negative performance curve where the person does well up 'til the point the items are too difficult. If you see variable effort and they get some of the most difficult ones right and some of the least difficult ones wrong, you know, that might cause you to suspect a problem with effort.

Q    Okay. Did Dr. Young do anything to determine whether Mr. Barrett was incapacitated in some way physically, for example, like whether he was ill?

A    Yes. In her clinical interview and behavioral observations, she asked about injuries, medication, other sources that might contribute to his performance adversely or

1181

positively in that regard.

Q   Physiologically was there anything significant that she reported that could have affected his performance?

A   No.

Q   What about as far as any psychiatric condition?  Was there anything significant in her clinical observations?

A   Yes.  And I can tell you what that is, but it raises an important point.

Q   Can you tell us what it is?

A   Yeah.  She described Mr. Barrett's manner as hypomanic.

Q   What does that mean?

A   Well, fast.  So, for example, pressured, fast, he would talk fast.  A couple of times he apologized because he had started to respond before she had finished providing an instruction or asking a question.  So that's relevant in the sense that that might be something she was measuring.  At the same time one could also wonder whether it was an impediment.

Q   Okay.  What about any medicines that he might have been taking?  Did she inquire as to whether he was taking anything that might impair his performance?

A   Yes.

Q   And was there anything?

A   No.

Q   Okay.  So you mentioned that there was these stand

alone, I think was the phrase you used, measures of effort. How many of those did Dr. Young administer?

A    She administered three different tests of three different types, but basically they are memory tests, three different kinds of memory tests.  And he made full effort, he passed.  We talk about passing and failing these kind of measures and he passed them all.

Q    Indicating that he was exerting his best efforts on these?

A    Yes.

Q    And these are -- are they sort of like designed to trick the person, like to, you know, make them think that what they are doing would produce a certain result, but it wouldn't?

A    Yes.  They are designed to look difficult.  For example, one of the tests is designed to look difficult, but it really isn't difficult.

Q    Okay.  And then you mentioned that there were embedded measures.  Are those just sort of throughout the battery or is there anything in specific?

A    They were -- they are present throughout the battery. She commented on a couple of the embedded effort measures. I am aware that there are others within the battery of tests she gave.  So in reviewing the data, I was able to look at those myself to determine whether her opinion was sustained

and --

Q     Okay.  In total --

A     It solidified it.

Q     Okay.  In total was there any reason to question whether Mr. Barrett was giving his best efforts?

A     No.

Q     So he passed all of these standalone measures?

A     He passed the stand alone and the embedded effort measures.  There were aspects of clinical observations she pointed to that told her he was making his best effort.  For example, asking to go back on an item he failed and to have a chance to do it again, which you can't do, but it showed his interest.  There was another I picked up on when he was given a spelling test that even though the words weren't necessarily all spelled properly, especially as they became more difficult, he spelled them correctly phonetically.  And if you have ever seen a child with phonological processing difficulties, they don't have an easy time spelling words or reading them correctly and he clearly was making an effort.

Q     Moving on to the overall tests, the list of tests that Dr. Young included in her battery, can we just run those off?  If you could just list them and -- and I think -- did you prepare a slide as well to list those for the Court?

A     I did.  I thought that might be easier and not ad nauseum if you could just see the list.

1184

MR. SCHARDL: Could I turn to slide 5, Your Honor?

THE COURT: Go ahead.

MR. SCHARDL: Thank you.

BY MR. SCHARDL:

Q    That is up there now. This is 1 of 2, I think that lists them.

A    Correct.

Q    So I would like to -- before we get into the details on each individual test, if you could just, as we go down this list, tell the Court generally what each test measures. So beginning with this first list, WAIS-IV, what does that stand for?

A    I apologize. That's the Wechsler Adult Intelligence Scale, 4th Edition.

Q    Okay. So what does that measure?

MR. WILSON: Objection, Your Honor. I am going to interpose an objection to this witness testifying about any results from the Wechsler-IV. That test was not available at the time that any of this testing could have been performed on Mr. Barrett at the time of trial. So any testing as a result of that is irrelevant to this determination.

THE COURT: Mr. Schardl, what do you say about that?

MR. SCHARDL: Well, Your Honor, that's a legitimate

concern and an objection that we raised previously and that the Court overruled, I think, but Dr. Miora will speak to why the WAIS-IV as opposed to the WAIS-III, which was the one in use at the time of trial, and I think she will describe how it is necessary to use the IV because that's the one norm for the time period in which the test was administered.  So she can relate it to whether it would produce the same results if the III was used in 2005.  It is strictly a matter of their protocols.

THE COURT:  Isn't this similar to the issue that arose regarding which version of the DSM applied?

MR. SCHARDL:  I would say yes and no, Your Honor. It is -- with the DSM you are talking about a whole diagnostic system, a set of criteria.

THE COURT:  But the witness, as I recall, wanted to relate -- wanted to testify a couple of times with regard to it would have been the same under DSM-IV than it was under DSM-V and we didn't let him do that, as I recall.

MR. SCHARDL:  Correct, because he hadn't reported anything about that.  And I believe there is something in Dr. Young's declaration that explains why she was using the test that she used.  If the Court will give me just a minute, I will look it up.

THE COURT:  Sure, go ahead.

(PAUSE)

MR. SCHARDL: I don't see it specifically, Your Honor. It is just the point that Dr. Miora was making before that the tests have to be -- the difference between the DSM and the test is the DSM is an overall classification scheme. Here the test is being given in a specific point in time. The condition of the individual has to be measured against the population for which that -- that is contemporaneous. So you can't administer -- well, you can, but you would have to make certain mathematical adjustments if you administer a test that was not normed for the time you are giving it. So there is this thing called the Flynn effect and - so I guess I could have the witness discuss that, but it is apples and oranges, I guess, is the point. The DSM has a separate set of criteria. The WAIS-IV and the WAIS-III apply the same criteria, they are just using different normative numbers. So there is a test of intelligence and we know how it measures it. The test itself is a refinement. It is not a different test, it is just a different set of norms.

THE COURT: Well, Doctor, is there any reason why -- even though the current test would have been a WAIS-IV, is there any reason why they couldn't have tested according to WAIS-III?

THE WITNESS: Well, the reason would be having to do with the norms and that it might over --

THE COURT: I mean, but you still have the norms

1187

around for a WAIS-III, don't you?

THE WITNESS:  Yes, but I don't know that the Flynn effect was accepted back then.  So there would have had to have been a statistical correction made that may have been called into question.  And as neuropsychologists if you feel ready to use a new instrument, we are encouraged to do so.  So, in fact, she was -- I understand the legal issue, but she was complying with --

THE COURT:  But understanding that the appropriate time frame would have been at the time this case was tried, wouldn't that have been a reason to use the previous norms?

MR. SCHARDL:  Well, that's the issue, Your Honor. It is inappropriate to apply the norms from one time period to a test that is administered at a different time period. That's what the normalization process is about in part.

THE COURT:  I am going to sustain the objection.

MR. SCHARDL:  Well, we would like to offer Dr. Young's declaration, Petitioner's Exhibit 25, as a proffer, paragraphs in particular 39 through 42.  And I would also say that Dr. Pitt did testify regarding -- he didn't identify the DSM-IV-TR, but he reached the same conclusion by stating that based on his training and experience and the work that was being done at the time, he would have reached the same conclusion, which I think is mutatis mutandis what Dr. Miora would be testifying to here.

(PAUSE)

THE COURT:  Well, let's go ahead and hear the testimony with -- bearing in mind that I may or may not take it into consideration, depending on whether I decide it is relevant or not.

MR. SCHARDL:  Okay, Your Honor, thank you.

BY MR. SCHARDL:

Q    Okay.  I think we were just on the list.  So, Dr. Miora, the Wechsler Adult Intelligence Scale IV, what does that measure?

A    I would like to start by saying that it is not formally a neuropsychological test instrument, but in a neuropsychological assessment we evaluate intellectual functioning.  That is what it measures and it measures different facets of intellectual functioning through performance on a series of what are called sub-tests and out of which are derived index scores, which I'll get into later, and a full scale I.Q. score.

Q    It is a measure of intelligence?

A    Yes.

Q    Along different areas?

A    Yes.

Q    Okay.  Moving to the next test there, the WRAT-III.  What is that?  What does WRAT-III stand for?

A    My apologies again.  It is the Wide Range Achievement

1189

Test 3rd Edition.  This is a -- essentially a measure of academic function.  It is not a brain function per se.  It measures reading, spelling and arithmetic, word decoding, word encoding and arithmetic skills.

Q     And the next test listed there, the Smell Identification Test.  What on earth does that have to do with a forensic case?

A     The Smell Identification Test evaluates olfactory functioning.  So you are exposed to different scents and asked to determine what they are or which one is lime, you know, that kind of thing.

Q     Why in a forensic case would you --

A     In a forensic case and where there is a question of brain damage and head injury, and specifically frontal dysfunction, it is helpful to see because of the area of the olfactory bulbs (sic) in the frontal region of the brain, which have to do with smell, how someone functions.

Q     All right.  The next test administered there, the Reitan-Klove Sensory Perception Examination, what does that do?

A     Yes.  That examination is a bit complicated.  It covers several different functions, but basically it has to do with the sensation of, you know, somebody's ability to discern different sensations.

Q     Physical sensations?

A    Yes.  And they've got to be able to use the regions of the brain, the parietal lobe and other regions, to be able to make those discerning recognitions.

Q    Is that tactile perception or like -- I mean, I am assuming that sensory perception, that covers olfactory and taste and everything.  So what specific sensory perception is being --

A    This is touch and --

Q    And --

A    Yes, tactual or tactile.

Q    What is the Finger Tapping Test?

A    The Finger Tapping Test is a test measuring speed of -- it is a motor test, but it is really just a test of motor speed where a person taps on a finger tapper.

Q    And Dr. Young administered that as well?

A    Yes.

Q    And what is the next test listed there and what does it do?

A    The Grooved Peg Board is another motor test.  I missed an important point.  On each of these tests, the Finger Tapping Test and Grooved Peg Board, one is able to compare performances between an individual's preferred hand and non-preferred hand or dominate and non-dominate.  The value in that is possibly being able to lateralize brain damage to one hemisphere, the left hemisphere or the right hemisphere.

The finger tapper is really just a measure of psychomotor speed.  Whereas, the Grooved Peg Board Test is more complicated.  It has to do with fine motor coordination.  So you are evaluating a more complex aspect of motor function.

Q    Okay.  What's the next test that Dr. Young administered?

A    The Seashore Rhythm Test is -- both the Seashore Rhythm Test and the next one, the Speech Sounds Perception Test, are measures of attention.  You know, rhythms, that's an aspect of temporal lobe function, being able to discern rhythms.  As well as the Speech Sounds Perception Test is looking at discerning differences in different sounds.

Q    So we have gone from olfactory, scents, smells, tactile senses, motor speed, the speed at which he can move his fingers, I guess, and now we are talking about his ability to take in auditory information; is that correct?

A    Yes.

Q    Attend to it?

A    Uh-huh, attend to it and make distinctions, yes.

Q    Now, on the -- what's the next test that Dr. Young administered?

A    The California Verbal Learning Test 2nd Edition.

Q    And what does that measure?

A    That measures in general or overall auditory verbal

learning.  It measures different aspects of auditory verbal learning, including the initial registration of verbal information and then the retaining of that verbal information and then being able to call it up both on a short-term basis and a long-term basis.

Q    So that would come from attention -- like can Kenny pay attention to auditory information and then it is whether he actually takes that in; is that correct?

A    Yes, whether he processes it and whether he can learn over time if he is repeatedly exposed to it.  It is a list learning task.

Q    So are those different, the idea of immediately recalling the information and learning it over time?  Are those different neurocognitive functions?

A    Yes.  There is frontal function, there is temporal function, yes, it is complex.

Q    Now, what's the next test that Dr. Young administered?

A    I don't know if I am looking at this -- we need to go to the next slide, I think.

Q    I am sorry.

       MR. SCHARDL:  Can I go to the next slide, Your Honor?

       THE COURT:  Go ahead.

BY MR. SCHARDL:

Q    It is called the Wechsler Memory Test 4th Edition.

MR. WILSON:  I am going to renew my objection.  I believe this test was also not available at the time of the original testing back at the time of trial.

THE COURT:  I am going to go ahead and reserve a ruling on the relevance of that test, but we will go ahead and hear what the doctor has to say about it.

MR. SCHARDL:  Thank you, Your Honor.

BY MR. SCHARDL:

Q     So the Wechsler Memory Test, what does -- I assume it tests memory?

A     Yes, but I have to say there is an error.  It is the Wechsler Memory Scale.

Q     Oh, I am sorry.

A     It is WMS, just so you have that correctly.  I apologize.  It measures different aspects of memory, both immediate memory and delayed memory, as well as recognition and in different spheres.  Again, auditory/verbal information, visual information, and different aspects of each of those systems as well.

Q     So someone can -- you measure these separately, auditory/visual memory separately?

A     Yes.

Q     What's the next test that Dr. Young administered?

A     The Rey Complex Figure Test.

Q     What does that look at?

A    That looks at certain motor function to some extent, but also visuospatial, visuoperceptual function.  So it actually incorporates different areas of the brain.  You have to be able to perceive the figure that you are being asked to copy.  It also deals with memory because you are asked to draw it from memory, both shortly after you've seen the copy and drawn the copy and then you are supposed to render a copy later.  So that's Delayed Recall Visual Memory.  It also measures what we call right frontal function, organization.  This is a complex figure and they have got to be able to perceive it and organize it and render it, which is output again, frontal function.  So it is a complicated and useful test.

Q    And what's the next test that Dr. Young administered?

A    I don't know what an Executive Functioning Test is.  I think that supposed to say the Delis-Kaplan Executive Function --

Q    Okay.  So you --

A    -- System.

Q    Delis-Kaplan Executive Function System?

A    Yes.

Q    Is that just one test?

A    It is a set of tests.

Q    And --

A    Normed together and administered as a battery of

1195

executive functioning.

Q    And again, executive functioning is what?

A    Executive functioning is what I described as frontal functioning, making decisions, being able to switch back and forth and to alternate between different stimuli, being able to respond to one target stimulus while ignoring other stimuli.

Q    Okay.

A    Being able to reason conceptually.

Q    All right.  So we've gone from sensory testing to attention testing to memory, different auditory and verbal... do I have that right?  Auditory and visual, correct, do I have it right?

A    Yes.

Q    And different tests of memory, immediate, delayed, long-term; is that correct?

A    Verbal and visual.

Q    Visual, yes.  Okay, and now we are into executive functioning.  And there are all of these -- what you've described as subcategories that, I guess, we will get into. What's the next test that she administered?

A    The next two tests actually are also tests of executive function, problem solving and abstract reasoning.  The Wisconsin Card Sort Test and the Short Category Test.

Q    Are there any other tests that Dr. Young tried to

administer?

A     She aborted an effort to administer the Paste Auditorial Serial Addition Task or Test, I am sorry, which is a test of attention as well, but complicated.

Q     Why did she abort it?

A     She reported that having given the instructions several times, Mr. Barrett still did not really understand the instructions and at that point, the appropriate thing to do is discontinue it.

Q     So is that it?  Are those all of the tests that we've got?

A     I believe so.

Q     How would you characterize that battery?  Is that normal, unusual?  How do we understand that?

A     I would consider this a comprehensive, well-selected battery of tests to assess overall brain functioning and the brain functions more specifically, as well as effort.

Q     And I think you mentioned this earlier, but did you go back and look at the raw data and see what results the raw data produced?

A     Yes, I rescored the data myself.

          MR. SCHARDL:  If I could ask the clerk to show you Petitioner's Exhibit 106.

BY THE WITNESS:

A     I have it.

BY MR. SCHARDL:

Q    Okay.  Are those the scoring sheets that you produced based on Dr. Young's raw data?

A    Yes, although some of them are actually hers because they were the same and I just reproduced them.

Q    So they are a combination of --

A    Yeah.

Q    So having reviewed the data and scored it, can you give us sort of an overview of what the test battery showed about Mr. Barrett, just in broad strokes what are his areas of strength and weakness and normality?

A    Yes.

Q    Let's start with his strengths.  What are his greatest strengths?

        MR. WILSON:  Judge, I would just ask for a continuing objection regarding the Wechsler test, both the I.Q. test and the memory test.

        THE COURT:  Doctor, what can the results of a WAIS-IV test administered in 2009 tell us about what you would have gotten with a WAIS-III test administered in 2005, if anything?

        THE WITNESS:  They reveal what you would have seen in 1995 or 1999.  What did you say?  I am sorry.  Could you repeat that?

        THE COURT:  Well, 2005.

THE WITNESS:  2005, yes.  They show performances on the tests, most of which were included in the WAIS-III and in the areas of function that both tests evaluate, verbal, comprehension, perceptual reasoning, working memory function and processing speed.

THE COURT:  So, in other words, so it is your belief, anyway, that whatever you discovered or whatever was discovered in 2009 would be substantially the same as what would have been discovered in 2005?

THE WITNESS:  Yes.

THE COURT:  And what about intervening circumstances?  Would that have made any difference?

THE WITNESS:  It would depend on the intervening circumstances.  It might.

THE COURT:  Right.

THE WITNESS:  If he had had a serious heart attack or, you know, other kinds of -- you know, there could be circumstances that would have to be considered.

THE COURT:  Right.  Well, I am going to -- as I said, I am going to reserve ruling on your objection, but I want to hear the testimony.

MR. SCHARDL:  Thank you, Your Honor.

BY MR. SCHARDL:

Q    Okay.  So I think I was asking you for sort of a broad overview and the first question is, what were Mr. Barrett's

particular strengths on the battery that Dr. Young

administered?

A     And -- well, okay.  Relatively speaking, he has a
strength in verbal -- in the auditory verbal area.  This
covers such a broad range.  Do you want me to get into
specifics?

Q     We will get into the specifics later.  I want to talk
about the -- in broad terms right now.  So auditory/verbal
information is a strength for him?

A     Yes, verbal comprehension, verbal expression, verbal
memory to some extent.

Q     And what were particular areas of weakness for Mr.
Barrett?

A     Particular areas of weakness were problem solving,
abstract reasoning, attention, planning...please give me a
moment, I am looking at my score sheets.

Q     Sure.

A     When he was required to alternate between two different
sets of stimuli, going back and forth like I was describing
with numbers and letters, tasks that required him to inhibit
one response in favor of another were difficult for him and
an area of weakness.  I would also add working with
information on line or in his head, in the moment or on his
feet was an area of difficulty, which relates to attention
but it is more than attention.

Q     So working with information on line...contrast that with some other way of working with information so we can have some idea of --

A     Here is an example.

Q     Okay.

A     A trial attorney has to be on his feet and thinking and working at the moment and working with what comes up in the moment and responding to it as opposed to sitting and researching for trial where you don't have time pressure necessarily and you are working at your own pace and -- yeah, go ahead.

Q     So time sensitive, things that are timed Mr. Barrett did more poorly on than things where he could take his time and do it at his own speed.  Is that what you are saying?

A     Or needed to pay attention very quickly and generate a response.

Q     And are there things in Mr. Barrett's history that you've looked at that make that pattern of strengths and weaknesses either make sense or not make sense?  How do you relate that pattern of strengths and weaknesses to his history?

A     Well, in cases of brain injury or head injury often what gets blown out right away, regardless of where the head injury occurred, is attention and processing speed.  So head injury, substance use, attention deficit, which was

diagnosed, learning disorders, those kind of difficulties are consistent with his problems in attention and processing speed.

Q    What is --

A    As well as -- pardon me, I am sorry.  There is another factor which is that him being strong with verbal information, that is stuff that is learned.  We learn the definition of words, you know, learning a list that is given to you a number of times.  In those kind of situations he does much better relatively speaking than in situations that are novelle and ever changing.  And that's what I meant about being able think on your feet.  You've got to be able to respond in the moment to whatever is going on.  It is very different functions.

Q    What areas of the brain are involved in those areas where he showed particular weakness on the testing?

A    Temporal lobe, frontal lobe, parietal lobe, but I think that the two main areas would be the frontal and temporal lobes that are implicated.

Q    So now I would like to move into the specifics, the specific tests that were administered.

MR. SCHARDL: I note, Your Honor, that it is five minutes until twelve and I am about to get into the details of this thing.  If the Court might be interested in a lunch break at this time, this would be a natural breaking point

1202

in the examination.

THE COURT:  Very well.  Let's go ahead and take our lunch break.  Be back at 1:00.

MR. SCHARDL:  Thank you, Your Honor.

(11:55 a.m.)

(LUNCH RECESS)

(1:00 p.m.)

COURT IN SESSION

THE COURT:  Go ahead, Mr. Schardl.

MR. SCHARDL:  Thank you, Your Honor.  Your Honor, may I correct something that I said before the break?  I think I made a mistake.  I think I reversed -- in our discussion of what was available or unavailable in relation to Dr. Pitt's testimony, I think I stated it backwards.  Dr. Pitt relied upon diagnostic criteria published in 2013 throughout his report and that was all admitted.  And he relied upon BOP documents that did not exist at the time of trial and I believe his testimony regarding that was admitted and I think I earlier had stated the opposite.  So I just wanted to correct myself.

THE COURT:  Very well.  Go ahead.

MR. SCHARDL:  Thank you.

DIRECT EXAMINATION CONTINUED

BY MR. SCHARDL:

Q     Dr. Miora, going back to the intelligence testing that

1203

Dr. Young did, the WAIS, was the WAIS itself, the Wechsler Adult Intelligence Scale, has that been around for a long time?

A    Yes.

Q    How long?

A    For seven some decades.

Q    And the version of the test that Dr. Young administered was the WAIS-IV, I think you said?

A    Yes.

Q    The criteria that the WAIS-IV used to measure intelligence, what are the components of that?

A    Attention or what they call Working Memory Index, processing speed, which is a processing speed index score, verbal comprehension, which is the Verbal Comprehension Index score and perceptual reasoning, which is the Perceptual Reasoning Index score.

Q    And how long have those components been a part of the Wechsler Adult Intelligence Scale?

A    They were a part of the III and they were a part of IV.  Prior to III, the processing index score was not included.

Q    And what is the reason that companies release new versions of -- or is it a version or a -- I guess, yeah, a new version of the test?

A    The new version of the test was prompted by the fact

that so many years had passed that the normative population that had been used in test development back in 1997, I believe, for the III is not the same as the people on whom the test might be normed.  So it was outdated norms that prompted the development.

Q     When you say norms, are you referring back to that slide we looked at before with the bell curve, like normal is -- when you say norm, normal is the center of that bell curve?

A     Right.  And the idea that any measure on that bell curve was part of the -- yes, there was a population upon which that was established, the normal bell curve and any-thing in or out of it.

Q     So you are saying that after time, as I understand it, the normative data for the older version is no longer good?

A     Right.  It kind of times out, so to speak.

Q     What was Mr. Barrett's full scale I.Q. on the WAIS-IV?

A     Do you want the slide up?  No?

Q     You could just give us the number.

A     Okay.  It was 82, which is at the 12th percentile.

Q     And where does that fall in the bell curve?

A     Low average.

Q     And is that the only thing that one would look at when examining results on tests like the WAIS?

A     No.

Q    What other components do you look at?

A    Well, you look at the index scores that go into the full scale I.Q.

Q    What are the index scores -- can you just name the index scores for the WAIS?

A    Yes, those are the ones that I just named, the verbal comprehension, perceptual reasoning, processing speed and working memory.

Q    Okay.  And were there any domains or subtests where Mr. Barrett's performance was impaired on the WAIS?

A    Yes.

Q    Which were those?

A    Are you asking about subtest scores or index scores that come from the subtests?

Q    I appreciate that.  Perhaps let's clarify that for the Court.  When we say index score, what do we mean?

A    Each index score is made up of various subtests.  So, you know, the person is tested on the 10 standard subtests, they get scored and then out of that are derived the index scores.

Q    So the index score is sort of an amalgam of the scores on all of these subtests?

A    Yes, a composite and then the full-scale I.Q. is the, you know, Crem de la Crem.  Although if there are variabilities in the index scores, it is very important to

consider those because they may inflate or lower a full scale

I.Q. score.

Q     And was there a variability in Mr. Barrett's index scores?

A     Yes.

Q     And did you prepare a slide to illustrate that for the Court?

A     I did.

THE COURT:  Can I show the Court -- I don't know what number I am on here, but -- this would be slide 8, I think, in the deck.

THE COURT:  Go ahead.

BY MR. SCHARDL:

Q     Okay.  Looking at this slide, Doctor, that says intellectual functioning, what are the index scores that are of a significant difference that you were talking about?

A     The Processing Speed Index score, the bottom score there where it says standard score of 65 --

Q     PSI, the row PSI?

A     Yes, which stands for Processing Speed Index.

Q     Okay.

A     It is significantly lower than any of the other index scores.

Q     And why is it important or is it important that that one score is significantly lower than the others?

1207

A      Yes, it is significant because it speaks to a particular area of deficit.  In addition, coupled with the lower working memory index score, it tells us that the full scale I.Q. score is probably not an adequate representation of Mr. Barrett's abilities.

Q      So what was his percentile rank on the processing speed index?

A      It was a the first percentile.

Q      And what does that mean?  Can you translate that into something that isn't statistics?

A      It means that 99 percent -- I am sorry, that's statistics again.  Most people, 99 percent of age matched cohorts, would do better than he on those kinds of tasks.

Q      Now, what exactly is processing speed?

A      This version of processing speed has to do with the ability to visually scan, analyze and associate material and select from a -- well, there were two different aspects of it, but basically it involves visual attention and quickness, speed.

Q      Were there other -- are those the only index scores? that you wanted to call to our attention on the WAIS?

A      There is a global general abilities index score, which I apologize for not having up there.  If you could hang on a moment...(PAUSE)  the general abilities index score is calculated if you see this kind of variability that is

significant.  It is statistically significant in terms of the -- you know, the manual and it also -- just even eyeballing it to see an 18 point spread between the two lowest scores is significant.  Just a moment...(PAUSE)  Okay.  I am looking at the WAIS-IV printout that I generated.  I apologize for the delay.  I don't have it.  So the basic idea is his score would be a bit higher, the full scale I.Q. score because it would be made up of the verbal comprehension and the perceptual reasoning tasks.  So it would be in the low 90s rather than at 82.  It shows areas of deficit and it neglects to show the strengths, which we've discussed.

Q     Now, whenever you administer a test like this are you able to test the person's functioning at some time in the past?  Is it going to give you a picture of their performance at some date in the past?

A     I have a compound answer, yes and no.

Q     Fair enough.  Okay.  Can you explain it?

A     Yes, in the sense that some of the functions measured are what they call hold functions or hold tests.  For example, the meaning of words is something that you learn and you will know.  You don't lose that as quickly as you might with a not hold test like attention.  Attention -- that can be long-term problems and -- and, you know, it can be in the moment, but I am not sure I am answering the question you are asking.

Q      Would you also -- when administering tests would you look back at other tests that were done in the past?

A      Absolutely.

Q      To check for consistency?

A      Yes.

Q      Hypothetically if you knew that Mr. Barrett had been given a WAIS back in 2002 and you knew that his verbal score in 2002 was 99 and his performance in 2002 was 93, would that be consistent with the results seen on the WAIS-IV in 2009?

A      Yes, and the confidence interval, the range within which the real score would be expected to fall, is a good way of thinking about that.

        MR. WILSON:  Your Honor, I need to object because I am not sure where counsel is getting the numbers.  So I am just asking if -- for some explanation of where those numbers are coming from.

        THE COURT:  Well, I think they were hypothetical, weren't they?

        MR. SCHARDL:  I believe that's right, Your Honor.

        THE COURT:  Okay.

        MR. SCHARDL:  But for the record, if it assists, I was drawing on Dr. Sharp's report from 2002.

        THE COURT:  Okay.

BY MR. SCHARDL:

Q      Moving on, Dr. Miora, were there other measures on --

or measures on the WAIS that you thought were significant in this case?

A    Yes.

Q    What were those?

A    Within the area of perceptual reasoning, his matrix reasoning score of 9 -- I am sorry -- of 7 as compared to his scaled score of 10 on block design is a one standard deviation difference.  The 10 is at the 50th percentile.  So when he is asked to put blocks together to make them look like designs, he has an average performance.  By contrast, when he was asked to look, visually attend to puzzles of increasing complexity --

Q    That's the matrix?

A    Yes.

Q    Okay.

A    He was less capable.  And while the score is only at the low average range, that difference relative to other scores in the battery -- that's how you develop a profile, is by looking at things that are similar and different across the test.  So that will become useful when we go over some of the other results.

Q    Are you --

A    And the other thing, I guess I mentioned, was his working memory index was lower than the other two categories and is significant in thinking about his having had

1211

attention difficulties, was having time registering digits of increasing length, numbers, and being able to recall them back or recall them in reverse and also putting together numbers and letters.

Q    Are you familiar with the repeatable battery for assessing neuropsychological symptoms?

A    Yes.

Q    The RBANS?

A    Yes.

Q    And are you familiar with that battery having an index for attention?

A    Yes.

Q    Hypothetically you knew that Mr. Barrett had a --

        MR. WILSON:  Objection, Your Honor.  This goes beyond the scope of any declaration, any raw testing data, anything provided to the government as a part of this particular witness's testimony.  I am going to object to any reference to RBANS or questions about RBANS.

        THE COURT:  Did Dr. Young use the RBANS?

        MR. SCHARDL:  No, Your Honor.  But if I may, in notifying the government of Dr. Miora's testimony, we stated that she would be prepared to testify to anything in either of her two declarations or in the declaration of Dr. Bigler. And Dr. Bigler did specifically refer to the administration of the RBANs in this case.  Again, it is a hypothetical

question about testimony that has already come in.  The Court

has received testimony about the administration of the RBANs

in this case.

THE COURT:  Objection sustained.

BY MR. SCHARDL:

Q    Doctor, I think you testified before that you would

look for consistency across different measures; is that

correct?

A    Yes.

Q    So on the attention on the WAIS, where was Mr.

Barrett's performance?

A    Attention on the WAIS was at the 13th percentile, which

is in the low average range.

Q    The 13th?  Can you tell me what you are looking at

there?

A    The Working Memory Index score.  You are talking about

attention on the WAIS?

Q    13th percentile?

A    Yes.

Q    Was there anything about Dr. Young's assessment of

sensory and motor functions that you found significant in

this case?

A    Yes.

Q    What was that?

A    Mr. Barrett's performances ranged from extremely low

to mildly to moderately impaired on finger tapping, which is more a measure of a speed.  On the grooved peg board he was one standard deviation below the mean on a task that required more fine motor coordination.  Additionally he performed very poorly on the tactile number recognition, the Reitan Klove Sensory Perceptual Examination.

Q     And what's the significance of that?

A     It tells the examiner that there is information that is not getting to his brain.  He is not able to process it. What they do in the Sensory Klove is to draw numbers on your fingers and it is a task that most people can complete.  He did very poorly on it suggesting there is something interfering with that information getting to his brain at a sensory level, as well as I've already talked about visual attention.

Q     And what areas of the brain are involved in that --

A     I was going to say the parietal lobe is very involved in that.

Q     And the parietal lobe, that's behind the front lobe; is that right?

A     Yes.

Q     And above the temporal lobe?

A     Yes.

Q     Sort of at the top side of that?

A     Exactly.

Q     And is that consistent with the results seen on the WAIS?

A     Uh...

Q     Or are they measuring just completely different things?

A     I would say they are measuring different things.

Q     Moving on to the next area of Dr. Young's testing, how did she go about assessing attention and concentration?

A     Okay.  In terms of attention and concentration, that area was covered by some of the subtests on the WAIS, like coding and simple search, which are tasks which require visual attentional focus and then executing an action.

Q     Let me take those one at a time.  So coding, how long have people used this coding task to measure attention and concentration?

A     That's been around for decades.

Q     And what is it?  What is the test?  How does it work?

A     The way the test works is that an individual sees at the top of the page boxes.  There are numbers in the top part and there are special marks in the bottom part with each number having its own mark.  And then what they are to do is on a sheet below that model, they are to fill in boxes with the special marks that should go there, according to the key, and they are supposed to do it as quickly as possible. It is called an associate of learning task, but hopefully if your working memory -- you know, if you are processing, after

1215

a while, you know, you continue to remember what the mark is for the one or the nine or the six.  They are simple marks.

Q    So his performance should go up?  Is that what you are saying?

A    Yes.

Q    Okay.  And how did Mr. Barrett do on coding?

A    He performed at the second percentile on that task.

Q    Okay.  And that means that 98 percent of the population performs better at that?

A    Yes, and his score is two standard deviations below the mean, which is when we are talking about moderate impairment.

Q    Okay.  Moving on to simple search, how does that test work?

A    The way that test works is the individual looks at a sheet on which there are two symbols.  They have to deter- mine if either of those symbols appears in a next row of symbols and they have a number of these items to do as quickly as possible.  These are both timed tasks, so time is key, visual attention is key, and being able to perform them as quickly as possible is key.  And he clearly has a weakness, a significant weakness in that area.

Q    What was his score on that?

A    His score on that was a scale score of 3, which is at the first percentile.

Q    Meaning that 99 percent of the population did better?

A    Yes.

Q    Right.  And that is, again, a test of attention?

A    That's a test of attention.  Attention is a complex system.  This is a test of his capacity to focus and execute.

Q    Focus and execute.  Focus and attention sound synonymous to me.  How does -- what's the difference between what's being measured there and on the coding?

A    Coding is also a focus and execute test.

Q    Oh, okay.  All right.  What other specific tests of attention and concentration did Dr. Young rely on?

A    The digit span task, the letter number sequencing task.  Those are both on the WAIS.  The start of the list learning task that I was talking about, all of those involve being able to encode information.  You have to attend in order to be able to encode.

Q    And digit span, has that been around for a long time?

A    Yes.

Q    And can you tell the Court what you mean by digit span?

A    What happens is the individual is read a series of numbers.  The numbers increase in length, so it gets harder and harder, and they have to repeat them back.  A second portion of the task involves them being read numbers, so auditory verbal.  And then they have got to repeat them in reverse.  So you see where there is kind of a working memory component because they have got to take what they've heard,

hopefully they have registered it, and then reverse it, the order.  So that's the thinking on your feet in a very basic way.

Q    And how did Mr. Barrett do on that?

A    He obtained a score one standard deviation below the mean at the 16th percentile.

Q    Is there a test called the trail making test that you were referring to before, the drawing lines between the -- it is like connect the dots?

A    Yes.

Q    Is that basically it, connect the dots?

A    Well, it is connect the dots.  However, it might be ignore the other dots or it might be letters and numbers. There are a number of different conditions and he showed some difficulties in some of those trail making tasks.

Q    And what is that measuring?

A    That is -- well, if we could pull up the slide, it might be helpful for people to see it.  If you can't find it, I understand.

Q    Which one...is that the --

A    There is one where the focus is -- oh, you've got it up.  Okay, thank you.

        MR. SCHARDL:  Your Honor, is that okay, if I show the Court that, slide 10 of the deck?

        THE COURT:  That's fine.

MR. SCHARDL:  Thank you, Your Honor.

THE WITNESS:  My apologies for not having page numbers also.  That was definitely a limitation on my part.

BY THE WITNESS:

A    You see TMT visual scanning, so it is tell us, once again, that when he is asked to visually scan, that is an area of impairment.  He got what is called a scaled score of 4, which if 10 is the mean and the standard deviation is 3 points, he is two standard deviations below the mean and that's considered moderate neurocognitive impairment.

BY MR. SCHARDL:

Q    So these are all measures, it sounds like, of visual attention; is that correct?

A    Yes.  Now, digit span, no.

Q    Oh, that's the measure of --

A    Yeah, but coding, symbol search, trail making, visual scanning are all about visual attention and quick.  The idea in all of these tasks are you are being timed as well.

Q    And what's the sort of sum total of the take away from all of these measures of attention and concentration?

A    The take away is that he has difficulty in -- he has shown to have difficulty in pressured situations where he has to visually attend to what is going on and generate a response.  And, of course, the other take away is it is related to circuitry in the brain.  It wasn't permitting him

1219

to --

Q    What is --

A    Frontal to subcortical circuitry.

Q    Moving on to the next area that Dr. Young measured, her assessment of memory and learning, what test did she use to measure memory and learning function?

A    She used the California Verbal Learning Test, the CVLT.  She used the Rey Complex Figure Test.  She used --

Q    Let me take you through those one at a time.

A    Oh, okay.

Q    The California Verbal Learning Test, was that available in 2005?

A    Yes.

Q    The Rey Complex Figure Test, was that available in 2005?

A    Yes.

Q    That's a pretty old test, is it not?

A    Yes.

Q    Back to like the '40s or something like that?

A    I can't give you a specific date, but it has been around for quite some time.  And the version she used was clearly around well before 2005.

Q    So the Rey, the CVLT, what other measures of memory and learning ability?

A    The WMS, the Wechsler Memory Scale.

Q      And she used which version of that?

A      She used the 4th Edition.

Q      And did it -- did the 4th edition use the same criteria for measuring the same thing as the 3rd edition?

A      Yes, the functions are the same.

Q      It is not like a different way of assessing memory or learning?

A      No.

Q      And were there any significant results from the administration of those tests of learning and memory?

A      Yes.

Q      What were the deficits that Mr. Barrett showed in that testing?

A      Well, there was a significant decrement between a really high scaled score when he was asked to remember a story narrative right away and then when he was asked to remember it 20 minutes later, 20 to 30 minutes later. Although they are both in the normal range, it is something that as neuropsychologist one would be looking at and thinking ah-hah.

Q      Well, what was the difference?

A      84th percentile for the immediate recall as compared to 37th percentile for the Delayed Recall.

Q      Was this verbal information or auditory information?

A      Verbal information, auditory verbal.

Q      Auditory verbal.  I meant visual, not --

A      Right, it is not visual and that is significant.  Like the scores on the WAIS, in the areas of verbal it is higher than what you see in the visual domain.

Q      Okay.  Were there any deficits that appeared in his testing on these instruments?

A      Yes.

Q      And what were they?

A      I am just referring to my notes here.  There was one huge discrepancy between his visual memory, which is an index score, which was at 130, a standard score of 130 with a mean of 100, meaning it was well above the mean, at the 98th percentile.

Q      And I am sorry, what was that specific ability there?

A      Visual memory.

Q      Visual memory.  But as I understood your testimony before, you were saying there is a difference between short term and medium term and long term.  So which of those are we talking about?

A      Visual memory, we are talking about not -- we are talking about something that stayed in his mind and he was able to bring up, not something he had to recall immediately. If you look right below -- oh, you are not in the slide.

Q      Did you prepare a slide of all of the measures for memory and learning?

A    Not all of them, but a good number of them.

Q    Those that you felt were significant?

A    Yes, in positive or negative ways.  If you look at visuospacial and working memory functions...

Q    You are saying that that's a slide?

A    Yes.

MR. SCHARDL:  May I turn to that, Your Honor?

THE COURT:  Yes.

BY MR. SCHARDL:

Q    Okay.  Could you explain what -- are any of the scores that you were just talking about on this slide?

A    If you look at the third to last and second to last --

Q    Excuse me one second.

MR. SCHARDL:  For the record, we are looking at slide 13 of the deck.

BY MR. SCHARDL:

Q    So -- I am sorry, Doctor, you were saying which scores?

A    If you look at the third to last and the second to last items under score, visual memory and visual working memory, visual memory, as I was saying, was an exceptionally strong performance, at the 98th percentile.  However, the Visual Working Memory Index score was at 70, which is two standard deviations below the mean, like na I.Q. score, at the 2nd percentile, borderline, should say extremely low.

Q    So what's the difference between visual memory and

visual working memory?

A    Visual working memory is in the moment, on your feet, you are being asked to respond to something right away and visual memory is over time.

Q    But the same pattern of disparity that we were talking about before?

A    Yes.  And the reason I have the slide as I do is that it shows problems in working memory that span visual attention and some, though not as low, in auditory attention, but it seems that attentional systems are key to his profile.

Q    So moving on to the tests that Dr. Young did to assess language, is there anything of significance to you in that testing?

A    Yes.  Consistent with the kinds of disparities you see between intellectual ability and academic functioning, you see that spelling and arithmetic are quite low.

Q    On what tests are you talking about?

A    This is -- I am sorry -- the Wide Range Achievement Test, 3rd Edition.

Q    Okay.  So is that an instrument that was in wide use back in 2005?

A    Yes.

Q    I think it is called the WRAT, in the trade; is that right?

A    That's correct.

Q    The silent 'W' for some reason.  And has the WRAT been used for quite a long time to measure academic achievement?

A    Yes.  And when you see a large disparity between academic functioning and intellectual, you know, I.Q., intellectual ability, it is suggestive of possible areas of a learning disability.

Q    Is that consistent with the history that you have of Mr. Barrett?

A    Yes.

Q    I would like to move on, Doctor, to Dr. Young's assessment of Mr. Barrett's executive functioning.

MR. SCHARDL:  One moment, Your Honor.  (PAUSE)

BY MR. SCHARDL:

Q    So, Doctor, moving on to executive functioning, just -- I think we've gone over what that is.  So let me ask you how Dr. Young measured executive function.

A    She used a battery of tests specifically devoted to the assessment of executive functions.  It is called the D-KEFS. The Delis-Kaplan Executive Function System.

Q    Is that a widely used instrument?

A    Oh, yes.

Q    How long has that been around?

A    That has been around for at least two decades now.

Q    Are tests of executive function common in a forensic context?

A      Yes.

Q      And the D-KEFS, the Delis-Kaplan Executive Function System, is there ecological validity testing behind that test?

A      Yes.

Q      So let's -- and again, the areas of the brain that are involved in executive functions are which?

A      Well, it is the frontal lobes, but we have to remember that it is the frontal lobes in relationship to the regions that come from subcortical regions, the reticular activating system, a person has to be aroused to be able to respond to what is going on out there or what they are being asked to do.

Q      And going down the tests that Dr. Young administered on executive functioning, what is the first test that is a part of that system that she produced results for?

A      That would have been the trail making test.

Q      And that's the connect the dots kind of thing that we were talking about before?

A      Yes.

Q      Now, how is that -- you said that there are variations of it, that it is not like a child's game, I guess, of one, two, three, four, five, A, B, C, D or whatever.  What are the variations that make it a little more interesting than a child's connect the dots?

1226

A      Well, one has to flexibly shift between numbers and letters, for example, or one has to visually scan and only respond to a particular number, like a 3 and make a mark through only the 3s.  So those kinds of tasks.

Q      So does the neuropsychologist give the person different sheets, I guess, to perform each of these different tasks on?  Is that how it works?

A      Yes.  Basically the trail making test has a number of different conditions, they are called, and so they are provided the sheet on which they are asked to perform the task.  They are timed and, you know, errors are -- where they responded when they shouldn't or where they failed to respond, those kinds of things are evaluated as well as the time, so time and accuracy.

Q      Okay.  And how many of these conditions did Mr. Barrett -- how many was he asked to - requested to meet or perform?

A      All, all, all of them.  And when he was asked to visually scan, he showed moderate impairment, two standard deviations below the mean.

Q      On visual scanning?

A      Yes, which again is that -- yes, visual attention. When he was asked to sequentially process numbers, his performance was slightly below average.

Q      Is the trail making test, is that considered fairly

sensitive or how -- where does it fall on that scale?

A    It is very sensitive and I think I may have mentioned earlier they use it in conjunction with trying to decide if somebody should be driving, for example, with an older adult.

Q    So his visual scanning, that was impaired you said?

A    Yes.

Q    Were there other impairments that showed up on the trail making test?

A    There were mild impairments in his ability to shift from -- to alternate between letters and numbers.

Q    So let's -- could you explain that a little more, what you mean by shifting?  How does that -- how does it test that?

A    Well -- and this goes for the old trail making test as well.  One is asked to draw a line alternating between numbers and letters.  So it might be 1 to A to 2 to B to 3 to C.  So it is a little more cognitively complex, maybe not for everybody, but, you know, it is more complex than simply drawing a line in numbers 1 to 9.

Q    And then this test is normed, I assume, against the population like all of the others that we are talking about, so that --

A    Yes, these were all co-normed, all of the subtests of the D-KEFs were co-normed together just like WAIS and the WIMS (sic).

Q     So that area, that type of switching where he had to go from performing the task in one way to another way, that was an area of difficulty?

A     Yes.

Q     And what other tests -- were there any other tests of executive function that were in the same area of like visual scanning and switching?

A     No.  And if there were, I am missing something.

Q     Well, on the test of the number/letter switching, that you were talking about, what did you say was Mr. Barrett's percentile rank there?

A     Oh, my gosh, yes, I have this on another side.  I apologize.  His letter/number switching, which is that alternating, was at a scaled score of 7.

Q     A scaled score of 7?

A     Yes.

Q     And you translate that into --

A     That is one standard deviation below the mean, which would be a score of 10 and at the 16th percentile.

Q     The standard deviation being 3, it is one standard below --

A     Yes, sorry.

Q     And what about on visual scanning, was there a measure of that on the trail making test?

A     Yes, and that was the one I had noted was a scaled

1229

score of 4 and is in the moderate range for impairment because it is two standard deviations below the mean of 10 which a standard deviation of 3.

Q    I think you noted that the examiner is looking not only at what the person does, but the things that they don't do, the omissions.

A    Yes.

Q    Was that at all significant in Mr. Barrett's case?

A    He did score at the 13th percentile in terms of omissions and while this may not seem significant unto itself, it is mild impairment, it is significant in the overall context of looking at how he processes visual information as well as when he has got to think on his feet.

Q    It is consistent with that being a weakness?  Is that what you are saying is --

A    Correct.

Q    And you were mentioning also that the examiner looks at the errors that the person makes.  Does that all just get fed into it or is that a separate measure that you score?

A    Well, there are different kinds of errors.  There are errors of omission, which is when they should have done something that they did not do, and then there are errors of commission, which is when you do something that you shouldn't have done.  There are also errors of what is called set loss. Set loss has to do with -- you know, you have been going

along and going from 1 to A to 2 to B and you've been doing what you were asked to do, but suddenly you either lose focus or you get lost.  So whatever you were doing is suddenly -- it is like an intentional blip.

Q    So it would be like applying a rule and then suddenly it is just like you -- it is not there to be applied?  Is that what you are saying?

A    Right.

Q    And did that show up on this test?

A    It did.  He had 22 percent of all of his responses that were what we call set loss errors and this was a below average score.  The sequencing errors that he made were at the 16th percentile, which is also below average.  So, you know, little cognitive complexity got added to the equation and he had more difficulty.

Q    Moving on in the D-KEFS, what is the next component of that system that Dr. Young looked at?

A    I have verbal fluency, but I am not sure --

Q    And was there any impairment shown in the test of verbal fluency?

A    Yes.  And again, it was the percent -- switching accuracy that was at issue.

Q    And what was his score on that?

A    You know, again -- okay, the score was a scaled score of 4, which is 2 standard deviations below the mean of 10.

It is moderate impairment.  So you might be asked, for example, to say girls' names and pieces of furniture.  You've got to switch back and forth between Jane/table, Bobby/desk, you know, that kind of thing.  So, again, it is being asked to do something rapidly and to switch.

Q    And this time though it is not visual information as in the trail making, it's verbally communicated information?

A    Yes.  And again, working memory is a huge part of executive function, that idea of being able to think on your feet and respond to what you are being asked to respond to and accurately.

Q    What was the next test of executive functioning within that D-KEFS?

A    Well, what I have down here of note was the Tower Test. I can explain what that is, if that would be helpful.

Q    Yes.  What's the -- well, was there any impairment that showed up on that test?

A    Yes.

Q    Okay.  So what is it, what is the Tower Test?

A    The Tower Test is one in which there is a wooden peg board and there are disks of different dimensions, bigger ones, littler ones, and you've got to move them to make a pattern that copies the pattern made by the examiner and you've got to follow the rules.  You've got to put only the right size disks on the right spindles and, you know, you

are not allowed to move two at a time.  He showed very strong problem solving, it was average, it was slightly above average in a scored scale of 11.  However, that can't be thought about outside of the fact that his move accuracy was at a scaled score of 3.  So, you know, it showed -- which is clearly a moderate to severe level of impairment.  And when it is --

Q    So move accuracy means what?

A    Move accuracy means you are following the rules and accurately working to solve the task.  So it tells us that -- this is the kind of task that requires planning.  You know, you see what you are supposed to do with the model and then you are supposed to do the same thing as quickly as you can and following the rules in as few moves as possible.

Q    So is --

A    The move accuracy relates to the number of moves. So sometimes people don't think before they take action and they are going to have to make more moves to create the same -- the model in a --

Q    The examiner creates a model and tells the person to recreate the model in the least number of moves and in the least amount of time.  Is that the idea?

A    And following the rules, right.

Q    By following the same rules, like you --

A    Right, yeah.

Q    -- can't --

A    Right.

Q    -- move two at the --

A    Uh-huh, yeah.

Q    -- same time or something like that?

A    So his move accuracy was moderately impaired.  His rule violations were mildly impaired.  So he had difficulty remaining within the framework even though he did well on the task.

Q    Now, was there another test on the D-KELFS that Dr. Young administered?

A    Yes.  (PAUSE)  I am just going through my notes.

Q    Is that the sorting test?

A    Yes.

Q    And was there any impairment shown on the sorting test?

A    I'm having trouble locating it.  I apologize to the Court.  I just need to look to find the information so I can respond to it.

        THE COURT:  Take your time.

                    (PAUSE)

BY THE WITNESS:

A    Okay, so I have found the sorting test.  Could you repeat your question?

BY MR. SCHARDL:

Q    Was there any impairment shown on the sorting test?

1234

A    Yes, and the impairment was in the area of sort recognition.

Q    What is sort recognition?

A    He correctly sorted by category, but he had difficulty recognizing in a --

Q    Let me stop you.  What is being sorted in this test?

A    To tell you the truth, I am not remembering right now. I am having a conventional blip.  I believe the idea is that there are categories of information and the individual has to sort whether it is colors or other kinds of concepts and they have to sort to the category.  I am not sure about the sort recognition score.  I am sorry.  I see it is impaired, but I right now cannot tell you why.

Q    All right.  Well, let's move on.  So summing up the results of the D-KEFS, the Delis-Kaplan Executive Function System, is there an area of the brain that these results indicate was damaged?

A    Yes.

Q    What area is that?

A    The areas of the brain are the dorsal lateral and the orbitofrontal.  The dorsal --

Q    Okay.

A    Yeah.

Q    So dorsal, like dorsal fin; correct?

A    Yes.

Q    So that's like the top; correct?

A    Yes.

Q    Lateral like in football, like to the side?

A    Yes.

Q    So dorsal lateral is top side and pre-frontal means like right before the frontal?

A    Yes.

Q    Okay.  So dorsal lateral frontal -- just so that we are all looking at the same brain space, I guess.

A    Well -- and he shows impairment in all of those areas, his frontal function and his -- yeah, impaired.

Q    And is that the sort of take away from all of the descriptions you gave previously regarding the switching and the other measures of executive function on the D-KEFS?

A    To some extent, yes.  I haven't really talked much about inhibition and the idea of -- I mean, maybe I have, but there was another element of the D-KEFS which had to do one has to read colors, words that are -- the names of colors.  Then one has to name ink color and then one has to inhibit one's self from responding to the written word and name the ink color.  So, in other words, you are being asked to divide your attention, inhibit your tendency to respond to one item and respond to another.  So two things are going on at once.

Q    So this is a separate test within the D-KEFS?

A      Yes.

Q      Okay.  So let me make sure I understand what you just said.

A      Okay.

Q      You have a word written on a page; correct?

A      (No Response).

Q      We need a verbal response.

A      Yes.  I apologize.

Q      So you have a word written.  And then you said there is -- you have to inhibit -- the word is printed in a particular color?  Is that the idea?

A      Yes.

Q      And so --

A      No, not initially.  First you have just words.

Q      Like --

A      And then you have got to read the words --

Q      Like on a piece of paper --  I am sorry.  Okay.  Go ahead.  At first the person is just shown --

A      The first condition is color naming on this version of this task.  So they have to name colors.  The second condition they have got to read words.  And you are seeing how quickly they can do it and how accurately they do it.

Q      Excuse me.  But the word you are reading is the word like red or green; is that correct?

A      Yes.

Q      All right.  So that's the second condition.  Next.

A      And the third condition you have to inhibit the inclination to read the word and name the color of the ink. So you have got the words printed of color names and then you've got the ink in a contrasting color.

Q      Red would be written in --

A      So the word green --

Q      -- green --

A      -- might be written in blue, right.

THE COURT:  Don't, don't -- try not to talk over each other, if you can.

MR. SCHARDL:  I apologize, Your Honor.

THE WITNESS:  I apologize.

THE COURT:  It's okay.  We have just got to be able to get it all down.

THE WITNESS:  I apologize.

BY MR. SCHARDL:

Q      I believe you were saying the word green might be written in red, for example?

A      Right.

Q      And the patient is told tell me the color it is printed in not the word; is that right?

A      Right.

Q      Or vice versa?

A      Right, to read -- to name the color and not -- oh, is

1238

that the same as what you said?  Right.  But the idea is you've got to inhibit one response which would be to read the word and just name the color or, right, just name the color and don't read the word.  So on that third inhibition condition, he made a total of -- his total number of errors placed his score at a scaled score of 6, which is slightly below low average, but it shows an inclination to have difficulties with inhibiting one response in favor of another if presented with more than one stimulus.  It is very similar to the trail making where there was the difficulty with switching...

Q    So a consistent result there?

A    Right.

Q    I apologize.  I did skip over that Color Word Interference Test.  Does that complete the D-KELFS?

A    No.  He did take a design fluency test.

Q    Was there any impairment in that?

A    No.

Q    In general, something like the D-KELFS, is it designed to measure how a person will perform in daily life?

A    Some of the tasks are -- it is not a one-to-one correlation, but the skills, the functions that are measured by the D-KELFS, do predict and say something about how that person would function in different circumstances.  You know, depending on whether there are verbal demands or demands

for, you know, quickly being able to move from one kind of activity to another, yeah.

Q    Is it designed to measure how someone would perform in an extreme situation?

A    No, it's not normed in that way in any way, shape or form.  It is looking at functioning.

Q    So when you establish someone's performance on these tests, does that give you like a sort of baseline of their functioning?

A    Yes.

Q    And does that tell you necessarily how they are going to perform under similar circumstances, but that are more extreme?  For example, you said that Mr. Barrett had difficulty when more than one piece of information was provided, I think; is that correct?

A    Yes, or there were competing -- yes, stimuli and he was asked to respond to one thing and not another, yeah. Increasing cognitive complexity is a challenge for him.

Q    So does the science tell you anything about whether someone is likely to perform better or worse than their base line when under extreme stress?

A    Some predictions can be made about that based on -- yes, based on their functioning and predictions can be made similarly about where they might do well.

Q    And in this case, based on the results on the D-KELFS,

are you able to say anything about how Mr. Barrett would do compared to that base line when under extreme stress?

A      Yes.

Q      What would that be?

A      When he has to perform -- and specific to the D-KELFS, not the overall testing?

A      Yes.

Q      Okay.  When he has to act quickly and has to pay visual attention and has to switch between different kinds of activities very quickly and in a thoughtful guided way, he will have more difficulty when he is under stress.  He would be inclined to make errors.

Q      And his base line on those measures was impaired; correct?

A      The ones I am talking about, yes.

Q      And then he would be expected to perform worse when under extreme stress?

A      Exactly.  I think the -- could I say something or no?

Q      Well, I didn't ask you a question, so...I would like to move on to the Wisconsin Card Sort, if I can, because I think that's the next test that Dr. Young administered in the executive function category; is that correct?

A      Yes.

Q      And this Wisconsin Card Sort test, is that a frequently used measure of executive functioning?

A    Yes, very frequently and has good ecological validity.

Q    Has it been around for a long time?

A    Yes.

Q    Decades?

A    Yes.

Q    And what areas of the brain are being implicated or brought to bear when doing the Wisconsin Card Sort Test?

A    The dorsal lateral area of the front cortex is highly implicated in this task.

Q    So some of the same areas that we were talking about previously?  And did Mr. Barrett show any impairment on Dr. Young's administration of the Wisconsin Card Sorting test?

A    Yes.

Q    And what was that?

A    There were several areas that were highly impaired, the most obvious of which is that he was unable to complete any of the six categories accurately.  Would it help to explain the --

Q    Well, yeah, let's talk about it.  So we are sorting cards, I guess, from the name?

A    One is sorting cards, one is sorting cards in response to an unknown principle.  They have got to figure out what the principle is, you don't tell them.  However, the examiner is providing feedback after each sorting effort correct/

incorrect.  Of course, in the best of circumstances the hope is somebody will be able to hear and use the feedback to alter their performance.

Q    Okay.  So you are handed a deck of cards and you are told there is some organizing principle, like suits, like -- something like that?

A    Uh-huh.

Q    Is that correct?

A    Yes.

Q    But it is not as obvious as suits?  Is that the idea?

A    No, it is -- no, they are pretty obvious.

Q    And you have to figure it out though?

A    Yes.

Q    Okay.  And --

A    There are a number of ways one might sort the cards and you've got to figure out which is the right way and the right way is based on, you know, the examiner knows how the test goes.  So...

Q    So like with a standard deck of playing cards, you might organize them by red -- all of the red face cards or all of the black face cards or whatever --

A    Exactly.

Q    -- or the suits or --

A    Exactly, right.

Q    And so --

1243

A    All of the 2s, all of the 4s, whatever it is, yeah.

Q    So in what areas was Mr. Barrett impaired on this test?

A    Well, along with not having actually solved any of the categories, there is an index for the percent conceptual level responses.  Well, you have to be able to think about it and think about the feedback and his score was at the less than first percentile.  He was not able to think about it and figure it out.  As a misleading score, which is the percent perseverative errors, you know, how many times did he keep trying to sort the same way even though he was told incorrect, incorrect --

Q    Excuse me.  So perseverative meaning what?

A    Perseverative meaning you keep trying to sort the same way.  You keep on going even though you are being given feedback that is not the correct way and you keep on going and you keep on going.  He did not do that.  So his score on the percent perseverative errors was at the 68th percentile, which sounds wonderful, but when you put it in the context of the other scores, that he didn't solve any categories and there were no -- you know, less than first percentile in terms of conceptual level responses, it is meaningless.

Q    I see.  So you said that he was -- he didn't solve any of the categories.  Were there other measures on this test to which he showed impairment?

A    Yes.

Q    What were those?

A    He -- the percent of errors itself, by definition, given that he didn't sort any categories, was at the less than first percentile.

Q    And what is the -- is category sorting a separate area of executive functioning or what is -- or what is being measured by this?  Are we inferring some other ability from this one?

A    Well, it is like sorting in the sense that the idea is to get a concept and to be able to sort, in this case, the cards, not colors and other variables like in D-KEFS, but you are supposed to be able to sort the cards.  If I sort -- if I put a King under a King, let's take a standard deck of cards, and that's correct, then you would say correct and I would realize, ah-hah, maybe it is kings.  On the other hand, I might put a 10 of hearts under a king of hearts and you say correct and I think ah-hah, you know, maybe it is the hearts. So the idea is -- and then you have got to stick with -- you have to be able to stick with the concept until it changes, it changes unbeknownst to the examinee.  So for a time there is one principle and then you alter the principle, but since he didn't get any, there was no altering the principle. They have to complete 10 trials correctly before you change to another principle.

1245

Q    So I assume then what is being measured is your ability to get the concept and to follow through; is that correct?

A    To problem solve, to reason.  Now, I will say, on a positive note, he did not lose set, meaning he didn't get the concept and then, you know, forget it, but that's because he never got the concept.  So...

Q    Okay.  I would like to move onto the next test of executive functioning that Dr. Young administered.  Is that the Short Category Test?

A    Yes.

Q    And what does it measure?

A    Very similar to the Wisconsin Card Sorting Test.  It is measuring problem solving, reasoning, dorsal lateral kinds of functioning.  Again, the person is given four numbers and then they see designs.  The numbers are 1, 2, 3, 4.  They see these designs and they have to associate what they see, the designs, with a number, 1, 2, 3 or 4, and then they are told it is correct or incorrect.  Same idea in which the principle changes after a time.

Q    Let me ask you, is this test, the Short Category Test, has that been around for a long time?

A    The Short Category Test is newer but it is based on the original categories test developed in the '50s by Halstead-and Reitan and the Short Category Test has a very high correlation to the original.  So it is considered perfectly

1246

fine and acceptable, peer reviewed and acceptable.

Q    So was there any impairment shown on this instrument?

A    Yes, comparable to his performance on the Wisconsin Card Sorting Test, the categories test he earned a score at the less than first percentile.  So they are consistent and it was an opportunity to see how he would perform on different -- on tests with different stimuli, but with a similar concept behind them and a similar function being evaluated.

Q    Yeah, these tests sound very similar.  What is the -- what is the point of giving all of these different tests that seem to be measuring very similar abilities?

A    Well, for one, you then get to look at somebody's performance across two different tests and to see if they are consistent, which is a nice way of looking at effort.  In addition, many of the tests that we give really measure more than one thing and this is particularly true with executive function.  Sometimes, you know, visual information is more important, sometimes verbal information is more important.  So it permits you to do what we call double disassociating to figure out where is the real problem.  Is it that they can't attend visually or is it that they are having trouble with their motor function, for example, on block design?  It could be they can't visualize the design they are supposed to copy or it could be they are having trouble

actually manipulating the blocks and they are slow with their motor function.  So --

Q    Is that why you would do, like, the tower test, is -- which obviously involves motor dexterity when you were describing moving the disk; is that correct?

A    (NO RESPONSE)

Q    The court reporter needs a verbal response.

A    Oh, yes, sorry.

Q    And then the others, the card sorting, you were describing that is visual information; correct?

A    Yes.  There are other differences between those tests.

Q    There being feedback, auditory information as well. Is that a difference?

A    Ongoing feedback rather than having to plan and -- yeah, carry out the task one's self.

Q    So is the idea that after you have given all of these different measures, you can tell, I guess, whether the person is really impaired or just impaired in one narrow area? What's the point?

A    The point is to determine what their strengths are, what their weaknesses are.  Yes, to try to determine whether there might be damage localized to a particular region or what kinds of dysfunction exist.

Q    And in going through all of these tests of executive functioning and I suppose other parts of the battery, did

that give you an indication of what parts of Mr. Barrett's brain, if any, were impaired?

A    Yes.

Q    What part?

A    In terms of his dysfunction, clearly there are problems with visual attention, which involves the parietal systems and the frontal lobes.  Working memory, very frontally oriented, the ability to work with information online, to work it quickly, in the moment.  Problem solving and even on the tower where he did --

Q    I am sorry.  I was asking for regions.

A    Yeah.

Q    So you said problem solving, that's a function.  What region is associated with that?

A    The frontal function.

Q    Okay.  And I guess all of these areas of impairment that we are talking about, do they all point to the same general area of the brain or multiple areas?

A    There are multiple areas of the brain, which include the temporal region, the frontal region, some of the frontal subcortical circuitry so that information isn't going back and forth in a way that would be helpful to his functioning.

MR. SCHARDL:  Your Honor, may I have just one moment?

THE COURT:  Yes.

1249

(PAUSE)

BY MR. SCHARDL:

Q    So these areas of impairment that you are talking about, would they have affected Mr. Barrett's functioning just on a regular daily basis?

A    Yes.

Q    And is the impairment that is being tested here or shown in the testing here, is that -- as we were talking about before, Mr. Barrett's -- I guess is that his best effort at performing these functions?

A    I have a yes and no answer and preferably more, but yes.

Q    And what's the no?

A    Well, it is not a no, it is an elaboration.  I am sorry, but...

Q    Oh, okay.

A    So, yes, it is --

Q    We need to understand --

A    There is no indication that he -- yes, he made his best effort.  This is his best level of functioning at the time he was being evaluated.  What would need to be considered from an ecological position is that he has been in a structured and directed setting and ostensibly more substance free than he would have been out on the streets. So, therefore, we are really getting a better brain than we

might have gotten.

Q    So Mr. Barrett's ability to attend to information, to focus his attention on that, I believe you testified that was impaired; is that correct?

A    Yes.

Q    And did he have any impairments in being able to recognize changing circumstances, visual cues of changing circumstances?

A    He had impairment in those areas.

Q    And did he have any impairment in his ability to inhibit responses in light of changing information?

A    Yes.

Q    How severe is the impairment in that area?

A    Very severe in some areas, moderately to -- yes.

Q    Was that one of his better areas or worse areas?

A    That was one of his worse areas, not a strength. Changing course of action was difficult for him, as we saw on the numerous executive function tests.

Q    And if he was being given -- hypothetically if Mr. Barrett was being fed lots of information very rapidly, would he tend to perform better or worse under those circumstances?

A    Worse under those circumstances because he would be overwhelmed.

Q    And that shows up in the testing?

A    Yes, it showed up on the CVLT, which we forgot to get to.

Q    We forgot?  What was the test -- what was the measure there?

A    The CVLT is a list -- a learning test and the individual five times is presented the same list and you are looking to see if they learn.  It is a 16 word list.  And he did fairly well on that, but then he was given a second list and with the new information he was 1.5 standard deviations below the mean, which is getting into the mild to moderate range because he couldn't handle any more information.  So that to me is just another example of a situation in which if the task is simple and clear and predictable, he performs well relative to when he is faced with changing circumstances, changing designs that he has got to figure out which one would best fit to complete the design, matrix reasoning or trail making when you are going from letters to numbers, et cetera.

Q    So performing some sort of task where you have to regulate your behavior to the circumstances?

A    Right.

Q    Exercising judgment?

A    Yeah, an unpredictable situation, you don't know what is coming, what's next.

Q    That's where he is most impaired?

1252

A     Yes.

MR. SCHARDL:  May I have just a moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. SCHARDL:  Okay.  At this point, Your Honor, I will pass the witness.

THE COURT:  Very well.  Let's take about a 10 minute break and then we will come back and commence with cross examination.

MR. WILSON:  Judge, can I ask for a little bit longer break than that, please?

THE COURT:  15?

MR. WILSON:  20?

THE COURT:  20?  All right.  We will come back at a quarter 'til.

MR. WILSON:  Thank you.

(2:25 p.m.)

(SHORT RECESS)

(2:45 p.m.)

THE COURT:  Go ahead, Mr. Wilson.

MR. WILSON:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. WILSON:

Q     Dr. Miora, you would agree with me that you are not a

1253

board certified forensic neurologist; isn't that correct?

A    I am not a neurologist at all.

Q    I am sorry.  Forensic neuropsychologist, you are not board certified in neuropsychology; correct?

A    That's correct.

Q    And you would also agree with me, ma'am, that you had, until today, never met Mr. Barrett; is that correct?

A    That's correct.

Q    And a neuropsychologist performs a number of standardized tests; correct?

A    Yes.

Q    And you would agree with me that based upon that scoring and based upon the clinical evaluation that a neuropsychologist performs there can be a differing opinion between neuropsychologists; isn't that correct?

A    There can be differences of opinions; that is correct.

Q    And you would agree with me, would you not, that especially in the forensic setting objectivity and honesty are very important when you evaluate and ultimately testify in a court of law?

A    Yes.

Q    And in order to be objective and honest, it is important to review the data and to report on it accurately; isn't that correct?

A    Yes.

Q    And it would also be important to review all available data in making your assessment; is that correct?

A    All data made available, yes.

Q    Absolutely.  And I believe that as a part of your testimony here, you testified that you reviewed a number of pieces of data; isn't that correct?

A    Yes.

Q    You reviewed all of the raw testing data from Dr. Young; correct?

A    Yes.

Q    Did you review any written notes, handwritten notes from her?

A    Not handwritten.  There were some typed notes.

Q    Okay.  And were those included in the raw data that you were provided?

A    Yes.

Q    And were those notes of the clinical interview of Mr. Barrett?

A    I am not remembering off-hand.  I know there were some written notes that were responses to actual tests items and I don't recall whether it was specifically of the clinical interview.  It may not have been.

Q    Would you agree with me that Dr. Young's -- the testing that she did and ultimately the opinions that she reached were based on more than just the psychological

testing; isn't that correct?

A    Yes.

Q    It was based in part upon review of the medical history; correct?

A    Yes.

Q    A review of some declarations that she was provided; is that correct?

A    Yes.

Q    It was based upon a clinical interview of Mr. Barrett or I would say an interview of Mr. Barrett?

A    Yes.

Q    And you would agree with me that you weren't present during that interview?

A    Absolutely not.

Q    That you have not seen any video or audio recording of that interview?

A    No.

Q    You weren't able to assess Mr. Barrett's behavior during that interview; isn't that correct?

A    No.

Q    You could not assess his hesitancy to respond or his ability to perform the tasks that were asked of either to be performed --

        MR. WILSON:  Let me back up, Judge.  I apologize.  Terrible question.

BY MR. WILSON:

Q    You weren't able to personally assess his performance on either the testing or the interview?

A    I was not there.

Q    Now, you mentioned that you reviewed the raw data.

MR. WILSON:  I would ask the clerk to hand the witness Government's Exhibit Number -- I believe it is Number 67.

BY MR. WILSON:

Q    And do you have that in front of you, ma'am?

A    Yes.

Q    Doctor, it is my understanding this is 190 pages of information.  And by looking at that, can you tell the Court that that is all of the raw data that you reviewed as a part of this -- of your testimony today?

A    I will need a moment to kind of leaf through it...

Q    Oh, absolutely.

(PAUSE)

BY THE WITNESS:

A    I believe there may be data in here I did not review. I can't be 100 percent sure without comparing it to mine, but I see things that I don't recall having seen.  Of course, I don't know if they are hers.

Q    Doctor, I will hand you what has been purported to me or been purported to the government to be the raw testing

1257

data.  So, specifically, what pages are you referring to that are documentation that you have never seen?

A    I don't think I have seen this pretrial criminal report.  See, there is other stuff in here.  I may be seeing other people's stuff.  An MMPI profile, pretrial criminal report?

MR. WILSON:  Judge, may I approach the witness?  I think -- and let me make sure we are looking at apples and apples?

THE COURT:  Sure.

THE WITNESS:  Okay, thank you.

BY THE WITNESS:

A    Yes.

BY MR. WILSON:

Q    All right.  And when you say yes, I assume that means that the information which is in Government's Exhibit Number 67 is, in fact, the raw data that you were provided in this case?

A    Yes.

Q    And earlier when you were testifying about some documents that you had not seen, those were not within 67, those were looking at 68?

A    That's correct.  I had --

Q    All right.

A    Yes.

Q    And so we talked earlier and I was asking about handwritten notes from Dr. Young of the interview. I don't -- do you agree that there are not any handwritten notes concerning the interview?

A    Yes. As I said before, I did not have access to any handwritten notes.

Q    So, in essence, you don't know what happened during the clinical interview, what was said?

A    From the perspective of having written notes, that's correct.

Q    Now, I believe that you adopted or do adopt the findings of Dr. Young; is that correct?

A    Uh, that's not the way I would put it.

Q    Well, did you not say I can and do concur with her findings, interpretations of the data, the opinions she developed and the conclusions she drew about Mr. Barrett's neurocognitive deficits and relative strengths?

A    Yes, based on my own analysis.

Q    And you would agree with me, and I believe you testified, that it was important and would be important to review all testing data that is available; correct?

A    That's correct.

Q    And you reviewed the testing data of a Dr. Faust Bianco; isn't that correct?

MR. SCHARDL: Objection, Your Honor. We covered

this in motions previously.  She hasn't testified about it and the Court's ruling was that if the witness doesn't testify about it, if we don't bring it up, then it is not coming into evidence and there was no testimony about it on direct.

THE COURT:  Well, I think what the ruling was that if she didn't criticize it during direct examination, then we weren't going to hear from Dr. Bianco, but just because they bring it up on cross doesn't mean I am going to let him put the witness on.  So overruled.

BY MR. WILSON:

Q    Do you agree with me that you examined that data as a part of your findings in this particular case; isn't that correct?

A    Yes.

Q    And you will agree with me that Dr. Bianco conducted a WAIS-III or gave Mr. Barrett a WAIS-III test back in 2000; isn't that correct?  Excuse me, back in 2002.

A    Yes, and that would have been his only option as compared to -- there was no WAIS-IV.

Q    Thank you.  I appreciate that, but it wasn't my question, but thank you.

A    You are welcome.

Q    And you will agree with me that Mr. Barrett -- back in 2000, I believe it was actually, that Mr. Barrett scored in

1260

the average category on the WAIS-IV, back in 2000; isn't that correct?

A    I just want to check to make sure and that I am answering clearly.  (PAUSE)  Might you direct me to that section in the data?

Q    Which section, Doctor, are you --

A    I see the WAIS data, but I don't see the overall scoring.

Q    Well, let me ask you, do you recall what the scoring was for the WAIS-III of Mr. Barrett back in 2000?

A    I will need to have my memory refreshed to be more accurate.

Q    Well, I am going to direct your attention to Government's Exhibit Number 68 and ask you if you recognize that.

A    Thank you.

        MR. SCHARDL:  Your Honor, I am going to interpose an objection.  The government is trying to get in through Dr. Miora what it couldn't do by calling Dr. Bianco.

        THE COURT:  Well, the objection is overruled.  The basis for my ruling, before the hearing commenced, was simply not to allow another witness if you all didn't bring it up.  And I think this is all pretty relevant.  It doesn't mean he is going to get to call Dr. Bianco to testify, but I think it is all pretty relevant to the opinions that we have heard

here today.  So the objection is overruled.

MR. WILSON:  Thank you.

BY THE WITNESS:

A     I have found the score report.

BY MR. WILSON:

Q     Okay.  Isn't it true that on the verbal I.Q. he scored in the average range?

A     Yes, he did.

Q     Is it also true that in the performance I.Q. he scored in the average range?

A     Yes.

Q     It is also true that on the verbal comprehension he scored in the average range?

A     That's correct.

Q     On the perceptual organization he scored actually in the low average; isn't that correct?

A     Yes.

Q     On the working memory, he scored in the average range; isn't that correct?

A     Yes.

Q     On the processing speed, he scored in the average range; isn't that correct?

A     Yes.

Q     And on the full scale I.Q., he scored in the average range; isn't that correct?

1262

A    It is.

Q    And so from 2000 to 2009, there was, in fact, a decline in his processing speed, according to the testing of Dr. Young; isn't that correct?

A    Right.

Q    But one year after the commission of this crime, Mr. Barrett is scoring in the average range on all except one of those categories; isn't that correct?

A    Yes, but he --

Q    Thank you.

A    Okay.

Q    He was also given the WIMS-III back in 2000; isn't that correct?

A    Yes.

Q    And I'll give you a moment to find that data as well.

(PAUSE)

A    I am looking at the printout.  I haven't analyzed his -- I don't have the analysis of his data.

Q    All right.  Well, looking at the printout, I will ask you this question:  Would you agree with me that in auditory immediate Mr. Barrett scored in the average range; is that correct?

A    Yes, yes.

Q    On auditory delay, in the average range; correct?

A    Yes.  It's a little hard to read this, but yes.

Q     On the logical memory, average range; correct?

A     Yes.

Q     Logical memory 2, average range?

A     Yes.

Q     Verbal paired association, average range on both 1 and 2; correct?

A     It is close to average, yes.

Q     Auditory recognition average.

A     Yes.

Q     And I don't know what Faces 1 and Faces 2 are.  Can you tell the Court what that is?

A     Yes.  The individual is exposed to 48 pictures of kids one after the other.  So they are serially or sequentially presented.  Then they are presented with another series of faces right away and asked yes or no as to whether each of the 48 faces was one of the original faces.

Q     And that's done very quickly, correct, that's a timed test; correct?

A     Well, timed in the sense that there is a couple of seconds between each presentation, but it is not timed as in they are being timed or pressured.

Q     I guess what I am trying to get at, Doctor, is in this particular test you don't hand the examinee these photographs and say take all of the time that you want to study through these photographs; isn't that correct?

A     Right, that's correct.

Q     It is just a matter of a few seconds that they are able to look through them; correct?

A     Yes.

Q     And he scored very superior on both Faces 1 and 2; isn't that correct?

A     I am looking for them.

Q     Okay, take your time.

(PAUSE)

A     Ah-hah, yes, I see it.  And what was your question?

Q     On Faces 1, isn't it true that he scored in the 99th percentile?

A     I have -- no, I don't have that.

Q     What do you show?

A     And we may be looking at different aspects of the same thing.  I see facial recognition.  Are you looking at the primary subtest scores?

Q     Yes.

A     Okay.  I don't see any percentile rank there.

Q     Do you have the score of 18?

A     Yes.

Q     Well, that would be in the well above average range; correct?

A     Yes, it is.  I just didn't see the score and you were asking me --

1265

Q    I am sorry.

A    Okay.

Q    And would you agree with me that on Faces 2 it was a scaled score of 16, which would be well above average?

A    Yes.

Q    The Visual Reproduction score is a 13, which is high average; correct?

A    I am sorry, I can't see the scores there.

Q    Okay.

A    It is not visible to me, but I'll take your word for it.

Q    I will move on down.  Spatial span, do you see that?

A    I don't.  Oh, yes, I do, I do see that.

Q    Would you agree with me that it is in the average range?

A    Yes.

Q    Do you see now the Visual Reproduction?  Have you seen that?

A    I don't believe I have that here.

Q    Okay, that's fine.  We will move on.  In addition to the WAIS-III and the WIMS-III, you would agree with me that Dr. Bianco also performed what is known as the -- a processing speed test, also a trail -- what is called a trail making test; is that correct?

A    Yes.

Q    And you would agree with me that the Trail Making Test then became a part of the D-KEFS later; is that correct?

A    Essentially, yes.  They borrowed the ideas and created their own versions.

Q    And you will agree with me that actually the D-KEFS didn't come into existence until 2001; isn't that right?

A    Yes.

Q    Okay.  So it hasn't been around for decades?

A    A couple of decades, close.

Q    As of now, I guess, we are close.

A    Yes.

Q    But in 2000, D-KEFS wasn't available; correct?

A    Right.

Q    So when Dr. Young  criticized -- well, I'll move on. On the Trail Making Test, do you -- I'll give you a moment to see if you can find the raw data on that.

A    Is it right after the prior printout that we were looking at?

Q    I don't have it thumb marked.  I apologize.

THE COURT:  Mr. Wilson, is there a page number?

MR. WILSON:  Well, that's what I am trying to find myself.  I'm sorry, Judge.

MR. SCHARDL:  If I may, Your Honor, there is a page number.  It begins at 3389.

MR. WILSON:  Thank you, Counsel.

BY MR. WILSON:

Q     You would agree with me that Pages 3389 through 3392 are the actual diagrams themselves; correct?

A     Yes.

Q     And on those diagrams is there any particular scoring right there?

A     I see a number in the upper right-hand side.  I don't think that is the -- the item you are looking for, so the answer is no.

Q     All right.  I'll direct your attention to Page -- at the bottom it is KEB-503266 and there are some bates numbers at the top, actually Page Number 10.  Do you recall reviewing this particular document as a part of your analysis of the data in this particular case?

A     Yes.

Q     What is this particular document -- this page of this document?

A     It's a -- well, it is a mental status examination and actually I would call it a neuro behavioral status examination.  He has it down as a mental status examination.

Q     And it purports to have the data from multiple tests correct that were performed?

A     I am not sure what you are asking.  This is -- these are his observations in addition to reports of tests.  Is what that you are...

Q    Are you looking at the page which -- in the top right has the Page Number 10?

A    Yes.

Q    Okay.

A    Yes, it does have some test results on it.

Q    And -- but I guess the question I am asking you is is the Trial Making Test on that particular document?

A    Oh, yes.

Q    All right.  Sorry, I went around the long way to get there.  Now, having that document in front of you, would you agree with me that on the trial making test Mr. Barrett scored in the average range back in 2000?

A    Yes, but that does not take into account other features.  If you look at the protocol, he overshot in one place and he made an error and those are important considera-tions as well, not just the time.

Q    But you will agree with me that the scoring is average on that test, isn't that correct?

A    The numerical value is average.

Q    Thank you.

A    A little lower than average, but yeah, it is in the "normal," quote, unquote, range.

Q    You mentioned some tests that were performed, a Seashore Rhythm test and also Speech Sounds or Speech Sound Recognition Tests; is that correct?

1269

A    Speech Sounds Perception Test, right.

Q    Those were performed by Dr. Bianco, correct, as well?

A    Yes.

Q    And you agree with me that Mr. Barrett scored on the average range on the Seashore Rhythm; correct?

A    I am looking for it now.  (PAUSE)  I am having trouble locating it.  What aisle is it in or column?

A    Well, let me ask you this.  When Dr. Young tested Mr. Barrett in 2009, he did not report any deficits in the Seashore Rhythm even in 2009; is that correct?

A    I believe that is correct.

Q    Okay.  And that would also be correct of Speech Sounds Perception?  Isn't that also correct?

A    I believe so.  I am still not finding them on this page.

Q    That's fine.  We can move along.  There is also a test that was performed by Dr. Bianco, a Visuospatial Memory Test, the Rey -- I don't recall the name of it.

A    The Rey Complex Figure Test?

Q    That may be it.  I apologize.  And that test was Immediate Recall, Delayed Recall and Recognition; is that correct?

A    Yes.  I would characterize it differently, with due respect, from what you said.  It is not simply a Visuospatial Test.

1270

Q     All right.

A     It is looking at spatial organization and there is an output aspect to it, but, yeah, okay.

Q     All right.  And you would agree with me that Dr. Bianco performed that test; is that correct?

A     That he performed it?  Yes.

Q     I am sorry.  That he --

A     Administered it --

Q     That he allowed Mr. Barrett to perform the test.

A     Yeah.  He administered that test.

Q     Thank you, administered.  And you would agree with me that Mr. Barrett, back in 2000, performed in the immediate recall in the average range?

A     Could you please tell me if you are still looking at the sheet?

          MR. SCHARDL:  Objection, Your Honor.  The defense has no idea what page is being referred to.

          THE COURT:  Can you be a little more specific about that, Mr. Wilson?

          MR. WILSON:  I will try, Your Honor.

BY THE WITNESS:

A     Ah-hah, I found it.

BY MR. WILSON:

Q     Well, help me out, Doctor.  Which column is it in -- is that particular one located in?

A    Can we make a deal?  It is down in the lower quadrant of the first column.  And interestingly enough, his copy was as poor as it was -- it was precisely the same as when administered by Dr. Young.  It was at the less than first percentile.  Do I have that right?

Q    Let me ask you about that.  And you are looking at --

     MR. WILSON:  For counsel's benefit and the Court's benefit, we are talking about in the bottom left-hand quadrant, line B -- I am sorry -- about midway through under the heading of A it shows R, U, Y and then copy and 1 percent; is that correct?

A    Less than or equal to the first percentile, yes.

Q    All right.  Now, what is that telling us?  What is that test in particular telling us?

A    One would need to look at the drawing because -- I didn't say it, but quantitative analysis is essential, of course.  That's the numbers behind the science.  But as equally as important is the qualitative science.  So one would want to go to the drawing to see how he did it.  Were there elements missing?  Were they misdrawn?  Were they misplaced?  Because depending on that analysis, it might tell you something about possible hypotheses about brain regions implicated.  So I don't recall the drawing and would need to look at it to tell you what it tells.  There could be problems in visual attention, visual organization of the material.

Do you know where the drawing is?  I do.  Hold on.  (PAUSE)
It is on Page 503314, is where you would find it.  There
are some problems with accuracy.  There are missing elements.
It has got problems.

Q     Okay.  And that would be he was asked to copy the
diagram that he previously had seen earlier in a part of
the test; is that correct?

A     Actually the copy is done while you have the stimulus
in front of you.  So you are literally copying it.  It is
only later that you copy it from memory or render it from
memory.  So this is an actual copy of what he saw at the time
he was drawing.

Q     And according to his testing data that you've seen,
he would have scored very low on just copying that down
right off the piece of paper; is that correct?

A     Yes, which could be visual attention problems.  I would
be -- you know, neuropsychological assessment is a process
of developing hypotheses and testing them out.  So in this
case, if this was all I had, I would wonder about problems
in visual attention and...

Q     Okay.

A     Yeah.

Q     Mr. Barrett was also administered the WRAT Test back
in 2000; correct?

A     Yes.

Q    And he scored in reading on a seventh grade level; correct?

A    Pardon me one moment.  In reading/language -- where do you see that?  Oh, I see -- is it under A/B or 3B, the second aisle or column?

Q    I see something that is in the fifth percentile.  I see something else that is at the -- oh, yes.  Which one were you suggesting was the --

A    The Reading.

Q    Reading, okay.  Yes, at the seventh grade level, that's correct, the 8th percentile.

Q    And Mr. Barrett only completed the ninth grade; correct?

A    That's my understanding.

Q    There is no reason to doubt that?  There is no reason to doubt that he only completed the ninth grade?

A    No.

Q    And that his spelling was a sixth grade equivalent; correct?

A    At the 5th percentile, yes.

Q    And he only completed the ninth grade; correct?

A    I am sorry?

Q    He only completed the ninth grade?

A    That's true.

Q    That his math was a sixth grade level; correct?

1274

A    I am not seeing that, but -- let me see.  Is it in that same area?

Q    I believe so.  Let me ask it this way.  It is not significantly different from 2009?

A    That's true.  I remember that.

Q    Now, there were a number of aphasia screenings or tests that were done.  What is aphasia?

A    Aphasia has to do with language.

Q    And you will agree with me Dr. Bianco performed a number of tests or administered several tests dealing with language; correct?

A    Yes.

Q    And you will agree with me that Mr. Barrett did not display any deficiencies in reference to language in 2000, during the time of Dr. Bianco's testing?

MR. SCHARDL:  I am going to object.  That is a very, very broad question.  Any deficiencies as to language that --

THE COURT:  I will rephrase the question, Counsel.  Thank you.

BY THE WITNESS:

A    Did you ask me a question before there was an objection?

BY MR. WILSON:

Q    I am going to rephrase it.

1275

A    Okay.

Q    Have you been able to locate that particular testing data?

A    Yes, but I still don't see the WRAT arithmetic, but I will just pass for now because I didn't respond to it.  So it is okay if --

Q    We have moved on to the aphasia now.

A    That's fine.

Q    Do you see that?

A    The Aphasia Screening Test?  No, I don't.  I would be happy to look if you would direct me to it.

Q    I'll come back to that in a second.  Doctor, what is the STROOP Test?

A    The STROOP Test is similar to the Color Word Interference Test that one finds on the D-KEFS.  First one is asked to read a list of words that are the names of colors, red, blue, green, and it is timed.  Then one is asked to name ink color on patches of ink and the ink colors are green, red and blue.  And then one is asked to inhibit the word reading and just name the color.

Q    So it is very similar to the test that you and counsel were talking about earlier; correct?

A    Minus some variations, yes.  The D-KEFS has more conditions, but, yes, the concept and what it is measuring are similar.

1276

Q    And it is an executive functioning test; correct?

A    Yes, it is.

Q    And it is a standard test that was given back in 2000; isn't that correct?

A    That is true.

Q    It was a part of the original Halstead-Reitan Neurological Battery, wasn't it?

A    No.

Q    It was not?

A    Not to the best of my knowledge, no.  It was a commonly given test, but I don't think it was one of the Halstead-Reitan or Big 7 or whatever, no.

Q    But you are not -- but you agree with me that it is an acceptable test?

A    Yes.

Q    And you agree with me that -- and have you had an opportunity or can you find that on the document showing the results of the STROOP test?

A    I see one number listed.  So I don't -- there are four -- depending on the system you are using for scoring, there should be four different scores so that you can compare how they did on word reading to how they did on the color naming to how they did in the condition where they have to suppress the word reading and simply name the color, which was in contrast to the written word.  And then you

develop what is called an interference score, that's a fourth score. So I don't see that, so I am not sure what a STROOP W -- the W -- to what he is referring there. Okay, there is color in another area. So I think he has got those separated out. I have found two. And I don't know what these numbers represent. Are those raw scores? Are those 'T' scores?

Q    I want to direct your attention to Page 503300.

A    300?

Q    Yes, ma'am.

A    Here we are.

Q    Do you recognize that document as a document that you reviewed as a part of your evaluation of the data in this case?

A    Yes.

Q    What is that document?

A    That document is some type of way of looking at 'T' scores for the STROOP data. I don't know where it is from or what kind of norms are being used there, but that's what it appears to be, for young adults. I am not sure what Mr. Barrett's age was at the time it was given.

Q    Now, Doctor, you will also agree with me that when Mr. Barrett was examined in 2000 by Dr. Bianco that he experienced some deficiency when it came to finger tapping, isn't that correct, which would be consistent with what you

found or what Dr. Young found in 2009?

A    I am just looking for it, but if that's so, yes, it would be consistent.  (PAUSE)  Do you see where the finger-tapping is?  I see it...

Q    Page 367, I believe.

A    What he has written down on that score sheet isn't clear on 266.  You said 367?

Q    Yes, it appears to be the score sheet 367, that is correct.

A    Okay.  (PAUSE)  I don't see -- oh, yes, there's the tapping.

Q    Do you agree with me that on the left hand side would be a scale score of 40 or a score of 40; is that right?

A    Well, no.  That is a raw score that is an average of his three performances.

Q    Okay.

A    So the 38, the 42 and the 40 --

Q    And what does that 40 indicate to us?

A    Well, I would have to look it up.  That's why we have norms -- books full of norms.  And I would have to know whose norms were being used.  You know, you put in different factors such as age and --

Q    Did you do that when you examined the raw data of Dr. Bianco?

A    No, actually I didn't because I didn't know what norms

1279

he used.  I had no way to do it.  I could have done it with my norms, but I would have been imposing them on his data. I don't know what he used and I did the best I could to evaluate what was there.

Q     And on that same page, 3367, do you see the STROOP scores?

A     Yes, those I see.  And again, I don't know what norms were used, but I do see it is a mechanism for translating raw scores into 'T' scores.

Q     And based upon this document that was within the raw data, you would agree with me that the STROOP scores fall within the average category?

A     Yeah.  The color word shows some interference.  It is almost a 'T' score below, one 'T' score below the mean.  40 would be a full 'T' score below the mean, but -- so that was more challenging for him --

Q     But it is still within --

A     -- relative to the other scores.

Q     But is still within the average --

A     Yeah.

Q     Okay.  And would you agree with me that also the STROOP color is within the average; correct?

A     Yes.

Q     And also the Color Word Test; correct?

A     Well, that's what I was saying, was...

Q    And you --

A    Yes, basically yes.  There is not a lot of variation there.

Q    And you would agree with me that Color Word is the exact same testing or very similar testing that you had talked about with the D-KEFS, where you are given a word and it is in a particular color, but it may be a different word and you are given instructions on which one to inhibit; correct?

A    Right.  But what I am saying is there are -- there are -- one of the things about the D-KEFS that makes it exceptional are that there are other conditions, so it is not just the three.  And for trail making, there are not just the two conditions.  So they get to evaluate in greater detail what is going on at an executive function level.  That's all I am saying.

Q    All right.

A    And it is meaningful because the switching accuracy -- having a measure of switching accuracy is looking at some-thing beyond, you know, were they able to just do the switching.  Remember with the trail making test I was telling you there were problems where he made errors?  Those aren't noted in this scoring because those errors --

Q    I appreciate that --

A    Well, that's important.

1281

Q    But you would agree with me that when you look at the scores, they fall within the average range?

A    Yes, for whatever this normative group is.

Q    Thank you.  Now, Doctor, you testified that it is important to look at records and you looked at some school records; correct?

A    Looked at some what records?  I am sorry.

Q    Some school records, educational records.

A    Yes, yes.

Q    And you will agree with me that there were records from first and second grade and then there weren't any records for third through -- up to the seventh grade; isn't that correct?

A    Yes, I believe that is so.

Q    So we don't know Mr. Barrett's educational scores in third, fourth, fifth or sixth grade; is that correct?

A    I believe so.  I would like to see the records just to refresh my memory, but if -- to see if we all have the same records.

Q    Do you have them with you?  Did you bring them with you today?

A    I did not.  I assumed -- I mean, if I had brought everything -- I have it on a disk, but my computer isn't allowed in.  If there is an exhibit with them, I would be happy to do a quick review.

Q    Well, I think all of the records are put in -- all of

the records that are available are in evidence.

A    Okay, thank you.

Q    Now, you also reviewed some medical records; is that correct?

A    Yes.

Q    And you reviewed medical records from Eastern State Hospital where Mr. Barrett was admitted back in 1986; isn't that correct?

A    Yes.

Q    And you will agree with me that he was admitted there under a court commitment because of some violent behavior with his wife and his mother; is that correct?

A    That was part of what I recall.

Q    And isn't it correct, sir -- excuse me -- Doctor, that --

A    I am okay with sir.

Q    -- that Mr. Barrett was allegedly very suicidal; is that correct?

A    That is what I was --

        MR. SCHARDL:  I object.  The witness wasn't asked about this on direct examination and she hasn't testified that it was a part of her conclusions.

        THE COURT:  Yes.  Why are we going through all of this stuff?  It is in the records, is it not?

        MR. WILSON:  It is, Judge.  I mean, I am just trying to get -- to find out what the basis of her opinions

were based upon her review of Mr. Young's opinions and

Dr. Young allegedly looked at all of this information as

well.

THE COURT:  Well, that's -- I mean --

MR. WILSON:  And I'll -- if I could just ask a

couple of very --

THE COURT:  I mean, I am wondering if you are just

going through all of it or if you are going to ask her --

MR. WILSON:  I am going to ask her about drug use

specifically.

THE COURT:  Okay.  Go ahead then.

BY MR. WILSON:

Q    Would you agree with me that in 1996 -- excuse me --

in 1986 at the time of the admission Mr. Barrett was

diagnosed with mixed substance abuse; isn't that correct?

A    Yes.

Q    And he had reported a history of polysubstance abuse at

that time; isn't that correct?

A    Yes, he had.

Q    And you will agree with me also that in 1995, he was

seen by a series of different medical providers during a

short span in January of 1995; is that correct?

A    Would you refresh my memory?

Q    I believe he ultimately shows up by ambulance or to

the E.R. at Wagoner Community Hospital.

A     Yes.

Q     And then he is referred out to a couple of other facilities; isn't that correct?

A     Yes.

Q     And you will agree with me that at the time of those admissions that Mr. Barrett was -- tested positive for high levels amphetamine, isn't that correct?

A     Yes.

Q     And that he was diagnosed with organic effective disorder and polysubstance abuse; isn't that correct?

A     Yes, I do recall that.

Q     But he denied headaches; correct?

A     Yes.

Q     I am sorry?

A     Yes.  I said if you say so.  I mean, I don't recall that specific detail.

Q     Well, the reason I bring it up is isn't it true that Dr. Young made mention that Mr. Barrett reported having a history of migraine headaches?  Isn't that right?  Isn't that what she reported?

A     Yes, but I am not sure how that relates to substance abuse.  I mean, it is possible he was not aware of anything when he was high all of the time.

Q     I appreciate that.

A     That is not uncommon.

Q    I appreciate that, Doctor.  But is it not true that Dr. Young, as a part of her findings, referenced that Mr. Barrett reported having a history of migraine headaches?

A    Yes.

Q    But that is inconsistent with the medical history; isn't that correct?

A    No, that's one record where he didn't mention that he had headaches, no headaches --

Q    So what medical record did you find --

A    That's an emergency record and, you know, they are finding out what is going on in the minute.  So he may not have felt headaches and wasn't thinking about headaches.  I mean, I really can't -- I don't think I can honestly respond to that.

Q    Well, let me ask you this question then:  What medical record do you recall from your review that purports that Mr. Barrett has migraine headaches?

A    I don't recall that.

Q    And what medical record have you reviewed that shows that Mr. Barrett suffered an injury to his head from a steel ball?

A    It was -- I evaluated not medical records, but this was --

Q    My --

A    But this was --

Q    My question is:  What medical record did you look at?

A    No medical records, just --

Q    Thank you.

A    -- reports from a number of different people independently who reported the event, including himself.

Q    But again, the question is, did you see any medical record of any event regarding Mr. Barrett being injured by a steel ball to the head?

A    No, I don't recall a medical record to that effect from his childhood.

Q    And did -- Dr. Young, did she report any medical record that she found of any incident of Mr. Barrett being struck in the head with a steel ball?

A    No.  She reported what she had reviewed that suggested that he had had the injury, not medical records, but kids often don't go to the hospital.  That is certainly something to be considered, unless they are --

THE COURT:  Doctor, you really need to let him ask a question rather than just volunteering.

THE WITNESS:  I apologize.

THE COURT:  That's okay.

BY MR. WILSON:

Q    Well, I will follow-up on what you just said.  You said kids don't always go to the hospital; is that right?

A    Yes.  I mean, if you look at culture and class and a

number of other variables, a lot of kids, unless there is an open wound that can't be managed, don't necessarily go to hospitals.

Q    Okay, I understand that.  But you would agree with me that looking at the reports that were given in this particular case, Mr. Barrett reported that he woke up in a doctor's office from this event; isn't that correct?  Isn't that what he reported?

A    Yes, and he may well have.

Q    But there is no medical record of that, is there?

A    Well, I have done a lot of capital cases and it is often hard to find records.  So I don't know what to say.

Q    So the answer to that would be, yes, there is no medical record?

A    There is no medical record that I know of.

Q    Thank you.  And you have reviewed the records from the State of Oklahoma Disability Determination; isn't that correct?

A    Yes, I did.

Q    Dr. Miora, this is the third federal case in which you've testified as an expert; is that correct?

A    In which I've testified?

Q    Yes.

A    Yes.

Q    And this will be the first time that you've testified

as an expert reviewing some other doctor's reports, solely for that purpose; correct?

A     That's correct, yes.

Q     But you would agree with me that you've -- in those times that you've testified as an expert in federal courts you've never testified for the government, have you?

A     No, unfortunately I haven't been -- well, for the government, no.  I have been agreed upon by the government and the defendants.

Q     All right, thank you.  You are a regular consultant with the California Appellate Project; correct?

A     As regular as it is these days, yes.

Q     And you would agree with me that is a non-profit corporation established by the California Bar for indigent people who are facing the death penalty; correct?

A     No.  It is people who have been convicted and sentenced to the death penalty.  They are not facing it, they have already --

Q     Oh, I am sorry.

A     Yeah.

Q     I apologize for the way I asked the question.  They have been sentenced to death; is that correct?

A     Right.  That's why they are appellate, yeah.

Q     And you've been paid for your services, is that correct, already in this case?

A    No.  I have been paid for some of my services, not all of them.

Q    And you are being paid or will be paid for your services today; correct?

A    I sure hope so.

Q    And you are being paid, I believe according to your C.V., at $250.00 an hour; is that correct?

A    Yes.

Q    And that includes courtroom testimony?

A    Yes.

Q    And how much have you been paid in this case to-date?

A    To-date?  Probably, I am going to guess, about $9,000.00, maybe a little more, nine to $11,000.00.

Q    Okay.  Nine, ten, eleven, it keeps going up.  Is eleven going to be the cap?

A    I said between nine and eleven because I am not 100 percent sure.  I haven't calculated it.

Q    Okay.

A    It is not going up or down.

Q    Now, I believe you testified earlier that when you look at data, specifically scoring data, that -- I believe it was your testimony that one point -- one standard deviation above the mean -- excuse me -- below the mean would be impairment.  Is that what your testimony was earlier?

A    No, I don't believe so.  It is below the mean, but not

until it is 1.5 are you really thinking, oh, my gosh, we are looking at some impairment.  I may look at scores that are just one standard deviation below the mean relative to other scores in a test battery and I may begin to see a pattern. We are very interested in patterns of performances across tests.

Q     Okay.  And as I read through your declaration and I read through Dr. Young's declaration actually, there seems to be some inconsistency about whether it was low average or was it mild impairment.

A     Meaning inconsistencies between hers and mine?

Q     Within the same document, what appeared to be within the same range of deviation was referred to sometimes as mildly impaired but sometimes low average.

A     I am not sure -- I apologize.  Are you referring to a document that I drafted or that she authored?  You mentioned mine and hers.

Q     Let's talk about Dr. Young's declaration.

A     Oh, okay.

Q     Would you agree with me there were some times where there was an inconsistent determination or reference to whether it was low function or -- I mean mild impairment versus low average?

A     If you could direct me to it, it is quite possible. I, I don't know where right now, but, yes, I do remember

some --

Q    All right.  Well, let's --

A    But, yes, I do remember some, you know, sort of synonyms or different terminology.

Q    Now, you had to rescore or you -- I say had to.  You re-scored the data; correct?

A    I had to, yes.

Q    And there were some errors in Dr. Young's numbers?

A    Yes.

Q    Well, one of the errors -- and I shouldn't characterize this as an error, but a difference, I believe, was on the WAIS-IV, the processing speed.

A    Yes, uh-huh.

Q    And it was a significant difference between the number that she had and the number that you have?

A    That's correct.

Q    Have you had an opportunity to determine what the difference was, what was the reason why your numbers were so much lower than hers?

A    Yes.  I mean, what I determined -- well, no.  I apologize.  I cannot answer why her number is so different from mine.  I just know that when I re-scored it I came up with a different figure than she did, which suggests that there had been an addition error or some other kind of clerical error --

Q    All right.  Well, let's --

A    -- that would explain that difference.

Q    I want to direct your attention back to Number 67, Government's Exhibit 67.  And specifically, I want to direct your attention to Pages 161 through 167.

A    Unfortunately, I don't think I have them numbered.  Oh, okay.

Q    Top right-hand corner.

A    Okay.  And please tell me again which numbers.

Q    161 through 167.

A    Okay.  I am with you.

Q    All right.  Do you recognize that document or series of documents?

A    I do.

Q    Can you tell the Court what that is?

A    That is the response booklet for the Symbol Search Test, as well as -- well, I'll say that.

Q    And is that one of the tests that you talked about with counsel earlier during your direct examination?

A    Yes.

Q    And that's one of the tests where you reported that there was some impairment of Mr. Barrett; isn't that correct?

A    Yes.

Q    And this is one of the scores that there was a difference -- this is one of the tests that there was a

1293

significant difference between your scoring and Dr. Young's;
correct?

A      Yes.

Q      If a page is missing of data, would that effect your
numbers?

A      Yes, it could.

Q      Well, let's look at that.  Page 161, top right, and
then turn to 162.  At the bottom of that that is Page Number
2; correct?

A      That would be the case.

Q      All right.  Then flip over to 163...

A      Right.

Q      What page is that?

A      That would be Number 3.

Q      But it says what?

A      No, no, no, you are misunderstanding what she has
there.  Those are correct and incorrect responses.  You mean
the number she has got at the bottom?

Q      No.

A      I should wait --

Q      No, no, I am talking about the page number that is
pre-printed on this form in the bottom middle.

A      Oh, I see what you are referring to.  Ah-huh, uh-huh.

Q      There is a page missing; right?

A      Good point, yes.

1294

Q     That's a full page of ten scores which you did not have?

A     That's correct.

Q     And that would make up the difference, wouldn't it?

A     It very well may.  Thank you for pointing that out.

Q     So his processing speed is not as bad as you re-calculated it; isn't that correct?

A     It is more believable actually.

Q     Okay.

A     And it is still bad.  I mean, that's the thing.  It is still very low.  I was having difficulty and you've helped me solve the problem in recognizing, yeah, what the problem was.

Q     All right.  Well, let's go back to her scores.  What was -- so her scores would be correct because she had all of the pages and you didn't have them.

A     Well, assuming that he got them all correct on that page that we are missing, which I don't know.

Q     Well, let's check her scores.  What score did she give him?

A     Just a minute, I am going to have to look.  I don't -- hold on.  (PAUSE)  I don't have a score report from Dr. Young for the WAIS.  I had to do it myself and didn't have hers, to which I could compare it.  My guess is it was on a disk and, you know, in a locked place where it couldn't be

obtained.

Q    But it is in her declaration; right?

A    Okay, I can go to the declaration, okay.

Q    If you will look at that for me...

MR. SCHARDL:  Your Honor, can counsel direct the witness to -- the declaration is 17 pages long.  Are we supposed to wait for her to read the whole thing?

THE COURT:  Can you point out the paragraph, Mr. Wilson?

MR. WILSON:  I believe I can, Judge.

THE WITNESS:  I have it, 1096, the end of the first paragraph.

BY THE WITNESS:

A    Processing speed 76 at the 5th percentile.  That still means 95 percent of people do better than he and it is still in the -- it is in the -- yeah -- borderline range.

BY MR. WILSON:

Q    Okay.  But it is not in the severely impaired range as you testified earlier?

A    Right.

Q    Thank you.

A    Actually I think I had written borderline but said severely impaired, so, yes, you are correct.

Q    And you would agree with me that with that score, then that brings down the entire score -- the rest of the scores;

1296

isn't that correct?

A      Slightly.  It is not a big difference.  82/84 full scale I.Q. score.

Q      But it brings them down; correct?

A      Bupkis as we say in the business.

Q      Sorry?

A      It is nothing, it is really -- it is not significant is what I'm trying to say.  Can you spell that? (TO COURT REPORTER)

Q      You would agree with me that in this battery of tests that were performed that there is some -- nearly one hundred different scores; correct?

A      I believe so.

Q      And would you also agree with me that a person's I.Q. and education level could impact their scores on a number of these tests; isn't that correct?

A      It is possible.  One would have to be very careful to determine which tests, and there is research behind it, are affected by I.Q. and education and which are not.

Q      Okay.

A      So, for example, the sensory motor tasks, those aren't affected by education.

Q      Okay, I appreciate that.

A      Yeah.

Q      And I am sure you are familiar with the research that deals with the testing of normal people, healthy people in

the population.

A    Yes.

Q    That if you give a large battery of tests to normal individuals, that a sixth of the population is going to have 25 percent of those scores being in the impaired range; isn't that correct?

A    I don't know that particular body of research and I would say that what is important is to look at the patterns of performances because to have a bit of a lower score here and there -- and it depends on what you mean by impairment. Are you talking about one standard deviation or are you talking about three?  But the point is that you won't necessarily in those normals see patterns of scores that group around certain areas of dysfunction, which is really what I am seeing here.

Q    But you would agree with me with the more tests that you give, the more -- the higher potential of there being lower scores even in a healthy population?

A    Not a higher potential of lower scores, a higher potential of finding something that is less than average.

Q    All right.

A    That I have read.

Q    All right.  One particular article I am familiar with is an article known as "To Err is Human."  Are you familiar with that particular article?

1298

A    Yes.

Q    It deals with what we've been talking about; correct?

A    Yes.

Q    All right.  And you would agree with me that when we look at the testing scores as a whole, -- and I said there was some nearly 100 of them from Mr. Barrett's testing that was performed by Dr. Young -- that if you were to look at them that roughly 22 percent would fall in the below average -- the mild impairment or below category; is that correct?

A    I didn't eyeball it in that way, so I am not comfortable to answer, but I know there were a combination of relative strengths and a number of patterned weaknesses.

Q    On the WAIS-IV you would agree with me that verbal comprehension was in the average range; correct?

A    Yes.

Q    That perceptional reasoning was in the average range; correct?

A    I believe so.  I can't remember if it was low average or average.  Let me get a look.  (PAUSE)  Yes, that is correct.

Q    And you would agree with me that working memory, I believe you testified, was in the low average; correct?

A    Right.

Q    That processing speed was down in the mild to moderate impairment range; is that correct, or was that in the mild

1299

impairment?

A      No, it was not in the mild impairment.

Q      So was it in the --

A      That was two standard deviations.  1.5, so I would give it -- yeah.

Q      Okay.  And that was significantly lower than the testing back in 2000; correct?

A      Yes, and I -- and I will say I can't speak to -- as you pointed out that I wasn't in the room, I wasn't in the room with Bianco, Dr. Bianco, and I don't know what the conditions were for his testing.  I just don't know.

Q      Okay.

A      I just don't know.  Maybe he follows different rules.

Q      All right.  You would agree with me that on the verbal comprehension -- that would be under the subtest -- that Mr. Barrett scored in the average range?

          MR. SCHARDL:  Objection, asked and answered.

          THE COURT:  We did cover that already, didn't we?

          MR. WILSON:  I will move on, Judge.

BY MR. WILSON:

Q      How about block design?  You would agree with me he scored in the average range; correct?

A      Yes, and that's where it becomes important to look at subtest scatter --

Q      The question is do you agree with me that he scored in

the average range?

A    I do.

Q    Do you agree with me that on the matrix reasoning he scored in the low average range?  Correct?

A    Yes.

Q    You will also agree that on visual puzzles he scored in the average range; correct?

A    Yes, close to average.

Q    And on the working memory subtest, digital span, low average; correct?

A    Yes.

Q    The arithmetic, low average?

A    That's correct.

Q    Letter numbering sequencing, low average?

A    Yes.

Q    The Processing Speed Subtest, the simple search -- I mean, we talked about that one already, that he was in the low average; correct?

A    No.  Symbol search?

Q    Symbol search; isn't that correct?  That's the one that was mis-scored; right?

A    Right, but I don't know that it brings it up to a low average.  I would have to do the calculation.  I don't -- let me look at her -- Dr. Young's declaration.  Have you calculated it?  Because I can't answer that and I don't have

the manual.  (PAUSE)  If you could direct me to somewhere where she spoke specifically about the symbol search, I would be happy to take a look.  I can't imagine with a score of the 5th percentile for the two tests combined it would be low average.

MR. WILSON:  May I have just one moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. WILSON:  Your Honor, if I may, I'll just move on from there.

THE COURT:  Okay.

BY MR. WILSON:

Q    Let's move to the CVLT.  That was right toward the end of the discussion you had with counsel earlier.  Would you agree with me that on the CVLT-2 that on trial one he scored in the average range; correct?

A    Correct.

Q    And trial 5 was in the above average range; correct?

A    Yes.  It shows he can learn.

Q    I am sorry?

A    It shows he learned over repeated exposure, which is consistent.

Q    Okay.  And he was above average in trials 1 through 5; correct?

1302

A    No, he wasn't above average, he was average.  A T score of 49 is average.  50 is average actually.

Q    All right.  On the Short Delay Free Recall, it was above average?

A    Right.

Q    Short Recall Quad Recall, above average?

A    Yes.

Q    Long Delay Free Recall, above average?

A    Are you asking a question?  I am sorry.  You made a statement.  I didn't know if you were asking a question.

Q    Is that correct, that he was above average on that?

A    Yes.

Q    Is it correct that he was above average on Repetition Errors?  Isn't that correct?

        MR. SCHARDL:  Your Honor, I am going to object.  I don't know what is being referred to in the scoring.

        THE COURT:  Can you be more specific?

        MR. WILSON:  I will ask about each one, Judge, sure.

BY MR. WILSON:

Q    Short Delay Free Recall.  Can you tell the Court what that is?

        THE COURT:  Where are we looking at?

        MR. WILSON:  We are looking at the CVLT-2.

BY THE WITNESS:

1303

A    Do you want me to tell the Court what that is?

Q    Yes.  What is the Short Delay Free Recall?

A    The Short Delay Free Recall is after they have been exposed to a -- they have the five trials of the first 16 word list.  Then they are exposed to a new list that he bombed horribly, trial B, and then --

Q    And that's on -- I am asking about the Short Delayed Free Recall.

A    I am getting there.  And then --

Q    That's all I am asking about.  What is the Short Delay Free Recall?

A    And then, and then after that, they return to the first list, the one that was presented several times and are simply asked tell me as many words as you can from the first list, the one that I read to you several times.

Q    And he scored above average?

A    Yes.

Q    The Short Delay Quad Recall, what is that?

A    The Short Delay Free Recall is they are provided queues --

Q    Hints, right?

A    I am sorry?

Q    Like a hint; correct?

A    Right.  They are provided category queues and he did better being provided a category queue and similarly was above

1304

average, yes.

I was just noticing that you had neglected to talk about trial B, which is important to his pattern of difficulties.

Q    Doctor, if you will just answer my questions, ma'am, and quit volunteering, it will -- and I will ask the Court again to instruct the witness to just answer the questions.

A    Okay, I will do that.

THE COURT:  Just whatever he asks you -- we can clear some of this stuff up on redirect, if necessary.

THE WITNESS:  Sounds good.

BY MR. WILSON:

Q    There is a scoring in the CVLT of repetition errors; is that correct?

A    Yes.

Q    And you would agree with me that he scored in the above average range on that; correct?

A    No, I don't think he did.  I am not sure.  I will have to look at the protocol.  What was the score associated with it?  Was it a one?

Q    I am just looking at a grid on repetition errors.  I don't have the number in front of me.  I am sorry.

A    Let me look for you.

Q    And I am sorry, the Z score is .05.

A    Thank you.  Yes, that's fine, average.

Q    And on trial B, as you've testified in direct, that's

when another set of information is provided and that he scored 1.5 below the mean; correct?

A     Yes, meaning there was the interference of the old information with learning new information.

Q     But then when you come back to the original information, he was able to recall the original information; correct?

A     It's still there, that's right.

Q     Now, on the WIMS-IV, there is a score or subtest on Auditory Memory Index; correct?

A     That's correct.

Q     And you would agree with me that Mr. Barrett scored in the low average on that; correct?

A     I am just looking.  Give me a moment, please.  (PAUSE) Ah, here we are.  And what are you looking at specifically?

Q     The Auditory Memory Index.

A     Okay.  Might you tell me which page you are looking at of those page numbers at the bottom.  I am just missing the particular reference you are making.

Q     Well, do you recall what his score was on the WIMS Auditory Memory Index?

A     Okay.  So you are having trouble finding it too?

Q     Yes, ma'am, I am.

A     Okay.  I believe it was 91.  I just found it.  Here it is.  So, yeah, that's average.

Q    And the Visual Memory Index was -- it was above average; correct?

A    The Visual Memory Index, yes, was very high.

Q    And the Immediate Memory Index was average; correct?

A    That's correct.

Q    The Delayed Memory Index was average?

A    No, it was above average.

Q    Oh, I am sorry, above average.

A    Call it like it is.

Q    Absolutely, thank you.  But as you testified earlier, the Visual Working Memory Index was impaired; correct?

A    Highly impaired, yes, moderately impaired, two standard deviations below the mean.

Q    Highly or moderately?

A    Moderately.

Q    Okay.  Logical Memory average; correct?

A    One moment.  I believe so, yes, yes, above average.

Q    Okay.  But then Verbal Paired Association, can you tell me what that is?

A    Yes.

Q    Verbal Paired Association?

A    Right.  They are given two words and what they are asked to do is to remember the words that pair -- there has been a list of words actually with two word pairs and then they are given one word and they have got to give the other word

that is paired with it.

Q    And Mr. Barrett scored in the impaired category on that; correct?

A    Yes, very low on the immediate recall, moderate, two standard deviations below.

Q    Within a -- what's the difference between the Verbal Paired Association 1 and a Verbal Paired Association 2?

A    It is when you receive it.  One is Immediate Recall and one is Delayed Recall.

Q    But on Delayed Recall he moves up to average; right?

A    Yes.  It is very similar to the Rey.

Q    Okay.

A    The problem is with registration of the information, but then later he is able to call up more of it, which tells you something is going on there that is not -- something is rotten in Denmark.

Q    I probably wouldn't have said it that way, but I appreciate that.

A    I know.  I apologize if that offends anyone in the court.

Q    Designs 1, that was above average?

A    Yes.

Q    And 2?

A    Correct.

Q    Visual Reproduction, that was average, on the 1 and

on the 2 above average; correct?

A    Exactly.

Q    Now, we've already talked about the Symbol Span earlier; correct?

A    I believe so, yes.

Q    All right.  Counsel spent during direct examination a considerable amount of time on the D-KEFS.  And when you were testifying you didn't go through all of the sub-scores and subtest scores, did you?

A    All of them?  No.

Q    It would take a long time, wouldn't it?

A    That's right.  And what I did was to make general comments.  If they were generally fine, I said they were fine.  The only ones I spoke to were the areas that were impaired.

Q    Okay.  You would agree with me, looking at the D-KEFS scores in their totality, if you look at all of the scores and the sub-scores of the subtests, you would have about 94 different scores just on the D-KEFS; isn't that correct?  Would you agree?

A    Yes, that's true.  It has got a lot of conditions and analyses.

Q    And if you look at this in its totality, Mr. Barrett scored in the mild impairment or below about 14 percent, 14.9 percent; is that correct?

1309

A     I don't know, but I'll take your word for it.  I have not done any calculation like that.

Q     All right.  Well, let's look at some of these quickly. Under the design fluency, there is a test on what is called the Filled Dots.  Are you familiar with that?

A     Yes.

Q     And you've administered that test in the past yourself?

A     Yes.

Q     Mr. Barrett scored above average; correct?

A     I am just trying to locate that data right now. (PAUSE)  I am not able to locate it, but if you would like to show me an exhibit so that I can respond to each area, I will.  (PAUSE)  I found it.  You are talking about the Filled Dots?

Q     That's correct.

A     Yeah, there are many scores in the normal range, many, many, many.

Q     You would agree with me that empty dots is average?

A     Yes.

Q     Switching...

A     Yes.

Q     His total composite was within the average?

A     That's correct.  There is no question that this man has strengths and many things he is able to do well.  The

trick of neuropsychology is the Sherlock Holmes in looking at patterns and clues and if there is something there, then being able to put it together.  So there are highly functioning people with deficits and --

Q    Well, before I got to anymore tests, did you -- during your examination, you talked about potential insults to the brain.  You talked about the mother using alcohol; correct?

A    Yes.

Q    You are not telling the Court that Mr. Barrett suffers from Fetal Alcohol Syndrome, are you?

A    No, I am not.

Q    As a matter of fact, Dr. Woods told us that he was not making that diagnosis; isn't that correct?

A    That's correct.

Q    You are not saying that Mr. Barrett's alleged steel ball to the head caused a brain injury, are you?

A    I am not in a position to make causative analyses of those sorts.

Q    So you can't say whether or not his decades long use of illegal drugs caused any of these problems?

A    It very well may have, but I --

Q    But you can't say it for sure, can you?

A    No, I don't have a method to say that is a definite, yeah.

1311

Q    Well, I am going to direct your attention to the Color Wod Interference we talked about earlier.  It was part of the STROOPs we talked about earlier.  Specifically on the D-KEFS there is a color word interference portion; correct?

A    Right.

Q    On that test he scored in the average range for color name; correct?

A    Yes, he did.

Q    For word reading, he was low average; right?

A    Yes.

Q    But for inhibition, average?

A    No.  Oh, that inhibition, yes.

Q    Yes.

A    This is completion times though.  I want to -- well...

Q    I am asking a question.  When we are looking at these test results and there is a test result for inhibition -- and I believe you testified that he scored in the average range; correct?

A    On completion time --

        MR. SCHARDL:  I am going to object, Your Honor.

A    Yes, please.

        MR. SCHARDL:  Counsel is asking about these results.  The exhibit has page numbers.  I don't know why we can't have page numbers so that everybody can clearly be looking at the same page that we are talking about when he

1312

says, "these results."  I can't follow the questions.

THE COURT:  Well, are you working from notes or are you working from the exhibits, Mr. Wilson?

MR. WILSON:  Obviously I am working from notes, Judge.  So I --

THE COURT:  And it would be helpful if we were all working off of the same page.

MR. WILSON:  Okay.  I will try my best to...

BY MR. WILSON:

Q     All right.  We are looking specifically at Page 74, Government's Exhibit Number 67, Page 74.

A     Well, I don't have that exhibit in front of me.  I have my version of the printouts.  If that is sufficient, I will try to --

THE COURT:  Can you give her the right book, Nick, if you would, please?

THE CLERK:  Yes, Judge, it is there underneath her notes.

THE WITNESS:  Thank you.  That's got my -- my data in it?

THE CLERK:  It has the page he is referencing, Exhibit 67, Page 74.

BY THE WITNESS:

A     I am here.

BY MR. WILSON:

Q    All right.  Are you on Page 74?

A    Yes.

Q    You mentioned that these are the primary measures, the completion time; correct?

A    Yes.

Q    And you will agree that on the category of color naming he has an average score?

A    Yes.

Q    And word reading was low average; correct?

A    But then you go -- inhibition, that's average?

A    Yes.

Q    And also true of inhibition and switching, was average?

A    His completion time on inhibition and switching was average, yes.

                            (PAUSE)

Q    The Tower Test that counsel asked you about --

A    Yes.

Q    And I believe you testified that the individual is shown a pattern and they are asked to repeat that?

A    That's correct.

Q    Mr. Barrett in that particular test on his total achievement was average; correct?

A    That's correct.  He was even a little bit above average.

1314

Q    So he performed that task; is that right?

A    I am sorry?

Q    He performed that task a little above average, comparatively speaking; is that correct?

A    What I need to tell you is to look at these scores independently of the other scores, it is like looking at half an elephant or a quarter of an elephant and say, ah, you know...

Q    Well, you will agree with me that the only part of the Tower Test which Mr. Barrett score as impaired was on his move accuracy; correct?  That's the number of moves that it took him to complete the task.

A    That's correct.  So the move accuracy and the rule violation was low average.

Q    Okay.  Now, the Proverbs Test -- I don't know that counsel talked much about that, but what is the Proverbs Test or the Proverb Test?

A    It is giving them an opportunity to state the meaning of Proverbs.

Q    That's a test of -- the ability to abstract concepts; correct?

A    Of a particular type, yes.

Q    And Mr. Barrett scored on all either average or above average; correct?

        MR. SCHARDL:  Again, Your Honor, same objection.

1315

If we could have a reference to --

MR. WILSON:  Page 80, Counsel.  Sorry about that.

Thank you.

BY MR. WILSON:

Q     Do you see average or above average by Mr. Barrett on that test?

A     I am sorry, I didn't hear the question.

Q     On the Proverbs Test, did he score average or above average?

A     On the achievement of common proverbs he scored above average ane he scored slightly below, but really average on the others.  However, there is an abstraction only score that was very low.  So the point is, you know, you need to take that into account in considering his performance.

Q     The abstraction score is the one you are talking about here?

A     Yes.  Do you see that?

Q     Is that the one that is scale scored as a 1?

A     Yes.

Q     Is that an accurate scoring?

A     I believe so based on what I found in her data.

Q     Now, a couple of other tests that counsel talked with you about were the Card Sorting Test and the Sort Categories Test.

A     Okay.

Q    And those are specifically tests that look at executive functioning.  That was your testimony; correct?

A    Yes.

Q    And I believe you testified that Mr. Barrett didn't complete a single sort; is that correct?  He didn't get 10 in a row as required to move to the next sort; is that correct?

A    That's correct.

Q    But isn't it true that he was correctly naming the rule, but simply not putting the card correctly to match that rule?

A    I don't know how often he was doing that, but I did read, yes -- to answer your question, yes, I read that he appeared to be doing that.

Q    So when you testified earlier he just didn't get the rule, that's not correct, is it?  He got the rule, he just simply couldn't -- he just didn't put the card in the right stack?

A    Honestly I wasn't clear on Dr. Young's testimony in that area.  So I would be making something up to respond to it.

Q    Well, you weren't there when the test was given, were you?

A    Exactly.  And nor when Bianco was doing his testing either.

1317

Q       That wasn't my question, Doctor.  Again, would you, please, just answer my questions.

A       Yes.

Q       Thank you.

MR. WILSON:  Referring counsel to Page 21 of the declaration.

THE COURT:  Exhibit 25?

MR. WILSON:  It's the declaration of Dr. Young.  I believe that is Number 25, Judge.  Well, I think I might have misspoke.  Hang on a second.  Sorry, Judge.  (PAUSE) Oh, I am sorry.  It is Page 22 of Exhibit Number 25.  It would be Paragraph 60.

(PAUSE)

BY MR. WILSON:

Q       Do you see that, Paragraph 60?

A       I do, but I don't see any reference to her saying that the rule that he was thinking about was accurate but simply that the rule that he came up with was not what he actually sorted.

Q       So is it your impression of that language that the rule was wrong, plus the action on the rule was also wrong?

A       No.  I am saying that it is ambiguous.  That when she writes, quote, "He was unable to carry out the, quote, 'rule,'" end quote, "he had stated," parentheses, "(categories completed equal zero)," end parentheses -- oh,

1318

I am sorry. Basically he was repeating the "rule", in quotes, that he was using, but she didn't say that that rule was accurate. So I don't know if the rule that he said out loud was accurate and just different from the one he sorted to, but there was some disconnect between what he was saying and he was doing. She didn't say -- she didn't say he came up with the correct rule. It was the rule he was using in the --

Q    Okay. So, again, we just don't know for sure?

A    I would say I couldn't answer that, correct.

Q    Okay. Mr. Barrett's inability to get a single sort, that's inconsistent with the rest of the testing, isn't it?

A    No, not at all.

Q    Not a single sort? He can't get 10 in a row?

A    If he got the concept, he might be able to get 10 in a row. His short categories test, which was given and they are often given in a battery together -- especially if there is a poor performance on one, then the other will be given. It is recommended. He did very poorly on that conceptual level task as well, which is nonverbal. Those are nonverbal tasks and one of the patterns I found was problems with visual attention and nonverbal changing kinds of tasks.

Q    Now, you examined the errors that he made as a part of this Wisconsin Card Sort; correct?

A    Yes.

Q     Mr. Barrett didn't get stuck, he didn't -- correct?

A     That's correct.

Q     What we call preserve -- I knew I was going to get that wrong.  Perseverative errors?

A     Correct.

Q     So when Dr. Woods testified a couple of months ago in this hearing that Mr. Barrett had a problem with getting stuck, that's not correct, is it?

MR. SCHARDL:  I am going to object.  Because of the Court's ruling earlier, we weren't able to bring Dr. Miora to listen to Dr. Woods' testimony.  She doesn't know what he testified to.  It is unfair.

THE COURT:  Okay.  And we really are here to talk about her work with Dr. Young's --

MR. WILSON:  Well, Judge, we objected to having this witness testify because Dr. Young -- excuse me -- Dr. Woods had already testified about all of what Dr. Young had done.  And now he testifies one way and now she comes in and testifies differently.  I am just pointing out that inconsistency.

THE COURT:  All right, so noted.

MR. WILSON:  Thank you.

BY MR. WILSON:

Q     Would you agree with me that Mr. Barrett committed, I believe, some 48 errors that simply didn't match anything

on the card sorting?

A    Yes, and I had a hypothesis about it.

Q    That's over 60 percent completely wrong, didn't match anything; correct?

A    No.

Q    That's not correct?

A    I can't be sure about that.  I discovered something that I have not published about, but that I wonder about with the card sorting test when it is given the way it is given, when it is not on a computer.

Q    Well, if someone misses 48 times with complete mismatches...

A    Mismatches, unless something else is considered.  They may not have been mismatches.  They were mismatches to the four cards to which you are supposed to sort.  They may not have been mismatches to the piles underneath and I see this time and time --

Q    Do you think Mr. Barrett just didn't understand the rules?

A    What's that?

Q    Maybe Mr. Barrett just didn't understand the rules.  Is that a possibility?

A    Yes, that is a possibility.

Q    And if he missed 48 times, that's pretty clear, he just didn't understand what he was supposed to do; correct?

1321

He didn't get the rules.

A     Well, it is not about him getting the rules.  One is you develop the concept in your mind.  The other is he may have understood the rules and he just didn't get the concepts.

Q     But we can't say for sure, can we?

A     Well, I suppose that's another hypothesis, yeah.

Q     And fatigue will play into that; correct?  Fatigue will play into your performance on the sorting test; correct?

A     Fatigue on the actual -- just the sorting test?  Not likely.

Q     I have been testing for 3 hours and that's not going to play into it?

A     Well, Dr. Young reported that he got breaks.  She was very careful about giving him breaks.  So --

Q     Looking at the raw data, can you tell us what order the tests were given in?

A     No.

Q     Can you tell us what time of day the card sorting test was given?

A     No.  I could come up with a number of hypotheses, but I don't have the data.

Q     Now, you testified that -- well, tell me with the card sorting test, Dr. Young --

MR. WILSON: And, Counsel, I am referring to Page 22 again, Paragraph 60.

BY MR. WILSON:

Q   Remember, we were discussing Mr. Barrett calling out the rule and then not following his own rule that he called out.

A   He called out the rule he was using --

Q   Correct.

A   -- to solve this problem.

Q   Now, in the latter part of that paragraph Dr. Young makes a comment. "Current research demonstrates a significant relationship between ability and inability to grasp and consistently carry out the demands of the WCST," which is the Wisconsin Card Sort Test, "and daily functioning such as driving an automobile or successfully returning to work after a closed head trauma." Right, that's what she says?

A   She did.

Q   Mr. Barrett didn't get a single sort; correct?

A   That's correct.

Q   And according to what Dr. Young is saying, there is a significant relationship between that inability and the ability to drive a car; correct?

A   Yes, she notes that there is that relationship.

Q   Are you suggesting that the fact that he is in the

90th -- sorry -- the one percentile that this man can't even drive a car?

A    I don't believe she was suggesting that and I wouldn't suggest that.  And I --

Q    So do you know why she put this in here?

A    No, I can't tell you why she put that in there.

Q    But you adopted her findings in totality; correct?

A    No, I did not.  If you are asking me, did I adopt that sentence --

Q    Well, you don't agree with that --

A    I don't know if I agree or disagree with it.  I hadn't considered it.

Q    Mr. Barrett was able to operate a motor vehicle.  We all agree with that; correct?

A    I don't know.

Q    You don't even know whether he can drive a car?

A    Now?  How long has he been in custody?  No, I have no idea.  Do you --

Q    At the time --  back in 1999 when Mr. Barrett murdered a trooper, do you know whether he could drive a car?

A    Yes.

Q    You do know that?

A    Yes.  I thought you were asking me about --

Q    Do you know whether he had the ability --

A    -- now.

Q    Do you know whether he had the ability when stopped by a law enforcement officer to convince a law enforcement officer to let him drive -- to let him drive home?  You were aware of that; right?

A    I am not sure.

Q    He was able conceptually to understand the circumstance he was in.  He knew he had been stopped by a police officer; correct?

A    That's pretty concrete.

Q    Okay.  And to be able to convince that officer -- he said don't take me to jail, let me drive myself home and then you can take me into custody.  He was able to formulate that concept, wasn't he?

A    Uh, according to what you are saying.  It is not a difficult concept.

THE COURT:  Are you familiar with that incident or not, Doctor?

THE WITNESS:  I believe I am.  I believe I have seen that, but I wasn't 100 percent sure, so I didn't want to -- yeah.

THE COURT:  All right.

BY MR. WILSON:

Q    So you are familiar with that event?

A    Yes.

Q    You are aware that on the night of this particular

event Mr. Barrett was using methamphetamine?

A    Yes.

Q    And that Dr. Miora can affect a person's ability to perceive their surroundings; isn't that correct?

A    Absolutely true.

Q    And substantial use -- or historical use of methamphetamine can affect a person's ability to perceive their circumstances; isn't that correct?

A    Absolutely true.

Q    But Mr. Barrett was able to obtain a firearm in the midst of this event; isn't that correct?

A    I don't know when he obtained a firearm.  I can't answer that.

Q    Have you read the facts of the event?

A    Yes.

Q    So you've read all of the law enforcement reports?

A    All of the law enforcement reports?  Probably not.  No, I would --

Q    Because I didn't see any of that in your declaration about the things that you reviewed, so I didn't know whether you had --

A    No, I was asked to review Dr. Young's work, not to get into anything having to do with the police reports and accounts of events.

Q    All right.  So getting back to my question, --

A    I am consulting on neuropsych data.

Q    -- the law enforcement --

A    No, I did not review all of those police reports.  Are they in my ---

Q    But you are here testifying about the cognitive abilities of Mr. Barrett; correct?

A    Based on Dr. Young's assessment, declarations I read and other professional reports I read, that's correct.  I am not testifying about --

Q    Counsel has asked you --

A    -- when he bought a gun or how he bought a gun or anything like that.  I don't know about that.

Q    Well, counsel was asking you about the ecological validity of these tests, the real world application of the findings of the tests; is that correct?

A    Yes.

Q    And wouldn't it be important to know the facts of the crime when you are talking about the ecological validity of these tests on Mr. Barrett's behavior back in September of 1999?

A    I am not called in, as far as I know, to make any -- to develop any opinion about what was going on with him at the time of the crime.

Q    Well, I --

A    I was asked to come in and opine about the validity

1327

and reliability and robustness of Dr. Young's work in the case.

Q    Well, if I am not mistaken, I believe you testified that Mr. Barrett was incapable of taking in information, that it was difficult for Mr. Barrett and to act upon that information in real time; isn't that correct?

A    Honestly it feels out of context for you to make that big general statement.  I don't feel like I can answer that yes or no.

MR. WILSON:  Can I have just a moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. WILSON:  Your Honor, I believe that's all of the questions I have.  At this time I would move to strike this testimony of this witness.  If the witness is not here to render an opinion, then it's not relevant to this Court's determination.  So I would ask to strike the testimony of Dr. Miora.

THE COURT:  What do you say about the motion, Mr. Schardl?

MR. SCHARDL:  I would say, Your Honor, that the Tenth Circuit remanded this case for a hearing in particular on the findings of Dr. Young as it relates to Mr. Barrett -- the findings of impairment that she identified.  So the Tenth Circuit obviously thinks that it is relevant and the

doctor has testified to possible etiology causes for the impairment that was found. Those possible causes, she has testified, would be cumulative. She has testified that they existed before the events and she has testified -- and counsel has brought out a number of similarities between his functioning in 2000 and 2009. So I would say we have measures of his functioning and his ability in the relevant areas of judgment and responding to stimuli or visual stimuli. And the witness has testified to the relevance of it and I think it is apparent from what the Tenth Circuit has ruled.

THE COURT: Anything further on this point, Mr. Wilson?

MR. WILSON: Well, Judge, I asked the witness specifically about the events in September of 1999 and what this testing -- any impact, what that has and she was not and did not render an opinion. So it is not relevant to this Court's determination as to the prejudice of any potential ineffective assistance of counsel by Mr. Smith or Mr. Hilfiger back at the time of trial.

THE COURT: Well, let me reserve a ruling on that. I will take it under advisement.

MR. WILSON: Thank you.

THE COURT: Is there any redirect?

MR. SCHARDL: A bit, Your Honor. I think I can do

it in about half an hour.

THE COURT:  Okay.  Well, let's take about a 10 minute break then, come back at 5:00 and do it in half an hour.

(4:48 p.m.)

(SHORT RECESS)

(5:02 p.m.)

COURT IN SESSION

THE COURT:  Mr. Wilson?

MR. WILSON:  If I may before counsel begins, I would move to introduce Government's Exhibit Numbers 67 and 68, which are the testing data that we were talking about earlier.

THE COURT:  Any objection?

MR. SCHARDL:  We will object to the introduction of Dr. Bianco's, whichever one that was, I don't recall if it was 67 or 68, but -- I am sorry?  Thank you, Counsel. We object to 68 in that the witness hasn't testified to it and we don't have his normative -- we don't know what norms he used.  So there is a big question about whether the Court would even be considering his --

(PAUSE)

THE COURT:  Go ahead and finish.

MR. SCHARDL:  I am sorry, Your Honor.  So we would want to voir dire Dr. Bianco about his methods and whether

they were scientifically valid and reliable at the time he used them.  As Dr. Bigler stated in his declaration, which is at Document Number 376-2, there are indications that Dr. Bianco's raw test data, the Exhibit 68, that he may have been using norms from the 1950s.  In which case, the Court in 2005 would probably exclude his testimony under Rule 703 on the grounds that it wasn't based on reliable, accepted scientific methods.

THE COURT:  Isn't all of that data a part of the record already?  We haven't admitted that exhibit, but wasn't that attached to the petition or...

MR. SCHARDL:  No, Your Honor, it was not.

THE COURT:  The government's response?

MR. WILSON:  Well, Judge, no, it was not attached to the --

THE COURT:  The affidavit -- it is not attached to the affidavit from Dr. Bianco?

MR. WILSON:  No, no, it was not.

THE COURT:  Okay.

MR. WILSON:  The reason I am moving for it, Judge, is because it was specifically relied upon by this witness and by Dr. Young and by Dr. Woods for their testimony.

THE COURT:  All right.  Well, I am going to admit both of those exhibits.  I will note your objection on the records of Dr. Bianco.

MR. SCHARDL: We will -- if I may, Your Honor, the defense would renew its request to have Dr. Bigler testify. If the Court is going to consider that evidence, the Court should consider whether it is reliable and what it means.

THE COURT: Well, this witness reviewed it and relied on it. That's the reason I am letting it in, not because it is independent proof of anything.

MR. SCHARDL: Your Honor, the witness relied upon it for the reasons stated in our opposition to the motion to call Dr. Bianco. That is, if trial counsel had testified on the issue of deficient performance that they relied upon the one page affidavit from Dr. Bianco, Dr. Miora or Dr. Bigler is going to testify that that would be unreasonable for some of the reasons stated in other documents. That is -- and it is the reason I stated before, nobody knows what that stuff means because there is no norm attached to it. If somebody says average or below average, it is in relationship to a population, to a base rate. Nobody knows what that is because Dr. Bianco never said. So the witness did not rely upon it in forming her opinions about Mr. Barrett's neuropsychological functioning. She testified about Dr. Young's opinions of his neuropsychological functioning. Again, it was only to be considered for the purpose of this deficient performance issue, which never emerged because the trial attorneys testified they never relied upon anything

-- or that one page affidavit from Dr. Bianco.

THE COURT:  Okay.  Well, we will --

MR. SCHARDL:  I won't deny that they consider it, but I am just saying that they considered it for a different purpose than the one for which this witness's testimony is being offered in this hearing.

THE COURT:  All right.  Go ahead and do your redirect.

MR. SCHARDL:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. SCHARDL:

Q    Dr. Miora, is it considered necessary in the field of psychology or neuropsychology to be board certified in order to render opinions about neuropsychological testing?

A    No.

Q    Do you know whether Dr. Young was board certified?

A    Yes, she was.

Q    You were asked a number of questions about Mr. Barrett's performance on various tests of his verbal abilities, such as the California Verbal Learning Test, the CVLT-II; correct?

A    Yes.

Q    In neuropsychological assessment, is there such a thing called discrepancy analysis?

A    Yes.

1333

Q      What is that?

A      Desrepency analysis allows for the comparison of different scores to determine whether there are any significant differences, statistically significant differences between the scores.

Q      And is there a type of discrepancy analysis that is between two subtests within the same index?  Is that one kind of discrepancy analysis?

A      Yes.

Q      So, if you are shown, as you were on cross examination, scores in an average range on tests within one index and then there is an impaired scored on another test within the same index, would you apply discrepancy analysis in that situation?

A      Yes.

Q      Is that what neuropsychologists basically do?

A      It is a -- yes, it is one of the methods used to establish discrepancies and in pattern analysis of the data. In other words, looking at the lower scores, for example, or higher scores and seeing if there is any pattern to them that emerges.

Q      Looking for any strengths and weaknesses?

A      Yes.

Q      How important is discrepancy analysis in neuropsychological assessment?

1334

A    Very important.

Q    So do you base conclusions as a neuropsychologist on the percentage of total tests given in which there is impairment?

A    No, I am not familiar with that as a method.

Q    You were asked on cross examination whether Mr. Barrett only showed impairment and -- and I think the number was 22 percent of the tests that were administered in the battery.  Are you familiar with any research that shows that kind of subtraction is indicative of any -- of anything at all?

A    No.

Q    There is no scientific basis for just saying...well, he did well on 78 percent of the tests?

A    Not to the best of my knowledge, and I do keep up on the literature.

Q    You were asked a number of questions about the testing that Dr. Bianco did.

MR. SCHARDL:  And for the record, I just want to say that we continue our objection to this, but to the extent that the Court is considering it in relation to Dr. Young's findings, I am just offering it for that purpose.

THE COURT:  Very well.

BY MR. SCHARDL:

Q    Could I refer you to Government's Exhibit Number 68?

(PAUSE)

Q      And if you could turn to the bates numbered page in the bottom right-hand corner that is 503266.

A      I am there.

Q      Okay.  Do you recognize the tests or any subset of the tests, I guess I should say, listed on this sheet as being part of a battery?  And let me be more specific, part of a fixed battery.

A      Yes.

Q      What is the difference between a fixed battery and a non-fixed battery?

A      A fixed battery is a battery of tests that are given each and every time and are generally normed together and serve as a way of evaluating neurocognitive function.

Q      And do you recognize the fixed battery of which constituent parts were used in Dr. Bianco's testing?

A      Yes.

Q      What is it?

A      He used tests that are a part of the Halstead-Reitan Battery.  It is not an entire battery but facets of it.

Q      And how long as the Halstead-Reitan Battery been around?

A      The original battery?  For 67 -- 60 plus years.

Q      It was published in about 1950?

A      Yes.

1336

Q    And we were talking before the beginning of your direct testimony about normative data; correct?

A    Yes.

Q    And could you just -- to refresh our recollection, what does it mean to have normative data?  What is its purpose for neuropsychological testing?

A    The purpose of normative data is in addition to the development of the test, then having comparison groups, having samples to which you can compare an individual you are assessing relative to those -- relative to the normative sample.

Q    So would you norm a test for different age groups, for example?

A    Yes.

Q    And I suppose if there is -- if there is a test that involves language, would you norm it for their education level?

A    Yes.

Q    And do they also change the norms of tests over time for those subcategories?

A    Yes.  They get re-normed or, you know, maybe a new test comes into being.  The WAIS is a good example of that happening.

Q    If you don't know the normative sample to which an individual's scores are being compared, do you know the

meaning of the score in a given range?

A    It opens up -- the answer is no.  It opens up a lot of questions about the meaning of the data.

Q    And in the -- in Government's Exhibit Number 68 did you see any indications of what the normative data used to do assigned -- well, let me strike that and ask you another question.  I am sorry.

MR. SCHARDL:  I apologize to the Court.  Let me strike that and back up.

BY MR. SCHARDL:

Q    You were asked a number of questions about whether Mr. Barrett's performance on these tests were average or below average or above average.  Do you recall that?

A    Yes.

Q    Or impaired or mildly impaired, et cetera.

A    Yes.

Q    Those terms, average, below average, above average, impaired, mildly impaired, what are those called in the trade or in your profession?  I apologize.

A    It's a trade of sorts.  Classification, it is a classification of the level of functioning.

Q    Are those qualitative descriptors considered something different than the quantitative numbers that you see?

A    Yes.  The numbers get put -- they will apply a classification to the numbers because the numbers stand on

1338

their own, but then they get classified according to different systems.

Q    When you say the numbers stand on their own, I want to clarify, if I can, the best I can, the process by which we get numbers and the different numbers that we are talking about.  So what's the first number that a neuropsychologist comes to after administering a test?

A    A raw score on that test.

Q    And if you just know a raw score, do you really know much of anything?

A    No.

Q    What's the next thing that a neuropsychologist does with the raw score?

A    The raw score then gets converted to a -- it could be a scaled score, if it is a subtest that has scaled scores with a mean of 10, a standard deviation of three.  It could be a standard score of 100, you know, with a standard deviation, but it is put into a statistical format which permits neuropsychologists to look at the scores and to understand something about them.

Q    And that putting it into something is putting into the set of normative data; is that correct?

A    Precisely.

Q    So if you take the raw score alone, you don't know anything.  If you stake the scaled score, which you were

just describing, you may know something, but you may not depending on what the norms are?

A     Right.  And some tests -- for example, the Wechsler Test have their norms published and, you know, you print out, if you wish to do it by computer, you know, the scoring such as you saw in this case and that's pretty clear, you know where the norms are coming from because the manual tells you. In the event that you have a list of 'T' scores for different raw scores, but you don't know the source, it is a problem.

Q     The Trails B or the Trail Making Test, is that a part of the Halstead?

A     Yes.

Q     The Seashore Rhythm Test, is that a part of the Halstead?

A     Yes, it is.

Q     I don't recall if you were asked about the TPT.

A     No, I was not asked about it, the Tactual Performance Test.

Q     All right, then never mind.  With regard to the STROOP, the Color Word Sort Test, you were asked about that on cross examination.  Do you recall that?

A     Yes.

Q     First, the STROOP administered by Dr. Bianco, is it the same thing as the Color Word Interference Test on the Delis-Kaplan Executive Function System administered by Dr.

1340

Young?

A    No.  It is designed to basically assess the same brain functions and areas of the brain, the dorsal/lateral area of the brain.  However, they are constructed differently.

Q    Do you know the norms that were used by Dr. Bianco for assigning these qualitative assessments of average on that test?

A    No.  I have a speculation, but I am not sure.

Q    Well, I want to back up actually.  Let me ask you to look at Page 503300 of that -- that is Government's Exhibit Number 68.

A    Yes.

Q    Well, now I can't find it.  What page did I say?

A    Oh, you said --

THE COURT:  3300.

A    -- 3300, yes.

Q    Thank you.  I am beginning to have a guess of how I would do on the Wisconsin Card Sorting Test.

I am sorry.  So we do know that there were -- looking at this page, does that indicate that there were norms?  Would you know what the norms were?

A    No.  It could be ten individuals who were 16 years old and 20 who are 20 -- no, I have no idea.

Q    Okay.  So just knowing that there is -- that this is the scale that is used doesn't tell is where it comes from?

A    Correct.

Q    And was -- I think you said there was a subset there. Did Dr. Bianco complete the Halstead Battery?

A    No, I don't believe so.  There was a subset of tests from that battery.

Q    Did he complete the Delis-Kaplan Executive Functioning Test?

A    No.

Q    Without completing those tests, can a neuropsychologist give a score on the impairment index on the Halstead-Reitan Test?

A    There are seven tests that would permit for an original Halstead impairment index score.  I would have to go through what is a difficult, you know, document there to determine if he gave each of those seven.  I think he may have.

Q    But you don't know because he didn't list a score?

A    Right.  I don't recall seeing any Halstead impairment index score.

Q    You were asked if Mr. Barrett complained of a headache when he was seen at the hospital one time.  Was it your interpretation of Dr. Young's findings that the presence of a migraine was a necessary condition for Mr. Barrett to have the impairments she found?

A    No.  My sense was she wanted to be sure that he was in good shape for the assessment and maybe in taking the medical

history -- and again I am hypothesizing, but he asked about -- she asked about it.

Q     If a person doesn't have headaches, does that mean they don't have brain damage?

A     No.

Q     If you have brain damage, do you necessarily have a headache?

A     No, and especially if it is a head injury from a long time ago.  You may have had headaches at the time, but...

Q     With regard to events occurring in the distant past, do neuropsychologists typically rely on reports from family members and the patient themselves when assessing whether there is a possible root cause of impairment?

A     Yes, those are one source of valuable data.

Q     Do you base your conclusion that Mr. Barrett has brain damage on the existence of records of a cause?

A     No.

Q     Do you base it on the test data?

A     Yes.  I cannot establish a cause.  There are a number of triggers, like I had said, but I don't...

Q     If you were presented an individual about whom you knew nothing in his background and you administered a battery and it showed impairment, would you conclude that the person was impaired?

A     Yes.

1343

(PAUSE)

A    The knowing can be helpful for rehabilitation and intervention, but --

Q    Thank you.  You were asked a question about the symbol search.  Do you recall that?

A    Yes.

Q    On the WAIS-IV.

A    Yes.

Q    And I think there was something you wanted to say about the scores on that test and -- and I am not sure -- let me see if I can find the page with the data.  (PAUSE) Well, I'll come back to that, if I can find the page I am looking for.

You mentioned something about the Block Design Test and the importance of looking at subtest scatter.  Would you like to explain your answer on that?

A    Yes.  Just like you look at discrepancies between index scores, you look at discrepancies within a test such as the WAIS in which there are 10 primary required subtests. And if within, for example, processing speed I found a really high score on symbol search and a really low score on coding, it would be worth trying -- you know, at least noting and then as I proceeded with my test battery and looking at the data, I might get some information about it.  It is very Sherlock Holmes'ium (sic).  You get clues and then you, you

know, work to see how they all fit together and you can't know.  So, for example, block design average score and matrix reasoning for Mr. Barrett of a low average score -- it is one standard deviation.  It doesn't mean anything statistically, but it might mean something in terms of an analysis of the patterns of performance across tests.

Q    So if you look at the patterns of performance in Mr. Barrett's case across tests using different instruments, how is this -- how is his performance on the block design consistent with other scores that he achieved on these tests?

A    It is a very structured and directed task.  He has some strength in constructional abilities that came out on the block design and -- as well, even though there were problems with his performance on the Tower Test, for example, he was able to look at the model and make patterns with the disks that were placed on the pegs.  Those are similar kinds of tasks that are structured and directed and the stimulus isn't changing over and over, as with some of the processing speed tasks where it is, you know, a rapid changing of stimuli.

Q    And again, that issue, that specific ability, I guess -- is that the right word?  To respond to rapidly changing stimuli, that's separately measured from other abilities?

A    Well, it is separately measured and in some tests, as

I was saying, there is an overlap of different brain functions and in those cases you want to try to sort out what's-what.  You know, what is the real problem.  Is it vision or is it motor functioning?  Yeah --

Q     And with Mr. Barrett, where was the greater problem?

A     The greater problem was with visual attention.  And to give an analogous test, on the Rey Complex Figure Test, that complex figure that you have to copy, it wasn't taking pre-existing shapes and putting them together like block design to look like the model.  He did have something to copy, but his visual attention interfered with his accurately counting the number, if he even counted them, but making them -- there were parts missing and that's visual attention.  It got in there somewhere.  His scores were fine on immediate and delayed recall, but it is that visual attention.  So I saw that across a number of different kinds of tests.  It is visual working memory on the Wechsler Memory Scale.

Q     Is it unusual to see an individual who has a particular area of deficits like this?

A     No, not at all.

Q     So if you --

A     Some people have defused (sic) damaged, but, no, not at all.

Q     So if you see somebody who has average overall

intellectual functioning, does well on verbal tests, does well on 78 percent of the neuropsychological tests that they are given, does that call into question the results of the tests of specific areas where they did poorly?

A    No.  It, in fact, kind of accentuates it because that's what you see == for example, in learning disorders, it will be the particular area that is difficult or in attention disorders or in executive function disorders, you see certain kinds of patterns of performances and the other stuff might be untouched.

Q    And you -- strike that.  On the California Verbal Learning Test, the proactive interference measure -- do you recall that?

A    Yes.

Q    What was his 'Z' score on that?

A    I believe it was minus 1.5.

Q    And is that significant in any way?

A    Yes.  It indicates that this is an individual who once he is filled up, he has got about as much as he can manage. He gets overwhelmed and he can't take in any more.  So, you know, he does well when he is repeatedly exposed to some-thing and he can learn it and do well with it.  That was seen over the five trials of the first list on the CVLT.  He really progressed nicely.  However, when he was then offered something new, which is not the case necessarily in the

normative data or you wouldn't see the score we saw, he was unable to hold on to anything new.  His brain was overwhelmed.

Q    So is Mr. Barrett a person easily overwhelmed by especially visual information?

A    Yes.

Q    You were --

A    And particularly changing visual information.

Q    I am sorry, I think I spoke over you.  What was it -- you were --

THE COURT:  It wasn't responsive.  Just go ahead and ask her another question.

THE WITNESS:  Sorry.

BY MR. SCHARDL:

Q    You were asked about Mr. Barrett's particularly low performance on the Wisconsin Card Sort.  Do you recall those questions?

A    Yes.

Q    Did Dr. Young throw out any tests where she felt that Mr. Barrett was not able to complete it in such a way that the results would be invalid?

A    Yes, there was one such test.

MR. WILSON:  Objection, Your Honor.  That goes beyond the scope of my cross examination.

THE COURT:  We are beyond the scope.

MR. SCHARDL:  May I be heard on that, Your Honor? I believe the implication was -- of the questioning was that Dr. Young included this even though it should have been tossed out.  Whereas, I want to show that she tossed out a test where in her exercise of clinical judgment she felt it should be.

THE COURT:  Well, let's do it quick because I don't recall the testimony the same way you do, but let's do it quickly.

BY MR. SCHARDL:

Q    In any event, Dr. Miora, did Dr. Young throw out a test that she felt she couldn't score?

A    Yes.  She aborted the test --

MR. WILSON:  Objection, Your Honor.  That is beyond the scope and --

THE COURT:  Overruled.

BY THE WITNESS:

A    Yes.

BY MR. SCHARDL:

Q    And which test was that?

A    That was the PASAT, the Paste Auditory Serial -- it is called the PASAT, P-A-S-A-T.

Q    And that stands for --

A    The Paste Auditory Serial Attention Test.

Q    And did Dr. Young describe the circumstances that

caused her to throw that out?

A    Yes.

Q    Do you recall what she said?

A    Yes.  She wrote that he was unable to understand the instructions which she repeated several times and at which point when there was no improvement she discontinued the test.

Q    So after considering all of the questions presented to you on cross examination about Mr. Barrett's strengths, do they cause you to question Dr. Young's conclusions about her -- about his weaknesses?

A    No, and I think she fairly addressed the strengths and weaknesses.

Q    After considering the questions you were posed on cross examination on the testing done by Dr. Bianco, does that cause you to question Dr. Young's findings about Mr. Barrett's functioning?

A    No.

Q    Were there consistencies between their testing?

A    Indeed there were.

Q    And taking into account that we don't know exactly what the norms were that Dr. Bianco used?  Even if you take that into account, is your answer the same?  That's my question. Sorry.

A    Some of his tests did have norms, to which I could

refer.  So particularly on those tests, such as the WAIS-III and the WAIS-IV, I could know the norming population and be able to make some comparative analysis.

Q     On the color word, you were asked about -- and I believe this is the Color Word Interference Test on the D-KEFS.  Do you recall being asked about Mr. Barrett's scores on completion time?

A     Yes.

Q     Are there other measures of performance on that?

A     Yes, and they are important.

Q     And where -- were there other measures of performance on the Color Word Interference, again on the D-KEFS, that indicated impairment?

A     Yes.

Q     Do you recall what those were?

A     I believe one was an accuracy ratio.  Uh, I would need to see...

Q     Well, let me just ask you --

A     Yes.

Q     Again, referring to this concept of discrepancy analysis, does the performance on the completion time in any way invalidate the performance on the accuracy?

A     No.  In fact, it is very important to consider.  Like with the Tower Test where he did really well, but there were problems with his move count.  So within a task, you

1351

absolutely need to compare and contrast and do a discrepancy analysis, or you are not doing a good job.

Q    We talked quite a bit at the beginning of your direct examination about test development and norming.  And I guess we are now talking about all of these subtests.  So my question is, are these subtests there for a reason?

A    Yes.

Q    And is the reason that if you don't include a subtest on one specific area of functioning, you might miss it?

A    Yes.

Q    And you wouldn't want to draw an inference about one area of functioning based on performance in another area of functioning?

A    I am --

Q    The two subtests are there to discriminate?

A    Oh, okay.  Well, the two -- yes, the two subtests help you to discern and to discriminate where the areas of strength and weakness lie, yes.

MR. SCHARDL:  May I have just a moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

BY MR. SCHARDL:

Q    So just in conclusion, Doctor, do you believe to a reasonable degree of neuropsychological certainty that the

testimony you have given about Mr. Barrett's impairments is a fair representation of his functioning?

A     Yes, at the time he was evaluated.

Q     And do you know if any pathology that would have changed his functioning between 1999 and the time of his evaluation?

A     No.

Q     Are you aware of any injury that would have changed his functioning from 1999 until 2000?

A     No.

Q     If -- you were asked questions about Mr. Barrett's drug use.  If Mr. Barrett was clean for a period of years before the testing in 2009, would that affect his performance?

A     Yes, it well could.

Q     And would it tend to make his performance improve or get worse?

A     Get better, a better brain, a clean brain.

Q     You were asked about Mr. Barrett being under the influence of methamphetamine on the night of the raid on his property.  Did -- and you were asked how methamphetamine effects perception, I think.

A     Yes, or does it, yes.

Q     Does it improve perceptual ability or not?

A     It would distort perceptual ability.  And given temporal lobe issues, it can lead to paranoia and -- I mean,

it does anyway, but, yeah, perception would be distorted, not improved to the best of my knowledge.

Q   So if Mr. Barrett's base line was impaired on neuropsychological tests with regard to visual perception, would his performance tend to be better or worse under the influence of methamphetamine?

A   I would like to say visual attention and I would expect -- I would predict that it would be worse.

Q   I stand corrected.

A   I am sorry.

Q   Visual attention, not visual perception.  Those are different things?

A   Yes.

Q   I stand corrected.  Thank you.

A   I apologize.

Q   So his performance could have been worse?

A   Yes, I would predict it would have been worse.

Q   So his base line is impaired.  If he is under the influence, it would be worse?

A   Yes.

Q   Thank you.

MR. SCHARDL:  No further questions.

THE COURT:  Mr. Wilson, I assume you have some more questions?

MR. WILSON:  I assume you are correct.

THE COURT:  Briefly.

MR. WILSON:  Yes, I am going to make it brief, Judge.

### RECROSS EXAMINATION

BY MR. WILSON:

Q    Counsel asked you at the very end if Mr. Barrett was impaired at the time of the crime, if methamphetamine would make it worse and I believe your answer was yes.

A    Correct.

Q    Is visual perceptive -- is that what you said?

A    No visual attention.

Q    His visual attention would be worsened by the affects of methamphetamine; correct?

A    Potentially.  I mean, I can't say for sure, but, yes, I would...

Q    That would also be correct of a completely healthy person?

A    On methamphetamine?

Q    They are --

A    On methamphetamine?

Q    Yes.

A    Yes.

Q    So if Mr. Barrett did not have impairments on September of 1999 and he was high on methamphetamine and had been for several days, that would affect his visual --

1355

THE COURT: Visual attention.

MR. WILSON: What?

THE COURT: Visual attention.

MR. WILSON: Attention, sorry. It has been a long day.

BY MR. WILSON:

Q    Visual attention.

A    Yes, it very well could.

Q    Okay, thank you.

MR. WILSON: Thank you, Judge. I appreciate that.

BY MR. WILSON:

Q    And Mr. Barrett, you testified, would have been overwhelmed by visual information, is that correct, and especially rapidly changing visual information.

A    That's a piece of it, that's correct.

Q    But Mr. Barrett was not so impaired to the point where he wasn't able to grab a firearm and fire it multiple times striking one vehicle, was he?

A    To the best of my knowledge, no.

Q    He wasn't impaired to the point where he wasn't able to go inside his home and obtain a firearm and fire off multiple rounds, was he?

A    No.

Q    He wasn't so impaired that he could not tell persons that he was watching for them and that he was prepared for

1356

the police to arrive at his house?  He wasn't that impaired, was he?

MR. SCHARDL:  Objection, that misstates the evidence.  It was a completely different area of functioning.

THE COURT:  Overruled.

BY MR. WILSON:

Q    He wasn't so impaired that he could not tell people I am prepared for the police to show up at my house?

A    Uh, I don't know.  I can't speak to that.

Q    He wasn't so impaired that he was unable to fire a firearm, was he?

A    Correct.

(PAUSE)

BY MR. WILSON:

Q    He wasn't so impaired that he was unable to respond to the cries of his son calling out his name?  He could respond to that; is that correct?

A    That's my understanding.  I just -- I have a thought though.

Q    Counsel asked you about the card sorting test and then went on to talk about the PASAT, the PASAT Test.

A    Right.

Q    And I believe it was your testimony that Dr. Young threw that one out because he didn't understand the directions; is that correct?

A     Right.  She repeated them several times and he still didn't get it.

Q     And did the raw data indicate when that test was given in relationship to the card sorting test?

A     I don't have that information.

Q     You are familiar with the literature that deals with malingering in the card -- in the Wisconsin Card Sorting Test; isn't that correct?

A     Yes.

Q     And it is your testimony, based upon your review of Dr. Young, that the fact that he made no matches, no matches, no sorts that he was not malingering?

A     It is not based on that.  It is based on my analysis of the data.

Q     But you agree with me that there is research out there, there are studies out there dealing with the issue of malingering in that particular test?

A     Yes, there is.

Q     And there are some concerns about the potential of malingering in that test; isn't that correct?

A     Yes.

                              (PAUSE)

A     He passed one of the embedded effort measures that --

          MR. WILSON:  Objection, Your Honor, that is nonresponsive.

1358

THE COURT:  You need to wait for a question.

THE WITNESS:  Okay.  Sorry, Your Honor.

THE COURT:  That's okay.

(PAUSE)

MR. WILSON:  Can I have just one moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

BY MR. WILSON:

Q    Just briefly, in reference to the Card Sorting Test and the -- and some 48 unique responses, isn't it true that that is potential evidence of malingering on this particular test?

A    I don't know of any research to that effect, so I can't answer that.

Q    I am sorry?

A    I don't know of any research to that effect on that test and I do malingering research with one of the leading malingering researchers.  I don't know of any literature having to do with the Card Sorting Test.

Oh, you are talking about the Wisconsin Card Sorting Test?

Q    Yes.

A    I am sorry.  Go ahead.  I strike my answer.  I misunderstood what you were referring to.  I thought you

1359

were talking about the D-KEFS sorting test.

Q    Sorry.  The Wisconsin, are you familiar with the literature regarding malingering on the Wisconsin Card Sorting Test?

A    Yes, I am.

Q    And would you agree with me that 48 unique responses which don't match anything was potential evidence of malingering on that particular testing?

A    Yes, but there are other explanations.  As I said, I would like to research my hypothesis.

Q    Fair enough.  Thank you.

MR. WILSON:  That's all I have, Your Honor.

THE WITNESS:  Thank you.

THE COURT:  Dr. Miora, you can step down.  Thank you.

All right.  With regard to the Motion to Strike, I am going to overrule the Motion to Strike.  And with regard to the objection to the testimony concerning the WAIS-IV, I am going to overrule that as well.  So all of her testimony is admitted.

I know that probably both of you wanted to put on additional evidence.  Is there anything we absolutely have to have?  Let me hear from the Petitioner first.

MR. SCHARDL:  Well, Your Honor, we would say, as we said previously, that the --

THE COURT:  You need Dr. Bigler?

MR. SCHARDL:  Well, I was speaking more broadly than that.

THE COURT:  Okay.  Go ahead.

MR. SCHARDL:  But, yes, thank you, Dr. Bigler.  And we have a number of other witnesses whose testimony that we proffered after it was excluded.  And in particular, we would present testimony from Richard Burr regarding the issue of deficient performance.  And with regard to prejudice, I would just say that the case law is very clear that the Court consider all available mitigation evidence, both introduced at trial and anything introduced post-conviction if it was available at the time of trial.  So to the extent that any mitigation evidence has been excluded, we believe that is in error and we would renew our request for an opportunity to present any and all available mitigation evidence.

THE COURT:  What else from the government?

MR. KAHAN:  Your Honor, in light of the testimony today, we would renew our request to put on Dr. Bianco.

THE COURT:  Well, if I allow you to put on Dr. Bianco, are you going to object then to Dr. Bigler?

MR. KAHAN:  Well, I -- I mean, yes.  I think the short answer to that is yes.  We feel that Dr. Miora has already addressed that and so has Dr. Woods.  They have certainly had their fair opportunity to take their shots at

Dr. Bianco at this point.

THE COURT:  With that in mind, then why do we need to hear from Dr. Bianco?

MR. KAHAN:  Well, we believe that Dr. Bianco has a lot to say about Mr. Barrett's performance closer in time to the crime.  And that information has come in through this witness, but as the defense has taken pains to point out, it is not complete as of yet.

THE COURT:  What do you all say about that?

MR. SCHARDL:  As to whether Dr. Miora testified as to all of the things that Dr. Bigler could have, that is simply not the case.  Dr. Bigler is the author of one of the leading text -- or one of the authors of one of the leading texts on neuropsychological assessment.  There were things in Dr. Bianco's data that he saw that frankly are just beyond the knowledge of Dr. Miora.

And with regard to what Dr. Bianco has to say, we would go back to our previous objection that whether he had some- thing to say was known to the government in time for the government to have prepared a report and submitted it consistent with the Court's orders.  The difference between Mr. Barrett's proffered evidence and what the government is seeking to do is that Mr. Barrett complied with the rules. Mr. Barrett and his legal team spent time and money and effort to make sure that we complied with Judge Payne's

schedule. The government could have done that with regard to Dr. Bianco, but it chose not to.

So with regard to the equities of the case and whether anybody is being treated unfairly, the government had a perfectly fair opportunity to present a report from him and chose not to do that. And then to delay the resolution of the case so that they could backfill that way after Mr. Barrett had put in all of the effort to comply, I think would be grossly unfair.

MR. KAHAN: Well, I -- first, I think that this elides (sic) an entire issue of whether or not the government could have, in the defense's other position, even spoken to Dr. Bianco. On the one hand they've claimed that he is their witness and we can't talk to him. And on the other, they've taken this position. In all honestly, while Dr. Young in her declaration stated that she relied on Dr. Bianco and his findings, which was misleading to the government in terms of going out and finding that evidence, we then found ourselves much closer in time to the hearing when this witness, Dr. Miora, was excluded. So it was really only at the last moment when we saw Dr. Miora actually coming in with a full understanding of her position, vis-a-vie, Dr. Bianco, that his testimony became fully relevant.

THE COURT: Well, do you still want to put on Dr. Bianco if I let them put on Dr. Bigler too?

1363

(PAUSE)

MR. SCHARDL:  While they are discussing that, can I...

(PAUSE)

MR. KAHAN:  Your Honor, given that obvious choice, the government's answer is no.

THE COURT:  That's kind of what I thought.  So from an evidentiary standpoint then, I guess I am going to hold the hearing as concluded.

I don't know if you all mentioned this or if I maybe dreamed it up or what, but there was some suggestion somewhere along the way that you all wanted to prepare new Proposed Findings and Conclusions; is that correct or not?  Is everybody happy with what they've already submitted?

MR. SCHARDL:  Well, for the defense, the answer is no because that was, of course, before Dr. Miora was allowed to testify.  I think that the evidence has -- it would be a worthwhile thing to do, post-hearing briefing, for different Proposed Findings of Facts.

THE COURT:  And how long would it take to --

MR. SCHARDL:  From the defense, I would think -- I am sorry, I am just thinking.  I am really bad at dates.  I am supposed to be out of the country in August, so I don't want to commit us to anything that I can't meet.  So I would say 90 days.

1364

THE COURT:  Well, I can't do 90 days.  I was thinking about 30 days.

MR. KAHAN:  Your Honor, can I suggest 30 days from the final transcript coming in?

MR. SCHARDL:  May I ask, Your Honor, do you want a brief or Proposed Findings of Fact?

THE COURT:  Proposed Findings of Fact and Conclusions of Law.

MR. SCHARDL:  Okay, we can do that.

THE COURT:  Yeah.  Do you need the transcript to do that?

MR. KAHAN:  We would prefer it, but...

MR. SCHARDL:  I will sweeten the deal by offering -- by offering to have the Defender pay for an expedited transcript, assuming that she doesn't fire me for saying that.  So I will ask about that.

THE COURT:  All right.  Then let's say Proposed Findings of Fact and Conclusions of Law due July 31st.

MR. SCHARDL:  Thank you, Your Honor.

THE COURT:  Does that sound good?

MR. KAHAN:  That's fine, Your Honor.

THE COURT:  And if anybody wants to brief anything along with it, go ahead, but it is not required.

MR. SCHARDL:  Thank you, Your Honor.

THE COURT:  Anything further?

1365

MR. WILSON:  Not from the government, Your Honor.

MR. SCHARDL:  Not from the defense.  I would just like to say as an out-of-towner, I really appreciate the hospitality of opposing counsel and the Court and everybody involved.

THE COURT:  Well, let me say for everybody here that I think it was very well tried and I will take it under advisement, at least until I've seen the Proposed Findings and Conclusions of Law from both sides.  We will see where we are at after that.

MR. SCHARDL:  Thank you, Your Honor.

THE COURT:  We are adjourned.

(END OF PROCEEDINGS)

"I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter."

s/Karla S. McWhorter

_____

KARLA S. McWHORTER

July 10, 2017

_____

DATE

1366