DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | CASE NO. CV-09-00105-JHP |

## PETITIONER'S PROPOSED
## POST-HEARING FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

A.   Overview .................................................................................................................. 1

B.   Preservation of Objections ...................................................................................... 2

1.   Deficient Performance ....................................................................................... 2

2.   Prejudice ............................................................................................................ 4

II.   PROPOSED FINDINGS OF FACT ............................................................................ 6

A.   Deficient Performance ............................................................................................ 6

1.   The Defense Team .............................................................................................. 6

2.   Family & Social History Investigation ............................................................ 11

3.   Mental Health Investigation ............................................................................ 19

B.   Prejudice ............................................................................................................... 22

1.   Family Witnesses ............................................................................................. 23

2.   Stephen Barrett. .............................................................................................. 23

a.   The differences in their upbringings ............................................................. 24

b.   Their mother and Petitioner's home life ....................................................... 25

c.   Mental health observations of Kenneth Barrett............................................ 26

d.   Observations based on Stephen Barrett's experience as an educator............ 27

3.   The testimony of Ernest Barrett. ..................................................................... 28

4.   The testimony of Phyllis Crawford. ................................................................ 30

5.   Ruth Harris and Mark Dotson. ........................................................................ 31

6.   Ada Blount, Warren Dotson and Carl Cook. ................................................... 32

7.   State counsel Jack Gordon and the state mitigation investigation. ................. 33

C.   MENTAL HEALTH EXPERTS............................................................................ 35

1.   Areas on which Dr. George Woods and Dr. Steven Pitt Agreed ..................... 35

a.   Family History of Mental Illness .................................................................. 35

b.   No anti-social personality disorder ............................................................... 37

c.   Family history of substance abuse. ............................................................... 37

d.   Mr. Barrett had a dysfunctional, chaotic, and abusive upbringing. .............. 38

e.   Learning disability......................................................................................... 39

f.   Neuropsychological deficits........................................................................... 40

2.   Areas of Disagreement..................................................................................... 42

a.   Bipolar disorder............................................................................................. 42

b.   Post-traumatic stress disorder (PTSD). ........................................................ 47

3.    Conclusions regarding the psychiatric testimony.............................................................. 48

4.    Neuropsychological Evidence.......................................................................................... 49

a.    Frontal lobe description................................................................................................. 51

b.    Parietal lobe description. ............................................................................................... 51

c.    Indications of a need for neuropsychological testing.................................................... 51

d.    Dr. Young's Evaluation ................................................................................................. 53

e.    Impaired executive functioning..................................................................................... 57

D.    The Risk Assessments........................................................................................................ 60

1.    Dr. Jeanne Russell ........................................................................................................... 60

2.    Dr. Randall Price ............................................................................................................. 62

E.    Faust Bianco....................................................................................................................... 69

III.  CONCLUSIONS OF LAW ....................................................................................................... 71

A.    Counsel's Performance was Deficient................................................................................ 71

1.    The Government's Defense of Trial Counsel .................................................................. 71

a.    Was it true that defense counsel had "no indications that defendant suffered from a mental impairment"?....................................................................................................... 71

b.    Were the trial attorneys "constrained from conducting a mental-health investigation by their client"?.......................................................................................................... 73

c.    Did trial counsel make an informed decision not to investigate?.............................. 74

2.    Conclusions from the Hearing Evidence......................................................................... 76

B.    Mr. Barrett Suffered Prejudice......................................................................................... 81

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | CASE NO. CV-09-00105-JHP |
| Petitioner, | **PETITIONER'S PROPOSED POST-HEARING FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## I.   INTRODUCTION

### A. OVERVIEW

COMES NOW Petitioner, KENNETH EUGENE BARRETT, by and through

undersigned counsel, who, pursuant to this Court's order, respectfully submits proposed findings

of fact and conclusions of law based on the evidence introduced during the evidentiary hearing.

The structure of these proposed findings and conclusions tracks the two prongs of the test for ineffective assistance from *Strickland v. Washington*, 466 U.S. 668 (1984). Mr. Barrett first addresses the facts and law related to assessing trial counsel's performance, then addresses prejudice. These proposed findings and conclusions also address the specific issues the Court of Appeals identified as needing resolution in *United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015), *cert. denied*, ___ U.S. ___, 137 S. Ct. 36 (2016).

### B.  PRESERVATION OF OBJECTIONS

By submitting these proposed findings of fact and conclusions of law Mr. Barrett does not waive, forfeit, or retreat from any prior objections he made, or grounds he asserted in opposition to the government's or the Court's efforts to limit the scope of evidence or issues to be presented or considered during this hearing. Due to the Court's exclusion of witnesses and the narrow scope of issues the Court has been willing to consider, Mr. Barrett did not receive a full and fair hearing on his claim of ineffective assistance of counsel during the penalty phase of trial. The excluded evidence and issues that preclude a full and fair consideration of the issues as required by *Strickland* and its progeny include, but are not necessarily limited to the following:

### 1.  *Deficient Performance*

(a)    Exclusion of witnesses the Tenth Circuit deemed relevant. In its decision, the Court of Appeals cited declarations from Julia O'Connell and Richard Burr as evidence that trial counsel failed to conduct a timely, thorough investigation into Mr. Barrett's background and mental health. *Barrett*, 797 F.3d at 1225. This Court excluded all testimony from Federal Defender O'Connell and Federal Death Penalty Resource Counsel Burr while simultaneously stating, before hearing the evidence, that trial counsel did not have time to develop the mitigation evidence presented with Mr. Barrett's post-conviction motion. Order (Doc. 269) at 12-13.

(b)    Exclusion of evidence regarding how counsel spent their time. The Tenth

Circuit's decision also reflects concern over the timing of trial counsel's mitigation investigation.

*Barrett*, 797 F.3d at 1225 quoting *Hooper v. Mullin*, 314 F.3d 1162, 1171 (10th Cir. 2002). That

concern is consistent with prevailing professional norms which require prompt investigation.

American Bar Association, Standards for Criminal Justice ("ABA Standards"), Defense

Function, Standard 4-4.1; American Bar Association, Guidelines for the Appointment and

Performance of Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913, 1023 (2003) ("ABA

Guidelines") ("The mitigation investigation should begin as quickly as possible" because results

could affect first stage strategy, selection and work of experts, motions, plea negotiations).

During the hearing, Mr. Barrett attempted to elicit testimony regarding how Judge Payne

compelled first lead trial counsel John D. Echols to devote a great deal of his time to budgeting,

and how delays in budgeting impacted the mitigation investigation, but the Court sustained the

government's objection and excluded that evidence. Tr. 453. Consequently, the record is

incomplete on an issue the Court both created and cited as a reason to deny Mr. Barrett's claim.

The Court's action in creating the conditions that interfered with counsel having time to work on

the substance of the defense then citing that lack of time as a reason for the defense to have been

reasonable, then barring evidence to the contrary, violates Mr. Barrett's right to due process of

law.

(c)    Exclusion of evidence regarding prevailing professional norms. As reflected in

their proffered declarations, Federal Defender O'Connell and Resource Counsel Burr also would

have testified regarding the prevailing professional norms of capital defense practice in

Oklahoma in 2005, specifically with regarding to (1) the use of mitigation specialists and other

experts to present mitigation evidence; (2) how mitigation evidence works and is understood by

attorneys and jurors; (3) how counsel address defendants' concerns about or sensitivities to potential mitigation evidence. This Court excluded all such testimony. Consequently, the findings proposed here do not cover the full range of the available evidence regarding another issue the Tenth Circuit considered. *Barrett*, 797 F.3d at 1226.

(d)    Allowance for post-hoc rationalizations. Prior to the hearing, Mr. Barrett sought an order excluding testimony in which trial counsel speculated about what they would have done with information they did not have at the time of trial. This Court denied that motion and, during the hearing, allowed some testimony that could be used to support post-hoc rationalizations for trial counsel's challenged acts and omissions. Mr. Barrett renews his objection to the Court considering post-hoc justifications for trial counsel's conduct and proposes no such speculative findings here.

### 2. *Prejudice*

(a)    Exclusion of available mitigation evidence. *Strickland*'s prejudice prong requires the Court "to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams (Terry) v. Taylor*, 529 U.S. 362, 397-98 (2000). This Court has excluded numerous lay and expert witnesses who Mr. Barrett has identified as having been available to testify at the time of trial. These proposed findings and conclusions reflect only the evidence admitted during the evidentiary hearing. Due to this Court's exclusion of evidence, this Court is unable to conduct the required prejudice analysis.

(b)    Exclusion of mitigating circumstances. *Strickland*'s prejudice analysis requires the reviewing court to consider mitigation evidence just as jurors would be required to consider it in a capital penalty proceeding. *See Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (citing in context

of prejudice from excluded mitigation *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)). Jurors in federal death penalty cases must consider, and weigh against the mitigation evidence presented in the penalty phase, all evidence presented in the first phase of trial. 18 U.S.C. § 3593(c). Initial trial counsel Echols sought to develop evidence of Mr. Barrett's organic brain impairments in part because it could bear on his perceptions and intentions at the time of the offense. Tr. 498-99, 501-02. Prior to the hearing Mr. Barrett served notice that he would attempt to present evidence as to how his psychological and neuropsychological impairments would mitigate the evidence that he intended to kill law enforcement officers. This Court excluded all that evidence and these proposed findings and conclusions do not address the excluded evidence and how jurors could have applied and weighed it. Therefore, these proposed findings and conclusions reflect, but do not concede the appropriateness of, this Court's unduly restrictive view of the issues.

(c)     Allowance of opinion testimony without considering reliability. The Court barred Mr. Barrett from conducting a voir dire of Dr. J. Randall Price on the last three prongs of Fed. R. Evid. 702 after Mr. Barrett's counsel stipulated to the first prong of the test for admissibility of expert opinion evidence. Tr. 822-23. The Court never made the threshold findings regarding reliability that are necessary before admitting expert opinion testimony. *Summers v. Missouri Pacific R.R. System*, 132 F.3d 599, 603 (10th Cir. 1999) ("district court 'must determine at the outset'" whether all aspects of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), have been satisfied) (quoting *Daubert*, 509 U.S. at 592); *United States v. Nichols*, 169 F.3d 1255, 1262 (10th Cir. 1999) (Rule 702 and *Daubert* are "threshold standard of reliability"). Based on the erroneous legal rationale that the question whether Dr. Price had a reliable scientific basis for his opinions was "a subject for cross," Tr. 862, *see also* Tr. 887, rather than a

"basic gatekeeping obligation" of the court as stated in the case law, *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 147 (1999), the Court allowed Dr. Price to testify without any inquiry into whether his opinions had a scientific basis. Therefore, Dr. Price's opinions are not properly before this Court. Mr. Barrett proposes findings and conclusions based on Dr. Price's testimony without waiving, forfeiting, or in any way retreating from his continuing assertion that Dr. Price's opinions were not properly admitted and should not be considered.

(d)     Admission of opinions that could not have been presented at trial. Over Mr. Barrett's objection this Court admitted the opinions of Dr. Steven Pitt based on evidence that did not exist at the time of trial, specifically, records generated by the Bureau of Prisons after 2005. For the reasons stated in Mr. Barrett's Motion to Exclude Witness Steven Pitt (Doc. 432), and in Mr. Barrett's Reply to the government's opposition to that motion (Doc. 443), which are incorporated by this specific reference as if fully set forth herein, and those reasons stated in court, Mr. Barrett renews his objection to the Court considering Dr. Pitt's opinions. Mr. Barrett proposes findings and conclusions regarding Dr. Pitt's testimony without prejudice to his objections.

In listing the foregoing objections, Mr. Barrett does not explicitly or implicitly waive, forfeit, or retreat from any other objections or arguments he raised prior to or during the hearing regarding the scope of the evidence or scope of the issues.

## II.     PROPOSED FINDINGS OF FACT

### A.  DEFICIENT PERFORMANCE

#### 1.  *The Defense Team*

1.     Attorney John D. Echols represented Mr. Barrett as his lead defense attorney during the two state trials before being appointing lead counsel in the federal case. The first

state-court trial ended in a hung jury. The second jury acquitted Mr. Barrett of murder and found him guilty of manslaughter. In both state cases, the State of Oklahoma sought the death penalty but, due to the results, there were no penalty phases. Tr. 426-28.

2.      Although Echols was the lead attorney in the state cases, and therefore considered himself ultimately responsible for all aspects of the case, prior to each state-court trial, he delegated to a different attorney primary responsibility for any penalty phase. The second chair attorney in the first state case was Geoffrey Standing Bear. Tr. 475.

3.      Jack E. Gordon is an Oklahoma criminal defense attorney. Tr. 145. He was appointed to assist John Echols in the defense of Kenneth Barrett at his second state trial. Tr. 147. Mr. Gordon was responsible for marshalling mitigation evidence in that case. Tr. 147.

4.      Prior to the first state-court trial, the defense team included a mitigation specialist, Roseann Schaye. Tr. 428-29. Before she completed her investigation, Schaye left the case due to dissatisfaction with Echols. Tx. 429.

5.      After Schaye resigned, responsibility for investigating mitigation evidence fell to Steve Leedy who was employed by the Oklahoma Indigent Defense System. Tr. 478.

6.      During the state court proceedings, Echols had Mr. Barrett evaluated by psychologist Bill Sharp. Tr. 437, 439.

7.      Roger Hilfiger has been a Muskogee, Oklahoma attorney since 1972. He is a former United States Attorney and tried a number of criminal cases in the federal system and has done only a few civil cases. Tr. 647-48. Prior to his appointment in Mr. Barrett's case, Mr. Hilfiger served as counsel on one federal capital case 1993-94. Tr. 652.  He had handled drugs and firearms cases but could not recall if he tried any murder cases in which drugs were directly involved. Tr. 653.

8.      On October 25, 2004, the Court appointed Echols and Hilfiger to represent Mr. Barrett in the federal case. Crim. Doc. 4.

9.      Mr. Echols had never handled a federal death penalty case before. In order to gain a better understanding of the process, and in particular case budgeting and strategic issues concerning a penalty trial, Echols consulted with Federal Death Penalty Resource Counsel Richard Burr. Tr. 464, 466, 505. Echols filed declarations from Burr in support of requests for authorization to retain a mitigation specialist, mental health experts, and requests for authorization to expend attorney time. Crim. Doc. 107(c); Crim. Doc. 118.

10.     On March 18, 2005, the Court authorized trial counsel to retain a "mitigation expert" and a mental health expert. Crim. Doc. 97.

11.     Echols and Hilfiger were co-counsel until May 5, 2005, when the District Judge granted Mr. Echols's motion to withdraw from the case. Crim. Doc. 128. There is no evidence in the record of any other personnel working as part of the defense team prior to Echols's withdrawl.

12.     During their time as co-counsel, Echols and Hilfiger had only intermittent contact. They never discussed how they would divide the work on Mr. Barrett's case. Tr. 450 (Echols); Tr. 661-62 (Hilfiger).

13.     Hilfiger deferred to Echols on strategy because Echols had successfully tried the case twice and was more familiar with the facts. Tr. 661-62.

14.     Echols was dissatisfied with the amount of work Hilfiger did on the case while they were both appointed. Tr. 451-52. He testified that Mr. Hilfiger was out of the country during part of the time. Tr. 450-51.

15. Mr. Echols was not aware of Mr. Hilfiger doing any work on the penalty phase during the time they were both on the federal case. Tr. 451. Echols considered himself responsible for the penalty phase. Tr. 467. By the time of his withdrawal from the case, Echols believed Hilfiger had done very little work on the case overall. Tr. 467.

16. Echols withdrew from the case because he believed he was not accomplishing anything and defense counsel could not aggressively present Mr. Barrett's case. Tr. 463. His primary concern was funding. Tr. 663. Mr. Hilfiger was opposed to Mr. Echols withdrawing from the case. Tr. 465. Echols viewed his motion to withdraw as an unsuccessful power play. Tr. 486-87. He had hoped Judge Payne would deny the motion and he would be able to get appellate review. Tr. 487.

17. After Echols withdrew, on May 13, 2005, the Court appointed Bret A. Smith to represent Mr. Barrett. Crim. Doc. 130.

18. Mr. Smith is a Muskogee, Oklahoma attorney with a general practice that includes a significant number of criminal cases. Prior to his work on this case, Smith had no training or experience in the litigation of capital cases. Tr. 519-20. He believed he discussed this matter with Judge Payne at the time Judge Payne offered him the appointment. Tr. 520-21.

19. Smith did not speak with Hilfiger before agreeing to accept the appointment to represent Mr. Barrett. Tr. 522. He did not recall Hilfiger laying out a strategy for the case at the time of their first meeting, the day after his appointment. Tr. 523.

20. Mr. Hilfiger and Mr. Smith did not specifically divide responsibilities but responded to what came up in the course of litigation. There was no "hard and fast separation of what [they] did."  They did not divide by guilt and sentencing stages. Tr. 689.

21.	Mr. Smith's role in relation to the case in general, and to the penalty phase in particular, was limited to assisting Mr. Hilfiger, Tr. 525-26, and doing those tasks Mr. Hilfiger assigned to him. Tr. 634 ("I was there to assist. I wasn't there to lead."). Smith believed that after the first stage of trial, the decision was made that Smith would give the opening statement for the penalty phase. Tr. 525-26; Tr. 534.

22.	After Echols withdrew and Smith was appointed, there was only one meeting between Echols, Hilfiger and Smith. Tr. 490-91 (Echols); Tr. 531 (Smith); Tr. 687 (Hilfiger). Echols testified that at that meeting he described for Hilfiger and Smith what he believed needed to be done to bring the case to trial. Tr. 490. In particular, he advised them to complete the budgeting process, retain experts, and put the experts to work "immediately." Tr. 490-91.

23.	Echols's view at the time of his withdrawal was that neither the first nor second stage defense case was ready for trial. Tr. 467-68. Through consultation with Federal Defender Paul Brunton and resource counsel Burr, Echols's view of the situation was that he "had a train wreck heading down the track." Tr. 487.

24.	At the time of their first meeting, Smith brought up with Hilfiger the ABA Guidelines call for a mitigation specialist to work on the case. Tr. 523-24. Although the Court authorized defense counsel to retain a mitigation specialist from Inquisitor, Inc., neither Mr. Hilfiger nor Mr. Smith had any contact with that firm. Tr. 528 (Smith); Tr. 671 (Hilfiger).

25.	The defense team included an investigator, but he did not work on the penalty phase.

26.	In late mid- to late-August, 2005, Mr. Hilfiger instructed Mr. Smith to contact Dr. Jeanne Russell. Mr. Smith believed he first contacted Dr. Russell in August 2005, Tr. 541, perhaps one week before their meeting on August 29, 2005. Tr. 607. Russell testified the contact was made in mid-August. Tr. 774. Echols retained Dr. Russell to perform a risk assessment on Mr. Barrett sometime in 2003. Tr. 769-70; Tr. 150 (Gordon).

27.	Russell's role consisted in consulting with counsel regarding the penalty phase and the cross-examination of prosecution expert James Horn and updating the risk assessment she did in 2003. Tr. 778, 781. Dr. Russell did not serve as a mitigation investigator or specialist. Tr. 782.

### 2.	Family & Social History Investigation

28.	At the time of Echols's withdrawal from the federal case, trial counsel had conducted no mitigation investigation beyond that which had been done during the state court proceedings. Tr. 462-63. Echols could not recall ever discussing the state of the mitigation case with Mr. Hilfiger. Tr. 466.

29.	At the time of his first meeting with Mr. Hilfiger, Mr. Smith brought up the ABA Guidelines's call for a mitigation specialist to work on the case. Hilfiger led Smith to understand that he would be relying on the work that had been done in state court, although there had been no penalty trial there. Tr. 523-24. When Smith brought up the need for a mitigation specialist, Hilfiger gave Smith the impression that he was "confident that those materials could be taken from what Echols had done and whipped into shape for trial." Tr. 527.

30.	According to Smith, the defense plan for developing mitigation evidence was to "build on the information that had already been compiled" by state court counsel. Tr. 538; *id.* at 575.

31.    Echols's view, based on his consultation with resource counsel and his reading of the case law, was that the mitigation investigation that had been done in state court fell below prevailing standards of representation in capital cases. Tr. 466. Echols believed that "just about everything" was left to be done on the mitigation case. Tr. 465. Echols also communicated to Mr. Hilfiger his views that the defense needed a mitigation investigator and mental health evaluation by providing Mr. Hilfiger copies of the budget requests, and the justifications for them, that he submitted to the court. Tr. 504-05.

32.    Smith expressed shock at the possibility that a mitigation case had not been investigated by the time of his appointment in May 2005. Tr. 534; *id.* at 573 ("I can't believe those two (Echols and Hilfiger) didn't discuss what had been done prior whenever they get together in January or December"). Smith indicated in his testimony that he did not review the files of state-court counsel related to mitigation evidence. Tr. 534.

33.    Mr. Hilfiger was responsible for deciding what mitigation investigation would be done. Mr. Smith emphatically testified that his role in the penalty phase was limited and did not emerge until later in his work on the case. To wit: "I was not the mitigation guy. Okay? I was not tasked with developing this mitigation case." Tr. 529. *See also* Tr. 609 (Smith explaining that plan for penalty phase regarding Russell was not his plan). Mr. Hilfiger assigned him some specific duties related to the penalty phase such as contacting Jack Gordon to find his materials, Tr. 597, contacting Jeanne Russell, Tr. 534, 545, 559, 607, and, possibly, arranging a meeting with Echols. But "as far as Bret being the mitigation guy, I was not that guy." Tr. 534.

34.    Smith did not work on the penalty phase during the first phase of his work on the case. Tr. 529. At a meeting on August 29, 2005, between Hilfiger, Smith and Jeanne Russell,

Smith was not familiar with the subject-matter that Hilfiger and Russell discussed, including the content of Russell's 2003 report. Tr. 558-59.

35.    Mr. Smith could not say when he became aware of Rosanne Schaye's work on the case, whether it was before the trial or during the post-conviction proceedings. Tr. 529-30. When asked whether he reviewed her reports, Mr. Smith testified "that was Mr. Hilfiger's area that he was working on." Tr. 557. Mr. Smith did not know who Steve Leedy was. Tr. 557. When asked more generally whether he reviewed the files from state-court counsel to determine what mitigation evidence had been developed, Mr. Smith protested that he was not the "mitigation guy." Tr. 534.

36.    Mitigation specialist Schaye interviewed Mr. Barrett several times and also interviewed members of his family. Tr. 429, 476. She produced memoranda and reports memorializing the status of her investigation and pointing to further investigation. Govt. Exs. 19-25 & 54-62.

37.    Echols had Schaye's memoranda in paper and digital form, Tr. 477, and he turned them over, or made them available through a secure website, along with all other documentation he had, to Hilfiger and Smith after he withdrew from the case. Tr. 456-58.

38.    Hilfiger and Smith took possession of Echols's files around the time of their one meeting in late May 2005. Tr. 687. Mr. Hilfiger testified that OIDS also sent boxes files to him after he took over for Echols. Tr. 688. Neither Mr. Hilfiger nor Mr. Smith made use of their access to Echols's database of information about the case. Tr. 621-22 (Smith); Tr. 663 (Hilfiger).

39.    Hilfiger kept the boxes of materials from Echols and OIDS at his office, and Smith would borrow documents to review, then return them. Tr. 559.

40.    Dr. Russell also had Schaye's memoranda, and relied upon them in drafting the report she prepared in 2003 and updated in 2005. Tr. 786-87. Dr. Russell also had a report prepared by Dr. Sharp in 2002. Tr. 787-88; Govt. Ex. 34.

41.    Based on Schaye's memoranda and Dr. Russell's summary of information in her 2003 report, federal counsel were on notice that witnesses were available to testify to the following mitigating information that was not fully presented at trial:

a.    Kenny Barrett's parents showed little interest in him, even after he had been badly beaten by police, Govt. Ex. 19;

b.    Kenny Barrett's father, Ernie, would tell his sons that he would visit them when he was in town, but then he would not show up, Govt. Ex. 19, Govt. Ex. 22;

c.    There was little structure in Kenny's life after his father left home, Govt. Ex. 21;

d.    In infancy and childhood, Kenny Barrett was extraordinarily active, Govt. Ex. 56;

e.    When Kenny was a toddler, he pulled a bag of groceries off a table and a large can fell on his head, Govt. Ex. 56;

f.    Ken's parents had an unstable marriage that included infidelity, Govt. Ex. 56;

g.    Ken's parents only cared about themselves and often left their children to fend for themselves, Govt. Ex. 62

h.    Ken's father Ernie was violent towards his mother, Gelene, and she was violent towards him, Govt. Ex. 20, Govt. Ex. 57, Govt. Ex. 61;

i.    Ken found it extremely difficult to be without his father, Govt. Ex. 20, Govt. Ex. 55, Govt. Ex. 57, Govt. Ex. 58;

j.    The parents' divorce was very difficult for Ken because he wanted to be with his father but his father would spend little time with him, Govt. Ex. 56;

k.  Ken showed intense emotions and dramatic mood swings, Govt. Ex. 56;

l.  There is an extensive history of mental illness in the family of Ken's mother, Gelene and father, Gov. Ex. 56, Govt. Ex. 58;

m.  Ken's maternal great grandfather was murdered in Sequoya County, Govt. Ex. 20;

n.  Steve Barrett had explained to his mother that he had more success in life than his brothers because he did not grow up in the broken home his brothers lived in, Govt. Ex. 20;

o.  Gelene smoked and drank alcohol during pregnancy, Govt. Ex. 60;

p.  Gelene always favored Ken's brother Richie, Govt. Ex. 21, Govt. Ex. 22, Govt. Ex. 25;

q.  Ken's relationship with his mother was full of turmoil, and Ken believes she resents him but does not know why, Govt. Ex. 21;

r.  Gelene drank heavily, and would be mean to him when she was drunk, Govt. Ex. 21;

s.  When Ken was 13 or 14 years old, Gelene would come home drunk late at night with a boyfriend, wake Ken up, and make him roll a cannabis cigarette for her boyfriend, then smoke cannabis with Ken, Govt. Ex. 21;

t.  Ken recognized that he was always hyperactive, Govt. Ex. 21;

u.  Ernie gave Ken his first experience with alcohol by forcing him to drink Jack Daniels as a punishment, Govt. Ex. 21;

v.  Although Ken took full responsibility for his problems with Abby, he believed they came from his drinking, Govt. Ex. 21;

w.  Ken stopped going to town because he believed he was being harassed by the police, Govt. Ex. 21;

x.  Ken's parents beat him, Govt. Ex. 55;

y.  In the eighth grade, Ken was placed in a class for children with learning disabilities, and was whipped by the principal, Govt. Ex. 55;

z.  Ken started using drugs when he was 13 or 14 and believed he used them to help him cope, but he now believes he functions better without them, Govt. Ex. 55;

aa.  At the time of the raid, Ken's son Toby was living with him as part of an agreement that would keep Toby in school until he finished high school, Govt. Ex. 55;

bb.  Ken had memories of his parents fighting, especially about his mother's drinking, Govt. Ex. 59;

cc.  After the divorce, the family was very poor, and the kids' poor clothing made it difficult to go to school, Govt. Ex. 59;

dd.  The first time Gelene left Ernie, she was depressed and failed to care for Kenny and Richie, leaving them to their own devices, Govt. Ex. 22;

ee.  When his parents separated Kenny felt sad and lonely, Govt. Ex. 22;

ff.  Ken's paternal grandfather had mental health problems and was a drunk who abused his wife, and threatened to kill her in front of Ken, Govt. Ex. 22, Govt. Ex. 61;

gg.  Ken was neglected by his mother, but his aunt Linda Reilly would take him home and bathe him and wash his clothes, Govt. Ex. 22;

hh.  Ken was underweight when Linda Reilly intervened in his care, Govt. Ex. 22;

ii.  After Gelene and Ernie split up a second time, Ken as rowdier and more distant, Govt. Ex. 22;

jj.  Ken was a hyperactive child, Govt. Ex. 24, Govt. Ex. 57, Govt. Ex. 58;

kk.  There is a history of alcoholism in Ken's extended family, Govt. Ex. 24;

ll.   Ken and his brothers were not well supervised, Govt. Ex. 24;

mm.   Ken and his brothers were left alone a lot, Govt. Ex. 25;

nn.   Ken suffered from depression as a young man and would isolate himself, Govt. Ex. 25;

oo.   At the time of the raid, Ken was isolating himself at home, Govt. Ex. 25;

pp.   Ken's son Toby loves him, Govt. Ex. 54;

qq.   Ken's son observed his dramatic mood swings, Govt. Ex. 54;

rr.   Ken's father taught him to swim by throwing him into deep water, Govt. Ex. 57;

ss.   Ken's mother beat him with a belt, usually because she was mad, Govt. Ex. 57;

tt.   Ernie had a drinking problem, Govt. Ex. 57.

42.   Mr. Smith did not review Schaye's memoranda, which he testified fell under Mr. Hilfiger's area of responsibility. Tr. 557.

43.   Mr. Hilfiger had no recollection of Roseann Schaye or her memoranda, Tr. 679, 680, 695, although he believes he had them and would have reviewed them prior to trial. Tr. 696-998.

44.   State-court penalty phase counsel Gordon testified that if the case had gone to a penalty phase, the defense believed it could present evidence supporting the following mitigating circumstances: Mr. Barrett's mother was an alcoholic who brought men home when Mr. Barrett was a boy and made him drink and do drugs with them; Mr. Barrett's mother was physically abusive to him; Mr. Barrett was arrested when he was 16 or 17 and severely beaten by the police; Mr. Barrett had Post-Traumatic Stress Disorder; Mr. Barrett had contacts with the mental health system and a mental health history; Mr. Barrett's suicide attempt, his reclusive personality, his

paranoia and his sense of failure in everything he did; and, in addition, Mr. Gordon would have provided an explanation for Mr. Barrett's drug abuse. Tr. 149-51.

45.     Echols testified to a similar, if shorter, list of mitigating information the defense possessed at the time of his departure from the case. Tr. 429-30.

46.     Trial counsel did not interview the following potential mitigation witnesses about Mr. Barrett's background or mental health, or interviewed them in the most cursory fashion:

    a.    Steve Barrett

    b.    Ernie Barrett

    c.    Gelene Barrett

    d.    Phyllis Crawford

    e.    Ruth Harris

    f.    Mark Dotson

    g.    Ada Blount

    h.    Warren Dotson

    i.    Carl Cook

    j.    Doris Barrett

    k.    Elnora Long

    l.    Linda Reilly

    m.    Richie Barrett.

47.     During a hearing held on September 9, 2005, Mr. Smith advised the court that federal defense counsel had located "very little on mitigation" at that point in time. Mr. Smith testified his account to the court in 2005 would better reflect his understanding than his memory in 2017. Tr. 538.

48.    Neither Mr. Hilfiger nor Mr. Smith testified to a strategic or tactical reason for failing to follow-up and interview Mr. Barrett's family members, or for failing to present potentially mitigating information identified in the Schaye memoranda.

49.    Mr. Hilfiger testified that when he visited Mr. Barrett's cabin in September 2005, he had "a little bit" of discussion about potential testimony with Mr. Barrett's family members because by then the defense "already had some idea what they're testimony was going to be." Tr. 731.  On October 1, Hilfiger's billing shows he "talked to some of Barrett's relatives but didn't list who they were." Tr. 731.

50.    Dr. Russell did not serve as a mitigation investigator in Mr. Barrett's case and has never been a mitigation specialist at any time. Tr. 782.

### 3.    Mental Health Investigation

51.    The only person with expertise on mental health matters whom trial counsel consulted was Dr. Russell. As regards the penalty phase, that consultation consisted in one meeting that took place at the end of August 2005.[1]

52.    Echols stated in his funds requests, which were provided to Hilfiger, that he believed the defense needed to have Mr. Barrett evaluated for organic brain disorders because "Mr. Barrett is known to have used drugs and suffered significant head injuries during his life." Crim. Doc. 50 at 8. The purpose of this sought-after evaluation was to be "assessing the likelihood that Mr. Barrett suffers from any psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting." *Ibid.*

---

[1] The date of this meeting is unclear. In Dr. Russell's billing records, the date is given as August 29, 2005. In Mr. Hilfiger's billing records, the date is listed as August 19, 2005. Pet. Ex. 72 at 33.

53. Mr. Smith testified that he was not aware of Echols's request or of the Court's order authorizing funds for that purpose. Tr. 578. Mr. Smith made no decision regarding whether Mr. Barrett should be examined for organic brain dysfunction, and he had no conversation with Mr. Hilfiger about that subject. Tr. 579.

54. Mr. Smith could not say whether he knew that Mr. Barrett had suffered head injuries, although he had access to documents that memorialized Mr. Barrett reporting head injuries. Tr. 578.

55. Although not stated in Mr. Echols's funds requests, Dr. Sharp had recommended such an evaluation in 2002. Govt. Ex. 16. Trial counsel stated in their declarations and testified at the hearing that they were not familiar with Dr. Sharp or his work in the state-court case, Tr. 704, 705-06 (Hilfiger); Tr. 555-556; id. at 557-58 (Smith), even though his work was mentioned in Dr. Russell's reports. Govt. Exs. 33 & 34.

56. In a motion for summary judgment filed before the hearing, the government suggested that trial counsel did not have Dr. Sharp's report. However, trial counsel knew of Dr. Russell's work, and she had the report, and even provided it to the government's expert, Dr. Price. Govt. Ex. 51. Neither Mr. Hilfiger nor Mr. Smith asked Dr. Russell about Dr. Sharp's report. Tr. 789.

57. Dr. Russell reviewed Dr. Bill Sharp's psychological evaluation of Mr. Barrett and his findings that Mr. Barrett had avoidant and paranoid personality disorders and potential neurological damage, and that further testing was indicated. Tr. 787-88.

58. The government attempted to develop evidence that federal trial counsel did not pursue the examination requested by Echols because an affidavit by psychologist Faust Bianco

dissuaded them from doing so. However, neither Mr. Hilfiger nor Mr. Smith was familiar with Bianco's affidavit, and neither testified to having relied upon it for any decision. Tr. 679.

59.    The government also attempted to show that defense counsel decided not to have Mr. Barrett evaluated by a mental health professional because it would lead to evidence that he used drugs. The trial record reflects that the jury heard evidence of Mr. Barrett's drug use from numerous witnesses, and convicted him of a drug trafficking offense.

60.    According to Mr. Smith, the defense did no investigation into why Mr. Barrett used drugs. Tr. 588. The defense did not consult any experts about whether Mr. Barrett's drug use might have been a response to an underlying mental or emotional problem, or to traumatic experiences he had. Tr. 588-89. The defense conducted no investigation into whether someone with a learning disability might use drugs. Tr. 589.

61.    The government elicited from Mr. Hilfiger testimony indicating that he did not want the defense case to focus on Mr. Barrett's drug use, Tr. 692, but there was no testimony linking that desire to any decision about what should or should not be investigated.

62.    As far as any penalty phase was concerned, Dr. Russell's work for the defense in state and federal court was limited to performing and updating a risk assessment. A risk assessment involves determining in what situations or in what context a person will become dangerous. Tr. 770.  It is not the same as neuropsychological testing. Tr. 771.

63.    According to Mr. Smith, it was at the late-August meeting between defense counsel and Dr. Russell that the penalty phase strategy was decided upon. Tr. 542; *id.* at 544-46; *id.* at 559; *id.* at 609. During that meeting Hilfiger, Smith and Russell discussed "what had been done, what needed to be done, and what she was willing to do." Tr. 558.

64.      The plan developed then was to "limit the government's intrusion into Kenny's past and their exploitation of that and proceeding along the lines of dangerousness as opposed to a full-blown mitigation strategy." Tr. 559. The focus was on limiting future dangerousness, not a mitigation case. Tr. 559-60.

65.      Mr. Hilfiger's recollection is consistent. He testified that they discussed Dr. Russell's previous work and her 2003 report. Tr. 722-23. Hilfiger's understanding was that Dr. Russell would update her risk assessment for the federal case. Tr. 724-25. The focus of that assessment was to be limiting the government's ability to prove future dangerousness. Tr. 725.

66.      Both Mr. Hilfiger and Mr. Smith testified that they concluded, on the basis of the meeting with Dr. Russell, that she should not testify because the government's counter expert would result in testimony that was a net loss for the defense. Tr. 726 (Hilfiger); Tr. 737; Tr. 739; Tr. 746; Tr. 563; *id.* at 575 (Smith); Tr. 609.

67.      Dr. Russell never told Mr. Hilfiger or Mr. Smith not to pursue mental health mitigation in Mr. Barrett's case. Tr. 791.

68.      The only context in which Mr. Hilfiger considered presenting a mental health expert in the penalty phase was in the context of Dr. Russell's risk assessment and combatting future dangerousness. Tr. 739. Mr. Hilfiger believed that the defense was constrained to limit its mitigation evidence to rebutting future dangerousness. Tr. 745.

### B. PREJUDICE

1.      Trial counsel informed the jury that four categories of "mitigation evidence" would be presented:  (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction;" (3) "Kenny Barrett's incarceration;" (4)

"Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999." Tr. 4704.

2.     The evidence of Kenny Barrett's life that was presented was incomplete and not "an accurate representation of Mr. Barrett."

### 1. Family Witnesses

3.     A reasonable mitigation investigation conducted in a timely manner would have produced significantly more compelling testimony from family witnesses. Mr. Barrett was prejudiced by defense counsel's failure to adequately prepare and present mitigating witnesses who would have testified to Mr. Barrett's family and personal history of mental illness, childhood deprivation and the physical and psychological abuse he suffered, including excessive corporal punishment, neglect, illegal and immoral acts by a parent imposed on a juvenile, and abandonment.

### 2. Stephen Barrett.

4.     Had Stephen Barrett been properly interviewed and prepared to testify in mitigation of his brother, Kenneth Barrett, his testimony would have shown the following. Stephen Wayne "Steve" Barrett, Kenneth Barrett's younger brother, by 7 years, was called as a witness at Kenneth Barrett's sentencing. Tr. 5029 -5051. Stephen and Petitioner have the same parents, Sylvia Gelene Dotson and Ernest Eugene Barrett. Though Stephen Barrett was called to testify at the trial, his testimony was much shorter, much less detailed and, far less compelling than that elicited in the § 2255 evidentiary hearing. See Cr-115, pp. 5029 – 5052.

5.     At trial, Stephen Barrett was asked no questions about family home life, no questions about his mother's alcoholism, or his mother's lifestyle, such as her partying, bringing strangers home from bars, her drug use, her mood swings, her anger or the beatings she inflicted

on the boys. He was asked no questions about his family's mental health or observations he'd made about Ken's mental health and no questions about Ken's suicide attempt. He is asked no questions about how his upbringing differed from that of Ken's, and how that, along with Ken's mental illness, was a major factor in the way their paths diverged. *See id.*

6.      Because of that, the prosecution was able to cross-examine Mr. Barrett in such a way as to compare Petitioner's successes to his brother's failures as simply a matter of a series of bad choices, made by Petitioner rather than presenting it in the manner to which Steve Barrett testified at the evidentiary hearing.

7.      Mr. Barrett's testimony was credible. His testimony at the evidentiary hearing differed in substance and intensity from the sentencing

8.      Steve Barrett, who by his profession now sees and works with many children who have difficulties in their home life and suffer from mental health issues (Tr. 84, 88-90, 120) offered an objective perspective to the troubling environment in which his brother Kenneth was raised, testimony that would have impacted a jury's consideration of the appropriate sentence.

9.      Steve Barrett is a successful, productive member of society.  He is presently high school principal in Noble and previously was an assistant principal at the high school, head middle school principle and before that taught chemistry and physics and was football coach. Stephen Barrett has undergraduate and graduate degrees from University of Oklahoma. 11 years in Army National Guard. Tr. 78-79.  Steve Barrett left the family home in Sallisaw at 19 and, he didn't stay in touch much after that. Tr. 98.

### a.   The differences in their upbringings

10.     Steve Barrett's adolescent years were very different than Kenneth Barrett's. When Steve was an adolescent, the family lived on family land, a quarter mile from five different

relatives' families. He spent a lot of time out of the house with his grandfather, uncles Mark Dotson, Roger Crawford and Tom Sanders, and aunts Phyllis Crawford and Janice Sanders. He was very close to a number of cousins with whom he used to hunt and fish. Kenneth Barrett, on the other hand, didn't have access to these people or activities during his adolescence. Rather Petitioner was an adolescent in an unstable household, full of drama, arguing all the time with his mother and/or younger brother, the middle son Richard, riddled with physical altercations - all about simple things. Tr. 81-82, 93-94.

11.     The family lived in town in Sallisaw when Kenneth Barrett was a teenager. Though it was only 8 or 9 miles to Vian, where his aunts, uncles and cousins lived, they didn't go out there very much. He remembers two violent outbursts from Ken, one of which caused Steve to get stitches. Stephen Barrett's opinion based on his professional experience with children like Kenneth Barrett opined that was the time in Ken's life when intervention would have been most helpful. Tr. 113, 117. In his job, it is "times like those with students you want to develop strategies they can use to become productive citizens." Tr. 119

12.     Steve Barrett was two when his parents divorced, so he was never raised with a father. It was different for Ken who missed his father, clung to his dad whenever he was around, and was "very fixated on dad." Tr. 85. As to why Steve Barrett was a principal and Kenneth was in trouble, Steve believes that Ken has psychological problems that Steve did not have, partly due to their father leaving at different times in their childhoods, compounded by drugs and alcohol. Tr. 92.

### b.   Their mother and Petitioner's home life

13.     Kenneth Barrett's mother, Sylvia Gelene Dotson is an alcoholic. Tr. 82. She suffered from severe depression. She would come into Steve Barrett's room late at night and cry.

He found her diary in which she said she wanted to die. Tr. 96. Stephen Barrett could not remember when there wasn't alcohol involved in growing up. Tr. 83. His mother came home late at night, frequented the bar scene. Tr. 83. There were many occasions when Steve woke up in the morning and there was a strange man in the house. Tr. 121. The more Gelene drank the more argumentative she became. Tr. 84. She drank every day, but to excess mostly on the weekends. Tr. 87.  Steve Barrett believes his mother has mental or emotional problems. She was like a roller coaster of mood swings, extremely happy to crying and depressed, and then angry. Tr. 86. She struggled being mother and father, was overwhelmed and sometimes broke down. Tr. 94. Corporal punishment was normal in the house. Tr. 109.

14.    Steven Barrett played high school football junior and senior years. His mother came to only two games. He was the top hurdler on the east side of state in his senior year; she came to one track meet. Tr. 107.  Steve felt neglected, had to rely on others as far as transportation to school activities and sports. Tr. 85

### c.    Mental health observations of Kenneth Barrett

15.    Kenny Barrett failed at school. He dropped out in the 9th grade. Tr. 90. He was reeling from the breakup of the family and never got any counseling or help for his special needs. There might have been interventions that would have helped him stay in school. Tr. 90-91.

16.    Steve and Ken have always had a similar work ethic. Tr. 119

17.    Steve used drugs himself in late adolescence. He overcame it in the military, where non-comissioned officers were drug-tested. Tr. 92.

18.    Ken was very hyperactive growing up. Tr. 95.

19.    Ken grew up in a dysfunctional family in his adolescent years. It was a volatile household. Tr. 95.

20.     Steve Barrett vividly described Kenneth Barrett's suicide attempt. Ken came in and borrowed Steve's shotgun. Then Steve saw Ken leaning against the truck, but not the gun. And then Kenneth Barrett pulled the trigger. He was hospitalized for 10-11 days. Ken never told Steve why he shot himself. Kenneth Barrett and his wife, Abby, had broken up at the time. That greatly affected Kenneth Barrett. Tr. 99 –100.

### d.   Observations based on Stephen Barrett's experience as an educator

21.     Steve Barrett believes that any case where there's heavy drinking, the absence of a parent is going to have an effect on the children.  Stephen Barrett felt it; he is sure Kenneth Barrett felt it. Tr. 84. Based on his experience as a principal and seeing similar behavioral patterns in some students that he saw with his brother, Stephen Barrett believes that Kenneth Barrett had mental health issues, evidenced by impulsive behavior, acting out over maybe small things, inability to moderate himself, or to identify triggers and refrain from behavior that caused more damage. Tr. 88-89.

22.     Stephen Barrett and his staff design individualized programs for these kinds of students to help them manage their days and get through school, provide safe places to relax and then re-enter, various strategies that he's not aware that Ken ever got the benefit of. Tr. 89-90.

23.     Stephen Barrett's observations over the years show him that behavior is not entirely by choice; other factors affect one's ability to make positive choices, including mental illness, or underlying emotional problems. It can be very bad. Tr. 120.

24.     Stephen Barrett would have been a powerful witness in mitigation had he been interviewed, and prepared to testify in a manner consistent with the prevailing professional norms. His testimony would have provided the jury with an inside view of the dysfunctional

home life in which Kenneth Barrett grew up, abandoned by his father and desperate for a connection with him, and relegated to the of a raging alcoholic mother.

25.    Gelene Dotson's relationship with her oldest son, Kenneth Barrett, was rife with argument and her violence. Gelene Dotson, burdened by extreme mood swings, was overwhelmed by being the single parent to three boys, the oldest of whom was hyperactive and suffered from psychological problems, later compounded by drugs and alcohol.

26.    Counsel's failures to develop and present the testimony, that Steven Barrett would have given had he only been prepared and asked, fell below the prevailing professional norms of appointed counsel in a capital case. The lapse was prejudicial to Mr. Barrett. A reasonable juror or jurors could find Steven Barrett's insight and analysis into his brother's psychological problems true and the conclusions significantly mitigating, calling for a lesser sentence.

### 3.    *The testimony of Ernest Barrett.*

27.    Like Stephen Barrett, Kenneth Barrett's father, Ernest Barrett was called to testify without appropriate preparation or understanding of the purpose and underlying significance of his testimony. Tr. 132.

28.    The defense did not elicit from Kenneth's father Ernest Barrett that his family had serious mental problems, and the details thereof. Pet. Ex. 20 at 3. The defense did not elicit from Mr. Barrett that Kenneth's mother was a full-blown alcoholic who drank when she was pregnant with Petitioner, or that Ernie himself was a hard-drinker who was brought before judges on numerous occasions over incidents caused by his use of alcohol. *Id.* at 5-7.  Nor did the defense bring out the inter-generational use of alcohol or that Ernie's father was a raging, violent alcoholic who had been committed to a mental institution. Id. at 3.

29.    The defense did not elicit from Mr. Barret that Kenneth's mother whipped Kenneth out of anger due more to her mood swings than to her boy's conduct, and that "she whipped them all the time" and said "cruel things" to them. *Id.* at 7, Tr. 22-23. Counsel did not elicit testimony about the anger and violence inherent in Mr. Barrett's marriage, nor testimony of witness, Ernie Barrett's serial infidelities and absence from the home. Pet. Ex. 20 at 6-7.

30.    There was no testimony of the observations that Petitioner's father had made of his child that reflected on Ken's mental health: "Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic…he could not sit still… his feet were always moving and he was bouncing…was not an independent person and had to be close to home...a sensitive little boy too who cried if you hurt his feelings…. He was not an independent person and had to be close to home," or of the trauma his parent's divorce caused him, or even that he had a hard time in school. *Id.* at 6-9.

31.    On cross examination at trial, when the prosecutor asked Ernie if he was the best dad he could have been and Ernie said, "Probably not" (Tr. 5117), the defense did not follow up on redirect. In fact, there was no redirect. Tr. 5125.

32.    Ernie Barrett made clear in his declaration that he regretted his mistakes in parenthood and would have gladly testified to his deficiencies as a father had counsel only asked. Pet. Ex. 20 at 10; *see also*, Tr.132-33.

33.    Counsel's failures to develop and present the testimony that Ernest Barrett would have given had he only been asked fell below the prevailing professional norms of appointed counsel in a capital case. The lapse was prejudicial to Mr. Barrett. A reasonable juror or jurors could find Mr. Barrett's father's abandonment and poor parental modeling and their impact on Barrett's development was a significant mitigating factor.

#### *4.    The testimony of Phyllis Crawford.*

34.    The defense put Roger Crawford on the stand at the last minute in lieu of his wife Phyllis Crawford, (Petitioner's maternal aunt) because she was too nervous to testify.Tr.5054 Unfortunately for Petitioner, Roger did not know "a whole lot" about his nephew by marriage. Tr. 5054

35.    Had a proper investigation been conducted and Ms. Crawford properly prepared and therefore less nervous, beyond the nervousness that any prepared witness suffers, she would have testified that "depression and mental illness" runs in her family, and that she herself was under treatment for depression, Pet. Ex.27,at 3, a subject that was not raised by defense counsel when they had her husband on the stand. Likewise, Roger and Phyliss's daughter is bipolar, and her son has a rare disorder that makes him unable to talk or mature. In addition, the Crawford's son Travis had long been under psychiatric treatment for anxiety and panic attacks. *Id.*

36.    She would have testified that Petitioner's mother was an alcoholic and that Phyllis lived with her and her husband during four early months of her pregnancy with Petitioner, and Petitioner's mother drank from morning till night during all those months. Pet. Ex. 27 at1 Additionally, she would have testified that her father and his relatives were heavy drinkers, as was Petitioner's father, who had hardly anything to do with his son after the divorce, and how hard Ken took that divorce.  Id., at 2.

37.    The jury would have heard that Ken's mother never had a kind word for him, that she screamed at him all the time which Phyllis could hear across their yards and through her walls, and that Ken could not get his mother's voice out of his head. *Id.* And that his mother had different men in the house all the time, just when Kenny was entering his teenage years, and that it was very confusing for her nephew." *Id.*

38.     The jury would have heard that Phyllis knew Petitioner "was different because he needed so much more attention as a child than the other children. He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man. He was always hyperactive, on the go, into everything, and could not sit still. He would break down and cry easily." *Id.*, at 1. And that Ken's emotions did not allow him to be independent as a grown man," (*id.*, at 2) and that his suicide attempt tells it all. *Id.*, at 3

39.     Importantly, Phyllis Crawford would have informed jurors of an incident when the police came to arrest Ken for a minor offense and Ken ran to her, asking what he should do, because at the time there were newspaper accounts of someone having been beaten to death at the county jail. She told Ken, "that we were going to walk out of the house and that he was going to get in the police car and that's just what he did." *Id.* at 3.

40.     Had trial counsel appropriately prepared Mrs. Crawford to testify and alleviated the natural nervousness of anyone called to testify on behalf of a beloved nephew at risk of being sentenced to death, there is a reasonably likelihood that at least one juror would have found the testimony, either separately or cumulatively to be sufficiently mitigating, to sentence Mr. Barrett to a sentence less than death.

### *5. Ruth Harris and Mark Dotson.*

41.     Though easily available, trial counsel failed to contact or call Mr. Barrett's maternal aunt Ruth Harris (Tr. 42-51) or uncle Mark Dotson (Tr. 56 -65) to testify.  The testimony would have confirmed the family history of mental health issues (Tr. 54-55, 61, 62, 63) and alcoholism (Tr. 42, 44, 64).  Both witnesses testified in particular to Gelene's drinking and mood swings (Tr.45, 55, 59).  Mark Dotson testified that Gelene always picked on Kenneth, argued with him, never let up on him. Tr. 58.  Ruth Harris testified that Gelene

was too busy to provide structure and support for him. Tr. 55.  Both would have acknowledged Kenneth's hyperactivity. Tr. 46 (Kenny was the most hyper child Ruth Harris had ever seen); Tr. 56, 57. Notwithstanding the difficulty he had navigating the world, he willingly helped his family in the ways that he could, e.g., attending Mark's wedding (Tr. or helping his aunt out with an automobile problem. Tr. 64, 65.  Mark Dotson confirmed the family genetic propensity to mental health issues (Tr. 54, 61-63) and alcoholism (Tr. 55, 64). The fact that notwithstanding his difficulties, his addictions and mental health concerns, Mr. Barrett loved and was loved, (e.g., Tr. 51) would have humanized him in a broader more complete way that the limited testimony presented by trial counsel. Counsel's failure to call two close relatives easily accessible and consistent with counsel's limited efforts, fell short of the prevailing professional standards.

### 6. *Ada Blount, Warren Dotson and Carl Cook.*

42.     Ada Blount was Kenneth Barrett's maternal aunt. Now deceased, her testimony is set out in Pet. Ex. 16.  She was willing and ready to testify that Kenny was "a hyper little boy who could not sit still." *Id.* "He did not bother me any, but I worried about him because I thought drugs made him do things he wouldn't do otherwise.. . . He was living by himself and got mad at himself sometimes. . . . Once he shot himself. . . .Kenny never had much of a father, never had any guidance. . . .We all still love him very much." *Id.*

43.     Warren Dotson, maternal great uncle, now deceased, would have testified to the fact that his daughters, rather than Gelene, took care of Ken after he was released from the hospital Pet. Ex.34 at 4. He would have made clear to the jury that Ken was a good worker and was loved. Id. Like so many family members and community residents, Mr. Dotson would have told the jury that "The law did not have to go to Kenny's place in the middle of the night to arrest

him. Our people live all around Kenny's place and know that he was not dangerous." Id. Kenny was a good worker and always respectful. Id. at 4.

44.     Carl Cook, now deceased, also would have offered testimonial support for Mr. Barrett, his maternal great nephew. Pet. Ex. 36. He would have testified, in part, as follows. "I think what got Kenny, what affected him more than anything, was their mother. I don't think Gelene knew how to raise a child. And as far as I know, Ernie wasn't a father. I blame him for a lot of it. I know Gelene was a drinker. It is hard on children not to have a father, but when their mother is a drinker too, it takes a toll on them." Pet. Ex.36 at 4. "John E [maternal uncle] was an alcoholic, and Hugh [maternal grandfather] drank quite a bit when he was young." Id.at 4.

45.     Carl Cook and Warren Dotson both could have laid out the history of Ken's family on both sides, fleshing out a family who struggled through poverty and war and simply survive.  Pet. Ex. 36 at 1-4; Pet. Ex. 34

46.     Though individually testimonially sparse, the cumulative consistency in the family history of addiction, neglect, abandonment and Ken as a beloved but troubled member of families with deep roots in the Oklahoma would have made more credible the mitigating humanization of Kenneth Barrett.  That he deserves "a life," as trial counsel Roger Hilfiger repeatedly asserted was their goal  was to show that Mr. Barrett was not a bad character and deserved life (Tr. 109,111) – a goal they fell far short of as a result of too little investigation and preparation.

### 7.   State counsel Jack Gordon and the state mitigation investigation.

47.     Jack E. Gordon is an Oklahoma criminal defense attorney. Tr. 145. He was appointed to assist John Echols in the defense of Kenneth Barrett at his second state trial. Tr. 147. Mr. Gordon was responsible for marshalling mitigation evidence. Tr. 147.

48.     Prior to Mr. Gordon's involvement, Roseann Schaye served as the mitigation investigator in Mr. Barrett's case. Tr. 148. Ms. Schaye conducted interviews with Mr. Barrett's family. Tr. 148.  Those interviews were introduced by the government.  Govt. Exs. 19-25.[2]

49.     The second state trial did not go on to a penalty phase but if it had, Mr. Gordon would have presented the following kinds of mitigation evidence:

> Mr. Barrett's mother was an alcoholic who brought men home when Mr. Barrett was a boy and made him drink and do drugs with them; Mr. Barrett's mother was physically abusive to him; Mr. Barrett was arrested when he was 16 or 17 and severely beaten by the police; Mr. Barrett had PTSD; Mr. Barrett had contacts with the mental health system and a mental health history; Mr. Barrett's suicide attempt, his reclusive personality, his paranoia and his sense of failure in everything he did; and, in addition, Mr. Gordon would have provided an explanation for Mr. Barrett's drug abuse.

Tr. 149-51.

50.     Jeanne Russell is a psychologist who John Echols hired to do a risk assessment of Mr. Barrett. Tr. 150.

51.     Dr. Russell would have testified in state court that Mr. Barrett was not a psychopath and would not be a risk if put in a prison population. Tr. 151.

52.     Mr. Barrett was a completely cooperative client during the state proceedings.

53.     Mr. Barrett encouraged Mr. Gordon to speak to his family and develop mitigating evidence. Tr. 152. Mr. Barrett never said that he did not want his attorneys to go into his background or that he would rather have a death sentence than a life sentence. Tr. 152-53.

54.     Mr. Gordon believed that the mitigation investigation was incomplete but he still had significant mitigating evidence had they gone to a penalty phase. Tr. 155.

---

[2] Family and Client Interviews of Elnora Long, Gelene Dotson, Ernie Barrett, Linda Reilly, Richard Barrett, Ruth Harris. (Govt. Ex. 24).

55.     Mr. Gordon would have been happy to share his files, discuss the case or provide any assistance to Mr. Hilfiger or Mr. Smith had he been asked. Tr. 158-59. Neither Roger Hilfiger nor Bret Smith or their representatives ever contacted Mr. Gordon Tr. 157.

56.     Mr. Barrett was prejudiced by the failure of either Mr. Hilfiger or Mr. Smith to contact state trial counsel responsible for mitigation and as a result failed to meaningfully review or appreciate the mitigating value of the Roseann Schaye's mitigative files they possessed.

57.     Had counsel spoken with Jack Gordon and reviewed his mitigation preparation with him and availed themselves of Mr. Gordon's insights and presented the aforesaid facts, developed additional evidence and apprised the jury of it, at least one reasonable juror would have been likely to consider it significant mitigation making a lesser sentence than death sufficient punishment.

## C.  MENTAL HEALTH EXPERTS

### 1.  *Areas on which Dr. George Woods and Dr. Steven Pitt Agreed*

58.     Mr. Barrett was prejudiced by hi trial counsel's failure to develop and present significantly compelling mitigation through psychiatrist, Dr. George Woods.

59.     A reasonable mitigation investigation would have produced a social history and psychiatric testimony that revealed the following:

### a.  *Family History of Mental Illness*

60.     Dr. Woods and Dr. Pitt agreed Mr. Barrett had "genetic loading," or a genetic predisposition, to developing mental illness (specifically, a mood disorder such as Bipolar Disorder) due to his family history. Tr. 188-89, 192-93, 319, 1023-24, 1095.  Because of Mr. Barrett's family history, he was more likely to develop mental illness, specifically, a mood disorder. Tr. 190, 1023.

61.    Dr. Woods and Dr. Pitt agreed there is a multi-generational history of mood disorders, including Bipolar disorder, and other mental illness, in both the paternal line and the maternal line of Mr. Barrett's family. This includes a history of mental commitments. Tr. 188-89, 192, 226-27, 1016-24.

62.    The history of inter-generational mental illness was supported by numerous medical and other records admitted without objection, none of which was produced by defense counsel at Mr. Barrett's sentencing. See Pet. Ex. 1 (Billy Dean Maxwell, second cousin), Pet. Exs.3, 50 (A.J. Barrett, paternal grandfather); Pet. Ex. 5 (Wallace Dotson, maternal first cousin, twice removed); Pet. Ex. 45 (Kathy Trotter, paternal first cousin); Pet. Ex. 46 (Brandy Hill, maternal second cousin); Pet. Ex. 47 (Toby Barrett, son); Pet. Exs. 48, 54, 58 (Travis Crawford, maternal first cousin); Pet. Ex. 49  (Linda Riley, paternal aunt), Pet. Ex. 50 (A.J. Barrett, paternal grandfather); Pet. Ex. 56 (Gwen Crawford, maternal first cousin); Pet. Ex. 57 (Carolyn Joseph, maternal aunt).

63.    Dr. Woods and Dr. Pitt agreed that in addition to the multi-generational history of mood disorders or mental illness among Mr. Barrett's ancestors and extended family, Mr. Barrett's parents, Ernie Barrett and Gelene Dotson, suffered from mood disorders (depression in the case of Gelene Dotson). Tr. 188-89, 261, 1007, 1016, 1021, 1023.

64.    Dr. Woods and Dr. Pitt agreed there is a history of suicides and suicidal ideation in Mr. Barrett's family. Tr. 189, 1017. Dr. Pitt acknowledged Mr. Barrett's serious suicide attempt in 1986, where he shot himself in the chest with a shotgun. Tr. 196, 976).

65.    Dr. Woods and Dr. Pitt both spoke to Mr. Barrett's history of chronic suicidality, which began in childhood, as well as other attempts at suicide (deliberately attempting to overdose on methamphetamine, driving his car at high speeds). Tr. 195, 200-01, 993, 1059-60,

1062-63, G-52. Although Mr. Barrett does not suffer from schizophrenia, he reported that he "heard things," and also discussed visual hallucinations with Dr. Pitt. Tr. 268-70, 352, 1048.

### b.  *No anti-social personality disorder*

66.    Dr. Woods and Dr. Pitt agreed Mr. Barrett does not have anti-social personality disorder. Tr. 233, 1013-14.

67.    Dr. Pitt declined to diagnose Mr. Barrett with antisocial personality disorder because he could not find evidence of conduct disorder in Petitioner's youth. Tr. 1041.

68.    Antisocial acts associated with drug use cannot be used to diagnose a person with antisocial personality disorder. Tr. 234.  Before the offense, no mental health professional who saw Mr. Barrett during his several significant contacts with the mental health system had diagnosed him as having antisocial personality disorder. Tr. 201.

69.    The defense did not elicit from Mr. Ernie Barrett that Kenneth's mother whipped Kenneth out of anger due more to her mood swings than to her boy's conduct, and that "she whipped them all the time" and said "cruel things" to them. Ex. 20 at 7.  Nor did they elicit testimony about the anger and violence inherent in Mr. Barrett's marriage, nor testimony of Mr. Barrett's serial infidelities and absence from the home. Ex. 20 at 5,7.

### c.  *Family history of substance abuse.*

70.    Dr. Woods and Dr. Pitt agreed there is a multi-generational history of substance abuse, including alcohol abuse, in Mr. Barrett's family. The history of substance abuse is present in both the paternal and maternal lines. Tr. 192, 1025. Both doctors agreed there is a high incidence of co-morbidity between mood disorders, such as Bipolar disorder, and substance abuse. Tr. 191, 246, 1038-39, 1127. In the immediate family, Mr. Barrett's father, Ernie

71.     Barrett, had an alcohol problem. Mr. Barrett's mother, Gelene Dotson, had and has a severe drinking problem and can be termed an alcoholic. Tr. 194, 1021-22, 1035. She also used drugs. Tr. 1026.

72.     Both Dr. Woods and Dr. Pitt agreed Mr. Barrett was genetically predisposed to developing a substance abuse disorder. E.g., Tr. 1025. Dr. Pitt characterized substance abuse disorder as a disease. Tr. 1025.

### d.  Mr. Barrett had a dysfunctional, chaotic, and abusive upbringing.

73.     Based on his review of declarations from Mr. Barrett's family members and other materials (which he had no reason to question), and which are discussed in further detail elsewhere in these findings of fact, Dr. Pitt agreed with Dr. Woods that Mr. Barrett suffered from a dysfunctional, chaotic, and abusive upbringing.  Tr. 195, 206, 226-27, 235, 238, 1028.

74.     Gelene Dotson, Mr. Barrett's mother, drank heavily while she was pregnant with him. E.g., Tr. 194-95. See discussion of Mr. Barrett's neurological deficits, infra. She continued to drink heavily during his childhood and teenage years, and also used drugs. She would sometimes get Mr. Barrett to use drugs with her. Tr. 194-95, 1026.

76.     The marriage of Mr. Barrett's parents was marked by continual domestic discord, including frequent arguments (and at least one act of domestic violence) and frequent separations and reconciliations before they finally divorced. Tr. 1028-29; Pet. Ex. 20 at 5,6 (Declaration of Ernest Barrett, Petitioner's father) . Much of the domestic turmoil was sparked by Ernie Barrett's unfaithfulness, as he caroused and carried on multiple affairs with other women. Tr. 1028-29; Pet. Ex. 20 at 6, 7. The family also moved fairly frequently during Mr. Barrett's childhood. Tr. 1029; see generally.,Pet. Ex. 20. Family members state that when he was a child, Mr. Barrett's mother frequently worked out her frustrations on him, subjecting him to excessive physical

"discipline." Id. See e.g., Pet. Ex. 27 at 1, 2 (Declaration of Phyllis Crawford); Pet. Ex. 36 at 3 (Declaration of Carl Cook, maternal great uncle).

77.    Dr. Pitt acknowledged that Petitioner's father subjected him to physical abuse by, among other things, hitting him in the head with a fork at the dinner table, ramming his head through a wall, and inflicting a serious beating over some stolen coins. Tr. 1030, 1032.  Dr. Pitt agreed Mr. Barrett lacked guidance due to his parents' selfishness, and was pretty much allowed to do as he pleased. Tr. 1027-28. Although Mr. Barrett looked up to his father and wanted a close relationship with him, following the divorce Ernie Barrett largely ignored him. Tr. 1030.

78.    Both Dr. Woods and Dr. Pitt stated Mr. Barrett's abusive and dysfunctional upbringing had or could well have had a negative impact on his neurocognitive development as a child. E.g., Tr. 1028. The government nowhere contests the facts surrounding Mr. Barrett's background and upbringing.

### e.  *Learning disability*

79.    In his testimony, Dr. Woods described Mr. Barrett's learning disabilities, as evidenced by Dr. Young's neuropsychological testing, his educational records, and statements by family members. Tr. 204, 209, 217, 283-89, 337.  See also, Pet. Ex. 41, 55. Mr. Barrett failed reading and math in the first grade, failed the eighth grade, and was placed in special education classes on occasion. Tr. 283- 89, 1037.  Both Drs. Sharp and Dr. Price found evidence of a learning disorder. Tr. 337, 1036.

80.    Dr. Pitt did not dispute that Mr. Barrett had a learning disorder. Tr. 227, 1036-37. Nor did he dispute, as found by Dr. Price, Dr. Young, and Dr. Woods, that Mr. Barrett had attention problems or deficits. Tr. 1036-38, 1064, 1116.

### f.    Neuropsychological deficits

81.    Dr. Woods and Dr. Pitt agreed Mr. Barrett's mother drank heavily while she was pregnant with him. Dr. Pitt agreed Mr. Barrett was "most likely" exposed to alcohol in utero. Both doctors stated exposure to alcohol before birth can have an adverse effect on the development of the brain. Tr. 194-95, 1035.

82.    The doctors also agreed, although the particulars differed, that Mr. Barrett had suffered several head injuries throughout his life, including approximately two occasions when he lost consciousness. Tr. 213, 997-98, 1032. The first such incident was when he was knocked unconscious by a steel ball when he was in elementary school. Tr. 213, 997-98, 1032.

83.    Although the government tried to question this incident because it was not supported by medical records from the 1960s, Dr. Pitt did not doubt this incident happened. He acknowledged this incident had been mentioned by Petitioner's mother, Gelene Dotson. Tr. 334, 1032. As pointed out by Dr. Woods, Mr. Barrett had reported this incident to every mental health expert who had examined him since the beginning of the state case. Tr. 334-35. Mr. Barrett also suffered a head injury when he was beaten by police when he was 17 years old and had his jaw broken. Tr. 335-36, 1034. Mr. Barrett's history of head injuries was relevant to assessing his neurocognitive functioning. Tr. 212, 336. Mr. Barrett's heavy use of methamphetamine over the years could also alter the structure of his brain. Tr. 1095.

84.    Mr. Barrett's neuropsychological damage is discussed in more detail in the findings of fact addressing the testimony of Dr. Miora (who testified to the findings of Dr. Myla Young) and Dr. Price. Dr. Woods also endorsed Dr. Young's findings and relied on them in making a neuropsychiatric diagnosis of Mr. Barrett. Tr. 207-08. Stated briefly, Dr. Young's testing showed Mr. Barrett had significant damage to the left side of his brain. The orbital part of the left frontal lobe, which is the seat of executive functioning, showed significant impairments.

Mr. Barrett has dysexecutive syndrome, which impairs his ability reason, plan, control impulses, weigh and deliberate actions, accurately perceive and process incoming information and alter behavior accordingly, and the like. Tr. 209, 211-12, 213-16, 219, 335. Mr. Barrett's executive functioning is especially compromised in stressful and rapidly unfolding situations. Tr. 211, 233. Mr. Barrett's dysexecutive syndrome is relevant to understanding his actions and reactions at the time of the law enforcement raid on his property (Tr. 218-19), and is a mitigating factor in its own right. Mr. Barrett's left temporal lobe, which is related to academic functioning, is also impaired. Tr. 209, 217. Petitioner's neuropsychological deficits are not a function of his drug abuse.

85.    While Dr. Pitt acknowledged Mr. Barrett's neurological deficits, he stated he would defer to the findings of the neuropsychologists (E.g., Tr. 222), and testified that it would be "intellectually dishonest" to dismiss Dr. Young's findings (which he could not and did not quibble with), he discounted their significance because they did not prevent Mr. Barrett from knowing right from wrong; he could still make choices. Tr. 1011-12.

86.    The question here is not whether Mr. Barrett could have mounted an insanity or diminished capacity defense, but whether Mr. Barrett's neurological damage provided a mitigating explanation for his conduct, and was itself a mitigating a mitigating circumstance. The Court answers "yes" to both. Mr. Barrett's neuropsychological deficits are significant, and had an adverse impact on his daily living. Tr. 233.

87.    Dr. Pitt also discounted Mr. Barrett's neurological deficits as having much effect on his life because he could build things and was a good mechanic. Tr. 1012. But, as Dr. Woods pointed out, Mr. Barrett had no neuropsychological abnormalities on the right side of his brain, which controls the type of mechanical activities Dr. Pitt referred to. Tr. 210.

### 2. Areas of Disagreement

#### a. Bipolar disorder

88.    Dr. Woods diagnosed Mr. Barrett with bipolar disorder.[3]  He based his diagnosis on Petitioner's extensive family history of Bipolar disorder or mood disorders; previous medical records; testing and evaluation by other experts during the state and federal cases; Mr. Barrett's dysfunctional upbringing; descriptions of Mr. Barrett's behavior by family members; Mr. Barrett's lifetime history of depression and suicidality, which included the serious suicide attempt in 1986; and his own examinations of Mr. Barrett in 2009 and 2017. Tr. 188-91, 193, 195-201, 203, 339-41. In addition to having a genetic predisposition to substance abuse, Dr. Woods opined that Petitioner's drug use was in the nature of self-medication for his underlying mental illness. Tr. 204-05. Dr. Woods noted also, consistent with the findings of Dr. Sharp, that Mr. Barrett exhibited a high degree of paranoia during his hospitalizations, and that his paranoid ideation was not simply a product of his drug use. Tr. 220-21. Both Drs. Woods and Pitt agree there is a degree of co-morbidity between Bipolar disorder and neuropsychological deficits. Tr.218, 1064.

89.    Dr. Pitt stated Mr. Barrett does not have Bipolar disorder. Tr. 988, 993-94, 996-97, 1003, 1006, 1008. His chief reason for rejecting this diagnosis is that Petitioner was, at bottom, a drug addict. Any behaviors that mirrored those of Bipolar disorder were attributable to drug use. Since Mr. Barrett was "always on drugs," there is no way to attribute his behavior and mental state to anything but drug use. Tr. 974, 994, 1001, 1007, 1049. Because, in Dr. Pitt's

---

[3] Bipolar disorder is a serious mental illness. Tr. 982. It adversely affects a person's ability to control mood, including feelings of anxiety, depression, and elation. Irritability, rather than mania, is its chief feature in what used to be called the "manic" phase. Mood lability and pressured speech are features of the disorder, as are reactivity, intrusive behaviors, hyper-sexuality, impulsivity, and flight of ideas. Depression is obviously a feature of the disorder. Bipolar disorder causes significant disruption in a person's life. Tr. 190-91, 203, 235.

opinion, Mr. Barrett was simply a drug user, he was not self-medicating an underlying mental illness. Dr. Pitt also pointed out that before Dr. Woods did so, no mental health professional who had examined Mr. Barrett previously had diagnosed him with Bipolar disorder, including personnel in the Bureau of Prisons while Petitioner has been on death row. Tr. 979-81, 983, 993, 994-96. Dr. Pitt noted that despite the well-documented and conceded multi-generational history of mood disorders in Mr. Barrett's family, Petitioner's brother, Steve Barrett does not suffer from a mood disorder.[4] Tr. 1007, 1114. Dr. Pitt chalked up Mr. Barrett's paranoia, which was first noted by Dr. Sharp, as the product of drug use. But Dr. Price, the government's other expert, noted Mr. Barrett's paranoid personality features in his 2005 examination. Tr. 1047-49.

90.     The Court concludes that a reasonable juror or jurors could find Mr. Barrett does suffer from Bipolar disorder, and that this is a significant mitigating factor.

91.     There is no question Mr. Barrett was addicted to drugs for many years, with his drug of choice being methamphetamine. Yet this does not tell the whole story.

92.     As noted, Mr. Barrett was genetically predisposed to a drug abuse disorder, and there is a high degree of co-morbidity between Bipolar disorder and drug abuse. Tr. 191, 1127. Before his significant drug use began, Mr. Barrett's family described him as extremely hyper, moody and sensitive, characteristics Dr. Pitt admitted could be indicators of a developing mood disorder. Tr. 1065-66. Common sense shows that Mr. Barrett's chronic suicidality, with suicidal ideation beginning in childhood, one serious suicide attempt, and other suicide attempts, speak to a mood disorder, not just chronic drug use. Dr. Pitt grudgingly conceded as much, and agreed the probable diagnosis of a depressive disorder when Mr. Barrett was admitted to Sparks Hospital

---

[4] The fact one sibling in a family having a long history of mental illness is obviously not determinative of whether another sibling has mental illness. Tr. 349. Dr. Pitt agreed that with respect to one of the factors relevant to the development of mental illness (the family environment), Steve Barrett was raised in a stable environment, while Kenneth Barrett was not. Tr. 1129.

immediately after his 1986 suicide attempt was appropriate. Tr. 993, 1060. Dr. Pitt acknowledged that regardless of drug use, Mr. Barrett's family, including his mother, ex-wife, and son described Petitioner as mentally ill, as evidenced by his wild mood swings, excessive emotionality, and deep depressions, which are indicative of a mood disorder and which were discussed, for example, in Dr. Russell's report. Tr. 199, 299, 203, 339-40, 1065-66. Dr. Pitt acknowledged that the "racing thoughts" Petitioner described to him, as well as Drs. Woods and Young, were a sign of a mood disorder. Tr. 1065-67. Although Dr. Pitt stated he did not know how Mr. Barrett's family members could distinguish between signs of mental illness and the effects of drug use, he conceded that their statements did not connect the disturbing behaviors they saw in him to his undoubted drug use. Tr. 1131.

93.      Dr. Pitt's rejection of a Bipolar disorder diagnosis because no mental health professional before Dr. Woods had diagnosed him with this malady, and the fact he has not been diagnosed with a mood disorder in the Bureau of Prisons, fails to convince. As Dr. Woods pointed out, Mr. Barrett's pre-offense contacts with the mental health system are replete with references to symptoms of Bipolar disorder or a mood disorder. Tr. 196-98, 220-21, 236, 322, 327-28, 341-

94.      Against Dr. Pitt's contention that Mr. Barrett is simply a drug addict, and that his behavioral problems stem exclusively from drug use, the medical records (and Dr. Woods's testimony) show that in his contacts with the Bill Willis Community Health Center and Eastern State Hospital in 1986, he was treated not as just an addict who needed treatment, but as someone with an underlying mental condition. Tr. 196-98, 236-37, 322, 327-28, 1073. Dr. Pitt more or less acknowledged Mr. Barrett was admitted to Eastern State as a "mentally ill person." Tr. 1069-70. Mr. Barrett's toxicology screens at Eastern State were negative, which conflicts

with Dr. Pitt's statement that he was always on drugs and that any problems were caused by drug use. Tr. 308, 1074. He was prescribed Elavil and Ascendin (which are anti-depressants) as a Bill Willis outpatient before he was court-ordered to Eastern State. Tr. 197, 328, 1073. These drugs are not prescribed for someone who simply has a substance abuse disorder. Prescribing them indicates an underlying depression. Tr. 328, 1074. Interestingly, during his examination, Dr. Pitt told Mr. Barrett it was unusual to have a 28-day court ordered commitment to a mental hospital for a drug problem alone. Tr. 1069-71. The Eastern State records show Mr. Barrett was characterized as being emotionally labile (a characteristic of Bipolar disorder, not drug abuse), having depressive neurosis with a high risk of suicide, and having a previous history of depression. Tr. 342, 1057-58, 1072-74. On discharge from Eastern State, he was again referred to Bill Willis, which is a mental health facility, not a drug rehabilitation center. Tr. 1075. Mr. Barrett was noncompliant. Tr. 1075.

95.     In January 1995, Mr. Barrett was seen at the Sequoyah Memorial Hospital, the Bill Willis facility, and Wagoner Hospital. He was provisionally diagnosed with Bipolar disorder. (Tr. 330-31, 1080, Gov't Exh. 9) He was then admitted to Wagoner Hospital, and thereafter referred back to Bill Willis for outpatient mental health treatment (where he was again noncompliant). (Tr. 1076-77) Dr. Pitt stated that in addition to substance abuse problems, the personnel at Bill Willis and Wagoner Hospital spoke of Petitioner having anxiety, depression, and inadequate coping skills. Tr. 1079.

96.     During these 1995 contacts with the mental health system, Petitioner was treated with Haldol, an anti-psychotic. Tr. 196, 331, 1076. As Dr. Woods stated in his testimony, Haldol is not prescribed for someone with drug addiction, or someone in the throes of an acute drug-induced psychosis. Tr. 328. Mr. Barrett was not given any medication to treat the symptoms of

methamphetamine withdrawal. Tr. 342. Although his drug urine screen was positive for amphetamines and cannabis, his blood test for amphetamines was negative. Tr. 312, 341. In addition to diagnosing Mr. Barrett with a drug abuse problem, he was diagnosed on discharge with organic affective disorder.[5]  Tr. 360-61, 1081. As with the previous hospitalization in 1986, Mr. Barrett was not simply treated for drug abuse or its effects, but for an underlying mental condition, and was referred for additional mental health treatment, not to a drug program. Tr. 313, 322, 327-28, 1080, 1082.

97.     While Dr. Pitt testified that any symptomology of Bipolar disorder exhibited by Petitioner was simply a reflection of his drug use (e.g., Tr. 1123), Dr. Woods testified (without any contradiction during Dr. Pitt's testimony) that the behavioral effects of Mr. Barrett's drug of choice (methamphetamine) and the other drugs he was habituated to using do not mirror the symptoms of Bipolar disorder manifested in Mr. Barrett's documented behavior. Tr. 329, 339. As to the question whether Mr. Barrett's drug use was a form of self-medication, Dr. Pitt's opinion that Petitioner was not self-medicating an underlying mental condition (Tr. 1120-21) is undercut by his own report, where he states "whether or not defendant's emotional complaints predate his substance use or his substance use was an attempt to self-medicate his complaints is unknown." (Tr. 1052, Gov't Exh. 52, p. 61) Dr. Pitt acknowledged Mr. Barrett's description to him of his drug use was consistent with someone who was self-medicating, and that self-medicating is common among individuals with untreated mental illness. Tr. 1054-55.

98.     Dr. Pitt also acknowledged that Mr. Barrett's description of being depressed for up to two weeks at a time and unable to work, but that he felt "normal" when he was using drugs,

_____

[5] Dr. Woods and Dr. Pitt disagreed on the meaning of organic affective disorder, as it was used in 1995. Dr. Woods stated it referred to an underlying mental condition, while Dr. Pitt said it could refer to that or the effects of drug abuse. Tr. 360-61, 1081. The Court need not decide which interpretation is correct, since it is clear that Petitioner was not being treated in 1995 for no more than the effects of drug abuse.

was consistent with self-medicating (although Dr. Pitt explained this listlessness as "coming down" off a drug high). Tr. 1055-56, 1117-18.

99.    On balance, the Court concludes the evidence Mr. Barrett suffered from Bipolar disorder is more persuasive than a rejection of that diagnosis. This is particularly (but by no means exclusively) true considering the multi-generational family history of mood disorders, which the Court believed Dr. Pitt did not take into sufficient account. Although Dr. Woods is the only mental health expert to have diagnosed Petitioner with Bipolar disorder (aside from the provisional diagnosis of Bipolar given by Bill Willis in 1995), he had access to more materials and information than the mental health professionals who saw Mr. Barrett before the commission of the offense, and the mental health professionals who examined him during the state case. Tr. 327. Before he was seen by Drs. Woods and Young, Mr. Barrett had not been subjected to a comprehensive mental health/neuropsychological examination. Tr. 185-86, 228-29, 231, 294.

100.    The fact that personnel at USP Terre Haute have not diagnosed Mr. Barrett with a mental illness is of little moment, as Dr. Pitt stated he did not know the nature or adequacy of any examinations, or what these individuals based their conclusions on. Tr. 1087-89. There is nothing in the record to show a comprehensive mental health examination was conducted in the Bureau of Prisons. Tr. 239.

### b.  *Post-traumatic stress disorder (PTSD).*

101.    Dr. Woods diagnosed Mr. Barrett with PTSD based on his turbulent upbringing and the trauma he suffered in his childhood. Tr. 206. Although Dr. Pitt rejected this finding because (for one) he could not identify a "triggering event," (Tr. 1010-11) he acknowledged that Mr. Barrett's abusive and dysfunctional upbringing as well as his beating by police could be considered precipitating events for developing PTSD. Tr. 1091-93. Regardless, there is no

question that Mr. Barrett suffered physical and emotional trauma during his childhood, which are mitigating facts.

### 3. *Conclusions regarding the psychiatric testimony.*

102.     As illustrated in the discussion of the areas of agreement between Drs. Woods and Pitt, the government's expert, Dr. Pitt, bolstered a number of lines of mitigating evidence that could have been, but were not developed at trial. Not the least of these areas of agreement, or at worst quasi-agreement, concern Mr. Barrett's significant neurocognitive deficits, which the Tenth Circuit stated was the most important aspect of the mental health evidence that has been developed in these post-conviction proceedings. *Barrett*, 797 F.3d at 1230.

103.     Beyond this, as previously alluded to, there is persuasive evidence that Mr. Barrett suffers from Bipolar disorder, a serious mental illness which adversely impacted his daily life. He also suffered significant trauma in his childhood that at the very least suggests post-traumatic stress disorder, but is a mitigating fact in its own right. All the evidence discussed above could have been, but was not, discovered and developed before trial. The failure to investigate this evidence (and the other omitted mitigating evidence addressed elsewhere in these findings of fact) and to present it to the jury prejudiced Petitioner in the penalty phase of trial. This is true because it could have given a mitigating explanation for Mr. Barrett's drug use, of which the jury was well aware, and the incidents of domestic violence the jury heard about. This is especially true because as the Tenth Circuit has found repeatedly, evidence of mental or organic impairments and an abusive and dysfunctional childhood are perhaps the most persuasive types of evidence leading juries to sentence capital defendants to life.Mr. Barrett meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.

### *4. Neuropsychological Evidence*

104.    Dr. Deborah Miora testified to the neuropsychological testing by Dr. Myla Young, now deceased.  Dr. Young's Declaration was relied upon in Dr. George Woods' testimony and admitted into evidence at the conclusion of Roger Hilfiger's testimony.  Tr. 758.

105. Deborah S. Miora is a licensed psychologist who practices clinical neuropsychology in California. Tr. 1143.

106.    Neuropsychology is the study of brain function through the administration, scoring and interpretation of standardized neuropsychological tests. Tr. 1151-53, 1254. A neuropsychological examination focuses on the relationship between the individual's brain and his behavior. Tr. 1151. It is different than a psychiatrist's evaluation or tests of personality. A neuropsychologist draws inferences about behavior based on the individual's performance on tests. Tr. 1152. Each test is designed to measure a distinct type of brain function.

107.    The results of the tests are compared to normative scales drawn from tests on people with similar characteristics to the individual being tested, Tr. 1163 & 1337-39, and with people who are known to have damage to the area of the brain involved in the function the test is supposed to measure. Tr. 1163-64. The normative data for a test provide the cut-offs for what is considered below average, average, and above average. Tr. 1164. It is the statistical range on which a raw score is scaled that gives it meaning. Tr. 1339. Performances on a given test are distributed across a bell curve in which most people perform in the average range. Tr. 1165. If an individual's performance is one standard deviation above the mean, it is mildly or moderately above average. If a score is one standard deviation below the mean, it shows mild or moderate impairment in that function. Tr. 1166.

108.    Because different areas of the brain are involved in different brain functions, the neuropsychologist administers a battery of tests assessing different functions in order to assess

the individual's strengths and weaknesses. Tr. 1153, 1162. The neuropsychologist compares test results, looking for discrepancies that show an individual's strengths and weaknesses, and analyzes those discrepancies in order to determine whether there is a pattern. Tr. 1334. Discrepancies in scores on subtests within the same instrument are used to discriminate between types of functioning as to which there may be a weakness. Tr. 1352. By administering tests that require different aspects of the same general function, the neuropsychologist can identify the individual's strengths and weakness and thereby locate a specific area of the brain that has been damaged. Tr. 1248.

109.    Lastly, neuropsychological tests are subjected to review for their ecological validity, their reliability in predicting real-world performance outside the testing context. Tr. 1167-68.

110.    In 2009, Myla Young, a board-certified neuropsychologist, Tr. 1333, administered a battery of neuropsychological tests to Mr. Barrett. She also reviewed medical and educational records and conducted a clinical interview. Tr. 1255-56. The results she obtained in 2009 showed how Mr. Barrett functioned in 2005 and earlier. Tr. 1199, 1209. There was no indication in any of Mr. Barrett's records that he suffered from an injury or a disease that would have caused him to function worse in 2009 than he did in 1999. Tr. 1353. Dr. Miora noted that Mr. Barrett may have functioned better in 2009 due to being away from drugs while he was in prison. Tr. 1353.

111.    Dr. Young died in 2013.

112.    In 2017, Dr. Miora reviewed Dr. Young's testing of Mr. Barrett. Tr. 1143-44. The review consisted in (a) reading the same background materials that Dr. Young relied upon; (b) gathering and reading her notes and raw test data; (c) assessing whether the tests in Dr. Young's battery were reliable, appropriate for Mr. Barrett, and appropriate for the purpose of the

evaluation, Tr. 1197; (d) rescoring the tests Dr. Young administered, Tr. 1197; (e) interpreting the test results. Tr. 1144-45.

113.    Dr. Miora reviewed the testing material and scoring originally done by Dr. Young. Tr. 1179.

### a. Frontal lobe description.

114.    The frontal lobes are considered to be the seat of reason, the capacity to think, to make decisions, to weigh the consequences of one's actions, to anticipate essentially to think and it is supposedly what distinguishes us from the rest of the animal kingdom. What is important as well about the frontal lobe is that it is associated with the output of behavior or responses. Whereas, most of the rest of the brain receives information   19 and stores information or does something with its senses. Tr. 1155.

### b. Parietal lobe description.

115.    The parietal lobe is very involved with visual attention and sensation of one's self in space and one's kinesthetic perception and seeing objects in perspective. It is very important again in relationship to the frontal lobe. Tr. 1157.

### c. Indications of a need for neuropsychological testing

116.    Dr. Young and Dr. Miora reviewed records that made neuropsychological testing an appropriate area of inquiry regarding Mr. Barrett. Tr. 1169. In considering these possible sources of brain damage, Dr. Miora stressed that "insults to the brain are cumulative" in their effects so that the more evidence there is of incidents, the more likely it is that the individual will have brain damage and brain dysfunction. Tr. 1170. In Mr. Barrett's case, the first indication of potential damage came from people who knew Mr. Barrett's mother and reported that she drank

alcohol when she was pregnant with him. Such in utero exposure can have a negative impact on brain development. Tr. 1169.

117.    Second, school records show Mr. Barrett had difficulty in school and was diagnosed with a learning disability. Tr. 1169.

118.    Third, Mr. Barrett suffered head injuries. Mr. Barrett and family members reported that during childhood, he was struck in the head with a steel ball and possible knocked unconscious. Tr. 1170. Later, he was in a motorcycle accident and sustained an injury in the area around the right frontal or periorbital area of the brain. Tr. 1170-71. Later still, Mr. Barrett shot himself in the chest with a shotgun, an event that could have caused loss of oxygen to the brain and a closed head injury from the subsequent fall. Tr. 1171.

119.    Fourth, Mr. Barrett began drinking alcohol and using drugs at an early age which "is a serious insult to the brain." Tr. 1171.

120.    Areas of the brain that are undergoing development are at greater risk of injury. Tr. 1171-72. During development in utero, the entire brain is vulnerable. Tr. 1172. During adolescence, the frontal lobe is undergoing development and it is more vulnerable to damage from alcohol or drugs. Tr. 1172-73. If an adolescent uses drugs and alcohol to excess, it is very likely that his judgment and impulse control, functions largely associated with the frontal lobe, will be impaired. Tr. 1173.

121.    A neuropsychologist also would see a need for neuropsychological testing in the circumstances of the offense Mr. Barrett was charged with. Tr. 1173-74. The frontal lobe of the brain is involved in this case because it has to do with planning, decision-making, being able to inhibit oneself, or deciding to act. Tr. 1174. It is the area of the brain involved in considered actions, as opposed to spontaneous reaction. Tr. 1174.

#### d. *Dr. Young's Evaluation*

122.    Dr. Young examined Mr. Barrett for 16 hours in early 2009. Tr. 1178. That amount of time was appropriate for the battery Dr. Young used. Tr. 1180. During that time, she administered a battery of neuropsychological tests that comprehensively covered relevant brain functions and whether Mr. Barrett was giving full effort to the tests. Tr. 1176, 1197. Dr. Young gave Mr. Barrett breaks so that fatigue did not affect his performance. Tr. 1322. Dr. Young chose tests that were appropriate for someone of Mr. Barrett's background and for the timing of the evaluation. Tr. 1176-77, 1163.

123.    Dr. Young's testing conditions were appropriate. Tr. 1178. She documented that Mr. Barrett was physically well enough to put his best efforts into the tests. Tr. 1181-82. Although Dr. Young found Mr. Barrett to be hypomanic--meaning he was exhibiting fast, pressured speech--he was psychologically capable of producing valid test results. Tr. 1182.

124.    Dr. Miora was able to evaluate whether Mr. Barrett was attempting to malinger symptoms because Dr. Young administered several tests of effort and malingering. Dr. Miora was able to review both the effort-testing materials and the scoring done by Dr. Young. Tr. 1180-81; 1182-84. The tests showed Mr. Barrett was putting forth his best efforts. Tr. 1183-84.

125.    Dr. Young measured Mr. Barrett's intelligence using the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"). Tr. 1189. She measured his academic functioning using the Wide Range Achievement Test-III ("WRAT-III"). Tr. 1190. She assessed his auditory verbal learning with the California Verbal Learning Test-II. Tr. 1192-93. Dr. Young administered the Wechsler Memory Scale-IV. Tr. 1194. Dr. Young evaluated Mr. Barrett's ability to handle complex, non-verbal visual information using the Rey Complex Figure Test. Tr. 1194-95.

126.    Dr. Young administered the Delis-Kaplan Executive Function System ("D-KEFS") which is a battery of different tests that have been normed to be considered together. Tr.

1195-96. This battery measured Mr. Barrett's executive functioning in areas such as his ability to make decisions, and to switch back and forth between stimuli, and to respond to one stimulus while ignoring another, and his ability to reason conceptually. Tr. 1196. To further assess Mr. Barrett's executive functioning, Dr. Young administered the Wisconsin Card Sort Test and the Short Category Test to assess Mr. Barrett's ability to solve problems and reason abstractly. Tr. 1196.

127.    Dr. Young measured Mr. Barrett's attention using a variety of tests. Tr. 1192.

128.    In addition, Dr. Young administered tests of Mr. Barrett's olfaction and tactile sensation, Tr. 1190, his fine motor speed and coordination, Tr. 1191-92, and his ability to discern rhythms and other sounds, Tr. 1192.

129.    Overall, Dr. Young found that Mr. Barrett had both strengths and weaknesses in brain functions. Tr. 1200, 1299. As the government brought out on cross-examination, in many areas of functioning, Mr. Barrett is average or slightly below average, Tr. 1299-1303. And on a few tasks, Mr. Barrett's functioning was above average. Tr. 1304, 1307. But the government did not establish how those areas of strength relate to the circumstances of the case or to the areas in which Mr. Barrett functioned significantly below average. The government's own neuropsychological expert, Dr. Price, testified that his test results were valid although Mr. Barrett scored in the first percentile on attention, in the average range on intelligence and other measures, and in the 96th percentile on visuospatial/constructional ability. Tr. 872. The evidence before the Court is that it is not unusual for an impaired individual to function normally in some areas. Tr. 1346-47. However, Dr. Price testified that the vast difference between Mr. Barrett's attentional and visuospatial abilities was abnormal. Tr. 905.

130. Mr. Barrett showed weakness in areas of executive functioning such as problem solving, attention, planning, shifting responses by inhibiting one and carrying out an alternative, and working with information in the moment or under pressure, as opposed to after time for reflection. Tr. 1200-01. Mr. Barrett does poorly when he is required to think on his feet. Tr. 1201. Although Mr. Barrett can learn information over time, he is impaired in his ability to respond to novel or changing situations. Tr. 1202. The areas of the brain most associated with Mr. Barrett's weaknesses are in the frontal and temporal lobes. Tr. 1202.

131. The areas of impairment that Dr. Young found using neuropsychological tests were consistent with Mr. Barrett's history of being diagnosed with a learning disability, having poor attention, and having suffered a head injury. Tr. 1201-02, id. at 1347.

132. Dr. Young measured Mr. Barrett's general intelligence in the low-average range. Tr. 1205. That result was consistent with the result obtained in 2002 when Dr. Faust Bianco administered the WAIS-III to Mr. Barrett. Tr. 1261-62. The WAIS-III was one instrument from Dr. Bianco's testing that Dr. Miora could rely upon because she knew the normative data. Tr. 1350-51. However, Mr. Barrett was impaired on the Processing Speed Index of the WAIS, meaning that he was impaired in his ability to scan, analyze and associate information conveyed visually. Tr. 1207-08. Id. at 1295-96 (explaining that after correcting an error to Dr. Miora's re-scoring of the test, Dr. Young's original score showed Mr. Barrett's processing speed as "very bad" and in the fifth percentile). There was a statistically significant difference between Mr. Barrett's scaled scores on a test of how he handled a simple task involving visual information, in which he did fair, and how he handled complex visual information, which he handled poorly. Tr. 1211. Dr. Miora found that contrast significant for understanding Mr. Barrett. Tr. 1211.

133.    Mr. Barrett was in the 13th percentile of performance on the WAIS's measure of attentional ability. Tr. 1213.

134.    Dr. Young's testing of sensory and motor functioning showed something interferes with sensory information reaching Mr. Barrett's brain, both tactile and visual information. Tr. 1214.

135.    The neuropsychological tests administered by Dr. Young showed Mr. Barrett's frontal to subcortical brain circuitry was damaged such that he was impaired when he was in a situation that required him to attend to visual information and generate a response. Tr. 1219-20. When he was required to visually scan for information and respond appropriately, Mr. Barrett scored two standard deviations below the mean. Tr. 1219. That test is similar to, and a complex variation on, connect-the-dots. Tr. 1218, 1226-27. On a test that required him to associate a simple shape with a number, as one would do when using a code that substitutes a shape for a letter or number, Mr. Barrett performed in the second percentile, below 98 percent of the population. Tr. 1215-16. When Mr. Barrett was given a timed test that required him to focus his attention on visual information, and identify the correct association, he performed in the first percentile, below 99 percent of the population. Tr. 1216-17. Dr. Young's finding on this test was consistent with Mr. Barrett's score on a test purportedly administered by Dr. Bianco in 2002 in which Mr. Barrett scored below the first percentile. Tr. 1272-73. By contrast, when called upon to respond to auditory, verbal information, Mr. Barrett performed in the 16th percentile. Tr. 1217-18.

136.    Although Dr. Young's tests showed Mr. Barrett was well above average in his ability to learn from visually presented information, he was far below average (more than two standard deviations below the mean) in his ability to work with visual information in the

moment. Tr. 1223-24. He also was impaired, scoring two standard deviations below the mean, when he had to perform a task involving verbal working memory, but not when the task involved delayed recall. Tr. 1307-08. That discrepancy between working with stored information and in-the-moment information appeared repeatedly. Tr. 1224, 1229. It also appeared in the testing of Dr. Price, the government's expert who found that Mr. Barrett scored very high on a test of visuospatial and constructional ability, Tr. 872, he was in the 25th percentile on a test of immediate memory, Tr. 871-72, and in the fifth percentile on a test of attention. Tr. 872-73, 902-03. (Dr. Young's testing also showed Mr. Barrett had constructional ability. Tr. 1345.)

137.    The results of Dr. Young's testing were consistent with historical information about Mr. Barrett going back to childhood. Mr. Barrett was reported to have been hyperactive and to have a learning disability. See, e.g., Tr. 6, 56, 57, 95, 846,1065-1066; Pet. Exs. 16, 27. Mr. Barrett was in a class for children with a learning disability when he was in the eighth grade. Pet. Ex. 73 at 4. Other experts, including the government's expert, Dr. Price, diagnosed Mr. Barrett with a learning disorder, probably Attention Deficit Hyperactivity Disorder. Tr. 889. Dr. Young's tests showed a disparity between Mr. Barrett's intellectual ability and his academic performance that Dr. Miora explained is consistent with a learning disability. Tr. 1224.

### e.    *Impaired executive functioning*

138.    Dr. Young measured Mr. Barrett's executive functioning using the D-KEFS, a battery that has been in use for decades, and is considered to be a good measure of a person's real-world functioning. Tr. 1225-26. Tests of executive functioning are common in a forensic setting. Tr. 1225-26. Executive functions are carried out by the frontal lobe through communication from subcortical systems that arouse the individual. Tr. 1226. Mr. Barrett's test results showed he is impaired in frontal lobe functions. Tr. 1235-36.

139.    On the Trail Making Test, which is considered very sensitive to brain damage, Mr. Barrett showed moderate impairment (two standard deviations below the mean) in his ability to visually scan for information. Tr. 1227, 1229-30. Mr. Barrett's test results also showed impairment in his ability to alternate his thinking, for example when instructed to draw a line alternating between numbers and letters, from 1 to A to 2 to B to 3 to C, and so on. Tr. 1228. On that test, Mr. Barrett scored in the 16th percentile, one standard deviation below the mean. Tr. 1229.

140.    Dr. Miora found that Mr. Barrett's performance on a test of inhibition, another frontal lobe, executive function, was consistent with his poor performance on the Trail Making Test. Tr. 1239. Mr. Barrett's performance was below average. Dr. Miora found the consistently poor performance appeared when Mr. Barrett was required to inhibit one action in favor of another one when he was presented with more than one stimulus. Tr. 1239.

141.    Similarly, Mr. Barrett scored very low on a test that required him to learn a concept through trial and error, and inhibit actions that the examiner told him were incorrect. Tr. 1242-44. Mr. Barrett failed to grasp any of the concepts Dr. Young was conveying through positive or negative responses to his actions. Tr. 1244-45. Those results were consistent with still more results on a test that required Mr. Barrett to learn to associate a visual design with a number. Tr. 1246-47; id., at 1319.

142.    Mr. Barrett also demonstrated that he is impaired when he must show verbal fluency by alternating between verbal concepts. Tr. 1231-32. The common thread between his poor performance on visual tasks and verbal tasks was in what Dr. Miora called working memory, and described as the ability to think on ones feet. Tr. 1232.

143.   Mr. Barrett's testing showed there are times when his mind loses its grasp on the task at hand, or the rule that he is following. Tr. 1231.

144.   When a test required Mr. Barrett to manipulate objects in order to solve a puzzle, his performance showed impairment, insofar as he was bad at planning according to a set of rules or instructions, although he could eventually solve the puzzle. Tr. 1232-34.

145.   Performance on the D-KEFS has been shown to predict how an individual will behave in situations similar to those in the testing, for example, as in Mr. Barrett's case, when conditions demand that he quickly shift from one kind of response to another. Tr. 1239-40. The test results show the individual's baseline functioning. Tr. 1240. In a more extreme set of conditions, Mr. Barrett could be expected to perform worse than his baseline because the testing showed he is challenged by increases in complexity. Tr. 1240-41; id. at 1345-46 (Mr. Barrett performed well compared to norms on structured tasks and poorly on those with changing conditions).

146.   Mr. Barrett's performance across all the various measures of executive functioning showed a pattern of impairment in visual attention, "working memory" which Dr. Miora described as the ability to work with information quickly, in the moment, and impaired problem-solving ability. Tr. 1249. Impairment in these functions indicates damage to the frontal, temporal, and parietal regions of Mr. Barrett's brain. Tr. 1249. These impairments are present for Mr. Barrett on a daily basis. Tr. 1250. At the time of Dr. Young's testing in 2009, Mr. Barrett would have been performing better than he would have been when he was out of custody and had access to drugs. Tr. 1250-51, id. at 1353.

147.   Mr. Barrett's areas of impairment are probative of his culpability during the raid in August 1999. The tactical team gave no auditory signal of its approach or identity. Mr.

Barrett's first indication that something was happening came when he heard his son yelling in alarm from the yard outside. The only potential source of information about who was alarming his son came from visual cues. However, the lead vehicle was unmarked. According to all law enforcement accounts, Mr. Barrett immediately opened fire on the lead vehicle. The entire shootout lasted 11 to 30 seconds, according to testimony from the tactical team. Dr. Young's testing showed that Mr. Barrett was most impaired in his ability to attend to visual cues. Tr. 1346. Mr. Barrett was impaired in his ability to recognize changing conditions based on visual cues. Mr. Barrett was moderately to severely impaired in his ability to inhibit one type of response in light of changing conditions or information. Test results indicated Mr. Barrett would tend to become overwhelmed when being fed lots of information at a rapid rate. Tr. 1347-48. He was most impaired in exercising judgment in an unpredictable situation. Tr. 1251-52. The government elicited evidence that Mr. Barrett's visual attentional abilities were further diminished by methamphetamine intoxication at the time of the raid. Tr. 1326, id. at 1354. Thus, even assuming one of the trailing vehicles had its emergency lights on, Mr. Barrett had brain impairments that restricted his ability to attend to all the visual information that was available, to shift his attention from the lead vehicle to others, to incorporate the all the visual information into his thinking, and to inhibit his response to the initial threat he perceived.

### D. THE RISK ASSESSMENTS

#### 1. Dr. Jeanne Russell

148.    Jeanne Russell is a psychologist licensed to practice in Oklahoma. Tr. 766.

149.    John Echols retained Dr. Russell to perform a risk assessment on Mr. Barrett sometime in 2003. Tr. 769-70.

150.    In mid-August 2005, Bret Smith asked Dr. Russell for assistance in the federal trial. Tr. 774. Dr. Russell stated that she did not think she fully understood what Mr. Smith was asking her to do in terms of an investigation, but she told him that in the month they had available, she could update the risk assessment she had previously prepared. Tr. 778. She also could assist him in the cross-examination of Dr. Horn. Tr. 781.

151.    Mr. Hilfiger and Mr. Smith decided not to use Dr. Russell because of the potential information. Tr. 737. They did not "feel like it would be a good idea to have the government assess him." Tr. 729. "Bret Smith, Kenneth Barrett and [Roger Hilfiger] determined that the information assembled by Dr. Russell and the anticipated counter information from the government – that mitigation expert would be more detrimental than advantageous to Kenneth Barrett." Tr. 746. Thus, they did not present evidence to the jury about Mr. Barrett's social history or his educational history or his mental health history because of the conversation with Dr. Russell on risk assessment.  Tr. 747.

152.    The problem with Dr. Russell, from defense counsel's perspective, was that she performed a risk assessment, a form of assessment that, if rebutted by the government, would draw testimony potentially damaging to the defense case. Trial counsel's view of mental health mitigation was thus skewed by their failed to consult anyone other than Dr. Russell.

153.    Mr. Barrett was prejudiced by the lack of investigation into his mental health based on an unfounded fear of an unknown expert. As shown at the hearing, if trial counsel had followed the initial idea of Echols to have Mr. Barrett evaluated for organic brain disorders, defense counsel could have presented mental health mitigation without drawing the testimony they feared would damage Mr. Barrett's case.

### 2. Dr. Randall Price

154.    Psychologist J. Randall Price, Ph.D., evaluated Mr. Barrett in October 2005. Dr. Price's evaluation on behalf of the government was allowed after the defense gave notice that it might rely on the risk assessment done by Dr. Jeanne Russell in 2003 that the federal defense lawyers asked her to update in 2005. The defense did not call Dr. Russell as a witness, at least in part because they were concerned that her testimony would trigger damaging testimony from Dr. Price. In these post-conviction proceedings, Mr. Barrett also did not call Dr. Russell as an expert.

156.    The government did not ask Dr. Price to prepare to rebut the opinions of Mr. Barrett's expert witnesses in these post-conviction proceedings. Tr. 893-94. Consequently, Dr. Price offered no opinions regarding whether Mr. Barrett suffered from Bipolar Disorder or Post-Traumatic Stress Disorder ("PTSD") as indicated by Dr. Woods. Tr. 857. Although Mr. Barrett reported symptoms of PTSD such as reliving a traumatic experience and longstanding, troubling memories, Tr. 917, Dr. Price did not inquire about those things. Tr. 937-38. Dr. Price did not perform neuropsychological tests on Mr. Barrett's executive functioning and did not issue a report on that area of functioning. Tr. 893. Dr. Price testified that he could not rule out dysfunction in areas he did not test. Tr. 936-37. Consequently, Dr. Price did not testify regarding the deficits in executive functioning as diagnosed by Dr. Young and Dr. Miora, or the dysexecutive syndrome diagnosed by Dr. Woods.

157.    In September 2005, United States Attorney Sheldon Sperling retained Dr. Price to conduct a forensic evaluation of Mr. Barrett for the purpose of rebutting testimony by Dr. Russell if it were offered at trial. Tr. 823, 825.

158.    As part of his work in 2005, Dr. Price reviewed records related to Mr. Barrett's prior treatment at mental health facilities. Tr. 826-29. Dr. Price found that Mr. Barrett's abuse of alcohol and drugs was a common thread running through those records. Tr. 829-30.

159.    Mr. Barrett began having problems with substances "very early" in life, and it continued into his adult years. Tr. 830. Although Mr. Barrett experimented with a wide variety of substances, alcohol, cannabis, and marijuana were the most problematic for him. Tr. 830-31. Records indicate Mr. Barrett was dependent upon more than one substance. Tr. 831.

160.    Dr. Price found the records documented one suicide attempt in the mid-1980's when Mr. Barrett shot himself in the chest. Tr. 831.

161.    Dr. Price evaluated Mr. Barrett over two days, October 13 and 14, 2005, in a jail. Tr. 832. Mr. Barrett cooperated with the evaluation. Tr. 832-33. In fact, although Mr. Barrett's attorney explained the purpose of the evaluation, Tr. 834, and it took place in the middle of his capital murder trial, "he was very cooperative and friendly and open about answering things." Tr. 835. Mr. Barrett put forth full effort on the tests Dr. Price gave him. Tr. 835.

162.    Like Dr. Sharp, who evaluated Mr. Barrett for his defense in 2002, Dr. Price found Mr. Barrett exhibited paranoid thinking such that Dr. Price diagnosed Mr. Barrett with the features of a paranoid personality. Tr. 836.

163.    Based on the referral question presented by the prosecution and the background materials Dr. Price reviewed prior to his evaluation, he determined that he "should do a neuropsychological screening to determine if there was potentially a problem with cognition or thinking that might be present." Tr. 839. Dr. Price explained he thought the neuropsychological screening was appropriate based on the information he had that Mr. Barrett had suffered head injuries and "the substance abuse for all those years would be a red flag to do a neuropsychological screening battery . . . ." Tr. 839-40.

164.    Dr. Price had the opportunity on the second day of his evaluation to follow up information he obtained on the first day. Tr. 841.

165.    The social history Dr. Price took from Mr. Barrett indicated his childhood was marked by "family dysfunction" that included his parents separating and eventually divorcing, "a lot of relocations due to his father's job," and Mr. Barrett being disturbed by his father's absences from the home. Tr. 841-42. Mr. Barrett's parents fought. Tr. 842. "[B]oth [his parents] had problems with alcohol." Tr. 843. Mr. Barrett also began using substances early in life, he married very young. His marriage included a lot of dysfunction. In general his life "was not one that was very predictable or organized." Tr. 842.

166.    Dr. Price reviewed school records showing that Mr. Barrett did not perform well. Tr. 844. Those records raised concerns for Dr. Price that Mr. Barrett might have deficits. Tr. 843-44.

167.    Mr. Barrett reported being hyperactive as a child and having difficulty paying attention in school, and that report was consistent with his performance on a neuropsychological test of attention. Tr. 846.

168.    Mr. Barrett reported that as an adult he could perform some jobs well when he was high on methamphetamine. Tr. 847.

169.    Mr. Barrett reported that he had success as a mechanic and in the months before the raid on his house, or perhaps for a longer period, he was increasing his clientele and business. Tr. 847-49. Mr. Barrett admitted that he had sold methamphetamine to support building his business, and his plan was to stop selling drugs when he could afford to. Tr. 849.

170.    Dr. Price assessed Mr. Barrett's general intellectual functioning using the Reynolds Intellectual Assessment System that measures verbal and non-verbal intellectual functioning. Tr. 864-67. Dr. Price found that Mr. Barrett had average intellectual functioning and there was not a "significant difference" between his verbal and non-verbal intellectual

functioning. Tr. 867-68. A person with a "severe brain injury" "typically" would have impaired intellectual functioning, although a person with a mild brain injury could have average functioning. Tr. 868.

171.    Dr. Price administered the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"). Tr. 868. The RBANS measures attention, memory, language functioning and visual-spatial non-verbal tasks. Tr. 869. It is necessary to measure multiple areas of functioning because different areas of the brain are involved in different functions such that a person with damage to an area involved in one function could have impairment in that function, but be normal in undamaged areas. Tr. 897-98.

172.    The RBANS is considered a screening test to determine whether further testing is needed. Tr. 869; id. at 898. Dr. Price distinguished the RBANS from a "comprehensive battery of neuropsychological assessments." Tr. 875.

173.    On the RBANS, on the measure of immediate memory, Mr. Barrett scored in the 25th percentile compared with a normative sample of people of similar age and education. Tr. 871. That 75 percent of people perform better than Mr. Barrett did not concern Dr. Price because Mr. Barrett's low performance was consistent with his history and attention problems. Tr. 871. Mr. Barrett's performance was consistent with someone who suffered a mild traumatic brain injury. Tr. 871-72.  Mr. Barrett's school records were consistent with his impairments appearing after a brain injury that occurred earlier in childhood. Tr. 906.

174.    Mr. Barrett scored in the 96th percentile on the RBANS measure of visuospatial/constructional ability. Tr. 872. That, too, was consistent with his history and self-report of being a skilled mechanic. Tr. 872.

175.    Mr. Barrett was in the average range on the RBANS measure of language functioning. Tr. 872.

176.    Mr. Barrett showed deficits on the RBANS measure of attention, in which he scored in the fifth percentile, worse than 95 percent of the population. Tr. 872-73. The test was timed and required sustained attention. Tr. 873. Mr. Barrett's impaired attention was consistent with his history of having a learning disorder. Tr. 875. Mr. Barrett's attention measure was two and a half standard deviations below the mean. Tr. 902-03. That is significant impairment. Tr. 903. Mr. Barrett's attentional deficits are consistent with his school records, Tr. 909-10, indicating that the cause of his brain impairment occurred in childhood.

177.    Mr. Barrett scored in the average range (58th percentile) on the RBANS measure of delayed memory, indicating that once his brain has time to consolidate information, he can retain and recall that information. Tr. 873.

178.    Although Dr. Price testified that Mr. Barrett's overall functioning on the RBANS was average, when all the index scores were averaged together, he also testified that the large difference between Mr. Barrett's very strong visuospatial ability and his very weak attentional ability, was abnormal, an infrequent finding. Tr. 905.

179.    Dr. Price administered the Personality Assessment Inventory to Mr. Barrett. In this test, the individual is presented with various statements about himself to which he must select the most appropriate answer from among four options: entirely false, mostly false, mostly true, and entirely true. Tr. 875-76. Mr. Barrett put effort into the test and did not exaggerate. Tr. 876.

180.    Dr. Price found the most clear thing about Mr. Barrett's answers on the PAI is that he recognized his substance abuse problem and its negative affects on his life. Tr. 876. Mr.

Barrett also showed depressive symptoms and paranoia. Dr. Price testified that those were "the main findings that [he] thought were relevant to this case." Tr. 876.

181.    Mr. Barrett's results on the PAI indicated that depression and drug abuse were equal concerns for him, but alcohol was a significantly greater concern. Tr. 910.  The Court finds that the government's witness, Dr. Price, would have if appropriately deposed or cross-examined undermined the government's expert, Dr. Pitt, and his insistence that the drug abuse by Mr. Barrett effectively ends the efforts to mitigate.  Tr. 1121.  It also directly undermines trial counsel's fear of and failure to educate themselves on the potentially mitigating or less than fatal emphasis on Mr. Barrett's drug use. Tr. 653, 691-692.

182.    The PAI also measures an individual's aggression. Mr. Barrett's score on the aggression subscale was average. Tr. 911. That result was consistent with the aggression measurement from the MMPI-2. Dr. Price testified that Mr. Barrett's "meta personality trait" for aggression was average. Tr. 921. Mr. Barrett also scored high on measures of introversion. Tr. 922, 923.

183.    Mr. Barrett scored in the average range on the antisocial scale on the PAI. Tr. 912.

184.    The PAI is scored by a computer which generates an interpretive report that is intended to assist the evaluator in understanding the data. Tr. 914. The interpretive report on Mr. Barrett's PAI was consistent with Dr. Price's description of the results in that it indicated that alcohol was a major concern for him. Tr. 914.

185.    Some results from Dr. Price's testing support Dr. Woods's conclusions. The PAI interpretive report included a section titled "critical item endorsement" which indicated that traumatic stress was a particular concern for Mr. Barrett. Tr. 915. On cross-examination, Dr.

Price acknowledged that Mr. Barrett scored two and one half standard deviations above the mean on the PAI scale for traumatic stress, which is outside the normal range. Tr. 915. The results of the MMPI-2 also included a high score on a scale associated with PTSD. Mr. Barrett scored 72 on the PK scale that Dr. Price testified (on cross-examination) relates to Post-traumatic Stress Disorder. Tr. 918.

186.    On the PAI, Mr. Barrett responded "very true" to the prompt "I keep reliving something horrible that happened to me." Tr. 917. Mr. Barrett responded "very true" to the prompt "I've been troubled by memories of a bad experience for a long time." Tr. 917. He responded "somewhat true" to the prompt "I've had some horrible experiences that make me feel guilty." Tr. 917. And he responded "somewhat true" to the prompt "since I had a very bad experience I am no longer interested in some things that I used to enjoy." Tr. 917.

187.    Dr. Price administered the MMPI-2 to Mr. Barrett. Tr. 877. The results included high scores for antisocial attitudes and behaviors, paranoia, and physical concerns. Tr. 879. The indications of paranoia were consistent with Dr. Sharp's findings and others. Tr. 880-81. Mr. Barrett believes elements of society are out to get him. Tr. 881. He also scored high on scales indicating opposition to society. Tr. 880.

188.    Mr. Barrett scored 76 on the MMPI-2 depression scale. Tr. 918. Although Dr. Price testified on cross-examination that was a significant finding, Tr. 918, he did not mention it as one of the issues of concern during his direct testimony.

189.    Dr. Price diagnosed Mr. Barrett with a learning disorder that he could not specify although he found "signs and symptoms of attention-deficit disorder and hyperactivity that was supported" by history, records and Dr. Prices evaluation. Tr. 889.

190.    Dr. Price diagnosed Mr. Barrett with polysubstance dependence in remission due to his incarceration. Tr. 890.

191.    Dr. Price diagnosed Mr. Barrett with dysthymia, a longstanding, chronic form of depression that is not as severe as major depressive disorder. Tr. 890.

192.    Dr. Price diagnosed Mr. Barrett with an unspecified personality disorder with antisocial and paranoid features. Tr. 890. Dr. Price did not diagnose Mr. Barrett with Antisocial Personality Disorder. Tr. 939.

193.    Norms are important for understanding neuropsychological test results. Tr. 899-900, 901.

### E. FAUST BIANCO

194.    The government cross-examined Dr. Miora at length regarding the results of intelligence tests and neuropsychological tests purportedly administered by Dr. Faust Bianco in 2000. Testimony from John Echols established that someone from the Oklahoma Indigent Defense System, someone other than Mr. Barrett's attorneys, retained Dr. Bianco to evaluate Mr. Barrett before the first state-court trial. Tr. 434-35. Mr. Echols did not put much stock in Dr. Bianco's opinion. Tr. 435-36. Federal defense counsel did not recognize Dr. Bianco's name. Tr. 679 (Hilfiger).

195.    Dr. Bianco did not produce a report and the record contains no evidence regarding the conditions under which he evaluated Mr. Barrett. The government chose not to present testimony from Dr. Bianco if the Court were willing to have his testing or scoring methods scrutinized by a defense expert. Tr. 1363-64. Therefore, the record contains no evidence regarding his qualifications, whether the facts or data he relied upon were sufficient, whether his methods were reliable, or whether he reliably applied his methods to the facts. The expert

proffered by the defense would have testified to the reliability of Dr. Bianco's methods. Doc. 376-2 (Bigler proffer). Therefore, the Court could not and did not find Dr. Bianco qualified to offer opinions in the field of neuropsychology. Fed. R. Evid. 702.

196.    Although some of the tests Dr. Bianco purportedly administered were the same as tests administered by Dr. Young, the government offered no evidence regarding whether other tests Dr. Bianco purportedly administered were comparable to tests administered by Dr. Young, or whether they tested the same areas of brain function in which Dr. Young and Dr. Miora found that Mr. Barrett was impaired. The government also provided no evidence regarding the normative data to which Dr. Bianco may have compared Mr. Barrett's results. The evidence before the court is that an opinion as to whether or not a test result is normal must be based on a comparison to a set of norms. Tr. 1163-64; id. at 1337. Without knowing the norms to which Dr. Bianco compared Mr. Barrett's scores, the Court cannot make any determinations about the meaning or significance of those scores. Tr. 1337-39, id. at 1341. The defense proffered evidence that Dr. Bianco relied upon out-of-date standardized scores on at least one battery of neuropsychological tests he is purported to have administered to Mr. Barrett, Doc. 376-2 at 7-8 (CM/ECF page numbers), and, as stated, the government elected not to call Dr. Bianco as a witness if the Court also considered the defense evidence. When Dr. Miora questioned whether Dr. Bianco had appropriately or reliably scored a test of executive functioning, the government demurred and moved on without adducing any evidence regarding what the test might or might not have shown. Tr. 1276-78, 1281-82. Similarly, the government was unable to elicit from Dr. Miora an opinion about what Dr. Bianco's scoring of another test showed because there was no information about the norms against which he compared Mr. Barrett's performance. Tr. 1279-80. Finally, Dr. Bianco did not complete all the batteries he started, he did not produce an index

score for one battery, and there is no explanation for that in the record. Tr. 1342. For all these

reasons, except where Dr. Miora was able to identify the norms Dr. Bianco relied upon, the

Court cannot find that Dr. Bianco's testing is probative, and the Court gives it no weight.

## III.    CONCLUSIONS OF LAW

### A.  COUNSEL'S PERFORMANCE WAS DEFICIENT

#### 1.  The Government's Defense of Trial Counsel

1.      In its decision remanding this case for an evidentiary hearing, the Tenth Circuit

indicated this Court should resolve disputes over the following three assertions made by the

government:

> first, [defense counsel] had no indications that Defendant suffered from a
> mental impairment, so there was no reason to pursue that line of inquiry;
> second, Defendant opposed a mitigation strategy based on personal
> sympathy or his childhood; and third, [defense counsel] already had a
> reasonable mitigation strategy.

*Barrett*, 797 F.3d at 1226. The Tenth Circuit found these assertions were

"questionable" on the record before it. *Ibid*.

##### a.  Was it true that defense counsel had "no indications that defendant suffered from a mental impairment"?

2.      The government supported the claim that "there were no 'red flags'" with the

declarations of Mr. Hilfiger and Mr. Smith. The hearing evidence does not support the

government's position. First, the testimony of trial counsel indicated that statements about

whether they were concerned about Mr. Barrett's mental health were made in reference to

competence, not mitigation.

3.      Second, the government's own expert, Dr. Price, testified that Mr. Barrett's drug

use alone was a red flag for a neuropsychological evaluation. Tr. 839-40. That is precisely the

type of evaluation that Mr. Echols requested funding for, and he, too, cited Mr. Barrett's long-

time drug use as one reason. Both Dr. Price and Mr. Echols testified that Mr. Barrett's reported history of a head injury in childhood, also raised a question about whether Mr. Barrett had neurological problems. As Mr. Hilfiger testified, at the time Mr. Echols requested the funds, he knew Mr. Barrett, his history, and the case, far better than Mr. Hilfiger did.

4.      The Tenth Circuit noted that the declarations of Mr. Hilfiger and Mr. Smith did not state "whether they ever asked about Defendant's mental health, background, or family history." Mr. Smith did not do any mitigation investigation. Mr. Hilfiger did not testify that he asked family members about a history of mental illness. The record from the hearing indicates that the only inquiry trial counsel made came at the end of August 2005, some two weeks before the beginning of jury selection. Although the government asked Mr. Hilfiger whether family members *told* him about a family history of mental illness, and he replied in the negative, Tr. 738, there is no evidence that Hilfiger asked.

5.      The record from the hearing shows Mr. Hilfiger and Mr. Smith possessed, or had access to, all the of the materials the Tenth Circuit referred to that raised questions about Mr. Barrett's mental health including mental health records, the report of Dr. Sharp and the investigative memoranda from mitigation specialist Roseann Schaye. Throughout the hearing the government has pointed out that these documents did not state that Mr. Barrett suffered from a major mental illness. As the Tenth Circuit's opinion makes clear, these documents contained sufficient indications of disturbance to trigger an expert evaluation. In addition, the hearing evidence shows trial counsel possessed memoranda from Schaye in which family members described a family history of mental illness. The issue is not whether trial counsel were told Mr. Barrett suffered from a major mental illness, but whether, given the information available to counsel, it was reasonable not to investigate for possible mental health mitigation.

6.      Given that the evidence was sufficient to call for further investigation, the question is whether trial counsel considered the information and made a strategic decision not to pursue it. The answer is no. According to Mr. Smith, the decision would have been Mr. Hilfiger's. Mr. Hilfiger could not say he reviewed the medical records and made a decision not to pursue the matter further.

7.      The Court finds that trial counsel possessed information that would have caused a reasonable capital defense lawyer to make use of the available funds and have Mr. Barrett evaluated for potential mental health mitigation.

### b.    Were the trial attorneys "constrained from conducting a mental-health investigation by their client"?

8.      The evidence adduced during the evidentiary hearing "does not establish an unambiguous command to refrain from investigating or presenting evidence of Defendant's personal history or mental health." *Barrett*, 797 F.3d at 1226. Mr. Barrett cooperated with mental health evaluations in state court and provided Roseann Schaye with detailed information about his background for use in developing mitigation evidence. That information was provided to Mr. Hilfiger and Mr. Smith and Mr. Smith testified that the plan was to build on that evidence. Thus, whatever Mr. Barrett might have said after Mr. Echols left the case, trial counsel already had the fruits of his cooperation to work from.

9.      Mr. Hilfiger, who was responsible for developing evidence for the penalty phase, and for making the strategic decisions about what would or would not be presented testified, said no more at the hearing than what he said in his declaration. He did add that Mr. Barrett never said anything to suggest he would prefer a death sentence to a life sentence. Mr. Smith also testified that the goal of the penalty phase was to get a life sentence.

10.     The evidence supports a finding that trial counsel never explained to Mr. Barrett that federal death penalty law does not allow anyone to beg for the defendant's life. Additionally, because trial counsel were not aware of the mitigation evidence that could be presented, and they consulted neither a mitigation specialist nor a mental health expert other than Dr. Russell,  they were not able to inform Mr. Barrett about what could be presented or how it could be presented. Because counsel did not fully inform themselves of the evidence that was available, and consequently could not have formed a strategy for presenting that evidence that would not appear to "beg" for Mr. Barrett's life, counsel also could not have made a reasonable decision about how to proceed in light of Mr. Barrett's concerns.

11.     There is no evidence that trial counsel attempted in any way to understand their client's feelings and work to assuage them. In sum, as regards any reluctance about mitigation strategy on Mr. Barrett's part, trial counsel did not perform according to prevailing professional norms which required them to advise Mr. Barrett after becoming fulling informed about the law and the facts. ABA Criminal Justice Standard 4-5.1.

12.     Both the prevailing professional norms, and the case law are clear that the decision about what witnesses to call is consigned to the discretion of counsel. ABA Criminal Justice Standard 4-5.2; *Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal") (citing ABA Standard 4-5.2). There is no evidence that counsel relinquished to their client any decisions about second stage strategy.

### c.  Did trial counsel make an informed decision not to investigate?

13.     Mr. Smith testified that he did not make any strategic decisions about what mitigation evidence the defense should pursue or not pursue. The decisions whether to hire a

mitigation specialist, whether to inquire about certain potential areas of mitigation, and whether to have Mr. Barrett evaluated by a mental health expert were not his to make. Further, he did not believe he had the knowledge of the facts or the experience to make those decisions.

14.    Mr. Hilfiger's testimony, like his letter requesting compensation for Dr. Russell, indicated that he equated Dr. Russell with a mitigation expert or specialist. That is, the only context in which he considered having an expert investigate or testify in mitigation was in relation to the issue of future dangerousness. That decision was made only in the last weeks before the trial.

15.    Mr. Hilfiger and Mr. Smith testified that the decision made after the meeting with Dr. Russell at the end of August 2005, was to have lay witnesses testify to mitigation contained in Dr. Russell's report so that the government would not be able to respond with expert testimony. Counsel's testimony contradicts the government's assertion that counsel made an informed decision not to present lay evidence in mitigation.

16.    With regard to mental health evidence, Mr. Hilfiger made the decision about what would be investigated and presented. He testified that he consulted Dr. Russell because she had worked on the case previously. He could not recall any of the other mental health professionals who had worked on the case, including Dr. Sharp who is mentioned repeatedly in Dr. Russell's report. Mr. Hilfiger testified that he only considered mental health testimony in the context of rebutting the government's case of future dangerousness. The Court cannot find that defense counsel made an informed decision not to have Mr. Barrett evaluated for mental health mitigation independent of the risk assessment and its attendant evidentiary and strategic downsides.

17.     In summary, this Court finds the evidence did not support the government's defenses of trial counsel's challenged acts and omissions.

### 2. *Conclusions from the Hearing Evidence*

18.     This Court's assessment of counsel's performance must be guided by objective criteria such as published prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003).

19.     In 2005, one of the prevailing professional norms of capital defense practice that was both codified in the ABA Guidelines and practiced locally, was for the defense to work as a multi-disciplinary team including attorneys, investigators, a mitigation specialist and experts in fields indicated by the evidence, including the client's medical and mental health history. Guideline 4.1, 31 Hofstra L. Rev. at 956, 1003; Crim. Doc. 46; Crim. Doc. 50; Crim. Doc. 107; Crim. Doc. 107-A; Crim. Doc. 107-C; Crim. Doc. 118.

20.     To the extent Mr. Barrett had a defense team, it did not function reasonably. Neither the team of Echols and Hilfiger nor the team of Hilfiger and Smith communicated reasonably about their respective roles and duties. Although the short time available to trial counsel overwhelmingly pointed to the need for a mitigation specialist to complete the work begun by Schaye, Hilfiger inexplicable testified he did not believe such assistance was needed. Trial counsel did not consult Russell until virtually the eve of trial, and consulted no mental health expert who could testify without drawing evidence of future dangerousness from the prosecution.

21.     A prevailing professional norm of capital defense work that was well-established at the time of this case was for defense counsel to "seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." ABA

Guideline 10.10.1, 31 Hofstra L. Rev. at 1059 (commentary on Guideline 10.11). During the first six months of the case, Echols and Hilfiger did not discuss a division of labor or penalty phase strategy. During the second six months, Hilfiger and Smith discussed division of labor in the sense that Hilfiger would assign tasks to Smith. Smith testified they never discussed how to develop a consistent two-stage strategy.

22.    Investigation is a core function of defense counsel, and the prevailing professional norms expressly call for "prompt investigation." ABA Standards, Defense Function, Standard 4-4.1. Hilfiger and Smith did not discuss penalty phase strategy in any meaningful way until the end of August, when it was too late to investigate or retain experts. Although they started the case with a significant head start based on the work done in state court, trial counsel did nothing to follow up.

23.    The prevailing professional norm at the time of this federal death penalty trial was for defense counsel, or more often a mitigation specialist acting on their behalf, to speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . . would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death." ABA Guideline 10.11(F)(1), 31 Hofstra L. Rev. at 1055-56.

24.    Mr. Hilfiger considered how to present evidence that would rebut the government's case for future dangerousness, and he presented such evidence. He also presented limited amounts of evidence about Mr. Barrett's good character. However, counsel did not investigate mitigation evidence that could have explained why Mr. Barrett was holed up on his

property or why he reacted as he did to the raid, nor did counsel present abundant evidence in mitigation that was consistent with counsel's stated objectives and readily available.

25.     The prevailing professional norms of capital defense practice at the time of this case recognized a need for defense counsel to develop and maintain a relationship of trust and confidence with the client due to the extraordinary stress and psychological strain the case can impose. ABA Guideline 10.5, 31 Hofstra L. Rev. at 1005-1011.

26.     The testimony from the hearing indicated that Mr. Smith developed a relationship of trust with Mr. Barrett despite his client's initial reluctance. Mr. Hilfiger also felt that he had a good relationship with Mr. Barrett although it appears the bond was stronger with Mr. Smith.

27.     The evidence does not support a finding that trial counsel attempted to use their relationship with Mr. Barrett to help him understand how a mitigation case could be presented so as not to appear to beg for his life or invoke sympathy as opposed to understanding.

28.     Trial counsel ultimately failed to retain the services of a mitigation specialist, although the court had authorized funds to retain one. The Supreme Court has found that delaying preparation for the penalty phase until shortly before trial is evidence of deficient performance. *Williams (Terry)*, *supra*, 529 U.S. at 395. The Court also has found that the failure to obtain readily available assistance with mitigation evidence is evidence of deficient performance. *Ibid.* Both trial counsel's delay and their failure to retain a mitigation specialist at all fell below prevailing professional norms of practice in federal death penalty cases.

29.     Trial counsel unreasonably believed that the only mitigation evidence that could be presented was evidence related to whether Mr. Barrett would be a future danger as a prisoner. It was clearly established long before Mr. Barrett's trial that the Eighth Amendment requires a capital sentencing jury to hear and consider any evidence that could be relied upon in support of

a sentence less than death. The Supreme Court has held that a failure to take action that is based on a misunderstanding of the law constitutes deficient performance. *Williams (Terry)*, 529 U.S. at 395; *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986). Trial counsel's misunderstanding of Mr. Barrett's constitutional right to present mitigation evidence fell below prevailing professional norms.

30.    Trial counsel's unreasonable belief about the limited scope of mitigation evidence had an adverse influence on their preparation for the penalty phase and the evidence they presented. Under *Williams* and *Kimmelman*, trial counsel's performance was constitutionally deficient.

31.    Trial counsel's penalty phase investigation fell below prevailing professional norms. It was well understood by capital defense counsel at the time that developing evidence of a neglectful or abusive childhood and its effects very often required the use of expert interviewers. Trial counsel in this case had such expertise at their disposal but unreasonably failed to retain an expert. It was well understood at the time of the trial in this case that defense counsel could need to spend many hours developing the trust and confidence of a client and his family members in order to discover and develop evidence of childhood neglect and abuse. Trial counsel in this case unreasonably failed to spend time needed to investigate and present readily available evidence that Mr. Barrett experienced neglect and abuse as a child.

32.    It was commonplace at the time of this trial for prosecutors to contrast one sibling who was successful with the defendant who was convicted of murder. Trial counsel in this case unreasonably failed to anticipate that the prosecution would use this tactic when the defense presented Mr. Barrett's brother Steve as a penalty phase witness. Trial counsel failed to interview Steve Barrett about the difference between his childhood and Mr. Barrett's, even though

information about that difference was in one of Schaye's memoranda. Trial counsel's performance fell below prevailing professional norms.

33.    The Supreme Court has held trial counsel ineffective for failing to make use of mitigation evidence that was made readily available to them. *Williams (Terry)*, 539 U.S. at 396. Here, trial counsel had in Schaye's memoranda abundant sources of mitigating circumstances. Trial counsel unreasonably failed to interview witnesses about what they told Schaye. Although trial counsel testified that they decided to use lay witnesses instead of an expert to convey the mitigating aspects of Mr. Barrett's life, they failed to call the witnesses, or if called, failed to elicit the information, contained in Schaye's reports.

34.    The Supreme Court also has held trial counsel ineffective for unreasonably ending an investigation despite indications that further, helpful evidence could be developed. *Wiggins*, 539 U.S. at 525-27. As indicated, trial counsel for Mr. Barrett unreasonably failed to follow-up on a great deal of mitigating information described in Schaye's memoranda, the Sharp report, Mr. Barrett's school records, records of Mr. Barrett's prior hospitalizations and mental health treatment, and in Dr. Russell's report.

35.    There was limited time available for defense counsel to develop mitigation evidence based on the information they had. The only reasonable response to that limitation was to bring in additional labor. Trial counsel had funds to retain a mitigation specialist to assist them, but unreasonably failed to make use of that resource.

36.    When trial counsel chose to abandon their investigation at an unreasonable juncture, it made "a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527-28.

37.    This Court concludes the performance of trial counsel in this case fell far below prevailing professional norms. Their performance was deficient within the meaning of Strickland.

### B.  MR. BARRETT SUFFERED PREJUDICE

198.    Due to trial counsel's deficient performance, the jury was not informed of the mitigating circumstances in Kenneth Barrett's background, including, the alcoholism of his parents, his mother's use and abuse of alcohol the entire time she carried him, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging, and harsher treatment than his brothers, he received from his mother, his father's abandonment of the family, this constant  uprooting throughout his childhood, his abandonment by his mother due when she was most depressed, his mother's abuse of him in encouraging him to party with drugs with her ever-changing boyfriends and other friends, his early childhood and other head injuries, his potential early childhood exposure to chemicals from the glass works in which both his parents worked, and that his suicide attempt was a symptom of mental disease.

199.    By failing to conduct an adequate investigation before deciding against presenting mental health evidence through mental health experts, trial counsel unconstitutionally limited Mr. Barrett's right to present any information or evidence that supported a sentence less than death.  *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (holding that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.).

200.    Counsels' abdication of the "duty to investigate" leading them to foresake even expert testimony identified to them by state counsel, rendered their performance below the standard of prevailing professional representation. *Strickland*, 466 U.S. at 690.

201.    If trial counsel had gathered these readily available facts and provided them to qualified experts, as prevailing professional norms required, the jury would have understood how Kenneth Barrett's life history, while intrinsically compelling and heartbreaking, also had profound implications for understanding the scientific underpinnings of Mr. Barrett's s mental health and actions.

202.    If trial counsel had followed prevailing professional norms and had timely retained appropriate mental health experts to assist the defense, Kenneth Barrett's jury would have heard extensive evidence of his mental illness and impaired brain functions due to organic damage.

203.    The government's expert, Dr. Pitt, bolstered a number of lines of mitigating evidence that could have been, but were not developed at trial. Not the least of these areas of agreement, or at worst quasi-agreement, concern Mr. Barrett's significant neurocognitive deficits, which the Tenth Circuit stated was the most important aspect of the mental health evidence that has been developed in these post-conviction proceedings. *Barrett*, 797 F.3d at 1230.

204.    Had trial counsel conducted a reasonable mitigation investigation, there was abundant, available evidence that a life sentence or a ter, of years, as the jury was instructed, was sufficient for Mr. Barrett. The information included facts surrounding the raid, Mr. Barrett's state convictions, and he impact of a childhood shaped by parental abandonment, neglect, immoral and illegal behavior and substance abuse, as well as Mr. Barrett's own mental illness and

substance abuse, the genetic components of which were pervasive, and most compelling his brain damage that impaired his ability to process events realistically and exercise reasonable and judgment in his response to the unforeseeable and traumatic events of September 2, 1999.

205.    Residual doubt is a reasonable mitigating circumstance to be presented at sentencing in a capital case.

206.    The evidence of the impact the dead of night raid had on a drug-addicted, paranoid, mentally-ill person like Kenneth Barrett, and his inability to assess and appropriately react to the situation would have been mitigating in nature.

207.    The overwhelming weight of the mitigating evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation before the raid, and in its conduct of the raid itself, which made it likely that there would be a firefight and that someone might die.

208.    Had the jury heard all of the evidence in mitigation including Kenneth Barrett's cultural and family and personal history, the medical, psychological and psychiatric history, the mitigating facts, (known to the Drug Enforcement Agency, the Drug Task Force, the Oklahoma Highway Patrol and local law enforcement),surrounding the raid, which was opposed by the Sequoyah County Sheriff, that led to the death of Trooper Eales, the jury would probably have made findings that ultimately concluded that just as Trooper Eales should not have been put in danger, it is at least reasonably probable that Kenneth Barrett would not have been sentenced to death.

209.    Had counsel presented the powerful case in mitigation that could have been marshaled, but which Kenneth Barrett's jury never heard, at least one juror would have opted not to impose the death penalty.

210.     The mental health evidence that could have and should have been presented on Kenneth Barrett's behalf was not only powerful evidence in mitigation of punishment, as the Supreme Court has recognized repeatedly, but was also directly relevant to refuting the statutory aggravating circumstances that Kenneth Barrett knowingly created a grave risk of death to one or more persons in addition to Trooper Eales, and that Kenneth Barrett committed the offense after substantial planning and premeditation.

211.     Dr. Price's findings support Petitioner. Dr. Young's and Dr. Miora's findings were consistent with Dr. Price's findings. Dr. Price also testified that his observations of Mr. Barrett's long-term memory was consistent with Dr. Sharp's report. Both sets of tests showed Mr. Barrett was in the average range of general intellectual ability. Both sets of test showed Mr. Barrett's ability to attend, to focus his concentration, and to perform under time pressure was impaired. And both sets of tests showed Mr. Barrett performed poorly on measures of immediate or working memory, but average on measures of delayed memory. Dr. Price did not perform tests of executive functioning, so no comparison can be made there. But where the testing evaluated the same or similar functions, the results were consistent. That consistency supports a finding that Dr. Young's testing was reliable, her results were valid, and Dr. Miora's re-scoring and interpretation of those results is accurate.

214.     Dr. Price's findings in other areas are of little value. Dr. Price testified that the "main findings" that he thought were relevant to this case related to Mr. Barrett's substance abuse, depression, and paranoia. He omitted any mention of symptoms of post-traumatic stress even though Petitioner's expert diagnosed Mr. Barrett with PTSD and Dr. Price's own testing showed Mr. Barrett reported symptoms of post-traumatic stress and produced elevated scales on two objective measures of PTSD symptomology.

215.    In its opinion remanding this case, the Court of Appeals for the Tenth Circuit, noted that if Dr. Price were to testify that Mr. Barrett was a "psychopath," that testimony could prove "devastating." *Barrett*, 797 F.3d at 1232. Faced with potential cross-examination and expert testimony on the validity and relevance of that label, the government "made a decision not to go there." Tr. 895. The Court infers from this decision that testimony from Dr. Price on this issue would not have been devastating to Mr. Barrett.

216.    Overall, Dr. Price's testimony tended to support the finding of mitigating circumstances more than it undermined them or supported aggravating circumstances.

217.    Although Dr. Price testified that Mr. Barrett showed antisocial attitudes and his record included antisocial behavior, neither Dr. Price, nor Dr. Pitt diagnosed Mr. Barrett with antisocial personality disorder. They explained that was because the diagnostic criteria for that disorder requires that a conduct disorder be present in childhood, and there is no evidence for that in Mr. Barrett's life. His misbehavior appears in the record in early adolescence. That is the same time his learning disability appears in the record. It is possible that the same brain injury that caused Mr. Barrett's attention deficits caused his executive function impairments.

218.    Additionally, although both Dr. Price and Dr. Pitt found Mr. Barrett's personality had antisocial features, Dr. Price's testing showed Mr. Barrett was low on measures of aggression. Mr. Barrett scored high on the antisocial scale on one test administered by Dr. Price, the MMPI-2, but in the average range on another test he gave, the PAI.

219.    For the foregoing reasons, the Court finds the evidence adduced at the hearing would not have added to the aggravating side of the scales. The jury heard testimony that Mr. Barrett abused drugs and alcohol and that he was violent towards his wife. The jury also heard

testimony about his antisocial behavior, and they could have inferred from the testimony about his drug dealing and the sign on the gate to his property that he harbored antisocial attitudes.

220.    The evidence presented at the § 2255 proceedings shows that trial counsel's lack of investigation, understanding of the capital sentencing jurisprudence and expert consultation fell below the objective standards of reasonableness codified in the ABA Standards and Guidelines and in case law that predated the guidelines.

221.    There was abundant "undiscovered mitigating evidence [that], taken as a whole, might well have influenced the jury's appraisal" of Kenneth Barrett's culpability.

222.    Had the jury been able to weigh the evidence that should have been presented in both phases of the trial "on the mitigation side of the scale, there a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

223.    The totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the [§ 2255] proceeding" outweighs the evidence in aggravation and would have affected the jury's consideration. *Barrett*, 797 F. 3d at 1229.

224.    Prejudice from trial counsel's failures to properly investigate and present available evidence in mitigation is manifest.

225.    Mr. Barrett has shown by the preponderance of the evidence that he was prejudiced by trial counsel's deficient performance.

226.    Accordingly, the sentence of death should be vacated and a new sentencing proceeding held.

DATED:        July 31, 2017            RESPECTFULLY SUBMITTED,

                                       /s/ *David Autry*
                                       DAVID AUTRY

                                       HEATHER E. WILLIAMS
                                       Federal Defender

                                       /s/ *Joan M. Fisher*
                                       JOAN M. FISHER
                                       Assistant Federal Defender

                                       /s/ *Tivon Schardl*
                                       TIVON SCHARDL
                                       Trial & Habeas Counsel

                                       Attorneys for Petitioner,
                                       KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 31st day of July 2017, I caused the foregoing Petitioner's Proposed Post-Hearing Findings of Fact and Conclusions of Law to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL