**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

   **COMES NOW** the United States of America, by and through undersigned counsel and

submits the following Findings of Fact and Conclusions of Law:

**<u>FINDINGS OF FACT</u>**

 A. <u>Counsel's Performance</u>

  1. John Echols represented Barrett in his two state trial for the killing of Trooper Eales. Though the state sought the death penalty, the jury hung on guilt in the first trial and returned a manslaughter verdict in the second.  As a result, Mr. Echols never presented a penalty-phase case in mitigation.  Tr. 426-28.

  2. Mr. Echols and others who represented the defendant in his state murder trials, undertook investigative efforts on behalf of Barrett.  He amassed records of those investigation, which included mental health evaluations and the collection of a social history based on witness interviews conducted by Steve Leedy and Rosanne Schaye. Tr. 428-32, 476-77.

  3. At the time of the state trials, Mr. Echols knew of Barrett's suicide attempt and contacts with the mental health system.  He was also aware of Barrett's drug use.  Tr. 478, 483.

  4. During the state investigation, Mr. Echols received mental health reports from Faust Bianco, Peter Rausch, and Kathryn LaFortune indicating that Barrett did not have a mental illness that merited further investigation.  Tr. 412-14, 433-36, 469-70, 493, 513.

5.  Mr. Echols retained Dr. Jeanne Russell in state court to perform a risk assessment of Barrett.  Written in 2003, the report was generally favorable and recounted Barrett's family dysfunction, suicide attempt, and history of mental health treatment.  Dr. Russell stated that Barrett was not exhibiting the symptoms of a major mental illness. Tr. 440-44, 484, 500-01; Gov't Ex. 34.

6.  In evaluating Barrett, Dr. Russell relied on background information about him,[1] including reports of interviews conducted by Ms. Schaye and Dr. Sharp.  Tr. 784-89.

7.  Jack Gordon was one of Barrett's attorneys during his second state trial, which occurred in 2004, in Sequoyah County.  Tr. 145-46.

8.  Mr. Gordon retained only one mental health expert for the state trial, Jeanne Russell. Tr. 160.

9.  Mr. Gordon was familiar with Dr. LaFortune's report, which recommended against the retention of a mental health expert. Tr. 161; Gov't Ex. 37.

10. Mr. Gordon intended to obtain more mental health expert assistance during a two-to-three-week break between phases, had the state court convicted Barrett's of a capital crime.  Tr. 149-54.

11. Prior to Mr. Gordon's involvement in the case, Ms. Schaye had interviewed Barrett and his relatives about dysfunction in his upbringing.  Tr. 148.

12. According to Mr. Gordon, the attorneys who represented Barrett during his federal trial never contacted him about Barrett's state case or retrieved his files.  Tr. 157-59.

13. The Oklahoma Indigent Defense System ("OIDS") refused to fund mental health evaluations of Barrett beyond those noted above.  Tr. 433.

14. Steve Leedy, an OIDS investigator also amassed a file in connection with Barrett's state trials, which included a memo memorializing his social history interview and those conducted by Ms. Schaye.  Tr. 379-82, 401-02.

15. Mr. Leedy believed that he provided all the material to Mr. Echols, but he separately retained a copy at the OIDS office.  Tr. 393, 403-11, 413-14.

16. Mr. Leedy did not remember if he told Mr. Echols of the existence of his file after Barrett was charged in federal court.  Tr. 418-19.

17. Mr. Leedy did not recall any contact from Bret. Smith or Roger Hilfiger regarding the file, nor did he inform them of its existence.  Tr. 383, 420-21.

---

[1] Initially, Dr. Russell testified to the substance of that background material.  See, e.g., Tr. 784-86.  However, the Court subsequently struck her references to hearsay at the request of Defendant's counsel.  Tr. 806.

18. Bret Smith, who ultimately acted as Barrett's second-chair trial counsel, did not have any reason to suspect that OIDS had any records relating to Barrett's case and did not recall contacting OIDS to obtain its files.   Tr. 531-32, 599.

19. The federal court appointed Mr. Echols as Barrett's attorney after the U.S. Attorney secured an indictment.  Mr. Echols intended to focus his investigation on possible brain dysfunction.  *See* Tr. 436-37.

20. Mr. Echols never formally divided the workload in the case with Mr. Hilfiger.  Tr. 450, 689.

21. Mr. Echols did not know if he ever discussed Dr. Sharp with Mr. Hilfiger or ever said that he considered the mitigation investigation incomplete.  Tr. 439-40, 466.

22. Mr. Hilfiger's co-counsel, Bret Smith, was unfamiliar with Dr. Sharp.  Tr. 555-58.

23. Mr. Echols withdrew from the case in a failed effort to obtain appellate review of the defense budget.  Tr. 460-61, 487, 683.

24. Roger Hilfiger began practicing law in 1972, and confined his practice almost entirely to criminal law.  During his career, he estimated that he had tried five capital cases, including two in federal court.  Tr. 647-52.

25. Mr. Hilfiger represented Barrett in 2004 and 2005.  Tr. 658-59.

26. Mr. Hilfiger's was appointed to the case while Mr. Echols also represented Barrett.  Mr. Hilifger did not, at the time of his appointment, believe he was expected to prepare the penalty phase case, exclusively.  Tr. 659-62.

27. Mr. Hilfiger followed Mr. Echols's lead regarding trial strategy, initially focusing on a double-jeopardy issue.  Tr. 664-65.

28. Mr. Hilfiger discussed with Barrett having him testify in his own mitigation case, but the defendant declined to do so in open court.  Tr. 730, 753.

29. Mr. Echols had previously represented Barrett.  Accordingly, Mr. Hilfiger believed Mr. Echols possessed the investigative files in the case, presumably at his office.  Tr. 662.

30. Mr. Hilfiger did not recall discussing with Mr. Echols the need for resources sought in a budget request: At the time Mr. Echols filed the request, Mr. Hilfiger did not have adequate knowledge of the case to have opined about resources.  Tr. 668-71; Trl. Doc. 16.

31. Mr. Hilfiger did not agree with all of Mr. Echols's budget requests, and thought some of them were excessive or repetitive. Tr. 683.

32. Mr. Hilfiger did not believe the defense required an expert in organic brain disorders, based on his interactions with Barrett and some reports Mr. Echols had previously received. Tr. 684.

33. Barrett's relatives gave trial counsel no reason to suspect they should retain an expert in brain damage. Tr. 740.

34. Mr. Hilfiger characterized Mr. Echols budgeting strategy as a "shotgun approach," and felt the case required more precision. Tr. 685

35. While representing Barrett, Mr. Hilfiger could not recall any indication that his client had brain damage or a history of significant head injuries. Tr. 677.

36. Mr. Hilfiger could not recall Roseanne Schaye's investigative reports. However, he thought the documents could have been in the materials he received from Mr. Echols, given that Mr. Smith interviewed some of the same people as Ms. Schaye. Tr. 679-80, 695-99; Gov't Exs. 18-25, 54-62.

37. Mr. Hilfiger could not recall if he received a report from Mr. Leedy, but remembered some of the information in Mr. Leedy's investigative report. Tr. 702-03; Gov't Ex. 49.

38. Mr. Hilfiger did not recall Dr. Sharp's report, which noted the possibility that Barrett suffered from an organic brain impairment, based on an evident tremor and long-term memory difficulty. But, Mr. Hilfiger never observed that Barrett suffered from any long-term memory impairment, as he could accurately recall testimony from his prior trials. Tr. 705-07; Gov't Ex. 16.

39. Given the totality of Dr. Sharp's report, Mr. Hilfiger would not have seen any reason to seek further expert assistance. Tr. 708.

40. Mr. Hilfiger could not recall a report authored by Dr. LaFortune, but remembered discussing her findings with Mr. Smith. Tr. 708-09; Gov't Ex. 37.

41. Mr. Hilfiger's billing records reflected – among other things – conversations with Barrett, Barrett's relatives, and Barrett's neighbors. Tr. 713-18, 729, 731, 733-37; Pet. Ex. 72.

42. While Mr. Hilfiger interviewed Barrett's relatives, he was generally aware what their testimony would be. Tr. 731.

43. Barrett's relatives did not share with Mr. Hilfiger any concerns that he suffered from any serious mental illness. Tr. 738.

44. Mr. Hilfiger acknowledged that the defense did not hire a mitigation specialist, but explained, "We just didn't feel like that a mitigation opinion expert would do us any good when we could - when we used the information we had from previous reports and talked to those people and had them testify." Tr. 739.

4

45. In May 2004, following Mr. Echols withdrawal, Bret Smith was appointed as second-chair counsel and had no responsibility for the budget.  Tr. 519-20, 526-27.

46. Mr. Smith did not have training in defending capital cases, but had extensive experience in criminal law and witness interviews.  Tr. 520, 532, 593-96.

47. Mr. Smith knew the defense had successfully litigated the case in state court, did not believe Mr. Hilfiger intended to employ a new strategy, and believed Mr. Hilfiger viewed the investigation as completed by Mr. Echols.  Tr. 523-24, 527, 538.

48. In their initial meeting, Barrett was suspicious of Mr. Smith, having had a strong relationship with Mr. Echols, but Mr. Smith understood the need to identify himself to the defendant, who might have rightfully suspected he was an agent.  Tr. 549-51.

49. Though Barrett was suspicious of Mr. Smith and sought to fire him, the pair developed a rapport, starting with their second meeting.  Tr. 551-52.

50. Messrs. Smith and Hilfiger never formally divided the workload in the Barrett case.  Tr. 694.

51. Mr. Echols surrendered his paper files to either Mr. Smith or Mr. Hilfiger.  *See* Tr. 457, 459, 487-89, 530-31, 687-88.

52. Mr. Echols maintained a separate computer file of other documents that Messrs. Smith and Hilfiger either did not access or accessed infrequently.  *See* Tr. 454-56, 458, 621-22, 662-63.

53. Mr. Echols would have printed the contents of the computer file had he received a request.  Tr. 508.

54. Mr. Smith contacted Mr. Gordon in an effort to obtain his files regarding previously-developed mitigation evidence.  Mr. Gordon told Mr. Smith he had no records from his representation of Barrett, having surrendered them to Mr. Echols.  Tr. 597-98, 701-02.

55. After his appointment as lead counsel, Mr. Hilfiger also received boxes of material in the Barrett case that he believed came directly from OIDS.  Tr. 688.

56. If Messrs. Smith and Hilfiger did not receive the totality of prior counsel's file or the Leedy investigative records, they did not realize what they were missing.

57. Mr. Smith first contacted Dr. Russell in August of 2005.  She agreed to update her earlier risk assessment of Barrett.  Tr. 541, 774-75.

58. In her 2005 report, updating the earlier risk assessment, Dr. Russell observed that Barrett's mood was normal, his affect was congruent with his mood, he did not appear anxious or depressed, his mood was euthymic (normal), he did not express any

delusional beliefs, and he did not exhibit any symptoms of a major mental illness, which would include bipolar disorder. Tr. 798-800; Gov't Ex. 35.

59. Dr. Russell reported that Dr. Sharp had no found no symptoms that Barrett was suffering from a major mental illness. Tr. 800, 808.

60. In her report, Dr. Russell summarized some background information from prior evaluations and investigations, but she did not recall if Messrs. Smith and Hilfiger requested the underlying documents and did not know if they had access to the material. Tr. 786-87, 789-90.

61. During a meeting with her and Mr. Hilfiger, they developed strategy to limit the government's future dangerousness case. Tr. 543, 545, 559.

62. Mr. Hilfiger knew Dr. Russell had completed some work on Barrett's case before he met with her and Mr. Smith in her Tulsa office, where he believed they discussed her 2003 report and potential testimony. Tr. 718-25.

63. Mr. Smith understood that Dr. Russell was not a mitigation specialist, but he recalled discussion of her testimony as a conduit for information from Barrett's relatives. Tr. 562-64, 576-78.

64. At the August meeting or later, Mr. Hilfiger recalled that Dr. Russell persuasively indicated that she did not believe her testimony would benefit the defense because it would invite damaging rebuttal. Tr. 726-27, 746.

65. Mr. Hilfiger shared Dr. Russell's concern that a government evaluation of Barrett would not benefit the defense. Tr. 729.

66. Following the decision to forgo Dr. Russell's testimony, Messrs. Smith and Hilfiger decided to rebut future dangerousness using lay witnesses to demonstrate Barrett was a well-behaved inmate. Tr. 737-38, 747.

67. During the penalty phase, Mr. Hilfiger also wanted to demonstrate that Barrett had already been punished for the murder. Tr. 747-49.

68. Dr. Russell read from a previously-executed declaration that Mr. Smith had asked her to act as a mitigation investigator. She noted "at the time I thought he was asking me to do mitigation . . . [] in terms of the risk assessment." She later stated, "I don't think I fully understood what he was asking in terms of an investigation." Tr. 777-78.

69. Dr. Russell never testified that Mr. Smith asked her to act as a mitigation "specialist." Her memory of events was clearly incomplete, and Barrett's counsel referred her repeatedly to her declaration, even when she did not claim a failure of recollection. *See* Tr. 775-76, 779, 780.

70. Dr. Russell did not advise Messrs. Smith and Hilfiger not to pursue a mental health mitigation case, but was wary of testifying, herself.  She appeared familiar with Dr. Price and thought he would be a dangerous witness.  Tr. 609-10, 791.

71. Even if Dr. Russell did not mention Dr. Price, the defense was concerned about government rebuttal.  Tr. 631.

72. Mr. Smith found Barrett higher functioning than most criminal defendants: "nothing in our conversations indicated to me that Kenny is nuts."  Tr. 553-55, 567-69, 603

73. Mr. Smith believed Barrett did not want to present family members to beg for his life or to rely on personal sympathy for him, much less to place anyone else in a bad light.  Mr. Smith doubted an appeal to sympathy would work given the conservative jury, the all-American victim and Barrett's history of drug abuse and criminal acts.  Tr. 547, 579-81, 587-88, 612, 616-17.

74. Barrett made clear that he did not want his attorneys to beg for his life.  Tr. 753.

75. Mr. Hilfiger interviewed a former juror from Barrett's state trials and determined that he should minimize evidence of drug use as much as possible.  Tr. 691-92.

76. Mr. Smith wanted to focus the case away from Barrett's emotional volatility and show he "was a decent enough person not to execute.  Tr. 612-13.

77. Mr. Smith did not consult with an expert about the possibility that Barrett used drugs to self-medicate, but had experience with a prior client who had done so but limited his drug use in a way that this defendant did not.  Tr. 589, 614-15, 633.

78. Mr. Smith visited the crime scene repeatedly and interviewed Barrett's relatives.  He also spoke in depth to his client, and was familiar with Barrett's personal history, but did not believe he was developing mitigation for the first time, just prior to the third trial of this offense.  Tr. 571-73.

B.  Lack of Prejudice

79. Barrett's aunt, Ruth Harris, could not describe the relationship her nephew had with his mother, Gelene Dotson, but recalled that his father, Ernie Barrett, was largely absent from family life.  Tr. 41-45.

80. In Ms. Harris's opinion, the divorce of his parents hurt Barrett.  Tr. 45.

81. Barrett appeared "hyper" to Ms. Harris, who believed Ms. Dotson had a difficult time raising her sons, Kenneth, Richie and Stephen Barrett.  Tr. 45-46.

82. Ms. Harris recalled that Ms. Dotson sometimes drank "a lot."  Tr. 46.

83. Ms. Harris loved Barrett and wanted him to have the best.  Tr. 46-47.

84. Ms. Harris had little contact with Barrett and his family during his childhood.  Tr. 47-49.

85. Ms. Harris thought she recalled speaking with a newspaper reporter around the time of the crime and had no reason to invent any statements she might have made during the interview.  She denied specific recollection of two statements attributed to her by the reporter: that Ms. Dotson had lived in a decent neighborhood until Barrett erected a shack next to her home, and that Barrett deterred prospective homebuyers when his mother attempted to sell her residence.  Tr. 49-51.

86. Ms. Harris had previously averred that Barrett's trial team did not interview her, but she believed an interview report from the time of trial accurately reflected her contemporaneous thoughts.  Tr. 51-52.

87. According to Barrett's uncle, Mark Dotson, his youngest sister, Carolyn, suffered from clinical depression; his sister, Gelene Dotson, had problems with alcohol and mood swings.  Tr. 53-55.

88. Barrett is two years older than Mark Dotson and was a "hyper" child.  Tr. 55-56.

89.  Mark Dotson had little contact with Barrett during their childhoods.  Prior to adolescence, they lived in different states; Barrett kept to himself as a teenager.  Tr. 55-56, 66, 76.

90. Mark Dotson did not believe Barrett was especially hyper as a teenager.  Tr. 67.

91. Mark Dotson had believed that Barrett's youngest brother, Steve, was exceptionally hyper, to the point of appearing retarded, but his perceptions were inaccurate - Steve Barrett is "extremely intelligent."  Tr. 67-69.

92. According to Mark Dotson, Steve Barrett made good choices in his life, furthering his education despite any problems he might have once had with drugs.  Tr. 69-70.

93. Mark Dotson recalled that, as a teenager, Barrett argued frequently with his mother, who "would sort of pick at him."  Tr. 58, 75.

94. Mark Dotson had heard from another sister that Gelene Dotson had men "in and out" of her home, but did not know if she engaged in that behavior during Barrett's childhood.  Tr. 59-61.

95. Mark Dotson avoided Gelene Dotson.  Tr. 75.

96. According to Mark Dotson, his sister, Phyllis Crawford, had two sons, both of whom appeared to suffer from attention deficit disorder, one of whom had received a formal diagnosis for the condition.  Tr. 61-62.

97. Mark Dotson recalled that Phyllis Crawford had "some depression," but did not know if she received treatment for it.  Tr. 63.

98. Mark Dotson thought, his sister, Carolyn, and one of her daughters had received treatment for depression.  Tr. 63-64.

99. Mark Dotson had no mental health training and had not consulted with any professionals concerning the mental conditions of his relatives.  Tr. 72.

100.    Mark Dotson thought his father and grandfather drank heavily.  Tr. 64.

101.    Mark Dotson does not personally suffer from mental illness, nor do his wife and three children.  Tr. 66-67.

102.    According to Mark Dotson, Barrett has a talent for auto mechanics and once repaired a car that belonged to Mark Dotson's wife, but the cousins did not otherwise have much contact.  Tr. 64-65.

103.    Mark Dotson had heard Barrett had a drug problem.  Tr. 70.

104.    Mark Dotson had also heard his aunt, Ms. Harris, was concerned about Barrett's well-being and once counseled him, albeit ineffectively, about his use of illegal drugs: Barrett murdered a state trooper within a year of the conversation.  Tr. 72-73.

105.    At the time of the killing, Mark Dotson had not seen Barrett for about eight months and had never visited his cabin.  Tr. 70-71.

106.    Kenneth Barrett's brother, Stephen Barrett, was a high school principal, who had taught science and coached football.  He had under graduate and graduate degrees from the University of Oklahoma and served in the Army National Guard.  Tr. 78-79.

107.    Stephen Barrett was seven years younger than his brother, Kenneth Barrett.  Tr. 80.

108.    Following their parents' divorce, Barrett and his brothers lived with their mother, during which time Barrett sometimes engaged in physically fights with her.  Tr. 81-82, 94-95.

109.    On at least two occasions, Kenneth Barrett attacked Stephen Barrett - once permanently scarring his younger brother and once causing injuries that required stitches.  Tr. 91, 117.

110.    Stephen Barrett observed his mother exhibit dramatic mood swings, sometimes appearing depressed.  Tr. 86-87, 96-97.

111.    Stephen Barrett believed his mother was overwhelmed by responsibility and struggled to parent three sons, including Kenneth Barrett, who was defiant.  Tr. 94-95.

112.    According to Stephen Barrett, his mother was an alcoholic, who frequented bars and regularly drank beer.  Tr. 82-85.

113.    Despite her daily drinking, Ms. Dotson maintained employment and went to work regularly, largely limiting excessive alcohol ingestion to the weekends.  Tr. 87-88.

114.    Stephen Barrett believed that Kenneth Barrett was fixated on their father and missed him greatly.  Stephen Barrett did not believe his father had a drinking problem.  Tr. 85-86, 120-22.

115.    Stephen Barrett observed that Kenneth Barrett was an impulsive child, unable to moderate himself, identify triggers or refrain from damaging behavior, but he did not know if he received any of the assistance he would offer his own students as an educational administrator.  Tr. 88-90.

116.    Kenneth and Stephen Barrett attended the same high school, where Stephen Barrett had a positive experience.  Tr. 122.

117.    Stephen Barrett conceded that Kenneth Barrett elected to drop out of high school. Tr. 23.

118.    Stephen Barrett acknowledged he was more successful than Kenneth Barrett, but attributed that to the defendant's childhood mental health issues, compounded by substance abuse. Tr. 91-92.

119.    Stephen Barrett believed he benefitted, as an adolescent, from living in a rural area near other relatives, unlike Kenneth Barrett.  Tr. 93-94, 106, 110-13.

120.    However, Stephen Barrett recalled that Kenneth Barrett had the opportunity to live with Ruth Harris's family, but did not know why the arrangement ended.  Tr. 113-14.

121.    Stephen Barrett also recalled that he and his brothers had spent extended amounts of time with another relative, Eleanor Long.  Tr. 114.

122.    Stephen Barrett agreed he succeeded through his own hard work, despite a lack of encouragement or effective parenting from his mother.  Tr. 108-10.

123.    As an adult, Stephen Barrett had little contact with Kenneth Barrett.  Tr. 97-98.

124.    Stephen Barrett did not know of anything that prevented Kenneth Barrett from ceasing his drug use or forging close relationships with his extended family.  Tr. 115-16.

125.    Stephen Barrett recalled that Kenneth Barrett borrowed his shotgun and used it to attempt suicide.  Tr. 98-100.

126.    Stephen Barrett opined that Kenneth Barrett might have attempted suicide in response to his divorce, but could not recall when the divorce occurred.  Tr. 99-100.

127. Without extensive preparation, Stephen Barrett testified at Kenneth Barrett's trial, answering questions similar to those posed at the instant hearing. Tr. 102-03.

128. During interviews, Messrs. Smith and Hilfiger did not ask Stephen Barrett about Kenneth Barret's response to his parent's divorce, Gelene Dotson's alcohol abuse, or Gelene Dotson's mood swings. Tr. 103.

129. Kenneth Barrett's step-mother, Doris Barrett, had little contact with him before he murdered Trooper Eales, but forged a strong relationship with him during his state and federal trials. Tr. 123-26, 130-31.

130. Doris Barrett did not notice any growth or change in Kenneth Barrett during his trials. Tr. 131.

131. Doris Barrett observed that her husband (the defendant's father), Ernie Barrett also strengthened his ties with Kenneth Barrett after the killing, visiting him regularly in jail. Tr. 126-27, 131.

132. Doris and Ernie Barrett testified at the defendant's federal trial but were never interviewed by Roger Hilfiger. Tr. 129-30.

133. According to Doris Barrett, she and Ernie Barrett had little interaction with Mr. Hilfiger: if they had concerns, they communicated them to Mr. Smith. Tr. 130.

134. Doris and Ernie Barrett had no reservations about testifying in the federal trial, apart from feeling unprepared to do so. Tr. 132-33. Though Doris Barrett was nervous about testifying, she did so without any difficulty, without requesting a break, or any opportunity to refresh her recollection. Tr. 134-35.

135. Doris Barrett did not attend meetings between Mr. Hilfiger and any other person. As a result, she had previously speculated in a declaration that he had no trial strategy. Tr. 133-34.

136. Doris Barrett believed that she had seen a defense strategy during Kenneth Barrett's state trials, but not his federal trial. Tr. 140-41.

137. Despite having testified that she "never really associated much with Mr. Hilfiger," Doris Barrett conceded that he requested her assistance in convincing Barrett to testify at trial. Tr. 135.

138. In recorded phone conversations, Doris Barrett implies that she had significant contact with Mr. Hilfiger about legal strategies. Tr. 135-37; Gov't Ex. 53.

139. Consistent with Mr. Echols's guidance, Doris Barrett told Kenneth Barrett he should refuse to testify. Gov't Ex. 53.

11

140.    During his phone calls with Doris Barrett, Kenneth Barrett stated that he would prefer the death penalty to life in prison and had felt that way since the outset of his litigation.  Gov't Ex. 53.

141.    Dr. George Woods, a psychiatrist and neuropsychiatrist, was retained by § 2255 counsel and evaluated Barrett on two occasions, once in 2009 and once in 2017.  Tr. 176-85.

142.    Dr. Woods had testified 80 or 90 times for capital defendants, and once for a state government.  Tr. 259.

143.    In preparing for the first evaluation, Dr. Woods reviewed materials prepared by Dr. Russell, Dr. Bill Sharp, Dr. Randall Price, and Dr. Myla Young, in addition to a variety of historical documents concerning the murder and Barrett's family history.  Before the second evaluation, Dr. Woods reviewed materials prepared by Dr. Erin Bigler and Dr. Deborah Miora.  Tr. 186-87.

144.    As part of his evaluation, Dr. Woods also reviewed an affidavit signed by Dr. Faust Bianco, which stated that he had performed a neuropsychological evaluation of Barrett, did not discover any significant deficits in functioning and therefore recommended against further testing.  Tr. 292-95; Gov't Ex. 12.

145.    Dr. Woods opined that Barrett's family included generations of people who exhibited symptoms consistent with psychiatric disorders, including indications of bipolar disorder and substance abuse, leading him to conclude that the defendant had genetic predisposition to developing a mood disorder and substance abuse disorder.  Tr. 188-90, 192-93.

146.    Dr. Woods found that Barrett's fetal and childhood development further predisposed him to developing bipolar disorder.  Tr. 193-95.

147.    Dr. Woods diagnosed Barrett with bipolar disorder.  Tr. 193.

148.    Dr. Woods based the diagnosis of bipolar disorder on Barrett's family history, his reports of suicidal ideation, his three psychiatric hospitalizations, and his history of treatment with psychotropic medications.  Tr. 195-97.

149.    Dr. Woods acknowledged that Stephen Barrett had the potential for the same genetic predisposition to mental illness as the defendant.  Tr. 321.

150.    Dr. Woods noted that Barrett's mental health records included the term "lability," which is used when describing bipolar disorder, and found that the defendant displayed pressured speech.  Tr. 197-98, 200.

151.    In support of his diagnosis of bipolar disorder, Dr. Woods also noted Barrett's history of hyper-sexuality and irritability, citing Kaplan and Sadock's Comprehensive Textbook of Psychiatry for the proposition that irritability constitutes the foremost symptom in bipolar disorder.  Tr. 199.

152.   Dr. Woods conceded that depression can accompany substance abuse, but said that Barrett's paranoia and suicidality indicated his depression was symptomatic of bipolar disorder, not methamphetamine use.  Tr. 200-01, 220-21.

153.   Dr. Woods asserted methamphetamine could not induce symptoms of bipolar disorder, such as mood lability and pressured speech, and noted that Barrett received a preliminary diagnosis for bipolar disorder at the Bill Willis Community Mental Health Center.   Tr. 330-31, 339; Gov't Ex. 9.

154.   Dr. Woods conceded that Barrett's diagnosis on discharge from Bill Willis was for organic affective disorder, polysubstance abuse, and marital conflict.  Tr. 360.

155.   Dr. Woods explained that bipolar disorder impairs the ability to weigh and deliberate, and can affect daily life.  Tr. 199-200, 202.

156.   According to Dr. Woods, Barrett's poor academic performance was symptomatic of his bipolar disorder, because it concerned the functioning of his brain, which may have also been compromised by fetal exposure to alcohol.  Tr. 202-04.

157.   Dr. Woods also noted that Barrett exhibited attentional deficits.  Tr. 204.

158.   Medical professionals prescribe amphetamines to treat attention disorders, and Dr. Woods opined that Barrett's drug dependency was consistent with self-medication. Tr. 204-05.

159.   Dr. Woods opined that Barrett exhibited symptoms consistent with post-traumatic stress disorder, stemming from family dysfunction.  Tr. 206.

160.   Dr. Woods agreed that Dr. Russell and Dr. LaFortune did not diagnose Barrett with bipolar disorder, and he could not identify another mental health professional who had diagnosed Barrett with post-traumatic stress disorder.  Tr. 295-300; Gov't Exs. 34 & 37.

161.   Dr. Woods reviewed neuropsychological testing administered to Barrett by Dr. Myla Young, especially the Wisconsin Card Sorting Test and Category Test, and agreed with her conclusion that the results indicated Barrett had suffered impairments of brain regions responsible for executive functioning.  Tr. 207-09, 212.

162.   Dr. Woods explained executive functioning as the ability to abstract, understand context, and figure things out, and asserted that impairments in that regard can inhibit the ability to react appropriately to stimuli.  Tr. 211-12, 214-16.

163.   Dr. Woods attributed Barrett's brain impairments to fetal alcohol exposure and a history of head injuries.  Tr. 213-14.

164.   Dr. Woods opined that the neuropsychological testing demonstrated that Barrett perseverated.  Tr. 215.

13

165.    Dr. Woods opined that Barrett's alleged psychiatric and neurological disorders interacted with one another and impaired his ability to perceive events and deliberate during the police raid that preceded his murder of Trooper Eales.  Tr. 218-20.

166.    Dr. Woods allowed that Barrett's drug use exacerbated the symptoms of his supposed mental illnesses.  Tr. 223.

167.    Dr. Woods disagreed with Dr. Steven Pitt's rejection of bipolar disorder, citing Barrett's pressured speech, his family history, and his history of mental health treatment.  Tr. 235-39.

168.    Dr. Woods asserted that Barrett was less likely to exhibit symptoms of mental illness in custody than he would outside of it.  Tr. 240-41, 301.

169.    Dr. Woods acknowledged that Dr. Price and Dr. Russell had each administered the Hare Psychopathy Checklist to Barrett, and that Dr. Price had found that the defendant was a psychopath, but Dr. Price had reached the contrary conclusion.  Tr. 242-44.

170.     Dr. Woods asserted, on the basis of studies from the late 2000s, that the Hare Psychopathy Checklist was not reliable predictor of future dangerousness in custodial settings.  Tr. 244-45.

171.    Dr. Woods did agree that stress can cause the manifestation of mental health symptoms, and that death row is a stressful environment.  Tr. 300-01; see Tr. 353-54.

172.    In support of his opinion, Dr. Woods relied on the lunacy record of A.J. Barrett, Kenneth Barrett's great-grandfather, which reflected a petition for, but not a finding of, mental illness.  Tr. 261-63; Deft. Ex. 2.

173.    Dr. Woods also relied on a record concerning Kenneth Barrett's grandfather, also named A.J. Barrett, for proof of auditory hallucinations, though the document does not support that finding.  Tr. 267-68.

174.    Dr. Woods credited Barrett's self-report of auditory hallucinations though no other mental health professional had ever observed such a symptom.  Tr. 268-69.

175.    Barrett only began reporting auditory hallucinations during the course of his § 2255 litigation.  Tr. 271.

176.    Even in the absence of corroborating medical records, Dr. Woods credited Barrett's self-report of a childhood head injury, inflicted by a steel ball, that the defendant said resulted in a brief loss of consciousness.  Tr. 272-74.

177.    As far as Dr. Woods knew, Barrett's parents never reported the steel ball incident.  Tr. 278.

14

178. But Dr. Woods conceded that Barrett reported to Dr. Pitt that the steel ball incident caused a significant period of unconsciousness, and asserted that he only awoke at a doctor's office. Tr. 275-77.

179. Dr. Woods also conceded that Barrett told Dr. Pitt, alone among known mental health professionals, that his head had been run over by a car. Tr. 279-80.

180. Dr. Woods admitted that Barrett failed math and reading in the first grade but received promotion to the second grade, where he obtained satisfactory grades in all classes. Tr. 287.

181. Dr. Woods further conceded that in the ninth grade, Barrett did not fail any classes, and dropped out when the principal told him to cut his hair. Tr. 283-86; Pet. Ex. 55.

182. Dr. Woods agreed that the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") states that "a primary diagnosis of bipolar disorder must be established based on symptoms that remain once substances are no longer being used." Tr. 306.

183. Dr. Woods agreed that the fourth revised edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") stated that "in order to make a diagnosis of bipolar, a person has to be separate from the use of substances for a period of time." Tr. 306-07.

184. While acknowledging a history of positive drug tests, Dr. Woods disputed the reliability of information concerning Barrett's drug use, opining that the reports were not definitive, for lack of confirmation that Barrett was actually intoxicated. Tr. 307-12, 324-26.

185. Dr. Woods maintained his skepticism of Barrett's drug use despite a 1995 diagnosis for substance abuse disorder, because the defendant received an anti-psychotic medication during his treatment. Tr. 312-13.

186. Dr. Woods relied on Dr. Sharp's 2002 report of institutional remission in finding that Barrett was not under the influence of any intoxicant when evaluated in state custody. Tr. 332-33.

187. Dr. Woods found in 2009 that Barrett could not have rationally assisted his trial counsel, despite interviewing Mr. Echols, who did not mention any such observation. Tr. 314-15.

188. Mr. Echols never requested a competency evaluation for Barrett and opined that the defendant had good insight into the case, "a very good mind in many areas . . . . was interested in his case . . . . [and] demonstrated recall." Tr. 471-74, 509.

189. Mr. Smith had experience representing clients he thought were incompetent, but he did not harbor any suspicions that Barrett was incompetent or suffered from any

15

significant mental health condition (though he understood that the defendant's apparent competence did not foreclose the possibility of mental health mitigation evidence).  Tr. 533-34, 552-53, 604-05.

190.    Mr. Hilfiger had numerous experiences representing defendants whom he believed were incompetent, but never harbored any concern about Barrett's ability to rationally assist him.  Tr. 653-54, 665-66, 754-55; Gov't Ex. 38.

191.    Dr. Woods found that at the time of the murder, Barrett could not distinguish right and wrong.  Tr. 317-19.

192.    Dr. Deborah Miora was a neuropsychologist who rescored psychometric testing performed on Barrett by the deceased Dr. Young.  Tr. 1140-53.

193.    Dr. Miora explained that the brain's frontal lobes are considered the seat of reason, thought, and decision making.  Tr. 1155.

194.    Dr. Miora premised the appropriateness of neuropsychological testing on Barrett's personal history, which included substance abuse, fetal alcohol exposure, reported head injuries, and a gunshot wound to the chest.  Tr. 1169-71.

195.    According to Dr. Miora, testing revealed that Barrett had strengths in verbal comprehension, verbal expression and verbal memory, but weaknesses in problem solving, abstract reasoning, attention, planning, and alternating between stimuli.  Tr. 1200-01.

196.    Barrett received a full scale IQ score of 82, on a test to which the government interposed a continuing objection.  Tr. 1185, 1194, 1198-99, 1205.

197.    As part of his full-scale IQ score, Barrett received a score of 65 in processing speed, revealing an area of particular deficit.  Tr. 1207-08, 1214.

198.    Barrett exhibited low average attention.  Tr. 1213.

199.    Based on Barrett's poor performance on coding tasks, simple search and TMT visual scanning, Dr. Miora concluded that he had difficulty in pressured situations in which he had to generate a response to visual stimuli.  Tr. 1215-16, 1219.

200.    Barrett scored in the normal range for recall and delayed recall, but Dr. Miora believed that the variation between his normal scores was significant.  Tr. 1221.

201.    Barrett scored in the 98th percentile for visual memory, but his visual working memory index was two standard deviations below the mean – a variation Dr. Miora attributed to attentional problems.  Tr. 1222-24.

202.    Dr. Miora found that Barrett's academic functioning reflected a possible learning disability.  Tr. 1225.

203.    To test executive functioning, Dr. Young administered the Delis-Kaplan Executive Function System (D-KEFS).  Tr. 1225.

204.    Barrett exhibited difficulty in switching between tasks, scoring one standard deviation below the norm on letter/number switching, while showing moderate impairment in visual scanning.  Tr. 1229-30.

205.    On the "Tower" test, Barrett exhibited slightly above-average problem-solving ability, but exhibited moderate impairment in "move accuracy," demonstrating a failure to follow test rules.  Tr. 1232-34.

206.    On the sorting portion of the D-KEFS, Barrett received an impaired score in "sort recognition."  Tr. 1234-35.

207.    Barret had trouble inhibiting responses based on conflicting stimuli.  Tr. 1236-39.

208.    According to Dr. Miora, Barrett's D-KEFS performance indicated damage to the dorsal lateral and orbitofrontal portions of his brain.  Tr. 1235.

209.    Dr. Miora conceded there is no one-to-one correlation between daily life and the skills tested on the D-KEFS, but said it did "say something about how that person would function in different circumstances," albeit not in an extreme situation.  Tr. 1239-40.

210.    Based on the D-KEFS scores, Dr. Miora predicted that Barrett would have difficulty under stress and likely make errors if he had to pay visual attention and switch between different kinds of activities quickly.  Tr. 1241.

211.    Dr. Miora did not testify about all of the 94 substests in the D-KEFS.  Tr. 1309.

212.    Over the course of all the D-KEFS testing, Barrett had a mild impairment or below in only about 14.9 percent of them.  Tr. 1309-11.

213.    Barrett had an impaired score on the Wisconsin Card Sorting Test (WCST), with some highly impaired sub-scores.  Tr. 1241-42.

214.    Dr. Miora stated that Barrett's performance on the WCST did not involve perseverative errors, but opined that his scores were meaningless given a failure to solve underlying conceptual problems.  Tr. 1244

215.    Barrett performed poorly on the Short Category Test.  Tr. 1246-47, 1320.

216.    Dr. Miora conceded that Barrett's performance on the WCST was consistent with malingering, though it could have been explained by other circumstances.  Tr. 1360.

217.    Dr. Miora later conceded that she did not understand the portion of Dr. Young's declaration that concerned the WCST.  Tr. 1317-18.

218.    It appears Barrett could verbally repeat the applicable rules of the WCST, but misapplied them.  Tr. 1318-19.

219.    Dr. Miora admitted that Barrett may have simply misunderstood the rules of the WCST.  Tr. 1321-22.

220.    In her declaration, Dr. Young correlated WCST performance with daily functioning, identifying a significant relationship between test performance and the ability to drive a car.  Tr. 1323-24.

221.    Dr. Miora did not know if Barrett could drive a car.  Tr. 1324.

222.    Dr. Miora was not certain she had reviewed records concerning an incident in which Barrett was stopped by the police while operating a vehicle and managed to convince the officer to let him drive home.  Tr. 1324-25.

223.    Considering Barrett's performance on all tests of executive functioning, Dr. Miora concluded that he demonstrated problems with frontal function, which included the temporal region and some of the frontal subcortical circuitry, impairments that would have affected him on a daily basis.  Tr. 1249-50.

224.    Dr. Miora stated that Barrett did poorly in inhibiting responses in light of changing stimuli and would tend to do worse if he received a rapid infusion of information.  Tr. 1251-52.

225.    Dr. Miora conceded that in 2000, Barrett scored in the normal range on verbal IQ, performance IQ, verbal comprehension, working memory, processing speed, and full scale IQ, in testing administered by Dr. Bianco.  Tr. 1261-62.

226.    Barrett experienced a decline in processing speed between 2000 and 2009.  Tr. 1263.

227.    In memory testing administered by Dr. Bianco, Barrett scored in the average to very superior ranges.  Tr. 1263-64.

228.    Dr. Miora conceded that Dr. Bianco could not have administered the D-KEFS to Barrett during his 2000 evaluation, because the test was not published until 2001.  Tr. 1267.

229.    Dr. Bianco administered a trail making test that was later adapted into the D-KEFS, on which Barrett received an average score.  Tr. 1266-69.

230.    Dr. Bianco also administered a color word interference test, similar to one on the D-KEFS, and Barrett scored in the normal range.  Tr. 1276-78, 1280.

231.    Dr. Miora did not review any of Barrett's medical records.  Tr. 1287.

18

232.    In rescoring Dr. Young's raw test data, Dr. Miora failed to notice that she was missing a page of information.  Tr. 1292-95.

233.    The missing data may well have improved Barrett's processing speed to something Dr. Miora conceded was "more believable," in the borderline range and raised his full scale IQ to 84.  Tr. 1295-97.

234.    Dr. Miora referred to the impact of her IQ scoring error as "bupkis."  Tr. 1297.

235.    Dr. Miora conceded that Barrett demonstrated strengths in many areas of neuropsychological functioning.  Tr. 1298-1301.

236.    Dr. Miora likewise conceded that Barrett scored above average on several components of the California Verbal Learning Test-2.  Tr. 1302-05

237.    Dr. Miora conceded that Barrett had scored in low average or average range for several subtests of the WIMS-IV.  Tr. 1306-08.

238.    Dr. Miora could not say if Barrett's decades of drug abuse caused his alleged brain injury, but allowed that it very well could have.  Tr. 1311.

239.    Dr. Miora explained that she was not testifying about the facts of the crime and had not reviewed the police reports stemming from the murder: she would not agree that Barrett "was incapable of taking in information, that it was difficult for [him] to act upon that information in real time."  Tr. 1328.

240.    Dr. Miora conceded that if Barrett were under the influence of drugs at the time of the crime, it could have impaired his visual attention.  Tr. 1355-56.

241.    Despite any impairments, Dr. Miora conceded that Barrett was capable of the perceptions necessary to commit the crime.  Tr. 1356-57.

242.    In 2005, former U.S. Attorney Sheldon Sperling retained board certified neuropsychologist and forensic psychologist Dr. J. Randall Price to evaluate Barrett, which included two days of interviews and testing. Tr. 812-15; 821, 825, 832-35; Gov't Ex. 53.

243.    Barrett cooperated during the interview with Dr. Price but voiced chronic suspiciousness about a variety of subjects, leading to a finding that the defendant had the traits of a paranoid personality.  Tr. 836-37.

244.    As part of the evaluation, Dr. Price reviewed records detailing the murder of Trooper Eales and Barrett's history of mental health treatment, which reflected the substance abuse but not diagnoses for bipolar disorder or post-traumatic stress disorder.  Tr. 826-31.

245.    During the interview, Dr. Price learned of dysfunction in Barrett's upbringing and marriage, and formed the impression that the quality of the defendant's relationship with his mother varied over time.  Tr. 841-43.

246.    Barrett told Dr. Price that he and his ex-wife had physically fought, and that she had obtained restraining orders against him.  Tr. 853-54.

247.    In reviewing educational records, Dr. Price determined that Barrett had performed poorly in school and lost interest, but not the ability to perform – failing the eighth grade as a result of chronic truancy and suffering suspension or expulsion because he refused to cut his hair.  Tr. 844-45.

248.    After dropping out of school, Barrett held jobs that required at least semi-skilled performance and claimed that he was a skilled mechanic who hoped to open a garage that, for want of money-management skills, he intended to finance through the sale of methamphetamine.   Tr. 845-49.

249.    Despite his poor money-management skills, Barrett did not express to Dr. Price that he engaged in spending sprees consistent with manic episodes.  Tr. 857-58.

250.    Barrett reported a history of hyperactivity to Dr. Price, but did not display such traits during their interview.  Tr. 846.

251.    During his interview with Dr. Price, Barrett reported a childhood incident in which he was struck by steel ball and lost consciousness, but did not experience any cognitive problems as a result.  Tr. 860-61.

252.    Dr. Price explained that a person who experienced hours of unconsciousness would have sustained a severe brain injury likely to result in multiple serious cognitive deficits – symptoms that Barrett did not display.  Tr. 861-63.

253.    Dr. Price administered a Reynolds Intellectual Assessment on which Barrett performed in the average range, without a significant difference between verbal and non-verbal abilities, a result he could not have achieved had he sustained a severe brain injury with a resulting loss of consciousness lasting several hours.  Tr. 865-68.

254.    Dr. Price administered a Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS") to Barrett, who performed in the overall average range for neurological functioning (a result inconsistent with traumatic brain injury) while displaying a deficit in short-term memory consistent with his attentional issues.  Tr. 868-75, 902-03.

255.    Dr. Price agreed that a person can suffer brain damage that affects one area of functioning but not another.  Tr. 897-98.

256.    Dr. Price stated that most people have strengths and weaknesses in their neurological functioning.  Tr. 902.

257. Dr. Price acknowledged that the variation in Barrett's strengths and weaknesses was atypical.  Tr. 905.

258. Dr. Price maintained his opinion, formed in 2005, that Barrett's RBANS performance did not merit further testing for brain damage.  Tr. 927.

259. On a Personality Assessment Inventory administered by Dr. Price, Barrett attributed his problems to substance abuse and displayed some depressive symptoms and paranoia.  Tr. 875-77.

260. On a Minnesota Multiphasic Personality Inventory administered by Dr. Price, Barrett's results indicated antisocial attitudes and behaviors; paranoid thinking or chronic suspiciousness; and concern about medical problems.  Tr. 877-80.

261. Dr. Price did not report on some of Barrett's elevated personality scales, including traumatic stressors, traumatic stress, post-traumatic stress disorder, but did note results on the "big-five" scales, which reflect meta-personality traits.  Tr. 912-20.

262. While acknowledging the elevated scores for post-traumatic stress disorder, Dr. Price did not see anything in his evaluation, like the endorsement of flashbacks to a life-threatening event – that indicated Barrett suffered from the condition.  Tr. 929-32.

263. Barrett scored in the average range for aggression, had somewhat elevated scores for psychosis and introversion, and had an elevated score on a schizophrenia scale that can also indicate confusion or eccentric beliefs.  Tr. 921-22, 924.

264. Dr. Price explained mental health professionals do not evaluate individual testing scales in isolation, as the scales can reflect many things.  Tr. 931

265. Dr. Price administered a malingering test, which indicated that Barrett did not grossly exaggerate his psychological problems.  Tr. 881.

266. Following the evaluation, Dr. Price diagnosed Barrett with a learning disorder, not otherwise specified; polysubstance dependence; dysthymic disorder; and personality disorder with antisocial and paranoid traits and features.  Tr. 889-90.

267. Dr. Steven Pitt, a board certified forensic psychiatrist, evaluated Barrett.  Tr. 956-64, 968-69; Gov't Ex. 52.

268. The government asked Dr. Pitt to opine whether Barrett suffered from a mental illness or defect; to determine if any such mental illness was a byproduct of substance use; and to determine if Barrett could distinguish right from wrong at the time of the murder.  Tr. 966.

269. Dr. Pitt memorialized his findings in a written report.  Tr. 966-67; Gov't Ex. 52, § 1.

270.    Dr. Pitt explained that bipolar disorder is a lifelong illness, the symptoms of which can ebb and flow but cannot be hidden for protracted periods of time, especially in stressful environments.  Tr. 1008-09.

271.    On January 19, 2017, Dr. Pitt interviewed Barrett at the U.S. Penitentiary in Terre Haute, Indiana, and made audio and video recordings of the meeting.  Tr. 969-70; Gov't Ex. 52, § 10.

272.    Dr. Pitt also arranged for a transcription of the interview with Barrett.  Tr. 972; Gov't Ex. 52; § 3.

273.    Dr. Pitt acknowledged controversy within the profession regarding taping of forensic interviews.  Tr. 1087.

274.    Dr. Pitt elicited Barrett's admission to regular, long-term drug use, and to primarily abusing marijuana and methamphetamine in the years preceding the murder of Trooper Eales.  Tr. 974-75, 1001-02.

275.    Barrett also indicated to Dr. Pitt that he had access to methamphetamine and OxyContin while in custody awaiting his state trials.  Tr. 1002, 1117.

276.    Dr. Pitt understood that Barrett's mother was a lax disciplinarian, and that his family life was dysfunctional.  Tr. 1027-28.

277.    Dr. Pitt acknowledged that Kenneth Barrett's father, Ernie Barrett, was a philanderer, who physically abused the defendant and, at least once, beat up the defendant's mother, Gelene Dotson.  Tr. 1028-29, 1030, 1033.

278.    Dr. Pitt also acknowledged that Barrett's mother, Gelene Dotson, appeared to have an alcohol addiction and likely exposed the defendant to alcohol in utero.  Tr. 1035.

279.    Dr. Pitt noted that Kenneth Barrett's brother, Stephen Barrett, did not suffer from a debilitating mental illness, and that the family's history of dysfunction constituted a data point, but not one upon which he would premise a diagnosis.  Tr. 1113-14.

280.    Barrett suffered a beating while in custody as a teenager.  Tr. 1033-34.

281.    During his interview with Dr. Pitt, Barrett did not endorse the symptoms of a mood disorder and attributed changes in his mood to drug use.  Tr. 1003.

282.    According to Dr. Pitt, drugs – especially cocaine and methamphetamine – can mimic the effects of mood disorder, creating mania, irritability, pressured speech, and mood lability.  Tr. 1003-04.

283.    Dr. Pitt did not detect any pressured speech in his interactions with Barrett.  Tr. 1004.

284.   As part of his evaluation, Dr. Pitt reviewed documents from Sparks Regional Medical Center concerning Barrett's treatment following his suicide attempt.  Tr. 975-76; Pet. Ex. 102.

285.   The treating psychiatrist at Sparks diagnosed Barrett with probable antisocial personality, drug abuse (marijuana with a history of hallucinogenic drugs), alcohol abuse, and probable major depressive disorder, and Dr. Pitt credited the information about drug use because medical personnel gathered it, likely from the defendant or his relatives.  Tr. 977.

286.   As part of his evaluation, Dr. Pitt reviewed documents from Eastern State Hospital, where the staff admitted Barrett with a diagnosis of marital problems, mixed substance abuse, alcohol abuse, and mixed personality disorder, information that appeared credible because they it evidently came from, at least, the defendant's wife and mother.  Tr. 978-80; Gov't Exs, 3, 4, 5 & 6.

287.   During his interview, Barrett told Dr. Pitt that he was taken to Eastern State Hospital because "I was nutted out.  I was doing - fighting with everybody and stuff, eating mushrooms a lot."  Tr. 1115.

288.   A drug screen at Eastern State Hospital was negative, but Dr. Pitt nonetheless credited Barrett's self-reports of long-term substance abuse.  Tr. 981.

289.   During the course of his treatment at Eastern State Hospital, Barrett denied a history of head injury.  Tr. 980; Gov't Ex. 5.

290.   He was discharged from Eastern State Hospital with diagnoses of marital problems, mixed substance abuse, and mixed personality disorder, but no mood disorder.  Tr. 980-81.

291.   As part of his evaluation, Dr. Pitt reviewed documents from Barrett's application for Social Security benefits, which was denied in light of the fact that he exhibited no signs of a severe mental illness.  Tr. 982; Gov't Ex. 10.

292.   The Social Security Administration concluded that Barrett could think clearly most of the time and carry out normal activities.  Tr. 983.

293.   As part of his evaluation, Dr. Pitt reviewed documents concerning Barrett's treatment at Sequoyah Memorial Hospital following his reports that he was "losing his mind," but which included a urine toxicology screen that was positive for amphetamines and THC.  Tr. 983-84; Gov't Ex. 11.

294.   Sequoyah Memorial medical staff administered Haldol to Barrett, but emergency room staff commonly use it to treat agitation, and Dr. Pitt characterized as "irresponsible" any inference that its administration to the defendant signified a diagnosis for a mood disorder.  Tr. 985-86, 1114-15.

295.    Dr. Pitt acknowledged that Barrett had received prescriptions for two anti-depressants, Asendin and Elavil, but observed that the records indicated that he never actually took the medications. Tr. 1073-74.

296.    As part of his evaluation, Dr. Pitt reviewed documents from Bill Willis Community Mental Health Center and Wagoner Hospital, where Barrett received treatment following a provisional diagnosis of bipolar disorder by a non-physician and was discharged for non-compliance.  Tr. 986-87, 1080-81; Gov't Exs. 8 & 9.

297.    When discharged, Barrett received a diagnosis of organic affective disorder, polysubstance abuse, amphetamine dependence, and urine drug screen positive for cannabis, and then marital conflicts.  (The now-disused term "organic affective disorder," referred to a mood disorder that was, according to Dr. Pitt, the apparent byproduct of substance abuse).  Tr. 989-90, 1080-81.

298.    Dr. Pitt rejected the provisional diagnosis Barrett received for bipolar disorder. Tr. 987-88.

299.    Barrett's history of substance abuse precluded a diagnosis for Bipolar disorder. Tr. 988; *see* Tr, 1120-22 ("You can't be giving these diagnoses as the primary diagnosis without first giving strong consideration and mentioning and weighing heavily the chronic methamphetamine use").

300.    As part of his evaluation, Dr. Pitt reviewed documents from St. Francis Hospital concerning Barrett's treatment for wounds sustained after murdering Trooper Eales, including a drug screen positive for cannabinoids and high levels of amphetamines and a record of the defendant's admission to using methamphetamine and marijuana that night.  Tr. 991-92; Gov't Ex. 7.

301.    Taken together, the medical records did not, in Dr. Pitt's opinion, suggest Barrett suffered from bipolar disorder or post-traumatic stress disorder.  Tr. 993.

302.    As part of his evaluation, Dr. Pitt reviewed Barrett's Bureau of Prisons records, which did not reflect diagnoses for bipolar disorder or post-traumatic stress disorder, though custodial settings are stressful and therefore impede the suppression of mental health symptoms.  Tr. 995-96, 1088-90.

303.    Dr. Pitt did not credit Barrett's claim that he could not recognize his own symptoms of mental illness in prison: he was verbally competent and insightful.  Tr. 996-97.

304.    Dr. Pitt rejected the notion that Barrett used illicit drugs to self-medicate bipolar disorder, as he had no access to drugs in federal custody but exhibited no symptoms of the illness.  Tr. 1055.

305.    To the extent he thought Barrett might have self-medicated with drugs, Dr. Pitt opined that the defendant was ameliorating the low that came at the end of each cycle of drug use.  Tr. 1117-18.

24

306. While mentally ill people sometimes self-medicate, Dr. Pitt stated that mental health professionals do not deduce underlying illnesses from the existence of a commonly-occurring co-morbid condition. Tr. 1038-39, 1116.

307. Dr. Pitt opined that Barrett's suicide attempts or gestures were attributable to substance abuse. Tr. 994.

308. Barrett denied a history of head injuries at Eastern State Hospital and upon intake in the Oklahoma Department of Corrections. Tr. 998-999; Gov't Ex. 66.

309. In a checklist completed at the Oklahoma Department of Corrections, Barrett also denied symptoms consistent with mental illness or head injury, including "periods of unconsciousness, blurred vision, double vision, depression or excessive worry, frequent thought of suicide and paralysis." Tr. 1000.

310. Dr. Pitt acknowledged some records that Barrett had sustained head injuries, and thought the truth lay somewhere between his litigation claims and his earlier denials. Tr. 1031-32.

311. On the night of the murder, Dr. Pitt opined that Barrett was not, irrespective of his family history, suffering from bipolar disorder, as a mental health professional could not diagnose bipolar disorder if the symptoms were better explained by the physiological effects of a substance or by a medical condition. Tr. 1006-08, 1016-26.

312. Dr. Pitt explained that he considered Barrett's family history, but that mental health professional do not diagnose on that basis alone. Tr. 1057; see Tr. 1112-13.

313. Dr. Pitt noted that not a single mental health professional had ever treated Barrett for bipolar disorder and that the only person who ever made such a diagnosis later changed it. Tr. 1008, 1049-50.

314. Dr. Pitt also concluded that, despite a dysfunctional upbringing, Barrett did not suffer from post-traumatic stress disorder: the defendant did not endorse the symptoms of the condition, and Dr. Pitt could not identify a threshold event that met the initial criteria for it. Tr. 1009-10, 1049-50.

315. While acknowledging Barrett's sometimes abusive upbringing, Dr. Pitt did not identify any incident that "rose to the level of a traumatic event that would really qualify for PTSD," and observed that no mental health professional apart from Dr. Woods had made the diagnosis, while Dr. LaFortune had specifically rejected it. Tr. 1091-92.

316. While conceding that testing might have detected neurological deficits, Dr. Pitt did not find evidence of brain damage that affected Barrett on the night of the murder: the defendant's verbal, social and mechanical competence foreclosed a finding of brain damage that impacted Barrett's choices at the time of the offense. Tr. 1012-13.

25

317.   Dr. Pitt did not diagnose Barrett with anti-social personality disorder, as he could not establish that the defendant had exhibited qualifying behaviors in his youth.  Tr. 1013-14.

318.   Dr. Pitt opined that Barrett could distinguish right from wrong at the time of the murder, largely because he said so, but also because the defendant had prior legal problems and understood what constituted unlawful behavior.  Tr. 1014.

319.   On the night of the murder, Dr. Pitt diagnosed Barrett with amphetamine dependence with physiologic dependence, features of an antisocial personality disorder, cannabis dependence, and a possible learning disorder.  Tr. 1015, 1036-37.

320.   While Barrett reported attention deficits to Dr. Pitt, he did "remarkably well" on a screening evaluation.  Tr. 1037-38.

321.   Dr. Pitt acknowledged some professionals had observed paranoid features in Barrett, but attributed the behavior to drug use.  Tr. 1039-40, 1047.

322.   Dr. Pitt also acknowledged the possibility that Barrett had elevated scores on specific psychometric depression and schizophrenia scales, but explained that mental health professionals do not interpret individual scales in isolation, and he referred to the results as "soft" data points.  Tr. 1061-62, 1122-23.

323.   While Dr. Price had observed in Barrett features of a paranoid personality, Dr. Pitt explained the finding did not represent the diagnosis of a disorder that interfered with daily functioning, and further stated, "I would expect those features in someone with Mr. Barrett's legal history and . . . drug use history."  Tr. 1119-20.

324.   To the extent that Barrett's relatives observed that he exhibited mood swings, Dr. Pitt could not find any reason to believe they could distinguish his behavior from the effects of drug use.  Tr. 1118.

## CONCLUSIONS OF LAW

1.   To demonstrate ineffective assistance, Barrett must show his attorneys' performance was deficient and that the deficiencies were prejudicial.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

2.   Thus, Barrett first must show that counsel's performance fell below prevailing professional norms.  *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *United States v. Salazar*, 323 F.3d 852, 857 (10th Cir. 2003).

3.   In demonstrating unreasonable performance, Barrett must overcome a strong presumption that counsel provided adequate assistance.  *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000) (citation omitted).

4. The prejudice prong of *Strickland* imposes a heavier burden on the petitioner than the harmless error test applied on direct appeal. *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993).

5. Under the prejudice prong, Barrett must show that, absent an alleged error, a reasonable probability exists that he would have received a more favorable verdict. *See Haddock*, 12 F.3d at 958.

6. An attorney need not investigate all leads or present all available mitigating evidence, so long as the decision to forego a particular lead or present particular evidence is reasonable under the circumstances. *See Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008).

7. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

8. When Messrs. Smith and Hilfiger took over Barrett's representation in federal court, the homicide had been tried twice in state court as a capital case.

9. Messrs. Smith and Hilfiger believed they received all the files from prior counsel and their investigators, and any error in that regard was reasonable given the volume of material they received.

10. Messrs. Smith and Hilfiger had no reason to believe that prior counsel had completely failed to develop a case in mitigation.

11. During the state proceedings, Mr. Echols received reports from multiple mental health experts, including Dr. Bianco and Dr. LaFortune, which indicated Barrett did not suffer from a major mental illness.

12. Even if Messrs. Smith and Hilfiger were unaware of the Bianco and LaFortune, their ignorance of extant facts should not create a professional obligation to undertake an investigation they had reason to avoid. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005); *Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2002).

13. It would not advance the fairness of any trial to punish Messrs. Smith and Hilfiger for actions that would have been justified in light of prior counsel's records. *See Kimmelman v. Morrison*, 477 U.S. 365, 397 (1986) (holding the right to counsel would be shaken from "its constitutional moorings to hold that the Sixth Amendment protects criminal defendants against errors that merely deny those defendants a windfall").

14. Burdening successor counsel with investigative duties based on ignorance of documents they should have received from Mr. Echols would require a novel rule in violation of *Teague v. Lane*, 489 U.S. 288 (1989).

15. Barrett indicated to his trial attorneys that he did not want them to beg for his life and did not want to place his relatives in a bad light.

16. Trial counsel's recollections of Barrett's attitude toward mitigation evidence is corroborated by the defendant's own statements to his step-mother, Doris Barrett.

17. By at least his adolescent years, Barrett was a full participant in his family's dysfunction – defying his mother, abusing drugs, dropping out of school, abusing his much younger brother, and impregnating an underage girl.

18. Barrett was 38 years old when he murdered Trooper Eales and presumably well beyond the control of his mother, but he was then voluntarily living next door to Gelene Dotson -- facts that would have blunted an attempt to develop mitigation evidence based on their relationship

19. At the time he murdered Trooper Eales, Barrett was under the influence of marijuana and methamphetamine, having heavily abused drugs for most of his life, all facts that trial counsel reasonably sought to minimize.

20. Some of Barrett's relatives testified against him at trial, indicating that family support for him was, at best, unreliable.

21. Messrs. Smith and Hilfiger interviewed their client and his relatives and knew enough about his upbringing to make a reasonable tactical choice to avoid a mitigation case based on family dysfunction.

22. Given the Barrett's evidence and the ambiguous evidence concerning his relationships with his relatives, and the potentially damning evidence of his drug use, Messrs. Smith and Hilfiger reasonably selected a mitigation strategy to place the defendant in the best possible light before the jury.

23. Ms. Harris's recollection of past events was unreliable: she had little factual basis for expressed opinions about Barrett's upbringing, and the positive light she attempted to cast on him was inconsistent the opinions she held at the time of the crime.

24. Any testimony Ms. Harris might have offered on Barrett's behalf at trial would have been subject to significant impeachment.

25. Mark Dotson had little personal knowledge of Barrett, as they had little contact as children, adolescents or adults.

26. Given his lack of personal knowledge, Mark Dotson could have offered little value to the defense during Defendant's trial.

27. Mark Dotson's testimony also made clear that Barrett would not cease his drug abuse even when counseled to do so by relatives.

28. The family life details developed through Stephen Barrett added nothing of weight to the mitigation testimony he provided at trial.

29. Stephen Barrett's recollections only served to demonstrate that he and Defendant both experienced dysfunctional upbringings by an ineffective, alcohol-abusing mother. But, while Stephen Barrett succeeded in life, he did so because he chose to apply himself in school and reject the drug abuse Kenneth Barrett embraced in the face of express discouragement.

30. Stephen Barrett had little, if any, relationship with Kenneth Barrett and sparse foundation for opinions about the causes of his brother's behavior.

31. Stephen Barrett's own success, during an upbringing marred by dysfunction and drug use, tended to place Kenneth Barrett's failures in a more negative light.

32. According to Stephen Barrett, Kenneth Barrett was a violent and defiant adolescent, who apparently rejected the assistance and counsel offered by extended family members throughout his life, choosing instead to abuse drugs to his own detriment.

33. Doris Barrett may have had a close relationship with Defendant, but she did not directly participate in trial counsel's planning, and could only speculate about their strategies.

34. Doris Barrett testified inaccurately, if not dishonestly, about the extent of her relationship with Mr. Hilfiger: her recorded calls made clear she had far more access to Mr. Hilfiger than she claimed during her testimony before this Court.

35. To the extent that she was privy to Mr. Hilfiger's plans, Doris Barrett demonstrated a willingness to thwart them when she advised Kenneth Barrett not to testify based on advice she received from Mr. Echols.

36. Trial counsel would have reasonably rejected the opportunity to present the testimony of Ruth Harris, Mark Dotson, Stephen Barrett, and Doris Barrett, as adduced before this Court.

37. No reasonable likelihood exists that the failure to adduce the opinions of Barrett's relatives – as presented to this Court – prejudiced the verdict at trial.

38. Dr. Woods's testimony would have provided little mitigating weight at trial, as he did not provide credible expert testimony.

39. Dr. Woods evinced an obvious bias, based on his consistent history of testimony for capital defendants.

40. Dr. Woods evinced a further obvious bias in his willingness to selectively rely on facts: crediting a rejected preliminary diagnosis for bipolar disorder but rejecting evidence of drug abuse that included multiple drug tests, admissions by Barrett and a final diagnosis of polysubstance abuse.

41. Dr. Woods rendered a diagnosis of bipolar disorder in the face of published limitations on his ability to do so in the face of evidence of drug abuse.

42. Dr. Woods relied on historical records that did not support the facts for which he cited them.

43. Dr. Woods relied on Barrett's self-reports of head injuries despite a lack of corroborating records and evidence that the defendant exaggerated his claims in other statements.

44. Dr. Woods inferred mental health diagnoses from family history, rather than using that information to corroborate findings based on observable symptoms.

45. Dr. Woods inferred mental health diagnoses from a scant record of psychotropic drugs administered to Barrett, without learning the reasons for their use.

46. Dr. Woods rendered a diagnosis of post-traumatic stress disorder though Barrett subsequently failed to endorse the symptoms of that disorder.

47. Dr. Woods misunderstood the neuropsychological testing, asserting that Barrett tended to perseverate, when the psychometrics demonstrated otherwise.

48. Dr. Woods found that Barrett could not rationally assist his trial counsel, though not one of his trial attorneys ever observed such an issue.

49. Dr. Woods found that Barrett could not distinguish right from wrong at the time he murdered Trooper Eales, but Barrett stated otherwise when asked.

50. No reasonable likelihood exists that the absence of Dr. Woods's opinion prejudiced the outcome of Barrett's trial.

51. Dr. Miora's testimony would have provided little mitigating weight at trial, as she did not provide credible expert testimony.

52. Dr. Miora evinced an obvious bias, based on her consistent history of testimony for the defense.

53. Dr. Miora evinced a lack of credibility in her sloppy test scoring and flippant attitude toward her errors – overlooking a missing page of data and referring to the resulting impact on Barrett's IQ score as "bupkis."

54. Dr. Miora's conclusions were inconsistent with known facts, as she seemed willing to posit that Barrett's WCST score indicated he could not drive though the historical record demonstrate he could.

55. Dr. Miora could not relate the results of neuropsychological testing to Barrett's daily functioning.

30

56. Dr. Miora never familiarized herself with the facts of Trooper Eales's murder and could not relate the results of neuropsychological testing to the crime.

57. Dr. Miora could not explain Barrett's demonstrated decline in processing speed between 2000 and 2009.

58. Dr. Miora could not identify the genesis of Barrett's supposed brain damage.

59. Specifically, Dr. Miora could not state that Barrett's own drug use had not cause any apparent brain damage.

60. Dr. Miora testified vaguely to the significance of variations in Barrett's test performance, but never identified a scientific theory or principle that supported her stated concerns.

61. Dr. Miora testified vaguely to the significance of variation s in Barrett's test performance, but never explained what inferences she could draw from them.

62. Dr. Miora never explained how she could find brain damage in the face of Barrett's average or better scores on the overwhelming majority of the D-KEFS.

63. Dr. Miora never explained why neuropsychological testing in 2009 was more reliable than the data available from Dr. Bianco and Dr. Price, much closer in time to the crime.

64. Dr. Miora never explained why Barrett's deficits might have had significance to his behavior at the time of the crime, given his obvious verbal, social and mechanical functioning, as noted by Dr. Pitt.

65. Had trial counsel adduced the opinions of Dr. Woods and Dr. Miora, the government would have rebutted the evidence with testimony from Dr. Pitt and Price, underscoring Barrett's drug abuse and anti-social traits.

66. No reasonable likelihood exists that the absence of Dr. Miora's opinion prejudiced the outcome of Barrett's trial.

67. No reasonable likelihood exists that Barrett would have received a more favorable sentencing verdict had he presented any of the evidence he adduced before this Court.

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to deny § 2255 relief.

Dated: July 31, 2017.

<div style="margin-left: 50%;">

Respectfully submitted,

DOUGLAS A. HORN
Acting United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

</div>

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on July 31, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit