# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. CIV-09-105-JHP** |
| | ) | |
| **UNITED STATED OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

The Plaintiff Kenneth Eugene Barrett was tried and convicted in this Court in 2005 on two counts of felony murder pursuant to 18 U.S.C. § 924(c)(1)(A) and one count of killing a state law enforcement officer in the commission of a drug trafficking crime pursuant to 21 U.S.C. § 848(e)(1)(B). He was sentenced to life in prison on the felony murder counts, and to death on the third count. *See* Case No. CR-04-115-JHP, Docket No. 285. The convictions and sentences were affirmed on direct appeal. *See United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007). Barrett (the plaintiff or petitioner in this case, and the defendant in Case No. CR-04-115-JHP, referred to herein as "the Defendant") then sought post-conviction relief pursuant to 28 U.S.C. § 2255, which this Court denied without a hearing. *See Barrett v. United States*, Case No. CIV-09-105-JHP, Docket No. 214, 2012 WL 3542609 (E.D. Okla. Aug. 16, 2012) [unpublished opinion]. The United States Court of Appeals for the Tenth Circuit granted a certificate of appealability (COA) on seven of the Defendant's claims for ineffective assistance of counsel, and affirmed the this Court's decision as to all claims but one, *i. e.*, whether the Defendant's "trial attorneys were

ineffective by failing to investigate and present evidence of his background and mental health for the trial's penalty phase." *Barrett v. United States,* 797 F.3d 1207, 1211 (10th Cir. 2015). The Tenth Circuit found that an evidentiary hearing was needed to resolve factual disputes and determine the merits of the claim. *Id.* at 1232 ("In short, we believe that Defendant presented sufficient evidence of deficient performance and prejudice to entitle him to an evidentiary hearing."). On remand, the District Judge referred the case to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for an evidentiary hearing and a report and recommendation. The undersigned Magistrate Judge heard evidence on March 27-30, 2017, June 12-13, 2017, and June 26, 2017, and afterward granted the parties until July 31, 2017 to submit Proposed Findings of Fact and Conclusions of Law. For the reasons set forth below, the undersigned Magistrate Judge recommends that the Defendant be granted relief under 28 U.S.C. § 2255 and given a new sentencing hearing on the charge of intentionally killing a state law enforcement officer in the commission of a drug trafficking crime.

## FINDINGS AND ANALYSIS

The background and facts of this case have been set out at length in previous decisions over the past twelve years and will not be reiterated here other than as needed to address Barrett's claim of ineffective assistance of counsel at the sentencing phase of his trial. With regard to such a claim, Barrett must demonstrate that the performance of his trial attorneys fell below an objective standard of reasonableness, and that he was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). And although ordinarily "counsel is strongly presumed to have rendered adequate assistance and made

all significant decisions in the exercise of reasonable professional judgment[,]" *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011), *quoting Dever v. Kansas State Penitentiary,* 36 F.3d 1531, 1537 (10th Cir. 1994), closer scrutiny must be applied "when reviewing attorney performance during the sentencing phase of a capital case." *Cooks v. Ward,* 165 F.3d 1283, 1294 (10th Cir. 1998). *See also Osborn v. Shillinger,* 861 F.2d 612, 626 n.12 (10th Cir. 1988) ("[T]he minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death, justify a court's closer scrutiny of attorney performance at the sentencing phase."). Counsel's performance is judged "by reference to 'prevailing professional norms,' which in capital cases include the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases[.] 'Among the topics defense counsel should investigate and consider presenting include medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experiences, and religious and cultural influences.'" *Hooks v. Workman*, 689 F.3d 1148, 1201 (10th Cir. 2012), *quoting Young v. Sirmons,* 551 F.3d 942, 957 (10th Cir. 2008).

### 1. Deficient Performance

In addressing the question of deficient performance, the Tenth Circuit observed that the Defendant had "presented a case that his defense team did little to investigate his background and mental condition . . . [I]t may never have hired a mitigation expert or a mental-health professional to assess Defendant's mental capacity" [and] "also apparently did little to investigate his background or mental health through his family." Barrett, 797 F.3d at 1225. Noting that any such omissions would ordinarily constitute deficient

performance, the Tenth Circuit proceeded to examine three explanations proffered by the government for such a strategy: (i) there was no reason to suspect the Defendant suffered from any mental impairment, and thus no need to investigate; (ii) the Defendant opposed such a mitigation strategy; and (iii) defense counsel developed a reasonable mitigation strategy without such investigation. *Id*. at 1225-1226. Finding these explanations doubtful on the existing record, the Tenth Circuit determined that the case should be remanded for an evidentiary hearing and further factual development. *See, e. g., Barrett,* 797 F.3d at 1228 ("We express no opinion on the issue; an evidentiary hearing can resolve the matter.").

Lack of Mitigation Expert/Background Investigation. The record before the Tenth Circuit as well as the evidence presented at the evidentiary hearing before this Court is consistent with the Tenth Circuit's observations that the Defendant's attorneys apparently never hired an expert on the issue of mitigation or otherwise themselves investigated the Defendant's mental health history or family background. *See, e. g., Barrett,* 797 F.3d at 1225 ("Additional evidence further supports Defendant's assertion of a lack of effort to retain mitigation expertise."). The undersigned Magistrate Judge therefore finds that the Defendant's attorneys neither retained any experts to assist in the investigation or presentation of mitigation evidence nor investigated that avenue of defense themselves.

Any analysis on this point must begin with the procedural history of the case prior to the indictment of the Defendant herein. The Defendant was tried twice for capital murder in the District Court of Sequoyah County for the episode giving rise to the charges in this case. The first trial resulted in a hung jury and the second in a manslaughter conviction. Attorney John Echols represented the Defendant at both trials, and was initially appointed

lead counsel (along with attorney Roger Hilfiger) to represent the Defendant in this case. Mr. Echols retained Roseann Schaye to serve as the mitigation investigator prior to the first state court trial (Tr. 428-429), but eventually settled on investigator Steve Leedy of the Oklahoma Indigent Defense System (Tr. 431). Mr. Echols also retained psychologist Dr. Jeanne Russell for an assessment as to future dangerousness, but she did not perform any comprehensive mental health evaluation or otherwise act as a mitigation investigator in the state court trials (Tr. 440, 444-45). Ultimately, no mitigation evidence was needed at the state court trials, as the Defendant was not convicted of any capital crime.

Mr. Echols sought leave to withdraw from representation of the Defendant in this case early in the proceedings. Mr. Hilfiger became lead counsel, and attorney Bret Smith was appointed to assist him. At the evidentiary hearing, Mr. Hilfiger testified that Mr. Echols initially provided the strategic planning for the Defendant's trial in this Court because he had done so for the two previous state court trials (Tr. 664). Billing records filed prior to Mr. Echols' withdrawal indicate that he requested authorization and funding for a mitigation investigator, *see* Case No. CIV-04-115-JHP, Docket Nos. 46, p. 4, & 97, p. 3, which was approved by the Court, and that Inquisitor, Inc. was chosen for this purpose (Tr. 672). Mr. Echols also requested an evaluation of the Defendant for organic brain dysfunction. But Mr. Hilfiger testified that he never had any contact with Inquisitor, Inc. (Tr. 672), and he decided after Mr. Echols withdrew that an evaluation for organic brain dysfunction was unnecessary as nothing in his interaction with the Defendant gave him any concerns about his mental capacity (Tr. 666, 676, 684). Mr. Hilfiger indicated that he

disagreed with Mr. Echols' "shotgun approach" to defense of the case in any event, preferring instead his own "more specific" approach (Tr. 685).

Mr. Hilfiger's billing records from June 29 and July 18, 2005 reflect that Mr. Hilfiger discussed a mitigation expert with Mr. Smith, but Mr. Hilfiger had no independent recollection of the substance of the conversation (Tr. 714-716). *See* Pet. Hr'g Ex. 72. Mr. Hilfiger did recall meeting with Dr. Russell and Mr. Smith in August 2005, but could not recall the exact details of the meeting (Tr. 721). It was his testimony that they discussed her continuing with and completing an updated risk assessment with regard to the Defendant's future dangerousness (Tr. 725). Mr. Hilfiger recalled that Dr. Russell did not believe her actual testimony at trial would be beneficial, because she believed the government's rebuttal would be detrimental to the Defendant (Tr. 726). In reviewing billing records and who he interviewed between the two phases of trial, Mr. Hilfiger testified that their strategy became the use of live witnesses, rather than opinions from experts such as Dr. Russell, with regard to the Defendant's future risk of danger (Tr. 737).

When asked why they did not hire a mitigation expert, Mr. Hilfiger testified that he did not believe it would do the defense any good because they had previous reports and live witnesses to testify (Tr. 739). Although Mr. Hilfiger testified that he believed he had access to these reports, he generally had no recollection of them and there is no indication he acted upon any of the information in them. Moreover, he did not recall any family members discussing a possible mental illness with regard to the Defendant, nor any information regarding possible head injuries (Tr. 738). Rather, he testified that the mitigation strategy included informing the jury that the Defendant had already been

-6-

convicted in state court, in order to garner sympathy or empathy since he was already convicted and serving time for the same thing (Tr. 747-748). They also called jailers and prison guards to talk about the Defendant's conduct and demonstrate he was not a future danger to anyone within the prison (Tr. 749). Mr. Hilfiger recalled that the Defendant did not want the defense team to "beg for his life," but he did not recall the Defendant saying he preferred a death sentence over a life sentence (Tr. 753-754).

Mr. Hilfiger had no independent recollection of a psychological evaluation done by Bill Sharp, Ph.D. in 2002, or any of Roseann Schaye's reports, although he seemed to believe he likely had received them from Mr. Echols, he had access to them, and would have reviewed them (Tr. 705, 688, 695-697). Dr. Sharp concluded in his evaluation that, *inter alia*, the Defendant follow up on the possibility of organic neurological damage, and that he seek mental health services. Gov't Hr'g Ex. 16. Nevertheless, Mr. Hilfiger did not believe there was a need for an expert on diagnosing organic brain disorders, because "we didn't see any need to." (Tr. 739-740).

Mr. Smith's testimony at the evidentiary hearing confirmed that the defense team did not hire any mitigation expert to assist in preparing for a penalty-phase presentation. He testified that upon first meeting with Mr. Echols, he thought "a mitigation specialist was required from his reading of the guides" and "at a minimum this case required two trial lawyers, an investigator and a mitigation specialist" (Tr. 524), but felt it was not his to lead in the case but rather to assist Mr. Hilfiger (Tr. 634). Mr. Smith added that Mr. Hilfiger planned to rely on what Mr. Echols had done in the state court trials and believed that a mitigation case could be "whipped into shape for trial" (Tr. 527). Though they were

planning to use the preparation work done in the state court cases as a starting point for developing mitigation evidence, they apparently did not believe there was no duty on their part to develop a mitigation strategy (Tr. 538).

When asked about whether he considered mental health problems as mitigating evidence for the Defendant, Mr. Smith noted that the Defendant had been through two previous state trials with no concerns regarding his *competence*, and he repeatedly stated a belief that the Defendant's mental condition would have been explored prior to his entry into the case in May 2005 (Tr. 533-534, 573, 604). Mr. Smith characterized the Defendant as a person who had "good recall," and knew "a lot of details about his case that [Mr. Smith was] interested in hearing" (Tr. 552). He testified that, in his interactions, he never experienced the Defendant as having "serious mental health problems," but offered no opinion on the Defendant's background (Tr. 555). He was not familiar with Dr. Sharp's report, either (Tr. 555-556).

Mr. Smith recalled the meeting with Mr. Hilfiger and Dr. Russell in August 2005. They discussed pursuing a mitigation strategy based on the Defendant's dangerousness, rather than pursuing a "full-blown mitigation strategy" (Tr. 559). His understanding was that in general a mitigation specialist performs an investigation including the history of the defendant and family members (including extended family) that encompasses, *inter alia*, health, background, and education, but that Dr. Russell's scope of work in *this* case was limited to the issue of future dangerousness (Tr. 562-563). As part of that limitation, Mr. Smith recalled that Dr. Russell did not have the time to do the work of a mitigation specialist, asserting, "I don't think anybody had an idea when we left that meeting that she

was our mitigation specialist." (Tr. 563). Referring to Dr. Russell's report, he interpreted it as stating that "nothing in [her interview of the Defendant] indicated to [her] that Kenny is nuts . . . It doesn't exclude the fact that he may have some underlying mental health issues that meet these psychological criteria." (Tr. 569). Mr. Smith also indicated that he and Mr. Hilfiger were concerned about potential testimony from Dr. Randall Price, a government expert, as to the dangerousness of the Defendant, and that conversations with Dr. Russell helped steer them away from any evidence that might implicate his testimony (Tr. 610). During the penalty phase, the mitigation strategy thus included establishing the unfairness of the federal prosecution (after the state-court prosecution), as well as the Defendant's lack of dangerousness (Tr. 613).

Dr. Russell's testimony makes clear the extent to which she was to provide assistance as mitigation evidence. She testified that she had never worked a mitigation investigator for a criminal defendant in any type of case, capital or otherwise (Tr. 768-769). She first met the Defendant in 2003 when Mr. Echols asked her to conduct a risk assessment on the Defendant, which involved determining in what situations or context a person will be dangerous (Tr. 769-771). She did not conduct a comprehensive mental health examination of the Defendant, but would have testified as to future dangerousness of the Defendant in the state court trials had there been a penalty phase (Tr. 772-773, 790-791). She met with Mr. Hilfiger and Mr. Smith in August 2005 and agreed to do an updated risk assessment and to help prepare cross-examination for the guilt phase of the trial (Tr. 774). Counsel

asked her about serving as a mitigation investigator, but she declined (Tr. 769, 775-776).[1] In her opinion, a competent mitigation investigation would not just be a risk assessment or an updated risk assessment (Tr. 791).

In summary, the undersigned Magistrate Judge finds that the Defendant's federal trial counsel neither hired a mitigation or mental-health professional nor attempted to investigate themselves in any depth the Defendant's mental health or family background. The undersigned Magistrate Judge next turns to the reasons offered by the government why such failures by defense counsel did not amount to deficient performance.

Reasons for Failure to Investigate. As noted by the Tenth Circuit, the government offers three reasons why the Defendant's trial attorneys' failure to investigate his mental health history or family background was not deficient performance: "first, they had no indications that Defendant suffered from a mental impairment, so there was no reason to pursue that line of inquiry; second, Defendant opposed a mitigation strategy based on personal sympathy or his childhood; and third, they already had a reasonable mitigation strategy." *Barrett*, 797 F.3d at 1226. Taking each of these arguments in turn, the undersigned Magistrate Judge first addresses the Government's argument that there was no reason to pursue a line of inquiry related to mental impairments.

The testimony and declarations by Mr. Hilfiger and Mr. Smith state that their interactions with him made them feel there was no need to go further. *See* Gov't Hr'g Exs.

---

[1] Dr. Russell originally testified that she was not asked to serve as a mitigation investigator, but upon having her recollection refreshed by a 2009 affidavit, she recalled that she was asked by Mr. Hilfiger and Mr. Smith to serve as a mitigation investigator and declined (Tr. 775-776).

1-2.  But this ignores the evidence available to them in records from Mr. Echols and from the state court mitigation investigation by Steve Leedy indicating the Defendant's personal history included head injuries, a suicide attempt in 1986 and another mental health hospitalization in 1995, and a tumultuous childhood that included impermanence, violence, and substance abuse, as well as the Defendant's extended family history which included generations of suicide attempts, volatility, substance abuse, and other mental health problems.  Mr. Hilfiger testified that he met with family members but that they did not volunteer information about past head injuries, nor is there any indication in the record that he inquired on any of these subjects, and Mr. Smith testified that while he met with members of the Defendant's family, he did not interview them on the issues a mitigation specialist would have (Tr. 572, 738).  Rather, their testimony indicated that they believed the Defendant was competent, and that they looked no further with regard to mental impairments or organic brain injury.  This was error.  *See Littlejohn v. Trammell*, 704 F.3d 817, 860 n. 23 (10th Cir. 2013) ("[W]here there are credible, reasonably discernable clues that a capital defendant's circumstances will support a mitigation theory based on organic brain damage, it is at the core of a defense counsel's constitutional responsibilities to conduct a reasonable investigation into the existence of evidence to validate or bolster such a theory and, ordinarily, to present such evidence to the jury, if it is found.").  The Tenth Circuit makes clear that the issue is whether they even asked these questions in an attempt to discover mitigating evidence, and the undersigned Magistrate Judge finds that they did not.  *Barrett*, 797 F.3d at 1226, *citing Cole v. Trammell*, 755 F.3d 1142, 1161 (10th Cir. 2014) ("[b]ecause 'family and social history' is one of the crucial areas of investigation

emphasized in the ABA Guidelines," the Court assumes that a failure to contact family members was constitutionally deficient performance.).

In fact, nothing in counsels' testimony indicates that they ever asked about "Defendant's mental health, background, or family history." *Id.* This is borne out further by Mr. Hilfiger's testimony, where he testified that although he did not recall that Mr. Echols had advised him about what he ought to do regarding mental health experts (as Mr. Echols testified that he did (Tr. 490-491, 693)), he was aware of the requests for an expert on an organic brain disorder and disagreed with Mr. Echols's opinion that they were necessary (Tr. 683-684). For his part, Mr. Smith does not recall being aware of the request for an expert in the area of organic brain dysfunction, or history of head injuries, although he was aware of the Defendant's 1986 suicide attempt (Tr. 578-579). He nevertheless agrees that he had access to all of Mr. Echols's files, which included a substantial amount of evidence relevant to mitigation (Tr. 531-532, 534, 574, 687-688). *See also Barrett*, 797 F.3d at 1226-1227. Moreover, we know that Mr. Hilfiger and Mr. Smith were in possession of Dr. Russell's original risk assessment at least as early as August 2005 when they met with her originally, as well as the updated risk assessment done for the federal trial, both of which set out in detail the records upon which she relied, including, *inter alia*, the 1986 hospital records, the 1995 hospital and mental health records, and reports from Ms. Schaye and Dr. Sharp (Tr. 544-545, 718-719, 722). *See also* Gov't Exs. 34, pp. 1-2 & 35, pp. 8-9. As such, the undersigned Magistrate Judge finds that there was sufficient evidence and indication for them to pursue an investigation into the Defendant's background, family history, and mental health, and that Mr. Hilfiger and Mr. Smith chose not to do so.

Furthermore, their actions were contrary to 2003 Supreme Court precedent which holds that failing to conduct an investigation was unreasonable where "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (describing as a "well-defined norm" that "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'") (emphasis in original), *quoting* ABA Guidelines for the appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) p. 93 (1989). *See also Strickland*, 466 U.S. at 690-691 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

The Government's position seems to be that Mr. Hilfiger and Mr. Smith's actions were not deficient because they could not tell the Defendant had a mental impairment, *i. e.*, he was competent (Tr. 604). But as the Tenth Circuit has stated:

> While counsel is afforded a great amount of deference in presenting a defense, *see Danny Hooks*[ *v. Workman,* 606 F.3d 715, 723 (10th Cir. 2010)], the failure to investigate a compelling mitigation theory can constitute ineffective assistance, *see Anderson*[ *v. Sirmons*, 476 F.3d 1131, 1145 (10th Cir. 2007)]. "[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." *Wiggins,* 539 U.S. at 523, 123 S. Ct. 2527. And, in making this determination, we cannot rely on "hindsight." *Rompilla*[ *v. Beard*, 545 U.S. 374, 381 (2005)]. Instead, we examine the reasonableness of "counsel's perspective at the time investigative decisions are made." *Id.* (quoting *Strickland,* 466 U.S. at 689, 104 S. Ct. 2052).

*Littlejohn v. Trammell*, 704 F.3d 817, 862 (10th Cir. 2013) (emphasis in original) (internal quotation marks omitted). *See also Wilson v. Sirmons,* 536 F.3d 1064, 1084–85 (10th Cir. 2008) ("First, the question is not whether counsel did *something;* counsel must conduct a full investigation and pursue reasonable leads when they become evident. Second, to determine what is reasonable investigation, courts must look first to the ABA guidelines, which serve as reference points for what is acceptable preparation for the mitigation phase of a capital case. Finally, because of the crucial mitigating role that evidence of a poor upbringing or *mental health problems* can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence.") (emphasis added), *citing*, *inter alia*, *Rompilla*, 545 U.S. at 387 n.7; *Wiggins*, 539 U.S. at 524. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington,* 466 U.S. at 690–691. Thus, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms. We long have recognized that prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . . Although they are only guides and not inexorable

-14-

commands, these standards may be valuable measures of the prevailing professional norms of effective representation, especially as these standards have been adapted to deal with the intersection of modern criminal prosecutions and immigration law." *Padilla v. Kentucky*, 559 U.S. 356, 366-367 (2010) (internal quotations and citations omitted).

Moreover, the undersigned Magistrate Judge finds that the concerns regarding the government's rebuttal evidence in the form of Dr. Price were not sufficient to forego an entire mitigation *investigation*. *Eaton v. Wilson*, 2014 WL 6622512, at *155 (D. Wyo. Nov. 20, 2014) ("The significant mitigation evidence presented to this Court, through lay and expert testimony, was not discovered, and if discovered, not utilized by Mr. Skaggs and the trial team. This lack of discovery and/or lack of use was apparently based on a concern an in-depth investigation might "open the door" to presentation of adverse information, arguably through the *possible* cross-examination of the potential mitigation witnesses. This type of mitigation investigation is inevitably ineffective as a judgement as to whether potential mitigation evidence will be helpful or harmful is not possible when there is absolutely no knowledge or understanding, based on a reasonable investigation, of the nature and character of the potential evidence. This is why a 'counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.'"), *quoting Wiggins,* 539 U.S. at 522, *quoting Williams v. Taylor,* 529 U.S. 362, 396 (2000).

-15-

Next, the Government asserts that Mr. Hilfiger and Mr. Smith were constrained in their mitigation investigation by the Defendant himself, who did not want them to beg for his life. This was supported by statements in declarations by Mr. Hilfiger and Mr. Smith, presented by the Government. Gov't Hr'g Exs. 1-2. However, neither Mr. Hilfiger nor Mr. Smith testified they were constrained in such a fashion by the Defendant with regard to their mitigation strategy. There *is* evidence that the Defendant changed his mind from time to time, but ultimately after Mr. Echols withdrew from the case the Defendant instructed Mr. Hilfiger to "try [his] hardest to beat this." *See* Docket No. 71, Ex. 26. Mr. Hilfiger recalled that the Defendant did not want them to beg or plead for his life, but he did not recall the Defendant expressing a preference for the death penalty over a life sentence (Tr. 753-754). In fact, the Defendant was cooperative, particularly with Mr. Smith who stated that the Defendant "impressed [him] as among the most cooperative criminal defense clients [he had] ever had." (Tr. 547, 600). Neither of the attorneys recalled specific conversations with the Defendant regarding a mitigation investigation, its purpose, and how it would be used (Tr. 634-635, 715-718). Rather, most of their testimony regarding mitigation work revolved around their August 2005 meeting with Dr. Russell and her subsequent contributions to their defense. Additionally, both Mr. Hilfiger and Mr. Smith referred to the work done in the previous state court trial as explanation for their actions, indicating a belief that they could "build on" what had previously been done (Tr. 527, 685).

As part of the Government's argument regarding the Defendant's constraints on their mitigation efforts, the government also references the Defendant's outburst in the

middle of the Prosecution's penalty-phase closing argument. However, both Mr. Hilfiger and Mr. Smith seemed to consider the Defendant's outburst an aberration, and related to ensuring that the focus of the trial was him and not his family members. Gov't Hr'g Exs. 1-2. Mr. Smith also testified that the Defendant had not wanted his ex-wife to testify, and Mr. Smith believed that the Defendant felt sorry about their past and did not want to further involve her or embarrass her (Tr. 633). But this opinion regarding his ex-wife and discussion of his family members is easily distinguishable from a complete opposition to any mitigating evidence or investigation. And startling though the outburst itself may have been at the time of trial, it is not conclusive evidence that the Defendant opposed an entire mitigation strategy, nor did Mr. Hilfiger and Mr. Smith attempt to make such an assertion at the evidentiary hearing. Furthermore, no additional evidence or testimony as to the outburst was presented at the evidentiary hearing in support of this argument. In any event, the undersigned Magistrate Judge finds that Mr. Hilfiger and Mr. Smith were not so constrained by the Defendant that they were prevented from even considering or conducting a mitigation investigation into the Defendant's background and mental health status.

Finally, the government asserts that the Defendant's attorneys made an alternative choice with regard to the mitigation strategy, *i. e.*, that he would be presented as a loving family member and that he posed no future danger in prison. But as the Tenth Circuit noted, "an uninformed choice is not a reasonable tactical decision." *Barrett*, 797 F.3d at 1228. The evidence adduced at the hearing supports a finding that the "alternative mitigation strategy" used by the Defendant's trial counsel was made not after a reasonable

investigation but rather was done out of expedience. *Barrett*, 797 F.3d at 1228-1229 ("[A] decision to focus on one potentially reasonable trial strategy [cannot be] justified by a tactical decision when counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."), *quoting Sears v. Upton*, 561 U.S. 945, 954 (2010).

In summary, the undersigned Magistrate Judge finds no merit in any of the reasons offered by the government as justification for the failure of defense counsel to investigate the Defendant's mental health history or family background (whether by professionals or otherwise). The undersigned Magistrate Judge therefore concludes that the defense team rendered constitutionally deficient performance in developing a mitigation strategy.

### 2. Counsel's Deficient Performance Prejudiced the Defendant

"If we find that counsel's performance at sentencing was deficient, we must then analyze the prejudicial effect on [the] defense." *Hooks*, 689 F.3d at 1202. The Supreme Court has stated that "the *Strickland* inquiry requires . . . probing and fact-specific analysis" that "will necessarily require a court to 'speculate' as to the effect of the new evidence— regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears v. Upton*, 561 U.S. 945, 955-956. However, "[i]n judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla*, 545 U.S. at 381, *quoting Strickland*, 466 U.S. at 689, 691. Furthermore, "we must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the

prosecution's response to that evidence would have been." *Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013).

"To assess [the] probability [that the Defendant would have received a different sentence], we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009), *quoting Williams v. Taylor*, 529 U.S. 362, 397-398 (2000). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial; it does not require that the petition show that counsel's deficient conduct more likely than not altered the outcome in the case." *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (internal quotations and citations omitted). On the issue of prejudice, the Tenth Circuit found that the proffered mitigation evidence was sufficient for an evidentiary hearing.

Specifically, the Tenth Circuit noted that the expert opinions of Dr. Bill Sharp, Dr. Myla Young, and Dr. George Woods required additional findings at the evidentiary hearing. Additionally, the Tenth Circuit found, *Barrett*, 797 F.3d at 1229-1230, and it was again demonstrated at the evidentiary hearing, that the Defendant had a long family history including mental health problems going back to great-great grandparents, and that the Defendant's own immediate family included parents who were violent with each other, and whose relationship was characterized by infidelity and ultimately divorce, as well as both engaging in alcohol abuse. *See* Pet. Hr'g Exs. 1, 3, 5, 20, 27, 34, 36, 45-46, 48-50, 56-57. As such, the Defendant's childhood was characterized by early exposure to alcohol and alcohol abuse, as well as physical and emotional abuse and neglect. The record further

reflects that the Defendant himself was developmentally delayed, repeated the eighth grade while in special education classes, and began consuming alcohol, tobacco, and illegal drugs somewhere between the ages of eleven and fourteen. *Barrett*, 797 F.3d at 1229-1230. The Defendant dropped out of school in the ninth grade, ostensibly over a dispute with the principal related to cutting his hair (Tr. 285). *See also* Pet. Hr'g Ex. 55. Furthermore, the Defendant was hospitalized twice in 1986 following a suicide attempt, and again in 1995 after he reported he was afraid he was losing his mind. Pet. Hr'g Exs. 6, 51, 102; Gov't Hr'g Exs. 4-6, 8-9, 11. Additional testimony was presented to suggest that the Defendant was hit in the head with a steel ball as a child, and was beaten by police officers at the age of seventeen (Tr. 213, 334, 335-336). In addition to the above evidence that was readily available to Mr. Hilfiger and Mr. Smith, the Petitioner presented the following evidence and testimony with regard to the claimant's mental impairments and judgment.

Bill Sharp, Ph.D. On September 28, 2002, Dr. Bill Sharp conducted a psychological examination of the claimant, which has been made part of the record. Govt. Hr'g Ex. 16. Upon exam, he found that the claimant had average intellectual ability, but that judgment and insight "would range from only fair to good." *Id.*, pp. 5-6. More specifically, Dr. Sharp noted that the claimant's reading was consistent with his education, but that his spelling and arithmetic were "considerably below" his education level. *Id.* at p. 6. Dr. Sharp assessed the claimant with amphetamine dependence, cannabis dependence, and alcohol dependence, each in sustained full remission in a controlled environment; nicotine dependence in early partial remission in a controlled environment; rule out learning disorder not otherwise specified; and rule out attention-deficit/hyperactivity disorder,

predominantly hyperactive-impulsive type. Additionally, he found that the claimant had avoidant personality disorder and paranoid personality disorder, and he included a rule out organic impairment relative to tremor and long-term memory difficulty. *Id.* at p. 7. Among Dr. Sharp's recommendations was that the Defendant should pursue the possibility of organic neurological damage, as well as mental health services to address the existence of obstructive personality related issues and/or family-of-origin related issue. *Id.* at p. 8.

<u>Dr. George Woods</u>. Dr. George Woods is a physician specializing in psychiatry and neuropsychiatry (Tr. 177). In 2009, he examined the Defendant over two days at the federal prison in Terre Haute, Indiana, conducting, in his opinion, the first "comprehensive psychiatric examination" in this case (Tr. 184-185). He also examined the Defendant again in January 2017 in preparation for the evidentiary hearing. At the evidentiary hearing, Dr. Woods testified that he found the Defendant's family history significant in the following ways: a long history of suicidal behavior and completed suicides going back three or four generations, family history of bipolar disorder and depression going back three or four generations, two family members hospitalized for behaviors consistent with the Defendant, and a long history of hypersexual behavior (Tr. 189). In addition, Dr. Woods testified that the Defendant's mother drank while pregnant with him, and that he suffered a series of head injuries, including being hit in the head with a steel ball as a child and a physical assault which caused a loss of consciousness when he was seventeen, in addition to the fact that he had a learning disability (Tr. 212-213, 335-336, 337). Dr. Woods also discussed the differences that can arise between siblings with the same parents, and agreed that the

Defendant and his brother, Stephen, had significantly different structure and support in their upbringing, which can make a difference (Tr. 349).

As to his evaluation of the Defendant, Dr. Woods diagnosed the Defendant with bipolar disorder and post-traumatic stress disorder, while noting that about 65% of people who carry a diagnosis of chemical dependency also meet the criteria for bipolar disorder (Tr. 191, 193, 219). He further stated that the Defendant's own description of chemical dependency was consistent with self-medication (Tr. 205). Dr. Woods pointed out that, in addition to his noted drug use, the Defendant was also given psychiatric diagnoses in his three previous hospitalizations (Tr. 196-197). Dr. Woods testified that the Defendant's mental impairment of bipolar disorder was thus distinguishable from his drug use in that recognizable symptoms of pressured speech and depression were not results of the drug use (Tr. 200-201). On cross-examination, however, Dr. Woods agreed that neither Dr. Russell, Dr. Faust Bianco, Dr. Kathy LaFortune (who each examined the Defendant prior to the federal trial), nor anyone from the Bureau of Prisons which had housed the Defendant since the federal trial, had diagnosed the Defendant with bipolar disorder (Tr. 299-300). And in discussing the 1995 discharge from Bill Willis Community Hospital, he agreed that the discharge diagnosis was not bipolar disorder, but organic affective disorder, which he described as "an excellent diagnosis, because what they are saying is, this person has an organic brain problem and they have a mood disorder" and characterized this diagnosis as a "more accurate diagnosis than even bipolar" (Tr. 360-361).

Dr. Woods further found that the Defendant could not rationally assist his attorneys in the preparation of his defense, and he stood by that assessment at the evidentiary hearing

(Tr. 314-315). In support, he relied on the Defendant's statements (continued to the present) that he was defending himself and his son when Trooper Eales was shot and killed, which Dr. Woods attributed to his (in)ability to distinguish right from wrong (Tr. 350-351).

<u>Dr. Deborah S. Miora</u>. At the evidentiary hearing, neuropsychologist Dr. Deborah Miora testified that she reviewed neuropsychologist Dr. Myla Young's report on the Defendant after Dr. Young passed away in 2013 (Tr. 1143). Dr. Young had administered a battery of tests regarding different brain functions, and Dr. Miora reviewed and re-scored them (Tr. 1152-1153). Dr. Miora testified that a neuropsychological evaluation was implicated by factors including the Defendant's mother's drinking while she was pregnant with him, learning disorders in his childhood, multiple reports of head injuries, and the 1986 suicide attempt, as well as the circumstances of the offense in the present case (Tr. 1169-1174). In Dr. Miora's opinion, Dr. Young administered a normatively appropriate and comprehensive battery of tests as to the Defendant's variety of brain functions (Tr. 1176).

Dr. Young's testing was done at the federal prison in Terre Haute in a face-to-face interview room, the Defendant was not shackled for the assessment, and Dr. Young described the Defendant's manner as "hypomanic," meaning pressured or fast (Tr. 1178, 1182). Dr. Miora testified that verbal comprehension, verbal expression, and verbal memory were areas of strength for the Defendant, while areas of weakness included problem solving, abstract reasoning, attention, planning, tasks that required him to inhibit

one response in favor or another, and working with information in the moment or on his feet (Tr. 1200).

Dr. Miora testified that the Defendant's full-scale IQ score on the WAIS-IV was 82, which was the 12th percentile, or low average (Tr. 1205). She noted that his processing speed was "significantly lower" than other index speeds, at 65, which falls into the first percentile (Tr. 1207-1208). She testified that this meant that the IQ score was "probably not an adequate representation" of the Defendant's capability (Tr. 1208). In referring to other subcategories of testing, Dr. Miora stated that "[t]he take away is that he has difficulty in – he has shown to have difficulty in pressured situations where he has to visually attend to what is going on and generate a response." (Tr. 1219). On cross-examination, the government pointed out that Dr. Miora had been missing a page in aid of scoring the WAIS-IV, which had resulted in a different score between Dr. Young and Dr. Miora such that Dr. Young had placed the Defendant in the borderline range for processing speed, at the fifth percentile, rather than the severely impaired range, or first percentile, as Dr. Miora had found (Tr. 1294-1295). When it was pointed out, Dr. Miora agreed that that this would account for the difference in their scores, but testified that it was a slight difference that was not significant, or that it was "bupkis" (Tr. 1296-1297). The undersigned Magistrate Judge notes the Government's objection to the use and administration of the WAIS-IV because the WAIS-III would have been the available test at the time of the federal trial (Tr. 1185-1186), but nevertheless allows the admission of the WAIS-IV test results because they would be admissible should a new sentencing hearing be granted. Moreover, Dr. Miora testified that the testing done by Dr. Young was a fair representation of the

Defendant's functioning at the time of the evaluation in 2009, and that she was not aware of any pathology or injury that would change his functioning from 1999 until 2009 other than the fact that he was no longer under the influence of drugs, which in her opinion would only improve his performance (Tr. 1352-1353).

Other tests administered were also suggestive of brain injury. On the Wide Range Achievement Test, Dr. Miora noted a disparity between academic functioning and intellectual ability, which she stated was suggestive of a learning disability (Tr. 1225). As to the Defendant's executive functioning, Dr. Young administered the Delis-Kaplan Executive Function System, which is comprised of a battery of tests ("D-KEFS") (Tr. 1225-1226). Based on this battery of tests, Dr. Miora testified that the results of the D-KEFS indicated that the dorsal lateral and orbitofrontal areas of the brain were damaged (Tr. 1235). Dr. Miora then opined that in extreme stress, the Defendant "would be inclined to make errors" (Tr. 1240-1241). On the Wisconsin Card Sorting Test, Dr. Miora testified that the Defendant was unable to perform any of the sorting tests, placing him at less than the first percentile (Tr. 1241-1245). As to the Short Category Test, Dr. Miora testified that the Defendant again tested at less than the first percentile, which was consistent with the Wisconsin Card Sorting Test (Tr. 1246-1247).

Dr. Miora testified that the results of these tests indicated impairments in multiple areas of the brain, including "the temporal region, the frontal region, [and] some of the frontal subcortical circuitry" (Tr. 1249). She noted, however, that this testing was performed in 2009 in a structured setting in which the Defendant was "ostensibly more substance free" than when he was not in prison, meaning that the testing resulted in "a

-25-

better brain than we might have gotten" (Tr. 1250-1251, 1353). She further testified that the Defendant was moderately to severely impaired in the ability to inhibit responses in light of changing information, and that he would perform worse in situations where he was being fed information rapidly (Tr. 1251). She said this was further demonstrated in the CVLT test, which indicated mild to moderate impairment when given new, changing information (Tr. 1252).

On re-direct, Dr. Miora testified that her finding that the Defendant has brain damage was based on test data, rather than records (or lack thereof) related to childhood injuries or reports from family members (Tr. 1343). She also characterized the Defendant as a person who is easily overwhelmed by changing visual information (Tr. 1348). When asked about the Defendant's perceptual impairments, she testified that methamphetamine would have further distorted the Defendant's visual attention, predicting his visual attention would likely have been worse than the test results showed with the addition of methamphetamine (Tr. 1354).

The undersigned Magistrate Judge thus finds that this evidence regarding the Defendant's brain could have had a "powerful mitigating effect" on the jury in this case. *Hooks*, 689 F.3d at 1205 ("Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect."), *citing Rompilla*, 545 U.S. at 392; *Wilson v. Sirmons*, 536 F.3d at 1094; *Smith v. Mullin*, 379 F.3d 919, 942–43 (10th Cir. 2004). As the Tenth Circuit has instructed, however, the undersigned Magistrate Judge has not "consider[ed] omitted mitigation evidence in a vacuum." *Wilson v. Trammell*, 706 F.3d at 1305. Rather, the undersigned

Magistrate Judge has considered the following evidence from the Government as to what the response would have been to the mitigation evidence presented. *Id.* at 1306 ("[W]e must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the prosecution's response to that evidence would have been.").

The Tenth Circuit accurately assessed that the Government's response surely would have challenged the Defendant's mental health diagnoses with the evidence related to his extensive drug use, including the evidence of drugs in his system on the night of the offense, as well as his volatile relationship that including physical violence with his ex-wife, and the denial of benefits from the Social Security Administration which found he did not have signs of a severe mental illness. *Barrett*, 797 F.3d at 1231-1232. However, the undersigned Magistrate Judge finds that, as the Tenth Circuit suggested, the jury *did hear* extensive testimony regarding the Defendant's drug use and his relationship with his ex-wife during both stages of the trial. *Id.* at 1232. Nevertheless, the question remained as to whether other mental health evidence from the Government might have been "devastating," particularly testimony from Dr. Randall Price. *Id.* At issue with Dr. Price's testimony was the possibility that he would be testifying that the Defendant was a psychopath, and at high risk of committing violent offenses if freed, which admittedly could have been a powerful counterpoint to the mitigation evidence. However, such testimony and evidence was not presented before the undersigned Magistrate Judge at the evidentiary hearing, although both Dr. Price and another expert psychiatrist testified.

Dr. J. Randall Price.  Dr. Randall Price is a licensed and board-certified forensic psychologist, who was originally retained by the Government in 2005 for the federal trial

(Tr. 813-815). He reviewed records including the Bill Willis Community Mental Health Center records, Wagoner Community Hospital records, school records, Dr. Russell's evaluations, and Dr. Sharp's evaluation, and he also noted that the claimant had problems with substance abuse in early adolescence, around the age of 13 (Tr. 826, 830). The interview took place while the Defendant was in custody, on October 13-14, 2005 (Tr. 832). At the evidentiary hearing in 2017, Dr. Price testified that the Defendant in 2005 exhibited elevated paranoia with regard to his circumstances, but was cooperative with the examination itself, which consisted of a clinical interview and history, based on a referral to conduct a psychological evaluation and offer opinions as to the risk the Defendant might pose in the future (Tr. 835-838).

At the evidentiary hearing, Dr. Price noted that the Defendant did not have symptoms of hyperactivity during the evaluation, and that he did have some trouble when it came to attention, but that the neuropsychological testing did not reveal evidence of a severe brain injury (Tr. 846, 863). Dr. Price found that the Defendant had average intellectual functioning and that there was not a significant difference between his verbal and nonverbal intellectual functioning (Tr. 867).

As part of his 2005 examination, Dr. Price administered the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"), a standardized test in which the Defendant scored in the 25th percentile with respect to immediate memory, 96th percentile on visual-spatial constructional ability, the 42nd percentile on language and language functioning, the 5th percentile on attention, and the 58th percentile on delayed memory (Tr. 868-873). Dr. Price testified that these results did not cause him any concerns

regarding the Defendant's neuropsychological functioning, and that they were consistent with his history (Tr. 875). However, he agreed on cross-examination that "his strength is very strong and his weakness is very weak," which was "out of ordinary" and "abnormal" (Tr. 905).

Dr. Price also administered the Personality Assessment Inventory ("PAI"), a self-reporting test, which indicated his perception of his problems as being due to substance abuse, as well as indications of depressive symptoms and paranoia (Tr. 876-877). On cross-examination, Dr. Price agreed that the Defendant scored in the 75th percentile (2.5 standard deviations above the mean) on the traumatic stress subscale, but he did not include a discussion of that in his report (Tr. 916). He likewise administered the MMPI-2, which indicated antisocial attitudes and behaviors, paranoid thinking or chronic suspiciousness, and concern with physical medical problems including pain and discomfort with his body (Tr. 877-879). Dr. Price ultimately diagnosed the claimant with a long-standing learning disorder, not otherwise specified; polysubstance dependence; dysthymic disorder; and personality disorder with antisocial and paranoid traits and features (Tr. 889-890). He provided no testimony or opinion as to whether the Defendant is a psychopath.[2]

Dr. Steven Pitt. Dr. Pitt is a board certified psychiatrist with additional board certification in forensic psychiatry, and he also testified at the evidentiary hearing on behalf

---

[2] Both Dr. Russell and Dr. Price had administered the Hare Psychopathy Checklist-Revised (PCL-R), to purportedly widely varying results. However, the Defendant did not put forth Dr. Russell's findings, and the government did not put forth Dr. Price's, at the evidentiary hearing. As such, the question of psychopathy was not at issue as part of the evidentiary hearing, and the undersigned Magistrate Judge has not considered it in these Findings and Recommendations.

of the government (Tr. 956). He interviewed the Defendant on January 17, 2017, at the federal prison in Terre Haute, Indiana, and the Defendant was interviewed while he was in restraints (Tr. 969-970). Dr. Pitt noted the Defendant's history of substance abuse, particularly around the time of the offense in September 1999, and that the Defendant himself reported that he was using drugs regularly at that time, specifically methamphetamine as well as marijuana (Tr. 974-975). Dr. Pitt testified that he reviewed records related to the Defendant's 1986 suicide attempt, which included a negative drug screen, and discharge diagnoses of marital problems, mixed substance abuse, and mixed personality disorder, but not a mood disorder (Tr. 976-981). He also noted the Social Security Administration's 1987 denial of benefits, which indicated that he was moderately depressed but had no signs of a severe mental illness (Tr. 982). *See also* Gov't Hr'g Ex.10.

He further noted that he reviewed the January 1995 Sequoyah Memorial Hospital records, which included a positive toxicology screen for amphetamines and THC, and the Defendant's subsequent transfer to Bill Willis Community Mental Health Center (Tr. 984-987). The records on admission contained a provisional diagnosis of bipolar disorder, but Dr. Pitt noted that the Defendant's *discharge* diagnosis was organic affective disorder, polysubstance abuse, amphetamine dependence, a urine drug screen positive for cannabis, and marital conflicts (Tr. 988). Contrary to Dr. Woods's testimony, Dr. Pitt testified that he believed the 1995 diagnosis of organic affective disorder was reasonable in light of the Defendant's substance use and for a substance-induced mood disorder, and that it was not related to head trauma (Tr. 990). As to the diagnosis of organic affective disorder, he stated that this "could have meant either a medical issue causing the mood problem, or it could

-30-

have meant a substance use issue" (Tr. 1081). He further testified that he believed the Defendant was appropriately diagnosed with a possible mood disorder in 1986 following his suicide attempt, but that he had no reason to find the claimant had bipolar disorder or PTSD (Tr. 993, 996).

In reaching his conclusions, Dr. Pitt also had the benefit of the Defendant's records from the Bureau of Prisons (BOP), which go to the Defendant's behavior after his conviction in the federal trial. Dr. Pitt considered these records an additional "data point" similar to the records prior to the offense, and which he found to confirm his opinion that the Defendant did not have a mental condition (Tr. 995-996). Furthermore, the BOP records contain a notation indicating that the Defendant had experienced no loss of consciousness in his life, which Dr. Pitt agrees was contrary to the Defendant's reports of multiple head injuries including two incidents in which he reported losing consciousness, as well as hospital records reflecting reports that the Defendant had lost consciousness (Tr. 997-1000, 1031-1032). He further testified that methamphetamine use could cause irritability, mood lability, and pressured speech, mimicking the effects of a mood disorder (Tr. 1003-1004). Dr. Pitt again stated that he rejected a diagnosis of bipolar disorder or PTSD because he felt that the Defendant's symptoms were better explained by the physiological effects of a substance or the physiological effects of a medical condition (Tr. 1006-1010).

Dr. Pitt is not a neuropsychologist and thus did not conduct a neuropsychological examination. Nevertheless, he noted the varying opinions as to whether the Defendant had brain damage and opined, "[T]o the extent that whatever that is that exists, I don't believe

-31-

it affects the totality of his behavior in the choices that he made around the time of the offense." (Tr. 1013). Dr. Pitt characterized the Defendant as someone "conversant with what constitutes unlawful behavior," and thought he could distinguish right from wrong at the time of the offense (Tr. 1014). He testified that he would diagnose the Defendant as of September 24, 1999 with amphetamine dependence with physiologic dependence, features of an antisocial personality disorder, cannabis dependence, and rule out learning disorder not otherwise specified (Tr. 1015). On cross-examination, Dr. Pitt conceded that the Defendant had "genetic loading," defined as multigenerational exposure to a problem, for mental illness and mood disorders, and that particularly his parents' problems placed him at increased risk for mood disorders, mental illness, and substance abuse disorder (Tr. 1023-1024). He also agreed that the Defendant came from a dysfunctional background that had elements of physical and emotional abuse (Tr. 1027-1028). Dr. Pitt further testified that, in looking at the features of different personality traits and the "totality of the information," this conclusion remained: "it's drugs, drugs, and more drugs" (Tr. 1120-1121). It was his opinion that "you can have substance-induced mood disorders that mimic drug use" and "[t]he idea is that . . . drug[s] can have people experience symptoms that are manic, depressed, or mixed." (Tr. 1123).

Based on all of the evidence and testimony presented, the undersigned Magistrate Judge thus finds that counsel's failure to put forth the previously-described evidence, in combination with his personal and family history, caused the Defendant prejudice. *See Sears*, 561 U.S. at 955–956 ("A proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence of Sears' 'significant' mental and

psychological impairments, along with the mitigation evidence introduced during Sears'
penalty phase trial, to assess whether there is a reasonable probability that Sears would
have received a different sentence after a constitutionally sufficient mitigation
investigation.") (citations omitted). *See also Wilson v. Trammel*, 706 F.3d at 1307 ("In
evaluating these claims of prejudice, we look to the testimony at the evidentiary hearing,
together with the exhibits offered in evidence at that hearing, to see what likely would
[have] been presented at trial if Defendant's counsel had done what he contends they should
have."). The evidence potentially available to the Defendant regarding his mental health
history and his family background would in all likelihood have aided substantially in
mitigation, and the rebuttal evidence provided by the Government would not appear to
have added substantially to the calculus of aggravation. *Porter*, 558 U.S. at 41 ("To assess
that probability [that the Defendant would have received a different sentence], we consider
the totality of the available mitigation evidence—both adduced at trial, and the evidence
adduced in the habeas proceeding—and reweig[h] it against the evidence in aggravation."),
*quoting Williams v. Taylor*, 529 U.S. at 397-398. Specifically, the undersigned Magistrate
Judge finds that the evidence and testimony from Dr. Price was not as "devastating" as
originally believed. Dr. Price offered no testimony or evidence that the Defendant was a
psychopath, nor did any other witness presented by the Government. As such, this most
potentially detrimental evidence is not a part of the undersigned Magistrate Judge's
reweighing of the evidence in aggravation. The undersigned Magistrate Judge therefore
finds that, based on *all* of the evidence presented both in mitigation and in aggravation,
there is a reasonable probability that the result of the penalty phase of the Defendant's trial

would have been different.  *See Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").  *See also Byrd*, 645 F.3d at 1168 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial; it does not require that the petitioner show that counsel's deficient conduct more likely than not altered the outcome in the case[.]") (internal quotations and citations omitted).

## CONCLUSION

In sum, the undersigned Magistrate Judge finds that the Defendant's counsel were deficient in their performance, which ultimately prejudiced the Defendant, and that the Defendant is therefore entitled to relief under 28 U.S.C. § 2255 and to a new sentencing hearing.  Accordingly, the undersigned Magistrate Judge recommends that the Petitioner be granted relief under 28 U.S.C. § 2255 and given a new sentencing hearing as set forth above.  Any objections to this Report and Recommendation must be filed within fourteen days.  *See* 18 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

IT IS SO ORDERED this 10th day of August, 2018.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma

-34-