**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S OBJECTIONS TO REPORT AND RECOMMENDATION**

**COMES NOW** the United States of America, by and through undersigned counsel and submits the following Objections to the Magistrate Judge's Report and Recommendation.

**STATEMENT OF THE CASE**

On September 24, 1999, Petitioner Kenneth Eugene Barrett ("defendant") fatally shot Oklahoma State Trooper David Eales, who – as part of a police Tactical Team ("Tac Team") – attempted to serve a warrant at the defendant's residence, which was used to manufacture and distribute methamphetamine.

In 2005, a petit jury empaneled in this district found Barrett guilty, as charged, on two counts of felony firearm murder (18 U.S.C. § 924(c)(1)(A)) and one count of killing a state law enforcement officer during the commission of a drug trafficking crime (21 U.S.C. § 848(e)(1)(B)). Following a bifurcated penalty trial, the jury recommended a death sentence, which the district court imposed. Case No. CR-04-115-JHP, Docket No. 285 ("TR Doc. 285"). On direct appeal, the Tenth Circuit Court of Appeals affirmed the judgment in a published opinion. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) ("*Barrett, I*"), *cert. denied*,

1

552 U.S. 1260 (2008). Following the affirmance, Barrett sought collateral relief under 28 U.S.C. § 2255, which the district court denied. Case No. CIV-09-105-JHP, § 2255 Docket Nos. 1, 214 ("§ 2255 Doc. 1, 214"). In a published opinion, the Tenth Circuit reversed on a single issue, remanding for an evidentiary hearing to assess trial counsel's effectiveness in investigating and presenting mitigating information. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015) ("*Barrett, II*"). Following that decision, Barrett sought permission to file a second collateral attack on his death sentence, which the Tenth Circuit denied in a third published opinion. *In re Barrett*, 840 F.3d 1223 (10th Cir. 2016 ("*In re Barrett*").

On remand, this Court received a referral to conduct the evidentiary hearing. Following six days of testimony,[1] the Court issued a Report and Recommendation that advised the district court to grant relief and a new penalty phase trial, based on a finding that trial counsel performed ineffectively and prejudicially. § 2255 Doc. 467 ("R&R"). These objections follow.

## ARGUMENT

### GIVEN BARRETT'S SUBSTANTIAL PLANNING AND PREMEDITATION OF THE MURDER, THE FORGONE MENTAL HEALTH EVIDENCE WOULD HAVE HAD NO IMPACT ON THE OUTCOME OF THE TRIAL

The government respectfully objects to the Court's prejudice analysis under *Strickland*. The Court did not evaluate the credibility of Barrett's mental health evidence. Rather, it appears to have considered that testimony, alongside the government's rebuttal evidence, as reliable for purposes of decision. The government's rebuttal evidence better explains Barrett's conduct than the theories advanced by his experts,[2] and no reasonable likelihood exists that a jury would have

---

[1] In view of this Court's familiarity with the facts giving rise to this litigation (R&R 2) and the testimony adduced before it, the government omits a recitation of the evidence.

[2] The Court premised its prejudice finding on trial counsel's failure to present mental health evidence, not on the absence of testimony by the defendant's relatives. The government limits the scope of these Objections to the Court's opinion, but notes that Barrett's relatives provided a

relied on that testimony. Moreover, the Court considered the impact of the omitted mental health testimony as if it had a nexus to the crimes of conviction. In fact, Barrett's mental health experts did not, and could not, explain his commission of this murder. Although the experts identified issues that supposedly compromised Barrett's ability to process information under pressure, the defendant had resolved to murder Trooper Eales long before the opportunity arose. Accordingly, the omission of mental health evidence, which merits little mitigating weight when divorced from the homicide, does not cast any doubt on the outcome of the penalty phase trial.

As the Court recognized, Barrett must demonstrate that the performance of his trial attorneys fell below an objective standard of reasonableness, and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To assess [the] probability [that the Defendant would have received a different sentence], we consider 'the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding' – and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000)). Furthermore, "we must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the prosecution's response to that evidence would have been." *Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013). The court must determine whether trial counsel's alleged errors resulted in a reasonable probability "'that at least one juror would have struck a different balance." *Grant v. Trammell*, 727 F.3d 1006, 1018-19 (10th Cir. 2013) (quoting *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)). "A reasonable probability is one that is

---

less-than-salutary view of the defendant, and one unlikely to have resulted in a more favorable verdict. *See, e.g.*, EH Tr. 70, 74, 92-93 (noting Barrett's drug use), 73 (noting Barrett's "chaotic" life), 91, 103, 117 (noting Barrett's violence).

'substantial, not just conceivable.'" *Id*. at 1019 (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

The expert testimony adduced by this defendant during the evidentiary hearing should receive little, if any, weight in any rebalancing of aggravators and mitigators.

A. Assessment of Reliability

The evidentiary hearing concerned testimony the defendant allegedly could have offered in mitigation during the penalty phase of his trial. Had Barrett adduced the supposedly forgone testimony at trial, the jury would have rejected it as incredible. This Court should do the same.

At trial, a capital defendant may submit any relevant mitigating evidence in support of a sentence less than death and has wide latitude to raise any aspect of his character, or record, or circumstance of the offense. *Roper v. Simmons*, 543 U.S. 551, 568 (2005); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982). In regard to theories of mitigation, the defendant must meet a burden of persuasion by a preponderance of the evidence. 18 U.S.C. § 3593(c); *United States v. Caro*, 597 F.3d 608, 612 n.4 (4th Cir. 2010). Simply put, the Constitution requires the jury's exposure to proffered mitigation evidence, but does not oblige the finding of any mitigator, even those supported by uncontradicted evidence. *United States v. Jackson*, 549 F.3d 963, 983 (5th Cir. 2008); *United States v. Higgs*, 353 F.3d 281, 327 (4th Cir. 2003). On collateral review, courts conducting evidentiary hearings may make credibility determinations regarding testifying witnesses. *See Griffith v. United States*, 871 F.3d 1321, 1330 & n.9 (11th Cir. 2017); *Earp v. Ornoski*, 431 F.3d 1158, 1169-70 (9th Cir. 2005). As such, this Court need not accept the credibility of evidence, even when descriptions of it caused an appellate court to order a hearing to consider it. *See Griffith*, at 1330 & n.9.

During the evidentiary hearing, the government offered two experts, Seven Pitt and J. Randall Price, who opined that Barrett did not suffer from the mental health conditions with which his own experts had diagnosed him, principally bipolar disorder and organic brain damage involving executive functioning.  The government offered this evidence to dispute the reliability and credibility of Barrett's experts, George Woods and Deborah Miora, not to support a theory of aggravation, alleged or otherwise.

The Court, however, rejected the government's evidence because it relied on Barrett's extensive drug use, about which the jury "did hear extensive testimony."  R&R at 27.  It further stated that the rebuttal evidence "would not appear to have added substantially to the calculus of aggravation." [3]  R&R 33.  The Court, however, failed to consider whether a jury would have credited Barrett's forgone mental health evidence in the first instance.  The government objects to the Court's conclusions, because Barrett's recreational drug use better explained his mental state at the time of the killing than the theories advanced by the defense.

As this Court has recognized, the government's experts explained Barrett's mental health, in simple vernacular: "drugs, drugs, and more drugs."  R&R 32 (quoting EH Tr. 1120-21).  More formally, Dr. Pitt found that Barrett "[e]xperienced psychiatric symptoms (mood swings and paranoid ideation), that were the byproduct of substance use and not the result of a mental disease or defect."  EH Gov't Ex. 52 at 69.  As Dr. Pitt, explained, Barrett's history of substance abuse precluded a diagnosis for bipolar disorder.  EH Tr. 988; *see* EH Tr, 1120-22 ("You can't be giving these diagnoses as the primary diagnosis without first giving strong consideration and mentioning and weighing heavily the chronic methamphetamine use").  And Barrett was hardly

---

[3] The government did not allege drug use as an aggravating factor, precluding reliance on such a theory at trial.  *See* 18 U.S.C. § 3593(d).

coy about his drug use, flatly informing Dr. Pitt, "there was no absence of drug use . . . . I've always used drugs . . . there was never a day that went by I wasn't [using]." EH Gov't Ex. 52 at 59. Indeed, as Dr. Pitt observed, Barrett himself attributed any history of manic episodes to his own abuse of intoxicants. EH Gov't Ex. 52 at 65.

Attempting to sidestep the intuitive conclusion that Barrett's mood varied with his drug ingestion, Dr. Woods opined that the defendant used drugs in an effort to self-medicate a mental health disorder. EH Tr. 204-05. Dr. Pitt, however, explained that Barrett had no access to drugs in federal custody but exhibited no symptoms of bipolar disorder. EH Tr. 1055. Dr. Pitt rejected any diagnosis of bipolar disorder premised on family history, as a mental health professional could not make such a determination if the symptoms were better explained by the physiological effects of a substance or a medical condition. EH Tr. 1006-08, 1016-26. Dr. Pitt also concluded that Barrett did not suffer from post-traumatic stress disorder: the defendant did not endorse the symptoms of the condition, and Dr. Pitt could not identify a threshold event that met the initial criteria for it. Tr. 1009-10, 1049-50.

For his part, Dr. Price diagnosed Barrett with a learning disorder, attention deficit/hyperactivity disorder, polysubstance dependence, mild depression, and a personality disorder with antisocial and paranoid traits and features. EH Tr. 889-90. Dr. Price specifically recognized that Barrett engaged in substance abuse, beginning in adolescence, as noted by mental health professionals who had treated him through the years. EH Tr. 829-31. Dr. Price's neuropsychological testing revealed no evidence that Barrett suffered from a severe brain injury. EH Tr. 863. Had Dr. Price observed any evidence of brain injury in Barrett, he would have re-evaluated him with more comprehensive assessments. EH Tr. 875.

The government experts' opinions were consistent with the findings of mental health workers who treated Barrett in non-forensic settings. At Sparks Regional Medical Center, where Barrett received treatment following a suicide attempt, the treating psychiatrist diagnosed the defendant with probable antisocial personality, drug abuse (marijuana with a history of hallucinogenic drugs), alcohol abuse, and probable major depressive disorder. EH Tr. 975-77. At Eastern State Hospital, the staff admitted Barrett with a diagnosis of marital problems, mixed substance abuse, alcohol abuse, and mixed personality disorder. EH Tr. 978-80; Gov't Exs, 3, 4, 5 & 6. On discharge from Eastern State Hospital, Barrett received diagnoses of marital problems, mixed substance abuse, and mixed personality disorder, but no mood disorder. EH Tr. 980-81. At Sequoyah Memorial Hospital, Barrett reported that he was "losing his mind," but a urine toxicology screen was positive for amphetamines and THC. EH Tr. 983-84; EH Gov't Ex. 11. The Social Security Administration rejected Barrett's application for benefits, finding he exhibited no signs of a severe mental illness. EH Tr. 982; EH Gov't Ex. 10. The government's evidence provided ample reason to reject the testimony of Drs. Woods and Miora.

The rebuttal aside, however, the evident exaggerations of the defense experts, both of whom had a long history of testifying only on behalf of the defense bar (*see* EH Tr. 259; EH Pet. Ex. 105), undermined the credibility of their findings. Dr. Woods described Barrett as exhibiting pressured speech, attentional deficits and "flight of ideas," (*see* EH Tr. 200, 224) but Dr. Pitt's videotaped interview with the defendant depicts Barrett exhibiting no difficulty attending to the conversation over a period of hours or responding in a logical, paced fashion. EH Gov't Ex. 52 video. Just as tellingly, Dr. Woods described Barrett as incompetent at the time of trial and unable to assist his counsel, but his trial attorneys described him as cooperative and helpful. *Compare* EH 314-15 (conceding an expert opinion that Barrett could not rationally assist his

counsel); *with* EH Tr. 547 (acknowledging a description of Barrett as "among the most cooperative criminal . . . defense clients I've ever had" and noting "He was very helpful during the trial to me. He knew as much about it as I did"), 665-66 (recalling no concerns about Barrett's ability to assist counsel); *see also* EH Gov't Ex. 38-40 (defendant's notes to counsel concerning case). Dr. Woods determined that Barrett was legally insane when he murdered Trooper Eales, as he could not differentiate right from wrong. EH Tr. 317-19. But Barrett specifically denied any such difficulty. EH Tr. 1014; EH Gov't Ex. 52 at 71-72.

Dr. Woods went so far as to assert that the effects of methamphetamine could not mimic symptoms of bipolar disorder (EH Tr. 330-31, 339), although his profession's *Diagnostic and Statistical Manual-V* states otherwise. EH Tr. 1006. Perhaps most incredibly, Dr. Woods maintained in the face of medical evidence to the contrary that the defendant did not regularly use drugs around the time he killed trooper Eales. *Compare* EH Tr. 307-08 (testifying "his toxicology screens were negative for methamphetamines."), 310 (testifying the medical records "do not reflect" daily methamphetamine use in 1999); *with* EH Gov't Ex. 7 at 2, 7 (Sept. 24-25, 1999 medical records noting "patient reports using . . . methamphetamine and marijuana"; "serum drug screening positive for cannabinoids, and positive for high levels of amphetamines"); EH Gov't Ex. 8 (1995 medical record noting amphetamine dependence).

Apart from Dr. Woods' self-evident deflections and exaggerations, Dr. Miora partially premised her diagnosis of dysexecutive syndrome on the Wisconsin Card Sorting test. EH Tr. 1218-22; 1360. But Barrett's performance on that test suggested either malingering or a failure to understand the exam. *Id.* Indeed, Barrett's performed so terribly on the test that Dr. Miora's predecessor, Dr. Young, correlated his performance with an inability to drive a car. EH Tr. 1323. For her part, Dr. Miora did not know whether Barrett could drive a car, though the trial

8

evidence clearly demonstrated he could. *Compare* EH Tr. 1324; *with* TR Tr. 4595-97; *see also* EH Gov't Ex. 36 (Barrett's driving record). Not only was Barrett demonstrably capable of driving, he presented evidence that he repaired cars. *See* TR Tr. 4929. In short, Dr. Miora's own evidence of a deficit in Barrett's executive functioning relied on test results inconsistent with the defendant's demonstrated abilities.

Given the obviously incredible opinions offered about Barrett's competence, sanity, and neurological functioning, this Court should reject the credibility of the defense experts in toto: the defendant's admitted drug use, as found by the government's experts, far better explains his behavior and mental state at and around the time of the murder.

B. <u>Assessment of Evidentiary Weight</u>

Assuming, arguendo, this Court credited the opinions of Drs. Woods and Miora, despite the indicia of incredibility noted above, the evidence still should not merit relief. In its Report and Recommendation, the Court did not analyze the expert testimony in reference to the strength of the government's case in aggravation. *Cf. Porter*, 558 U.S. at 41 (requiring reweighing of aggravating and mitigating factors). Rather, it treated the government's case as a theoretical construct – a case adequate to merit a death verdict, devoid any detail or distinction – against which seemingly *any* showing of previously-unexplored mitigation would result in a life sentence. A fair evaluation of the supposed prejudice requires a complete review of the government's evidence. Against that showing, the mental health evidence cited by the Court would not merit relief.

The government's case in aggravation portrayed Barrett as a man consumed with killing the police and the victim as a pillar of his family and community. The government proved beyond a reasonable doubt two statutory aggravating factors: substantial planning and

premeditation; and multiple murders or attempted murders in a single criminal episode. Tr. Doc. 258. In regard to the multiple murder aggravator, the trial prosecutor appropriately observed that nothing short of "Providence, fate, [or] dumb luck" prevented Barrett from actually killing more than one person on September 24, 1999. TR. Tr. 5402. Barrett fired two shots at the driver of Eales' vehicle, Trooper Hamilton, who sustained wounds to his eye, cheek, and left shoulder. TR. Tr. 5343. Indeed, Barrett loosed nineteen .223 caliber bullets on the night of the killing, any one of which could have killed a member of Tac team as he entered the property. Barrett clearly intended to kill, indiscriminately, any and all members of the team, and wounded Trooper Hamilton in the eye and shoulder.

As to the substantial planning and premeditation of this homicide, the prosecutor observed that Barrett plotted the killing for months, preparing the murder weapon with 91 rounds and maintaining it, always, at hand. TR Tr. 5340-41. The prosecutor also noted Barrett's mental preparations and his statements to friends: "["]I'm going to take those bastards out, as many of them as I can. I'm going to kill the first one through the door.['] He was hyping himself up, building himself up mentally." TR Tr. 5341.

As a non-statutory aggravator, the government also established victim impact. TR Doc. 258. To explain the impact of Trooper Eales' murder, the government proffered five witnesses, including two friends, William DeWeese and Gene Hise. DeWeese knew Trooper Eales from the Marine Corps. TR. Tr. 4527-40. He was "devastated" by his friend's death, describing him as "this splendid manifestation of American manhood, this exemplary marine and law enforcement officer." *Id*. at 4535. Another friend, Trooper Hise, served with the victim on the Oklahoma Highway Patrol Tac Team. TR. Tr. 4663-5. He described the impact of Trooper Eales' death: "I lost a part of me. I lost a brother. . . . Somebody I had to put more trust in than I

10

would somebody in my own family. Almost lost my wife and my son because I suffered for three years with Post-Traumatic Stress Syndrome. Our team fell apart. Almost half of the men in the team are divorced. And it literally crushed my world." TR Tr. 4665.

In addition to friends, the government called Trooper Eales' sister, Nancy Stalcup, his mother, Bobby Eales, and his widow, Kelli Eales. The relatives testified about the victim's personal qualities and the loss they felt due to his death. Ms. Stalcup testified about the impact of the death upon her child. TR. Tr. 4641-50. Trooper Eales' mother tearfully recounted her loss. TR. Tr. 4650-60. Kelli Eales described her life, her loss, and the impact of the death on her two children. She explained her son wished he could go to heaven to be with his father. She read a prize-winning essay written by her twelve-year-old daughter, observing her father "was killed when I was six and a half years old, but in that short time, he made enough memories to last a lifetime. . . . Some kids go through their entire life not having a good father. I am thankful that my dad showed me how to love in six and a half short years to last me my whole life. I am so very thankful to have had him." TR. Tr. 4666-93.

The remaining penalty phase evidence concerned Barrett's violent encounters, with friends and adversaries. On one occasion, Barrett fled from a police officer who generously permitted him to drive his own vehicle to a pre-arranged meeting place. The officer pursued Barrett to his home, where the defendant had armed himself with a long-barreled revolver. When the officer withdrew momentarily from the confrontation, Barrett fled again. TR Tr. 4541-50. On another occasion, Barrett attempted to run down officers at a checkpoint. TR Tr. 4591-98, 4612-18. The wife of Barrett's cousin described the defendant's failed effort to seduce her. TR Tr. 4575-79. When she spurned his advanced, Barrett threatened her with a shotgun.

11

TR Tr. 4578.  Barrett openly discussed his desire to murder the person who informed on him. TR Tr. XXII, pp. 4587-88.

The government adduced the evidence of uncharged violence in support of a future dangerousness aggravator that the jury rejected.  TR Doc. 258.  Nonetheless, that evidence rebutted Barrett's mitigation theory of non-dangerousness, which ten jurors rejected.  *Id.* Likewise, that evidence tends to rebut any theory that Barrett's actions stemmed from mental illness or neurological damage, rather than a proclivity for violence and an aversion for authority.

The Court, however, ignored the weight of the evidence in aggravation and focused solely on the mental health evidence at the core of Barrett's § 2255 claim.  Furthermore, the Court treated that mental health evidence – especially as to brain damage – as virtually insurmountable, given the Tenth Circuit's observation, under *Hooks v. Workman*, that "organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect."  R& R at 26 (quoting *Hooks v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 2012)).  Apart from the fact that the Tenth Circuit remanded for an evaluation of the foregone mental health evidence, rather than a mere confirmation of its existence, the *Hooks* opinion does not create a per se rule that mandates a finding of persuasive mitigation whenever evidence of neurological damage appears.  Rather, the Court of Appeals recognized that juries often credit such information because it "tends to diminish moral culpability, altering the causal relationship between impulse and action."  *Id.*; *see also Barrett, II*, 797 F.3d at 1231 (citing *Grant*, 727 F.3d at 1020-21for the proposition that brain damage evidence permits counsel to explain the reasons for the defendant's conduct).

In this case, however, Barrett never established a nexus between his supposed mental illnesses and his crime.  His expert on brain damage, Dr. Miora expressly rejected any suggestion

that she could relate her findings to the facts of Trooper Eales' murder: "I am not called in, as far as I know, to make any -- to develop any opinion about what was going on with him at the time of the crime. . . . [¶] I was asked to come in and opine about the validity and reliability and robustness of [her predecessor's] work." EH Tr. VIII pp. 1327-28. 209; She conceded there was no one-to-one correlation between daily life and the executive functioning deficits Barrett had shown on the D-KEFS neuropsychological instrument. EH Tr. 1239-40. On the basis of the D-KEFS, Dr. Miora predicted only that Barrett would have difficulty under stress if he had to pay visual attention and quickly switch between different kinds of activities. EH Tr. 1241. It does not appear that Dr. Miora's predecessor, Dr. Young, could have offered any theory of her own explaining Barrett's commission of the crime in terms of any organic brain damage. *See* Doc. 72-38 (Dr. Young's declaration).

Barrett's other mental health expert, Dr. Woods., did relate the mental health findings to the night of the murder, but evinced a misapprehension of the events. Dr. Woods suggests that Barrett killed Trooper Eales during an exchange of gunfire, in which the defendant suffered non-fatal wounds. EH Tr. 218. In view of that apparent misperception, he opined that Barrett's mental conditions led him to believe he justifiably killed Trooper Eales. EH Tr. 220. Dr. Woods' testimony is consistent with his 2009 declaration, in which he suggested that Barrett killed Trooper Eales during the course of a gunfight. Doc. 72-66 (asserting that Barrett's mental health symptoms set "the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer").

Had an exchange of gunfire preceded the killing, Barrett might have subjectively concluded that he had a right to fire on Trooper Eales, a circumstance that would have lent

13

relevance to his alleged mental health conditions.  But the truth, as the jury found it, nullifies any effort to attribute the killing to deficits in Barrett's perception or information processing.  Barrett announced well ahead of the murder that he would violently confront the police if they entered his land.  *See e.g.*, TR Tr. 466, 3067-69, 3492.  When he, in fact, saw the police on his property, he acted in accordance with his plan, using of the most deadly of his three loaded firearms to engage the nearest target.  TR Tr. 536-37.  Barrett opened fire on Eales' vehicle before it stopped moving or any of its occupants could have threatened him in any way.  *Id*.  Indeed, Trooper Eales lay dying behind his police vehicle before any member of the Tac Team was able to return Barrett's fire.  TR Tr. 543-48.

Even if Dr. Woods understood that the murder preceded the troopers' fire, his opinion still fails to shed mitigating light on Barrett's motives under the circumstances found by the jury.  Dr. Woods concluded that Barrett – unable to efficiently process information – misperceived the threat presented by the Tac Team and felt justified in his actions.  EH Tr. 220, 350-51; *see also* Doc. 72-66 ¶ 73 (noting Barrett's alleged "inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action").  Those opinions might have merited weight in mitigation if the jury had believed Barrett misapprehended the identity and nature of the threat at hand.  But the jury's verdicts under 28 U.S.C. § 848(e) (murder of a law enforcement officer during the course of a drug crime) and 18 U.S.C. § 3591(c)(9) (substantial planning and premeditation) reflect its reliance on evidence that the defendant not only had knew he was shooting at the police but doing so because he recognized them as law enforcement – acting on his-oft mentioned plan.  Under these circumstances, Dr. Woods' conclusion that Barrett felt justified in shooting would not have merited any weight in mitigation (EH Tr. 220), given that the defendant told Dr. Pitt that he

14

shooting at the police was wrong at the time he did so (*see* EH Gov't Ex. 52 at 70-71).  Dr. Woods' opinion fails to inform the facts of the case as developed to the satisfaction of the jury, and should not merit a presumption of prejudice under *Hooks* or a finding of prejudice under any other standard.  Dr. Woods cannot, by force of will or expertise, transmogrify a premeditated murder into some lesser offense.

Given Barrett's premeditation, to say nothing of the lethality with which he executed his plan, none of his alleged mental conditions – ranging from bipolar disorder, to paranoia, to organic attention deficits – meaningfully explain, negate or mitigate his nakedly-homicidal conduct.  Simply stated, Barrett sprung a well-planned ambush, wounding one police officer and killing another.[4]  Not only did the jury find that Barrett had substantially planned and premeditated the murder, the Tenth Circuit observed that the trial evidence overwhelmingly demonstrated as much:

> When asked what Defendant "sa[id] that he was intending to do if the laws came to his place," [Randy] Turman replied that Defendant declared "[t]here was going to be a shootout" and "he was going to take out as many as he could before they got him."  [Citation.]  Cindy Crawford testified that . . . Defendant said there was a chance law enforcement would come to his home and "that's why . . . he had protection"; and that Defendant boasted if ''Police, or anyone, [came to his home] that he would go out in a blaze of glory.''  [Citation.]  Karen Real testified that Defendant said "if they [cops] ever come out he would shoot them" (although she did not believe him at the time).  [Citation.]  Finally, Brandi Price testified that when discussing the warrant, Defendant told her and some friends that if they were there when law enforcement showed up they were to ''either grab a gun or hit the floor'' and that ''[h]e was going to open fire on them and . . . [t]ake as many of them bastards with him as he could.''  [Citation.] . . . . We concluded on Defendant's direct appeal that the "evidence was more than sufficient to allow the jury to reasonably find that [Defendant] knew that [Trooper] Eales and the other persons approaching his residence were law enforcement officers and that he intended to kill Eales."

---

[4] Barrett's ability to accurately acquire Trooper Eales as a target, fatally wound him, and then shoot Trooper Hamilton following the deployment of flashbang (TR Tr. 543-44) gives the lie to Dr. Miora's assertion that the defendant suffered from a deficit in his ability attend to visual information and switch activities under pressure.  *Cf.* EH Tr. 218-20.

*In re Barrett*, 840 F.3d 1231-32 n.4. Barrett's presentation of mental health evidence meant to explain a version of events that found no traction with the jury should not receive any weight in mitigation at this juncture.

Barrett would no doubt answer that mental health evidence need not have a nexus to the crime of conviction to have mitigating effect. *See Tennard v. Dretke*, 542 U.S. 274, 288 (2004). The government has no quarrel with that rule, but *Hooks* presumes weight in mitigation to evidence that *does* explain the crime of conviction. *See* 689 F.3d at 1205. Indeed, the Tenth Circuit has observed the lack of any presumed prejudice for evidence of "'generalized personality orders'" that fail to provide "'a compelling or sympathetic explanation for [the defendant's] violent behavior'" *Grant*, 727 F.3d at 1021. Absent some connection to the murder, the evidence Barrett has presented deserves far less weight than this Court has attributed to it, if it merits any at all. Indeed, the mental health evidence leaves Barrett with an untenable choice between the case he presented at trial and the case his current attorneys would present. On the one hand, he could maintain – as he asserted at trial – that he was beloved family member and a profitable shade-tree mechanic. *See* TR Tr. 4715-5125. On the other, he could seek sympathy as a self-medicating victim of bipolar disorder and organic deficits that render him incapable of maintaining attention.

Given the tension between the two potential portraits, Barrett cannot establish that a full-throated presentation of both would have had additive impact. Indeed, insistence that the defendant suffered from brain damage and was physiologically incapable of sorting visual stimuli would have undermined evidence that he provided a valuable community service repairing cars at modest prices. Insistence that he suffered from paranoia driven by bipolar disorder would have tended to underscore a government allegation of future dangerousness that

16

the jury rejected, while detracting from the weight of mitigators concerning Barrett's role in family life.  As such, the forgone mental health evidence has little mitigating effect, in and of itself.  *See Grant*, 727 F.3d at 1021 (noting the potentially "double-edged nature" of evidence concerning mental illness and abusive family environments).

Barrett might also assert that the Tenth Circuit's remand order implicitly rejected any tension between the trial evidence and his experts' opinions.  But the Tenth Circuit never expressly considered the proposition, and its opinion does not constitute law of the case or otherwise bind this Court in regard to this issue.  *See United States v. West*, 646 F.3d 745, 748 (10th Cir. 2011) (holding "[t]he law of the case doctrine precludes re-litigation of a ruling of law in a case once it has been decided").  In any event, the government's rebuttal evidence provides new and stronger bases upon which to conclude that the defense experts' opinions cannot and do not address the crimes of conviction as found by the jury.  Principally, the rebuttal provides ample reason – as discussed above – to question the reliability of the mental health evidence, quite apart from the fact that it does not address the actual facts of the crime.  *See, supra*, part A. Even evidence adduced outside of the government's case-in-chief tends to undermine the notion that the murder represented an aberration driven by mental illness or deficit.  Steven Barrett's testimony demonstrated that his brother lashed out violently as a teenager, permanently scarring his elementary school aged brother.  *See* EH Tr. 117.

Accordingly, this Court should hold that the omission of mental health evidence from Barrett's penalty phase trial did not have a prejudicial impact under *Strickland*.

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to deny § 2255 relief.

Dated: October 23, 2018.

<div style="margin-left:40%;">

Respectfully submitted,
BRIAN J. KUESTER
United States Attorney
Eastern District of Oklahoma

*/S/ Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Deputy Chief, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

</div>

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on October 23, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry: Dbautry77@gmail.Com
Ms. Joan M. Fisher:  Joan.Fisher@fd.Org
Karl J. Saddlemire:  Karl_Saddlemire@fd.Org
Mr. Tivon Schardl:  Tim_Schardl@fd.org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Deputy Chief, Capital Case Unit